# EXHIBIT A

Case: 1:21-cv-00238-MRB Doc #: 66-1 Filed: 08/02/24 Page: 2 of 79 PAGEID #: 2625

Deposition of Marsha Conrad Williams                    Philip R. McHugh v. Fifth Third Bancorp, et al.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION


-----------------------------:
                             :
PHILIP R. MCHUGH,            :
                             :
          Plaintiff,         :
                             :
     vs.                     :   CASE NO.
                             :   1:21-cv-00238
FIFTH THIRD BANCORP, et      :
al.,                         :
                             :
          Defendants.        :
-----------------------------


          Videotaped
          Deposition of:    MARSHA CONRAD WILLIAMS

          Taken:           By the Plaintiff

                           Pursuant to Notice

          Date:            February 16, 2023

          Time:            Commencing at 9:16 a.m.

          Place:           Fifth Third Center
                           511 Walnut Street
                           Cincinnati, Ohio  45202

          Before:          Wendy L. Raymer, RPR, CRR
                                     and
                           Bruce L. Sandy, Videographer
                           Notaries Public-State of Ohio

```
 1   APPEARANCES:

 2

         On behalf of the Plaintiff:
 3
         Peter A. Saba, Esq.
 4               and
         Joshua M. Smith, Esq.
 5               of
         Stagnaro, Saba & Patterson Co., L.P.A.
 6       2623 Erie Avenue
         Cincinnati, Ohio  45208
 7       Phone:  (513) 533-2701
         Email:  Pas@sspfirm.com
 8               jms@sspfirm.com

 9
         On behalf of the Defendants and the Deponent:
10
         Michael L. Cioffi, Esq.
11               of
         Blank Rome LLP
12       1700 PNC Center
         201 East Fifth Street
13       Cincinnati, Ohio  45202
         Phone:  (513) 362-8700
14       Email:  Michael.cioffi@blankrome.com

15
         Also Present:
16
         Philip R. McHugh
17       Phenise Poole, Esq., Fifth Third Bancorp
         Brian Thomas, Esq., Fifth Third Bancorp
18

19                       - - -

20

21

22

23

24

25
```

```
1                      I N D E X

2

3  MARSHA CONRAD WILLIAMS                      PAGE

4     Examination by Mr. Saba                     5
      Examination by Mr. Cioffi                 140
5     Further Examination by Mr. Saba           161
      Further Examination by Mr. Cioffi         173
6
   EXHIBITS                        MARKED   REFERENCED
7
      Plaintiff's Exhibit 1         21          21
8     Plaintiff's Exhibit 2         24          24
      Plaintiff's Exhibit 3         54          54
9     Plaintiff's Exhibit 4         61          61
      Plaintiff's Exhibit 5         62          62
10    Plaintiff's Exhibit 6         83          83
      Plaintiff's Exhibit 7         87          87
11    Plaintiff's Exhibit 8         88          88
      Plaintiff's Exhibit 9         91          92
12    Plaintiff's Exhibit 10       105         105

13    Plaintiff's Exhibit 11       107         107
      Plaintiff's Exhibit 12       108         108
14    Plaintiff's Exhibit 13       110         110
      Plaintiff's Exhibit 14       111         111
15

16

17                       - - -

18

19

20

21

22

23

24

25
```

Deposition of Marsha Conrad Williams                                                  Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 4

1      THE VIDEOGRAPHER: Today is February 16, 2023.
2 The time is 9:16 a.m. We're on the record for the
3 deposition of Marsha C. Williams for a case pending
4 in the United States District Court, Southern
5 District of Ohio, Western Division, entitled Philip
6 R. McHugh, Plaintiff, vs. Fifth Third Bancorp,
7 et al., Defendants, Case No. 1:21-cv-00238. If at
8 this time all counsel present would introduce
9 themselves for the record then the witness can be
10 sworn.
11      MR. SABA: Peter Saba for the plaintiff.
12      MR. SMITH: Joshua Smith also for the
13 plaintiff.
14      MR. CIOFFI: Michael Cioffi on behalf
15 of   all defendants. I also represent
16 Ms. Williams personally pursuant to a
17 written engagement letter.
18      MR. THOMAS: Brian Thomas for Fifth Third
19 Bank.
20      MS. POOLE: Phenise Poole for Fifth Third
21 Bank.
22      MARSHA CONRAD WILLIAMS,
23 of lawful age, a witness herein, being first duly sworn
24 as hereinafter certified, was examined and deposed as
25 follows:

Page 5

1      EXAMINATION
2 BY MR. SABA:
3    Q. Ms. Williams, can you go ahead and state your
4 name for the record, please, and spell your last.
5    **A. Marsha Conrad Williams is my full name, and my**
6 **last name is spelled W-i-l-l-i-a-m-s.**
7    Q. And have you ever had your deposition taken
8 before?
9    **A. Yes.**
10    Q. As a reminder, I'm going to be asking you a
11 series of questions. If there's anything you don't hear
12 or don't understand, please feel free to ask me to
13 repeat, rephrase the question.
14      For the sake of the court reporter, I do need
15 you to answer verbally, notwithstanding the fact that we
16 are doing this via video. It is difficult for her to
17 take down uh-huhs or uh-uhs or just shakes or nods of
18 the head.
19      Also, if you could wait for me to finish my
20 question before you answer, and I'll try and do the same
21 to let you finish your answer before I ask another
22 question. That also makes for a clearer record.
23      Do you understand those instructions?
24    **A. I do.**
25    Q. Additionally, if you need to take a break at

Page 6

1 any time, let me know. I'll just need you to answer the
2 question that's on the table at the time.
3    **A. I understand.**
4    Q. Okay. What is your current residence address?
5    **A. 400 Port Republic Street, Beaufort, South**
6 **Carolina 29902.**
7    Q. And how long have you lived at that address?
8    **A. Approximately five years.**
9    Q. Who lives there with you?
10    **A. My husband.**
11    Q. How long have you been married?
12    **A. 28 years.**
13    Q. What is your date of birth?
14    **A. March 28, 1951.**
15    Q. The other depositions that you have given, why
16 did you give depositions in the past?
17    **A. Two were in connection with a mutual fund**
18 **board, and one was in connection with the oil company**
19 **that I formerly worked for.**
20    Q. What was the name of that company?
21    **A. Amoco Oil Company, Amoco Corporation.**
22    Q. And what was the nature of the litigation that
23 required your deposition for Amoco?
24    **A. I believe it was an employment dispute.**
25    Q. What was the nature of the claim?

Page 7

1    **A. The nature of the claim was dismissal for**
2 **discrimination.**
3    Q. What kind of discrimination?
4    **A. Racial discrimination.**
5    Q. When was that deposition?
6    **A. Oh, approximately 1990. I don't recall**
7 **exactly.**
8    Q. And what was your role in that case?
9    **A. I was asked questions about the person's**
10 **performance.**
11    Q. Did they report to you, the plaintiff?
12    **A. I don't recall.**
13    Q. The two times you were deposed with respect to
14 the mutual fund board, what did those claims involve?
15    **A. One was a fee dispute, and I don't recall the**
16 **other -- the topic of the other deposition.**
17    Q. What's the extent of your education?
18    **A. I have an undergraduate degree in economics**
19 **from Wellesley College, and a master's degree from the**
20 **University of Chicago Business School.**
21    Q. Are you currently employed?
22    **A. I am retired.**
23    Q. How long have you been retired?
24    **A. Since January of 2011.**
25    Q. Where were you last employed?

Deposition of Marsha Conrad Williams                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 8

1  A.  Orbitz Worldwide.

2  Q.  How many boards do you currently serve on?

3  A.  I currently serve on four boards.  Four

4  corporate boards.

5  Q.  And which are those corporate boards?

6  A.  Modine Manufacturing Company, the Davis Funds,

7  Fifth Third Bancorp, and Crown Holdings.

8  Q.  How long have you served on the board of

9  Modine Manufacturing?

10  A.  Since 1999.

11  Q.  And what about the Davis Funds?

12  A.  Also since 1999.

13  Q.  And the last one, it sounded like Crown Cork

14  and Seal, but I know that's not what they're called

15  anymore?

16  A.  Crown Holdings.

17  Q.  Okay.  And how long have you served on the

18  board of Crown Holdings?

19  A.  Since 2022.

20  Q.  When did you first meet Greg Carmichael?

21  A.  I first met Greg Carmichael in December of

22  2008 when I was interviewing for the Fifth Third board.

23  Q.  What was his position with Fifth Third at that

24  time?

25  A.  I believe he was the chief operating officer.

Page 9

1  Q.  How would you describe your relationship with

2  Greg Carmichael?

3  A.  Professional.

4  Q.  How often do you meet with Greg Carmichael

5  one-on-one?

6  A.  At every board meeting.

7  Q.  Is it during the board meeting or is there a

8  particular time when you just meet with Mr. Carmichael,

9  you and Mr. Carmichael?

10  A.  It's generally after the board meeting.

11  Q.  And what is the reason for those meetings?

12  A.  To provide feedback to Greg from the board.

13  Q.  Are there any notes or minutes kept from those

14  meetings?

15  A.  No.

16  Q.  How long do those meetings typically last?

17  A.  Depends on the topic.  Anywhere from 15

18  minutes to 45 minutes.  Generally it's 30 minutes or

19  less.

20  Q.  Other than the meetings that you have with

21  Mr. Carmichael following board meetings, do you have any

22  other one-on-one meetings with Mr. Carmichael?

23  A.  Could you be a little more specific about your

24  question?  I mean, during what time frame are you

25  asking?  I guess I'm not completely clear on what you're

Page 10

1  asking.

2  Q.  Certainly.  I can narrow down the time frame

3  for you.  Since January 1 of 2019.

4  A.  Oh, okay.  I believe we met -- I believe we

5  met in conjunction with the MB Financial transaction,

6  although that may have been before January of '19, I'm

7  not clear exactly on date, but other than that,

8  generally my meetings were in conjunction with board

9  meetings.

10  Q.  Do you communicate with Mr. Carmichael by

11  phone?

12  A.  Yes.

13     MR. CIOFFI:  Go ahead.

14  BY MR. SABA:

15  Q.  How frequently do you communicate with

16  Mr. Carmichael by phone?

17     MR. CIOFFI:  Objection.  Time frame.

18  BY MR. SABA:

19  Q.  Since January 1 of 2019.

20  A.  I can't tell you exactly.  I would say

21  periodically.  Usually in conjunction with preparation

22  of the agenda or if there were particular topics of --

23  relating to the board that were relevant or if I had a

24  question.  We communicated more often during COVID.

25  Q.  And is that by both voice calls and text?

Page 11

1  A.  Primarily voice calls.  There may have been

2  texts; I just don't recall.

3  Q.  How frequently do you communicate with

4  Mr. Carmichael by email?

5     MR. CIOFFI:  Again, same time frame?

6     MR. SABA:  Yes.

7     THE WITNESS:  I would say on occasion.

8  BY MR. SABA:

9  Q.  What is your email address?

10  A.  Marsha Williams@outlook.com.

11  Q.  And what is your cell phone number?

12     MR. CIOFFI:  By way of objection, I'm going to

13  ask that this be designated as confidential, both

14  in terms of her email and her personal cell phone

15  number.

16     MR. SABA:  We have no objection to that.

17  That's fine.

18     MR. CIOFFI:  Go ahead.

19     THE WITNESS:  My cell phone number?

20     MR. SABA:  Yes.

21     THE WITNESS:  312-485-4885.

22  BY MR. SABA:

23  Q.  Who is your cell phone provider?

24  A.  Verizon.

25  Q.  When did you first meet Robert Shaffer?

Deposition of Marsha Conrad Williams                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 12

1   A.  I believe it was in January of '09 at the
2   Fifth Third board meeting.
3       Q.  How would you describe your relationship with
4   Mr. Shaffer?
5       A.  Professional.
6       Q.  Since January of 2019, how often have you met
7   one-on-one with Mr. Shaffer?
8       A.  I don't believe I've met with -- one-on-one
9   with Mr. Shaffer at all since 2019.
10      Q.  Since January 1 of 2019, how frequently have
11  you communicated with Mr. Shaffer by phone?
12      A.  I don't believe at all.
13      Q.  That would include text messages as well?
14      A.  Correct.
15      Q.  Have you communicated with Mr. Shaffer by
16  email since January 1 of 2019?
17      A.  I don't recall specifically, but I don't
18  believe so.
19      Q.  Since January 1 of 2019, how many times have
20  you spoken with Mr. Shaffer?
21          MR. CIOFFI:  Objection.  Context.  Ever or I
22  mean --
23          MR. SABA:  Anything.
24          THE WITNESS:  At every board meeting.  At
25  every board dinner.

Page 13

1   BY MR. SABA:
2       Q.  Any other occasions?
3       A.  Committee meetings outside of the actual board
4   meetings.  Committee meetings in conjunction with the
5   board.
6       Q.  Any other occasions?
7       A.  Not that I recall.
8       Q.  Can you summarize for me the history of your
9   relationship with Fifth Third Bank?
10      A.  I was invited to interview.  I was visited in
11  Chicago by Kevin Kabat and invited to interview for the
12  board in the early winter of 2008.  I went to the
13  December board meeting in 2008 and was asked to join the
14  board at that point.
15      Q.  When did you become the lead independent
16  director?
17      A.  2014.
18      Q.  On which committees have you served?
19      A.  I've served on the risk committee.  I've
20  served on the finance committee.  I've served on the
21  audit committee.  I've served on the nominating and
22  governance committee.
23      Q.  When did you serve on the risk committee?
24      A.  Starting in 2009, I served on the risk
25  committee.  I don't recall when my -- when my service on

Page 14

1   that committee ended.
2       Q.  Are you no longer serving on the risk
3   committee?
4       A.  At the moment I am not on the risk committee.
5       Q.  And when did you serve on the finance
6   committee?
7       A.  We formed the finance committee in
8   approximately -- well, we reconstituted the membership
9   of the finance committee in approximately 2015.  I may
10  have served prior to that.  I don't recall specifically,
11  but I know certainly starting in 2015 until the present.
12      Q.  When did you serve on the audit committee?
13      A.  I don't recall the dates.
14      Q.  Do you currently serve on the audit committee?
15      A.  No, I do not.
16      Q.  When did you serve on the nominating and
17  governance committee?
18      A.  I don't recall when I started on that
19  committee, but I am currently on that committee and have
20  been for the last few years.
21      Q.  Have you ever served on the human capital and
22  compensation committee?
23      A.  Yes.  That is the other committee I have
24  served on, and I am currently on that committee.
25      Q.  And how long have you served on the human

Page 15

1   capital and compensation committee?
2       A.  I don't recall when I started, but I am still
3   on that committee.
4       Q.  What are your duties as the lead independent
5   director?
6       A.  Well, I am no longer the lead independent
7   director.
8       Q.  When did you stop being the lead independent
9   director?
10      A.  In April of 2022.
11      Q.  Who currently serves as the lead independent
12  director?
13      A.  Nick Akins.
14      Q.  Did you continually serve as the lead
15  independent director from 2014 up until April 2022?
16      A.  From April of 2014 until April of 2015, I was
17  the lead director.  Then I was the chairman of the board
18  from April of 2015 until December of 2018.  And then I
19  became lead director December of 2018 until April of
20  2022.
21      Q.  Did Greg Carmichael replace you as chairman of
22  the board in December of 2018?
23      A.  Yes.
24      Q.  Between December of 2018 and April of 2022,
25  what were your duties as lead director -- lead

Deposition of Marsha Conrad Williams                          Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 16

1  independent director?  Excuse me.
2      A.   My duties were to review and approve the
3  agenda for each board meeting, to -- to conduct the
4  executive -- the executive sessions of the board
5  meeting, to coordinate the views of -- to coordinate and
6  communicate the views of the board to Greg and the other
7  members of senior management.
8      Q.   Explain to me the process by which the agenda
9  for board meetings would be reviewed and approved?
10     A.   I would generally get it in advance.  I would
11 look it over.  I would make comments, if there were any
12 necessary, and I would send comments back.
13     Q.   Who would provide the agenda to you for your
14 review?
15     A.   Usually the office of the secretary, the
16 corporate secretary.
17     Q.   Who would initially set the agenda for your
18 review?
19     A.   Oftentimes it was prepared by the staff, but
20 if, for example, at the prior meeting, there was a
21 specific topic that we needed to be covered, I would ask
22 that that be added to the agenda.  And so it was a
23 combination of the routine matters that we needed to
24 cover, the matters of importance that needed to be
25 addressed, and any matters that the board specifically

Page 17

1  asked be on the agenda.
2      Q.   Separate and apart from your role as lead
3  independent director, what were your duties as a board
4  member?
5      A.   My duties as a board member were to read and
6  come prepared to all board meetings.  To ask questions
7  of management.  To exercise my business judgment.  To
8  understand the business of the board.  To evaluate
9  senior management.  To evaluate the performance of the
10 company.  And to generally act in the best interest of
11 the shareholders.
12     Q.   How often did Fifth Third's board meet in
13 2019?
14     A.   I don't recall exactly, but generally the
15 board meetings -- generally we had five board meetings a
16 year.  Years when we had particularly active items, like
17 during COVID, we would have more meetings, but generally
18 the schedule was five meetings a year.
19     Q.   And you serve as a member of the board of both
20 Fifth Third Bancorp and Fifth Third Bank National
21 Association; is that correct?
22     A.   That's correct.
23     Q.   Do you distinguish between the board meetings
24 for each of those boards?
25     A.   Generally, no.

Page 18

1      Q.   So when you answer that there were five board
2  meetings in 2019, to the best of your recollection as
3  you sit here, that would refer to board meetings for
4  both Fifth Third Bancorp and Fifth Third Bank National
5  Association; is that correct?
6      A.   Correct.
7      Q.   How many board meetings were there in 2020?
8      A.   I do not recall.  There were a number of board
9  meetings telephonically in connection with COVID.  I do
10 recall that.  I haven't counted up the total number of
11 board meetings.
12     Q.   How many members of the board are there?
13     A.   Right now, there are either 15 or 16.
14     Q.   And what is the board's role with respect to
15 executive succession at Fifth Third?
16         MR. CIOFFI:  Objection.  Can you be more
17     specific?
18 BY MR. SABA:
19     Q.   Did you understand my question?
20     A.   Specificity would be helpful.
21     Q.   Okay.  Beginning in January of 2019, what was
22 the board's role with respect to executive succession of
23 employees at Fifth Third Bank?
24     A.   Our role was to review and evaluate succession
25 candidates and discuss among ourselves our views of the

Page 19

1  candidates.
2      Q.   Anything else?
3      A.   We met and talked about them and generally
4  talked about the candidates at every -- at every board
5  meeting.  Talked about and to the candidates at every
6  board meeting.  So really an evaluation role.
7      Q.   What is the board's role with respect to
8  executive succession of the president and CEO at Fifth
9  Third Bank?
10     A.   It would be the same role -- so could you
11 clarify your question?
12     Q.   Certainly.  What I'm asking now is
13 specifically with respect to the president and CEO at
14 Fifth Third Bank, what is the board's role?
15     A.   The board's role is to evaluate candidates, to
16 look at the entire Enterprise team and determine if
17 anyone on the Enterprise team or any one of the top five
18 people listed in the proxy would be appropriate
19 successors when the time came.  To think through the
20 types of skills that we would need in a new president
21 and CEO at the time that we would need a new president
22 and CEO.  And to generally speak to the people that
23 would be possibly under consideration for that role, and
24 to evaluate their performance and their capabilities and
25 their experience and their education to make sure that

Deposition of Marsha Conrad Williams                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 20

1  whoever we ultimately chose to be the next president and
2  CEO was qualified.
3       Q.   With respect to executive succession of the
4  president and/or CEO of Fifth Third, did your role
5  differ with respect to being a lead director, lead
6  independent director, from those other directors on the
7  board?
8       A.   I would say all of the independent -- all of
9  the independent directors on the board had a voice and a
10  role.  I would say it was a similar voice and role.  If
11  there were any dissenting voices who perhaps didn't feel
12  comfortable speaking out, they could easily call me and
13  communicate their views to me and I would disseminate
14  those views.
15      Q.   Who would you disseminate those views to?
16      A.   Other board members.
17      Q.   Other than being a conduit for disseminating
18  views of other board members, did your role as lead
19  independent director give you any different
20  responsibilities or obligations than other board members
21  had with respect to executive succession of the
22  president or CEO at Fifth Third?
23      A.   The role of the entire board is to plan for
24  succession and to select the next leaders of the
25  organization.  That's one of our primary goals.  It's

Page 21

1  listed very clearly in the regulatory materials that we
2  received from the OCC when we became an OCC bank.  It is
3  the full board's responsibility, not just the role of
4  any one director.
5           (Plaintiff's Exhibit 1 is marked for
6           identification.)
7  BY MR. SABA:
8       Q.   Ms. Williams, you've been handed what has been
9  marked as Exhibit Number 1.  Can you identify that for
10  me, please?
11      A.   Identify in what way?
12      Q.   Can you -- are you able to identify what this
13  document is?
14      A.   Yes.  It's a Schedule 14A.
15      Q.   Okay.  And this has a series of pages attached
16  to it; is that correct?
17      A.   Correct.
18      Q.   In fact, in total there are 107 pages attached
19  to this Schedule 14A; is that right?
20      A.   Yes.
21      Q.   And the Schedule 14A includes a copy of the
22  Fifth Third Bancorp 2020 proxy statement; is that
23  correct?
24           MR. CIOFFI:  Objection.  The document speaks
25      for itself.

Page 22

1  BY MR. SABA:
2       Q.   Is that correct?
3       A.   Yes.
4       Q.   And referring to -- and if you look at the
5  bottom right-hand corner is a page reference you'll see
6  the first page begins with a 1 of 107 and
7  correspondingly after that it marks the page number as a
8  page number of 107.  Do you see what I'm referring to in
9  the bottom right-hand corner?
10      A.   I do.
11      Q.   Referring to pages 4 and 5, can you identify
12  for me what that is?
13      A.   That is a letter from the chairman and lead
14  independent director.
15      Q.   And do you recall whether or not the Fifth
16  Third Bank Corps proxy statements prior to 2020 included
17  a joint letter from the chairman and lead independent
18  director?
19      A.   I do not recall.
20      Q.   Do you ever recall preparing or being involved
21  in the sending of a joint letter from the chairman and
22  lead independent director prior to 2020?
23      A.   I don't recall.  I do recall reviewing some
24  letters.  I don't recall the years.
25      Q.   Do you recall this particular letter that we

Page 23

1  see as part of Exhibit 1?
2       A.   Yes.
3       Q.   Can you explain to me the process by which
4  this letter was created?
5       A.   It was drafted by someone within the company.
6  It was sent to me for review and comment.  And then it
7  was finalized.
8       Q.   Do you know who in the company drafts the
9  letter?
10      A.   I do not.
11      Q.   Did you have any changes to the letter?
12      A.   I don't recall.
13      Q.   Did you have any notes that would reflect any
14  changes you had to this letter?
15      A.   I doubt it.
16      Q.   When you reviewed the letter, did you try and
17  review it for accuracy?
18      A.   I would have always reviewed it for accuracy.
19      Q.   So you feel the statements that are made in
20  here are accurate and correct; is that right?
21      A.   I believe they are accurate.
22      Q.   Would you know if Mr. Carmichael had any
23  changes to the draft of the letter?
24      A.   I do not know.
25      Q.   As part of the process of preparing this joint

Deposition of Marsha Conrad Williams  Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 24

1 letter, you were not given any changes made by
2 Mr. Carmichael?
3   A. I recall reviewing a draft.  I don't recall
4 what -- whether he had made -- I wouldn't have been -- I
5 wasn't part of that process, so I don't know.
6   Q. Do you recall when the timing was that you did
7 review this draft of the letter?
8   A. No, I do not.
9   Q. Obviously it would be sometime prior to the
10 proxy statement being issued in 2020, correct?
11   A. Correct.  Correct.
12   Q. Do you recall if that was weeks before, months
13 before?
14   A. I don't recall.
15   Q. How was that draft provided to you for review?
16 Was that via email or was that handed to you in person?
17   A. I believe it was email.
18   Q. Would you still have that email?
19   A. I don't -- I don't know.  I don't believe so.
20    (Plaintiff's Exhibit 2 is marked for
21    identification.)
22 BY MR. SABA:
23   Q. Ms. Williams, you've been handed what's been
24 marked as Exhibit Number 2.  Are you able to identify
25 that for me, please?

Page 25

1   A. Yes.  It's again a Schedule 14A.
2   Q. And do you recognize this as the Schedule 14A
3 for 2019?
4   A. Yes.
5   Q. And Exhibit Number 2 -- referring again to the
6 page marks on the bottom right-hand corner -- would be
7 147 pages long; is that correct?
8   A. That's correct.
9   Q. And referring you to page 4 of 147, that is
10 the Fifth Third Bancorp 2019 proxy statement; is that
11 correct?
12   A. That's correct.
13   Q. And if you could look through that, do you
14 agree with me that there was no joint letter sent from
15 yourself and Mr. Carmichael with the 2019 proxy
16 statement; is that correct?
17   A. That appears to be correct.
18   Q. Whose decision was it that there would be a
19 joint letter sent from yourself and Mr. Carmichael along
20 with the 2020 proxy statement?
21   A. I don't recall.
22   Q. What is the role of the human capital and
23 compensation committee with respect to executive
24 succession at Fifth Third Bank?
25   A. It is to evaluate the candidates on an annual

Page 26

1 basis for their compensation changes, any compensation
2 changes, if any, for the following year, but the primary
3 succession discussions are handled by the entire board.
4 The compensation committee also develops a framework for
5 a new president or CEO, a framework which we first
6 developed in 2015 as we were evaluating Greg Carmichael
7 for the CEO position.
8   Q. What do you mean by a "framework"?  What is a
9 framework?
10   A. A set of guidelines that are sort of
11 principles and sort of a definition of what we're
12 seeking in a new -- in the role -- the kind of qualities
13 we wanted for anyone who was in the role of CEO --
14 president or CEO.
15   Q. And you said the human capital and
16 compensation committee first did that in 2015; is that
17 correct?
18   A. I don't recall if the committee did that in
19 2015.  We hired an outside firm to help us develop that
20 in 2015.  I don't recall who -- I believe it was the
21 compensation committee that directed that.
22   Q. And the guidelines and principles that formed
23 that framework for what Fifth Third is seeking for the
24 next president and CEO, had that changed at all from
25 2015 to 2020?

Page 27

1   A. There were minor changes, but in general, the
2 framework that we established in 2015 remained the same.
3 But I believe there were some minor updates and small
4 changes.  I don't recall what they were, but fairly
5 minor, as I believe.
6   Q. And is that framework set forth in writing?
7   A. Yes.
8   Q. And what is that framework called, the
9 document that contains that framework?
10   A. I've forgotten the exact title, but it was
11 prepared by RHR International.  Something like the
12 winning formula or something close to that.
13   Q. And how frequently would that winning formula
14 be updated?
15   A. As needed.
16   Q. Between 2015 and September of 2020, how many
17 times was the winning formula updated?
18   A. Once.
19   Q. And when was that one time?
20   A. I don't recall precisely, but I believe as the
21 board was thinking through Greg's potential succession,
22 the compensation committee decided it would be an
23 appropriate time to refresh the framework.  I don't
24 recall the exact dates.
25   Q. Prior to January 1st of 2020, what was your

Deposition of Marsha Conrad Williams      Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 28

1  relationship with Phil McHugh?
2      A.  I saw him at board meetings.
3      Q.  Prior to January 1, 2020, had you ever seen
4  Phil McHugh outside of the board meetings?
5      A.  At board dinners.
6      Q.  Other than board dinners and board meetings,
7  did you ever see Phil McHugh prior to January 1, 2020?
8      A.  Not to my knowledge.
9      Q.  With respect to those board meetings, how much
10 time would you spend conversing with Phil McHugh?
11     A.  Could you -- could you clarify that question?
12     Q.  Certainly.  Prior to January 1, 2020, you
13 indicated that the only time you saw Phil McHugh was at
14 either board meetings or board dinners.
15     A.  Correct.
16     Q.  And I'm asking specifically with respect to
17 the board meetings at which you would have seen Phil
18 McHugh, how much time would you converse with Phil
19 McHugh at these respective board meetings?
20      MR. CIOFFI:  I'm going to object -- converse?
21     What do you mean by that?
22 BY MR. SABA:
23     Q.  Do you understand what the word "converse"
24 means, to have a conversation with somebody?
25     A.  I do understand what the word "converse"

Page 29

1  means.  I'm not clear on the context, so...
2       MR. CIOFFI:  Can you clarify it?  So, for
3      example, you could ask what happened at the board
4      meetings when they interacted, something that just
5      allows her to answer the question without
6      understanding your word "converse."
7  BY MR. SABA:
8      Q.  Going back to the board meetings at which you
9  would have seen Phil McHugh prior to January 1, 2020,
10 did you have any conversations with Phil McHugh?
11     A.  I would ask questions during the board
12 meetings and he would answer, if that's included in a
13 conversation.
14     Q.  And how frequently would that happen at board
15 meetings that you would ask a question of Mr. McHugh and
16 he would answer?
17      MR. CIOFFI:  You're now including in your
18     question all board meetings?
19      MR. SABA:  Prior to January 1, 2020.
20      THE WITNESS:  I don't recall exactly, but
21     prior to January 1, 2020, I had, at that point,
22     been on the board 11 years.  We had approximately
23     five board meetings a year.  Phil would have
24     presented at some of those board meetings, probably
25     all of them, I don't recall exactly.  He would have

Page 30

1  been at board dinners.  So various times he would
2  have been at board lunches.  So various times to
3  converse.
4  BY MR. SABA:
5      Q.  Other than asking Phil specific questions
6  about presentations at a board meeting, would you have
7  had any other conversations with him at board meetings?
8      A.  At lunch, we could have had conversations.  At
9  dinners, we could have had conversations.  I don't
10 recall the extent and topic of those conversations.
11     Q.  Do you recall any of those conversations
12 specifically?
13     A.  I recall speaking to him.  I don't recall the
14 nature of the conversations.
15     Q.  Prior to January 1, 2020, did you ever observe
16 Phil McHugh in the workplace at Fifth Third?
17     A.  I observed him at board meetings.
18     Q.  Outside of board meetings or a board dinner or
19 a board lunch?
20     A.  No.
21     Q.  Prior to January 1, 2020, did you ever meet
22 with or interview any of Phil McHugh's direct reports?
23     A.  I don't recall.  Some of his -- so, for
24 example, some of his direct reports may have presented
25 to the board, in which case I would have.  I don't

Page 31

1  recall the specifics.
2      Q.  Did you ever discuss Phil McHugh with any of
3  Phil McHugh's direct reports?
4      A.  I don't believe so.
5      Q.  Did you ever discuss Phil McHugh with Greg
6  Carmichael?
7      A.  In conjunction with performance reviews during
8  the HCC committee and -- yes.  And during the executive
9  talent review that we held every December, yes, we would
10 have had conversations.
11     Q.  Do you recall the content of any of those
12 conversations?
13     A.  Well, the content of the performance, the
14 salary discussions at the June compensation committee
15 meetings would have been to understand his level of
16 compensation, his performance, and the rationale for
17 whatever compensation changes were occurring.
18     Q.  And what about the December meetings?
19     A.  The December meetings, we talked about a
20 number of executives and we talked about their
21 backgrounds, their current responsibilities, some of
22 their prior responsibilities, their strengths and
23 weaknesses, and their suitability for promotions.
24     Q.  And do you recall any specific conversations
25 with Phil McHugh with respect to those topics?

Deposition of Marsha Conrad Williams        Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 32

1    A.  We would have discussed him, but I don't

2 recall the specifics of any of the conversations.

3    Q.  Did you ever discuss with Greg Carmichael the

4 topic of Phil McHugh succeeding him as the president

5 and/or CEO of Fifth Third?

6    A.  No.  I never had that conversation because I

7 don't believe Phil would have been a suitable candidate

8 for either position.

9    Q.  And why is that?

10    A.  Well, because I don't think that he had the

11 experience.  I don't think that he had the educational

12 background.  I don't think that he had the knowledge.  I

13 don't think that he had the skills.  I don't think that

14 he had the digital banking background that we were

15 seeking.  And I don't think he had the communication

16 skills.

17      I don't think, for example, that he could have

18 effectively spoken to Wall Street, and I don't think he

19 would have been an effective communicator with the

20 press, both of which are critical in a CEO.

21    Q.  Going through your list, you said Phil did not

22 have the experience.  What experience was Phil McHugh

23 lacking?

24    A.  He was lacking M&A experience.  He was lacking

25 capital markets experience.  He was lacking experience

Page 33

1 in interacting with other bank CEOs.  He was lacking

2 sort of -- I would call it global experience.  He had --

3 you know, he had spent his entire career at Fifth Third,

4 so he had no experience with other organizations and how

5 other organizations are organized and run.  He had

6 limited geographic experience, having lived and gone to

7 school in Cincinnati and worked in Louisville.  So it's

8 very regional experience, basically limited to two

9 states.  And when you think about the Fifth Third

10 footprint, it covers a wide swath of the country.  So I

11 was concerned about his -- I don't think he had the

12 geographic scope of what a CEO should have.

13    Q.  What M&A experience did Mr. Spence have?

14    A.  He had significant M&A experience.  He was a

15 consultant with Oliver Wyman for over nine years.  He

16 worked on multiple bank M&A transactions, both

17 domestically and internationally.  He did due diligence

18 for a number of bank mergers and acquisitions.  And when

19 we were negotiating the MB Financial transaction, he was

20 the gentleman who basically opened up the doors for

21 Fifth Third to ultimately acquire MB.  He had contacts

22 at MB.  MB had decided that they needed to sell

23 themselves but didn't necessarily want to go through an

24 auction, so they were discussing a potential sale with

25 two organizations.

Page 34

1      I went to Chicago with Tim Spence and Tayfun

2 Tazun and Greg Carmichael and we met with the chair and

3 the CEO of Fifth Third Bank, and they told us

4 specifically that the reason they were interested in

5 selling MB Financial to Fifth Third Bank was because Tim

6 had introduced us to them.  Tim had done -- Tim knew the

7 MB Financial senior team and they believed that Tim's

8 presence was an important reason why they would be

9 interested in talking with us.

10    Q.  When did that trip and conversation occur?

11    A.  I don't recall exactly, but it would have been

12 just as we were starting due diligence on the MB

13 Financial transaction.

14    Q.  What year would that have been?

15    A.  It was either 2018 or '19, I don't recall

16 exactly.  The meeting was held in Chicago, outside of

17 Chicago.

18    Q.  What is Tim Spence's capital markets

19 experience?

20    A.  Again, as various of his consulting clients

21 were thinking about different structures and capital

22 raises that they needed to do, my understanding is that

23 Tim met with a number of the investment banks to talk

24 through different ways to raise money, and he had

25 contacts with a number of the major investment banks in

Page 35

1 New York.  And also I believe with investment analysts.

2 You know, in his role as independent consultant, he had

3 the ability to develop those contacts over quite a

4 number of years.

5    Q.  And who gave you that understanding?

6    A.  Well, it was clear when we hired Tim that that

7 was an important element of his background, in addition

8 to the fact that he had a deep understanding of Fintech,

9 and we hired Tim in 2015 because we needed some -- we

10 needed a head of strategy.  We did not have one.  Tim

11 had drafted our 2011 strategic plan and presented it to

12 the board.  We did a strategic plan every two years at

13 that point and he also did the strategic plan in 2013.

14      And it became apparent that we didn't have any

15 of the skill sets inside the bank to really draft a

16 sophisticated strategic plan, so as the Fintechs were

17 gaining in importance and starting to eat into -- excuse

18 me -- commercial banking's traditional purview, it was

19 clear that we needed somebody who understood Fintechs,

20 who had worked in -- in the digital space, and who could

21 help us lead our strategy.  So when we hired Tim, we

22 knew quite a bit about his background.  And he was very

23 well-known to the board.

24    Q.  With respect to interacting with other bank

25 CEOs, what experience did Mr. Spence have with

Deposition of Marsha Conrad Williams          Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 36

1 interacting with other bank CEOs?

2     A. Well, he would work on strategic issues with a

3 number of the CEOs. I know, for example, that he

4 interacted with Mitch Feiger, who was the CEO of MB, and

5 he had as his clients both a number of domestic and

6 international banks. So he also had international

7 banking experience.

8     Oftentimes when you're working on a strategic

9 project like that, when a bank hires a firm like Oliver

10 Wyman -- which was the leading bank consulting firm in

11 the country -- the CEO is involved in that conversation

12 because you're talking about strategic issues.

13     Q. So what other CEOs are you specifically aware

14 of that Tim Spence interacted with?

15     A. I believe the CEO of Bank of America.

16     Q. And what do you base that upon?

17     A. Different conversations I've had with Tim over

18 the years.

19     Q. When did you have those conversations?

20     A. Over -- I don't recall precisely, but over a

21 period of time. He had an extensive consulting

22 background that really covered a variety of

23 institutions -- again, both domestically and

24 internationally -- large institutions, medium-sized

25 institutions. I know he, for example, worked with Kevin

Page 37

1 Kabat, the former CEO of Fifth Third. I believe he also

2 may have worked with the Huntington Bank CEO. He had

3 quite the good Rolodex and he brought that Rolodex and

4 those contacts to Fifth Third.

5     Q. When did you first meet Tim Spence?

6     A. I believe it was either -- I believe it was in

7 2010 presented to the board, but the first time I recall

8 clearly was 2011 when he presented the strategic plan to

9 the board. He drafted the strategic plan. We didn't

10 have the capability in-house to do that.

11     Q. Prior to January 1, 2020, how would you

12 describe your relationship with Tim Spence?

13     A. Professional.

14     Q. How often would you meet with Tim Spence?

15     A. I would meet with him at the board meetings.

16 I would meet with him at the board dinners. I would

17 meet with him at the various -- if he was presenting to

18 the committee at the committee meetings. We also met in

19 conjunction with some M&A transactions that we were

20 working on, for example, like MB. There were other

21 transactions like that that Tim was involved in that I

22 would have met with him on maybe two or three occasions.

23     Q. When were those?

24     A. I don't recall the years exactly, but probably

25 2017, '18.

Page 38

1     Q. Who else would have been involved in those

2 meetings?

3     A. Greg Carmichael and Tayfun most probably.

4     Q. You indicated before that you went to Chicago

5 with Tim Spence; is that correct?

6     A. I met them in Chicago, that's correct.

7 Outside of Chicago.

8     Q. Other than meeting Tim Spence and -- Greg

9 Carmichael was the other person you met there; is that

10 correct?

11     A. And Tayfun Tazun.

12     Q. Other than that meeting with Tim Spence, how

13 many other meetings did you have with Tim Spence outside

14 the board meetings, board dinners, board lunches,

15 committee meetings, and the two to three MB occasions?

16 How many occasions had you met?

17     A. No other occasions that I recall.

18     Q. Did you ever communicate directly with Tim

19 Spence by phone or by text?

20     A. I don't believe so.

21     Q. Did you ever communicate directly with Tim

22 Spence by email?

23     A. He sent me an email after one board meeting

24 because I had asked him -- step back a little bit.

25     One of the things that always impressed me

Page 39

1 about Tim was his ability to speak with some depth of

2 knowledge on a wide variety of topics. And I asked him

3 in particular about an article that he had cited, and I

4 asked him what publication that article came from or

5 what was the name of the periodical or website he was

6 reading, and he sent me the name of that. I do recall

7 that.

8     Q. When was that?

9     A. I don't recall when.

10     Q. What global experience did Tim Spence have?

11     A. Well, he was quite widely traveled, even as a

12 child. His mother was an international flight

13 attendant, so he had exposure to the world, you know, an

14 opportunity that many of us didn't have as children to

15 see the various parts of the world which, you know,

16 increased his understanding of the world at a very young

17 age. And then when he was at Oliver Wyman, he consulted

18 with some international banks and some Canadian banks.

19     Q. Going back to Mr. Spence's travel, where

20 specifically did he go?

21     A. I don't know specifically.

22     Q. And do you know what ages we're talking about?

23     A. I do not. But when he was at Oliver Wyman, he

24 would have been, you know, in his 30s and presumably

25 20s.

Deposition of Marsha Conrad Williams                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 40

1  Q. And where did he go for Oliver Wyman?
2  A. I don't know specifically, but I do believe he
3  went at least some place in Europe and I believe
4  Australia and perhaps more. I don't know the full list.
5  Q. How many times did he go there?
6  A. I do not know.
7  Q. Do you know how many places he went to in
8  Europe?
9  A. I do not know.
10 Q. Do you know how many places he went to in
11 Australia?
12 A. No.
13 Q. Do we know of any other continents or
14 countries that he went to?
15 A. I do not know.
16 Q. Do you have any idea how many countries he
17 would have gone to with his mother, the flight
18 attendant?
19 A. I do not know.
20 Q. Other than his mother, the flight attendant,
21 and the potential trip to Europe and Australia with
22 Oliver Wyman, do you have any other examples of
23 Mr. Spence's global experience?
24    MR. CIOFFI: Objection to the form of the
25 question. Mischaracterizes her testimony. She

Page 41

1  didn't say there was a trip.
2  BY MR. SABA:
3  Q. Do you know how many trips there were?
4  A. I do not know.
5  Q. Do you know -- are you certain there were
6  trips?
7  A. Yes.
8  Q. What is that based upon?
9  A. Conversations I've had with Tim Spence over
10 the years.
11 Q. When did you have those conversations?
12 A. Any number of times.
13 Q. And where would those conversations have taken
14 place?
15 A. Board meetings, after board meetings. Board
16 lunches, board dinners.
17 Q. Do you recall specifically what was said?
18 A. Just a little bit about his childhood and the
19 fact that he -- his mother would take him on
20 international trips and that when he worked for Oliver
21 Wyman, he did consult with foreign banks, including
22 banks in Canada.
23 Q. As you sit here today, do you know if Phil
24 McHugh's mother was a flight attendant?
25 A. I do not.

Page 42

1  Q. Do you know if he has any flight attendants in
2  his family?
3  A. I do not.
4  Q. Do you know which countries he's traveled to
5  as a child or otherwise?
6  A. I do not.
7  Q. You mentioned that Mr. McHugh was lacking in
8  geographic experience. What is Mr. Spence's geographic
9  experience?
10 A. Well, he was raised in the Pacific Northwest.
11 He went to college in -- excuse me -- in New York state.
12 So as an 18-year-old, he would have had exposure to a
13 completely different part of the country. And I had a
14 similar experience as an 18-year-old and I can tell you
15 I learned a significant amount by simply living and
16 going to school in a different region; that was
17 enormously helpful.
18    He then also spent a little bit of time in
19 Silicon Valley. He spent time in Minnesota when he was
20 with Oliver Wyman. And he traveled quite extensively,
21 as consultants do. And so he's worked -- lived and
22 worked in many, you know, four or five or six parts of
23 the country, and I find value in that.
24 Q. And where did you obtain that information
25 from?

Page 43

1  A. From Tim Spence.
2  Q. You indicated that Mr. McHugh's education made
3  him not suitable to be a president or CEO at Fifth
4  Third. What --
5  A. I don't believe I said that.
6  Q. I think you said he did not have the
7  experience, education, knowledge, skills, digital
8  banking background, communication skills.
9     So just to be clear, you are not saying that
10 Mr. McHugh's education would make him not suitable to be
11 a president or CEO of Fifth Third Bank?
12    MR. CIOFFI: Objection. The record will speak
13    for itself. She testified as she testified. I
14    think your correction of your own question where
15    she articulated a lot of different distinctions and
16    differentiations between Tim Spence and Phil McHugh
17    is what she answered, but -- we can read her answer
18    back, but it was a long list of things, not just
19    one.
20 BY MR. SABA:
21 Q. Ms. Williams, are you saying that Mr. McHugh's
22 education was not something that made him not suitable
23 to be a president or CEO of Fifth Third Bank?
24 A. It was a double negative.
25 Q. It's a double negative. I'm sorry.

Deposition of Marsha Conrad Williams                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 44

1    A.  I always struggle with those.  Could you
2  clarify, please?
3       MR. CIOFFI:  Rephrase it.
4  BY MR. SABA:
5    Q.  That Mr. McHugh's education would not be
6  included by you as a factor that would prevent him from
7  become suitable for being a president and CEO of Fifth
8  Third Bank?
9       MR. CIOFFI:  Objection.  By way -- for
10      clarification.  When you say "education," are you
11      just talking about college or high school or are
12      you talking about education, what one learns as a
13      consultant in the industry?  Clarify your question,
14      please.
15  BY MR. SABA:
16    Q.  Go ahead, Ms. Williams.
17    A.  I'm still confused.
18    Q.  Okay.
19    A.  So what I meant to say is I believe that Tim
20  Spence's educational background was stronger than Phil
21  McHugh's based on where he went to school, the fact that
22  he had a liberal arts degree.  I'm a believer in a
23  liberal arts degree because I think it teaches one how
24  to think critically and broadly.  And that he went to a
25  very prestigious college that's very difficult to get

Page 45

1  into.
2       So as -- if you compare the two, I was trying
3  to compare the two, and I believe Tim Spence's
4  educational experiences were stronger than someone with
5  a -- stronger than Phil's.
6    Q.  Where did Mr. Spence go to school?
7    A.  He went to Colgate University, Hamilton, New
8  York.
9    Q.  And what was his degree that he received at
10  Colgate?
11    A.  He had a double major.  I don't recall
12  exactly, but I think one of them was history, or world
13  history perhaps.
14    Q.  Where did Mr. McHugh go to school?
15    A.  Xavier University.
16    Q.  And what was Mr. McHugh's degree in?
17    A.  Business.
18    Q.  And just to be clear, you're saying that in
19  your opinion Colgate is a more prestigious school than
20  Xavier University, correct?
21    A.  I know that it's more difficult to get into.
22  So, yes, I agree with that.
23    Q.  You also mentioned communication skills with
24  respect to Wall Street and the press, that Mr. McHugh's
25  communication skills with Wall Street and the press were

Page 46

1  not suitable for him to be president and CEO; is that
2  correct?
3    A.  I -- I'd like to clarify that.
4    Q.  Sure.
5    A.  So I don't believe his communication skills in
6  general were sufficient to be the CEO, and that was
7  based on the way he answered questions during board
8  meetings.  I always felt that his answers were guarded
9  and carefully worded to tell the board what the board
10  wanted to hear.  And he tended to read his board
11  presentations rather than having a conversation is
12  feedback I got from a number of board members, please,
13  please, tell the management, and they would list
14  specific people, not to read their board presentations
15  to us because we want to have a conversation.  So that's
16  the communication.
17       The other item I was trying to indicate is I
18  don't think, because of his style of communication, I
19  don't think he would be effective with the press.  And
20  also he did not have the contacts with Wall Street that
21  Tim had.
22    Q.  What contacts did Tim Spence have with Wall
23  Street?
24    A.  Well, as he was working with his bank clients,
25  a number of whom were major banks, he would often

Page 47

1  interact with analysts and investment bankers to -- to,
2  number one, understand what might be feasible as you're
3  thinking through an acquisition or some acquisition
4  funding or a recapitalization, and you also want to
5  understand in any context how the Wall Street analysts
6  would view any potential merger combinations or
7  restructures or anything.
8    Q.  Who specifically were these contacts that
9  Mr. Spence had on Wall Street?
10    A.  I do not know.
11    Q.  Did you speak to any of his contacts on Wall
12  Street?
13    A.  I did not.
14    Q.  Were you provided with a list of any of his
15  contacts on Wall Street?
16    A.  I was not.
17    Q.  Did any of the board members speak to any of
18  the purported contacts that Mr. Spence had on Wall
19  Street?
20    A.  I do not know.
21       MR. SABA:  If we can go ahead and go off the
22  record and take a break.  He needs to change tapes.
23       THE VIDEOGRAPHER:  The time is 10:32 a.m.
24  We're going off the record.
25       (A recess was taken from 10:32 a.m. to

Deposition of Marsha Conrad Williams                                     Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 48

1    11:03 a.m.)
2       THE VIDEOGRAPHER: The time is 11:03 a.m.
3    We're back on the record.
4    BY MR. SABA:
5       Q. Ms. Williams, with respect to Phil McHugh's
6    merger and acquisition experience, do you know which
7    mergers and acquisitions Phil McHugh led on behalf of
8    Fifth Third Bank between 2017 and 2020?
9       **A. I don't believe he led any of them. So, no, I**
10   **do not know.**
11      Q. Do you know which acquisitions took place,
12   mergers and acquisitions took place on behalf of Fifth
13   Third Bank between 2017 and 2020?
14      **A. The MB merger.**
15      Q. Any others?
16      **A. We may have done some Fintech acquisitions**
17   **during that period, but I don't recall exactly.**
18      Q. What about wealth acquisitions?
19      **A. Yes. We might have purchased some wealth**
20   **advisory firms. I don't recall their names.**
21      Q. Do you recall where they were?
22      **A. I know that we acquired one in North Carolina.**
23   **I don't recall any of the others, if there were others.**
24      Q. And who led that acquisition in North
25   Carolina?

Page 49

1       **A. I do not know.**
2       Q. Do you know if Phil McHugh led that
3    acquisition?
4       **A. I do not know.**
5       Q. And that would be --
6       **A. I know it was a very small acquisition.**
7       Q. And that was Franklin Partners; is that
8    correct?
9       **A. I don't recall the exact name. I know that we**
10   **own Franklin Partners. I don't recall when it was**
11   **acquired.**
12      Q. Any other wealth acquisitions that took place
13   during that time, 2017 to 2020?
14      **A. I know there were some very small wealth**
15   **acquisitions. I don't recall the time frame.**
16      Q. Do you know which areas around the country
17   that Phil McHugh was the head of regional banking for
18   between 2017 and 2020?
19      **A. I believe he was head of regional banking for**
20   **the bank. So that would have covered a number of**
21   **different regions.**
22      Q. Throughout the country, correct?
23      **A. Throughout the swath of our footprint.**
24      Q. That would include Florida, correct?
25      **A. Correct.**

Page 50

1       Q. Chicago?
2       **A. Correct.**
3       Q. California?
4       **A. Correct.**
5       Q. Texas?
6       **A. Correct.**
7       Q. You mentioned Mr. McHugh's education at
8    Xavier. Are you aware of any post graduate education
9    that Mr. McHugh had?
10      **A. No.**
11      Q. Did you ever look into it?
12      **A. On the talent sheet that we were provided,**
13   **which I assumed to be accurate, it said that he went to**
14   **a seminar as part of Young Presidents and then Xavier.**
15   **So I took that as accurate.**
16      Q. When would that have been provided to you?
17      **A. Would have been provided at every one of the**
18   **December talent reviews that we had. So a few years, I**
19   **don't recall the exact number of years when we started**
20   **that process.**
21      Q. We were talking before about your
22   communications with Greg Carmichael. In 2020, did you
23   ask Greg Carmichael for assistance with a PPP loan?
24      **A. I mentioned to him the challenges that I was**
25   **having applying for a PPP loan for one of my small**

Page 51

1    **businesses. He mentioned that it might be possible for**
2    **Fifth Third to provide one, and I said I would prefer**
3    **not to get it from Fifth Third if I could find another**
4    **source for the PPP loan, which I did.**
5       Q. What is your past involvement with the process
6    by which Fifth Third would identify and elect a new
7    president and/or CEO?
8          MR. CIOFFI: Objection. Time frame? The
9    whole length of her board tenure?
10         MR. SABA: Her experience.
11         THE WITNESS: Well, I was on the board when
12   the board -- and Kevin -- the board but more
13   specifically the chairman of the board or perhaps
14   the director at the time, I think -- I believe
15   chairman of the board was negotiating with Kevin to
16   retire or depart Fifth Third. So I was on the
17   periphery of some of those discussions as well as
18   involved with the discussions to promote Greg to
19   CEO.
20   BY MR. SABA:
21      Q. And what was your involvement in that process?
22      **A. Jim Hackett, who was primarily leading that**
23   **process and I had a few conversations about that**
24   **transaction or that process. It was primarily handled**
25   **by Jim Hackett at the time.**

Page 52

Q. Other than conversations with Jim Hackett,
what involvement did you have in that process?

A. Well, the board had a number of conversations
among themselves. So I was involved in those
conversations as well.

Q. How long did that process take?

A. Could you be more specific about what you're
asking?

Q. Sure. The process of identifying somebody to
replace Mr. Kabat and inserting Mr. Carmichael.

A. So Mr. Carmichael was already the president of
the bank at that point. So the board had been
evaluating him as a potential successor for Mr. Kabat.
And at the June 2015 meeting, we had a number of
in-depth discussions about Mr. Kabat and the transition
to Mr. Carmichael occurred shortly thereafter.

Q. When did the process begin to find a
replacement for Mr. Carmichael?

A. You know, I would say the process was
continual. We would have a discussion, so it's an
ongoing process. We would have a discussion at least
once a year among the board members about succession
planning, and those conversations occasionally took
place at the June -- some of the June meetings but then
more formally at the December meetings where we

Page 53

reviewed -- the entire board -- reviewed the entire
Enterprise committee and discussed succession potential
of a number of -- of all of the Enterprise committee for
a number of different positions.

Q. What is the Enterprise committee?

A. The Enterprise committee is the top 12 people
within the company who lead various functions, both line
and staff.

Q. With respect to that December meeting, what
information or materials is the board provided with to
assess the Enterprise committee?

MR. CIOFFI: Objection to the form. Time
frame. December meeting when?

MR. SABA: Let's refer to December 2019.
BY MR. SABA:

Q. What information would the board be provided
with in order to assess the Enterprise committee?

A. The board would be presented with a talent
management deck that had a profile of each of the
members of the Enterprise committee, and that was
written material. And then we would have a discussion
about each of the individuals.

Q. Who prepares the talent management deck?

A. I believe the HR department. I cannot tell
you precisely who.

Page 54

Q. What involvement, if any, do you have in the
preparation of the talent management deck?

A. In the preparation of the deck, we did not
participate. I did not participate.

(Plaintiff's Exhibit 3 is marked for
identification.)
BY MR. SABA:

Q. Ms. Williams, I've handed you a document that
has been marked as Exhibit Number 3. Can you identify
that for me, please?

A. Yes. It is an email from Bob Shaffer.

Q. And if you look on that first page, you agree
with me it's an email from Bob Shaffer first to Paula
Hennard, and then below that is an email from Bob
Shaffer dated Tuesday, December 3, 2019, 8:50 a.m. to
yourself and Mike McCallister with a copy to Greg
Carmichael; is that correct?

A. That's correct.

Q. Do you recall receiving this email from
Mr. Shaffer?

A. I don't. But I see that I did receive it.

Q. And the email references the talent management
deck that you were referring to before; is that correct?

A. That's correct.

Q. The email reads, "Attached is a draft of the

Page 55

deck we will use for the human capital and executive
talent management and succession plan updates with the
board on December 17th. We wanted to share with you
ahead of time for your review. We plan to distribute to
all boards members by mid next week. Please let me know
if you have any questions or other feedback. I
appreciate it. Looking forward to seeing you in a
couple weeks"; is that correct?

MR. THOMAS: Peter, I think the mic is being
obscured.

MR. SABA: It's blocked. All right. Sorry.

THE WITNESS: Yes, that is correct.
BY MR. SABA:

Q. Did you review the draft talent deck that
Mr. Shaffer sent to you dated December 3rd?

A. Yes. I would have. If I got it from him, I
would have received it -- or reviewed it.

Q. And did you provide him with any questions or
feedback regarding the December 3rd talent deck?

A. I don't recall.

Q. With respect to Exhibit 3, do you see the
number that's on the bottom right-hand corner? We refer
to that as a Bates stamp number. It says Fifth Third
McHugh 001465; is that correct?

A. That is correct.

Deposition of Marsha Conrad Williams                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 56

1    Q.   And that runs through the last page of Fifth
2  Third McHugh 001515; do you see that?
3    A.   00 -- say again, please.
4        MR. CIOFFI:  The last page.
5  BY MR. SABA:
6    Q.   The last page.
7    A.   Thank you.
8    Q.   Fifth Third McHugh, 001515; is that correct?
9    A.   Yes, that is correct.
10   Q.   And if you could review beginning with the
11 second page of Exhibit 3, Fifth Third McHugh 001466
12 through Fifth Third McHugh 001515 and verify that
13 appears to be the draft of the December 3, 2019 human
14 capital and executive talent management succession plan
15 that was sent to you by Mr. Shaffer.
16   A.   Yes, it appears to be that.
17   Q.   Was this the first version of the, as you call
18 it, talent management deck that you saw for 2019?
19   A.   I believe it is.
20   Q.   How is the talent management deck used by the
21 board at the December meeting?
22   A.   It is reviewed.  It is discussed.  We go
23 through each of the individuals and talk about the
24 individuals and talk about what they're currently doing,
25 what they're -- how we think they're developing, what

Page 57

1  responsibilities they have, where we think -- what we
2  think their next position could be, you know.  We talk
3  about all of the -- we talk about the strengths and the
4  focus areas and what we believe their opportunities are.
5    Q.   And with respect to strengths and focus areas,
6  you're talking about the specific page for each member
7  of the Enterprise committee; is that correct?
8    A.   That is correct.
9    Q.   If I could refer you to Fifth Third McHugh
10 001493.  This is the talent deck page for Phil McHugh;
11 is that correct?
12   A.   That is correct.
13   Q.   And the information that we see with respect
14 to Mr. McHugh, both in terms of strengths, focus areas,
15 potential next positions and potential and leader
16 capabilities, that was already filled in there before
17 you saw this draft; is that correct?
18   A.   That is correct.
19   Q.   Do you know who put that information in there?
20   A.   I assume it was someone on the HR team.
21   Q.   By "the HR team," who do you mean?
22   A.   I -- whoever works on this.  I don't know the
23 names specifically.
24   Q.   I am referring you now to Fifth Third McHugh
25 001496.  That is the talent deck page for Tim Spence; is

Page 58

1  that correct?
2    A.   That is correct.
3    Q.   And once again, the information regarding key
4  strengths, key focus areas, potential, potential next
5  positions, and leader capabilities, that information was
6  already in there before you saw this; is that correct?
7    A.   That is correct.  And I agree with this
8  information.
9    Q.   And do you know who put that information in
10 there?
11   A.   Again, the same group who would have prepared
12 the decks.  I don't know exactly who prepared the decks.
13   Q.   But with respect to the HR team, do you have a
14 specific list of people in mind who that would be?
15   A.   Well, Bob Shaffer is on the HR team.  I
16 believe Peg Jula was on the HR team at the time, and I
17 don't know any of the other names of who might have been
18 involved.  I just don't know.
19   Q.   Looking through this document now, do you
20 recall if you had any changes?
21   A.   I don't recall.
22   Q.   Referring you to Fifth Third McHugh 001503.
23   A.   Okay.
24   Q.   This is a chart of CEO succession; is that
25 correct?

Page 59

1    A.   That is correct.
2    Q.   This would have already been completed before
3  you saw this document; is that correct?
4    A.   That's correct.
5    Q.   Once again, do you know who would have filled
6  that information in?
7    A.   I do not.
8    Q.   Did you make any changes to the CEO succession
9  plan?
10   A.   No.  I think the reason we didn't make any
11 changes is we felt very comfortable that Tim Spence
12 would be the appropriate next CEO.
13   Q.   And did you agree that that was three-plus
14 years away?
15   A.   Yes, or -- yes.
16   Q.   And did you agree that Phil McHugh was an
17 appropriate choice for an emergency successor for CEO?
18   A.   I would not have chosen Phil McHugh for that
19 role.  I would have chosen Tayfun Tazun.
20   Q.   Did you give instruction to anyone that Phil
21 McHugh's name should be removed from emergency
22 successor?
23   A.   No.
24   Q.   And why is that?
25   A.   Because I've actually been through this

Deposition of Marsha Conrad Williams                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 60

1  process with another board, and when you're in an
2  emergency situation, you look at what's on the piece of
3  paper but you're forced to make a decision fairly
4  quickly. And one of the thought processes that you go
5  through is you got two conflicting -- two conflicting --
6  not conflicting -- two different constituencies. You
7  have the business that you need to keep running and you
8  have the shareholders that you need to make sure are
9  calm.
10       So I think given Tayfun's relationship with
11  Wall Street and his knowledge of our shareholder base,
12  he would have been the emergency successor that I would
13  have strongly advocated for, and I believe that's true
14  of the other board members. So we needed to be able to
15  make sure, in an emergency, that the CFO could
16  communicate with Wall Street effectively, and that's
17  how -- often how many emergency successors are chosen.
18  That's how I've done it in the past.
19       Q. What was Tayfun's relationship with Wall
20  Street?
21       A. He was one of the primary spokesmen for the
22  bank with Wall Street.
23       Q. What do you mean by that?
24       A. Well, he's the chief financial officer. So he
25  often would be the person to talk to the analysts and

Page 61

1  the investors.
2       Q. Were you present for those conversations?
3       A. No. Board members are typically not present
4  for those conversations.
5       Q. Do you know if Mr. McCallister had any
6  changes, comments, or feedback regarding the
7  December 3rd draft of the talent deck?
8       A. I do not know.
9       Q. Did you discuss it with him at all?
10      A. I don't recall.
11      Q. Did you have any discussions with
12  Mr. Carmichael about the December 3rd draft of the
13  talent deck?
14      A. Not to my knowledge.
15          (Plaintiff's Exhibit 4 is marked for
16           identification.)
17  BY MR. SABA:
18      Q. Ms. Williams, I've handed you what's been
19  marked as Exhibit Number 4. Can you identify that for
20  me, please?
21      A. Identify in what way?
22      Q. Can you tell me what it is?
23      A. Oh. It's an email from Greg -- Bob Shaffer to
24  the board members saying here's the deck we'll use for
25  the human capital and executive talent management

Page 62

1  succession updates in 2019.
2       Q. And just to be clear, Exhibit Number 4 is
3  Bates stamped Fifth Third McHugh 001104 through Fifth
4  Third McHugh 001154; is that correct?
5       A. That is correct.
6          (Plaintiff's Exhibit 5 is marked for
7           identification.)
8          MR. CIOFFI: Counsel, is this Exhibit 5 that
9  you just handed me?
10         MR. SABA: It is.
11  BY MR. SABA:
12      Q. Ms. Williams, we've handed you what has been
13  marked as Exhibit Number 5. Can you identify that for
14  me, please?
15      A. Yes. It is a copy of the minutes of the
16  meeting of the board of directors from December 17,
17  2019.
18      Q. Have you seen this document before?
19      A. Yes.
20      Q. Who presided over this meeting of the board of
21  directors?
22      A. Mr. Carmichael.
23      Q. Would you agree with me that Exhibit 5 is
24  Bates stamped Fifth Third McHugh 000266 through -- let
25  me clarify that again -- Fifth Third McHugh minutes

Page 63

1  000266 through Fifth Third McHugh minutes 000283; is
2  that correct?
3       A. That is correct.
4       Q. Referring you to the second page of Exhibit 5,
5  which is Fifth Third McHugh minutes 000267, the first
6  full paragraph after the resolutions reads, "Thereafter
7  Mr. Carmichael and Mr. Shaffer initiated a review of
8  potential succession time lines and candidates for the
9  chief executive officer position. They reviewed top
10  succession candidates, including Mr. Spence, and
11  discussed the potential timelines for the readiness and
12  key development priorities for each such candidate."
13         Do you see that?
14      A. I do.
15      Q. Who were the candidates that Mr. Carmichael
16  and Mr. Shaffer reviewed?
17      A. I don't recall specifically.
18      Q. Did they review individuals other than
19  Mr. Spence?
20      A. They -- I don't recall specifically.
21      Q. Separate and apart from these minutes, do you
22  ever recall Mr. Shaffer and Mr. Carmichael proposing
23  other candidates for CEO or president other than
24  Mr. Spence?
25      A. Well, we would have discussed the potential

Deposition of Marsha Conrad Williams                                Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 64

1  candidates in the talent management review, and we would
2  come -- you know, on all of them, and over a period of
3  years there were a number of candidates that we
4  discussed.  We discussed -- we discussed Chad Borton.
5  We had originally discussed Lars Anderson when he was --
6  when he joined the bank -- as a potential president and
7  as a potential successor to be president.  We discussed
8  Chad Borton, as I mentioned, who was running parts of
9  the consumer bank.  We discussed Brian Lamb.
10     So over the years, this was a CEO succession
11  process, was something that we talked about at every --
12  at least annually, and we did review a slate of
13  candidates.  The slate changed during -- over the years
14  as people either could hope to -- could -- the slate
15  changed as people's accomplishments and success in any
16  one role changed or didn't change.  So, for example,
17  with Lars, we, you know, concluded after a certain
18  number of years of watching him in his position that he
19  was probably best suited for the position he held.
20     So over the years, the board did review a
21  number of candidates for the CEO succession.  However,
22  at no time did we ever consider Phil McHugh a viable
23  candidate for that role.
24     Q.  Was Phil McHugh one of the candidates
25  discussed by Mr. Carmichael and Mr. Shaffer during the

Page 65

1  December 2019 meeting?
2     A.  He was discussed at the talent review meeting,
3  which includes the entire board.  And in the deck that
4  you just showed me, he -- his potential -- is cited as
5  moderate potential.  So based on the belief of the board
6  that he wasn't a viable candidate to be the CEO because
7  he didn't have -- he didn't have the experience that we
8  were looking for.  He didn't have the Fintech
9  background, and he didn't have a lot of other skills
10  that we thought were important.  I would say he was not
11  ever discussed in detail as a viable CEO candidate.
12     Q.  And I think you referenced the information in
13  the talent deck.  That information in the talent deck
14  would have confirmed that Mr. McHugh was not a viable
15  candidate for CEO/president; is that correct?
16       MR. CIOFFI:  Objection to the form of the
17     question.  What information are you talking about?
18  BY MR. SABA:
19     Q.  Do you understand my question?
20     A.  Could you repeat it?
21     Q.  Certainly.
22       You referenced the talent deck and how it
23  described Mr. McHugh's potential as moderate.  And with
24  respect to that, he was never considered a viable
25  candidate for president or CEO.  My question is just the

Page 66

1  information in the talent deck confirmed for the board
2  that Mr. McHugh was not a viable candidate for
3  CEO/president for Fifth Third Bank?
4     A.  I think the information in the talent deck
5  confirmed for the board that all of the observations we
6  have made of Mr. McHugh over the various years, all of
7  the discussions that we had, all of the presentations
8  that we had had, all of the questions that we had asked
9  him and the way that he answered those questions
10  confirmed for the board the board's -- the board's view
11  that he was not a viable candidate.
12     So the idea that he was not a viable candidate
13  developed over many years, over many board
14  presentations, and over many board discussions.  I
15  believe that, you know, his board presentations were
16  somewhat superficial -- superficial is the wrong word.
17  I would say not as detailed as I think the board would
18  like.  I do recall that whenever Mr. McHugh was
19  questioned about anything in his content his responses
20  tended to be somewhat brief and, again, superficial and
21  that was in direct contrast to Mr. Spence's answers to
22  the questions.
23     The best way I can kind of explain that or go
24  into it more in depth, if you ask, is by an analogy, if
25  that's okay to use.  If you ask Mr. McHugh and

Page 67

1  Mr. Spence to describe a house, Mr. McHugh would say
2  it's -- this is just an analogy -- he would say it's two
3  bedrooms, 2 1/2 baths, it's tan, it is a split-level
4  house, it's got an attached garage and it was built in
5  1980.  Mr. Spence would say all of those things and then
6  go on to say it's on a lot that's a half an acre.  The
7  lot is fenced, and it's got plenty of room in the
8  backyard for children to play.  There's a great grade
9  school about a half a mile to the east and a terrific
10  middle school and high school a mile to the west.
11  Another mile to the south is a shopping center that has
12  a convenience store, a drugstore.
13     He would -- Mr. Spence could speak with
14  detail and conviction and authority.  So he could paint
15  a picture for the board of what the situation is and how
16  we -- how we -- how he would explain it, he could
17  create an oil painting for the board of that house.
18  Mr. McHugh provided what I often thought of as a
19  charcoal sketch of a house.  And that really is the
20  difference in communication that was very profound.
21     Q.  These criticisms that you identified of
22  Mr. McHugh's presentation style and/or answers to
23  questions, were those ever communicated to Mr. McHugh?
24     A.  I do not know the answer to that.  I -- I
25  presume that somewhere in the -- I don't know the

Deposition of Marsha Conrad Williams        Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 68

1 answer. But that having been said, Mr. McHugh was
2 present at all of the meetings where other people were
3 answering questions with much more depth of -- apparent
4 depth of knowledge. So he could certainly witness how
5 other people in the room were answering questions.
6      Q. Were those criticisms ever communicated to
7 Mr. Carmichael about Mr. McHugh?
8      A. Well, one of the criticisms of Mr. McHugh was
9 often that he read his presentations to the board and
10 the board -- he was not necessarily alone in that. Tim
11 Spence did not do that, but other members of the
12 management did that, and that particular item was
13 certainly communicated to Mr. Carmichael and perhaps
14 even to the -- certainly to Mr. Carmichael.
15      Q. When were those communicated to
16 Mr. Carmichael?
17      A. At various points over the years. I can't
18 point to a specific date, but I can say that it was a
19 recurring theme with Mr. McHugh and other of the
20 executives. We wanted them to have a conversation with
21 us, not simply read the board decks that they -- that
22 were provided. And Mr. Spence was able to do that,
23 again, with great -- great depth of knowledge. He
24 evidenced a depth of knowledge about Fifth Third Bank,
25 about the industry, about Fintech, about the

Page 69

1 competitors, about the strategy of each of the
2 competitors, sometimes about the -- he didn't really
3 talk about the management of the competitors, but he
4 knew them, and he could -- he could talk with quite
5 amazing facility and insights into the current state of
6 the banking industry.
7      We hired Mr. Spence in 2015 because we did not
8 have that capability in-house, and that was an important
9 hire for us because we had had to outsource our strategy
10 because we did not have any -- anybody in-house that had
11 the strategic -- the ability to communicate -- to draft
12 and communicate a strategy with the skill that
13 Mr. Spence had. And he developed that skill, I believe,
14 over his years at Oliver Wyman and his -- he also spent
15 some time in the -- in I believe in -- working for a dot
16 com, so also understood both the dot com industries --
17 excuse me -- dot com and Fintech industries, and was
18 able to communicate the future of digital banking.
19      Q. Recognizing that the board never considered
20 Mr. McHugh as a candidate for president and CEO, is it
21 fair to say that Mr. Carmichael and Mr. Shaffer did not
22 discuss Mr. McHugh as a candidate, as referenced on
23 Fifth Third McHugh minutes 000267?
24      MR. CIOFFI: Objection. Argumentative.
25      Misstates her prior testimony. She explained in

Page 70

1 great detail how Mr. McHugh was considered over the
2 years, and you're misstating her testimony to make
3 an argument. That's totally improper. So please
4 rephrase your question.
5 BY MR. SABA:
6      Q. Do you understand the question?
7      A. No.
8      Q. Okay. Let me ask you again.
9      A. Please.
10      Q. Fifth Third McHugh minutes 000267, I
11 previously read to you the language from the first full
12 paragraph following the resolutions, "That thereafter
13 Mr. Carmichael and Mr. Shaffer initiated a review of
14 potential succession, time lines and candidates for the
15 chief executive officer position. They reviewed top
16 succession candidates, including Mr. Spence."
17      With respect to the reference to candidates,
18 referencing your prior testimony regarding Mr. McHugh
19 that he was never considered as a viable candidate for
20 CEO or president, is it fair to say he was not included
21 as one of the candidates that Mr. Carmichael and
22 Mr. Shaffer referenced at the December 2019 meeting?
23      MR. CIOFFI: Objection to the form of the
24 question. Rambling and confusing, but if you can
25 answer.

Page 71

1      THE WITNESS: I don't recall the other
2 candidates who may have been mentioned. I just
3 don't recall.
4 BY MR. SABA:
5      Q. Is there a chance that Mr. McHugh was included
6 in that list of candidates?
7      A. Is there a chance? I -- I don't know if there
8 was a chance or not.
9      Q. Okay. All right.
10      A. I know that the board did not believe he was a
11 viable candidate, so -- but I don't know when these
12 minutes were drafted, if there was a chance or not.
13      Q. If I could refer you back to Exhibit 4,
14 please.
15      A. Uh-huh.
16      Q. And referring to Fifth Third McHugh 001132.
17 Does the talent deck page for Mr. McHugh reference
18 anywhere his -- the deficiencies in his communication
19 skills?
20      MR. CIOFFI: Objection. The document speaks
21 for itself. You may answer, if you have an answer.
22      THE WITNESS: I'm trying to read some of the
23 small print. I don't see any reference to
24 communication skills. I do see a reference to his
25 moderate potential, which I assume might

Deposition of Marsha Conrad Williams                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 72

1    incorporate his communication skills.
2    BY MR. SABA:
3        Q.   And, again, that "moderate potential," that
4    was put in before the board or yourself actually
5    reviewed this talent deck for the first time; is that
6    correct?
7        A.   Yes.
8        Q.   When was Lars Anderson eliminated as a
9    potential candidate for president and CEO?
10       A.   I don't recall the exact date.  It would
11   probably have been in the -- this is an estimate,
12   probably 2017 or maybe '18.  I don't recall precisely.
13       Q.   When was Chad Burton eliminated as a potential
14   candidate for president and CEO?
15       A.   It's actually Borton.
16       Q.   Borton, I'm sorry.  Thank you.  Could you
17   spell that, just to make sure the court reporter has it
18   down correctly, please?
19       A.   I believe it was B-o-r-t-o-n.
20       Q.   Thank you.
21       A.   He resigned from the bank, I don't recall the
22   exact year.  He took the presidency of another bank.
23       Q.   And when was Brian Lamb considered as a
24   candidate for president and CEO?
25       A.   I believe he's in this talent deck as a

Page 73

1    potential successor.  I'd have to check that, but the
2    board believed that his runway was long, longer than
3    others.
4        Q.   What do you mean by "his runway"?
5        A.   That it would take him longer to potentially
6    become the CEO than perhaps others because he needed
7    more exposure and more experience.
8        Q.   How long was Mr. Lamb's runway?
9        A.   I believe there was something in here that
10   said it was -- I'd have to go back, but in the previous
11   one you showed me, I believe it said, as I recall, I
12   believe somewhere in this deck it says seven-plus years.
13       MR. CIOFFI:  Counsel, I think for the record
14       the witness is referring to Bates stamp number
15       Fifth Third McHugh 001142 of Exhibit 4.
16   BY MR. SABA:
17       Q.   Referring back to Exhibit Number 5, and,
18   again, to Fifth Third McHugh minutes 000267, in the
19   second sentence of the paragraph that I referred to
20   before, "They reviewed top succession candidates,
21   including Mr. Spence, and discussed the potential time
22   lines for their readiness and key development priorities
23   for each such candidate."
24       Do you see where it says that?
25       A.   I do.

Page 74

1        Q.   Who determined the potential time lines for
2    readiness for Mr. Spence?
3        A.   It was a combination of the board and
4    management.  The board wanted to make sure that if Tim
5    Spence was the ultimate choice to be president, that we
6    felt 100 percent confident that we were making the right
7    choice.  And so we would have said he needs to -- a
8    little bit more time in the role.  So those kinds of
9    discussions we would have had about his readiness and
10   the amount of time we wanted to continue to evaluate him
11   before we felt he was the right choice.
12       So he was definitely the leading candidate.
13   If you look at the people in the proxy, the proxy is
14   usually the top five individuals.  Tim Spence was in the
15   proxy.  Phil McHugh was not in the proxy.  And as we
16   evaluated Tim Spence's capabilities, we wanted, as I
17   said, we wanted to make sure that he had somewhat more
18   seasoning, somewhat more experience, somewhat more, you
19   know, time in the -- time in the role so that we could
20   appropriately -- we, meaning the board -- could
21   appropriately evaluate his readiness.
22       Q.   And at that point in time, how much seasoning
23   and experience did the board determine that Mr. Spence
24   needed?
25       A.   Do you mean -- when you say "at that point in

Page 75

1    time," do you mean 2019?
2        Q.   Correct.  At the December 2019 meeting where
3    you're discussing this topic.
4        A.   I think the board felt anywhere from two to
5    four years.  It was partially a function of how well he
6    would perform during that period.  Mr. Carmichael had
7    not identified precisely his desired retirement date.
8    He did assure the board that he would not retire until
9    he felt he had a very qualified successor ready to take
10   the position.  So, you know, I think three years was a
11   good time frame, and I think the board agreed that three
12   years would -- could be a good amount of time.
13       Q.   That's the same runway or timeline that we see
14   set forth in Exhibit 4, I believe?
15       A.   That's correct.
16       Q.   It's on the same exhibit that you
17   identified before.  It's both on Fifth Third
18   McHugh 001142 and again on Fifth Third McHugh 001135;
19   is that correct?
20       MR. CIOFFI:  Again, counsel, for purposes of
21       making the record clear, are you talking about
22       timeline to president or timeline to CEO?  Because
23       one's relevant and one is not.
24   BY MR. SABA:
25       Q.   Do you understand my question?

Deposition of Marsha Conrad Williams        Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 76

1    A.  I was answering about the CEO, which was three
2    years.
3    Q.  Correct.
4    A.  It looks as if the president was sooner than
5    that.  So I'm not completely sure which one you were
6    asking about.
7    Q.  Well, 001142 of Exhibit Number 4?
8    A.  Uh-huh.
9    Q.  Is the CEO succession plan, correct?
10   A.  That's correct.
11   Q.  And then 001135 also mentions CEO three-plus
12   years; is that correct?
13   A.  That is correct.
14       MR. CIOFFI:  For the record, that's not the
15   subject matter of this lawsuit, CEO succession.  I
16   mean the CEO position happened after the lawsuit
17   was filed.
18       MR. SABA:  This is the subject of this
19   lawsuit.
20       MR. CIOFFI:  You should read your complaint.
21       MR. SABA:  It says both president and CEO
22   position.
23       MR. CIOFFI:  Tim Spence was named CEO more
24   than a year after --
25       MR. SABA:  Correct.

Page 77

1        MR. CIOFFI:  -- the lawsuit was filed.  So
2    it's not the subject matter.
3        MR. SABA:  We can -- we can -- it is the
4    subject matter of this lawsuit.
5        MR. CIOFFI:  I guess the judge will eventually
6    decide that.
7        MR. SABA:  As we well know, yes.
8        MR. CIOFFI:  But wait.  For the purpose of
9    your question, what are you asking about?
10   President or CEO or both?
11       MR. SABA:  She understood my question and she
12   answered it.
13       MR. CIOFFI:  I think she said she didn't know
14   what you were talking about.  That there were two
15   different time lines that are on this particular
16   Exhibit 5 and --
17       MR. SABA:  We'll continue on, Michael.  You
18   can create your own testimony later, but we're
19   going to continue with the deposition.  She already
20   answered my question.
21       MR. CIOFFI:  She didn't.
22       MR. SABA:  Well, you can ask her the question,
23   then.
24       MR. CIOFFI:  I will.
25       MR. SABA:  I'm sure you will.

Page 78

1    BY MR. SABA:
2    Q.  Referring you back to Fifth Third McHugh
3    minutes 000267, the paragraph references the "key
4    development priorities" that were discussed for
5    Mr. Spence.  What were those key development priorities?
6    A.  I believe one was that Greg wanted to start to
7    introduce Tim to the particular analysts that follow us.
8    So I think he was more involved in the investor
9    presentations.  I think he wanted Tim more visible.
10   Those were two that I recall -- or one -- well, two,
11   really, that I recall.  I don't recall the others.  He
12   may have been -- he may also have wanted him to have
13   somewhat more exposure to the regulators, but I'm --
14   it's a vague memory on that.
15   Q.  Anything else that you can recall?
16   A.  Not that I can recall specifically.
17   Q.  Was any decision made at the December 17, 2019
18   meeting regarding Tim Spence becoming the next
19   president?
20   A.  No.
21   Q.  Was any decision made at the December 17, 2019
22   meeting that Tim Spence was the only candidate for
23   president for Fifth Third Bank?
24   A.  We didn't really make decisions at this -- at
25   the meeting.  We talked about potentials and a lot of

Page 79

1    things can change between -- between meetings, between,
2    you know -- a lot of things can change.  So in terms of
3    decisions, no.  But decision for the president is made
4    when the decision is made.  And as you know, we have to
5    do a number of regulatory filings at a time when any
6    important decision like that is made.
7        So I would say there were no decisions made at
8    that meeting.  There were -- people were leaning towards
9    Tim.  People thought Tim was by far and away the only
10   internal candidate who was qualified, but no decisions
11   were made.
12   Q.  Do you make notes of any of the board meetings
13   you attend?
14   A.  I will make notes in Diligent in advance of
15   the board meetings, but generally -- well, generally at
16   the executive session, I may take a note or two to
17   review with Greg, but then I just throw those notes
18   after the board meetings.
19   Q.  You don't keep any of your notes?
20   A.  No.
21   Q.  What about your notes on materials and
22   preparation for the board meeting?
23   A.  No, generally not.
24   Q.  Do you review the minutes of board meetings
25   before they're finalized?

Deposition of Marsha Conrad Williams                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 80

1    A.  In some cases I have, but not regularly.
2    Q.  In which cases have you?
3    A.  I think -- I think when I was chairman, I did.
4  It's kind of a dim memory.  But as lead director, I did
5  not.  I don't believe I did.  That having been said,
6  they're not really finalized until the board votes on
7  them at the board meeting.  So there may have been
8  changes at the board meeting that all the board members
9  would have seen, but I just don't recall the specifics.
10   Q.  How frequently are changes made to board
11 minutes at a board meeting?
12   A.  Occasionally.  I would say occasionally.
13   Q.  Were there any changes made to the
14 December 2019 board minutes?
15   A.  I don't recall.  I don't believe so, but I
16 don't recall.
17   Q.  Do you recall any changes being made to any of
18 the minutes for board meetings between January 1 of 2019
19 through September of 2020?
20   A.  I don't recall.
21   Q.  Other than as summarized in the board minutes,
22 do you have any specific recollection regarding
23 presentations made by Mr. -- by Phil McHugh between
24 January 1 of 2019 through September of 2020?
25   MR. CIOFFI:  Objection.  She already testified

Page 81

1  to a number of presentations, but you may answer.
2    THE WITNESS:  I believe there was a
3    presentation in June of 2020 that all of the lines
4    of business individuals would have made, it was a
5    telephonic meeting because it was during COVID.
6  BY MR. SABA:
7    Q.  Did you attend by phone?
8    A.  Yes.
9    Q.  Was it a video teleconference or just a phone
10 conference?
11   A.  I don't recall which it was.  They tended to
12 be video, but I don't recall for that specific one.
13   Q.  And do you have a specific recollection of
14 Mr. McHugh's presentation at the June 2020 meeting?
15   A.  What I recall about that is that there were
16 four presenters and they were presenting their line of
17 business, I think it was results, perhaps, or, you know,
18 how COVID had impacted the business, that was one page.
19 And then another page was how they were going to operate
20 the business going forward, what -- how we were going
21 to -- I'm trying to recall exactly -- how we were going
22 to defend ourselves, and then how we were going to win
23 in the marketplace.  Or defend ourselves and prove our
24 performance or something like that.  I don't recall
25 the specifics.

Page 82

1    What I do recall is that -- so the
2  presentations were made by Kris Garrett, Kevin Lavender,
3  Phil McHugh, and Tim Spence.  And what I recall about
4  their presentations is that the language, in terms of
5  how people were going to manage the business going
6  forward, the language in Kevin Lavender's presentation
7  and Phil McHugh's presentation, two separate lines of
8  business, was identical language, the same -- the very
9  same language.  Kris Garrett had different language.
10 Tim Spence had very detailed language.  And what I
11 recall is that Phil McHugh's -- some of Phil McHugh's
12 action plans on how he was going to win in the business
13 he was running at the time was to monitor things and
14 keep doing what he was doing and, you know, there was a
15 great lack of specificity, and in some cases, identical
16 language to another business leader, which I had never
17 seen before in a board presentation.
18   Q.  And this is the meeting that you're not sure
19 if you just attended by phone or by video; is that
20 correct?
21   A.  That is correct.  Most of the meetings during
22 COVID were by video, but I believe some were telephonic
23 and I just don't recall which one this was.
24   Q.  Other than the June 2020 presentation by Phil
25 McHugh, do you recall -- do you have any other specific

Page 83

1  recollection of presentations made by Phil McHugh at
2  board meetings between January 1 of 2019 and
3  September 2020?
4    A.  I do not.
5    (Plaintiff's Exhibit 6 is marked for
6    identification.)
7  BY MR. SABA:
8    Q.  Ms. Williams, I've handed you what's been
9  marked as Exhibit Number 6.  Can you identify that for
10 me, please.
11   A.  Yes.  The minutes of the board of directors
12 meeting June 16, 2020.
13   Q.  Just to confirm, Exhibit 6 is marked Fifth
14 Third McHugh minutes 000454 through Fifth Third McHugh
15 minutes 000477; is that correct?
16   A.  Mine goes through 000495.
17   MR. CIOFFI:  As does mine.
18   MR. SABA:  Does yours?  All right.  Let me see
19   that.
20 BY MR. SABA:
21   Q.  Let me rephrase my question, now that I have a
22 full packet as well.
23   Can you confirm for me that Exhibit 6 is
24 marked Fifth Third McHugh minutes 000454 through Fifth
25 Third McHugh minutes 000495?

Page 84

A. Yes, I can confirm that.

Q. Perfect. Thank you. The minutes would also confirm that your attendance was by telephone; is that correct? As opposed to videoconference?

A. It says teleconference. So I -- oh, directors -- I see that, yes, correct, by telephone.

Q. When the board meets in executive session, are there any minutes that are taken of the executive session?

A. No.

Q. How does the board confirm what happened at the executive session?

A. What do you mean by "confirm"?

Q. Is any action taken during the executive session?

A. No. The executive session is a chance for the board to talk among ourselves, talk about how we believed the board went -- how the board meeting was conducted, how -- any changes we would like to see in future board meetings, and just, you know, assessment. As I said, one of the things we talked about more than once was the fact that we would like the presenters not to read their presentations but rather to have a conversation with the board about the matters at hand. So it was that type of discussion.

Page 85

MR. SABA: We can go off the record.

THE VIDEOGRAPHER: The time is 12:18 p.m. We are going off the record.

(A recess was taken from 12:18 p.m. to 1:04 p.m.)

THE VIDEOGRAPHER: The time is 1:04 p.m. We are back on the record.

BY MR. SABA:

Q. Ms. Williams, did you ever review Mr. Spence's employee annual performance reviews?

A. We would have discussed his performance at the December -- I'm sorry, excuse me -- the February compensation committee meeting, and Greg would have given an update on how he did during the prior year. And I don't recall if we saw his specific performance review or not, but we would have discussed his compensation, how it was set, why it was set, and what it was based upon.

Q. But a physical copy of his annual performance review, you can't say whether or not you've ever seen those?

A. I don't recall.

Q. With respect to Phil McHugh, did you ever see or review any of his annual employee performance reviews?

Page 86

A. I don't recall.

Q. Did you ever review any of Tim Spence's employee engagement surveys?

A. I don't believe so.

Q. Did you ever review Phil McHugh's employee engagement surveys?

A. I don't believe so.

Q. Did you ever review Tim Spence's customer experience surveys?

A. I don't believe so.

Q. Did you ever review Phil McHugh's customer experience surveys?

A. I don't believe so.

Q. Did you ever review the -- Tim Spence's financial performance relative to goals for his divisions?

A. We did have a line of business reviews. I don't recall the details or what specifically they covered, but we did at times discuss the performance of each of the divisions.

Q. And did you ever see income statements and balance sheets specifically broken out for just the divisions managed by Mr. Spence?

A. I -- certainly not balance sheets I would not have seen. Income statements I don't recall.

Page 87

Q. What about with respect to Mr. McHugh, did you ever see financial performance information for the divisions that he managed relative to annual goals?

A. We would have seen -- I believe we would have seen at a high level how the divisions did relative to goals, but I don't recall the specifics.

Q. And would you have seen anything broken out by the individual and the divisions they managed?

A. I don't recall.

Q. Do you ever recall anyone at Fifth Third referring to Phil McHugh as "the Silver Fox"?

A. No.

(Plaintiff's Exhibit 7 is marked for identification.)

BY MR. SABA:

Q. Ms. Williams, can you identify Exhibit Number 7 for me, please.

A. Board minutes -- the board minutes from the September 21, 2020 board of directors meeting.

Q. You would agree with me that Exhibit Number 7 is Bates stamped Fifth Third McHugh minutes 000508 through Fifth Third McHugh minutes 000516; is that correct?

A. That is correct.

Q. In the first full paragraph under Legal,

Deposition of Marsha Conrad Williams                               Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 88

1  Regulatory, and Government Affairs Update, the second
2  sentence reads, "Ms. Zaunbrecher noted that the most
3  significant litigation exposures continue to be with
4  respect to sales practices enforcement litigation and
5  related follow-on suits, payment card interchange fee
6  cases and Klopfenstein."
7      Do you see that sentence?
8  A.  I see that sentence.
9  Q.  Do you agree with that sentence?
10  A.  Yes, I agree with that sentence.
11  Q.  And in the next sentence she points out that
12  the sales practices litigation -- and she has a
13  parenthetical CFPB; do you see that?
14  A.  I see that.
15  Q.  Are you familiar with the CFPB litigation?
16  A.  I am.
17  Q.  And with respect to that, that is still
18  ongoing now; is that correct?
19  A.  That is correct.
20      (Plaintiff's Exhibit 8 is marked for
21      identification.)
22  BY MR. SABA:
23  Q.  Ms. Williams, you've been handed what's been
24  marked as Exhibit Number 8.  Can you identify that for
25  me, please?

Page 89

1  A.  That is the board of directors of Fifth Third
2  Bank NA board of directors minutes of meeting of
3  September 21, 2020.
4  Q.  And just to distinguish that from Exhibit 7,
5  Exhibit 7 is the minutes for Fifth Third Bancorp for
6  that same day, correct?
7  A.  Correct.
8  Q.  And Exhibit Number 8 is Bates stamped Fifth
9  Third McHugh minutes 000517 through 000527; is that
10  correct?
11  A.  Correct.
12  Q.  In the second full paragraph under Talent
13  Management, it indicates, "Mr. Shaffer then introduced
14  Guy Beaudin and Chuck Evans with RHR International who
15  were engaged to perform an assessment of Mr. Spence's
16  capabilities to be a successor candidate to
17  Mr Carmichael"; do you see that?
18  A.  I see that.
19  Q.  And I believe you referenced RHR International
20  before; is that correct?
21  A.  Correct.
22  Q.  And Mr. Beaudin from RHR International, what
23  is your understanding of the role he serves with RHR
24  International?
25  A.  He's a partner.

Page 90

1  Q.  Did you ever speak to Mr. Beaudin?
2  A.  I did.
3  Q.  When did you speak to Mr. Beaudin?
4  A.  I spoke to him in the -- I believe it was in
5  the summer of 2015; I don't recall the exact date.  In
6  the summer of 2015, we met in Chicago to talk about the
7  work he was doing for Fifth Third.  I believe it was
8  summer.
9  Q.  And what work was he doing for Fifth Third in
10  2015?
11  A.  He was developing some guidelines and some --
12  he was helping clarify the qualities that we were
13  looking for in the next CEO, the winning formula, I
14  think it's referred to.  So he developed that document
15  in 2015 to help the board think through how to proceed
16  with the CEO change.
17  Q.  Other than that meeting with Mr. Beaudin in
18  the summer of 2015, did you have any other meetings with
19  him?
20  A.  I do not recall.
21  Q.  Other than that meeting, did you have any
22  other direct communication with him by email or
23  otherwise?
24  A.  I do not recall specifically if I did or did
25  not.

Page 91

1  Q.  The third sentence in that paragraph reads,
2  "Mr. Shaffer also reminded the board members of the
3  succession planning discussion at the June 2020 board
4  meeting in which the board approved the CEO profile to
5  be utilized by Mr. Beaudin and Mr. Evans to assess
6  Mr. Spence."
7      Do you see that?
8  A.  I see that, yes.
9  Q.  And the CEO profile you're referring to, is
10  that the winning formula?
11  A.  Yes.
12  Q.  The next sentence reads, "Mr. Shaffer noted
13  that the CEO profile identified essential behaviors
14  related to business management, leadership,
15  interpersonal skills, and personal attributes deemed
16  critical to assess Fifth Third Bank president and CEO
17  successor candidates."
18      Do you see that?
19  A.  Yes.
20  Q.  Do you agree with that statement?
21  A.  I do agree with that statement.
22      (Plaintiff's Exhibit 9 is marked for
23      identification.)
24  BY MR. SABA:
25  Q.  Ms. Williams, I've handed you what's been

Deposition of Marsha Conrad Williams

Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 92

1 marked as Exhibit Number 9. Can you identify that for

2 me, please?

3   A.  Yes. It's an email sent from Bob Shaffer to

4 Greg Carmichael.

5   Q.  Have you ever seen this document before?

6   A.  I don't believe so.

7   Q.  And Exhibit Number 9 is marked Fifth Third

8 McHugh 006414 through Fifth Third McHugh 006415; is that

9 correct?

10   A.  That is correct.

11   Q.  The email is dated June 8, 2020; is that

12 correct?

13   A.  That's correct.

14   Q.  And the subject is "Guy Conversation"; is that

15 right?

16   A.  That's correct.

17   Q.  And under Key Highlights and Next Steps, the

18 first point is, "Guy agrees that if Tim is 'the'

19 successor, don't add Tayfun and Phil formerly.

20 Although, he would recommend, at a minimum, we discuss

21 with Marsha that she/the board is okay with only having

22 Tim assessed by Guy. He said he has seen a few boards

23 surprised in the past the CEO/CHRO did have at least one

24 other internal candidate assessed"; do you see that?

25   A.  I see that.

Page 93

1   Q.  Did Greg Carmichael or Bob Shaffer ever

2 discuss with you the concept of Tim Spence being the

3 only person assessed by RHR?

4   A.  I don't recall, but had they discussed with

5 me, I would have supported that decision.

6   Q.  And why is that?

7   A.  Because he was, in my view and in the view of

8 the entire board, he was the really only viable internal

9 candidate that we had available or only internal

10 candidate who was qualified, as I said before, based on

11 his experience, his education, his knowledge, his

12 skills, his knowledge of the digital world, which was

13 significantly changing banking at the time, and his

14 overall strategic vision.

15   Q.  And to be clear, that's based on the

16 information that had been provided to you, correct?

17   A.  It's based on the many years of observations

18 that we had of both Phil and Tim Spence in comparing and

19 contrasting their different presentations and skills

20 that they brought to the board room.

21   Q.  Was there ever an independent assessment done

22 of Phil McHugh to determine his qualifications to be

23 president and CEO of Fifth Third Bank?

24     MR. CIOFFI:  Objection. You mean other than

25   by the independent directors? Could you clarify

Page 94

1 it, please?

2 BY MR. SABA:

3   Q.  Did you hear my question?

4   A.  I heard your question, yes.

5   Q.  Go ahead.

6   A.  The independent directors evaluated Mr. McHugh

7 and those independent directors, some of those

8 independent -- at least one of those independent

9 directors had been on the board since 2006. I have been

10 on the board since 2009. Many others joined the board

11 in '11, '12, '13. This was a group of anywhere from 12

12 to 15 independent directors, all of whom had extensive

13 business experience, extensive experience evaluating

14 people and assessing people, and we had the chance to

15 see Mr. McHugh and Mr. Spence and all of the other

16 executives, who at one time or another -- the other two

17 executives who were on the list for possible succession,

18 we had a chance to listen to and evaluate all of those

19 people. So there was a lot of years of independent

20 directors evaluating management and the likelihood that

21 they could succeed to be the president.

22   Q.  Well, if the review of the independent

23 directors, based upon your board observations, was

24 adequate, why hire an RHR at all to do an independent

25 assessment of a candidate?

Page 95

1   A.  It's kind of like the Good Housekeeping seal

2 of approval. I mean, it's always nice to have one

3 person also vet the person. I see in here that

4 Mr. Beaudin also interviewed all of Phil's -- or excuse

5 me, Tim Spence's peers and based on -- it says based on

6 the feedback that his peers identified no concerns about

7 him being the next CEO, is the way I read this.

8     So that's something that we would, you know,

9 we didn't do a -- we didn't do a review of Tim Spence's

10 peers, but it looks as if RHR did, which means Phil

11 would have been a participant in that process, and it

12 says that none of his peers responded that there were

13 any concerns identified. This is in the document you

14 just gave me.

15   Q.  So it's fair to say RHR does a more detailed

16 analysis than just the assessment of the independent

17 directors, correct?

18     MR. CIOFFI:  Objection. Argumentative.

19   Assumes facts not in evidence. You can answer.

20 BY MR. SABA:

21   Q.  Mr. Cioffi is going to object to any question

22 he doesn't like, but go ahead.

23     MR. CIOFFI:  No, come on, Counsel. The record

24   will speak for itself. I'm going to object to any

25   improper question, including argumentative

Deposition of Marsha Conrad Williams                                                  Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 96

1  questions in which you state a conclusion and then
2  want her to agree to. She's here as a fact
3  witness. Ask her facts.
4      THE WITNESS: Could you repeat the question?
5      MR. SABA: Certainly. I'd be happy to.
6  BY MR. SABA:
7  Q. Ms. Williams, RHR does a more detailed
8  analysis and investigation than the board does, correct?
9      A. I would -- I don't agree with that. I would
10  say that RHR does a different type of analysis. The
11  board had ample time to analyze the -- what's the word
12  I'm trying to think of? The real time performance of
13  director -- or excuse me, management as they present to
14  the board. So we had -- we had a process for making
15  sure that all of the senior talent presented to the
16  board. We had a chance to interact with them at dinners
17  and, again, in the case of Phil McHugh, this goes back
18  at least with one director to 2006, with Tim back to
19  2010.
20      So we had plenty of opportunities to evaluate
21  the skills and capabilities and qualities. So I would
22  say RHR does a different kind of analysis than the board
23  did as they watched candidates develop over the years.
24  Q. RHR actually spoke to direct reports; is that
25  correct?

Page 97

1      A. That is what this -- your report -- the report
2  that you gave me says.
3  Q. Correct. The board never speaks to any direct
4  reports of Tim Spence or Phil McHugh, correct?
5      A. Some direct reports of Phil and Tim would have
6  presented to the board meetings. So in that context, we
7  would have spoken to them.
8  Q. You spoke to them, but you never interviewed
9  them specifically about Phil McHugh and his
10  qualifications and his ability to be a president or CEO
11  of Fifth Third?
12      A. We did not because in the board's collective
13  judgment of 400 years of corporate leadership, the board
14  did not believe Phil had the qualifications to be the
15  next CEO of Fifth Third.
16  Q. And with respect to -- and, again, you've
17  talked about, you did -- they do the board
18  presentations. You never spoke to their direct reports.
19  No one at the board ever looked at any of Phil McHugh's
20  annual performance reviews, correct?
21      A. We would hear -- I don't believe so, but we
22  would hear the results of that performance during the
23  compensation discussion.
24      So -- and I would argue that how his direct
25  reports felt about their boss is not necessarily a

Page 98

1  deciding factor as to whether or not they should be the
2  next CEO. There are many other components that go into
3  that decision rather than simply how the direct reports
4  feel about them.
5  Q. That's just one factor, correct?
6      A. What's just one factor?
7  Q. How the direct reports feel and respond and
8  work with their -- with that individual, it's just one
9  factor you might consider in terms of their management
10  skills or otherwise?
11      A. Certainly the ability to lead a team is
12  important.
13  Q. Going back to my earlier question, there was
14  no independent outside entity that was ever hired to do
15  an independent assessment of Phil McHugh?
16      MR. CIOFFI: Objection. States facts not in
17  evidence. She's already answered the question. Do
18  you want her to change her answer or answer it
19  again?
20  BY MR. SABA:
21  Q. Ms. Williams, go ahead.
22      A. The board did not feel it was necessary to
23  have an independent assessment of Mr. McHugh for the
24  president's position because the board, in its
25  collective wisdom, did not feel he was qualified. The

Page 99

1  board would not have been comfortable with him as
2  president.
3  Q. And the board didn't do an independent review
4  of anybody other than Tim Spence, correct?
5      A. That is correct, because we believed Tim
6  Spence was by far and away the most qualified to be the
7  next president. He had extensive industry knowledge.
8  He was hired in 2015 to bring his strategic capabilities
9  to the board. He had -- he was named digital banker of
10  the year in 2018. So he clearly had his pulse on --
11  that was by the American Banker Magazine, which is a
12  very well-respected publication in the banking industry.
13  He clearly was, as Mr. Beaudin noted, he "is a creative
14  forward-thinking strategic thinker who balances
15  objective data with his subjective experience to derive
16  innovative solutions to business challenges." That was
17  the independent assessment we got Phil -- or excuse me,
18  of Tim, and I think that in part reflects what the board
19  had observed ever since Phil's -- or excuse me, Tim
20  started presenting to the board in 2011.
21  Q. What is required to be digital banker of the
22  year?
23      A. I don't know specifically, but I believe it's
24  knowledge of the digital space and ability to
25  communicate and develop products, but I don't know

Deposition of Marsha Conrad Williams        Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 100

1 specifically.

2     Q. Where did you get that guess from?

3       MR. CIOFFI: Objection. Argumentative.

4       THE WITNESS: Just I don't --

5       MR. CIOFFI: She's not guessing.

6 BY MR. SABA:

7     Q. That's fine. If you're not guessing --

8     A. Yeah.

9     Q. -- tell me the source of information you

10 identify setting forth the criteria for establishing how

11 somebody is named digital banker of the year. Where

12 does that come from?

13     A. I don't know.

14     Q. You don't know at all; is that right?

15     A. I don't.

16     Q. Okay.

17     A. But what I do know that the American Banker

18 Magazine is -- has been around a long time and is very

19 well regarded, and I'm quite certain they have criteria

20 that they evaluate because that's the kind of high

21 caliber magazine that would have a fairly rigorous

22 process. I'm simply not familiar with the process.

23     Q. You don't know what their process is?

24     A. I do not know their process.

25     Q. What is the American Banker Magazine

Page 101

1 circulation?

2     A. I do not know.

3     Q. Do you know the publisher's name?

4     A. I do not know. But I recall when I was a

5 banker from 1973 until 1988, everybody read the American

6 Banker Magazine.

7     Q. Who's everybody?

8     A. Everybody, all of my peers at First Chicago.

9 It was -- it's an important magazine in the banking

10 industry.

11     Q. Okay. And you base that on because the other

12 people in your office at First Chicago read it in the

13 mid '70s; is that correct?

14     A. I base it on the fact that it's been a

15 magazine that's been an industry magazine for many years

16 and well regarded.

17     Q. Do you currently subscribe to American Banker

18 Magazine?

19     A. I do not.

20     Q. How long has it been since you've subscribed

21 to American Banker Magazine?

22     A. I do not recall.

23     Q. Do you know how many candidates were

24 considered for digital banker of the year by American

25 Banker Magazine?

Page 102

1     A. I do not know. I know simply that Tim Spence

2 was chosen.

3     Q. Was Tim Spence's selection as digital banker

4 of the year part of the reason why he was selected as

5 president of Fifth Third Bank?

6     A. I would say that his selection by the American

7 Banker Magazine for that accolade was simply -- so first

8 of all, it reflected well on Fifth Third because it

9 suggested that we had some very qualified

10 forward-looking digital -- people familiar with the

11 digital world. And was it a criteria for being

12 selected? No.

13       The reason he was selected is that he, over a

14 long period of time, from 2010 until he was selected, he

15 consistently performed at a very high level in every

16 single one of his assignments. He consistently gave the

17 board in-depth knowledge. He led the strategic planning

18 organization for the board. He was very instrumental in

19 a number of the acquisitions we did, particularly the

20 large acquisitions, the important acquisitions -- not

21 the smaller acquisitions, but the large acquisitions,

22 and particularly the MB Financial acquisition where he

23 was critical in MB wanting to sell themselves to Fifth

24 Third, and I was told that specifically by the MB CEO.

25 So it was a combination of factors that all of the board

Page 103

1 used in coming to the conclusion that Tim was really by

2 far and away the most qualified person to be the next

3 president.

4     Q. Did the board ever consider any outside

5 candidates for the position of president or CEO for

6 Fifth Third Bank?

7     A. We discussed whether or not we should go

8 outside and concluded that the candidate that we had,

9 that our internal candidate, was very strong and we did

10 not need to go outside. As you know, as many people

11 know or believe, it is always -- can always be risky to

12 go outside when you're looking for a new CEO or when

13 you're looking for any new position. Oftentimes -- I

14 think there used to be a statistic, I don't know if it's

15 true, that 50 percent of outside hires don't work out.

16       So this is such a critically important role,

17 we wanted to make sure that we had someone that we knew

18 well, had been in front of the board for at least ten

19 years, either in a consultant's role or as a business

20 unit leader, that we felt had all of the qualifications

21 that we were looking for in the next president and CEO.

22     Q. Just to confirm -- and I believe you indicated

23 this here earlier -- between your meeting with Guy

24 Beaudin in the summer of 2015 and the September 21, 2020

25 board meeting, you did not have any conversations with

Deposition of Marsha Conrad Williams

Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 104

1  Guy Beaudin?
2      A.  I don't recall specifically because he was --
3  he was Greg Carmichael's coach when he first took over
4  the CEO role and I may have spoken to Guy in that
5  capacity, but I don't recall specifically.
6      Q.  Let me narrow the time frame then, just to
7  confirm.  Between the time that RHR was first retained
8  with respect to assessing Tim Spence and the
9  September 21, 2020 board meeting, you did not have any
10  conversations or communications with Mr. Beaudin?
11      A.  I do not recall.  I just don't recall.
12      Q.  Based upon Exhibit Number 9, it would appear
13  that Mr. Shaffer and Mr. Carmichael were the ones having
14  direct communication with Mr. Beaudin; is that correct?
15      A.  They --
16          MR. CIOFFI:  Objection to the form of the
17      question.  Are you asking her if that's what the
18      document says or if your assumption is correct?
19  BY MR. SABA:
20      Q.  Go ahead.  You can answer.
21      A.  Could you repeat the question?
22      Q.  Sure.  Based upon the information provided in
23  Exhibit Number 9, it would appear that Mr. Shaffer and
24  Mr. Carmichael were the individuals having direct
25  contact with Mr. Beaudin; is that correct?

Page 105

1      A.  They definitely would have had contact with
2  Mr. Beaudin.  I don't know if they were the only people
3  that had contact with Mr. Beaudin.
4      Q.  Okay.
5      A.  It says here that he wanted to interview Tim's
6  peers, so...
7      Q.  As part of the assessment process; is that
8  correct?
9      A.  Correct, uh-huh.
10          (Plaintiff's Exhibit 10 is marked for
11          identification.)
12  BY MR. SABA:
13      Q.  Ms. Williams, you've been handed what's been
14  marked as Exhibit Number 10.  Can you identify that for
15  me, please.
16      A.  It is an email from Bob Shaffer to it looks
17  like the human capital and compensation committee
18  members dated July 17, 2020.
19      Q.  Have you seen Exhibit 10 before?
20      A.  I received it as an email.
21      Q.  And you'd agree with me that Exhibit 10 is
22  Bates stamped Fifth Third McHugh 001457 through Fifth
23  Third McHugh 001463; is that correct?
24      A.  That is correct.
25      Q.  And within that email, Bob Shaffer indicates

Page 106

1  that "Greg, Guy, and I have worked to develop the
2  attached CEO profile, which Guy will utilize as one
3  component to assess Tim's capabilities."
4      Do you see that?
5      A.  I do.
6      Q.  He goes on to say, "I would appreciate your
7  review of the attached and confirmation back to me that
8  you are either okay with the profile or have any changes
9  to the components of it so I can give Guy the go-ahead
10  to continue his assessment work."
11      Do you see that as well?
12      A.  I do.
13      Q.  It says, "Please respond to me by July 24th";
14  is that correct?
15      A.  That is correct.
16      Q.  Did you review the attached profile?
17      A.  I would have reviewed it.
18      Q.  And did you respond back to Bob Shaffer?
19      A.  I do not recall.
20      Q.  How would you have communicated your response
21  back to him?
22      A.  Either a phone call or an email.
23      Q.  And do you recall whether or not you were okay
24  with the profile or had any changes?
25      A.  I do not recall.  It looks fairly similar to

Page 107

1  the profile we developed in 2015, so -- but I don't
2  recall.
3      Q.  Do you recall if any other members of the
4  human capital compensation committee had any changes to
5  the CEO profile?
6      A.  I would not know that.
7          (Plaintiff's Exhibit 11 is marked for
8          identification.)
9  BY MR. SABA:
10      Q.  Can you identify Exhibit Number 11 for me,
11  please?
12      A.  It is an email from Bob Shaffer to Guy Beaudin
13  dated July 23, 2020.
14      Q.  Have you seen Exhibit Number 11 before?
15      A.  I don't believe so.
16      Q.  And just to be clear, Exhibit Number 11 is
17  Bates stamped Fifth Third McHugh to 001071 through Fifth
18  Third McHugh 001032; is that correct?
19      A.  That is correct.
20      Q.  Actually, let me clarify that just to make
21  sure we're clear on the Bates stamp pages.  Exhibit
22  Number 11 includes Fifth Third McHugh 001071 through
23  Fifth Third McHugh 001073, and then includes the
24  attached July draft of the CEO profile Bates stamped
25  Fifth Third McHugh 001013 through Fifth Third McHugh

Deposition of Marsha Conrad Williams

Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 108

1  001032.

2    A.  I see the last digit.  Yes, that is correct.

3    Q.  Is that correct?

4    A.  Yes, that is correct.

5    Q.  In the email that Mr. Shaffer sends to

6  Mr. Beaudin, he indicates, "Hope all is well.  I have

7  reviewed the updated profile with Greg and with the

8  Human Capital & Compensation Committee members.  Only

9  one very minor tweak.  We can consider it finalized."

10      Do you see where it says that?

11    A.  Yes.

12    Q.  Is it fair to say that if you had any

13  recommended changes at all to the prior version sent to

14  you, it was a minor tweak as described by Mr. Shaffer;

15  is that correct?

16    A.  Yes.

17      (Plaintiff's Exhibit 12 is marked for

18      identification.)

19  BY MR. SABA:

20    Q.  Ms. Williams, you've been handed what's been

21  marked as Exhibit Number 12.  Can you identify that for

22  me, please.

23    A.  It is an email from Bob Shaffer to Greg

24  Carmichael dated August 18, 2020.

25    Q.  Have you ever seen this document before?

Page 109

1    A.  No.

2    Q.  In the email, Mr. Shaffer indicates to

3  Mr. Carmichael, "Follow-up items from this morning's

4  talent management update discussion."  In the second set

5  of bullet points, it says, "Talk to each board member

6  about the succession discussion and Saema."  And then

7  your name is listed first.

8      Do you recall any discussions with

9  Mr. Carmichael or Mr. Shaffer after this August 18th

10  email regarding succession discussion and Saema?

11      MR. THOMAS:  Saema.  She was a corporate

12    employee at the time.

13      MR. SABA:  I'm sorry.  It's pronounced Saema.

14      MR. THOMAS:  Saema.  Just so you have it right

15    on the record.

16      THE WITNESS:  I'm sorry.  Could you repeat the

17    question?

18  BY MR. SABA:

19    Q.  There's a reference here that they were going

20  to talk to each board member about the succession

21  discussion and Saema.

22    A.  So --

23    Q.  And my question to you is, did you have any

24  conversations with Mr. Shaffer or Mr. Carmichael about

25  succession discussions or Saema?

Page 110

1    A.  I may have spoken with Mr. Carmichael, I don't

2  recall specifically.  I don't believe I spoke with

3  Mr. Shaffer.  I may have.  I don't recall that at all,

4  but I may have spoken with Greg.

5    Q.  Exhibit 12 also includes an email from

6  Mr. Shaffer it looks like to himself on various notes

7  from Monday, August 17, 2020.  That was forwarded as

8  part of the August 18th email.  And on the second page

9  of this document, he has, "Greg, do you want to remind

10  Marsha of the upcoming succession discussion in

11  September?"

12      Do you recall any conversations you and

13  Mr. Carmichael had about that upcoming succession

14  discussion in September?

15    A.  I think Greg would have called me to remind

16  me.  I just -- but I don't recall.  I may have, I just

17  don't recall.

18      (Plaintiff's Exhibit 13 is marked for

19      identification.)

20  BY MR. SABA:

21    Q.  Ms. Williams, can you identify Exhibit Number

22  13 for me, please?

23    A.  It is a board summary regarding Tim Spence.

24  It was prepared by RHR.

25    Q.  Have you seen this document before?

Page 111

1    A.  Yes.

2    Q.  When did you see this document?

3    A.  I would have seen that at the September board

4  meeting.

5    Q.  And just to be clear, Exhibit Number 13 is

6  Bates stamped Fifth Third McHugh 001033 through Fifth

7  Third McHugh 001040; is that correct?

8    A.  That's correct.

9      (Plaintiff's Exhibit 14 is marked for

10      identification.)

11  BY MR. SABA:

12    Q.  Ms. Williams, you've been handed what's been

13  marked as Exhibit Number 14.  Can you identify that

14  document for me, please?

15    A.  It is Executive Assessment Development Report

16  for Tim Spence, presented by RHR dated July 31, 2020.

17    Q.  Have you ever seen Exhibit Number 14 before?

18    A.  I do not recall if I've seen it.

19    Q.  Just to be clear, Exhibit Number 14 is Bates

20  stamped Fifth Third McHugh 000954 through Fifth Third

21  McHugh 000976; is that correct?

22    A.  That is correct.

23    Q.  Ms. Williams, referring you back to Number 11.

24    A.  Number 11?  Number 11.

25    Q.  Do you have Exhibit 11 in front of you?

Deposition of Marsha Conrad Williams      Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 112

1   A. I do.

2   Q. If I could refer you to the fifth page of

3 Exhibit 11, which is actually Fifth Third McHugh 001015,

4 and it's essentially the second printed page of the CEO

5 profile; do you see that?

6   A. I see that, yes. I got a blank page in

7 between.

8   Q. If you can turn to the next one, please.

9   A. Yes.

10   Q. Are you on Fifth Third McHugh 001015?

11   A. Yes.

12   Q. This page identifies essential leadership

13 behaviors; is that correct?

14   A. Yes.

15   Q. With respect to the first category,

16 Establishing Strategic Direction, do you have any

17 objective information or data indicating that as of

18 September 22, 2020, Tim Spence was superior to or better

19 than Phil McHugh with respect to establishing strategic

20 direction?

21   A. Yes. We hired him in 2010 to do our strategic

22 plan and hired him in 2015 to -- excuse me, 2011 and

23 2013 to do the strategic plan because we had no one

24 internally that was capable, in our view, in

25 management's view, in the board's view, of doing that

Page 113

1 plan. We then hired him in 2015 to run the strategy

2 group because we felt, based on his extensive experience

3 at Oliver Wyman, with working across various

4 companies -- excuse me, various banks and various

5 countries and various transactions, that he was a very

6 strong strategic -- very strong at setting and executing

7 on a strategic direction.

8   Q. And with respect to Phil McHugh, what is your

9 basis of saying he lacked the ability to establish

10 strategic direction at an equivalent level?

11   A. He did not have the depth of experience with

12 other banks in terms of understanding what was going on,

13 particularly with Fintechs, and he did not have, in our

14 view, as global a view of the banking industry or as

15 much experience in dealing with -- or he did not

16 evidence to the board any experience with dealing with a

17 significant number of other bankers in the industry.

18      And it looks, from what I can see from RHR's

19 assessment of Tim, they ranked Tim as absolutely top

20 ranking in terms of being able to establish strategic

21 direction. And I think the board would agree with that.

22 Tim was superb at strategy. That's what he did at

23 Oliver Wyman for nine years, including helping Fifth

24 Third starting in 2010, 2011. If we had had that talent

25 internally in Mr. McHugh, we would not have needed to

Page 114

1 hire Tim Spence.

2   Q. Historically, how often has the bank hired

3 outside consultants for various issues?

4   A. The bank hires out consultants for all sorts

5 of issues.

6   Q. Including strategy?

7   A. Including strategy when we didn't have those

8 skills inside. But once we had those skills inside, we

9 decided to simply buy the skills, which is why we hired

10 Mr. Spence, because we could keep -- we could continue

11 to pay Oliver Wyman or we could bring that skill set

12 inside with the hopes or -- not the hopes, that's the

13 wrong word -- with the expectation that he would help us

14 set a strong strategic direction over the next -- or the

15 coming few years.

16   Q. Is the hiring of Oliver Wyman the only time

17 that Fifth Third Bank has ever hired a consultant with

18 respect to strategic issues?

19   A. I don't know that. The bank's been around

20 since 1858. I can't answer that.

21   Q. Within the time frame that you've been here,

22 is Oliver Wyman the only outside consultant that Fifth

23 Third Bank has hired with respect to strategic issues?

24   A. I don't specifically know that. I believe

25 they are the only bank we hired to draft our strategic

Page 115

1 plan, but there may have been other consulting firms

2 that were hired for other strategic issues that I'm just

3 not familiar with. For example, I can think of one

4 example. We certainly hire outside IT consultants to

5 help us with our IT infrastructure strategy, which I

6 think of as strategic to the future of the bank, but --

7 you know, so there may be other situations, but

8 certainly in the context of developing a strategic plan

9 to present to the board, Oliver Wyman is the only firm

10 I'm familiar with or that I can recall.

11   Q. Referring you back to page Fifth Third McHugh

12 001015, under Establishing Strategic Direction, the

13 first bullet point indicates, "The CEO must possess the

14 vision to outline a balanced strategy of organic growth,

15 acquisitions, and optimization, rooted in deep knowledge

16 of the banking industry"; do you see that?

17   A. I see that.

18   Q. Is it your opinion that Mr. Spence possessed a

19 deeper or superior knowledge of the banking industry

20 than Mr. McHugh?

21   A. Yes. Absolutely. It's not only my opinion

22 but the opinion of the full board.

23   Q. And what is that based upon?

24   A. That is based upon his many years as an

25 external consultant visiting with and working with the

Deposition of Marsha Conrad Williams                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 116

1 CEOs of many, many major banks around the country and
2 around the world, which gave him an in-depth knowledge
3 of the banking industry. He also had quite a deep
4 knowledge of the Fintech industry and the inroads that
5 Fintechs were making into the traditional banking
6 industry. And we could -- we can feel the impact of
7 Fintechs on our business, and it was critical for the
8 bank to have someone inside who was really conversant
9 with the developments going on in Fintech and again,
10 given Tim Spence's background, he had that knowledge.
11     Q. What was your understanding of the depth of
12 Mr. McHugh's knowledge of the banking industry?
13     A. Mr. McHugh understands the roles or the
14 businesses that he ran, but that is a subset of the
15 knowledge that's needed to run and lead a bank as large
16 and complex as Fifth Third. The board did not believe
17 he had the skills to be able to effectively lead Fifth
18 Third going forward.
19     Q. And as of September 21, 2020, what was your
20 understanding of the businesses that Phil McHugh had
21 run?
22     A. He had run a wealth. He had run business
23 banking. And I believe consumer.
24     Q. Anything else?
25     A. I don't recall.

Page 117

1     Q. As of September 2020, how long had Mr. Spence
2 been working in or with the banking industry?
3     A. Let's see. He'd been at Oliver Wyman for nine
4 years and he joined us in 2015. So that would mean he
5 joined Oliver Wyman in 2006 and he had some experience
6 with tech companies before that, but I do not know if it
7 was in financial services or not.
8     Q. So how many years would that have been?
9     A. Let's see. 2006 to -- what was your end date?
10 I apologize.
11     Q. 2020, September.
12     A. 2020. So 14 years.
13     Q. And how many years had Mr. McHugh worked in
14 the banking industry as of September 2020?
15     A. I don't know exactly. Probably over 30. But
16 time and grade is not what we were looking for in a CEO
17 so -- or president. So what we were looking for was
18 strategic vision, leadership, the understanding of the
19 Fintech industry, experience -- broad experience with
20 Wall Street, with regulators, with policy makers in
21 Washington, with digital banking, with strong
22 communication skills. So as I said, time and grade was
23 not a deciding factor.
24     Q. Explain to me about Mr. Spence's broad
25 experience with regulators.

Page 118

1     A. Well, I probably should say the regulatory
2 framework because I know that he did meet in Washington
3 with -- when he was at Oliver Wyman, with regulatory
4 agencies to understand the future of bank regulation,
5 and then when he came to Fifth Third, he would have had
6 experience working with regulators.
7     Q. What was that experience?
8     A. Just I think the normal experience that any
9 banker has is the regulators come in and ask you
10 questions about your businesses.
11     Q. And what was his experience with policy makers
12 in Washington?
13     A. My understanding is when he was a consultant,
14 he met with policy makers in Washington to understand
15 the way the policy makers were thinking about financial
16 regulation.
17     Q. Which policy makers did he meet with?
18     A. I do not know.
19     Q. When did he meet with these policy makers?
20     A. I do not know. He worked for Oliver Wyman at
21 the time, not Fifth Third.
22     Q. How was it communicated to you that he met
23 with policy makers?
24     A. Well, when we first interviewed Tim, he walked
25 through some of his experience and he was very, very

Page 119

1 well regarded at Oliver Wyman. As I said, when I met
2 with the CEO of MB Financial, he also spoke in depth
3 about -- he spoke to us, to me in particular, about
4 Tim's background and his skills and his contacts within
5 the banking industry, which included, you know,
6 regulatory people in Washington.
7     Q. Were you ever provided with a list of the
8 policy makers that Mr. Spence met with and the dates
9 that he met with them?
10     A. No, I was not.
11         MR. CIOFFI: Counsel, we've been going a
12 little more than an hour.
13         MR. SABA: We can take a break if you want to
14 take one.
15         MR. CIOFFI: Do you want to --
16         MR. SABA: That's fine.
17         MR. CIOFFI: But how much time do you need?
18         THE VIDEOGRAPHER: The time is 2:09 p.m.
19 We're going off the record.
20         (A recess was taken from 2:10 p.m. to
21 2:29 p.m.)
22         THE VIDEOGRAPHER: The time is 2:28 p.m. We
23 are back on the record.
24 BY MR. SABA:
25     Q. Ms. Williams, referring to the second

Deposition of Marsha Conrad Williams          Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 120

1 Essential Leadership Behaviors, Driving Execution, do
2 you have any objective information or data indicating
3 that as of September 22, 2020, Tim Spence was superior
4 to or better than Phil McHugh with respect to driving
5 execution?
6       MR. CIOFFI: Counsel, what document are you
7 looking? What exhibit?
8       MR. SABA: We are on Exhibit 11, Fifth Third
9 McHugh 001015.
10       THE WITNESS: Could you repeat the question,
11 please?
12       MR. SABA: Sure.
13 BY MR. SABA:
14    Q. Do you have the page?
15    **A. I do.**
16    Q. Referring to the second Essential Leadership
17 Behaviors Driving Execution, do you have any objective
18 information or data indicating that as of September 22,
19 2020, Tim Spence was superior to or better than Phil
20 McHugh with respect to driving execution?
21    **A. Yes. I would say that he very successfully**
22 **initiated and pleaded in -- with obviously the help of a**
23 **larger team -- the MB Financial transaction, which has**
24 **proven very beneficial. It's a very large transaction**
25 **and the size of that transaction necessarily made it**

Page 121

1 more complex. So that is one item.
2       **He also completed several Fintech, smaller**
3 **Fintech acquisitions, and so I would say that in terms**
4 **of driving execution, he achieved some major milestones,**
5 **more significant in the opinion of the board than any of**
6 **the projects that Phil McHugh was working on.**
7    Q. And when you say that, which -- which projects
8 that Phil McHugh was working on were less significant
9 than Mr. Spence's?
10    **A. Well, the small acquisitions that you**
11 **referenced earlier. They were acquisitions, but they**
12 **were minor compared to the size of the MB acquisition.**
13    Q. What other acquisitions was Mr. McHugh
14 involved in other than the two I referenced?
15    **A. I'm not completely familiar.**
16    Q. Do you know what Mr. McHugh's role was with
17 respect to the MB Financial transaction?
18    **A. I'm certain he was involved, but I don't**
19 **recall.**
20    Q. You don't know how significant his role was?
21    **A. No. I know that he did not initiate it. That**
22 **was initiated by Tim Spence, and the reason we were**
23 **chosen by the MB team, in addition to having a good**
24 **financial offer, was that they believed that Tim --**
25 **Tim's involvement, they wanted to join a bank that had**

Page 122

1 **Tim as the strategy officer because they believed so**
2 **strongly in his strategic skills and believed so**
3 **strongly that if he had aligned himself with Fifth Third**
4 **Bank, it must be a strong bank that they themselves**
5 **would like to be aligned with, and that has proven to be**
6 **the case.**
7    Q. Looking at the bullet points under Driving
8 Execution, it does not talk about mergers and
9 acquisitions, it talks about "Maintaining Fifth Third
10 Bank's regulatory standing requires management of the
11 core business to be conducted within a disciplined
12 framework."
13       Do you see that?
14    **A. I do, yes.**
15    Q. What objective evidence do you have that
16 Mr. Spence was better at managing the core business to
17 be conducted within a disciplined framework than
18 Mr. McHugh?
19    **A. I don't know what objective evidence I can**
20 **point to other than the fact that the board believed**
21 **that Mr. Spence's judgment was quite excellent. I'm not**
22 **quite sure what objective evidence you're looking for.**
23 **I don't have a good answer for that.**
24    Q. In the third bullet point of driving execution
25 it says, "Given the likelihood of a protracted economic

Page 123

1 recovery, the CEO will need to be particularly adept at
2 optimizing the bank's success through the economic
3 cycle, effectively balancing quarterly results while
4 maintaining focus and investment in Fifth Third Bank's
5 longer-term success."
6       What evidence do you have that historically
7 Mr. Spence was better at balancing quarterly results
8 while maintaining focus and investment in Fifth Third
9 Bank's longer-term success than Phil McHugh?
10    **A. He was more strategic. He was driving a**
11 **long-term success. He had visions for different**
12 **Fintechs we could purchase, some of which we have**
13 **purchased, that have been very successful. So he was**
14 **very focused on the future. In fact, even the report**
15 **you provided said, you know, he thinks -- I'm trying to**
16 **think. There was a particular comment in here by his**
17 **peers saying he is "a forward-thinking, open to new**
18 **ideas, outside the box, creative idea generator who**
19 **capably puts structure into those ideas and has the**
20 **potential to be a visionary."**
21       **So when you talk about longer-term success,**
22 **Tim was deemed by RHR and the board, the entire board,**
23 **to be a visionary, and we never saw that skill in Phil**
24 **McHugh.**
25    Q. What does that report say about Mr. McHugh?

Deposition of Marsha Conrad Williams                         Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 124

1   A.  This report only covers Mr. Spence.

2   Q.  So it says nothing about Mr. McHugh?

3   A.  That's correct.

4   Q.  Okay.

5   A.  And the reason it doesn't is that we had had

6 multiple years to witness Mr. McHugh in his various

7 positions and didn't feel that he would have the

8 necessary skills to be the president of Fifth Third, so

9 we saw no need to have an RHR assessment because the

10 board would not have selected him.  The board's paid for

11 their business judgment.  We've got 500 years, 400 years

12 of business judgment on the board, witnessing people,

13 observing people, judging people -- judging is the wrong

14 word -- evaluating people.

15       And in the assessment of the board, Phil did

16 not have the capabilities to be the CEO, which is why we

17 did not have him do the -- an RHR assessment.  Tim did

18 have the capability, in our view, to be the next CEO, so

19 we had the RHR assessment done and it validated many of

20 our beliefs.

21   Q.  Going back to the third bullet point, with

22 respect to historically balancing quarterly results, did

23 you ever compare Mr. McHugh's quarterly results to

24 Mr. Spence's quarterly results to see who more

25 effectively balanced those?

Page 125

1   A.  No, we did not.

2   Q.  So you have no idea who was more effective at

3 balancing their quarterly results?

4       MR. CIOFFI:  Objection.  Mischaracterizes her

5   testimony as argumentative.  You may answer.

6       THE WITNESS:  You know, quarterly results are

7   good, we are really looking for a long-term leader.

8   So Phil's may have been fine, I don't know the

9   answer to that.  Tim's may have been fine, I don't

10   know the answer to that.  We were not necessarily

11   looking at quarterly results.  We wanted a leader

12   for the future.  And clearly, we believed Tim was

13   by far and away the best leader for the future of

14   the company.

15 BY MR. SABA:

16   Q.  The next characteristic is -- listed is

17 Leading Teams.  What objective information or data do

18 you -- excuse me, strike that.

19       Do you have any objective information or data

20 indicating that as of September 22, 2020, Tim Spence was

21 superior to or better than Phil McHugh with respect to

22 leading teams?

23   A.  I can tell you that Tim recruited some

24 extraordinary outside talent that I doubt that we would

25 have had without Tim's leadership and his ability to go

Page 126

1 out and get that talent.  And I didn't -- the board

2 didn't see the same talent development under Mr. McHugh.

3 So Tim's team, particularly when you think about the new

4 head of strategy, Ben Hoffman, and the head of -- at one

5 point the head of digital, Melissa Stevens, this was

6 extraordinary talent that came to Fifth Third as a

7 result of Tim's leadership.

8       So, you know, they brought -- again, they

9 brought skills to the bank that we didn't have before,

10 and so, you know, we determined that he had the ability

11 to lead teams.

12   Q.  You mentioned Ben Hoffman and Melissa Stevens

13 are the talent that Tim Spence brought in, correct?

14   A.  Among the talent.

15   Q.  Can you identify any others?

16   A.  I know -- well, we have recently made in the

17 last few years a couple of acquisitions.  Provide is one

18 and there's another one whose name I just blanked on,

19 but they also brought talent into the -- into the

20 overall organization that may eventually some day evolve

21 into talent within the bank.  Right now they're sitting

22 in their Fintechs running those, but there may be talent

23 that we bring from there into the bank.  So it's a

24 different brand of talent, but it's in the sense that

25 these are oftentimes Fintech talent that we did not

Page 127

1 develop internally but, that will help us, we believe,

2 the board believes, moving forward.

3   Q.  When did Ben Hoffman come in?

4   A.  I don't recall exactly.

5   Q.  What about Melissa Stevens?

6   A.  I don't recall exactly, but I know that Tim

7 hired them both.

8   Q.  And when did the Provide situation occur?

9   A.  I think it was '21 or maybe '22.  I think it

10 was '22.

11   Q.  So it would have been after this point in

12 time?

13   A.  That's correct.

14   Q.  And what talent did Mr. McHugh bring in?

15   A.  I don't know the answer to that.

16   Q.  Did you ever look into it?

17   A.  If he had brought in talent, he presumably

18 would have introduced them to the board, but I just

19 don't recall who it might have been.

20   Q.  The next category is Cultivating Networks.  Do

21 you have any objective information or data indicating

22 that as of September 22, 2020, Tim Spence was superior

23 to or better than Phil McHugh with respect to

24 cultivating networks?

25   A.  Well, it talks about the relationship with the

Deposition of Marsha Conrad Williams                                              Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 128

1 regulators and the need for the CEO to maintain and
2 consolidate that, and I believe Tim has the ability to
3 do that. It talks about the bank's relationship with
4 its communities, and I know that Tim has been involved
5 in the Cincinnati community and talks about M&A
6 opportunities. And I was positive that Tim's extensive
7 network among other bank presidents and CEOs, as well as
8 in the financial community were much more significant
9 and broader and deeper than Phil McHugh's networks
10 within those specific communities, specifically the
11 investment banking community, the community of peers,
12 CEOs, and some of the legislative community. It was
13 just Tim objectively had much broader networks of
14 outside contacts in areas that the bank wanted more --
15 more exposure to. The Fintech community, the
16 external -- the peer bank community. And the peer bank
17 community, I think, again, is the reason that we were
18 able to get the MB transaction. So yes, there is
19 objective evidence that Tim's networks were broader and
20 deeper than Phil McHugh's, was the view of the board.
21     Q.   And what were you aware of with respect to
22 Phil McHugh's networks in the community?
23     A.   He had some -- I think in the talent review it
24 indicated he had some involvement with some
25 not-for-profits here in Cincinnati.

Page 129

1     Q.   And you were aware that with respect to Tim
2 Spence, involvement in the community was not a strength
3 for him, in fact, it was a focus area he needed to work
4 on, correct?
5     A.   Everybody has focus areas they need to work
6 on, so that wouldn't necessarily, you know, the fact
7 that he had something to work on is fine. Everybody has
8 that. But his networks outside of Cincinnati were
9 extensive, and those networks were particularly
10 important to us.
11     Q.   And which networks were those specifically?
12        MR. CIOFFI:  Objection.  Asked and answered.
13 Beginning this morning, but --
14        THE WITNESS:  The networks of peer bank --
15 peer bank CEOs, other bank CEOs, other consultants,
16 other, you know, his contact list.  He brought a
17 very strong, as I said earlier today, a very strong
18 Rolodex of contacts to Fifth Third, many of which I
19 don't know that we had those contacts internally
20 which is why we hired Tim.  We wanted to increase
21 our focus on strategy and strategic direction, and
22 Tim had the contacts within the banking community
23 and the Fintech community through his work at
24 Oliver Wyman to help the banks -- the bank have a
25 broader network of contacts within the industry.

Page 130

1 BY MR. SABA:
2     Q.   The strong Rolodex, the list of contacts
3 you're referring to, have you ever seen this list of
4 contacts?
5     A.   I have not seen a list per se, but when he has
6 referred to people with whom he has spoken about various
7 and sundry topics, it's clear to me as well as the rest
8 of the board that he has a very strong network of
9 contacts throughout the financial industry and
10 throughout the Fintech industry, with the venture
11 capital industry, you know, a lot of contacts that
12 Mr. McHugh simply didn't have.
13     Q.   Have you done anything to validate the list of
14 contacts in Mr. Spence's Rolodex?
15     A.   I have not audited his list of contacts.  That
16 said, again, he spent nine years in consulting, had a
17 very prominent role at Oliver Wyman, he's a partner,
18 which is a -- which is the -- probably the premier bank
19 consulting group in the country.  He spent nine years
20 traveling the country and the world working with banks.
21 So I have no doubt that his list of contacts is
22 extensive.
23     Q.   But you've done nothing to validate it
24 yourself?
25     A.   The mere fact that he was made a partner of

Page 131

1 Oliver Wyman was sufficient validation in my view.  They
2 would not have made him a partner if he didn't have that
3 type of network.
4     Q.   That's your assumption?
5        MR. CIOFFI:  Objection.  That's her answer.
6 Counsel, you're drifting in to argumentation, both
7 in terms of the tone of your voice and nature of
8 your questions.
9        MR. SABA:  Go ahead.  You can answer.
10        MR. CIOFFI:  You're entitled to an answer, but
11 not the answer you want.
12        MR. SABA:  Go ahead.
13        THE WITNESS:  Could you repeat your question?
14        MR. SABA:  Yeah.
15 BY MR. SABA:
16     Q.   I'm saying that's your assumption, that they
17 made him a partner at Oliver Wyman because of his
18 contacts?
19     A.   Well, I can't think of any other reason they
20 would make him partner if he didn't -- if he hadn't
21 developed contacts and was bringing in business.  That's
22 how you get to be a partner in consulting businesses, is
23 my opinion, and he did -- you know, he was able to open
24 doors, certainly.
25        Again, I'll go back to MB Financial.  He was

Case: 1:21-cv-00238-MRB Doc #: 66-1 Filed: 08/02/24 Page: 37 of 79 PAGEID #: 2660

Deposition of Marsha Conrad Williams        Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 132

1 able to open doors there, and there were other M&A
2 transactions that we looked at and ultimately did not
3 pursue where it was clear to us that he was on a
4 first-name basis with some other CEOs in the banking
5 industry. So he has extensive contacts, I am quite
6 confident of that.
7     Q. What have you done to examine Mr. McHugh's
8 contacts?
9     A. When I look at Mr. McHugh's background, it was
10 clear to me that he was focused primarily, through most
11 of his career, in the Cincinnati and Kentucky areas, and
12 he has never evidenced any knowledge of having extensive
13 contacts with any other bank CEOs or the external
14 financial community such as investment bankers or
15 investment analysts. I've never heard him comment about
16 that or talk about that or frankly even mention it.
17     Q. Have you ever asked him about it?
18     A. No, but he has also never offered any
19 information to that -- to that. He has never referenced
20 any of his own capabilities in that area.
21     Q. Did the board ever ask him about those
22 capabilities?
23     A. I think the board didn't necessarily see the
24 need to ask him about those capabilities because the
25 board never viewed him as a potential president --

Page 133

1 potential candidate to be the president or CEO of the
2 bank. They believed he had, you know, not the full
3 scope of -- not the full scope of characteristics we
4 were looking for. In our view and the view of the
5 board, he was not a strategic thinker. He was -- did
6 not have or did not evidence to the board any particular
7 knowledge of Fintech. Could not speak or did not speak
8 to the board about any views about the future of digital
9 banking or any of the forces that were impacting our --
10 and are continuing to impact the banking industry.
11     Q. Was Mr. McHugh ever asked to make a
12 presentation to the board regarding the future of
13 digital banking?
14     A. I don't know the answer to that.
15     Q. One of the final categories under the CEO
16 profile is Personal Attributes. Do you have any
17 objective information or data indicating that as of
18 September 22, 2020, Tim Spence was superior to or better
19 than Phil McHugh with respect to the personal attributes
20 needed to be a CEO of Fifth Third Bank?
21     A. Well, it says he "needs to be able to manage
22 the business with the soul and energy of an
23 entrepreneur," which we definitely saw in Phil McHugh
24 (sic). He's very energetic. He acts like an
25 entrepreneur. It is his -- in his DNA to think like an

Page 134

1 entrepreneur, based again on ten years of observing him.
2 We never saw the soul and energy of an entrepreneur in
3 Phil McHugh during any of his board presentations. He
4 came across as very, very cautious of answering
5 questions. He read his presentations to the board. He
6 did not speak to the board in a conversational tone. He
7 did not have the soul and energy of an entrepreneur in
8 any of the board presentations that we observed.
9     Q. Outside the board presentations, do you have
10 anything else to indicate anything with respect to
11 personal attributes that Mr. Spence was somehow superior
12 to or better than Mr. McHugh?
13     A. Well --
14       MR. CIOFFI: Are you referring to her to any
15    of the other bullets you want her to speak about
16    or --
17       MR. SABA: No, she referenced -- my question
18    stands. She referenced the board presentations and
19    the soul of an entrepreneur. I'm asking her
20    anything else other than the board presentations
21    that she saw.
22       THE WITNESS: During the board dinners or
23    during any of the conversations, he did not
24    evidence any particular energy and didn't really
25    talk about any adaptability to find new avenues of

Page 135

1 growth. It was kind of business as usual, you
2 know, blocking and tackling, which is fine. We
3 need that, obviously, but that's in order to be a
4 leader of a very, very large regional bank, you
5 need more than -- many more skills than blocking
6 and tackling, and you need to think about new
7 avenues of growth. Tim Spence thinks about new
8 avenues of growth all the time. We never saw in a
9 board presentation or in any board conversations
10 that we had with Phil of hard charging desire to
11 find new avenues of growth. I'm not saying they
12 weren't there, I'm just saying he never evidenced
13 that during his presentations to the board.
14 BY MR. SABA:
15     Q. The board dinners you keep referencing, just
16 to -- explain to me how that scenario typically takes
17 place. Are all the board members and members of
18 management at one table? Are you split into separate
19 tables? What is the typical setting for one of these
20 board dinners?
21     A. We are typically set -- there are -- there's
22 usually a cocktail hour. So -- in which you mingle
23 around and talk to people, and there are -- sometimes
24 the board members are separated into different tables.
25 Sometimes it's as many as four or six. Sometimes it's

Deposition of Marsha Conrad Williams                                          Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 136

as few as two. So there was no -- no regular -- no typical format. It usually depended on where the board dinner was taking place. So it could vary depending on, again, the size of the restaurant and the number of attendees.

Q. So you wouldn't necessarily be sitting at a table with all the members of the Enterprise committee?

A. Correct.

Q. At how many of the board dinners over the years have you sat at the same table with Phil McHugh?

A. I do not know. I did not keep a scorecard.

Q. I'm assuming not every time, correct?

A. Correct, not every time.

Q. And at how many of the dinners would you sit at the same table as Tim Spence?

A. Again, I did not keep a scorecard. It was not every time.

Q. You had mentioned before that Guy Beaudin was hired as a coach for Greg Carmichael after Greg Carmichael became CEO; is that correct?

A. That's correct.

Q. Is Guy Beaudin also serving as a coach for Tim Spence?

Page 137

A. I don't know the answer to that.

Q. Do you know how much Guy Beaudin was paid to serve as a coach for Greg Carmichael?

A. I do not know.

Q. Do you know how much RHR was paid to do their assessment of Tim Spence?

A. I do not know.

Q. Who would?

A. I may have known at the time but I have long since forgotten.

Q. Who would know that?

A. Probably Bob Shaffer and Mike McCallister might have known.

Q. I believe you testified earlier that you would keep notes in Diligent; is that correct?

A. Yes. At board meetings, correct. Not in executive session but during the board meetings.

Q. And are those notes still available on Diligent?

A. I do not know.

Q. Who would know?

A. I don't know.

Q. What's your understanding of the events leading up to Phil McHugh's departure from Fifth Third Bank?

Page 138

A. My understanding is that Phil McHugh was offered a different job that paid over $2 million a year. He decided not to accept that job because he didn't want to work for Tim Spence and he basically quit. He refused to accept his new job, which was, again, a very lucrative -- a very lucrative job that he chose to walk away from.

Q. Where did you gain the understanding of that information?

A. From the management of Fifth Third.

Q. What was the job that was offered to Phil McHugh?

A. I believe it was -- I believe it was wealth. It might have been consumer. I've forgotten which, but it was a substantial job, paid a lot of money.

Q. You're not sure what the duties were?

A. I just don't recall. It was either wealth or consumer. It was one of the two. I think it was wealth, but I'm not 100 percent positive. It might have been consumer.

Q. How much are you paid a year as a board member?

A. Oh, golly. I've actually forgotten. I should know. I just don't recall. It's in the proxy. I'm sorry. I don't recall the number.

Page 139

Q. Do you recall the additional amount you received to be lead director?

A. I think --

MR. CIOFFI: Objection. It's a public record. You're wasting time, counsel.

THE WITNESS: I don't recall. It was an increment over the base salary, but I just don't recall.

MR. SABA: We can go off the record? Let me see what additional questions I have.

THE VIDEOGRAPHER: The time is 2:59 p.m. We're going off the record.

(A recess was taken from 2:59 p.m. to 3:10 p.m.)

THE VIDEOGRAPHER: The time is 3:10 p.m. We are back on the record.

MR. SABA: That's all the questions we have at this time. Obviously there's pending discovery issues regarding additional documents we've requested. We'd hold the deposition open for that purpose to the extent of new information revealed by those documents.

MR. CIOFFI: We understand you're attempting to reserve rights. We don't agree that you have any, but the court will determine that at some

Deposition of Marsha Conrad Williams                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 140

1    point in time.
2                    EXAMINATION
3    BY MR. CIOFFI:
4        Q.  Ms. Williams, I have a few questions for you.
5        A.  Okay.
6        Q.  You testified earlier that you joined the
7    board in approximately 2006; is that correct?
8        A.  December -- I was elected either December 2008
9    or January of 2009.
10       Q.  From the time you joined the board until
11   September of 2020, approximately how many opportunities
12   did you have to discuss issues confronting the banking
13   industry with both Tim Spence and Phil McHugh?
14           MR. SABA:  Objection.  Go ahead.  You can
15   answer.
16           THE WITNESS:  Well, in the case of Phil
17   McHugh, I believe he attended very nearly every
18   board meeting and dinner.  So from 2009 to 2020
19   would be 11 years.  We had six -- five to six to
20   seven board meetings a year, so let's say -- let's
21   say six.  And then six board dinners.  So that's
22   12.  Six board meetings, each were two days or one
23   day, six, 12, so 12 times 11 years so, what, 120 --
24   let's say 100.  100 interactions with Phil McHugh
25   over a roughly 11-year period.

Page 141

1    BY MR. CIOFFI:
2        Q.  Did you have the same number of interactions
3    more or less with Tim Spence?
4        A.  I would say starting with his presentation at
5    the board in 2010, I would say we had a lot of
6    interactions with Tim.  Whether it was as many as with
7    Phil, hard to say, but he did present his strategy to
8    the board.  Those were a little bit longer.  So probably
9    about the same, maybe a tiny bit fewer.
10       Q.  These interactions -- and I think you
11   described them as board meetings, board lunches, board
12   dinners -- during those interactions, what kinds of
13   topics were discussed?
14       A.  The results of the businesses were discussed.
15   The -- we usually had an update on the legal situation
16   of the bank.  We had an update on the regulatory
17   situation of the bank.  We had an update on mergers and
18   acquisitions and potential investments we were making.
19   We had an update on investor relations.  We had an
20   update on basically how the business was doing in each
21   of the major business lines.
22       Q.  During these interactions, did Tim Spence have
23   an opportunity to articulate or otherwise demonstrate
24   his knowledge and experience with respect to the
25   regulatory environment impacting the banking industry?

Page 142

1        A.  Yes.  He could talk quite effectively about
2    financial regulations, some of which was pending and
3    some of which had just gone into effect.  He was
4    knowledgeable about bank regulation, extremely
5    knowledgeable about bank regulation and extremely
6    articulate about not only what the regulations were that
7    were -- had been passed, but also regulations that were
8    under consideration and the impact that those may have
9    on the bank.  And he could also talk about Fintech and
10   the impact that Fintech was having on basically eating
11   into the market share of traditional banks.
12       Q.  You've used that term several times today,
13   Fintech.  What do you mean by that?
14       A.  I mean financial companies outside of the
15   traditional banking companies who are developing tech
16   companies outside the traditional banking industry that
17   are developing tools and processes and applications for
18   consumers to use to basically circumvent the financial
19   industry.  So I would say something like Venmo or Glint,
20   or some of those -- some of those tools that have
21   recently come into the financial world.
22       Q.  In these interactions over ten years, did --
23   similarly did Phil McHugh have an opportunity to
24   articulate and otherwise demonstrate his experience or
25   knowledge about the regulatory environment impacting the

Page 143

1    banking industry?
2            MR. SABA:  Objection.  Go ahead.  You can
3    answer.
4            THE WITNESS:  Phil McHugh had many
5    opportunities to present to the board.  I did not
6    hear from Phil McHugh any particular knowledge or
7    comments about regulatory or Fintech issues.  His
8    reports to the board, as I said earlier in the day,
9    he tended to read his reports to the board and
10   never really engaged in an in-depth conversation
11   with the board about any of those issues that I can
12   recall.
13   BY MR. CIOFFI:
14       Q.  Based on his interactions, did you come to a
15   conclusion -- in the exercise of your independent
16   business judgment -- as to Tim's knowledge and
17   experience with respect to regulatory environment
18   affecting the banking industry and Fintech?
19       A.  Yes.
20           MR. SABA:  Objection.  Go ahead, you can
21   answer.
22           THE WITNESS:  Yes.  I believe Tim had an
23   extraordinary grasp of the future of banking
24   through his consulting days, but as well as through
25   his ongoing education and contacts with various

Page 144

people in the financial world. And he certainly
has kept up with the Fintech landscape and is
actively -- pursues and can speak to various
Fintech players who are out there and who may
ultimately be disrupters -- further disrupters to
the banking industry.

BY MR. CIOFFI:

Q. How would you compare, through these
interactions that you observed, Tim Spence's knowledge
of the regulatory environment and also the competitive
threat from Fintech businesses to Phil McHugh's
knowledge in those areas?

A. Well, as someone in the RHR document
commented, Tim really is a visionary. He understands
the financial world. He understands the banking world.
He understands what the trends are that are coming. He
is very well-read. He reads a lot of journals and
periodicals and keeps up-to-date with what's really
cutting edge financial issues and financial companies
and tools. There has never been any time I've ever
asked him a question about a particular product or a
particular -- a particular tool that I may have read
about in the newspaper or read about somewhere, Tim
always had, to my mind, a very in-depth and detailed
understanding of the product and issue.

Page 145

Q. And how would you compare that knowledge
demonstrated and articulated by Tim Spence to Phil
McHugh's?

MR. SABA: Objection. Go ahead. You can
answer.

THE WITNESS: As I said earlier, I always had
the impression that Phil McHugh was a little
guarded in his conversations with the board. He
would answer a question very narrowly. He would
read his board presentations to the board, and so
his performance led me to believe that he did not
have nearly the breadth of knowledge about a number
of areas that are critical to the future of the
bank. He just -- he didn't display that knowledge.

BY MR. CIOFFI:

Q. Did you discuss your observations in that
regard with the other board members?

A. Yes. And I believe the other board members
felt the same way. I believe to a person all of the
board members felt that when we selected Tim to be the
next president, that he was by far the superior
candidate to Phil McHugh, which is why we felt we had
such a good candidate, we did not -- did not see the
need to have Phil assessed by RHR because he was never
really -- he was never a candidate to be the next

Page 146

president. Tim was far superior in all of the key
areas, in knowledge of the banking industry, in contacts
in the banking industry, in communication skills, we
thought he was far superior, and in digital banking,
there was absolutely no comparison in their skill sets,
and those are the skills that we think are really
critical to leading the bank forward. He also had
strong leadership skills and those are critical as well.

Q. Same question, what conclusions were you able
to draw, if any, through these interactions with both
Tim Spence and Phil McHugh about their knowledge of the
competitive landscape affecting the banking industry?

MR. SABA: Objection. Go ahead, you can
answer.

THE WITNESS: I -- to -- I believe all of the
board members would say there was no comparison in
the knowledge base, the competitive landscape of
the banking industry. Tim spends his knowledge
based on his many years at Oliver Wyman and the
fact that he was a partner at Oliver Wyman gave him
an in-depth understanding and knowledge of the
competitive landscape and, in particular, he had a
good knowledge of the CEOs in the industry, what
many of those CEOs were thinking, how they were --
what plans they were making for the future of the

Page 147

bank. He was on a first-name basis with, you know,
I believe more than one major bank -- major bank
CEO, and that knowledge was -- that knowledge and
those contacts and that network were invaluable.

As I said, he is the -- he is one of the
primary reasons that the MB Financial team chose
Fifth Third as the bank they would want to join,
the bank they wanted to join, the bank they did
join. And that's been a very lucrative, successful
transaction for Fifth Third and its shareholders.

BY MR. CIOFFI:

Q. Same question with respect to your
observations about Tim Spence and Phil McHugh in these
interactions over a ten-plus year period with respect to
their knowledge of Wall Street and capital markets?

MR. SABA: Objection. Go ahead. You can
answer.

THE WITNESS: I never saw -- let me start
over.

Tim Spence had contacts on Wall Street in the
investment houses and was able to talk to those
contacts. He also had contacts within the banks,
in the investment banking areas, and so he has a
facility and a comfort with Wall Street, both on
the banking side and I believe on the analyst side

Deposition of Marsha Conrad Williams                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

---

Page 148

1  that I don't believe Phil had.  I never saw any
2  evidence that he had any contacts with Wall Street.
3  He may have.  He never demonstrated that to the
4  bank board -- to the board.
5  BY MR. CIOFFI:
6      Q.  Again, over this ten-year period and the
7  hundred-plus opportunities to observe both Tim Spence
8  and Phil McHugh with respect to mergers and
9  acquisitions, how would you compare their knowledge of
10  mergers and acquisitions as it impacted the banking
11  industry?
12      A.  Well, Tim --
13      MR. SABA:  Objection.  But you can answer.
14      THE WITNESS:  Tim had a remarkable ability to
15  articulate and describe the competitive landscape
16  in the banking industry and he did that during our
17  September board meetings.  And he could tell you
18  what the strengths and weaknesses were of all of
19  our key competitors, and he could walk through in
20  detail what he believed those competitors were
21  going to do, which competitors might be actionable
22  by us for future growth, actionable in the sense of
23  a potential merger candidate or acquisition
24  candidate, and he had -- the fascinating thing
25  about Tim Spence is he could do much of that

Page 149

1  without ever looking at a note.  He had that all in
2  his brain, and he was very, very knowledgeable and
3  very articulate and he could answer every question
4  about any bank's strategy or at least any question
5  that the board asked him, he had an answer at his
6  fingertips.  He was extremely articulate and
7  extremely well-spoken and extremely knowledgeable
8  about those particular topics and the bank
9  merger -- the bank competitive landscape and the
10  merger market.  We never saw any of that from Phil
11  McHugh.
12  BY MR. CIOFFI:
13      Q.  You mentioned in your testimony earlier in
14  response to one of Mr. Saba's questions about the lack
15  of specificity in a presentation by Phil McHugh in June
16  of 2020.  Do you remember that testimony?
17      A.  I do.
18      Q.  What did you observe with respect to the depth
19  and specificity of Phil McHugh's other presentations to
20  the board over this ten-year period?
21      A.  He was quite specific.  His --
22      Q.  I'm asking you Phil McHugh.
23      A.  Oh, Phil McHugh, I'm sorry.  I thought you
24  said Tim Spence.  I apologize.  I would say in general
25  most of his presentations were fairly high level and

Page 150

1  there were some details, but whenever we asked about the
2  details, I didn't believe that there was a very in-depth
3  answer.  So there were some details in his presentation.
4  Again, he tended to read the presentations to the board
5  which was -- the board didn't appreciate because the
6  board had already read them and nobody likes to be read
7  to, but when we asked questions about his presentations,
8  his answers seemed superficial and guarded.
9      Q.  What objectively did you take away from the
10  fact that Phil McHugh always read his presentations in
11  terms of his qualifications?
12      A.  Could you repeat the question?
13      Q.  Yeah.  What assessment did you make from the
14  fact that Tim -- or that Phil McHugh always read his
15  presentations with respect to the depth and extent of
16  the knowledge being conveyed?
17      A.  You know, I took away from that that his
18  knowledge was -- that he was guarded, that he was
19  somewhat superficial in how he presented information,
20  that he was afraid basically to answer the questions,
21  and I never understood that.  Very guarded, very -- very
22  guarded and superficial.
23      Q.  Mr. Saba asked you some questions about Phil
24  McHugh's involvement in the acquisition of wealth
25  management companies; do you recall that?

Page 151

1      A.  I recall that.
2      Q.  What was the size of these acquisitions in
3  relationship to the gross revenues of the bank?
4      A.  Extremely small.  I don't recall the exact
5  number, but very small.  I think some of the teams were
6  very small.  I don't know the exact numbers.
7      Q.  Less than some fraction of 1 percent?
8      A.  In terms of the revenues of the bank, yes, I
9  would believe that to be the case.
10      Q.  How would you compare that knowledge and
11  experience to Tim Spence's knowledge and experience with
12  mergers and acquisitions?
13      MR. SABA:  Objection.  Go ahead.  You can
14  answer.
15      THE WITNESS:  Tim had worked on a number of
16  acquisitions while he was at Oliver Wyman advising
17  Oliver -- advising his bank clients on potential
18  targets and then being involved in the execution
19  and the due diligence when those deals,
20  transactions were being -- transactions were being
21  negotiated and discussed.  So I believe Tim
22  Spence's knowledge of the M&A landscape was far
23  more extensive than Phil McHugh's knowledge.
24  BY MR. CIOFFI:
25      Q.  I'd like to direct your attention to

Deposition of Marsha Conrad Williams        Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 152

1 Exhibit Number 4. Would you look at the first page,
2 next page. Mr. Saba asked you some questions about this
3 as to who prepared this document. Do you recall those
4 questions?
5    **A. I recall some of them.**
6    Q. Do you recall your answer as who generated
7 this document?
8    **A. Someone in the HR department.**
9    Q. Did you just accept all the information on these
10 documents, similar documents that is marked as Exhibit 4
11 at face value?
12      MR. SABA: Objection. You can answer.
13      THE WITNESS: No. We receive documents, we
14      read them, we discuss them, and we as a board make
15      our own judgments about what we think about those
16      documents, and we don't simply always follow or --
17      we make our own judgments about them. This is a
18      group of anywhere from 12 to 15 executives, most
19      all are senior executives -- or we even have a
20      senator on the board -- who have years and years
21      and years of judgments evaluating people.
22      And so we take in the information. It's an
23      important source of information, but we don't -- we
24      make our own decisions in terms of how we assess
25      the information.

Page 153

1 BY MR. CIOFFI:
2    Q. In that respect, you testified earlier in the
3 day about the board's duty to exercise independent
4 business judgment. Do you remember that testimony?
5    **A. I do remember that. It's a very important**
6 **duty.**
7    Q. How did you apply and discharge that duty with
8 respect to information from management like Exhibit
9 Number 4?
10      MR. SABA: Objection. Go ahead. You can
11      answer.
12      THE WITNESS: Well, we read the information.
13      We evaluated the information in the documents and
14      compared in our own minds that information with our
15      own observations and with the discussions that we
16      had among ourselves as board members, and basically
17      reached our own judgments, but did use these
18      documents as helpful and sometimes interesting
19      background information.
20      Again, we had a number of board directors with
21      a lot of years of business experience, and we had a
22      lot of years and interactions with both Phil McHugh
23      and Tim Spence. And we had the ability to evaluate
24      and assess them in the context of choosing Greg
25      Carmichael's next successor, and we came to the

Page 154

1 reason to judgment and reasonable best judgment
2 that Tim Spence was by far and away the succession
3 candidate who was better than any other succession
4 candidate at the bank, and that is why he was
5 ultimately made president.
6 BY MR. CIOFFI:
7    Q. When the board came to that decision and
8 through its discussions about that decision, did anyone
9 on the board discuss age as a factor in that decision?
10    **A. No. Age was never a factor in any of our**
11 **conversations.**
12    Q. Did anyone on the board discriminate against
13 Mr. McHugh in any of its decision making concerning
14 succession and the appointment of Tim Spence as
15 president, did any board member discriminate against
16 Mr. McHugh on account of his age?
17      MR. SABA: Objection. Go ahead. You can
18      answer.
19      THE WITNESS: Absolutely not, no. There was
20      no discussion or concern about his age. He was
21      offered a very good job when -- that he chose to
22      turn down. So had we been concerned about his age,
23      there probably wouldn't have been an offer of a
24      very, very large job that paid a lot of money every
25      year.

Page 155

1 BY MR. CIOFFI:
2    Q. I want to direct your attention to Exhibit
3 Number 13, please. I know you described it a little bit
4 earlier, but, again, what is that document?
5    **A. Oh, this document is the summary that was**
6 **given to the board by RH -- prepared by RHR, their**
7 **summary of Tim Spence as a potential candidate for the**
8 **presidency of the bank.**
9    Q. Did you and the other board members discuss
10 this assessment?
11    **A. Yes, we did.**
12    Q. I want to direct your attention to the first
13 page inside the cover page, which is Bates stamped
14 001034; do you see that?
15    **A. I do.**
16    Q. And it's captioned Executive Summary; do you
17 see that?
18    **A. I do.**
19    Q. And it says in the first paragraph, "Tim
20 Spence demonstrates a strong fit to the leadership
21 characteristics desired in a chief effective officer at
22 Fifth Third Bank. He is a creative, forward-thinking
23 strategic thinker who balances objective data with his
24 subjective experience to derive innovative solutions to
25 business challenges."

Deposition of Marsha Conrad Williams                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 156

1    Do you see that language?
2    A.  I do.
3    Q.  Did you and your fellow independent board
4 members discuss those findings?
5    A.  We discussed the findings and we agreed with
6 the findings.  We believe that what -- the assessment
7 was an accurate and fair assessment of Tim Spence.
8    Q.  Was that decision on the part of the board
9 unanimous?
10    A.  It was unanimous, and it was developed over a
11 long period of time.  It was developed over all of the
12 interactions that we had with Tim Spence, and we
13 believed, as we watched him -- since we had been
14 watching him since 2010, he continued to grow in his
15 capabilities, and we strongly supported, as a full board
16 the -- his election to president because we felt he was
17 without a doubt the strongest internal candidate we had,
18 and the board to this day continues to feel quite
19 confident that we have chosen the right person to be the
20 president and chairman -- or excuse me, president and
21 CEO of Fifth Third.  We are very comfortable with our
22 choice.
23    Q.  The remainder of that first paragraph says,
24 "He demonstrates exceptional abilities in dealing with
25 complexity and ambiguity and a capacity to exercise the

Page 157

1 business levers most material to having an impact on the
2 bottom line.  He is thoughtful and thorough -- he is a
3 thoughtful and thorough decision maker who is
4 disciplined and structured in his approach to work.  He
5 holds himself to high standards of performance but also
6 knows when good enough is good enough."
7    Did you discuss those findings on the board?
8    A.  We did discuss those findings, and one of the
9 interesting things about Tim Spence, most valuable
10 things about Tim Spence, is that given his many years in
11 consulting for banks, he understood the operating levers
12 necessary to drive the performance of a bank, and
13 understood -- understands how a bank makes money, how a
14 bank can serve its customers best, how a bank -- what
15 the -- what a bank needs to do to survive in a fairly
16 rapidly changing legislative and technology-based
17 environment, which is what we're in the middle of right
18 now.  There's a lot of regulation.  Regulations are
19 changing, and there are a lot of financial technology
20 companies, Fintechs, who are anxious to eat into the
21 market share of banks.  And he understands all of that.
22    Q.  Was the board's assessment of Tim Smith -- Tim
23 Spence with respect to that part of the findings
24 unanimous?
25    A.  Absolutely.  The decision to appoint Tim was

Page 158

1 unanimous on the part of the board.  Not a single board
2 member ever called me or communicated in any way, shape,
3 or form that they thought a different individual should
4 be evaluated.  Tim by far and away was the strongest
5 candidate and to our mind still is the strongest
6 candidate we could have possibly chosen to lead Fifth
7 Third.
8    Q.  The remainder of this executive summary says
9 as follows:  "As a values-based leader, he cares deeply
10 about organizational culture and the well-being of its
11 employees.  He is admired for his ability to adjust his
12 leadership approach based on what is required by the
13 individual and the circumstance at hand.  He is a
14 compelling speaker who projects a passionate message to
15 his audience.  His diplomatic manner allows him to
16 challenge the ideas of others without creating
17 defensiveness or resistance, which facilitates his
18 ability to gain buy-in to his strategies and objectives.
19 He perseveres in the face of difficulties and has
20 effective strategies in place to manage the stresses and
21 strains inherent in an executive position.
22    "As a continuous learner, Tim pushes himself
23 to further hone his skills.  He is very insightful
24 regarding his strengths and weaknesses and remains open
25 to feedback and ongoing development."

Page 159

1    Did the board discuss those findings?
2    A.  We did discuss those findings.
3    Q.  And what did the board conclude?
4    A.  Well, the board concluded that that was an
5 accurate assessment of Tim Spence.  He is an enormously
6 compelling speaker, and as I said, when he -- when he
7 answers questions -- because he doesn't know what
8 questions are coming -- when he answers questions, he
9 offers very detailed and very specific answers to the
10 questions, which lead people to understand -- I believe,
11 in my case certainly and I think it's true of the other
12 board members -- that he really had an in-depth
13 knowledge of the topics about which he was speaking.
14 And he is -- I know that he's a voracious reader based
15 on conversations I've had over the years, and he very
16 much keeps up-to-date on current events, and can talk
17 with great knowledge about current events and in
18 particular about current events as it relates to the
19 financial industry and the banking industry.
20    Q.  Based on your observations and interactions
21 with Phil McHugh over more than a ten-year period, do
22 you have an opinion as to whether he possessed the
23 qualifications set forth in this executive summary?
24    A.  I do not believe he possessed those
25 qualifications, nor did the rest of the board.

Deposition of Marsha Conrad Williams                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 160

1  Q. I was going to ask you, is your opinion about
2  Phil McHugh not possessing these qualities something
3  that was shared by the board?
4  A. Yes. The board did not believe Phil McHugh
5  shared these qualities, and that was evidenced by all
6  the different presentations we had by Phil McHugh over
7  many years as compared to the types of presentations we
8  received from Tim Spence, again, over many years.
9  Q. Was that view unanimous on the board?
10 A. That view was absolutely unanimous on the part
11 of the board.
12 Q. Tell us again how many independent directors
13 are on the board?
14 A. Right now there are -- I believe there are 13.
15 We have 3 inside directors and 13 independent directors,
16 and of those 13 independent directors, most have been
17 CEOs -- many have been CEOs. One is a former senator.
18 We have a couple of former CFOs. We have people who
19 have been in and around the banking world and the
20 consulting world and the technology world and the
21 government circles for each on average probably 40
22 years. So whatever 40 by 13 is. I would have to do
23 that math. That's a lot of years of experience.
24 Q. You mentioned something over 4 to 500 years of
25 business judgment experience --

Page 161

1  A. Yes.
2  Q. -- is that correct?
3  A. Correct. And we have a fiduciary duty to
4  exercise our business judgment. That is the role of the
5  board, and that includes setting a strategy and
6  selecting the next CEO, and we believe we exercised that
7  fiduciary duty and that business judgment when we
8  selected Tim Spence as the next president and CEO.
9  MR. CIOFFI: I have no further questions.
10 MR. SABA: Can we go off the record for a
11 minute?
12 THE VIDEOGRAPHER: The time is 3:43 p.m.
13 We're going off the record.
14 (A recess was taken from 3:44 p.m. to
15 3:47 p.m.)
16 THE VIDEOGRAPHER: The time is 3:47 p.m.
17 We're back on the record.
18 FURTHER EXAMINATION
19 BY MR. SABA:
20 Q. Ms. Williams, Mr. Cioffi was asking you about
21 what he described as your interactions with Mr. Spence
22 and Mr. McHugh, repeated several times going back over
23 ten years and that a lot of your opinions are based on
24 these interactions, correct?
25 A. Yeah, that is correct.

Page 162

1  Q. They're important to your ability to have
2  assessed Mr. Spence and Mr. McHugh; isn't that right?
3  A. Me and the entire -- the rest of the entire
4  board.
5  Q. And the entire board; is that right?
6  A. That's correct.
7  Q. The unanimous board, as you've referred to
8  several times, right?
9  A. Yes. Uh-huh.
10 Q. So I'm trying to understand these interactions
11 which you seem to recall in more detail about them. And
12 with Mr. McHugh you have -- you're talking about the
13 interactions going back to you said 2008; is that right?
14 A. That's when I first joined the -- I joined the
15 board in either December of 2008 or January of 2009; I
16 don't recall.
17 Q. Okay.
18 A. But 2009 would have been my first board
19 meeting.
20 Q. Was when the interactions began?
21 A. I don't know if that's when the interactions
22 began. The interactions went back over a number of
23 years. I can't give you the exact date of when they
24 began, but --
25 Q. When would they have began because you gave us

Page 163

1  an estimated number based on 11 years?
2  A. I did.
3  Q. So you came up with some figure of 100?
4  A. Yep. I don't know exactly when they began,
5  but the -- I think it was a lot of interactions. I
6  don't know the exact date they began.
7  Q. Okay. Do you recall any of the interactions
8  specifically?
9  A. You know, I remember various presentations
10 over the years. As I said, I recall the June 2020
11 presentation perhaps because that's more recent where
12 his deck was identical in a number of the sections of
13 wording with another executive's deck, which struck me
14 as peculiar. I remember various presentations like in
15 decks, but I can't give you exact dates.
16 Q. Do you recall any of the presentations in 2009
17 that Mr. McHugh did?
18 A. No, I do not.
19 Q. What about 2010?
20 A. As I said earlier, I do not know the exact
21 dates. There were multiple presentations over many
22 years. I cannot give you the exact dates.
23 Q. What about 2011?
24 MR. CIOFFI: Objection. Asked and answered.
25 I mean --

Page 164

1     MR. SABA:  No, I haven't asked about -- no, I
2  haven't asked about 2011.
3     MR. CIOFFI:  She said she can't remember.
4  BY MR. SABA:
5     Q.  What about 2012?
6     MR. CIOFFI:  That was ten years ago.
7     MR. SABA:  She seemed to remember when you
8  were asking her.  Suddenly she can't remember.  So
9  I'm trying to find out, these are the only things
10  that she has to evaluate him.  I want to understand
11  when they were and what happened.
12     THE WITNESS:  Well, in any time that he
13  presented to the board between 2009 and 2020, I
14  would have observed his interactions and
15  presentations.
16  BY MR. SABA:
17     Q.  So between 2009 and let's say 2016, how many
18  presentations did Mr. McHugh do to the board?
19     **A.  I don't recall.**
20     Q.  Do you recall any?
21     **A.  I don't -- as I just said, I don't recall how**
22  **many presentations there were.**
23     Q.  Do you recall anything about any of the
24  presentations he made between 2009 and 2016?
25     **A.  For the third time, I don't recall.**

Page 165

1     Q.  Well, you said before he reads all the time.
2  That's --
3     **A.  Yes, he does.**
4     Q.  So did --
5     **A.  When he did make presentations, he did read**
6  **them to the board.**
7     Q.  Was he reading during all the presentations
8  between 2009 and 2016?
9     MR. CIOFFI:  Objection.
10     THE WITNESS:  As I said, I do not recall
11  exactly how many times he presented, but in all the
12  times he did present while I was on the board, he
13  read his presentations.
14  BY MR. SABA:
15     Q.  Every one?
16     **A.  To the best of my knowledge.**
17     Q.  And was this ever communicated as a deficit to
18  Mr. McHugh?
19     MR. CIOFFI:  Objection.  Asked and answered.
20  BY MR. SABA:
21     Q.  And the answer is no, right?
22     MR. CIOFFI:  The answer -- no, that wasn't her
23  answer.  She pointed out to you in the talent deck
24  what the criticism was, but anyway.
25  BY MR. SABA:

Page 166

1     Q.  Oh, can you point that out to me again?  I
2  didn't see that about communication skills in the talent
3  deck.  Can you show me where that is, please?  And we
4  can refer to Exhibit 4.
5     MR. CIOFFI:  She answered this question,
6  Counsel.  You're wasting time.
7     MR. SABA:  No, I think you gave a different
8  answer.
9     MR. CIOFFI:  You're badgering the witness.
10     MR. SABA:  No, I'm not.  You're the one who
11  gave the answer.  We're having her follow up on
12  your answer.
13  BY MR. SABA:
14     Q.  And I will refer you to Fifth Third McHugh
15  001132.
16     MR. CIOFFI:  Which exhibit?
17     MR. SABA:  We are on Exhibit 4.
18  BY MR. SABA:
19     Q.  And if you can show me what Mr. Cioffi is
20  referencing about the poor communication skills in the
21  talent deck, that would be helpful.
22     MR. CIOFFI:  You asked this question already.
23     MR. SABA:  Well, no, apparently --
24     MR. CIOFFI:  You asked it and she answered it.
25  The record speaks for itself, but what page are you

Page 167

1  directing her to?
2     MR. SABA:  Fifth Third McHugh 001132.
3     THE WITNESS:  Oh, I'm reading the wrong
4  person.  Sorry.  So could you repeat the question?
5     MR. SABA:  Certainly.
6  BY MR. SABA:
7     Q.  Mr. Cioffi represented that you pointed out in
8  the talent deck where it was indicated that Mr. McHugh
9  would read his reports or otherwise had difficulty
10  communicating.
11     MR. CIOFFI:  Objection.  That's not what I
12  pointed out.  You asked her this question three
13  hours ago.
14     THE WITNESS:  I'm sorry.  Could you repeat the
15  question again?
16     MR. SABA:  Certainly.
17  BY MR. SABA:
18     Q.  Does the talent deck for Mr. McHugh, marked as
19  Fifth Third McHugh 001132, in any way indicate that he
20  has a deficit with respect to communication skills or
21  that he was reading his reports to the board?
22     **A.  It does not say he was reading his reports to**
23  **the board.  It doesn't say that in here, though he was,**
24  **it doesn't specifically say that.  And that was**
25  **communicated to -- to -- as I believe I said, which is**

Deposition of Marsha Conrad Williams                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 168

1  correct, a number of executives were doing that.  Tim
2  Spence was not doing that, but a number of executives
3  were doing that, and we asked specifically that they
4  discontinue that.  I -- so I don't know that I see
5  that in see here, but I can tell you that that was an
6  issue, certainly an issue.
7      Q.  And who did you ask that they not do that?
8      A.  I don't recall exactly, but there were a
9  number of executives who needed to be coached on their
10  presentation skills.
11      Q.  Going back to the interactions that you
12  mentioned with Mr. McHugh, going back ten-plus years, do
13  you know if Mr. McHugh attended any board meetings
14  between 2009 and 2016?
15      A.  I don't recall.  I believe that he did, but I
16  don't recall specifically.  And if he -- I just don't
17  recall.  I believe he did.
18      Q.  How many do you believe he attended during
19  that time period?
20      A.  I don't recall.
21      Q.  The fact of the matter is, you have no idea
22  how many interactions you had with Mr. McHugh over the
23  last ten years, much less five years, correct?
24      MR. CIOFFI:  Objection.  Argumentative.
25      THE WITNESS:  I had a number of -- quite a

Page 169

1  number of interactions with Mr. McHugh.  I believe
2  it was fairly extensive.  The -- and as I said, the
3  interactions were such that I -- I and many of the
4  other board members came away -- all of the other
5  board members came away with the impression that he
6  would not be an appropriate next CEO for Fifth
7  Third because Phil -- Tim Spence had significantly
8  stronger skills in many, many areas, not simply
9  communication, but in many areas.
10  BY MR. SABA:
11      Q.  Referring you back to Exhibit Number 13, the
12  board summary regarding Tim Spence; do you see that?
13      A.  So I'm still looking for it.  13.  Thank you.
14  Yes, I have it.
15      Q.  Do you know who from Fifth Third participated
16  in the wording of the board's summary regarding Tim
17  Spence?
18      MR. CIOFFI:  Objection.  Assumes facts not in
19  evidence, and it is argumentative.
20      THE WITNESS:  This was prepared by --
21      MR. CIOFFI:  There's no foundation.  Go ahead.
22      THE WITNESS:  This was prepared by RHR.
23  BY MR. SABA:
24      Q.  Do you know if anyone from Fifth Third
25  participated in the wording of the board summary --

Page 170

1      A.  I do not.
2      Q.  -- marked as Exhibit 13?
3      A.  I do not know.  I do see that it calls out his
4  strength as a strong communicator with charisma, a great
5  leader, very innovative, bright and insightful.  He's a
6  great thinker and problem solver.  Has had a great
7  impact from a strategy perspective.  I do see that.
8      Q.  But you don't know who participated in the
9  wording of that, correct?
10      A.  Again, it was prepared by RHR, so I am
11  assuming this is an RHR document.
12      Q.  But you don't know?
13      A.  I don't know for a fact, but I have no reason
14  to think it isn't.
15      Q.  You mentioned during the time that Mr. Cioffi
16  was questioning you that Mr. Spence did a number of
17  acquisitions while at Oliver Wyman; is that correct?
18      MR. CIOFFI:  Objection.  She didn't say that.
19      THE WITNESS:  I did not say that.
20      MR. CIOFFI:  The record speaks for itself.
21      THE WITNESS:  He did not do acquisitions.  He
22  helped banks plan for and work on acquisitions, but
23  he would not have executed those acquisitions
24  himself.  They would have been executed by the
25  bank, although my understanding is he worked on due

Page 171

1  diligence and he worked on helping banks do
2  acquisitions.
3  BY MR. SABA:
4      Q.  Do you know how many acquisitions he helped
5  banks with?
6      A.  I do not.
7      Q.  Do you know which banks he helped?
8      A.  I do not.
9      Q.  You talked about the MB acquisition and what a
10  big success that was.  Do you know how many customers
11  and employees were lost as a result of the integration?
12      A.  I do not.
13      Q.  Do you know what the program was called
14  Transforming Fifth Third?
15      A.  Yes.
16      Q.  What was Transforming Fifth Third?
17      A.  It was a -- kind of a reengineering of some of
18  the processes and a desire to put Fifth Third on a
19  stronger target for the future, trying to build a better
20  base for the future.  It's been a long time so I don't
21  recall all of the details but I definitely recall the
22  program.
23      Q.  Do you know who led that program?
24      A.  I do not recall.
25      Q.  Do you know if the purpose of it was to

Deposition of Marsha Conrad Williams                              Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 172

1 upgrade the CAMEL rating for Fifth Third?
2 **A. I think the purpose was to do a variety of**
3 **things, certainly to improve processes and make them**
4 **more streamlined and efficient, and certainly that would**
5 **have benefited our CAMEL ratings.**
6 Q. Did you understand that it was successful in
7 upgrading Fifth Third's CAMEL ratings?
8 **A. I don't know -- our CAMEL ratings did**
9 **increase, but increased over a period of time. I don't**
10 **recall that -- I don't recall what the increase was**
11 **simply as a result of TFT, Transforming Fifth Third.**
12 Q. And do you know if that was led by Phil
13 McHugh?
14 **A. I do not know. There were a wide variety of**
15 **work streams in that program and a wide variety of**
16 **people involved in it. I do recall that.**
17 Q. But you don't know if it was led by Phil
18 McHugh or not?
19 **A. I do not recall.**
20 Q. With respect to the MB acquisition, has Fifth
21 Third's market share increased in the Chicago area as
22 measured by the FDIC?
23 **A. I don't know the FDIC rankings of the Chicago**
24 **market.**
25 Q. So you don't know if it's increased or

Page 173

1 decreased, correct?
2 **A. Correct.**
3 MR. SABA: We'll go off the record one second.
4 THE VIDEOGRAPHER: The time is 4:04 p.m.
5 We're going off the record.
6 (A recess was taken from 4:04 p.m. to
7 4:05 p.m.)
8 THE VIDEOGRAPHER: The time is 4:05 p.m.
9 We're back on the record.
10 MR. SABA: That's all the questions I have,
11 again, subject to continuation in progress relative
12 to the various pending discovery issues.
13 MR. CIOFFI: I have the same reaction this
14 time as I did last time you said that.
15 FURTHER EXAMINATION
16 BY MR. CIOFFI:
17 Q. I want to direct your attention back to
18 Exhibit Number 4. And if I could direct your attention
19 to 001132, the Phil McHugh talent card. You see there
20 it has talent information and then it has under that a
21 block that says moderate potential; do you see that?
22 **A. I do see that.**
23 Q. And I want to direct your attention back to
24 001135, the talent information under Tim Spence is high
25 potential; do you see that?

Page 174

1 **A. I do see that.**
2 Q. Is that information, both on 001132 with
3 respect to Phil McHugh and 001135, was that view of
4 Mr. McHugh's talent as being moderate and Mr. Spence's
5 as being high of you that was shared by board?
6 **A. Yes. The board unanimously agreed with those**
7 **views.**
8 Q. Does the fact that this particular document
9 says Mr. McHugh's talent is moderate reflect his
10 deficiencies in communication skills?
11 MR. SABA: Objection.
12 THE WITNESS: Yes, it does.
13 BY MR. CIOFFI:
14 Q. And does it also reflect deficiencies in his
15 experience and knowledge in the banking industry?
16 MR. SABA: Objection.
17 THE WITNESS: Yes, it does.
18 BY MR. CIOFFI:
19 Q. Similarly, does the rating of high talent
20 potential for Mr. Spence reflect his high communication
21 skills?
22 MR. SABA: Objection.
23 THE WITNESS: Yes, it does.
24 BY MR. CIOFFI:
25 Q. Does it also respect -- does it also reflect

```
 1   his high knowledge and experience in the banking

 2   industry?

 3             MR. SABA:  Objection.

 4             THE WITNESS:  Yes.

 5             MR. CIOFFI:  I have no further questions.

 6             MR. SABA:  Again, I have no questions.  We'll

 7        continue this in progress due to discovery issues

 8        and issues raised before.

 9             THE VIDEOGRAPHER:  The time is 4:07.  We are

10        going off the record.

11

12

13

14                    _____

15                     MARSHA CONRAD WILLIAMS

16                    _____

17                     DATE

18                         - - -

19             DEPOSITION CONCLUDED AT 4:07 P.M.

20                         - - -

21

22

23

24

25
```

Deposition of Marsha Conrad Williams                    Philip R. McHugh v. Fifth Third Bancorp, et al.

```
 1                    C E R T I F I C A T E

 2    STATE OF OHIO           :
                              :            SS
 3    COUNTY OF HAMILTON      :

 4            I, Wendy L. Raymer, RPR, CRR, the undersigned,

 5    a duly qualified and commissioned notary public within

 6    and for the State of Ohio, do hereby certify that before

 7    the giving of her aforesaid deposition, MARSHA CONRAD

 8    WILLIAMS was by me first duly sworn to depose the truth,

 9    the whole truth and nothing but the truth; that the

10    foregoing is the deposition given at said time and place

11    by MARSHA CONRAD WILLIAMS; that said deposition was

12    taken in all respects pursuant to stipulation of

13    counsel; that I am neither a relative of nor employee of

14    any of the parties or their counsel, and have no

15    interest whatever in the result of the action' that I am

16    not, not nor is the court reporting firm with which I am

17    affiliated, under a contract as defined in Civil Rule 28

18    (D).

19            IN WITNESS WHEREOF, I hereunto set my hand and

20    official seal of office at Cincinnati, Ohio, this 3rd

21    day of March, 2023.

22

23

24                                _____
      My Commission expires       S/Wendy L. Raymer, RPR, CRR
25    December 6, 2026             Notary Public - State of Ohio
```

1    1 DEPOSITION ERRATA SHEET

2    Date Taken:  February 16, 2023

3    Case Caption:  PHILIP R. MCHUGH

4    vs. FIFTH THIRD BANCORP, et al.

5    DECLARATION UNDER PENALTY OF PERJURY

6    I declare under penalty of perjury

7    that I have read the entire transcript of

8    my deposition taken in the captioned matter

9    or the same has been read to me, and

10   the same is true and accurate, save and

11   except for changes and/or corrections, if

12   any, as indicated by me on the DEPOSITION

13   ERRATA SHEET hereof, with the understanding

14   that I offer these changes as if still under

15   oath.

16   Signed on the _____ day of

17   _____, 20___.

18   _____

19   MARSHA CONRAD WILLIAMS

20

21

22

23

24

25

```
 1    2 DEPOSITION ERRATA SHEET

 2    Page No._____Line No._____Change to:_____

 3    _____

 4    Reason for change:_____

 5    Page No._____Line No._____Change to:_____

 6    _____

 7    Reason for change:_____

 8    Page No._____Line No._____Change to:_____

 9    _____

10    Reason for change:_____

11    Page No._____Line No._____Change to:_____

12    _____

13    Reason for change:_____

14    Page No._____Line No._____Change to:_____

15    _____

16    Reason for change:_____

17    Page No._____Line No._____Change to:_____

18    _____

19    Reason for change:_____

20    Page No._____Line No._____Change to:_____

21    _____

22    Reason for change:_____

23    SIGNATURE:_____DATE:_____

24    MARSHA CONRAD WILLIAMS

25
```

```
 1   3 DEPOSITION ERRATA SHEET

 2   Page No._____Line No._____Change to:_____

 3   _____

 4   Reason for change:_____

 5   Page No._____Line No._____Change to:_____

 6   _____

 7   Reason for change:_____

 8   Page No._____Line No._____Change to:_____

 9   _____

10   Reason for change:_____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change:_____

23   SIGNATURE:_____DATE:_____

24   MARSHA CONRAD WILLIAMS

25
```

**WORD INDEX**

**< $ >**
**$2** 138:2

**< 0 >**
**00** 56:3
**000266** 62:24 63:1
**000267** 63:5 69:23 70:10 73:18 78:3
**000283** 63:1
**000454** 83:14, 24
**000477** 83:15
**000495** 83:16, 25
**000508** 87:21
**000516** 87:22
**000517** 89:9
**000527** 89:9
**000954** 111:20
**000976** 111:21
**001013** 107:25
**001015** 112:3, 10 115:12 120:9
**001032** 107:18 108:1
**001033** 111:6
**001034** 155:14
**001040** 111:7
**001071** 107:17, 22
**001073** 107:23
**001104** 62:3
**001132** 71:16 166:15 167:2, 19 173:19 174:2
**001135** 75:18 76:11 173:24 174:3
**001142** 73:15 75:18 76:7
**001154** 62:4
**001457** 105:22
**001463** 105:23
**001465** 55:24
**001466** 56:11
**001493** 57:10
**001496** 57:25
**001503** 58:22
**001515** 56:2, 8, 12
**006414** 92:8
**006415** 92:8
**09** 12:1

**< 1 >**
**1** 3:5 10:3, 19 12:10, 16, 19 21:5, 9 22:6 23:1 28:3, 7, 12 29:9, 19, 21 30:15, 21 37:11 80:18, 24 83:2 151:7 177:1
**1/2** 67:3
**1:04** 85:5, 6
**1:21-cv-00238** 1:9 4:7
**10** 3:12 105:10, 14, 19, 21
**10:32** 47:23, 25
**100** 74:6 138:19 140:24 163:3
**105** 3:12
**107** 3:13 21:18 22:6, 8
**108** 3:13
**11** 3:13 29:22 94:11 107:7, 10, 14, 16, 22 111:23, 24, 25 112:3 120:8 140:19, 23 163:1
**11:03** 48:1, 2
**110** 3:14
**111** 3:14
**11-year** 140:25
**12** 3:13 53:6 94:11 108:17, 21 110:5 140:22, 23 152:18
**12:18** 85:2, 4
**120** 140:23
**13** 3:14 94:11 110:18, 22 111:5 155:3 160:14, 15, 16, 22 169:11, 13 170:2
**14** 3:14 111:9, 13, 17, 19 117:12
**140** 3:4
**147** 25:7, 9
**14A** 21:14, 19, 21 25:1, 2
**15** 9:17 18:13 94:12 152:18
**16** 1:14 4:1 18:13 83:12 177:2
**161** 3:5

**17** 62:16 78:17, 21 105:18 110:7
**1700** 2:12
**173** 3:5
**17th** 55:3
**18** 37:25 72:12 108:24
**1858** 114:20
**18th** 109:9 110:8
**18-year-old** 42:12, 14
**19** 10:6 34:15
**1951** 6:14
**1973** 101:5
**1980** 67:5
**1988** 101:5
**1990** 7:6
**1999** 8:10, 12
**1st** 27:25

**< 2 >**
**2** 3:8 24:20, 24 25:5 67:3 178:1
**2:09** 119:18
**2:10** 119:20
**2:28** 119:22
**2:29** 119:21
**2:59** 139:11, 13
**20** 177:17
**2006** 94:9 96:18 117:5, 9 140:7
**2008** 8:22 13:12, 13 140:8 162:13, 15
**2009** 13:24 94:10 140:9, 18 162:15, 18 163:16 164:13, 17, 24 165:8 168:14
**201** 2:12
**2010** 37:7 96:19 102:14 112:21 113:24 141:5 156:14 163:19
**2011** 7:24 35:11 37:8 99:20 112:22 113:24 163:23 164:2
**2012** 164:5
**2013** 35:13 112:23
**2014** 13:17 15:15, 16
**2015** 14:9, 11 15:16, 18 26:6, 16, 19, 20, 25 27:2, 16 35:9 52:14

**69:7 90:5, 6, 10, 15, 18 99:8 103:24 107:1 112:22 113:1 117:4
**2016** 164:17, 24 165:8 168:14
**2017** 37:25 48:8, 13 49:13, 18 72:12
**2018** 15:18, 19, 22, 24 34:15 99:10
**2019** 10:3, 19 12:6, 9, 10, 16, 19 17:13 18:2, 21 25:3, 10, 15 53:14 54:15 56:13, 18 62:1, 17 65:1 70:22 75:1, 2 78:17, 21 80:14, 18, 24 83:2
**2020** 18:7 21:22 22:16, 22 24:10 25:20 26:25 27:16, 25 28:3, 7, 12 29:9, 19, 21 30:15, 21 37:11 48:8, 13 49:13, 18 50:22 80:19, 24 81:3, 14 82:24 83:3, 12 87:19 89:3 91:3 92:11 103:24 104:9 105:18 107:13 108:24 110:7 111:16 112:18 116:19 117:1, 11, 12, 14 120:3, 19 125:20 127:22 133:18 140:11, 18 149:16 163:10 164:13
**2022** 8:19 15:10, 15, 20, 24
**2023** 1:14 4:1 176:21 177:2
**2026** 176:25
**20s** 39:25
**21** 3:5 87:19 89:3 103:24 104:9 116:19 127:9
**22** 112:18 120:3, 18 125:20 127:9, 10, 22 133:18
**23** 107:13
**24** 3:8

Deposition of Marsha Conrad Williams          Philip R. McHugh v. Fifth Third Bancorp, et al.

**24th**  106:13
**2623**  2:6
**28**  6:12, 14  176:17
**29902**  6:6

**< 3 >**
**3**  3:8  54:5, 9, 15
55:21  56:11, 13
160:15  179:1
**3:10**  139:14, 15
**3:43**  161:12
**3:44**  161:14
**3:47**  161:15, 16
**30**  9:18  117:15
**30s**  39:24
**31**  111:16
**312-485-4885**  11:21
**362-8700**  2:13
**3rd**  55:15, 19  61:7,
12  176:20

**< 4 >**
**4**  3:9  22:11  25:9
61:15, 19  62:2  71:13
73:15  75:14  76:7
152:1, 10  153:9
160:24  166:4, 17
173:18
**4:04**  173:4, 6
**4:05**  173:7, 8
**4:07**  175:9, 19
**40**  160:21, 22
**400**  6:5  97:13
124:11
**45**  9:18
**45202**  1:20  2:13
**45208**  2:6

**< 5 >**
**5**  3:4, 9  22:11  62:6,
8, 13, 23  63:4  73:17
77:16
**50**  103:15
**500**  124:11  160:24
**511**  1:20
**513**  2:7, 13
**533-2701**  2:7
**54**  3:8

**< 6 >**

**6**  3:10  83:5, 9, 13, 23
176:25
**61**  3:9
**62**  3:9

**< 7 >**
**7**  3:10  87:13, 17, 20
89:4, 5
**70s**  101:13

**< 8 >**
**8**  3:11  88:20, 24
89:8  92:11
**8:50**  54:15
**83**  3:10
**87**  3:10
**88**  3:11

**< 9 >**
**9**  3:11  91:22  92:1, 7
104:12, 23
**9:16**  1:14  4:2
**91**  3:11
**92**  3:11

**< A >**
**a.m.**  1:14  4:2  47:23,
25  48:1, 2  54:15
**abilities**  156:24
**ability**  35:3  39:1
69:11  97:10  98:11
99:24  113:9  125:25
126:10  128:2  148:14
153:23  158:11, 18
162:1
**able**  21:12  24:24
60:14  68:22  69:18
113:20  116:17
128:18  131:23  132:1
133:21  146:9  147:21
**absolutely**  113:19
115:21  146:5  154:19
157:25  160:10
**accept**  138:3, 5  152:9
**accolade**  102:7
**accomplishments**
64:15
**account**  154:16
**accuracy**  23:17, 18

**accurate**  23:20, 21
50:13, 15  156:7
159:5  177:10
**achieved**  121:4
**acquire**  33:21
**acquired**  48:22  49:11
**acquisition**  47:3
48:6, 24  49:3, 6
102:22  121:12
148:23  150:24  171:9
172:20
**acquisitions**  33:18
48:7, 11, 12, 16, 18
49:12, 15  102:19, 20,
21  115:15  121:3, 10,
11, 13  122:9  126:17
141:18  148:9, 10
151:2, 12, 16  170:17,
21, 22, 23  171:2, 4
**acre**  67:6
**act**  17:10
**action**  82:12  84:14
176:15
**actionable**  148:21, 22
**active**  17:16
**actively**  144:3
**acts**  133:24
**actual**  13:3
**adaptability**  134:25
**add**  92:19
**added**  16:22
**addition**  35:7  121:23
**additional**  139:1, 10,
19
**Additionally**  5:25
**address**  6:4, 7  11:9
**addressed**  16:25
**adept**  123:1
**adequate**  94:24
**adjust**  158:11
**admired**  158:11
**advance**  16:10  79:14
**advising**  151:16, 17
**advisory**  48:20
**advocated**  60:13
**Affairs**  88:1
**affiliated**  176:17
**aforesaid**  176:7
**afraid**  150:20

**age**  4:23  39:17
154:9, 10, 16, 20, 22
**agencies**  118:4
**agenda**  10:22  16:3, 8,
13, 17, 22  17:1
**ages**  39:22
**ago**  164:6  167:13
**agree**  25:14  45:22
54:12  58:7  59:13, 16
62:23  87:20  88:9, 10
91:20, 21  96:2, 9
105:21  113:21
139:24
**agreed**  75:11  156:5
174:6
**agrees**  92:18
**ahead**  5:3  10:13
11:18  44:16  47:21
55:4  94:5  95:22
98:21  104:20  131:9,
12  140:14  143:2, 20
145:4  146:13  147:16
151:13  153:10
154:17  169:21
**Akins**  15:13
**al**  1:10  4:7  177:4
**aligned**  122:3, 5
**allows**  29:5  158:15
**amazing**  69:5
**ambiguity**  156:25
**America**  36:15
**American**  99:11
100:17, 25  101:5, 17,
21, 24  102:6
**Amoco**  6:21, 23
**amount**  42:15  74:10
75:12  139:1
**ample**  96:11
**analogy**  66:24  67:2
**analysis**  95:16  96:8,
10, 22
**analyst**  147:25
**analysts**  35:1  47:1, 5
60:25  78:7  132:15
**analyze**  96:11
**and/or**  20:4  32:5
51:7  67:22  177:11
**Anderson**  64:5  72:8
**annual**  25:25  85:10,

Case: 1:21-cv-00238-MRB Doc #: 66-1 Filed: 08/02/24 Page: 55 of 79 PAGEID #: 2678

Deposition of Marsha Conrad Williams                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

19, 24  87:3  97:20
**annually**  64:12
**answer**  5:15, 20, 21
6:1  18:1  29:5, 12, 16
43:17  67:24  68:1
70:25  71:21  81:1
95:19  98:18  104:20
114:20  122:23  125:5,
9, 10  127:15  131:5, 9,
10, 11  133:14  137:1
140:15  143:3, 21
145:5, 9  146:14
147:17  148:13  149:3,
5  150:3, 20  151:14
152:6, 12  153:11
154:18  165:21, 22, 23
166:8, 11, 12
**answered**  43:17  46:7
66:9  77:12, 20  98:17
129:12  163:24
165:19  166:5, 24
**answering**  68:3, 5
76:1  134:4
**answers**  46:8  66:21
67:22  150:8  159:7, 8,
9
**anxious**  157:20
**anybody**  69:10  99:4
**anymore**  8:15
**anyway**  165:24
**apart**  17:2  63:21
**apologize**  117:10
149:24
**apparent**  35:14  68:3
**apparently**  166:23
**appear**  104:12, 23
**APPEARANCES**  2:1
**appears**  25:17  56:13,
16
**applications**  142:17
**apply**  153:7
**applying**  50:25
**appoint**  157:25
**appointment**  154:14
**appreciate**  55:7
106:6  150:5
**approach**  157:4
158:12

**appropriate**  19:18
27:23  59:12, 17
169:6
**appropriately**  74:20,
21
**approval**  95:2
**approve**  16:2
**approved**  16:9  91:4
**Approximately**  6:8
7:6  14:8, 9  29:22
140:7, 11
**April**  15:10, 15, 16,
18, 19, 24
**area**  129:3  132:20
172:21
**areas**  49:16  57:4, 5,
14  58:4  128:14
129:5  132:11  144:12
145:13  146:2  147:23
169:8, 9
**argue**  97:24
**argument**  70:3
**argumentation**  131:6
**Argumentative**  69:24
95:18, 25  100:3
125:5  168:24  169:19
**article**  39:3, 4
**articulate**  141:23
142:6, 24  148:15
149:3, 6
**articulated**  43:15
145:2
**arts**  44:22, 23
**asked**  7:9  13:13
17:1  38:24  39:2, 4
66:8  129:12  132:17
133:11  144:21  149:5
150:1, 7, 23  152:2
163:24  164:1, 2
165:19  166:22, 24
167:12  168:3
**asking**  5:10  9:25
10:1  19:12  28:16
30:5  52:8  76:6  77:9
104:17  134:19
149:22  161:20  164:8
**assess**  53:11, 17  91:5,
16  106:3  152:24
153:24

**assessed**  92:22, 24
93:3  145:24  162:2
**assessing**  94:14  104:8
**assessment**  84:20
89:15  93:21  94:25
95:16  98:15, 23
99:17  105:7  106:10
111:15  113:19  124:9,
15, 17, 19  137:6
150:13  155:10  156:6,
7  157:22  159:5
**assignments**  102:16
**assistance**  50:23
**Association**  17:21
18:5
**assume**  57:20  71:25
**assumed**  50:13
**Assumes**  95:19
169:18
**assuming**  136:14
170:11
**assumption**  104:18
131:4, 16
**assure**  75:8
**attached**  21:15, 18
54:25  67:4  106:2, 7,
16  107:24
**attempting**  139:23
**attend**  79:13  81:7
**attendance**  84:3
**attendant**  39:13
40:18, 20  41:24
**attendants**  42:1
**attended**  82:19
140:17  168:13, 18
**attendees**  136:5
**attention**  151:25
155:2, 12  173:17, 18,
23
**attributes**  91:15
133:16, 19  134:11
**auction**  33:24
**audience**  158:15
**audit**  13:21  14:12, 14
**audited**  130:15
**August**  108:24  109:9
110:7, 8
**Australia**  40:4, 11, 21
**authority**  67:14

**available**  93:9  137:18
**Avenue**  2:6
**avenues**  134:25
135:7, 8, 11
**average**  160:21
**aware**  36:13  50:8
128:21  129:1

< B >
**back**  16:12  29:8
38:24  39:19  43:18
48:3  71:13  73:10, 17
78:2  85:7  96:17, 18
98:13  106:7, 18, 21
111:23  115:11
119:23  124:21
131:25  139:16
161:17, 22  162:13, 22
168:11, 12  169:11
173:9, 17, 23
**background**  32:12,
14  35:7, 22  36:22
43:8  44:20  65:9
116:10  119:4  132:9
153:19
**backgrounds**  31:21
**backyard**  67:8
**badgering**  166:9
**balance**  86:22, 24
**balanced**  115:14
124:25
**balances**  99:14
155:23
**balancing**  123:3, 7
124:22  125:3
**BANCORP**  1:10
2:17  4:6  8:7  17:20
18:4  21:22  25:10
89:5  177:4
**Bank**  4:19, 21  13:9
17:20  18:4, 23  19:9,
14  21:2  22:16  25:24
33:1, 16, 18  34:3, 5
35:15, 24  36:1, 9, 10,
15  37:2  43:11, 23
44:8  46:24  48:8, 13
49:20  52:12  60:22
64:6, 9  66:3  68:24
72:21, 22  78:23  89:2
91:16  93:23  102:5

103:6 114:2, 4, 17, 23, 25 115:6 116:8, 15 118:4 121:25 122:4 126:9, 21, 23 128:7, 14, 16 129:14, 15, 24 130:18 132:13 133:2, 20 135:4 137:25 141:16, 17 142:4, 5, 9 145:14 146:7 147:1, 2, 7, 8 148:4 149:8, 9 151:3, 8, 17 154:4 155:8, 22 157:12, 13, 14, 15 170:25

**banker** 99:9, 11, 21 100:11, 17, 25 101:5, 6, 17, 21, 24, 25 102:3, 7 118:9

**bankers** 47:1 113:17 132:14

**banking** 32:14 36:7 43:8 49:17, 19 69:6, 18 93:13 99:12 101:9 113:14 115:16, 19 116:3, 5, 12, 23 117:2, 14, 21 119:5 128:11 129:22 132:4 133:9, 10, 13 140:12 141:25 142:15, 16 143:1, 18, 23 144:6, 15 146:2, 3, 4, 12, 18 147:23, 25 148:10, 16 159:19 160:19 174:15 175:1

**banking's** 35:18

**banks** 34:23, 25 36:6 39:18 41:21, 22 46:25 113:4, 12 116:1 129:24 130:20 142:11 147:22 157:11, 21 170:22 171:1, 5, 7

**bank's** 114:19 122:10 123:2, 4, 9 128:3 149:4

**base** 36:16 60:11 101:11, 14 139:7 146:17 171:20

**based** 41:8 44:21 46:7 65:5 85:18 93:10, 15, 17 94:23

95:5 104:12, 22 113:2 115:23, 24 134:1 143:14 146:19 158:12 159:14, 20 161:23 163:1

**basically** 33:8, 20 138:4 141:20 142:10, 18 150:20 153:16

**basis** 26:1 113:9 132:4 147:1

**Bates** 55:23 62:3, 24 73:14 87:21 89:8 105:22 107:17, 21, 24 111:6, 19 155:13

**baths** 67:3

**Beaudin** 89:14, 22 90:1, 3, 17 91:5 95:4 99:13 103:24 104:1, 10, 14, 25 105:2, 3 107:12 108:6 136:20, 24 137:2

**Beaufort** 6:5

**becoming** 78:18

**bedrooms** 67:3

**began** 162:20, 22, 24, 25 163:4, 6

**Beginning** 18:21 56:10 129:13

**begins** 22:6

**behalf** 2:1, 8 4:14 48:7, 12

**behaviors** 91:13 112:13 120:1, 17

**belief** 65:5

**beliefs** 124:20

**believe** 6:24 8:25 10:4 12:1, 8, 12, 18 23:21 24:17, 19 26:20 27:3, 5, 20 31:4 32:7 35:1 36:15 37:1, 6 38:20 40:2, 3 43:5 44:19 45:3 46:5 48:9 49:19 51:14 53:24 56:19 57:4 58:16 60:13 66:15 69:13, 15 71:10 72:19, 25 73:9, 11, 12 75:14 78:6 80:5, 15 81:2 82:22 86:4, 7, 10, 13

87:4 89:19 90:4, 7 92:6 97:14, 21 99:23 103:11, 22 107:15 110:2 114:24 116:16, 23 127:1 128:2 137:14 138:13 140:17 143:22 145:11, 18, 19 146:15 147:2, 25 148:1 150:2 151:9, 21 156:6 159:10, 24 160:4, 14 161:6 167:25 168:15, 17, 18 169:1

**believed** 34:7 73:2 84:18 99:5 121:24 122:1, 2, 20 125:12 133:2 148:20 156:13

**believer** 44:22

**believes** 127:2

**Ben** 126:4, 12 127:3

**beneficial** 120:24

**benefited** 172:5

**best** 17:10 18:2 64:19 66:23 125:13 154:1 157:14 165:16

**better** 112:18 120:4, 19 122:16 123:7 125:21 127:23 133:18 134:12 154:3 171:19

**big** 171:10

**birth** 6:13

**bit** 35:22 38:24 41:18 42:18 74:8 141:8, 9 155:3

**Blank** 2:11 112:6

**blanked** 126:18

**block** 173:21

**blocked** 55:11

**blocking** 135:2, 5

**board** 6:18 7:14 8:8, 18, 22 9:6, 7, 10, 12, 21 10:8, 23 12:2, 24, 25 13:3, 5, 12, 13, 14 15:17, 22 16:3, 4, 6, 9, 25 17:3, 5, 6, 8, 12, 15, 19, 23 18:1, 3, 7, 8, 11, 12 19:4, 6 20:7, 9, 16, 18, 20, 23 26:3 27:21

28:2, 4, 5, 6, 9, 14, 17, 19 29:3, 8, 11, 14, 18, 22, 23, 24 30:1, 2, 6, 7, 17, 18, 19, 25 35:12, 23 37:7, 9, 15, 16 38:14, 23 41:15, 16 46:7, 9, 10, 12, 14 47:17 51:9, 11, 12, 13, 15 52:3, 12, 22 53:1, 10, 16, 18 55:3 56:21 60:1, 14 61:3, 24 62:16, 20 64:20 65:3, 5 66:1, 5, 10, 13, 14, 15, 17 67:15, 17 68:9, 10, 21 69:19 71:10 72:4 73:2 74:3, 4, 20, 23 75:4, 8, 11 79:12, 15, 18, 22, 24 80:6, 7, 8, 10, 11, 14, 18, 21 82:17 83:2, 11 84:7, 11, 17, 18, 20, 24 87:18, 19 89:1, 2 90:15 91:2, 3, 4 92:21 93:8, 20 94:9, 10, 23 96:8, 11, 14, 16, 22 97:3, 6, 13, 17, 19 98:22, 24 99:1, 3, 9, 18, 20 102:17, 18, 25 103:4, 18, 25 104:9 109:5, 20 110:23 111:3 113:16, 21 115:9, 22 116:16 121:5 122:20 123:22 124:10, 12, 15 126:1 127:2, 18 128:20 130:8 132:21, 23, 25 133:5, 6, 8, 12 134:3, 5, 6, 8, 9, 18, 20, 22 135:9, 13, 15, 17, 20, 24 136:2, 10 137:16, 17 138:21 140:7, 10, 18, 20, 21, 22 141:5, 8, 11 143:5, 8, 9, 11 145:8, 10, 17, 18, 20 146:16 148:4, 17 149:5, 20 150:4, 5, 6 152:14, 20 153:16, 20 154:7, 9, 12, 15 155:6, 9 156:3, 8, 15, 18 157:7 158:1 159:1, 3,

*4*, *12*, *25*  160:*3*, *4*, *9*,
*11*, *13*  161:*5*  162:*4*, *5*,
*7*, *15*, *18*  164:*13*, *18*
165:*6*, *12*  167:*21*, *23*
168:*13*  169:*4*, *5*, *12*,
*25*  174:*5*, *6*
**boards**  8:*2*, *3*, *4*, *5*
17:*24*  55:*5*  92:*22*
**board's**  18:*14*, *22*
19:*7*, *14*, *15*  21:*3*
66:*10*  97:*12*  112:*25*
124:*10*  153:*3*  157:*22*
169:*16*
**Bob**  54:*11*, *13*, *14*
58:*15*  61:*23*  92:*3*
93:*1*  105:*16*, *25*
106:*18*  107:*12*
108:*23*  137:*12*
**Borton**  64:*4*, *8*  72:*15*,
*16*
**B-o-r-t-o-n**  72:*19*
**boss**  97:*25*
**bottom**  22:*5*, *9*  25:*6*
55:*22*  157:*2*
**box**  123:*18*
**brain**  149:*2*
**brand**  126:*24*
**breadth**  145:*12*
**break**  5:*25*  47:*22*
119:*13*
**Brian**  2:*17*  4:*18*
64:*9*  72:*23*
**brief**  66:*20*
**bright**  170:*5*
**bring**  99:*8*  114:*11*
126:*23*  127:*14*
**bringing**  131:*21*
**broad**  117:*19*, *24*
**broader**  128:*9*, *13*, *19*
129:*25*
**broadly**  44:*24*
**broken**  86:*22*  87:*7*
**brought**  37:*3*  93:*20*
126:*8*, *9*, *13*, *19*
127:*17*  129:*16*
**Bruce**  1:*22*
**build**  171:*19*
**built**  67:*4*
**bullet**  109:*5*  115:*13*

122:*7*, *24*  124:*21*
**bullets**  134:*15*
**Burton**  72:*13*
**Business**  7:*20*  17:*7*,
*8*  45:*17*  60:*7*  81:*4*,
*17*, *18*, *20*  82:*5*, *8*, *12*,
*16*  86:*17*  91:*14*
94:*13*  99:*16*  103:*19*
116:*7*, *22*  122:*11*, *16*
124:*11*, *12*  131:*21*
133:*22*  135:*1*  141:*20*,
*21*  143:*16*  153:*4*, *21*
155:*25*  157:*1*  160:*25*
161:*4*, *7*
**businesses**  51:*1*
116:*14*, *20*  118:*10*
131:*22*  141:*14*
144:*11*
**buy**  114:*9*
**buy-in**  158:*18*

< C >
**caliber**  100:*21*
**California**  50:*3*
**call**  20:*12*  33:*2*
56:*17*  106:*22*
**called**  8:*14*  27:*8*
110:*15*  158:*2*  171:*13*
**calls**  10:*25*  11:*1*
170:*3*
**calm**  60:*9*
**CAMEL**  172:*1*, *5*, *7*, *8*
**Canada**  41:*22*
**Canadian**  39:*18*
**candidate**  32:*7*
63:*12*  64:*23*  65:*6*, *11*,
*15*, *25*  66:*2*, *11*, *12*
69:*20*, *22*  70:*19*
71:*11*  72:*9*, *14*, *24*
73:*23*  74:*12*  78:*22*
79:*10*  89:*16*  92:*24*
93:*9*, *10*  94:*25*  103:*8*,
*9*  133:*1*  145:*22*, *23*,
*25*  148:*23*, *24*  154:*3*,
*4*  155:*7*  156:*17*
158:*5*, *6*
**candidates**  18:*25*
19:*1*, *4*, *5*, *15*  25:*25*
63:*8*, *10*, *15*, *23*  64:*1*,
*3*, *13*, *21*, *24*  70:*14*, *16*,

*17*, *21*  71:*2*, *6*  73:*20*
91:*17*  96:*23*  101:*23*
103:*5*
**capabilities**  19:*24*
57:*16*  58:*5*  74:*16*
89:*16*  96:*21*  99:*8*
106:*3*  124:*16*  132:*20*,
*22*, *24*  156:*15*
**capability**  37:*10*
69:*8*  124:*18*
**capable**  112:*24*
**capably**  123:*19*
**capacity**  104:*5*
156:*25*
**capital**  14:*21*  15:*1*
25:*22*  26:*15*  32:*25*
34:*18*, *21*  55:*1*  56:*14*
61:*25*  105:*17*  107:*4*
108:*8*  130:*11*  147:*15*
**Caption**  177:*3*
**captioned**  155:*16*
177:*8*
**card**  88:*5*  173:*19*
**career**  33:*3*  132:*11*
**carefully**  46:*9*
**cares**  158:*9*
**Carmichael**  8:*20*, *21*
9:*2*, *4*, *8*, *9*, *21*, *22*
10:*10*, *16*  11:*4*  15:*21*
23:*22*  24:*2*  25:*15*, *19*
26:*6*  31:*6*  32:*3*  34:*2*
38:*3*, *9*  50:*22*, *23*
52:*10*, *11*, *16*, *18*
54:*17*  61:*12*  62:*22*
65:*15*, *22*  64:*25*
68:*7*, *13*, *14*, *16*  69:*21*
70:*13*, *21*  75:*6*  89:*17*
92:*4*  93:*1*  104:*13*, *24*
108:*24*  109:*3*, *9*, *24*
110:*1*, *13*  136:*21*, *22*
137:*3*
**Carmichael's**  104:*3*
153:*25*
**Carolina**  6:*6*  48:*22*,
*25*
**CASE**  1:*9*  4:*3*, *7*
7:*8*  30:*25*  96:*17*
122:*6*  140:*16*  151:*9*
159:*11*  177:*3*

**cases**  80:*1*, *2*  82:*15*
88:*6*
**categories**  133:*15*
**category**  112:*15*
127:*20*
**cautious**  134:*4*
**cell**  11:*11*, *14*, *19*, *23*
**Center**  1:*14*  2:*12*
67:*11*
**CEO**  19:*8*, *13*, *21*, *22*
20:*2*, *4*, *22*  26:*5*, *7*, *13*,
*14*, *24*  32:*5*, *20*  33:*12*
34:*3*  36:*4*, *11*, *15*
37:*1*, *2*  43:*3*, *11*, *23*
44:*7*  46:*1*, *6*  51:*7*, *19*
58:*24*  59:*8*, *12*, *17*
63:*23*  64:*10*, *21*  65:*6*,
*11*, *25*  69:*20*  70:*20*
72:*9*, *14*, *24*  73:*6*
75:*22*  76:*1*, *9*, *11*, *15*,
*16*, *21*, *23*  77:*10*
90:*13*, *16*  91:*4*, *9*, *13*,
*16*  93:*23*  95:*7*  97:*10*,
*15*  98:*2*  102:*24*
103:*5*, *12*, *21*  104:*4*
106:*2*  107:*5*, *24*
112:*4*  115:*13*  117:*16*
119:*2*  123:*1*  124:*16*,
*18*  128:*1*  133:*1*, *15*,
*20*  136:*22*  147:*3*
156:*21*  161:*6*, *8*
169:*6*
**CEO/CHRO**  92:*23*
**CEO/president**  65:*15*
66:*3*
**CEOs**  33:*1*  35:*25*
36:*1*, *3*, *13*  116:*1*
128:*7*, *12*  129:*15*
132:*4*, *13*  146:*23*, *24*
160:*17*
**certain**  41:*5*  64:*17*
100:*19*  121:*18*
**Certainly**  10:*2*  14:*11*
19:*12*  28:*12*  65:*21*
68:*4*, *13*, *14*  86:*24*
96:*5*  98:*11*  115:*4*, *8*
131:*24*  144:*1*  159:*11*
167:*5*, *16*  168:*6*
172:*3*, *4*

**certified** 4:*24*
**certify** 176:*6*
**CFO** 60:*15*
**CFOs** 160:*18*
**CFPB** 88:*13, 15*
**Chad** 64:*4, 8* 72:*13*
**chair** 34:*2*
**chairman** 15:*17, 21*
22:*13, 17, 21* 51:*13,*
*15* 80:*3* 156:*20*
**challenge** 158:*16*
**challenges** 50:*24*
99:*16* 155:*25*
**chance** 71:*5, 7, 8, 12*
84:*16* 94:*14, 18*
96:*16*
**change** 47:*22* 64:*16*
79:*1, 2* 90:*16* 98:*18*
178:*4, 7, 10, 13, 16, 19,*
*22* 179:*4, 7, 10, 13, 16,*
*19, 22*
**changed** 26:*24* 64:*13,*
*15, 16*
**changes** 23:*11, 14, 23*
24:*1* 26:*1, 2* 27:*1, 4*
31:*17* 58:*20* 59:*8, 11*
61:*6* 80:*8, 10, 13, 17*
84:*19* 106:*8, 24*
107:*4* 108:*13* 177:*11,*
*14*
**changing** 93:*13*
157:*16, 19*
**characteristic** 125:*16*
**characteristics** 133:*3*
155:*21*
**charcoal** 67:*19*
**charging** 135:*10*
**charisma** 170:*4*
**chart** 58:*24*
**check** 73:*1*
**Chicago** 7:*20* 13:*11*
34:*1, 16, 17* 38:*4, 6, 7*
50:*1* 90:*6* 101:*8, 12*
172:*21, 23*
**chief** 8:*25* 60:*24*
63:*9* 70:*15* 155:*21*
**child** 39:*12* 42:*5*
**childhood** 41:*18*
**children** 39:*14* 67:*8*

**choice** 59:*17* 74:*5, 7,*
*11* 156:*22*
**choosing** 153:*24*
**chose** 20:*1* 138:*7*
147:*6* 154:*21*
**chosen** 59:*18, 19*
60:*17* 102:*2* 121:*23*
156:*19* 158:*6*
**Chuck** 89:*14*
**Cincinnati** 1:*20* 2:*6,*
*13* 33:*7* 128:*5, 25*
129:*8* 132:*11* 176:*20*
**Cioffi** 2:*8* 3:*4, 5*
4:*14* 10:*13, 17* 11:*5,*
*12, 18* 12:*21* 18:*16*
21:*24* 28:*20* 29:*2, 17*
40:*24* 43:*12* 44:*3, 9*
51:*8* 53:*12* 56:*4*
62:*8* 65:*16* 69:*24*
70:*23* 71:*20* 73:*13*
75:*20* 76:*14, 20, 23*
77:*1, 5, 8, 13, 21, 24*
80:*25* 83:*17* 93:*24*
95:*18, 21, 23* 98:*16*
100:*3, 5* 104:*16*
119:*11, 15, 17* 120:*6*
125:*4* 129:*12* 131:*5,*
*10* 134:*14* 139:*4, 23*
140:*3* 141:*1* 143:*13*
144:*7* 145:*15* 147:*11*
148:*5* 149:*12* 151:*24*
153:*1* 154:*6* 155:*1*
161:*9, 20* 163:*24*
164:*3, 6* 165:*9, 19, 22*
166:*5, 9, 16, 19, 22, 24*
167:*7, 11* 168:*24*
169:*18, 21* 170:*15, 18,*
*20* 173:*13, 16* 174:*13,*
*18, 24* 175:*5*
**circles** 160:*21*
**circulation** 101:*1*
**circumstance** 158:*13*
**circumvent** 142:*18*
**cited** 39:*3* 65:*4*
**Civil** 176:*17*
**claim** 6:*25* 7:*1*
**claims** 7:*14*
**clarification** 44:*10*
**clarify** 19:*11* 28:*11*
29:*2* 44:*2, 13* 46:*3*

62:*25* 90:*12* 93:*25*
107:*20*
**clear** 9:*25* 10:*7*
29:*1* 35:*6, 19* 43:*9*
45:*18* 62:*2* 75:*21*
93:*15* 107:*16, 21*
111:*5, 19* 130:*7*
132:*3, 10*
**clearer** 5:*22*
**clearly** 21:*1* 37:*8*
99:*10, 13* 125:*12*
**clients** 34:*20* 36:*5*
46:*24* 151:*17*
**close** 27:*12*
**coach** 104:*3* 136:*21,*
*24* 137:*3*
**coached** 168:*9*
**cocktail** 135:*22*
**Colgate** 45:*7, 10, 19*
**collective** 97:*12*
98:*25*
**College** 7:*19* 42:*11*
44:*11, 25*
**com** 69:*16, 17*
**combination** 16:*23*
74:*3* 102:*25*
**combinations** 47:*6*
**come** 17:*6* 64:*2*
95:*23* 100:*12* 118:*9*
127:*3* 142:*21* 143:*14*
**comfort** 147:*24*
**comfortable** 20:*12*
59:*11* 99:*1* 156:*21*
**coming** 103:*1*
114:*15* 144:*16* 159:*8*
**Commencing** 1:*14*
**comment** 23:*6*
123:*16* 132:*15*
**commented** 144:*14*
**comments** 16:*11, 12*
61:*6* 143:*7*
**commercial** 35:*18*
**Commission** 176:*24*
**commissioned** 176:*5*
**Committee** 13:*3, 4,*
*19, 20, 21, 22, 23, 25*
14:*1, 3, 4, 6, 7, 9, 12,*
*14, 17, 19, 22, 23, 24*
15:*1, 3* 25:*23* 26:*4,*
*16, 18, 21* 27:*22* 31:*8,*

*14* 37:*18* 38:*15* 53:*2,*
*3, 5, 6, 11, 17, 20* 57:*7*
85:*13* 105:*17* 107:*4*
108:*8* 136:*8*
**committees** 13:*18*
**communicate** 10:*10,*
*15* 11:*3* 16:*6* 20:*13*
38:*18, 21* 60:*16*
69:*11, 12, 18* 99:*25*
**communicated** 10:*24*
12:*11, 15* 67:*23* 68:*6,*
*13, 15* 106:*20* 118:*22*
158:*2* 165:*17* 167:*25*
**communicating**
167:*10*
**communication** 32:*15*
43:*8* 45:*23, 25* 46:*5,*
*16, 18* 67:*20* 71:*18,*
*24* 72:*1* 90:*22*
104:*14* 117:*22* 146:*3*
166:*2, 20* 167:*20*
169:*9* 174:*10, 20*
**communications**
50:*22* 104:*10*
**communicator** 32:*19*
170:*4*
**communities** 128:*4,*
*10*
**community** 128:*5, 8,*
*11, 12, 15, 16, 17, 22*
129:*2, 22, 23* 132:*14*
**companies** 113:*4*
117:*6* 142:*14, 15, 16*
144:*19* 150:*25*
157:*20*
**company** 6:*18, 20, 21*
8:*6* 17:*10* 23:*5, 8*
53:*7* 125:*14*
**compare** 45:*2, 3*
124:*23* 144:*8* 145:*1*
148:*9* 151:*10*
**compared** 121:*12*
153:*14* 160:*7*
**comparing** 93:*18*
**comparison** 146:*5, 16*
**compelling** 158:*14*
159:*6*
**compensation** 14:*22*
15:*1* 25:*23* 26:*1, 4,*
*16, 21* 27:*22* 31:*14,*

16, 17 85:13, 17
97:23 105:17 107:4
108:8
**competitive** 144:10
146:12, 17, 22 148:15
149:9
**competitors** 69:1, 2, 3
148:19, 20, 21
**complaint** 76:20
**completed** 59:2
121:2
**completely** 9:25
42:13 76:5 121:15
**complex** 116:16
121:1
**complexity** 156:25
**component** 106:3
**components** 98:2
106:9
**concept** 93:2
**concern** 154:20
**concerned** 33:11
154:22
**concerning** 154:13
**concerns** 95:6, 13
**conclude** 159:3
**concluded** 64:17
103:8 159:4 175:19
**conclusion** 96:1
103:1 143:15
**conclusions** 146:9
**conduct** 16:3
**conducted** 84:19
122:11, 17
**conduit** 20:17
**conference** 81:10
**confident** 74:6 132:6
156:19
**confidential** 11:13
**confirm** 83:13, 23
84:1, 3, 11, 13 103:22
104:7
**confirmation** 106:7
**confirmed** 65:14
66:1, 5, 10
**conflicting** 60:5, 6
**confronting** 140:12
**confused** 44:17
**confusing** 70:24

**conjunction** 10:5, 8,
21 13:4 31:7 37:19
**connection** 6:17, 18
18:9
**CONRAD** 1:14 3:3
4:22 5:5 175:14
176:7, 11 177:19
178:24 179:24
**consider** 64:22 98:9
103:4 108:9
**consideration** 19:23
142:8
**considered** 65:24
69:19 70:1, 19 72:23
101:24
**consistently** 102:15,
16
**consolidate** 128:2
**constituencies** 60:6
**consult** 41:21
**consultant** 33:15
35:2 44:13 114:17,
22 115:25 118:13
**consultants** 42:21
114:3, 4 115:4
129:15
**consultant's** 103:19
**consulted** 39:17
**consulting** 34:20
36:10, 21 115:1
130:16, 19 131:22
143:24 157:11
160:20
**consumer** 64:9
116:23 138:14, 18, 20
**consumers** 142:18
**contact** 104:25 105:1,
3 129:16
**contacts** 33:21 34:25
35:3 37:4 46:20, 22
47:8, 11, 15, 18 119:4
128:14 129:18, 19, 22,
25 130:2, 4, 9, 11, 14,
15, 21 131:18, 21
132:5, 8, 13 143:25
146:2 147:4, 20, 22
148:2
**contains** 27:9
**content** 31:11, 13
66:19

**Context** 12:21 29:1
47:5 97:6 115:8
153:24
**continents** 40:13
**continual** 52:20
**continually** 15:14
**continuation** 173:11
**continue** 74:10
77:17, 19 88:3
106:10 114:10 175:7
**continued** 156:14
**continues** 156:18
**continuing** 133:10
**continuous** 158:22
**contract** 176:17
**contrast** 66:21
**contrasting** 93:19
**convenience** 67:12
**conversant** 116:8
**conversation** 28:24
29:13 32:6 34:10
36:11 46:11, 15
68:20 84:24 92:14
143:10
**conversational** 134:6
**conversations** 29:10
30:7, 8, 9, 10, 11, 14
31:10, 12, 24 32:2
36:17, 19 41:9, 11, 13
51:23 52:1, 3, 5, 23
61:2, 4 103:25
104:10 109:24
110:12 134:23 135:9
145:8 154:11 159:15
**converse** 28:18, 20,
23, 25 29:6 30:3
**conversing** 28:10
**conveyed** 150:16
**conviction** 67:14
**coordinate** 16:5
**copy** 21:21 54:16
62:15 85:19
**core** 122:11, 16
**Cork** 8:13
**corner** 22:5, 9 25:6
55:22
**corporate** 8:4, 5
16:16 97:13 109:11
**Corporation** 6:21
**Corps** 22:16

**Correct** 12:14 17:21,
22 18:5, 6 21:16, 17,
23 22:2 23:20 24:10,
11 25:7, 8, 11, 12, 16,
17 26:17 28:15 38:5,
6, 10 45:20 46:2
49:8, 22, 24, 25 50:2,
4, 6 54:17, 18, 23, 24
55:8, 12, 24, 25 56:8,
9 57:7, 8, 11, 12, 17,
18 58:1, 2, 6, 7, 25
59:1, 3, 4 62:4, 5
63:2, 3 65:15 72:6
75:2, 15, 19 76:3, 9,
10, 12, 13, 25 82:20,
21 83:15 84:4, 6
87:23, 24 88:18, 19
89:6, 7, 10, 11, 20, 21
92:9, 10, 12, 13, 16
93:16 95:17 96:8, 25
97:3, 4, 20 98:5 99:4,
5 101:13 104:14, 18,
25 105:8, 9, 23, 24
106:14, 15 107:18, 19
108:2, 3, 4, 15 111:7,
8, 21, 22 112:13
124:3 126:13 127:13
129:4 136:9, 14, 15,
22, 23 137:15, 16
140:7 161:2, 3, 24, 25
162:6 168:1, 23
170:9, 17 173:1, 2
**correction** 43:14
**corrections** 177:11
**correctly** 72:18
**correspondingly** 22:7
**counsel** 4:8 62:8
73:13 75:20 95:23
119:11 120:6 131:6
139:5 166:6 176:13,
14
**counted** 18:10
**countries** 40:14, 16
42:4 113:5
**country** 33:10 36:11
42:13, 23 49:16, 22
116:1 130:19, 20
**COUNTY** 176:3
**couple** 55:8 126:17
160:18

Case: 1:21-cv-00238-MRB Doc #: 66-1 Filed: 08/02/24 Page: 60 of 79 PAGEID #: 2683
Deposition of Marsha Conrad Williams
Philip R. McHugh v. Fifth Third Bancorp, et al.

**COURT** 1:*2* 4:*4*
5:*14* 72:*17* 139:*25*
176:*16*
**cover** 16:*24* 155:*13*
**covered** 16:*21* 36:22
49:*20* 86:*19*
**covers** 33:*10* 124:*1*
**COVID** 10:*24* 17:*17*
18:*9* 81:*5, 18* 82:22
**create** 67:*17* 77:*18*
**created** 23:*4*
**creating** 158:*16*
**creative** 99:*13*
123:*18* 155:*22*
**criteria** 100:*10, 19*
102:*11*
**critical** 32:*20* 91:*16*
102:*23* 116:*7* 145:*13*
146:*7, 8*
**critically** 44:*24*
103:*16*
**criticism** 165:*24*
**criticisms** 67:*21* 68:*6,
8*
**Crown** 8:*7, 13, 16, 18*
**CRR** 1:*20* 176:*4, 24*
**Cultivating** 127:*20, 24*
**culture** 158:*10*
**current** 6:*4* 31:*21*
69:*5* 159:*16, 17, 18*
**currently** 7:*21* 8:*2, 3*
14:*14, 19, 24* 15:*11*
56:*24* 101:*17*
**customer** 86:*8, 11*
**customers** 157:*14*
171:*10*
**cutting** 144:*19*
**cycle** 123:*3*

**< D >**
**data** 99:*15* 112:*17*
120:*2, 18* 125:*17, 19*
127:*21* 133:*17*
155:*23*
**Date** 1:*14* 6:*13* 10:*7*
68:*18* 72:*10* 75:*7*
90:*5* 117:*9* 162:*23*
163:*6* 175:*16* 177:*2*

**dated** 54:*15* 55:*15*
92:*11* 105:*18* 107:*13*
108:*24* 111:*16*
**dates** 14:*13* 27:*24*
119:*8* 163:*15, 21, 22*
**Davis** 8:*6, 11*
**day** 89:*6* 126:*20*
140:*23* 143:*8* 153:*3*
156:*18* 176:*21*
177:*16*
**days** 140:*22* 143:*24*
**dealing** 113:*15, 16*
156:*24*
**deals** 151:*19*
**December** 8:*21*
13:*13* 15:*18, 19, 22,
24* 31:*9, 18, 19* 50:*18*
52:*25* 53:*9, 13, 14*
54:*15* 55:*3, 15, 19*
56:*13, 21* 61:*7, 12*
62:*16* 65:*1* 70:22
75:*2* 78:*17, 21* 80:*14*
85:*12* 140:*8* 162:*15*
176:*25*
**decide** 77:*6*
**decided** 27:22 33:22
114:*9* 138:*3*
**deciding** 98:*1* 117:*23*
**decision** 25:*18* 60:*3*
78:*17, 21* 79:*3, 4, 6*
93:*5* 98:*3* 154:*7, 8, 9,
13* 156:*8* 157:*3, 25*
**decisions** 78:*24* 79:*3,
7, 10* 152:*24*
**deck** 53:*19, 23* 54:*2,
3, 23* 55:*1, 14, 19*
56:*18, 20* 57:*10, 25*
61:*7, 13, 24* 65:*3, 13,
22* 66:*1, 4* 71:*17*
72:*5, 25* 73:*12*
163:*12, 13* 165:*23*
166:*3, 21* 167:*8, 18*
**decks** 58:*12* 68:*21*
163:*15*
**DECLARATION**
177:*5*
**declare** 177:*6*
**decreased** 173:*1*
**deemed** 91:*15* 123:22

**deep** 35:*8* 115:*15*
116:*3*
**deeper** 115:*19* 128:*9,
20*
**deeply** 158:*9*
**defend** 81:22, 23
**Defendants** 1:*11* 2:*8*
4:*7, 15*
**defensiveness** 158:*17*
**deficiencies** 71:*18*
174:*10, 14*
**deficit** 165:*17* 167:20
**defined** 176:*17*
**definitely** 74:*12*
105:*1* 133:23 171:*21*
**definition** 26:*11*
**degree** 7:*18, 19*
44:22, 23 45:*9, 16*
**demonstrate** 141:*23*
142:*24*
**demonstrated** 145:*2*
148:*3*
**demonstrates** 155:*20*
156:*24*
**depart** 51:*16*
**department** 53:*24*
152:*8*
**departure** 137:*24*
**depended** 136:*2*
**depending** 136:*3*
**Depends** 9:*17*
**Deponent** 2:*8*
**depose** 176:*8*
**deposed** 4:*24* 7:*13*
**Deposition** 1:*14* 4:*3*
5:*7* 6:23 7:*5, 16*
77:*19* 139:*20* 175:*19*
176:*7, 10, 11* 177:*1, 8,
12* 178:*1* 179:*1*
**depositions** 6:*15, 16*
**depth** 39:*1* 66:*24*
68:*3, 4, 23, 24* 113:*11*
116:*11* 119:*2* 149:*18*
150:*15*
**derive** 99:*15* 155:*24*
**describe** 9:*1* 12:*3*
37:*12* 67:*1* 148:*15*
**described** 65:*23*
108:*14* 141:*11* 155:*3*

161:*21*
**designated** 11:*13*
**desire** 135:*10* 171:*18*
**desired** 75:*7* 155:*21*
**detail** 65:*11* 67:*14*
70:*1* 148:20 162:*11*
**detailed** 66:*17* 82:*10*
95:*15* 96:*7* 144:*24*
159:*9*
**details** 86:*18* 150:*1,
2, 3* 171:*21*
**determine** 19:*16*
74:*23* 93:22 139:*25*
**determined** 74:*1*
126:*10*
**develop** 26:*19* 35:*3*
96:*23* 99:*25* 106:*1*
127:*1*
**developed** 26:*6*
66:*13* 69:*13* 90:*14*
107:*1* 131:*21* 156:*10,
11*
**developing** 56:*25*
90:*11* 115:*8* 142:*15,
17*
**development** 63:*12*
73:22* 78:*4, 5* 111:*15*
126:*2* 158:*25*
**developments** 116:*9*
**develops** 26:*4*
**differ** 20:*5*
**difference** 67:20
**different** 20:*19*
34:*21, 24* 36:*17*
42:*13, 16* 43:*15*
49:*21* 53:*4* 60:*6*
77:*15* 82:*9* 93:*19*
96:*10, 22* 123:*11*
126:*24* 135:*24* 138:*2*
158:*3* 160:*6* 166:*7*
**differentiations** 43:*16*
**difficult** 5:*16* 44:*25*
45:*21*
**difficulties** 158:*19*
**difficulty** 167:*9*
**digit** 108:*2*
**digital** 32:*14* 35:*20*
43:*7* 69:*18* 93:*12*
99:*9, 21, 24* 100:*11*
101:*24* 102:*3, 10, 11*

Deposition of Marsha Conrad Williams      Philip R. McHugh v. Fifth Third Bancorp, et al.

117:*21*  126:*5*  133:*8,*
*13*  146:*4*
**diligence**  33:*17*
34:*12*  151:*19*  171:*1*
**Diligent**  79:*14*
137:*15, 19*
**dim**  80:*4*
**dinner**  12:*25*  30:*18*
136:*3*  140:*18*
**dinners**  28:*5, 6, 14*
30:*1, 9*  37:*16*  38:*14*
41:*16*  96:*16*  134:*22*
135:*15, 20*  136:*10, 16*
140:*21*  141:*12*
**diplomatic**  158:*15*
**direct**  30:*22, 24*  31:*3*
66:*21*  90:*22*  96:*24*
97:*3, 5, 18, 24*  98:*3, 7*
104:*14, 24*  151:*25*
155:*2, 12*  173:*17, 18,*
*23*
**directed**  26:*21*
**directing**  167:*1*
**Direction**  112:*16, 20*
113:*7, 10, 21*  114:*14*
115:*12*  129:*21*
**directly**  38:*18, 21*
**director**  13:*16*  15:*5,*
*7, 9, 12, 15, 17, 19, 25*
16:*1*  17:*3*  20:*5, 6, 19*
21:*4*  22:*14, 18, 22*
51:*14*  80:*4*  96:*13, 18*
139:*2*
**directors**  20:*6, 9*
62:*16, 21*  83:*11*  84:*6*
87:*19*  89:*1, 2*  93:*25*
94:*6, 7, 9, 12, 20, 23*
95:*17*  153:*20*  160:*12,*
*15, 16*
**discharge**  153:*7*
**disciplined**  122:*11, 17*
157:*4*
**discontinue**  168:*4*
**discovery**  139:*18*
173:*12*  175:*7*
**discriminate**  154:*12,*
*15*
**discrimination**  7:*2, 3,*
*4*

**discuss**  18:*25*  31:*2, 5*
32:*3*  61:*9*  69:*22*
86:*19*  92:*20*  93:*2*
140:*12*  145:*16*
152:*14*  154:*9*  155:*9*
156:*4*  157:*7, 8*  159:*1,*
*2*
**discussed**  32:*1*  53:*2*
56:*22*  63:*11, 25*  64:*4,*
*5, 7, 9, 25*  65:*2, 11*
73:*21*  78:*4*  85:*11, 16*
93:*4*  103:*7*  141:*13,*
*14*  151:*21*  156:*5*
**discussing**  33:*24*  75:*3*
**discussion**  52:*20, 21*
53:*21*  84:*25*  91:*3*
97:*23*  109:*4, 6, 10, 21*
110:*10, 14*  154:*20*
**discussions**  26:*3*
31:*14*  51:*17, 18*
52:*15*  61:*11*  66:*7, 14*
74:*9*  109:*8, 25*
153:*15*  154:*8*
**dismissal**  7:*1*
**display**  145:*14*
**dispute**  6:*24*  7:*15*
**disrupters**  144:*5*
**disseminate**  20:*13, 15*
**disseminating**  20:*17*
**dissenting**  20:*11*
**distinctions**  43:*15*
**distinguish**  17:*23*
89:*4*
**distribute**  55:*4*
**DISTRICT**  1:*2, 3*
4:*4, 5*
**DIVISION**  1:*4*  4:*5*
**divisions**  86:*16, 20,*
*23*  87:*3, 5, 8*
**DNA**  133:*25*
**document**  21:*13, 24*
27:*9*  54:*8*  58:*19*
59:*3*  62:*18*  71:*20*
90:*14*  92:*5*  95:*13*
104:*18*  108:*25*  110:*9,*
*25*  111:*2, 14*  120:*6*
144:*13*  152:*3, 7*
155:*4, 5*  170:*11*
174:*8*

**documents**  139:*19, 22*
152:*10, 13, 16*  153:*13,*
*18*
**doing**  5:*16*  56:*24*
82:*14*  90:*7, 9*  112:*25*
141:*20*  168:*1, 2, 3*
**domestic**  36:*5*
**domestically**  33:*17*
36:*23*
**doors**  33:*20*  131:*24*
132:*1*
**dot**  69:*15, 16, 17*
**double**  43:*24, 25*
45:*11*
**doubt**  23:*15*  125:*24*
130:*21*  156:*17*
**draft**  23:*23*  24:*3, 7,*
*15*  35:*15*  54:*25*
55:*14*  56:*13*  57:*17*
61:*7, 12*  69:*11*
107:*24*  114:*25*
**drafted**  23:*5*  35:*11*
37:*9*  71:*12*
**drafts**  23:*8*
**draw**  146:*10*
**drifting**  131:*6*
**drive**  157:*12*
**Driving**  120:*1, 4, 17,*
*20*  121:*4*  122:*7, 24*
123:*10*
**drugstore**  67:*12*
**due**  33:*17*  34:*12*
151:*19*  170:*25*  175:*7*
**duly**  4:*23*  176:*5, 8*
**duties**  15:*4, 25*  16:*2*
17:*3, 5*  138:*16*
**duty**  153:*3, 6, 7*
161:*3, 7*

**< E >**
**earlier**  98:*13*  103:*23*
121:*11*  129:*17*
137:*14*  140:*6*  143:*8*
145:*6*  149:*13*  153:*2*
155:*4*  163:*20*
**early**  13:*12*
**easily**  20:*12*
**East**  2:*12*  67:*9*
**eat**  35:*17*  157:*20*
**eating**  142:*10*

**economic**  122:*25*
123:*2*
**economics**  7:*18*
**edge**  144:*19*
**education**  7:*17*
19:*25*  43:*2, 7, 10, 22*
44:*5, 10, 12*  50:*7, 8*
93:*11*  143:*25*
**educational**  32:*11*
44:*20*  45:*4*
**effect**  142:*3*
**effective**  32:*19*  46:*19*
125:*2*  155:*21*  158:*20*
**effectively**  32:*18*
60:*16*  116:*17*  123:*3*
124:*25*  142:*1*
**efficient**  172:*4*
**either**  18:*13*  28:*14*
32:*8*  34:*15*  37:*6*
64:*14*  103:*19*  106:*8,*
*22*  138:*17*  140:*8*
162:*15*
**elect**  51:*6*
**elected**  140:*8*
**election**  156:*16*
**element**  35:*7*
**eliminated**  72:*8, 13*
**Email**  2:*7, 14*  11:*4, 9,*
*14*  12:*16*  24:*16, 17,*
*18*  38:*22, 23*  54:*11,*
*13, 14, 19, 22, 25*
61:*23*  90:*22*  92:*3, 11*
105:*16, 20, 25*  106:*22*
107:*12*  108:*5, 23*
109:*2, 10*  110:*5, 8*
**emergency**  59:*17, 21*
60:*2, 12, 15, 17*
**employed**  7:*21, 25*
**employee**  85:*10, 24*
86:*3, 5*  109:*12*
176:*13*
**employees**  18:*23*
158:*11*  171:*11*
**employment**  6:*24*
**ended**  14:*1*
**energetic**  133:*24*
**energy**  133:*22*  134:*2,*
*7, 24*
**enforcement**  88:*4*

Case: 1:21-cv-00238-MRB Doc #: 66-1 Filed: 08/02/24 Page: 62 of 79 PAGEID #: 2685
Deposition of Marsha Conrad Williams
Philip R. McHugh v. Fifth Third Bancorp, et al.

engaged 89:15 143:10

engagement 4:17 86:3, 6

enormously 42:17 159:5

Enterprise 19:16, 17 53:2, 3, 5, 6, 11, 17, 20 57:7 136:7

entire 19:16 20:23 26:3 33:3 53:1 65:3 93:8 123:22 162:3, 5 177:7

entitled 4:5 131:10

entity 98:14

entrepreneur 133:23, 25 134:1, 2, 7, 19

environment 141:25 142:25 143:17 144:10 157:17

equivalent 113:10

Erie 2:6

ERRATA 177:1, 13 178:1 179:1

Esq 2:1, 4, 8, 17

essential 91:13 112:12 120:1, 16

essentially 112:4

establish 113:9, 20

established 27:2

establishing 100:10 112:16, 19 115:12

estimate 72:11

estimated 163:1

et 1:10 4:7 177:4

Europe 40:3, 8, 21

evaluate 17:8, 9 18:24 19:15, 24 25:25 74:10, 21 94:18 96:20 100:20 153:23 164:10

evaluated 74:16 94:6 153:13 158:4

evaluating 26:6 52:13 94:13, 20 124:14 152:21

evaluation 19:6

Evans 89:14 91:5

events 137:23 159:16, 17, 18

eventually 77:5 126:20

everybody 101:5, 7, 8 129:5, 7

evidence 95:19 98:17 113:16 122:15, 19, 22 123:6 128:19 133:6 134:24 148:2 169:19

evidenced 68:24 132:12 135:12 160:5

evolve 126:20

exact 27:10, 24 49:9 50:19 72:10, 22 90:5 151:4, 6 162:23 163:6, 15, 20, 22

exactly 7:7 10:7, 20 17:14 29:20, 25 34:11, 16 37:24 45:12 48:17 58:12 81:21 117:15 127:4, 6 163:4 165:11 168:8

Examination 3:4, 5 5:1 140:2 161:18 173:15

examine 132:7

examined 4:24

example 16:20 29:3 30:24 32:17 36:3, 25 37:20 64:16 115:3, 4

examples 40:22

excellent 122:21

exceptional 156:24

Excuse 16:1 35:17 42:11 69:17 85:12 95:4 96:13 99:17, 19 112:22 113:4 125:18 156:20

executed 170:23, 24

executing 113:6

Execution 120:1, 5, 17, 20 121:4 122:8, 24 151:18

executive 16:4 18:15, 22 19:8 20:3, 21 25:23 31:8 55:1 56:14 61:25 63:9 70:15 79:16 84:7, 8, 12, 14, 16 111:15

137:17 155:16 158:8, 21 159:23

executives 31:20 68:20 94:16, 17 152:18, 19 168:1, 2, 9

executive's 163:13

exercise 17:7 143:15 153:3 156:25 161:4

exercised 161:6

Exhibit 3:5, 8, 9, 10, 11, 12, 13, 14 21:5, 9 23:1 24:20, 24 25:5 54:5, 9 55:21 56:11 61:15, 19 62:2, 6, 8, 13, 23 63:4 71:13 73:15, 17 75:14, 16 76:7 77:16 83:5, 9, 13, 23 87:13, 16, 20 88:20, 24 89:4, 5, 8 91:22 92:1, 7 104:12, 23 105:10, 14, 19, 21 107:7, 10, 14, 16, 21 108:17, 21 110:5, 18, 21 111:5, 9, 13, 17, 19, 25 112:3 120:7, 8 152:1, 10 153:8 155:2 166:4, 16, 17 169:11 170:2 173:18

EXHIBITS 3:5

expectation 114:13

experience 19:25 32:11, 22, 24, 25 33:2, 4, 6, 8, 13, 14 34:19 35:25 36:7 39:10 40:23 42:8, 9, 14 43:7 48:6 51:10 65:7 73:7 74:18, 23 86:9, 12 93:11 94:13 99:15 113:2, 11, 15, 16 117:5, 19, 25 118:6, 7, 8, 11, 25 141:24 142:24 143:17 151:11 153:21 155:24 160:23, 25 174:15 175:1

experiences 45:4

expires 176:24

Explain 16:8 23:3 66:23 67:16 117:24 135:16

explained 69:25

exposure 39:13 42:12 73:7 78:13 128:15

exposures 88:3

extensive 36:21 94:12, 13 99:7 113:2 128:6 129:9 130:22 132:5, 12 151:23 169:2

extensively 42:20

extent 7:17 30:10 139:21 150:15

external 115:25 128:16 132:13

extraordinary 125:24 126:6 143:23

extremely 142:4, 5 149:6, 7 151:4

< F >

face 152:11 158:19

facilitates 158:17

facility 69:5 147:24

fact 5:15 21:18 35:8 41:19 44:21 84:22 96:2 101:14 122:20 123:14 129:3, 6 130:25 146:20 150:10, 14 168:21 170:13 174:8

factor 44:6 98:1, 5, 6, 9 117:23 154:9, 10

factors 102:25

facts 95:19 96:3 98:16 169:18

fair 69:21 70:20 95:15 108:12 156:7

fairly 27:4 60:3 100:21 106:25 149:25 157:15 169:2

familiar 88:15 100:22 102:10 115:3, 10 121:15

family 42:2

far 79:9 99:6 103:2 125:13 145:21 146:1,

*4* 151:22 154:2
158:*4*
**fascinating** 148:2*4*
**FDIC** 172:22, *23*
**feasible** 47:*2*
**February** 1:*14* 4:*1*
85:*12* 177:2
**fee** 7:*15* 88:5
**feedback** 9:*12* 46:*12*
55:6, *19* 61:6 95:6
158:25
**feel** 5:*12* 20:*11*
23:*19* 98:4, *7, 22, 25*
116:6 124:7 156:*18*
**Feiger** 36:*4*
**fellow** 156:*3*
**felt** 46:8 59:*11* 74:6,
*11* 75:4, *9* 97:25
103:*20* 113:2 145:*19,
20, 22* 156:*16*
**fenced** 67:7
**fewer** 141:*9*
**fiduciary** 161:*3, 7*
**FIFTH** 1:*10, 14* 2:*12,
17* 4:6, *18, 20* 8:7, *22,
23* 12:2 13:*9* 17:*12,
20* 18:*4, 15, 23* 19:*8,
14* 20:*4, 22* 21:22
22:*15* 25:*10, 24*
26:*23* 30:*16* 32:5
33:*3, 9, 21* 34:*3, 5*
37:*1, 4* 43:*3, 11, 23*
44:7 48:8, *12* 51:*2, 3,
6, 16* 55:*23* 56:*1, 8,
11, 12* 57:*9, 24* 58:22
62:*3, 24, 25* 63:*1, 5*
66:*3* 68:24 69:23
70:*10* 71:*16* 73:*15,
18* 75:*17, 18* 78:*2, 23*
83:*13, 14, 24* 87:*10,
21, 22* 89:*1, 5, 8* 90:7,
*9* 91:*16* 92:7, *8*
93:*23* 97:*11, 15*
102:*5, 8, 23* 103:*6*
105:*22* 107:*17, 22, 23,
25* 111:6, *20* 112:*2, 3,
10* 113:*23* 114:*17, 22*
115:*11* 116:*16, 17*
118:*5, 21* 120:8
122:*3, 9* 123:*4, 8*

124:*8* 126:*6* 129:*18*
133:*20* 137:*24*
138:*10* 147:*7, 10*
155:*22* 156:*21* 158:*6*
166:*14* 167:*2, 19*
169:*6, 15, 24* 171:*14,
16, 18* 172:*1, 7, 11, 20*
177:*4*
**figure** 163:*3*
**filed** 76:*17* 77:*1*
**filings** 79:*5*
**filled** 57:*16* 59:*5*
**final** 133:*15*
**finalized** 23:*7* 79:*25*
80:*6* 108:*9*
**finance** 13:*20* 14:*5,
7, 9*
**Financial** 10:*5* 33:*19*
34:*5, 7, 13* 60:*24*
86:*15* 87:*2* 102:*22*
117:*7* 118:*15* 119:*2*
120:*23* 121:*17, 24*
128:*8* 130:*9* 131:*25*
132:*14* 142:*2, 14, 18,
21* 144:*1, 15, 19*
147:*6* 157:*19* 159:*19*
**find** 42:*23* 51:*3*
52:*17* 134:*25* 135:*11*
164:*9*
**findings** 156:*4, 5, 6*
157:*7, 8, 23* 159:*1, 2*
**fine** 11:*17* 100:*7*
119:*16* 125:*8, 9*
129:*7* 135:*2*
**fingertips** 149:*6*
**finish** 5:*19, 21*
**Fintech** 35:*8* 48:*16*
65:*8* 68:25 69:*17*
116:*4, 9* 117:*19*
121:*2, 3* 126:*25*
128:*15* 129:*23*
130:*10* 133:*7* 142:*9,
10, 13* 143:*7, 18*
144:*2, 4, 11*
**Fintechs** 35:*16, 19*
113:*13* 116:*5, 7*
123:*12* 126:22
157:*20*
**firm** 26:*19* 36:*9, 10*

115:*9* 176:*16*
**firms** 48:*20* 115:*1*
**first** 4:*23* 8:*20, 21*
11:*25* 22:6 26:*5, 16*
37:*5, 7* 54:*12, 13*
56:*17* 63:*5* 70:*11*
72:*5* 87:*25* 92:*18*
101:*8, 12* 102:*7*
104:*3, 7* 109:*7*
112:*15* 115:*13*
118:*24* 152:*1* 155:*12,
19* 156:*23* 162:*14, 18*
176:*8*
**first-name** 132:*4*
147:*1*
**fit** 155:*20*
**five** 6:*8* 17:*15, 18*
18:*1* 19:*17* 29:*23*
42:*22* 74:*14* 140:*19*
168:*23*
**flight** 39:*12* 40:*17,
20* 41:*24* 42:*1*
**Florida** 49:*24*
**focus** 57:*4, 5, 14*
58:*4* 123:*4, 8* 129:*3,
5, 21*
**focused** 123:*14*
132:*10*
**follow** 78:*7* 152:*16*
166:*11*
**following** 9:*21* 26:*2*
70:*12*
**follow-on** 88:*5*
**follows** 4:*25* 158:*9*
**Follow-up** 109:*3*
**footprint** 33:*10* 49:*23*
**forced** 60:*3*
**forces** 133:*9*
**foregoing** 176:*10*
**foreign** 41:*21*
**forgotten** 27:*10*
137:*10* 138:*14, 23*
**form** 40:*24* 53:*12*
65:*16* 70:*23* 104:*16*
158:*3*
**formally** 52:*25*
**format** 136:*2*
**formed** 14:*7* 26:*22*
**former** 37:*1* 160:*17,*

*18*
**formerly** 6:*19* 92:*19*
**formula** 27:*12, 13, 17*
90:*13* 91:*10*
**forth** 27:*6* 75:*14*
100:*10* 159:*23*
**forward** 55:*7* 81:*20*
82:*6* 116:*18* 127:*2*
146:*7*
**forwarded** 110:*7*
**forward-looking**
102:*10*
**forward-thinking**
99:*14* 123:*17* 155:*22*
**foundation** 169:*21*
**four** 8:*3* 42:*22* 75:*5*
81:*16* 135:*25*
**Fox** 87:*11*
**fraction** 151:*7*
**frame** 9:*24* 10:*2, 17*
11:*5* 49:*15* 51:*8*
53:*13* 75:*11* 104:*6*
114:*21*
**framework** 26:*4, 5, 8,
9, 23* 27:*2, 6, 8, 9, 23*
118:*2* 122:*12, 17*
**Franklin** 49:*7, 10*
**frankly** 132:*16*
**free** 5:*12*
**frequently** 10:*15*
11:*3* 12:*10* 27:*13*
29:*14* 80:*10*
**front** 103:*18* 111:*25*
**full** 5:*5* 21:*3* 40:*4*
63:*6* 70:*11* 83:*22*
87:*25* 89:*12* 115:*22*
133:*2, 3* 156:*15*
**function** 75:*5*
**functions** 53:*7*
**fund** 6:*17* 7:*14*
**funding** 47:*4*
**Funds** 8:*6, 11*
**Further** 3:*5* 144:*5*
158:*23* 161:*9, 18*
173:*15* 175:*5*
**future** 69:*18* 84:*20*
115:*6* 118:*4* 123:*14*
125:*12, 13* 133:*8, 12*
143:*23* 145:*13*

146:*25*  148:*22*
171:*19, 20*

**< G >**
**gain**  138:*8*  158:*18*
**gaining**  35:*17*
**garage**  67:*4*
**Garrett**  82:2, *9*
**general**  27:*1*  46:*6*
149:*24*
**generally**  9:*10, 18*
10:*8*  16:*10*  17:*10, 14,
15, 17, 25*  19:*3, 22*
79:*15, 23*
**generated**  152:*6*
**generator**  123:*18*
**gentleman**  33:*20*
**geographic**  33:*6, 12*
42:*8*
**give**  6:*16*  20:*19*
59:*20*  106:*9*  162:*23*
163:*15, 22*
**given**  6:*15*  24:*1*
60:*10*  85:*14*  116:*10*
122:*25*  155:*6*  157:*10*
176:*10*
**giving**  176:*7*
**Glint**  142:*19*
**global**  33:*2*  39:*10*
40:*23*  113:*14*
**go**  5:*3*  10:*13*  11:*18*
33:*23*  39:*20*  40:*1, 5*
44:*16*  45:*6, 14*  47:*21*
56:*22*  60:*4*  66:*23*
67:*6*  73:*10*  85:*1*
94:*5*  95:*22*  98:2, *21*
103:*7, 10, 12*  104:*20*
125:*25*  131:*9, 12, 25*
139:*9*  140:*14*  143:*2,
20*  145:*4*  146:*13*
147:*16*  151:*13*
153:*10*  154:*17*
161:*10*  169:*21*  173:*3*
**go-ahead**  106:*9*
**goals**  20:*25*  86:*15*
87:*3, 6*
**goes**  83:*16*  96:*17*
106:*6*
**going**  5:*10*  11:*12*
28:*20*  29:*8*  32:*21*

39:*19*  42:*16*  47:*24*
77:*19*  81:*19, 20, 21,
22*  82:*5, 12*  85:*3*
95:*21, 24*  98:*13*
109:*19*  113:*12*  116:*9,
18*  119:*11, 19*  124:*21*
139:*12*  148:*21*  160:*1*
161:*13, 22*  162:*13*
168:*11, 12*  173:*5*
175:*10*
**golly**  138:*23*
**good**  37:*3*  75:*11, 12*
95:*1*  121:*23*  122:*23*
125:*7*  145:*23*  146:*23*
154:*21*  157:*6*
**governance**  13:*22*
14:*17*
**Government**  88:*1*
160:*21*
**grade**  67:*8*  117:*16,
22*
**graduate**  50:*8*
**grasp**  143:*23*
**great**  67:*8, 13*  68:*23*
70:*1*  82:*15*  159:*17*
170:*4, 6*
**Greg**  8:*20, 21*  9:2, *4,
12*  15:*21*  16:*6*  26:*6*
31:*5*  32:*3*  34:*2*  38:*3,
8*  50:22, *23*  51:*18*
54:*16*  61:*23*  78:*6*
79:*17*  85:*13*  92:*4*
93:*1*  104:*3*  106:*1*
108:*7, 23*  110:*4, 9, 15*
136:*21*  137:*3*  153:*24*
**Greg's**  27:*21*
**gross**  151:*3*
**group**  58:*11*  94:*11*
113:*2*  130:*19*  152:*18*
**grow**  156:*14*
**growth**  115:*14*  135:*1,
7, 8, 11*  148:*22*
**guarded**  46:*8*  145:*8*
150:*8, 18, 21, 22*
**guess**  9:*25*  77:*5*
100:*2*
**guessing**  100:*5, 7*
**guidelines**  26:*10, 22*
90:*11*

**Guy**  89:*14*  92:*14, 18,
22*  103:*23*  104:*1, 4*
106:*1, 2, 9*  107:*12*
136:*20, 24*  137:*2*

**< H >**
**Hackett**  51:22, *25*
52:*1*
**half**  67:*6, 9*
**Hamilton**  45:*7*  176:*3*
**hand**  84:*24*  158:*13*
176:*19*
**handed**  21:*8*  24:*16,
23*  54:*8*  61:*18*  62:*9,
12*  83:*8*  88:*23*  91:*25*
105:*13*  108:*20*
111:*12*
**handled**  26:*3*  51:*24*
**happen**  29:*14*
**happened**  29:*3*
76:*16*  84:*11*  164:*11*
**happy**  96:*5*
**hard**  135:*10*  141:*7*
**HCC**  31:*8*
**head**  5:*18*  35:*10*
49:*17, 19*  126:*4, 5*
**hear**  5:*11*  46:*10*
94:*3*  97:*21, 22*  143:*6*
**heard**  94:*4*  132:*15*
**He'd**  117:*3*
**held**  31:*9*  34:*16*
64:*19*
**help**  26:*19*  35:*21*
90:*15*  114:*13*  115:*5*
120:*22*  127:*1*  129:*24*
**helped**  170:*22*  171:*4,
7*
**helpful**  18:*20*  42:*17*
153:*18*  166:*21*
**helping**  90:*12*
113:*23*  171:*1*
**Hennard**  54:*14*
**hereinafter**  4:*24*
**hereof**  177:*13*
**hereunto**  176:*19*
**high**  44:*11*  67:*10*
87:*5*  100:*20*  102:*15*
149:*25*  157:*5*  173:*24*
174:*5, 19, 20*  175:*1*
**Highlights**  92:*17*

**hire**  69:*9*  94:*24*
114:*1*  115:*4*
**hired**  26:*19*  35:*6, 9,
21*  69:*7*  98:*14*  99:*8*
112:*21, 22*  113:*1*
114:*2, 9, 17, 23, 25*
115:*2*  127:*7*  129:*20*
136:*21*
**hires**  36:*9*  103:*15*
114:*4*
**hiring**  114:*16*
**Historically**  114:*2*
123:*6*  124:*22*
**history**  13:*8*  45:*12,
13*
**Hoffman**  126:*4, 12*
127:*3*
**hold**  139:*20*
**Holdings**  8:*7, 16, 18*
**holds**  157:*5*
**hone**  158:*23*
**hope**  64:*14*  108:*6*
**hopes**  114:*12*
**hour**  119:*12*  135:*22*
**hours**  167:*13*
**house**  67:*1, 4, 17, 19*
**Housekeeping**  95:*1*
**houses**  147:*21*
**HR**  53:*24*  57:*20, 21*
58:*13, 15, 16*  152:*8*
**human**  14:*21, 25*
25:*22*  26:*15*  55:*1*
56:*13*  61:*25*  105:*17*
107:*4*  108:*8*
**hundred-plus**  148:*7*
**Huntington**  37:*2*
**husband**  6:*10*

**< I >**
**idea**  40:*16*  66:*12*
123:*18*  125:*2*  168:*21*
**ideas**  123:*18, 19*
158:*16*
**identical**  82:*8, 15*
163:*12*
**identification**  21:*6*
24:*21*  54:*6*  61:*16*
62:*7*  83:*6*  87:*14*
88:*21*  91:*23*  105:*11*

107:8  108:18  110:19
111:10
**identified**  67:21  75:7,
17  91:13  95:6, 13
**identifies**  112:12
**identify**  21:9, 11, 12
22:11  24:24  51:6
54:9  61:19, 21  62:13
83:9  87:16  88:24
92:1  100:10  105:14
107:10  108:21
110:21  111:13
126:15
**identifying**  52:9
**impact**  116:6  133:10
142:8, 10  157:1
170:7
**impacted**  81:18
148:10
**impacting**  133:9
141:25  142:25
**importance**  16:24
35:17
**important**  34:8  35:7
65:10  69:8  79:6
98:12  101:9  102:20
103:16  129:10
152:23  153:5  162:1
**impressed**  38:25
**impression**  145:7
169:5
**improper**  70:3  95:25
**improve**  172:3
**include**  12:13  49:24
**included**  22:16
29:12  44:6  70:20
71:5  119:5
**includes**  21:21  65:3
107:22, 23  110:5
161:5
**including**  29:17
41:21  63:10  70:16
73:21  95:25  113:23
114:6, 7
**income**  86:21, 25
**incorporate**  72:1
**increase**  129:20
172:9, 10
**increased**  39:16

**increment**  139:7
**independent**  13:15
15:4, 6, 8, 11, 15  16:1
17:3  20:6, 8, 9, 19
22:14, 17, 22  35:2
93:21, 25  94:6, 7, 8,
12, 19, 22, 24  95:16
98:14, 15, 23  99:3, 17
143:15  153:3  156:3
160:12, 15, 16
**in-depth**  52:15
102:17  116:2  143:10
144:24  146:21  150:2
159:12
**indicate**  46:17
134:10  167:19
**indicated**  28:13  38:4
43:2  103:22  128:24
167:8  177:12
**indicates**  89:13
105:25  108:6  109:2
115:13
**indicating**  112:17
120:2, 18  125:20
127:21  133:17
**individual**  87:8  98:8
158:3, 13
**individuals**  53:22
56:23, 24  63:18
74:14  81:4  104:24
**industries**  69:16, 17
**industry**  44:13
68:25  69:6  99:7, 12
101:10, 15  113:14, 17
115:16, 19  116:3, 4, 6,
12  117:2, 14, 19
119:5  129:25  130:9,
10, 11  132:5  133:10
140:13  141:25
142:16, 19  143:1, 18
144:6  146:2, 3, 12, 18,
23  148:11, 16  159:19
174:15  175:2
**information**  42:24
53:10, 16  57:13, 19
58:3, 5, 8, 9  59:6
65:12, 13, 17  66:1, 4
87:2  93:16  100:9
104:22  112:17  120:2,

18  125:17, 19  127:21
132:19  133:17  138:9
139:21  150:19  152:9,
22, 23, 25  153:8, 12,
13, 14, 19  173:20, 24
174:2
**infrastructure**  115:5
**inherent**  158:21
**in-house**  37:10  69:8,
10
**initially**  16:17
**initiate**  121:21
**initiated**  63:7  70:13
120:22  121:22
**innovative**  99:16
155:24  170:5
**inroads**  116:4
**inserting**  52:10
**inside**  35:15  114:8,
12  116:8  155:13
160:15
**insightful**  158:23
170:5
**insights**  69:5
**institutions**  36:23, 24,
25
**instruction**  59:20
**instructions**  5:23
**instrumental**  102:18
**integration**  171:11
**interact**  47:1  96:16
**interacted**  29:4  36:4,
14
**interacting**  33:1
35:24  36:1
**interactions**  140:24
141:2, 6, 10, 12, 22
142:22  143:14  144:9
146:10  147:14
153:22  156:12
159:20  161:21, 24
162:10, 13, 20, 21, 22
163:5, 7  164:14
168:11, 22  169:1, 3
**interchange**  88:5
**interest**  17:10  176:15
**interested**  34:4, 9
**interesting**  153:18
157:9

**internal**  79:10  92:24
93:8, 9  103:9  156:17
**internally**  112:24
113:25  127:1  129:19
**International**  27:11
36:6  39:12, 18  41:20
89:14, 19, 22, 24
**internationally**  33:17
36:24
**interpersonal**  91:15
**interview**  13:10, 11
30:22  105:5
**interviewed**  95:4
97:8  118:24
**interviewing**  8:22
**introduce**  4:8  78:7
**introduced**  34:6
89:13  127:18
**invaluable**  147:4
**investigation**  96:8
**investment**  34:23, 25
35:1  47:1  123:4, 8
128:11  132:14, 15
147:21, 23
**investments**  141:18
**investor**  78:8  141:19
**investors**  61:1
**invited**  13:10, 11
**involve**  7:14
**involved**  22:20
36:11  37:21  38:1
51:18  52:4  58:18
78:8  121:14, 18
128:4  151:18  172:16
**involvement**  51:5, 21
52:2  54:1  121:25
128:24  129:2  150:24
**issue**  144:25  168:6
**issued**  24:10
**issues**  36:2, 12  114:3,
5, 18, 23  115:2
139:19  140:12  143:7,
11  144:19  173:12
175:7, 8
**item**  46:17  68:12
121:1
**items**  17:16  109:3
**its**  98:24  128:4
147:10  154:8, 13

157:*14*  158:*10*

**< J >**
**January**  7:*24*  10:*3, 6,
*19*  12:*1, 6, 10, 16, 19*
*18*:21  27:25  28:*3, 7,
12*  29:*9, 19, 21*  30:*15,
21*  37:*11*  80:*18, 24*
83:2  140:*9*  162:*15*
**Jim**  51:*22, 25*  52:*1*
jms@sspfirm.com  2:*8*
**job**  138:*2, 3, 5, 6, 11,
15*  154:*21, 24*
**join**  13:*13*  121:*25*
147:*7, 8, 9*
**joined**  64:6  94:*10*
117:*4, 5*  140:6, *10*
162:*14*
**joint**  22:*17, 21*  23:25
25:*14, 19*
**Joshua**  2:*4*  4:*12*
**journals**  144:*17*
**judge**  77:5
**judging**  124:*13*
**judgment**  17:7
97:*13*  122:*21*  124:*11,
12*  143:*16*  153:*4*
154:*1*  160:*25*  161:*4,
7*
**judgments**  152:*15, 17,
21*  153:*17*
**Jula**  58:*16*
**July**  105:*18*  106:*13*
107:*13, 24*  111:*16*
**June**  31:*14*  52:*14, 24*
81:*3, 14*  82:*24*  83:*12*
91:*3*  92:*11*  149:*15*
163:*10*

**< K >**
**Kabat**  13:*11*  37:*1*
52:*10, 13, 15*
**keep**  60:7  79:*19*
82:*14*  114:*10*  135:*15*
136:*13, 18*  137:*15*
**keeps**  144:*18*  159:*16*
**Kentucky**  132:*11*
**kept**  9:*13*  144:2
**Kevin**  13:*11*  36:25
51:*12, 15*  82:2, 6

**key**  58:*3, 4*  63:*12*
73:22  78:*3, 5*  92:*17*
146:*1*  148:*19*
**kind**  7:*3*  26:*12*
66:23  80:*4*  95:*1*
96:22  100:*20*  135:*1*
171:*17*
**kinds**  74:8  141:*12*
**Klopfenstein**  88:*6*
**knew**  34:6  35:22
69:*4*  103:*17*
**know**  6:*1*  8:*14*
14:*11*  23:8, 22, 24
24:*5, 19*  33:*3*  35:2
36:*3, 25*  39:*13, 15, 21,
22, 24*  40:*2, 4, 6, 7, 9,
10, 13, 15, 19*  41:*3, 4,
5, 23*  42:*1, 4, 22*
45:*21*  47:*10, 20*  48:6,
*10, 11, 22*  49:*1, 2, 4, 6,
9, 14, 16*  52:*19*  55:*5*
57:*2, 19, 22*  58:*9, 12,
17, 18*  59:*5*  61:*5, 8*
64:*2, 17*  66:*15*  67:*24,
25*  71:*7, 10, 11*  74:*19*
75:*10*  77:*7, 13*  79:*2,
4*  81:*17*  82:*14*  84:*20*
95:*8*  99:*23, 25*
100:*13, 14, 17, 23, 24*
101:*2, 3, 4, 23*  102:*1*
103:*10, 11, 14*  105:*2*
107:6  114:*19, 24*
115:*7*  117:*6, 15*
118:*2, 18, 20*  119:*5*
121:*16, 20, 21*  122:*19*
123:*15*  125:*6, 8, 10*
126:*8, 10, 16*  127:*6,
15*  128:*4*  129:*6, 16,
19*  130:*11*  131:*23*
133:*2, 14*  135:*2*
136:*13*  137:*1, 2, 4, 5,
7, 11, 20, 21, 22*
138:*24*  147:*1*  150:*17*
151:*6*  155:*3*  159:*7,
14*  162:*21*  163:*4, 6, 9,
20*  168:*4, 13*  169:*15,
24*  170:*3, 8, 12, 13*
171:*4, 7, 10, 13, 23, 25*
172:*8, 12, 14, 17, 23,
25*

**knowledge**  28:*8*
32:*12*  39:2  43:*7*
60:*11*  61:*14*  68:*4, 23,
24*  93:*11, 12*  99:*7, 24*
102:*17*  115:*15, 19*
116:*2, 4, 10, 12, 15*
132:*12*  133:*7*  141:*24*
142:*25*  143:*6, 16*
144:*9, 12*  145:*1, 12,
14*  146:*2, 11, 17, 18,
21, 23*  147:*3, 15*
148:*9*  150:*16, 18*
151:*10, 11, 22, 23*
159:*13, 17*  165:*16*
174:*15*  175:*1*
**knowledgeable**  142:*4,
5*  149:*2, 7*
**known**  137:*9, 13*
**knows**  157:6
**Kris**  82:2, *9*

**< L >**
**L.P.A**  2:*5*
**lack**  82:*15*  149:*14*
**lacked**  113:*9*
**lacking**  32:*23, 24, 25*
33:*1*  42:7
**Lamb**  64:*9*  72:23
**Lamb's**  73:8
**landscape**  144:2
146:*12, 17, 22*  148:*15*
149:*9*  151:22
**language**  70:*11*  82:*4,
6, 8, 9, 10, 16*  156:*1*
**large**  36:24  102:*20,
21*  116:*15*  120:*24*
135:*4*  154:*24*
**larger**  120:*23*
**Lars**  64:*5, 17*  72:*8*
**Lavender**  82:2
**Lavender's**  82:6
**lawful**  4:*23*
**lawsuit**  76:*15, 16, 19*
77:*1, 4*
**lead**  13:*15*  15:*4, 6, 8,
11, 14, 17, 19, 25*  17:2
20:*5, 18*  22:*13, 17, 22*
35:*21*  53:7  80:*4*
98:*11*  116:*15, 17*

**leader**  126:*11*  139:2  158:*6*
159:*10*
**leader**  57:*15*  58:*5*
82:*16*  103:*20*  125:*7,
11, 13*  135:*4*  158:*9*
170:*5*
**leaders**  20:*24*
**leadership**  91:*14*
97:*13*  112:*12*  117:*18*
120:*1, 16*  125:*25*
126:*7*  146:*8*  155:*20*
158:*12*
**leading**  36:*10*  51:22
74:*12*  125:*17, 22*
137:*24*  146:7
**leaning**  79:*8*
**learned**  42:*15*
**learner**  158:22
**learns**  44:*12*
**led**  48:*7, 9, 24*  49:2
102:*17*  145:*11*
171:*23*  172:*12, 17*
**Legal**  87:*25*  141:*15*
**legislative**  128:*12*
157:*16*
**length**  51:*9*
**letter**  4:*17*  22:*13, 17,
21, 25*  23:*4, 9, 11, 14,
16, 23*  24:*1, 7*  25:*14,
19*
**letters**  22:*24*
**level**  31:*15*  87:*5*
102:*15*  113:*10*
149:*25*
**levers**  157:*1, 11*
**liberal**  44:*22, 23*
**likelihood**  94:*20*
122:*25*
**likes**  150:*6*
**limited**  33:*6, 8*
**line**  53:7  81:*16*
86:*17*  157:*2*
**lines**  63:*8*  70:*14*
73:22  74:*1*  77:*15*
81:*3*  82:7  141:*21*
**list**  32:*21*  40:*4*
43:*18*  46:*13*  47:*14*
58:*14*  71:6  94:*17*
119:7  129:*16*  130:*2,
3, 5, 13, 15, 21*

**listed** 19:*18* 21:*1*
109:7 125:*16*
**listen** 94:*18*
**litigation** 6:22 88:*3, 4, 12, 15*
**little** 9:*23* 38:*24*
41:*18* 42:*18* 74:8
119:*12* 141:8 145:7
155:*3*
**lived** 6:7 33:6 42:*21*
**lives** 6:*9*
**living** 42:*15*
**LLP** 2:*11*
**loan** 50:*23, 25* 51:*4*
**long** 6:7, *11* 7:23
8:8, *17* 9:*16* 14:25
25:7 43:*18* 52:6
73:2, 8 100:*18*
101:*20* 102:*14* 117:*1*
137:9 156:*11* 171:*20*
**longer** 14:2 15:*6*
73:2, 5 141:8
**longer-term** 123:5, *9, 21*
**long-term** 123:*11*
125:7
**look** 16:*11* 19:*16*
22:4 25:*13* 50:*11*
54:*12* 60:2 74:*13*
127:*16* 132:9 152:*1*
**looked** 97:*19* 132:*2*
**Looking** 55:7 58:*19*
65:8 90:*13* 103:*12, 13, 21* 117:*16, 17*
120:7 122:7, 22
125:7, *11* 133:*4*
149:*1* 169:*13*
**looks** 76:4 95:*10*
105:*18* 106:25 110:6
113:*18*
**lost** 171:*11*
**lot** 43:*15* 65:9 67:6, 7 78:25 79:2 94:*19*
130:*11* 138:*15* 141:5
144:*17* 153:*21, 22*
154:*24* 157:*18, 19*
160:*23* 161:*23* 163:5
**Louisville** 33:7
**lucrative** 138:6 147:*9*
**lunch** 30:8, *19*

**lunches** 30:2 38:*14*
41:*16* 141:*11*

**< M >**
**M&A** 32:24 33:*13, 14, 16* 37:*19* 128:5
132:*1* 151:22
**Magazine** 99:*11*
100:*18, 21, 25* 101:6, *9, 15, 18, 21, 25* 102:7
**maintain** 128:*1*
**Maintaining** 122:9
123:*4, 8*
**major** 34:25 45:*11*
46:25 116:*1* 121:*4*
141:*21* 147:2
**maker** 157:*3*
**makers** 117:20
118:*11, 14, 15, 17, 19, 23* 119:8
**making** 74:6 75:*21*
96:*14* 116:5 141:*18*
146:*25* 154:*13*
**manage** 82:5 133:*21*
158:*20*
**managed** 86:*23* 87:*3, 8*
**management** 16:7
17:7, 9 46:*13* 53:*19, 23* 54:2, 22 55:2
56:*14, 18, 20* 61:25
64:*1* 68:*12* 69:*3*
74:4 89:*13* 91:*14*
94:20 96:*13* 98:9
109:*4* 122:*10* 135:*18*
138:*10* 150:25 153:8
**management's** 112:25
**managing** 122:16
**manner** 158:*15*
**Manufacturing** 8:6, 9
**March** 6:*14* 176:*21*
**MARKED** 3:5 21:5, *9* 24:20, *24* 54:5, 9
61:*15, 19* 62:6, *13*
83:5, 9, *13, 24* 87:*13*
88:20, *24* 91:22 92:*1, 7* 105:*10, 14* 107:7
108:*17, 21* 110:*18*
111:9, *13* 152:*10*
167:*18* 170:2

**market** 142:*11*
149:*10* 157:*21*
172:*21, 24*
**marketplace** 81:*23*
**markets** 32:25 34:*18*
147:*15*
**marks** 22:7 25:6
**married** 6:*11*
**MARSHA** 1:*14* 3:*3*
4:*3, 22* 5:5 11:*10*
92:*21* 110:*10* 175:*14*
176:7, *11* 177:*19*
178:24 179:*24*
**master's** 7:*19*
**material** 53:*21* 157:*1*
**materials** 21:*1* 53:*10*
79:*21*
**math** 160:*23*
**matter** 76:*15* 77:2, *4*
168:*21* 177:8
**matters** 16:*23, 24, 25*
84:*24*
**MB** 10:5 33:*19, 21, 22* 34:5, 7, 12 36:*4*
37:*20* 38:*15* 48:*14*
102:22, *23, 24* 119:2
120:*23* 121:*12, 17, 23*
128:*18* 131:25 147:6
171:9 172:*20*
**McCallister** 54:*16*
61:5 137:*12*
**MCHUGH** 1:7 2:*14*
4:6 28:*1, 4, 7, 10, 13, 18, 19* 29:9, *10, 15*
30:*16* 31:2, 5, 25
32:4, 22 42:7 43:*16*
45:*14* 48:7 49:2, *17*
50:9 55:24 56:2, *8, 11, 12* 57:9, *10, 14, 24*
58:22 59:*16, 18* 62:*3, 4, 24, 25* 63:*1, 5*
64:22, *24* 65:*14* 66:2, *6, 18, 25* 67:*1, 18, 23*
68:*1, 7, 8, 19* 69:20, *22, 23* 70:*1, 10, 18*
71:5, *16, 17* 73:*15, 18*
74:15 75:*18* 78:2
80:*23* 82:*3, 25* 83:*1, 14, 24, 25* 85:23 87:*1, 11, 21, 22* 89:9 92:8

93:22 94:6, *15* 96:*17*
97:4, *9* 98:*15, 23*
105:22, *23* 107:*17, 18, 22, 23, 25* 111:6, *7, 20, 21* 112:*3, 10, 19*
113:*8, 25* 115:*11, 20*
116:*13, 20* 117:*13*
120:4, *9, 20* 121:6, *8, 13* 122:*18* 123:9, *24, 25* 124:2, 6 125:*21*
126:2 127:*14, 23*
130:*12* 133:*11, 19, 23*
134:*3, 12* 136:*12*
138:*1, 12* 140:*13, 17, 24* 142:*23* 143:*4, 6*
145:7, *22* 146:*11*
147:*13* 148:8 149:*11, 15, 22, 23* 150:*10, 14*
153:22 154:*13, 16*
159:*21* 160:2, *4, 6*
161:22 162:2, *12*
163:*17* 164:*18*
165:*18* 166:*14* 167:2, *8, 18, 19* 168:*12, 13, 22* 169:*1* 172:*13, 18*
173:*19* 174:*3* 177:*3*
**McHugh's** 30:22
31:*3* 41:*24* 43:2, *10, 21* 44:5, *21* 45:*16, 24*
48:5 50:7 59:*21*
65:*23* 67:22 81:*14*
82:7, *11* 86:5, *11*
97:*19* 116:*12* 121:*16*
124:*23* 128:9, *20, 22*
132:7, 9 137:24
144:*11* 145:*3* 149:*19*
150:*24* 151:*23* 174:*4, 9*
**mean** 9:*24* 12:22
26:8 28:*21* 57:*21*
60:23 73:4 74:25
75:*1* 76:*16* 84:*13*
93:*24* 95:2 117:*4*
142:*13, 14* 163:25
**meaning** 74:*20*
**means** 28:*24* 29:*1*
95:*10*
**meant** 44:*19*
**measured** 172:22
**medium-sized** 36:*24*

**meet** 8:20 9:4, 8
11:25 17:12 30:21
37:5, 14, 15, 16, 17
118:2, 17, 19
**meeting** 9:6, 7, 10
12:2, 24 13:13 16:3,
5, 20 19:5, 6 30:6
34:16 38:8, 12, 23
52:14 53:9, 13 56:21
62:16, 20 65:1, 2
70:22 75:2 78:18, 22,
25 79:8, 22 80:7, 8,
11 81:5, 14 82:18
83:12 84:18 85:13
87:19 89:2 90:17, 21
91:4 103:23, 25
104:9 111:4 140:18
162:19
**meetings** 9:11, 14, 16,
20, 21, 22 10:8, 9
13:3, 4 16:9 17:6, 15,
17, 18, 23 18:2, 3, 7, 9,
11 28:2, 4, 6, 9, 14, 17,
19 29:4, 8, 12, 15, 18,
23, 24 30:7, 17, 18
31:15, 18, 19 37:15,
18 38:2, 13, 14, 15
41:15 46:8 52:24, 25
68:2 79:1, 12, 15, 18,
24 80:18 82:21 83:2
84:20 90:18 97:6
137:16, 17 140:20, 22
141:11 148:17
168:13
**meets** 84:7
**Melissa** 126:5, 12
127:5
**member** 17:4, 5, 19
57:6 109:5, 20
138:22 154:15 158:2
**members** 16:7 18:12
20:16, 18, 20 46:12
47:17 52:22 53:20
55:5 60:14 61:3, 24
68:11 80:8 91:2
105:18 107:3 108:8
135:17, 24 136:7
145:17, 18, 20 146:16
153:16 155:9 156:4

**membership** 14:8
**memory** 78:14 80:4
**mention** 132:16
**mentioned** 42:7
45:23 50:7, 24 51:1
64:8 71:2 126:12
136:20 149:13
160:24 168:12
170:15
**mentions** 76:11
**mere** 130:25
**merger** 47:6 48:6, 14
148:23 149:9, 10
**mergers** 33:18 48:7,
12 122:8 141:17
148:8, 10 151:12
**message** 158:14
**messages** 12:13
**met** 8:21 10:4, 5
12:6, 8 19:3 34:2, 23
37:18, 22 38:6, 9, 16
90:6 118:14, 22
119:1, 8, 9
**mic** 55:9
**Michael** 2:8 4:14
77:17
**Michael.cioffi@blankr**
**ome.com** 2:14
**mid** 55:5 101:13
**middle** 67:10 157:17
**Mike** 54:16 137:12
**mile** 67:9, 10, 11
**milestones** 121:4
**million** 138:2
**mind** 58:14 144:24
158:5
**minds** 153:14
**Mine** 83:16, 17
**mingle** 135:22
**minimum** 92:20
**Minnesota** 42:19
**minor** 27:1, 3, 5
108:9, 14 121:12
**minute** 161:11
**minutes** 9:13, 18
62:15, 25 63:1, 5, 21
69:23 70:10 71:12
73:18 78:3 79:24
80:11, 14, 18, 21

83:11, 14, 15, 24, 25
84:2, 8 87:18, 21, 22
89:2, 5, 9
**Mischaracterizes**
40:25 125:4
**Misstates** 69:25
**misstating** 70:2
**Mitch** 36:4
**moderate** 65:5, 23
71:25 72:3 173:21
174:4, 9
**Modine** 8:6, 9
**moment** 14:4
**Monday** 110:7
**money** 34:24 138:15
154:24 157:13
**monitor** 82:13
**months** 24:12
**morning** 129:13
**morning's** 109:3
**mother** 39:12 40:17,
20 41:19, 24
**moving** 127:2
**multiple** 33:16 124:6
163:21
**mutual** 6:17 7:14

**< N >**
**name** 5:4, 5, 6 6:20
39:5, 6 49:9 59:21
101:3 109:7 126:18
**named** 76:23 99:9
100:11
**names** 48:20 57:23
58:17
**narrow** 10:2 104:6
**narrowly** 145:9
**National** 17:20 18:4
**nature** 6:22, 25 7:1
30:14 131:7
**nearly** 140:17 145:12
**necessarily** 33:23
68:10 97:25 120:25
125:10 129:6 132:23
136:6
**necessary** 16:12
98:22 124:8 157:12
**need** 5:14, 25 6:1
19:20, 21 60:7, 8
103:10 119:17 123:1

**124:9** 128:1 129:5
132:24 135:3, 5, 6
145:24
**needed** 16:21, 23, 24
27:15 33:22 34:22
35:9, 10, 19 60:14
73:6 74:24 113:25
116:15 129:3 133:20
168:9
**needs** 47:22 74:7
133:21 157:15
**negative** 43:24, 25
**negotiated** 151:21
**negotiating** 33:19
51:15
**neither** 176:13
**network** 128:7
129:25 130:8 131:3
147:4
**Networks** 127:20, 24
128:9, 13, 19, 22
129:8, 9, 11, 14
**never** 32:6 65:24
69:19 70:19 82:16
97:3, 8, 18 123:23
132:12, 15, 18, 19, 25
134:2 135:8, 12
143:10 144:20
145:24, 25 147:18
148:1, 3 149:10
150:21 154:10
**new** 19:20, 21 26:5,
12 35:1 42:11 45:7
51:6 103:12, 13
123:17 126:3 134:25
135:6, 7, 11 138:5
139:21
**newspaper** 144:23
**nice** 95:2
**Nick** 15:13
**nine** 33:15 113:23
117:3 130:16, 19
**No.____Change**
178:2, 5, 8, 11, 14, 17,
20 179:2, 5, 8, 11, 14,
17, 20
**No.____Line** 178:2,
5, 8, 11, 14, 17, 20
179:2, 5, 8, 11, 14, 17,

*20*
**nods** 5:*17*
**nominating** 13:*21*
*14:16*
**normal** 118:*8*
**North** 48:22, *24*
**Northwest** 42:*10*
**Notaries** 1:*23*
**notary** 176:*5, 25*
**note** 79:*16* 149:*1*
**noted** 88:*2* 91:*12*
99:*13*
**notes** 9:*13* 23:*13*
79:*12*, 14, *17, 19, 21*
110:*6* 137:*15, 18*
**not-for-profits** 128:*25*
**Notice** 1:*14*
**notwithstanding** 5:*15*
**number** 11:*11, 15, 19*
18:*8, 10* 21:*9* 22:*7, 8*
24:*24* 25:*5* 31:*20*
33:*18* 34:*23, 25* 35:*4*
36:*3, 5* 41:*12* 46:*12,*
*25* 47:*2* 49:*20* 50:*19*
52:*3, 14* 53:*3, 4* 54:*9*
55:*22, 23* 61:*19* 62:*2,*
*13* 64:*3, 18, 21* 73:*14,*
*17* 76:*7* 79:*5* 81:*1*
83:*9* 87:*17, 20* 88:*24*
89:*8* 92:*1, 7* 102:*19*
104:*12, 23* 105:*14*
107:*10, 14, 16, 22*
108:*21* 110:*21* 111:*5,*
*13, 17, 19, 23, 24*
113:*17* 136:*4* 138:*25*
141:*2* 145:*12* 151:*5,*
*15* 152:*1* 153:*9, 20*
155:*3* 162:*22* 163:*1,*
*12* 168:*1, 2, 9, 25*
169:*1, 11* 170:*16*
173:*18*
**numbers** 151:*6*

**< O >**
**oath** 177:*15*
**object** 28:*20* 95:*21,*
*24*
**Objection** 10:*17*
11:*12, 16* 12:*21*
18:*16* 21:*24* 40:*24*

43:*12* 44:*9* 51:*8*
53:*12* 65:*16* 69:*24*
70:*23* 71:*20* 80:*25*
93:*24* 95:*18* 98:*16*
100:*3* 104:*16* 125:*4*
129:*12* 131:*5* 139:*4*
140:*14* 143:*2, 20*
145:*4* 146:*13* 147:*16*
148:*13* 151:*13*
152:*12* 153:*10*
154:*17* 163:*24* 165:*9,*
*19* 167:*11* 168:*24*
169:*18* 170:*18*
174:*11, 16, 22* 175:*3*
**objective** 99:*15*
112:*17* 120:*2, 17*
122:*15, 19, 22* 125:*17,*
*19* 127:*21* 128:*19*
133:*17* 155:*23*
**objectively** 128:*13*
150:*9*
**objectives** 158:*18*
**obligations** 20:*20*
**obscured** 55:*10*
**observations** 66:*5*
93:*17* 94:*23* 145:*16*
147:*13* 153:*15*
159:*20*
**observe** 30:*15* 148:*7*
149:*18*
**observed** 30:*17*
99:*19* 134:*8* 144:*9*
164:*14*
**observing** 124:*13*
134:*1*
**obtain** 42:*24*
**Obviously** 24:*9*
120:*22* 135:*3* 139:*18*
**OCC** 21:*2*
**occasion** 11:*7*
**occasionally** 52:*23*
80:*12*
**occasions** 13:*2, 6*
37:*22* 38:*15, 16, 17*
**occur** 34:*10* 127:*8*
**occurred** 52:*16*
**occurring** 31:*17*
**offer** 121:*24* 154:*23*
177:*14*

**offered** 132:*18* 138:*2,*
*11* 154:*21*
**offers** 159:*9*
**office** 16:*15* 101:*12*
176:*20*
**officer** 8:*25* 60:*24*
63:*9* 70:*15* 122:*1*
155:*21*
**official** 176:*20*
**Oftentimes** 16:*19*
36:*8* 103:*13* 126:*25*
**Oh** 7:*6* 10:*4* 61:*23*
84:*5* 138:*23* 149:*23*
155:*5* 166:*1* 167:*3*
**OHIO** 1:*3, 20, 23*
2:*6, 13* 4:*5* 176:*2, 6,*
*20, 25*
**oil** 6:*18, 21* 67:*17*
**Okay** 6:*4* 8:*17* 10:*4*
18:*21* 21:*15* 44:*18*
58:*23* 66:*25* 70:*8*
71:*9* 92:*21* 100:*16*
101:*11* 105:*4* 106:*8,*
*23* 124:*4* 140:*5*
162:*17* 163:*7*
**Oliver** 33:*15* 36:*9*
39:*17, 23* 40:*1, 22*
41:*20* 42:*20* 69:*14*
113:*3, 23* 114:*11, 16,*
*22* 115:*9* 117:*3, 5*
118:*3, 20* 119:*1*
129:*24* 130:*17* 131:*1,*
*17* 146:*19, 20* 151:*16,*
*17* 170:*17*
**Once** 27:*18* 52:*22*
58:*3* 59:*5* 84:*22*
114:*8*
**one-on-one** 9:*5, 22*
12:*7, 8*
**ones** 104:*13*
**one's** 75:*23*
**ongoing** 52:*21* 88:*18*
143:*25* 158:*25*
**open** 123:*17* 131:*23*
132:*1* 139:*20* 158:*24*
**opened** 33:*20*
**operate** 81:*19*
**operating** 8:*25*
157:*11*

**opinion** 45:*19*
115:*18, 21, 22* 121:*5*
131:*23* 159:*22* 160:*1*
**opinions** 161:*23*
**opportunities** 57:*4*
96:*20* 128:*6* 140:*11*
143:*5* 148:*7*
**opportunity** 39:*14*
141:*23* 142:*23*
**opposed** 84:*4*
**optimization** 115:*15*
**optimizing** 123:*2*
**Orbitz** 8:*1*
**order** 53:*17* 135:*3*
**organic** 115:*14*
**organization** 20:*25*
102:*18* 126:*20*
**organizational** 158:*10*
**organizations** 33:*4, 5,*
*25*
**organized** 33:*5*
**originally** 64:*5*
**outline** 115:*14*
**outside** 13:*3* 26:*19*
28:*4* 30:*18* 34:*16*
38:*7, 13* 98:*14* 103:*4,*
*8, 10, 12, 15* 114:*3, 22*
115:*4* 123:*18* 125:*24*
128:*14* 129:*8* 134:*9*
142:*14, 16*
**outsource** 69:*9*
**overall** 93:*14* 126:*20*

**< P >**
**p.m** 85:*2, 4, 5, 6*
119:*18, 20, 21, 22*
139:*11, 13, 14, 15*
161:*12, 14, 15, 16*
173:*4, 6, 7, 8* 175:*19*
**Pacific** 42:*10*
**packet** 83:*22*
**PAGE** 3:*3* 22:*5, 6, 7,*
*8* 25:*6, 9* 54:*12* 56:*1,*
*4, 6, 11* 57:*6, 10, 25*
63:*4* 71:*17* 81:*18, 19*
110:*8* 112:*2, 4, 6, 12*
115:*11* 120:*14* 152:*1,*
*2* 155:*13* 166:*25*
178:*2, 5, 8, 11, 14, 17,*

Deposition of Marsha Conrad Williams                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

20  179:2, 5, 8, 11, 14, 17, 20

pages  21:15, 18 22:11  25:7  107:21

paid  124:10  137:2, 5 138:2, 15, 21  154:24

paint  67:14

painting  67:17

paper  60:3

paragraph  63:6 70:12  73:19  78:3 87:25  89:12  91:1 155:19  156:23

parenthetical  88:13

part  23:1, 25  24:5 42:13  50:14  99:18 102:4  105:7  110:8 156:8  157:23  158:1 160:10

partially  75:5

participant  95:11

participate  54:4

participated  169:15, 25  170:8

particular  9:8  10:22 22:25  39:3  68:12 77:15  78:7  119:3 123:16  133:6  134:24 143:6  144:21, 22 146:22  149:8  159:18 174:8

particularly  17:16 102:19, 22  113:13 123:1  126:3  129:9

parties  176:14

partner  89:25 130:17, 25  131:2, 17, 20, 22  146:20

Partners  49:7, 10

parts  39:15  42:22 64:8

Pas@sspfirm.com  2:7

passed  142:7

passionate  158:14

Patterson  2:5

Paula  54:13

pay  114:11

payment  88:5

peculiar  163:14

peer  128:16  129:14, 15

peers  95:5, 6, 10, 12 101:8  105:6  123:17 128:11

Peg  58:16

PENALTY  177:5, 6

pending  4:3  139:18 142:2  173:12

people  19:18, 22 46:14  53:6  58:14 64:14  68:2, 5  74:13 79:8, 9  82:5  94:14, 19  101:12  102:10 103:10  105:2  119:6 124:12, 13, 14  130:6 135:23  144:1  152:21 159:10  160:18 172:16

people's  64:15

percent  74:6  103:15 138:19  151:7

Perfect  84:2

perform  75:6  89:15

performance  7:10 17:9  19:24  31:7, 13, 16  81:24  85:10, 11, 15, 19, 24  86:15, 19 87:2  96:12  97:20, 22 145:11  157:5, 12

performed  102:15

period  36:21  48:17 64:2  75:6  102:14 140:25  147:14  148:6 149:20  156:11 159:21  168:19  172:9

periodical  39:5

periodically  10:21

periodicals  144:18

periphery  51:17

PERJURY  177:5, 6

perseveres  158:19

person  24:16  38:9 60:25  93:3  95:3 103:2  145:19  156:19 167:4

personal  11:14 91:15  133:16, 19 134:11

personally  4:16

person's  7:9

perspective  170:7

Peter  2:1  4:11  55:9

Phenise  2:17  4:20

Phil  28:1, 4, 7, 10, 13, 17, 18  29:9, 10, 23 30:5, 16, 22  31:2, 3, 5, 25  32:4, 7, 21, 22 41:23  43:16  44:20 48:5, 7  49:2, 17 57:10  59:16, 18, 20 64:22, 24  74:15 80:23  82:3, 7, 11, 24 83:1  85:23  86:5, 11 87:11  92:19  93:18, 22  95:10  96:17  97:4, 5, 9, 14, 19  98:15 99:17  112:19  113:8 116:20  120:4, 19 121:6, 8  123:9, 23 124:15  125:21 127:23  128:9, 20, 22 133:19, 23  134:3 135:10  136:11 137:24  138:1, 11 140:13, 16, 24  141:7 142:23  143:4, 6 144:11  145:2, 7, 22, 24  146:11  147:13 148:1, 8  149:10, 15, 19, 22, 23  150:10, 14, 23  151:23  153:22 159:21  160:2, 4, 6 169:7  172:12, 17 173:19  174:3

PHILIP  1:7  2:14 4:5  177:3

Phil's  45:5  95:4 99:19  125:8

Phone  2:7, 13  10:11, 16  11:11, 14, 19, 23 12:11  38:19  81:7, 9 82:19  106:22

physical  85:19

picture  67:15

piece  60:2

Place  1:14  40:3 41:14  48:11, 12

personally  4:16

49:12  52:24  135:17 136:3  158:20  176:10

places  40:7, 10

Plaintiff  1:8, 14  2:1 4:6, 11, 13  7:11

Plaintiff's  3:5, 8, 9, 10, 11, 12, 13, 14  21:5 24:20  54:5  61:15 62:6  83:5  87:13 88:20  91:22  105:10 107:7  108:17  110:18 111:9

plan  20:23  35:11, 12, 13, 16  37:8, 9  55:2, 4 56:14  59:9  76:9 112:22, 23  113:1 115:1, 8  170:22

planning  52:23  91:3 102:17

plans  82:12  146:25

play  67:8

players  144:4

pleaded  120:22

please  5:4, 12  21:10 24:25  44:2, 14  46:12, 13  54:10  55:5  56:3 61:20  62:14  70:3, 9 71:14  72:18  83:10 87:17  88:25  92:2 94:1  105:15  106:13 107:11  108:22 110:22  111:14  112:8 120:11  155:3  166:3

plenty  67:7  96:20

PNC  2:12

point  13:14  29:21 35:13  52:12  68:18 74:22, 25  92:18 115:13  122:20, 24 124:21  126:5  127:11 140:1  166:1

pointed  165:23 167:7, 12

points  68:17  88:11 109:5  122:7

policy  117:20  118:11, 14, 15, 17, 19, 23 119:8

Poole  2:17  4:20

Deposition of Marsha Conrad Williams                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

poor 166:20
Port 6:5
position 8:23 26:7
32:8 57:2 63:9
64:18, 19 70:15
75:10 76:16, 22
98:24 103:5, 13
158:21
positions 53:4 57:15
58:5 124:7
positive 128:6 138:19
possess 115:13
possessed 115:18
159:22, 24
possessing 160:2
possible 51:1 94:17
possibly 19:23 158:6
post 50:8
potential 27:21
33:24 40:21 47:6
52:13 53:2 57:15
58:4 63:8, 11, 25
64:6, 7 65:4, 5, 23
70:14 71:25 72:3, 9,
13 73:1, 21 74:1
123:20 132:25 133:1
141:18 148:23
151:17 155:7 173:21,
25 174:20
potentially 73:5
potentials 78:25
PPP 50:23, 25 51:4
practices 88:4, 12
precisely 27:20
36:20 53:25 72:12
75:7
prefer 51:2
premier 130:18
preparation 10:21
54:2, 3 79:22
prepared 16:19 17:6
27:11 58:11, 12
110:24 152:3 155:6
169:20, 22 170:10
prepares 53:23
preparing 22:20
23:25
presence 34:8
Present 2:14 4:8
14:11 61:2, 3 68:2

96:13 115:9 141:7
143:5 165:12
presentation 67:22
81:3, 14 82:6, 7, 17,
24 133:12 135:9
141:4 149:15 150:3
163:11 168:10
presentations 30:6
46:11, 14 66:7, 14, 15
68:9 78:9 80:23
81:1 82:2, 4 83:1
84:23 93:19 97:18
134:3, 5, 8, 9, 18, 20
135:13 145:10
149:19, 25 150:4, 7,
10, 15 160:6, 7 163:9,
14, 16, 21 164:15, 18,
22, 24 165:5, 7, 13
presented 29:24
30:24 35:11 37:7, 8
53:18 96:15 97:6
111:16 150:19
164:13 165:11
presenters 81:16
84:22
presenting 37:17
81:16 99:20
presided 62:20
presidency 72:22
155:8
president 19:8, 13, 20,
21 20:1, 4, 22 26:5,
14, 24 32:4 43:3, 11,
23 44:7 46:1 51:7
52:11 63:23 64:6, 7
65:25 69:20 70:20
72:9, 14, 24 74:5
75:22 76:4, 21 77:10
78:19, 23 79:3 91:16
93:23 94:21 97:10
99:2, 7 102:5 103:3,
5, 21 117:17 124:8
132:25 133:1 145:21
146:1 154:5, 15
156:16, 20 161:8
Presidents 50:14
128:7
president's 98:24
press 32:20 45:24,
25 46:19

prestigious 44:25
45:19
presumably 39:24
127:17
presume 67:25
prevent 44:6
previous 73:10
previously 70:11
Primarily 11:1
51:22, 24 132:10
primary 20:25 26:2
60:21 147:6
principles 26:11, 22
print 71:23
printed 112:4
prior 14:10 16:20
22:16, 22 24:9 27:25
28:3, 7, 12 29:9, 19,
21 30:15, 21 31:22
37:11 69:25 70:18
85:14 108:13
priorities 63:12
73:22 78:4, 5
probably 29:24
37:24 38:3 64:19
72:11, 12 117:15
118:1 130:18 137:12
141:8 154:23 160:21
problem 170:6
proceed 90:15
process 16:8 23:3,
25 24:5 50:20 51:5,
21, 23, 24 52:2, 6, 9,
17, 19, 21 60:1 64:11
95:11 96:14 100:22,
23, 24 105:7
processes 60:4
142:17 171:18 172:3
product 144:21, 25
products 99:25
Professional 9:3
12:5 37:13
profile 53:19 91:4, 9,
13 106:2, 8, 16, 24
107:1, 5, 24 108:7
112:5 133:16
profound 67:20
program 171:13, 22,
23 172:15

progress 173:11
175:7
project 36:9
projects 121:6, 7
158:14
prominent 130:17
promote 51:18
promotions 31:23
pronounced 109:13
proposing 63:22
protracted 122:25
prove 81:23
proven 120:24 122:5
provide 9:12 16:13
51:2 55:18 126:17
127:8
provided 24:15
47:14 50:12, 16, 17
53:10, 16 67:18
68:22 93:16 104:22
119:7 123:15
provider 11:23
proxy 19:18 21:22
22:16 24:10 25:10,
15, 20 74:13, 15
138:24
public 139:4 176:5,
25
publication 39:4
99:12
Public-State 1:23
publisher's 101:3
pulse 99:10
purchase 123:12
purchased 48:19
123:13
purported 47:18
purpose 77:8 139:21
171:25 172:2
purposes 75:20
Pursuant 1:14 4:16
176:12
pursue 132:3
pursues 144:3
purview 35:18
pushes 158:22
put 57:19 58:9 72:4
171:18
puts 123:19

Deposition of Marsha Conrad Williams                    Philip R. McHugh v. Fifth Third Bancorp, et al.

**< Q >**
**qualifications** 93:22
97:10, 14 103:20
150:11 159:23, 25
**qualified** 20:2 75:9
79:10 93:10 98:25
99:6 102:9 103:2
176:5
**qualities** 26:12
90:12 96:21 160:2, 5
**quarterly** 123:3, 7
124:22, 23, 24 125:3,
6, 11
**question** 5:13, 20, 22
6:2 9:24 10:24
18:19 19:11 28:11
29:5, 15, 18 40:25
43:14 44:13 65:17,
19, 25 70:4, 6, 24
75:25 77:9, 11, 20, 22
83:21 94:3, 4 95:21,
25 96:4 98:13, 17
104:17, 21 109:17, 23
120:10 131:13
134:17 144:21 145:9
146:9 147:12 149:3,
4 150:12 166:5, 22
167:4, 12, 15
**questioned** 66:19
**questioning** 170:16
**questions** 5:11 7:9
17:6 29:11 30:5
46:7 55:6, 18 66:8, 9,
22 67:23 68:3, 5
96:1 118:10 131:8
134:5 139:10, 17
140:4 149:14 150:7,
20, 23 152:2, 4 159:7,
8, 10 161:9 173:10
175:5, 6
**quickly** 60:4
**quit** 138:5
**quite** 35:3, 22 37:3
39:11 42:20 69:4
100:19 116:3 122:21,
22 132:5 142:1
149:21 156:18
168:25

**< R >**
**Racial** 7:4
**raise** 34:24
**raised** 42:10 175:8
**raises** 34:22
**Rambling** 70:24
**ran** 116:14
**ranked** 113:19
**ranking** 113:20
**rankings** 172:23
**rapidly** 157:16
**rating** 172:1 174:19
**ratings** 172:5, 7, 8
**rationale** 31:16
**Raymer** 1:20 176:4,
24
**reached** 153:17
**reaction** 173:13
**read** 17:5 43:17
46:10, 14 68:9, 21
70:11 71:22 76:20
84:23 95:7 101:5, 12
134:5 143:9 144:22,
23 145:10 150:4, 6,
10, 14 152:14 153:12
165:5, 13 167:9
177:7, 9
**reader** 159:14
**readiness** 63:11
73:22 74:2, 9, 21
**reading** 39:6 165:7
167:3, 21, 22
**reads** 54:25 63:6
88:2 91:1, 12 144:17
165:1
**ready** 75:9
**real** 96:12
**really** 19:6 35:15
36:22 67:19 69:2
78:11, 24 80:6 93:8
103:1 116:8 125:7
134:24 143:10
144:14, 18 145:25
146:6 159:12
**reason** 9:11 34:4, 8
59:10 102:4, 13
121:22 124:5 128:17
131:19 154:1 170:13
178:4, 7, 10, 13, 16, 19,

22 179:4, 7, 10, 13, 16,
19, 22
**reasonable** 154:1
**reasons** 147:6
**recall** 7:6, 12, 15
11:2 12:17 13:7, 25
14:10, 13, 18 15:2
17:14 18:8, 10 22:15,
19, 20, 23, 24, 25
23:12 24:3, 6, 12, 14
25:21 26:18, 20 27:4,
20, 24 29:20, 25
30:10, 11, 13, 23 31:1,
11, 24 32:2 34:11, 15
36:20 37:7, 24 38:17
39:6, 9 41:17 45:11
48:17, 20, 21, 23 49:9,
10, 15 50:19 54:19
55:20 58:20, 21
61:10 63:17, 20, 22
66:18 71:1, 3 72:10,
12, 21 73:11 78:10,
11, 15, 16 80:9, 15, 16,
17, 20 81:11, 12, 15,
21, 24 82:1, 3, 11, 23,
25 85:15, 22 86:1, 18,
25 87:6, 9, 10 90:5,
20, 24 93:4 101:4, 22
104:2, 5, 11 106:19,
23, 25 107:2, 3 109:8
110:2, 3, 12, 16, 17
111:18 115:10
116:25 121:19 127:4,
6, 19 138:17, 24, 25
139:1, 6, 8 143:12
150:25 151:1, 4
152:3, 5, 6 162:11, 16
163:7, 10, 16 164:19,
20, 21, 23, 25 165:10
168:8, 15, 16, 17, 20
171:21, 24 172:10, 16,
19
**recapitalization** 47:4
**receive** 54:21 152:13
**received** 21:2 45:9
55:17 105:20 139:2
160:8
**receiving** 54:19

**recess** 47:25 85:4
119:20 139:13
161:14 173:6
**recognize** 25:2
**Recognizing** 69:19
**recollection** 18:2
80:22 81:13 83:1
**recommend** 92:20
**recommended** 108:13
**reconstituted** 14:8
**record** 4:2, 9 5:4, 22
43:12 47:22, 24 48:3
73:13 75:21 76:14
85:1, 3, 7 95:23
109:15 119:19, 23
139:4, 9, 12, 16
161:10, 13, 17 166:25
170:20 173:3, 5, 9
175:10
**recovery** 123:1
**recruited** 125:23
**recurring** 68:19
**reengineering** 171:17
**refer** 18:3 53:14
55:22 57:9 71:13
112:2 166:4, 14
**reference** 22:5 70:17
71:17, 23, 24 109:19
**REFERENCED** 3:5
65:12, 22 69:22
70:22 89:19 121:11,
14 132:19 134:17, 18
**references** 54:22
78:3
**referencing** 70:18
135:15 166:20
**referred** 73:19 90:14
130:6 162:7
**referring** 22:4, 8, 11
25:5, 9 54:23 57:24
58:22 63:4 71:16
73:14, 17 78:2 87:11
91:9 111:23 115:11
119:25 120:16 130:3
134:14 169:11
**reflect** 23:13 174:9,
14, 20, 25
**reflected** 102:8
**reflects** 99:18

Deposition of Marsha Conrad Williams                    Philip R. McHugh v. Fifth Third Bancorp, et al.

**refresh** 27:*23*
**refused** 138:*5*
**regard** 145:*17*
**regarded** 100:*19*
101:*16* 119:*1*
**regarding** 55:*19*
58:*3* 61:6 70:*18*
78:*18* 80:22 109:*10*
110:*23* 133:*12*
139:*19* 158:*24*
169:*12, 16*
**region** 42:*16*
**regional** 33:8 49:*17,
19* 135:*4*
**regions** 49:*21*
**regular** 136:*1*
**regularly** 80:*1*
**regulation** 118:*4, 16*
142:*4, 5* 157:*18*
**regulations** 142:2, *6,
7* 157:*18*
**regulators** 78:*13*
117:*20, 25* 118:*6, 9*
128:*1*
**regulatory** 21:*1* 79:5
88:*1* 118:*1, 3* 119:*6*
122:*10* 141:*16, 25*
142:*25* 143:*7, 17*
144:*10*
**related** 88:*5* 91:*14*
**relates** 159:*18*
**relating** 10:*23*
**relations** 141:*19*
**relationship** 9:*1*
12:*3* 13:*9* 28:*1*
37:*12* 60:*10, 19*
127:*25* 128:*3* 151:*3*
**relative** 86:*15* 87:*3,
5* 173:*11* 176:*13*
**relevant** 10:*23* 75:*23*
**remainder** 156:*23*
158:*8*
**remained** 27:*2*
**remains** 158:*24*
**remarkable** 148:*14*
**remember** 149:*16*
153:*4, 5* 163:*9, 14*
164:*3, 7, 8*
**remind** 110:*9, 15*

**reminded** 91:*2*
**reminder** 5:*10*
**removed** 59:*21*
**repeat** 5:*13* 65:*20*
96:*4* 104:*21* 109:*16*
120:*10* 131:*13*
150:*12* 167:*4, 14*
**repeated** 161:*22*
**rephrase** 5:*13* 44:*3*
70:*4* 83:*21*
**replace** 15:*21* 52:*10*
**replacement** 52:*18*
**report** 7:*11* 97:*1*
111:*15* 123:*14, 25*
124:*1*
**reporter** 5:*14* 72:*17*
**reporting** 176:*16*
**reports** 30:22, *24*
31:*3* 96:*24* 97:*4, 5,
18, 25* 98:*3, 7* 143:*8,
9* 167:*9, 21, 22*
**represent** 4:*15*
**represented** 167:*7*
**Republic** 6:*5*
**requested** 139:*20*
**required** 6:*23* 99:*21*
158:*12*
**requires** 122:*10*
**reserve** 139:*24*
**residence** 6:*4*
**resigned** 72:*21*
**resistance** 158:*17*
**resolutions** 63:*6*
70:*12*
**respect** 7:*13* 18:*14,
22* 19:*7, 13* 20:*3, 5,
21* 25:*23* 28:*9, 16*
31:*25* 35:*24* 45:*24*
48:*5* 53:*9* 55:*21*
57:*5, 13* 58:*13* 65:*24*
70:*17* 85:*23* 87:*1*
88:*4, 17* 97:*16* 104:*8*
112:*15, 19* 113:*8*
114:*18, 23* 120:*4, 20*
121:*17* 124:*22*
125:*21* 127:*23*
128:*21* 129:*1* 133:*19*
134:*10* 141:*24*
143:*17* 147:*12, 14*
148:*8* 149:*18* 150:*15*

**reminded** 153:2, *8* 157:*23*
167:*20* 172:*20* 174:*3,
25*
**respective** 28:*19*
**respects** 176:*12*
**respond** 98:*7* 106:*13,
18*
**responded** 95:*12*
**response** 106:*20*
149:*14*
**responses** 66:*19*
**responsibilities** 20:*20*
31:*21, 22* 57:*1*
**responsibility** 21:*3*
**rest** 130:*7* 159:*25*
162:*3*
**restaurant** 136:*4*
**restructures** 47:*7*
**result** 126:*7* 171:*11*
172:*11* 176:*15*
**results** 81:*17* 97:22
123:*3, 7* 124:22, *23,
24* 125:*3, 6, 11*
141:*14*
**retained** 104:*7*
**retire** 51:*16* 75:*8*
**retired** 7:*22, 23*
**retirement** 75:*7*
**revealed** 139:*21*
**revenues** 151:*3, 8*
**review** 16:*2, 14, 18*
18:*24* 23:*6, 17* 24:*7,
15* 31:*9* 55:*4, 14*
56:*10* 63:*7, 18* 64:*1,
12, 20* 65:*2* 70:*13*
79:*17, 24* 85:*9, 16, 20,
24* 86:*2, 5, 8, 11, 14*
94:22 95:*9* 99:*3*
106:*7, 16* 128:*23*
**reviewed** 16:*9* 23:*16,
18* 53:*1* 55:*17* 56:*22*
63:*9, 16* 70:*15* 72:*5*
73:*20* 106:*17* 108:*7*
**reviewing** 22:*23* 24:*3*
**reviews** 31:*7* 50:*18*
85:*10, 25* 86:*17*
97:*20*
**RH** 155:*6*
**RHR** 27:*11* 89:*14,
19, 22, 23* 93:*3* 94:*24*

**reminded** 95:*10, 15* 96:*7, 10, 22,
24* 104:*7* 110:*24*
111:*16* 123:22 124:*9,
17, 19* 137:*5* 144:*13*
145:*24* 155:*6* 169:22
170:*10, 11*
**RHR's** 113:*18*
**Right** 18:*13* 21:*19*
23:*20* 55:*11* 71:*9*
74:*6, 11* 83:*18* 92:*15*
100:*14* 109:*14*
126:*21* 156:*19*
157:*17* 160:*14* 162:*2,
5, 8, 13* 165:*21*
**right-hand** 22:*5, 9*
25:*6* 55:*22*
**rights** 139:*24*
**rigorous** 100:*21*
**risk** 13:*19, 23, 24*
14:*2, 4*
**risky** 103:*11*
**Robert** 11:*25*
**role** 7:*8* 17:*2* 18:*14,
22, 24* 19:*6, 7, 10, 14,
15, 23* 20:*4, 10, 18, 23*
21:*3* 25:22 26:*12, 13*
35:*2* 59:*19* 64:*16, 23*
74:*8, 19* 89:*23*
103:*16, 19* 104:*4*
121:*16, 20* 130:*17*
161:*4*
**roles** 116:*13*
**Rolodex** 37:*3* 129:*18*
130:*2, 14*
**Rome** 2:*11*
**room** 67:*7* 68:*5*
93:*20*
**rooted** 115:*15*
**roughly** 140:*25*
**routine** 16:*23*
**RPR** 1:*20* 176:*4, 24*
**Rule** 176:*17*
**run** 33:*5* 113:*1*
116:*15, 21, 22*
**running** 60:*7* 64:*8*
82:*13* 126:*22*
**runs** 56:*1*
**runway** 73:*2, 4, 8*
75:*13*

**< S >**

**S/Wendy** 176:24
**Saba** 2:1, 5 3:4, 5
4:11 5:2 10:14, 18
11:6, 8, 16, 20, 22
12:23 13:1 18:18
21:7 22:1 24:22
28:22 29:7, 19 30:4
41:2 43:20 44:4, 15
47:21 48:4 51:10, 20
53:14, 15 54:7 55:11,
13 56:5 61:17 62:10,
11 65:18 70:5 71:4
72:2 73:16 75:24
76:18, 21, 25 77:3, 7,
11, 17, 22, 25 78:1
81:6 83:7, 18, 20
85:1, 8 87:15 88:22
91:24 94:2 95:20
96:5, 6 98:20 100:6
104:19 105:12 107:9
108:19 109:13, 18
110:20 111:11
119:13, 16, 24 120:8,
12, 13 125:15 130:1
131:9, 12, 14, 15
134:17 135:14 139:9,
17 140:14 143:2, 20
145:4 146:13 147:16
148:13 150:23
151:13 152:2, 12
153:10 154:17
161:10, 19 164:1, 4, 7,
16 165:14, 20, 25
166:7, 10, 13, 17, 18,
23 167:2, 5, 6, 16, 17
169:10, 23 171:3
173:3, 10 174:11, 16,
22 175:3, 6
**Saba's** 149:14
**Saema** 109:6, 10, 11,
13, 14, 21, 25
**sake** 5:14
**salary** 31:14 139:7
**sale** 33:24
**sales** 88:4, 12
**Sandy** 1:22
**sat** 136:11
**save** 177:10

**saw** 28:2, 13 56:18
57:17 58:6 59:3
85:15 123:23 124:9
133:23 134:2, 21
135:8 147:18 148:1
149:10
**saying** 43:9, 21
45:18 61:24 113:9
123:17 131:16
135:11, 12
**says** 55:23 73:12, 24
76:21 84:5 95:5, 12
97:2 104:18 105:5
106:13 108:10 109:5
122:25 124:2 133:21
155:19 156:23 158:8
173:21 174:9
**scenario** 135:16
**schedule** 17:18
21:14, 19, 21 25:1, 2
**School** 7:20 33:7
42:16 44:11, 21 45:6,
14, 19 67:9, 10
**scope** 33:12 133:3
**scorecard** 136:13, 18
**se** 130:5
**Seal** 8:14 95:1
176:20
**seasoning** 74:18, 22
**second** 56:11 63:4
73:19 88:1 89:12
109:4 110:8 112:4
119:25 120:16 173:3
**secretary** 16:15, 16
**sections** 163:12
**see** 22:5, 8 23:1
28:7 39:15 54:21
55:21 56:2 57:13
63:13 71:23, 24
73:24 75:13 83:18
84:6, 19 85:23 86:21
87:2 88:7, 8, 13, 14
89:17, 18 91:7, 8, 18
92:24, 25 94:15 95:3
106:4, 11 108:2, 10
111:2 112:5, 6
113:18 115:16, 17
117:3, 9 122:13
124:24 126:2 132:23
139:10 145:23

155:14, 17 156:1
166:2 168:4, 5
169:12 170:3, 7
173:19, 21, 22, 25
174:1
**seeing** 55:7
**seeking** 26:12, 23
32:15
**seen** 28:3, 17 29:9
62:18 80:9 82:17
85:20 86:25 87:4, 5,
7 92:5, 22 105:19
107:14 108:25
110:25 111:3, 17, 18
130:3, 5
**select** 20:24
**selected** 102:4, 12, 13,
14 124:10 145:20
161:8
**selecting** 161:6
**selection** 102:3, 6
**sell** 33:22 102:23
**selling** 34:5
**seminar** 50:14
**senator** 152:20
160:17
**send** 16:12
**sending** 22:21
**sends** 108:5
**senior** 16:7 17:9
34:7 96:15 152:19
**sense** 126:24 148:22
**sent** 23:6 25:14, 19
38:23 39:6 55:15
56:15 92:3 108:13
**sentence** 73:19 88:2,
7, 8, 9, 10, 11 91:1, 12
**Separate** 17:2 63:21
82:7 135:18
**separated** 135:24
**September** 27:16
80:19, 24 83:3 87:19
89:3 103:24 104:9
110:11, 14 111:3
112:18 116:19 117:1,
11, 14 120:3, 18
125:20 127:22
133:18 140:11
148:17
**series** 5:11 21:15

**serve** 8:2, 3 13:23
14:5, 12, 14, 16 15:14
17:19 137:3 157:14
**served** 8:8, 17 13:18,
19, 20, 21, 24 14:10,
21, 24, 25
**serves** 15:11 89:23
**service** 13:25
**services** 117:7
**serving** 14:2 136:24
**session** 79:16 84:7, 9,
12, 15, 16 137:17
**sessions** 16:4
**set** 16:17 26:10
27:6 75:14 85:17
109:4 114:11, 14
135:21 159:23
176:19
**sets** 35:15 146:5
**setting** 100:10 113:6
135:19 161:5
**seven** 104:20
**seven-plus** 73:12
**Shaffer** 11:25 12:4,
7, 9, 11, 15, 20 54:11,
13, 15, 20 55:15
56:15 58:15 61:23
63:7, 16, 22 64:25
69:21 70:13, 22
89:13 91:2, 12 92:3
93:1 104:13, 23
105:16, 25 106:18
107:12 108:5, 14, 23
109:2, 9, 24 110:3, 6
137:12
**shakes** 5:17
**shape** 158:2
**share** 55:3 142:11
157:21 172:21
**shared** 160:3, 5
174:5
**shareholder** 60:11
**shareholders** 17:11
60:8 147:10
**she/the** 92:21
**sheet** 50:12 177:1,
13 178:1 179:1
**sheets** 86:22, 24
**shopping** 67:11

shortly 52:16
show 166:3, 19
showed 65:4 73:11
sic 133:24
side 147:25
SIGNATURE:_____
_____DA
TE 178:23 179:23
Signed 177:16
significant 33:14
42:15 88:3 113:17
121:5, 8, 20 128:8
significantly 93:13
169:7
Silicon 42:19
Silver 87:11
similar 20:10 42:14
106:25 152:10
similarly 142:23
174:19
simply 42:15 68:21
98:3 100:22 102:1, 7
114:9 130:12 152:16
169:8 172:11
single 102:16 158:1
sit 18:3 41:23
136:16
sitting 126:21 136:6
situation 60:2 67:15
127:8 141:15, 17
situations 115:7
six 42:22 135:25
140:19, 21, 22, 23
size 120:25 121:12
136:4 151:2
sketch 67:19
skill 35:15 69:12, 13
114:11 123:23 146:5
skills 19:20 32:13,
16 43:7, 8 45:23, 25
46:5 65:9 71:19, 24
72:1 91:15 93:12, 19
96:21 98:10 114:8, 9
116:17 117:22 119:4
122:2 124:8 126:9
135:5 146:3, 6, 8
158:23 166:2, 20
167:20 168:10 169:8
174:10, 21
slate 64:12, 13, 14

small 27:3 49:6, 14
50:25 71:23 121:10
151:4, 5, 6
smaller 102:21 121:2
Smith 2:4 4:12
157:22
solutions 99:16
155:24
solver 170:6
somebody 28:24
35:19 52:9 100:11
somewhat 66:16, 20
74:17, 18 78:13
150:19
sooner 76:4
sophisticated 35:16
sorry 43:25 55:11
72:16 85:12 109:13,
16 138:25 149:23
167:4, 14
sort 26:10, 11 33:2
sorts 114:4
soul 133:22 134:2, 7,
19
sounded 8:13
source 51:4 100:9
152:23
South 6:5 67:11
SOUTHERN 1:3 4:4
space 35:20 99:24
speak 19:22 39:1
43:12 47:11, 17
67:13 90:1, 3 95:24
133:7 134:6, 15
144:3
speaker 158:14 159:6
speaking 20:12
30:13 159:13
speaks 21:24 71:20
97:3 166:25 170:20
specific 9:23 16:21
18:17 30:5 31:24
46:14 52:7 57:6
58:14 68:18 80:22
81:12, 13 82:25
85:15 128:10 149:21
159:9
specifically 12:17
14:10 16:25 19:13
28:16 30:12 34:4

36:13 39:20, 21 40:2
41:17 47:8 51:13
57:23 63:17, 20
78:16 86:18, 22
90:24 97:9 99:23
100:1 102:24 104:2,
5 110:2 114:24
128:10 129:11 163:8
167:24 168:3, 16
Specificity 18:20
82:15 149:15, 19
specifics 31:1 32:2
80:9 81:25 87:6
spell 5:4 72:17
spelled 5:6
Spence 33:13 34:1
35:25 36:14 37:5, 12,
14 38:5, 8, 12, 13, 19,
22 39:10 41:9 43:1,
16 45:6 46:22 47:9,
18 57:25 59:11
63:10, 19, 24 67:1, 5,
13 68:11, 22 69:7, 13
70:16 73:21 74:2, 5,
14, 23 76:23 78:5, 18,
22 82:3, 10 86:23
91:6 93:2, 18 94:15
97:4 99:4, 6 102:1
104:8 110:23 111:16
112:18 114:1, 10
115:18 117:1 119:8
120:3, 19 121:22
122:16 123:7 124:1
125:20 126:13
127:22 129:2 133:18
134:11 135:7 136:17,
25 137:6 138:4
140:13 141:3, 22
145:2 146:11 147:13,
20 148:7, 25 149:24
153:23 154:2, 14
155:7, 20 156:7, 12
157:9, 10, 23 159:5
160:8 161:8, 21
162:2 168:2 169:7,
12, 17 170:16 173:24
174:20
Spence's 34:18
39:19 40:23 42:8
44:20 45:3 66:21

74:16 85:9 86:2, 8,
14 89:15 95:5, 9
102:3 116:10 117:24
121:9 122:21 124:24
130:14 144:9 151:11,
22 174:4
spend 28:10
spends 146:18
spent 33:3 42:18, 19
69:14 130:16, 19
split 135:18
split-level 67:3
spoke 90:4 96:24
97:8, 18 110:2 119:2,
3
spoken 12:20 32:18
97:7 104:4 110:1, 4
130:6
spokesmen 60:21
SS 176:2
staff 16:19 53:8
Stagnaro 2:5
stamp 55:23 73:14
107:21
stamped 62:3, 24
87:21 89:8 105:22
107:17, 24 111:6, 20
155:13
standards 157:5
standing 122:10
stands 134:18
start 78:6 147:18
started 14:18 15:2
50:19 99:20
Starting 13:24 14:11
34:12 35:17 113:24
141:4
state 5:3 42:11 69:5
96:1 176:2, 6, 25
statement 21:22
24:10 25:10, 16, 20
91:20, 21
statements 22:16
23:19 86:21, 25
STATES 1:2 4:4
33:9 98:16
statistic 103:14
step 38:24
Steps 92:17

**Stevens** 126:5, *12*
127:5
**stipulation** 176:*12*
**stop** 15:*8*
**store** 67:*12*
**strains** 158:*21*
**strategic** 35:*11*, *12*,
*13, 16* 36:2, *8, 12*
37:*8, 9* 69:*11* 93:*14*
99:8, *14* 102:*17*
112:*16, 19, 21, 23*
113:6, *7, 10, 20*
114:*14, 18, 23, 25*
115:*2, 6, 8, 12* 117:*18*
122:2 123:*10* 129:*21*
133:5 155:*23*
**strategies** 158:*18, 20*
**strategy** 35:*10, 21*
69:*1, 9, 12* 113:*1, 22*
114:6, *7* 115:5, *14*
122:*1* 126:4 129:*21*
141:*7* 149:4 161:5
170:7
**streamlined** 172:*4*
**streams** 172:15
**Street** 1:*20* 2:*12* 6:5
32:*18* 45:*24, 25*
46:*20, 23* 47:5, *9, 12,
15, 19* 60:*11, 16, 20,
22* 117:*20* 147:*15, 20,
24* 148:2
**strength** 129:2 170:*4*
**strengths** 31:*22* 57:*3,
5, 14* 58:4 148:*18*
158:*24*
**stresses** 158:*20*
**strike** 125:*18*
**strong** 103:*9* 113:6
114:*14* 117:*21* 122:*4*
129:*17* 130:2, *8*
146:*8* 155:*20* 170:*4*
**stronger** 44:*20* 45:*4,
5* 169:8 171:*19*
**strongest** 156:*17*
158:*4, 5*
**strongly** 60:*13* 122:2,
*3* 156:15
**struck** 163:*13*
**structure** 123:*19*

**structured** 157:*4*
**structures** 34:*21*
**struggle** 44:*1*
**style** 46:*18* 67:*22*
**subject** 76:*15, 18*
77:2, *4* 92:*14* 173:*11*
**subjective** 99:*15*
155:*24*
**subscribe** 101:*17*
**subscribed** 101:*20*
**subset** 116:*14*
**substantial** 138:*15*
**succeed** 94:*21*
**succeeding** 32:*4*
**success** 64:*15* 123:2,
*5, 9, 11, 21* 171:*10*
**successful** 123:*13*
147:*9* 172:6
**successfully** 120:*21*
**succession** 18:*15, 22,
24* 19:8 20:*3, 21, 24*
25:*24* 26:*3* 27:*21*
52:*22* 53:*2* 55:*2*
56:*14* 58:*24* 59:*8*
62:*1* 63:*8, 10* 64:*10,
21* 70:*14, 16* 73:*20*
76:*9, 15* 91:*3* 94:*17*
109:6, *10, 20, 25*
110:*10, 13* 154:2, *3,
14*
**successor** 52:*13*
59:*17, 22* 60:*12* 64:*7*
73:*1* 75:*9* 89:*16*
91:*17* 92:*19* 153:*25*
**successors** 19:*19*
60:*17*
**Suddenly** 164:*8*
**sufficient** 46:*6* 131:*1*
**suggested** 102:*9*
**suitability** 31:*23*
**suitable** 32:7 43:*3,
10, 22* 44:*7* 46:*1*
**suited** 64:*19*
**suits** 88:*5*
**summarize** 13:*8*
**summarized** 80:*21*
**summary** 110:*23*
155:5, *7, 16* 158:*8*
159:*23* 169:*12, 16, 25*

**summer** 90:*5, 6, 8, 18*
103:*24*
**sundry** 130:*7*
**superb** 113:*22*
**superficial** 66:*16, 20*
150:*8, 19, 22*
**superior** 112:*18*
115:*19* 120:*3, 19*
125:*21* 127:*22*
133:*18* 134:*11*
145:*21* 146:*1, 4*
**supported** 93:*5*
156:*15*
**sure** 19:*25* 46:*4*
52:*9* 60:*8, 15* 72:*17*
74:*4, 17* 76:*5* 77:*25*
82:*18* 96:*15* 103:*17*
104:*22* 107:*21*
120:*12* 122:*22*
138:*16*
**surprised** 92:*23*
**surveys** 86:*3, 6, 9, 12*
**survive** 157:*15*
**swath** 33:*10* 49:*23*
**sworn** 4:*10, 23* 176:*8*

**< T >**
**table** 6:*2* 135:*18*
136:*7, 11, 17*
**tables** 135:*19, 24*
**tackling** 135:*2, 6*
**take** 5:*17, 25* 41:*19*
47:*22* 52:*6* 73:*5*
75:*9* 79:*16* 119:*13,
14* 150:*9* 152:*22*
**Taken** 1:*14* 5:*7*
41:*13* 47:*25* 84:*8, 14*
85:*4* 119:*20* 139:*13*
161:*14* 173:*6* 176:*12*
177:*2, 8*
**takes** 135:*16*
**talent** 31:*9* 50:*12, 18*
53:*18, 23* 54:*2, 22*
55:*2, 14, 19* 56:*14, 18,
20* 57:*10, 25* 61:*7, 13,
25* 64:*1* 65:*2, 13, 22*
66:*1, 4* 71:*17* 72:*5,
25* 89:*12* 96:*15*
109:*4* 113:*24* 125:*24*
126:*1, 2, 6, 13, 14, 19,*

*21, 22, 24, 25* 127:*14,
17* 128:*23* 165:*23*
166:*2, 21* 167:*8, 18*
173:*19, 20, 24* 174:*4,
9, 19*
**talk** 34:*23* 56:*23, 24*
57:*2, 3* 60:*25* 69:*3, 4*
84:*17* 90:*6* 109:*5, 20*
122:*8* 123:*21* 132:*16*
134:*25* 135:*23* 142:*1,
9* 147:*21* 159:*16*
**talked** 19:*3, 4, 5*
31:*19, 20* 64:*11*
78:*25* 84:*21* 97:*17*
171:*9*
**talking** 34:*9* 36:*12*
39:*22* 44:*11, 12*
50:*21* 57:*6* 65:*17*
75:*21* 77:*14* 162:*12*
**talks** 122:*9* 127:*25*
128:*3, 5*
**tan** 67:*3*
**tapes** 47:*22*
**target** 171:*19*
**targets** 151:*18*
**Tayfun** 34:*1* 38:*3,
11* 59:*19* 92:*19*
**Tayfun's** 60:*10, 19*
**Tazun** 34:2 38:*11*
59:*19*
**teaches** 44:*23*
**team** 19:*16, 17* 34:*7*
57:*20, 21* 58:*13, 15,
16* 98:*11* 120:*23*
121:*23* 126:*3* 147:*6*
**Teams** 125:*17, 22*
126:*11* 151:*5*
**tech** 117:*6* 142:*15*
**technology** 157:*19*
160:*20*
**technology-based**
157:*16*
**teleconference** 81:*9*
84:*5*
**telephone** 84:*3, 6*
**telephonic** 81:*5*
82:*22*
**telephonically** 18:*9*
**tell** 10:*20* 42:*14*
46:*9, 13* 53:*24* 61:*22*

100:9  125:23  148:17
160:12  168:5
**ten**  103:18  134:1
142:22  161:23  164:6
168:23
**tended**  46:10  66:20
81:11  143:9  150:4
**ten-plus**  147:14
168:12
**tenure**  51:9
**ten-year**  148:6
149:20  159:21
**term**  142:12
**terms**  11:14  57:14
79:2  82:4  98:9
113:12, 20  121:3
131:7  150:11  151:8
152:24
**terrific**  67:9
**testified**  43:13  80:25
137:14  140:6  153:2
**testimony**  40:25
69:25  70:2, 18  77:18
125:5  149:13, 16
153:4
**Texas**  50:5
**text**  10:25  12:13
38:19
**texts**  11:2
**TFT**  172:11
**Thank**  56:7  72:16,
20  84:2  169:13
**theme**  68:19
**thing**  148:24
**things**  38:25  43:18
67:5  79:1, 2  82:13
84:21  157:9, 10
164:9  172:3
**think**  19:19  32:10,
11, 12, 13, 15, 17, 18
33:9, 11  43:6, 14
44:23, 24  45:12
46:18, 19  51:14  55:9
56:25  57:1, 2  59:10
60:10  65:12  66:4, 17
73:13  75:4, 10, 11
77:13  78:8, 9  80:3
81:17  90:14, 15
96:12  99:18  103:14
110:15  113:21  115:3,

6  118:8  123:16
126:3  127:9  128:17,
23  131:19  132:23
133:25  135:6  138:18
139:3  141:10  146:6
151:5  152:15  159:11
163:5  166:7  170:14
172:2
**thinker**  99:14  133:5
155:23  170:6
**thinking**  27:21
34:21  47:3  118:15
146:24
**thinks**  123:15  135:7
**THIRD**  1:10, 14
2:17  4:6, 18, 20  8:7,
22, 23  12:2  13:9
17:20  18:4, 15, 23
19:9, 14  20:4, 22
21:22  22:16  25:10,
24  26:23  30:16  32:5
33:3, 9, 21  34:3, 5
37:1, 4  43:4, 11, 23
44:8  48:8, 13  51:2, 3,
6, 16  55:23  56:2, 8,
11, 12  57:9, 24  58:22
62:3, 4, 24, 25  63:1, 5
66:3  68:24  69:23
70:10  71:16  73:15,
18  75:17, 18  78:2, 23
83:14, 24, 25  87:10,
21, 22  89:1, 5, 9  90:7,
9  91:1, 16  92:7, 8
93:23  97:11, 15
102:5, 8, 24  103:6
105:22, 23  107:17, 18,
22, 23, 25  111:6, 7, 20
112:3, 10  113:24
114:17, 23  115:11
116:16, 18  118:5, 21
120:8  122:3, 9, 24
123:4, 8  124:8, 21
126:6  129:18  133:20
137:24  138:10  147:7,
10  155:22  156:21
158:7  164:25  166:14
167:2, 19  169:7, 15,
24  171:14, 16, 18
172:1, 11  177:4

**Third's**  17:12  172:7,
21
**Thomas**  2:17  4:18
55:9  109:11, 14
**thorough**  157:2, 3
**thought**  60:4  65:10
67:18  79:9  146:4
149:23  158:3
**thoughtful**  157:2, 3
**threat**  144:11
**three**  37:22  38:15
75:10, 11  76:1
167:12
**three-plus**  59:13
76:11
**throw**  79:17
**Tim**  34:1, 5, 6, 18, 23
35:6, 9, 10, 21  36:14,
17  37:5, 12, 14, 21
38:5, 8, 12, 13, 18, 21
39:1, 10  41:9  43:1,
16  44:19  45:3  46:21,
22  57:25  59:11
68:10  74:4, 14, 16
76:23  78:7, 9, 18, 22
79:9  82:3, 10  86:2, 8,
14  92:18, 22  93:12, 18
95:5, 9  96:18  97:4, 5
99:4, 5, 18, 19  102:1,
3  103:1  104:8
110:23  111:16
112:18  113:19, 22
114:1  116:10  118:24
120:3, 19  121:22, 24
122:1  123:22  124:17
125:12, 20, 23  126:13
127:6, 22  128:2, 4, 13
129:1, 20, 22  133:18
135:7  136:17, 24
137:6  138:4  140:13
141:3, 6, 22  143:22
144:9, 14, 23  145:2,
20  146:1, 11, 18
147:13, 20  148:7, 12,
14, 25  149:24  150:14
151:11, 15, 21  153:23
154:2, 14  155:7, 19
156:7, 12  157:9, 10,
22, 25  158:4, 22
159:5  160:8  161:8

168:1  169:7, 12, 16
173:24
**Time**  1:14  4:2, 8
6:1, 2  8:24  9:8, 24
10:2, 17  11:5  19:19,
21  27:19, 23  28:10,
13, 18  36:21  37:7
42:18, 19  47:23  48:2
49:13, 15  51:8, 14, 25
53:12  55:4  58:16
63:8  64:22  69:15
70:14  72:5  73:21
74:1, 8, 10, 19, 22
75:1, 11, 12  77:15
79:5  82:13  85:2, 6
93:13  94:16  96:11,
12  100:18  102:14
104:6, 7  109:12
114:16, 21  117:16, 22
118:21  119:17, 18, 22
127:12  135:8  136:14,
15, 19  137:9  139:5,
11, 15, 18  140:1, 10
144:20  156:11
161:12, 16  164:12, 25
165:1  166:6  168:19
170:15  171:20  172:9
173:4, 8, 14  175:9
176:10
**timeline**  75:13, 22
**timelines**  63:11
**times**  7:13  12:19
27:17  30:1, 2  40:5
41:12  86:19  140:23
142:12  161:22  162:8
165:11, 12
**timing**  24:6
**Tim's**  34:7  105:5
106:3  119:4  121:25
125:9, 25  126:3, 7
128:6, 19  143:16
**tiny**  141:9
**title**  27:10
**Today**  4:1  41:23
129:17  142:12
**told**  34:3  102:24
**tone**  131:7  134:6
**tool**  144:22
**tools**  142:17, 20
144:20

**top** 19:*17* 53:6 63:9 70:*15* 73:*20* 74:*14* 113:*19*
**topic** 7:*16* 9:*17* 16:*21* 30:*10* 32:4 75:3
**topics** 10:22 31:25 39:2 130:7 141:*13* 149:8 159:*13*
**total** 18:*10* 21:*18*
**totally** 70:3
**traditional** 35:*18* 116:5 142:*11, 15, 16*
**transaction** 10:5 33:*19* 34:*13* 51:24 120:*23, 24, 25* 121:*17* 128:*18* 147:*10*
**transactions** 33:*16* 37:*19, 21* 113:5 132:2 151:*20*
**transcript** 177:7
**Transforming** 171:*14, 16* 172:*11*
**transition** 52:*15*
**travel** 39:*19*
**traveled** 39:*11* 42:4, 20
**traveling** 130:*20*
**trends** 144:*16*
**trip** 34:*10* 40:*21* 41:*1*
**trips** 41:3, 6, 20
**true** 60:*13* 103:*15* 159:*11* 177:*10*
**truth** 176:8, 9
**try** 5:*20* 23:*16*
**trying** 45:2 46:*17* 71:22 81:*21* 96:*12* 123:*15* 162:*10* 164:9 171:*19*
**Tuesday** 54:*15*
**turn** 112:8 154:22
**tweak** 108:9, 14
**Two** 6:*17* 7:*13* 33:8, 25 35:*12* 37:22 38:*15* 45:2, 3 60:5, 6 67:2 75:4 77:*14* 78:*10* 79:*16* 82:7 94:*16* 121:*14* 136:*1* 138:*18* 140:22

**type** 84:*25* 96:*10* 131:3
**types** 19:*20* 160:7
**typical** 135:*19* 136:2
**typically** 9:*16* 61:3 135:*16, 21*

**< U >**
**Uh-huh** 71:*15* 76:8 105:9 162:9
**uh-huhs** 5:*17*
**uh-uhs** 5:*17*
**ultimate** 74:5
**ultimately** 20:*1* 33:*21* 132:2 144:5 154:5
**unanimous** 156:9, *10* 157:*24* 158:*1* 160:9, *10* 162:7
**unanimously** 174:6
**undergraduate** 7:*18*
**undersigned** 176:4
**understand** 5:*12, 23* 6:3 17:8 18:*19* 28:*23, 25* 31:*15* 47:2, 5 65:*19* 70:6 75:25 118:4, *14* 139:*23* 159:*10* 162:*10* 164:*10* 172:6
**understanding** 29:6 34:22 35:5, 8 39:*16* 89:*23* 113:*12* 116:*11, 20* 117:*18* 118:*13* 137:*23* 138:*1, 8* 144:25 146:*21* 170:25 177:*13*
**understands** 116:*13* 144:*14, 15, 16* 157:*13, 21*
**understood** 35:*19* 69:*16* 77:*11* 150:*21* 157:*11, 13*
**unit** 103:*20*
**UNITED** 1:2 4:4
**University** 7:*20* 45:7, 15, 20
**upcoming** 110:*10, 13*
**update** 85:*14* 88:*1* 109:4 141:*15, 16, 17, 19, 20*

**updated** 27:*14, 17* 108:7
**updates** 27:3 55:2 62:*1*
**upgrade** 172:*1*
**upgrading** 172:7
**up-to-date** 144:*18* 159:*16*
**use** 55:*1* 61:24 66:25 142:*18* 153:*17*
**usual** 135:*1*
**Usually** 10:*21* 16:*15* 74:*14* 135:22 136:2 141:*15*
**utilize** 106:2
**utilized** 91:5

**< V >**
**vague** 78:*14*
**validate** 130:*13, 23*
**validated** 124:*19*
**validation** 131:*1*
**Valley** 42:*19*
**valuable** 157:9
**value** 42:23 152:*11*
**values-based** 158:9
**variety** 36:22 39:2 172:2, *14, 15*
**various** 30:*1, 2* 34:20 37:*17* 39:*15* 53:7 66:6 68:*17* 110:6 113:3, 4, 5 114:3 124:6 130:6 143:25 144:3 163:9, *14* 173:*12*
**vary** 136:3
**Venmo** 142:*19*
**venture** 130:*10*
**verbally** 5:*15*
**verify** 56:*12*
**Verizon** 11:*24*
**version** 56:*17* 108:*13*
**vet** 95:3
**viable** 64:22 65:6, *11, 14, 24* 66:2, *11, 12* 70:*19* 71:*11* 93:8
**video** 5:*16* 81:9, *12* 82:*19, 22*
**videoconference** 84:4

**Videographer** 1:22 4:*1* 47:23 48:2 85:2, 6 119:*18, 22* 139:*11, 15* 161:*12, 16* 173:4, 8 175:9
**Videotaped** 1:*14*
**view** 47:6 66:*10* 93:7 112:*24, 25* 113:*14* 124:*18* 128:*20* 131:*1* 133:4 160:9, *10* 174:3
**viewed** 132:*25*
**views** 16:5, 6 18:25 20:*13, 14, 15, 18* 133:8 174:7
**visible** 78:9
**vision** 93:*14* 115:*14* 117:*18*
**visionary** 123:*20, 23* 144:*14*
**visions** 123:*11*
**visited** 13:*10*
**visiting** 115:*25*
**voice** 10:*25* 11:*1* 20:9, *10* 131:7
**voices** 20:*11*
**voracious** 159:*14*
**votes** 80:6
**vs** 1:9 4:6 177:4

**< W >**
**wait** 5:*19* 77:8
**walk** 138:7 148:*19*
**walked** 118:24
**Wall** 32:*18* 45:24, *25* 46:*20, 22* 47:5, 9, *11, 15, 18* 60:*11, 16, 19, 22* 117:*20* 147:*15, 20, 24* 148:2
**Walnut** 1:*20*
**want** 33:*23* 46:*15* 47:4 96:2 98:*18* 110:9 119:*13, 15* 131:*11* 134:*15* 138:4 147:7 155:2, *12* 164:*10* 173:*17, 23*
**wanted** 26:*13* 46:*10* 55:3 68:*20* 74:4, *10, 16, 17* 78:6, 9, *12* 103:*17* 105:5 121:25

Case: 1:21-cv-00238-MRB Doc #: 66-1 Filed: 08/02/24 Page: 79 of 79 PAGEID #: 2702
Deposition of Marsha Conrad Williams
Philip R. McHugh v. Fifth Third Bancorp, et al.

125:*11*  128:*14*
129:*20*  147:*8*
**wanting**  102:*23*
**Washington**  117:*21*
118:*2, 12, 14*  119:*6*
**wasting**  139:*5*  166:*6*
**watched**  96:*23*
156:*13*
**watching**  64:*18*
156:*14*
**way**  11:*12*  21:*11*
44:*9*  46:*7*  61:*21*
66:*9, 23*  95:*7*  118:*15*
145:*19*  158:*2*  167:*19*
**ways**  34:*24*
**weaknesses**  31:*23*
148:*18*  158:*24*
**wealth**  48:*18, 19*
49:*12, 14*  116:*22*
138:*13, 17, 19*  150:*24*
**website**  39:*5*
**week**  55:*5*
**weeks**  24:*12*  55:*8*
**well**  12:*13*  14:*8*
15:*6*  31:*13*  32:*10*
35:*6*  36:*2*  39:*11*
42:*10*  46:*24*  51:*11,*
*17*  52:*3, 5*  58:*15*
60:*24*  63:*25*  68:*8*
75:*5*  76:*7*  77:*7, 22*
78:*10*  79:*15*  83:*22*
94:*22*  100:*19*  101:*16*
102:*8*  103:*18*  106:*11*
108:*6*  118:*1, 24*
119:*1*  121:*10*  126:*16*
127:*25*  128:*7*  130:*7*
131:*19*  133:*21*
134:*13*  140:*16*
143:*24*  144:*13*  146:*8*
148:*12*  153:*12*  159:*4*
164:*12*  165:*1*  166:*23*
**well-being**  158:*10*
**Wellesley**  7:*19*
**well-known**  35:*23*
**well-read**  144:*17*
**well-respected**  99:*12*
**well-spoken**  149:*7*
**Wendy**  1:*20*  176:*4*
**went**  13:*12*  34:*1*
38:*4*  40:*3, 7, 10, 14*

42:*11*  44:*21, 24*  45:*7*
50:*13*  84:*18*  162:*22*
**We're**  4:*2*  26:*11*
39:*22*  47:*24*  48:*3*
77:*18*  107:*21*  119:*19*
139:*12*  157:*17*
161:*13, 17*  166:*11*
173:*5, 9*
**west**  67:*10*
**WESTERN**  1:*4*  4:*5*
**we've**  62:*12*  119:*11*
124:*11*  139:*19*
**WHEREOF**  176:*19*
**wide**  33:*10*  39:*2*
172:*14, 15*
**widely**  39:*11*
**WILLIAMS**  1:*14*
3:*3*  4:*3, 16, 22*  5:*3, 5*
21:*8*  24:*23*  43:*21*
44:*16*  48:*5*  54:*8*
61:*18*  62:*12*  83:*8*
85:*9*  87:*16*  88:*23*
91:*25*  96:*7*  98:*21*
105:*13*  108:*20*
110:*21*  111:*12, 23*
119:*25*  140:*4*  161:*20*
175:*14*  176:*8, 11*
177:*19*  178:*24*
179:*24*
**W-i-l-l-i-a-m-s**  5:*6*
**Williams@outlook.co**
**m**  11:*10*
**win**  81:*22*  82:*12*
**winning**  27:*12, 13, 17*
90:*13*  91:*10*
**winter**  13:*12*
**wisdom**  98:*25*
**witness**  4:*9, 23*  11:*7,*
*19, 21*  12:*24*  29:*20*
51:*11*  55:*12*  68:*4*
71:*1, 22*  73:*14*  81:*2*
96:*3, 4*  100:*4*  109:*16*
120:*10*  124:*6*  125:*6*
129:*14*  131:*13*
134:*22*  139:*6*  140:*16*
143:*4, 22*  145:*6*
146:*15*  147:*18*
148:*14*  151:*15*
152:*13*  153:*12*
154:*19*  164:*12*

165:*10*  166:*9*  167:*3,*
*14*  168:*25*  169:*20, 22*
170:*19, 21*  174:*12, 17,*
*23*  175:*4*  176:*19*
**witnessing**  124:*12*
**word**  28:*23, 25*  29:*6*
66:*16*  96:*11*  114:*13*
124:*14*
**worded**  46:*9*
**wording**  163:*13*
169:*16, 25*  170:*9*
**work**  36:*2*  90:*7, 9*
98:*8*  103:*15*  106:*10*
129:*3, 5, 7, 23*  138:*4*
157:*4*  170:*22*  172:*15*
**worked**  6:*19*  33:*7,*
*16*  35:*20*  36:*25*  37:*2*
41:*20*  42:*21, 22*
106:*1*  117:*13*  118:*20*
151:*15*  170:*25*  171:*1*
**working**  36:*8*  37:*20*
46:*24*  69:*15*  113:*3*
115:*25*  117:*2*  118:*6*
121:*6, 8*  130:*20*
**workplace**  30:*16*
**works**  57:*22*
**world**  39:*13, 15, 16*
45:*12*  93:*12*  102:*11*
116:*2*  130:*20*  142:*21*
144:*1, 15*  160:*19, 20*
**Worldwide**  8:*1*
**writing**  27:*6*
**written**  4:*17*  53:*21*
**wrong**  66:*16*  114:*13*
124:*13*  167:*3*
**Wyman**  33:*15*  36:*10*
39:*17, 23*  40:*1, 22*
41:*21*  42:*20*  69:*14*
113:*3, 23*  114:*11, 16,*
*22*  115:*9*  117:*3, 5*
118:*3, 20*  119:*1*
129:*24*  130:*17*  131:*1,*
*17*  146:*19, 20*  151:*16*
170:*17*

**< X >**
**Xavier**  45:*15, 20*
50:*8, 14*

**< Y >**

**Yeah**  100:*8*  131:*14*
150:*13*  161:*25*
**year**  17:*16, 18*  26:*2*
29:*23*  34:*14*  52:*22*
72:*22*  76:*24*  85:*14*
99:*10, 22*  100:*11*
101:*24*  102:*4*  138:*3,*
*21*  140:*20*  147:*14*
154:*25*
**years**  6:*8, 12*  14:*20*
17:*16*  22:*24*  29:*22*
33:*15*  35:*4, 12*  36:*18*
37:*24*  41:*10*  50:*18,*
*19*  59:*14*  64:*3, 10, 13,*
*18, 20*  66:*6, 13*  68:*17*
69:*14*  70:*2*  73:*12*
75:*5, 10, 12*  76:*2, 12*
93:*17*  94:*19*  96:*23*
97:*13*  101:*15*  103:*19*
113:*23*  114:*15*
115:*24*  117:*4, 8, 12,*
*13*  124:*6, 11*  126:*17*
130:*16, 19*  134:*1*
136:*11*  140:*19, 23*
142:*22*  146:*19*
152:*20, 21*  153:*21, 22*
157:*10*  159:*15*  160:*7,*
*8, 22, 23, 24*  161:*23*
162:*23*  163:*1, 10, 22*
164:*6*  168:*12, 23*
**Yep**  163:*4*
**York**  35:*1*  42:*11*
45:*8*
**young**  39:*16*  50:*14*

**< Z >**
**Zaunbrecher**  88:*2*