# EXHIBIT B

Deposition of Michael McAllister                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

 1              UNITED STATES DISTRICT COURT

 2               SOUTHERN DISTRICT OF OHIO

 3                    WESTERN DIVISION

 4                      - - -

 5   PHILIP R. MCHUGH,              :
                                    :
 6           Plaintiff,             :
        -vs-                        : CASE NO. 1:21-CV-00238
 7                                  :
     FIFTH THIRD BANCORP, et        :
 8   al.,                           :
                                    :
 9           Defendants.            :

10                      - - -

11       Videotaped deposition of MICHAEL MCALLISTER, a

12   witness herein, taken by the Plaintiff as upon

13   Cross-Examination and pursuant to the Federal Rules of

14   Civil Procedure and Notice at the offices of Fifth Third

15   Bancorp, 515 East Walnut Street, Cincinnati, Ohio, on

16   December 14, 2022 at 10:00 a.m., before Bruce Sandy,

17   videographer, and Jennifer K. Starner, RPR, a Notary

18   Public within and for the State of Ohio.

19                      - - -

20

21

22

23

24

25

```
 1    APPEARANCES:

 2            On behalf of the Plaintiff:

 3                    John J. McHugh, III, Esquire
                      McHugh & McCarthy, Limited
 4                    5580 Monroe Street
                      Sylvania, Ohio  43560
 5                    419.885.3597

 6                    Peter A. Saba, Esquire
                      Joshua M. Smith, Esquire
 7                    Stagnaro, Saba & Patterson Company, LPA
                      2623 Erie Avenue
 8                    Cincinnati, Ohio  45208
                      513.533.2711
 9                    pas@sspfirm.com
                      jms@sspfirm.com
10
              On behalf of the Defendant:
11
                      Michael L. Cioffi, Esquire
12                    Blank Rome LLP
                      201 East Fifth Street
13                    Cincinnati, Ohio  45202
                      michael.cioffi@blankrome.com
14                    513.362.8701

15

16                    Also present:  Brian Thomas, Esquire
                                     Fifth Third Bancorp
17
                              -  -  -
18

19

20

21

22

23

24

25
```

| | |
|---|---|
| 1 | S T I P U L A T I O N S |
| 2 | It is stipulated by and among counsel for the |
| 3 | respective parties that the deposition of MICHAEL |
| 4 | MCALLISTER, a witness herein, called as upon |
| 5 | Cross-Examination by the Plaintiff may be taken at this |
| 6 | time and place pursuant to the Federal Rules of Civil |
| 7 | procedure and Notice as to the time and place of taking |
| 8 | said deposition; that the deposition was recorded in |
| 9 | stenotypy by the court reporter, Jennifer K. Starner, |
| 10 | RPR, and transcribed out of the presence of the witness; |
| 11 | and that said deposition is to be submitted to the |
| 12 | witness for his examination and signature, and that |
| 13 | signature may be affixed out of the presence of the |
| 14 | Notary Public. |
| 15 | - - - |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

Deposition of Michael McAllister                    Philip R. McHugh v. Fifth Third Bancorp, et al.

```
 1                        I N D E X

 2     WITNESS:

 3     MICHAEL MCALLISTER

 4                                               Page
```

```
 5     Cross-Examination By Mr. McHugh             6
       Direct Examination By Mr. Cioffi          137
 6     Recross-Examination By Mr. McHugh         160
       Redirect Examination By Mr. Cioffi       168

 7
```

```
 8                      E X H I B I T S
                                                Page
```
```
 9     Plaintiff's Exhibit 1                      76
       Plaintiff's Exhibit 2                     101
10     Plaintiff's Exhibit 3                     102
       Plaintiff's Exhibit 3                     103
11     Plaintiff's Exhibit 3A                    127
       Plaintiff's Exhibit 3B                    127
12     Plaintiff's Exhibit 3C                    127
       Plaintiff's Exhibit 3D                    127
13     Plaintiff's Exhibit 4                     108
       Plaintiff's Exhibit 5                     121
14     Defendant's Exhibit 7                     138
       Defendant's Exhibit 8                     141
```

```
15

16

17

18

19

20

21

22

23

24

25
```

Deposition of Michael McAllister

Philip R. McHugh v. Fifth Third Bancorp, et al.

---

Page 5

1  VIDEOGRAPHER: Today is December 14th, 2022.
2  The time is 10:08 a.m. We're on the record for the
3  deposition of Michael B. McAllister for a case
4  pending in the United States District Court,
5  Southern District of Ohio, Western Division,
6  entitled Philip R. McHugh, Plaintiff, versus Fifth
7  Third Bancorp, et al., Defendants, Case
8  No. 1:21-CV-00238. If at this time all counsel
9  present would introduce themselves for the record,
10  then the witness can be sworn.
11    MR. MCHUGH: My name is John McHugh. I am
12  co-trial counsel for Philip R. McHugh,
13  plaintiff.
14    MR. SABA: Peter Saba, co-counsel for
15  Philip McHugh.
16    MR. CIOFFI: Michael Cioffi of Blank
17  Rome on behalf of all the defendants. I represent
18  all the defendants and Mr. McAllister personally
19  through a joint representation agreement.
20    MR. THOMAS: Brian Thomas, Fifth Third
21  Bank.
22    MICHAEL MCALLISTER,
23  of lawful age, as having been duly sworn, as hereinafter
24  certified, was examined and testified as follows:
25

---

Page 6

1    CROSS-EXAMINATION
2  BY MR. MCHUGH
3    Q. Good morning, Mr. McAllister.
4    A. Good morning.
5    Q. Have you ever had your deposition taken
6  before?
7    A. Yes.
8    Q. And on how many occasions?
9    A. Oh, a handful.
10    Q. Have you ever testified live in any trial in
11  front of a jury?
12    A. I have.
13    Q. And do you recall when that took place?
14    A. Oh my, that would be a wild estimate. Probably
15  2000 -- you know, no. '96.
16    Q. Can you tell me briefly whether your testimony
17  was in the role of a fact witness or as an expert
18  witness?
19    A. I don't know the difference frankly.
20    Q. Do you know who the parties in that litigation
21  were?
22    A. It was a physician suing my company at the
23  time.
24    Q. Your company at the time was?
25    A. Humana.

---

Page 7

1    Q. Mr. Cioffi and I have been at this for
2  sometime in the practice of law, but there are a few
3  simple rules that we like to at least share with the
4  witness as a matter of courtesy so that we establish a
5  clean record and we make sure that we're communicating
6  with each other and I'd like just to touch briefly on
7  those, if you may -- if I may.
8    A. Sure.
9    Q. First of all, I'd like you to listen to my
10  question and let me finish my question. And I will in
11  turn listen to your answer and let you finish your
12  answer completely before I ask the next question. Okay?
13    A. Yeah.
14    Q. Second, I will trust you that since you've
15  been deposed before that if you answer a question that
16  you do understand the question and that the answer is
17  your truthful response to the best of your ability.
18    A. Okay. If I don't understand it, I'll ask you
19  to clarify it.
20    Q. Thank you very much. And one other slight
21  change is always to verbalize your answer, if you will,
22  please. Even though we have a videographer, uh-huh and
23  other nods of the head are difficult to perceive
24  sometimes. So a verbal answer will ensure we have a
25  clean record.

---

Page 8

1    A. Okay.
2    Q. Okay. Thank you. Will you give me your full
3  residence address, please?
4    A. 8644 North Morning Glory Road, Paradise
5  Valley, Arizona 85253.
6    Q. How long have you lived there?
7    A. Since 2012.
8    Q. You live there with your wife?
9    A. Yes.
10    Q. And do you have any children that live there
11  with you?
12    A. No.
13    Q. Mr. Cioffi earlier mentioned that there was a
14  joint representation agreement between you and him that
15  was signed. Did you hear him say that this morning?
16    A. I did hear him.
17    Q. When was that document signed?
18    A. Oh, I don't actually recall. Within the last
19  few weeks.
20    Q. Did you have a lawyer review that document for
21  you before it was signed?
22    A. I did not.
23    Q. I don't mean to be impertinent by the
24  question, but did you read the entire document before
25  you signed it?

---

Deposition of Michael McAllister                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 9

1    A. I did.

2    Q. And the joint representation is because you

3 understand that there's a current consistent interest

4 between you and Fifth Third Bank in this litigation?

5        MR. CIOFFI: Objection. Calls for a

6 legal conclusion. If you -- if you know an

7 answer.

8    A. That would be my assumption.

9    Q. Did you ask for the joint representation

10 agreement or was it presented to you?

11    A. It was presented as an option and I accepted

12 it.

13    Q. How was it presented to you? In person? In a

14 meeting? Via email?

15    A. Started with a conference call.

16    Q. And that conference call involved what

17 parties?

18    A. The two of us.

19    Q. Anyone else present?

20    A. No.

21    Q. And did it progress from the conference call

22 then to an exchange of documents?

23    A. Yes.

24    Q. How long was the conference call? Do you have

25 any idea?

Page 10

1    A. 30, 45 minutes.

2    Q. Was that the first time that you had spoke

3 with Mr. Cioffi?

4    A. Yes.

5    Q. And do you have a time frame when you think

6 that occurred? Daily or monthly range?

7    A. Oh, I don't know exactly. Maybe a month ago,

8 something like that.

9    Q. Did you take any notes at all from that

10 conference?

11    A. No.

12    Q. Was the summary of the conference provided to

13 you by Mr. Cioffi?

14    A. No.

15    Q. Were there any other agreements that you

16 executed between Mr. Cioffi as counsel for the bank and

17 -- the bank?

18    A. No.

19    Q. Can you tell me the length of the agreement?

20 Was it a two or three-page agreement or was it longer

21 than that?

22    A. I remember it being relatively brief. Probably

23 one page. It might have been a page and a half.

24    Q. And then Mr. Cioffi explained the language of

25 the agreement to you and what it was intended to

Page 11

1 accomplish?

2    A. Yes.

3    Q. Okay. And I assume you have still a copy of

4 that agreement?

5    A. Yes.

6    Q. After you received the agreement, you signed

7 it and sent it back to Mr. Cioffi?

8    A. Yes.

9    Q. And did you have any subsequent meetings with

10 him then?

11    A. Yes.

12    Q. And when did those meetings occur?

13    A. Yesterday.

14    Q. How long that was meeting?

15    A. Several hours.

16    Q. Where did it occur?

17    A. This room.

18    Q. Does the heat get any better in here?

19    A. It's pretty hot.

20    Q. I just wondered.

21        Did you happen to be in town for a Fifth Third

22 Bank at a board meeting at that time?

23    A. I was.

24    Q. And when did the board meeting conclude?

25    A. Noon-ish.

Page 12

1    Q. And how long did you meet with

2 Mr. Cioffi?

3    A. Probably a couple of hours.

4    Q. Was anyone else present?

5    A. Yes.

6    Q. Could you identify who they were?

7    A. Two lawyers from the bank, Brian being one of

8 them.

9    Q. Do you know the identity of the other lawyer?

10    A. I don't recall her name.

11    Q. Do you recall anything about her that you

12 could -- in other words, that you might describe her

13 that would help us identify her? Is she young? Old?

14 White? Black?

15        MR. CIOFFI: Objection. I'm not going

16 to allow -- it's -- it's. He identified her as a

17 lawyer. That's sufficient for the purpose of your

18 examination.

19        MR. MCHUGH: I think I get to decide

20 that, but are you instructing him not to answer?

21        MR. CIOFFI: No.

22        MR. MCHUGH: Okay. Thank you.

23        MR. CIOFFI: I'll -- for the record,

24 I'll represent that the other person was Phenise

25 Poole.

Deposition of Michael McAllister                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 13

1    MR. MCHUGH: Thank you.
2    Q. Other than --
3    MR. MCHUGH: Brian, your last name is
4    Thomas; is that right?
5    MR. THOMAS: Correct.
6    Q. Other than Mr. Thomas and Miss Poole and Mr.
7    Cioffi, have you met with any other lawyers of the bank?
8    MR. CIOFFI: Objection. Time frame.
9    A. Ever?
10   Q. I'm sorry. Yes. With respect to the claim
11   that's been made by Philip McHugh.
12   A. Yesterday the general counsel stepped in here
13   for about five minutes.
14   Q. And the general counsel was Susan Zaunbrecher?
15   A. Correct.
16   Q. And the length of her stay was very brief?
17   A. Very brief. Just said hello and left.
18   Q. Were there documents that you reviewed at that
19   meeting?
20   A. Yes.
21   Q. Could you tell me what format those documents
22   appeared in and how they were presented to you?
23   A. I don't know what you mean by format.
24   Q. Was it a stack of documents like I have here
25   or was it put in a binder?

Page 14

1    A. It's very similar to your stack right there.
2    Q. Some lawyers share old habits, I think.
3    A. It seems to be a pattern.
4    Q. Did you take any of those documents with you?
5    Do you intend to take them with you when you leave?
6    A. Nope.
7    Q. And do you have a fairly good recollection of
8    the type and the nature of the content of the documents
9    that you reviewed?
10   A. In general, sure.
11   Q. Did you ask to see any other documents?
12   A. I did not.
13   Q. Were you told that there were documents that
14   were not being provided to you for any particular
15   reason?
16   MR. CIOFFI: Objection as to what he was
17   told by counsel. Instruct him not to answer.
18   Q. Do you have any reason to think there were
19   documents that you might have asked for that you weren't
20   shown or seen?
21   A. No.
22   Q. Did you -- well, did you review minutes of the
23   HCCC committee?
24   MR. CIOFFI: Objection as to what he
25   reviewed. Privileged.

Page 15

1    MR. MCHUGH: You're instructing him on
2    that one?
3    MR. CIOFFI: Yeah, I'm instructing him
4    not to answer.
5    MR. MCHUGH: Michael, I'm not sure I
6    want to cause difficulty, but is there a protocol
7    or procedure that is followed generally down here
8    in the Southern District of Ohio with respect to
9    the preservation of an objection on privilege and
10   the instruction answer?
11   MR. CIOFFI: No. I think my objection
12   and instructing him not to --
13   MR. MCHUGH: You think that's sufficient
14   for your purposes?
15   MR. CIOFFI: Sure. You can take the
16   transcript to the judge if you want a motion to
17   compel. That's the procedure.
18   MR. MCHUGH: All right. Thank you.
19   Q. Apart from yesterday, when was the last time
20   that you reviewed the HCC minutes for, let's say, 2017,
21   '18, '19 or '20?
22   A. It would have been back in those years.
23   Q. Contemporaneous with the meeting itself?
24   A. Within a month or so after the meeting.
25   Q. Okay. Do you recall any episode where you --

Page 16

1    following an HCC meeting where you might have gone back
2    to review how it was recorded or how it was reported?
3    MR. CIOFFI: Objection. Lack of
4    clarity. At least as to time frame. Ever or
5    when?
6    Q. My time frame is going to be 2017 through
7    2020.
8    A. Try that again.
9    Q. Sure, I'd be happy to. At any time let's say
10   within the four years, five years at the most, was there
11   an occasion where you went back to a file that you had
12   or maintained to review or refresh your recollection as
13   to what was recorded about action or comments taken by
14   the committee?
15   A. No.
16   Q. Would you -- would you tell me your -- your
17   practice or your protocol when you attended the meeting
18   and the meeting concluded? This meeting is the HCC
19   meeting. What did you do with any documents or papers
20   that you saw at the meeting?
21   A. We never had papers. It was all done online
22   or systems. So I would be -- basically you would have a
23   meeting and the folks draw up their minutes. It's
24   reviewed by the group and basically approved in the
25   following meeting.

Deposition of Michael McAllister       Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 17

1  Q. Great. So there was a portal that you
2  accessed as a member of the committee to review the
3  documents --
4  A. Yes.
5  Q. -- that were presented? Do you recall what
6  that portal's name was?
7  A. I think it's Diligent.
8  Q. Okay. How many of the HCC meetings in 2018,
9  '19 and '20 were you physically present in Cincinnati,
10  Ohio for?
11  A. I don't recall.
12  Q. Were you present for any?
13  A. Yes.
14  Q. Were you present for all?
15  A. I don't recall. There are occasional virtual
16  meetings. The timelines and when those occurred or
17  didn't occur, I can't tie together for you right now.
18  Q. What was the general length of an HCC meeting?
19  A. About an hour.
20  Q. Was there a format that you followed as the
21  chairman?
22  A. There's an agenda drawn up, I review it with
23  the staff before the meeting. And that's pretty much
24  the way it works. There is an annual schedule of what's
25  going to be done at certain meetings that's established

Page 18

1  before the year starts and that sometimes changes and
2  sometimes not.
3  Q. Did you have a principal inside contact at
4  Fifth Third Bank who assisted you in preparing the
5  agenda or the schedules?
6  A. Yes.
7  Q. And who was that?
8  A. Let me be sure about the timelines. I dealt
9  with a couple of people. Peg Julia was one of them.
10  Q. Okay.
11  A. And Nancy Pinckney was the other one, but I'm
12  not sure about the timelines and when all that
13  conversion took place. Or turnover.
14  Q. May I ask you who preceded who?
15  A. Peg was before Nancy.
16  Q. And how would that be accomplished in terms of
17  exchanging communication? Would the format customarily
18  be a telephone call or would it be a text or would it be
19  through Diligent? Can you tell me?
20  A. The digital documents would be on Diligent.
21  They would be prepared as a draft. Then we would have a
22  conference call and in many cases Zoom meetings as a
23  prep meeting to go through all of that before the actual
24  meeting would occur at the board.
25  Q. Do you make a distinction between the meeting

Page 19

1  in which you attended as a member of the board and a
2  meeting in which you chaired as part of the HCC
3  committee?
4  A. Try that again. I'm not sure what you're
5  asking me.
6  Q. In your mind, do you keep those two events
7  separate?
8  A. They were separate.
9  Q. Right. And so when you're telling me that you
10  had a -- you would see it on a Diligent presentation,
11  then you would have a conference call --
12  A. That would be an HCC.
13  Q. Thank you. And then what would be the final
14  results of that HCC conference call?
15  A. There would be a report out to the board and
16  approval of anything that the board in total needed to
17  deal with.
18  Q. And would you see that before it was presented
19  to the board?
20  A. I'm the one that presented it.
21  Q. Was it generally your practice to review
22  presentations to the board with Mr. Carmichael in 2018,
23  '19 or '20?
24  A. You mean between the HCC and the board?
25  Q. Yes, sir.

Page 20

1  A. No.
2  Q. There was never a time where you expected him
3  to review and approve your report?
4  A. No.
5  Q. The report would then be contained in the HCC
6  committee records and then a summary of your report
7  would be reflected customarily in the board minutes?
8  A. The report would be reflected in the board
9  minutes.
10  Q. The report was not a part of the board
11  minutes, was it?
12  A. Eventually it would be.
13  Q. The full report from the committee?
14  A. Yeah.
15  Q. And I'm going to repeat this question just to
16  make sure I have the process in my mind.
17  Once you delivered the report and once the
18  meeting concluded, the board meeting concluded, you
19  can't recall an instance where you went back and
20  reviewed how it was written up or --
21  A. Oh, I always looked at the minutes in terms of
22  how they were -- both the board minutes get reviewed and
23  the HCC minutes get reviewed after they're done.
24  Q. And that's at the following meeting?
25  A. Yes.

Deposition of Michael McAllister                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 21

1    Q.  All right.  My question to you is do you
2  recall any instance where you did that personally as
3  part of just to make sure that everything was recorded
4  properly outside your role as a board member or
5  committee member?
6          MR. CIOFFI:  Objection.  Lack of
7    clarity.  You mean did he proofread documents?  I
8    don't know what you're asking.
9    A.  I'm not sure what you're asking me.  I mean,
10  I -- I --
11    Q.  Okay.  After the board meeting
12  minutes --
13    A.  After the board minutes are completed --
14    Q.  Right.
15    A.  -- and before they get approved at the next
16  meeting, everybody looks at them to see if they reflect
17  whatever occurred at the meeting.
18    Q.  Right.  And so it's your practice that this is
19  done after you get the Diligent access or before that?
20  Because the report can only be provided to you as part
21  of the Diligent facility, correct?
22    A.  I'm not sure exactly what point you're asking
23  about.
24    Q.  Okay.
25    A.  What do you -- try it again.

Page 22

1    Q.  Sure.  I'd be happy to.  Thank you.
2        The first thing that would occur in
3  the -- in that universe would be the HCC committee
4  convention?
5    A.  We would hold a meeting, yes.
6    Q.  Right.  And that meeting would generate
7  minutes of what was decided at that meeting?
8    A.  Eventually, but I would take it before those
9  minutes were finished and take it to the board to review
10  what occurred in that meeting.
11    Q.  Oh, okay.  So you would -- you would complete
12  your draft of the minutes to take it to the board and
13  approve it and then the HCC --
14    A.  I would review -- I would review what happened
15  at that meeting verbally with the board.
16    Q.  And then the HCC minutes would be prepared?
17    A.  At a later date along with the board minutes.
18    Q.  Okay.  Thank you.  That's what I was trying to
19  establish.
20    A.  Okay.
21    Q.  Thank you very much.
22        Did you have anyone assist you at any time in
23  2018, '19 or '20 in preparing the minutes that you were
24  presenting to the board?
25    A.  The law department drafts the minutes and asks

Page 23

1  for changes or to make sure they're clear on what
2  happened.
3    Q.  So would you take me through then the steps --
4  let's say this last -- this most recent meeting, was
5  there a meeting of the HCC?
6    A.  There was.
7    Q.  All right.  And when did that take place?
8  Date and time, if you can.
9    A.  The day before the overall board meeting.
10    Q.  And so the overall --
11    A.  Well, it was before the board.  Same day, but
12  part of it.  Before it.
13    Q.  Same place?
14    A.  Same building.
15    Q.  Same building.  Okay.  But not in the board
16  room, some other room?
17    A.  Some other room.
18    Q.  Okay.  And you took notes of what was
19  decided --
20    A.  Right.
21    Q.  -- at that meeting?
22    A.  Correct.
23    Q.  Before those notes were presented to the board
24  at the board meeting, they would be presented to the law
25  department for --

Page 24

1    A.  No.  The minutes would not be generated that
2  quickly.
3    Q.  Would your notes --
4    A.  I basically use the agenda --
5    Q.  Uh-huh.
6    A.  -- on the system --
7    Q.  Yes.
8    A.  -- at the board meeting to walk the board
9  through what we did --
10    Q.  All right.
11    A.  -- verbally.
12    Q.  Does the law department have any intervention
13  between the conclusion of the HCC meeting and your
14  report to the board?
15    A.  They do not.
16    Q.  When does the law department get this?
17    A.  They produce them in the next few weeks.
18    Q.  And you became a director of Fifth Third Bank
19  in 2011; is that right?
20    A.  That's correct.
21    Q.  And you're a chair of the HCCC?
22    A.  Yes.
23    Q.  Are you a member of any other committees?
24    A.  Audit.
25    Q.  Any other committees?

Deposition of Michael McAllister             Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 25

1  A.  Finance.
2  Q.  Any others?
3  A.  No.
4  Q.  You chair the HCC and member of the other two?
5  A.  Correct.
6  Q.  And how long have you been a member of auditor
7  and finance committee?
8  A.  Oh, I don't know the exact years?  I've been
9  off and on and back on the audit committee, so -- and
10  finance committee, it's been a few years, but I don't
11  know when it started.  I can't remember.
12  Q.  And you are compensated as -- as the chairman
13  of the HCC committee?
14  A.  I think there's -- there's a -- yeah, there's
15  a bit extra for that.
16  Q.  Okay.  And what is your director fee for those
17  services?
18  A.  I honestly don't know.
19  Q.  Okay.  All right.  And same is true for both
20  audit and finance?
21  A.  I don't know.  I could give you round numbers,
22  but I would be guessing.  I don't look at it.
23     MR. CIOFFI:  John, as you know, these
24  are publicly available information.  It is public
25  finance.

Page 26

1  Q.  One of the tasks or duties of the HCC is to
2  decide director of compensation?
3  A.  No.  The board approves the director of
4  compensation, but the HCC looks at it and recommends
5  whatever changes.
6  Q.  So as I understand your testimony,
7  the -- the staff source comes from the HCC, presented to
8  the board and the board approves it?
9  A.  Correct.
10  Q.  Okay.  And you look that in terms of both base
11  compensation for -- and these are management -- senior
12  management employees.  You look at base compensation of
13  the board?
14  A.  Are you talking board or management now?
15  Q.  Now I'm talking management.
16  A.  Okay.
17  Q.  You do the same for management; isn't that
18  right?
19  A.  There's market research that's done, studies
20  about where people are positioned individually and
21  generally.  And specific changes are made as necessary
22  and they -- ultimately when it comes to the executive
23  officers, it goes to the board for approval.
24  Q.  And that assistance is usually provided to you
25  by Charlie King's firm?

Page 27

1  A.  Yes.
2  Q.  Does Mr. King's firm in any way engage in
3  recommendations for succession planning?
4  A.  No.
5  Q.  In connection with the succession planning
6  that was done by Fifth Third Bank in 2018, '19 or '20,
7  can you tell me who your commission -- your committee
8  consulted with?
9  A.  The HCC does not do the succession work.
10  That's done at the board level.
11  Q.  Did you have any role at the committee level
12  with regard to succession planning?
13  A.  Succession, no.
14  Q.  Did the committee ever see any what I would
15  call talent deck presentations of evaluations by
16  management of senior leaders or members of the
17  enterprise committee?
18     MR. CIOFFI:  Objection.  He just
19     answered the committee didn't deal with succession
20     planning.  It was done at the board level.  Do you
21     mean as part of the board?  I mean, obviously all
22     members of the HCC were part of the board.  Could
23     you clarify, please?
24     MR. MCHUGH:  I'm going to stand on the
25     question, but I'll be happy to clarify.

Page 28

1  Q.  As a member of the HCC, did you ever see
2  talent deck presentations that were prepared by senior
3  management evaluating members of the enterprise
4  committee for succession?
5  A.  HCC separately and individually does not do
6  that.  However, there is an annual meeting where the
7  board in total is there which includes the HCC --
8  Q.  Uh-huh.
9  A.  -- where that does occur.
10  Q.  Okay.  And at which annual meeting does that
11  occur?
12  A.  Usually December.  Well, always December.
13  Q.  Did it recently occur?
14  A.  It did.
15  Q.  And that was at the meeting that you just
16  concluded?
17  A.  Yes.
18  Q.  Have you apart from a formal meeting of either
19  the board or HCC spoken to Greg Carmichael regarding the
20  claims that have been made by Philip McHugh in this
21  lawsuit?
22  A.  I have not.
23  Q.  Have you spoken to Robert Shaffer?
24  A.  No, not outside of the board context.
25  Q.  Within the board context, has there been

Deposition of Michael McAllister                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 29

1  discussion of the claims made by Philip McHugh against
2  Fifth Third Bank?
3      A.  I'm not sure what you mean by claims, but
4  there's been discussion about what occurred.
5      Q.  And when did that take place, please?
6      A.  Back when the occurrence happened.
7      Q.  All right.  And the occurrence, if we talk
8  about it, is at least -- seems to be centered around the
9  middle October of 2020.  Is that consistent with your
10 recollection?
11     A.  I don't recall specifically the time line.
12     Q.  Well, what -- what -- can you tell me what you
13 do recall?  If somebody said what happened, what would
14 be your presentation of what your understanding was?
15     A.  I would say there was an organizational change
16 announced in the company and Mr. McHugh got angry and
17 left.
18     Q.  Did you ever have any conversations with
19 Philip McHugh --
20     A.  Not --
21     Q.  -- regarding that?
22     A.  Not after that.
23     Q.  Not after his departure?
24     A.  No.
25     Q.  Did you have any discussions with Philip

Page 30

1  McHugh prior to that event regarding his expectations or
2  continued roles at Fifth Third Bank?
3      A.  No.
4      Q.  Your testimony would be that you had no
5  discussions of any kind with Philip regarding his
6  succeeding Greg Carmichael as president of the bank?
7      A.  No.
8      Q.  And no communications or discussions with
9  Philip McHugh regarding his succeeding to the position
10 of chairman of the board or chief executive officer?
11     A.  No.
12     Q.  At the -- at the board meeting where this was
13 discussed?
14     A.  What was discussed?
15     MR. CIOFFI:  Objection to the indefinite
16 pronoun "this."  Can you -- I mean, it's
17 confusing.  You've just got to clarify, please.
18     MR. MCHUGH:  Sure.  As I asked Mr. McAllister
19 and I also extended you the courtesy, if you'll let
20 me finish the question, I may be able to do that.
21     MR. CIOFFI:  Well, not when you start with
22 "this."  I mean, go ahead, please.
23     Q.  At the meeting where this organizational
24 change was discussed, was it a full board meeting?
25     A.  Yes.

Page 31

1      Q.  And do you have any recollection as to when
2  that occurred?
3      A.  I wouldn't know the specific one.  These kind
4  of conversations happen periodically.  It's not like one
5  single event.
6      Q.  Okay.  Tell me what you recall of the
7  discussion.
8      A.  Well, it was part of an overall discussion
9  about succession.  Are you talking about the
10 announcement kind of event or everything that led to it?
11 Or what are you getting at?
12     Q.  Well, it's my impression -- perhaps unwisely.
13 It's my impression that when a 34-year executive of the
14 bank leaves, that there's some explanation as to the
15 circumstances under which he left.  Well, that may be
16 wrong.  That's just what I'm asking you.  Is that the
17 case?
18     MR. CIOFFI:  Objection, Counsel.  You
19 can't testify.  You know that.  Just ask a
20 question.
21     MR. MCHUGH:  I just did.
22     MR. CIOFFI:  That's not a question.
23     MR. MCHUGH:  Yes.  I just asked him what
24 took place.
25     MR. CIOFFI:  That's a speech.  Took

Page 32

1  place when?
2      MR. MCHUGH:  Following your example.
3  Okay?
4      MR. CIOFFI:  What took place when?  Can
5  you give him a specific -- you have the minutes.
6  You know when it was discussed.  This is not a
7  memory test.  Just ask him what happened at the
8  September 21st, 2020 meeting and see if he has
9  recollection, but you really should just show him
10 the document.
11     MR. MCHUGH:  Thank you.  I'll do the
12 examination.  I afforded you that same courtesy.
13     MR. CIOFFI:  You've got to be fair,
14 come on.
15     MR. MCHUGH:  I was.
16     MR. CIOFFI:  No.  You're making this a
17 memory test.  That's not fair, but go ahead.
18     Q.  Mr. McAllister, do you remember when you first
19 learned that Philip McHugh was no longer with the bank?
20     A.  It would have been at a board meeting.  I'm not
21 sure exactly which one.  It probably would have been one
22 after the announcement of the organizational change
23 because that would have -- that would have led to
24 everything else, so...
25     Q.  No one reached out to you privately before the

Deposition of Michael McAllister        Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 33

1 organizational announcement to let you know that that
2 had happened?
3     A. You've got -- the organizational announcement
4 came first.
5     Q. Yes, I'm asking you that. It's a different
6 question.
7       Did anyone reach to you personally before the
8 organizational announcement was made to let you know
9 what had happened?
10      MR. CIOFFI: Objection. Could you read
11    the question back, please?
12      MR. MCHUGH: Wait, wait, wait a minute.
13    You have a right to object to the question. If
14    Mr. McAllister told me that he didn't understand
15    the question, I would be happy to rephrase it.
16     A. I still feel like you have it backwards.
17     Q. You do? All right. Well, you tell me why.
18     A. Because you're asking me if somebody reached
19 out before the --
20     Q. Yes.
21     A. -- announcement.
22     Q. Right.
23     A. What occurred did not happen before the
24 announcement that I'm aware of. If it did, I didn't
25 know that.

Page 34

1     Q. That's what I'm asking you. Let's -- let's
2 just for my purposes and your purposes see if we can
3 establish a couple of dates.
4     A. Okay.
5     Q. Okay. The announcement occurred on October
6 26th?
7     A. All right.
8     Q. And the announcement simply said Philip McHugh
9 left the bank?
10      MR. CIOFFI: Objection. The problem,
11    John, is you're -- you're confusing the witness
12    with what announcement. He was assuming that you
13    meant the announcement of Tim Spence becoming
14    president.
15      THE WITNESS: That's right.
16     Q. I'm sorry. That's, you know --
17     A. That's what I was thinking.
18     Q. Nice to have Mr. Cioffi tell me what you're
19 thinking, but that's all right. That's what I'm trying
20 to establish here is just what you did know.
21     A. Okay.
22     Q. So when Tim Pence is announced as president --
23     A. Right.
24     Q. -- it says that Philip McHugh left the bank,
25 that announcement. Did you have any prior notice before

Page 35

1 that announcement issued that Philip had left the bank?
2     A. I -- I -- I don't recall. I mean, I was at
3 the board when the decision was made to make the
4 organizational change.
5     Q. And when was that meeting?
6     A. I don't know which one that was within I would
7 have to do some research.
8     Q. Well, the --
9     A. And then --
10     Q. Go ahead. No. No. I want you --
11     A. You're up.
12     Q. No. I'd like you to finish your answer.
13     A. No. I'm done.
14     Q. All right. So let's go back to the -- to the
15 announcement. The announcement then that you saw or
16 received, how did you get that?
17      MR. CIOFFI: Again, objection. John,
18    you're confusing the record and witness. If you
19    have a document to show him, show him the
20    document.
21      MR. MCHUGH: Michael, I'm asking as I
22    choose to ask him, which I have the right.
23      MR. CIOFFI: But you don't have the
24    right to confuse the record and the witness.
25    That's what I'm objecting to.

Page 36

1      MR. MCHUGH: I'm not going to -- I'm not
2    going to engage in argument. You know what the
3    rules are. If you have an objection, state it.
4    That's all you need to say. I don't mean to
5    quibble with you in front of Mr. McAllister. His
6    time is important.
7     Q. My question is how did you learn it?
8     A. What?
9     Q. How did you learn that Philip had left the
10 bank?
11     A. In a board meeting verbally from
12 Mr. Carmichael.
13     Q. Okay. And did you see any written
14 announcement to that effect?
15     A. I don't recall specifically.
16     Q. Okay. And was the first time that you were
17 aware that Philip had left the bank was when
18 Mr. Carmichael said that you to in the board meeting?
19     A. That's the way I recall it.
20     Q. What did Mr. Carmichael say?
21     A. Something along the lines when the
22 announcement was made Phil came to see him, he was angry
23 about the thing, didn't agree with it and just was
24 leaving. And he was frankly surprised at that.
25     Q. Did he say anything else of substance that you

Deposition of Michael McAllister                              Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 37

1  can recall?
2      A.  I don't think so.  I think he kept it
3  relatively brief.
4      Q.  Did anyone confirm that a counter version to
5  you any other executive officer of the bank?
6      A.  What kind of version?
7      Q.  What Mr. Carmichael had reported to you.
8      A.  Try it again.
9      Q.  Sure.  Did Bob Shaffer make any comment with
10 respect to that?
11     A.  No.
12     Q.  Did Susan Zaunbrecher make any comment with
13 respect to that?
14     A.  No.
15     Q.  Did you at any time in that October or
16 November time frame of 2020 review any court papers that
17 were filed by Philip McHugh against the bank?
18     A.  No.
19     Q.  Have you ever seen the amended complaint that
20 was filed against the bank and Mr. Carmichael?
21     A.  No.
22     Q.  And you said that you had had no private
23 communications with Mr. Carmichael regarding the
24 exchange that he and Philip McHugh had?
25     A.  No.

Page 38

1      Q.  And none with Mr. Shaffer?
2      A.  No.
3      Q.  And I'm not interested in any conversations
4  that you may have had with Mr. Cioffi, but with any
5  other inside counsel at the bank did you have any such
6  communications?
7          MR. CIOFFI:  I'm going to object to any
8      communication with counsel for the bank.  It's
9      privileged.
10         MR. MCHUGH:  Well, I don't believe an
11     announcement like that is privileged, but --
12         MR. CIOFFI:  Well, you asked him if he
13     had any other conversations.  So I'm going to
14     object and instruct him not to answer if he had
15     conversations with counsel from the bank.
16     Q.  Did you have any communications with
17 counsel for the bank in which you were informed by bank
18 counsel as to the circumstances of Philip McHugh's
19 departure?
20         MR. CIOFFI:  Objection.  Privileged.
21     Instruct him not to answer.
22     Q.  Did you participate in any vetting of Timothy
23 Spence to become the president of Fifth Third Bank in
24 2016?
25     A.  Again, the timelines I don't --

Page 39

1      Q.  I'm sorry.  That's a bad question on my part.
2  2020?
3      A.  What do you mean by vetting?
4      Q.  Did you have any conversations between you and
5  Mr. Spence personally where you had a meeting with him
6  to evaluate his credentials or his competencies?
7      A.  I think I did have a dinner with him one time
8  just to talk about his future, but I have no idea when
9  that occurred.  It's somewhere in this process which is
10 over multiple years, so...
11     Q.  Do you recall where that dinner took place?
12     A.  I don't recall.  It would have been here in
13 Cincinnati or Arizona, but I don't recall.
14     Q.  Did you ever invite him to your residence in
15 Cincinnati for such conversation?
16     A.  I never lived here.
17     Q.  I'm sorry.  Did you ever invite him to your
18 residence in Arizona?
19     A.  I probably did, but I don't think he -- that
20 that ever happened.
21     Q.  Was anyone else present?
22     A.  For the dinner?
23     Q.  Yes.
24     A.  No.
25     Q.  Did you submit any report or make any written

Page 40

1  evaluations of any kind?
2      A.  No.
3      Q.  Did you conduct any investigation of any kind
4  into Mr. Carmichael's assertion that Philip was angry
5  and just --
6      A.  No.
7      Q.  In your association with Philip, had you ever
8  seen him get angry?
9      A.  Nope.
10     Q.  Had you ever received any report from anyone
11 at Fifth Third Bank that Philip McHugh's conduct was
12 unacceptable or it reflected or demonstrated some anger
13 issues?
14     A.  No.
15     Q.  As I understand it, you had a preexisting
16 business relationship with Philip McHugh before coming
17 to Fifth Third Bank; is that right?
18     A.  That's correct.
19     Q.  Could you tell me a little bit about that,
20 please?
21     A.  I was CEO of Humana based in Louisville,
22 Kentucky.  Philip was the market, I guess, president or
23 leader for Fifth Third in that market.  I was a banking
24 customer going back to, well, early -- I don't know --
25 probably 2000.  And so through that we got to know each

Deposition of Michael McAllister

Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 41

1 other in various us community settings, civic things.
2    Q. Did you consider Philip McHugh to be your
3 personal banker at Fifth Third?
4    A. Not directly, no. At one time he was over the
5 private bank, which I'm a customer of.
6    Q. Uh-huh.
7    A. So in a line of authority, yes. But no. I had
8 people below him that were dealing directly with me.
9    Q. Was there anybody above him in Cincinnati or
10 in Louisville that you dealt with for your matters at
11 Humana?
12    A. No. I mean, at Humana or me personally?
13    Q. I'm sorry. First -- I did mean Humana. And
14 then I'll ask you personally.
15    A. You know, I'd have to go back. It's possible
16 that the company had a minor banking relationship. It
17 would have been small, so...
18    Q. My understanding is that you've pretty much
19 had Fifth Third now manage your money along with another
20 investment bank since you came on board at Fifth Third?
21    A. That's correct.
22    MR. CIOFFI: I'm sorry. We're getting
23 pretty far field. How his money was being managed
24 in 2000. So I ask you to be at least within the
25 Rule 26 scope of discovery, John.

Page 42

1    MR. MCHUGH: Well, thank you.
2    Q. You -- you were also at one time a director of
3 National City Bank; isn't that right?
4    A. That's correct.
5    Q. And who is the regulator of National City
6 Bank, if you know?
7    A. Federal Reserve.
8    Q. The officer, the controller of currency have
9 any obligations with respect to National City Bank since
10 it was a national bank?
11    A. I don't -- I don't recall to be honest with
12 you.
13    Q. When were you -- when did you serve as
14 director of National City Bank?
15    A. From December of '06 through December
16 of -- boy, I think it was '08.
17    Q. Did you --
18    A. Might have been '09. I don't know exactly.
19 Two or three years.
20    Q. Did you resign your position?
21    A. No. The bank sold.
22    Q. And the bank was sold to PNC?
23    A. Correct.
24    Q. You did not continue on as a director at PNC?
25    A. Did not.

Page 43

1    Q. Were you asked to do so?
2    A. No.
3    Q. You first became a director at Fifth Third
4 when?
5    A. I think it was '11.
6    Q. Did you have any supervisory responsibility as
7 a board member for any other financial institution
8 between 2008 and 2011?
9    A. My own company.
10    Q. And that was Humana?
11    A. Yes.
12    Q. Do you have -- I don't mean to press too much
13 on this issue, but do you have a private investment
14 foundation or anything like that --
15    MR. CIOFFI: Objection.
16    Q. -- that you're involved in managing money for?
17    MR. CIOFFI: Objection. How does that
18 come within the scope of Rule 26?
19    MR. MCHUGH: Well, I'll --
20    MR. CIOFFI: You know that's pretty far
21 field.
22    MR. MCHUGH: No. No.
23    A. Ask it again. I'm not sure what you mean.
24    Q. Do you have a charitable foundation that you
25 have selected an institutional money manager for?

Page 44

1    A. I have two.
2    Q. Great. And is Fifth Third involved in
3 managing that money for you?
4    A. Yes. It's a family foundation.
5    Q. And that family foundation's name?
6    A. McAllister Family Foundation.
7    Q. And is that a shared investment responsibility
8 between Fifth Third and any other party?
9    A. No.
10    Q. When you -- well, were you at all involved in
11 the decision by Fifth Third Bank to seek supervision by
12 the OCC rather than the State of Ohio?
13    MR. CIOFFI: Objection. Again, it's
14 beyond the scope of discovery.
15    MR. MCHUGH: Well, we don't know that,
16 Michael. That's why I'm asking the question.
17    MR. CIOFFI: What does that have to do
18 with the -- any claim --
19    MR. MCHUGH: It's the foundation --
20    MR. CIOFFI: -- in your complaint? It
21 doesn't, but I'm going to allow him to answer this
22 one, but you're really -- you're really far field.
23    A. At the board level, yes.
24    Q. Okay. And do you know why that was
25 undertaken?

Case: 1:21-cv-00238-MRB Doc #: 66-2 Filed: 08/02/24 Page: 16 of 75  PAGEID #: 2718

Deposition of Michael McAllister                              Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 45

A.  It was felt that the OCC would represent a more appropriate regulator given the size of the bank. The bank had grown to be pretty significant.  It's one of the biggest banks I've actually dealt with.

Q.  At that time, the bank was somewhere in the top ten of the national banks?

A.  I don't recall exactly.

Q.  But somewhere in that range?

A.  Sizable.

Q.  Did you -- did you have any training from the bank regarding duties and responsibilities regarding executive succession as part of the OCC supervisory process?

A.  I don't -- I don't recall any specific training relative anything to the OCC would do.  I mean, there's general organization as to what a board member is supposed as a board member.  I've been through five of these HCC successions.  So I've got a lot of track record on this, so it's -- I generally know what I'm supposed to do.

MR. MCHUGH:  Excuse me for a second.

Q.  When you say you've been through six of these --

A.  Five.

Q.  Five of the CEO successions who was the first

Page 46

one?

A.  Me.

Q.  And then after that?

A.  One at AT&T.  I'm not sure.  We'd have to stack them up time wise.  Two here.  Actually three here.

Q.  There would be --

A.  Maybe Cavett, Carmichael.  Well, Cavett was already here.  So Carmichael, Spence.  I'm chairman of Zoetis.  We had a CEO succession here -- there in the last two years.  And one at AT&T, which occurred last year.

Q.  So this is -- this is not an area which is either unfamiliar to you or --

A.  I'm relatively familiar with this.

Q.  Okay.  So let me go back, if I can, just for a minute to your time in Louisville with Humana just for a couple of purposes.

When -- when you accepted the position as director of National City Bank --

A.  Uh-huh.

Q.  -- did you -- were you required to move money from some depository account to acquire a certain amount of stock at National City Bank?

MR. CIOFFI:  Objection.  Beyond the

Page 47

scope of discovery.

Q.  You may answer the question.

A.  No.  No, there was nothing required.

Q.  Okay.  I see that Fifth Third appears to have a policy that requires its director to have a certain percentage of equity in the institution itself?

A.  That's -- yeah, that's true.

Q.  That is true.  Do you know if the same policy existed with respect to National City Bank?

A.  I would argue that virtually every public company has a policy as such.

Q.  Do you recall withdrawing money from Fifth Third to fund the purchase at National City Bank and then when you accepted the position --

A.  That's not what happened.

Q.  Can you tell me what happened?

A.  Yeah.  To me you have to have loyalty to the people you work with.  So when I went on National City's board, I told them this should be my bank.

Q.  Okay.

A.  It's really simple.  So I moved my banking business to National City.

Q.  Right.

A.  In terms of meeting their requirements relative to ownership of stock, that's done a different

Page 48

way.

Q.  So the same principle of loyalty applied to --

A.  I mean, I could have gone in and bought the stock and solved the problem, but over time it would have been solved through the relationship with the bank.

Q.  And that's the same relationship that you then established with Fifth Third Bank when you became a member of its board?

A.  I'm not sure about the timing of all of that, but at some point I brought everything back to Fifth Third because I wasn't going to be doing banking with someone else if I'm on the board here.

Q.  Do you have any conversation that you recall with Philip McHugh regarding what your strategies then were for your banking relationship with Fifth Third Bank?

MR. CIOFFI:  Objection.  Beyond the scope of discovery.  Has nothing to do with the claims in this case.

A.  Like I said, I don't recall.

Q.  Well, when -- you told me, I think, that you -- you didn't really consider Philip to be your personal private banker in Louisville?

MR. CIOFFI:  Objection.  Asked and answered.

Deposition of Michael McAllister          Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 49

1      A.   Not directly.   Clearly he was in the line of
2 authority in the process, but...
3      Q.   Did you have -- did you have experience with
4 Philip that enabled you to determine whether or not he
5 was honest?
6        MR. CIOFFI:   Objection.   Beyond the
7 scope of discovery.
8      A.   I don't know what you mean by that.
9      Q.   Well, simple question.   Did you have any
10 reason to think that Philip was not honest?
11      A.   I have no reason to believe he's dishonest.
12      Q.   Did you have any reason to think he was not
13 competent to discharge the responsibilities he had as a
14 banker for Fifth Third in Louisville?
15      A.   I had no reason to think otherwise.
16      Q.   Do you have any reason to think that Phil was
17 not competent or prepared to discharge the
18 responsibilities he had at Fifth Third in the positions
19 he held before his departure?
20        MR. CIOFFI:   Objection.   Vague.
21 Imprecise.   What positions are you talking about?
22      Q.   Do you understand my question?
23      A.   Well, I would answer it more broadly than
24 Philip.   No one at the executive level in an institution
25 like this will be incompetent and in that position very

Page 50

1 long.
2      Q.   Okay.   And the fact that Philip was in the
3 successive position for 34 years speaks to his
4 competency?
5      A.   It does.
6      Q.   Does it speak to his diligence and activity
7 and loyalty to the bank?
8      A.   It does.
9      Q.   Does it speak to his temperament and his
10 ability to retain management and to improve management?
11      A.   It does.
12      Q.   Is there any detriment, as far as you can see,
13 to his 34 years of service at Fifth Third Bank in the
14 various positions he held?
15        MR. CIOFFI:   Objection.   Vague.
16 Confusing.   But if you can answer, you may answer.
17      A.   No.
18      Q.   Okay.   I'm going to try to repeat that
19 question so we don't have the -- the possible confusion
20 that may arise from a negative answer or the objection.
21      Is there anything at all that you think
22 prevented Philip McHugh from becoming president of Fifth
23 Third Bank?
24      A.   Yes.
25      Q.   And what was that?

Page 51

1      A.   Because it's part of the succession process
2 which had gone on for several years.
3      Q.   Uh-huh.
4      A.   And this happens in all companies.
5      Q.   Uh-huh.
6      A.   You've got to have people positioned in the
7 right place so the succession can be successfully done.
8 And while Philip was very good at doing what he did, the
9 perception of the board -- this was a growing consensus
10 over several years -- was that Tim, in fact, had
11 broader -- had more broadly met the general criteria of
12 what we thought a CEO needed to be here.   And so in
13 order to make all that work, somebody had to be stepped
14 up to get ready.   And that's how Tim ended up being
15 promoted to the president slot.
16      Q.   So were there any talent deficiencies that
17 Philip exhibited that prevented him from exercising the
18 responsibilities as president of the bank?
19      A.   Ask it again.
20      Q.   Yes.   Were there any talent deficiencies that
21 Philip McHugh prevented him from qualifying to be
22 president of the bank?
23      A.   I would answer that along the lines of there's
24 a lot of variables that go into this.   Some of the
25 judgments are going to be around which strengths and

Page 52

1 weaknesses exist.
2      Q.   Did you make any such judgments of strengths
3 or weaknesses which would disqualify Philip from being
4 president?
5      A.   I wouldn't say disqualify, but clearly the
6 board made the decision based on all the variables that
7 we were considering that Tim was a better choice.
8      Q.   And to the best of your knowledge, when did
9 that occur?
10      A.   Well, until the -- until the vote -- the vote
11 actually happened on the change, it was always up in the
12 air.   But, I mean, again, it was a growing consensus
13 that this was the way this was going to go barring
14 something unusual happening, so -- but it's never done
15 until it's done.
16      Q.   Do you -- do you know whether there was a
17 recommendation by Mr. Carmichael to make Mr. Spence
18 president in 1999?   I'm sorry.   In 2019?   I'm losing
19 track of mind.
20      A.   I wouldn't say board recommendation is
21 appropriate.   I would say that he believed that Tim
22 could be the CEO at some point.
23      Q.   And do you know that whether
24 Mr. Carmichael ever made a recommendation for Philip
25 McHugh to be president?

Deposition of Michael McAllister                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 53

1    A.  He never did.
2    Q.  Did he tell you that he never did?
3    A.  What?
4    Q.  Did Carmichael tell you that he had never done
5  that?
6    A.  I'm not sure.  That makes no sense to me.  Try
7  that question a different way.
8    Q.  Sure.  Did Mr. Carmichael tell you that he
9  never considered Philip McHugh as a candidate for
10  presidency of Fifth Third Bank?
11    A.  I don't know if I remember him saying that
12  specifically like that.  I mean, if you look over a
13  ten-year period, you know, people come on and off lists
14  for these things.  And there's always an effort to try
15  to figure out what talents you have and what's possible
16  because you never know if your CEO is going to get hit
17  by a bus tomorrow.  So, I mean, this is what -- this is
18  what boards have to do is look down the road.  And
19  whatever CEO you have in place, you better be thinking
20  about what the next one looks like.  And that can change
21  year to year and, you know, it does and it does often.
22    Q.  Okay.  So you don't have a recollection -- or
23  -- that Mr. Carmichael ever made in a presentation to
24  the board or to the HCC that Timothy Spence should be
25  the president of the bank in 2019?

Page 54

1    A.  I don't know about that specific timeline, but
2  the board was always looking around at what succession
3  would look like.  Tim had been teed up somewhere along
4  the way there and over time the board got real
5  comfortable that that was the future.
6    Q.  Was there ever a consideration of any
7  candidates other than Tim Spence?
8    A.  We never really looked at seriously outside
9  the company.  And I guess if you go back through all the
10  succession work, he came to the top of the pile
11  relatively early.  So then it became a question of what
12  do you have to do to prepare him for the job.
13    Q.  So my question was, were there any other
14  internal candidates?
15    A.  I don't -- I don't recall what that list would
16  have looked liked it.  It changed over the years.
17  It's possible there were others on that.  I don't know.
18    Q.  Well, were there any other candidates that you
19  as either a commissioner, committee member of the HCC or
20  as a board member thought ought to be considered that
21  you voiced at a board meeting or at any committee
22  meeting?
23    A.  No.
24    Q.  Did you ever give any consideration to Philip
25  R. McHugh becoming the president of Fifth Third Bank?

Page 55

1    A.  Of course that would have been part of the
2  conversations over the years.  Phil was a senior
3  executive.  Everybody on that senior team is potentially
4  going to be stepping up.  So that's -- that's -- yes,
5  that's the normal course of business.  Whether he's on
6  some roster or not, I don't know, but yes, that
7  discussion would occur.
8    Q.  And you're testifying under oath that you know
9  Philip was in fact considered to be the
10  president -- among the candidates to become the
11  president of Fifth Third Bank?
12    A.  I don't recall specifically, but it's likely
13  at some point, yes.
14    Q.  Now, in -- I want to be fair to the facts
15  here.  My question to you is to testify under oath
16  whether you can recall that, that Philip was in fact --
17    A.  I don't actually.
18    Q.  And do you as you sit here --
19      MR. CIOFFI:  John.
20      MR. MCHUGH:  Oh, I'm sorry.  I'm going
21  to ask for a break in just a minute.
22    Q.  Do you as you sit here right now recall any
23  disabling factor in your mind that prevented Philip
24  McHugh from becoming president of Fifth Third Bank?
25    A.  I'm not sure disabling is the right word.  All

Page 56

1  I'm saying is if you're comparing people that are
2  potential candidates, some are stronger in some areas,
3  some are weaker in other areas and you balance all those
4  things when you make your choice.
5    Q.  And in -- in that regard, was there ever a
6  comparative analysis done between Tim Spence and Philip
7  McHugh by either the commission, your committee or by
8  the board?
9    A.  There wouldn't have been a side-by-side
10  comparison done anywhere.  That was something that would
11  have evolved -- and it did -- over time in terms of who
12  appeared to be coming to the top of the list, to the top
13  of the consideration.
14    Q.  When you say that there wasn't a side-by-side
15  comparison, was there any formal evaluation, comparative
16  evaluation between those two candidates?
17    A.  Formal?
18    Q.  Yes, sir.
19    A.  I don't believe so.
20    Q.  Was there ever any independent evaluation of
21  multiple candidates?
22    A.  Not multiple candidates.
23    Q.  Were you aware of any recommendations by the
24  consultant that -- that normal practice is to have more
25  than one internal candidate evaluated?

Deposition of Michael McAllister                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 57

1    A.  I'm not sure what you mean by normal practice.
2    Like I said, I've been through five of these.
3    That didn't always follow that pattern.
4    Q.  Well --
5    A.  What do you mean by normal?  I don't know what
6    that means.
7    Q.  Did you have -- did you have any
8    communications with Guy Beaudin in HR?
9    A.  Personally and directly?
10   Q.  Yes, sir.
11   A.  No.
12   Q.  You know who he is?
13   A.  Yes.
14   Q.  And I take it that you -- you heard and you
15   relied on his report then when you cast your vote or
16   made your decision with respect to the selection of
17   president?
18   A.  That's one factor.
19   Q.  Okay.  Any other factors that you relied upon
20   from other persons' reports?
21   A.  Other individuals and reports?
22   Q.  Yes.
23   A.  No.
24   Q.  So from at least your perspective, it was your
25   perception of Philip's strengths and weaknesses and your

Page 58

1    perception of Tim Spence's strengths and weaknesses and
2    the recommendations of Mr. Bodan?
3    A.  That was a component, yes.
4    Q.  I'm sorry?
5    A.  Yes.
6    Q.  Okay.  Was there anything else?
7    A.  No.  I mean, it's -- again, this a process
8    where the entire board is sort of involved in this and
9    there's a lot of experience around that table.  A lot of
10   people have been through these things many times.  It's
11   -- it's difficult to pick somebody for these jobs.  You
12   never really know what you're going to get until they're
13   in it to be honest with you.  So you do your best, you
14   do your due diligence, you look for outside input.  It's
15   one thing.  And then ultimately there's a collective
16   judgment made.
17   Q.  Did you -- did you seek any information from
18   any other members of the executive management team or
19   the enterprise group for their comments on that issue?
20   A.  Well, you look to Mr. Carmichael for his
21   comments.  He works with everybody every day, so...
22   Q.  Anybody else?
23   A.  No.
24   Q.  Okay.  So we had Mr. Carmichael's comments,
25   Mr. Bodan's comments and your overall perception based

Page 59

1    on your experience and judgment that led to that?
2    A.  Right.
3         MR. MCHUGH:  All right.  Time to take a
4    quick break.
5         VIDEOGRAPHER:  The time is 11:13 a.m.
6    We're going off the record.
7         (Whereupon, a brief recess was taken.)
8         VIDEOGRAPHER:  The time is 11:35 a.m.
9    We're back on the record.
10   Q.  Mr. McAllister, I'd like to follow up just on
11   a couple of things and we'll move on to another area.
12        The responsibility for establishing the
13   compensation of the president and the CEO of the board
14   is with the human capital committee?
15   A.  That committee does the legwork.  It
16   ultimately goes to the full board for approval.
17   Q.  And when the full board makes approval, then
18   it publishes that as a part of its proxy statement; is
19   that right?
20   A.  Ultimately.
21   Q.  Has it generally been the practice at Fifth
22   Third Bank that the president and CEO are -- if the
23   position is divided or if it's held by the same person,
24   that they are included in the highest compensated
25   officers in the bank?

Page 60

1    A.  Ask that again.
2    Q.  Sure.  Is the salary and the benefits --
3    A.  For the CEO?
4    Q.  -- equity of the CEO listed?
5    A.  In the proxy?
6    Q.  Yes, sir.
7    A.  Yes.
8    Q.  And is the same true for the president if the
9    president is not part of -- is not the CEO?
10   A.  If the -- the dollar amount dictates it so, it
11   will be.
12   Q.  Okay.
13   A.  It's a math problem.  That's all it is.
14   Q.  All right.  And it's -- it's for the five
15   highest compensated executive officers; is that right?
16   A.  Correct.
17   Q.  And is that reviewed in any way by the HCCC
18   before it is published?
19   A.  The HCC reviews the proxy before it's
20   published.
21   Q.  Okay.  Now, I've used the -- the acronym the
22   HCCC.  Is there a -- a better way to describe that?
23   That -- that does constitute the human capital and
24   compensation committee, right?
25   A.  It does.

Deposition of Michael McAllister          Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 61

1  Q.  Okay.  When you speak about it, do you refer
2 to it by any shorthand term or is HCCC sufficient?
3  A.  I've probably called it the comp committee
4 once in a while.
5  Q.  Comp committee.  So if I use comp committee as
6 opposed to repeating the acronym --
7  A.  I'll understand.
8  Q.  -- you'll understand.  Okay.  Thank you.
9  Did I understand you correctly to say from
10 your perspective the comp committee has nothing to do
11 with succession planning, executive succession planning?
12  A.  That's not part of the process.  That's all
13 done at the board level.
14  Q.  Okay.  So that would be a true statement that
15 the --
16  A.  To my knowledge, yes.
17  Q.  Okay.  Have you ever had any disagreement with
18 anybody about that at the comp committee?
19  A.  I don't think so.
20  Q.  Okay.  In the -- how many years have you been
21 a member of the comp committee?
22  A.  I don't know off the top of my head.
23  Q.  Does it make it easier if I say how many years
24 have you been the chairman of the comp committee?
25  A.  Again, that's probably two, three, at the most

Page 62

1 four.
2  Q.  Okay.  At any time during your tenure either
3 as the chairman of the compensation committee or as a
4 member of the committee, do you recall it ever
5 undertaking any role or responsibility with respect to
6 executive succession?
7  A.  I don't recall.
8  Q.  If -- if you were to be asked, as you are now,
9 what is the role of the comp committee with respect to
10 executive succession, you would simply say it has none?
11  A.  It's not directly involved.
12  Q.  And when you say it's not directly --
13  A.  I mean --
14  Q.  Sure.  Okay.
15  A.  For example, yesterday in the meeting I
16 mentioned earlier --
17  Q.  Yes, sir.
18  A.  -- it's a combined comp/HCC meeting with
19 the full board doing succession work, but the
20 comp committee/HCC doesn't do that
21 independently.
22  Q.  Okay.
23  A.  So it's part of a -- it's basically a board
24 function.
25  Q.  And I think I understand it.  We're going to

Page 63

1 try this case, if we do, to a number of people who don't
2 have that same level of familiarity.  So if I say the
3 HCC or the comp committee doesn't have any independent
4 responsibility for executive succession, that's a true
5 statement?
6  A.  That would be right.
7  Q.  And whatever role it has, it only has because
8 of a membership on the board?
9  A.  It's in the context of the board.
10  Q.  Great.  One other matter I wanted to make
11 sure I understood you correctly on.  You said
12 that Mr. Carmichael offered an explanation that Phil
13 was angry and that he was surprised.  Do you remember
14 that?
15  A.  Uh-huh.
16  Q.  Can you elaborate, if you can, a little bit
17 more on that conversation or that report from
18 Mr. Carmichael?
19  A.  I wouldn't remember it extensively, but what I
20 recall is, like, he had basically sat down with Phil to
21 talk about what he wanted to do going forward and Phil
22 didn't want any part of it.  So it wasn't -- I mean, he
23 expected him, I think -- you'll have to ask him -- for
24 Phil to stick around, so -- and continue to function at
25 the executive team or whatever the particular assignment

Page 64

1 was.
2  Q.  Can you explain to me what you understood
3 or what he communicated with regard to his being
4 surprised?
5  A.  Not really.  I guess I don't think he expected
6 that reaction.
7  Q.  Did he offer any explanation about the context
8 of his communication with Phil at that -- at that
9 incident?
10  A.  Not beyond what I've described.  I mean, that
11 he had done the reorganization.
12  Q.  Uh-huh.
13  A.  Announcement was going to happen.  He talked
14 to Phil.  Phil didn't like it.  Phil left.
15  Q.  And he was surprised by that reaction?
16  A.  He was surprised by that, yeah.
17  Q.  And did he offer any emphasis or any
18 explanation or qualitatively explain Phil was angry?  I
19 mean, I could see upset.  I can see angry.  I can see
20 different things.  And I'm just wondering if he --
21  A.  Well, that's my word.  It could be
22 interchanged by anything else you use.
23  Q.  Could disappointed be --
24  A.  Could be.
25  Q.  -- similarly --

Deposition of Michael McAllister                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 65

1    A.  I wouldn't -- yeah, I wouldn't quibble with
2  that.
3    Q.  All right.  Were you trying to, by the use of
4  the word 'angry,' characterize the reaction as in any
5  way inappropriate?
6    A.  No.  Again, I go back to surprise more than
7  anything else.
8    Q.  Okay.  Thank you.  Thank you.
9        Now, I -- I am, I suppose, a novice and a
10  little bit confused about the process.  And you
11  mentioned that you had at least five experiences with
12  this succession.  So I wonder if you would educate me
13  just a little bit about this in the context of what
14  happened in 2018, '19 or '20 with regard to Tim Spence.
15  Okay?  So that's the context of my questions.
16        MR. CIOFFI:  Objection to the form.
17  It's confusing.  I think you have the dates mixed
18  up.  I mean, you used the word -- the date 2000.
19  Tim Spence wasn't here.
20        MR. MCHUGH:  I thought I said 2016, '17,
21  '18.  I'll be happy to rephrase it.
22        MR. CIOFFI:  Rephrase.
23        THE WITNESS:  Try it again.  Try it again.
24  BY MR. MCHUGH:
25    Q.  Sure.  I'd be happy to.

Page 66

1        From the time that Tim Spence came to the
2  bank --
3    A.  Okay.
4    Q.  Okay.  When he originally came there, Greg
5  Carmichael hired him, right?
6    A.  I think so.
7    Q.  Okay.  Were you aware of any commitment or
8  communication that he was hired to become the next
9  president and CEO?
10    A.  No.
11    Q.  And --
12    A.  That would be inappropriate anyway.  The CEO
13  can't make that commitment.
14    Q.  Okay.  Only the board can make that decision?
15    A.  Correct.
16    Q.  And so when Tim Spence came and was given the
17  assignments he had, he was part of the enterprise group,
18  right?
19    A.  Yeah.
20    Q.  And when I use the word "enterprise group," I
21  have a -- I kind of mean senior management.  Is that
22  a --
23    A.  That's accurate.
24    Q.  That's accurate.  Okay.
25    A.  Or I would call it the executive team.

Page 67

1    Q.  The executive team?
2    A.  Yeah.
3    Q.  As -- as a board member and with your
4  experience at AT&T -- and did you say Zatus?
5    A.  Zoetis, Z-O-E-T-I-S.
6    Q.  Z-O-E-T-I-S.  What kind of company is that?
7    A.  Animal health.  Animal health.
8    Q.  Tell me how the process at Fifth Third started
9  when you first became aware of the need to plan for the
10  corporate succession as it affected Greg Carmichael's
11  ultimate departure?
12    A.  So this process to me was very similar to one
13  I've seen everywhere.  I mean, they all follow the same
14  sort of course.
15    Q.  Okay.
16    A.  You know, it starts -- your succession starts
17  the day you hire the one you hire and you start talking
18  about who's next.  And so from that moment forward, the
19  CEO has the responsibility to prepare somebody for their
20  replacement.
21    Q.  Uh-huh.
22    A.  That's part of their job.  And so it's just an
23  ongoing process at that point to figure out, you know,
24  who do we think might do this, how long is it going to
25  take to get them ready, you know, who develops over

Page 68

1  time. And, once again, that changes as things, you know,
2  progress over several years.  I mean, you hope to have a
3  CEO come on for, you know, five to ten years so you
4  don't go through this.  It's always high risk to make
5  this change.
6    Q.  Uh-huh.
7    A.  So you want somebody who's going to be around
8  a while, but once you bring the CEO in you start on the
9  next one.  And so that's the way this works.  You have
10  people -- watch them, they're brought in, they get
11  before the board.  The board gets a chance to see them
12  work, think, how they communicate, what they know, the
13  breadth of their knowledge.  You get to watch their
14  operating rhythm, what their businesses can do, how they
15  led them.  You get a sense of how people respond to
16  them.  And all of those things go into an ultimate
17  judgment call over time.
18        And, of course, the CEO has input into that
19  because they work with them even more closely than the
20  board does.  The board has to work to get, you know,
21  exposure to these folks.  It's part of the job.  And so
22  that's how it works.  It works that way everywhere.
23  And then basically it takes a while to get comfortable
24  that you've got the right candidate.  And then at that
25  point, you've got to think about whatever you're going

Deposition of Michael McAllister          Philip R. McHugh v. Fifth Third Bancorp, et al.

---

Page 69

1 to do organizationally to sort of tee him up for the
2 thing.
3    Q. Does the board's responsibility begin even
4 before the incumbent says this is my time deadline for
5 departure?
6    A. Try that one more time.
7    Q. Sure. Does the board's responsibility to find
8 a replacement to proceed with corporate succession
9 commence even before the incumbent says this is my
10 schedule?
11    A. It's a perpetual ongoing process.
12    Q. Okay.
13    A. So it's possible you would have several people
14 maybe on a succession program even before this next CEO
15 gets named because they may be considered five, ten
16 years out before they're going to be ready. I mean,
17 it's possible you can have that kind of long-term view.
18 So the answer is sometimes that can be true, yes.
19    Q. Do you know if that were true with regard to
20 Tim Spence?
21    A. I don't think it was.
22    Q. When do you think that Tim Spence first became
23 considered to become president and then CEO of Fifth
24 Third Bank?
25    A. I wouldn't know the exact date of that.

Page 70

1 I mean, it was relatively early on. He was considered
2 very bright and had a great strategic view of the world.
3 He brought a whole, you know, background in terms of
4 fintec and the use of technology. He had a broad array
5 of skills and talents that became pretty clear pretty
6 fast. So I would not know exactly when. I would say
7 it's pretty early.
8    Q. What -- what reports or what evaluations would
9 the board as a board have looked at as it engaged in the
10 succession planning process?
11    A. Specific to succession planning or just in
12 terms of --
13    Q. Yes.
14    A. -- succession reports.
15    Q. Yes.
16    A. There's an annual -- remember that meeting
17 I've talked about where you sit down and, you know, you
18 look at the entire executive team.
19    Q. Uh-huh.
20    A. And you look at the succession planning of
21 virtually every spot, not just the CEO, so...
22    Q. And this is the December board meeting that
23 you talked about?
24    A. Yeah. In terms of actual form -- you know,
25 formulaic review, that's when it happens. That was not

Page 71

1 my point earlier. It's going on all the time.
2    Q. Right.
3    A. Because there's discussions and things where
4 there's no documents. We're just having a chat about
5 what we're thinking, so...
6    Q. And as you said, this is always at board
7 level?
8    A. Uh-huh.
9    Q. Is there anybody at that stage independent
10 or outside of the bank who's participating in that
11 process?
12    A. Usually not.
13    Q. We've seen some minutes that suggest that
14 there were candidates, the plural, for position of
15 president at the bank in 2019 and 2020. Do you -- can
16 you identify any of those candidates other than Mr.
17 Spence?
18      MR. CIOFFI: Objection. Again, it's --
19      the deposition is not a memory test. If you have
20      a document, show it to him and let him answer the
21      question. But it's unfair the way you phrased the
22      question.
23 BY MR. MCHUGH:
24    Q. Can you answer the question as I've asked it?
25    A. Well, there was always, you know -- I mean, I

Page 72

1 don't know how to say this. There's usually a couple of
2 names that are there that could step in the short term
3 should something happen. So if you're referring to
4 something like that, the answer is yes. If you're
5 talking about somebody who's absolutely been identified
6 as a candidate for the top job --
7    Q. Right.
8    A. -- I don't know that there's anybody beyond
9 Tim.
10    Q. Okay. And I understand that -- that sometimes
11 the first position you talked about is the emergency or
12 interim or a temporary president in the event of a
13 catastrophe of an incumbent?
14    A. I always refer to it as who can keep
15 the lights on long enough for us to make a final
16 decision.
17    Q. Okay. So that's -- that's maintaining the
18 status quo --
19    A. Right.
20    Q. -- as best we can --
21    A. Right.
22    Q. -- in light of an emergency?
23    A. Right.
24    Q. All right. Excluding that -- excluding that,
25 do you recall the identity of any candidates other than

Deposition of Michael McAllister                                          Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 73

1  Tim Spence for president while you were --
2      A. I do not recall.
3      Q. So how -- the communication must essentially
4  have come from Mr. Carmichael as he winnows out the
5  candidates; is that fair?
6          MR. CIOFFI: Objection to the form of
7      the question. It's not -- it's not what he
8      testified to. You may answer.
9          THE WITNESS: I'm not sure I understood it.
10     Try it again.
11 BY MR. MCHUGH:
12     Q. Uh-huh. Who provides the information to the
13 board that the board uses in this process?
14         MR. CIOFFI: Objection. Asked and answered.
15     He talked about that already.
16         THE WITNESS: The staff work is done by the
17     staff and -- but the board ultimately looks at what
18     they've done. I don't care what they present to
19     us. If we have a different point of view, it's
20     going to be handled differently. So I'm not sure
21     what you're getting at.
22 BY MR. MCHUGH:
23     Q. Well, what I'm looking for is just to find
24 out who are the people that are presenting it.
25 How -- just tell me again how that process works in

Page 74

1  terms of collecting information and evaluating it and
2  sorting it?
3      A. The corporate human resources people will do
4  the staff work and -- for all the executives, not just
5  this. And they present that to the -- to the board.
6  I'm sure Carmichael or whoever's sitting in that seat
7  has got a view of all of that clearly.
8      Q. Uh-huh.
9      A. And so it's a combination. When we have the
10 meeting, the CEO is sitting in the room, he's a member
11 of the board. The HR people walk us through all this
12 with all the executives and all the people and there's a
13 discussion among the board, so...
14     Q. Okay. There was a document that was marked at
15 Mr. McHugh's deposition by Mr. Cioffi that's marked as
16 Board of Directors Human Capital and Executive Talent
17 and Management Succession Plan Updates --
18     A. Right.
19     Q. -- for December of 2019. That would be
20 consistent with the time frame that you talked about,
21 right?
22     A. Relative to what?
23     Q. Relative to when in the year the board
24 considers this a succession planning?
25     A. Yes. Correct.

Page 75

1      Q. Okay. And I'm wondering -- I'd like you to
2  just take a look at that, if you would, please.
3          MR. CIOFFI: Do you want to mark it in
4      this deposition as well?
5          MR. MCHUGH: Well, I'm happy to do
6      whatever you feel, Mike. It's -- it's easy to do
7      it either way.
8          MR. CIOFFI: Well, I think we ought
9      to -- to make the record clear, we ought to mark
10     it -- if you're going to ask the witness to look
11     at it, we're going to mark it as Exhibit 1
12     orwhatever it was in the other deposition.
13         MR. MCHUGH: No. It's marked right on
14     the top. That's why I did that.
15         MR. CIOFFI: Well, it's marked as -- it
16     looks like the pages are coming out of it, but --
17     Brian, do we have a stapler.
18         MR. SABA: Can we go off the record one
19     second?
20         MR. CIOFFI: Yeah.
21         VIDEOGRAPHER: Time is 11:55 a.m. We're
22     going off the record.
23         (Whereupon, a brief recess was taken.)
24         VIDEOGRAPHER: The time is 11:57 a.m.
25     We're now back on the record.

Page 76

1          (Whereupon, Plaintiff's Exhibit 1 was
2          marked for identification purposes.)
3      Q. Mr. McAllister, I've placed in front of you
4  what -- after some trouble as we've learned -- for
5  identification purposes as Plaintiff's Exhibit 1.
6      A. Okay.
7      Q. First of all, could I direct your attention to
8  the front page of that exhibit? Do you recognize that
9  this is the -- an email from Bob Shaffer to members of
10 the board, you included?
11     A. Yep.
12     Q. And you see your email address on there?
13     A. No. But I'm going to find it if you know
14 where it is.
15     Q. Are you MBM2045?
16     A. I still haven't found it, but I --
17     Q. Oh, I'm sorry. Yes. See where it says "MBM"?
18     A. Oh, yep. Okay. Got it.
19     Q. Okay.
20     A. Yes.
21     Q. And so this, as it reflects, is the -- a
22 report from Bob Shaffer?
23     A. Okay.
24     Q. That's what it says, right?
25     A. Looks like it, yep.

Deposition of Michael McAllister | Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 77

1  Q.  And it says it's the document that he and Mr.
2  Carmichael will utilize for the HC -- Human Capital and
3  Executive Talent Management and Succession Plan
4  Updates --
5  **A.  Yep.**
6  Q.  -- for the December 19th meeting, right?
7  **A.  Okay.**
8  Q.  And that appears to then have attached to it
9  the December 17th, 2019 Board of Directors Report.
10 This is the document that you saw at the board?
11 **A.  Yes.**
12 Q.  Okay.  So may I -- will you take me through
13 that and especially when you get to -- the first part of
14 this talks about the mission and the trends and leading.
15 And then there's a section that -- it has talent
16 framework.  Will you tell me why we -- why that is the
17 approach that's utilized?
18     MR. CIOFFI:  Objection to the form of
19 the question.  You -- you asked about three
20 questions there.  You were asking him to confirm
21 your representation of what the beginning pages
22 were and then you ask another.  Can you just ask
23 one question and -- about the document and let him
24 answer that question?
25     MR. MCHUGH:  All right.  Let's do it the

Page 78

1  easy way.
2  Q.  Would you take us through the document itself
3  and tell us what -- what it reflects?
4     MR. CIOFFI:  Each page?
5     MR. MCHUGH:  Yes, sir.  Since that's
6  what you want me to do, that's what we're going to
7  do.
8     MR. CIOFFI:  Why don't you direct him to
9  the page you want him to talk about?
10    MR. MCHUGH:  Because I want him to talk
11 about all the pages.
12 Q.  Okay.  So let's --
13    MR. CIOFFI:  What -- what --
14 **A.  All right.**
15    MR. CIOFFI:  You have to ask him a
16 question about them.  You can't just say talk
17 about them.  Ask him a question.  Ask him a
18 question about a page.  You can't just say talk
19 about it.
20    MR. MCHUGH:  Michael --
21    MR. CIOFFI:  That's not a proper
22 question.
23    MR. MCHUGH:  I'm trying to accommodate
24 your objection, but...
25 Q.  Explain how this document, please, reflects

Page 79

1  the process that you've described for me as you said you
2  watched it emerge for the selection of Tim Spence as the
3  president.
4  **A.  First of all, I would point out this is for**
5  **all executives that are in this document.**
6  Q.  All right.
7  **A.  It's not specific to the CEO.**
8     MR. CIOFFI:  I'm going to object further
9  because it mischaracterizes the record.  He didn't
10 say this document is the only document that
11 represents how the board came to its decision
12 about Tim Spence.
13    MR. MCHUGH:  I didn't ask him that,
14 but --
15    MR. CIOFFI:  So you can't mischaracterize it,
16 but just ask him a question about the document or
17 any page of the document, please.
18    MR. MCHUGH:  I just did.
19 Q.  Is this the report -- is this the first report
20 that the board saw with respect to the succession
21 management for the executive management team in 2019?
22 **A.  It is the one that we used.**
23 Q.  All right.  Was there anything else that
24 preceded it that you saw?
25 **A.  No, not that I saw.  I'm sure there were**

Page 80

1  **drafts that somebody was dealing with, but I didn't see**
2  **them.**
3  Q.  Okay.  So -- so what was presented to the
4  board was this document that we marked as Exhibit 1?
5  **A.  Correct.**
6  Q.  Now, the -- well, Page 1,110 is -- begins a
7  section called Talent Framework?
8  **A.  All right.**
9  Q.  And you reviewed this?
10 **A.  Then I would have, yes.**
11 Q.  And tell me what this then reflects.
12 Does it show the schedule and the time deadline?
13 **A.  Where?**
14 Q.  Well, if you'd like, it's Page 1,111 or Page
15 1,112?
16    MR. CIOFFI:  For the witness's benefit,
17 he's referring to the lower right-hand numbers
18 called Bates numbers.
19    THE WITNESS:  I see them.  I see them.
20 **A.  Ask me again.**
21 Q.  There's a pending question.
22    MR. CIOFFI:  Could you read it back?
23    (Whereupon, the previous question was
24    read back by the court reporter.)
25 **A.  For what?**

Deposition of Michael McAllister          Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 81

1   Q. For the process? In other words, let's look
2 at Page 1,112.
3    A. 1,112. Okay.
4   Q. How does the board use that information?
5    A. It just outlines how we got to this point and
6 over what period of time.
7   Q. So this is explanatory to the board?
8    A. It's just a review more than anything else.
9   Q. All right. And then a few pages later there's
10 a Talent Metrics Highlights and an Employee Viewpoint
11 Survey?
12    A. What page are you on?
13   Q. There on Page 1,115.
14    A. Okay.
15   Q. Now, was this all reviewed by the board at
16 this meeting?
17    A. Yes.
18   Q. And did this information come to you through
19 that portal that you described where it was this --
20    A. You know, normally at this meeting there's an
21 option and it is on the portal, but they also bring hard
22 copies in if somebody wants to use them, so...
23   Q. Okay. Were you at this -- physically present
24 in Cincinnati at this time?
25    A. I don't know. If this was pre-pandemic, I

Page 82

1 probably was.
2   Q. Yes. This is, I believe, pre-pandemic.
3    A. Yes, likely. I mean, I'm not a hundred
4 percent certain, but yes, I think so.
5   Q. All right. Directing your attention to 1,117.
6    A. Okay.
7   Q. How was this used by the board?
8    A. This is FYI kind of information,
9 frankly --
10   Q. Uh-huh.
11    A. -- just to kind of lay out where we are with
12 various things.
13   Q. Well, what does it tell you in terms of that?
14    A. Tells you what the employee makeup is based on
15 age, the mix.
16   Q. Okay. So that it shows you the -- the age of
17 what they identify as a five generations in the
18 workplace?
19    A. Correct.
20   Q. Do you know if this is relied upon for any
21 decision making by the board?
22    A. I don't think it's really given much time.
23   Q. Can you tell me what Page 1,118 means, the
24 talent wins?
25    A. Well, these are -- these are hires and/or

Page 83

1 internal movement that we consider to be good hires or
2 good moves, so...
3   Q. Is there anything else that you relied upon or
4 that the board considered in the succeeding pages, the
5 succeeding three or four pages?
6    A. For what purposes?
7   Q. For purposes of evaluating succession
8 planning.
9    A. It's all here.
10   Q. Do you see the enterprise committee that
11 appears on 1,126?
12    A. 1,126? Yep.
13   Q. Are these the people who the board is
14 considering for purposes of succession planning?
15    A. Well, not all of these people would be on
16 the -- generally succession folks come from this roster,
17 though.
18   Q. Okay. So in 2019 who were -- who were the
19 people that were on the list for succession planning for
20 president and CEO?
21     MR. CIOFFI: Objection. Assumes facts
22 not in evidence that there was a list. I mean, do
23 you have a document that says -- that shows
24 there's a list?
25     MR. MCHUGH: This is the document.

Page 84

1     MR. CIOFFI: Is there a page in here as
2 to what it was?
3     MR. MCHUGH: Michael --
4    A. Ask it again.
5   Q. Sure. From this list -- from this
6 presentation, how did the board use it to determine the
7 succession for the president and CEO?
8    A. We wouldn't have done anything from this page
9 this is just information that says this is who we have.
10   Q. Okay. Can you tell me whether all of these
11 were potential candidates?
12    A. Of course not.
13   Q. Okay. Can you tell me who were the
14 candidates?
15    A. I don't know exactly at this time who would
16 show up where, but I know Tim Spence would be there. And
17 beyond that, I would not know.
18   Q. All right. Now, beyond this executive talent
19 management presentation, there appear to be talent
20 cards --
21    A. Right.
22   Q. -- for each of the individuals?
23    A. Right.
24   Q. How did the board use those?
25    A. It was just a discussion thing. We'd go

Case: 1:21-cv-00238-MRB Doc #: 66-2 Filed: 08/02/24 Page: 26 of 75  PAGEID #: 2728

Deposition of Michael McAllister                                          Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 85

1  through each individual and kind of go through the
2  information that's in front of you and decide whether
3  you're feeling good about it, feeling bad about it, how
4  they're doing, were they progressing, were they not
5  progressing, were they going to move anywhere. I mean,
6  this was all the kind of background information you
7  would use to determine, you know, what's going on with
8  your senior people.
9      Q.  Generally, how long would this process take in
10  the board meeting?
11     A.  At least a couple of hours.
12     Q.  Okay.  And would the board consider every
13  listed individual?
14     A.  While we absolutely considered them, we'd
15  spend a different amount of time on people depending on
16  the situation, but...
17     Q.  Can you tell me that -- what particular
18  form -- why the information is there, how it is
19  important to you to make a decision?
20     A.  I don't know.  I don't know what you mean.
21     Q.  The first thing that is informative on there
22  is the participants' age after his name and his title.
23  Do you see that?
24     A.  I see that, yeah.
25     Q.  Okay.  And there's other information.

Page 86

1  How do you -- how does the board take in that
2  information?
3      A.  Which information?
4      Q.  All the information that is contained in that
5  page?
6      A.  I have no idea how to answer that question.  I
7  mean, basically -- this is an annual review. Many times
8  there's nothing to do with this information, so...
9      Q.  Can you tell me what information you used to
10  evaluate the potential candidates to succeed Greg
11  Carmichael?
12         MR. CIOFFI:  Objection.  Time frame.  Meaning
13      any given year?  He said it was a process
14      that lasted over a number of years.  So are you
15      asking him totally?
16         MR. MCHUGH:  You know I'm speaking about
17      this report.
18         MR. CIOFFI:  No, I don't know what
19      you're talking about.
20         MR. MCHUGH:  This report.
21      Q.  This is the report that you said is the only
22  will report that you received.  So I'm asking you, in
23  looking at this the report, who were the candidates that
24  were identified as potential successors to Greg
25  Carmichael?

Page 87

1         MR. CIOFFI:  Objection.  Mischaracterizes his
2      testimony about how the board came to its decision.
3      He didn't say it was just this report.
4         MR. MCHUGH:  No.
5         MR. CIOFFI:  But you --
6         MR. MCHUGH:  Michael, please, you're
7      testifying.
8         MR. CIOFFI:  I'm not testifying.
9         MR. MCHUGH:  Yes, you are.
10        MR. CIOFFI:  I'm simply objecting to the
11     mischaracterization.
12        MR. MCHUGH:  Make your objection and
13     we'll move forward, please.
14     A.  I have no idea what's on the table for
15  questions right now.
16     Q.  Who were the candidates that you considered to
17  replace Greg Carmichael for president as reflected in
18  this report marked as Exhibit 1?
19     A.  Tim Spence.
20     Q.  Anybody else?
21     A.  I don't think so.
22     Q.  What was the discussion that you recall?
23     A.  Specific to succession in this meeting on this
24  document?
25     Q.  On Tim Spence?

Page 88

1      A.  We do this in the board meeting all of the
2  time.  This is not that big of a moment in time in terms
3  of criticality.  Other than the fact that we're doing
4  sort of an annual look across the entire organization,
5  Tim is one of many people that are in here.  So I'm not
6  sure what you're trying to get to.
7      Q.  Well, what I'm trying to get to is simply to
8  inquire is whether there was any other candidate
9  considered at the board in 2019 other than Tim Spence?
10     A.  I think by the time 2019 rolled around Tim was
11  the one.
12     Q.  Okay.  Have you ever seen any other versions
13  of this report, earlier drafts or --
14     A.  I would not see this report.
15     Q.  There is a listing for Philip McHugh.
16  Do you see that?
17     A.  What page?
18     Q.  Page 132.
19     A.  Okay.
20     Q.  In the first instance, did you review this --
21  did you review this evaluation for Philip McHugh?
22        MR. CIOFFI:  Objection to the form of
23     the question.  It being an evaluation, it doesn't
24     say that.
25     Q.  Did you review it?

Deposition of Michael McAllister                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 89

1    A.   Well, as part of the meeting, we went through
2  every single one of these.  So I don't know what you
3  mean by review, but yes.
4    Q.   Did you make a decision with respect to
5  Philip?
6    A.   There's -- no decisions came out of this
7  meeting.
8    Q.   So at the December 19th meeting, there were no
9  board decisions with respect to finality of the
10 selection?
11   A.   None.
12   Q.   There was the recommendation from
13 Mr. Carmichael that it be Mr. Spence?
14   A.   If you point at moment in time, was that
15 it was going to be Tim barring something unusual in his
16 continued progression in the job.
17   Q.   And did you have any further discussion with
18 the members of the board other than what you just told
19 me about your assessment of Timothy Spence?
20   A.   Gee, I'm going to keep coming back to it.
21 This is a routine process.  It was discussed at almost
22 virtually every board meeting at some level, sometimes
23 more in depth, sometimes not.  There wasn't a lot of
24 documents flying around.  There was communication among
25 the board relative to impressions.  What did they think?

Page 90

1  What did they think of Tim's presentation today?  Does
2  he seem to be on top of his game?  This was common and
3  constant.  So these moments in time weren't, you know,
4  not relative -- relatively critical to the process.
5    Q.   Are you aware of any records of any of those
6  communications or assessments, either informal or
7  otherwise --
8    A.   I don't -- I don't know.
9    Q.   -- among members of the board?
10   A.   I don't know that there are.  A lot of that
11 happened in executive session.
12   Q.   When executive session took place, how did
13 that -- what happened then?
14   A.   Well, management leaves and the board just
15 chats among theirselves.
16   Q.   So Mr. Carmichael --
17   A.   He'd be there for part, he would leave and it
18 would just be us for the rest of it.
19   Q.   Was there any other use that was made of this
20 report by the board then in December of 2019?
21       MR. CIOFFI:  Objection to form of the
22       form question as confused.  But you may answer.
23   A.   You know, in terms of correct context, no.
24 This was -- this was sort of our -- I mean, there's
25 always conversations going every meeting about what's

Page 91

1  happening with staff and executives and who's stepping
2  up, who's got issues.  I mean, that's just part of
3  management and the board's interaction with -- with
4  management.  But in terms of formally going through and
5  talking about folks and getting a viewpoint of sort of
6  where they are, this is it.
7    Q.   Was there any discussion of Philip McHugh as
8  candidate for presidency --
9    A.   No.
10   Q.   -- at that time?
11   A.   No.
12   Q.   Was there ever a discussion at any time in
13 2019 that you participated in regarding Philip McHugh as
14 a successor to Greg Carmichael for presidency?
15   A.   I don't recall any of that.
16   Q.   When the -- after the December 17th board
17 meeting, was there any further use made by the board of
18 Plaintiff's Exhibit 1?
19   A.   No.
20   Q.   Did you have any discussions with
21 Mr. Carmichael following the review of the talent
22 management cards?
23   A.   Afterwards specific to this process?
24   Q.   Yes, sir.
25   A.   Not specific, but again, I'll say it for the

Page 92

1  20th time.  We constantly talked to him about all of
2  this all of the time.  So, yes.  The answer is yes.  But
3  as specific follow-up to these documents?
4    Q.   Yes.
5    A.   No.
6    Q.   Was there any question in your mind as to how
7  many candidates there were then in December of 2019 to
8  succeed Mr. Carmichael?
9    A.   There was no question in mind.
10   Q.   Were you aware of any question that was
11 expressed by any of the other board members at that
12 meeting as to potential candidates?
13   A.   By that time, I think the consensus has grown
14 that Tim was the candidate.
15   Q.   Okay.  What did you then do next to as the
16 member of the board with regard to determine whether Tim
17 Spence was the candidate?
18   A.   I mean, at this time or any time?
19   Q.   After 2019, after this was considered, you
20 heard that Tim Spence is the only candidate?
21   A.   Right.
22   Q.   Okay.
23   A.   Well, eventually we -- I mean, we would probe
24 Carmichael regularly about how Tim was doing and what
25 was happening and whether he was progressing and who he

Deposition of Michael McAllister                                     Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 93

1 was -- just questioning him getting mature, you know, in
2 the president's role and getting going. So that was a
3 routine sort of conversation that occurred. Eventually
4 there was an outside consulting firm that did an
5 analysis of things based on a profile that we drafted
6 for the job, so...
7     Q.  Who drafted the profile?
8     A.  I think, again, that was a collective board
9 thing at the end of the day as to what we thought, so...
10    Q.  Did you -- was it presented -- was it drafted
11 and prepared by the board or by the staff?
12    A.  Obviously it was done by the staff, but it's
13 on behalf of the board. I mean, so the board tells the
14 staff what to do, so...
15    Q.  Did you -- did you involve Mr. Spence in any
16 fashion in that process?
17    A.  No.
18    Q.  What -- in your mind, would it be appropriate
19 to ask Mr. Spence, you know, what he thought of his
20 evaluation and how he would respond to it?
21    A.  I would not -- I would not ask him.
22    Q.  Okay.
23    A.  Sorry.
24    Q.  Do you know whether anybody did?
25    A.  I don't know.

Page 94

1     Q.  Why wouldn't you ask him?
2     A.  It might be interesting, but, you know, I
3 think the board should have its own point of view about
4 what they're looking for and shouldn't be miss -- you
5 know, not -- it shouldn't be led anywhere by a potential
6 candidate. That just sounds inappropriate to me. I've
7 never seen that done either anywhere, so -- where you go
8 to a candidate and say what would you like your profile
9 to look like so we can evaluate you. I mean...
10    Q.  That would kind of be --
11    A.  It would be ridiculous.
12    Q.  The -- would it be your testimony then that
13 the -- there were -- there was one succession candidate
14 as of December 19th, 2019?
15    A.  You know, I don't know about the exact
16 timeline, but I would say that sounds about right to me.
17 But by then the consensus had developed and there was a
18 question of, you know -- and at that time, we weren't
19 even certain how long Greg was going to stay, so...
20    Q.  What was your understanding about
21 Mr. Carmichael's tenure?
22    A.  I would say generally it wasn't going to be
23 long-term, but we weren't sure whether it was a year, 18
24 months, three years. I mean, that -- that never really
25 clarified. And A lot of that was going to be developing

Page 95

1 around the idea is -- is Tim ready or not because
2 nobody's going to pull that trigger until the board
3 comes to the conclusion that, yeah, he's ready, so...
4     Q.  Did the board ever request that
5 Mr. Carmichael delay his plans?
6     A.  You know, in the middle of this process I'm
7 not really sure whether that happened. I mean, I would
8 argue that if you've got a good CEO, every board would
9 want the CEO to stick around forever.
10    Q.  Right.
11    A.  So probably somewhere along the way it's
12 possible that you want to keep him as long as you can
13 because you've got a bird in the hand versus something
14 you're not sure of.
15    Q.  Right.
16    A.  So that's just the way it tends to work. But I
17 don't recall specifically whether we ever -- Greg had
18 made the commitment he wasn't leaving until he was
19 comfortable with his replacement, so -- and that was
20 always left a little nebulous. We knew it wasn't going
21 to be five years.
22    Q.  When you look at Plaintiff's Exhibit 1, does
23 Greg make a recommendation as to when his replacement
24 would be ready?
25    A.  At that time, I can't recall what his opinion

Page 96

1 would have been at that time.
2     Q.  All right. Would you look at the -- and the
3 page for that is -- it looks like it may be cut off, but
4 it looks like 1,135.
5     A.  Okay.
6     Q.  Do -- do you remember any consideration of
7 that at all?
8     A.  I can't even read this print. It's so tiny.
9     Q.  Okay.
10    A.  Consideration of what?
11    Q.  Any consideration of the information there?
12 They talk about, you know, 2018 rating, 2019 rating. Any
13 of those matters.
14    A.  All of this would have been considered.
15    Q.  All right. What -- after you received this,
16 what next did the board do as it progressed along this
17 matter or this process to select Mr. Spence as
18 president?
19    A.  Just stay in communication with Carmichael
20 about what was happening in the company, continued to
21 evaluate his work, made sure he was in front of us for
22 various things. He was attending the meetings
23 regularly. We had a lot of exposure to him, so...
24    Q.  And you told me earlier that you did not have
25 any direct contact with Mr. -- is it Guy Beaudin? Is

Deposition of Michael McAllister        Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 97

1 that he pronounces his name?
2   **A. I don't know.**
3   Q. Okay. But --
4   **A. I know who you're talking about.**
5   Q. And you had not had any direct contact?
6   **A. Not directly, no.**
7   Q. Were you aware of any contact by any members
8 of the compensation committee with Mr. Beaudin?
9   **A. I don't think they would have had any contact**
10 **with him. I think, again, that's a board thing, so--**
11   Q. Okay. Do you have any recollection of what
12 the discussion was about Philip McHugh at the
13 December 19th -- December 2019 meeting?
14   **A. Nothing specific.**
15   Q. Was it ever indicated to you that he was at
16 risk of departing the bank?
17   **A. No.**
18   Q. Were you ever told by Mr. Carmichael or Mr.
19 Shaffer or anybody prior to October 16th that Philip
20 McHugh was at risk of leaving the bank?
21   **A. No.**
22   Q. So who -- who's driving the boat at this time
23 then? Once you have the December 19 talent management
24 assessment, who establishes the deadline for what's next
25 occurring?

Page 98

1   **A. Again, that's a collective board thing.**
2   Q. How does it do that?
3   **A. And there wasn't necessarily a deadline.**
4   Q. How does the board do that?
5   **A. In discussions just amongst us.**
6   Q. All right. Anything formal?
7   **A. Not on that sort of thing, no. I mean, the**
8 **things we could talk about are, you know, what are --**
9 **how long do you think Greg's going to stick in here? Do**
10 **we have any risk with him leaving earlier than we want**
11 **him to? Those kind of things pop up. As to how far do**
12 **we think Tim is being ready versus what Greg may think,**
13 **you know, what is he not -- what bases has he not**
14 **touched? Has he had enough exposure to Wall Street?**
15 **All the things that a CEO is going to need that an**
16 **operator does not -- it's on the other side of the**
17 **company. So that's the kind of thing we talk about.**
18 **Ultimately just kind of assess general maturity along**
19 **all those lines.**
20   Q. Do you remember any of those particular
21 discussions?
22   **A. No.**
23   Q. Do you remember any of the directors who had
24 input into those -- you know, more than just a customary
25 input into those communications or evaluations?

Page 99

1   **A. No.**
2   Q. Was anybody on the board a particular champion
3 or advocate for Mr. Spence above all other board
4 members?
5   **A. Again, that was -- that was a consensus that**
6 **had grown. I would consider it unanimous among the**
7 **board members that this was -- so I wouldn't -- I**
8 **wouldn't tee up any individual on it.**
9   Q. Okay. And if you can, when -- when did this
10 crystalize first as it emerged?
11   **A. Oh, I don't know the exact timeline.**
12 **Like I say, he emerged pretty early as -- as we thought**
13 **the strongest candidate. But in terms of that consensus**
14 **being nailed down, I couldn't give you a specific time**
15 **to that. Probably -- if I'm -- if I'm guessing, which I**
16 **probably shouldn't be doing, it was probably in the '19**
17 **time frame, somewhere along in there.**
18   Q. Reasonably contemporaneous with the talent
19 review that we've marked as Exhibit Plaintiff's Exhibit
20 1?
21   **A. Yeah. I wouldn't -- I wouldn't argue with**
22 **that.**
23     MR. MCHUGH: Pete, can I have --
24     MR. SABA: Let's go off the record for a
25 second, so we can have a second.

Page 100

1     VIDEOGRAPHER: The time is 12:26 p.m.
2 We are going off the record.
3     (Whereupon, a brief recess was taken.)
4     VIDEOGRAPHER: The time is 1:17 p.m. We
5 are back on the record.
6     MR. MCHUGH: Thank you.
7 BY MR. MCHUGH
8   Q. You ready to proceed?
9   A. Uh-huh.
10   Q. When we -- when we spoke before lunch, you
11 indicated that the -- could you indicate when it was in
12 your mind that the board actually voted on making Mr.
13 Spence president?
14     MR. CIOFFI: Objection. Minutes and
15     documents speaks for themselves. The deposition
16     is not a memory test. It doesn't really matter
17     what his recollection is.
18   A. I don't recall what that meeting was.
19   Q. Do you recall whether it was a meeting or
20 unanimous written consent?
21   A. I don't recall.
22   Q. Okay. It was your position, as I understand
23 it, that until the board made the vote everything was
24 still up in the air?
25   **A. Well, yes. I mean, it's never done until it's**

Deposition of Michael McAllister                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 101

1  done.

2    Q.  Right.  So until the board makes a decision,

3  there is no decision?

4    A.  Correct.

5      (Whereupon, Plaintiff's Exhibit 2 was

6      marked for identification purposes.)

7    Q.  Okay.  Mr. McAllister, I'm going to place in

8  front of you what's marked for identification as

9  Plaintiff's Exhibit 2.

10   A.  Okay.

11   Q.  And I will represent to you that these are

12 papers that were filed by Mr. Cioffi in connection with

13 the lawsuit that was filed in connection with this case.

14   A.  Okay.

15   Q.  And I would direct your attention to the

16 answer that is set forth on Page 6, Paragraph 4.  And I

17 won't read the entire thing to you, but the essence is

18 that Fifth Third has interposed an objection based upon

19 its position.  And it says that without waiving that

20 we're going to identify for you the documents that we

21 think are responsive to your request.

22     Do you see that there in that "Subject to and

23 without waiver"?

24   A.  Yes.

25   Q.  Okay.  And you also see in the answers to

Page 102

1  Paragraph 5 that Fifth Third asserts the same objection

2  and it makes the same response?

3    A.  Without reading the whole thing, I'll

4  stipulate to that.

5    Q.  All right.  Thank you.

6      (Off-the-record discussion.)

7      (Whereupon, Plaintiff's Exhibit 3 was

8      marked for identification purposes.)

9      MR. MCHUGH:  I'm going to hand you,

10 Michael, first the document that I'm going to show

11 Mr. McAllister and ask you if -- if you will

12 confirm that those are the four documents that you

13 referred to in the interrogatories.  I'll have him

14 do it if you wish, but...

15     MR. CIOFFI:  You want me to testify?  Is

16 that -- is that what you're doing?

17     MR. MCHUGH:  No.  I'm asking you as a

18 courtesy -- I'm showing them to you as a courtesy.

19 I'm happy to do that.  Okay.

20   Q.  So the -- you have the interrogatory response

21 then, correct?

22   A.  That's what this is?

23   Q.  Yes, sir.

24   A.  Okay.

25   Q.  That is the interrogatory response.

Page 103

1      (Whereupon, Plaintiff's Exhibit 3 was

2      marked for identification purposes.)

3    Q.  And now I'm going to hand you what's been

4  marked for identification as Plaintiff's Exhibit 3.  Do

5  you see that?

6    A.  I see the marking, yes.

7    Q.  Okay.  And Exhibit 3 says that those are the

8  documents that are identified.

9      MR. CIOFFI:  I don't have an Exhibit 3.

10     MR. MCHUGH:  You won't.  That's why I

11 handed you those.

12     MR. CIOFFI:  All right.  Let me look at

13 what you've marked as Exhibit 3.  What's the

14 source of the first page of Exhibit 3?

15     MR. MCHUGH:  Those are our notes.  Thank

16 you.

17     MR. CIOFFI:  So you -- you -- okay.

18 You're going to ask him questions about your

19 notes?  Okay.

20     MR. MCHUGH:  Thank you.  You can teach

21 me afterwards.  All right.

22   Q.  So would you take a look at those documents

23 that are attached?  And in the first tab do you see that

24 it matches the documents that are shown here?  And you

25 can tell that quite easily, Mr. McAllister, just by

Page 104

1  looking at the notes in the right-hand corner which are

2  the Bates Stamp numbers.

3      MR. CIOFFI:  I'm going to object to this

4  line of questions.  He's here as a fact witness,

5  not as a 30(b)6 witness.  He has no authority to

6  speak on behalf of the bank and he's not here to

7  speak on behalf of the bank.  If he has personal

8  knowledge about these interrogatories that he can

9  speak about, I'm going to allow him to answer.  If

10 he doesn't, then I'm not.

11     MR. MCHUGH:  Okay.  Now, I've asked you

12 a couple of times nicely.  Speaking objections you

13 know are inappropriate.  You can make your

14 objection and that's it.

15     MR. CIOFFI:  It's not a speaking

16 objection.

17     MR. MCHUGH:  If you're trying to coach

18 the witness, then it is a speaking objection and

19 it's going to delay what we're doing.  So make

20 your objection, understand it, we'll move forward.

21     MR. CIOFFI:  Objecting that he's not a

22 30(b)(6) witness doesn't tell the witness anything

23 to say.

24     MR. MCHUGH:  Well, you --

25     MR. CIOFFI:  Go ahead, ask your

Deposition of Michael McAllister          Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 105

1   question, but...

2   Q. All right. Do you see the first document

3 there that's called "Final: The Winning Formula"?

4   A. I do.

5   Q. All right. And that has a Bates Stamp number

6 that begins with the n01074. Do you see that?

7   A. I do.

8   Q. Second document is "Board Summary, Timothy

9 Spence." Do you see that? That's behind Tab 2.

10   A. Nothing behind Tab 2.

11   Q. Nothing behind Tab 2?

12   A. No.

13   Q. It says "Board Summary"?

14   A. Nope.

15   Q. Let me hand that to you.

16   MR. CIOFFI: You just handed it to him.

17   Is that what you say that should go into Tab 2?

18   MR. MCHUGH: Yes, I am saying that.

19 That's why I handed them to you ahead of time.

20   Q. Okay. Is there anything behind Tab 3?

21   A. Yes.

22   Q. Is behind Tab 3 the executive vice

23 president -- I'm sorry -- the Executive Assessment

24 Development Report?

25   A. Yes.

Page 106

1   Q. Okay. And what is behind Tab 4?

2   A. Executive Succession Planning.

3   Q. Those are the documents I handed to you, so --

4 all right. So can you -- if you place that 2 behind the

5 Tab 2, do you find those four documents that are

6 identified in response to the questions 4 and 5?

7   A. It looks like it.

8   Q. Now, I will represent to you that subject to

9 the bank's objection the bank has indicated that those

10 are the documents that it relied upon to make the

11 decision it did. And I'd like to ask you are you aware

12 of any other documents that you saw or that you as a

13 member of the board relied upon in reaching a decision

14 that the board made?

15   A. That's a very broad question. What do you

16 mean other documents? I mean, we just went through

17 something earlier where there was evaluation done. So I

18 guess -- this was -- this was part of the process, yes.

19   Q. Okay. Apart from the evaluation that I showed

20 you earlier that we had marked as Plaintiff's Exhibit 1

21 and those that are marked as Exhibit 4 --

22   A. I would -- I would agree that these are things

23 that we considered. I would not agree this is all I

24 ever saw, so...

25   Q. What -- what do you -- what else do you think

Page 107

1 you saw?

2   A. I don't recall because this happened over

3 multiple years. I mean, I don't have that kind of

4 memory to know what came before us all the time.

5   Q. Well, was there any recommendation that was

6 made in 2017 for succession planning for president?

7   A. Five years ago?

8   Q. Five years ago, yes.

9   MR. CIOFFI: Objection to the form of

10 the question. Recommendation from whom? From

11 anyone?

12   A. I don't know what -- I don't recall that.

13   Q. All right. Do you recall any recommendations

14 by the board in 2018? In the December 2018 meeting?

15   A. I wouldn't be surprised if the board hadn't

16 started -- at that point started consolidated around the

17 idea that Tim was the candidate. I don't know a -- I

18 don't know of a specific date or that particular time

19 line, but...

20   Q. Okay. Is there anything other than

21 board minutes, to your recollection, that would

22 show that?

23   A. No.

24   Q. As -- as you said, this was not a compensation

25 committee matter?

Page 108

1   A. Correct.

2   Q. In 2019 I've shown you those documents that

3 were put together?

4   A. These were produced by the bank?

5   Q. Yes, sir.

6   A. Okay.

7   Q. Yes. As you'll see in each one of them, it

8 says "Fifth Third" in the cue down in the lower

9 right-hand corner?

10   A. All right.

11   Q. And you haven't seen any other document?

12   A. Not that I recall.

13   Q. Okay. Thank you. Now, the --

14   (Whereupon, Plaintiff's Exhibit 4 was

15   marked for identification purposes.)

16 BY MR. MCHUGH:

17   Q. Mr. McAllister, I'm going to place in front of

18 you what I've had marked for identification as

19 Plaintiff's Exhibit --

20   A. Are we done with this?

21   Q. Yes, sir, we are. 4.

22   A. Okay.

23   Q. And do you recognize that document?

24   A. Yep.

25   Q. And could you tell us what that is, please?

Page 109

1    A.  That's the proxy.

2    Q.  Okay.  And what -- what -- what is the proxy?

3    A.  It's a required document from a public company

4  outlining many things, what's going on in the company,

5  compensation issues.  I mean, there's dozens of things

6  in there.

7    Q.  Okay.  And in that proxy there's an

8  indication, is there not, of the compensation of named

9  executive officers?

10   A.  There is.

11   Q.  Okay.  And are you able to locate that section

12  of the proxy?

13   A.  No.  You'll have to tell me what page it is.

14   Q.  The copy I have is Page 71.  Let me see it in

15  this one.

16   A.  Nope, that's not it.

17   Q.  Find it in there.  I'm going to show you what

18  is an excerpt from that page to see if we can facilitate

19  this, which is reported to be the Page 71 out of the

20  proxy statement issued by Fifth Third Bank.

21   A.  According to the table of contents,

22  it's probably 48.  I'd rather get it out of here

23  than this.

24   Q.  48 doesn't seem to be that one either.

25   A.  Nope.  All right.

Page 110

1    MR. CIOFFI:  Wait a minute.

2    MR. MCHUGH:  We'll get it for you.

3  We'll get it for you.  I'll have that back,

4  Michael, when you're finished with it.

5    MR. CIOFFI:  Just on the record, you

6  handed the witness a document that says "Proxy

7  Statement Highlights."  You want that marked as an

8  exhibit or --

9    MR. MCHUGH:  No, I do not.  He doesn't

10  feel comfortable with it.  Oh, it does say 71.

11  Oh, that's mine.  Okay.

12  BY MR. MCHUGH:

13   Q.  It is marked as Bates 77 in your document and

14  you'll see about halfway up it says 71.

15   A.  Okay.

16   Q.  Do you recognize that document?

17   A.  Yes.

18   Q.  All right.  Could you tell us what that?

19   A.  It's the compensation table for the NEOs.

20   Q.  And it has the compensation, does it not, for

21  the -- that was paid to the president of the bank for

22  2019, 2020 and 2021?

23   A.  It does.

24   Q.  And could you describe for me briefly the --

25  the table itself and what the table is designed to

Page 111

1  illustrate?

2    MR. CIOFFI:  Objection.  The document

3  speaks for itself.  This is a waste of time.

4    THE WITNESS:  He's right, but...

5    MR. CIOFFI:  What do you want him to do?

6  It's an exhibit.  It's a proxy.  We'll stipulate

7  it's the proxy, but what -- what do you want him

8  to describe?

9    MR. MCHUGH:  Well, what I'd like him

10  to do then is stipulate that it is in fact

11  the compensation, both salary, bonus, stock

12  awards, option awards and nonessential

13  compensation.

14    MR. CIOFFI:  Well --

15    MR. MCHUGH:  Hold on.  You asked me the

16  question and I'm going to answer it.  And all

17  other compensation that was paid during the

18  three-year period.

19    MR. CIOFFI:  Assuming that this is an

20  authentic document.  I mean, he can't authenticate

21  it.  This was actually what was filed.  We'll

22  stipulate that -- that the company properly

23  reported and accurately reported to the SEC in the

24  proxy the salaries.  Yes, we'll stipulate to that.

25  I don't know where you -- you printed this

Page 112

1  document.  I don't know where you got it from, but

2  whatever was filed with the SEC does accurately

3  state the salaries.

4    MR. MCHUGH:  That were paid during the

5  stated periods of time?

6    MR. CIOFFI:  Yes.  Yes.  Yes.

7    MR. MCHUGH:  Very good.  Thank you.

8  BY MR. MCHUGH:

9    Q.  And those were positions that were paid to

10  the -- for the positions that -- those were payments for

11  the positions held, correct?

12    A.  That's what this chart is intended to say.

13    Q.  All right.  And it does include all components

14  of compensation?

15    A.  It does.

16    Q.  Is there any other better summary that you're

17  aware of that sets forth that information?

18    A.  No.

19    Q.  Now, at the December 17th board of directors

20  meeting that we talked about previously --

21    A.  Okay.

22    Q.  -- you said that at that point it was

23  established that Tim Spence was the candidate to be

24  reviewed for the president?

25    A.  Absolutely.

Page 113

1  MR. CIOFFI: Objection. That
2  mischaracterizes his testimony. The consensus
3  was forming, but...
4  THE WITNESS: I never specifically said that
5  was the date.
6  BY MR. MCHUGH:
7  Q. Oh, all right. When -- when do you think
8  that -- that consensus emerged?
9  A. Over time. I don't know exactly when, but
10  it was -- you know, it could have been in that time
11  frame.
12  Q. Okay.
13  A. But I don't know that there was a moment in
14  time where all of a sudden everybody declared this is
15  it, so...
16  Q. Well, was there consideration that you recall
17  of any other candidate than Tim Spence in December of
18  2019 to succeed Mr. Carmichael?
19  A. I don't recall consideration of anyone else at
20  that time.
21  Q. Okay. And you told me that you never
22  considered Phil McHugh to be a candidate for
23  president?
24  A. Not me. The board never went down there.
25  Q. Did you, sir?

Page 114

1  A. No.
2  Q. And you told me that -- did you feel that
3  there were any disabling characteristics or traits that
4  disqualified Mr. McHugh from that position?
5  MR. CIOFFI: Objection to the form.
6  Compared to what?
7  BY MR. MCHUGH:
8  Q. You can answer.
9  A. I answered that about two hours ago.
10  The answer is not about him. It's about the upside
11  possible by having Tim take the job. So there was no
12  specific thing that said Phil had a problem. What we
13  did look at was the overall picture. We saw executives
14  all of the time. Every meeting we had people coming in
15  and talking to us, talking about their businesses,
16  talking about the markets, talking technology, talking
17  about everything you can think of.
18  That's what they do.
19  Q. Uh-huh.
20  A. So we saw them all along.
21  Q. Okay.
22  A. And the valuation was that Tim had the broader
23  and best opportunity to succeed as our CEO.
24  Q. To what -- what credit did you give the
25  34 years of experience that Phil had had with the

Page 115

1  bank?
2  A. I spent 39 years with my company and I don't
3  think time and spot is in this particular situation a
4  critical factor.
5  Q. And what was the particulars of the situation
6  that gave you that -- to help you to draw that
7  conclusion?
8  A. About what?
9  Q. Well, as you said, the particulars of this
10  situation, you don't think time and service is that
11  determinative?
12  A. I think looking backwards, when you're talking
13  about putting somebody like -- somebody in a job like
14  this is interesting, it's important, but you're looking
15  forward. What does the company need going forward?
16  What does the future look like, in this case, banking?
17  You know what are the implications of whatever's going
18  on competitively, market positions, geography? There's
19  a thousand things you're looking at, but it's a going
20  forward consideration. It's not about the past.
21  Q. All right. Well, was there anything that you
22  thought was, again, something that was inadequate in
23  Philip McHugh's performance --
24  A. I would say --
25  Q. -- or background?

Page 116

1  A. You're characterizing that backwards. What I'm
2  telling you is the board's evaluation was that Tim was
3  better --
4  Q. Okay. And --
5  A. -- at Strategic thinking, presentation,
6  possibly, you know, relative to -- I mean, there's a
7  dozen factors that go into this.
8  Q. Well, tell me what those are, please.
9  A. I just did.
10  Q. Well, I heard three.
11  A. Well, how many do you need?
12  Q. Well, as many as you can --
13  A. The board could have done it on one if they
14  had chosen too.
15  Q. Well, that's what I'm asking you. What were
16  the factors that were considered by the board in making
17  that decision?
18  A. Did you read the profile that the board has
19  established for hiring into the job?
20  Q. I'm going to ask you about that in just a
21  minute.
22  A. Well, it's in there.
23  Q. Can you tell me anything beyond what's in that
24  profile?
25  MR. CIOFFI: Objection. Again, you keep

Deposition of Michael McAllister — Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 117

1  trying to make this a memory test. Show him the
2  document and -- and he'll answer the question, but
3  what he recalls is totally irrelevant. It's what
4  the documents say and what his testimony is based
5  on the documents.
6       MR. MCHUGH: Well, we'll -- we'll see.
7  We'll see.
8  BY MR. MCHUGH:
9       Q. May I see that Exhibit 3, please? Thank you.
10  Take a look at, please, for me, Tab 2 and Tab
11  3, the first page beneath -- the first substantive page,
12  both of which are called executive summaries.
13       MR. CIOFFI: Can you identify them by
14  the Bates number, please, because you gave me an
15  incomplete exhibit?
16       MR. MCHUGH: You have the numbers there,
17  Mr. McAllister.
18       MR. CIOFFI: For me, what are the
19  numbers?
20       MR. MCHUGH: Yes, I'm asking him if he can
21  tell you which one's he's looking at.
22       THE COURT: Well, which one are you
23  asking him to look at?
24       MR. MCHUGH: I asked him to look at
25  Tab 2.

Page 118

1       MR. CIOFFI: I know, but you gave me an
2  exhibit with no tabs. So what numbers are you
3  referring to so that I can know if you're asking a
4  proper question?
5       MR. MCHUGH: What I'm looking at is
6  Document No. 036 and 956, both of which were
7  identified by you in your answers to
8  interrogatories.
9       MR. CIOFFI: All right. From what
10  you handed me, I don't see anything that's
11  036.
12       MR. MCHUGH: Well, I don't know what you
13  might have done with it, but I handed you the
14  exhibits.
15       MR. CIOFFI: 1036 is what you're
16  referring to, right? Not 036?
17       MR. MCHUGH: No. I'm referring to 036
18  as those are the last three digits.
19       MR. CIOFFI: No. Come on, it's right
20  there. It's 1036.
21       MR. MCHUGH: Do you have the document?
22       MR. CIOFFI: I do now.
23       MR. MCHUGH: Okay.
24       MR. CIOFFI: But you've got to tell me
25  the accurate number.

Page 119

1  BY MR. MCHUGH:
2       Q. Mr. McAllister, if you look at Tab 3, there's
3  a different executive summary.
4       A. Okay. Well, I don't know. All right.
5       Q. All right. Did you receive that summary?
6       A. I did.
7       Q. You did?
8       A. At the board level.
9       Q. You're sure of that?
10       A. I think so.
11       Q. Okay. Do you know why there was a summary
12  then -- a different summary presented to you for the
13  board at --
14       A. No. I don't even know if that happened, but
15  you're saying it did.
16       Q. Well, that's why I want to know from your best
17  recollection because I don't know whether you saw 3 at
18  the board level. And that's why I'm just asking the
19  question.
20       A. I'd have to go back and probably pour through
21  all the minutes to figure that out to be honest with
22  you. I mean, the board asked for this assessment. The
23  fact that it would not come would be ridiculous.
24       Q. Well, you may have gotten just an abbreviated
25  assessment presented to the board?

Page 120

1       A. I don't recall.
2       Q. Okay. So you don't know one way or the other?
3       A. No, I don't.
4       Q. Okay. That's fair. All right. Thank you.
5       A. You want this back?
6       Q. I would for just a moment, please. Directing
7  your attention to the Document 4, Executive Succession
8  Planning, Document No. 6991. Can you tell me what
9  positions were recommended for Tim Spence and for Philip
10  McHugh, if you can read them? If you can't, that's
11  okay.
12       A. That's not even -- do you have a magnifying
13  glass?
14       Q. No, sir, I don't.
15       A. I don't either. I can't read it.
16       Q. If I read it to you and it said, "Tim Spence,
17  head of consumer bank payments and strategy; Phil
18  McHugh, head of regional middle market and business
19  banking and wealth management" --
20       A. Okay.
21       Q. -- would that --
22       A. I'm trusting that you're reading it.
23       Q. So the -- all right.
24       MR. MCHUGH: Would you mark that as
25  Exhibit 5.

Deposition of Michael McAllister                                Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 121

1    (Whereupon, Plaintiff's Exhibit 5 was
2    marked for identification purposes.)
3  BY MR. MCHUGH:
4    Q.  Mr. McAllister, I've handed you what's been
5  marked as Plaintiff's Exhibit 5.  Can you identify that
6  document and can you identify your signature on the
7  second page?
8    A.  Okay.
9    Q.  That is the document that you understand that
10  the board used to appoint Tim Pence -- Tim Spence as
11  president of the bank?
12    MR. CIOFFI:  Objection.  The
13    document speaks for itself.  Memorializes
14    that decision.
15    MR. MCHUGH:  I think it records the
16    decision, but we'll debate that later.
17  BY MR. MCHUGH:
18    Q.  But do you understand that's what it is?
19    A.  It looks like it.
20    Q.  Okay.  Thank you.  I'm going to -- I'm
21  just going to show you what was provided to us
22  recently.
23    MR. CIOFFI:  John, usually when we do
24    this here in the Southern District of Ohio you
25    have a counsel -- you give counsel a copy and the

Page 122

1  witness a copy and the court reporter a copy.
2    MR. MCHUGH:  Thank you for the
3    information.
4    MR. CIOFFI:  But, I mean, I'd appreciate
5    that courtesy going forward because we've always
6    done that.  We did it -- I deposed your client and
7    I did that for every exhibit.
8  BY MR. MCHUGH:
9    Q.  Mr. McAllister, I've handed you what's been
10  marked for identification as Plaintiff's Exhibit 6 and
11  ask you if you can identify that document?
12    A.  It looks like the minutes of the meeting.
13    Q.  Okay.  And you can see that there's a portions
14  of that that's redacted, but there's also a portion that
15  is legible immediately above that?
16    A.  Yes.
17    Q.  And it talks about the introduction of
18  Mr. Beaudin?  I am saying his name right?
19    A.  Oh, I don't know.
20    Q.  Mr. Beaudin did not report on any other
21  candidate for presidency, did he?
22    A.  Did not.
23    Q.  And no other the candidate for president was
24  considered by any other consultant, was he?
25    A.  No.

Page 123

1    Q.  Thank you.
2    MR. MCHUGH:  Mike, if you give me five
3  minutes, I may be finished.
4    MR. CIOFFI:  Okay.
5    MR. MCHUGH:  Or ten minutes.
6    MR. CIOFFI:  Okay.
7    MR. MCHUGH:  The time is 1:46 p.m.
8  We're going off the record.
9    (Whereupon, a brief recess was taken.)
10    VIDEOGRAPHER:  The time is 2:11 p.m.  We
11  are back on the record.
12  BY MR. MCHUGH:
13    Q.  I'm going to try to clarify one matter and
14  then --
15    A.  Okay.
16    Q.  -- we'll stop, but we're not finished.
17    A.  All right.
18    Q.  I'll discuss that with Mr. Cioffi.
19    With respect to the interrogatories that
20  I showed you that were marked as Exhibit 2 -- and I
21  told you about the bank's objection and then the
22  documents that were produced to you.  And we read those
23  for Mr. Cioffi.  Did that put you back in the frame of
24  mind?
25    A.  Okay.

Page 124

1    Q.  Okay.  The question that we asked was: "State
2  the factual basis for the defendant's decision to
3  appoint Timothy N. Spence as president in 2020."  And
4  the four documents that I showed to you are these four
5  that are attached.
6    A.  Okay.
7    Q.  All right.  Do you agree with that?
8    MR. CIOFFI:  Objection.  Again, he's only here
9  as a fact witness.  There's no foundation that he
10  has any personal knowledge about these things.
11    MR. MCHUGH:  Well, that doesn't make
12  sense.
13    MR. CIOFFI:  Well, ask him and then we
14  can go on.
15    MR. MCHUGH:  Well, they -- all right.
16  BY MR. MCHUGH:
17    Q.  You understand that these are the four
18  documents that they've identified and I asked you about
19  those?
20    MR. CIOFFI:  Objection.  You're asking
21  him to accept your representation.
22    MR. MCHUGH:  All right.  Michael, we'll
23  do --
24    MR. CIOFFI:  Ask him if he's seen the
25  interrogatories before.

Deposition of Michael McAllister                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 125

1     MR. MCHUGH:  We'll do it your way.
2  We'll do it your way.
3     MR. CIOFFI:  Ask him.
4  BY MR. MCHUGH:
5     Q.  I apologize for this, Mr. McAllister.
6  I'll hand you what's marked as Exhibit 3.  And I'm
7  going to ask you if you can pull out of that section
8  out of Exhibit 3 the document that is marked 1074 to
9  1079.
10    A.  Okay.
11    Q.  Do you have that, sir?
12    A.  I do.
13    Q.  Okay.  Can I ask you next to pull out the
14 document that is marked 1033 to 1040?
15    A.  Okay.
16    Q.  Do you -- do you have that, sir?
17    A.  I do.
18    Q.  Can I ask you next to pull out the document
19 that is marked 0954 to 0976?
20    A.  It starts at -- wait a minute.  No.
21    Q.  Do you have that, sir?
22    A.  I do.
23    Q.  All right.  And, lastly, I'm going to ask you
24 if you can pull out of that set the document that is
25 marked 6977 to 7015?

Page 126

1     A.  Okay.  I have it.
2     Q.  Do you have all four of those documents in
3  front of you?
4     A.  I do.
5     Q.  All right.  Thank you.  Now, I'm going to read
6  to you the two questions that were asked to give you a
7  framework for answer.  And I know you're not the bank.
8  I know you're Michael McAllister.  We asked the bank to
9  tell us the factual basis for their decision to appoint
10 Mr. Spence president and to identify all criteria which
11 Fifth Third considered in selecting Timothy N. Spence
12 for the position of president of Fifth Third Bancorp.
13 Okay?
14    A.  Okay.
15    Q.  To repeat what you told me, Mr. Carmichael
16 cannot appoint Mr. Spence?
17    A.  Correct.
18    Q.  That's solely a board decision?
19    A.  Correct.
20    Q.  You have the four documents that were
21 identified in both of these answers to interrogatories.
22 We just went through that, correct?
23    A.  (Witness nods head).
24        Now, would you be so kind as to tell me with
25 regard to Exhibit 3 -- oh, I'm sorry.  Here, let's

Page 127

1  do -- let's make this really easy.  Can I have those,
2  please?
3     MR. MCHUGH:  Michael, I'm going to mark
4  these as individual documents.
5     MR. CIOFFI:  No.  It's going to confuse
6  the record.  You've already marked them as 3.
7  Just ask him your question.
8     MR. MCHUGH:  All right.  Very
9  good.  We'll keep them like that.  Go
10 ahead.
11    (Off-the-record discussion.)
12    MR. MCHUGH:  Would you make four tabs
13 for me, 3A, 3B, 3C and 3D?
14    (Whereupon, Plaintiff's Exhibit 3A, Exhibit
15    3B, Exhibit 3C, and Exhibit 3D were marked for
16    identification purposes.)
17 BY MR. MCHUGH:
18    Q.  Mr. McAllister --
19    A.  You're going to trust me to do this Properly.
20    Q.  Yes, I am.  3A, B, C and D, just as you have
21 them in order.
22    MR. MCHUGH:  That's 3A, 3B, 3C and 3D.
23 Mr. Cioffi, would you like to examine the exhibits
24 as they've been marked?
25    MR. CIOFFI:  I can see them from where

Page 128

1  they sit.
2     MR. MCHUGH:  Okay.  Very good.
3     THE WITNESS:  I think we got it right.
4  BY MR. MCHUGH:
5     Q.  Mr. McAllister, with respect to
6  Exhibit 3C --
7     A.  Okay.
8     Q.  -- it is a document called Executive
9  Assessment Development Report.  It appears to be dated
10 July 31st, 2020 and it's signed by Mr. Beaudin or
11 Beaudin or however his name is pronounced.
12    A.  Okay.
13    Q.  My first question to you is, do you
14 remember seeing this report?  Reading and reviewing
15 this report?
16    A.  I don't remember it.
17    Q.  All right.  Now, may I take you then to
18 Exhibit 3A?  Do you see that 3A precedes 3C in the
19 dating?
20    A.  Yes.
21    Q.  And do you see that the -- this is a proposal
22 to establish the winning formula in the developing model
23 for the selection of the CEO and the identification of
24 the central leadership behaviors?
25    A.  How did you describe this?

Deposition of Michael McAllister                                       Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 129

1  Q.  This is the proposal for Mr. Beaudin
2 to identify the winning formula and to outline
3 the essential leadership behaviors that he is
4 evaluating?
5  **A.  Where does it say -- it doesn't say proposal**
6 **anywhere.**
7   MR. CIOFFI:  Objection.  It's your
8 characterization.  Why don't you ask the witness
9 about the document instead of giving him your
10 characterization of it.  It's totally improper.
11 Objection.
12   MR. MCHUGH:  I'll be happy to do that.
13 BY MR. MCHUGH:
14  Q.  Tell me what Exhibit 3A is, please, to the
15 best of your knowledge.
16  **A.  3A is the outline of what we're trying to seek**
17 **out in finding a CEO.**
18  Q.  The proposed 3A?
19  **A.  This is -- I don't know the answer to that.**
20 **The board as a group sort of developed this over time,**
21 **but I don't know.  I'm not sure who reduced it to a**
22 **document, but this is the board's thinking about what**
23 **we're looking for.**
24  Q.  And this identifies the -- on the two and a
25 half pages, are these the criteria that you talked about

Page 130

1 earlier when you said I could name a dozen criteria?
2  **A.  I wouldn't say criteria.  I would say**
3 **attributes.**
4  Q.  Okay.  This is the document that you were
5 identifying?
6  **A.  Yes.**
7  Q.  Okay.  So with respect to establishing
8 strategic direction, you see the three paragraphs there,
9 right?
10  **A.  Yeah.**
11  Q.  All right.  What factors did you consider in
12 comparing Philip McHugh for these positions -- for this
13 position?
14   MR. CIOFFI:  Objection.  Assumes facts
15 not in evidence.  You can answer.
16   THE WITNESS:  I'm not sure how you
17 characterized it.  Try it again so I can --
18 BY MR. MCHUGH:
19  Q.  Let me ask it this way:  What strengths does
20 Mr. Spence have that are better than Philip McHugh in
21 terms of establishing strategic direction?
22  **A.  Well, this -- it was Spence's background on**
23 **strategy.  I mean, he comes to the dance with an awful**
24 **lot here.  And this is what he was presenting to the**
25 **board, was the streety.  And so far we were interested**

Page 131

1 in the strategy given where the bank was at that time.
2 And so, I mean, that's not a comparison.
3  Q.  All right.  It says, "The CEO must possess the
4 vision to outline a balanced strategy of organic growth,
5 acquisitions and optimization rooted in deep knowledge
6 of the banking industry."
7   Do you see that?
8  **A.  I do.**
9  Q.  Do you believe that Mr. Spence had a
10 better knowledge of the banking industry than Mr. McHugh
11 did?
12  **A.  I would say the subjective evaluation of the**
13 **board on all of these things is that collectively Spence**
14 **was in a better position to take the job.**
15  Q.  The subjective evaluation --
16  **A.  Because you're never going to come up**
17 **with specific criteria on this.  There's no map**
18 **associated with this.  It's judgment based on what we**
19 **hear from people over time, the presentations they make,**
20 **their broad-based thinking.  That's how you figure this**
21 **out.**
22  Q.  All right.  Do you have any other criteria
23 other than this subjective determination by the board
24 based upon what they hear?
25   MR. CIOFFI:  Objection to the form of

Page 132

1 the question.  Hear when?
2   MR. MCHUGH:  Just -- just answer -- I'll
3 be happy to rephrase it.
4   THE WITNESS:  Try it again.
5 BY MR. MCHUGH:
6  Q.  Sure.  What else do you have other than the
7 subjective determination by the board which identifies
8 factors?
9  **A.  You have the experience of listening to these**
10 **people in meeting after meeting and hearing what they're**
11 **thinking, what they think needs to be done, their view**
12 **of the world.  That's what you have, is our experience**
13 **over time.**
14  Q.  Okay.  Do you have any document that
15 memorializes or records those factors?
16  **A.  Specifically I can't think of one.**
17  Q.  Okay.  All right.  There is a notion of an
18 essential leadership behavior as a driving execution for
19 the bank.  Where is Tim Spence's capabilities exceeding
20 Philip McHugh in that regard?
21  **A.  Are we going to go through this and compare**
22 **every single one side by side?  Because you're going**
23 **down the wrong path.**
24  Q.  Well, I just --
25  **A.  This is not the way -- this is not the way**

Deposition of Michael McAllister          Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 133

1  this is done, the way you're trying to do it.
2    Q.  Well, I'm just asking you then -- I appreciate
3  you indulging my question, but I'm trying to
4  see -- I understand what you're telling me in terms of
5  the subjective knowledge.  And I'm asking you do we have
6  anything other than subjective knowledge?
7    A.  We have the experience of listening to these
8  people present their business plans, what they think
9  about the industry, their results.  I don't know what
10  else you would need to come to an opinion.
11    Q.  What is the last presentation that you can
12  recall made by Philip McHugh to the board?
13      MR. CIOFFI:  Objection.  Again, not a
14  memory test.  It's in the minutes.  You have the
15  minutes.  Why don't you show it to him?
16      THE WITNESS:  I don't know.
17  BY MR. MCHUGH:
18    Q.  Do you remember -- do you remember
19  the last presentation that was made by Philip
20  McHugh?
21    A.  I do not.
22    Q.  Okay.  Do you remember Philip McHugh being
23  away from the last board meeting from illness due to the
24  covid pandemic?
25    A.  No.

Page 134

1    Q.  In the last two or three years, who made more
2  presentations to the board, Philip McHugh or Timothy
3  Spence?
4    A.  Oh, I don't know the actual math on that.  It
5  would be close because both of them presented at most
6  meetings something, you know, so...
7    Q.  So in -- in your sense, was that there was
8  sufficient exposure that you had to both executives to
9  enable you to make the determination that you did?
10    A.  Yes.
11    Q.  Okay.  Were you given any reports or data by
12  Mr. Beaudin or anyone elsewhere there was an attempt to
13  quantify the information that are identified in this
14  winning formula?
15    A.  Do that one again.
16    Q.  Sure.  Were you given any hard data to address
17  these items?
18    A.  From the consultant?
19    Q.  Yes, sir.
20    A.  That we're hiring of their opinion.
21    Q.  Okay.  So the answer to that would be no?
22    A.  Yes.
23    Q.  Okay.  Are you --
24    A.  They may have some quantitative thing they do,
25  but at the end of the day they're giving us their

Page 135

1  opinion.
2    Q.  Right.
3    A.  Right.
4    Q.  And the -- did you ever see any employment
5  engagement -- employee engagement surveys or summaries
6  affecting Mr. Spence?
7    A.  If so, I don't recall it.  I mean, I know the
8  bank does them, but I think by the time it gets to the
9  board it's pretty high level.
10    Q.  Do you remember any discussions at the board
11  level about Mr. Spence's lack of structure and
12  organization?
13    A.  I do not.
14      MR. CIOFFI:  Objection.
15  BY MR. MCHUGH:
16    Q.  Do you -- do you remember any discussions at
17  the board level about Mr. Spence's need to develop the
18  skills to communicate more directly and succinctly?
19    A.  No.
20    Q.  Do you remember any comments or discussions at
21  the board level about Mr. Spence being defensive when
22  challenged?
23    A.  No.
24    Q.  Do you remember any discussions at the board
25  about whether Mr. Spence can make correct talent

Page 136

1  decisions?
2    A.  Nope.
3    Q.  Do you remember any discussions at the board
4  regarding evaluations of Mr. Spence's ability to spend
5  and invest enough time in developing personal
6  relationships?
7    A.  No.
8    Q.  Do you have any recollection, Mr. McAllister,
9  of looking at a SWOT analysis of strength, weakness,
10  opportunities and -- that type analysis for
11  Mr. Spence?
12    A.  If there was one, I don't recall it.
13    Q.  Okay.  And as I understand your testimony,
14  from your perspective, from at least 2019 -- at this
15  point in 2019 on, Tim Spence was the only candidate and
16  Philip McHugh was never a candidate?
17    A.  That's true.
18      MR. MCHUGH:  All right.  I think at this point
19  what I'm going to do is suspend the deposition
20  because we have some outstanding discovery disputes
21  with Mr. Cioffi.  I don't want to bother you with
22  those.  Thank you for your courtesy and time,
23  but -- and hopefully we won't speak again, but if
24  we do it'll be here.  And I, again, thank you for
25  your courtesy.

Deposition of Michael McAllister            Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 137

1  MR. CIOFFI:  Just for the record, I'll
2  recognize you've tried to reserve rights to keep
3  the deposition open.  I recognize you've tried to
4  do that.  We don't agree that you have any such
5  rights.
6  MR. MCHUGH:  Yes.  And excuse me.  Thank
7  you for reminding me.  There's also the reason
8  that you instructed him not to answer certain
9  questions on the assertion of privilege and I'm
10  preserving that as well.
11  MR. CIOFFI:  Well, you have the right
12  to --
13  MR. MCHUGH:  Thank you.  I have a right
14  to speak.
15  MR. CIOFFI:  -- whatever remedy.  So I
16  have some questions.
17          DIRECT EXAMINATION
18  BY MR. CIOFFI
19  Q.  Mr. McAllister, Mr. McHugh asked you some
20  questions about from 2019 forward Tim was the only
21  candidate.  Do you remember that question just now?
22  A.  (Witness nods head).
23  Q.  You testified earlier that over a number of
24  years the consensus developed --
25  MR. MCHUGH:  Objection to the form of

Page 138

1  the question.  This is redirect.
2  MR. CIOFFI:  Okay.  State your
3  objection.
4  MR. MCHUGH:  I just did.
5  Q.  Okay.  Over -- was it your testimony earlier
6  today that over a number of years the board began
7  forming consensus that Tim Spence was the best
8  candidate?
9  A.  Yes.
10  MR. CIOFFI:  Let's mark this as -- just
11  continue the numbering.
12  (Whereupon, Defendant's Exhibit 7 was
13  marked for identification purposes.)
14  Q.  Please look at Exhibit No. 7, please.  Look at
15  the first page.  What is that document?
16  A.  Executive Succession Planning.
17  Q.  Is it a document from -- from what executive
18  session planning meeting?
19  A.  It looks like August.
20  Q.  And what -- what's the date on the document?
21  A.  2017.
22  Q.  Is it -- no.  Look at the front page.
23  A.  Oh, front page.  December of 2018.
24  Q.  If you turn to the last page of that document,
25  read into the record the caption of the document?

Page 139

1  A.  "Strategic Talent Opportunities Planning for
2  Future Talent Moves."
3  Q.  There are a series of bullets after that,
4  right?
5  A.  Yes.
6  Q.  And what's the first bullet?
7  A.  Tim Spence.
8  Q.  And after Tim Spence what?
9  A.  CEO.
10  Q.  And after that there are a number of other --
11  A.  Yep.
12  Q.  -- talent opportunities; is that correct?
13  A.  Correct.
14  Q.  Is Phil McHugh listed anywhere there?
15  A.  No.
16  Q.  Based on this document, does it refresh your
17  memory as to when the board began developing its
18  consensus that Tim Spence was the best president and CEO
19  candidate?
20  A.  Like I say, this sounds about the right time
21  line, so...
22  Q.  2018?
23  A.  Something in that range, yes.
24  Q.  Why did the board begin forming this consensus
25  at least as far back as 2018 that Tim Spence possessed

Page 140

1  the qualities to be the CEO and president?
2  MR. MCHUGH:  Objection.  Competency.
3  A.  Say it again.
4  Q.  Why did the board form this consensus that Tim
5  Spence as early as 2018 demonstrated the qualities that
6  would make him the best candidate for president and CEO?
7  A.  Again --
8  MR. MCHUGH:  Same objection.  Excuse me.
9  MR. CIOFFI:  What's your objection?
10  MR. MCHUGH:  My objection is he can't
11  speak for the board.
12  MR. CIOFFI:  Well, let's just clarify
13  this.
14  Q.  So, first of all, did you form that opinion?
15  A.  I did.
16  Q.  And did you discuss that opinion at board
17  meetings?
18  A.  Yes.
19  Q.  And through those discussions, did you learn
20  what the board thought?
21  A.  Yes.
22  Q.  Okay.  And based on that consensus, why is it
23  that the board began developing that consensus in 2018?
24  A.  Well, I mean, we've been watching all this --
25  you know, again, meeting after meeting for a couple of

Deposition of Michael McAllister                                      Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 141

1 years and the board -- again, we talk about the
2 succession all of the time because it is a primary
3 responsibility of the board to make sure there's a CEO
4 in place. So it's not like it was an event. It was
5 like a process that we basically -- every meeting
6 there's some conversation about that and people would
7 respond, you know, that was actually pretty well done or
8 this was interesting and da da da da da. That's how --
9 you know, that's how it happens and just over time
10 people kind of come to the conclusion that this -- you
11 know, this -- this is making a lot of sense, so...
12     MR. CIOFFI: Would you mark this as the
13 next Exhibit, please. Jennifer, is that 8?
14     THE COURT REPORTER: Yes.
15     (Whereupon, Plaintiff's Exhibit 8 was
16     marked for identification purposes.)
17     Q. When you talk about this process over a number
18 of years, do you have any experience of your own
19 personal knowledge of this process?
20     A. A lot.
21     Q. Describe, first of all, your background and
22 number of years in which you were a CEO?
23     A. Well, I was -- I became a hospital CEO at the
24 age of 25. Humana was a company that used to be in the
25 hospital business, so I kind of came up through the

Page 142

1 company as a hospital CEO. And then when they -- we got
2 in insurance business, I ultimately ended up on the
3 insurance side of the business. The company was split
4 in two and I became a divisional president. It was some
5 point in the insurance business ultimately finding my
6 way to the CEO job in 2000. And served as their CEO
7 until 2012, stayed on as chairman until 2013.
8     And then after the passage of healthcare
9 reform, I announced to my board I was going to be going.
10 So I spent the next couple of years preparing for my
11 replacement. Unfortunately, I had to go to the outside
12 to do that. I had a COO which was terrific. I mean, he
13 kept the trains running. He was good, but he was not
14 going to be going to the CEO job. He knew it, we knew
15 it, the board knew it. And so we ended up bringing
16 somebody from the outside, spent about -- I don't
17 know -- 18 to 24 months kind of getting him ready and
18 then I stepped down.
19     Q. In your experience, CEO's have a senior
20 executive management team; is that correct?
21     A. Correct.
22     Q. And at Fifth Third, that's called the
23 enterprise team; is that right?
24     A. I think that's the title, yep.
25     Q. In your -- based on your experience, can you

Page 143

1 explain the difference between the qualities needed to
2 be CEO and the qualities needed to be a member of the
3 management team with his or her specific
4 responsibilities?
5     A. Well, through my own experience. I sort of
6 got thrust into the job because I was an operator
7 running a division. And so all of a sudden I'm now
8 dealing with Wall Street and a whole level of different
9 financial issues and, you know, team building and
10 endless things that were way different than anything I
11 had ever done just running a division as an operator. I
12 had about half of the company at that time.
13     So it was just a different skill set in terms
14 of -- they tended -- some of it tended to be soft stuff,
15 leadership skills, the ability to motivate and encourage
16 people and, you know, bring about a passion for
17 performance from them. Dealing with the street is a
18 whole new deal. You're managing a balance sheet which
19 you never really manage when you're running a division.
20 And you've got to -- generally you have an executive
21 team, which is a bunch of type A's. So you're herding
22 some pretty serious cats usually. So it's just a
23 different -- a different job.
24     Q. I want to direct your attention to Exhibit --
25 I think it was 3, The Winning Formula.

Page 144

1     A. There it is, right here, 3A.
2     Q. Yeah. And this document was -- was developed
3 with board input; is that correct?
4     MR. MCHUGH: Objection. You're leading
5     your witness.
6     Q. I believe you testified earlier; is that
7 correct?
8     A. I did. This was developed with board input
9 and --
10     Q. And this was developed -- was it developed
11 after this consensus that was beginning to develop in
12 2018?
13     A. I'm not sure where along the way, but yeah.
14     Q. Look at the front page of that document.
15     A. I assume we were familiar sort of finalizing
16 our thoughts before we started the process of really
17 deciding where to go next. So, yes, the consensus was
18 building before this was ever produced.
19     Q. Does it -- is it fair to say that this
20 document 3C is a way for the board to validate its
21 consensus?
22     A. Yes. That's exactly what it was. Basically
23 we've come to an opinion. We wanted to make sure we,
24 you know, had somebody else to take a look at it, which
25 is where 3C came from, and it came back and validated

Deposition of Michael McAllister        Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 145

1 sort of what we believed, so...
2     Q. Is it your experience that that is a customary
3 and usual process for a corporation to go
4 through -- for a board of a corporation to go through in
5 its succession choices?
6     A. It's relatively routine. I wouldn't say it's
7 a hundred percent, but in my experience, yes, we'll do
8 this kind of work. In my particular case, when I was
9 replacing myself I had -- I had to evaluate about six
10 people.
11     Q. Back again. I just want to make sure I get
12 the number right. 3C.
13     A. That's -- that's --
14     Q. Are there two 3Cs? The winning formula one.
15     A. Yep, A.
16     Q. 3A. Okay. It's been numbered a couple of
17 different ways. So, again, Mr. John McHugh was asking
18 you some questions about the qualifications or
19 characteristics and he talked about -- if you look at
20 the first page of the document, business management; do
21 you see that?
22     A. Yep.
23     Q. Establishing a strategic direction, do you see
24 that?
25     A. I do.

Page 146

1     Q. Driving execution, do you see that?
2     A. Yep.
3     Q. Leading teams, do you see that as a
4 qualification?
5     A. I do.
6     Q. Interpersonal, do you see that as a
7 qualification?
8     A. I do.
9     Q. Influencing, do you see that as a
10 qualification?
11     A. Yes.
12     Q. And over the years in which the board was
13 developing a consensus that Tim Spence was the best
14 candidate to be president and CEO, did the board
15 evaluate Tim Spence's vis-a-vis these qualification?
16     A. I wouldn't say we went and ticked off a list,
17 but basically these are the things we were looking for.
18 So this was an effort to kind of, you know, put it all
19 down so we would be pretty robust about how we thought
20 about it, so -- but yeah, that's how it came about.
21     Q. In the exercise of its sound business
22 judgment, did the board come to a conclusion with
23 respect to Mr. Spence and these qualifications?
24       MR. MCHUGH: Objection.
25     A. We did.

Page 147

1     Q. And what was that conclusion?
2     A. The conclusion was he was the best candidate.
3     Q. He was the best in comparison to everyone else
4 on the enterprise team; is that correct?
5     A. Yes.
6     Q. You mentioned before over a period of years as
7 the board was forming this consensus you had an
8 opportunity to observe members of the enterprise team
9 doing their job; is that correct?
10     A. Well, at least reporting the work.
11     Q. Okay. Did they report this work at the board
12 meetings?
13     A. Pretty routinely, yes. And then randomly they
14 would come in with longer term plans and that sort of
15 thing, but every meeting we had a pretty good insight of
16 what was going on.
17     Q. Handing you what's been marked as Exhibit 8,
18 I'll represent to you that those are board meetings that
19 have been produced in this case. They're redacted to
20 delete confidential business information. But these are
21 a collection of board minutes beginning in February of
22 2019 and going forward through October of 2020.
23 I want to direct your attention to the first page. And
24 that's a board minutes from what particular date?
25     A. February 28th, 2020. Is that a 6 or an 8? I

Page 148

1 think it's an 8.
2     Q. Turning your attention to the second page,
3 which is Bates stamp 212472, do you see that at the
4 bottom?
5     A. I do.
6     Q. Would you read the first couple of sentences
7 under strategy update?
8     A. "Mr. Carmichael introduced Mr. Spence to
9 provide the strategic update as included in the meeting
10 materials. Mr. Spence began with the digital update.
11 He noted that first that significant progress had been
12 made in 2018 on the digital channel and product adoption
13 and reviewed increases in active mobile customers, new
14 account sales, deposits going through mobile or ATM's
15 and statements suppressed -- statements suppressed. He
16 stated that the rate of accusation was somewhat slowed
17 by the evolution pace in cyber security, technology and
18 that certain capabilities had not yet come on line
19 pending the implementation of information security
20 technology solutions."
21     Q. Okay. With -- with respect to the -- the
22 digital channels and digital update, how would you
23 describe Mr. Spence's breadth of knowledge?
24     A. Well, the board was confronted with
25 the -- I mean, these fintech companies were starting to

Deposition of Michael McAllister      Philip R. McHugh v. Fifth Third Bancorp, et al.

---

Page 149

1  emerge and things were changing and the big banks were
2  being pretty aggressive about using technology to run
3  the business and make it more productive and all those
4  sort of things. So this was of particular interest. He
5  had -- he had particularly strong background in this and
6  so we were very interested in this. And he was actually
7  quite good at being able to kind of lay out our -- both
8  our opportunities and our problems, so, you know...
9 Q.  Would you say his breadth of knowledge was
10 superior to anyone else on the management team?
11 A.  I would think so, yes.
12 Q.  And go to the next paragraph, please.
13 A.  "Mr. Spence then turned to digital
14 transformation. He reviewed efforts to organize and
15 inform the enterprise noting that mark management had --
16 had built excitement and advocacy by sharing the digit
17 transformation approach with approximately 1,000
18 employees and then revalidated the stakeholder digital
19 priorities."
20 Q.  At this moment in time, which was February of
21 2019, was this digital transformation a matter of
22 importance for the bank?
23 A.  The board's view of it was it was critical.
24 Q.  Was Mr. Spence's knowledge and command of this
25 particular aspect of the business superior to others on

Page 150

1  the management team?
2 A.  In our opinion, it was.
3 Q.  Going to the next paragraph, which is on the
4  next page.
5 A.  "Mr. Spence then turned to a strategic
6  discussion on bancorp and bank landscape. Mr.
7  Carmichael noted that the Sun Trust BBT merger and the
8  general regional bank landscape had been discussed by
9  the board extensively in executive session. In response
10 to a direct request from Mr. Spence, Mr. Carmichael
11 commented on the potential for synergies in the Sun
12 Trust BBT merger given branch overlaps and whether
13 similar opportunities exist in other industry pairings."
14 Q.  I'll ask you to stop there. Was
15 Mr. Spence's knowledge of the bank landscape superior to
16 others on the management team?
17 A.  It was very good. And I would say in my own
18 experience, it's some of the best I've seen.
19 Q.  How would you characterize, based on your
20 experience of many, many years, Mr. Spence's strategic
21 vision?
22 A.  Well, this is probably the first thing that
23 the board came to a consensus on was he really had his
24 strategic hat on and understood it. So it was strong,
25 so...

Page 151

1 Q.  Was it among the strongest strategic visions
2  that you had seen in your career?
3 A.  Absolutely.
4 Q.  Going back in time, had Mr. Spence made other
5  presentations of a similar nature about the bank
6  landscape, about technology, about strategic vision to
7  the board?
8 A.  Each meeting he basically touched on some
9  aspect of those things. We always didn't do the full
10 bank landscape at every meeting, but it happened a lot,
11 so...
12 Q.  All right. I know later on in this particular
13 board minute there's a report from Mr. Tuzun. Do you
14 see that?
15 A.  Yes.
16 Q.  Is it customary for Mr. Tuzun to report?
17 A.  He is. He's the CFO.
18 MR. MCHUGH:  Would you excuse me for one
19 minute. I hate to interrupt, but I have a call
20 from my wife that's an emergency.
21 MR. CIOFFI:  Okay. Well, we can go off
22 the record. Go ahead. Emergencies are important.
23 VIDEOGRAPHER:  The time is 2:46 p.m.
24 We're going off the record.
25 (Whereupon, a brief recess was taken.)

Page 152

1 VIDEOGRAPHER:  The time is 2:49 p.m. We
2  are back on the record.
3 Q.  Directing your attention back to Exhibit A,
4  would you go to Page No. -- Bates No. 212513, please?
5 A.  Okay.
6 Q.  You see that's board minutes from what date
7  meeting?
8 A.  September 17th, 2019.
9 Q.  Do you see the heading "Strategy Market
10 Context Progress and Next Steps"?
11 A.  Yes.
12 Q.  Would you read just the first two sentences of
13 the first paragraph?
14 A.  "Mr. Carmichael then invited Mr. Spence to
15 begin the meeting with a review of market context,
16 progress and next steps as included in the materials in
17 the meeting -- for the meeting. Mr. Spence provided an
18 overview of the annual strategic planning process and
19 noted some new requirements that would become applicable
20 to Fifth Third as a result of conversion to the OCC
21 charter and were in the process of being created."
22 Q.  Will you read the first sentence of the next
23 paragraph, please?
24 A.  "Next, Mr. Spence reviewed key political,
25 economic, social, technological and competitive factions

Deposition of Michael McAllister                                     Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 153

1  -- factors shaping the regional banking market."
2      Q.   Read the next paragraph, first sentence,
3  please.
4      A.   "Mr. Spence also discussed competitive
5  dynamics in the U.S. banking sector.  He noted that
6  following the financial crisis alternative lenders
7  became an important source of capital and liquidity as
8  traditional banking sector entrenched -- retrenched."
9      Q.   All right.  And the first sentence of the next
10 paragraph.
11     A.   "Mr. Spence then provided further details
12 regarding the taking of market share by alternative
13 lenders."
14     Q.   The next paragraph please.
15     A.   "Thereafter, Mr. Spence provided perspectives
16 on the competitive threats posed by venture capital
17 companies, VC's, and trillionaire banks."
18     Q.   Read the first sentence in the next paragraph,
19 please.
20     A.   "Mr. Spence then discussed the importance of
21 local regional markets."
22     Q.   Read -- read the next sentence.
23     A.   "He noted that sufficient market presence in
24 pivotal regional markets was key to growth and that
25 banking was still predominantly won and lost in local

Page 154

1  markets."
2      Q.   If you'll read the first sentence in the next
3  paragraph, please.
4      A.   "Mr. Spence then reviewed trends in financial
5  technology.  He noted that fintech companies lead in
6  product innovation, but no one firm has been able to
7  dominate the landscape."
8      Q.   The first sentence in the next paragraph,
9  please.
10     A.   "Following the session, Mr. Spence provided a
11 review of the impact of Project North Star."
12     Q.   Read the next sentence, please.
13     A.   "He noted that the project was implemented in
14 2016 to improve profitability and competitive
15 positioning."
16     Q.   What was Project North Star?
17     A.   It was an effort to actually drive a lot of
18 efficiency in the company and there's some more
19 organizational changes that were part of it, but
20 generally, it was about, you know, taking technology and
21 processes and making a lot of changes in order to get a
22 lot of expense out of the company.
23     Q.   Go on to the next page.  Read the first
24 sentence of the next paragraph.
25     A.   "Mr. Spence then provided a detailed

Page 155

1  discussion of progress against specific initiatives
2  under Project North Star as described on slide 162 of
3  the materials for the meeting."
4      Q.   And then the first sentence in the next
5  paragraph.
6      A.   "Next, Mr. Spence proceeded to a discussion of
7  lessons learned and conclusions through the
8  implementation of North Star."
9      Q.   And, finally, the next paragraph, first
10 sentence.
11     A.   "Thereafter, Mr. Spence reviewed results of
12 tuck-in acquisitions and strategic investments executed
13 under North Star including Franklin Street, Cogo
14 Capital, EPIC Insurance, GreenSky, AvidXchange,
15 Transactis and Dade Systems."
16     Q.   Finally, the next paragraph.
17     A.   "Mr. Spence concluded with the current state
18 assessment and discussion of key priorities for the near
19 and medium term.  He noted that in the regional banking
20 sector relationship banking was the key strategic
21 differentiator and that key strategic enablers included
22 leading share and attractive markets."
23     Q.   How did you evaluate Mr. Spence's presentation
24 both in terms of substance, thoroughness and -- and
25 communication skills?

Page 156

1      A.   Well, personally I looked at this and this is
2  a -- I mean, this is a broad-based review of things.  And
3  his -- his knowledge of these things was actually
4  outstanding, deep and he was very articulate about what
5  it really meant to us, so...
6      Q.   Okay.  Did you have a discussion about your
7  impressions with the other board members?
8      A.   This is the kind of thing that we'd produce in
9  discussion at the executive session.  At the end of the
10 meeting we'd say, Tim did a nice job with da da da da da
11 or whatever the thoughts were among the group, but yeah.
12     Q.   And based on his presentations over time and
13 those discussions following those presentations, did the
14 board form its business judgment as to Tim's
15 qualifications to be president and CEO?
16          MR. MCHUGH:  Objection.
17     Q.   You may answer.
18     A.   That's exactly how it happened.  I mean, over
19 time this is the kind of thing we would have a lot.
20 And so just over and over and the redundancy of it in
21 terms of getting a chance to see him in action, it
22 became pretty clear.
23     Q.   I note -- continuing with this document,
24 Exhibit No. 8, I note that at the bottom of Page 212515
25 there's also a presentation by Mr. McHugh?

Deposition of Michael McAllister                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 157

1   A.  Yep.
2   Q.  Is that right?
3   A.  Yep.
4   Q.  And then on the next page a presentation by a
5   Mr. Anderson; is that right?
6   A.  Yes.
7   Q.  Okay.  Over the course of several years and
8   several meetings, were the -- there -- did the board
9   have the opportunity to see all of these members of the
10  enterprise team make presentations about the business
11  strategic vision side by side?
12  A.  They all were before the board regularly.  The
13  broad-based strategic vision was usually carried by --
14  by Tim, but everybody within their own business segment
15  would talk about the strategy they had for their own
16  business, what they were doing operationally and
17  performance and all those sort of things.  So we got to
18  see everyone present their business cases, how they were
19  doing and what they thought about their business.
20  Q.  Based on that assessment, did the board in the
21  exercise of its sound business judgment, make a
22  determination about Tim's qualifications?
23      MR. MCHUGH:  Same objection.
24  A.  Well, that's how it came about.  I mean, it
25  was -- like I said earlier, it's a judgment call at the

Page 158

1   end of the day based on everything we knew and
2   everything we'd seen.  And that was the judgment and the
3   consensus that the board came to.
4   Q.  That determination, that business judgment was
5   the result of a several-year process as you've described
6   it; is that correct?
7       MR. MCHUGH:  Objection.  Leading and
8   repetitive.
9   A.  Well, as I said earlier today, yes.  The
10  process was -- it was in some ways, you know, meeting by
11  meeting, but, God, it was a result of conversations, a
12  lot of opportunities to see
13  people and it took -- you know, it developed over years.
14  Q.  Did the board rely on one person's
15  recommendation in making its business judgment as to
16  hiring Tim as the president and CEO?
17  A.  No.
18  Q.  Did it rely on one consultant and that
19  consultant's report in making the determination?
20  A.  That was one input.  The whole thing.
21  Q.  In forming its business judgment to hire Tim
22  as the president, did the board discriminate against
23  Phil McHugh on account of his age?
24      MR. MCHUGH:  Objection.  Objection.
25  A.  I don't even know that age was ever brought

Page 159

1   up, so no.
2   Q.  Did you even know the age of --
3   A.  I did not.
4   Q.  -- of Tim Spence --
5   A.  It was --
6   Q.  -- versus the other members of the management
7   team?
8   A.  It was on a document here somewhere earlier,
9   but that's not something we pay much attention to.  When
10  it comes to age basically -- you know, if you're
11  bringing a CEO, you want to make sure they have some
12  running room.  So, you know, you don't want to be hiring
13  somebody for two years.  So you're looking at somewhere
14  between -- this is -- all companies do this.  You try to
15  think in terms of five to ten-year run and that's the
16  way you think about it, so, you know...
17  Q.  So that five or ten-year run -- it is --
18  allows one to consider anyone between the age of 40 and
19  60; is that correct?
20  A.  I mean, you're not -- there's no hard line
21  even for that, frankly, but that generally is where
22  you'd want to land, yes, if possible, just because of
23  the timelines of getting in the job, finding the next
24  one, getting them ready.  I mean, all of this is an
25  ongoing thing.

Page 160

1   Q.  Did any individual on the board in the
2   exercise of his or her business judgment discriminate
3   against Phil McHugh on account of his age?
4       MR. MCHUGH:  Objection.
5   A.  Not that I'm aware of.
6   Q.  Did Phil McHugh ever tell anyone on the board
7   that he wanted to be considered for the position of
8   president or CEO?
9   A.  I don't think so.  I don't know.  Not that I'm
10  aware of.
11  Q.  Not that you're aware of.  Did he ever send an
12  email or a letter putting in an application or a
13  petition to be considered?
14  A.  Not that I ever saw, no.
15      MR. CIOFFI:  I have no further
16  questions.
17          RECROSS-EXAMINATION
18  BY MR. MCHUGH
19  Q.  Mr. McAllister, I'm going to ask you a couple
20  more.
21      Is it the practice that you've seen in your
22  business career that executives request appointment to
23  the CEO or the presidency's office?
24  A.  I have seen cases where people make it quite
25  clear what their interests are.  So yes.  I

Deposition of Michael McAllister                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 161

1  wouldn't -- it's not something you see every day, but
2  it's not unusual to have somebody raise their hand and
3  say, you know -- as a matter of fact, that's how I ended
4  up with my job.
5      Q. Did you ever see it happen in the bank
6  business?
7      A. Not here, no.
8      Q. In fact, it's pretty well established what the
9  succession plan is, isn't it?
10     A. You mean in the bank?
11     Q. Yes.
12     A. Well, I don't know what you mean by
13  established. I mean, we followed the normal pattern
14  that you would normally do in something like this.
15     Q. Does your succession plan anywhere say see if
16  anyone is interested?
17     A. No. No.
18     Q. Does it say anywhere check the box if you want
19  to be a president?
20     A. No. I would say that if somebody wants to --
21  they will generally make it be known, but no, it's not
22  written in the process anywhere or a book. But I --
23  just the real worst case is is that, yes, it gets -- it
24  gets known.
25     Q. And you -- if you were going to say it to

Page 162

1  somebody, you might say it to your immediate superior
2  officer, right?
3      A. I don't know who else you'd bother telling, I
4  mean, other than maybe a board member.
5      Q. I mean, if it were Phil, the person he would
6  talk to about that would be Greg Carmichael, right?
7          MR. CIOFFI: Objection. Calls for
8  speculation. If you know.
9      A. I don't know. I would speculate.
10  That's all you can do. The answer is is that would make
11  sense.
12     Q. That would make sense, right?
13     A. Right.
14     Q. And, in fact, it might be perceived as
15  insubordinate to go the board and avoid the president
16  and chief executive officer, wouldn't it?
17     A. That depends on the -- that depends on the
18  CEO. Some would not be bothered by that and some would.
19     Q. Some would be irate by that, right?
20     A. Yeah.
21     Q. At -- at what point is an executive too old to
22  be considered for president or CEO given your five to
23  ten-year run?
24     A. There's no hard line on it. And my experience
25  is, you know, once somebody gets into their 60s, it's --

Page 163

1  it depends -- it kind of depends on the company.
2  What exactly do you need? You know, do you need
3  somebody that's got a two or three-year window that
4  brings specifically exactly what you might want? You
5  would definitely consider somebody like that. But if
6  you're in a situation where you have time and you have
7  some flexibility around setting schedules and going
8  through a process and all that sort of thing, again,
9  you're going to be looking for somebody to be around for
10  five to ten years, so...
11     Q. Certainly, Fifth Third Bank had that
12  flexibility?
13     A. In this case, yes.
14     Q. When you were asked whether Phil McHugh or Tim
15  Spence was the best candidate, you said he was the best
16  candidate. And my question to you is he was the only
17  candidate, right?
18     A. Well, it certainly -- you know, yes, at some
19  point that became the facts.
20     Q. Are you aware when Mr. Cioffi showed you
21  that -- I think it was 3A when you finally identified it
22  with regard to the perspective management plans in
23  succession where Brian Lamb was listed, where Kevin
24  Lipscomb was listed. Do you remember that document?
25     A. Uh-huh.

Page 164

1      Q. What time frame was that for?
2      A. For those particular jobs?
3      Q. Yes, sir.
4      A. I don't know if I know off the top of my head.
5      Q. Yeah. And if you look at the document, you
6  won't find anything there, will you?
7      A. Correct.
8      Q. Okay. So that could have been three-year
9  plan, could have been a five-year plan, could have been
10  a seven-year or ten-year plan?
11     A. They rarely go out that far, so...
12     Q. Five years?
13     A. When we look at these things -- if you look at
14  the analysis we look at, we generally don't think beyond
15  five for developing someone. They're too far out, so...
16         (Off-the-record discussion.)
17     Q. I said this was Exhibit 3A. It is not. It was
18  a special exhibit that was marked by Mr. Cioffi. It was
19  called Executive Succession Planning dated
20  September 2018 and it was --
21     A. Exhibit 7 --
22         MR. CIOFFI: Exhibit 7.
23     Q. -- Exhibit 7. Thank you very much. And if
24  you look at that, you can see that there is no time
25  frame set on that, right?

Deposition of Michael McAllister                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 165

1    A.   That's what it says.
2    Q.   What experience did Tim Spence have with Wall
3    Street before joining the bank?
4    A.   Before joining the bank?
5    Q.   Uh-huh.
6    A.   I don't know.
7    Q.   Okay.  And each of the -- each of the
8    candidates had -- had strengths and comparative
9    weaknesses between Phil and Tim; isn't that the right?
10       MR. CIOFFI:  Objection.
11   A.   You're -- you haven't characterized -- we only
12   had one candidate.
13   Q.   Are you familiar with the Life 360 Program?
14   A.   I generally know what it is, yes.
15   Q.   What is it?
16   A.   It's a -- well, I have it myself personally
17   because it comes with the private bank.
18   Q.   Okay.
19   A.   It's basically an aggregation of all of your
20   financial life into one place.
21   Q.   It's been a tremendous success for the bank,
22   hasn't it, in terms of aggregating client well?
23   A.   You'd have to ask somebody else about that.
24   I'm not real happy with it personally, but it --
25   Q.   Has the bank retained it, the program?

Page 166

1    Is it --
2    A.   Still there?
3    Q.   -- still there?
4    A.   It's still there.  I occasionally still look
5    at it.  It's got a fair number of bugs in it, so...
6    Q.   It has a fair number of bucks in it?
7    What do you mean by --
8    A.   Bugs.
9    Q.   Bugs?
10   A.   Yes.
11   Q.   Okay.
12   A.   So it's a piece of software that was purchased
13   outside the company and brought in.
14   Q.   Who's responsible for that acquisition?
15   A.   I don't know.
16   Q.   Would you be surprised if it were Philip?
17   A.   I guess not because it tends to be private
18   wealth kind of management sort of documents.
19   Q.   Were you ever aware -- ever aware of
20   Mr. Spence losing areas of responsibility due to
21   underperformance while at the bank?
22       MR. CIOFFI:  Objection.  Vague.  What --
23   losing?  What do you mean?
24       THE WITNESS:  I don't know anything about
25   that.

Page 167

1    BY MR. MCHUGH:
2    Q.   You have no information at all about that.
3    Were you aware of Mr. Spence's areas of responsibility
4    regarding financial integration of NB?
5    A.   Not specific to the tasks.
6    Q.   Okay.
7    A.   But he was in -- he was part of the
8    acquisition team that was part of the big
9    transaction.
10   Q.   And would you qualify -- or characterize that
11   as a qualified success?
12   A.   That has been a big success.
13   Q.   When Mr. Cioffi talked to you about the
14   criteria, he handed you that Exhibit 7.  Were there any
15   other documents that he showed you or you discussed with
16   him or that you considered to be evidence upon which the
17   board relied in reaching its decision?
18       MR. CIOFFI:  Exhibit 7 is wrong.  It's
19   Exhibit 3A.
20       MR. MCHUGH:  I'm sorry.  You showed him
21   Exhibit 7.  I thought you --
22       MR. CIOFFI:  I know.  That's executive
23   succession planning.
24       MR. MCHUGH:  Right.
25       THE WITNESS:  I would say it more generally.

Page 168

1    Based on everything you all have put in front of
2    me, I can't think of anything that I haven't seen
3    outside of this.
4    BY MR. MCHUGH:
5    Q.   Okay.  And is there -- as a result of this
6    fairly extensive discussion that we've had this
7    afternoon, is there anything that has led you now to
8    more firmly believe that you did in fact see Exhibit 3B
9    or 3C?
10   A.   I just don't recall.  To be honest with you, I
11   just don't know.
12   Q.   Okay.  All right.
13   A.   So no.  The answer is no.
14       MR. MCHUGH:  Thank you.  I think
15   that's all the questions I have, sir.  Thank
16   you.
17       MR. CIOFFI:  One follow-up question.
18       REDIRECT EXAMINATION
19   BY MR. CIOFFI
20   Q.   Did anyone tell the board to hire Tim Spence
21   to be president?
22   A.   No.
23   Q.   Did the board exercise its own independent
24   business judgment in making that determination?
25   A.   Yes.

```
 1              MR. MCHUGH:  Objection.  Repetitive.

 2      And now argumentative.

 3      A.    Yes.

 4              MR. CIOFFI:  Now, I usually don't argue

 5      with my own witnesses, but all right.  I have no

 6      further questions.

 7              MR. MCHUGH:  You do usually argue with

 8      your opponents.

 9              MR. CIOFFI:  All the time.

10              VIDEOGRAPHER:  The time is 3:09 p.m.

11      We're now going off the record.

12

13

14

15                       _____

16                         MICHAEL MCALLISTER

17

18              (DEPOSITION CONCLUDED AT 3:09 P.M.)

19

20

21

22

23

24

25
```

Deposition of Michael McAllister                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

1                     C E R T I F I C A T E
   STATE OF OHIO                    :
2                                   : SS:
   COUNTY OF HAMILTON               :
3            I, Jennifer K. Starner, the undersigned, a

4    duly qualified and commissioned Notary Public within and

5    for the State of Ohio, do hereby certify that before

6    giving of the aforesaid deposition, the said MICHAEL

7    MCALLISTER was by me first duly sworn to depose the

8    truth, the whole truth and nothing but the truth; that

9    the foregoing deposition was given at the said time and

10   place and was taken in all respects pursuant to Notice;

11   that the deposition was taken in stenotypy by me and

12   transcribed into typewritten form under my supervision;

13   that the transcribed deposition is to be submitted to

14   the witness for his examination and signature, and that

15   signature may be affixed out of the presence of the

16   Notary Public; that I am neither relative, attorney, nor

17   employee of any party or their counsel and have no

18   interest in the result of this pending action.

19           IN WITNESS WHEREOF, I have hereunto set my

20   hand and official seal of office at Cincinnati, Ohio,

21   this 23rd day of December, 2022.

22

23

24                             _____
   My commission expires:      Jennifer K. Starner, RPR
25      March 7, 2024                  Notary Public

```
 1   1 DEPOSITION ERRATA SHEET

 2   Date Taken:  December 14, 2022

 3   Case Caption:  PHILIP R. MCHUGH

 4   vs. FIFTH THIRD BANCORP, et al.

 5   DECLARATION UNDER PENALTY OF PERJURY

 6   I declare under penalty of perjury

 7   that I have read the entire transcript of

 8   my deposition taken in the captioned matter

 9   or the same has been read to me, and

10   the same is true and accurate, save and

11   except for changes and/or corrections, if

12   any, as indicated by me on the DEPOSITION

13   ERRATA SHEET hereof, with the understanding

14   that I offer these changes as if still under

15   oath.

16   Signed on the _____ day of

17   _____, 20___.

18   _____

19   MICHAEL MCALLISTER

20

21

22

23

24

25
```

```
 1   2 DEPOSITION ERRATA SHEET

 2   Page No._____Line No._____Change to:_____

 3   _____

 4   Reason for change:_____

 5   Page No._____Line No._____Change to:_____

 6   _____

 7   Reason for change:_____

 8   Page No._____Line No._____Change to:_____

 9   _____

10   Reason for change:_____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change:_____

23   SIGNATURE:_____DATE:_____

24   MICHAEL MCALLISTER

25
```

```
 1   3 DEPOSITION ERRATA SHEET

 2   Page No._____Line No._____Change to:_____

 3   _____

 4   Reason for change:_____

 5   Page No._____Line No._____Change to:_____

 6   _____

 7   Reason for change:_____

 8   Page No._____Line No._____Change to:_____

 9   _____

10   Reason for change:_____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change:_____

23   SIGNATURE:_____DATE:_____

24   MICHAEL MCALLISTER

25
```

### WORD INDEX

**< 0 >**
**036** 118:*6, 11, 16, 17*
**06** 42:*15*
**08** 42:*16*
**09** 42:*18*
**0954** 125:*19*
**0976** 125:*19*

**< 1 >**
**1** 4:*9* 75:*11* 76:*1, 5* 80:*4* 87:*18* 91:*18* 95:*22* 99:*20* 106:*20* 171:*1*
**1,000** 149:*17*
**1,110** 80:*6*
**1,111** 80:*14*
**1,112** 80:*15* 81:*2, 3*
**1,115** 81:*13*
**1,117** 82:*5*
**1,118** 82:*23*
**1,126** 83:*11, 12*
**1,135** 96:*4*
**1:17** 100:*4*
**1:21-CV-00238** 1:*6* 5:*8*
**1:46** 123:*7*
**10:00** 1:*16*
**10:08** 5:*2*
**101** 4:*9*
**102** 4:*10*
**103** 4:*10*
**1033** 125:*14*
**1036** 118:*15, 20*
**1040** 125:*14*
**1074** 125:*8*
**1079** 125:*9*
**108** 4:*13*
**11** 43:*5*
**11:13** 59:*5*
**11:35** 59:*8*
**11:55** 75:*21*
**11:57** 75:*24*
**12:26** 100:*1*
**121** 4:*13*
**127** 4:*11, 12*
**132** 88:*18*
**137** 4:*5*

**138** 4:*14*
**14** 1:*16* 171:*2*
**141** 4:*14*
**14th** 5:*1*
**160** 4:*6*
**162** 155:*2*
**168** 4:*6*
**16th** 97:*19*
**17** 65:*20*
**17th** 77:*9* 91:*16* 112:*19* 152:*8*
**18** 15:*21* 65:*21* 94:*23* 142:*17*
**19** 15:*21* 17:*9* 19:*23* 22:*23* 27:*6* 65:*14* 97:*23* 99:*16*
**1999** 52:*18*
**19th** 77:*6* 89:*8* 94:*14* 97:*13*

**< 2 >**
**2** 4:*9* 101:*5, 9* 105:*9, 10, 11, 17* 106:*4, 5* 117:*10, 25* 123:*20* 172:*1*
**2:11** 123:*10*
**2:46** 151:*23*
**2:49** 152:*1*
**20** 15:*21* 17:*9* 19:*23* 22:*23* 27:*6* 65:*14* 171:*17*
**2000** 6:*15* 40:*25* 41:*24* 65:*18* 142:*6*
**2008** 43:*8*
**201** 2:*12*
**2011** 24:*19* 43:*8*
**2012** 8:*7* 142:*7*
**2013** 142:*7*
**2016** 38:*24* 65:*20* 154:*14*
**2017** 15:*20* 16:*6* 107:*6* 138:*21*
**2018** 17:*8* 19:*22* 22:*23* 27:*6* 65:*14* 96:*12* 107:*14* 138:*23* 139:*22, 25* 140:*5, 23* 144:*12* 148:*12* 164:*20*
**2019** 52:*18* 53:*25* 71:*15* 74:*19* 77:*9*

**79:**21* 83:*18* 88:*9, 10* 90:*20* 91:*13* 92:*7, 19* 94:*14* 96:*12* 97:*13* 108:*2* 110:*22* 113:*18* 136:*14, 15* 137:*20* 147:*22* 149:*21* 152:*8*
**2020** 16:*7* 29:*9* 32:*8* 37:*16* 39:*2* 71:*15* 110:*22* 124:*3* 128:*10* 147:*22, 25*
**2021** 110:*22*
**2022** 1:*16* 5:*1* 170:*21* 171:*2*
**2024** 170:*25*
**20th** 92:*1*
**212472** 148:*3*
**212513** 152:*4*
**212515** 156:*24*
**21st** 32:*8*
**23rd** 170:*21*
**24** 142:*17*
**25** 141:*24*
**26** 41:*25* 43:*18*
**2623** 2:*7*
**26th** 34:*6*
**28th** 147:*25*

**< 3 >**
**3** 4:*10* 102:*7* 103:*1, 4, 7, 9, 13, 14* 105:*20, 22* 117:*9, 11* 119:*2, 17* 125:*6, 8* 126:*25* 127:*6* 143:*25* 173:*1*
**3:09** 169:*10, 15*
**30** 10:*1*
**30(b)(6** 104:*22*
**30(b)6** 104:*5*
**31st** 128:*10*
**34** 50:*3, 13* 114:*25*
**34-year** 31:*13*
**360** 165:*13*
**39** 115:*2*
**3A** 4:*11* 127:*13, 14, 20, 22* 128:*18* 129:*14, 16, 18* 144:*1* 145:*16* 163:*21* 164:*17* 167:*19*
**3B** 4:*11* 127:*13, 15, 22* 168:*8*

**3C** 4:*12* 127:*13, 15, 22* 128:*6, 18* 144:*20, 25* 145:*12* 168:*9*
**3Cs** 145:*14*
**3D** 4:*12* 127:*13, 15, 22*

**< 4 >**
**4** 4:*13* 101:*16* 106:*1, 6, 21* 108:*14, 21* 120:*7*
**40** 159:*18*
**419.885.3597** 2:*5*
**43560** 2:*4*
**45** 10:*1*
**45202** 2:*13*
**45208** 2:*8*
**48** 109:*22, 24*

**< 5 >**
**5** 4:*13* 102:*1* 106:*6* 120:*25* 121:*1, 5*
**513.362.8701** 2:*14*
**513.533.2711** 2:*8*
**515** 1:*15*
**5580** 2:*4*

**< 6 >**
**6** 4:*5* 101:*16* 122:*10* 147:*25*
**60** 159:*19*
**60s** 162:*25*
**6977** 125:*25*
**6991** 120:*8*

**< 7 >**
**7** 4:*14* 138:*12, 14* 164:*21, 22, 23* 167:*14, 18, 21* 170:*25*
**7015** 125:*25*
**71** 109:*14, 19* 110:*10, 14*
**76** 4:*9*
**77** 110:*13*

**< 8 >**
**8** 4:*14* 141:*13, 15* 147:*17, 25* 148:*1* 156:*24*

Case: 1:21-cv-00238-MRB Doc #: 66-2 Filed: 08/02/24 Page: 53 of 75 PAGEID #: 2755

Deposition of Michael McAllister     Philip R. McHugh v. Fifth Third Bancorp, et al.

**85253** 8:*5*

**8644** 8:*4*

**< 9 >**

**956** 118:*6*

**96** 6:*15*

**< A >**

**a.m** 1:*16* 5:2 59:*5, 8* 75:*21, 24*

**abbreviated** 119:*24*

**ability** 7:*17* 50:*10* 136:*4* 143:*15*

**able** 30:*20* 109:*11* 149:*1* 154:*6*

**absolutely** 72:*5* 85:*14* 112:*25* 151:*3*

**accept** 124:*21*

**accepted** 9:*11* 46:*19* 47:*14*

**access** 21:*19*

**accessed** 17:*2*

**accommodate** 78:*23*

**accomplish** 11:*1*

**accomplished** 18:*16*

**account** 46:*23* 148:*14* 158:*23* 160:*3*

**accurate** 66:*23, 24* 118:*25* 171:*10*

**accurately** 111:*23* 112:*2*

**accusation** 148:*16*

**acquire** 46:*23*

**acquisition** 166:*14* 167:*8*

**acquisitions** 131:*5* 155:*12*

**acronym** 60:*21* 61:*6*

**action** 16:*13* 156:*21* 170:*18*

**active** 148:*13*

**activity** 50:*6*

**actual** 18:*23* 70:*24* 134:*4*

**address** 8:*3* 76:*12* 134:*16*

**adoption** 148:*12*

**advocacy** 149:*16*

**advocate** 99:*3*

**affixed** 3:*13* 170:*15*

**afforded** 32:*12*

**aforesaid** 170:*6*

**afternoon** 168:7

**age** 5:*23* 82:*15, 16* 85:*22* 141:*24* 158:*23, 25* 159:*2, 10, 18* 160:*3*

**agenda** 17:*22* 18:*5* 24:*4*

**aggregating** 165:*22*

**aggregation** 165:*19*

**aggressive** 149:*2*

**ago** 10:*7* 107:*7, 8* 114:*9*

**agree** 36:*23* 106:*22, 23* 124:*7* 137:*4*

**agreement** 5:*19* 8:*14* 9:*10* 10:*19, 20, 25* 11:*4, 6*

**agreements** 10:*15*

**ahead** 30:*22* 32:*17* 35:*10* 104:*25* 105:*19* 127:*10* 151:*22*

**air** 52:*12* 100:*24*

**al** 1:*8* 5:*7* 171:*4*

**allow** 12:*16* 44:*21* 104:*9*

**allows** 159:*18*

**alternative** 153:*6, 12*

**amended** 37:*19*

**amount** 46:*23* 60:*10* 85:*15*

**analysis** 56:*6* 93:*5* 136:*9, 10* 164:*14*

**and/or** 82:*25* 171:*11*

**Anderson** 157:*5*

**anger** 40:*12*

**angry** 29:*16* 36:*22* 40:*4, 8* 63:*13* 64:*18, 19* 65:*4*

**Animal** 67:*7*

**announced** 29:*16* 34:*22* 142:*9*

**announcement** 31:*10* 32:*22* 33:*1, 3, 8, 21, 24* 34:*5, 8, 12, 13, 25* 35:*1, 15* 36:*14, 22* 38:*11* 64:*13*

**annual** 17:*24* 28:*6, 10* 70:*16* 86:*7* 88:*4* 152:*18*

**answer** 7:*11, 12, 15, 16, 21, 24* 9:*7* 12:*20* 14:*17* 15:*4, 10* 35:*12* 38:*14, 21* 44:*21* 47:*2* 49:*23* 50:*16, 20* 51:*23* 69:*18* 71:*20, 24* 72:*4* 73:*8* 77:*24* 86:*6* 90:*22* 92:*2* 101:*16* 104:*9* 111:*16* 114:*8, 10* 117:*2* 126:*7* 129:*19* 130:*15* 132:*2* 134:*21* 137:*8* 156:*17* 162:*10* 168:*13*

**answered** 27:*19* 48:*25* 73:*14* 114:*9*

**answers** 101:*25* 118:*7* 126:*21*

**anybody** 41:*9* 58:*22* 61:*18* 71:*9* 72:*8* 87:*20* 93:*24* 97:*19* 99:*2*

**anyway** 66:*12*

**Apart** 15:*19* 28:*18* 106:*19*

**apologize** 125:*5*

**appear** 84:*19*

**APPEARANCES** 2:*1*

**appeared** 13:*22* 56:*12*

**appears** 47:*4* 77:*8* 83:*11* 128:*9*

**applicable** 152:*19*

**application** 160:*12*

**applied** 48:*2*

**appoint** 121:*10* 124:*3* 126:*9, 16*

**appointment** 160:*22*

**appreciate** 122:*4* 133:*2*

**approach** 77:*17* 149:*17*

**appropriate** 45:*2* 52:*21* 93:*18*

**approval** 19:*16* 26:*23* 59:*16, 17*

**approve** 20:*3* 22:*13*

**approved** 16:*24* 21:*15*

**approves** 26:*3, 8*

**approximately** 149:*17*

**area** 46:*13* 59:*11*

**areas** 56:*2, 3* 166:*20* 167:*3*

**argue** 47:*10* 95:*8* 99:*21* 169:*4, 7*

**argument** 36:*2*

**argumentative** 169:*2*

**Arizona** 8:*5* 39:*13, 18*

**array** 70:*4*

**articulate** 156:*4*

**A's** 143:*21*

**asked** 14:*19* 30:*18* 31:*23* 38:*12* 43:*1* 48:*24* 62:*8* 71:*24* 73:*14* 77:*19* 104:*11* 111:*15* 117:*24* 119:*22* 124:*1, 18* 126:*6, 8* 137:*19* 163:*14*

**asking** 19:*5* 21:*8, 9, 22* 31:*16* 33:*5, 18* 34:*1* 35:*21* 44:*16* 77:*20* 86:*15, 22* 102:*17* 116:*15* 117:*20, 23* 118:*3* 119:*18* 124:*20* 133:*2, 5* 145:*17*

**asks** 22:*25*

**aspect** 149:*25* 151:*9*

**assertion** 40:*4* 137:*9*

**asserts** 102:*1*

**assess** 98:*18*

**assessment** 89:*19* 97:*24* 105:*23* 119:*22, 25* 128:*9* 155:*18* 157:*20*

**assessments** 90:*6*

**assignment** 63:*25*

**assignments** 66:*17*

**assist** 22:*22*

**assistance** 26:*24*

**assisted** 18:*4*

**associated** 131:*18*

**association** 40:*7*

**assume** 11:*3* 144:*15*

Case: 1:21-cv-00238-MRB Doc #: 66-2 Filed: 08/02/24 Page: 54 of 75 PAGEID #: 2756

Deposition of Michael McAllister        Philip R. McHugh v. Fifth Third Bancorp, et al.

**Assumes** 83:*21*
130:*14*

**assuming** 34:*12*
111:*19*

**assumption** 9:*8*

**AT&T** 46:*4, 11* 67:*4*

**ATM's** 148:*14*

**attached** 77:8
103:*23* 124:5

**attempt** 134:*12*

**attended** 16:*17* 19:*1*

**attending** 96:22

**attention** 76:7 82:5
101:*15* 120:7 143:*24*
147:*23* 148:2 152:*3*
159:*9*

**attorney** 170:*16*

**attractive** 155:22

**attributes** 130:*3*

**Audit** 24:*24* 25:*9, 20*

**auditor** 25:6

**August** 138:*19*

**authentic** 111:*20*

**authenticate** 111:*20*

**authority** 41:7 49:2
104:5

**available** 25:*24*

**Avenue** 2:7

**AvidXchange** 155:*14*

**avoid** 162:*15*

**awards** 111:*12*

**aware** 33:*24* 36:*17*
56:*23* 66:7 67:9
90:5 92:*10* 97:7
106:*11* 112:*17* 160:*5,
10, 11* 163:*20* 166:*19*
167:*3*

**awful** 130:*23*

**< B >**

**back** 11:7 15:22
16:*1, 11* 20:*19* 25:9
29:6 33:*11* 35:*14*
40:*24* 41:*15* 46:*16*
48:*10* 54:9 59:9
65:6 75:25 80:22, *24*
89:*20* 100:5 110:*3*
119:*20* 120:5 123:*11,
23* 139:*25* 144:*25*

145:*11* 151:4 152:2,
*3*

**background** 70:*3*
85:6 115:*25* 130:22
141:*21* 149:5

**backwards** 33:*16*
115:*12* 116:*1*

**bad** 39:*1* 85:*3*

**balance** 56:*3* 143:*18*

**balanced** 131:*4*

**BANCORP** 1:7, *15*
2:*16* 5:7 126:*12*
150:6 171:*4*

**Bank** 5:*21* 9:4
10:*16, 17* 11:22 12:7
13:7 18:4 24:*18*
27:6 29:2 30:2, *6*
31:*14* 32:*19* 34:9, *24*
35:*1* 36:*10, 17* 37:5,
*17, 20* 38:5, *8, 15, 17,
23* 40:*11, 17* 41:5, *20*
42:*3, 6, 9, 10, 14, 21,
22* 44:*11* 45:2, *3, 5,
11* 46:*20, 24* 47:9, *13,
19* 48:5, *7, 16* 50:7,
*13, 23* 51:*18, 22*
53:*10, 25* 54:25
55:*11, 24* 59:22, *25*
66:2 69:*24* 71:*10, 15*
97:*16, 20* 104:6, 7
106:9 108:4 109:*20*
110:*21* 115:*1* 120:*17*
121:*11* 126:7, 8
131:*1* 132:*19* 135:8
149:22 150:6, *8, 15*
151:5, *10* 161:5, *10*
163:*11* 165:*3, 4, 17,
21, 25* 166:*21*

**banker** 41:*3* 48:*23*
49:*14*

**banking** 40:*23* 41:*16*
47:*21* 48:*11, 15*
115:*16* 120:*19* 131:6,
*10* 153:*1, 5, 8, 25*
155:*19, 20*

**banks** 45:*4, 6* 149:*1*
153:*17*

**bank's** 106:9 123:*21*

**barring** 52:*13* 89:*15*

**base** 26:*10, 12*

**based** 40:*21* 52:6
58:*25* 82:*14* 93:5
101:*18* 117:4 131:*18,
24* 139:*16* 140:22
142:*25* 150:*19*
156:*12* 157:*20* 158:*1*
168:*1*

**bases** 98:*13*

**basically** 16:22, *24*
24:4 62:*23* 63:*20*
68:*23* 86:7 141:5
144:22 146:*17* 151:8
159:*10* 165:*19*

**basis** 124:2 126:*9*

**Bates** 80:*18* 104:2
105:5 110:*13* 117:*14*
148:*3* 152:*4*

**BBT** 150:7, *12*

**Beaudin** 57:8 96:*25*
97:8 122:*18, 20*
128:*10, 11* 129:*1*
134:*12*

**becoming** 34:*13*
50:22 54:*25* 55:*24*

**began** 138:6 139:*17*
140:*23* 148:*10*

**beginning** 77:*21*
144:*11* 147:*21*

**begins** 80:6 105:6

**behalf** 2:2, *9* 5:*17*
93:*13* 104:6, 7

**behavior** 132:*18*

**behaviors** 128:*24*
129:*3*

**believe** 38:*10* 49:*11*
56:*19* 82:2 131:*9*
144:6 168:8

**believed** 52:*21* 145:*1*

**beneath** 117:*11*

**benefit** 80:*16*

**benefits** 60:2

**best** 7:*17* 52:8
58:*13* 72:20 114:*23*
119:*16* 129:*15* 138:7
139:*18* 140:6 146:*13*
147:2, *3* 150:*18*
163:*15*

**better** 11:*18* 52:7
53:*19* 60:22 112:*16*

116:*3* 130:*20* 131:*10,
14*

**beyond** 44:*14* 46:*25*
48:*17* 49:6 64:*10*
72:8 84:*17, 18*
116:*23* 164:*14*

**big** 88:2 149:*1*
167:8, *12*

**biggest** 45:*4*

**binder** 13:*25*

**bird** 95:*13*

**bit** 25:*15* 40:*19*
63:*16* 65:*10, 13*

**Black** 12:*14*

**Blank** 2:*12* 5:*16*

**board** 11:22, *24*
18:*24* 19:*1, 15, 16, 19,
22, 24* 20:7, *8, 10, 18,
22* 21:*4, 11, 13* 22:9,
*12, 15, 17, 24* 23:9, *11,
15, 23, 24* 24:8, *14*
26:*3, 8, 13, 14, 23*
27:*10, 20, 21, 22* 28:7,
*19, 24, 25* 30:*10, 12,
24* 32:20 35:*3* 36:*11,
18* 41:20 43:7 44:*23*
45:*16, 17* 47:*19* 48:8,
*12* 51:9 52:6, *20*
53:*24* 54:2, *4, 20, 21*
56:8 58:8 59:*13, 16,
17* 61:*13* 62:*19, 23*
63:8, *9* 66:*14* 67:*3*
68:*11, 20* 70:9, *22*
71:6 73:*13, 17* 74:5,
*11, 13, 16, 23* 76:*10*
77:9, *10* 79:*11, 20*
80:*4* 81:4, *7, 15* 82:7,
*21* 83:*4, 13* 84:6, *24*
85:*10, 12* 86:*1* 87:2
88:*1, 9* 89:9, *18, 22,
25* 90:9, *14, 20* 91:*16,
17* 92:*11, 16* 93:8, *11,
13* 94:3 95:2, *4, 8*
96:*16* 97:*10* 98:*1, 4*
99:*2, 3, 7* 100:*12, 23*
101:2 105:8, *13*
106:*13, 14* 107:*14, 15,
21* 112:*19* 113:*24*
116:*13, 16, 18* 119:8,
*13, 18, 22, 25* 121:*10*

Case: 1:21-cv-00238-MRB Doc #: 66-2 Filed: 08/02/24 Page: 55 of 75 PAGEID #: 2757

Deposition of Michael McAllister　　　　　　　　　　　　　Philip R. McHugh v. Fifth Third Bancorp, et al.

126:*18* 129:*20*
130:*25* 131:*13*, *23*
132:*7* 133:*12*, *23*
134:*2* 135:*9*, *10*, *17*,
*21*, *24* 136:*3* 138:*6*
139:*17*, *24* 140:*4*, *11*,
*16*, *20*, *23* 141:*1*, *3*
142:*9*, *15* 144:*3*, *8*, *20*
145:*4* 146:*12*, *14*, *22*
147:*7*, *11*, *18*, *21*, *24*
148:*24* 150:*9*, *23*
151:*7*, *13* 152:*6*
156:*7*, *14* 157:*8*, *12*,
*20* 158:*3*, *14*, *22*
160:*1*, *6* 162:*4*, *15*
167:*17* 168:*20*, *23*
**boards** 53:*18*
**board's** 69:*3*, *7* 91:*3*
116:*2* 129:*22* 149:*23*
**boat** 97:*22*
**Bob** 37:*9* 76:*9*, *22*
**Bodan** 58:*2*
**Bodan's** 58:*25*
**bonus** 111:*11*
**book** 161:*22*
**bother** 136:*21* 162:*3*
**bothered** 162:*18*
**bottom** 148:*4* 156:*24*
**bought** 48:*3*
**box** 161:*18*
**boy** 42:*16*
**branch** 150:*12*
**breadth** 68:*13*
148:*23* 149:*9*
**break** 55:*21* 59:*4*
**Brian** 2:*16* 5:*20*
12:*7* 13:*3* 75:*17*
163:*23*
**brief** 10:*22* 13:*16*, *17*
37:*3* 59:*7* 75:*23*
100:*3* 123:*9* 151:*25*
**briefly** 6:*16* 7:*6*
110:*24*
**bright** 70:*2*
**bring** 68:*8* 81:*21*
143:*16*
**bringing** 142:*15*
159:*11*
**brings** 163:*4*
**broad** 70:*4* 106:*15*

**broad-based** 131:*20*
156:*2* 157:*13*
**broader** 51:*11*
114:*22*
**broadly** 49:*23* 51:*11*
**brought** 48:*10* 68:*10*
70:*3* 158:*25* 166:*13*
**Bruce** 1:*16*
**bucks** 166:*6*
**bugs** 166:*5*, *8*, *9*
**building** 23:*14*, *15*
143:*9* 144:*18*
**built** 149:*16*
**bullet** 139:*6*
**bullets** 139:*3*
**bunch** 143:*21*
**bus** 53:*17*
**business** 40:*16* 47:*22*
55:*5* 120:*18* 133:*8*
141:*25* 142:*2*, *3*, *5*
145:*20* 146:*21*
147:*20* 149:*3*, *25*
156:*14* 157:*10*, *14*, *16*,
*18*, *19*, *21* 158:*4*, *15*,
*21* 160:*2*, *22* 161:*6*
168:*24*
**businesses** 68:*14*
114:*15*

**< C >**
**call** 9:*15*, *16*, *21*, *24*
18:*18*, *22* 19:*11*, *14*
27:*15* 66:*25* 68:*17*
151:*19* 157:*25*
**called** 3:*4* 61:*3* 80:*7*,
*18* 105:*3* 117:*12*
128:*8* 142:*22* 164:*19*
**Calls** 9:*5* 162:*7*
**candidate** 53:*9*
56:*25* 68:*24* 72:*6*
88:*8* 91:*8* 92:*14*, *17*,
*20* 94:*6*, *8*, *13* 99:*13*
107:*17* 112:*23*
113:*17*, *22* 122:*21*, *23*
136:*15*, *16* 137:*21*
138:*8* 139:*19* 140:*6*
146:*14* 147:*2* 163:*15*,
*16*, *17* 165:*12*
**candidates** 54:*7*, *14*,
*18* 55:*10* 56:*2*, *16*, *21*,

*22* 71:*14*, *16* 72:*25*
73:*5* 84:*11*, *14* 86:*10*,
*23* 87:*16* 92:*7*, *12*
165:*8*
**capabilities** 132:*19*
148:*18*
**capital** 59:*14* 60:*23*
74:*16* 77:*2* 153:*7*, *16*
155:*14*
**caption** 138:*25* 171:*3*
**captioned** 171:*8*
**cards** 84:*20* 91:*22*
**care** 73:*18*
**career** 151:*2* 160:*22*
**Carmichael** 19:*22*
28:*19* 30:*6* 36:*12*, *18*,
*20* 37:*7*, *20*, *23* 46:*8*,
*9* 52:*17*, *24* 53:*4*, *8*,
*23* 58:*20* 63:*12*, *18*
66:*5* 73:*4* 74:*6* 77:*2*
86:*11*, *25* 87:*17*
89:*13* 90:*16* 91:*14*,
*21* 92:*8*, *24* 95:*5*
96:*19* 97:*18* 113:*18*
126:*15* 148:*8* 150:*7*,
*10* 152:*14* 162:*6*
**Carmichael's** 40:*4*
58:*24* 67:*10* 94:*21*
**carried** 157:*13*
**CASE** 1:*6* 5:*3*, *7*
31:*17* 48:*19* 63:*1*
101:*13* 115:*16* 145:*8*
147:*19* 161:*23*
163:*13* 171:*3*
**cases** 18:*22* 157:*18*
160:*24*
**cast** 57:*15*
**catastrophe** 72:*13*
**cats** 143:*22*
**cause** 15:*6*
**Cavett** 46:*8*
**centered** 29:*8*
**central** 128:*24*
**CEO** 40:*21* 45:*25*
46:*10* 51:*12* 52:*22*
53:*16*, *19* 59:*13*, *22*
60:*3*, *4*, *9* 66:*9*, *12*
67:*19* 68:*3*, *8*, *18*
69:*14*, *23* 70:*21*
74:*10* 79:*7* 83:*20*

84:*7* 95:*8*, *9* 98:*15*
114:*23* 128:*23*
129:*17* 131:*3* 139:*9*,
*18* 140:*1*, *6* 141:*3*, *22*,
*23* 142:*1*, *6*, *14* 143:*2*
146:*14* 156:*15*
158:*16* 159:*11* 160:*8*,
*23* 162:*18*, *22*
**CEO's** 142:*19*
**certain** 17:*25* 46:*23*
47:*5* 82:*4* 94:*19*
137:*8* 148:*18*
**Certainly** 163:*11*, *18*
**certified** 5:*24*
**certify** 170:*5*
**CFO** 151:*17*
**chair** 24:*21* 25:*4*
**chaired** 19:*2*
**chairman** 17:*21*
25:*12* 30:*10* 46:*9*
61:*24* 62:*3* 142:*7*
**challenged** 135:*22*
**champion** 99:*2*
**chance** 68:*11* 156:*21*
**change** 7:*21* 29:*15*
30:*24* 32:*22* 35:*4*
52:*11* 53:*20* 68:*5*
172:*4*, *7*, *10*, *13*, *16*, *19*,
*22* 173:*4*, *7*, *10*, *13*, *16*,
*19*, *22*
**changed** 54:*16*
**changes** 18:*1* 23:*1*
26:*5*, *21* 68:*1* 154:*19*,
*21* 171:*11*, *14*
**changing** 149:*1*
**channel** 148:*12*
**channels** 148:*22*
**characteristics** 114:*3*
145:*19*
**characterization**
129:*8*, *10*
**characterize** 65:*4*
150:*19* 167:*10*
**characterized** 130:*17*
165:*11*
**characterizing** 116:*1*
**charitable** 43:*24*
**Charlie** 26:*25*
**chart** 112:*12*

charter 152:*21*
chat 71:*4*
chats 90:*15*
check 161:*18*
chief 30:*10* 162:*16*
children 8:*10*
choice 52:7 56:*4*
choices 145:*5*
choose 35:*22*
chosen 116:*14*
Cincinnati 1:*15* 2:*8,
13* 17:9 39:*13, 15*
41:9 81:*24* 170:*20*
Cioffi 2:*9* 4:*5, 6*
5:*16* 7:*1* 8:*13* 9:*5*
10:*3, 13, 16, 24* 11:7
12:2, *15, 21, 23* 13:*7,
8* 14:*16, 24* 15:*3, 11,
15* 16:*3* 21:*6* 25:*23*
27:*18* 30:*15, 21*
31:*18, 22, 25* 32:*4, 13,
16* 33:*10* 34:*10, 18*
35:*17, 23* 38:*4, 7, 12,
20* 41:*22* 43:*15, 17,
20* 44:*13, 17, 20*
46:*25* 48:*17, 24* 49:*6,
20* 50:*15* 55:*19*
65:*16, 22* 71:*18* 73:*6,
14* 74:*15* 75:*3, 8, 15,
20* 77:*18* 78:*4, 8, 13,
15, 21* 79:*8, 15* 80:*16,
22* 83:*21* 84:*1* 86:*12,
18* 87:*1, 5, 8, 10*
88:*22* 90:*21* 100:*14*
101:*12* 102:*15* 103:*9,
12, 17* 104:*3, 15, 21,
25* 105:*16* 107:*9*
110:*1, 5* 111:2, *5, 14,
19* 112:*6* 113:*1*
114:*5* 116:*25* 117:*13,
18* 118:*1, 9, 15, 19, 22,
24* 121:*12, 23* 122:*4*
123:*4, 6, 18, 23* 124:*8,
13, 20, 24* 125:*3*
127:*5, 23, 25* 129:7
130:*14* 131:*25*
133:*13* 135:*14*
136:*21* 137:*1, 11, 15,
18* 138:*2, 10* 140:*9,
12* 141:*12* 151:*21*

160:*15* 162:7 163:*20*
164:*18, 22* 165:*10*
166:*22* 167:*13, 18, 22*
168:*17, 19* 169:*4, 9*
circumstances 31:*15*
38:*18*
City 42:*3, 5, 9, 14*
46:*20, 24* 47:*9, 13, 22*
City's 47:*18*
civic 41:*1*
Civil 1:*14* 3:6
claim 13:*10* 44:*18*
claims 28:*20* 29:*1, 3*
48:*19*
clarified 94:*25*
clarify 7:*19* 27:*23,
25* 30:*17* 123:*13*
140:*12*
clarity 16:*4* 21:7
clean 7:*5, 25*
clear 23:*1* 70:*5*
75:9 156:*22* 160:*25*
Clearly 49:*1* 52:*5*
74:7
client 122:*6* 165:*22*
close 134:*5*
closely 68:*19*
coach 104:*17*
co-counsel 5:*14*
Cogo 155:*13*
collecting 74:*1*
collection 147:*21*
collective 58:*15* 93:8
98:*1*
collectively 131:*13*
combination 74:*9*
combined 62:*18*
come 32:*14* 43:*18*
53:*13* 68:*3* 73:*4*
81:*18* 83:*16* 118:*19*
119:*23* 131:*16*
133:*10* 141:*10*
144:*23* 146:*22*
147:*14* 148:*18*
comes 26:*7, 22* 95:*3*
130:*23* 159:*10*
165:*17*
comfortable 54:*5*
68:*23* 95:*19* 110:*10*

coming 40:*16* 56:*12*
75:*16* 89:*20* 114:*14*
command 149:*24*
commence 69:*9*
comment 37:*9, 12*
commented 150:*11*
comments 16:*13*
58:*19, 21, 24, 25*
135:*20*
commission 27:7
56:7 170:*24*
commissioned 170:*4*
commissioner 54:*19*
commitment 66:*7, 13*
95:*18*
committee 14:*23*
16:*14* 17:2 19:*3*
20:*6, 13* 21:*5* 22:*3*
25:*7, 9, 10, 13* 27:*7,
11, 14, 17, 19* 28:*4*
54:*19, 21* 56:7 59:*14,
15* 60:*24* 61:*3, 5, 10,
18, 21, 24* 62:*3, 4, 9*
63:*3* 83:*10* 97:*8*
107:*25*
committee/HCC
62:*20*
committees 24:*23, 25*
common 90:2
communicate 68:*12*
135:*18*
communicated 64:*3*
communicating 7:*5*
communication 18:*17*
38:*8* 64:*8* 66:*8* 73:*3*
89:*24* 96:*19* 155:*25*
communications 30:*8*
37:*23* 38:*6, 16* 57:*8*
90:*6* 98:*25*
community 41:*1*
comp 61:*3, 5, 10, 18,
21, 24* 62:*9, 20* 63:*3*
comp/HCC 62:*18*
companies 51:*4*
148:*25* 153:*17* 154:*5*
159:*14*
Company 2:7 6:*22,
24* 29:*16* 41:*16* 43:9
47:*11* 54:9 67:*6*
96:*20* 98:*17* 109:*3, 4*

111:*22* 115:2, *15*
141:*24* 142:*1, 3*
143:*12* 154:*18, 22*
163:*1* 166:*13*
comparative 56:*6, 15*
165:*8*
compare 132:*21*
Compared 114:*6*
comparing 56:*1*
130:*12*
comparison 56:*10, 15*
131:2 147:*3*
compel 15:*17*
compensated 25:*12*
59:*24* 60:*15*
compensation 26:2, *4,
11, 12* 59:*13* 60:*24*
62:*3* 97:*8* 107:*24*
109:*5, 8* 110:*19, 20*
111:*11, 13, 17* 112:*14*
competencies 39:*6*
competency 50:*4*
140:*2*
competent 49:*13, 17*
competitive 152:*25*
153:*4, 16* 154:*14*
competitively 115:*18*
complaint 37:*19*
44:*20*
complete 22:*11*
completed 21:*13*
completely 7:*12*
component 58:*3*
components 112:*13*
conclude 11:*24*
concluded 16:*18*
20:*18* 28:*16* 155:*17*
169:*15*
conclusion 9:*6* 24:*13*
95:*3* 115:7 141:*10*
146:*22* 147:*1, 2*
conclusions 155:7
conduct 40:*3, 11*
conference 9:*15, 16,
21, 24* 10:*10, 12*
18:*22* 19:*11, 14*
confidential 147:*20*
confirm 37:*4* 77:*20*
102:*12*

**confronted** 148:24
**confuse** 35:24 127:5
**confused** 65:10 90:22
**confusing** 30:17
34:11 35:18 50:16
65:17
**confusion** 50:19
**connection** 27:5
101:12, 13
**consensus** 51:9
52:12 92:13 94:17
99:5, 13 113:2, 8
137:24 138:7 139:18,
24 140:4, 22, 23
144:11, 17, 21 146:13
147:7 150:23 158:3
**consent** 100:20
**consider** 41:2 48:22
83:1 85:12 99:6
130:11 159:18 163:5
**consideration** 54:6,
24 56:13 96:6, 10, 11
113:16, 19 115:20
**considered** 53:9
54:20 55:9 69:15, 23
70:1 83:4 85:14
87:16 88:9 92:19
96:14 106:23 113:22
116:16 122:24
126:11 160:7, 13
162:22 167:16
**considering** 52:7
83:14
**considers** 74:24
**consistent** 9:3 29:9
74:20
**consolidated** 107:16
**constant** 90:3
**constantly** 92:1
**constitute** 60:23
**consultant** 56:24
122:24 134:18
158:18
**consultant's** 158:19
**consulted** 27:8
**consulting** 93:4
**consumer** 120:17
**contact** 18:3 96:25
97:5, 7, 9
**contained** 20:5 86:4

**Contemporaneous**
15:23 99:18
**content** 14:8
**contents** 109:21
**context** 28:24, 25
63:9 64:7 65:13, 15
90:23 152:10, 15
**continue** 42:24
63:24 138:11
**continued** 30:2
89:16 96:20
**continuing** 156:23
**controller** 42:8
**convention** 22:4
**conversation** 39:15
48:13 63:17 93:3
141:6
**conversations** 29:18
31:4 38:3, 13, 15
39:4 55:2 90:25
158:11
**conversion** 18:13
152:20
**COO** 142:12
**copies** 81:22
**copy** 11:3 109:14
121:25 122:1
**corner** 104:1 108:9
**corporate** 67:10
69:8 74:3
**corporation** 145:3, 4
**Correct** 13:5, 15
21:21 23:22 24:20
25:5 26:9 40:18
41:21 42:4, 23 60:16
66:15 74:25 80:5
82:19 90:23 101:4
102:21 108:1 112:11
126:17, 19, 22 135:25
139:12, 13 142:20, 21
144:3, 7 147:4, 9
158:6 159:19 164:7
**corrections** 171:11
**correctly** 61:9 63:11
**co-trial** 5:12
**counsel** 3:2 5:8, 12
10:16 13:12, 14
14:17 31:18 38:5, 8,
15, 17, 18 121:25

170:17
**counter** 37:4
**COUNTY** 170:2
**couple** 12:3 18:9
34:3 46:18 59:11
72:1 85:11 104:12
140:25 142:10
145:16 148:6 160:19
**course** 55:1, 5 67:14
68:18 84:12 157:7
**COURT** 1:1 3:9
5:4 37:16 80:24
117:22 122:1 141:14
**courtesy** 7:4 30:19
32:12 102:18 122:5
136:22, 25
**covid** 133:24
**created** 152:21
**credentials** 39:6
**credit** 114:24
**crisis** 153:6
**criteria** 51:11
126:10 129:25 130:1,
2 131:17, 22 167:14
**critical** 90:4 115:4
149:23
**criticality** 88:3
**Cross-Examination**
1:13 3:5 4:5 6:1
**crystalize** 99:10
**cue** 108:8
**currency** 42:8
**current** 9:3 155:17
**customarily** 18:17
20:7
**customary** 98:24
145:2 151:16
**customer** 40:24 41:5
**customers** 148:13
**cut** 96:3
**cyber** 148:17

**< D >**
**da** 141:8 156:10
**Dade** 155:15
**Daily** 10:6
**dance** 130:23
**data** 134:11, 16
**date** 22:17 23:8
65:18 69:25 107:18

113:5 138:20 147:24
152:6 171:2
**dated** 128:9 164:19
**dates** 34:3 65:17
**dating** 128:19
**day** 23:9, 11 58:21
67:17 93:9 134:25
158:1 161:1 170:21
171:16
**deadline** 69:4 80:12
97:24 98:3
**deal** 19:17 27:19
143:18
**dealing** 41:8 80:1
143:8, 17
**dealt** 18:8 41:10
45:4
**debate** 121:16
**December** 1:16 5:1
28:12 42:15 70:22
74:19 77:6, 9 89:8
90:20 91:16 92:7
94:14 97:13, 23
107:14 112:19
113:17 138:23
170:21 171:2
**decide** 12:19 26:2
85:2
**decided** 22:7 23:19
**deciding** 144:17
**decision** 35:3 44:11
52:6 57:16 66:14
72:16 79:11 82:21
85:19 87:2 89:4
101:2, 3 106:11, 13
116:17 121:14, 16
124:2 126:9, 18
167:17
**decisions** 89:6, 9
136:1
**deck** 27:15 28:2
**DECLARATION**
171:5
**declare** 171:6
**declared** 113:14
**deep** 131:5 156:4
**Defendant** 2:9
**Defendants** 1:9 5:7,
17, 18

Case: 1:21-cv-00238-MRB Doc #: 66-2 Filed: 08/02/24 Page: 58 of 75 PAGEID #: 2760

Deposition of Michael McAllister                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

**Defendant's** 4:*14*
124:2 138:*12*
**defensive** 135:*21*
**deficiencies** 51:*16, 20*
**definitely** 163:5
**delay** 95:5 104:*19*
**delete** 147:*20*
**delivered** 20:*17*
**demonstrated** 40:*12*
140:5
**departing** 97:*16*
**department** 22:25
23:25 24:*12, 16*
**departure** 29:*23*
38:*19* 49:*19* 67:*11*
69:5
**depending** 85:*15*
**depends** 162:*17*
163:*1*
**depose** 170:7
**deposed** 7:*15* 122:6
**deposition** 1:*11* 3:3,
*8, 11* 5:3 6:5 71:*19*
74:*15* 75:4, *12*
100:*15* 136:*19* 137:*3*
169:*15* 170:6, *9, 11,
13* 171:*1, 8, 12* 172:*1*
173:*1*
**depository** 46:*23*
**deposits** 148:*14*
**depth** 89:*23*
**describe** 12:*12* 60:22
110:2*4* 111:8 128:25
141:*21* 148:*23*
**described** 64:*10*
79:*1* 81:*19* 155:2
158:5
**designed** 110:25
**detailed** 154:25
**details** 153:*11*
**determination** 131:*23*
132:7 134:*9* 157:22
158:*4, 19* 168:*24*
**determinative** 115:*11*
**determine** 49:*4* 84:6
85:7 92:*16*
**detriment** 50:*12*
**develop** 135:*17*
144:*11*

**developed** 94:*17*
129:*20* 137:*24* 144:2,
*8, 10* 158:*13*
**developing** 94:25
128:22 136:5 139:*17*
140:*23* 146:*13*
164:*15*
**Development** 105:*24*
128:*9*
**develops** 67:25
**dictates** 60:*10*
**difference** 6:*19* 143:*1*
**different** 33:5 47:25
53:7 64:*20* 73:*19*
85:*15* 119:*3, 12*
143:*8, 10, 13, 23*
145:*17*
**differentiator** 155:*21*
**differently** 73:*20*
**difficult** 7:*23* 58:*11*
**difficulty** 15:6
**digit** 149:*16*
**digital** 18:*20* 148:*10,
12, 22* 149:*13, 18, 21*
**digits** 118:*18*
**diligence** 50:6 58:*14*
**Diligent** 17:7 18:*19,
20* 19:*10* 21:*19, 21*
**dinner** 39:7, *11, 22*
**Direct** 4:5 76:7
78:8 96:25 97:5
101:*15* 137:*17*
143:*24* 147:*23*
150:*10*
**Directing** 82:5 120:6
152:*3*
**direction** 130:*8, 21*
145:*23*
**directly** 41:4, *8* 49:*1*
57:*9* 62:*11, 12* 97:6
135:*18*
**director** 24:*18* 25:*16*
26:2, *3* 42:2, *14, 24*
43:*3* 46:*20* 47:5
**Directors** 74:*16* 77:*9*
98:*23* 112:*19*
**disabling** 55:*23, 25*
114:*3*
**disagreement** 61:*17*

**disappointed** 64:*23*
**discharge** 49:*13, 17*
**discovery** 41:25
44:*14* 47:*1* 48:*18*
49:7 136:*20*
**discriminate** 158:22
160:2
**discuss** 123:*18*
140:*16*
**discussed** 30:*13, 14,
24* 32:6 89:*21* 150:8
153:*4, 20* 167:*15*
**discussion** 29:*1, 4*
31:7, *8* 55:7 74:*13*
84:25 87:22 89:*17*
91:7, *12* 97:*12* 102:6
127:*11* 150:6 155:*1,
6, 18* 156:6, *9* 164:*16*
168:6
**discussions** 29:25
30:5, *8* 71:*3* 91:20
98:5, *21* 135:*10, 16,
20, 24* 136:*3* 140:*19*
156:*13*
**dishonest** 49:*11*
**disputes** 136:*20*
**disqualified** 114:*4*
**disqualify** 52:*3, 5*
**distinction** 18:25
**DISTRICT** 1:*1, 2*
5:4, 5 15:8 121:*24*
**divided** 59:*23*
**DIVISION** 1:*3* 5:5
143:7, *11, 19*
**divisional** 142:*4*
**document** 8:*17, 20,
24* 32:*10* 35:*19, 20*
71:*20* 74:*14* 77:*1, 10,
23* 78:2, 25 79:5, *10,
16, 17* 80:*4* 83:*23, 25*
87:*24* 102:*10* 105:2,
*8* 108:*11, 23* 109:*3*
110:6, *13, 16* 111:2,
*20* 112:*1* 117:2
118:6, *21* 120:7, *8*
121:6, *9, 13* 122:*11*
125:8, *14, 18, 24*
128:8 129:*9, 22*
130:*4* 132:*14* 138:*15,
17, 20, 24, 25* 139:*16*

144:2, *14, 20* 145:*20*
156:*23* 159:8 163:*24*
164:5
**documents** 9:22
13:*18, 21, 24* 14:*4, 8,
11, 13, 19* 16:*19* 17:*3*
18:*20* 21:7 71:*4*
89:*24* 92:*3* 100:*15*
101:*20* 102:*12* 103:*8,
22, 24* 106:*3, 5, 10, 12,
16* 108:2 117:*4, 5*
123:22 124:*4, 18*
126:2, *20* 127:*4*
166:*18* 167:*15*
**doing** 48:*11* 51:8
62:*19* 85:*4* 88:*3*
92:24 99:*16* 102:*16*
104:*19* 147:*9* 157:*16,
19*
**dollar** 60:*10*
**dominate** 154:7
**dozen** 116:7 130:*1*
**dozens** 109:5
**draft** 18:*21* 22:*12*
**drafted** 93:5, *7, 10*
**drafts** 22:25 80:*1*
88:*13*
**draw** 16:*23* 115:6
**drawn** 17:22
**drive** 154:*17*
**driving** 97:22
132:*18* 146:*1*
**due** 58:*14* 133:*23*
166:*20*
**duly** 5:*23* 170:*4, 7*
**duties** 26:*1* 45:*11*
**dynamics** 153:5

**< E >**
**earlier** 8:*13* 62:*16*
71:*1* 88:*13* 96:*24*
98:*10* 106:*17, 20*
130:*1* 137:*23* 138:5
144:6 157:*25* 158:*9*
159:8
**early** 40:*24* 54:*11*
70:*1, 7* 99:*12* 140:5
**easier** 61:*23*
**easily** 103:*25*
**East** 1:*15* 2:*12*

**easy** 75:6 78:1
  127:1
**economic** 152:25
**educate** 65:12
**effect** 36:14
**efficiency** 154:18
**effort** 53:14 146:18
  154:17
**efforts** 149:14
**either** 28:18 46:14
  54:19 56:7 62:2
  75:7 90:6 94:7
  109:24 120:15
**elaborate** 63:16
**email** 9:14 76:9, 12
  160:12
**emerge** 79:2 149:1
**emerged** 99:10, 12
  113:8
**Emergencies** 151:22
**emergency** 72:11, 22
  151:20
**emphasis** 64:17
**Employee** 81:10
  82:14 135:5 170:17
**employees** 26:12
  149:18
**employment** 135:4
**enable** 134:9
**enabled** 49:4
**enablers** 155:21
**encourage** 143:15
**ended** 51:14 142:2,
  15 161:3
**endless** 143:10
**engage** 27:2 36:2
**engaged** 70:9
**engagement** 135:5
**ensure** 7:24
**enterprise** 27:17
  28:3 58:19 66:17, 20
  83:10 142:23 147:4,
  8 149:15 157:10
**entire** 8:24 58:8
  70:18 88:4 101:17
  171:7
**entitled** 5:6
**entrenched** 153:8
**EPIC** 155:14

**episode** 15:25
**equity** 47:6 60:4
**Erie** 2:7
**ERRATA** 171:1, 13
  172:1 173:1
**especially** 77:13
**Esquire** 2:3, 6, 9, 16
**essence** 101:17
**essential** 129:3
  132:18
**essentially** 73:3
**establish** 7:4 22:19
  34:3, 20 128:22
**established** 17:25
  48:7 112:23 116:19
  161:8, 13
**establishes** 97:24
**establishing** 59:12
  130:7, 21 145:23
**estimate** 6:14
**et** 1:7 5:7 171:4
**evaluate** 39:6 86:10
  94:9 96:21 145:9
  146:15 155:23
**evaluated** 56:25
**evaluating** 28:3 74:1
  83:7 129:4
**evaluation** 56:15, 16,
  20 88:21, 23 93:20
  106:17, 19 116:2
  131:12, 15
**evaluations** 27:15
  40:1 70:8 98:25
  136:4
**event** 30:1 31:5, 10
  72:12 141:4
**events** 19:6
**Eventually** 20:12
  22:8 92:23 93:3
**everybody** 21:16
  55:3 58:21 113:14
  157:14
**evidence** 83:22
  130:15 167:16
**evolution** 148:17
**evolved** 56:11
**exact** 25:8 69:25
  94:15 99:11
**exactly** 10:7 21:22
  32:21 42:18 45:7

  70:6 84:15 113:9
  144:22 156:18 163:2,
  4
**examination** 3:12
  4:5, 6 12:18 32:12
  137:17 168:18
  170:14
**examine** 127:23
**examined** 5:24
**example** 32:2 62:15
**exceeding** 132:19
**excerpt** 109:18
**exchange** 9:22 37:24
**exchanging** 18:17
**excitement** 149:16
**Excluding** 72:24
**Excuse** 45:21 137:6
  140:8 151:18
**executed** 10:16
  155:12
**execution** 132:18
  146:1
**executive** 26:22
  30:10 31:13 37:5
  45:12 49:24 55:3
  58:18 60:15 61:11
  62:6, 10 63:4, 25
  66:25 67:1 70:18
  74:16 77:3 79:21
  84:18 90:11, 12
  105:22, 23 106:2
  109:9 117:12 119:3
  120:7 128:8 138:16,
  17 142:20 143:20
  150:9 156:9 162:16,
  21 164:19 167:22
**executives** 74:4, 12
  79:5 91:1 114:13
  134:8 160:22
**exercise** 146:21
  157:21 160:2 168:23
**exercising** 51:17
**Exhibit** 4:9, 10, 11,
  12, 13, 14 75:11 76:1,
  5, 8 80:4 87:18
  91:18 95:22 99:19
  101:5, 9 102:7 103:1,
  4, 7, 9, 13, 14 106:20,
  21 108:14, 19 110:8
  111:6 117:9, 15

  118:2 120:25 121:1,
  5 122:7, 10 123:20
  125:6, 8 126:25
  127:14, 15 128:6, 18
  129:14 138:12, 14
  141:13, 15 143:24
  147:17 152:3 156:24
  164:17, 18, 21, 22, 23
  167:14, 18, 19, 21
  168:8
**exhibited** 51:17
**exhibits** 118:14
  127:23
**exist** 52:1 150:13
**existed** 47:9
**expectations** 30:1
**expected** 20:2 63:23
  64:5
**expense** 154:22
**experience** 49:3 58:9
  59:1 67:4 114:25
  132:9, 12 133:7
  141:18 142:19, 25
  143:5 145:2, 7
  150:18, 20 162:24
  165:2
**experiences** 65:11
**expert** 6:17
**expires** 170:24
**explain** 64:2, 18
  78:25 143:1
**explained** 10:24
**explanation** 31:14
  63:12 64:7, 18
**explanatory** 81:7
**exposure** 68:21
  96:23 98:14 134:8
**expressed** 92:11
**extended** 30:19
**extensive** 168:6
**extensively** 63:19
  150:9
**extra** 25:15

**< F >**
**facilitate** 109:18
**facility** 21:21
**fact** 6:17 50:2
  51:10 55:9, 16 88:3
  104:4 111:10 119:23

124:*9*  161:*3*, *8*
162:*14*  168:*8*
**factions**  152:*25*
**factor**  55:*23*  57:*18*
115:*4*
**factors**  57:*19*  116:*7*,
*16*  130:*11*  132:*8*, *15*
153:*1*
**facts**  55:*14*  83:*21*
130:*14*  163:*19*
**factual**  124:2  126:*9*
**fair**  32:*13*, *17*  55:*14*
73:5  120:*4*  144:*19*
166:5, *6*
**fairly**  14:7  168:6
**familiar**  46:*15*
144:*15*  165:*13*
**familiarity**  63:*2*
**family**  44:*4*, *5*, *6*
**far**  41:*23*  43:*20*
44:*22*  50:*12*  98:*11*
130:*25*  139:*25*
164:*11*, *15*
**fashion**  93:*16*
**fast**  70:*6*
**February**  147:*21*, *25*
149:*20*
**Federal**  1:*13*  3:*6*
42:7
**fee**  25:*16*
**feel**  33:*16*  75:6
110:*10*  114:2
**feeling**  85:*3*
**felt**  45:*1*
**field**  41:*23*  43:*21*
44:*22*
**FIFTH**  1:*7*, *14*  2:*12*,
*16*  5:*6*, *20*  9:*4*  11:*21*
18:*4*  24:*18*  27:6
29:2  30:2  38:*23*
40:*11*, *17*, *23*  41:*3*, *19*,
*20*  43:*3*  44:2, *8*, *11*
47:*4*, *12*  48:*7*, *10*, *15*
49:*14*, *18*  50:*13*, *22*
53:*10*  54:*25*  55:*11*,
*24*  59:*21*  67:*8*  69:*23*
101:*18*  102:*1*  108:*8*
109:*20*  126:*11*, *12*
142:*22*  152:*20*
163:*11*  171:*4*

**figure**  53:*15*  67:*23*
119:*21*  131:*20*
**file**  16:*11*
**filed**  37:*17*, *20*
101:*12*, *13*  111:*21*
112:*2*
**final**  19:*13*  72:*15*
105:*3*
**finality**  89:*9*
**finalizing**  144:*15*
**finally**  155:*9*, *16*
163:*21*
**Finance**  25:*1*, *7*, *10*,
*20*, *25*
**financial**  43:*7*  143:*9*
153:*6*  154:*4*  165:*20*
167:*4*
**find**  69:*7*  73:*23*
76:*13*  106:5  109:*17*
164:*6*
**finding**  129:*17*  142:*5*
159:*23*
**finish**  7:*10*, *11*  30:*20*
35:*12*
**finished**  22:*9*  110:*4*
123:*3*, *16*
**fintec**  70:*4*
**fintech**  148:*25*  154:*5*
**firm**  26:*25*  27:*2*
93:*4*  154:*6*
**firmly**  168:*8*
**First**  7:*9*  10:*2*  22:*2*
32:*18*  33:*4*  36:*16*
41:*13*  43:*3*  45:*25*
67:*9*  69:*22*  72:*11*
76:*7*  77:*13*  79:*4*, *19*
85:*21*  88:*20*  99:*10*
102:*10*  103:*14*, *23*
105:*2*  117:*11*  128:*13*
138:*15*  139:*6*  140:*14*
141:*21*  145:*20*
147:*23*  148:*6*, *11*
150:*22*  152:*12*, *13*, *22*
153:*2*, *9*, *18*  154:*2*, *8*,
*23*  155:*4*, *9*  170:*7*
**five**  13:*13*  16:*10*
45:*17*, *24*, *25*  57:*2*
60:*14*  65:*11*  68:*3*
69:*15*  82:*17*  95:*21*
107:*7*, *8*  123:*2*

159:*15*, *17*  162:*22*
163:*10*  164:*12*, *15*
**five-year**  164:*9*
**flexibility**  163:*7*, *12*
**flying**  89:*24*
**folks**  16:*23*  68:*21*
83:*16*  91:*5*
**follow**  57:*3*  59:*10*
67:*13*
**followed**  15:*7*  17:*20*
161:*13*
**following**  16:*1*, *25*
20:*24*  32:*2*  91:*21*
153:*6*  154:*10*  156:*13*
**follows**  5:*24*
**follow-up**  92:*3*
168:*17*
**foregoing**  170:*9*
**forever**  95:*9*
**form**  65:*16*  70:*24*
73:*6*  77:*18*  85:*18*
88:*22*  90:*21*, *22*
107:*9*  114:*5*  131:*25*
137:*25*  140:*4*, *14*
156:*14*  170:*12*
**formal**  28:*18*  56:*15*,
*17*  98:*6*
**formally**  91:*4*
**format**  13:*21*, *23*
17:*20*  18:*17*
**forming**  113:*3*  138:*7*
139:*24*  147:*7*  158:*21*
**Formula**  105:*3*
128:*22*  129:*2*  134:*14*
143:*25*  145:*14*
**formulaic**  70:*25*
**forth**  101:*16*  112:*17*
**forward**  63:*21*  67:*18*
87:*13*  104:*20*  115:*15*,
*20*  122:*5*  137:*20*
147:*22*
**found**  76:*16*
**foundation**  43:*14*, *24*
44:*4*, *6*, *19*  124:*9*
**foundation's**  44:*5*
**four**  16:*10*  62:*1*
83:*5*  102:*12*  106:*5*
124:*4*, *17*  126:*2*, *20*
127:*12*

**frame**  10:*5*  13:*8*
16:*4*, *6*  37:*16*  74:*20*
86:*12*  99:*17*  113:*11*
123:*23*  164:*1*, *25*
**framework**  77:*16*
80:*7*  126:*7*
**Franklin**  155:*13*
**frankly**  6:*19*  36:*24*
82:*9*  159:*21*
**front**  6:*11*  36:*5*
76:*3*, *8*  85:*2*  96:*21*
101:*8*  108:*17*  126:*3*
138:*22*, *23*  144:*14*
168:*1*
**full**  8:*2*  20:*13*  30:*24*
59:*16*, *17*  62:*19*
151:*9*
**function**  62:*24*  63:*24*
**fund**  47:*13*
**further**  79:*8*  89:*17*
91:*17*  153:*11*  160:*15*
169:*6*
**future**  39:*8*  54:*5*
115:*16*  139:*2*
**FYI**  82:*8*

< G >
**game**  90:*2*
**Gee**  89:*20*
**general**  13:*12*, *14*
14:*10*  17:*18*  45:*16*
51:*11*  98:*18*  150:*8*
**generally**  15:*7*  19:*21*
26:*21*  45:*19*  59:*21*
83:*16*  85:*9*  94:*22*
143:*20*  154:*20*
159:*21*  161:*21*
164:*14*  165:*14*
167:*25*
**generate**  22:*6*
**generated**  24:*1*
**generations**  82:*17*
**geography**  115:*18*
**getting**  31:*11*  41:*22*
73:*21*  91:*5*  93:*1*, *2*
142:*17*  156:*21*
159:*23*, *24*
**give**  8:*2*  25:*21*  32:*5*
54:*24*  99:*14*  114:*24*
121:*25*  123:*2*  126:*6*

**given** 45:2 66:16
82:22 86:13 131:1
134:11, 16 150:12
162:22 170:9
**giving** 129:9 134:25
170:6
**glass** 120:13
**Glory** 8:4
**go** 18:23 30:22
32:17 35:10, 14
41:15 46:16 51:24
52:13 54:9 65:6
68:4, 16 75:18 84:25
85:1 94:7 99:24
104:25 105:17 116:7
119:20 124:14 127:9
132:21 142:11
144:17 145:3, 4
149:12 151:21, 22
152:4 154:23 162:15
164:11
**God** 158:11
**goes** 26:23 59:16
**going** 12:15 16:6
17:25 20:15 27:24
36:1, 2 38:7, 13
40:24 44:21 48:11
50:18 51:25 52:13
53:16 55:4, 20 58:12
59:6 62:25 63:21
64:13 67:24 68:7, 25
69:16 71:1 73:20
75:10, 11, 22 76:13
78:6 79:8 85:5, 7
89:15, 20 90:25 91:4
93:2 94:19, 22, 25
95:2, 20 98:9, 15
100:2 101:7, 20
102:9, 10 103:3, 18
104:3, 9, 19 108:17
109:4, 17 111:16
115:15, 17, 19 116:20
121:20, 21 122:5
123:8, 13 125:7, 23
126:5 127:3, 5, 19
131:16 132:21, 22
136:19 142:9, 14
147:16, 22 148:14
150:3 151:4, 24

160:19 161:25 163:7,
9 169:11
**Good** 6:3, 4 14:7
51:8 83:1, 2 85:3
95:8 112:7 127:9
128:2 142:13 147:15
149:7 150:17
**gotten** 119:24
**Great** 17:1 44:2
63:10 70:2
**GreenSky** 155:14
**Greg** 28:19 30:6
66:4 67:10 86:10, 24
87:17 91:14 94:19
95:17, 23 98:12
162:6
**Greg's** 98:9
**group** 16:24 58:19
66:17, 20 129:20
156:11
**growing** 51:9 52:12
**grown** 45:3 92:13
99:6
**growth** 131:4 153:24
**guess** 40:22 54:9
64:5 106:18 166:17
**guessing** 25:22 99:15
**Guy** 57:8 96:25

< H >
**habits** 14:2
**half** 10:23 129:25
143:12
**halfway** 110:14
**HAMILTON** 170:2
**hand** 95:13 102:9
103:3 105:15 125:6
161:2 170:20
**handed** 103:11
105:16, 19 106:3
110:6 118:10, 13
121:4 122:9 167:14
**handful** 6:9
**Handing** 147:17
**handled** 73:20
**happen** 11:21 31:4
33:23 64:13 72:3
161:5
**happened** 22:14
23:2 29:6, 13 32:7

33:2, 9 39:20 47:15,
16 52:11 65:14
90:11, 13 95:7 107:2
119:14 151:10
156:18
**happening** 52:14
91:1 92:25 96:20
**happens** 51:4 70:25
141:9
**happy** 16:9 22:1
27:25 33:15 65:21,
25 75:5 102:19
129:12 132:3 165:24
**hard** 81:21 134:16
159:20 162:24
**hat** 150:24
**hate** 151:19
**HC** 77:2
**HCC** 15:20 16:1, 18
17:8, 18 19:2, 12, 14,
24 20:5, 23 22:3, 13,
16 23:5 24:13 25:4,
13 26:1, 4, 7 27:9, 22
28:1, 5, 7, 19 45:18
53:24 54:19 60:19
63:3
**HCCC** 14:23 24:21
60:17, 22 61:2
**head** 7:23 61:22
120:17, 18 126:23
137:22 164:4
**heading** 152:9
**health** 67:7
**healthcare** 142:8
**hear** 8:15, 16 131:19,
24 132:1
**heard** 57:14 92:20
116:10
**hearing** 132:10
**heat** 11:18
**He'd** 90:17
**held** 49:19 50:14
59:23 112:11
**he'll** 117:2
**hello** 13:17
**help** 12:13 115:6
**herding** 143:21
**hereinafter** 5:23
**hereof** 171:13

**hereunto** 170:19
**high** 68:4 135:9
**highest** 59:24 60:15
**Highlights** 81:10
110:7
**hire** 67:17 158:21
168:20
**hired** 66:5, 8
**hires** 82:25 83:1
**hiring** 116:19
134:20 158:16
159:12
**hit** 53:16
**hold** 22:5 111:15
**honest** 42:11 49:5,
10 58:13 119:21
168:10
**honestly** 25:18
**hope** 68:2
**hopefully** 136:23
**hospital** 141:23, 25
142:1
**hot** 11:19
**hour** 17:19
**hours** 11:15 12:3
85:11 114:9
**HR** 57:8 74:11
**human** 59:14 60:23
74:3, 16 77:2
**Humana** 6:25 40:21
41:11, 12, 13 43:10
46:17 141:24
**hundred** 82:3 145:7

< I >
**idea** 9:25 39:8 86:6
87:14 95:1 107:17
**identification** 76:2, 5
101:6, 8 102:8 103:2,
4 108:15, 18 121:2
122:10 127:16
128:23 138:13
141:16
**identified** 12:16 72:5
86:24 103:8 106:6
118:7 124:18 126:21
134:13 163:21
**identifies** 129:24
132:7

Case: 1:21-cv-00238-MRB Doc #: 66-2 Filed: 08/02/24 Page: 62 of 75 PAGEID #: 2764

Deposition of Michael McAllister          Philip R. McHugh v. Fifth Third Bancorp, et al.

**identify** 12:6, *13*
71:*16* 82:*17* 101:*20*
117:*13* 121:5, *6*
122:*11* 126:*10* 129:2
**identifying** 130:5
**identity** 12:9 72:25
**III** 2:*3*
**illness** 133:*23*
**illustrate** 111:*1*
**immediate** 162:*1*
**immediately** 122:*15*
**impact** 154:*11*
**impertinent** 8:*23*
**implementation**
148:*19* 155:8
**implemented** 154:*13*
**implications** 115:*17*
**importance** 149:*22*
153:*20*
**important** 36:6
85:*19* 115:*14* 151:22
153:7
**Imprecise** 49:*21*
**impression** 31:*12, 13*
**impressions** 89:*25*
156:7
**improper** 129:*10*
**improve** 50:*10*
154:*14*
**inadequate** 115:22
**inappropriate** 65:5
66:*12* 94:6 104:*13*
**incident** 64:9
**include** 112:*13*
**included** 59:*24*
76:*10* 148:9 152:*16*
155:*21*
**includes** 28:7
**including** 155:*13*
**incompetent** 49:*25*
**incomplete** 117:*15*
**increases** 148:*13*
**incumbent** 69:*4, 9*
72:*13*
**indefinite** 30:*15*
**independent** 56:*20*
63:*3* 71:9 168:*23*
**independently** 62:*21*
**indicate** 100:*11*

**indicated** 97:*15*
100:*11* 106:9 171:*12*
**indication** 109:8
**individual** 85:*1, 13*
99:8 127:*4* 160:*1*
**individually** 26:*20*
28:*5*
**individuals** 57:*21*
84:*22*
**indulging** 133:*3*
**industry** 131:6, *10*
133:9 150:*13*
**Influencing** 146:9
**inform** 149:*15*
**informal** 90:6
**information** 25:*24*
58:*17* 73:*12* 74:*1*
81:*4, 18* 82:*8* 84:9
85:2, *6, 18, 25* 86:2, *3,*
*4, 8, 9* 96:*11* 112:*17*
122:*3* 134:*13* 147:*20*
148:*19* 167:2
**informative** 85:*21*
**informed** 38:*17*
**initiatives** 155:*1*
**innovation** 154:6
**input** 58:*14* 68:*18*
98:*24, 25* 144:*3, 8*
158:*20*
**inquire** 88:8
**inside** 18:*3* 38:*5*
**insight** 147:*15*
**instance** 20:*19* 21:2
88:*20*
**institution** 43:7 47:6
49:*24*
**institutional** 43:*25*
**Instruct** 14:*17* 38:*14,*
*21*
**instructed** 137:8
**instructing** 12:*20*
15:*1, 3, 12*
**instruction** 15:*10*
**insubordinate** 162:*15*
**insurance** 142:2, *3, 5*
155:*14*
**integration** 167:*4*
**intend** 14:*5*
**intended** 10:*25*

112:*12*
**interaction** 91:*3*
**interchanged** 64:*22*
**interest** 9:*3* 149:*4*
170:*18*
**interested** 38:*3*
130:*25* 149:6 161:*16*
**interesting** 94:*2*
115:*14* 141:8
**interests** 160:*25*
**interim** 72:*12*
**internal** 54:*14* 56:*25*
83:*1*
**Interpersonal** 146:6
**interposed** 101:*18*
**interrogatories**
102:*13* 104:8 118:8
123:*19* 124:*25*
126:*21*
**interrogatory** 102:*20,*
*25*
**interrupt** 151:*19*
**intervention** 24:*12*
**introduce** 5:*9*
**introduced** 148:8
**introduction** 122:*17*
**invest** 136:5
**investigation** 40:*3*
**investment** 41:*20*
43:*13* 44:7
**investments** 155:*12*
**invite** 39:*14, 17*
**invited** 152:*14*
**involve** 93:*15*
**involved** 9:*16* 43:*16*
44:2, *10* 58:8 62:*11*
**irate** 162:*19*
**irrelevant** 117:*3*
**issue** 43:*13* 58:*19*
**issued** 35:*1* 109:*20*
**issues** 40:*13* 91:2
109:*5* 143:9
**items** 134:*17*
**it'll** 136:*24*
**its** 47:*5* 48:*8* 59:*18*
79:*11* 87:2 94:*3*
101:*19* 139:*17*
144:*20* 145:*5* 146:*21*
156:*14* 157:*21*

158:*15, 21* 167:*17*
168:*23*

**< J >**
**Jennifer** 1:*17* 3:9
141:*13* 170:*3, 24*
**jms@sspfirm.com** 2:*9*
**job** 54:*12* 67:22
68:*21* 72:6 89:*16*
93:6 114:*11* 115:*13*
116:*19* 131:*14* 142:6,
*14* 143:6, *23* 147:9
156:*10* 159:*23* 161:*4*
**jobs** 58:*11* 164:2
**John** 2:*3* 5:*11*
25:*23* 34:*11* 35:*17*
41:*25* 55:*19* 121:*23*
145:*17*
**joining** 165:*3, 4*
**joint** 5:*19* 8:*14* 9:2,
*9*
**Joshua** 2:6
**judge** 15:*16*
**judgment** 58:*16*
59:*1* 68:*17* 131:*18*
146:22 156:*14*
157:*21, 25* 158:2, *4,*
*15, 21* 160:2 168:*24*
**judgments** 51:*25*
52:2
**Julia** 18:9
**July** 128:*10*
**jury** 6:*11*

**< K >**
**keep** 19:6 72:*14*
89:*20* 95:*12* 116:*25*
127:9 137:2
**Kentucky** 40:*22*
**kept** 37:2 142:*13*
**Kevin** 163:*23*
**key** 152:*24* 153:*24*
155:*18, 20, 21*
**kind** 30:5 31:*3, 10*
37:6 40:*1, 3* 66:*21*
67:6 69:*17* 82:8, *11*
85:*1, 6* 94:*10* 98:*11,*
*17, 18* 107:*3* 126:*24*
141:*10, 25* 142:*17*
145:8 146:*18* 149:7

156:8, 19   163:1
166:18
King's   26:25   27:2
knew   95:20   142:14,
15   158:1
know   6:15, 19, 20
9:6   10:7   12:9   13:23
21:8   25:8, 11, 18, 21,
23   31:3, 19   32:6
33:1, 8, 25   34:16, 20
35:6   36:2   40:24, 25
41:15   42:6, 18   43:20
44:15, 24   45:19   47:8
49:8   52:16, 23   53:11,
13, 16, 21   54:1, 17
55:6, 8   57:5, 12
58:12   61:22   67:16,
23, 25   68:1, 3, 12, 20
69:19, 25   70:3, 6, 17,
24   71:25   72:1, 8
76:13   81:20, 25
82:20   84:15, 16, 17
85:7, 20   86:16, 18
89:2   90:3, 8, 10, 23
93:1, 19, 24, 25   94:2,
5, 15, 18   95:6   96:12
97:2, 4   98:8, 13, 24
99:11   104:13   107:4,
12, 17, 18   111:25
112:1   113:9, 10, 13
115:17   116:6   118:1,
3, 12   119:4, 11, 14, 16,
17   120:2   122:19
126:7, 8   129:19, 21
133:9, 16   134:4, 6
135:7   140:25   141:7,
9, 11   142:17   143:9,
16   144:24   146:18
149:8   151:12   154:20
158:10, 13, 25   159:2,
10, 12, 16   160:9
161:3, 12   162:3, 8, 9,
25   163:2, 18   164:4
165:6, 14   166:15, 24
167:22   168:11
knowledge   52:8
61:16   68:13   104:8
124:10   129:15   131:5,
10   133:5, 6   141:19

148:23   149:9, 24
150:15   156:3
known   161:21, 24

< L >
Lack   16:3   21:6
135:11
Lamb   163:23
land   159:22
landscape   150:6, 8,
15   151:6, 10   154:7
language   10:24
lasted   86:14
lastly   125:23
law   7:2   22:25   23:24
24:12, 16
lawful   5:23
lawsuit   28:21   101:13
lawyer   8:20   12:9, 17
lawyers   12:7   13:7
14:2
lay   82:11   149:7
lead   154:5
leader   40:23
leaders   27:16
leadership   128:24
129:3   132:18   143:15
leading   77:14   144:4
146:3   155:22   158:7
learn   36:7, 9   140:19
learned   32:19   76:4
155:7
leave   14:5   90:17
leaves   31:14   90:14
leaving   36:24   95:18
97:20   98:10
led   31:10   32:23
59:1   68:15   94:5
168:7
left   13:17   29:17
31:15   34:9, 24   35:1
36:9, 17   64:14   95:20
legal   9:6
legible   122:15
legwork   59:15
lenders   153:6, 13
length   10:19   13:16
17:18
lessons   155:7
letter   160:12

level   27:10, 11, 20
44:23   49:24   61:13
63:2   71:7   89:22
119:8, 18   135:9, 11,
17, 21   143:8
Life   165:13, 20
light   72:22
lights   72:15
liked   54:16
Limited   2:3
line   29:11   41:7   49:1
104:4   107:19   139:21
148:18   159:20
162:24
lines   36:21   51:23
98:19
Lipscomb   163:24
liquidity   153:7
list   54:15   56:12
83:19, 22, 24   84:5
146:16
listed   60:4   85:13
139:14   163:23, 24
listen   7:9, 11
listening   132:9   133:7
listing   88:15
lists   53:13
litigation   6:20   9:4
little   40:19   63:16
65:10, 13   95:20
live   6:10   8:8, 10
lived   8:6   39:16
LLP   2:12
local   153:21, 25
locate   109:11
long   8:6   9:24   11:14
12:1   25:6   50:1
67:24   72:15   85:9
94:19   95:12   98:9
longer   10:20   32:19
147:14
long-term   69:17
94:23
look   25:22   26:10, 12
53:12, 18   54:3   58:14,
20   70:18, 20   75:2, 10
81:1   88:4   94:9
95:22   96:2   103:12,
22   114:13   115:16
117:10, 23, 24   119:2

138:14, 22   144:14, 24
145:19   164:5, 13, 14,
24   166:4
looked   20:21   54:8,
16   70:9   156:1
looking   54:2   73:23
86:23   94:4   104:1
115:12, 14, 19   117:21
118:5   129:23   136:9
146:17   159:13   163:9
looks   21:16   26:4
53:20   73:17   75:16
76:25   96:3, 4   106:7
121:19   122:12
138:19
losing   52:18   166:20,
23
lost   153:25
lot   45:18   51:24
58:9   89:23   90:10
94:25   96:23   130:24
141:11, 20   151:10
154:17, 21, 22   156:19
158:12
Louisville   40:21
41:10   46:17   48:23
49:14
lower   80:17   108:8
loyalty   47:17   48:2
50:7
LPA   2:7
lunch   100:10

< M >
magnifying   120:12
maintained   16:12
maintaining   72:17
makeup   82:14
making   32:16   82:21
100:12   116:16
141:11   154:21
158:15, 19   168:24
manage   41:19   143:19
managed   41:23
management   26:11,
12, 14, 15, 17   27:16
28:3   50:10   58:18
66:21   74:17   77:3
79:21   84:19   90:14
91:3, 4, 22   97:23

120:*19* 142:*20* 143:*3*
145:*20* 149:*10, 15*
150:*1, 16* 159:6
163:22 166:*18*
**manager** 43:*25*
**managing** 43:*16*
44:*3* 143:*18*
**map** 131:*17*
**March** 170:*25*
**mark** 75:*3, 9, 11*
120:*24* 127:*3* 138:*10*
141:*12* 149:*15*
**marked** 74:*14, 15*
75:*13, 15* 76:2 80:*4*
87:*18* 99:*19* 101:6, *8*
102:8 103:*2, 4, 13*
106:20, *21* 108:*15, 18*
110:*7, 13* 121:*2, 5*
122:*10* 123:*20* 125:*6,*
*8, 14, 19, 25* 127:*6, 15,*
*24* 138:*13* 141:*16*
147:*17* 164:*18*
**market** 26:*19* 40:22,
*23* 115:*18* 120:*18*
152:*9, 15* 153:*1, 12,*
*23*
**markets** 114:*16*
153:*21, 24* 154:*1*
155:22
**marking** 103:6
**matches** 103:*24*
**materials** 148:*10*
152:*16* 155:*3*
**math** 60:*13* 134:*4*
**matter** 7:*4* 63:*10*
96:*17* 100:*16* 107:*25*
123:*13* 149:*21* 161:*3*
171:8
**matters** 41:*10* 96:*13*
**mature** 93:*1*
**maturity** 98:*18*
**MBM** 76:*17*
**MBM2045** 76:*15*
**MCALLISTER** 1:*11*
3:*4* 4:*3* 5:*3, 18, 22*
6:*3* 30:*18* 32:*18*
33:*14* 36:*5* 44:6
59:*10* 76:*3* 101:*7*
102:*11* 103:*25*
108:*17* 117:*17* 119:2

121:*4* 122:*9* 125:*5*
126:8 127:*18* 128:*5*
136:8 137:*19* 160:*19*
169:*15* 170:*7* 171:*19*
172:*24* 173:*24*
**McCarthy** 2:*3*
**MCHUGH** 1:*5* 2:*3*
4:*5, 6* 5:*6, 11, 12, 15*
6:*2* 12:*19, 22* 13:*1, 3,*
*11* 15:*1, 5, 13, 18*
27:*24* 28:*20* 29:*1, 16,*
*19* 30:*1, 9, 18* 31:*21,*
*23* 32:*2, 11, 15, 19*
33:*12* 34:*8, 24* 35:*21*
36:*1* 37:*17, 24* 38:*10*
40:*16* 41:*2* 42:*1*
43:*19, 22* 44:*15, 19*
45:*21* 48:*14* 50:*22*
51:*21* 52:*25* 53:*9*
54:*25* 55:*20, 24* 56:*7*
59:*3* 65:*20, 24* 71:*23*
73:*11, 22* 75:*5, 13*
77:*25* 78:*5, 10, 20, 23*
79:*13, 18* 83:*25* 84:*3*
86:*16, 20* 87:*4, 6, 9,*
*12* 88:*15, 21* 91:*7, 13*
97:*12, 20* 99:*23*
100:*6, 7* 102:*9, 17*
103:*10, 15, 20* 104:*11,*
*17, 24* 105:*18* 108:*16*
110:*2, 9, 12* 111:*9, 15*
112:*4, 7, 8* 113:*6, 22*
114:*4, 7* 117:*6, 8, 16,*
*20, 24* 118:*5, 12, 17,*
*21, 23* 119:*1* 120:*10,*
*18, 24* 121:*3, 15, 17*
122:*2, 8* 123:*2, 5, 7,*
*12* 124:*11, 15, 16, 22*
125:*1, 4* 127:*3, 8, 12,*
*17, 22* 128:*2, 4*
129:*12, 13* 130:*12, 18,*
*20* 131:*10* 132:*2, 5,*
*20* 133:*12, 17, 20, 22*
134:*2* 135:*15* 136:*16,*
*18* 137:*6, 13, 19, 25*
138:*4* 139:*14* 140:*2,*
*8, 10* 144:*4* 145:*17*
146:*24* 151:*18*
156:*16, 25* 157:*23*
158:*7, 23, 24* 160:*3, 4,*

6, *18* 163:*14* 167:*1,*
*20, 24* 168:*4, 14*
169:*1, 7* 171:*3*
**McHugh's** 38:*18*
40:*11* 74:*15* 115:*23*
**mean** 8:*23* 13:*23*
19:*24* 21:*7, 9* 27:*21*
29:*3* 30:*16, 22* 35:*2*
36:*4* 39:*3* 41:*12, 13*
43:*12, 23* 45:*15* 48:*3*
49:*8* 52:*12* 53:*12, 17*
57:*1, 5* 58:*7* 62:*13*
63:22 64:*10, 19*
65:*18* 66:*21* 67:*13*
68:2 69:*16* 70:*1*
71:*25* 82:*3* 83:22
85:*5, 20* 86:*7* 89:*3*
90:*24* 91:*2* 92:*18, 23*
93:*13* 94:*9, 24* 95:*7*
98:*7* 100:*25* 106:*16*
107:*3* 109:*5* 111:*20*
116:*6* 119:22 122:*4*
130:*23* 131:*2* 135:*7*
140:*24* 142:*12*
148:*25* 156:*2, 18*
157:*24* 159:*20, 24*
161:*10, 12, 13* 162:*4,*
*5* 166:*7, 23*
**Meaning** 86:*12*
**means** 57:6 82:*23*
**meant** 34:*13* 156:*5*
**medium** 155:*19*
**meet** 12:*1*
**meeting** 9:*14* 11:*14,*
*22, 24* 13:*19* 15:*23,*
*24* 16:*1, 17, 18, 19, 20,*
*23, 25* 17:*18, 23*
18:*23, 24, 25* 19:*2*
20:*18, 24* 21:*11, 16,*
*17* 22:*5, 6, 7, 10, 15*
23:*4, 5, 9, 21, 24* 24:*8,*
*13* 28:*6, 10, 15, 18*
30:*12, 23, 24* 32:*8, 20*
35:*5* 36:*11, 18* 39:*5*
47:*24* 54:*21, 22*
62:*15, 18* 70:*16, 22*
74:*10* 77:6 81:*16, 20*
85:*10* 87:*23* 88:*1*
89:*1, 7, 8, 22* 90:*25*
91:*17* 92:*12* 97:*13*

100:*18, 19* 107:*14*
112:*20* 114:*14*
122:*12* 132:*10*
133:*23* 138:*18*
140:*25* 141:*5* 147:*15*
148:*9* 151:*8, 10*
152:*7, 15, 17* 155:*3*
156:*10* 158:*10, 11*
**meetings** 11:*9, 12*
17:*8, 16, 25* 18:22
96:22 134:6 140:*17*
147:*12, 18* 157:8
**member** 17:2 19:*1*
21:*4, 5* 24:*23* 25:*4, 6*
28:*1* 43:*7* 45:*16, 17*
48:8 54:*19, 20* 61:*21*
62:*4* 67:*3* 74:*10*
92:*16* 106:*13* 143:*2*
162:*4*
**members** 27:*16, 22*
28:*3* 58:*18* 76:*9*
89:*18* 90:*9* 92:*11*
97:*7* 99:*4, 7* 147:*8*
156:*7* 157:*9* 159:6
**membership** 63:8
**Memorializes** 121:*13*
132:*15*
**memory** 32:*7, 17*
71:*19* 100:*16* 107:*4*
117:*1* 133:*14* 139:*17*
**mentioned** 8:*13*
62:*16* 65:*11* 147:6
**merger** 150:*7, 12*
**met** 13:7 51:*11*
**Metrics** 81:*10*
**MICHAEL** 1:*11* 2:*9*
3:*3* 4:*3* 5:*3, 16, 22*
15:*5* 35:*21* 44:*16*
78:20 84:*3* 87:6
102:*10* 110:*4* 124:*22*
126:8 127:*3* 169:*15*
170:6 171:*19* 172:*24*
173:*24*
**michael.cioffi@blankr**
**ome.com** 2:*13*
**middle** 29:9 95:6
120:*18*
**Mike** 75:6 123:*2*

Case: 1:21-cv-00238-MRB Doc #: 66-2 Filed: 08/02/24 Page: 65 of 75 PAGEID #: 2767

Deposition of Michael McAllister        Philip R. McHugh v. Fifth Third Bancorp, et al.

**mind** 19:*6* 20:*16* 52:*19* 55:*23* 92:6, *9* 93:*18* 100:*12* 123:*24*
**mine** 110:*11*
**minor** 41:*16*
**minute** 33:*12* 46:*17* 55:*21* 110:*1* 116:*21* 125:*20* 151:*13*, *19*
**minutes** 10:*1* 13:*13* 14:*22* 15:*20* 16:*23* 20:7, *9*, *11*, *21*, *22*, *23* 21:*12*, *13* 22:7, *9*, *12*, *16*, *17*, *23*, *25* 24:*1* 32:5 71:*13* 100:*14* 107:*21* 119:*21* 122:*12* 123:*3*, *5* 133:*14*, *15* 147:*21*, *24* 152:6
**mischaracterization** 87:*11*
**mischaracterize** 79:*15*
**mischaracterizes** 79:9 87:*1* 113:2
**mission** 77:*14*
**mix** 82:*15*
**mixed** 65:*17*
**mobile** 148:*13*, *14*
**model** 128:22
**moment** 67:*18* 88:2 89:*14* 113:*13* 120:6 149:*20*
**moments** 90:*3*
**money** 41:*19*, *23* 43:*16*, *25* 44:*3* 46:22 47:*12*
**Monroe** 2:*4*
**month** 10:7 15:*24*
**monthly** 10:6
**months** 94:*24* 142:*17*
**morning** 6:*3*, *4* 8:*4*, *15*
**motion** 15:*16*
**motivate** 143:*15*
**move** 46:22 59:*11* 85:5 87:*13* 104:2*0*
**moved** 47:2*1*
**movement** 83:*1*
**moves** 83:2 139:2
**multiple** 39:*10* 56:2*1*,

22 107:*3*

**< N >**
**n01074** 105:6
**nailed** 99:*14*
**name** 5:*11* 12:*10* 13:*3* 17:6 44:5 85:22 97:*1* 122:*18* 128:*11* 130:*1*
**named** 69:*15* 109:8
**names** 72:2
**Nancy** 18:*11*, *15*
**National** 42:*3*, *5*, *9*, *10*, *14* 45:6 46:2*0*, *24* 47:*9*, *13*, *18*, *22*
**nature** 14:8 151:5
**NB** 167:*4*
**near** 155:*18*
**nebulous** 95:2*0*
**necessarily** 98:*3*
**necessary** 26:2*1*
**need** 36:*4* 67:*9* 98:*15* 115:*15* 116:*11* 133:*10* 135:*17* 163:2
**needed** 19:*16* 51:*12* 143:*1*, *2*
**needs** 132:*11*
**negative** 50:2*0*
**neither** 170:*16*
**NEOs** 110:*19*
**never** 16:2*1* 20:2 39:*16* 52:*14* 53:*1*, *2*, *4*, *9*, *16* 54:8 58:*12* 94:7, *24* 100:2*5* 113:*4*, *21*, *24* 131:*16* 136:*16* 143:*19*
**new** 143:*18* 148:*13* 152:*19*
**Nice** 34:*18* 156:*10*
**nicely** 104:*12*
**No._____Change** 172:2, *5*, *8*, *11*, *14*, *17*, *20* 173:2, *5*, *8*, *11*, *14*, *17*, *20*
**No._____Line** 172:2, *5*, *8*, *11*, *14*, *17*, *20* 173:2, *5*, *8*, *11*, *14*, *17*, *20*
**nobody's** 95:2

**nods** 7:*23* 126:2*3* 137:22
**nonessential** 111:*12*
**Noon-ish** 11:2*5*
**Nope** 14:6 40:9 105:*14* 109:*16*, *25* 136:2
**normal** 55:5 56:2*4* 57:*1*, *5* 161:*13*
**normally** 81:2*0* 161:*14*
**North** 8:*4* 154:*11*, *16* 155:2, *8*, *13*
**Notary** 1:*17* 3:*14* 170:*4*, *16*, *25*
**note** 156:2*3*, *24*
**noted** 148:*11* 150:7 152:*19* 153:5, *23* 154:5, *13* 155:*19*
**notes** 10:9 23:*18*, *23* 24:*3* 103:*15*, *19* 104:*1*
**Notice** 1:*14* 3:7 34:2*5* 170:*10*
**noting** 149:*15*
**notion** 132:*17*
**November** 37:*16*
**novice** 65:*9*
**number** 63:*1* 86:*14* 105:5 117:*14* 118:2*5* 137:2*3* 138:6 139:*10* 141:*17*, *22* 145:*12* 166:5, *6*
**numbered** 145:*16*
**numbering** 138:*11*
**numbers** 25:2*1* 80:*17*, *18* 104:2 117:*16*, *19* 118:2

**< O >**
**oath** 55:*8*, *15* 171:*15*
**object** 33:*13* 38:7, *14* 79:8 104:*3*
**objecting** 35:2*5* 87:*10* 104:2*1*
**Objection** 9:5 12:*15* 13:8 14:*16*, *24* 15:*9*, *11* 16:*3* 21:6 27:*18* 30:*15* 31:*18* 33:*10* 34:*10* 35:*17* 36:*3*

38:2*0* 43:*15*, *17* 44:*13* 46:2*5* 48:*17*, *24* 49:*6*, *20* 50:*15*, *20* 65:*16* 71:*18* 73:6, *14* 77:*18* 78:2*4* 83:2*1* 86:*12* 87:*1*, *12* 88:22 90:2*1* 100:*14* 101:*18* 102:*1* 104:*14*, *16*, *18*, *20* 106:9 107:9 111:2 113:*1* 114:5 116:2*5* 121:*12* 123:2*1* 124:8, *20* 129:7, *11* 130:*14* 131:2*5* 133:*13* 135:*14* 137:2*5* 138:*3* 140:2, *8*, *9*, *10* 144:*4* 146:2*4* 156:*16* 157:2*3* 158:7, *24* 160:*4* 162:7 165:*10* 166:22 169:*1*
**objections** 104:*12*
**obligations** 42:9
**observe** 147:8
**obviously** 27:2*1* 93:*12*
**OCC** 44:*12* 45:*1*, *12*, *15* 152:2*0*
**occasion** 16:*11*
**occasional** 17:*15*
**occasionally** 166:*4*
**occasions** 6:8
**occur** 11:*12*, *16* 17:*17* 18:2*4* 22:2 28:*9*, *11*, *13* 52:9 55:7
**occurred** 10:6 17:*16* 21:*17* 22:*10* 29:*4* 31:2 33:2*3* 34:5 39:9 46:*11* 93:*3*
**occurrence** 29:6, *7*
**occurring** 97:2*5*
**October** 29:9 34:5 37:*15* 97:*19* 147:22
**offer** 64:7, *17* 171:*14*
**offered** 63:*12*
**office** 160:2*3* 170:2*0*
**officer** 30:*10* 37:5 42:8 162:2, *16*
**officers** 26:2*3* 59:2*5*

60:15  109:9
**offices**  1:14
**official**  170:20
**Off-the-record**  102:6
127:11  164:16
**Oh**  6:9, 14  8:18
10:7  20:21  22:11
25:8  55:20  76:17, 18
99:11  110:10, 11
113:7  122:19  126:25
134:4  138:23
**OHIO**  1:2, 15, 18
2:4, 8, 13  5:5  15:8
17:10  44:12  121:24
170:1, 5, 20
**Okay**  7:12, 18  8:1, 2
11:3  12:22  15:25
17:8  18:10  21:11, 24
22:11, 18, 20  23:15,
18  25:16, 19  26:10,
16  28:10  31:6  32:3
34:4, 5, 21  36:13, 16
44:24  46:16  47:4, 20
50:2, 18  53:22  57:19
58:6, 24  60:12, 21
61:1, 8, 14, 17, 20
62:2, 14, 22  65:8, 15
66:3, 4, 7, 14, 24
67:15  69:12  72:10,
17  74:14  75:1  76:6,
18, 19, 23  77:7, 12
78:12  80:3  81:3, 14,
23  82:6, 16  83:18
84:10, 13  85:12, 25
88:12, 19  92:15, 22
93:22  96:5, 9  97:3,
11  99:9  100:22
101:7, 10, 14, 25
102:19, 24  103:7, 17,
19  104:11  105:20
106:1, 19  107:20
108:6, 13, 22  109:2, 7,
11  110:11, 15  112:21
113:12, 21  114:21
116:4  118:23  119:4,
11  120:2, 4, 11, 20
121:8, 20  122:13
123:4, 6, 15, 25  124:1,
6  125:10, 13, 15
126:1, 13, 14  128:2, 7,

12  130:4, 7  132:14,
17  133:22  134:11, 21,
23  136:13  138:2, 5
140:22  145:16
147:11  148:21
151:21  152:5  156:6
157:7  164:8  165:7,
18  166:11  167:6
168:5, 12
**Old**  12:13  14:2
162:21
**Once**  20:17  61:4
68:1, 8  97:23  162:25
one's  117:21
**ongoing**  67:23  69:11
159:25
**online**  16:21
**open**  137:3
**operating**  68:14
**operationally**  157:16
**operator**  98:16
143:6, 11
**opinion**  95:25
133:10  134:20  135:1
140:14, 16  144:23
150:2
**opponents**  169:8
**opportunities**  136:10
139:1, 12  149:8
150:13  158:12
**opportunity**  114:23
147:8  157:9
**opposed**  61:6
**optimization**  131:5
**option**  9:11  81:21
111:12
**order**  51:13  127:21
154:21
**organic**  131:4
**organization**  45:16
88:4  135:12
**organizational**  29:15
30:23  32:22  33:1, 3,
8  35:4  154:19
**organizationally**  69:1
**organize**  149:14
**originally**  66:4
**orwhatever**  75:12
**ought**  54:20  75:8, 9

**outline**  129:2, 16
131:4
**outlines**  81:5
**outlining**  109:4
**outside**  21:4  28:24
54:8  58:14  71:10
93:4  142:11, 16
166:13  168:3
**outstanding**  136:20
156:4
**overall**  23:9, 10  31:8
58:25  114:13
**overlaps**  150:12
**overview**  152:18
**ownership**  47:25

**< P >**
**p.m**  100:1, 4  123:7,
10  151:23  152:1
169:10, 15
**pace**  148:17
**Page**  4:4, 8  10:23
76:8  78:4, 9, 18
79:17  80:6, 14  81:2,
12, 13  82:23  84:1, 8
86:5  88:17, 18  96:3
101:16  103:14
109:13, 14, 18, 19
117:11  121:7  138:15,
22, 23, 24  144:14
145:20  147:23  148:2
150:4  152:4  154:23
156:24  157:4  172:2,
5, 8, 11, 14, 17, 20
173:2, 5, 8, 11, 14, 17,
20
**pages**  75:16  77:21
78:11  81:9  83:4, 5
129:25
**paid**  110:21  111:17
112:4, 9
**pairings**  150:13
**pandemic**  133:24
**papers**  16:19, 21
37:16  101:12
**Paradise**  8:4
**Paragraph**  101:16
102:1  149:12  150:3
152:13, 23  153:2, 10,

14, 18  154:3, 8, 24
155:5, 9, 16
**paragraphs**  130:8
**part**  19:2  20:10
21:3, 20  23:12  27:21,
22  31:8  39:1  45:12
51:1  55:1  59:18
60:9  61:12  62:23
63:22  66:17  67:22
68:21  77:13  89:1
90:17  91:2  106:18
154:19  167:7, 8
**participants**  85:22
**participate**  38:22
**participated**  91:13
**participating**  71:10
**particular**  14:14
63:25  85:17  98:20
99:2  107:18  115:3
145:8  147:24  149:4,
25  151:12  164:2
**particularly**  149:5
**particulars**  115:5, 9
**parties**  3:3  6:20
9:17
**party**  44:8  170:17
**pas@sspfirm.com**  2:9
**passage**  142:8
**passion**  143:16
**path**  132:23
**pattern**  14:3  57:3
161:13
**Patterson**  2:7
**pay**  159:9
**payments**  112:10
120:17
**Peg**  18:9, 15
**PENALTY**  171:5, 6
**Pence**  34:22  121:10
**pending**  5:4  80:21
148:19  170:18
**people**  18:9  26:20
41:8  47:18  51:6
53:13  56:1  58:10
63:1  68:10, 15  69:13
73:24  74:3, 11, 12
83:13, 15, 19  85:8, 15
88:5  114:14  131:19
132:10  133:8  141:6,

*10* 143:*16* 145:*10*
158:*13* 160:*24*
perceive 7:*23*
perceived 162:*14*
percent 82:*4* 145:*7*
percentage 47:*6*
perception 51:*9*
57:*25* 58:*1, 25*
performance 115:*23*
143:*17* 157:*17*
period 53:*13* 81:*6*
111:*18* 147:*6*
periodically 31:*4*
periods 112:*5*
PERJURY 171:*5, 6*
perpetual 69:*11*
person 9:*13* 12:*24*
59:*23* 162:*5*
personal 41:*3* 48:*22*
104:*7* 124:*10* 136:*5*
141:*19*
personally 5:*18* 21:*2*
33:*7* 39:*5* 41:*12, 14*
57:*9* 156:*1* 165:*16,
24*
persons 57:*20*
person's 158:*14*
perspective 57:*24*
61:*10* 136:*14* 163:*22*
perspectives 153:*15*
Pete 99:*23*
Peter 2:*6* 5:*14*
petition 160:*13*
Phenise 12:*24*
Phil 36:*22* 49:*16*
55:*2* 63:*12, 20, 21, 24*
64:*8, 14, 18* 113:*22*
114:*12, 25* 120:*17*
139:*14* 158:*23* 160:*3,
6* 162:*5* 163:*14*
165:*9*
PHILIP 1:*5* 5:*6, 12,
15* 13:*11* 28:*20* 29:*1,
19, 25* 30:*5, 9* 32:*19*
34:*8, 24* 35:*1* 36:*9,
17* 37:*17, 24* 38:*18*
40:*4, 7, 11, 16, 22*
41:*2* 48:*14, 22* 49:*4,
10, 24* 50:*2, 22* 51:*8,
17, 21* 52:*3, 24* 53:*9*

54:*24* 55:*9, 16, 23*
56:*6* 88:*15, 21* 89:*5*
91:*7, 13* 97:*12, 19*
115:*23* 120:*9* 130:*12,
20* 132:*20* 133:*12, 19,
22* 134:*2* 136:*16*
166:*16* 171:*3*
Philip's 57:*25*
phrased 71:*21*
physically 17:*9* 81:*23*
physician 6:*22*
pick 58:*11*
picture 114:*13*
piece 166:*12*
pile 54:*10*
Pinckney 18:*11*
pivotal 153:*24*
place 3:*6, 7* 6:*13*
18:*13* 23:*7, 13* 29:*5*
31:*24* 32:*1, 4* 39:*11*
51:*7* 53:*19* 90:*12*
101:*7* 106:*4* 108:*17*
141:*4* 165:*20* 170:*10*
placed 76:*3*
Plaintiff 1:*6, 12* 2:*2*
3:*5* 5:*6, 13*
Plaintiff's 4:*9, 10, 11,
12, 13* 76:*1, 5* 91:*18*
95:*22* 99:*19* 101:*5, 9*
102:*7* 103:*1, 4*
106:*20* 108:*14, 19*
121:*1, 5* 122:*10*
127:*14* 141:*15*
plan 67:*9* 74:*17*
77:*3* 161:*9, 15* 164:*9,
10*
planning 27:*3, 5, 12,
20* 61:*11* 70:*10, 11,
20* 74:*24* 83:*8, 14, 19*
106:*2* 107:*6* 120:*8*
138:*16, 18* 139:*1*
152:*18* 164:*19*
167:*23*
plans 95:*5* 133:*8*
147:*14* 163:*22*
please 7:*22* 8:*3*
27:*23* 29:*5* 30:*17, 22*
33:*11* 40:*20* 75:*2*
78:*25* 79:*17* 87:*6, 13*
108:*25* 116:*8* 117:*9,

10, 14* 120:*6* 127:*2*
129:*14* 138:*14*
141:*13* 149:*12* 152:*4,
23* 153:*3, 14, 19*
154:*3, 9, 12*
plural 71:*14*
PNC 42:*22, 24*
point 21:*22* 48:*10*
52:*22* 55:*13* 67:*23*
68:*25* 71:*1* 73:*19*
79:*4* 81:*5* 89:*14*
94:*3* 107:*16* 112:*22*
136:*15, 18* 142:*5*
162:*21* 163:*19*
policy 47:*5, 8, 11*
political 152:*24*
Poole 12:*25* 13:*6*
pop 98:*11*
portal 17:*1* 81:*19, 21*
portal's 17:*6*
portion 122:*14*
portions 122:*13*
posed 153:*16*
position 30:*9* 42:*20*
46:*19* 47:*14* 49:*25*
50:*3* 59:*23* 71:*14*
72:*11* 100:*22* 101:*19*
114:*4* 126:*12* 130:*13*
131:*14* 160:*7*
positioned 26:*20*
51:*6*
positioning 154:*15*
positions 49:*18, 21*
50:*14* 112:*9, 10, 11*
115:*18* 120:*9* 130:*12*
possess 131:*3*
possessed 139:*25*
possible 41:*15* 50:*19*
53:*15* 54:*17* 69:*13,
17* 95:*12* 114:*11*
159:*22*
possibly 116:*6*
potential 56:*2* 84:*11*
86:*10, 24* 92:*12* 94:*5*
150:*11*
potentially 55:*3*
pour 119:*20*
practice 7:*2* 16:*17*
19:*21* 21:*18* 56:*24*
57:*1* 59:*21* 160:*21*

preceded 18:*14*
79:*24*
precedes 128:*18*
predominantly 153:*25*
preexisting 40:*15*
prep 18:*23*
pre-pandemic 81:*25*
82:*2*
prepare 54:*12* 67:*19*
prepared 18:*21*
22:*16* 28:*2* 49:*17*
93:*11*
preparing 18:*4*
22:*23* 142:*10*
presence 3:*10, 13*
153:*23* 170:*15*
present 2:*16* 5:*9*
9:*19* 12:*4* 17:*9, 12,
14* 39:*21* 73:*18* 74:*5*
81:*23* 133:*8* 157:*18*
presentation 19:*10*
29:*14* 53:*23* 84:*6, 19*
90:*1* 116:*5* 133:*11,
19* 155:*23* 156:*25*
157:*4*
presentations 19:*22*
27:*15* 28:*2* 131:*19*
134:*2* 151:*5* 156:*12,
13* 157:*10* 158:*12*
presented 9:*10, 11,
13* 13:*22* 17:*5* 19:*18,
20* 23:*23, 24* 26:*7*
80:*3* 93:*10* 119:*12,
25* 134:*5*
presenting 22:*24*
73:*24* 130:*24*
preservation 15:*9*
preserving 137:*10*
presidency 53:*10*
91:*8, 14* 122:*21*
presidency's 160:*23*
president 30:*6* 34:*14,
22* 38:*23* 40:*22*
50:*22* 51:*15, 18, 22*
52:*4, 18, 25* 53:*25*
54:*25* 55:*10, 11, 24*
57:*17* 59:*13, 22* 60:*8,
9* 66:*9* 69:*23* 71:*15*
72:*12* 73:*1* 79:*3*
83:*20* 84:*7* 87:*17*

Case: 1:21-cv-00238-MRB Doc #: 66-2 Filed: 08/02/24 Page: 68 of 75 PAGEID #: 2770
Deposition of Michael McAllister
Philip R. McHugh v. Fifth Third Bancorp, et al.

96:18 100:13 105:23
107:6 110:21 112:24
113:23 121:11
122:23 124:3 126:10,
12 139:18 140:1, 6
142:4 146:14 156:15
158:16, 22 160:8
161:19 162:15, 22
168:21
**president's** 93:2
**press** 43:12
**pretty** 11:19 17:23
41:18, 23 43:20 45:3
70:5, 7 99:12 135:9
141:7 143:22 146:19
147:13, 15 149:2
156:22 161:8
**prevented** 50:22
51:17, 21 55:23
**previous** 80:23
**previously** 112:20
**primary** 141:2
**principal** 18:3
**principle** 48:2
**print** 96:8
**printed** 111:25
**prior** 30:1 34:25
97:19
**priorities** 149:19
155:18
**private** 37:22 41:5
43:13 48:23 165:17
166:17
**privately** 32:25
**privilege** 15:9 137:9
**Privileged** 14:25
38:9, 11, 20
**Probably** 6:14 10:22
12:3 32:21 39:19
40:25 61:3, 25 82:1
95:11 99:15, 16
109:22 119:20
150:22
**probe** 92:23
**problem** 34:10 48:4
60:13 114:12
**problems** 149:8
**Procedure** 1:14 3:7
15:7, 17

**proceed** 69:8 100:8
**proceeded** 155:6
**process** 20:16 39:9
45:13 49:2 51:1
58:7 61:12 65:10
67:8, 12, 23 69:11
70:10 71:11 73:13,
25 79:1 81:1 85:9
86:13 89:21 90:4
91:23 93:16 95:6
96:17 106:18 141:5,
17, 19 144:16 145:3
152:18, 21 158:5, 10
161:22 163:8
**processes** 154:21
**produce** 24:17 156:8
**produced** 108:4
123:22 144:18
147:19
**product** 148:12
154:6
**productive** 149:3
**profile** 93:5, 7 94:8
116:18, 24
**profitability** 154:14
**program** 69:14
165:13, 25
**progress** 9:21 68:2
148:11 152:10, 16
155:1
**progressed** 96:16
**progressing** 85:4, 5
92:25
**progression** 89:16
**Project** 154:11, 13, 16
155:2
**promoted** 51:15
**pronoun** 30:16
**pronounced** 128:11
**pronounces** 97:1
**proofread** 21:7
**proper** 78:21 118:4
**properly** 21:4
111:22 127:19
**proposal** 128:21
129:1, 5
**proposed** 129:18
**protocol** 15:6 16:17
**provide** 148:9

**provided** 10:12
14:14 21:20 26:24
121:21 152:17
153:11, 15 154:10, 25
**provides** 73:12
**proxy** 59:18 60:5, 19
109:1, 2, 7, 12, 20
110:6 111:6, 7, 24
**Public** 1:18 3:14
25:24 47:10 109:3
170:4, 16, 25
**publicly** 25:24
**published** 60:18, 20
**publishes** 59:18
**pull** 95:2 125:7, 13,
18, 24
**purchase** 47:13
**purchased** 166:12
**purpose** 12:17
**purposes** 15:14 34:2
46:18 76:2, 5 83:6, 7,
14 101:6 102:8
103:2 108:15 121:2
127:16 138:13
141:16
**pursuant** 1:13 3:6
170:10
**put** 13:25 108:3
123:23 146:18 168:1
**putting** 115:13
160:12

**< Q >**
**qualification** 146:4, 7,
10, 15
**qualifications** 145:18
146:23 156:15
157:22
**qualified** 167:11
170:4
**qualify** 167:10
**qualifying** 51:21
**qualitatively** 64:18
**qualities** 140:1, 5
143:1, 2
**quantify** 134:13
**quantitative** 134:24
**question** 7:10, 12, 15,
16 8:24 20:15 21:1
27:25 30:20 31:20,

22 33:6, 11, 13, 15
36:7 39:1 44:16
47:2 49:9, 22 50:19
53:7 54:11, 13 55:15
71:21, 22, 24 73:7
77:19, 23, 24 78:16,
17, 18, 22 79:16
80:21, 23 86:6 88:23
90:22 92:6, 9, 10
94:18 105:1 106:15
107:10 111:16 117:2
118:4 119:19 124:1
127:7 128:13 132:1
133:3 137:21 138:1
163:16 168:17
**questioning** 93:1
**questions** 65:15
77:20 87:15 103:18
104:4 106:6 126:6
137:9, 16, 20 145:18
160:16 168:15 169:6
**quibble** 36:5 65:1
**quick** 59:4
**quickly** 24:2
**quite** 103:25 149:7
160:24
**quo** 72:18

**< R >**
**raise** 161:2
**randomly** 147:13
**range** 10:6 45:8
139:23
**rarely** 164:11
**rate** 148:16
**rating** 96:12
**reach** 33:7
**reached** 32:25 33:18
**reaching** 106:13
167:17
**reaction** 64:6, 15
65:4
**read** 8:24 33:10
80:22, 24 96:8
101:17 116:18
120:10, 15, 16 123:22
126:5 138:25 148:6
152:12, 22 153:2, 18,
22 154:2, 12, 23
171:7, 9

**reading** 102:*3*
120:22   128:*14*
**ready** 51:*14*   67:25
69:*16*   95:*1, 3, 24*
98:*12*   100:8   142:*17*
159:*24*
**real** 54:*4*   161:*23*
165:*24*
**really** 32:9   44:22
47:*21*   48:22   54:8
58:*12*   64:5   82:22
94:*24*   95:7   100:*16*
127:*1*   143:*19*   144:*16*
150:*23*   156:5
**reason** 14:*15, 18*
49:*10, 11, 12, 15, 16*
137:7   172:4, 7, 10, 13,
16, 19, 22   173:4, 7, 10,
13, 16, 19, 22
**Reasonably** 99:*18*
**recall** 6:*13*   8:*18*
12:*10, 11*   15:25   17:*5,
11, 15*   20:*19*   21:*2*
29:*11, 13*   31:6   35:2
36:*15, 19*   37:*1*   39:*11,
12, 13*   42:*11*   45:7, *14*
47:*12*   48:*13, 20*
54:*15*   55:*12, 16, 22*
62:*4, 7*   63:*20*   72:25
73:2   87:22   91:*15*
95:*17, 25*   100:*18, 19,
21*   107:2, *12, 13*
108:*12*   113:*16, 19*
120:*1*   133:*12*   135:7
136:*12*   168:*10*
**recalls** 117:*3*
**receive** 119:5
**received** 11:6   35:*16*
40:*10*   86:22   96:*15*
**recess** 59:7   75:*23*
100:*3*   123:9   151:*25*
**recognize** 76:8
108:*23*   110:*16*   137:*2,
3*
**recollection** 14:7
16:*12*   29:*10*   31:*1*
32:9   53:22   97:*11*
100:*17*   107:2*1*
119:*17*   136:8

**recommendation**
52:*17, 20, 24*   89:*12*
95:*23*   107:*5, 10*
158:*15*
**recommendations**
27:*3*   56:*23*   58:*2*
107:*13*
**recommended** 120:9
**recommends** 26:*4*
**record** 5:*2, 9*   7:*5, 25*
12:*23*   35:*18, 24*
45:*19*   59:*6, 9*   75:*9,
18, 22, 25*   79:9   99:*24*
100:*2, 5*   110:*5*   123:*8,
11*   127:*6*   137:*1*
138:*25*   151:22, *24*
152:*2*   169:*11*
**recorded** 3:8   16:*2,
13*   21:*3*
**records** 20:6   90:5
121:*15*   132:*15*
**Recross-Examination**
4:6   160:*17*
**redacted** 122:*14*
147:*19*
**Redirect** 4:6   138:*1*
168:*18*
**reduced** 129:2*1*
**redundancy** 156:*20*
**refer** 61:*1*   72:*14*
**referred** 102:*13*
**referring** 72:3   80:*17*
118:*3, 16, 17*
**reflect** 21:*16*
**reflected** 20:7, 8
40:*12*   87:*17*
**reflects** 76:*21*   78:*3,
25*   80:*11*
**reform** 142:9
**refresh** 16:*12*   139:*16*
**regard** 27:*12*   56:5
64:*3*   65:*14*   69:*19*
92:*16*   126:25   132:*20*
163:*22*
**regarding** 28:*19*
29:*21*   30:*1, 5, 9*
37:*23*   45:*11*   48:*14*
91:*13*   136:*4*   153:*12*
167:*4*

**regional** 120:*18*
150:8   153:*1, 21, 24*
155:*19*
**regularly** 92:*24*
96:*23*   157:*12*
**regulator** 42:5   45:*2*
**relationship** 40:*16*
41:*16*   48:*5, 6, 15*
155:*20*
**relationships** 136:6
**relative** 45:*15*   47:25
74:22, *23*   89:25   90:4
116:6   170:*16*
**relatively** 10:22   37:*3*
46:*15*   54:*11*   70:*1*
90:*4*   145:6
**relied** 57:*15, 19*
82:*20*   83:*3*   106:*10,
13*   167:*17*
**rely** 158:*14, 18*
**remedy** 137:*15*
**remember** 10:22
25:*11*   32:*18*   53:*11*
63:*13, 19*   70:*16*   96:6
98:*20, 23*   128:*14, 16*
133:*18, 22*   135:*10, 16,
20, 24*   136:*3*   137:2*1*
163:*24*
**reminding** 137:7
**reorganization** 64:*11*
**repeat** 20:*15*   50:*18*
126:*15*
**repeating** 61:6
**repetitive** 158:*8*
169:*1*
**rephrase** 33:*15*
65:2*1, 22*   132:*3*
**replace** 87:*17*
**replacement** 67:*20*
69:*8*   95:*19, 23*
142:*11*
**replacing** 145:9
**report** 19:*15*   20:*3, 5,
6, 8, 10, 13, 17*   21:*20*
24:*14*   39:25   40:*10*
57:*15*   63:*17*   76:22
77:9   79:*19*   86:*17, 20,
21, 22, 23*   87:*3, 18*
88:*13, 14*   90:*20*
105:*24*   122:*20*   128:*9,*

**regional** ...
**14, 15**   147:*11*   151:*13,
16*   158:*19*
**reported** 16:2   37:7
109:*19*   111:*23*
**reporter** 3:9   80:*24*
122:*1*   141:*14*
**reporting** 147:*10*
**reports** 57:*20, 21*
70:8, *14*   134:*11*
**represent** 5:*17*   12:*24*
45:*1*   101:*11*   106:8
147:*18*
**representation** 5:*19*
8:*14*   9:2, 9   77:2*1*
124:2*1*
**represents** 79:*11*
**request** 95:*4*   101:2*1*
150:*10*   160:22
**required** 46:22   47:*3*
109:*3*
**requirements** 47:*24*
152:*19*
**requires** 47:*5*
**research** 26:*19*   35:7
**Reserve** 42:7   137:*2*
**residence** 8:*3*   39:*14,
18*
**resign** 42:2*0*
**resources** 74:*3*
**respect** 13:*10*   15:8
37:*10, 13*   42:9   47:9
57:*16*   62:*5, 9*   79:2*0*
89:*4, 9*   123:*19*   128:5
130:7   146:*23*   148:2*1*
**respective** 3:*3*
**respects** 170:*10*
**respond** 68:*15*   93:2*0*
141:7
**response** 7:*17*   102:*2,
20, 25*   106:6   150:9
**responsibilities** 45:*11*
49:*13, 18*   51:*18*
143:*4*
**responsibility** 43:6
44:7   59:*12*   62:5
63:*4*   67:*19*   69:*3, 7*
141:*3*   166:2*0*   167:*3*
**responsible** 166:*14*
**responsive** 101:2*1*
**rest** 90:*18*

Case: 1:21-cv-00238-MRB Doc #: 66-2 Filed: 08/02/24 Page: 70 of 75 PAGEID #: 2772
Deposition of Michael McAllister
Philip R. McHugh v. Fifth Third Bancorp, et al.

**result** 152:*20* 158:*5, 11* 168:*5* 170:*18*

**results** 19:*14* 133:*9* 155:*11*

**retain** 50:*10*

**retained** 165:*25*

**retrenched** 153:*8*

**revalidated** 149:*18*

**review** 8:*20* 14:*22* 16:*2, 12* 17:*2, 22* 19:*21* 20:*3* 22:*9, 14* 37:*16* 70:*25* 81:*8* 86:*7* 88:*20, 21, 25* 89:*3* 91:*21* 99:*19* 152:*15* 154:*11* 156:*2*

**reviewed** 13:*18* 14:*9, 25* 15:*20* 16:*24* 20:*20, 22, 23* 60:*17* 80:*9* 81:*15* 112:*24* 148:*13* 149:*14* 152:*24* 154:*4* 155:*11*

**reviewing** 128:*14*

**reviews** 60:*19*

**rhythm** 68:*14*

**ridiculous** 94:*11* 119:*23*

**right** 13:*4* 14:*1* 15:*18* 17:*17* 19:*9* 21:*1, 14, 18* 22:*6* 23:*7, 20* 24:*10, 19* 25:*19* 26:*18* 29:*7* 33:*13, 17, 22* 34:*7, 15, 19, 23* 35:*14, 22, 24* 40:*17* 42:*3* 47:*23* 51:*7* 55:*22, 25* 59:*2, 3, 19* 60:*14, 15, 24* 63:*6* 65:*3* 66:*5, 18* 68:*24* 71:*2* 72:*7, 19, 21, 23, 24* 74:*18, 21* 75:*13* 76:*24* 77:*6, 25* 78:*14* 79:*6, 23* 80:*8* 81:*9* 82:*5* 84:*18, 21, 23* 87:*15* 92:*21* 94:*16* 95:*10, 15* 96:*2, 15* 98:*6* 101:*2* 102:*5* 103:*12, 21* 105:*2, 5* 106:*4* 107:*13* 108:*10* 109:*25* 110:*18* 111:*4* 112:*13* 113:*7* 115:*21* 118:*9, 16, 19* 119:*4, 5*

**120:***4, 23* 122:*18* 123:*17* 124:*7, 15, 22* 125:*23* 126:*5* 127:*8* 128:*3, 17* 130:*9, 11* 131:*3, 22* 132:*17* 135:*2, 3* 136:*18* 137:*11, 13* 139:*4, 20* 142:*23* 144:*1* 145:*12* 151:*12* 153:*9* 157:*2, 5* 162:*2, 6, 12, 13, 19* 163:*17* 164:*25* 165:*9* 167:*24* 168:*12* 169:*5*

**right-hand** 80:*17* 104:*1* 108:*9*

**rights** 137:*2, 5*

**risk** 68:*4* 97:*16, 20* 98:*10*

**Road** 8:*4* 53:*18*

**Robert** 28:*23*

**robust** 146:*19*

**role** 6:*17* 21:*4* 27:*11* 62:*5, 9* 63:*7* 93:*2*

**roles** 30:*2*

**rolled** 88:*10*

**Rome** 2:*12* 5:*17*

**room** 11:*17* 23:*16, 17* 74:*10* 159:*12*

**rooted** 131:*5*

**roster** 55:*6* 83:*16*

**round** 25:*21*

**routine** 89:*21* 93:*3* 145:*6*

**routinely** 147:*13*

**RPR** 1:*17* 3:*10* 170:*24*

**Rule** 41:*25* 43:*18*

**Rules** 1:*13* 3:*6* 7:*3* 36:*3*

**run** 149:*2* 159:*15, 17* 162:*23*

**running** 142:*13* 143:*7, 11, 19* 159:*12*

**< S >**

**Saba** 2:*6, 7* 5:*14* 75:*18* 99:*24*

**salaries** 111:*24* 112:*3*

**salary** 60:*2* 111:*11*

**sales** 148:*14*

**Sandy** 1:*16*

**sat** 63:*20*

**save** 171:*10*

**saw** 16:*20* 35:*15* 77:*10* 79:*20, 24, 25* 106:*12, 24* 107:*1* 114:*13, 20* 119:*17* 160:*14*

**saying** 53:*11* 56:*1* 105:*18* 119:*15* 122:*18*

**says** 34:*24* 69:*4, 9* 76:*17, 24* 77:*1* 83:*23* 84:*9* 101:*19* 103:*7* 105:*13* 108:*8* 110:*6, 14* 131:*3* 165:*1*

**schedule** 17:*24* 69:*10* 80:*12*

**schedules** 18:*5* 163:*7*

**scope** 41:*25* 43:*18* 44:*14* 47:*1* 48:*18* 49:*7*

**seal** 170:*20*

**seat** 74:*6*

**SEC** 111:*23* 112:*2*

**Second** 7:*14* 45:*21* 75:*19* 99:*25* 105:*8* 121:*7* 148:*2*

**section** 77:*15* 80:*7* 109:*11* 125:*7*

**sector** 153:*5, 8* 155:*20*

**security** 148:*17, 19*

**see** 14:*11* 19:*10, 18* 21:*16* 27:*14* 28:*1* 32:*8* 34:*2* 36:*13, 22* 47:*4* 50:*12* 64:*19* 68:*11* 76:*12, 17* 80:*1, 19* 83:*10* 85:*23, 24* 88:*14, 16* 101:*22, 25* 103:*5, 6, 23* 105:*2, 6, 9* 108:*7* 109:*14, 18* 110:*14* 117:*6, 7, 9* 118:*10* 122:*13* 127:*25* 128:*18, 21* 130:*8* 131:*7* 133:*4* 135:*4* 145:*21, 23* 146:*1, 3, 6, 9* 148:*3* 151:*14* 152:*6, 9*

**156:***21* 157:*9, 18* 158:*12* 161:*1, 5, 15* 164:*24* 168:*8*

**seeing** 128:*14*

**seek** 44:*11* 58:*17* 129:*16*

**seen** 14:*20* 37:*19* 40:*8* 67:*13* 71:*13* 88:*12* 94:*7* 108:*11* 124:*24* 150:*18* 151:*2* 158:*2* 160:*21, 24* 168:*2*

**segment** 157:*14*

**select** 96:*17*

**selected** 43:*25*

**selecting** 126:*11*

**selection** 57:*16* 79:*2* 89:*10* 128:*23*

**send** 160:*11*

**senior** 26:*11* 27:*16* 28:*2* 55:*2, 3* 66:*21* 85:*8* 142:*19*

**sense** 53:*6* 68:*15* 124:*12* 134:*7* 141:*11* 162:*11, 12*

**sent** 11:*7*

**sentence** 152:*22* 153:*2, 9, 18, 22* 154:*2, 8, 12, 24* 155:*4, 10*

**sentences** 148:*6* 152:*12*

**separate** 19:*7, 8*

**separately** 28:*5*

**September** 32:*8* 152:*8* 164:*20*

**series** 139:*3*

**serious** 143:*22*

**seriously** 54:*8*

**serve** 42:*13*

**served** 142:*6*

**service** 50:*13* 115:*10*

**services** 25:*17*

**session** 90:*11, 12* 138:*18* 150:*9* 154:*10* 156:*9*

**set** 101:*16* 125:*24* 143:*13* 164:*25* 170:*19*

**sets** 112:*17*

**setting** 163:7
**settings** 41:1
**seven-year** 164:10
**several-year** 158:5
**Shaffer** 28:23 37:9
  38:1 76:9, 22 97:19
**shaping** 153:1
**share** 7:3 14:2
  153:12 155:22
**shared** 44:7
**sharing** 149:16
**sheet** 143:18 171:1,
  13 172:1 173:1
**short** 72:2
**shorthand** 61:2
**show** 32:9 35:19
  71:20 80:12 84:16
  102:10 107:22
  109:17 117:1 121:21
  133:15
**showed** 106:19
  123:20 124:4 163:20
  167:15, 20
**showing** 102:18
**shown** 14:20 103:24
  108:2
**shows** 82:16 83:23
**side** 98:16 132:22
  142:3 157:11
**side-by-side** 56:9, 14
**signature** 3:12, 13
  121:6 170:14, 15
**SIGNATURE:_____**
**_____DA**
**TE** 172:23 173:23
**signed** 8:15, 17, 21,
  25 11:6 128:10
  171:16
**significant** 45:3
  148:11
**similar** 14:1 67:12
  150:13 151:5
**similarly** 64:25
**simple** 7:3 47:21
  49:9
**simply** 34:8 62:10
  87:10 88:7
**single** 31:5 89:2
  132:22

**sir** 19:25 56:18
  57:10 60:6 62:17
  78:5 91:24 102:23
  108:5, 21 113:25
  120:14 125:11, 16, 21
  134:19 164:3 168:15
**sit** 55:18, 22 70:17
  128:1
**sitting** 74:6, 10
**situation** 85:16
  115:3, 5, 10 163:6
**six** 45:22 145:9
**Sizable** 45:9
**size** 45:2
**skill** 143:13
**skills** 70:5 135:18
  143:15 155:25
**slide** 155:2
**slight** 7:20
**slot** 51:15
**slowed** 148:16
**small** 41:17
**Smith** 2:6
**social** 152:25
**soft** 143:14
**software** 166:12
**sold** 42:21, 22
**solely** 126:18
**solutions** 148:20
**solved** 48:4, 5
**somebody** 29:13
  33:18 51:13 58:11
  67:19 68:7 72:5
  80:1 81:22 115:13
  142:16 144:24
  159:13 161:2, 20
  162:1, 25 163:3, 5, 9
  165:23
**somewhat** 148:16
**sorry** 13:10 34:16
  39:1, 17 41:13, 22
  52:18 55:20 58:4
  76:17 93:23 105:23
  126:25 167:20
**sort** 58:8 67:14
  69:1 88:4 90:24
  91:5 93:3 98:7
  129:20 143:5 144:15
  145:1 147:14 149:4

  157:17 163:8 166:18
**sorting** 74:2
**sound** 146:21 157:21
**sounds** 94:6, 16
  139:20
**source** 26:7 103:14
  153:7
**SOUTHERN** 1:2
  5:5 15:8 121:24
**speak** 50:6, 9 61:1
  104:6, 7, 9 136:23
  137:14 140:11
**speaking** 86:16
  104:12, 15, 18
**speaks** 50:3 100:15
  111:3 121:13
**special** 164:18
**specific** 26:21 31:3
  32:5 45:14 54:1
  70:11 79:7 87:23
  91:23, 25 92:3 97:14
  99:14 107:18 114:12
  131:17 143:3 155:1
  167:5
**specifically** 29:11
  36:15 53:12 55:12
  95:17 113:4 132:16
  163:4
**speculate** 162:9
**speculation** 162:8
**speech** 31:25
**Spence** 34:13 38:23
  39:5 46:9 52:17
  53:24 54:7 56:6
  65:14, 19 66:1, 16
  69:20, 22 71:17 73:1
  79:2, 12 84:16 87:19,
  25 88:9 89:13, 19
  92:17, 20 93:15, 19
  96:17 99:3 100:13
  105:9 112:23 113:17
  120:9, 16 121:10
  124:3 126:10, 11, 16
  130:20 131:9, 13
  134:3 135:6, 21, 25
  136:11, 15 138:7
  139:7, 8, 18, 25 140:5
  146:13, 23 148:8, 10
  149:13 150:5, 10
  151:4 152:14, 17, 24

  153:4, 11, 15, 20
  154:4, 10, 25 155:6,
  11, 17 159:4 163:15
  165:2 166:20 168:20
**Spence's** 58:1
  130:22 132:19
  135:11, 17 136:4
  146:15 148:23
  149:24 150:15, 20
  155:23 167:3
**spend** 85:15 136:4
**spent** 115:2 142:10,
  16
**split** 142:3
**spoke** 10:2 100:10
**spoken** 28:19, 23
**spot** 70:21 115:3
**SS** 170:2
**stack** 13:24 14:1
  46:5
**staff** 17:23 26:7
  73:16, 17 74:4 91:1
  93:11, 12, 14
**stage** 71:9
**Stagnaro** 2:7
**stakeholder** 149:18
**Stamp** 104:2 105:5
  148:3
**stand** 27:24
**stapler** 75:17
**Star** 154:11, 16
  155:2, 8, 13
**Starner** 1:17 3:9
  170:3, 24
**start** 30:21 67:17
  68:8
**Started** 9:15 25:11
  67:8 107:16 144:16
**starting** 148:25
**starts** 18:1 67:16
  125:20
**State** 1:18 36:3
  44:12 112:3 124:1
  138:2 155:17 170:1,
  5
**stated** 112:5 148:16
**statement** 59:18
  61:14 63:5 109:20
  110:7

statements 148:*15*
STATES 1:*1* 5:*4*
status 72:*18*
stay 13:*16* 94:*19*
  96:*19*
stayed 142:*7*
stenotypy 3:*9* 170:*11*
step 72:*2*
stepped 13:*12* 51:*13*
  142:*18*
stepping 55:*4* 91:*1*
steps 23:*3* 152:*10, 16*
stick 63:*24* 95:*9*
  98:*9*
stipulate 102:*4*
  111:*6, 10, 22, 24*
stipulated 3:*2*
stock 46:*24* 47:*25*
  48:*4* 111:*11*
stop 123:*16* 150:*14*
strategic 70:*2* 116:*5*
  130:*8, 21* 139:*1*
  145:*23* 148:*9* 150:*5,*
  *20, 24* 151:*1, 6*
  152:*18* 155:*12, 20, 21*
  157:*11, 13*
strategies 48:*14*
strategy 120:*17*
  130:*23* 131:*1, 4*
  148:*7* 152:*9* 157:*15*
Street 1:*15* 2:*4, 12*
  98:*14* 143:*8, 17*
  155:*13* 165:*3*
streety 130:*25*
strength 136:*9*
strengths 51:*25* 52:*2*
  57:*25* 58:*1* 130:*19*
  165:*8*
strong 149:*5* 150:*24*
stronger 56:*2*
strongest 99:*13*
  151:*1*
structure 135:*11*
studies 26:*19*
stuff 143:*14*
Subject 101:*22* 106:*8*
subjective 131:*12, 15,*
  *23* 132:*7* 133:*5, 6*
submit 39:*25*

submitted 3:*11*
  170:*13*
subsequent 11:*9*
substance 36:*25*
  155:*24*
substantive 117:*11*
succeed 86:*10* 92:*8*
  113:*18* 114:*23*
succeeding 30:*6, 9*
  83:*4, 5*
success 165:*21*
  167:*11, 12*
successfully 51:*7*
succession 27:*3, 5, 9,*
  *12, 13, 19* 28:*4* 31:*9*
  45:*12* 46:*10* 51:*1, 7*
  54:*2, 10* 61:*11* 62:*6,*
  *10, 19* 63:*4* 65:*12*
  67:*10, 16* 69:*8, 14*
  70:*10, 11, 14, 20*
  74:*17, 24* 77:*3* 79:*20*
  83:*7, 14, 16, 19* 84:*7*
  87:*23* 94:*13* 106:*2*
  107:*6* 120:*7* 138:*16*
  141:*2* 145:*5* 161:*9,*
  *15* 163:*23* 164:*19*
  167:*23*
successions 45:*18, 25*
successive 50:*3*
successor 91:*14*
successors 86:*24*
succinctly 135:*18*
sudden 113:*14* 143:*7*
sufficient 12:*17*
  15:*13* 61:*2* 134:*8*
  153:*23*
suggest 71:*13*
suing 6:*22*
summaries 117:*12*
  135:*5*
summary 10:*12* 20:*6*
  105:*8, 13* 112:*16*
  119:*3, 5, 11, 12*
Sun 150:*7, 11*
superior 149:*10, 25*
  150:*15* 162:*1*
supervision 44:*11*
  170:*12*
supervisory 43:*6*

45:*12*
suppose 65:*9*
supposed 45:*17, 20*
suppressed 148:*15*
sure 7:*5, 8* 14:*10*
  15:*5, 15* 16:*9* 18:*8,*
  *12* 19:*4* 20:*16* 21:*3,*
  *9, 22* 22:*1* 23:*1* 29:*3*
  30:*18* 32:*21* 37:*9*
  43:*23* 46:*4* 48:*9*
  53:*6, 8* 55:*25* 57:*1*
  60:*2* 62:*14* 63:*11*
  65:*25* 69:*7* 73:*9, 20*
  74:*6* 79:*25* 84:*5*
  88:*6* 94:*23* 95:*7, 14*
  96:*21* 119:*9* 129:*21*
  130:*16* 132:*6* 134:*16*
  141:*3* 144:*13, 23*
  145:*11* 159:*11*
surprise 65:*6*
surprised 36:*24*
  63:*13* 64:*4, 15, 16*
  107:*15* 166:*16*
Survey 81:*11*
surveys 135:*5*
Susan 13:*14* 37:*12*
suspend 136:*19*
sworn 5:*10, 23* 170:*7*
SWOT 136:*9*
Sylvania 2:*4*
synergies 150:*11*
system 24:*6*
systems 16:*22* 155:*15*

< T >
tab 103:*23* 105:*9, 10,*
  *11, 17, 20, 22* 106:*1, 5*
  117:*10, 25* 119:*2*
table 58:*9* 87:*14*
  109:*21* 110:*19, 25*
tabs 118:*2* 127:*12*
take 10:*9* 14:*4, 5*
  15:*15* 22:*8, 9, 12*
  23:*3, 7* 29:*5* 57:*14*
  59:*3* 67:*25* 75:*2*
  77:*12* 78:*2* 85:*9*
  86:*1* 103:*22* 114:*11*
  117:*10* 128:*17*
  131:*14* 144:*24*

taken 1:*12* 3:*5* 6:*5*
  16:*13* 59:*7* 75:*23*
  100:*3* 123:*9* 151:*25*
  170:*10, 11* 171:*2, 8*
takes 68:*23*
talent 27:*15* 28:*2*
  51:*16, 20* 74:*16* 77:*3,*
  *15* 80:*7* 81:*10* 82:*24*
  84:*18, 19* 91:*21*
  97:*23* 99:*18* 135:*25*
  139:*1, 2, 12*
talents 53:*15* 70:*5*
talk 29:*7* 39:*8*
  63:*21* 78:*9, 10, 16, 18*
  96:*12* 98:*8, 17* 141:*1,*
  *17* 157:*15* 162:*6*
talked 64:*13* 70:*17,*
  *23* 72:*11* 73:*15*
  74:*20* 92:*1* 112:*20*
  129:*25* 145:*19*
  167:*13*
talking 26:*14, 15*
  31:*9* 49:*21* 67:*17*
  72:*5* 86:*19* 91:*5*
  97:*4* 114:*15, 16*
  115:*12*
talks 77:*14* 122:*17*
tasks 26:*1* 167:*5*
teach 103:*20*
team 55:*3* 58:*18*
  63:*25* 66:*25* 67:*1*
  70:*18* 79:*21* 142:*20,*
  *23* 143:*3, 9, 21* 147:*4,*
  *8* 149:*10* 150:*1, 16*
  157:*10* 159:*7* 167:*8*
teams 146:*3*
technological 152:*25*
technology 70:*4*
  114:*16* 148:*17, 20*
  149:*2* 151:*6* 154:*5,*
  *20*
tee 69:*1* 99:*8*
teed 54:*3*
telephone 18:*18*
tell 6:*16* 10:*19*
  13:*21* 16:*16* 18:*19*
  27:*7* 29:*12* 31:*6*
  33:*17* 34:*18* 40:*19*
  47:*16* 53:*2, 4, 8* 67:*8*
  73:*25* 77:*16* 78:*3*

80:*11*  82:*13, 23*
84:*10, 13*  85:*17*  86:9
103:25  104:22
108:25  109:*13*
110:*18*  116:8, *23*
117:*21*  118:24  120:8
126:9, *24*  129:*14*
160:6  168:*20*
**telling**  19:9  116:2
133:*4*  162:*3*
**Tells**  82:*14*  93:*13*
**temperament**  50:9
**temporary**  72:*12*
**ten**  45:6  68:*3*  69:*15*
123:5  163:*10*
**tended**  143:*14*
**tends**  95:*16*  166:*17*
**tenure**  62:2  94:*21*
**ten-year**  53:*13*
159:*15, 17*  162:*23*
164:*10*
**term**  61:2  72:2
147:*14*  155:*19*
**terms**  18:*16*  20:*21*
26:*10*  47:24  56:*11*
70:*3, 12, 24*  74:*1*
82:*13*  88:2  90:*23*
91:*4*  99:*13*  130:*21*
133:*4*  143:*13*  155:24
156:*21*  159:*15*
165:22
**terrific**  142:*12*
**test**  32:7, *17*  71:*19*
100:*16*  117:*1*  133:*14*
**testified**  5:*24*  6:*10*
73:8  137:*23*  144:6
**testify**  31:*19*  55:*15*
102:*15*
**testifying**  55:8  87:7,
*8*
**testimony**  6:*16*  26:6
30:*4*  87:2  94:*12*
113:2  117:*4*  136:*13*
138:5
**text**  18:*18*
**Thank**  7:*20*  8:2
12:22  13:*1*  15:*18*
19:*13*  22:*1, 18, 21*
32:*11*  42:*1*  61:8
65:8  100:6  102:5

103:*15, 20*  108:*13*
112:7  117:9  120:*4*
121:*20*  122:2  123:*1*
126:5  136:22, *24*
137:6, *13*  164:*23*
168:*14, 15*
**theirselves**  90:*15*
**thing**  22:2  36:*23*
58:*15*  69:2  84:25
85:*21*  93:9  97:*10*
98:*1*, 7, *17*  101:*17*
102:*3*  114:*12*  134:*24*
147:*15*  150:22  156:*8,
19*  158:*20*  159:*25*
163:8
**things**  41:*1*  53:*14*
56:*4*  58:*10*  59:*11*
64:*20*  68:*1, 16*  71:*3*
82:*12*  93:5  96:22
98:8, *11, 15*  106:22
109:*4, 5*  115:*19*
124:*10*  131:*13*
143:*10*  146:*17*  149:*1,
4*  151:9  156:2, *3*
157:*17*  164:*13*
**think**  10:5  12:*19*
14:2, *18*  15:*11, 13*
17:7  25:*14*  37:2
39:7, *19*  42:*16*  43:5
48:*21*  49:*10, 12, 15,
16*  50:*21*  61:*19*
62:25  63:23  64:5
65:*17*  66:6  67:24
68:*12, 25*  69:*21, 22*
75:8  82:4, *22*  87:*21*
88:*10*  89:25  90:*1*
92:*13*  93:8  94:*3*
97:9, *10*  98:9, *12*
101:*21*  106:25  113:7
114:*17*  115:*3, 10, 12*
119:*10*  121:*15*  128:*3*
132:*11, 16*  133:8
135:8  136:*18*  142:24
143:25  148:*1*  149:*11*
159:*15, 16*  160:9
163:*21*  164:*14*  168:2,
*14*
**thinking**  34:*17, 19*
53:*19*  71:5  116:5

129:22  131:*20*
132:*11*
**THIRD**  1:7, *14*  2:*16*
5:7, *20*  9:*4*  11:*21*
18:*4*  24:*18*  27:6
29:2  30:2  38:*23*
40:*11, 17, 23*  41:*3, 19,
20*  43:*3*  44:2, 8, *11*
47:*4, 13*  48:7, *11, 15*
49:*14, 18*  50:*13, 23*
53:*10*  54:25  55:*11,
24*  59:22  67:8  69:24
101:*18*  102:*1*  108:8
109:*20*  126:*11, 12*
142:22  152:*20*
163:*11*  171:*4*
**Thomas**  2:*16*  5:*20*
13:*4*, 5, *6*
**thoroughness**  155:*24*
**thought**  51:*12*  54:*20*
65:*20*  93:9, *19*  99:*12*
115:22  140:*20*
146:*19*  157:*19*
167:*21*
**thoughts**  144:*16*
156:*11*
**thousand**  115:*19*
**threats**  153:*16*
**three**  42:*19*  46:5
61:25  77:*19*  83:5
94:*24*  116:*10*  118:*18*
130:8  134:*1*
**three-page**  10:*20*
**three-year**  111:*18*
163:*3*  164:8
**thrust**  143:6
**ticked**  146:*16*
**tie**  17:*17*
**Tim**  34:*13, 22*  51:*10,
14*  52:7, *21*  54:3, 7
56:6  58:*1*  65:*14, 19*
66:*1, 16*  69:20, 22
72:9  73:*1*  79:2, *12*
84:*16*  87:*19, 25*  88:5,
9, *10*  89:*15*  92:*14, 16,
20, 24*  95:*1*  98:*12*
107:*17*  112:23
113:*17*  114:*11, 22*
116:2  120:9, *16*
121:*10*  132:*19*

136:*15*  137:*20*  138:7
139:*7, 8, 18, 25*  140:*4*
146:*13, 15*  156:*10*
157:*14*  158:*16, 21*
159:*4*  163:*14*  165:2,
*9*  168:*20*
**time**  3:6, 7  5:2, 8
6:*23, 24*  10:2, 5
11:22  13:8  15:*19*
16:*4*, 6, 9  20:2  22:22
23:8  29:*11*  36:6, *16*
37:*15, 16*  39:7  41:*4*
42:2  45:5  46:5, *17*
48:*4*  54:*4*  56:*11*
59:*3, 5, 8*  62:2  66:*1*
68:*1, 17*  69:4, 6  71:*1*
74:20  75:*21, 24*
80:*12*  81:6, *24*  82:22
84:*15*  85:*15*  86:*12*
88:2, *10*  89:*14*  90:*3*
91:*10, 12*  92:*1, 2, 13,
18*  94:*18*  95:25  96:*1*
97:22  99:*14, 17*
100:*1, 4*  105:*19*
107:*4, 18*  111:*3*
112:5  113:9, *10, 14,
20*  114:*14*  115:*3, 10*
123:7, *10*  129:*20*
131:*1, 19*  132:*13*
135:8  136:*5, 22*
139:*20*  141:2, 9
143:*12*  149:*20*  151:*4,
23*  152:*1*  156:*12, 19*
163:6  164:*1, 24*
169:*9, 10*  170:9
**timeline**  54:*1*  94:*16*
99:*11*
**timelines**  17:*16*  18:*8,
12*  38:25  159:*23*
**times**  58:*10*  86:7
104:*12*
**timing**  48:9
**Timothy**  38:22
53:24  89:*19*  105:8
124:*3*  126:*11*  134:2
**Tim's**  90:*1*  156:*14*
157:22
**tiny**  96:8
**title**  85:22  142:*24*

**Today** 5:*1* 90:*1*
138:*6* 158:*9*
**told** 14:*13, 17* 33:*14*
47:*19* 48:*21* 89:*18*
96:*24* 97:*18* 113:*21*
114:*2* 123:*21* 126:*15*
**tomorrow** 53:*17*
**top** 45:*6* 54:*10*
56:*12* 61:*22* 72:*6*
75:*14* 90:*2* 164:*4*
**total** 19:*16* 28:*7*
**totally** 86:*15* 117:*3*
129:*10*
**touch** 7:*6*
**touched** 98:*14* 151:*8*
**town** 11:*21*
**track** 45:*18* 52:*19*
**traditional** 153:*8*
**training** 45:*10, 15*
**trains** 142:*13*
**traits** 114:*3*
**transaction** 167:*9*
**Transactis** 155:*15*
**transcribed** 3:*10*
170:*12, 13*
**transcript** 15:*16*
171:*7*
**transformation**
149:*14, 17, 21*
**tremendous** 165:*21*
**trends** 77:*14* 154:*4*
**trial** 6:*10*
**tried** 137:*2, 3*
**trigger** 95:*2*
**trillionaire** 153:*17*
**trouble** 76:*4*
**true** 25:*19* 47:*7, 8*
60:*8* 61:*14* 63:*4*
69:*18, 19* 136:*17*
171:*10*
**trust** 7:*14* 127:*19*
150:*7, 12*
**trusting** 120:*22*
**truth** 170:*8*
**truthful** 7:*17*
**Try** 16:*8* 19:*4*
21:*25* 37:*8* 50:*18*
53:*6, 14* 63:*1* 65:*23*
69:*6* 73:*10* 123:*13*
130:*17* 132:*4* 159:*14*

**trying** 22:*18* 34:*19*
65:*3* 78:*23* 88:*6, 7*
104:*17* 117:*1* 129:*16*
133:*1, 3*
**tuck-in** 155:*12*
**turn** 7:*11* 138:*24*
**turned** 149:*13* 150:*5*
**Turning** 148:*2*
**turnover** 18:*13*
**Tuzun** 151:*13, 16*
**two** 9:*18* 10:*20* 12:*7*
19:*6* 25:*4* 42:*19*
44:*1* 46:*5, 11* 56:*16*
61:*25* 114:*9* 126:*6*
129:*24* 134:*1* 142:*4*
145:*14* 152:*12*
159:*13* 163:*3*
**type** 14:*8* 136:*10*
143:*21*
**typewritten** 170:*12*

**< U >**
**U.S** 153:*5*
**uh-huh** 7:*22* 24:*5*
28:*8* 41:*6* 46:*21*
51:*3, 5* 63:*15* 64:*12*
67:*21* 68:*6* 70:*19*
71:*8* 73:*12* 74:*8*
82:*10* 100:*9* 114:*19*
163:*25* 165:*5*
**ultimate** 67:*11* 68:*16*
**ultimately** 26:*22*
58:*15* 59:*16, 20*
73:*17* 98:*18* 142:*2, 5*
**unacceptable** 40:*12*
**unanimous** 99:*6*
100:*20*
**underperformance**
166:*21*
**undersigned** 170:*3*
**understand** 7:*16, 18*
9:*3* 26:*6* 33:*14*
40:*15* 49:*22* 61:*7, 8,*
9* 62:*25* 72:*10*
100:*22* 104:*20* 121:*9,*
18* 124:*17* 133:*4*
136:*13*
**understanding** 29:*14*
41:*18* 94:*20* 171:*13*

**understood** 63:*11*
64:*2* 73:*9* 150:*24*
**undertaken** 44:*25*
**undertaking** 62:*5*
**unfair** 71:*21*
**unfamiliar** 46:*14*
**Unfortunately** 142:*11*
**UNITED** 1:*1* 5:*4*
**universe** 22:*3*
**unusual** 52:*14* 89:*15*
161:*2*
**unwisely** 31:*12*
**update** 148:*7, 9, 10,*
22*
**Updates** 74:*17* 77:*4*
**upset** 64:*19*
**upside** 114:*10*
**use** 24:*4* 61:*5* 64:*22*
65:*3* 66:*20* 70:*4*
81:*4, 22* 84:*6, 24*
85:*7* 90:*19* 91:*17*
**uses** 73:*13*
**usual** 145:*3*
**usually** 26:*24* 28:*12*
71:*12* 72:*1* 121:*23*
143:*22* 157:*13* 169:*4,*
7*
**utilize** 77:*2*
**utilized** 77:*17*

**< V >**
**Vague** 49:*20* 50:*15*
166:*22*
**validate** 144:*20*
**validated** 144:*25*
**Valley** 8:*5*
**valuation** 114:*22*
**variables** 51:*24* 52:*6*
**various** 41:*1* 50:*14*
82:*12* 96:*22*
**VC's** 153:*17*
**venture** 153:*16*
**verbal** 7:*24*
**verbalize** 7:*21*
**verbally** 22:*15* 24:*11*
36:*11*
**version** 37:*4, 6*
**versions** 88:*12*
**versus** 5:*6* 95:*13*

98:*12* 159:*6*
**vetting** 38:*22* 39:*3*
**vice** 105:*22*
**videographer** 1:*17*
5:*1* 7:*22* 59:*5, 8*
75:*21, 24* 100:*1, 4*
123:*10* 151:*23* 152:*1*
169:*10*
**Videotaped** 1:*11*
**view** 69:*17* 70:*2*
73:*19* 74:*7* 94:*3*
132:*11* 149:*23*
**Viewpoint** 81:*10*
91:*5*
**virtual** 17:*15*
**virtually** 47:*10*
70:*21* 89:*22*
**vis-a-vis** 146:*15*
**vision** 131:*4* 150:*21*
151:*6* 157:*11, 13*
**visions** 151:*1*
**voiced** 54:*21*
**vote** 52:*10* 57:*15*
100:*23*
**voted** 100:*12*
**vs** 1:*6* 171:*4*

**< W >**
**Wait** 33:*12* 110:*1*
125:*20*
**waiver** 101:*23*
**waiving** 101:*19*
**walk** 24:*8* 74:*11*
**Wall** 98:*14* 143:*8*
165:*2*
**Walnut** 1:*15*
**want** 15:*6, 16* 35:*10*
55:*14* 63:*22* 68:*7*
75:*3* 78:*6, 9, 10* 95:*9,*
12* 98:*10* 102:*15*
110:*7* 111:*5, 7*
119:*16* 120:*5* 136:*21*
143:*24* 145:*11*
147:*23* 159:*11, 12, 22*
161:*18* 163:*4*
**wanted** 63:*10, 21*
144:*23* 160:*7*
**wants** 81:*22* 161:*20*
**waste** 111:*3*

Deposition of Michael McAllister | Philip R. McHugh v. Fifth Third Bancorp, et al.

**watch** 68:*10*, *13*
**watched** 79:2
**watching** 140:*24*
**way** 17:*24* 27:2
36:*19* 48:*1* 52:*13*
53:7 54:4 60:*17*, *22*
65:5 68:9, *22* 71:*21*
75:7 78:*1* 95:11, *16*
120:2 125:*1, 2*
130:*19* 132:*25* 133:*1*
142:*6* 143:*10* 144:*13*,
*20* 159:16
**ways** 145:*17* 158:*10*
**weaker** 56:*3*
**weakness** 136:*9*
**weaknesses** 52:*1, 3*
57:25 58:*1* 165:9
**wealth** 120:*19* 166:*18*
**weeks** 8:*19* 24:*17*
**well** 14:22 23:*11*
28:*12* 29:*12* 30:*21*
31:*8, 12, 15* 33:*17*
35:8 38:*10, 12* 40:*24*
42:*1* 43:*19* 44:*10, 15*
46:8 48:*21* 49:9, *23*
52:*10* 54:*18* 57:4
58:*20* 64:*21* 71:*25*
73:23 75:*4, 5, 8, 15*
80:6, *14* 82:*13, 25*
83:*15* 88:7 89:*1*
90:*14* 92:*23* 100:*25*
104:*24* 107:5 111:9,
*14* 113:*16* 115:9, *21*
116:8, *10, 11, 12, 15*,
*22* 117:*6, 22* 118:*12*
119:*4, 16, 24* 124:*11*,
*13, 15* 130:22 132:*24*
133:2 137:*10, 11*
140:*12, 24* 141:7, *23*
143:5 147:*10* 148:*24*
150:22 151:*21* 156:*1*
157:*24* 158:9 161:8,
*12* 163:*18* 165:*16, 22*
**went** 16:*11* 20:*19*
47:*18* 89:*1* 106:*16*
113:*24* 126:22
146:*16*
**We're** 5:2 7:5
41:22 59:6, 9 62:25
71:*4, 5* 75:*11, 21, 25*

78:6 88:*3* 101:*20*
104:*19* 123:8, *16*
129:*16, 23* 134:*20*
151:24 169:*11*
**WESTERN** 1:*3* 5:5
**We've** 71:*13* 76:4
99:*19* 122:5 140:*24*
144:23 168:6
**whatever's** 115:*17*
**WHEREOF** 170:*19*
**White** 12:*14*
**whoever's** 74:*6*
**wife** 8:*8* 151:*20*
**wild** 6:*14*
**window** 163:*3*
**Winning** 105:*3*
128:22 129:2 134:*14*
143:25 145:*14*
**winnows** 73:*4*
**wins** 82:*24*
**wise** 46:*5*
**wish** 102:*14*
**withdrawing** 47:*12*
**witness** 1:*12* 3:*4, 10*,
*12* 4:2 5:*10* 6:*17*, *18*
7:*4* 34:*11, 15* 35:*18*,
*24* 65:*23* 73:9, *16*
75:*10* 80:*19* 104:*4, 5*,
*18, 22* 110:6 111:*4*
113:*4* 122:*1* 124:9
126:*23* 128:*3* 129:8
130:*16* 132:*4* 133:*16*
137:22 144:5 166:*24*
167:25 170:*14, 19*
**witnesses** 169:*5*
**witness's** 80:*16*
**won** 153:*25*
**wonder** 65:*12*
**wondered** 11:*20*
**wondering** 64:*20*
75:*1*
**word** 55:25 64:*21*
65:*4, 18* 66:20
**words** 12:*12* 81:*1*
**work** 27:9 47:*18*
51:*13* 54:*10* 62:*19*
68:*12, 19, 20* 73:*16*
74:*4* 95:*16* 96:*21*
145:8 147:*10, 11*
**workplace** 82:*18*

**works** 17:*24* 58:*21*
68:*9, 22* 73:*25*
**world** 70:2 132:*12*
161:*23*
**written** 20:*20* 36:*13*
39:*25* 100:*20* 161:22
**wrong** 31:*16* 132:23
167:*18*

**< Y >**
**Yeah** 7:*13* 15:*3*
20:*14* 25:*14* 47:7, *17*
64:*16* 65:*1* 66:*19*
67:2 70:*24* 75:*20*
85:24 95:*3* 99:*21*
130:*10* 144:2, *13*
146:*20* 156:*11*
162:*20* 164:*5*
**year** 18:*1* 46:*12*
53:*21* 74:*23* 86:*13*
94:*23*
**years** 15:22 16:*10*
25:8, *10* 39:*10* 42:*19*
46:*11* 50:*3, 13* 51:2,
*10* 54:*16* 55:2 61:*20*,
*23* 68:2, *3* 69:*16*
86:*14* 94:*24* 95:*21*
107:*3, 7, 8* 114:25
115:2 134:*1* 137:*24*
138:*6* 141:*1, 18, 22*
142:*10* 146:*12* 147:*6*
150:*20* 157:7 158:*13*
159:*13* 163:*10*
164:*12*
**Yep** 76:*11, 18, 25*
77:5 83:*12* 108:*24*
139:*11* 142:*24*
145:*15, 22* 146:2
157:*1, 3*
**Yesterday** 11:*13*
13:*12* 15:*19* 62:*15*
**young** 12:*13*

**< Z >**
**Zatus** 67:*4*
**Zaunbrecher** 13:*14*
37:*12*
**Zoetis** 46:*10* 67:5
**Z-O-E-T-I-S** 67:*5, 6*

**Zoom** 18:22