# EXHIBIT C

Case: 1:21-cv-00238-MRB Doc #: 66-3 Filed: 08/02/24 Page: 2 of 114  PAGEID #: 2779

Deposition of Gregory Carmichael, Volume I                    Philip R. McHugh v. Fifth Third Bancorp, et al.

```
 1              UNITED STATES DISTRICT COURT

 2              SOUTHERN DISTRICT OF OHIO

 3                   WESTERN DIVISION

 4

 5    -------------------------  :
                                 :
 6    PHILIP MCHUGH,             :
                                 :
 7          Plaintiff,           :
                                 :   CASE NO. 1:21-CV-00238
 8       vs.                     :
                                 :
 9    FIFTH THIRD BANCORP, et    :
      al.,                       :
10                               :
            Defendants.          :
11    -------------------------  :

12

13                     VOLUME I

14

15          Videotaped
            Deposition of:    Gregory Carmichael

16          Taken:           By the Plaintiff

17          Date:            September 26, 2023

18          Time:            Commencing at 9:40 a.m.

19          Place:           Fifth Third Center
                             511 Walnut Street,
20                           Cincinnati, Ohio 45202

21          Before:          Sydney Jackson
                             Notary Public - State of Ohio
22

23

24

25
```

```
 1   APPEARANCES:

 2

             On behalf of the Plaintiff:
 3
             Peter A. Saba, Esq.
 4           Joshua M. Smith, Esq.
             Bailey Wharton, Esq., via Videoconference
 5                   of
             Stagnaro, Saba & Patterson Co.,
 6           2623 Erie Avenue
             Cincinnati, Ohio 45208
 7           Phone:  513.533.2701
             E-mail: Pas@sspfirm.com
 8                   jms@sspfirm.com

 9
             On behalf of the Defendants and the Deponent:
10
             Michael L. Cioffi, Esq.
11                   of
             Blank Rome LLP
12           1700 PNC Center
             201 East Fifth Street
13           Cincinnati, Ohio 45202
             Phone:  513.362.8700
14           E-mail: Michael@blankrome.com

15
             Also Present:
16
             Philip R. McHugh
17           Phenise Poole, Esq., Fifth Third Bancorp
             Brian C. Thomas, Esq., Fifth Third Bancorp
18

19

20

21

22

23

24

25
```

```
 1                       I N D E X

 2

 3    Gregory Carmichael                          PAGE

 4     Examination by Peter A. Saba                 5

 5

 6    EXHIBITS                      MARKED      REFERENCED

 7    Exhibit 1                        10          10
      Exhibit 2                        29          29
 8    Exhibit 3                        36          36
      Exhibit 4                        88          88
 9    Exhibit 5                       110         110
      Exhibit 6                       113         113
10    Exhibit 7                       114         114
      Exhibit 8                       120         120
11    Exhibit 9                       122         122
      Exhibit 10                      124         124
12    Exhibit 11                      127         127
      Exhibit 12                      130         130
13    Exhibit 13                      132         132
      Exhibit 14                      140         140
14    Exhibit 15                      152         152
      Exhibit 16                      155         155
15    Exhibit 17                      177         177
      Exhibit 18                      201         201
16    Exhibit 19                      203         203
      Exhibit 20                      212         212
17    Exhibit 21                      212         212
      Exhibit 22                      223         223
18    Exhibit 23                      229         229
      Exhibit 24                      230         230
19    Exhibit 25                      242         242
      Exhibit 26                      244         244
20    Exhibit 27                      252         252
      Exhibit 28                      253         253
21    Exhibit 29                      254         254
      Exhibit 30                      258         258
22    Exhibit 31                      260         260
      Exhibit 32                      260         260
23

24

25
```

Deposition of Gregory Carmichael, Volume I                                      Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 4

1  THE VIDEOGRAPHER: Today is September 26,
2  2023, the time is 9:40 a.m. We're on the record in
3  the deposition of Gregory D. Carmichael for the
4  case pending in the United States District Court,
5  Southern District of Ohio, Western Division, titled
6  Philip R. McHugh versus Fifth Third Bancorp., et
7  al, case number 1:21-CV-00238. At this time, all
8  counsel present and will introduce themselves for
9  the record.
10  MR. SABA: On behalf of the plaintiff, Philip
11  McHugh, Peter Saba.
12  MR. SMITH: On behalf of the plaintiff, Joshua
13  Smith.
14  MR. CIOFFI: Peter, before I introduce myself,
15  would you state for the record if there's anyone
16  participating by Zoom or video or otherwise for
17  this deposition?
18  MR. SABA: Currently I think there is at least
19  one -- there is one monitoring by Zoom. There's
20  one monitoring by Zoom. Is there a second one on,
21  Sydney? There's one attorney from our office,
22  Bailey Wharton.
23  MR. CIOFFI: As long as it's attorneys only
24  because of some confidential information in the
25  protective order, things like that, as we've

Page 5

1  discussed before.
2  MR. SABA: That's fine. John McHugh may join.
3  MR. CIOFFI: All right. If that changes, we
4  can just put it on the record.
5  MR. SABA: Right.
6  MR. CIOFFI: Just so we know.
7  On behalf of the defendants, Michael Cioffi
8  and Collin Hart of Blank Rome.
9  MR. THOMAS: Brian Thomas for Fifth Third.
10  MS. POOLE: Phenise Poole for Fifth Third.
11
12  GREGORY CARMICHAEL
13  of lawful age, a defendant herein, being first duly
14  sworn as hereinafter certified, was examined and deposed
15  as follows:
16
17  EXAMINATION
18  BY MR. SABA:
19  Q. Mr. Carmichael, could you state your name for
20  the record, please, and spell your last name?
21  A. Gregory D. Carmichael, C-A-R-M-I-C-H-A-E-L.
22  Q. Have you ever had your deposition taken
23  before?
24  A. I have.
25  Q. When have you had your deposition taken?

Page 6

1  A. Probably about mid 2005, 2006.
2  Q. Why did you have your deposition taken?
3  A. I was asked about one e-mail in an individual
4  that had left the company.
5  Q. Fifth Third, is that the company you're
6  referring to?
7  A. Yes.
8  Q. What type of claim was made by the employee
9  that left the company?
10  A. I don't recall what the claim was.
11  Q. Do you know if it was a claim against Fifth
12  Third?
13  A. I believe it was a claim against Fifth Third,
14  yes.
15  Q. Do you know where that case was filed?
16  A. I do not.
17  Q. As a reminder, I'm going to be asking you a
18  series of questions. If there's anything you don't hear
19  or understand, please feel free to ask me to repeat or
20  rephrase the question. For the sake of the court
21  reporter -- we're taking this via video -- I need you to
22  answer verbally. No shaking or nodding of the head,
23  uh-uhs or uh-huhs. It's difficult for her to take that
24  down.
25  Additionally, if you could wait for me to

Page 7

1  finish my question before you answer, and I'll try to do
2  the same before I ask another question. It makes for a
3  clear record.
4  Do you understand all those instructions?
5  A. Yes.
6  Q. Could you give me your address, please?
7  A. 3 Abbington Ridge, Cincinnati, Ohio 45242.
8  Q. How long have you lived there?
9  A. Approximately 20 years.
10  Q. Who do you live there with?
11  A. Currently my wife, Sarah Carmichael.
12  Q. How long have you been married?
13  A. 35 years.
14  Q. What did you do to prepare for today's
15  deposition?
16  A. Met with my attorneys.
17  Q. Did you review any documents in preparation
18  for today's deposition?
19  A. Those provided to me by my attorneys.
20  Q. Did you discuss this case with anybody at
21  Fifth Third other than attorneys?
22  A. No.
23  Q. Have you ever discussed this litigation with
24  anyone at Fifth Third other than attorneys?
25  A. No.

Deposition of Gregory Carmichael, Volume I                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 8

1    Q.  Have you ever discussed this case with anyone
2  outside Fifth Third other than attorneys?
3    A.  No.
4    Q.  Have you had discussions with anyone at Fifth
5  Third about Phil McHugh since this litigation began?
6    A.  Would you ask the question again, please?
7    Q.  Yes.  Have you had discussions with anyone
8  about Phil McHugh at Fifth Third since this litigation
9  began?  I'm talking about other than your attorneys.
10   A.  I don't recall if I've had any conversations
11 or anything.  I would have talked to Susan Zaunbrecher
12 about this.  She is an attorney, but she knows about the
13 status of the case.  I would have had that conversation.
14   Q.  What about anyone besides Susan Zaunbrecher?
15   A.  Not that I recall.
16   Q.  Did you ever have any conversations with Bob
17 Shaffer about this litigation?
18      MR. CIOFFI:  By way of objection, you mean
19 outside the presence of lawyers?
20      MR. SABA:  Outside the presence of counsel.
21      MR. CIOFFI:  Yeah, if counsel's present.
22      THE WITNESS:  If counsel's present, I'm okay?
23      MR. CIOFFI:  Yeah.  You should not answer the
24 question.  You should just say counsel was present.
25      THE WITNESS:  Counsel was present.

Page 9

1  BY MR. SABA:
2    Q.  Have you had any discussions about Phil McHugh
3  with Bob Shaffer since this litigation began, outside
4  the presence of counsel?
5    A.  I do not believe so.
6    Q.  And by "conversations," I'm also referring to
7  any e-mails, text messages, any other communications
8  with Mr. Shaffer about Phil McHugh since this litigation
9  began.
10   A.  I believe I got a text message yesterday, good
11 luck on the deposition, something to that extent.  That
12 would have been a communication.
13   Q.  What about any other communications with
14 anyone else about Phil McHugh since this litigation,
15 whether through text messaging, e-mail, or otherwise?
16   A.  Not that I can recall.
17   Q.  What's the extent of your education?
18   A.  Undergrad degree in computer science.  I got a
19 master's degree in business administration.
20   Q.  Where did you obtain this?
21   A.  University of Dayton for the undergrad,
22 Central Michigan University for the graduate degree.
23   Q.  Are you employed?
24   A.  Effective September 21st of this year, I am
25 now employed by RBC, the bank.

Page 10

1    Q.  That's the Royal Bank of Scotland; is that
2  correct?
3    A.  The Royal Bank of Canada.
4    Q.  Royal Bank of Canada, excuse me.
5       What is your role with the Royal Bank of
6  Canada?
7    A.  EVP.  I'm the executive chair of the USA
8  National Bank Company.
9    Q.  What are your duties there?
10   A.  Oversee strategy, direction, operations.
11      (Exhibit 1 is marked for identification.)
12 BY MR. SABA:
13   Q.  Mr. Carmichael, I've handed you what's been
14 marked as Exhibit Number 1.  Can you identify that for
15 me, please?
16   A.  Appears to be my bio as of March 31, 2022.
17   Q.  That's your bio of your employment at Fifth
18 Third Bank; is that right?
19   A.  Yes.
20   Q.  Take me through the history of your employment
21 with Fifth Third.
22   A.  I started Fifth Third back in 2003, as the
23 chief information officer, took on additional
24 responsibilities of operation.  2006, I became chief
25 operating officer.  I believe 2011 or '12, I became the

Page 11

1  president, then the CEO in 2015.  Then probably chairman
2  -- if I read this -- roughly 2018.
3    Q.  You became president in September 2012; is
4  that correct?
5    A.  Yes.  Correct.
6    Q.  And you stayed in that position until October
7  2020, when you were succeeded by Mr. Spence; is that
8  correct?
9    A.  For the bank president, yes.
10   Q.  Okay.  That's the position I'm talking about
11 is president at Fifth Third Bank; is that right?
12   A.  Correct.
13   Q.  You were appointed to the board of directors
14 in July of 2015; is that correct?
15   A.  I'd have to go back and look at that, Counsel.
16 It may have been 2012, when I became president.  Let me
17 see if it's in my bio.
18   Q.  Well, go ahead and refer to your bio, then.
19 I'm referring to the third full paragraph down, third
20 sentence.  It says he was appointed to the board of
21 directors in July of 2015.  Do you see that?
22   A.  Okay, then it was 2015; it was not 2012.
23 Correct.
24   Q.  And you remained on the board until July of
25 2022; is that correct?

Deposition of Gregory Carmichael, Volume I                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 12

A. No. I would have remained on the board as the executive chair until I stepped down to shareholder meeting this year, in the April timeframe.

Q. So just to clarify your relationship with the board, you first went on the board July of 2015, correct?

A. Yes.

Q. You became CEO in November 2015; is that right?

A. Correct.

Q. Okay. And your role as CEO ended July of 2022; is that correct?

A. It ended July 5th of 2022, correct.

Q. And you were replaced by -- or succeeded by Mr. Spence, at that time, as CEO; is that correct?

A. That is correct.

Q. You were elected chairman of the board in January of 2018; is that right?

A. Yes.

Q. And then you became -- how long did you remain chairman of the board?

A. Until I stepped down in July -- I'm sorry, April of this year.

Q. But your title changed from chairman of the board to executive chairman of the board; is that

Page 13

correct?

A. Correct. Still the chairman, but became the executive chairman, which is basically a non-independent position because it's executive chairman.

Q. Explain to me the difference between being a chairman of the board and executive chairman of the board.

A. Executive chairman, you're employed by the company. It's not -- in a lot of cases obviously -- I was already non-independent, but it would be a -- it would not be independent. The responsibilities would be to continue to make sure that I provide oversight, strategic input to the executive team, support for the CEO, and oversight for the board.

Q. Going back to your role as president, what were your duties as president of Fifth Third Bank?

A. Oversee the -- most of the -- what I'll call the P&L -- profit and loss -- operation of the bank, so line of businesses, the markets themselves, the regions. So basically everything except for the staff positions are typically responsibilities that I had as president.

Q. And what were your duties as the member of the board of directors?

A. Well, I was the chair of the board, so therefore, I had responsibilities for making sure that

Page 14

the board communications, board preparation, materials were sent to the board appropriately, feedback from our lead director on items that the board wanted to hear about, talk about; send the agenda based on the account of events that needed to take place, coordinated that; receiving feedback from the lead director after the board meetings on things that the board would like to see or questions or concerns the board would like to have addressed; other points in the next meeting itself. That's basically the responsibilities of the chairman.

Q. Going back to my question for a second, there was a period of time where you just were a member of the board and then you became CEO?

A. Correct.

Q. And then you became chairman of the board. Distinguish for me your duties as being merely a member of the board and then CEO, and then chairman.

A. When I was appointed to the board as a board member, oftentimes you'll see, in corporate America, where you have other members of the executive team that are on and appointed to the board itself. I was appointed to the board, but I really had no board responsibilities. I wasn't considered an independent, so I didn't have voting responsibilities of that nature, and I was just an executive that was on the board, not

Page 15

independent, not part of any of the committees. I was there more for input and support of the executive team to the board.

Q. And then how does that distinguish from when you became CEO?

A. Nothing changed when I became CEO but my responsibilities as the CEO. I'm still on the board. My board responsibilities evolve, as the CEO, to the board, so the CEO has certain responsibilities to the board itself.

I was then -- as CEO, I would have had conversations with the chairman at that time after the board meeting. Any -- once again, input from the board after the board meeting, he would want me to hear that input. I was responsibile obviously for making sure that the materials that was going to be presented to the board, the subject matters going to be covered. Once again, that's all calendar-based or being coordinated, and as the CEO that became my responsibility versus just being on the board when I wasn't the CEO.

Q. You said that, as CEO, you're responsible for providing materials to the board. What materials were you providing to the board?

A. There was a significant amount of materials that were provided to the board. Once again, this was

Deposition of Gregory Carmichael, Volume I        Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 16

1 all driven by the calendar events that had to take place
2 throughout the year. It's driven by requirements of the
3 regulations in front of us. It's risk-related
4 information, it's our related information, it's even
5 capital information, it's strategic information, it's
6 operational performance, it's regulatory data against
7 regulatory requirements.
8      It's everything you would think of to run a
9 bank in a structured format. That information has to be
10 provided to the board in a very coordinated fashion,
11 based on a calendar of events and points in time in the
12 year. And at the end of the day, we try to provide that
13 information to the board as, you know, hopefully a week
14 ahead of time, but typically it goes out on Thursday.
15      So making sure that all that information was
16 put out on to our platform that we use -- It's called
17 Diligent, making sure that information was available on
18 Diligent at the right time.
19      So just a typical responsibility of the CEO to
20 make sure that the different entities that prepare that
21 information have it done and complete and available to
22 the board so they have time to digest it prior to coming
23 in to the board meeting itself.
24      Q. And what information, with respect to your
25 duties as CEO, would you provide to the board with

Page 17

1 respect to CEO and president's succession planning?
2      A. The information that gets provided to the
3 board -- ask me the question one more time, please.
4      Q. With respect to your duties as CEO, what
5 information would you provide to the board with respect
6 to president and CEO succession planning?
7      A. That would be done in December timeframe, at
8 an executive session of the board. It's a structured
9 meeting. It's on the calendar. We do it every single
10 year, where I go through my executive team and we talk
11 about succession planning for my team. We also then
12 talk about emergency succession plan for the CEO. It's
13 an orchestrated process. It's a requirement by the
14 regulators, a requirement by the oversight governance
15 entities that exist out there that we have succession
16 planning. It's something that's extremely important.
17      But that's presented at that time. The
18 process itself for succession planning of the CEO, and
19 the information used to support that succession planning
20 process, such as emergency successors, or in the now
21 successors, those type of things will all be presented
22 at that December meeting, and that happens annually at
23 that period of time with the board.
24      And that's really, like I think about it at
25 the time, the only time I really spend that type time of

Page 18

1 time with the board on that subject matter. Because
2 it's -- it's the most important thing the board does,
3 succession planning, putting the CEO in place, removing
4 the CEO; it's the most important job. They take it very
5 seriously, and we allocate a lot of time to do that in
6 December. It's the primary objective of the December
7 meeting, is to go through that talent discussion.
8      Q. And what materials do you provide to the board
9 at that December meeting with respect to CEO and
10 president succession planning?
11      A. It's well documented, and I think if you ask
12 Bob, he can provide that information for you if you
13 don't already have it. But there's a -- there's a --
14 there's a document that we presented to him that goes
15 through the whole succession planning process, kind of
16 to break the glass. It talks about emergency sessions,
17 talks about, you know, the process to the -- to a
18 permanent successor in the event that an emergency
19 successor is needed. It defines the different
20 alternatives that a board can evaluate for an emergency
21 successor. And then I go through talent cards of each
22 of my leadership team.
23      Q. And what is your role in putting those
24 materials together?
25      A. Well, it's a partnership of myself and the

Page 19

1 human capital team. Bob Shaffer led that for me at that
2 period of time. So my job would be to make sure, at
3 the end of the day, that the information that we're
4 providing to the board in that context is reflective of
5 how I feel about the individuals in the organization,
6 feedback that I received from the board in prior
7 discussions, performance against that feedback, progress
8 against that feedback over -- since the last time we had
9 that discussion, and making sure we identify potential
10 emergency successors in the event that the board needs
11 those options. That's a board decision. My job would
12 be to make sure that information was correct, to the
13 best of my ability reflects my views and the views
14 that I want to put forth to the board. It's also part
15 of the conversations I've had with the board in prior
16 talent management discussions and feedback they might
17 provide to me throughout the year, if there's feedback
18 from individuals after other sessions with my management
19 team at the board sessions. They could provide me
20 feedback.
21      I bring all that together and I prepare with
22 Bob Shaffer and his team the talent management cards and
23 review the succession planning documentation.
24      Q. Going back to 2019, who are the other people
25 on the human capital team besides Bob Shaffer?

Deposition of Gregory Carmichael, Volume I                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 20

1    A.  I don't know the whole team.  Bob is the one
2  I -- Bob's the only one, quite frankly, that I interact
3  with on this subject, that I can recall.  I don't recall
4  working with anybody else.  It's primarily Bob.
5    Bob works with this team, and at that time,
6  I'm not sure who was in what role and had what
7  responsibilities.  I would be making assumptions and I
8  don't want to do that.  Bob Shaffer was my primary
9  contact in those discussions.
10    Q.  You mentioned feedback from the other
11  directors throughout the year; is that right?
12    A.  Yes.
13    Q.  As far as this process, how was that feedback
14  communicated to you?
15    A.  It's not necessarily part of the process, but
16  it occurs.  So I will get feedback after -- after
17  the individuals on my board, on my management team
18  present to the board.  I could get feedback through the
19  lead director afterwards.  I could get feedback from
20  another member of the board throughout -- after that
21  session or a phone call later, or at the next board
22  meeting, that feedback can come forth.
23    Once again, I've strongly encouraged all my
24  board members to work closely with my team, interact
25  with my team.  They have their information, their

Page 21

1  contact information.  Members of the board often
2  schedule meetings with -- if you're the chair of the
3  Union Cap committee or you're the chair of the audit
4  committee, it's very common for them to set up special
5  meetings, individual one-on-one meetings with the head
6  of audit or the head of HCC on my team.  I encourage
7  that.  That gives them direct access to get to know
8  those individuals, something that I'm very proud of,
9  that's very transparent.
10    So conversations happen all throughout the
11  year with different members on my executive team and the
12  board without me in it.  I'll often get feedback on,
13  hey, great conversation.  Really enjoyed this or that,
14  or learned this.
15    So those type of things happen throughout the
16  year, normal course of business between the board and
17  interacting with the executive team.  I did not want
18  information only funneled through myself; I wanted to
19  make sure they had complete access to my executive team,
20  and they took full advantage of that.
21    Q.  With respect to that feedback, how would it be
22  communicated to you?
23    A.  I just -- I think I answered that.
24    Q.  Well, my question is, was it always verbal?
25  Was it in e-mails?  Was it in text messages?

Page 22

1  Physically, what was the method of communication of the
2  feedback?
3    A.  Thank you for clarification.
4    I would -- I don't recall that I received
5  things -- anything in writing.  They obviously wouldn't
6  text me.  There might be an e-mail; I don't recall an
7  e-mail.  But I will tell you, my recollection would be
8  it was always verbal.
9    Q.  You referred to "my team."  Who are you
10  referring to when you refer to "my team"?  We'll focus
11  on the 2019 timeframe.
12    A.  It would have been the executive --
13  the executive team, my enterprise team.  Refer to them
14  as the enterprise.
15    Q.  The enterprise committee?
16    A.  Yes.
17    Q.  And you indicated there would be one-on-one
18  meetings from the board and different members of your
19  team.  You gave two examples, human capital compensation
20  and the head of an audit.  What other one-on-one
21  meetings are you aware of between -- from board members
22  and members of the enterprise committee?
23    A.  Um, risk and compliance.  I would imagine the
24  head of risk would have -- would -- would have
25  conversations with different board members.  Chief

Page 23

1  credit officer could have conversations with different
2  board members.  Once again, I didn't -- I didn't corral
3  that type of communication; I encouraged it.  I wasn't
4  required to be communicated to when they were reaching
5  out to any member of my team.  I would get feedback and
6  sometimes potentially I wouldn't get feedback.
7    Once again, we tried to -- we tried to make
8  sure the board had access, especially committee chairs,
9  to the individuals that would be a counterpart of my
10  enterprise team.  For instance, the HCC would be Bob
11  Shaffer, the -- whoever was running audit at the time
12  would be the person who was the chair.  I would want to
13  talk to that individual.
14    So I encouraged that.  I wouldn't always be
15  aware that the conversation was happening.  I would
16  sometimes get feedback.  So you know, we have a -- now
17  we have a technology committee, and I know Jorge, who
18  chairs that committee, has oftentimes reached out to
19  Jude Schramm directly, asking for clarification, talking
20  about trends in the industry, things he might like to
21  see at the next board meeting that he thinks are
22  relevant.
23    We do a lot of external education, so maybe
24  want to talk about that things of that nature.
25  That necessarily doesn't all get back to me.  But it

Deposition of Gregory Carmichael, Volume I                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 24

1 could through Jude. Jude might stop by and say, hey, I
2 talked to Jorge. Here's what was on his mind. I'd say
3 fantastic. That kind of communication, it's very
4 informal and encouraged to make sure that my board
5 members have complete access and transparency to my
6 enterprise team.
7     Q.   The feedback that you would receive from
8 various directors throughout the year, would you make
9 notes of any of that feedback?
10     A.   I don't believe I would make a note of
11 something of that nature.
12     Q.   The head of risk would be the chief risk
13 officer; is that correct?
14     A.   Correct.
15     Q.   What are the duties of the chief risk officer?
16     A.   Well, the duties can change based on whether
17 they have -- they have credit reportings or not.
18 Oftentimes, you know, you might find the chief risk
19 officer does not have -- or the chief credit officer
20 reporting to him. Chief credit officer could report
21 directly to the CEO, so that duty could have inflow
22 depending the individual in that role and -- and how the
23 role is structured.
24     But its overall responsibilities is to provide
25 -- as the role states, You know, risk management for the

Page 25

1 organization. So at the end of the day, the bank is in
2 the business to take risks and making sure those risks
3 are well identified, understood, mitigating factors are
4 put in place if necessary, anything and everything
5 related to oversight of our risk tolerance.
6     So there's a risk framework that's put in
7 place. There's risk tolerances that are put in place.
8 There's monitoring mechanisms put in place. There's
9 dashboards that are prepared for the board that they see
10 how we're performing against some of those risk metrics
11 that's presented to the board. So this individual would
12 have responsibility and oversight not just for the
13 methodology, but how the business is performing and
14 being measured against that methodology that is
15 performed, KPIs and so forth. This individual would be
16 responsible for oversight in that, and also working with
17 the lines of businesses to make sure that they have the
18 right risk metrics put in place and they're monitoring
19 appropriately.
20     Q.   The risk you're talking about is financial
21 risk?
22     A.   No, there's -- there's many risks in the
23 organization. There's -- I think we identify eight or
24 nine different risks. You know, reputational risk would
25 be an example of a risk that a bank would take on,

Page 26

1 regulatory risk. You can go down the list. Financial
2 performance, capital risks, liquidity risk.
3     Q.   Who was the chief risk officer in 2019?
4     A.   I believe in 2019 -- I don't have my
5 enterprise chart in front of me -- but I believe that
6 would have been -- 2019 -- Frank Forrest.
7     Q.   You mentioned the position of COO. What are
8 the duties of the COO?
9     A.   Well, that, once again, is dependent on the
10 organization. The COO, by design, that title can mean a
11 lot of things and have a lot of things reporting to it.
12 It's -- it's -- it's a position that we've had at
13 certain times and we haven't had at certain times.
14     So depending on the point in time, it could
15 have different entities and different elements of the
16 organization reporting into it. So I couldn't give you
17 any -- any more information than that. It depends on
18 the point in time, the needs of the organization, talent
19 in the organization; that job can be structured
20 accordingly.
21     Q.   Who would the COO typically report to?
22     A.   If the COO and president was -- was one -- was
23 one combined role, as it was in the majority of my
24 tenure, that COO would report probably most likely to
25 the CEO and president.

Page 27

1     Q.   And if the COO and president are separate
2 roles, who would the COO report to?
3     A.   Could report -- could report to the president,
4 could report to the CEO also, once again, based on the
5 organizational needs.
6     Q.   There was a period of time when you were with
7 Fifth Third that COO was a separate position, correct?
8     A.   I'm not sure of the question. You say
9 separate position?
10     Q.   Just to clarify, you indicated before that you
11 held the role of COO prior to holding the role of
12 president. You weren't necessarily holding both at the
13 same time initially; is that correct?
14     A.   Correct.
15     Q.   So the -- the role of COO was a separate
16 position at that point in time when you held it?
17     A.   It became a separate position at that time.
18 Oftentimes -- I believe, in that period of time, you --
19 at one point, you would have had a CEO/president, and a
20 COO/president; it would have been one role. They broke
21 it out, I believe -- I'm not quite sure what the
22 organizational -- if we -- if -- if the title was there
23 with the president or not, but I believe my predecessor,
24 at the time I was named COO, was president/COO, and then
25 that COO title went to me in 2006. I believe that's how

Deposition of Gregory Carmichael, Volume I         Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 28

1  that occurred, but I'm not positive.

2    Q.  Who did you report to when you were COO, then?

3    A.  When I became COO, initially it would have

4  been Kevin Kabat.  He was the president and then became

5  CEO a year later.  So depending on the timing, I believe

6  it was Kevin Kabat, then -- then Kevin became the CEO in

7  2000, I want to say, late '6 or early '7, somewhere

8  around there.

9    Q.  What is your understanding of the duties of

10  the chief human resources officer?

11    A.  Oversees human capital responsibilities for

12  the corporation in total.

13    Q.  At Fifth Third, who does the chief human

14  resources officer report to?

15    A.  It could vary -- and it has varied --

16  throughout the years.  In my case, here in 2019, then

17  human capital -- human capital officer reported to

18  myself, Greg Carmichael.

19    Q.  And who was the chief human resources officer

20  at that time?

21    A.  Bob Shaffer.

22    Q.  Mr. Carmichael, were you aware that you filed

23  a counterclaim against Phil McHugh as a result of him

24  filing claims of age discrimination against you?

25    A.  Yes.

Page 29

1    Q.  When did you become aware of that?

2    A.  When it was filed.

3    Q.  Have you reviewed the counterclaim?

4    A.  I did at the time it was filed.  It's been

5  some time since I've seen that claim.

6    Q.  And did you believe the allegations to be

7  accurate that were set forth in the counterclaim?

8    A.  Absolutely.

9    (Exhibit 2 is marked for identification.)

10  BY MR. SABA:

11    Q.  Mr. Carmichael, you've been handed what's been

12  marked as Exhibit Number 2.  Are you able to identify

13  this document for me?

14    A.  It looks like the counterclaim you were just

15  referring to.

16    Q.  It would also include Fifth Third's answer to

17  the amended complaint filed by Philip McHugh, but you're

18  referring to the second half as the counterclaim?

19    A.  Right.  Yes.  I see that.

20    Q.  If I can refer you to page 20.  Let me first

21  ask, you said you reviewed the counterclaim.  Did you

22  review it for accuracy?

23    MR. CIOFFI:  Objection.  Can you clarify the

24  question?  He's not a lawyer, so -- I'm assuming

25  factual accuracy?

Page 30

1    MR. SABA:  I'm asking about the factual --

2    MR. CIOFFI:  As opposed to legal claims.

3  BY MR. SABA:

4    Q.  Did you review the factual allegations for

5  accuracy?

6    A.  I believe the claim -- the counterclaim itself

7  and what's in this document is accurate and correct when

8  I reviewed it.

9    Q.  If I could refer you to page 20, paragraph

10  number 5.  Do you see that?

11    A.  I do.

12    Q.  It indicates, since August 2018, plaintiff

13  Philip McHugh was employed by Fifth Third as executive

14  vice president and head of Fifth Third regional bank.

15    Is that right?

16    A.  That's what it says, correct.

17    Q.  What would have been Phil McHugh's duties as

18  head of regional banking?

19    A.  The head of regional banking, it's a position

20  that -- that five different people held over ten years.

21  We use it as a opportunity, a developmental opportunity.

22  It's more of an administrative role, overseeing the

23  regional presidents.  At any one time, we would have 14,

24  16, 17 regional presidents.  They obviously can't all

25  report, you know, directly to the CEO, nor should they.

Page 31

1  So it was more of an administrative role, providing

2  oversight for the regions, responsible for making sure

3  there was coaching in place, performance reviews,

4  lessons learned from one region to the other.

5    That was the way we used that --

6  that position.  Helping the organization in the region

7  prepare for a potential ops review, where we go in and

8  we sit down, we spend time with the region.

9    This individual would kind of be an oversight

10  role, administrative role position.  That's what the

11  regional job was.  Once again, five different people

12  have had that role in ten years.  I use that as a

13  rotational development position for -- for individuals

14  on my team.

15    Q.  And the regions that would have reported to

16  Phil McHugh at that time, that would have included the

17  Cincinnati region as well; is that correct?

18    A.  At that time, yes.

19    Q.  If I can refer you to paragraph 6.  It

20  indicates plaintiff's combined 2020 compensation package

21  in his role as head of regional banking, a total of

22  2,050,352.  Is that correct?

23    A.  I couldn't answer that.  I mean, if that's

24  what it says here and that's what we put in here, I

25  believe that would be correct.  But we wouldn't put

Page 32

1  misinformation there, so I assume that that's what he
2  made, if we typed it in this document.
3      Q.  What -- where would that information have come
4  from?
5      A.  It would have came from our compensation
6  department.  They report on our human capital position.
7      Q.  And that's a -- that's a compensation figure.
8  You provide that indication to him at an annual review;
9  is that correct?
10     A.  I sit down in February; I go through his
11 rewards against -- for performance against the prior
12 year, how our long-term equity performed.  I give him
13 the awards for the prior year and his compensation
14 numbers.  Then any changes in his go forward
15 compensation would also be communicated and reflected at
16 that time in the document.
17     Q.  In paragraph 7, you indicate, in late 2018,
18 Fifth Third Bank president chief executive officer and
19 chairman of board of directors, Gregory Carmichael,
20 approached plaintiff and offered him the position of
21 president of one of Fifth Third's largest regions.  Is
22 that correct?
23     A.  That is correct.
24     Q.  Okay.  And the region that you're referring to
25 there, that you offered to Phil McHugh, was the

Page 33

1  Cincinnati region; is that correct?
2      A.  That is correct.
3      Q.  And you already indicated, at that time, the
4  Cincinnati region was already reporting to Phil McHugh;
5  is that correct?
6      A.  I want to go back.  I need to verify, because
7  at -- that Cincinnati position was in and out -- was --
8  was -- may not have been in the region at that time.
9  I'm not positive.  Thinking back, that may not have been
10 in there at the time; I really don't know.  I'm not sure
11 if it was in there yet or we put it in afterwards.  I'm
12 not -- I'm not positive of that.
13     Q.  However, if that region was already reporting
14 to Phil McHugh, that would have been a demotion to go
15 down to heading a region that was already reporting to
16 him; isn't that right?
17         MR. CIOFFI:  Objection.  Calls for
18     speculation.  And, Counsel, how are you defining
19     demotion?
20         MR. SABA:  Go ahead.  You can answer.
21         MR. CIOFFI:  If -- if you can, without
22     speculating.
23         THE WITNESS:  I'm not going to speculate.  I'm
24     trying to remember the timeframe we're talking
25     about here.  That region, I don't believe -- I

Page 34

1  would not have had that conversation -- this is
2  correct.  I had that conversation with Phil McHugh
3  about taking over the president and CEO of the
4  Cincinnati region, our largest region, our flagship
5  company.  I don't believe the region was -- that
6  Cincinnati region was probably in the regional
7  structure yet.  We had it separate.  I just can't
8  be positive of that, but I'm pretty sure it's
9  correct.  I offered that to Phil because Phil
10 acknowledged to me many times that Cincinnati's
11 home; this is where he wants to be.  It's a very
12 different region than the other regions.  It's our
13 largest region.  It's our flagship.  It's viewed
14 very differently.  That's why it was independent of
15 the other regions for many -- most of my career, it
16 was independent of the other regions.  And we had
17 it as an enterprise position.
18     So when Bob would have had that, when another
19 individual would have had that, like Michael, it
20 was not part of the regional structure.  It was
21 held on its own because of the importance of that
22 market and that region.  So at that time, when I
23 mentioned that to Phil, I don't believe it was
24 necessarily reporting into the regions at that
25 time, as I think through it.

Page 35

1      Regardless, it was a region, it was a great
2  opportunity, and I knew he wanted the opportunity
3  to be responsible in the community and have that
4  opportunity to lead an entity like the Cincinnati
5  region in the community, as part of the community.
6      Q.  In paragraph 7, it references, in late 2018.
7  What is meant by "late 2018"?
8      A.  Well, I'd think it would be the second half of
9  the year.
10     Q.  Are you able to be more exact than the second
11 half of the year?
12     A.  Without going back, I don't know.  Late --
13 late 2018.  I mean, can't be more exact than that.
14     Q.  How was that offer made to Phil McHugh; was
15 that made in writing?
16     A.  No, I sat down.  I was in Phil's office.  I
17 asked him if he'd be interested in leading the regions.
18 As I go back and think about that conversation that you
19 brought forth, it was an enterprise role at that time.
20 Cincinnati was an enterprise role at that time, so
21 therefore, it wasn't reporting into the regions.  So I
22 asked him if he wanted to take over that region.  He
23 quickly informed me that he was not interested in it
24 because he was only planning on working five more years.
25 And he thought someone that would take over the region

Deposition of Gregory Carmichael, Volume I          Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 36

1 needed to be work -- work more than five years.  It
2 wouldn't be fair to the region.
3     I then asked Bob Shaffer to approach Phil
4 McHugh and ask him if he would reconsider that
5 opportunity, and he told Bob Shaffer, as Bob
6 communicated back to me, that he only wanted to work
7 five more years and that he was not going to take that
8 job.
9     Q.  Didn't Phil actually tell you he was not
10 connected in the Cinci market enough to be successful
11 there?
12     A.  No, he didn't.  That was not what he said at
13 all.
14     Q.  That's not what he said to you?
15     A.  That's not what he said at all.
16         (Exhibit 3 is marked for identification.)
17 BY MR. SABA:
18     Q.  Mr. Carmichael, I've handed you what's been
19 marked as Exhibit Number 3.  And for point of reference,
20 as we proceed in the deposition, this has a Bates stamp
21 number, which is that number you see in the bottom
22 left-hand corner.  Fifth Third McHugh 0213064.  Do you
23 see that?
24     A.  On the bottom, which --
25     Q.  Left-hand corner.

Page 37

1     A.  Yes, I see it.  Yes.  Okay.
2     Q.  So for future reference, we'll be referring to
3 Bate stamp numbers.  That's what that is.
4     A.  Okay.
5     Q.  Mr. Carmichael, this was produced as a text
6 message exchange between yourself and Mr. Shaffer.  Do
7 you recognize your phone number there of 513-765-9166?
8     A.  That's correct.
9     Q.  Okay.  And do you recognize that 513-470-8400
10 is Mr. Shaffer's cell phone number?
11     A.  I don't recall what Bob Shaffer's cell phone
12 number is offhand.  I just have him in my phone as Bob
13 Shaffer, so I --
14     Q.  You don't dispute, as I represent to you, that
15 that's Mr. Shaffer's cell phone number; is that right?
16     A.  I'm not sure if it is or isn't.
17     Q.  Okay.  And this text message exchange, I'm
18 going to refer you specifically to the July 2, 2018,
19 text, at 8:09 p.m. from Mr. Shaffer to you.  Do you see
20 that?  Are you able to see where that is?
21     A.  I got my glasses on now, so which text
22 exact --
23     Q.  I'm referring specifically to the one on
24 July 2, 2018, on 8:09 p.m.  That would be 2009 military
25 time.  Do you see that?

Page 38

1     A.  2009, yes, I see that.
2     Q.  And Mr. Shaffer says to you, I forgot to ask
3 you today, have you had a chance to talk to Phil and
4 find out why he doesn't want to be the Cinci RP?  Do you
5 see that?
6     A.  I do.
7     Q.  And RP would stand for regional president; is
8 that right?
9     A.  That's correct.
10     Q.  Okay.  That's the position we've just been
11 talking about; isn't that right?
12     A.  Yes.
13     Q.  And could you read what your response was?
14     A.  Yes, I doesn't {sic} feel he is connected
15 enough in the Cincinnati market to be successful.
16     Q.  And there's a typo in there, correct, in terms
17 of how you typed that; is that right?
18     A.  Appears so.
19     Q.  So the indication you gave to Mr. Shaffer at
20 that time was that Phil did not feel connected enough in
21 the Cinci market to be successful; isn't that right?
22     A.  That's what this text says.
23     Q.  Okay.  There's no mention of, oh, he's going
24 to retire in five years or he only wanted to stay five
25 years; isn't that right?

Page 39

1     A.  Not in this text, there's not.  But that's
2 what he told me.
3     Q.  All right.  Is there any written documentation
4 that would indicate to the contrary of this text that
5 you sent to Mr. Shaffer, that Mr. McHugh somehow
6 indicated that I will only stay with the company five
7 more years?
8         MR. CIOFFI:  Objection to the form of the
9 question.  Mischaracterizes the e-mail in the use
10 of the word contradiction.  You may answer.
11         THE WITNESS:  Phil McHugh told me he wasn't
12 going to take the position because he felt
13 that that role needed to have someone that wanted
14 to work more than five years.  That's what he told
15 me.  Did he mention the word "connected"?
16 Obviously he did because I put it in this text, but
17 he told me he did not want to take that position
18 because he did not want to work five more years.
19         We have regional presidents that step into new
20 regions and build connectivity over years, all
21 right?  The fact that he wanted to work five more
22 years, maybe he felt he couldn't build that
23 connection in five years because he only wanted to
24 work five years.  He knew -- he felt the market
25 needed someone in that position more than five

Deposition of Gregory Carmichael, Volume I          Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 40

1  years.  And he was clear that he did not want to
2  work more than five years when I offered him that
3  position, and if the word connectivity -- which he
4  obviously did -- to the marketplace, because he
5  didn't feel he could establish that connectivity in
6  that period of time, he wasn't going to be
7  connected to the market.  That's all I can
8  reference from this conversation.
9      But the glowing thing, and the most important
10  thing was -- is he was only going to work five more
11  years, that's what he told me.  And he didn't think
12  he could build the relationships, and the market
13  needed somebody who's going to work five more years
14  to build those relationships.
15  BY MR. SABA:
16    Q.  Didn't Phil McHugh actually indicate to you
17  that he did -- that it would take five to seven years to
18  be successful in that position, and he didn't want to
19  work in that position for five to seven years?
20    **A.  No.  He thought -- he knew it was going to**
21  **take time to build the relationships to connectivity,**
22  **but he was only going to work five more years.  He never**
23  **ever said work in that position for five years.  He only**
24  **wanted to work five more years.**
25    Q.  And do you have any notes from that meeting?

Page 41

1    A.  No, I don't.
2    Q.  You didn't make any written record of
3  that meeting?
4    **A.  No.  I stepped in his office and asked him if**
5  **he'd be interested to step into that role.  Now as I go**
6  **through my recollection, that was not reporting to the**
7  **regions at the time; it was an enterprise position.  He**
8  **was not on enterprise.  So it was an opportunity to step**
9  **onto the enterprise.  That's what assistant in that**
10  **region always reported into, was on the enterprise**
11  **committee.  The regional head of all the regions did**
12  **not, because it was more administrative role.  We viewed**
13  **Cincinnati very differently, all right?**
14    **And I asked him if he wanted to step into that**
15  **role, which would put him on enterprise, and he said he**
16  **only wanted to work five more years, and he did**
17  **reference his ability to establish himself in the**
18  **marketplace, build those relationships, and that wasn't**
19  **going to be fair to the market since he was only going**
20  **to work five more years.**
21    Q.  But you made no reference to that to
22  Mr. Shaffer; is that right?
23    **A.  Not in this text message, I didn't.**
24    Q.  In fact, instead, what you do is, you actually
25  have the Cincinnati region ultimately report to

Page 42

1  Mr. McHugh; isn't that right?
2    **A.  I think, as I looked at the consistency**
3  **necessary going forward, for the regions, and with Phil**
4  **stepping into that role, we did bring the Cincinnati**
5  **region under the regional president at that time.**
6    **I had to go back and look exactly what the**
7  **timeframe was when I moved the Cincinnati region into**
8  **the regional -- rest of the regional structure, because**
9  **it was a very different region, thought out very**
10  **differently and viewed very differently.  That's why it**
11  **was on enterprise.  So from a timeframe perspective, at**
12  **some point, that region reported into the region**
13  **structure and to Phil McHugh.**
14    Q.  Okay.  After this point in time; is that
15  correct?
16    **A.  I believe that to be the case, yes.**
17    Q.  Do you recall that occurring in August of
18  2018?
19    **A.  I do not recall exactly when it occurred.**
20    Q.  Okay.  You wouldn't dispute that that occurred
21  in August 2018?
22    **A.  I don't know.  I don't -- I don't have -- I**
23  **don't have that -- that information in front of me, to**
24  **go back and look exactly when that move was made.  It**
25  **could have happened at that point; I'm just not sure.**

Page 43

1    Q.  Referring back to the second exhibit, in
2  paragraph 8, if you could go back to page 21.
3    **A.  Okay.**
4    Q.  Paragraph reads, shortly thereafter, Fifth
5  Third chief human resources officer Bob Shaffer and
6  another Fifth Third executive each had a conversation
7  with plaintiff about the position of president of one of
8  Fifth Third's largest regions.
9      Who is the -- another "Fifth Third executive"
10  that's referenced there?
11    **A.  I believe that individual is Mike Michael.**
12    Q.  When did these conversations occur between
13  Phil McHugh and Bob Shaffer and Mike Michael?
14    **A.  It would have been very shortly after the**
15  **timeframe in which I had a conversation with Phil about**
16  **the opportunity to be the CEO of the Cincinnati market.**
17    Q.  And what was Mike Michael's role with Fifth
18  Third at that time?
19    **A.  I got to go back in time to think.  Mike**
20  **Michael, at one point, was the Cincinnati regional**
21  **president.  Then I think we elevated him -- we did**
22  **elevate him to the chairman of the Cincinnati market to**
23  **keep connectivity with Mike.  Great, great leader for**
24  **us, very well connected in the marketplace.**
25    **So I believe, at the time, that he would have**

Deposition of Gregory Carmichael, Volume I                          Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 44

1 been the -- chairman of the Cincinnati market was his
2 title. Not working full-time, still with the bank,
3 providing oversight to -- to the CEO and president of
4 the Cincinnati market. Once again, Mike had deep roots
5 and -- and -- and connectivity in the Cincinnati region.
6 We thought there was tremendous value in retaining his
7 services as part of the Fifth Third Bank. So I believe
8 that's Mike Michael.
9     Q. Have you had any discussions with Mike Michael
10 about this 2018 conversation with Phil McHugh?
11     A. Not that I can recall.
12     Q. Why would you know that that is Mike Michael
13 then?
14     A. Because that would have been the only other
15 executive in his capacity -- restate the question?
16         Because I asked Mike to go speak with -- with
17 Phil. You said after -- what timeframe are you talking
18 about when you "say afterwards"? Just so I'm clear
19 about when you say --
20         MR. CIOFFI: Counsel, please repeat the
21     question so there's no --
22 BY MR. SABA:
23     Q. At -- at any time did you have a
24 conversation -- discussion with Mike Michael about his
25 conversation with Phil McHugh?

Page 45

1     A. I did, shortly after he had the conversation
2 with Phil.
3     Q. Do you have any notes of that meeting with
4 Mike Michael?
5     A. I do not.
6     Q. Did Mike Michael take any notes of that
7 meeting?
8     A. Not that I'm aware of.
9     Q. Other than your text message exchange with
10 Mr. Shaffer, do you have any other communications with
11 Mr. Shaffer and Mr. Michael regarding Phil McHugh
12 declining the Cincinnati regional president position?
13     A. I don't believe so.
14     Q. The allegations in -- in paragraph 9 of the
15 counterclaim. At that time, plaintiff told each
16 executive separately that he would not accept the
17 position of president of one of Fifth Third's largest
18 regions because it was his intention to work only for
19 the next five years before he would enter retirement.
20 He stated that he did not feel it would be fair to Fifth
21 Third because success in that position would take longer
22 than five years. The need for continuity warranted the
23 installation of someone who would remain with the Fifth
24 Third Bank for longer than five years.
25         Do you see that?

Page 46

1     A. I do.
2     Q. Where did that information come from?
3     A. It came from my conversation with -- with
4 Phil, subsequent conversation that Bob Shaffer had with
5 Phil, and my ask of -- of Mike Michael, as executive --
6 or as the chair of the region, to speak with Phil.
7     Q. When was Bob Shaffer's conversation with Phil?
8     A. It would have been sometime after I first
9 spoke with Phil. Shortly thereafter.
10     Q. Was this after your text message exchange with
11 Bob Shaffer?
12     A. Repeat the question, please?
13     Q. Yes. I asked, when was Bob Shaffer's
14 conversation with Phil McHugh, and you said it was after
15 your conversation with Phil McHugh, and I asked, was it
16 after -- was Bob Shaffer's conversation with Phil McHugh
17 after your text message exchange with Bob Shaffer?
18     A. I'm not sure. I'm not sure when -- when --
19 the text went versus when he had the conversation with
20 Phil; I don't know.
21     Q. Were you present for the conversations between
22 Phil McHugh and Bob Shaffer and/or Mike Michael?
23     A. I was not present.
24     Q. Where does your understanding of what happened
25 during those conversations come from?

Page 47

1         MR. CIOFFI: Objection. Asked and answered.
2     He testified that they told him.
3         THE WITNESS: That's correct. Bob came back
4     to me afterwards, reiterated what Phil told me. I
5     asked Mike to also approach him to see if he might
6     reconsider. Mike shared with me the conversation,
7     that he only wanted to work five more years and
8     didn't think he could build the connectivity
9     relationships in the marketplace.
10 BY MR. SABA:
11     Q. And with respect to that conversation with
12 Mr. Shaffer, did you make any notes of that
13 conversation?
14     A. I did not.
15     Q. Is -- is that recorded anywhere, the comments
16 made by Mr. Shaffer or what Mr. McHugh allegedly said to
17 Mr. Shaffer?
18     A. I did not take any notes or make any -- any
19 comments anywhere with -- in those conversations. So I
20 do not have any recollection of making any notes or
21 taking any notes on that conversation.
22     Q. Do you know if Mr. Shaffer has any notes from
23 that?
24         MR. CIOFFI: Objection. Asked and answered.
25         THE WITNESS: I'm not aware of any.

Deposition of Gregory Carmichael, Volume I                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 48

BY MR. SABA:

Q.  Are you representing today that, during your
conversation with Phil McHugh, he specifically indicated
that he would be entering retirement?

A.  He never used the word "retirement." He told
me he only wanted to work five more years.

Q.  Referring you to paragraph 10, following many
months of succession planning in 2020, Tim Spence, an
experienced high ranking executive at Fifth Third Bank,
was vetted for the position of president at Fifth Third
Bank. Mr. Spence is in the same protected age
classification of over 40. Do you see that?

A.  I do.

Q.  Okay. And with respect to the "many months of
succession planning," what is that referring to?

A.  Well, succession planning is a process that
goes over an extended period of time. We do that, we --
we exercise that process every single year in December,
as I referenced earlier in my testimony. So at the end
of the day, it's a process. We go through it each year
with the board. There's development plans around
potential individuals in the organization with respect
to succession planning. So that's what that's referring
to.

Q.  And it indicates that Mr. Spence was "vetted

Page 49

for the position of president." What does that mean, he
was "vetted"?

A.  Part of our talent management process and
succession planning process. Those discussions were
held by the board. The board vets that; it's the
board's decision. It's the board's opportunity to go
through the succession planning process as structured
and as required by the regulators, as required by the --
by the Glass Lewis and -- and other oversight entities.
They review that process. They vet the process.

Q.  And that's all that's referring -- that's all
that's referring to with respect to the vetting; it's
the board's decision to appoint Mr. Spence, or is that
referring to anything else as vetting for the position
of president?

A.  The board is the only one that makes that
decision. It's a board process. The board elects the
president; the board elects the CEO. That's their job.
So any vetting that was done is with respect of the
talent management process, assess management process
that was done in December; it was the board.

Q.  And you were the chairman of the board at that
time; is that right?

A.  I was.

Q.  So referring to the next paragraph, the bank

Page 50

did not conceal this vetting activity. So the bank was
not concealing that the board would decide who would be
the next president. Is that what that means?

MR. CIOFFI:  Objection. The paragraph, the
words speak for themselves. But if you have
something to add, you can add something.

THE WITNESS:  No. It's part of the vetting
process; it's coming out of the talent management.
For the vetting process for Tim Spence would have
been an independent assessment as requested by the
board. Marsha Williams called me after the talent
management discussion in December and asked me to
have RHR engage. That was their decision; that was
their selection. It was the same individual and
organization used when I became -- was vetted for
the -- for the CEO position. So part of the
board's vetting process also included independent
assessment of Tim Spence by RHR.

BY MR. SABA:

Q.  And was that independent assessment a
necessary part of Tim Spence being vetted for the
position of president with Fifth Third Bank?

A.  It was the board's decision and it was the
board's request to validate their beliefs and -- and
their understanding of who they believe was the best

Page 51

qualified person to -- to be put in the position of
president, CEO. That's their decision. They asked to
have further validation by bringing in a third party
that's recognized as an industry leader, expert, and has
done this for hundreds of companies. It's one they were
comfortable with because they'd used them prior.

I did not request they bring in RHR. They
requested that. And Bob Shaffer facilitated that
process. So when you think of vetting here, that was
part of the board's vetting of Tim Spence.

Q.  And my question was, is that vetting of Tim
Spence by RHR, this independent third party, was that a
necessary part of Tim Spence being appointed president
of Fifth Third Bank?

MR. CIOFFI:  Objection to the form of the
question, Counsel. He answered the question. Do
you have a particular definition of "necessary"?

BY MR. SABA:

Q.  I meant, do you understand what the word
"necessary" means?

A.  Yes, I'm very well of what the word necessary
means.

Q.  Okay. Thank you.

My question --

MR. CIOFFI:  But do you know what it means in

Deposition of Gregory Carmichael, Volume I                     Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 52

1  the context of his question?
2      MR. SABA: Thank you. It's my deposition, not
3  your deposition. You can ask him questions,
4  Michael. The issue is -- he indicated he
5  understands --
6      MR. CIOFFI: You've asked the question three
7  times --
8      MR. SABA: It's not if you understand.
9      MR. CIOFFI: Emphasizing the word necessary.
10     MR. SABA: No, I haven't.
11     MR. CIOFFI: You have. You're using it as a
12  term of art. That's the point of the objection.
13     MR. SABA: No, I'm not. I asked if he
14  understands. He understands. Whether or not you
15  want to interrupt and put your own answer in is
16  not -- it's not appropriate.
17     MR. CIOFFI: The objection is our only way to
18  have a clear record. If you can answer the
19  question, answer the question.
20     THE WITNESS: Let me -- let me try and answer
21  the question, what I think you're referring.
22     The board's not required to have an
23  independent third-party assessment. The board
24  elected and they felt that -- that as a good part
25  of their due diligence in assessing talent that

Page 53

1  would be the next CEO of the company, you get a
2  third-party opinion, understand how that
3  individual, against their database of other CEOs
4  would stack up, and Tim stacked up exceptionally
5  well top core down. All right?
6      They wanted that confirmation. They felt that
7  they would like to have that confirmation and
8  validation. That was their decision. Whether it
9  was necessary or not, they obviously wanted to do
10  it. Whether they thought that was necessary or
11  not, that was the board's decision. I wasn't in
12  that conversation.
13  BY MR. SABA:
14     Q. You were a member of the board at that time,
15  correct?
16     A. I was a member of the board, but not -- when
17  the board has an executive session, I step out. So I am
18  not in an executive session of independent directors
19  where those conversations could happen.
20     Q. With respect to -- let me -- let me ask you
21  this a different way.
22     Was -- was Tim Spence going to be made
23  president of Fifth Third Bank without being vetted by
24  RHR?
25     A. I can't answer that.

Page 54

1      MR. CIOFFI: Yeah, objection to the form of
2  the question. Calls for speculation.
3      THE WITNESS: I won't speculate. I can't
4  answer. This is a board process. They take it
5  very seriously. We have a lot of very successful
6  board members who take this job very seriously.
7  They're independent. I don't rubber stamp
8  anything. This was not my recommendation. This
9  was the board's decision. The board wanted RHR. I
10  have no clue whether they felt that that was a
11  mandated requirement, that they had to do it. They
12  did it. It was a request.
13  BY MR. SABA:
14     Q. Referring back to paragraph 11, the first
15  sentence reads, the bank did not conceal this vetting
16  activity, which was widely known across the bank. What
17  does that mean, it was "widely known across the bank"?
18     A. Once again, this was written some time ago,
19  but what I believe that -- widely known across the bank,
20  is that when they brought in RHR as part of the vetting
21  process with Tim Spence, right, that process involved
22  peers being interviewed by RHR, Guy in particular,
23  Odyne. It also involved subordinates, reports of Tim
24  Spence, being interviewed as part of the process. It
25  involved a lot of things, reaffirming the CEO profile,

Page 55

1  the winning formula.
2      So that was known, and I think they brought in
3  quite a few of his peers and a few of his direct
4  reports. So when it says it was known, it was also
5  known to Phil McHugh that Tim was being put through the
6  vetting process. Phil McHugh was part of the vetting
7  process. Phil McHugh didn't have any objections. When
8  you look at the feedback that was -- that was --
9  that was put together by RHR from his peers and his
10  subordinates, Tim got very high marks, all right? There
11  was no one stepping up and saying this person was not
12  the right individual to become the CEO or president of
13  the company.
14      So when I say it was known, there was many
15  people involved in this vetting process of Tim for the
16  next president of Fifth Third Bank.
17     Q. All right. Did you have any conversations
18  with Phil McHugh about him being involved in the vetting
19  process by RHR of Tim Spence for president of Fifth
20  Third Bank?
21     A. I believe that I spoke with each one of Tim's
22  peers to let them know that they would be involved in
23  this process. It would have been irresponsible of me
24  not to communicate to them that this process was going
25  to take place and that they would be involved in this

Deposition of Gregory Carmichael, Volume I                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 56

1 process. I would not want them surprised by someone
2 from the outside reaching in to them and out to them and
3 asking them for information on a peer of theirs without
4 understanding the process.
5       So as I would always do, I would absolutely
6 have talked to each of these individuals that was a peer
7 of Tim Spence and informed them of the process and what
8 was going to take place.
9       Q.   When did you have this conversation with Phil
10 McHugh?
11      A.   I can't answer that question. I don't have
12 the -- I don't have that in front of me.
13      Q.   What do you recall about the conversation you
14 had with Phil McHugh, about RHR vetting Tim Spence?
15      A.   I don't -- I don't really recall the
16 conversation with respect to -- I just let them know it
17 was going to -- it was going to transpire. I don't
18 recall Phil McHugh reacting to that, those statements. He never said -- he definitely never
19 those statements. He never said -- he definitely never
20 said why am I not being vetted? Why am I not being
21 considered for the president because you've -- you've
22 promised me in some way that I would be that? Never a
23 conversation of that nature.
24      I would have informed him it was going to
25 happen, and I think he acknowledged that. He didn't

Page 57

1 come back and ask me or why this or why that? He said
2 he would -- he would talk to him when he call him.
3 That's what I remember.
4       Q.   Do you recall anything specifically that was
5 said during that conversation?
6       MR. CIOFFI:   Objection. He just answered the
7 question.
8       MR. SABA:   He told me what wasn't said. I'm
9 trying to -- I'm trying to have you tell me what
10 specifically was said.
11      THE WITNESS:   I cannot recall anything Phil
12 said except where he would be prepared to take the
13 conversation and participate. I'm not aware of
14 anything more than that, and I cannot recall
15 anything more than that about that conversation.
16 BY MR. SABA:
17      Q.   Can you recall anything you specifically said?
18      MR. CIOFFI:   Objection. He answered the
19 question.
20      THE WITNESS:   I just informed him that this
21 process was going to take place, that Tim was being
22 assessed by a third party for potential president
23 of CEO -- of Fifth Third Bank, and that they would
24 be part of that vetting process. And you would --
25 so expect a call from this individual and he's

Page 58

1 going to want an interview. That's the only
2 conversation I had.
3 BY MR. SABA:
4       Q.   And that conversation, was that documented
5 anywhere in writing?
6       A.   I did not document every one of these
7 conversations with every one of his peers or
8 subordinates if I talked to them. I just informed them
9 that was going to happen. I did not write anything
10 down.
11      Q.   Did you indicate to any of these individuals
12 that Tim is -- the timing for when Tim would be
13 succeeding you as president and CEO?
14      A.   It's not my decision. That's the board's
15 decision. I would never ever talk about the timing of a
16 decision of that nature when it's not my decision. It's
17 the board's decision.
18      I'm going back; RHR would have required me, by
19 the way, in conversations with Guy, to make sure
20 that these individuals were going to be informed that
21 they were going to be getting a phone call from his
22 organization.
23      So that is what -- also, as I remember back, I
24 would have did it anyway, but he reminded me it has to
25 be done before he makes a call in to them so they're not

Page 59

1 surprised, so.
2       Q.   So with respect to these conversations you had
3 with these individuals, you wouldn't have necessarily
4 indicated any timing of when Tim Spence would become
5 president and/or CEO --
6       MR. CIOFFI:   Objection. Asked and answered.
7 Counsel, you -- you keep repeating questions, and
8 I'll remind you of the court's order. You're only
9 permitted to go a second day if the questions
10 aren't redundant. This is sort of the third time
11 you've asked him that question.
12      MR. SABA:   They're not redundant questions.
13      MR. CIOFFI:   He can answer.
14      It is a redundant question. The record will
15 speak for itself. I mean, it's not the only
16 redundant question in the first hour.
17      MR. SABA:   Michael --
18      MR. CIOFFI:   Could you repeat the question,
19 please?
20      (The record was read.)
21      MR. CIOFFI:   Objection. Asked and answered.
22 Twice already. But you may answer it again.
23      THE WITNESS:   I would never provide timing to
24 anybody when I don't know the timing myself.
25 And this is a decision the board makes. And

Deposition of Gregory Carmichael, Volume I

Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 60

1  obviously, the vetting process is the vetting
2  process, and the board makes decisions based on the
3  outcomes of those processes.
4  BY MR. SABA:
5      Q.  During this conversation you had with Phil
6  McHugh about the vetting process, did you specifically
7  indicate to him that he was not being considered for
8  president and/or CEO?
9      **A.  I would never have that conversation about him**
10 **not being vetted for CEO or president because he was**
11 **never considered.  He knows he was never considered, all**
12 **right?  That's why he never responded back when I told**
13 **him that RHR was coming in to assess Tim and vet Tim; he**
14 **never once said why not me, because he was never being**
15 **considered.  He knew he wasn't being considered because**
16 **he wasn't qualified.  At no discussion ever with Phil**
17 **McHugh did we ever talk about him being the permanent**
18 **future leader of Fifth Third Bank as a CEO.  We never**
19 **had a conversation of that nature.  Never happened.**
20     Q.  Did you, during this conversation you had with
21 Phil McHugh about Tim Spence being vetted by RHR -- did
22 you indicate to Phil McHugh that you were not going to
23 recommend him as president and CEO succeeding you?
24     **A.  I never had a conversation about recommending**
25 **him as president/CEO succeeding me.  The only**

Page 61

1  **conversation that ever occurred with Phil McHugh was**
2  **would he be interested, if something happened to me and**
3  **I had to step out, would he be interested to be**
4  **considered as an emergency successor if the board wanted**
5  **him to step into that role?  It's a board decision**
6  **again.  My job is to make sure that the individual would**
7  **be willing to do that as an emergency successor.  That's**
8  **keeping the lights on, keeping the trains on the track,**
9  **keeping things moving forward until the board completed**
10 **their process.  That was the only conversation, ever, I**
11 **had with Phil McHugh about, quote, CEO job, and it was**
12 **an emergency successor.**
13     MR. SABA:  If we can go off the record.
14     THE VIDEOGRAPHER:  It's 10:56 a.m.  We're
15  going off the record.
16     (A recess was taken from 10:56 to 11:14.)
17     THE VIDEOGRAPHER:  The time is 11:14 a.m.
18  We're back on the record.
19  BY MR. SABA:
20     Q.  Mr. Carmichael, referring you back to
21  Exhibit 2, paragraph number 10 of the counterclaim, and
22  I'm on page 21.
23     The last sentence of paragraph 10 reads,
24  Mr. Spence is in the same protected age classification
25  of over 40.

Page 62

1      Who is that referring to, "the same protected
2  age classification" as whom?
3      MR. CIOFFI:  Objection.  It calls for a legal
4  conclusion.  If you can answer.
5      THE WITNESS:  I would just be making -- I
6  mean, I would assume we're talking about Phil
7  McHugh here, same protected class.  That's an
8  assumption, but I don't -- I don't know why else it
9  would be in there.
10 BY MR. SABA:
11     Q.  What is your understanding of what constitutes
12  age discrimination?
13     MR. CIOFFI:  Objection.  Calls for a legal
14  conclusion.
15 BY MR. SABA:
16     Q.  I'm asking for your understanding.  Go ahead.
17     MR. CIOFFI:  Well, his understanding is
18  irrelevant, Counsel, and it's beyond the scope of
19  discovery.
20     MR. SABA:  Go ahead.
21     MR. CIOFFI:  If you can answer.
22     THE WITNESS:  Discrimination of an action,
23  someone that is, legally, I guess, above 40 years
24  old, that you're -- you're doing and taking an
25  action, based on their age, that's detrimental to

Page 63

1  them, would be my understanding of age
2  discrimination.  You're making decisions based on
3  age.
4  BY MR. SABA:
5      Q.  Did you believe that, because Tim Spence was
6  over the age of 40, that you were free to make a
7  decision based upon age with respect to Phil McHugh?
8      MR. CIOFFI:  Objection.  Assumes facts not in
9  evidence, and no decision was -- was based on age.
10  That's what he just testified to.  Could you repeat
11  -- read the question back.
12     MR. SABA:  Re-read the question, then.
13     (The record was read.)
14     THE WITNESS:  Yes.
15 BY MR. SABA:
16     Q.  Did you believe that, because Tim Spence was
17  over the age of 40, that you were free to make a
18  decision regarding Phil McHugh, based upon age?
19     **A.  I don't ever make age a factor in any**
20 **discussion on this topic.  This is -- at the end of the**
21 **day, it was based on qualifications.  Phil was not**
22 **qualified for the CEO, so he was never considered.  It**
23 **had nothing do with his age.  He just wasn't qualified.**
24 **I can give you all the examples of why he wasn't**
25 **qualified.  I'm sure you'll ask.**

Deposition of Gregory Carmichael, Volume I                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 64

1  But at the end of the day, I don't make
2  decisions based on age, and we didn't do anything with
3  respect to succession planning because of Tim's age or
4  Phil's age.
5  Q.  Is age included in a factor with respect to
6  CEO and president/CEO succession planning at Fifth Third
7  Bank?
8  A.  I've never had a conversation with the board,
9  and the board's never asked me anything with respect to
10  someone's age.  It's based on the merits of their
11  qualifications to elevate to higher levels in the
12  organization and potentially CEO.
13  Q.  Do you believe it would be inappropriate for
14  the board to make a decision based upon the president or
15  CEO succession and use age as a factor?
16  MR. CIOFFI:  Objection.  Asked and answered.
17  He said it wasn't a factor.  You can answer it
18  again, if you can.
19  THE WITNESS:  Wasn't a factor.
20  BY MR. SABA:
21  Q.  That wasn't my question.  I didn't ask if it
22  was a factor.  I'm asking if you believe it would be
23  inappropriate for the board to use age as a factor with
24  respect to succession planning of the president or CEO
25  at Fifth Third Bank.

Page 65

1  MR. CIOFFI:  Objection.  Completely redundant.
2  You asked if it was a factor, he said it wasn't a
3  factor.  Now you're asking him again.
4  MR. SABA:  I'm asking him.  No, no, no.
5  That's not my question.  You can answer whatever
6  question you want to in your own mind, Michael.
7  BY MR. SABA:
8  Q.  My question is, is it inappropriate, in your
9  opinion, for the bank to use -- excuse me.
10  Is it inappropriate, in your opinion, for the
11  board to use age as a factor with respect to succession
12  planning of the president or CEO at Fifth Third Bank?
13  A.  The board never used age as a factor.  I never
14  had to reason to be concerned about that because it was
15  never brought up, never a factor.  And I wouldn't expect
16  them to make it a factor.  I understand it's about
17  qualifications, not about age, so would it be
18  inappropriate?  Absolutely.  But it was never discussed
19  because it was never brought forth.
20  Q.  You did recognize that, with respect to CEO
21  and president succession planning at Fifth Third Bank,
22  that it was important to make sure that the candidate
23  had a long enough runway to be able to take on that
24  position; is that right?
25  MR. CIOFFI:  Objection to the form of the

Page 66

1  question.  There's nothing in testimony that says
2  he believed that.
3  THE WITNESS:  It's the board's decision on who
4  becomes the CEO.  My beliefs are irrelevant in this
5  case; it's the board's decision.  And the board may
6  factor in, in their decision, the longevity of an
7  individual in that position, not based on age but
8  could be because the individual only wants to work
9  two or three more years.  That might be a factor in
10  their decision to put someone in that role because
11  it takes time to put someone in that role; it takes
12  time for them to develop into that role.  It takes
13  time to have the next successor brought forth in
14  that role.
15  So if that individual only wants to work three
16  or four more years, the board would consider
17  something like that, all right?  But they wouldn't
18  consider age beyond that.  That's really a
19  timeline, not an age thing.
20  BY MR. SABA:
21  Q.  If you could turn to paragraph 13 of the
22  counterclaim, page 22.  It reads, in addition, multiple
23  executives conferred with plaintiff that Mr. Spence was
24  being vetted for president/CEO succession purposes.  At
25  no time did plaintiff object or state that he,

Page 67

1  plaintiff, should be president or should be CEO.
2  Do you see that?
3  A.  I do.
4  Q.  Who are the "multiple executives"?
5  A.  They would have been the other executives that
6  were part of the vetting process, would have been Tim
7  Spence's peers.
8  Q.  Do you recall specifically who those multiple
9  executives were?
10  A.  I know Tayfun Tuzun was one of those
11  individuals.  I believe Lars Anderson was one of those
12  individuals.  I believe Bob Shaffer may have been one
13  of those individuals.  I'm speculating, but there is a list
14  of, I think, you know, six, seven individuals that were
15  considered peers that were vetted in this process.  I
16  don't have that list in front of me.
17  Q.  And when did these individuals confer with
18  Phil McHugh that Mr. Spence was being vetted for
19  president and CEO succession purposes?
20  A.  It's my understanding that conversations
21  occurred that -- when Tim was going through the process,
22  my understanding, from an individual -- that an
23  individual was asked what the process was for.  An
24  individual also had conversations with Phil and was
25  clear that it was -- they all understood that this was

Page 68

1 about vetting Tim as a potential president.
2     Once again, I made that clear to each of them,
3 that this vetting process and this assessment was about
4 Tim becoming president. So it wasn't a secret.
5 Everyone understood what this was about that he was
6 going to be vetted, and his peers knew he was being
7 vetted for the president, including Phil McHugh, who, by
8 the way, never came to me and said, why not me? What's
9 going on? Why am I not being vetted?
10     Once again, all the peers were communicated he
11 was being vetted as the potential president. Did they
12 talk among themselves? I believe they did; I heard
13 that. I don't have that documented, but comments were
14 made to me that we all knew what was going on.
15     Q. Who made those comments to you?
16     A. Jamie Leonard made those comments; Tayfun
17 Tuzun would have made those comments to me.
18     Q. When did Jamie Leonard and Tayfun Tuzun make
19 these comments to you?
20     A. Jamie's comment was made to me weeks after --
21 weeks after -- a week or so after Phil left -- somewhere
22 shortly thereafter when Phil walked out and quit.
23     Q. Had a lawsuit already been filed?
24     A. I don't know what the time exactly was, to be
25 honest with you.

Page 69

1     Q. And what specifically did Jamie Leonard say?
2     A. It was -- it was in conversation that, not
3 sure what's going on. We all knew that -- that Tim was
4 being vetted for the president. Not sure what the issue
5 is here. Something to that extent. I didn't write it
6 down. I don't know exactly verbatim. But indicating
7 that they had -- that they were aware. Of course they
8 were aware because they were -- they were told.
9     Q. And what did Tayfun Tuzun say to you?
10     A. When Phil refused to do the job and quit --
11 and I'm not sure the exact timing of that -- Tayfun was
12 in my office and said, hey, we all knew what was going
13 on. This is the -- he knew what was going on. This is
14 not a -- this is not a surprise. Everyone knew what was
15 going on. We were all part of the process. Something
16 to that extent. I don't -- I didn't record it; I didn't
17 write it down.
18     Q. Do you recall any other conversations with --
19 do you recall any other conversations regarding what
20 Phil McHugh knew with anyone other than Jamie Leonard or
21 Tayfun Tuzun?
22     A. Repeat the question, please?
23     Q. Sure. You were identifying the multiple
24 executives that you believe conferred with Mr. McHugh
25 regarding Mr. Spence being vetted for president and CEO

Page 70

1 succession purposes. And you referred to Bob Shaffer,
2 Lars Anderson, Tayfun Tuzun and Jamie Leonard.
3     I asked you, when did these conversations
4 occur; when did you become aware of them? You
5 identified two conversations, one with Jamie Leonard and
6 Tayfun Tuzun. I'm wondering if you can identify any
7 other conversations with any other executives who
8 indicated that Phil McHugh knew that Tim Spence was
9 being vetted for president and CEO.
10     MR. CIOFFI: Wait. By way of objection, that
11 was a long question, which I couldn't follow.
12 Could you just read the whole question back?
13     (Record was read.)
14     MR. CIOFFI: Objection to the form of the
15 question because it's several questions. But if
16 you can answer, you may. Go ahead.
17     THE WITNESS: Obviously, Bob Shaffer was --
18 was -- was having conversations. Once again,
19 when -- when Phil quit the bank and refused to do
20 the consumer job -- which is a top five job in the
21 company, all right, which is substantially
22 different than -- than -- than that position was
23 prior -- it was never about him not becoming the
24 president or CEO. All right? He walked out and
25 said, I won't report to Tim Spence. I'm not going

Page 71

1 to do the consumer job. I refuse it -- he refused
2 to do the job he was offered; he refused to work
3 for Tim Spence. All right?
4     Had nothing ever to do about him should have
5 been the CEO, could have been the CEO, or promised
6 the CEO. That was an after the fact once the --
7 and when the suit was filed, that was the first I
8 became aware that he believed that. And at the end
9 of the day, that was an afterthought. It was never
10 ever part of any conversation.
11 BY MR. SABA:
12     Q. Referring to paragraph 14, the counterclaim.
13 It reads, at the bank's September 2020 board meeting,
14 Fifth Third Bank's board of directors met with the
15 executive development agency to discuss the vetting of
16 Mr. Spence. Plaintiff was aware of this meeting.
17     When the executive development agency meets
18 with the board to discuss the vetting of Mr. Spence,
19 who's present at that board meeting?
20     A. Well, it would have been the board. It would
21 have been the -- Bob Shaffer would have most likely been
22 there. I can't remember exactly. Myself, I would have
23 been there for that -- for that review. Good chance we
24 would have had -- Susan Zaunbrecher potentially could
25 have been there. Myself and Bob would have definitely

Deposition of Gregory Carmichael, Volume I                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 72

1  been there.  I can't recall any other executive
2  non-board member that would have attended that session.
3  And obviously we have RHR.
4      Q.   And Phil McHugh would not have been present
5  for that presentation, correct?
6      A.   No, he would not have been present for that
7  presentation.
8      Q.   Referring you down to paragraph 19, the
9  counterclaim.  It indicates, significantly this
10 transition to head of consumer banking would have put
11 plaintiff in a proxy level position, which would have
12 resulted in the plaintiff becoming a named executive
13 officer in the bank's 2021 proxy statement at an annual
14 total income level well in excess of 2 million dollars.
15     Do you see that?
16     A.   I do.
17     Q.   Then referring to paragraph 20, beyond that,
18 if plaintiff continued as head of consumer banking, his
19 total income would not have diminished, and his total
20 annual compensation was continued at 2 million 250,
21 making one of the top five highest paid executives in
22 the company.
23     Do you see that?
24     A.   I do.
25     Q.   And those two paragraphs are accurate, right?

Page 73

1      A.   If they're in here, they're accurate because I
2  reviewed it at the time, the point in time, so yes, I
3  believe they'd be accurate.
4      Q.   So to be clear, Phil McHugh was already due to
5  make 2 million, 250 in 2020.  So he was already going to
6  be part of the proxy statement; is that right?
7      A.   Incorrect.  This position of the consumer
8  bank, head of consumer bank, was going to be in the
9  proxy because it had over 50 percent of the gross
10 revenue, over 60 percent of the gross revenue in the
11 company.  I was going to put the consumer head job --
12 that was the job identifying the proxy because of the
13 scale of that job at this point.  The regional job would
14 have never been in the proxy.  It never has been in the
15 proxy.  If you check today, it's not in the proxy, okay?
16     By design, it's more of an administrative
17 role.  Okay?  It's not a proxy position.  I was going to
18 ensure that Phil was going to be in the proxy by adding
19 additional compensation beyond this, I believe, because
20 I wanted to make sure that that job was identified as a
21 proxy position and the consumer head was in the proxy.
22     If -- when Phil didn't take this job, the new
23 consumer head is now in the proxy.  Okay?  The regional
24 job is not in the proxy.  So no, this -- that
25 compensation would not have gotten the proxy because I

Page 74

1  would have made adjustments to bring the consumer head
2  in that would have been in the proxy.  All right?  This
3  is a top five job in the company.  I only have five of
4  these excellent top leadership roles that Phil was
5  qualified to step in and do.  He refused to do that job.
6  His compensation wasn't diminished or taken down; it was
7  going up.  All of his perks, he was going to keep, the
8  only executive with two country clubs that he was
9  maintaining that he had to have, okay?
10     Executive physical, execute weight -- none of
11 that changed.  He was being given a raise.  He was asked
12 to take one of the top five jobs in the company, refused
13 to do it, told me he wouldn't work for Tim Spence and
14 wouldn't take the role.
15     Q.   This didn't indicate he was being given a
16 raise, correct?  It indicates he's going to receive the
17 exact same compensation that he was otherwise receiving
18 in 2020; isn't that right?
19     A.   I communicated with Phil that I was going to
20 add more to this number, right.  That wasn't decided in
21 writing yet.  I hadn't put that into the system yet.
22 This is probably what was in the system.  But I was
23 going to add more money to this job because Phil's
24 always about money.  Every time I've ever given him a
25 role, it was all about the hardship it was going to

Page 75

1  create and what was in it for him.  And he had to have
2  more money to do it.
3      I headed that off.  I offered him an
4  additional 100,000, which would have meant his bonus
5  would have gone up.  His annual individual compensation
6  would have gone up.  His bonus would have gone up on top
7  of this.
8      This is probably what was stated, at the time,
9  in the documentation, not what I offered him in addition
10 to that, in that conversation.
11     Q.   There's no reference to an additional 100,000
12 in this counterclaim, is there?
13     A.   They need to put it in there, because at
14 the end of the day -- this compensation was going up at
15 the end of the day.  This is more than he made the prior
16 year.  His compensation was going up.
17     Q.   This paragraph that you reviewed for accuracy
18 says his total annual compensation would have continued
19 at 2 million, 250.  It says nothing about going up, does
20 it?
21     A.   Didn't put it in the suit, didn't need to.  It
22 was going -- it was going to go up if he took the
23 position.  He didn't take the position.
24     Q.   It's your position -- is it your position
25 today that the top five highest paid executives in the

Page 76

1 company are not included in the proxy?
2      MR. CIOFFI: Objection to the form of the
3 question.
4      THE WITNESS: Please restate the question.
5 BY MR. SABA:
6    Q. Sure. Is it your position today that the top
7 five highest paid executives in the company are not
8 included in the proxy?
9    A. Is it my position that the top -- state that
10 again. I'm not clear what you're asking.
11   Q. Is it your position that the top five highest
12 paid executives in the company are not included in the
13 proxy?
14   A. Top five highest paid -- it's not -- it's just
15 not the highest paid. There's certain roles -- certain
16 roles that have to be in the proxy. All right? CFO is
17 one of them that has to be in the proxy. So it's not
18 necessarily just the highest paid.
19      But once you get past the ones that are
20 required to be there, it's typically, all right -- and I
21 think by requirement, it's the next highest paid
22 executive officers.
23      But once again, we've decided, because of the
24 scope of the consumer job, that that job needed to be
25 compensated to be in the proxy. All right? If -- his

Page 77

1 compensation as it stood at the time of our discussion,
2 I felt that it might fall short of what we were going to
3 need to do. I was going to add more money, roughly
4 $100,000 to that, I communicated that, to his
5 compensation if required, and I believe it was going to
6 be required to make sure he was in the proxy.
7    Q. This $100,000 that you keep talking about --
8 which is not referenced in the counterclaim -- is that
9 in writing anywhere?
10   A. No, it was a conversation Phil and I had when
11 I explained to him the transition of an elevation of Tim
12 to president, that he would be reporting in to Tim as
13 president, because Tim had all lines of businesses in
14 all the regions, and that he was going -- I was going to
15 elevate his role to that of the head of the consumer
16 bank, which now had about 60-plus percent of the gross
17 revenue, and then I was also going to increase his
18 salary to make sure he was in a proxy in this position.
19 That was the conversation.
20   Q. And do you have any notes from this meeting?
21   A. Absolutely not. I wouldn't write something
22 like that down until it became official. I was
23 explaining what I was going to do; it had not become
24 official. ACC still has to do a final approval of
25 something of that nature, but I had no doubt they would

Page 78

1 support that decision because they understood that the
2 consumer head was going to be in the proxy.
3    Q. Did you communicate that to anybody in writing
4 anywhere?
5    A. No. Bob Shaffer and I had a conversation
6 about it. I told him I was going to -- I was going to
7 increase that. We're going to head that off because I
8 knew Phil would want something, as always, and I was
9 going to head that off. And I wanted to ensure that he
10 was going to be the proxy, and I wanted to send him a
11 message that this was, once again, going to elevate him
12 to the proxy level and he was going to be compensated
13 appropriately for it.
14   Q. Are you now taking the position that paragraph
15 20 of the counterclaim is inaccurate?
16      MR. CIOFFI: Objection. That's not his
17 testimony.
18      MR. SABA: I know, because he hasn't answered
19 the question yet. Let's let him answer the
20 question.
21 BY MR. SABA:
22   Q. Are you now taking a position that paragraph
23 20 is inaccurate?
24      MR. CIOFFI: You're saying -- by saying are
25 you taking a position, you're referring back to his

Page 79

1 earlier testimony. I'm making an objection
2 that that's not what he testified to. But go
3 ahead. You can answer.
4      THE WITNESS: Once again, this was done some
5 time ago. At the end of the day, I believe this
6 was probably the compensation on paper, not what I
7 was communicating to him that I was going to do if
8 he stepped into that role.
9 BY MR. SABA:
10   Q. And you actually reviewed this counterclaim
11 contemporaneous with when these conversations would have
12 occurred; is that correct?
13   A. I reviewed this claim before it was filed.
14 These compensation numbers came from the -- from the
15 head of HR, the compensation group that was put into
16 this -- my communication with Bob is, we need to make
17 sure that this position was going to be in the proxy,
18 and I think we may need to put another $100,000 in it,
19 and I was just going to communicate that to Phil.
20 That's what transpired. So that's how the numbers, in
21 my mind, were working. That's what I anticipated.
22      So my guess is, if I was making an assumption,
23 these are the numbers we had that weren't going to be
24 reduced, and I added to it. It wasn't in writing, we
25 hadn't finalized it yet, we hadn't proceeded with it

Deposition of Gregory Carmichael, Volume I                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 80

1  yet, we hadn't had final approval for it.

2      Q.  Are you aware of -- that Phil McHugh's

3  testimony that you did not offer him any additional

4  compensation with respect to the consumer banking role?

5      MR. CIOFFI:  Objection.  Mischaracterizes

6  supposed testimony.

7      THE WITNESS:  Yes.

8      MR. CIOFFI:  You can answer, if you know.

9      THE WITNESS:  I don't know.  I'm going back

10  through.  I'm not sure what Phil recalls and

11  doesn't recall.  That's a big question mark.  I

12  will state one thing.  There's never been a role

13  that I've asked Phil to take that increases

14  responsibilities where he didn't get more money and

15  he didn't expect more money.  Matter of fact, when

16  I offered him position after position throughout

17  his career, it was always about the hardship this

18  was going to create.  When I asked him to take on

19  the regions, oh my God, this is going to create so

20  much hardship.  I need to talk to my wife.

21      Next day, he comes back, I'll do it, but

22  what's in it for me?  Same thing when I moved him

23  from Louisville to Cincinnati, same thing I did

24  when I moved him to the next position.  Every

25  promotion was followed by comments about the

Page 81

1  hardship and then how much money am I going to

2  make.  So I knew this was coming, and I tried to

3  get ahead of it.

4  BY MR. SABA:

5      Q.  Don't promotions typically come with an

6  increase in compensation?

7      A.  Not all the time.  Definitely not at Fifth

8  Third.  I was promoted every point in my career, and

9  compensation always trailed by almost a year.  But not

10  in Phil's case.

11      Q.  So it's not uncommon at Fifth Third to move to

12  some new position and not receive an increase in

13  compensation?

14      A.  More than -- it's more the norm.  We do -- we

15  do increases on a normal basis, typically in February.

16  If you get promoted prior to February, it's not -- it's

17  typically not -- we typically don't do an increase.

18  Now, that doesn't mean it's all the time, doesn't mean

19  we don't do it.  I'm saying oftentimes we do not.  In my

20  career, when I was promoted multiple times throughout my

21  old career, I don't recall getting an increase the day I

22  was promoted except for when I became, I believe,

23  president or CEO.  I think at that point, they made some

24  adjustments.  But typically, I did not.

25      Q.  And notwithstanding Phil's interest in being

Page 82

1  compensated along with any promotion, you would still

2  promote him; is that right?

3      A.  Phil was a very competent leader and did a --

4  and did a good job at the assignments he was given.  All

5  right?  He would have done a good job as the head of

6  consumer business if he'd taken the job.  I have no

7  doubt.  And I wanted to recognize him for that, wanted

8  to make sure he was in the proxy, and I wanted to

9  make -- make him feel that he was one of the top five

10  guys in this company and very valued.

11      This is a tremendous role.  I've only got five

12  of these roles, okay?  And he's sitting in one of them.

13  All right?  He wasn't in one of those roles prior, where

14  it was in the proxy.  His compensation was going up; all

15  of his benefits stayed the same.  He wouldn't take the

16  job because he refused to work for Tim Spence, and he

17  refused to step into the consumer job because he

18  wouldn't work for Tim Spence.

19      Q.  Phil McHugh used to be head of the consumer

20  banking, didn't he?

21      A.  Very different job at the time Phil McHugh had

22  it.  The answer's yes, but different job though.

23      Q.  Referring to paragraph 21, it says, human

24  hubris being what it is, the news about Mr. Spence

25  angered plaintiff.  How do you know that angered

Page 83

1  Mr. McHugh?

2      A.  Because in my office, when he refused to do

3  the job, told me he wouldn't do the job and he wouldn't

4  work for Tim Spence, he walked out of my office.  The

5  last conversation I had was he wouldn't take the job, he

6  wouldn't take -- work for Tim Spence, and he was the

7  most respected executive on this floor.  And then he

8  walked out.  That's how I'm referring to him as angry.

9      Q.  Do you recall the date of that conversation?

10      A.  It would have been the Thursday before he

11  quit, because I believe it was a Thursday, not a Friday.

12  So I think -- I believe I spoke with him on a Tuesday.

13  He told me he needed a couple days; he walked by my

14  office.  Once again, when I told him what we were doing

15  with Tim Spence, it wasn't, why not me?  What he said,

16  you surprised me on my timing, I need to talk to my wife

17  and think about this.  He walks by my office the next

18  day, which was a Wednesday, told me, I surprised him on

19  the timing; he wasn't expecting this.

20      All about timing, not that he wasn't the

21  president or CEO.  And then the next day, he walks in my

22  office -- I believe that would have been a Thursday --

23  and he told me he would not take the job, he would not

24  work for Tim Spence, that he was the most respected

25  executive on the floor, and he wasn't going to do it.

Deposition of Gregory Carmichael, Volume I          Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 84

1 And he walked out.

2     I did not talk to him again ever since then.

3 The only communication I had was with Bob Shaffer and

4 Susan Zaunbrecher, our chief legal officer, prior to the

5 suit being filed.

6     Q.  These conversations, they were in October of

7 2020; is that right?

8     A.  It would have been right prior to the

9 announcement of -- of Tim Spence becoming president,

10 because these conversations had to be -- I had to have

11 these conversations prior to the announcement so the

12 organization could be adjusted and aligned for the

13 announcement.

14     Q.  Do you recall those being in October of 2020?

15     A.  I would assume, based on the timing of the

16 announcement, that that would have been the timeframe,

17 yes.  I don't have my calendar in front of me to be more

18 specific than that.

19     Q.  Referring back to paragraph 21.  The second

20 sentence starts in a fit of petulance, plaintiff told

21 Carmichael that he would not accept the assignment of

22 head of consumer banking.

23     What -- what what do you mean there by in a

24 fit of petulance?

25     A.  Well, I didn't write the wording.  I wouldn't

Page 85

1 -- that's not how I would word things.  He was angry; he

2 was upset.  But it wasn't that he wasn't being promoted

3 to president; that was -- he knew exactly who the

4 president was going to be.  All right?  He didn't want

5 to report to Tim Spence, and he didn't want to give up

6 his regional role because he enjoyed the regional role.

7 By the way, you're not entitled to the regional job.

8 It's not an entitlement job.  None of our jobs are

9 entitled.  So he was angered by the fact that he had to

10 give up the regions to report to Tim Spence.

11     Q.  But are you able to tell me what was meant by

12 "in a fit of petulance"?  You said it's not your word,

13 so if you don't know, you don't know.

14     A.  I don't know.  I just told you how I would

15 have described it.

16     Q.  Okay.  In paragraph 23, it says immediately

17 thereafter, the guerilla litigation tactics began.  What

18 is meant by "guerilla litigation tactics."  What does

19 that mean?

20     A.  Let me read the whole paragraph here.  Okay.

21 This is referring to the fact that Phil refused to give

22 up, like it's his decision that he -- it's my decision,

23 not Phil McHugh's decision -- that he's going to run the

24 regions or he's going to be the head of consumer

25 banking.

Page 86

1     He can turn the head of consumer bank down,

2 but it's not his role and responsibility to determine

3 what's in the best interest of the company.  That's what

4 I get paid to do.  He refused to give up the job.  All

5 right?  I wasn't asking him if he wanted to give up the

6 job.  I was making an organization change that was in

7 the best interest of the company, that was at the

8 direction of the board, to support the promotion of Tim

9 Spence as president.  All right?

10     For him to tell me he's not giving up

11 something, he's not doing this or he's not doing that --

12 it's always about Phil McHugh; it's never about the

13 company first in these discussions.  So he puts himself

14 at what he wants, not what the company needs.  And he

15 refuses to give up the job.  And he tells me he's

16 refusing to give up the job, he's refusing to do a top

17 five job in the company, he's refusing to go into

18 the proxy, all right, and he's refusing to report to Tim

19 Spence.  That's what we're referring to here.

20     And what he expected me to do, I'm assuming,

21 based on prior reactions, is he expected me to change my

22 position and potentially say that this job wouldn't --

23 this consumer head wouldn't report to Tim Spence and

24 report directly to me or that he could keep the regions

25 reporting to me, but he's already been out there telling

Page 87

1 people he wouldn't report to Tim Spence.  So he has a

2 situation he's dealing with now, and that's what I

3 believe came forth in our conversation.

4     Q.  And that's your understanding of guerilla

5 litigation tactics; is that right?

6     MR. CIOFFI:  Objection.  The document speaks

7 for itself.  You got to let him read the whole

8 document.

9     THE WITNESS:  I don't believe that any

10 employee should hold the company hostage.  I

11 believe people work at the pleasure of the company.

12 I report to the board at the pleasure of the board.

13 Our first responsibilities are always to our

14 shareholders and the company's health and

15 well-being, and to our employees.

16     For someone to put themselves ahead of that

17 and make it about them when they're getting a

18 raise, they're not -- they're getting all the perks

19 and everything, being one of the top five jobs, of

20 putting themself ahead of what's best for the

21 organization, guerilla tactics.  And that's going

22 to force me -- because he won't do this -- it's

23 going to force me to change what's in the best

24 interest of the company.  Not acceptable.

25 BY MR. SABA:

Deposition of Gregory Carmichael, Volume I                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 88

1  Q.  Referring to paragraph 22, it says plaintiff
2  then left the Fifth Third center, refused to follow
3  Carmichael's directive to assume the role of head of
4  consumer banking, and refused to return to work.
5      Do you see that?
6  A.  I do.
7  Q.  Didn't Mr. Shaffer actually tell Phil McHugh
8  not to come back?
9  A.  I don't know which -- I wasn't part of the
10 conversation that Phil had with -- with Mr. Shaffer.  At
11 the end of the day, Phil refused to do the job.  In our
12 -- in our -- by company policy and by any definition,
13 when you refuse to do a top job, you're quitting the
14 company.  So if you're not going to do the job, there's
15 no need to come in because you've already quit the
16 company.  And that's what he did.
17     (Exhibit 4 is marked for identification.)
18 BY MR. SABA:
19 Q.  Mr. Carmichael, I've handed you what's been
20 marked as Exhibit Number 4.  And this is defendant's
21 Fifth Third Bank National Association Gregory
22 Carmichael's initial rule 2680 disclosures to the court.
23     Have you ever seen this document before?
24 A.  I believe this is the complaint that was filed
25 against Fifth Third by Phil McHugh.

Page 89

1  Q.  Let me represent to you it's not that.  These
2  are initial disclosures filed on the bank's behalf and
3  on your behalf with the court.
4  A.  Okay.  Can I read through this?
5  Q.  You can read through it and see if --
6  A.  I'm just reading the headlines here, so...
7     MR. CIOFFI:  Yeah, take your time, read the
8  document.
9     THE WITNESS:  Okay.
10 BY MR. SABA:
11 Q.  Mr. Carmichael, were you aware that, in your
12 counterclaim, you were seeking punitive damages to be
13 awarded against Phil McHugh for filing an age
14 discrimination claim against you and Fifth Third Bank?
15     MR. CIOFFI:  Objection.  It mistakes the
16 record.  The counterclaim speaks for itself.  It's
17 not for filing a counterclaim, it's for abuse of
18 process.  It's clear from the document itself.
19 You're mischaracterizing it purposefully, Counsel.
20 Read the question back, please.
21 MR. SABA:  Certainly.
22     (The record was read.)
23 BY MR. SABA:
24 Q.  You understand that Phil McHugh has filed the
25 litigation.  He's claiming that you and Fifth Third Bank

Page 90

1  engaged in age discrimination against him; is that
2  right?
3  A.  I'm aware of that claim, yes.
4  Q.  Okay.  And is it your position that making
5  that claim by Phil McHugh is an abuse of process?
6     MR. CIOFFI:  Objection.  The counterclaim
7  speaks for itself, what is an abuse of process.
8  The witness is not an attorney, cannot opine or
9  speculate as to what "abuse of process" means under
10 the facts as set forth in the counterclaim.  You
11 can ask him if he can answer the question.
12 BY MR. SABA:
13 Q.  Go ahead.  Can you answer the question?
14 A.  There was -- there was -- there was a
15 significant amount of allegations that were made, in the
16 filing of the suit, against Fifth Third by Phil McHugh
17 that were completely erroneous, not factual,
18 misrepresented facts, disclosed what I believe is
19 sensitive information into the street that caused damage
20 to the bank, harm to the bank, once again putting
21 himself above the company.
22     And at the end of the day, very inappropriate.
23 Age never ever had a factor in any of the discussions,
24 and that's an afterthought after he quit the bank,
25 trying to find a way to increase the amount of damages

Page 91

1  he's seeking from Fifth Third.  And it was all an
2  afterthought of him being the CEO.  So at the end of the
3  day, there was no substance to his claims against Fifth
4  Third.  The majority of what he was claiming was not
5  accurate, was not factual, didn't occur in the way it
6  was stated, and we never made a decision based on age.
7  Q.  And as a result of --
8  A.  It was always the board's decision.  It's not
9  Greg Carmichael.  I'm being -- I'm being, you know,
10 called out here and being sued here, and I don't make
11 that decision.  The board makes the decision.  So if him
12 not being promoted to CEO is what you guys are arguing,
13 then that's the board's decision, not mine.  And they're
14 not -- and it's me in here.
15 Q.  And as a result of that, you're seeking
16 punitive damages against Phil McHugh?  Isn't that right?
17     MR. CIOFFI:  Objection.  That's not what the
18 document says.  The document speaks for itself.
19 BY MR. SABA:
20 Q.  Are you aware that your counterclaim is
21 seeking punitive damages?
22 A.  I'm aware we're seeking damages for the harm
23 done by that -- this suit.
24 Q.  And that includes punitive damages; isn't that
25 right?

Case: 1:21-cv-00238-MRB Doc #: 66-3 Filed: 08/02/24 Page: 27 of 114 PAGEID #: 2804

Deposition of Gregory Carmichael, Volume I                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 92

A. I'm not a lawyer. I'll defer to my counsel for it.

Q. Do you know why you're seeking punitive damages against Phil McHugh?

MR. CIOFFI: Objection. The document sets forth clearly the counterclaim of why punitive damages are sought and the legal authority for it. He's not a lawyer; he cannot speculate about that.

And if -- if you know the legal basis for the punitive damages, you can answer the question. Otherwise --

BY MR. SABA:

Q. I'm asking for your understanding; I'm not asking for a legal basis. What is your understanding of why you are seeking punitive damages against Phil McHugh?

MR. CIOFFI: Objection. The basis, as stated in the counterclaim, is legal authority from the Supreme Court of Ohio. He's not a lawyer; he doesn't -- he can't opine about that.

BY MR. SABA:

Q. I'm asking about your understanding, not Mr. Cioffi's. What is your understanding of why you are seeking punitive damages against Phil McHugh in your counterclaim?

Page 93

MR. CIOFFI: Objection. It's a legal conclusion. He cannot form a legal conclusion.

BY MR. SABA:

Q. Go ahead. You can answer.

A. I can't form a legal conclusion, so therefore, I'm not going to answer that question.

Q. I'm asking for your understanding, not for a legal conclusion.

A. My understanding, we are seeking damages because of the erroneous, harmful damage that that suit did to Fifth Third, myself, and all involved on false claims that were made, blatant false claims that were made by the plaintiff.

Q. And referring you to paragraph 9 -- to page 9 of Exhibit 4, which is the initial disclosures. And the paragraph that is -- the first paragraph at the top, it ends at the top. The last sentence reads, more important than that, this figure is both reasonable, equal to one year plaintiff's pay, and accomplishes the twin aims of punishment and deterrence as to plaintiff; isn't that right?

A. That's what this says.

Q. Okay. Do you agree with that sentence?

A. Do I agree with what in the sentence? Rephrase the question.

Page 94

Q. That the -- that the punitive damages that are sought accomplishes the twin aims of punishment and deterrence as to plaintiff Phil McHugh?

A. I'm not going to argue the wording. The wording is what it says. But at the end of the day, we don't -- individuals who bring false claims against the company intentionally to harm the company, in order to get -- extract money from the company because they didn't get what they wanted is not -- is not something that's acceptable in a professional workplace and something that should never occur. It's occurring in this case because he never thought he'd file this lawsuit when he did. Now he has to defend it, and the claims were egregious, incorrect, inaccurate, and put the organization at risk with our shareholders, our investment community, analysts, and at the end of the day, this is something we wouldn't want to see occur again.

Q. And what you're including in those egregious and false claims are Phil McHugh's claims of age discrimination; isn't that right?

A. There's substantially more claims --

MR. CIOFFI: Objection.

MR. SABA: My question, sir, are you including claims of age discrimination in what you consider

Page 95

to be egregious and false claims?

THE WITNESS: No.

MR. CIOFFI: Objection to the form of the question. The basis of the counterclaim is stated in the counterclaim. The witness's understanding of the law is totally irrelevant to that.

MR. SABA: I'm asking for his understanding.

MR. CIOFFI: If you have an understanding of the basis for the counterclaim and abuse of process, you can answer the question. If you don't, I'll instruct you not to answer the question -- if he doesn't have an understanding of the law.

BY MR. SABA:

Q. So back to my question. My question's specific. You referred to the egregious and false claims that were raised by the plaintiff. I said, is the claim of age discrimination by Phil McHugh included in your list of egregious and false claims made by the plaintiff? Or are you --

MR. CIOFFI: Objection.

MR. SABA: Let me finish my question.

BY MR. SABA:

Q. -- or are you claiming that's an accurate claim by Phil McHugh and not egregious or false?

Deposition of Gregory Carmichael, Volume I                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 96

1  MR. CIOFFI: Objection. The base of the claim
2  is abuse of process, has nothing to do with the
3  lawsuit filed by Phil McHugh.
4  BY MR. SABA:
5  Q. Go ahead, Mr. Carmichael.
6  MR. CIOFFI: You -- you can answer
7  the question, but with this proviso. I'm going to
8  instruct you, as your counsel, that if you
9  understand the law of abuse of process in Ohio, you
10 may answer the question. If you don't, you may
11 not.
12 THE WITNESS: I'm not going to answer your
13 question because I don't fully understand the role.
14 MR. SABA: That's not a basis for not
15 answering a question. Whether you try and create
16 an answer or create an obstruction.
17 MR. CIOFFI: You're asking a question
18 that's -- that is --
19 MR. SABA: I'm asking for his understanding.
20 I'm asking for the basis of this claim; he's
21 identified that they are bringing this claim for
22 punitive damages because of all the egregious and
23 false claims made by Mr. McHugh. My specific
24 question goes to, is he including in his list of
25 egregious and false claims the claim of age

Page 97

1  discrimination brought by Mr. McHugh against you
2  and Fifth Third Bank?
3  MR. CIOFFI: Objection. That's not the basis
4  of the counterclaim, and you know that.
5  MR. SABA: That's right. There's your
6  objection. Let him answer.
7  THE WITNESS: I'm not a lawyer. I'm not going
8  to comment on that. My reference was, the claims
9  that he made about being promised this or promised
10 that about being CEO, those conversations never,
11 never occurred about him being CEO outside of being
12 considered for emergency successor. That's what
13 I'm referring to, all right? Nothing to do with
14 his age was ever, ever, ever a consideration as I
15 thought about the claims. The claims I'm talking
16 about is making statements that were false, not
17 about age.
18 BY MR. SABA:
19 Q. So are his claims about age not false?
20 A. We never had a discussion about age. Age was
21 never a factor. All right? He -- he can claim whatever
22 he -- he needs to claim or considers he wants to claim
23 after the fact. But during the process, and as long as
24 he's worked for me, age was never a factor in any of the
25 discussions. It was a board decision based on

Page 98

1  qualifications. And when you get around to asking about
2  that, I'll give you a litany of reasons why he was never
3  qualified -- considered ever to be the CEO of the
4  company.
5  Q. Is it your position that Phil McHugh's claims
6  that -- that Fifth Third and yourself have engaged in
7  age discrimination, that those are false and egregious?
8  A. There's no substance for those claims, I
9  believe.
10 Q. As part of your support and recommendation for
11 Tim Spence to become CEO of Fifth Third Bank, did you
12 make Tim Spence a promise that he would not settle the
13 litigation with Phil McHugh?
14 MR. CIOFFI: Objection. Objection. Assumes
15 facts not in evidence. You may answer.
16 THE WITNESS: I'd love to answer this one.
17 Absolutely not. Absolutely not.
18 BY MR. SABA:
19 Q. Before your departure from Fifth Third Bank,
20 did you make any individuals promise you that they would
21 not settle the litigation with Phil McHugh?
22 A. I don't make people make promises to me. So
23 no. I don't make people make promises to me. I have no
24 authority to ask for a promise when I'm leaving the
25 company, I'm no longer involved in the company.

Page 99

1  The company makes its own decisions.
2  Q. Did you make any statements to anyone at Fifth
3  Third Bank that Phil will not work in the banking
4  industry again?
5  A. I didn't make any comments, that I'm aware of,
6  on that topic. I mean, obviously, when you sue your
7  employer, I think you're going to be challenged to work
8  anywhere. That's -- that's -- that's just a matter of
9  fact. That's not my position, that's my -- that's just
10 what typically happens, so.
11 If something was said there, you know, I'm not
12 aware of it, but I think that's just common knowledge.
13 Q. Did you tell any individuals at Fifth Third
14 Bank that you were furious at Phil McHugh for making
15 claims of age discrimination against you and the bank?
16 A. I was -- I was -- I was not pleased,
17 frustrated that -- that false claims were made against
18 the bank, had nothing to do with age -- age
19 discrimination. The claims I was referring to was his
20 claim that I told him he was going to be the next CEO of
21 the company, and I made a promise. That's what I would
22 be upset about.
23 Q. And you were upset?
24 A. No, I was very pleased about everything. Yes,
25 I was -- I was not happy. I'm not sure of anyone who

Deposition of Gregory Carmichael, Volume I                          Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 100

1  gets sued, false claims brought against the company and
2  themself, that would be happy about something like that.
3      Q. Did you recommend to the board that Tim Spence
4  should succeed you as president and CEO of Fifth Third
5  Bank?
6      A. I agree with the board's position that he
7  should be the next CEO and president of Fifth Third
8  Bank. There was a consensus building. It was the
9  board's decision. We had lengthy discussions. At the
10 talent management process, I was asked for my opinion
11 and my thoughts on his qualifications as a data point
12 for the board. I don't control the board, I don't --
13 they don't rubber stamp my decisions; they ask for my
14 input. I believe Tim will make a great -- and has made
15 a great president and CEO of this company.
16     Q. And was that the opinion you shared with the
17 board?
18     MR. CIOFFI: Objection. Asked and answered.
19 He just answered it.
20 BY MR. SABA:
21     Q. When did you share that opinion with the
22 board?
23     MR. CIOFFI: Objection.
24     THE WITNESS: Throughout -- throughout a
25 lengthy process of assessing Tim, I would have

Page 101

1  shared that opinion during the talent review
2  process in 2019, as I put him on there, I think,
3  you know, ready for president in a year and CEO in
4  two years. I would have -- I would have shared my
5  opinion, that of his readiness and his
6  qualifications.
7  BY MR. SABA:
8      Q. When you say "ready for president" in a year,
9  two years, are you referring to what would be in the
10 talent decks?
11     A. I would have had that in the talent deck in
12 the 2019 discussion. That would have been in there.
13 I'm not sure the exact date, but I would have had him in
14 there at that point.
15     Q. With respect to the board, have you ever made
16 the statement, I am the only vote that really matters?
17     A. Absolutely never.
18     Q. You never said that?
19     A. No. If I said that to our board, they
20 would -- they would question my judgment and my
21 leadership capabilities because that's not my decision.
22 And -- and at the end of the day, the board oftentimes
23 would -- would basically deviate from my recommendation
24 or what I believe was right -- might be the right thing
25 for the business. Numerous times, the board has taken a

Page 102

1  different position than I recommended. The board
2  doesn't rubber stamp anything for the CEO. This is a --
3  board's a very serious position.
4      You know, we are heavily regulated. These are
5  very strong individuals that have been brought onto the
6  board because of their capabilities. They're
7  independent. My -- I get one vote. In an executive
8  session, I get 0 votes. I have an opinion; they make
9  the decisions. I never would have said my vote was the
10 only one that counts.
11     Q. When --
12     A. That would be ludicrous.
13     Q. -- when specifically has the board deviated
14 from a recommendation made by you?
15     A. Throughout my career as -- as CEO. I would
16 have discussions on -- strategic discussions, potential
17 NMA opportunities, which I'm not going to go into any
18 more. Detailed -- that's privileged information and
19 confidential.
20     They would -- they have -- they have
21 disagreed. They have taken different approaches. They
22 have asked for -- for another option. Those things
23 happen all the time. I don't get a rubber stamp.
24     Q. With respect to the recommendation you have
25 made in promoting an individual or employee, when has

Page 103

1  the board deviated from your recommendation?
2      A. Ask the question -- because the only -- the
3  only time the board has input on those type of decisions
4  if it's a president or CEO. The other positions, that's
5  my job and my responsibility to make those moves that
6  best -- that best supports the needs of the business and
7  the best interest of our shareholders.
8      The only time that -- that I recommend
9  something to the board, I may inform the board of -- of
10 things I'm doing, but the only time I ask for their
11 support in a vote is president and CEO.
12     Q. And they've never deviated from your
13 recommendation with respect to president and CEO, have
14 they?
15     MR. CIOFFI: Objection to the form and the
16 sequence of the question in terms of the timeframe
17 we're talking about.
18     THE WITNESS: Listen, just -- the board, and
19 individuals on the board, one in particular,
20 recommended we bring in Tim Spence because of his
21 deep industry knowledge, his deep strategic
22 understanding, his innovative mindset, his
23 understanding of our competitors, the deep
24 knowledge he had on the industry. When we brought
25 Tim in, from that point forward, the board has been

Case: 1:21-cv-00238-MRB Doc #: 66-3 Filed: 08/02/24 Page: 30 of 114  PAGEID #: 2807

Deposition of Gregory Carmichael, Volume I                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 104

1  assessing Tim as someone who has the qualifications
2  that they believe will make it necessary for the
3  next CEO.  They vetted him over years.  That
4  position was formed over years that he would be --
5  potentially become the next CEO and president.  It
6  started becoming more solidified as you approached
7  the 2019 talent review discussion.
8      The board has always thought he had the
9  qualifications, the skill set.  There was things
10 that they wanted to continue to watch in Tim's
11 development, roles and responsibility.  But that
12 was the board's decision, all right?  Did I agree
13 with it?  Did I think he was absolutely the right
14 person to step in?
15     I agreed with that.  I felt that way.  All
16 right?  But I don't make that call.  I have -- I
17 have input to the process; I have input to the
18 individuals, but they make the call.  They can ask
19 for anything they want to ask for.
20 Q.  That wasn't my question.  My question is, has
21 the board ever deviated from a recommendation that
22 you've made for president and/or CEO of Fifth Third
23 Bank?
24     MR. CIOFFI:  Objection.  He did answer the
25 question.  You don't like the question{sic}, so you

Page 105

1  keep asking it again.  He answered the question.
2  Do you want to add anything to your answer?
3      THE WITNESS:  I put him on -- I put him on the
4  potential list, as the document supports.  I put
5  Phil in there as emergency successor, as I promised
6  him I would.  All right?  The board then makes
7  the -- continues to make that call.  The board
8  expected him to be the next president.  They
9  expected to see that in there.  All right.
10     I wasn't necessarily making the
11 recommendation, I was supporting the fillings in
12 the direction of the board, but I also agreed with
13 that.  And by the way, that only happened with one
14 time in my career.
15 BY MR. SABA:
16 Q.  And they agreed with you, correct?
17     MR. CIOFFI:  Objection.  He answered the
18 question already.
19 BY MR. SABA:
20 Q.  They did not deviate from your recommendation,
21 correct?
22     MR. CIOFFI:  Objection.  The decision of the
23 board happened before any recommendation.  He
24 testified to that.  You're trying to change his
25 testimony.

Page 106

1      THE WITNESS:  I didn't recommend him as CEO; I
2  recommended him as the potential for the board's
3  consideration, based on feedback from the board,
4  based on my personal experience and what I thought
5  was in the best interest of the company.  The board
6  recommends him as the CEO.  The board votes on
7  that.  Greg Carmichael doesn't vote on that.
8  BY MR. SABA:
9  Q.  So, in that recommendation you would have made
10 in the December 2019 board meeting; is that correct?
11 **A.  I -- I identified him as a potential president**
12 **within a year.  You want to call that a recommendation?**
13 **I identified talent that could be in that position.**
14 Q.  Okay.  And had the board -- Mr. Cioffi
15 indicated the board had already made a decision prior to
16 that recommendation.  Had the board already made a
17 decision that Tim Spence be president prior to that
18 recommendation?
19     MR. CIOFFI:  Objection.  He answered at length
20 the board's assessment over a number of years about
21 Tim Spence.  At what -- I mean, what -- why do you
22 keep asking the same question over and over?
23     MR. SABA:  It's not the same question.  I'm
24 trying to understand your -- your insertion{sic}
25 that the board made a decision that -- that Tim

Page 107

1  Spence would be the next president and CEO before
2  Mr. Carmichael made his recommendation.
3      MR. CIOFFI:  And he explained why.
4      MR. SABA:  So the board had already made a
5  decision before you made that recommendation in
6  December 2019?
7      MR. CIOFFI:  Objection.  Mischaracterized his
8  prior testimony.
9      THE WITNESS:  Let me be clear.  The board
10 doesn't make -- didn't make a decision at that
11 point.  If the board made a decision, that's a
12 public disclosure.  Okay?  The board didn't make a
13 decision.  The board was -- was continuing their
14 process of succession planning and identifying
15 talent in the organization that could someday
16 elevate to CEO.  All right?
17     Was the board leaning towards that?  Did the
18 board believe that he -- he was the best qualified
19 candidate?  They were -- they were of like mind,
20 and unanimous like mind, that he was qualified and
21 potentially the next CEO and could become the next
22 CEO and president of Fifth Third Bank.
23     There were still processes that had to be
24 vetted, RHR's being one of them, as an example, one
25 of those process.  If that assessment came back

Deposition of Gregory Carmichael, Volume I                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 108

1  very negative and said something different, the
2  board hadn't made their decision yet. But you have
3  candidates. You have individuals they've
4  identified that I supported could step into that
5  role. And that became more solidified in 2019.
6  But the consensus of the board that he was the
7  right guy happened over years, not just one year.
8  I don't know how to make that any clearer.
9      MR. CIOFFI: Counsel, as you think about your
10  next question, do you want to break for lunch in 15
11  minutes, 20 minutes? Follow with your notes. I'm
12  just thinking around 12:30 might be a good time.
13  But keep going; I don't want to interrupt your line
14  of questioning. Let's go to at least 12:30; we can
15  talk about it.
16      MR. SABA: That's fine. We can talk about it.
17      MR. CIOFFI: Okay.
18  BY MR. SABA:
19      Q. When did you first meet Phil McHugh?
20      A. I joined the company in 2003. He was in
21  Louisville, I think, running the commercial bank or
22  wealth; I'm not sure which. I think it was the
23  commercial bank. Reported to Jim Gaunt. Jim stepped
24  down and Phil became president. So it was somewhere in
25  that timeframe, I ran into Phil and met Phil. Don't

Page 109

1  know exactly what year or date. But it would have been
2  a long time ago. It would have been prior to 20 -- 2005
3  timeframe.
4      Q. And you said he was -- what was Phil's
5  position at that time?
6      A. It was one of the business line heads that --
7  down in Louisville. I believe it was a commercial bank,
8  but I could be wrong.
9      Q. You are aware that Phil became president and
10  CEO of the Louisville region shortly after you started
11  with the bank; is that right?
12      A. I am aware of that, as I just mentioned.
13  Replaced Jim Gaunt, I believe.
14      Q. Did Phil McHugh eventually report to you?
15      A. He did.
16      Q. When does that begin?
17      A. I believe he reported to me -- let me think
18  back here. When I had the regions, where was Phil at --
19  was he still -- he may have been -- when I had
20  responsibilities for the region, he may have been a
21  regional, president, at that time, of Louisville. I --
22  that's a lot of years ago. I don't really recall. I do
23  know, when I brought him up here to head wealth, he
24  reported to me, running the wealth group, when I brought
25  him up from Louisville. But he may have reported to me

Page 110

1  as -- when I was like a timing -- between when I had the
2  regions. There may have been a little window of time
3  there when he reported to me as one of the regional
4  leaders. At the time, they were called affiliates.
5      Q. You brought him up to Cincinnati in 2010; is
6  that right?
7      A. I believe that's roughly the timeframe, to run
8  the wealth group for Fifth Third Bank.
9      Q. Okay. He was promoted to senior vice
10  president, head of investment advisors?
11      A. I don't have his career path in front of me,
12  but I brought him up here to lead the wealth group. I
13  could have my dates off somewhere, but that's what he
14  came up for.
15      (Exhibit 5 is marked for identification.)
16  BY MR. SABA:
17      Q. Mr. Carmichael, I've handed you what's been
18  marked as Exhibit Number 4. Can you identify that for
19  me, please?
20      A. Excuse me. This is marked Exhibit Number 5.
21      Q. 5, excuse me. Thank you. Just by way of
22  correction, Exhibit Number 5 is Bates stamped Fifth
23  Third McHugh 000695 through 000700. Is that right?
24      A. That's correct.
25      Q. Can you identify Exhibit Number 5 for me,

Page 111

1  please.
2      A. Looks like an old performance management form
3  that we used back in this timeframe.
4      Q. The timeframe being 2011; is that right?
5      A. That is correct.
6      Q. Okay. Have you seen this document before?
7      A. Well, if this is the review I did, I would
8  have -- I would have put it together. But that's been
9  12 -- 13 years ago, so I don't recall it, but my name's
10  on it; I put it together.
11      Q. Okay. And to be specific, can we turn to
12  Fifth Third McHugh 000700. It refers to you as manager;
13  is that correct?
14      A. That is correct.
15      Q. And it's dated March 6, 2012; is that right?
16      A. It is correct.
17      Q. And this would have been for Phil McHugh's
18  performance for 2011; is that right?
19      A. Apparently so.
20      Q. And with respect to this review of Phil
21  McHugh, what were his -- what were his duties at that
22  time? Are you able to identify that from Exhibit 5?
23      A. Let me just read it. So he ran the --
24  the wealth division, which we called investment advisory
25  division at that time.

Deposition of Gregory Carmichael, Volume I                                  Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 112

1  Q.  And with respect to Phil's performance that
2  year, how was his performance in 2011?
3     MR. CIOFFI:  Objection.  The document speaks
4  for itself.  You want him to read something from
5  here?  Or you're really not expecting him to
6  remember something from 12 years ago?
7     THE WITNESS:  I'm going to go to the same page
8  he has, and I'm going to read it off, what I wrote
9  here.
10    Core values were very strong, which you would
11  expect from Phil, does a great job in that area.
12  Leadership competencies, I gave him strength.
13  Community involvement was effective.  Strategic in
14  this type of role, the role he was filling at this
15  time, which is not the CEO role, was strength.
16  And talent for this role in this position, I gave
17  him a strength.  So it was a good review, which I
18  would expect.
19  MR. SABA:
20    Q.  Your overall comment at the end is, Phil has
21  done a great job leading the IA team and continues to
22  step up as a leader in other critical issues for the
23  bank.  Is that right?
24    A.  That's correct.
25    Q.  You indicate, I appreciated his support on

Page 113

1  FTAM and his leadership on the president circle trip.
2  He is a great leader with a long runway at Fifth Third.
3  Is that right?
4     A.  Absolutely correct.
5     Q.  Great year and I appreciate your partnership;
6  is that correct?
7     A.  Yep, that's correct.  All those comments were
8  in reference to the job he was holding, which was not
9  the CEO job; it was the line of business job in the
10  organization.  And this review supported why I promoted
11  Phil up and offered him the top job in the company as
12  the head of consumer bank, one of the top five jobs.
13    (Exhibit 6 is marked for identification.)
14  BY MR. SABA:
15    Q.  Mr. Carmichael, I've handed you what's been
16  marked as Exhibit 6, Fifth Third McHugh 000701 through
17  Fifth Third McHugh 000709.  Can you identify that
18  document for me, please?
19    A.  Looks like a 2012 leadership PM form for Phil
20  R. McHugh.
21    Q.  This form was used for the annual review of,
22  in this case, Phil McHugh at that time; is that right?
23    A.  That would be correct.
24    Q.  What was Phil McHugh's role at that time?
25    A.  Let me go through here and look at it.  Head

Page 114

1  of the investment advisory group, so similar to the
2  2011, same organization, same responsibilities.
3     Q.  And how was Phil McHugh's review in 2012,
4  before 2012?
5     MR. CIOFFI:  Objection.  The document speaks
6  for itself.
7     THE WITNESS:  In the role he was performing,
8  he did extremely well, and I gave him a very, very
9  strong rating.  Once again, it says Phil does a
10  good job in these type of assignments.
11    MR. CIOFFI:  Counsel, it's 12:30; do you want
12  to take a break?
13    MR. SABA:  Sure.  That's fine.
14    MR. CIOFFI:  You're finished with that 2012,
15  right?
16    MR. SABA:  Yeah, that's fine.
17    VIDEOGRAPHER:  Time is 12:28 p.m.  We're going
18  off the record.
19    (A recess was taken from 12:28 to 1:06.)
20    VIDEOGRAPHER:  Time is 1:06 p.m.  We're back
21  on the record.
22    (Exhibit 7 is marked for identification.)
23  BY MR. SABA:
24    Q.  Mr. Carmichael, I've handed you what's been
25  marked as Exhibit Number 7, which is Bates stamped Fifth

Page 115

1  Third McHugh 000732 through Fifth Third McHugh 000737.
2  Can you identify that document for me, please?
3     A.  2013 performance management for Phil McHugh,
4  performance management form we used in 2013.
5     Q.  What position did Phil McHugh hold at that
6  time?
7     A.  Head of wealth and asset management.
8     Q.  And would you have completed this review of
9  Phil McHugh?
10    A.  Yes, I would have.
11    Q.  And you completed this in April of 2014; is
12  that correct?
13    A.  That's correct.
14    Q.  And what were the results of Mr. McHugh's
15  review for his performance in 2013?
16    A.  Good performance in this position.  In the
17  role that he was overseeing, he did a good job.
18    Q.  He was far above expectations; isn't that
19  right?
20    A.  Yes, that's a good job.
21    Q.  Referring you to page 5 of 6, under team
22  effectiveness.  Do you see that?
23    A.  I do.
24    Q.  Says far above expectations.  And it
25  references Phil's employee engagement; is that right?

Case: 1:21-cv-00238-MRB Doc #: 66-3 Filed: 08/02/24 Page: 33 of 114 PAGEID #: 2810

Deposition of Gregory Carmichael, Volume I                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 116

1  A.  Let me just take a look at this.  Yes, I see
2  that.
3  Q.  What is "employee engagement"?
4  A.  Employee engagement is a process and
5  methodology in which we measure the engagement level of
6  an organization, and we typically engage a third party,
7  and we've had multiple third parties come in and do that
8  process for us and support that process for the bank,
9  and we typically do it annually, but that's not always
10 the case.  Sometimes we'll do -- we'll skip a year or
11 something of that nature.
12 Q.  And under manager comments, those are your
13 comments, first of all; is that right?  Your manager
14 comments?
15 A.  Yes, it is.  I believe that's correct, because
16 I'm the manager.
17 Q.  The last line of your manager comments, it
18 says, please stay focused on improving EE, employee
19 engagement, in 2014; is that correct?
20 A.  That's what it says.
21 Q.  Why did you want Phil to stay focused on
22 improving employee engagement?
23 A.  I expect all my leaders every year -- and I
24 can't think of a reason -- why where we wouldn't have an
25 opportunity for our leaders to continue to elevate

Page 117

1  engagement scores in their line of business.  Engagement
2  score looks at a lot of things.  It looks at, you know,
3  communication, how things are getting down to the
4  organization, how people are receiving information, how
5  they feel about leadership.  There's a lot of things
6  that go into that, so we always want to continue to
7  improve on employee engagement scores.
8  Every organization has opportunities there;
9  every line of business has opportunities there.  So it's
10 always something I always encourage my leaders to
11 continue to stay focused on because at the end of the
12 day, it's -- it's important that we have -- and we
13 continue to elevate engagement in the organization.
14 Once again, it is at a point in time.  The
15 organization can be at a very different state.  There
16 could be a lot of changes going on in the organization.
17 So those -- those outcomes can ebb and flow
18 substantially with no respect or relationship to what
19 the manager might be doing.  It could be a point in time
20 for the organization, what the organization's going
21 through, what the company's going through, that could
22 change those scores quite drastically.
23 So it's -- they're data points.  They're
24 helpful.  Year after year, if you look at those data
25 points, there's trend opportunities.  But once again,

Page 118

1  it's just another data point of how we think about
2  elevating our work force, making sure we're looking at
3  every opportunity.
4  Q.  You mentioned it's important to improve
5  employee engagement and have employee engagement.  Why
6  is it important?
7  A.  Well, by definition, the more engaged an
8  organization is, the better outcome you get as an
9  organization in general.  But once again, at any point
10 in time, the organization that an individual might be
11 leading could be at a different phase or can be making
12 tough challenges -- tough decisions in that
13 organization.  The organization could be going through a
14 transformation.  And you could go with coming in; you
15 could be going out.
16 So it's just something that we use as another
17 data point.  But we like to see the scores continue to
18 go up, but that's not always a result of that manager's
19 or the executive's performance.  There's a lot of
20 factors that could go into that engagement score.  It's
21 just another data point, and we look at all that.
22 Q.  Clearly though, it's something a manager can
23 focus on improving; is that right?
24 A.  I think every manager can continue to find
25 opportunities.  Once again, depends on what the

Page 119

1  engagement scores demonstrate.  For instance, if -- if
2  the organization says they're not clear on
3  organizational strategy, well, there's something a
4  manager can work on to provide more clarity on
5  organizational strategies.  So there's definitely
6  opportunities that come out of those discussions.
7  Q.  What can a manager typically do to improve
8  their employee engagement scores?
9  A.  I just gave you one example.  So the -- of
10 communication, so the manager may elevate the amount of
11 communication he provides to his organization around
12 strategy, draw parallels of our strategy versus another
13 group's, and how they can support that strategy.  Those
14 are examples of things that -- that might have shown up
15 on the viewpoint survey as an opportunity for
16 improvement.
17 Q.  Are those different types of coaching that a
18 manager can provide to the employees?
19 A.  Can you repeat the question?
20 Q.  Yeah, I'm asking are those different types of
21 coaching that a manager can provide to employees to help
22 improve employee engagement scores?
23 A.  There's opportunities.  The word "coaching,"
24 I'm not sure that I would use the word coaching.
25 There's opportunities for that leader to -- to put in

Deposition of Gregory Carmichael, Volume I                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 120

1 processes such as communication processes, enhanced
2 communication processes. There's educational
3 opportunities that a manager can bring forth. I
4 wouldn't use the word necessarily coaching.
5     (Exhibit 8 is marked for identification.)
6 BY MR. SABA:
7     Q. Mr. Carmichael, I've handed you what's marked
8 as Exhibit Number 8, Fifth Third McHugh 000758 through
9 Fifth Third McHugh 000763. Can you identify this for
10 me, please?
11     A. 2014 performance management for Phil McHugh.
12     Q. And what was Phil McHugh's position at this
13 point in time?
14     A. Same as prior year, head of wealth and asset
15 management.
16     Q. And you were serving as his manager at this
17 time; is that correct?
18     A. Correct.
19     Q. And you would have completed Exhibit 8; is
20 that right?
21     A. Correct.
22     Q. And you completed this on February 25, 2015;
23 is that right?
24     A. Correct.
25     Q. And how was Phil McHugh's performance in 2014?

Page 121

1     A. Strong performance review calculated out to a
2 3.75 in this case.
3     Q. On what page are you looking?
4     A. Page 4 of 6. So it looks like his rating went
5 down from the prior year.
6     Q. His overall rating was far above expectations,
7 correct?
8     A. This form switches pages, so bear with me. I
9 thought I was looking at the rating summary, which was
10 calculated at 3.75.
11     Q. Then the overall rating is a 5, "far above
12 expectations"; is that right?
13     A. These forms change a little bit year to year;
14 I just got to see how they're doing this one. I've got
15 rating summary. Okay, that must have been the rating
16 summary -- I mean, later, the overall rating was -- was
17 -- was -- calculated at 3.7 in a rating of 5. That
18 seems inconsistent. I have to study this form a little
19 bit to see where that inconsistency's coming from.
20     But this -- strong performance. I can go
21 through and read these summaries, but I know Phil was
22 doing a good job for us at that time, and I have no
23 doubt he had a good performance review. In this -- in
24 this role, what I was asking him to do, he would have
25 done a good job, and that's why he was asked to do more

Page 122

1 for the company and given further opportunities for --
2 for a promotion.
3     Q. But your comments would indicate Phil was
4 actually doing a great job; is that right?
5     A. All my leaders do a great job in the
6 organization to reach the levels that they are. They're
7 good managers. They do well. They can run the
8 operation I'm asking them to run. They're good
9 performers, and if he wasn't a good performer, he
10 wouldn't have been asked to take a promotion to be
11 the top five guy in the proxy -- one of the guys in the
12 proxy, top five positions in the company. So Phil was
13 doing a good job in this role that I asked him to
14 fulfill. It's not the CEO role. It has very different
15 skills and requirements. In this role, he did a very
16 good job, yes. Yes. That's what this review would
17 reflect.
18     Q. And I'm just referring to your comments. You
19 actually used the word "great," not just good; is that
20 right?
21     A. Yeah. In this role, okay -- which was not a
22 top role in the company -- he had very good -- great
23 performance in this role, which I expect my managers to
24 have at this level.
25     (Exhibit 9 is marked for identification.)

Page 123

1 BY MR. SABA:
2     Q. Mr. Carmichael, I've handed you what's been
3 marked as Exhibit Number 9, Fifth Third McHugh 006552
4 through Fifth Third McHugh 006554. Can you identify
5 this document for me, please?
6     A. Looks like an enterprise DDI competencies in
7 the October 2015 timeframe.
8     Q. Do you know what the enterprise DDI
9 competencies is referring to?
10     A. We had -- it's the skill competency matrix
11 that I'm not -- we've used it -- obviously, we used it
12 once. I'm not -- I'm not really strong with that tool.
13 This was facilitated by the HR organization; they
14 administered it. This wasn't something I was closely
15 involved with, to be honest with you.
16     But I am familiar with what they were -- they
17 were trying to do here, I believe, assessing strengths
18 and weaknesses of an individual, and they used a tool
19 called, I believe, DDI. That's all I know about it.
20     Q. What does DDI refer to?
21     A. I don't know. I couldn't tell you what the
22 acronym is.
23     Q. And when you say "the HR organization," who
24 are you referring to?
25     A. 2015, it would have been -- this was probably

Deposition of Gregory Carmichael, Volume I                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 124

1  Theresa Tanner at the time at 2015.
2      Q.  So by the HR organization, you're referring to
3  in-house at Fifth Third, not an outside source?
4      A.  I don't recall.  I don't recall this tool and
5  how it was -- who brought it forth, but it would come
6  through and been facilitated by the HR department that
7  Theresa Tanner led.  I know no more than that about this
8  form.
9      Q.  Do you know if it's assessing enterprise
10 leaders for the qualifications to serve as CEO?
11     A.  I'm not familiar with this.  To be honest with
12 you, I do not recognize this -- this -- it was eight
13 years ago.  I don't recognize and don't recall this
14 page, this deck at all.  So I'm really not sure and I
15 can't answer that question with any level of confidence.
16     Q.  Have you seen this document before?
17     A.  I don't recall ever seeing this document.
18         (Exhibit 10 is marked for identification.)
19 BY MR. SABA:
20     Q.  Mr. Carmichael, I've handed you what's been
21 marked as Exhibit Number 10, Fifth Third McHugh 0006555
22 through Fifth Third McHugh 0006562.  Can you identify
23 this document for me, please?
24     A.  It says succession discussion confidential.
25     Q.  Have you seen this document before?

Page 125

1      A.  I do not recall ever seeing this document.  I
2  don't recall seeing it.  Doesn't mean I never saw it.  I
3  do not recall seeing this document.
4      Q.  Do you know what it's referring to?
5      A.  I have no -- I've got to look through this.
6         MR. CIOFFI:  Take your time.  Look at it.
7         THE WITNESS:  This looks like some succession
8      management timeline for the prior CEO and different
9      scenarios.  I absolutely can't recall ever seeing
10     that document.
11 BY MR. SABA:
12     Q.  The document makes several references to
13 "Kevin."  Is that Kevin Kabat?
14     A.  I would imagine so, since he was the CEO at
15 the time, and I think that's what we're talking about
16 here.
17     Q.  Referring to page 6 of this document, Fifth
18 Third McHugh 006560.  It talks about, in the box,
19 personal challenges for accelerated timeline.  And under
20 messaging, age matters.  Do you see that?
21     A.  I do.
22     Q.  Can you explain to me -- do you know why age
23 matters with respect to this timeline for CEO
24 succession?
25         MR. CIOFFI:  Objection.  He's testified he's

Page 126

1  never seen this document before, and objection to
2  the representation that the messaging has anything
3  to do with the succession timeline.  But you can
4  answer, if you know.
5         THE WITNESS:  I have no clue; I've never seen
6      this document before.  I was not involved in this
7      process.
8  BY MR. SABA:
9      Q.  You said you were never involved in the
10 process.  You were in --
11     A.  This document.  Referring to that document.
12     Q.  Okay.
13     A.  The process.
14     Q.  The process of becoming CEO.  You're the one
15 that succeeded Kevin Kabat as CEO, right?
16     A.  I was informed that the board was undertaking
17 the process.  I'm not familiar with this succession plan
18 document, is what I was referring to.  I've never
19 seen -- I would not have seen that document.
20     Q.  You were not involved in putting this document
21 together?
22     A.  I just said I didn't see the document, so
23 obviously I wasn't involved.
24     Q.  Do you know who would have put Exhibit 10
25 together?

Page 127

1      A.  I don't know exactly who put that together.  I
2  would assume HR, working with the union capital
3  committee, would have been involved in that type of
4  process.  I do not know.  I did not put it together.
5  I've never seen it.
6         (Exhibit 11 is marked for identification.)
7  BY MR. SABA:
8      Q.  Mr. Carmichael, I've handed you what's been
9  marked as Exhibit Number 11, Fifth Third McHugh 000766
10 through Fifth Third McHugh 000773.  Can you identify
11 this document for me, please?
12     A.  2015 performance management form for Phil
13 McHugh.
14     Q.  And you were not Mr. McHugh's manager for
15 2015; is that correct?
16     A.  When this form was done -- I've got to recall
17 how the organization flowed at this point -- when this
18 form was done, it says here the manager at the time was
19 Lars Anderson, who would have been the chief operating
20 officer at that time in this position, then he would
21 have reported to the chief operating officer, it
22 appears, according to this form, which I suspect is
23 correct.
24     Q.  And what was Phil McHugh's position at
25 that time?

Deposition of Gregory Carmichael, Volume I                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 128

1   A.  Head of investment advisors.
2   Q.  Referring you back to Exhibit 8, which is the
3   2014 performance review, his title at that time says
4   head of wealth and asset management.  Do you see that?
5   A.  I do.
6   Q.  Did his position change from 2014 to 2015?
7   A.  I don't recall his position changing.  I think
8   we renamed -- we're changing the name of the division
9   itself.  I'm not a -- it used to be the IA division,
10  then we shifted to wealth and asset management.  It was
11  basically a naming -- a line of business name change is
12  what I think we have here.  I just can't recall exactly
13  the sequence and timings of these changes.  But I don't
14  believe the job was any different.
15  Q.  Would Mr. Anderson have reported to you at
16  this point in time?
17  A.  He would have.
18  Q.  Have you seen Exhibit 11 before?
19  A.  I don't recall seeing this performance review.
20  It was done by Lars Anderson, so I would not have -- I
21  would not be expected to see this.  I don't believe I
22  have.  I don't recall it.
23  Q.  As part of your role of being the supervisor
24  to Lars Anderson, he would not have provided this to
25  you?

Page 129

1   A.  No, he would not have.
2   Q.  In 2015, you said Lars Anderson was COO; is
3   that right?
4   A.  I believe that's correct.
5   Q.  Was he also in charge of the regions?
6   A.  I believe when he came in he had the regions
7   reporting to him.  I believe that.  I'm not positive,
8   but I believe that was the case.  But I'm not -- I can't
9   be a hundred percent factual about that.
10  Q.  Was he also included in the proxy that year?
11  A.  That year, 2015, I'm not sure if he was in
12  there in 2015 or 2016, when he actually became in the --
13  when he actually entered the proxy, I'm not sure if it
14  was a 2015 proxy or 2016.
15  Q.  Are you able to determine how Phil did in
16  2015, from Exhibit 11?
17  MR. CIOFFI:  Objection.  The document speaks
18  for itself.  It's not a proper question to ask him
19  to read the documents and say what it says.  It
20  says what it says.
21  BY MR. SABA:
22  Q.  Referring to page 2 of 6, it indicates an
23  overall rating again of exceeds expectations; is that
24  right?
25  MR. CIOFFI:  Objection.  Document speaks for

Page 130

1   itself.
2   BY MR. SABA:
3   Q.  Do you see that, Mr. Carmichael?
4   A.  That's correct.
5   (Exhibit 12 is marked for identification.)
6   BY MR. SABA:
7   Q.  Mr. Carmichael, I've handed you what's been
8   marked as Exhibit Number 12, Fifth Third McHugh 000784
9   through Fifth Third McHugh 000791.  Can you identify
10  that document for me, please?
11  A.  According to the form, it's 2016 performance
12  management for Phil McHugh.
13  Q.  And what was Phil McHugh's position at that
14  time?
15  A.  Head of wealth and asset management.
16  Q.  And his manager was still Lars Anderson; is
17  that correct?
18  A.  That's what the form says.
19  Q.  It also indicates that Frank Forrest
20  participated in the review; do you see that?
21  A.  I do.
22  Q.  Do you know why Frank Forrest would have
23  participated in the review back in 2016, of Phil McHugh?
24  A.  At this time, I believe we introduced risk
25  ratings that were -- that had to be independently done

Page 131

1   by the chief risk and compliance officer, which at the
2   time was Frank Forrest.  And Frank's responsibility
3   would be to assess the manager with respect to risk
4   competencies and managing and overseeing risks in the
5   area of responsibility that that individual had.  There
6   was a form and a process that Frank went through to do
7   that.  It was done independent of the manager, which
8   would have been Lars Anderson, and it was part of the
9   final review.
10  Q.  And what was Lars Anderson's position at this
11  point in time in 2016?
12  A.  I believe he was still chief operating
13  officer, but I believe that to be correct, but I've got
14  to look at the data.  But I'm pretty sure it was still
15  chief operating officer.
16  Q.  And referring to the last page, Fifth Third
17  McHugh 000791, Phil McHugh's review for 2016 would
18  indicate, again, that he exceeds expectation; is that
19  correct?
20  MR. CIOFFI:  Objection.  The document speaks
21  for itself.  You don't have to have him read it.
22  THE WITNESS:  Says exceeds, and it says
23  calculated raise ebb and flowed for Phil for the
24  last three-plus years in his position.  And once
25  again, it demonstrates he's done a good job and

Deposition of Gregory Carmichael, Volume I          Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 132

1   he's been in his role for a while, and he does a
2   good job at performing in this role and meeting
3   expectations of his role in the company.
4       (Exhibit 13 is marked for identification.)
5   BY MR. SABA:
6      Q.   Mr. Carmichael, I've handed you what's marked
7   as Exhibit Number 13, Fifth Third McHugh 000823 through
8   Fifth Third McHugh 000830. Can you identify that
9   document for me, please?
10     **A. 2017 performance management of Phil McHugh.**
11     Q.   And you were the person who performed this
12   review of Phil McHugh for 2017; isn't that right?
13     **A. That's correct.**
14     Q.   What was your position with the bank at that
15   point in time?
16     **A. I would have been the CEO and president of the**
17   **company.**
18     Q.   And why did Phil -- and Phil McHugh was
19   reporting directly to you; is that correct?
20     **A. At this point in time, yes.**
21     Q.   Why was Phil McHugh switched to reporting
22   directly to you instead of to Lars Anderson?
23     **A. Because I felt that was the best structure for**
24   **the organization for optimal performance. It's a**
25   **decision I had responsibility to make, and I believe**

Page 133

1   **that having that role and breaking it out from a chief**
2   **operating officer role was a better way to run the**
3   **group, so I changed reporting structure and it appears,**
4   **at that time, Phil was also asked to step up and add the**
5   **regional banking group, which is regional banks.**
6     Q.   And that was added to his duties as head of
7   wealth and asset management; is that right?
8     **A. Yeah, I think he also picked up business**
9   **banking at that time. Once again, another nice**
10   **promotion to a bigger role in the company for Phil**
11   **McHugh.**
12     Q.   And what was your overall ranking for Phil
13   McHugh that year?
14     **A. Calculated out to 3.8, which is exceeds**
15   **expectations.**
16     Q.   If you could turn to page 6 of 7, Fifth Third
17   McHugh 000828. What does the last paragraph on that
18   page refer to?
19     **A. It refers to the CFPB kicking off a sales**
20   **practice, our sales practices, and it also talks about**
21   **other actions and work that the teams are doing to**
22   **continue to elevate our performance and controls around**
23   **sales practices, something that's extremely important**
24   **that we take very seriously, so this was more of that**
25   **continued effort.**

Page 134

1     Q.   And is that the same investigation by the CFPB
2   that continues today?
3     **A. That -- the investigation -- there's a suit**
4   **that was filed by the CFPB that we have addressed, and**
5   **continue to address, that's still -- that's still**
6   **active, it's not been settled.**
7     Q.   Why is that being brought up in Phil McHugh's
8   review?
9     **A. Because wealth and asset management has sales**
10   **practice-related activities in wealth and asset**
11   **management at this point in time, as this -- CFPB is**
12   **starting their process of evaluating our sales practices**
13   **and identifying review of that area. So he would be**
14   **involved from that perspective.**
15      **There's also, now that he has responsibilities**
16   **for the region, the overall sales practices, to make**
17   **sure the regions are plugged into those appropriate**
18   **practices, so -- because of his roles, regional banking**
19   **oversight and responsibilities, and WAM, has sales**
20   **practice-related. In business banking, there's a fine**
21   **line there. A lot of times as a consumer -- he has his**
22   **own company, so we want to make sure all those are**
23   **covered. So that's why he would have been involved.**
24     Q.   And he was -- just to be clear, you referenced
25   business banking. He was the head of the consumer bank

Page 135

1   at this point; is that correct?
2     **A. That's not what it says. Head of regional**
3   **banking, WAM, and business banking, but I believe -- but**
4   **-- yeah, that's what this says.**
5     Q.   Okay. If I can refer you to --
6     **A. I'm looking at the strategic --**
7     Q.   If I can refer to your comments on Fifth Third
8   McHugh 000830.
9     **A. Okay.**
10     Q.   If you look at the second paragraph -- first
11   of all, do you recognize that these are your notes that
12   you put on here?
13     **A. These would have been my notes. I'm just**
14   **trying to draw the disconnect between his title and the**
15   **head of the consumer bank, and I want to know if this --**
16   **if there's a mid-year transition where he was moved over**
17   **to head of the consumer bank. So I'm just a little**
18   **confused by this, so once again, I just got this handed**
19   **to me. But if he's leading the consumer bank at this**
20   **time, then obviously the sales practice issue was very**
21   **consumer-focused. It was a hundred percent**
22   **consumer-focused. And if he had responsibility for the**
23   **consumer bank, he would have been engaged in that -- in**
24   **that process and review of the CFPB, and he also would**
25   **have had some responsibilities to continue to elevate**

Deposition of Gregory Carmichael, Volume I                          Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 136

1  our sales practice activities in the bank and make sure
2  we continue to do a better job in that area wherever
3  possible.
4      Q.  So as one point of clarification, in your
5  second paragraph of notes on page Fifth Third McHugh
6  000830, you indicate Phil recently took over leadership
7  of the consumer business.  He's done a nice job of
8  addressing challenges, achieving this year's financial
9  plan, and setting the stage for a successful 2018.  Phil
10  does a nice job with the regulators representing his
11  business, communicating effectively, and addressing any
12  outstanding issues.
13      Do you see that?
14      A.  I do.
15      Q.  So does that refresh your recollection of him
16  taking over the consumer bank?
17      A.  My guess is it happened midyear or near the
18  end of the year.  I don't know.  But my guess is he
19  started off as the head of the regional banking and WAM,
20  and then took over the head of the consumer.  I don't
21  know -- I don't recall exactly the timelines and how
22  this transpired.  I was just confused by the title
23  versus the comments about the consumer banking.  He
24  obviously took over the consumer banking that year.
25      Q.  The assignment for him to take over the

Page 137

1  consumer banking, that's something you would have given
2  him, correct?
3      A.  I absolutely would have given him that
4  opportunity, yes.
5      Q.  And this is the same consumer bank that you
6  were offering to him in 2020, October; is that correct?
7      A.  No, that's not correct.
8      Q.  Why is that incorrect?
9      A.  I'll explain it to you.  The consumer bank in
10  2020 had a much larger scope, had over 60 percent of the
11  revenue of the company.  The consumer bank during this
12  period of time did not have Fifth Third securities,
13  which is our brokerage business.  It did not have MB
14  Financial, which was a substantial -- largest
15  acquisition in the history -- maybe -- probably the
16  largest acquisition.  Old Kent may have been about the
17  same size -- been right up there with Old Kent.  That
18  made us the second largest consumer bank in Chicago,
19  which was huge and very important to us.  A tremendous
20  southeast expansion where we were building hundreds of
21  branches in those markets.  Very important markets for
22  us that we didn't have when he had it prior.  We
23  elevated that strategy.
24      Then the consumer credit card business wasn't
25  reporting into the consumer bank at this time.  So the

Page 138

1  job was much bigger, and it was, therefore, became --
2  because of the amount of revenue that was directly --
3  directly attributed to that line of business.  Not the
4  regions but the line of business, which was about
5  60-plus percent of the gross revenue, that was a job
6  that Phil was being offered at that time, different than
7  the one that he had prior.
8      Q.  Is it fair to say that the consumer bank role
9  in 2020 was a far more important role than the consumer
10  bank role was in 2017?
11      A.  It was a -- it was a larger line of business.
12  Therefore, it had more revenue, responsibilities, which
13  obviously means importance to the company because
14  obviously that's what we're in business to do, serve our
15  customers, center revenues and returns for our
16  shareholders.  So it had a much bigger financial
17  responsibility to the corporation.  So yes.
18      Q.  Can you read to me your first paragraph on
19  Fifth Third McHugh 000830?
20      MR. CIOFFI:  Objection.  Document speaks for
21  itself.  You may answer.
22      THE WITNESS:  Phil was a long season employee
23  that understands our business and is deeply
24  committed to the success of Fifth Third.  Always
25  does what is in the best interest of the company to

Page 139

1  achieve outcomes in the right way.  Phil takes full
2  accountability for his organization.  Never makes
3  excuses or distributes blame.  He is a great leader
4  for his people and is always there to assist them
5  in their success.  Phil is the epitome of a team
6  player and collaborates with all of his business
7  partners and appropriately addresses challenges.
8  BY MR. SABA:
9      Q.  You wrote that, correct?
10      A.  Yes, I did.
11      Q.  Can you read the last paragraph for me,
12  please?
13      MR. CIOFFI:  Same objection.  Go ahead.
14      THE WITNESS:  Phil approaches everything with
15  the highest integrity and fully assesses the risk
16  in every decision.  He partners well with the risk
17  and compliance groups to ensure decisions are
18  consistent with our risk appetite.  Phil operates
19  in a very collaborative manner with his peers and
20  lives our core values.
21  BY MR. SABA:
22      Q.  What are Fifth Third's core values?
23      A.  They're stated in the document numerous times
24  through all these performance reviews.  We can go to
25  them and I can read them to you, if you'd like.

Page 140

1   Q.   Certainly.
2   A.   Accountability.  Customer experience.
3  Employee engagement.  Then the core values:  Work as one
4  bank, take accountability, be respectful and inclusive,
5  act with integrity.
6        (Exhibit 14 is marked for identification.)
7  BY MR. SABA:
8   Q.   Mr. Carmichael, I've handed you what's been
9  marked as Exhibit Number 14, Fifth Third McHugh 000836
10 through Fifth Third McHugh 000840.  Can you identify
11 this document for me, please?
12  A.   It says 2018 performance management for Phil
13 McHugh.
14  Q.   Have you seen this document before?
15  A.   It would be his performance review that I
16 signed.
17  Q.   You were still his manager at this point in
18 time?
19  A.   Apparently so.  If I've signed this, I was his
20 manager.
21  Q.   And what was Phil McHugh's position in 2018?
22  A.   I'm reading this right now.  Phil recently
23 took over the leash of the regions, so he had that
24 responsibility reporting in 2018.  So he had taken over
25 the regions.  He also provided leadership over our

Page 141

1  president's circle, and then, if the title on this is
2  right, he still had responsibilities for wealth and
3  asset management in business banking.
4   Q.   Were you able to determine, with respect to
5  that reference, or does it refresh your recollection as
6  to whether or not Phil also took over leadership of the
7  Cincinnati region in 2018?
8   A.   I'm not sure -- it does not.  I don't have
9  clarity as to when the Cincinnati region was no longer
10 an enterprise position directly and then came underneath
11 the region.  I don't have the exact timeframe
12 crystallized in my head when that occurred.  It wouldn't
13 have been too far off this time.  I just don't know
14 exactly when.
15  Q.   And you would have filled out these comments
16 we see on the first page of Exhibit Number 14; is that
17 right?
18  A.   I would have wrote this, correct.
19  Q.   And looking at this document, it appears you
20 repeated the first paragraph from 2017; is that correct?
21  A.   Apparently so.
22  Q.   And you still -- you still believe that to be
23 true for 2018 as well; is that right?
24  A.   In the job that Phil was doing, understanding
25 our business and deeply committed to the success of

Page 142

1  Fifth Third, absolutely.  I believe he always tried to
2  do what was in the best interest of the company,
3  absolutely.  And he was a very accountable leader,
4  that's why he was a good leader for the organization,
5  that's why he was promoted, and that's why he was paid
6  substantially for his services to the company.
7   Q.   In the second paragraph, where you mention
8  where he recently took over leadership of the regions,
9  you note in the last sentence, and he has ensured the
10 appropriate expectations are in place to position the
11 regions for success in 2019; is that right?
12  A.   That's what it says.
13  Q.   With respect to the regions, you were also
14 responsible for the regions before you took over the
15 role of president and CEO; is that correct?
16  A.   I was.
17  Q.   In fact, it's responsibilities for the
18 regions, you wanted Tim Spence to be responsible for the
19 regions so he could get some experience doing that for
20 the role of president; isn't that right?
21  A.   The board decided it was their decision to
22 promote Tim Spence to president of the bank.  When you
23 have a president in place, the logical -- the logical
24 structure, when it's in that president, separate from
25 the CEO, is that the regions, as presidents themselves

Page 143

1  are reporting to the president when it's a separate
2  role.
3        So that's the change we made.  In that case,
4  also, as I mentioned before, it's more of an oversight
5  responsibility and role for the organization, the
6  regional leader is.  All right?  If you go back through
7  my career, that regional position reported to numerous
8  executives over time, because it's administrative in
9  nature.  There was guides, coaching, the performance
10 reviews, those types of things.  We had five different
11 people performing that role.
12       So I use it for -- as a rotational development
13 role for all leaders.  I used it for Phil, when I gave
14 Phil that opportunity.  I gave Phil that opportunity.
15 We took it away from somebody else.  So is it an
16 opportunity that continues to develop, to enhance their
17 skills, to get to know the organization better?
18 Absolutely.
19       Was there an opportunity for Tim to have that
20 role and elevate his experience level in the regions and
21 oversight of the regions?  Absolutely.  And that was the
22 decision that was made by myself, supported by the
23 board, as he became president.
24  Q.   In the third paragraph, you indicate, Phil
25 does a great job of proactively managing regulatory

Page 144

1  considerations and potential concerns. He does a nice
2  job of leading his teams' engagement in such matters to
3  achieve positive outcomes.
4       What is that referring to?
5       A. Refers that all my leaders are expected to do
6  a good job in managing the regulatory processes, be
7  responsive to the regulatory environment, be responsive
8  to the regulatory request, being responsive to
9  completing regulatory actions MRAs, such as MRIs in
10  their organization. You don't get to become a leader in
11  this organization at the highest level without being
12  good in this space and doing a nice job. That's the way
13  the banking sector works because of the highly
14  regulatory environment we are.
15       I was pointing out here that he does a very
16  good job, as all my leaders do, in running their lines
17  of business and areas of responsibility. I was
18  acknowledging that.
19       Q. In the fourth full paragraph, you talk about
20  Phil does a great job of providing outstanding executive
21  leadership to many corporate activities and events and
22  normally assumes such leadership responsibilities. One
23  significant example is the president circle, which
24  recognizes the top performers in our sales force. Phil
25  does a great job at leading such events to ensure they

Page 145

1  achieve the best outcomes and positively impacts our
2  employees.
3       Do you see that?
4       A. I do.
5       Q. What are you talking about, the president's
6  circle?
7       A. This was -- this was an event that recognizes
8  and rewards our top performers in the company more on
9  the consumer types of businesses than the commercial
10  business. But we did expand over the years to bring
11  more commercial people involved. It was typically a
12  recognition for -- to think about the retail CSRs,
13  people that work in the retail branch. It would be
14  mortgage loan officers, those kind of individuals.
15  The individuals that don't make a substantial amount of
16  money. This is a great way to recognize our top
17  performers in that area. We view it as money very well
18  spent, to recognize those leaders.
19       So it's top performers more in the consumer
20  businesses, some entry into the commercial side over
21  time. It was a rewards trip where we took them and
22  their significant other and we recognized them at a
23  formal event. Typically, you know, out of state, out of
24  country. We had a nice venue. It's a very nice event
25  to recognize and reward them. I've had multiple --

Page 146

1  there's been multiple leaders over the years that have
2  done that. Phil stepped in, raised his hand. Greatly
3  appreciated that to lead the president circle. He did a
4  very nice job leading the president circle.
5       Q. How long was Phil in the role of leading the
6  president's circle event?
7       A. I don't know off the top of my head, but
8  multiple years. That job requires, you know, future
9  planning on the site location, entertainment that we're
10  going to have, working with the third party that puts
11  that together for us, potentially previewing the venue
12  if necessary. But he did that for multiple years for
13  us. It's a role that we want our top -- one of our top
14  executives to have and provide that leadership. So I
15  think at least two, maybe three years he did that for
16  us.
17       Q. Under the how section, you repeat some of the
18  sentences that you had from 2017. But you also add,
19  Phil is our most tenured executive and brings deep
20  historical knowledge to all of our key decisions to
21  ensure prior learnings and results are appropriately
22  considered. Do you see that?
23       A. I do.
24       Q. What did you mean by that?
25       A. Exactly what it says, that Phil was our -- you

Page 147

1  know, most tenured executive. He has been with the
2  company 30-something years. There's no executive on the
3  floor that has that tenure, that I'm aware of, in the
4  organization.
5       So he has deep history -- deep knowledge of
6  the operations of the company. All right? And I
7  believe every member of the team contributes to the
8  success of the team. Phil had a very good perspective
9  on historical events, the bank as it evolved, the areas
10  of operations of the bank itself, the lines of -- good
11  command of lines of businesses. He was a very good
12  tactical leader that could execute in the job he was in,
13  given the assignments that he was given, that he could
14  execute well. All right?
15       This is all about historical perspective.
16  It's about understanding the organization. It's not
17  about future leadership, it's not about the CEO role,
18  it's not about the requirements that a CEO would have to
19  have to be successful moving the corporation forward in
20  a very digital world, but historical, keeping the lights
21  on, executing well against the objectives of the
22  organization. He's very good at that.
23       Q. Under the opportunities for 2019, there are
24  four listed. The first is continue to deepen knowledge
25  of the regions and our talent to support the success in

Case: 1:21-cv-00238-MRB Doc #: 66-3 Filed: 08/02/24 Page: 41 of 114 PAGEID #: 2818
Deposition of Gregory Carmichael, Volume I
Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 148

each of our various markets in the most impactful
manner.

Do you see that?

A. I do.

Q. What did you mean by that?

A. You have administrative support for the
regions and oversight of the regions. You're expected
to continue to make sure that the key jobs and
responsibilities are being met in your organization. So
we have turnover. You know, the presidents in the
markets or the line of business heads in most cases are
responsible for -- depending on what role it was -- are
responsible for making sure the position gets filled.

But as the administrator, oversight of the
regions, it's something that Phil also has to keep
making sure he's on top of, encouraging the leadership
to get those roles filled and so forth. So just making
sure we have the right talent in the organization and be
part of that decision and work with the people
responsible for filling those jobs. That's just part of
the administrative role of the regional president. It
doesn't fully -- isn't fully responsible for every role
out there or filling every role, but, you know,
oversight as an administrator of the regional
presidents, it's part of what I would expect to know,

Page 149

have oversight of.

Q. The second bullet point reads be very visible
to our clients and appropriately support client
acquisition in our markets.

What did you mean by that?

A. Yeah, when -- where appropriate, they need a
representative from corporate, or we're trying to bring
in a new client or new opportunity to the bank and it's
helpful to have someone from the corporate office to
show strength and also show breadth of our -- of our
banking capabilities and the scale of our organizations.

The regional presidents, oftentimes myself as
president or chief operating officer, we would go into
those markets and help those regional presidents
themselves acquire relationships. I held that -- I kept
that responsibility and expected that responsibility of
all my executives. As a CIO, I would go into the market
and help with a client acquisition opportunity if it was
more of a technology-related client.

So you know, as the oversight of the region,
that's one of Phil's responsibilities. Going in and
helping where appropriate is very logical and beneficial
to the corporation.

Q. The next bullet point reads, ensure the smooth
integration of MB Financial and realize the revenue and

Page 150

expense synergies as defined by the MB integration plan.
Also ensure the adoption of the MB Financial business
banking model in Chicago is successful, and identify, if
appropriate, opportunities to make similar modifications
in other regions.

What did you mean by that?

A. As it states, basically as the head of the
regions, and have an oversight responsibility for the
regions. We are bringing in a very large acquisition in
the Chicago region. So a natural responsibility of the
individual that has oversight for the regions to make
sure that integration goes as smoothly as possible. He
didn't have the sole responsibility, the only
responsibility for doing that integration. He didn't
have sole responsibility for every task and every line
of business to integrate it, but he had oversight.

We run a major organization, and because he
was a regional leader at the time of all the regions,
and we did an acquisition of the region, I asked him to
make sure he had his eyes and ears open to provide and
help us be successful in integrating that transaction.

Q. Who else was responsible for the integration
of MB Financial?

A. Well, I believe Charlie Bradley was the main
person on point as the program office. We had a program

Page 151

office set up to manage the integration of this
business. The consumer business went extremely well.
The commercial business on current market we had, it
wasn't as smooth. We had some different challenges
there. But the consumer side went extremely well. The
head of the consumer that was at the time would have
been instrumental in making sure the consumer line went
well. The head of the commercial bank would have been,
you know, engaged in making sure that went as well as
possible. Phil, I would say, was -- was -- had
oversight to make sure all those entities came together
well because of the nature of the fact there was
integration of the region.

Q. Who was the head of the consumer bank at that
time?

A. I believe, at this time, this would have been
2019 -- I believe, at this time, it was Tim Spence.

Q. And who was the head of the commercial bank?

A. The commercial bank is -- Kevin Lavender
probably would have been elevated, at this time, to the
large corp. I believe Lars still had the core middle
market, commercial bank, at this time. But once again,
I don't have that right directly in front of me. But I
believe that was those individuals that you mentioned,
to the best of my recall.

Deposition of Gregory Carmichael, Volume I                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 152

Q. Last bullet point reads, ensure timely execution of talent management actions to make certain the very best leaders are in key positions.

What did you mean by that?

A. That's his role. That's what -- that's what oversight and that's what administrative role is, over the regions, is to make sure talent management actions happen in a timely manner.

(Exhibit 15 is marked for identification.)

BY MR. SABA:

Q. Mr. Carmichael, I've handed you a three-page document which is marked as Exhibit Number 15. This is defendant's disclosure of fact witnesses. Can you see that?

A. I do.

Q. And these are witnesses that defendants may call at trial. Looking at number 4 on this list, who is Emerson L. Brumback?

A. Longstanding member of the board of directors, independent director.

Q. And what is your understanding of what Emerson Brumback would know about this case or be able to offer or add to this case?

A. Nothing more than the rest of the board understands about this case.

Page 153

Q. Who is Eileen Mallesch?

A. Independent board member.

Q. How long has Eileen Mallesch been a member of the board?

A. I don't know exactly. I think she came on right before or close to when I became CEO, somewhere in that timeframe. Maybe right after. So five-plus years, maybe longer.

Q. And what factual information would Eileen Mallesch be able to provide about this case?

A. Same as Emerson Brumback, no more than the rest of the board.

Q. Susan Zaunbrecher, what's your understanding of what Susan Zaunbrecher would be able to provide for this case?

A. She's a chief legal officer, so she has -- the only knowledge she has is what's transpired and when Phil resigned -- quit the company, she was involved in those discussions. She was involved in communicating with me during that timeframe, and she was involved in engaging outside counsel.

Q. How long has Mr. Brumback been on the board?

A. As long as I can recall. So well before I became CEO.

Q. Is Mr. Brumback on any committees?

Page 154

A. Mr. Brumback was the head of the audit committee for many years. I'm not -- I can't recall other committees he might have been on over the long period of time. But the one he chaired for the majority of time that I can recall was the head of the audit committee. He stepped off that recently, as he's transitioning off the board and retiring from the --

Q. Did you have any specific conversations with Mr. Brumback regarding CEO succession?

MR. CIOFFI: Objection to timeframe.

BY MR. SABA:

Q. Any time after January 1, 2018?

A. I have no independent discussions separate from any discussion I had with the rest of the board during talent management.

Q. Was Ms. Mallesch on any committees?

A. Ms. Mallesch, today, I believe she has -- she's now responsible for audit. Emerson might have gone over to risk -- did go over the risk at some point to chair the risk committee. I don't know exactly when that transition happened, but Eileen came in, she was assigned after I think one year -- I think you have to be on the board one year before you can take over a committee. She now has responsibility for audit. And I think Emerson has responsibilities -- still has for --

Page 155

for risk in the bank.

Q. Did she serve -- did Eileen Mallesch serve on any committees during 2018 or '19?

A. 2018 or '19, any committees? I don't recall. That information is all available publicly in the proxy.

MR. SABA: Can we go off the record?

VIDEOGRAPHER: Time is 2:23 p.m.

(A recess was taken from 2:23 to 2:39.)

VIDEOGRAPHER: Time is 2:39 p.m. We're back on the record.

(Exhibit 16 is marked for identification.)

BY MR. SABA:

Q. Mr. Carmichael, I've handed you what's been marked as Exhibit Number 16, which is Bates stamped Fifth Third McHugh 0214533 through 0214550. Can you identify this document for me, please?

A. The title of it says Fifth Third inclusion tool kit, from Awareness to Advocacy.

Q. Have you seen this document before?

A. It was -- I would imagine it was presented in one of our inclusion and diversity discussions. I can't recall exactly when I saw it, but I would assume I would see something of this nature, because it's got me on the front page of it.

Q. Did they ever have you review this document?

Deposition of Gregory Carmichael, Volume I                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 156

1    A.  My -- I would only be assuming that I would
2  have probably read -- read over it and they would
3  probably have presented it to enterprise, something of
4  this importance to the company.  I just don't recall
5  when and how.
6    Q.  Did you ever receive any training regarding
7  microaggression?
8    A.  We have inclusion and diversity training every
9  year that's online that we go through.  I've brought
10  external individuals in to teach unbiased -- unconscious
11  biases training, which I thought was fantastic.  I also
12  had shared that training with the board.
13      So as part of our annual process, I would have
14  been exposed and gone through the training module, which
15  I go through all the training modules, I'm required to
16  each year, so I would have been exposed to it in that
17  form.
18    Q.  You said you brought individuals in to provide
19  training; is that right?
20    A.  We brought an external company in, individual
21  lady in particular, ex-New York police individual,
22  worked for the New York Police Department, police
23  officer.  She was -- had a company that taught
24  unconscious biases.  I thought she did a fantastic job.
25  I brought her in to train and educate our management

Page 157

1  committee, which is our top, you know, 100 people in the
2  organization.  Mr. McHugh was part of that.  Then I
3  brought her in because she did such a fantastic job, I
4  had her -- had her do the same thing for the board,
5  which they greatly appreciated, as part of the board
6  education.
7    Q.  What's her name?
8    A.  I don't recall her name.
9    Q.  Do you recall the name of her company?
10    A.  I don't.  It's been a while.
11    Q.  What years did you bring her in?
12    A.  I would say shortly after I became CEO,
13  because I remember Theresa Tanner was -- Theresa Tanner
14  was the one that identified her and brought her in.
15  Theresa Tanner was here up through 2000 I think '16,
16  '17.  So it took her shortly thereafter I became
17  CEO of the company, so roughly that 2016-2017 timeframe.
18    Q.  How many times total did this person come in
19  that was a former police officer?
20    A.  For the unbiased -- unconscious bias training,
21  she came in twice, because Theresa had her in for
22  another event, I brought her in because that went so
23  well for the management committee, then I brought her in
24  for the board.  So at least three times.
25    Q.  Other than this woman you mentioned, are there

Page 158

1  any other individuals you brought in to provide training
2  regarding microaggression or unconscious bias?
3      MR. CIOFFI:  Objection.  Just so the record is
4    clear, when you say "you," do you mean him
5    personally, or the company?
6      MR. SABA:  Right now, I'm asking him
7    personally.  He said he brought this woman in, so
8    I'm asking --
9      MR. CIOFFI:  Asking for clarification.
10      THE WITNESS:  Then to be clear, Theresa
11    Tanner, head of the human capital group, brought
12    this individual in.  I was exposed to her, Theresa
13    shared her program with me, I had a chance to speak
14    with her, and I had recommended we bring her in for
15    a management committee.  So Theresa Tanner brought
16    her in under my direction from management
17    committee.  But Theresa Tanner's the one who
18    introduced her to the firm.
19      MR. SABA:  Okay.
20      THE WITNESS:  Her company to the firm.  The
21    term "microaggression" was not used, it was
22    inclusion and diversity is -- is how we would refer
23    to this, as the document states.  Not
24    microaggression or -- yeah, microaggression.
25  BY MR. SABA:

Page 159

1    Q.  Going back to my question before and
2  rephrasing it, are you aware of any other individuals
3  that Fifth Third brought in to do training on either
4  unconscious bias or microaggression?
5    A.  I don't have that date in front of me with
6  firms, but I know Theresa's engaged other entities,
7  external trainings along those lines.  I don't know
8  exactly who, what timeframe, that would be something
9  that you'd have to talk to Theresa Tanner about.
10    Q.  What is your understanding of what is
11  unconscious bias?
12    A.  It's -- it's -- it's when you have an
13  unconscious bias, basically, based on your upbringing,
14  based on what you've been exposed to.  You know, don't
15  think it's intentional.  You don't, you know, you're not
16  being intentional about it, but based on your background
17  and your experiences, you may make decisions that have a
18  certain level of bias associated with them, but not
19  intentional.
20    Q.  And what is your understanding of what
21  constitutes microaggression?
22    A.  It think it would be a negative, derogatory,
23  demeaning action or comment of a protected class.
24  Something that could be related to bullying, very
25  demeaning, not appropriate.

Deposition of Gregory Carmichael, Volume I                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 160

1  Q.  Referring to Exhibit 16, and specifically
2  page 5, Fifth Third McHugh 0214537, do you see the
3  definition of microaggression provided in Fifth Third's
4  materials?
5  A.  I do see that.
6  Q.  Do you agree with that definition of
7  microaggression?
8  A.  I'm not an expert at this, but that's the
9  definition that we used in this documentation, so.
10  Q.  You agree it indicates a comment or action
11  that subtly, and often unconsciously or unintentionally,
12  expresses a prejudiced attitude toward a member of a
13  marginalized group; is that right?
14  A.  That's what it says.
15  Q.  Okay.  So it doesn't have to be intentionally
16  demeaning; is that right or do I have to --
17  A.  It doesn't have to be.  It could be.  Doesn't
18  have to be.
19  Q.  In fact, somebody could intend something as a
20  compliment or a badge of honor, and yet it still could
21  be a microaggression.
22  MR. CIOFFI:  Objection.  Mischaracterizes what
23  the document says, but you may answer.
24  THE WITNESS:  I'm not on expert in this case.
25  I couldn't tell you.  I couldn't answer that

Page 161

1  question.
2  BY MR. SABA:
3  Q.  You've received your own training.  You've
4  received your own understanding; is that right?
5  A.  I have.
6  Q.  The goal of Fifth Third's training is to
7  remove unconscious bias or microaggressions in the
8  workplace; isn't that right?
9  A.  We would not be tolerant of any of those type
10  of actions.  If they're inappropriate actions and knew
11  that definition, actions of this nature, we would review
12  as inappropriate.  So yes.
13  Q.  Were you aware that several of your executives
14  referred to Phil McHugh as the silver fox?
15  A.  The only executive that ever referred --
16  that I ever heard refer to that term the silver fox was
17  Phil McHugh.  Nobody in my organization have I ever
18  heard refer to Phil McHugh as the silver fox, except for
19  Phil McHugh.  In my office, when we were talking about
20  the president circle trip, the silver fox has this.
21  The silver -- not when -- when the silver fox is on the
22  job, sticking his chest out, strutting around as a badge
23  of honor.  He said it multiple times.  I thought it was
24  very odd that someone would refer to himself like that,
25  right.  Because I think of a fox as sly, smart, you

Page 162

1  know, deceitful.  Nothing of those things that -- that I
2  would characterize it with Phil, so I was taken back why
3  he refers to himself as the silver fox.
4  I'd never referred to himself -- referred to
5  him as a silver fox.  I would never have a reason to do
6  that.  It doesn't make sense to me.  But he refers to
7  himself that way and had numerous times to me.  I've
8  never heard of my executives or anybody call him the
9  silver fox.
10  Q.  And when were the specific dates and times --
11  A.  I don't have dates and times of when he said
12  that.  It was about the president circle trip, one of
13  the trips, because we were going to an all-inclusive
14  venue, and I was concerned about exposure on an
15  all-inclusive event to alcohol and so forth, and Phil
16  said, not to worry, the silver fox has this, I'm in
17  control, you don't need to worry it.
18  I've heard him mention that, the silver fox
19  phrase, a few times.  Once again, I've never used it.
20  I've never heard anyone else use it.  It would have
21  been, you know, it just wasn't -- you know, he embodied
22  it, he was proud of it, he boasted about it.  I found
23  that very, very telling and I mean unusual that someone
24  would do that.  That's what he did.
25  Q.  Okay.  You said a couple -- you said you heard

Page 163

1  him use it a few times; is that right?
2  A.  I did.
3  Q.  How many times is "a few"?
4  A.  At a minimum, two to three times.
5  Q.  Okay.  And what do you mean he boasted about
6  it?
7  A.  He sticks his chest out; he's proud of it.  He
8  was strutting around my office.  The silver fox has
9  this.  Those types of comments, I view that as boasting.
10  Q.  Who was present when Phil was strutting around
11  your office with his chest out, referring to himself as
12  the silver fox?
13  A.  Greg Carmichael was present.
14  Q.  Just the two of you?
15  A.  Greg Carmichael was present and Phil McHugh.
16  He was making the comments, I was listening to them.
17  Q.  And do you recall what year this occurred?
18  A.  I do not.  I do not have year and timeframes.
19  He was leading the president's circle for multiple
20  years, but this wasn't a term I heard once.  It was,
21  like I said, a minimum two to three times, only by Phil
22  McHugh.
23  Q.  How many times did Phil McHugh strut around
24  your office with his chest out referring to himself as
25  the silver fox?

Deposition of Gregory Carmichael, Volume I

Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 164

1    A.  Just that one time.

2    Q.  Have you ever seen where any members of the
3  enterprise committee ever referred to Phil McHugh as the
4  silver fox?

5    A.  I've already answered that question.  I said
6  no.

7    Q.  In writing.  You said you've never heard
8  anybody say that.  I'm asking if you've ever read it in
9  writing?

10    A.  I've never read it in writing.

11    Q.  Would you recognize it as inappropriate for
12  members of the enterprise committee to refer to Phil
13  McHugh as the silver fox?

14    A.  Phil McHugh --

15         MR. CIOFFI:  Objection.  You may answer if you
16  know.

17         THE WITNESS:  Phil McHugh referred to himself
18  as the silver fox.  If he did it in front of me,
19  I'm assuming he did it in front of other members of
20  the team quite a bit.  If someone embraces
21  something, embodies it, is proud of it, and thinks
22  it's a compliment to their character and who they
23  are, that's them -- that's them viewing themselves
24  that way.  That's -- that's -- if someone refers to
25  them again that way, it's because he wants them --

Page 165

1  himself to be referred that way.  I've never heard
2  it, never seen it in writing.  I'm learning about
3  it.

4  BY MR. SABA:

5    Q.  In your mind, would it be appropriate to refer
6  to a black employee who refers to himself as black fox?

7         MR. CIOFFI:  Objection.

8         THE WITNESS:  I'm not going to speculate.
9  There's all kinds of circumstances that could have
10  transpired, so I'm not going to speculate on what I
11  would or wouldn't consider.  There's a lot of
12  variables that have to be understood, and in my HR
13  department that would engage, but I'd have to
14  understand all the variables and I'm not going to
15  speculate under what scenario that --

16  BY MR. SABA:

17    Q.  Are you saying that there's situations where
18  it would be appropriate to refer to a black employee as
19  black fox if they refer to themselves as black fox --

20         MR. CIOFFI:  Objection.  Asked and answered.

21         THE WITNESS:  Same answer.

22  BY MR. SABA:

23    Q.  This was a different question.  Are you saying
24  that there are appropriate times?

25         MR. CIOFFI:  Objection, Counsel.  It wasn't a

Page 166

1  different question.

2         MR. SABA:  Yes, it was.

3         MR. CIOFFI:  No, it wasn't.  You keep
4  repeating questions and saying they're different.
5  Read back his last question and you may answer that
6  again.

7         (The record was read.)

8         MR. SABA:  Let me go back.

9  BY MR. SABA:

10    Q.  Do you recognize, Mr. Carmichael, that there
11  are times where it would be inappropriate to refer to a
12  black employee at Fifth Third as black fox even though
13  they may have referred to themselves as black fox?

14    A.  I'm not going to speculate on this.  You're
15  talking about someone's skin color versus potentially
16  someone's hair color.  Phil's had silver hair since the
17  day I've known him.  So I've never known anything but
18  Phil with silver hair, so I don't equate that to age
19  whatsoever.  I don't necessarily believe that to be a
20  microaggression.  I wouldn't speculate on anything else
21  beyond that until I had all the facts in front of me, so
22  I'm not going to speculate.

23    Q.  Do you recognize that black fox is a
24  microaggression?

25    A.  I'm not going to speculate.

Page 167

1    Q.  I'm not asking you to speculate.  I'm asking
2  you whether or not the term "black fox" would be a
3  microaggression?

4         MR. CIOFFI:  Objection, he's asked and
5  answered it.

6         THE WITNESS:  Do I have all the circumstances?
7  Understood all the facts?  I don't have an opinion
8  yet.

9  BY MR. SABA:

10    Q.  What circumstances would you need to determine
11  that?

12    A.  I'm not going to speculate.

13    Q.  I'm not asking you to speculate.  I'm asking
14  you what circumstances would you need to make that
15  determination?

16         MR. CIOFFI:  Counsel, your question's a
17  hypothetical and by its very nature calls for
18  speculation.  You can't require him to speculate.

19         MR. SABA:  I'm not asking him to speculate.

20         MR. CIOFFI:  Yes, you are.  He said he can't
21  answer the question.

22         MR. SABA:  I'm not asking him to speculate.
23  I'm asking him under what circumstances would it be
24  inappropriate for you to refer to a black employee
25  at Fifth Third as black fox?  It's not speculation;

Page 168

1  it's a specific question.
2      MR. CIOFFI: Objection. It's a hypothetical
3  question. Until he knows all the conditions of the
4  hypothetical, he's not going to speculate and he's
5  entitled not to speculate. Period. You can't make
6  him speculate about something that's never
7  happened. Ask it one more time and then, you know,
8  he can answer it.
9  BY MR. SABA:
10     Q.  Under what circumstances would it be
11 inappropriate to refer to a black employee at Fifth
12 Third as black fox?
13     **A.  I'd have to understand all the circumstances.**
14 **I'm not going to speculate.**
15     Q.  What circumstances would you need to
16 understand to make the determination that that would be
17 inappropriate?
18     MR. CIOFFI: Objection. It's just a different
19 form of the question.
20     THE WITNESS: I'm not going to speculate,
21 don't have an answer. I'd have to have the facts
22 in front of me. I just gave examples where silver
23 fox of someone's hair color doesn't equate to
24 discriminatory practice or a comment about
25 someone's age. My brother had hair, gray hair when

Page 169

1  he was in his 30's, so I mean, I would view that
2  completely different than the comment you just made
3  about an individual. And I'd have to understand
4  those circumstances too, and I'm not going to
5  speculate.
6  BY MR. SABA:
7      Q.  So as you sit here today, you don't
8  acknowledge that the term silver fox is an age
9  reference?
10     **A.  Absolutely not. Absolutely not. As I said**
11 **before, I've never known Phil not to have gray hair. As**
12 **far as I know, he had gray hair when he was in Little**
13 **League. My brother had gray hair before he was 40 years**
14 **old. My best friend's wife has beautiful silver hair,**
15 **and she's not old.**
16     **So I don't equate hair color to someone's age.**
17 **It could imply -- could be someone older has gray hair,**
18 **but they could be dying it too, black. So I don't**
19 **necessarily get to that outcome whatsoever. I sure**
20 **don't get there when someone boasts about it and**
21 **promotes it about himself and is proud of it. So I**
22 **would have to understand all that before I jump to a**
23 **conclusion that that was a microaggression.**
24     Q.  It's apparent -- at least you understand
25 that a microaggression can be intended as a compliment

Page 170

1  and still lead to unconscious bias; is that right?
2      MR. CIOFFI: Objection. That's your opinion.
3  Are you asking if he agrees with your
4  characterization?
5      MR. SABA: I asked him a question. Can you
6  answer the question?
7      THE WITNESS: Repeat the question.
8      MR. SABA: You understand that a
9  microaggression can lead to unconscious bias; isn't
10 that right?
11     MR. CIOFFI: Objection. Sort of the opposite.
12 But if you can answer that question.
13     THE WITNESS: I can't answer that question.
14     MR. SABA: You haven't received enough
15 training to understand that the reason
16 microaggressions are a problem is that they can
17 lead to unconscious bias in the workplace?
18     MR. CIOFFI: Objection. Mischaracterization
19 of the definition.
20     THE WITNESS: Yeah.
21     MR. CIOFFI: But are you asking him to just
22 agree with your statement; is that -- I'm just
23 trying to clarify what your question is.
24     MR. SABA: I'm trying to understand his
25 understanding. That's where the question goes to.

Page 171

1  Other than your objection and coaching.
2      MR. CIOFFI: There's no coaching. You're
3  trying to get him to answer a question the way you
4  want it answered. He's giving you an answer. He
5  can't speculate.
6      THE WITNESS: I'm not going to speculate. You
7  look at all the factors. The reference to silver
8  fox is a reference made by Phil McHugh, who's proud
9  of it. He was proud in my office, and at the end
10 of the day I don't associate that whatsoever with
11 age. That's how he viewed himself, not as I viewed
12 him. I never called him that, I never thought of
13 him that way. I never thought of him as smart,
14 cunning, clever like you would a fox, so I was
15 taken aback by that, but he continued to promote
16 it.
17     And at the end of the day if other people
18 referred to him that way, that situation may have
19 existed, I'm not aware of it. It was never brought
20 to my attention. Phil McHugh never came to me with
21 an issue. I'm not aware of him going to HR with an
22 issue.
23 BY MR. SABA:
24     Q.  You recognize that Phil McHugh was included in
25 what would be recognized as a group of the older

Page 172

1  employees of Fifth Third; isn't that right?
2      A.  I think that's pretty -- I mean, at the end of
3  the day we don't look at age.  We don't consider age.
4  We consider ability.  I mean, I think right now we've
5  got two presidents that are 80 years old that are up
6  there in years.  You got Warren Buffet.  You got -- you
7  got other senior executives.  Jamie Diamond,
8  67-years-old.  So, I mean, you have a lot of senior
9  leaders that are excellent in their job.  We never look
10 at age when we think about leadership.  We look at
11 capabilities and talent, and that's how the board
12 thought about it.
13     Q.  The board was never provided with any age
14 information; is that correct?
15     A.  I didn't say that, you said that.
16     Q.  I'm asking you that.
17     A.  Well, look through the documentation.  I'm
18 sure on -- potentially on town reviews or something
19 where you have to put in the proxy, so yeah, the
20 board reviews the proxy.  They see the proxy.  There's
21 age in the proxy.  It's a requirement.
22     Q.  Did you ever ask Phil McHugh why he called
23 himself the silver fox?
24     A.  I never did.
25     Q.  Do you think that microaggressions are

Page 173

1  appropriate in the workplace?
2      MR. CIOFFI:  Counsel, just by way of
3  clarification, you're talking about the definition
4  that appears on page 5 of Exhibit 15?
5      MR. SABA:  Sure.
6      MR. CIOFFI:  Look at it and read that, then
7  answer the question.
8      THE WITNESS:  A comment or action that subtly
9  and often unconsciously or unintentionally
10 expresses a prejudiced attitude toward a member of
11 a marginalized group (such as commenting that a
12 black person "talks white" if they are articulate
13 and eloquent or moving to the opposite side of the
14 street to avoid interacting with a particular race
15 group).
16     This -- we have no place -- no place for
17 discriminatory practices in the workplace; I made
18 that very clear.  This training, microaggression,
19 which I think is a fairly new term, I'm not sure
20 how old that term is, all right.  As is written
21 here on paper, no.  We wouldn't -- we wouldn't
22 accept that.  We wouldn't tolerate that.  I'm not
23 saying the situation we were just talking about,
24 that this applies whatsoever.
25

Page 174

1  BY MR. SABA:
2      Q.  Has Fifth Third ever provided specific
3  training regarding age discrimination in the workplace?
4      A.  I believe that is part of our annual training,
5  when we talk about discriminatory practices, that age is
6  part of that training.  I may not be correct, but once
7  again, that training has evolved.  We've had various
8  vendors at times issuing that training, presenting that
9  training.  So age absolutely has been part of the
10 curriculum at different points in time.  I'm not sure
11 it's in there every single year.  It might be.  I'd have
12 to go look.
13     Q.  And what -- what do you recall about age
14 specifically as part of the training regarding
15 discrimination at Fifth Third Bank?
16     A.  Age should never be a factor in any of our
17 decisions and it never has been.  All right.  People
18 tell us they have a certain runway or are interested in
19 doing something at a certain period of time, we factor
20 those things that in, but those aren't age-related.
21 Those are their desires from a timing perspective.  It
22 could be retirement, could be anything else, but we
23 never consider someone's age when we make a decision.
24     We determine who's best qualified to do the
25 job in the best interest of the company, in the best

Page 175

1  interest of our shareholders, which go hand in hand, we
2  make a decision based on capabilities, never about age.
3  Age never comes up in that discussion.
4      Q.  Fifth Third does not have any business groups
5  that would support the issue of age; is that right?
6      MR. CIOFFI:  Objection to the form.  Lacks a
7  foundation.  He's not the human resource director.
8  If you can answer the question.
9      THE WITNESS:  I don't know if that's one of
10 our business resource groups or not.  It would be a
11 large group if it was.  Everybody over 40 would be
12 part of that group.
13 BY MR. SABA:
14     Q.  Exhibit Number 16 makes no reference to any
15 business resource group directed toward age, does it?
16     MR. CIOFFI:  Objection.  The document speaks
17 for itself.  Do you want him to read all through
18 it?
19     MR. SABA:  Feel free.
20     THE WITNESS:  First page, it says stamp out
21 racism and discrimination.  Race -- or age is a
22 protected class.  So it says right there
23 discrimination in this country, so it references
24 age.  People understand age is a protected class.
25 The first page.

Deposition of Gregory Carmichael, Volume I                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 176

1   BY MR. SABA:
2       Q.   My specific question was, Fifth Third did not
3   have a business resource group specifically directed
4   toward age?
5       MR. CIOFFI:  Objection, Counsel, that was not
6       your last question.  Your last question was, does
7       the document, anywhere, have a reference to age,
8       and he just answered that question.  Now you're
9       asking him a different question.
10      MR. SABA:  That's not the question I asked.
11      MR. CIOFFI:  It is.  The record will speak for
12      itself.  It's in there.  It's not going to
13      disappear.  So if you want to change it.
14      MR. SABA:  The question's right there and it's
15      not changed.
16      MR. CIOFFI:  Of course it is.  It's clear.
17      But.
18  BY MR. SABA:
19      Q.   Did you understand the question,
20  Mr. Carmichael?
21      A.   You've asked a couple, so why don't you try
22  again.
23      Q.   Okay.  Sure.  You ready?  Specifically,
24  referring to Exhibit Number 16, does it identify
25  anywhere in there a business resource group directed

Page 177

1   toward age?  Did you understand that question?
2       A.   Now I have clarity, yes.
3       Q.   Good.
4       A.   I do not see one listed on page 17.
5       Q.   Has Fifth Third ever had a business resource
6   group directed toward addressing age discrimination?
7       A.   I can't answer that question; I'm not aware.
8       (Exhibit 17 is marked for identification.)
9   BY MR. SABA:
10      Q.   Mr. Carmichael, you've been handed Exhibit
11  Number 17, Bates stamp Fifth Third McHugh 086284.  Can
12  you identify that for me, please?
13      A.   Looks like a calendar entry for a midyear
14  review with Phil McHugh in my office on 8/15/2019, at
15  1:00 p.m., going to 8/15/2019, to 1:30.
16      Q.   Do you recall having Phil Hugh's midyear
17  review on August 15, 2019?
18      A.   I don't know the exact date, but it would
19  be -- anywhere from June to that period of time would be
20  reasonable, so there would have been a discussion had on
21  his midterm, yes.
22      Q.   Explain to me the process for midyear reviews.
23      A.   Midyear reviews are very informal.  They're
24  not typically documented.  It's a touch base on how the
25  year's going.  We never want our executives to be

Page 178

1   surprised at the end of the year.  So it's really just a
2   check-in and conversation.  It's, once again, not
3   formal.
4       Q.   Who would you be performing midyear reviews
5   of?
6       A.   My direct reports.
7       Q.   How many direct reports did you have in the
8   summer of 2019?
9       A.   I don't know offhand.
10      Q.   Would that include all members of the
11  enterprise committee?
12      A.   If they report -- if they were a member who
13  reported to me, and a majority did, it would be every
14  one of them.  But not all members of management
15  committee report to the CEO.  So the ones that reported
16  to me, I would do their midterm review.
17      Q.   Do you recall which members of the enterprise
18  committee did not report to you?
19      A.   You have an individual like Melissa Stevens,
20  who is on -- didn't report to the -- to the CEO.  Let me
21  go around the room and think.  We elevated another
22  individual on inclusion and diversity that didn't report
23  initially in to me.  So there was a couple individuals
24  that didn't report to me.  I gave you a couple examples.
25  The majority reported to me.

Page 179

1       Q.   What role did Bob Shaffer have with respect to
2   midyear reviews of members of the enterprise committee?
3       A.   I would touch base with Bob and ask him if he
4   had any input from his role in the organization as
5   the head of human capital.  He would make sure that
6   these meetings were on the calendar.  You know, keep the
7   process moving forward, and just making sure that these
8   were on the calendar, and probably some conversation
9   that if there's anything that we wanted -- that he
10  thought he wanted me to emphasize or share during that
11  discussion that's come to his observation or his
12  attention that he's observed, that he may share that
13  with me.
14      Q.   Other than touching base with Bob Shaffer,
15  what else would you do to prepare for a midyear review?
16      A.   It's an informal process, there's not a lot I
17  would do.  This is based on my observations throughout
18  the year, based on the expectations that we set forth
19  for the organization and the individual's
20  responsibility.  Very informal, very casual, just a
21  touch and, hey, things are going well.  Hey, do a little
22  bit more of this, or what's going on here?  Or hey, we
23  got to think about this.
24      Those type of things.  Conversations.  But
25  nothing -- nothing, once again, formal.  I didn't

Deposition of Gregory Carmichael, Volume I        Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 180

1  prepare a lot for it.  The formal process was the end of
2  the year review that happens in February.  That's where
3  we had the deeper discussion, the ratings, risk
4  assessments are brought forth at that point.
5       Q.  Did you do anything in particular to prepare
6  for Phil McHugh's midyear review on August 15, 2019?
7       A.  Well, in that -- at that point in time, I
8  would have had a conversation and -- and sought Phil's
9  interest in being considered for the board's
10  consideration for an emergency successor.  There were
11  some situations going on with me at that time that were
12  personal in nature that may have caused me to have to --
13  to have to step down earlier than my desires or the
14  board's desires would have been.
15       So I was asking Phil if he wanted to be
16  considered as an emergency successor by the board.  I
17  was going into talent management in December.  I would
18  never put an emergency successor in front of the board
19  that didn't want the job because, by nature, when
20  something happens to the CEO, that's a very difficult
21  job to step into.  A lot's going to be going on, a lot
22  of questions, shareholders, analysts, those type of
23  things are going to be -- the organization.
24       So I wanted to make sure that the individual
25  would be interested in stepping up as an emergency

Page 181

1  successor if the board determined what was necessary, at
2  the board's call.  I was going to ask Phil if he was
3  interested in that opportunity to keep the lights on, to
4  be an emergency successor in the event something
5  happened to me earlier than we initially had planned.
6       So I did have a conversation with Bob.  I was
7  going to have that conversation with Phil.  Did he have
8  any concerns that Phil wouldn't be a good emergency
9  successor and any issue with him being an emergency
10  successor, and he did not have any concerns and thought
11  it was appropriate, and I asked Phil McHugh, as I asked
12  Tayfun Tuzun the same question during his midterm
13  review.
14       Q.  Other than bringing up these conversations
15  with Bob Shaffer, did you do anything else to prepare
16  for Phil McHugh's midyear review on August 15, 2019?
17       A.  I do not believe so.
18       Q.  What happened at Phil McHugh's 2019 midyear
19  review on August 15, 2019?
20       A.  I asked Phil if he would want to be considered
21  as an emergency successor, and that I was going to put
22  him and add him to the list to the board and recommend
23  him as an emergency successor, and did he want to be
24  considered for that position in the event that I had to
25  step down earlier.

Page 182

1       He said he absolutely did, he wanted to be
2  considered for the position, and I -- he fully
3  understands it's the board's decision if they need an
4  emergency successor, which they did not, by the way.
5  There was no need for them to go down the emergency
6  successor route, so they didn't execute that play.  I
7  ended up staying on longer.  There was no need for that.
8  The board didn't execute that play.  But I wanted his
9  understanding that he was interested in a role before I
10  put him on the list and presented it to the board, and
11  he said absolutely.
12       Q.  Anything else that happened during that
13  midyear review of Phil McHugh on August 15, 2019?
14       A.  I don't recall any other discussion that comes
15  to mind at that time, besides the normal check-in on his
16  organization and any comments I might have had about his
17  business responsibilities.  I just don't recall what
18  those would have been.
19       Q.  Did you indicate during that August 15, 2019,
20  midyear review with Phil McHugh that you were planning
21  on pursuing other matters?
22       A.  I told Phil that I had some personal issues, I
23  might be pursuing other matters, no definites, nothing
24  for certain, but I had some cause for concern and my job
25  is to make sure the organization's protected, and that

Page 183

1  the board had options in the event that they needed an
2  emergency successor.  At that point in time, for
3  personal reasons, there was a heightened sensitivity
4  that that situation might exist.  And I wanted to
5  confirm that he was interested in it and being
6  considered as emergency successor if the board felt the
7  need to execute on an emergency successor.  As part of
8  our succession planning process until they identified
9  and were comfortable with the next CEO of the company.
10       Q.  During the August 15, 2019, midyear review of
11  Phil McHugh, did you indicate that you would recommend
12  Phil McHugh to the board to be the next president and
13  chief executive officer until Spence was ready for the
14  assignment?
15       A.  Absolutely not.
16       Q.  During the August 15, 2019, midyear review of
17  Phil McHugh, did you tell Phil McHugh that he was the
18  most qualified officer on the executive team to take and
19  -- in order to take the role of president and chief
20  executive officer position?
21       A.  I did not.  I told Phil I thought he was very
22  qualified, I thought he could do a very good job of
23  stepping in, in the emergency situation.  He has 30-plus
24  years of experience with the company.  He could keep the
25  lights on, could keep the train on track.  He could

Deposition of Gregory Carmichael, Volume I          Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 184

1 continue to move the organization forward. He's a good
2 backup quarterback in the event that we need to finish
3 the game until the board can make a better and final
4 decision on the permanent replacement for the CEO.
5     Q. During the August 15, 2019, midyear review of
6 Phil McHugh, did you indicate that Tim Spence was not
7 only too young but also lacked necessary banking
8 experience, having been at that point at Fifth Third
9 only four years?
10     A. I did not.
11     Q. During the August 15, 2019, midyear review of
12 Phil McHugh, did Phil McHugh indicate that he absolutely
13 wanted to be president and CEO of Fifth Third Bank?
14     A. He said he was willing to step in as an
15 emergency successor if that's what the board needed and
16 wanted. He would absolutely do that.
17     Q. Did you have an understanding that he would
18 also absolutely want to be president and CEO of Fifth
19 Third Bank?
20     A. Phil was -- never ever had a conversation with
21 me about him being a long-term president of the bank.
22 Never one. If you go back and look at any of these
23 reviews, as we can, you'll see there's never a comment
24 in here about him being the next president and CEO of
25 the company in the review I did with him.

Page 185

1       After the 2019 talent management discussion,
2 Phil never came to me and said, what was the outcome of
3 that discussion? Am I going to be the next president
4 and CEO? When we were putting -- vetting Tim through
5 RHR, Phil never came to me and said why not me? The
6 reason for that is, we never had that conversation. He
7 never told me he wanted to be the president and CEO. He
8 absolutely was interested in stepping in if there was a
9 need as an interim emergency successor. He wanted that
10 role when I brought it forth and asked him if he was
11 interested. Beyond that, there was never a
12 conversation, there's no documentation to the board. I
13 did exactly what I said I was going to do with Tim -- or
14 with Phil McHugh. I promoted him as an emergency
15 successor to the board. That's on the 2019 succession
16 planning document. That's what I committed to doing.
17 That's the board's ultimate decision whether they want
18 to execute the emergency plan if they felt they needed
19 one, and he was going to be considered, as was Tayfun
20 Tuzun and another board member.
21     Q. Did you make any notes of the August 15, 2019,
22 midyear review with Phil McHugh?
23     A. It's an informal discussion; I did not take
24 notes.
25     Q. Did you send any text messages, e-mails, or

Page 186

1 other communications with anybody summarizing what
2 happened during the August 15, 2019, midyear review of
3 Phil McHugh?
4     A. That would not be a practice that we ever --
5 ever did. I would never send a note on a midterm. I
6 did confirm with Bob that Tim was -- that Phil was
7 interested in being an emergency successor, and I had
8 the conversation with Phil that he'd be interested in
9 being the emergency successor. Because once again, I
10 would not want to put that on a document to the board
11 because that's a big challenge and a big job to step in
12 as an emergency without that individual, one, being
13 asked, and two, having that individual say yes, they
14 would be interested in that role. That's why it
15 occurred and not the final end-of-year review.
16     Q. Is it your testimony that you had a personal
17 health issue and that is why you were approaching Phil
18 McHugh about being an emergency successor for president
19 and CEO?
20     A. I had a personal issue. I won't say any more
21 than that. I had a personal issue. But regardless, I
22 would have had an emergency successor identified on a
23 succession plan for the board to review during the
24 talent management succession planning discussion.
25       So I was more concerned at that point that

Page 187

1 there may be a need for an emergency successor, given my
2 current personal situation, so I wanted to make sure
3 that that conversation that I had with the individual
4 identified that could -- and would be willing to and
5 could step in, in an emergency capacity if the board
6 needed that. That's what occurred.
7     Q. Had emergency successors been previously
8 identified for the role of CEO and president of Fifth
9 Third Bank?
10     A. I think if you go back over our talent decks,
11 I think we have emergency successors, because it's part
12 of our process. As long as the successor planning
13 process has been in place, emergency successors have
14 been identified.
15       So I believe that to be the case, that they
16 would have been on prior -- emergency successors would
17 have been identified prior.
18       There's also a pretty extensive flow chart
19 that kind of goes through the steps of what occurs in an
20 emergency situation to select the next CEO and who could
21 potentially step up as emergency successor. We also
22 have a board member -- I believe it was Emerson
23 Brumback. He's a very qualified ex-president with M&T
24 Bank that was also on that list.
25       Once again, it's going to be the board's

Page 188

1  decision. My role is that process and Bob's role was
2  identify individuals who we thought could step in, in an
3  emergency situation and keep the lights on.
4      Q.  When did you have a conversation with Bob
5  Shaffer about Phil McHugh's review?
6      A.  Which review are you referring to?
7      Q.  Midyear review August 15, 2019.
8      A.  I would have quickly circled back to Bob and
9  said we're -- that Phil was interested in the emergency
10 successor role, so I had that conversation with him and
11 we'll put him on the list for this year.
12     Q.  Did you ask Bob Shaffer to have a conversation
13 with Phil about the issue?
14     A.  I don't think I asked Bob to have a
15 conversation with Phil. Bob communicated to me that
16 Phil came to him at our off-site strategy meeting and
17 confirmed the conversation that I had with Phil and
18 asked if Bob would support that, and I believe Bob said,
19 absolutely, yes. That's Bob's role to support people
20 the we put on that list, and Bob was supportive of that
21 and for that list in my conversations before I even
22 talked to Phil.
23     Q.  Is it your testimony today that Bob clearly
24 understood that you were proposing that Phil be the
25 emergency successor for president/CEO, and that you were

Page 189

1  not proposing Phil to be your successor for
2  president/CEO?
3      A.  Absolutely. Absolutely was crystal clear on
4  that. This was emergency successor only in the event
5  the board needed an emergency successor, and there was
6  three names on that list. And what I told Phil is, I
7  would put his name on that list, okay, and recommend him
8  as an emergency successor. I thought he'd be -- he'd do
9  a good job of it. I did say that because I meant it.
10 He would do a good job of that. As an emergency, not as
11 the permanent CEO.
12     Q.  Why would Phil do a good job as an emergency
13 CEO and not as the permanent CEO and president?
14     A.  Phil clearly doesn't have the experience that
15 the board was looking for with respect to strategic
16 agility, strategic thinking. Doesn't have the
17 innovative, innovation gene, mindset. He's not
18 innovative. He doesn't have the deep understanding of
19 our competitors. He does not have deep understanding of
20 our competitor strategy. He doesn't have a technology
21 background. He doesn't have deep understandings of the
22 financial technology, which is who we're now competing
23 mostly against, this fintech. That's the emerging
24 threat. He has no background there. He doesn't have a
25 network in the fintech space. Tim has a deep network in

Page 190

1  the fintech space. He understands the space extremely
2  well. He worked for a fintech company early in his
3  career. He has deep strategic knowledge. He was
4  basically the strategist that many of my peers brought
5  in to help them develop their strategies. He knows the
6  players, he knows their strategies, he knows their
7  strengths, their weaknesses. He can articulate every
8  single one of them.
9      He also was brought in multiple years prior to
10 us hiring Tim to do strategy for us. That was his core
11 competency. He was extremely good at it. He had
12 exposure to the board presenting those strategies. The
13 board got to know Tim during those discussions. Tim was
14 -- Tim is innovative, he's strategic in thinking, deep
15 technology background, deep fintech experience, deep
16 network capabilities, deep knowledge of the industry in
17 banking.
18     He also understood the strengths and
19 weaknesses of our peers. He also had a network of other
20 CEOs. MB Financial Never happens. We never acquire
21 that business in that bank if it's not for Tim Spence.
22 You talked to the three board members that are now part
23 of Fifth Third's board that were MB Financial, they will
24 tell you. It was Tim Spence. They admire Tim, they
25 respected Tim, they were excited about Tim's leadership

Page 191

1  in the company, and Tim was the reason that they came to
2  Fifth Third.
3      It doesn't happen to Phil McHugh. He doesn't
4  have that network or any of those experiences that I
5  just articulated. What Phil does do is he does a nice
6  job of executing against the strategy, of leading an
7  organization, of driving task, of completing task, all
8  right, and fostering a team organization. Those are
9  very good traits, but they're not the traits necessary
10 to be the next CEO of the company. Those traits are
11 important. Leaders have to develop those.
12     But the things that I've just referred to as
13 for Tim's strengths, there's a huge gap between Tim and
14 Phil. It was never a discussion whether it was going to
15 be Tim as the next CEO from the board's perspective or
16 Phil, because Phil was never in the discussion. The
17 only time Phil's name ever came up in discussion for
18 CEO, because of what I just mentioned in the
19 qualifications, was emergency only.
20     Q.  The criticisms that you listed of Phil McHugh,
21 are those set forth in writing anywhere?
22         MR. CIOFFI: Objection to the form of the
23         question. I don't believe he used the term
24         "criticism."
25         THE WITNESS: Those are -- those are

Deposition of Gregory Carmichael, Volume I                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 192

1  experiences that Tim -- that Phil does not have,
2  that Tim has, that the board needs against the
3  profile that the board developed with RHR, of who
4  the next CEO and what the skill sets of the next
5  CEO need to be, all right? I wasn't being critical
6  that -- of Phil in those areas. Phil didn't have
7  those skills, all right? And those skills were
8  defined by the board, all right? And those were
9  the skill sets the board was looking for, all
10 right?
11      The fact that Phil hadn't developed those
12 skills isn't a criticism, all right. It's just, he
13 doesn't have those skill sets. And that's
14 paramount to what the board felt was necessary for
15 the next CEO to have.
16 BY MR. SABA:
17 Q. So let me rephrase my question. These skill
18 sets that you indicate Phil doesn't have, is that set
19 forth anywhere in writing that Phil does not have the
20 following skill sets?
21 A. I think I've mentioned in discussions with --
22 those are not set forth in writing that Phil was
23 deficient in this, this, and doesn't have these skills,
24 because he was never assessed for the CEO role. So
25 there was never a reason to step forth and say, as a

Page 193

1  CEO, you lack these skills. So therefore, you're not
2  going to be considered for the CEO. We don't have that
3  in writing, all right?
4      Those skill sets -- that skill set was
5  developed by the board. At the end of the day, the only
6  executive that basically supported those skill sets or
7  had the qualifications was Tim Spence. That's who the
8  board was aligning with and believed unanimously
9  that was the right person. I never sat down with Phil
10 and said, you have deficiencies in all these areas.
11 You're never going to be the CEO of the company. We've
12 never had this conversation like that because it was
13 never warranted. Never necessary. He never came to me,
14 asking to be the CEO. He never told me he wanted to be
15 considered for the CEO. That might have prompted some
16 of that.
17      I was always evaluating Phil against the job
18 he was doing and the skill sets necessary in the job he
19 was doing. I never evaluated him against the CEO
20 position. There was never a requirement to do that.
21 There was never an ask to do that. There was never an
22 assessment against Phil against the CEO profile. If
23 there was, those things would have been clearly
24 articulated.
25 Q. The only person that was ever assessed for

Page 194

1  those -- for that skill set was Tim Spence, correct?
2  A. At the direction of the board, correct.
3  Q. With respect to the conversation that Bob
4  Shaffer had with Phil McHugh at the Inn at Perry's
5  Cabin, did Bob Shaffer inform you that he told Phil that
6  Carmichael wanted to leave in one to two years and
7  wanted McHugh to succeed him as president and CEO?
8  A. Restate that question again.
9  Q. My question is, I'm trying to understand what
10 Bob Shaffer communicated to you about his conversation
11 with Phil McHugh at the Inn of Perry's Cabin. Did he --
12 A. That's different than what you just said. So
13 what he -- Bob's conversation back to me, he told me
14 Phil approached him and he did talk to Phil and he did
15 confirm that Phil was absolutely interested in
16 succeeding me in an emergency situation if the board
17 needed that, and that he would be willing to do that and
18 he'd like to do that. He confirmed that conversation.
19      Emergency successor, he wanted to do it and
20 willing to do it, and wanted to know if Bob would
21 support him, and Bob told me he told him absolutely, he
22 would support him. That's the conversation Bob had with
23 me.
24 Q. Did Bob Shaffer ever tell you that he told
25 Phil that Greg Carmichael wanted Phil -- wanted to leave

Page 195

1  in one to two years and wanted Phil to succeed him as
2  president and CEO?
3      MR. CIOFFI: Objection. Asked and answered
4  three minutes ago.
5      THE WITNESS: I shared with you the
6  conversation I had with Bob. It was not anything
7  like you just suggested it was at all.
8      MR. SABA: Okay.
9      THE WITNESS: No. The conversation -- I'm not
10 aware ever happened. It would have been
11 inconsistent with any of our conversations.
12 BY MR. SABA:
13 Q. Did Bob Shaffer ever tell you that he told
14 Phil McHugh that Tim Spence is not ready and that Tim
15 would be well served by observing Phil?
16 A. Bob never said that to me.
17 Q. You mentioned before that after the August 15,
18 2019, midyear review with Phil McHugh, you would have
19 reached out right away to Bob Shaffer; is that right?
20 A. Yeah, he's in the office next door to me. We
21 come in early every day. I believe I circled right
22 around with him and said, yeah, I had a chance to talk
23 to Phil. He's definitely interested in emergency
24 successor. We want to put him on the list.
25 Q. That's what you told Bob?

Deposition of Gregory Carmichael, Volume I                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 196

1    A.   That's what I told Bob.
2    Q.   And did you have a subsequent conversation
3  with Bob after he had the conversation with Phil at the
4  Inn of Perry's Cabin?
5    A.   I think I answered that already.
6  The conversation was with Bob, came back and said he
7  talked to Phil, Phil wanted to understand if Bob Shaffer
8  would support him, and Bob said he absolutely would. He
9  wanted to confirm that it was -- that he would be
10 considered and I was going to put him on the
11 recommendation list to be considered for the emergency
12 successor in the event the board needed an emergency
13 successor.
14   Q.   And my -- I'm just trying to put out the time.
15   A.   I'm just trying to --
16   Q.   No, no. I understand. I'm just trying to
17 understand the timing of that second conversation. When
18 did that take place?
19   A.   Counsel, I believe that conversation took
20 place shortly -- it may have taken place at Perry's
21 Cabin before I left, or if it didn't it was very shortly
22 after. I don't really recall, but it would have been in
23 a very tight timeframe. After that conversation at
24 Perry's Cabin, that while we were still there, or
25 shortly the day after, two days after, whenever we got

Page 197

1  back, he would have came in and had the conversation
2  with me.
3         But he absolutely said that Phil had come and
4  spoke with him during that retreat, and strategy --
5  strategy planning session, and asked about that
6  conversation he had with me. Phil wanted confirmation
7  that he heard it right.
8    Q.   The MB Financial acquisition, that closed in
9  May of 2019; is that correct?
10   A.   Yeah. It's a long close process with the
11 regulators. So when we announced it -- when we
12 announced the transaction that we were buying them and
13 when it closed would probably be close to 10 months
14 probably, in that transaction. I think that's somewhere
15 -- yeah, that would probably be about the right
16 timeframe.
17   Q.   You announced sometime in May of 2018; does
18 that sound correct?
19   A.   Yeah. So yeah, that would -- that fits.
20   Q.   And you got regulatory approval in March of
21 2019; does that sound right?
22   A.   That would be about the timeline that we were
23 dealing with this. It was approaching a year. I don't
24 think it quite got to a year or not.
25   Q.   All right. After that deal closed, I think

Page 198

1  you indicated there were three executives overseeing
2  that operation of MB Financial. I think you identified
3  Tim Spence, Lars Anderson, and Phil McHugh essentially,
4  correct?
5    A.   Not the operation. The oversight for
6  integration of that into our business. It was a large
7  acquisition, a lot of moving parts. A lot of people had
8  oversight responsibilities for different aspects of that
9  integration. If you think about it, we have a regional
10 structure that's being integrated into one of our
11 largest regional opportunities. It's going to become
12 one of our largest regions with this acquisition. Each
13 line of business head had a responsibility for
14 integrating their lines of business.
15        We had a program management office set up that
16 I believe Charlie Bradley ran that was overseeing the
17 whole integration and kind of the glue and
18 responsibility for keeping all the trains moving in the
19 right direction. And then a line of businesses, the
20 commercial will be responsible for integrating the
21 commercial business, the consumer for the consumer
22 business. As I mentioned before, the consumer went
23 really well. Commercial struggled.
24        But Phil had responsibility for the regions at
25 the time, so he would have a role to play and contribute

Page 199

1  to that integration, and if something wasn't going well,
2  I would expect Phil to get engaged with that. And I
3  believe I probably had directed Phil and would have
4  expected Phil to be engaged in that acquisition on
5  things that may not have been going as smoothly as we'd
6  like.
7    Q.   What were the problems with that integration?
8    A.   Different commercial core middle markets.
9  They were a core middle market, small business bank.
10 They weren't a large core bank. They had different
11 credit processes, different relationship management
12 structure, and trying to fit that into Fifth Third's
13 structure, they -- their processes were different than
14 our processes. They actually had, I thought, some very
15 good process-related core middle market, onboarding, how
16 they managed deposits, how they basically handled
17 credit, credit decisions and the credit process, that I
18 thought we could learn from. They were a very good core
19 middle market bank, and that was the one area that when
20 we put the two together we had some I'll call it
21 dysfunctional performance there that needed to be
22 addressed, and we needed to meld the two processes
23 together and get the best process together between the
24 two companies, and that just took some work to get that
25 done. Consumer was a lot easier. Wealth was very easy.

Deposition of Gregory Carmichael, Volume I                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 200

1 It was the commercial core middle market bank that was a
2 little more challenging.
3    Q.  And what about treasury management?
4    A.  Well, treasury management was part of the
5 commercial bank.  All right?  Think about it.  So that's
6 part of the commercial challenge that we had.  They had
7 a very high touch, customized treasury management.  They
8 would do a lot of one-off things to support various
9 customers, and we had a more vanilla platform.
10       So try and take all those customizations and
11 basically lay them on top of our treasury management
12 platform, which wasn't as customized, in trying to get
13 either customers were going to conform to our standard
14 vanilla, or we were going to have to make modifications,
15 which we didn't want to really do because that
16 creates -- one often creates regulatory risk and other
17 risks, trying to make those changes to our platform.
18       So we had to vet through those challenges.
19 That was part of the commercial bank.  It was credit and
20 treasury management, and the relationship with managers
21 themselves and our expectations there.  Those three
22 things were what drove most of the clunkiness in the
23 integration.
24    Q.  And ultimately, between Tim Spence, Lars, and
25 Phil, Phil was the guy who was needed to fix those

Page 201

1 problems, correct?
2    A.  Phil was one of the individuals asked to get
3 involved and help resolve those issues.  So I absolutely
4 would have expected Tim to -- I'm sorry -- Phil to be up
5 there on point.  He's the regional leader, working with
6 that bigger market, kind of being a traffic cop on some
7 of these issues.  I mean, some of these things needed
8 someone to break the ties, so to speak.  So I expected
9 Phil to get involved.  I expected Tim to be heavily
10 involved in that, on the consumer side, which he had
11 responsibilities for, which he was.
12       And then, Lars Anderson, this wasn't really
13 Lars's strength here, I think needed some support from
14 Phil.  Once again, what you would expect from someone
15 leading the regions, that they would be involved in
16 this.
17       (Exhibit 18 is marked for identification.)
18 BY MR. SABA:
19    Q.  Mr. Carmichael, I've handed you Exhibit
20 Number 18, which is Bates stamp Fifth Third McHugh
21 0213203.
22    A.  I see that.
23    Q.  I'll represent to you this is a text message
24 exchange between Frank Forrest and Bob Shaffer.  If I
25 can refer you to the text message on October 11, 2019,

Page 202

1 at 10:51 a.m., from Bob Shaffer.
2    A.  Okay, I see that.
3    Q.  Heading to Chicago for some productive
4 conversations and problem resolution.  I'll try to solve
5 the credit issues while I'm up there as well.
6       And Frank Forrest responds, you need to do
7 that.  We need one capable executive, not three
8 overseeing MB.  That would be a great start.  Make it
9 happen.
10       Bob Shaffer responds, I already did.  I met
11 with Greg earlier this week and told him Phil is the
12 guy, and that Lars needs to work through Phil when
13 necessary in Chicago.
14       Do you see that?
15    A.  I do see that.
16    Q.  Do you recall having that conversation with
17 Bob Shaffer when he told you Phil's the guy to fix the
18 problems at MB Financial?
19    A.  I don't necessarily recall a conversation with
20 Bob in these texts, but generally, this is correct.  I
21 mean, I would have said, you know, there was a lot of
22 pushing and shoving.  There's a lot of different views
23 on the commercial core middle market credit side, how to
24 do it, who should do it with authorities.  Phil has a
25 commercial core middle market background.  He's got

Page 203

1 responsibility for the region, and I wanted him to go up
2 there and break the tie, so to speak, and finalize how
3 we're going to get it done.
4       Lars had his opinion.  Other people may have
5 had their opinion.  The chief credit officer, Richard
6 Stein, had his opinion on how he wanted things to work.
7 At some point we got to put these two organizations
8 together and someone's going to have to break the ties
9 and make final decisions, and I said let's get -- Phil
10 runs the regions, get him up there.  He has a commercial
11 background.  So yeah, that's absolutely consistent with
12 what I said.  I don't know how I said it like
13 that, but that's what I would have did.
14    Q.  And over time, Phil was able to resolve those
15 issues, correct?
16    A.  The issues got resolved over time, yes.  I'm
17 not going to portray that Phil solved all those issues,
18 but I asked someone to get up there and do what I just
19 described, and requested, and over time these issues got
20 resolved.
21       I will tell you this went on for well over a
22 year and a half.  This was not a quick fix.  This wasn't
23 something that got done quickly.  This took time to get
24 this resolved.
25       (Exhibit 19 is marked for identification.)

Deposition of Gregory Carmichael, Volume I                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 204

BY MR. SABA:

Q.  Mr. Carmichael, I've handed you what's been
marked as Exhibit Number 19, Fifth Third McHugh 005483
through Fifth Third McHugh 005515.  Can you identify
this document for me, please?

A.  It appears to be the December 2018 talent
management update that I would have presented.  If this
is the final copy, it would have been the final one I
presented, but I assume I'm looking at the final
version.  I can't -- there's no draft on it, so I assume
it's the final version.

Q.  And you were saying you would have presented
this to the board; is that correct?

A.  In our December meeting, correct.

Q.  And do you recall when you would have gotten
involved in preparation of the December 2018 talent
deck?

A.  Typically, this process is facilitated and
administered by the human capital group.  Bob Shaffer's
organization at this timeframe would have been Bob
Shaffer would be leading this.  I would -- I would get
involved as we -- we approached the December timeframe.
Whether that's two or three weeks, Bob and I would -- I
start to see drafts, potential drafts of this document.
We'd just be, you know, making sure we're in sync about

Page 205

the message we're going to communicate to the board and
the consistency of the messaging.  Also take into
consideration conversations that have been had
throughout the years.  So yeah, I would have -- I'd
probably see the draft of this sometime approaching this
timeframe.

Q.  And would you review the document in detail?

A.  I would review the final -- I would review the
draft and final, as we get -- as we get towards the
timeframe that we're going to present this, I would be
very, very close to the data that's in this deck.  I
wouldn't be in earlier revisions of it or necessarily
seen earlier drafts or something of this nature, if
that's your question.

Q.  I'm more asking about this particular
document.  You would review this document in detail,
correct, the final version?

A.  Yes, absolutely.

Q.  And would you make changes to the talent deck?

A.  If I thought something was an error or
inconsistent with our beliefs or conversations or the
way we viewed something, absolutely.

MR. CIOFFI:  Counsel, while you're looking for
your next document, let's take a five-minute break
and come back.

Page 206

MR. SABA:  That's fine.  Go off the record.

VIDEOGRAPHER:  Time is 3:51 p.m.

(A recess was taken from 3:51 to 4:07.)

VIDEOGRAPHER:  Time is 4:07 p.m.  We're back
on the record.

BY MR. SABA:

Q.  Mr. Carmichael, you previously indicated that
you communicated to Phil McHugh that you were -- to see
if he was interested in being the emergency successor of
you as president and CEO because of some personal issues
you were having, correct?

MR. CIOFFI:  Objection.  Mischaracterizes his
testimony.  But you may answer.

THE WITNESS:  I shared with Phil that I had a
personal situation that may require me to step out,
step down earlier than I initially anticipated.  I
didn't elaborate on what those issues might be, and
I asked him if he wanted to be considered if the
board was moving forward with the emergency
successor, which they could, did he want to be
considered and I wanted to make sure that he was
interested before I put him on the list in the
December talent management discussion.

BY MR. SABA:

Q.  This personal issue that you did not discuss

Page 207

with Phil that would have caused you to step down
earlier than anticipated, how quickly was that going to
have to have you step down?

A.  I'm not going to answer that question.  It's
personal.  So I'm not going to --

Q.  I'm not asking what the personal issue is; I'm
asking what the timing would be.

A.  I don't know what the timing would be; it's
personal.

Q.  The timing issue is personal?

A.  It's related to the issues.  Related to the
situation.

Q.  Well, they're relevant to this case, sir,
because you're making it relevant to this case, based
upon the heart of what you're disclosing here.

A.  I don't know how it's relevant to the case
when because I'm going to put him as emergency
successor, and it's going to be up to the board if they
needed an emergency successor.  My timeline, whether I'd
step down or have to step down or not, is irrelevant to
the process.  The process is that we needed to identify
an emergency successor, which we do anyway.  It was part
of the process that we were going to forthwith, but I
was heightened concern because I might have to step down
sooner than I was anticipating, that may facilitate the

Deposition of Gregory Carmichael, Volume I      Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 208

1 board assessing whether they wanted to put an emergency
2 successor in place.
3     Q. And how is --
4     A. As far as that timing goes, I can't answer the
5 question because it was -- it was a difficult situation.
6     Q. You're saying you won't answer the question
7 because it's a personal issue?
8     A. No, I said I can't answer the question. I
9 don't know. I didn't have a -- I didn't know exactly.
10     Q. How soon could it possibly have been?
11     A. There was a lot going on.
12     Q. What's the soonest it could have been?
13     A. I'm not going to speculate.
14     Q. Do you know?
15     A. I do not know.
16     Q. Was it a health issue?
17     A. I said it's a personal-related issue. I'm not
18 going to go into any more detail than that. It's not
19 relevant to the case. The case is, there's a potential
20 situation where I may have to step down.
21     Q. Why would you have to step down?
22     A. I think I've answered that question multiple
23 times.
24     Q. No, you didn't.
25     A. Yes, I did.

Page 209

1     Q. You didn't explain why this personal issue
2 would cause you to have to step down.
3     MR. CIOFFI: Counsel, that's not relevant to
4     the case. What's relevant to the case is the
5     emergency successor. The emergency successor is
6     there because emergencies could happen any day. He
7     could get hit by a bus, et cetera. It's not
8     outside of the process of the board. That's what
9     he's saying. It has nothing to do with his
10     personal situation.
11     MR. SABA: It is relevant to the case --
12     MR. CIOFFI: How?
13     MR. SABA: -- because he's bringing it up as a
14 justification for why he said he had a certain
15 conversation with Phil McHugh which is completely
16 disputed by the plaintiff in terms of what was said
17 during that conversation. So the fact that he's
18 bringing up an issue to justify what he said makes
19 it relevant to this case. He's making it relevant
20 to this case. We --
21     MR. CIOFFI: No. The emergency successor is
22 part of a normal -- this is what he testified to --
23 the normal process of succession planning. It has
24 nothing to do with whether he has a personal issue
25 or a health issue or might get hit by a bus. It's

Page 210

1 just part of the process, and he asked, as he
2 testified, if Phil McHugh wanted to be part of that
3 process. That's all.
4     MR. SABA: I understand what his testimony is.
5     MR. CIOFFI: It's nothing to do with his
6 situation.
7     MR. SABA: It does in terms of it's a
8 contradiction to what the other testimony is and
9 what happened during that conversation. He's
10 bringing it up for justification for why he made
11 that statement. That's why it's in dispute.
12 That's why we're entitled to find out what is his
13 basis for saying that he would have to step out
14 earlier than anticipated.
15     THE WITNESS: I never said I would. I said
16 there's a chance I might have to. But as part of
17 our succession process -- which I was getting ready
18 to present in December -- I would have asked Phil
19 regardless of my situation if he was interested in
20 stepping in as emergency successor. I thought he
21 should be on that list.
22     He was going to get that question no matter
23 what in that timeframe. I did highlight that there
24 may be a need for me to step down sooner, so I
25 wanted to make sure he really wanted to step in

Page 211

1 this position and would consider it. All right? I
2 do not know what my timing might be. All right?
3 It could have been days, it could have been months.
4 It ended up being never. By the way, I never did
5 step down early. The process went forth, there was
6 no need for an emergency successor play. I would
7 have had the conversation anyway. All right? That
8 I might need to step down was just part of a
9 discussion, but not anything different that would
10 have drove a different outcome of the process.
11 That's my point.
12 BY MR. SABA:
13     Q. During Tim Spence's midyear review in 2019,
14 did you ask him if he wanted to be an emergency
15 successor for president and CEO?
16     A. No, I didn't have him on the emergency
17 successor. I wasn't putting him on the emergency
18 successor list, so I did not ask him that question.
19     Q. Why not?
20     A. Because Tim was identified by the board, in
21 conversation I had with the board, and I viewed Tim as
22 ready to be the president within a year and a CEO a
23 couple years. All right? So I wouldn't have a person
24 that's lining up to be, in the board's eyes, the
25 potential next CEO of the company and president, and

Deposition of Gregory Carmichael, Volume I                     Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 212

1  then have him as an emergency.
2      The emergency person, by design, is someone
3  that can hold the bank together, keep the lights on,
4  keep the trains moving. The fact that Tim was on this
5  page -- and on the talent management deck in 2019, in
6  succession management, as a potential CEO/president
7  replacement, president in one year and CEO in two to
8  three years, I believe, or something of that nature -- I
9  already had him on the list.
10     By default, he's on the list. The board looks
11 at that and will make a determination between that
12 situation with Tim Spence's readiness, in my view, okay,
13 they still make the final call, and if they need an
14 emergency successor. That's the way the process works
15 in corporate America.
16     (Exhibit 20 is marked for identification.)
17     (Exhibit 21 is marked for identification.)
18     MR. CIOFFI: Counsel, are you marking the
19 draft of 11/07 as 20 and 10/25?
20     MR. SABA: It's 21. Yes, that's correct.
21 BY MR. SABA:
22     Q. Mr. Carmichael, you've been handed two
23 exhibits. First is Exhibit 20, Bates stamp Fifth Third
24 McHugh 006714 through Fifth Third McHugh 006761. Do you
25 see that?

Page 213

1      A. I do.
2      Q. Can you identify that document for me, please?
3      A. That would have been a draft 11/07/19, board
4  of directors executive talent management and succession
5  plan update.
6      Q. You've also been handed Exhibit Number 21,
7  which is Fifth Third McHugh 006943 through Fifth Third
8  McHugh 006989. Can you identify that for me, please?
9      A. Appears to be a draft dated 10/25/19. Fifth
10 Third Bank executive talent management and succession
11 plan update.
12     Q. Referring first to Exhibit Number 21. Have
13 you ever seen Exhibit Number 21 before?
14     A. No, I've never seen this document.
15     Q. Do you know who prepared Exhibit Number 21?
16     A. I do not.
17     Q. I'll refer you to Fifth Third McHugh 006968.
18 This is on Exhibit Number 21. Can you identify that?
19     A. 6968?
20     Q. That's correct. Can you identify that for me,
21 please?
22     MR. CIOFFI: Counsel, objection. He said he's
23 never seen this document before. How can he
24 identify it?
25     MR. SABA: He already identified it as the

Page 214

1  talent deck draft from October 25, 2019.
2      MR. CIOFFI: Well, he said he's never seen it
3  before. He didn't identify it, he read the first
4  page of it.
5  BY MR. SABA:
6      Q. Are you able to identify what Fifth Third
7  McHugh 006968 appears to be?
8      A. Appears to be an erroneous draft of a talent
9  management card.
10     Q. For Phil McHugh; is that correct?
11     A. For Phil McHugh. I've never seen it before,
12 but looking at the data here it's obviously nothing I've
13 ever seen, I have no knowledge.
14     Q. If I could also refer you to Exhibit 19. If I
15 could refer you to Exhibit Fifth Third McHugh 005507.
16     A. Okay. I'm there.
17     Q. Fifth Third McHugh 005507, the talent card for
18 2018, makes no reference to Phil McHugh's age, does it?
19     MR. CIOFFI: Objection, counsel. No one's
20 identified 005507 as a talent card. It's not what
21 it is. If you look at 5502, you'll see what it is.
22 You're misrepresenting it.
23     THE WITNESS: This doesn't look like --
24     MR. SABA: And would you -- let's go back
25 then. Fifth Third McHugh 005507, you would not

Page 215

1  recognize that as a talent card?
2      THE WITNESS: I'm not saying it's -- to be
3  honest, Counsel, I --
4      MR. CIOFFI: It's an individual development
5  plan, if you look at 5502. There's no reason for
6  the record to be confused.
7  BY MR. SABA:
8      Q. Have you ever heard these referred to as
9  talent cards as part of the talent deck, Mr. Carmichael?
10     A. Individual development plans. I'm just going
11 back -- if this is the deck I presented to the board at
12 the 2018 talent and management discussion with the
13 board, then we could refer to this as a talent card
14 potentially, yes. We could.
15     Q. Okay.
16     A. I just don't know if we did. I'll just be
17 honest with you, I just don't know. I go through a ton
18 of information a day as a CEO, and this is five years
19 old.
20     Q. Going back to my question, comparing Fifth
21 Third McHugh 005507 from the 2018 talent deck to the
22 draft we see for October 25, 2019, of the 2019 talent
23 deck, do you see that they --
24     A. Is that 6968 you're referring to?
25     Q. That is correct, yes.

Deposition of Gregory Carmichael, Volume I                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 216

1    A.   Okay.  Thank you.

2    Q.   Do you see they've added Phil McHugh's age to

3  that talent card; is that correct?

4    A.   Apparently, age has been added, yes.  I see

5  that.  It's been added to all the talent cards, not just

6  Phil McHugh's, based on this --

7    Q.   Correct.  Correct.  Do you know whose decision

8  it was to add ages to the talent cards?

9    A.   This process is facilitated -- these documents

10 are facilitated by the human capital group.  I would

11 have no clue why -- but age is something we've got to

12 report in the proxy.  I'm not sure if they were lining

13 in for the proxy.  I don't know why it was added.  I

14 didn't request it and I know the board didn't request

15 it.  But it could have been something they felt

16 necessary because this information shows up in the

17 proxy.  I don't know how it came about.

18   Q.   Under the potential next positions for Phil

19 McHugh, it lists president ready now, CEO one to two

20 years.  Do you see that?

21   A.   I do.

22   Q.   Do you have any idea where that information

23 would have come from?

24   A.   Absolutely not.  It's inconsistent with -- if

25 you look above, potential, moderate potential.  You know

Page 217

1  someone's not going to be a president/CEO of this

2  company when they're at this level already if they're

3  moderate potential.  That's not going to happen.

4        So there's inconsistencies in this deck.  I've

5  never seen it, I don't know who put it together, I don't

6  know why it's there.  It's inconsistent with any

7  conversation I've ever had.

8    Q.   You do recognize that that's consistent with

9  what Phil McHugh says that you told him during his

10 August 15, 2019, midyear review; is that right?

11   A.   I never told Phil McHugh that, so I have no

12 clue what Phil McHugh thinks was said.  But that was

13 never said.  It was emergency successor only.  So I

14 can't help a mistake that was made by somebody in the

15 organization.  I have no clue how it was done.

16 Inconsistent with moderate potential.

17   Q.   With respect to leader capabilities for Phil

18 McHugh, each one is listed as a strength; do you see

19 that?

20   A.   I do.

21   Q.   Do you have an idea where that information

22 came from?

23   A.   I have never seen this draft.  I've already

24 answered the question.  I don't know who put it

25 together.  I've never seen this draft.

Page 218

1    Q.   Staying with Exhibit Number 21, referring you

2  to Fifth Third McHugh 006971, can you identify that

3  document for me, please?

4    A.   Which number again, please?

5    Q.   6971.

6        MR. CIOFFI:  Same objection.  He's already

7    testified he's never seen it before.

8        THE WITNESS:  Appears to be a talent card for

9    Tim Spence.  Once again, I've never seen it before.

10 BY MR. SABA:

11   Q.   Under potential next positions, it lists head

12 of regional banking two plus years, head of commercial

13 banking years two-plus years.  Do you see that?

14   A.   I can see that.

15   Q.   Do you have any idea where that information

16 would have come from?

17   A.   Counsel, I've testified I've never seen this

18 document and I don't know who put it there.  So I

19 don't know where the information came from.

20   Q.   Staying with Exhibit 21.  If you could turn to

21 Fifth Third McHugh 006955.

22   A.   6955, I have in front of me.

23   Q.   Have you ever seen this document before?

24   A.   I've never seen this document before.  I've

25 said that multiple times before, I've never seen this

Page 219

1  document.

2    Q.   Have you ever seen this breakdown of workforce

3  of the future five generations in the workplace of Fifth

4  Third Bank?

5    A.   I don't recall seeing this.  There's a lot of

6  information in this deck that the HR group puts

7  together.  I don't necessarily recall visiting this page

8  five years ago -- four years ago.

9    Q.   Staying with Exhibit 21, Fifth Third McHugh --

10 if you turn to Fifth Third McHugh 006977.

11   A.   I'm there.

12   Q.   Can you identify what Fifth Third McHugh

13 006977 and 006978 are?

14   A.   Appears to be the first -- cover page and the

15 second page of the CEO succession plan according to the

16 draft document I've never seen.

17   Q.   And 6978 lists Phil McHugh as the first

18 successor for CEO in one to two years; is that correct?

19   A.   That's what this document states.

20   Q.   Followed by Tim Spence in two-plus years; is

21 that right?

22   A.   That's what the document says.

23   Q.   And then, under emergency successions, Tayfun

24 Tuzun and then Phil McHugh.  Is that right?

25   A.   That's what it says.

Page 220

1    Q.   Do you have any idea where this information
2  came from?
3    A.   I do not.
4    Q.   Again, this would be consistent with what Phil
5  McHugh indicates you said to him on August 15, 2019; is
6  that right?
7    A.   I've never seen this draft and it's
8  inconsistent with what I said to Phil McHugh in my eyes
9  and what I know was said and that Bob Shaffer would
10 confer.  So I've never seen this document.  I don't know
11 how this information got here.  It's not consistent with
12 what we were talking about.  It's not consistent with
13 what we communicated.
14   Q.   It's consistent with what Phil McHugh said you
15 said, correct?
16   A.   I don't control what Phil McHugh wants to say.
17   Q.   Were you having any conversations with Bob
18 Shaffer about the talent decks in October of 2019?
19   A.   I don't get involved in the process,
20 literally, until weeks prior to -- looking at the last
21 couple drafts, we would get in sync on.  So I wouldn't
22 have any reason to have a conversation with Bob in that
23 timeframe.  But I don't recall every conversation to my
24 head of HR who sits next to me, but I don't believe any
25 conversation usually takes place at that point in time.

Page 221

1  I couldn't say with ultimate certainty, but no, I
2  wouldn't think so.
3    Q.   Referring you to Exhibit 20.  And again,
4  Exhibit 20's the November 7, 2019, draft of the talent
5  deck?
6    A.   I see that.
7    Q.   Have you ever seen this document before?
8    A.   I got to look through it.  No, I've never seen
9  this document before.
10   Q.   Referring to Fifth Third McHugh 006739, can
11 you turn to that page?  This, again, is the talent card
12 for Phil McHugh for November 7, 2019; is that right?
13   A.   It's a draft that I've never seen before,
14 nothing I agreed with or would support, and it's
15 inconsistent, again, with moderate potential in
16 president, so.
17   Q.   As you point out, it continues to list Phil
18 McHugh as under potential next positions, president,
19 ready now, CEO, one to two years; is that right?
20   A.   Appears to be so in this draft.
21   Q.   Under -- under key focus areas, do you see
22 that box?  It says exposure to certain key stakeholders,
23 example investors, earnings call, and rating agencies;
24 is that right?
25   A.   I see that.

Page 222

1    Q.   Would that have been a key focus area for Phil
2  McHugh in 2019?
3    A.   Not for Phil McHugh, but for a president would
4  have been.  But it would have not been for Phil McHugh.
5  As I said, this document is totally inconsistent,
6  erroneous, inconsistencies in it, so I don't know who
7  did this or how it came about.
8    Q.   Referring you to Fifth Third McHugh 006742.
9  That's the talent card for Tim Spence, is that correct?
10   A.   A draft talent card that I've never seen.
11   Q.   And that continues to list Tim Spence as
12 potential next positions, head of regional banking,
13 two-plus years.  Head of commercial banking, two plus
14 years.  Is that right?
15   A.   Apparently so.  I didn't put it in there,
16 so...
17   Q.   And it lists under, be a great coach,
18 effective; is that right?  Under leader capabilities on
19 the right-hand side; do you see that?
20   A.   Yeah, I see that.  But I didn't put it in
21 there.  I don't know where this information came from.
22 Why don't you show me the final one, that would be more
23 clear.  I did see that.
24   Q.   If you could turn to Fifth Third McHugh
25 006748.  That is the November 7th version of the CEO

Page 223

1  succession plan; is that correct?
2    A.   Appears so.
3    Q.   And that continues to list Phil McHugh as the
4  next CEO one to two years, followed by Tim Spence, two
5  plus years.  And then -- do you see that?
6    A.   I see it on this page, yes.
7    Q.   And then emergency CEO lists Tuzun Tayfun and
8  Phil McHugh; is that right?
9    A.   Correct.
10        (Exhibit 22 is marked for identification.)
11 BY MR. SABA:
12   Q.   Mr. Carmichael, you've been handed what's been
13 marked as Exhibit Number 22, Fifth Third McHugh 006886
14 through Fifth Third McHugh 006940.  Can you identify
15 that for me, please?
16   A.   Appears to be another draft of the board of
17 directors executive talent management and succession
18 plan update.
19   Q.   Have you ever seen this document before?
20   A.   I cannot tell you if I've seen this draft at
21 this point.  If this draft was one before that was
22 presented to me or a couple before presented to me, I
23 don't know.  But what I do know is the data starts to
24 look consistent with my conversations and my beliefs,
25 and what I was planning to present to the board of

Deposition of Gregory Carmichael, Volume I                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 224

1  directors.
2      So the data is lining up with how I would
3  think about the opportunities in the conversations I've
4  had, and what I was promoting -- putting forth based on
5  the board's expectation and the emergency succession
6  plan then has -- now has Phil McHugh and now has Tim
7  Spence in the right positions, so I could have seen this
8  draft, I can't say for sure. But the data is
9  directionally now correct.
10     Q.  And so referring to -- on Exhibit Number 22,
11 Fifth Third McHugh 006918, that --
12     A.  Hang on. Hang on. 69 -- okay. Yes, I'm
13 there.
14     Q.  That is the talent card for Phil McHugh; is
15 that correct?
16     A.  I can't recall -- it's a talent card for Phil
17 McHugh on this draft. I don't have any -- and I
18 wouldn't take exception as either me or as I
19 was thinking about Phil, and as I wanted to present
20 during the talent management discussion to the board.
21 That data is now correct. The leader capabilities, I
22 can't recall if that's correct or not, but the potential
23 in next positions are correct on this draft. And so are
24 the key focus areas.
25     Q.  And so it lists for potential next positions,

Page 225

1  head of middle market banking, ready now. What did you
2  mean by that?
3      A.  What it says, head of middle market banking,
4  ready now.
5      Q.  And would that have made him the head of the
6  consumer bank?
7      A.  Head of middle market banking, would that make
8  him head of the consumer banking? No.
9      Q.  No, it wouldn't, right?
10     A.  No. That would not make him head of consumer
11 bank at this point, no. The word potential's important
12 here, because this is a potential position, next
13 position for Phil. Not necessarily the only
14 opportunity. It's one identified as a potential.
15     Q.  Do you know who changed the information on
16 Phil McHugh's talent card from the November 7th version
17 of the talent deck?
18     A.  Counsel, I have no idea who put this
19 information together. That's well below the CEO's role
20 -- it would be expected of the CEO to look at these
21 decks at this level down the organization. I assume it
22 was people down that reported to Bob in his
23 organization, pulling information together, drafts
24 together, cut and paste. It could have been a lot of
25 things. It wasn't anything to do with what our

Page 226

1  expectations were for these roles in those earlier
2  drafts. I never saw them.
3      Q.  If you turn to Fifth Third McHugh 006921.
4      A.  Okay.
5      Q.  That's a talent card for Tim Spence; is that
6  right?
7      A.  That is correct.
8      Q.  And now, on his talent card, the potential
9  next position has been changed from head of regional
10 banking two plus years, head of commercial banking two
11 plus years, to president, COO one year, CEO two years.
12 Is that right?
13     A.  That's what the document says.
14     Q.  This also modified this category of be a great
15 coach from effective to strength. Is that right?
16     A.  That's what the document states.
17     Q.  Do you know who made these changes?
18     MR. CIOFFI:  Objection; asked and answered.
19 You may answer.
20     THE WITNESS:  To be honest with you, I do not
21 know -- did Bob make that? Did I tell him to make
22 that change? I'm not sure I saw this draft.
23 You're asking me about drafts. There's just going
24 to be a litany of drafts that get prepared and
25 circulated before I see it. I don't know what

Page 227

1  point in time I saw -- I saw this. So Bob may have
2  changed that knowing that I would want that changed
3  or I felt that was correct. I don't know. I'd be
4  speculating.
5  BY MR. SABA:
6      Q.  Turn to Fifth Third McHugh 006927; this is
7  still on Exhibit 22.
8      A.  I'm there.
9      Q.  That is the CEO succession plan; is that
10 correct?
11     A.  That's correct.
12     Q.  It now lists Tim Spence as the first in line,
13 one to two years. Is that right?
14     A.  That's correct.
15     Q.  And Brian Lamb is listed in five-plus years;
16 is that correct?
17     A.  That's correct, on this document.
18     Q.  And then, Tayfun Tuzun and Phil McHugh are
19 listed as emergency successors; is that right?
20     A.  That's correct.
21     Q.  Do you know where they would have gotten the
22 information about Brian Lamb five plus years?
23     A.  Brian Lamb was talked about in a talent
24 management discussion with the board in 2018. He was an
25 up-and-coming leader. Had a lot of the characteristics

Deposition of Gregory Carmichael, Volume I                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 228

1  that potentially could elevate to a CEO position. He
2  was someone we put on the list as someone we should keep
3  an eye on. You know, five plus years, it could have
4  been ten years. The document was only structured for
5  five-plus. Doesn't mean it was in five years. So it
6  was just a high potential person we should keep an eye
7  on.
8      Q.  And is that information that you would have
9  communicated to Bob Shaffer?
10     A.  That's information Bob would also have
11 received in our conversations during the executive
12 talent management discussion that goes on for hours with
13 the board. His name would have been talked about as
14 someday, would he have the runway to do that. That's
15 more of a placeholder for someone that's a high
16 potential that would someday could step -- potentially
17 be considered for that role. But at the end of the day,
18 that's something I believe the board wanted -- that has
19 to consider. But at the end of the day when you look at
20 Brian's background, I'm not sure that ever would be
21 elevated to a CEO role. That's just a place holder for
22 someone with high potential that was on the executive
23 team, that was fairly new on the executive team,
24 that wasn't necessarily wanting to be close to being
25 vetted for a CEO job. Just someone we could keep an eye

Page 229

1  on. That's how I believe that was used.
2      Q.  Do you recall instructing Bob Shaffer to put
3  Brian Lamb's name in for CEO succession?
4      A.  I don't recall instructing Bob to do that.
5  I'm not saying I didn't. I don't recall that, putting
6  Brian Lamb on there. That might have been a name we
7  threw on there just to have, to make the board aware of
8  a high potential person of keller{sic} in the
9  organization that we should keep an eye on.
10     Subsequently, Brian Lamb got a tremendous
11 offer to be one of the top ten people job at JP Morgan
12 Chase. So he was a high performing, high potential, but
13 far from consideration for a CEO, but someone to keep an
14 eye on. That's why he's on that list.
15     (Exhibit 23 is marked for identification.)
16 BY MR. SABA:
17     Q.  As you sit here today, are you aware of any
18 event that would have occurred between November 7th and
19 November 11, 2019, that would have led to Phil McHugh
20 not being listed on the talent deck as president and
21 CEO, and Tim Spence listed instead as the next
22 successor as president and CEO?
23     A.  I am baffled and confused how Tim -- Phil's
24 name ever showed up on the one to two list. I don't
25 know how that ever occurred, so I'm not aware of any

Page 230

1  event that added him there, I'm not aware of any event
2  that took him off. It was completely inconsistent with
3  any conversations, direction from the board,
4  expectations. So I have no clue what would have
5  happened, no instructions from me to do anything of that
6  nature.
7      Q.  Mr. Carmichael, you've been handed Exhibit
8  Number 23, Fifth Third McHugh 006762 through Fifth Third
9  McHugh 006811.
10     MR. CIOFFI:  Counsel, do you have a copy for
11 us?
12 BY MR. SABA:
13     Q.  Can you identify that for me, please?
14     A.  Draft 11/12/19, human capital and executive
15 talent management succession plan updates.
16     Q.  Have you ever seen this document before?
17     A.  I very well could have. We're getting --
18 11/12, we're starting to get within four weeks of the
19 event, so I would probably start to see drafts of this
20 nature by now. That would be consistent with our
21 practice. The data's consistent with how I was thinking
22 of the organization. So I don't see any discrepancies
23 on how I was thinking about it.
24     (Exhibit 24 is marked for identification.)
25

Page 231

1  BY MR. SABA:
2      Q.  Can you identify Exhibit Number 24 for me,
3  please?
4      A.  Looks like an e-mail from Bob Shaffer. Let's
5  see the date on this e-mail. Its attachment is
6  executive talent management/update 2019, 11/12/19
7  PowerPoint presentation. Greg attaches a draft deck for
8  your review. So he sent me the draft for review, this
9  deck.
10     Q.  Goes on to say I've set up a time with you on
11 Thursday to go through this and discuss succession.
12     Do you see that?
13     A.  I do.
14     Q.  And he also indicates there are a number of
15 changes to this deck compared to what we used the last
16 couple of years. Do you see that as well?
17     A.  I see that. So based on this, I would tell
18 you that I'm about to see the first draft since my
19 review of last year's deck and discussions of last
20 year's deck. He's pointing out that we have changes.
21     Q.  What happened during your meeting with
22 Mr. Shaffer to review this talent deck?
23     A.  I don't recall exactly what happened. I don't
24 recall what changes were made. I would go through this
25 with Bob. This would have been my first pass at this,

Deposition of Gregory Carmichael, Volume I         Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 232

1 it appears. I would have provided my input if I saw any
2 discrepancies in the way we were thinking and talking
3 about the talent and succession planning. I would have
4 made sure this deck provided the clarity necessary to
5 the board and consistent with what we wanted to present
6 to the board.
7      What I don't know and can't tell is if I
8 requested a change or Bob requested a change after this,
9 but this is what was presented to me. And this
10 indicates this was the first one I've seen.
11      Q. I'm referring to Fifth Third McHugh 006789.
12 That would still refer to Phil McHugh now for potential
13 next position as head of middle market banking. Ready
14 now. Is that right?
15      A. In this draft there was a potential
16 opportunity for Phil, something I thought he would do an
17 excellent job of, something we needed. And at the time,
18 if I remember correctly, we were restructuring middle
19 market out of what I'll call the total commercial bank
20 and providing different levels because it's a very
21 different type of banking, and it's tough to get one
22 person to do large corp and middle market banking.
23      So this is, once again, trying to play to the
24 strength of the organization, leverage our talent for
25 the benefit of the organization, and my responsibilities

Page 233

1 are to make sure I put people in place that can do that
2 and elevate the total organization.
3      So this was an opportunity for Phil that I
4 thought made sense. It doesn't mean we're going to put
5 him in that job. It's a potential. But that would also
6 be very consistent with moderate potential, which was an
7 expansion of his role or different role, that once
8 again, these jobs at the top of the house, we add things
9 to them, we take things away from them. They ebb and
10 flow based upon the needs of the organization and the
11 capabilities of the individual leading the organization.
12 This happens every single year. No one's entitled,
13 they're not kings in our position, they're employees of
14 the bank.
15      Q. How was potential determined?
16      A. Someone that was capable of doing that role, a
17 role we might need to have filled. Potential means they
18 can do the job. This was ready -- this was someone that
19 could be a potential, ready now. So that means is if we
20 needed him to take over middle market, he could do that
21 immediately, right now. He has -- he's capable of doing
22 that.
23      Q. There's three levels given a potential, high,
24 moderate, at potential. Do you see that under the word
25 potential?

Page 234

1      A. Yeah, it's hard to read, but yeah, I see it.
2      Q. Okay. Who would determine if an individual
3 was high, moderate, or at potential?
4      A. That determination is made over years of
5 assessment. In this case, Phil McHugh, or any of my
6 executives, it would be -- it would be my opinion, my
7 assessment, it would be human capital, Bob Shaffer's
8 assessment, it would be the board's assessment because
9 when I review this with them, we talk about that
10 potential, how they see the individual. I share how I
11 see the individual. We talk about their experiences, we
12 talk about their capabilities, we talk about their
13 strengths, we talk about their weaknesses.
14      And basically when you're at the top of the
15 level of the organization, all right, when you say high
16 potential, you should be able to jump up one to two
17 significant levels in the organization. So when you're
18 at the very top of the organization, and you're in that
19 executive level, enterprise committee member, the next
20 role up is going to be the president of the bank or the
21 CEO. That's the next role up.
22      So it's hard to be above moderate potential
23 when you're already at the highest level of the
24 organization. As I say, you can take on more, you can
25 do different roles, but you're not going to elevate to

Page 235

1 the president or the CEO role in the case of a top
2 executive of the company on enterprise. That's kind of
3 how we think about it.
4      Now, this individual, if this was earlier in
5 Phil's career and he had multiple moves ahead of him,
6 you could easily see this as high potential. It ebbs
7 and flows based on where the person is in their career
8 and what level in the organization they hold.
9      Q. And what, if any, objective criteria are used
10 to determine an individual's potential?
11      A. The evaluation of the individual's skill set
12 and leadership, which includes his leadership
13 capability, and what the next role might be, whether
14 they can perform that role or not. In this case, high
15 potential would mean he could step in because of where
16 he was at in the organization to be the president or
17 CEO. Phil does not have those skill sets.
18      So the fact he doesn't have the skill set to
19 take a high, next high potential role in the company,
20 he's not a high potential because a high potential would
21 be reflective of him being able to take the CEO or
22 president's role.
23      If this was a lower level in the organization,
24 he could be a high potential because he could have a
25 couple of moves ahead of him that would elevate him.

Deposition of Gregory Carmichael, Volume I                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 236

1   But now you're at the top of the organization, and now
2   we're assessing against the CEO potential, the president
3   potential, he doesn't have that potential.  So
4   therefore, he's not high potential In the way we define
5   it.
6        Q.   And the skill sets you refer to that you claim
7   that Phil doesn't that, that wasn't set forth in writing
8   anywhere, that Phil does not have these skill sets,
9   correct?
10       A.   Phil does not have those skill sets -- is it
11  in writing that he doesn't have any fintech experience?
12  Is it put in writing that he didn't have strategic
13  agility and we had to hire someone to come in and do the
14  strategic plan for him year after year?  Is it put down
15  in writing he has no network with -- on the fintech
16  side?
17       Those are experiences after watching an
18  individual operate, reported to me for years, he doesn't
19  have those skills.  He has never brought forth one
20  example of a fintech opportunity.  He's never done
21  anything on the M&A side.  He can't go in depth at all
22  about our competitors, all right?  So I don't need to
23  write a document that says, Phil, you can't be the CEO
24  because you lack these skills, when he doesn't seek
25  that job, he's never sought that job, we never had a

Page 237

1   conversation about that job, and he was never considered
2   for the job.
3        If he was asking me why he's not going to be
4   the CEO, he wants to be the CEO, we would have had a
5   conversation about those weaknesses, because I would
6   have based it on the needs are of the CEO, based on the
7   profile that we've established for the CEO,
8   that the board's established for the CEO.
9        Q.   The assessment that Phil only has moderate
10  potential, is it set forth in any way in the terms of
11  the analysis that was done to determine that, by you or
12  by Bob Shaffer or by any members of the board?
13       A.   I'm not clear on the question.  Will you
14  please repeat the question?
15       Q.   Sure.  You've listed moderate potential here,
16  and I'm asking, is there any analysis that's done that
17  leads to that description of moderate potential?
18       A.   The fact is, Phil does not have the skill set
19  to elevate to the president or CEO position.  By our
20  definition, the way we view moderate potential, or at
21  potential, is he could do more at the current level of
22  the organization he is, he could take on more
23  responsibility, he could do a different job, but he's
24  not qualified to elevate -- since he's at the highest
25  level already of the organization, short of the CEO, he

Page 238

1   can't elevate to the CEO job because he doesn't have the
2   skills.  Therefore, he's moderate potential.
3        Q.   Are those parameters for moderate, high, or at
4   potential, is that set forth in writing anywhere?
5        A.   We have definitions of those that we've used
6   in the past and when we do our talent management
7   discussion, which I've done for decades and Phil's been
8   part of for decades.  We always identify high potential
9   as someone that could elevate to a significant
10  additional role in the company.  They can elevate to one
11  to two levels higher in the organization, and that's how
12  we've always thought about high potential.  We've always
13  debated and argued individuals on the nine blocker.
14       If they're high potential or they're at
15  moderate, can they take on more -- really, can they
16  elevate to the next higher level?  When you're at the
17  enterprise level, that next higher level would be the
18  president or CEO.  All right?
19       So by the way we've defined it and the way
20  we've used it throughout the years, moderate potential
21  means he can take on more responsibility, do a slightly
22  bigger role or bigger role, but can't elevate above
23  that.  Once again, it's a point in time in their careers
24  where they're at and what opportunities they would have
25  above them.  When you're at the top job -- one of the

Page 239

1   top jobs in the company --
2        Q.   Under the categories of leader capabilities,
3   be a great coach indicates that Phil is effective as
4   opposed to strength.  Do you see that?
5        A.   I do.
6        Q.   Why is he listed as effective as opposed to
7   strength in be a great coach?
8        A.   Because at the end of the day, I don't recall
9   any -- when I think about being a great coach, I look at
10  overall talent management, this is not a strength of
11  Phil McHugh.  I can't recall any top level executive in
12  the company, in our top 100 management team, where Phil
13  McHugh has brought anyone into the organization.  Matter
14  of fact, there was at least one individual, I think two
15  individuals that he brought in, one was Ruben Rashty,
16  both those individuals we had to exit out of the company
17  -- were the only two individuals I can think of that he
18  recruited from the outside.  Only two individuals I can
19  recall that he's ever recruited from the outside at high
20  level, and neither of them worked out.
21       That happens, but you should be recruiting
22  some that do work out, and he never has.  In addition to
23  that, he doesn't take action on employees.  He's very
24  slow to take action.  An example of that would be
25  the head of retail when he had consumer bank, Mike

Case: 1:21-cv-00238-MRB Doc #: 66-3 Filed: 08/02/24 Page: 64 of 114 PAGEID #: 2841

Deposition of Gregory Carmichael, Volume I                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 240

1  Butera, he wouldn't take action on that.  It was a
2  problem.  Everybody knew it was a problem.  Phil knew it
3  was a problem.  He wouldn't take action.
4       So I don't see Phil as a great coach of
5  talent.  If he was, we would have a lot of members on
6  enterprise that were related to Phil bringing them in
7  and bringing them up through organization.  There's not
8  one.
9       So when I think about his talent skills, his
10 ability to recruit talent from the outside, his ability
11 to elevate talent, promote talent, I don't think that's
12 a strength of his.  It's not something I observed as a
13 strength.  Matter of fact, I would tell you, you know, I
14 wouldn't call it necessarily a weakness, but not a
15 strength of Phil McHugh.
16      Q.   Are there any specific definitions for what's
17 required to be a great coach?
18      MR. CIOFFI:  Objection.  He just answered that
19 question.
20 BY MR. SABA:
21      Q.   Does Fifth Third have a specific template or a
22 list of requirements to be a great coach?
23      A.   When we think about talent and we think about
24 this category, you have to ask Bob Shaffer, but we think
25 about how an individual recruits, develops, and elevates

Page 241

1  talent in the organization.  All right?  All of that is
2  part of being a great coach, the way we categorize that
3  phrase, "great coach," it's around talent:  talent
4  recruiting, talent development, talent elevation.
5       Q.   Is that set forth in writing anywhere?
6       A.   I'd have to go back and look and see how --
7  how defined that is, but that's how we think about it.
8       Q.   Is there a list of objective criteria
9  that's listed for what --
10      A.   I just listed out how I view that and what we
11 look for when we talk about that strength or weakness,
12 we look for those characteristics in the role and those
13 actions in individuals in the role.  The fact that
14 Phil's never brought in any leadership is indicative
15 that he's not someone who can recruit talent in the
16 organization.  That attracts talent to the organization.
17      The fact that I haven't seen him really
18 elevate anyone to a top position in the company after
19 30-something years, that's indicative of someone who
20 doesn't focus on talent and elevate talent.  That's my
21 experience level as a CEO, that's Bob Shaffer's reaction
22 in assessment of that situation, and that's how we think
23 about that role.  How defined it is underneath that ,
24 you can talk to Bob and see if he has a document that
25 describes that, but I described how I think about it and

Page 242

1  how I read that.
2       Q.   You don't have a document of listed objective
3  criteria that you specifically use for making
4  that assessment, correct?
5       A.   It's recruiting, it's promoting, it's taking
6  action on talent, it's making sure you have the best
7  people in the right roles.  It's all of the above, and
8  it's subjective to a point that when I look at it in
9  totality, I rate how I think my leader does in that
10 area.  I also have HR involved in their assessment of
11 that strength or weakness also involved, and we have a
12 discussion and we evaluate that based on that criteria.
13      Q.   My question was, is that set forth anywhere in
14 writing?
15      A.   I can't answer that question.  I don't know.
16 That's a question for Bob Shaffer.
17      (Exhibit 25 is marked for identification.)
18 BY MR. SABA:
19      Q.   Mr. Carmichael, you've been handed Exhibit
20 Number 25, which is Bates stamp Fifth Third McHugh
21 006836 through Fifth Third McHugh 006885.  Can you
22 identify this document, please?
23      A.   Appears to be another draft 11/13/19, board of
24 directors human capital executive talent management
25 succession plan updates.

Page 243

1       Q.   If I can refer you to Fifth Third McHugh
2  006873 in Exhibit Number 25.  That's the CEO's
3  succession template; is that right?
4       A.   That's correct.
5       Q.   The document now lists Tim Spence, still first
6  in line for CEO, but it says two to three years, as
7  opposed to one to two years, and Brian Lamb, longer
8  term.  Do you see that?
9       A.   I do.
10      Q.   Why does it say two to three years as opposed
11 to one to two years?
12      A.   As we worked through these drafts, we felt
13 that two to three years for CEO was probably an
14 appropriate timeline for Tim.  Once again, this is going
15 to be the board -- this is for board discussion.  The
16 board will opine on that two to three years when we sit
17 down with them.  It was my best assessment of when I
18 thought Tim would be best positioned to step into
19 the CEO role.  And it's my assessment to the board was,
20 that's the timeframe from my professional assessment as
21 the CEO of the company.  Once again, the board will look
22 at that and make their own determination.  And I think
23 that's the timeline things happened on roughly.
24      Q.   Did you consult with any board members before
25 making that change from one to two years to two to three

Deposition of Gregory Carmichael, Volume I                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 244

1  years?
2    A.  No, I would not have consulted with any board
3  member.
4        (Exhibit 26 is marked for identification.)
5  BY MR. SABA:
6    Q.  Mr. Carmichael, you've been handed Exhibit
7  Number 26, which is Bates stamp Fifth Third McHugh
8  006330 through Fifth Third McHugh 006370.  Can you
9  identify that document for me, please?
10   A.  Draft 11/18/19, board of directors human
11 capital and executive talent management and succession
12 plan updates.
13   Q.  If I can refer you to Fifth Third McHugh
14 006357.
15   A.  Okay.
16   Q.  Referring to potential next positions, it says
17 expand current responsibilities to include middle market
18 leadership.  What does that mean?
19   A.  It meant expand current responsibilities to
20 include middle market leadership.
21   Q.  Referring back to Exhibit Number 25.
22   A.  Okay.
23   Q.  And referring you to Fifth Third McHugh
24 006866, the talent card for Tim Spence.
25   A.  6866?

Page 245

1    Q.  Correct.
2    A.  Okay.  I have that.
3    Q.  Under Tim Spence's potential, it says high
4  potential, head of regional banking and head of
5  commercial banking ready now.  Do you see that?
6    A.  I do.
7    Q.  And with respect to that, what was the
8  intention that you would be moving him to the head of
9  regional banking and head of commercial banking?
10   A.  This is potential, not a decision was made or
11 not made to move this individual or any individual in
12 these potential positions.  I -- my job is identify
13 opportunities to create the best organization possible.
14 That's my job.  That potential means this is a role that
15 Tim Spence could take immediately, might take
16 immediately, or might not.  It's a potential.
17       That's what the purpose of this card is for,
18 is to demonstrate to the board my belief that this
19 individual could take on these additional
20 responsibilities.  This is all to facilitate a
21 discussion for the board who's going to make the final
22 decision on president and CEO.  I make decisions beneath
23 that.  I inform them of those decisions, but those are
24 my decisions.  So Tim, I would consider him for this
25 role of the head of regions of commercial banking as an

Page 246

1  opportunity, but once again, a potential opportunity as
2  I defined it.  Needs to be ready now to do that.  That's
3  what that means.
4    Q.  Did you have any intention that Tim Spence be
5  placed in that role of head of regional banking and head
6  of commercial banking?
7    A.  My belief was that would be a great
8  opportunity for Tim Spence to continue to elevate the
9  organization and acquire the experience that other
10 executives, such as Phil McHugh acquired, and five other
11 executives acquired prior to him when I was part of the
12 bank, to lead their regions.  Once again, that region
13 position is used as a development opportunity, and I
14 thought that would be a great opportunity for Tim to get
15 that experience at some point under his belt because
16 he's a very high potential.  Can elevate, I believe, all
17 the way to CEO role, present CEO role.  So that is an
18 opportunity for him and a potential opportunity for him
19 to continue to expand his experiences, as it was when
20 Phil took the job.
21   Q.  Referring you to Exhibit Number 26, and Fifth
22 Third McHugh 006360.  This is the November 18th draft.
23   A.  Okay.  Hang on.  This is the 18th draft.  This
24 is the 13th draft.  Okay.
25   Q.  The timeline under potential for Mr. Spence

Page 247

1  has changed again.  The head of regional banking ready
2  now, the head of commercial banking, one to two years.
3  Do you see that?
4    A.  I do.
5    Q.  Why did that change?
6    A.  I don't know.  Must have been my thinking at
7  the time that I wanted him to have more time before he
8  took on the commercial bank -- my assessment that that
9  would probably be a better role for him to take in one
10 to two years.
11       Once again, I'll reinforce, these are
12 potential.  It's not cast in stone.  This is how I'm
13 thinking about it.  Other things can materialize, other
14 situations can materialize that would warrant a
15 different outcome here based on the needs of the
16 organization.  This is meant to facilitate discussion
17 only and identify opportunities.  That's why the word
18 potential is used.
19   Q.  Also listed as one of his key focus areas --
20 what are the key focus areas, just areas for them to
21 work on?
22   A.  Areas of opportunity.  Every executive -- I
23 would be remiss in my responsibility as CEO if I didn't
24 find opportunities for my executives to get better.
25 That's what that is.

Deposition of Gregory Carmichael, Volume I          Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 248

1   Q. So there was an opportunity for him to get
2 better, Tim Spence, to demonstrate consistent attraction
3 of key senior talent. Is that right?
4   A. Yes.
5   Q. That was an area that he could focus on as
6 opportunity to improve?
7   A. That's absolutely an opportunity to improve
8 was -- as he continues to elevate in the organization,
9 staying focused on bringing in -- consistent, staying
10 focused on bringing in talent and evaluating and
11 developing talent.
12     Once again, as a high potential, that would be
13 something I think is critical as he continues to elevate
14 in the organization. It wasn't a weakness of his, but
15 there was opportunity to get better.
16     Just for the record, I'm always going to find
17 opportunities for my executives to get better. No
18 matter how -- even if it's a strength of theirs, I'm
19 going to find opportunities in a lot of cases for focus
20 on something I think's going to be critical for their
21 long-term success, and I will put it in there if I felt
22 it was appropriate.
23     MR. SABA: We can go off the record.
24     (A recess was taken from 5:23 to 5:33.)
25     VIDEOGRAPHER: Time is 5:33 p.m. We're back

Page 249

1 on the record.
2 BY MR. SABA:
3   Q. Mr. Carmichael, you were bringing up your
4 evaluation, what makes a great coach, and one assessment
5 or factor you brought up is whether or not they've hired
6 anybody who's now in the top 100 or 150 executives of
7 the company?
8   A. I said top 100.
9   Q. Top 100. And are you aware of any hires that
10 Phil McHugh has made that are currently in the top 100
11 of the company?
12   A. I'm not aware of anyone he's hired from the
13 outside and brought in as talent. I'm not aware of
14 that. I'm not saying there's not anybody, I'm just not
15 aware of who that would be.
16   Q. You're not saying they're not; is that right?
17   A. I'm saying I'm not aware of anybody.
18   Q. Okay. Do you know who Chris Garrett is?
19   A. I do know Chris Garrett.
20   Q. Who's Chris Garrett?
21   A. Chris Garrett runs a wealth asset management
22 company, an individual, I believe, Mike Michael
23 recruited into the bank.
24   Q. Didn't Phil McHugh actually recruit her, that
25 he knew her through the wealth management executive

Page 250

1 circle, and that's why he recommended that she be hired?
2   A. I was under the impression that was Mike
3 Michael's hire. If that was erroneous information, I
4 was told in the person of Mike Michael was the one that
5 brought her in. I'm not suggesting that Phil didn't
6 have a role to play there; that was my understanding.
7   Q. And Chris Garrett is currently on the
8 enterprise committee; is that right?
9   A. She is.
10   Q. Do you know who Cary Putrino is?
11   A. Cary Putrino is a president of now our North
12 Florida market, I believe.
13   Q. North Florida or South Florida?
14   A. I think he's North Florida. He's North
15 Florida, I think.
16   Q. And he was also recruited and hired by Phil
17 McHugh; isn't that right?
18   A. I'm not aware of that.
19   Q. Do you know who Eric Houseman is?
20   A. I do know who Eric is.
21   Q. Okay. And what is Eric's role with Fifth
22 Third?
23   A. I don't know what his role is with Fifth Third
24 right now.
25   Q. What was your last understanding of Eric's

Page 251

1 role with Fifth Third?
2   A. First off, Eric Houseman, I believe, was hired
3 by Tom Hikes and recruited by Tom Hikes. So that was my
4 understanding of Eric Houseman. Cary Putrino, I'm not
5 sure who was involved in Cary Putrino's hiring.
6     My statement was, I'm not aware of anyone that
7 Phil's brought in.
8   Q. Is that specifically tracked at Fifth Third, a
9 record of who actually found this person and hired them?
10   A. I don't believe that's tracked. This is just
11 my exposure and my experience. That's why I used the
12 word I'm not aware of.
13   Q. So with respect to your assessment of who
14 actually brings these people in and cultivates these
15 people in the top 100, you're not necessarily aware of
16 who brought them all in; isn't that right?
17   A. I'm not aware of everybody, no.
18   Q. So it's difficult for you to accurately assess
19 with respect to whether or not somebody's a great coach,
20 you don't know how many people they've brought in; is
21 that right?
22   A. I have a pretty good idea of my leadership
23 and who they're bringing into the organization. The
24 timeframe we've talked about was over -- was over a
25 decade. I'm -- I was involved with Eric Houseman's

Page 252

1  hiring. I'm not aware of Phil bringing Eric in. Once
2  again, I said I'm not aware. That doesn't mean Phil
3  wasn't involved in that process. He may have identified
4  somebody. I'm just not aware of that. In a lot of
5  individuals I know directly who was hired, some of them
6  I'm just not aware.
7          (Exhibit 27 is marked for identification.)
8  BY MR. SABA:
9      Q. Mr. Carmichael, you've been handed Exhibit
10  Number 27, which is Bates stamp Fifth Third McHugh
11  007016 through Fifth Third McHugh 007065. Can you
12  identify this document for me, please?
13      A. Draft 12/01/19 board of directors human
14  capital executive talent management and succession plan
15  updates.
16      Q. And referring to Fifth Third McHugh 007053 --
17  and again, this is the CEO succession chart. Under that
18  succession chart, Tim Spence is still listed first in
19  line with Brian Lamb second. Tim Spence is now listed
20  three-plus years instead of two to three, and Brian Lamb
21  is listed seven-plus years.
22          Do you see that?
23      A. I do.
24      Q. Why was that change made?
25      A. Because that was the current thinking when

Page 253

1  this draft was put together. That was probably a more
2  realistic timeframe. That's all I can assess and the
3  assumption I would make based on the fact that we go
4  through multiple drafts for a reason. Thinking's
5  evolving, adjustments are made.
6      Q. Did you have any discussions with any of the
7  board members regarding that?
8      A. I did not.
9          (Exhibit 28 is marked for identification.)
10  BY MR. SABA:
11      Q. Mr. Carmichael, I've handed you what's been
12  marked as Exhibit Number 28, Bates stamp Fifth Third
13  McHugh 001465. Can you identify this document for me,
14  please?
15      A. Appears to be an e-mail from Bob Shaffer to
16  Marsha Williams and Mike McCallister, with a copy to
17  myself. Subject matter Fifth Third human capital and
18  executive talent management succession plan updates.
19      Q. And it goes on to indicate Marsha and Mike,
20  attached is a draft to the deck we will use for the
21  human capital and executive talent and management
22  succession plan updates of the board on December 17th.
23  Wanted to share with you ahead of time for your review.
24  We plan to distribute to all board members by mid next
25  week. Please let me know if you have any questions or

Page 254

1  other feedback. I appreciate it. Looking forward to
2  seeing you in a couple weeks.
3          Do you know if Marsha or Mike McCallister had
4  any feedback regarding the talent deck as of that date?
5      A. That would be a good question for Bob since he
6  sent this e-mail out and was soliciting feedback. I
7  don't recall what that feedback might have been, but Bob
8  would.
9      Q. Did you have any discussions with Marsha
10  Williams or Mike McCallister about this 2019 version of
11  the talent deck?
12      A. I do not recall having a discussion. I do not
13  recall a discussion. My guess is that the first
14  discussion would have been with Bob, but they might
15  have -- they may have contacted me. I just don't recall
16  any discussion of this topic for this deck.
17          (Exhibit 29 is marked for identification.)
18  BY MR. SABA:
19      Q. Mr. Carmichael, can you identify Exhibit
20  Number 29 for me, please?
21      A. This looks like an e-mail sent to -- it would
22  have been the board of directors copying some assistants
23  from Bob Shaffer, providing them a copy of the deck we
24  plan on using in the human capital executive talent
25  management succession planning update on 12/17/19.

Page 255

1      Q. That would have been approximately a week
2  before the actual board meeting; is that right?
3      A. This says in the attachments, there's a date
4  here, 2019, 12/10, so this would have been a 12/10
5  draft. If one exists, if you have that, that would have
6  been the draft that would have been associated with
7  this. And probably not -- I'm using the word draft
8  instead of final, so it wouldn't have been a draft, it
9  would have been the final document. So if you have
10  that, that's what we would have shared at this point,
11  according to what this memo was.
12      Q. And that would have been sent approximately a
13  week before the board meeting; is that correct?
14      A. Well, I've got to look at it exactly. This is
15  12/10. I think we met on 12/17, so that's seven days,
16  that constitutes a week. Yes.
17      Q. Okay. And I think he indicates in here, I
18  look forward to seeing you next week. Is that right?
19      A. So I believe that's correct. Yes.
20      Q. All right. Did you have any discussions with
21  any of the board meetings prior to -- I'm sorry.
22      A. Board members.
23      Q. Correct that.
24          Did you have any conversations with any
25  members of the board prior to that board meeting

Deposition of Gregory Carmichael, Volume I                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 256

regarding the talent deck?

A.  I did not.  I don't -- I'm not aware of any conversation I had.  I can't recall if someone reached out to me on that.  Once again, I don't have that recall if that happened three years ago -- four years ago, so I don't recall that.

Q.  Do you recall that there would have been an enterprise committee meting on Thursday, December 12, 2019?

A.  Well, we have a Thursday -- we have enterprise committees on Thursday, I believe, during that time period.  So I'm not positive, but I believe we would have enterprise committee.  We typically would have our enterprise committee so -- we would have our enterprise committee by design during that week, unless we made a decision not to have one that week.  I can't recall that.  I don't have the calendar in front of me.

Q.  And do you recall there was an enterprise committee meeting where Frank Forrest said in the meeting, we all know that Greg likes to control the message to the board?

A.  I have never heard a comment of that nature whatsoever.  I've never heard a comment like that, of that nature ever.  No, I wasn't aware of that.  I've never heard of that, and I wasn't in any conversation

Page 257

that that took place, which would be contrary to what Frank has told me over and over again about the transparency that he has to the board and the connectivity he has to the board, and the opportunities he has to meet one-on-one with the board.

So I don't know how I would be controlling.  That's just the opposite of how I think and how I managed the organization.  I get high marks for being very transparent.  My job is to make sure the messages are clear to the board, that they don't confuse the board.  Board members only come in four times a year, so we want to make sure that -- how they say things to the board.  They use a lot acronyms and so forth, so I would have that type of conversation.

But never the message itself.  There's too much data, too much visibility for me to control anything.  The board has full access and full visibility.  So no, the answer is no to that question.

Q.  Did Bob Shaffer ever contact you while in an enterprise committee meeting and let you know that Frank Forrest had made a comment that Greg likes to control the message to the board?

A.  I can't recall that.  I do not recall that happening.  It doesn't mean I didn't get something of that nature.  I don't have that kind of recall on

Page 258

messages, text messages, that kind of stuff.  It doesn't resonate with me.

Q.  Did you ever have a conversation with Tim Spence where he indicated that Frank Forrest had said during an enterprise committee meeting that we all know that Greg likes to control the message to the board?

A.  I can't recall ever hearing that statement.  Frank does my risk reviews.  He gives me extremely high marks.  If I was controlling and he felt controlling the message to the board, it would be his job and responsibility to identify that as a risk because you would never want to see or control the message to the board.  You want the message to be what the message is, and you want the data to speak for itself in a highly regulated industry.  I've never seen any of that in my risk assessment from Frank that he thought that way.  I've never heard anyone mention that to me, that I can recall.

And Frank's not shy about walking in my office and telling me any concern he has, so I have no doubt if he felt that way he would have come and see me.  I have never heard from him on that topic or ever felt that he had that concern.

(Exhibit 30 is marked for identification.)

Page 259

BY MR. SABA:

Q.  Mr. Carmichael, I've handed you what's been marked as Exhibit Number 30, which is Bates stamp Fifth Third McHugh 001105 through Fifth Third McHugh 001154.  Can you identify this for me, please?

A.  It doesn't say draft.  It just says board of directors human capital and executive talent management succession plan updates, December 17, 2019.  My assumption would be and only assumption would be this is the final version that was used.

Q.  Let me represent to you that this has been previously testified to as the final version that was presented to the board.  Do you have any reason to believe that it's not the final version that was presented to the board?

A.  Nope.  I have no reason to believe that this was not the final version presented to the board.  From my quick observations.

Q.  With respect to the topic of executive talent management and succession planning, specifically with respect to president and CEO, was there any other documentation that was provided to the board for the December 2019 meeting?

A.  Could you please re-ask the question again?

Q.  Certainly.  With respect to executive talent

Page 260

1  management and succession planning, specifically with
2  respect to president and CEO, was there any other
3  documentation presented to the board for the December
4  2019 meeting?
5      **A.  I don't believe so.  Typically, this would be**
6  **the only document.  We only have -- we have two or**
7  **three-hours discussions that usually facilitated this**
8  **document.  I'm not aware and can't recall any other**
9  **information, documentation being presented at this -- at**
10  **that meeting at that time.**
11          (Exhibit 31 is marked for identification.)
12          (Exhibit 32 is marked for identification.)
13  BY MR. SABA:
14      Q.  Mr. Carmichael, you've been handed Exhibits 31
15  and 32.  For first Exhibit Number 31, it is Bates stamp
16  000253 through 000265.  Can you identify Exhibit Number
17  31 for me, please?
18      **A.  Appears to be the minutes of the meeting of**
19  **the board of directors on December 17, 2019.**
20      Q.  And then referring to Exhibit Number 32, which
21  is Bates stamp Fifth Third McHugh 000266 through 000283.
22  Identify that document for me, please.
23      **A.  This appears to be the minutes of the board of**
24  **directors, December 17, 2019.**
25      Q.  Just to be clear, Exhibit 31 are the minutes

Page 261

1  for the Fifth Third Bank corp; is that correct?
2      **A.  31 is Fifth Third Bank corp and 32 is Fifth**
3  **Third Bank.**
4      Q.  And the meetings for these two entities are
5  taking place simultaneously with the board of directors,
6  correct?
7      **A.  Yes, it's one board minuted for at a board**
8  **level, bank corp level, and at a bank level.  Regulatory**
9  **requirements.**
10      Q.  And at least with -- through the section of
11  executive session of CEO on page 2 --
12      **A.  Which exhibit, please?**
13      Q.  I'm going to be referring to both in my
14  question.  So hold on one second.
15          My question is, essentially, that with respect
16  to this first section of Exhibit 31 and Exhibit 32,
17  specifically through executive session with CEO on
18  page 2, the minutes are identical; is that right?
19      **A.  I haven't read it yet, but I would be**
20  **surprised if they were different.  Would you -- want me**
21  **to read through these and compare them?  But I would**
22  **expect them to be the same.**
23      Q.  You can.  I'm -- just for simplicity, I'm just
24  trying to confirm that section is the same.  There are
25  other sections that are different in the minutes.

1      A.   Just give me one second.  I would think these

2   sections would be -- Counsel, would be identical, but I

3   haven't read them both side by side.  So yeah, my

4   assumption is these should be, would be identical, that

5   section.

6      Q.   Okay.  And I'm going to refer to Exhibit 31

7   starting out.

8

9           (Off-the-record discussion.)

10

11

12                         _____

13                         Gregory Carmichael

14                         _____

15                         Date

16

17                    - - -

18           DEPOSITION CONCLUDED AT 6:00

19                    - - -

20

21

22

23

24

25

1                        C E R T I F I C A T E

2

STATE OF OHIO              :
3                           :              SS
COUNTY OF HAMILTON         :
4

5              I, Sydney Jackson, the undersigned, a duly

6    qualified and commissioned notary public within and for

7    the State of Ohio, do hereby certify that I recorded in

8    stenotype and thereafter transcribed the within pages,

9    and that the foregoing transcript of proceedings is a

10   true, complete, and accurate transcript of my said

11   stenotype notes to the best of my ability.

12              IN WITNESS WHEREOF, I hereunto set my hand and

13   official seal of office at Cincinnati, Ohio, this 10th

14   day of October, 2023.

15

16

17

18   My Commission expires      _____
19   February 17, 2026          S/Sydney Jackson
                                Notary Public - State of Ohio
20

21

22

23

24

25

 1   1 DEPOSITION ERRATA SHEET

 2   Date Taken:  September 26, 2023

 3   Case Caption:  PHILIP MCHUGH

 4   vs. FIFTH THIRD BANCORP, et al.

 5   DECLARATION UNDER PENALTY OF PERJURY

 6   I declare under penalty of perjury

 7   that I have read the entire transcript of

 8   my deposition taken in the captioned matter

 9   or the same has been read to me, and

10   the same is true and accurate, save and

11   except for changes and/or corrections, if

12   any, as indicated by me on the DEPOSITION

13   ERRATA SHEET hereof, with the understanding

14   that I offer these changes as if still under

15   oath.

16   Signed on the _____ day of

17   _____, 20___.

18   _____

19   Gregory Carmichael

20

21

22

23

24

25

```
 1   2 DEPOSITION ERRATA SHEET

 2   Page No._____Line No._____Change to:_____

 3   _____

 4   Reason for change:_____

 5   Page No._____Line No._____Change to:_____

 6   _____

 7   Reason for change:_____

 8   Page No._____Line No._____Change to:_____

 9   _____

10   Reason for change:_____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change:_____

23   SIGNATURE:_____DATE:_____

24   Gregory Carmichael

25
```

Deposition of Gregory Carmichael, Volume I                    Philip R. McHugh v. Fifth Third Bancorp, et al.

```
 1   3 DEPOSITION ERRATA SHEET

 2   Page No._____Line No._____Change to:_____

 3   _____

 4   Reason for change:_____

 5   Page No._____Line No._____Change to:_____

 6   _____

 7   Reason for change:_____

 8   Page No._____Line No._____Change to:_____

 9   _____

10   Reason for change:_____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change:_____

23   SIGNATURE:_____DATE:_____

24   Gregory Carmichael

25
```

Deposition of Gregory Carmichael, Volume I      Philip R. McHugh v. Fifth Third Bancorp, et al.

## WORD INDEX

**< $ >**
**$100,000**  77:4, 7
 79:18

**< 0 >**
**0**  102:8
**000253**  260:16
**000265**  260:16
**000266**  260:21
**000283**  260:21
**0006555**  124:21
**0006562**  124:22
**000695**  110:23
**000700**  110:23
 111:12
**000701**  113:16
**000709**  113:17
**000732**  115:1
**000737**  115:1
**000758**  120:8
**000763**  120:9
**000766**  127:9
**000773**  127:10
**000784**  130:8
**000791**  130:9  131:17
**000823**  132:7
**000828**  133:17
**000830**  132:8  135:8
 136:6  138:19
**000836**  140:9
**000840**  140:10
**001105**  259:4
**001154**  259:4
**001465**  253:13
**005483**  204:3
**005507**  214:15, 17, 20,
 25  215:21
**005515**  204:4
**006330**  244:8
**006357**  244:14
**006360**  246:22
**006370**  244:8
**006552**  123:3
**006554**  123:4
**006560**  125:18
**006714**  212:24
**006739**  221:10

**006742**  222:8
**006748**  222:25
**006761**  212:24
**006762**  230:8
**006789**  232:11
**006811**  230:9
**006836**  242:21
**006866**  244:24
**006873**  243:2
**006885**  242:21
**006886**  223:13
**006918**  224:11
**006921**  226:3
**006927**  227:6
**006940**  223:14
**006943**  213:7
**006955**  218:21
**006968**  213:17  214:7
**006971**  218:2
**006977**  219:10, 13
**006978**  219:13
**006989**  213:8
**007016**  252:11
**007053**  252:16
**007065**  252:11
**0213064**  36:22
**0213203**  201:21
**0214533**  155:15
**0214537**  160:2
**0214550**  155:15
**086284**  177:11

**< 1 >**
**1**  3:7  10:11, 14
 154:12  264:1
**1:00**  177:15
**1:06**  114:19, 20
**1:21-CV-00238**  1:7
 4:7
**1:30**  177:15
**10**  3:7, 11  48:7
 61:21, 23  124:18, 21
 126:24  197:13
**10/25**  212:19
**10/25/19**  213:9
**10:51**  202:1
**10:56**  61:14, 16
**100**  157:1  239:12
 249:6, 8, 9, 10  251:15

**100,000**  75:4, 11
**10th**  263:13
**11**  3:12  54:14  127:6,
 9  128:18  129:16
 201:25  229:19
**11/07**  212:19
**11/07/19**  213:3
**11/12**  230:18
**11/12/19**  230:14
 231:6
**11/13/19**  242:23
**11/18/19**  244:10
**11:14**  61:16, 17
**110**  3:9
**113**  3:9
**114**  3:10
**12**  3:12  10:25  111:9
 112:6  130:5, 8  256:8
**12/01/19**  252:13
**12/10**  255:4, 15
**12/17**  255:15
**12/17/19**  254:25
**12:28**  114:17, 19
**12:30**  108:12, 14
 114:11
**120**  3:10
**122**  3:11
**124**  3:11
**127**  3:12
**13**  3:13  66:21  111:9
 132:4, 7
**130**  3:12
**132**  3:13
**13th**  246:24
**14**  3:13  30:23  71:12
 140:6, 9  141:16
**140**  3:13
**15**  3:14  108:10
 152:9, 12  173:4
 177:17  180:6  181:16,
 19  182:13, 19  183:10,
 16  184:5, 11  185:21
 186:2  188:7  195:17
 217:10  220:5
**150**  249:6
**152**  3:14
**155**  3:14
**16**  3:14  30:24
 155:11, 14  157:15
 160:1  175:14  176:24

**17**  3:15  30:24
 157:16  177:4, 8, 11
 259:8  260:19, 24
 263:19
**1700**  2:12
**177**  3:15
**17th**  253:22
**18**  3:15  201:17, 20
**18th**  246:22, 23
**19**  3:16  72:8  155:3,
 4  203:25  204:3
 214:14

**< 2 >**
**2**  3:7  29:9, 12  37:18,
 24  61:21  72:14, 20
 73:5  75:19  129:22
 261:11, 18  265:1
**2,050,352**  31:22
**2:23**  155:7, 8
**2:39**  155:8, 9
**20**  3:16  7:9  29:20
 30:9  72:17  78:15, 23
 108:11  109:2  212:16,
 19, 23  221:3  264:17
**2000**  28:7  157:15
**2003**  10:22  108:20
**2005**  6:1  109:2
**2006**  6:1  10:24
 27:25
**2009**  37:24  38:1
**201**  2:12  3:15
**2010**  110:5
**2011**  10:25  111:4, 18
 112:2  114:2
**2012**  11:3, 16, 22
 111:15  113:19  114:3,
 4, 14
**2013**  115:3, 4, 15
**2014**  115:11  116:19
 120:11, 25  128:3, 6
**2015**  11:1, 14, 21, 22
 12:5, 8  120:22  123:7,
 25  124:1  127:12, 15
 128:6  129:2, 11, 12,
 14, 16
**2016**  129:12, 14
 130:11, 23  131:11, 17
**2016-2017**  157:17

Case: 1:21-cv-00238-MRB Doc #: 66-3 Filed: 08/02/24 Page: 76 of 114 PAGEID #: 2853

Deposition of Gregory Carmichael, Volume I        Philip R. McHugh v. Fifth Third Bancorp, et al.

**2017** 132:*10*, *12* 138:*10* 141:*20* 146:*18*
**2018** 11:2 12:*18* 30:*12* 32:*17* 35:6, *7*, *13* 37:*18*, *24* 42:*18*, *21* 44:*10* 136:9 140:*12*, *21*, *24* 141:*7*, *23* 154:*12* 155:*3*, *4* 197:*17* 204:6, *16* 214:*18* 215:*12*, *21* 227:*24*
**2019** 19:*24* 22:*11* 26:*3*, *4*, *6* 28:*16* 101:2, *12* 104:7 106:*10* 107:6 108:*5* 142:*11* 147:*23* 151:*17* 177:*17* 178:*8* 180:*6* 181:*16*, *18*, *19* 182:*13*, *19* 183:*10*, *16* 184:5, *11* 185:*1*, *15*, *21* 186:2 188:*7* 195:*19* 197:9, *21* 201:*25* 211:*13* 212:5 214:*1* 215:22 217:*10* 220:5, *18* 221:*4*, *12* 222:*2* 229:*19* 231:6 254:*10* 255:*4* 256:9 259:8, *23* 260:*4*, *19*, *24*
**2020** 11:7 31:*20* 48:8 71:*13* 73:5 74:*18* 84:7, *14* 137:6, *10* 138:9
**2021** 72:*13*
**2022** 10:*16* 11:*25* 12:*12*, *13*
**2023** 1:*17* 4:2 263:*14* 264:2
**2026** 263:*19*
**203** 3:*16*
**20's** 221:*4*
**21** 3:*17* 43:2 61:22 82:*23* 84:*19* 212:*17*, *20* 213:6, *12*, *13*, *15*, *18* 218:*1*, *20* 219:9
**212** 3:*16*, *17*
**21st** 9:*24*

**22** 3:*17* 66:22 88:*1* 223:*10*, *13* 224:*10* 227:7
**223** 3:*17*
**229** 3:*18*
**23** 3:*18* 85:16 229:*15* 230:8
**230** 3:*18*
**24** 3:*18* 230:*24* 231:2
**242** 3:*19*
**244** 3:*19*
**25** 3:*19* 120:22 214:*1* 215:22 242:*17*, *20* 243:2 244:*21*
**250** 72:*20* 73:5 75:*19*
**252** 3:*20*
**253** 3:*20*
**254** 3:*21*
**258** 3:*21*
**26** 1:*17* 3:*19* 4:*1* 244:*4*, *7* 246:*21* 264:2
**260** 3:22
**2623** 2:6
**2680** 88:22
**27** 3:*20* 252:7, *10*
**28** 3:*20* 253:9, *12*
**29** 3:*7*, *21* 254:*17*, *20*

**< 3 >**
**3** 3:8 7:7 36:*16*, *19* 266:*1*
**3.7** 121:*17*
**3.75** 121:2, *10*
**3.8** 133:*14*
**3:51** 206:2, *3*
**30** 3:*21* 258:*24* 259:*3*
**30-plus** 183:*23*
**30's** 169:*1*
**30-something** 147:2 241:*19*
**31** 3:22 10:*16* 260:*11*, *14*, *15*, *17*, *25* 261:2, *16* 262:6
**32** 3:22 260:*12*, *15*, *20* 261:2, *16*

**35** 7:*13*
**36** 3:8

**< 4 >**
**4** 3:8 88:*17*, *20* 93:*15* 110:*18* 121:4 152:*17*
**4:07** 206:*3*, *4*
**40** 48:*12* 61:25 62:*23* 63:6, *17* 169:*13* 175:*11*
**45202** 1:*20* 2:*13*
**45208** 2:6
**45242** 7:7

**< 5 >**
**5** 3:*4*, *9* 30:*10* 110:*15*, *20*, *21*, *22*, *25* 111:22 115:*21* 121:*11*, *17* 160:2 173:*4*
**5:23** 248:*24*
**5:33** 248:*24*, 25
**50** 73:9
**511** 1:*19*
**513.362.8700** 2:*13*
**513.533.2701** 2:7
**513-470-8400** 37:9
**513-765-9166** 37:7
**5502** 214:*21* 215:5
**5th** 12:*13*

**< 6 >**
**6** 3:9 28:7 31:*19* 111:*15* 113:*13*, 16 115:*21* 121:*4* 125:*17* 129:22 133:*16*
**6:00** 262:*18*
**60** 73:*10* 137:*10*
**60-plus** 77:*16* 138:*5*
**67-years-old** 172:8
**6866** 244:*25*
**69** 224:*12*
**6955** 218:22
**6968** 213:*19* 215:24
**6971** 218:*5*
**6978** 219:*17*

**< 7 >**

**7** 3:*10* 28:7 32:*17* 35:6 114:22, *25* 133:*16* 221:*4*, *12*
**7th** 222:25 225:*16* 229:*18*

**< 8 >**
**8** 3:*10* 43:2 120:5, *8*, *19* 128:2
**8/15/2019** 177:*14*, *15*
**8:09** 37:*19*, *24*
**80** 172:5
**88** 3:8

**< 9 >**
**9** 3:*11* 45:*14* 93:*14* 122:25 123:*3*
**9:40** 1:*18* 4:2

**< A >**
**a.m** 1:*18* 4:2 61:*14*, *17* 202:*1*
**aback** 171:*15*
**Abbington** 7:7
**ability** 19:*13* 41:*17* 172:*4* 240:*10* 263:*11*
**able** 29:*12* 35:*10* 37:*20* 65:23 85:*11* 111:22 129:*15* 141:*4* 152:22 153:*10*, *14* 203:*14* 214:6 234:*16* 235:*21*
**Absolutely** 29:8 56:*5* 65:*18* 77:*21* 98:*17* 101:*17* 104:*13* 113:*4* 125:9 137:*3* 142:*1*, *3* 143:*18*, *21* 169:*10* 174:9 182:*1*, *11* 183:*15* 184:*12*, *16*, *18* 185:8 188:*19* 189:*3* 194:*15*, *21* 196:*8* 197:*3* 201:*3* 203:*11* 205:*18*, 22 216:*24* 248:7
**abuse** 89:*17* 90:*5*, *7*, *9* 95:9 96:2, *9*
**ACC** 77:*24*
**accelerated** 125:*19*
**accept** 45:*16* 84:*21* 173:22

**acceptable** 87:*24*
94:*10*

**access** 21:7, *19* 23:8
24:5 257:*17*

**accomplishes** 93:*19*
94:2

**account** 14:*4*

**accountability** 139:2
140:2, *4*

**accountable** 142:*3*

**accuracy** 29:*22, 25*
30:5 75:*17*

**accurate** 29:7 30:7
72:*25* 73:*1, 3* 91:5
95:*24* 263:*10* 264:*10*

**accurately** 251:*18*

**achieve** 139:*1* 144:*3*
145:*1*

**achieving** 136:8

**acknowledge** 169:8

**acknowledged** 34:*10*
56:25

**acknowledging**
144:*18*

**acquire** 149:*15*
190:*20* 246:9

**acquired** 246:*10, 11*

**acquisition** 137:*15,*
*16* 149:*4, 18* 150:9,
*19* 197:8 198:7, *12*
199:*4*

**acronym** 123:22

**acronyms** 257:*13*

**act** 140:5

**action** 62:22, *25*
159:*23* 160:*10* 173:8
239:*23, 24* 240:*1, 3*
242:6

**actions** 133:*21* 144:9
152:2, *7* 161:*10, 11*
241:*13*

**active** 134:6

**activities** 134:*10*
136:*1* 144:*21*

**activity** 50:*1* 54:*16*

**actual** 255:2

**add** 50:6 74:*20, 23*
77:*3* 105:2 133:*4*
146:*18* 152:*23*
181:22 216:8 233:8

**added** 79:*24* 133:6
216:2, *4, 5, 13* 230:*1*

**adding** 73:*18*

**addition** 66:22 75:9
239:*22*

**additional** 10:*23*
73:*19* 75:*4, 11* 80:3
238:*10* 245:*19*

**Additionally** 6:*25*

**address** 7:6 134:5

**addressed** 14:9
134:*4* 199:*22*

**addresses** 139:7

**addressing** 136:8, *11*
177:6

**adjusted** 84:*12*

**adjustments** 74:*1*
81:*24* 253:5

**administered** 123:*14*
204:*19*

**administration** 9:*19*

**administrative** 30:22
31:*1, 10* 41:*12* 73:*16*
143:8 148:6, *21*
152:6

**administrator** 148:*14,*
*24*

**admire** 190:*24*

**adoption** 150:2

**advantage** 21:*20*

**advisors** 110:*10*
128:*1*

**advisory** 111:*24*
114:*1*

**Advocacy** 155:*18*

**affiliates** 110:*4*

**afterthought** 71:9
90:*24* 91:2

**age** 5:*13* 28:*24*
48:*11* 61:*24* 62:2, *12,*
*25* 63:*1, 3, 6, 7, 9, 17,*
*18, 19, 23* 64:2, *3, 4, 5,*
*10, 15, 23* 65:*11, 13,*
*17* 66:7, *18, 19* 89:*13*
90:*1, 23* 91:6 94:*20,*
*25* 95:*18* 96:25
97:*14, 17, 19, 20, 24*
98:7 99:*15, 18*
125:*20, 22* 166:*18*
168:*25* 169:8, *16*

**171**:*11* 172:*3, 10, 13,*
*21* 174:*3, 5, 9, 13, 16,*
*23* 175:2, *3, 5, 15, 21,*
*24* 176:4, *7* 177:*1, 6*
214:*18* 216:2, *4, 11*

**agencies** 221:*23*

**agency** 71:*15, 17*

**agenda** 14:*4*

**age-related** 174:*20*

**ages** 216:8

**agility** 189:*16* 236:*13*

**ago** 54:*18* 79:5
109:2, *22* 111:9
112:6 124:*13* 195:*4*
219:8 256:5

**agree** 93:*23, 24*
100:6 104:*12* 160:6,
*10* 170:22

**agreed** 104:*15*
105:*12, 16* 221:*14*

**agrees** 170:*3*

**ahead** 11:*18* 16:*14*
33:20 62:*16, 20*
70:*16* 79:*3* 81:*3*
87:*16, 20* 90:*13* 93:*4*
96:5 139:*13* 235:*5,*
*25* 253:*23*

**aims** 93:*20* 94:2

**al** 1:*9* 4:7 264:*4*

**alcohol** 162:*15*

**aligned** 84:*12*

**aligning** 193:8

**allegations** 29:6 30:*4*
45:*14* 90:*15*

**allegedly** 47:*16*

**all-inclusive** 162:*13,*
*15*

**allocate** 18:5

**alternatives** 18:*20*

**amended** 29:*17*

**America** 14:*19*
212:*15*

**amount** 15:*24* 90:*15,*
*25* 119:*10* 138:2
145:*15*

**analysis** 237:*11, 16*

**analysts** 94:*16*
180:22

**and/or** 46:22 59:5
60:8 104:22 264:*11*

**Anderson** 67:*11*
70:2 127:*19* 128:*15,*
*20, 24* 129:2 130:*16*
131:8 132:22 198:*3*
201:*12*

**Anderson's** 131:*10*

**angered** 82:25 85:9

**angry** 83:8 85:*1*

**announced** 197:*11,*
*12, 17*

**announcement** 84:*9,*
*11, 13, 16*

**annual** 32:8 72:*13,*
*20* 75:*5, 18* 113:*21*
156:*13* 174:*4*

**annually** 17:22 116:9

**answer** 6:22 7:*1*
8:*23* 29:*16* 31:*23*
33:20 39:*10* 52:*15,*
*18, 19, 20* 53:25 54:*4*
56:*11* 59:*13, 22* 62:*4,*
*21* 64:*17* 65:5 70:*16*
78:*19* 79:*3* 80:8
90:*11, 13* 92:*10* 93:*4,*
*6* 95:*10, 11* 96:6, *10,*
*12, 16* 97:6 98:*15, 16*
104:*24* 105:2 124:*15*
126:*4* 138:*21* 160:*23,*
*25* 164:*15* 165:*21*
166:5 167:*21* 168:8,
*21* 170:6, *12, 13*
171:*3, 4* 173:7 175:8
177:7 206:*13* 207:*4*
208:4, *6, 8* 226:*19*
242:*15* 257:*18*

**answered** 21:*23* 47:*1,*
*24* 51:*16* 57:6, *18*
59:6, *21* 64:*16* 78:*18*
100:*18, 19* 105:*1, 17*
106:*19* 164:5 165:*20*
167:5 171:*4* 176:8
195:*3* 196:5 208:22
217:24 226:*18*
240:*18*

**answering** 96:*15*

**answer's** 82:22

**anticipated** 79:*21*
206:*16* 207:2 210:*14*

**anticipating** 207:*25*

Deposition of Gregory Carmichael, Volume I                    Philip R. McHugh v. Fifth Third Bancorp, et al.

anybody 7:20 20:4
59:24 78:3 162:8
164:8 186:1 249:6,
14, 17
anyway 58:24
207:22 211:7
apparent 169:24
Apparently 111:19
140:19 141:21 216:4
222:15
APPEARANCES 2:1
Appears 10:16
38:18 127:22 133:3
141:19 173:4 204:6
213:9 214:7, 8 218:8
219:14 221:20 223:2,
16 232:1 242:23
253:15 260:18, 23
appetite 139:18
applies 173:24
appoint 49:13
appointed 11:13, 20
14:18, 21, 22 51:13
appreciate 113:5
254:1
appreciated 112:25
146:3 157:5
approach 36:3 47:5
approached 32:20
104:6 194:14 204:22
approaches 102:21
139:14
approaching 186:17
197:23 205:5
appropriate 52:16
134:17 142:10 149:6,
22 150:4 159:25
165:5, 18, 24 173:1
181:11 243:14
248:22
appropriately 14:2
25:19 78:13 139:7
146:21 149:3
approval 77:24 80:1
197:20
Approximately 7:9
255:1, 12
April 12:3, 23 115:11
area 112:11 131:5
134:13 136:2 145:17

199:19 222:1 242:10
248:5
areas 144:17 147:9
192:6 193:10 221:21
224:24 247:19, 20, 22
argue 94:4
argued 238:13
arguing 91:12
art 52:12
articulate 173:12
190:7
articulated 191:5
193:24
asked 6:3 35:17, 22
36:3 41:4, 14 44:16
46:13, 15 47:1, 5, 24
50:12 51:2 52:6, 13
59:6, 11, 21 64:9, 16
65:2 67:23 70:3
74:11 80:13, 18
100:10, 18 102:22
121:25 122:10, 13
133:4 150:19 165:20
167:4 170:5 176:10,
21 181:11, 20 185:10
186:13 188:14, 18
195:3 197:5 201:2
203:18 206:18 210:1,
18 226:18
asking 6:17 23:19
30:1 56:3 62:16
64:22 65:3, 4 76:10
86:5 92:13, 14, 22
93:7 95:7 96:17, 19,
20 98:1 105:1
106:22 119:20
121:24 122:8 158:6,
8, 9 164:8 167:1, 13,
19, 22, 23 170:3, 21
172:16 176:9 180:15
193:14 205:15 207:6,
7 226:23 237:3, 16
aspects 198:8
assess 49:20 60:13
131:3 251:18 253:2
assessed 57:22
192:24 193:25
assesses 139:15

assessing 52:25
100:25 104:1 123:17
124:9 208:1 236:2
assessment 50:10, 18,
20 52:23 68:3
106:20 107:25
193:22 234:5, 7, 8
237:9 241:22 242:4,
10 243:17, 19, 20
247:8 249:4 251:13
258:16
assessments 180:4
asset 115:7 120:14
128:4, 10 130:15
133:7 134:9, 10
141:3 249:21
assigned 154:22
assignment 84:21
136:25 183:14
assignments 82:4
114:10 147:13
assist 139:4
assistant 41:9
assistants 254:22
associate 171:10
associated 159:18
255:6
Association 88:21
assume 32:1 62:6
84:15 88:3 127:2
155:22 204:9, 10
225:21
Assumes 63:8 98:14
144:22
assuming 29:24
86:20 156:1 164:19
assumption 62:8
79:22 253:3 259:9
262:4
assumptions 20:7
attached 253:20
attaches 231:7
attachment 231:5
attachments 255:3
attended 72:2
attention 171:20
179:12
attitude 160:12
173:10

attorney 4:21 8:12
90:8
attorneys 4:23 7:16,
19, 21, 24 8:2, 9
attraction 248:2
attracts 241:16
attributed 138:3
audit 21:3, 6 22:20
23:11 154:1, 5, 18, 24
August 30:12 42:17,
21 177:17 180:6
181:16, 19 182:13, 19
183:10, 16 184:5, 11
185:21 186:2 188:7
195:17 217:10 220:5
authorities 202:24
authority 92:7, 18
98:24
available 16:17, 21
155:5
Avenue 2:6
avoid 173:14
awarded 89:13
awards 32:13
aware 22:21 23:15
28:22 29:1 45:8
47:25 57:13 69:7, 8
70:4 71:8, 16 80:2
89:11 90:3 91:20, 22
99:5, 12 109:9, 12
147:3 159:2 161:13
171:19, 21 177:7
195:10 229:7, 17, 25
230:1 249:9, 12, 13,
15, 17 250:18 251:6,
12, 15, 17 252:1, 2, 4,
6 256:2, 24 260:8
Awareness 155:18

< B >
back 10:22 11:15
13:15 14:11 19:24
23:25 33:6, 9 35:12,
18 36:6 42:6, 24
43:1, 2, 19 47:3
54:14 57:1 58:18, 23
60:12 61:18, 20
63:11 70:12 78:25
80:9, 21 84:19 88:8
89:20 95:15 107:25

Case: 1:21-cv-00238-MRB Doc #: 66-3 Filed: 08/02/24 Page: 79 of 114 PAGEID #: 2856

Deposition of Gregory Carmichael, Volume I      Philip R. McHugh v. Fifth Third Bancorp, et al.

109:*18* 111:*3* 114:*20* 128:2 130:*23* 143:*6* 155:9 159:*1* 162:2 166:5, *8* 184:22 187:*10* 188:*8* 194:*13* 196:*6* 197:*1* 205:25 206:*4* 214:*24* 215:*11*, *20* 241:*6* 244:*21* 248:25

**background** 159:*16* 189:*21*, *24* 190:*15* 202:25 203:*11* 228:*20*

**backup** 184:2

**badge** 160:*20* 161:22

**baffled** 229:*23*

**Bailey** 2:*4* 4:22

**BANCORP** 1:*9* 2:*17* 4:*6* 264:*4*

**bank** 9:25 10:*1*, *3*, *4*, *5*, *8*, *18* 11:9, *11* 13:*16*, *18* 16:9 25:*1*, *25* 30:*14* 32:*18* 44:2, *7* 45:*24* 48:9, *11* 49:25 50:*1*, *22* 51:*14* 53:*23* 54:*15*, *16*, *17*, *19* 55:*16*, *20* 57:*23* 60:*18* 64:7, *25* 65:9, *12*, *21* 70:*19* 73:8 77:*16* 86:*1* 88:*21* 89:*14*, *25* 90:*20*, *24* 97:2 98:*11*, *19* 99:*3*, *14*, *15*, *18* 100:5, *8* 104:*23* 107:22 108:*21*, *23* 109:7, *11* 110:8 112:*23* 113:*12* 116:8 132:*14* 134:25 135:*15*, *17*, *19*, *23* 136:*1*, *16* 137:*5*, *9*, *11*, *18*, *25* 138:*8*, *10* 140:*4* 142:22 147:9, *10* 149:8 151:8, *14*, *18*, *19*, *22* 155:*1* 174:*15* 184:*13*, *19*, *21* 187:9, *24* 190:*21* 199:9, *10*, *19* 200:*1*, 5, *19* 212:*3* 213:*10* 219:*4* 225:6, *11* 232:*19* 233:*14* 234:*20* 239:25

246:*12* 247:*8* 249:*23* 261:*1*, 2, *3*, 8

**banking** 30:*18*, *19* 31:*21* 72:*10*, *18* 80:*4* 82:*20* 84:22 85:25 88:*4* 99:*3* 133:5, *9* 134:*18*, *20*, *25* 135:*3* 136:*19*, *23*, *24* 137:*1* 141:*3* 144:*13* 149:*11* 150:*3* 184:*7* 190:*17* 218:*12*, *13* 222:*12*, *13* 225:*1*, *3*, *7*, *8* 226:*10* 232:*13*, *21*, *22* 245:*4*, 5, *9*, *25* 246:5, *6* 247:*1*, *2*

**banks** 133:5

**bank's** 71:*13*, *14* 72:*13* 89:2

**base** 96:*1* 177:*24* 179:*3*, *14*

**based** 14:*4* 16:*11* 24:*16* 27:*4* 60:2 62:*25* 63:2, *7*, 9, *18*, *21* 64:*2*, *10*, *14* 66:*7* 84:*15* 86:*21* 91:*6* 97:*25* 106:*3*, *4* 159:*13*, *14*, *16* 175:2 179:*17*, *18* 207:*14* 216:*6* 224:*4* 231:*17* 233:*10* 235:*7* 237:*6* 242:*12* 247:*15* 253:*3*

**basically** 13:*3*, *20* 14:*10* 101:*23* 128:*11* 150:*7* 159:*13* 190:*4* 193:*6* 199:*16* 200:*11* 234:*14*

**basis** 81:*15* 92:9, *14*, *17* 95:*4*, 9 96:*14*, *20* 97:*3* 210:*13*

**Bate** 37:*3*

**Bates** 36:*20* 110:22 114:*25* 155:*14* 177:*11* 201:*20* 212:*23* 242:*20* 244:*7* 252:*10* 253:*12* 259:*3* 260:*15*, *21*

**bear** 121:*8*

**beautiful** 169:*14*

**becoming** 68:*4* 70:*23* 72:*12* 84:*9* 104:*6* 126:*14*

**began** 8:5, 9 9:*3*, 9 85:*17*

**behalf** 2:*1*, 8 4:*10*, *12* 5:*7* 89:*2*, *3*

**belief** 245:*18* 246:7

**beliefs** 50:*24* 66:*4* 205:*21* 223:*24*

**believe** 6:*13* 9:5, *10* 10:*25* 24:*10* 26:*4*, 5 27:*18*, *21*, *23*, *25* 28:5 29:6 30:6 31:*25* 33:*25* 34:5, *23* 42:*16* 43:*11*, *25* 44:7 45:*13* 50:*25* 54:*19* 55:*21* 63:5, *16* 64:*13*, *22* 67:*11*, *12* 68:*12* 69:*24* 73:*3*, *19* 77:5 79:5 81:22 83:*11*, *12*, *22* 87:*3*, 9, *11* 88:*24* 90:*18* 98:9 100:*14* 101:*24* 104:2 107:*18* 109:7, *13*, *17* 110:7 116:*15* 123:*17*, *19* 128:*14*, *21* 129:*4*, 6, *7*, 8 130:*24* 131:*12*, *13* 132:*25* 135:*3* 141:22 142:*1* 147:7 150:*24* 151:*16*, *17*, *21*, *24* 154:*17* 166:*19* 174:*4* 181:*17* 187:*15*, *22* 188:*18* 191:*23* 195:*21* 196:*19* 198:*16* 199:*3* 212:8 220:*24* 228:*18* 229:*1* 246:*16* 249:22 250:*12* 251:*2*, *10* 255:*19* 256:*11*, *12* 259:*14*, *16* 260:5

**believed** 66:2 71:8 193:8

**belt** 246:*15*

**beneath** 245:22

**beneficial** 149:22

**benefit** 232:*25*

**benefits** 82:*15*

**best** 19:*13* 50:25 86:*3*, 7 87:*20*, *23*

103:6, 7 106:5 107:*18* 132:*23* 138:*25* 142:2 145:*1* 151:*25* 152:*3* 169:*14* 174:*24*, *25* 199:*23* 242:*6* 243:*17*, *18* 245:*13* 263:*11*

**better** 118:*8* 133:2 136:2 143:*17* 184:*3* 247:9, *24* 248:2, *15*, *17*

**beyond** 62:*18* 66:*18* 72:*17* 73:*19* 166:*21* 185:*11*

**bias** 157:*20* 158:2 159:*4*, *11*, *13*, *18* 161:7 170:*1*, 9, *17*

**biases** 156:*11*, *24*

**big** 80:*11* 186:*11*

**bigger** 133:*10* 138:*1*, *16* 201:6 238:22

**bio** 10:*16*, *17* 11:*17*, *18*

**bit** 121:*13*, *19* 164:*20* 179:22

**black** 165:6, *18*, *19* 166:*12*, *13*, *23* 167:2, *24*, *25* 168:*11*, *12* 169:*18* 173:*12*

**blame** 139:*3*

**Blank** 2:*11* 5:*8*

**blatant** 93:*12*

**blocker** 238:*13*

**board** 11:*13*, *20*, *24* 12:*1*, 5, *17*, *21*, *25* 13:6, *7*, *14*, *23*, *24* 14:*1*, 2, *3*, 7, *8*, *13*, *15*, *17*, *18*, *21*, *22*, *25* 15:*3*, 7, *8*, 9, *10*, *13*, *14*, *17*, *20*, *22*, *23*, *25* 16:*10*, *13*, *22*, *23*, *25* 17:*3*, 5, *8*, *23* 18:*1*, 2, 8, *20* 19:*4*, 6, *10*, *11*, *14*, *15*, *19* 20:*17*, *18*, *20*, *21*, *24* 21:*1*, *12*, *16* 22:*18*, *21*, *25* 23:2, *8*, *21* 24:*4* 25:9, *11* 32:*19* 48:*21* 49:5, *16*, *17*, *18*, *21*, *22* 50:2, *11* 52:*23* 53:*14*, *16*, *17* 54:*4*, 6,

Case: 1:21-cv-00238-MRB Doc #: 66-3 Filed: 08/02/24 Page: 80 of 114 PAGEID #: 2857

Deposition of Gregory Carmichael, Volume I      Philip R. McHugh v. Fifth Third Bancorp, et al.

*9* 59:25 60:2 61:*4, 5, 9* 64:8, *14, 23* 65:*11, 13* 66:5, *16* 71:*13, 14, 18, 19, 20* 86:8 87:*12* 91:*11* 97:25 100:*3, 12, 17, 22* 101:*15, 19, 22, 25* 102:*1, 6, 13* 103:*1, 3, 9, 18, 19, 25* 104:8, *21* 105:6, *7, 12, 23* 106:*3, 5, 6, 10, 14, 15, 16, 25* 107:*4, 9, 11, 12, 13, 17, 18* 108:2, *6* 126:*16* 142:*21* 143:*23* 152:*19, 24* 153:2, *4, 12, 22* 154:*7, 14, 23* 156:*12* 157:*4, 5, 24* 172:*11, 13, 20* 180:*16, 18* 181:*1, 22* 182:8, *10* 183:*1, 6, 12* 184:*3, 15* 185:*12, 15, 20* 186:*10, 23* 187:5, *22* 189:*5, 15* 190:*12, 13, 22, 23* 192:2, *3, 8, 9, 14* 193:*5, 8* 194:2, *16* 196:*12* 204:*13* 205:*1* 206:*19* 207:*18* 208:*1* 209:*8* 211:*20, 21* 212:*10* 213:*3* 215:*11, 13* 216:*14* 223:*16, 25* 224:*20* 227:*24* 228:*13, 18* 229:*7* 230:*3* 232:*5, 6* 237:*12* 242:*23* 243:*15, 16, 19, 21, 24* 244:*2, 10* 245:*18, 21* 252:*13* 253:*7, 22, 24* 254:*22* 255:*2, 13, 21, 22, 25* 256:*21* 257:*3, 4, 5, 10, 11, 13, 17, 22* 258:*6, 10, 13* 259:*6, 13, 15, 17, 22* 260:*3, 19, 23* 261:*5, 7*

**board's** 49:*6, 13* 50:*17, 23, 24* 51:*10* 52:22 53:*11* 54:9 58:*14, 17* 64:9 66:*3, 5* 91:8, *13* 100:6, *9* 102:*3* 104:*12* 106:2, *20* 180:9, *14* 181:2 182:*3* 185:*17* 187:*25*

191:*15* 211:*24* 224:*5* 234:8 237:8

**boasted** 162:22 163:5
**boasting** 163:9
**boasts** 169:*20*
**Bob** 8:*16* 9:*3* 18:*12* 19:*1, 22, 25* 20:*1, 4, 5, 8* 23:*10* 28:21 34:*18* 36:*3, 5* 37:*11, 12* 43:*5, 13* 46:*4, 7, 11, 13, 16, 17, 22* 47:*3* 51:8 67:*12* 70:*1, 17* 71:2*1, 25* 78:5 79:*16* 84:*3* 179:*1, 3, 14* 181:*6, 15* 186:*6* 188:*4, 8, 12, 14, 15, 18, 20, 23* 194:*3, 5, 10, 20, 21, 22, 24* 195:*6, 13, 16, 19, 25* 196:*1, 3, 6, 7, 8* 201:*24* 202:*1, 10, 17, 20* 204:*19, 20, 23* 220:*9, 17, 22* 225:*22* 226:*21* 227:*1* 228:*9, 10* 229:*2, 4* 231:*4, 25* 232:8 234:7 237:*12* 240:*24* 241:*21, 24* 242:*16* 253:*15* 254:*5, 7, 14, 23* 257:*19*
**Bob's** 20:*2* 188:*1, 19* 194:*13*
**bonus** 75:*4, 6*
**bottom** 36:2*1, 24*
**box** 125:*18* 221:22
**Bradley** 150:*24* 198:*16*
**branch** 145:*13*
**branches** 137:*21*
**breadth** 149:*10*
**break** 18:*16* 108:*10* 114:*12* 201:8 203:2, *8* 205:*24*
**breakdown** 219:*2*
**breaking** 133:*1*
**Brian** 2:*17* 5:*9* 227:*15, 22, 23* 229:*3, 6, 10* 243:*7* 252:*19, 20*
**Brian's** 228:2*0*
**bring** 19:2*1* 42:*4* 51:*7* 74:*1* 94:*6*

103:*20* 120:*3* 145:*10* 149:*7* 157:*11* 158:*14*
**bringing** 51:*3* 96:*21* 150:9 181:*14* 209:*13, 18* 210:*10* 240:6, *7* 248:*9, 10* 249:*3* 251:*23* 252:*1*
**brings** 146:*19* 251:*14*
**broke** 27:20
**brokerage** 137:*13*
**brother** 168:*25* 169:*13*
**brought** 35:*19* 54:20 55:*2* 65:*15, 19* 66:*13* 97:*1* 100:*1* 102:*5* 103:*24* 109:*23, 24* 110:*5, 12* 124:*5* 134:*7* 156:*9, 18, 20, 25* 157:*3, 14, 22, 23* 158:*1, 7, 11, 15* 159:*3* 171:*19* 180:*4* 185:*10* 190:*4, 9* 236:*19* 239:*13, 15* 241:*14* 249:*5, 13* 250:*5* 251:*7, 16, 20*
**Brumback** 152:*18, 22* 153:*11, 22, 25* 154:*1, 9* 187:*23*
**Buffet** 172:*6*
**build** 39:*20, 22* 40:*12, 14, 21* 41:*18* 47:*8*
**building** 100:*8* 137:*20*
**bullet** 149:*2, 24* 152:*1*
**bullying** 159:*24*
**bus** 209:*7, 25*
**business** 9:*19* 21:*16* 25:*2, 13* 82:*6* 101:*25* 103:*6* 109:*6* 113:*9* 117:*1, 9* 128:*11* 133:8 134:*20, 25* 135:*3* 136:*7, 11* 137:*13, 24* 138:*3, 4, 11, 14, 23* 139:*6* 141:*3, 25* 144:*17* 145:*10* 148:*11* 150:*2, 16* 151:*2, 3* 175:*4, 10, 15* 176:*3, 25* 177:*5*

182:*17* 190:2*1* 198:*6, 13, 14, 21, 22* 199:*9*
**businesses** 13:*19* 25:*17* 77:*13* 145:*9, 20* 147:*11* 198:*19*
**Butera** 240:*1*
**buying** 197:*12*

**< C >**
**Cabin** 194:*5, 11* 196:*4, 21, 24*
**calculated** 121:*1, 10, 17* 131:*23* 133:*14*
**calendar** 16:*1, 11* 17:9 84:*17* 177:*13* 179:*6, 8* 256:*17*
**calendar-based** 15:*18*
**call** 13:*17* 20:2*1* 57:*2, 25* 58:2*1, 25* 104:*16, 18* 105:*7* 106:*12* 152:*17* 162:8 181:*2* 199:*20* 212:*13* 221:*23* 232:*19* 240:*14*
**called** 16:*16* 50:*11* 91:*10* 110:*4* 111:*24* 123:*19* 171:*12* 172:22
**Calls** 33:*17* 54:*2* 62:*3, 13* 167:*17*
**Canada** 10:*3, 4, 6*
**candidate** 65:*22* 107:*19*
**candidates** 108:*3*
**Cap** 21:*3*
**capabilities** 101:*2*1* 102:*6* 149:*11* 172:*11* 175:*2* 190:*16* 217:*17* 222:*18* 224:*21* 233:*11* 234:*12* 239:*2*
**capability** 235:*13*
**capable** 202:*7* 233:*16, 21*
**capacity** 44:*15* 187:*5*
**capital** 16:*5* 19:*1, 25* 22:*19* 26:*2* 28:*11, 17* 32:*6* 127:*2* 158:*11* 179:*5* 204:*19* 216:*10* 230:*14* 234:*7* 242:*24* 244:*11* 252:*14*

Case: 1:21-cv-00238-MRB Doc #: 66-3 Filed: 08/02/24 Page: 81 of 114 PAGEID #: 2858
Deposition of Gregory Carmichael, Volume I
Philip R. McHugh v. Fifth Third Bancorp, et al.

253:*17*, 21  254:*24*
259:7
**Caption**  264:*3*
**captioned**  264:*8*
**card**  137:*24*  214:*9,
17*, *20*  215:*1*, *13*
216:*3*  218:*8*  221:*11*
222:*9*, *10*  224:*14*, *16*
225:*16*  226:*5*, *8*
244:*24*  245:*17*
**cards**  18:*21*  19:*22*
215:*9*  216:*5*, *8*
**career**  34:*15*  80:*17*
81:*8*, *20*, *21*  102:*15*
105:*14*  110:*11*  143:*7*
190:*3*  235:*5*, *7*
**careers**  238:*23*
**Carmichael**  1:*15*  3:*3*
4:*3*  5:*12*, *19*, *21*  7:*11*
10:*13*  28:*18*, *22*
29:*11*  32:*19*  36:*18*
37:*5*  61:*20*  84:*21*
88:*19*  89:*11*  91:*9*
96:*5*  106:*7*  107:*2*
110:*17*  113:*15*
114:*24*  120:*7*  123:*2*
124:*20*  127:*8*  130:*3,
7*  132:*6*  140:*8*
152:*11*  155:*13*
163:*13*, *15*  166:*10*
176:*20*  177:*10*  194:*6,
25*  201:*19*  204:*2*
206:*7*  212:*22*  215:*9*
223:*12*  230:*7*  242:*19*
244:*6*  249:*3*  252:*9*
253:*11*  254:*19*  259:*2*
260:*14*  262:*12*
264:*19*  265:*24*
266:*24*
**C-A-R-M-I-C-H-A-E-
L**  5:*21*
**Carmichael's**  88:*3*, *22*
**Cary**  250:*10*, *11*
251:*4*, *5*
**CASE**  1:*7*  4:*4*, *7*
6:*15*  7:*20*  8:*1*, *13*
28:*16*  42:*16*  66:*5*
81:*10*  94:*12*  113:*22*
116:*10*  121:*2*  129:*8*
143:*3*  152:*22*, *23*, *25*

153:*10*, *15*  160:*24*
187:*15*  207:*13*, *14*, *16*
208:*19*  209:*4*, *11*, *19*,
*20*  234:*5*  235:*1*, *14*
264:*3*
**cases**  13:*9*  148:*11*
248:*19*
**cast**  247:*12*
**casual**  179:*20*
**categories**  239:*2*
**categorize**  241:*2*
**category**  226:*14*
240:*24*
**cause**  182:*24*  209:*2*
**caused**  90:*19*  180:*12*
207:*1*
**cell**  37:*10*, *11*, *15*
**Center**  1:*19*  2:*12*
88:*2*  138:*15*
**Central**  9:*22*
**CEO**  11:*1*  12:*8*, *11*,
*15*  13:*14*  14:*13*, *17*
15:*5*, *6*, *7*, *8*, *9*, *11*, *19*,
*20*, *21*  16:*19*, *25*  17:*1*,
*4*, *6*, *12*, *18*  18:*3*, *4*, *9*
24:*21*  26:*25*  27:*4*
28:*5*, *6*  30:*25*  34:*3*
43:*16*  44:*3*  49:*18*
50:*16*  51:*2*  53:*1*
54:*25*  55:*12*  57:*23*
58:*13*  59:*5*  60:*8*, *10*,
*18*, *23*  61:*11*  63:*22*
64:*6*, *12*, *15*, *24*  65:*12*,
*20*  66:*4*  67:*1*, *19*
69:*25*  70:*9*, *24*  71:*5*,
*6*  81:*23*  83:*21*  91:*2*,
*12*  97:*10*, *11*  98:*3*, *11*
99:*20*  100:*4*, *7*, *15*
101:*3*  102:*2*, *15*
103:*4*, *11*, *13*  104:*3*, *5*,
*22*  106:*1*, *6*  107:*1*, *16*,
*21*, *22*  109:*10*  112:*15*
113:*9*  122:*14*  124:*10*
125:*8*, *14*, *23*  126:*14*,
*15*  132:*16*  142:*15*, *25*
147:*17*, *18*  153:*6*, *24*
154:*9*  157:*12*, *17*
178:*15*, *20*  180:*20*
183:*9*  184:*4*, *13*, *18*,
*24*  185:*4*, *7*  186:*19*

187:*8*, *20*  189:*11*, *13*
191:*10*, *15*, *18*  192:*4*,
*5*, *15*, *24*  193:*1*, *2*, *11*,
*14*, *15*, *19*, *22*  194:*7*
195:*2*  206:*10*  211:*15*,
*22*, *25*  212:*7*  215:*18*
216:*19*  219:*15*, *18*
221:*19*  222:*25*  223:*4*,
*7*  225:*20*  226:*11*
227:*9*  228:*1*, *21*, *25*
229:*3*, *13*, *21*, *22*
234:*21*  235:*1*, *17*, *21*
236:*2*, *23*  237:*4*, *6*, *7*,
*8*, *19*, *25*  238:*1*, *18*
241:*21*  243:*6*, *13*, *19*,
*21*  245:*22*  246:*17*
247:*23*  252:*17*
259:*21*  260:*2*  261:*11*,
*17*
**CEO/president**  27:*19*
212:*6*
**CEOs**  53:*3*  190:*20*
**CEO's**  225:*19*  243:*2*
**certain**  15:*9*  26:*13*
76:*15*  152:*2*  159:*18*
174:*18*, *19*  182:*24*
209:*14*  221:*22*
**Certainly**  89:*21*
140:*1*  259:*25*
**certainty**  221:*1*
**certified**  5:*14*
**certify**  263:*7*
**cetera**  209:*7*
**CFO**  76:*16*
**CFPB**  133:*19*  134:*1*,
*4*, *11*  135:*24*
**chair**  10:*7*  12:*2*
13:*24*  21:*2*, *3*  23:*12*
46:*6*  154:*20*
**chaired**  154:*4*
**chairman**  11:*1*
12:*17*, *21*, *24*, *25*  13:*2*,
*3*, *4*, *6*, *8*  14:*10*, *15*, *17*
15:*12*  32:*19*  43:*22*
44:*1*  49:*22*
**chairs**  23:*8*, *18*
**challenge**  186:*11*
200:*6*
**challenged**  99:*7*

**challenges**  118:*12*
125:*19*  136:*8*  139:*7*
151:*4*  200:*18*
**challenging**  200:*2*
**chance**  38:*3*  71:*23*
158:*13*  195:*22*
210:*16*
**change**  24:*16*  86:*6*,
*21*  87:*23*  105:*24*
117:*22*  121:*13*  128:*6*,
*11*  143:*3*  176:*13*
226:*22*  232:*8*  243:*25*
247:*5*  252:*24*  265:*4*,
*7*, *10*, *13*, *16*, *19*, *22*
266:*4*, *7*, *10*, *13*, *16*, *19*,
*22*
**changed**  12:*24*  15:*6*
74:*11*  133:*3*  176:*15*
225:*15*  226:*9*  227:*2*
247:*1*
**changes**  5:*3*  32:*14*
117:*16*  128:*13*
200:*17*  205:*19*
226:*17*  231:*15*, *20*, *24*
264:*11*, *14*
**changing**  128:*7*, *8*
**character**  164:*22*
**characteristics**
227:*25*  241:*12*
**characterization**
170:*4*
**characterize**  162:*2*
**charge**  129:*5*
**Charlie**  150:*24*
198:*16*
**chart**  26:*5*  187:*18*
252:*17*, *18*
**Chase**  229:*12*
**check**  73:*15*
**check-in**  178:*2*
182:*15*
**chest**  161:*22*  163:*7*,
*11*, *24*
**Chicago**  137:*18*
150:*3*, *10*  202:*3*, *13*
**chief**  10:*23*, *24*  22:*25*
24:*12*, *15*, *18*, *19*, *20*
26:*3*  28:*10*, *13*, *19*
32:*18*  43:*5*  84:*4*
127:*19*, *21*  131:*1*, *12*,

Case: 1:21-cv-00238-MRB Doc #: 66-3 Filed: 08/02/24 Page: 82 of 114 PAGEID #: 2859

Deposition of Gregory Carmichael, Volume I      Philip R. McHugh v. Fifth Third Bancorp, et al.

*15* 133:*1* 149:*13*
153:*16* 183:*13*, *19*
203:*5*
**Chris** 249:*18*, *19*, 20,
*21* 250:*7*
**Cinci** 36:*10* 38:*4*, *21*
**Cincinnati** 1:*20* 2:6,
*13* 7:*7* 31:*17* 33:*1*, 4,
*7* 34:*4*, 6 35:*4*, 20
38:*15* 41:*13*, 25 42:4,
*7* 43:*16*, 20, 22 44:*1*,
*4*, *5* 45:*12* 80:*23*
110:*5* 141:*7*, 9
263:*13*
**Cincinnati's** 34:*10*
**CIO** 149:*17*
**Cioffi** 2:*8* 4:*14*, 23
5:*3*, 6, 7 8:*18*, 21, 23
29:*23* 30:2 33:*17*, 21
39:*8* 44:*20* 47:*1*, *24*
50:*4* 51:*15*, 25 52:6,
*9*, *11*, *17* 54:*1* 57:*6*,
*18* 59:6, *13*, *18*, 21
62:*3*, *13*, *17*, 21 63:*8*
64:*16* 65:*1*, 25 70:*10*,
*14* 76:2 78:*16*, 24
80:*5*, *8* 87:6 89:*7*, *15*
90:*6* 91:*17* 92:*5*, *17*
93:*1* 94:*23* 95:*3*, 8,
*21* 96:*1*, 6, *17* 97:*3*
98:*14* 100:*18*, 23
103:*15* 104:*24*
105:*17*, 22 106:*14*, 19
107:*3*, 7 108:*9*, *17*
112:*3* 114:*5*, *11*, *14*
125:*6*, 25 129:*17*, 25
131:*20* 138:*20*
139:*13* 154:*10* 158:*3*,
*9* 160:*22* 164:*15*
165:*7*, 20, 25 166:*3*
167:*4*, *16*, 20 168:*2*,
*18* 170:*2*, *11*, *18*, 21
171:*2* 173:*2*, 6 175:*6*,
*16* 176:*5*, *11*, 16
191:*22* 195:*3* 205:*23*
206:*12* 209:*3*, *12*, 21
210:*5* 212:*18* 213:22
214:*2*, *19* 215:*4*
218:*6* 226:*18* 230:*10*

240:*18*
**Cioffi's** 92:*23*
**circle** 113:*1* 141:*1*
144:*23* 145:6 146:*3*,
*4*, 6 161:*20* 162:*12*
163:*19* 250:*1*
**circled** 188:*8* 195:*21*
**circulated** 226:*25*
**circumstances** 165:*9*
167:*6*, *10*, *14*, *23*
168:*10*, *13*, *15* 169:*4*
**claim** 6:*8*, *10*, *11*, *13*
29:*5* 30:*6* 79:*13*
89:*14* 90:*3*, *5* 95:*18*,
*25* 96:*1*, *20*, *21*, *25*
97:*21*, 22 99:*20*
236:*6*
**claiming** 89:*25* 91:*4*
95:*24*
**claims** 28:*24* 30:2
91:*3* 93:*12* 94:*6*, *14*,
*20*, *22*, 25 95:*1*, *17*, *19*
96:*23*, 25 97:*8*, *15*, *19*
98:*5*, 8 99:*15*, *17*, *19*
100:*1*
**clarification** 22:*3*
23:*19* 136:*4* 158:*9*
173:*3*
**clarify** 12:*4* 27:*10*
29:*23* 170:*23*
**clarity** 119:*4* 141:*9*
177:*2* 232:*4*
**class** 62:*7* 159:*23*
175:*22*, 24
**classification** 48:*12*
61:*24* 62:2
**clear** 7:*3* 40:*1*
44:*18* 52:*18* 67:*25*
68:*2* 73:*4* 76:*10*
89:*18* 107:*9* 119:*2*
134:*24* 158:*4*, *10*
173:*18* 176:*16* 189:*3*
222:*23* 237:*13*
257:*10* 260:*25*
**clearer** 108:*8*
**clearly** 92:6 118:*22*
188:*23* 189:*14*
193:*23*
**clever** 171:*14*

**client** 149:*3*, 8, *18*, *19*
**clients** 149:*3*
**close** 153:6 197:*10*,
*13* 205:*11* 228:*24*
**closed** 197:*8*, *13*, *25*
**closely** 20:*24* 123:*14*
**clubs** 74:*8*
**clue** 54:*10* 126:*5*
216:*11* 217:*12*, *15*
230:*4*
**clunkiness** 200:*22*
**coach** 222:*17* 226:*15*
239:*3*, *7*, *9* 240:*4*, *17*,
*22* 241:*2*, *3* 249:*4*
251:*19*
**coaching** 31:*3*
119:*17*, *21*, *23*, *24*
120:*4* 143:*9* 171:*1*, *2*
**collaborates** 139:*6*
**collaborative** 139:*19*
**Collin** 5:*8*
**color** 166:*15*, *16*
168:*23* 169:*16*
**combined** 26:*23*
31:*20*
**come** 20:*22* 32:*3*
46:*2*, *25* 57:*1* 81:*5*
88:*8*, *15* 116:*7* 119:*6*
124:*5* 157:*18* 179:*11*
195:*21* 197:*3* 205:*25*
216:*23* 218:*16*
236:*13* 257:*11*
258:*21*
**comes** 80:*21* 175:*3*
182:*14*
**comfortable** 51:*6*
183:*9*
**coming** 16:*22* 50:*8*
60:*13* 81:*2* 118:*14*
121:*19*
**command** 147:*11*
**Commencing** 1:*18*
**comment** 68:*20* 97:*8*
112:*20* 159:*23*
160:*10* 168:*24* 169:*2*
173:*8* 184:*23* 256:*22*,
*23* 257:*21*
**commenting** 173:*11*
**comments** 47:*15*, *19*
68:*13*, *15*, *16*, *17*, *19*

80:*25* 99:*5* 113:*7*
116:*12*, *13*, *14*, *17*
122:*3*, *18* 135:*7*
136:*23* 141:*15* 163:*9*,
*16* 182:*16*
**commercial** 108:*21*,
*23* 109:*7* 145:*9*, *11*,
*20* 151:*3*, *8*, *18*, *19*, *22*
198:*20*, *21*, *23* 199:*8*
200:*1*, *5*, *6*, *19* 202:*23*,
*25* 203:*10* 218:*12*
222:*13* 226:*10*
232:*19* 245:*5*, *9*, *25*
246:*6* 247:*2*, *8*
**Commission** 263:*18*
**commissioned** 263:*6*
**committed** 138:*24*
141:*25* 185:*16*
**committee** 21:*3*, *4*
22:*15*, *22* 23:*8*, *17*, *18*
41:*11* 127:*3* 154:*2*, *6*,
*20*, *24* 157:*1*, *23*
158:*15*, *17* 164:*3*, *12*
178:*11*, *15*, *18* 179:*2*
234:*19* 250:*8* 256:*8*,
*13*, *14*, *15*, *19* 257:*20*
258:*5*
**committees** 15:*1*
153:*25* 154:*3*, *16*
155:*3*, *4* 256:*11*
**common** 21:*4* 99:*12*
**communicate** 55:*24*
78:*3* 79:*19* 205:*1*
**communicated** 20:*14*
21:*22* 23:*4* 32:*15*
36:*6* 68:*10* 74:*19*
77:*4* 188:*15* 194:*10*
206:*8* 220:*13* 228:*9*
**communicating** 79:*7*
136:*11* 153:*19*
**communication** 9:*12*
22:*1* 23:*2* 24:*3*
79:*16* 84:*3* 117:*3*
119:*10*, *11* 120:*1*, *2*
**communications** 9:*7*,
*13* 14:*1* 45:*10* 186:*1*
**community** 35:*3*, *5*
94:*16* 112:*13*
**companies** 51:*5*
199:*24*

**company** 6:4, 5, 9
10:8 13:9 34:5 39:6
53:1 55:13 70:21
72:22 73:11 74:3, 12
76:1, 7, 12 82:10
86:3, 7, 13, 14, 17
87:10, 11, 24 88:12,
14, 16 90:21 94:7, 8
98:4, 25 99:1, 21
100:1, 15 106:5
108:20 113:11 122:1,
12, 22 132:3, 17
133:10 134:22
137:11 138:13, 25
142:2, 6 145:8 147:2,
6 153:18 156:4, 20,
23 157:9, 17 158:5,
20 174:25 183:9, 24
184:25 190:2 191:1,
10 193:11 211:25
217:2 235:2, 19
238:10 239:1, 12, 16
241:18 243:21 249:7,
11, 22
**company's** 87:14
117:21
**compare** 261:21
**compared** 231:15
**comparing** 215:20
**compensated** 76:25
78:12 82:1
**compensation** 22:19
31:20 32:5, 7, 13, 15
72:20 73:19, 25 74:6,
17 75:5, 14, 16, 18
77:1, 5 79:6, 14, 15
80:4 81:6, 9, 13
82:14
**competencies** 112:12
123:6, 9 131:4
**competency** 123:10
190:11
**competent** 82:3
**competing** 189:22
**competitor** 189:20
**competitors** 103:23
189:19 236:22
**complaint** 29:17
88:24

**complete** 16:21
21:19 24:5 263:10
**completed** 61:9
115:8, 11 120:19, 22
**Completely** 65:1
90:17 169:2 209:15
230:2
**completing** 144:9
191:7
**compliance** 22:23
131:1 139:17
**compliment** 160:20
164:22 169:25
**computer** 9:18
**conceal** 50:1 54:15
**concealing** 50:2
**concern** 182:24
207:24 258:20, 23
**concerned** 65:14
162:14 186:25
**concerns** 14:8 144:1
181:8, 10
**CONCLUDED**
262:18
**conclusion** 62:4, 14
93:2, 5, 8 169:23
**conditions** 168:3
**confer** 67:17 220:10
**conferred** 66:23
69:24
**confidence** 124:15
**confidential** 4:24
102:19 124:24
**confirm** 183:5 186:6
194:15 196:9 261:24
**confirmation** 53:6, 7
197:6
**confirmed** 188:17
194:18
**conform** 200:13
**confuse** 257:10
**confused** 135:18
136:22 215:6 229:23
**connected** 36:10
38:14, 20 39:15 40:7
43:24
**connection** 39:23
**connectivity** 39:20
40:3, 5, 21 43:23
44:5 47:8 257:4

**consensus** 100:8
108:6
**consider** 66:16, 18
94:25 165:11 172:3,
4 174:23 211:1
228:19 245:24
**consideration** 97:14
106:3 180:10 205:3
229:13
**considerations** 144:1
**considered** 14:23
56:21 60:7, 11, 15
61:4 63:22 67:15
97:12 98:3 146:22
180:9, 16 181:20, 24
182:2 183:6 185:19
193:2, 15 196:10, 11
206:18, 21 228:17
237:1
**considers** 97:22
**consistency** 42:2
205:2
**consistent** 139:18
203:11 217:8 220:4,
11, 12, 14 223:24
230:20, 21 232:5
233:6 248:2, 9
**constitutes** 62:11
159:21 255:16
**consult** 243:24
**consulted** 244:2
**consumer** 70:20
71:1 72:10, 18 73:7,
8, 11, 21, 23 74:1
76:24 77:15 78:2
80:4 82:6, 17, 19
84:22 85:24 86:1, 23
88:4 113:12 134:21,
25 135:15, 17, 19, 23
136:7, 16, 20, 23, 24
137:1, 5, 9, 11, 18, 24,
25 138:8, 9 145:9, 19
151:2, 5, 6, 7, 14
198:21, 22 199:25
201:10 225:6, 8, 10
239:25
**consumer-focused**
135:21, 22
**contact** 20:9 21:1

**contacted** 254:15
**contemporaneous**
79:11
**context** 19:4 52:1
**continue** 13:12
104:10 116:25 117:6,
11, 13 118:17, 24
133:22 134:5 135:25
136:2 147:24 148:8
184:1 246:8, 19
**continued** 72:18, 20
75:18 133:25 171:15
**continues** 105:7
112:21 134:2 143:16
221:17 222:11 223:3
248:8, 13
**continuing** 107:13
**continuity** 45:22
**contradiction** 39:10
210:8
**contrary** 39:4 257:1
**contribute** 198:25
**contributes** 147:7
**control** 100:12
162:17 220:16
256:20 257:16, 21
258:6, 12
**controlling** 257:6
258:9
**controls** 133:22
**conversation** 8:13
21:13 23:15 34:1, 2
35:18 40:8 43:6, 15
44:10, 24, 25 45:1
46:3, 4, 7, 14, 15, 16,
19 47:6, 11, 13, 21
48:3 53:12 56:9, 13,
16, 23 57:5, 13, 15
58:2, 4 60:5, 9, 19, 20,
24 61:1, 10 64:8
69:2 71:10 75:10
77:10, 19 78:5 83:5,
9 87:3 88:10 178:2
179:8 180:8 181:6, 7
184:20 185:6, 12
186:8 187:3 188:4,
10, 12, 15, 17 193:12
194:3, 10, 13, 18, 22
195:6, 9 196:2, 3, 6,

257:19

17, 19, 23  197:1, 6
202:16, 19  209:15, 17
210:9  211:7, 21
217:7  220:22, 23, 25
237:1, 5  256:3, 25
257:14  258:3
**conversations**  8:10,
16  9:6  15:12  19:15
21:10  22:25  23:1
43:12  46:21, 25
47:19  53:19  55:17
58:7, 19  59:2  67:20,
24  69:18, 19  70:3, 5,
7, 18  79:11  84:6, 10,
11  97:10  154:8
179:24  181:14
188:21  195:11  202:4
205:3, 21  220:17
223:24  224:3  228:11
230:3  255:24
**COO**  26:7, 8, 10, 21,
22, 24  27:1, 2, 7, 11,
15, 24, 25  28:2, 3
129:2  226:11
**COO/president**  27:20
**coordinated**  14:5
15:18  16:10
**cop**  201:6
**copy**  204:8  230:10
253:16  254:23
**copying**  254:22
**core**  53:5  112:10
139:20, 22  140:3
151:21  190:10  199:8,
9, 10, 15, 18  200:1
202:23, 25
**corner**  36:22, 25
**corp**  151:21  232:22
261:1, 2, 8
**corporate**  14:19
144:21  149:7, 9
212:15
**corporation**  28:12
138:17  147:19
149:23
**corral**  23:2
**correct**  10:2  11:4, 5,
8, 12, 14, 23, 25  12:6,
10, 12, 13, 15, 16  13:1,
2  14:14  19:12  24:13,

14  27:7, 13, 14  30:7,
16  31:17, 22, 25  32:9,
22, 23  33:1, 2, 5  34:2,
9  37:8  38:9, 16
42:15  47:3  53:15
72:5  74:16  79:12
105:16, 21  106:10
110:24  111:5, 13, 14,
16  112:24  113:4, 6, 7,
23  115:12, 13  116:15,
19  120:17, 18, 21, 24
121:7  127:15, 23
129:4  130:4, 17
131:13, 19  132:13, 19
135:1  137:2, 6, 7
139:9  141:18, 20
142:15  172:14  174:6
194:1, 2  197:9, 18
198:4  201:1  202:20
203:15  204:13, 14
205:17  206:11
212:20  213:20
214:10  215:25  216:3,
7  219:18  220:15
222:9  223:1, 9  224:9,
15, 21, 22, 23  226:7
227:3, 10, 11, 14, 16,
17, 20  236:9  242:4
243:4  245:1  255:13,
19, 23  261:1, 6
**correction**  110:22
**corrections**  264:11
**correctly**  232:18
**counsel**  4:8  8:20, 24,
25  9:4  11:15  33:18
44:20  51:16  59:7
62:18  89:19  92:1
96:8  108:9  114:11
153:21  165:25
167:16  173:2  176:5
196:19  205:23  209:3
212:18  213:22
214:19  215:3  218:17
225:18  230:10  262:2
**counsel's**  8:21, 22
**counterclaim**  28:23
29:3, 7, 14, 18, 21
30:6  45:15  61:21
66:22  71:12  72:9
75:12  77:8  78:15

79:10  89:12, 16, 17
90:6, 10  91:20  92:6,
18, 25  95:4, 5, 9  97:4
**counterpart**  23:9
**country**  74:8  145:24
175:23
**counts**  102:10
**COUNTY**  263:3
**couple**  83:13  162:25
176:21  178:23, 24
211:23  220:21
223:22  231:16
235:25  254:2
**course**  21:16  69:7
176:16
**COURT**  1:1  4:4
6:20  88:22  89:3
92:19
**court's**  59:8
**cover**  219:14
**covered**  15:17  134:23
**create**  75:1  80:18, 19
96:15, 16  245:13
**creates**  200:16
**credit**  23:1  24:17, 19,
20  137:24  199:11, 17
200:19  202:5, 23
203:5
**criteria**  235:9  241:8
242:3, 12
**critical**  112:22  192:5
248:13, 20
**criticism**  191:24
192:12
**criticisms**  191:20
**crystal**  189:3
**crystallized**  141:12
**CSRs**  145:12
**cultivates**  251:14
**cunning**  171:14
**current**  151:3  187:2
237:21  244:17, 19
252:25
**Currently**  4:18  7:11
249:10  250:7
**curriculum**  174:10
**Customer**  140:2
**customers**  138:15
200:9, 13

**customizations**  200:10
**customized**  200:7, 12
**cut**  225:24

< D >
**damage**  90:19  93:10
**damages**  89:12
90:25  91:16, 21, 22,
24  92:4, 7, 10, 15, 24
93:9  94:1  96:22
**dashboards**  25:9
**data**  16:6  100:11
117:23, 24  118:1, 17,
21  131:14  205:11
214:12  223:23  224:2,
8, 21  257:16  258:14
**database**  53:3
**data's**  230:21
**Date**  1:17  83:9
101:13  109:1  159:5
177:18  231:5  254:4
255:3  262:14  264:2
**dated**  111:15  213:9
**dates**  110:13  162:10,
11
**day**  16:12  19:3  25:1
48:20  59:9  63:21
64:1  71:9  75:14, 15
79:5  80:21  81:21
83:18, 21  88:11
90:22  91:3  94:5, 17
101:22  117:12
166:17  171:10, 17
172:3  193:5  195:21
196:25  209:6  215:18
228:17, 19  239:8
263:14  264:16
**days**  83:13  196:25
211:3  255:15
**Dayton**  9:21
**DDI**  123:6, 8, 19, 20
**deal**  197:25
**dealing**  87:2  197:23
**debated**  238:13
**decade**  251:25
**decades**  238:7, 8
**deceitful**  162:1
**December**  17:7, 22
18:6, 9  48:18  49:21
50:12  106:10  107:6

180:*17*   204:6, *14, 16,*
*22*   206:*23*   210:*18*
253:*22*   256:8   259:*8,*
*23*   260:*3, 19, 24*
**decide**   50:*2*
**decided**   74:*20*   76:*23*
142:*21*
**decision**   19:*11*   49:*6,*
*13, 17*   50:*13, 23*   51:*2*
53:*8, 11*   54:*9*   58:*14,*
*15, 16, 17*   59:*25*   61:*5*
63:*7, 9, 18*   64:*14*
66:*3, 5, 6, 10*   78:*1*
85:*22, 23*   91:*6, 8, 11,*
*13*   97:*25*   100:*9*
101:*21*   104:*12*
105:*22*   106:*15, 17, 25*
107:*5, 10, 11, 13*
108:*2*   132:*25*   139:*16*
142:*21*   143:*22*
148:*19*   174:*23*   175:*2*
182:*3*   184:*4*   185:*17*
188:*1*   216:*7*   245:*10,*
*22*   256:*16*
**decisions**   60:*2*   63:*2*
64:*2*   99:*1*   100:*13*
102:*9*   103:*3*   118:*12*
139:*17*   146:*20*
159:*17*   174:*17*
199:*17*   203:*9*   245:*22,*
*23, 24*
**deck**   101:*11*   124:*14*
204:*17*   205:*11, 19*
212:*5*   214:*1*   215:*9,*
*11, 21, 23*   217:*4*
219:*6*   221:*5*   225:*17*
229:*20*   231:*7, 9, 15,*
*19, 20, 22*   232:*4*
253:*20*   254:*4, 11, 16,*
*23*   256:*1*
**decks**   101:*10*   187:*10*
220:*18*   225:*21*
**DECLARATION**
264:*5*
**declare**   264:*6*
**declining**   45:*12*
**deep**   44:*4*   103:*21, 23*
146:*19*   147:*5*   189:*18,*
*19, 21, 25*   190:*3, 14,*

*15, 16*
**deepen**   147:*24*
**deeper**   180:*3*
**deeply**   138:*23*   141:*25*
**default**   212:*10*
**defend**   94:*13*
**defendant**   5:*13*
**Defendants**   1:*10*   2:*8*
5:*7*   152:*16*
**defendant's**   88:*20*
152:*13*
**defer**   92:*1*
**deficiencies**   193:*10*
**deficient**   192:*23*
**define**   236:*4*
**defined**   150:*1*   192:*8*
238:*19*   241:*7, 23*
246:*2*
**defines**   18:*19*
**defining**   33:*18*
**definitely**   56:*19*
71:*25*   81:*7*   119:*5*
195:*23*
**definites**   182:*23*
**definition**   51:*17*
88:*12*   118:*7*   160:*3, 6,*
*9*   161:*11*   170:*19*
173:*3*   237:*20*
**definitions**   238:*5*
240:*16*
**degree**   9:*18, 19, 22*
**demeaning**   159:*23,*
*25*   160:*16*
**demonstrate**   119:*1*
245:*18*   248:*2*
**demonstrates**   131:*25*
**demotion**   33:*14, 19*
**department**   32:*6*
124:*6*   156:*22*   165:*13*
**departure**   98:*19*
**dependent**   26:*9*
**depending**   24:*22*
26:*14*   28:*5*   148:*12*
**depends**   26:*17*
118:*25*
**Deponent**   2:*8*
**deposed**   5:*14*
**Deposition**   1:*15*   4:*3,*
*17*   5:*22, 25*   6:*2*   7:*15,*
*18*   9:*11*   36:*20*   52:*2,*

*3*   262:*18*   264:*1, 8, 12*
265:*1*   266:*1*
**deposits**   199:*16*
**depth**   236:*21*
**derogatory**   159:*22*
**described**   85:*15*
203:*19*   241:*25*
**describes**   241:*25*
**description**   237:*17*
**design**   26:*10*   73:*16*
212:*2*   256:*15*
**desires**   174:*21*
180:*13, 14*
**detail**   205:*7, 16*
208:*18*
**Detailed**   102:*18*
**determination**   167:*15*
168:*16*   212:*11*   234:*4*
243:*22*
**determine**   86:*2*
129:*15*   141:*4*   167:*10*
174:*24*   234:*2*   235:*10*
237:*11*
**determined**   181:*1*
233:*15*
**deterrence**   93:*20*
94:*3*
**detrimental**   62:*25*
**develop**   66:*12*
143:*16*   190:*5*   191:*11*
**developed**   192:*3, 11*
193:*5*
**developing**   248:*11*
**development**   31:*13*
48:*21*   71:*15, 17*
104:*11*   143:*12*   215:*4,*
*10*   241:*4*   246:*13*
**developmental**   30:*21*
**develops**   240:*25*
**deviate**   101:*23*
105:*20*
**deviated**   102:*13*
103:*1, 12*   104:*21*
**Diamond**   172:*7*
**difference**   13:*5*
**different**   16:*20*
18:*19*   21:*11*   22:*18,*
*25*   23:*1*   25:*24*   26:*15*
30:*20*   31:*11*   34:*12*
42:*9*   53:*21*   70:*22*

82:*21, 22*   102:*1, 21*
108:*1*   117:*15*   118:*11*
119:*17, 20*   122:*14*
125:*8*   128:*14*   138:*6*
143:*10*   151:*4*   165:*23*
166:*1, 4*   168:*18*
169:*2*   174:*10*   176:*9*
194:*12*   198:*8*   199:*8,*
*10, 11, 13*   202:*22*
211:*9, 10*   232:*20, 21*
233:*7*   234:*25*   237:*23*
247:*15*   261:*20, 25*
**differently**   34:*14*
41:*13*   42:*10*
**difficult**   6:*23*   180:*20*
208:*5*   251:*18*
**digest**   16:*22*
**digital**   147:*20*
**diligence**   52:*25*
**Diligent**   16:*17, 18*
**diminished**   72:*19*
74:*6*
**direct**   21:*7*   55:*3*
178:*6, 7*
**directed**   175:*15*
176:*3, 25*   177:*6*
199:*3*
**direction**   10:*10*   86:*8*
105:*12*   158:*16*   194:*2*
198:*19*   230:*3*
**directionally**   224:*9*
**directive**   88:*3*
**directly**   23:*19*   24:*21*
30:*25*   86:*24*   132:*19,*
*22*   138:*2, 3*   141:*10*
151:*23*   252:*5*
**director**   14:*3, 6*
20:*19*   152:*20*   175:*7*
**directors**   11:*13, 21*
13:*23*   20:*11*   24:*8*
32:*19*   53:*18*   71:*14*
152:*19*   213:*4*   223:*17*
224:*1*   242:*24*   244:*10*
252:*13*   254:*22*   259:*7*
260:*19, 24*   261:*5*
**disagreed**   102:*21*
**disappear**   176:*13*
**disclosed**   90:*18*
**disclosing**   207:*15*

Case: 1:21-cv-00238-MRB Doc #: 66-3 Filed: 08/02/24 Page: 86 of 114 PAGEID #: 2863

Deposition of Gregory Carmichael, Volume I                    Philip R. McHugh v. Fifth Third Bancorp, et al.

disclosure 107:*12*
152:*13*
disclosures 88:*22*
89:2 93:*15*
disconnect 135:*14*
discovery 62:*19*
discrepancies 230:*22*
232:2
discrimination 28:*24*
62:*12, 22* 63:2 89:*14*
90:*1* 94:*21, 25* 95:*18*
97:*1* 98:7 99:*15, 19*
174:*3, 15* 175:*21, 23*
177:*6*
discriminatory
168:*24* 173:*17* 174:*5*
discuss 7:*20* 71:*15,*
*18* 206:*25* 231:*11*
discussed 5:*1* 7:*23*
8:*1* 65:*18*
discussion 18:7 19:9
44:*24* 50:*12* 60:*16*
63:*20* 77:*1* 97:*20*
101:*12* 104:7 124:*24*
154:*14* 175:3 177:*20*
179:*11* 180:3 182:*14*
185:*1, 3, 23* 186:*24*
191:*14, 16, 17* 206:*23*
211:9 215:*12* 224:*20*
227:*24* 228:*12* 238:7
242:*12* 243:*15*
245:*21* 247:*16*
254:*12, 13, 14, 16*
262:9
discussions 8:*4, 7*
9:2 19:*7, 16* 20:9
44:9 49:4 86:*13*
90:*23* 97:*25* 100:9
102:*16* 119:6 153:*19*
154:*13* 155:*21*
190:*13* 192:*21*
231:*19* 253:6 254:9
255:*20* 260:7
dispute 37:*14* 42:*20*
210:*11*
disputed 209:*16*
Distinguish 14:*16*
15:*4*
distribute 253:*24*
distributes 139:*3*

DISTRICT 1:*1, 2*
4:*4, 5*
diversity 155:*21*
156:8 158:*22* 178:*22*
DIVISION 1:3 4:5
111:*24, 25* 128:8, 9
document 18:*14*
29:*13* 30:7 32:2, *16*
58:6 87:6, 8 88:*23*
89:8, *18* 91:*18* 92:5
105:*4* 111:6 112:*3*
113:*18* 114:5 115:2
123:5 124:*16, 17, 23,*
*25* 125:*1, 3, 10, 12, 17*
126:*1, 6, 11, 18, 19, 20,*
*22* 127:*11* 129:*17, 25*
130:*10* 131:*20* 132:9
138:*20* 139:*23*
140:*11, 14* 141:*19*
152:*12* 155:*16, 19, 25*
158:*23* 160:*23*
175:*16* 176:7 185:*16*
186:*10* 204:5, *24*
205:*7, 16, 24* 213:*2,*
*14, 23* 218:*3, 18, 23,*
*24* 219:*1, 16, 19, 22*
220:*10* 221:7, 9
222:5 223:*19* 226:*13,*
*16* 227:*17* 228:*4*
230:*16* 236:*23*
241:*24* 242:2, *22*
243:5 244:9 252:*12*
253:*13* 255:9 260:*6,*
*8, 22*
documentation 19:*23*
39:3 75:9 160:9
172:*17* 185:*12*
259:*22* 260:*3, 9*
documented 18:*11*
58:*4* 68:*13* 177:*24*
documents 7:*17*
129:*19* 216:9
doing 62:*24* 83:*14*
86:*11* 103:*10* 117:*19*
121:*14, 22* 122:*4, 13*
133:*21* 141:*24*
142:*19* 144:*12*
150:*14* 174:*19*
185:*16* 193:*18, 19*

233:*16, 21*
dollars 72:*14*
door 195:*20*
doubt 77:*25* 82:7
121:*23* 258:*20*
draft 204:*10* 205:5,
9 212:*19* 213:*3, 9*
214:*1, 8* 215:*22*
217:*23, 25* 219:*16*
220:7 221:*4, 13, 20*
222:*10* 223:*16, 20, 21*
224:8, *17, 23* 226:*22*
230:*14* 231:7, 8, *18*
232:*15* 242:*23*
244:*10* 246:*22, 23, 24*
252:*13* 253:*1, 20*
255:5, 6, 7, 8 259:6
drafts 204:*24* 205:*13*
220:*21* 225:*23* 226:2,
*23, 24* 230:*19* 243:*12*
253:*4*
drastically 117:*22*
draw 119:*12* 135:*14*
driven 16:*1, 2*
driving 191:7
drove 200:*22* 211:*10*
due 52:*25* 73:*4*
duly 5:*13* 263:5
duties 10:9 13:*16, 22*
14:*16* 16:*25* 17:*4*
24:*15, 16* 26:8 28:9
30:*17* 111:*21* 133:6
duty 24:*21*
dying 169:*18*
dysfunctional 199:*21*

< E >
earlier 48:*19* 79:*1*
180:*13* 181:5, *25*
202:*11* 205:*12, 13*
206:*16* 207:2 210:*14*
226:*1* 235:*4*
early 28:7 190:2
195:*21* 211:5
earnings 221:*23*
ears 150:*20*
easier 199:*25*
easily 235:6
East 2:*12*
easy 199:*25*

ebb 117:*17* 131:*23*
233:9
ebbs 235:6
educate 156:*25*
education 9:*17*
23:*23* 157:6
educational 120:2
EE 116:*18*
Effective 9:*24*
112:*13* 222:*18*
226:*15* 239:*3, 6*
effectively 136:*11*
effectiveness 115:*22*
effort 133:*25*
egregious 94:*14, 19*
95:*1, 16, 19, 25* 96:*22,*
*25* 98:7
eight 25:*23* 124:*12*
Eileen 153:*1, 3, 9*
154:*21* 155:2
either 159:3 200:*13*
elaborate 206:*17*
elected 12:*17* 52:*24*
elects 49:*17, 18*
elements 26:*15*
elevate 43:*22* 64:*11*
77:*15* 78:*11* 107:*16*
116:*25* 117:*13*
119:*10* 133:*22*
135:*25* 143:*20* 228:*1*
233:2 234:*25* 235:*25*
237:*19, 24* 238:*1, 9,*
*10, 16, 22* 240:*11*
241:*18, 20* 246:8, *16*
248:8, *13*
elevated 43:*21*
137:*23* 151:*20*
178:*21* 228:*21*
elevates 240:*25*
elevating 118:2
elevation 77:*11* 241:*4*
eloquent 173:*13*
E-mail 2:7, *14* 6:*3*
9:*15* 22:6, 7 39:9
231:*4, 5* 253:*15*
254:6, *21*
e-mails 9:7 21:*25*
185:*25*
embodied 162:*21*

Case: 1:21-cv-00238-MRB Doc #: 66-3 Filed: 08/02/24 Page: 87 of 114 PAGEID #: 2864
Deposition of Gregory Carmichael, Volume I
Philip R. McHugh v. Fifth Third Bancorp, et al.

embodies 164:21
embraces 164:20
emergencies 209:6
emergency 17:12, 20
18:16, 18, 20 19:10
61:4, 7, 12 97:12
105:5 180:10, 16, 18,
25 181:4, 8, 9, 21, 23
182:4, 5 183:2, 6, 7,
23 184:15 185:9, 14,
18 186:7, 9, 12, 18, 22
187:1, 5, 7, 11, 13, 16,
20, 21 188:3, 9, 25
189:4, 5, 8, 10, 12
191:19 194:16, 19
195:23 196:11, 12
206:9, 19 207:17, 19,
22 208:1 209:5, 21
210:20 211:6, 14, 16,
17 212:1, 2, 14
217:13 219:23 223:7
224:5 227:19
emerging 189:23
Emerson 152:18, 21
153:11 154:18, 25
187:22
emphasize 179:10
Emphasizing 52:9
employed 9:23, 25
13:8 30:13
employee 6:8 87:10
102:25 115:25 116:3,
4, 18, 22 117:7 118:5
119:8, 22 138:22
140:3 165:6, 18
166:12 167:24
168:11
employees 87:15
119:18, 21 145:2
172:1 233:13 239:23
employer 99:7
employment 10:17, 20
encourage 21:6
117:10
encouraged 20:23
23:3, 14 24:4
encouraging 148:16
ended 12:11, 13
182:7 211:4

end-of-year 186:15
ends 93:17
engage 50:13 116:6
165:13
engaged 90:1 98:6
118:7 135:23 151:9
159:6 199:2, 4
engagement 115:25
116:3, 4, 5, 19, 22
117:1, 7, 13 118:5, 20
119:1, 8, 22 140:3
144:2
engaging 153:21
enhance 143:16
enhanced 120:1
enjoyed 21:13 85:6
ensure 73:18 78:9
139:17 144:25
146:21 149:24 150:2
152:1
ensured 142:9
enter 45:19
entered 129:13
entering 48:4
enterprise 22:13, 14,
15, 22 23:10 24:6
26:5 34:17 35:19, 20
41:7, 8, 9, 10, 15
42:11 123:6, 8 124:9
141:10 156:3 164:3,
12 178:11, 17 179:2
234:19 235:2 238:17
240:6 250:8 256:8,
10, 13, 14, 18 257:20
258:5
entertainment 146:9
entire 264:7
entities 16:20 17:15
26:15 49:9 151:11
159:6 261:4
entitled 85:7, 9
168:5 210:12 233:12
entitlement 85:8
entity 35:4
entry 145:20 177:13
environment 144:7,
14
epitome 139:5
equal 93:19

equate 166:18
168:23 169:16
equity 32:12
Eric 250:19, 20
251:2, 4, 25 252:1
Eric's 250:21, 25
Erie 2:6
ERRATA 264:1, 13
265:1 266:1
erroneous 90:17
93:10 214:8 222:6
250:3
error 205:20
especially 23:8
Esq 2:1, 4, 8, 17
essentially 198:3
261:15
establish 40:5 41:17
established 237:7, 8
et 1:9 4:6 209:7
264:4
evaluate 18:20
242:12
evaluated 193:19
evaluating 134:12
193:17 248:10
evaluation 235:11
249:4
event 18:18 19:10
145:7, 23, 24 146:6
157:22 162:15 181:4,
24 183:1 184:2
189:4 196:12 229:18
230:1, 19
events 14:5 16:1, 11
144:21, 25 147:9
eventually 109:14
Everybody 175:11
240:2 251:17
evidence 63:9 98:15
evolve 15:8
evolved 147:9 174:7
evolving 253:5
EVP 10:7
exact 35:10, 13
37:22 69:11 74:17
101:13 141:11
177:18
exactly 42:6, 19, 24
68:24 69:6 71:22

85:3 109:1 127:1
128:12 136:21
141:14 146:25 153:5
154:20 155:22 159:8
185:13 208:9 231:23
255:14
Examination 3:4
5:17
examined 5:14
example 25:25
107:24 119:9 144:23
221:23 236:20
239:24
examples 22:19
63:24 119:14 168:22
178:24
exceeds 129:23
131:18, 22 133:14
excellent 74:4 172:9
232:17
exception 224:18
exceptionally 53:4
excess 72:14
exchange 37:6, 17
45:9 46:10, 17
201:24
excited 190:25
excuse 10:4 65:9
110:20, 21
excuses 139:3
execute 74:10
147:12, 14 182:6, 8
183:7 185:18
executing 147:21
191:6
execution 152:2
executive 10:7 12:2,
25 13:3, 4, 6, 8, 13
14:20, 25 15:2 17:8,
10 21:11, 17, 19
22:12, 13 30:13
32:18 43:6, 9 44:15
45:16 46:5 48:9
53:17, 18 71:15, 17
72:1, 12 74:8, 10
76:22 83:7, 25 102:7
144:20 146:19 147:1,
2 161:15 183:13, 18,
20 193:6 202:7
213:4, 10 223:17

228:*11, 22, 23* 230:*14*
231:*6* 234:*19* 235:*2*
239:*11* 242:*24*
244:*11* 247:*22*
249:*25* 252:*14*
253:*18, 21* 254:*24*
259:*7, 19, 25* 261:*11, 17*

**executives** 66:*23*
67:*4, 5, 9* 69:*24* 70:*7*
72:*21* 75:*25* 76:*7, 12*
143:*8* 146:*14* 149:*17*
161:*13* 162:*8* 172:*7*
177:*25* 198:*1* 234:*6*
246:*10, 11* 247:*24*
248:*17* 249:*6*
**executive's** 118:*19*
**exercise** 48:*18*
**Exhibit** 3:*7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22*
10:*11, 14* 29:*9, 12*
36:*16, 19* 43:*1* 61:*21*
88:*17, 20* 93:*15*
110:*15, 18, 20, 22, 25*
111:*22* 113:*13, 16*
114:*22, 25* 120:*5, 8, 19* 122:*25* 123:*3*
124:*18, 21* 126:*24*
127:*6, 9* 128:*2, 18*
129:*16* 130:*5, 8*
132:*4, 7* 140:*6, 9*
141:*16* 152:*9, 12*
155:*11, 14* 160:*1*
173:*4* 175:*14* 176:*24*
177:*8, 10* 201:*17, 19*
203:*25* 204:*3* 212:*16, 17, 23* 213:*6, 12, 13, 15, 18* 214:*14, 15*
218:*1, 20* 219:*9*
221:*3, 4* 223:*10, 13*
224:*10* 227:*7* 229:*15*
230:*7, 24* 231:*2*
242:*17, 19* 243:*2*
244:*4, 6, 21* 246:*21*
252:*7, 9* 253:*9, 12*
254:*17, 19* 258:*24*
259:*3* 260:*11, 12, 15, 16, 20, 25* 261:*12, 16*
262:*6*

**EXHIBITS** 3:*6*
212:*23* 260:*14*
**exist** 17:*15* 183:*4*
**existed** 171:*19*
**exists** 255:*5*
**exit** 239:*16*
**ex-New** 156:*21*
**expand** 145:*10*
244:*17, 19* 246:*19*
**expansion** 137:*20*
233:*7*
**expect** 57:*25* 65:*15*
80:*15* 112:*11, 18*
116:*23* 122:*23*
148:*25* 199:*2* 201:*14*
261:*22*
**expectation** 131:*18*
224:*5*
**expectations** 115:*18, 24* 121:*6, 12* 129:*23*
132:*3* 133:*15* 142:*10*
179:*18* 200:*21* 226:*1*
230:*4*
**expected** 86:*20, 21*
105:*8, 9* 128:*21*
144:*5* 148:*7* 149:*16*
199:*4* 201:*4, 8, 9*
225:*20*
**expecting** 83:*19*
112:*5*
**expense** 150:*1*
**experience** 106:*4*
140:*2* 142:*19* 143:*20*
183:*24* 184:*8* 189:*14*
190:*15* 236:*11*
241:*21* 246:*9, 15*
251:*11*
**experienced** 48:*9*
**experiences** 159:*17*
191:*4* 192:*1* 234:*11*
236:*17* 246:*19*
**expert** 51:*4* 160:*8, 24*
**expires** 263:*18*
**Explain** 13:*5* 125:*22*
137:*9* 177:*22* 209:*1*
**explained** 77:*11*
107:*3*
**explaining** 77:*23*
**exposed** 156:*14, 16*
158:*12* 159:*14*

**exposure** 162:*14*
190:*12* 221:*22*
251:*11*
**ex-president** 187:*23*
**expresses** 160:*12*
173:*10*
**extended** 48:*17*
**extensive** 187:*18*
**extent** 9:*11, 17* 69:*5, 16*
**external** 23:*23*
156:*10, 20* 159:*7*
**extract** 94:*8*
**extremely** 17:*16*
114:*8* 133:*23* 151:*2, 5* 190:*1, 11* 258:*8*
**eye** 228:*3, 6, 25*
229:*9, 14*
**eyes** 150:*20* 211:*24*
220:*8*

**< F >**
**facilitate** 207:*25*
245:*20* 247:*16*
**facilitated** 51:*8*
123:*13* 124:*6* 204:*18*
216:*9, 10* 260:*7*
**fact** 39:*21* 41:*24*
71:*6* 80:*15* 85:*9, 21*
97:*23* 99:*9* 142:*17*
151:*12* 152:*13*
160:*19* 192:*11*
209:*17* 212:*4* 235:*18*
237:*18* 239:*14*
240:*13* 241:*13, 17*
253:*3*
**factor** 63:*19* 64:*5, 15, 17, 19, 22, 23* 65:*2, 3, 11, 13, 15, 16* 66:*6, 9*
90:*23* 97:*21, 24*
174:*16, 19* 249:*5*
**factors** 25:*3* 118:*20*
171:*7*
**facts** 63:*8* 90:*10, 18*
98:*15* 166:*21* 167:*7*
168:*21*
**factual** 29:*25* 30:*1, 4*
90:*17* 91:*5* 129:*9*
153:*9*

**fair** 36:*2* 41:*19*
45:*20* 138:*8*
**fairly** 173:*19* 228:*23*
**fall** 77:*2*
**false** 93:*11, 12* 94:*6, 20* 95:*1, 16, 19, 25*
96:*23, 25* 97:*16, 19*
98:*7* 99:*17* 100:*1*
**familiar** 123:*16*
124:*11* 126:*17*
**fantastic** 24:*3*
156:*11, 24* 157:*3*
**far** 20:*13* 115:*18, 24*
121:*6, 11* 138:*9*
141:*13* 169:*12* 208:*4*
229:*13*
**fashion** 16:*10*
**February** 32:*10*
81:*15, 16* 120:*22*
180:*2* 263:*19*
**feedback** 14:*2, 6*
19:*6, 7, 8, 16, 17, 20*
20:*10, 13, 16, 18, 19, 22* 21:*12, 21* 22:*2*
23:*5, 6, 16* 24:*7, 9*
55:*8* 106:*3* 254:*1, 4, 6, 7*
**feel** 6:*19* 19:*5* 38:*14, 20* 40:*5* 45:*20* 82:*9*
117:*5* 175:*19*
**felt** 39:*12, 22, 24*
52:*24* 53:*6* 54:*10*
77:*2* 104:*15* 132:*23*
183:*6* 185:*18* 192:*14*
216:*15* 227:*3* 243:*12*
248:*21* 258:*9, 21, 22*
**FIFTH** 1:*9, 19* 2:*12, 17* 4:*6* 5:*9, 10* 6:*5, 11, 13* 7:*21, 24* 8:*2, 4, 8* 10:*17, 21, 22* 11:*11*
13:*16* 27:*7* 28:*13*
29:*16* 30:*13, 14*
32:*18, 21* 36:*22* 43:*4, 6, 8, 9, 17* 44:*7* 45:*17, 20, 23* 48:*9, 10* 50:*22*
51:*14* 53:*23* 55:*16, 19* 57:*23* 60:*18* 64:*6, 25* 65:*12, 21* 71:*14*
81:*7, 11* 88:*2, 21, 25*
89:*14, 25* 90:*16* 91:*1,*

Case: 1:21-cv-00238-MRB Doc #: 66-3 Filed: 08/02/24 Page: 89 of 114 PAGEID #: 2866

Deposition of Gregory Carmichael, Volume I        Philip R. McHugh v. Fifth Third Bancorp, et al.

*3* 93:*11* 97:2 98:*6*, *11*, *19* 99:2, *13* 100:*4*, 7 104:22 107:22 110:8, *22* 111:*12* 113:2, *16*, *17* 114:*25* 115:*1* 120:8, *9* 123:*3*, *4* 124:*3*, *21*, *22* 125:*17* 127:9, *10* 130:8, *9* 131:*16* 132:7, *8* 133:*16* 135:7 136:*5* 137:*12* 138:*19*, *24* 139:22 140:9, *10* 142:*1* 155:*15*, *17* 159:*3* 160:2, *3* 161:6 166:*12* 167:25 168:*11* 172:*1* 174:2, *15* 175:*4* 176:2 177:*5*, *11* 184:8, *13*, *18* 187:8 190:*23* 191:2 199:*12* 201:*20* 204:*3*, *4* 212:23, *24* 213:7, *9*, *17* 214:6, *15*, *17*, *25* 215:20 218:2, *21* 219:3, *9*, *10*, *12* 221:*10* 222:8, *24* 223:*13*, *14* 224:*11* 226:*3* 227:6 230:8 232:*11* 240:2*1* 242:20, *21* 243:*1* 244:7, *8*, *13*, *23* 246:*21* 250:*21*, *23* 251:*1*, *8* 252:*10*, *11*, *16* 253:*12*, *17* 259:*3*, *4* 260:21 261:*1*, *2* 264:*4*

**figure** 32:7 93:*18*
**file** 94:*12*
**filed** 6:*15* 28:22 29:2, *4*, *17* 68:23 71:7 79:*13* 84:5 88:*24* 89:2, *24* 96:*3* 134:*4*
**filing** 28:*24* 89:*13*, *17* 90:*16*
**filled** 141:*15* 148:*13*, *17* 233:*17*
**filling** 112:*14* 148:*20*, *23*
**fillings** 105:*11*

**final** 77:*24* 80:*1* 131:9 184:*3* 186:*15* 203:9 204:8, *9*, *11* 205:8, *9*, *17* 212:*13* 222:22 245:*21* 255:8, *9* 259:*10*, *12*, *14*, *17*
**finalize** 203:2
**finalized** 79:*25*
**financial** 25:*20* 26:*1* 136:8 137:*14* 138:*16* 149:25 150:2, *23* 189:22 190:*20*, *23* 197:8 198:2 202:*18*
**find** 24:*18* 38:*4* 90:25 118:*24* 210:*12* 247:*24* 248:*16*, *19*
**fine** 5:2 108:*16* 114:*13*, *16* 134:*20* 206:*1*
**finish** 7:*1* 95:22 184:2
**finished** 114:*14*
**fintech** 189:*23*, *25* 190:*1*, *2*, *15* 236:*11*, *15*, *20*
**firm** 158:*18*, *20*
**firms** 159:6
**first** 5:*13* 12:5 29:20 46:8 54:*14* 59:*16* 71:7 86:*13* 87:*13* 93:*16* 108:*19* 116:*13* 135:*10* 138:*18* 141:*16*, *20* 147:*24* 175:*20*, *25* 212:*23* 213:*12* 214:*3* 219:*14*, *17* 227:*12* 231:*18*, *25* 232:*10* 243:5 251:2 252:*18* 254:*13* 260:*15* 261:*16*
**fit** 84:*20*, *24* 85:*12* 199:*12*
**fits** 197:*19*
**five** 30:*20* 31:*11* 35:*24* 36:*1*, *7* 38:*24* 39:*6*, *14*, *18*, *21*, *23*, *24*, *25* 40:2, *10*, *13*, *17*, *19*, *22*, *23*, *24* 41:*16*, *20* 45:*19*, *22*, *24* 47:*7* 48:*6* 70:*20* 72:*21*

74:*3*, *12* 75:25 76:*7*, *11*, *14* 82:*9*, *11* 86:*17* 87:*19* 113:*12* 122:*11*, *12* 143:*10* 215:*18* 219:*3*, *8* 227:22 228:*3*, *5* 246:*10*
**five-minute** 205:*24*
**five-plus** 153:7 227:*15* 228:5
**fix** 200:*25* 202:*17* 203:22
**flagship** 34:*4*, *13*
**floor** 83:*7*, *25* 147:*3*
**Florida** 250:*12*, *13*, *14*, *15*
**flow** 117:*17* 187:*18* 233:*10*
**flowed** 127:*17* 131:*23*
**flows** 235:7
**focus** 22:*10* 118:*23* 221:*21* 222:*1* 224:*24* 241:*20* 247:*19*, *20* 248:5, *19*
**focused** 116:*18*, *21* 117:*11* 248:9, *10*
**follow** 70:*11* 88:2 108:*11*
**followed** 80:*25* 219:*20* 223:*4*
**following** 48:*7* 192:*20*
**follows** 5:*15*
**force** 87:22, *23* 118:2 144:*24*
**foregoing** 263:*9*
**forgot** 38:2
**form** 39:8 51:*15* 54:*1* 65:25 70:*14* 76:*2* 93:2, *5* 95:*3* 103:*15* 111:2 113:*19*, *21* 115:*4* 121:8, *18* 124:8 127:*12*, *16*, *18*, *22* 130:*11*, *18* 131:6 156:*17* 168:*19* 175:6 191:22
**formal** 145:*23* 178:*3* 179:*25* 180:*1*
**format** 16:9
**formed** 104:*4*

**former** 157:*19*
**forms** 121:*13*
**formula** 55:*1*
**Forrest** 26:6 130:*19*, *22* 131:2 201:*24* 202:6 256:*19* 257:*21* 258:*4*
**forth** 19:*14* 20:22 25:*15* 29:*7* 35:*19* 65:*19* 66:*13* 87:*3* 90:*10* 92:6 120:*3* 124:5 148:*17* 162:*15* 179:*18* 180:*4* 185:*10* 191:*21* 192:*19*, *22*, *25* 211:5 224:*4* 236:*7*, *19* 237:*10* 238:*4* 241:5 242:*13* 257:*13*
**forthwith** 207:*23*
**forward** 32:*14* 42:*3* 61:9 103:*25* 147:*19* 179:7 184:*1* 206:*19* 254:*1* 255:*18*
**fostering** 191:*8*
**found** 162:22 251:9
**foundation** 175:7
**four** 66:*16* 147:*24* 184:*9* 219:*8* 230:*18* 256:5 257:*11*
**fourth** 144:*19*
**fox** 161:*14*, *16*, *18*, *20*, *21*, *25* 162:*3*, *5*, *9*, *16*, *18* 163:*8*, *12*, *25* 164:4, *13*, *18* 165:*6*, *19* 166:*12*, *13*, *23* 167:*2*, *25* 168:*12*, *23* 169:8 171:*8*, *14* 172:*23*
**framework** 25:*6*
**Frank** 26:6 130:*19*, *22* 131:2, *6* 201:*24* 202:6 256:*19* 257:*2*, *20* 258:*4*, *8*, *16*
**frankly** 20:2
**Frank's** 131:2 258:*19*
**free** 6:*19* 63:6, *17* 175:*19*
**Friday** 83:*11*
**friend's** 169:*14*
**front** 16:*3* 26:5 42:*23* 56:*12* 67:*16*

Case: 1:21-cv-00238-MRB Doc #: 66-3 Filed: 08/02/24 Page: 90 of 114 PAGEID #: 2867

Deposition of Gregory Carmichael, Volume I                    Philip R. McHugh v. Fifth Third Bancorp, et al.

84:*17* 110:*11* 151:*23*
155:*24* 159:*5* 164:*18*,
*19* 166:*21* 168:*22*
180:*18* 218:*22*
256:*17*
**frustrated** 99:*17*
**FTAM** 113:*1*
**fulfill** 122:*14*
**full** 11:*19* 21:*20*
139:*1* 144:*19* 257:*17*
**full-time** 44:*2*
**fully** 96:*13* 139:*15*
148:*22* 182:*2*
**funneled** 21:*18*
**furious** 99:*14*
**further** 51:*3* 122:*1*
**future** 37:2 60:*18*
146:*8* 147:*17* 219:*3*

**< G >**
**game** 184:*3*
**gap** 191:*13*
**Garrett** 249:*18*, *19*,
*20*, *21* 250:*7*
**Gaunt** 108:*23* 109:*13*
**gene** 189:*17*
**general** 118:*9*
**generally** 202:*20*
**generations** 219:*3*
**getting** 58:*21* 81:*21*
87:*17*, *18* 117:*3*
210:*17* 230:*17*
**give** 7:6 26:*16*
32:*12* 63:*24* 85:*5*, *10*,
*21* 86:*4*, *5*, *15*, *16*
98:*2* 262:*1*
**given** 74:*11*, *15*, *24*
82:*4* 122:*1* 137:*1*, *3*
147:*13* 187:*1* 233:*23*
**gives** 21:7 258:*8*
**giving** 86:*10* 171:*4*
**glass** 18:*16* 49:9
**glasses** 37:*21*
**glowing** 40:9
**glue** 198:*17*
**go** 11:*15*, *18* 17:*10*
18:7, *21* 26:*1* 31:7
32:*10*, *14* 33:6, *14*, *20*
35:*18* 41:5 42:6, *24*
43:2, *19* 44:*16* 48:*20*

49:6 59:9 61:*13*
62:*16*, *20* 70:*16*
75:22 79:2 86:*17*
90:*13* 93:4 96:5
102:*17* 108:*14* 112:7
113:*25* 117:6 118:*14*,
*18*, *20* 121:*20* 139:*13*,
*24* 143:6 149:*13*, *17*
154:*19* 155:6 156:9,
*15* 166:8 174:*12*
175:*1* 178:*21* 182:5
184:*22* 187:*10* 203:*1*
206:*1* 208:*18* 214:*24*
215:*17* 231:*11*, *24*
236:*21* 241:6 248:*23*
253:*3*
**goal** 161:6
**God** 80:*19*
**goes** 16:*14* 18:*14*
48:*17* 96:*24* 150:*12*
170:*25* 187:*19* 208:*4*
228:*12* 231:*10*
253:*19*
**going** 6:*17* 13:*15*
14:*11* 15:*16*, *17*
19:*24* 33:*23* 35:*12*
36:7 37:*18* 38:*23*
39:*12* 40:6, *10*, *13*, *20*,
*22* 41:*19* 42:*3* 53:22
55:*24* 56:8, *17*, *24*
57:*21* 58:*1*, 9, *18*, *20*,
*21* 60:*22* 61:*15*
67:*21* 68:6, 9, *14*
69:*3*, *12*, *13*, *15* 70:*25*
73:*5*, 8, *11*, *17*, *18*
74:7, *16*, *19*, *23*, *25*
75:*14*, *16*, *19*, 22 77:*2*,
*3*, *5*, *14*, *17*, *23* 78:*2*, 6,
7, 9, *10*, *11*, *12* 79:7,
*17*, *19*, *23* 80:9, *18*, *19*
81:*1* 82:*14* 83:*25*
85:*4*, *23*, *24* 87:*21*, *23*
88:*14* 93:6 94:4
96:7, *12* 97:7 99:7,
*20* 102:*17* 108:*13*
112:7, 8 114:*17*
117:*16*, *20*, *21* 118:*13*,
*15* 146:*10* 149:*21*
159:*1* 162:*13* 165:8,
*10*, *14* 166:*14*, 22, 25

167:*12* 168:*4*, *14*, *20*
169:*4* 171:6, *21*
176:*12* 177:*15*, 25
179:*21*, 22 180:*11*, *17*,
*21*, *23* 181:*2*, 7, *21*
185:*3*, *13*, *19* 187:*25*
191:*14* 193:2, *11*
196:*10* 198:*11* 199:*1*,
*5* 200:*13*, *14* 203:*3*, 8,
*17* 205:*1*, *10* 207:*2*, *4*,
*5*, *17*, *18*, *23* 208:*11*,
*13*, *18* 210:22 215:*10*,
*20* 217:*1*, *3* 226:*23*
233:*4* 234:*20*, 25
237:*3* 243:*14* 245:*21*
248:*16*, *19*, *20* 261:*13*
262:6
**good** 9:*10* 52:*24*
71:*23* 82:*4*, *5* 108:*12*
112:*17* 114:*10*
115:*16*, *17*, *20* 121:*22*,
*23*, 25 122:7, 8, 9, *13*,
*16*, *19*, 22 131:*25*
132:2 142:*4* 144:*6*,
*12*, *16* 147:*8*, *10*, *11*,
*22* 177:*3* 181:*8*
183:22 184:*1* 189:9,
*10*, *12* 190:*11* 191:9
199:*15*, *18* 251:*22*
254:*5*
**gotten** 73:*25* 204:*15*
227:*21*
**governance** 17:*14*
**graduate** 9:*22*
**gray** 168:*25* 169:*11*,
*12*, *13*, *17*
**great** 21:*13* 35:*1*
43:*23* 100:*14*, *15*
112:*11*, *21* 113:*2*, *5*
122:*4*, *5*, *19*, 22 139:*3*
143:*25* 144:*20*, 25
145:*16* 202:*8* 222:*17*
226:*14* 239:*3*, 7, 9
240:*4*, *17*, 22 241:*2*, *3*
246:7, *14* 249:*4*
251:*19*
**Greatly** 146:2 157:*5*
**Greg** 28:*18* 91:9
106:7 163:*13*, *15*

194:*25* 202:*11* 231:7
256:*20* 257:*21* 258:6
**Gregory** 1:*15* 3:*3*
4:*3* 5:*12*, *21* 32:*19*
88:*21* 262:*12* 264:*19*
265:*24* 266:*24*
**gross** 73:9, *10* 77:*16*
138:*5*
**group** 79:*15* 109:*24*
110:8, *12* 114:*1*
133:*3*, *5* 158:*11*
160:*13* 171:*25*
173:*11*, *15* 175:*11*, *12*,
*15* 176:*3*, 25 177:6
204:*19* 216:*10* 219:6
**groups** 139:*17* 175:*4*,
*10*
**group's** 119:*13*
**guerilla** 85:*17*, *18*
87:*4*, *21*
**guess** 62:*23* 79:22
136:*17*, *18* 254:*13*
**guides** 143:9
**Guy** 54:22 58:*19*
108:7 122:*11* 200:*25*
202:*12*, *17*
**guys** 82:*10* 91:*12*
122:*11*

**< H >**
**hair** 166:*16*, *18*
168:*23*, 25 169:*11*, *12*,
*13*, *14*, *16*, *17*
**half** 29:*18* 35:8, *11*
203:22
**HAMILTON** 263:*3*
**hand** 146:2 175:*1*
263:*12*
**handed** 10:*13* 29:*11*
36:*18* 88:*19* 110:*17*
113:*15* 114:*24* 120:7
123:2 124:*20* 127:8
130:7 132:6 135:*18*
140:8 152:*11* 155:*13*
177:*10* 201:*19* 204:2
212:22 213:6 223:*12*
230:7 242:*19* 244:6
252:9 253:*11* 259:2
260:*14*

**handled** 199:*16*
**Hang** 224:*12* 246:*23*
**happen** 21:*10, 15*
53:*19* 56:*25* 58:*9*
102:*23* 152:*8* 191:*3*
202:*9* 209:*6* 217:*3*
**happened** 42:*25*
46:*24* 60:*19* 61:*2*
105:*13, 23* 108:*7*
136:*17* 154:*21* 168:*7*
181:*5, 18* 182:*12*
186:*2* 195:*10* 210:*9*
230:*5* 231:*21, 23*
243:*23* 256:*5*
**happening** 23:*15*
257:*24*
**happens** 17:*22* 99:*10*
180:*2, 20* 190:*20*
233:*12* 239:*21*
**happy** 99:*25* 100:*2*
**hard** 234:*1, 22*
**hardship** 74:*25*
80:*17, 20* 81:*1*
**harm** 90:*20* 91:*22*
94:*7*
**harmful** 93:*10*
**Hart** 5:*8*
**HCC** 21:*6* 23:*10*
**head** 6:*22* 21:*5, 6*
22:*20, 24* 24:*12*
30:*14, 18, 19* 31:*21*
41:*11* 72:*10, 18* 73:*8,
11, 21, 23* 74:*1* 77:*15*
78:*2, 7, 9* 79:*15* 82:*5,
19* 84:*22* 85:*24* 86:*1,
23* 88:*3* 109:*23*
110:*10* 113:*12, 25*
115:*7* 120:*14* 128:*1,
4* 130:*15* 133:*6*
134:*25* 135:*2, 15, 17*
136:*19, 20* 141:*12*
146:*7* 150:*7* 151:*6, 8,
14, 18* 154:*1, 5*
158:*11* 179:*5* 198:*13*
218:*11, 12* 220:*24*
222:*12, 13* 225:*1, 3, 5,
7, 8, 10* 226:*9, 10*
232:*13* 239:*25* 245:*4,
8, 9, 25* 246:*5* 247:*1,*

**2**
**headed** 75:*3*
**heading** 33:*15* 202:*3*
**headlines** 89:*6*
**heads** 109:*6* 148:*11*
**health** 87:*14* 186:*17*
208:*16* 209:*25*
**hear** 6:*18* 14:*3*
15:*14*
**heard** 68:*12* 161:*16,
18* 162:*8, 18, 20, 25*
163:*20* 164:*7* 165:*1*
197:*7* 215:*8* 256:*22,
23, 25* 258:*17, 22*
**hearing** 258:*7*
**heart** 207:*15*
**heavily** 102:*4* 201:*9*
**he'd** 35:*17* 41:*5*
82:*6* 94:*12* 186:*8*
189:*8* 194:*18*
**heightened** 183:*3*
207:*24*
**held** 27:*11, 16* 30:*20*
34:*21* 49:*5* 149:*15*
**help** 119:*21* 149:*14,
18* 150:*21* 190:*5*
201:*3* 217:*14*
**helpful** 117:*24* 149:*9*
**Helping** 31:*6* 149:*22*
**hereinafter** 5:*14*
**hereof** 264:*13*
**hereunto** 263:*12*
**hey** 21:*13* 24:*1*
69:*12* 179:*21, 22*
**high** 48:*9* 55:*10*
200:*7* 228:*6, 15, 22*
229:*8, 12* 233:*23*
234:*3, 15* 235:*6, 14,
19, 20, 24* 236:*4*
238:*3, 8, 12, 14*
239:*19* 245:*3* 246:*16*
248:*12* 257:*8* 258:*8*
**higher** 64:*11* 238:*11,
16, 17*
**highest** 72:*21* 75:*25*
76:*7, 11, 14, 15, 18, 21*
139:*15* 144:*11*
234:*23* 237:*24*
**highlight** 210:*23*

**highly** 144:*13* 258:*14*
**Hikes** 251:*3*
**hire** 236:*13* 250:*3*
**hired** 249:*5, 12*
250:*1, 16* 251:*2, 9*
252:*5*
**hires** 249:*9*
**hiring** 190:*10* 251:*5*
252:*1*
**historical** 146:*20*
147:*9, 15, 20*
**history** 10:*20* 137:*15*
147:*5*
**hit** 209:*7, 25*
**hold** 87:*10* 115:*5*
212:*3* 235:*8* 261:*14*
**holder** 228:*21*
**holding** 27:*11, 12*
113:*8*
**home** 34:*11*
**honest** 68:*25* 123:*15*
124:*11* 215:*3, 17*
226:*20*
**honor** 160:*20* 161:*23*
**hopefully** 16:*13*
**hostage** 87:*10*
**hour** 59:*16*
**hours** 228:*12*
**house** 233:*8*
**Houseman** 250:*19*
251:*2, 4*
**Houseman's** 251:*25*
**HR** 79:*15* 123:*13, 23*
124:*2, 6* 127:*2*
165:*12* 171:*21* 219:*6*
220:*24* 242:*10*
**hubris** 82:*24*
**huge** 137:*19* 191:*13*
**Hugh's** 177:*16*
**human** 19:*1, 25*
22:*19* 28:*10, 11, 13,
17, 19* 32:*6* 43:*5*
82:*23* 158:*11* 175:*7*
179:*5* 204:*19* 216:*10*
230:*14* 234:*7* 242:*24*
244:*10* 252:*13*
253:*17, 21* 254:*24*
259:*7*
**hundred** 129:*9*
135:*21*

**hundreds** 51:*5*
137:*20*
**hypothetical** 167:*17*
168:*2, 4*

**< I >**
**IA** 112:*21* 128:*9*
**idea** 216:*22* 217:*21*
218:*15* 220:*1* 225:*18*
251:*22*
**identical** 261:*18*
262:*2, 4*
**identification** 10:*11*
29:*9* 36:*16* 88:*17*
110:*15* 113:*13*
114:*22* 120:*5* 122:*25*
124:*18* 127:*6* 130:*5*
132:*4* 140:*6* 152:*9*
155:*11* 177:*8* 201:*17*
203:*25* 212:*16, 17*
223:*10* 229:*15*
230:*24* 242:*17* 244:*4*
252:*7* 253:*9* 254:*17*
258:*24* 260:*11, 12*
**identified** 25:*3* 70:*5*
73:*20* 96:*21* 106:*11,
13* 108:*4* 157:*14*
183:*8* 186:*22* 187:*4,
8, 14, 17* 198:*2*
211:*20* 213:*25*
214:*20* 225:*14* 252:*3*
**identify** 10:*14* 19:*9*
25:*23* 29:*12* 70:*6*
110:*18, 25* 111:*22*
113:*17* 115:*2* 120:*9*
123:*4* 124:*22* 127:*10*
130:*9* 132:*8* 140:*10*
150:*3* 155:*16* 176:*24*
177:*12* 188:*2* 204:*4*
207:*21* 213:*2, 8, 18,
20, 24* 214:*3, 6* 218:*2*
219:*12* 223:*14*
230:*13* 231:*2* 238:*8*
242:*22* 244:*9* 245:*12*
247:*17* 252:*12*
253:*13* 254:*19*
258:*11* 259:*5* 260:*16,
22*
**identifying** 69:*23*
73:*12* 107:*14* 134:*13*

Case: 1:21-cv-00238-MRB Doc #: 66-3 Filed: 08/02/24 Page: 92 of 114 PAGEID #: 2869

Deposition of Gregory Carmichael, Volume I                    Philip R. McHugh v. Fifth Third Bancorp, et al.

**imagine** 22:23 125:14 155:20

**immediately** 85:16 233:21 245:15, 16

**impactful** 148:1

**impacts** 145:1

**imply** 169:17

**importance** 34:21 138:13 156:4

**important** 17:16 18:2, 4 40:9 65:22 93:18 117:12 118:4, 6 133:23 137:19, 21 138:9 191:11 225:11

**impression** 250:2

**improve** 117:7 118:4 119:7, 22 248:6, 7

**improvement** 119:16

**improving** 116:18, 22 118:23

**inaccurate** 78:15, 23 94:14

**inappropriate** 64:13, 23 65:8, 10, 18 90:22 161:10, 12 164:11 166:11 167:24 168:11, 17

**include** 29:16 178:10 244:17, 20

**included** 31:16 50:17 64:5 76:1, 8, 12 95:18 129:10 171:24

**includes** 91:24 235:12

**including** 68:7 94:19, 24 96:24

**inclusion** 155:17, 21 156:8 158:22 178:22

**inclusive** 140:4

**income** 72:14, 19

**inconsistencies** 217:4 222:6

**inconsistency's** 121:19

**inconsistent** 121:18 195:11 205:21 216:24 217:6, 16 220:8 221:15 222:5 230:2

**Incorrect** 73:7 94:14 137:8

**increase** 77:17 78:7 81:6, 12, 17, 21 90:25

**increases** 80:13 81:15

**independent** 13:11 14:23 15:1 34:14, 16 50:10, 17, 20 51:12 52:23 53:18 54:7 102:7 131:7 152:20 153:2 154:13

**independently** 130:25

**indicate** 32:17 39:4 40:16 58:11 60:7, 22 74:15 112:25 122:3 131:18 136:6 143:24 182:19 183:11 184:6, 12 192:18 253:19

**indicated** 22:17 27:10 33:3 39:6 48:3 52:4 59:4 70:8 106:15 198:1 206:7 258:4 264:12

**indicates** 30:12 31:20 48:25 72:9 74:16 129:22 130:19 160:10 220:5 231:14 232:10 239:3 255:17

**indicating** 69:6

**indication** 32:8 38:19

**indicative** 241:14, 19

**individual** 6:3 21:5 23:13 24:22 25:11, 15 31:9 34:19 43:11 50:14 53:3 55:12 57:25 61:6 66:7, 8, 15 67:22, 23, 24 75:5 102:25 118:10 123:18 131:5 150:11 156:20, 21 158:12 169:3 178:19, 22 180:24 186:12, 13 187:3 215:4, 10 233:11 234:2, 10, 11 235:4 236:18 239:14 240:25 245:11, 19 249:22

**individuals** 19:5, 18 20:17 21:8 23:9

31:13 48:22 56:6 58:11, 20 59:3 67:11, 12, 13, 14, 17 94:6 98:20 99:13 102:5 103:19 104:18 108:3 145:14, 15 151:24 156:10, 18 158:1 159:2 178:23 188:2 201:2 238:13 239:15, 16, 17, 18 241:13 252:5

**individual's** 179:19 235:10, 11

**industry** 23:20 51:4 99:4 103:21, 24 190:16 258:15

**inflow** 24:21

**inform** 103:9 194:5 245:23

**informal** 24:4 177:23 179:16, 20 185:23

**information** 4:24 10:23 16:4, 5, 9, 13, 15, 17, 21, 24 17:2, 5, 19 18:12 19:3, 12 20:25 21:1, 18 26:17 32:3 42:23 46:2 56:3 90:19 102:18 117:4 153:9 155:5 172:14 215:18 216:16, 22 217:21 218:15, 19 219:6 220:1, 11 222:21 225:15, 19, 23 227:22 228:8, 10 250:3 260:9

**informed** 35:23 56:7, 24 57:20 58:8, 20 126:16

**in-house** 124:3

**initial** 88:22 89:2 93:15

**initially** 27:13 28:3 178:23 181:5 206:16

**Inn** 194:4, 11 196:4

**innovation** 189:17

**innovative** 103:22 189:17, 18 190:14

**input** 13:13 15:2, 13, 15 100:14 103:3 104:17 179:4 232:1

**insertion{sic** 106:24

**installation** 45:23

**instance** 23:10 119:1

**instruct** 95:11 96:8

**instructing** 229:2, 4

**instructions** 7:4 230:5

**instrumental** 151:7

**integrate** 150:16

**integrated** 198:10

**integrating** 150:21 198:14, 20

**integration** 149:25 150:1, 12, 14, 22 151:1, 13 198:6, 9, 17 199:1, 7 200:23

**integrity** 139:15 140:5

**intend** 160:19

**intended** 169:25

**intention** 45:18 245:8 246:4

**intentional** 159:15, 16, 19

**intentionally** 94:7 160:15

**interact** 20:2, 24

**interacting** 21:17 173:14

**interest** 81:25 86:3, 7 87:24 103:7 106:5 138:25 142:2 174:25 175:1 180:9

**interested** 35:17, 23 41:5 61:2, 3 174:18 180:25 181:3 182:9 183:5 185:8, 11 186:7, 8, 14 188:9 194:15 195:23 206:9, 22 210:19

**interim** 185:9

**interrupt** 52:15 108:13

**interview** 58:1

**interviewed** 54:22, 24

**introduce** 4:8, 14

Deposition of Gregory Carmichael, Volume I                    Philip R. McHugh v. Fifth Third Bancorp, et al.

introduced 130:24
  158:18
investigation 134:1, 3
investment 94:16
  110:10  111:24  114:1
  128:1
investors 221:23
involved 54:21, 23, 25
  55:15, 18, 22, 25
  93:11  98:25  123:15
  126:6, 9, 20, 23  127:3
  134:14, 23  145:11
  153:18, 19, 20  201:3,
  9, 10, 15  204:16, 22
  220:19  242:10, 11
  251:5, 25  252:3
involvement 112:13
irrelevant 62:18
  66:4  95:6  207:20
irresponsible 55:23
issue 52:4  69:4
  135:20  171:21, 22
  175:5  181:9  186:17,
  20, 21  188:13  206:25
  207:6, 10  208:7, 16,
  17  209:1, 18, 24, 25
issues 112:22  136:12
  182:22  201:3, 7
  202:5  203:15, 16, 17,
  19  206:10, 17  207:11
issuing 174:8
items 14:3
its 24:24  34:21  99:1
  167:17  231:5

< J >
Jackson 1:21  263:5,
  18
Jamie 68:16, 18  69:1,
  20  70:2, 5  172:7
Jamie's 68:20
January 12:18
  154:12
Jim 108:23  109:13
jms@sspfirm.com 2:8
job 18:4  19:2, 11
  26:19  31:11  36:8
  49:18  54:6  61:6, 11
  69:10  70:20  71:1, 2
  73:11, 12, 13, 20, 22,

24  74:3, 5, 23  76:24
  82:4, 5, 6, 16, 17, 21,
  22  83:3, 5, 23  85:7, 8
  86:4, 6, 15, 16, 17, 22
  88:11, 13, 14  103:5
  112:11, 21  113:8, 9,
  11  114:10  115:17, 20
  121:22, 25  122:4, 5,
  13, 16  128:14  131:25
  132:2  136:2, 7, 10
  138:1, 5  141:24
  143:25  144:2, 6, 12,
  16, 20, 25  146:4, 8
  147:12  156:24  157:3
  161:22  172:9  174:25
  180:19, 21  182:24
  183:22  186:11  189:9,
  10, 12  191:6  193:17,
  18  228:25  229:11
  232:17  233:5, 18
  236:25  237:1, 2, 23
  238:1, 25  245:12, 14
  246:20  257:9  258:10
jobs 74:12  85:8
  87:19  113:12  148:8,
  20  233:8  239:1
John 5:2
join 5:2
joined 108:20
Jorge 23:17  24:2
Joshua 2:4  4:12
JP 229:11
Jude 23:19  24:1
judgment 101:20
July 11:14, 21, 24
  12:5, 11, 13, 22  37:18,
  24
jump 169:22  234:16
June 177:19
justification 209:14
  210:10
justify 209:18

< K >
Kabat 28:4, 6
  125:13  126:15
keep 43:23  59:7
  74:7  77:7  86:24
  105:1  106:22  108:13
  148:15  146:3  179:6

181:3  183:24, 25
  188:3  212:3, 4  228:2,
  6, 25  229:9, 13
keeping 61:8, 9
  147:20  198:18
keller{sic 229:8
Kent 137:16, 17
kept 149:15
Kevin 28:4, 6  125:13
  126:15  151:19
key 146:20  148:8
  152:3  221:21, 22
  222:1  224:24  247:19,
  20  248:3
kicking 133:19
kind 18:15  24:3
  31:9  145:14  187:19
  198:17  201:6  235:2
  257:25  258:1
kinds 165:9
kings 233:13
kit 155:18
knew 35:2  39:24
  40:20  60:15  68:6, 14
  69:3, 12, 13, 14, 20
  70:8  78:8  81:2  85:3
  161:10  240:2  249:25
know 5:6  6:11, 15
  16:13  18:17  20:1
  21:7  23:16, 17  24:18,
  25  25:24  30:25
  33:10  35:12  42:22
  44:12  46:20  47:22
  51:25  55:22  56:16
  59:24  62:8  67:10, 14
  68:24  69:6  78:18
  80:8, 9  82:25  85:13,
  14  88:9  91:9  92:3, 9
  97:4  99:11  101:3
  102:4  108:8  109:1,
  23  117:2  121:21
  123:8, 19, 21  124:7, 9
  125:4, 22  126:4, 24
  127:1, 4  130:22
  135:15  136:18, 21
  141:13  143:17
  145:23  146:7, 8
  147:1  148:10, 23, 25
  149:20  151:9  152:22
  153:5  154:20  157:1

159:6, 7, 14, 15  162:1,
  21  164:16  168:7
  169:12  175:9  177:18
  178:9  179:6  190:13
  194:20  202:21
  203:12  204:25  207:8,
  16  208:9, 14, 15
  211:2  213:15  215:16,
  17  216:7, 13, 14, 17,
  25  217:5, 6, 24
  218:18, 19  220:9, 10
  222:6, 21  223:23
  225:15  226:17, 21, 25
  227:3, 21  228:3
  229:25  232:7  240:13
  242:15  247:6  249:18,
  19  250:10, 19, 20, 23
  251:20  252:5  253:25
  254:3  256:20  257:6,
  20  258:5
knowing 227:2
knowledge 99:12
  103:21, 24  146:20
  147:5, 24  153:17
  190:3, 16  214:13
known 54:16, 17, 19
  55:2, 4, 5, 14  166:17
  169:11
knows 8:12  60:11
  168:3  190:5, 6
KPIs 25:15

< L >
lack 193:1  236:24
lacked 184:7
Lacks 175:6
lady 156:21
Lamb 227:15, 22, 23
  229:6, 10  243:7
  252:19, 20
Lamb's 229:3
large 150:9  151:21
  175:11  198:6  199:10
  232:22
larger 137:10  138:11
largest 32:21  34:4,
  13  43:8  45:17
  137:14, 16, 18  198:11,
  12

**Lars** 67:*11* 70:2
127:*19* 128:2*0*, 24
129:2 130:*16* 131:*8*,
*10* 132:22 151:*21*
198:*3* 200:2*4* 201:*12*
202:*12* 203:*4*
**Lars's** 201:*13*
**late** 28:7 32:*17* 35:6,
*7*, *12*, *13*
**Lavender** 151:*19*
**law** 95:6, *13* 96:9
**lawful** 5:*13*
**lawsuit** 68:*23* 94:*13*
96:*3*
**lawyer** 29:*24* 92:*1*, 8,
*19* 97:7
**lawyers** 8:*19*
**lay** 200:*11*
**lead** 14:*3*, 6 20:*19*
35:*4* 110:*12* 146:*3*
170:*1*, 9, *17* 246:*12*
**leader** 43:*23* 51:*4*
60:*18* 82:*3* 112:22
113:2 119:*25* 139:*3*
142:*3*, *4* 143:6
144:*10* 147:*12*
150:*18* 201:*5* 217:*17*
222:*18* 224:2*1*
227:*25* 239:2 242:9
**leaders** 110:*4* 116:2*3*,
*25* 117:*10* 122:*5*
124:*10* 143:*13* 144:*5*,
*16* 145:*18* 146:*1*
152:*3* 172:9 191:*11*
**leadership** 18:22
74:*4* 101:2*1* 112:*12*
113:*1*, *19* 117:*5*
136:6 140:*25* 141:*6*
142:*8* 144:2*1*, 22
146:*14* 147:*17*
148:*16* 172:*10*
190:*25* 235:*12*
241:*14* 244:*18*, 20
251:*22*
**leading** 35:*17*
112:2*1* 118:*11*
135:*19* 144:2, *25*
146:*4*, *5* 163:*19*
191:6 201:*15* 204:2*1*

233:*11*
**leads** 237:*17*
**League** 169:*13*
**leaning** 107:*17*
**learn** 199:*18*
**learned** 21:*14* 31:*4*
**learning** 165:2
**learnings** 146:2*1*
**leash** 140:*23*
**leave** 194:6, *25*
**leaving** 98:*24*
**led** 19:*1* 124:7
229:*19*
**left** 6:*4*, 9 68:2*1*
88:2 196:2*1*
**left-hand** 36:22, *25*
**legal** 30:2 62:*3*, *13*
84:*4* 92:*7*, 9, *14*, 18
93:*1*, 2, *5*, 8 153:*16*
**legally** 62:*23*
**length** 106:*19*
**lengthy** 100:9, *25*
**Leonard** 68:*16*, 18
69:*1*, 20 70:2, *5*
**lessons** 31:*4*
**level** 72:*11*, 14 78:*12*
116:*5* 122:*24* 124:*15*
143:*20* 144:*11*
159:*18* 217:2 225:2*1*
234:*15*, *19*, *23* 235:*8*,
*23* 237:2*1*, *25* 238:*16*,
*17* 239:*11*, 20 241:2*1*
261:*8*
**levels** 64:*11* 122:6
232:*20* 233:*23*
234:*17* 238:*11*
**leverage** 232:*24*
**Lewis** 49:*9*
**lights** 61:*8* 147:*20*
181:*3* 183:*25* 188:*3*
212:*3*
**likes** 256:*20* 257:2*1*
258:6
**line** 13:*19* 108:*13*
109:6 113:9 116:*17*
117:*1*, 9 128:*11*
134:2*1* 138:*3*, *4*, *11*
148:*11* 150:*15* 151:7
198:*13*, *19* 227:*12*
243:6 252:*19*

**lines** 25:*17* 77:*13*
144:*16* 147:*10*, *11*
159:7 198:*14*
**lining** 211:*24* 216:*12*
224:2
**liquidity** 26:2
**list** 26:*1* 67:*13*, 16
95:*19* 96:*24* 105:*4*
152:*17* 181:22
182:*10* 187:*24*
188:*11*, *20*, *21* 189:6,
*7* 195:*24* 196:*11*
206:22 210:2*1*
211:*18* 212:9, *10*
221:*17* 222:*11* 223:*3*
228:2 229:*14*, *24*
240:22 241:*8*
**listed** 147:*24* 177:*4*
191:*20* 217:*18*
227:*15*, *19* 229:20, *21*
237:*15* 239:6 241:*9*,
*10* 242:2 247:*19*
252:*18*, *19*, *21*
**Listen** 103:*18* 121:*16*
**listening** 163:*16*
**lists** 216:*19* 218:*11*
219:*17* 222:*17* 223:7
224:*25* 227:*12* 243:*5*
**litany** 98:2 226:*24*
**literally** 220:*20*
**litigation** 7:*23* 8:*5*, 8,
*17* 9:*3*, 8, *14* 85:*17*,
*18* 87:*5* 89:*25* 98:*13*,
*21*
**little** 110:2 121:*13*,
*18* 135:*17* 169:*12*
179:2*1* 200:2
**live** 7:*10*
**lived** 7:*8*
**lives** 139:*20*
**LLP** 2:*11*
**loan** 145:*14*
**location** 146:9
**logical** 142:*23* 149:22
**long** 4:*23* 7:*8*, *12*
12:*20* 65:*23* 70:*11*
97:*23* 109:2 113:2
138:22 146:*5* 153:*3*,
*23* 154:*3* 187:*12*
197:*10*

**longer** 45:2*1*, 24
98:*25* 141:9 153:*8*
182:7 243:7
**longevity** 66:6
**Longstanding** 152:*19*
**long-term** 32:*12*
184:2*1* 248:2*1*
**look** 11:*15* 42:6, *24*
55:*8* 113:*25* 116:*1*
117:*24* 118:2*1* 125:*5*,
*6* 131:*14* 135:*10*
171:7 172:*3*, 9, *10*, *17*
173:6 174:*12* 184:22
214:2*1*, *23* 215:*5*
216:*25* 221:*8* 223:*24*
225:*20* 228:*19* 239:9
241:6, *11*, *12* 242:*8*
243:2*1* 255:*14*, *18*
**looked** 42:2
**looking** 118:2 121:*3*,
9 135:6 141:*19*
152:*17* 189:*15* 192:9
204:9 205:*23* 214:*12*
220:*20* 254:*1*
**looks** 29:*14* 111:2
113:*19* 117:2 121:*4*
123:6 125:7 177:*13*
212:*10* 231:*4* 254:2*1*
**loss** 13:*18*
**lot** 13:9 18:*5* 23:*23*
26:*11* 54:*5*, *25*
109:22 117:2, *5*, *16*
118:*19* 134:2*1*
165:*11* 172:*8* 179:*16*
180:*1*, *21* 198:7
199:*25* 200:*8* 202:2*1*,
22 208:*11* 219:*5*
225:*24* 227:*25* 240:*5*
248:*19* 252:*4* 257:*13*
**lot's** 180:2*1*
**Louisville** 80:*23*
108:2*1* 109:*7*, *10*, 2*1*,
*25*
**love** 98:*16*
**lower** 235:*23*
**luck** 9:*11*
**ludicrous** 102:*12*
**lunch** 108:*10*

Case: 1:21-cv-00238-MRB Doc #: 66-3 Filed: 08/02/24 Page: 95 of 114 PAGEID #: 2872

Deposition of Gregory Carmichael, Volume I | Philip R. McHugh v. Fifth Third Bancorp, et al.

**< M >**
**M&A** 236:*21*
**M&T** 187:*23*
**main** 150:*24*
**maintaining** 74:*9*
**major** 150:*17*
**majority** 26:*23* 91:*4*
154:*4* 178:*13, 25*
**making** 13:*25* 15:*15*
16:*15, 17* 19:*9* 20:*7*
25:*2* 31:*2* 47:*20*
62:*5* 63:*2* 72:*21*
79:*1, 22* 86:*6* 90:*4*
97:*16* 99:*14* 105:*10*
118:*2, 11* 148:*13, 16,*
*17* 151:*7, 9* 163:*16*
179:*7* 204:*25* 207:*14*
209:*19* 242:*3, 6*
243:*25*
**Mallesch** 153:*1, 3, 10*
154:*16, 17* 155:*2*
**manage** 151:*1*
**managed** 199:*16*
257:*8*
**management** 19:*16,*
*18, 22* 20:*17* 24:*25*
49:*3, 20* 50:*8, 12*
100:*10* 111:*2* 115:*3,*
*4, 7* 120:*11, 15* 125:*8*
127:*12* 128:*4, 10*
130:*12, 15* 132:*10*
133:*7* 134:*9, 11*
140:*12* 141:*3* 152:*2,*
*7* 154:*15* 156:*25*
157:*23* 158:*15, 16*
178:*14* 180:*17* 185:*1*
186:*24* 198:*15*
199:*11* 200:*3, 4, 7, 11,*
*20* 204:*7* 206:*23*
212:*5, 6* 213:*4, 10*
214:*9* 215:*12* 223:*17*
224:*20* 227:*24*
228:*12* 230:*15* 238:*6*
239:*10, 12* 242:*24*
244:*11* 249:*21, 25*
252:*14* 253:*18, 21*
254:*25* 259:*7, 20*
260:*1*
**management/update**
231:*6*

**manager** 111:*12*
116:*12, 13, 16, 17*
117:*19* 118:*22, 24*
119:*4, 7, 10, 18, 21*
120:*3, 16* 127:*14, 18*
130:*16* 131:*3, 7*
140:*17, 20*
**managers** 122:*7, 23*
200:*20*
**manager's** 118:*18*
**managing** 131:*4*
143:*25* 144:*6*
**mandated** 54:*11*
**manner** 139:*19*
148:*2* 152:*8*
**March** 10:*16* 111:*15*
197:*20*
**marginalized** 160:*13*
173:*11*
**mark** 80:*11*
**MARKED** 3:*6* 10:*11,*
*14* 29:*9, 12* 36:*16, 19*
88:*17, 20* 110:*15, 18,*
*20* 113:*13, 16* 114:*22,*
*25* 120:*5, 7* 122:*25*
123:*3* 124:*18, 21*
127:*6, 9* 130:*5, 8*
132:*4, 6* 140:*6, 9*
152:*9, 12* 155:*11, 14*
177:*8* 201:*17* 203:*25*
204:*3* 212:*16, 17*
223:*10, 13* 229:*15*
230:*24* 242:*17* 244:*4*
252:*7* 253:*9, 12*
254:*17* 258:*24* 259:*3*
260:*11, 12*
**market** 34:*22* 36:*10*
38:*15, 21* 39:*24* 40:*7,*
*12* 41:*19* 43:*16, 22*
44:*1, 4* 149:*17* 151:*3,*
*22* 199:*9, 15, 19*
200:*1* 201:*6* 202:*23,*
*25* 225:*1, 3, 7* 232:*13,*
*19, 22* 233:*20* 244:*17,*
*20* 250:*12*
**marketplace** 40:*4*
41:*18* 43:*24* 47:*9*
**markets** 13:*19*
137:*21* 148:*1, 11*

149:*4, 14* 199:*8*
**marking** 212:*18*
**marks** 55:*10* 257:*8*
258:*9*
**married** 7:*12*
**Marsha** 50:*11*
253:*16, 19* 254:*3, 9*
**master's** 9:*19*
**materialize** 247:*13, 14*
**materials** 14:*1* 15:*16,*
*22, 24* 18:*8, 24* 160:*4*
**matrix** 123:*10*
**matter** 18:*1* 80:*15*
99:*8* 210:*22* 239:*13*
240:*13* 248:*18*
253:*17* 264:*8*
**matters** 15:*17*
101:*16* 125:*20, 23*
144:*2* 182:*21, 23*
**MB** 137:*13* 149:*25*
150:*1, 2, 23* 190:*20,*
*23* 197:*8* 198:*2*
202:*8, 18*
**McCallister** 253:*16*
254:*3, 10*
**MCHUGH** 1:*6* 2:*14*
4:*6, 11* 5:*2* 8:*5, 8*
9:*2, 8, 14* 28:*23*
29:*17* 30:*13* 31:*16*
32:*25* 33:*4, 14* 34:*2*
35:*14* 36:*4, 22* 39:*5,*
*11* 40:*16* 42:*1, 13*
43:*13* 44:*10, 25*
45:*11* 46:*14, 15, 16,*
*22* 47:*16* 48:*3* 55:*5,*
*6, 7, 18* 56:*10, 14, 18*
60:*6, 17, 21, 22* 61:*1,*
*11* 62:*7* 63:*7, 18*
67:*18* 68:*7* 69:*20, 24*
70:*8* 72:*4* 73:*4*
82:*19, 21* 83:*1* 86:*12*
88:*7, 25* 89:*13, 24*
90:*5, 16* 91:*16* 92:*4,*
*16, 24* 94:*3* 95:*18, 25*
96:*3, 23* 97:*1* 98:*13,*
*21* 99:*14* 108:*19*
109:*14* 110:*23*
111:*12, 21* 113:*16, 17,*
*20, 22* 115:*1, 3, 5, 9*
120:*8, 9, 11* 123:*3, 4*

124:*21, 22* 125:*18*
127:*9, 10, 13* 130:*8, 9,*
*12, 23* 131:*17* 132:*7,*
*8, 10, 12, 18, 21*
133:*11, 13, 17* 135:*8*
136:*5* 138:*19* 140:*9,*
*10, 13* 155:*15* 157:*2*
160:*2* 161:*14, 17, 18,*
*19* 163:*15, 22, 23*
164:*3, 13, 14, 17*
171:*8, 20, 24* 172:*22*
177:*11, 14* 181:*11*
182:*13, 20* 183:*11, 12,*
*17* 184:*6, 12* 185:*14,*
*22* 186:*3, 18* 191:*3,*
*20* 194:*4, 7, 11*
195:*14, 18* 198:*3*
201:*20* 204:*3, 4*
206:*8* 209:*15* 210:*2*
212:*24* 213:*7, 8, 17*
214:*7, 10, 11, 15, 17,*
*25* 215:*21* 216:*19*
217:*9, 11, 12, 18*
218:*2, 21* 219:*9, 10,*
*12, 17, 24* 220:*5, 8, 14,*
*16* 221:*10, 12, 18*
222:*2, 3, 4, 8, 24*
223:*3, 8, 13, 14* 224:*6,*
*11, 14, 17* 226:*3*
227:*6, 18* 229:*19*
230:*8, 9* 232:*11, 12*
234:*5* 239:*11, 13*
240:*15* 242:*20, 21*
243:*1* 244:*7, 8, 13, 23*
246:*10, 22* 249:*10, 24*
250:*17* 252:*10, 11, 16*
253:*13* 259:*4* 260:*21*
264:*3*
**McHugh's** 30:*17*
80:*2* 85:*23* 94:*20*
98:*5* 111:*17* 113:*24*
114:*3* 115:*14* 120:*12,*
*25* 127:*14, 24* 130:*13*
131:*17* 134:*7* 140:*21*
180:*6* 181:*16, 18*
188:*5* 214:*18* 216:*2,*
*6* 225:*16*
**mean** 8:*18* 26:*10*
31:*23* 35:*13* 49:*1*
54:*17* 59:*15* 62:*6*

81:18  84:23  85:19
99:6  106:21  121:16
125:2  146:24  148:5
149:5  150:6  152:4
158:4  162:23  163:5
169:1  172:2, 4, 8
201:7  202:21  225:2
228:5  233:4  235:15
244:18  252:2  257:24
**means**  50:3  51:20,
22, 25  90:9  138:13
233:17, 19  238:21
245:14  246:3
**meant**  35:7  51:19
75:4  85:11, 18  189:9
244:19  247:16
**measure**  116:5
**measured**  25:14
**mechanisms**  25:8
**meet**  108:19  257:5
**meeting**  12:3  14:9
15:13, 14  16:23  17:9,
22  18:7, 9  20:22
23:21  40:25  41:3
45:3, 7  71:13, 16, 19
77:20  106:10  132:2
188:16  204:14
231:21  255:2, 13, 25
256:19, 20  257:20
258:5  259:23  260:4,
10, 18
**meetings**  14:7  21:2,
5  22:18, 21  179:6
255:21  261:4
**meets**  71:17
**meld**  199:22
**Melissa**  178:19
**member**  13:22  14:12,
16, 19  20:20  23:5
53:14, 16  72:2  147:7
152:19  153:2, 3
160:12  173:10
178:12  185:20
187:22  234:19  244:3
**members**  14:20
20:24  21:1, 11  22:18,
21, 22, 25  23:2  24:5
54:6  164:2, 12, 19
178:10, 14, 17  179:2
190:22  237:12  240:5

243:24  253:7, 24
255:22, 25  257:11
**memo**  255:11
**mention**  38:23  39:15
142:7  162:18  258:17
**mentioned**  20:10
26:7  34:23  109:12
118:4  143:4  151:24
157:25  191:18
192:21  195:17
198:22
**merely**  14:16
**merits**  64:10
**message**  9:10  37:6,
17  41:23  45:9  46:10,
17  78:11  201:23, 25
205:1  256:21  257:15,
22  258:6, 10, 12, 13
**messages**  9:7  21:25
185:25  257:9  258:1
**messaging**  9:15
125:20  126:2  205:2
**Met**  7:16  71:14
108:25  148:9  202:10
255:15
**method**  22:1
**methodology**  25:13,
14  116:5
**meting**  256:8
**metrics**  25:10, 18
**Michael**  2:8  5:7
34:19  43:11, 13, 20
44:8, 9, 12, 24  45:4, 6,
11  46:5, 22  52:4
59:17  65:6  249:22
250:4
**Michael@blankrome.c
om**  2:14
**Michael's**  43:17
250:3
**Michigan**  9:22
**microaggression**
156:7  158:2, 21, 24
159:4, 21  160:3, 7, 21
166:20, 24  167:3
169:23, 25  170:9
173:18
**microaggressions**
161:7  170:16  172:25
**mid**  6:1  253:24

**middle**  151:21  199:8,
9, 15, 19  200:1
202:23, 25  225:1, 3, 7
232:13, 18, 22  233:20
244:17, 20
**midterm**  177:21
178:16  181:12  186:5
**midyear**  136:17
177:13, 16, 22, 23
178:4  179:2, 15
180:6  181:16, 18
182:13, 20  183:10, 16
184:5, 11  185:22
186:2  188:7  195:18
211:13  217:10
**mid-year**  135:16
**Mike**  43:11, 13, 17,
19, 23  44:4, 8, 9, 12,
16, 24  45:4, 6  46:5,
22  47:5, 6  239:25
249:22  250:2, 4
253:16, 19  254:3, 10
**military**  37:24
**million**  72:14, 20
73:5  75:19
**mind**  24:2  65:6
79:21  107:19, 20
165:5  182:15
**mindset**  103:22
189:17
**mine**  91:13
**minimum**  163:4, 21
**minuted**  261:7
**minutes**  108:11
195:4  260:18, 23, 25
261:18, 25
**Mischaracterization**
170:18
**Mischaracterized**
107:7
**Mischaracterizes**
39:9  80:5  160:22
206:12
**mischaracterizing**
89:19
**misinformation**  32:1
**misrepresented**  90:18
**misrepresenting**
214:22

**mistake**  217:14
**mistakes**  89:15
**mitigating**  25:3
**model**  150:3
**moderate**  216:25
217:3, 16  221:15
233:6, 24  234:3, 22
237:9, 15, 17, 20
238:2, 3, 15, 20
**modifications**  150:4
200:14
**modified**  226:14
**module**  156:14
**modules**  156:15
**money**  74:23, 24
75:2  77:3  80:14, 15
81:1  94:8  145:16, 17
**monitoring**  4:19, 20
25:8, 18
**months**  48:8, 14
197:13  211:3
**Morgan**  229:11
**mortgage**  145:14
**move**  42:24  81:11
184:1  245:11
**moved**  42:7  80:22,
24  135:16
**moves**  103:5  235:5,
25
**moving**  61:9  147:19
173:13  179:7  198:7,
18  206:19  212:4
245:8
**MRAs**  144:9
**MRIs**  144:9
**multiple**  66:22  67:4,
8  69:23  81:20  116:7
145:25  146:1, 8, 12
161:23  163:19  190:9
208:22  218:25  235:5
253:4

**< N >**
**name**  5:19, 20  128:8,
11  157:7, 8, 9  189:7
191:17  228:13  229:3,
6, 24
**named**  27:24  72:12
**names**  189:6

Case: 1:21-cv-00238-MRB Doc #: 66-3 Filed: 08/02/24 Page: 97 of 114 PAGEID #: 2874
Deposition of Gregory Carmichael, Volume I

Philip R. McHugh v. Fifth Third Bancorp, et al.

name's 111:9
naming 128:11
National 10:8 88:21
natural 150:10
nature 14:24 23:24
24:11 56:23 58:16
60:19 77:25 116:11
143:9 151:12 155:23
161:11 167:17
180:12, 19 205:13
212:8 230:6, 20
256:22, 24 257:25
near 136:17
necessarily 20:15
23:25 27:12 34:24
59:3 76:18 105:10
120:4 166:19 169:19
202:19 205:12 219:7
225:13 228:24
240:14 251:15
necessary 25:4 42:3
50:21 51:13, 17, 20,
21 52:9 53:9, 10
104:2 146:12 181:1
184:7 191:9 192:14
193:13, 18 202:13
216:16 232:4
need 6:21 33:6
45:22 75:13, 21 77:3
79:16, 18 80:20
83:16 88:15 149:6
162:17 167:10, 14
168:15 182:3, 5, 7
183:7 184:2 185:9
187:1 192:5 202:6, 7
210:24 211:6, 8
212:13 233:17
236:22
needed 14:5 18:19
36:1 39:13, 25 40:13
76:24 83:13 183:1
184:15 185:18 187:6
189:5 194:17 196:12
199:21, 22 200:25
201:7, 13 207:19, 21
232:17 233:20
needs 19:10 26:18
27:5 86:14 97:22
103:6 192:2 202:12

233:10 237:6 246:2
247:15
negative 108:1
159:22
neither 239:20
network 189:25
190:16, 19 191:4
236:15
never 40:22 48:5
56:19, 22 58:15
59:23 60:9, 11, 12, 14,
18, 19, 24 63:22 64:8,
9 65:13, 15, 18, 19
68:8 70:23 71:9
73:14 80:12 86:12
90:23 91:6 94:11, 12
97:10, 11, 20, 21, 24
98:2 101:17, 18
102:9 103:12 125:2
126:1, 5, 9, 18 127:5
139:2 162:4, 5, 8, 19,
20 164:7, 10 165:1, 2
166:17 168:6 169:11
171:12, 13, 19, 20
172:9, 13, 24 174:16,
17, 23 175:2, 3
177:25 180:18
184:20, 22, 23 185:2,
5, 6, 7, 11 186:5
190:20 191:14, 16
192:24, 25 193:9, 11,
12, 13, 14, 19, 20, 21
195:16 210:15 211:4
213:14, 23 214:2, 11
217:5, 11, 13, 23, 25
218:7, 9, 17, 24, 25
219:16 220:7, 10
221:8, 13 222:10
226:2 236:19, 20, 25
237:1 239:22 241:14
256:22, 23, 25 257:15
258:12, 15, 17, 22
new 39:19 73:22
81:12 149:8 156:22
173:19 228:23
news 82:24
nice 133:9 136:7, 10
144:1, 12 145:24
146:4 191:5

nine 25:24 238:13
NMA 102:17
No._____Change
265:2, 5, 8, 11, 14, 17,
20 266:2, 5, 8, 11, 14,
17, 20
No._____Line 265:2,
5, 8, 11, 14, 17, 20
266:2, 5, 8, 11, 14, 17,
20
nodding 6:22
non-board 72:2
non-independent
13:3, 10
Nope 259:16
norm 81:14
normal 21:16 81:15
182:15 209:22, 23
normally 144:22
North 250:11, 13, 14
Notary 1:21 263:6,
19
note 24:10 142:9
186:5
notes 24:9 40:25
45:3, 6 47:12, 18, 20,
21, 22 77:20 108:11
135:11, 13 136:5
185:21, 24 263:11
notwithstanding
81:25
November 12:8
221:4, 12 222:25
225:16 229:18, 19
246:22
number 4:7 10:14
29:12 30:10 36:19,
21 37:7, 10, 12, 15
61:21 74:20 88:20
106:20 110:18, 20, 22,
25 114:25 120:8
123:3 124:21 127:9
130:8 132:7 140:9
141:16 152:12, 17
155:14 175:14
176:24 177:11
201:20 204:3 213:6,
12, 13, 15, 18 218:1, 4
223:13 224:10 230:8
231:2, 14 242:20

243:2 244:7, 21
246:21 252:10
253:12 254:20 259:3
260:15, 16, 20
numbers 32:14 37:3
79:14, 20, 23
Numerous 101:25
139:23 143:7 162:7

< O >
oath 264:15
object 66:25
objection 8:18 29:23
33:17 39:8 47:1, 24
50:4 51:15 52:12, 17
54:1 57:6, 18 59:6,
21 62:3, 13 63:8
64:16 65:1, 25 70:10,
14 76:2 78:16 79:1
80:5 87:6 89:15
90:6 91:17 92:5, 17
93:1 94:23 95:3, 21
96:1 97:3, 6 98:14
100:18, 23 103:15
104:24 105:17, 22
106:19 107:7 112:3
114:5 125:25 126:1
129:17, 25 131:20
138:20 139:13
154:10 158:3 160:22
164:15 165:7, 20, 25
167:4 168:2, 18
170:2, 11, 18 171:1
175:6, 16 176:5
191:22 195:3 206:12
213:22 214:19 218:6
226:18 240:18
objections 55:7
objective 18:6 235:9
241:8 242:2
objectives 147:21
observation 179:11
observations 179:17
259:18
observed 179:12
240:12
observing 195:15
obstruction 96:16
obtain 9:20

Case: 1:21-cv-00238-MRB Doc #: 66-3 Filed: 08/02/24 Page: 98 of 114 PAGEID #: 2875

Deposition of Gregory Carmichael, Volume I    Philip R. McHugh v. Fifth Third Bancorp, et al.

obviously 13:9 15:15 22:5 30:24 39:16 40:4 53:9 60:1 70:17 72:3 99:6 123:11 126:23 135:20 136:24 138:13, 14 214:12

occur 43:12 70:4 91:5 94:11, 17

occurred 28:1 42:19, 20 61:1 67:21 79:12 97:11 141:12 163:17 186:15 187:6 229:18, 25

occurring 42:17 94:11

occurs 20:16 187:19

October 11:6 84:6, 14 123:7 137:6 201:25 214:1 215:22 220:18 263:14

odd 161:24

Odyne 54:23

offer 35:14 80:3 152:22 229:11 264:14

offered 32:20, 25 34:9 40:2 71:2 75:3, 9 80:16 113:11 138:6

offering 137:6

offhand 37:12 178:9

office 4:21 35:16 41:4 69:12 83:2, 4, 14, 17, 22 149:9 150:25 151:1 161:19 163:8, 11, 24 171:9 177:14 195:20 198:15 258:19 263:13

officer 10:23, 25 23:1 24:13, 15, 19, 20 26:3 28:10, 14, 17, 19 32:18 43:5 72:13 84:4 127:20, 21 131:1, 13, 15 133:2 149:13 153:16 156:23 157:19 183:13, 18, 20 203:5

officers 76:22 145:14

official 77:22, 24 263:13

off-site 188:16

Off-the-record 262:9

oftentimes 14:19 23:18 24:18 27:18 81:19 101:22 149:12

oh 38:23 80:19

OHIO 1:2, 20, 21 2:6, 13 4:5 7:7 92:19 96:9 263:1, 7, 13, 19

okay 8:22 11:10, 22 12:11 32:24 37:1, 4, 9, 17 38:10, 23 42:14, 20 43:3 48:14 51:23 73:15, 17, 23 74:9 82:12 85:16, 20 89:4, 9 90:4 93:23 106:14 107:12 108:17 110:9 111:6, 11 121:15 122:21 126:12 135:5, 9 158:19 160:15 162:25 163:5 176:23 189:7 195:8 202:2 212:12 214:16 215:15 216:1 224:12 226:4 234:2 244:15, 22 245:2 246:23, 24 249:18 250:21 255:17 262:6

old 62:24 81:21 111:2 137:16, 17 169:14, 15 172:5 173:20 215:19

older 169:17 171:25

onboarding 199:15

once 15:13, 17, 25 20:23 23:2, 7 26:9 27:4 31:11 44:4 54:18 60:14 68:2, 10 70:18 71:6 76:19, 23 78:11 79:4 83:14 90:20 114:9 117:14, 25 118:9, 25 123:12 131:24 133:9 135:18 151:22 162:19 163:20 174:6 178:2 179:25 184:22 186:9 187:25 201:14 218:9

232:23 233:7 238:23 243:14, 21 246:1, 12 247:11 248:12 252:1 256:4

one-off 200:8

one-on-one 21:5 22:17, 20 257:5

ones 76:19 178:15

one's 214:19 233:12

online 156:9

open 150:20

operate 236:18

operates 139:18

operating 10:25 127:19, 21 131:12, 15 133:2 149:13

operation 10:24 13:18 122:8 198:2, 5

operational 16:6

operations 10:10 147:6, 10

opine 90:8 92:20 243:16

opinion 53:2 65:9, 10 100:10, 16, 21 101:1, 5 102:8 167:7 170:2 203:4, 5, 6 234:6

opportunities 102:17 117:8, 9, 25 118:25 119:6, 23, 25 120:3 122:1 147:23 150:4 198:11 224:3 238:24 245:13 247:17, 24 248:17, 19 257:4

opportunity 30:21 35:2, 4 36:5 41:8 43:16 49:6 116:25 118:3 119:15 137:4 143:14, 16, 19 149:8, 18 181:3 225:14 232:16 233:3 236:20 246:1, 8, 13, 14, 18 247:22 248:1, 6, 7, 15

opposed 30:2 239:4, 6 243:7, 10

opposite 170:11 173:13 257:7

ops 31:7

optimal 132:24

option 102:22

options 19:11 183:1

orchestrated 17:13

order 4:25 59:8 94:7 183:19

organization 19:5 25:1, 23 26:10, 16, 18, 19 31:6 48:22 50:15 58:22 64:12 84:12 86:6 87:21 94:15 107:15 113:10 114:2 116:6 117:4, 8, 13, 15, 16, 20 118:8, 9, 10, 13 119:2, 11 122:6 123:13, 23 124:2 127:17 132:24 139:2 142:4 143:5, 17 144:10, 11 147:4, 16, 22 148:9, 18 150:17 157:2 161:17 179:4, 19 180:23 182:16 184:1 191:7, 8 204:20 217:15 225:21, 23 229:9 230:22 232:24, 25 233:2, 10, 11 234:15, 17, 18, 24 235:8, 16, 23 236:1 237:22, 25 238:11 239:13 240:7 241:1, 16 245:13 246:9 247:16 248:8, 14 251:23 257:8

organizational 27:5, 22 119:3, 5

organizations 149:11 203:7

organization's 117:20 182:25

outcome 118:8 169:19 185:2 211:10 247:15

outcomes 60:3 117:17 139:1 144:3 145:1

outside 8:2, 19, 20 9:3 56:2 97:11 124:3 153:21 209:8 239:18, 19 240:10 249:13

**outstanding** 136:*12* 144:*20*

**overall** 24:*24* 112:*20* 121:*6, 11, 16* 129:*23* 133:*12* 134:*16* 239:*10*

**Oversee** 10:*10* 13:*17*

**overseeing** 30:*22* 115:*17* 131:*4* 198:*1, 16* 202:*8*

**Oversees** 28:*11*

**oversight** 13:*12, 14* 17:*14* 25:5, *12, 16* 31:2, *9* 44:*3* 49:*9* 134:*19* 143:*4, 21* 148:7, *14, 24* 149:*1, 20* 150:8, *11, 16* 151:*11* 152:6 198:*5, 8*

**< P >**

**P&L** 13:*18*

**p.m** 37:*19, 24* 114:*17, 20* 155:7, *9* 177:*15* 206:2, *4* 248:*25*

**package** 31:*20*

**PAGE** 3:*3* 29:*20* 30:*9* 43:2 61:*22* 66:*22* 93:*14* 112:7 115:*21* 121:3, *4* 124:*14* 125:*17* 129:22 131:*16* 133:*16, 18* 136:5 141:*16* 155:*24* 160:2 173:*4* 175:*20, 25* 177:*4* 212:5 214:*4* 219:7, *14, 15* 221:*11* 223:6 261:*11, 18* 265:2, 5, *8, 11, 14, 17, 20* 266:2, 5, *8, 11, 14, 17, 20*

**pages** 121:*8* 263:*8*

**paid** 72:*21* 75:*25* 76:7, *12, 14, 15, 18, 21* 86:*4* 142:5

**paper** 79:*6* 173:*21*

**paragraph** 11:*19* 30:*9* 31:*19* 32:*17* 35:6 43:2, *4* 45:*14*

48:7 49:*25* 50:*4* 54:*14* 61:*21, 23* 66:*21* 71:*12* 72:8, *17* 75:*17* 78:*14, 22* 82:*23* 84:*19* 85:*16, 20* 88:*1* 93:*14, 16* 133:*17* 135:*10* 136:5 138:*18* 139:*11* 141:*20* 142:7 143:*24* 144:*19*

**paragraphs** 72:*25*

**parallels** 119:*12*

**parameters** 238:*3*

**paramount** 192:*14*

**part** 15:*1* 19:*14* 20:*15* 34:*20* 35:5 44:7 49:*3* 50:7, *16, 21* 51:*10, 13* 52:*24* 54:*20, 24* 55:6 57:*24* 67:6 69:*15* 71:*10* 73:6 88:*9* 98:*10* 128:*23* 131:8 148:*19, 20, 25* 156:*13* 157:2, *5* 174:*4, 6, 9, 14* 175:*12* 183:7 187:*11* 190:*22* 200:*4, 6, 19* 207:*22* 209:*22* 210:*1, 2, 16* 211:*8* 215:*9* 238:*8* 241:2 246:*11*

**participate** 57:*13*

**participated** 130:*20, 23*

**participating** 4:*16*

**particular** 51:*17* 54:*22* 103:*19* 156:*21* 173:*14* 180:5 205:*15*

**parties** 116:*7*

**partners** 139:*7, 16*

**partnership** 18:*25* 113:*5*

**parts** 198:*7*

**party** 51:*3, 12* 57:*22* 116:*6* 146:*10*

**Pas@sspfirm.com** 2:*7*

**pass** 231:*25*

**paste** 225:*24*

**path** 110:*11*

**Patterson** 2:*5*

**pay** 93:*19*

**peer** 56:*3, 6*

**peers** 54:*22* 55:*3, 9, 22* 58:7 67:*7, 15* 68:*6, 10* 139:*19* 190:*4, 19*

**PENALTY** 264:*5, 6*

**pending** 4:*4*

**people** 19:*24* 30:*20* 31:*11* 55:*15* 87:*1, 11* 98:*22, 23* 117:*4* 139:*4* 143:*11* 145:*11, 13* 148:*19* 157:*1* 171:*17* 174:*17* 175:*24* 188:*19* 198:7 203:*4* 225:*22* 229:*11* 233:*1* 242:7 251:*14, 15, 20*

**percent** 73:*9, 10* 77:*16* 129:*9* 135:*21* 137:*10* 138:5

**perform** 235:*14*

**performance** 16:6 19:7 26:2 31:*3* 32:*11* 111:2, *18* 112:*1, 2* 115:*3, 4, 15, 16* 118:*19* 120:*11, 25* 121:*1, 20, 23* 122:*23* 127:*12* 128:*3, 19* 130:*11* 132:*10, 24* 133:*22* 139:*24* 140:*12, 15* 143:*9* 199:*21*

**performed** 25:*15* 32:*12* 132:*11*

**performer** 122:*9*

**performers** 122:*9* 144:*24* 145:*8, 17, 19*

**performing** 25:*10, 13* 114:7 132:2 143:*11* 178:*4* 229:*12*

**period** 14:*12* 17:*23* 19:2 27:*6, 18* 40:6 48:*17* 137:*12* 154:*4* 168:5 174:*19* 177:*19* 256:*12*

**PERJURY** 264:*5, 6*

**perks** 74:7 87:*18*

**permanent** 18:*18* 60:*17* 184:*4* 189:*11, 13*

**permitted** 59:*9*

**Perry's** 194:*4, 11* 196:*4, 20, 24*

**person** 23:*12* 51:*1* 55:*11* 104:*14* 132:*11* 150:*25* 157:*18* 173:*12* 193:*9, 25* 211:*23* 212:2 228:6 229:*8* 232:*22* 235:7 250:*4* 251:*9*

**personal** 106:*4* 125:*19* 180:*12* 182:*22* 183:*3* 186:*16, 20, 21* 187:2 206:*10, 15, 25* 207:*5, 6, 9, 10* 208:7 209:*1, 10, 24*

**personally** 158:*5, 7*

**personal-related** 208:*17*

**perspective** 42:*11* 134:*14* 147:*8, 15* 174:*21* 191:*15*

**Peter** 2:*1* 3:*4* 4:*11, 14*

**petulance** 84:*20, 24* 85:*12*

**phase** 118:*11*

**Phenise** 2:*17* 5:*10*

**Phil** 8:*5, 8* 9:2, *8, 14* 28:*23* 30:*17* 31:*16* 32:*25* 33:*4, 14* 34:*2, 9, 23* 35:*14* 36:*3, 9* 38:*3, 20* 39:*11* 40:*16* 42:*3, 13* 43:*13, 15* 44:*10, 17, 25* 45:*2, 11* 46:*4, 5, 6, 7, 9, 14, 15, 16, 20, 22* 47:*4* 48:*3* 55:*5, 6, 7, 18* 56:*9, 14, 18* 57:*11* 60:*5, 16, 21, 22* 61:*1, 11* 62:6 63:*7, 18, 21* 67:*18, 24* 68:*7, 21, 22* 69:*10, 20* 70:*8, 19* 72:*4* 73:*4, 18, 22* 74:*4, 19* 77:*10* 78:*8* 79:*19* 80:*2, 10, 13* 82:*3, 19, 21* 85:*21, 23* 86:*12* 88:*7, 10, 11, 25* 89:*13, 24* 90:*5, 16* 91:*16* 92:*4, 15, 24* 94:*3, 20* 95:*18, 25* 96:*3* 98:*5, 13, 21*

99:3, 14  105:5
108:19, 24, 25  109:9,
14, 18  111:17, 20
112:11, 20  113:11, 19,
22, 24  114:3, 9  115:3,
5, 9  116:21  120:11,
12, 25  121:21  122:3,
12  127:12, 24  129:15
130:12, 13, 23  131:17,
23  132:10, 12, 18, 21
133:4, 10, 12  134:7
136:6, 9  138:6, 22
139:1, 5, 14, 18
140:12, 21, 22  141:6,
24  143:13, 14, 24
144:20, 24  146:2, 5,
19, 25  147:8  148:15
151:10  153:18
161:14, 17, 18, 19
162:2, 15  163:10, 15,
21, 23  164:3, 12, 14,
17  166:18  169:11
171:8, 20, 24  172:22
177:14, 16  180:6, 15
181:2, 7, 8, 11, 16, 18,
20  182:13, 20, 22
183:11, 12, 17, 21
184:6, 12, 20  185:2, 5,
14, 22  186:3, 6, 8, 17
188:5, 9, 13, 15, 16, 17,
22, 24  189:1, 6, 12, 14
191:3, 5, 14, 16, 20
192:1, 6, 11, 18, 19, 22
193:9, 17, 22  194:4, 5,
11, 14, 15, 25  195:1,
14, 15, 18, 23  196:3, 7
197:3, 6  198:3, 24
199:2, 3, 4  200:25
201:2, 4, 9, 14  202:11,
12, 24  203:9, 14, 17
206:8, 14  207:1
209:15  210:2, 18
214:10, 11, 18  216:2,
6, 18  217:9, 11, 12, 17
219:17, 24  220:4, 8,
14, 16  221:12, 17
222:1, 3, 4  223:3, 8
224:6, 14, 16, 19
225:13, 16  227:18
229:19  232:12, 16

233:3  234:5  235:17
236:7, 8, 10, 23  237:9,
18  239:3, 11, 12
240:2, 4, 6, 15  246:10,
20  249:10, 24  250:5,
16  252:1, 2
**PHILIP**  1:6  2:14
4:6, 10  29:17  30:13
264:3
**Phil's**  35:16  64:4
74:23  81:10, 25
109:4  112:1  115:25
149:21  166:16  180:8
191:17  202:17
229:23  235:5  238:7
241:14  251:7
**Phone**  2:7, 13  20:21
37:7, 10, 11, 12, 15
58:21
**phrase**  162:19  241:3
**physical**  74:10
**Physically**  22:1
**picked**  133:8
**Place**  1:19  14:5
16:1  18:3  25:4, 7, 8,
18  31:3  55:25  56:8
57:21  142:10, 23
173:16  187:13
196:18, 20  208:2
220:25  228:21  233:1
257:1  261:5
**placed**  246:5
**placeholder**  228:15
**Plaintiff**  1:7, 16  2:1
4:10, 12  30:12  32:20
43:7  45:15  66:23, 25
67:1  71:16  72:11, 12,
18  82:25  84:20  88:1
93:13, 20  94:3  95:17,
20  209:16
**plaintiff's**  31:20
93:19
**plan**  17:12  126:17
136:9  150:1  185:18
186:23  213:5, 11
215:5  219:15  223:1,
18  224:6  227:9
230:15  236:14
242:25  244:12

252:14  253:18, 22, 24
254:24  259:8
**planned**  181:5
**planning**  17:1, 6, 11,
16, 18, 19  18:3, 10, 15
19:23  35:24  48:8, 15,
16, 23  49:4, 7  64:3, 6,
24  65:12, 21  107:14
146:9  182:20  183:8
185:16  186:24
187:12  197:5  209:23
223:25  232:3  254:25
259:20  260:1
**plans**  48:21  215:10
**platform**  16:16
200:9, 12, 17
**play**  182:6, 8  198:25
211:6  232:23  250:6
**player**  139:6
**players**  190:6
**please**  5:20  6:19
7:6  8:6  10:15  17:3
44:20  46:12  59:19
69:22  76:4  89:20
110:19  111:1  113:18
115:2  116:18  120:10
123:5  124:23  127:11
130:10  132:9  139:12
140:11  155:16
177:12  204:5  213:2,
8, 21  218:3, 4  223:15
230:13  231:3  237:14
242:22  244:9  252:12
253:14, 25  254:20
259:5, 24  260:17, 22
261:12
**pleased**  99:16, 24
**pleasure**  87:11, 12
**plugged**  134:17
**plus**  218:12  222:13
223:5  226:10, 11
227:22  228:3
**PM**  113:19
**PNC**  2:12
**point**  26:14, 18
27:16, 19  36:19
42:12, 14, 25  43:20
52:12  73:2, 13  81:8,
23  100:11  101:14
103:25  107:11

117:14, 19  118:1, 9,
17, 21  120:13  127:17
128:16  131:11
132:15, 20  134:11
135:1  136:4  140:17
149:2, 24  150:25
152:1  154:19  180:4,
7  183:2  184:8
186:25  201:5  203:7
211:11  220:25
221:17  223:21
225:11  227:1  238:23
242:8  246:15  255:10
**pointing**  144:15
231:20
**points**  14:9  16:11
117:23, 25  174:10
**police**  156:21, 22
157:19
**policy**  88:12
**Poole**  2:17  5:10
**portray**  203:17
**position**  11:6, 10
13:4  26:7, 12  27:7, 9,
16, 17  30:19  31:6, 10,
13  32:6, 20  33:7
34:17  38:10  39:12,
17, 25  40:3, 18, 19, 23
41:7  43:7  45:12, 17,
21  48:10  49:1, 14
50:16, 22  51:1  65:24
66:7  70:22  72:11
73:7, 17, 21  75:23, 24
76:6, 9, 11  77:18
78:14, 22, 25  79:17
80:16, 24  81:12
86:22  90:4  98:5
99:9  100:6  102:1, 3
104:4  106:13  109:5
112:16  115:5, 16
120:12  127:20, 24
128:6, 7  130:13
131:10, 24  132:14
140:21  141:10
142:10  143:7  148:13
181:24  182:2  183:20
193:20  211:1  225:12,
13  226:9  228:1
232:13  233:13

237:*19*  241:*18*
246:*13*
**positioned**  243:*18*
**positions**  13:*20*
103:*4*  122:*12*  152:*3*
216:*18*  218:*11*
221:*18*  222:*12*  224:*7*,
*18*, *23*, *25*  244:*16*
245:*12*
**positive**  28:*1*  33:*9*,
*12*  34:*8*  129:*7*  144:*3*
256:*12*
**positively**  145:*1*
**possible**  136:*3*
150:*12*  151:*10*
245:*13*
**possibly**  208:*10*
**potential**  19:*9*  31:*7*
48:*22*  57:*22*  68:*1*, *11*
102:*16*  105:*4*  106:*2*,
*11*  144:*1*  204:*24*
208:*19*  211:*25*  212:*6*
216:*18*, *25*  217:*3*, *16*
218:*11*  221:*15*, *18*
222:*12*  224:*18*, *22*, *25*
225:*12*, *14*  226:*8*
228:*6*, *16*, *22*  229:*8*,
*12*  232:*12*, *15*  233:*5*,
*6*, *15*, *17*, *19*, *23*, *24*, *25*
234:*3*, *10*, *16*, *22*
235:*6*, *10*, *15*, *19*, *20*,
*24*  236:*2*, *3*, *4*  237:*10*,
*15*, *17*, *20*, *21*  238:*2*, *4*,
*8*, *12*, *14*, *20*  244:*16*
245:*3*, *4*, *10*, *12*, *14*, *16*
246:*1*, *16*, *18*, *25*
247:*12*, *18*  248:*12*
**potentially**  23:*6*
64:*12*  71:*24*  86:*22*
104:*5*  107:*21*  146:*11*
166:*15*  172:*18*
187:*21*  215:*14*  228:*1*,
*16*
**potential's**  225:*11*
**PowerPoint**  231:*7*
**practice**  133:*20*
135:*20*  136:*1*  168:*24*
186:*4*  230:*21*
**practice-related**
134:*10*, *20*

**practices**  133:*20*, *23*
134:*12*, *16*, *18*  173:*17*
174:*5*
**predecessor**  27:*23*
**prejudiced**  160:*12*
173:*10*
**preparation**  7:*17*
14:*1*  204:*16*
**prepare**  7:*14*  16:*20*
19:*21*  31:*7*  179:*15*
180:*1*, *5*  181:*15*
**prepared**  25:*9*  57:*12*
213:*15*  226:*24*
**presence**  8:*19*, *20*  9:*4*
**Present**  2:*14*  4:*8*
8:*21*, *22*, *24*, *25*  20:*18*
46:*21*, *23*  71:*19*  72:*4*,
*6*  163:*10*, *13*, *15*
205:*10*  210:*18*
223:*25*  224:*19*  232:*5*
246:*17*
**presentation**  72:*5*, *7*
231:*7*
**presented**  15:*16*
17:*17*, *21*  18:*14*
25:*11*  155:*20*  156:*3*
182:*10*  204:*7*, *9*, *12*
215:*11*  223:*22*  232:*9*
259:*13*, *15*, *17*  260:*3*,
*9*
**presenting**  174:*8*
190:*12*
**president**  11:*1*, *3*, *9*,
*11*, *16*  13:*15*, *16*, *21*
17:*6*  18:*10*  26:*22*, *25*
27:*1*, *3*, *12*, *23*  28:*4*
30:*14*  32:*18*, *21*  34:*3*
38:*7*  42:*5*  43:*7*, *21*
44:*3*  45:*12*, *17*  48:*10*
49:*1*, *15*, *18*  50:*3*, *22*
51:*2*, *13*  53:*23*  55:*12*,
*16*, *19*  56:*21*  57:*22*
58:*13*  59:*5*  60:*8*, *10*,
*23*  64:*14*, *24*  65:*12*,
*21*  67:*1*, *19*  68:*1*, *4*, *7*,
*11*  69:*4*, *25*  70:*9*, *24*
77:*12*, *13*  81:*23*
83:*21*  84:*9*  85:*3*, *4*
86:*9*  100:*4*, *7*, *15*
101:*3*, *8*  103:*4*, *11*, *13*

**practices**  104:*5*, *22*  105:*8*
106:*11*, *17*  107:*1*, *22*
108:*24*  109:*9*, *21*
110:*10*  113:*1*  132:*16*
142:*15*, *20*, *22*, *23*, *24*
143:*1*, *23*  144:*23*
146:*3*, *4*  148:*21*
149:*13*  161:*20*
162:*12*  183:*12*, *19*
184:*13*, *18*, *21*, *24*
185:*3*, *7*  186:*18*
187:*8*  189:*13*  194:*7*
195:*2*  206:*10*  211:*15*,
*22*, *25*  212:*7*  216:*19*
221:*16*, *18*  222:*3*
226:*11*  229:*20*, *22*
234:*20*  235:*1*, *16*
236:*2*  237:*19*  238:*18*
245:*22*  250:*11*
259:*21*  260:*2*
**president/CEO**  60:*25*
64:*6*  66:*24*  188:*25*
189:*2*  217:*1*
**president/COO**  27:*24*
**presidents**  30:*23*, *24*
39:*19*  142:*25*  148:*10*,
*25*  149:*12*, *14*  172:*5*
**president's**  17:*1*
141:*1*  145:*5*  146:*6*
163:*19*  235:*22*
**pretty**  34:*8*  131:*14*
172:*2*  187:*18*  251:*22*
**previewing**  146:*11*
**previously**  187:*7*
206:*7*  259:*12*
**primarily**  20:*4*
**primary**  18:*6*  20:*8*
**prior**  16:*22*  19:*6*, *15*
27:*11*  32:*11*, *13*  51:*6*
70:*23*  75:*15*  81:*16*
82:*13*  84:*4*, *8*, *11*
86:*21*  106:*15*, *17*
107:*8*  109:*2*  120:*14*
121:*5*  125:*8*  137:*22*
138:*7*  146:*21*  187:*16*,
*17*  190:*9*  220:*20*
246:*11*  255:*21*, *25*
**privileged**  102:*18*
**proactively**  143:*25*

**Probably**  6:*1*  11:*1*
26:*24*  34:*6*  74:*22*
75:*8*  79:*6*  123:*25*
137:*15*  151:*20*  156:*2*,
*3*  179:*8*  197:*13*, *14*,
*15*  199:*3*  205:*5*
230:*19*  243:*13*  247:*9*
253:*1*  255:*7*
**problem**  170:*16*
202:*4*  240:*2*, *3*
**problems**  199:*7*
201:*1*  202:*18*
**proceed**  36:*20*
**proceeded**  79:*25*
**proceedings**  263:*9*
**process**  17:*13*, *18*, *20*
18:*15*, *17*  20:*13*, *15*
48:*16*, *18*, *20*  49:*3*, *4*,
*7*, *10*, *17*, *20*  50:*8*, *9*,
*17*  51:*9*  54:*4*, *21*, *24*
55:*6*, *7*, *15*, *19*, *23*, *24*
56:*1*, *4*, *7*  57:*21*, *24*
60:*1*, *2*, *6*  61:*10*  67:*6*,
*15*, *21*, *23*  68:*3*  69:*15*
89:*18*  90:*5*, *7*, *9*
95:*10*  96:*2*, *9*  97:*23*
100:*10*, *25*  101:*2*
104:*17*  107:*14*, *25*
116:*4*, *8*  126:*7*, *10*, *13*,
*14*, *17*  127:*4*  131:*6*
134:*12*  135:*24*
156:*13*  177:*22*  179:*7*,
*16*  180:*1*  183:*8*
187:*12*, *13*  188:*1*
197:*10*  199:*17*, *23*
204:*18*  207:*21*, *23*
209:*8*, *23*  210:*1*, *3*, *17*
211:*5*, *10*  212:*14*
216:*9*  220:*19*  252:*3*
**processes**  60:*3*
107:*23*  120:*1*, *2*
144:*6*  199:*11*, *13*, *14*,
*22*
**process-related**
199:*15*
**produced**  37:*5*
**productive**  202:*3*
**professional**  94:*10*
243:*20*

**profile** 54:25 192:3
193:22 237:7
**profit** 13:18
**program** 150:25
158:13 198:15
**progress** 19:7
**promise** 98:12, 20, 24
99:21
**promised** 56:22 71:5
97:9 105:5
**promises** 98:22, 23
**promote** 82:2 142:22
171:15 240:11
**promoted** 81:8, 16,
20, 22 85:2 91:12
110:9 113:10 142:5
185:14
**promotes** 169:21
**promoting** 102:25
224:4 242:5
**promotion** 80:25
82:1 86:8 122:2, 10
133:10
**promotions** 81:5
**prompted** 193:15
**proper** 129:18
**proposing** 188:24
189:1
**protected** 48:11
61:24 62:1, 7 159:23
175:22, 24 182:25
**protective** 4:25
**proud** 21:8 162:22
163:7 164:21 169:21
171:8, 9
**provide** 13:12 16:12,
25 17:5 18:8, 12
19:17, 19 24:24 32:8
59:23 119:4, 18, 21
146:14 150:20
153:10, 14 156:18
158:1
**provided** 7:19 15:25
16:10 17:2 128:24
140:25 160:3 172:13
174:2 232:1, 4
259:22
**provides** 119:11
**providing** 15:22, 23
19:4 31:1 44:3

144:20 232:20
254:23
**proviso** 96:7
**proxy** 72:11, 13 73:6,
9, 12, 14, 15, 17, 18, 21,
23, 24, 25 74:2 76:1,
8, 13, 16, 17, 25 77:6,
18 78:2, 10, 12 79:17
82:8, 14 86:18
122:11, 12 129:10, 13,
14 155:5 172:19, 20,
21 216:12, 13, 17
**Public** 1:21 107:12
263:6, 19
**publicly** 155:5
**pulling** 225:23
**punishment** 93:20
94:2
**punitive** 89:12 91:16,
21, 24 92:3, 6, 10, 15,
24 94:1 96:22
**purpose** 245:17
**purposefully** 89:19
**purposes** 66:24
67:19 70:1
**pursuing** 182:21, 23
**pushing** 202:22
**put** 5:4 16:16 19:14
25:4, 6, 7, 8, 18 31:24,
25 33:11 39:16
41:15 51:1 52:15
55:5, 9 66:10, 11
72:10 73:11 74:21
75:13, 21 79:15, 18
87:16 94:14 101:2
105:3, 4 111:8, 10
119:25 126:24 127:1,
4 135:12 172:19
180:18 181:21
182:10 186:10
188:11, 20 189:7
195:24 196:10, 14
199:20 203:7 206:22
207:17 208:1 217:5,
24 218:18 222:15, 20
225:18 228:2 229:2
233:1, 4 236:12, 14
248:21 253:1
**Putrino** 250:10, 11

251:4
**Putrino's** 251:5
**puts** 86:13 146:10
219:6
**putting** 18:3, 23
87:20 90:20 126:20
185:4 211:17 224:4
229:5

**< Q >**
**qualifications** 63:21
64:11 65:17 98:1
100:11 101:6 104:1,
9 124:10 191:19
193:7
**qualified** 51:1 60:16
63:22, 23, 25 74:5
98:3 107:18, 20
174:24 183:18, 22
187:23 237:24 263:6
**quarterback** 184:2
**question** 6:20 7:1, 2
8:6, 24 14:11 17:3
21:24 27:8 29:24
39:9 44:15, 21 46:12
51:11, 16, 24 52:1, 6,
19, 21 54:2 56:11
57:7, 19 59:11, 14, 16,
18 63:11, 12 64:21
65:5, 6, 8 66:1 69:22
70:11, 12, 15 76:3, 4
78:19, 20 80:11
89:20 90:11, 13
92:10 93:6, 25 94:24
95:4, 10, 12, 15, 22
96:7, 10, 13, 15, 17, 24
101:20 103:2, 16
104:20, 25 105:1, 18
106:22, 23 108:10
119:19 124:15
129:18 159:1 161:1
164:5 165:23 166:1,
5 167:21 168:1, 3, 19
170:5, 6, 7, 12, 13, 23,
25 171:3 173:7
175:8 176:2, 6, 8, 9,
10, 19 177:1, 7
181:12 191:23
192:17 194:8, 9
205:14 207:4 208:5,

6, 8, 22 210:22
211:18 215:20
217:24 237:13, 14
240:19 242:13, 15, 16
254:5 257:18 259:24
261:14, 15
**question{sic** 104:25
**questioning** 108:14
**questions** 6:18 14:8
52:3 59:7, 9, 12
70:15 166:4 180:22
253:25
**question's** 95:15
167:16 176:14
**quick** 203:22 259:18
**quickly** 35:23 188:8
203:23 207:2
**quit** 68:22 69:10
70:19 83:11 88:15
90:24 153:18
**quite** 20:2 27:21
55:3 117:22 164:20
197:24
**quitting** 88:13
**quote** 61:11

**< R >**
**race** 173:14 175:21
**racism** 175:21
**raise** 74:11, 16 87:18
131:23
**raised** 95:17 146:2
**ran** 108:25 111:23
198:16
**ranking** 48:9 133:12
**Rashty** 239:15
**rate** 242:9
**rating** 114:9 121:4,
6, 9, 11, 15, 16, 17
129:23 221:23
**ratings** 130:25 180:3
**RBC** 9:25
**reach** 122:6
**reached** 23:18
195:19 256:3
**reaching** 23:4 56:2
**reacting** 56:18
**reaction** 241:21
**reactions** 86:21

Case: 1:21-cv-00238-MRB Doc #: 66-3 Filed: 08/02/24 Page: 103 of 114 PAGEID #: 2880

Deposition of Gregory Carmichael, Volume I      Philip R. McHugh v. Fifth Third Bancorp, et al.

**read** 11:2 38:*13* 59:20 63:*11, 13* 70:*12, 13* 85:20 87:7 89:*4, 5, 7, 20, 22* 111:*23* 112:*4, 8* 121:*21* 129:*19* 131:*21* 138:*18* 139:*11, 25* 156:2 164:*8, 10* 166:*5, 7* 173:6 175:*17* 214:*3* 234:*1* 242:*1* 261:*19, 21* 262:3 264:7, 9

**readiness** 101:5 212:*12*

**reading** 89:6 140:22

**reads** 43:*4* 54:*15* 61:23 66:22 71:*13* 93:*17* 149:2, *24* 152:*1*

**ready** 101:*3, 8* 176:23 183:*13* 195:*14* 210:*17* 211:22 216:*19* 221:*19* 225:1, *4* 232:13 233:*18, 19* 245:5 246:2 247:*1*

**reaffirming** 54:*25*

**realistic** 253:2

**realize** 149:*25*

**really** 14:22 17:*24, 25* 21:*13* 33:*10* 56:*15* 66:*18* 101:*16* 109:22 112:5 123:*12* 124:*14* 178:*1* 196:22 198:23 200:*15* 201:*12* 210:25 238:15 241:*17*

**re-ask** 259:*24*

**reason** 65:*14* 116:*24* 162:5 170:*15* 185:6 191:*1* 192:25 215:5 220:22 253:4 259:*13, 16* 265:*4, 7, 10, 13, 16, 19, 22* 266:*4, 7, 10, 13, 16, 19, 22*

**reasonable** 93:*18* 177:*20*

**reasons** 98:2 183:*3*

**recall** 6:*10* 8:*10, 15* 9:*16* 20:*3* 22:*4, 6*

37:*11* 42:*17, 19* 44:*11* 56:*13, 15, 18* 57:*4, 11, 14, 17* 67:8 69:*18, 19* 72:*1* 80:*11* 81:*21* 83:*9* 84:*14* 109:22 111:*9* 124:*4, 13, 17* 125:*1, 2, 3, 9* 127:*16* 128:7, *12, 19, 22* 136:*21* 151:*25* 153:*23* 154:*2, 5* 155:*4, 22* 156:*4* 157:*8, 9* 163:*17* 174:*13* 177:*16* 178:*17* 182:*14, 17* 196:22 202:*16, 19* 204:*15* 219:5, *7* 220:23 224:*16, 22* 229:*2, 4, 5* 231:*23, 24* 239:*8, 11, 19* 254:7, *12, 13, 15* 256:*3, 4, 6, 7, 16, 18* 257:*23, 25* 258:7, *18* 260:8

**recalls** 80:*10*

**receive** 24:7 74:*16* 81:*12* 156:6

**received** 19:6 22:*4* 161:*3, 4* 170:*14* 228:*11*

**receiving** 14:6 74:*17* 117:*4*

**recess** 61:*16* 114:*19* 155:8 206:*3* 248:*24*

**recognition** 145:*12*

**recognize** 37:7, *9* 65:20 82:7 124:*12, 13* 135:*11* 145:*16, 18, 25* 164:*11* 166:*10, 23* 171:*24* 215:*1* 217:8

**recognized** 51:*4* 145:22 171:*25*

**recognizes** 144:*24* 145:*7*

**recollection** 22:7 41:6 47:20 136:*15* 141:*5*

**recommend** 60:*23* 100:*3* 103:8 106:*1* 181:*22* 183:*11* 189:7

**recommendation** 54:8 98:*10* 101:*23*

102:*14, 24* 103:*1, 13* 104:*21* 105:*11, 20, 23* 106:9, *12, 16, 18* 107:2, *5* 196:*11*

**recommended** 102:*1* 103:*20* 106:2 158:*14* 250:*1*

**recommending** 60:*24*

**recommends** 106:6

**reconsider** 36:4 47:6

**record** 4:2, 9, *15* 5:4, *20* 7:3 41:2 52:*18* 59:*14, 20* 61:*13, 15, 18* 63:*13* 69:*16* 70:*13* 89:*16, 22* 114:*18, 21* 155:6, *10* 158:*3* 166:7 176:*11* 206:*1, 5* 215:6 248:*16, 23* 249:*1* 251:9

**recorded** 47:*15* 263:7

**recruit** 240:*10* 241:*15* 249:*24*

**recruited** 239:*18, 19* 249:23 250:*16* 251:*3*

**recruiting** 239:*21* 241:*4* 242:5

**recruits** 240:*25*

**reduced** 79:*24*

**redundant** 59:*10, 12, 14, 16* 65:*1*

**refer** 11:*18* 22:*10, 13* 29:20 30:9 31:*19* 37:*18* 123:*20* 133:*18* 135:5, 7 158:22 161:*16, 18, 24* 164:*12* 165:5, *18, 19* 166:*11* 167:24 168:*11* 201:25 213:*17* 214:*14, 15* 215:*13* 232:12 236:6 243:*1* 244:*13* 262:6

**reference** 36:*19* 37:2 40:8 41:*17, 21* 75:*11* 97:8 113:8 141:5 169:9 171:*7, 8* 175:*14* 176:7 214:*18*

**REFERENCED** 3:6 43:*10* 48:*19* 77:8 134:*24*

**references** 35:6 115:25 125:*12* 175:23

**referred** 22:9 70:*1* 95:*16* 161:*14, 15* 162:4 164:*3, 17* 165:1 166:*13* 171:*18* 191:*12* 215:8

**referring** 6:6 9:6 11:*19* 22:*10* 29:*15, 18* 32:24 37:2, *23* 43:*1* 48:7, *15, 23* 49:*11, 12, 14, 25* 52:*21* 54:*14* 61:20 62:*1* 71:*12* 72:8, *17* 78:25 82:23 83:8 84:*19* 85:*21* 86:*19* 88:*1* 93:*14* 97:*13* 99:*19* 101:9 115:*21* 122:18 123:9, *24* 124:2 125:*4, 17* 126:*11, 18* 128:2 129:22 131:*16* 144:*2* 160:*1* 163:*11, 24* 176:24 188:6 213:*12* 215:24 218:*1* 221:*3, 10* 222:8 224:*10* 232:11 244:*16, 21, 23* 246:*21* 252:*16* 260:20 261:*13*

**refers** 111:*12* 133:*19* 144:5 162:*3, 6* 164:*24* 165:6

**reflect** 122:*17*

**reflected** 32:*15*

**reflective** 19:4 235:*21*

**reflects** 19:*13*

**refresh** 136:*15* 141:*5*

**refuse** 71:*1* 88:*13*

**refused** 69:*10* 70:*19* 71:*1, 2* 74:5, *12* 82:*16, 17* 83:2 85:*21* 86:*4* 88:2, *4, 11*

**refuses** 86:*15*

**refusing** 86:*16, 17, 18*

**regarding** 45:*11* 63:*18* 69:*19, 25* 154:9 156:6 158:2

Case: 1:21-cv-00238-MRB Doc #: 66-3 Filed: 08/02/24 Page: 104 of 114 PAGEID #: 2881
Deposition of Gregory Carmichael, Volume I
Philip R. McHugh v. Fifth Third Bancorp, et al.

174:3, *14* 253:7
254:4 256:*1*
**Regardless** 35:*1*
186:*21* 210:*19*
**region** 31:*4, 6, 8, 17*
32:*24* 33:*1, 4, 8, 13,*
*15, 25* 34:*4, 5, 6, 12,*
*13, 22* 35:*1, 5, 22, 25*
36:*2* 41:*10, 25* 42:*5,*
*7, 9, 12* 44:5 46:6
109:*10, 20* 134:*16*
141:7, *9, 11* 149:20
150:*10, 19* 151:*13*
203:*1* 246:*12*
**regional** 30:*14, 18, 19,*
*23, 24* 31:*11, 21* 34:*6,*
*20* 38:7 39:*19* 41:*11*
42:*5, 8* 43:20 45:*12*
73:*13, 23* 85:6, 7
109:*21* 110:*3* 133:5
134:*18* 135:2 136:*19*
143:6, 7 148:*21, 24*
149:*12, 14* 150:*18*
198:9, *11* 201:5
218:*12* 222:*12* 226:9
245:*4, 9* 246:5 247:*1*
**regions** 13:*19* 31:2,
*15* 32:*21* 34:*12, 15,*
*16, 24* 35:*17, 21*
39:20 41:7, *11* 42:*3*
43:8 45:*18* 77:*14*
80:*19* 85:*10, 24*
86:*24* 109:*18* 110:2
129:5, *6* 134:*17*
138:*4* 140:*23, 25*
142:*8, 11, 13, 14, 18,*
*19, 25* 143:*20, 21*
147:*25* 148:7, *15*
150:*5, 8, 9, 11, 18*
152:*7* 198:*12, 24*
201:*15* 203:*10*
245:*25* 246:*12*
**regulated** 102:*4*
258:*15*
**regulations** 16:*3*
**regulators** 17:*14*
49:8 136:*10* 197:*11*
**regulatory** 16:6, *7*
26:*1* 143:*25* 144:6, 7,

8, 9, *14* 197:*20*
200:*16* 261:*8*
**reinforce** 247:*11*
**reiterated** 47:*4*
**related** 16:*4* 25:5
159:*24* 207:*11* 240:*6*
**relationship** 12:*4*
117:*18* 199:*11*
200:*20*
**relationships** 40:*12,*
*14, 21* 41:*18* 47:9
149:*15*
**relevant** 23:22
207:*13, 14, 16* 208:*19*
209:*3, 4, 11, 19*
**remain** 12:20 45:*23*
**remained** 11:*24* 12:*1*
**remember** 33:*24*
57:*3* 58:*23* 71:22
112:*6* 157:*13* 232:*18*
**remind** 59:8
**reminded** 58:*24*
**reminder** 6:*17*
**remiss** 247:*23*
**remove** 161:7
**removing** 18:*3*
**renamed** 128:*8*
**repeat** 6:*19* 44:*20*
46:*12* 59:*18* 63:*10*
69:22 119:*19* 146:*17*
170:7 237:*14*
**repeated** 141:*20*
**repeating** 59:7 166:*4*
**rephrase** 6:*20* 93:*25*
192:*17*
**rephrasing** 159:*2*
**replaced** 12:*14*
109:*13*
**replacement** 184:*4*
212:*7*
**report** 24:*20* 26:*21,*
*24* 27:*2, 3, 4* 28:2, *14*
30:*25* 32:6 41:*25*
70:*25* 85:*5, 10* 86:*18,*
*23, 24* 87:*1, 12*
109:*14* 178:*12, 15, 18,*
*20, 22, 24* 216:*12*
**reported** 28:*17*
31:*15* 41:*10* 42:*12*
108:*23* 109:*17, 24, 25*

110:*3* 127:*21* 128:*15*
143:7 178:*13, 15, 25*
225:22 236:*18*
**reporter** 6:*21*
**reporting** 24:*20*
26:*11, 16* 33:*4, 13, 15*
34:*24* 35:*21* 41:6
77:*12* 86:*25* 129:7
132:*19, 21* 133:*3*
137:*25* 140:*24* 143:*1*
**reportings** 24:*17*
**reports** 54:*23* 55:*4*
178:6, *7*
**represent** 37:*14* 89:*1*
201:*23* 259:*11*
**representation** 126:2
**representative** 149:7
**representing** 48:*2*
136:*10*
**reputational** 25:*24*
**request** 50:*24* 51:7
54:*12* 144:8 216:*14*
**requested** 50:*10*
51:8 203:*19* 232:8
**require** 167:*18*
206:*15*
**required** 23:*4* 49:8
52:22 58:*18* 76:20
77:*5, 6* 156:*15*
240:*17*
**requirement** 17:*13,*
*14* 54:*11* 76:*21*
172:*21* 193:*20*
**requirements** 16:2, 7
122:*15* 147:*18*
240:22 261:*9*
**requires** 146:8
**Re-read** 63:*12*
**resigned** 153:*18*
**resolution** 202:*4*
**resolve** 201:*3* 203:*14*
**resolved** 203:*16, 20,*
*24*
**resonate** 258:*2*
**resource** 175:7, *10,*
*15* 176:*3, 25* 177:5
**resources** 28:*10, 14,*
*19* 43:5
**respect** 16:*24* 17:*1, 4,*
*5* 18:9 21:*21* 47:*11*

48:*14, 22* 49:*12, 19*
53:20 56:*16* 59:2
63:7 64:*3, 5, 9, 24*
65:*11, 20* 80:4
101:*15* 102:*24*
103:*13* 111:*20* 112:*1*
117:*18* 125:*23* 131:*3*
141:*4* 142:*13* 179:*1*
189:*15* 194:*3* 217:*17*
245:7 251:*13, 19*
259:*19, 21, 25* 260:*2*
261:*15*
**respected** 83:7, *24*
190:*25*
**respectful** 140:*4*
**responded** 60:*12*
**responds** 202:6, *10*
**response** 38:*13*
**responsibile** 15:*15*
**responsibilities** 10:*24*
13:*11, 21, 25* 14:*10,*
*23, 24* 15:7, *8, 9* 20:7
24:*24* 28:*11* 80:*14*
87:*13* 109:20 114:2
134:*15, 19* 135:*25*
138:*12* 141:2 142:*17*
144:*22* 148:9 149:*21*
154:*25* 182:*17* 198:*8*
201:*11* 232:*25*
244:*17, 19* 245:*20*
**responsibility** 15:*19*
16:*19* 25:*12* 86:2
103:5 104:*11* 131:2,
*5* 132:*25* 135:22
138:*17* 140:*24* 143:*5*
144:*17* 149:*16* 150:*8,*
*10, 13, 14, 15* 154:*24*
179:20 198:*13, 18, 24*
203:*1* 237:*23* 238:*21*
247:*23* 258:*11*
**responsible** 15:*21*
25:*16* 31:2 35:*3*
142:*14, 18* 148:*12, 13,*
*20, 22* 150:22 154:*18*
198:*20*
**responsive** 144:7, *8*
**rest** 42:8 152:*24*
153:*12* 154:*14*
**restate** 44:*15* 76:*4*

194:8
**restructuring** 232:*18*
**result** 28:*23* 91:*7, 15*
118:*18*
**resulted** 72:*12*
**results** 115:*14* 146:*21*
**retail** 145:*12, 13*
239:*25*
**retaining** 44:*6*
**retire** 38:*24*
**retirement** 45:*19*
48:*4, 5* 174:*22*
**retiring** 154:*7*
**retreat** 197:*4*
**return** 88:*4*
**returns** 138:*15*
**revenue** 73:*10* 77:*17*
137:*11* 138:2, *5, 12*
149:*25*
**revenues** 138:*15*
**review** 7:*17* 19:*23*
29:*22* 30:*4* 31:*7*
32:*8* 49:*10* 71:*23*
101:*1* 104:*7* 111:*7,*
*20* 112:*17* 113:*10, 21*
114:*3* 115:*8, 15*
121:*1, 23* 122:*16*
128:*3, 19* 130:*20, 23*
131:*9, 17* 132:*12*
134:*8, 13* 135:*24*
140:*15* 155:*25*
161:*11* 177:*14, 17*
178:*16* 179:*15* 180:*2,*
*6* 181:*13, 16, 19*
182:*13, 20* 183:*10, 16*
184:*5, 11, 25* 185:*22*
186:*2, 15, 23* 188:*5, 6,*
*7* 195:*18* 205:*7, 8, 16*
211:*13* 217:*10* 231:*8,*
*19, 22* 234:*9* 253:*23*
**reviewed** 29:*3, 21*
30:*8* 73:*2* 75:*17*
79:*10, 13*
**reviews** 31:*3* 139:*24*
143:*10* 172:*18, 20*
177:*22, 23* 178:*4*
179:*2* 184:*23* 258:*8*
**revisions** 205:*12*
**reward** 145:*25*

**rewards** 32:*11* 145:*8,*
*21*
**RHR** 50:*13, 18* 51:*7,*
*12* 53:*24* 54:*9, 20, 22*
55:*9, 19* 56:*14* 58:*18*
60:*13, 21* 72:*3* 185:*5*
192:*3*
**RHR's** 107:*24*
**Richard** 203:*5*
**Ridge** 7:*7*
**right** 5:*3, 5* 10:*18*
11:*11* 12:*9, 18* 16:*18*
20:*11* 25:*18* 29:*19*
30:*15* 33:*16* 37:*15*
38:*8, 11, 17, 21, 25*
39:*3, 21* 41:*13, 22*
42:*1* 49:*23* 53:*5*
54:*21* 55:*10, 12, 17*
60:*12* 65:*24* 66:*17*
70:*21, 24* 71:*3* 72:*25*
73:*6* 74:*2, 18, 20*
76:*16, 20, 25* 82:*2, 5,*
*13* 84:*7, 8* 85:*4* 86:*5,*
*9, 18* 87:*5* 90:*2*
91:*16, 25* 93:*21*
94:*21* 97:*5, 13, 21*
101:*24* 104:*12, 13, 16*
105:*6, 9* 107:*16*
108:*7* 109:*11* 110:*6,*
*23* 111:*4, 15, 18*
112:*23* 113:*3, 22*
114:*15* 115:*19, 25*
116:*13* 118:*23*
120:*20, 23* 121:*12*
122:*4, 20* 126:*15*
129:*3, 24* 132:*12*
133:*7* 137:*17* 139:*1*
140:*22* 141:*2, 17, 23*
142:*11, 20* 143:*6*
147:*6, 14* 148:*18*
151:*23* 153:*6, 7*
156:*19* 158:*6* 160:*13,*
*16* 161:*4, 8, 25* 163:*1*
170:*1, 10* 172:*1, 4*
173:*20* 174:*17* 175:*5,*
*22* 176:*14* 191:*8*
192:*5, 7, 8, 10, 12*
193:*3, 9* 195:*19, 21*
197:*7, 15, 21, 25*
198:*19* 200:*5* 211:*1,*

2, 7, 23 217:*10*
219:*21, 24* 220:*6*
221:*12, 19, 24* 222:*14,*
*18* 223:*8* 224:*7*
225:*9* 226:*6, 12, 15*
227:*13, 19* 232:*14*
233:*21* 234:*15*
236:*22* 238:*18* 241:*1*
242:*7* 243:*3* 248:*3*
249:*16* 250:*8, 17, 24*
251:*16, 21* 255:*2, 18,*
*20* 261:*18*
**right-hand** 222:*19*
**risk** 22:*23, 24* 24:*12,*
*15, 18, 25* 25:*5, 6, 7,*
*10, 18, 20, 21, 24, 25*
26:*1, 2, 3* 94:*15*
130:*24* 131:*1, 3*
139:*15, 16, 18* 154:*19,*
*20* 155:*1* 180:*3*
200:*16* 258:*8, 11, 16*
**risk-related** 16:*3*
**risks** 25:*2, 22, 24*
26:*2* 131:*4* 200:*17*
**role** 10:*5* 12:*11*
13:*15* 18:*23* 20:*6*
24:*22, 23, 25* 26:*23*
27:*11, 15, 20* 30:*22*
31:*1, 10, 12, 21* 35:*19,*
*20* 39:*13* 41:*5, 12, 15*
42:*4* 43:*17* 61:*5*
66:*10, 11, 12, 14*
73:*17* 74:*14, 25*
77:*15* 79:*8* 80:*4, 12*
82:*11* 85:*6* 86:*2*
88:*3* 96:*13* 108:*5*
112:*14, 15, 16* 113:*24*
114:*7* 115:*17* 121:*24*
122:*13, 14, 15, 21, 22,*
*23* 128:*23* 132:*1, 2, 3*
133:*1, 2, 10* 138:*8, 9,*
*10* 142:*15, 20* 143:*2,*
*5, 11, 13, 20* 146:*5, 13*
147:*17* 148:*12, 21, 22,*
*23* 152:*5, 6* 179:*1, 4*
182:*9* 183:*19* 185:*10*
186:*14* 187:*8* 188:*1,*
*10, 19* 192:*24* 198:*25*
225:*19* 228:*17, 21*
233:*7, 16, 17* 234:*20,*

21 235:*1, 13, 14, 19,*
*22* 238:*10, 22* 241:*12,*
*13, 23* 243:*19* 245:*14,*
*25* 246:*5, 17* 247:*9*
250:*6, 21, 23* 251:*1*
**roles** 27:*2* 74:*4*
76:*15, 16* 82:*12, 13*
104:*11* 134:*18*
148:*17* 226:*1* 234:*25*
242:*7*
**Rome** 2:*11* 5:*8*
**room** 178:*21*
**roots** 44:*4*
**rotational** 31:*13*
143:*12*
**roughly** 11:*2* 77:*3*
110:*7* 157:*17* 243:*23*
**route** 197:*3*
**Royal** 10:*1, 3, 4, 5*
**RP** 38:*4, 7*
**rubber** 54:*7* 100:*13*
102:*2, 23*
**Ruben** 239:*15*
**rule** 88:*22*
**run** 16:*8* 85:*23*
110:*7* 122:*7, 8* 133:*2*
150:*17*
**running** 23:*11*
108:*21* 109:*24*
144:*16*
**runs** 203:*10* 249:*21*
**runway** 65:*23* 113:*2*
174:*18* 228:*14*

**< S >**
**S/Sydney** 263:*18*
**Saba** 2:*1, 5* 3:*4*
4:*10, 11, 18* 5:*2, 5, 18*
8:*20* 9:*1* 10:*12*
29:*10* 30:*1, 3* 33:*20*
36:*17* 40:*15* 44:*22*
47:*10* 48:*1* 50:*19*
51:*18* 52:*2, 8, 10, 13*
53:*13* 54:*13* 57:*8, 16*
58:*3* 59:*12, 17* 60:*4*
61:*13, 19* 62:*10, 15,*
*20* 63:*4, 12, 15* 64:*20*
65:*4, 7* 66:*20* 71:*11*
76:*5* 78:*18, 21* 79:*9*
81:*4* 87:*25* 88:*18*

89:*10*, *21*, *23*  90:*12*
91:*19*  92:*12*, *21*  93:*3*
94:*24*  95:*7*, *14*, *22*, *23*
96:*4*, *14*, *19*  97:*5*, *18*
98:*18*  100:*20*  101:*7*
105:*15*, *19*  106:*8*, *23*
107:*4*  108:*16*, *18*
110:*16*  112:*19*
113:*14*  114:*13*, *16*, *23*
120:*6*  123:*1*  124:*19*
125:*11*  126:*8*  127:*7*
129:*21*  130:*2*, *6*
132:*5*  139:*8*, *21*
140:*7*  152:*10*  154:*11*
155:*6*, *12*  158:*6*, *19*,
*25*  161:*2*  165:*4*, *16*,
*22*  166:*2*, *8*, *9*  167:*9*,
*19*, *22*  168:*9*  169:*6*
170:*5*, *8*, *14*, *24*
171:*23*  173:*5*  174:*1*
175:*13*, *19*  176:*1*, *10*,
*14*, *18*  177:*9*  192:*16*
195:*8*, *12*  201:*18*
204:*1*  206:*1*, *6*, *24*
209:*11*, *13*  210:*4*, *7*
211:*12*  212:*20*, *21*
213:*25*  214:*5*, *24*
215:*7*  218:*10*  223:*11*
227:*5*  229:*16*  230:*12*
231:*1*  240:*20*  242:*18*
244:*5*  248:*23*  249:*2*
252:*8*  253:*10*  254:*18*
259:*1*  260:*13*
**sake**  6:*20*
**salary**  77:*18*
**sales**  133:*19*, *20*, *23*
134:*9*, *12*, *16*, *19*
135:*20*  136:*1*  144:*24*
**Sarah**  7:*11*
**sat**  35:*16*  193:*9*
**save**  264:*10*
**saw**  125:*2*  155:*22*
226:*2*, *22*  227:*1*
232:*1*
**saying**  55:*11*  78:*24*
81:*19*  165:*17*, *23*
166:*4*  173:*23*  204:*12*
208:*6*  209:*9*  210:*13*
215:*2*  229:*5*  249:*14*,
*16*, *17*

**says**  11:*20*  30:*16*
31:*24*  38:*2*, *22*  55:*4*
66:*1*  75:*18*, *19*  82:*23*
85:*16*  88:*1*  91:*18*
93:*22*  94:*5*  114:*9*
115:*24*  116:*18*, *20*
119:*2*  124:*24*  127:*18*
128:*3*  129:*19*, *20*
130:*18*  131:*22*  135:*2*,
*4*  140:*12*  142:*12*
146:*25*  155:*17*
160:*14*, *23*  175:*20*, *22*
217:*9*  219:*22*, *25*
221:*22*  225:*3*  226:*13*
236:*23*  243:*6*  244:*16*
245:*3*  255:*3*  259:*6*
**scale**  73:*13*  149:*11*
**scenario**  165:*15*
**scenarios**  125:*9*
**schedule**  21:*2*
**Schramm**  23:*19*
**science**  9:*18*
**scope**  62:*18*  76:*24*
137:*10*
**score**  117:*2*  118:*20*
**scores**  117:*1*, *7*, *22*
118:*17*  119:*1*, *8*, *22*
**Scotland**  10:*1*
**seal**  263:*13*
**season**  138:*22*
**second**  4:*20*  14:*11*
29:*18*  35:*8*, *10*  43:*1*
59:*9*  84:*19*  135:*10*
136:*5*  137:*18*  142:*7*
149:*2*  196:*17*  219:*15*
252:*19*  261:*14*  262:*1*
**secret**  68:*4*
**section**  146:*17*
261:*10*, *16*, *24*  262:*5*
**sections**  261:*25*  262:*2*
**sector**  144:*13*
**securities**  137:*12*
**see**  11:*17*, *21*  14:*8*,
*19*  23:*21*  25:*9*  29:*19*
30:*10*  36:*21*, *23*  37:*1*,
*19*, *20*, *25*  38:*1*, *5*
45:*25*  47:*5*  48:*12*
67:*2*  72:*15*, *23*  88:*5*
89:*5*  94:*17*  105:*9*
115:*22*  116:*1*  118:*17*

121:*14*, *19*  125:*20*
126:*22*  128:*4*, *21*
130:*3*, *20*  136:*13*
141:*16*  145:*3*  146:*22*
148:*3*  152:*13*  155:*23*
160:*2*, *5*  172:*20*
177:*4*  184:*23*  201:*22*
202:*2*, *14*, *15*  204:*24*
205:*5*  206:*8*  212:*25*
214:*21*  215:*22*, *23*
216:*2*, *4*, *20*  217:*18*
218:*13*, *14*  221:*6*, *21*,
*25*  222:*19*, *20*, *23*
223:*5*, *6*  226:*25*
230:*19*, *22*  231:*5*, *12*,
*16*, *17*, *18*  233:*24*
234:*1*, *10*, *11*  235:*6*
239:*4*  240:*4*  241:*6*,
*24*  243:*8*  245:*5*
247:*3*  252:*22*  258:*12*,
*21*
**seeing**  124:*17*  125:*1*,
*2*, *3*, *9*  128:*19*  219:*5*
254:*2*  255:*18*
**seek**  236:*24*
**seeking**  89:*12*  91:*1*,
*15*, *21*, *22*  92:*3*, *15*, *24*
93:*9*
**seen**  29:*5*  88:*23*
111:*6*  124:*16*, *25*
126:*1*, *5*, *19*  127:*5*
128:*18*  140:*14*
155:*19*  164:*2*  165:*2*
205:*13*  213:*13*, *14*, *23*
214:*2*, *11*, *13*  217:*5*,
*23*, *25*  218:*7*, *9*, *17*, *23*,
*24*, *25*  219:*2*, *16*
220:*7*, *10*  221:*7*, *8*, *13*
222:*10*  223:*19*, *20*
224:*7*  230:*16*  232:*10*
241:*17*  258:*15*
**select**  187:*20*
**selection**  50:*14*
**send**  14:*4*  78:*10*
185:*25*  186:*5*
**senior**  110:*9*  172:*7*,
*8*  248:*3*
**sense**  162:*6*  233:*4*
**sensitive**  90:*19*
**sensitivity**  183:*3*

**sent**  14:*2*  39:*5*
231:*8*  254:*6*, *21*
255:*12*
**sentence**  11:*20*  54:*15*
61:*23*  84:*20*  93:*17*,
*23*, *24*  142:*9*
**sentences**  146:*18*
**separate**  27:*1*, *7*, *9*, *15*,
*17*  34:*7*  142:*24*
143:*1*  154:*13*
**separately**  45:*16*
**September**  1:*17*  4:*1*
9:*24*  11:*3*  71:*13*
264:*2*
**sequence**  103:*13*
128:*13*
**series**  6:*18*
**serious**  102:*3*
**seriously**  18:*5*  54:*5*,
*6*  133:*24*
**serve**  124:*10*  138:*14*
155:*2*
**served**  195:*15*
**services**  44:*7*  142:*6*
**serving**  120:*16*
**session**  17:*8*  20:*21*
53:*17*, *18*  72:*2*  102:*8*
197:*5*  261:*11*, *17*
**sessions**  18:*16*  19:*18*,
*19*
**set**  21:*4*  29:*7*  90:*10*
104:*9*  151:*1*  179:*18*
191:*21*  192:*18*, *22*
193:*4*  194:*1*  198:*15*
231:*10*  235:*11*, *18*
236:*7*  237:*10*, *18*
238:*4*  241:*5*  242:*13*
263:*12*
**sets**  92:*5*  192:*4*, *9*, *13*,
*18*, *20*  193:*4*, *6*, *18*
235:*17*  236:*6*, *8*, *10*
**setting**  136:*9*
**settle**  98:*12*, *21*
**settled**  134:*6*
**seven**  40:*17*, *19*
67:*14*  255:*15*
**seven-plus**  252:*21*
**Shaffer**  8:*17*  9:*3*, *8*
19:*1*, *22*, *25*  20:*8*
23:*11*  28:*21*  36:*3*, *5*

37:6, *13*, *19* 38:2, *19*
39:5 41:22 43:5, *13*
45:*10*, *11* 46:*4*, *11*, *17*,
22 47:*12*, *16*, *17*, 22
51:8 67:*12* 70:*1*, *17*
71:*21* 78:5 84:*3*
88:7, *10* 179:*1*, *14*
181:*15* 188:5, *12*
194:*4*, *5*, *10*, *24*
195:*13*, *19* 196:7
201:*24* 202:*1*, *10*, *17*
204:*21* 220:9, *18*
228:9 229:2 231:*4*,
22 237:*12* 240:*24*
242:*16* 253:*15*
254:*23* 257:*19*
**Shaffer's** 37:*10*, *11*,
*15* 46:7, *13*, *16*
204:*19* 234:7 241:*21*
**shaking** 6:22
**share** 100:*21* 179:*10*,
*12* 234:*10* 253:*23*
**shared** 47:6 100:*16*
101:*1*, *4* 156:*12*
158:*13* 195:5 206:*14*
255:*10*
**shareholder** 12:2
**shareholders** 87:*14*
94:*15* 103:7 138:*16*
175:*1* 180:22
**SHEET** 264:*1*, *13*
265:*1* 266:*1*
**shifted** 128:*10*
**short** 77:2 237:*25*
**shortly** 43:*4*, *14* 45:*1*
46:9 68:22 109:*10*
157:*12*, *16* 196:*20*, *21*,
*25*
**shoving** 202:*22*
**show** 149:*10* 222:22
**showed** 229:*24*
**shown** 119:*14*
**shows** 216:*16*
**shy** 258:*19*
**sic** 38:*14*
**side** 145:*20* 151:5
173:*13* 201:*10*
202:*23* 222:*19*
236:*16*, *21* 262:*3*

**SIGNATURE:**_____
_____**DA**
**TE** 265:*23* 266:*23*
**signed** 140:*16*, *19*
264:*16*
**significant** 15:*24*
90:*15* 144:*23* 145:22
234:*17* 238:9
**significantly** 72:9
**silver** 161:*14*, *16*, *18*,
*20*, *21* 162:*3*, *5*, *9*, *16*,
*18* 163:8, *12*, *25*
164:*4*, *13*, *18* 166:*16*,
*18* 168:22 169:8, *14*
171:7 172:*23*
**similar** 114:*1* 150:*4*
**simplicity** 261:*23*
**simultaneously** 261:5
**single** 17:9 48:*18*
174:*11* 190:8 233:*12*
**sir** 94:*24* 207:*13*
**sit** 31:8 32:*10* 169:7
229:*17* 243:*16*
**site** 146:9
**sits** 220:*24*
**sitting** 82:*12*
**situation** 87:2
171:*18* 173:*23* 183:*4*,
*23* 187:2, *20* 188:*3*
194:*16* 206:*15*
207:*12* 208:5, *20*
209:*10* 210:6, *19*
212:*12* 241:22
**situations** 165:*17*
180:*11* 247:*14*
**six** 67:*14*
**size** 137:*17*
**skill** 104:9 123:*10*
192:*4*, *9*, *13*, *17*, *20*
193:*4*, *6*, *18* 194:*1*
235:*11*, *17*, *18* 236:6,
*8*, *10* 237:*18*
**skills** 122:*15* 143:*17*
192:7, *12*, *23* 193:*1*
236:*19*, *24* 238:2
240:9
**skin** 166:*15*
**skip** 116:*10*
**slightly** 238:*21*

**slow** 239:*24*
**sly** 161:*25*
**small** 199:9
**smart** 161:*25* 171:*13*
**Smith** 2:4 4:*12*, *13*
**smooth** 149:*24* 151:*4*
**smoothly** 150:*12*
199:5
**sole** 150:*13*, *15*
**soliciting** 254:6
**solidified** 104:6
108:5
**solve** 202:*4*
**solved** 203:*17*
**somebody** 40:*13*
143:*15* 160:*19*
217:*14* 252:*4*
**somebody's** 251:*19*
**someday** 107:*15*
228:*14*, *16*
**someone's** 64:*10*
166:*15*, *16* 168:*23*, *25*
169:*16* 174:*23* 203:8
217:*1*
**soon** 208:*10*
**sooner** 207:*25* 210:*24*
**soonest** 208:*12*
**sorry** 12:22 201:*4*
255:*21*
**sort** 59:*10* 170:*11*
**sought** 92:7 94:2
180:8 236:*25*
**sound** 197:*18*, *21*
**source** 124:*3*
**South** 250:*13*
**southeast** 137:*20*
**SOUTHERN** 1:2 4:5
**space** 144:*12* 189:*25*
190:*1*
**speak** 44:*16* 46:6
50:5 59:*15* 158:*13*
176:*11* 201:8 203:2
258:*14*
**speaks** 87:6 89:*16*
90:7 91:*18* 112:*3*
114:5 129:*17*, *25*
131:*20* 138:*20*
175:*16*
**special** 21:*4*

**specific** 84:*18* 95:*16*
96:*23* 111:*11* 154:8
162:*10* 168:*1* 174:2
176:2 240:*16*, *21*
**specifically** 37:*18*, *23*
48:*3* 57:*4*, *10*, *17*
60:6 67:8 69:*1*
102:*13* 160:*1* 174:*14*
176:*3*, *23* 242:*3*
251:8 259:*20* 260:*1*
261:*17*
**speculate** 33:*23* 54:*3*
90:9 92:8 165:8, *10*,
*15* 166:*14*, *20*, *22*, *25*
167:*1*, *12*, *13*, *18*, *19*,
22 168:*4*, *5*, *6*, *14*, *20*
169:5 171:5, *6*
208:*13*
**speculating** 33:22
67:*13* 227:*7*
**speculation** 33:*18*
54:2 167:*18*, *25*
**spell** 5:*20*
**Spence** 11:7 12:*15*
48:8, *11*, *25* 49:*13*
50:9, *18*, *21* 51:*10*, *12*,
*13* 53:22 54:*21*, *24*
55:*19* 56:7, *14* 59:*4*
60:*21* 61:*24* 63:5, *16*
66:*23* 67:*18* 69:*25*
70:8, *25* 71:*3*, *16*, *18*
74:*13* 82:*16*, *18*, *24*
83:*4*, *6*, *15*, *24* 84:9
85:5, *10* 86:9, *19*, *23*
87:*1* 98:*11*, *12* 100:*3*
103:*20* 106:*17*, *21*
107:*1* 142:*18*, *22*
151:*17* 183:*13* 184:6
190:*21*, *24* 193:7
194:*1* 195:*14* 198:*3*
200:*24* 218:9 219:*20*
222:9, *11* 223:*4*
224:7 226:5 227:*12*
229:*21* 243:5 244:*24*
245:*15* 246:*4*, *8*, *25*
248:2 252:*18*, *19*
258:*4*
**Spence's** 67:7
211:*13* 212:*12* 245:*3*

Deposition of Gregory Carmichael, Volume I                     Philip R. McHugh v. Fifth Third Bancorp, et al.

**spend** 17:25 31:8

**spent** 145:18

**spoke** 46:9 55:21
83:12 197:4

**SS** 263:3

**stack** 53:4

**stacked** 53:4

**staff** 13:20

**stage** 136:9

**Stagnaro** 2:5

**stakeholders** 221:22

**stamp** 36:20 37:3
54:7 100:13 102:2,
23 175:20 177:11
201:20 212:23
242:20 244:7 252:10
253:12 259:3 260:15,
21

**stamped** 110:22
114:25 155:14

**stand** 38:7

**standard** 200:13

**start** 202:8 204:24
230:19

**started** 10:22 104:6
109:10 136:19

**starting** 134:12
230:18 262:7

**starts** 84:20 223:23

**State** 1:21 4:15
5:19 66:25 76:9
80:12 117:15 145:23
263:1, 7, 19

**stated** 45:20 75:8
91:6 92:17 95:4
139:23

**statement** 72:13
73:6 101:16 170:22
210:11 251:6 258:7

**statements** 56:19
97:16 99:2

**STATES** 1:1 4:4
24:25 150:7 158:23
219:19 226:16

**status** 8:13

**stay** 38:24 39:6
116:18, 21 117:11

**stayed** 11:6 82:15

**staying** 182:7 218:1,

20 219:9 248:9

**Stein** 203:6

**stenotype** 263:8, 11

**step** 39:19 41:5, 8,
14 53:17 61:3, 5
74:5 82:17 104:14
108:4 112:22 133:4
180:13, 21 181:25
184:14 186:11 187:5,
21 188:2 192:25
206:15, 16 207:1, 3,
20, 24 208:20, 21
209:2 210:13, 24, 25
211:5, 8 228:16
235:15 243:18

**stepped** 12:2, 22
41:4 79:8 108:23
146:2 154:6

**stepping** 42:4 55:11
180:25 183:23 185:8
210:20

**steps** 187:19

**Stevens** 178:19

**sticking** 161:22

**sticks** 163:7

**stone** 247:12

**stood** 77:1

**stop** 24:1

**strategic** 13:13 16:5
102:16 103:21
112:13 135:6 189:15,
16 190:3, 14 236:12,
14

**strategies** 119:5
190:5, 6, 12

**strategist** 190:4

**strategy** 10:10 119:3,
12, 13 137:23 188:16
189:20 190:10 191:6
197:4, 5

**Street** 1:19 2:12
90:19 173:14

**strength** 112:12, 15,
17 149:10 201:13
217:18 226:15
232:24 239:4, 7, 10
240:12, 13, 15 241:11
242:11 248:18

**strengths** 123:17
190:7, 18 191:13
234:13

**strong** 102:5 112:10
114:9 121:1, 20
123:12

**strongly** 20:23

**structure** 34:7, 20
42:8, 13 132:23
133:3 142:24 198:10
199:12, 13

**structured** 16:9 17:8
24:23 26:19 49:7
228:4

**struggled** 198:23

**strut** 163:23

**strutting** 161:22
163:8, 10

**study** 121:18

**stuff** 258:1

**subject** 15:17 18:1
20:3 253:17

**subjective** 242:8

**subordinates** 54:23
55:10 58:8

**subsequent** 46:4
196:2

**Subsequently** 229:10

**substance** 91:3 98:8

**substantial** 137:14
145:15

**substantially** 70:21
94:22 117:18 142:6

**subtly** 160:11 173:8

**succeed** 100:4 194:7
195:1

**succeeded** 11:7
12:14 126:15

**succeeding** 58:13
60:23, 25 194:16

**success** 45:21 138:24
139:5 141:25 142:11
147:8, 25 248:21

**successful** 36:10
38:15, 21 40:18 54:5
136:9 147:19 150:3,
21

**succession** 17:1, 6, 11,
12, 15, 18, 19 18:3, 10,
15 19:23 48:8, 15, 16,

23 49:4, 7 64:3, 6, 15,
24 65:11, 21 66:24
67:19 70:1 107:14
124:24 125:7, 24
126:3, 17 154:9
183:8 185:15 186:23,
24 209:23 210:17
212:6 213:4, 10
219:15 223:1, 17
224:5 227:9 229:3
230:15 231:11 232:3
242:25 243:3 244:11
252:14, 17, 18 253:18,
22 254:25 259:8, 20
260:1

**successions** 219:23

**successor** 18:18, 19,
21 61:4, 7, 12 66:13
97:12 105:5 180:10,
16, 18 181:1, 4, 9, 10,
21, 23 182:4, 6 183:2,
6, 7 184:15 185:9, 15
186:7, 9, 18, 22 187:1,
12, 21 188:10, 25
189:1, 4, 5, 8 194:19
195:24 196:12, 13
206:9, 20 207:18, 19,
22 208:2 209:5, 21
210:20 211:6, 15, 17,
18 212:14 217:13
219:18 229:22

**successors** 17:20, 21
19:10 187:7, 11, 13,
16 227:19

**sue** 99:6

**sued** 91:10 100:1

**suggested** 195:7

**suggesting** 250:5

**suit** 71:7 75:21 84:5
90:16 91:23 93:10
134:3

**summaries** 121:21

**summarizing** 186:1

**summary** 121:9, 15,
16

**summer** 178:8

**supervisor** 128:23

**support** 13:13 15:2
17:19 78:1 86:8
98:10 103:11 112:25

116:8 119:13 147:25
148:6 149:3 175:5
188:18, 19 194:21, 22
196:8 200:8 201:13
221:14
**supported** 108:4
113:10 143:22 193:6
**supporting** 105:11
**supportive** 188:20
**supports** 103:6 105:4
**supposed** 80:6
**Supreme** 92:19
**sure** 13:12, 25 15:15
16:15, 17, 20 19:2, 9,
12 20:6 21:19 23:8
24:4 25:2, 17 27:8,
21 31:2 33:10 34:8
37:16 42:25 46:18
58:19 61:6 63:25
65:22 69:3, 4, 11, 23
73:20 76:6 77:6, 18
79:17 80:10 82:8
99:25 101:13 108:22
114:13 118:2 119:24
124:14 129:11, 13
131:14 134:17, 22
136:1 141:8 148:8,
13, 16, 18 150:12, 20
151:7, 9, 11 152:7
169:19 172:18 173:5,
19 174:10 176:23
179:5, 7 180:24
182:25 187:2 204:25
206:21 210:25
216:12 224:8 226:22
228:20 232:4 233:1
237:15 242:6 251:5
257:9, 12
**surprise** 69:14
**surprised** 56:1 59:1
83:16, 18 178:1
261:20
**survey** 119:15
**Susan** 8:11, 14 71:24
84:4 153:13, 14
**suspect** 127:22
**switched** 132:21
**switches** 121:8
**sworn** 5:14

**Sydney** 1:21 4:21
263:5
**sync** 204:25 220:21
**synergies** 150:1
**system** 74:21, 22

< T >
**tactical** 147:12
**tactics** 85:17, 18
87:5, 21
**take** 6:23 10:20
14:5 16:1 18:4 25:2,
25 35:22, 25 36:7
39:12, 17 40:17, 21
45:6, 21 47:18 54:4,
6 55:25 56:8 57:12,
21 65:23 73:22
74:12, 14 75:23
80:13, 18 82:15 83:5,
6, 23 89:7 114:12
116:1 122:10 125:6
133:24 136:25 140:4
154:23 183:18, 19
185:23 196:18
200:10 205:2, 24
224:18 233:9, 20
234:24 235:19, 21
237:22 238:15, 21
239:23, 24 240:1, 3
245:15, 19 247:9
**Taken** 1:16 5:22, 25
6:2 61:16 74:6 82:6
101:25 102:21
114:19 140:24 155:8
162:2 171:15 196:20
206:3 248:24 264:2,
8
**takes** 66:11, 12
139:1 220:25
**talent** 18:7, 21 19:16,
22 26:18 49:3, 20
50:8, 11 52:25
100:10 101:1, 10, 11
104:7 106:13 107:15
112:16 147:25
148:18 152:2, 7
154:15 172:11
180:17 185:1 186:24
187:10 204:6, 16
205:19 206:23 212:5

213:4, 10 214:1, 8, 17,
20 215:1, 9, 12, 13, 21,
22 216:3, 5, 8 218:8
220:18 221:4, 11
222:9, 10 223:17
224:14, 16, 20 225:16,
17 226:5, 8 227:23
228:12 229:20
230:15 231:6, 22
232:3, 24 238:6
239:10 240:5, 9, 10,
11, 23 241:1, 3, 4, 15,
16, 20 242:6, 24
244:11, 24 248:3, 10,
11 249:13 252:14
253:18, 21 254:4, 11,
24 256:1 259:7, 19,
25
**talk** 14:4 17:10, 12
23:13, 24 38:3 57:2
58:15 60:17 68:12
80:20 83:16 84:2
108:15, 16 144:19
159:9 174:5 194:14
195:22 234:9, 11, 12,
13 241:11, 24
**talked** 8:11 24:2
56:6 58:8 188:22
190:22 196:7 227:23
228:13 251:24
**talking** 8:9 11:10
23:19 25:20 33:24
38:11 44:17 62:6
77:7 97:15 103:17
125:15 145:5 161:19
166:15 173:3, 23
220:12 232:2
**talks** 18:16, 17
125:18 133:20
173:12
**Tanner** 124:1, 7
157:13, 15 158:11, 15
159:9
**Tanner's** 158:17
**task** 150:15 191:7
**taught** 156:23
**Tayfun** 67:10 68:16,
18 69:9, 11, 21 70:2,
6 181:12 185:19

219:23 223:7 227:18
**teach** 156:10
**team** 13:13 14:20
15:2 17:10, 11 18:22
19:1, 19, 22, 25 20:1,
5, 17, 24, 25 21:6, 11,
17, 19 22:9, 10, 13, 19
23:5, 10 24:6 31:14
112:21 115:21 139:5
147:7, 8 164:20
183:18 191:8 228:23
239:12
**teams** 133:21 144:2
**technology** 23:17
189:20, 22 190:15
**technology-related**
149:19
**tell** 22:7 36:9 57:9
85:11 86:10 88:7
99:13 123:21 160:25
174:18 183:17
190:24 194:24
195:13 203:21
223:20 226:21
231:17 232:7 240:13
**telling** 86:25 162:23
258:20
**tells** 86:15
**template** 240:21
243:3
**ten** 30:20 31:12
228:4 229:11
**tenure** 26:24 147:3
**tenured** 146:19 147:1
**term** 52:12 158:21
161:16 163:20 167:2
169:8 173:19, 20
191:23 243:8
**terms** 38:16 103:16
209:16 210:7 237:10
**testified** 47:2 63:10
79:2 105:24 125:25
209:22 210:2 218:7,
17 259:12
**testimony** 48:19
66:1 78:17 79:1
80:3, 6 105:25 107:8
186:16 188:23
206:13 210:4, 8

**text** 9:7, 10, 15 21:25 22:6 37:5, 17, 19, 21 38:22 39:1, 4, 16 41:23 45:9 46:10, 17, 19 185:25 201:23, 25 258:1

**texts** 202:20

**Thank** 22:3 51:23 52:2 110:21 216:1

**theirs** 56:3 248:18

**themself** 87:20 100:2

**Theresa** 124:1, 7 157:13, 15, 21 158:10, 12, 15, 17 159:9

**Theresa's** 159:6

**thing** 18:2 40:9, 10 66:19 80:12, 22, 23 101:24 157:4

**things** 4:25 14:7 17:21 21:15 22:5 23:20, 24 26:11 54:25 61:9 85:1 102:22 103:10 104:9 117:2, 3, 5 119:14 143:10 162:1 174:20 179:21, 24 180:23 191:12 193:23 199:5 200:8, 22 201:7 203:6 225:25 233:8, 9 243:23 247:13 257:12

**think** 4:18 16:8 17:24 18:11 21:23 25:23 34:25 35:8, 18 40:11 42:2 43:19, 21 47:8 51:9 52:21 55:2 56:25 67:14 76:21 79:18 81:23 83:12, 17 99:7, 12 101:2 104:13 108:9, 21, 22 109:17 116:24 118:1, 24 125:15 128:7, 12 133:8 145:12 146:15 153:5 154:22, 25 157:15 159:15, 22 161:25 172:2, 4, 10, 25 173:19 178:21 179:23 187:10, 11 188:14 192:21 196:5

**197**:14, 24, 25 198:2, 9 200:5 201:13 208:22 221:2 224:3 235:3 239:9, 14, 17 240:9, 11, 23, 24 241:7, 22, 25 242:9 243:22 248:13 250:14, 15 255:15, 17 257:7 262:1

**Thinking** 33:9 108:12 189:16 190:14 224:19 230:21, 23 232:2 247:6, 13 252:25

**Thinking's** 253:4

**thinks** 23:21 164:21 217:12

**think's** 248:20

**THIRD** 1:9, 19 2:17 4:6 5:9, 10 6:5, 12, 13 7:21, 24 8:2, 5, 8 10:18, 21, 22 11:11, 19 13:16 27:7 28:13 30:13, 14 32:18 36:22 43:5, 6, 9, 18 44:7 45:21, 24 48:9, 10 50:22 51:3, 12, 14 53:23 55:16, 20 57:22, 23 59:10 60:18 64:6, 25 65:12, 21 71:14 81:8, 11 88:2, 21, 25 89:14, 25 90:16 91:1, 4 93:11 97:2 98:6, 11, 19 99:3, 13 100:4, 7 104:22 107:22 110:8, 23 111:12 113:2, 16, 17 115:1 116:6, 7 120:8, 9 123:3, 4 124:3, 21, 22 125:18 127:9, 10 130:8, 9 131:16 132:7, 8 133:16 135:7 136:5 137:12 138:19, 24 140:9, 10 142:1 143:24 146:10 155:15, 17 159:3 160:2 166:12 167:25 168:12 172:1 174:2, 15 175:4 176:2

**177**:5, 11 184:8, 13, 19 187:9 191:2 201:20 204:3, 4 212:23, 24 213:7, 10, 17 214:6, 15, 17, 25 215:21 218:2, 21 219:4, 9, 10, 12 221:10 222:8, 24 223:13, 14 224:11 226:3 227:6 230:8 232:11 240:21 242:20, 21 243:1 244:7, 8, 13, 23 246:22 250:22, 23 251:1, 8 252:10, 11, 16 253:12, 17 259:4 260:21 261:1, 2, 3 264:4

**third-party** 52:23 53:2

**Third's** 29:16 32:21 43:8 45:17 139:22 160:3 161:6 190:23 199:12

**Thomas** 2:17 5:9

**thought** 35:25 40:20 42:9 44:6 53:10 94:12 97:15 104:8 106:4 121:9 156:11, 24 161:23 171:12, 13 172:12 179:10 181:10 183:21, 22 188:2 189:8 199:14, 18 205:20 210:20 232:16 233:4 238:12 243:18 246:14 258:16

**thoughts** 100:11

**threat** 189:24

**three** 52:6 66:9, 15 146:15 157:24 163:4, 21 189:6 190:22 195:4 198:1 200:21 202:7 204:23 212:8 233:23 243:6, 10, 13, 16, 25 252:20 256:5

**three-hours** 260:7

**three-page** 152:11

**three-plus** 131:24

**252**:20

**threw** 229:7

**Thursday** 16:14 83:10, 11, 22 231:11 256:8, 10, 11

**tie** 203:2

**ties** 201:8 203:8

**tight** 196:23

**Tim** 48:8 50:9, 18, 21 51:10, 11, 13 53:4, 22 54:21, 23 55:5, 10, 15, 19 56:7, 14 57:21 58:12 59:4 60:13, 21 63:5, 16 67:6, 21 68:1, 4 69:3 70:8, 25 71:3 74:13 77:11, 12, 13 82:16, 18 83:4, 6, 15, 24 84:9 85:5, 10 86:8, 18, 23 87:1 98:11, 12 100:3, 14, 25 103:20, 25 104:1 106:17, 21, 25 142:18, 22 143:19 151:17 184:6 185:4, 13 186:6 189:25 190:10, 13, 14, 21, 24, 25 191:1, 13, 15 192:1, 2 193:7 194:1 195:14 198:3 200:24 201:4, 9 211:13, 20, 21 212:4, 12 218:9 219:20 222:9, 11 223:4 224:6 226:5 227:12 229:21, 23 243:5, 14, 18 244:24 245:3, 15, 24 246:4, 8, 14 248:2 252:18, 19 258:3

**Time** 1:18 4:2, 7 12:15 14:12 15:12 16:11, 14, 18, 22 17:3, 17, 23, 25 18:1, 5 19:2, 8 20:5 23:11 26:14, 18 27:6, 13, 16, 17, 18, 24 28:20 29:4, 5 30:23 31:8, 16, 18 32:16 33:3, 8, 10 34:22, 25 35:19, 20 37:25 38:20 40:6, 21 41:7 42:5, 14 43:18,

19, 25  44:23  45:15
48:17  49:23  53:14
54:18  59:10  61:17
66:11, 12, 13, 25
68:24  73:2  74:24
75:8  77:1  79:5  81:7,
18  82:21  89:7
102:23  103:3, 8, 10
105:14  108:12  109:2,
5, 21  110:2, 4  111:22,
25  112:15  113:22, 24
114:17, 20  115:6
117:14, 19  118:10
120:13, 17  121:22
124:1  125:6, 15
127:18, 20, 25  128:3,
16  130:14, 24  131:2,
11  132:15, 20  133:4,
9  134:11  135:20
137:12, 25  138:6
140:18  141:13  143:8
145:21  150:18  151:6,
15, 16, 17, 20, 22
154:4, 5, 12  155:7, 9
164:1  168:7  174:10,
19  177:19  180:7, 11
182:15  183:2  191:17
196:14  198:25
203:14, 16, 19, 23
206:2, 4  220:25
227:1  231:10  232:17
238:23  247:7  248:25
253:23  256:11
260:10
timeframe  12:3  17:7
22:11  33:24  42:7, 11
43:15  44:17  84:16
103:16  108:25  109:3
110:7  111:3, 4  123:7
141:11  153:7, 20
154:10  157:17  159:8
196:23  197:16
204:20, 22  205:6, 10
210:23  220:23
243:20  251:24  253:2
timeframes  163:18
timeline  66:19  125:8,
19, 23  126:3  197:22
207:19  243:14, 23

246:25
timelines  136:21
timely  152:1, 8
times  26:13  34:10
52:7  81:20  101:25
134:21  139:23
157:18, 24  161:23
162:7, 10, 11, 19
163:1, 3, 4, 21, 23
165:24  166:11  174:8
208:23  218:25
257:11
timing  28:5  58:12,
15  59:4, 23, 24  69:11
83:16, 19, 20  84:15
110:1  174:21  196:17
207:7, 8, 10  208:4
211:2
timings  128:13
Tim's  55:21  64:3
104:10  190:25
191:13
title  12:24  26:10
27:22, 25  44:2  128:3
135:14  136:22  141:1
155:17
titled  4:5
Today  4:1  38:3
48:2  73:15  75:25
76:6  134:2  154:17
169:7  188:23  229:17
today's  7:14, 18
told  36:5  39:2, 11,
14, 17  40:11  45:15
47:2, 4  48:5  57:8
60:12  69:8  74:13
78:6  83:3, 13, 14, 18,
23  84:20  85:14
99:20  182:22  183:21
185:7  189:6  193:14
194:5, 13, 21, 24
195:13, 25  196:1
202:11, 17  217:9, 11
250:4  257:2
tolerance  25:5
tolerances  25:7
tolerant  161:9
tolerate  173:22
Tom  251:3
ton  215:17

tool  123:12, 18
124:4  155:18
top  53:5  70:20
72:21  74:3, 4, 12
75:6, 25  76:6, 9, 11,
14  82:9  86:16  87:19
88:13  93:16, 17
113:11, 12  122:11, 12,
22  144:24  145:8, 16,
19  146:7, 13  148:16
157:1  200:11  229:11
233:8  234:14, 18
235:1  236:1  238:25
239:1, 11, 12  241:18
249:6, 8, 9, 10  251:15
topic  63:20  99:6
254:16  258:22
259:19
total  28:12  31:21
72:14, 19  75:18
157:18  232:19  233:2
totality  242:9
totally  95:6  222:5
touch  177:24  179:3,
21  200:7
touching  179:14
tough  118:12  232:21
town  172:18
track  61:8  183:25
tracked  251:8, 10
traffic  201:6
trailed  81:9
train  156:25  183:25
training  156:6, 8, 11,
12, 14, 15, 19  157:20
158:1  159:3  161:3, 6
170:15  173:18  174:3,
4, 6, 7, 8, 9, 14
trainings  159:7
trains  61:8  198:18
212:4
traits  191:9, 10
transaction  150:21
197:12, 14
transcribed  263:8
transcript  263:9, 10
264:7
transformation
118:14

transition  72:10
77:11  135:16  154:21
transitioning  154:7
transparency  24:5
257:3
transparent  21:9
257:9
transpire  56:17
transpired  79:20
136:22  153:17
165:10
treasury  200:3, 4, 7,
11, 20
tremendous  44:6
82:11  137:19  229:10
trend  117:25
trends  23:20
trial  152:17
tried  23:7  81:2
142:1
trip  113:1  145:21
161:20  162:12
trips  162:13
true  141:23  263:10
264:10
try  7:1  16:12  52:20
96:15  176:21  200:10
202:4
trying  33:24  57:9
90:25  105:24  106:24
123:17  135:14  149:7
170:23, 24  171:3
194:9  196:14, 15, 16
199:12  200:12, 17
232:23  261:24
Tuesday  83:12
turn  66:21  86:1
111:11  133:16
218:20  219:10
221:11  222:24  226:3
227:6
turnover  148:10
Tuzun  67:10  68:17,
18  69:9, 21  70:2, 6
181:12  185:20
219:24  223:7  227:18
Twice  59:22  157:21
twin  93:20  94:2
two  22:19  66:9  70:5
72:25  74:8  101:4, 9

146:15  163:4, 14, 21
172:5  186:13  194:6
195:1  196:25  199:20,
22, 24  203:7  204:23
212:7, 22  216:19
218:12  219:18
221:19  222:13  223:4
226:10, 11  227:13
229:24  234:16
238:11  239:14, 17, 18
243:6, 7, 10, 11, 13, 16,
25  247:2, 10  252:20
260:6  261:4
**two-plus**  218:13
219:20  222:13
**type**  6:8  17:21, 25
21:15  23:3  103:3
112:14  114:10  127:3
161:9  179:24  180:22
232:21  257:14
**typed**  32:2  38:17
**types**  119:17, 20
143:10  145:9  163:9
**typical**  16:19
**typically**  13:21
16:14  26:21  76:20
81:5, 15, 17, 24  99:10
116:6, 9  119:7
145:11, 23  177:24
204:18  256:13  260:5
**typo**  38:16

**< U >**
**uh-huhs**  6:23
**uh-uhs**  6:23
**ultimate**  185:17
221:1
**ultimately**  41:25
200:24
**Um**  22:23
**unanimous**  107:20
**unanimously**  193:8
**unbiased**  156:10
157:20
**uncommon**  81:11
**unconscious**  156:10,
24  157:20  158:2
159:4, 11, 13  161:7
170:1, 9, 17

**unconsciously**  160:11
173:9
**Undergrad**  9:18, 21
**underneath**  141:10
241:23
**undersigned**  263:5
**understand**  6:19  7:4
51:19  52:8  53:2
65:16  89:24  96:9, 13
106:24  165:14
168:13, 16  169:3, 22,
24  170:8, 15, 24
175:24  176:19  177:1
194:9  196:7, 16, 17
210:4
**understanding**  28:9
46:24  50:25  56:4
62:11, 16, 17  63:1
67:20, 22  87:4  92:13,
14, 22, 23  93:7, 9
95:5, 7, 8, 12  96:19
103:22, 23  141:24
147:16  152:21
153:13  159:10, 20
161:4  170:25  182:9
184:17  189:18, 19
250:6, 25  251:4
264:13
**understandings**
189:21
**understands**  52:5, 14
138:23  152:25  182:3
190:1
**understood**  25:3
67:25  68:5  78:1
165:12  167:7  188:24
190:18
**undertaking**  126:16
**unintentionally**
160:11  173:9
**Union**  21:3  127:2
**UNITED**  1:1  4:4
**University**  9:21, 22
**unusual**  162:23
**up-and-coming**
227:25
**upbringing**  159:13
**update**  204:7  213:5,
11  223:18  254:25

**updates**  230:15
242:25  244:12
252:15  253:18, 22
259:8
**upset**  85:2  99:22, 23
**USA**  10:7
**use**  16:16  30:21
31:12  39:9  64:15, 23
65:9, 11  118:16
119:24  120:4  143:12
162:20  163:1  242:3
253:20  257:13
**usually**  220:25  260:7

**< V >**
**validate**  50:24
**validation**  51:3  53:8
**value**  44:6
**valued**  82:10
**values**  112:10
139:20, 22  140:3
**vanilla**  200:9, 14
**variables**  165:12, 14
**varied**  28:15
**various**  24:8  148:1
174:7  200:8
**vary**  28:15
**vendors**  174:8
**venue**  145:24  146:11
162:14
**verbal**  21:24  22:8
**verbally**  6:22
**verbatim**  69:6
**verify**  33:6
**version**  204:10, 11
205:17  222:25
225:16  254:10
259:10, 12, 14, 17
**versus**  4:6  15:19
46:19  119:12  136:23
166:15
**vet**  49:10  60:13
200:18
**vets**  49:5
**vetted**  48:10, 25  49:2
50:15, 21  53:23
56:20  60:10, 21
66:24  67:15, 18  68:6,
7, 9, 11  69:4, 25  70:9
104:3  107:24  228:25

**vetting**  49:12, 14, 19
50:1, 7, 9, 17  51:9, 10,
11  54:15, 20  55:6, 15,
18  56:14  57:24  60:1,
6  67:6  68:1, 3  71:15,
18  185:4
**vice**  30:14  110:9
**video**  4:16  6:21
**Videoconference**  2:4
**VIDEOGRAPHER**
4:1  61:14, 17  114:17,
20  155:7, 9  206:2, 4
248:25
**Videotaped**  1:13
**view**  145:17  163:9
169:1  212:12  237:20
241:10
**viewed**  34:13  41:12
42:10  171:11  205:22
211:21
**viewing**  164:23
**viewpoint**  119:15
**views**  19:13  202:22
**visibility**  257:16, 18
**visible**  149:2
**visiting**  219:7
**VOLUME**  1:13
**vote**  101:16  102:7, 9
103:11  106:7
**votes**  102:8  106:6
**voting**  14:24
**vs**  1:8  264:4

**< W >**
**wait**  6:25  70:10
**walked**  68:22  70:24
83:4, 8, 13  84:1
**walking**  258:19
**walks**  83:17, 21
**Walnut**  1:19
**WAM**  134:19  135:3
136:19
**want**  15:14  19:14
20:8  21:17  23:12, 24
28:7  33:6  38:4
39:17, 18  40:1, 18
52:15  56:1  58:1
65:6  78:8  85:4, 5
94:17  104:19  105:2
106:12  108:10, 13

Deposition of Gregory Carmichael, Volume I                     Philip R. McHugh v. Fifth Third Bancorp, et al.

112:*4* 114:*11* 116:*21*
117:*6* 134:22 135:*15*
146:*13* 171:*4* 175:*17*
176:*13* 177:25
180:*19* 181:20, *23*
184:*18* 185:*17*
186:*10* 195:24
200:*15* 206:20 227:2
257:*12* 258:*12*, *13*, *14*
261:*20*

**wanted** 14:*3* 21:*18*
35:2, *22* 36:6 38:*24*
39:*13*, *21*, *23* 40:*24*
41:*14*, *16* 47:7 48:6
53:6, *9* 54:*9* 61:*4*
73:20 78:*9*, *10* 82:7,
*8* 86:5 94:*9* 104:*10*
142:*18* 179:*9*, *10*
180:*15*, *24* 182:*1*, *8*
183:*4* 184:*13*, *16*
185:7, *9* 187:2
193:*14* 194:6, 7, *19*,
*20*, *25* 195:*1* 196:7, *9*
197:*6* 203:*1*, *6*
206:*18*, *21* 208:*1*
210:2, *25* 211:*14*
224:*19* 228:*18* 232:5
247:7 253:*23*

**wanting** 228:*24*
**wants** 34:*11* 66:8, *15*
86:*14* 97:22 164:*25*
220:*16* 237:*4*
**warrant** 247:*14*
**warranted** 45:22
193:*13*
**Warren** 172:6
**watch** 104:*10*
**watching** 236:*17*
**way** 8:*18* 31:5
52:*17* 53:*21* 56:22
58:*19* 68:*8* 70:*10*
85:7 90:25 91:5
104:*15* 105:*13*
110:*21* 133:2 139:*1*
144:*12* 145:*16* 162:7
164:*24*, *25* 165:*1*
171:*3*, *13*, *18* 173:2
182:*4* 205:22 211:*4*
212:*14* 232:2 236:*4*
237:*10*, *20* 238:*19*

241:2 246:*17* 258:*16*,
*21*
**weakness** 240:*14*
241:*11* 242:*11*
248:*14*
**weaknesses** 123:*18*
190:7, *19* 234:*13*
237:5
**wealth** 108:22
109:*23*, *24* 110:8, *12*
111:*24* 115:7 120:*14*
128:*4*, *10* 130:*15*
133:7 134:*9*, *10*
141:2 199:*25* 249:*21*,
*25*
**Wednesday** 83:*18*
**week** 16:*13* 68:*21*
202:*11* 253:*25* 255:*1*,
*13*, *16*, *18* 256:*15*, *16*
**weeks** 68:20, *21*
204:*23* 220:*20*
230:*18* 254:2
**weight** 74:*10*
**Well** 11:*18* 13:*24*
18:*11*, *25* 21:*24*
24:*16* 25:*3* 26:*9*
31:*17* 35:8 43:*24*
48:*16* 51:*21* 53:5
62:*17* 71:20 72:*14*
84:*25* 111:7 114:*8*
118:7 119:*3* 122:7
139:*16* 141:*23*
145:*17* 147:*14*, *21*
150:*24* 151:2, *5*, *8*, *9*,
*12* 153:*23* 157:*23*
172:*17* 179:*21* 180:7
190:2 195:*15* 198:*23*
199:*1* 200:*4* 202:5
203:*21* 207:*13* 214:2
225:*19* 230:*17*
231:*16* 255:*14*
256:*10*
**well-being** 87:*15*
**went** 12:5 27:25
46:*19* 121:*4* 131:6
151:2, *5*, 7, *9* 157:22
198:22 203:*21* 211:*5*
**We're** 4:*2* 6:*21*
19:*3* 25:*10* 33:*24*
61:*14*, *18* 62:6 78:7

86:*19* 91:22 103:*17*
114:*17*, *20* 118:2
125:*15* 128:*8* 138:*14*
146:*9* 149:7 155:*9*
188:*9* 189:22 203:*3*
204:*25* 205:*1*, *10*
206:*4* 210:*12* 230:*17*,
*18* 233:*4* 236:2
248:*25*
**WESTERN** 1:*3* 4:*5*
**we've** 4:*25* 26:*12*
38:*10* 76:*23* 116:7
123:*11* 172:*4* 174:7
193:*11* 216:*11* 237:7
238:*5*, *12*, *19*, *20*
251:*24*
**Wharton** 2:*4* 4:22
**whatsoever** 166:*19*
169:*19* 171:*10*
173:*24* 256:*23*
**WHEREOF** 263:*12*
**white** 173:*12*
**widely** 54:*16*, *17*, *19*
**wife** 7:*11* 80:*20*
83:*16* 169:*14*
**Williams** 50:*11*
253:*16* 254:*10*
**willing** 61:7 184:*14*
187:*4* 194:*17*, *20*
**window** 110:2
**winning** 55:*1*
**WITNESS** 8:22, *25*
33:*23* 39:*11* 47:*3*, *25*
50:7 52:20 54:*3*
57:*11*, *20* 59:*23* 62:5,
*22* 63:*14* 64:*19* 66:*3*
70:*17* 76:*4* 79:*4*
80:7, *9* 87:*9* 89:*9*
90:*8* 95:2 96:*12*
97:7 98:*16* 100:*24*
103:*18* 105:*3* 106:*1*
107:*9* 112:7 114:7
125:7 126:5 131:22
138:22 139:*14*
158:*10*, *20* 160:*24*
164:*17* 165:8, *21*
167:*6* 168:*20* 170:7,
*13*, *20* 171:6 173:*8*
175:*9*, 20 191:*25*
195:*5*, *9* 206:*14*

210:*15* 214:*23* 215:2
218:*8* 226:*20* 263:*12*
**witnesses** 152:*13*, *16*
**witness's** 95:5
**woman** 157:*25* 158:7
**wondering** 70:6
**word** 39:*10*, *15* 40:*3*
48:5 51:*19*, *21* 52:*9*
85:*1*, *12* 119:*23*, *24*
120:*4* 122:*19* 225:*11*
233:*24* 247:*17*
251:*12* 255:7
**wording** 84:*25* 94:4,
*5*
**words** 50:*5*
**work** 20:*24* 36:*1*, 6
39:*14*, *18*, *21*, *24* 40:2,
*10*, *13*, *19*, 22, *23*, *24*
41:*16*, 20 45:*18* 47:7
48:6 66:8, *15* 71:2
74:*13* 82:*16*, *18* 83:*4*,
*6*, *24* 87:*11* 88:*4*
99:*3*, 7 118:2 119:*4*
133:*21* 140:*3* 145:*13*
148:*19* 199:*24*
202:*12* 203:6 239:22
247:*21*
**worked** 97:*24*
156:22 190:2 239:*20*
243:*12*
**workforce** 219:2
**working** 20:*4* 25:*16*
35:*24* 44:2 79:*21*
127:2 146:*10* 201:5
**workplace** 94:*10*
161:*8* 170:*17* 173:*1*,
*17* 174:*3* 219:*3*
**works** 20:*5* 144:*13*
212:*14*
**world** 147:*20*
**worry** 162:*16*, *17*
**write** 58:*9* 69:*5*, *17*
77:*21* 84:*25* 236:*23*
**writing** 22:*5* 35:*15*
58:*5* 74:*21* 77:*9*
78:*3* 79:*24* 164:7, *9*,
*10* 165:2 191:*21*
192:*19*, 22 193:*3*
236:7, *11*, *12*, *15*
238:*4* 241:5 242:*14*

**written**  39:*3*  41:*2*
54:*18*  173:*20*
**wrong**  109:*8*
**wrote**  112:*8*  139:*9*
141:*18*

**< Y >**
**Yeah**  8:*21, 23*  54:*1*
89:*7*  114:*16*  119:*20*
122:*21*  133:*8*  135:*4*
149:*6*  158:*24*  170:*20*
172:*19*  195:*20, 22*
197:*10, 15, 19*  203:*11*
205:*4*  222:*20*  234:*1*
262:*3*
**year**  9:*24*  12:*3, 23*
16:2, *12*  17:*10*  19:*17*
20:*11*  21:*11, 16*  24:*8*
28:*5*  32:*12, 13*  35:*9,*
*11*  48:*18, 20*  75:*16*
81:*9*  93:*19*  101:*3, 8*
106:*12*  108:*7*  109:*1*
112:*2*  113:*5*  116:*10,*
*23*  117:*24*  120:*14*
121:*5, 13*  129:*10, 11*
133:*13*  136:*18, 24*
154:*22, 23*  156:*9, 16*
163:*17, 18*  174:*11*
178:*1*  179:*18*  180:*2*
188:*11*  197:*23, 24*
203:*22*  211:*22*  212:*7*
226:*11*  233:*12*
236:*14*  257:*11*
**years**  7:*9, 13*  28:*16*
30:*20*  31:*12*  35:*24*
36:*1, 7*  38:*24, 25*
39:*7, 14, 18, 20, 22, 23,*
*24*  40:*1, 2, 11, 13, 17,*
*19, 22, 23, 24*  41:*16,*
*20*  45:*19, 22, 24*  47:*7*
48:*6*  62:*23*  66:*9, 16*
101:*4, 9*  104:*3, 4*
106:*20*  108:*7*  109:*22*
111:*9*  112:*6*  124:*13*
131:*24*  145:*10*  146:*1,*
*8, 12, 15*  147:*2*  153:*7*
154:*2*  157:*11*  163:*20*
169:*13*  172:*5, 6*
183:*24*  184:*9*  190:*9*
194:*6*  195:*1*  205:*4*

211:*23*  212:*8*  215:*18*
216:*20*  218:*12, 13*
219:*8, 18, 20*  221:*19*
222:*13, 14*  223:4, *5*
226:*10, 11*  227:*13, 15,*
*22*  228:*3, 4, 5*  231:*16*
234:*4*  236:*18*  238:*20*
241:*19*  243:*6, 7, 10,*
*11, 13, 16, 25*  244:*1*
247:2, *10*  252:*20, 21*
256:*5*
**year's**  136:*8*  177:*25*
231:*19, 20*
**Yep**  113:*7*
**yesterday**  9:*10*
**York**  156:*21, 22*
**young**  184:*7*

**< Z >**
**Zaunbrecher**  8:*11, 14*
71:*24*  84:*4*  153:*13,*
*14*
**Zoom**  4:*16, 19, 20*