# EXHIBIT D

Case: 1:21-cv-00238-MRB Doc #: 66-4 Filed: 08/02/24 Page: 2 of 65 PAGEID #: 2893

Deposition of Nicholas Kevin Akins                    Philip R. McHugh v. Fifth Third Bancorp, et al.

1

2                 UNITED STATES DISTRICT COURT

3                 SOUTHERN DISTRICT OF OHIO

4                      WESTERN DIVISION

5

6      ----------------------------:
                                    :
7      PHILIP R. MCHUGH,            :
                                    :
8           Plaintiff,             :
                                    :
9        vs.                        :  CASE NO.
                                    :  1:21-cv-00238
10     FIFTH THIRD BANCORP, et      :
       al.,                         :
11                                  :
12          Defendants.            :
       ----------------------------:

13

14            Videotaped
              Deposition of:   NICHOLAS KEVIN AKINS
15
              Taken:           By the Plaintiff
16
                               Pursuant to Notice
17
              Date:            July 2, 2024
18
              Time:            Commencing at 9:39 a.m.
19
              Place:           Fifth Third Center
20                             511 Walnut Street
                               Cincinnati, Ohio  45202
21
              Before:          Wendy L. Raymer, RPR, CRR
22                                      and
                               Connie Ihle-Adkins,
23                             Videographer
                               Notaries Public-State of Ohio
24

25

```
 1    APPEARANCES:

 2

              On behalf of the Plaintiff:
 3
              Peter A. Saba, Esq.
 4                      and
              Joshua M. Smith, Esq.
 5                      of
              Stagnaro, Saba & Patterson Co., L.P.A.
 6            2623 Erie Avenue
              Cincinnati, Ohio  45208
 7            Phone:  (513) 533-2701
              Email:  Pas@sspfirm.com
 8                    jms@sspfirm.com

 9
              On behalf of the Defendants and the Deponent:
10
              Michael L. Cioffi, Esq.
11                      and
              Collin D. Hart, Esq.
12                      of
              Blank Rome LLP
13            1700 PNC Center
              201 East Fifth Street
14            Cincinnati, Ohio  45202
              Phone:  (513) 362-8700
15            Email:  Michael.cioffi@blankrome.com
                      Collin.hart@blankrome.com
16

17            Also Present:

18            Philip R. McHugh
              Brian Thomas, Esq., Fifth Third Bancorp
19

20                              - - -

21

22

23

24

25
```

```
1                        I N D E X

2

3   NICHOLAS KEVIN AKINS                              PAGE

4     Examination by Mr. Saba                            7
      Examination by Mr. Cioffi                        121
5     Further Examination by Mr. Saba                  130

6

    EXHIBITS                         MARKED    REFERENCED
7
      Plaintiff's Exhibit 1           10          11
8     Plaintiff's Exhibit 2           71          71
      Plaintiff's Exhibit 3           71          71
9     Plaintiff's Exhibit 4           77          77
      Plaintiff's Exhibit 5          102         102
10    Plaintiff's Exhibit 6          103         103
      Plaintiff's Exhibit 7          104         104
11    Plaintiff's Exhibit 8          104         104
      Plaintiff's Exhibit 9          105         105
12    Plaintiff's Exhibit 10         106         106

13    Plaintiff's Exhibit 11         106         107
      Plaintiff's Exhibit 12         107         107
14    Plaintiff's Exhibit 13         108         108
      Plaintiff's Exhibit 14         109         109
15    Plaintiff's Exhibit 15         109         109
      Plaintiff's Exhibit 16         111         111
16    Plaintiff's Exhibit 17         111         112
      Plaintiff's Exhibit 18         115         115

17

18
                         -  -  -
19

20

21

22

23

24

25
```

Deposition of Nicholas Kevin Akins | Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 4

1 THE VIDEOGRAPHER: We are on the videotape
2 record. Today is Tuesday, July 2, 2024. The time
3 is 9:42 a.m. We're here today to take the
4 deposition of Nicholas K. Akins pursuant to Rule
5 30(b)(1) deposition, and the case style is Philip
6 R. McHugh versus Fifth Third Bancorp, et al.,
7 United States District Court, Southern District of
8 Ohio, Western Division, Case No. 1:21-cv-00238.
9 Will the attorneys now introduce themselves
10 and state who they represent?
11 MR. SABA: Peter Saba on behalf of the
12 Plaintiff Philip R. McHugh.
13 MR. SMITH: Joshua Smith on behalf of the
14 Plaintiff Philip R. McHugh.
15 MR. CIOFFI: On behalf of the defendant, Fifth
16 Third Bank, Michael Cioffi and Collin Hart of Blank
17 Rome, and Brian Thomas of Fifth Third Bank.
18 MR. SABA: And additionally attending via Zoom
19 is Attorney Bailey Sharpe from our office.
20 THE VIDEOGRAPHER: And would the court
21 reporter please swear in the witness?
22 (Witness sworn.)
23 MR. CIOFFI: Peter, before you begin, let me
24 say something on the record. This deposition is
25 being taken over the defendant's objection given

Page 5

1 the fact that we're beyond now the limit under the
2 civil rules for the number of depositions, and also
3 given the fact that this is the fourth director
4 deposition. So the defendant objected.
5 The court permitted this deposition, and the
6 record is pretty clear about this, provided that
7 the scope of the deposition is limited. It doesn't
8 repeat everything you've asked the other directors
9 and the other witnesses.
10 And you agreed in a couple of conferences in
11 December of 2023 and in 2024 that the scope would
12 be limited and it would not be repetitive or
13 redundant. It would concern this particular
14 witness's understanding of the decision and the
15 decision-making process. And while the court
16 speculated that perhaps it could be done in 30
17 minutes, the court did not limit the deposition to
18 30 minutes.
19 However, the court said the following, and I'm
20 reading from the court statement. At the
21 February 20, 2024 conference in which the court
22 said, but I think if you get straight to the point,
23 I mean, it's really simple. Was there any
24 discussion of age? What information did you rely
25 on? I mean, it's not complex.

Page 6

1 And, Peter, as counsel for the plaintiff, you
2 agreed that the scope of this would be limited,
3 that it would be focused, and this would not be a
4 simple repetition of the three other director
5 depositions.
6 MR. SABA: Michael, we completely disagree
7 with your summary of the purpose for this
8 deposition, and there was no limitation
9 specifically as to scope. The only discussion was
10 we would try and keep this under six hours and that
11 would be the goal, and that was the representation
12 that was made. There was no ruling. There was no
13 requirement. There was no limitation.
14 We're going to seek to do this in as efficient
15 manner as possible, but we disagree with your
16 representation of what brings us here today and
17 what the parameters are for the deposition.
18 MR. CIOFFI: Well, the record will speak for
19 itself, but please go ahead.
20 NICHOLAS KEVIN AKINS,
21 of lawful age, a witness herein, being first duly sworn
22 as hereinafter certified, was examined and deposed as
23 follows:
24
25

Page 7

1 EXAMINATION
2 BY MR. SABA:
3 Q. Mr. Akins, can you go ahead and state your
4 name for the record, please?
5 A. Nicholas K. Akins.
6 Q. Have you ever had your deposition taken
7 before?
8 A. Yes.
9 Q. How many times have you had your deposition
10 taken?
11 A. Twice.
12 Q. As a reminder, I'm going to be asking you a
13 series of questions. For the sake of the court
14 reporter, I need you to answer verbally, no shaking or
15 nodding of the head, notwithstanding that we're going to
16 have this on video.
17 A. Yes.
18 Q. For the transcription record, we still need
19 that verbally. Additionally, if you can wait for me to
20 finish my question before you answer, and I'll try to do
21 the same before I ask you another question, also makes
22 for a clearer record.
23 With respect to if you need to take a break at
24 any time, you can just let us know that and we can go
25 ahead and take a break, but I'll need you to answer the

Deposition of Nicholas Kevin Akins                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 8

1  question that's standing at that point in time before we
2  take the break. Do you understand all those
3  instructions?
4  **A. Yes.**
5  Q. What is your address?
6  **A. 6 Highgrove Farms, New Albany, Ohio 43054.**
7  Q. How long have you lived there?
8  **A. Since 2017.**
9  Q. Who do you live there with?
10 **A. My wife.**
11 Q. How long have you been married?
12 **A. 41 years.**
13 Q. What's your date of birth?
14 **A. 8/26/60.**
15 Q. Who recommend -- excuse me.
16     You explained that you've been deposed twice
17 before; is that right?
18 **A. Yes.**
19 Q. What were the purpose of those two
20 depositions?
21 **A. One was a US bankruptcy case. The company I**
22 **worked for was trying to acquire another utility that**
23 **was going through bankruptcy, so I was deposed in that**
24 **case. And then the other is an SEC case with AEP,**
25 **American Electric Power, who I was the former chair and**

Page 9

1  **CEO. That was a case involving the company's**
2  **interactions relative to HB6.**
3  Q. What did you do to prepare for today's
4  deposition?
5  **A. I looked at materials that fit the -- that was**
6  **supplied by my counsel.**
7  Q. Did you review any of the prior depositions
8  that were taken in this case?
9      MR. CIOFFI: Objection. Whatever he reviewed
10     was at the instruction of counsel. I should say at
11     the beginning, as I did in the other depositions,
12     we represent the defendant Fifth Third Bank, but we
13     also represent Mr. Akins personally pursuant to a
14     joint representation agreement. So whatever he
15     reviewed was reviewed at our request and I'm not
16     going to let him describe those documents.
17 BY MR. SABA:
18 Q. Did you speak to any board members in advance
19 of this deposition regarding the case with Phil McHugh?
20 **A. There were a couple of conversations where I**
21 **talked about the deposition, the timing of depositions,**
22 **things like that.**
23 Q. What about the content of the deposition?
24 **A. No content.**
25 Q. Any testimony -- who did you speak to?

Page 10

1  **A. I believe it was Marsha Ryan at the board**
2  **meetings, saying I was about to be deposed.**
3  Q. Marsha Ryan?
4  **A. Excuse me. Marsha --**
5  Q. Williams?
6  **A. Williams.**
7  Q. Anyone else?
8  **A. No.**
9  Q. Did you speak to any employees at Fifth Third
10 Bank about the Philip R. McHugh case?
11 **A. Well, I mentioned to Tim I was being deposed.**
12 Q. Tim Spence is who you're referring to?
13 **A. Tim Spence, yeah.**
14 Q. Other than these conversations with Mr. Spence
15 or Ms. Williams with respect to your deposition, have
16 you had any conversations with any of the other board
17 members about the Phil McHugh litigation?
18 **A. No.**
19 Q. Have you had any conversations with any
20 employees at Fifth Third Bank about the Phil McHugh
21 litigation?
22 **A. No.**
23     (Plaintiff's Exhibit 1 is marked for
24     identification.)
25

Page 11

1  BY MR. SABA:
2  Q. Mr. Akins, I've handed you what has been
3  marked as Exhibit Number 1. Have you ever seen this
4  document before?
5  **A. Yes.**
6  Q. When did you see this document?
7  **A. In preparation for this deposition.**
8  Q. Let me represent to you this is an amended
9  notice for your deposition for today, and it includes
10 attached to it a request for production of documents
11 which begins on page 3 of Exhibit 1; do you see that?
12 **A. Which page?**
13 Q. Page 3.
14 **A. I don't remember seeing this one.**
15 Q. You do not see where at the top --
16 **A. No, I don't remember seeing the document. I**
17 **don't know that I have seen this, but go ahead.**
18 Q. You don't recall seeing this before, just to
19 be clear for the record?
20 **A. No, I don't recall seeing it.**
21 Q. All right. Let me represent to you, this was
22 a document that was sent to -- who is now represented to
23 be your counsel with respect to producing documents for
24 today's deposition. Do you have any documents with you
25 today?

Deposition of Nicholas Kevin Akins          Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 12

1  A. No.

2  MR. CIOFFI: Let me say for the record in
3  response to that question that the documents were
4  searched by -- for by counsel and provided to you,
5  either in response to this particular production or
6  as a result of the earlier productions, but there
7  is nothing in response to this particular request
8  for production of documents that exists that has
9  not been produced.

10 BY MR. SABA:

11 Q. Mr. Akins, let me represent to you, this was a
12 request directed specifically to you for today's
13 deposition. And if I could refer you to page 6 of this
14 document, please.

15 A. Uh-huh.

16 Q. Of Exhibit 1.

17 MR. CIOFFI: And I'm going to say for the
18 record that as his counsel, we responded to this
19 particular request.

20 BY MR. SABA:

21 Q. And referring to request for production of
22 documents number 1, do you see where that is, about
23 two-thirds of the way down on page 6?

24 A. Yes.

25 Q. The first request refers to "communications

Page 13

1  between you and any other director or officer of Fifth
2  Third which refers, mentions, or otherwise relates to:"
3  and the first subtitle, "Succession planning for the
4  position of president and/or CEO of Fifth Third"; do you
5  see that?

6  A. Yes.

7  Q. Did you ever actively look for or search out
8  any such communications?

9  A. I didn't have any.

10 Q. Did you look for them?

11 A. I didn't need to. I didn't have any.

12 Q. Okay. Subcategory B is, "Identified and/or
13 selected candidates for the position of president and/or
14 CEO of Fifth Third."

15 Did you have any documents in response to that
16 category?

17 A. I did not have any.

18 Q. Subcategory C is, "Processes or timelines,
19 whether proposed or final, with respect to the
20 identification and/or selection of candidates for the
21 position of president and/or CEO of Fifth Third."

22 A. I didn't have any.

23 Q. With respect to 1D, "Development of potential
24 candidates for the position of president and/or CEO of
25 Fifth Third."

Page 14

1  A. I didn't have any there neither.

2  Q. Subcategory E is, "Any facts upon which you
3  and any other director relied upon when identifying
4  and/or selecting candidates for the position of
5  president and/or CEO of Fifth Third."

6  A. No, I didn't have any.

7  Q. Subcategory F would be any documents regarding
8  that refer to Phil McHugh.

9  A. I didn't have any.

10 Q. And subcategory G is any documents that would
11 refer to Tim Spence.

12 A. No, I didn't have any.

13 MR. CIOFFI: Counsel, I'm going to state again
14 for the record to the extent these documents exit
15 in the books and records of Fifth Third Bank or the
16 board, they have been produced to you, to the
17 extent they exist.

18 MR. SABA: Okay.

19 BY MR. SABA:

20 Q. And specifically, we're asking for your
21 documents, Mr. Akins.

22 A. Right, that's what I understand.

23 MR. CIOFFI: You're asking for his personal
24 documents?

25 MR. SABA: Correct.

Page 15

1  THE WITNESS: That's the way I understand the
2  question.

3  MR. CIOFFI: As long as it's clear on the
4  record that's what you're requesting.

5  THE WITNESS: Yeah.

6  BY MR. SABA:

7  Q. With respect to number 2, it asks for, "Any
8  communications as defined above between you and Philip
9  McHugh."

10 A. I didn't have any.

11 Q. The third category is, "Any communications
12 between you and Timothy Spence."

13 A. I didn't have any.

14 Q. And just to be clear, "The words
15 communications or communicate mean any correspondence,
16 disclosure, transfer, exchange of information, whether
17 oral or written, and whether in person, by telephone,
18 mail, email, telecopy, text message, or other document
19 form."

20 Did you understand that in responding to that
21 question?

22 MR. CIOFFI: Again, objection to the form.
23 It's overbroad and includes information that is not
24 discoverable.

25

Deposition of Nicholas Kevin Akins                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 16

BY MR. SABA:

Q. Did you understand that being the definition of communication in responding to that question?

A. Can you repeat the question?

Q. Sure. The definition of communication as provided in this document means any correspondence, disclosure, transfer or exchange of information whether oral or written and whether in person, by telephone, mail, email, telecopy, text message, or other document form.

A. I haven't had any communication relative to the details of this case.

Q. And going back again with respect to that understanding of communication, do you have any communications between you and Philip McHugh?

A. No.

Q. Did you ever have any communications between you and Philip McHugh?

A. No.

Q. Number 3 is, "Any communications between you and Timothy Spence"; do you see that?

A. Yes.

Q. Did you have any communications between you and Tim Spence?

A. About this case?

Page 17

MR. CIOFFI: Yeah, objection to the form of the question. It's overbroad. It's not discoverable. Irrelevant. If you confine it to the issues in this case, I'll allow him to answer.

THE WITNESS: Can you be more specific?

BY MR. SABA:

Q. Well, generally speaking, have you communicated with Tim Spence by text message or phone or email?

A. No.

Q. Okay. Did you have any communications with Mr. Spence regarding any aspect of this litigation of this case?

A. No. Other than I'm having a deposition.

Q. Request number 4 asks for, "All documents created, received, or obtained by you which refer, mention, or otherwise relate to:" and the first under category A, "Succession planning for the position of president and/or CEO of Fifth Third."

A. I don't have any documents for that.

Q. Subcategory 4B is, "Identified and/selected candidates for the position of president and/or CEO of Fifth Third."

A. I don't have any documents on that.

Q. Subcategory 4C is, "Processes or timelines,

Page 18

whether proposed or final, with respect to the identification and/or selection of candidates for the position of president and/or CEO of Fifth Third."

A. I don't have those documents.

Q. Subcategory D is, "Development of potential candidates for the position of president and/or CEO of Fifth Third."

A. I don't have those.

Q. Subcategory 4E is, "Any facts upon which you or any other director relied upon when identifying and/or selecting candidates for the position of president and/or CEO of Fifth Third."

A. I don't have that.

Q. Subcategory F is referring specifically to Philip McHugh.

A. No, I don't have that.

Q. And any documents you retained regarding Timothy Spence?

A. No.

Q. You don't have any documents?

A. I don't have any documents.

Q. What's the extent of your education?

A. I have a master's in science and electrical engineering, a bachelor of science in electrical engineering as well.

Page 19

Q. Where did you obtain those?

A. Louisiana Tech University.

Q. When did you obtain those?

A. Bachelor's in 1982. Master's in 1986.

Q. When did you first become a board member at Fifth Third?

A. I believe it was October of 2013.

Q. Were you employed at that time?

A. Yes.

Q. Where did you work?

A. American Electric Power.

Q. What was your position with American Electric Power?

A. Chairman, president, and the CEO.

Q. When did you become president of American Electric Power?

A. November 12, 2011. Oh, excuse me, January 1, 2011 for president.

Q. How long had you been employed with American Electric Power before you became president?

A. Well, that was 2011. So 29 years. 1982 to 2011 is -- I think that's right.

Q. You went to work for American Electric Power out of college?

A. Yes. Well, actually, I went to work for

Deposition of Nicholas Kevin Akins         Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 20

1 Southwestern Electric Power Company, which was part of
2 Central and Southwest Corporation. And then AEP
3 acquired Central and Southwest in 2000. So technically,
4 yes.
5     Q. Essentially you worked for the same company up
6 until the time that you became president; is that right?
7     A. That's right.
8     Q. You were a lifer there; is that right?
9     A. Yes.
10     Q. And they still made you CEO and president even
11 though you were a lifer; is that right?
12     A. Yes.
13     Q. What's the benefit of making a lifer the CEO
14 and president of the company?
15        MR. CIOFFI: Objection.
16        THE WITNESS: Well, actually, I would say that
17     while it's not a necessity, I certainly had the
18     benefit of knowing the internal operations of the
19     company. I had been in various operating
20     utilities, and then with the experiences of being
21     in the utility business.
22 BY MR. SABA:
23     Q. You ran several different branches of the
24 company; is that right?
25     A. Yes.

Page 21

1     Q. You understood the history of the company; is
2 that right?
3     A. Yes.
4     Q. And as you indicated, that the utility
5 industry is heavily regulated; is that a fair statement?
6     A. Yes.
7     Q. As a result of your history with the company,
8 you had an understanding of the regulations affecting
9 that industry; is that correct?
10     A. Yes.
11     Q. Was your mother a flight attendant?
12     A. No.
13     Q. Okay. And they still made you CEO and
14 president?
15     A. Yes.
16     Q. Okay. How large is AEP?
17     A. Depends on what measure you use. Are you
18 asking market cap or --
19     Q. Sure, let's start with market cap.
20     A. Market cap's about 46, 47 billion. It was 50
21 when I was there. It's over 11 states, one of the
22 largest electric utilities in the country.
23     Q. Number of employees?
24     A. 18,000.
25     Q. Number of customers served?

Page 22

1     A. 5.6 million.
2     Q. Where does AEP currently stand on the Forbes
3 500?
4     A. It varies from year to year, but it's a
5 Fortune 200 company.
6     Q. Roughly around 185, around that number; does
7 that sound right?
8     A. That sounds about right.
9     Q. How long did you remain chairman, president --
10 let me go back.
11        How long did you remain president of AEP?
12     A. From 2011 to January -- let's see.
13 January 1st of '23. August, excuse me.
14     I get president -- it all changed with the
15 transition. So president, August of '23.
16     Q. And what about with respect to CEO, how long
17 did you remain CEO for AEP?
18     A. I was CEO -- hold on a second. August of '22
19 for president. January 1st of '23, I turned over the
20 CEO title and stayed on as executive chair of AEP until
21 October of '24 -- or excuse me, October of '23.
22     Q. Is it a fair statement that your role in -- as
23 president and CEO of AEP was a demanding job; is that
24 right?
25     A. Yes. Much different than an executive vice

Page 23

1 president. There is no comparison.
2     Q. What do you mean by that?
3     A. As an executive vice president, I always
4 thought, you know, I worked as hard and as many hours,
5 that kind of thing, I could be CEO of the company.
6 After I became CEO of the company, I realized it's a
7 very different position. You're in a glass house.
8 Employees are looking at every mannerism, every comment
9 you make. Investors are looking at every comment you
10 make. The commitment relative to the schedule is
11 significant.
12     You have to be quick on your feet and you have
13 to be very adaptable. You have to be able to talk to
14 the president or the governor, in the same day talk to
15 the -- talk to the frontline employees and be able to
16 identify with them. Very different role.
17     Q. And it's 24/7; is that correct?
18     A. Yes.
19     Q. You're constantly on with respect to issues
20 that may arise; is that right?
21     A. That's correct. Just to be clear, I am
22 sleeping sometimes. Okay. All right. I'm using 24/7
23 as --
24     Q. I understand.
25     A. All right.

Deposition of Nicholas Kevin Akins          Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 24

1  Q.   During the period of 2015 through October of
2  2020, how many different boards did you serve on?
3  A.   Only the -- it was an AEP board, obviously,
4  American Electric Power board, and Fifth Third's board.
5  I was only as an active CEO, typically you can only be
6  on one additional board, and Fifth Third was that board.
7  There were other not-for-profit boards that I was
8  involved with.
9  Q.   What were the not-for-profit boards?
10  A.   I was chair of the Ohio Health board.  The
11  board of the Rock and Roll Hall of Fame.  Let's see.
12  Several industry-related boards.
13  Q.   Would that be the Institute of Nuclear Power
14  Operators?
15  A.   Institute of Nuclear Power Operators, the
16  Edison Electric Institute, the Global Sustainable Energy
17  Partnership, the -- let's see, INPO, Institute of
18  Nuclear Power Operators.  Let's see, there was the
19  business round table, US Business Round Table, the Ohio
20  Business Round Table.  I'm trying to think of the
21  others.  I think that's about it.
22  Q.   OBRT?
23  A.   The Ohio Business Round Table.  I chaired that
24  as well.
25  Q.   How often would each of those charitable

Page 25

1  boards meet?
2  A.   Typically on a quarterly basis.
3  Q.   Going back to the demanding nature of your job
4  with AEP, at times it would become very time consuming;
5  is that correct?
6  A.   Yes, of course.
7  Q.   The -- you had some issues, and I believe you
8  referenced it with respect to your deposition in July of
9  2020, is that right, with certain allegations made
10  against AEP's involvement with House Speaker Householder
11  and HB6; is that correct?
12  A.   I didn't have any depositions at that point in
13  time.
14  Q.   No, let me rephrase the question.
15  There was, beginning in July of 2020, the
16  Columbus Dispatch reported that AEP may have contributed
17  money to a group called Empowering Ohio's Economy, Inc.,
18  which was labeled as potential dark money with respect
19  to some of the actions between First Energy and House
20  Speaker Larry Householder; is that correct?
21  MR. CIOFFI:  Objection.  Beyond the scope of
22  discovery.  You may answer yes or no.
23  THE WITNESS:  There was an article in the
24  Columbus Dispatch about that time.
25

Page 26

BY MR. SABA:
2  Q.   Okay.  It also eventually led to litigation
3  against you personally with respect to a shareholder
4  claim against AEP and you; is that correct?
5  A.   There were derivative shareholder claims.
6  Q.   Okay.  That began in August of 2020; is that
7  right?
8  A.   I believe that's about right.
9  Q.   Okay.  How many times have you been sued
10  personally?
11  A.   I've never been sued personally other than
12  through my role as CEO of AEP and as a board member of
13  AEP.
14  Q.   How often did that happen as a board member or
15  CEO of AEP?
16  MR. CIOFFI:  Objection.  Beyond the scope of
17  discovery in this case.  I'll allow you to answer,
18  if you know.
19  THE WITNESS:  I don't recall how many times.
20  BY MR. SABA:
21  Q.   When did you first meet Greg Carmichael?
22  A.   I don't recall specifically, but it would be
23  about 2014, maybe.
24  Q.   How would you describe your relationship with
25  Greg Carmichael?

Page 27

A.   Just professional.
2  Q.   How frequently would you meet personally with
3  Greg Carmichael?
4  A.   I didn't.  Are you asking during the time of
5  the -- of the period in question or -- because I would
6  meet with Greg when he became CEO.
7  Q.   Sure.  Sure.  Let me rephrase the question.
8  You first met him in 2014; is that correct?
9  A.   That's about right, I think.
10  Q.   All right.  Did you ever meet with Greg
11  Carmichael outside his duties as a president or CEO or
12  employee of Fifth Third Bank?
13  A.   When he was CEO of Fifth Third Bank, I would
14  meet with him because I was chair of the governance
15  committee and I would meet with him on governance
16  committee matters, scheduling, logistics, those kinds of
17  things, but I never met with him until -- individually
18  until he became CEO.
19  Q.   Okay.  And how frequently would you meet with
20  him after he became CEO of Fifth Third Bank?
21  MR. CIOFFI:  Again, objection.  Time frame.
22  Are you talking 2015 to 2020, is that the time
23  frame you're asking him about?
24  MR. SABA:  During the time he was CEO of Fifth
25  Third Bank, correct.

Deposition of Nicholas Kevin Akins                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 28

1  THE WITNESS: During the time he was CEO,
2  rarely, but when I did meet him, it was -- or have
3  a call with him, it was because of the governance
4  committee matters. So it may be once a year, maybe
5  twice a year.
6  BY MR. SABA:
7  Q. Other than those once or twice a year
8  conversations or meetings with Mr. Carmichael regarding
9  governance, were all your other meetings with
10 Mr. Carmichael at Fifth Third board meetings?
11 A. Yes. **Fifth Third board meetings, and that**
12 **includes the dinners and other events of the Fifth Third**
13 **board.**
14 Q. And encompassed in that one to two times a
15 year, that would include any phone calls you may have
16 with Mr. Carmichael or text messages, any other
17 communications; is that right?
18     MR. CIOFFI: Objection. Assumes facts not in
19     evidence. Lack of foundation. He's never
20     testified there were any such things. In fact, I
21     think he testified that there weren't. But do you
22     understand the question?
23     THE WITNESS: No. Can you repeat it?
24     MR. SABA: Sure.
25

Page 29

1  BY MR. SABA:
2  Q. You mentioned these one to two communications
3  a year of meeting with Greg Carmichael. I'm just
4  trying -- let me go back a second.
5     Would you communicate with him by phone?
6  A. **Typically by phone, in preparation for**
7  **governance committee matters.**
8  Q. All right. Would you communicate with him by
9  text?
10 A. **No, I don't recall that.**
11 Q. All right. Would you communicate with
12 Mr. Carmichael by email?
13 A. **I don't recall that.**
14 Q. So going back to my question again, that one
15 to two times a year that you would communicate directly
16 with Mr. Carmichael outside any Fifth Third board
17 meetings and related board events, that would
18 include any emails or text messages or other
19 communications to the extent there were any; is that
20 correct?
21     MR. CIOFFI: Objection to the form of the
22     question. I believe you said outside of board
23     matters in your question, and he testified there
24     weren't any such communications. Is that what you
25     intended to say? I'm not clear about the question.

Page 30

1  BY MR. SABA:
2  Q. I'm just trying to clarify the nature and
3  volume of communications that you had had with
4  Mr. Carmichael.
5  A. **My communications with Greg after he became**
6  **the CEO, I would meet with him occasionally just to see**
7  **how he was doing as a new CEO because somewhat of a**
8  **mentor relationship as lead director. So I would have**
9  **calls occasionally with him just to see how he is doing,**
10 **those types of things, and then when I took over the**
11 **governance committee, it was really governance committee**
12 **logistics and those types of things. So it was all bank**
13 **business. There was nothing -- I mean, nothing**
14 **personal.**
15 Q. And in terms of volume, that would be one to
16 two times a year that you would have those
17 communications?
18 A. **Yes, I think so.**
19 Q. What about with respect to Robert Schaffer,
20 when did you first meet Robert Schaffer?
21 A. **I met Bob during the time of -- I think it was**
22 **during TFT, Transforming Fifth Third, and it was really**
23 **around those kinds of matters that were occurring at**
24 **that particular time.**
25 Q. Do you recall what year that was?

Page 31

1  A. **I don't recall what year. It was probably**
2  **2015, '16, I suppose.**
3  Q. How would you describe your relationship with
4  Mr. Schaffer?
5  A. **Just professional.**
6  Q. How frequently would you directly communicate
7  with Mr. Schaffer?
8  A. **I don't recall communicating with him. I**
9  **mean, other than board settings.**
10 Q. Was there an occasion where would you
11 separately communicate with him by cell phone or by
12 email?
13 A. **I don't recall that.**
14 Q. What was your relationship with Phil McHugh
15 prior to January 1, 2020?
16 A. **Prior to January 1, 2020?**
17 Q. Correct.
18 A. **Professional.**
19 Q. What was your understanding of Phil McHugh's
20 role at Fifth Third Bank prior to January 1, 2020?
21 A. **Well, he had various -- various roles, the**
22 **consumer bank, and then he had wealth management for a**
23 **period of time. So he had different roles at the**
24 **company.**
25 Q. How frequently did you meet with Phil McHugh

Deposition of Nicholas Kevin Akins
Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 32

1 prior to January 1, 2020?

2    **A. I didn't, other than board settings.**

3    Q. How frequently did you communicate with Phil

4 McHugh prior to January 1, 2020?

5    **A. I'm sorry, that sounded like the same**

6 **question, but --**

7    Q. Yeah, I'll rephrase the question.

8       Did you ever communicate with Mr. McHugh by

9 cell phone or email?

10    **A. No, I did not.**

11    Q. Other than the board settings, did you ever

12 observe Phil McHugh in the workplace?

13    **A. Not that I recall.**

14    Q. Prior to January 1, 2020, did you ever meet

15 with or interview any of Phil McHugh's direct reports?

16    **A. No.**

17    Q. Prior to January 1, 2020, did you ever

18 participate in any of Phil McHugh's annual or midyear

19 reviews?

20    **A. No. Other than the talent management reviews**

21 **for the board.**

22    Q. You're referring to the talent management that

23 would take place in December of each year, talent

24 management reviews?

25    **A. Yes.**

Page 33

1    Q. But with respect to Mr. McHugh's annual

2 reviews or midyear reviews, you would not participate in

3 those; is that right?

4    **A. No, I didn't see those.**

5    Q. Did you ever see the materials from

6 Mr. McHugh's annual reviews or midyear reviews?

7    **A. No.**

8    Q. Did you ever review Phil McHugh's employee

9 engagement surveys?

10    **A. No.**

11    Q. Did you ever review Phil McHugh's customer

12 experience surveys?

13    **A. No.**

14    Q. Did you ever review Phil McHugh's financial

15 performance relative to goals for his divisions?

16    **A. No, not specifically. I mean, we would**

17 **obviously see the rollup of how the company was doing at**

18 **the board meeting settings. And then as far as the, you**

19 **know, his skills and abilities and things that I presume**

20 **came out of the reviews, we would see in the talent**

21 **review deck synopsis of it, but that's it.**

22    Q. You never saw the specifics of how he did with

23 respect to his divisions, correct?

24    **A. No.**

25    Q. Did you ever see income statements and balance

Page 34

1 sheets specifically broken out for the divisions managed

2 by Mr. McHugh?

3    **A. No. I would have to say we would see the**

4 **rollup of -- I mean, there would be discussions during**

5 **board meetings of how the consumer bank was doing, how**

6 **wealth management was doing. So we would -- it wouldn't**

7 **be the income and balance sheets, but certainly we'd get**

8 **a synopsis of how those areas were doing.**

9    Q. Do you recall any specific criticisms of how

10 those areas were doing during the time that Mr. McHugh

11 was managing those areas?

12    **A. No.**

13    Q. In 2015, how often would the Fifth Third board

14 meet?

15    **A. In 2015? Six, seven times a year, something**

16 **like that, yeah.**

17    Q. And would those be -- when you say six to

18 seven times a year, are those six different sessions in

19 terms of they may meet one time, it would be for two

20 separate days, meet for a few hours?

21    **A. It would be committee meetings, generally the**

22 **first day and then start of the board meeting, and then**

23 **finish up of the board meeting the next day. So**

24 **primarily two-day meetings.**

25    Q. So just to be clear, when you say six to seven

Page 35

1 times, are you saying six to seven two-day meetings a

2 year?

3    **A. The annual meeting was a meeting, too. So**

4 **whether that's six or seven, I'd have to count up.**

5    Q. And during that year, do you recall how many

6 of those meetings did you attend in person and how many

7 did you attend by phone?

8    **A. I don't recall specifically, but whenever**

9 **there was a physical meeting, I was at the physical**

10 **meetings, with the exception of occasionally the**

11 **September meeting because my board meeting conflicted**

12 **with that one. And then obviously during COVID, we went**

13 **to virtual meetings during that period.**

14    Q. Is it fair to say that each year there would

15 be a certain number of meetings you would attend by

16 phone between 2015 and 2020? Let me rephrase the

17 question.

18       Is it a fair statement that between the dates

19 of January 1, 2015 and October of 2020, there would be a

20 number of meetings that you would just attend by phone;

21 is that correct?

22    **A. There may have been. I mean, during COVID**

23 **there was. I don't -- there may have been call-in**

24 **meetings, but most were physical meetings.**

25    Q. Do you recall how many times the board would

Deposition of Nicholas Kevin Akins            Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 36

1 have met in 2016?

2     A.  It would be the same estimate I gave earlier,

3 six to seven.

4     Q.  Would that be true for 2017, 2018, 2019, and

5 2020?

6     A.  Yeah, I think that's about right.

7     Q.  As you sit here today, it's a fair statement

8 you don't recall how many meetings that you attended by

9 phone or how many you may have been absent for?

10     A.  Oh, I was -- the only time I was absent was

11 the September meeting on a few occasions where it

12 conflicted with the AEP board meeting.  The other

13 meetings I was at.

