# EXHIBIT F

1

2               UNITED STATES DISTRICT COURT

3               SOUTHERN DISTRICT OF OHIO

4                    WESTERN DIVISION

5

6       ----------------------------:
                                     :
7       PHILIP R. MCHUGH,            :
                                     :
8            Plaintiff,              :
                                     :
9         vs.                        :   CASE NO.
                                     :   1:21-cv-00238
10      FIFTH THIRD BANCORP, et      :
        al.,                         :
11                                   :
             Defendants.             :
12      ----------------------------

13

14           Videotaped
             Deposition of:    GARY R. HEMINGER
15
             Taken:           By the Plaintiff
16
                              Pursuant to Notice
17
             Date:            December 20, 2022
18
             Time:            Commencing at 9:39 a.m.
19
             Place:           Fifth Third Center
20                            511 Walnut Street
                              Cincinnati, Ohio  45202
21
             Before:          Wendy L. Raymer, RPR, CRR
22                                    and
                              Bruce L. Sandy, Videographer
23                            Notaries Public-State of Ohio

24

25

```
 1   APPEARANCES:

 2

             On behalf of the Plaintiff:
 3
             Peter A. Saba, Esq.
 4                   and
             Joshua M. Smith, Esq.
 5                   of
             Stagnaro, Saba & Patterson Co., L.P.A.
 6           2623 Erie Avenue
             Cincinnati, Ohio  45208
 7           Phone:  (513) 533-2701
             Email:  Pas@sspfirm.com
 8                   jms@sspfirm.com

 9
             On behalf of the Defendants and the Deponent:
10
             Michael L. Cioffi, Esq.
11                   of
             Blank Rome LLP
12           1700 PNC Center
             201 East Fifth Street
13           Cincinnati, Ohio  45202
             Phone:  (513) 362-8700
14           Email:  Michael.cioffi@blankrome.com

15
             Also Present:
16
             Philip R. McHugh
17           Phenise Poole, Esq., Fifth Third Bancorp
             Brian Thomas, Esq., Fifth Third Bancorp
18

19                        - - -

20

21

22

23

24

25
```

```
 1                      I N D E X

 2

 3   GARY R. HEMINGER                              PAGE

 4     Examination by Mr. Saba                        5
       Examination by Mr. Cioffi                    161
 5     Further Examination by Mr. Saba              212

 6

 7   EXHIBITS                        MARKED    REFERENCED

 8     Plaintiff's Exhibit 1           46          46
       Plaintiff's Exhibit 2           51          52
 9     Plaintiff's Exhibit 3           55          55
       Plaintiff's Exhibit 4           56          57
10     Plaintiff's Exhibit 5           58          59
       Plaintiff's Exhibit 6           60          60
11     Plaintiff's Exhibit 7           62          62
       Plaintiff's Exhibit 8           64          64
12     Plaintiff's Exhibit 9           66          66
       Plaintiff's Exhibit 10          84          84
13
       Plaintiff's Exhibit 11         111         111
14     Plaintiff's Exhibit 12         112         112
       Plaintiff's Exhibit 13         114         114
15     Plaintiff's Exhibit 14         115         115
       Plaintiff's Exhibit 15         116         116
16     Plaintiff's Exhibit 16         119         119
       Plaintiff's Exhibit 17         120         120
17     Plaintiff's Exhibit 18         121         121
       Plaintiff's Exhibit 19         123         123
18     Plaintiff's Exhibit 20         125         125

19     Plaintiff's Exhibit 21         128         128
       Plaintiff's Exhibit 22         132         132
20     Plaintiff's Exhibit 23         132         132
       Plaintiff's Exhibit 24         138         138
21     Plaintiff's Exhibit 25         140         140
       Plaintiff's Exhibit 26         156         156
22     Plaintiff's Exhibit 27         157         157
       Plaintiff's Exhibit 28         159         159
23

24
                         -  -  -
25
```

Page 4

1  THE VIDEOGRAPHER: Today is December 20th,
2  2022. The time is 9:39 a.m. We're on the record
3  for the deposition of Gary R. Heminger for a case
4  pending in the United States District Court,
5  Southern District of Ohio, Western Division,
6  entitled Philip R. McHugh, Plaintiff, vs. Fifth
7  Third Bancorp, et al., Defendants, Case No.
8  1:21-cv-00238.
9  If at this time all counsel present would
10  introduce themselves for the record, then the
11  witness can be sworn.
12  MR. SABA: Peter Saba on behalf of the
13  Plaintiff Philip R. McHugh.
14  MR. SMITH: Joshua Smith on behalf of the
15  Plaintiff Philip R. McHugh.
16  MR. CIOFFI: Michael Cioffi on behalf of all
17  the defendants. I also represent Mr. Heminger
18  personally pursuant to a written joint
19  representation agreement.
20  MR. THOMAS: Brian Thomas with Fifth Third
21  Bank.
22  MS. POOLE: Phenise Poole for Fifth Third
23  Bank.
24  GARY R. HEMINGER,
25  of lawful age, a witness herein, being first duly sworn

Page 5

1  as hereinafter certified, was examined and deposed as
2  follows:
3  EXAMINATION
4  BY MR. SABA:
5  Q. Mr. Heminger, can you go ahead and state your
6  name for the record, please, and spell your last name?
7  A. Gary R. Heminger, H-e-m-i-n-g-e-r.
8  Q. Have you ever had your deposition taken
9  before?
10  A. Yes, sir.
11  Q. As a reminder, I'm going to be asking you a
12  series of questions. If there's anything you don't hear
13  or don't understand, please feel free to ask me to
14  repeat or rephrase the question. I think you indicated
15  earlier you may have some problems with hearing so --
16  A. Right.
17  Q. -- please let me know if you need me to speak
18  up and clarify anything. For the sake of the court
19  reporter, although this is being taken down via video, I
20  do need you to answer verbally. No shaking or nodding
21  of the head or uh-huh or uh-uhs. It's difficult for her
22  to take that down with a written record.
23  Additionally, if you'd wait for me to finish
24  my question before you answer and I'll try and do the
25  same with your answers, it also makes for a clearer

Page 6

1  record. Do you understand all those instructions?
2  A. Yes, sir.
3  Q. Could I have your residence address, please?
4  A. My residence is 312 Pheasant Run Place,
5  Findlay, Ohio.
6  Q. How long have you lived there?
7  A. 20 -- 25 years.
8  Q. Who lives there with you?
9  A. My wife, Jane.
10  Q. What's your date of birth?
11  A. 9/10/53.
12  Q. You indicated you've had depositions taken
13  before. Have you ever given trial testimony?
14  A. I have.
15  Q. When is the last time that you gave a
16  deposition?
17  A. Approximately ten years.
18  Q. And what was that for?
19  A. It was a case involving one of the refineries
20  at Marathon Petroleum Company.
21  Q. And with respect to the trial testimony you
22  gave, when was -- when did you give the trial testimony?
23  A. I'm sorry, I didn't hear. What?
24  Q. You indicated that you've also given trial
25  testimony?

Page 7

1  A. Oh, yes.
2  Q. When's the last time you gave trial testimony?
3  A. Probably 20 years ago. The same with Marathon
4  Petroleum Company.
5  Q. What did you do to prepare for today's
6  deposition?
7  A. I met with my counsel.
8  Q. Anything else?
9  A. No, sir.
10  Q. Did you review the deposition of
11  Mr. McCallister?
12  A. I did.
13  MR. CIOFFI: Objection. I'm going to instruct
14  him not to answer. What he reviewed were documents
15  that I instructed him to review. Those
16  instructions are a part of my thought process and
17  work product. So for that reason, I would instruct
18  him not to answer.
19  MR. SABA: I asked a specific question. Did
20  you review the deposition of Mr. McCallister?
21  Whether or not he reviewed it is a specific
22  question. It doesn't go into --
23  MR. CIOFFI: The identity of the documents is
24  what's privileged because I selected them. You can
25  ask him if he reviewed any documents that I didn't

Deposition of Gary R. Heminger      Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 8

1  select or that he selected.  I'm not going to
2  object to that.  The documents I selected, if he
3  reviewed it other than through my selection, you
4  can ask him that.
5  BY MR. SABA:
6      Q.  You indicated yes to the previous question
7  about whether or not you reviewed Mr. McCallister's
8  deposition.  Is there anything specific with respect to
9  Mr. McCallister's testimony that you disagree with?
10     MR. CIOFFI:  Objection.  Move to strike his
11     answer, is that he answered it while I was
12     objecting and I'm going to instruct him not to
13     answer.
14     MR. SABA:  And what's the basis of the
15     instruction?
16     MR. CIOFFI:  Again, it -- it goes to the
17     privilege of the document.
18 BY MR. SABA:
19     Q.  Did you speak to Mr. McCallister at all prior
20 to this deposition?
21     A.  No.
22     Q.  With respect to Mr. McCallister's deposition,
23 did you note anything that you agreed with?
24     MR. CIOFFI:  Objection.  I'm going to instruct
25     him not to answer about documents that he reviewed

Page 9

1  at my request.
2      MR. SABA:  And that's going to be a continuing
3      objection?
4      MR. CIOFFI:  Yes.  Yes, sir.
5      MR. SABA:  All right.  So we'll just -- we'll
6      note to bring that up with the court at a later
7      time.
8  BY MR. SABA:
9      Q.  What's the extent of your education?
10     A.  I have a bachelor's degree in accounting from
11 Tiffin University, MBA from University of Dayton.
12     Q.  Are you currently employed?
13     A.  I'm retired.
14     Q.  Where did you retire from?
15     A.  I retired from Marathon Petroleum Company in
16 2020.
17     Q.  What was your position?
18     A.  I was a chairman and CEO.
19     Q.  How long had you held the position of chairman
20 and CEO at Marathon Petroleum?
21     A.  11 years.
22     Q.  Were you involved in the process to select
23 your replacement?
24     A.  I was.
25     Q.  What was your involvement?

Page 10

1      A.  I had made recommendations to the board on
2  various candidates.
3      Q.  How many candidates did you recommend to the
4  board?
5      A.  We reviewed over -- over the span of preparing
6  for my succession, we reviewed three intensively.
7      Q.  What was that span that you referenced?
8      A.  Over the last three years.
9      Q.  By "the last three years," you mean the last
10 three years prior to your departure?
11     A.  Yes, sir.
12     Q.  Did Marathon Oil retain any outside agencies
13 to do an independent review or analysis or assessment of
14 the candidates?
15     A.  Let me correct you.  It's Marathon Petroleum.
16     Q.  Marathon Petroleum.
17     A.  Okay.  Now repeat the question.
18     Q.  Certainly.  Did Marathon Petroleum retain any
19 outside agency to do a review or assessment of any of
20 the candidates?
21     A.  We do.
22     Q.  Who did you retain?
23     A.  I don't recall the name of the -- of the firm.
24     Q.  And did the firm analyze more than one
25 candidate or assess more than one candidate?

Page 11

1      A.  Yes.
2      Q.  How many candidates did the outside firm that
3  Marathon Petroleum retained assess?
4      A.  I believe it was two.
5      Q.  Who was ultimately selected as your
6  replacement?
7      A.  A fellow by the name of Mike Hennigan.
8      Q.  Was Mike Hennigan one of the people that you
9  recommended to the board?
10     A.  Yes.
11     Q.  How many boards do you serve on currently?
12     A.  I serve on two public boards, Fifth Third Bank
13 and PPG in Pittsburgh, and I'm on Ohio State
14 University's board as well.
15     Q.  How long have you served on the board at Fifth
16 Third Bank?
17     A.  I believe 2006 was the year that I joined.
18     Q.  And just to be clear, when you say you "served
19 on the board of Fifth Third Bank," you're indicating
20 that you've served on the board of both Fifth Third
21 Bancorp and Fifth Third National Association, correct?
22     A.  I don't know the difference there.  I'm just
23 aware of it as Fifth Third Bancorp.
24     Q.  Okay.  You don't have an understanding of one
25 being the holding company for the other?

Deposition of Gary R. Heminger                                            Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 12

1   A.  I do understand that, yes.
2   Q.  Okay.  What is your understanding?
3   A.  My understanding is I'm a board member of
4   Fifth Third Bancorp.
5   Q.  You don't know if you're a board member of
6   Fifth Third Bank National Association?
7   A.  I don't.
8   Q.  How often does the Fifth Third Bank board meet
9   a year?
10  A.  Approximately six or seven times.  Our -- you
11  know, dates that are already predetermined at the end of
12  each quarter, and then we'll have a strategy
13  session and -- probably two strategy sessions.  So six
14  or seven that are determined, and then you may have a
15  call now and then.
16  Q.  And you referenced "a strategy session."  Is a
17  strategy session different from a board meeting?
18  A.  No.
19  Q.  Is that separate and apart from board
20  meetings?
21  A.  No.  It's a -- it's a full board meeting.
22  Q.  So when you count board meetings, you're
23  saying you set four or so board meetings a year and then
24  a couple strategy sessions?
25  MR. CIOFFI:  Objection.  That was not his

Page 13

1   testimony, but you can ask him.
2   BY MR. SABA:
3   Q.  I'm just trying to understand what you mean by
4   which meetings you hold and what they are?
5   A.  All of them are board meetings, but you meet
6   as a board on the quarterly cycle to review financial
7   statements and public documents or documents you're
8   going to make public.  And then we'll have at least one,
9   maybe two board meetings that we review the business
10  plan, the strategy plan, for the upcoming years, but
11  they're all part of the board meeting.
12  Q.  The meetings where you review the strategy
13  plan for the upcoming years, are those held at the same
14  time each year?
15  A.  I believe so.
16  Q.  When are those held?
17  A.  We'll have one -- the preliminary review in --
18  I believe it's October, and then a final review in
19  December.
20  Q.  And what is your understanding of what the
21  duties of the -- of the board members are?
22  A.  Oh, the duties of a board member are -- are to
23  give an independent view, advice and counsel, on the
24  business of the Fifth Third Bank and the -- and the
25  direction that management is recommending to take the

Page 14

1   company forward.
2   Q.  How many board members are there?
3   A.  I believe there are 12.
4   Q.  And how many of those board members are
5   independent of Fifth Third Bank?
6   A.  All except the CEO, and currently the outgoing
7   CEO is still on the board, but I don't believe he would
8   be considered independent yet.
9   Q.  And that is Mr. Carmichael you're referring to
10  as the outgoing CEO?
11  A.  Yes, sir.
12  Q.  And the other CEO member that you're referring
13  to is Mr. Spence; is that correct?
14  A.  That's correct.
15  Q.  What is the board's role with respect to
16  executive succession?
17  A.  I would say that that is the primary role of
18  the board, is to be able to learn, observe development,
19  observe, you know, the management team, both inside the
20  bank and outside the bank for future succession
21  planning.
22  Q.  Do you serve on any committees?
23  A.  I do.
24  Q.  Which committees do you serve on?
25  A.  I chair the finance committee.  I serve on the

Page 15

1   risk committee and on the human capital compensation
2   committee.
3   Q.  What does the finance committee do?
4   A.  The finance committee is a committee of all
5   the chairs of the different committees, where it serves
6   kind of as a quasi executive committee.
7   Q.  How long have you served on the finance
8   committee?
9   A.  Approximately five years.
10  Q.  How long have you been the chair?
11  A.  From the beginning, all five years.
12  Q.  What does the risk committee do?
13  A.  The risk committee reviews all of the
14  policies, both credit, risk, governmental compliance, so
15  anything associated with risk on lending, credit
16  allowances, loss allowances, anything to do with risk in
17  and around the bank is reviewed by the risk committee.
18  Q.  How long have you been on the risk committee?
19  A.  About the last four years.
20  Q.  And what does the Human Capital Compensation
21  Committee do?
22  A.  We review all of the executive compensation
23  and company compensation for the bank, and it is our
24  duty to observe and advise and make the final
25  recommendations to the board on any compensation for the

Deposition of Gary R. Heminger                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 16

1  executives and management.
2      Q.  Is the Human Capital Compensation Committee
3  also referred as to the HCCC?
4      A.  Yes, sir.
5      Q.  What role does the HCCC play in the process of
6  executive succession for the president and CEO?
7      A.  The members of the HCC are joined by the other
8  members of the board, and so executive succession for
9  the CEO is all done at the board level, not just
10 particularly within the HCCC -- HCC, I should say.
11     Q.  Independent of the board, does the HCCC have
12 any part in the process of executive succession for the
13 president and CEO?
14     MR. CIOFFI:  Objection.  Asked and answered,
15 but you may answer.
16     THE WITNESS:  Repeat it, independent --
17 BY MR. SABA:
18     Q.  Independent of the board, does the HCCC have
19 any role in the executive succession for the president
20 and CEO?
21     A.  No, sir.
22     Q.  How often do each of those committees meet?
23     A.  The finance committee will meet -- and let me
24 clarify, you want me to talk about each committee I'm
25 on?

Page 17

1      Q.  Please.
2      A.  The finance committee will meet probably six
3  times a year.  The risk committee meets every board
4  meeting and maybe a call -- we will have a separate risk
5  committee call with regulatory agencies about twice a
6  year.  The HCC committee meets I would say five, six
7  times a year.
8      Q.  Is it correct to say that the finance
9  committee and risk committee have no involvement in the
10 succession planning for president and/or CEO?
11     A.  At the committee level, that is correct.
12     Q.  At what level do they have any involvement in
13 the succession planning for president and/or CEO?
14     A.  At the committee level, they do not.  The
15 board members separately do, but not at the committee
16 level.
17     Q.  And just to clarify that, are you saying the
18 board members do as members of the board, but not
19 necessarily as members of the finance or risk committee?
20     A.  That's correct.
21     Q.  Prior to January 1st, 2020, what was your
22 relationship with Philip McHugh?
23     A.  I've known Philip for all of the years that
24 I've been on the board, so it was a professional
25 relationship that I would see Philip at the board

Page 18

1  meetings.
2      Q.  Other than seeing Philip at the board
3  meetings, where else would you see him?
4      A.  I believe that's it.
5      Q.  You didn't spend any time with him socially;
6  is that correct?
7      A.  No, sir.
8      Q.  Did you, outside of the board meetings, did
9  you ever observe Philip in the workplace?
10     A.  No.
11     Q.  Did -- outside board meetings, did you ever
12 meet with Philip at any time to discuss any Fifth Third
13 issues?
14     A.  Not that I recall.
15     Q.  Did you ever communicate with Phil McHugh by
16 phone, by text, by email?
17     A.  I may have, but not that I recall.
18     Q.  Did you ever discuss Phil McHugh with any of
19 his direct reports or any of his subordinates?
20     A.  Not that I recall.
21     Q.  Did you ever discuss Phil McHugh with Greg
22 Carmichael?  And, again, the period of time I'm
23 referring to is prior to January 1, 2020.
24     A.  Could you repeat that question?
25     Q.  Sure.  Prior to January 1 of 2020, did you

Page 19

1  ever discuss Phil McHugh with Greg Carmichael?
2      A.  We would have discussed inside the boardroom,
3  but not specifically one-on-one with Greg Carmichael,
4  but I would have had discussions inside the boardroom
5  where Greg was presenting.
6      Q.  Prior to January 1 of 2020, do you recall any
7  specific discussions in the boardroom about Phil McHugh?
8      A.  As we, you know, reviewed the development of
9  executives, yes, we would have had discussions about
10 Mr. McHugh's development, yes.
11     Q.  What do you recall about those discussions?
12     A.  I don't -- I really don't recall any of the
13 details at this time.
14     Q.  Do you know what the enterprise committee is?
15     A.  I do.
16     Q.  What is the enterprise committee?
17     A.  The enterprise committee is the members of the
18 executive team of the bank.
19     Q.  Outside the board meetings, did you have any
20 discussions with any members of the enterprise committee
21 regarding Phil McHugh?
22     A.  No, sir.
23     Q.  Outside of any board meetings, did you do any
24 of your own independent analysis of Phil McHugh's
25 performance with Fifth Third bank?

Deposition of Gary R. Heminger

Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 20

1   A.  No, sir.
2   Q.  Was there ever a discussion during any of the
3   board meetings of Phil McHugh succeeding Greg Carmichael
4   as president and/or CEO of Fifth Third Bank?
5       MR. CIOFFI:  Objection.  Vague.  And
6   discussions with whom?
7       MR. SABA:  Let me rephrase the question.
8   BY MR. SABA:
9   Q.  Prior to January 1, 2020, during any board
10  meetings, do you recall any discussions about Phil
11  McHugh succeeding Greg Carmichael as president and/or
12  CEO of Fifth Third Bank?
13      MR. CIOFFI:  Objection.  I didn't hear the
14  first part of that.  Could you read that back,
15  please?
16      (The record was read.)
17      MR. CIOFFI:  Your first question was outside
18  the board meeting, but this one is during the board
19  meeting.
20      MR. SABA:  Correct.  I rephrased the question.
21      MR. CIOFFI:  Do you understand the question?
22      THE WITNESS:  Well, now I'm confused, so
23  remind me again.
24      MR. SABA:  Let me repeat the question.
25      THE WITNESS:  And excuse me one second.  I

Page 21

1   forgot to turn my phone off.  I'm sorry.
2   BY MR. SABA:
3   Q.  Prior to January 1st, 2020, do you recall any
4   discussions during any of the board meetings regarding
5   Phil McHugh replacing Greg Carmichael as president
6   and/or CEO of Fifth Third Bank?
7   A.  I do not.
8   Q.  Do you believe that there were any discussions
9   of -- regarding Phil McHugh replacing Greg Carmichael as
10  president and/or CEO of Fifth Third Bank prior to
11  January 1st, 2020 during any of the board meetings?
12  A.  Not as replacing Greg Carmichael, no.
13  Q.  What about other than replacing Greg
14  Carmichael?
15      MR. CIOFFI:  Objection, vague.  Other
16  discussions?
17  BY MR. SABA:
18  Q.  Other discussions of Fifth -- I can rephrase
19  the question.
20      MR. CIOFFI:  Please do.
21  BY MR. SABA:
22  Q.  Prior to January 1, 2020, were there ever any
23  discussions during board meetings regarding Phil
24  McHugh becoming president and/or CEO of Fifth Third
25  Bank?

Page 22

1   A.  Isn't that the same question I just answered?
2       MR. CIOFFI:  I think so, but --
3   BY MR. SABA:
4   Q.  You answered not with respect to replacing
5   Greg Carmichael.
6   A.  Okay.
7   Q.  So I rephrased the question --
8   A.  All right.
9   Q.  -- to remove that characteristic of replacing
10  Greg Carmichael to see if there were any discussions,
11  separate and apart from replacing Greg Carmichael?
12  A.  Right.
13  Q.  Do you understand the question?
14  A.  I do.
15  Q.  Okay.
16  A.  The -- in the board meeting, when we're doing
17  succession planning, we review -- it's a continuous
18  process that we review candidates.  So we would have had
19  discussions, you know, not only Mr. McHugh, but other
20  candidates as well.
21  Q.  When you say "candidates," as candidates for
22  president and CEO of Fifth Third Bank?
23  A.  Candidates for potential for any upward
24  movement within the enterprise team.
25  Q.  Were there any specifically with respect to

Page 23

1   Phil McHugh as president and/or CEO of Fifth Third Bank?
2   A.  Not that I recall.
3   Q.  Focusing on the period after January 1st,
4   2020, was your relationship with Phil McHugh any
5   different after that date?
6       MR. CIOFFI:  Objection.  Vague.  Different
7   than what?
8   BY MR. SABA:
9   Q.  Different than what you indicated prior to
10  January 1st, 2020?  I'll ask it a different way.
11      Describe to me your relationship with Phil
12  McHugh after January 1st, 2020?
13  A.  I don't see my relationship any
14  different.  It's always been a professional
15  relationship.
16  Q.  Did you have any direct meetings with Phil
17  McHugh after January 1st, 2020, outside any board
18  meetings?
19  A.  Not that I recall.
20  Q.  Did you have any conversations with Phil
21  McHugh after January 1st, 2020, outside any board
22  meetings?
23      MR. CIOFFI:  Objection.  You just asked that
24  question, I think.
25      THE WITNESS:  Not that I recall.

Deposition of Gary R. Heminger                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 24

BY MR. SABA:

Q. Did you have any communication by text, email, or telephone with Phil McHugh after January 1st, 2020?

A. Not that I recall.

Q. After January 1st, 2020, did you do any independent analysis of Phil McHugh's performance at Fifth Third Bank?

MR. CIOFFI: Objection. I didn't get the preface. Did you say outside the board meetings?

MR. SABA: After.

MR. CIOFFI: Could you read the question back? I'm sure it's perfectly fine, but I didn't hear it.

(The record was read.)

MR. CIOFFI: Objection. Lack of clarity. Are you saying outside the board meetings?

MR. SABA: In or outside board meetings.

MR. CIOFFI: Could you -- because that wasn't the question. Could you rephrase the question, please?

MR. SABA: Sure.

BY MR. SABA:

Q. After January 1st, 2020, did you do any independent analysis of Phil McHugh outside any board meetings?

A. No, sir.

Page 25

Q. After January 1st, 2020, did you meet with any of Phil McHugh's direct reports or subordinates to discuss Phil McHugh's performance?

A. No, sir.

Q. After January 1st, 2020, did you have any meetings or conversations with Greg Carmichael to discuss Phil McHugh succeeding him as president and/or CEO of Fifth Third bank?

A. Not that I recall.

Q. Outside of any board meetings, did you have any meetings with Greg Carmichael during which you discussed Phil McHugh?

A. Not that I recall.

Q. After January 1st, 2020, did you have any meetings with any members of the enterprise committee, other than Greg Carmichael, during which you discussed Phil McHugh?

A. That's --

Q. It's broad.

A. That's broad. Run that by my again.

Q. Sure. After January 1, 2020, did you have any meetings with any members of the enterprise committee during which you discussed Phil McHugh?

A. No, sir.

Q. Prior to January 1st, 2020, what was your

Page 26

relationship with Tim Spence?

A. A professional relationship as a member of the management team of Fifth Third.

Q. Prior to January 1st, 2020, did you have any meetings with Mr. Spence outside any board meetings?

A. I would have had some phone calls.

Q. When did you have those phone calls with Mr. Spence?

A. I don't recall.

Q. Why did you have phone calls with Mr. Spence prior to January 1, 2020?

A. Just, again, as a professional relationship for clarification of different things that were presented at a board presenting.

Q. How many phone calls did you have with Mr. Spence?

A. I don't recall.

Q. More than five?

A. No.

Q. Do you recall what year those phone calls were?

A. No.

Q. Do you recall any of the topics that you followed up with him about?

A. One was to get -- have further information,

Page 27

further understanding, I should say, of some of the digital platforms that were being considered at the bank.

Q. Do you recall any of the other topics?

A. I do not.

Q. Did you ever communicate with Mr. Spence by email or text message prior to January 1, 2020?

A. I don't recall.

Q. Prior to January 1, 2020, did you have any conversations with Mr. Carmichael about Mr. Spence succeeding him as president and CEO of Fifth Third Bank?

MR. CIOFFI: Objection. Are you saying outside the board meetings?

MR. SABA: I'm saying at any time prior to January 1, 2020, did you have any conversations with Mr. Carmichael about Mr. Spence succeeding him as president and/or CEO of Fifth Third Bank?

MR. CIOFFI: My objection is are you including both inside and outside the board meetings in your question? That's what is not clear.

MR. SABA: No, my question is clear. Any conversations. So that could be in a board meeting, it could be outside a board meeting.

MR. CIOFFI: Do you understand the question?

THE WITNESS: I do.

Deposition of Gary R. Heminger | Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 28

1  MR. CIOFFI: Please answer.
2  THE WITNESS: I would have had conversations
3  inside the board meeting.
4  BY MR. SABA:
5  Q. Did you have any conversations outside the
6  board meeting with Mr. Carmichael about Mr. Spence
7  succeeding him as president and/or CEO of Fifth Third
8  Bank?
9  A. Not that I recall.
10  Q. During which board meetings did you have
11  conversations with Mr. Carmichael about Mr. Spence
12  succeeding him as president and CEO of Fifth Third Bank?
13  A. I don't recall the actual dates.
14  Q. Did you have any conversations with any of the
15  other board meetings -- excuse me, let me rephrase that.
16  Did you have any conversations with any of the
17  other board members, either during a board meeting our
18  outside a board meeting, regarding Mr. Spence succeeding
19  Mr. Carmichael as president and/or CEO of Fifth Third
20  Bank?
21  MR. CIOFFI: Objection. Time frame. Ever?
22  MR. SABA: I wasn't done with my question.
23  MR. CIOFFI: Oh, I thought you were.
24  BY MR. SABA:
25  Q. This is prior to January 1st, 2020.

Page 29

1  MR. CIOFFI: Can you read the question back
2  please.
3  MR. SABA: Let me repeat the question.
4  BY MR. SABA:
5  Q. Prior to January 1st, 2020, did you have any
6  conversations with any other board members, either
7  inside a board meeting or outside a board meeting,
8  regarding Mr. Spence succeeding Mr. Carmichael as
9  president and/or CEO of Fifth Third Bank?
10  A. Yes.
11  Q. When were those conversations?
12  A. I don't recall the exact dates.
13  Q. Who did you have those conversations with?
14  A. Well, as part of -- as I mentioned earlier in
15  my deposition, its responsibility -- the number one
16  responsibility of the board is succession planning, and
17  we would have had discussions in executive session of
18  the board, you know, a couple times a year.
19  Q. Did you have any conversations outside any
20  board meetings or executive sessions with any of the
21  other board members regarding Mr. Spence succeeding
22  Mr. Carmichael as president and/or CEO of Fifth Third
23  Bank?
24  MR. CIOFFI: Objection. Asked and answered.
25  The same question.

Page 30

1  MR. SABA: No, I'm clarifying whether he had
2  any conversations outside any board meetings.
3  THE WITNESS: Not that I recall.
4  BY MR. SABA:
5  Q. Did you ever observe Mr. Spence in the
6  workplace?
7  MR. CIOFFI: Objection.
8  BY MR. SABA:
9  Q. Outside any board meeting?
10  A. Run that question by me again.
11  Q. Certainly. Prior to January 1, 2020, did you
12  ever observe Mr. Spence in the workplace?
13  A. In the workplace? Yes.
14  Q. When did you observe him in the workplace?
15  A. In many presentations at the board meetings.
16  Q. Outside any board meetings, did you ever
17  observe Mr. Spence in the workplace?
18  A. Not that I recall.
19  Q. Did you ever meet with any of Mr. Spence's
20  subordinates or direct reports regarding Mr. Spence?
21  MR. CIOFFI: Objection. Clarity. You
22  keep going inside, outside the board meetings.
23  Is this ever or inside or outside or what are you
24  asking?
25  MR. SABA: I can rephrase the question.

Page 31

1  BY MR. SABA:
2  Q. Prior to January 1, 2020, did you ever have
3  any meetings with any of the direct reports or
4  subordinates to Mr. Spence outside any board meetings to
5  discuss Mr. Spence?
6  A. Not that I recall.
7  Q. Outside -- excuse me. Prior to January 1,
8  2020, outside any board meetings, did you have any
9  conversations with any members of the enterprise
10  committee regarding Mr. Spence succeeding Mr. Carmichael
11  as president and/or CEO of Fifth Third Bank?
12  MR. CIOFFI: Objection. Lack of clarity.
13  You're asking those questions really fast. Could
14  you read it back, please?
15  MR. SABA: I can repeat it slower.
16  MR. CIOFFI: I couldn't really follow it.
17  BY MR. SABA:
18  Q. After -- excuse me. Prior to January 1, 2020,
19  did you ever have any conversations with any members of
20  the enterprise committee outside any board meetings
21  regarding Mr. Spence succeeding Mr. Carmichael as
22  president and/or CEO of Fifth Third Bank?
23  A. Not that I recall.
24  Q. You indicated that you first joined the Fifth
25  Third board in 2006; is that correct?

Deposition of Gary R. Heminger                                Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 32

1    A.  Yes, sir.
2    Q.  Were you involved in the process of Mr. Kabat
3   succeeding Mr. Shaffer's position?
4    A.  I was not.
5    Q.  Obviously you were here when Mr. Carmichael
6   succeeded Mr. Kabat; is that correct?
7    A.  That's correct.
8    Q.  Explain to me what your understanding is of
9   the executive succession process at Fifth Third for
10  replacing the president and/or CEO?
11   A.  The process, the executive succession
12  planning -- and it's not just the process here at Fifth
13  Third, it's the process that I'm very familiar with at
14  the company that I ran for many years, Marathon
15  Petroleum, it's the same process at PPG -- where we
16  evaluate many candidates over a span of time, and so
17  it's a continuous process to see how they're developing,
18  to see what their strategic vision is, to see what
19  their -- I will call it a culture index, how they manage
20  people, their leadership skills with people.  So we are
21  continually evaluating the development of executives
22  that might some day be considered for that position.
23   Q.  What else?
24   A.  I think I summed it up pretty well.
25   Q.  With respect to Fifth Third Bank

Page 33

1   specifically -- and we'll focus on the most recent
2   transition from Mr. Carmichael to Mr. Spence -- who were
3   the many candidates that were evaluated?
4        MR. CIOFFI:  Objection.  Time frame?  You are
5   talking about the process, so --
6        MR. SABA:  You said many candidates were
7   evaluated.  Who were the many candidates that were
8   evaluated?
9        MR. CIOFFI:  Again, time frame.  I mean, are
10  you talking about from the time Mr. Carmichael
11  became CEO?
12        MR. SABA:  He said they evaluate many
13  candidates.  I'm asking about with respect to Mr.
14  -- locating Mr. Carmichael's replacement, who were
15  the many candidates that were considered?
16        THE WITNESS:  I don't recall that that's what
17  I stated.  I said in the executive succession
18  planning --
19        MR. SABA:  Right.
20        THE WITNESS:  -- that can be for many
21  different executive enterprise positions, we
22  evaluate many candidates over time.  Not
23  specifically the president and CEO.
24  BY MR. SABA:
25   Q.  My question goes specifically with respect to

Page 34

1   president and CEO, what is that process at Fifth Third
2   Bank?
3    A.  As we evaluate the -- in this case, a very
4   short list, it would not be many.  We evaluate internal
5   candidates in this case to determine how those possible
6   candidates are developing.
7    Q.  Anything else that goes into selecting the
8   president and/or CEO at Fifth Third Bank?
9    A.  It's very important to understand, as I said,
10  the strategic vision of a person, their apparent
11  leadership skills, their gravitas with the employees,
12  with the outside investment community, and their
13  presentation skills, you know, to the board itself.
14   Q.  And what did the board do to gain that
15  understanding of Mr. Spence?
16   A.  Throughout all of the board meetings that I
17  spoke about earlier, including the strategy sessions,
18  every meeting, you're being evaluated.  Every breakfast,
19  lunch, and dinner you're with the board, you're being
20  interviewed on how you're developing and how you're
21  preparing.  So over all of those meetings, we would have
22  observed Mr. Spence, observed how he's developing,
23  observed his strategic vision, observed his
24  interpersonal skills with the enterprise team.  You
25  always, as a director, you're always observing the

Page 35

1   executive management team.
2    Q.  And that's all within the board meetings,
3   correct?
4    A.  Well, within the board meetings, as I said,
5   within -- whether you have a breakfast, lunch, or
6   dinner, it's all part of the board meeting, but you
7   break away from the actual board meeting when you have a
8   dinner.
9    Q.  Outside the board meetings and the breakfast,
10  lunch, or dinner, anything else?
11   A.  No, sir.
12   Q.  And during what period of time was Mr. Spence
13  evaluated as a candidate to replace Mr. Carmichael as
14  president and CEO?
15   A.  Over the last -- I don't recall the exact
16  dates, but the last three or four years, the board
17  continuously observed and were evaluating Mr. Spence's
18  development.
19   Q.  You referenced a short list of internal
20  candidates for president and CEO of Fifth Third Bank to
21  replace Mr. Carmichael.  Who was on the short list of
22  internal candidates?
23        MR. CIOFFI:  Objection.  That misstates his
24  testimony, but you may answer.
25        THE WITNESS:  The CFO, Mr. Tayfun Tazun, would

Deposition of Gary R. Heminger                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 36

1  have been evaluated. Mr. McHugh would have been
2  evaluated. Mr. Spence. At one point in time we
3  observed Mr. Anderson, Lars Anderson. Again, the
4  board is continuously observing their development.
5  It doesn't mean that any or all of them were
6  considered to be the president and CEO. We're
7  observing their development to see how they are --
8  how they're coming along.
9  BY MR. SABA:
10  Q.  With respect to Mr. McHugh, during what period
11  of time would he have been on that short list of
12  candidates?
13     MR. CIOFFI: Objection. Asked and answered,
14  but you may answer.
15     THE WITNESS: I would have -- first of all, I
16  said he was on the short list of people we
17  observed. I didn't say he was a short list of --
18  as a candidate for president and CEO, but a short
19  list of the executives that we are observing and
20  evaluating.
21  BY MR. SABA:
22  Q.  Was there a short list of candidates for
23  president and CEO?
24  A.  Yes.
25  Q.  And who was on that short list of candidates

Page 37

1  for president and CEO to replace Mr. Carmichael?
2  A.  Mr. Spence.
3  Q.  Anybody else?
4  A.  Not that I'm aware of.
5  Q.  When was Mr. Spence placed on that short list
6  of candidates to replace Mr. Carmichael as president and
7  CEO?
8  A.  I don't recall the exact date.
9  Q.  Do you know a time frame?
10  A.  Within the last three to four years.
11  Q.  Was Mr. McHugh ever on the short list of
12  candidates to become president and CEO of Fifth Third
13  bank?
14  A.  Not that I recall.
15  Q.  Who creates the short list of candidates for
16  someone to become the next president and CEO of Fifth
17  Third Bank?
18  A.  It's an iterative process where executives are
19  reviewed with the board and then within the board
20  meeting, within the succession planning group, it is
21  determined who we are going to further observe as a
22  potential candidate as a successor.
23  Q.  You mentioned a succession planning group.
24  What is a succession planning group?
25     MR. CIOFFI: Objection. Asked and answered.

Page 38

1     THE WITNESS: The full board.
2  BY MR. SABA:
3  Q.  There's no separate group within the full
4  board?
5     MR. CIOFFI: Objection. Asked and answered.
6  Redundant. Argumentative. You may answer.
7     THE WITNESS: There's no separate group.
8  BY MR. SABA:
9  Q.  Why was Mr. Spence the only person on the
10  short list to replace Mr. Carmichael as president and
11  CEO of Fifth Third Bank?
12     MR. CIOFFI: Objection. Mischaracterizes his
13  testimony. You may answer.
14     THE WITNESS: From our observation of members
15  of the management team, we felt that Tim had the --
16  during his presentations, that he observed, you
17  know, exemplary strategic vision, a tremendous
18  depth and breadth of the digital Fintech platforms,
19  outstanding interpersonal skills, and a passion to
20  really take the bank forward.
21  BY MR. SABA:
22  Q.  What do you do to prepare for a Fifth Third
23  board meeting?
24  A.  You need to -- I don't hear you when you're
25  talking that way.

Page 39

1  Q.  Oh, I'm sorry. Excuse me. What do you do to
2  prepare for a Fifth Third board meeting?
3  A.  We receive in advance, depending on the
4  committee, whether it's the finance committee or excuse
5  me, whether it's the audit committee, the HCC committee,
6  the risk committee, the finance committee, we receive in
7  advance all of the materials that are going to be
8  presented at those different committees, and so I read
9  those. The information that is detailed and the agendas
10  that are detailed per committee, and you read and are
11  prepared so that when you get into the board meeting, it
12  all doesn't have to be recited again.
13  Q.  Who presides over the board meetings?
14  A.  The chairman of the board and the lead
15  director.
16  Q.  Chairman would be Mr. Carmichael; is that
17  right?
18  A.  At this time, yes.
19  Q.  Well, going back for the past several years,
20  he's been presiding over the board meetings, correct?
21     MR. CIOFFI: Objection. Lack of clarity, over
22  several years. You may answer.
23     THE WITNESS: Yes. Marsha Williams was our
24  lead director early in Mr. Carmichael's career. I
25  don't recall, but I don't believe that

Deposition of Gary R. Heminger

Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 40

1     Mr. Carmichael was immediately chairman upon

2 succeeding Mr. Kabat, but Marsha Williams was our

3 lead director and presided over a good number of

4 meetings during that period of time.

5 BY MR. SABA:

6     Q.  Mr. Carmichael became CEO in 2015; does that

7 sound correct?

8     **A.  Approximately, yes.**

9     Q.  And since that time, he's presided over the

10 board meetings; is that correct?

11        MR. CIOFFI:  Objection.  Asked and answered.

12     That is not what he said.

13        THE WITNESS:  I don't recall the exact date

14     that Mr. Carmichael was made chairman.

15 BY MR. SABA:

16     Q.  Let me represent to you that it was

17 November 1st, 2015.  Since that time, has Mr. Carmichael

18 presided over the board meetings?

19        MR. CIOFFI:  Objection.  Counsel's testifying.

20     The witness answered the question.  He doesn't

21     know.

22        THE WITNESS:  I don't know the exact date.

23 BY MR. SABA:

24     Q.  Since Mr. Carmichael has become CEO, has he

25 presided over the board meetings?

Page 41

1        MR. CIOFFI:  Objection.  Asked and answered.

2     Argumentative.  Redundant.

3        THE WITNESS:  The CEO does not preside over

4     the board meetings.

5 BY MR. SABA:

6     Q.  Excuse me.  Since Mr. Carmichael has become

7 chairman of the board, he has presided over the board

8 meetings; is that correct?

9     **A.  Since he became chairman, that's correct.**

10     Q.  Thank you.  How and when are the

11 documents provided to the board members for the

12 board meetings?

13     **A.  Usually a week, maybe up to two weeks in**

14 **advance of the board meeting via a system called**

15 **Diligent.  They are downloaded and --**

16     Q.  The Diligent board's portal; is that what that

17 is?

18     **A.  Yes, sir.**

19     Q.  And who provides those documents for the board

20 meetings?

21     **A.  They come from the secretary's office, the**

22 **legal office of Fifth Third.**

23     Q.  Who sets the agenda for each board meeting?

24     **A.  The agenda is discussed with the chair of each**

25 **committee, reviews their committee information, and then**

Page 42

1 **the lead director will review the agenda for the full**

2 **board with the chairman.**

3     Q.  And who determines who the presenters or

4 speakers will be at each board meeting?

5     **A.  It will be the management team, but usually**

6 **the CEO.**

7        MR. SABA:  If we can go off the record.

8        THE VIDEOGRAPHER:  The time is 10:35 a.m.

9     We're going off the record.

10        (A recess was taken from 10:36 a.m. to

11     11:01 a.m.)

12        THE VIDEOGRAPHER:  The time is 11:01.  We are

13     back on the record.

14 BY MR. SABA:

15     Q.  Mr. Heminger, how much are you paid for being

16 a member of the board at Fifth Third?

17     **A.  Approximately $300,000, half in cash and half**

18 **in stock.**

19     Q.  And do you receive additional funds for being

20 on the committees?

21     **A.  No, sir.**

22     Q.  What about for being a -- the chair of a

23 committee?

24     **A.  You get an additional fee as the chair of a**

25 **committee, yes.**

Page 43

1     Q.  How much is that?

2     **A.  I believe -- I believe it's about 35,000 -- 35**

3 **to $40,000 to be the chair of the finance committee.**

4     Q.  Did Mr. Carmichael ever recommend to the board

5 that Mr. Spence replace him as president and/or CEO of

6 Fifth Third?

7        MR. CIOFFI:  Objection.  Time frame?

8        MR. SABA:  Any time.

9        THE WITNESS:  In our last meeting, it was a

10     collective -- it was a recommendation from Greg,

11     but it was a decision in the executive session of

12     the board where we made the decision.

13 BY MR. SABA:

14     Q.  By the last meeting, what are you referring

15 to, "the last meeting"?

16     **A.  Whatever meeting it was where we made the**

17 **decision on Tim Spence.**

18     Q.  And are you referring to the decision for Tim

19 Spence to become president or the decision for Tim

20 Spence to become CEO?

21     **A.  I was referring to when he became CEO.**

22     Q.  Did Mr. Carmichael ever make a recommendation

23 with respect to Mr. Spence becoming president to the

24 board?

25     **A.  There would have been a recommendation back**

Deposition of Gary R. Heminger        Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 44

1 when we made Mr. Spence president, yes, there would have
2 been a recommendation by Mr. Carmichael that we consider
3 him.
4   Q.  Do you recall when that recommendation was
5 made?
6   A.  I don't recall the exact date.
7   Q.  Did he make that recommendation -- did
8 Mr. Carmichael make that recommendation at more than one
9 board meeting?
10   A.  Not that I recall.
11   Q.  Do you recall if the recommendation made by
12 Mr. Carmichael was during a regular portion of the board
13 meeting or during an executive session?
14   A.  The recommendation had been made during an
15 executive session of the board.
16   Q.  Are minutes taken of executive sessions?
17   A.  I believe so.
18   Q.  Who is responsible for taking the minutes
19 during an executive session of the board?
20   A.  I don't know.
21   Q.  Have you ever seen minutes from an executive
22 session of the board?
23   A.  I've seen minutes of the entire board meeting,
24 and I think that they are inclusive of executive
25 session.

Page 45

1   Q.  You think the board minutes include minutes of
2 what takes place in the executive session?
3   A.  I think, but I'm not sure.
4   Q.  You'd agree, from a practical standpoint,
5 the -- you would want a record of what happened during
6 the executive session so you all know what you did
7 during the prior executive session, correct?
8       MR. CIOFFI:  Objection to the form.  Counsel
9       is testifying.  Do you have a question or do you
10       want him to agree with your testimony?
11       MR. SABA:  That was my question.
12       MR. CIOFFI:  Your testimony was your question.
13 BY MR. SABA:
14   Q.  Do you understand the question, Mr. Heminger?
15 Do you understand the question?
16   A.  Run it by me again, please.
17   Q.  From a practical standpoint, wouldn't you want
18 a record of what happened during an executive session so
19 you would know what you all decided during the executive
20 session?
21   A.  Yes.
22   Q.  Did Mr. Carmichael ever recommend to the board
23 that Mr. McHugh should succeed him as president and/or
24 CEO?
25   A.  Not that I recall.

Page 46

1       (Plaintiff's Exhibit 1 is marked for
2       identification.)
3 BY MR. SABA:
4   Q.  Mr. Heminger, I've handed you what's been
5 marked as Exhibit Number 1.  Can you identify that for
6 me, please?
7   A.  Fifth Third Bancorp Minutes of the Meeting of
8 the Board of Directors February 28, 2019.
9   Q.  And if you look down at the bottom right-hand
10 corner of that document, it has what we call a Bates
11 stamp.  Do you see where it says Fifth Third McHugh
12 212471?
13   A.  Yes.
14   Q.  Do you see that number there?  And if you page
15 through, it goes through to 212474; is that correct?
16   A.  Yes.
17   Q.  Have you seen this document before,
18 Mr. Heminger?
19   A.  I would have seen the minutes before, yes.
20   Q.  And as you indicated, this was for the meeting
21 that took place on February the 26th, 2019; is that
22 correct?
23   A.  Yes.  I'm sorry, I said earlier February 28.
24 It's hard to read, but it is February 26.
25   Q.  And you were present at that meeting, correct?

Page 47

1   A.  Yes.
2   Q.  And if we look down, Mr. Carmichael presided
3 over this meeting; is that correct?
4   A.  Yes.
5   Q.  You would agree, Mr. Heminger -- actually, let
6 me rephrase the question.  Does this appear to you to be
7 a full set of the minutes from the February 26, 2019
8 board meeting for Fifth Third Bancorp?
9   A.  I can't determine if it's a full set or not.
10   Q.  Based upon Exhibit 1, are you able to tell me
11 whether or not there was any discussion of succession
12 timelines and candidates for the position of president
13 during the February 26, 2019 board meeting?
14       MR. CIOFFI:  Objection.  The document speaks
15       for itself, but if you have --
16       MR. SABA:  Go ahead.
17       MR. CIOFFI:  -- an answer, go ahead and answer
18       it.
19       THE WITNESS:  Rephrase the question, please.
20       I have to look at the minutes.
21 BY MR. SABA:
22   Q.  Sure.  Based upon Exhibit Number 1?
23   A.  Uh-huh.
24   Q.  Are you able to tell me whether or not there
25 was any discussion of succession timelines and

Deposition of Gary R. Heminger                                        Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 48

1  candidates for the position of president during the
2  February 26, 2019 board meeting?
3       MR. CIOFFI: Counsel, do you have a section of
4    this you want to direct his attention to rather
5    than have him read the whole thing or --
6       MR. SABA: No. My question speaks for itself.
7       MR. CIOFFI: So does the document. Whether he
8    points it out right now doesn't matter, but go
9    ahead. You may answer if you have one.
10      THE WITNESS: I do not see anything in this
11   document, no.
12  BY MR. SABA:
13      Q.  As you sit here today, can you tell me whether
14  or not there were any discussions during the
15  February 26, 2019 board meeting, regarding the
16  succession timelines and candidates for the position of
17  president?
18      A.  I do not recall.
19      Q.  What would you need in order to determine
20  whether or not there were any discussions during the
21  February 26, 2019 board meeting regarding the succession
22  timelines and candidates for the position of president?
23      MR. CIOFFI: Objection to the form of the
24    question. It's vague. You mean out --
25      MR. SABA: Go ahead, Mr. Heminger.

Page 49

1       MR. CIOFFI: Other than total recall, I mean,
2    he said he just didn't recall. So do you have
3    something to refresh his memory?
4  BY MR. SABA:
5       Q.  Do you understand my question?
6       A.  I do.
7       Q.  What is your answer?
8       A.  I -- I don't see anything in this document
9    that makes me recall if there was any discussion or not.
10      Q.  You would agree with me that this document --
11  let me represent to you this is what was produced by
12  Fifth Third's counsel with respect to the minutes of the
13  meeting of the board of directors for Fifth Third
14  Bancorp on February 26, 2019, that there would appear to
15  be several pages missing. Recognizing it goes from the
16  first page to page 15.
17      MR. CIOFFI: Objection to the form of the
18    question. Are you asking him to agree with you?
19      THE WITNESS: I --
20  BY MR. SABA:
21      Q.  You indicated before you couldn't tell if this
22  was a full set of the minutes or not; is that right?
23      A.  That's what I said, yes.
24      Q.  If you look at the first page, Fifth Third
25  McHugh 212471?

Page 50

1       A.  Correct.
2       Q.  We don't have a page number there, but when
3  you turn the page, the next page, Fifth Third McHugh
4  212472 has a page number 15; do you see that?
5       A.  I do.
6       Q.  Which would appear to indicate that there is
7  at least 13 pages missing; is that correct?
8       A.  According to this numbering sequence, yes.
9       Q.  If you had the full set of board minutes for
10  February 26, 2019, would you be able to tell us whether
11  or not there was a discussion regarding succession
12  timelines and candidates for the position of president
13  during that meeting?
14      MR. CIOFFI: Objection to the form.
15      THE WITNESS: I don't know. I can't observe
16    anything from -- other than what you've put in
17    front of me.
18  BY MR. SABA:
19      Q.  Based upon Exhibit 1, can you tell me everyone
20  who made a presentation at the February 26, 2019 board
21  meeting for Fifth Third Bancorp?
22      A.  I can't tell you everyone, no.
23      Q.  If you had a full set of the minutes for the
24  board of directors meeting for Fifth Third Bancorp for
25  February 26, 2019, would you be able to tell me everyone

Page 51

1  who made a presentation at that meeting?
2       A.  I believe --
3       MR. CIOFFI: Objection to the form. You're
4    asking him to speculate on what might or might not
5    be in the minutes and whether those presentations
6    were recorded, but you may answer. Go ahead.
7       THE WITNESS: I believe I could.
8       MR. SABA: We'll make a note at this point as
9    we proceed, Michael. Obviously we've made a
10   request for the full set of minutes which haven't
11   been provided, but we will have to continue this
12   deposition in progress for additional questions
13   regarding the full sets of minutes.
14      MR. CIOFFI: Again, like the deposition of
15   Mr. McCallister, I recognize you're trying to keep
16   the deposition open and preserving whatever rights
17   you may have. I don't agree that you have any
18   rights. We've produced every page of the minutes
19   that are arguably relevant in this case, but -- so
20   there's no need to keep it open because you have
21   more than what's relevant and what is responsive to
22   Civil Rule 26, but I recognize you're trying to
23   preserve whatever rights you believe you have.
24      (Plaintiff's Exhibit 2 is marked for
25    identification.)

Deposition of Gary R. Heminger

Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 52

BY MR. SABA:

Q. Mr. Heminger, I've handed you what has been marked as Exhibit Number 2. Can you identify that for me, please?

A. Yes. Fifth Third Bank Minutes of the Meeting of the Board of Directors February 26, 2019.

Q. And do you recognize that this is a separate set of minutes for Fifth Third Bank as opposed to Fifth Third Bancorp?

A. Yes.

Q. Does this clarify your understanding that you're actually on the board of directors for both Fifth Third Bank and Fifth Third Bancorp?

A. Yes.

Q. And is it fair to say that these meetings are held simultaneously both beginning at the same time?

A. I believe that is correct.

Q. Essentially they're joint meetings of both board of directors?

A. Yes.

Q. You serve both roles simultaneously, correct?

A. Yes.

Q. And, again, referring to the Bates stamps at the bottom of Exhibit Number 2, this is marked Fifth Third McHugh 212475 through McHugh 212479; is that

Page 53

correct?

A. That's correct.

Q. If you could look through Exhibit Number 2, Mr. Heminger, are you able to tell me whether or not this is a complete set of the minutes -- of the board minutes for Fifth Third Bank for February 26, 2019?

A. No, I'm not.

Q. Making the same reference as before, the -- you'll see that the first page goes from having no page mark on it 212475, but the second page, Firth Third McHugh 212476, is marked as page 21; do you see that?

A. Yes.

Q. So it would appear that there is at least 19 pages missing between there; is that correct?

A. It appears.

Q. Based upon your review of these minutes, are you able to tell me whether or not there was any discussion of succession timelines and candidates for the position of president during the February 26, 2019 board meeting for Fifth Third Bank?

A. I do not see anything in these minutes, no.

Q. Based upon Exhibit 2, are you able to tell me who the presenters were during the February 26, 2019 board meeting for Fifth Third Bank?

A. In some cases, yes.

Page 54

Q. Can you tell me who all the presenters were?

A. During the strategy update, it was Mr. Spence and Mr. Carmichael, Mr. Anderson, Mr. Tazun, Mr. Leonard.

Q. Anyone else?

A. Hang on. That's all I can see from what you've given me.

Q. So going back to my earlier question, are you able to identify every presenter?

A. I'm sorry?

Q. Are you able to identify everyone who made a presentation at the February 26, 2019 board meeting of Fifth Third Bank, based upon Exhibit 2?

MR. CIOFFI: Objection to the form. It seems that there are others besides what he answered, but you may answer.

THE WITNESS: I answered on -- based on what you gave me, I answered who appears to have been the presenters.

BY MR. SABA:

Q. And my question is, are you able to identify everyone who presented during that board meeting?

A. No.

MR. CIOFFI: Objection. Argumentative. Assumes facts not before the witness.

Page 55

(Plaintiff's Exhibit 3 is marked for identification.)

BY MR. SABA:

Q. Mr. Heminger, I have handed you what has been marked as Exhibit Number 3. Can you identify that for me, please?

A. Fifth Third Bancorp Minutes of Meeting of the Board of Directors February 26, 2019.

Q. And, sir, if you compare this to Exhibit 1, which is also Fifth Third Bancorp Minutes of Meeting of the Board of Directors February 26, 2019, if I can first refer you to the Bates stamp numbers on Exhibit 3, those are marked Fifth Third McHugh 212771; is that correct?

A. Yes.

Q. And they run through 212774; is that correct?

A. Yes.

Q. Which you agree are different than the Bates stamp numbers on Exhibit 1 for the same set of minutes; is that correct?

MR. CIOFFI: Objection. The documents speak for themselves.

BY MR. SABA:

Q. Do you agree with that, sir, Exhibit 1 and Exhibit 3 have different Bates stamp numbers; is that correct?

Deposition of Gary R. Heminger                                      Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 56

1    A.  That's correct.
2    Q.  And they are both listed as Fifth Third
3  Bancorp minutes for the same day.  Do you know if one is
4  a draft set of minutes?
5    A.  I don't know.
6    Q.  Do you know if either one is the final set of
7  minutes that was approved by the board?
8    A.  I don't.
9    Q.  What would you need to see in order to
10 determine whether or not the minutes were a final set of
11 minutes approved by the board?
12    A.  I would need to see the record that is held
13 with the corporate secretary.
14    Q.  Comparing Exhibit 1 to Exhibit Number 3,
15 Mr. Heminger, the first paragraph under executive
16 session with CEO, under Exhibit Number 3, has been
17 blacked out.  Whereas under Exhibit Number 1 under
18 executive session with CEO, that paragraph has not been
19 blacked out.  My question is, is there any additional
20 information that you can recall that occurred during
21 that executive session that is not disclosed under
22 Exhibit Number 1?
23    A.  Not that I recall.
24    (Plaintiff's Exhibit 4 is marked for
25    identification.)

Page 57

1  BY MR. SABA:
2    Q.  Mr. Heminger, I have handed you what has been
3  marked as Exhibit Number 4.  Can you identify that for
4  me, please?
5    A.  Fifth Third Bancorp Minutes of Meeting of the
6  Board of Directors April 16, 2019.
7    Q.  Have you seen this document before?
8    A.  I don't recall.
9    Q.  You would agree with me this document is Bates
10 stamped at the bottom Fifth Third McHugh 212480 through
11 212481; is that correct?
12    A.  Yes.
13    Q.  Do you recall if the Fifth Third Bancorp board
14 meeting minutes for April 16, 2019 were more than two
15 pages?
16    A.  I don't recall.
17    Q.  Based upon Exhibit 4, are you able to tell
18 whether or not there was any discussion of succession
19 timelines of candidates for the position of president
20 during the April 16, 2019 meeting?
21    A.  I cannot -- I cannot determine that, no.
22    Q.  Based upon Exhibit 4, are you able to tell me
23 who the presenters were at the April 16, 2019 board
24 meeting for Fifth Third Bancorp?
25    A.  Mr. Carmichael and Ms. Somalya.

Page 58

1    Q.  Were there any other presenters?
2    A.  Not that I read here.
3    Q.  Based on Exhibit 4, are you able to tell me
4  the complete list of presenters at the April 16, 2019
5  meeting?
6    A.  No.
7    Q.  And just to be clear, you did attend that
8  meeting; is that correct?
9    A.  Yes.
10    Q.  And Mr. Carmichael presided over that meeting;
11 is that correct?
12    A.  Yes.
13    Q.  During that April 16, 2019 meeting, was there
14 also a simultaneous meeting for Fifth Third Bank Board
15 of Directors?
16    A.  I don't know.
17    Q.  Is it fair to say that if there was a board of
18 directors meeting for Fifth Third Bank on April 16th,
19 2019, that there would also be a set of minutes for that
20 meeting?
21    A.  Yes.
22    (Plaintiff's Exhibit 5 is marked for
23    identification.)
24    THE WITNESS:  That is an extra.
25    MR. SABA:  Thank you.

Page 59

1  BY MR. SABA:
2    Q.  Mr. Heminger, I've handed you what has been
3  marked as Exhibit 5.  Can you identify that for me,
4  please?
5    A.  Fifth Third Bancorp Minutes of Meeting of the
6  Board of Directors, June 18, 2019.
7    Q.  And do you agree with me that Exhibit Number 5
8  is Bates stamped Fifth Third McHugh 212487 through Fifth
9  Third McHugh 212489?
10    A.  Yes.
11    Q.  If you can just let me finish before you
12 answer.
13    Do you agree with that, sir?
14    A.  Repeat it.
15    Q.  Do you agree with me that Exhibit Number 5 is
16 Bates stamped Fifth Third McHugh 212487 through Fifth
17 Third McHugh 212489?
18    A.  Yes.
19    Q.  And to be clear, you were present for that
20 board meeting; is that correct?
21    A.  Yes.
22    Q.  And Mr. Carmichael presided over that board
23 meeting; is that correct?
24    A.  Yes.
25    Q.  Based upon Exhibit Number 5, are you able to

Deposition of Gary R. Heminger

Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 60

1 tell me whether or not there was any discussion of
2 succession timelines and candidates for the position of
3 president during the June 18, 2019 board meeting for
4 Fifth Third Bancorp?
5   A.  No, I cannot.
6   Q.  Based upon Exhibit Number 5, are you able to
7 identify for me all of the presenters at the June 18,
8 2019 board meeting for Fifth Third Bancorp?
9   A.  Mr. Carmichael, Mr. Spence, Mr. Anderson,
10 Mr. Tazun.
11   Q.  Are those all the people that presented during
12 the June 18, 2019 board meeting for Fifth Third Bancorp?
13   A.  I don't know.
14     (Plaintiff's Exhibit 6 is marked for
15      identification.)
16 BY MR. SABA:
17   Q.  Mr. Heminger, I've handed you what's been
18 marked as Exhibit Number 6.  Can you identify that for
19 me, please?
20   A.  Fifth Third Bank Minutes of Meeting of the
21 Board of Directors, June 18, 2019.
22   Q.  Do you agree, sir, that Exhibit 6 is Bates
23 stamped Fifth Third McHugh 212490 through Fifth Third
24 McHugh 212501?
25   A.  That's correct.

Page 61

1   Q.  Based upon Exhibit -- excuse me, let me go
2 back again, sir.
3     Again, this was a meeting that was held
4 simultaneous with the board meeting for Fifth Third
5 Bancorp on June 18, 2019; is that correct?
6   A.  That's correct.
7   Q.  As you previously indicated, you were in
8 attendance for that meeting; is that right?
9   A.  That's correct.
10   Q.  And Mr. Carmichael presided over that meeting;
11 is that correct?
12   A.  Yes.
13   Q.  Based upon Exhibit 6, are you able to tell me
14 whether or not there was any discussion of succession
15 timelines and candidates for the position of president
16 during the June 18, 2019 board meeting for Fifth Third
17 Bank?
18   A.  I cannot tell.
19   Q.  As you sit here today, do you recall whether
20 or not there was a discussion regarding succession
21 timelines and candidates for the position of president
22 during the June 18, 2019 board meeting for Fifth Third
23 Bank?
24   A.  I do not recall.
25   Q.  Based upon Exhibit 6, are you able to tell me

Page 62

1 who all of the presenters were at the June 18, 2019
2 board meeting for Fifth Third Bank?
3   A.  Mr. Carmichael, Mr. Tazun, Mr. -- Mr. Spence,
4 Mr. Schramm.  That's all I can tell.
5   Q.  Are you able to tell me whether or not those
6 were all of the presenters at the June 18, 2019 board
7 meeting for Fifth Third Bank?
8   A.  No.
9     (Plaintiff's Exhibit 7 is marked for
10      identification.)
11 BY MR. SABA:
12   Q.  Mr. Heminger, I have handed you what's been
13 marked as Exhibit Number 7.  Can you identify that for
14 me, please?
15   A.  Fifth Third Bancorp Minutes of Joint Meeting
16 of the Board of Directors, September 16, 2019.
17   Q.  And you were present for that meeting; is that
18 correct?
19   A.  Yes.
20   Q.  And Mr. Carmichael presided over that meeting;
21 is that right?
22   A.  Yes.
23   Q.  You would agree with me that Exhibit 7 is
24 Bates stamped Fifth Third McHugh 212502 through 212506;
25 is that correct?

Page 63

1   A.  Yes.
2   Q.  Based upon Exhibit Number 7, are you able to
3 tell me whether or not there was any discussion
4 regarding succession timelines and candidates for the
5 position of president during the board meeting on
6 September 16, 2019?
7   A.  I do not see any.
8   Q.  Based upon Exhibit Number 7, are you able to
9 identify for me all of the presenters during the
10 September 16, 2019 board meeting for Fifth Third
11 Bancorp?
12   A.  Mr. Carmichael, Mr. Tazun, Mr. Leonard,
13 Mr. Anderson, Mr. McHugh, Mr. Spence.  That's it.
14   Q.  Are those all the people that presented during
15 that time?
16   A.  I don't recall.
17   Q.  Independent of Exhibit Number 7, do you recall
18 whether or not there was a discussion of succession
19 timelines and candidates for the position of president
20 during the September 16, 2019 meeting of the board of
21 directors for Fifth Third Bancorp?
22   A.  I don't recall.
23   Q.  Independent of Exhibit Number 7, do you recall
24 who all the presenters were during the September 16,
25 2019 meeting of the board of directors for Fifth Third

Deposition of Gary R. Heminger                                          Philip R. McHugh v. Fifth Third Bancorp, et al.

---

Page 64

1  Bancorp?
2      A.  I do not recall.
3          (Plaintiff's Exhibit 8 is marked for
4      identification.)
5  BY MR. SABA:
6      Q.  Mr. Heminger, I've handed you what has been
7  marked as Exhibit Number 8.  Can you identify that for
8  me, please?
9      A.  Fifth Third Bank Minutes of Meeting of the
10 Board of Directors, September 16, 2019.
11     Q.  And Exhibit 8 is Bates stamped Fifth Third
12 McHugh 212507 through McHugh 212512; is that correct?
13     A.  Yes, sir.
14     Q.  And briefly, sir, explain to me the process by
15 which the minutes are created and approved?
16         MR. CIOFFI:  Objection to the form.  Lack of
17     foundation.  If you know, you can answer.
18         THE WITNESS:  I'm sorry, what did you say at
19     the end?
20         MR. CIOFFI:  If you know.  If you have some
21     knowledge about how it was created, you can answer.
22         THE WITNESS:  I know that they are -- the
23     minutes are taken by the corporate secretary, and
24     it's the corporate secretary's office then that
25     assembles the minutes and sends them out to the

---

Page 65

1  board after their completion.
2  BY MR. SABA:
3      Q.  And does the board vote on and approve the
4  minutes?
5      A.  That's correct.
6      Q.  And when does that typically occur?
7      A.  At the next meeting of the board of directors.
8      Q.  Based upon Exhibit Number 8, are you able to
9  tell me whether or not there was any discussion of
10 succession timelines and candidates for the position of
11 president during the September 16, 2019 meeting of the
12 board of directors of Fifth Third Bank?
13     A.  I cannot.
14     Q.  Based upon Exhibit Number 8, are you able to
15 tell me who all of the presenters were at the
16 September 16, 2019 board meeting for the board of
17 directors for Fifth Third Bank?
18     A.  I could tell Mr. Carmichael,
19 Mr. Spence, Mr. Bashara and Mr. Carbody.
20 That's all I can tell.
21     Q.  Based upon Exhibit Number 8, are you able to
22 determine whether or not those were all of the
23 presenters at the board meeting for Fifth Third Bank on
24 September 16, 2019?
25     A.  I cannot.

---

Page 66

1          (Plaintiff's Exhibit 9 is marked for
2      identification.)
3  BY MR. SABA:
4      Q.  Mr. Heminger, I've handed you what's been
5  marked as Exhibit Number 9.  Are you able to identify
6  that for me?
7      A.  It's a document to be utilized for the human
8  capital executive talent management and succession plan
9  updates discussion on December 17, 2019.
10     Q.  You'd agree with me that Exhibit Number 9 is
11 Bates stamped Fifth Third McHugh 001104 through 001154;
12 is that correct?
13     A.  Yes.
14     Q.  The first page is an email; is that correct?
15     A.  That's correct.
16     Q.  And you're one of the recipients of that
17 email; is that right?
18     A.  Yes.
19     Q.  And this would be an email to the entire
20 board; is that correct?
21     A.  Yes.
22     Q.  And the email is from Bob Shaffer; is that
23 right?
24     A.  That is correct.
25     Q.  And in the email where he references,

---

Page 67

1  "Attached is the document Greg and I will utilize," Greg
2  is Greg Carmichael; is that right?
3      A.  That's correct.
4      Q.  Beginning on the second page of Exhibit 9,
5  Fifth Third McHugh 001105 through McHugh 001154, can you
6  explain to me what that document is?
7          MR. CIOFFI:  Objection.  Do you want to direct
8      him to a particular page or do you want him to look
9      at all of 45 pages?  No particular page?
10         MR. SABA:  No.  Do you understand my question?
11         THE WITNESS:  I do.
12 BY MR. SABA:
13     Q.  Can you identify for me what that document is,
14 please?
15     A.  This is a document that the full board uses
16 for an update on executive talent management, the
17 development of executive talent management and
18 succession planning that we use as a collective board as
19 we continue to follow a candidates' performance.
20     Q.  And how and when was this particular document
21 used?
22     A.  It was presented at the December 17th meeting
23 of the -- of the full board.
24     Q.  Would you have reviewed this prior to the
25 board meeting?

---

Deposition of Gary R. Heminger          Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 68

1   A.  I believe this would have been sent out prior
2 to the board meeting, yes.
3   Q.  Do you know when you received Mr. Shaffer's
4 email?
5   A.  I don't.
6   Q.  Based upon the email that Mr. Shaffer sent, it
7 would appear he sent it roughly a week before the
8 meeting itself; is that correct?
9   A.  I don't see a date on here.
10   Q.  Looking at the last line of his email, "I look
11 forward to seeing you next week."
12   A.  Okay.  I would assume that's correct.
13   Q.  And is there a term for these roughly 50 pages
14 that comprise the back portion of Exhibit 9?
15     MR. CIOFFI:  Objection to the form.  When you
16     say the back pages, what are you referring to?
17     MR. SABA:  Let me rephrase.
18 BY MR. SABA:
19   Q.  The document that's Bates stamped McHugh
20 001105 through 001154, attached to the email of
21 Mr. Shaffer, is there a particular term that's used for
22 this document?
23   A.  As it says on 1105, Human Capital Executive
24 Talent Management and Succession Plan Updates.
25   Q.  Have you ever heard this referred to as the

Page 69

1 talent deck?
2   A.  No.
3   Q.  And how is this document -- strike that.
4    How was this document used during the
5 December 17, 2019 board meeting?
6   A.  The full board reviews, the strategic -- human
7 capital strategic priorities, the talent framework, the
8 development of management, executive succession planning
9 materials.  So the full board reviews this to be able to
10 observe how management has continued to develop and be
11 prepared for the future.
12   Q.  So does the full board go through this
13 document in detail?
14   A.  Yes.
15   Q.  Who prepares the board of directors human
16 capital executive talent management and succession plan
17 updates?
18   A.  I don't know everyone that prepares it.
19   Q.  This is not prepared by the board, it's
20 prepared for the board, correct?
21   A.  It's prepared in combination with the board.
22   Q.  And what role does the board play in preparing
23 this document?
24   A.  The board -- so in this case, the lead
25 director and the chair of the human capital compensation

Page 70

1 committee would review this along with the chairman/CEO
2 in preparing the agenda and preparing the materials for
3 this meeting.
4   Q.  Who are those three people?
5   A.  At this time frame it would have been Greg
6 Carmichael, Marsha Williams, and Michael McCallister.
7   Q.  Would you have seen any drafts of the board of
8 directors human capital and executive talent management
9 succession plan updates?
10   A.  No.  I would only see whatever was going to be
11 presented.
12   Q.  Do you know if Mr. McCallister saw any drafts
13 of the board of directors human capital and executive
14 talent management succession plan updates?
15   A.  I don't know.
16   Q.  Do you know if -- you said Marsha Williams; is
17 that right?
18   A.  That's what I said, yes.
19   Q.  Do you know if Ms. Williams saw any drafts of
20 the board of directors human capital and executive
21 talent management and succession plan updates?
22   A.  I don't know.
23   Q.  Did the board make any decisions based in
24 whole or in part upon the information provided in the
25 board of directors human capital and executive talent

Page 71

1 management and succession plan updates?
2     MR. CIOFFI:  Objection to the form.  Any
3     decisions about what?
4 BY MR. SABA:
5   Q.  Do you understand the question?
6     MR. CIOFFI:  It's vague, but it's your
7     question.  You may answer if you have an answer.
8     THE WITNESS:  I understand what you said, but
9     I don't understand the question.  Repeat the
10     question, please.
11 BY MR. SABA:
12   Q.  Sure.  I asked if the board made any
13 decisions, based in whole or in part, on the information
14 provided in the board of directors human capital and
15 executive talent management and succession plan updates?
16   A.  I don't recall at this particular meeting if
17 we made decisions or not.
18   Q.  To be more specific, did the board of
19 directors make any decisions regarding succession
20 planning for president and/or CEO based upon any of the
21 information provided in the human capital and executive
22 talent management and succession plan updates?
23   A.  I don't know if it was this exact meeting.
24   Q.  What role would this document play with
25 respect to the succession planning process for president

Deposition of Gary R. Heminger                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 72

1  and/or CEO?

2     A. Well, this document is used to give the board,
3  again, the full board, an update on the qualities of
4  management that might be considered, how they've
5  developed over the past year, areas where they may be
6  working on particular different development attributes,
7  and so all this is assembled for the board to observe,
8  and then the board takes this very seriously. As I said
9  earlier, this is the number one job of the board, to
10  determine who is going to be the future leader or
11  leaders of the company. So we take this very serious,
12  and we question vigorously the presenter or presenters
13  into the content of this meeting.

14     Q. When you say "the presenter or the presenters"
15  that you question seriously, is this information also
16  presented to the board as a PowerPoint?

17     A. Not -- it's presented like you've handed it to
18  me here.

19     Q. And does the board question anybody about the
20  content of the information that's contained in the board
21  of directors human capital and executive talent
22  management and succession plan updates?

23     A. Absolutely.

24     Q. And who does the board question about that?

25     A. We will question the current CEO. We'll

Page 73

1  question the head of HR that generally is in the
2  meeting. We'll question them on the development, what
3  they're seeing with the development of different people
4  that might be mentioned in here. But we question the
5  CEO vigorously, as I said.

6     Q. And the CEO is Mr. Carmichael; is that
7  correct?

8     A. That's correct.

9     Q. And the head of HR, would that be Mr. Shaffer?

10     A. At this meeting, that would be correct.

11     Q. You said you didn't recall if there were
12  decisions made at this particular meeting regarding the
13  information provided in Exhibit 9. Were there decisions
14  that were ultimately made at either another meeting or
15  this meeting, based upon the information provided in
16  Exhibit Number 9?

17        MR. CIOFFI: Objection to the form. Earlier
18     you asked in whole or part. Is that part of your
19     question or just --

20        MR. SABA: Sure. I can rephrase it that way.

21  BY MR. SABA:

22     Q. You didn't -- Mr. Heminger, you indicated you
23  didn't recall whether or not a decision was made at this
24  particular December 2019 meeting regarding the
25  information provided in Exhibit Number 9. And my

Page 74

1  question is, was there ever a decision made, based in
2  whole or in part, on the information provided in Exhibit
3  Number 9 regarding the succession for president and/or
4  CEO?

5     A. I don't recall.

6     Q. If I can refer you to Fifth Third McHugh
7  001142.

8     A. 12? 1112?

9     Q. No. 1142.

10     A. I'm sorry. Okay.

11     Q. Can you identify what is on that page for me,
12  please?

13     A. This is a page that says CEO succession where
14  the board -- the CEO reports to the board of directors
15  and it relates on -- it looks at different people within
16  the company who might be considered, you know, for
17  possible succession to the CEO over -- this illustrates
18  over the next seven-plus years.

19     Q. Have you seen this document before?

20     A. I have.

21     Q. And what does this document indicate about who
22  would be ready to be CEO over the next seven years?

23     A. It indicates that Mr. Spence could be ready in
24  three-plus years. Mr. Lamb in seven-plus years.

25     Q. Who is Mr. Lamb?

Page 75

1     A. He was an executive with the -- with the bank
2  back in this period of time. I don't believe he's with
3  the company anymore.

4     Q. Is it fair to say that Mr. Lamb was considered
5  as a candidate for president and/or CEO of Fifth Third
6  Bank?

7     A. No, it did not -- this page does not indicate
8  to me that he is being considered. It's saying that he
9  may be developed to be able to be considered in
10  seven-plus years, but not being considered right at this
11  time.

12     Q. What does it indicate about Mr. Spence?

13     A. It says that if he continues his development,
14  he may be, you know, considered in three-plus years.

15     Q. With respect to emergency successor, what does
16  that mean?

17     A. That means if something were to happen to the
18  CEO, you know, something tragic or catastrophic were to
19  happen to the CEO, that we would possibly consider in
20  this case Mr. Tazun or Mr. McHugh or possibly a board
21  member as an interim successor until we could locate who
22  we want or determine who we want to be the CEO going
23  forward.

24     Q. The list that we see there, Mr. Tazun,
25  Mr. McHugh, and then a board member, is that ranked by

Deposition of Gary R. Heminger | Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 76

1  order of priority or are those just individuals under
2  consideration?
3      A.  I believe it's just individuals under
4  consideration.
5      Q.  Do you know who prepared 001142?
6      A.  It would have been prepared with the input of
7  the lead director, the head of the comp committee, and
8  the CEO, and the head of HR.
9      Q.  What characteristics would be required to be
10 considered an emergency successor for CEO?
11     A.  Oh, it -- you know, someone who can keep the
12 business operating for a period of time that takes to
13 recruit and determine who the next CEO should be.  But
14 characteristics to have the knowledge to how to continue
15 running the bank during this period of time, and to be
16 able to direct, you know -- direct the responsibilities
17 of, you know, workings of the bank under control.
18     Q.  In your experience with the various boards
19 you've been on and companies you've been involved with,
20 was there ever a situation where an emergency CEO needed
21 to be appointed?
22     A.  At Ohio State we had one indication or one
23 particular time, yes.
24     Q.  When did that occur?  After the Michigan
25 football game?

Page 77

1      A.  Both of them.  Coincidentally it did occur,
2  but had nothing to do with it.  In 2019, 2020 time
3  frame.
4      Q.  And using that as an example, how long did it
5  take to find the -- strike that.
6          In that situation where there was an
7  emergency -- a need for an emergency CEO -- how long did
8  that person who came in as the emergency CEO, how long
9  did they remain in that position?
10     A.  About four months.
11     Q.  Beyond your experience at Ohio State, have you
12 had any other situations where it was necessary to put
13 in an emergency CEO?
14     A.  No.
15     Q.  Do you recall any of the discussions that the
16 board had with respect to Mr. McHugh serving as an
17 emergency successor CEO?
18         MR. CIOFFI:  Objection to the form.  He didn't
19     testify that they did, but you may answer.
20         THE WITNESS:  I recall we had that discussion,
21     yes.
22 BY MR. SABA:
23     Q.  Do you recall when that discussion took place?
24     A.  That discussion was in the event of an
25 emergency, that Mr. McHugh would be one that would be

Page 78

1  considered, only on an emergency interim basis.
2      Q.  Do you recall when that conversation took
3  place?
4      A.  In this time frame of the document that we're
5  looking at.
6      Q.  The December 2019 time frame; is that correct?
7      A.  That's correct.
8      Q.  Outside that time frame, were there any other
9  discussions of Mr. McHugh serving as the emergency
10 successor as CEO?
11     A.  I don't recall the exact time frame if we --
12 in subsequent meetings, I do recall this time frame, but
13 I don't recall a subsequent meeting or prior meetings.
14     Q.  Can you explain to me what, if any, different
15 characteristics would be required from an emergency CEO
16 versus the regular replacement of a CEO?
17     A.  Yes.  When you -- in all of my background and
18 naming new CEOs to companies, you're looking for someone
19 that you believe has the superior qualities to be able
20 to be the CEO for a long period of time.  So this
21 process is going through and observing candidates that
22 as they continue to develop, and you're looking for
23 those superior qualities of strategic planning,
24 strategic vision, interpersonal skills, presentations to
25 investment communities, and someone that really has the

Page 79

1  depth, the breadth, and has the pulse of this entire
2  banking industry, that really understands what's going
3  on, whether it's venture capital, whether it's activism,
4  whether it's fed policy, somebody who has that depth and
5  breadth that can really fulfill the entire engagement
6  process of being a CEO.
7      Q.  You said "long period of time."  What did you
8  mean by a long period of time?
9      A.  Well, I mean more than, you know, as I
10 answered before, on an interim basis, you know, four to
11 five months.  So I'm talking about a longer period of
12 time.  Someone who can take the span of control.  And
13 you always want to look at a CEO that would have a
14 runway of, you know, probably a minimum of five to seven
15 years.
16     Q.  What do you mean, "a runway of a minimum of
17 five to seven years"?
18     A.  Someone who you believe you can develop and
19 has a -- someone that you believe has the passion and
20 the ability, you know, to work that long.
21     Q.  What are the factors that determine whether or
22 not somebody has a runway of a minimum of five to seven
23 years?
24     A.  What I just said, strategic vision,
25 interpersonal skills, depth and breadth of the market.

Deposition of Gary R. Heminger | Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 80

1  Somebody who really understands how to take the business
2  forward.
3      Q.  How does that translate in determining whether
4  or not that runway is five to seven years?
5      A.  You look and see how they have developed over
6  time and whether or not you believe they can continue to
7  develop and perform at the, you know, exceptional level
8  that you expect.
9      Q.  Is there a certain age at which you believe
10 someone would not be able to complete the runway of a
11 minimum of five to seven years?
12     A.  It's all individual, based on the individual.
13     Q.  You're identifying the attributes of the
14 chairman during the regular process.  What are the
15 distinctions between those and the emergency successor
16 CEO?
17         MR. CIOFFI:  Objection to the form.  You used
18     the word "chairman."
19         MR. SABA:  Excuse me.  Let me rephrase the
20     question.
21 BY MR. SABA:
22     Q.  You're identifying the -- what is required for
23 a CEO during the regular succession process and the
24 characteristics you're looking for.  How do those differ
25 from the characteristics of an emergency successor CEO?

Page 81

1      A.  As you're going through this process, you're
2  looking at the skills of each individual and, you know,
3  the pyramid is a very, very -- is very narrow very quick.
4  So you're looking for, what I said earlier, the superior
5  qualities.  Every executive I expect has qualities,
6  that's what I have observed throughout my entire, you
7  know, tenure as an executive, but you're looking for
8  that person that has the superior qualities versus
9  someone who can keep the lights on and keep the business
10 running on an interim basis under control, and I would
11 expect any executive to be able to do that at this
12 level, but you're looking for that person who can, for a
13 long period of time, be able to manage and bring their
14 vision to the table and not someone that's just, you
15 know, can run the place for a short period of time.
16     Q.  And, again, that long period of time that you
17 just referenced, that's the five to seven year period?
18     A.  It could be -- it could be three to five.  It
19 could be -- it's longer than four months, let's put it
20 that way.
21     Q.  Okay.  If I could refer you to 001135.
22     A.  Got it.
23     Q.  Can you identify for me what that is on McHugh
24 001135?
25     A.  This would be the document used to review the

Page 82

1  current development and the expected potential, in this
2  case, of Tim Spence.
3      Q.  And how is this information used?
4      A.  I'm sorry?
5      Q.  How does the board use this information?  What
6  do you do with it?
7      A.  We look at this information for every
8  executive that is presented and we use this to really
9  question.  In this case the CEO that's presenting, the
10 head of HR that might be there, but we use this, as I
11 say, in all cases of everyone that's being presented to
12 really question and based on the observations that we
13 have and the meetings that we've set in on the
14 performance of what we think the potential could be of
15 this person.
16     Q.  And who would have provided the information on
17 McHugh 001135?
18     A.  It would have been provided by the head of HR,
19 the CEO, in review and consultation with the head of the
20 compensation committee and the lead director.
21     Q.  Would you have seen any drafts of McHugh
22 001135?
23     A.  This is all I would see, right here.
24         MR. SABA:  If we can go off the record.
25         THE VIDEOGRAPHER:  The time is 12:18 p.m.  We

Page 83

1  are going off the record.
2         (A recess was taken from 12:18 p.m. to
3         12:19 p.m.)
4         THE VIDEOGRAPHER:  The time is 12:19 p.m.  We
5      are back on the record.
6  BY MR. SABA:
7      Q.  Mr. Heminger, you were explaining how the
8  information presented on McHugh 001135 would be used by
9  the board, with respect to succession planning and
10 identifying potential candidates for different positions
11 at the bank; is that correct?
12     A.  That's correct.
13     Q.  And that would be true for all the summary
14 pages that we see of explaining individuals that are on
15 McHugh 001127 through McHugh 1137; is that correct?
16         MR. CIOFFI:  Objection to the form.  Could you
17     read the question back, please?
18         (The record was read.)
19         MR. CIOFFI:  And the indefinite pronoun,
20     "that" means what?
21         MR. SABA:  We can clarify.
22         MR. CIOFFI:  Please.
23 BY MR. SABA:
24     Q.  Can you identify what we see on McHugh pages
25 001127 through McHugh 001137?

Deposition of Gary R. Heminger                                      Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 84

1     **A.  In this case, the board is reviewing the**
2  **performance and potential of -- I should say the**
3  **background, we are looking at the background and the**
4  **development of the potential executive, and then what we**
5  **see is the potential that they might be able to aspire**
6  **to in the future.**
7     Q.  And just to clarify, I think foundationally
8  going back to my question, can you just clarify for the
9  record what we see on McHugh 001127 through McHugh
10 001137?
11    **A.  It's an individual document on each of the**
12 **officers that are being reviewed as to their -- as to**
13 **their background, their development, and their**
14 **potential.**
15    Q.  And I believe you were previously explaining
16 how that information is used by the board; is that
17 correct?
18    **A.  That's correct.**
19       (Plaintiff's Exhibit 10 is marked for
20       identification.)
21 BY MR. SABA:
22    Q.  Mr. Heminger, I've handed you what has been
23 marked as Exhibit Number 10.  Can you identify that for
24 me, please?
25    **A.  Minutes of the Joint Meeting of the Board of**

Page 85

1  **Directors, December 17, 2019.**
2     Q.  And this is for both Fifth Third Bancorp and
3  Fifth Third Bank; is that correct?
4     **A.  Yes.**
5     Q.  And you were in attendance at that meeting; is
6  that right?
7     **A.  Yes.**
8     Q.  And Mr. Carmichael presided over that meeting;
9  is that right?
10    **A.  Yes.**
11    Q.  And Exhibit Number 10 is Bates stamped Fifth
12 Third McHugh 007108 through 007128; is that correct?
13    **A.  That's correct.**
14    Q.  Referring you to the last page, Fifth Third
15 McHugh 007128, there's a signature line for Saema
16 Somalya as assistant secretary; do you see that?
17    **A.  Yes.**
18    Q.  Do you know why these minutes are not signed?
19    **A.  No.**
20    Q.  Do you know if these are a draft of the
21 minutes for that meeting or are they a final copy?
22    **A.  I don't know.**
23    Q.  Have you seen these minutes before?
24    **A.  I don't recall.**
25    Q.  Would you typically see the minutes after they

Page 86

1  are prepared?
2     **A.  I would.**
3     Q.  As far as you know, have you seen the minutes
4  for the meeting that took place on December 17th, 2019?
5     **A.  I would expect that I would.**
6     Q.  Under Executive Performance Review, referring
7  to the second paragraph, the first sentence reads, "They
8  then reviewed the proposed performance review for each
9  executive officer other than Mr. Carmichael, including a
10 discussion of key achievements, strengths,
11 opportunities, and development planning priorities for
12 such individuals."
13     Do you see that?
14    **A.  Yes.**
15    Q.  And would it appear that "they" is referring
16 to Mr. Carmichael and Mr. Shaffer?
17    **A.  That's correct.**
18    Q.  And with respect to their review of the
19 proposed performance review for each executive officer,
20 is that referring to the information that is provided on
21 Exhibit Number 9 for the Bates stamped pages 001127
22 through 001137?
23    **A.  That would be correct.**
24    Q.  And do you recall, are they just summarizing
25 the information in each of those sheets, or are they

Page 87

1  providing additional information?
2     **A.  Well, we go into detailed discussions and**
3  **sometimes debate as the board is trying to, you know,**
4  **gain a consensus of how they feel on the development of**
5  **different officers.**
6     Q.  And that debate and discussion is -- I'm just
7  trying to understand where the information comes from --
8  that debate and discussion you referenced, is it based
9  upon the information that we see in Exhibit 9, 001127
10 through 001137?
11    **A.  Correct.**
12    Q.  Other than the information we see here in
13 Exhibit 9, is there additional information in document
14 form or otherwise that Mr. Carmichael, Mr. Shaffer, are
15 also presenting during that time?
16       MR. CIOFFI:  Objection.  You're confining this
17       question only to what Carmichael and Shaffer
18       presented or other information?  You started out
19       broad and then you sort of all of a sudden narrowed
20       it.
21 BY MR. SABA:
22    Q.  My question goes back to, I'm focused -- do
23 you understand, Mr. Heminger, what I'm talking about,
24 the December 19th -- excuse me, the December 17th
25 meeting, 2019?

Deposition of Gary R. Heminger

Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 88

1    A.  Frame it for me again.
2    Q.  What I'm asking is, based upon the minutes,
3  Mr. Carmichael and Mr. Shaffer reviewed the proposed
4  performance review for each executive officer, including
5  a discussion of key achievements, strengths,
6  opportunities, and development planning opportunities
7  for such individuals.  What I am trying to get an
8  understanding of is the information that went into
9  that presentation by Mr. Carmichael, Mr. Shaffer in that
10  discussion.  We did discuss from Exhibit 9 the various
11  pages regarding the respective officers.  My question
12  now goes to, as you sit here today, do you recall if
13  they referred to any other documentation or information
14  regarding each of these officers?
15        MR. CIOFFI:  I'll renew my objection, but if
16    you can answer.  Again, you're only talking about
17    what Carmichael and Shaffer said, nobody else.
18        MR. SABA:  I am talking about right now this
19    presentation.
20        THE WITNESS:  Yes.  I'm not aware of any other
21    documentation, but we had vigorous discussions
22    about each individual.
23  BY MR. SABA:
24    Q.  But in terms of other information, as you sit
25  here today, you don't recall any other information other

Page 89

1  than what we see provided here in Exhibit 9 by
2  Mr. Carmichael and Mr. Shaffer during that portion?
3    A.  I don't recall.
4    Q.  If you could turn to Fifth Third McHugh
5  007109, which is the second page of Exhibit 10.
6  Referring first to the resolution that we -- that's
7  first listed on the top of the second page, McHugh
8  007109, can you read that resolution to me?
9    A.  "Resolved that the chief executive officer
10  shall have the authority to negotiate potential role
11  changes for each of Mr. Forrest and Mr. Anderson
12  respectively, including, at his discretion, a potential
13  removal of category 1, section 16, and Regulation O
14  status from such individuals, and to appoint succession
15  candidates" -- excuse me -- "appoint succession
16  candidates for the roles of chief risk officer, head of
17  commercial banking, and treasurer from among the
18  candidates discussed at the meeting."
19    Q.  And the chief executive officer referred to
20  there is Mr. Carmichael, correct?
21    A.  That's correct.
22    Q.  Referring to the first full paragraph after
23  the resolutions, it says, "Thereafter, Mr. Carmichael
24  and Mr. Shaffer initiated a review of potential
25  succession timelines and candidates for the chief

Page 90

1  executive officer/CEO position."
2        Do you see that sentence?
3    A.  I do.
4    Q.  Did I read that correctly?
5    A.  Yes.
6    Q.  Who were the candidates that Mr. Carmichael
7  and Mr. Shaffer referenced and reviewed?
8    A.  Well, this meeting, as in every meeting that
9  we do succession planning, we review all of the officers
10  and we determine from that whether or not we have any
11  internal candidate or candidates that might be
12  considered for possible potential to CEO.
13    Q.  The next sentence reads, "They reviewed top
14  succession candidates, including Mr. Spence, and
15  discussed the potential timelines for their readiness
16  and key development priorities for each such candidate."
17        Do you see that?
18    A.  I do.
19    Q.  Who were the other candidates that were
20  reviewed other than Mr. Spence?
21        MR. CIOFFI:  Objection.  Asked and answered.
22    Redundant.  He just answered it, and argumentative
23    here.  You're just repeating the question so you
24    get the answer you want.  You're entitled to an
25    answer, but not the answer you want.

Page 91

1  BY MR. SABA:
2    Q.  Go ahead, Mr. Heminger?
3        MR. CIOFFI:  You may answer.
4        THE WITNESS:  Every executive here that is
5    listed on these pages 27 through 37, we review, and
6    as I stated earlier, we vigorously question.
7    That's why the resolution that I just reviewed,
8    where we were making a couple changes, is because
9    the board questions the potential and the current
10    performance of a couple of executives.  So we
11    review everyone in this -- on these pages to
12    determine what their potential might be.
13  BY MR. SABA:
14    Q.  And so everyone would be considered a top
15  succession candidate?
16        MR. CIOFFI:  Objection.  Argumentative.  You
17    may answer.
18        THE WITNESS:  I didn't say "a top succession."
19    I said to determine their succession, their
20    potential.  I didn't say that they were -- everyone
21    is going to be considered to be the CEO.
22  BY MR. SABA:
23    Q.  So going back to that second sentence and how
24  the minutes read, they say, "They reviewed top
25  succession candidates, including Mr. Spence."  Is every

Deposition of Gary R. Heminger          Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 92

1   officer considered a top succession candidate?

2       MR. CIOFFI: Objection. Asked and answered.

3   This is the fourth time you asked it, but you may

4   answer.

5       THE WITNESS: Every officer is considered a

6   candidate for what their potential might be, but

7   not everyone can ascend to -- but not everyone does

8   ascend to be a candidate to be the CEO.

9   BY MR. SABA:

10    Q. Do you see a distinction between a succession

11   candidate and a top succession candidate?

12       MR. CIOFFI: Objection. Distinction how?

13   BY MR. SABA:

14    Q. Go ahead.

15    **A. Repeat the question.**

16    Q. Do you -- and I'm asking for your opinion. Do

17   you see a distinction between a succession candidate and

18   a top succession candidate?

19    **A. Excuse me. I had turned this off. That's**

20   **what happens when you have hearing aids. Sorry. And I**

21   **apologize.**

22       **A distinction between a top succession**

23   **candidate and a candidate?**

24    Q. Correct.

25    **A. Yeah, everyone is a candidate, but only very,**

Page 93

1   **very few will ever ascend to being a top candidate.**

2    Q. And so with respect to the review of the top

3   succession candidates that was done by Mr. Carmichael

4   and Mr. Shaffer, who was included in the top succession

5   candidates?

6    **A. I'll have to review each one to determine**

7   **that.**

8    Q. Okay.

9    **A. Okay. In this presentation, only Tim Spence**

10   **was considered to have the potential to be a top**

11   **candidate.**

12    Q. Are you able to explain why the minutes

13   referred to them reviewing top succession candidates,

14   plural, including Mr. Spence?

15    **A. As I stated earlier, all officers are reviewed**

16   **as candidates. So a distinction between a candidate and**

17   **top candidate, I think that's a parallel.**

18    Q. Well, their sense would indicate they reviewed

19   more than one top succession candidate?

20    **A. I just --**

21       MR. CIOFFI: Objection. Argumentative. He

22   answered the question that they're, in his mind,

23   parallel concepts. You're now arguing with him to

24   get the answer you want, which is improper. Read

25   the question back, please.

Page 94

1       MR. SABA: I didn't finish my question.

2   BY MR. SABA:

3    Q. Mr. Heminger, the sentence in the minutes

4   indicates that Mr. Carmichael and Mr. Shaffer reviewed

5   more than one top succession candidate. And my question

6   is, because you indicated that Mr. Spence was the only

7   top succession candidate at that time, correct?

8    **A. What I stated was --**

9       MR. CIOFFI: Wait a minute. Objection.

10   It's repetitive, argumentative. You're stating

11   and testifying as to your interpretation. He

12   already answered as to his interpretation the

13   sentence.

14   BY MR. SABA:

15    Q. Mr. Heminger?

16       MR. CIOFFI: Do you have a different answer

17   than you gave last time?

18       THE WITNESS: As I stated, everyone is

19   considered a candidate. Only one out of this

20   funnel that we go through of all the candidates,

21   only one graded out to what we considered, on this

22   particular date, to have the potential to be, as is

23   stated here, president in one to two years, CEO

24   three-plus years. Only one of the candidates is

25   considered to have that potential.

Page 95

1   BY MR. SABA:

2    Q. What were the key development priorities for

3   Mr. Spence?

4    **A. Well, Mr. Spence came to the bank with a**

5   **tremendous background in banking consultancy so as to**

6   **develop him in operations. He had all the requisite**

7   **skills, the financial skills, the financial digital**

8   **platform background, he understood that. So as to**

9   **develop him in operations, to develop him in executive**

10   **leadership roles and just to continue to really observe**

11   **his skills and observe how, you know, he continued to,**

12   **you know, develop and perform. But as I said, he had**

13   **all the requisite skills when he joined the firm, and**

14   **then it was just to continue to develop him in**

15   **operations, in markets, understand his ability to do M**

16   **and A work, mergers and acquisitions work.**

17    Q. Anything else?

18    **A. I think that sums it up.**

19    Q. You indicated that all of the officers are

20   considered, and that you have detailed discussions and

21   questions regarding each person. Were there any

22   detailed discussions or conversations regarding

23   Mr. McHugh as a candidate for the chief executive

24   officer position?

25    **A. We would have had discussions, yes.**

Deposition of Gary R. Heminger             Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 96

1    Q.  And what were those discussions?

2    A.  We had just discussed, again, his development,

3 his performance within the bank and the different jobs

4 he had had.  We had several discussions among the board

5 members as to that performance and where we would see

6 the potential and discussed those types of items.

7    Q.  And what were the content of those

8 discussions?

9    A.  It was a clear consensus by the board that we

10 didn't feel that Mr. McHugh had the potential to be the

11 CEO of the company.

12    Q.  And what was that based upon?

13    A.  Based on his strategic vision, presentation

14 skills, and just performance of the organizations of

15 which he was operating.

16    Q.  What was your understanding of Mr. McHugh's

17 strategic vision?

18    A.  You know, we would see his vision of the

19 operations and, again, over this period of time that I

20 have been on the board he had several different jobs and

21 you would continue -- or you would get a flavor for how

22 he continued to develop and what his vision might be

23 and, you know, any executive at this level you expect to

24 have a good vision and be a good tactical operator, but

25 a big difference between being a tactical operator and a

Page 97

1 strategic operator.  Strategic operator has the vision

2 for where you can go and where can we expand the

3 horizons of this business and the other business of

4 boards that I've been on, and it's a rare quality.  It's

5 a superior quality to see somebody that has the whole

6 package.  And that's what we saw in Tim versus what we

7 saw in Mr. McHugh.

8    Q.  Where did you get your understanding of

9 Mr. McHugh's strategic vision?

10    A.  Different presentations that he would have

11 made over the many years I've been on the board.

12    Q.  Anywhere else?

13    A.  No.  No.  We had -- you know, as a board

14 member since 2006, I observed many, many presentations

15 by Mr. McHugh.  So I was able to have a pretty good

16 understanding over all of these years as to what I

17 thought the potential was.

18    Q.  You also said there was an issue with

19 Mr. McHugh's presentation abilities.  What was that?

20    A.  I was just making a comparison to his

21 presentation skills, his command of the subject wasn't

22 as strong as what we -- what I expected to see in a

23 future CEO.

24    Q.  Do you have specific examples of any command

25 of subject matter that Mr. McHugh did not have?

Page 98

1    A.  I can't recall specific examples.

2    Q.  And then you said "performance of the areas of

3 the corporation that were managed by Mr. McHugh"; is

4 that correct?

5    A.  That's correct.

6    Q.  And what issues do you have with the

7 performance of the areas of the corporation that were

8 managed by Mr. McHugh?

9    A.  I don't have any specific areas of performance

10 I recall.  What I was trying to explain is that you just

11 observe the different organizations that Mr. McHugh

12 would be managing and how they were performing vis-à-vis

13 business plan vis-à-vis the market, you know, again, the

14 different organizations of which he may have been

15 managing at the time.

16    Q.  Can you recall any specific situation where

17 the areas of the corporation that were managed by

18 Mr. McHugh were deficient relative to any business plan

19 or to any areas of the market?

20        MR. CIOFFI:  Objection to the form of the

21    question and any basis for it.  He didn't testify

22    that there was a deficiency.  He testified it

23    wasn't as good.

24        MR. SABA:  He didn't testify.  That's your

25    answer, Michael.

Page 99

1        MR. CIOFFI:  No, he testified three minutes

2    ago, come on.

3        MR. SABA:  You testified to your own

4    interpretation.

5        MR. CIOFFI:  You have a selective memory,

6    Counsel, come on.

7 BY MR. SABA:

8    Q.  Mr. Heminger, although I appreciate

9 Mr. Cioffi's attempt to help you testify and to provide

10 answers to you, if you can go back and answer my

11 question please, and I can ask it again if you --

12    A.  Will you please.

13        MR. CIOFFI:  Objection.  Asked and answered,

14    but go ahead.

15        MR. SABA:  You answered it.  He didn't.

16        MR. CIOFFI:  No, he answered it before.  The

17    record will speak for itself.  Come on.

18 BY MR. SABA:

19    Q.  Mr. Heminger, are you aware of any situations

20 where Mr. McHugh's management of any areas of the

21 corporation were deficient relative to either any

22 business plan or any market performance?

23    A.  And I did not state "deficient."  I stated

24 they weren't as, in my opinion, weren't as polished as

25 what we expected in the next CEO.

Deposition of Gary R. Heminger                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 100

1  Q. Can you give me any specific examples where
2  Mr. McHugh's management of any particular areas of the
3  corporation were not as polished as you would expect
4  from the next CEO?
5  A. I don't recall.
6  Q. Can you give me a time frame of when these
7  situations were -- would have occurred where
8  Mr. McHugh's performance was not as polished?
9  A. I observed -- I've been on the board for 16
10 years, so probably over the last 10 years and 8 years in
11 Mr. McHugh's tenure with the company, I would have
12 observed his presentation.
13 Q. My specific question goes to where his
14 performance with respect to the areas of the corporation
15 that he managed were not as polished as you would expect
16 from a CEO?
17 A. Yeah. I can't -- I don't recall the exact
18 incident.
19 Q. And do you know if there was an incident at
20 all, even though you're saying -- you're referring to an
21 incident that you can't recall. Was there a particular
22 incident?
23 A. What I'm comparing against is Mr. McHugh's
24 performance versus Mr. Spence, and in my opinion, there
25 was a completely superior qualities performed by

Page 101

1  Mr. Spence.
2  Q. So let's talk about those superior qualities
3  that you talked about, Mr. Spence's superior qualities.
4  With respect to the areas of corporation that were
5  managed by Mr. Spence compared to Mr. -- the areas
6  managed by Mr. McHugh, where were -- in what situation
7  were Mr. Spence's management superior to Mr. McHugh's?
8  A. Sure. I think he had a superior strategic
9  vision, understood venture capital markets, understood
10 the competition much better. Had a very strong ability
11 to, in my opinion, to build a culture within the
12 company, a culture of working together as one single
13 team, and I just observed that those were superior
14 qualities.
15 Q. Well, going back to my question. My question
16 was about performance of the particular areas of the
17 company that they managed, the corporation that they
18 managed. Can you cite to any example or situation where
19 the performance of the areas of the corporation that
20 were managed by Mr. Spence were superior in performance
21 to those managed by Mr. McHugh?
22 A. You're managing different -- they're managing
23 different operations of the company, so no, I can't.
24 Q. You can't compare those?
25 A. They're managing completely different

Page 102

1  businesses.
2  Q. Based upon that, can you say whether or not
3  Mr. Spence's management of areas of the corporation were
4  superior to the areas -- and performance were superior
5  to those managed by Mr. McHugh?
6  MR. CIOFFI: Objection to the form. Can you
7  read the question back? I'm confused by it.
8  (The record was read.)
9  MR. CIOFFI: Objection to the form.
10 MR. SABA: Go ahead.
11 MR. CIOFFI: If you can answer.
12 THE WITNESS: It was the observation of a
13 board member, every board member has the
14 requirement and the duty to observe the performance
15 of different executives. It's my opinion that
16 Mr. Spence was clearly a -- had superior qualities
17 in all the areas that I mentioned earlier.
18 BY MR. SABA:
19 Q. Do you have any objective information with
20 respect to the areas of the bank that he managed or with
21 respect to the people reporting to him that he was
22 superior to Mr. McHugh in any of those areas?
23 MR. CIOFFI: Objection. He testified that it
24 was his judgment. It wasn't -- it was his
25 judgment.

Page 103

1  MR. SABA: That's not my question.
2  THE WITNESS: Yeah, I will answer that to
3  Mr. Spence's intellect and immediate grasp of all
4  parts of the banking industry was far superior.
5  BY MR. SABA:
6  Q. And what objective information do you have to
7  base that upon?
8  MR. CIOFFI: Objection. Asked and answered.
9  He talked about his observations over many, many
10 years. You keep repeating the questions hoping you
11 will get the answer you want.
12 MR. SABA: I'm not asking about his subjective
13 observations. I said objective information.
14 MR. CIOFFI: His observations are objective.
15 MR. SABA: By definition, his observations are
16 subjective.
17 BY MR. SABA:
18 Q. What objective information do you have,
19 Mr. Heminger, to in any way indicate that Mr. Spence's
20 qualities and the characteristics that you're examining
21 were superior to that of Mr. McHugh's?
22 A. During this period of time, many transactions
23 within the banking industry, many different changes
24 within the banking industry throughout Fintech, and, you
25 know, digital platforms, and Tim just had, you know, an

Deposition of Gary R. Heminger                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 104

1 unbelievable grasp and understanding and control of --
2 and vision for not only where the digital platform was
3 going, but any discussion about a -- the competitive
4 landscape, he had a far superior understanding of what
5 is making up the competitive landscape, how Fifth Third
6 is performing versus other banks.
7     Q.  And, again, that's all from presentations made
8 during board meetings, correct?
9     A.  Presentations, but my answer is more to off
10 the -- out of the presentation questions and discussions
11 and debate being held within the board, we just don't
12 accept any presentation that's being made by an
13 executive as being -- being the end, and that's all
14 they're going to present.  We would have several
15 detailed questions about what's going on in the market?
16 Why is this transaction?  Why is this company
17 outperforming?  And Tim always had a superior grasp of
18 the entire industry.
19     Q.  That's all within the board meeting itself,
20 correct?
21     A.  Correct.
22     Q.  You reference Mr. Spence's strong ability to
23 build consensus within the company; is that correct?
24     A.  Did I say that?  I'm not sure that I said
25 exactly that, but go on.

Page 105

1     Q.  Well, correct me if I'm wrong; I'm just trying
2 to understand one of the characteristics that you
3 pointed to within which you felt Mr. Spence was superior
4 to Mr. McHugh?
5     A.  Yeah, I don't -- you can go back and read it.
6 I don't recall saying "consensus."  Maybe I did, I don't
7 recall.
8     Q.  All right.  Okay.
9         MR. CIOFFI:  Counsel, do you want to finish up
10     your line of questioning because it's well past
11     lunchtime.
12         MR. SABA:  Certainly.  We can go --
13         MR. CIOFFI:  If you're about ready to
14     conclude, we can conclude.  I don't want to --
15         MR. SABA:  Oh, no, no, I'm not ready to
16     conclude, but we can go off the record and break
17     for lunch, certainly.
18         THE VIDEOGRAPHER:  The time is 12:55 p.m.  We
19     can go off the record.
20         (A recess was taken from 12:56 p.m. to
21         1:42 p.m.)
22         THE VIDEOGRAPHER:  The time is 1:42 p.m.
23     We're back on the record.
24 BY MR. SABA:
25     Q.  Mr. Heminger, before we broke I asked you

Page 106

1 about in what ways Mr. Spence's management abilities
2 were superior to Mr. McHugh's, and you indicated four
3 different things in your answer.  Superior strategic
4 vision, understood venture capital markets, understood
5 the competition much better, and he's able to build a
6 culture within the company, a culture of working
7 together as one single team.  Do you recall that?
8     A.  Yes, sir.
9     Q.  With respect to -- we've talked about
10 strategic vision.  With respect to understanding venture
11 capital markets, what, if any, objective information or
12 evidence or data do you have that Mr. Spence understood
13 venture capital markets better than Mr. McHugh?
14     A.  In various presentations that would have been
15 made in the board meetings, Mr. Spence was able to
16 articulate how venture capital and then activism in and
17 around venture capital, that it was affecting the entire
18 banking industry, and I believe that he had a very deep
19 knowledge and understanding of this new change of
20 competition within the banking industry.
21     Q.  Outside the presentations made by Mr. Spence
22 to the board, do you have any other evidence or data
23 that shows that Mr. Spence understood venture capital
24 markets better than Mr. McHugh did?
25     A.  No, sir.

Page 107

1         MR. CIOFFI:  Objection.  Asked and answered.
2     Go ahead.
3 BY MR. SABA:
4     Q.  With respect to understanding the competition
5 much better, do you have any evidence, objective --
6 excuse me, strike that.
7         With respect to understanding the competition
8 much better, do you have any objective evidence or data
9 indicating that Mr. Spence's skills were superior to
10 that of Mr. McHugh?
11         MR. CIOFFI:  Objection.  Could you read that
12     back?  Are you saying inside or outside the board
13     presentations?  Could you read the question back?
14         (The record was read.)
15         THE WITNESS:  No.
16 BY MR. SABA:
17     Q.  With respect to building a culture within the
18 company, a culture of working together as one single
19 team, do you have any objective evidence or information
20 indicating that Mr. Spence's skills were superior to
21 Mr. McHugh's?
22     A.  Yes.  My observations of the culture within
23 the boardroom.
24     Q.  Outside the culture within the boardroom,
25 anything else?

Deposition of Gary R. Heminger                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 108

1   A. No.

2   Q. And the team you're referring to, is that the

3 team of employees and employees of the bank that would

4 be under Mr. Spence?

5   A. No.

6   Q. What team are you referring to?

7   **A. The enterprise team.**

8   Q. Did you interview the enterprise team about

9 their opinions regarding Mr. Spence?

10   A. No.

11   Q. Did you interview the enterprise team

12 regarding their opinions regarding Mr. McHugh?

13   A. No.

14   Q. Did you ever ask any of the enterprise team

15 about their ability to work with Mr. McHugh as one team?

16   A. No.

17   Q. Did you ever ask any of the enterprise team

18 about their ability to work with Mr. Spence as one team?

19   A. No.

20   Q. Did you ever review any of the employee

21 engagement scores?

22   A. I don't recall.

23   Q. Do you know what the employee engagement

24 scores are?

25   **A. I know what the term means, yes.**

Page 109

1   Q. And what do those show?

2   **A. It's an array of questions on how an**

3 **individual performance on many different attributes.**

4   Q. Do you recall ever seeing employee engagement

5 scores for Fifth Third Bank?

6   A. I don't recall, no.

7   Q. Did you ever receive -- excuse me, strike

8 that.

9      Did you ever see any income statements or

10 profit and loss statements for any areas of Fifth Third

11 that were managed by Mr. McHugh?

12   **A. I certainly would have.**

13   Q. And did you see any income statements or

14 profit and loss statements for the areas of Fifth Third

15 Bank that were managed by Mr. Spence?

16   **A. Yes, I would have.**

17   Q. And did you ever compare the two?

18   **A. I remember reviewing them and seeing them, but**

19 **doing a comparative analysis, no.**

20   Q. As you sit here today, are you able to say,

21 based upon the income statements or profit and loss

22 statements for the respective areas that Mr. McHugh and

23 Mr. Spence managed, that Mr. McHugh's areas performed

24 better than Mr. - excuse me, that Mr. Spence's areas

25 performed better than Mr. McHugh's?

Page 110

1   A. I don't know.

2   Q. Mr. Heminger --

3   A. Yes.

4   Q. -- referring you back to Exhibit 10, and the

5 second page of that exhibit, which is Bates stamped

6 Fifth Third McHugh 007109, below the section titled

7 "Executive Session With CEO," it says, "Following

8 conclusion of the executive performance review

9 discussion, Mr. Shaffer departed the meeting and the

10 directors went into executive session with

11 Mr. Carmichael. During this session, there was a

12 discussion of key talent management and succession

13 planning concerns, as well as a discussion of key

14 strategic priorities that would be discussed in the

15 general session."

16      Do you see the area I'm referring to?

17   A. Yes, sir.

18   Q. Do you recall what the discussions were

19 regarding succession planning concerns?

20   A. I do not.

21   Q. Do you recall if there were minutes taken

22 during that executive session?

23   A. I do not.

24   Q. As of the conclusion of the December 17, 2019

25 board meeting, was there a definitive determination made

Page 111

1 regarding who would succeed Mr. Carmichael as president

2 and/or CEO of Fifth Third?

3   A. I don't recall the exact timing.

4   Q. Do you recall if any decision had been made as

5 of the end of that meeting?

6   **A. As I just stated, I don't know the exact**

7 **timing of when that decision was made.**

8      (Plaintiff's Exhibit 11 is marked for

9      identification.)

10 BY MR. SABA:

11   Q. Mr. Heminger, I've just handed you what has

12 been marked as Exhibit Number 11. Can you identify that

13 for me, please?

14   **A. It's Fifth Third Bancorp Minutes of Meeting of**

15 **the Board of Directors, February 25, 2020.**

16   Q. And were you in attendance at that meeting?

17   A. Yes, sir.

18   Q. Was that meeting presided over by

19 Mr. Carmichael?

20   A. Yes, sir.

21   Q. You would agree with me that Exhibit 11 is

22 Bates stamped Fifth Third McHugh 212523 through Fifth

23 Third McHugh 212532?

24   A. Yes.

25   Q. Based upon Exhibit Number 11, are you able to

Deposition of Gary R. Heminger                                            Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 112

1  determine whether or not there was any discussion of
2  succession timelines and candidates for the position of
3  president during the February 25, 2020 board meeting?
4  **A. I do not see any.**
5  Q. Based upon Exhibit Number 11, are you able to
6  tell me or identify everyone who presented information
7  at the February 25, 2020 board meeting?
8  **A. Mr. Carmichael. Mr. King, who was an outside**
9  **consultant with FW Cook, Mr. Spence, Mr. Lamb,**
10 **Mr. Leonard, Mr. Tazun, Ms. Zaunbrecher. That's all**
11 **that I can ascertain from this document.**
12 Q. Are those all the people that made
13 presentations at the February 25, 2020 board meeting?
14 **A. I don't know.**
15    (Plaintiff's Exhibit 12 is marked for
16    identification.)
17 BY MR. SABA:
18 Q. Mr. Heminger, I've handed you what's been
19 marked as Exhibit Number 12. Can you mark that for
20 me -- excuse me, can you identify that for me, please?
21 **A. Fifth Third Bancorp Minutes of Meeting of the**
22 **Board of Directors, September 17, 2019.**
23 Q. You were in attendance at that meeting; is
24 that correct?
25 **A. Yes.**

Page 113

1  Q. And Mr. Carmichael presided over that meeting;
2  is that correct?
3  **A. Yes.**
4  Q. Exhibit 12 is Bates stamped Fifth Third McHugh
5  212513 through 212516; is that correct?
6  **A. Yes.**
7  Q. Based upon Exhibit 12, are you able to tell me
8  whether or not there was any discussion regarding
9  succession timelines and candidates for the position of
10 president during the September 17th, 2019 board meeting
11 for Fifth Third Bancorp?
12 **A. No.**
13 Q. Based upon Exhibit Number 12, are you able to
14 identify for me all of the presenters at the
15 September 17, 2019 Fifth Third Bancorp meeting?
16 **A. Mr. Carmichael, Mr. Spence, Mr. Anderson,**
17 **Mr. Schramm. Did I say Mr. Tazun? Mr. McHugh.**
18 **Mr. Forrest. Okay. That's all.**
19 Q. Based upon Exhibit Number 12, are you able to
20 tell me whether or not those were all the presenters
21 and/or presentations made at the September 17, 2019
22 board meeting for Fifth Third Bancorp?
23 **A. I can't, but presumably whenever it says**
24 **management present, generally everyone will make some**
25 **sort of a presentation.**

Page 114

1  Q. You're saying that's true for every meeting?
2  **A. Most generally.**
3  Q. Would the board meeting -- would the board
4  meeting minutes indicate whether or not that's accurate?
5  **A. It should.**
6  Q. But you would need a complete set of the board
7  meeting minutes to determine that, correct?
8  **A. Yeah. I mean, it should -- yes, it should be**
9  **stated in a complete set of the board meeting minutes,**
10 **yes.**
11    (Plaintiff's Exhibit 13 is marked for
12    identification.)
13 BY MR. SABA:
14 Q. Mr. Heminger, I've handed you what's been
15 marked as Exhibit Number 13. Can you identify that for
16 me, please?
17 **A. That's Fifth Third Bank Minutes of Meeting of**
18 **the Board of Directors, September 17, 2019.**
19 Q. This took place at the same time as the board
20 of directors meeting for Fifth Third Bancorp on that
21 date; is that correct?
22 **A. Yes.**
23 Q. And as indicated before, you were in
24 attendance at the meeting and Mr. Carmichael presided
25 over the meeting; is that right?

Page 115

1  **A. Right.**
2  Q. Exhibit Number 13 is Bates stamped Fifth Third
3  McHugh 212517 through Fifth Third McHugh 212522; is that
4  correct?
5  **A. Yes.**
6  Q. Based upon Exhibit Number 13, are you able to
7  determine whether or not there was any discussion of
8  succession timelines and candidates for the position of
9  president during the September 17, 2019 board meeting
10 for Fifth Third Bank?
11 **A. I do not see any.**
12    (Plaintiff's Exhibit 14 is marked for
13    identification.)
14 BY MR. SABA:
15 Q. Mr. Heminger, I've handed you what has been
16 marked as Exhibit Number 14. Can you identify that for
17 me, please?
18 **A. Fifth Third Bank, National Association Minutes**
19 **of Meeting of the Board of Directors, February 25, 2022.**
20 Q. And you were present for that meeting,
21 correct?
22 **A. Yes.**
23 Q. And Mr. Carmichael presided over that meeting;
24 is that right?
25 **A. Yes.**

Deposition of Gary R. Heminger                                                                            Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 116

1    Q.  Exhibit Number 14 is Bates stamped Fifth Third
2  McHugh 212533 through Fifth Third McHugh 212538; is that
3  correct?
4    A.  That's correct.
5    Q.  Based upon Exhibit Number 14, can you
6  determine whether or not there was any discussion
7  regarding timeline or candidates for succession planning
8  for president for Fifth Third Bank?
9    A.  No.
10    Q.  Based upon Exhibit Number 14, are you able to
11  identify all of the presenters that made presentations
12  at the February 25, 2020 board meeting for Fifth Third
13  Bank, National Association?
14    A.  Mr. Carmichael, Mr. Spence, Mr. Tazun,
15  Mr. Leonard, Ms. Zaunbrecher.  That appears to be it.
16    Q.  Were you able to determine whether or not that
17  was all the people who made presentations at the
18  February 25, 2020 board meeting for Fifth Third Bank,
19  National Association?
20    A.  No.
21      (Plaintiff's Exhibit 15 is marked for
22      identification.)
23  BY MR. SABA:
24    Q.  Mr. Heminger, I've handed you what has been
25  marked as Exhibit Number 14.  Can you identify that for

Page 117

1  me, please?
2    A.  Fifth Third Bancorp Minutes of Meeting of the
3  Board of Directors, April 14, 2020.
4      MR. SMITH:  That might be 15.
5      MR. SABA:  Excuse me, Exhibit 15, I misspoke.
6  BY MR. SABA:
7    Q.  Correction.  That's Exhibit 15; is that
8  correct, Mr. Heminger?
9    A.  Yes.
10    Q.  Thank you.  Exhibit 15 is Bates stamped Fifth
11  Third McHugh 212539 through Fifth Third McHugh 212543;
12  is that correct?
13    A.  Correct.
14    Q.  And you attended that meeting by telephone; is
15  that correct?
16    A.  That's correct.
17    Q.  This would have been post COVID; is that
18  right?  Let me clarify my question.
19    A.  I don't know if it was post COVID or not.
20      MR. CIOFFI:  Are you making a medical
21      determination?
22      MR. SABA:  No.  Let me clarify my question.
23  BY MR. SABA:
24    Q.  Do you recall that there was a period of time
25  where the meetings were done by phone because of issues

Page 118

1  with COVID after March of 2020?
2    A.  I just -- I don't know the exact dates.  I do
3  recall we had several meetings by phone due to the
4  pandemic, yes.
5    Q.  And this meeting would have taken place on
6  April 14, 2020; is that right, and Mr. Carmichael
7  presided over the meeting?
8    A.  That's correct.
9    Q.  Based upon Exhibit Number 15, are you able to
10  tell me whether or not there was any discussion
11  regarding succession timelines and candidates for the
12  position of president of Fifth Third on April 14, 2020?
13    A.  No.
14    Q.  And with respect to this particular board
15  meeting and the directors being present by telephone,
16  was that a video teleconference?
17    A.  I believe it was.
18    Q.  Based upon Exhibit Number 15, are you able to
19  determine who the presenters were at the April 14, 2020
20  board meeting for Fifth Third Bancorp?
21    A.  Mr. Carmichael, Mr. McCallister on behalf of
22  the human capital compensation committee.
23  Ms. Zaunbrecher.  And Ms. Somalya.
24    Q.  Based upon Exhibit Number 15, are you able to
25  determine whether or not that was everyone who made a

Page 119

1  presentation at the April 14, 2020 board meeting for
2  Fifth Third Bancorp?
3    A.  No.
4      (Plaintiff's Exhibit 16 is marked for
5      identification.)
6  BY MR. SABA:
7    Q.  Mr. Heminger, I've handed you what has been
8  marked as Exhibit Number 16.  Can you identify is that
9  for me, please?
10    A.  Fifth Third Bank, National Association Minutes
11  of Meeting of the Board of Directors, April 14, 2020.
12    Q.  Exhibit Number 16 is Bates stamped Fifth Third
13  McHugh 212544 through 212546; is that correct?
14    A.  That's correct.
15    Q.  Based upon the minutes for Fifth Third Bank,
16  National Association on April 14, 2020, are you able to
17  determine whether or not there was any discussion
18  regarding succession timelines and candidates for the
19  position of president during that April 14, 2020
20  meeting?
21    A.  No.
22    Q.  Based upon Exhibit Number 16, are you able to
23  determine who all of the presenters were at that
24  meeting?
25    A.  Mr. Carmichael.  Ms. Somalya.  I believe

Deposition of Gary R. Heminger                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 120

1  that's it.
2      Q.  Are you able to determine whether or not those
3  were all the presenters who made a presentation at the
4  April 14, 2020 meeting?
5      A.  I don't know.
6          (Plaintiff's Exhibit 17 is marked for
7          identification.)
8  BY MR. SABA:
9      Q.  Mr. Heminger, I've handed you what's been
10 marked as Exhibit Number 17.  Can you identify that for
11 me, please?
12     A.  Fifth Third Bancorp Minutes of Meeting of the
13 Board of Directors, June 16, 2020.
14     Q.  Based upon Exhibit Number 17, are you able to
15 determine whether or not there was any discussion
16 regarding CEO succession during that meeting?
17     A.  Under page 28, it says that the "CEO
18 succession key executive departures were discussed."
19     Q.  Do you recall specifically what was discussed
20 concerning CEO succession and key executive departures
21 during an executive session of the full board on
22 June 16, 2020?
23     A.  I do not.
24     Q.  Would that also be true with respect to the
25 executive session with independent directors only, where

Page 121

1  it again indicates that CEO succession key executive
2  departures were discussed?
3      A.  I don't recall.
4      Q.  You don't recall what was discussed during
5  that time period either; is that correct?
6      A.  No.
7      Q.  And just to clarify, the June 16, 2020
8  meeting, you, again, attended by phone; is that correct?
9      A.  That's correct.
10     Q.  And Mr. Carmichael presided over that meeting;
11 is that right?
12     A.  That's correct.
13     Q.  Based upon Exhibit Number 17, are you able to
14 tell me who the presenters were at that June 16, 2020
15 board meeting for Fifth Third Bancorp?
16     A.  Mr. Carmichael, and then Marsha Williams in
17 the executive session.
18     Q.  Does Exhibit Number 17 indicate who all the
19 presenters were at the June 16, 2020 meeting for Fifth
20 Third Bancorp?
21     A.  I don't know.
22         (Plaintiff's Exhibit 18 is marked for
23         identification.)
24 BY MR. SABA:
25     Q.  Mr. Heminger, I've handed you what has been

Page 122

1  marked as Exhibit Number 18.  Can you identify that for
2  me, please?
3      A.  Fifth Third Bank, National Association
4  Minutes of Meeting of the Board of Directors on
5  June 16, 2020.
6      Q.  This took place simultaneous with the board of
7  directors meeting for Fifth Third Bancorp; is that
8  correct?
9      A.  That's correct.
10     Q.  Exhibit Number 18 is Bates stamped Fifth Third
11 McHugh 212549 through Fifth Third McHugh 212556; is that
12 correct?
13     A.  That's correct.
14     Q.  Referring to page Fifth Third McHugh 212556,
15 there's again a reference to the executive session of
16 the full board and executive session of independent
17 directors only, both of which indicate there was a
18 discussion of CEO succession and key executive
19 departures; do you see that?
20     A.  Yes.
21     Q.  Is your answer the same as it was with respect
22 to the board of directors meeting minutes for -- excuse
23 me, for Exhibit Number 17, do you recall what was
24 discussed during those executive sessions?
25     A.  I do not.

Page 123

1      Q.  Based upon the -- strike that.
2          Based upon Exhibit Number 18, are you able to
3  identify who made presentations during the June 16, 2020
4  meeting for Fifth Third Bank National Association?
5      A.  Mr. Carmichael, Mr. Spence, Ms. Garrett,
6  Mr. Lavender, Mr. McHugh, Mr. Spence, Ms. Somalya, and
7  Ms. Williams.
8      Q.  Based upon Exhibit Number 18, are you able to
9  determine whether that is all of the presenters who made
10 presentations at the June 16, 2020 board meeting for
11 Fifth Third Bank, National Association?
12     A.  I don't know.
13         (Plaintiff Exhibit 19 is marked for
14         identification.)
15 BY MR. SABA:
16     Q.  Mr. Heminger, I've handed you what has been
17 marked as Exhibit Number 19.  Can you identify that for
18 me, please?
19     A.  Fifth Third Bancorp Minutes of Meeting of the
20 Board of Directors, September 21, 2020.
21     Q.  And you were present at that meeting in
22 person; is that correct?
23     A.  That's correct.
24     Q.  And Mr. Carmichael presided over that meeting;
25 is that correct?

Deposition of Gary R. Heminger                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 124

1    A.   That's correct.

2    Q.   Exhibit Number 19 is Bates stamped Fifth Third

3 McHugh 212557 through Fifth Third McHugh 212560; is that

4 correct?

5    A.   Correct.

6    Q.   Are you able to determine whether or not there

7 was any discussion regarding CEO or president succession

8 planning during the September 21, 2020 board of

9 directors meeting for Fifth Third Bancorp?

10       MR. CIOFFI:   Are you asking based on this

11   document or his recollection?

12       MR. SABA:   I'm asking based on this document.

13       THE WITNESS:   I'm sorry.  Could you rephrase

14   that, please?

15       MR. SABA:   Certainly.

16 BY MR. SABA:

17   Q.   Based upon Exhibit Number 19, are you able to

18 determine whether or not there were any discussions

19 regarding the CEO or president succession at Fifth Third

20 Bank during the September 21, 2020 board of directors

21 meeting for Fifth Third Bancorp?

22   A.   I did see an indication for president and CEO

23 competency model, and I'm trying to read if there were

24 any discussions inside of that note, but I do not see

25 any.  So no.

Page 125

1        (Plaintiff's Exhibit 20 is marked for

2        identification.)

3 BY MR. SABA:

4    Q.   Mr. Heminger, I've handed you what's been

5 marked as Exhibit Number 20.  Can you identify that for

6 me, please?

7    A.   Fifth Third Bank, National Association Minutes

8 of Meeting of the Board of Directors, September 21,

9 2020.

10   Q.   And this board of directors meeting at Fifth

11 Third Bank, National Association took place

12 simultaneously with the meeting for Fifth Third Bancorp;

13 is that correct?

14   A.   Yes.

15   Q.   As you previously indicated, you were present

16 at that meeting; is that right?

17   A.   Yes.

18   Q.   And Mr. Carmichael presided over that meeting;

19 is that right?

20   A.   Yes.

21   Q.   Based upon review -- let me clarify.  Exhibit

22 Number 20 is Bates stamped Fifth Third McHugh 212561

23 through Fifth Third McHugh 212565; is that correct?

24   A.   Correct.

25   Q.   Based upon your review of Exhibit Number 20,

Page 126

1 does it appear that president and chief executive

2 officer succession planning was discussed during that

3 board meeting?

4    A.   Yes.

5    Q.   Did you have a conference call with Greg

6 Carmichael sometime between August 18, 2020 and

7 September 21, 2020, to discuss the upcoming succession

8 discussion at the September 21, 2020 board meeting?

9    A.   I don't recall.

10   Q.   Under Talent Management, the second sentence

11 reads, "Mr. Shaffer began by reminding the directors of

12 prior discussions related to executive succession

13 planning, including discussions related to Mr. Spence as

14 a possible president and chief executive officer

15 successor to Mr. Carmichael."

16       Do you see that?

17   A.   Yes, sir.

18   Q.   Do you know which prior discussions

19 Mr. Shaffer was reminding the board of?

20   A.   I would -- I believe it would be, based on

21 those documents we reviewed earlier today, on our

22 different talent -- executive talent management updates

23 that we would review.

24   Q.   Do you know who RHR International -- excuse

25 me.  Do you know what RHR International is?

Page 127

1    A.   You need to -- you need to direct your voice

2 this way.

3    Q.   I'm sorry.  I apologize.  You indicated that

4 before.

5        Do you know what RHR International is?

6    A.   Yes.

7    Q.   What is RHR International?

8    A.   They're a consulting firm that is renowned for

9 their assessment of executive management.

10   Q.   Outside of Fifth Third, have you ever used RHR

11 International?

12   A.   I believe I used them once at Marathon.

13   Q.   And was that to locate your replacement?

14   A.   No.  That was a -- just an executive that I

15 was doing some assessment on.

16   Q.   In the second full paragraph below Talent

17 Management, the third sentence reads, "Mr. Shaffer also

18 reminded the board members of the succession planning

19 discussion at the June 2020 board meeting in which the

20 board approved the CEO profile to be utilized by

21 Mr. Beaudin and Mr. Evans to assess Mr. Spence."

22       Do you see that sentence?

23   A.   I do.

24   Q.   Do you know what they're referring to with

25 respect to the CEO profile?

Deposition of Gary R. Heminger                                                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 128

1    A. Yes. We discussed at one of our meetings what
2  we believed the attributes and the -- and the profile,
3  to use that term, profile should be as we considered the
4  next CEO.
5    Q. Is it your understanding that Mr. Spence was
6  the only individual assessed by RHR for the president
7  and CEO positions?
8    A. I don't know.
9    Q. Did you ever see an assessment for anybody
10  other than Mr. Spence that was made by RHR?
11    A. No.
12    Q. Are you aware if anyone made a determination
13  that Mr. Spence would be the only person assessed by
14  RHR?
15    A. I don't, no.
16        (Plaintiff's Exhibit 21 is marked for
17        identification.)
18  BY MR. SABA:
19    Q. Mr. Heminger, I handed you what's marked as
20  Exhibit Number 21. Can you identify that for me,
21  please?
22    A. It's an email from Bob Shaffer to Guy Beaudin
23  of RHR International and Chuck Evans pertaining to the
24  CEO profile draft.
25    Q. And specifically, if we stop -- excuse me. If

Page 129

1  we start at the top of the first page of Exhibit 21,
2  which is Bates stamped Fifth Third McHugh 001071; is
3  that correct?
4    A. Yes.
5    Q. Looking at that, that's an email from Bob
6  Shaffer to Mr. Beaudin and Chuck Evans, correct?
7    A. Right.
8    Q. And that is dated July 23, 2020; is that
9  right?
10    A. Correct.
11    Q. And the attachment that's indicated is for the
12  Fifth Third CEO profile final; is that right?
13    A. Correct.
14    Q. The email that Mr. Shaffer sends says, "Guy -
15  hope all is well. I have reviewed the updated profile
16  with Greg and with the Human Capital & Compensation
17  Committee members."
18        And by "Greg," is he referring to Greg
19  Carmichael there?
20    A. Yes.
21    Q. And with respect to the Human Capital and
22  Compensation Committee members, did he review this
23  document with you?
24    A. I've got to look at the document to refresh my
25  memory.

Page 130

1    Q. All right. And just to clarify, there's an
2  initial email that is three pages, Bates stamped Fifth
3  Third McHugh 001071 through 001073; is that correct?
4    A. Correct.
5    Q. Then attached to the email are documents that
6  are Bates stamped Fifth Third McHugh 001013 through
7  001024; is that correct?
8    A. That's correct.
9    Q. Turning to the page that's Bates stamped Fifth
10  Third McHugh 001013, can you identify what this document
11  is for me, please?
12    A. It's a draft of what's called "The Winning
13  Formula for Fifth Third Bank President and Chief
14  Executive Officer."
15    Q. Do you recall if this is the CEO profile
16  that's being referenced in the email?
17    A. Can I look at it?
18    Q. Yes.
19    A. Yes, it appears so.
20    Q. And referring to McHugh 001019, does
21  that appear to be the final version of the CEO
22  profile?
23    A. That's what it illustrates.
24    Q. Going back to my earlier question, would you
25  have reviewed the draft and/or final version of the CEO

Page 131

1  profile that's attached to -- as part of Exhibit 21?
2    A. As a member of the compensation committee
3  meeting, yes.
4    Q. Did you make any changes to the CEO profile?
5    A. I don't recall.
6    Q. And what was your understanding of the purpose
7  of the CEO profile?
8    A. Well, as the board is reviewing, you know,
9  succession planning alternatives, you start with this is
10  the foundation of what you're looking for, the
11  attributes of a CEO successor. This is the foundation
12  of what you're looking for as well as those key elements
13  that you want to see the next CEO be able to build upon
14  within the Fifth Third Bank.
15    Q. Referring you back to Exhibit 20.
16    A. Okay.
17    Q. And I'm again referring to the second full
18  paragraph under Talent Management on the first page of
19  Exhibit 20, and the last sentence of that paragraph
20  says, "Mr. Shaffer then asked Mr. Beaudin to describe
21  the assessment process utilized by RHR International to
22  assess Mr. Spence and to review the assessment report
23  distributed to the directors at today's meeting."
24        Do you see that?
25    A. Yes.

Deposition of Gary R. Heminger                                           Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 132

1   (Plaintiff's Exhibits 22 and Exhibit 23 are
2   marked for identification.)
3       MR. SABA: This is 23. The first one I handed
4   you is 22.
5   BY MR. SABA:
6       Q. Mr. Heminger, I just handed you two exhibits,
7   one marked as Exhibit Number 22, the other one marked as
8   Exhibit Number 23. Can you identify Exhibit Number 22
9   for me, please?
10      **A. Exhibit 22 is Board Summary of Tim Spence,**
11  **provided by RHR International.**
12      Q. And that document is Bates stamped Fifth Third
13  McHugh 001033 through Fifth Third McHugh 001040; is that
14  correct?
15      **A. Right.**
16      Q. Can you also identify Exhibit Number 23 for
17  me, please?
18      **A. Exhibit 23 is Executive Assessment Development**
19  **Report provided by RHR International for Tim Spence as**
20  **Executive Vice President and Head of Consumer Bank,**
21  **Payments, and Strategies, Fifth Third Bank, July 31st,**
22  **2020.**
23      Q. And Exhibit Number 23 is Bates stamped Fifth
24  Third McHugh 000954 through Fifth Third McHugh 000976;
25  is that correct?

Page 133

1       **A. Yes.**
2       Q. With respect to the assessment report that was
3   distributed to the directors at the September 21st, 2020
4   meeting, are you able to determine whether or not the
5   assessment report that was distributed is either Exhibit
6   22 or 23 or both?
7       **A. The date again, please?**
8       Q. This is at the September 21st, 2020 meeting.
9   It's referenced in the minutes that Mr. Beaudin was
10  going to describe the assessment report distributed to
11  the directors at today's meeting. What I'm trying to
12  determine is do either Exhibit 22 or 23 both
13  constitute the report that was distributed to the
14  directors at the September 21st, 2020 meeting?
15      **A. Can I go back and look at these minutes?**
16      Q. Sure. The minutes are Exhibit 20.
17      **A. 20?**
18      Q. 20.
19      **A. It appears as though that's the case, yes.**
20      Q. Well, my question is -- let me ask you first,
21  sir, have you seen Exhibit 22 before?
22      **A. I recall seeing it, 22, I recall seeing it a**
23  **while back, yes.**
24      Q. Do you recall seeing it at that
25  September 21st, 2020 board meeting?

Page 134

1       **A. I don't recall the exact date, but presumably.**
2       Q. Have you seen Exhibit Number 23 before?
3       **A. Yes, I believe I recall seeing this.**
4       Q. And do you recall seeing it at the
5   September 21st, 2020 board meeting?
6       **A. I don't recall the exact date, but presumably.**
7       Q. Referring you back to Exhibit 20 and to the
8   second full paragraph again under Talent Management?
9       **A. Uh-huh.**
10      Q. And within that paragraph, the second to last
11  sentence of the paragraph reads, "Mr. Shaffer noted that
12  the CEO profile identified essential behaviors related
13  to business management, leadership, interpersonal skills
14  and personal attributes deemed critical to assess Fifth
15  Third Bank president and CEO successor candidates."
16      Is that correct?
17      **A. Yes.**
18      Q. Do you agree with that statement?
19      **A. I do.**
20      Q. If you would turn to the second page of
21  Exhibit 20, please, which is Bates stamped Fifth Third
22  McHugh 212562. At the top of the page, the paragraph
23  that continues over from the first page, the last
24  sentence reads, "Lastly, Mr. Beaudin reviewed the
25  development goals for Mr. Spence included in the

Page 135

1   assessment report."
2       Do you see that?
3       **A. Yes.**
4       Q. What is your understanding of what those
5   development goals were? And if need be, you can refer
6   to the assessment report.
7       **A. I'd probably have to refer to that.**
8       Q. Go ahead.
9       **A. We need to take a time out.**
10      MR. SABA: Go off the record.
11      THE VIDEOGRAPHER: The time is 2:45 p.m.
12      (A recess was taken from 2:46 p.m. to
13      2:58 p.m.)
14      THE VIDEOGRAPHER: The time is 2:57 p.m. We
15  are back on the record.
16  BY MR. SABA:
17      Q. Mr. Heminger, before we broke, we were
18  discussing the development recommendations for
19  Mr. Spence. I was asking you about if you recalled
20  those and what they were. You indicated that you'd have
21  to refer to the report. If you can go ahead and refer
22  to the report that's Bates stamped as Exhibit Number 23
23  and I believe beginning on Fifth Third McHugh 000971.
24  Can you identify the development recommendations for me?
25      **A. They're outlined here. "To slow down, avoid**

Deposition of Gary R. Heminger                                          Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 136

1  overwhelming others with too many change initiatives,
2  and sustain focus across all initiatives.  And gain
3  greater comfort in having difficult conversations and
4  holding others accountable."
5      Q.  Do you disagree with any of the development
6  recommendations that RHR gave regarding Mr. Spence?
7      A.  I understand.  I can't say I agree or
8  disagree.
9      Q.  Why is that?
10     A.  I'm sorry?
11     Q.  Why can't you say if you agree or disagree?
12     A.  "Sustain focus across all initiatives."  I
13  find that as a very positive attribute.  I believe
14  "avoid overwhelming others with too many change
15  initiatives," I believe that's a developmental process
16  that as you're trying to assimilate all of the work to
17  be done, you learn over time, you know, where to really
18  identify your priorities.  So I agree with some, but I
19  think some of those are positive.
20     Q.  What's your read of when it says "sustain
21  focus across all initiatives"?
22         MR. CIOFFI:  Objection to the form of the
23     question.
24         MR. SABA:  I'll clarify the question.
25         MR. CIOFFI:  If you have an opinion.

Page 137

1         MR. SABA:  I'll clarify the question.
2  BY MR. SABA:
3      Q.  Mr. Heminger, are you saying you read that as
4  Mr. Spence sustains focus across all initiatives or
5  that he needs to sustain focus across all initiatives?
6      A.  I read it that he does sustain focus across
7  all initiatives, highly focused.
8      Q.  Do you see the second bullet point next to
9  sustain focus across all initiatives?
10     A.  Yes.
11     Q.  And do you see that reads, "Timothy needs to
12  ensure he evenly distributes his focus across all
13  the activities his direct reports are pursuing"; is that
14  correct?
15     A.  Correct.
16     Q.  "He needs to take the time to check in and ask
17  about progress"; do you see that?
18     A.  Yes.
19     Q.  Wouldn't that indicate to you that he needs to
20  improve on sustaining focus across all initiatives, not
21  that he has it?
22         MR. CIOFFI:  Objection.  He gave you his
23     interpretation, now you're arguing with him to
24     adopt yours.  You may answer.
25         THE WITNESS:  I read it that, yes, he's very

Page 138

1  focused on many things, and he has sustained focus
2  on many things is how I read it.
3  BY MR. SABA:
4      Q.  Do you read all the development
5  recommendations for Mr. Spence as positives for him?
6      A.  I'll have to read the rest of them.
7      Q.  Go ahead.
8      A.  Yes.  I can read that -- I can read positives
9  into them, and then areas that he certainly can be
10  coached to improve.
11         (Plaintiff's Exhibit 24 is marked for
12     identification.)
13  BY MR. SABA:
14     Q.  Mr. Heminger, I've handed you what's been
15  marked as Exhibit Number 24.  Can you identify that for
16  me, please?
17     A.  It's a memo of June 8, 2020 from Bob Shaffer
18  to Greg Carmichael, subject of "Guy Conversation on the
19  Winning Formula for the CEO Profile."
20     Q.  You said a memo.  It's actually an email; is
21  that a fair statement?
22     A.  Yes.
23     Q.  And under key highlights and next steps, the
24  first bullet point reads, "Guy agrees that if Tim is
25  'the' successor, don't add Tayfun and Phil formerly.

Page 139

1  Although, he would recommend, at a minimum, we discuss
2  with Marsha that she/the board is okay with only having
3  Tim assessed by Guy.  He said he has seen a few boards
4  surprised in the past.  The CEO/CHRO did have at least
5  one other internal candidate assessed."
6         Do you see that?
7      A.  I do.
8      Q.  Does that refresh your recollection as to
9  how the decision was made to only have Tim Spence
10  assessed?
11     A.  I wasn't part of this email or part of that
12  discussion.
13     Q.  Was it your understanding as of June 8, 2020,
14  that Tim Spence was the successor?
15     A.  I don't recall the exact date -- the exact
16  dates, but it was clear in my mind that Tim was head and
17  shoulders above any other candidate.
18     Q.  Do you recall the question of whether or not
19  Tayfun and/or Phil McHugh should be assessed by RHR as
20  well?
21     A.  I don't recall that.
22     Q.  Did anyone ever come and ask you if more than
23  one internal candidate should be assessed by RHR to
24  succeed Greg Carmichael as president and/or CEO?
25     A.  Not that I recall.

Deposition of Gary R. Heminger                                   Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 140

1     (Plaintiff's Exhibit 25 is marked for
2     identification.)
3  BY MR. SABA:
4     Q.  Mr. Heminger, I've just handed you Exhibit
5  Number 25, and let me represent to you this is a
6  remarking of the CEO profile that is previously marked
7  as part of Exhibit 21.  It again just contains Bates
8  stamped numbers 001074 through 001079; is that correct?
9     A.  Correct.
10     Q.  With respect to the Essential Leadership
11  Behaviors, and under Business Management, do you have
12  any objective information or data indicating that as of
13  September 22nd, 2020, Tim Spence was superior to or
14  better than Phil McHugh with respect to driving
15  "innovative thinking on the strategic side while
16  simultaneously maintaining a close eye on rigorous
17  execution"?
18     MR. CIOFFI:  Objection to the form of the
19     question.  You mean other than what he experienced?
20     MR. SABA:  I'm asking does he have any
21     objective information or data.
22  BY MR. SABA:
23     Q.  Do you understand the question?
24     A.  Uh-huh.
25     Q.  And what's your answer?

Page 141

1     A.  My objective information would come from
2  observations of presentations by the various parties.
3  And, yes, I believe that Tim Spence provided superior
4  qualities in being able to present detailed technology,
5  detailed digital platforms that were exemplary.
6     Q.  Other than your opinion of their presentations
7  or Mr. Spence's presentation, do you have any objective
8  information or data indicating that as of September
9  22nd, 2020, Tim Spence was superior to or better than
10  Phil McHugh with respect to driving innovative thinking
11  on the strategic side while simultaneously maintaining a
12  close eye on rigorous execution?
13     MR. CIOFFI:  Objection to the form of the
14     question.
15     THE WITNESS:  I believe I answered the
16     question to the best of my ability.
17  BY MR. SABA:
18     Q.  Do you have anything beyond just your personal
19  judgment based on their presentations, any data, any
20  objective evidence?
21     A.  I don't have any, no.
22     Q.  Do you have any objective information or data,
23  other than just your personal opinion, indicating that
24  as of September 22nd, 2020, Tim Spence was superior to
25  or better than Phil McHugh with respect to establishing

Page 142

1  strategic direction?
2     MR. CIOFFI:  Objection to the form of the
3     question.  Are you, in his personal opinion, are
4     you including his business judgment or are you
5     excluding his business judgment?
6     MR. SABA:  I'm asking for any objective
7     information or data.
8     MR. CIOFFI:  Well, you said other than his
9     personal opinion.  I'm just asking what's included
10     in his personal opinion?  Is it his business
11     judgment or not his business judgment?
12     MR. SABA:  I'm asking for objective
13     information or data.
14     THE WITNESS:  My objective information is my
15     business acumen, and that's what I rely on.
16  BY MR. SABA:
17     Q.  That's your own personal business judgment,
18  correct?
19     A.  Yes.
20     Q.  I'm asking for any objective data -- objective
21  information or data.
22     MR. CIOFFI:  Objection.
23     MR. SABA:  Other than just -- let me finish my
24     question.
25     MR. CIOFFI:  You're arguing with him.  You're

Page 143

1  not asking a question.
2     MR. SABA:  I'm clarifying my question for him.
3  I'm not asking for his opinion or his business
4  judgment.  I'm asking, does he have any objective
5  information or data that would indicate that Tim
6  Spence is superior to or better than Phil McHugh
7  with respect to establishing strategic direction as
8  of September 22nd, 2020.
9     MR. CIOFFI:  Objection.  Redundant.
10  Argumentative.
11     MR. SABA:  Go ahead.
12     THE WITNESS:  There were many presentations
13  made throughout the last few years in the board
14  meeting that were objective.  I can't recall the
15  exact presentations, but he was far superior in
16  making strategic and technical presentations.
17  BY MR. SABA:
18     Q.  That's your opinion of the presentation,
19  correct?
20     MR. CIOFFI:  Objection.  You're
21  mischaracterizing his testimony.  He's saying that
22  was his business judgment.
23     MR. SABA:  Fine.  That's your --
24  BY MR. SABA:
25     Q.  Other than your business judgment, other than

Deposition of Gary R. Heminger                                          Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 144

1  your judgment call, what data do you have?  What
2  objective evidence do you have that Tim Spence was
3  superior to or better than Phil McHugh with respect to
4  establishing strategic direction?
5        MR. CIOFFI:  Objection.  He answered that
6     question.  What he based his business judgment on.
7        THE WITNESS:  The presentations that were made
8     were not objective.  They were actual presentations
9     made.  And from those presentations, it's my
10    business judgment that they were far superior.
11 BY MR. SABA:
12    Q.  Other than your business judgment, do you have
13 anything else to indicate that Mr. Spence was superior
14 to Phil McHugh with respect to establishing strategic
15 direction?
16       MR. CIOFFI:  Objection.  Asked and answered.
17       THE WITNESS:  I can't answer it any better
18    than what I've done.
19 BY MR. SABA:
20    Q.  I'm asking if you have any other data, any --
21 purely data, do you have any data to support that?
22       MR. CIOFFI:  Objection.  He described it.
23       THE WITNESS:  No.
24 BY MR. SABA:
25    Q.  Do you have any objective information or data

Page 145

1  indicating that as of September 22nd, 2020, Tim Spence
2  was superior to or better than Phil McHugh with respect
3  to possessing the vision to outline a balanced, "organic
4  growth, acquisitions, and optimization, rooted in deep
5  knowledge of the banking industry"?
6     **A.  Again, from all the presentations that were**
7  **made, it was quite obvious and clear that he had a much**
8  **deeper understanding, depth and breadth of the future of**
9  **banking.  So that's my assessment of the presentations**
10 **that were made.**
11    Q.  Other than your assessment of the
12 presentations that were made, do you have any data or
13 objective evidence that would indicate that Mr. Spence
14 is superior to or better than Phil McHugh with respect
15 to "possessing the vision to outline a balanced organic
16 growth, acquisitions, and optimization, rooted in a deep
17 knowledge of the banking industry"?
18       MR. CIOFFI:  Objection.  Asked and answered.
19    Argumentative.
20       THE WITNESS:  I've answered the question.
21 BY MR. SABA:
22    Q.  No, you didn't.  I asked other than the
23 presentations and your opinion of them, do you have any
24 objective information or data indicating that as of
25 September 22nd, 2020, Tim Spence was superior to or

Page 146

1  better than Phil McHugh with respect to possessing the
2  vision to outline a balanced organic growth,
3  acquisitions, and optimization, rooted in deep knowledge
4  of the banking industry?
5     **A.  Presentation skills and the depth and breadth**
6  **of those presentation skills, in my opinion, are**
7  **objective, and they were clearly --**
8     Q.  I didn't ask that question.  I said other than
9  the presentation --
10       MR. CIOFFI:  Objection, Counsel.  You're being
11    argumentative.  Allow him to finish.
12       THE WITNESS:  I've answered the question to
13    the best of my ability.
14       MR. CIOFFI:  Allow him to finish answering.
15    Finish your answer.  Go ahead.
16 BY MR. SABA:
17    Q.  Do you understand my question, because you're
18 not answering?
19       MR. CIOFFI:  Counsel, let him answer his
20    question.
21       THE WITNESS:  I understand your question and
22    I'm giving you my business judgment on watching the
23    objective presentations made by not those two,
24    other executives as well, and intellectually it was
25    quite obvious and clear from the data that was

Page 147

1  presented that Tim Spence had a much better grasp.
2  BY MR. SABA:
3     Q.  Other than the presentations, do you
4  understand that clause?
5     **A.  I do.**
6     Q.  So other than the presentations, do you have
7  any objective information or data indicating that as of
8  September 22nd, 2020, Tim Spence was superior to or
9  better than Phil McHugh with respect to possessing the
10 vision to outline a balanced organic growth,
11 acquisitions, and optimization, rooted in deep knowledge
12 of the banking industry?
13       MR. CIOFFI:  Objection.  Redundant.
14    Argumentative.  He answered.
15       MR. SABA:  He didn't answer.  Go ahead.
16       MR. CIOFFI:  He did answer.  He answered based
17    on the data in the presentations and his
18    assessment --
19       MR. SABA:  I said other than the
20    presentations.  He said -- answer the question.
21       THE WITNESS:  I don't know what "other" would
22    be.
23 BY MR. SABA:
24    Q.  Do you have anything, other than the
25 presentations, that's data or objective evidence that

Deposition of Gary R. Heminger                            Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 148

1 would support that?
2    A. The presentations would be data.
3    Q. I didn't have -- did you hear my question?
4    MR. CIOFFI: Counsel, you keep cutting him
5 off. Let him finish his answer. Finish your
6 answer, please.
7    THE WITNESS: The presentations would include
8 data and objective presentation materials that I
9 based my judgment on.
10 BY MR. SABA:
11    Q. What data and presentation materials were ever
12 presented in a presentation that would indicate that Tim
13 Spence possessed the vision to outline a balanced
14 organic growth, acquisitions, and optimization, rooted
15 in a deep knowledge of the banking industry? What
16 specific data can you point to?
17    A. I don't know.
18    Q. Do you have any objective information or data,
19 specific data, indicating that as of September 22nd,
20 2020, Tim Spence was superior to or better than Phil
21 McHugh with respect to driving execution?
22    A. Again, based on all the presentations in the
23 board meetings, my answer is yes, I feel that he drove
24 the performance of the bank much better.
25    Q. Outside your observation of the presentations,

Page 149

1 do you have any data?
2    A. No.
3    Q. Do you have any objective information?
4    A. No.
5    MR. CIOFFI: Objection. Asked and answered.
6 BY MR. SABA:
7    Q. Do you have any objective information or data
8 indicating that as of September 22, 2020, Tim Spence was
9 superior to Phil McHugh with respect to effectively
10 managing the strength of the existing team while
11 continuing to attract a more diverse group of
12 executives?
13    A. Again, from the presentations made in all the
14 various -- and recall, I would have sat through dozens
15 and dozens of meetings, watching both present and,
16 again, it's my clear view that Tim was far superior in
17 all of those attributes.
18    Q. Do you have any objective data or information
19 outside those presentations indicating that Tim Spence
20 was superior to Phil McHugh with respect to "effectively
21 managing the strength of the existing team while
22 continuing to attract a more diverse group of
23 executives"?
24    A. No.
25    MR. CIOFFI: Objection. Asked and answered.

Page 150

1 BY MR. SABA:
2    Q. Do you have any objective information or data
3 indicating that as of September 22nd, 2020, Tim Spence
4 was superior to Phil McHugh with respect to "maintaining
5 FTB's standing with the regulators and managing the
6 implications of the rise of ESG issues in 2020 and
7 beyond"?
8    A. From all the presentations that were made,
9 again, at the board meetings with regulators present,
10 Tim was far superior than any other executive we've ever
11 had in being able to articulate the design, articulate
12 the balance, and articulate the new controls put in
13 place to be able to meet or exceed the compliance
14 reporting requirements.
15    Q. Outside your opinions regarding Tim Spence's
16 presentations, do you have any objective information or
17 actual data indicating that as of September 22nd, 2020,
18 Tim Spence was superior to Phil McHugh with respect to
19 "maintaining FTB's standing with the regulators and
20 managing the implications of the rise of ESG issues in
21 2020 and beyond"?
22    MR. CIOFFI: Objection. You just asked that
23 question.
24    MR. SABA: No, I didn't.
25    MR. CIOFFI: Yeah, you did.

Page 151

1    MR. SABA: No, I didn't. Go ahead.
2    THE WITNESS: No.
3 BY MR. SABA:
4    Q. Do you have any objective information or data
5 indicating that as of September 22nd, 2020, Tim Spence
6 was superior to Phil McHugh with respect to the "ability
7 to navigate complexity and demonstrate resilience in a
8 challenging world"?
9    A. Again, all of the presentations, the dozens of
10 presentations that I've sat through during my years on
11 the board, again, it is my business judgment in watching
12 all those presentations that he did possess a far
13 superior quality.
14    Q. Other than the presentations you observed, do
15 you have any objective information or actual data
16 indicating that as of September 22nd, 2020, Tim Spence
17 was superior to Phil McHugh with respect to the ability
18 to navigate complexity and demonstrate resilience in a
19 challenging world?
20    MR. CIOFFI: Objection. Redundant.
21 Argumentative. Asked and answered.
22    THE WITNESS: No.
23 BY MR. SABA:
24    Q. Referring you to Exhibit 22 again. And I'm
25 going to refer you to the page Fifth Third McHugh

Deposition of Gary R. Heminger                                   Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 152

1  001036.  And do you see where Mr. Spence received a
2  benchmark rating of 4 out of 5 from RHR International's
3  assessment; is that correct?
4      A.  Correct.
5      Q.  Do you have any objective information or data
6  indicating that as of September 22nd, 2020, that Phil
7  McHugh would have not received a 4 or better in an
8  assessment by RHR?
9          MR. CIOFFI:  Objection.  Form of the question.
10  Asking a hypothetical.
11         MR. SABA:  You can answer.
12         MR. CIOFFI:  If you have an answer.
13         THE WITNESS:  No.
14  BY MR. SABA:
15      Q.  You don't?
16      A.  I don't have any information, no.
17      Q.  What is your understanding of why Mr. McHugh's
18  employment with Fifth Third Bank was terminated?
19         MR. CIOFFI:  Objection.  Form of the question.
20  Assumes facts not in evidence.  It's argumentative.
21  He wasn't terminated.  He quit.  You may answer.
22         THE WITNESS:  It's my understanding and my
23  opinion that Mr. McHugh was not terminated.  In
24  fact, he quit, which was a very substantial, very
25  important position.

Page 153

1  BY MR. SABA:
2      Q.  What specifically is your understanding of the
3  facts, other than Mr. Cioffi's prompting, what
4  specifically is your understanding of the facts that led
5  to Mr. Spence's -- excuse me, led to the termination of
6  Mr. McHugh's employment?
7          MR. CIOFFI:  Objection.  Assumes facts not in
8  evidence.  Is argumentative.  He wasn't terminated.
9          MR. SABA:  That's not what the question said.
10         MR. CIOFFI:  Yes, it did.  Read the question
11  back, please.
12         MR. SABA:  His employment terminated, his
13  employment ended, that's what it means.  It doesn't
14  mean to anything else other than it ended.
15  BY MR. SABA:
16      Q.  Is it your understanding that Mr. McHugh's
17  employment terminated, it ended, correct?
18      A.  He was not terminated.
19      Q.  That's not what my question said?
20      A.  That's my definition of terminated.
21      Q.  What is your understanding of what led to the
22  end of Mr. McHugh's employment with Fifth Third Bank?
23      A.  My understanding is he was disappointed that
24  he was not selected to become the future CEO of the
25  company and, therefore, he decided to leave.

Page 154

1      Q.  What is your understanding of why he was
2  disappointed?
3          MR. CIOFFI:  Objection to the form of the
4  question.  Lacks a foundation.  If you know.  If
5  you know what he was thinking.
6          THE WITNESS:  I just stated he was
7  disappointed that he did not -- he was not offered
8  the top CEO job.
9  BY MR. SABA:
10      Q.  And what is your understanding of his basis
11  for being disappointed that he was not given the top CEO
12  or president job?
13      A.  What I just said.  He didn't get the top job.
14      Q.  Did you have an understanding that Mr. McHugh
15  was under the impression that he would be receiving the
16  top job of president or CEO?
17      A.  Absolutely --
18         MR. CIOFFI:  Objection to the form of the
19  question as to what impression Mr. McHugh was
20  under, but you may answer.  Go ahead.
21         THE WITNESS:  Absolutely not.  It was never
22  discussed.  He was never discussed as a top
23  candidate within the boardroom.
24  BY MR. SABA:
25      Q.  Did you ever discuss the termination or end of

Page 155

1  Mr. McHugh's employment with Fifth Third Bank with
2  anybody inside Fifth Third Bank?
3          MR. CIOFFI:  Objection to the form of the
4  question.  Are you saying outside of the board
5  meetings or --
6          MR. SABA:  No.  At any time.
7          THE WITNESS:  Would you restate that for me?
8          MR. CIOFFI:  Read it back, please.
9  BY MR. SABA:
10      Q.  Have you had any discussions with any
11  person at Fifth Third Bank regarding Mr. McHugh's
12  termination or end of his employment with Fifth Third
13  Bank?
14      A.  Yes.  All the board, we were informed of
15  Mr. McHugh's decision to leave the bank.  I don't know
16  the exact date, but, yes, we were informed.  We had a
17  discussion pertaining to that information.
18      Q.  Who informed the board of that?
19      A.  I believe it was the CEO, Greg Carmichael.
20      Q.  And when was the board informed of that?
21      A.  I don't know the exact date.
22      Q.  Outside the board venue, did you have any
23  discussions with any other employees of Fifth Third Bank
24  regarding Mr. McHugh's departure or termination of
25  employment from Fifth Third Bank?

Deposition of Gary R. Heminger                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 156

1    A.   Not that I recall.
2    Q.   Was there any decision made regarding
3  Mr. Spence becoming president of Fifth Third Bank during
4  the September 21st, 2020 meeting of the board?
5    A.   I don't recall the exact dates.
6         (Plaintiff's Exhibit 26 is marked for
7         identification.)
8  BY MR. SABA:
9    Q.   Mr. Heminger, I've handed you what is marked
10 as Exhibit 26.  Can you identify that for me?
11   A.   Yes.  Fifth Third Bank, National Association
12 Minutes of Joint Meeting of the Board of Directors,
13 September 22, 2020.
14   Q.   And Exhibit Number 26 is Bates stamped Fifth
15 Third McHugh 212566 through Fifth Third McHugh 212569;
16 is that correct?
17   A.   Correct.
18   Q.   And you attended that meeting in person; is
19 that correct?
20   A.   Yes.
21   Q.   And that meeting was presided over by
22 Mr. Carmichael; is that correct?
23   A.   That's correct.
24   Q.   Based upon Exhibit Number 26, are you able to
25 determine whether or not there was any decision made

Page 157

1  regarding Mr. Spence becoming president of Fifth Third
2  Bank during that board meeting?
3    A.   I do not see any.
4    Q.   Based upon Exhibit Number 26, are you able to
5  determine whether or not there was any discussion
6  regarding CEO or president succession planning or
7  candidates during the September 22nd, 2020 joint board
8  meeting of the board of directors?
9    A.   I do not.
10        (Plaintiff's Exhibit 27 is marked for
11        identification.)
12 BY MR. SABA:
13   Q.   Mr. Heminger, I've handed you what's been
14 marked as Exhibit Number 27.  Can you identify that for
15 me, please?
16   A.   Yes.  Fifth Third Bancorp Unanimous Written
17 Consent of the Board of Directors Appointing President,
18 October 26, 2020.
19   Q.   And do you know what the purpose of this
20 unanimous written consent was?
21   A.   It was to appoint Tim Spence as the president
22 of Fifth Third Bancorp.
23   Q.   Prior to this unanimous consent being
24 circulated for signature, had there already been a
25 determination that Mr. Spence would become president of

Page 158

1  Fifth Third Bancorp?
2    A.   It wasn't a determination until this
3  final document was signed, but there were
4  presentations in effect that Tim was being developed
5  and being recommended to be the next president of
6  the bank.
7    Q.   Was there a meeting held in conjunction with
8  the signing of this unanimous written consent identified
9  as Exhibit Number 27?
10   A.   I don't recall if there was a separate
11 meeting.
12   Q.   Just to clarify, Exhibit Number 27 is Bates
13 stamped Fifth Third McHugh 212871 through 212872; is
14 that correct?
15   A.   Yes.
16   Q.   Do you know why -- strike that.
17        Do you know if there's a particular reason why
18 the appointment of Mr. Spence as president was done as
19 unanimous written consent instead of being done as a
20 vote at a board meeting?
21        MR. CIOFFI:  Objection to the form of the
22        question.  Because it was unanimous written
23        consent.  I mean, the document speaks for itself,
24        Counsel.
25        MR. SABA:  That's not my question.

Page 159

1  BY MR. SABA:
2    Q.   Do you know why it was done in this fashion,
3  as a unanimous written consent, as opposed to being done
4  as a vote at a board meeting?
5    A.   I don't recall.
6         (Plaintiff's Exhibit 28 is marked for
7         identification.)
8  BY MR. SABA:
9    Q.   Mr. Heminger, I've handed you what's been
10 marked as Exhibit Number 28.  Can you identify that for
11 me, please?
12   A.   Yes.
13   Q.   What is Exhibit Number 28?
14   A.   An organizational announcement representing
15 that Tim Spence will become the president of Fifth
16 Third Bancorp.
17   Q.   Have you seen this announcement before?
18   A.   I don't recall that I have exactly seen this
19 announcement.
20   Q.   Do you know when this announcement was issued
21 that's marked as Exhibit Number 28?
22   A.   No.  I don't see a date on it.
23   Q.   Do you know who prepared the announcement
24 that's marked as Exhibit Number 28?
25   A.   It would have been prepared under Greg

Case: 1:21-cv-00238-MRB Doc #: 66-6 Filed: 08/02/24 Page: 44 of 96 PAGEID #: 3053

Deposition of Gary R. Heminger                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 160

1 Carmichael's direction, but I don't know who prepared
2 it.
3        MR. SABA:  We can go off the record.
4        THE VIDEOGRAPHER:  The time is 3:38 p.m.
5 We're going off the record.
6        (A recess was taken from 3:38 p.m. to
7        3:48 p.m.)
8        THE VIDEOGRAPHER:  The time is 3:48 p.m.
9 We're back on the record.
10       MR. SABA:  At this point in time, that is all
11 the questions I have.  We are going to keep the
12 deposition continued in progress pending resolution
13 of the various discovery disputes and documents
14 that we have been given, so we keep it open for the
15 purpose of asking Mr. Heminger about those
16 additional documents as soon as they are produced.
17       MR. CIOFFI:  While I recognize that you are
18 attempting to keep the deposition open without
19 agreeing that you have the right to keep it open,
20 but I understand your position.  So we will take a
21 break and decide.
22       THE VIDEOGRAPHER:  The time is 3:49 p.m.
23 We're going off the record.
24       (A recess was taken from 3:49 p.m. to
25       4:02 p.m.)

Page 161

1        THE VIDEOGRAPHER:  The time is 4:02 p.m.  We
2 are back on the record.
3              EXAMINATION
4 BY MR. CIOFFI:
5     Q.  Mr. Heminger, earlier today you testified that
6 succession planning by a board is an iterative process;
7 do you remember that testimony?
8     A.  Yes, sir.
9     Q.  Is that true of all boards you're familiar
10 with?
11    A.  It is.
12    Q.  Okay.
13    A.  In fact, it's the number one responsibility of
14 the board.
15    Q.  Would you describe what that process is like
16 generally for boards and then specifically how it took
17 place at Fifth Third with respect to the succession
18 planning for Greg Carmichael's successor?
19    A.  You're continually assessing the executive
20 management of the company, and you, in this assessment,
21 usually you review a couple times a year formally and
22 then -- but you're making observations at every meeting.
23 And during executive sessions you will have discussions
24 on how a person performed in their presentation, how
25 their business is performing or not performing, and then

Page 162

1 you questioned.  And it's not just one person, the whole
2 board questions.  And I will say that this board is not
3 bashful and really questioning and requiring very strong
4 answers on why one person is assessed one way or
5 another.
6     Q.  Did this iterative process in the evaluation
7 of members of the enterprise team take place over one or
8 two meetings in presentations by them or over many?
9        MR. SABA:  Objection as to form.  Go ahead.
10 You can answer.
11 BY MR. CIOFFI:
12    Q.  You may answer.
13       THE WITNESS:  And I'm sorry, I couldn't hear
14 you.
15       MR. SABA:  I just said objection as to form.
16 Go ahead, you can answer.
17       THE WITNESS:  No, it takes, you know, I've sat
18 through dozens and dozens of meetings.  So -- but
19 we formally -- once, sometimes twice a year, we
20 formally sit down and kind of update the files on
21 how we're seeing the performance and development of
22 an executive, but it's a very iterative process
23 over many different meetings, and you're always
24 assessing.  As I said early this morning, every day
25 that you're in a board meeting, you're assessing

Page 163

1 all the management that's there.
2 BY MR. CIOFFI:
3     Q.  In the succession planning with respect to
4 Mr. Carmichael's successor, you testified that part of
5 the business judgment that you made and the board made
6 was based on presentations from various enterprise team
7 members; is that correct?
8     A.  That's correct.
9     Q.  Were these -- approximately how many
10 presentations by Mr. Spence?
11       MR. SABA:  Objection.  Go ahead, you can
12 answer.
13       THE WITNESS:  I'm assuming we've had -- we
14 will average approximately six meetings per year
15 and sometimes a couple of telephonic calls, and Tim
16 would make at times multiple presentations
17 throughout the day and a half, two-day board
18 meetings.  So, you know, probably at least a dozen
19 per year presentations, at least.
20 BY MR. CIOFFI:
21    Q.  And this iterative process, with respect to
22 Mr. Carmichael's successor, continued over what period
23 of time?
24    A.  Well, we would have assessed -- I believe Tim
25 came to the bank in approximately 2015, and when you're

Deposition of Gary R. Heminger                                              Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 164

1 bringing someone in at a very high level, executive
2 level that we did, trust me, the board is assessing them
3 every meeting.
4     Q.   Are you familiar with the hiring of Tim
5 Spence?
6     A.   I am.
7     Q.   Would you describe that?
8     A.   Well, we were -- in fact, I, for one, was
9 always very impressed when Tim was -- we had hired Tim
10 to do some work when he was with the consultancy firm
11 called Oliver Wyman, and he made various presentations
12 on the banking industry specifically in and around the
13 digital platforms, but other, as I said earlier, venture
14 capital-type competitive threats that were coming in,
15 and I was always, you know, very, very impressed with
16 his knowledge, not only of the banking industry but his
17 intimate knowledge of Fifth Third. And I spoke to Greg
18 at one time, Greg Carmichael, that is, and said if you
19 ever have a chance, you ought to take a look and see if
20 there's any way that you could steal him away from
21 Oliver Wyman.
22     Q.   And did, in fact, that happen?
23     A.   It did.
24     Q.   You mentioned that Tim Spence came into the
25 bank at a very high level; is that correct?

Page 165

1     A.   That's correct.
2     Q.   And, in fact, from the beginning of his
3 employment, he was one of the named executives in the
4 proxy statement; is that correct?
5     A.   I believe so.
6     Q.   What does that mean, a "named executive" in
7 the proxy statement?
8     A.   A named executive in the proxy, it depends on
9 kind of an outgoing or incoming a person, but generally
10 it's the top five compensated officers in the company.
11 Sometimes it might go to six if you straddle a -- I
12 think it's a CEO or a chairman or CFO, if one of those
13 straddle a time period, you'll have an extra in the
14 proxy, but usually it's five or six people.
15     Q.   Does the board make that determination as to
16 the compensation of those executives?
17     A.   Yes, sir.
18     Q.   Is -- does the compensation reflect the
19 judgment, the business judgment of the board as to the
20 value of those employees?
21          MR. SABA:  Objection as to form.  Go ahead,
22 you can answer.
23          MR. CIOFFI:  You may answer.
24          THE WITNESS:  The board makes an assessment
25 not only of the value and judgment, but how that

Page 166

1 executive stacks up or compares to other executives
2 within our industry.
3 BY MR. CIOFFI:
4     Q.   At any time from -- at any time during your
5 tenure on the board, was Phil McHugh a named executive?
6     A.   I don't recall whether in the last proxy he
7 was a named executive or not.  He had been very close,
8 but I don't recall whether he was or not.
9     Q.   But Tim Spence was for certain; is that
10 correct?
11     A.   To my knowledge, yes.
12     Q.   You talked about the board forming its
13 business judgment based on presentations from members of
14 the executive team, the enterprise team, and you talked
15 about Mr. Spence making dozens of presentations; is that
16 correct?
17     A.   Yes, sir.
18     Q.   How many presentations approximately did
19 Mr. McHugh make to the board?
20     A.   Oh, he would have made presentations.
21 Generally, the members of the enterprise team will make
22 a presentation either in one of the committees, such as
23 the risk committee, the audit committee, the technology
24 committee, or -- generally not human capital because for
25 that we're just reviewing the management team -- but

Page 167

1 they'll make presentations possibly inside of those
2 committees, but then at the full board meeting, most
3 generally the enterprise leaders will review their
4 organization.  So most generally every meeting they'll
5 have at least one presentation.
6     Q.   Is it accurate to say that Mr. McHugh would
7 have made dozens of presentations to the board?
8          MR. SABA:  Objection as to form.  Go ahead,
9 you can answer.
10          MR. CIOFFI:  You may answer.
11          THE WITNESS:  I'm sorry.  I couldn't hear you.
12          MR. SABA:  I just said objection as to form.
13 Go ahead, you can answer.
14          THE WITNESS:  Okay.  Okay.  Yes.  Over my
15 tenure, I would have seen dozens of presentations
16 by Mr. McHugh.
17 BY MR. CIOFFI:
18     Q.   Is the same thing true of other members of the
19 enterprise team, dozens of presentations?
20     A.   Yes, sir.
21     Q.   I'm going to direct your attention to Exhibit
22 Number 10 that was marked by counsel for the plaintiff.
23 Would you look at that, please?
24     A.   Okay.
25     Q.   You see that document?  What is that document?

Deposition of Gary R. Heminger                                        Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 168

1  A.  It's the document of Minutes of the Joint
2  Meeting of the Board of Directors on December 17, 2019.
3  Q.  I want to direct your attention to page 2 of
4  that document which has the Bates stamp 010 -- 7109; do
5  you see that at the bottom?
6  A.  Yes, sir.
7  Q.  Would you read into the record at the bottom
8  of the page, beginning with "following this approval."
9  A.  Under Market Context?
10  Q.  Yes, under Market Context.
11  A.  "Following this approval, Mr. Spence provided
12  an overview of the strategy plan review as included in
13  the materials for the meeting.  He began with a
14  discussion of the market context, including a discussion
15  of political, economic, social, technological, and
16  competitive factors.  He described the expected
17  population trends in Fifth Third's footprint, noting
18  that larger regional cities were generally increasing
19  modestly, whereas population growth in smaller cities
20  and the largest U.S. markets have leveled off.  In
21  response to" --
22  Q.  Let me stop you there.  So based on this
23  aspect of Mr. Spence's presentation, did you have an
24  opportunity to observe objective data about these
25  particular subjects?

Page 169

1      MR. SABA:  Objection as to form.  Go ahead,
2  you can answer.
3      THE WITNESS:  Mr. Spence would have provided
4  generally market data, population data, economic
5  data, to support his presentation.
6  BY MR. CIOFFI:
7  Q.  What kind of facility with that data did
8  Mr. Spence demonstrate?
9  A.  The facility used?
10  Q.  The facility, his ability to comprehend and
11  understand that data?
12  A.  You know, I always compare executives on do
13  they read to you or do they really know the subject
14  matter by just looking at the data and really draw your
15  attention to the important parts, important analytics of
16  that data, and Tim was exceptional in doing that.
17  Q.  Based on that information, were you able to
18  form an independent business judgment as to Mr. Spence's
19  depth of knowledge about strategy with respect to the
20  bank?
21      MR. SABA:  Objection as to form.  Go ahead,
22  you can answer.
23      THE WITNESS:  Yes, I was always very
24  impressed.  In fact, I believe -- I believe Tim was
25  one of the top executives I've ever dealt with and

Page 170

1  watched them develop into becoming a CEO.
2  BY MR. CIOFFI:
3  Q.  Were you able to form an independent business
4  judgment with respect to Mr. Spence's knowledge about
5  competitive factors affecting the bank in the industry?
6  A.  I was.
7      MR. SABA:  Objection as to form.
8      THE WITNESS:  I was.
9  BY MR. CIOFFI:
10  Q.  Were you able to form an independent business
11  judgment with respect to his breadth and depth of
12  knowledge concerning population trends in the Fifth
13  Third footprint?
14  A.  Yes.
15  Q.  Were you able to compare Mr. Spence's
16  knowledge and depth of analysis in those areas to
17  Mr. McHugh?
18      MR. SABA:  Objection.  Lack of foundation.
19  Form of the question.  Go ahead, you can answer.
20      MR. CIOFFI:  He's being disruptive, you can
21  answer.
22      THE WITNESS:  Yeah, you know --
23      MR. SABA:  He's correcting my objections.
24      THE WITNESS:  They would -- both Mr. Spence
25  and Mr. McHugh would make presentations, but they

Page 171

1  always weren't making anywhere near the same
2  presentation.  So in this case, Tim was reviewing a
3  broad strategic plan, whereas Phil might be
4  reviewing organizational data within his
5  organization, which did not pertain to the same
6  information that Tim was presenting.
7  BY MR. CIOFFI:
8  Q.  What conclusions, if any, were you able to
9  draw based on this presentation by Mr. Spence in
10  comparison to the presentation by Mr. McHugh and others?
11      MR. SABA:  Objection as to form.  Go ahead,
12  you can answer.
13      THE WITNESS:  I don't recall the data behind
14  the exact presentation that was made in December of
15  2019.
16  BY MR. CIOFFI:
17  Q.  But in terms of the depth of knowledge about
18  competitive factors and about strategic planning, were
19  you able to draw a business judgment as to Mr. Spence's
20  qualifications?
21  A.  Yes.
22      MR. SABA:  Objection.  Go ahead, you can
23  answer.
24      THE WITNESS:  Yes.  Over the time of watching,
25  as I said earlier, being able to observe the

Deposition of Gary R. Heminger                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 172

1  analytics behind the presentations between Tim and
2  Mr. McHugh, I was. I felt that Tim was always,
3  just at his fingertips, had all the data and was
4  very articulate and succinct in being able to
5  present that data to the full board.
6  BY MR. CIOFFI:
7  Q. You mentioned a little bit earlier one of the
8  distinguishing factors you made between enterprise team
9  members was that some members, like Mr. Spence, really
10 understood the information and the data that was being
11 presented, and others were simply reading that
12 information.
13 **A. Correct. That's correct.**
14 Q. Where would you put Mr. Spence and where would
15 you put Mr. McHugh?
16 **A. And I recognized that back when Tim was with**
17 **Oliver Wyman, why I recommended to Greg that if there's**
18 **ever a chance, you ought to see if you could bring him**
19 **on board; that he just had such a grasp of the intricate**
20 **details of the banking industry at his fingertips. And**
21 **up to the last board meeting, I still recognize that he**
22 **has that intellectual capacity to draw on his knowledge**
23 **and have the facts at his fingertips, and he's quite**
24 **remarkable.**
25 Q. Did you find Mr. McHugh performing at that

Page 173

1  same level in his presentations or did you find that he
2  was more or less reading?
3      MR. SABA: Objection. Go ahead. You can
4  answer.
5      MR. CIOFFI: You may answer.
6      THE WITNESS: And they're presenting different
7  things, but I found Mr. Spence's presentation
8  skills superior to Mr. McHugh's.
9  BY MR. CIOFFI:
10 Q. You mentioned in the iterative process that
11 the board members would discuss these presentations; is
12 that correct?
13 **A. Yes, sir.**
14 Q. Did you have a discussion with the other board
15 members about your business judgment as to Mr. Spence's
16 skill set that you just described?
17     MR. SABA: Objection as to form. Go ahead,
18 you can answer.
19     THE WITNESS: Yes, we did. Often we would
20 have, in the executive sessions, we would have
21 discussions about how we saw executives developing.
22 So yes.
23 BY MR. CIOFFI:
24 Q. Did that involve comparing Mr. Spence to other
25 members of the enterprise team?

Page 174

1  **A. At times it would be a comparison, but it was**
2  **quickly observed that Tim was, in my business judgment,**
3  **head and shoulders above anybody else on the enterprise**
4  **team.**
5  Q. I want to direct your attention to the --
6  well, before I ask you that question, did the other
7  board members share that business judgment with you?
8      MR. SABA: Objection. Go ahead, you can
9  answer.
10     MR. CIOFFI: You may answer.
11     THE WITNESS: Sir, I'm -- when you turn your
12 head, I'm sorry, I just can't hear you.
13     MR. SABA: No, no, you're fine.
14     THE WITNESS: Yes, they did share that with
15 me.
16 BY MR. CIOFFI:
17 Q. When they -- when I say "share," they had the
18 same business judgment as you did with respect to
19 Mr. Spence; is that your testimony?
20     MR. SABA: Objection. Go ahead, you can
21 answer.
22     MR. CIOFFI: You may answer.
23     THE WITNESS: Yes. I mean, it was clearly a
24 consensus of the board that as we were watching
25 Tim's development, that we believed that he had the

Page 175

1  entire package.
2  BY MR. CIOFFI:
3  Q. Go to the next paragraph of Exhibit Number 10,
4  which is 7110. Would you read that first sentence of
5  that first full paragraph, which is --
6  **A. Oh, on 7110.**
7  Q. Yes, 7110.
8  **A. "Mr. Spence then discussed the competitive**
9  **dynamics with the US banking industry, including, a**
10 **discussion of non-traditional threats to the regional**
11 **banking industry generally and to Fifth Third**
12 **specifically. He reviewed the threats posed by large**
13 **technology companies, which have significantly larger**
14 **budgets to leverage for digital innovation and to drive**
15 **disintermediation of traditional banks."**
16 Q. Let me stop you there and ask you again, based
17 on Mr. Spence's presentation, were you able to form a
18 business judgment as to the breadth and depth of his
19 knowledge with respect to the competitive dynamics for
20 the US banking industry?
21 **A. Absolutely.**
22     MR. SABA: Objection. Go ahead, you can
23 answer.
24     THE WITNESS: In fact, upon Mr. Spence coming
25 into Fifth Third, we had never received that type

Deposition of Gary R. Heminger                                   Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 176

1    of detail and depth and breadth of the competitive
2    landscape before. Tim really brought that
3    knowledge and that background to -- and I think it
4    comes from his consultancy days where he saw the
5    entire industry, but he saw the threats coming in
6    the industry outside of the traditional banks.
7    BY MR. CIOFFI:
8        Q.   In this part of Mr. Spence's presentation on
9    December 17, 2019, did he present to the board objective
10   data and information?
11       A.   Yes.
12           MR. SABA:  Objection.
13   BY MR. CIOFFI:
14       Q.   Was he -- did he analyze that information?
15       A.   Within his presentation, there was analysis
16   and, you know, yes, deep thought and recommendations on
17   how Fifth Third can counteract, compete, or maybe not
18   compete in certain operations or in business.
19       Q.   How would you assess Mr. Spence's
20   understanding of the competitive dynamics of the banking
21   industry?
22           MR. SABA:  Objection.  Go ahead, you can
23   answer.
24           THE WITNESS:  I would assess it, you know, one
25   of the best visions of the business and a point in

Page 177

1    fact, when I first joined the board, banking was
2    all about auto liens and, you know, loaning money
3    for autos.  Tim turned us around and said you guys
4    got to figure out how to do something other than
5    just autos.  He was very good at bringing a
6    different view into the business.
7    BY MR. CIOFFI:
8        Q.   Did you share that business judgment with
9    other members of the board?
10       A.   Yes, sir.  We talked often about that.
11       Q.   Did other members of the board share your
12   assessment of Tim's depth and breadth of knowledge of
13   the competitive dynamics?
14           MR. SABA:  Objection.
15           THE WITNESS:  Yes, sir.
16   BY MR. CIOFFI:
17       Q.   Was that -- was there a consensus developing
18   about Tim at this point in time in terms of being a
19   leading candidate for president and CEO?
20       A.   In 2019, we were certainly building the
21   consensus that he was the top candidate, leading
22   candidate, and we wanted to continue to see him develop.
23       Q.   Was that view you've just articulated shared
24   unanimously among the board members?
25       A.   That's my opinion, yes.

Page 178

1        Q.   Go ahead and move to the next paragraph if you
2    would, the Bank M&A Outlook, would you look at that
3    section?
4        A.   Yes.
5        Q.   Could you read the first couple of sentences
6    there?
7        A.   "Mr. Spence next reviewed the bank mergers and
8    acquisitions (M&A) outlook.  He noted that trillionaire
9    banks were unable to execute M&A due to deposit cap
10   legislation and that, based on recent commentary and
11   executive level changes, large regional bank mergers of
12   equals were appearing less probable."
13       Q.   Let me stop you there.  In this aspect of
14   Mr. Spence's presentation regarding mergers and
15   acquisitions, did he present to the board objective
16   facts, information, and data?
17       A.   Yes.
18           MR. SABA:  Objection.  Go ahead, you can
19   answer.
20           THE WITNESS:  Yes, he did.
21   BY MR. CIOFFI:
22       Q.   Did he present an analysis of that data
23   that -- those facts and that information?
24       A.   Yes, he would have presented several different
25   combinations, several different merger candidates, and

Page 179

1    the positives, negatives, looking at balance sheet
2    information, income statement information, allowance for
3    losses, an array of different financial information that
4    the board should take into context if ever making a
5    decision.
6        Q.   Based on this aspect of Mr. Spence's
7    presentation on December 17, 2019, were you able to form
8    a business judgment as to Mr. Spence's qualifications to
9    be president?
10           MR. SABA:  Objection.  Go ahead, you can
11   answer.
12           THE WITNESS:  Yes.  My business judgment and
13   the judgment of the board was that he was
14   developing rapidly and someone that we thought
15   certainly had the potential.
16           MR. SABA:  Objection.  Move to strike.
17   BY MR. CIOFFI:
18       Q.   Go ahead and move to the next paragraph.
19   Would you look at that, please?
20       A.   The Look Back?
21       Q.   The Look Back, yeah?
22       A.   "Next, Mr. Spence reviewed progress against
23   key Northstar metrics and goals to become a top quartile
24   bank, including progress on return on tangible common
25   equity, (ROTCE), return on assets, (ROA), efficiency

Deposition of Gary R. Heminger          Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 180

1  ratio, and primary bank consideration since 2016."

2      Q. Keep going.

3      A. "He noted that performance against each of

4  these metrics had improved significantly in the past

5  several years."

6      Q. Given the reference to metrics and this part

7  of the presentation, did Mr. Spence's presentation on

8  these metrics contain objective data, facts, and other

9  information?

10        MR. SABA: Objection. Go ahead, you can

11      answer.

12        THE WITNESS: Yes, sir. It would have been a

13      comparative, not just of Fifth Third by itself but

14      comparing us against all of our peers. And

15      generally, the peers that are included in the proxy

16      that we compare ourselves to for compensation

17      purposes.

18  BY MR. CIOFFI:

19      Q. How would you describe Mr. Spence's analytical

20  abilities with respect to this data and his facility

21  with those metrics facts objective data?

22      A. His recall on all these objectives and the

23  analytics on which he would present -- and he had

24  that -- he possesses that ability to take very

25  intricate, difficult, complex situations and be able to

Page 181

1  explain them in a very levelheaded, common sense way to

2  directors who don't work with this data every day. So,

3  yes, he was an outstanding presenter and assessed the

4  business knowledge to be able to, again, articulate what

5  the numbers meant.

6      Q. Did you discuss your business judgment with

7  respect to his presentation about the metrics with the

8  other board members?

9      A. Yes, sir.

10      Q. Did they share your assessment of Mr. Spence?

11      A. Yes, sir.

12      Q. Let's go on to the next page, page 4, which is

13  7111. Can you see that?

14      A. Yes, sir.

15      Q. Would you read that first sentence at the top

16  of the page?

17      A. "Mr. Spence then reviewed the strategic

18  planning process against OCC requirements under

19  heightened standards, and made note of required

20  enhancements."

21      Q. What -- were you able to form a business

22  judgment about Mr. Spence's strategic planning

23  capabilities from this presentation?

24      A. This would have been one part of the

25  presentation, yes.

Page 182

1      Q. In this part of the presentation, did

2  Mr. Spence also present objective facts, data, and

3  information?

4      A. He did.

5        MR. SABA: Objection.

6  BY MR. CIOFFI:

7      Q. Based on his presentation and those objective

8  facts, data, and information, were you able to form a

9  business judgment as to Mr. Spence's capabilities as a

10  strategic planner?

11      A. Yes, I was.

12      Q. What business judgment did you form?

13      A. I felt that he had a tremendous ability to,

14  again, articulate a vision to really -- to be passionate

15  and drive a culture within the bank and within the

16  management team to make us better.

17      Q. On this point, go on down to the next

18  paragraph, and please read that first sentence -- first

19  two sentences, please?

20      A. "Thereafter, Mr. Spence proceeded to a

21  preliminary discussion of strategic priorities. He

22  discussed the focus on relationship banking and

23  articulated the vision, sources of differentiation, and

24  foundation for achieving the vision around relationship

25  banking. He noted that the focus would be on pursuing

Page 183

1  strategic enablers including leading share and

2  attractive markets, One Bank value and execution,

3  differentiated digitally enabled and maintaining an

4  ability to engage in selective M&A as opportunities

5  arise."

6      Q. In this part of his presentation, did

7  Mr. Spence present objective facts, data, and

8  information to the board?

9      A. Yes, sir.

10        MR. SABA: Objection.

11  BY MR. CIOFFI:

12      Q. Did he analyze those facts, that information,

13  and that data?

14      A. Yes.

15      Q. How would you describe his analysis of those

16  facts, information, and data?

17      A. Again, he had a very keen way of being able to

18  present for everybody to understand and I would say one

19  of his best attributes was getting people to think a new

20  way around banking and not just the old school of

21  banking.

22      Q. Based on the strategic vision articulated by

23  Mr. Spence, were you able to form a business judgment as

24  to his qualifications to be president of the bank?

25        MR. SABA: Objection. Go ahead, you can

Deposition of Gary R. Heminger             Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 184

1 answer.
2     THE WITNESS: Yes.
3 BY MR. CIOFFI:
4   Q. And what was that business judgment?
5   A. We felt clearly that he was our top candidate
6 to become the president and CEO, and we were very
7 interested and continued to watch him develop.
8   Q. Go ahead and read into the record the next
9 couple of sentences at the beginning of the third full
10 paragraph.
11   A. "Mr. Spence then reviewed the strengths and
12 weaknesses of the organization against these strategic
13 enablers and foundation elements. With respect to
14 leading share, he noted that Fifth Third was first in
15 its peer group with respect to deposits in its top three
16 share and that early de novo branching results were
17 strong."
18   Q. Let me stop you there. And, again, this
19 analysis of the strengths and weaknesses of the
20 organization is referring to the bank; is that right?
21   A. Yes, sir.
22   Q. And in this analysis of the strengths and
23 weaknesses of the bank, did Mr. Spence present to you
24 objective data, facts, and information?
25   A. Yes.

Page 185

1   Q. Did he analyze the data, those facts, and that
2 information?
3   A. He did. And what we were most impressed with,
4 in fact, what I was most impressed with, is he never --
5 he just didn't present the good things. He presented
6 all the metrics and exactly where we stood. So you
7 could really ascertain where we needed to work and where
8 we needed to continue to perform better.
9   Q. Did that ability on the part of Mr. Spence
10 allow you to form a business judgment with respect to
11 his leadership skills?
12   A. Yes, sir.
13   Q. And would you explain how, please.
14   A. His leadership skills and how he was bringing
15 the team together to recognize where we stood on these
16 metrics, we always weren't at the top. There were many
17 areas that we needed to improve, and he was able to, as
18 I say, really coalesce the team to recognize where we
19 needed to improve, and where we could improve quickly.
20 We couldn't get, you know, to the top immediately, but
21 where we could start pecking away at improving our
22 position within our competitors.
23   Q. Did you discuss your business judgment with
24 respect to his leadership skills with the other board
25 members?

Page 186

1   A. Yes, sir.
2   Q. Did the other board members have the same
3 opinion as you did with respect to his leadership
4 skills?
5     MR. SABA: Objection.
6     MR. CIOFFI: You may answer.
7     THE WITNESS: Yes, sir.
8 BY MR. CIOFFI:
9   Q. Go ahead and read the next paragraph, please.
10   A. Next Mr. Spence, right there?
11   Q. Yes.
12   A. "Next Mr. Spence identified the four key
13 strategic objectives for the near future and reviewed
14 key investments and investments relating thereto:
15 Leading share and attractive markets, One Bank value
16 proposition, digitally enabled experience, strategic
17 M&A, and strong foundations. With respect to leading
18 share in attractive markets, he reviewed target
19 build-outs required to achieve top five market share in
20 key geographies primarily in the southeast, and
21 discussed necessary investments in relationship in
22 relation thereto."
23   Q. Let me stop you there. In this part of his
24 presentation, did Mr. Spence present additional facts,
25 data, and information to the board?

Page 187

1   A. Yes, sir.
2   Q. Did he analyze those facts, data, and that
3 information?
4   A. Yes, sir.
5   Q. Based on that analysis of those facts, data,
6 and information, were you able to form a business
7 judgment as to Mr. Spence's qualifications to be
8 president of the bank?
9   A. Yes, sir.
10   Q. Did you discuss your business judgment with
11 the other board members?
12   A. Yes, sir.
13   Q. What was your business judgment and did the
14 other board members agree with it?
15     MR. SABA: Objection as to form. Go ahead.
16     MR. CIOFFI: Go ahead.
17     THE WITNESS: My business judgment, and as
18   a -- also agreed to by other members, was that Tim
19   was developing rapidly and certainly had the skills
20   that we thought was going to be required to be the
21   president.
22 BY MR. CIOFFI:
23   Q. Turn to the next page, please, page 5, there's
24 a -- the first full paragraph, would you read?
25   A. "Thereafter, Mr. Spence discussed the plans

Deposition of Gary R. Heminger                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 188

1  for digital transformation and reviewed the consumer and
2  commercial focus areas for 2020."
3      Q.  Let me stop you there.  Did Mr. Spence have a
4  particular expertise in addition to everything you've
5  articulated with respect to digital banking?
6      A.  Yes, sir.
7      Q.  Would you describe that expertise?
8      A.  His expertise really came from what he was
9  able to learn and develop and, you know, in the
10  consultancy business, sell.  They sell that expertise
11  and those digital platform ideas to many competitors in
12  the industry.  So he brought that depth and breadth of
13  knowledge with him when he came to the bank, and as I
14  said earlier, one of the first times we saw it
15  articulated within our management team.
16      Q.  And presenting to you information about
17  digital transformation of the banking industry, did
18  Mr. Spence present to you objective facts, data, and
19  information?
20      A.  Yes, sir.
21      Q.  Did he analyze those facts, data, and
22  information?
23      A.  Yes, sir.
24      Q.  And how would you assess his ability to
25  understand and analyze that data, those facts, and that

Page 189

1  information?
2      A.  He had a tremendous acumen to understand the
3  digital information, the digital space, and then be able
4  to explain it to those people who did not have, you
5  know, that deep IT digital transformation background.
6      Q.  Based on this presentation, did you discuss
7  with the other board members the depth and breadth of
8  Mr. Spence's knowledge of the industry, his knowledge of
9  Fintech, his knowledge of the strategic initiatives and
10  goals of the company and his leadership skills with the
11  other board members?
12      A.  Yes, sir.
13      Q.  And what was their assessment?
14      A.  Again, we felt he was developing rapidly and
15  he brought a new depth -- and Greg was outstanding at
16  understanding this as well, but Tim brought a new depth
17  and breadth of information that he saw from outside the
18  banking industry, which was very helpful.
19      Q.  This depth and breadth of knowledge on the
20  part of Mr. Spence, at this point in time did the board
21  members have an opportunity to compare it to other
22  members of the enterprise team?
23      A.  We continuously observed, continuously
24  assessed the presentation skills and the depth and
25  breadth and the acumen of the executives as they

Page 190

1  presented.  As I said earlier this morning, every day
2  everyone was being interviewed.  So, yes, we did that.
3  We talked amongst ourselves and would always reach a
4  consensus.
5      Q.  At this point in time, in December of 2019,
6  was that sentiment about Mr. Spence held unanimously by
7  the board?
8          MR. SABA:  Objection.
9          THE WITNESS:  Yes, sir.
10  BY MR. CIOFFI:
11      Q.  Did you or anyone on the board form a business
12  judgment that anyone else on the enterprise team,
13  including but not limited to Mr. McHugh, possess
14  anything comparable to Mr. Spence's strategic vision,
15  strategic planning, presentation skills, knowledge of
16  Fintech, leadership skills?
17          MR. SABA:  Objection.  Go ahead, you can
18      answer.
19          THE WITNESS:  No.  We felt -- my business
20      judgment and my colleagues on the board's business
21      judgment -- was that Tim was, you know, far and
22      above any other candidate.
23  BY MR. CIOFFI:
24      Q.  If you could direct your attention to
25  Exhibit 9 now.  Go ahead and describe this document

Page 191

1  again.  I know you did in your prior testimony.  Go
2  ahead and describe it, just so we can put it in context
3  of what we were just talking about.
4      A.  This is a document to all of the board members
5  from Bob Shaffer, and it appears to a couple people in
6  management as well, Greg Carmichael, and I think -- I
7  think Paula at the time was in the HR department.  But
8  anyway -- and copied Bob Shaffer as well, who's in the
9  HR department.  But this is a Fifth Third Talent
10  Management and Succession Planning Document for Board
11  Meeting on December 17, 2019.
12      Q.  I'd like to direct your attention to again at
13  the bottom, this numbering system we call Bates numbers,
14  1135; do you see that?  Mr. Saba asked you some
15  questions about this, but I want to direct your
16  attention to that section of this page that talks about
17  potential next positions for Mr. Spence; do you see
18  that?
19      A.  Uh-huh.
20      Q.  Across from that it shows president in one to
21  two years; do you see that?
22      A.  Yes, sir.
23      Q.  And the CEO in three-plus years?
24      A.  Yes, sir.
25      Q.  Did, in fact, those potentials materialize?

Deposition of Gary R. Heminger                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 192

1    A.  They did.
2    Q.  And at the time of this document, was it the
3  consensus of the board that Tim could become president
4  in one to two years?
5    A.  It was the consensus of the board that we were
6  hoping that he would continue to develop to be able to
7  get the job, but there was no decision at that time that
8  the job was his.
9    Q.  Right.  And is the same thing true of the CEO
10  position?
11    A.  Yes, sir.
12    Q.  Is it accurate to say that there was a
13  consensus around the fact that he was the leading
14  candidate?
15    A.  Absolutely.
16    Q.  Is that because of what you just described in
17  terms of his strategic vision, his leadership, his depth
18  and breadth of knowledge of the industry?
19    A.  Yes.  His business acumen, leadership skills,
20  strategic vision, and just his overall performance.
21    Q.  Going back to Exhibit 10, do you see that?
22    A.  Okay.
23    Q.  So we went through Mr. Spence's presentation.
24  And I believe your earlier testimony was this was but
25  one of many presentations by Mr. Spence to the board; is

Page 193

1  that right?
2    MR. SABA:  Objection.  Go ahead, you can
3  answer.
4    THE WITNESS:  Yes, sir.
5  BY MR. CIOFFI:
6    Q.  I believe your testimony was there were
7  dozens; is that correct?
8    MR. SABA:  Objection.  Leading.  Go ahead, you
9  can answer.
10    THE WITNESS:  Yes, I sat through dozens of
11  presentations that Mr. Spence made.
12  BY MR. CIOFFI:
13    Q.  With respect to those other presentations, how
14  would you assess Mr. Spence's depth of and breadth of
15  knowledge of the industry, his strategic vision, his
16  leadership skills, as demonstrated in those other
17  presentations?
18    A.  I would say that they were exemplary.  I've --
19  you know, throughout my career, I've had a tremendous
20  amount of vision inside of all the major -- the
21  trillionaire banks, because I used to present to them
22  all the time and they would come and present to me.  And
23  I would stack Tim up with any of the leads of the
24  trillionaire banks.  I think he is of that caliber.
25    Q.  And is this true prior to December of 2019, in

Page 194

1  your judgment?
2    A.  Well, I saw him developing.  Remember, we
3  hired Tim in 2015.
4    Q.  Right.
5    A.  And he's been through a very rapid development
6  cycle through that period of time.  So not from the very
7  beginning, but as he has continued to develop, I see
8  him, you know, at that level that I say, you know, at
9  the top shelf of all the trillionaire banks.
10    Q.  I want to direct your attention to Exhibit 14
11  that Mr. Saba marked.  Do you see that?  Directing your
12  attention to what's numbered as page 4, it has the Bates
13  number 212534; do you see that?
14    A.  Yes, sir.
15    Q.  Is this another presentation by Mr. Spence?
16    A.  Yes.  This is a presentation on the Three Year
17  Strategic Plan in February of 2020.
18    Q.  Would you read the first sentence of that
19  first paragraph on 212534, please?
20    A.  "Next, Mr. Spence discussed the Three-Year
21  Strategic Plan.  He noted that, based on OCC
22  requirements, the strategic plan was presented in
23  written form as included with the materials for the
24  meeting.  He began" to review -- or "He began the review
25  of this plan with a discussion of the strategic context,

Page 195

1  which included a discussion of the macroeconomic
2  context, technological developments, and M&A markets."
3    Q.  Let me stop you there.  So with respect to
4  macroeconomic context, technological developments, M&A
5  markets, and overall strategic plan, did Mr. Spence
6  present to you objective facts, data, and information?
7    A.  Yes, sir.
8    Q.  Did he present to you an analysis of those
9  facts, that data, and that information?
10    A.  Yes, sir.
11    Q.  Based on his presentation, were you able to
12  form a business judgment as to his depth and breadth of
13  knowledge about technological developments, M&A markets,
14  macroeconomic context, and strategic context?
15    A.  Yes, sir.
16    MR. SABA:  Objection.
17  BY MR. CIOFFI:
18    Q.  What was that judgment that you were able to
19  form?
20    A.  That we felt that Mr. Spence possessed the
21  ability to frame a vision of what, in his opinion, could
22  happen over the next three years.  It's not always
23  perfect, but what could happen, looking at different
24  risks, different variables for the board to, you know,
25  be able to have a good understanding of where some of

Page 196

1 the positives could be, but where some of the pitfalls
2 could be of the business going forward.
3     Q.  Did you discuss your business judgment at this
4 point in time in February of 2020 with other members of
5 the board?
6     A.  Yes, sir.
7     Q.  Did other members of the board share your
8 assessment of Mr. Spence?
9         MR. SABA:  Objection.
10        MR. CIOFFI:  You may answer.
11        THE WITNESS:  Yes, sir.
12 BY MR. CIOFFI:
13    Q.   Also in those discussions with the other board
14 members, did you have an opportunity to compare and
15 contrast Mr. Spence's depth and breadth of knowledge,
16 his strategic vision, his knowledge of technology, his
17 knowledge of macroeconomic context, his knowledge of M&A
18 matters, with other members of the enterprise team?
19    A.   Well, other members of the enterprise team did
20 not present this data.  This was under Mr. Spence's
21 peer, you know, review, his -- I shouldn't say peer
22 review, but his organizational review, and but, you
23 know, what was so impressive was that he had the base
24 knowledge, but he had the ability, as I said earlier, to
25 explain this data, which is very, very complex, but

Page 197

1 explain how it can affect all parts of the business
2 going forward.
3     Q.  In your business judgment at this point in
4 time, did any other member of the enterprise team,
5 including but not limited to Mr. McHugh, have that kind
6 of ability?
7         MR. SABA:  Objection.
8         THE WITNESS:  No.
9 BY MR. CIOFFI:
10    Q.   Based on the depth and breadth of knowledge of
11 the industry, of technology, macroeconomic trends, of
12 strategic vision, of leadership skills, throughout 2020,
13 did Mr. Spence continue to be the leading candidate to
14 be president?
15        MR. SABA:  Objection.  Go ahead, you can
16    answer.
17        THE WITNESS:  Yes.
18 BY MR. CIOFFI:
19    Q.   Did there come a time in 2020 where the board
20 wanted to validate its assessment or as we sometimes say
21 in the industry, pressure test its business judgment
22 with respect to Mr. Spence?
23    A.   Yes.  I would call it due diligence.
24    Q.   Due diligence is a better term?
25    A.   Yes.

Page 198

1     Q.   And --
2     A.   It was clear that the board wanted to have an
3 outside opinion, therefore due diligence on, are we
4 missing anything?
5     Q.   How did the board go about securing that due
6 diligence for that outside evaluation?
7     A.   I don't recall the exact dates or the timing,
8 but sometime I believe over early summer the -- our lead
9 director, Marsha Williams, would have been involved with
10 the Human Capital Compensation Committee as well as the
11 CEO, the head of HR, to hire an outside firm to provide
12 that assessment.
13    Q.  I want to direct your attention to a couple of
14 exhibits and see if that refreshes your memory as to the
15 time frame.  Will you look at Exhibit 24, please.
16    A.   Got it.
17    Q.   And then if you would, if you would look at
18 Exhibit 21.
19    A.   Okay.
20    Q.   Based on the dates of those documents, are you
21 able to determine approximately when the board went to
22 an outside consultant to conduct the due diligence in
23 the vetting of Mr. Spence?
24        MR. SABA:  Objection.  Go ahead, you can
25    answer.

Page 199

1        THE WITNESS:  I'm sorry, I got lost with your
2    question and your objection.
3        MR. CIOFFI:  That happens with objections.
4    Could you read my question back, please?
5        Do you want to take a break?
6        THE WITNESS:  I'm just going to take my jacket
7    off.
8        (The record was read.)
9        MR. SABA:  Objection.  Go ahead.
10        THE WITNESS:  Yes.  Again, I was close in my
11    assessment before.  It was early summer, so it
12    looks like it started around June 8th, and then the
13    report that came back on the profile around
14    July 23rd.  So it was over the early summer,
15    midsummer time frame.
16 BY MR. CIOFFI:
17    Q.   What did the board do in order to commence its
18 due diligence with respect to Mr. Spence?
19        MR. SABA:  Objection.  Go ahead, you can
20    answer.
21        THE WITNESS:  The board did hire a firm by the
22    name of RHR International, who is one of the top
23    firms in the field of assessing executives and
24    assessing their abilities and their interpersonal
25    skills, you know, for the possible potential

Deposition of Gary R. Heminger                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 200

1  advancement within their company.
2  BY MR. CIOFFI:
3  Q.  I want to direct your attention to Exhibit
4  Number 25.  Will you look at that?
5  A.  Got it.
6  Q.  Is this the first step in the due diligence
7  process of vetting Mr. Spence?
8  A.  Yes, sir.
9  Q.  What is this document again?
10  A.  This document is, as stated here, the final --
11  what they call competency model developed for the CEO in
12  2015.  It talks about that, but this is the final
13  document of the profile of what working with RHR
14  International and with the board what we believe the
15  profile would be for our next CEO.
16  Q.  Directing your attention to the first sentence
17  of this document, which is on page 1, it's 1076.  Would
18  you look at that, please?
19  A.  "The structure of the competency model
20  developed for the CEO in 2015 still largely stands as
21  very accurate today."
22  Q.  What's your interpretation of that sentence?
23       MR. SABA:  Objection.  Go ahead, you can
24  answer.
25       THE WITNESS:  The board is doing a very good

Page 201

1  job.  In 2015 we had an assessment of what we felt
2  the requirements of the CEO should be and they
3  still stand pretty firm today that those are still
4  in place or still are required.
5  BY MR. CIOFFI:
6  Q.  So it talks about the model developed for the
7  CEO in 2015.  Was that the decision by the board to hire
8  Mr. Carmichael?
9       MR. SABA:  Objection.  Go ahead, you can
10  answer.
11       THE WITNESS:  I'm not exactly sure the date we
12  hired Mr. Carmichael, but that's pretty close.  And
13  I know that the model we have today pretty much
14  mirrors the same as Mr. Carmichael.
15  BY MR. CIOFFI:
16  Q.  Does it also mirror the CEO profile for almost
17  all corporations?
18       MR. SABA:  Objection.  Go ahead, you can
19  answer.
20       THE WITNESS:  I mean, almost all corporations
21  today go through this similar exercise of a
22  profile, and it depends whether you're in
23  pharmaceuticals or energy or banking, it depends on
24  what type of business you're in, but we all have a
25  profile and we all try to come to a consensus on

Page 202

1  what type of leader is it that we want going
2  forward.
3  BY MR. CIOFFI:
4  Q.  This document -- and Mr. Saba took you through
5  it -- on 1076 talks about Essential Leadership
6  Behaviors; do you see that?
7  A.  Yes, sir.
8  Q.  One of them is under the heading of Business
9  Management; do you see that?
10  A.  I do.
11  Q.  Establishing Strategic Direction; do you see
12  that?
13  A.  Yes.
14  Q.  And the other subheading, Driving Execution;
15  do you see that?
16  A.  Yes.
17  Q.  On the next page, Leadership, do you see that?
18  A.  Yes.
19  Q.  Interpersonal; do you see that characteristic?
20  A.  Uh-huh, yes.
21  Q.  Under Interpersonal, Cultivating Networks; do
22  you see that?
23  A.  Yes.
24  Q.  And then Influencing; do you see that?
25  A.  Yes.

Page 203

1  Q.  And on the last page, Personal Attributes,
2  Navigating Complexity; do you see that?
3  A.  Yes.
4  Q.  Demonstrating Resilience; do you see that?
5  A.  Yes.
6  Q.  Based on the facts, data, information analysis
7  that Mr. Spence presented to the board dozens of times,
8  was the board able to form a business judgment as to
9  whether Mr. Spence satisfied those characteristics?
10       MR. SABA:  Objection.  Go ahead and answer.
11       THE WITNESS:  Clearly it was a consensus of
12  the board and not over -- excuse me, not over just
13  one meeting but several meetings, and watching Tim
14  develop that he by far was the consensus of the
15  board to be our next CEO.
16  BY MR. CIOFFI:
17  Q.  I want to direct your attention to Exhibit 24.
18  Do you see that?  Exhibit 24.
19  A.  Got it.
20  Q.  Mr. Saba also showed you this exhibit in the
21  first bullet.  Would you read the first bullet?
22  A.  "Guy agrees that if Tim is 'the' successor,
23  don't add Tayfun and Phil formerly."
24  Q.  And Guy is --
25  A.  Guy is Guy Beaudin.

Deposition of Gary R. Heminger                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 204

1  Q.  Who is that?
2  A.  Would have been the consultant that we hired
3  within RHR International.
4  Q.  And he agrees that if Tim is the --
5  the successor, don't add Tayfun and Phil -- I think it's
6  formally, but --
7  A.  It should be formally, yeah.
8  Q.  It's a typo.  Did the board also agree with
9  that statement?
10     MR. SABA:  Objection.  Go ahead, you can
11  answer.
12     THE WITNESS:  I don't recall the details.
13  BY MR. CIOFFI:
14  Q.  Well, going back to your prior testimony, and
15  if you look at Exhibit 9, do you see that there?
16  A.  Got it.
17  Q.  At this point in time in December of 2019, the
18  consensus was forming, I believe you testified, that Tim
19  was the leading candidate to be president; is that
20  correct?
21     MR. SABA:  Objection.  Go ahead, you can
22  answer.
23     THE WITNESS:  That is correct.
24  BY MR. CIOFFI:
25  Q.  Based on that consensus that was forming, was

Page 205

1  it the board's view that Tim is the leading candidate,
2  is the only person who should be vetted?
3     MR. SABA:  Objection.  Contrary to prior
4  testimony.  Misrepresents his prior testimony.  Go
5  ahead, you can answer.
6     MR. CIOFFI:  Read my question back, please.
7  He's trying to disrupt your testimony.  So go
8  ahead, read my question back, please.
9     (The record was read.)
10     MR. SABA:  Objection.  Contrary to prior
11  testimony, misrepresents the prior testimony and
12  contradicts his prior testimony.  You're trying to
13  create perjury.
14     MR. CIOFFI:  Counsel, that's totally
15  ridiculous.  State your objection, not a speaking
16  objection.
17     You may answer.
18     THE WITNESS:  Okay.  It clearly was a
19  consensus of the board that Tim was our leading
20  candidate, but I was not the lead director.  I
21  don't know whether it was recommended or not to
22  look at one more -- more than one.  I don't recall
23  and I don't recall that I said anything different
24  in my earlier testimony.
25     MR. CIOFFI:  You didn't.  But go ahead, read

Page 206

1  the next sentence.
2     THE WITNESS:  Am I on 24?
3  BY MR. CIOFFI:
4  Q.  Yes.
5  A.  So schedule a 90 minute, that one?
6  Q.  No, the next sentence.
7  A.  "Although he would recommend, at a minimum, we
8  discuss with Marsha that she/the board is okay with only
9  having Tim assessed by Guy."
10  Q.  And Marsha is Marsha Williams; is that
11  correct?
12  A.  Yes, sir.  She was the lead director.
13  Q.  She was the lead director, yeah.  Do you know
14  if there was such a discussion with Marsha Williams?
15  A.  I don't know.
16  Q.  Would it surprise you to know that there was
17  such a discussion?
18     MR. SABA:  Objection.  Misrepresentation.
19  Trying to provide his own testimony.  But there's
20  no evidence in the record --
21     MR. CIOFFI:  What are you talking about?
22     MR. SABA:  You're trying to create testimony
23  in evidence that is not in the record.
24     MR. CIOFFI:  That's ridiculous.  It's all in
25  the record.  It's right.  Read my question back,

Page 207

1  please.
2     (The record was read.)
3     MR. SABA:  There's no indication in this
4  record or this document that there was such a
5  discussion.
6     MR. CIOFFI:  The question stands.
7     THE WITNESS:  It would not surprise me, but as
8  I said, I was not the lead director.
9  BY MR. CIOFFI:
10  Q.  Marsha Williams was the lead director,
11  correct?
12  A.  Yes, sir.
13  Q.  Sir, I want to direct your attention to what
14  Mr. Saba marked as Exhibit 22.  Will you look at that,
15  please?
16  A.  Got it.
17  Q.  What is that document again, please, for the
18  record?
19  A.  This is a board summary for Fifth Third Bank
20  presented by RHR International of an assessment of Tim
21  Spence.
22  Q.  Is this part of the due diligence you were
23  testifying about earlier?
24  A.  Yes, sir.
25  Q.  And this was an independent assessment of

Deposition of Gary R. Heminger                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 208

1  Mr. Spence by RHR; is that correct?
2      A.   Yes, sir.
3      Q.   Would you read the executive summary on the
4  first page, please?  Read it into the record.
5      A.   "Tim Spence demonstrates a strong fit to the
6  leadership characteristics desired in a chief executive
7  officer at Fifth Third Bank."
8      Q.   A little bit slower because she needs to take
9  it down.
10     A.   I'm sorry.
11     Q.   Keep going.
12     A.   "He is a creative, forward-thinking strategic
13  thinker who balances objective data with his subjective
14  experience to derive innovative solutions to business
15  challenges.  He demonstrates exceptional abilities in
16  dealing with complexity and ambiguity and a capacity to
17  exercise the business levers most material to having an
18  impact on the bottom line.  He is a thoughtful and
19  thorough decision maker who is disciplined and
20  structured in his approach to work.  He holds himself to
21  high standards of performance but also knows when good
22  enough is good enough.
23          "A values-based leader, he cares deeply about
24  organizational culture and the well-being of its
25  employees.  He is admired for his ability to adjust his

Page 209

1  leadership approach based on what is required by the
2  individual and the circumstance at hand.  He is a
3  compelling speaker who projects a passionate message to
4  his audience.  His diplomatic manner allows him to
5  challenge the ideas of others without creating
6  defensiveness or resistance, which facilities his
7  ability to gain buy-in to his strategies and objectives.
8  He perseveres in the face of difficulties and has
9  effective strategies in place to manage the stresses and
10  strengths inherent in an executive position.
11          "As a continuous learner, Tim pushes himself
12  to further hone his skills.  He is very insightful
13  regarding his strengths and weaknesses and remains open
14  to feedback and ongoing development."
15     Q.   As part of the iterative process and the
16  discussions within the board, did the board in the
17  exercise of its business judgment come to the same
18  conclusions about Tim's characteristics?
19     A.   Yes, sir.
20     Q.   In the exercise of its business judgment, did
21  the board view any other member of the enterprise team,
22  including but not limited to Mr. McHugh, as possessing
23  these characteristics?
24     A.   Not at this level.
25          MR. SABA:  Objection.

Page 210

1  BY MR. CIOFFI:
2      Q.   In the exercise of its business judgment, did
3  the board come to a conclusion that Mr. McHugh did not
4  possess these characteristics?
5          MR. SABA:  Objection.  Go ahead, you can
6  answer.
7          THE WITNESS:  He did not possess them at the
8  same level.
9  BY MR. CIOFFI:
10     Q.   In coming to that conclusion, did the board
11  decide to name Tim the president of Fifth Third Bank?
12     A.   Yes, sir.
13     Q.   In doing so, did the board in any way consider
14  age as the factor in that determination?
15          MR. SABA:  Objection.  Go ahead, you can
16  answer.
17          THE WITNESS:  No, sir.
18  BY MR. CIOFFI:
19     Q.   Did you or any member of the board
20  discriminate against Mr. McHugh on account of his age?
21          MR. SABA:  Objection.  Go ahead, you can
22  answer.
23          THE WITNESS:  Absolutely not.
24  BY MR. CIOFFI:
25     Q.   Was the decision to name Tim Spence the

Page 211

1  president of Fifth Third Bank based on the
2  qualifications that you described in your testimony this
3  afternoon?
4          MR. SABA:  Objection.  Go ahead, you can
5  answer.
6          THE WITNESS:  The consensus -- my judgment and
7  the consensus of the full board was that Tim
8  possessed superior qualities in all of the things I
9  testified earlier today.
10  BY MR. CIOFFI:
11     Q.   Did Mr. Carmichael tell the board to appoint
12  Tim Spence as president of Fifth Third Bank?
13     A.   No, sir.  That's the board's job.
14     Q.   Did the board exercise its independent
15  judgment, its independent business judgment, in naming
16  Tim Spence president of Fifth Third Bank?
17          MR. SABA:  Objection as to form.  Go ahead,
18  you can answer.
19          THE WITNESS:  Yes, sir.
20  BY MR. CIOFFI:
21     Q.   Did RHR tell the board to name Tim Spence
22  president of Fifth Third Bank?
23     A.   No, sir.
24     Q.   Did anyone tell the board to name Tim Spence
25  the president of Fifth Third Bank?

Case: 1:21-cv-00238-MRB Doc #: 66-6 Filed: 08/02/24 Page: 57 of 96 PAGEID #: 3066

Deposition of Gary R. Heminger                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 212

1    MR. SABA:  Objection.
2    THE WITNESS:  No, sir.  It was a board
3    decision.
4  BY MR. CIOFFI:
5    Q.  In making that decision, did the board
6  exercise its sound and independent business judgment?
7    MR. SABA:  Objection.
8    THE WITNESS:  Yes, sir.
9    MR. CIOFFI:  Why don't we go off the record.
10  I think he has to change the tapes.  I may or may
11  not have more questions.
12    THE WITNESS:  Okay.
13    THE VIDEOGRAPHER:  The time is 5:10 p.m.
14  We're going off the record.
15    (A recess was taken from 5:11 p.m. to
16    5:22 p.m.)
17    THE VIDEOGRAPHER:  The time is 5:22 p.m.
18  We're back on the record.
19    MR. CIOFFI:  I have no further questions.
20    FURTHER EXAMINATION
21  BY MR. SABA:
22    Q.  Mr. Heminger, during your -- the questions
23  asked by Mr. Cioffi, you indicated that one one to two times
24  a year the board will update the files and how we see an
25  executive.  What files were you talking about?

Page 213

1    A.  I'm talking about the executive succession
2  plan.  The same document that we reviewed.
3    Q.  So the board would update -- which document
4  are you referring to specifically?  Is it the document
5  attached to Exhibit 9?  Did you hear my question,
6  Mr. Heminger?
7    A.  I'm looking for the document.
8    Q.  Okay.
9    A.  Just hang loose.  I think this is it right
10  here.  It's this Exhibit 22, it's this type of document
11  that we would just -- we would review this one to two
12  times a year, just to see how the executive is doing
13  versus the, you know, behavior ratings.
14    Q.  So you would review the board summary provided
15  by RHR twice a year?
16    A.  Well, that's RHR.  No, it is --
17    Q.  Sir, let me refer you to Exhibit Number 9 and
18  see if that's the document you are referring to.  Turn
19  to the second page of it.
20    A.  Okay.  This is what I'm looking at, was
21  looking for.  So these documents of the individuals.  We
22  would just have an update one time in this level of
23  detail, and then another time of the year when we do
24  compensation, how's the person doing.
25    Q.  So when you're referring to the files that you

Page 214

1  were updating, you would refer to those talent profiles
2  that we see in Exhibit Number 9; is that right?
3    A.  Correct.
4    Q.  And so when would you do the compensation
5  review?
6    A.  Usually at the end of February.
7    Q.  All right.  And when would be the second time
8  that you would review them?
9    A.  This document is -- this is done usually at
10  the December board meeting, the full talent review is
11  done at the December board meeting.
12    Q.  At the December board meeting?
13    A.  And in February -- end of February when we do
14  the annual compensation is when we look to see if
15  there's any updates.
16    Q.  All right.  And that would be done each year;
17  is that correct?
18    A.  I'm sorry?
19    Q.  That would be done each year, each December
20  and each February; is that correct?
21    A.  That's my understanding, yes.
22    Q.  Mr. Cioffi was asking you about the top five
23  compensated employees?
24    A.  Uh-huh.
25    Q.  You indicated that the compensation reflects

Page 215

1  their value to Fifth Third; do you recall that?
2    A.  I do.
3    Q.  And so based on that, Lars Anderson would have
4  more value to Fifth Third than Mr. Spence?
5    MR. CIOFFI:  Objection to the form.
6  Mischaracterizes his testimony.
7  BY MR. SABA:
8    Q.  Mr. Heminger?
9    MR. CIOFFI:  No, you may answer.
10    THE WITNESS:  Mr. Anderson was hired long
11    before Mr. Spence, and he was brought in at a
12    higher value, as you'll -- as I stated in my
13    testimony, we had discussions with the board and
14    Mr. Anderson is no longer in that position.
15  BY MR. SABA:
16    Q.  But at that point in time, he would have
17  reflected more value to the company than Mr. Spence?
18    MR. CIOFFI:  Objection to the form.  What is
19    that point?  What you referred to, "that"?
20  BY MR. SABA:
21    Q.  So let's go back to 2019 and 2020, where
22  Mr. Anderson's compensation exceeded that of
23  Mr. Spence's.  He would have reflected more value to
24  Fifth Third than Mr. Spence, correct?
25    MR. CIOFFI:  Objection, misstates his

Deposition of Gary R. Heminger                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 216

1   testimony, mischaracterizes the facts. He has
2   answered the question as to why.
3   BY MR. SABA:
4      Q.  Go ahead, Mr. Heminger.
5      A.  We had hired Mr. Anderson earlier than
6   Mr. Spence, and he had many more years of experience,
7   and so I wouldn't say that it prescribed more value,
8   it's just where he was in his career.
9      Q.  So the amount of salary an employee is
10  receiving may not be indicative of their value to Fifth
11  Third; is that correct?
12     A.  That's correct.
13     Q.  Since you had Exhibit 9 open, let me go back
14  to that for a second. And if you could go back to Fifth
15  Third McHugh 001135?
16     A.  Got it.
17     Q.  Are you on that page?
18     A.  Yes, sir.
19     Q.  And that's Mr. Spence's talent profile; is
20  that correct?
21     A.  Yes, sir.
22     Q.  And if I -- Mr. Cioffi was pointing out the
23  potential next positions and focusing on that it says
24  president, one to two years and CEO three-plus years; is
25  that correct?

Page 217

1      A.  That's correct.
2      Q.  Who put that information in there?
3      A.  That would have been determined by the head of
4   HR, the head of the talent and compensation committee,
5   at the time would have been Mr. McCallister. Marsha
6   Williams, lead independent director, and then Greg
7   Carmichael, CEO, is how they would have presented this.
8   But then the board has a very rigorous -- the board
9   doesn't -- we don't rubber stamp anything. We would
10  have a very rigorous discussion on whether or not we
11  agree with that.
12     Q.  And with respect to that information being in
13  there, do you know if that was first put in there by
14  Mr. Shaffer and Mr. Carmichael?
15     A.  I don't.
16        MR. CIOFFI:  Objection. He answered the
17     question. You're arguing with him. You want your
18     answer. He answered the question.
19        MR. SABA:  No.
20        MR. CIOFFI:  Marsha Williams --
21        MR. SABA:  I didn't finish my --
22        MR. CIOFFI:  Mike McCallister, Greg
23     Carmichael, head of HR.
24        MR. SABA:  It's nice that you have your
25     answer, Mike.

Page 218

1        MR. CIOFFI:  That's what he said.
2        MR. SABA:  Mike, let me finish my question. I
3     know you want to coach your witness. I know you
4     want to try and create an answer that's not there.
5     Let me finish my question.
6        MR. CIOFFI:  I can't coach him on what he's
7     already said.
8   BY MR. SABA:
9      Q.  Do you know whether or not that information
10  was put into this talent deck for Mr. Spence by
11  Mr. Shaffer and Mr. Carmichael before it was ever seen
12  by Mr. McCallister?
13     A.  I do not.
14     Q.  What about Ms. Williams before she ever saw
15  it, do you know if that's the case?
16     A.  I do not.
17     Q.  You indicated that when you first joined Fifth
18  Third they were only doing auto loans. When did Fifth
19  Third switch out of just doing auto loans?
20     A.  That's not what I said. I said when I first
21  joined Fifth Third, one of the biggest businesses was
22  auto loans and we needed to learn how to do something
23  other than just auto loans.
24     Q.  Was auto loans Fifth Third's largest portion
25  of their business when you joined?

Page 219

1      A.  No.
2      Q.  What was the largest portion of their
3   business?
4      A.  Probably mortgage. Probably commercial
5   banking. But auto loans was a big piece of it.
6      Q.  And what line of loans has Mr. Spence added
7   since that time?
8      A.  I don't know.
9      Q.  Has he added any?
10     A.  Any --
11     Q.  Any lines of loans that the bank engages in
12  that they didn't engage in before he came?
13     A.  Oh, yes. We've gone to several things. We
14  have this company called Dividend and this company
15  called Provide, which does solo work, ESG-type work. A
16  number of Fintech type of, you know, technologies on
17  being able to provide financial services.
18     Q.  And which of those are added by Mr. Spence and
19  which were added by other executives?
20     A.  I just stated those are the ones that Tim
21  provided.
22     Q.  And are those -- do those provide a new line
23  of loans for the bank?
24     A.  Yes, sir.
25     Q.  What type of loans do those provide?

Deposition of Gary R. Heminger                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 220

1  A.  Consumer and commercial lending.

2  Q.  And what year was that added?

3  A.  Over the last three or four years we've been

4  adding these companies or these parts of business.

5  Q.  If I can refer you back to Exhibit 10.

6  A.  Got it.

7  Q.  If you can go to page 2 again, McHugh 007109.

8  Do you see that there?

9  A.  Yes.

10  Q.  Mr. Cioffi had you focus on the first sentence

11  on the bottom, below Market Context; do you see that?

12  A.  Yes.

13  Q.  And it refers to again, "Mr. Spence provided

14  an overview of the strategy plan review as included in

15  the materials for the meeting."

16      Who prepared the strategy plan review?

17  A.  With me?

18  Q.  No.  As referenced here on Exhibit Number 10,

19  Fifth Third McHugh 007109.  It references the strategy

20  plan review as included in the materials.  Do you know

21  who included -- excuse me, who prepared the strategy

22  plan review?

23  A.  No.  It would have been a large team under the

24  direction of Mr. Spence, but number of members that will

25  provide economic data, credit data, market data, but it

Page 221

1  would be a big team.

2  Q.  There's a number of members of the enterprise

3  team that are involved in preparing that information; is

4  that right?

5      MR. CIOFFI:  Objection.  Counsel, you're

6      testifying.

7      MR. SABA:  It's a question.

8      MR. CIOFFI:  If you want to file a question.

9  BY MR. SABA:

10  Q.  There are a number of members of the

11  enterprise team that are involved in that, correct?

12  A.  I would assume so.

13  Q.  Yes.  If you could refer to Exhibit 14,

14  please.

15  A.  Got it.

16  Q.  And if you could turn to the second page of

17  Exhibit 14, Fifth Third McHugh 212534.  Do you have that

18  page?

19  A.  Got it.

20  Q.  All right.  And Mr. Cioffi was focused on

21  beginning with the first sentence at the top there,

22  "Next, Mr. Spence discussed the Three-Year Strategic

23  Plan."

24      Do you see that?

25  A.  Yes.

Page 222

1  Q.  Who prepared the three-year strategic plan?

2  A.  I don't know, but several people.

3  Q.  Do you know who any of the specific people

4  were?

5  A.  Well, all of the enterprise -- not all the

6  enterprise leaders.  HR wouldn't have been involved.

7  Well, they could be involved on the labor side.  General

8  counsel would not be involved, but generally members of

9  the commercial banking, consumer banking, economics,

10  CFO, a number of people, all bring it together and then

11  Mr. Spence presented it.

12  Q.  He's presenting information that other people

13  prepared, correct?

14      MR. CIOFFI:  Objection.  Misstates the

15      testimony.

16      THE WITNESS:  No, I disagree with that.  Other

17      people presented objective data, as you like to

18      call it, but it takes a certain skill to be able to

19      bring it all together and to explain it and

20      articulate it at a board level.

21  BY MR. SABA:

22  Q.  And that's what he's explaining?  He's

23  explaining what other people brought together in the

24  three-year strategic plan, correct?

25      MR. CIOFFI:  Objection.  That's not what he

Page 223

1  testified to.  The record will speak for itself.

2  You're trying to put words in his mouth.

3      MR. SABA:  That's not the case.

4      MR. CIOFFI:  It is the case.

5      MR. SABA:  Go ahead.

6      THE WITNESS:  That's the way it's done in

7  every business I've ever been involved with.  One

8  person doesn't do it all.

9  BY MR. SABA:

10  Q.  Have you ever reviewed the revenue generated

11  by Mr. Spence's digital initiatives?

12  A.  Parts of it.  I don't recall it in total, but

13  yes, parts of it.

14  Q.  And what's your understanding of what the

15  revenue has been that's been generated by Mr. Spence's

16  digital initiatives?

17  A.  Off the top of my head, I don't know.

18  Q.  Referring you back to Exhibit Number 22.

19  A.  Got it.

20  Q.  The board summary.  And you read the executive

21  summary into the record, correct?

22  A.  Yes.

23  Q.  Do you know whether or not Mr. Carmichael and

24  Mr. Shaffer were involved in reviewing and/or otherwise

25  editing Exhibit Number 22?

Deposition of Gary R. Heminger                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 224

1     A. I am not aware.

2     Q. You indicated and Mr. Cioffi asked you several

3 times over and over again whether or not within his

4 presentations Mr. Spence references data or numbers. Do

5 you go through the process of verifying the numbers

6 or the data represented by Mr. Spence?

7     A. I do. As a board member, I take great pride

8 **in the homework that I do and understanding the data**

9 **that makes up the material that's presented.**

10     Q. And what specifically did you do to verify the

11 data and the numbers presented by Mr. Spence in any of

12 his reports?

13     **A. Well, first of all, you have to have the**

14 **business acumen to understand the data to begin with,**

15 **which I do. But a case in point, I recall from a**

16 **macroeconomic standpoint some data was being presented**

17 **on inflation, and you might understand that we've had a**

18 **very difficult inflationary period. And one of Tim's**

19 **thoughts and advice was be careful, this is not**

20 **temporary inflation. In fact, this inflation can be**

21 **prolonged. So that's one of the things that really**

22 **stuck with me in understanding that, you know, things**

23 **aren't all going to be simple going forward over the**

24 **last three to four years.**

25     Q. When did he say that?

Page 225

1     **A. This would have been during one of the**

2 **strategic planning reviews, probably in the 2020 -- it**

3 **was probably in the 2020, early 2021 time frame.**

4     Q. And what did you do to go verify that

5 information?

6     **A. I --**

7       MR. CIOFFI: Objection. He answered that

8 already, but go ahead.

9       THE WITNESS: Yeah, I'm -- sorry. There.

10 I'm -- as I said earlier, I was of the opinion that

11 inflationary trends were going to be much more

12 difficult from my background and my understanding

13 of energy policy, fiscal policy, other inflationary

14 tendencies. So from all the data that I have

15 observed and I understood from doing a lot of

16 economic work myself, I was of the same ilk that

17 inflationary period was going to be much more

18 difficult than quote to the experts were saying

19 outside of the bank.

20 BY MR. SABA:

21     Q. Did you do anything outside that particular

22 board meeting to go verify his data?

23     **A. I didn't need to. I already had a pretty good**

24 **understanding of it.**

25     Q. So you agreed with what he was saying,

Page 226

1 essentially?

2     **A. I agree with what Tim was saying, yes.**

3       MR. SABA: We can go off the record just for

4 one minute. I'll be right back.

5       THE VIDEOGRAPHER: The time is 5:42 p.m.

6 We're going off the record.

7       (A recess was taken from 5:43 p.m. to

8       5:44 p.m.)

9       THE VIDEOGRAPHER: The time is 5:43 p.m. We

10 are back on the record.

11       MR. SABA: That's all the questions I have at

12 this time. As I indicated before, we are

13 continuing this in progress.

14       MR. CIOFFI: We recognize that you've

15 attempted to reserve a right to continue in

16 progress. We dispute that you have such a right.

17 So at this point in time the witness will read and

18 sign the deposition.

19       THE VIDEOGRAPHER: The time is 5:44 p.m.

20 We're going off the record.

```
 1

 2

 3

 4                          _____

 5                              GARY R. HEMINGER

 6                          _____

 7                              DATE

 8                          -  -  -

 9           DEPOSITION CONCLUDED AT 5:44 p.m.

10                          -  -  -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Deposition of Gary R. Heminger                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

```
 1                  C E R T I F I C A T E

 2     STATE OF OHIO            :
                                :          SS
 3     COUNTY OF HAMILTON       :

 4              I, Wendy L. Raymer, RPR, CRR, the undersigned,

 5     a duly qualified and commissioned notary public within

 6     and for the State of Ohio, do hereby certify that before

 7     the giving of his aforesaid deposition, GARY R. HEMINGER

 8     was by me first duly sworn to depose the truth, the

 9     whole truth and nothing but the truth; that the

10     foregoing is the deposition given at said time and place

11     by GARY R. HEMINGER; that said deposition was taken in

12     all respects pursuant to stipulation of counsel; that I

13     am neither a relative of nor employee of any of the

14     parties or their counsel, and have no interest whatever

15     in the result of the action; that I am not, nor is the

16     court reporting firm with which I am affiliated, under a

17     contract as defined in Civil Rule 28 (D).

18              IN WITNESS WHEREOF, I hereunto set my hand and

19     official seal of office at Cincinnati, Ohio, this 9th

20     day of January, 2023.

21

22

23

24                                _____
       My Commission expires      S/Wendy L. Raymer, RPR, CRR
25     December 6, 2026            Notary Public - State of Ohio
```

Deposition of Gary R. Heminger                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

1   1 DEPOSITION ERRATA SHEET

2   Date Taken:  December 20, 2022

3   Case Caption:  PHILIP R. MCHUGH

4   vs. FIFTH THIRD BANCORP, et al.

5   DECLARATION UNDER PENALTY OF PERJURY

6   I declare under penalty of perjury

7   that I have read the entire transcript of

8   my deposition taken in the captioned matter

9   or the same has been read to me, and

10  the same is true and accurate, save and

11  except for changes and/or corrections, if

12  any, as indicated by me on the DEPOSITION

13  ERRATA SHEET hereof, with the understanding

14  that I offer these changes as if still under

15  oath.

16  Signed on the _____ day of

17  _____, 20___.

18  _____

19  GARY R. HEMINGER

20

21

22

23

24

25

```
 1   2 DEPOSITION ERRATA SHEET

 2   Page No._____Line No._____Change to:_____

 3   _____

 4   Reason for change:_____

 5   Page No._____Line No._____Change to:_____

 6   _____

 7   Reason for change:_____

 8   Page No._____Line No._____Change to:_____

 9   _____

10   Reason for change:_____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change:_____

23   SIGNATURE:_____DATE:_____

24   GARY R. HEMINGER

25
```

Deposition of Gary R. Heminger                                      Philip R. McHugh v. Fifth Third Bancorp, et al.

```
 1   3 DEPOSITION ERRATA SHEET

 2   Page No._____Line No._____Change to:_____

 3   _____

 4   Reason for change:_____

 5   Page No._____Line No._____Change to:_____

 6   _____

 7   Reason for change:_____

 8   Page No._____Line No._____Change to:_____

 9   _____

10   Reason for change:_____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change:_____

23   SIGNATURE:_____DATE:_____

24   GARY R. HEMINGER

25
```

## WORD INDEX

**< $ >**
**$300,000**  42:*17*
**$40,000**  43:*3*

**< 0 >**
**000954**  132:*24*
**000971**  135:*23*
**000976**  132:*24*
**001013**  130:6, *10*
**001019**  130:*20*
**001024**  130:*7*
**001033**  132:*13*
**001036**  152:*1*
**001040**  132:*13*
**001071**  129:2  130:*3*
**001073**  130:*3*
**001074**  140:*8*
**001079**  140:*8*
**001104**  66:*11*
**001105**  67:5  68:*20*
**001127**  83:*15, 25*
84:9  86:*21*  87:9
**001135**  81:*21, 24*
82:*17, 22*  83:8
216:*15*
**001137**  83:25  84:*10*
86:22  87:*10*
**001142**  74:7  76:5
**001154**  66:*11*  67:5
68:*20*
**007108**  85:*12*
**007109**  89:5, *8*  110:6
220:7, *19*
**007128**  85:*12, 15*
**010**  168:*4*

**< 1 >**
**1**  3:8  18:*23, 25*  19:6
20:9  21:22  25:*21*
26:*11*  27:7, *9, 15*
30:*11*  31:2, *7, 18*
46:*1, 5*  47:*10, 22*
50:*19*  55:9, *18, 23*
56:*14, 17, 22*  89:*13*
200:*17*  229:*1*
**1:21-cv-00238**  1:9
4:*8*
**1:42**  105:*21, 22*

**10**  3:*12*  84:*19, 23*
85:*11*  89:5  100:*10*
110:4  167:22  175:*3*
192:*21*  220:5, *18*
**10:35**  42:*8*
**10:36**  42:*10*
**1076**  200:*17*  202:5
**11**  3:*12*  9:*21*  111:8,
*12, 21, 25*  112:5
**11:01**  42:*11, 12*
**1105**  68:*23*
**111**  3:*12*
**1112**  74:*8*
**112**  3:*14*
**1135**  191:*14*
**1137**  83:*15*
**114**  3:*14*
**1142**  74:*9*
**115**  3:*15*
**116**  3:*15*
**119**  3:*16*
**12**  3:*14*  14:*3*  74:*8*
112:*15, 19*  113:*4, 7,
13, 19*
**12:18**  82:25  83:2
**12:19**  83:*3, 4*
**12:55**  105:*18*
**12:56**  105:*20*
**120**  3:*16*
**121**  3:*17*
**123**  3:*17*
**125**  3:*18*
**128**  3:*19*
**13**  3:*14*  50:7  114:*11,
15*  115:2, *6*
**132**  3:*19, 20*
**138**  3:*20*
**14**  3:*15*  115:*12, 16*
116:*1, 5, 10, 25*  117:*3*
118:6, *12, 19*  119:*1,
11, 16, 19*  120:4
194:*10*  221:*13, 17*
**140**  3:*21*
**15**  3:*15*  49:16  50:4
116:*21*  117:*4, 5, 7, 10*
118:9, *18, 24*
**156**  3:*21*
**157**  3:*22*
**159**  3:*22*

**16**  3:*16*  57:6, *14, 20,
23*  58:*4, 13*  62:*16*
63:6, *10, 20, 24*  64:*10*
65:*11, 16, 24*  89:*13*
100:9  119:*4, 8, 12, 22*
120:*13, 22*  121:7, *14,
19*  122:5  123:*3, 10*
**161**  3:*4*
**16th**  58:*18*
**17**  3:*16*  66:9  69:5
85:*1*  110:24  112:22
113:*15, 21*  114:*18*
115:9  120:6, *10, 14*
121:*13, 18*  122:*23*
168:2  176:9  179:7
191:*11*
**1700**  2:*12*
**17th**  67:22  86:4
87:*24*  113:*10*
**18**  3:*17*  59:6  60:*3, 7,
12, 21*  61:*5, 16, 22*
62:*1, 6*  121:22  122:*1,
10*  123:2, 8  126:6
**19**  3:*17*  53:13
123:*13, 17*  124:2, *17*
**19th**  87:*24*
**1st**  17:*21*  21:*3, 11*
23:*3, 10, 12, 17, 21*
24:*3, 5, 22*  25:*1, 5, 14,
25*  26:4  28:25  29:5
40:*17*

**< 2 >**
**2**  3:8  51:24  52:*3, 24*
53:*3, 22*  54:*13*  168:*3*
220:7  230:*1*
**2:45**  135:*11*
**2:46**  135:*12*
**2:57**  135:*14*
**2:58**  135:*13*
**20**  1:*14*  3:*18*  6:7
7:*3*  125:*1, 5, 22, 25*
131:*15, 19*  133:*16, 17,
18*  134:*7, 21*  229:*2,
17*
**2006**  11:*17*  31:25
97:*14*
**201**  2:*12*

**2015**  40:6, *17*  163:*25*
194:*3*  200:*12, 20*
201:*1, 7*
**2016**  180:*1*
**2019**  46:8, *21*  47:7,
*13*  48:2, *15, 21*  49:*14*
50:*10, 20, 25*  52:6
53:6, *19, 23*  54:*12*
55:*8, 11*  57:6, *14, 20,
23*  58:*4, 13, 19*  59:6
60:*3, 8, 12, 21*  61:*5,
16, 22*  62:*1, 6, 16*
63:6, *10, 20, 25*  64:*10*
65:*11, 16, 24*  66:9
69:5  73:24  77:2
78:6  85:*1*  86:4
87:25  110:24  112:22
113:*10, 15, 21*  114:*18*
115:9  168:2  171:*15*
176:9  177:20  179:7
190:5  191:*11*  193:25
204:*17*  215:*21*
**2020**  9:16  17:*21*
18:*23, 25*  19:6  20:9
21:*3, 11, 22*  23:4, *10,
12, 17, 21*  24:*3, 5, 22*
25:*1, 5, 14, 21, 25*
26:*4, 11*  27:7, *9, 15*
28:25  29:5  30:*11*
31:2, *8, 18*  77:2
111:*15*  112:*3, 7, 13*
116:*12, 18*  117:*3*
118:*1, 6, 12, 19*  119:*1,
11, 16, 19*  120:4, *13,
22*  121:7, *14, 19*
122:5  123:*3, 10, 20*
124:8, *20*  125:9
126:6, *7, 8*  127:*19*
129:8  132:22  133:*3,
8, 14, 25*  134:5
138:*17*  139:*13*
140:*13*  141:9, *24*
143:8  145:*1, 25*
147:8  148:20  149:8
150:*3, 6, 17, 21*  151:*5,
16*  152:6  156:*4, 13*
157:*7, 18*  188:2
194:*17*  196:4  197:*12,
19*  215:*21*  225:2, *3*
**2021**  225:*3*

**2022**   1:*14*   4:2
115:*19*   229:2
**2023**   228:*20*
**2026**   228:*25*
**20th**   4:*1*
**21**   3:*19*   53:*11*
123:*20*   124:8, *20*
125:8   126:7, 8
128:*16*, *20*   129:*1*
131:*1*   140:7   198:*18*
**212**   3:5
**212471**   46:*12*   49:*25*
**212472**   50:*4*
**212474**   46:*15*
**212475**   52:*25*   53:*10*
**212476**   53:*11*
**212479**   52:*25*
**212480**   57:*10*
**212481**   57:*11*
**212487**   59:8, *16*
**212489**   59:9, *17*
**212490**   60:*23*
**212501**   60:*24*
**212502**   62:*24*
**212506**   62:*24*
**212507**   64:*12*
**212512**   64:*12*
**212513**   113:5
**212516**   113:5
**212517**   115:*3*
**212522**   115:*3*
**212523**   111:*22*
**212532**   111:*23*
**212533**   116:2
**212534**   194:*13*, *19*
221:*17*
**212538**   116:2
**212539**   117:*11*
**212543**   117:*11*
**212544**   119:*13*
**212546**   119:*13*
**212549**   122:*11*
**212556**   122:*11*, *14*
**212557**   124:*3*
**212560**   124:*3*
**212561**   125:*22*
**212562**   134:*22*
**212565**   125:*23*
**212566**   156:*15*

**212569**   156:*15*
**212771**   55:*13*
**212774**   55:*15*
**212871**   158:*13*
**212872**   158:*13*
**21st**   133:*3*, 8, *14*, *25*
134:5   156:*4*
**22**   3:*19*   132:*1*, 4, 7, 8,
*10*   133:6, *12*, *21*, *22*
149:8   151:*24*   156:*13*
207:*14*   213:*10*
223:*18*, *25*
**22nd**   140:*13*   141:9,
*24*   143:8   145:*1*, *25*
147:8   148:*19*   150:*3*,
*17*   151:5, *16*   152:6
157:7
**23**   3:*20*   129:8   132:*1*,
*3*, 8, *16*, *18*, *23*   133:6,
*12*   134:2   135:*22*
**23rd**   199:*14*
**24**   3:*20*   138:*11*, *15*
198:*15*   203:*17*, *18*
206:2
**25**   3:*21*   6:7   111:*15*
112:*3*, 7, *13*   115:*19*
116:*12*, *18*   140:*1*, 5
200:*4*
**26**   3:*21*   46:*24*   47:7,
*13*   48:2, *15*, *21*   49:*14*
50:*10*, *20*, *25*   51:*22*
52:6   53:6, *19*, *23*
54:*12*   55:8, *11*   156:6,
*10*, *14*, *24*   157:*4*, *18*
**2623**   2:6
**26th**   46:*21*
**27**   3:*22*   91:5   157:*10*,
*14*   158:9, *12*
**28**   3:*22*   46:8, *23*
120:*17*   159:6, *10*, *13*,
*21*, *24*   228:*17*

**< 3 >**
**3**   3:9   55:*1*, 5, *12*, *24*
56:*14*, *16*   231:*1*
**3:38**   160:*4*, 6
**3:48**   160:7, 8
**3:49**   160:*22*, *24*
**312**   6:*4*

**31st**   132:*21*
**35**   43:2
**35,000**   43:2
**362-8700**   2:*13*
**37**   91:5

**< 4 >**
**4**   3:9   56:*24*   57:*3*, *17*,
*22*   58:*3*   152:2, 7
181:*12*   194:*12*
**4:02**   160:*25*   161:*1*
**45**   67:9
**45202**   1:*20*   2:*13*
**45208**   2:6
**46**   3:8

**< 5 >**
**5**   3:*4*, *10*   58:*22*   59:*3*,
7, *15*, *25*   60:6   152:2
187:*23*
**5:10**   212:*13*
**5:11**   212:*15*
**5:22**   212:*16*, *17*
**5:42**   226:5
**5:43**   226:7, 9
**5:44**   226:8, *19*   227:9
**50**   68:*13*
**51**   3:8
**511**   1:*20*
**513**   2:7, *13*
**52**   3:8
**533-2701**   2:7
**55**   3:9
**56**   3:9
**57**   3:9
**58**   3:*10*
**59**   3:*10*

**< 6 >**
**6**   3:*10*   60:*14*, *18*, *22*
61:*13*, *25*   228:*25*
**60**   3:*10*
**62**   3:*11*
**64**   3:*11*
**66**   3:*12*

**< 7 >**
**7**   3:*11*   62:9, *13*, *23*
63:2, 8, *17*, *23*

**7109**   168:*4*
**7110**   175:*4*, 6, 7
**7111**   181:*13*

**< 8 >**
**8**   3:*11*   64:*3*, 7, *11*
65:8, *14*, *21*   100:*10*
138:*17*   139:*13*
**84**   3:*12*
**8th**   199:*12*

**< 9 >**
**9**   3:*12*   66:*1*, 5, *10*
67:*4*   68:*14*   73:*13*, *16*,
*25*   74:*3*   86:*21*   87:9,
*13*   88:*10*   89:*1*
190:*25*   204:*15*   213:5,
*17*   214:2   216:*13*
**9/10/53**   6:*11*
**9:39**   1:*14*   4:2
**90**   206:5
**9th**   228:*19*

**< A >**
**a.m**   1:*14*   4:2   42:8,
*10*, *11*
**abilities**   97:*19*   106:*1*
180:*20*   199:*24*
208:*15*
**ability**   79:*20*   95:*15*
101:*10*   104:*22*
108:*15*, *18*   141:*16*
146:*13*   151:6, *17*
169:*10*   180:*24*
182:*13*   183:*4*   185:9
188:*24*   195:*21*
196:*24*   197:6   208:*25*
209:7
**able**   14:*18*   47:*10*, *24*
50:*10*, *25*   53:*4*, *17*, *22*
54:9, *11*, *21*   57:*17*, *22*
58:*3*   59:*25*   60:6
61:*13*, *25*   62:5   63:2,
8   65:8, *14*, *21*   66:5
69:9   75:9   76:*16*
78:*19*   80:*10*   81:*11*,
*13*   84:5   93:*12*   97:*15*
106:5, *15*   109:*20*
111:*25*   112:5   113:7,
*13*, *19*   115:6   116:*10*,

Case: 1:21-cv-00238-MRB Doc #: 66-6 Filed: 08/02/24 Page: 68 of 96 PAGEID #: 3077
Deposition of Gary R. Heminger
Philip R. McHugh v. Fifth Third Bancorp, et al.

*16* 118:*9, 18, 24*
119:*16, 22*  120:2, *14*
121:*13*  123:2, *8*
124:6, *17*  131:*13*
133:*4*  141:*4*  150:*11,*
*13*  156:*24*  157:*4*
169:*17*  170:*3, 10, 15*
171:8, *19, 25*  172:*4*
175:*17*  179:*7*  180:*25*
181:*4, 21*  182:*8*
183:*17, 23*  185:*17*
187:6  188:*9*  189:*3*
192:6  195:*11, 18, 25*
198:*21*  203:8  219:*17*
222:*18*
**Absolutely**  72:*23*
154:*17, 21*  175:*21*
192:*15*  210:*23*
**accept**  104:*12*
**account**  210:*20*
**accountable**  136:*4*
**accounting**  9:*10*
**accurate**  114:*4*
167:6  192:*12*  200:*21*
229:*10*
**achieve**  186:*19*
**achievements**  86:*10*
88:*5*
**achieving**  182:*24*
**acquisitions**  95:*16*
145:*4, 16*  146:*3*
147:*11*  148:*14*  178:8,
*15*
**action**  228:*15*
**activism**  79:*3*  106:*16*
**activities**  137:*13*
**actual**  28:*13*  35:7
144:8  150:*17*  151:*15*
**acumen**  142:*15*
189:*2, 25*  192:*19*
224:*14*
**add**  138:*25*  203:*23*
204:5
**added**  219:*6, 9, 18, 19*
220:2
**adding**  220:*4*
**addition**  188:*4*
**additional**  42:*19, 24*
51:*12*  56:*19*  87:*1, 13*

160:*16*  186:*24*
**Additionally**  5:*23*
**address**  6:*3*
**adjust**  208:*25*
**admired**  208:*25*
**adopt**  137:*24*
**advance**  39:*3, 7*
41:*14*
**advancement**  200:*1*
**advice**  13:*23*  224:*19*
**advise**  15:*24*
**affect**  197:*1*
**affiliated**  228:*16*
**aforesaid**  228:*7*
**afternoon**  211:*3*
**age**  4:*25*  80:*9*
210:*14, 20*
**agencies**  10:*12*  17:*5*
**agency**  10:*19*
**agenda**  41:*23, 24*
42:*1*  70:*2*
**agendas**  39:*9*
**ago**  7:*3*  99:*2*
**agree**  45:*4, 10*  47:5
49:*10, 18*  51:*17*
55:*17, 23*  57:*9*  59:7,
*13, 15*  60:22  62:*23*
66:*10*  111:*21*  134:*18*
136:*7, 11, 18*  187:*14*
204:8  217:*11*  226:2
**agreed**  8:*23*  187:*18*
225:*25*
**agreeing**  160:*19*
**agreement**  4:*19*
**agrees**  138:*24*
203:22  204:*4*
**ahead**  5:5  47:*16, 17*
48:*9, 25*  51:6  91:2
92:*14*  99:*14*  102:*10*
107:2  135:8, *21*
138:7  143:*11*  146:*15*
147:*15*  151:*1*  154:*20*
162:9, *16*  163:*11*
165:*21*  167:8, *13*
169:*1, 21*  170:*19*
171:*11, 22*  173:*3, 17*
174:8, *20*  175:22
176:22  178:*1, 18*
179:*10, 18*  180:*10*
183:*25*  184:8  186:9

187:*15, 16*  190:*17, 25*
191:2  193:2, *8*
197:*15*  198:*24*  199:9,
*19*  200:*23*  201:*9, 18*
203:*10*  204:*10, 21*
205:5, 8, *25*  210:5, *15,*
*21*  211:*4, 17*  216:*4*
223:5  225:8
**aids**  92:*20*
**al**  1:*10*  4:7  229:*4*
**Allow**  146:*11, 14*
185:*10*
**allowance**  179:*2*
**allowances**  15:*16*
**allows**  209:*4*
**alternatives**  131:*9*
**ambiguity**  208:*16*
**amount**  193:*20*  216:*9*
**analysis**  10:*13*  19:*24*
24:6, *23*  109:*19*
170:*16*  176:*15*
178:22  183:*15*
184:*19, 22*  187:*5*
195:8  203:6
**analytical**  180:*19*
**analytics**  169:*15*
172:*1*  180:*23*
**analyze**  10:*24*
176:*14*  183:*12*  185:*1*
187:2  188:*21, 25*
**and/or**  17:*10, 13*
20:*4, 11*  21:6, *10, 24*
23:*1*  25:7  27:*17*
28:7, *19*  29:9, *22*
31:*11, 22*  32:*10*  34:8
43:5  45:*23*  71:20
72:*1*  74:*3*  75:5
111:2  113:*21*  130:*25*
139:*19, 24*  223:*24*
229:*11*
**Anderson**  36:*3*  54:*3*
60:*9*  63:*13*  89:*11*
113:*16*  215:*3, 10, 14*
216:5
**Anderson's**  215:*22*
**announcement**
159:*14, 17, 19, 20, 23*
**annual**  214:*14*
**answer**  5:*20, 24*  7:*14,*
*18*  8:*11, 13, 25*  16:*15*

28:*1*  35:*24*  36:*14*
38:6, *13*  39:*22*  47:*17*
48:*9*  49:*7*  51:*6*
54:*16*  59:*12*  64:*17,*
*21*  71:7  77:*19*  88:*16*
90:*24, 25*  91:*3, 17*
92:*4*  93:*24*  94:*16*
98:*25*  99:*10*  102:*11*
103:*2, 11*  104:*9*
106:*3*  122:*21*  137:*24*
140:*25*  144:*17*
146:*15, 19*  147:*15, 16,*
*20*  148:*5, 6, 23*
152:*11, 12, 21*  154:*20*
162:*10, 12, 16*  163:*12*
165:*22, 23*  167:*9, 10,*
*13*  169:*2, 22*  170:*19,*
*21*  171:*2, 23*  173:*4,*
*5, 18*  174:*9, 10, 21, 22*
175:*23*  176:*23*
178:*19*  179:*11*
180:*11*  184:*1*  186:*6*
190:*18*  193:*3, 9*
196:*10*  197:*16*
198:*25*  199:*20*
200:*24*  201:*10, 19*
203:*10*  204:*11, 22*
205:*5, 17*  210:*6, 16,*
*22*  211:*5, 18*  215:*9*
217:*18, 25*  218:*4*
**answered**  8:*11*  16:*14*
22:*1, 4*  29:*24*  36:*13*
37:*25*  38:*5*  40:*11, 20*
41:*1*  54:*15, 17, 18*
79:*10*  90:*21, 22*  92:*2*
93:*22*  94:*12*  99:*13,*
*15, 16*  103:*8*  107:*1*
141:*15*  144:*5, 16*
145:*18, 20*  146:*12*
147:*14, 16*  149:*5, 25*
151:*21*  216:*2*  217:*16,*
*18*  225:*7*
**answering**  146:*14, 18*
**answers**  5:*25*  99:*10*
162:*4*
**Anybody**  37:*3*  72:*19*
128:*9*  155:*2*  174:*3*
**anymore**  75:*3*
**anyway**  191:*8*
**apart**  12:*19*  22:*11*

**apologize**  92:*21*
  127:*3*
**apparent**  34:*10*
**appear**  47:6  49:*14*
  50:*6*  53:*13*  68:*7*
  86:*15*  126:*1*  130:*21*
**APPEARANCES**  2:*1*
**appearing**  178:*12*
**appears**  53:*15*  54:*18*
  116:*15*  130:*19*
  133:*19*  191:*5*
**appoint**  89:*14, 15*
  157:*21*  211:*11*
**appointed**  76:*21*
**Appointing**  157:*17*
**appointment**  158:*18*
**appreciate**  99:*8*
**approach**  208:*20*
  209:*1*
**approval**  168:*8, 11*
**approve**  65:*3*
**approved**  56:*7, 11*
  64:*15*  127:*20*
**Approximately**  6:*17*
  12:*10*  15:9  40:8
  42:*17*  163:9, *14, 25*
  166:*18*  198:*21*
**April**  57:*6, 14, 20, 23*
  58:*4, 13, 18*  117:*3*
  118:*6, 12, 19*  119:*1,
  11, 16, 19*  120:*4*
**area**  110:*16*
**areas**  72:5  98:2, *7, 9,
  17, 19*  99:20  100:*2,
  14*  101:*4, 5, 16, 19*
  102:*3, 4, 17, 20, 22*
  109:*10, 14, 22, 23, 24*
  138:9  170:*16*  185:*17*
  188:*2*
**arguably**  51:*19*
**arguing**  93:*23*
  137:*23*  142:*25*
  217:*17*
**Argumentative**  38:*6*
  41:2  54:*24*  90:*22*
  91:*16*  93:*21*  94:*10*
  143:*10*  145:*19*
  146:*11*  147:*14*
  151:*21*  152:*20*  153:8
**array**  109:2  179:*3*

**articulate**  106:*16*
  150:*11, 12*  172:*4*
  181:*4*  182:*14*  222:*20*
**articulated**  177:*23*
  182:*23*  183:22  188:*5,
  15*
**ascend**  92:*7, 8*  93:*1*
**ascertain**  112:*11*
  185:*7*
**asked**  7:*19*  16:*14*
  23:*23*  29:*24*  36:*13*
  37:*25*  38:5  40:*11*
  41:*1*  71:*12*  73:*18*
  90:*21*  92:*2, 3*  99:*13*
  103:8  105:*25*  107:*1*
  131:*20*  144:*16*
  145:*18, 22*  149:*5, 25*
  150:*22*  151:*21*
  191:*14*  212:*23*  224:*2*
**asking**  5:*11*  30:*24*
  31:*13*  33:*13*  49:*18*
  51:*4*  88:*2*  92:*16*
  103:*12*  124:*10, 12*
  135:*19*  140:*20*  142:*6,
  9, 12, 20*  143:*1, 3, 4*
  144:*20*  152:*10*
  160:*15*  214:*22*
**aspect**  168:*23*
  178:*13*  179:*6*
**aspire**  84:*5*
**assembled**  72:*7*
**assembles**  64:*25*
**assess**  10:*25*  11:*3*
  127:*21*  131:*22*
  134:*14*  176:*19, 24*
  188:*24*  193:*14*
**assessed**  128:*6, 13*
  139:*3, 5, 10, 19, 23*
  162:*4*  163:*24*  181:*3*
  189:*24*  206:*9*
**assessing**  161:*19*
  162:*24, 25*  164:*2*
  199:*23, 24*
**assessment**  10:*13, 19*
  127:*9, 15*  128:*9*
  131:*21, 22*  132:*18*
  133:*2, 5, 10*  135:*1, 6*
  145:*9, 11*  147:*18*
  152:*3, 8*  161:*20*
  165:*24*  177:*12*

**articulate** 181:*10*  189:*13*  196:*8*
  197:*20*  198:*12*
  199:*11*  201:*1*  207:*20,
  25*
**assets**  179:*25*
**assimilate**  136:*16*
**assistant**  85:*16*
**associated**  15:*15*
**Association**  11:*21*
  12:*6*  115:*18*  116:*13,
  19*  119:*10, 16*  122:*3*
  123:*4, 11*  125:*7, 11*
  156:*11*
**assume**  68:*12*  221:*12*
**Assumes**  54:*25*
  152:*20*  153:*7*
**assuming**  163:*13*
**Attached**  67:*1*  68:*20*
  130:*5*  131:*1*  213:*5*
**attachment**  129:*11*
**attempt**  99:*9*
**attempted**  226:*15*
**attempting**  160:*18*
**attend**  58:*7*
**attendance**  61:*8*
  85:*5*  111:*16*  112:*23*
  114:*24*
**attended**  117:*14*
  121:*8*  156:*18*
**attention**  48:*4*
  167:*21*  168:*3*  169:*15*
  174:*5*  190:*24*  191:*12,
  16*  194:*10, 12*  198:*13*
  200:*3, 16*  203:*17*
  207:*13*
**attract**  149:*11, 22*
**attractive**  183:*2*
  186:*15, 18*
**attribute**  136:*13*
**attributes**  72:*6*
  80:*13*  109:*3*  128:*2*
  131:*11*  134:*14*
  149:*17*  183:*19*  203:*1*
**audience**  209:*4*
**audit**  39:*5*  166:*23*
**August**  126:*6*
**authority**  89:*10*
**auto**  177:*2*  218:*18,
  19, 22, 23, 24*  219:*5*

**autos**  177:*3, 5*
**Avenue**  2:*6*
**average**  163:*14*
**avoid**  135:*25*  136:*14*
**aware**  11:*23*  37:*4*
  88:*20*  99:*19*  128:*12*
  224:*1*

**< B >**
**bachelor's**  9:*10*
**back**  20:*14*  24:*11*
  29:*1*  31:*14*  39:*19*
  42:*13*  43:*25*  54:*8*
  61:*2*  68:*14, 16*  75:*2*
  83:*5, 17*  84:*8*  87:*22*
  91:*23*  93:*25*  99:*10*
  101:*15*  102:*7*  105:*5,
  23*  107:*12, 13*  110:*4*
  130:*24*  131:*15*
  133:*15, 23*  134:*7*
  135:*15*  153:*11*  155:*8*
  160:*9*  161:*2*  172:*16*
  179:*20, 21*  192:*21*
  199:*4, 13*  204:*14*
  205:*6, 8*  206:*25*
  212:*18*  215:*21*
  216:*13, 14*  220:*5*
  223:*18*  226:*4, 10*
**background**  78:*17*
  84:*3, 13*  95:*5, 8*
  176:*3*  189:*5*  225:*12*
**balance**  150:*12*  179:*1*
**balanced**  145:*3, 15*
  146:*2*  147:*10*  148:*13*
**balances**  208:*13*
**BANCORP**  1:*10*
  2:*17*  4:*7*  11:*21, 23*
  12:*4*  46:*7*  47:*8*
  49:*14*  50:*21, 24*  52:*9,
  13*  55:*7, 10*  56:*3*
  57:*5, 13, 24*  59:*5*
  60:*4, 8, 12*  61:*5*
  62:*15*  63:*11, 21*  64:*1*
  85:*2*  111:*14*  112:*21*
  113:*11, 15, 22*  114:*20*
  117:*2*  118:*20*  119:*2*
  120:*12*  121:*15, 20*
  122:*7*  123:*19*  124:*9,
  21*  125:*12*  157:*16, 22*
  158:*1*  159:*16*  229:*4*

**Bank** 4:21, 23  11:12, 16, 19  12:6, 8  13:24  14:5, 20  15:17, 23  19:18, 25  20:4, 12  21:6, 10, 25  22:22  23:1  24:7  25:8  27:3, 11, 17  28:8, 12, 20  29:9, 23  31:11, 22  32:25  34:2, 8  35:20  37:13, 17  38:11, 20  52:5, 8, 13  53:6, 20, 24  54:13  58:14, 18  60:20  61:17, 23  62:2, 7  64:9  65:12, 17, 23  75:1, 6  76:15, 17  83:11  85:3  95:4  96:3  102:20  108:3  109:5, 15  114:17  115:10, 18  116:8, 13, 18  119:10, 15  122:3  123:4, 11  124:20  125:7, 11  130:13  131:14  132:20, 21  134:15  148:24  152:18  153:22  155:1, 2, 11, 13, 15, 23, 25  156:3, 11  157:2  158:6  163:25  164:25  169:20  170:5  178:2, 7, 11  179:24  180:1  182:15  183:2, 24  184:20, 23  186:15  187:8  188:13  207:19  208:7  210:11  211:1, 12, 16, 22, 25  219:11, 23  225:19

**banking** 79:2  89:17  95:5  103:4, 23, 24  106:18, 20  145:5, 9, 17  146:4  147:12  148:15  164:12, 16  172:20  175:9, 11, 20  176:20  177:1  182:22, 25  183:20, 21  188:5, 17  189:18  201:23  219:5  222:9

**banks** 104:6  175:15  176:6  178:9  193:21, 24  194:9

**base** 103:7  196:23

**Based** 47:10, 22  50:19  53:16, 22  54:13, 17  57:17, 22  58:3  59:25  60:6  61:1, 13, 25  63:2, 8  65:8, 14, 21  68:6  70:23  71:13, 20  73:15  74:1  80:12  82:12  87:8  88:2  96:12, 13  102:2  109:21  111:25  112:5  113:7, 13, 19  115:6  116:5, 10  118:9, 18, 24  119:15, 22  120:14  121:13  123:1, 2, 8  124:10, 12, 17  125:21, 25  126:20  141:19  144:6  147:16  148:9, 22  156:24  157:4  163:6  166:13  168:22  169:17  171:9  175:16  178:10  179:6  182:7  183:22  187:5  189:6  194:21  195:11  197:10  198:20  203:6  204:25  209:1  211:1  215:3

**Bashara** 65:19
**bashful** 162:3
**basis** 8:14  78:1  79:10  81:10  98:21  154:10
**Bates** 46:10  52:23  55:12, 17, 24  57:9  59:8, 16  60:22  62:24  64:11  66:11  68:19  85:11  86:21  110:5  111:22  113:4  115:2  116:1  117:10  119:12  122:10  124:2  125:22  129:2  130:2, 6, 9  132:12, 23  134:21  135:22  140:7  156:14  158:12  168:4  191:13  194:12
**Beaudin** 127:21  128:22  129:6  131:20  133:9  134:24  203:25

**becoming** 21:24  43:23  156:3  157:1  170:1
**began** 126:11  168:13  194:24
**beginning** 15:11  52:16  67:4  135:23  165:2  168:8  184:9  194:7  221:21
**behalf** 2:1, 8  4:12, 14, 16  118:21
**behavior** 213:13
**behaviors** 134:12  140:11  202:6
**believe** 11:4, 17  13:15, 18  14:3, 7  18:4  21:8  39:25  43:2  44:17  51:2, 7, 23  52:17  68:1  75:2  76:3  78:19  79:18, 19  80:6, 9  84:15  106:18  118:17  119:25  126:20  127:12  134:3  135:23  136:13, 15  141:3, 15  155:19  163:24  165:5  169:24  192:24  193:6  198:8  200:14  204:18
**believed** 128:2  174:25
**benchmark** 152:2
**best** 141:16  146:13  176:25  183:19
**better** 101:10  106:5, 13, 24  107:5, 8  109:24, 25  140:14  141:9, 25  143:6  144:3, 17  145:2, 14  146:1  147:1, 9  148:20, 24  152:7  182:16  185:8  197:24
**Beyond** 77:11  141:18  150:7, 21
**big** 96:25  219:5  221:1
**biggest** 218:21
**birth** 6:10
**bit** 172:7  208:8
**blacked** 56:17, 19
**Blank** 2:11

**board** 10:1, 4  11:9, 14, 15, 19, 20  12:3, 5, 8, 17, 19, 21, 22, 23  13:5, 6, 9, 11, 21, 22  14:2, 4, 7, 18  15:25  16:8, 9, 11, 18  17:3, 15, 18, 24, 25  18:2, 8, 11  19:19, 23  20:3, 9, 18  21:4, 11, 23  22:16  23:17, 21  24:9, 15, 16, 23  25:10  26:5, 14  27:13, 19, 22, 23  28:3, 6, 10, 15, 17, 18  29:6, 7, 16, 18, 20, 21  30:2, 9, 15, 16, 22  31:4, 8, 20, 25  34:13, 14, 16, 19  35:2, 4, 6, 7, 9, 16  36:4  37:19  38:1, 4, 23  39:2, 11, 13, 14, 20  40:10, 18, 25  41:4, 7, 11, 12, 14, 19, 23  42:2, 4, 16  43:4, 12, 24  44:9, 12, 15, 19, 22, 23  45:1, 22  46:8  47:8, 13  48:2, 15, 21  49:13  50:9, 20, 24  52:6, 12, 19  53:5, 20, 24  54:12, 22  55:8, 11  56:7, 11  57:6, 13, 23  58:14, 17  59:6, 20, 22  60:3, 8, 12, 21  61:4, 16, 22  62:2, 6, 16  63:5, 10, 20, 25  64:10  65:1, 3, 7, 12, 16, 23  66:20  67:15, 18, 23, 25  68:2  69:5, 6, 9, 12, 15, 19, 20, 21, 22, 24  70:7, 13, 20, 23, 25  71:12, 14, 18  72:2, 3, 7, 8, 9, 16, 19, 20, 24  74:14  75:20, 25  77:16  82:5  83:9  84:1, 16, 25  87:3  91:9  96:4, 9, 20  97:11, 13  100:9  102:13  104:8, 11, 19  106:15, 22  107:12  110:25  111:15  112:3, 7, 13, 22  113:10, 22  114:3, 6, 9, 18, 19  115:9, 19  116:12, 18

Case: 1:21-cv-00238-MRB Doc #: 66-6 Filed: 08/02/24 Page: 71 of 96 PAGEID #: 3080
Deposition of Gary R. Heminger
Philip R. McHugh v. Fifth Third Bancorp, et al.

117:*3* 118:*14, 20*
119:*1, 11* 120:*13, 21*
121:*15* 122:*4, 6, 16,*
22 123:*10, 20* 124:*8,*
20 125:*8, 10* 126:*3, 8,*
19 127:*18, 19, 20*
131:8 132:*10* 133:*25*
134:5 139:*2* 143:*13*
148:*23* 150:*9* 151:*11*
155:*4, 14, 18, 20, 22*
156:*4, 12* 157:*2, 7, 8,*
17 158:*20* 159:*4*
161:*6, 14* 162:*2, 25*
163:*5, 17* 164:*2*
165:*15, 19, 24* 166:*5,*
12, 19 167:*2, 7* 168:*2*
172:*5, 19, 21* 173:*11,*
14 174:*7, 24* 176:*9*
177:*1, 9, 11, 24*
178:*15* 179:*4, 13*
181:8 183:*8* 185:*24*
186:*2, 25* 187:*11, 14*
189:*7, 11, 20* 190:*7,*
11 191:*4, 10* 192:*3, 5,*
25 195:*24* 196:*5, 7,*
13 197:*19* 198:*2, 5,*
21 199:*17, 21* 200:*14,*
25 201:*7* 203:*7, 8, 12,*
15 204:*8* 205:*19*
206:*8* 207:*19* 209:*16,*
21 210:*3, 10, 13, 19*
211:*7, 11, 14, 21, 24*
212:*2, 5, 24* 213:*3, 14*
214:*10, 11, 12* 215:*13*
217:*8* 222:*20* 223:*20*
224:*7* 225:*22*
**boardroom** 19:*2, 4, 7*
107:*23, 24* 154:*23*
**boards** 11:*11, 12*
76:*18* 97:*4* 139:*3*
161:*9, 16*
**board's** 14:*15* 41:*16*
190:*20* 205:*1* 211:*13*
**Bob** 66:*22* 128:*22*
129:*5* 138:*17* 191:*5,*
8
**bottom** 46:*9* 52:*24*
57:*10* 168:*5, 7*
191:*13* 208:*18*

220:*11*
**branching** 184:*16*
**breadth** 38:*18* 79:*1,*
5, 25 145:*8* 146:*5*
170:*11* 175:*18* 176:*1*
177:*12* 188:*12* 189:*7,*
17, 19, 25 192:*18*
193:*14* 195:*12*
196:*15* 197:*10*
**break** 35:*7* 105:*16*
160:*21* 199:*5*
**breakfast** 34:*18* 35:*5,*
9
**Brian** 2:*17* 4:*20*
**briefly** 64:*14*
**bring** 9:*6* 81:*13*
172:*18* 222:*10, 19*
**bringing** 164:*1*
177:*5* 185:*14*
**broad** 25:*19, 20*
87:*19* 171:*3*
**broke** 105:*25* 135:*17*
**brought** 176:*2*
188:*12* 189:*15, 16*
215:*11* 222:*23*
**Bruce** 1:*22*
**budgets** 175:*14*
**build** 101:*11* 104:*23*
106:*5* 131:*13*
**building** 107:*17*
177:*20*
**build-outs** 186:*19*
**bullet** 137:*8* 138:*24*
203:*21*
**business** 13:*9, 24*
76:*12* 80:*1* 81:*9*
97:*3* 98:*13, 18* 99:*22*
134:*13* 140:*11* 142:*4,*
5, 10, 11, 15, 17 143:*3,*
22, 25 144:*6, 10, 12*
146:*22* 151:*11*
161:*25* 163:*5* 165:*19*
166:*13* 169:*18* 170:*3,*
10 171:*19* 173:*15*
174:*2, 7, 18* 175:*18*
176:*18, 25* 177:*6, 8*
179:*8, 12* 181:*4, 6, 21*
182:*9, 12* 183:*23*
184:*4* 185:*10, 23*
187:*6, 10, 13, 17*

188:*10* 190:*11, 19, 20*
192:*19* 195:*12* 196:*2,*
3 197:*1, 3, 21* 201:*24*
202:*8* 203:*8* 208:*14,*
17 209:*17, 20* 210:*2*
211:*15* 212:*6* 218:*25*
219:*3* 220:*4* 223:*7*
224:*14*
**businesses** 102:*1*
218:*21*
**buy-in** 209:*7*

**< C >**
**caliber** 193:*24*
**call** 12:*15* 17:*4, 5*
32:*19* 46:*10* 126:*5*
144:*1* 191:*13* 197:*23*
200:*11* 222:*18*
**called** 41:*14* 130:*12*
164:*11* 219:*14, 15*
**calls** 26:*6, 7, 10, 15,*
20 163:*15*
**candidate** 10:*25*
35:*13* 36:*18* 37:*22*
75:*5* 90:*11, 16* 91:*15*
92:*1, 6, 8, 11, 17, 18,*
23, 25 93:*1, 11, 16, 17,*
19 94:*5, 7, 19* 95:*23*
139:*5, 17, 23* 154:*23*
177:*19, 21, 22* 184:*5*
190:*22* 192:*14*
197:*13* 204:*19* 205:*1,*
20
**candidates** 10:*2, 3, 14,*
20 11:*2* 22:*18, 20, 21,*
23 32:*16* 33:*3, 6, 7,*
13, 15, 22 34:*5, 6*
35:*20, 22* 36:*12, 22,*
25 37:*6, 12, 15* 47:*12*
48:*1, 16, 22* 50:*12*
53:*18* 57:*19* 60:*2*
61:*15, 21* 63:*4, 19*
65:*10* 67:*19* 78:*21*
83:*10* 89:*15, 16, 18,*
25 90:*6, 11, 14, 19*
91:*25* 93:*3, 5, 13, 16*
94:*20, 24* 112:*2*
113:*9* 115:*8* 116:*7*
118:*11* 119:*18*

134:*15* 157:*7* 178:*25*
**cap** 178:*9*
**capabilities** 181:*23*
182:*9*
**capacity** 172:*22*
208:*16*
**capital** 15:*1, 20* 16:*2*
66:*8* 68:*23* 69:*7, 16,*
25 70:*8, 13, 20, 25*
71:*14, 21* 72:*21* 79:*3*
101:*9* 106:*4, 11, 13,*
16, 17, 23 118:*22*
129:*16, 21* 166:*24*
198:*10*
**capital-type** 164:*14*
**Caption** 229:*3*
**captioned** 229:*8*
**Carbody** 65:*19*
**career** 39:*24* 193:*19*
216:*8*
**careful** 224:*19*
**cares** 208:*23*
**Carmichael** 14:*9*
18:*22* 19:*1, 3* 20:*3,*
11 21:*5, 9, 12, 14*
22:*5, 10, 11* 25:*6, 11,*
16 27:*10, 16* 28:*6, 11,*
19 29:*8, 22* 31:*10, 21*
32:*5* 33:*2, 10* 35:*13,*
21 37:*1, 6* 38:*10*
39:*16* 40:*1, 6, 14, 17,*
24 41:*6* 43:*4, 22*
44:*2, 8, 12* 45:*22*
47:*2* 54:*3* 57:*25*
58:*10* 59:*22* 60:*9*
61:*10* 62:*3, 20* 63:*12*
65:*18* 67:*2* 70:*6*
73:*6* 85:*8* 86:*9, 16*
87:*14, 17* 88:*3, 9, 17*
89:*2, 20, 23* 90:*6*
93:*3* 94:*4* 110:*11*
111:*1, 19* 112:*8*
113:*1, 16* 114:*24*
115:*23* 116:*14* 118:*6,*
21 119:*25* 121:*10, 16*
123:*5, 24* 125:*18*
126:*6, 15* 129:*19*
138:*18* 139:*24*
155:*19* 156:*22*
164:*18* 191:*6* 201:*8,*

*12*, *14* 211:*11* 217:7,
*14*, *23* 218:*11* 223:*23*
**Carmichael's** 33:*14*
39:*24* 160:*1* 161:*18*
163:*4*, *22*
**CASE** 1:*9* 4:*3*, 7
6:*19* 34:*3*, *5* 51:*19*
69:*24* 75:*20* 82:*2*, *9*
84:*1* 133:*19* 171:2
218:*15* 223:*3*, *4*
224:*15* 229:*3*
**cases** 53:*25* 82:*11*
**cash** 42:*17*
**catastrophic** 75:*18*
**category** 89:*13*
**Center** 1:*14* 2:*12*
**CEO** 9:*18*, *20* 14:*6*,
*7*, *10*, *12* 16:*6*, *9*, *13*,
*20* 17:*10*, *13* 20:*4*, *12*
21:*6*, *10*, *24* 22:*22*
23:*1* 25:*8* 27:*11*, *17*
28:*7*, *12*, *19* 29:*9*, *22*
31:*11*, *22* 32:*10*
33:*11*, *23* 34:*1*, *8*
35:*14*, *20* 36:*6*, *18*, *23*
37:*1*, *7*, *12*, *16* 38:*11*
40:*6*, *24* 41:*3* 42:*6*
43:*5*, *20*, *21* 45:*24*
56:*16*, *18* 71:*20* 72:*1*,
*25* 73:*5*, *6* 74:*4*, *13*,
*14*, *17*, *22* 75:*5*, *18*, *19*,
*22* 76:*8*, *10*, *13*, *20*
77:*7*, *8*, *13*, *17* 78:*10*,
*15*, *16*, *20* 79:*6*, *13*
80:*16*, *23*, *25* 82:*9*, *19*
90:*12* 91:*21* 92:*8*
94:*23* 96:*11* 97:*23*
99:*25* 100:*4*, *16*
110:*7* 111:2 120:*16*,
*17*, *20* 121:*1* 122:*18*
124:*7*, *19*, *22* 127:*20*,
*25* 128:*4*, *7*, *24*
129:*12* 130:*15*, *21*, *25*
131:*4*, *7*, *11*, *13*
134:*12*, *15* 138:*19*
139:*24* 140:6 153:*24*
154:*8*, *11*, *16* 155:*19*
157:*6* 165:*12* 170:*1*
177:*19* 184:6 191:*23*
192:*9* 198:*11* 200:*11*,

*15*, *20* 201:2, *7*, *16*
203:*15* 216:*24* 217:7
**CEO/CHRO** 139:*4*
**CEOs** 78:*18*
**certain** 80:*9* 166:*9*
176:*18* 222:*18*
**Certainly** 10:*18*
30:*11* 105:*12*, *17*
109:*12* 124:*15* 138:*9*
177:*20* 179:*15*
187:*19*
**certified** 5:*1*
**certify** 228:*6*
**CFO** 35:*25* 165:*12*
222:*10*
**chair** 14:*25* 15:*10*
41:*24* 42:*22*, *24* 43:*3*
69:*25*
**chairman** 9:*18*, *19*
39:*14*, *16* 40:*1*, *14*
41:*7*, *9* 42:*2* 80:*14*,
*18* 165:*12*
**chairman/CEO** 70:*1*
**chairs** 15:*5*
**challenge** 209:*5*
**challenges** 208:*15*
**challenging** 151:*8*, *19*
**chance** 164:*19*
172:*18*
**change** 106:*19* 136:*1*,
*14* 212:*10* 230:*4*, *7*,
*10*, *13*, *16*, *19*, *22*
231:*4*, *7*, *10*, *13*, *16*, *19*,
*22*
**changes** 89:*11* 91:*8*
103:*23* 131:*4* 178:*11*
229:*11*, *14*
**characteristic** 22:*9*
202:*19*
**characteristics** 76:*9*,
*14* 78:*15* 80:*24*, *25*
103:*20* 105:2 203:*9*
208:*6* 209:*18*, *23*
210:*4*
**check** 137:*16*
**chief** 89:*9*, *16*, *19*, *25*
95:*23* 126:*1*, *14*
130:*13* 208:*6*
**Chuck** 128:*23* 129:6

**Cincinnati** 1:*20* 2:*6*,
*13* 228:*19*
**Cioffi** 2:*8* 3:*4* 4:*16*
7:*13*, *23* 8:*10*, *16*, *24*
9:*4* 12:*25* 16:*14*
20:*5*, *13*, *17*, *21* 21:*15*,
*20* 22:*2* 23:*6*, *23*
24:*8*, *11*, *14*, *17* 27:*12*,
*18*, *24* 28:*1*, *21*, *23*
29:*1*, *24* 30:*7*, *21*
31:*12*, *16* 33:*4*, *9*
35:*23* 36:*13* 37:*25*
38:*5*, *12* 39:*21* 40:*11*,
*19* 41:*1* 43:*7* 45:*8*,
*12* 47:*14*, *17* 48:*3*, *7*,
*23* 49:*1*, *17* 50:*17*
51:*3*, *14* 54:*14*, *24*
55:*20* 64:*16*, *20* 67:*7*
68:*15* 71:*2*, *6* 73:*17*
77:*18* 80:*17* 83:*16*,
*19*, *22* 87:*16* 88:*15*
90:*21* 91:*3*, *16* 92:*2*,
*12* 93:*21* 94:*9*, *16*
98:*20* 99:*1*, *5*, *13*, *16*
102:*6*, *9*, *11*, *23* 103:*8*,
*14* 105:*9*, *13* 107:*1*,
*11* 117:*20* 124:*10*
136:*22*, *25* 137:*22*
140:*18* 141:*13* 142:*2*,
*8*, *22*, *25* 143:*9*, *20*
144:*5*, *16*, *22* 145:*18*
146:*10*, *14*, *19* 147:*13*,
*16* 148:*4* 149:*5*, *25*
150:*22*, *25* 151:*20*
152:*9*, *12*, *19* 153:*7*,
*10* 154:*3*, *18* 155:*3*, *8*
158:*21* 160:*17* 161:*4*
162:*11* 163:*2*, *20*
165:*23* 166:*3* 167:*10*,
*17* 169:*6* 170:*2*, *9*, *20*
171:*7*, *16* 172:*6*
173:*5*, *9*, *23* 174:*10*,
*16*, *22* 175:*2* 176:*7*,
*13* 177:*7*, *16* 178:*21*
179:*17* 180:*18* 182:*6*
183:*11* 184:*3* 186:*6*,
*8* 187:*16*, *22* 190:*10*,
*23* 193:*5*, *12* 195:*17*
196:*10*, *12* 197:*9*, *18*
199:*3*, *16* 200:2

201:*5*, *15* 202:*3*
203:*16* 204:*13*, *24*
205:*6*, *14*, *25* 206:*3*,
*21*, *24* 207:*6*, *9* 210:*1*,
*9*, *18*, *24* 211:*10*, *20*
212:*4*, *9*, *19*, *23*
214:*22* 215:*5*, *9*, *18*,
*25* 216:*22* 217:*16*, *20*,
*22* 218:*1*, *6* 220:*10*
221:*5*, *8*, *20* 222:*14*,
*25* 223:*4* 224:*2*
225:*7* 226:*14*
**Cioffi's** 99:*9* 153:*3*
**circulated** 157:*24*
**circumstance** 209:*2*
**cite** 101:*18*
**cities** 168:*18*, *19*
**Civil** 51:*22* 228:*17*
**clarification** 26:*13*
**clarify** 5:*18* 16:*24*
17:*17* 52:*11* 83:*21*
84:*7*, *8* 117:*18*, *22*
121:*7* 125:*21* 130:*1*
136:*24* 137:*1* 158:*12*
**clarifying** 30:*1* 143:*2*
**clarity** 24:*14* 30:*21*
31:*12* 39:*21*
**clause** 147:*4*
**clear** 11:*18* 27:*20*, *21*
58:*7* 59:*19* 96:*9*
139:*16* 145:*7* 146:*25*
149:*16* 198:*2*
**clearer** 5:*25*
**clearly** 102:*16* 146:*7*
174:*23* 184:*5* 203:*11*
205:*18*
**close** 140:*16* 141:*12*
166:*7* 199:*10* 201:*12*
**coach** 218:*3*, *6*
**coached** 138:*10*
**coalesce** 185:*18*
**Coincidentally** 77:*1*
**colleagues** 190:*20*
**collective** 43:*10*
67:*18*
**combination** 69:*21*
**combinations** 178:*25*
**come** 41:*21* 99:*2*, *6*,
*17* 139:*22* 141:*1*

193:22  197:19
201:25  209:17  210:3
comes  87:7  176:4
comfort  136:3
coming  36:8  164:14
175:24  176:5  210:10
command  97:21, 24
commence  199:17
Commencing  1:14
commentary  178:10
commercial  89:17
188:2  219:4  220:1
222:9
Commission  228:24
commissioned  228:5
committee  14:25
15:1, 2, 3, 4, 6, 8, 12,
13, 17, 18, 21  16:2, 23,
24  17:2, 3, 5, 6, 9, 11,
14, 15, 19  19:14, 16,
17, 20  25:15, 22
31:10, 20  39:4, 5, 6,
10  41:25  42:23, 25
43:3  70:1  76:7
82:20  118:22  129:17,
22  131:2  166:23, 24
198:10  217:4
committees  14:22, 24
15:5  16:22  39:8
42:20  166:22  167:2
common  179:24
181:1
communicate  18:15
27:6
communication  24:2
communities  78:25
community  34:12
comp  76:7
companies  76:19
78:18  175:13  220:4
Company  6:20  7:4
9:15  11:25  14:1
15:23  32:14  72:11
74:16  75:3  96:11
100:11  101:12, 17, 23
104:16, 23  106:6
107:18  153:25
161:20  165:10
189:10  200:1  215:17

219:14
comparable  190:14
comparative  109:19
180:13
compare  55:9
101:24  109:17
169:12  170:15
180:16  189:21
196:14
compared  101:5
compares  166:1
Comparing  56:14
100:23  173:24
180:14
comparison  97:20
171:10  174:1
compelling  209:3
compensated  165:10
214:23
compensation  15:1,
20, 22, 23, 25  16:2
69:25  82:20  118:22
129:16, 22  131:2
165:16, 18  180:16
198:10  213:24  214:4,
14, 25  215:22  217:4
compete  176:17, 18
competency  124:23
200:11, 19
competition  101:10
106:5, 20  107:4, 7
competitive  104:3, 5
164:14  168:16  170:5
171:18  175:8, 19
176:1, 20  177:13
competitors  185:22
188:11
complete  53:5  58:4
80:10  114:6, 9
completely  100:25
101:25
completion  65:1
complex  180:25
196:25
complexity  151:7, 18
203:2  208:16
compliance  15:14
150:13
comprehend  169:10

comprise  68:14
concepts  93:23
concerning  120:20
170:12
concerns  110:13, 19
conclude  105:14, 16
CONCLUDED  227:9
conclusion  110:8, 24
210:3, 10
conclusions  171:8
209:18
conduct  198:22
conference  126:5
confining  87:16
confused  20:22  102:7
conjunction  158:7
consensus  87:4  96:9
104:23  105:6  174:24
177:17, 21  190:4
192:3, 5, 13  201:25
203:11, 14  204:18, 25
205:19  211:6, 7
Consent  157:17, 20,
23  158:8, 19, 23
159:3
consider  44:2  75:19
210:13
consideration  76:2, 4
180:1
considered  14:8
27:2  32:22  33:15
36:6  72:4  74:16
75:4, 8, 9, 10, 14
76:10  78:1  90:12
91:14, 21  92:1, 5
93:10  94:19, 21, 25
95:20  128:3
constitute  133:13
consultancy  95:5
164:10  176:4  188:10
consultant  112:9
198:22  204:2
consultation  82:19
consulting  127:8
Consumer  132:20
188:1  220:1  222:9
contain  180:8
contained  72:20
contains  140:7

content  72:13, 20
96:7
Context  168:9, 10, 14
179:4  191:2  194:25
195:2, 4, 14  196:17
220:11
continually  32:21
161:19
continue  51:11
67:19  76:14  78:22
80:6  95:10, 14  96:21
177:22  185:8  192:6
197:13  226:15
continued  69:10
95:11  96:22  160:12
163:22  184:7  194:7
continues  75:13
134:23
continuing  9:2
149:11, 22  226:13
continuous  22:17
32:17  209:11
continuously  35:17
36:4  189:23
contract  228:17
contradicts  205:12
Contrary  205:3, 10
contrast  196:15
control  76:17  79:12
81:10  104:1
controls  150:12
conversation  78:2
138:18
conversations  23:20
25:6  27:10, 15, 22
28:2, 5, 11, 14, 16
29:6, 11, 13, 19  30:2
31:9, 19  95:22  136:3
Cook  112:9
copied  191:8
copy  85:21
corner  46:10
corporate  56:13
64:23, 24
corporation  98:3, 7,
17  99:21  100:3, 14
101:4, 17, 19  102:3
corporations  201:17,
20

correct 10:*15* 11:*21*
14:*13, 14* 17:8, *11, 20*
18:6 20:20 31:25
32:6, *7* 35:*3* 39:20
40:*7, 10* 41:8, *9* 45:7
46:*15, 22, 25* 47:*3*
50:*1, 7* 52:*17, 21*
53:*1, 2, 14* 55:*13, 15,*
*19, 25* 56:*1* 57:*11*
58:8, *11* 59:20, *23*
60:25 61:*5, 6, 9, 11*
62:*18, 25* 64:*12* 65:*5*
66:*12, 14, 15, 20, 24*
67:*3* 68:*8, 12* 69:20
73:7, *8, 10* 78:6, *7*
83:*11, 12, 15* 84:*17,*
*18* 85:*3, 12, 13* 86:*17,*
*23* 87:*11* 89:20, *21*
92:24 94:7 98:*4, 5*
104:*8, 20, 21, 23*
105:*1* 112:24 113:*2,*
*5* 114:7, *21* 115:*4, 21*
116:*3, 4* 117:8, *12, 13,*
*15, 16* 118:8 119:*13,*
*14* 121:*5, 8, 9, 12*
122:8, *9, 12, 13*
123:*22, 23, 25* 124:*1,*
*4, 5* 125:*13, 23, 24*
129:*3, 6, 10, 13* 130:*3,*
*4, 7, 8* 132:*14, 25*
134:*16* 137:*14, 15*
140:8, *9* 142:*18*
143:*19* 152:*3, 4*
153:*17* 156:*16, 17, 19,*
*22, 23* 158:*14* 163:7,
*8* 164:25 165:*1, 4*
166:*10, 16* 172:*13*
173:*12* 193:7 204:*20,*
*23* 206:*11* 207:*11*
208:*1* 214:*3, 17, 20*
215:24 216:*11, 12, 20,*
*25* 217:*1* 221:*11*
222:*13, 24* 223:*21*
correcting 170:*23*
Correction 117:*7*
corrections 229:*11*
correctly 90:*4*
counsel 4:*9* 7:*7*
13:*23* 45:8 48:*3*
49:*12* 99:6 105:*9*

146:*10, 19* 148:*4*
158:24 167:*22*
205:*14* 221:*5* 222:*8*
228:*12, 14*
Counsel's 40:*19*
count 12:*22*
counteract 176:*17*
COUNTY 228:*3*
couple 12:*24* 29:*18*
91:*8, 10* 161:*21*
163:*15* 178:*5* 184:*9*
191:*5* 198:*13*
COURT 1:*2* 4:*4*
5:*18* 9:*6* 228:*16*
COVID 117:*17, 19*
118:*1*
create 205:*13* 206:*22*
218:*4*
created 64:*15, 21*
creates 37:*15*
creating 209:*5*
creative 208:*12*
credit 15:*14, 15*
220:*25*
critical 134:*14*
CRR 1:*20* 228:*4, 24*
Cultivating 202:*21*
culture 32:*19* 101:*11,*
*12* 106:6 107:*17, 18,*
*22, 24* 182:*15* 208:24
current 72:*25* 82:*1*
91:*9*
currently 9:*12* 11:*11*
14:*6*
cutting 148:*4*
cycle 13:*6* 194:*6*

< D >
data 106:*12, 22*
107:*8* 140:*12, 21*
141:8, *19, 22* 142:*7,*
*13, 20, 21* 143:*5*
144:*1, 20, 21, 25*
145:*12, 24* 146:25
147:*7, 17, 25* 148:*2, 8,*
*11, 16, 18, 19* 149:*1, 7,*
*18* 150:*2, 17* 151:*4,*
*15* 152:*5* 168:*24*
169:*4, 5, 7, 11, 14, 16*
171:*4, 13* 172:*3, 5, 10*

176:*10* 178:*16, 22*
180:*8, 20, 21* 181:*2*
182:*2, 8* 183:*7, 13, 16*
184:24 185:*1* 186:25
187:*2, 5* 188:*18, 21,*
*25* 195:*6, 9* 196:*20,*
*25* 203:*6* 208:*13*
220:25 222:*17* 224:*4,*
*6, 8, 11, 14, 16* 225:*14,*
*22*
Date 1:*14* 6:*10* 23:5
37:*8* 40:*13, 22* 44:6
68:*9* 94:22 114:*21*
133:*7* 134:*1, 6*
139:*15* 155:*16, 21*
159:22 201:*11* 227:6
229:*2*
dated 129:*8*
dates 12:*11* 28:*13*
29:*12* 35:*16* 118:*2*
139:*16* 156:*5* 198:*7,*
*20*
day 32:22 56:*3*
162:24 163:*17* 181:*2*
190:*1* 228:20 229:*16*
days 176:*4*
Dayton 9:*11*
de 184:*16*
dealing 208:*16*
dealt 169:*25*
debate 87:*3, 6, 8*
104:*11*
December 1:*14* 4:*1*
13:*19* 66:*9* 67:*22*
69:*5* 73:24 78:6
85:*1* 86:*4* 87:*24*
110:24 168:*2* 171:*14*
176:*9* 179:*7* 190:*5*
191:*11* 193:25
204:*17* 214:*10, 11, 12,*
*19* 228:25 229:*2*
decide 160:*21* 210:*11*
decided 45:*19* 153:25
decision 43:*11, 12, 17,*
*18, 19* 73:*23* 74:*1*
111:*4, 7* 139:*9*
155:*15* 156:*2, 25*
179:*5* 192:*7* 201:*7*
208:*19* 210:25 212:*3,*
*5*

decisions 70:*23* 71:*3,*
*13, 17, 19* 73:*12, 13*
deck 69:*1* 218:*10*
**DECLARATION**
229:*5*
declare 229:*6*
deemed 134:*14*
deep 106:*18* 145:*4,*
*16* 146:*3* 147:*11*
148:*15* 176:*16* 189:*5*
deeper 145:*8*
deeply 208:*23*
Defendants 1:*11* 2:*8*
4:*7, 17*
defensiveness 209:*6*
deficiency 98:22
deficient 98:*18*
99:*21, 23*
defined 228:*17*
definition 103:*15*
153:*20*
definitive 110:*25*
degree 9:*10*
demonstrate 151:*7,*
*18* 169:*8*
demonstrated 193:*16*
demonstrates 208:*5,*
*15*
**Demonstrating** 203:*4*
departed 110:*9*
department 191:*7, 9*
departure 10:*10*
155:*24*
departures 120:*18,*
*20* 121:*2* 122:*19*
depending 39:*3*
depends 165:8
201:*22, 23*
Deponent 2:*8*
depose 228:*8*
deposed 5:*1*
deposit 178:*9*
Deposition 1:*14* 4:*3*
5:*8* 6:*16* 7:*6, 10, 20*
8:*8, 20, 22* 29:*15*
51:*12, 14, 16* 160:*12,*
*18* 226:*18* 227:*9*
228:*7, 10, 11* 229:*1, 8,*
*12* 230:*1* 231:*1*

depositions 6:12
deposits 184:15
depth 38:18 79:1, 4, 25 145:8 146:5 169:19 170:11, 16 171:17 175:18 176:1 177:12 188:12 189:7, 15, 16, 19, 24 192:17 193:14 195:12 196:15 197:10
derive 208:14
Describe 23:11 131:20 133:10 161:15 164:7 180:19 183:15 188:7 190:25 191:2
described 144:22 168:16 173:16 192:16 211:2
design 150:11
desired 208:6
detail 69:13 176:1 213:23
detailed 39:9, 10 87:2 95:20, 22 104:15 141:4, 5
details 19:13 172:20 204:12
determination 110:25 117:21 128:12 157:25 158:2 165:15 210:14
determine 34:5 47:9 48:19 56:10 57:21 65:22 72:10 75:22 76:13 79:21 90:10 91:12, 19 93:6 112:1 114:7 115:7 116:6, 16 118:19, 25 119:17, 23 120:2, 15 123:9 124:6, 18 133:4, 12 156:25 157:5 198:21
determined 12:14 37:21 217:3
determines 42:3
determining 80:3
develop 69:10 78:22 79:18 80:7 95:6, 9, 12, 14 96:22 170:1

177:22 184:7 188:9 192:6 194:7 203:14
developed 72:5 75:9 80:5 158:4 200:11, 20 201:6
developing 32:17 34:6, 20, 22 173:21 177:17 179:14 187:19 189:14 194:2
development 14:18 19:8, 10 32:21 35:18 36:4, 7 67:17 69:8 72:6 73:2, 3 75:13 82:1 84:4, 13 86:11 87:4 88:6 90:16 95:2 96:2 132:18 134:25 135:5, 18, 24 136:5 138:4 162:21 174:25 194:5 209:14
developmental 136:15
developments 195:2, 4, 13
differ 80:24
difference 11:22 96:25
different 12:17 15:5 23:5, 6, 9, 10, 14 26:13 33:21 39:8 55:17, 24 72:6 73:3 74:15 78:14 83:10 87:5 94:16 96:3, 20 97:10 98:11, 14 101:22, 23, 25 102:15 103:23 106:3 109:3 126:22 162:23 173:6 177:6 178:24, 25 179:3 195:23, 24 205:23
differentiated 183:3
differentiation 182:23
difficult 5:21 136:3 180:25 224:18 225:12, 18
difficulties 209:8
digital 27:2 38:18 95:7 103:25 104:2 141:5 164:13 175:14 188:1, 5, 11, 17 189:3, 5 223:11, 16

digitally 183:3 186:16
diligence 197:23, 24 198:3, 6, 22 199:18 200:6 207:22
Diligent 41:15, 16
dinner 34:19 35:6, 8, 10
diplomatic 209:4
direct 18:19 23:16 25:2 30:20 31:3 48:4 67:7 76:16 127:1 137:13 167:21 168:3 174:5 190:24 191:12, 15 194:10 198:13 200:3 203:17 207:13
Directing 194:11 200:16
direction 13:25 142:1 143:7 144:4, 15 160:1 202:11 220:24
director 34:25 39:15, 24 40:3 42:1 69:25 76:7 82:20 198:9 205:20 206:12, 13 207:8, 10 217:6
Directors 46:8 49:13 50:24 52:6, 12, 19 55:8, 11 57:8 58:15, 18 59:6 60:21 62:16 63:21, 25 64:10 65:7, 12, 17 69:15 70:8, 13, 20, 25 71:14, 19 72:21 74:14 85:1 110:10 111:15 112:22 114:18, 20 115:19 117:3 118:15 119:11 120:13, 25 122:4, 7, 17, 22 123:20 124:9, 20 125:8, 10 126:11 131:23 133:3, 11, 14 156:12 157:8, 17 168:2 181:2
disagree 8:9 136:5, 8, 11 222:16
disappointed 153:23

154:2, 7, 11
disciplined 208:19
disclosed 56:21
discovery 160:13
discretion 89:12
discriminate 210:20
discuss 18:12, 18, 21 19:1 25:3, 7 31:5 88:10 126:7 139:1 154:25 173:11 181:6 185:23 187:10 189:6 196:3 206:8
discussed 19:2 25:12, 16, 23 41:24 89:18 90:15 96:2, 6 110:14 120:18, 19 121:2, 4 122:24 126:2 128:1 154:22 175:8 182:22 186:21 187:25 194:20 221:22
discussing 135:18
discussion 20:2 47:11, 25 49:9 50:11 53:18 57:18 60:1 61:14, 20 63:3, 18 65:9 66:9 77:20, 23, 24 86:10 87:6, 8 88:5, 10 104:3 110:9, 12, 13 112:1 113:8 115:7 116:6 118:10 119:17 120:15 122:18 124:7 126:8 127:19 139:12 155:17 157:5 168:14 173:14 175:10 182:21 194:25 195:1 206:14, 17 207:5 217:10
discussions 19:4, 7, 9, 11, 20 20:6, 10 21:4, 8, 16, 18, 23 22:10, 19 29:17 48:14, 20 77:15 78:9 87:2 88:21 95:20, 22, 25 96:1, 4, 8 104:10 110:18 124:18, 24 126:12, 13, 18 155:10, 23 161:23 173:21 196:13 209:16 215:13

**disintermediation** 175:*15*
**dispute** 226:*16*
**disputes** 160:*13*
**disrupt** 205:*7*
**disruptive** 170:*20*
**distinction** 92:*10, 12, 17, 22* 93:*16*
**distinctions** 80:*15*
**distinguishing** 172:*8*
**distributed** 131:*23* 133:*3, 5, 10, 13*
**distributes** 137:*12*
**DISTRICT** 1:*2, 3* 4:*4, 5*
**diverse** 149:*11*
**diversive** 149:*22*
**Dividend** 219:*14*
**DIVISION** 1:*4* 4:*5*
**document** 8:*17* 46:*10, 17* 47:*14* 48:*7, 11* 49:*8, 10* 57:*7, 9* 66:*7* 67:*1, 6, 13, 15, 20* 68:*19, 22* 69:*3, 4, 13, 23* 71:*24* 72:*2* 74:*19, 21* 78:*4* 81:*25* 84:*11* 87:*13* 112:*11* 124:*11, 12* 129:*23, 24* 130:*10* 132:*12* 158:*3, 23* 167:*25* 168:*1, 4* 190:*25* 191:*4, 10* 192:*2* 200:*9, 10, 13, 17* 202:*4* 207:*4, 17* 213:*2, 3, 4, 7, 10, 18* 214:*9*
**documentation** 88:*13, 21*
**documents** 7:*14, 23, 25* 8:*2, 25* 13:*7* 41:*11, 19* 55:*20* 126:*21* 130:*5* 160:*13, 16* 198:*20* 213:*21*
**doing** 22:*16* 109:*19* 127:*15* 169:*16* 200:*25* 210:*13* 213:*12, 24* 218:*18, 19* 225:*15*
**downloaded** 41:*15*
**dozen** 163:*18*

**dozens** 149:*14, 15* 151:*9* 162:*18* 166:*15* 167:*7, 15, 19* 193:*7, 10* 203:*7*
**draft** 56:*4* 85:*20* 128:*24* 130:*12, 25*
**drafts** 70:*7, 12, 19* 82:*21*
**draw** 169:*14* 171:*9, 19* 172:*22*
**drive** 175:*14* 182:*15*
**driving** 140:*14* 141:*10* 148:*21* 202:*14*
**drove** 148:*23*
**due** 118:*3* 178:*9* 197:*23, 24* 198:*3, 5, 22* 199:*18* 200:*6* 207:*22*
**duly** 4:*25* 228:*5, 8*
**duties** 13:*21, 22*
**duty** 15:*24* 102:*14*
**dynamics** 175:*9, 19* 176:*20* 177:*13*

< E >
**earlier** 5:*15* 29:*14* 34:*17* 46:*23* 54:*8* 72:*9* 73:*17* 81:*4* 91:*6* 93:*15* 102:*17* 126:*21* 130:*24* 161:*5* 164:*13* 171:*25* 172:*7* 188:*14* 190:*1* 192:*24* 196:*24* 205:*24* 207:*23* 211:*9* 216:*5* 225:*10*
**early** 39:*24* 162:*24* 184:*16* 198:*8* 199:*11, 14* 225:*3*
**East** 2:*12*
**economic** 168:*15* 169:*4* 220:*25* 225:*16*
**economics** 222:*9*
**editing** 223:*25*
**education** 9:*9*
**effect** 158:*4*
**effective** 209:*9*
**effectively** 149:*9, 20*
**efficiency** 179:*25*

**either** 28:*17* 29:*6* 56:*6* 73:*14* 99:*21* 121:*5* 133:*5, 12* 166:*22*
**elements** 131:*12* 184:*13*
**Email** 2:*7, 14* 18:*16* 24:*2* 27:*7* 66:*14, 17, 19, 22, 25* 68:*4, 6, 10, 20* 128:*22* 129:*5, 14* 130:*2, 5, 16* 138:*20* 139:*11*
**emergency** 75:*15* 76:*10, 20* 77:*7, 8, 13, 17, 25* 78:*1, 9, 15* 80:*15, 25*
**employed** 9:*12*
**employee** 108:*20, 23* 109:*4* 216:*9* 228:*13*
**employees** 34:*11* 108:*3* 155:*23* 165:*20* 208:*25* 214:*23*
**employment** 152:*18* 153:*6, 12, 13, 17, 22* 155:*1, 12, 25* 165:*3*
**enabled** 183:*3* 186:*16*
**enablers** 183:*1* 184:*13*
**ended** 153:*13, 14, 17*
**energy** 201:*23* 225:*13*
**engage** 183:*4* 219:*12*
**engagement** 79:*5* 108:*21, 23* 109:*4*
**engages** 219:*11*
**enhancements** 181:*20*
**ensure** 137:*12*
**enterprise** 19:*14, 16, 17, 20* 22:*24* 25:*15, 22* 31:*9, 20* 33:*21* 34:*24* 108:*7, 8, 11, 14, 17* 162:*7* 163:*6* 166:*14, 21* 167:*3, 19* 172:*8* 173:*25* 174:*3* 189:*22* 190:*12* 196:*18, 19* 197:*4* 209:*21* 221:*2, 11* 222:*5, 6*
**entire** 44:*23* 66:*19* 79:*1, 5* 81:*6* 104:*18*

106:*17* 175:*1* 176:*5* 229:*7*
**entitled** 4:*6* 90:*24*
**equals** 178:*12*
**equity** 179:*25*
**Erie** 2:*6*
**ERRATA** 229:*1, 13* 230:*1* 231:*1*
**ESG** 150:*6, 20*
**ESG-type** 219:*15*
**Esq** 2:*1, 4, 8, 17*
**essential** 134:*12* 140:*10* 202:*5*
**Essentially** 52:*18* 226:*1*
**establishing** 141:*25* 143:*7* 144:*4, 14* 202:*11*
**et** 1:*10* 4:*7* 229:*4*
**evaluate** 32:*16* 33:*12, 22* 34:*3, 4*
**evaluated** 33:*3, 7, 8* 34:*18* 35:*13* 36:*1, 2*
**evaluating** 32:*21* 35:*17* 36:*20*
**evaluation** 162:*6* 198:*6*
**Evans** 127:*21* 128:*23* 129:*6*
**evenly** 137:*12*
**event** 77:*24*
**everybody** 183:*18*
**evidence** 106:*12, 22* 107:*5, 8, 19* 141:*20* 144:*2* 145:*13* 147:*25* 152:*20* 153:*8* 206:*20, 23*
**exact** 29:*12* 35:*15* 37:*8* 40:*13, 22* 44:*6* 71:*23* 78:*11* 100:*17* 111:*3, 6* 118:*2* 134:*1, 6* 139:*15* 143:*15* 155:*16, 21* 156:*5* 171:*14* 198:*7*
**exactly** 104:*25* 159:*18* 185:*6* 201:*11*
**Examination** 3:*4, 5* 5:*3* 161:*3* 212:*20*
**examined** 5:*1*

**examining** 103:*20*
**example** 77:*4* 101:*18*
**examples** 97:*24* 98:*1*
   100:*1*
**exceed** 150:*13*
**exceeded** 215:22
**exceptional** 80:7
   169:*16* 208:*15*
**excluding** 142:*5*
**excuse** 20:25 28:*15*
   31:*7*, *18* 39:*1*, *4* 41:*6*
   61:*1* 80:*19* 87:*24*
   89:*15* 92:*19* 107:*6*
   109:*7*, *24* 112:*20*
   117:*5* 122:22 126:*24*
   128:*25* 153:*5* 203:*12*
   220:*21*
**execute** 178:*9*
**execution** 140:*17*
   141:*12* 148:*21* 183:2
   202:*14*
**executive** 14:*16* 15:*6*,
   *22* 16:*6*, *8*, *12*, *19*
   19:*18* 29:*17*, *20* 32:9,
   *11* 33:*17*, *21* 35:*1*
   43:*11* 44:*13*, *15*, *16*,
   *19*, *21*, *24* 45:2, *6*, *7*,
   *18*, *19* 56:*15*, *18*, *21*
   66:*8* 67:*16*, *17* 68:*23*
   69:*8*, *16* 70:*8*, *13*, *20*,
   *25* 71:*15*, *21* 72:*21*
   75:*1* 81:*5*, *7*, *11* 82:*8*
   84:*4* 86:*6*, *9*, *19* 88:*4*
   89:*9*, *19* 90:*1* 91:*4*
   95:*9*, *23* 96:*23*
   104:*13* 110:*7*, *8*, *10*,
   *22* 120:*18*, *20*, *21*, *25*
   121:*1*, *17* 122:*15*, *16*,
   *18*, *24* 126:*1*, *12*, *14*,
   *22* 127:*9*, *14* 130:*14*
   132:*18*, *20* 150:*10*
   161:*19*, *23* 162:22
   164:*1* 165:*6*, *8* 166:*1*,
   *5*, *7*, *14* 173:20
   178:*11* 208:*3*, *6*
   209:*10* 212:25 213:*1*,
   *12* 223:20
**executives** 16:*1* 19:9
   32:*21* 36:*19* 37:*18*
   91:*10* 102:*15* 146:*24*

149:*12*, *23* 165:*3*, *16*
   166:*1* 169:*12*, *25*
   173:2*1* 189:*25*
   199:*23* 219:*19*
**exemplary** 38:*17*
   141:*5* 193:*18*
**exercise** 201:*21*
   208:*17* 209:*17*, *20*
   210:2 211:*14* 212:*6*
**Exhibit** 3:*8*, *9*, *10*, *11*,
   *12*, *14*, *15*, *16*, *17*, *18*,
   *19*, *20*, *21*, *22* 46:*1*, *5*
   47:*10*, *22* 50:*19*
   51:*24* 52:*3*, *24* 53:*3*,
   *22* 54:*13* 55:*1*, *5*, *9*,
   *12*, *18*, *23*, *24* 56:*14*,
   *16*, *17*, *22*, *24* 57:*3*, *17*,
   *22* 58:*3*, *22* 59:*3*, *7*,
   *15*, *25* 60:*6*, *14*, *18*, *22*
   61:*1*, *13*, *25* 62:*9*, *13*,
   *23* 63:*2*, *8*, *17*, *23*
   64:*3*, *7*, *11* 65:*8*, *14*,
   *21* 66:*1*, *5*, *10* 67:*4*
   68:*14* 73:*13*, *16*, *25*
   74:2 84:*19*, *23* 85:*11*
   86:2*1* 87:*9*, *13* 88:*10*
   89:*1*, *5* 110:*4*, *5*
   111:*8*, *12*, *21*, *25*
   112:*5*, *15*, *19* 113:*4*, *7*,
   *13*, *19* 114:*11*, *15*
   115:*2*, *6*, *12*, *16* 116:*1*,
   *5*, *10*, *21*, *25* 117:*5*, *7*,
   *10* 118:*9*, *18*, *24*
   119:*4*, *8*, *12*, *22* 120:*6*,
   *10*, *14* 121:*13*, *18*, *22*
   122:*1*, *10*, *23* 123:*2*, *8*,
   *13*, *17* 124:*2*, *17*
   125:*1*, *5*, *21*, *25*
   128:*16*, *20* 129:*1*
   131:*1*, *15*, *19* 132:*1*, *7*,
   *8*, *10*, *16*, *18*, *23* 133:*5*,
   *12*, *16*, *21* 134:*2*, *7*, *21*
   135:22 138:*11*, *15*
   140:*1*, *4*, *7* 151:*24*
   156:*6*, *10*, *14*, *24*
   157:*4*, *10*, *14* 158:*9*,
   *12* 159:*6*, *10*, *13*, *21*,
   *24* 167:*21* 175:*3*
   190:*25* 192:*21*
   194:*10* 198:*15*, *18*

200:*3* 203:*17*, *18*, *20*
   204:*15* 207:*14* 213:*5*,
   *10*, *17* 214:2 216:*13*
   220:*5*, *18* 221:*13*, *17*
   223:*18*, *25*
**EXHIBITS** 3:*7*
   132:*1*, *6* 198:*14*
**existing** 149:*10*, *21*
**expand** 97:2
**expect** 80:*8* 81:*5*, *11*
   86:*5* 96:*23* 100:*3*, *15*
**expected** 82:*1* 97:*22*
   99:*25* 168:*16*
**experience** 76:*18*
   77:*11* 186:*16* 208:*14*
   216:*6*
**experienced** 140:*19*
**expertise** 188:*4*, *7*, *8*,
   *10*
**experts** 225:*18*
**expires** 228:*24*
**Explain** 32:*8* 64:*14*
   67:*6* 78:*14* 93:*12*
   98:*10* 181:*1* 185:*13*
   189:*4* 196:*25* 197:*1*
   222:*19*
**explaining** 83:*7*, *14*
   84:*15* 222:*22*, *23*
**extent** 9:*9*
**extra** 58:*24* 165:*13*
**eye** 140:*16* 141:*12*

**< F >**
**face** 209:*8*
**facilities** 209:*6*
**facility** 169:*7*, *9*, *10*
   180:*20*
**fact** 152:*24* 161:*13*
   164:*8*, *22* 165:2
   169:*24* 175:*24* 177:*1*
   185:*4* 191:*25* 192:*13*
   224:*20*
**factor** 210:*14*
**factors** 79:*21* 168:*16*
   170:*5* 171:*18* 172:*8*
**facts** 54:*25* 152:*20*
   153:*3*, *4*, *7* 172:*23*
   178:*16*, *23* 180:*8*, *21*
   182:*2*, *8* 183:*7*, *12*, *16*
   184:*24* 185:*1* 186:*24*

187:*2*, *5* 188:*18*, *21*,
   *25* 195:*6*, *9* 203:*6*
   216:*1*
**fair** 52:*15* 58:*17*
   75:*4* 138:*21*
**familiar** 32:*13* 161:*9*
   164:*4*
**far** 86:*3* 103:*4*
   104:*4* 143:*15* 144:*10*
   149:*16* 150:*10*
   151:*12* 190:*21*
   203:*14*
**fashion** 159:*2*
**fast** 31:*13*
**February** 46:*8*, *21*, *23*,
   *24* 47:*7*, *13* 48:*2*, *15*,
   *21* 49:*14* 50:*10*, *20*,
   *25* 52:*6* 53:*6*, *19*, *23*
   54:*12* 55:*8*, *11*
   111:*15* 112:*3*, *7*, *13*
   115:*19* 116:*12*, *18*
   194:*17* 196:*4* 214:*6*,
   *13*, *20*
**fed** 79:*4*
**fee** 42:*24*
**feedback** 209:*14*
**feel** 5:*13* 87:*4* 96:*10*
   148:*23*
**fellow** 11:*7*
**felt** 38:*15* 105:*3*
   172:2 182:*13* 184:*5*
   189:*14* 190:*19*
   195:*20* 201:*1*
**field** 199:*23*
**FIFTH** 1:*10*, *14* 2:*12*,
   *17* 4:*6*, *20*, *22* 11:*12*,
   *15*, *19*, *20*, *21*, *23* 12:*4*,
   *6*, *8* 13:*24* 14:*5*
   18:*12* 19:*25* 20:*4*, *12*
   21:*6*, *10*, *18*, *24* 22:*22*
   23:*1* 24:*7* 25:*8* 26:*3*
   27:*11*, *17* 28:*7*, *12*, *19*
   29:*9*, *22* 31:*11*, *22*, *24*
   32:*9*, *12*, *25* 34:*1*, *8*
   35:*20* 37:*12*, *16*
   38:*11*, *22* 39:*2* 41:*22*
   42:*16* 43:*6* 46:*7*, *11*
   47:*8* 49:*12*, *13*, *24*
   50:*3*, *21*, *24* 52:*5*, *8*,
   *12*, *13*, *24* 53:*6*, *20*, *24*

54:13  55:7, 10, 13
56:2  57:5, 10, 13, 24
58:14, 18  59:5, 8, 16
60:4, 8, 12, 20, 23
61:4, 16, 22  62:2, 7,
15, 24  63:10, 21, 25
64:9, 11  65:12, 17, 23
66:11  67:5  74:6
75:5  85:2, 3, 11, 14
89:4  104:5  109:5, 10,
14  110:6  111:2, 14,
22  112:21  113:4, 11,
15, 22  114:17, 20
115:2, 3, 10, 18  116:1,
2, 8, 12, 18  117:2, 10,
11  118:12, 20  119:2,
10, 12, 15  120:12
121:15, 19  122:3, 7,
10, 11, 14  123:4, 11,
19  124:2, 3, 9, 19, 21
125:7, 10, 12, 22, 23
127:10  129:2, 12
130:2, 6, 9, 13  131:14
132:12, 13, 21, 23, 24
134:14, 21  135:23
151:25  152:18
153:22  155:1, 2, 11,
12, 23, 25  156:3, 11,
14, 15  157:1, 16, 22
158:1, 13  159:15
161:17  164:17
168:17  170:12
175:11, 25  176:17
180:13  184:14  191:9
207:19  208:7  210:11
211:1, 12, 16, 22, 25
215:1, 4, 24  216:10,
14  218:17, 18, 21, 24
220:19  221:17  229:4
figure  177:4
file  221:8
files  162:20  212:24,
25  213:25
final  13:18  15:24
56:6, 10  85:21
129:12  130:21, 25
158:3  200:10, 12
finance  14:25  15:3,
4, 7  16:23  17:2, 8, 19
39:4, 6  43:3

financial  13:6  95:7
179:3  219:17
find  77:5  136:13
172:25  173:1
Findlay  6:5
fine  24:12  143:23
174:13
fingertips  172:3, 20,
23
finish  5:23  59:11
94:1  105:9  142:23
146:11, 14, 15  148:5
217:21  218:2, 5
Fintech  38:18
103:24  189:9  190:16
219:16
firm  10:23, 24  11:2
95:13  127:8  164:10
198:11  199:21  201:3
228:16
firms  199:23
first  4:25  20:14, 17
31:24  36:15  49:16,
24  53:9  55:11  56:15
66:14  86:7  89:6, 7,
22  129:1  131:18
132:3  133:20  134:23
138:24  175:4, 5
177:1  178:5  181:15
182:18  184:14
187:24  188:14
194:18, 19  200:6, 16
203:21  208:4  217:13
218:17, 20  220:10
221:21  224:13  228:8
Firth  53:10
fiscal  225:13
fit  208:5
five  15:9, 11  17:6
26:18  79:11, 14, 17,
22  80:4, 11  81:17, 18
165:10, 14  186:19
214:22
flavor  96:21
focus  33:1  136:2, 12,
21  137:4, 5, 6, 9, 12,
20  138:1  182:22, 25
188:2  220:10
focused  87:22  137:7

138:1  221:20
Focusing  23:3  216:23
follow  31:16  67:19
followed  26:24
Following  110:7
168:8, 11
follows  5:2
football  76:25
footprint  168:17
170:13
foregoing  228:10
forgot  21:1
form  45:8  48:23
49:17  50:14  51:3
54:14  64:16  68:15
71:2  73:17  77:18
80:17  83:16  87:14
98:20  102:6, 9
136:22  140:18
141:13  142:2  152:9,
19  154:3, 18  155:3
158:21  162:9, 15
165:21  167:8, 12
169:1, 18, 21  170:3, 7,
10, 19  171:11  173:17
175:17  179:7  181:21
182:8, 12  183:23
185:10  187:6, 15
190:11  194:23
195:12, 19  203:8
211:17  215:5, 18
formally  161:21
162:19, 20  204:6, 7
formerly  138:25
203:23
forming  166:12
204:18, 25
Formula  130:13
138:19
Forrest  89:11  113:18
forward  14:1  38:20
68:11  75:23  80:2
196:2  197:2  202:2
224:23
forward-thinking
208:12
found  173:7
foundation  64:17
131:10, 11  154:4

170:18  182:24
184:13
foundationally  84:7
foundations  186:17
four  12:23  15:19
35:16  37:10  77:10
79:10  81:19  106:2
186:12  220:3  224:24
fourth  92:3
frame  28:21  33:4, 9
37:9  43:7  70:5  77:3
78:4, 6, 8, 11, 12  88:1
100:6  195:21  198:15
199:15  225:3
framework  69:7
free  5:13
front  50:17
FTB's  150:5, 19
fulfill  79:5
full  12:21  38:1, 3
42:1  47:7, 9  49:22
50:9, 23  51:10, 13
67:15, 23  69:6, 9, 12
72:3  89:22  120:21
122:16  127:16
131:17  134:8  167:2
172:5  175:5  184:9
187:24  211:7  214:10
funds  42:19
funnel  94:20
Further  3:5  26:25
27:1  37:21  209:12
212:19, 20
future  14:20  69:11
72:10  84:6  97:23
145:8  153:24  186:13
FW  112:9

< G >
gain  34:14  87:4
136:2  209:7
game  76:25
Garrett  123:5
GARY  1:14  3:3  4:3,
24  5:7  227:4  228:7,
11  229:19  230:24
231:24
general  110:15  222:7
generally  73:1
113:24  114:2  161:16

165:9  166:21, 24
167:3, 4  168:18
169:4  175:11  180:15
222:8
**generated**  223:10, 15
**geographies**  186:20
**getting**  183:19
**give**  6:22  13:23
72:2  100:1, 6
**given**  6:13, 24  54:7
154:11  160:14  180:6
228:10
**giving**  146:22  228:7
**go**  5:5  7:22  42:7
47:16, 17  48:8, 25
51:6  61:1  69:12
82:24  87:2  91:2
92:14  94:20  97:2
99:10, 14  102:10
104:25  105:5, 12, 16,
19  107:2  133:15
135:8, 10, 21  138:7
143:11  146:15
147:15  151:1  154:20
160:3  162:9, 16
163:11  165:11, 21
167:8, 13  169:1, 21
170:19  171:11, 22
173:3, 17  174:8, 20
175:3, 22  176:22
178:1, 18  179:10, 18
180:10  181:12
182:17  183:25  184:8
186:9  187:15, 16
190:17, 25  191:1
193:2, 8  197:15
198:5, 24  199:9, 19
200:23  201:9, 18, 21
203:10  204:10, 21
205:4, 7, 25  210:5, 15,
21  211:4, 17  212:9
215:21  216:4, 13, 14
220:7  223:5  224:5
225:4, 8, 22  226:3
**goals**  134:25  135:5
179:23  189:10
**goes**  8:16  33:25
34:7  46:15  49:15
53:9  87:22  88:12
100:13

**going**  5:11  7:13  8:1,
12, 24  9:2  13:8
30:22  37:21  39:7, 19
42:9  54:8  70:10
72:10  75:22  78:21
79:2  81:1  83:1  84:8
91:21, 23  101:15
104:3, 14, 15  130:24
133:10  151:25  160:5,
11, 23  167:21  180:2
187:20  192:21  196:2
197:2  199:6  202:1
204:14  208:11
212:14  224:23
225:11, 17  226:6, 20
**good**  40:3  96:24
97:15  98:23  177:5
185:5  195:25  200:25
208:21, 22  225:23
**governmental**  15:14
**graded**  94:21
**grasp**  103:3  104:1,
17  147:1  172:19
**gravitas**  34:11
**great**  224:7
**greater**  136:3
**Greg**  18:21  19:1, 3,
5  20:3, 11  21:5, 9, 12,
13  22:5, 10, 11  25:6,
11, 16  43:10  67:1, 2
70:5  126:5  129:16,
18  138:18  139:24
155:19  159:25
161:18  164:17, 18
172:17  189:15  191:6
217:6, 22
**group**  37:20, 23, 24
38:3, 7  149:11, 22
184:15
**growth**  145:4, 16
146:2  147:10  148:14
168:19
**Guy**  128:22  129:14
138:18, 24  139:3
203:22, 24, 25  206:9
**guys**  177:3


**< H >**
**half**  42:17  163:17

**HAMILTON**  228:3
**hand**  209:2  228:18
**handed**  46:4  52:2
55:4  57:2  59:2
60:17  62:12  64:6
66:4  72:17  84:22
111:11  112:18
114:14  115:15
116:24  119:7  120:9
121:25  123:16  125:4
128:19  132:3, 6
138:14  140:4  156:9
157:13  159:9
**Hang**  54:6  213:9
**happen**  75:17, 19
164:22  195:22, 23
**happened**  45:5, 18
**happens**  92:20  199:3
**hard**  46:24
**HCC**  16:7, 10  17:6
39:5
**HCCC**  16:3, 5, 10, 11,
18
**head**  5:21  73:1, 9
76:7, 8  82:10, 18, 19
89:16  132:20  139:16
174:3, 12  198:11
217:3, 4, 23  223:17
**heading**  202:8
**hear**  5:12  6:23
20:13  24:12  38:24
148:3  162:13  167:11
174:12  213:5
**heard**  68:25
**hearing**  5:15  92:20
**heightened**  181:19
**held**  9:19  13:13, 16
52:16  56:12  61:3
104:11  158:7  190:6
**help**  99:9
**helpful**  189:18
**HEMINGER**  1:14
3:3  4:3, 17, 24  5:5, 7
42:15  45:14  46:4, 18
47:5  48:25  52:2
53:4  55:4  56:15
57:2  59:2  60:17
62:12  64:6  66:4
73:22  83:7  84:22
87:23  91:2  94:3, 15

99:8, 19  103:19
105:25  110:2  111:11
112:18  114:14
115:15  116:24  117:8
119:7  120:9  121:25
123:16  125:4  128:19
132:6  135:17  137:3
138:14  140:4  156:9
157:13  159:9  160:15
161:5  212:22  213:6
215:8  216:4  227:4
228:7, 11  229:19
230:24  231:24
**H-e-m-i-n-g-e-r**  5:7
**Hennigan**  11:7, 8
**hereinafter**  5:1
**hereof**  229:13
**hereunto**  228:18
**high**  164:1, 25
208:21
**higher**  215:12
**highlights**  138:23
**highly**  137:7
**hire**  198:11  199:21
201:7
**hired**  164:9  194:3
201:12  204:2  215:10
216:5
**hiring**  164:4
**hold**  13:4
**holding**  11:25  136:4
**holds**  208:20
**homework**  224:8
**hone**  209:12
**hope**  129:15
**hoping**  103:10  192:6
**horizons**  97:3
**how's**  213:24
**HR**  73:1, 9  76:8
82:10, 18  191:7, 9
198:11  217:4, 23
222:6
**human**  15:1, 20  16:2
66:7  68:23  69:6, 15,
25  70:8, 13, 20, 25
71:14, 21  72:21
118:22  129:16, 21
166:24  198:10
**hypothetical**  152:10

Deposition of Gary R. Heminger                    Philip R. McHugh v. Fifth Third Bancorp, et al.

< I >

**ideas** 188:*11* 209:*5*

**identification** 46:2 51:*25* 55:2 56:*25* 58:*23* 60:*15* 62:*10* 64:*4* 66:2 84:*20* 111:9 112:*16* 114:*12* 115:*13* 116:*22* 119:*5* 120:7 121:*23* 123:*14* 125:2 128:*17* 132:2 138:*12* 140:2 156:7 157:*11* 159:7

**identified** 134:*12* 158:8 186:*12*

**identify** 46:5 52:3 54:9, *11, 21* 55:5 57:3 59:3 60:7, *18* 62:*13* 63:9 64:7 66:5 67:*13* 74:*11* 81:*23* 83:*24* 84:*23* 111:*12* 112:6, *20* 113:*14* 114:*15* 115:*16* 116:*11, 25* 119:8 120:*10* 122:1 123:*3, 17* 125:5 128:*20* 130:*10* 132:8, *16* 135:*24* 136:*18* 138:*15* 156:*10* 157:*14* 159:*10*

**identifying** 80:*13, 22* 83:*10*

**identity** 7:*23*

**ilk** 225:*16*

**illustrates** 74:*17* 130:*23*

**immediate** 103:*3*

**immediately** 40:*1* 185:*20*

**impact** 208:*18*

**implications** 150:6, *20*

**important** 34:9 152:*25* 169:*15*

**impressed** 164:9, *15* 169:*24* 185:*3, 4*

**impression** 154:*15, 19*

**impressive** 196:*23*

**improper** 93:*24*

**improve** 137:*20*

138:*10* 185:*17, 19*

**improved** 180:*4*

**improving** 185:*21*

**incident** 100:*18, 19, 21, 22*

**include** 45:*1* 148:7

**included** 93:*4* 134:*25* 142:9 168:*12* 180:*15* 194:*23* 195:*1* 220:*14, 20, 21*

**including** 27:*18* 34:*17* 86:9 88:*4* 89:*12* 90:*14* 91:*25* 93:*14* 126:*13* 142:*4* 168:*14* 175:9 179:*24* 183:*1* 190:*13* 197:*5* 209:*22*

**inclusive** 44:*24*

**income** 109:9, *13, 21* 179:2

**incoming** 165:9

**increasing** 168:*18*

**indefinite** 83:*19*

**independent** 10:*13* 13:*23* 14:5, 8 16:*11, 16, 18* 19:*24* 24:6, *23* 63:*17, 23* 120:*25* 122:*16* 169:*18* 170:*3, 10* 207:*25* 211:*14, 15* 212:6 217:6

**index** 32:*19*

**indicate** 50:6 74:*21* 75:7, *12* 93:*18* 103:*19* 114:4 121:*18* 122:*17* 137:*19* 143:5 144:*13* 145:*13* 148:*12*

**indicated** 5:*14* 6:*12, 24* 8:6 23:9 31:*24* 46:*20* 49:*21* 61:7 73:*22* 94:6 95:*19* 106:2 114:*23* 125:*15* 127:*3* 129:*11* 135:*20* 212:*23* 214:*25* 218:*17* 224:2 226:*12* 229:*12*

**indicates** 74:*23* 94:*4* 121:*1*

**indicating** 11:*19* 107:9, *20* 140:*12*

141:*8, 23* 145:*1, 24* 147:7 148:*19* 149:*8, 19* 150:*3, 17* 151:*5, 16* 152:6

**indication** 76:*22* 124:*22* 207:*3*

**indicative** 216:*10*

**individual** 80:*12* 81:2 84:*11* 88:*22* 109:*3* 128:6 209:2

**individuals** 76:*1, 3* 83:*14* 86:*12* 88:7 89:*14* 213:*21*

**industry** 79:2 103:*4, 23, 24* 104:*18* 106:*18, 20* 145:5, *17* 146:*4* 147:*12* 148:*15* 164:*12, 16* 166:2 170:5 172:*20* 175:9, *11, 20* 176:5, 6, *21* 188:*12, 17* 189:8, *18* 192:*18* 193:*15* 197:*11, 21*

**inflation** 224:*17, 20*

**inflationary** 224:*18* 225:*11, 13, 17*

**Influencing** 202:*24*

**information** 26:*25* 39:9 41:*25* 56:*20* 70:*24* 71:*13, 21* 72:*15, 20* 73:*13, 15, 25* 74:2 82:*3, 5, 7, 16* 83:8 84:*16* 86:*20, 25* 87:*1, 7, 9, 12, 13, 18* 88:8, *13, 24, 25* 102:*19* 103:6, *13, 18* 106:*11* 107:*19* 112:6 140:*12, 21* 141:*1, 8, 22* 142:7, *13, 14, 21* 143:5 144:*25* 145:*24* 147:7 148:*18* 149:*3, 7, 18* 150:2, *16* 151:*4, 15* 152:5, *16* 155:*17* 169:*17* 171:6 172:*10, 12* 176:*10, 14* 178:*16, 23* 179:*2, 3* 180:9 182:*3, 8* 183:8, *12, 16* 184:*24* 185:2 186:*25* 187:*3, 6* 188:*16, 19, 22* 189:*1, 3, 17* 195:6,

9 203:6 217:2, *12* 218:9 221:*3* 222:*12* 225:5

**informed** 155:*14, 16, 18, 20*

**inherent** 209:*10*

**initial** 130:2

**initiated** 89:*24*

**initiatives** 136:*1, 2, 12, 15, 21* 137:*4, 5, 7, 9, 20* 189:9 223:*11, 16*

**innovation** 175:*14*

**innovative** 140:*15* 141:*10* 208:*14*

**input** 76:6

**inside** 14:*19* 19:2, *4* 27:*19* 28:3 29:7 30:*22, 23* 107:*12* 124:*24* 155:2 167:*1* 193:*20*

**insightful** 209:*12*

**instruct** 7:*13, 17* 8:*12, 24*

**instructed** 7:*15*

**instruction** 8:*15*

**instructions** 6:*1* 7:*16*

**intellect** 103:*3*

**intellectual** 172:*22*

**intellectually** 146:*24*

**intensively** 10:6

**interest** 228:*14*

**interested** 184:7

**interim** 75:*21* 78:*1* 79:*10* 81:*10*

**internal** 34:*4* 35:*19, 22* 90:*11* 139:5, *23*

**International** 126:*24, 25* 127:5, *7, 11* 128:*23* 131:*21* 132:*11, 19* 199:*22* 200:*14* 204:*3* 207:*20*

**International's** 152:2

**interpersonal** 34:*24* 38:*19* 78:*24* 79:*25* 134:*13* 199:*24* 202:*19, 21*

**interpretation** 94:*11, 12* 99:*4* 137:*23*

Deposition of Gary R. Heminger                                        Philip R. McHugh v. Fifth Third Bancorp, et al.

200:22
**interview** 108:8, 11
**interviewed** 34:20
190:2
**intimate** 164:17
**intricate** 172:19
180:25
**introduce** 4:10
**investment** 34:12
78:25
**investments** 186:14,
21
**involve** 173:24
**involved** 9:22 32:2
76:19 198:9 221:3,
11 222:6, 7, 8 223:7,
24
**involvement** 9:25
17:9, 12
**involving** 6:19
**issue** 97:18
**issued** 159:20
**issues** 18:13 98:6
117:25 150:6, 20
**items** 96:6
**iterative** 37:18 161:6
162:6, 22 163:21
173:10 209:15
**its** 29:15 166:12
184:15 197:20, 21
199:17 208:24
209:17, 20 210:2
211:14, 15 212:6

**< J >**
**jacket** 199:6
**Jane** 6:9
**January** 17:21 18:23,
25 19:6 20:9 21:3,
11, 22 23:3, 10, 12, 17,
21 24:3, 5, 22 25:1, 5,
14, 21, 25 26:4, 11
27:7, 9, 15 28:25
29:5 30:11 31:2, 7,
18 228:20
**jms@sspfirm.com** 2:8
**job** 72:9 154:8, 12,
13, 16 192:7, 8 201:1
211:13
**jobs** 96:3, 20

**joined** 11:17 16:7
31:24 95:13 177:1
218:17, 21, 25
**joint** 4:18 52:18
62:15 84:25 156:12
157:7 168:1
**Joshua** 2:4 4:14
**judgment** 102:24, 25
141:19 142:4, 5, 11,
17 143:4, 22, 25
144:1, 6, 10, 12
146:22 148:9 151:11
163:5 165:19, 25
166:13 169:18 170:4,
11 171:19 173:15
174:2, 7, 18 175:18
177:8 179:8, 12, 13
181:6, 22 182:9, 22
183:23 184:4 185:10,
23 187:7, 10, 13, 17
190:12, 20, 21 194:1
195:12, 18 196:3
197:3, 21 203:8
209:17, 20 210:2
211:6, 15 212:6
**July** 129:8 132:21
199:14
**June** 59:6 60:3, 7, 12,
21 61:5, 16, 22 62:1,
6 120:13, 22 121:7,
14, 19 122:5 123:3,
10 127:19 138:17
139:13 199:12

**< K >**
**Kabat** 32:2, 6 40:2
**keen** 183:17
**keep** 30:22 51:15, 20
76:11 81:9 103:10
148:4 160:11, 14, 18,
19 180:2 208:11
**key** 86:10 88:5
90:16 95:2 110:12,
13 120:18, 20 121:1
122:18 131:12
138:23 179:23
186:12, 14, 20
**kind** 15:6 162:20
165:9 169:7 197:5
**King** 112:8

**know** 5:17 11:22
12:5, 11 14:19 19:8,
14 22:19 29:18
34:13 37:9 38:17
40:21, 22 44:20 45:6,
19 50:15 56:3, 5, 6
58:16 60:13 64:17,
20, 22 68:3 69:18
70:12, 15, 16, 19, 22
71:23 74:16 75:14,
18 76:5, 11, 16, 17
79:9, 10, 14, 20 80:7
81:2, 7, 15 85:18, 20,
22 86:3 87:3 95:11,
12 96:18, 23 97:13
98:13 100:19 103:25
108:23, 25 110:1
111:6 112:14 117:19
118:2 120:5 121:21
123:12 126:18, 24, 25
127:5, 24 128:8
131:8 136:17 147:21
148:17 154:4, 5
155:15, 21 157:19
158:16, 17 159:2, 20,
23 160:1 162:17
163:18 164:15
169:12, 13 170:22
176:16, 24 177:2
185:20 188:9 189:5
190:21 191:1 193:19
194:8 195:24 196:21,
23 199:25 201:13
205:21 206:13, 15, 16
213:13 217:13 218:3,
9, 15 219:8, 16
220:20 222:2, 3
223:17, 23 224:22
**knowledge** 64:21
76:14 106:19 145:5,
17 146:3 147:11
148:15 164:16, 17
166:11 169:19 170:4,
12, 16 171:17 172:22
175:19 176:3 177:12
181:4 188:13 189:8,
9, 19 190:15 192:18
193:15 195:13
196:15, 16, 17, 24

197:10
**known** 17:23
**knows** 208:21

**< L >**
**L.P.A** 2:5
**labor** 222:7
**Lack** 24:14 31:12
39:21 64:16 170:18
**Lacks** 154:4
**Lamb** 74:24, 25 75:4
112:9
**landscape** 104:4, 5
176:2
**large** 175:12 178:11
220:23
**largely** 200:20
**larger** 168:18 175:13
**largest** 168:20
218:24 219:2
**Lars** 36:3 215:3
**Lastly** 134:24
**Lavender** 123:6
**lawful** 4:25
**lead** 39:14, 24 40:3
42:1 69:24 76:7
82:20 198:8 205:20
206:12, 13 207:8, 10
217:6
**leader** 72:10 202:1
208:23
**leaders** 72:11 167:3
222:6
**leadership** 32:20
34:11 95:10 134:13
140:10 185:11, 14, 24
186:3 189:10 190:16
192:17, 19 193:16
197:12 202:5, 17
208:6 209:1
**leading** 177:19, 21
183:1 184:14 186:15,
17 192:13 193:8
197:13 204:19 205:1,
19
**leads** 193:23
**learn** 14:18 136:17
188:9 218:22
**learner** 209:11

Deposition of Gary R. Heminger                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

**leave** 153:*25* 155:*15*
**led** 153:*4, 5, 21*
**legal** 41:*22*
**legislation** 178:*10*
**lending** 15:*15* 220:*1*
**Leonard** 54:*4* 63:*12*
  112:*10* 116:*15*
**level** 16:*9* 17:*11, 12,*
  *14, 16* 80:*7* 81:*12*
  96:*23* 164:*1, 2, 25*
  173:*1* 178:*11* 194:*8*
  209:*24* 210:*8* 213:*22*
  222:*20*
**leveled** 168:*20*
**levelheaded** 181:*1*
**leverage** 175:*14*
**levers** 208:*17*
**liens** 177:*2*
**lights** 81:*9*
**limited** 190:*13* 197:*5*
  209:*22*
**line** 68:*10* 85:*15*
  105:*10* 208:*18* 219:*6,*
  *22*
**lines** 219:*11*
**list** 34:*4* 35:*19, 21*
  36:*11, 16, 17, 19, 22,*
  *25* 37:*5, 11, 15* 38:*10*
  58:*4* 75:*24*
**listed** 56:*2* 89:*7* 91:*5*
**little** 172:*7* 208:*8*
**lived** 6:*6*
**lives** 6:*8*
**LLP** 2:*11*
**loaning** 177:*2*
**loans** 218:*18, 19, 22,*
  *23, 24* 219:*5, 6, 11, 23,*
  *25*
**locate** 75:*21* 127:*13*
**locating** 33:*14*
**long** 6:*6* 9:*19* 11:*15*
  15:*7, 10, 18* 77:*4, 7, 8*
  78:*20* 79:*7, 8, 20*
  81:*13, 16* 215:*10*
**longer** 79:*11* 81:*19*
  215:*14*
**look** 46:*9* 47:*2, 20*
  49:*24* 53:*3* 67:*8*
  68:*10* 79:*13* 80:*5*
  82:*7* 129:*24* 130:*17*

133:*15* 164:*19*
  167:*23* 178:*2* 179:*19,*
  *20, 21* 198:*15, 17*
  200:*4, 18* 204:*15*
  205:*22* 207:*14*
  214:*14*
**Looking** 68:*10* 78:*5,*
  *18, 22* 80:*24* 81:*2, 4,*
  *7, 12* 84:*3* 129:*5*
  131:*10, 12* 169:*14*
  179:*1* 195:*23* 213:*7,*
  *20, 21*
**looks** 74:*15* 199:*12*
**loose** 213:*9*
**loss** 15:*16* 109:*10, 14,*
  *21*
**losses** 179:*3*
**lost** 199:*1*
**lot** 225:*15*
**lunch** 34:*19* 35:*5, 10*
  105:*17*
**lunchtime** 105:*11*

**< M >**
**M&A** 178:*2, 8, 9*
  183:*4* 186:*17* 195:*2,*
  *4, 13* 196:*17*
**macroeconomic**
  195:*1, 4, 14* 196:*17*
  197:*11* 224:*16*
**maintaining** 140:*16*
  141:*11* 150:*4, 19*
  183:*3*
**major** 193:*20*
**maker** 208:*19*
**Making** 53:*8* 91:*8*
  97:*20* 104:*5* 117:*20*
  143:*16* 161:*22*
  166:*15* 171:*1* 179:*4*
  212:*5*
**manage** 32:*19* 81:*13*
  209:*9*
**managed** 98:*3, 8, 17*
  100:*15* 101:*5, 6, 17,*
  *18, 20, 21* 102:*5, 20*
  109:*11, 15, 23*
**management** 13:*25*
  14:*19* 16:*1* 26:*3*
  35:*1* 38:*15* 42:*5*
  66:*8* 67:*16, 17* 68:*24*

69:*8, 10, 16* 70:*8, 14,*
  *21* 71:*1, 15, 22* 72:*4,*
  *22* 99:*20* 100:*2*
  101:*7* 102:*3* 106:*1*
  110:*12* 113:*24*
  126:*10, 22* 127:*9, 17*
  131:*18* 134:*8, 13*
  140:*11* 161:*20* 163:*1*
  166:*25* 182:*16*
  188:*15* 191:*6, 10*
  202:*9*
**managing** 98:*12, 15*
  101:*22, 25* 149:*10, 21*
  150:*5, 20*
**manner** 209:*4*
**Marathon** 6:*20* 7:*3*
  9:*15, 20* 10:*12, 15, 16,*
  *18* 11:*3* 32:*14*
  127:*12*
**March** 118:*1*
**mark** 53:*10* 112:*19*
**MARKED** 3:*7* 46:*1,*
  *5* 51:*24* 52:*3, 24*
  53:*11* 55:*1, 5, 13*
  56:*24* 57:*3* 58:*22*
  59:*3* 60:*14, 18* 62:*9,*
  *13* 64:*3, 7* 66:*1, 5*
  84:*19, 23* 111:*8, 12*
  112:*15, 19* 114:*11, 15*
  115:*12, 16* 116:*21, 25*
  119:*4, 8* 120:*6, 10*
  121:*22* 122:*1* 123:*13,*
  *17* 125:*1, 5* 128:*16,*
  *19* 132:*2, 7* 138:*11,*
  *15* 140:*1, 6* 156:*6, 9*
  157:*10, 14* 159:*6, 10,*
  *21, 24* 167:*22* 194:*11*
  207:*14*
**market** 79:*25* 98:*13,*
  *19* 99:*22* 104:*15*
  168:*9, 10, 14* 169:*4*
  186:*19* 220:*11, 25*
**markets** 95:*15* 101:*9*
  106:*4, 11, 13, 24*
  168:*20* 183:*2* 186:*15,*
  *18* 195:*2, 5, 13*
**Marsha** 39:*23* 40:*2*
  70:*6, 16* 121:*16*
  139:*2* 198:*9* 206:*8,*

*10, 14* 207:*10* 217:*5,*
  *20*
**material** 208:*17*
  224:*9*
**materialize** 191:*25*
**materials** 39:*7* 69:*9*
  70:*2* 148:*8, 11*
  168:*13* 194:*23*
  220:*15, 20*
**matter** 48:*8* 97:*25*
  169:*14* 229:*8*
**matters** 196:*18*
**MBA** 9:*11*
**McCallister** 7:*11, 20*
  8:*19* 51:*15* 70:*6, 12*
  118:*21* 217:*5, 22*
  218:*12*
**McCallister's** 8:*7, 9,*
  *22*
**MCHUGH** 1:*7* 2:*14*
  4:*6, 13, 15* 17:*22*
  18:*15, 18, 21* 19:*1, 7,*
  *21* 20:*3, 11* 21:*5, 9,*
  *24* 22:*19* 23:*1, 4, 12,*
  *17, 21* 24:*3, 23* 25:*7,*
  *12, 17, 23* 36:*1, 10*
  37:*11* 45:*23* 46:*11*
  49:*25* 50:*3* 52:*25*
  53:*11* 55:*13* 57:*10*
  59:*8, 9, 16, 17* 60:*23,*
  *24* 62:*24* 63:*13*
  64:*12* 66:*11* 67:*5*
  68:*19* 74:*6* 75:*20, 25*
  77:*16, 25* 78:*9* 81:*23*
  82:*17, 21* 83:*8, 15, 24,*
  *25* 84:*9* 85:*12, 15*
  89:*4, 7* 95:*23* 96:*10*
  97:*7, 15, 25* 98:*3, 8,*
  *11, 18* 101:*6, 21*
  102:*5, 22* 105:*4*
  106:*13, 24* 107:*10*
  108:*12, 15* 109:*11, 22*
  110:*6* 111:*22, 23*
  113:*4, 17* 115:*3*
  116:*2* 117:*11* 119:*13*
  122:*11, 14* 123:*6*
  124:*3* 125:*22, 23*
  129:*2* 130:*3, 6, 10, 20*
  132:*13, 24* 134:*22*
  135:*23* 139:*19*

Deposition of Gary R. Heminger                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

140:*14*  141:*10, 25*
143:*6*  144:*3, 14*
145:*2, 14*  146:*1*
147:*9*  148:*21*  149:*9,
20*  150:*4, 18*  151:*6,
17, 25*  152:*7, 23*
154:*14, 19*  156:*15*
158:*13*  166:*5, 19*
167:*6, 16*  170:*17, 25*
171:*10*  172:*2, 15, 25*
190:*13*  197:*5*  209:*22*
210:*3, 20*  216:*15*
220:*7, 19*  221:*17*
229:*3*

**McHugh's**  19:*10, 24*
24:*6*  25:*2, 3*  96:*16*
97:*9, 19*  99:*20*  100:*2,
8, 11, 23*  101:*7*
103:*21*  106:*2*  107:*21*
109:*23, 25*  152:*17*
153:*6, 16, 22*  155:*1,
11, 15, 24*  173:*8*

**mean**  10:*9*  13:*3*
33:*9*  36:*5*  48:*24*
49:*1*  75:*16*  79:*8, 9,
16*  114:*8*  140:*19*
153:*14*  158:*23*  165:*6*
174:*23*  201:*20*

**means**  75:*17*  83:*20*
108:*25*  153:*13*

**meant**  181:*5*

**medical**  117:*20*

**meet**  12:*8*  13:*5*
16:*22, 23*  17:*2*  18:*12*
25:*1*  30:*19*  150:*13*

**meeting**  12:*17, 21*
13:*11*  17:*4*  20:*18, 19*
22:*16*  26:*14*  27:*23*
28:*3, 6, 17, 18*  29:*7*
30:*9*  34:*18*  35:*6, 7*
37:*20*  38:*23*  39:*2, 11*
41:*14, 23*  42:*4*  43:*9,
14, 15, 16*  44:*9, 13, 23*
46:*7, 20, 25*  47:*3, 8,
13*  48:*2, 15, 21*  49:*13*
50:*13, 21, 24*  51:*1*
52:*5*  53:*20, 24*  54:*12,
22*  55:*7, 10*  57:*5, 14,
20, 24*  58:*5, 8, 10, 13,
14, 18, 20*  59:*5, 20, 23*

60:*3, 8, 12, 20*  61:*3, 4,
8, 10, 16, 22*  62:*2, 7,
15, 17, 20*  63:*5, 10, 20,
25*  64:*9*  65:*7, 11, 16,
23*  67:*22, 25*  68:*2, 8*
69:*5*  70:*3*  71:*16, 23*
72:*13*  73:*2, 10, 12, 14,
15, 24*  78:*13*  84:*25*
85:*5, 8, 21*  86:*4*
87:*25*  89:*18*  90:*8*
104:*19*  110:*9, 25*
111:*5, 14, 16, 18*
112:*3, 7, 13, 21, 23*
113:*1, 10, 15, 22*
114:*1, 3, 4, 7, 9, 17, 20,
24, 25*  115:*9, 19, 20,
23*  116:*12, 18*  117:*2,
14*  118:*5, 7, 15, 20*
119:*1, 11, 20, 24*
120:*4, 12, 16*  121:*8,
10, 15, 19*  122:*4, 7, 22*
123:*4, 10, 19, 21, 24*
124:*9, 21*  125:*8, 10,
12, 16, 18*  126:*3, 8*
127:*19*  131:*3, 23*
133:*4, 8, 11, 14, 25*
134:*5*  143:*14*  156:*4,
12, 18, 21*  157:*2, 8*
158:*7, 11, 20*  159:*4*
161:*22*  162:*25*  164:*3*
167:*2, 4*  168:*2, 13*
172:*21*  191:*11*
194:*24*  203:*13*
214:*10, 11, 12*  220:*15*
225:*22*

**meetings**  12:*20, 22,
23*  13:*4, 5, 9, 12*  18:*1,
3, 8, 11*  19:*19, 23*
20:*3, 10*  21:*4, 11, 23*
23:*16, 18, 22*  24:*9, 15,
16, 24*  25:*6, 10, 11, 15,
22*  26:*5*  27:*13, 19*
28:*10, 15*  29:*20*  30:*2,
15, 16, 22*  31:*3, 4, 8,
20*  34:*16, 21*  35:*2, 4,
9*  39:*13, 20*  40:*4, 10,
18, 25*  41:*4, 8, 12, 20*
52:*15, 18*  78:*12, 13*
82:*13*  104:*8*  106:*15*
117:*23*  118:*3*  128:*1*

148:*23*  149:*15*  150:*9*
155:*5*  162:*8, 18, 23*
163:*14, 18*  203:*13*

**meets**  17:*3, 6*

**member**  12:*3, 5*
13:*22*  14:*12*  26:*2*
42:*16*  75:*21, 25*
97:*14*  102:*13*  131:*2*
197:*4*  209:*21*  210:*19*
224:*7*

**members**  13:*21*  14:*2,
4*  16:*7, 8*  17:*15, 18,
19*  19:*17, 20*  25:*15,
22*  28:*17*  29:*6, 21*
31:*9, 19*  38:*14*  41:*11*
96:*5*  127:*18*  129:*17,
22*  162:*7*  163:*7*
166:*13, 21*  167:*18*
172:*9*  173:*11, 15, 25*
174:*7*  177:*9, 11, 24*
181:*8*  185:*25*  186:*2*
187:*11, 14, 18*  189:*7,
11, 21, 22*  191:*4*
196:*4, 7, 14, 18, 19*
220:*24*  221:*2, 10*
222:*8*

**memo**  138:*17, 20*

**memory**  49:*3*  99:*5*
129:*25*  198:*14*

**mentioned**  29:*14*
37:*23*  73:*4*  102:*17*
164:*24*  172:*7*  173:*10*

**merger**  178:*25*

**mergers**  95:*16*  178:*7,
11, 14*

**message**  27:*7*  209:*3*

**met**  7:*7*

**metrics**  179:*23*
180:*4, 6, 8, 21*  181:*7*
185:*6, 16*

**Michael**  2:*8*  4:*16*
51:*9*  70:*6*  98:*25*

**Michael.cioffi@blankr
ome.com**  2:*14*

**Michigan**  76:*24*

**midsummer**  199:*15*

**Mike**  11:*7, 8*  217:*22,
25*  218:*2*

**mind**  93:*22*  139:*16*

**minimum**  79:*14, 16,
22*  80:*11*  139:*1*
206:*7*

**minute**  94:*9*  206:*5*
226:*4*

**minutes**  44:*16, 18, 21,
23*  45:*1*  46:*7, 19*
47:*7, 20*  49:*12, 22*
50:*9, 23*  51:*5, 10, 13,
18*  52:*5, 8*  53:*5, 6, 16,
21*  55:*7, 10, 18*  56:*3,
4, 7, 10, 11*  57:*5, 14*
58:*19*  59:*5*  60:*20*
62:*15*  64:*9, 15, 23, 25*
65:*4*  84:*25*  85:*18, 21,
23, 25*  86:*3*  88:*2*
91:*24*  93:*12*  94:*3*
99:*1*  110:*21*  111:*14*
112:*21*  114:*4, 7, 9, 17*
115:*18*  117:*2*  119:*10,
15*  120:*12*  122:*4, 22*
123:*19*  125:*7*  133:*9,
15, 16*  156:*12*  168:*1*

**mirror**  201:*16*

**mirrors**  201:*14*

**Mischaracterizes**
38:*12*  215:*6*  216:*1*

**mischaracterizing**
143:*21*

**Misrepresentation**
206:*18*

**Misrepresents**  205:*4,
11*

**missing**  49:*15*  50:*7*
53:*14*  198:*4*

**misspoke**  117:*5*

**misstates**  35:*23*
215:*25*  222:*14*

**model**  124:*23*
200:*11, 19*  201:*6, 13*

**modestly**  168:*19*

**money**  177:*2*

**months**  77:*10*  79:*11*
81:*19*

**morning**  162:*24*
190:*1*

**mortgage**  219:*4*

**mouth**  223:*2*

**Move**  8:*10*  178:*1*

Case: 1:21-cv-00238-MRB Doc #: 66-6 Filed: 08/02/24 Page: 84 of 96 PAGEID #: 3093
Deposition of Gary R. Heminger
Philip R. McHugh v. Fifth Third Bancorp, et al.

179:*16*, *18*
**movement** 22:*24*
**multiple** 163:*16*

**< N >**
**name** 5:*6* 10:*23*
 11:*7* 199:22 210:*11*,
 *25* 211:*21*, *24*
**named** 165:*3*, *6*, *8*
 166:*5*, *7*
**naming** 78:*18* 211:*15*
**narrow** 81:*3*
**narrowed** 87:*19*
**National** 11:*21* 12:*6*
 115:*18* 116:*13*, *19*
 119:*10*, *16* 122:*3*
 123:*4*, *11* 125:*7*, *11*
 156:*11*
**navigate** 151:*7*, *18*
**Navigating** 203:2
**near** 171:*1* 186:*13*
**necessarily** 17:*19*
**necessary** 77:*12*
 186:*21*
**need** 5:*17*, *20* 38:*24*
 48:*19* 51:20 56:*9*, *12*
 77:*7* 114:*6* 127:*1*
 135:*5*, *9* 225:23
**needed** 76:*20* 185:*7*,
 *8*, *17*, *19* 218:22
**needs** 137:*5*, *11*, *16*,
 *19* 208:*8*
**negatives** 179:*1*
**negotiate** 89:*10*
**neither** 228:*13*
**Networks** 202:*21*
**never** 154:*21*, *22*
 175:25 185:*4*
**new** 78:*18* 106:*19*
 150:*12* 183:*19*
 189:*15*, *16* 219:22
**nice** 217:*24*
**No._____Change**
 230:2, *5*, *8*, *11*, *14*, *17*,
 *20* 231:2, *5*, *8*, *11*, *14*,
 *17*, *20*
**No._____Line** 230:2,
 *5*, *8*, *11*, *14*, *17*, *20*
 231:2, *5*, *8*, *11*, *14*, *17*,

20
**nodding** 5:*20*
**non-traditional**
 175:*10*
**Northstar** 179:*23*
**Notaries** 1:*23*
**notary** 228:5, *25*
**note** 8:*23* 9:*6* 51:*8*
 124:*24* 181:*19*
**noted** 134:*11* 178:*8*
 180:*3* 182:25 184:*14*
 194:*21*
**Notice** 1:*14*
**noting** 168:*17*
**November** 40:*17*
**novo** 184:*16*
**number** 29:*15* 40:*3*
 46:*5*, *14* 47:22 50:2,
 *4* 52:*3*, *24* 53:*3* 55:*5*
 56:*14*, *16*, *17*, *22* 57:*3*
 59:*7*, *15*, *25* 60:*6*, *18*
 62:*13* 63:*2*, *8*, *17*, *23*
 64:*7* 65:*8*, *14*, *21*
 66:*5*, *10* 72:*9* 73:*16*,
 *25* 74:*3* 84:*23* 85:*11*
 86:*21* 111:*12*, *25*
 112:*5*, *19* 113:*13*, *19*
 114:*15* 115:*2*, *6*, *16*
 116:*1*, *5*, *10*, *25* 118:*9*,
 *18*, *24* 119:*8*, *12*, *22*
 120:*10*, *14* 121:*13*, *18*
 122:*1*, *10*, *23* 123:*2*, *8*,
 *17* 124:*2*, *17* 125:*5*,
 *22*, *25* 128:20 132:*7*,
 *8*, *16*, *23* 134:*2*
 135:22 138:*15* 140:*5*
 156:*14*, *24* 157:*4*, *14*
 158:*9*, *12* 159:*10*, *13*,
 *21*, *24* 161:*13* 167:22
 175:*3* 194:*13* 200:*4*
 213:*17* 214:2 219:*16*
 220:*18*, *24* 221:*2*, *10*
 222:*10* 223:*18*, *25*
**numbered** 194:*12*
**numbering** 50:*8*
 191:*13*
**numbers** 55:*12*, *18*,
 *24* 140:8 181:*5*
 191:*13* 224:*4*, *5*, *11*

**< O >**
**oath** 229:*15*
**object** 8:2
**objecting** 8:*12*
**Objection** 7:*13* 8:*10*,
 *24* 9:*3* 12:25 16:*14*
 20:*5*, *13* 21:*15* 23:*6*,
 *23* 24:*8*, *14* 27:*12*, *18*
 28:*21* 29:*24* 30:*7*, *21*
 31:*12* 33:*4* 35:*23*
 36:*13* 37:*25* 38:*5*, *12*
 39:*21* 40:*11*, *19* 41:*1*
 43:*7* 45:*8* 47:*14*
 48:*23* 49:*17* 50:*14*
 51:*3* 54:*14*, *24* 55:*20*
 64:*16* 67:*7* 68:*15*
 71:*2* 73:*17* 77:*18*
 80:*17* 83:*16* 87:*16*
 88:*15* 90:*21* 91:*16*
 92:*2*, *12* 93:*21* 94:*9*
 98:*20* 99:*13* 102:*6*, *9*,
 *23* 103:*8* 107:*1*, *11*
 136:22 137:22
 140:*18* 141:*13* 142:*2*,
 *22* 143:*9*, *20* 144:*5*,
 *16*, *22* 145:*18* 146:*10*
 147:*13* 149:*5*, *25*
 150:22 151:20 152:*9*,
 *19* 153:*7* 154:*3*, *18*
 155:*3* 158:*21* 162:*9*,
 *15* 163:*11* 165:*21*
 167:*8*, *12* 169:*1*, *21*
 170:*7*, *18* 171:*11*, *22*
 173:*3*, *17* 174:*8*, *20*
 175:22 176:*12*, *22*
 177:*14* 178:*18*
 179:*10*, *16* 180:*10*
 182:5 183:*10*, *25*
 186:5 187:*15* 190:*8*,
 *17* 193:*2*, *8* 195:*16*
 196:*9* 197:*7*, *15*
 198:*24* 199:*2*, *9*, *19*
 200:*23* 201:*9*, *18*
 203:*10* 204:*10*, *21*
 205:*3*, *10*, *15*, *16*
 206:*18* 209:25 210:*5*,
 *15*, *21* 211:*4*, *17*
 212:*1*, *7* 215:*5*, *18*, *25*

 217:*16* 221:*5* 222:*14*,
 *25* 225:*7*
**objections** 170:*23*
 199:*3*
**objective** 102:*19*
 103:*6*, *13*, *14*, *18*
 106:*11* 107:*5*, *8*, *19*
 140:*12*, *21* 141:*1*, *7*,
 *20*, *22* 142:*6*, *12*, *14*,
 *20* 143:*4*, *14* 144:*2*, *8*,
 *25* 145:*13*, *24* 146:*7*,
 *23* 147:*7*, *25* 148:*8*,
 *18* 149:*3*, *7*, *18* 150:2,
 *16* 151:*4*, *15* 152:*5*
 168:*24* 176:*9* 178:*15*
 180:*8*, *21* 182:*2*, *7*
 183:*7* 184:*24* 188:*18*
 195:*6* 208:*13* 222:*17*
**objectives** 180:*22*
 186:*13* 209:*7*
**observation** 38:*14*
 102:*12* 148:*25*
**observations** 82:*12*
 103:*9*, *13*, *14*, *15*
 107:22 141:*2* 161:22
**observe** 14:*18*, *19*
 15:*24* 18:*9* 30:*5*, *12*,
 *14*, *17* 37:*21* 50:*15*
 69:*10* 72:*7* 95:*10*, *11*
 98:*11* 102:*14* 168:*24*
 171:*25*
**observed** 34:*22*, *23*
 35:*17* 36:*3*, *17* 38:*16*
 81:*6* 97:*14* 100:*9*, *12*
 101:*13* 151:*14* 174:2
 189:*23* 225:*15*
**observing** 34:*25*
 36:*4*, *7*, *19* 78:*21*
**obvious** 145:*7* 146:*25*
**Obviously** 32:*5* 51:*9*
**OCC** 181:*18* 194:*21*
**occur** 65:*6* 76:*24*
 77:*1*
**occurred** 56:*20* 100:*7*
**October** 13:*18*
 157:*18*
**offer** 229:*14*
**offered** 154:*7*
**office** 41:*21*, *22*
 64:*24* 228:*19*

**officer** 86:*9*, *19* 88:*4*
89:*9*, *16*, *19* 92:*1*, *5*
95:*24* 126:*2*, *14*
130:*14* 208:7

**officer/CEO** 90:*1*

**officers** 84:*12* 87:*5*
88:*11*, *14* 90:*9* 93:*15*
95:*19* 165:*10*

**official** 228:*19*

**Oh** 7:*1* 13:*22* 28:*23*
39:*1* 76:*11* 105:*15*
166:*20* 175:*6* 219:*13*

**OHIO** 1:*3*, *20*, *23*
2:*6*, *13* 4:*5* 6:*5*
11:*13* 76:*22* 77:*11*
228:*2*, *6*, *19*, *25*

**Oil** 10:*12*

**Okay** 10:*17* 11:*24*
12:*2* 22:*6*, *15* 68:*12*
74:*10* 81:*21* 93:*8*, *9*
105:*8* 113:*18* 131:*16*
139:*2* 161:*12* 167:*14*,
*24* 192:*22* 198:*19*
205:*18* 206:*8* 212:*12*
213:*8*, *20*

**old** 183:*20*

**Oliver** 164:*11*, *21*
172:*17*

**once** 127:*12* 162:*19*

**one-on-one** 19:*3*

**ones** 219:*20*

**ongoing** 209:*14*

**open** 51:*16*, *20*
160:*14*, *18*, *19* 209:*13*
216:*13*

**operating** 76:*12*
96:*15*

**operations** 95:*6*, *9*, *15*
96:*19* 101:*23* 176:*18*

**operator** 96:*24*, *25*
97:*1*

**opinion** 92:*16* 99:*24*
100:*24* 101:*11*
102:*15* 136:*25* 141:*6*,
*23* 142:*3*, *9*, *10* 143:*3*,
*18* 145:*23* 146:*6*
152:*23* 177:*25* 186:*3*
195:*21* 198:*3* 225:*10*

**opinions** 108:*9*, *12*
150:*15*

**opportunities** 86:*11*
88:*6* 183:*4*

**opportunity** 168:*24*
189:*21* 196:*14*

**opposed** 52:*8* 159:*3*

**optimization** 145:*4*,
*16* 146:*3* 147:*11*
148:*14*

**order** 48:*19* 56:*9*
76:*1* 199:*17*

**organic** 145:*3*, *15*
146:*2* 147:*10* 148:*14*

**organization** 167:*4*
171:*5* 184:*12*, *20*

**organizational**
159:*14* 171:*4* 196:*22*
208:*24*

**organizations** 96:*14*
98:*11*, *14*

**ought** 164:*19* 172:*18*

**outgoing** 14:*6*, *10*
165:*9*

**outline** 145:*3*, *15*
146:*2* 147:*10* 148:*13*

**outlined** 135:*25*

**Outlook** 178:*2*, *8*

**outperforming** 104:*17*

**outside** 10:*12*, *19*
11:*2* 14:*20* 18:*8*, *11*
19:*19*, *23* 20:*17*
23:*17*, *21* 24:*9*, *15*, *16*,
*23* 25:*10* 26:*5* 27:*13*,
*19*, *23* 28:*5*, *18* 29:*7*,
*19* 30:*2*, *9*, *16*, *22*, *23*
31:*4*, *7*, *8*, *20* 34:*12*
35:*9* 78:*8* 106:*21*
107:*12*, *24* 112:*8*
127:*10* 148:*25*
149:*19* 150:*15* 155:*4*,
*22* 176:*6* 189:*17*
198:*3*, *6*, *11*, *22*
225:*19*, *21*

**outstanding** 38:*19*
181:*3* 189:*15*

**overall** 192:*20* 195:*5*

**overview** 168:*12*
220:*14*

**overwhelming** 136:*1*,
*14*

**< P >**

**p.m** 82:*25* 83:*2*, *3*, *4*
105:*18*, *20*, *21*, *22*
135:*11*, *12*, *13*, *14*
160:*4*, *6*, *7*, *8*, *22*, *24*,
*25* 161:*1* 212:*13*, *15*,
*16*, *17* 226:*5*, *7*, *8*, *9*,
*19* 227:*9*

**package** 97:*6* 175:*1*

**PAGE** 3:*3* 46:*14*
49:*16*, *24* 50:*2*, *3*, *4*
51:*18* 53:*9*, *10*, *11*
66:*14* 67:*4*, *8*, *9*
74:*11*, *13* 75:*7* 85:*14*
89:*5*, *7* 110:*5* 120:*17*
122:*14* 129:*1* 130:*9*
131:*18* 134:*20*, *22*, *23*
151:*25* 168:*3*, *8*
181:*12*, *16* 187:*23*
191:*16* 194:*12*
200:*17* 202:*17* 203:*1*
208:*4* 213:*19* 216:*17*
220:*7* 221:*16*, *18*
230:*2*, *5*, *8*, *11*, *14*, *17*,
*20* 231:*2*, *5*, *8*, *11*, *14*,
*17*, *20*

**pages** 49:*15* 50:*7*
53:*14* 57:*15* 67:*9*
68:*13*, *16* 83:*14*, *24*
86:*21* 88:*11* 91:*5*, *11*
130:*2*

**paid** 42:*15*

**pandemic** 118:*4*

**paragraph** 56:*15*, *18*
86:*7* 89:*22* 127:*16*
131:*18*, *19* 134:*8*, *10*,
*11*, *22* 175:*3*, *5* 178:*1*
179:*18* 182:*18*
184:*10* 186:*9* 187:*24*
194:*19*

**parallel** 93:*17*, *23*

**part** 7:*16* 13:*11*
16:*12* 20:*14* 29:*14*
35:*6* 70:*24* 71:*13*
73:*18* 74:*2* 131:*1*
139:*11* 140:*7* 163:*4*
176:*8* 180:*6* 181:*24*
182:*1* 183:*6* 185:*9*

186:*23* 189:*20*
207:*22* 209:*15*

**particular** 67:*8*, *9*, *20*
68:*21* 71:*16* 72:*6*
73:*12*, *24* 76:*23*
94:*22* 100:*2*, *21*
101:*16* 118:*14*
158:*17* 168:*25* 188:*4*
225:*21*

**particularly** 16:*10*

**parties** 141:*2* 228:*14*

**parts** 103:*4* 169:*15*
197:*1* 220:*4* 223:*12*,
*13*

**Pas@sspfirm.com** 2:*7*

**passion** 38:*19* 79:*19*

**passionate** 182:*14*
209:*3*

**Patterson** 2:*5*

**Paula** 191:*7*

**Payments** 132:*21*

**pecking** 185:*21*

**peer** 184:*15* 196:*21*

**peers** 180:*14*, *15*

**PENALTY** 229:*5*, *6*

**pending** 4:*4* 160:*12*

**people** 11:*8* 32:*20*
36:*16* 60:*11* 63:*14*
70:*4* 73:*3* 74:*15*
102:*21* 112:*12*
116:*17* 165:*14*
183:*19* 189:*4* 191:*5*
222:*2*, *3*, *10*, *12*, *17*, *23*

**perfect** 195:*23*

**perfectly** 24:*12*

**perform** 80:*7* 95:*12*
185:*8*

**performance** 19:*25*
24:*6* 25:*3* 67:*19*
82:*14* 84:*2* 86:*6*, *8*,
*19* 88:*4* 91:*10* 96:*3*,
*5*, *14* 98:*2*, *7*, *9* 99:*22*
100:*8*, *14*, *24* 101:*16*,
*19*, *20* 102:*4*, *14*
109:*3* 110:*8* 148:*24*
162:*21* 180:*3* 192:*20*
208:*21*

**performed** 100:*25*
109:*23*, *25* 161:*24*

Deposition of Gary R. Heminger                                        Philip R. McHugh v. Fifth Third Bancorp, et al.

**performing** 98:*12*
104:*6* 161:*25* 172:*25*
**period** 18:*22* 23:*3*
35:*12* 36:*10* 40:*4*
75:*2* 76:*12*, *15* 78:*20*
79:*7*, *8*, *11* 81:*13*, *15*,
*16*, *17* 96:*19* 103:*22*
117:*24* 121:*5* 163:*22*
165:*13* 194:*6* 224:*18*
225:*17*
**perjury** 205:*13*
229:*5*, *6*
**perseveres** 209:*8*
**person** 34:*10* 38:*9*
77:*8* 81:*8*, *12* 82:*15*
95:*21* 123:*22* 128:*13*
155:*11* 156:*18*
161:*24* 162:*1*, *4*
165:*9* 205:*2* 213:*24*
223:*8*
**personal** 134:*14*
141:*18*, *23* 142:*3*, *9*,
*10*, *17* 203:*1*
**personally** 4:*18*
**pertain** 171:*5*
**pertaining** 128:*23*
155:*17*
**Peter** 2:*1* 4:*12*
**Petroleum** 6:*20* 7:*4*
9:*15*, *20* 10:*15*, *16*, *18*
11:*3* 32:*15*
**pharmaceuticals**
201:*23*
**Pheasant** 6:*4*
**Phenise** 2:*17* 4:*22*
**Phil** 18:*15*, *18*, *21*
19:*1*, *7*, *21*, *24* 20:*3*,
*10* 21:*5*, *9*, *23* 23:*1*, *4*,
*11*, *16*, *20* 24:*3*, *6*, *23*
25:*2*, *3*, *7*, *12*, *17*, *23*
138:*25* 139:*19*
140:*14* 141:*10*, *25*
143:*6* 144:*3*, *14*
145:*2*, *14* 146:*1*
147:*9* 148:*20* 149:*9*,
*20* 150:*4*, *18* 151:*6*,
*17* 152:*6* 166:*5*
171:*3* 203:*23* 204:*5*

**PHILIP** 1:*7* 2:*14*
4:*6*, *13*, *15* 17:*22*, *23*,
*25* 18:*2*, *9*, *12* 229:*3*
**Phone** 2:*7*, *13* 18:*16*
21:*1* 26:*6*, *7*, *10*, *15*,
*20* 117:*25* 118:*3*
121:*8*
**piece** 219:*5*
**pitfalls** 196:*1*
**Pittsburgh** 11:*13*
**Place** 1:*14* 6:*4* 45:*2*
46:*21* 77:*23* 78:*3*
81:*15* 86:*4* 114:*19*
118:*5* 122:*6* 125:*11*
150:*13* 161:*17* 162:*7*
201:*4* 209:*9* 228:*10*
**placed** 37:*5*
**Plaintiff** 1:*8*, *14* 2:*1*
4:*6*, *13*, *15* 123:*13*
167:*22*
**Plaintiff's** 3:*8*, *9*, *10*,
*11*, *12*, *14*, *15*, *16*, *17*,
*18*, *19*, *20*, *21*, *22* 46:*1*
51:*24* 55:*1* 56:*24*
58:*22* 60:*14* 62:*9*
64:*3* 66:*1* 84:*19*
111:*8* 112:*15* 114:*11*
115:*12* 116:*21* 119:*4*
120:*6* 121:*22* 125:*1*
128:*16* 132:*1* 138:*11*
140:*1* 156:*6* 157:*10*
159:*6*
**plan** 13:*10*, *13* 66:*8*
68:*24* 69:*16* 70:*9*, *14*,
*21* 71:*1*, *15*, *22* 72:*22*
98:*13*, *18* 99:*22*
168:*12* 171:*3* 194:*17*,
*21*, *22*, *25* 195:*5*
213:*2* 220:*14*, *16*, *20*,
*22* 221:*23* 222:*1*, *24*
**planner** 182:*10*
**planning** 14:*21*
17:*10*, *13* 22:*17*
29:*16* 32:*12* 33:*18*
37:*20*, *23*, *24* 67:*18*
69:*8* 71:*20*, *25* 78:*23*
83:*9* 86:*11* 88:*6*
90:*9* 110:*13*, *19*
116:*7* 124:*8* 126:*2*,
*13* 127:*18* 131:*9*

157:*6* 161:*6*, *18*
163:*3* 171:*18* 181:*18*,
*22* 190:*15* 191:*10*
225:*2*
**plans** 187:*25*
**platform** 95:*8* 104:*2*
188:*11*
**platforms** 27:*2*
38:*18* 103:*25* 141:*5*
164:*13*
**play** 16:*5* 69:*22*
71:*24*
**please** 5:*6*, *13*, *17*
6:*3* 17:*1* 20:*15*
21:*20* 24:*19* 28:*1*
29:*2* 31:*14* 45:*16*
46:*6* 47:*19* 52:*4*
55:*6* 57:*4* 59:*4*
60:*19* 62:*14* 64:*8*
67:*14* 71:*10* 74:*12*
83:*17*, *22* 84:*24*
93:*25* 99:*11*, *12*
111:*13* 112:*20*
114:*16* 115:*17* 117:*1*
119:*9* 120:*11* 122:*2*
123:*18* 124:*14* 125:*6*
128:*21* 130:*11* 132:*9*,
*17* 133:*7* 134:*21*
138:*16* 148:*6* 153:*11*
155:*8* 157:*15* 159:*11*
167:*23* 179:*19*
182:*18*, *19* 185:*13*
186:*9* 187:*23* 194:*19*
198:*15* 199:*4* 200:*18*
205:*6*, *8* 207:*1*, *15*, *17*
208:*4* 221:*14*
**plural** 93:*14*
**PNC** 2:*12*
**point** 36:*2* 51:*8*
137:*8* 138:*24* 148:*16*
160:*10* 176:*25*
177:*18* 182:*17*
189:*20* 190:*5* 196:*4*
197:*3* 204:*17* 215:*16*,
*19* 224:*15* 226:*17*
**pointed** 105:*3*
**pointing** 216:*22*
**points** 48:*8*
**policies** 15:*14*
**policy** 79:*4* 225:*13*

**polished** 99:*24* 100:*3*,
*8*, *15*
**political** 168:*15*
**Poole** 2:*17* 4:*22*
**population** 168:*17*, *19*
169:*4* 170:*12*
**portal** 41:*16*
**portion** 44:*12* 68:*14*
89:*2* 218:*24* 219:*2*
**posed** 175:*12*
**position** 9:*17*, *19*
32:*3*, *22* 47:*12* 48:*1*,
*16*, *22* 50:*12* 53:*19*
57:*19* 60:*2* 61:*15*, *21*
63:*5*, *19* 65:*10* 77:*9*
90:*1* 95:*24* 112:*2*
113:*9* 115:*8* 118:*12*
119:*19* 152:*25*
160:*20* 185:*22*
192:*10* 209:*10*
215:*14*
**positions** 33:*21*
83:*10* 128:*7* 191:*17*
216:*23*
**positive** 136:*13*, *19*
**positives** 138:*5*, *8*
179:*1* 196:*1*
**possess** 151:*12*
190:*13* 210:*4*, *7*
**possessed** 148:*13*
195:*20* 211:*8*
**possesses** 180:*24*
**possessing** 145:*3*, *15*
146:*1* 147:*9* 209:*22*
**possible** 34:*5* 74:*17*
90:*12* 126:*14* 199:*25*
**possibly** 75:*19*, *20*
167:*1*
**post** 117:*17*, *19*
**potential** 22:*23*
37:*22* 82:*1*, *14* 83:*10*
84:*2*, *4*, *5*, *14* 89:*10*,
*12*, *24* 90:*12*, *15* 91:*9*,
*12*, *20* 92:*6* 93:*10*
94:*22*, *25* 96:*6*, *10*
97:*17* 179:*15* 191:*17*
199:*25* 216:*23*
**potentials** 191:*25*
**PowerPoint** 72:*16*

**PPG** 11:*13* 32:*15*
**practical** 45:4, *17*
**predetermined** 12:*11*
**preface** 24:*9*
**preliminary** 13:*17*
182:*21*
**prepare** 7:5 38:22
39:2
**prepared** 39:*11*
69:*11, 19, 20, 21* 76:5,
*6* 86:*1* 159:*23, 25*
160:*1* 220:*16, 21*
222:*1, 13*
**prepares** 69:*15, 18*
**preparing** 10:5
34:*21* 69:22 70:2
221:*3*
**prescribed** 216:7
**Present** 2:*14* 4:9
46:25 59:*19* 62:*17*
104:*14* 113:24
115:*20* 118:*15*
123:*21* 125:*15* 141:4
149:*15* 150:9 172:5
176:9 178:*15, 22*
180:*23* 182:2 183:7,
*18* 184:*23* 185:5
186:*24* 188:*18*
193:*21, 22* 195:6, *8*
196:*20*
**presentation** 34:*13*
50:*20* 51:*1* 54:*12*
88:9, *19* 93:9 96:*13*
97:*19, 21* 100:*12*
104:*10, 12* 113:25
119:*1* 120:*3* 141:7
143:*18* 146:5, *6, 9*
148:8, *11, 12* 161:*24*
166:22 167:5 168:*23*
169:5 171:2, *9, 10, 14*
173:7 175:*17* 176:8,
*15* 178:*14* 179:7
180:7 181:7, *23, 25*
182:*1, 7* 183:6
186:*24* 189:6, *24*
190:*15* 192:*23*
194:*15, 16* 195:*11*
**presentations** 30:*15*
38:*16* 51:5 78:*24*
97:*10, 14* 104:7, *9*

106:*14, 21* 107:*13*
112:*13* 113:*21*
116:*11, 17* 123:3, *10*
141:2, *6, 19* 143:*12,
15, 16* 144:7, *8, 9*
145:6, *9, 12, 23*
146:*23* 147:3, *6, 17,
20, 25* 148:2, *7, 22, 25*
149:*13, 19* 150:8, *16*
151:9, *10, 12, 14*
158:*4* 162:8 163:6,
*10, 16, 19* 164:*11*
166:*13, 15, 18, 20*
167:*1, 7, 15, 19*
170:*25* 172:*1* 173:*1,
11* 192:*25* 193:*11, 13,
17* 224:4
**presented** 26:*14*
39:8 54:22 60:*11*
63:*14* 67:22 70:*11*
72:*16, 17* 82:8, *11*
83:8 87:*18* 112:6
147:*1* 148:*12* 172:*11*
178:*24* 185:5 190:*1*
194:22 203:7 207:*20*
217:7 222:*11, 17*
224:9, *11, 16*
**presenter** 54:9 72:*12,
14* 181:*3*
**presenters** 42:*3*
53:*23* 54:*1, 19* 57:*23*
58:*1, 4* 60:7 62:*1, 6*
63:9, *24* 65:*15, 23*
72:*12, 14* 113:*14, 20*
116:*11* 118:*19*
119:*23* 120:*3* 121:*14,
19* 123:9
**presenting** 19:5 82:9
87:*15* 171:6 173:6
188:*16* 222:*12*
**preserve** 51:*23*
**preserving** 51:*16*
**preside** 41:*3*
**presided** 40:*3, 9, 18,
25* 41:7 47:2 58:*10*
59:22 61:*10* 62:*20*
85:8 111:*18* 113:*1*
114:*24* 115:*23* 118:7
121:*10* 123:*24*
125:*18* 156:*21*

**president** 16:6, *13, 19*
17:*10, 13* 20:4, *11*
21:5, *10, 24* 22:22
23:*1* 25:7 27:*11, 17*
28:7, *12, 19* 29:9, 22
31:*11, 22* 32:*10*
33:*23* 34:*1, 8* 35:*14,
20* 36:6, *18, 23* 37:*1,
6, 12, 16* 38:*10* 43:5,
19, 23* 44:*1* 45:23
47:*12* 48:*1, 17, 22*
50:*12* 53:*19* 57:*19*
60:*3* 61:*15, 21* 63:5,
19* 65:*11* 71:20, 25
74:*3* 75:5 94:*23*
111:*1* 112:*3* 113:*10*
115:9 116:8 118:*12*
119:*19* 124:7, *19, 22*
126:*1, 14* 128:6
130:*13* 132:*20*
134:*15* 139:24
154:*12, 16* 156:*3*
157:*1, 6, 17, 21, 25*
158:5, *18* 159:*15*
177:*19* 179:9 183:24
184:6 187:8, *21*
191:*20* 192:*3* 197:*14*
204:*19* 210:*11* 211:*1,
12, 16, 22, 25* 216:24
**presides** 39:*13*
**presiding** 39:*20*
**pressure** 197:*21*
**presumably** 113:*23*
134:*1, 6*
**pretty** 32:24 97:*15*
201:*3, 12, 13* 225:*23*
**previous** 8:6
**previously** 61:7
84:*15* 125:*15* 140:6
**pride** 224:7
**primarily** 186:*20*
**primary** 14:*17* 180:*1*
**prior** 8:*19* 10:*10*
17:*21* 18:*23, 25* 19:6
20:9 21:*3, 10, 22*
23:9 25:25 26:*4, 11*
27:7, *9, 14* 28:25
29:5 30:*11* 31:2, 7,
*18* 45:7 67:*24* 68:*1*
78:*13* 126:*12, 18*

157:*23* 191:*1* 193:*25*
204:*14* 205:*3, 4, 10,
11, 12*
**priorities** 69:7 86:*11*
90:*16* 95:2 110:*14*
136:*18* 182:*21*
**priority** 76:*1*
**privilege** 8:*17*
**privileged** 7:*24*
**probable** 178:*12*
**Probably** 7:*3* 12:*13*
17:2 79:*14* 100:*10*
135:7 163:*18* 219:4
225:2, *3*
**problems** 5:*15*
**proceed** 51:9
**proceeded** 182:*20*
**process** 7:*16* 9:22
16:5, *12* 22:*18* 32:2,
9, *11, 12, 13, 15, 17*
33:5 34:*1* 37:*18*
64:*14* 71:25 78:*21*
79:6 80:*14, 23* 81:*1*
131:*21* 136:*15* 161:6,
15* 162:6, 22* 163:*21*
173:*10* 181:*18* 200:7
209:*15* 224:5
**produced** 49:*11*
51:*18* 160:*16*
**product** 7:*17*
**professional** 17:*24*
23:*14* 26:2, *12*
**profile** 127:*20, 25*
128:2, *3, 24* 129:*12,
15* 130:*15, 22* 131:*1,
4, 7* 134:*12* 138:*19*
140:6 199:*13* 200:*13,
15* 201:*16, 22, 25*
216:*19*
**profiles** 214:*1*
**profit** 109:*10, 14, 21*
**progress** 51:*12*
137:*17* 160:*12*
179:22, *24* 226:*13, 16*
**projects** 209:*3*
**prolonged** 224:*21*
**prompting** 153:*3*
**pronoun** 83:*19*
**proposed** 86:8, *19*

Deposition of Gary R. Heminger                                                Philip R. McHugh v. Fifth Third Bancorp, et al.

88:3
**proposition** 186:16
**provide** 99:9 198:11
206:19 219:15, 17, 22,
25 220:25
**provided** 41:11
51:11 70:24 71:14,
21 73:13, 15, 25 74:2
82:16, 18 86:20 89:1
132:11, 19 141:3
168:11 169:3 213:14
219:21 220:13
**provides** 41:19
**providing** 87:1
**proxy** 165:4, 7, 8, 14
166:6 180:15
**public** 11:12 13:7, 8
228:5, 25
**Public-State** 1:23
**pulse** 79:1
**purely** 144:21
**purpose** 131:6
157:19 160:15
**purposes** 180:17
**Pursuant** 1:14 4:18
228:12
**pursuing** 137:13
182:25
**pushes** 209:11
**put** 50:16 77:12
81:19 150:12 172:14,
15 191:2 217:2, 13
218:10 223:2
**pyramid** 81:3

**< Q >**
**qualifications** 171:20
179:8 183:24 187:7
211:2
**qualified** 228:5
**qualities** 72:3 78:19,
23 81:5, 8 100:25
101:2, 3, 14 102:16
103:20 141:4 211:8
**quality** 97:4, 5
151:13
**quarter** 12:12
**quarterly** 13:6
**quartile** 179:23
**quasi** 15:6

**question** 5:14, 24
7:19, 22 8:6 10:17
18:24 20:7, 17, 20, 21,
24 21:19 22:1, 7, 13
23:24 24:11, 18
27:20, 21, 24 28:22
29:1, 3, 25 30:10, 25
33:25 40:20 45:9, 11,
12, 14, 15 47:6, 19
48:6, 24 49:5, 18
54:8, 21 56:19 67:10
71:5, 7, 9, 10 72:12,
15, 19, 24, 25 73:1, 2,
4, 19 74:1 80:20
82:9, 12 83:17 84:8
87:17, 22 88:11
90:23 91:6 92:15
93:22, 25 94:1, 5
98:21 99:11 100:13
101:15 102:7 103:1
107:13 117:18, 22
130:24 133:20
136:23, 24 137:1
139:18 140:19, 23
141:14, 16 142:3, 24
143:1, 2 144:6
145:20 146:8, 12, 17,
20, 21 147:20 148:3
150:23 152:9, 19
153:9, 10, 19 154:4,
19 155:4 158:22, 25
170:19 174:6 199:2,
4 205:6, 8 206:25
207:6 213:5 216:2
217:17, 18 218:2, 5
221:7, 8
**questioned** 162:1
**questioning** 105:10
162:3
**questions** 5:12 31:13
51:12 91:9 95:21
103:10 104:10, 15
109:2 160:11 162:2
191:15 212:11, 19, 22
226:11
**quick** 81:3
**quickly** 174:2 185:19
**quit** 152:21, 24
**quite** 145:7 146:25

172:23
**quote** 225:18

**< R >**
**ran** 32:14
**ranked** 75:25
**rapid** 194:5
**rapidly** 179:14
187:19 189:14
**rare** 97:4
**rating** 152:2
**ratings** 213:13
**ratio** 180:1
**Raymer** 1:20 228:4,
24
**reach** 190:3
**read** 20:14, 16 24:11,
13 29:1 31:14 39:8,
10 46:24 48:5 58:2
83:17, 18 89:8 90:4
91:24 93:24 102:7, 8
105:5 107:11, 13, 14
124:23 136:20 137:3,
6, 25 138:2, 4, 6, 8
153:10 155:8 168:7
169:13 175:4 178:5
181:15 182:18 184:8
186:9 187:24 194:18
199:4, 8 203:21
205:6, 8, 9, 25 206:25
207:2 208:3, 4
223:20 226:17 229:7,
9
**readiness** 90:15
**reading** 172:11 173:2
**reads** 86:7 90:13
126:11 127:17
134:11, 24 137:11
138:24
**ready** 74:22, 23
105:13, 15
**really** 19:12 31:13,
16 38:20 78:25 79:2,
5 80:1 82:8, 12
95:10 136:17 162:3
169:13, 14 172:9
176:2 182:14 185:7,
18 188:8 224:21
**reason** 7:17 158:17
230:4, 7, 10, 13, 16, 19,

22 231:4, 7, 10, 13, 16,
19, 22
**recall** 10:23 18:14,
17, 20 19:6, 11, 12
20:10 21:3 23:2, 19,
25 24:4 25:9, 13
26:9, 17, 20, 23 27:4,
8 28:9, 13 29:12
30:3, 18 31:6, 23
33:16 35:15 37:8, 14
39:25 40:13 44:4, 6,
10, 11 45:25 48:18
49:1, 2, 9 56:20, 23
57:8, 13, 16 61:19, 24
63:16, 17, 22, 23 64:2
71:16 73:11, 23 74:5
77:15, 20, 23 78:2, 11,
12, 13 85:24 86:24
88:12, 25 89:3 98:1,
10, 16 100:5, 17, 21
105:6, 7 106:7
108:22 109:4, 6
110:18, 21 111:3, 4
117:24 118:3 120:19
121:3, 4 122:23
126:9 130:15 131:5
133:22, 24 134:1, 3, 4,
6 139:15, 18, 21, 25
143:14 149:14 156:1,
5 158:10 159:5, 18
166:6, 8 171:13
180:22 198:7 204:12
205:22, 23 215:1
223:12 224:15
**recalled** 135:19
**receive** 39:3, 6 42:19
109:7
**received** 68:3 152:1,
7 175:25
**receiving** 154:15
216:10
**recess** 42:10 83:2
105:20 135:12 160:6,
24 212:15 226:7
**recipients** 66:16
**recited** 39:12
**recognize** 51:15, 22
52:7 160:17 172:21
185:15, 18 226:14

recognized 172:*16*
**Recognizing** 49:*15*
**recollection** 124:*11*
139:*8*
**recommend** 10:*3*
43:*4* 45:*22* 139:*1*
206:*7*
**recommendation**
43:*10, 22, 25* 44:*2, 4, 7, 8, 11, 14*
**recommendations**
10:*1* 15:*25* 135:*18, 24* 136:*6* 138:*5*
176:*16*
**recommended** 11:*9*
158:*5* 172:*17* 205:*21*
**recommending** 13:*25*
**record** 4:*2, 10* 5:*6, 22* 6:*1* 20:*16* 24:*13*
42:*7, 9, 13* 45:*5, 18*
56:*12* 82:*24* 83:*1, 5, 18* 84:*9* 99:*17* 102:*8*
105:*16, 19, 23* 107:*14*
135:*10, 15* 160:*3, 5, 9, 23* 161:*2* 168:*7*
184:*8* 199:*8* 205:*9*
206:*20, 23, 25* 207:*2, 4, 18* 208:*4* 212:*9, 14, 18* 223:*1, 21* 226:*3, 6, 10, 20*
**recorded** 51:*6*
**recruit** 76:*13*
**Redundant** 38:*6*
41:*2* 90:*22* 143:*9*
147:*13* 151:*20*
**refer** 55:*12* 74:*6*
81:*21* 135:*5, 7, 21*
151:*25* 213:*17* 214:*1*
220:*5* 221:*13*
**reference** 53:*8*
104:*22* 122:*15* 180:*6*
**REFERENCED** 3:*7*
10:*7* 12:*16* 35:*19*
81:*17* 87:*8* 90:*7*
130:*16* 133:*9* 220:*18*
**references** 66:*25*
220:*19* 224:*4*
**referred** 16:*3* 68:*25*
88:*13* 89:*19* 93:*13*
215:*19*

**referring** 14:*9, 12*
18:*23* 43:*14, 18, 21*
52:*23* 68:*16* 85:*14*
86:*6, 15, 20* 89:*6, 22*
100:*20* 108:*2, 6*
110:*4, 16* 122:*14*
127:*24* 129:*18*
130:*20* 131:*15, 17*
134:*7* 151:*24* 184:*20*
213:*4, 18, 25* 223:*18*
**refers** 220:*13*
**refineries** 6:*19*
**reflect** 165:*18*
**reflected** 215:*17, 23*
**reflects** 214:*25*
**refresh** 49:*3* 129:*24*
139:*8*
**refreshes** 198:*14*
**regarding** 19:*21*
21:*4, 9, 23* 28:*18*
29:*8, 21* 30:*20* 31:*10, 21* 48:*15, 21* 50:*11*
51:*13* 61:*20* 63:*4*
71:*19* 73:*12, 24* 74:*3*
88:*11, 14* 95:*21, 22*
108:*9, 12* 110:*19*
111:*1* 113:*8* 116:*7*
118:*11* 119:*18*
120:*16* 124:*7, 19*
136:*6* 150:*15* 155:*11, 24* 156:*2* 157:*1, 6*
178:*14* 209:*13*
**regional** 168:*18*
175:*10* 178:*11*
**regular** 44:*12* 78:*16*
80:*14, 23*
**Regulation** 89:*13*
**regulators** 150:*5, 9, 19*
**regulatory** 17:*5*
**related** 126:*12, 13*
134:*12*
**relates** 74:*15*
**relating** 186:*14*
**relation** 186:*22*
**relationship** 17:*22, 25*
23:*4, 11, 13, 15* 26:*1, 2, 12* 182:*22, 24*
186:*21*
**relative** 98:*18* 99:*21*

228:*13*
**relevant** 51:*19, 21*
**rely** 142:*15*
**remain** 77:*9*
**remains** 209:*13*
**remarkable** 172:*24*
**remarking** 140:*6*
**remember** 109:*18*
161:*7* 194:*2*
**remind** 20:*23*
**reminded** 127:*18*
**reminder** 5:*11*
**reminding** 126:*11, 19*
**removal** 89:*13*
**remove** 22:*9*
**renew** 88:*15*
**renowned** 127:*8*
**repeat** 5:*14* 10:*17*
16:*16* 18:*24* 20:*24*
29:*3* 31:*15* 59:*14*
71:*9* 92:*15*
**repeating** 90:*23*
103:*10*
**repetitive** 94:*10*
**rephrase** 5:*14* 20:*7*
21:*18* 24:*18* 28:*15*
30:*25* 47:*6, 19* 68:*17*
73:*20* 80:*19* 124:*13*
**rephrased** 20:*20* 22:*7*
**replace** 35:*13, 21*
37:*1, 6* 38:*10* 43:*5*
**replacement** 9:*23*
11:*6* 33:*14* 78:*16*
127:*13*
**replacing** 21:*5, 9, 12, 13* 22:*4, 9, 11* 32:*10*
**report** 131:*22*
132:*19* 133:*2, 5, 10, 13* 135:*1, 6, 21, 22*
199:*13*
**reporter** 5:*19*
**reporting** 102:*21*
150:*14* 228:*16*
**reports** 18:*19* 25:*2*
30:*20* 31:*3* 74:*14*
137:*13* 224:*12*
**represent** 4:*17* 40:*16*
49:*11* 140:*5*
**representation** 4:*19*

**represented** 224:*6*
**representing** 159:*14*
**request** 9:*1* 51:*10*
**required** 76:*9* 78:*15*
80:*22* 181:*19* 186:*19*
187:*20* 201:*4* 209:*1*
**requirement** 102:*14*
**requirements** 150:*14*
181:*18* 194:*22* 201:*2*
**requiring** 162:*3*
**requisite** 95:*6, 13*
**reserve** 226:*15*
**residence** 6:*3, 4*
**resilience** 151:*7, 18*
203:*4*
**resistance** 209:*6*
**resolution** 89:*6, 8*
91:*7* 160:*12*
**resolutions** 89:*23*
**Resolved** 89:*9*
**respect** 6:*21* 8:*8, 22*
14:*15* 22:*4, 25* 32:*25*
33:*13, 25* 36:*10*
43:*23* 49:*12* 71:*25*
75:*15* 77:*16* 83:*9*
86:*18* 93:*2* 100:*14*
101:*4* 102:*20, 21*
106:*9, 10* 107:*4, 7, 17*
118:*14* 120:*24*
122:*21* 127:*25*
129:*21* 133:*2* 140:*10, 14* 141:*10, 25* 143:*7*
144:*3, 14* 145:*2, 14*
146:*1* 147:*9* 148:*21*
149:*9, 20* 150:*4, 18*
151:*6, 17* 161:*17*
163:*3, 21* 169:*19*
170:*4, 11* 174:*18*
175:*19* 180:*20* 181:*7*
184:*13, 15* 185:*10, 24*
186:*3, 17* 188:*5*
193:*13* 195:*3* 197:*22*
199:*18* 217:*12*
**respective** 88:*11*
109:*22*
**respectively** 89:*12*
**respects** 228:*12*
**response** 168:*21*
**responsibilities** 76:*16*

responsibility  29:*15*,
*16*  161:*13*
responsible  44:*18*
responsive  51:*21*
rest  138:*6*
restate  155:*7*
result  228:*15*
results  184:*16*
retain  10:*12*, *18*, *22*
retained  11:*3*
retire  9:*14*
retired  9:*13*, *15*
return  179:*24*, *25*
revenue  223:*10*, *15*
review  7:*10*, *15*, *20*
*10*:*13*, *19*  13:*6*, *9*, *12*,
*17*, *18*  15:*22*  22:*17*,
*18*  42:*1*  53:*16*  70:*1*
81:*25*  82:*19*  86:*6*, *8*,
*18*, *19*  88:*4*  89:*24*
90:*9*  91:*5*, *11*  93:*2*, *6*
108:*20*  110:*8*  125:*21*,
*25*  126:*23*  129:*22*
131:*22*  161:*21*  167:*3*
168:*12*  194:*24*
196:*21*, *22*  213:*11*, *14*
214:*5*, *8*, *10*  220:*14*,
*16*, *20*, *22*
reviewed  7:*14*, *21*, *25*
8:*3*, *7*, *25*  10:*5*, *6*
15:*17*  19:*8*  37:*19*
67:*24*  84:*12*  86:*8*
88:*3*  90:*7*, *13*, *20*
91:*7*, *24*  93:*15*, *18*
94:*4*  126:*21*  129:*15*
130:*25*  134:*24*
175:*12*  178:*7*  179:*22*
181:*17*  184:*11*
186:*13*, *18*  188:*1*
213:*2*  223:*10*
reviewing  84:*1*
93:*13*  109:*18*  131:*8*
166:*25*  171:*2*, *4*
223:*24*
reviews  15:*13*  41:*25*
69:*6*, *9*  225:*2*
RHR  126:*24*, *25*
127:*5*, *7*, *10*  128:*6*, *10*,
*14*, *23*  131:*21*  132:*11*,
*19*  136:*6*  139:*19*, *23*

152:*2*, *8*  199:*22*
200:*13*  204:*3*  207:*20*
208:*1*  211:*21*  213:*15*,
*16*
ridiculous  205:*15*
206:*24*
Right  5:*16*  9:*5*  22:*8*,
*12*  33:*19*  39:*17*  48:*8*
49:*22*  61:*8*  62:*21*
66:*17*, *23*  67:*2*  70:*17*
75:*10*  82:*23*  85:*6*, *9*
88:*18*  105:*8*  114:*25*
115:*1*, *24*  117:*18*
118:*6*  121:*11*  125:*16*,
*19*  129:*7*, *9*, *12*  130:*1*
132:*15*  160:*19*
184:*20*  186:*10*  192:*9*
193:*1*  194:*4*  206:*25*
213:*9*  214:*2*, *7*, *16*
221:*4*, *20*  226:*4*, *15*,
*16*
right-hand  46:*9*
rights  51:*16*, *18*, *23*
rigorous  140:*16*
141:*12*  217:*8*, *10*
rise  150:*6*, *20*
risk  15:*1*, *12*, *13*, *14*,
*15*, *16*, *17*, *18*  17:*3*, *4*,
*9*, *19*  39:*6*  89:*16*
166:*23*
risks  195:*24*
ROA  179:*25*
role  14:*15*, *17*  16:*5*,
*19*  69:*22*  71:*24*
89:*10*
roles  52:*21*  89:*16*
95:*10*
Rome  2:*11*
rooted  145:*4*, *16*
146:*3*  147:*11*  148:*14*
ROTCE  179:*25*
roughly  68:*7*, *13*
RPR  1:*20*  228:*4*, *24*
rubber  217:*9*
Rule  51:*22*  228:*17*
Run  6:*4*  25:*20*
30:*10*  45:*16*  55:*15*
81:*15*
running  76:*15*  81:*10*

runway  79:*14*, *16*, *22*
80:*4*, *10*

< S >
S/Wendy  228:*24*
Saba  2:*1*, *5*  3:*4*, *5*
4:*12*  5:*4*  7:*19*  8:*5*,
*14*, *18*  9:*2*, *5*, *8*  13:*2*
16:*17*  20:*7*, *8*, *20*, *24*
21:*2*, *17*, *21*  22:*3*
23:*8*  24:*1*, *10*, *16*, *20*,
*21*  27:*14*, *21*  28:*4*, *22*,
*24*  29:*3*, *4*  30:*1*, *4*, *8*,
*25*  31:*1*, *15*, *17*  33:*6*,
*12*, *19*, *24*  36:*9*, *21*
38:*2*, *8*, *21*  40:*5*, *15*,
*23*  41:*5*  42:*7*, *14*
43:*8*, *13*  45:*11*, *13*
46:*3*  47:*16*, *21*  48:*6*,
*12*, *25*  49:*4*, *20*  50:*18*
51:*8*  52:*1*  54:*20*
55:*3*, *22*  57:*1*  58:*25*
59:*1*  60:*16*  62:*11*
64:*5*  65:*2*  66:*3*
67:*10*, *12*  68:*17*, *18*
71:*4*, *11*  73:*20*, *21*
77:*22*  80:*19*, *21*
82:*24*  83:*6*, *21*, *23*
84:*21*  87:*21*  88:*18*,
*23*  91:*1*, *13*, *22*  92:*9*,
*13*  94:*1*, *2*, *14*  95:*1*
98:*24*  99:*3*, *7*, *15*, *18*
102:*10*, *18*  103:*1*, *5*,
*12*, *15*, *17*  105:*12*, *15*,
*24*  107:*3*, *16*  111:*10*
112:*17*  114:*13*
115:*14*  116:*23*  117:*5*,
*6*, *22*, *23*  119:*6*  120:*8*
121:*24*  123:*15*
124:*12*, *15*, *16*  125:*3*
128:*18*  132:*3*, *5*
135:*10*, *16*  136:*24*
137:*1*, *2*  138:*3*, *13*
140:*3*, *20*, *22*  141:*17*
142:*6*, *12*, *16*, *23*
143:*2*, *11*, *17*, *23*, *24*
144:*11*, *19*, *24*  145:*21*
146:*16*  147:*2*, *15*, *19*,
*23*  148:*10*  149:*6*
150:*1*, *24*  151:*1*, *3*, *23*

152:*11*, *14*  153:*1*, *9*,
*12*, *15*  154:*9*, *24*
155:*6*, *9*  156:*8*
157:*12*  158:*25*  159:*1*,
*8*  160:*3*, *10*  162:*9*, *15*
163:*11*  165:*21*  167:*8*,
*12*  169:*1*, *21*  170:*7*,
*18*, *23*  171:*11*, *22*
173:*3*, *17*  174:*8*, *13*,
*20*  175:*22*  176:*12*, *22*
177:*14*  178:*18*
179:*10*, *16*  180:*10*
182:*5*  183:*10*, *25*
186:*5*  187:*15*  190:*8*,
*17*  191:*14*  193:*2*, *8*
194:*11*  195:*16*  196:*9*
197:*7*, *15*  198:*24*
199:*9*, *19*  200:*23*
201:*9*, *18*  202:*4*
203:*10*, *20*  204:*10*, *21*
205:*3*, *10*  206:*18*, *22*
207:*3*, *14*  209:*25*
210:*5*, *15*, *21*  211:*4*,
*17*  212:*1*, *7*, *21*  215:*7*,
*15*, *20*  216:*3*  217:*19*,
*21*, *24*  218:*2*, *8*  221:*7*,
*9*  222:*21*  223:*3*, *5*, *9*
225:*20*  226:*3*, *11*
Saema  85:*15*
sake  5:*18*
salary  216:*9*
Sandy  1:*22*
sat  149:*14*  151:*10*
162:*17*  193:*10*
satisfied  203:*9*
save  229:*10*
saw  70:*12*, *19*  97:*6*,
*7*  173:*21*  176:*4*, *5*
188:*14*  189:*17*  194:*2*
218:*14*
saying  12:*23*  17:*17*
24:*15*  27:*12*, *14*  75:*8*
100:*20*  105:*6*  107:*12*
114:*1*  137:*3*  143:*21*
155:*4*  225:*18*, *25*
226:*2*
says  46:*11*  68:*23*
74:*13*  75:*13*  89:*23*
110:*7*  113:*23*  120:*17*

Deposition of Gary R. Heminger                                      Philip R. McHugh v. Fifth Third Bancorp, et al.

129:*14*  131:*20*
136:*20*  216:*23*
**schedule**  206:*5*
**school**  183:*20*
**Schramm**  62:*4*
113:*17*
**scores**  108:*21, 24*
109:*5*
**seal**  228:*19*
**second**  20:*25*  53:*10*
67:*4*  86:*7*  89:*5, 7*
91:*23*  110:*5*  126:*10*
127:*16*  131:*17*  134:*8,
10, 20*  137:*8*  213:*19*
214:*7*  216:*14*  221:*16*
**secretary**  56:*13*
64:*23*  85:*16*
**secretary's**  41:*21*
64:*24*
**section**  48:*3*  89:*13*
110:*6*  178:*3*  191:*16*
**securing**  198:*5*
**see**  17:*25*  18:*3*
22:*10*  23:*13*  32:*17,
18*  36:*7*  46:*11, 14*
48:*10*  49:*8*  50:*4*
53:*9, 11, 21*  54:*6*
56:*9, 12*  63:*7*  68:*9*
70:*10*  75:*24*  80:*5*
82:*23*  83:*14, 24*  84:*5,
9*  85:*16, 25*  86:*13*
87:*9, 12*  89:*1*  90:*2,
17*  92:*10, 17*  96:*5, 18*
97:*5, 22*  109:*9, 13*
110:*16*  112:*4*  115:*11*
122:*19*  124:*22, 24*
126:*16*  127:*22*  128:*9*
131:*13, 24*  135:*2*
137:*8, 11, 17*  139:*6*
152:*1*  157:*3*  159:*22*
164:*19*  167:*25*  168:*5*
172:*18*  177:*22*
181:*13*  191:*14, 17, 21*
192:*21*  194:*7, 11, 13*
198:*14*  202:*6, 9, 11,
15, 17, 19, 22, 24*
203:*2, 4, 18*  204:*15*
212:*24*  213:*12, 18*
214:*2, 14*  220:*8, 11*
221:*24*

**seeing**  18:*2*  68:*11*
73:*3*  109:*4, 18*
133:*22, 24*  134:*3, 4*
162:*21*
**seen**  44:*21, 23*  46:*17,
19*  57:*7*  70:*7*  74:*19*
82:*21*  85:*23*  86:*3*
133:*21*  134:*2*  139:*3*
159:*17, 18*  167:*15*
218:*11*
**select**  8:*1*  9:*22*
**selected**  7:*24*  8:*1, 2*
11:*5*  153:*24*
**selecting**  34:*7*
**selection**  8:*3*
**selective**  99:*5*  183:*4*
**sell**  188:*10*
**sends**  64:*25*  129:*14*
**sense**  93:*18*  181:*1*
**sent**  68:*1, 6, 7*
**sentence**  86:*7*  90:*2,
13*  91:*23*  94:*3, 13*
126:*10*  127:*17, 22*
131:*19*  134:*11, 24*
175:*4*  181:*15*  182:*18*
194:*18*  200:*16, 22*
206:*1, 6*  220:*10*
221:*21*
**sentences**  178:*5*
182:*19*  184:*9*
**sentiment**  190:*6*
**separate**  12:*19*  17:*4*
22:*11*  38:*3, 7*  52:*7*
158:*10*
**separately**  17:*15*
**September**  62:*16*
63:*6, 10, 20, 24*  64:*10*
65:*11, 16, 24*  112:*22*
113:*10, 15, 21*  114:*18*
115:*9*  123:*20*  124:*8,
20*  125:*8*  126:*7, 8*
133:*3, 8, 14, 25*  134:*5*
140:*13*  141:*8, 24*
143:*8*  145:*1, 25*
147:*8*  148:*19*  149:*8*
150:*3, 17*  151:*5, 16*
152:*6*  156:*4, 13*
157:*7*
**sequence**  50:*8*

**series**  5:*12*
**serious**  72:*11*
**seriously**  72:*8, 15*
**serve**  11:*11, 12*
14:*22, 24, 25*  52:*21*
**served**  11:*15, 18, 20*
15:*7*
**serves**  15:*5*
**services**  219:*17*
**serving**  77:*16*  78:*9*
**session**  12:*13, 16, 17*
29:*17*  43:*11*  44:*13,
15, 19, 22, 25*  45:*2, 6,
7, 18, 20*  56:*16, 18, 21*
110:*7, 10, 11, 15, 22*
120:*21, 25*  121:*17*
122:*15, 16*
**sessions**  12:*13, 24*
29:*20*  34:*17*  44:*16*
122:*24*  161:*23*
173:*20*
**set**  12:*23*  47:*7, 9*
49:*22*  50:*9, 23*  51:*10*
52:*8*  53:*5*  55:*18*
56:*4, 6, 10*  58:*19*
82:*13*  114:*6, 9*
173:*16*  228:*18*
**sets**  41:*23*  51:*13*
**seven**  12:*10, 14*
74:*22*  79:*14, 17, 22*
80:*4, 11*  81:*17*
**seven-plus**  74:*18, 24*
75:*10*
**Shaffer**  66:*22*  68:*6,
21*  73:*9*  86:*16*  87:*14,
17*  88:*3, 9, 17*  89:*2,
24*  90:*7*  93:*4*  94:*4*
110:*9*  126:*11, 19*
127:*17*  128:*22*  129:*6,
14*  131:*20*  134:*11*
138:*17*  191:*5, 8*
217:*14*  218:*11*
223:*24*
**Shaffer's**  32:*3*  68:*3*
**shaking**  5:*20*
**share**  174:*7, 14, 17*
177:*8, 11*  181:*10*
183:*1*  184:*14, 16*
186:*15, 18, 19*  196:*7*

**shared**  177:*23*
**she/the**  139:*2*  206:*8*
**sheet**  179:*1*  229:*1,
13*  230:*1*  231:*1*
**sheets**  86:*25*
**shelf**  194:*9*
**short**  34:*4*  35:*19, 21*
36:*11, 16, 17, 18, 22,
25*  37:*5, 11, 15*  38:*10*
81:*15*
**shoulders**  139:*17*
174:*3*
**show**  109:*1*
**showed**  203:*20*
**shows**  106:*23*  191:*20*
**side**  140:*15*  141:*11*
222:*7*
**sign**  226:*18*
**signature**  85:*15*
157:*24*
**SIGNATURE:_____**
**_____DA**
**TE**  230:*23*  231:*23*
**signed**  85:*18*  158:*3*
229:*16*
**significantly**  175:*13*
180:*4*
**signing**  158:*8*
**similar**  201:*21*
**simple**  224:*23*
**simply**  172:*11*
**simultaneous**  58:*14*
61:*4*  122:*6*
**simultaneously**  52:*16,
21*  125:*12*  140:*16*
141:*11*
**single**  101:*12*  106:*7*
107:*18*
**sir**  5:*10*  6:*2*  7:*9*
9:*4*  10:*11*  14:*11*
16:*4, 21*  18:*7*  19:*22*
20:*1*  24:*25*  25:*4, 24*
32:*1*  35:*11*  41:*18*
42:*21*  55:*9, 23*  59:*13*
60:*22*  61:*2*  64:*13, 14*
106:*8, 25*  110:*17*
111:*17, 20*  126:*17*
133:*21*  161:*8*  165:*17*
166:*17*  167:*20*  168:*6*
173:*13*  174:*11*

Deposition of Gary R. Heminger                                        Philip R. McHugh v. Fifth Third Bancorp, et al.

177:*10, 15* 180:*12*
181:*9, 11, 14* 183:*9*
184:*21* 185:*12* 186:*1,
7* 187:*1, 4, 9, 12*
188:*6, 20, 23* 189:*12*
190:*9* 191:*22, 24*
192:*11* 193:*4* 194:*14*
195:*7, 10, 15* 196:*6,
11* 200:*8* 202:*7*
206:*12* 207:*12, 13, 24*
208:*2* 209:*19* 210:*12,
17* 211:*13, 19, 23*
212:*2, 8* 213:*17*
216:*18, 21* 219:*24*
**sit** 48:*13* 61:*19*
88:*12, 24* 109:*20*
162:*20*
**situation** 76:*20* 77:*6*
98:*16* 101:*6, 18*
**situations** 77:*12*
99:*19* 100:*7* 180:*25*
**six** 12:*10, 13* 17:*2, 6*
163:*14* 165:*11, 14*
**skill** 173:*16* 222:*18*
**skills** 32:*20* 34:*11,
13, 24* 38:*19* 78:*24*
79:*25* 81:*2* 95:*7, 11,
13* 96:*14* 97:*21*
107:*9, 20* 134:*13*
146:*5, 6* 173:*8*
185:*11, 14, 24* 186:*4*
187:*19* 189:*10, 24*
190:*15, 16* 192:*19*
193:*16* 197:*12*
199:*25* 209:*12*
**slow** 135:*25*
**slower** 31:*15* 208:*8*
**smaller** 168:*19*
**Smith** 2:*4* 4:*14*
117:*4*
**social** 168:*15*
**socially** 18:*5*
**solo** 219:*15*
**solutions** 208:*14*
**Somalya** 57:*25*
85:*16* 118:*23* 119:*25*
123:*6*
**somebody** 79:*4, 22*
80:*1* 97:*5*
**soon** 160:*16*

**sorry** 6:*23* 21:*1*
39:*1* 46:*23* 54:*10*
64:*18* 74:*10* 82:*4*
92:*20* 124:*13* 127:*3*
136:*10* 162:*13*
167:*11* 174:*12* 199:*1*
208:*10* 214:*18* 225:*9*
**sort** 87:*19* 113:*25*
**sound** 40:*7* 212:*6*
**sources** 182:*23*
**southeast** 186:*20*
**SOUTHERN** 1:*3* 4:*5*
**space** 189:*3*
**span** 10:*5, 7* 32:*16*
79:*12*
**speak** 5:*17* 8:*19*
55:*20* 99:*17* 223:*1*
**speaker** 209:*3*
**speakers** 42:*4*
**speaking** 205:*15*
**speaks** 47:*14* 48:*6*
158:*23*
**specific** 7:*19, 21* 8:*8*
19:*7* 71:*18* 97:*24*
98:*1, 9, 16* 100:*1, 13*
148:*16, 19* 222:*3*
**specifically** 19:*3*
22:*25* 33:*1, 23, 25*
120:*19* 128:*25* 153:*2,
4* 161:*16* 164:*12*
175:*12* 213:*4* 224:*10*
**speculate** 51:*4*
**spell** 5:*6*
**Spence** 14:*13* 26:*1, 5,
8, 10, 16* 27:*6, 10, 16*
28:*6, 11, 18* 29:*8, 21*
30:*5, 12, 17, 20* 31:*4,
5, 10, 21* 33:*2* 34:*15,
22* 35:*12* 36:*2* 37:*2,
5* 38:*9* 43:*5, 17, 19,
20, 23* 44:*1* 54:*2*
60:*9* 62:*3* 63:*13*
65:*19* 74:*23* 75:*12*
82:*2* 90:*14, 20* 91:*25*
93:*9, 14* 94:*6* 95:*3, 4*
100:*24* 101:*1, 5, 20*
102:*16* 105:*3* 106:*12,
15, 21, 23* 108:*4, 9, 18*
109:*15, 23* 112:*9*
113:*16* 116:*14* 123:*5,

6* 126:*13* 127:*21*
128:*5, 10, 13* 131:*22*
132:*10, 19* 134:*25*
135:*19* 136:*6* 137:*4*
138:*5* 139:*9, 14*
140:*13* 141:*3, 9, 24*
143:*6* 144:*2, 13*
145:*1, 13, 25* 147:*1, 8*
148:*13, 20* 149:*8, 19*
150:*3, 18* 151:*5, 16*
152:*1* 156:*3* 157:*1,
21, 25* 158:*18* 159:*15*
163:*10* 164:*5, 24*
166:*9, 15* 168:*11*
169:*3, 8* 170:*24*
171:*9* 172:*9, 14*
173:*24* 174:*19* 175:*8,
24* 178:*7* 179:*22*
181:*10, 17* 182:*2, 20*
183:*7, 23* 184:*11, 23*
185:*9* 186:*10, 12, 24*
187:*25* 188:*3, 18*
189:*20* 190:*6* 191:*17*
192:*25* 193:*11*
194:*15, 20* 195:*5, 20*
196:*8* 197:*13, 22*
198:*23* 199:*18* 200:*7*
203:*7, 9* 207:*21*
208:*1, 5* 210:*25*
211:*12, 16, 21, 24*
215:*4, 11, 17, 24*
216:*6* 218:*10* 219:*6,
18* 220:*13, 24* 221:*22*
222:*11* 224:*4, 6, 11*
**Spence's** 30:*16*
35:*17* 101:*3, 7* 102:*3*
103:*3, 19* 104:*22*
106:*1* 107:*9, 20*
109:*24* 141:*7* 150:*15*
153:*5* 168:*23* 169:*18*
170:*4, 15* 171:*19*
173:*7, 15* 175:*17*
176:*8, 19* 178:*14*
179:*6, 8* 180:*7, 19*
181:*22* 182:*9* 187:*7*
189:*8* 190:*14* 192:*23*
193:*14* 196:*15, 20*
215:*23* 216:*19*
223:*11, 15*

**spend** 18:*5*
**spoke** 34:*17* 164:*17*
**SS** 228:*2*
**stack** 193:*23*
**stacks** 166:*1*
**Stagnaro** 2:*5*
**stamp** 46:*11* 55:*12,
18, 24* 168:*4* 217:*9*
**stamped** 57:*10* 59:*8,
16* 60:*23* 62:*24*
64:*11* 66:*11* 68:*19*
85:*11* 86:*21* 110:*5*
111:*22* 113:*4* 115:*2*
116:*1* 117:*10* 119:*12*
122:*10* 124:*2* 125:*22*
129:*2* 130:*2, 6, 9*
132:*12, 23* 134:*21*
135:*22* 140:*8* 156:*14*
158:*13*
**stamps** 52:*23*
**stand** 201:*3*
**standards** 181:*19*
208:*21*
**standing** 150:*5, 19*
**standpoint** 45:*4, 17*
224:*16*
**stands** 200:*20* 207:*6*
**start** 129:*1* 131:*9*
185:*21*
**started** 87:*18* 199:*12*
**state** 5:*5* 11:*13*
76:*22* 77:*11* 99:*23*
205:*15* 228:*2, 6, 25*
**stated** 33:*17* 91:*6*
93:*15* 94:*8, 18, 23*
99:*23* 111:*6* 114:*9*
154:*6* 200:*10* 215:*12*
219:*20*
**statement** 134:*18*
138:*21* 165:*4, 7*
179:*2* 204:*9*
**statements** 13:*7*
109:*9, 10, 13, 14, 21,
22*
**STATES** 1:*2* 4:*4*
**stating** 94:*10*
**status** 89:*14*
**steal** 164:*20*
**step** 200:*6*

**steps** 138:*23*
**stipulation** 228:*12*
**stock** 42:*18*
**stood** 185:6, *15*
**stop** 128:25 168:22
  175:*16* 178:*13*
  184:*18* 186:*23* 188:*3*
  195:*3*
**straddle** 165:*11*, *13*
**strategic** 32:*18*
  34:*10*, *23* 38:*17* 69:6,
  *7* 78:*23*, *24* 79:*24*
  96:*13*, *17* 97:*1*, *9*
  101:*8* 106:*3*, *10*
  110:*14* 140:*15*
  141:*11* 142:*1* 143:7,
  *16* 144:4, *14* 171:*3*,
  *18* 181:*17*, *22* 182:*10*,
  *21* 183:*1*, *22* 184:*12*
  186:*13*, *16* 189:*9*
  190:*14*, *15* 192:*17*, *20*
  193:*15* 194:*17*, *21*, *22*,
  *25* 195:*5*, *14* 196:*16*
  197:*12* 202:*11*
  208:*12* 221:22 222:*1*,
  *24* 225:*2*
**Strategies** 132:*21*
  209:7, *9*
**strategy** 12:*12*, *13*, *16*,
  *17*, *24* 13:*10*, *12*
  34:*17* 54:2 168:*12*
  169:*19* 220:*14*, *16*, *19*,
  *21*
**Street** 1:*20* 2:*12*
**strength** 149:*10*, *21*
**strengths** 86:*10* 88:5
  184:*11*, *19*, *22* 209:*10*,
  *13*
**stresses** 209:*9*
**strike** 8:*10* 69:*3*
  77:5 107:6 109:7
  123:*1* 158:16 179:*16*
**strong** 97:22 101:*10*
  104:22 162:*3* 184:*17*
  186:*17* 208:*5*
**structure** 200:*19*
**structured** 208:*20*
**stuck** 224:22
**subheading** 202:*14*

**subject** 97:*21*, *25*
  138:*18* 169:*13*
**subjective** 103:*12*, *16*
  208:*13*
**subjects** 168:*25*
**subordinates** 18:*19*
  25:2 30:*20* 31:*4*
**subsequent** 78:*12*, *13*
**substantial** 152:*24*
**succeed** 45:*23* 111:*1*
  139:*24*
**succeeded** 32:*6*
**succeeding** 20:*3*, *11*
  25:*7* 27:*11*, *16* 28:*7*,
  *12*, *18* 29:*8*, *21* 31:*10*,
  *21* 32:*3* 40:*2*
**succession** 10:*6*
  14:*16*, *20* 16:*6*, *8*, *12*,
  *19* 17:*10*, *13* 22:*17*
  29:*16* 32:*9*, *11* 33:*17*
  37:*20*, *23*, *24* 47:*11*,
  *25* 48:*16*, *21* 50:*11*
  53:*18* 57:*18* 60:*2*
  61:*14*, *20* 63:*4*, *18*
  65:*10* 66:*8* 67:*18*
  68:*24* 69:*8*, *16* 70:*9*,
  *14*, *21* 71:*1*, *15*, *19*, *22*,
  *25* 72:22 74:*3*, *13*, *17*
  80:*23* 83:*9* 89:*14*, *15*,
  *25* 90:*9*, *14* 91:*15*, *18*,
  *19*, *25* 92:*1*, *10*, *11*, *17*,
  *18*, *22* 93:*3*, *4*, *13*, *19*
  94:*5*, *7* 110:*12*, *19*
  112:2 113:*9* 115:8
  116:7 118:*11* 119:*18*
  120:*16*, *18*, *20* 121:*1*
  122:*18* 124:7, *19*
  126:2, 7, *12* 127:*18*
  131:*9* 157:6 161:6,
  *17* 163:*3* 191:*10*
  213:*1*
**successor** 37:*22*
  75:*15*, *21* 76:*10*
  77:*17* 78:*10* 80:*15*,
  *25* 126:*15* 131:*11*
  134:*15* 138:*25*
  139:*14* 161:*18* 163:*4*,
  *22* 203:22 204:*5*
**succinct** 172:*4*

**sudden** 87:*19*
**summarizing** 86:*24*
**summary** 83:*13*
  132:*10* 207:*19* 208:*3*
  213:*14* 223:*20*, *21*
**summed** 32:*24*
**summer** 198:*8*
  199:*11*, *14*
**sums** 95:*18*
**superior** 78:*19*, *23*
  81:*4*, *8* 97:*5* 100:*25*
  101:*2*, *3*, *7*, *8*, *13*, *20*
  102:*4*, *16*, *22* 103:*4*,
  *21* 104:*4*, *17* 105:*3*
  106:*2*, *3* 107:*9*, *20*
  140:*13* 141:*3*, *9*, *24*
  143:*6*, *15* 144:*3*, *10*,
  *13* 145:*2*, *14*, *25*
  147:*8* 148:*20* 149:*9*,
  *16*, *20* 150:*4*, *10*, *18*
  151:*6*, *13*, *17* 173:*8*
  211:*8*
**support** 144:*21*
  148:*1* 169:*5*
**Sure** 18:*25* 24:*12*, *20*
  25:*21* 45:*3* 47:*22*
  71:*12* 73:*20* 101:*8*
  104:*24* 133:*16*
  201:*11*
**surprise** 206:*16*
  207:*7*
**surprised** 139:*4*
**sustain** 136:2, *12*, *20*
  137:*5*, *6*, *9*
**sustained** 138:*1*
**sustaining** 137:*20*
**sustains** 137:*4*
**switch** 218:*19*
**sworn** 4:*11*, *25* 228:*8*
**system** 41:*14* 191:*13*

**< T >**
**table** 81:*14*
**tactical** 96:*24*, *25*
**take** 5:22 13:*25*
  38:*20* 72:*11* 77:5
  79:*12* 80:*1* 135:*9*
  137:*16* 160:*20* 162:7
  164:*19* 179:*4* 180:*24*
  199:*5*, *6* 208:*8* 224:7

**Taken** 1:*14* 5:*8*, *19*
  6:*12* 42:*10* 44:*16*
  64:*23* 83:*2* 105:*20*
  110:*21* 118:*5* 135:*12*
  160:6, *24* 212:*15*
  226:7 228:*11* 229:*2*,
  *8*
**takes** 45:2 72:8
  76:*12* 162:*17* 222:*18*
**talent** 66:*8* 67:*16*, *17*
  68:*24* 69:*1*, *7*, *16*
  70:8, *14*, *21*, *25* 71:*15*,
  *22* 72:*21* 110:*12*
  126:*10*, *22* 127:*16*
  131:*18* 134:*8* 191:*9*
  214:*1*, *10* 216:*19*
  217:*4* 218:*10*
**talk** 16:*24* 101:*2*
**talked** 101:*3* 103:*9*
  106:*9* 166:*12*, *14*
  177:*10* 190:*3*
**talking** 33:5, *10*
  38:*25* 79:*11* 87:*23*
  88:*16*, *18* 191:*3*
  206:*21* 212:*25* 213:*1*
**talks** 191:*16* 200:*12*
  201:6 202:*5*
**tangible** 179:*24*
**tapes** 212:*10*
**target** 186:*18*
**Tayfun** 35:*25*
  138:*25* 139:*19*
  203:*23* 204:*5*
**Tazun** 35:*25* 54:*3*
  60:*10* 62:*3* 63:*12*
  75:*20*, *24* 112:*10*
  113:*17* 116:*14*
**team** 14:*19* 19:*18*
  22:*24* 26:*3* 34:*24*
  35:*1* 38:*15* 42:*5*
  101:*13* 106:*7* 107:*19*
  108:*2*, *3*, *6*, *7*, *8*, *11*, *14*,
  *15*, *17*, *18* 149:*10*, *21*
  162:7 163:6 166:*14*,
  *21*, *25* 167:*19* 172:*8*
  173:*25* 174:*4* 182:*16*
  185:*15*, *18* 188:*15*
  189:22 190:*12*
  196:*18*, *19* 197:*4*

209:*21*  220:*23*  221:*1,*
*3, 11*
**technical**  143:*16*
**technological**  168:*15*
195:*2, 4, 13*
**technologies**  219:*16*
**technology**  141:*4*
166:*23*  175:*13*
196:*16*  197:*11*
**teleconference**  118:*16*
**telephone**  24:*3*
117:*14*  118:*15*
**telephonic**  163:*15*
**tell**  47:*10, 24*  48:*13*
49:*21*  50:*10, 19, 22,*
*25*  53:*4, 17, 22*  54:*1*
57:*17, 22*  58:*3*  60:*1*
61:*13, 18, 25*  62:*4, 5*
63:*3*  65:*9, 15, 18, 20*
112:*6*  113:*7, 20*
118:*10*  121:*14*
211:*11, 21, 24*
**temporary**  224:*20*
**ten**  6:*17*
**tendencies**  225:*14*
**tenure**  81:*7*  100:*11*
166:*5*  167:*15*
**term**  68:*13, 21*
108:*25*  128:*3*  197:*24*
**terminated**  152:*18,*
*21, 23*  153:*8, 12, 17,*
*18, 20*
**termination**  153:*5*
154:*25*  155:*12, 24*
**terms**  88:*24*  171:*17*
177:*18*  192:*17*
**test**  197:*21*
**testified**  98:*22*  99:*1,*
*3*  102:*23*  161:*5*
163:*4*  204:*18*  211:*9*
223:*1*
**testify**  77:*19*  98:*21,*
*24*  99:*9*
**testifying**  40:*19*  45:*9*
94:*11*  207:*23*  221:*6*
**testimony**  6:*13, 21,*
*22, 25*  7:*2*  8:*9*  13:*1*
35:*24*  38:*13*  45:*10,*
*12*  143:*21*  161:*7*
174:*19*  191:*1*  192:*24*

193:*6*  204:*14*  205:*4,*
*7, 11, 12, 24*  206:*19,*
*22*  211:*2*  215:*6, 13*
216:*1*  222:*15*
**text**  18:*16*  24:*2*  27:*7*
**Thank**  41:*10*  58:*25*
117:*10*
**thereto**  186:*14, 22*
**thing**  48:*5*  167:*18*
192:*9*
**things**  26:*13*  106:*3*
138:*1, 2*  173:*7*  185:*5*
211:*8*  219:*13*  224:*21,*
*22*
**think**  5:*14*  22:*2*
23:*24*  32:*24*  44:*24*
45:*1, 3*  82:*14*  84:*7*
93:*17*  95:*18*  101:*8*
136:*19*  165:*12*  176:*3*
183:*19*  191:*6, 7*
193:*24*  204:*5*  212:*10*
213:*9*
**thinker**  208:*13*
**thinking**  140:*15*
141:*10*  154:*5*
**THIRD**  1:*10, 14*
2:*17*  4:*7, 20, 22*
11:*12, 16, 19, 20, 21,*
*23*  12:*4, 6, 8*  13:*24*
14:*5*  18:*12*  19:*25*
20:*4, 12*  21:*6, 10, 24*
22:*22*  23:*1*  24:*7*
25:*8*  26:*3*  27:*11, 17*
28:*7, 12, 19*  29:*9, 22*
31:*11, 22, 25*  32:*9, 13,*
*25*  34:*1, 8*  35:*20*
37:*12, 17*  38:*11, 22*
39:*2*  41:*22*  42:*16*
43:*6*  46:*7, 11*  47:*8*
49:*13, 24*  50:*3, 21, 24*
52:*5, 8, 9, 13, 25*  53:*6,*
*10, 20, 24*  54:*13*  55:*7,*
*10, 13*  56:*2*  57:*5, 10,*
*13, 24*  58:*14, 18*  59:*5,*
*8, 9, 16, 17*  60:*4, 8, 12,*
*20, 23*  61:*4, 16, 22*
62:*2, 7, 15, 24*  63:*10,*
*21, 25*  64:*9, 11*  65:*12,*
*17, 23*  66:*11*  67:*5*
74:*6*  75:*5*  85:*2, 3, 12,*

*14*  89:*4*  104:*5*  109:*5,*
*10, 14*  110:*6*  111:*2,*
*14, 22, 23*  112:*21*
113:*4, 11, 15, 22*
114:*17, 20*  115:*2, 3,*
*10, 18*  116:*1, 2, 8, 12,*
*18*  117:*2, 11*  118:*12,*
*20*  119:*2, 10, 12, 15*
120:*12*  121:*15, 20*
122:*3, 7, 10, 11, 14*
123:*4, 11, 19*  124:*2, 3,*
*9, 19, 21*  125:*7, 11, 12,*
*22, 23*  127:*10, 17*
129:*2, 12*  130:*3, 6, 10,*
*13*  131:*14*  132:*12, 13,*
*21, 24*  134:*15, 21*
135:*23*  151:*25*
152:*18*  153:*22*  155:*1,*
*2, 11, 12, 23, 25*  156:*3,*
*11, 15*  157:*1, 16, 22*
158:*1, 13*  159:*15*
161:*17*  164:*17*
170:*13*  175:*11, 25*
176:*17*  180:*13*  184:*9,*
*14*  191:*9*  207:*19*
208:*7*  210:*11*  211:*1,*
*12, 16, 22, 25*  215:*1, 4,*
*24*  216:*11, 15*  218:*18,*
*19, 21*  220:*19*  221:*17*
229:*4*
**Third's**  49:*12*
168:*17*  218:*24*
**Thomas**  2:*17*  4:*20*
**thorough**  208:*19*
**thought**  7:*16*  28:*23*
97:*17*  176:*16*  179:*14*
187:*20*
**thoughtful**  208:*18*
**thoughts**  224:*19*
**threats**  164:*14*
175:*10, 12*  176:*5*
**three**  10:*6, 8, 9, 10*
35:*16*  37:*10*  70:*4*
81:*18*  99:*1*  130:*2*
184:*15*  194:*16*
195:*22*  220:*3*  224:*24*
**three-plus**  74:*24*
75:*14*  94:*24*  191:*23*
216:*24*

**Three-Year**  194:*20*
221:*22*  222:*1, 24*
**Tiffin**  9:*11*
**Tim**  26:*1*  38:*15*
43:*17, 18, 19*  82:*2*
93:*9*  97:*6*  103:*25*
104:*17*  132:*10, 19*
138:*24*  139:*3, 9, 14,*
*16*  140:*13*  141:*3, 9,*
*24*  143:*5*  144:*2*
145:*1, 25*  147:*1, 8*
148:*12, 20*  149:*8, 16,*
*19*  150:*3, 10, 15, 18*
151:*5, 16*  157:*21*
158:*4*  159:*15*  163:*15,*
*24*  164:*4, 9, 24*  166:*9*
169:*16, 24*  171:*2, 6*
172:*1, 2, 16*  174:*2*
176:*2*  177:*3, 18*
187:*18*  189:*16*
190:*21*  192:*3*  193:*23*
194:*3*  203:*13, 22*
204:*4, 18*  205:*1, 19*
206:*9*  207:*20*  208:*5*
209:*11*  210:*11, 25*
211:*7, 12, 16, 21, 24*
219:*20*  226:*2*
**Time**  1:*14*  4:*2, 9*
6:*15*  7:*2*  9:*7*  13:*14*
18:*5, 12, 22*  19:*13*
27:*14*  28:*21*  32:*16*
33:*4, 9, 10, 22*  35:*12*
36:*2, 11*  37:*9*  39:*18*
40:*4, 9, 17*  42:*8, 12*
43:*7, 8*  52:*16*  63:*15*
70:*5*  75:*2, 11*  76:*12,*
*15, 23*  77:*2*  78:*4, 6, 8,*
*11, 12, 20*  79:*7, 8, 12*
80:*6*  81:*13, 15, 16*
82:*25*  83:*4*  87:*15*
92:*3*  94:*7, 17*  96:*19*
98:*15*  100:*6*  103:*22*
105:*18, 22*  114:*19*
117:*24*  121:*5*  135:*9,*
*11, 14*  136:*17*  137:*16*
155:*6*  160:*4, 8, 10, 22*
161:*1*  163:*23*  164:*18*
165:*13*  166:*4*  171:*24*
177:*18*  189:*20*  190:*5*
191:*7*  192:*2, 7*

193:22  194:6  196:4
197:4, 19  198:15
199:15  204:17
212:13, 17  213:22, 23
214:7  215:16  217:5
219:7  225:3  226:5, 9,
12, 17, 19  228:10
**timeline**  116:7
**timelines**  47:12, 25
48:16, 22  50:12
53:18  57:19  60:2
61:15, 21  63:4, 19
65:10  89:25  90:15
112:2  113:9  115:8
118:11  119:18
**times**  12:10  17:3, 7
29:18  161:21  163:16
174:1  188:14  203:7
212:23  213:12  224:3
**timing**  111:3, 7  198:7
**Timothy**  137:11
**Tim's**  174:25  177:12
209:18  224:18
**titled**  110:6
**Today**  4:1  48:13
61:19  88:12, 25
109:20  126:21  161:5
200:21  201:3, 13, 21
211:9
**today's**  7:5  131:23
133:11
**top**  89:7  90:13
91:14, 18, 24  92:1, 11,
18, 22  93:1, 2, 4, 10,
13, 17, 19  94:5, 7
129:1  134:22  154:8,
11, 13, 16, 22  165:10
169:25  177:21
179:23  181:15  184:5,
15  185:16, 20  186:19
194:9  199:22  214:22
221:21  223:17
**topics**  26:23  27:4
**total**  49:1  223:12
**totally**  205:14
**traditional**  175:15
176:6
**tragic**  75:18
**transaction**  104:16

**transactions**  103:22
**transcript**  229:7
**transformation**  188:1,
17  189:5
**transition**  33:2
**translate**  80:3
**treasurer**  89:17
**tremendous**  38:17
95:5  182:13  189:2
193:19
**trends**  168:17
170:12  197:11
225:11
**trial**  6:13, 21, 22, 24
7:2
**trillionaire**  178:8
193:21, 24  194:9
**true**  83:13  114:1
120:24  161:9  167:18
192:9  193:25  229:10
**trust**  164:2
**truth**  228:8, 9
**try**  5:24  201:25
218:4
**trying**  13:3  51:15,
22  87:3, 7  88:7
98:10  105:1  124:23
133:11  136:16  205:7,
12  206:19, 22  223:2
**turn**  21:1  50:3  89:4
134:20  174:11
187:23  213:18
221:16
**turned**  92:19  177:3
**Turning**  130:9
**twice**  17:5  162:19
213:15
**two**  11:4, 12  12:13
13:9  41:13  57:14
94:23  109:17  132:6
146:23  162:8  182:19
191:21  192:4  212:23
213:11  216:24
**two-day**  163:17
**type**  175:25  201:24
202:1  213:10  219:16,
25
**types**  96:6
**typically**  65:6  85:25

**typo**  204:8

**< U >**
**U.S**  168:20
**uh-huh**  5:21  47:23
134:9  140:24  191:19
202:20  214:24
**uh-uhs**  5:21
**ultimately**  11:5  73:14
**unable**  178:9
**Unanimous**  157:16,
20, 23  158:8, 19, 22
159:3
**unanimously**  177:24
190:6
**unbelievable**  104:1
**undersigned**  228:4
**understand**  5:13  6:1
12:1  13:3  20:21
22:13  27:24  34:9
45:14, 15  49:5  67:10
71:5, 8, 9  87:7, 23
95:15  105:2  136:7
140:23  146:17, 21
147:4  160:20  169:11
183:18  188:25  189:2
224:14, 17
**understanding**  11:24
12:2, 3  13:20  27:1
32:8  34:15  52:11
88:8  96:16  97:8, 16
104:1, 4  106:10, 19
107:4, 7  128:5  131:6
135:4  139:13  145:8
152:17, 22  153:2, 4,
16, 21, 23  154:1, 10,
14  176:20  189:16
195:25  214:21
223:14  224:8, 22
225:12, 24  229:13
**understands**  79:2
80:1
**understood**  95:8
101:9  106:4, 12, 23
172:10  225:15
**UNITED**  1:2  4:4
**University**  9:11
**University's**  11:14
**upcoming**  13:10, 13
126:7

**update**  54:2  67:16
72:3  162:20  212:24
213:3, 22
**updated**  129:15
**updates**  66:9  68:24
69:17  70:9, 14, 21
71:1, 15, 22  72:22
126:22  214:15
**updating**  214:1
**upward**  22:23
**use**  67:18  82:5, 8, 10
128:3
**uses**  67:15
**Usually**  41:13  42:5
161:21  165:14  214:6,
9
**utilize**  67:1
**utilized**  66:7  127:20
131:21

**< V >**
**Vague**  20:5  21:15
23:6  48:24  71:6
**validate**  197:20
**value**  165:20, 25
183:2  186:15  215:1,
4, 12, 17, 23  216:7, 10
**values-based**  208:23
**variables**  195:24
**various**  10:2  76:18
88:10  106:14  141:2
149:14  160:13  163:6
164:11
**venture**  79:3  101:9
106:4, 10, 13, 16, 17,
23  164:13
**venue**  155:22
**verbally**  5:20
**verify**  224:10  225:4,
22
**verifying**  224:5
**version**  130:21, 25
**versus**  78:16  81:8
97:6  100:24  104:6
213:13
**vetted**  205:2
**vetting**  198:23  200:7
**Vice**  132:20
**video**  5:19  118:16

**Videographer** 1:22
4:*1* 42:8, *12* 82:25
83:*4* 105:*18, 22*
135:*11, 14* 160:4, *8,*
*22* 161:*1* 212:*13, 17*
226:*5, 9, 19*
**Videotaped** 1:*14*
**view** 13:*23* 149:*16*
177:*6, 23* 205:*1*
209:*21*
**vigorous** 88:*21*
**vigorously** 72:*12*
73:*5* 91:*6*
**vis-à-vis** 98:*12, 13*
**vision** 32:*18* 34:*10,*
*23* 38:*17* 78:24
79:*24* 81:*14* 96:*13,*
*17, 18, 22, 24* 97:*1, 9*
101:*9* 104:2 106:*4,*
*10* 145:*3, 15* 146:2
147:*10* 148:*13*
182:*14, 23, 24* 183:22
190:*14* 192:*17, 20*
193:*15, 20* 195:*21*
196:*16* 197:*12*
**visions** 176:*25*
**voice** 127:*1*
**vote** 65:*3* 158:2*0*
159:*4*
**vs** 1:*9* 4:*6* 229:*4*

**< W >**
**wait** 5:*23* 94:*9*
**Walnut** 1:2*0*
**want** 16:*24* 45:*5, 10,*
*17* 48:*4* 67:7, *8*
75:22 79:*13* 90:*24,*
*25* 93:24 103:*11*
105:*9, 14* 131:*13*
168:*3* 174:*5* 191:*15*
194:*10* 198:*13* 199:*5*
200:*3* 202:*1* 203:*17*
207:*13* 217:*17* 218:*3,*
*4* 221:*8*
**wanted** 177:*22*
197:2*0* 198:2
**watch** 184:*7*
**watched** 170:*1*
**watching** 146:*22*
149:*15* 151:*11*

171:*24* 174:2*4*
203:*13*
**way** 23:*10* 38:25
73:2*0* 81:2*0* 103:*19*
127:*2* 162:*4* 164:2*0*
181:*1* 183:*17, 20*
210:*13* 223:*6*
**ways** 106:*1*
**weaknesses** 184:*12,*
*19, 23* 209:*13*
**week** 41:*13* 68:7, *11*
**weeks** 41:*13*
**well** 11:*14* 20:22
22:2*0* 29:*14* 32:24
35:*4* 39:*19* 72:2
79:*9* 87:*2* 90:*8*
93:*18* 95:*4* 101:*15*
105:*1, 10* 110:*13*
129:*15* 131:*8, 12*
133:2*0* 139:2*0* 142:*8*
146:24 163:24 164:*8*
174:*6* 189:*16* 191:*6,*
*8* 194:*2* 196:*19*
198:*10* 204:*14*
213:*16* 222:*5, 7*
224:*13*
**well-being** 208:2*4*
**Wendy** 1:2*0* 228:*4*
**went** 88:*8* 110:*10*
192:*23* 198:2*1*
**We're** 4:*2* 22:*16*
36:*6* 42:*9* 78:*4*
105:2*3* 160:*5, 9, 23*
162:2*1* 166:25
212:*14, 18* 226:*6, 20*
**WESTERN** 1:*4* 4:*5*
**we've** 51:*9, 18* 82:*13*
106:*9* 150:*10* 163:*13*
219:*13* 220:*3* 224:*17*
**When's** 7:*2*
**WHEREOF** 228:*18*
**wife** 6:*9*
**Williams** 39:*23* 40:*2*
70:*6, 16, 19* 121:*16*
123:*7* 198:*9* 206:*10,*
*14* 207:*10* 217:*6, 20*
218:*14*
**Winning** 130:*12*
138:*19*

**witness** 4:*11, 25*
16:*16* 20:22, 25
23:25 27:25 28:2
30:*3* 33:*16, 20* 35:25
36:*15* 38:*1, 7, 14*
39:*23* 40:*13, 20, 22*
41:*3* 43:*9* 47:*19*
48:*10* 49:*19* 50:*15*
51:*7* 54:*17, 25* 58:24
64:*18, 22* 67:*11* 71:*8*
77:2*0* 88:2*0* 91:*4, 18*
92:*5* 94:*18* 102:*12*
103:*2* 107:*15* 124:*13*
137:25 141:*15*
142:*14* 143:*12* 144:*7,*
*17, 23* 145:2*0* 146:*12,*
*21* 147:*21* 148:*7*
151:*2, 22* 152:*13, 22*
154:*6, 21* 155:*7*
162:*13, 17* 163:*13*
165:24 167:*11, 14*
169:*3, 23* 170:*8, 22,*
*24* 171:*13, 24* 173:*6,*
*19* 174:*11, 14, 23*
175:24 176:24
177:*15* 178:2*0*
179:*12* 180:*12* 184:*2*
186:*7* 187:*17* 190:*9,*
*19* 193:*4, 10* 196:*11*
197:*8, 17* 199:*1, 6, 10,*
*21* 200:25 201:*11, 20*
203:*11* 204:*12, 23*
205:*18* 206:*2* 207:*7*
210:*7, 17, 23* 211:*6,*
*19* 212:*2, 8, 12*
215:*10* 218:*3* 222:*16*
223:*6* 225:*9* 226:*17*
228:*18*
**word** 80:*18*
**words** 223:*2*
**work** 7:*17* 79:2*0*
95:*16* 108:*15, 18*
136:*16* 164:*10* 181:*2*
185:*7* 208:2*0* 219:*15*
225:*16*
**working** 72:*6* 101:*12*
106:*6* 107:*18* 200:*13*
**workings** 76:*17*
**workplace** 18:*9* 30:*6,*

*12, 13, 14, 17*
**world** 151:*8, 19*
**written** 4:*18* 5:22
157:*16, 20* 158:*8, 19,*
*22* 159:*3* 194:*23*
**wrong** 105:*1*
**Wyman** 164:*11, 21*
172:*17*

**< Y >**
**Yeah** 92:25 100:*17*
103:*2* 105:*5* 114:*8*
150:25 170:22
179:2*1* 204:*7* 206:*13*
225:*9*
**year** 11:*17* 12:*9, 23*
13:*14* 17:*3, 6, 7*
26:2*0* 29:*18* 72:*5*
81:*17* 161:2*1* 162:*19*
163:*14, 19* 194:*16*
212:24 213:*12, 15, 23*
214:*16, 19* 220:*2*
**years** 6:*7, 17* 7:*3*
9:*21* 10:*8, 9, 10*
13:*10, 13* 15:*9, 11, 19*
17:23 32:*14* 35:*16*
37:*10* 39:*19, 22*
74:*18, 22, 24* 75:*10,*
*14* 79:*15, 17, 23* 80:*4,*
*11* 94:*23, 24* 97:*11,*
*16* 100:*10* 103:*10*
143:*13* 151:*10* 180:*5*
191:*21, 23* 192:*4*
195:22 216:*6, 24*
220:*3* 224:24

**< Z >**
**Zaunbrecher** 112:*10*
116:*15* 118:*23*