## INTRODUCTION

1. Unfortunately, the Defendants have been forced to bring this Counterclaim to prevent attempts by the Plaintiff to coerce Fifth Third Bank to act in a way that benefits him personally to the detriment of the Bank's shareholders, customers, employees, and public. This Fifth Third Bank will not do. Instead, the Bank will steadfastly protect its shareholders, customers, and employees.

2. This Plaintiff, of course, is not the first person to use the litigation process to coerce a defendant to behave as he wants. Some would argue that litigation as a guerilla tactic has become common in our society.

3. As a bulwark against this trend, the Ohio Supreme Court held for the first time in 1994 that "Ohio recognizes the tort of abuse of process" to prevent a plaintiff from perverting the legal process "to accomplish an ulterior purpose" and that "a claim for abuse of process can legitimately be brought as a counterclaim." *Yaklevich v. Kemp, Schaeffer & Rowe Co., LPA*, 68 Ohio St. 3d 294, 1994-Ohio-503 (1994).

4. Later in 1996, the Ohio Supreme Court again recognized the tort of abuse of process and held: "In an abuse of process case, '[t]he improper purpose usually takes the form of coercion to obtain a collateral advantage not properly involved in the proceeding itself … by the use of the process as a threat or a club.' Simply, abuse of process occurs where someone attempts to achieve through use of the court that which the court is itself powerless to order." *Robb v. Chagrin Lagoons Yacht Club*, 75 Ohio St. 3d 264, 1996-Ohio-189 (1996) (internal citations omitted).

### THE FACTS AND PLAINTIFF'S GUERILLA LITIGATION TACTICS

5. Since August 2018, Plaintiff Phil McHugh ("Plaintiff") was employed by Fifth Third Bank as Executive Vice President and Head of Fifth Third Regional Banking.

20

6. Plaintiff's combined 2020 compensation package in his role as Head of Regional Banking totaled $2,050,352.

7. In late 2018, Fifth Third Bank President, Chief Executive Officer ("CEO"), and Chairman of the Board of Directors Gregory Carmichael approached Plaintiff and offered him the position of president of one of Fifth Third's largest regions.

8. Shortly thereafter, Fifth Third Chief Human Resources Officer Bob Shaffer and another Fifth Third executive each had a conversation with Plaintiff about the position of president of one of Fifth Third's largest regions.

9. At that time, Plaintiff told each executive separately that he would not accept the position of president of one Fifth Third's largest regions because it was his intention to work only for the next five years before he would enter retirement. He stated that he did not feel it would be fair to Fifth Third Bank because success in that position would take longer than five years and the need for continuity warranted the installation of someone who would remain with the Fifth Third Bank for longer than five years.

10. Following many months of succession planning, in 2020 Tim Spence—an experienced, high-ranking executive at Fifth Third Bank—was vetted for the position of President at Fifth Third Bancorp. Mr. Spence is in the same protected age classification of "over 40."

11. The Bank did not conceal this vetting activity, which was widely known across the Bank. In fact, Mr. Carmichael informed Plaintiff that he would be part of the vetting process. At that time, Plaintiff agreed to participate and did not raise any issues or concerns with this activity or his status with the company.

12. Plaintiff thereafter actively took part in the vetting process himself through interviews he completed with the executive development agency that was responsible for evaluating and vetting Mr. Spence.

13. In addition, multiple executives conferred with Plaintiff that Mr. Spence was being vetted for President and CEO succession purposes. At no time did Plaintiff object or state that he, Plaintiff, should be President or should be CEO.

14. At the Bank's September 2020 Board meeting, Fifth Third Bank's Board of Directors met with the executive development agency to discuss the vetting of Mr. Spence. Plaintiff was aware of this meeting.

15. Despite this activity—of which Plaintiff had intricate knowledge—at no time did Plaintiff ever approach Mr. Carmichael or Mr. Shaffer to inquire about his status in being considered for the position of President or CEO.

16. Nor did Plaintiff ever make any attempt to speak to the Board of Directors or the executive development experts responsible for vetting Mr. Spence to inquire about whether he would also take part in a similar vetting process.

17. On October 13, 2020, Mr. Carmichael met with Plaintiff to inform him about the Board of Directors' decision to appoint Mr. Spence as President, and the impending announcement that would be made regarding this development in the near future.

18. At the same time, Mr. Carmichael also informed Plaintiff that he wanted him to transition from his position as Head of Regional Banking to Head of Consumer Banking.

19. Significantly, this transition to Head of Consumer Banking would have put Plaintiff in a proxy-level position, which would have resulted in Plaintiff becoming a Named Executive