Page 52

1  the context of his question?
2      MR. SABA: Thank you. It's my deposition, not
3  your deposition. You can ask him questions,
4  Michael. The issue is -- he indicated he
5  understands --
6      MR. CIOFFI: You've asked the question three
7  times --
8      MR. SABA: It's not if you understand.
9      MR. CIOFFI: Emphasizing the word necessary.
10     MR. SABA: No, I haven't.
11     MR. CIOFFI: You have. You're using it as a
12 term of art. That's the point of the objection.
13     MR. SABA: No, I'm not. I asked if he
14 understands. He understands. Whether or not you
15 want to interrupt and put your own answer in is
16 not -- it's not appropriate.
17     MR. CIOFFI: The objection is our only way to
18 have a clear record. If you can answer the
19 question, answer the question.
20     THE WITNESS: Let me -- let me try and answer
21 the question, what I think you're referring.
22     The board's not required to have an
23 independent third-party assessment. The board
24 elected and they felt that -- that as a good part
25 of their due diligence in assessing talent that

Page 53

1  would be the next CEO of the company, you get a
2  third-party opinion, understand how that
3  individual, against their database of other CEOs
4  would stack up, and Tim stacked up exceptionally
5  well top core down. All right?
6      They wanted that confirmation. They felt that
7  they would like to have that confirmation and
8  validation. That was their decision. Whether it
9  was necessary or not, they obviously wanted to do
10 it. Whether they thought that was necessary or
11 not, that was the board's decision. I wasn't in
12 that conversation.
13 BY MR. SABA:
14     Q. You were a member of the board at that time,
15 correct?
16     A. I was a member of the board, but not -- when
17 the board has an executive session, I step out. So I am
18 not in an executive session of independent directors
19 where those conversations could happen.
20     Q. With respect to -- let me -- let me ask you
21 this a different way.
22     Was -- was Tim Spence going to be made
23 president of Fifth Third Bank without being vetted by
24 RHR?
25     A. I can't answer that.

Page 54

1      MR. CIOFFI: Yeah, objection to the form of
2  the question. Calls for speculation.
3      THE WITNESS: I won't speculate. I can't
4  answer. This is a board process. They take it
5  very seriously. We have a lot of very successful
6  board members who take this job very seriously.
7  They're independent. I don't rubber stamp
8  anything. This was not my recommendation. This
9  was the board's decision. The board wanted RHR. I
10 have no clue whether they felt that that was a
11 mandated requirement, that they had to do it. They
12 did it. It was a request.
13 BY MR. SABA:
14     Q. Referring back to paragraph 11, the first
15 sentence reads, the bank did not conceal this vetting
16 activity, which was widely known across the bank. What
17 does that mean, it was "widely known across the bank"?
18     A. Once again, this was written some time ago,
19 but what I believe that -- widely known across the bank,
20 is that when they brought in RHR as part of the vetting
21 process with Tim Spence, right, that process involved
22 peers being interviewed by RHR, Guy in particular,
23 Odyne. It also involved subordinates, reports of Tim
24 Spence, being interviewed as part of the process. It
25 involved a lot of things, reaffirming the CEO profile,

Page 55

1  the winning formula.
2      So that was known, and I think they brought in
3  quite a few of his peers and quite a few of his direct
4  reports. So when it says it was known, it was also
5  known to Phil McHugh that Tim was being put through the
6  vetting process. Phil McHugh was part of the vetting
7  process. Phil McHugh didn't have any objections. When
8  you look at the feedback that was -- that was --
9  that was put together by RHR from his peers and his
10 subordinates, Tim got very high marks, all right? There
11 was no one stepping up and saying this person was not
12 the right individual to become the CEO or president of
13 the company.
14     So when I say it was known, there was many
15 people involved in this vetting process of Tim for the
16 next president of Fifth Third Bank.
17     Q. All right. Did you have any conversations
18 with Phil McHugh about him being involved in the vetting
19 process by RHR of Tim Spence for president of Fifth
20 Third Bank?
21     A. I believe that I spoke with each one of Tim's
22 peers to let them know that they would be involved in
23 this process. It would have been irresponsible of me
24 not to communicate to them that this process was going
25 to take place and that they would be involved in this