14     Q.  Either by phone or in person?

15     A.  Yes.

16     Q.  When did you first meet Tim Spence?

17     A.  I don't recall specifically, but I would say

18 maybe 2015, 2016.

19     Q.  And how did you first meet Mr. Spence?

20     A.  He was reporting to the board on a strategy.

21     Q.  Prior to January 1, 2020, how frequently did

22 you meet with Mr. Spence?

23     A.  I met with him -- I mean, I saw him at board

24 meetings.  I didn't meet with him outside the board

25 meetings.

Page 37

1     Q.  Did you ever communicate with Mr. Spence

2 outside board meetings between January 1, 2015 and

3 October of 2020?

4     A.  No, I don't recall.

5     Q.  Other than board meetings, did you ever

6 observe Mr. Spence in the workplace at Fifth Third prior

7 to January 1, 2020?

8     A.  No.

9     Q.  Prior to January 1, 2020, did you ever meet

10 with or interview any of Mr. Spence's direct reports or

11 subordinates?

12     A.  No, nothing other than board meetings, if he

13 brought people that reported to him to the board

14 meetings, but I dont know if Ben Hoffman was doing that

15 at that point in time or not, but it would be people who

16 reported from a strategy standpoint.

17     Q.  Do you specifically recall ever speaking to

18 any of Mr. Spence's direct reports?

19     A.  No.

20     Q.  Or subordinates at any board meetings?

21     A.  No.

22     Q.  Did you participate in or perform at any of

23 Mr. Spence's annual or midyear reviews?

24     A.  No, I did not.

25     Q.  Did you review any documentation for

Page 38

1 Mr. Spence's annual reviews?

2     A.  No.

3     Q.  Did you --

4     A.  Other than what came up through the talent

5 review process.

6     Q.  Again, you're referring to what we've

7 called as -- what we've referred to as the talent

8 deck; is that right?

9     A.  Yes.

10     Q.  Okay.  Did you ever review any of Tim Spence's

11 employee engagement surveys?

12     A.  No.

13     Q.  Did you ever review any of Tim Spence's

14 customer experience surveys?

15     A.  No.

16     Q.  Did you ever review Tim Spence's financial

17 performance relative to the goals for his divisions?

18     A.  No.

19     Q.  Did you ever review any or see any income

20 statements and balance sheets specifically broken out

21 for just the divisions managed by Mr. Spence?

22     A.  No.

23     Q.  Going back to your reference to the board

24 meeting process, and you said there were activities

25 accompanying the board meetings, is that right, dinners;

Page 39

1 is that correct?

2     A.  Yes, uh-huh.

3     Q.  How would that take place or what would be --

4 your involvement be if you were attending the board

5 meeting by phone?

6     A.  If I was attending the board meeting by phone,

7 it would be primarily the board meeting itself, not the

8 dinner.

9     Q.  Would you attend any committee meetings by

10 phone?

11     A.  Yes.

12     Q.  Okay.  During the period from January 1, 2015

13 through October 2020, do you recall how frequently Phil

14 McHugh attended board meetings?

15     A.  He was at most -- most of the board meetings

16 because he had a major part of the bank business.  He'd

17 give reports like the rest of the executive leadership

18 team.

19     Q.  Between January 1, 2015 and October 2020, do

20 you recall how many board meetings were attended by

21 Mr. Spence?

22     A.  He also attended the same -- same meetings as

23 part of the executive team.

24     Q.  Do you understand what the term "enterprise

25 committee" means?

Deposition of Nicholas Kevin Akins          Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 40

1  A.  Yes.

2  Q.  What does that mean?

3  A.  It's the executive leadership team at the bank

4  reporting to the CEO.

5  Q.  Mr. McHugh and Mr. Spence both would have been

6  members of the enterprise committee between 2015 --

7  between January 1, 2015 and October 2020; is that

8  correct?

9  A.  Yes, I believe so.

10  Q.  Okay.  Is it your understanding that all

11  members of the enterprise committee would attend each

12  board meeting?

13  A.  Yes, that's what I assumed, yep.

14  Q.  Do you know who determined which members of

15  the enterprise committee would attend board meetings

16  between the period of January 1, 2015 through October

17  2020?

18  A.  The CEO.

19  Q.  Mr. Carmichael?

20  A.  Greg Carmichael.

21  Q.  Is that right?  Do you know who it was who

22  would determine which members of the enterprise

23  committee would make presentations at a board meeting

24  between January 1, 2015 and October 2020?

25  A.  Usually it's the CEO.  I assume Greg

Page 41

1  Carmichael did that.  I don't know for sure who decides

2  that or not, but I am sure it's cleared through the CEO.

3  Q.  What is your understanding of the executive

4  succession process at Fifth Third for president and CEO?

5  A.  The executive succession process is typically

6  that the talent management review goes together with the

7  succession planning and individuals would be identified

8  for particular positions, at least potential for

9  positions and developmental goals associated with that.

10  Are you talking about the CEO or just

11  generally executive?

12  Q.  For president and CEO.

13  A.  Okay.  For president and CEO, it's a much more

14  detailed process that we go through, particularly as it

15  relates to analysis that's done by outside consultants,

16  certainly the internal focus of the talent review,

17  the -- certainly the focus on developmental activities.

18  Q.  You referred to outside consultants.  What do

19  you mean by the use of outside consultants?

20  A.  Typically every board I've been involved with,

21  whenever there is an executive succession planning, an

22  outside consultant is brought in to do outside analysis,

23  analytics associated with whether a person is capable of

24  taking on the CEO role, and it's used as -- just like

25  the talent management, used as a tool to get outside

Page 42

1  expertise on -- that focused on this kind of -- this

2  kind of activity.

3  And it either validates what you're thinking

4  or it doesn't, and in many cases, boards have their

5  views of whether -- what candidates are suitable for

6  CEO, they make that determination, and then the

7  outside -- the outside consultant is brought in to help

8  facilitate and validate the process, and it's just part

9  of the analytics that the board uses, along with the

10  talent management activities that we talked about

11  earlier.

12  So -- and, of course, every board member has

13  their own interpretation during this whole process of --

14  from their own experiences of what they expect from a

15  CEO perspective.  My view may be different than other

16  board members' views based on my knowledge about what it

17  takes to be a CEO, and -- and -- but the board comes

18  together with those various perspectives to determine

19  what the next steps are.

20  Q.  Did Fifth Third use an outside consultant in

21  2015 when Greg Carmichael was being assessed for

22  president and CEO?

23  A.  They did.

24  Q.  Who did they use?

25  A.  RHR.  I forgot the exact name, but it was an

Page 43

1  outside consultant that had been used previously.

2  Q.  In 2015, how many potential candidates were

3  there for president and CEO at Fifth Third?

4  A.  In 2000 --

5  Q.  '15.

6  A.  '15.  Let's see.  In '15, I think there

7  were -- at that point, in '15, I -- I believe that this

8  was where the -- can you repeat your question?

9  Q.  Certainly.  In 2015, how many potential

10  candidates were there for president and CEO of Fifth

11  Third Bank?

12  A.  Yeah.  In '15, there's really only one that we

13  felt like was -- had the skills and abilities to be CEO.

14  Q.  And that --

15  A.  And this is -- when I talk about this, I talk

16  about long-term CEO for the bank, not emergency CEO.

17  Q.  And what is the distinction?

18  A.  There's a huge distinction between emergency

19  CEO and a CEO that you want to be able to have for the

20  long term.  Emergency CEO can be anyone.  It could be

21  someone from the operational area.  It could be the CFO.

22  It could be the general counsel.  That person is

23  specifically put in place to keep the wheels on the --

24  on the wagon while the board decides who a long-term CEO

25  would be.

Deposition of Nicholas Kevin Akins                                      Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 44

1   The qualifications for a long-term CEO are
2   very different.  The emergency CEO is more tactical.
3   Long-term CEO is much more strategic in terms of where
4   the direction for the bank, the vision for the bank in
5   the future, whether it fits the life of the bank at that
6   particular time or not.
7       And in a lot of cases, someone may be suitable
8   as an emergency CEO but not suitable as a long-term CEO.
9       Q.  What do you mean by the term "fits the life of
10  the bank"?
11      A.  Well, I can tell you, I mean -- I have
12  experienced this in my own company.  I've experienced it
13  in other companies that I've been on the not-for-profit
14  boards and so forth, Fifth Third in particular.  When
15  Kevin Kabat was CEO, Kevin had come out of the financial
16  crisis and he would -- admittedly so, he was tired.  The
17  regulatory activities of the bank were not good.
18      We always characterize that we were in the
19  regulatory doghouse, and it was important to have a CEO
20  put in place that -- that was very focused on the
21  processes and procedures of the bank to improve our
22  regulatory outcome and ensure that we were in the
23  position where we could do M&A and other activities.
24      Greg Carmichael fit the bill from that
25  perspective, and that's why I mean the company needed

Page 45

1   someone who was very focused on the internal workings of
2   the bank, the processes to improve the vitality of the
3   bank moving forward, and you get the fundamentals in
4   place to ensure that we could continue on from a
5   strategic standpoint.
6       So when I talk about the life of the company,
7   you had moved from Kevin to Greg.  Greg was for that
8   specific purpose.  The question was, you know, was he --
9   and he turned out to be strategic as well.  We didn't
10  know that at the time, but we didn't really need that as
11  much.  But fast forward to when Tim Spence became CEO,
12  we were very much in the process where the fundamentals
13  were in place, the process was in place, and the
14  strategic activities of the bank were extremely
15  important.  You even saw it in our board settings where
16  it was more tactical, focused on how we rehabilitate the
17  bank and then we move to more -- the strategic aspects.
18      And then you had Fintech and everything else
19  going on at the time, and that's why I say the life of
20  the bank at that particular point was to make sure that
21  there was a strategic vision and the analytics in place,
22  the knowledge base in place, to ensure that we could
23  continue to progress in the face of competition from
24  Fintechs and others.
25      So that's why I say the life of the bank.  You

Page 46

1   see that in every company, the CEO is chosen based upon
2   where the company is at the time, what the conditions
3   are externally, and who best fits the major criteria in
4   place to ensure that the bank can move forward, or any
5   company.
6       Q.  Between January 1, 2016 and January 1 of 2020,
7   did you ever discuss with Greg Carmichael the topic of
8   Phil McHugh succeeding him as president and CEO of Fifth
9   Third?
10      A.  No.
11      Q.  Between January 1, 2016 and January 1, 2020,
12  did you ever discuss with Greg Carmichael the topic of
13  Tim Spence succeeding him as president and CEO of Fifth
14  Third?
15      A.  Of 2020?
16      Q.  January 1 of 2020, correct.
17      A.  Yes, he had that discussion with the board,
18  that Tim was very strategic and that he was well thought
19  of in terms of his further development.
20      Q.  You said "he" had that discussion with the
21  board.  You're saying Greg Carmichael had the discussion
22  with the board?
23      A.  Greg gave us regular updates of progress.
24      Q.  Go ahead.  Did I cut you off?  I'm sorry.
25      A.  No.

Page 47

1       Q.  So just to clarify my previous question, you
2   were saying that Greg Carmichael was the one who
3   discussed with the board about Tim Spence being the next
4   president and CEO of Fifth Third; is that correct?
5       A.  No.  He would say he's a potential candidate
6   as he progresses in his development.  He could succeed
7   to the CEO role.  Now, he did talk about Phil in the
8   context of this is a person that could step in on an
9   emergency basis, potentially.
10      I think Tayfun or Phil could step into the
11  role and the board would have to look at it based upon
12  what condition was occurring at the time because, you
13  know, Phil -- you know, Phil was a Steady Eddie -- my
14  words -- utility player that could continue the
15  operation of the bank from a tactical sense.  So he fit
16  well potentially as a, you know, as an emergency
17  temporary interim CEO while the board determined who the
18  long-term CEO should be.
19      So the context of Greg's discussion was really
20  around long-term CEO.  Because we didn't know how long
21  Greg would be there.
22      Q.  These reports that Greg Carmichael gave to the
23  board first with respect to Mr. Spence, when did those
24  occur?
25      A.  I don't recall specifically, but various times

Page 48

1  during -- during executive sessions of the boards, he
2  would give his latest thinking. And that could change.
3  That could change from time to time, but he was very --
4  very supportive of Tim and his development.
5      Q.  And with respect to Mr. Carmichael's comments
6  regarding Mr. McHugh to the board, when did those occur?
7      A.  When we talked about emergency CEO. So you
8  can have a conversation that says this is the person
9  that really fits the bill for the long-term view of the
10 bank, but if you have something that happens to me, if I
11 get run over by a bus, these are the people that you
12 could look at potentially to fill that role until you
13 can -- until you can get established who the next CEO
14 would be.
15     So it was really a view of the trajectory of
16 development, which that's typical. In a lot of cases
17 you see executives that have a high trajectory, they
18 just need time to develop that. You see it pretty
19 clearly, and his name was put forward at given times of
20 being a long-term CEO of the bank because he knew so
21 much about strategy. He knew so much about Fintech,
22 digital banking, all those things that would as -- that
23 would have an impact on the bank from a strategic sense
24 going forward. And he had the skills, the acumen,
25 certainly in the conversations we had in the board

Page 49

1  setting, he knew the details, was very fluent, typically
2  didn't have to use notes at all, and he was very quick
3  on his feet. So he met a lot of those -- a lot of those
4  objectives. So the board -- the board was very
5  supportive of him and his development, and Greg knew
6  that.
7      Q.  And just to be clear, because you used the
8  pronouns he, him, he, him, you're referring to Tim
9  Spence during that --
10     A.  Tim.
11     Q.  -- period?
12     A.  Yes.
13     Q.  And you indicated that this was what would be
14 reported to the board, you're saying this is what Greg
15 Carmichael would report to the board about Tim Spence;
16 is that correct?
17         MR. CIOFFI: Objection. Mischaracterizes his
18     testimony. He testified about what the board
19     thought.
20 BY MR. SABA:
21     Q.  Mr. Akins, I'm just trying to get
22 clarification of -- you just went through a series of
23 referring to somebody as he, him, he has. You're
24 referring to Mr. Spence during that time?
25     A.  I'm referring to Tim Spence. Greg would give

Page 50

1  regular updates of really all his employees, all of his
2  direct reports. Occasionally it was in a lot of detail,
3  occasionally it wasn't. He would give his views of how
4  people were developing in different roles, and he was
5  very -- I mean, certainly we saw it from a Tim Spence
6  perspective, and the board wanted to know more about his
7  development as time went on.
8      Q.  You said "regular updates." How frequent was
9  the regular updates?
10     A.  I'd say they -- I mean, they weren't like at
11 every meeting, but certainly when we were considering as
12 a board -- a board has a significant responsibility to
13 make sure that if something were to happen to Greg or
14 if -- when Greg decided to retire or whatever, that we
15 were ready for were there internal candidates in the
16 company that could succeed to that CEO role. So he
17 would occasionally give us updates on his thinking, and
18 his thinking was pretty consistent.
19     Q.  Are you --
20     A.  As was the board's.
21     Q.  Are you able to identify something more
22 frequently than occasionally?
23     A.  Well, I don't know. I don't recall the
24 frequency.
25     Q.  With respect to those updates regarding

Page 51

1  Mr. Spence, when did they begin by Mr. Carmichael?
2      A.  I don't -- I don't recall specifically. Yeah,
3  I just don't recall when it originally started.
4      Q.  And with respect to the regular updates
5  regarding Mr. McHugh, when did those begin?
6      A.  Well, when he gave updates of individuals, he
7  would say, you know, Phil is -- I mean, Phil was doing
8  well in his job. He performed well. And Greg, you
9  know, was confident in his abilities to move from one
10 area of the bank to another, and that's why I say he was
11 a real utility player and one that could move from one
12 area to another, had broad experience with the bank, and
13 Greg was very supportive of Phil in his roles as well,
14 and the board was, too. I'm not saying that, you
15 know -- you know, certainly Phil could do the jobs that
16 he was given and -- but that's not what we needed as a
17 CEO of the bank, moving forward.
18     Q.  Did you ever discuss with any members of the
19 board the topic of Phil McHugh succeeding Greg
20 Carmichael as the president and/or CEO of Fifth Third?
21     A.  No.
22     Q.  Why is that?
23     A.  Because Phil was viewed -- at least in my
24 view, I never asked others -- but in my view he was a
25 utility player. He very much knew, and I've had -- I've

Deposition of Nicholas Kevin Akins                                          Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 52

1  had executives that worked for me, at least two that I
2  can think of -- that were -- that were in that vein.
3  They were utility players. They enjoyed what they were
4  doing. They were very good at what they did and they
5  could be very supportive to a CEO in terms of the
6  internal workings that were occurring. You know, you
7  typically -- and that's -- and the board and Greg felt
8  good about Phil in that respect.
9       When you talk about CEO, that's a totally
10 different thing. You can -- when you're evaluating for
11 a CEO, you've got investors, you have external market
12 conditions of -- that are occurring in the industry, you
13 have contacts in the industry, all those types of things
14 that are incredibly important.
15      And where the bank was, and, again, in the
16 life of the bank, Tim Spence had those skills and
17 abilities. What we wanted to see more of was his -- how
18 he would perform in various areas of the bank, and given
19 time and experience and Greg stayed so that could be
20 done. I mean, Greg was staying anyway, but certainly
21 Tim's development was -- was something that we looked
22 at.
23      MR. SABA: Can we go off the record?
24      (A recess was taken from 11:01 a.m. to 11:14
25 a.m.)

Page 53

1       THE VIDEOGRAPHER: We are back on the record.
2  This is media 2 of today's deposition. The time is
3  11:14.
4  BY MR. SABA:
5  Q.  Mr. Akins, before we went off the record, you
6  made a reference to Mr. McHugh as a "utility player"; is
7  that correct?
8  A.  Yes.
9  Q.  Okay. And by that reference to utility
10 player, are you indicating that Mr. McHugh was not
11 suitable to succeed Greg Carmichael as president and CEO
12 of Fifth Third Bank?
13 A.  Yes.
14      MR. CIOFFI: I --
15      THE WITNESS: Oh.
16      MR. CIOFFI: By way of objection, when you say
17 suitable, do you mean qualified?
18 BY MR. SABA:
19 Q.  Do you understand my question?
20 A.  Yeah, I understand the question.
21 Q.  Okay.
22 A.  He -- he was -- he did not have the skill sets
23 for what we viewed, the board viewed, as what the CEO
24 for the future would need. He had very good operational
25 skills, very good convening authority skills within

Page 54

1  the -- within the enterprise.
2       As a utility player, what I'm saying is, it
3  that he's more internally focused, more focused on his
4  experiences around internal to the banking environment,
5  and that's -- by someone who can -- is relatively
6  portable from one place to another in the bank, because
7  of their knowledge of the internal operations of the
8  bank. That's what I meant.
9  Q.  When did the board determine that Phil McHugh
10 did not have the skill set to be the next president and
11 CEO of Fifth Third?
12 A.  Phil McHugh was never considered to be the
13 future CEO of the bank. He was viewed to be, as I said
14 earlier, if emergency arose because of his experiential
15 level within the bank, there's a big difference between
16 keeping the wheels on versus progressing the bank into
17 the future, particularly with the environment that the
18 banking industry is in.
19      That's -- that's the way I looked at it. I
20 mean, other board members may look at it differently,
21 but that's the way I look at it, and that's based on my
22 experience.
23 Q.  With respect to Mr. McHugh, you said he was
24 never considered to be the next president and CEO of
25 Fifth Third Bank; is that right?

Page 55

1  A.  Well, I mean, as long as I've been with the
2  board, he was never considered. Now, he may have been
3  considered earlier, I don't know.
4  Q.  During the time that you were with Fifth Third
5  Bank, who were the individuals that were considered to
6  be the next president and CEO of Fifth Third Bank?
7  A.  Well, keep in mind, we went -- we went from
8  Kevin to Greg and the focus was on Greg to become CEO.
9  Well, he had just become CEO. So then the board is
10 really focused on Greg's development and emergency
11 setting for CEO, not so much on long term at that point
12 in time. Then it sort of crescendos over time base upon
13 how long the sitting CEO is in place.
14      So you really had -- and then when Tim came to
15 the company, it was, I mean, Greg certainly was very
16 positive about it and we were very positive, the board
17 was positive about what we were seeing, and if anyone in
18 the bank, internal to the bank, was someone to take a
19 look at for the future, it was Tim Spence. I mean,
20 that's how things developed. You don't have to have
21 multiple candidates for -- internal candidates for a CEO
22 role.
23      Really, you're thinking about making sure that
24 the -- that the bank is ready if emergency condition
25 existed, and then as time develops, you're watching the

Deposition of Nicholas Kevin Akins        Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 56

1  development of people -- in this case it was Tim
2  Spence -- and he was successful in that.  And the bank
3  has been hugely successful afterwards.  So it turned out
4  to be a great selection.
5      Q.  So is it fair to say during your time at the
6  bank, the only two people that have ever been considered
7  for CEO and president of Fifth Third Bank were Greg
8  Carmichael and Tim Spence?
9      A.  I don't recall others in a serious sense.
10      Q.  What do you mean by "a serious sense"?  What
11  does that mean?
12      A.  Where the board was actually convening around
13  someone who could fill that role.
14      Q.  Well, was anybody considered in a non-serious
15  sense?
16      A.  Well, you always have -- you always have names
17  that are -- that are potential, but nothing was --
18  nothing was, like I said, serious at that point.
19      Q.  Was Phil McHugh ever one of the names that was
20  potential?
21      A.  Well, I mean, if you looked at it from an
22  emergency CEO perspective, he was.  For long-term CEO, I
23  don't remember -- I just don't remember his name being
24  involved in that discussion.
25      Q.  For long-term CEO, who were the other

Page 57

1  potential names?
2      A.  Well, there was discussion about Tayfun
3  naturally because he's CFO, but he really didn't have
4  the skills to become CEO.  And the board sort of
5  recognized that.  Greg recognized that.  And typically
6  you'll look at individuals and say no, they're -- we
7  just don't see them as a future CEO and, you know,
8  that's the way it works within the board setting.
9      Q.  Was it ever communicated to Phil McHugh that
10  the board would never consider him a long-term CEO or
11  president of Fifth Third Bank?
12      A.  I don't know.  The board -- to my knowledge,
13  the board never communicated to Phil McHugh that he was
14  going to be the next CEO, the board never did that.  And
15  the board's responsibility is to do that, not the CEO.
16  And that's the independent board members.
17         And as far as the independent board members
18  are concerned, we were very, you know, we had certainly
19  seen Tim, his adaptability, the work he has done, the
20  things he had done, and I think the board wanted to see
21  further development of him to see if he could be
22  potential CEO.
23      Q.  My question is, did any of the independent
24  board members ever communicate to Phil McHugh that he
25  would never be considered to be the future long-term

Page 58

1  president and/or CEO of Fifth Third Bank?
2      A.  I don't think -- I don't know what other board
3  members have done, whether they had individual
4  communications or not.  I have not heard of any of
5  those.  I certainly did not, and I don't think any board
6  member would tell somebody, you know, you're not -- I
7  mean, you're not being considered because there's no
8  reason to do it.  You don't just go walk up to any
9  employee and say, you know, you're not -- you're not
10  suitable for CEO.  Especially if you weren't considered.
11      Q.  Are you aware of anyone at Fifth Third Bank
12  communicating to Phil McHugh -- Greg Carmichael or
13  otherwise -- that he would never be considered for
14  president and/or CEO of Fifth Third Bank --
15      A.  No.
16      Q.  -- on a long-term basis?
17      A.  No.
18      Q.  The determination that Phil McHugh did not
19  have the skill set to be the next president and CEO of
20  Fifth Third Bank on a long-term basis, what was that
21  based upon?
22      A.  We didn't determine that Phil did not have the
23  skill set.  He just never was in the conversation for
24  long-term CEO.
25      Q.  Didn't you testify earlier that Phil McHugh

Page 59

1  did not have the skill set that the bank would need for
2  the next --
3      A.  And that's my impression, you asked me.  And I
4  imagine other board members may have their own views of
5  that as well.  But it never was my view of Phil being
6  CEO, the long-term CEO.  I think perfectly appropriate
7  could have been the emergency CEO, but not the long-term
8  CEO based upon where the bank was at that particular
9  time.
10      Q.  In your determination.  What is your -- excuse
11  me.  What is your determination based upon?
12      A.  So board members -- board members see
13  individuals at the board meeting setting.  They also,
14  there is certainly views of how they position themselves
15  in board meetings.  I really felt like that Phil -- this
16  is my view -- Phil was more introverted and more focused
17  on the operations of the bank and more internal for the
18  bank.  And for, you know, for him, it would be a very
19  difficult proposition to ask him to do, you know,
20  strategic development when he didn't have the skill sets
21  to do it.
22      Q.  Your conclusion that Phil did not have the
23  skill sets to do strategic, what is that based upon?
24      A.  Because everything he had done was primarily
25  tactical within the organization.  I used my experience

Deposition of Nicholas Kevin Akins

Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 60

1 as a CEO to think about, okay, what does the bank need
2 to do in the future, what's important to the bank, what
3 are the -- what are the competitive environment for the
4 bank and particularly when you're talking about
5 technical skill sets, when you're talking about
6 certainly the market and what's happening in the market
7 with Fintechs, contacts are very important in the market
8 as well, and actually Tim's demeanor.
9         Tim struck me as someone he could go as deep
10 as you wanted to in terms of a discussion without any
11 notes or anything, but also he could carry on, you know,
12 you know, a conversation on just about any topic that's
13 specific to areas of the bank.  So Tim was the person
14 that I felt like would be prepared to be running the
15 bank.
16    Q.  Other than seeing Phil McHugh at the board
17 meetings and the regular updates, what other information
18 was available to you to determine that Phil McHugh did
19 not have the skill set to become the next president and
20 CEO of Fifth Third Bank on a long-term basis?
21    A.  Well, okay, I can tell you my thinking, okay?
22 As a CEO, a CEO is responsible for putting the right
23 people in the right positions to get the maximum output
24 from the team.  And you can tell from a CEO where they
25 place people, where they move people around, what

Page 61

1 they're -- what they're thinking in terms of who best
2 fits any particular picture.
3         So if there was an operational issue, if there
4 was something associated with -- and I believe Phil was
5 involved with TFT, a good thing for him to do.  Because
6 it was right down -- right down his alley.
7         But when you get to dealing with investors,
8 dealing with changes in the marketplace, having a
9 conversation, more of a conversation that's almost
10 casual as opposed to a conversation that's canned,
11 that's really important for a CEO.
12         And so that -- I just observed him, certainly
13 the talent reviews that we saw were consistent with
14 that, and -- and the rest of the board members I assume
15 felt that way as well, because the focus very much was
16 on Tim and his development.
17         It was also focused on other people's
18 development, I'm not downplaying that at all, because
19 when you see -- when you see the development activities
20 of Tim, it was more focused on, okay, getting
21 operational experience.  And if you were to look at
22 Phil's, you know, Phil's was really different parts of
23 the bank, moving to different parts of the bank, because
24 he was readily able to move over to those roles and be,
25 in my mind -- this is my mind only -- but he could have

Page 62

1 been a very effective chief operating officer of the
2 bank, because he knew so much about the internal
3 workings.
4         I had a chief operating officer when I was
5 CEO.  I had people who were enterprise-wide that could
6 get around very well to support me.  Matter of fact, the
7 chief operating officer of my previous company, he was
8 one of the -- one of those and actually, in a lot of
9 views, was a front runner to be CEO, but he didn't get
10 it.  I did.  But he stayed with the company, because it
11 was important to him to see the company do well, and he
12 did fantastic.  He's now on the external boards, and so
13 I'm just saying that not everybody can be CEO.
14         There's only one position, and there's
15 executive and senior VPs that are very good at doing
16 their roles, very good at moving from one role to
17 another.  That doesn't mean they can be CEO, and you
18 just sort of have to get over it.  And I think it's --
19 there's people that don't get the CEO role and -- but
20 they stay with the company.
21    Q.  You indicated that you observed him, meaning
22 Phil, at the board meetings, correct?
23    A.  Yes.
24    Q.  Okay.  You're not referring to any
25 observations outside any board settings, correct?

Page 63

1    A.  Of Phil?
2    Q.  Correct.
3    A.  No.
4    Q.  And then you also, you referred to the talent
5 reviews or talent decks; is that correct?
6    A.  Yes.
7    Q.  And I believe earlier you referenced the
8 regular updates were Greg Carmichael, correct?
9    A.  There were updates from Greg Carmichael.
10    Q.  Okay.
11    A.  I walked back the regular, because you had
12 questions of, you know, was that frequently and that.
13 It was not that -- it was occasionally and about
14 different people.
15    Q.  Fair enough.
16    A.  Okay.
17    Q.  There were updates from Greg Carmichael?
18    A.  Yeah.
19    Q.  You don't recall specifically how frequently
20 they were?
21    A.  Right.
22    Q.  Okay.  Other than those three things, your
23 observations of Phil at the board meetings, board
24 settings, the talent decks, and the updates from Greg
25 Carmichael, anything else that you had regarding Phil

Deposition of Nicholas Kevin Akins | Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 64

1  McHugh, received regarding Phil McHugh, that helped you
2  to determine that he did not have the skill set to be
3  the next president and CEO of Fifth Third Bank?
4      A.  I'd say those were the primary -- the primary
5  inputs to my decision process, along with you'd have to
6  add my experience as a CEO and observing other
7  individuals in the same genre, and that's what each and
8  every board member does.  I mean, the independent board
9  members decide who the next CEO is based upon the inputs
10 that are provided to them, and the management team and
11 the CEO is there as the conduit to the board.  That's
12 the responsibility of the CEO, to make sure that the
13 board knows and understands the talent levels of the
14 executive management team and all that kind of stuff.
15     And I think it is really important for the
16 board members to get that input.  But the board is also
17 pulling on their own experience based upon their own --
18 that's why you have the diversity of board members and
19 experiences so that they can come to the table and say
20 oh, maybe this person is not right for it or this person
21 is.
22     But in this case, in this case, there is no
23 doubt the board members were very, very focused on the
24 development of Tim because if there was an internal
25 candidate for CEO in the future, he was it.

Page 65

1      Q.  Was there a particular date or time period
2  that occurred when the board determined that Phil McHugh
3  would never have the skill set to be the next president
4  and CEO of Fifth Third Bank?
5      MR. CIOFFI:  Objection.  Asked and answered.
6  You can answer it again.
7      THE WITNESS:  We had a candidate that we felt
8  like was far above -- and the internal candidate,
9  because there's really not a comparison that was --
10 that was done.  This was really focused on who fits
11 the skills and abilities for the bank going
12 forward, and Tim Spence fit the bill.  So there's
13 no need for us to go back and say, okay, what about
14 Phil McHugh or what about Tayfun or what about this
15 person or that person?
16     When you have a person who -- who is readily
17 able to assume that role in the future and really
18 the entire board recognizes that, the verdict is
19 still out.  I'd have to say, you know, you
20 initially see that and then you form a
21 developmental plan, talk to the CEO about it, that
22 continues over time, and if that were to falter,
23 then we'd be back at ground zero, probably an
24 external candidate, but nevertheless, that's --
25 that's what's done in general board settings.

Page 66

1  BY MR. SABA:
2      Q.  At what point in time did the board determine
3  that Tim Spence was far and above any other internal
4  candidate for president and CEO of Fifth Third Bank?
5      A.  I don't know the exact time -- time or
6  anything like that.  I think -- I think it was seeing
7  him in action with the M&A transactions, the other
8  transactions that were done, but also his discussion
9  from a strategic sense from a banking standpoint, I
10 think that evolved over time.  We were very positive
11 about him and -- with our impressions of him, but the
12 board wanted Greg to know that we were -- we were very
13 supportive of his further development and -- and we
14 eventually were getting reports on his development even
15 after he became president of the bank, because we wanted
16 to make absolutely sure that he was -- he was ready to
17 be CEO.  That's why -- that's how transitions work.
18     I became president.  I became CEO.  Then I
19 became chairman of the board.  Same for Tim.  And Greg
20 stayed around during that transition period so that he
21 would have the value of his mentorship.  And I also
22 mentored Greg and him during the process as well.
23     Q.  Do you recall a particular time when the board
24 determined that Tim Spence was far and above any other
25 internal candidate?

Page 67

1      A.  I don't recall the particular year because all
2  those 2015, '16, '17 sort of -- '18 sort of comes -- it
3  sort of comes together.  There was -- I mean, you have
4  initial discussions and then things gradually --
5  gradually grow, and that's why I said earlier, Greg
6  would occasionally give updates on developmental
7  activities.
8      The interesting thing, I think, is no board
9  member ever said, well, you know, maybe we should look
10 at Phil McHugh.  I never heard that.  And I never
11 heard -- as a matter of fact, I only heard support for
12 Tim and Tim's continued development.  That's -- except
13 in the case of emergency CEO.
14     Q.  The updates that Greg Carmichael would provide
15 to the board, were those documented anywhere in writing?
16     A.  No.
17     Q.  Were those always during an executive session
18 of the board?
19     A.  Typically during executive session.  Because
20 the rest of the management team would leave at that
21 particular time, and that's when the CEO can have
22 conversations with the independent board members.
23     Q.  With respect to the updates that Greg
24 Carmichael would provide regarding Tim Spence, did he
25 ever provide any criticisms or negatives regarding Tim

Deposition of Nicholas Kevin Akins                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 68

Spence?

A. I don't think there was negatives or criticisms. There was always discussions of, you know, development activities. And really every one of the talent management reviews, none of that is meant to be critical or anything, it's meant to be development. Everybody has developmental activities.

I had development activities for my board as a ten-year CEO. I would have, you know, 26 pages of review and development activities. So everybody has those. And he would comment that, you know, he wanted to get exposed to this area or that area, and we were fine with that.

Q. Do you recall any of the specific development activities that Greg Carmichael referred to for Tim Spence?

A. I think it was the ones that were primarily in the -- you know, in the general updates we received in talent management. For example, I mean, he was very quick on his feet, very knowledgeable. Sometimes he would move, you know, too fast for people. And as a CEO, you have to sort of learn how to communicate in a very deliberate fashion and one that recognizes that your audience is keeping up with you and, you know, there is generally things like that. Nothing -- nothing

Page 69

that he had in terms of development was a fatal flaw at all. They were all constructive in terms of development and actually the same for Phil.

I mean, each one of the -- each one of the -- the executive team would not be in their positions if they were, you know, not good at what they did and -- but every one of them had developmental activities and that's what -- that's the kind of thing Greg would occasionally report on.

Q. Were you ever aware that in August of 2019 there was a chance that Greg Carmichael would have to step down earlier than desired because of situations going on with him that were personal in nature?

A. No.

Q. That was never communicated to you?

A. No. Greg always reiterated to us he would stay with the bank as long as it took for us to be comfortable with who the new leader would be. He -- as with any conversation that occurs with a CEO, the board has to have conversations about, you know, what's your time frame, what are you thinking in terms of -- in terms of retirement? Not set in stone, but certainly comments like that.

And during that period, I guess it was, you know, 2018 or so -- I can't remember exactly -- but he

Page 70

was saying, hey, you know, I have done a lot of great things here and -- and at some point I need to be looking at moving on, and I'm willing to work with the board on the transition of that. He committed to stay as long as it needed -- as long as we needed. So really it is up to a CEO to initiate that process in earnest, and that's what Greg was doing. He never -- he never indicated that there was some personal issue that he had to -- he had to step down or anything like that, I never heard any of that.