Page 56

1 process. I would not want them surprised by someone
2 from the outside reaching in to them and out to them and
3 asking them for information on a peer of theirs without
4 understanding the process.
5     So as I would always do, I would absolutely
6 have talked to each of these individuals that was a peer
7 of Tim Spence and informed them of the process and what
8 was going to take place.
9     Q.  When did you have this conversation with Phil
10 McHugh?
11     A.  I can't answer that question.  I don't have
12 the -- I don't have that in front of me.
13     Q.  What do you recall about the conversation you
14 had with Phil McHugh, about RHR vetting Tim Spence?
15     A.  I don't -- I don't really recall the
16 conversation with respect to -- I just let them know it
17 was going to -- it was going to transpire.  I don't
18 recall Phil reacting -- Phil McHugh reacting to that,
19 those statements.  He never said -- he definitely never
20 said why am I not being vetted?  Why am I not being
21 considered for the president because you've -- you've
22 promised me in some way that I would be that?  Never a
23 conversation of that nature.
24     I would have informed him it was going to
25 happen, and I think he acknowledged that.  He didn't

Page 57

1 come back and ask me or why this or why that?  He said
2 he would -- he would talk to him when he call him.
3 That's what I remember.
4     Q.  Do you recall anything specifically that was
5 said during that conversation?
6     MR. CIOFFI:  Objection.  He just answered the
7 question.
8     MR. SABA:  He told me what wasn't said.  I'm
9 trying to -- I'm trying to have you tell me what
10 specifically was said.
11     THE WITNESS:  I cannot recall anything Phil
12 said except where he would be prepared to take the
13 conversation and participate.  I'm not aware of
14 anything more than that, and I cannot recall
15 anything more than that about that conversation.
16 BY MR. SABA:
17     Q.  Can you recall anything you specifically said?
18     MR. CIOFFI:  Objection.  He answered the
19 question.
20     THE WITNESS:  I just informed him that this
21 process was going to take place, that Tim was being
22 assessed by a third party for potential president
23 of CEO -- of Fifth Third Bank, and that they would
24 be part of that vetting process.  And you would --
25 so expect a call from this individual and he's

Page 58

1 going to want an interview.  That's the only
2 conversation I had.
3 BY MR. SABA:
4     Q.  And that conversation, was that documented
5 anywhere in writing?
6     A.  I did not document every one of these
7 conversations with every one of his peers or
8 subordinates if I talked to them.  I just informed them
9 that was going to happen.  I did not write anything
10 down.
11     Q.  Did you indicate to any of these individuals
12 that Tim is -- the timing for when Tim would be
13 succeeding you as president and CEO?
14     A.  It's not my decision.  That's the board's
15 decision.  I would never ever talk about the timing of a
16 decision of that nature when it's not my decision.  It's
17 the board's decision.
18     I'm going back; RHR would have required me, by
19 the way, in conversations with Guy, to make sure
20 that these individuals were going to be informed that
21 they were going to be getting a phone call from his
22 organization.
23     So that is what -- also, as I remember back, I
24 would have did it anyway, but he reminded me it has to
25 be done before he makes a call in to them so they're not

Page 59

1 surprised, so.
2     Q.  So with respect to these conversations you had
3 with these individuals, you wouldn't have necessarily
4 indicated any timing of when Tim Spence would become
5 president and/or CEO --
6     MR. CIOFFI:  Objection.  Asked and answered.
7 Counsel, you -- you keep repeating questions, and
8 I'll remind you of the court's order.  You're only
9 permitted to go a second day if the questions
10 aren't redundant.  This is sort of the third time
11 you've asked him that question.
12     MR. SABA:  They're not redundant questions.
13     MR. CIOFFI:  He can answer.
14     It is a redundant question.  The record will
15 speak for itself.  I mean, it's not the only
16 redundant question in the first hour.
17     MR. SABA:  Michael --
18     MR. CIOFFI:  Could you repeat the question,
19 please?
20     (The record was read.)
21     MR. CIOFFI:  Objection.  Asked and answered.
22 Twice already.  But you may answer it again.
23     THE WITNESS:  I would never provide timing to
24 anybody when I don't know the timing myself.
25 And this is a decision the board makes.  And

Page 60

obviously, the vetting process is the vetting process, and the board makes decisions based on the outcomes of those processes.

BY MR. SABA:

Q. During this conversation you had with Phil McHugh about the vetting process, did you specifically indicate to him that he was not being considered for president and/or CEO?