Q. You've been making the reference to a long-term CEO. What's the time period required to constitute a long-term CEO?

A. I think -- I mean, typically the average CEO today is about 3 1/2 years, and my industry it's about seven. In banking, it tends to be about that, but you're probably looking for, you know, three to five years at least for a new CEO because if you -- if you -- if you something less than that, you're completing a process and then walking right back into the same process, and the bank never has a chance to -- and its employees and stakeholders don't have a chance to get their footing with a new CEO. So it has to be at least three to five years.

Q. Prior to December of 2019, had the board

Page 71

already determined that Tim Spence was the only candidate to be the next president and CEO of Fifth Third Bank?

A. Are you meaning internally?

Q. Or anyone.

A. Well, I don't know that the board had made -- we felt like -- we felt like that he was the person that we wanted to focus on in terms of development to give him the opportunity to develop where he could be considered to be CEO. He was the lead -- he was very much the lead internal candidate.

(Plaintiff's Exhibit 2 is marked for identification.)

THE WITNESS: Thank you. Do you want that one back?

MR. SABA: You can just put it right there.

MR. CIOFFI: Put it right there.

(Plaintiff Exhibit 3 is marked for identification.)

BY MR. SABA:

Q. Mr. Akins, I've handed you two documents which are marked as Exhibits 2 and 3, respectively.

A. Yes.

Q. And first referring to Exhibit 2, just for point of reference, you'll see at the bottom of the

Deposition of Nicholas Kevin Akins                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 72

1  first page there's a stamp that says Fifth
2  Third-McHugh-Minutes 000253; do you see that?
3      A.  Yes.
4      Q.  And if you look at the last page, it should
5  say Fifth Third-McHugh-Minutes 000265; is that correct?
6      A.  That's correct.
7      Q.  All right.  And with respect to Exhibit 3, the
8  first page is Bates stamped at the bottom Fifth
9  Third-McHugh-Minutes 000266; do you see that?
10     A.  Yes.
11     Q.  And the last page is Bates stamped Fifth
12 Third-McHugh-Minutes 000283; is that correct?
13     A.  Yes.
14     Q.  Going back to Exhibit Number 2, can you
15 identify Exhibit Number 2 for me, please?
16     A.  It's the minutes of the board of directors of
17 Fifth Third dated December 17, 2019.
18     Q.  Have you seen this document before?
19     A.  Yes.
20     Q.  And can you identify Exhibit 3 for me, please?
21     A.  Minutes of the board of directors Fifth Third
22 Bank December 17, 2019.
23     Q.  And have you seen Exhibit 3 before?
24     A.  I believe so, yes.
25     Q.  When would you typically see the minutes from

Page 73

1  a meeting?
2      A.  Typically they'll show up at the succeeding
3  meeting afterwards, and then we review the minutes and
4  approve them at that board meeting.
5      Q.  All right.  Referring you to Exhibit 2 and to
6  the second page, Fifth Third-McHugh-Minutes 000254,
7  two-thirds of the way down the page, the paragraph
8  begins after the resolutions, "Thereafter,
9  Mr. Carmichael and Mr. Schaffer initiated a review of
10 potential succession timelines and candidates for the
11 chief executive officer position.  They reviewed top
12 succession candidates, including Mr. Spence, and
13 discussed the potential time lines for their readiness
14 and key development priorities for each such candidate."
15     Do you see that?
16     A.  Yes.
17     Q.  Do you recall who the candidates were that
18 Mr. Schaffer and Mr. Carmichael discussed at that
19 December 17, 2019 meeting?
20     A.  I don't.  I don't recall.  Typically it would
21 have been the CFO, I suppose, Tayfun; I just don't
22 recall.
23     Q.  Do you recall them discussing more than one
24 candidate?
25     A.  I don't.  I don't recall.

Page 74

1      MR. CIOFFI:  I'm going to instruct the witness
2  to read the whole paragraph before you answer any
3  additional questions.
4      THE WITNESS:  There's external candidates,
5  okay.  Yeah, I thought he was talking about the
6  long-term CEO because -- I mean, it sort of tells
7  you something when you read this to say including
8  Mr. Spence, and then a discussion of external
9  candidates.
10     So there -- I don't know if there was other
11 names or not, I don't recall that.  And then it
12 falls into the emergency succession discussions.  I
13 think it's exactly what I've been saying.
14 BY MR. SABA:
15     Q.  So going back to the third sentence, I believe
16 it is, which indicates, "In response to director
17 questions, Mr. Carmichael and Mr. Schaffer commented
18 upon the potential external candidates that could be
19 considered for such a role --
20     A.  Uh-huh.
21     Q.  -- including a discussion of the known
22 capabilities of such candidates and the potential
23 challenges created by appointment of an external
24 candidate for the role."
25     Do you see that?

Page 75

1      A.  Yes.
2      Q.  Do you recall who the potential external
3  candidates were?
4      A.  I don't recall the names, but I'm pretty sure
5  it was other bank CEOs that could potentially be
6  interested in a Fifth Third Bank role.
7      Q.  Do you recall any of the discussion of the
8  known capabilities of such candidates?
9      A.  I don't recall.
10     Q.  Do you recall the discussion of the potential
11 challenges created by appointment of an external
12 candidate for the role?
13     A.  Yes.
14     Q.  And what was that discussion?
15     A.  Well, any time you bring an external candidate
16 in, it's -- you don't know exactly what you're getting.
17 You interview in the process and that kind of thing, but
18 you don't know exactly what you're getting.  You do know
19 their qualifications on paper and that kind of thing.
20 This is really more the initiating of a soft question or
21 a soft search to say, do you know, Greg, of any other
22 people in the industry who could fit the bill relative
23 to being CEO of the company?
24     So it would be an active CEO that falls into
25 the role, but they may or may not know about Fifth Third

Page 76

Bank. So a lot of those issues are -- they are always
brought up in a succession planning process. Sometimes
it is a soft search, sometimes it is a hard search. In
this case it was asking Greg, it wasn't even a soft
search at this point.

Q. Referring back to the first page of
Exhibit Number 2, it indicates the directors present and
it indicates you were present in person at that meeting;
is that correct?

A. Yes.

Q. Okay. Phil McHugh was not present at that
meeting; is that right?

A. I don't recall. Yeah, it doesn't look like he
was. His name's not on there.

Q. The minutes indicated that the meeting started
at 10:00 a.m. How long did the meeting last?

A. I don't know if it said at the end or not, but
typically they wind up around noon, 12:30, something
like that. Does it say anywhere at the end? Here is
resolutions. Yeah, typically it is around 12:00 or
12:30.

Q. And for clarification, referring to Exhibit 3,
these are the minutes for Fifth Third Bank as compared
to Exhibit 2, which are the minutes for Fifth Third
Bancorp; is that correct?

Page 77

A. That's correct.

Q. What's your understanding of the relationship
between Fifth Third Bank and Fifth Third Bancorp?

A. Well, Fifth Third Bancorp is the overall
holding company. Fifth Third National is the bank
itself.

Q. And also for clarification, these meetings are
held simultaneously; is that right?

A. Yes.

Q. Notwithstanding the two separate sets of
minutes, it's all taking place at the same time?

A. That's correct. There are some specific
actions that may be dealt with one versus the other.
I've actually forgotten what they were, but bank
regulations require -- seemed like there was one area
that is dealt with by the national bank, so we purposely
do that, but it doesn't happen all the time.

(Plaintiff's Exhibit 4 is marked for
identification.)

BY MR. SABA:

Q. Mr. Akins, I have handed you what has been
marked as Exhibit Number 4, which is Bates stamped Fifth
Third-McHugh-001105 through Fifth Third-McHugh-001154.
Are you able to identify this document for me?

A. Well, it appears to be the human capital and

Page 78

executive talent management and succession plan update
document.

Q. Is this the talent deck that you were
referring to before that would be used at the December
board meetings?

A. Typically, yes.

Q. Do you recognize this as being the particular
talent deck for the December 2019 board meeting?

A. Yeah, uh-huh.

Q. How would this document be used at the
meeting?

A. Well, typically it was a dinner or later on it
was in the meeting itself, but in the executive session
we would go through each individual and look at the
succession planning for various important positions and
then, of course, that would move to, you know, the
development activities, discussion of that. Greg and
whoever the chief human resource officer at the time
would be would go through the deck in terms of each
individual person, what their developmental needs were,
what their potential next positions could be, those
were -- it was a typical update that was done.

Q. The talent deck would be prepared -- just so
we're on the same page -- I'm referring to Exhibit 4 as
the talent deck?

Page 79

A. Yes.

Q. Is that a fair description?

A. Yes.

Q. This talent deck that we see marked as
Exhibit 4, that would be prepared in advance of the
board meeting; is that correct?

A. That's correct.

Q. Do you know who prepared the talent deck?

A. Management.

Q. Who do you mean by management? Who had
prepared that?

A. Well, I don't know who exactly prepares it,
but the presenters are usually the CEO and the head of
human resources.

Q. Who was the head of human resources as of
December 2019?

A. I have to look at the -- it should have an
organization chart in here somewhere.

Q. Would it have been --

A. It changed -- it changed during that time
after the --

Q. Would it have been Bob Schaffer?

A. Maybe at that time. Because it was sort of an
interim thing after -- there was a -- I forgot her name,
she was there and she left. And then he had it

Deposition of Nicholas Kevin Akins                                          Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 80

1 and then -- so I guess, yes, it was Bob. Yeah, he's
2 shown as chief human resources officer.
3    Q.   Okay.
4    A.   Yeah, he had all this for a while, so --
5    Q.   All right. So just to be clear, your
6 understanding would that this would have been prepared
7 by Mr. Carmichael and Mr. Schaffer, correct?
8    A.   That it would have been sponsored by them. I
9 don't know who prepared them.
10    Q.   Okay. As a board member, did you have any
11 involvement in the preparation of the talent deck marked
12 as Exhibit 4?
13    A.   No.
14    Q.   Would you have seen any drafts of the talent
15 deck marked as Exhibit 4?
16    A.   No.
17    Q.   Would the board make any changes to the talent
18 deck during the board meeting?
19    A.   There was discussions of each person. I can't
20 recall any specific change that was made by the board.
21 I don't recall that.
22    Q.   Referring specifically to Fifth Third-McHugh
23 001135, it's -- I'm sorry, let me be clear.
24         On Exhibit 4, I'm just trying to give you a
25 page reference --

Page 81

1    A.   Oh, okay.
2    Q.   -- so you can get there.
3    A.   1135, got it.
4    Q.   So Exhibit 4, Fifth Third-McHugh 001135; do
5 you see that there?
6    A.   Yes.
7    Q.   Can you identify that page for me?
8    A.   That's the individual page for Tim Spence.
9    Q.   And again, as we determined, this information
10 was filled out for the board prior to the meeting; is
11 that correct?
12    A.   Yes, that's correct.
13    Q.   Under the talent information and potential
14 category, it has high potential for Mr. Spence; is that
15 correct?
16    A.   Yes.
17    Q.   Who would have put that information in?
18    A.   I don't know who would have initially put
19 those in, but I presume -- I mean, certainly it would
20 have to go through the chief human resource officer and
21 the CEO, particularly the CEO.
22    Q.   Below that, under potential next positions, it
23 has president one to two years, CEO three-plus years; do
24 you see that?
25    A.   Yes.

Page 82

1    Q.   Do you know where that information came from?
2    A.   My previous answer holds on that, but it would
3 have eventually been sponsored by the CEO and chief
4 human resource officer.
5    Q.   Did the board make any changes to that
6 information?
7    A.   No, not that I'm aware of.
8    Q.   If you could turn to Fifth Third-McHugh
9 001132.
10    A.   Okay.
11    Q.   Can you identify that page for me, please?
12    A.   That's the individual sheet for Phil McHugh.
13    Q.   Potential for Phil McHugh it lists moderate
14 potential; do you see that?
15    A.   Yes.
16    Q.   And who would have put that information in
17 there for Mr. McHugh as being moderate potential?
18    A.   I don't -- I don't know initially, but it
19 would have been sponsored by the CEO and the CHRO.
20    Q.   And with respect to potential next positions,
21 it says, "Expand current responsibilities to include
22 middle market leadership."
23         Do you see that?
24    A.   Yes.
25    Q.   And who would have put that information in

Page 83

1 there?
2    A.   It would have been sponsored by the CEO and
3 the CHRO. I don't know who specifically, but that's --
4 it would have to go through them.
5    Q.   If you could turn to Fifth Third-McHugh
6 001141?
7    A.   1141. 1141?
8    Q.   Correct.
9    A.   Yeah. That's the CEO succession plan.
10    Q.   Correct. That's the title page for the CEO
11 succession plan; is that right?
12    A.   Yes.
13    Q.   This also would have also been reviewed during
14 the close of the December 2019 board meeting, correct?
15    A.   Yes.
16    Q.   Turning to the next page, Fifth Third-McHugh
17 001142, can you identify that for me, please?
18    A.   That's -- that's the -- we're on the same
19 page, right?
20    Q.   Correct.
21    A.   That's the CEO succession view, just shows
22 different blocks, different readiness, that kind of
23 thing.
24    Q.   And it's an indication of who would
25 potentially succeed to CEO; is that correct?

Deposition of Nicholas Kevin Akins

Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 84

1  A.  It's an indication of who had the opportunity
2  to eventually become CEO, yes.
3  Q.  Who would have completed this CEO succession
4  chart that we see on Fifth Third-McHugh 001142?
5  A.  I don't know who specifically, but, again, it
6  would be sponsored by the CEO and CHRO.
7  Q.  And this particular plan indicates that nobody
8  is ready now with respect to CEO succession; is that
9  correct?
10  A.  That's correct.
11  Q.  And then it indicates three-plus years of Tim
12  Spence; is that correct?
13  A.  That's correct.
14  Q.  Seven-plus years of Brian Lamb; is that right?
15  A.  That's correct.
16  Q.  And then for emergency successor, it has
17  Tayfun Tuzun, Phil McHugh, and a board member; is that
18  right?
19  A.  That's correct.
20  Q.  Did the board make any changes to the CEO
21  succession plan we see on Fifth Third-McHugh 001142?
22  A.  No, not that I'm aware of.
23  Q.  Did the board have any criticisms of the CEO
24  succession plan we see on Fifth Third-McHugh 001142?
25  A.  Not that I'm aware of.  And I would keep in

Page 85

1  mind these are living, breathing documents.  I've been
2  through this a lot as CEO, but these can change at any
3  given time.  So what you're seeing is basically a
4  snapshot.
5  Q.  With respect to this particular talent deck,
6  did you see another revision of this talent deck?
7  A.  No, I did not.
8  Q.  When you say "these can change at any time,"
9  are you referring specifically to the CEO succession
10  plan or for all the information we see in the talent
11  deck?
12  A.  Well, generally -- this is generally how the
13  process works, that I'm accustomed to.  There are people
14  that come together in the organization, whether it's the
15  executive team or whatever, they come together with
16  their views of individual -- individual people, and they
17  have disagreements about those views.
18  And so it's sort of how the sausage is made
19  for this type of activity before it gets to the CEO, and
20  the CEO, as part of that process, evaluates it, can make
21  changes to it, that kind of thing.  Then it goes to the
22  board level.
23  Typically, the board has been -- enough
24  discussion where there's not a lot of, you know,
25  comments, we'll comment about people and that kind of

Page 86

1  thing, what we've seen -- what we've seen, but that's
2  another step.  Because when it comes to CEO succession,
3  it, again, is the lead -- it's the lead director's
4  responsibility to do the CEO succession.  So this is
5  really done -- there's just several filters you go
6  through to get there.  So -- and there could be a lot of
7  drafts.  In my experience, you typically get that,
8  and -- and then you go through it and you come up with
9  the best -- the best case you have and present to the
10  board.
11  Q.  Are you aware of any other drafts of this CEO
12  succession plan that appeared either before this
13  document 001142 or after 001142?
14  A.  I did not see any of the previous drafts.
15  Q.  What about after this particular draft?
16  A.  After?
17  Q.  Correct.  Did you see any revisions --
18  A.  No, I did not.
19  Q.  Okay.  Are you aware of any revisions being
20  made to the CEO succession plan we see marked as 001142?
21  A.  I'm not aware of any revisions to this
22  document.
23  Q.  With respect to Phil McHugh being identified
24  as an emergency successor --
25  A.  I'm sorry, what page was that?

Page 87

1  Q.  I'm still on 001142.
2  A.  I was paging ahead with you.  Sorry about
3  that.
4  Q.  No, you're all right.
5  Going back to Fifth Third-McHugh 001142.
6  A.  Okay.  Got it.
7  Q.  Were -- were there any criticisms of Phil
8  McHugh being listed as an emergency successor on the CEO
9  succession plan we see identified on 01142?
10  A.  Not that I recall.
11  Q.  Do you recall any criticisms of him being an
12  emergency successor during that December 2019 meeting?
13  A.  These are positioned as potential candidates
14  to look at if there was emergency successions.  There
15  was no negative comments about that.  This is -- the
16  only distinction I'm trying to make here is why we
17  weren't choosing an emergency person at that time.
18  Q.  Prior to December 2019, are you aware of any
19  other written CEO succession plans like we see in Fifth
20  Third-McHugh 001142?
21  A.  No.  Before this?
22  Q.  Correct.
23  A.  There could have been previous board reviews
24  in previous years.  I just don't recall them.  I mean,
25  we had decks for each time we went through these

Deposition of Nicholas Kevin Akins      Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 88

1  annually, but I just don't recall.

2      Q.  As you sit here today, do you recall if any of

3  the prior talent decks for 2016, 2017, 2018, if they had

4  any CEO succession plan set forth in them?

5      A.  I don't recall.

6      Q.  Other than what we've identified as the talent

7  deck, marked as Exhibit 4, was the board provided with

8  any other documentation with respect to CEO succession?

9      A.  None other than the consultant analysis, that

10  I recall.

11      Q.  The "consultant analysis."  You're referring

12  to the assessment done by RHR; is that correct?

13      A.  Yes.

14      Q.  Okay.  Is it -- excuse me.  What is your

15  understanding of when RHR did their assessment?

16      A.  That was an initial -- I don't recall exactly

17  what the time frame was.  Let's see, I'm backing up from

18  when -- let's see, Tim took -- I guess it was like 2019,

19  2020.

20      Q.  You don't recall specifically as you sit here

21  today?

22      A.  No, I don't.

23      Q.  What involvement did you have in the RHR

24  assessment?

25      A.  I didn't have an involvement other than their

Page 89

1  presenting to the board in executive session.

2      Q.  When did they present to the board in

3  executive session?

4      A.  I don't recall.  Either '19 or '20, I believe.

5      Q.  Were you present for that presentation?

6      A.  Yes.

7      Q.  You were present for the presentation?

8      A.  I was there -- well, I was not there the first

9  time.  I was there the second time.  Because it was done

10  in a September board meeting that, again, that was when

11  I had my own board meeting, so I was not there, but I

12  was made aware of the presentation.  I can't recall

13  exactly how I was made aware of it.  It was afterwards.

14      Q.  In what way were you made aware of the

15  presentation?

16      A.  I can't recall.  Either Marsha may have given

17  me a call to update me.  The presentation -- I remember

18  a presentation by RHR, but I can't remember specifically

19  which one.

20      Q.  How many presentations were there by RHR?

21      A.  Well, I was involved with the first one so

22  that sort of runs together.

23      Q.  Just to be clear, by "the first one," you're

24  year referring to when RHR did an assessment of

25  Mr. Carmichael?

Page 90

1      A.  Yes.  Yes.

2      Q.  And this was back in 2015?

3      A.  Right.

4      Q.  Did RHR assess anyone else back in 2015?

5      A.  Not that I recall.  I just don't recall.

6      Q.  Who dealt directly with RHR in terms of the

7  parameters of what they would do and the assessment they

8  would perform in 2015?

9      A.  Management.

10      Q.  What would -- what was your role in 2015 with

11  respect to RHR?

12      A.  I didn't have a role with RHR.  I was just a

13  board member.  But listen to their report.

14      Q.  What do you recall specifically about RHR's

15  assessment in 2020?

16      A.  I remember that it pretty much confirmed our

17  views of Tim Spence.  There was some discussion I

18  remember with the board and that's why I think there was

19  an initial discussion with RHR that -- and then they

20  went off and did their thing and then they came back and

21  they presented on Tim Spence, and it was consistent with

22  what the board's views were.

23      Q.  When you said "there was an initial discussion

24  with RHR," who had an initial discussion with RHR?

25      A.  I think we were introduced.  I'm fuzzy on

Page 91

1  this, but I think we were introduced to them, and then

2  they were told to go off and do their thing and they

3  did.  There was some discussion by the board at that

4  particular time, you know, are we comfortable with just

5  going with one person in terms of analysis, and I was

6  completely comfortable with it and the board was as

7  well.

8      Q.  When was that discussion?

9      A.  I don't recall specifically.  It seems like it

10  was a dinner, that executive -- executive session that

11  we had.  I just don't recall.

12      Q.  Do you know what year that was?

13      A.  It was the year they were doing the analysis.

14  So it would be in that '19 to '20 time frame.

15      Q.  Who was present for that?

16        MR. CIOFFI:  Objection.  What do you mean by

17  "that"?

18        MR. SABA:  Who was -- who -- I'll rephrase the

19  question.

20  BY MR. SABA:

21      Q.  Who was present for the executive session

22  where you discussed how many people RHR should assess?

23      A.  The board was there.

24      Q.  Including Greg Carmichael?

25      A.  Including Greg.

Page 92

1  Q. Okay.
2  A. That's my recollection. Now, it may be
3  faulty, but that's my recollection.
4  Q. And you're not able to pin it down, a month or
5  year when that occurred?
6  A. No. It all sort of runs together during that
7  period of time.
8  Q. Would there be any documentation in writing of
9  that session?
10  MR. CIOFFI: Objection to the form of the
11  question. Lack of foundation. That he knows of?
12  MR. SABA: The deposition is his personal
13  knowledge, so yeah.
14  MR. CIOFFI: Well --
15  THE WITNESS: I just don't recall. I just
16  don't recall.
17  BY MR. SABA:
18  Q. Did you read Marsha Williams' deposition in
19  preparation for this deposition today?
20  MR. CIOFFI: Objection. Instruct him not to
21  answer.
22  BY MR. SABA:
23  Q. Did you read Greg Carmichael's deposition in
24  preparation for this deposition today?
25  MR. CIOFFI: Objection. Again, as I said

Page 93

1  earlier, we represent him personally and whatever
2  he read, he read at our instruction as his counsel.
3  You can -- I'll let him answer the question did he
4  read anything outside of what we instructed him to
5  read.
6  BY MR. SABA:
7  Q. Did you review any documents or reports from
8  RHR?
9  MR. CIOFFI: Again, same objection.
10  THE WITNESS: In what context are you asking?
11  BY MR. SABA:
12  Q. As a board member.
13  A. Oh, yes.
14  Q. When did you review those?
15  A. I probably would have seen it after the board
16  meeting.
17  Q. After the board meeting in September of 2020?
18  A. It's either September or December, I forgot
19  which. September is the one I missed. So I would have
20  seen it after that, I presume.
21  Q. Did you ever communicate directly with anyone
22  from RHR?
23  A. No.
24  Q. Did you ever -- I'm referring to the time span
25  of 2019 or 2020 -- ever personally see any presentations

Page 94

1  made by the individuals from RHR?
2  A. I don't recall.
3  MR. SABA: If we can go off the record for a
4  second.
5  THE VIDEOGRAPHER: Off the record at 12:22.
6  (A recess was taken from 12:24 p.m. to
7  12:40 p.m.)
8  THE VIDEOGRAPHER: We are back on the record.
9  This is media 3 today's deposition. The time is
10  12:40.
11  BY MR. SABA:
12  Q. Mr. Akins, you gave me a time period before
13  for the long-term CEO. What would be the time period
14  that the emergency successor would serve?
15  A. Typically it's just a few months.
16  Q. Did you or any other board member communicate
17  to Mr. Spence at any time that he was far and above any
18  other internal candidate to be the next president and
19  CEO of Fifth Third Bank?
20  A. No. Not during the time that he was being
21  considered, no.
22  Q. Why not?
23  A. Because -- at least I can speak for me, not
24  the other board members, you'd have to talk to them, but
25  I don't have those kinds of conversations with

Page 95

1  individuals before it's right, and it wasn't right. And
2  you're talking about during the period of when the
3  evaluation was occurring, right, before he became
4  president?
5  Q. Correct.
6  A. Yeah, okay. Okay.
7  Q. I'm talking about any time he -- I believe the
8  resolution or the resolution signed in October 2020 and
9  the meeting discussing the resolution is September 2020.
10  So let's take it any time prior to September 2020.
11  A. Yeah. Well, the resolution was done --
12  because it's an AK issue from an SEC perspective -- so
13  when -- that's when the board ultimately decides when
14  they -- and to have a conversation beforehand would not
15  be appropriate.
16  Q. Would there have been a discussion with
17  Mr. Spence during the time that he was assessed by RHR
18  that he was being assessed to be CEO and president of
19  Fifth Third Bank?
20  A. I don't know the answer to that.
21  Q. Go ahead. Sorry.
22  A. He would have -- he would have known that he
23  was at least in the mix, I guess, because of the
24  evaluation, but that's all supposition on my part.
25  Q. Okay. You referenced an executive session or

Deposition of Nicholas Kevin Akins                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 96

1  dinner wherein it was discussed how many individuals
2  would be assessed by RHR in 2020 to be president and CEO
3  and that a determination would be that it was just one
4  person. Was Greg Carmichael present for that
5  conversation?
6     A. Yes.
7     Q. Okay. Do you recall any comments he made
8  during that conversation?
9     A. He asked the board -- at least this is my
10 recollection -- but he asked the board, are you
11 comfortable with either one or multiple candidates, and
12 the board responded that we were comfortable with one
13 candidate.
14    Q. And why was the board just comfortable with
15 one candidate?
16    A. Because we had our guy. I mean, he -- we felt
17 very positively toward his progression, and we felt like
18 that from the internal -- internal from Fifth Third, he
19 was the right person to really focus on from that
20 aspect.
21    Q. And this determination that was made because
22 you had your guy, that was before RHR did their
23 assessment?
24    A. No. I think, you know, board members have
25 conversations with each other in board member settings,

Page 97

1  and if we're impressed by someone, you'll talk to
2  someone and say, hey, I'm really impressed by this
3  person. That's a progression that occurs over time, and
4  then by the time it got to that meeting, it was very
5  clear that Tim Spence was favorable from a board
6  perspective and that's why the board said we're
7  comfortable with only one person.
8     Q. You don't recall the date of that meeting, but
9  it would have been before RHR did their assessment?
10    A. It was -- and I may be totally off base, but I
11 remember -- I remember an introduction meeting with RHR,
12 it seems like, and there was a discussion about whether
13 there was a single candidate or multiple candidates, and
14 we -- the board decided a single candidate was fine.
15    Q. And my question is, that was before RHR did
16 their assessment, correct?
17    A. That was before -- let's see. I think -- I'm
18 just not sure if it was before or when they came -- when
19 they did the other presentation; I'm just not sure.
20    Q. Well, it wouldn't have made sense for them to
21 come to you after they've already done all the
22 assessments to say --
23    A. Right.
24    Q. So this would, from all practical standpoints,
25 it sounds like you had this meeting that you're talking

Page 98

1  about before RHR did their assessment, correct?
2     A. I would -- I would think that it was done when
3  they were initiated to do their review, because they
4  have to know what their scope is, and they have to know
5  what -- what they're going to look at. And the board
6  felt comfortable with looking at one person. And,
7  remember, this is not -- this is not final. I mean, RHR
8  goes off and does their thing focused on Tim Spence. If
9  they came back with some fatal flaw, something we need
10 to look at, we'd look at it.
11        So there was no deadline, no timeline or
12 anything like that. It was really, okay, give us the
13 information that you have, we're comfortable with
14 looking at one person at this point, and we'll see where
15 it goes. Then it became a discussion we're comfortable
16 with moving forward with Tim and then under these
17 developmental actions and that falls on the transition
18 process. That's the way the transition process works.
19    Q. Do you know if at any time RHR was retained to
20 review three people?
21    A. I don't recall that. I don't know.
22    Q. Other than the RHR assessment, what else did
23 the board base their determination on that Tim Spence
24 should succeed Greg Carmichael as the next president and
25 CEO of Fifth Third Bank?

Page 99

1     MR. CIOFFI: Objection. Asked and answered a
2  couple of times, but --
3     THE WITNESS: So observations -- I can't speak
4  for the other board members -- but observations
5  that I had during the board meeting settings,
6  observations that I had during the board dinners,
7  because it's just as much -- it's just as important
8  of, you know, seeing people in those kinds of
9  settings, too. And then of course you had the
10 talent review process and you had the RHR analysis
11 and my own experience, just drawing from my own
12 experience and observing people, and then my own
13 thought process of where bank leadership needed to
14 be in the future and what they need to be focused
15 on and who had those skill sets that match that.
16 That's my thinking.
17       Now -- and it's really important to note that
18 no matter how I came up with my thinking, the other
19 board members from their perspective came up with
20 the same thing.
21 BY MR. SABA:
22    Q. With respect to your reference to the talent
23 review process, you're referring to the talent decks
24 that we were looking through earlier; is that correct?
25    A. Yes.

Deposition of Nicholas Kevin Akins                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 100

1  Q.  With respect to the board dinners, explain to
2  me how those are conducted.
3  A.  They're in the evenings.  Usually there's a
4  reception beforehand, the executive team, leadership
5  team is there in a very casual environment, and then we
6  sit down for dinner with everyone, the board and
7  executive, and just it's really a way of meeting and
8  talking to people in a more casual environment.
9  Q.  Are you all sitting at one table?
10  A.  Generally not, depending on what the space
11  was.  Sometimes it was the same table, long table,
12  sometimes it was smaller tables that people had
13  assignments to sit at.
14  Q.  Throughout the years between 2015 and
15  September of 2020, how often did you sit with Tim Spence
16  at these dinners?
17  A.  I don't recall.  Nothing unusual.  It's not
18  like I sat with Tim Spence every time or anything like
19  that.  Matter of fact, it appeared to me it was the same
20  as what I did as CEO, I made sure board members were
21  scattered with people who were different than the
22  previous time.  I kept track of that.  I don't know if
23  they did or not, but it seemed that way because I'd be
24  sitting with different people depending on the --
25  depending on which night it was.  I mean, there never

Page 101

1  was any consistency, if that's what you're getting at.
2  Q.  Did you have assigned seats at dinner?
3  A.  Generally yes, we had assigned seats.
4  Q.  Who would determine who would sit where?
5  A.  I have no idea.
6  Q.  How frequently did you sit next to Phil McHugh
7  at the board dinners?
8  A.  I don't recall.
9  Q.  So other than your own personal experience and
10  opinions as CEO, the other information that you based
11  your decision on with respect to Tim Spence are the
12  observation during board meetings and dinners, the
13  talent decks, the RHR assessment.  Is there anything
14  else?
15  A.  Oh, and of course the CEO feedback on
16  individuals as well.
17  Q.  The Greg Carmichael comments that we discussed
18  earlier, correct?
19  A.  Yes.
20  Q.  Anything else?
21  A.  Not that I can think of.
22  MR. SABA:  Can we go off the record for one
23  second?
24  THE VIDEOGRAPHER:  Yes.  Off the record at
25  12:52.

Page 102

1  (A recess was taken from 12:53 p.m. to 12:55
2  p.m.)
3  (Mr. McHugh exits the room.)
4  THE VIDEOGRAPHER:  Back on the record, 12:54.
5  (Plaintiff's Exhibit 5 is marked for
6  identification.)
7  BY MR. SABA:
8  Q.  Mr. Akins, I've handed you what has been
9  marked as Exhibit Number 5, which is Bates stamped Fifth
10  Third-McHugh-0213249 through Fifth Third-McHugh-0213254;
11  is that correct?
12  A.  Yes, that's correct.
13  Q.  Let me represent to you these are the board of
14  directors minutes for Fifth Third Bancorp for January 5,
15  2015; is that correct?
16  A.  Yes.  Special joint meeting, yes.
17  Q.  Okay.  And with respect to that meeting, you
18  attended that meeting via teleconference; is that
19  correct?
20  A.  Yes, that's what it says.
21  Q.  Okay.  And that would have been a conference
22  call, that's not a Zoom call, correct?
23  A.  Correct.
24  Q.  Okay.  And also as indicated by the other
25  people present, neither Phil McHugh nor Tim Spence were

Page 103

1  present for that meeting, correct?
2  A.  That's correct.
3  MR. CIOFFI:  Peter, as I said, the documents
4  speak for themselves who was there and who wasn't
5  so it seems a waste of time to go through it, but
6  go ahead.
7  (Plaintiff's Exhibit 6 is marked for
8  identification.)
9  THE WITNESS:  Thank you.
10  BY MR. SABA:
11  Q.  Mr. Akins, you've been handed what's been
12  marked as Exhibit Number 6, Fifth Third-McHugh-0213255
13  through Fifth Third-McHugh-0213275; is that correct?
14  A.  That's correct.
15  Q.  Let me represent to you these are the minutes
16  for Fifth Third Bancorp for January 20, 2015; is that
17  correct?
18  A.  That's correct.
19  Q.  Okay.  And you attended that meeting live; is
20  that correct?
21  A.  Yes.  It appears so, yes.
22  Q.  And indicating looking at who else was also
23  present, Mr. McHugh -- neither Mr. McHugh nor Mr. Spence
24  were present for that meeting; is that correct?
25  A.  That's correct.

Deposition of Nicholas Kevin Akins                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 104

1   (Plaintiff's Exhibit 7 is marked for
2   identification.)
3   THE WITNESS:  Thank you.
4   BY MR. SABA:
5   Q.  Mr. Akins, I have handed you what has been
6   marked as Exhibit Number 7, Fifth Third-McHugh-0213292
7   through Fifth Third-McHugh-0213303; is that correct?
8   A.  Yes, that's correct.
9   Q.  And Exhibit 7 is the board of directors
10  minutes for Fifth Third Bancorp for March 16, 2015; is
11  that correct?
12  A.  Yes.
13  Q.  And you attended that meeting live; is that
14  correct?
15  A.  Yes.
16  Q.  Okay.  Neither Mr. Spence nor Mr. McHugh were
17  present for that meeting; is that correct?
18  A.  That's correct.
19  (Plaintiff's Exhibit 8 is marked for
20  identification.)
21  THE WITNESS:  Thank you.
22  BY MR. SABA:
23  Q.  Mr. Akins, I've handed you what's been marked
24  as Exhibit Number 8, Fifth Third-McHugh-0213326 through
25  Fifth Third-McHugh-0213329; is that correct?