A. I would never have that conversation about him not being vetted for CEO or president because he was never considered. He knows he was never considered, all right? That's why he never responded back when I told him that RHR was coming in to assess Tim and vet Tim; he never once said why not me, because he was never being considered. He knew he wasn't being considered because he wasn't qualified. At no discussion ever with Phil McHugh did we ever talk about him being the permanent future leader of Fifth Third Bank as a CEO. We never had a conversation of that nature. Never happened.

Q. Did you, during this conversation you had with Phil McHugh about Tim Spence being vetted by RHR -- did you indicate to Phil McHugh that you were not going to recommend him as president and CEO succeeding you?

A. I never had a conversation about recommending him as president/CEO succeeding me. The only

Page 61

conversation that ever occurred with Phil McHugh was would he be interested, if something happened to me and I had to step out, would he be interested to be considered as an emergency successor if the board wanted him to step into that role? It's a board decision again. My job is to make sure that the individual would be willing to do that as an emergency successor. That's keeping the lights on, keeping the trains on the track, keeping things moving forward until the board completed their process. That was the only conversation, ever, I had with Phil McHugh about, quote, CEO job, and it was an emergency successor.

MR. SABA: If we can go off the record.
THE VIDEOGRAPHER: It's 10:56 a.m. We're going off the record.
(A recess was taken from 10:56 to 11:14.)
THE VIDEOGRAPHER: The time is 11:14 a.m. We're back on the record.

BY MR. SABA:

Q. Mr. Carmichael, referring you back to Exhibit 2, paragraph number 10 of the counterclaim, and I'm on page 21.

The last sentence of paragraph 10 reads, Mr. Spence is in the same protected age classification of over 40.

Page 62

Who is that referring to, "the same protected age classification" as whom?

MR. CIOFFI: Objection. It calls for a legal conclusion. If you can answer.

THE WITNESS: I would just be making -- I mean, I would assume we're talking about Phil McHugh here, same protected class. That's an assumption, but I don't -- I don't know why else it would be in there.

BY MR. SABA:

Q. What is your understanding of what constitutes age discrimination?

MR. CIOFFI: Objection. Calls for a legal conclusion.

BY MR. SABA:

Q. I'm asking for your understanding. Go ahead.

MR. CIOFFI: Well, his understanding is irrelevant, Counsel, and it's beyond the scope of discovery.

MR. SABA: Go ahead.

MR. CIOFFI: If you can answer.

THE WITNESS: Discrimination of an action, someone that is, legally, I guess, above 40 years old, that you're -- you're doing and taking an action, based on their age, that's detrimental to

Page 63

them, would be my understanding of age discrimination. You're making decisions based on age.

BY MR. SABA:

Q. Did you believe that, because Tim Spence was over the age of 40, that you were free to make a decision based upon age with respect to Phil McHugh?

MR. CIOFFI: Objection. Assumes facts not in evidence, and no decision was -- was based on age. That's what he just testified to. Could you repeat -- read the question back.

MR. SABA: Re-read the question, then.
(The record was read.)
THE WITNESS: Yes.

BY MR. SABA:

Q. Did you believe that, because Tim Spence was over the age of 40, that you were free to make a decision regarding Phil McHugh, based upon age?

A. I don't ever make age a factor in any discussion on this topic. This is -- at the end of the day, it's based on qualifications. Phil was not qualified for the CEO, so he was never considered. It had nothing do with his age. He just wasn't qualified. I can give you all the examples of why he wasn't qualified. I'm sure you'll ask.

Page 64

1 But at the end of the day, I don't make
2 decisions based on age, and we didn't do anything with
3 respect to succession planning because of Tim's age or
4 Phil's age.
5    Q.  Is age included in a factor with respect to
6 CEO and president/CEO succession planning at Fifth Third
7 Bank?
8    A.  I've never had a conversation with the board,
9 and the board's never asked me anything with respect to
10 someone's age.  It's based on the merits of their
11 qualifications to elevate to higher levels in the
12 organization and potentially CEO.
13    Q.  Do you believe it would be inappropriate for
14 the board to make a decision based upon the president or
15 CEO succession and use age as a factor?
16        MR. CIOFFI:  Objection.  Asked and answered.
17    He said it wasn't a factor.  You can answer it
18    again, if you can.
19        THE WITNESS:  Wasn't a factor.
20 BY MR. SABA:
21    Q.  That wasn't my question.  I didn't ask if it
22 was a factor.  I'm asking if you believe it would be
23 inappropriate for the board to use age as a factor with
24 respect to succession planning of the president or CEO
25 at Fifth Third Bank.