Page 105

1   A.  Yes, that's correct.
2   Q.  And Exhibit 8 is the minutes for the board of
3   directors meeting for Fifth Third Bank on Tuesday,
4   March 17, 2015; is that correct?
5   A.  Yes, that's correct.
6   Q.  And you attended that meeting via
7   teleconference; is that right?
8   A.  Yes.
9   Q.  Okay.  Neither Mr. Spence nor Mr. McHugh was
10  present for that meeting; is that right?
11  A.  That's correct.
12  (Plaintiff's Exhibit 9 is marked for
13  identification.)
14  BY MR. SABA:
15  Q.  Mr. Akins, you have been handed what's marked
16  as Exhibit Number 9, Fifth Third-McHugh-0213330 through
17  0213335; is that correct?
18  A.  Yes.
19  Q.  And these are the minutes from a special joint
20  meeting at Fifth Third Bancorp and Fifth Third Bank of
21  directors held on April 14, 2015; is that correct?
22  A.  That's correct.
23  Q.  And you were present live for that meeting; is
24  that right?
25  A.  Yes.

Page 106

1   Q.  And neither Mr. Spence nor Mr. McHugh were
2   present for that meeting; is that correct?
3   A.  That's correct.
4   (Plaintiff's Exhibit 10 is marked for
5   identification.)
6   THE WITNESS:  Thank you.
7   BY MR. SABA:
8   Q.  Mr. Akins, you've been handed what's been
9   marked as Exhibit Number 10, Fifth Third-McHugh-0213336
10  through 0213337; is that correct?
11  A.  Yes, that's correct.
12  Q.  And Exhibit Number 10 is the minutes of the
13  joint meeting of the board of directors for Fifth Third
14  Bancorp and Fifth Third Bank from May 27, 2015; is that
15  correct?
16  A.  Yes, that's correct.
17  Q.  And you attended that via teleconference; is
18  that right?
19  A.  Yes.
20  Q.  Okay.  And neither Mr. McHugh nor Mr. Spence
21  were present for that meeting; is that right?
22  A.  That's correct.
23  (Plaintiff's Exhibit 11 is marked for
24  identification.)
25

Page 107

1   BY MR. SABA:
2   Q.  Mr. Akins, you've been handed what's been
3   marked as Exhibit Number 11, Fifth Third-McHugh-0213338
4   through Fifth Third-McHugh-0213343; is that correct?
5   A.  Yes, that's correct.
6   Q.  And Exhibit Number 11 is the minutes of the
7   meeting of the board of directors for Fifth Third
8   Bancorp dated June 15, 2015; is that correct?
9   A.  Yes, that's correct.
10  Q.  Okay.  And you attended that meeting live; is
11  that correct?
12  A.  Yes.
13  Q.  And neither Mr. Spence nor Mr. McHugh attended
14  that meeting; is that correct?
15  A.  That's correct.
16  (Plaintiff's Exhibit 12 is marked for
17  identification.)
18  THE WITNESS:  Thank you.
19  BY MR. SABA:
20  Q.  Mr. Akins, you've been handed what has been
21  marked as Exhibit Number 12, Fifth Third-McHugh-0213362
22  through Fifth Third-McHugh-0213371; is that correct?
23  A.  Yes, that's correct.
24  Q.  And Exhibit Number 12 is the minutes of the
25  meeting of the board of directors for Fifth Third

Deposition of Nicholas Kevin Akins | Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 108

1  Bancorp for June 16, 2015; is that correct?
2     A.  That's correct.
3     Q.  And you attended that meeting live; is that
4  correct?
5     A.  Yes.
6     Q.  And neither Mr. Spence nor Mr. McHugh attended
7  that meeting; is that right?
8     A.  Yes, that's correct.
9        (Plaintiff's Exhibit 13 is marked for
10          identification.)
11       THE WITNESS:  Thank you.
12  BY MR. SABA:
13    Q.  Mr. Akins, you've been handed what's been
14  marked as Exhibit Number 13, Fifth Third-McHugh-0213380
15  through Fifth Third-McHugh-0213383; is that correct?
16    A.  Yes, that's correct.
17    Q.  All right.  And Exhibit Number 13 is the
18  minutes of the joint meeting of the board of directors
19  for Fifth Third Bancorp and Fifth Third Bank for July 6,
20  2015; is that right?
21    A.  Yes, that's correct.
22    Q.  And you attended that meeting via
23  teleconference; is that correct?
24    A.  That's correct.
25    Q.  Okay.  And neither Mr. McHugh nor Mr. Spence

Page 109

1  were present for that meeting; is that right?
2     A.  That's correct.
3        (Plaintiff's Exhibit 14 is marked for
4          identification.)
5        THE WITNESS:  Thank you.
6  BY MR. SABA:
7     Q.  Mr. Akins, you've been handed what's been
8  marked as Exhibit Number 14, Fifth Third-McHugh-0213400
9  through Fifth Third-McHugh-0213413; is that correct?
10    A.  Yes, that's correct.
11    Q.  And Exhibit Number 14 is the minutes of the
12  meeting of the board of directors for Fifth Third
13  Bancorp for September 14, 2015; is that correct?
14    A.  That's correct.
15    Q.  Okay.  And you attended that meeting live; is
16  that correct?
17    A.  Yes.
18    Q.  Okay.  Neither Mr. McHugh nor Mr. Spence
19  attended that meeting; is that right?
20    A.  That's correct.
21       (Plaintiff's Exhibit 15 is marked for
22          identification.)
23  BY MR. SABA:
24    Q.  Mr. Akins, you've been handed Exhibit
25  Number 15, Fifth Third-McHugh-0213442 through Fifth

Page 110

1  Third-McHugh-0213447; is that correct?
2     A.  That's correct.
3     Q.  Exhibit Number 15 is the minutes of the
4  meeting of the board of directors for Fifth Third
5  Bancorp, dated September 15, 2015; is that right?
6     A.  Yes.
7     Q.  And you attended that meeting live; is that
8  right?
9     A.  Yes.
10    Q.  Okay.  And Mr. McHugh and Mr. Spence also
11  attended that meeting; is that right?
12    A.  Yes.
13    Q.  Do you recall if there was a dinner following
14  that meeting?
15    A.  Typically there is.  Not following the
16  meeting, but in the middle.
17    Q.  The meeting indicates it was in North
18  Carolina, started at 8:00 a.m.; do you see that?
19    A.  Yeah.  That was on Tuesday.  There may have
20  been committee meetings on Monday and a dinner and then
21  the meeting started at 8:00 a.m.  I don't -- does it say
22  when it finished?  I don't know if there was a dinner
23  after this, that's what I'm saying.
24    Q.  Okay.
25

Page 111

1        (Plaintiff's Exhibit 16 is marked for
2          identification.)
3  BY MR. SABA:
4     Q.  Mr. Akins, you've been handed Exhibit Number
5  16, which is Bates stamped 0213455 through Fifth
6  Third-McHugh-0213464; is that correct?
7     A.  Yes.
8     Q.  And Exhibit Number 16 is the minutes of the
9  meeting of the board of directors for December 14, 2015
10  for Fifth Third Bancorp; is that right?
11    A.  That's correct.
12    Q.  Okay.  And you were present live for that
13  meeting; is that correct?
14    A.  Yes.
15    Q.  And Phil McHugh was also present for that
16  meeting; is that right?
17    A.  Yes.
18    Q.  And Tim Spence was not present for that
19  meeting; is that correct?
20    A.  I don't see his name, so I assume he was not.
21       (Plaintiff's Exhibit 17 is marked for
22          identification.)
23       THE WITNESS:  Thank you.
24  BY MR. SABA:
25    Q.  Mr. Akins, you've been handed what's been

Deposition of Nicholas Kevin Akins                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 112

1  marked as Exhibit Number 17, Fifth Third-McHugh-0213475
2  through Fifth Third-McHugh-0213494; is that correct?
3      A.  That's correct.
4      Q.  And Exhibit Number 17 is the minutes of
5  meeting of board of directors for Fifth Third Bancorp
6  for December 15, 2015; is that correct?
7      A.  Yes.
8      Q.  And you were present for that meeting; is that
9  correct?
10     A.  Yes.
11     Q.  And Mr. Spence was also present for that
12 meeting; is that correct?
13     A.  That's correct.
14     Q.  Mr. McHugh was not present for that meeting;
15 is that right?
16     A.  His name is not on there so I assume he
17 wasn't.
18         MR. CIOFFI:  Counsel, we've been doing this
19     for about half an hour.  We're happy to stipulate
20     that the documents speak for themselves, and
21     whoever they indicate was present was present, and
22     if someone is not indicated as present, they
23     weren't present.  It is just a waste of time.  Is
24     there a purpose to this?
25         MR. SABA:  There is a purpose to it.

Page 113

1          MR. CIOFFI:  Well --
2          MR. SABA:  We can go off the record one
3      second.
4          MR. CIOFFI:  It's hard to see.
5          MR. SABA:  Hold on.
6          THE VIDEOGRAPHER:  Off the record, 1:10.
7      (A recess was taken from 1:11 p.m. to
8      1:13 p.m.)
9          THE VIDEOGRAPHER:  Back on the record, 1:11.
10         MR. SABA:  So confirming your stipulation, you
11     will stipulate that with respect to any of the
12     minutes provided, that they accurately depict who
13     was present, who was absent, and who was present
14     via teleconference or present live; is that
15     correct?
16         MR. CIOFFI:  So stipulated.
17         MR. SABA:  And just to confirm, that would be
18     for all minutes from January 2015 through December
19     of 2020, correct?
20         MR. CIOFFI:  Yes, correct.
21     (Phil McHugh enters the room.)
22 BY MR. SABA:
23     Q.  Mr. Akins, you indicated before that you were
24 not present for the September 2020 board meetings,
25 correct?

Page 114

1      A.  Not all of them.  I think there is a few that
2  I was not because it would match up with AEPs and so --
3      Q.  My question specifically --
4      A.  It wasn't every one.
5      Q.  Was the year 2020?
6      A.  2020?
7      Q.  Yes.
8      A.  If it shows I wasn't there, the minutes, I
9  wasn't there.
10     Q.  Okay.  Let me represent to you that they show
11 that you were not in attendance in September 2020.
12     A.  Okay.
13     Q.  As was previously stipulated.  With respect to
14 that particular meeting, do you recall being provided
15 any supplemental information or having any contact or
16 communications with any board members regarding that
17 meeting?
18     A.  I mean, at some point I probably asked Marsha
19 how it went and I was told it went fine, so if there was
20 an update, it was a very general update.
21     Q.  Would you have spoken to anybody other than
22 Marsha Williams?
23     A.  Marsha Williams.  Did I say Marsha Ryan again?
24         MR. CIOFFI:  No, you said --
25

Page 115

1  BY MR. SABA:
2      Q.  No, you just said Marsha.
3      A.  She used to work for me at AEP, that's why --
4      Q.  All right.
5      A.  No, it probably would have been Marsha.
6      Q.  Did you have any conversation with Greg
7  Carmichael regarding that meeting?
8      A.  I don't recall.
9      Q.  Would you have been provided with the board
10 materials for that meeting?
11     A.  It would have been through Boardvantage or
12 whatever the -- that they would have been provided
13 beforehand.  May have been Diligent, one or the other.
14     (Plaintiff's Exhibit 18 is marked for
15     identification.)
16 BY MR. SABA:
17     Q.  Mr. Akins, you've been handed what's been
18 marked as Exhibit Number 18, which is Bates stamped
19 Fifth Third-McHugh-001216 through Fifth
20 Third-McHugh-001222; is that correct?
21     A.  Yes.
22     Q.  Are you able to identify these documents for
23 me?
24     A.  Yes.  The information in the news release, the
25 note to the board on unanimous consent concerning the

Deposition of Nicholas Kevin Akins                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 116

1  appointment of Tim Spence as president of the Bancorp.
2    Q.  Have you seen these documents before?
3    A.  Yes.  I signed it.
4    Q.  How was the unanimous consent circulated?
5    A.  It was sent through the -- either Diligent or
6  Boardvantage, whichever, it was sent through -- in that
7  fashion, and then electronically signed.
8    Q.  And -- I'm sorry.  The unanimous consent
9  portion is marked Fifth Third-McHugh-001221 and Fifth
10 Third-McHugh-001222; is that correct?
11   A.  Yes.
12   Q.  And the unanimous consent is dated October 26,
13 2020; is that right?
14   A.  That's correct.
15   Q.  Did you have any discussion with any of the
16 other board members regarding the unanimous consent
17 prior to signing?
18   A.  Yes.
19   Q.  When would you have had that discussion?
20   A.  It would have been a previous board discussion
21 that to expect a unanimous consent to come out and if
22 you agreed with it, then that's when the vote would be
23 taken.
24   Q.  When did that meeting take place?
25   A.  Was there an October board meeting?  I can't

Page 117

1  recall.  I don't recall.
2    Q.  Let me represent to you the records we have is
3  that the prior meeting was the September meeting, the
4  one you did not attend.
5    A.  So I must have been informed of it after --
6  after the meeting.
7    Q.  Do you recall any specific conversations with
8  anybody about this unanimous consent?
9      MR. CIOFFI:  Objection.  Asked and answered.
10 He just described it.
11     THE WITNESS:  Yeah.  I knew it was coming out.
12 I was put on notice that it would come out and it
13 was consistent with, you know, all the board
14 activity leading up to that point.
15 BY MR. SABA:
16   Q.  Who put you on notice that the unanimous
17 consent was coming out?
18   A.  I don't recall.
19   Q.  Referring you to the third page of Exhibit 18,
20 Fifth Third-McHugh-001218.
21   A.  Yes, I have it.
22   Q.  This is a letter from Greg Carmichael to the
23 board; is that correct?
24   A.  Yes.
25   Q.  In the second paragraph it indicates, "As Bob

Page 118

1  Schaffer and I discussed with you at the September board
2  meeting, we believe that Phil McHugh could be at risk
3  with Tim's promotion.  And, in fact, Phil has decided
4  not to accept the role of head of consumer and business
5  banking and is leaving the company."
6      Do you see that?
7    A.  Yes.
8    Q.  Did you ever have any conversations with Bob
9  Schaffer and/or Greg Carmichael where they indicated
10 to you that they believe Phil McHugh could be at risk with
11 Tim's promotion?
12   A.  I don't recall that.
13   Q.  What is your understanding of why Phil McHugh
14 was leaving the company?
15   A.  My understanding was he was upset with -- that
16 he didn't get the -- didn't get to move to president and
17 he quit.
18   Q.  Do you have any understanding of the details
19 of the timing of Phil McHugh's departure?
20   A.  The only understanding I had was when Tim was
21 selected, this note came out and we were put on notice
22 that Phil had gotten upset and he decided to not accept
23 the role that was offered to him, which was a great role
24 in the company.  He got upset, left, and he resigned.
25   Q.  Did you ever discuss Phil McHugh's departure

Page 119

1  with Greg Carmichael?
2    A.  I don't recall.  I mean, after this came out,
3  I mean, it pretty much spoke for itself.  I don't know
4  that anyone anticipated Phil deciding to resign.  I
5  mean, that was somewhat of a surprise to me, because, I
6  mean, like I said earlier, I mean, Phil was well thought
7  of, great utility player, should have stayed with the
8  company, but he didn't.  He got upset, resigned,
9  probably didn't think it all the way through, that's my
10 opinion, but I never had a conversation, you know, with
11 Greg about why he left or anything like that.
12   Q.  Obviously Greg Carmichael and Bob Schaffer
13 knew that Phil was at risk even as of September 2020;
14 isn't that right?
15     MR. CIOFFI:  Objection.  Lack of foundation.
16     THE WITNESS:  I don't know the answer to that.
17     MR. CIOFFI:  You can answer.
18     THE WITNESS:  Anybody could be at risk, I
19 don't know.
20 BY MR. SABA:
21   Q.  That's what the letter indicates, correct?
22   A.  Well, this letter says --
23     MR. CIOFFI:  Objection to the lack of
24 foundation.
25

Deposition of Nicholas Kevin Akins          Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 120

BY MR. SABA:

Q. Go ahead. You can answer.

MR. CIOFFI: Do you want to repeat your question, please?

MR. SABA: Sure.

THE WITNESS: Go ahead.

BY MR. SABA:

Q. Obviously based on the wording of the letter, Greg Carmichael and Bob Schaffer knew as of September 2020 that Phil McHugh would be at risk as a result of Tim Spence's promotion?

MR. CIOFFI: Objection. Lack of foundation. If you can answer.

THE WITNESS: Yeah. I mean, I don't know the individual discussions or any of that, but the letter seems to indicate that -- that they discussed it previously with the board that he may be at risk. I mean, any senior executive could be at risk when there's only one job. And when you don't get it, there are people upset, people can live with it, people who can't, and that's obviously what happened, in my opinion.

MR. SABA: We can go off the record.

THE VIDEOGRAPHER: Off the record, 1:24.

Page 121

(A recess was taken from 1:24 p.m. to 1:33 p.m.)

THE VIDEOGRAPHER: Back on the record, 1:33.

BY MR. SABA:

Q. Mr. Akins, did you ever hear any of the board members or any of the enterprise committee or Fifth Third employees refer to Phil McHugh as the Silver Fox?

A. No, I did not.

MR. SABA: That is all the questions I have at this time, continued in progress with respect to other issues that may arise, but that's all I have.

MR. CIOFFI: As you know our position, it is that you don't have the right to continue it in progress, but the court will eventually decide. I do have a couple of questions.

THE WITNESS: Yeah.

EXAMINATION

BY MR. CIOFFI:

Q. And if you look at Exhibit Number 4, please, first turn to page 1135 if you would. You testified previously that this is the talent card that was prepared by management concerning Tim Spence; is that correct?

A. Yes, that's correct.

Q. Looking at the box that's captioned potential

Page 122

as you testified before, it says high potential; do you see that?

A. Yes.

Q. My question for you as a member of the board, separate and apart and independent of this particular document, did you have an opinion about Tim Spence's potential in December of 2019?

A. Yes, I did.

Q. And what was that opinion?

A. His trajectory was high, and there's no question that he had the skills required for a CEO at that particular time looking forward into the future. He was very adept, very communicative. He certainly could go to any level of detail that you wanted to go in, very attuned to the strategic aspects of the banking industry, but he as a person -- you could tell he was a constant learner, but also somebody who would be a great cultural fit as a CEO.

And that was my own personal feelings as he developed, and there's no question in my mind that it ultimately was the right decision.

Q. Did you have discussions with your fellow board members about Tim Spence's potential?

A. Well, I -- you have regular board chatter, and there was no question that people were impressed by Tim

Page 123

Spence.

Q. Based on those discussions, do you know what the other board members' opinions were with respect to Tim Spence's potential?

A. Yes. Yes, it was clear.

Q. And what was it?

A. Board members are looking for -- based on the conditions we're in, based the state of the company, the life of the company and where he is, but also the skills necessary, the things that we were trying to approach from a competitive standpoint, particularly the online banking when COVID hit, that even further accentuated it, there is no question that he had those abilities.

But apart from that, his temperament, the way he approached things that we saw, certainly the depth of understanding of the strategic nature of the banking industry, the ins and outs, the contacts, all those things, they seemed very fluid to him and that said to us that, I mean, he was impressive from that perspective. And when you're thinking about the future of the bank, particularly in that environment, you needed a CEO with a vision, and he actually did a strategic plan. So it was really important to have that kind of skill set at the CEO level.

Q. Separate and apart from this particular

Deposition of Nicholas Kevin Akins | Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 124

1 document, 1135, did your fellow board members share

2 those opinions about Tim Spence?

3     **A. Yes, they did.**

4     Q. Looking at the next box right below that, it

5 talks about potential next positions.

6     **A. Yes.**

7     Q. And then it says, "President one to two years,

8 CEO three-plus years." Separate and apart from this

9 document and independent of this document, did you have

10 an opinion about Tim Spence's potential in terms of

11 these positions?

12     **A. Yes.**

13     Q. And what was your opinion?

14     **A. I thought that -- and, again, this is a**

15 **snapshot, and my only impression that was he was on a**

16 **steep trajectory and these time frames could change.**

17 **And it was very flexible given where Greg was and where**

18 **he was at that particular time.**

19     Q. And, in fact, did these time frames

20 articulated in 2019 in fact come to be true?

21     **A. Yes, that's correct.**

22     Q. Based on your discussions with your fellow

23 board members, did they also share the opinions you just

24 expressed about Tim Spence's potential for next

25 positions?

Page 125

1     MR. SABA: Objection.

2     THE WITNESS: Yes, as far as I know.

3 BY MR. CIOFFI:

4     Q. I want to direct your attention to 1132 in the

5 lower right-hand corner. Fifth Third-McHugh-001132,

6 would you look at that?

7     **A. Yes.**

8     Q. And what is that particular document?

9     **A. That's Phil McHugh's sheet for the talent**

10 **management.**

11     Q. Again, looking at the box which is captioned

12 potential, it says next to that moderate potential; do

13 you see that?

14     **A. Yes.**

15     Q. Separate and apart from this document and

16 independent of this document, did you have an opinion in

17 December of 2019 about Phil McHugh's potential?

18     **A. Yes. And I said this previously, I felt he**

19 **was a utility player. He was sort of a Steady Eddie in**

20 **his role. He could move to other roles because of his**

21 **ability to work with multiple parts of the organization.**

22 **He obviously knew many people in the organization, could**

23 **bring them together. To me, he was -- he was more of a**

24 **chief operating officer type and, you know, he was -- to**

25 **me, he was more introverted, more focused internally to**

Page 126

1 the company. I think that bode well for his future in

2 terms of his ability to help Tim. I had the same

3 condition at AEP, and I recognized that in Phil. The

4 moderate potential just says that he's reached a plateau

5 that's appropriate for him and he's well placed.

6     Q. Did you agree with the assessment of moderate

7 potential in December of 2019?

8     **A. Yes.**

9     Q. Based on your discussions with the other board

10 members and separate and independent of this particular

11 document, did they share that view of yours?

12     MR. SABA: Objection.

13     THE WITNESS: Yes.

14 BY MR. CIOFFI:

15     Q. If you look at the next box where it says

16 potential next positions, you see --

17     **A. Yes.**

18     Q. -- it says, "Expand current responsibilities

19 to include middle market leadership."

20     **A. Yes.**

21     Q. Again, separate and independent of this

22 document, did you have an opinion as to the appropriate

23 next positions for Phil McHugh?

24     **A. Well, I certainly felt like that this would be**

25 **a really great move to expand his abilities to look at a**

Page 127

1 **broad view of the enterprise from an operational**

2 **perspective. I was very comfortable when he made the**

3 **change to include wealth management and because he had**

4 **that ability to go across the organization.**

5     **So the middle marketing piece was the part**

6 **that he could continue to develop with and continue**

7 **being a great employee for the future. I mean, that's**

8 **what I was thinking.**

9     Q. And separate and apart from this particular

10 document, did your fellow board members, based on your

11 discussions with them, have similar views as yours about

12 his next positions?

13     MR. SABA: Objection.

14     THE WITNESS: Yes, so far as I know.

15 BY MR. CIOFFI:

16     Q. Yeah. In any of the discussions about Greg

17 Carmichael's successor, did the board at any time

18 discuss age as a factor in making that decision?

19     **A. No.**

20     Q. Did --

21     **A. No.**

22     Q. -- in fact age play any factor in the board's

23 determination of who should succeed Greg Carmichael as

24 president and then eventually CEO?

25     **A. No.**

Deposition of Nicholas Kevin Akins            Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 128

1   Q.  I have no --

2   A.  It was clearly based upon the factors we felt

3 like in the market, as I've said several times, how Tim

4 fit within those primary areas that were important for

5 the bank moving forward.  That was -- that was the focus

6 there.  But if someone else were to have those, then

7 they would have been included in the list, but they

8 weren't.

9   Q.  And what were those areas again, just for the

10 record?

11   A.  Well, first of all, he had many contacts

12 within the industry, banking.  He also had very fluent

13 knowledge of the state of banking and the issues that

14 we're dealing with.  Certainly the technical side,

15 technology side of it with Fintech, with other aspects

16 from a strategic nature with M&A, those were clearly

17 areas that he was well-versed in.

18      And he also had a great ability to communicate

19 those variances within the banking industry, who was

20 thinking what and who's likely to move this way or that

21 way in terms of banking, you know, bank M&A and so

22 forth.  He had a very good understanding.

23      So there's no question in my mind that he

24 would have hit the ground running with investors and

25 would have -- because I've been involved with a lot of

Page 129

1 one-on-ones, a lot of investor conferences, a lot of

2 activities that the CEO has to be -- have the foundation

3 to think on his feet or -- in his or her feet, and make

4 sure that they can respond very quickly, very adeptly,

5 and communicate in a very clear and concise fashion.  He

6 had those skills.

7   Q.  I want to direct your attention to Exhibit

8 Number 18, if you would, please, which is the unanimous

9 written consent; do you see that?

10   A.  Yes.

11   Q.  And prior to this unanimous written consent in

12 October of 2020, for how many years prior to this

13 appointment as president had Tim Spence been making the

14 strategic plan for the bank?

15   A.  Well, he made a strategic plan even before he

16 joined the bank with Oliver Wyman, and then -- and then

17 after that, he was involved with every step of the way

18 and brought in other strategic people to support him as

19 well.  So he's -- he was, certainly from a talent

20 perspective, he brought in the right talent.

21   Q.  So when --

22   A.  Several years.

23   Q.  Do you know when he was hired from Oliver

24 Wyman by the bank?

25   A.  I don't know the exact year.

Page 130

1   Q.  Okay.  Does 2014, '15 sound about right?

2   A.  Yeah.  It's been several years.  Particularly

3 I sort of mark things when Greg became CEO, and there

4 you saw Tim start to really -- really show up, but --

5 and obviously for obvious reasons.

6   Q.  Yeah.  And prior to being hired by the bank,

7 for how many years at Oliver Wyman had Tim Spence been

8 making and developing the strategic plan for the bank?

9   A.  Several years.

10   Q.  So by the time the decision was made in 2020,

11 he had been, in fact, creating the strategic plan and

12 vision for the bank for six to eight years; is that

13 correct?

14   A.  Yes.  Yes.

15      MR. SABA:  Objection.

16      MR. CIOFFI:  I have no further questions.

17       FURTHER EXAMINATION

18 BY MR. SABA:

19   Q.  Mr. Akins, you previously indicated that the

20 input for making your determinations regarding

21 Mr. Spence were your observations during the board

22 settings, the talent deck, the RHR assessment, and then

23 your own experience, correct?

24   A.  Yes.  Did you mention Greg Carmichael's --

25   Q.  And Greg Carmichael's comments.

Page 131

1   A.  Okay.  All right.

2   Q.  And Mr. Cioffi then asked you about the high

3 potential given to Mr. Spence that's referenced in the

4 talent deck, and he said separate and apart from that

5 talent deck, did you have an opinion regarding his

6 potential, correct?

7   A.  Yes.

8   Q.  Okay.  Which would mean if you remove the

9 talent deck, then the only other inputs would be the

10 observations during the board settings, the RHR

11 assessment, and the comments from Greg Carmichael,

12 correct?

13   A.  And my own experience.

14   Q.  And your own experience, correct?

15   A.  Yes.

16   Q.  But the inputs regarding Mr. Spence, the

17 objective data, is the observations, the RHR assessment,

18 and the comments from Mr. Carmichael, correct?

19   A.  Can you repeat that question?

20   Q.  Sure.  The -- you're bringing your own

21 personal experience in, you said that, you know --

22   A.  Yes.

23   Q.  -- from what you have seen.  You're using your

24 own personal experience to evaluate the information

25 you're given about Tim Spence, correct?

Page 132

1   A. That's correct.

2   Q. Okay. And the information, the sources of

3 information about Tim Spence, you had identified four

4 sources. You identified the comments by Mr. Carmichael,

5 the observations made of Mr. Spence during board

6 settings, the talent deck, and the RHR assessment,

7 correct?

8   A. Yes.

9   Q. Okay. So in Mr. Cioffi's question, if we take

10 away the talent deck, that just leaves the three other

11 portions of the assessment, the observations --

12   A. Was it three or four?

13   Q. Well, there were four total, the RHR

14 assessment, Mr. Carmichael's comments, the talent deck,

15 and the observations at the board setting, correct?

16   A. And my own experience.

17   Q. Yeah.

18   A. Did you cover that?

19   Q. Your own experience. As we discussed, your

20 own experience is taking those inputs and determining

21 that, correct?

22   A. No. My own experience, too, is observing

23 executive talent. It's a lot more than just looking at

24 objective -- objective data.

25   Q. Without any --

Page 133

1   A. I don't -- I don't view my -- I don't view

2 my --

3   Q. Well, so let me ask the question --

4      MR. CIOFFI: Counsel, let him answer the

5 question.

6      MR. SABA: Let me ask the question this way.

7      MR. CIOFFI: No, no, no, no, let him finish.

8 Were you finished with your answer?

9      MR. SABA: I have a different question.

10      MR. CIOFFI: Were you finished with your

11 answer?

12      MR. SABA: Here's my question.

13      MR. CIOFFI: No, Counsel, he wasn't finished.

14 Let him finish.

15      MR. SABA: I wasn't finished with my

16 question.

17      MR. CIOFFI: He was answering your last

18 question when you started another question.

19      MR. SABA: Let's --

20      MR. CIOFFI: Allow him to finish.

21      MR. SABA: Allow me to finish.

22      MR. CIOFFI: No. Allow him to finish.

23      MR. SABA: No. Allow me to finish. We can go

24 on for hours, but let -- just --

25      MR. CIOFFI: Why are you doing that?

Page 134

1      MR. SABA: Because you're interrupting me.

2 It's my deposition, not yours.

3      MR. CIOFFI: You're interrupting the

4 witness.

5 BY MR. SABA:

6   Q. Mr. Akins --

7      MR. CIOFFI: He's allowed to finish his

8 answer.

9 BY MR. SABA:

10   Q. Mr. Akins --

11      MR. CIOFFI: Do you have more to say?

12      THE WITNESS: Yes.

13      MR. SABA: Okay.

14      MR. CIOFFI: Please finish your answer.

15      MR. SABA: Look, I'll let you finish

16 your --

17 BY MR. SABA:

18   Q. Mr. Akins, without --

19      MR. CIOFFI: No, finish your answer.

20 BY MR. SABA:

21   Q. Without -- without -- are you --

22      MR. CIOFFI: Counsel --

23 BY MR. SABA:

24   Q. I want to know this question, Mr. Akins.

25      MR. CIOFFI: Counsel --

Page 135

1 BY MR. SABA:

2   Q. Without any input regarding Mr. Spence, so if

3 you take away the observations from the board meetings,

4 if you take away the information in the talent deck, you

5 take away the RHR assessment, you take away any comments

6 from Mr. Carmichael, what information would you have

7 available to you to decide that Mr. Spence should be the

8 next president and CEO of Fifth Third Bank?

9      MR. CIOFFI: And I'm going to instruct the

10 witness, before he answers that question, to finish

11 your answer to the previous question.

12      THE WITNESS: I was going to say that it's

13 important -- I don't view my experiences as being

14 entirely subjective. There's objective things that

15 I see in people, how they're utilized within an

16 organization, how the CEO decides how to utilize

17 that talent within the organization, and so I don't

18 view that as subjective. So you can add that to

19 the objective list.

20      The other things you mentioned, yes, outside

21 of -- outside, if you took one out, there's still,

22 in my mind, four to go.

23 BY MR. SABA:

24   Q. So let's go back then. Take away the

25 observations you made of Mr. Spence at any board

Page 136

1 settings, take away the RHR assessments, take away the
2 talent deck, and take away Mr. Carmichael's comments to
3 you, are you then in a position to decide oh, yeah
4 Mr. Spence should be the next CEO and president of Fifth
5 Third Bank, if you take away all that information?
6    A.   That's speculative because it never
7 happened.
8    Q.   Well, there would be nothing to base a
9 decision on; isn't that right?
10    A.   I didn't have that.  I had all those that you
11 mentioned.
12    Q.   That's correct.  And without those, without
13 that information, there would be nothing to base that
14 decision on?
15        MR. CIOFFI:  Objection.  It's argumentative
16    and calls for speculation.
17 BY MR. SABA:
18    Q.   You used your own experience to process that
19 information, right?
20    A.   My job as a board member is to have those
21 inputs.  I had the inputs.  The decision was made.  So
22 to say one's missing or another's missing, they're not
23 missing, they're there.
24    Q.   So going back to Mr. Cioffi's question, you
25 couldn't say that that was missing, how that affected

Page 137

1 your decision because you had the talent deck indicating
2 high potential; is that right?
3    A.   Could you repeat that, please?
4    Q.   Sure.  You said, I can't -- I can't speculate
5 if one of those items are missing.  The premise of
6 Mr. Cioffi's question to you was, take away the talent
7 deck and would you still evaluate Mr. Spence as having
8 high potential?  And you said yes.  And you said you can
9 speculate --
10    A.   No, no.
11        MR. CIOFFI:  Hold on.
12        THE WITNESS:  Okay.
13        MR. CIOFFI:  Objection to the form of the
14    question, it's compound.  That wasn't my question.
15    Misstates the question.  My question was, did he
16    form an opinion separate and independent of the
17    talent deck, not that it didn't exist.  But your
18    question is totally argumentative and calls for
19    speculation.  That's my objection.  Do you have an
20    answer to his question?
21        THE WITNESS:  Yeah.  I'll say as a former CEO
22    and certainly as a board member, the job really is
23    making a decision based upon the facts that are
24    available to you.  I make a lot of decisions based
25    upon whether this thing is missing or that thing is

Page 138

1 missing, I make a decision based upon the input
2 available to me.  That's what I did here.
3 BY MR. SABA:
4    Q.   Okay.  And the facts available to you were the
5 observations that you made of Mr. Spence during the
6 board settings, the RHR assessments, correct?
7    A.   Correct.
8    Q.   And the talent deck, correct?
9    A.   Correct.
10    Q.   And the comments from Mr. Carmichael,
11 correct?
12    A.   Yes.  And my own experiences.
13        MR. CIOFFI:  Objection to the form of the
14    question.  It's incomplete.  It's also the
15    observations of Mr. McHugh.  He testified about
16    that.  So, you know, you're mischaracterizing his
17    testimony and arguing with him.  The record's clear
18    what he already testified to.
19        MR. SABA:  It is.  We are just talking about
20    Mr. Spence right now.
21 BY MR. SABA:
22    Q.   In terms of those inputs regarding Mr. Spence,
23 if you take away the observations at the board meetings,
24 if you take away the talent deck, the RHR assessment,
25 and Mr. Carmichael's comments, you have no information

Page 139

1 regarding Mr. Spence, correct?
2        MR. CIOFFI:  Objection.  Speculative.  If you
3    can answer, you can answer.  If you can't, you
4    can't.
5        THE WITNESS:  I can't answer that.  It's
6    pretty meaningless.
7 BY MR. SABA:
8    Q.   But what other sources of information did you
9 have --
10    A.   I don't need other sources.  I have all these
11 sources you just mentioned.
12    Q.   That's correct.  What other -- you had no
13 other sources of information specifically regarding
14 Mr. Spence other than those four, correct?
15    A.   I had -- I had all the ones that you
16 listed.
17    Q.   Correct.  Those four items, correct?
18    A.   Was it four or five?  Go through the list
19 again.
20    Q.   Sure.  It's the observations you made
21 during the board settings.  It is the talent deck.
22 It is the RHR assessment and the comments made by
23 Mr. Carmichael?
24    A.   And my own experiences, five.
25    Q.   Okay.  But you had no independent experiences

Deposition of Nicholas Kevin Akins                          Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 140

1  with Mr. Spence outside those four sources of
2  information, did you?
3      A.  **No independent experiences, what does that**
4  **mean?**
5      Q.  Correct.  You had no interaction with
6  Mr. Spence other than the information provided from your
7  observations, from the talent deck, the RHR assessment,
8  and the comments made by Mr. Carmichael, you had no
9  other interactions or communications with Mr. Spence in
10 any fashion?
11     A.  **I don't recall any, other than the board**
12 **dinners, that kind of thing.**
13     Q.  Correct.  Which we included in those
14 observations.
15     A.  **Included in the board observations.**
16     Q.  Correct.  Whenever those would happen to
17 occur, correct.
18     A.  **So that's correct.**
19     Q.  Okay.  And that's also true for Mr. McHugh?
20     A.  **That's true.**
21     Q.  It's the same information, excluding the RHR
22 assessment.  There was no RHR assessment regarding
23 Mr. McHugh, correct?
24     A.  **That's correct.**
25     Q.  With respect to the strategic plans that are

Page 141

1  prepared for Fifth Third Bank, are you aware of the
2  involvement that all the members in the enterprise
3  committee have in the preparation of those strategic
4  plans?
5      A.  **I'm not aware to what extent, no.**
6      Q.  You don't know what the sources of all the
7  information is that creates those strategic plans; is
8  that right?
9      A.  **No.**
10     MR. SABA:  That's all I have.  Continued in
11 progress.
12     MR. CIOFFI:  Same objection to continuing in
13 progress.  I have no further questions.
14     MR. SABA:  Thank you Mr. Akins.
15     THE VIDEOGRAPHER:  We are off the record at
16 1:55.
17     THE COURT REPORTER:  Mr. Cioffi, do you want
18 signature?
19     MR. CIOFFI:  Yes, we will review and sign.
20     THE COURT REPORTER:  And, Peter, are you going
21 to order the transcript?
22     MR. SABA:  Yes.
23     THE COURT REPORTER:  Regular delivery?
24     MR. SABA:  Yes, thank you.
25     THE COURT REPORTER:  And, Mike, do you want a

1       copy?