Page 65

1        MR. CIOFFI:  Objection.  Completely redundant.
2    You asked if it was a factor, he said it wasn't a
3    factor.  Now you're asking him again.
4        MR. SABA:  I'm asking him.  No, no, no.
5    That's not my question.  You can answer whatever
6    question you want to in your own mind, Michael.
7 BY MR. SABA:
8    Q.  My question is, is it inappropriate, in your
9 opinion, for the bank to use -- excuse me.
10        Is it inappropriate, in your opinion, for the
11 board to use age as a factor with respect to succession
12 planning of the president or CEO at Fifth Third Bank?
13    A.  The board never used age as a factor.  I never
14 had to reason to be concerned about that because it was
15 never brought up, never a factor.  And I wouldn't expect
16 them to make it a factor.  I understand it's about
17 qualifications, not about age, so would it be
18 inappropriate?  Absolutely.  But it was never discussed
19 because it was never brought forth.
20    Q.  You did recognize that, with respect to CEO
21 and president succession planning at Fifth Third Bank,
22 that it was important to make sure that the candidate
23 had a long enough runway to be able to take on that
24 position; is that right?
25        MR. CIOFFI:  Objection to the form of the

Page 66

1    question.  There's nothing in testimony that says
2    he believed that.
3        THE WITNESS:  It's the board's decision on who
4    becomes the CEO.  My beliefs are irrelevant in this
5    case; it's the board's decision.  And the board may
6    factor in, in their decision, the longevity of an
7    individual in that position, not based on age but
8    could be because the individual only wants to work
9    two or three more years.  That might be a factor in
10    their decision to put someone in that role because
11    it takes time to put someone in that role; it takes
12    time for them to develop into that role.  It takes
13    time to have the next successor brought forth in
14    that role.
15        So if that individual only wants to work three
16    or four more years, the board would consider
17    something like that, all right?  But they wouldn't
18    consider age beyond that.  That's really a
19    timeline, not an age thing.
20 BY MR. SABA:
21    Q.  If you could turn to paragraph 13 of the
22 counterclaim, page 22.  It reads, in addition, multiple
23 executives conferred with plaintiff that Mr. Spence was
24 being vetted for president/CEO succession purposes.  At
25 no time did plaintiff object or state that he,

Page 67

1 plaintiff, should be president or should be CEO.
2        Do you see that?
3    A.  I do.
4    Q.  Who are the "multiple executives"?
5    A.  They would have been the other executives that
6 were part of the vetting process, would have been Tim
7 Spence's peers.
8    Q.  Do you recall specifically who those multiple
9 executives were?
10    A.  I know Tayfun Tuzun was one of those
11 individuals.  I believe Lars Anderson was one of those
12 individuals.  I believe Bob Shaffer may have been one of
13 those individuals.  I'm speculating, but there is a list
14 of, I think, you know, six, seven individuals that were
15 considered peers that were vetted in this process.  I
16 don't have that list in front of me.
17    Q.  And when did these individuals confer with
18 Phil McHugh that Mr. Spence was being vetted for
19 president and CEO succession purposes?
20    A.  It's my understanding that conversations
21 occurred that -- when Tim was going through the process,
22 my understanding, from an individual -- that an
23 individual was asked what the process was for.  An
24 individual also had conversations with Phil and was
25 clear that it was -- they all understood that this was

Case 1:21-cv-00238-MRB Doc #: 67-31 Filed: 08/22/24 Page: 5 of 14 PAGEID #: 3798
Case 1:21-cv-00238-MRB Doc #: 66-31 Filed: 08/06/24 Page: 5 of 14 PAGEID #: 3598
Deposition of Gregory Carmichael, Volume I                Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 68