2            MR. CIOFFI:  Yes, same with us.

3

4

5

6                     _____

7                     NICHOLAS KEVIN AKINS

8                     _____

9                     DATE

10                    - - -

11          DEPOSITION ADJOURNED AT 1:57 p.m.

12                    - - -

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    C E R T I F I C A T E

2   STATE OF OHIO          :
                           :            SS
3   COUNTY OF HAMILTON     :

4            I, Wendy L. Raymer, RPR, CRR, the undersigned,

5   a duly qualified and commissioned notary public within

6   and for the State of Ohio, do hereby certify that before

7   the giving of his aforesaid deposition, NICHOLAS KEVIN

8   AKINS was by me first duly sworn to depose the truth,

9   the whole truth and nothing but the truth; that the

10  foregoing is the deposition given at said time and place

11  by NICHOLAS KEVIN AKINS; that said deposition was taken

12  in all respects pursuant to stipulation of counsel; that

13  I am neither a relative of nor employee of any of the

14  parties or their counsel, and have no interest whatever

15  in the result of the action; that I am not, nor is the

16  court reporting firm with which I am affiliated, under a

17  contract as defined in Civil Rule 28 (D).

18           IN WITNESS WHEREOF, I hereunto set my hand and

19  official seal of office at Cincinnati, Ohio, this 17th

20  day of July, 2024.

21

22

23

24                            _____
    My Commission expires     S/Wendy L. Raymer, RPR, CRR
25  December 6, 2026           Notary Public - State of Ohio
```

1    1 DEPOSITION ERRATA SHEET

2    Date Taken:  July 2, 2024

3    Case Caption:  PHILIP R. MCHUGH

4    vs. FIFTH THIRD BANCORP, et al.

5    DECLARATION UNDER PENALTY OF PERJURY

6    I declare under penalty of perjury

7    that I have read the entire transcript of

8    my deposition taken in the captioned matter

9    or the same has been read to me, and

10   the same is true and accurate, save and

11   except for changes and/or corrections, if

12   any, as indicated by me on the DEPOSITION

13   ERRATA SHEET hereof, with the understanding

14   that I offer these changes as if still under

15   oath.

16   Signed on the _____ day of

17   _____, 20___.

18   _____

19   NICHOLAS KEVIN AKINS

20

21

22

23

24

25