1 about vetting Tim as a potential president.
2     Once again, I made that clear to each of them,
3 that this vetting process and this assessment was about
4 Tim becoming president. So it wasn't a secret.
5 Everyone understood what this was about that he was
6 going to be vetted, and his peers knew he was being
7 vetted for the president, including Phil McHugh, who, by
8 the way, never came to me and said, why not me? What's
9 going on? Why am I not being vetted?
10     Once again, all the peers were communicated he
11 was being vetted as the potential president. Did they
12 talk among themselves? I believe they did; I heard
13 that. I don't have that documented, but comments were
14 made to me that we all knew what was going on.
15     Q. Who made those comments to you?
16     A. Jamie Leonard made those comments; Tayfun
17 Tuzun would have made those comments to me.
18     Q. When did Jamie Leonard and Tayfun Tuzun make
19 these comments to you?
20     A. Jamie's comment was made to me weeks after --
21 weeks after -- a week or so after Phil left -- somewhere
22 shortly thereafter when Phil walked out and quit.
23     Q. Had a lawsuit already been filed?
24     A. I don't know what the time exactly was, to be
25 honest with you.

Page 69

1     Q. And what specifically did Jamie Leonard say?
2     A. It was -- it was in conversation that, not
3 sure what's going on. We all knew that -- that Tim was
4 being vetted for the president. Not sure what the issue
5 is here. Something to that extent. I didn't write it
6 down. I don't know exactly verbatim. But indicating
7 that they had -- that they were aware. Of course they
8 were aware because they were -- they were told.
9     Q. And what did Tayfun Tuzun say to you?
10     A. When Phil refused to do the job and quit --
11 and I'm not sure the exact timing of that -- Tayfun was
12 in my office and said, hey, we all knew what was going
13 on. This is the -- he knew what was going on. This is
14 not a -- this is not a surprise. Everyone knew what was
15 going on. We were all part of the process. Something
16 to that extent. I don't -- I didn't record it; I didn't
17 write it down.
18     Q. Do you recall any other conversations with --
19 do you recall any other conversations regarding what
20 Phil McHugh knew with anyone other than Jamie Leonard or
21 Tayfun Tuzun?
22     A. Repeat the question, please?
23     Q. Sure. You were identifying the multiple
24 executives that you believe conferred with Mr. McHugh
25 regarding Mr. Spence being vetted for president and CEO

Page 70

1 succession purposes. And you referred to Bob Shaffer,
2 Lars Anderson, Tayfun Tuzun and Jamie Leonard.
3     I asked you, when did these conversations
4 occur; when did you become aware of them? You
5 identified two conversations, one with Jamie Leonard and
6 Tayfun Tuzun. I'm wondering if you can identify any
7 other conversations with any other executives who
8 indicated that Phil McHugh knew that Tim Spence was
9 being vetted for president and CEO.
10     MR. CIOFFI: Wait. By way of objection, that
11 was a long question, which I couldn't follow.
12 Could you just read the whole question back?
13     (Record was read.)
14     MR. CIOFFI: Objection to the form of the
15 question because it's several questions. But if
16 you can answer, you may. Go ahead.
17     THE WITNESS: Obviously, Bob Shaffer was --
18 was -- was having conversations. Once again,
19 when -- when Phil quit the bank and refused to do
20 the consumer job -- which is a top five job in the
21 company, all right, which is substantially
22 different than -- than -- than the position was
23 prior -- it was never about him not becoming the
24 president or CEO. All right? He walked out and
25 said, I won't report to Tim Spence. I'm not going

Page 71

1 to do the consumer job. I refuse it -- he refused
2 to do the job he was offered; he refused to work
3 for Tim Spence. All right?
4     Had nothing ever to do about him should have
5 been the CEO, could have been the CEO, or promised
6 the CEO. That was an after the fact once the --
7 and when the suit was filed, that was the first I
8 became aware that he believed that. And at the end
9 of the day, that was an afterthought. It was never
10 ever part of any conversation.
11 BY MR. SABA:
12     Q. Referring to paragraph 14, the counterclaim.
13 It reads, at the bank's September 2020 board meeting,
14 Fifth Third Bank's board of directors met with the
15 executive development agency to discuss the vetting of
16 Mr. Spence. Plaintiff was aware of this meeting.
17     When the executive development agency meets
18 with the board to discuss the vetting of Mr. Spence,
19 who's present at that board meeting?
20     A. Well, it would have been the board. It would
21 have been the -- Bob Shaffer would have most likely been
22 there. I can't remember exactly. Myself, I would have
23 been there for that -- for that review. Good chance we
24 would have had -- Susan Zaunbrecher potentially could
25 have been there. Myself and Bob would have definitely