```
 1   2 DEPOSITION ERRATA SHEET

 2   Page No._____Line No._____Change to:_____

 3   _____

 4   Reason for change:_____

 5   Page No._____Line No._____Change to:_____

 6   _____

 7   Reason for change:_____

 8   Page No._____Line No._____Change to:_____

 9   _____

10   Reason for change:_____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change:_____

23   SIGNATURE:_____DATE:_____

24   NICHOLAS KEVIN AKINS

25
```

```
 1  3 DEPOSITION ERRATA SHEET

 2  Page No._____Line No._____Change to:_____

 3  _____

 4  Reason for change:_____

 5  Page No._____Line No._____Change to:_____

 6  _____

 7  Reason for change:_____

 8  Page No._____Line No._____Change to:_____

 9  _____

10  Reason for change:_____

11  Page No._____Line No._____Change to:_____

12  _____

13  Reason for change:_____

14  Page No._____Line No._____Change to:_____

15  _____

16  Reason for change:_____

17  Page No._____Line No._____Change to:_____

18  _____

19  Reason for change:_____

20  Page No._____Line No._____Change to:_____

21  _____

22  Reason for change:_____

23  SIGNATURE:_____DATE:_____

24  NICHOLAS KEVIN AKINS

25
```

### WORD INDEX

**< 0 >**
**000253** 72:2
**000254** 73:6
**000265** 72:5
**000266** 72:9
**000283** 72:12
**001132** 82:9
**001135** 80:23 81:4
**001141** 83:6
**001142** 83:17 84:4, 21, 24 86:13, 20 87:1, 5, 20
**01142** 87:9
**0213335** 105:17
**0213337** 106:10
**0213455** 111:5

**< 1 >**
**1** 3:5 10:23 11:3, 11 12:16, 22 19:17 31:15, 16, 20 32:1, 4, 14, 17 35:19 36:21 37:2, 7, 9 39:12, 19 40:7, 16, 24 46:6, 11, 16 144:1
**1/2** 70:15
**1:10** 113:6
**1:11** 113:7, 9
**1:13** 113:8
**1:21-cv-00238** 1:9 4:8
**1:24** 120:24 121:1
**1:33** 121:1, 3
**1:55** 141:16
**1:57** 142:11
**10** 3:5, 12 106:4, 9, 12
**10:00** 76:16
**102** 3:9
**103** 3:10
**104** 3:10, 11
**105** 3:11
**106** 3:12, 13
**107** 3:13
**108** 3:14
**109** 3:14, 15
**11** 3:5, 13 21:21

**106**:23 **107**:3, 6
**11:01** 52:24
**11:14** 52:24 53:3
**111** 3:15, 16
**112** 3:16
**1132** 125:4
**1135** 81:3 121:20 124:1
**1141** 83:7
**115** 3:16
**12** 3:13 19:17 107:16, 21, 24
**12:00** 76:20
**12:22** 94:5
**12:24** 94:6
**12:30** 76:18, 21
**12:40** 94:7, 10
**12:52** 101:25
**12:53** 102:1
**12:54** 102:4
**12:55** 102:1
**121** 3:4
**13** 3:14 108:9, 14, 17
**130** 3:5
**14** 3:14 105:21 109:3, 8, 11, 13 111:9
**15** 3:15 43:5, 6, 7, 12 107:8 109:21, 25 110:3, 5 112:6 130:1
**16** 3:15 31:2 67:2 104:10 108:1 111:1, 5, 8
**17** 3:16 67:2 72:17, 22 73:19 105:4 111:21 112:1, 4
**1700** 2:13
**17th** 143:19
**18** 3:16 67:2 115:14, 18 117:19 129:8
**18,000** 21:24
**185** 22:6
**19** 89:4 91:14
**1982** 19:4, 21
**1986** 19:4
**1D** 13:23
**1st** 22:13, 19

**< 2 >**
**2** 1:14 3:8 4:2 15:7 53:2 71:12, 22, 24

**72**:14, 15 **73**:5 **76**:7, 24 **144**:2 **145**:1
**20** 5:21 89:4 91:14 103:16 144:17
**200** 22:5
**2000** 20:3 43:4
**201** 2:13
**2011** 19:17, 18, 21, 22 22:12
**2013** 19:7
**2014** 26:23 27:8 130:1
**2015** 24:1 27:22 31:2 34:13, 15 35:16, 19 36:18 37:2 39:12, 19 40:6, 7, 16, 24 42:21 43:2, 9 67:2 90:2, 4, 8, 10 100:14 102:15 103:16 104:10 105:4, 21 106:14 107:8 108:1, 20 109:13 110:5 111:9 112:6 113:18
**2016** 36:1, 18 46:6, 11 88:3
**2017** 8:8 36:4 88:3
**2018** 36:4 69:25 88:3
**2019** 36:4 69:10 70:25 72:17, 22 73:19 78:8 79:16 83:14 87:12, 18 88:18 93:25 122:7 124:20 125:17 126:7
**2020** 24:2 25:9, 15 26:6 27:22 31:15, 16, 20 32:1, 4, 14, 17 35:16, 19 36:5, 21 37:3, 7, 9 39:13, 19 40:7, 17, 24 46:6, 11, 15, 16 88:19 90:15 93:17, 25 95:8, 9, 10 96:2 100:15 113:19, 24 114:5, 6, 11 116:13 119:13 120:10 129:12 130:10
**2023** 5:11
**2024** 1:14 4:2 5:11,

**21** 143:20 144:2
**2026** 143:25
**22** 22:18
**23** 22:13, 15, 19, 21
**24** 22:21
**24/7** 23:17, 22
**26** 68:9 116:12
**2623** 2:6
**27** 106:14
**28** 143:17
**29** 19:21

**< 3 >**
**3** 3:8 11:11, 13 16:20 70:15 71:18, 22 72:7, 20, 23 76:22 94:9 146:1
**30** 5:16, 18
**30(b)(1** 4:5
**362-8700** 2:14

**< 4 >**
**4** 3:9 17:15 77:18, 22 78:24 79:5 80:12, 15, 24 81:4 88:7 121:19
**41** 8:12
**43054** 8:6
**45202** 1:20 2:14
**45208** 2:6
**46** 21:20
**47** 21:20
**4B** 17:21
**4C** 17:25
**4E** 18:9

**< 5 >**
**5** 3:9 102:5, 9, 14
**5.6** 22:1
**50** 21:20
**500** 22:3
**511** 1:20
**513** 2:7, 14
**533-2701** 2:7

**< 6 >**
**6** 3:10 8:6 12:13, 23 103:7, 12 108:19 143:25

Case: 1:21-cv-00238-MRB Doc #: 66-4 Filed: 08/02/24 Page: 46 of 65 PAGEID #: 2937
Deposition of Nicholas Kevin Akins
Philip R. McHugh v. Fifth Third Bancorp, et al.

< 7 >
**7** 3:*4, 10* 104:*1, 6, 9*
**71** 3:*8*
**77** 3:*9*

< 8 >
**8** 3:*11* 104:*19, 24*
105:*2*
**8/26/60** 8:*14*
**8:00** 110:*18, 21*

< 9 >
**9** 3:*11* 105:*12, 16*
**9:39** 1:*14*
**9:42** 4:*3*

< A >
**a.m** 1:*14* 4:*3* 52:*24,*
*25* 76:*16* 110:*18, 21*
**abilities** 33:*19* 43:*13*
51:*9* 52:*17* 65:*11*
123:*13* 126:*25*
**ability** 125:*21* 126:*2*
127:*4* 128:*18*
**able** 23:*13, 15* 43:*19*
50:*21* 61:*24* 65:*17*
77:*24* 92:*4* 115:*22*
**absent** 36:*9, 10*
113:*13*
**absolutely** 66:*16*
**accentuated** 123:*12*
**accept** 118:*4, 22*
**accompanying** 38:*25*
**accurate** 144:*10*
**accurately** 113:*12*
**accustomed** 85:*13*
**acquire** 8:*22*
**acquired** 20:*3*
**action** 66:*7* 143:*15*
**actions** 25:*19* 77:*13*
98:*17*
**active** 24:*5* 75:*24*
**actively** 13:*7*
**activities** 38:*24*
41:*17* 42:*10* 44:*17,*
*23* 45:*14* 61:*19* 67:*7*
68:*4, 7, 8, 10, 15* 69:*7*
78:*17* 129:*2*

**activity** 42:*2* 85:*19*
117:*14*
**acumen** 48:*24*
**adaptability** 57:*19*
**adaptable** 23:*13*
**add** 64:*6* 135:*18*
**additional** 24:*6* 74:*3*
**additionally** 4:*18*
7:*19*
**address** 8:*5*
**adept** 122:*13*
**adeptly** 129:*4*
**ADJOURNED** 142:*11*
**admittedly** 44:*16*
**advance** 9:*18* 79:*5*
**AEP** 8:*24* 20:*2*
21:*16* 22:*2, 11, 17, 20,*
*23* 24:*3* 25:*4, 16*
26:*4, 12, 13, 15* 36:*12*
115:*3* 126:*3*
**AEPs** 114:*2*
**AEP's** 25:*10*
**affiliated** 143:*16*
**aforesaid** 143:*7*
**age** 5:*24* 6:*21*
127:*18, 22*
**agree** 126:*6*
**agreed** 5:*10* 6:*2*
116:*22*
**agreement** 9:*14*
**ahead** 6:*19* 7:*3, 25*
11:*17* 46:*24* 87:*2*
95:*21* 103:*6* 120:*2, 6*
**AK** 95:*12*
**AKINS** 1:*14* 3:*3*
4:*4* 6:*20* 7:*3, 5* 9:*13*
11:*2* 12:*11* 14:*21*
49:*21* 53:*5* 71:*21*
77:*21* 94:*12* 102:*8*
103:*11* 104:*5, 23*
105:*15* 106:*8* 107:*2,*
*20* 108:*13* 109:*7, 24*
111:*4, 25* 113:*23*
115:*17* 121:*5* 130:*19*
134:*6, 10, 18, 24*
141:*14* 142:*6* 143:*8,*
*11* 144:*19* 145:*24*
146:*24*
**al** 1:*10* 4:*6* 144:*4*

**Albany** 8:*6*
**allegations** 25:*9*
**alley** 61:*6*
**allow** 17:*4* 26:*17*
133:*20, 21, 22, 23*
**allowed** 134:*7*
**amended** 11:*8*
**American** 8:*25*
19:*11, 12, 15, 19, 23*
24:*4*
**analysis** 41:*15, 16, 22*
88:*9, 11* 91:*5, 13*
99:*10*
**analytics** 41:*23* 42:*9*
45:*21*
**and/or** 13:*4, 12, 13,*
*20, 21, 24* 14:*4, 5*
17:*19, 22* 18:*2, 3, 6,*
*11, 12* 51:*20* 58:*1, 14*
118:*9* 144:*11*
**and/selected** 17:*21*
**annual** 32:*18* 33:*1, 6*
35:*3* 37:*23* 38:*1*
**annually** 88:*1*
**another's** 136:*22*
**answer** 7:*14, 20, 25*
17:*4* 25:*22* 26:*17*
65:*6* 74:*2* 82:*2*
92:*21* 93:*3* 95:*20*
119:*16, 17* 120:*2, 13*
133:*4, 8, 11* 134:*8, 14,*
*19* 135:*11* 137:*20*
139:*3, 5*
**answered** 65:*5* 99:*1*
117:*9*
**answering** 133:*17*
**answers** 135:*10*
**anticipated** 119:*4*
**anybody** 56:*14*
114:*21* 117:*8* 119:*18*
**anyway** 52:*20*
**apart** 122:*5* 123:*14,*
*25* 124:*8* 125:*15*
127:*9* 131:*4*
**APPEARANCES** 2:*1*
**appeared** 86:*12*
100:*19*
**appears** 77:*25*
103:*21*

**appointment** 74:*23*
75:*11* 116:*1* 129:*13*
**approach** 123:*10*
**approached** 123:*15*
**appropriate** 59:*6*
95:*15* 126:*5, 22*
**approve** 73:*4*
**April** 105:*21*
**area** 43:*21* 51:*10, 12*
68:*12* 77:*15*
**areas** 34:*8, 10, 11*
52:*18* 60:*13* 128:*4, 9,*
*17*
**arguing** 138:*17*
**argumentative**
136:*15* 137:*18*
**arose** 54:*14*
**article** 25:*23*
**articulated** 124:*20*
**asked** 5:*8* 51:*24*
59:*3* 65:*5* 96:*9, 10*
99:*1* 114:*18* 117:*9*
131:*2*
**asking** 7:*12* 14:*20,*
*23* 21:*18* 27:*4, 23*
76:*4* 93:*10*
**asks** 15:*7* 17:*15*
**aspect** 17:*12* 96:*20*
**aspects** 45:*17* 122:*15*
128:*15*
**assess** 90:*4* 91:*22*
**assessed** 42:*21* 95:*17,*
*18* 96:*2*
**assessment** 88:*12, 15,*
*24* 89:*24* 90:*7, 15*
96:*23* 97:*9, 16* 98:*1,*
*22* 101:*13* 126:*6*
130:*22* 131:*11, 17*
132:*6, 11, 14* 135:*5*
138:*24* 139:*22* 140:*7,*
*22*
**assessments** 97:*22*
136:*1* 138:*6*
**assigned** 101:*2, 3*
**assignments** 100:*13*
**associated** 41:*9, 23*
61:*4*
**assume** 40:*25* 61:*14*
65:*17* 111:*20* 112:*16*

assumed 40:13
Assumes 28:18
attached 11:10
attend 35:6, 7, 15, 20
  39:9 40:11, 15 117:4
attendance 114:11
attendant 21:11
attended 36:8 39:14,
  20, 22 102:18 103:19
  104:13 105:6 106:17
  107:10, 13 108:3, 6,
  22 109:15, 19 110:7,
  11
attending 4:18 39:4,
  6
attention 125:4 129:7
Attorney 4:19
attorneys 4:9
attuned 122:15
audience 68:24
August 22:13, 15, 18
  26:6 69:10
authority 53:25
available 60:18
  135:7 137:24 138:2,
  4
Avenue 2:6
average 70:14
aware 58:11 69:10
  82:7 84:22, 25 86:11,
  19, 21 87:18 89:12,
  13, 14 141:1, 5

< B >
bachelor 18:24
Bachelor's 19:4
back 16:13 22:10
  25:3 29:4, 14 38:23
  53:1 63:11 65:13, 23
  70:20 71:15 72:14
  74:15 76:6 87:5
  90:2, 4, 20 94:8 98:9
  102:4 113:9 121:3
  135:24 136:24
backing 88:17
Bailey 4:19
balance 33:25 34:7
  38:20
BANCORP 1:10
  2:18 4:6 76:25 77:3,

4 102:14 103:16
  104:10 105:20
  106:14 107:8 108:1,
  19 109:13 110:5
  111:10 112:5 116:1
  144:4
Bank 4:16, 17 9:12
  10:10, 20 14:15
  27:12, 13, 20, 25
  30:12 31:20, 22 34:5
  39:16 40:3 43:11, 16
  44:4, 5, 10, 17, 21
  45:2, 3, 14, 17, 20, 25
  46:4 47:15 48:10, 20,
  23 51:10, 12, 17
  52:15, 16, 18 53:12
  54:6, 8, 13, 15, 16, 25
  55:5, 6, 18, 24 56:2, 6,
  7 57:11 58:1, 11, 14,
  20 59:1, 8, 17, 18
  60:1, 2, 4, 13, 15, 20
  61:23 62:2 64:3
  65:4, 11 66:4, 15
  69:17 70:21 71:3
  72:22 75:5, 6 76:1,
  23 77:3, 5, 14, 16
  94:19 95:19 98:25
  99:13 105:3, 20
  106:14 108:19
  123:21 128:5, 21
  129:14, 16, 24 130:6,
  8, 12 135:8 136:5
  141:1
banking 48:22 54:4,
  18 66:9 70:16 118:5
  122:15 123:12, 16
  128:12, 13, 19, 21
bankruptcy 8:21, 23
base 45:22 55:12
  97:10 98:23 136:8,
  13
based 42:16 46:1
  47:11 54:21 58:21
  59:8, 11, 23 64:9, 17
  101:10 120:8 123:2,
  7, 8 124:22 126:9
  127:10 128:2 137:23,
  24 138:1
basically 85:3

basis 25:2 47:9
  58:16, 20 60:20
Bates 72:8, 11 77:22
  102:9 111:5 115:18
began 26:6
beginning 9:11 25:15
begins 11:11 73:8
behalf 2:1, 8 4:11,
  13, 15
believe 10:1 19:7
  25:7 26:8 29:22
  40:9 43:7 61:4 63:7
  72:24 74:15 89:4
  95:7 118:2, 10
Ben 37:14
benefit 20:13, 18
best 46:3 61:1 86:9
beyond 5:1 25:21
  26:16
big 54:15
bill 44:24 48:9
  65:12 75:22
billion 21:20
birth 8:13
Blank 2:12 4:16
blocks 83:22
board 9:18 10:1, 16
  14:16 19:5 24:3, 4, 6,
  10, 11 26:12, 14
  28:10, 11, 13 29:16,
  17, 22 31:9 32:2, 11,
  21 33:18 34:5, 13, 22,
  23 35:11, 25 36:12,
  20, 23, 24 37:2, 5, 12,
  13, 20 38:23, 25 39:4,
  6, 7, 14, 15, 20 40:12,
  15, 23 41:20 42:9, 12,
  16, 17 43:24 45:15
  46:17, 21, 22 47:3, 11,
  17, 23 48:6, 25 49:4,
  14, 15, 18 50:6, 12
  51:14, 19 52:7 53:23
  54:9, 20 55:2, 9, 16
  56:12 57:4, 8, 10, 12,
  13, 14, 16, 17, 20, 24
  58:2, 5 59:4, 12, 13,
  15 60:16 61:14
  62:22, 25 63:23 64:8,
  11, 13, 16, 18, 23 65:2,
  18, 25 66:2, 12, 19, 23

67:8, 15, 18, 22 68:8
  69:19 70:4, 25 71:6
  72:16, 21 73:4 78:5,
  8 79:6 80:10, 17, 18,
  20 81:10 82:5 83:14
  84:17, 20, 23 85:22,
  23 86:10 87:23 88:7
  89:1, 2, 10, 11 90:13,
  18 91:3, 6, 23 93:12,
  15, 17 94:16, 24
  95:13 96:9, 10, 12, 14,
  24, 25 97:5, 6, 14
  98:5, 23 99:4, 5, 6, 19
  100:1, 6, 20 101:7, 12
  102:13 104:9 105:2
  106:13 107:7, 25
  108:18 109:12 110:4
  111:9 112:5 113:24
  114:16 115:9, 25
  116:16, 20, 25 117:13,
  23 118:1 120:17
  121:5 122:4, 23, 24
  123:3, 7 124:1, 23
  126:9 127:10, 17
  130:21 131:10 132:5,
  15 135:3, 25 136:20
  137:22 138:6, 23
  139:21 140:11, 15
boards 24:2, 7, 9, 12
  25:1 42:4 44:14
  48:1 62:12
board's 50:20 57:15
  90:22 127:22
Boardvantage 115:11
  116:6
Bob 30:21 79:22
  80:1 117:25 118:8
  119:12 120:9
bode 126:1
books 14:15
bottom 71:25 72:8
box 121:25 124:4
  125:11 126:15
branches 20:23
break 7:23, 25 8:2
breathing 85:1
Brian 2:18 4:17
  84:14
bring 75:15 125:23

bringing 131:*20*
brings 6:*16*
broad 51:*12* 127:*1*
broken 34:*1* 38:*20*
brought 37:*13* 41:*22*
42:*7* 76:2 129:*18, 20*
bus 48:*11*
business 20:*21* 24:*19,*
*20, 23* 30:*13* 39:*16*
118:*4*

< C >
call 28:*3* 89:*17*
102:*22*
called 25:*17* 38:*7*
call-in 35:*23*
calls 28:*15* 30:*9*
136:*16* 137:*18*
candidate 47:*5*
64:*25* 65:*7, 8, 24*
66:*4, 25* 71:*2, 11*
73:*14, 24* 74:*24*
75:*12, 15* 94:*18*
96:*13, 15* 97:*13, 14*
candidates 13:*13, 20,*
*24* 14:*4* 17:*22* 18:*2,*
*6, 11* 42:*5* 43:*2, 10*
50:*15* 55:*21* 73:*10,*
*12, 17* 74:*4, 9, 18, 22*
75:*3, 8* 87:*13* 96:*11*
97:*13*
canned 61:*10*
cap 21:*18, 19*
capabilities 74:*22*
75:*8*
capable 41:*23*
capital 77:*25*
cap's 21:*20*
Caption 144:*3*
captioned 121:*25*
125:*11* 144:*8*
card 121:*21*
Carmichael 26:*21, 25*
27:*3, 11* 28:*8, 10, 16*
29:*3, 12, 16* 30:*4*
40:*19, 20* 41:*1* 42:*21*
44:*24* 46:*7, 12, 21*
47:*2, 22* 49:*15* 51:*1,*
*20* 53:*11* 56:*8* 58:*12*
63:*8, 9, 17, 25* 67:*14,*

*24* 68:*15* 69:*11* 73:*9,*
*18* 74:*17* 80:*7* 89:*25*
91:*24* 96:*4* 98:*24*
101:*17* 115:*7* 117:*22*
118:*9* 119:*1, 12*
120:*9* 127:*23* 131:*11,*
*18* 132:*4* 135:*6*
138:*10* 139:*23* 140:*8*
Carmichael's 48:*5*
92:*23* 127:*17* 130:*24,*
*25* 132:*14* 136:*2*
138:*25*
Carolina 110:*18*
carry 60:*11*
CASE 1:*9* 4:*5, 8*
8:*21, 24* 9:*1, 8, 19*
10:*10* 16:*12, 25* 17:*4,*
*13* 26:*17* 56:*1* 64:*22*
67:*13* 76:*4* 86:*9*
144:*3*
cases 42:*4* 44:*7*
48:*16*
casual 61:*10* 100:*5, 8*
category 13:*16*
15:*11* 17:*18* 81:*14*
cell 31:*11* 32:*9*
Center 1:*14* 2:*13*
Central 20:*2, 3*
CEO 9:*1* 13:*4, 14,*
*21, 24* 14:*5* 17:*19, 22*
18:*3, 6, 12* 19:*14*
20:*10, 13* 21:*13*
22:*16, 17, 18, 20, 23*
23:*5, 6* 24:*5* 26:*12,*
*15* 27:*6, 11, 13, 18, 20,*
*24* 28:*1* 30:*6, 7* 40:*4,*
*18, 25* 41:*2, 4, 10, 12,*
*13, 24* 42:*6, 15, 17, 22*
43:*3, 10, 13, 16, 19, 20,*
*24* 44:*1, 2, 3, 8, 15, 19*
45:*11* 46:*1, 8, 13*
47:*4, 7, 17, 18, 20*
48:*7, 13, 20* 50:*16*
51:*17, 20* 52:*5, 9, 11*
53:*11, 23* 54:*11, 13,*
*24* 55:*6, 8, 9, 11, 13,*
*21* 56:*7, 22, 25* 57:*4,*
*7, 10, 14, 15, 22* 58:*1,*
*10, 14, 19, 24* 59:*6, 7,*
*8* 60:*1, 20, 22, 24*

61:*11* 62:*5, 9, 13, 17,*
*19* 64:*3, 6, 9, 11, 12,*
*25* 65:*4, 21* 66:*4, 17,*
*18* 67:*13, 21* 68:*9, 22*
69:*19* 70:*6, 12, 13, 14,*
*18, 23* 71:*2, 10* 74:*6*
75:*23, 24* 79:*13*
81:*21, 23* 82:*3, 19*
83:*2, 9, 10, 21, 25*
84:*2, 3, 6, 8, 20, 23*
85:*2, 9, 19, 20* 86:*2, 4,*
*11, 20* 87:*8, 19* 88:*4,*
*8* 94:*13, 19* 95:*18*
96:*2* 98:*25* 100:*20*
101:*10, 15* 122:*11, 18*
123:*22, 24* 124:*8*
127:*24* 129:*2* 130:*3*
135:*8, 16* 136:*4*
137:*21*
CEOs 75:*5*
certain 25:*9* 35:*15*
certainly 20:*17* 34:*7*
41:*16, 17* 43:*9* 48:*25*
50:*5, 11* 51:*15* 52:*20*
55:*15* 57:*18* 58:*5*
59:*14* 60:*6* 61:*12*
69:*22* 81:*19* 122:*13*
123:*15* 126:*24*
128:*14* 129:*19*
137:*22*
certified 6:*22*
certify 143:*6*
CFO 43:*21* 57:*3*
73:*21*
chair 8:*25* 22:*20*
24:*10* 27:*14*
chaired 24:*23*
Chairman 19:*14*
22:*9* 66:*19*
challenges 74:*23*
75:*11*
chance 69:*11* 70:*21,*
*22*
change 48:*2, 3* 80:*20*
85:*2, 8* 124:*16* 127:*3*
145:*4, 7, 10, 13, 16, 19,*
*22* 146:*4, 7, 10, 13, 16,*
*19, 22*
changed 22:*14* 79:*20*

changes 61:*8* 80:*17*
82:*5* 84:*20* 85:*21*
144:*11, 14*
characterize 44:*18*
charitable 24:*25*
chart 79:*18* 84:*4*
chatter 122:*24*
chief 62:*1, 4, 7* 73:*11*
78:*18* 80:*2* 81:*20*
82:*3* 125:*24*
choosing 87:*17*
chosen 46:*1*
CHRO 82:*19* 83:*3*
84:*6*
Cincinnati 1:*20* 2:*6,*
*14* 143:*19*
Cioffi 2:*8* 3:*4* 4:*15,*
*16, 23* 6:*18* 9:*9* 12:*2,*
*17* 14:*13, 23* 15:*3, 22*
17:*1* 20:*15* 25:*21*
26:*16* 27:*21* 28:*18*
29:*21* 49:*17* 53:*14,*
*16* 65:*5* 71:*17* 74:*1*
91:*16* 92:*10, 14, 20,*
*25* 93:*9* 99:*1* 103:*3*
112:*18* 113:*1, 4, 16,*
*20* 114:*24* 117:*9*
119:*15, 17, 23* 120:*3,*
*12* 121:*12, 18* 125:*3*
126:*14* 127:*15*
130:*16* 131:*2* 133:*4,*
*7, 10, 13, 17, 20, 22, 25*
134:*3, 7, 11, 14, 19, 22,*
*25* 135:*9* 136:*15*
137:*11, 13* 138:*13*
139:*2* 141:*12, 17, 19*
142:*2*
Cioffi's 132:*9*
136:*24* 137:*6*
circulated 116:*4*
civil 5:*2* 143:*17*
claim 26:*4*
claims 26:*5*
clarification 49:*22*
76:*22* 77:*7*
clarify 30:*2* 47:*1*
clear 5:*6* 11:*19*
15:*3, 14* 23:*21* 29:*25*
34:*25* 49:*7* 80:*5, 23*

89:*23* 97:*5* 123:*5*
129:*5* 138:*17*
**cleared** 41:*2*
**clearer** 7:*22*
**clearly** 48:*19* 128:*2,
16*
**close** 83:*14*
**college** 19:*24*
**Collin** 2:*11* 4:*16*
**Collin.hart@blankrom
e.com** 2:*15*
**Columbus** 25:*16, 24*
**come** 44:*15* 64:*19*
85:*14, 15* 86:*8* 97:*21*
116:*21* 117:*12*
124:*20*
**comes** 42:*17* 67:*2, 3*
86:*2*
**comfortable** 69:*18*
91:*4, 6* 96:*11, 12, 14*
97:*7* 98:*6, 13, 15*
127:*2*
**coming** 117:*11, 17*
**Commencing** 1:*14*
**comment** 23:*8, 9*
68:*11* 85:*25*
**commented** 74:*17*
**comments** 48:*5*
69:*23* 85:*25* 87:*15*
96:*7* 101:*17* 130:*25*
131:*11, 18* 132:*4, 14*
135:*5* 136:*2* 138:*10,
25* 139:*22* 140:*8*
**Commission** 143:*24*
**commissioned** 143:*5*
**commitment** 23:*10*
**committed** 70:*4*
**committee** 27:*15, 16*
28:*4* 29:*7* 30:*11*
34:*21* 39:*9, 25* 40:*6,
11, 15, 23* 110:*20*
121:*6* 141:*3*
**communicate** 15:*15*
29:*5, 8, 11, 15* 31:*6,
11* 32:*3, 8* 37:*1*
57:*24* 68:*22* 93:*21*
94:*16* 128:*18* 129:*5*
**communicated** 17:*8*
57:*9, 13* 69:*15*

**communicating** 31:*8*
58:*12*
**communication** 16:*3,
5, 11, 14*
**communications**
12:*25* 13:*8* 15:*8, 11,
15* 16:*15, 17, 20, 23*
17:*11* 28:*17* 29:*2, 19,
24* 30:*3, 5, 17* 58:*4*
114:*16* 140:*9*
**communicative**
122:*13*
**companies** 44:*13*
**company** 8:*21* 20:*1,
5, 14, 19, 24* 21:*1, 7*
22:*5* 23:*5, 6* 31:*24*
33:*17* 44:*12, 25* 45:*6*
46:*1, 2, 5* 50:*16*
55:*15* 62:*7, 10, 11, 20*
75:*23* 77:*5* 118:*5, 14,
24* 119:*8* 123:*8, 9*
126:*1*
**company's** 9:*1*
**compared** 76:*23*
**comparison** 23:*1*
65:*9*
**competition** 45:*23*
**competitive** 60:*3*
123:*11*
**completed** 84:*3*
**completely** 6:*6* 91:*6*
**completing** 70:*19*
**complex** 5:*25*
**compound** 137:*14*
**concern** 5:*13*
**concerned** 57:*18*
**concerning** 115:*25*
121:*22*
**concise** 129:*5*
**conclusion** 59:*22*
**condition** 47:*12*
55:*24* 126:*3*
**conditions** 46:*2*
52:*12* 123:*8*
**conducted** 100:*2*
**conduit** 64:*11*
**conference** 5:*21*
102:*21*
**conferences** 5:*10*

129:*1*
**confident** 51:*9*
**confine** 17:*3*
**confirm** 113:*17*
**confirmed** 90:*16*
**confirming** 113:*10*
**conflicted** 35:*11*
36:*12*
**Connie** 1:*22*
**consent** 115:*25*
116:*4, 8, 12, 16, 21*
117:*8, 17* 129:*9, 11*
**consider** 57:*10*
**considered** 54:*12, 24*
55:*2, 3, 5* 56:*6, 14*
57:*25* 58:*7, 10, 13*
71:*10* 74:*19* 94:*21*
**considering** 50:*11*
**consistency** 101:*1*
**consistent** 50:*18*
61:*13* 90:*21* 117:*13*
**constant** 122:*17*
**constantly** 23:*19*
**constitute** 70:*13*
**constructive** 69:*2*
**consultant** 41:*22*
42:*7, 20* 43:*1* 88:*9,
11*
**consultants** 41:*15, 18,
19*
**consumer** 31:*22*
34:*5* 118:*4*
**consuming** 25:*4*
**contact** 114:*15*
**contacts** 52:*13* 60:*7*
123:*17* 128:*11*
**content** 9:*23, 24*
**context** 47:*8, 19*
93:*10*
**continue** 45:*4, 23*
47:*14* 121:*13* 127:*6*
**continued** 67:*12*
121:*10* 141:*10*
**continues** 65:*22*
**continuing** 141:*12*
**contract** 143:*17*
**contributed** 25:*16*
**convening** 53:*25*
56:*12*

**conversation** 48:*8*
58:*23* 60:*12* 61:*9, 10*
69:*19* 95:*14* 96:*5, 8*
115:*6* 119:*10*
**conversations** 9:*20*
10:*14, 16, 19* 28:*8*
48:*25* 67:*22* 69:*20*
94:*25* 96:*25* 117:*7*
118:*8*
**copy** 142:*1*
**corner** 125:*5*
**Corporation** 20:*2*
**Correct** 14:*25* 21:*9*
23:*17, 21* 25:*5, 11, 20*
26:*4* 27:*8, 25* 29:*20*
31:*17* 33:*23* 35:*21*
39:*1* 40:*8* 46:*16*
47:*4* 49:*16* 53:*7*
62:*22, 25* 63:*2, 5, 8*
72:*5, 6, 12* 76:*9, 25*
77:*1, 12* 79:*6, 7* 80:*7*
81:*11, 12, 15* 83:*8, 10,
14, 20, 25* 84:*9, 10, 12,
13, 15, 19* 86:*17*
87:*22* 88:*12* 95:*5*
97:*16* 98:*1* 99:*24*
101:*18* 102:*11, 12, 15,
19, 22, 23* 103:*1, 2, 13,
14, 17, 18, 20, 24, 25*
104:*7, 8, 11, 14, 17, 18,
25* 105:*1, 4, 5, 11, 17,
21, 22* 106:*2, 3, 10, 11,
15, 16, 22* 107:*4, 5, 8,
9, 11, 14, 15, 22, 23*
108:*1, 2, 4, 8, 15, 16,
21, 23, 24* 109:*2, 9, 10,
13, 14, 16, 20* 110:*1, 2*
111:*6, 11, 13, 19*
112:*2, 3, 6, 9, 12, 13*
113:*15, 19, 20, 25*
115:*20* 116:*10, 14*
117:*23* 119:*21*
121:*23, 24* 124:*21*
130:*13, 23* 131:*6, 12,
14, 18, 25* 132:*1, 7, 15,
21* 136:*12* 138:*6, 7, 8,
9, 11* 139:*1, 12, 14, 17*
140:*5, 13, 16, 17, 18,
23, 24*
**corrections** 144:*11*

correspondence
15:*15*  16:*6*
counsel   6:*1*  9:*6*, *10*
11:*23*  12:*4*, *18*  14:*13*
43:*22*  93:*2*  112:*18*
133:*4*, *13*  134:*22*, *25*
143:*12*, *14*
count   35:*4*
country   21:*22*
COUNTY   143:*3*
couple   5:*10*  9:*20*
99:*2*  121:*15*
course   25:*6*  42:*12*
78:*16*  99:*9*  101:*15*
COURT   1:*2*  4:*7*, *20*
5:*5*, *15*, *17*, *19*, *20*, *21*
7:*13*  121:*14*  141:*17*,
*20*, *23*, *25*  143:*16*
cover   132:*18*
COVID   35:*12*, *22*
123:*12*
created   17:*16*  74:*23*
75:*11*
creates   141:*7*
creating   130:*11*
crescendos   55:*12*
crisis   44:*16*
criteria   46:*3*
critical   68:*6*
criticisms   34:*9*  67:*25*
68:*3*  84:*23*  87:*7*, *11*
CRR   1:*20*  143:*4*, *24*
cultural   122:*18*
current   82:*21*  126:*18*
currently   22:*2*
customer   33:*11*
38:*14*
customers   21:*25*
cut   46:*24*

< D >
dark   25:*18*
data   131:*17*  132:*24*
Date   1:*14*  8:*13*  65:*1*
97:*8*  142:*8*  144:*2*
dated   72:*17*  107:*8*
110:*5*  116:*12*
dates   35:*18*
day   23:*14*  34:*22*, *23*

143:*20*  144:*16*
days   34:*20*
deadline   98:*11*
dealing   61:*7*, *8*
128:*14*
dealt   77:*13*, *16*  90:*6*
December   5:*11*
32:*23*  70:*25*  72:*17*,
*22*  73:*19*  78:*4*, *8*
79:*16*  83:*14*  87:*12*,
*18*  93:*18*  111:*9*
112:*6*  113:*18*  122:*7*
125:*17*  126:*7*  143:*25*
decide   64:*9*  121:*14*
135:*7*  136:*3*
decided   50:*14*  97:*14*
118:*3*, *22*
decides   41:*1*  43:*24*
95:*13*  135:*16*
deciding   119:*4*
decision   5:*14*  64:*5*
101:*11*  122:*21*
127:*18*  130:*10*  136:*9*,
*14*, *21*  137:*1*, *23*
138:*1*
decision-making   5:*15*
decisions   137:*24*
deck   33:*21*  38:*7*
78:*3*, *8*, *19*, *23*, *25*
79:*4*, *8*  80:*11*, *15*, *18*
85:*5*, *6*, *11*  88:*7*
130:*22*  131:*4*, *5*, *9*
132:*6*, *10*, *14*  135:*4*
136:*2*  137:*1*, *7*, *17*
138:*8*, *24*  139:*21*
140:*7*
decks   63:*5*, *24*  87:*25*
88:*3*  99:*23*  101:*13*
DECLARATION
144:*5*
declare   144:*6*
deep   60:*9*
defendant   4:*15*  5:*4*
9:*12*
Defendants   1:*11*  2:*8*
defendant's   4:*25*
defined   15:*8*  143:*17*
definition   16:*2*, *5*
deliberate   68:*23*
delivery   141:*23*

demanding   22:*23*
25:*3*
demeanor   60:*8*
departure   118:*19*, *25*
depending   100:*10*, *24*,
*25*
Depends   21:*17*
depict   113:*12*
Deponent   2:*8*
depose   143:*8*
deposed   6:*22*  8:*16*,
*23*  10:*2*, *11*
Deposition   1:*14*  4:*4*,
*5*, *24*  5:*4*, *5*, *7*  17  6:*8*,
*17*  7:*6*, *9*  9:*4*, *19*, *21*,
*23*  10:*15*  11:*7*, *9*, *24*
12:*13*  17:*14*  25:*8*
53:*2*  92:*12*, *18*, *19*, *23*,
*24*  94:*9*  134:*2*
142:*11*  143:*7*, *10*, *11*
144:*1*, *8*, *12*  145:*1*
146:*1*
depositions   5:*2*  6:*5*
8:*20*  9:*7*, *11*, *21*
25:*12*
depth   123:*15*
derivative   26:*5*
describe   9:*16*  26:*24*
31:*3*
described   117:*10*
description   79:*2*
desired   69:*12*
detail   50:*2*  122:*14*
detailed   41:*14*
details   16:*12*  49:*1*
118:*18*
determination   42:*6*
58:*18*  59:*10*, *11*  96:*3*,
*21*  98:*23*  127:*23*
determinations
130:*20*
determine   40:*22*
42:*18*  54:*9*  58:*22*
60:*18*  64:*2*  66:*2*
101:*4*
determined   40:*14*
47:*17*  65:*2*  66:*24*
71:*1*  81:*9*
determining   132:*20*

develop   48:*18*  71:*9*
127:*6*
developed   55:*20*
122:*20*
developing   50:*4*
130:*8*
Development   13:*23*
18:*5*  46:*19*  47:*6*
48:*4*, *16*  49:*5*  50:*7*
52:*21*  55:*10*  56:*1*
57:*21*  59:*20*  61:*16*,
*18*, *19*  64:*24*  66:*13*,
*14*  67:*12*  68:*4*, *6*, *8*,
*10*, *14*  69:*1*, *2*  71:*8*
73:*14*  78:*17*
developmental   41:*9*,
*17*  65:*21*  67:*6*  68:*7*
69:*7*  78:*20*  98:*17*
develops   55:*25*
difference   54:*15*
different   20:*23*
22:*25*  23:*7*, *16*  24:*2*
31:*23*  34:*18*  42:*15*
44:*2*  50:*4*  52:*10*
61:*22*, *23*  63:*14*
83:*22*  100:*21*, *24*
133:*9*
differently   54:*20*
difficult   59:*19*
digital   48:*22*
Diligent   115:*13*
116:*5*
dinner   39:*8*  78:*12*
91:*10*  96:*1*  100:*6*
101:*2*  110:*13*, *20*, *22*
dinners   28:*12*  38:*25*
99:*6*  100:*1*, *16*  101:*7*,
*12*  140:*12*
direct   32:*15*  37:*10*,
*18*  50:*2*  125:*4*  129:*7*
directed   12:*12*
direction   44:*4*
directly   29:*15*  31:*6*
90:*6*  93:*21*
director   5:*3*  6:*4*
13:*1*  14:*3*  18:*10*
30:*8*  74:*16*
directors   5:*8*  72:*16*,
*21*  76:*7*  102:*14*
104:*9*  105:*3*, *21*

106:*13* 107:*7, 25*
108:*18* 109:*12* 110:*4*
111:*9* 112:*5*
**director's** 86:*3*
**disagree** 6:*6, 15*
**disagreements** 85:*17*
**disclosure** 15:*16* 16:*7*
**discoverable** 15:*24*
17:*3*
**discovery** 25:*22*
26:*17*
**discuss** 46:*7, 12*
51:*18* 118:*25* 127:*18*
**discussed** 47:*3* 73:*13,*
*18* 91:*22* 96:*1*
101:*17* 118:*1* 120:*17*
132:*19*
**discussing** 73:*23* 95:*9*
**discussion** 5:*24* 6:*9*
46:*17, 20, 21* 47:*19*
56:*24* 57:*2* 60:*10*
66:*8* 74:*8, 21* 75:*7,*
*10, 14* 78:*17* 85:*24*
90:*17, 19, 23, 24* 91:*3,*
*8* 95:*16* 97:*12* 98:*15*
116:*15, 19, 20*
**discussions** 34:*4*
67:*4* 68:*3* 74:*12*
80:*19* 120:*15* 122:*22*
123:*2* 124:*22* 126:*9*
127:*11, 16*
**Dispatch** 25:*16, 24*
**distinction** 43:*17, 18*
87:*16*
**DISTRICT** 1:*2, 3* 4:*7*
**diversity** 64:*18*
**DIVISION** 1:*4* 4:*8*
**divisions** 33:*15, 23*
34:*1* 38:*17, 21*
**document** 11:*4, 6, 16,*
*22* 12:*14* 15:*18* 16:*6,*
*9* 72:*18* 77:*24* 78:*2,*
*10* 86:*13, 22* 122:*6*
124:*1, 9* 125:*8, 15, 16*
126:*11, 22* 127:*10*
**documentation** 37:*25*
88:*8* 92:*8*
**documented** 67:*15*
**documents** 9:*16*
11:*10, 23, 24* 12:*3, 8,*

*22* 13:*15* 14:*7, 10, 14,*
*21, 24* 17:*15, 20, 24*
18:*4, 17, 20, 21* 71:*21*
85:*1* 93:*7* 103:*3*
112:*20* 115:*22* 116:*2*
**doghouse** 44:*19*
**doing** 30:*7, 9* 33:*17*
34:*5, 6, 8, 10* 37:*14*
51:*7* 52:*4* 62:*15*
70:*7* 91:*13* 112:*18*
133:*25*
**dont** 37:*14*
**doubt** 64:*23*
**downplaying** 61:*18*
**draft** 86:*15*
**drafts** 80:*14* 86:*7, 11,*
*14*
**drawing** 99:*11*
**duly** 6:*21* 143:*5, 8*
**duties** 27:*11*

**< E >**
**earlier** 12:*6* 36:*2*
42:*11* 54:*14* 55:*3*
58:*25* 63:*7* 67:*5*
69:*12* 93:*1* 99:*24*
101:*18* 119:*6*
**earnest** 70:*6*
**East** 2:*13*
**Economy** 25:*17*
**Eddie** 47:*13* 125:*19*
**Edison** 24:*16*
**education** 18:*22*
**effective** 62:*1*
**efficient** 6:*14*
**eight** 130:*12*
**either** 12:*5* 36:*14*
42:*3* 86:*12* 89:*4, 16*
93:*18* 96:*11* 116:*5*
**Electric** 8:*25* 19:*11,*
*12, 16, 20, 23* 20:*1*
21:*22* 24:*4, 16*
**electrical** 18:*23, 24*
**electronically** 116:*7*
**Email** 2:*7, 15* 15:*18*
16:*9* 17:*9* 29:*12*
31:*12* 32:*9*
**emails** 29:*18*
**emergency** 43:*16, 18,*
*20* 44:*2, 8* 47:*9, 16*

48:*7* 54:*14* 55:*10, 24*
56:*22* 59:*7* 67:*13*
74:*12* 84:*16* 86:*24*
87:*8, 12, 14, 17* 94:*14*
**employed** 19:*8, 19*
**employee** 27:*12* 33:*8*
38:*11* 58:*9* 127:*7*
143:*13*
**employees** 10:*9, 20*
21:*23* 23:*8, 15* 50:*1*
70:*22* 121:*7*
**Empowering** 25:*17*
**encompassed** 28:*14*
**Energy** 24:*16* 25:*19*
**engagement** 33:*9*
38:*11*
**engineering** 18:*24, 25*
**enjoyed** 52:*3*
**ensure** 44:*22* 45:*4,*
*22* 46:*4*
**enterprise** 39:*24*
40:*6, 11, 15, 22* 54:*1*
121:*6* 127:*1* 141:*2*
**enterprise-wide** 62:*5*
**enters** 113:*21*
**entire** 65:*18* 144:*7*
**entirely** 135:*14*
**environment** 54:*4, 17*
60:*3* 100:*5, 8* 123:*21*
**Erie** 2:*6*
**ERRATA** 144:*1, 13*
145:*1* 146:*1*
**Especially** 58:*10*
**Esq** 2:*1, 4, 8, 11, 18*
**Essentially** 20:*5*
**established** 48:*13*
**estimate** 36:*2*
**et** 1:*10* 4:*6* 144:*4*
**evaluate** 131:*24*
137:*7*
**evaluates** 85:*20*
**evaluating** 52:*10*
**evaluation** 95:*3, 24*
**evenings** 100:*3*
**events** 28:*12* 29:*17*
**eventually** 26:*2*
66:*14* 82:*3* 84:*2*
121:*14* 127:*24*
**everybody** 62:*13*

68:*7, 10*
**evidence** 28:*19*
**evolved** 66:*10*
**exact** 42:*25* 66:*5*
129:*25*
**exactly** 69:*25* 74:*13*
75:*16, 18* 79:*12*
88:*16* 89:*13*
**Examination** 3:*4, 5*
7:*1* 121:*17* 130:*17*
**examined** 6:*22*
**example** 68:*19*
**exception** 35:*10*
**exchange** 15:*16* 16:*7*
**excluding** 140:*21*
**excuse** 8:*15* 10:*4*
19:*17* 22:*13, 21*
59:*10* 88:*14*
**executive** 22:*20, 25*
23:*3* 39:*17, 23* 40:*3*
41:*3, 5, 11, 21* 48:*1*
62:*15* 64:*14* 67:*17,*
*19* 69:*5* 73:*11* 78:*1,*
*13* 85:*15* 89:*1, 3*
91:*10, 21* 95:*25*
100:*4, 7* 120:*18*
132:*23*
**executives** 48:*17* 52:*1*
**Exhibit** 3:*5, 8, 9, 10,*
*11, 12, 13, 14, 15, 16*
10:*23* 11:*3, 11* 12:*16*
71:*12, 18, 24* 72:*7, 14,*
*15, 20, 23* 73:*5* 76:*7,*
*22, 24* 77:*18, 22*
78:*24* 79:*5* 80:*12, 15,*
*24* 81:*4* 88:*7* 102:*5,*
*9* 103:*7, 12* 104:*1, 6,*
*9, 19, 24* 105:*2, 12, 16*
106:*4, 9, 12, 23* 107:*3,*
*6, 16, 21, 24* 108:*9, 14,*
*17* 109:*3, 8, 11, 21, 24*
110:*3* 111:*1, 4, 8, 21*
112:*1, 4* 115:*14, 18*
117:*19* 121:*19* 129:*7*
**EXHIBITS** 3:*5* 71:*22*
**exist** 14:*17* 137:*17*
**existed** 55:*25*
**exists** 12:*8*
**exit** 14:*14*
**exits** 102:*3*

Case: 1:21-cv-00238-MRB Doc #: 66-4 Filed: 08/02/24 Page: 52 of 65 PAGEID #: 2943
Deposition of Nicholas Kevin Akins
Philip R. McHugh v. Fifth Third Bancorp, et al.

**Expand** 82:*21*
126:*18*, 25
**expect** 42:*14* 116:*21*
**experience** 33:*12*
38:*14* 51:*12* 52:*19*
54:22 59:25 61:*21*
64:*6*, *17* 86:7 99:*11*,
*12* 101:9 130:*23*
131:*13*, *14*, *21*, *24*
132:*16*, *19*, *20*, *22*
136:*18*
**experienced** 44:*12*
**experiences** 20:*20*
42:*14* 54:*4* 64:*19*
135:*13* 138:*12*
139:*24*, *25* 140:*3*
**experiential** 54:*14*
**expertise** 42:*1*
**expires** 143:*24*
**explain** 100:*1*
**explained** 8:*16*
**exposed** 68:*12*
**expressed** 124:*24*
**extent** 14:*14*, *17*
18:22 29:*19* 141:5
**external** 52:*11* 62:*12*
65:*24* 74:*4*, *8*, *18*, *23*
75:2, *11*, *15*
**externally** 46:*3*
**extremely** 45:*14*

**< F >**
**face** 45:*23*
**facilitate** 42:8
**fact** 5:*1*, *3* 28:20
62:6 67:*11* 100:*19*
118:*3* 124:*19*, *20*
127:22 130:*11*
**factor** 127:*18*, 22
**factors** 128:2
**facts** 14:2 18:9
28:*18* 137:*23* 138:*4*
**fair** 21:5 22:22
35:*14*, *18* 36:7 56:5
63:*15* 79:2
**falls** 74:*12* 75:24
98:*17*
**falter** 65:22
**Fame** 24:*11*
**fantastic** 62:*12*

**far** 33:*18* 57:*17*
65:8 66:*3*, *24* 94:*17*
125:2 127:*14*
**Farms** 8:6
**fashion** 68:*23* 116:7
129:5 140:*10*
**fast** 45:*11* 68:*21*
**fatal** 69:*1* 98:9
**faulty** 92:*3*
**favorable** 97:5
**February** 5:*21*
**feedback** 101:*15*
**feelings** 122:*19*
**feet** 23:*12* 49:*3*
68:*20* 129:*3*
**fellow** 122:22 124:*1*,
22 127:*10*
**felt** 43:*13* 52:7
59:*15* 60:*14* 61:*15*
65:7 71:7 96:*16*, *17*
98:6 125:*18* 126:*24*
128:2
**FIFTH** 1:*10*, *14* 2:*13*,
*18* 4:6, *15*, *17* 9:*12*
10:*9*, *20* 13:*1*, *4*, *14*,
*21*, *25* 14:5, *15* 17:*19*,
*23* 18:*3*, 7, *12* 19:6
24:*4*, *6* 27:*12*, *13*, *20*,
*24* 28:*10*, *11*, *12*
29:*16* 30:22 31:*20*
34:*13* 37:6 41:*4*
42:*20* 43:*3*, *10* 44:*14*
46:*8*, *13* 47:*4* 51:*20*
53:*12* 54:*11*, *25* 55:*4*,
6 56:7 57:*11* 58:*1*,
*11*, *14*, *20* 60:*20* 64:*3*
65:*4* 66:*4* 71:2 72:*1*,
5, 8, *11*, *17*, *21* 73:6
75:6, *25* 76:*23*, *24*
77:*3*, *4*, 5, 22, *23*
80:22 81:*4* 82:8
83:5, *16* 84:*4*, *21*, *24*
87:5, *19* 94:*19* 95:*19*
96:*18* 98:25 102:*9*,
*10*, *14* 103:*12*, *13*
104:6, 7, *10*, *24*, *25*
105:*3*, *16*, *20* 106:*9*,
*13*, *14* 107:*3*, *4*, 7, *21*,
22, *25* 108:*14*, *15*, *19*
109:8, 9, *12*, *25* 110:*4*

**far** 111:*5*, *10* 112:*1*, 2, 5
115:*19* 116:9 117:*20*
121:6 125:5 135:8
136:*4* 141:*1* 144:*4*
**fill** 48:*12* 56:*13*
**filled** 81:*10*
**filters** 86:5
**final** 13:*19* 18:*1*
98:7
**financial** 33:*14*
38:*16* 44:*15*
**fine** 68:*13* 97:*14*
114:*19*
**finish** 7:20 34:*23*
133:7, *14*, *20*, *21*, 22,
*23* 134:7, *14*, *15*, *19*
135:*10*
**finished** 110:22
133:8, *10*, *13*, *15*
**Fintech** 45:*18* 48:*21*
128:*15*
**Fintechs** 45:*24* 60:7
**firm** 143:*16*
**first** 6:*21* 12:25
13:*3* 17:*17* 19:5
25:*19* 26:*21* 27:8
30:*20* 34:22 36:*16*,
*19* 47:*23* 71:*24* 72:*1*,
8 76:6 89:8, *21*, *23*
121:*20* 128:*11* 143:8
**Firth** 103:*16*
**fit** 9:5 44:*24* 47:*15*
65:*12* 75:22 122:*18*
128:*4*
**fits** 44:5, 9 46:*3*
48:9 61:2 65:*10*
**five** 70:*17*, *24* 139:*18*,
*24*
**flaw** 69:*1* 98:9
**flexible** 124:*17*
**flight** 21:*11*
**fluent** 49:*1* 128:*12*
**fluid** 123:*18*
**focus** 41:*17* 55:8
61:*15* 71:8 96:*19*
128:5
**focused** 6:*3* 42:*1*
44:20 45:*1*, *16* 54:*3*
55:*10* 59:*16* 61:*17*,

*far* 20 64:*23* 65:*10* 98:8
99:*14* 125:25
**following** 5:*19*
110:*13*, *15*
**follows** 6:*23*
**footing** 70:*23*
**Forbes** 22:2
**foregoing** 143:*10*
**forgot** 42:*25* 79:*24*
93:*18*
**forgotten** 77:*14*
**form** 15:*19*, 22 16:*10*
17:*1* 29:*21* 65:*20*
92:*10* 137:*13*, *16*
138:*13*
**former** 8:*25* 137:*21*
**forth** 44:*14* 88:*4*
128:22
**Fortune** 22:5
**forward** 45:*3*, *11*
46:*4* 48:*19*, *24* 51:*17*
65:*12* 98:*16* 122:*12*
128:5
**foundation** 28:*19*
92:*11* 119:*15*, *24*
120:*12* 129:2
**four** 132:*3*, *12*, *13*
135:22 139:*14*, *17*, *18*
140:*1*
**fourth** 5:*3*
**Fox** 121:7
**frame** 27:*21*, *23*
69:*21* 88:*17* 91:*14*
**frames** 124:*16*, *19*
**frequency** 50:24
**frequent** 50:8
**frequently** 27:2, *19*
31:6, *25* 32:*3* 36:*21*
39:*13* 50:22 63:*12*,
*19* 101:6
**front** 62:9
**frontline** 23:*15*
**fundamentals** 45:*3*, *12*
**Further** 3:5 46:*19*
57:*21* 66:*13* 123:*12*
130:*16*, *17* 141:*13*
**future** 44:5 53:24
54:*13*, *17* 55:*19* 57:7,
*25* 60:2 64:25 65:*17*

Case: 1:21-cv-00238-MRB Doc #: 66-4 Filed: 08/02/24 Page: 53 of 65 PAGEID #: 2944
Deposition of Nicholas Kevin Akins
Philip R. McHugh v. Fifth Third Bancorp, et al.

99:*14* 122:*12* 123:*20*
126:*1* 127:*7*
**fuzzy** 90:*25*

**< G >**
**general** 43:*22* 65:*25*
68:*18* 114:*20*
**generally** 17:*7* 34:*21*
41:*11* 68:*25* 85:*12*
100:*10* 101:*3*
**genre** 64:*7*
**getting** 61:*20* 66:*14*
75:*16, 18* 101:*1*
**give** 39:*17* 48:*2*
49:*25* 50:*3, 17* 67:*6*
71:*8* 80:*24* 98:*12*
**given** 4:*25* 5:*3*
48:*19* 51:*16* 52:*18*
85:*3* 89:*16* 124:*17*
131:*3, 25* 143:*10*
**giving** 143:*7*
**glass** 23:*7*
**Global** 24:*16*
**go** 6:*19* 7:*3, 24*
11:*17* 22:*10* 29:*4*
41:*14* 46:*24* 52:*23*
58:*8* 60:*9* 65:*13*
78:*14, 19* 81:*20* 83:*4*
86:*5, 8* 91:*2* 94:*3*
95:*21* 101:*22* 103:*5,
6* 113:*2* 120:*2, 6, 23*
122:*14* 127:*4* 133:*23*
135:*22, 24* 139:*18*
**goal** 6:*11*
**goals** 33:*15* 38:*17*
41:*9*
**goes** 41:*6* 85:*21*
98:*8, 15*
**going** 6:*14* 7:*12, 15*
8:*23* 9:*16* 12:*17*
14:*13* 16:*13* 25:*3*
29:*14* 38:*23* 45:*19*
48:*24* 57:*14* 65:*11*
69:*13* 72:*14* 74:*1, 15*
87:*5* 91:*5* 98:*5*
135:*9, 12* 136:*24*
141:*20*
**good** 44:*17* 52:*4, 8*
53:*24, 25* 61:*5* 62:*15,*

16* 69:*6* 128:*22*
**gotten** 118:*22*
**governance** 27:*14, 15*
28:*3, 9* 29:*7* 30:*11*
**governor** 23:*14*
**gradually** 67:*4, 5*
**great** 56:*4* 70:*1*
118:*23* 119:*7* 122:*17*
126:*25* 127:*7* 128:*18*
**Greg** 26:*21, 25* 27:*3,
6, 10* 29:*3* 30:*5*
40:*20, 25* 42:*21*
44:*24* 45:*7* 46:*7, 12,
21, 23* 47:*2, 21, 22*
49:*5, 14, 25* 50:*13, 14*
51:*8, 13, 19* 52:*7, 19,
20* 53:*11* 55:*8, 15*
56:*7* 57:*5* 58:*12*
63:*8, 9, 17, 24* 66:*12,
19, 22* 67:*5, 14, 23*
68:*15* 69:*8, 11, 16*
70:*7* 75:*21* 76:*4*
78:*17* 91:*24, 25*
92:*23* 96:*4* 98:*24*
101:*17* 115:*6* 117:*22*
118:*9* 119:*1, 11, 12*
120:*9* 124:*17* 127:*16,
23* 130:*3, 24, 25*
131:*11*
**Greg's** 47:*19* 55:*10*
**ground** 65:*23* 128:*24*
**group** 25:*17*
**grow** 67:*5*
**guess** 69:*24* 80:*1*
88:*18* 95:*23*
**guy** 96:*16, 22*

**< H >**
**half** 112:*19*
**Hall** 24:*11*
**HAMILTON** 143:*3*
**hand** 143:*18*
**handed** 11:*2* 71:*21*
77:*21* 102:*8* 103:*11*
104:*5, 23* 105:*15*
106:*8* 107:*2, 20*
108:*13* 109:*7, 24*
111:*4, 25* 115:*17*
**happen** 26:*14* 50:*13*
77:*17* 140:*16*

**happened** 120:*22*
136:*7*
**happening** 60:*6*
**happens** 48:*10*
**happy** 112:*19*
**hard** 23:*4* 76:*3*
113:*4*
**Hart** 2:*11* 4:*16*
**HB6** 9:*2* 25:*11*
**head** 7:*15* 79:*13, 15*
118:*4*
**Health** 24:*10*
**hear** 121:*5*
**heard** 58:*4* 67:*10, 11*
70:*10*
**heavily** 21:*5*
**He'd** 39:*16*
**held** 77:*8* 105:*21*
**help** 42:*7* 126:*2*
**helped** 64:*1*
**hereinafter** 6:*22*
**hereof** 144:*13*
**hereunto** 143:*18*
**hey** 70:*1* 97:*2*
**high** 48:*17* 81:*14*
122:*1, 10* 131:*2*
137:*2, 8*
**Highgrove** 8:*6*
**hired** 129:*23* 130:*6*
**history** 21:*1, 7*
**hit** 123:*12* 128:*24*
**Hoffman** 37:*14*
**hold** 22:*18* 113:*5*
137:*11*
**holding** 77:*5*
**holds** 82:*2*
**hour** 112:*19*
**hours** 6:*10* 23:*4*
34:*20* 133:*24*
**house** 23:*7* 25:*10, 19*
**Householder** 25:*10,
20*
**huge** 43:*18*
**hugely** 56:*3*
**human** 77:*25* 78:*18*
79:*14, 15* 80:*2* 81:*20*
82:*4*

**< I >**
**idea** 101:*5*

**identification** 10:*24*
13:*20* 18:*2* 71:*13, 19*
77:*19* 102:*6* 103:*8*
104:*2, 20* 105:*13*
106:*5, 24* 107:*17*
108:*10* 109:*4, 22*
111:*2, 22* 115:*15*
**Identified** 13:*12*
17:*21* 41:*7* 86:*23*
87:*9* 88:*6* 132:*3, 4*
**identify** 23:*16* 50:*21*
72:*15, 20* 77:*24* 81:*7*
82:*11* 83:*17* 115:*22*
**identifying** 14:*3*
18:*10*
**Ihle-Adkins** 1:*22*
**imagine** 59:*4*
**impact** 48:*23*
**important** 44:*19*
45:*15* 52:*14* 60:*2, 7*
61:*11* 62:*11* 64:*15*
78:*15* 99:*7, 17*
123:*23* 128:*4* 135:*13*
**impressed** 97:*1, 2*
122:*25*
**impression** 59:*3*
124:*15*
**impressions** 66:*11*
**impressive** 123:*19*
**improve** 44:*21* 45:*2*
**include** 28:*15* 29:*18*
82:*21* 126:*19* 127:*3*
**included** 128:*7*
140:*13, 15*
**includes** 11:*9* 15:*23*
28:*12*
**including** 73:*12* 74:*7,
21* 91:*24, 25*
**income** 33:*25* 34:*7*
38:*19*
**incomplete** 138:*14*
**incredibly** 52:*14*
**independent** 57:*16,
17, 23* 64:*8* 67:*22*
122:*5* 124:*9* 125:*16*
126:*10, 21* 137:*16*
139:*25* 140:*3*
**indicate** 112:*21*
120:*16*

**indicated** 21:4 49:13
62:21 70:8 76:15
102:24 112:22
113:23 118:9 130:19
144:12
**indicates** 74:16 76:7,
8 84:7, 11 110:17
117:25 119:21
**indicating** 53:10
103:22 137:1
**indication** 83:24 84:1
**individual** 58:3
78:14, 20 81:8 82:12
85:16 120:15
**individually** 27:17
**individuals** 41:7
51:6 55:5 57:6
59:13 64:7 94:1
95:1 96:1 101:16
**industry** 21:5, 9
52:12, 13 54:18
70:15 75:22 122:16
123:17 128:12, 19
**industry-related**
24:12
**information** 5:24
15:16, 23 16:7 60:17
81:9, 13, 17 82:1, 6,
16, 25 85:10 98:13
101:10 114:15
115:24 131:24 132:2,
3 135:4, 6 136:5, 13,
19 138:25 139:8, 13
140:2, 6, 21 141:7
**informed** 117:5
**initial** 67:4 88:16
90:19, 23, 24
**initially** 65:20 81:18
82:18
**initiate** 70:6
**initiated** 73:9 98:3
**initiating** 75:20
**INPO** 24:17
**input** 64:16 130:20
135:2 138:1
**inputs** 64:5, 9 131:9,
16 132:20 136:21
138:22
**ins** 123:17

**Institute** 24:13, 15, 16,
17
**instruct** 74:1 92:20
135:9
**instructed** 93:4
**instruction** 9:10 93:2
**instructions** 8:3
**intended** 29:25
**interaction** 140:5
**interactions** 9:2
140:9
**interest** 143:14
**interested** 75:6
**interesting** 67:8
**interim** 47:17 79:24
**internal** 20:18 41:16
45:1 50:15 52:6
54:4, 7 55:18, 21
59:17 62:2 64:24
65:8 66:3, 25 71:11
94:18 96:18
**internally** 54:3 71:4
125:25
**interpretation** 42:13
**interrupting** 134:1, 3
**interview** 32:15
37:10 75:17
**introduce** 4:9
**introduced** 90:25
91:1
**introduction** 97:11
**introverted** 59:16
125:25
**investor** 129:1
**Investors** 23:9 52:11
61:7 128:24
**involved** 24:8 41:20
56:24 61:5 89:21
128:25 129:17
**involvement** 25:10
39:4 80:11 88:23, 25
141:2
**involving** 9:1
**Irrelevant** 17:3
**issue** 61:3 70:8
95:12
**issues** 17:4 23:19
25:7 76:1 121:11
128:13

**items** 137:5 139:17
**its** 70:21

< J >
**January** 19:17 22:12,
13, 19 31:15, 16, 20
32:1, 4, 14, 17 35:19
36:21 37:2, 7, 9
39:12, 19 40:7, 16, 24
46:6, 11, 16 102:14
103:16 113:18
**jms@sspfirm.com** 2:8
**job** 22:23 25:3 51:8
120:19 136:20
137:22
**jobs** 51:15
**joined** 129:16
**joint** 9:14 102:16
105:19 106:13
108:18
**Joshua** 2:4 4:13
**July** 1:14 4:2 25:8,
15 108:19 143:20
144:2
**June** 107:8 108:1

< K >
**Kabat** 44:15
**keep** 6:10 43:23
55:7 84:25
**keeping** 54:16 68:24
**kept** 100:22
**KEVIN** 1:14 3:3
6:20 44:15 45:7
55:8 142:6 143:7, 11
144:19 145:24
146:24
**key** 73:14
**kind** 23:5 42:1, 2
64:14 69:8 75:17, 19
83:22 85:21, 25
123:24 140:12
**kinds** 27:16 30:23
94:25 99:8
**knew** 48:20, 21 49:1,
5 51:25 62:2 117:11
119:13 120:9 125:22
**know** 7:24 11:17
23:4 26:18 33:19
37:14 40:14, 21 41:1

45:8, 10 47:13, 16, 20
50:6, 23 51:7, 9, 15
52:6 55:3 57:7, 12,
18 58:2, 6, 9 59:18,
19 60:11, 12 61:22
63:12 65:19 66:5, 12
67:9 68:3, 9, 11, 18,
21, 24 69:6, 20, 25
70:1, 17 71:6 74:10
75:16, 18, 21, 25
76:17 78:16 79:8, 12
80:9 81:18 82:1, 18
83:3 84:5 85:24
91:4, 12 95:20 96:24
98:4, 19, 21 99:8
100:22 110:22
117:13 119:3, 10, 16,
19 120:14 121:12
123:2 125:2, 24
127:14 128:21
129:23, 25 131:21
134:24 138:16 141:6
**knowing** 20:18
**knowledge** 42:16
45:22 54:7 57:12
92:13 128:13
**knowledgeable** 68:20
**known** 74:21 75:8
95:22
**knows** 64:13 92:11

< L >
**L.P.A** 2:5
**labeled** 25:18
**Lack** 28:19 92:11
119:15, 23 120:12
**Lamb** 84:14
**large** 21:16
**largest** 21:22
**Larry** 25:20
**latest** 48:2
**lawful** 6:21
**lead** 30:8 71:10, 11
86:3
**leader** 69:18
**leadership** 39:17
40:3 82:22 99:13
100:4 126:19
**leading** 117:14

Deposition of Nicholas Kevin Akins                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

learn 68:22
learner 122:17
leave 67:20
leaves 132:10
leaving 118:5, 14
led 26:2
left 79:25 118:24
  119:11
letter 117:22 119:21,
  22 120:8, 16
level 54:15 85:22
  122:14 123:24
levels 64:13
life 44:5, 9 45:6, 19,
  25 52:16 123:9
lifer 20:8, 11, 13
limit 5:1, 17
limitation 6:8, 13
limited 5:7, 12 6:2
lines 73:13
list 128:7 135:19
  139:18
listed 87:8 139:16
listen 90:13
lists 82:13
litigation 10:17, 21
  17:12 26:2
live 8:9 103:19
  104:13 105:23
  107:10 108:3 109:15
  110:7 111:12 113:14
  120:21
lived 8:7
living 85:1
LLP 2:12
logistics 27:16 30:12
long 8:7, 11 15:3
  19:19 22:9, 11, 16
  43:20 47:20 55:1, 11,
  13 69:17 70:5 76:16
  100:11
long-term 43:16, 24
  44:1, 3, 8 47:18, 20
  48:9, 20 56:22, 25
  57:10, 25 58:16, 20,
  24 59:6, 7 60:20
  70:12, 13 74:6 94:13
look 13:7, 10 47:11
  48:12 54:20, 21
  55:19 57:6 61:21

67:9 72:4 76:13
  78:14 79:17 87:14
  98:5, 10 121:19
  125:6 126:15, 25
  134:15
looked 9:5 52:21
  54:19 56:21
looking 23:8, 9 70:3,
  17 98:6, 14 99:24
  103:22 121:25
  122:12 123:7 124:4
  125:11 132:23
lot 44:7 48:16 49:3
  50:2 62:8 70:1 76:1
  85:2, 24 86:6 128:25
  129:1 132:23 137:24
Louisiana 19:2
lower 125:5

< M >
M&A 44:23 66:7
  128:16, 21
mail 15:18 16:9
major 39:16 46:3
making 20:13 55:23
  70:11 127:18 129:13
  130:8, 20 137:23
managed 34:1 38:21
management 31:22
  32:20, 22, 24 34:6
  41:6, 25 42:10 64:10,
  14 67:20 68:5, 19
  78:1 79:9, 10 90:9
  121:22 125:10 127:3
managing 34:11
manner 6:15
mannerism 23:8
March 104:10 105:4
mark 130:3
MARKED 3:5 10:23
  11:3 71:12, 18, 22
  77:18, 22 79:4 80:11,
  15 86:20 88:7 102:5,
  9 103:7, 12 104:1, 6,
  19, 23 105:12, 15
  106:4, 9, 23 107:3, 16,
  21 108:9, 14 109:3, 8,
  21 111:1, 21 112:1
  115:14, 18 116:9

market 21:18, 19, 20
  52:11 60:6, 7 82:22
  126:19 128:3
marketing 127:5
marketplace 61:8
married 8:11
Marsha 10:1, 3, 4
  89:16 92:18 114:18,
  22, 23 115:2, 5
master's 18:23 19:4
match 99:15 114:2
materials 9:5 33:5
  115:10
Matter 62:6 67:11
  99:18 100:19 144:8
matters 27:16 28:4
  29:7, 23 30:23
maximum 60:23
MCHUGH 1:7 2:18
  4:6, 12, 14 9:19
  10:10, 17, 20 14:8
  15:9 16:15, 18 18:15
  31:14, 25 32:4, 8, 12
  34:2, 10 39:14 40:5
  46:8 48:6 51:5, 19
  53:6, 10 54:9, 12, 23
  56:19 57:9, 13, 24
  58:12, 18, 25 60:16,
  18 64:1 65:2, 14
  67:10 76:11 82:12,
  13, 17 84:17 86:23
  87:8 101:6 102:3, 25
  103:23 104:16 105:9
  106:1, 20 107:13
  108:6, 25 109:18
  110:10 111:15
  112:14 113:21 118:2,
  10, 13 120:10 121:7
  126:23 138:15
  140:19, 23 144:3
McHugh's 31:19
  32:15, 18 33:1, 6, 8,
  11, 14 118:19, 25
  125:9, 17
mean 5:23, 25 15:15
  23:2 30:13 31:9
  33:16 34:4 35:22
  36:23 40:2 41:19
  44:9, 11, 25 50:5, 10
  51:7 52:20 53:17

54:20 55:1, 15, 19
  56:10, 11, 21 58:7
  62:17 64:8 67:3
  68:19 69:4 70:14
  74:6 79:10 81:19
  87:24 91:16 96:16
  98:7 100:25 114:18
  119:2, 3, 5, 6 120:14,
  18 123:19 127:7
  131:8 140:4
meaning 62:21 71:4
meaningless 139:6
means 16:6 39:25
meant 54:8 68:5, 6
measure 21:17
media 53:2 94:9
meet 25:1 26:21
  27:2, 6, 10, 14, 15, 19
  28:2 30:6, 20 31:25
  32:14 34:14, 19, 20
  36:16, 19, 22, 24 37:9
meeting 29:3, 17
  33:18 34:22, 23 35:3,
  9, 11 36:11, 12 38:24
  39:5, 6, 7 40:12, 23
  50:11 59:13 73:1, 3,
  4, 19 76:8, 12, 15, 16
  78:8, 11, 13 79:6
  80:18 81:10 83:14
  87:12 89:10, 11
  93:16, 17 95:9 97:4,
  8, 11, 25 99:5 100:7
  102:16, 17, 18 103:1,
  19, 24 104:13, 17
  105:3, 6, 10, 20, 23
  106:2, 13, 21 107:7,
  10, 14, 25 108:3, 7, 18,
  22 109:1, 12, 15, 19
  110:4, 7, 11, 14, 16, 17,
  21 111:9, 13, 16, 19
  112:5, 8, 12, 14
  114:14, 17 115:7, 10
  116:24, 25 117:3, 6
  118:2
meetings 10:2 28:8,
  9, 10, 11 29:17 34:5,
  21, 24 35:1, 6, 10, 13,
  15, 20, 24 36:8, 13, 24,
  25 37:2, 5, 12, 14, 20
  38:25 39:9, 14, 15, 20,

Case: 1:21-cv-00238-MRB Doc #: 66-4 Filed: 08/02/24 Page: 56 of 65 PAGEID #: 2947
Deposition of Nicholas Kevin Akins
Philip R. McHugh v. Fifth Third Bancorp, et al.

22 40:15 59:15
60:17 62:22 63:23
77:7 78:5 101:12
110:20 113:24 135:3
138:23
**member** 19:5 26:12,
14 42:12 58:6 64:8
67:9 80:10 84:17
90:13 93:12 94:16
96:25 122:4 136:20
137:22
**members** 9:18 10:17
40:6, 11, 14, 22 42:16
51:18 54:20 57:16,
17, 24 58:3 59:4, 12
61:14 64:9, 16, 18, 23
67:22 94:24 96:24
99:4, 19 100:20
114:16 116:16 121:6
122:23 123:3, 7
124:1, 23 126:10
127:10 141:2
**mention** 17:17
130:24
**mentioned** 10:11
29:2 135:20 136:11
139:11
**mentions** 13:2
**mentor** 30:8
**mentored** 66:22
**mentorship** 66:21
**message** 15:18 16:9
17:8
**messages** 28:16
29:18
**met** 27:8, 17 30:21
36:1, 23 49:3
**Michael** 2:8 4:16
6:6
**Michael.cioffi@blankr**
**ome.com** 2:15
**middle** 82:22 110:16
126:19 127:5
**midyear** 32:18 33:2,
6 37:23
**Mike** 141:25
**million** 22:1
**mind** 55:7 61:25
85:1 122:20 128:23
135:22

**minutes** 5:17, 18
72:16, 21, 25 73:3
76:15, 23, 24 77:11
102:14 103:15
104:10 105:2, 19
106:12 107:6, 24
108:18 109:11 110:3
111:8 112:4 113:12,
18 114:8
**Mischaracterizes**
49:17
**mischaracterizing**
138:16
**missed** 93:19
**missing** 136:22, 23,
25 137:5, 25 138:1
**Misstates** 137:15
**mix** 95:23
**moderate** 82:13, 17
125:12 126:4, 6
**Monday** 110:20
**money** 25:17, 18
**month** 92:4
**months** 94:15
**mother** 21:11
**move** 45:17 46:4
51:9, 11 60:25 61:24
68:21 78:16 118:16
125:20 126:25
128:20
**moved** 45:7
**moving** 45:3 51:17
61:23 62:16 70:3
98:16 128:5
**multiple** 55:21 96:11
97:13 125:21

< N >
**name** 7:4 42:25
48:19 56:23 79:24
111:20 112:16
**names** 56:16, 19
57:1 74:11 75:4
**name's** 76:14
**National** 77:5, 16
**naturally** 57:3
**nature** 25:3 30:2
69:13 123:16 128:16
**necessary** 123:10
**necessity** 20:17

**need** 7:14, 18, 23, 25
13:11 45:10 48:18
53:24 59:1 60:1
65:13 70:2 98:9
99:14 139:10
**needed** 44:25 51:16
70:5 99:13 123:22
**needs** 78:20
**negative** 87:15
**negatives** 67:25 68:2
**neither** 14:1 102:25
103:23 104:16 105:9
106:1, 20 107:13
108:6, 25 109:18
143:13
**never** 26:11 27:17
28:19 33:22 51:24
54:12, 24 55:2 57:10,
13, 14, 25 58:13, 23
59:5 65:3 67:10
69:15 70:7, 9, 21
100:25 119:10 136:6
**nevertheless** 65:24
**New** 8:6 30:7 69:18
70:18, 23
**news** 115:24
**NICHOLAS** 1:14
3:3 4:4 6:20 7:5
142:6 143:7, 11
144:19 145:24
146:24
**night** 100:25
**No._____Change**
145:2, 5, 8, 11, 14, 17,
20 146:2, 5, 8, 11, 14,
17, 20
**No._____Line** 145:2,
5, 8, 11, 14, 17, 20
146:2, 5, 8, 11, 14, 17,
20
**nodding** 7:15
**non-serious** 56:14
**noon** 76:18
**North** 110:17
**Notaries** 1:23
**notary** 143:5, 25
**note** 99:17 115:25
118:21
**notes** 49:2 60:11

**not-for-profit** 24:7, 9
44:13
**Notice** 1:14 11:9
117:12, 16 118:21
**notwithstanding** 7:15
77:10
**November** 19:17
**Nuclear** 24:13, 15, 18
**number** 5:2 11:3
12:22 15:7 16:20
17:15 21:23, 25 22:6
35:15, 20 72:14, 15
76:7 77:22 102:9
103:12 104:6, 24
105:16 106:9, 12
107:3, 6, 21, 24
108:14, 17 109:8, 11,
25 110:3 111:4, 8
112:1, 4 115:18
121:19 129:8

< O >
**oath** 144:15
**objected** 5:4
**objection** 4:25 9:9
15:22 17:1 20:15
25:21 26:16 27:21
28:18 29:21 49:17
53:16 65:5 91:16
92:10, 20, 25 93:9
99:1 117:9 119:15,
23 120:12 125:1
126:12 127:13
130:15 136:15
137:13, 19 138:13
139:2 141:12
**objective** 131:17
132:24 135:14, 19
**objectives** 49:4
**OBRT** 24:22
**observation** 101:12
**observations** 62:25
63:23 99:3, 4, 6
130:21 131:10, 17
132:5, 11, 15 135:3,
25 138:5, 15, 23
139:20 140:7, 14, 15
**observe** 32:12 37:6
**observed** 61:12 62:21

observing 64:6
99:12 132:22
obtain 19:1, 3
obtained 17:16
obvious 130:5
obviously 24:3 33:17
35:12 119:12 120:8,
22 125:22 130:5
occasion 31:10
occasionally 30:6, 9
35:10 50:2, 3, 17, 22
63:13 67:6 69:9
occasions 36:11
occur 47:24 48:6
140:17
occurred 65:2 92:5
occurring 30:23
47:12 52:6, 12 95:3
occurs 69:19 97:3
October 19:7 22:21
24:1 35:19 37:3
39:13, 19 40:7, 16, 24
95:8 116:12, 25
129:12
offer 144:14
offered 118:23
office 4:19 143:19
officer 13:1 62:1, 4,
7 73:11 78:18 80:2
81:20 82:4 125:24
official 143:19
Oh 19:17 36:10
53:15 64:20 81:1
93:13 101:15 136:3
OHIO 1:3, 20, 23
2:6, 14 4:8 8:6
24:10, 19, 23 143:2, 6,
19, 25
Ohio's 25:17
Okay 13:12 14:18
17:11 21:13, 16
23:22 26:2, 6, 9
27:19 38:10 39:12
40:10 41:13 53:9, 21
60:1, 21 61:20 62:24
63:10, 16, 22 65:13
74:5 76:11 80:3, 10
81:1 82:10 86:19
87:6 88:14 92:1
95:6, 25 96:7 98:12

102:17, 21, 24 103:19
104:16 105:9 106:20
107:10 108:25
109:15, 18 110:10, 24
111:12 114:10, 12
130:1 131:1, 8 132:2,
9 134:13 137:12
138:4 139:25 140:19
Oliver 129:16, 23
130:7
once 28:4, 7
one-on-ones 129:1
ones 68:17 139:15
one's 136:22
online 123:11
operating 20:19
62:1, 4, 7 125:24
operation 47:15
operational 43:21
53:24 61:3, 21 127:1
operations 20:18
54:7 59:17
Operators 24:14, 15,
18
opinion 119:10
120:22 122:6, 9
124:10, 13 125:16
126:22 131:5 137:16
opinions 101:10
123:3 124:2, 23
opportunity 71:9
84:1
opposed 61:10
oral 15:17 16:8
order 141:21
organization 59:25
79:18 85:14 125:21,
22 127:4 135:16, 17
originally 51:3
outcome 44:22
output 60:23
outs 123:17
outside 27:11 29:16,
22 36:24 37:2 41:15,
18, 19, 22, 25 42:7, 20
43:1 62:25 93:4
135:20, 21 140:1
overall 77:4
overbroad 15:23

17:2

< P >
p.m 94:6, 7 102:1, 2
113:7, 8 121:1, 2
142:11
PAGE 3:3 11:11, 12,
13 12:13, 23 72:1, 4,
8, 11 73:6, 7 76:6
78:24 80:25 81:7, 8
82:11 83:10, 16, 19
86:25 117:19 121:20
145:2, 5, 8, 11, 14, 17,
20 146:2, 5, 8, 11, 14,
17, 20
pages 68:9
paging 87:2
paper 75:19
paragraph 73:7 74:2
117:25
parameters 6:17
90:7
part 20:1 39:16, 23
42:8 85:20 95:24
127:5
participate 32:18
33:2 37:22
particular 5:13 12:5,
7, 19 30:24 41:8
44:6, 14 45:20 59:8
61:2 65:1 66:23
67:1, 21 78:7 84:7
85:5 86:15 91:4
114:14 122:5, 12
123:25 124:18 125:8
126:10 127:9
particularly 41:14
54:17 60:4 81:21
123:11, 21 130:2
parties 143:14
Partnership 24:17
parts 61:22, 23
125:21
Pas@sspfirm.com 2:7
Patterson 2:5
PENALTY 144:5, 6
people 37:13, 15
48:11 50:4 56:1, 6
60:23, 25 62:5, 19
63:14 68:21 75:22

85:13, 16, 25 91:22
98:20 99:8, 12 100:8,
12, 21, 24 102:25
120:20, 21 122:25
125:22 129:18
135:15
people's 61:17
perfectly 59:6
perform 37:22 52:18
90:8
performance 33:15
38:17
performed 51:8
period 24:1 27:5
31:23 35:13 39:12
40:16 49:11 65:1
66:20 69:24 70:12
92:7 94:12, 13 95:2
PERJURY 144:5, 6
permitted 5:5
person 15:17 16:8
35:6 36:14 41:23
43:22 47:8 48:8
60:13 64:20 65:15,
16 71:7 76:8 78:20
80:19 87:17 91:5
96:4, 19 97:3, 7 98:6,
14 122:16
personal 14:23
30:14 69:13 70:8
92:12 101:9 122:19
131:21, 24
personally 9:13 26:3,
10, 11 27:2 93:1, 25
perspective 42:15
44:25 50:6 56:22
95:12 97:6 99:19
123:20 127:2 129:20
perspectives 42:18
Peter 2:1 4:11, 23
6:1 103:3 141:20
Phil 9:19 10:17, 20
14:8 31:14, 19, 25
32:3, 12, 15, 18 33:8,
11, 14 39:13 46:8
47:7, 10, 13 51:7, 13,
15, 19, 23 52:8 54:9,
12 56:19 57:9, 13, 24
58:12, 18, 22, 25 59:5,
15, 16, 22 60:16, 18

61:*4* 62:*22* 63:*1, 23,*
25 64:*1* 65:*2, 14*
67:*10* 69:*3* 76:*11*
82:*12, 13* 84:*17*
86:*23* 87:*7* 101:*6*
102:*25* 111:*15*
113:*21* 118:*2, 3, 10,*
*13, 19, 22, 25* 119:*4, 6,*
*13* 120:*10* 121:*7*
125:*9, 17* 126:*3, 23*
**PHILIP** 1:*7* 2:*18*
4:*5, 12, 14* 10:*10*
15:*8* 16:*15, 18* 18:*15*
144:*3*
**Phil's** 61:*22*
**Phone** 2:*7, 14* 17:*8*
28:*15* 29:*5, 6* 31:*11*
32:*9* 35:*7, 16, 20*
36:*9, 14* 39:*5, 6, 10*
**physical** 35:*9, 24*
**picture** 61:*2*
**piece** 127:*5*
**pin** 92:*4*
**Place** 1:*14* 32:*23*
39:*3* 43:*23* 44:*20*
45:*4, 13, 21, 22* 46:*4*
54:*6* 55:*13* 60:*25*
77:*11* 116:*24* 143:*10*
**placed** 126:*5*
**Plaintiff** 1:*8, 14* 2:*1*
4:*12, 14* 6:*1* 71:*18*
**Plaintiff's** 3:*5, 8, 9,*
*10, 11, 12, 13, 14, 15,*
*16* 10:*23* 71:*12*
77:*18* 102:*5* 103:*7*
104:*1, 19* 105:*12*
106:*4, 23* 107:*16*
108:*9* 109:*3, 21*
111:*1, 21* 115:*14*
**plan** 65:*21* 78:*1*
83:*9, 11* 84:*7, 21, 24*
85:*10* 86:*12, 20* 87:*9*
88:*4* 123:*23* 129:*14,*
*15* 130:*8, 11*
**planning** 13:*3* 17:*18*
41:*7, 21* 76:*2* 78:*15*
**plans** 87:*19* 140:*25*
141:*4, 7*
**plateau** 126:*4*
**play** 127:*22*

**player** 47:*14* 51:*11,*
*25* 53:*6, 10* 54:*2*
119:*7* 125:*19*
**players** 52:*3*
**please** 4:*21* 6:*19*
7:*4* 12:*14* 72:*15, 20*
82:*11* 83:*17* 120:*4*
121:*19* 129:*8* 134:*14*
137:*3*
**PNC** 2:*13*
**point** 5:*22* 8:*1*
25:*12* 37:*15* 43:*7*
45:*20* 55:*11* 56:*18*
66:*2* 70:*2* 71:*25*
76:*5* 98:*14* 114:*18*
117:*14*
**portable** 54:*6*
**portion** 116:*9*
**portions** 132:*11*
**position** 13:*4, 13, 21,*
*24* 14:*4* 17:*18, 22*
18:*3, 6, 11* 19:*12*
23:*7* 44:*23* 59:*14*
62:*14* 73:*11* 121:*12*
136:*3*
**positioned** 87:*13*
**positions** 41:*8, 9*
60:*23* 69:*5* 78:*15, 21*
81:*22* 82:*20* 124:*5,*
*11, 25* 126:*16, 23*
127:*12*
**positive** 55:*16, 17*
66:*10*
**positively** 96:*17*
**possible** 6:*15*
**potential** 13:*23* 18:*5*
25:*18* 41:*8* 43:*2, 9*
47:*5* 56:*17, 20* 57:*1,*
*22* 73:*10, 13* 74:*18,*
*22* 75:*2, 10* 78:*27*
81:*13, 14, 22* 82:*13,*
*14, 17, 20* 87:*13*
121:*25* 122:*1, 7, 23*
123:*4* 124:*5, 10, 24*
125:*12, 17* 126:*4, 7,*
*16* 131:*3, 6* 137:*2, 8*
**potentially** 47:*9, 16*
48:*12* 75:*5* 83:*25*

**Power** 8:*25* 19:*11,*
*13, 16, 20, 23* 20:*1*
24:*4, 13, 15, 18*
**practical** 97:*24*
**premise** 137:*5*
**preparation** 11:*7*
29:*6* 80:*11* 92:*19, 24*
141:*3*
**prepare** 9:*3*
**prepared** 60:*14*
78:*23* 79:*5, 8, 11*
80:*6, 9* 121:*22* 141:*1*
**prepares** 79:*12*
**Present** 2:*17* 76:*7, 8,*
*11* 86:*9* 89:*2, 5, 7*
91:*15, 21* 96:*4*
102:*25* 103:*1, 23, 24*
104:*17* 105:*10, 23*
106:*2, 21* 109:*1*
111:*12, 15, 18* 112:*8,*
*11, 14, 21, 22, 23*
113:*13, 14, 24*
**presentation** 89:*5, 7,*
*12, 15, 17, 18* 97:*19*
**presentations** 40:*23*
89:*20* 93:*25*
**presented** 90:*21*
**presenters** 79:*13*
**presenting** 89:*1*
**president** 13:*4, 13, 21,*
*24* 14:*5* 17:*19, 22*
18:*3, 6, 12* 19:*14, 15,*
*18, 20* 20:*6, 10, 14*
21:*14* 22:*9, 11, 14, 15,*
*19, 23* 23:*1, 3, 14*
27:*11* 41:*4, 12, 13*
42:*22* 43:*3, 10* 46:*8,*
*13* 47:*4* 51:*20* 53:*11*
54:*10, 24* 55:*6* 56:*7*
57:*11* 58:*1, 14, 19*
60:*19* 64:*3* 65:*3*
66:*4, 15, 18* 71:*2*
81:*23* 94:*18* 95:*4, 18*
96:*2* 98:*24* 116:*1*
118:*16* 124:*7* 127:*24*
129:*13* 135:*8* 136:*4*
**presume** 33:*19*
81:*19* 93:*20*

**pretty** 5:*6* 48:*18*
50:*18* 75:*4* 90:*16*
119:*3* 139:*6*
**previous** 47:*1* 62:*7*
82:*2* 86:*14* 87:*23, 24*
100:*22* 116:*20*
135:*11*
**previously** 43:*1*
114:*13* 120:*17*
121:*21* 125:*18*
130:*19*
**primarily** 34:*24*
39:*7* 59:*24* 68:*17*
**primary** 64:*4* 128:*4*
**prior** 9:*7* 31:*15, 16,*
*20* 32:*1, 4, 14, 17*
36:*21* 37:*6, 9* 70:*25*
81:*10* 87:*18* 88:*3*
95:*10* 116:*17* 117:*3*
129:*11, 12* 130:*6*
**priorities** 73:*14*
**probably** 31:*1* 65:*23*
70:*17* 93:*15* 114:*18*
115:*5* 119:*9*
**procedures** 44:*21*
**process** 5:*15* 38:*5,*
*24* 41:*4, 5, 14* 42:*8,*
*13* 45:*12, 13* 64:*5*
66:*22* 70:*6, 20, 21*
75:*17* 76:*2* 85:*13, 20*
98:*18* 99:*10, 13, 23*
136:*18*
**Processes** 13:*18*
17:*25* 44:*21* 45:*2*
**produced** 12:*9* 14:*16*
**producing** 11:*23*
**production** 11:*10*
12:*5, 8, 21*
**productions** 12:*6*
**professional** 27:*1*
31:*5, 18*
**progress** 45:*23*
46:*23* 121:*10, 14*
141:*11, 13*
**progresses** 47:*6*
**progressing** 54:*16*
**progression** 96:*17*
97:*3*
**promotion** 118:*3, 11*

Case: 1:21-cv-00238-MRB Doc #: 66-4 Filed: 08/02/24 Page: 59 of 65 PAGEID #: 2950

Deposition of Nicholas Kevin Akins                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

120:*11*
**pronouns** 49:*8*
**proposed** 13:*19* 18:*1*
**proposition** 59:*19*
**provide** 67:*14, 24, 25*
**provided** 5:*6* 12:*4*
16:*6* 64:*10* 88:*7*
113:*12* 114:*14* 115:*9,
12* 140:*6*
**public** 143:*5, 25*
**Public-State** 1:*23*
**pulling** 64:*17*
**purpose** 6:*7* 8:*19*
45:*8* 112:*24, 25*
**purposely** 77:*16*
**Pursuant** 1:*14* 4:*4*
9:*13* 143:*12*
**put** 43:*23* 44:*20*
48:*19* 71:*16, 17*
81:*17, 18* 82:*16, 25*
117:*12, 16* 118:*21*
**putting** 60:*22*

**< Q >**
**qualifications** 44:*1*
75:*19*
**qualified** 53:*17* 143:*5*
**quarterly** 25:*2*
**question** 7:*20, 21*
8:*1* 12:*3* 15:*2, 21*
16:*3, 4* 17:*2* 25:*14*
27:*5, 7* 28:*22* 29:*14,
22, 23, 25* 32:*6, 7*
35:*17* 43:*8* 45:*8*
47:*1* 53:*19, 20* 57:*23*
75:*20* 91:*19* 92:*11*
93:*3* 97:*15* 114:*3*
120:*4* 122:*4, 11, 20,
25* 123:*13* 128:*23*
131:*19* 132:*9* 133:*3,
5, 6, 9, 12, 16, 18*
134:*24* 135:*10, 11*
136:*24* 137:*6, 14, 15,
18, 20* 138:*14*
**questions** 7:*13* 63:*12*
74:*3, 17* 121:*9, 15*
130:*16* 141:*13*
**quick** 23:*12* 49:*2*
68:*20*

**quickly** 129:*4*
**quit** 118:*17*

**< R >**
**ran** 20:*23*
**rarely** 28:*2*
**Raymer** 1:*20* 143:*4,
24*
**reached** 126:*4*
**read** 74:*2, 7* 92:*18,
23* 93:*2, 4, 5* 144:*7, 9*
**readily** 61:*24* 65:*16*
**readiness** 73:*13*
83:*22*
**reading** 5:*20*
**ready** 50:*15* 55:*24*
66:*16* 84:*8*
**real** 51:*11*
**realized** 23:*6*
**really** 5:*23* 30:*11, 22*
43:*12* 45:*10* 47:*19*
48:*9, 15* 50:*1* 55:*10,
14, 23* 57:*3* 59:*15*
61:*11, 22* 64:*15* 65:*9,
10, 17* 68:*4* 70:*5*
75:*20* 86:*5* 96:*19*
97:*2* 98:*12* 99:*17*
100:*7* 123:*23* 126:*25*
130:*4* 137:*22*
**reason** 58:*8* 145:*4, 7,
10, 13, 16, 19, 22*
146:*4, 7, 10, 13, 16, 19,
22*
**reasons** 130:*5*
**recall** 11:*18, 20*
26:*19, 22* 29:*10, 13*
30:*25* 31:*1, 8, 13*
32:*13* 34:*9* 35:*5, 8,
25* 36:*8, 17* 37:*4, 17*
39:*13, 20* 47:*25*
50:*23* 51:*2, 3* 56:*9*
63:*19* 66:*23* 67:*1*
68:*14* 73:*17, 20, 22,
23, 25* 74:*11* 75:*2, 4,
7, 9, 10* 76:*13* 80:*20,
21* 87:*10, 11, 24* 88:*1,
2, 5, 10, 16, 20* 89:*4,
12, 16* 90:*5, 14* 91:*9,
11* 92:*15, 16* 94:*2*
96:*7* 97:*8* 98:*21*

100:*17* 101:*8* 110:*13*
114:*14* 115:*8* 117:*1,
7, 18* 118:*12* 119:*2*
140:*11*
**received** 17:*16* 64:*1*
68:*18*
**reception** 100:*4*
**recess** 52:*24* 94:*6*
102:*1* 113:*7* 121:*1*
**recognize** 78:*7*
**recognized** 57:*5*
126:*3*
**recognizes** 65:*18*
68:*23*
**recollection** 92:*2, 3*
96:*10*
**recommend** 8:*15*
**record** 4:*2, 24* 5:*6*
6:*18* 7:*4, 18, 22*
11:*19* 12:*2, 18* 14:*14*
15:*4* 52:*23* 53:*1, 5*
94:*3, 5, 8* 101:*22, 24*
102:*4* 113:*2, 6, 9*
120:*23, 24* 121:*3*
128:*10* 141:*15*
**records** 14:*15* 117:*2*
**record's** 138:*17*
**redundant** 5:*13*
**refer** 12:*13* 14:*8, 11*
17:*16* 121:*7*
**reference** 38:*23* 53:*6,
9* 70:*11* 71:*25* 80:*25*
99:*22*
**REFERENCED** 3:*5*
25:*8* 63:*7* 95:*25*
131:*3*
**referred** 38:*7* 41:*18*
63:*4* 68:*15*
**referring** 10:*12*
12:*21* 18:*14* 32:*22*
38:*6* 49:*8, 23, 24, 25*
62:*24* 71:*24* 73:*5*
76:*6, 22* 78:*4, 24*
80:*22* 85:*9* 88:*11*
89:*24* 93:*24* 99:*23*
117:*19*
**refers** 12:*25* 13:*2*
**regarding** 9:*19* 14:*7*
17:*12* 18:*17* 28:*8*
48:*6* 50:*25* 51:*5*

63:*25* 64:*1* 67:*24, 25*
114:*16* 115:*7* 116:*16*
130:*20* 131:*5, 16*
135:*2* 138:*22* 139:*1,
13* 140:*22*
**regular** 46:*23* 50:*1,
8, 9* 51:*4* 60:*17* 63:*8,
11* 122:*24* 141:*23*
**regulated** 21:*5*
**regulations** 21:*8*
77:*15*
**regulatory** 44:*17, 19,
22*
**rehabilitate** 45:*16*
**reiterated** 69:*16*
**relate** 17:*17*
**related** 29:*17*
**relates** 13:*2* 41:*15*
**relationship** 26:*24*
30:*8* 31:*3, 14* 77:*2*
**relative** 9:*2* 16:*11*
23:*10* 33:*15* 38:*17*
75:*22* 143:*13*
**relatively** 54:*5*
**release** 115:*24*
**relied** 14:*3* 18:*10*
**rely** 5:*24*
**remain** 22:*9, 11, 17*
**remember** 11:*14, 16*
56:*23* 69:*25* 89:*17,
18* 90:*16, 18* 97:*11*
98:*7*
**reminder** 7:*12*
**remove** 131:*8*
**repeat** 5:*8* 16:*4*
28:*23* 43:*8* 120:*3*
131:*19* 137:*3*
**repetition** 6:*4*
**repetitive** 5:*12*
**rephrase** 25:*14* 27:*7*
32:*7* 35:*16* 91:*18*
**report** 49:*15* 69:*9*
90:*13*
**reported** 25:*16*
37:*13, 16* 49:*14*
**reporter** 4:*21* 7:*14*
141:*17, 20, 23, 25*
**reporting** 36:*20* 40:*4*
143:*16*

Case: 1:21-cv-00238-MRB Doc #: 66-4 Filed: 08/02/24 Page: 60 of 65 PAGEID #: 2951

Deposition of Nicholas Kevin Akins
Philip R. McHugh v. Fifth Third Bancorp, et al.

**reports** 32:*15* 37:*10*, *18* 39:*17* 47:22 50:2 66:*14* 93:7

**represent** 4:*10* 9:*12, 13* 11:8, *21* 12:*11* 93:*1* 102:*13* 103:*15* 114:*10* 117:2

**representation** 6:*11, 16* 9:*14*

**represented** 11:22

**request** 9:*15* 11:*10* 12:7, *12, 19, 21, 25* 17:*15*

**requesting** 15:*4*

**require** 77:*15*

**required** 70:*12* 122:*11*

**requirement** 6:*13*

**resign** 119:*4*

**resigned** 118:*24* 119:8

**resolution** 95:8, *9, 11*

**resolutions** 73:8 76:20

**resource** 78:*18* 81:20 82:4

**resources** 79:*14, 15* 80:2

**respect** 7:*23* 10:*15* 11:*23* 13:*19, 23* 15:7 16:*13* 18:*1* 22:*16* 23:*19* 25:8, *18* 26:*3* 30:*19* 33:*1, 23* 47:*23* 48:5 50:25 51:*4* 52:8 54:*23* 67:*23* 72:7 82:*20* 84:8 85:5 86:*23* 88:8 90:*11* 99:22 100:*1* 101:*11* 102:*17* 113:*11* 114:*13* 121:*10* 123:*3* 140:*25*

**respectively** 71:22

**respects** 143:*12*

**respond** 129:*4*

**responded** 12:*18* 96:*12*

**responding** 15:*20* 16:*3*

**response** 12:*3, 5, 7* 13:*15* 74:*16*

**responsibilities** 82:*21* 126:*18*

**responsibility** 50:*12* 57:*15* 64:*12* 86:*4*

**responsible** 60:22

**rest** 39:*17* 61:*14* 67:20

**result** 12:6 21:7 120:*10* 143:*15*

**retained** 18:*17* 98:*19*

**retire** 50:*14*

**retirement** 69:22

**review** 9:7 33:8, *11, 14, 21* 37:25 38:5, *10, 13, 16, 19* 41:6, *16* 68:*10* 73:*3, 9* 93:7, *14* 98:*3, 20* 99:*10, 23* 141:*19*

**reviewed** 9:9, *15* 73:*11* 83:*13*

**reviews** 32:*19, 20, 24* 33:2, 6, *20* 37:23 38:*1* 61:*13* 63:5 68:5 87:*23*

**revision** 85:6

**revisions** 86:*17, 19, 21*

**RHR** 42:25 88:*12, 15, 23* 89:*18, 20, 24* 90:*4, 6, 11, 12, 19, 24* 91:22 93:8, *22* 94:*1* 95:*17* 96:2, *22* 97:9, *11, 15* 98:*1, 7, 19, 22* 99:*10* 101:*13* 130:22 131:*10, 17* 132:6, *13* 135:5 136:*1* 138:6, *24* 139:22 140:7, *21, 22*

**RHR's** 90:*14*

**right** 8:*17* 11:*21* 14:22 19:22 20:6, *7, 8, 11, 24* 21:2 22:7, *8, 24* 23:20, *22, 25* 25:9 26:7, *8* 27:9, *10* 28:*17* 29:8, *11* 33:*3* 36:6 38:8, *25* 40:*21* 54:25 60:22, *23* 61:6 63:*21* 64:*20* 70:20 71:*16, 17* 72:7 73:5 76:*12* 77:8 80:5 83:*11, 19* 84:*14, 18*

**responsibilities** continued

**87**:*4* 90:*3* 95:*1, 3* 96:*19* 97:*23* 105:7, *10, 24* 106:*18, 21* 108:7, *17, 20* 109:*1, 19* 110:5, 8, *11* 111:*10, 16* 112:*15* 115:*4* 116:*13* 119:*14* 121:*13* 122:*21* 124:*4* 129:20 130:*1* 131:*1* 136:9, *19* 137:2 138:*20* 141:8

**right-hand** 125:5

**risk** 118:2, *10* 119:*13, 18* 120:*10, 18, 19*

**Robert** 30:*19, 20*

**Rock** 24:*11*

**role** 22:22 23:*16* 26:*12* 31:20 41:24 47:7, *11* 48:*12* 50:*16* 55:22 56:*13* 62:*16, 19* 65:*17* 74:*19, 24* 75:6, *12, 25* 90:*10, 12* 118:*4, 23* 125:20

**roles** 31:*21, 23* 50:4 51:*13* 61:24 62:*16* 125:20

**Roll** 24:*11*

**rollup** 33:*17* 34:4

**Rome** 2:*12* 4:*17*

**room** 102:*3* 113:*21*

**Roughly** 22:6

**round** 24:*19, 20, 23*

**RPR** 1:*20* 143:*4, 24*

**Rule** 4:*4* 143:*17*

**rules** 5:2

**ruling** 6:*12*

**run** 48:*11*

**runner** 62:9

**running** 60:*14* 128:*24*

**runs** 89:22 92:6

**Ryan** 10:*1, 3* 114:*23*

**< S >**

**S/Wendy** 143:*24*

**Saba** 2:*1, 5* 3:*4, 5* 4:*11, 18* 6:6 7:2 9:*17* 11:*1* 12:*10, 20* 14:*18, 19, 25* 15:6

**16**:*1* 17:6 20:22 26:*1, 20* 27:24 28:*6, 24* 29:*1* 30:*1* 49:20 52:23 53:*4, 18* 66:*1* 71:*16, 20* 74:*14* 77:20 91:*18, 20* 92:*12, 17, 22* 93:6, *11* 94:*3, 11* 99:*21* 101:22 102:7 103:*10* 104:*4, 22* 105:*14* 106:7 107:*1, 19* 108:*12* 109:6, *23* 111:*3, 24* 112:*25* 113:2, *5, 10, 17, 22* 115:*1, 16* 117:*15* 119:*20* 120:*1, 5, 7, 23* 121:*4, 9* 125:*1* 126:*12* 127:*13* 130:*15, 18* 133:6, *9, 12, 15, 19, 21, 23* 134:*1, 5, 9, 13, 15, 17, 20, 23* 135:*1, 23* 136:*17* 138:*3, 19, 21* 139:7 141:*10, 14, 22, 24*

**sake** 7:*13*

**sat** 100:*18*

**sausage** 85:*18*

**save** 144:*10*

**saw** 33:22 36:23 45:*15* 50:5 61:*13* 123:*15* 130:*4*

**saying** 10:2 35:*1* 46:*21* 47:2 49:*14* 51:*14* 54:2 62:*13* 70:*1* 74:*13* 110:*23*

**says** 48:8 72:*1* 82:*21* 102:*20* 119:22 122:*1* 124:7 125:*12* 126:*4, 15, 18*

**scattered** 100:*21*

**Schaffer** 30:*19, 20* 31:*4, 7* 73:9, *18* 74:*17* 79:22 80:7 118:*1, 9* 119:*12* 120:9

**schedule** 23:*10*

**scheduling** 27:*16*

**science** 18:*23, 24*

**scope** 5:7, *11* 6:2, *9*
  25:*21* 26:*16* 98:*4*
**seal** 143:*19*
**search** 13:7 75:*21*
  76:*3, 5*
**searched** 12:*4*
**seats** 101:2, *3*
**SEC** 8:*24* 95:*12*
**second** 22:*18* 29:*4*
  73:6 89:*9* 94:*4*
  101:*23* 113:*3* 117:*25*
**see** 11:6, *11, 15*
  12:22 13:5 16:*21*
  22:12 24:*11, 17, 18*
  30:6, *9* 33:*4, 5, 17, 20,*
  *25* 34:*3* 38:*19* 43:6
  46:*1* 48:*17, 18* 52:*17*
  57:7, *20, 21* 59:*12*
  61:*19* 62:*11* 65:*20*
  71:*25* 72:2, *9, 25*
  73:*15* 74:*25* 79:*4*
  81:*5, 24* 82:*14, 23*
  84:*4, 21, 24* 85:6, *10*
  86:*14, 17, 20* 87:*9, 19*
  88:*17, 18* 93:*25*
  97:*17* 98:*14* 110:*18*
  111:*20* 113:*4* 118:6
  122:2 125:*13* 126:*16*
  129:9 135:*15*
**seeing** 11:*14, 16, 18,*
  *20* 55:*17* 60:*16* 66:6
  85:*3* 99:8
**seek** 6:*14*
**seen** 11:*3, 17* 57:*19*
  72:*18, 23* 80:*14* 86:*1*
  93:*15, 20* 116:2
  131:*23*
**selected** 13:*13* 118:*21*
**selecting** 14:*4* 18:*11*
**selection** 13:*20* 18:2
  56:*4*
**senior** 62:*15* 120:*18*
**sense** 47:*15* 48:*23*
  56:*9, 10, 15* 66:*9*
  97:*20*
**sent** 11:22 116:5, *6*
**sentence** 74:*15*
**separate** 34:*20* 77:*10*
  122:5 123:*25* 124:8

125:*15* 126:*10, 21*
  127:9 131:*4* 137:*16*
**separately** 31:*11*
**September** 35:*11*
  36:*11* 89:*10* 93:*17,*
  *18, 19* 95:*9, 10*
  100:*15* 109:*13* 110:5
  113:*24* 114:*11* 117:*3*
  118:*1* 119:*13* 120:9
**series** 7:*13* 49:22
**serious** 56:*9, 10, 18*
**serve** 24:2 94:*14*
**served** 21:*25*
**session** 67:*17, 19*
  78:*13* 89:*1, 3* 91:*10,*
  *21* 92:*9* 95:*25*
**sessions** 34:*18* 48:*1*
**set** 54:*10* 58:*19, 23*
  59:*1* 60:*19* 64:2
  65:*3* 69:22 88:*4*
  123:*24* 143:*18*
**sets** 53:22 59:*20, 23*
  60:5 77:*10* 99:*15*
**setting** 49:*1* 55:*11*
  57:8 59:*13* 132:*15*
**settings** 31:9 32:2,
  *11* 33:*18* 45:*15*
  62:*25* 63:*24* 65:*25*
  96:*25* 99:5, *9* 130:22
  131:*10* 132:6 136:*1*
  138:6 139:*21*
**seven** 34:*15, 18, 25*
  35:*1, 4* 36:*3* 70:*16*
**Seven-plus** 84:*14*
**shaking** 7:*14*
**share** 124:*1, 23*
  126:*11*
**shareholder** 26:*3, 5*
**Sharpe** 4:*19*
**sheet** 82:*12* 125:*9*
  144:*1, 13* 145:*1*
  146:*1*
**sheets** 34:*1, 7* 38:*20*
**show** 73:2 114:*10*
  130:*4*
**shown** 80:2
**shows** 83:*21* 114:8
**side** 128:*14, 15*
**sign** 141:*19*
**signature** 141:*18*

**SIGNATURE:**_____
_____**DA**
**TE** 145:*23* 146:*23*
**signed** 95:8 116:*3, 7*
  144:*16*
**significant** 23:*11*
  50:*12*
**signing** 116:*17*
**Silver** 121:*7*
**similar** 127:*11*
**simple** 5:*23* 6:*4*
**simultaneously** 77:8
**single** 97:*13, 14*
**sit** 36:7 88:2, *20*
  100:6, *13, 15* 101:*4, 6*
**sitting** 55:*13* 100:*9,*
  *24*
**situations** 69:*12*
**six** 6:*10* 34:*15, 17,*
  *18, 25* 35:*1, 4* 36:*3*
  130:*12*
**skill** 53:22 54:*10*
  58:*19, 23* 59:*1, 20, 23*
  60:5, *19* 64:2 65:*3*
  99:*15* 123:*24*
**skills** 33:*19* 43:*13*
  48:*24* 52:*16* 53:*25*
  57:*4* 65:*11* 122:*11*
  123:9 129:6
**sleeping** 23:22
**smaller** 100:*12*
**Smith** 2:*4* 4:*13*
**snapshot** 85:*4* 124:*15*
**soft** 75:*20, 21* 76:*3, 4*
**somebody** 49:*23*
  58:6 122:*17*
**somewhat** 30:7 119:*5*
**sorry** 32:5 46:*24*
  80:*23* 86:*25* 87:2
  95:*21* 116:8
**sort** 55:*12* 57:*4*
  62:*18* 67:2, *3* 68:22
  74:6 79:*23* 85:*18*
  89:*22* 92:6 125:*19*
  130:*3*
**sound** 22:7 130:*1*
**sounded** 32:5
**sounds** 22:8 97:*25*

**sources** 132:2, *4*
  139:*8, 10, 11, 13*
  140:*1* 141:6
**SOUTHERN** 1:*3* 4:7
**Southwest** 20:2, *3*
**Southwestern** 20:*1*
**space** 100:*10*
**span** 93:*24*
**speak** 6:*18* 9:*18, 25*
  10:9 94:*23* 99:*3*
  103:*4* 112:*20*
**Speaker** 25:*10, 20*
**speaking** 17:7 37:*17*
**Special** 102:*16*
  105:*19*
**specific** 17:5 34:*9*
  45:8 60:*13* 68:*14*
  77:*12* 80:*20* 117:7
**specifically** 6:*9*
  12:*12* 14:20 18:*14*
  26:22 33:*16* 34:*1*
  35:8 36:*17* 37:*17*
  38:*20* 43:*23* 47:*25*
  51:2 63:*19* 80:22
  83:*3* 84:5 85:*9*
  88:*20* 89:*18* 90:*14*
  91:9 114:*3* 139:*13*
**specifics** 33:22
**speculate** 137:*4, 9*
**speculated** 5:*16*
**speculation** 136:*16*
  137:*19*
**speculative** 136:6
  139:2
**Spence** 10:*12, 13, 14*
  14:*11* 15:*12* 16:*21,*
  *24* 17:*8, 12* 18:*18*
  36:*16, 19, 22* 37:*1, 6*
  38:*21* 39:*21* 40:5
  45:*11* 46:*13* 47:*3, 23*
  49:9, *15, 24, 25* 50:5
  51:*1* 52:*16* 55:*19*
  56:2, *8* 65:*12* 66:*3,*
  *24* 67:*24* 68:*1, 16*
  71:*1* 73:*12* 74:8
  81:*8, 14* 84:*12* 90:*17,*
  *21* 94:*17* 95:*17* 97:5
  98:*8, 23* 100:*15, 18*
  101:*11* 102:*25*
  103:*23* 104:*16* 105:9

106:*1, 20* 107:*13* 108:*6, 25* 109:*18* 110:*10* 111:*18* 112:*11* 116:*1* 121:22 123:*1* 124:*2* 129:*13* 130:*7, 21* 131:*3, 16, 25* 132:*3, 5* 135:*2, 7, 25* 136:*4* 137:*7* 138:*5, 20, 22* 139:*1, 14* 140:*1, 6, 9*

**Spence's** 37:*10, 18, 23* 38:*1, 10, 13, 16* 120:*11* 122:*6, 23* 123:*4* 124:*10, 24*

**spoke** 119:*3*

**spoken** 114:*21*

**sponsored** 80:*8* 82:*3, 19* 83:*2* 84:*6*

**SS** 143:*2*

**Stagnaro** 2:*5*

**stakeholders** 70:*22*

**stamp** 72:*1*

**stamped** 72:*8, 11* 77:*22* 102:*9* 111:*5* 115:*18*

**stand** 22:*2*

**standing** 8:*1*

**standpoint** 37:*16* 45:*5* 66:*9* 123:*11*

**standpoints** 97:*24*

**start** 21:*19* 34:*22* 130:*4*

**started** 51:*3* 76:*15* 110:*18, 21* 133:*18*

**state** 4:*10* 7:*3* 14:*13* 123:*8* 128:*13* 143:*2, 6, 25*

**statement** 5:*20* 21:*5* 22:*22* 35:*18* 36:*7*

**statements** 33:*25* 38:*20*

**STATES** 1:*2* 4:*7* 21:*21*

**stay** 62:*20* 69:*17* 70:*4*

**stayed** 22:*20* 52:*19* 62:*10* 66:*20* 119:*7*

**staying** 52:*20*

**Steady** 47:*13* 125:*19*

**steep** 124:*16*

**step** 47:*8, 10* 69:*12* 70:*9* 86:*2* 129:*17*

**steps** 42:*19*

**stipulate** 112:*19* 113:*11*

**stipulated** 113:*16* 114:*13*

**stipulation** 113:*10* 143:*12*

**stone** 69:*22*

**straight** 5:*22*

**strategic** 44:*3* 45:*5, 9, 14, 17, 21* 46:*18* 48:*23* 59:*20, 23* 66:*9* 122:*15* 123:*16, 23* 128:*16* 129:*14, 15, 18* 130:*8, 11* 140:*25* 141:*3, 7*

**strategy** 36:*20* 37:*16* 48:*21*

**Street** 1:*20* 2:*13*

**struck** 60:*9*

**stuff** 64:*14*

**style** 4:*5*

**Subcategory** 13:*12, 18* 14:*2, 7, 10* 17:*21, 25* 18:*5, 9, 14*

**subjective** 135:*14, 18*

**subordinates** 37:*11, 20*

**subtitle** 13:*3*

**succeed** 47:*6* 50:*16* 53:*11* 83:*25* 98:*24* 127:*23*

**succeeding** 46:*8, 13* 51:*19* 73:*2*

**successful** 56:*2, 3*

**Succession** 13:*3* 17:*18* 41:*4, 5, 7, 21* 73:*10, 12* 74:*12* 76:*2* 78:*1, 15* 83:*9, 11, 21* 84:*3, 8, 21, 24* 85:*9* 86:*2, 4, 12, 20* 87:*9, 19* 88:*4, 8*

**successions** 87:*14*

**successor** 84:*16* 86:*24* 87:*8, 12* 94:*14* 127:*17*

**sued** 26:*9, 11*

**suitable** 42:*5* 44:*7, 8* 53:*11, 17* 58:*10*

**summary** 6:*7*

**supplemental** 114:*15*

**supplied** 9:*6*

**support** 62:*6* 67:*11* 129:*18*

**supportive** 48:*4* 49:*5* 51:*13* 52:*5* 66:*13*

**suppose** 31:*2* 73:*21*

**supposition** 95:*24*

**Sure** 16:*5* 21:*19* 27:*7* 28:*24* 41:*1, 2* 45:*20* 50:*13* 55:*23* 64:*12* 66:*16* 75:*4* 97:*18, 19* 100:*20* 120:*5* 129:*4* 131:*20* 137:*4* 139:*20*

**surprise** 119:*5*

**surveys** 33:*9, 12* 38:*11, 14*

**Sustainable** 24:*16*

**swear** 4:*21*

**sworn** 4:*22* 6:*21* 143:*8*

**synopsis** 33:*21* 34:*8*

**< T >**

**table** 24:*19, 20, 23* 64:*19* 100:*9, 11*

**tables** 100:*12*

**tactical** 44:*2* 45:*16* 47:*15* 59:*25*

**take** 4:*3* 7:*23, 25* 8:*2* 32:*23* 39:*3* 55:*18* 95:*10* 116:*24* 132:*9* 135:*3, 4, 5, 24* 136:*1, 2, 5* 137:*6* 138:*23, 24*

**Taken** 1:*14* 4:*25* 7:*6, 10* 9:*8* 52:*24* 94:*6* 102:*1* 113:*7* 116:*23* 121:*1* 143:*11* 144:*2, 8*

**takes** 42:*17*

**talent** 32:*20, 22, 23* 33:*20* 38:*4, 7* 41:*6, 16, 25* 42:*10* 61:*13* 63:*4, 5, 24* 64:*13* 68:*5, 19* 78:*1, 3, 8, 23,*

*25* 79:*4, 8* 80:*11, 14, 17* 81:*13* 85:*5, 6, 10* 88:*3, 6* 99:*10, 22, 23* 101:*13* 121:*21* 125:*9* 129:*19, 20* 130:*22* 131:*4, 5, 9* 132:*6, 10, 14, 23* 135:*4, 17* 136:*2* 137:*1, 6, 17* 138:*8, 24* 139:*21* 140:*7*

**talk** 23:*13, 14, 15* 43:*15* 45:*6* 47:*7* 52:*9* 65:*21* 94:*24* 97:*1*

**talked** 9:*21* 42:*10* 48:*7*

**talking** 27:*22* 41:*10* 60:*4, 5* 74:*5* 95:*2, 7* 97:*25* 100:*8* 138:*19*

**talks** 124:*5*

**Tayfun** 47:*10* 57:*2* 65:*14* 73:*21* 84:*17*

**team** 39:*18, 23* 40:*3* 60:*24* 64:*10, 14* 67:*20* 69:*5* 85:*15* 100:*4, 5*

**Tech** 19:*2*

**technical** 60:*5* 128:*14*

**technically** 20:*3*

**technology** 128:*15*

**teleconference** 102:*18* 105:*7* 106:*17* 108:*23* 113:*14*

**telecopy** 15:*18* 16:*9*

**telephone** 15:*17* 16:*8*

**tell** 44:*11* 58:*6* 60:*21, 24* 122:*16*

**tells** 74:*6*

**temperament** 123:*14*

**temporary** 47:*17*

**tends** 70:*16*

**ten-year** 68:*9*

**term** 39:*24* 43:*20* 44:*9* 55:*11*

**terms** 30:*15* 34:*19* 44:*3* 46:*19* 52:*5* 60:*10* 61:*1* 69:*1, 2, 21, 22* 71:*8* 78:*19* 90:*6* 91:*5* 124:*10* 126:*2* 128:*21* 138:*22*

**testified** 28:*20*, *21*
29:*23* 49:*18* 121:*20*
122:*1* 138:*15*, *18*
**testify** 58:*25*
**testimony** 9:*25*
49:*18* 138:*17*
**text** 15:*18* 16:*9*
17:*8* 28:*16* 29:*9*, *18*
**TFT** 30:*22* 61:*5*
**Thank** 71:*14* 103:*9*
104:*3*, *21* 106:*6*
107:*18* 108:*11* 109:*5*
111:*23* 141:*14*, *24*
**thing** 23:*5* 52:*10*
61:*5* 67:*8* 69:*8*
75:*17*, *19* 79:*24*
83:*23* 85:*21* 86:*1*
90:*20* 91:*2* 98:*8*
99:*20* 137:*25* 140:*12*
**things** 9:*22* 27:*17*
28:*20* 30:*10*, *12*
33:*19* 48:*22* 52:*13*
55:*20* 57:*20* 63:*22*
67:*4* 68:*25* 70:*2*
123:*10*, *15*, *18* 130:*3*
135:*14*, *20*
**think** 5:*22* 19:*22*
24:*20*, *21* 27:*9* 28:*21*
30:*18*, *21* 36:*6* 43:*6*
47:*10* 52:*2* 57:*20*
58:*2*, *5* 59:*6* 60:*1*
62:*18* 64:*15* 66:*6*, *10*
67:*8* 68:*2*, *17* 70:*14*
74:*13* 90:*18*, *25* 91:*1*
96:*24* 97:*17* 98:*2*
101:*21* 114:*1* 119:*9*
126:*1* 129:*3*
**thinking** 42:*3* 48:*2*
50:*17*, *18* 55:*23*
60:*21* 61:*1* 69:*21*
99:*16*, *18* 123:*20*
127:*8* 128:*20*
**THIRD** 1:*10*, *14*
2:*18* 4:*6*, *16*, *17* 9:*12*
10:*9*, *20* 13:*2*, *4*, *14*,
*21*, *25* 14:*5*, *15* 15:*11*
17:*19*, *23* 18:*3*, *7*, *12*
19:*6* 24:*6* 27:*12*, *13*,
*20*, *25* 28:*10*, *11*, *12*
29:*16* 30:*22* 31:*20*

34:*13* 37:*6* 41:*4*
42:*20* 43:*3*, *11* 44:*14*
46:*9*, *14* 47:*4* 51:*20*
53:*12* 54:*11*, *25* 55:*4*,
*6* 56:*7* 57:*11* 58:*1*,
*11*, *14*, *20* 60:*20* 64:*3*
65:*4* 66:*4* 71:*3*
72:*17*, *21* 74:*15* 75:*6*,
*25* 76:*23*, *24* 77:*3*, *4*,
*5* 94:*19* 95:*19* 96:*18*
98:*25* 102:*14* 103:*16*
104:*10* 105:*3*, *20*
106:*13*, *14* 107:*7*, *25*
108:*19* 109:*12* 110:*4*
111:*10* 112:*5* 117:*19*
121:*7* 135:*8* 136:*5*
141:*1* 144:*4*
**Third-McHugh** 80:*22*
81:*4* 82:*8* 83:*5*, *16*
84:*4*, *21*, *24* 87:*5*, *20*
**Third-McHugh-
001105** 77:*23*
**Third-McHugh-
001132** 125:*5*
**Third-McHugh-
001154** 77:*23*
**Third-McHugh-
001216** 115:*19*
**Third-McHugh-
001218** 117:*20*
**Third-McHugh-
001221** 116:*9*
**Third-McHugh-
001222** 115:*20*
116:*10*
**Third-McHugh-
0213249** 102:*10*
**Third-McHugh-
0213254** 102:*10*
**Third-McHugh-
0213255** 103:*12*
**Third-McHugh-
0213275** 103:*13*
**Third-McHugh-
0213292** 104:*6*
**Third-McHugh-
0213303** 104:*7*
**Third-McHugh-
0213326** 104:*24*

**Third-McHugh-
0213329** 104:*25*
**Third-McHugh-
0213330** 105:*16*
**Third-McHugh-
0213336** 106:*9*
**Third-McHugh-
0213338** 107:*3*
**Third-McHugh-
0213343** 107:*4*
**Third-McHugh-
0213362** 107:*21*
**Third-McHugh-
0213371** 107:*22*
**Third-McHugh-
0213380** 108:*14*
**Third-McHugh-
0213383** 108:*15*
**Third-McHugh-
0213400** 109:*8*
**Third-McHugh-
0213413** 109:*9*
**Third-McHugh-
0213442** 109:*25*
**Third-McHugh-
0213447** 110:*1*
**Third-McHugh-
0213464** 111:*6*
**Third-McHugh-
0213475** 112:*1*
**Third-McHugh-
0213494** 112:*2*
**Third-McHugh-
Minutes** 72:*2*, *5*, *9*, *12*
73:*6*
**Third's** 24:*4*
**Thomas** 2:*18* 4:*17*
**thought** 23:*4* 46:*18*
49:*19* 74:*5* 99:*13*
119:*6* 124:*14*
**three** 6:*4* 63:*22*
70:*17*, *24* 98:*20*
132:*10*, *12*
**three-plus** 81:*23*
84:*11* 124:*8*
**Tim** 10:*11*, *12*, *13*
14:*11* 16:*24* 17:*8*
36:*16* 38:*10*, *13*, *16*
45:*11* 46:*13*, *18* 47:*3*
48:*4* 49:*8*, *10*, *15*, *25*

50:*5* 52:*16* 55:*14*, *19*
56:*1*, *8* 57:*19* 60:*9*,
*13* 61:*16*, *20* 64:*24*
65:*12* 66:*3*, *19*, *24*
67:*12*, *24*, *25* 68:*15*
71:*1* 81:*8* 84:*11*
88:*18* 90:*17*, *21* 97:*5*
98:*8*, *16*, *23* 100:*15*,
*18* 101:*11* 102:*25*
111:*18* 116:*1* 118:*20*
120:*11* 121:*22* 122:*6*,
*23*, *25* 123:*4* 124:*2*,
*10*, *24* 126:*2* 128:*3*
129:*13* 130:*4*, *7*
131:*25* 132:*3*
**Time** 1:*14* 4:*2* 7:*24*
8:*1* 19:*8* 20:*6* 25:*4*,
*13*, *24* 27:*4*, *21*, *22*, *24*
28:*1* 30:*21*, *24* 31:*23*
34:*10*, *19* 36:*10*
37:*15* 44:*6* 45:*10*, *19*
46:*2* 47:*12* 48:*3*, *18*
49:*24* 50:*7* 52:*19*
53:*2* 55:*4*, *12*, *25*
56:*5* 59:*9* 65:*1*, *22*
66:*2*, *5*, *10* 67:*21*
69:*21* 70:*12* 73:*13*
75:*15* 77:*11*, *17*
78:*18* 79:*20*, *23* 85:*3*,
*8* 87:*17*, *25* 88:*17*
89:*9* 91:*4*, *14* 92:*7*
93:*24* 94:*9*, *12*, *13*, *17*,
*20* 95:*7*, *10*, *17* 97:*3*,
*4* 98:*19* 100:*18*, *22*
103:*5* 112:*23* 121:*10*
122:*12* 124:*16*, *18*, *19*
127:*17* 130:*10*
143:*10*
**timeline** 98:*11*
**timelines** 13:*18*
17:*25* 73:*10*
**times** 7:*9* 25:*4* 26:*9*,
*19* 28:*14* 29:*15*
30:*16* 34:*15*, *18* 35:*1*,
*25* 47:*25* 48:*19* 99:*2*
128:*3*
**timing** 9:*21* 118:*19*
**Timothy** 15:*12*
16:*21* 18:*18*

Deposition of Nicholas Kevin Akins        Philip R. McHugh v. Fifth Third Bancorp, et al.

**Tim's** 52:21 60:8 67:12 118:3, 11
**tired** 44:16
**title** 22:20 83:10
**Today** 4:2, 3 6:16 11:9, 25 36:7 70:15 88:2, 21 92:19, 24
**today's** 9:3 11:24 12:12 53:2 94:9
**told** 91:2 114:19
**tool** 41:25
**top** 11:15 73:11
**topic** 46:7, 12 51:19 60:12
**total** 132:13
**totally** 52:9 97:10 137:18
**track** 100:22
**trajectory** 48:15, 17 122:10 124:16
**transactions** 66:7, 8
**transcript** 141:21 144:7
**transcription** 7:18
**transfer** 15:16 16:7
**Transforming** 30:22
**transition** 22:15 66:20 70:4 98:17, 18
**transitions** 66:17
**true** 36:4 124:20 140:19, 20 144:10
**truth** 143:8, 9
**try** 6:10 7:20
**trying** 8:22 24:20 29:4 30:2 49:21 80:24 87:16 123:10
**Tuesday** 4:2 105:3 110:19
**turn** 82:8 83:5 121:20
**turned** 22:19 45:9 56:3
**Turning** 83:16
**Tuzun** 84:17
**Twice** 7:11 8:16 28:5, 7
**two** 8:19 28:14 29:2, 15 30:16 34:19 52:1 56:6 71:21 77:10

**81**:23 124:7
**two-day** 34:24 35:1
**two-thirds** 12:23 73:7
**type** 85:19 125:24
**types** 30:10, 12 52:13
**typical** 48:16 78:22
**typically** 24:5 25:2 29:6 41:5, 20 49:1 52:7 57:5 67:19 70:14 72:25 73:2, 20 76:18, 20 78:6, 12 85:23 86:7 94:15 110:15

**< U >**
**Uh-huh** 12:15 39:2 74:20 78:9
**ultimately** 95:13 122:21
**unanimous** 115:25 116:4, 8, 12, 16, 21 117:8, 16 129:8, 11
**undersigned** 143:4
**understand** 8:2 14:22 15:1, 20 16:2 23:24 28:22 39:24 53:19, 20
**understanding** 5:14 16:14 21:8 31:19 40:10 41:3 77:2 80:6 88:15 118:13, 15, 18, 20 123:16 128:22 144:13
**understands** 64:13
**understood** 21:1
**UNITED** 1:2 4:7
**University** 19:2
**unusual** 100:17
**update** 78:1, 22 89:17 114:20
**updates** 46:23 50:1, 8, 9, 17, 25 51:4, 6 60:17 63:8, 9, 17, 24 67:6, 14, 23 68:18
**upset** 118:15, 22, 24 119:8 120:20
**use** 21:17 41:19 42:20, 24 49:2
**uses** 42:9

**Usually** 40:25 79:13 100:3
**utilities** 20:20 21:22
**utility** 8:22 20:21 21:4 47:14 51:11, 25 52:3 53:6, 9 54:2 119:7 125:19
**utilize** 135:16
**utilized** 135:15

**< V >**
**validate** 42:8
**validates** 42:3
**value** 66:21
**variances** 128:19
**varies** 22:4
**various** 20:19 31:21 42:18 47:25 52:18 78:15
**vein** 52:2
**verbally** 7:14, 19
**verdict** 65:18
**versus** 4:6 54:16 77:13
**vice** 22:25 23:3
**video** 7:16
**Videographer** 1:23 4:1, 20 53:1 94:5, 8 101:24 102:4 113:6, 9 120:24 121:3 141:15
**videotape** 4:1
**Videotaped** 1:14
**view** 42:15 48:9, 15 51:24 59:5, 16 83:21 126:11 127:1 133:1 135:13, 18
**viewed** 51:23 53:23 54:13
**views** 42:5, 16 50:3 59:4, 14 62:9 85:16, 17 90:17, 22 127:11
**virtual** 35:13
**vision** 44:4 45:21 123:22 130:12
**vitality** 45:2
**volume** 30:3, 15
**vote** 116:22
**VPs** 62:15

**vs** 1:9 144:4

**< W >**
**wagon** 43:24
**wait** 7:19
**walk** 58:8
**walked** 63:11
**walking** 70:20
**Walnut** 1:20
**want** 43:19 71:14 120:3 125:4 129:7 134:24 141:17, 25
**wanted** 50:6 52:17 57:20 60:10 66:12, 15 68:11 71:8 122:14
**waste** 103:5 112:23
**watching** 55:25
**way** 12:23 15:1 53:16 54:19, 21 57:8 61:15 73:7 89:14 98:18 100:7, 23 119:9 123:14 128:20, 21 129:17 133:6
**wealth** 31:22 34:6 127:3
**Well** 6:18 10:11 17:7 18:25 19:21, 25 20:16 24:24 31:21 44:11 45:9 46:18 47:16 50:23 51:6, 8, 13 55:1, 7, 9 56:14, 16, 21 57:2 59:5 60:8, 21 61:15 62:6, 11 66:22 67:9 71:6 75:15 77:4, 25 78:12 79:12 85:12 89:8, 21 91:7 92:14 95:11 97:20 101:16 113:1 119:6, 22 122:24 126:1, 5, 24 128:11 129:15, 19 132:13 133:3 136:8
**well-versed** 128:17
**Wendy** 1:20 143:4
**went** 19:23, 25 35:12 49:22 50:7 53:5 55:7 87:25 90:20 114:19

**We're** 4:*3* 5:*1* 6:*14*
7:*15* 14:*20* 78:*24*
83:*18* 97:*1, 6* 98:*13,
15* 112:*19* 123:*8*
128:*14*
**WESTERN** 1:*4* 4:*8*
**we've** 38:*6, 7* 86:*1*
88:*6* 112:*18*
**wheels** 43:*23* 54:*16*
**WHEREOF** 143:*18*
**whichever** 116:*6*
**wife** 8:*10*
**Williams** 10:*5, 6, 15*
92:*18* 114:*22, 23*
**willing** 70:*3*
**wind** 76:*18*
**witness** 4:*21, 22*
6:*21* 15:*1, 5* 17:*5*
20:*16* 25:*23* 26:*19*
28:*1, 23* 53:*15* 65:*7*
71:*14* 74:*1, 4* 92:*15*
93:*10* 99:*3* 103:*9*
104:*3, 21* 106:*6*
107:*18* 108:*11* 109:*5*
111:*23* 117:*11*
119:*16, 18* 120:*6, 14*
121:*16* 125:*2* 126:*13*
127:*14* 134:*4, 12*
135:*10, 12* 137:*12, 21*
139:*5* 143:*18*
**witnesses** 5:*9*
**witness's** 5:*14*
**wording** 120:*8*
**words** 15:*14* 47:*14*
**work** 19:*10, 23, 25*
57:*19* 66:*17* 70:*3*
115:*3* 125:*21*
**worked** 8:*22* 20:*5*
23:*4* 52:*1*
**workings** 45:*1* 52:*6*
62:*3*
**workplace** 32:*12*
37:*6*
**works** 57:*8* 85:*13*
98:*18*
**writing** 67:*15* 92:*8*
**written** 15:*17* 16:*8*
87:*19* 129:*9, 11*
**Wyman** 129:*16, 24*

130:*7*

**< Y >**
**yeah** 10:*13* 15:*5*
17:*1* 32:*7* 34:*16*
36:*6* 43:*12* 51:*2*
53:*20* 63:*18* 74:*5*
76:*13, 20* 78:*9* 80:*1,
4* 83:*9* 92:*13* 95:*6,
11* 110:*19* 117:*11*
120:*14* 121:*16*
127:*16* 130:*2, 6*
132:*17* 136:*3* 137:*21*
**year** 22:*4* 28:*4, 5, 7,
15* 29:*3, 15* 30:*16, 25*
31:*1* 32:*23* 34:*15, 18*
35:*2, 5, 14* 66:*23*
67:*1* 89:*24* 91:*12, 13*
92:*5* 114:*5* 129:*25*
**years** 8:*12* 19:*21*
70:*15, 18, 24* 81:*23*
84:*11, 14* 87:*24*
100:*14* 124:*7, 8*
129:*12, 22* 130:*2, 7, 9,
12*
**yep** 40:*13*

**< Z >**
**zero** 65:*23*
**Zoom** 4:*18* 102:*22*