1

2                          UNITED STATES DISTRICT COURT

3                           SOUTHERN DISTRICT OF OHIO

4                                WESTERN DIVISION

5

6       ----------------------------:
                                     :
7       PHILIP R. MCHUGH,            :
                                     :
8              Plaintiff,            :
                                     :
9          vs.                       :  CASE NO.
                                     :  1:21-cv-00238
10      FIFTH THIRD BANCORP, et      :
        al.,                         :
11                                   :
               Defendants.           :
12      ----------------------------:

13

14          ***THIS TRANSCRIPT CONTAINS CONFIDENTIAL --
                SUBJECT TO PROTECTIVE ORDER TESTIMONY***
15

16            Videotaped
              Deposition of:    ROBERT PAUL SHAFFER
17
              Taken:           By the Plaintiff
18
                               Pursuant to Notice
19
              Date:            August 24, 2023
20
              Time:            Commencing at 9:48 a.m.
21
              Place:           Fifth Third Center
22                             511 Walnut Street
                               Cincinnati, Ohio  45202
23
              Before:          Wendy L. Raymer, RPR, CRR
24                                  and
                               Bruce L. Sandy, Videographer
25                             Notaries Public-State of Ohio

```
 1    APPEARANCES:

 2
              On behalf of the Plaintiff:
 3
              Peter A. Saba, Esq.
 4                   and
              Joshua M. Smith, Esq.
 5                   of
              Stagnaro, Saba & Patterson Co., L.P.A.
 6            2623 Erie Avenue
              Cincinnati, Ohio  45208
 7            Phone:  (513) 533-2701
              Email:  Pas@sspfirm.com
 8                    jms@sspfirm.com

 9                    and

10            Appearing via Videoconference in Sylvania,
              Ohio:
11
              John J. McHugh, III, Esq.
12                   of
              McHugh & McCarthy, Limited
13            5580 Monroe Street
              Sylvania, Ohio  43560
14            Phone:  (419) 885-3597

15
              On behalf of the Defendants and the Deponent:
16
              Michael L. Cioffi, Esq.
17                   and
              Collin D. Hart, Esq.
18                   of
              Blank Rome LLP
19            1700 PNC Center
              201 East Fifth Street
20            Cincinnati, Ohio  45202
              Phone:  (513) 362-8700
21            Email:  Michael.cioffi@blankrome.com
                      Collin.hart@blankrome.com
22

23            Also Present:

24            Philip R. McHugh
              Phenise Poole, Esq., Fifth Third Bancorp
25            Brian Thomas, Esq., Fifth Third Bancorp
```

```
 1                      I N D E X

 2

 3    ROBERT PAUL SHAFFER                              PAGE

 4       Examination by Mr. Saba                          6

 5

      EXHIBITS                           MARKED    REFERENCED
 6
         Deposition Exhibit 1              8           9
 7
         Deposition Exhibit 4             44          44
 8       Deposition Exhibit 5             78          78

 9       Deposition Exhibit 7             91          91
         Deposition Exhibit 8             95          95
10       Deposition Exhibit 9            101         101
         Deposition Exhibit 10           102         102
11
         Deposition Exhibit 11           123         123
12       Deposition Exhibit 12           127         127
         Deposition Exhibit 13           136         137
13       Deposition Exhibit 14           154         155
         Deposition Exhibit 15           165         165
14       Deposition Exhibit 16           172         172
         Deposition Exhibit 17           175         175
15       Deposition Exhibit 18           175         175
         Deposition Exhibit 19           178         178
16       Deposition Exhibit 20           179         179

17       Deposition Exhibit 23           200         200
         Deposition Exhibit 24           202         202
18       Deposition Exhibit 25           205         205
         Deposition Exhibit 26           209         209
19       Deposition Exhibit 27           227         227
         Deposition Exhibit 28           238         238
20

21

22

23

24

25
```

```
 1                    I N D E X (CONTINUED)

 2


 3          ***THE FOLLOWING PAGES CONTAIN CONFIDENTIAL --
                SUBJECT TO PROTECTIVE ORDER TESTIMONY***
 4
        Page 16
 5
        Pages  22 - 26
 6
        Pages  37 - 39
 7
        Pages  86 - 90
 8
        Pages  184 - 199
 9
        Pages  258 - 277
10

11

12          ***THE FOLLOWING EXHIBITS ARE CONFIDENTIAL --
                SUBJECT TO PROTECTIVE ORDER***
13
```

| EXHIBITS | MARKED | REFERENCED |
|---|---|---|
| Deposition Exhibit 2 | 22 | 22 |
| Deposition Exhibit 3 | 37 | 37 |
| Deposition Exhibit 6 | 86 | 86 |
| Deposition Exhibit 21 | 184 | 184 |
| Deposition Exhibit 22 | 188 | 189 |
| Deposition Exhibit 29 | 258 | 258 |
| Deposition Exhibit 30 | 264 | 267 |
| Deposition Exhibit 31 | 264 | 264 |
| Deposition Exhibit 32 | 268 | 268 |
| Deposition Exhibit 33 | 276 | 276 |

```
                          - - -
```

Page 5

1   THE VIDEOGRAPHER:  Today is August 24, 2023.
2   The time is 9:48 a.m.  We're on the record for the
3   deposition of Robert P. Shaffer for a case pending
4   in the United States District Court, Southern
5   District of Ohio, Western Division, Case No.
6   1:21-CV-00238, entitled Philip R. McHugh, Plaintiff
7   versus Fifth Third Bancorp, et al., Defendants.
8       If at this time all counsel present would
9   introduce themselves for the record, then the
10  witness can be sworn.
11      MR. SABA:  Peter Saba on behalf of the
12  Plaintiff Philip McHugh.
13      MR. SMITH:  Joshua Smith on behalf of the
14  Plaintiff Philip McHugh.
15      MR. CIOFFI:  Michael Cioffi and Collin Hart of
16  Blank Rome on behalf of all the defendants.  We
17  also represent Mr. Shaffer personally pursuant to a
18  joint written representation agreement.
19      MR. THOMAS:  Brian Thomas for Fifth Third.
20      MS. POOLE:  Phenise Poole for Fifth Third.
21          ROBERT PAUL SHAFFER,
22  of lawful age, a witness herein, being first duly sworn
23  as hereinafter certified, was examined and deposed as
24  follows:
25

Page 6

1           EXAMINATION
2   BY MR. SABA:
3       Q.  Mr. Shaffer, could you go ahead and state your
4   name for the record, please, and spell your last name?
5       A.  Robert Paul Shaffer.  Last name is spelled
6   S-h-a-f-f-e-r.
7       Q.  Have you ever had your deposition taken
8   before?
9       A.  I have not.
10      Q.  Sir, I'm going to be asking you a series of
11  questions.  If there's anything you don't hear or
12  understand, please feel free to ask me to repeat or
13  rephrase the question.  For the sake of the court
14  reporter, notwithstanding the fact this is being taken
15  by video, I do need you to answer verbally.  No shaking
16  of the head or uh-uhs or uh-huhs.  It's difficult for
17  her to take that down.
18      Additionally, if you can wait for me to finish
19  my question before you answer, and I'll try and do the
20  same before I ask another question.  It also makes it
21  easier for the court reporter to take down the
22  information.  Do you understand that?
23      A.  I do.
24      Q.  Okay.  Can you give me your address, please?
25      A.  ███████████████

Page 7

1       Q.  How long have you lived at that address?
2       A.  21 years.
3       Q.  Who do you live there with?
4       A.  My wife, and I have three daughters.  One's
5   not there anymore, and two are in college.
6       Q.  What's the extent of your education?
7       A.  I have a bachelor's in business administration
8   and accounting from Bucknell University.
9       Q.  What year did you obtain that?
10      A.  '91, I graduated.  1991.
11      Q.  What's your date of birth?
12      A.  ██████ 1969.
13      Q.  What is your current role with Fifth Third
14  Bank?
15      A.  I'm the chief risk officer.
16      Q.  What did you do to prepare for today's
17  deposition?
18      A.  I talked to my attorneys.
19      Q.  Anything else?
20      A.  No.
21      Q.  Did you talk to anybody else at Fifth Third
22  besides your attorneys?
23      A.  No.
24      Q.  Have you discussed this case with anybody at
25  Fifth Third besides your attorneys?

Page 8

1       A.  Nothing substantial, only my administrative
2   assistants and a couple others to reschedule some
3   meetings for today because of the deposition.
4       Q.  You've not discussed any other aspects of this
5   case?
6       A.  No.
7       Q.  Have you communicated with anybody else at
8   Fifth Third regarding aspects of this case, whether by
9   text message, email, or otherwise?
10      A.  No, not outside of my counsel.
11      Q.  Did you review any documents in preparation
12  for this deposition today?
13      MR. CIOFFI:  Objection.  I'm going to instruct
14  him not to answer.  Whatever documents he reviewed,
15  he reviewed at my direction.  That's protected by
16  attorney-client privilege, but also by the work
17  product privilege.
18  BY MR. SABA:
19      Q.  Did you review any documents other than at
20  Mr. Shaffer's -- at Mr. Cioffi's direction?
21      A.  No.
22      (Deposition Exhibit 1 is marked for
23      identification.)
24  BY MR. SABA:
25      Q.  Mr. Shaffer, I've handed you what has been

Deposition of Robert Paul Shaffer          Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 9

1 marked as Exhibit 1. Can you identify that for me,
2 please?
3    A. **It is my Fifth Third executive bio.**
4    Q. Is the information on that executive bio
5 current?
6    A. **It is not.**
7    Q. What is not current?
8    A. **The fact that I'm currently the chief risk**
9 **officer.**
10    Q. You became chief risk officer November 2020;
11 is that correct?
12    A. **That is correct.**
13    Q. And you were the chief human resources officer
14 beginning in February 2017; is that right?
15    A. **Yes.**
16    Q. Going back to your position as chief human
17 resources officer, what were your duties?
18    A. **My primary responsibilities were to lead the**
19 **strategic aspects and the execution of our human capital**
20 **strategies and processes for the company, things like**
21 **talent acquisition, learning development, compensation**
22 **benefits, human capital operations.**
23    Q. Who was your direct supervisor in
24 that position?
25    A. **Initially it was Teresa Tanner, and then it**

Page 10

1 **subsequently changed to Greg Carmichael.**
2    Q. When did it change to Greg Carmichael?
3    A. **I don't recall the exact date.**
4    Q. Do you recall the year?
5    A. **2018, I believe.**
6    Q. Do you recall when in 2018?
7    A. **I do not.**
8    Q. What role did Teresa Tanner hold?
9    A. **She was our chief administrative officer, I**
10 **believe was her official title.**
11    Q. Why did you stop reporting to Teresa Tanner
12 and start reporting directly to Greg Carmichael?
13    A. **Teresa left the company and my role was**
14 **changed to reporting to Greg Carmichael.**
15    Q. As chief human resources officer, what role
16 did you serve with respect to succession planning for
17 president and CEO of Fifth Third Bank?
18    A. **I served in an administrative capacity at the**
19 **direction of the board.**
20    Q. What specifically did you do?
21    A. **I provided the board with information that**
22 **they requested or needed for the process and oversaw**
23 **preparation of such information at the request and what**
24 **they needed.**
25    Q. Did you work directly with the board or

Page 11

1 through Mr. Carmichael?
2    A. **Both.**
3    Q. What are your duties as chief risk officer?
4    A. **I'm responsible for seeing -- overseeing all**
5 **the risk management aspects of the company, and ensuring**
6 **that we have good risk management processes and controls**
7 **in place and complying with regulatory compliance and**
8 **requirements and other expectations.**
9    Q. Who do you report to as chief risk officer?
10    A. **Tim Spence.**
11    Q. In the period of time that you were chief
12 human resources officer, who reported to you?
13    A. **I had multiple direct reports. I would have**
14 **had Nancy Pinckney reported to me, Shawn Harter, Maureen**
15 **Balent, Peg Jula reported to me. That's who I recall**
16 **right now. Chris Sonneman, I'm sorry, with compensation**
17 **benefits.**
18    Q. What calendar system do you use at Fifth
19 Third?
20    A. **Microsoft Outlook.**
21    Q. How long have you been using that calendar
22 system at Fifth Third?
23    A. **Personally or as a company?**
24    Q. Both.
25    A. **I don't know as a company. I don't recall**

Page 12

1 **when we started using it personally either -- or I**
2 **started using it.**
3    Q. When did you start with Fifth Third?
4    A. **2002.**
5    Q. What was your role?
6    A. **I was the director of financial audit.**
7    Q. Is it fair to say that between January 1st of
8 2018 and November 1st of 2020, that Fifth Third was
9 using Microsoft Outlook for their calendar systems?
10    A. **I believe it is fair to say that.**
11    Q. Have you deleted information from your
12 calendar from the time period January 1, 2018 through
13 November 1, 2020?
14    A. **No.**
15    Q. What email system do you use at Fifth Third?
16    A. **It's a Microsoft Outlook product, I guess. I**
17 **don't know all the different names of the suites of**
18 **email versus calendar and so forth, but I assume it's**
19 **all the same.**
20    Q. And, again, with respect to that email system,
21 that was the same email system that you were using at
22 Fifth Third between the time period of January 1, 2018
23 and November 1, 2020; is that correct?
24    A. **I believe. I know we upgrade our technologies**
25 **all the time. So I can't be -- I wasn't in charge of**

Deposition of Robert Paul Shaffer                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 13

1  that. I can't be specifically certain if we just did
2  version updates or changed applications.
3       Q. Have you deleted any emails from the time
4  period of January 1, 2018 through November 1, 2020?
5       A. When? What's the period of time? I mean,
6  during that period I would have -- I get things every
7  day that I delete, junk emails and things like that.
8       Q. Other than junk emails, have you deleted any
9  emails or correspondence between yourself and Greg
10  Carmichael during that time period?
11       MR. CIOFFI: Objection. Overbroad. Do you
12       mean pertaining to this case?
13       MR. SABA: Any emails.
14       MR. CIOFFI: Objection. Not discoverable.
15  You may answer.
16       THE WITNESS: I don't recall. I'm sure -- I
17       try to keep my email inbox pretty clean on a daily
18       basis because we get so many. So Greg could have
19       sent me an email just asking me to do something or
20       sending me information that I could have deleted,
21       sure.
22  BY MR. SABA:
23       Q. Did you delete any emails between yourself and
24  Tim Spence between the time period of January 1, 2018
25  and November 1, 2020?

Page 14

1       A. I --
2       MR. CIOFFI: Same objection.
3       THE WITNESS: I give the same response.
4  BY MR. SABA:
5       Q. Which is?
6       A. Which is on a day-to-day basis, Tim certainly
7  could have sent me emails that -- asking me for
8  information, giving me information that I didn't deem I
9  needed to save just on the day-to-day operations of my
10  inbox.
11       Q. Did you delete any emails between yourself and
12  Phil McHugh between the time period of January 1, 2018
13  and November 1, 2020?
14       MR. CIOFFI: Same objection. Not
15       discoverable. Overbroad. You may answer.
16       THE WITNESS: Same answer.
17  BY MR. SABA:
18       Q. But you're saying yes, you deleted emails on a
19  daily basis?
20       A. I said I could have, you know, I had a
21  day-to-day email between Phil and I that I didn't deem
22  that I needed to save, just informational items or
23  something like that. We share articles, you know,
24  publications, things like that that, you know, once you
25  read you don't need to keep.

Page 15

1       Q. When did you first become aware of this
2  lawsuit between Mr. McHugh and Fifth Third Bank and
3  Mr. Carmichael?
4       A. I don't remember the specific date. I don't
5  recall it.
6       Q. Were you ever informed that you were not to
7  delete any emails after the time period that this
8  litigation was filed?
9       A. I was.
10       Q. Have you deleted any emails since this
11  litigation was filed?
12       A. Absolutely not.
13       Q. Do you have a separate email that you use at
14  home?
15       A. A personal email?
16       Q. Yes.
17       A. I do.
18       Q. What is that email address?
19       A. It's --
20       MR. CIOFFI: Objection. I'm going to
21       designate that as confidential.
22       (The following testimony is Confidential --
23       Subject to Protective Order.)
24
25

Page 16

1       * * *
2  BY MR. SABA:
3       Q. Go ahead.
4       MR. CIOFFI: You can give it.
5       THE WITNESS: ███████████████.
6       * * *
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Deposition of Robert Paul Shaffer                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 17

1    (The previous testimony is Confidential --
2    Subject to Protective Order.)
3  BY MR. SABA:
4    Q. How long have you had that email address?
5    A. I don't know.
6    Q. Have you had it longer than five years?
7    A. I believe I have.
8    Q. Did you ever use your personal email to
9  communicate with Mr. Carmichael?
10   A. Not that I recall.
11   Q. Did you ever use your personal email to
12 communicate with Mr. Spence?
13   A. Not that I recall.
14   Q. Did you ever use your personal email to
15 communicate with Phil McHugh?
16   A. Not that I recall.
17   Q. Who is your cell phone provider?
18   A. Verizon.
19   Q. How long has Verizon been your cell phone
20 provider?
21   A. I don't know.
22   Q. Has Verizon been your cell phone provider
23 since before January 1, 2018?
24   A. I believe so.
25   Q. Have you ever communicated by text message

Page 18

1  with Mr. Carmichael?
2    A. Yes.
3    Q. Have you deleted any of the text messages
4  between you and Mr. Carmichael?
5    A. I don't believe so.
6    Q. Have you ever communicated by Mr. Spence by
7  text message?
8    A. Yes.
9    Q. Have you deleted any of the text messages
10 between yourself and Mr. Spence?
11   A. I do not believe so.
12   Q. Have you ever communicated with Phil McHugh by
13 text message?
14   A. Yes.
15   Q. Have you deleted any of the text messages
16 between yourself and Mr. McHugh?
17   A. I do not believe so.
18   Q. Between January 1, 2018 and November 1, 2020,
19 how frequently would you meet with Mr. Carmichael?
20   A. I'm sorry, which time period again?
21   Q. January 1, 2018 through November 1, 2020?
22   A. I have no idea how many times I would meet
23 with him or how frequently I would meet with him. We're
24 in offices next to one another, so I'd see him in the
25 hall quite frequently.

Page 19

1    Q. At some point in time, did you start to have
2  daily meetings with Mr. Carmichael?
3    A. No.
4    Q. Never?
5    A. Daily meetings, no.
6    Q. Didn't you have a period of time where you
7  would schedule daily meetings in the afternoon with
8  Mr. Carmichael?
9        MR. CIOFFI: Objection. You mean on a
10       calendar or what kind of meeting, business-related
11       meetings?
12 BY MR. SABA:
13   Q. Do you understand the question?
14   A. I do not.
15   Q. Is there a period of time between November 1st
16 of 2018 -- January 1, 2018 and November 1, 2020, where
17 you were having daily meetings, in-person meetings, with
18 Mr. Carmichael?
19   A. Not that I recall.
20   Q. Do you have any recollection of how frequently
21 you would meet with Mr. Carmichael during that time
22 period?
23       MR. CIOFFI: Objection. Asked and answered.
24       He's already answered that question.
25 BY MR. SABA:

Page 20

1    Q. Go ahead.
2        MR. CIOFFI: You may answer again.
3        THE WITNESS: What's the question again?
4  BY MR. SABA:
5    Q. Do you have any recollection of how frequently
6  you would meet with Mr. Carmichael during the period of
7  time between January 1, 2018 and November 1, 2020?
8    A. No.
9        MR. CIOFFI: Counsel, I'm going to object and
10       designate this as confidential. It's designated
11       for attorneys' eyes only. The court has not
12       permitted it to be used beyond that.
13       (Mr. McHugh exits the room.)
14       MR. SABA: Our position is we can use it for
15       purposes of deposition, particularly if it's a
16       document that Mr. Shaffer created. So he can see
17       this and the attorneys can see this. We've had the
18       client step out of the room. So at this point, we
19       can use it in this deposition.
20       MR. CIOFFI: For the court reporter, if you
21       could designate this as confidential. There's
22       privileged, confidential, and other information on
23       this particular document. So I'm going to ask you
24       not to review it and to keep it segregated from the
25       other documents that are exhibits.

Deposition of Robert Paul Shaffer                                           Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 21

1   (The following testimony is Confidential --
2   Subject to Protective Order.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 22

1                    * * *
2   (Deposition Exhibit 2 is marked for
3        identification.)
4   BY MR. SABA:
5   Q.   Mr. Shaffer, I've handed you what's been
6   marked as Exhibit Number 2, and I'm going to refer to a
7   Bates stamp number, which is that number in the bottom
8   left-hand corner, do you see that, Fifth Third McHugh
9   0213076; do you see that?
10  A.   I do.
11  Q.   And let me represent to you, this is a series
12  of text messages between yourself and Mr. Carmichael; do
13  you see that?
14  A.   I do.
15  Q.   And your phone number is the 513-470-8400; is
16  that correct?
17  A.   It is.
18  Q.   Okay.  And I'm going to refer you to
19  specifically the text message that you send to
20  Mr. Carmichael on April 9, 2020 at 8:06 p.m.; do you see
21  that?  That would be 20:06 as written in military time?
22  A.   Uh-huh, yes.
23  Q.   Do you see that?
24  A.   Yeah.
25  Q.   Can you read that to me, what your text

Page 23

1   message is?
2   A.   "Do you want to move our date" -- "Do you want
3   to move our daily 3:30 meeting tomorrow to the morning?"
4   Q.   And that's the text message you sent to
5   Mr. Carmichael; is that right?
6   A.   Yes.
7   Q.   And he responds, "Yes.  Thanks."  Is that
8   correct?
9   A.   He does.
10  Q.   So at that point in time, you were having
11  daily meetings with Mr. Carmichael; is that correct?
12  A.   That's what this says, but I do not recall
13  having daily meetings with Mr. Carmichael.
14  Q.   You're the one who wrote that text, correct?
15  A.   Correct.
16  Q.   So there's clear indication at some point in
17  time you were having daily meetings with Mr. Carmichael,
18  correct?
19  A.   Well, I don't know if this -- it was -- Greg
20  and I, by ourselves, with others, we were meeting on --
21  or we have lots of projects and initiatives and issues
22  and challenges and opportunities we work on in the bank
23  for business purposes on a business as usual basis.  It
24  could have been any number of topics probably.  But I do
25  not recall having any daily one-on-one meetings with him

Page 24

1   at all.
2   Q.   You don't dispute what it says in this text,
3   that you were having daily meetings at this time,
4   correct?
5        MR. CIOFFI:  Objection.  Mischaracterizes his
6        testimony.  He said he didn't remember them.  But
7        you may answer.  Go ahead.
8        THE WITNESS:  I'm sorry, what was the
9        question.
10  BY MR. SABA:
11  Q.   You do not dispute what it says in this text,
12  that you were having daily meetings with Mr. Carmichael
13  at that point in time; is that correct?
14       MR. CIOFFI:  Objection to the form of the
15       question.  Is your question, is that what the text
16       says?
17       MR. SABA:  No.
18       MR. CIOFFI:  What's your question?
19  BY MR. SABA:
20  Q.   My question is -- let me know if you don't
21  understand this, Mr. Shaffer.  You do not dispute that
22  you were having daily meetings with Mr. Carmichael in
23  April of 2020, correct?
24       MR. CIOFFI:  Objection.  Asked and answered.

Deposition of Robert Paul Shaffer                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 25

1  BY MR. SABA:
2     Q.  Correct?
3        THE WITNESS:  Do I answer?
4        MR. CIOFFI:  You may answer, sure.
5        THE WITNESS:  I do not recall having daily
6  meetings with him.  I don't dispute that's what it
7  says there was a daily meeting, but, again, I don't
8  know if it was Greg and I or multiple people and
9  some other business topic.  I mean, we had a lot --
10  like I said earlier and testified earlier, we have
11  lots of things going on in the bank that might
12  require daily meetings.
13       For instance, we just went through a crisis in
14  the banking industry here with certain banks in
15  March, starting with Silicon Valley Bank, and we're
16  meeting every day as an enterprise team to talk
17  through our deposit gathering initiatives in the
18  company and other impacts of that.
19       So there could be any number of reasons that
20  we have daily meetings as an enterprise team or a
21  smaller enterprise team if we're working on a
22  certain thing.
23  BY MR. SABA:
24     Q.  How frequently would you communicate with Tim
25  Spence between January 1, 2018 and November 1st --

Page 26

1  November 1, 2020?
2     A.  I don't know how frequently.
3     Q.  How frequently would you meet with Tim Spence
4  during that same time period?
5     A.  I could not -- I don't know how frequently I
6  met with him.
7                        * * *

Page 27

1        (The previous testimony is Confidential --
2        Subject to Protective Order.)
3        MR. SABA:  If we can go off the record one
4  second.
5        THE VIDEOGRAPHER:  The time is 10:14 a.m.  We
6  are going off the record.
7        (A recess was taken from 10:14 a.m. to
8        10:15 a.m.)
9        (Mr. McHugh enters the room.)
10       THE VIDEOGRAPHER:  The time is 10:15 a.m.  We
11  are back on the record.
12       MR. CIOFFI:  I want to put on the record a
13  colloquy counsel and I had during the break.
14  There's a document, Exhibit 2, that was used, and
15  it's for attorneys' eyes only.  It has a lot of
16  personal, medical, and other information that
17  cannot be used, should not be used, should not be
18  disclosed.  I've asked counsel to redact that kind
19  of information if he's going to use these
20  attorneys' eyes only documents, documents with
21  confidential and sensitive, medical, and other
22  information.  Counsel agreed to do that.  So at the
23  end of the deposition, at some point, the court
24  reporter will redact these particular sections of
25  the document.

Page 28

1        MR. SABA:  And just my comment would be, we
2  can review that and, to the extent we deem it
3  necessary, we can block out those portions.
4  BY MR. SABA:
5     Q.  Mr. Shaffer, with respect to your role as
6  chief human resources officer, what involvement did you
7  have with respect to inclusion and diversity?
8     A.  So in that role, the chief inclusion and
9  diversity officer, Stephanie Smith, reported to me, and
10  we would discuss various strategies that she was leading
11  or thinking about leading and implementing in the
12  company related to those topics.  And I would, you know,
13  obviously ask questions, challenge, support, and so
14  forth related to those strategies and what Stephanie's
15  work was.
16     Q.  Were you involved in putting together the
17  inclusion tool kit in 2020?
18     A.  Just from a, you know, review perspective.  I
19  was not the primary person putting -- or people putting
20  that together.  Stephanie would have led that effort.
21     Q.  Did you receive diversity and inclusion
22  training in 2020?
23     A.  I did as part of our annual training program.
24     Q.  When did you receive that in 2020?
25     A.  I have no idea.

Deposition of Robert Paul Shaffer                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 29

1   Q.   Did your training include an understanding
2   regarding the use of microaggression and inherent bias?
3       A.   I believe it did.
4       Q.   What did you learn about microaggression and
5   inherent bias?
6       A.   Well, I don't know if I necessarily learned
7   anything new because from a microaggression perspective
8   I know what those are.
9       Q.   So what did you understand microaggression to be?
10      A.   It's really unknowingly or unconsciously
11  making comments about protected classes.
12      Q.   And do you recognize age to be a protected
13  class?
14      A.   I do.
15      Q.   Do you recognize the comments like "silver
16  fox" would be a microaggression?
17      A.   Not as it was used in Fifth Third.  It was not
18  a microaggression.
19      Q.   How would the term silver fox be used at Fifth
20  Third?
21      A.   Phil actually used it himself.  He called
22  himself the Silver Fox.  I think he considered it a
23  badge of honor.  He considered it a term of endearment.
24  He -- I think he thought about how, you know, his looks,
25  his intelligence, and his dress represented that.  He

Page 30

1   called himself the Silver Fox quite a bit.  And in my
2   role as a CHRO, Phil McHugh never came to me and raised
3   any concerns about being called the Silver Fox.  We
4   train our people to do that, to talk to their manager,
5   to talk to HR.  We have an ethics line number that
6   somebody could call, and I am not aware of any time Phil
7   McHugh ever raised a concern about being called the
8   Silver Fox.  It was quite -- quite the opposite.
9       Q.   You indicated that you said Phil McHugh used
10  that term frequently.  What did you mean by that?
11      A.   When he called himself the Silver Fox or -- he
12  would just call himself the Silver Fox.
13      Q.   And how frequently would that be?
14      A.   I don't know necessarily the number of times,
15  but from time to time he would call himself that.  He
16  would put it in text messages.  I remember getting text
17  messages where he called himself the Silver Fox or you
18  wouldn't want the Silver Fox to be upset or something
19  like that.  So he used it himself.
20      Q.   Do you still have all those text messages?
21      A.   I have no idea.
22      Q.   You said you --
23      A.   I haven't deleted any.  To my recollection, I
24  don't recall deleting any.
25      Q.   Have you provided those to counsel, all these

Page 31

1   silver fox text messages?
2       A.   My phone was provided to counsel at the
3   beginning of this.
4       Q.   And your position is you didn't delete any of
5   these silver fox text messages that you received from
6   Phil McHugh?
7       A.   I don't recall deleting any text messages
8   between Phil and I.
9       Q.   So all the silver fox text messages that
10  you're referring to where Phil refers to himself as the
11  Silver Fox should be in those text messages; is that
12  correct?
13      A.   They would be, yes.
14      Q.   Okay.  When else did you -- when else did Phil
15  McHugh refer to himself as the Silver Fox?
16      A.   I don't recall specific dates or times, but in
17  conversations we had, I was involved with him and others
18  in the company, he would refer to himself as the Silver
19  Fox.
20      Q.   Do you recall any specific situations?
21      A.   I don't recall any specifics, just that he did
22  it.
23      Q.   Do you recall a time period when this
24  occurred?
25      A.   It was over, you know, a long period of time.

Page 32

1   I don't remember exact when I first heard it.  But over
2   the years I've heard him refer to himself as the Silver
3   Fox, yes.
4       Q.   "The years," what do you mean by the years?
5   Can you give me a time period?
6       A.   I can't give you an exact time period, but,
7   you know, we were all executives for Fifth Third,
8   working on the same floor, going to a lot of the same
9   meetings and so forth.  So but I don't have a specific
10  time period.
11      Q.   Who else would refer to Phil McHugh as the
12  Silver Fox?
13      A.   I think others of his peers would.  Again,
14  Phil embraced it.  He enjoyed it.  He kind of brought it
15  on as his own persona.
16      Q.   How do you know he embraced it and enjoyed it?
17      A.   Because he called himself that.  He never
18  complained about being called that.  And, you know, I
19  think he was happy to be called that.
20      Q.   Why do you think he was happy to be called
21  that?
22      A.   As I explained earlier, I think he thought it
23  was a term of endearment, a badge of honor,
24  representative of how he dresses, looks, and his
25  intelligence.

Deposition of Robert Paul Shaffer                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 33

1   Q.   Who were the other peers that would refer to
2   Phil as the Silver Fox?
3        A.   I would say Jamie Leonard was, Tayfun Tuzun,
4   other members, other members of the enterprise team. I
5   can't remember specifics.
6        Q.   Greg Carmichael?
7        A.   I don't know if I remember Greg referring to
8   him as that. I don't recall.
9        Q.   Did anybody ever refer to Phil as the silver
10  fox in front of Greg Carmichael?
11       A.   Not that I recall.
12       Q.   You indicated earlier at Fifth Third we would
13  use the term silver fox as a compliment; is that right?
14            MR. CIOFFI: Objection. That's not what he
15       said. Do you want to ask him if he said that?
16       That's not what he said.
17            MR. SABA: The record speaks for itself.
18  BY MR. SABA:
19       Q.   Go ahead.
20            MR. CIOFFI: It does speak for itself.
21            THE WITNESS: I didn't say it was a compliment
22       to him.
23  BY MR. SABA:
24       Q.   It wasn't perceived as a compliment to him?
25       A.   I think he perceived it as a compliment to

Page 34

1   him.
2        Q.   How did you perceive it?
3        A.   I just perceived it as something Phil liked to
4   be called because he used it himself. And he never
5   raised any concern to me in my role as the chief human
6   resources officer about it.
7        Q.   When is the first time that Phil McHugh
8   experienced an adverse employment action in conjunction
9   with being referred to as the Silver Fox?
10            MR. CIOFFI: Objection. Lack of foundation.
11       There's no basis that he ever did.
12  BY MR. SABA:
13       Q.   Go ahead. Answer the question.
14       A.   He never did, to my knowledge.
15       Q.   He never received an adverse employment action
16  ever?
17       A.   As it relates to the silver fox, being called
18  that, is that what -- what was your question again?
19  Sorry.
20       Q.   At any point in time during which Phil McHugh
21  was being referred to as the Silver Fox, did he
22  experience an adverse employment action?
23            MR. CIOFFI: Objection to the form of the
24       question. Lacks the foundation. Assumes facts not
25       in evidence. It's contradictory to what the

Page 35

1   witness has already testified.
2   BY MR. SABA:
3        Q.   Go ahead.
4        A.   Definitely not that I'm aware of.
5        Q.   You were aware that with respect to the
6   reference to silver fox that it was indicative of the Phil
7   McHugh's age, correct?
8             MR. CIOFFI: Objection. Lack of foundation.
9        No basis in the record. You may answer.
10            THE WITNESS: Absolutely not. It was never
11       based on his age.
12  BY MR. SABA:
13       Q.   What was your role with respect to creating
14  the diversity and inclusion committee?
15            MR. CIOFFI: Objection. Asked and answered.
16       He answered that 15 minutes ago. Go ahead. You
17       can answer.
18            THE WITNESS: I was involved in the initial
19       person -- including leadership -- diversity
20       leadership council, but Stephanie Smith was really
21       leading the charge in forming that.
22  BY MR. SABA:
23       Q.   You selected people that would be on the
24  diversity inclusion counsel, is that what you called it?
25       A.   Yeah. The DLC, yeah. Again, Stephanie

Page 36

1   reported to me. There were others involved in
2   assessing. We wanted to be a broad cross-section of
3   people to be included on that council, yes.
4        Q.   And one of the people you selected was Phil
5   McHugh; is that right?
6        A.   Yes.
7        Q.   And you selected Phil because of his age,
8   correct?
9        A.   Absolutely not.
10       Q.   You didn't select Phil because of his age?
11       A.   No. We selected Phil because he covered a big
12  area. He was running the regions then so he had a broad
13  geographic view of the company and hearing from
14  different employees across the whole footprint. So it
15  was valuable to have his insight and perspectives of
16  what he led at that time.
17            (Mr. McHugh exits the room. )
18            (The following testimony is Confidential --
19            Subject to Protective Order.)

Page 37

```
1                    * * *
2        (Deposition Exhibit 3 is marked for
3        identification.)
4  BY MR. SABA:
5     Q.  Mr. Shaffer, I've handed you what has been
6  marked as Exhibit Number 3.  And you can see that it's
7  also Bates stamped Fifth Third McHugh 0213026; do you
8  see that?
9     A.  Yes.
10        MR. CIOFFI:  Counsel, I'm going to renew my
11     other objection earlier.  This is another
12     attorneys' eyes only document.  This particular
13     document you were given in redacted form with only
14     the relevant portion you're going to ask the
15     witness about.
16        Again, there is personal medical information
17     that's highly inappropriate to put on the record.
18     So, again, we need to redact these documents at a
19     minimum, but I'll ask you to use the redacted
20     versions because it's -- you were given it in a
21     redacted form with only the relevant portions
22     available for viewing.  But go ahead.  You've
23     already introduced it.
24  BY MR. SABA:
25     Q.  Mr. Shaffer, this is a text message exchange
```

Page 38

```
1  between yourself and Tayfun Tuzun; do you see that?
2     A.  I do.
3     Q.  And do you see -- referring to the June 4,
4  2020 text message at 1:46 p.m. sent from you; do you see
5  that?
6     A.  Uh-huh.
7     Q.  Can you read that to me?
8     A.  I'm sorry?  From Tayfun or me?
9     Q.  From you.  At 1:46 p.m., 13:46?
10     A.  Oh, sure.  "We want you both on the Diversity
11  Counsel."
12     Q.  And Tayfun Tuzun responds, "Are you adding
13  Phil for his age?"
14     A.  Uh-huh.
15     Q.  And your response is, "Yes, even Tayfun"; is
16  that correct?
17     A.  Yes.
18     Q.  So the reason you put Phil McHugh on the
19  diversity counsel was because of his age, correct?
20        MR. CIOFFI:  Objection.  Lacks foundation.
21     You may answer.
22        THE WITNESS:  It is not.
23  BY MR. SABA:
24     Q.  That's what you indicate in this text message;
25  is that correct?  You don't dispute what it says, right?
```

Page 39

```
1     A.  I don't dispute that's what the text says that
2  you read, but it's not why we put Phil on the diversity
3  council.  This is banter back and forth between Tayfun
4  and me.
5     Q.  And you wrote this text message, correct?
6     A.  Yes.
7                    * * *
```

Page 40

```
1        (The previous testimony is Confidential --
2        Subject to Protective Order.)
3        (Mr. McHugh enters the room.)
4  BY MR. SABA:
5     Q.  Going back to your use of the term Silver Fox,
6  how often would you refer to Phil McHugh as a silver
7  fox?
8     A.  I believe as I testified earlier, I'm not sure
9  how often.
10     Q.  And you would do that outside his presence; is
11  that correct?
12     A.  I am not sure about that.
13     Q.  You don't recall using the term silver fox
14  outside Phil's presence?
15     A.  I might have, sure.
16     Q.  And you understood with your microaggression
17  training that even if there is an intended compliment
18  with respect to the comment you're making about
19  somebody, it could include an inherent bias within that;
20  is that correct?
21        MR. CIOFFI:  Objection.  Is that your
22     testimony, Counsel?  Is that a question?
23  BY MR. SABA:
24     Q.  Do you understand the question?
25     A.  I do not.
```

Deposition of Robert Paul Shaffer  Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 41

Q. With respect to your micro -- training regarding microaggression, you understood that even though comment could be intended as a compliment, it could contain inherent bias; is that correct?

A. It could, but not in this case because of what I testified earlier with Phil's own use of it and never complaining about it.

Q. And you understood that the term Silver Fox included a reference to age; isn't that right?

A. It did not.

MR. CIOFFI: Objection. Asked and answered. Counsel, you can't just keep asking questions until you get the answer you want. That's not appropriate.

MR. SABA: Go ahead. Answer the question.

MR. CIOFFI: He answered it directly. You may answer one more time.

THE WITNESS: As I testified earlier, it did not refer to age.

BY MR. SABA:

Q. When you would use that term, what would it refer to?

MR. CIOFFI: Objection. Asked and answered. Counsel, again, you can't repeat questions until you get the answer you want. He's answered that

Page 42

directly.

MR. SABA: I haven't asked that question. Go ahead.

MR. CIOFFI: Yes, you did. Go ahead.

THE WITNESS: Can you repeat the question, please?

MR. SABA: Sure.

BY MR. SABA:

Q. When you would use the term "silver fox" to refer to Phil McHugh, what did it refer to?

A. Exactly what we all believed -- Phil believed it to mean, a term of endearment, a badge of honor, representation of Phil's intelligence, but nothing to do with age.

Q. What did the silver refer to?

A. Quite frankly I don't know. It could be his hair, I don't know. I have no idea. He called himself that, so --

Q. Do you ever recall Tim Spence referring to Phil McHugh as a silver fox?

A. Yes.

Q. When do you recall Tim Spence referring to Phil McHugh as a silver fox?

A. I don't recall when.

Q. How many times did Tim Spence refer to Phil

Page 43

McHugh as a silver fox?

A. I do not know.

Q. But you do recall him referring to Phil McHugh as a silver fox?

A. Yes.

Q. As you sit here today, do you know in what context Tim Spence was referring to Phil McHugh as a silver fox?

A. I would believe it's exactly the same as I just testified a couple times to in terms of it being a term of endearment for Phil, a representation of his intelligence, and the fact that he called himself that.

Q. During the period of time that you were chief human resources officer, what, if any, programs did Fifth Third have that were specifically directed toward preventing discrimination based upon age?

A. We didn't have any specific programs. We have age representation, you know, across all generations in our workforce.

Q. But you had no programs that were designed to prevent or train against age discrimination in the workplace?

A. No specific programs, but we do have very specific policies and procedures from an HR perspective that we do not discriminate hiring, promotion, etc.,

Page 44

from an age perspective.

(Deposition Exhibit 4 is marked for identification.)

BY MR. SABA:

Q. Mr. Shaffer, you've been handed what's been marked as Exhibit 4, which is Bates stamped Fifth Third McHugh 0214533 through 0214550; do you see that?

A. Sorry. What did you say the first numbers were again?

Q. 0214533 --

A. Uh-huh.

Q. -- through 0214550.

A. Yes.

Q. Can you identify that for me, please?

A. It is entitled, "Fifth Third Inclusion Tool Kit From Awareness to Advocacy."

Q. And it's dated July 2020; is that correct?

A. That is correct.

Q. Have you seen this document before?

A. I have.

Q. Were you involved at all in the creation of this document?

A. Not in the detailed construction of it. I would have reviewed it.

Q. You're familiar with it; is that right?

Page 45

1  A. Yes.

2  Q. With respect to the business resource groups
3  identified in the Fifth Third inclusion tool kit, Fifth
4  Third did not have any business resource groups directed
5  toward age; is that correct?

6  MR. CIOFFI: Counsel, are you referring to a
7  particular page?

8  MR. SABA: I can refer to a page. Fifth Third
9  McHugh 021459, which is page 17 of the document.

10  THE WITNESS: I'm sorry. What was your
11  question?

12  BY MR. SABA:

13  Q. With respect to Fifth Third's business
14  resource groups, Fifth Third did not have a business
15  resource group directed toward age; is that correct?

16  A. That's correct.

17  Q. You indicated before that -- let me actually
18  rephrase that.

19  Is it your position that because Mr. McHugh
20  referred to himself as silver fox, that it was okay for
21  others to refer to him as silver fox?

22  MR. CIOFFI: Objection. Asked and answered.

23  MR. SABA: Go ahead.

24  THE WITNESS: What's the question again?

25  BY MR. SABA:

Page 46

1  Q. The question is, is it your position that
2  because Mr. McHugh referred to him as a silver fox that
3  it was okay for others to refer to him as silver fox,
4  other employees of Fifth Third?

5  A. Yes.

6  Q. Okay. So if a black employee at Fifth Third
7  referred to themselves as the Black Fox, would it be
8  okay for other employees at Fifth Third to refer to that
9  employee as the Black Fox?

10  MR. CIOFFI: Objection, Counsel. We're going
11  down a really terrible path. It's not appropriate.
12  I don't want to have to address this with the court
13  again. The court has already admonished you not to
14  do this.

15  MR. SABA: No, the court did not admonish us.
16  The court basically said we were free to explore
17  this because it's an appropriate topic to pursue
18  both -- in terms of this case. You weren't on the
19  conference call with the court.

20  MR. CIOFFI: I read the transcript.

21  MR. SABA: And it specifically indicates we
22  are free to pursue this, and they weren't going to
23  waste time addressing your issue.

24  BY MR. SABA:

25  Q. Back to the question, Mr. Shaffer. If an

Page 47

1  employee, a black employee of Fifth Third, referred to
2  themselves as a black fox, would it be okay for other
3  employees at Fifth Third to refer to that employee as a
4  black fox?

5  MR. CIOFFI: Objection. Go ahead. You may
6  answer.

7  THE WITNESS: I don't know. I don't know what
8  context you're talking about. I don't know the
9  relationships those people have. So I don't know.

10  BY MR. SABA:

11  Q. They're other employees in the bank, they're
12  peers in the bank?

13  MR. CIOFFI: Objection. He answered the
14  question. Counsel, you can't just keep asking
15  questions, the same question, to get the answer you
16  want. You're entitled to a square, straightforward
17  answer. He answered the question. Move on.

18  BY MR. SABA:

19  Q. Let me answer -- let me ask the question
20  again, because you indicated it would depend upon what
21  positions they had in the bank and who the employees
22  are; is that correct?

23  A. I didn't.

24  MR. CIOFFI: He did not. That's not what he
25  said.

Page 48

1  BY MR. SABA:

2  Q. Well, let's ask that question. With respect
3  to that scenario, would it depend on what positions the
4  respective employees hold in the bank?

5  A. I said it would depend on the context, which I
6  don't know what you're referring to. It would depend on
7  the relationship those people have. It was -- I can't
8  answer it. I was very involved in the situation with
9  the silver fox because he called himself that
10  frequently, as I testified earlier.

11  Q. In the context of the hypothetical I gave you,
12  under what situation would it be inappropriate for the
13  one employee to refer to another black employee as black
14  fox even if that black employee referred to themselves
15  as black fox?

16  MR. CIOFFI: Objection, Counsel. He answered
17  the question. You keep asking it over and over in
18  different --

19  MR. SABA: He didn't answer that question.

20  MR. CIOFFI: He did answer that question.

21  BY MR. SABA:

22  Q. Mr. Shaffer, referring back to this
23  hypothetical in a different situation, I'm asking you
24  under what circumstances -- because you said it would
25  depend on the circumstances -- under what circumstances

Deposition of Robert Paul Shaffer                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 49

1  would it be inappropriate for one employee to refer to
2  another black employee as a black fox, even if that
3  black employee referred to themselves as Black Fox?
4      MR. CIOFFI: Objection. If you know, you may
5  answer.
6      THE WITNESS: I don't know the answer to that.
7  Again, I'd go back to it's the context of the
8  situation. It's the relationship of the people. I
9  can't speculate on hypotheticals.
10 BY MR. SABA:
11     Q. Do you acknowledge that a term such as "black
12 fox" constitutes a microaggression?
13     MR. CIOFFI: Objection. He answered it. You
14 keep asking it again. He said it depends on the
15 context.
16     MR. SABA: I didn't ask that question.
17 BY MR. SABA:
18     Q. Do you acknowledge that the term black fox
19 constitutes a microaggression?
20     **A. I do not. It would depend on the context and**
21 **the relationship of the individuals.**
22     Q. So at Fifth Third Bank, at certain times you
23 can use terms and they're not microaggression based upon
24 how you want to use the name calling, whether it
25 refers -- whether it's implicit of age or race; is that

Page 50

1  correct?
2      MR. CIOFFI: Objection. Argumentative.
3  You're arguing with him to try and get the answer
4  you want.
5      MR. SABA: That's not --
6      MR. CIOFFI: He's answered the question.
7      MR. SABA: Go ahead, Mr. Shaffer.
8      THE WITNESS: I didn't understand the
9  question.
10 BY MR. SABA:
11     Q. Okay. You indicate it would depend on the
12 context to be used in the office place; is that right?
13 So a term such as black fox, you're saying at Fifth
14 Third it may be appropriate to refer to a black employee
15 as black fox at certain times in the workplace; is that
16 correct?
17     MR. CIOFFI: Objection. He answered the
18 question now three times. It depends on the
19 context. Go ahead. You can answer it one more
20 time.
21 BY MR. SABA:
22     Q. Do you understand my question?
23     **A. No.**
24     Q. You said it depends on the context. My
25 question is, so at Fifth Third there are times where it

Page 51

1  would be appropriate to refer to a black employee as
2  black fox because of the context; is that right?
3      **A. Again, I don't know. I would have to**
4  **understand the details of the context and the**
5  **relationship those individuals have.**
6      Q. Are you saying that it's never appropriate or
7  there are times where it would be appropriate?
8      **A. I don't know.**
9      Q. You don't know if it's never appropriate?
10     MR. CIOFFI: Objection. Is there something
11 you didn't understand about his question? He
12 answered the question. He doesn't know. What more
13 do you want him to say?
14 BY MR. SABA:
15     Q. Mr. Shaffer --
16     MR. CIOFFI: You can ask it again, but --
17 BY MR. SABA:
18     Q. You're the chief -- you were the chief human
19 resources officer at Fifth Third; is that correct?
20     **A. I was.**
21     Q. Okay. So with respect to that, as you sit
22 here today, you say you don't know if there's a
23 situation or context -- let me rephrase this question.
24     As the chief human resources officer, as you
25 sit here today, you can't say that it would always be

Page 52

1  inappropriate to use a term to refer to a black employee
2  at Fifth Third as black fox?
3      MR. CIOFFI: Objection. Asked and answered.
4  It's hypothetical. Calls for speculation. He's
5  answered it, but...
6
7  BY MR. SABA:
8      Q. Go ahead.
9      MR. CIOFFI: You can answer it again.
10     THE WITNESS: Again, I'd have to understand
11 the specific context and the relationships the
12 individuals have.
13 BY MR. SABA:
14     Q. So what would be a context and a relationship
15 between the individuals that would make it appropriate
16 to refer to a black employee at Fifth Third as a black
17 fox?
18     MR. CIOFFI: Objection. Calls for
19 speculation. He said he doesn't know and can't
20 speculate.
21 BY MR. SABA:
22     Q. Go ahead.
23     **A. I don't know. Again, every situation could**
24 **have its own context, could have its own relationship**
25 **aspects to it. So I don't know.**

Deposition of Robert Paul Shaffer                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 53

Q. Well, and what we're trying to understand,
you're saying there may a context or relationship where
it's appropriate. What is that?

MR. CIOFFI: Objection. He's answered. He
doesn't know. You can't force him to know
something he doesn't know. What's your point,
counsel?

THE WITNESS: Again, I don't know. I'd have
to understand the context and the relationship
aspects involved in the situation.

MR. CIOFFI: Counsel, I can tell by the look
on your face you don't like his answer, but that's
his answer. He's answered it squarely.

MR. SABA: No, no, no. I don't like --

MR. CIOFFI: You keep asking it and then
arguing with him.

MR. SABA: I don't like the answers you're
making up for him. I hope -- that's all right.

BY MR. SABA:

Q. Mr. Shaffer, do you know enough, as the former
chief human resources officer at Fifth Third, to
recognize if there's situations where the term "black
fox," when used to refer to a black employee at Fifth
Third, would be inappropriate?

MR. CIOFFI: Objection. If you know, you can

Page 54

answer the question.

THE WITNESS: I'm sorry. What's the question
again?

MR. SABA: Yes.

BY MR. SABA:

Q. I'm asking as the former chief human resources
officer for Fifth Third Bank, are there situations where
it would be inappropriate for an individual to refer to
a black employee as black fox?

A. Every situation has its own facts and
circumstances, so I don't know. We'd have to understand
the context and the relationship aspects to determine
one way or the other.

Q. And I'm asking you, is there a situation where
it would be inappropriate?

MR. CIOFFI: Objection. He answered the
question. It depends on the context.

BY MR. SABA:

Q. Yes, I'm asking you for a context to when it
would be inappropriate?

MR. CIOFFI: And he's answered that question
he doesn't know. The fact that you ask him five
times isn't going to put knowledge in his head.
Objection. Counsel, you need to move on. This is
ridiculous.

Page 55

MR. SABA: Thank you. Thank you for the
advice, Michael.

BY MR. SABA:

Q. Mr. Shaffer, so as you sit here today, as the
chief human resources officer for Fifth Third for over
three years, you can't tell me because you don't know of
a situation when it would be inappropriate for an
employee at Fifth Third to refer to a black employee as
black fox; is that correct?

MR. CIOFFI: Objection. Asked and answered.
Calls for speculation.

BY MR. SABA:

Q. Go ahead.

A. I'm telling you, I would have to understand
the details and the context of the situation and the
relationships to the individuals to determine.

Q. That's what I'm asking you for. What would be
the context, details, and relationships with individuals
where that would be inappropriate?

MR. CIOFFI: Objection. He's answered that
question, too, and it calls for speculation. It's
an inappropriate question, but you can answer it
again.

MR. SABA: It's not an inappropriate question.

MR. CIOFFI: You can't ask a witness to

Page 56

speculate.

MR. SABA: I'm not asking him to speculate.

MR. CIOFFI: Yes you are.

THE WITNESS: What's the question again?

MR. CIOFFI: The whole question is
hypothetical. The whole question calls
for speculation.

BY MR. SABA:

Q. As the chief human resources officer for Fifth
Third Bank for three years, I'm asking you, is there a
situation where it would be inappropriate for an
individual to refer to a black employee as black fox?

MR. CIOFFI: Objection. He's answered that
question. It depends on the circumstances.

THE WITNESS: As I've answered the question
multiple times, it would depend on the situation
and certain facts and circumstances and context and
relationships.

BY MR. SABA:

Q. And I asked you, what are the situations,
circumstances, facts, and relationships where it would
be inappropriate?

MR. CIOFFI: Objection. If he doesn't know,
he can't speculate. How many times does he have to
say it? He's answered it like about ten times now.

Deposition of Robert Paul Shaffer      Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 57

BY MR. SABA:

Q. You don't know is what your answer is?

A. I didn't say that. I said I'd have to understand the facts and circumstances, the context of the situation, and the relationships of the individuals.

Q. Okay. And so of those factors, what would they need to be for it to be inappropriate?

A. I don't want to speculate on what those situations might be. They're all individual.

Q. So you can't give me a situation where that would be inappropriate?

MR. CIOFFI: Counsel, he has said he can't speculate. Objection.

BY MR. SABA:

Q. Can you identify a situation where that would be inappropriate?

MR. CIOFFI: Objection. Same objection.

BY MR. SABA:

Q. Mr. Shaffer --

A. What's the question?

Q. -- can you identify a situation where it would be inappropriate for an employee at Fifth Third Bank to refer to a black employee at Fifth Third Bank as black fox?

A. Again, as I've answered, I'd want to

Page 58

understand the situation, the context, the facts and circumstances, and the relationships --

Q. Okay. And I asked you --

A. -- to be able to make a ruling on it.

Q. And I asked you, can you identify a situation where that would be inappropriate?

MR. CIOFFI: Objection. And he's answered it numerous times.

Counsel, you're --

MR. SABA: No, no. He doesn't want to answer it. I understand that.

MR. CIOFFI: No, he did answer it. He can't speculate. I mean, what don't you understand about --

MR. SABA: No, no. He can identify a situation.

MR. CIOFFI: No. How do you know what he can do? He's answered the question.

BY MR. SABA:

Q. Mr. Shaffer --

A. Same answer.

Q. -- you can't identify a situation; is that right?

A. Again, if you would go through the facts and circumstances, the relationship aspects, the context,

Page 59

then you would make an assessment, but --

Q. Right.

A. I don't want to speculate.

Q. And I'm asking you to identify that?

A. I don't want to speculate on what that might be because they're all individual and it could be complex.

Q. But you can't identify a situation where that would certainly be inappropriate for an employee at Fifth Third Bank to refer to a black employee at Fifth Third Bank as black fox?

MR. CIOFFI: Objection. He's answered it.

BY MR. SABA:

Q. Is that right?

A. Same answer.

Q. Do you understand what unconscious or implicit bias is?

A. Yes.

Q. What is unconscious or implicit bias?

A. It's unknowingly making statements or comments about protected class individuals.

Q. And what effect does unconscious or implicit bias have in the workplace?

A. I'm sorry, I don't understand the question.

Q. The question is, you identified what

Page 60

unconscious or implicit bias is. What effect can unconscious and implicit bias have in the workplace?

A. Well, I guess it would depend on what is happening, what the context of the situation is, who's involved, and understanding the facts and circumstances of that situation.

Q. Do you understand that unconscious or implicit bias can lead to workplace bias or decisions in the workplace based upon that bias?

A. Sure.

Q. When did you receive your training regarding microaggression and unconscious and implicit bias?

MR. CIOFFI: Objection. He's answered that question, too, but go ahead.

THE WITNESS: I mean, as part of our normal curriculum at Fifth Third. I can't remember when we started it, and I'm sure it's evolved over time in terms of the content and our curriculum on an annual basis.

BY MR. SABA:

Q. Did you receive any documentation as part of that training?

A. Well, it's typically online kind of tests -- or not tests, training. There could be a testing component to it to assess your knowledge of what you

Deposition of Robert Paul Shaffer                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 61

1    just went through.

2            With any of our trainings, if there are any

3    policies, guides, etc., those would be referenced in the

4    training via links or where to go to get something on

5    our website, Internet site.

6        Q.   What was the online training with respect to

7    microaggression and unconscious or implicit bias?

8        A.   When are you talking about?

9        Q.   Any time between January 1 of 2018 and

10   November 1, 2020.

11       A.   I'd have to go back and look at the individual

12   training modules for each year to see explicitly what

13   was in there on those topics.

14       Q.   Who provides those training modules?

15       A.   When you say "provides," what do you mean?

16       Q.   Are they -- are they created by Fifth Third?

17   Are they created by a third-party source?

18       A.   I can't speak specifically to inclusion and

19   diversity training, but typically we either have

20   in-house construction of those materials or

21   accommodation of getting third-party assistance on

22   specific topics, but I'm answering that in the context

23   of all of our annual training programs, compliance, risk

24   management, inclusion, diversity, etc.

25       Q.   Who would have been responsible for creating

Page 62

1    or obtaining the inclusion and diversity training?

2        A.   Probably a combination of HR and legal, but I

3    can't recall specifically for those individual modules.

4        Q.   Do you know if the modules had a particular

5    name?

6        A.   I don't recall the specific names of them.

7        Q.   Would a report be generated after somebody

8    completed the training?

9        A.   What do you mean by "report"?

10       Q.   A report of how they did, if there were

11   testing involved, a record of attendance?

12       A.   We do keep record if somebody's taken the

13   training, that's monitored, because they're required

14   trainings.  If you -- if there's a testing component,

15   you receive, you know, a certificate of completion with

16   that, assuming you passed the test or you retake the

17   training.  That's it.

18       Q.   Going back to the period of time January 1st

19   to November 1st, 2020, when would reviews take place of

20   members of the enterprise committee?

21       A.   I'm sorry?  November?

22       Q.   January 1, 2018 --

23       A.   Yeah.

24       Q.   -- through November 1, 2020.

25       A.   Uh-huh.

Page 63

1        Q.   When would there be reviews of the members of

2    the enterprise committee?

3        A.   Typically the CEO would have a midyear

4    discussion with the enterprise member on progress on

5    goals and performance, expectations, opportunities, then

6    there would be a formal annual review conducted roughly

7    in February of each year where the enterprise member

8    would have an opportunity to provide a self-review and

9    the CEO would provide a written performance review

10   rating, compensation information and so forth.  But I

11   think as with any manager, the CEO would provide

12   feedback continuously throughout the year.

13       Q.   With -- go ahead.  I'm sorry.

14       A.   When appropriate or when needed, positively or

15   constructively.

16       Q.   What was your involvement with respect to the

17   midyear review?

18           MR. CIOFFI:  Objection.  Involvement with

19       respect to himself or others or what?

20           MR. SABA:  I'll rephrase the question.

21           MR. CIOFFI:  Please.

22   BY MR. SABA:

23       Q.   As the chief human resources officer in --

24   between January 1, 2018 and November 1, 2020, what was

25   your involvement with respect to the performance of the

Page 64

1    midyear reviews of members of the enterprise committee?

2        A.   Very little.  I would have the executive

3    assistant of the CEO ensure that she set up meeting

4    times for the CEO and the respective executive or

5    enterprise member.  I guess there probably could have

6    been occasions where the CEO asked me for any feedback

7    or thoughts, but I think those were very limited because

8    our CEO was very plugged in and had his own perspectives

9    on the strengths and opportunities of each of the

10   enterprise members.

11       Q.   Would you provide any information to -- the

12   CEO we're referring to at that point in time is Greg

13   Carmichael, correct?

14       A.   Correct.

15       Q.   And he's the one -- Greg Carmichael would

16   perform these midyear reviews and the annual reviews

17   during the time period that I'm referring to, January 1,

18   2018 --

19       A.   Uh-huh.

20       Q.   -- through November 1, 2020; is that correct?

21       A.   Yes.

22       Q.   And so with respect to -- and I asked you

23   about the midyear reviews.  Mr. Carmichael may ask you

24   for some comments before a midyear review, it would

25   depend; is that correct?

Page 65

1    A.   Yeah, or just any feedback or observations,
2  yeah.
3    Q.   Would you provide any documentation to
4  Mr. Carmichael in preparation for any of the midyear
5  reviews of members in the enterprise committee?
6    A.   No.  Those were discussion based.
7    Q.   Would you attend any of the midyear reviews?
8    A.   No.
9    Q.   Was there any record kept of the midyear
10 reviews?
11   A.   Not that I'm aware of.  I think we used to put
12 the dates in the system when the midyear reviews
13 occurred, but I'm not sure that is a requirement
14 anymore.
15       So it's just the, you know, the manager
16 setting up, I guess, it would be on their calendar when
17 the midyear reviews occurred.
18   Q.   Other than that, there wouldn't be reports
19 generated from the midyear review; is that correct?
20   A.   No.  Nope.
21   Q.   Would you ever meet with Mr. Carmichael or
22 discuss with Mr. Carmichael the results of any of the
23 midyear reviews of members of the enterprise committee?
24   A.   I think only to the extent in my role as the
25 CHRO that Mr. Carmichael wanted me to, you know, follow

Page 66

1  up with an individual or, you know, help assess, you
2  know, progress if there's something being worked on
3  because in my role as CHRO, I was very responsible,
4  invested in the enterprise team's development and, you
5  know, getting -- getting accomplished from a skill set
6  or development perspective that they needed to.
7    Q.   What do you mean follow up with an individual?
8  What would you do in that situation?
9    A.   Oh, just if there was any feedback that, you
10 know, Mr. Carmichael wanted to make sure that the
11 executive, if they needed any help, or any assistance
12 with anything that, you know, in my role that I could
13 help facilitate.
14   Q.   Were those -- strike that.
15       When you would have discussions with
16 Mr. Carmichael regarding any follow-up he wanted you to
17 do with an enterprise committee member following their
18 midyear review, would that be documented anywhere?
19   A.   I'm sorry, could you repeat that question?
20   Q.   Sure.  You indicated that on occasion with
21 respect to the midyear reviews --
22   A.   Uh-huh.
23   Q.   -- Mr. Carmichael may have you follow up with
24 certain members of the enterprise committee to see what
25 you could do to assist them or facilitate them in your

Page 67

1  role as CHRO.
2    A.   Uh-huh.
3    Q.   My question is, would that request for you to
4  follow up with an individual or issues he wanted you to
5  work on them with, was that documented anywhere?  Was
6  that done in writing?  Was that the byproduct of just a
7  face-to-face meeting or discussion between you and
8  Mr. Carmichael?
9    A.   Just a discussion.  There wasn't any
10 documentation.
11   Q.   Phil McHugh's midyear review with
12 Mr. Carmichael in 2019 was on August 15, 2019.  Did you
13 have any discussions with Mr. Carmichael regarding that
14 review?
15       MR. CIOFFI:  Objection.  Compound question.
16       Are you asking him if it happened on August 15 and
17       did he have any discussions?
18 BY MR. SABA:
19   Q.   I'm representing to you that he had a review,
20 midyear review with Mr. Carmichael on August 15th, 2019.
21   A.   Uh-huh.
22   Q.   Do you have any reason to contest that that
23 was the date of Mr. McHugh's midyear review with
24 Mr. Carmichael?
25   A.   No.

Page 68

1    Q.   Do you recall that being the date of
2  Mr. McHugh's midyear review with Mr. Carmichael?
3    A.   Not the exact date, no.
4    Q.   Did you have any discussions with
5  Mr. Carmichael regarding Phil McHugh's midyear review
6  with Mr. Carmichael on August 15, 2019?
7    A.   Yes.
8    Q.   What were those discussions?
9    A.   Those discussions were related to the fact
10 that Greg wanted to talk to Phil about Phil's
11 interested -- Phil's interest in potentially being -- or
12 Phil's interest in being recommended by Greg to the
13 board to be a potential candidate for an emergency CEO
14 successor.
15       So he had that conversation with Phil.  He
16 actually had the same conversation with Tayfun Tuzun at
17 that time.  I don't know the exact date of that
18 conversation either.
19   Q.   Anything else about that that you discussed
20 with Mr. Carmichael?
21   A.   Not that I recall.
22   Q.   When did you have this discussion with
23 Mr. Carmichael about Phil's interest in being the
24 emergency CEO and successor?
25       MR. CIOFFI:  Objection.  I'm confused by the

Deposition of Robert Paul Shaffer                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 69

1 question. Did you mean to say with Mr. Carmichael
2 or with Mr. McHugh?
3 BY MR. SABA:
4  Q. Do you understand my question?
5  A. No.
6  Q. You indicated -- I asked you about what -- did
7 you have any conversations with Mr. Carmichael about his
8 midyear review with Mr. McHugh on August 15, 2019, you
9 said yes, Uh-huh.
10  A. Uh-huh.
11  Q. And I asked you what was the context of that
12 conversation, and you indicated it conveyed to you about
13 Phil's interest in being recommended to the board as the
14 emergency successor to being CEO; is that correct?
15  A. Yes.
16  Q. When did that conversation between you and
17 Mr. Carmichael occur about Phil's interest in being
18 recommended to the board as an emergency CEO and
19 successor to Carmichael?
20  A. I don't remember the exact date. I don't
21 recall it.
22  Q. Was that before the -- Mr. McHugh's annual
23 review with Mr. Carmichael on August 15, 2019 or after?
24  MR. CIOFFI: Objection. Again, just to
25 clarify the record, the August 15 was not an annual

Page 70

1 review. It was a midyear review, right?
2  MR. SABA: Correct.
3  MR. CIOFFI: Okay. You said annual.
4  MR. SABA: Sorry.
5  THE WITNESS: I'm sorry, is it -- could you
6 repeat it?
7  MR. CIOFFI: Would you ask the question again,
8 please?
9  MR. SABA: Yes.
10 BY MR. SABA:
11  Q. My question was, the conversation you had with
12 Mr. Carmichael where you say he indicated that
13 Mr. McHugh was interested in being the emergency
14 successor --
15  A. Uh-huh.
16  Q. -- did that occur before the midyear review on
17 August 15, 2019, or after the midyear review on
18 August 15, 2019?
19  A. I don't recall for sure. I know we had it
20 after. We may have had it before as well, but I can't
21 recall that specifically.
22  Q. Did you have any conversations with Phil
23 McHugh about his midyear review with Mr. Carmichael?
24  A. I did.
25  Q. When did you have a conversation with

Page 71

1 Mr. McHugh about his midyear review with Mr. Carmichael?
2  A. Phil approached me right after the period of
3 time we had an offsite strategic planning meeting in
4 Maryland. Phil approached me to talk about him. He
5 wanted to confirm with me what Greg had communicated to
6 him, and I did confirm that Greg did, as Greg
7 communicated to me, that in the case of a need for an
8 emergency successor, would Phil have an interest in
9 being recommended to the board?
10  Q. What else was said during that conversation?
11  A. I don't recall what else. I know that Phil
12 did ask me if I would support that, in terms of him
13 being, you know, if he's interested to be recommended to
14 the board as a potential emergency successor, so I told
15 him I supported that.
16  But it's not my decision. It's ultimately the
17 board's decision who they place as potential emergency
18 successors or permanent successors. Not my decision.
19  Q. Do you recall anything else about that
20 conversation?
21  A. I do not.
22  Q. Did you indicate that you would support Phil
23 McHugh as being an emergency successor as president and
24 CEO to Greg Carmichael?
25  A. I did not. I supported Greg recommending to

Page 72

1 the board further consideration of Phil at the board's
2 decision being in that position as an emergency
3 successor. It's not my decision to make that.
4  Q. I'm not asking it's your decision. I'm just
5 asking if you supported Phil serving in that role?
6  MR. CIOFFI: Objection. Again, he's asked and
7 answered the question, support the recommendation,
8 but go ahead, you can answer.
9  THE WITNESS: It's not my decision to support
10 him or put him in that role. I supported what Greg
11 had indicated to him, Phil's interest to be
12 recommended by Greg to the board to be an emergency
13 CEO successor.
14 BY MR. SABA:
15  Q. In your opinion, was Phil an appropriate and
16 a -- excuse me -- an appropriate candidate for that
17 role?
18  A. For which role?
19  Q. Emergency successor?
20  A. As an emergency successor, yes.
21  Q. With respect to -- strike that.
22  At any time, did you have a conversation with
23 Mr. Carmichael during which he indicated that he
24 represented to Phil McHugh that he would want Phil to
25 succeed him in one to two years as president and CEO?

Deposition of Robert Paul Shaffer                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 73

1   **A. No.**

2   Q. At any time during your conversations with

3  Phil McHugh, did he indicate that he was interested in

4  succeeding Greg in one to two years as president and

5  CEO?

6   **A. No. Not that I recall.**

7   Q. At any time during your conversations with

8  Phil McHugh, did you indicate to him that you were aware

9  that Greg Carmichael stated that Greg wanted to leave in

10  one to two years and that Phil would succeed him as

11  president and CEO?

12   **A. No. I'm not aware of any such conversation.**

13  **The context of the emergency successor discussions was**

14  **around the fact that Greg may need, for personal**

15  **reasons, to step out earlier than what he had planned,**

16  **but never any specific timeline by which that would**

17  **occur.**

18   Q. But it's your position during the offsite at

19  the Inn at Perry's Cabin, you didn't communicate to Phil

20  McHugh that you knew that Greg Carmichael stayed at the

21  -- that Greg Carmichael wanted to leave in one to two

22  years and that Phil would succeed him as president and

23  CEO, correct?

24   **A. No.**

25   Q. You're saying no, that you did not state that

Page 74

1  to Phil McHugh, correct?

2   **A. I'm sorry, what was the question again?**

3   Q. So let me rephrase the question again, so you

4  understand what I'm saying.

5   **A. Yeah.**

6   Q. Is it your position that during the offsite at

7  the Inn at Perry's Cabin in August of 2019, that you did

8  not communicate to Phil McHugh that you knew Greg

9  Carmichael had indicated to Phil that Greg wanted to

10  leave in one to two years and that Phil would succeed

11  him as president and CEO?

12   **A. I did not state that.**

13   Q. Why did Greg Carmichael believe that he might

14  need an emergency successor and CEO?

15   MR. CIOFFI: Objection. Lack of foundation.

16  I mean, if you know.

17   THE WITNESS: He --

18   MR. CIOFFI: If you know.

19   THE WITNESS: He communicated to me for

20  personal reasons, potentially personal health

21  reasons, but I don't know any more details than

22  that.

23  BY MR. SABA:

24   Q. During your meeting with Phil McHugh at the

25  Inn of Perry's Cabin, did you communicate to Phil that

Page 75

1  you knew that Tim Spence was not ready to succeed Greg

2  as president and CEO, and that Tim would be well served

3  by observing Phil as president and CEO?

4   **A. I'm sorry. Could you repeat all that again?**

5   Q. Correct. Yes.

6   During your meeting with Phil McHugh at the

7  offsite in Maryland, did you communicate to Phil that

8  Tim Spence was not ready to succeed Greg as president

9  and CEO, and Tim Spence would be well served by

10  observing Phil as president and CEO?

11   MR. CIOFFI: Objection to the form. You may

12  answer.

13   THE WITNESS: I do not recall that. Because

14  the discussion I was having with Phil was around

15  emergency successor because those were the

16  qualifications that Phil has. He definitely does

17  not have the qualifications to be the CEO and

18  president of this company.

19  BY MR. SABA:

20   Q. And why do you say that?

21   **A. Phil's qualifications -- I mean, he doesn't**

22  **have the vision, kind of long-term strategy aspects to**

23  **lead the company forward, to inspire people. What the**

24  **emergency successor is, is somebody who can keep the**

25  **lights on. Phil has a lot of experience with us. You**

Page 76

1  **know, we've always said he's a good manager, a competent**

2  **manager, kind of like a caretaker is what an emergency**

3  **successor is, and, you know, that's the -- the**

4  **qualifications Phil has.**

5   **It's kind of like, in a sports analogy, your**

6  **starting quarterback goes down, you put your second**

7  **stringer in there just to hope to keep the -- keep the**

8  **lights on, keep the business as usual and kind of the**

9  **status quo going.**

10   Q. At any point in time, did Phil McHugh indicate

11  to you that he was interested in being the president and

12  CEO of Fifth Third Bank?

13   **A. Not that I recall.**

14   Q. At any point in time did Phil McHugh indicate

15  to you that he was only interested in being an emergency

16  successor as president and CEO of Fifth Third Bank, but

17  he did not want to be the president and CEO of Fifth

18  Third Bank?

19   MR. CIOFFI: Objection. A couple double

20  negatives in there, but can you restate that?

21   THE WITNESS: Could you restate it, please?

22  BY MR. SABA:

23   Q. At any point in time, did Phil McHugh indicate

24  to you that he was only interested in being the

25  emergency successor as president and CEO of Fifth Third

Deposition of Robert Paul Shaffer                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 77

1 Bank, but otherwise was not interested in being the
2 president and CEO of Fifth Third Bank?
3      **A. The discussion we were having in Maryland was**
4 **around what Greg talked to him about previously, which**
5 **was about his interest in being recommended to**
6 **potentially serve as the emergency successor if Greg had**
7 **to step out earlier than planned.**
8      Q. Do you recall indicating to Phil McHugh during
9 the -- your offsite meeting with him in Maryland that
10 you were excited to see Phil in the role of president
11 and CEO, and that you would do anything to help Phil
12 succeed in that role?
13      **A. No. I remember having, again, as I testified**
14 **earlier, if I would support Phil in being recommended by**
15 **Greg and ultimately if the board considered Phil an**
16 **emergency successor. As with any enterprise member, I**
17 **would do anything I could do to support their**
18 **development and what, you know, they wanted to try to**
19 **achieve as goals.**
20      MR. CIOFFI: Counsel, we've been going well
21      past 90 minutes. I don't want to interrupt this
22      line of questions. Please continue it, but when
23      you're finished with this line of questioning,
24      let's take a break.
25      MR. SABA: We can take a break right now.

Page 78

1      MR. CIOFFI: No, finish it. Finish your line
2      of questions.
3      MR. SABA: Why don't we go off for about five
4      minutes.
5      MR. CIOFFI: Yeah, let's keep it tight so we
6      can -- I don't know how much you have.
7      THE VIDEOGRAPHER: The time is 11:24 a.m. We
8      are going off the record.
9      (A recess was taken from 11:24 a.m. to
10      11:43 a.m.)
11      THE VIDEOGRAPHER: The time is 11:43 a.m. We
12      are back on the record.
13      (Deposition Exhibit 5 is marked for
14      identification.)
15 BY MR. SABA:
16      Q. Mr. Shaffer, I've handed you what's been
17 marked as Exhibit Number 5, which should be Bates
18 stamped Fifth Third McHugh 197022 through 197033; is
19 that correct?
20      **A. It is correct.**
21      Q. Are you able to identify this document for me?
22      **A. This is a document that was prepared for**
23 **strategic planning offsite from August 18th through the**
24 **21st, 2019.**
25      Q. And this is the same offsite that you were

Page 79

1 referring to where you had the conversation with Phil
2 McHugh about his midyear review with Greg Carmichael; is
3 that correct?
4      **A. Yes.**
5      Q. And do you recall that the conversation you
6 had with Phil McHugh was on August 18, 2019, that
7 evening?
8      **A. I believe it was the first night we were**
9 **there.**
10      Q. And with respect to that conversation you had
11 with Mr. McHugh, did you subsequently have conversations
12 about your Phil McHugh conversation with Frank Forrest?
13      **A. Not that I recall.**
14      Q. Did you ever indicate to Frank Forrest that
15 Greg had communicated to Phil that he wanted Phil to
16 replace him or succeed him as president and CEO in one
17 to two years?
18      **A. I'm sorry, I don't understand the question.**
19 **Is it Phil or Frank that you're questioning?**
20      Q. My question is, did you share the information
21 from your conversation with Phil McHugh or about Phil
22 McHugh with Frank Forrest?
23      **A. I don't recall.**
24      Q. Specifically, did you share the information
25 that Greg Carmichael wanted Phil to succeed him as

Page 80

1 president and CEO within one to two years?
2      **A. I don't recall that, no.**
3      Q. Did you ever have a conversation with Tuzun
4 Tayfun (sic) about your conversation with Phil at the
5 offsite on August 18, 2019?
6      **A. Not that I recall.**
7      Q. Did you ever indicate to Tuzun Tayfun that
8 Greg Carmichael had indicated that he would like Phil to
9 succeed him in one to two years as president and CEO?
10      **A. I'm sorry, can you repeat that, please?**
11      Q. Yes. Did you ever indicate to Tayfun Tuzun
12 that Greg had indicated that he wanted Phil to succeed
13 him as president and CEO within one to two years?
14      **A. Not that I recall.**
15      Q. Did you ever indicate to Tayfun Tuzun that you
16 hoped that Phil had not recorded your conversation with
17 him at the Inn at Perry's Cabin on August 18, 2019?
18      **A. Not that I recall.**
19      Q. Did you ever have a conversation with Brian
20 Lamb regarding your conversation with Phil at the Inn at
21 Perry's Cabin on August 18, 2019?
22      **A. Not that I recall.**
23      Q. Did you ever indicate to Brian Lamb that Greg
24 Carmichael had indicated that he wanted Phil to succeed
25 him as president and CEO within one to two years?

Deposition of Robert Paul Shaffer          Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 81

1    A. Not that I recall.

2    Q. And with respect to all those questions, you

3 indicated that you did not recall. Are you saying that

4 those conversations never took place or as you sit here

5 today, you can't recall one way or the other?

6    A. I don't recall them ever taking place.

7    Q. You indicated that you felt Phil is not

8 qualified to be president and CEO; is that correct?

9    A. That is correct.

10    Q. When did you develop the opinion that Phil was

11 not qualified to be president and CEO of Fifth Third

12 Bank?

13    A. Well, first of all, it's ultimately the

14 board's opinion to determine whether Phil or any other

15 candidate would be qualified to be the president and the

16 CEO of Fifth Third Bank. From my perspective, Phil has

17 a number of -- lack of qualifications to be in that

18 role.

19    First, as I testified earlier, he lacks the --

20 to be able to develop a vision and implement a vision

21 that would lead this company forward, inspire people.

22 He lacks the strategic capability to do that as well.

23 Obviously we had to hire Oliver Wyman, the board did, in

24 2010 or '11, and ultimately we hired Tim Spence because

25 Tim brought that strategic capability. We didn't have

Page 82

1 anybody in the company, excuse me, that had that

2 strategic capability, including Phil.

3    Phil lacks technology skills and depth of

4 knowledge. He lacks Fintech skills and knowledge of

5 that industry and what that industry brings to banking

6 competition. He lacks in-depth knowledge of our peers

7 and our competitors from a -- doesn't understand, have a

8 lot of knowledge of their business model, their

9 strategies, their management teams. I've -- also feel

10 that Phil -- that Phil lacks the emotional intelligence

11 and executive presence to be in that role as well. It's

12 fairly easy to get him riled up and flustered. I

13 certainly wouldn't want to put somebody like that in

14 front of shareholders, potential investors, analysts,

15 rating agencies.

16    And then from a talent perspective, that's

17 definitely not a strength of Phil's. And I've plenty of

18 examples where I could talk about on the talent side.

19 I'll give a few here.

20    One is, if you look at our current management

21 committee membership, which is the top 100 plus in the

22 company, there's not a single person on that management

23 committee that Phil McHugh hired. To me, 34 years at

24 the bank, not having anybody at that level, I think is a

25 tall tale (sic) sign.

Page 83

1    Secondly, the only two real high level --

2 higher level people I ever remember Phil hiring

3 externally was a gentleman by Ruben Rashty in our wealth

4 and asset management business, and Jamie Cahn, who ran

5 our institutional business. And in both of those cases,

6 those were disasters. We had to ask those individuals

7 to leave the company.

8    Another good example of Phil's lack of talent,

9 skills, when Phil ran the consumer bank, Mike Butera was

10 our retail leader. I know Greg talked to Phil a number

11 of times about Mike not being capable of leading that

12 group in the way we needed to. Phil never took any

13 action on that.

14    And it wasn't until Tim Spence took over the

15 consumer bank that Tim took action and actually didn't

16 want to get rid of Mike from the company. Mike has a

17 lot of good skills and actually, and to this day, Mike

18 is with Fifth Third and has a big role, but it took Tim

19 to really take that action to get it done. Phil just

20 never really had the ability to do the hard coaching,

21 deliver the tough feedback, to really improve anyone's

22 performance.

23    Q. And these thoughts about Phil, when did you

24 develop those?

25    A. Over time, just based on my experiences with

Page 84

1 him. We were executives together at the bank. We were

2 in a lot of meetings together, a lot of situations,

3 worked on a lot of things together, and of course being

4 the chief human resources officer for a period of time,

5 you know, observing and looking at Phil closer from that

6 perspective.

7    Q. Did you feel that way as of January 1 of 2019?

8    A. Yes.

9    Q. Did you feel that way as of January 1, 2018?

10    A. Yeah. I've always had those views, that Phil

11 doesn't have the qualifications to be the CEO or

12 president of this company.

13    Q. But you did feel he had the qualifications to

14 be the emergency successor, president and CEO; is that

15 right?

16    A. I did.

17    Q. And what characteristics did he have that made

18 him appropriate to be the emergency successor president

19 and CEO?

20    A. To be the emergency, as I testified earlier,

21 you know, Phil could keep the lights on. He has a lot

22 of experience with the bank. He could keep the team

23 together. He could keep the business as usual,

24 operations running, keep the status quo and really serve

25 in that caretaker kind of capacity for, you know, a

Page 85

1  short period of time until a permanent successor was
2  identified.
3        And, again, it's not my decision of who is the
4  emergency successor or the permanent successor, it's the
5  board's, but helping the board administer, you know,
6  those processes, providing them with information, our
7  emergency succession plan actually has a bunch of steps
8  in it that, you know, happen in case, you know, our
9  current CEO gets sick, gets killed, commits fraud, you
10 know, whatever. They get enacted very quickly so we
11 have a very defined mature process that the board
12 oversees and leads.
13       The last step of that process is for the board
14 to initiate the search for a permanent successor. So
15 that would be viewed as a very short period of time and
16 Phil, I believe, at that time had those capabilities to
17 do that.
18       (Mr. McHugh exits the room.)
19       (The following testimony is Confidential --
20       Subject to Protective Order.)
21
22
23
24
25

Page 86

1              * * *
2        (Deposition Exhibit 6 is marked for
3              identification.)
4  BY MR. SABA:
5    Q.  Mr. Shaffer, I've handed you what's been
6  marked as Exhibit Number 6. Fifth Third McHugh 0213203;
7  do you see that?
8    A.  I do.
9        MR. CIOFFI: Counsel, before you go any
10       further, by way of objection, this again is an
11       attorneys' eyes only document. Only part of it
12       should really be public in use. Some of it has
13       personal confidential medical information. Again,
14       we'll ask that this get redacted before it goes
15       into the record of this deposition. Go ahead.
16 BY MR. SABA:
17   Q.  Mr. Shaffer, this is a text message exchange
18 between you and Frank Forrest; is that correct?
19   A.  Uh-huh, it is correct.
20   Q.  And I'm going to refer you down to your text
21 message on October 11, 2019 at 10:51 a.m.; do you see
22 that?
23   A.  10:51, you said?
24   Q.  Yes.
25   A.  Uh-huh.

Page 87

1    Q.  Can you read that text message, please.
2    A.  "Heading to Chicago for some productive
3  conversations and problem resolution. I'll try to solve
4  the credit issues while I'm up there as well."
5    Q.  And Frank Forrest responds, "You need to do
6  that. We need one capable executive, not three,
7  overseeing MB. That would be a great start. Make it
8  happen."
9        Do you see that? Did I read that correctly?
10   A.  Uh-huh.
11   Q.  What is MB?
12   A.  It is MB Financial. It's a financial
13 institution in Chicago that we acquired.
14   Q.  When did Fifth Third acquire MB?
15   A.  20 -- I'm trying to figure closing -- I can't
16 remember if it's 2018 or 2019, I think. I can't
17 remember specifically.
18   Q.  And what were the problems you were having at
19 MB at that time in October 2019?
20   A.  I can't remember specifically. I think it was
21 really related to around integration aspects and
22 particularly in the credit area. You know, we bought MB
23 Financial for the middle market bank -- middle market
24 business and the retail business that they had. On the
25 credit side, I think what was happening at that time was

Page 88

1  we had, you know, lots of views and cooks in the kitchen
2  in terms of how they wanted to run that structure, and
3  we just needed to make sure that we brought the right
4  stability and so forth to it.
5    Q.  And in response to Frank Forrest's text
6  message of, "You need to do that. We need one capable
7  executive, not three overseeing MB. That would be a
8  great start. Make it happen." How did you respond?
9    A.  "I already did. I met with Greg earlier this
10 week and told him Phil is the guy. And that Lars needs
11 to work through Phil when necessary in Chicago."
12   Q.  And when you refer to "Greg," that's Greg
13 Carmichael; is that right?
14   A.  That's right.
15   Q.  And when you refer to "Phil," that's Phil
16 McHugh being the guy; is that correct?
17   A.  That's correct.
18   Q.  And was Phil made the guy to oversee MB?
19   A.  Well, I think at that time, as I recall, Phil
20 leading the regions, he was, you know, he was doing his
21 job and making sure we brought stability and the
22 appropriate communication and collaboration. So -- and
23 the right business processes. So again, he's just doing
24 his job in that role. He was leading the region so MB
25 was a big acquisition for our regions.

Deposition of Robert Paul Shaffer                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 89

Q. Well, clearly he was the capable executive
that you saw overseeing MB; is that right?

A. Yeah. No one ever said Phil wasn't a
competent manager.

Q. Mr. Shaffer, what are the talent decks?

A. What are you referring to?

Q. Have you heard the phrase "talent deck"?

A. Yes.

Q. When I use the phrase "talent deck," what do
you understand that to mean?

A. Well, what I assume you're referring to is the
talent decks that we use of the enterprise members for
the board of directors.

Q. How were they used?

A. Information that the board, you know, wants or
needs is provided to them.

Q. Why is that information provided to the board?

A. It's the board's responsibility to oversee our
top-level talent management and succession planning
processes for the enterprise level. So it's a key
responsibility if -- you know, in terms of succession
planning, particularly as it relates to CEO and
presidents, the most critical thing the board does. We
have regulatory requirements that we have to have a
sound talent management succession planning process in

Page 90

place for the highest levels of the company, and the
board oversees that.

                              * * *

Page 91

(The previous testimony is Confidential --
Subject to Protective Order.)

(Mr. McHugh enters the room.)

BY MR. SABA:

Q. What was your role with respect to the talent
decks?

A. You know, an administrative role in terms of
ensuring that they got prepared, that they reflected
accurately the information that the board, you know, has
communicated then or previously, and any other request
that the board might have to put in.

(Deposition Exhibit 7 is marked for
identification.)

BY MR. SABA:

Q. Mr. Shaffer, you've been handed what's been
marked as Exhibit Number 7. It's Bates stamped Fifth
Third McHugh 005483 through 005515; is that correct?

A. What did you say the last number was?

Q. It's Fifth Third McHugh 005515.

A. Yes.

Q. Can you identify Exhibit Number 7 for me,
please?

A. Talent Management Update December 2018.

Q. And with respect to this particular -- and
strike that.

Page 92

Is this what you would refer to as the talent
deck?

A. As it relates to the board, yes.

Q. And with respect to this particular talent
deck, December 2018, what involvement did you have in
the creation of this talent deck?

A. I would have had ultimate administrative
oversight and responsibility for preparing the
information to present to the board that they expected
to see and wanted to see.

Q. Explain to me the process as to how the talent
deck is created?

A. Well, as it relates to 2018, I'll speak to
since that document's in front of me, it would be
working with a couple of my human capital people to
prepare it. In this case in 2018, we would start with
the prior year deck and update it. We would add any
relevant information that we thought the board wanted or
needed related to the overarching human capital aspects
of our company, as well as then some specific
information on the enterprise team around pipelines, as
well as individual development plans which are included
at the back of this document, which were documents that
were generally prepared by the executive and their
senior HR business partners.

Deposition of Robert Paul Shaffer      Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 93

1 Q.  When you say "we" would add information, who's
2 we?
3 A.  Well, I would add information as my human
4 capital, a couple folks I worked with that put this
5 together, we would think about, you know, is there
6 anything major going on in the company from a human
7 capital perspective or the environment that's important.
8 A lot of this is just factual information on time lines
9 that we use for our talent approach or just continued
10 awareness.  It's results of, you know, talent wins,
11 external hires, promotions we've had during the year, so
12 it's just adding current information to the document
13 from the prior year.
14 Q.  Who are those people from human capital when
15 you refer to we?
16 A.  Nancy Pinckney and Liz McKay.
17 Q.  Anybody else?
18 A.  Well, as I said, these individual development
19 plans in the back for each executive would generally
20 have been prepared by the executive and their senior HR
21 business partners which could be a multiple group of
22 people.
23 Q.  What is Greg Carmichael's involvement in the
24 talent deck creation process?
25 A.  I would ask for input from Greg if

Page 94

1 there's anything from an overall human capital
2 perspective that he would like to see reflected prior to
3 us starting the drafting process, you know, and if there
4 was anything like that, we would certainly think about
5 considering -- or we would add it or build it in.
6 Obviously he has more direct discussions with the board,
7 so he has that perspective that they might want in here
8 as well.
9  And then he would review, you know, final
10 draft before I would send out a draft version to the
11 lead independent director as well as the head of the
12 human capital compensation committee to get any feedback
13 they have on changes, additions, deletions before it
14 would get sent out to the full board for the actual
15 meeting.
16 Q.  When would the process start each year to
17 create the new talent deck?
18 A.  Roughly, you know, maybe two months, a month
19 or two ahead.  Probably two months ahead of the actual
20 meeting, which always was like mid -- mid or a little
21 bit later than mid-December.
22 Q.  So two months or more ahead, we're talking
23 about sometime in September, October?
24 A.  Probably October.  I doubt if we ever started
25 in September, but I can't speak specifically for each

Page 95

1 year.
2  (Deposition Exhibit 8 is marked for
3  identification.)
4 BY MR. SABA:
5 Q.  Mr. Shaffer, I've handed you what's been
6 marked as Exhibit Number 8, Fifth Third McHugh 006380.
7 Can you identify that for me, please?
8 A.  I'm sorry, could you repeat the number again?
9 Q.  Exhibit Number 8, Fifth Third McHugh 006380;
10 do you see that?
11 A.  I do.
12 Q.  Can you identify that?
13 A.  I do, yeah.
14 Q.  What is this document?
15 A.  This is an email from me, September 3, 2019 to
16 Charlie King.
17 Q.  And what does the email indicate?
18 A.  I'm sorry, what's the question?
19 Q.  What does this email indicate?
20 A.  This email is to Charley King, who's the lead
21 partner from our compensation -- external independent
22 compensation consulting firm FW Cook, and I was sending
23 him a couple documents that I would like him to review
24 and provide me with any, you know, best practices
25 feedback on what others do, because he has extensive

Page 96

1 experience in the human capital and compensation area
2 with peers and other large public companies.
3 Q.  And to be specific, you sent Charley King the
4 final talent deck from 2018; is that correct?
5 A.  According to the title on this here as an
6 attachment.
7 Q.  And you sent him the 2018 Break The Glass
8 Toolkit; is that correct?
9 A.  Same -- same answer.
10 Q.  And you indicate to him you'll be covering
11 these with the full board in December; is that right?
12 A.  That's correct.
13 Q.  And you also wanted to discuss any insight he
14 could provide on CEO succession processes; is that
15 right?
16 A.  That's correct.
17 Q.  Did you have your meeting with Charley King on
18 September 16, 2019?
19 A.  I know I met with him.  I'm not sure of the
20 exact date.
21 Q.  Did you have the meeting where you discussed
22 with Charley King his feedback regarding the 2018 talent
23 deck?
24 A.  I did.
25 Q.  What happened during that meeting?

Deposition of Robert Paul Shaffer                                        Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 97

A. So the context here is me as the chief human resources officer, I'm trying to, you know, utilize all my available resources to help with the talent -- executive talent management succession processes. Charley has a lot of view and visibility, like I had testified earlier, into other companies. He reviewed both documents. You know, he didn't have -- my recollection is he didn't have a lot of substantive comments other than he thought the documents looked really good.

I'm sure we'll get into this. The reason I was doing this is in 2019 was trying to take multiple documents and put them into one place for the ease of the board to review and have their discussion about the talent management, the executives and succession.

Q. Did he provide any specific feedback or recommendations?

A. I don't recall that happening.

Q. What insight did he provide regarding CEO succession processes?

MR. CIOFFI: Objection. Asked and answered. Go ahead.

THE WITNESS: I don't recall any specific feedback he provided on that.

BY MR. SABA:

Page 98

Q. Referring specifically to the creation of the 2019 talent deck, what would have been the next step in the process after your meeting with Charley King?

A. Well, what I did in 2019 in the October time frame, again, worked with two members of my human capital team to begin to prepare a draft of -- or drafts of the document that would ultimately go to the board in December for their discussion.

Q. And how would you and your team work to prepare a draft for the talent deck, what specifically would you do?

A. I'm sorry, I missed the beginning of that.

Q. Yes, how would you -- you mentioned your team would work to prepare a draft of the talent deck. How would that work? What specifically would your team do?

A. So 2019, again, as I testified earlier, we had a couple different documents out there. We had the Break the Glass toolkit, which was a specific document used prior to 2019 related to emergency CEO succession planning. That typically was presented and reviewed with the board in June or September of the -- during the year -- and we also had a separate talent management deck, of which you provided me a copy of the 2018 one earlier. I wanted to take those two documents and combine them into one for the ease of board discussion

Page 99

and assessment, as well as to, you know, bring the conversations together, because there's a lot of overlap in terms of talking about the talent management of the enterprise team and succession planning for all the executive roles as well as the CEO and president of the bank and the emergency -- potential emergency successor candidates.

Q. So would that start with a meeting between you and your team? How would that initially begin?

A. So I did have a meeting with Nancy and Liz. It was in my office. And we did a whiteboard session because I wanted to kind of look at these documents that we had in place and really focus on, initially, early on in the process of the conceptual framework and structure of the documents, the categories of information we're carrying over, you know, the names of boxes, things like that, to put in the one document going forward for the board.

Q. How long did that meeting last?

A. I don't recall.

Q. Who conducts the meeting?

A. What do you mean?

Q. Who runs the meeting? Who's operating the whiteboard?

A. I was up at the whiteboard.

Page 100

Q. And how are you communicating the information that you want inserted into the talent deck?

A. At that meeting?

Q. Yes.

A. Well, again, we were kind of focused on the conceptual structure and framework of the documents, so we were just, you know, I was whiteboarding up what, you know, various topics and so forth we could have in there, how the talent cards would look, and type of information that, based on all my conversations and discussions I've been in with the board, thought would be responsive to what they are looking for in a one-stop document.

(Deposition Exhibit 9 is marked for identification.)

BY MR. SABA:

Q. Can you identify Exhibit 9 for me, please?

A. It's an email from Elizabeth McKay to me copying Nancy Pinckney and Paula Hennard.

Q. Paula Hennard is your assistant; is that correct, or was your assistant?

A. She was and is my executive assistant.

Q. Exhibit 9 is Bates stamped Fifth Third McHugh 006048; is that correct?

A. That is correct.

Deposition of Robert Paul Shaffer                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 101

1  Q. And what does that email indicate?
2     MR. CIOFFI: Objection. The document speaks
3  for itself. Do you want him to read it into the
4  record or what?
5  BY MR. SABA:
6  Q. Do you recall receiving this email marked as
7  Exhibit 9?
8     A. I don't specifically recall receiving it, no.
9  Q. Okay. The email sent to you a current draft
10 of the talent deck dated October 25, 2019; is that
11 correct?
12    A. I'm sorry, repeat that date?
13 Q. October 25, 2019?
14    A. Correct.
15 Q. This was the talent deck that was created as a
16 result of the whiteboard meeting; is that right?
17    A. A first draft probably, yeah.
18 Q. What would be the process after you received
19 the first draft of the talent deck?
20    A. Well, that particular year in 2019, again, I
21 was solely focused on the early drafts. I'm looking at
22 the conceptual structure and format of the document. I
23 was not worried about any details, any words and boxes
24 and so forth. I was just trying to get to the point
25 where I was comfortable with the overall structure and

Page 102

1  format.
2     (Deposition Exhibit 10 is marked for
3     identification.)
4  BY MR. SABA:
5  Q. Mr. Shaffer, you've been handed Exhibit
6  Number 10, which is Bates stamped Fifth Third McHugh
7  006943 through Fifth Third McHugh 006989. Do you see
8  that?
9     A. What's -- I didn't get the last numbers again.
10 Q. 006989; is that correct?
11    A. Yes, that's correct.
12 Q. Can you identify Exhibit 10 for me, please?
13    A. It's a draft dated October 25, 2019 of
14 the Executive Talent Management Succession Plan Update.
15 Q. Which is what we've been referring to as the
16 talent deck; is that correct?
17    A. That is correct.
18 Q. This is the document that would have been
19 emailed to you by Elizabeth McKay on October 25th; is
20 that correct?
21    A. I can't specifically say that this was the
22 document that was in that email, no.
23 Q. The attachments on Exhibit 9 refer to draft
24 talent management update 2019, October 25, 2019; is that
25 correct?

Page 103

1     A. That is correct.
2  Q. Okay. Do you have any reason to believe that
3  Exhibit 10 was not the document that was emailed to you
4  by Elizabeth McKay on October 25, 2019?
5     A. I don't have any reason to believe, but,
6  again, I can't say that this document was attached to
7  that email.
8  Q. Do you recall a different document being
9  attached to that email?
10    A. I do not recall. No. As I indicated, I
11 didn't recall the email.
12 Q. Have you seen Exhibit 10 before?
13    A. Yes.
14 Q. When would you have seen Exhibit 10?
15    A. As part of the drafting process.
16 Q. If I can refer you to Fifth Third McHugh
17 006955.
18    A. 6955?
19 Q. Yes.
20    A. Yes.
21 Q. Can you identify that document for me?
22    A. It's entitled, "Workforce of the Future Five
23 Generations in the Workplace Fifth Third Bank."
24 Q. Was this document part of the 2018 talent
25 deck?

Page 104

1     A. I don't recall. I could go back and look, but
2  I don't recall.
3  Q. You can go ahead and look.
4     A. It was not.
5  Q. Who made the decision to add in the Workforce
6  of the Future Five Generations in the Workforce Fifth
7  Third Bank into the talent deck for 2019?
8     A. I don't recall specifically who made the
9  decision. Again, as Nancy, Liz, and I were
10 whiteboarding and thinking about information that's
11 relevant from a human capital perspective just as data
12 points, that might have been the reason we added it; I
13 don't know.
14 Q. Why would this information be relevant as a
15 data point?
16    A. It's just a data point to show the
17 demographics of our workforce.
18 Q. By age?
19    A. From -- well, from a generation perspective.
20 Q. Which is essentially showing the workforce by
21 age, correct?
22    A. It has the year range in here, but it
23 wasn't -- didn't have anything to do with age. Again,
24 it's just showing the demographics across the different
25 generations.

Deposition of Robert Paul Shaffer        Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 105

1   Q. And what is the significance of showing
2 different generations in the workforce?
3   **A. Again, it's just a data point, you know, as**
4 **with any company, you know, the different generations**
5 **have, you know, different work -- potential different**
6 **work preferences and how they interact and so forth**
7 **together but, again, it's not age based, it's just**
8 **informational purposes here.**
9   Q. Well, it's age based because each generation
10 represents a different age group, correct?
11   **A. Sure.**
12   Q. Referring you on Exhibit Number 10 to Fifth
13 Third McHugh 006963.
14   **A. 6963?**
15   Q. Can you identify that document for me, please?
16   **A. It's Lars Anderson's talent card.**
17   Q. And that's what you would refer to these
18 profiles of each enterprise committee member as a talent
19 card for them; is that correct?
20   **A. Yes.**
21   Q. And with respect to using Lars Anderson as an
22 example, it provides his age; is that correct?
23   **A. It does.**
24   Q. And the age of the various members of the
25 enterprise committee was not included in the 2018

Page 106

1 version of the talent deck, was it?
2   **A. May I look again?**
3   Q. Please do.
4   **A. It was not.**
5   Q. Who decided that age information for each
6 member of the enterprise committee should be added to
7 the 2019 talent deck?
8   **A. I mean, ultimately I would have decided to**
9 **include that.**
10   Q. Why did you decide to include age to the 2019
11 version of the talent deck?
12   **A. It's just simple biographical information, no**
13 **different than where someone went to college. You know,**
14 **there's no other reason other than it included as**
15 **biographical information. Age is not a secret. All of**
16 **our executive team is -- has their age published in our**
17 **annual report every year, which is publicly available.**
18 **Again, that's biographical information in there.**
19   **And as we all know, no matter where we go,**
20 **doctor, you know, one of the first things we always have**
21 **to add to something we're filling out is the date of**
22 **birth or age, so it's just simple biographical**
23 **information.**
24   Q. What changed between 2018 and 2019 that
25 necessitated including age as a factor on each talent

Page 107

1 card?
2    MR. CIOFFI: Objection. Lack of foundation
3   that anything necessitated it, but if you know.
4    THE WITNESS: No, nothing did necessitate it.
5   It was just, again, kind of looking at the holistic
6   aspects of each individual and, you know, what type
7   of information, you know, we could include. So
8   nothing necessitated it.
9 BY MR. SABA:
10   Q. So you said, you know, wherever anybody goes
11 they have to provide their age, like to the doctor; is
12 that right?
13   **A. Not every place we go, but every form you fill**
14 **out for driver's license, doctors, you know, whatever,**
15 **we're always asked to add our age, date of birth.**
16   Q. So when employees apply for a job at Fifth
17 Third, are they required to give their age?
18   **A. I don't know. No, I don't believe so. No.**
19 **And we don't -- we have policies that we do not**
20 **discriminate against age in terms of the hiring process,**
21 **promotion process, or anything like that.**
22   Q. Right. You're not going to include age in
23 anything related to employment, hiring, or advancement,
24 are you?
25   **A. Sorry. Repeat that?**

Page 108

1   Q. Specifically, Fifth Third is not going to have
2 an employee candidate include their age on an
3 application because you're not supposed to include age
4 as a factor; isn't that right?
5    MR. CIOFFI: Objection. Lacks foundation.
6   But if you can answer.
7    THE WITNESS: Can you repeat that, please?
8 BY MR. SABA:
9   Q. Yes. When an employee candidate applies for a
10 job at Fifth Third Bank, they're not going to provide
11 their age on that application, are they?
12   **A. Right.**
13   Q. Because age is not supposed to be used as a
14 factor related to employment, is it?
15   **A. That's correct.**
16   Q. Okay.
17   **A. And age was not used as a factor here for**
18 **anything other than a biographical piece of information.**
19   Q. But you did include it for the board of
20 directors to look at with respect to these candidates,
21 correct?
22   **A. Yeah. Just as a piece of biographical**
23 **information. No different than what is in our annual**
24 **report.**
25   Q. Referring again to Fifth Third McHugh 006963,

Deposition of Robert Paul Shaffer                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 109

1  and using as an example the talent card for Lars
2  Anderson again, you also added a category of leader
3  capabilities under talent information; is that correct?
4      A.  Correct.
5      Q.  In fact, the whole category of talent
6  information was added, correct?
7      A.  The performance ratings I don't believe was
8  new.
9      Q.  You can go ahead and refer back to the 2018
10  talent deck so you can compare it.
11     A.  Yeah.  Yeah, performance rating was not new.
12  Key strengths and opportunities was not new.  We had
13  information in '18 on successor candidates and emergency
14  successors for these roles.  So not all of it.
15     Q.  Which parts were new?
16         MR. CIOFFI:  Objection.  The document speaks
17  for itself.  The two documents.  Did you notice
18  anything else in your review?
19         THE WITNESS:  That was new or --
20         MR. CIOFFI:  Yeah.
21         THE WITNESS:  I'm sorry, your question, any
22  new items?
23  BY MR. SABA:
24     Q.  Let's go back again.
25     A.  Yeah.

Page 110

1      Q.  And start looking under the talent
2  information.  The categories under leader capabilities,
3  strength and effective opportunity, that was all added,
4  correct?
5      A.  Other than the rating, PM rating, that was in
6  last year, the prior year document.
7      Q.  I'm -- well, right now I'm just referring to
8  the right side of the talent information box --
9      A.  Yeah, that's new, yeah.
10     Q.  -- under leader capabilities.  That was all
11  new, correct?
12     A.  Added into this document, yes.
13     Q.  And who decided to add that in?
14     A.  Again, at the end of the day, it would have
15  probably been me.  It would have been me.
16     Q.  Where did you get that information from?
17     A.  So that's a common framework we utilize for
18  all of our employees across the company, those four
19  specific leader capabilities, and we assess whether
20  people have strengths, are effective, or have
21  opportunities in those areas.
22     Q.  And who decides that?
23     A.  The manager.
24     Q.  And with respect to these members of the
25  enterprise committee, who would decide that?

Page 111

1      A.  The manager, CEO.
2      Q.  In this case, it would be Greg Carmichael with
3  respect to every member of the enterprise committee?
4      A.  Correct.
5      Q.  When would that information be communicated to
6  you?
7      A.  Well, it's -- I believe we include that in the
8  performance -- it's in the performance management
9  system.  So it's everybody's individual performance
10  review each year.  So we would have probably, from an HR
11  perspective, picked up whatever the prior year one --
12  prior year ratings were, and then Greg would have
13  reviewed those, obviously.
14     Q.  You're saying these are from 2018, is that
15  right, the end of 2018?  That's why they -- how they
16  ended up in 2019?
17     A.  Yeah, I mean, as it relates to the very first
18  draft, I mean, I assume -- I wasn't responsible for
19  going to get that information, but I assume Liz would
20  have picked it up from the prior year performance
21  review.
22     Q.  Referring specifically to Fifth Third McHugh
23  006968, I'm on Exhibit 10 again.
24     A.  Yes.
25     Q.  Can you identify that for me, please?

Page 112

1      A.  Phil McHugh's talent card.
2      Q.  And referring to the talent information under
3  leader capabilities --
4      A.  Uh-huh.
5      Q.  -- it has under act like an owner, be a great
6  coach, create connections, lead with ability, those are
7  all strengths for Phil McHugh; is that right?
8      A.  I wasn't paying attention to any of the
9  details.  This was a first draft of, you know, multiple
10  documents we were bringing together, and I was looking
11  at the conceptual structure and framework of the
12  document.  So I wasn't paying any attention to the
13  accuracy or even what was in the boxes of this -- in the
14  early drafts.
15     Q.  Yeah, I'm just confirming that's what it
16  indicates there; is that right?
17     A.  It does indicate it in this draft, yes.
18     Q.  And strength would be the highest ranking; is
19  that correct?
20     A.  Correct.
21     Q.  Under potential next positions, it lists
22  president, ready now, and CEO, one to two years; do you
23  see that?
24     A.  Yes.
25     Q.  Who would put that in there?

Deposition of Robert Paul Shaffer                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 113

1      A.   I don't know.  I wasn't responsible for
2   creating the documents.  You know, that would have been
3   Liz putting information in there.  So if I would have
4   been paying attention to anything other than structure
5   and format, I would have realized that that was a
6   complete mistake.  Obviously somebody with moderate
7   potential, which is what Phil obviously -- has always
8   demonstrated -- that would not be a president or CEO
9   successor.  So I don't know if it's a miscommunication,
10  a clerical error on Liz's part, she copied and pasted
11  something wrong from other documents, but that's an
12  error.
13     Q.   Wasn't this document created as a result of
14  the whiteboard meeting in your office?
15     A.   Yeah, the structure and format was, yes.  But
16  we didn't go through the details of any of the boxes.  I
17  wasn't ready to do that yet.  I needed to make sure we
18  got the right format and structure down.
19     Q.   Liz McKay indicated that you provided that
20  information to list Phil McHugh as president ready now
21  and CEO in one to two years?
22          MR. CIOFFI:  Objection.
23  BY MR. SABA:
24     Q.   Go ahead.  Is it your position that she
25  testified wrongly or incorrectly?

Page 114

1      A.   That's not my position.  I know I never
2   instructed Liz McKay to put that information in there.
3      Q.   Where would she have gotten that from?
4      A.   As I just testified, I don't know if it's a
5   clerical error, miscommunication, copy and paste error,
6   I'm not sure.  This was the first of -- draft of 10 or
7   11 drafts that we had, and I wasn't focused on that
8   detail at this point.
9      Q.   The information that's put in for Phil McHugh
10  for potential next positions is exactly what Phil McHugh
11  testified that Greg Carmichael told him on August 15th,
12  that he would be the next president and ready for CEO in
13  one to two years; isn't that right?
14     A.   I have no idea what Greg told -- or what Phil
15  testified; I don't know.
16     Q.   You noted that Phil had only moderate
17  potential.  Where did that come from?
18     A.   That's been, you know, common of Phil over
19  time, prior discussions I've been in with the board and
20  other talent discussions.  There's nobody on the board
21  that ever communicated to me anything other than
22  moderate potential for him.
23     Q.   That's not part of the 2018 talent deck.
24  There's nothing that indicates there that Phil had
25  moderate potential, did it?

Page 115

1      A.   I'd have to go back and look.  I don't know.
2      Q.   Please do.
3      A.   Yeah, it kind of does here on McHugh 005498,
4   "capability/capacity to take on more," that's the exact
5   definition of moderate potential.
6      Q.   So to be specific, we're looking back at
7   Exhibit 7, and you're on page Fifth Third McHugh 005498;
8   is that right?
9      A.   Right.
10     Q.   And under the box for Phil McHugh, where it
11  lists his PM rating, it says "capability/capacity to
12  take on more," and you're saying that is indicative of
13  moderate potential because he has the ability to take on
14  more?
15     A.   Yeah.  That's, you know, we didn't note it as
16  moderate potential in here, but as -- in my role as
17  CHRO, the ability to take on more at that given time
18  was, you know, reflective of moderate potential.
19     Q.   So if we look down to Tim Spence on that same
20  page, he also only had moderate potential; isn't that
21  right, because he had the capability and capacity to
22  take on more?
23     A.   Yeah.  At that given time, that's what it says
24  on here, yeah.
25     Q.   So that's what that is, moderate potential?

Page 116

1      A.   Yeah, generally speaking.  Again, it's not the
2   exact definition that's, you know, put in here, in
3   our -- but it's an indication of, you know, Phil was a
4   good manager and he could take on more at that time.
5      Q.   So with respect to potential, it has three
6   rankings, high, moderate, and at potential.  I'm
7   referring back to 006968 on Exhibit Number 10; do you
8   see that?
9      A.   I do.
10     Q.   Are there definitions for each of those
11  categories?
12     A.   We would have formal definitions in our human
13  capital procedures and policies, yes.
14     Q.   And is the formal definition for moderate
15  potential capable -- capability capacity to take on
16  more?
17     A.   I mean, I think as you look at this level of
18  executive in the company, you have to look at moderate
19  potential being somebody who has the ability to expand
20  their role, take on some additional responsibilities,
21  but it's not somebody that can take that giant leap
22  forward and take on substantial more responsibilities
23  and a much broader scope of leadership capabilities.
24          But, again, the details of all in this 10/25
25  draft is not what I was looking at.  I was looking at

Deposition of Robert Paul Shaffer

Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 117

1  structure and format.
2      Q.  Where would Liz McKay have gotten the ranking
3  of moderate potential for Phil McHugh?
4      A.  Again, as with any of these boxes, I'm not
5  sure where she got the information.
6      Q.  Going back to the potential next positions,
7  would Liz McKay, is it your position she just made up
8  the president ready now CEO one to two years for Phil
9  McHugh?
10     MR. CIOFFI:  Objection.  Argumentative,
11  mischaracterizes what he said.  He said he didn't
12  know.
13     THE WITNESS:  That's not my position.
14  BY MR. SABA:
15     Q.  With respect to the information provided in
16  the key strengths and key focus areas, for Phil McHugh
17  specifically, where did that come from?
18     A.  I would assume it could have come from the
19  prior year performance review that Greg did for Phil,
20  but, again, I'd have to go back and look at it.  I don't
21  know where Liz captured the information, but if I had to
22  guess, that would be the starting point.
23     Q.  Did that -- did this information and key
24  strengths and key focus areas come as a result of the
25  whiteboard meeting?

Page 118

1      A.  No.
2      Q.  Were those covered in the whiteboard meeting?
3      A.  No.
4      Q.  Under key focus areas, it indicates "exposure
5  to certain key stakeholders, example investors, earnings
6  call and rating agencies"; do you see that?
7      A.  I do.
8      Q.  Where would that have come from?
9      A.  Same answer as the other boxes.  I'm not sure.
10  I don't know.
11     Q.  Under succession candidates for Phil, it lists
12  Tim Spence one to two years.  Do you see that?
13     A.  I do.
14     Q.  What is that referring to?
15     A.  Again, I wasn't putting in detail here.  I
16  wasn't looking at the accuracy of this information.
17     Q.  I'm just asking what does it refer to when
18  under the succession candidates box?
19     A.  Well, in the final version it would refer to
20  somebody being a potential successor candidate for this
21  role and whatever listed time period.
22     Q.  So as listed here on the October 25, 2019
23  version of the talent deck, it's listing that Tim Spence
24  would be ready to succeed Phil McHugh in one to two
25  years, correct?

Page 119

1      A.  That's what it says in this first draft, yes.
2      Q.  Do you know where Liz McKay would have gotten
3  this information to put in this talent deck for Phil
4  McHugh?
5      A.  I do not.
6      Q.  Referring to -- and I'm still on Exhibit 10,
7  Fifth Third McHugh 006971, which is the talent card for
8  Tim Spence; do you see that?
9      A.  I do.
10     Q.  Focusing on the talent information box,
11  specifically leader capabilities on the right hand side?
12     A.  Uh-huh.
13     Q.  It indicates that although act like an owner,
14  create connections, lead with agility, Mr. Spence has a
15  rating of strength, and be a great coach he only has a
16  rating as effective; is that correct?
17     A.  That's what this first draft says, yes.
18     Q.  Where would this information have come from?
19     A.  I don't know.  I wasn't focused on the details
20  here in the early drafts.
21     Q.  Under potential next positions for Mr. Spence,
22  it lists, "Head of regional banking two plus years, head
23  of commercial banking two plus years"; do you see that?
24     A.  I do.
25     Q.  Where would Liz McKay have gotten that

Page 120

1  information from?
2      A.  I don't know.  Same answer.
3      Q.  Under potential for Mr. Spence it lists, "High
4  potential."  Where would that information have come
5  from?
6      A.  Same answer.
7      Q.  Although clearly he only had moderate
8  potential back in 2018; is that right?
9      A.  In terms of what we looked at in the 2018
10  document, but consensus was building with the board, you
11  know, for a long time and the board definitely reflected
12  Tim as having very high potential.
13     Q.  Where do you get that from?
14     A.  Discussions that I've been involved with at
15  the board and talent sessions and so forth.
16     Q.  Who specifically?
17     A.  Who specifically what?
18     Q.  From the board did you have these discussions
19  about Tim?
20     A.  Full board.  We'd had the December talent
21  discussion, so I was in the December '17, the December
22  '18 talent discussions.
23     Q.  December 17 of what year?
24     A.  I'm sorry, 2017.  December 2017 and 2018.
25     Q.  You're saying that's when you had the

Deposition of Robert Paul Shaffer                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 121

1  discussions with them about Tim Spence's potential?
2      A.  Well, that's -- I'm just referencing the board
3  discussions that I would be in.  You know, there would
4  be other discussions from time to time with the board.
5  It's a continuous process for them for succession
6  planning.  They're constantly looking at it, you know,
7  they would talk to Greg and share their views with Greg
8  as well.
9      Q.  Is that where Liz McKay got this information
10 from for potential for Tim Spence?
11         MR. CIOFFI:  Objection.  Lack of foundation.
12     If you know.
13         THE WITNESS:  No.  As I've testified, I don't
14     know where any of the details came from here in
15     this first draft.
16 BY MR. SABA:
17     Q.  Referring you to Fifth Third McHugh 006978,
18 this is again on Exhibit Number 10, can you identify
19 that document for me, please?
20     A.  Title CEO Succession.
21     Q.  And this document lists Phil McHugh as the
22 first successor to be CEO in one to two years; is that
23 correct?
24     A.  That's what this first draft says.
25     Q.  He's also listed as an emergency successor

Page 122

1  along with Tayfun Tuzun; is that right?
2      A.  That's correct.
3      Q.  Where did Liz McKay get the information with
4  respect to this CEO succession plan and listing Phil
5  McHugh as the CEO successor in one to two years?
6      A.  I don't know.
7      Q.  Did that come as a result of the whiteboard
8  session that she had with you?
9      A.  It did not.
10     Q.  This would also be consistent with Phil
11 McHugh's representation of what Greg Carmichael
12 indicated to him during his midyear review on August 15,
13 2019; is that correct?
14         MR. CIOFFI:  Objection to the form.  Assumes
15     facts not in the record.  You may answer.
16         THE WITNESS:  I can't represent to Phil's
17     representation -- I can't validate Phil's
18     representation.
19 BY MR. SABA:
20     Q.  Referring you back to Exhibit 9, which is Liz
21 McKay's October 25, 2019 email to you.  At the end of
22 the email she asks a number of questions, "Also,
23 currently, the EVP that is listed as high potential has
24 two next potential positions, both with a readiness of
25 two plus years?  Should this be moderate potential for

Page 123

1  the point in time?  Thoughts?"
2      Did you ever respond to those questions?
3      A.  Not that I recall.  Again, I was looking at
4  the format and the structure of the document that we
5  were putting together and the early drafts.  I think Liz
6  is, you know, pointing out, you know, inconsistencies
7  both -- in both of those last two paragraphs that
8  somebody with moderate potential, in the second
9  paragraph, you know, wouldn't necessarily be the -- have
10 the positions indicated in that box, the same with the
11 high potential person might not be two plus years.  But
12 she apparently was just pointing out potential
13 inconsistencies.
14         (Deposition Exhibit 11 is marked for
15     identification.)
16 BY MR. SABA:
17     Q.  Mr. Shaffer, I've handed you what's been
18 marked as Exhibit Number 11, which is Bates stamped
19 Fifth Third McHugh 006713.  Can you identify that for
20 me, please?
21     A.  It is an email from me to Nancy Pinckney and
22 Liz McKay.
23     Q.  What do you indicate in your email to Nancy
24 and Liz McKay?
25         MR. CIOFFI:  Objection.  The document speaks

Page 124

1  for itself, but do you want him to read a portion
2  of it?
3         MR. SABA:  Sure.
4  BY MR. SABA:
5      Q.  Read the first paragraph.
6      A.  "Thanks for all the great work on this.  I
7  have made some changes to directly to the document
8  attached.  I would appreciate you reviewing and letting
9  me know if you have any questions or other suggestions.
10 Nancy, as we were communicating earlier, please have
11 Brian add the 12/17 data to the generations page.  Also,
12 I would like to get the EVS executive summary slide we
13 use for enterprise and replace it with the current slide
14 in the attached.  I want the board to get the page that
15 includes the Fifth Third score without MB."
16     Q.  What is the EVS executive summary slide?
17     A.  It's the employee viewpoint survey.  It refers
18 to that.
19     Q.  What is an employee viewpoint survey?
20     A.  It's an annual survey that we use an
21 independent third-party to survey our employees on
22 engagement.
23     Q.  Why do you do that?
24     A.  To take the temperature of the employee base,
25 get, you know, feedback on what's working well, what

Page 125

1  might be opportunities for us to address, both on a
2  macro basis across the company as well as on individual
3  teams.
4      Q.  It references here that you attached the
5  executive -- the talent deck updated to the November 7,
6  2019 draft; is that correct?
7      A.  Yes.
8          MR. SABA:  We can go off the record.
9          THE VIDEOGRAPHER:  The time is 1:01 p.m.  We
10 are going off the record.
11         (A recess was taken from 1:01 p.m. to
12         1:09 p.m.)
13         THE VIDEOGRAPHER:  The time is 1:09 p.m.  We
14 are back on the record.
15 BY MR. SABA:
16     Q.  Mr. Shaffer, in the last paragraph of your
17 email that's marked as Exhibit Number 11 that you sent
18 on November 11, 2019, the paragraph reads, "Lastly, I
19 had Phil review the one page on Kris Garrett.  He was
20 good with it.  I have Brian's out to Tim for his review
21 as well.  And, I had Saema review the CEO emergency
22 succession plan.  She had one comment I will address
23 tomorrow."
24         Do you see all that?
25     A.  I do.

Page 126

1      Q.  So Phil was Phil McHugh; is that right?
2      A.  Yes.
3      Q.  And who is Kris Garrett?
4      A.  Kris Garrett would have been reporting to Phil
5  at that time, running I believe WAM, wealth and asset
6  management.
7      Q.  And was Kris Garrett a part of the Enterprise
8  committee?
9      A.  Yes.  Let me just double-check that, but I'm
10 pretty sure she worked with it.  Yes.
11     Q.  And when you were saying the one page on Kris
12 Garrett, it's the Kris Garrett talent card; is that
13 right?
14     A.  I'm not sure.  I don't know.
15     Q.  Well, what other page would there be on Kris
16 Garrett other than her talent card?
17     A.  I don't know.
18     Q.  And for Brian, you're referring to Brian Lamb;
19 is that right?
20     A.  Yes.
21     Q.  And you're referring to Brian Lamb's talent
22 card; is that correct?
23     A.  Again, I'm not sure.  I didn't write talent
24 card in here.  I just said one page, so I'm not sure.
25     Q.  What else would they be reviewing on Kris

Page 127

1  Garrett or Brian Lamb other than their talent card?
2      A.  I don't know.  I don't recall back to November
3  of 2019.
4      Q.  And you're referring to Tim there, that's Tim
5  Spence; is that correct?
6      A.  Yes.
7      Q.  In the middle paragraph you referenced, "I
8  changed Marybeth from red since the announcement went
9  out about her."
10         What does that mean?
11     A.  I don't know.  I'm not sure.
12     Q.  And you go to say, "And on page 24, the
13 percentages out to the right seem to be distorted.
14 Could you please look at them and see if they need
15 fixed?"
16         Do you know what that means?
17     A.  I do not.
18         (Deposition Exhibit 12 is marked for
19         identification.)
20 BY MR. SABA:
21     Q.  Mr. Shaffer, I've handed you what's been
22 marked as Exhibit Number 12, Fifth Third McHugh 006714
23 through Fifth Third McHugh 006761.
24     A.  Yes.
25     Q.  Is that correct?

Page 128

1      A.  That's correct.
2      Q.  Can you identify this document for me, please?
3      A.  It's a draft dated November 7, 2019, the Board
4  of Directors Executive Talent Management and Succession
5  Plan update.
6      Q.  And this is the document that would have been
7  attached to your November 11th email to Nancy Pinckney;
8  is that correct?
9      A.  Again, I can't specifically say this was the
10 document, but there's an indicator and attachments that
11 something 2019, 11/7/19, but I can't specifically say
12 this was the attachment to the email.
13     Q.  Are you aware if there's a different draft to
14 the November 7, 2019?
15     A.  I am not.
16     Q.  Would there have been other conversations and
17 meetings between you and Ms. McKay and Ms. Pinckney
18 between October 25, 2019 and November 11, 2019?
19     A.  Regarding?
20     Q.  The talent deck?
21     A.  Not that I recall.  Again, that's almost four
22 years ago.
23     Q.  Referring you to Fifth Third McHugh 006739.
24     A.  Yes.
25     Q.  And this is again on Exhibit Number 12.  That

Page 129

1  is the talent card for Phil McHugh; is that correct?
2      A.  Correct.
3      Q.  And with respect to this talent card for Phil
4  McHugh, it has not changed from the October 25, 2019
5  draft with respect to the fact it still lists potential
6  next position president ready now; is that correct?
7      A.  That's correct.  And I'm not surprised because
8  as I said earlier, testified earlier, I was focused on
9  the conceptual structure and framework of the early
10  drafts of this document, not the details.
11      Q.  And it also lists CEO one to two years; is
12  that right?
13      A.  Correct.
14      Q.  Where you had Phil McHugh review Kris
15  Garrett's page, did you have anybody else review Phil
16  McHugh's page?
17      A.  Not that I recall.
18      Q.  With respect to Fifth Third --
19      A.  And I said earlier, I wasn't sure that one
20  pager in that email referred to her talent card.
21      Q.  But you're not able to identify anything else
22  that you would have Fifth -- Phil McHugh review
23  regarding Kris Garrett; is that right?
24      A.  Not that I recall, yes.
25      Q.  And referring to Fifth Third McHugh 006742 in

Page 130

1  Exhibit 12, that is the November 7th talent card for Tim
2  Spence; is that correct?
3      A.  That's correct.
4      Q.  And it lists potential next positions, head of
5  regional banking, head of commercial banking still; is
6  that correct?
7      A.  That is correct.
8      Q.  That's not changed since October 25, 2019
9  either; is that right?
10      A.  And I'm not surprised again, because I wasn't
11  reviewing details at that point.
12          You know, you talk about details of where Liz
13  may have gotten some of this information.  One thought
14  that I, you know, speculated on potentially is if you
15  look at the 2018 talent document, which was Exhibit 7.
16      Q.  Uh-huh.
17      A.  And you look at, you know, page 3, one of our
18  real trends influencing human capital going forward, you
19  know, there was a digital transformation which is a
20  really key focus -- was a key focus back then and
21  continues to be and, you know, I look at on the
22  individual development plan -- I'm sorry, not the
23  individual development plan.  Page 16 of that deck, you
24  know, you look at the strengths of Tim, "Intelligent,
25  forward-thinking, strategic leader, tremendous knowledge

Page 131

1  of banking sector, growth mindset, considered an
2  industry expert in digital banking."  He won the digital
3  banker of the year award that year from the American
4  Banker magazine.  "Strong focus on talent."
5          I mean, if I look at all that, you know,
6  again, I'm speculating where Liz might have got some
7  information, but if she looked at our priorities and
8  looked at the strengths of the team, that would be an
9  indicator of high potential.  I look at Phil's
10  strengths, "Long-seasoned leader, significant knowledge
11  of the organization, thoughtful, does a good job setting
12  direction and drives execution, holds himself and his
13  team accountable."  I mean, that's -- that's a
14  caretaker, that's a, you know, really looking at
15  somebody, as we talked back earlier on the emergency
16  successor discussion, that really, really holds out that
17  as well as somebody who has moderate potential versus
18  high potential based on Tim's strengths here.
19          So, again, I'm speculating on where because I
20  didn't direct Liz to put any information in the details
21  of these cards back then, but that could be something
22  that she looked at.
23      Q.  So she could be looking at 2018, and that
24  would be the same information that would indicate that
25  Phil McHugh should be the president now and ready to be

Page 132

1  CEO in one to two years?
2      A.  I was simply referring to potential, yeah.
3  Yeah.
4      Q.  Would she have also gotten the information
5  that Phil should be president now and ready to be CEO in
6  one to two years from that same talent deck?
7      A.  No, not necessarily.  As I said, I'm kind of
8  speculating on where she might have got information
9  because you asked me a number of questions on where this
10  came from and, again, I didn't direct her to it.  I'm
11  just giving you what might have been a possibility.
12      Q.  Referring you back to Exhibit Number 12, Fifth
13  Third McHugh 006749.
14      A.  6749?
15      Q.  Yes.
16      A.  Yes.
17      Q.  And that still lists Phil McHugh as the first
18  successor to be CEO in one to two years; is that
19  correct?
20      A.  That is correct.  Again, an early draft that I
21  didn't look at the content.  I know that wasn't the
22  expectation of what the board would see and was
23  subsequently changed to reflect what the board's views
24  are.
25      Q.  How did you know what the board's views were?

Page 133

1   A.   Based on sitting in talent discussions with
2  them over time.
3   Q.   So the board already decided at this point who
4  would be the next successor to be CEO?
5   A.   No, they did not.  They did assess that Phil
6  McHugh does not have the qualifications to be the next
7  president or CEO of the company, and they were building
8  a consensus over time, as I testified earlier, clear
9  back to 2015 when we hired Tim, but even further back
10 maybe 2011 when we hired Oliver Wyman to do our
11 strategic plan, because we didn't have anybody in-house,
12 including Phil, that could do that.  So they've been
13 building their consensus over time.  That continued to
14 be built through the talent discussions we had in 2017
15 and '18 as well.
16  Q.   So if I understand you correctly, you're
17 saying as early as 2011 the board had determined that
18 Phil McHugh was not qualified to be president or CEO?
19  A.   I didn't say that.  I said that they were
20 building a consensus that Tim Spence potentially had the
21 qualifications to do that role.  I'm not sure the exact
22 timing.  The discussions I started having or were
23 involved with with the board when I took over as a CHRO
24 clearly indicated that the board felt that Phil did not
25 have the qualifications to be the CEO or president of

Page 134

1  Fifth Third Bank.
2   Q.   When did you develop the understanding that
3  the board had determined that Phil did not possess the
4  qualifications to be president and/or CEO of the bank?
5   A.   I can't remember the exact time.  Again, it's,
6  you know, when I became the head of HR in 2017 and just
7  the discussions that ensued after that is my knowledge
8  base.  You'd have to ask the board specifically when
9  they felt that Phil didn't have the qualifications to do
10 that.
11  Q.   Was that ever communicated to you in writing?
12  A.   No.
13  Q.   Who specifically from the board communicated
14 that to you beginning back in 2017?
15  A.   I don't recall specifically who.  It was just
16 an open conversation, you know, a talent discussion with
17 the entire board, and no one in that room said in any
18 discussion I was in with the board that Phil ever had
19 the qualifications.  In fact, the opposite, that he did
20 not.
21  Q.   And did they specifically indicate to you why?
22  A.   They talked about things, you know, strategic
23 planning and development of the strategic plan and
24 execution were key -- was one key that Phil didn't
25 possess.  Again, that's why we had to go external and

Page 135

1  hire Oliver Wyman and ultimately Tim to do that.
2   The board is very focused on the go forward
3  strategy that we had back then, and today on digital
4  transformation the focus on technology and, you know,
5  the conclusion was by the board that I heard was that
6  Phil just does not have those capabilities, you know,
7  again the executive presence and emotional intelligence.
8  My feedback that I heard in those meetings from the
9  board as well as my own observations is when Phil is
10 presenting, he's reading the page, you know, you can
11 pretty easily get him derailed from his planned comments
12 and, you know, get him a little bit off base.  Emotional
13 intelligence aspect, executive presence.  So some of the
14 things I mentioned earlier informed those comments for
15 me.
16  Q.   This determination that Phil McHugh did not
17 possess the qualifications, skills, or abilities to be
18 president and CEO of Fifth Third Bank, is that reflected
19 anywhere in the board minutes?
20  A.   Not that I'm aware of.  But, again, you'd have
21 to ask the board.  It's not my decision on who is the
22 emergency successor or the ultimate successor for CEO.
23 The board makes those decisions.
24  Q.   Did Nancy and Liz ever respond to your email
25 on November 11th?

Page 136

1   A.   Not that I'm aware of.  I don't recall if they
2  did or not.
3   Q.   Would that be typical of them not to respond
4  with any reviews or changes that you requested?
5   A.   I'm not sure.  If they -- I don't know if the
6  email asked them.  I mean, maybe they updated things in
7  the following draft and provided it.  I can't recall
8  what happened back at this time.
9   Q.   They reported to you, correct?
10  A.   Nancy was a direct report of mine, yes.
11  Q.   What about Liz McKay?
12  A.   Liz reported to Nancy at that time, I believe.
13  Q.   Well, they both were subordinates of yours,
14 correct?
15  A.   Sure.  Yes.
16  Q.   But you don't recall if they responded back to
17 any direction you gave them?
18  A.   I don't recall getting an email back.  I mean,
19 could there have been a conversation?  I don't know, I
20 don't recall that either.  But there was a drafting
21 process going on that, you know, was continuing from
22 October until the time of the board meeting and
23 the final draft reviewed by -- to the board members.
24  (Deposition Exhibit 13 is marked for
25 identification.)

Deposition of Robert Paul Shaffer                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 137

BY MR. SABA:

Q.   Mr. Shaffer, you've been handed what's marked as Exhibit Number 12, Fifth Third McHugh 006886.

A.   No, it's actually Exhibit Number 13.

Q.   Oh, I'm sorry.  Are we on 13?  I stand corrected.  Thank you.

Exhibit 13.  Thank you.  It's Fifth Third McHugh 006886; is that correct?

A.   That's the first page, yes.

Q.   And that is through Fifth Third McHugh 006940; is that right?

A.   Correct.

Q.   Thank you.  Can you identify this document for me, please?

A.   It's a draft dated November 11, 2019, Board of Directors Executive Talent Management and Succession Plan Update.

Q.   If I can refer you specifically to Fifth Third McHugh 006918.

A.   Yes.

Q.   And that is the talent card for Phil McHugh; is that correct?

A.   That is correct.

Q.   And looking specifically at talent information under leader capabilities, the category of be a great

Page 138

coach has changed from a strength to effective; is that correct?

A.   It has, and that makes a lot of sense to me. This is obviously the draft I got into the details.  And actually if you look back at Phil's performance reviews that Greg did, I can only speak to 2017, 2018, 2019, basically Greg always had a comment in there about Phil's talent opportunities or needs, many of which I highlighted earlier in my testimony.

Q.   So who made the determination that that should change from a great coach from strength to effective?

A.   I would have as I started to look at the details of these talent cards and aligning them to what I know the board's views are, and as well as if there's specific information that would come from data sources we have, so whether those are performance reviews that Greg has done of the enterprise members or, you know, just confirming other factual information presented here.

Q.   Do you recall specifically where that change came from?

A.   I would -- I would assume it came from me.

Q.   No.  You said you would go to a number of different sources.  What was the specific source to change be a great coach from a strength to effective?

Page 139

A.   Well, I would have probably gone back and looked at performance -- the prior year performance reviews, as well as, again, the discussions that we've had with the board in the past and their views of these different categories and so forth.

Q.   Did the board ever express views about Phil's ability as a great coach?

A.   The conversations and the talent discussions included some of the assessments that I discussed earlier around Phil's capabilities and not being able to take timely employee actions in terms of changing somebody out of position, getting them in the right role, not having those tough conversations and so forth. So those were all included in the discussions.

Q.   Those comments that you're referring to about not being able to timely remove employees being made by board members, are those reflected anywhere in writing?

A.   No, they would not be reflected in writing. They would have been discussed in like in key focus areas here, timely execution of talent management actions to ensure the best leaders are in key positions.

Q.   Are you able to identify who specifically referred to those issues with Phil, which board members?

A.   No.

Q.   Are you able to identify when these comments

Page 140

were made?

A.   They would have been in the context of the talent management conversations we specifically had in December of each year.

Q.   But they're not documented in writing anywhere?

A.   Not documented other than the discussions that would occur with the board members, you know, Greg, and me.

Q.   Well, my point being they're verbal, there's nothing in writing that reflects that?

A.   Correct.  Correct.  Greg's annual performance review would include any of these potential strengths and focus areas.

Q.   With respect to potential next position, it's been changed from president ready now and CEO one to two years to head of middle market banking ready now?

A.   Correct.

Q.   Where did that information come from?

A.   Well, when I started reviewing the details, again, the board, you know, never expressed that Phil had the qualifications to be the president or CEO, so that was just inaccurate information.  We talked about that earlier.  In terms of head of middle market banking, I think that would have been, you know, coming

Page 141

from conversations we had previously had with the board or, you know, Greg's thought on opportunities for the enterprise team in general. No different than -- I bet you if I looked at mine, it would indicate that potential next positions would be the chief risk officer, and I guess that's exactly what happened in 2020.

Q. So specifically, where did head of middle market banking come from? Did you put that in? Did that come from Greg Carmichael? Who put that in the talent deck?

A. It would have been discussions that Greg and I would have had related to the executive team. It's our job -- Greg as the manager, me as the head of HR -- to look at the executive team and see what potential next positions might make sense for their continued development, our continued need as a company, and the shareholders' needs.

And that's more, you know, at the -- Greg and my level, I mean, the board sees this, they understand it, they agree with it. The board's focus is on the CEO succession. They're the ones that are ultimately making the call on the next CEO, whether that's an emergency CEO or a permanent successor CEO.

Q. When did you and Greg have the discussion that

Page 142

Phil McHugh's talent card should indicate that his potential next position is head of middle market banking?

A. I would say we could have discussions throughout the year on all the enterprise members. Again, it's his job as the CEO, the leader of the enterprise team. It's my job as the head of HR to continuously be thinking about what our executive team members' potential next positions could be, what makes sense for the company, as I mentioned earlier, and to the individual in terms of development and so forth.

It's not a one-and-done kind of conversation. It's a continuous process.

Q. Are any of these conversations documented in writing anywhere, indicating that the potential next position for Phil McHugh should be head of middle market banking ready now?

A. Not that I'm aware of.

Q. And is there any documentation in writing anywhere where board members indicated, prior to November 11, 2019, that Phil McHugh is not suitable to be president and/or CEO of Fifth Third Bank?

A. Can you repeat that?

Q. Sure.

A. Long question.

Page 143

Q. Is there any documentation in writing anywhere where a board member has indicated, prior to November 11, 2019, that Phil McHugh is not qualified to be president and/or CEO of Fifth Third Bank?

MR. CIOFFI: Counsel, just for clarification sake, you're talking about documents only, not testimony, are you?

MR. SABA: I'm talking about documents, correct.

MR. CIOFFI: Documents only. You may answer.

THE WITNESS: Not that I'm aware of from the documentation perspective. Again, being in my role and being in the conversations with the board over time on talent succession planning, it was very clear to me, again, the board's decision that they believed that Phil did not have the qualifications to be the president or CEO of Fifth Third Bank.

BY MR. SABA:

Q. Under key focus areas, the first bullet point that existed on the November 7th draft, indicating exposure to certain key shareholders, example investors, earnings -- earnings call and rating agencies was removed. Why was that bullet point removed?

MR. CIOFFI: Counsel, by way of objection, could you state on the record which two pages

Page 144

you're talking about, just so it's clear?

MR. SABA: Certainly. I'm referring -- I'm comparing Fifth Third McHugh 006739, which is --

MR. CIOFFI: Yes.

MR. SABA: -- part of Exhibit 12 --

MR. CIOFFI: Okay.

MR. SABA: -- to Fifth Third McHugh 006918.

MR. CIOFFI: Okay.

MR. SABA: Which is the talent card for Phil McHugh for -- on Exhibit 13; do you see that? And I'm referring specifically to the key focus area box and the first bullet point that appears on Fifth Third McHugh 06739 under key focus areas has been removed in the talent card version that we see on Fifth Third McHugh 006918; do you see that?

A. I do.

Q. Why was that removed?

A. Well, again, I can't attest to the earlier -- or the former page you referenced. As I testified earlier, that information, I'm not sure exactly where all that came from as I focus on more of the details in this draft when somebody has moderate potential and can be the head of middle market banking or take on some additional responsibilities, it would not be a development or focus area to get that type of exposure

Deposition of Robert Paul Shaffer                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 145

1 versus somebody who does have the qualifications and the
2 potential to -- and high potential to be the next
3 president or CEO candidate.
4    Q.  Where would Liz McKay get that as a key focus
5 area for Phil McHugh?
6    A.  Which one are you referring to?
7    Q.  In the -- and I'm referring to Fifth Third
8 McHugh 006739, first bullet point.
9    A.  6739.
10    Q.  That's the November 7th.
11    A.  Right.  As I testified earlier, I'm not sure.
12 I don't know.  Cut and paste error, clerical error, I'm
13 not sure.
14    Q.  Exhibit 13, if you can turn to Fifth Third
15 McHugh 006921.  Now I'm going to compare that to Fifth
16 Third McHugh 006742.  Under leader capabilities, Tim
17 Spence was previously indicated to be only effective as
18 be a great coach, and then he was changed to strength in
19 the November 11, 2019 version.  Do you have those pages
20 open?
21    A.  I do.
22    Q.  Who made the decision to change his ranking of
23 be a great coach from effective to strength?
24    A.  I would have.
25    Q.  And what did you base that upon?

Page 146

1    A.  Well, if you go back to Exhibit 7, the 2018
2 talent management update document, page 16, other than
3 me just knowing Tim and what the board thinks of Tim's
4 talent, effectiveness, coaching, the last bullet of
5 Tim's strength, "strong focus on talent and the
6 workforce of the future."
7    Q.  So you based -- you based that ranking off his
8 2018 talent deck?
9    A.  As one -- one item potentially looking at it.
10 Also on other things that we discussed with the board,
11 the talent moves Tim made over time.  I mean, when Tim
12 joined Fifth Third, he inherited a team and a direct
13 report team that he completely changed.  And there was
14 Kevin Sullivan, Charlie Bradley, Rick Rosen, and another
15 person in there, Mike Butera, who Tim looked at add said
16 they're not getting done what they need to in this role,
17 but they're valuable employees, and he moved them to
18 different roles.  And still today they're with the
19 company performing very effectively for us.
20      There were two other people on that direct
21 report team that Tim didn't feel was appropriate to have
22 in the company, given their skill sets and performance
23 and so forth, so they were no longer with the company.
24      He then over time has really hired really some
25 significant key talent force in the company.  At that

Page 147

1 time he hired Ben Hoffman in the strategy group, who now
2 runs strategy for us, and also runs consumer product, so
3 a big role.  He hired Bridgit Chayt, who runs our
4 payments business.  He's hired Tim Bianco, who runs our
5 embedded payments business, so I could go on and on with
6 examples of -- that would emphasize how I would view Tim
7 and how the board would view Tim in terms of the
8 strength of his talent and being a great coach.
9    Q.  So being a great coach is based on who you
10 hire is what you're saying?
11    A.  Not solely, no.
12    Q.  So --
13    A.  It's really more all-encompassing kind of
14 talent.
15    Q.  Is being a great coach giving employees the
16 perception that you're dismissive?
17      MR. CIOFFI:  Objection to the form of the
18    question, lack of foundation.
19 BY MR. SABA:
20    Q.  Go ahead.
21    A.  I'm not sure what you mean by the question.
22    Q.  Is being -- is one characteristic of being a
23 great coach giving employees the perception that you're
24 dismissive of their suggestions, their recommendations?
25    A.  I don't have a specific example of what you're

Page 148

1 talking about.
2    Q.  You'd agree that based upon Tim Spence's
3 review, his problem was, one of his issues was, is that
4 he had to improve his communication skills because his
5 approach that he had with employees made him appear
6 dismissive of them?
7    A.  Yeah, I think that's one thing Tim needed to
8 work on early.  I mean, Tim is incredibly intelligent,
9 he's fast paced, and the feedback really resulted around
10 Tim bringing people along and making sure that they're
11 fully understanding, onboard.  He's done a fantastic job
12 with that.  He accepted that feedback and I don't see
13 any issue with it.
14      But, again, in the talent world and being a
15 great coach with everything inclusive, there's a lot of
16 stuff that goes into that assessment overall.
17    Q.  So with respect to that issue that he had, you
18 ignored that with respect to labeling him as a strength
19 of be a great coach?
20    A.  No.
21      MR. CIOFFI:  Objection.  Lack of foundation.
22    Argumentative.  But you may answer.
23      THE WITNESS:  No, it would have been all
24    inclusive of -- if that existed at that time.  Are
25    you referring to the dismissive feedback in the

Deposition of Robert Paul Shaffer

Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 149

1 third-party review?

2 BY MR. SABA:

3 Q. No. I'm referring -- you're relying a lot on

4 this, it said you went back to the 2018 talent deck --

5 A. Uh-huh.

6 Q. -- when you determined he's a great coach

7 looking at that talent deck?

8 A. Yeah.

9 Q. If we look at that same page, Fifth Third

10 McHugh 005498, it indicates specifically, "Improve

11 communication response approach to eliminate perception

12 of being dismissive."

13 A. Yeah.

14 Q. So clearly that was a problem that he had.

15 A. Well, that was an opportunity he had to work

16 on, sure, as I just attested to.

17 Q. And notwithstanding that, you still decide to

18 give him a rating of strength for being a great coach;

19 is that right?

20 A. Well, again, in this draft I would have put

21 that in. Ultimately at the end of the day, Greg would

22 have needed to agree. He's the manager here.

23 The manager is ultimately responsible for these

24 assessments. We're working through building the

25 document of what we believe the board would consider and

Page 150

1 reflect as information that would be in here. But Greg

2 would also have that view, and we would look at

3 everything holistically.

4 Q. Going back to Fifth Third McHugh 006921,

5 Exhibit 13, this is the November 11th talent deck.

6 A. Uh-huh.

7 Q. Under Tim Spence's next potential -- next --

8 or potential next positions, it has, "President/CEO one

9 year, CEO two years"; is that right?

10 A. It does.

11 Q. Who put that in?

12 A. I would have put that in based on discussions

13 that I heard from the board or the -- that Greg

14 communicated to me from the board.

15 Q. When specifically did you have a conversation

16 with anybody at the board that Tim Spence would be

17 president, CEO within one year and CEO within two years?

18 A. Again, it would have been in the broader

19 talent discussions with the board and/or feedback that

20 Greg would have given me from his discussions with the

21 board.

22 Q. When did Greg specifically indicate that Tim

23 Spence would be president, CEO within one year and CEO

24 within two years?

25 A. I don't recall a specific time.

Page 151

1 Q. When did anybody from the board specifically

2 indicate to you that Tim Spence would be president, CEO

3 within one year or CEO within two years?

4 A. I don't remember a specific time. The

5 consensus was building all along, as I attested to

6 earlier by the board, and what I heard in those

7 discussions from Tim from 2015 and prior that he had the

8 potential and that capabilities and the qualifications

9 to be the next president, CEO, and that was building

10 over time.

11 Q. Can you identify the specific board members

12 who said that and when they said it?

13 A. No, I can't. I don't recall the specific

14 ones.

15 Q. Did you have any conversations with Greg

16 Carmichael prior to revising the talent deck to insert

17 that Tim Spence would be listed as president, CEO one

18 year and CEO two years?

19 A. I don't recall discussions specifically

20 related to the deck here, but as I attested to earlier,

21 Greg and I had conversations throughout the year on the

22 enterprise team and their next potential positions and

23 so forth, and more importantly as it relates to

24 potential CEO, emergency, or permanent successor

25 candidates, whatever information he's discussing or

Page 152

1 getting from the board.

2 Q. The bullet point that was previously listed

3 for Phil McHugh of exposure to certain key stakeholders,

4 example investors, earnings call and rating agencies,

5 was added to Tim Spence's key focus areas on

6 November 11th. Did you make that change?

7 A. I did.

8 Q. Why did you make that change?

9 A. Because that's one of the key focus areas for

10 somebody that the board considers to be qualified to be

11 the next president or CEO successor.

12 Q. And I know we've asked this question about

13 Phil McHugh, but with respect to Tim Spence, your

14 conclusion that the board has indicated that Tim Spence

15 is qualified to be the next president, CEO and

16 successor, is that set forth in writing anywhere?

17 A. No. Because once -- it would not have been

18 finalized in terms of that decision until the board

19 actually made that decision. Now, when that board

20 meeting occurred, there might have been minutes taken at

21 that time, but I -- I'm not -- I wasn't in the CHR role

22 at that time. But nothing's final until the board makes

23 their final decision on what they want to do.

24 Q. Can you turn to Fifth Third McHugh 006928?

25 Again, this is part of Exhibit 13, the November 11, 2019

Deposition of Robert Paul Shaffer                                   Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 153

1  talent deck draft.  Can you identify that document for
2  me, please?
3      A.   The title is CEO Succession.
4      Q.   And the succession plan has been changed to
5  now list Tim Spence as the first CEO successor in one to
6  two years instead of Phil McHugh; is that right?
7      A.   That's correct.  Accurately reflecting the
8  board's views, yes.
9      Q.   And you keep referring to the board's views,
10 but those aren't reflected anywhere in writing as of
11 this point in time, are they?
12     A.   No.  It's discussions that the board has, has
13 with Greg and I or has just with Greg, yes.
14     Q.   Did you ever show any of the earlier drafts of
15 the talent deck to any members of the board?
16     A.   To any members of the board?
17     Q.   Yes.
18     A.   No.
19     Q.   Why not?
20     A.   They're not involved in the sausage making
21 process of drafts and iterations of drafts and so forth.
22 The intent is to get in here, especially since we were
23 restructuring the structure and the format of the
24 document, and reflecting, you know, attempting to really
25 reflect the accuracy of the information.

Page 154

1      We've heard from the board and/or just this
2  raw data from our HR systems and so forth.  But, as
3  always, I would provide a final draft that in this case
4  with this document would have gone to Marsha Williams as
5  the lead independent director and Mike McCallister who's
6  the head of the human capital and compensation committee
7  to get any of their feedback, changes, etc., prior to
8  initially finalizing the document and issuing it to the
9  full board.
10     And when we had the talent management
11 discussion in December with the full board, I mean, the
12 full -- anybody on the board could raise any changes,
13 questions, concerns on any information in this deck that
14 they want to, particularly around CEO succession and
15 emergency succession.
16     MR. SABA:  We can go off the record.
17     THE VIDEOGRAPHER:  The time is 1:54 p.m.  We
18 can go off the record.
19
20     (A recess was taken from 1:54 p.m. to 2:31
21 p.m.)
22     THE VIDEOGRAPHER:  The time is 2:31 p.m.  We
23 are back on the record.
24     (Deposition Exhibit 14 is marked for
25 identification.)

Page 155

1  BY MR. SABA:
2      Q.   Mr. Shaffer, you've been handed what's been
3  marked as Fifth Third McHugh 006762 through Fifth Third
4  McHugh 006811.  Could you identify that for me, please?
5      A.   It's a draft dated November 12, 2019.  Board
6  of Directors Human Capital and Executive Talent
7  Management Succession Plan Updates.
8      Q.   If I can refer you to Fifth Third McHugh
9  006792 on Exhibit Number 14.  That is a talent card for
10 Tim Spence; is that correct?
11     A.   It is.
12     Q.   If you can compare that for me to Exhibit
13 Number 13, Fifth Third McHugh 006921.
14     A.   Compared in what ways are we talking about?
15     Q.   I'm going to ask you a specific question.  Do
16 you have both those pages open?
17     A.   92 and 21, yeah.
18     Q.   Correct.  And the key strengths areas and key
19 focus areas for Mr. Spence have been rewritten in the
20 November 12th version; do you see that?
21     A.   Uh-huh.
22     Q.   Who rewrote the key strengths and key focus
23 areas for Mr. Spence?
24     A.   Very likely me, as I was continuing to iterate
25 through the drafting process, you know, going from those

Page 156

1  early drafts of conceptual format and structure being
2  correct to now focused on the details within the
3  document.  So I would assume that I would have provided
4  direction to Liz and/or Nancy to make those changes.
5      Q.   So Liz and Nancy, just to be clear, they're
6  the ones who were physically going in and making the
7  changes; is that correct?
8      A.   I think for the most part, although you had an
9  earlier email that said I made some changes, but I don't
10 know what those are.  But generally speaking, yes.
11     Q.   You would have them make the changes?
12     A.   Yes.
13     Q.   And they would make the changes at your
14 direction, correct?
15     A.   Correct.
16     Q.   And with respect to the changes we see to the
17 key strengths and the key focus areas on Mr. Spence's
18 talent card, where did that information come from?
19     A.   I'm sorry, can you repeat that, please?
20     Q.   With respect to the changes that we see in the
21 key strengths areas and key focus areas for Mr. Spence,
22 from the November 11 --
23     A.   Uh-huh.
24     Q.   -- 2019 talent card to the November 12, 2019
25 talent card, where did the information come from that

Page 157

1  you inserted in the key strengths and key focus areas?
2     A.  I don't remember specifically where the
3  details of the changes came from.  You know, it's
4  probably me continuing to iterate on the details, now
5  that I've focussed on them, and these drafts based on,
6  you know, prior conversations I had with Greg, what
7  we've talked to the board about, or the board's talked
8  to us about it in the past, so it's continuing to, you
9  know, like any normal drafting process, continuing to
10  build it out and get it reflective of what we believe
11  the ending draft needs to look like and what the board
12  information -- what the information the board wants.
13     Q.  Are you able to refer to any specific
14  documents where you would have obtained the information
15  from, that we see, for example, on key strengths from
16  Mr. Spence on Fifth Third McHugh 006792?
17     A.  Not a specific document.  Again, we would
18  always look back to the prior year's version that we
19  utilized for the board.  You know, might have looked at
20  Tim's performance evaluation that Greg completed of him
21  in the prior year, as well as just, you know, my role as
22  the CHRO and the discussions I had with Greg or -- and
23  discussions with the board continue to refine out and
24  fill out the detailed information.
25     Q.  In the last bullet point under key strengths,

Page 158

1  you indicate, "Attracts and effectively coaches talent.
2  Has followership and is viewed as inspiring and
3  approachable"; is that right?
4     A.  Uh-huh.  I do.
5     Q.  Isn't that the complete opposite of somebody
6  who is perceived as being dismissive?
7     A.  I guess I would like to go back to Exhibit 7,
8  the December 2018 talent management update.  You know,
9  really thinking through the comments here and the
10  strengths for both Phil McHugh and Tim Spence, and the
11  opportunities, you know, these are not mutually
12  inclusive and so forth.  I think if you look -- a couple
13  different things here from my perspective.
14        As I mentioned earlier, if you look at the
15  strengths for Tim, intelligent, forward-thinking,
16  strategic, tremendous knowledge of banking sector, you
17  know, growth mindset, industry expert in digital banking
18  transformation, strong focus on talent, I mean, those
19  are, again, considerations and qualities that the
20  board -- qualifications the board would look at in
21  somebody being qualified to be a CEO, president of the
22  company; whereas I mentioned earlier, the strengths that
23  Phil has would lead to more that caretaker approach, can
24  take on a little bit more responsibility but so forth.
25        So I think from going back covering a couple

Page 159

1  things, your question and the potential pieces, I mean,
2  I think you really have to look at those strength
3  buckets as the -- how the board viewed the potential.
4  And you asked me about documentation earlier.  You know,
5  the board reviewed this document in December of 2018.
6  They obviously didn't make any changes to it.  So I
7  would probably consider this documentation of how the
8  board viewed the strengths and opportunities of Phil and
9  Tim and the potential that they have overall.
10     Q.  So you said the board didn't make any changes
11  to the 2018 talent deck?
12     A.  There was no requested changes to this talent
13  deck from 2018, and the final version that was reviewed
14  with the board.
15     Q.  So does the board typically request changes be
16  made to the talent deck?
17     A.  They could request changes.  It's at their
18  discretion, or they could have discussions and form
19  different views.
20     Q.  Has the board ever requested any changes to
21  any talent deck?
22     A.  I have no idea.  I was only ever in a few of
23  the yearend talent discussion with these decks maybe.
24     Q.  Has the board ever requested any of the talent
25  decks that you were involved in, changed any of the

Page 160

1  talent decks that were involved in?
2     A.  No, I don't believe so.  I think, you know,
3  again, we get reflected in here what the board's views
4  are, and they validate them.  They can certainly have
5  the discretion to make the changes, if they wanted.
6     Q.  But you're not aware of the board ever making
7  any changes to any talent deck, correct?
8     A.  Not the ones I was involved with, yes.
9     Q.  Or any others that you weren't involved with,
10  are you aware of the board requesting changes to the
11  talent deck?
12        MR. CIOFFI:  Objection.  Lack of foundation.
13  No basis.  No foundation.
14        THE WITNESS:  I do not know.
15  BY MR. SABA:
16     Q.  My question was with respect to the key
17  strength that you added for Mr. Spence, where he is it
18  viewed as inspiring and approachable --
19     A.  Uh-huh.
20     Q.  -- that's the opposite of being perceived as
21  dismissive; isn't that correct?
22     A.  Yeah, again, I think you have to look at all
23  the stuff in totality and the dismissive piece we talked
24  about earlier, I mean, you could also view that as --
25  and what it might have been back then -- is when Tim

Deposition of Robert Paul Shaffer                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 161

1 joined the company he had to make some significant
2 changes to talent, and some of those folks may not have
3 viewed him as anything but dismissive. Particularly if
4 they were no longer with the company and giving that
5 feedback or were moved to other places.
6         So you have to look at all in totality, and
7 Tim's strengths were very significant, and that was
8 reflective of the -- of the view at that point.
9     Q.   What, if any, objective data supports the key
10 strengths that you listed for Mr. Spence on the
11 November 12, 2019 talent deck?
12    A.   So we're on the --
13    Q.   That is Exhibit Number 14, and that's Fifth
14 Third McHugh 006792.
15    A.   Could you repeat the question, please?
16    Q.   Sure. What, if any, objective data do you
17 have to support the key strengths that you listed for
18 Mr. Spence on Exhibit Number 14, Fifth Third McHugh
19 006792?
20    A.   I think you could look at all these
21 individually and have objective data. The strategic
22 vision, you know, sees and executes on growth
23 strategies. MB financial, we talked about that earlier.
24 Tim was the entire reason we were able to acquire MB
25 Financial and have those types of growth opportunities.

Page 162

1 He cultivated relationships with that management team,
2 and I guarantee you if you ask the three members that
3 are on our board, including one who is the former CEO of
4 MB Financial, Mitch Feiger, he would tell you that Tim
5 Spence is absolutely the only reason Fifth Third was
6 able to buy MB, even though we were not the highest
7 bidder.
8     Q.   Although Phil McHugh was the guy who you
9 needed to fix all the problems at MB; isn't that right?
10    A.   He did not fix -- we did not need Phil to fix
11 all the problems. We needed him to focus on what I
12 discussed earlier around credit and the communication
13 and coordination between the team members of MB that we
14 were acquiring and integrating with the team members
15 from Fifth Third to make sure the collaboration and
16 communication was going on, but Phil wouldn't have had
17 that opportunity if Tim Spence hadn't closed that deal
18 for us.
19    Q.   Go ahead. You were providing me with
20 objective data.
21    A.   Yeah, the profitability and so forth. We'd
22 have to pull the, you know, whatever the financial
23 information for the areas that Tim was responsible for
24 back then.
25         But there would be objective -- you asked if

Page 163

1 there was objective information. There would have been
2 at that time. I witnessed him setting high standards
3 and holding his team, you know, accountable for meeting
4 expectations, coaching them when needed and adjusting.
5 Has the courage to make the tough decisions. I mean, I
6 would go back to what I talked about with talent
7 earlier. In fact, he had to clean out and repopulate
8 his entire direct report line when he joined the
9 company.
10        So -- and that kind of ties into the fourth
11 bullet point as well. So I think there's a lot of
12 objective and other evidence that just supports all
13 those key strengths.
14    Q.   What do you understand "objective data" to
15 mean when I use that phrase?
16    A.   I think it can mean a lot of things. Like the
17 MB Financial example I gave you. That's very objective.
18 We wouldn't have had that deal if it wasn't for Tim.
19 Financial information would be the financial statements,
20 you know, documentation of those. The talent moves and
21 why he's being called out as a strength here are very
22 objective. Those were people that were in roles that
23 are no longer in roles. New roles are people he's hired
24 externally to fill those roles.
25    Q.   And viewed as inspiring, as approachable, that

Page 164

1 would be something we would see obviously in the
2 employee viewpoint surveys, that information, correct?
3     A.   Not necessarily, no.
4     Q.   Why not?
5     A.   You know, the employee viewpoint survey, as I
6 mentioned earlier, is a good tool that we utilize on an
7 annual basis to get feedback from our employee base to
8 look at things on a macro level, from a bank roll
9 perspective that we can either reinforce if we're doing
10 well or if we're not doing something as well as we want
11 to, make some changes. As well as down to the
12 individual manager level.
13        But the employee viewpoint survey,
14 particularly in Tim's areas, when you're coming in and
15 changing that whole direct report line, and you're
16 changing people out underneath it, I mean, you know,
17 that takes some time. I mean, the employee viewpoint
18 survey I would equate to a little bit more like a
19 likability survey, so that is not representative --
20 those results are not representative of the
21 characteristics and qualities of making an overall good
22 leader, and certainly not qualifications from a
23 successor of the CEO or president of Fifth Third.
24    Q.   Wouldn't those be indicative of the ability to
25 lead, the ability to get the employee to remain engaged,

Page 165

1  employee engagement surveys?
2    A.  Yeah.  Not in all cases, though.  In cases
3  where, as I described a couple times now, where Tim had
4  to make wholesale changes to the team, it takes some
5  time to work through those, get the employees in, get
6  them integrated in the company, get them more engaged
7  and productive in the way that you need to.
8       So -- and it all depends.  I was the chief
9  auditor for a long time, and some years I had good
10 survey results and others I didn't because the sole role
11 of internal audit in the company is rating, providing a
12 control rating to people, and sometimes those are good
13 and sometimes those are bad.
14      So people who are doing that work and
15 delivering those messages don't always feel good about
16 their job and so forth.  Now, we do all kinds of things
17 to try to make them feel good in terms of development
18 opportunities and other engagement activities, but it
19 doesn't necessarily reflect on the leader's overall
20 capabilities.
21      (Deposition Exhibit 15 is marked for
22      identification.)
23 BY MR. SABA:
24   Q.  Mr. Shaffer, you've been handed what's marked
25 as Exhibit Number 15, Fifth Third McHugh 006836 through

Page 166

1  Fifth Third McHugh 006885.
2    A.  Yes.
3    Q.  Can you identify that document for me, please?
4    A.  It's a draft dated November 13, 2019,
5  entitled, "Board of Directors Human Capital and
6  Executive Talent Management and Succession Plan
7  Updates."
8    Q.  With respect to Exhibit 15, if you could turn
9  to Fifth Third McHugh 006873.  And if you can compare
10 that to Exhibit 14, Fifth Third McHugh 06799; do you see
11 that?
12   A.  6799?
13   Q.  Yes.
14   A.  Yes.
15   Q.  With respect to Tim Spence, in the
16 November 12, 2019 version, Fifth Third McHugh 006799, it
17 says CEO succession one to two years.  That's then
18 changed to two to three years in the November 13th
19 version; do you see that?
20   A.  I do.
21   Q.  Why was that changed?
22   A.  I don't recall specifically.  I know this is
23 an iterative drafting process as we were going through,
24 you know, fine tuning, trying to get the information
25 reflective of the board's view, particularly in the CEO

Page 167

1  succession areas.
2    Q.  Who made that decision that should be changed?
3    A.  I'm not sure there.  I mean, ultimately, you
4  know, I would have been responsible for the document, so
5  but I don't remember specifically making the change.
6    Q.  Who decided it was the board's view that Tim
7  Spence would be CEO in two to three years instead of one
8  to two years?
9    A.  I think it's is not deciding whether he would
10 be.  It's, you know, the potential of being there in a
11 period of time.  Whether it's one to two years or two to
12 tree years, at the end of the day the board -- when the
13 board's ready and they believe Tim's ready or whoever
14 the candidate is, that's when they pull the trigger.
15   Q.  You said this was to reflect the board's view
16 of when he would be ready --
17   A.  Yeah.
18   Q.  -- who determined that the board's view was
19 that he would be ready in two to three years as opposed
20 to one to two years?
21   A.  Again, I don't remember exactly -- I don't
22 recall how this changed version to version.  We were
23 iterating through.  I think we're probably, what, on
24 draft 5 or 6 at this point of 10 or 11.  So we were
25 iterating to get the information reflective of what it

Page 168

1  needed to be before it went in draft form to the two
2  board members for review, and then ultimately to the
3  full board for discussion.
4    Q.  And, again, the board doesn't see any of these
5  versions; is that right?
6    A.  They do not.  They do not.
7       Well, let me clarify that.  When you say "any
8  of these versions," nothing that we've looked at so far.
9  Clearly, as I testified earlier, Marsha Williams is our
10 lead independent director, Mike McCallister had of our
11 human capital compensation committee, did receive a
12 draft version that they had the opportunity to look at
13 and provide any feedback that they wanted prior to
14 finalizing and sending out to the board.
15   Q.  Right.  That's after you've gone through the
16 drafts; is that right?
17   A.  Yeah, after the iterative drafting process,
18 yeah.
19   Q.  And the general intention of each of the
20 revisions you've been making is to make Tim Spence more
21 attractive to the board as an candidate and CEO and
22 CEO and to make Phil McHugh less attractive as a
23 candidate and president CEO; isn't that correct?
24      MR. CIOFFI:  Objection.  Lack of foundation.
25 Argumentative, but if you can answer.

Deposition of Robert Paul Shaffer                                        Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 169

1    THE WITNESS:  Sure.  Absolutely not.  It's not
2  my job to make anybody more attractive or less
3  attractive, and it really doesn't matter what my
4  view or opinion or how attractive or unattractive I
5  make somebody look.  It's the board's decision on
6  who's qualified to be the next president and CEO.
7    So I had nothing to do with making anybody
8  more or less attractive.
9  BY MR. SABA:
10   Q.  That's right, but you know that the board
11 relies heavily on what the talent deck indicates with
12 respect to these individuals and their candidacy for
13 being potentially president or CEO; isn't that right?
14   MR. CIOFFI:  Objection.  Lack of foundation.
15  Assumes facts not in evidence.  Argumentative.  You
16  may answer.
17 BY MR. SABA:
18   Q.  Go ahead.
19   **A.  Sure.  The board looks at this information**
20 **year over year.  It's a continuous process.  But at the**
21 **end of the day, they do not rely on this information.**
22 **They rely on their own independent assessment of who is**
23 **qualified to be either an emergency or a permanent**
24 **successor to the CEO.**
25   Q.  And they can only rely on the information that

Page 170

1  you all are ultimately going to provide to them about
2  these particular candidates; isn't that right?
3    MR. CIOFFI:  Objection.  Same objection.
4  Assumes facts not in evidence.  No foundation.
5  BY MR. SABA:
6    Q.  Go ahead.
7    MR. CIOFFI:  Argumentative.
8    THE WITNESS:  Yeah, that's incorrect again.
9  They have their own basis for building their
10  understanding and understanding the capabilities
11  and qualifications of the individual candidates as
12  they've worked with the executive team over the
13  years.  They're forming their own conclusions.
14   I could put anything I want in these
15  documents.  At the end of the day, it doesn't
16  matter.  The board would decide on what they want
17  to do.
18 BY MR. SABA:
19   Q.  They don't observe the executive team in the
20 workplace, do they?
21   **A.  They do in board meetings.  You know, there**
22 **might be other individual meetings they have with**
23 **various executive team members on various topics.  We've**
24 **had some issues from time to time.  For instance, in my**
25 **capacity as audit chair for a while, human capital comp**

Page 171

1  **chair, and now the risk chair, I have separate**
2  **discussions with that committee and the chair of that**
3  **committee very frequently.**
4    Q.  Outside you attending board meetings or
5  committee meetings, the board members do not come and
6  observe members of the enterprise committee on a
7  day-to-day basis doing their job?
8    MR. CIOFFI:  Objection.  He answered the
9  question.
10 BY MR. SABA:
11   Q.  Correct?
12   **A.  Actually our lead --**
13   MR. CIOFFI:  Argumentative.  Go ahead.
14   THE WITNESS:  Actually our lead independent
15  director, Nick Akins, in the office today meeting
16  with some folks.
17 BY MR. SABA:
18   Q.  Did Marsha Williams or any other members of
19 the board ever go and observe and watch Phil McHugh in
20 the office on a daily basis?
21   MR. CIOFFI:  Objection.  Lack of foundation.
22  Argumentative.
23   THE WITNESS:  I don't know.
24 BY MR. SABA:
25   Q.  Are you aware of any information that they

Page 172

1  obtained other than the information provided to them for
2  board meetings or committee meetings?
3    MR. CIOFFI:  Objection.  Asked and answered.
4  He already answered it.
5    THE WITNESS:  Could you repeat the question,
6  please?
7    MR. SABA:  Sure.
8  BY MR. SABA:
9    Q.  During the period prior to September 21, 2020,
10 are you aware of any information that the board was
11 provided regarding Phil McHugh other than at board
12 meetings and committee meetings?
13   **A.  I am not aware of any.  It doesn't mean there**
14 **wasn't.**
15   (Deposition Exhibit 16 is marked for
16  identification.)
17 BY MR. SABA:
18   Q.  Mr. Shaffer, I've handed you what's been
19 marked as Exhibit 15, Fifth Third McHugh 007016 -- 16,
20 excuse me.  Exhibit 16, Fifth Third McHugh 007016
21 through Fifth Third McHugh 007065.
22   **A.  Correct.**
23   Q.  Can you identify that for me, please?
24   **A.  It's a draft dated December 1, 2019 entitled,**
25 **"Board of Directors Human Capital and Executive Talent**

Deposition of Robert Paul Shaffer                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 173

1  Management and Succession Plan Updates."
2      Q.   Referring you to Fifth Third McHugh 007053.
3      A.   Uh-huh.
4      Q.   And that again is the CEO succession chart; do
5  you see that?
6      A.   I do.
7      Q.   And the CEO succession timeline for Tim Spence
8  has been changed from two to three years to three-plus
9  years.
10      A.   Uh-huh.
11      Q.   Do you see that?
12      A.   I do.
13      Q.   Who made that change?
14      A.   I do not know.  I mean, I did not review all
15  these drafts.  This was an iterative process that, you
16  know, there's 10 or 11 drafts of, but I know for a fact
17  I did not review every single draft.
18      Q.   Well, who's reviewing the other drafts if
19  you're not reviewing them?
20      A.   Well, I don't -- not necessarily anybody other
21  than maybe Liz and Nancy, because as each draft is being
22  iterated, they're probably making formatting changes,
23  font size changes, color changes, you know, I don't
24  know, but I did not review all the drafts, nor would it
25  be common for me to review every draft of any document

Page 174

1  we prepared.
2      Q.   Would Liz or Nancy unilaterally change the
3  timeline for Tim Spence to become CEO from two to three
4  years to three-plus years?
5      A.   I don't know.  I would assume not, but I also
6  don't know why it's changing, and we're iterating again
7  and having this, you know, discussions probably Nancy
8  and me and Liz from time to time, I don't know.
9      Q.   Do you know where that information came from
10  to change that to three-plus years?
11      A.   I do not.
12      Q.   Do you know why it was changed?
13          MR. CIOFFI:  Objection.  Asked and answered.
14          THE WITNESS:  I do not.  Again, I would just
15      emphasize it's important to have a perspective on
16      time period, but it's the board's decision.  And I
17      do want to say that the board is very sophisticated
18      at Fifth Third.  We have a lot of former public
19      company CEOs.  We have former CFOs, we have
20      regulators, people deep in technology capabilities,
21      so, again, when the final draft was reviewed by the
22      two board members I mentioned earlier and
23      distributed to the board, they can make whatever
24      decision they want.  This is just information in
25      front of them.  At the end of the day, they have

Page 175

1  the final decision on who and when somebody goes
2  into the president and/or CEO role.
3          (Deposition Exhibit 17 is marked for
4      identification.)
5  BY MR. SABA:
6      Q.   Mr. Shaffer, you've been handed what's been
7  marked as Exhibit 17, Fifth Third McHugh 001466 through
8  Fifth Third McHugh 001515.  Can you identify that
9  document for me, please?
10      A.   It's a draft document dated December 3, 2019,
11  entitled, "Board of Directors Human Capital and
12  Executive Talent Management Succession Plan Updates."
13          (Deposition Exhibit 18 is marked for
14      identification.)
15  BY MR. SABA:
16      Q.   Mr. Shaffer, I've handed you Exhibit Number
17  18, which is Fifth Third McHugh 001465.  Can you
18  identify that document for me, please?
19      A.   It is an email from me dated December 5th --
20  excuse me, December 5, 2019 to Paula Hennard -- I don't
21  know what that is -- maybe just -- I don't know.
22  Further down it's an email from me to -- on December the
23  3, 2019 to Marsha Williams, our lead independent
24  director, Mike McCallister, head of human capital
25  compensation committee, and Greg Carmichael.

Page 176

1      Q.   And this is when you forwarded them a draft of
2  the human capital executive talent management succession
3  plan; is that right?
4      A.   What's the question again?
5      Q.   Just to be clear, Exhibit 18 is a forward to
6  Paula Hennard of a prior email that you had sent to
7  Marsha Williams, Mike McCallister, and Greg Carmichael;
8  is that right?
9      A.   Correct.  Correct.
10      Q.   And it also included an attachment of the
11  December 3, 2019 talent deck; is that right?
12      A.   That's the date on this.
13      Q.   And that's the talent deck we've marked as
14  Exhibit Number 17; is that correct?
15      A.   Yes.  Again, as I said earlier, I can't attest
16  that this was the exact exhibit attached to that email,
17  but it's dated the same.
18      Q.   In your email, you ask Marsha Williams and
19  Mike McCallister to let you know if they have any
20  questions or other feedback; is that correct?
21      A.   I did.
22      Q.   Did they have any other questions or any other
23  feedback?
24      A.   I don't recall.  That's four years ago.  I
25  don't know.

Page 177

1    Q.   You don't know if they requested any changes?
2    A.   Not that I recall from back then, no. It's a
3    long time ago.
4    Q.   You had previously met -- and when I say
5    "previously," prior to sending the talent deck to Marsha
6    Williams and Mike McCallister -- with Greg Carmichael to
7    review the talent deck; is that right, 2019?
8    A.   My standard process would have been to have
9    the CEO review any materials that go out to the board,
10   yes.
11   Q.   How many meetings did you have with Greg
12   Carmichael regarding the 2019 talent deck?
13   A.   I do not recall.
14   Q.   What, if any, changes do you recall Greg
15   Carmichael making to the 2019 talent deck?
16   A.   I don't recall.
17   Q.   Do you recall him making any changes to the
18   2019 talent deck?
19   A.   I don't recall.
20   Q.   To clarify my question, did Greg Carmichael
21   ever tell you to make changes to the talent deck? Bless
22   you.
23   A.   I'm sorry. Could you repeat that?
24   Q.   Did Greg Carmichael ever tell you to make
25   changes to the 2019 talent deck?

Page 178

1    A.   Oh, I think he would he have, yeah, if he
2    reviewed it and had any changes he wanted me to make, he
3    would have, yeah.
4    Q.   Which changes did he tell you to make?
5    A.   I don't recall.
6        (Deposition Exhibit 19 is marked for
7        identification.)
8    BY MR. SABA:
9    Q.   Mr. Shaffer, you've been handed what's marked
10   as Exhibit Number 19, Fifth Third McHugh 001104. Can
11   you identify that for me, please?
12   A.   It is an email that went to all of our board
13   members, copying Greg and others.
14   Q.   And this email that you sent to the board
15   members is sending them a final version of the talent
16   deck before the September 17, 2019 board meeting; is
17   that correct?
18   A.   Yes.
19   Q.   And based on the wording of the email, you
20   would have sent that about a week before the meeting; is
21   that correct?
22   A.   There's not a date on the email. Maybe my
23   assistant sent this out, I don't know.
24   Q.   Your last line in the email indicates, "I look
25   forward to seeing you next week"; is that right?

Page 179

1    A.   Yeah. That's correct.
2        (Deposition Exhibit 20 is marked for
3        identification.)
4    BY MR. SABA:
5    Q.   Mr. Shaffer, you've been handed what's marked
6    as Exhibit Number 20, Fifth Third McHugh 001105 through
7    Fifth Third McHugh 001154. Is that correct?
8    A.   That is correct.
9    Q.   Can you identify this document for me, please?
10   A.   It's a document entitled, "Board of Directors
11   Human Capital and Executive Talent Management Succession
12   Plan Updates" dated December 17, 2019.
13   Q.   Would this appear to be the final version of
14   the December 2019 talent deck that you emailed to the
15   all the board members in anticipation of the board
16   meeting on December 17, 2019?
17   A.   It would appear to be, yes.
18   Q.   Five days before the December 17, 2019 board
19   meeting, was there an enterprise committee meeting on
20   Thursday, December 12th?
21   A.   I have no idea.
22   Q.   Did you ever -- did you ever attend the
23   enterprise committee meetings that were held on Thursday
24   mornings?
25   A.   All of them from the time I -- well, I

Page 180

1    shouldn't say all of them. I was on the enterprise
2    committee, so if there would have been an enterprise
3    meeting, I would have attended.
4    Q.   Do you have any recollection of the enterprise
5    committee meeting that was held on December 12, 2019?
6    A.   No, I do not have any recollection of it.
7    Q.   Do you recall at an enterprise committee
8    meeting, although you don't recall that one, at that
9    meeting Frank Forrest indicating that we all know that
10   Greg likes to control the message to the board?
11       Do you recall that statement?
12   A.   No, I do not.
13   Q.   Do you recall Frank Forrest ever making a
14   comment like that at an enterprise committee meeting
15   about Greg wanting to control the message to the board?
16   A.   I do not recall that kind of a message -- that
17   kind of a comment from Frank.
18   Q.   Do you recall that after Frank Forrest made
19   that comment at an enterprise committee meeting, you
20   immediately texted Greg about Frank Forrest's comment?
21       MR. CIOFFI: Objection. Lack of foundation.
22       THE WITNESS: I don't recall that, no.
23   BY MR. SABA:
24   Q.   You do not recall being concerned about Frank
25   affecting the ability of Greg Carmichael to influence

Page 181

1 the board regarding the selection of Tim Spence as the
2 next president and CEO of Fifth Third Bank?
3      MR. CIOFFI: Objection. Lack of foundation.
4  Argumentative. But you may answer.
5      THE WITNESS: I do not recall and I don't ever
6  recall Greg controlling a message to the board that
7  I was involved in. In fact, I had free rein with
8  my board committee that I was responsible for or
9  any board members. So I never felt that at all.
10 BY MR. SABA:
11     Q. Weren't you concerned about Frank Forrest
12 being left alone with the board of the directors as a
13 result of that comment?
14     MR. CIOFFI: Objection. Lack of foundation.
15     THE WITNESS: What was the question?
16 BY MR. SABA:
17     Q. Weren't you concerned about Frank Forrest
18 being left alone with the board of directors as a result
19 of that comment?
20     A. I don't recall four years ago.
21     Q. You were afraid that because of that comment,
22 Frank was a loose cannon rolling around on the deck;
23 isn't that right?
24     MR. CIOFFI: Objection. Foundation. Lack of
25 foundation. But you may answer.

Page 182

1      THE WITNESS: I don't recall that.
2 BY MR. SABA:
3      Q. You were also concerned that if Frank was not
4 controlled, he would screw up the plan of Greg
5 influencing the board of directors to select Tim Spence
6 as the next president and CEO; isn't that right?
7      MR. CIOFFI: Objection. Lack of foundation.
8      THE WITNESS: I don't recall that, and as I've
9  testified earlier, Greg doesn't make the decision
10 on who the next CEO is; it's the board.
11 BY MR. SABA:
12     Q. In fact, you were concerned -- you referred to
13 it as Frank could blow the mast off the ship. You
14 agreed with that, correct?
15     MR. CIOFFI: Objection. Lack of foundation.
16 Argumentative.
17     THE WITNESS: I don't recall that.
18 BY MR. SABA:
19     Q. In fact, your concerns regarding what Frank
20 Forrest might say to the board about Greg's control of
21 the message to the board made it clear to you that you
22 needed to move forward quickly with respect to the
23 recommendation of Tim Spence as successor to Greg
24 Carmichael as president and CEO; isn't that right?
25     MR. CIOFFI: Objection. Lack of foundation.

Page 183

1  Argumentative.
2      THE WITNESS: I do not recall that.
3  (Mr. McHugh exits the room.)
4  (The following testimony is Confidential --
5  Subject to Protective Order.)

Page 184

1                    * * *
2      (Deposition Exhibit 21 is marked for
3  identification.)
4 BY MR. SABA:
5      Q. Mr. Shaffer, you've been handed what's been
6 marked as Exhibit Number 21.
7      MR. CIOFFI: Counsel, objection, again. This
8  is for attorneys' eyes only. It contains
9  privileged information and materials that should
10 not be disclosed publicly.
11 BY MR. SABA:
12     Q. It is Bates stamped Fifth Third McHugh
13 0213148; is that correct?
14     A. I'm sorry, repeat that. Oh, yes, 023148
15 (sic), yes.
16     Q. And I am going to refer you, Mr. Shaffer, this
17 is a text message exchange between you and Tim Spence;
18 is that correct?
19     A. It is.
20     Q. And referring you to the text message from
21 you, beginning on December 12, 2019 at 6:44 p.m., and
22 you text, "How about that comment he made about GC in
23 enterprise"; do you see that?
24     A. I do.
25     Q. Okay. Do you know who that's referring to?

Case: 1:21-cv-00238-MRB Doc #: 77-14 Filed: 06/27/25 Page: 50 of 118 PAGEID #: 3654
Deposition of Robert Paul Shaffer
Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 185

1  A. I do not. I do not recall.

2  Q. And Tim Spence responded, "Not good." Do you

3  see that?

4  A. I do.

5  Q. And then you responded, "Don't leave him alone

6  with the board."

7  A. I did not.

8  Q. Or Tim Spence said, "Don't leave him alone

9  with the board"; is that right?

10  A. That's what this says, yes.

11  Q. You then agree with that statement, "Agree";

12  is that right?

13  A. Yes.

14  Q. "I already confronted him on this comment. He

15  backtracked." That was Frank Forrest that you

16  confronted; isn't that right?

17  A. I do not recall.

18  Q. Then Tim Spence responds, "Good. Thanks for

19  doing that"; do you see that?

20  A. I do.

21  Q. And then Tim Spence responds again, "He is a

22  loose cannon rolling around on the decks right now"; do

23  you see that?

24  A. I do.

25  Q. He also says, "Could blow the mast of the

Page 186

1  ship"; do you see that?

2  A. I do.

3  Q. And you respond, "I agree. Need to move

4  forward quickly"; is that right?

5  A. Yes.

6  Q. That was all discussing comments by Frank

7  Forrest at the December 12th enterprise committee

8  meeting; isn't that right?

9  A. I have no idea. I don't know what the context

10  of this is or who it's about.

11  Q. The text message exchange between you and

12  Mr. Spence, it jumps from November 23, 2019 to

13  December 12, 2019.

14  A. Uh-huh.

15  Q. Do you see that?

16  A. I do.

17  Q. Had you deleted the text messages for that

18  month between yourself and Mr. Spence?

19  A. Not that I recall.

20  Q. You'd agree that your comment, "How about that

21  comment he made about GC in enterprise," that appears to

22  be responding about somebody else and responding to

23  another text; isn't that right?

24      MR. CIOFFI: Objection. Counsel, you're sort

25  of making this up as you go along. There's no such

Page 187

1  inference that is reasonable there. Is that -- is

2  that your -- you trying to testify or what? Are

3  you asking him a question?

4  BY MR. SABA:

5  Q. Mr. Shaffer, do you see that?

6      MR. CIOFFI: What's your question?

7  BY MR. SABA:

8  Q. Do you understand the question?

9  A. I do not.

10  Q. You would agree, sir, that your text message

11  on December 12th appears to be in the middle of a

12  conversation, "How about that comment he made about GC

13  in enterprise"; isn't that right?

14  A. I have no idea whether that's in the middle of

15  a conversation or not. It could have been the first

16  text I sent him.

17  Q. Do you have any recollection of this text

18  message exchange?

19  A. I do not.

20  Q. You agree that he could blow the mast off the

21  ship; is that right?

22      MR. CIOFFI: Objection.

23  BY MR. SABA:

24  Q. Do you see that in the text message exchange?

25      MR. CIOFFI: Is your question does it say

Page 188

1  that?

2  BY MR. SABA:

3  Q. You agree it says that. You know that, right?

4  A. I agree that it says it, sure.

5  Q. Why did you feel you needed to move forward

6  quickly?

7      MR. CIOFFI: Objection. Lack of foundation.

8  Lack of context. But if you know.

9      THE WITNESS: As I testified, I have no idea

10  what the context of this text chain is or who it's

11  about.

12      (Mr. McHugh enters the room.)

13      (Deposition Exhibit 22 is marked for

14  identification.)

15      MR. CIOFFI: Counsel, if you're going to move

16  past 20 again, as with these other exhibits for

17  eyes only, we need to redact all the

18  personal information, confidential information,

19  etc., other than what you just questioned the

20  witness about, of course. That's fine. Agreed?

21      MR. SABA: I don't have a problem with that.

22      MR. CIOFFI: Okay.

23      And then when you finish your next line of

24  questioning, you know, we've been going maybe 60 --

25  you know, about 80 minutes or 90 minutes. So

Page 189

1  whenever you're --
2      MR. SABA:  Okay.
3  BY MR. SABA:
4      Q.  Mr. Shaffer, you've been handed what is marked
5  as Exhibit Number 22, Fifth Third McHugh 000253 through
6  Fifth Third McHugh 000265; do you see that?
7      A.  Yes.
8      Q.  Are you able to identify this document for me?
9      A.  It is the minutes from the board of directors
10 meeting on December 17th.
11     Q.  2019?
12     A.  I'm sorry, 2019, yes.
13     Q.  Have you ever seen these minutes before?
14     A.  I don't recall.
15     Q.  Are you ever provided with copies of the board
16 of directors minutes?
17     A.  Not typically, no.
18     Q.  You were obviously present at this board
19 meeting; is that correct?
20     A.  I was present for the executive performance
21 review session in the role of CHRO, chief human
22 resources officer.  I would not have attended the entire
23 board meeting.  Different than what I am as a chief risk
24 officer, I typically attend most of the board meeting.
25     Q.  Referring down into the executive performance

Page 190

1  review, in the second full paragraph, "They," --
2  referring to you and Mr. Carmichael -- "then reviewed
3  the proposed performance review for each executive
4  officer other than Mr. Carmichael, including a
5  discussion of key achievements, strengths,
6  opportunities, and development planning priorities for
7  such individuals"; is that correct?
8      A.  That's what it says.
9      Q.  Did I read that correctly?
10         Is that essentially the information that's in
11 the final version of the talent deck?
12     A.  I would believe that it was, whoever wrote the
13 minutes proposed performance review.  Yeah, this would
14 have been strength of opportunities and so forth in
15 those talent cards, yeah.
16     Q.  It then goes on to say, "For each of the chief
17 audit officer and chief risk officer, the directors also
18 reviewed the results of such officer's completed
19 self-review, individual risk assessment, and individual
20 director reviews"; is that correct?
21     A.  Yes, that is correct.
22     Q.  But that's only done for the chief audit
23 officer and the chief risk officer; is that correct?
24     A.  That's correct.  That's a regulatory
25 requirement that we have independent assessments done by

Page 191

1  board -- the board committees that those two positions
2  are responsible for.
3      Q.  And that's why it's just for those two board
4  positions; is that right?
5      A.  That's correct.
6      Q.  It then indicates "Mr. King from FW Cook
7  provided aggregate data reporting on the performance of
8  each officer."
9      A.  Yes.
10     Q.  Do you know what data that is that Mr. King is
11 providing?
12     A.  That would have been the individual director
13 reviews for the chief audit officer and chief risk
14 officer, because our process is such that it's
15 independent feedback from each of the applicable board
16 members that are on the audit committee and the risk
17 committee.  It goes to FW Cook and FW Cook aggregates
18 the information for those two positions and provides it
19 back to us as a company.
20     Q.  Moving back to the third full paragraph, it
21 says, "After Mr. Shaffer returned to the meeting, he
22 and Mr. Carmichael also reviewed succession planning for
23 each executive officer, including a discussion of
24 potential long-term and emergency succession planning
25 candidates for each such position."

Page 192

1      Do you see that?
2      A.  I do.
3      Q.  Who were the candidates that were reviewed for
4  long-term and emergency succession planning?
5      A.  Well, it said for each such position, so those
6  are all the --
7      Q.  It's a number of different positions?  All
8  right.
9      A.  Yes.  Yeah.  Yes.
10     Q.  Turning to the next page, 000254?
11     A.  Uh-huh.
12     Q.  Beginning with the first full paragraph after
13 the resolutions; do you see that?
14     A.  I'm sorry, after the resolutions?
15     Q.  Yes.  It begins with the paragraph thereafter.
16     A.  Uh-huh.
17     Q.  About halfway down the page.
18     A.  Yes.
19     Q.  "Thereafter, Mr. Carmichael and Mr. Shaffer
20 initiated review of potential succession time lines and
21 candidates for the chief executive officer position.
22 They reviewed top succession candidates, including
23 Mr. Spence, and discussed the potential time lines for
24 their readiness and key development priorities for each
25 such candidate."

Deposition of Robert Paul Shaffer                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 193

1    Do you see that?
2    A.  Uh-huh.
3    Q.  Who were the candidates that were reviewed by
4  you and Mr. Carmichael for chief executive officer?
5    A.  For chief executive officer in 2019, we would
6  have reviewed the information in the talent deck that we
7  previously looked at, related to Tim Spence, because Tim
8  was the only qualified successor candidate as viewed by
9  the board for such a position.  So that would have been
10  Tim.
11    Q.  The sentence indicates you reviewed top
12  succession candidates, not just a candidate.
13    A.  Yeah.  My guess is that refers to the fact
14  that we had some emergency successors on there, too.  If
15  I recall, we had Phil, Tayfun Tuzun, and a board member
16  as potential emergency successor candidates.  So that
17  might be what that sentence is referring to.
18    Q.  But you're saying there were no other
19  candidates reviewed for CEO other than Mr. Spence?
20    A.  That's correct.  Because that was the board's
21  view that Tim was the only qualified potential successor
22  candidate for that position.
23    Q.  The sentence goes on to read, "and discussed
24  the potential time lines for their readiness and key
25  development priorities for each such candidate."

Page 194

1    A.  Hold on.  I lost you there.  Which sentence
2  you at?
3    Q.  I'm continuing that same sentence.  "They
4  reviewed top succession candidates --
5    A.  Yes.
6    Q.  -- "including Mr. Spence, and discussed the
7  potential time lines for their readiness and key
8  development priorities for each such candidate."
9    A.  Yeah, it does say that.
10    Q.  But you're saying you didn't go over any
11  candidates other than Mr. Spence, you didn't review time
12  lines for anyone other than Mr. Spence; is that correct?
13    MR. CIOFFI:  Objection.  Asked and answered.
14    Mischaracterizes what he said about the emergency
15    successors.  Could you repeat the question?
16  BY MR. SABA:
17    Q.  Yes.  It's your position that with respect to
18  CEO, you didn't provide any other candidates other than
19  Mr. Spence and that you didn't provide time lines for
20  readiness and/or the development priorities for any
21  other candidates other than Mr. Spence; is that right?
22    A.  For the permanent CEO successor position,
23  that's correct, because that was the board's view, that
24  he was the only qualified internal successor candidate
25  we had.

Page 195

1    Q.  And was that communicated anywhere in writing
2  prior to this December 17, 2019 meeting?
3    A.  In writing, no.  It would have been in
4  discussions with the board, prior talent discussions,
5  discussions, you know, that they had.  So --
6    Q.  The next sentence reads, "In response to
7  director questions, Mr. Carmichael and Mr. Shaffer
8  commented upon the potential external candidates that
9  could be considered for such a role, including a
10  discussion of the known capabilities of such candidates
11  and the potential challenges created by appointment of
12  an external candidate for the role."
13    Do you see that?
14    A.  I do.
15    Q.  Who were the external candidates that were
16  reviewed?
17    A.  I don't recall.
18    Q.  Were there any?
19    A.  I don't recall.
20    Q.  Do you recall any of the known capabilities
21  and/or potential challenges of the candidates, the
22  external candidates?
23    A.  I don't recall any discussion around
24  capabilities.  The potential challenges, I think,
25  potentially relate to just bringing in an external

Page 196

1  candidate at that level is always more risky.
2    I know the board's number one desire they
3  presented would be to, if we have a qualified internal
4  candidate, that would be the person that gets put into
5  the role any time we have an opening at that level.
6    Q.  The next sentence reads, "In addition, in
7  response to additional director questions,
8  Mr. Carmichael and Mr. Shaffer discussed details of
9  development priorities and planning to cultivate
10  internal candidates for the role and the expected time
11  lines for completion of such development plans and
12  candidate readiness."
13    Do you see that?
14    A.  I do.
15    Q.  Who were the internal candidates that would be
16  cultivated for the role?
17    A.  Tim Spence was the only qualified candidate
18  the board viewed as an internal candidate.
19    Q.  Why does it say candidates, plural?
20    A.  I didn't write the minutes.  I don't know.  I
21  wasn't the board secretary.
22    Q.  What was the expected timeline for completion?
23    A.  I don't know.  I don't recall.
24    Q.  Next sentence reads, "Mr. Shaffer also
25  reviewed the emergency planning succession candidates

Page 197

1 and reviewed the readiness of Mr. Tuzun and other key
2 leaders to manage investor, employee, and customer
3 concerns in the event of an unplanned or emergency CEO
4 succession scenario."
5      Do you see that?
6      A.  I do.
7      Q.  Who were the other emergency planning
8 succession candidates that were reviewed, other than
9 Mr. Tuzun?
10     A.  In the 2019 talent deck, we had Tayfun Tuzun,
11 Phil McHugh, and another board member, I believe.
12     Q.  Do you specifically recall reviewing the
13 readiness of Phil McHugh with respect to being a
14 succession candidate for emergency -- excuse me, an
15 emergency planning succession candidate?
16     A.  I don't recall the specific discussions around
17 Tayfun or Phil.  I think what this is referring to is
18 other key leaders to manage investor employee
19 and customer concerns.
20     Emergency succession is a critical point in
21 time decision the board would have to make.  So it's
22 Greg and my job and the two roles we had back then to
23 present candidates to the board.  Ultimately they could
24 decide on someone else if they wanted to as an urgency
25 successor.  And what I mean by a point in time, if you

Page 198

1 take a look at the banking situation that we just went
2 through in March and April from Silicon Valley Bank,
3 First Republic, etc., that's a time period where if your
4 CEO in a bank got incapacitated, died, whatever, that we
5 needed an emergency, my guess is the board would
6 probably choose the CFO in that period of time, because
7 that's somebody you really need in that role that knows
8 the street, knows the investors, knows how to manage
9 liquidity and capital because that's their day-to-day
10 job.  So that's I think what that is getting at there
11 with the different stakeholders and a point in time of
12 when an emergency succession plan would have to be
13 enacted.
14     Q.  You and Mr. Carmichael are the only people
15 doing presentations to the board regarding the potential
16 succession time lines and candidates for chief executive
17 officer; is that correct?
18     A.  Yeah.  Just like any topic that gets put in
19 front of the board, it's management's responsibility to,
20 you know, present the data, but clearly the board and
21 the board members at Fifth Third have whatever
22 discussions they want to have, ask any questions, ask
23 for additional information, etc.  That's very common in
24 any public company.
25     Q.  Did any of the board members disagree with any

Page 199

1 of the recommendations or information presented by you
2 and Mr. Carmichael with respect to the CEO candidate and
3 with respect to this Mr. Spence?
4      A.  No.
5      Q.  Did any of the board of directors disagree
6 with any of the information presented by you and
7 Mr. Carmichael regarding the potential external
8 candidates and the potential challenges created by
9 appointment of an external candidate?
10     A.  I don't really remember the conversation,
11 don't recall it around the external candidates.
12     MR. SABA:  You wanted to take a break?  Is
13 that what you said?
14     MR. CIOFFI:  If you're finished with that line
15 of questioning.  I don't want to prolong this.  I
16 want you to finish that line and then we can move
17 on.
18     MR. SABA:  Yeah.  I'm fine.
19     THE VIDEOGRAPHER:  The time is 3:42 p.m.  We
20 are going off the record.
21            * * *
22
23
24
25

Page 200

1      (The previous testimony is Confidential --
2      Subject to Protective Order.)
3      (A recess was taken from 3:42 p.m. to
4      3:56 p.m.)
5      THE VIDEOGRAPHER:  The time is 3:56 p.m.  We
6 are back on the record.
7      (Deposition Exhibit 23 is marked for
8      identification.)
9 BY MR. SABA:
10     Q.  Mr. Shaffer, you've been handed Exhibit Number
11 23, which is Bates stamped Fifth Third McHugh 071635
12 through 071709; is that correct?
13     A.  Correct.
14     Q.  Are you able to identify Exhibit Number 23 for
15 me?
16     A.  It's the 2018 Fifth Third Bank Employee
17 Viewpoints Survey Results Briefing by Aon.
18     Q.  Have you seen this document before?
19     A.  Yes.
20     Q.  And these are the results of the employee
21 viewpoint surveys that you were talking about before; is
22 that correct?
23     A.  For that particular year, yes.
24     Q.  Okay.  And Fifth Third pays to have this done
25 every year; is that right?

Deposition of Robert Paul Shaffer                                          Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 201

1  A.  We do.  I can't say it's every year, but it's
2  pretty much every year, yes.
3  Q.  Do you know how much Fifth Third pays to have
4  this done each year?
5  A.  I do not.
6  Q.  Do you know what's involved in the process of
7  obtaining the employee viewpoint surveys?
8  A.  I'm sorry, what do you mean?
9  Q.  Do you understand what the process is in order
10  to put together the employee viewpoint surveys?
11  A.  Yeah.  I think representatives from the bank
12  work with the third-party.  Typically we use a couple
13  different third-parties over time and they have a
14  standard methodology that we employ, and maybe add or
15  delete questions that we want to get specific
16  information on our workforce.
17  Q.  The employee engagement scores for various
18  departments are then used to measure the performance of
19  members of the enterprise committee; isn't that right?
20  A.  I'm sorry, what's the question?
21  Q.  The employee viewpoint survey scores are then
22  used as a measure of performance of the members of the
23  enterprise committee; isn't that right?
24  MR. CIOFFI:  Objection.  Lack of foundation.
25  If you know.

Page 202

1  THE WITNESS:  It's a component that's looked
2  at and included in self-assessments as well as
3  could be commented on by the manager.
4  (Deposition Exhibit 24 is marked for
5  identification.)
6  BY MR. SABA:
7  Q.  Mr. Shaffer, I've also handed you
8  Exhibit Number 24, which is Bates stamped Fifth Third
9  McHugh 071710 through Fifth Third McHugh 071802; is that
10  correct?
11  A.  That is correct.
12  Q.  Can you identify that document for me, please?
13  A.  It is entitled, "2019 Fifth Third Bank
14  Employee Viewpoints Survey Results Briefing" dated
15  November 1, 2010 (sic) from Concentric.
16  Q.  Now, if I can refer you to Fifth Third McHugh
17  071796, please?
18  A.  You're in Exhibit 24, correct?
19  Q.  That is correct.
20  A.  Could you give me a page number again?
21  Q.  071796.  It's page 85, I believe, of the
22  document.
23  A.  Okay.
24  Q.  You'd agree that the purpose of these employee
25  viewpoint surveys is to measure the level of employee

Page 203

1  engagement; is that correct?
2  A.  Yes.
3  Q.  And they define employee engagement, as
4  indicated on this page, is a "state of emotional
5  and intellectual involvement that motivates employees to
6  do their best work"; is that correct?
7  A.  That's what it says here.  And just to
8  clarify, specifically with Concentric, there are 6
9  questions that are the say, stay, and strive questions
10  that do drive a score, but there are also 16 or some
11  number of dimensions that are also other areas that
12  employees, you know, provide feedback on.  So there are
13  multiple components to this survey that gets done.
14  Q.  So there's a lot of data that they bring in to
15  analyze with respect to the results of the survey of the
16  employee; is that correct?
17  A.  They being Concentric?
18  Q.  They being Concentric, right?
19  A.  Yes.
20  Q.  And that's why Fifth Third uses this
21  third-party source, as they're able to bring in a more
22  objective view and analysis of where the employees
23  aren't and what level they are engaged, correct?
24  A.  Yeah, as well as all the other dimension
25  activities, yeah.

Page 204

1  Q.  Sure.
2  A.  Or dimension boxes.
3  Q.  We talked about the midyear reviews before and
4  your involvement in those.  What is your involvement
5  with the annual reviews of the enterprise committee?
6  A.  My involvement would be to help Greg
7  Carmichael document his comments, basically.  I don't
8  think any company would expect the CEO to sit down and
9  type up performance reviews, so Greg meets with me and
10  provides me with the information that he wants included
11  in the performance reviews, the ratings he wants
12  included in those performance reviews.  So we have a
13  meeting to do that or meetings to do that.  I, you know,
14  type those comments up, give them back to Greg.  He
15  reviews them, makes any changes he wants to.
16  Q.  Is there any other additional information you
17  provide?
18  A.  I'm sorry?
19  Q.  Is there any additional information you
20  provide beyond that?
21  A.  In terms of?
22  Q.  With respect to the annual performance
23  reviews?
24  A.  That's not very specific.  What are you
25  specifically asking about here?

Deposition of Robert Paul Shaffer          Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 205

1   Q.  You talked about you type up information for
2 him based upon the information he provides to you; is
3 that correct?
4   A.  Uh-huh.
5   Q.  Do you gather any other information for him
6 other than what he has you type up?
7   A.  I don't recall necessarily, gathering other
8 information.  Greg always has a very good pulse on the
9 performance of his team members.  I mean, he might from
10 time to time ask me to go gather up information on
11 different topics, but I can't recall specifics.
12     (Deposition Exhibit 25 is marked for
13     identification.)
14 BY MR. SABA:
15   Q.  Mr. Shaffer, you've been handed Exhibit 25,
16 which is Bates stamp Fifth Third McHugh 000469.  Can you
17 identify that for me, please?
18   A.  Sure.  It's an email from me dated January 3,
19 2020 to Greg Carmichael.
20   Q.  And the subject is the Carmichael Direct
21 Report Reviews; is that correct?
22   A.  For 2019, yes.
23   Q.  And if you can read that first section of the
24 email for me, please, through the bullet points.
25   A.  Read the bullet points?

Page 206

1   Q.  Yeah.  Beginning with Greg and through the
2 bullet points, please.
3   A.  Sure.  "Greg, Happy New Year.  I hope you had
4 a great holiday season with your family.  Attached is a
5 Word document with draft performance reviews for all of
6 your direct reports.  A few items:  I included proposed
7 ratings for each 'what' goal category.  The rating
8 options are exceptional, exceeds, achieves, needs
9 improvement, and unsatisfactory.
10     "I also included the ratings for each 'how'
11 goal category.  These ratings were included in the deck
12 we used for the talent discussion with the board.  The
13 rating options are strength, effective, and opportunity.
14     "See the attached Excel document for a summary
15 of the proposed 'what' and 'how' ratings for each of
16 your direct reports.  I like to look at them on one page
17 for alignment purposes.
18     "I directly leveraged the key strengths and
19 key opportunities for each person from the deck we used
20 for the board meeting.
21     "I added" -- excuse me -- "I added employee
22 viewpoints survey scores for each person.
23     "I don't have the manage risk ratings from
24 Frank yet.  I will add them when I get them.
25     "Please review and let me know if you have any

Page 207

1 questions, thoughts.  We have time scheduled at 8:30
2 Monday that we can use to discuss as well.
3     "I should have proposed compensation
4 recommendations early next week.  Lorin Olson is
5 preparing them based on the market data we shared with
6 the human capital, HCCC, in December."
7   Q.  In this email you note, "I added employee
8 viewpoint scores for each person."
9   A.  Uh-huh.
10   Q.  Those employee viewpoint survey scores, those
11 weren't provided to the board, were they?
12   A.  I'm not sure.  I do know we provide employee
13 viewpoint survey result information to the board, but I
14 don't believe we had it in the deck, the talent deck
15 that was covered in December, but the board does have --
16 gets a debrief probably including materials on the
17 employee viewpoint survey results.  That's my
18 recollection.
19   Q.  Do you have any documentation that would show
20 that they're given the detail of the employee viewpoint
21 survey scores for each person in the enterprise
22 committee?
23   A.  I don't recall any information like that.
24   Q.  There's nothing in the talent deck that would
25 indicate the employee viewpoint survey scores for each

Page 208

1 person in the enterprise committee, is there?
2   A.  As I just stated, there wasn't employee
3 viewpoint survey data in the talent deck for December
4 '19.
5   Q.  What are the managed risk ratings from Frank?
6   A.  The chief risk officer, now in my capacity, is
7 responsible for performing independent risk assessments
8 of each of what we call category one employees, which is
9 a regulatory definition.  In our case as a bank, it's
10 really the -- in most cases the direct reports of the
11 CEO, but there are a few others as well.
12   Q.  Why aren't the employee viewpoint survey
13 scores for each person included in the talent deck?
14   A.  I don't recall.
15   Q.  Who made the decision that the employee
16 viewpoint survey scores for each person should not be
17 included in the talent deck?
18   A.  I don't recall there was ever a decision made
19 as we're assessing the talent and potential and so forth
20 of the individuals in the talent deck.  The employee
21 viewpoint survey results, like I described earlier, are
22 not indications of the qualifications of being, you
23 know, at that level or being promoted to the next level
24 or a lateral move to the next level within the
25 enterprise team.

Page 209

1 **They're important. We care about it. We**
2 **spend money on it each year. We have made nice strides**
3 **as a company implementing actions from those results to**
4 **help improve employee engagement and other aspects of**
5 **our employee's experience within the company.**
6     (Deposition Exhibit 26 is marked for
7     identification.)
8 BY MR. SABA:
9     Q. Mr. Shaffer, you've been handed what's been
10 marked as Exhibit Number 26, Fifth Third McHugh 000492
11 through Fifth Third McHugh 000511.
12     **A. Correct.**
13     Q. Can you identify this document for me, please?
14     **A. Yeah, these would be, as it indicates, the**
15 **final version dated January 10, 2020, 20th, of Greg's**
16 **performance reviews for his direct reports.**
17     Q. Referring you to Fifth Third McHugh 000496 and
18 Fifth Third McHugh 000497, can you identify those two
19 pages for me, please?
20     **A. Those relate to Phil McHugh's 2019 review from**
21 **Greg.**
22     Q. Under the "what" category for Phil McHugh, it
23 lists that he exceeds with respect to strategic and
24 financial management, operational efficiency, and
25 customer experience, and then just achieves with talent

Page 210

1 optimization.
2     **A. Uh-huh.**
3     Q. What, if anything, in the narrative below that
4 would indicate that Phil only achieves with respect to
5 talent optimization?
6     MR. CIOFFI: Objection. The document speaks
7     for itself.
8 BY MR. SABA:
9     Q. Go ahead. You can answer?
10     MR. CIOFFI: You may answer.
11     THE WITNESS: If you go to the next page, the
12     last bullet point relates to "ensure timely
13     execution of talent management actions to make
14     certain the very best leaders are in key
15     positions."
16     It's back to what I testified to earlier
17     around Phil's talent, actions, and activity and
18     management are not strengths of his.
19 BY MR. SABA:
20     Q. Where -- anywhere in this narrative does it
21 indicate that he does that poorly?
22     **A. It's an opportunity for 2020. And it would go**
23 **back to, like I said earlier too, since I was a CHRO in**
24 **2017, I'm sure Greg had comments in each of his reviews**
25 **along those lines.**

Page 211

1     Q. What -- bless you.
2     Where is there any -- just starting with these
3 first full paragraphs on talent optimization -- where is
4 there any negative statement regarding the performance
5 of Phil McHugh?
6     **A. This section is not intended to have negatives**
7 **in it, necessarily. It doesn't mean there aren't for**
8 **some, but those are really -- the negatives are the**
9 **opportunities, or intended to be in the opportunities**
10 **for 2020 section.**
11     Q. Where is there any indication that he has not
12 engaged in timely execution of talent management actions
13 to make certain the very best leaders are in key
14 management positions?
15     **A. It says it in the last bullet point on 497.**
16     Q. I understand what you're saying, it says it's
17 an opportunity for him?
18     **A. Yes.**
19     Q. But where does it ever express in detail how
20 he's failed to do that?
21     **A. Well, by an opportunity, that means that he**
22 **hasn't lived up to the expectations of having it as an**
23 **exceeds item.**
24     Q. So referring back to the first full paragraph
25 under -- under the "what" category, the fourth to last

Page 212

1 sentence reads, "He is a great leader for his people,
2 inspires followership, and is always there to assist
3 them in their success."
4     **A. Uh-huh.**
5     Q. How is that not talent optimization?
6     **A. That's -- let me -- again, no one's ever said**
7 **that Phil wasn't a competent manager capable of managing**
8 **people at a certain level.**
9     Q. Let's be clear. It says he's a great leader,
10 not a competent manager.
11     **A. Yeah. Yeah, yeah, and he does. And I think**
12 **this inspires followership can be interpreted as a**
13 **fault, too, because as I described earlier, there were**
14 **some situations where Phil did not take timely actions**
15 **and other executives had to on employees. So I agree**
16 **that a lot of his employees really liked him.**
17     Q. And so how is always being there to assist
18 employees in their success a weakness in talent
19 optimization?
20     MR. CIOFFI: Objection. Argumentative.
21     THE WITNESS: We're not saying it's a
22     weakness. He got an achieved rating. He would
23     have got a -- needs improvement or whatever the
24     lowest rating would have been, but it's not a
25     strength.

Page 213

BY MR. SABA:

Q. My question goes back in this narrative section.

Is there any indication of anything that Phil McHugh does negatively with respect to talent optimization?

A. Not here, but like I said, in the opportunity section, which you have to look at collectively for the rating assessment.

Q. In fact, there is nothing negative there, correct?

A. On Bates 497, he needs to ensure he timely executes talent management actions, make sure the very best leaders are in key positions. That's not an indicator of an overall positive.

Q. Staying with that first full paragraph, the last sentence reads, "Phil's 2019 employee viewpoint survey score for all his areas totaled 73 percent --

A. Uh-huh.

Q. -- compared to the Bancorp score of 72 percent, exclusive of legacy MB employees."

Do you see that?

A. I do.

Q. How is that score of all of his areas totaling 73 percent, how is that calculated?

Page 214

A. I don't know. Concentric calculates that, so I don't know what their methodology is.

Q. Does Concentric give a separate report for each employee?

A. Did Concentric -- 2019. I'm sorry?

Q. Does Concentric give a separate report for each employee?

A. I believe they give it for each manager that has a certain number of employees responding, that might be five employees. I'm not sure, but there's a de minimis number that if isn't achieved, of course at the enterprise level you would get more than a minimus number.

Q. Is it based on the survey scores for the areas that Phil was responsible for?

A. Yes. The 73?

Q. Yes.

A. Yes.

Q. Are you the one that provided that number?

A. Concentric provided that number.

Q. Do you recall which areas Phil was responsible for at this period of time?

A. In 2019, he would have had the regions, I believe, yeah.

Q. And what else?

Page 215

A. He had the regions, WAM, and business banking.

Q. Was he responsible for wealth and asset management?

A. Yes. I'm sorry, I said WAM. It is wealth and asset management.

Q. Is his score calculated based on a combination of those scores, or do you know how his individual score is calculated?

A. I don't know how his individual score is calculated. We do not, at Fifth Third, calculate any scores outside of what Concentric provides to us. So each executive would have received scores representing employees in their areas.

Q. The report we see as Exhibit 24, does that include the individual enterprise committee member scores?

MR. CIOFFI: Objection. Lack of foundation. The document speaks for itself. No foundation laid that he knows what's in it.

THE WITNESS: It doesn't look like this particular document gives it for each individual enterprise member. There is -- there are scores for lines of business and staff functions. There are scores for each region individually, as well as scores for each of the 12 largest Fifth Third work

Page 216

cities, and by officer level and so forth, but I don't see, in this particular document, by each enterprise member.

BY MR. SABA:

Q. Going back to Fifth Third McHugh 000496, the narrative section we see in the "what" area, who wrote this?

A. Greg Carmichael would have dictated what he -- what he wanted in here. This particular email in 1/3, the process Greg and I had in place was after we got through the board meetings in December, we would spend some time together where he would, you know, basically tell me what he wants in each individual direct reports, reviews. I obviously spent some time probably over the holidays putting that together, and that's the draft I sent to him on January 3rd, for him to look at and comment on.

But it's my job as a CHRO to be very plugged in and understand the performance of each enterprise member. That's why I can, you know, I'm sure he and I, when we met in December, discussed ratings and so forth, but that's why -- plus this was my, you know, almost third, you know, going into my third year in the role. I knew the enterprise team pretty well from an HR perspective.

Deposition of Robert Paul Shaffer                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 217

1    Q.  So ultimately Greg Carmichael reviews and
2  approves of the language in here; is that correct?
3    **A.  Absolutely.**
4    Q.  And the one common theme from what Greg
5  Carmichael sets forth in January 2020 is that Phil
6  McHugh is a great leader, correct?
7        MR. CIOFFI:  Objection.  Counsel, you're not
8        testifying.  Is that a question?
9  BY MR. SABA:
10    Q.  Is that right?
11        MR. CIOFFI:  Could you ask it as a question,
12        please.
13  BY MR. SABA:
14    Q.  Mr. Shaffer?
15    **A.  I'm sorry.  I didn't understand the question.**
16    Q.  The one common theme conveyed by
17  Mr. Carmichael in his description of Phil McHugh in
18  January of 2020 is that Phil McHugh is a great leader,
19  correct?
20        MR. CIOFFI:  Objection.  The document speaks
21        for itself.  That's not -- at least that's not how
22        I would read it.
23  BY MR. SABA:
24    Q.  Correct?
25    **A.  That is not what the common theme is here.  It**

Page 218

1  **talks about him being a senior and versatile leader,**
2  **strong understanding, strong team player.  Phil did a**
3  **nice job, Phil proactively, Phil continues to do a great**
4  **job.  So there's different ways Greg is describing the**
5  **different components of Phil's performance for that**
6  **year, but, again, none of us have ever said that Phil is**
7  **not a competent, you know, good manager of those people**
8  **and areas.**
9    Q.  So let's be clear.  It's not competent, it's
10  not just good.  Correct me if I'm wrong, but doesn't the
11  fourth last sentence of the first paragraph read, "He is
12  a great leader for his people, inspires followership and
13  is always there to assist them in their success."
14        Is that correct?
15    **A.  Yeah, as it relates to that sentence, yeah.**
16    Q.  Then moving on to the third sentence of the
17  second paragraph, "Phil did a great job leading the
18  regional ops review in 2019 and continues to visit each
19  region as needed to more deeply understand strengths and
20  opportunities as well as to assess talent"; is that
21  correct?
22    **A.  It does say that.**
23    Q.  The next sentence reads, "Phil provided great
24  leadership to build support for key moves in the regions
25  in 2019."  Isn't that right?

Page 219

1    **A.  It does.**
2    Q.  Moving to the last paragraph, first sentence,
3  "Phil continues to do a great job of providing
4  outstanding executive leadership to many of corporate
5  activities and events, and willing to assume such
6  leadership responsibilities."
7    **A.  It does say that.**
8    Q.  It repeats over and over again, not just
9  good --
10    **A.  Uh-huh.**
11    Q.  -- not just capable, but great; isn't that
12  right?
13    **A.  That word is used in here, and that's why Phil**
14  **received an overall exceeds rating.  But, again, if we**
15  **are comparing and contrasting the skill sets and**
16  **capabilities for the type of roles that Phil has had and**
17  **the role that he had this year, we would expect somebody**
18  **at this level with this level of experience to have a**
19  **performance review like this and be very capable of**
20  **doing their job.  It doesn't mean they have the**
21  **qualifications or capabilities to be the next president**
22  **or CEO of Fifth Third Bank.**
23    Q.  And going back to the employee viewpoint
24  survey scores, in terms of individual scores, Phil had
25  the highest employee viewpoint survey score of any

Page 220

1  member of the enterprise committee; isn't that right?
2    **A.  I don't know that.  I don't have that**
3  **information.**
4    Q.  Well, let's continue to look through Exhibit
5  Number 26.  This is the final reviews for all members of
6  the enterprise committee; isn't that right?
7    **A.  Yes.**
8    Q.  Why don't we first go to Fifth Third McHugh
9  000500 and 000501.
10    **A.  500, you said?**
11    Q.  Yes, and 501.
12    **A.  Okay.**
13    Q.  And this is the -- can you identify these two
14  pages for me?
15    **A.  Tim Spence's review.**
16    Q.  Okay.  And who would have written the language
17  that we see for Tim Spence's review as of January 2020?
18    **A.  You mean documented what Greg wanted in here?**
19    Q.  Yes.
20    **A.  I would have documented, as I indicated**
21  **earlier.**
22    Q.  And who would have determined what should be
23  in here in the final version?
24    **A.  Greg Carmichael.**
25    Q.  With respect to Tim Spence, there's a note at

Deposition of Robert Paul Shaffer                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 221

1 the bottom of the third full paragraph that says,
2 "Credit fraud losses relayed to the credit card
3 portfolio were over plan by 10 percent and need
4 continued significant focus"; is that correct?
5     A.  It does say that.
6     Q.  And then with respect to "Tim's 2019 employee
7 viewpoint survey score results were mixed."
8     A.  Uh-huh.
9     Q.  And it talks about "consumer was" -- then it
10 just goes to visual areas as opposed to his individual
11 score.  "Consumer was 74 percent, up from 5 percent.
12 The chief strategy officer was 46 percent."
13     A.  Uh-huh.
14     Q.  "Payments was 57 percent.  And mortgage was 62
15 percent."  Is that correct?
16     A.  That is correct.
17     Q.  And the -- with respect to 46 percent and the
18 57 percent, those are two of the lowest in the entire
19 company, aren't they?
20     A.  I would have to look at all the scores to be
21 able to make that conclusion.
22     Q.  It goes on to indicate "Tim needs to ensure
23 action plans are identified and implemented to
24 significantly improve employee engagement in these
25 areas"; isn't that right?

Page 222

1     A.  That's correct.
2     Q.  He was having problems; isn't that correct?
3     A.  Yeah.  I wouldn't call them problems.  I
4 think, as I indicated earlier, there was initially and
5 continue to be, you know, lots of change in those areas,
6 you know, you'd have to look at the different factors
7 that existed within those areas at that time and what
8 was going on.  Consumer, for instance, went up 5
9 percent.  I guess that's from when Tim took over for
10 Phil.  So it went up.  Mortgage was down slightly, but
11 you've got to remember where interest rates were at that
12 time, and the volume of business activity would be going
13 through that group and the stress on those employees.
14         So you can't look at one single thing,
15 including the leadership or the structure,
16 organizational structure within a particular area, to
17 make any conclusions on individual employee engagement
18 scores.
19     Q.  The information, again, you already indicated
20 the employee engagement scores were not provided to the
21 board and the talent deck.  Also the information
22 regarding the credit fraud losses related to the credit
23 card portfolio being over plan by 10 percent needed
24 continued significant focus.  That information was also
25 not provided to the board, was it?

Page 223

1     MR. CIOFFI:  Objection.  Lack of foundation.
2     THE WITNESS:  I don't know.  We'd have to go
3 back and look at the financial information that the
4 board received throughout the year.  My guess is
5 they would have received financial information that
6 included revenue line items, expense line items,
7 loss line items.  So I couldn't make that
8 conclusion without going back and looking at all
9 the financial information that was provided to the
10 board.
11 BY MR. SABA:
12     Q.  You can't say one way or another?  It was not
13 information provided in the talent deck, was it?
14     A.  It definitely was not.  But I'm saying it
15 could have definitely been provided throughout the year
16 and the financial results and updates that are provided
17 to the board at least quarterly.
18     Q.  And, again, with respect to the opportunities
19 that we now see listed on his review, it again
20 emphasizes the employee engagement items above.
21     A.  Uh-huh.
22     Q.  Because it says "in addition to the employee
23 engagement items above."
24     A.  Yeah.
25     Q.  Then it also talks about other issues that

Page 224

1 were not addressed in the talent deck to the board, does
2 it?
3     A.  Yeah.  This is a more, you know, granular
4 assessment that Greg would do for each individual, and
5 we all have things that we have to work on.  Any leader
6 does.
7     Q.  In addition, on the opportunities for 2020,
8 another point of information not provided to the board
9 was where it indicates he needs to "be more proactive in
10 assessing talent and taking action when necessary";
11 isn't that right?
12     A.  I'm sorry, where are you.
13     Q.  I'm on page 000501, I'm looking at the third
14 bullet point and the last sentence in the third bullet
15 point.
16     A.  Yes.  Again, this is a much more granular
17 summary than would be, you know, provided to the board.
18 The board needs the big picture of things that are the
19 more key things for people to work on.  There are lots
20 of things that Greg or any manager in the company
21 that would work on with their employees at a more
22 granular level.
23     Q.  Well, that statement doesn't appear to be
24 granular, it's more broad in terms of assessing talent
25 and taking action when necessary; isn't that right?

Page 225

1    MR. CIOFFI: Objection. Argumentative. Lack
2  of foundation. But you may answer.
3    THE WITNESS: I don't remember the context. I
4  don't recall the context of that particular
5  sentence. So I don't know if it spoke to one
6  particular situation or more. I don't know.
7  BY MR. SABA:
8    Q. And you indicated before that opportunities
9  are negatives, is that right? You said that with
10 respect to Phil McHugh, at least?
11   A. There are certain items that could be
12 negatives, that people need to work on. There are other
13 items that could be just for your continued development
14 and, you know, growth. There could be those types of
15 items as well.
16   Q. Because obviously it indicates that Tim Spence
17 in bullet point four needed to continue to "focus on the
18 operationalization of our digital investments to build
19 out a complete digital solution as defined in our
20 strategic plan."
21   A. Right.
22   Q. Clearly that wasn't being done; is that right?
23   A. It was absolutely being done. What Greg
24 wanted Tim to do is to continue to really focus on it
25 because he's the only leader we had in the company that

Page 226

1  had the capabilities to drive that strategy. So he
2  wanted to make that an emphasis for Tim, not that Tim
3  needed it because he knows that, but that's a positive
4  continue to focus on that. No different than the next
5  bullet, "deepen exposure to certain key stakeholders."
6  That's not a negative. A lot of that depended on Greg,
7  our CFO, getting Tim that exposure.
8    Q. So just to be clear, opportunities may not be
9  a negative, they may be a positive?
10   A. They could be both.
11   Q. Okay.
12   A. There are some both in these things.
13   Q. And that's true for all the employees, right,
14 and all the members of the enterprise committee?
15   A. Sure.
16   Q. So with respect to Phil McHugh, where you were
17 referring them to as negatives, those could be
18 positives?
19   A. I didn't refer to all of them as negatives,
20 just that last bullet point on talent. I didn't read
21 the other ones.
22     And I can't remember specifically on those
23 what Greg was thinking about in terms of, was Phil
24 lacking here, needed to do more of or continue what he
25 had been doing. And just a point of emphasis from Greg.

Page 227

1  I wasn't in the review, so I don't know how those were
2  discussed with each individual executive.
3    Q. By March 28th of 2020, you and Greg Carmichael
4  were already picking the day when Tim Spence would
5  become president of Fifth Third, correct?
6    MR. CIOFFI: Objection. Argumentative.
7  Lack of foundation.
8    THE WITNESS: That's incorrect. The board is
9  the one that makes the decision on who and when
10 someone becomes the CEO.
11 BY MR. SABA:
12   Q. You weren't already working on deciding what
13 day they would start as president?
14   A. Again, it wasn't our job to decide the
15 ultimate date. It's our job to facilitate the board's
16 executing a succession process.
17    (Deposition Exhibit 27 is marked for
18    identification.)
19 BY MR. SABA:
20   Q. Mr. Shaffer, you've been handed Exhibit Number
21 27, Fifth Third McHugh 006260. Can you identify that
22 for me, please?
23   A. It is an email dated March 28, 2020 from me to
24 Greg Carmichael.
25   Q. Can you go ahead and read that email into the

Page 228

1  record for me, please?
2    A. "Greg, getting back to some succession
3  planning work. I am working to set up a call for Guy,
4  you and I for Thursday or Friday this upcoming week.
5  Attached are three organizational charts:
6    "Current enterprise org chart. Proposed
7  enterprise org chart for either October 2020 or January
8  2021. Proposed enterprise org chart for April 2022.
9    "These org charts and timing are based on our
10 discussions and prior to consideration of any timing
11 impacts of our succession plans related to the
12 Coronavirus or the CFPB matter. The following are data
13 points and assumptions:
14    "Investor day is December 10, 2020. Tim to
15 president on either October 1, 2020 (if we want to
16 announce before investor day) or January 1, 2021.
17 Possibly indicate to Phil at time of Tim's promotion to
18 president that he will be named COO upon Tim's promotion
19 to CEO.
20    "Greg retires on the day of our annual
21 shareholders meeting in April 2022. Tim to CEO and
22 president. Greg remains as chairman of the board until
23 April 2023.
24    "Just want to keep our discussions and thought
25 processes going. Let me know your thoughts. Thanks,

Deposition of Robert Paul Shaffer                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 229

Bob."

Q.  So as indicated in this email March 28th, you and Greg were already deciding on what day Tim Spence would become president of Fifth Third, whether it would be October 1st or January 1st; is that right?

MR. CIOFFI:  Objection.  The document speaks for itself.

THE WITNESS:  No.  This is really following up from the December 2019 talent session with the board.  Again, the board had been, you know, really driving towards their consensus of Tim's qualifications and capabilities to be our next CEO and president.  We had talked at that time about, you know, getting an independent review done by Guy.  That is in reference to RHR International.

And this is simply just Greg and I putting together some different options and considerations for the board.  As I mentioned before, at the end of the day the board makes the ultimate decisions on who would assume the CEO role and the timing around that.

Q.  Well, it's pretty clear that you and Greg are picking the when; is that correct?

MR. CIOFFI:  Objection.  Lack of foundation.  Counsel, you're testifying a lot today.  That's not

Page 230

what the document says, but you can answer.

THE WITNESS:  We were merely putting together some options that we discussed in the December '19 talent session.

BY MR. SABA:

Q.  And the document confirms that it's pretty automatic that once Tim Spence becomes president, he would then become CEO?

A.  I'm sorry?

Q.  It also confirms that it's generally perceived to be automatic that once Tim Spence becomes president, then he will subsequently become CEO, correct?

MR. CIOFFI:  Objection.

THE WITNESS:  It does not conclude that at all.  These are simply options and so forth that we were -- it's the responsibility of the CEO and the CHRO to outline and put some straw men together for the board to ultimately consider and make their decision.

It could have been on this time line, some other time line, it could have been Tim, could not have been Tim.  So it's up to the board as the final decision-maker.

BY MR. SABA:

Q.  The third bullet point, "Possibly indicate to

Page 231

Phil at time of Tim's promotion to president that he had be named COO upon Tim's promotion to CEO."

The Phil that's referred to there is Phil McHugh; is that right?

A.  Correct.

Q.  And the reason that you wanted to indicate to Phil, that both you and Greg Carmichael want to indicate to Phil that he would be named COO when Tim becomes CEO is because you knew that Phil was at risk of leaving if you were going to name -- if the board would name Tim Spence president instead of Phil McHugh; isn't that right?

MR. CIOFFI:  Objection.  Lack of foundation.  Assumes facts not in evidence.  Argumentative.

THE WITNESS:  I was not aware of Phil being at risk at that time.  I don't know how he could be at risk, given he had a very top level job in the company making, you know, over $2 million a year.  I found out, you know, after he quit the company that he did not want to report to Tim Spence.

BY MR. SABA:

Q.  Well, both you and Greg knew that Phil was at risk of leaving if Tim Spence was named president and CEO instead of him; is that right?

MR. CIOFFI:  Objection.  Lack of foundation.

Page 232

BY MR. SABA:

Q.  Is that correct?

A.  I do not recall that.

Q.  You didn't state to anybody that both you and Greg Carmichael were aware that Phil McHugh was at risk of leaving if Tim Spence was the one promoted to president and eventually CEO?

A.  I do not recall that.

Q.  Your final sentence says, "Just want to keep our discussion and thought process going."

Had you and Greg Carmichael had ongoing discussions regarding these specific topics that we see here today?

A.  No.  Again, this really stems back to the March -- I'm sorry, the December 2019 talent discussion.  In the time period from then until March, there's a lot going on in the company from the yearend perspective, performance management, etc.

Q.  Did you and Greg Carmichael have a subsequent discussion regarding the bullet points we see in Exhibit 27?

A.  I don't recall a discussion.

Q.  Do you recall any of the further communications that you had Greg -- with Greg Carmichael regarding the bullet points we see in Exhibit 27?

Page 233

1   A.   I'm sure we had further discussions.  I don't
2   recall specifics or time periods.
3   Q.   Consistent with Exhibit Number 27 and the
4   timeline or the optional timelines you give in bullet
5   point number two, was Tim Spence voted in as president
6   as part of the September 21, 2020 board meeting?
7   A.   I'm sorry, I didn't follow that question.
8   Q.   Your second bullet point indicates "Tim to
9   president on either October 1, 2020 (if we want to
10  announce before investor day) or January 1, 2021"; do
11  you see that?
12  A.   Uh-huh.
13  Q.   Do you recall --
14  A.   I do.
15  Q.   -- when Tim Spence was approved as president
16  of Fifth Third Bank?
17  A.   He became president, the board made a decision
18  in September or October of 2020.
19  Q.   There was an initial board meeting where the
20  process was discussed, and then a final resolution that
21  was signed in October, correct?
22  A.   I believe that's correct.  I'd have to look at
23  the documentation.
24  Q.   When did Tim Spence move from president to
25  president and CEO?

Page 234

1   A.   July of 2022, I believe.
2   Q.   When did Greg Carmichael retire?
3   A.   He would have retired as CEO at that time that
4   Tim was appointed by the board to be the CEO, and then
5   he became our executive chairman.
6   Q.   Which is generally consistent with your last
7   two bullet points, correct?
8   A.   Yep, generally consistent.  I mean, it had
9   been discussed with the board that Greg would, you know,
10  stay on for some period of time as executive chairman of
11  the board after the board appointed Tim if they decided
12  to do that.
13  Q.   What is the CFPB matter?
14  A.   I believe that relates to the ongoing sales
15  practices litigation that we've had with the CFPB for a
16  large number of years.
17       MR. SABA:  We can go off the record.
18       THE VIDEOGRAPHER:  The time is 4:48 p.m.
19  We're going off the record.
20
21       (A recess was taken from 4:48 p.m. to
22  4:59 p.m.)
23       THE VIDEOGRAPHER:  The time is 4:59 p.m.
24  We're back on the record.
25

Page 235

1   BY MR. SABA:
2   Q.   Mr. Shaffer, you were explaining what the
3   CFPB matter was, correct?
4   A.   Correct.
5   Q.   And you said that -- explain that to me again.
6   What was the CFPB matter?
7   A.   I think you asked me what it related to and I
8   said it related to sales practices, litigation
9   that we've had outstanding.
10  Q.   That was an investigation by the CFPB
11  regarding accounts that were being opened without
12  customer knowledge in the consumer bank; is that right?
13       MR. CIOFFI:  Objection.  Lack of foundation.
14       If you know what it's about.
15       THE WITNESS:  I mean, I don't know all the
16       details, but generally that was the allegations and
17       investigation work around it.  It's been
18       outstanding for a long period of time.
19  BY MR. SABA:
20  Q.   Actually they weren't just allegations.  Fifth
21  Third admitted to opening accounts without customer
22  knowledge in the consumer bank.
23  A.   We did.  We admitted to a very small number of
24  accounts that were opened.  We self-identified those.
25  We remediated those.

Page 236

1   Q.   But the investigation is still ongoing.  The
2   bank recognizes it has a very serious matter; is that
3   right?
4       MR. CIOFFI:  Objection.  Lack of foundation.
5       You're testifying, counsel.
6   BY MR. SABA:
7   Q.   Is that correct?
8   A.   The investigation and the litigation is still
9   outstanding.  I guess you'd have to talk to the
10  attorneys on the level of seriousness they believe it
11  presents at this point in time from a legal perspective.
12  Q.   Well, you understood it to be a serious
13  matter; is that right?
14  A.   From what perspective do you mean?
15  Q.   Well, it was one of the reasons why -- which
16  delayed Greg Carmichael in terminating the employment of
17  Susan Zaunbrecher because he didn't want to do it in the
18  middle of the CFPB investigation.
19  A.   Yeah, I think there were some thoughts on
20  Greg's part, depending on where this went, where it
21  ended up, if it ever got resolved.  Greg likes to get
22  things done and get things resolved, so those don't have
23  to be handed off.  Unfortunately, it's outside of our
24  control.  And we've been actively working.
25       Again, you'd have to talk to the legal team on

Deposition of Robert Paul Shaffer                                        Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 237

1 all the ins and outs of what they've been working on
2 with the matter ever since, but it's a longstanding
3 item. A number of banks have a similar or other related
4 CFPB matters that are out there.
5     Q. And it would create concern for anybody who
6 would be put in that consumer lead role; isn't that
7 right?
8     A. I'm sorry, what was the question?
9     Q. It would create concerns for anybody who would
10 be in that consumer lead role; isn't that right?
11     A. I think it would be a concern for the
12 executive management team in general any time we have
13 outstanding litigation.
14     Q. You mentioned Guy, G-u-y. So his name is
15 pronounced Gee, not Guy?
16     A. I believe it's pronounced Gee, yes.
17     Q. Guy Beaudin, is that his last name?
18     A. Yes.
19     Q. And he's with RHR; is that correct?
20     A. RHR.
21     Q. What is RHR?
22     A. RHR is an independent firm that provides
23 executive level assessments of potential candidates for
24 positions like president, CEO, they may have a search
25 arm as well to them, but I can't guarantee that.

Page 238

1     Q. Why did Fifth Third retain the services of RHR
2 in the spring of 2020?
3     A. So the board wanted to do that. The board
4 utilized RHR clear back to 2015, the last time that the
5 CEO position was being assessed for a potential new
6 candidate.
7     Q. How did the board communicate to you or
8 Mr. Carmichael that they wanted you to use RHR?
9     A. We first talked about it in the December 2019
10 talent discussion, that we would utilize RHR for the
11 next CEO succession process.
12     Q. Was that a suggestion made by a member of the
13 board -- strike that.
14     Was that a suggestion made by Mr. Carmichael
15 or was that made by another member of the board?
16     A. I don't recall the initial suggestion,
17 although the board absolutely wanted to and directed me
18 to engage RHR for that process.
19     (Deposition Exhibit 28 is marked for
20     identification.)
21 BY MR. SABA:
22     Q. Mr. Shaffer, you've been handed Exhibit Number
23 28, which is Bates stamped Fifth Third McHugh 006414.
24 Can you identify that for me, please?
25     A. It is an e-mail from me dated June 8 -- I'm

Page 239

1 sorry, June 8, 2020 to Greg Carmichael.
2     Q. And can you read the -- and the subject is Guy
3 conversation; is that right?
4     A. That's correct.
5     Q. Can you read the first three bullet points,
6 please?
7     A. "Guy agrees that if Tim is the successor,
8 don't add Tayfun and Phil formally. Although, he would
9 recommend, at a minimum, we discuss with Marsha that
10 she/the board is okay with only having Tim assessed by
11 Guy. He said he has seen a few boards surprised in the
12 past the CEO/CHRO did have at least one" -- "did have at
13 least one other internal candidate assessed.
14     "Schedule a 90-minute call for Greg, Guy, and
15 me to assess and modify the attached CEO profile used in
16 2015. Guy would also use this time to get feedback from
17 each of us on Tim. We will try to schedule this for" --
18 "for this week or next.
19     "Guy wants to interview four of Tim's other
20 peers, not including me, and four of his direct reports.
21 Guy wants us to pick the interviewees. My
22 recommendations are below. Let me know what you think."
23     Q. Who was Guy agreeing with that if Tim is the
24 successor, don't add Tayfun and Phil?
25     A. He's agreeing with a conversation that I had

Page 240

1 with Guy based off of the discussions I had with him
2 along the way, and what that relates to is this is my
3 first time going through the process as a CHRO to engage
4 RHR or any third-party to do this type of work, and when
5 I originally talked to Guy, I said, you know, we wanted
6 Tim to go through -- the board wanted Tim to go through
7 the process, you know, we may have a couple of others
8 because I was looking at the emergency successor
9 candidates, who were Tayfun and Phil at that time, and I
10 didn't know what the board wanted in terms of having
11 those other two assessed.
12     They clearly wanted Tim assessed because he
13 was the most qualified candidate to be in the president
14 and CEO position. Tayfun and Phil were not. But that's
15 just me initially talking to Guy. And then once, you
16 know, I went back to him and said, hey, the board
17 believes that Tim is the only qualified successor, he
18 recommended that don't have Tayfun and Phil run through
19 the process if they're really not being considered for
20 that role by the board.
21     So his comment here about making sure that we
22 check with Marsha and she's okay, Greg Carmichael did
23 check with Marsha and Marsha agreed, and Greg
24 communicated back to me that Marsha and -- representing
25 the board only wants Tim to go through the process.

Deposition of Robert Paul Shaffer                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 241

1    Q.  When did you have the conversation with Guy
2  about Tim Spence, Tayfun, and Phil all being assessed?
3    A.  I don't remember the exact date.
4    Q.  Was it prior to December of 2019?
5    A.  It would not have been.
6    Q.  Was it after the board meeting in December?
7    A.  It would have been sometime, I believe, in
8  February, March, of 2020, was probably my initial
9  discussion with him.
10    Q.  And when did you determine that the board did
11  not want you to have Tayfun and Phil assessed?
12    A.  As I just stated, Greg confirmed with Marsha
13  that since neither Tayfun or Phil were qualified to be
14  permanent successors, the board only wanted Tim to go
15  through it.
16    Q.  When did Greg do that with Marsha?  When did
17  he communicate with Marsha?
18    A.  I don't know the exact date.
19    Q.  Was it after this email?
20    A.  I believe it would have had to have been,
21  yeah.
22    Q.  You said before that you had a conversation
23  with Guy that -- about assessing Tim, Tayfun, and Phil,
24  and then you determined that Tim was the guy, and so you
25  spoke to Guy again and said that you don't need to do

Page 242

1  Tayfun and Phil and he agreed?
2      MR. CIOFFI:  Objection to the form of the
3    question.  You're repeating his testimony, but
4    you're not repeating it accurately.  So the form is
5    wrong.
6      THE WITNESS:  Yeah.  I did not determine that
7    Tim was the most qualified successor or the only
8    one to go through it.  The board did.
9  BY MR. SABA:
10    Q.  Who did Guy agree with that if Tim is the
11  successor, don't add Tayfun and Phil?  Who is he
12  agreeing with?
13    A.  As I stated earlier, that was the conversation
14  I had with him because I knew that the board did not
15  consider Phil or Tim -- Phil or Tayfun qualified
16  successors.  So I wanted to clarify with him as we got
17  closer to getting the engagement in place what the board
18  wanted.
19    Q.  How did you know the board did not consider
20  Phil or Tayfun to be qualified successors?
21    A.  Based on my participation in the conversations
22  in December of 2019 in other talent succession
23  discussions with the board.
24    Q.  So based on your -- was that set forth in
25  writing anywhere that Bill -- excuse me, that Phil and

Page 243

1  Tayfun are not qualified to be permanent successors as
2  president and CEO?
3    A.  It was not set forth in writing anywhere but
4  by definition emergency successor doesn't have
5  the qualifications to be the permanent successor.
6    Q.  So based on your perception of what the board
7  was saying, you were initially person who communicated
8  to Guy that Tim should be the only one assessed, not
9  Phil and not Tayfun?
10    A.  It was not my perception.  I participated in
11  discussions and heard the board directly say that Tim
12  was the only qualified successor internally that the
13  bank had.
14    Q.  Exactly.  That was your perception of what the
15  board was saying, correct?
16      MR. CIOFFI:  Objection.  You're arguing with
17    him.  He said that wasn't his perception --
18      MR. SABA:  I don't know if he understands the
19    word perception.
20  BY MR. SABA:
21    Q.  So you perceived what they said to you and
22  based on your perception of what they said to you, you
23  then made the decision to communicate to Guy that Tim
24  should be the only person that's assessed, not Tayfun
25  and Phil, correct?

Page 244

1      MR. CIOFFI:  Objection to the form.
2    Argumentative.  Misstates his statement.
3  BY MR. SABA:
4    Q.  Correct?
5    A.  I heard the board talk about that in multiple
6  conversations in the different annual talent management
7  discussions that we had so --
8    Q.  Sure.  But hearing is part of your perception.
9  So you perceived what they said and based on your
10  perception, not anything in writing, you went to Guy and
11  said only assess Tim; don't assess Phil and Tayfun,
12  correct?
13      MR. CIOFFI:  Objection to the form of the
14    question.  Misstates his prior testimony as a
15    question.  And is inappropriate.
16  BY MR. SABA:
17    Q.  Correct?
18      MR. CIOFFI:  If you can answer.
19      THE WITNESS:  What's the question again?
20  BY MR. SABA:
21    Q.  Based on your perception of what the board
22  said, you communicated to Guy that Tim is the guy and
23  Tayfun and Phil should not be assessed?
24    A.  I heard the board in discussions that that's
25  exactly what they said, that's what I said to Guy, and

Deposition of Robert Paul Shaffer                        Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 245

1  that's what Greg confirmed back with Marsha, that Tim
2  was the only qualified successor and only run him
3  through. That was the board's decision.
4      Q.  And going back to Greg's confirmation with
5  Marsha, when did Greg confirm that with Marsha?
6      A.  I don't know the exact date or time.
7      Q.  How did Greg confirm that with Marsha?
8          MR. CIOFFI:  Objection. Asked and answered.
9          MR. SABA:  I asked him when. "How" is a
10  different question.
11         THE WITNESS:  What's the question? I'm sorry?
12  BY MR. SABA:
13     Q.  How did he confirm it with Marsha?
14     A.  I don't know if it was a phone call
15  or whatever. I don't know how he did it. You'd have to
16  ask him.
17     Q.  Is there any documentation in writing of
18  Greg's confirmation with Marsha that only Tim Spence and
19  no one else should be assessed for president and CEO by
20  an independent third-party?
21     A.  Not that I'm aware of.
22     Q.  How did you become aware that Greg had
23  communicated with Marsha about Tim being the only person
24  assessed by RHR?
25     A.  Greg told me.

Page 246

1      Q.  When did Greg tell you that?
2      A.  I don't remember the exact date or time.
3      Q.  And that was a verbal conversation?
4      A.  Yes.
5      Q.  Was it ever communicated to you why the board
6  did not want Tayfun or Phil to be assessed by RHR?
7          MR. CIOFFI:  Objection. Asked and answered.
8          THE WITNESS:  Could you repeat the question?
9  BY MR. SABA:
10     Q.  Yes. Was it ever communicated to you why the
11  board did not want Tayfun or Phil to be assessed?
12     A.  It was in the context of them not having the
13  qualifications to be the next president or CEO of the
14  company.
15     Q.  Did Greg ever communicate to you what Marsha
16  said as to why she did not think Phil or Tayfun should
17  be assessed in addition to Tim Spence?
18     A.  He communicated that he talked to Marsha and
19  the fact that the board was not considering them as
20  legitimate qualified candidates to be in either one of
21  those positions, that the board did not want them
22  assessed.
23     Q.  Then none of those conversations are
24  documented in writing; is that correct?
25     A.  Not that I'm aware of.

Page 247

1      Q.  You and Greg Carmichael remained actively
2  involved in the whole RHR assessment process; isn't that
3  right?
4          MR. CIOFFI:  Objection to the form of the
5  question. Lacks foundation.
6          THE WITNESS:  Could you repeat the question?
7  BY MR. SABA:
8      Q.  You and Greg Carmichael remained actively
9  involved in RHR's assessment of Tim Spence; isn't that
10  right?
11     A.  Sure. Acting at the direction of the board as
12  the current CEO and the CHRO, chief human resources
13  officer, it's our responsibility to help the board
14  administer the process.
15     Q.  So specifically you were involved in terms of
16  reviewing, modifying the CEO profile that was going to
17  be used to assess him; is that correct?
18     A.  The winning formula profile you're talking
19  about?
20     Q.  Correct.
21     A.  Yeah, that we started with the 2015 final
22  version that the board had created with RHR. The
23  request of the board was for Greg, Guy, and I to look at
24  that and make any determinations, particularly from
25  Guy's perspective, if there's anything that should be

Page 248

1  modified, changed, added. There were really minor
2  insignificant changes from the 2015 one.
3      The board, I sent that out to -- I believe I
4  sent it out to the entire human capital compensation
5  committee in draft form to get their review and any
6  feedback to be incorporated into the final profile that
7  the board would utilize.
8      Q.  You were also actively involved in revising
9  RHR's assessment of Tim Spence; isn't that right?
10         MR. CIOFFI:  Objection. Lack of foundation.
11  You may answer.
12         THE WITNESS:  I made probably some proposed
13  changes to it. At the end of the day, RHR remained
14  control -- in control of the process, the results,
15  the reporting. They had a professional
16  responsibility to deliver the results that they
17  assessed accurately, and they did that to the
18  board. Guy Beaudin came in himself and delivered
19  and met with the board, discussed the results. The
20  board had plenty of opportunity to ask Guy any
21  questions that they wanted to.
22  BY MR. SABA:
23     Q.  Well, Tim Spence himself became concerned
24  about some of the comments they were making about him
25  and complained to you about those; isn't that right?

Deposition of Robert Paul Shaffer                          Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 249

1    A.  I don't really remember him complaining.

2    Q.  Ultimately did you indicate to Tim Spence that
3  you would have the opportunity to debrief Guy and give
4  context to any of the areas of concern that he had
5  regarding Tim Spence?

6          MR. CIOFFI:  Objection to the form of the
7    question.  Lacks a foundation as to areas of
8    concern.  They don't appear in the document.

9        THE WITNESS:  I'm sorry, could you repeat the
10   question?

11         MR. SABA:  Sure.

12  BY MR. SABA:

13   Q.  Didn't you indicate to Tim Spence that you
14  would have the opportunity to debrief Guy and give him
15  context regarding any areas of concern that Tim Spence
16  had?

17   A.  I'm sure I did.  My responsibility as the
18  chief human resources officer is to understand any
19  feedback that our executive team is getting, any member
20  of our executive team in ensuring that, you know, if
21  they have the right context and understand what that
22  feedback is so that they can act on.

23   Q.  Ultimately, you and Greg were involved in
24  editing and revising the presentation that RHR would
25  make to the board for the final approval of Tim Spence

Page 250

1  as president; isn't that right?

2          MR. CIOFFI:  Objection.  Lack of foundation.

3        THE WITNESS:  I believe after we reviewed the
4    draft report from Guy, as would be expected, we
5    provided Guy with some proposed changes and, again,
6    it was up to Guy to accept our reject those
7    proposed changes.  And at the end of the day it was
8    his responsibility and RHR's responsibility to
9    report from a professional responsibility
10   perspective the results to the board.

11  BY MR. SABA:

12   Q.  Who decided that when Tim Spence would be
13  promoted to president, that Phil McHugh would be demoted
14  to the lead consumer role?

15         MR. CIOFFI:  Objection to the form of the
16   question.  No foundation.

17       THE WITNESS:  I think there might be two
18   questions in there.  The first is the decision to
19   promote Tim to president of the company would have
20   been made by the board of directors.  Secondly,
21   Phil McHugh was not demoted by being offered the
22   consumer role.  In fact, the consumer role that
23   Phil was being offered was a little different than
24   the first time he had been head of the consumer
25   bank.  From the time he was the head originally

Page 251

1  until he was offered it again, there had been some
2  pretty significant changes to it.

3      We put the Fifth Third securities brokerage
4  business into the consumer bank.  We put the
5  consumer car business in there.  We broke it out
6  from the payments business.  We acquired MB
7  Financial, as we discussed earlier, which
8  significantly increased our retail footprint in the
9  Chicagoland area, and we were embarking on a
10  significant strategic initiative to build hundreds
11  of branches in the southeast section of the United
12  States.

13     So there were pretty significant additional
14  responsibilities and accountabilities that Phil
15  would have had with that job.  Additionally, at
16  that time, Greg had offered Phil an additional
17  $100,000 of base compensation, which would have
18  also increased his variable compensations bonus by
19  about another 110,000, so another couple hundred
20  thousand dollars, but still near $2 1/2 million was
21  in the making there, and it was a top five job in
22  the company, in the proxy.  So a very significant
23  role.  And it amounted to almost 50 percent of the
24  revenue of the company was that business.

Page 252

1  BY MR. SABA:

2   Q.  And it would come with the ongoing CFPB
3  litigation that he would be responsible for; isn't that
4  right?

5          MR. CIOFFI:  Objection.  Lack of foundation.
6    Those events happened years ago.

7        THE WITNESS:  I agree, the events did happen
8    years ago and the hands of that matter are in our
9    legal department right now.  So the consumer
10   business is not handling that matter anymore.

11  BY MR. SABA:

12   Q.  And Phil was already going to be an employee
13  in the proxy state, he was already going to be one of
14  the top five highest employees in 2019 as it was,
15  correct?

16         MR. CIOFFI:  Objection.  Lack of foundation.
17   But if you can answer.

18       THE WITNESS:  I don't know that.  I don't know
19   how there would be a basis for that, what time
20   period was that discussed?  Because if it was
21   discussed any time during the year, early in the
22   year, like a performance management or time or when
23   he received his compensation in February for 2019,
24   anything could happen between then and the end of
25   the year in terms of executives leaving, us having

Deposition of Robert Paul Shaffer                                      Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 253

1 to hire other executives. So you really don't nail
2 down that, you know, distinction until later in the
3 year.
4 BY MR. SABA:
5    Q. You acknowledge, though, that that was a role
6 he already had, notwithstanding your claims that there
7 were some additional duties that came with it. He had
8 already been in that position, correct?
9    **A. I do acknowledge that he served as the head of**
10 **consumer bank previously, but again, there were**
11 **significant new responsibilities in there, again, almost**
12 **50 percent of the revenue of the company, much more**
13 **significant than the revenue of the regions had**
14 **business.**
15    Q. He would also have to report to Tim Spence; is
16 that correct?
17    **A. He would.**
18    Q. It also required that he would give up the
19 leadership of the regional presence; is that correct?
20    **A. Yes. That was being moved to Tim Spence. He**
21 **also -- I'm sorry. He also, you know, along with that**
22 **role, would continue to have a significant benefits**
23 **package. He continued to have his office, his executive**
24 **parking space. He was the only executive in our company**
25 **that had two country club memberships as well. He was**

Page 254

1 **maintaining those.**
2    Q. Why was the leadership of the regional
3 presence being moved to Tim Spence?
4    **A. Greg wanted to move it to Tim Spence to get**
5 **that experience and exposure running the regions. Not**
6 **uncommon in the past where that role has been used for**
7 **development and exposure. I think we probably have had**
8 **somewhere in the neighborhood of five executives in that**
9 **region's role in the last decade.**
10    Q. He wanted Spence to get the experience that
11 Phil already had of leading the regional banks,
12 something that Greg Carmichael noted Phil was a great
13 leader of; isn't that right?
14    MR. CIOFFI: Objection to the form of the
15    question. Assumes facts not in evidence.
16    THE WITNESS: Yeah. If you go back to that
17    performance review discussion, I mean, Greg was
18    being very complimentary to Phil's operational
19    leadership and the job that he does. I mean, we
20    would not have people on the enterprise team that
21    weren't great operators and operating leaders.
22    Doesn't mean they have the capabilities and
23    qualifications to be the next president or CEO of
24    the company.
25

Page 255

1 BY MR. SABA:
2    Q. As part of the demotion to the consumer lead
3 role, Phil was also losing leadership in the middle
4 market banking and wealth and asset management; isn't
5 that right?
6    MR. CIOFFI: Counsel, you know, repeating
7    something that's not true doesn't make it true.
8    Objection to the form of your question. He's asked
9    and answered and explained why it's not a demotion.
10    The law's clear on the issue, but you keep using
11    the term. So --
12    MR. SABA: Because the law is clear on the
13    issue.
14    MR. CIOFFI: Absolutely.
15    MR. SABA: As part of his demotion --
16    MR. CIOFFI: So why where you asking this
17    question?
18    MR. SABA: -- from the consumer lead role,
19    Phil was also required to give up leadership of
20    middle market banking and wealth and asset
21    management; isn't that right.
22    THE WITNESS: It was not a demotion. When you
23    look at the enterprise level roles, I mean, these
24    are big roles, significant roles in the company.
25    Managing lots of people. Lots of resources, highly

Page 256

1 compensated. These are lateral moves, you know, at
2 the enterprise level.
3 BY MR. SABA:
4    Q. That wasn't my question.
5    **A. I'm sorry, repeat your question.**
6    Q. As part of that demotion, Phil was required to
7 give up leadership of the middle market banking and
8 wealth and asset management; isn't that right?
9    MR. CIOFFI: Objection to the form of the
10    question. It's argumentative. He's asked --
11    you've asked it. Now this is the third time.
12    MR. SABA: He hasn't answered.
13    MR. CIOFFI: You keep asking questions
14    redundantly until you attempt to get the answer you
15    want. He has answered it.
16    MR. SABA: He hasn't answered the question.
17    MR. CIOFFI: He has answered the question.
18 BY MR. SABA:
19    Q. Do you understand the question about giving up
20 middle market, the leadership of middle market banking
21 and wealth and asset management as part of the demotion
22 of the consumer lead role?
23    **A. It was not a demotion. Those pieces of**
24 **businesses are being moved as well.**
25    Q. And where were they being moved to?

Deposition of Robert Paul Shaffer                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 257

1    A. I can't remember exactly middle market if that
2  went to commercial at that time, I can't remember.
3    Q. Those both went to Tim Spence, didn't they?
4    A. I don't recall. I know wealth and asset
5  management I believe did. I can't remember middle
6  market if we had put it in commercial at that time under
7  I guess Kevin Lavender's leadership at that time.
8    Q. Either way, they were moved away from Phil
9  McHugh; isn't that right?
10   A. Yes, it did.
11      (Phil McHugh exits the room.)
12      (The following testimony is Confidential --
13      Subject to Protective Order.)
14
15
16
17
18
19
20
21
22
23
24
25

Page 258

1       * * *
2      (Deposition Exhibit 29 is marked for
3      identification.)
4  BY MR. SABA:
5    Q. Mr. Shaffer, I've handed you what has been
6  marked as Exhibit Number 29. It's Bates stamped Fifth
7  Third McHugh 0213246 through Fifth Third McHugh 0213248.
8      MR. CIOFFI: Again, counsel, before you
9      continue, I'll renew my previous objection. This
10     is attorneys' eyes only document. All of the
11     material that's not relevant to this case needs to
12     be redacted. Should have been done before it was
13     used, but it needs to be done in the next day or so
14     before it goes into the permanent record.
15 BY MR. SABA:
16   Q. Mr. Shaffer, if I can refer you to -- this is
17 a text message exchange between yourself and Nancy
18 Pinckney from October 16, 2020. If I could refer you to
19 the text message you send on October 16, 2020 at 2:16
20 p.m.; do you see that?
21   A. 2:16?
22   Q. Yes.
23   A. Yes.
24   Q. And what did you write this?
25   A. "The Silver Fox could be out tomorrow."

Page 259

1    Q. What did you mean by that?
2    A. What I meant by that was Phil was refusing to
3  take the consumer position that he was being offered in
4  the bank. He refused it on the day Greg offered it to
5  him on October 13th. He refused it again on the 14th.
6  I talked to him specifically on the 15th, and he refused
7  again, said he needed more time. We connected on the
8  16th, later, after this text message time, and that's
9  when Phil said he refused to accept the consumer
10 position. He wanted to keep the regions, and he did not
11 want to report to Tim Spence and he was quitting the
12 company.
13   Q. Let me clarify one thing. Did you send that
14 at 2:16 a.m.?
15   A. I doubt if I'd have been up that late on
16 vacation. I was in Michigan, I think it looks like
17 here. I might -- I don't know. Is this military time
18 or -- it looks like it is both.
19      MR. CIOFFI: It's a different time zone,
20      counsel.
21      THE WITNESS: That's true, too.
22 BY MR. SABA:
23   Q. Either way, with respect to that
24 communication, you're referring to Phil McHugh as the
25 Silver Fox, correct?

Page 260

1    A. Correct.
2    Q. And you were referring to him with respect to
3  the termination of his employment at Fifth Third Bank;
4  is that right?
5      MR. CIOFFI: Objection. Argumentative.
6      Misstates the facts. Go ahead.
7      THE WITNESS: No, he was not being terminated
8      from the company. He was offered one of the five
9      largest jobs in the company, and he was refusing to
10     take it.
11 BY MR. SABA:
12   Q. Well, when you say he could be out tomorrow,
13 you're saying he could be out of his employment
14 tomorrow; isn't that right?
15   A. Meaning that he could quit the company
16 tomorrow, yes. He was never terminated.
17   Q. Reading down October 16, 2020, 4:33 p.m.,
18 Nancy Pinckney texts you, "Got it. PS, Phenise asked me
19 to pull Phil's LTI agreements (evaluating non-compete
20 clauses).
21     Do you see that?
22   A. I do.
23   Q. And your response is, "Okay, Phil has still
24 not talked to Greg or me today about his decision."
25     Correct?

Deposition of Robert Paul Shaffer                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 261

1    A.  My response -- yes.

2    Q.  Reading down to the bottom of Exhibit 29,

3  October 17th, 4:07 p.m., you have a text message that

4  starts, "I just sent this to Phil."

5    A.  Yes.

6    Q.  And it appears there is a crying emoji next to

7  it, or laughing emoji -- laughing emoji?

8    A.  That is not mine.  I don't know what that is.

9    Q.  And you sent the -- did you text Phil or did

10 you email Phil?

11   A.  I texted him this note on the top of page

12 0213247.

13   Q.  And go ahead and read that into the record.

14   A.  "Phil, I understand you reached out to Greg

15 today.  Since you indicated you were getting an

16 attorney, please have your attorney contact Susan."

17 Which would be Susan Zaunbrecher.  "As I told you

18 yesterday, since you refuse to take the consumer lead

19 role you are voluntarily resigning from the company, as

20 there is no other position available.  As such, and as I

21 indicated yesterday, you do not need to come into the

22 office and your last day with the company will be

23 October 30th."

24       So this is in response on the 17th -- I'm

25 sorry, the 16th -- when Phil and I talked and he

Page 262

1  continued to refuse to take the consumer role, and said

2  he only wanted the regions role and did not want to

3  report to Tim.  He asked me three times if I was -- if

4  he was being terminated, three times I said absolutely

5  not.  You're receiving one of the top five positions in

6  the company.  So that was on the 16th.

7       On the 17th, Greg called me, I was in Michigan

8  again, and Greg said that Phil tried to call him and I

9  advised Greg that we need to talk to Susan because Phil

10 said he was getting an attorney.  So I don't want the

11 CEO or anybody else in the company talking to somebody

12 that said they're getting an attorney.  So that's the

13 note that Susan instructed me to send to Phil.

14   Q.  You indicate no other positions were

15 available; is that correct?

16   A.  That's what it says in this email, yes.

17   Q.  So no effort was made by Fifth Third to find a

18 position that would be tolerable for Phil McHugh to

19 retain his job at Fifth Third Bank?

20   A.  There were no other enterprise positions

21 available at that time.

22   Q.  Why wasn't the regional bank's position

23 available to Phil?

24   A.  Because it was being moved to Tim Spence.

25   Q.  But Phil had indicated to you that he would

Page 263

1  work that position, correct?

2    A.  He did.

3    Q.  But that was taken away from him, correct?

4    A.  It was being moved to Tim Spence.  Greg

5  Carmichael was the CEO.  He was responsible for the

6  assignment of his team, and that's what Greg wanted to

7  do and offered Phil the consumer job, again, an expanded

8  role from the prior time he had it with lots of perks

9  and top five role.

10       And I should point out, you mentioned earlier

11 whether Phil would have been in the proxy that year

12 based on his February compensation.  To this day -- and

13 you can look at our current proxy -- the consumer role

14 is in our proxy.  The regions head role is not in our

15 proxy.

16   Q.  The individuals in the proxy is based upon the

17 amount of salary they receive, right, the amount of --

18   A.  Total compensation.

19   Q.  Total compensation?

20   A.  There are certain positions that are required,

21 the CEO position is required, the CFO position is

22 required, and then it's basically I think if you have a

23 COO, too, I think it's required, which we didn't have.

24 But then it would be the next three top compensated

25 employees, yes.

Page 264

1    Q.  Correct.

2       (Deposition Exhibit 30 and Exhibit 31 are

3       marked for identification.)

4  BY MR. SABA:

5    Q.  Mr. Shaffer, you've been handed two exhibits.

6  If you can first grab Exhibit Number 31, Fifth Third

7  McHugh 0213204.

8    A.  Okay.

9       MR. CIOFFI:  Counsel, again, this is

10   attorneys' eyes only.  There's material on here

11   that is confidential, not relevant to the case,

12   which needs to be redacted, as we've discussed, but

13   go ahead.

14 BY MR. SABA:

15   Q.  This is a text message exchange between you

16 and Tim Spence referring you to the October 13, 2020

17 text at 11:19 a.m. from you; do you see that?

18   A.  I'm sorry, what's the date, October --

19   Q.  October 13, 2020.

20   A.  Yeah.

21   Q.  It says, "Tayfun knows now about the moves.

22 Very professional.  Said he is not surprised and will be

23 supportive.  Silver Fox is next."

24       Do you see that?

25   A.  I do.

Deposition of Robert Paul Shaffer                                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 265

1  Q.  And Tim Spence responds, "Nice.  Do I need to
2  reach out to him right away?  If not, I will just come
3  in early tomorrow and see him in person."
4       And you indicate, "Tomorrow would be fine."
5       And Tim Spence says, "Thumbs up."
6  A.  Uh-huh.
7  Q.  Referring back to your -- first, your text
8  message, the first sentence says, "Tayfun knows about
9  the moves" -- the moves.  What moves are we talking
10 about that Tayfun knows about?
11 A.  Those would have been about the moves of
12 moving the regions to Tim, offering Phil the consumer
13 bank.  So Greg must have -- I'm surmising here -- talked
14 to Tayfun about that, and the -- talked to Phil, Greg
15 would talk to Phil next.
16 Q.  So that's what is meant by Silver Fox is next;
17 is that right?
18 A.  Greg would talk to him, yeah.
19 Q.  And was the intent of what Greg would talk to
20 him about?
21 A.  Would communicate the moves that he wanted to
22 make, with the regions to Tim, and Phil in the consumer
23 bank.
24 Q.  On October 13 of 2020 at 1:10 p.m., you text
25 back to Mr. Spence, "Greg talked to Phil.  Said it went

Page 266

1  better than expected.  Phil said he gets it.  Makes
2  sense just needs to digest it.  I expect him to ask me
3  for comp increase."
4  A.  Yes.
5  Q.  Did I read that correctly?
6  A.  You did.
7  Q.  What is meant where it said "it went better
8  than expected"?  How was it expected to go?
9  A.  I don't recall what that meant.
10 Q.  Did you and Greg Carmichael both expect that
11 it was not going to go well because Phil McHugh expected
12 he was going to be the next president of Fifth Third
13 Bank?
14 MR. CIOFFI:  Objection to the form of the
15 question.  Lacks foundation.  You may answer.
16 THE WITNESS:  Can you repeat the question?
17 MR. SABA:  Yes.
18 BY MR. SABA:
19 Q.  With respect to the statement "it went better
20 than expected," it indicates that neither nor
21 Mr. Carmichael expected it was going to go well if Phil
22 McHugh was not being named the next president of Fifth
23 Third Bank?
24 MR. CIOFFI:  Objection.  Lack of foundation.
25 THE WITNESS:  I don't ever recall believing

Page 267

1  that Phil, you know, think it wouldn't go well.  I
2  can't recall what this is about.
3  BY MR. SABA:
4  Q.  What do you mean, you can't recall what this
5  is about?
6  A.  Well, I know it's about the discussion Greg
7  had with Phil, but said it went better than expected.
8  I'm not sure -- I don't recall what that meant.
9  Q.  Was it expected that it would not go well when
10 Phil McHugh was going to be told that he would not be
11 the next president of Fifth Third Bank?
12 MR. CIOFFI:  Objection.  Lack of foundation,
13 but you can answer.
14 THE WITNESS:  I don't recall that.  I don't
15 know why Phil would ever have thought he'd have
16 been the next president of Fifth Third Bank.
17 BY MR. SABA:
18 Q.  Referring you to Exhibit 30, Fifth Third
19 McHugh 0123195, I'm referring you to the text, this is a
20 text message exchange again between you and Mr. Spence,
21 referring you to the text on October 17, 2020 at 2:52
22 p.m.  And Tim Spence indicates, "Any further word from
23 the Silver" --
24 A.  Hold on, let me find it.  2:52, October 17th?
25 Q.  Correct.

Page 268

1  A.  Is that 13:52 or would it --
2  Q.  14:52.
3  A.  14:52.
4  Q.  See that, the second to last line?
5  A.  Okay.  Got it.
6  Q.  And Mr. Spence texts you, "Any further word
7  from the Silver Fox?"  And then he texts, "I am
8  terrified he will show up on Monday."
9  A.  Uh-huh.
10 Q.  Do you see that?
11 A.  I do.
12 Q.  Do you know why Mr. Spence was terrified that
13 Mr. McHugh would show up on Monday?
14 A.  I do not recall why -- why he said that.
15 Q.  Were you aware of anything that he should be
16 terrified about?
17 A.  No.  I'm just speculating here that Phil would
18 maybe not -- or would come in even though he had quit
19 the company.  I don't know.  I don't recall what this is
20 about.
21     (Deposition Exhibit 32 is marked for
22     identification.)
23 BY MR. SABA:
24 Q.  Mr. Shaffer, I've handed you what's been
25 marked as Exhibit Number 32, Fifth Third McHugh 0213207.

Case: 1:21-cv-00238-MRB Doc #: 77-14 Filed: 06/27/25 Page: 71 of 118 PAGEID #: 3675

Deposition of Robert Paul Shaffer                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 269

1  This is a text message exchange between yourself and
2  Mr. Spence from October 17th and 18th; do you see that?
3        MR. CIOFFI:  Again, counsel, by way of
4     objection, this is attorneys' eyes only.  There's
5     material on here that needs to be redacted,
6     consistent with my earlier objections.  But go
7     ahead, you may answer.
8  BY MR. SABA:
9     Q.   And just to be clear, although the Bates
10 numbers are not consecutive, Exhibit Number 32 is a
11 continuation of the text message exchange from
12 Exhibit 30; do you see that?
13    A.   From Exhibit 30?
14    Q.   Correct.  In other words, the text message at
15 the end of Exhibit 30 that reads, "I'm terrified he will
16 show up on Monday and that Frank will need to escort him
17 out'; do you see that?
18    A.   I do.
19    Q.   You then later send a text message to
20 Mr. Spence, "Here is what I sent to Phil."  And it's the
21 same text message that you also sent to Nancy Pinckney;
22 is that right?
23    A.   Yeah.  This is going to Tim.  Did we look at
24 something where I sent it to Nancy?
25    Q.   That was Exhibit 29.

Page 270

1     A.   Okay.
2     Q.   So you sent the same note to Tim Spence,
3  correct?
4     A.   I did.
5     Q.   You then indicate on October 17th at 4:53 p.m.
6  that, "Phil did respond.  Bob, I was told by you and
7  Greg that I did not need an attorney and told by you not
8  to report to work on Monday."  Correct?
9     A.   Let me get in here and see.  The 17th, 2020 at
10 16:53?
11    Q.   Correct.
12    A.   Yes, I see that.
13    Q.   Tim Spence responds, "We need to know whether
14 or not he's gotten an attorney.  You definitely did not
15 tell him he didn't need one."
16         And you responded, "I did not tell him that.
17 I told him I was surprised he was asking in the
18 conversation if he needed one."  Excuse me, I read that
19 incorrectly.  "I did not tell him that.  I told him I
20 was surprised he was asking in the first conversation if
21 he needed one.  But in the third and fourth
22 conversations, he told me that he was getting one"; is
23 that correct?
24    A.   That's what it says.  Yeah, again, this was in
25 the context of Phil not wanting to accept the consumer

Page 271

1  job.  He wanted the regions job.  He did not want to
2  report to Tim Spence.
3         Interestingly enough, during any of these
4  discussions I had with Phil here in these texts or
5  verbally on the phone, did he ever one time question,
6  object to, or even raise a concern about Tim being the
7  president.  It was never about that.  And, in fact, in
8  any of the vetting process, we talked about RHR earlier.
9  RHR, everybody knew that process was going on.  Phil was
10 even involved in that process, and he never said
11 anything to RHR.  He never said anything to Greg
12 Carmichael or me at all about his concern for not being
13 vetted for that process.
14        So Phil had firsthand knowledge of what was
15 going on, and even as he was quitting the company here
16 in mid-October, he never raised that as a concern.  It
17 really wasn't until the complaint that he filed that
18 that came up.
19    Q.   Well, Phil was still under the impression that
20 he was under consideration for president, wasn't he?
21        MR. CIOFFI:  Objection to the form of the
22     question.  Lack of foundation.
23        THE WITNESS:  I would not know why he would
24     think that.
25 BY MR. SABA:

Page 272

1     Q.   You specifically, and Greg Carmichael both
2  knew that, didn't you?
3     A.   I'm sorry?
4     Q.   You and Greg Carmichael both knew that,
5  correct?
6     A.   Knew what, that he was being considered?
7     Q.   That he still thought he was being considered?
8     A.   I definitely did not.
9     Q.   Didn't you and Greg Carmichael both
10 communicate to the board that you knew that Phil was at
11 risk of leaving if Tim Spence was going to be promoted
12 to president instead of Phil?
13    A.   I think that's two different concepts.  One, I
14 don't recall us ever communicating that to the board nor
15 do I recall Phil and why he would ever think he's being
16 considered for president.
17    Q.   So your response is no to that, correct?
18    A.   Well I guess -- repeat the question.  It was a
19 two-part question.
20    Q.   Sure.  Didn't you and what Mr. Carmichael
21 communicate to the board that you knew that Phil McHugh
22 was at risk of leaving if Tim Spence was promoted to
23 president instead of Phil?
24    A.   I do not recall that.
25    Q.   Referring back to Exhibit 32, on October 17,

Page 273

1  2020, 5:07 p.m., Tim Spence ultimately communicates to
2  you, "This is insane. The Silver Fox, of all people."
3  Is that correct?
4      A. That's what it says.
5      Q. It's fair to say based on the review of these
6  several text message chains and exhibits, that you and
7  Mr. Spence, at least, regrettably refer to Phil McHugh
8  as the Silver Fox outside his presence, correct?
9      A. In these text messages, yes.
10     Q. And that would also be true with respect to
11 decisions regarding his future employment; isn't that
12 correct?
13     A. That is not correct.
14     Q. These aren't discussions about Phil McHugh's
15 employment with the bank?
16     A. Maybe I misunderstood the question. Could you
17 please reask it?
18     Q. Sure. That you would also refer to Phil
19 McHugh as the Silver Fox when discussing issues with
20 respect to his employment with Fifth Third Bank?
21         MR. CIOFFI: Objection to the form of the
22     question. The messages speak for themselves.
23     That's not what they say.
24         THE WITNESS: I am not sure what you're
25     asking, because Phil's future employment with the

Page 274

1  bank was the offer of the consumer role. So we
2  weren't talking about or discussing anything
3  related to any other type of employment or any
4  other position with the bank. It was the consumer
5  position.
6  BY MR. SABA:
7      Q. You're discussing his employment with the bank
8  and the potential of that employment and escorting
9  him out of the bank if he tries to come back to the
10 bank, and during that time you're both referring to him
11 as the Silver Fox; isn't that correct?
12         MR. CIOFFI: Objection. Argumentative,
13     counsel. That's your argument, but that's not what
14     the document says. So do you want him to agree
15     with your argument? Is that your question, does he
16     agree with you?
17         MR. SABA: Go ahead and answer the question.
18         MR. CIOFFI: What is your question?
19         THE WITNESS: Yeah, please. Could you
20     please --
21         MR. CIOFFI: Did you understand the question?
22         THE WITNESS: No.
23 BY MR. SABA:
24     Q. Both you and Mr. Spence refer to Mr. McHugh as
25 the Silver Fox when discussing either his employment

Page 275

1  relationship with the bank and/or escorting him out of
2  the bank if he would come back to the bank after you
3  believed his employment relationship had been
4  terminated?
5         MR. CIOFFI: Objection to the form of the
6     question. Continues to be argumentative.
7         THE WITNESS: First, he was never terminated.
8     The escorting out of the bank refers to the
9     following Monday after he quit and left --
10    voluntarily resigned from the bank.
11 BY MR. SABA:
12     Q. So you're referring to him as a silver fox in
13 relation to what you would call his voluntary
14 resignation from the bank; isn't that right?
15     A. We were just simply using the moniker and the
16 badge of honor that he liked to be called. He called
17 himself that, I stated that multiple times this morning.
18     Q. Do you have any record at all -- I don't know
19 if I asked you this before -- anything in writing where
20 Phil McHugh communicated with you in writing and
21 referred to himself as the Silver Fox?
22     A. Do I have anything in writing?
23     Q. Yes. Text message, email, anything, where he
24 is communicating to you calling himself the Silver Fox?
25         MR. CIOFFI: Objection to the form of

Page 276

1  question. Counsel, you've seen that text, so --
2         MR. SABA: There's no text.
3         MR. CIOFFI: Yes, there is.
4         MR. SABA: To Bob Shaffer?
5         MR. CIOFFI: Yes, there certainly is. It has
6     been provided to you.
7         (Mr. McHugh enters the room.)
8         (Deposition Exhibit 33 is marked for
9     identification.)
10 BY MR. SABA:
11     Q. Mr. Shaffer, I've handed you what's been
12 marked as Exhibit Number 33, which is Bates stamped
13 Fifth Third McHugh 000517 through 000527. Are you able
14 to identify this document for me?
15     A. It's board minutes from September 21,
16 2020.
17     Q. Have you ever seen this document
18 before?
19     A. I don't recall.
20     Q. Do you recall that this was the board meeting
21 where you, Mr. Beaudin, and Mr. Evans presented the
22 information regarding the assessment by RHR of
23 Mr. Spence?
24     A. I do, but I did not present any of the
25 information. I was simply introducing Guy and Chuck

Deposition of Robert Paul Shaffer                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 277

1  **and reminding the board of some of the process and**
2  **the CEO profile and so forth that had already**
3  **previously been discussed and that they reviewed.**
4  **The RHR representatives were responsible for**
5  **presenting the information under evaluation of**
6  **Mr. Spence.**
7      Q.  Have you ever seen this document
8  before?
9      **A.  I don't recall.**
10                     * * *

Page 278

1      (The previous testimony is Confidential --
2      Subject to Protective Order.)
3      MR. SABA:  We can go off the
4  record.
5      THE VIDEOGRAPHER:  The time is 6:11 p.m.  We
6  are going off the record.
7      (A recess was taken from 6:11 p.m. to
8      6:19 p.m.)
9      THE VIDEOGRAPHER:  The time is 6:19 p.m.  We
10  are back on the record.
11  BY MR. SABA:
12      Q.  Mr. Shaffer, earlier you were
13  indicating that there was additional compensation
14  offered to Mr. McHugh as part of what we consider
15  a demotion, you considered it a lateral move to
16  the consumer role.  Is that set forth anywhere in
17  writing?
18      **A.  It is not in writing.  Greg and I talked**
19  **about it before he talked to Phil, and Greg**
20  **communicated to me that he did communicate that to**
21  **Phil.  And the reason he did that is every time**
22  **Phil would get a new role or increased**
23  **responsibilities, I mean, the first thing Phil was**
24  **after was hey, what's in it for me?  How am I going to**
25  **feed the family.  You know, he always wanted additional**

Page 279

1  **compensation.  So Greg was just going to head that off**
2  **with this specific position.  And wanted to, you know,**
3  **give Phil some additional compensation for taking on**
4  **that role.**
5      Q.  Were these purported terms set forth in
6  writing anywhere?
7      **A.  They were not.**
8      Q.  Is there any written evidence
9  of what Greg Carmichael communicated to
10  Phil McHugh as to what he would be given
11  as a result of Tim Spence being promoted
12  to president?
13      **A.  I missed the beginning of that.  I'm**
14  **sorry.**
15      Q.  Yes.  Is there any written documentation of
16  what Greg Carmichael communicated to Phil McHugh about
17  what he would be given when Tim Spence is promoted to
18  president?
19      **A.  Not that I'm aware of.**
20      MR. SABA:  That is all the questions I
21  have.
22      THE VIDEOGRAPHER:  The time is 6:21 p.m.  This
23  concludes the deposition.
24      (The following was recorded stenographically
25      only.)

1          MR. CIOFFI:  Defendants have no

2      questions.

3

4

5

6                          _____

7                          ROBERT PAUL SHAFFER

8                          _____

9                          DATE

10                          - - -

11          DEPOSITION CONCLUDED AT 6:21 P.M.

12                          - - -

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2    STATE OF OHIO            :
                              :            SS
3    COUNTY OF HAMILTON       :

4              I, Wendy L. Raymer, RPR, CRR, the undersigned,

5    a duly qualified and commissioned notary public within

6    and for the State of Ohio, do hereby certify that before

7    the giving of his aforesaid deposition, ROBERT PAUL

8    SHAFFER was by me first duly sworn to depose the truth,

9    the whole truth and nothing but the truth; that the

10   foregoing is the deposition given at said time and place

11   by ROBERT PAUL SHAFFER; that said deposition was taken

12   in all respects pursuant to stipulation of counsel; that

13   I am neither a relative of nor employee of any of the

14   parties or their counsel, and have no interest whatever

15   in the result of the action; that I am not, nor is the

16   court reporting firm with which I am affiliated, under a

17   contract as defined in Civil Rule 28 (D).

18             IN WITNESS WHEREOF, I hereunto set my hand and

19   official seal of office at Cincinnati, Ohio, this 8th

20   day of September, 2023.

21

22

23

24                                  _____
     My Commission expires          S/Wendy L. Raymer, RPR, CRR
25   December 6, 2026                Notary Public - State of Ohio

Case: 1:21-cv-00238-MRB Doc #: 77-14 Filed: 06/27/25 Page: 76 of 118 PAGEID #: 3680

Deposition of Robert Paul Shaffer                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

1 DEPOSITION ERRATA SHEET

Date Taken:  August 24, 2023

Case Caption:  PHILIP R. MCHUGH

vs. FIFTH THIRD BANCORP, et al.

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury

that I have read the entire transcript of

my deposition taken in the captioned matter

or the same has been read to me, and

the same is true and accurate, save and

except for changes and/or corrections, if

any, as indicated by me on the DEPOSITION

ERRATA SHEET hereof, with the understanding

that I offer these changes as if still under

oath.

Signed on the _____ day of

_____, 20___.

_____

ROBERT PAUL SHAFFER

```
 1   2 DEPOSITION ERRATA SHEET

 2   Page No._____Line No._____Change to:_____

 3   _____

 4   Reason for change:_____

 5   Page No._____Line No._____Change to:_____

 6   _____

 7   Reason for change:_____

 8   Page No._____Line No._____Change to:_____

 9   _____

10   Reason for change:_____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change:_____

23   SIGNATURE:_____DATE:_____

24   ROBERT PAUL SHAFFER

25
```

```
1   3 DEPOSITION ERRATA SHEET

2   Page No._____Line No._____Change to:_____

3   _____

4   Reason for change:_____

5   Page No._____Line No._____Change to:_____

6   _____

7   Reason for change:_____

8   Page No._____Line No._____Change to:_____

9   _____

10  Reason for change:_____

11  Page No._____Line No._____Change to:_____

12  _____

13  Reason for change:_____

14  Page No._____Line No._____Change to:_____

15  _____

16  Reason for change:_____

17  Page No._____Line No._____Change to:_____

18  _____

19  Reason for change:_____

20  Page No._____Line No._____Change to:_____

21  _____

22  Reason for change:_____

23  SIGNATURE:_____DATE:_____

24  ROBERT PAUL SHAFFER

25
```

### WORD INDEX

**< $ >**
**$100,000** 251:*17*
**$2** 231:*18* 251:*20*

**< 0 >**
**000253** 189:*5*
**000254** 192:*10*
**000265** 189:*6*
**000469** 205:*16*
**000492** 209:*10*
**000496** 209:*17* 216:*5*
**000497** 209:*18*
**000500** 220:*9*
**000501** 220:*9* 224:*13*
**000511** 209:*11*
**000517** 276:*13*
**000527** 276:*13*
**001104** 178:*10*
**001105** 179:*6*
**001154** 179:*7*
**001465** 175:*17*
**001466** 175:*7*
**001515** 175:*8*
**005483** 91:*17*
**005498** 115:*3, 7*
  149:*10*
**005515** 91:*17, 19*
**006048** 100:*24*
**006260** 227:*21*
**006380** 95:*6, 9*
**006414** 238:*23*
**006713** 123:*19*
**006714** 127:*22*
**006739** 128:*23*  144:*3*
  145:*8*
**006742** 129:*25*
  145:*16*
**006749** 132:*13*
**006761** 127:*23*
**006762** 155:*3*
**006792** 155:*9* 157:*16*
  161:*14, 19*
**006799** 166:*16*
**006811** 155:*4*
**006836** 165:*25*
**006873** 166:*9*
**006885** 166:*1*
**006886** 137:*3, 8*

**006918** 137:*19*  144:*7,
15*
**006921** 145:*15*  150:*4*
  155:*13*
**006928** 152:*24*
**006940** 137:*10*
**006943** 102:*7*
**006955** 103:*17*
**006963** 105:*13*
  108:*25*
**006968** 111:*23*  116:*7*
**006971** 119:*7*
**006978** 121:*17*
**006989** 102:*7, 10*
**007016** 172:*19, 20*
**007053** 173:*2*
**007065** 172:*21*
**0123195** 267:*19*
**0213026** 37:*7*
**0213076** 22:*9*
**0213148** 184:*13*
**0213203** 86:*6*
**0213204** 264:*7*
**0213207** 268:*25*
**0213246** 258:*7*
**0213247** 261:*12*
**0213248** 258:*7*
**0214533** 44:*7, 10*
**0214550** 44:*7, 12*
**021459** 45:*9*
**023148** 184:*14*
**06739** 144:*13*
**06799** 166:*10*
**071635** 200:*11*
**071709** 200:*12*
**071710** 202:*9*
**071796** 202:*17, 21*
**071802** 202:*9*

**< 1 >**
**1** 3:*4* 8:*22* 9:*1*
  12:*12, 13, 22, 23*  13:*4,
  24, 25* 14:*12, 13*
  17:*23* 18:*18, 21*
  19:*16* 20:*7* 25:*25*
  26:*1* 61:*9, 10* 62:*22,
  24* 63:*24* 64:*17, 20*
  84:*7, 9* 172:*24*
  202:*15* 228:*15, 16*

233:*9, 10* 282:*1*
**1/2** 251:*20*
**1/3** 216:*9*
**1:01** 125:*9, 11*
**1:09** 125:*12, 13*
**1:10** 265:*24*
**1:21-cv-00238** 1:*9*
  5:*6*
**1:46** 38:*4, 9*
**1:54** 154:*17, 20*
**10** 3:*10* 102:*2, 6, 12*
  103:*3, 12, 14* 105:*12*
  111:*23* 114:*6* 116:*7*
  119:*6* 121:*18* 167:*24*
  173:*16* 209:*15* 221:*3*
  222:*23* 228:*14*
**10/25** 116:*24*
**10:14** 27:*5, 7*
**10:15** 27:*8, 10*
**10:51** 86:*21, 23*
**100** 82:*21*
**101** 3:*10*
**102** 3:*10*
**11** 3:*10* 81:*24* 86:*21*
  114:*7* 123:*14, 18*
  125:*17, 18* 128:*18*
  137:*15* 142:*21* 143:*3*
  145:*19* 152:*25*
  156:*22* 167:*24*
  173:*16*
**11/7/19** 128:*11*
**11:19** 264:*17*
**11:24** 78:*7, 9*
**11:43** 78:*10, 11*
**110,000** 251:*19*
**11th** 128:*7* 135:*25*
  150:*5* 152:*6*
**12** 3:*12* 127:*18, 22*
  128:*25* 130:*1* 132:*12*
  137:*3* 144:*5* 155:*5*
  156:*24* 161:*11*
  166:*16* 180:*5* 184:*21*
  186:*13* 215:*25*
**12/17** 124:*11*
**123** 3:*10*
**127** 3:*12*
**12th** 155:*20* 179:*20*
  186:*7* 187:*11*
**13** 3:*12* 136:*24*
  137:*4, 5, 7* 144:*10*

145:*14* 150:*5* 152:*25*
  155:*13* 166:*4* 264:*16,
  19* 265:*24*
**13:46** 38:*9*
**13:52** 268:*1*
**136** 3:*12*
**137** 3:*12*
**13th** 166:*18* 259:*5*
**14** 3:*13* 154:*24*
  155:*9* 161:*13, 18*
  166:*10*
**14:52** 268:*2, 3*
**14th** 259:*5*
**15** 3:*13* 35:*16* 67:*12,
  16* 68:*6* 69:*8, 23, 25*
  70:*17, 18* 122:*12*
  165:*21, 25* 166:*8*
  172:*19*
**154** 3:*13*
**155** 3:*13*
**15th** 67:*20* 114:*11*
  259:*6*
**16** 3:*14* 4:*3* 96:*18*
  130:*23* 146:*2* 172:*15,
  19, 20* 203:*10* 258:*18,
  19* 260:*17*
**16:53** 270:*10*
**165** 3:*13*
**16th** 259:*8* 261:*25*
  262:*6*
**17** 3:*14* 45:*9* 120:*21,
  23* 175:*3, 7* 176:*14*
  178:*16* 179:*12, 16, 18*
  195:*2* 267:*21* 272:*25*
**1700** 2:*19*
**172** 3:*14*
**175** 3:*14, 15*
**178** 3:*15*
**179** 3:*16*
**17th** 189:*10* 261:*3,
  24* 262:*7* 267:*24*
  269:*2* 270:*5, 9*
**18** 3:*15* 79:*6* 80:*5,
  17, 21* 109:*13* 120:*22*
  133:*15* 175:*13, 17*
  176:*5*
**184** 4:*3, 15*
**188** 4:*18*
**189** 4:*18*
**18th** 78:*23* 269:*2*

Deposition of Robert Paul Shaffer                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

**19** 3:15 178:6, *10*
*208:4* 230:*3*
**1969** 7:*12*
**197022** 78:*18*
**197033** 78:*18*
**199** 4:*3*
**1991** 7:*10*
**1st** 12:7, *8* 19:*15*
25:25 62:18, *19*
229:*5*

**< 2 >**
**2** 4:15 22:2, *6* 27:*14*
283:*1*
**2:16** 258:*19*, *21*
259:*14*
**2:31** 154:20, *22*
**2:52** 267:*21*, *24*
**20** 3:*16* 87:*15* 179:2,
*6* 188:*16* 282:*17*
**20:06** 22:*21*
**200** 3:*17*
**2002** 12:*4*
**201** 2:*19*
**2010** 81:24 202:*15*
**2011** 133:*10*, *17*
**2015** 133:9 151:*7*
*238:4* 239:*16* 247:*21*
248:*2*
**2017** 9:*14* 120:24
133:*14* 134:6, *14*
138:6 210:*24*
**2018** 10:5, *6* 12:8, *12*,
*22* 13:4, *24* 14:*12*
17:23 18:*18*, *21*
19:*16* 20:7 25:*25*
61:9 62:22 63:*24*
64:*18* 84:9 87:*16*
91:23 92:5, *13*, *16*
96:*4*, *7*, *22* 98:*23*
103:24 105:*25*
106:*24* 109:9 111:*14*,
*15* 114:23 120:8, *9*,
*24* 130:*15* 131:*23*
138:6 146:*1*, *8* 149:*4*
158:8 159:*5*, *11*, *13*
200:*16*
**2019** 67:*12*, *20* 68:*6*
69:8, *23* 70:*17*, *18*
74:7 78:24 79:*6*

80:*5*, *17*, *21* 84:*7*
86:*21* 87:*16*, *19*
95:*15* 96:*18* 97:*12*
98:*2*, *4*, *16*, *19* 101:*10*,
*13*, *20* 102:*13*, *24*
103:*4* 104:7 106:*7*,
*10*, *24* 111:*16* 118:22
122:*13*, *21* 125:6, *18*
127:*3* 128:*3*, *11*, *14*,
*18* 129:*4* 130:*8*
137:*15* 138:*6* 142:*21*
143:*3* 145:*19* 152:*25*
155:*5* 156:*24* 161:*11*
166:*4*, *16* 172:*24*
175:*10*, *20*, *23* 176:*11*
177:*7*, *12*, *15*, *18*, *25*
178:*16* 179:*12*, *14*, *16*,
*18* 180:*5* 184:*21*
186:*12*, *13* 189:*11*, *12*
193:*5* 195:*2* 197:*10*
202:*13* 205:22
209:*20* 213:*17* 214:*5*,
*23* 218:*18*, *25* 221:*6*
229:*9* 232:*15* 238:*9*
241:*4* 242:22 252:*14*,
*23*
**202** 3:*17*
**2020** 9:*10* 12:8, *13*,
*23* 13:*4*, *25* 14:*13*
18:*18*, *21* 19:*16* 20:7
22:*20* 24:*23* 26:*1*
28:*17*, *22*, *24* 38:*4*
44:*17* 61:*10* 62:*19*,
*24* 63:*24* 64:*20*
141:*7* 172:*9* 205:*19*
209:*15* 210:22
211:*10* 217:5, *18*
220:*17* 224:7 227:*3*,
*23* 228:7, *14*, *15*
233:6, *9*, *18* 238:*2*
239:*1* 241:*8* 258:*18*,
*19* 260:*17* 264:*16*, *19*
265:*24* 267:*21* 270:*9*
273:*1* 276:*16*
**2021** 228:8, *16*
233:*10*
**2022** 228:8, *21* 234:*1*
**2023** 1:*16* 5:*1*
228:23 281:*20* 282:*2*

**2026** 281:*25*
**205** 3:*18*
**209** 3:*18*
**20th** 209:*15*
**21** 4:*15* 7:*2* 155:*17*
172:*9* 184:*2*, *6* 233:*6*
276:*15*
**21st** 78:*24*
**22** 4:*3*, *15*, *18* 188:*13*
189:*5*
**227** 3:*19*
**23** 3:*17* 186:*12*
200:*7*, *11*, *14*
**238** 3:*19*
**24** 1:*16* 3:*17* 5:*1*
127:*12* 202:*4*, *8*, *18*
215:*14* 282:*2*
**25** 3:*18* 101:*10*, *13*
102:*13*, *24* 103:*4*
118:22 122:*21*
128:*18* 129:*4* 130:*8*
205:*12*, *15*
**258** 4:*3*, *19*
**25th** 102:*19*
**26** 3:*18* 4:*3* 209:*6*,
*10* 220:*5*
**2623** 2:*6*
**264** 4:*19*
**267** 4:*19*
**268** 4:*21*
**27** 3:*19* 227:*17*, *21*
232:*21*, *25* 233:*3*
**276** 4:*21*
**277** 4:*3*
**28** 3:*19* 227:*23*
238:*19*, *23* 281:*17*
**28th** 227:*3* 229:*2*
**29** 4:*19* 258:2, *6*
261:*2* 269:*25*

**< 3 >**
**3** 4:*15* 37:2, *6* 95:*15*
130:*17* 175:*10*, *23*
176:*11* 205:*18* 284:*1*
**3:30** 23:*3*
**3:42** 199:*19* 200:*3*
**3:56** 200:*4*, *5*
**30** 4:*19* 264:*2*
267:*18* 269:*12*, *13*, *15*

**30th** 261:*23*
**31** 4:*19* 264:2, *6*
**32** 4:*21* 268:*21*, *25*
269:*10* 272:25
**33** 4:*21* 276:8, *12*
**34** 82:*23*
**362-8700** 2:*20*
**37** 4:*3*, *15*
**39** 4:*3*
**3rd** 216:*16*

**< 4 >**
**4** 3:*4* 38:*3* 44:2, *6*
**4:07** 261:*3*
**4:33** 260:*17*
**4:48** 234:*18*, *21*
**4:53** 270:*5*
**4:59** 234:22, *23*
**419** 2:*14*
**43560** 2:*13*
**44** 3:*4*
**45140** 6:*25*
**45202** 1:22 2:*20*
**45208** 2:*6*
**46** 221:*12*, *17*
**497** 211:*15* 213:*12*

**< 5 >**
**5** 3:*8* 78:*13*, *17*
167:*24* 175:*20*
221:*11* 222:*8*
**5:07** 273:*1*
**50** 251:*23* 253:*12*
**500** 220:*10*
**501** 220:*11*
**511** 1:22
**513** 2:7, *20*
**513-470-8400** 22:*15*
**533-2701** 2:*7*
**5580** 2:*13*
**57** 221:*14*, *18*
**5th** 175:*19*

**< 6 >**
**6** 3:*4* 4:*15* 86:2, *6*
167:*24* 203:8 281:*25*
**6:11** 278:5, *7*
**6:19** 278:8, *9*
**6:21** 279:22 280:*11*

Deposition of Robert Paul Shaffer                                        Philip R. McHugh v. Fifth Third Bancorp, et al.

**6:44** 184:*21*
**60** 188:*24*
**62** 221:*14*
**6739** 145:*9*
**6749** 132:*14*
**6799** 166:*12*
**6955** 103:*18*
**6963** 105:*14*

**< 7 >**
**7** 3:*9* 91:*12, 16, 21*
 115:*7* 125:*5* 128:*3,*
 *14* 130:*15* 146:*1*
 158:*7*
**72** 213:*20*
**73** 213:*18, 25* 214:*16*
**74** 221:*11*
**768** 6:*25*
**78** 3:*8*
**7th** 130:*1* 143:*20*
 145:*10*

**< 8 >**
**8** 3:*4, 9* 95:*2, 6, 9*
 238:*25* 239:*1*
**8:06** 22:*20*
**8:30** 207:*1*
**80** 188:*25*
**85** 202:*21*
**86** 4:*3, 15*
**885-3597** 2:*14*
**8th** 281:*19*

**< 9 >**
**9** 3:*4, 10* 7:*12* 22:*20*
 100:*14, 17, 23* 101:*7*
 102:*23* 122:*20*
**9:48** 1:*16* 5:*2*
**90** 4:*3* 77:*21* 188:*25*
**90-minute** 239:*14*
**91** 3:*9* 7:*10*
**92** 155:*17*
**95** 3:*9*

**< A >**
**a.m** 1:*16* 5:*2* 27:*5,*
 *7, 8, 10* 78:*7, 9, 10, 11*
 86:*21* 259:*14* 264:*17*
**abilities** 135:*17*

**ability** 83:*20* 112:*6*
 115:*13, 17* 116:*19*
 139:*7* 164:*24, 25*
 180:*25*
**able** 58:*4* 78:*21*
 81:*20* 129:*21* 139:*10,*
 *16, 22, 25* 157:*13*
 161:*24* 162:*6* 189:*8*
 200:*14* 203:*21*
 221:*21* 276:*13*
**Absolutely** 15:*12*
 35:*10* 36:*9* 162:*5*
 169:*1* 217:*3* 225:*23*
 238:*17* 255:*14* 262:*4*
**accept** 250:*6* 259:*9*
 270:*25*
**accepted** 148:*12*
**accommodation** 61:*21*
**accomplished** 66:*5*
**accountabilities**
 251:*14*
**accountable** 131:*13*
 163:*3*
**accounting** 7:*8*
**accounts** 235:*11, 21,*
 *24*
**accuracy** 112:*13*
 118:*16* 153:*25*
**accurate** 282:*10*
**accurately** 91:*9*
 153:*7* 242:*4* 248:*17*
**achieve** 77:*19*
**achieved** 212:*22*
 214:*11*
**achievements** 190:*5*
**achieves** 206:*8*
 209:*25* 210:*4*
**acknowledge** 49:*11,*
 *18* 253:*5, 9*
**acquire** 87:*14* 161:*24*
**acquired** 87:*13* 251:*6*
**acquiring** 162:*14*
**acquisition** 9:*21*
 88:*25*
**act** 112:*5* 119:*13*
 249:*22*
**Acting** 247:*11*
**action** 34:*8, 15, 22*
 83:*13, 15, 19* 221:*23*
 224:*10, 25* 281:*15*

**actions** 139:*11, 21*
 209:*3* 210:*13, 17*
 211:*12* 212:*14*
 213:*13*
**actively** 236:*24*
 247:*1, 8* 248:*8*
**activities** 165:*18*
 203:*25* 219:*5*
**activity** 210:*17*
 222:*12*
**actual** 94:*14, 19*
**add** 92:*17* 93:*1, 3*
 94:*5* 104:*5* 106:*21*
 107:*15* 110:*13*
 124:*11* 146:*15*
 201:*14* 206:*24* 239:*8,*
 *24* 242:*11*
**added** 104:*12* 106:*6*
 109:*2, 6* 110:*3, 12*
 152:*5* 160:*17* 206:*21*
 207:*7* 248:*1*
**adding** 38:*12* 93:*12*
**addition** 196:*6*
 223:*22* 224:*7* 246:*17*
**additional** 116:*20*
 144:*24* 196:*7* 198:*23*
 204:*16, 19* 251:*13, 16*
 253:*7* 278:*13, 25*
 279:*3*
**Additionally** 6:*18*
 251:*15*
**additions** 94:*13*
**address** 6:*24* 7:*1*
 15:*18* 17:*4* 46:*12*
 125:*1, 22*
**addressed** 224:*1*
**addressing** 46:*23*
**adjusting** 163:*4*
**administer** 85:*5*
 247:*14*
**administration** 7:*7*
**administrative** 8:*1*
 10:*9, 18* 91:*7* 92:*7*
**admitted** 235:*21, 23*
**admonish** 46:*15*
**admonished** 46:*13*
**advancement** 107:*23*
**adverse** 34:*8, 15, 22*
**advice** 55:*2*

**advised** 262:*9*
**Advocacy** 44:*16*
**affiliated** 281:*16*
**aforesaid** 281:*7*
**afraid** 181:*21*
**afternoon** 19:*7*
**age** 5:*22* 29:*12* 35:*7,*
 *11* 36:*7, 10* 38:*13, 19*
 41:*9, 19* 42:*14* 43:*16,*
 *18, 21* 44:*1* 45:*5, 15*
 49:*25* 104:*18, 21, 23*
 105:*7, 9, 10, 22, 24*
 106:*5, 10, 15, 16, 22,*
 *25* 107:*11, 15, 17, 20,*
 *22* 108:*2, 3, 11, 13, 17*
**agencies** 82:*15* 118:*6*
 143:*22* 152:*4*
**aggregate** 191:*7*
**aggregates** 191:*17*
**agility** 119:*14*
**ago** 35:*16* 128:*22*
 176:*24* 177:*3* 181:*20*
 252:*6, 8*
**agree** 141:*21* 148:*2*
 149:*22* 185:*11* 186:*3,*
 *20* 187:*10, 20* 188:*3,*
 *4* 202:*24* 212:*15*
 242:*10* 252:*7* 274:*14,*
 *16*
**agreed** 27:*22* 182:*14*
 188:*20* 240:*23* 242:*1*
**agreeing** 239:*23, 25*
 242:*12*
**agreement** 5:*18*
**agreements** 260:*19*
**agrees** 239:*7*
**ahead** 6:*3* 16:*3* 20:*1*
 24:*7* 33:*19* 34:*13*
 35:*3, 16* 37:*22* 41:*15*
 42:*3, 4* 45:*23* 47:*5*
 50:*7, 19* 52:*8, 22*
 55:*13* 60:*14* 63:*13*
 72:*8* 86:*15* 94:*19, 22*
 97:*22* 104:*3* 109:*9*
 113:*24* 147:*20*
 162:*19* 169:*18* 170:*6*
 171:*13* 210:*9* 227:*25*
 260:*6* 261:*13* 264:*13*
 269:*7* 274:*17*

**Akins** 171:*15*
**al** 1:*10* 5:*7* 282:*4*
**aligning** 138:*13*
**alignment** 206:*17*
**allegations** 235:*16, 20*
**all-encompassing** 147:*13*
**American** 131:*3*
**amount** 263:*17*
**amounted** 251:*23*
**analogy** 76:*5*
**analysis** 203:*22*
**analysts** 82:*14*
**analyze** 203:*15*
**and/or** 134:*4* 142:22
143:*4* 150:*19* 154:*1*
156:*4* 175:2 194:*20*
195:*21* 275:*1* 282:*11*
**Anderson** 105:*21*
109:2
**Anderson's** 105:*16*
**announce** 228:*16*
233:*10*
**announcement** 127:8
**annual** 28:*23* 60:*19*
61:*23* 63:6 64:*16*
69:*22, 25* 70:*3*
106:*17* 108:*23*
124:*20* 140:*12* 164:7
204:*5, 22* 228:*20*
244:6
**answer** 6:*15, 19* 8:*14*
13:*15* 14:*15, 16* 20:2
24:7 25:*3, 4* 34:*13*
35:*9, 17* 38:*21* 41:*13,*
*15, 17, 25* 47:*6, 15, 17,*
*19* 48:*8, 19, 20* 49:*5,*
*6* 50:*3, 19* 52:*9*
53:*12, 13* 54:*1* 55:*22*
57:*2* 58:*10, 12, 21*
59:*15* 72:8 75:*12*
96:*9* 108:6 118:*9*
120:*2, 6* 122:*15*
143:*10* 148:*22*
168:*25* 169:*16* 181:*4,*
*25* 210:*9, 10* 225:2
230:*1* 244:*18* 248:*11*
252:*17* 256:*14*
266:*15* 267:*13* 269:7
274:*17*

**answered** 19:*23, 24*
24:*24* 35:*15, 16*
41:*11, 16, 23, 25*
45:*22* 47:*13, 17*
48:*16* 49:*13* 50:6, *17*
51:*12* 52:*3, 5* 53:*4,*
*13* 54:*16, 21* 55:*10,*
*20* 56:*13, 15, 25*
57:*25* 58:*7, 18* 59:*12*
60:*13* 72:7 97:*21*
171:*8* 172:*3, 4*
174:*13* 194:*13* 245:8
246:7 255:*9* 256:*12,*
*15, 16, 17*
**answering** 61:22
**answers** 53:*17*
**anticipation** 179:*15*
**anybody** 7:*21, 24*
8:7 33:*9* 82:*1, 24*
93:*17* 107:*10* 129:*15*
133:*11* 150:*16* 151:*1*
154:*12* 169:*2, 7*
173:*20* 232:*4* 237:*5,*
*9* 262:*11*
**anymore** 7:5 65:*14*
252:*10*
**anyone's** 83:*21*
**Aon** 200:*17*
**apparently** 123:*12*
**appear** 148:*5* 179:*13,*
*17* 224:*23* 249:8
**APPEARANCES** 2:*1*
**Appearing** 2:*10*
**appears** 144:*12*
186:*21* 187:*11* 261:6
**applicable** 191:*15*
**application** 108:*3, 11*
**applications** 13:2
**applies** 108:*9*
**apply** 107:*16*
**appointed** 234:*4, 11*
**appointment** 195:*11*
199:*9*
**appreciate** 124:*8*
**approach** 93:*9* 148:*5*
149:*11* 158:*23*
**approachable** 158:*3*
160:*18* 163:*25*
**approached** 71:2, *4*

**appropriate** 41:*14*
46:*11, 17* 50:*14* 51:*1,*
*6, 7, 9* 52:*15* 53:*3*
63:*14* 72:*15, 16*
84:*18* 88:22 146:*21*
**approval** 249:*25*
**approved** 233:*15*
**approves** 217:2
**April** 22:*20* 24:*23*
198:2 228:*8, 21, 23*
**area** 36:*12* 87:*22*
96:*1* 144:*11, 25*
145:*5* 216:6 222:*16*
251:*9*
**areas** 110:*21* 117:*16,*
*24* 118:*4* 139:*20*
140:*14* 143:*19*
144:*13* 152:*5, 9*
155:*18, 19, 23* 156:*17,*
*21* 157:*1* 162:*23*
164:*14* 167:*1* 203:*11*
213:*18, 24* 214:*14, 21*
215:*13* 218:8 221:*10,*
*25* 222:*5, 7* 249:*4, 7,*
*15*
**arguing** 50:*3* 53:*16*
243:*16*
**argument** 274:*13, 15*
**Argumentative** 50:2
117:*10* 148:22
168:*25* 169:*15* 170:7
171:*13, 22* 181:*4*
182:*16* 183:*1* 212:*20*
225:*1* 227:7 231:*14*
244:2 256:*10* 260:*5*
274:*12* 275:6
**arm** 237:*25*
**articles** 14:*23*
**Asked** 19:*23* 24:*24*
27:*18* 35:*15* 41:*11,*
*23* 42:2 45:*22* 52:*3*
55:*10* 56:*20* 58:*3, 5*
64:*6, 22* 69:*6, 11*
72:6 97:*21* 107:*15*
132:*9* 136:6 152:*12*
159:*4* 162:*25* 172:*3*
174:*13* 194:*13* 235:7
245:*8, 9* 246:7 255:8
256:*10, 11* 260:*18*
262:*3* 275:*19*

**asking** 6:*10* 13:*19*
14:7 41:*12* 47:*14*
48:*17, 23* 49:*14*
53:*15* 54:6, *14, 19*
55:*17* 56:*2, 10* 59:*4*
67:*16* 72:*4, 5* 118:*17*
187:*3* 204:*25* 255:*16*
256:*13* 270:*17, 20*
273:*25*
**asks** 122:*22*
**aspect** 135:*13*
**aspects** 8:*4, 8* 9:*19*
11:*5* 52:*25* 53:*10*
54:*12* 58:*25* 75:22
87:*21* 92:*19* 107:6
209:*4*
**assess** 60:*25* 66:*1*
110:*19* 133:*5* 218:*20*
239:*15* 244:*11*
247:*17*
**assessed** 238:*5*
239:*10, 13* 240:*11, 12*
241:*2, 11* 243:*8, 24*
244:*23* 245:*19, 24*
246:*6, 11, 17, 22*
248:*17*
**assessing** 36:2
208:*19* 224:*10, 24*
241:*23*
**assessment** 59:*1*
99:*1* 148:*16* 169:22
190:*19* 213:*9* 224:*4*
247:*2, 9* 248:*9*
276:22
**assessments** 139:*9*
149:*24* 190:*25* 208:7
237:*23*
**asset** 83:*4* 126:*5*
215:*2, 5* 255:*4, 20*
256:*8, 21* 257:*4*
**assignment** 263:6
**assist** 66:*25* 212:2,
*17* 218:*13*
**assistance** 61:*21*
66:*11*
**assistant** 64:*3*
100:*20, 21, 22* 178:*23*
**assistants** 8:2
**assume** 12:*18* 89:*11*
111:*18, 19* 117:*18*

138:22  156:3  174:5
219:5  229:20
**Assumes**  34:24
122:14  169:15  170:4
231:14  254:15
**assuming**  62:16
**assumptions**  228:13
**attached**  103:6, 9
124:8, 14  125:4
128:7  176:16  206:4,
14  228:5  239:15
**attachment**  96:6
128:12  176:10
**attachments**  102:23
128:10
**attempt**  256:14
**attempting**  153:24
**attend**  65:7  179:22
189:24
**attendance**  62:11
**attended**  180:3
189:22
**attending**  171:4
**attention**  112:8, 12
113:4
**attest**  144:18  176:15
**attested**  149:16
151:5, 20
**attorney**  261:16
262:10, 12  270:7, 14
**attorney-client**  8:16
**attorneys**  7:18, 22, 25
20:11, 17  27:15, 20
37:12  86:11  184:8
236:10  258:10
264:10  269:4
**attractive**  168:21, 22
169:2, 3, 4, 8
**Attracts**  158:1
**audit**  12:6  165:11
170:25  190:17, 22
191:13, 16
**auditor**  165:9
**August**  1:16  5:1
67:12, 16, 20  68:6
69:8, 23, 25  70:17, 18
74:7  78:23  79:6
80:5, 17, 21  114:11
122:12  282:2
**automatic**  230:7, 11

**available**  37:22  97:3
106:17  261:20
262:15, 21, 23
**Avenue**  2:6
**award**  131:3
**aware**  15:1  30:6
35:4, 5  65:11  73:8,
12  128:13  135:20
136:1  142:18  143:11
160:6, 10  171:25
172:10, 13  231:15
232:5  245:21, 22
246:25  268:15
279:19
**Awareness**  44:16
93:10

**< B >**
**bachelor's**  7:7
**back**  9:16  27:11
39:3  40:5  46:25
48:22  49:7  61:11
62:18  78:12  92:23
93:19  104:1  109:9,
24  115:1, 6  116:7
117:6, 20  120:8
122:20  125:14  127:2
130:20  131:15, 21
132:12  133:9  134:14
135:3  136:8, 16, 18
138:5  139:1  146:1
149:4  150:4  154:23
157:18  158:7, 25
160:25  162:24  163:6
177:2  191:19, 20
197:22  200:6  204:14
210:16, 23  211:24
213:2  216:5  219:23
223:3, 8  228:2
232:14  234:24  238:4
240:16, 24  245:1, 4
254:16  265:7, 25
272:25  274:9  275:2
278:10
**backtracked**  185:15
**bad**  165:13
**badge**  29:23  32:23
42:12  275:16
**Balent**  11:15

**BANCORP**  1:10
2:24, 25  5:7  213:20
282:4
**Bank**  7:14  10:17
15:2  23:22  25:11, 15
47:11, 12, 21  48:4
49:22  54:7  56:10
57:22, 23  59:10, 11
76:12, 16, 18  77:1, 2
81:12, 16  82:24  83:9,
15  84:1, 22  87:23
99:6  103:23  104:7
108:10  134:1, 4
135:18  142:22  143:4,
17  164:8  181:2
198:2, 4  200:16
201:11  202:13  208:9
219:22  233:16
235:12, 22  236:2
243:13  250:25  251:4
253:10  259:4  260:3
262:19  265:13, 23
266:13, 23  267:11, 16
273:15, 20  274:1, 4, 7,
9, 10  275:1, 2, 8, 10,
14
**banker**  131:3, 4
**banking**  25:14  82:5
119:22, 23  130:5
131:1, 2  140:17, 25
141:9  142:3, 17
144:23  158:16, 17
198:1  215:1  255:4,
20  256:7, 20
**banks**  25:14  237:3
254:11
**bank's**  262:22
**banter**  39:3
**base**  124:24  134:8
135:12  145:25  164:7
251:17
**based**  35:11  43:16
49:23  60:9  65:6
83:25  100:10  105:7,
9  131:18  133:1
146:7  147:9  148:2
150:12  157:5  178:19
205:2  207:5  214:14
215:6  228:9  240:1
242:21, 24  243:6, 22

244:9, 21  263:12, 16
273:5
**basically**  46:16
138:7  204:7  216:12
263:22
**basis**  13:18  14:6, 19
23:23  34:11  35:9
60:19  125:2  160:13
164:7  170:9  171:7,
20  252:19
**Bates**  22:7  37:7
44:6  78:17  91:16
100:23  102:6  123:18
184:12  200:11  202:8
205:16  213:12
238:23  258:6  269:9
276:12
**Beaudin**  237:17
248:18  276:21
**beginning**  9:14  31:3
98:12  134:14  184:21
192:12  206:1  279:13
**begins**  192:15
**behalf**  2:1, 14  5:11,
13, 16
**believe**  10:5, 10
12:10, 24  17:7, 24
18:5, 11, 17  29:3
40:8  43:9  74:13
79:8  85:16  103:2, 5
107:18  109:7  111:7
126:5  136:12  149:25
157:10  160:2  167:13
190:12  197:11
202:21  207:14  214:8,
24  233:22  234:1, 14
236:10  237:16  241:7,
20  248:3  250:3
257:5
**believed**  42:11
143:16  275:3
**believes**  240:17
**believing**  266:25
**Ben**  147:1
**benefits**  9:22  11:17
253:22
**best**  95:24  139:21
203:6  210:14  211:13
213:14
**bet**  141:3

**better** 266:*1, 7, 19*
267:*7*
**beyond** 20:*12* 204:*20*
**Bianco** 147:*4*
**bias** 29:*2, 5* 40:*19*
41:*4* 59:*17, 19, 23*
60:*1, 2, 8, 9, 12* 61:*7*
**bidder** 162:*7*
**big** 36:*11* 83:*18*
88:*25* 147:*3* 224:*18*
255:*24*
**Bill** 242:*25*
**bio** 9:*3, 4*
**biographical** 106:*12,*
*15, 18, 22* 108:*18, 22*
**birth** 7:*11* 106:*22*
107:*15*
**bit** 30:*1* 94:*21*
135:*12* 158:*24*
164:*18*
**black** 46:*6, 7, 9* 47:*1,*
*2, 4* 48:*13, 14, 15*
49:*2, 3, 11, 18* 50:*13,*
*14, 15* 51:*1, 2* 52:*1, 2,*
*16* 53:*22, 23* 54:*9*
55:*8, 9* 56:*12* 57:*23*
59:*10, 11*
**Blank** 2:*18* 5:*16*
**Bless** 177:*21* 211:*1*
**block** 28:*3*
**blow** 182:*13* 185:*25*
187:*20*
**board** 10:*19, 21, 25*
68:*13* 69:*13, 18* 71:*9,*
*14* 72:*1, 12* 77:*15*
81:*23* 85:*5, 11, 13*
89:*13, 15, 17, 23* 90:*2*
91:*9, 11* 92:*3, 9, 18*
94:*6, 14* 96:*11* 97:*14*
98:*7, 21, 25* 99:*18*
100:*11* 108:*19*
114:*19, 20* 120:*10, 11,*
*15, 18, 20* 121:*2, 4*
124:*14* 128:*3* 132:*22*
133:*3, 17, 23, 24*
134:*3, 8, 13, 17, 18*
135:*2, 5, 9, 19, 21, 23*
136:*22, 23* 137:*15*
139:*4, 6, 17, 23* 140:*8,*
*21* 141:*1, 20* 142:*20*

143:*2, 13* 146:*3, 10*
147:*7* 149:*25* 150:*13,*
*14, 16, 19, 21* 151:*1, 6,*
*11* 152:*1, 10, 14, 18,*
*19, 22* 153:*12, 15, 16*
154:*1, 9, 11, 12* 155:*5*
157:*7, 11, 12, 19, 23*
158:*20* 159:*3, 5, 8, 10,*
*14, 15, 20, 24* 160:*6,*
*10* 162:*3* 166:*5*
167:*12* 168:*2, 3, 4, 14,*
*21* 169:*10, 19* 170:*16,*
*21* 171:*4, 5, 19* 172:*2,*
*10, 11, 25* 174:*17, 22,*
*23* 175:*11* 177:*9*
178:*12, 14, 16* 179:*10,*
*15, 18* 180:*10, 15*
181:*1, 6, 8, 9, 12, 18*
182:*5, 10, 20, 21*
185:*6, 9* 189:*9, 15, 18,*
*23, 24* 191:*1, 3, 15*
193:*9, 15* 195:*4*
196:*18, 21* 197:*11, 21,*
*23* 198:*5, 15, 19, 20,*
*21, 25* 199:*5* 206:*12,*
*20* 207:*11, 13, 15*
216:*11* 222:*21, 25*
223:*4, 10, 17* 224:*1, 8,*
*17, 18* 227:*8* 228:*22*
229:*10, 18, 19* 230:*18,*
*22* 231:*10* 233:*6, 17,*
*19* 234:*4, 9, 11* 238:*3,*
*7, 13, 15, 17* 239:*10*
240:*6, 10, 16, 20, 25*
241:*6, 10, 14* 242:*8,*
*14, 17, 19, 23* 243:*6,*
*11, 15* 244:*5, 21, 24*
246:*5, 11, 19, 21*
247:*11, 13, 22, 23*
248:*3, 7, 18, 19, 20*
249:*25* 250:*10, 20*
272:*10, 14, 21* 276:*15,*
*20* 277:*1*
**boards** 239:*11*
**board's** 71:*17* 72:*1*
81:*14* 85:*5* 89:*18*
132:*23, 25* 138:*14*
141:*21* 143:*15* 153:*8,*
*9* 157:*7* 160:*3*
166:*25* 167:*6, 13, 15,*

*18* 169:*5* 174:*16*
193:*20* 194:*23* 196:*2*
227:*15* 245:*3*
**Bob** 229:*1* 270:*6*
276:*4*
**bonus** 251:*18*
**bottom** 22:*7* 221:*1*
261:*2*
**bought** 87:*22*
**box** 110:*8* 115:*10*
118:*18* 119:*10*
123:*10* 144:*12*
**boxes** 99:*16* 101:*23*
112:*13* 113:*16* 117:*4*
118:*9* 204:*2*
**Bradley** 146:*14*
**branches** 251:*11*
**break** 27:*13* 77:*24,*
*25* 96:*7* 98:*18*
199:*12*
**Brian** 2:*25* 5:*19*
80:*19, 23* 124:*11*
126:*18, 21* 127:*1*
**Brian's** 125:*20*
**Bridgit** 147:*3*
**Briefing** 200:*17*
202:*14*
**bring** 99:*1* 203:*14, 21*
**bringing** 112:*10*
148:*10* 195:*25*
**brings** 82:*5*
**broad** 36:*2, 12*
224:*24*
**broader** 116:*23*
150:*18*
**broke** 251:*5*
**brokerage** 251:*3*
**brought** 32:*14* 81:*25*
88:*3, 21*
**Bruce** 1:*24*
**buckets** 159:*3*
**Bucknell** 7:*8*
**build** 94:*5* 157:*10*
218:*24* 225:*18*
251:*10*
**building** 120:*10*
133:*7, 13, 20* 149:*24*
151:*5, 9* 170:*9*
**built** 133:*14*

**bullet** 143:*19, 23*
144:*12* 145:*8* 146:*4*
152:*2* 157:*25* 163:*11*
205:*24, 25* 206:*2*
210:*12* 211:*15*
224:*14* 225:*17* 226:*5,*
*20* 230:*25* 232:*20, 25*
233:*4, 8* 234:*7* 239:*5*
**bunch** 85:*7*
**business** 7:*7* 23:*23*
25:*9* 45:*2, 4, 13, 14*
76:*8* 82:*8* 83:*4, 5*
84:*23* 87:*24* 88:*23*
92:*25* 93:*21* 147:*4, 5*
215:*1, 23* 222:*12*
251:*4, 5, 6, 24* 252:*10*
253:*14*
**businesses** 256:*24*
**business-related**
19:*10*
**Butera** 83:*9* 146:*15*
**buy** 162:*6*
**byproduct** 67:*6*

**< C >**
**Cabin** 73:*19* 74:*7,*
*25* 80:*17, 21*
**Cahn** 83:*4*
**calculate** 215:*10*
**calculated** 213:*25*
215:*6, 8, 10*
**calculates** 214:*1*
**calendar** 11:*18, 21*
12:*9, 12, 18* 19:*10*
65:*16*
**call** 30:*6, 12, 15*
46:*19* 118:*6* 141:*23*
143:*22* 152:*4* 208:*8*
222:*3* 228:*3* 239:*14*
245:*14* 262:*8* 275:*13*
**called** 29:*21* 30:*1, 3,*
*7, 11, 17* 32:*17, 18, 19,*
*20* 34:*4, 17* 35:*24*
42:*17* 43:*12* 48:*9*
163:*21* 262:*7* 275:*16*
**calling** 49:*24* 275:*24*
**Calls** 52:*4, 18* 55:*11,*
*21* 56:*6*
**candidacy** 169:*12*

Case: 1:21-cv-00238-MRB Doc #: 77-14 Filed: 06/27/25 Page: 85 of 118 PAGEID #: 3689
Deposition of Robert Paul Shaffer
Philip R. McHugh v. Fifth Third Bancorp, et al.

**candidate** 68:*13*
72:*16* 81:*15* 108:2, *9*
118:*20* 145:*3* 167:*14*
168:*21, 23* 192:25
193:*8, 12, 22, 25*
194:*8, 24* 195:*12*
196:*1, 4, 12, 17, 18*
197:*14, 15* 199:2, *9*
238:*6* 239:*13* 240:*13*
**candidates** 99:*7*
108:*20* 109:*13*
118:*11, 18* 151:25
170:2, *11* 191:25
192:*3, 21, 22* 193:*3,*
*12, 16, 19* 194:*4, 11,*
*18, 21* 195:8, *10, 15,*
*21, 22* 196:*10, 15, 19,*
*25* 197:*8, 23* 198:*16*
199:*8, 11* 237:*23*
240:*9* 246:*20*
**cannon** 181:22
185:22
**capabilities** 85:*16*
109:*3* 110:2, *10, 19*
112:*3* 116:*23* 119:*11*
135:*6* 137:25 139:*10*
145:*16* 151:*8* 165:*20*
170:*10* 174:*20*
195:*10, 20, 24* 219:*16,*
*21* 226:*1* 229:*12*
254:22
**capability** 81:22, *25*
82:*2* 115:*21* 116:*15*
**capability/capacity**
115:*4, 11*
**capable** 83:*11* 87:*6*
88:*6* 89:*1* 116:*15*
212:*7* 219:*11, 19*
**capacity** 10:*18* 84:25
115:*21* 116:*15*
170:25 208:*6*
**capital** 9:*19, 22*
92:*15, 19* 93:*4, 7, 14*
94:*1, 12* 96:*1* 98:*6*
104:*11* 116:*13*
130:*18* 154:*6* 155:*6*
166:*5* 168:*11* 170:25
172:25 175:*11, 24*
176:2 179:*11* 198:*9*

207:*6* 248:*4*
**Caption** 282:*3*
**captioned** 282:*8*
**captured** 117:*21*
**car** 251:*5*
**card** 105:*16, 19*
107:*1* 109:*1* 112:*1*
119:*7* 126:*12, 16, 22,*
*24* 127:*1* 129:*1, 3, 20*
130:*1* 137:*21* 142:*1*
144:*9, 14* 155:*9*
156:*18, 24, 25* 221:2
222:*23*
**cards** 100:*9* 131:*21*
138:*13* 190:*15*
**care** 209:*1*
**caretaker** 76:2 84:25
131:*14* 158:*23*
**Carmichael** 10:*1, 2,*
*12, 14* 11:*1* 13:*10*
15:*3* 17:*9* 18:*1, 4, 19*
19:*2, 8, 18, 21* 20:*6*
22:*12, 20* 23:*5, 11, 13,*
*17* 24:*12, 22* 33:*6, 10*
64:*13, 15, 23* 65:*4, 21,*
*22, 25* 66:*10, 16, 23*
67:*8, 12, 13, 20, 24*
68:*2, 5, 6, 20, 23* 69:*1,*
*7, 17, 19, 23* 70:*12, 23*
71:*1, 24* 72:*23* 73:*9,*
*20, 21* 74:*9, 13* 79:*2,*
*25* 80:*8, 24* 88:*13*
111:2 114:*11* 122:*11*
141:*10* 151:*16*
175:25 176:*7* 177:*6,*
*12, 15, 20, 24* 180:25
182:*24* 190:2, *4*
191:*22* 192:*19* 193:*4*
195:*7* 196:*8* 198:*14*
199:*2, 7* 204:*7*
205:*19, 20* 216:*8*
217:*1, 5, 17* 220:*24*
227:*3, 24* 231:*7*
232:*5, 11, 19, 24*
234:2 236:*16* 238:*8,*
*14* 239:*1* 240:*22*
247:*1, 8* 254:*12*
263:*5* 266:*10, 21*
271:*12* 272:*1, 4, 9, 20*

279:*9, 16*
**Carmichael's** 93:*23*
**carrying** 99:*16*
**CASE** 1:*9* 5:*3, 5*
7:*24* 8:*5, 8* 13:*12*
41:*5* 46:*18* 71:*7*
85:*8* 92:*16* 111:*2*
154:*3* 208:*9* 258:*11*
264:*11* 282:*3*
**cases** 83:*5* 165:*2*
208:*10*
**categories** 99:*15*
110:2 116:*11* 139:*5*
**category** 109:2, *5*
137:25 206:*7, 11*
208:*8* 209:*22* 211:25
**Cedar** 6:*25*
**cell** 17:*17, 19, 22*
**Center** 1:*16* 2:*19*
**CEO** 10:*17* 63:*3, 9,*
*11* 64:*3, 4, 6, 8, 12*
68:*13, 24* 69:*14, 18*
71:*24* 72:*13, 25* 73:*5,*
*11, 23* 74:*11, 14* 75:*2,*
*3, 9, 10, 17* 76:*12, 16,*
*17, 25* 77:*2, 11* 79:*16*
80:*1, 9, 13, 25* 81:*8,*
*11, 16* 84:*11, 14, 19*
85:*9* 89:*22* 96:*14*
97:*19* 98:*19* 99:*5*
111:*1* 112:22 113:*8,*
*21* 114:*12* 117:*8*
121:*20, 22* 122:*4, 5*
125:*21* 129:*11* 132:*1,*
*5, 18* 133:*4, 7, 18, 25*
134:*4* 135:*18, 22*
140:*16, 22* 141:*21, 23,*
*24* 142:*6, 22* 143:*4,*
*17* 145:*3* 150:*9, 17,*
*23* 151:*2, 3, 9, 17, 18,*
*24* 152:*11, 15* 153:*3,*
*5* 154:*14* 158:*21*
162:*3* 164:*23* 166:*17,*
*25* 167:*7* 168:*22, 23*
169:*6, 13, 24* 173:*4, 7*
174:*3* 175:*2* 177:*9*
181:*2* 182:*6, 10, 24*
193:*19* 194:*18, 22*
197:*3* 198:*4* 199:*2*
204:*8* 208:*11* 219:*22*

227:*10* 228:*19, 21*
229:*12, 20* 230:*8, 12,*
*16* 231:*2, 8, 24* 232:*7*
233:25 234:*3, 4*
237:*24* 238:*5, 11*
239:*15* 240:*14* 243:*2*
245:*19* 246:*13*
247:*12, 16* 254:*23*
262:*11* 263:*5, 21*
277:*2*
**CEO/CHRO** 239:*12*
**CEOs** 174:*19*
**certain** 13:*1* 25:*14,*
*22* 49:22 50:*15*
56:*17* 66:*24* 118:*5*
143:*21* 152:*3* 210:*14*
211:*13* 212:*8* 214:*9*
225:*11* 226:*5* 263:*20*
**certainly** 14:*6* 59:*9*
82:*13* 94:*4* 144:*2*
160:*4* 164:22 276:*5*
**certificate** 62:*15*
**certified** 5:*23*
**certify** 281:*6*
**CFO** 198:*6* 226:*7*
263:*21*
**CFOs** 174:*19*
**CFPB** 228:*12*
234:*13, 15* 235:*3, 6,*
*10* 236:*18* 237:*4*
252:*2*
**chain** 188:*10*
**chains** 273:*6*
**chair** 170:25 171:*1, 2*
**chairman** 228:22
234:*5, 10*
**challenge** 28:*13*
**challenges** 23:22
195:*11, 21, 24* 199:*8*
**change** 10:2 138:*11,*
*20, 25* 145:22 152:*6,*
*8* 167:*5* 173:*13*
174:2, *10* 222:*5*
283:*4, 7, 10, 13, 16, 19,*
*22* 284:*4, 7, 10, 13, 16,*
*19, 22*
**changed** 10:*1, 14*
13:*2* 106:24 127:*8*
129:*4* 130:*8* 132:*23*
138:*1* 140:*16* 145:*18*

146:13  153:4  159:25
166:18, 21  167:2, 22
173:8  174:12  248:1
**changes**  94:13  124:7
136:4  154:7, 12
156:4, 7, 9, 11, 13, 16,
20  157:3  159:6, 10,
12, 15, 17, 20  160:5, 7,
10  161:2  164:11
165:4  173:22, 23
177:1, 14, 17, 21, 25
178:2, 4  204:15
248:2, 13  250:5, 7
251:2  282:11, 14
**changing**  139:11
164:15, 16  174:6
**characteristic**  147:22
**characteristics**  84:17
164:21
**charge**  12:25  35:21
**Charley**  95:20  96:3,
17, 22  97:5  98:3
**Charlie**  95:16  146:14
**chart**  173:4  228:6, 7,
8
**charts**  228:5, 9
**Chayt**  147:3
**check**  240:22, 23
**Chicago**  87:2, 13
88:11
**Chicagoland**  251:9
**chief**  7:15  9:8, 10, 13,
16  10:9, 15  11:3, 9,
11  28:6, 8  34:5
43:13  51:18, 24
53:21  54:6  55:5
56:9  63:23  84:4
97:1  141:5  165:8
189:21, 23  190:16, 17,
22, 23  191:13  192:21
193:4, 5  198:16
208:6  221:12  247:12
249:18
**choose**  198:6
**CHR**  152:21
**Chris**  11:16
**CHRO**  30:2  65:25
66:3  67:1  115:17
133:23  157:22
189:21  210:23

216:18  230:17  240:3
247:12
**Chuck**  276:25
**Cincinnati**  1:22  2:6,
20  281:19
**Cioffi**  2:14  5:15
8:13  13:11, 14  14:2,
14  15:20  16:4  19:9,
23  20:2, 9, 20  24:5,
14, 18, 24  25:4  27:12
33:14, 20  34:10, 23
35:8, 15  37:10  38:20
40:21  41:11, 16, 23
42:4  45:6, 22  46:10,
20  47:5, 13, 24  48:16,
20  49:4, 13  50:2, 6,
17  51:10, 16  52:3, 9,
18  53:4, 11, 15, 25
54:16, 21  55:10, 20,
25  56:3, 5, 13, 23
57:12, 17  58:7, 12, 17
59:12  60:13  63:18,
21  67:15  68:25
69:24  70:3, 7  72:6
74:15, 18  75:11
76:19  77:20  78:1, 5
86:9  97:21  101:2
107:2  108:5  109:16,
20  113:22  117:10
121:11  122:14
123:25  143:5, 10, 24
144:4, 6, 8  147:17
148:21  160:12
168:24  169:14  170:3,
7  171:8, 13, 21  172:3
174:13  180:21  181:3,
14, 24  182:7, 15, 25
184:7  186:24  187:6,
22, 25  188:7, 15, 22
194:13  199:14
201:24  210:6, 10
212:20  215:17  217:7,
11, 20  223:1  225:1
227:6  229:6, 24
230:13  231:13, 25
235:13  236:4  242:2
243:16  244:1, 13, 18
245:8  246:7  247:4
248:10  249:6  250:2,
15  252:5, 16  254:14

255:6, 14, 16  256:9,
13, 17  258:8  259:19
260:5  264:9  266:14,
24  267:12  269:3
271:21  273:21
274:12, 18, 21  275:5,
25  276:3, 5  280:1
**Cioffi's**  8:20
**circumstances**  48:24,
25  54:11  56:14, 17,
21  57:4  58:2, 25
60:5
**cities**  216:1
**Civil**  281:17
**claims**  253:6
**clarification**  143:5
**clarify**  69:25  168:7
177:20  203:8  242:16
259:13
**class**  29:13  59:21
**classes**  29:11
**clauses**  260:20
**clean**  13:17  163:7
**clear**  23:16  133:8
143:15  144:1  156:5
176:5  182:21  212:9
218:9  226:8  229:22
238:4  255:10, 12
269:9
**clearly**  89:1  120:7
133:24  149:14  168:9
198:20  225:22
240:12
**clerical**  113:10  114:5
145:12
**client**  20:18
**closed**  162:17
**closer**  84:5  242:17
**closing**  87:15
**club**  253:25
**coach**  112:6  119:15
138:1, 11, 25  139:7
145:18, 23  147:8, 9,
15, 23  148:15, 19
149:6, 18
**coaches**  158:1
**coaching**  83:20
146:4  163:4
**collaboration**  88:22

162:15
**collectively**  213:8
**college**  7:5  106:13
**Collin**  2:17  5:15
**Collin.hart@blankrom**
**e.com**  2:21
**colloquy**  27:13
**color**  173:23
**combination**  62:2
215:6
**combine**  98:25
**come**  114:17  117:17,
18, 24  118:8  119:18
120:4  122:7  138:15
140:19  141:9, 10
156:18, 25  171:5
252:2  261:21  265:2
268:18  274:9  275:2
**comfortable**  101:25
**coming**  140:25
164:14
**Commencing**  1:16
**comment**  28:1  40:18
41:3  125:22  138:7
180:14, 17, 19, 20
181:13, 19, 21  184:22
185:14  186:20, 21
187:12  216:17
240:21
**commented**  195:8
202:3
**comments**  29:11, 15
59:20  64:24  97:9
135:11, 14  139:15, 25
158:9  186:6  204:7,
14  210:24  248:24
**commercial**  119:23
130:5  257:2, 6
**Commission**  281:24
**commissioned**  281:5
**commits**  85:9
**committee**  35:14
62:20  63:2  64:1
65:5, 23  66:17, 24
82:21, 23  94:12
105:18, 25  106:6
110:25  111:3  126:8
154:6  168:11  171:2,
3, 5, 6  172:2, 12
175:25  179:19, 23

180:2, *5, 7, 14, 19*
181:*8* 186:*7* 191:*16,
17* 201:*19, 23* 204:*5*
207:*22* 208:*1* 215:*15*
220:*1, 6* 226:*14*
248:*5*
**committees** 191:*1*
**common** 110:*17*
114:*18* 173:*25*
198:*23* 217:*4, 16, 25*
**communicate** 17:*9,
12, 15* 25:*24* 73:*19*
74:*8, 25* 75:*7* 238:*7*
241:*17* 243:*23*
246:*15* 265:*21*
272:*10, 21* 278:*20*
**communicated** 8:*7*
17:*25* 18:*6, 12* 71:*5,
7* 74:*19* 79:*15* 91:*10*
111:*5* 114:*21* 134:*11,
13* 150:*14* 195:*1*
240:*24* 243:*7* 244:*22*
245:*23* 246:*5, 10, 18*
275:*20* 278:*20* 279:*9,
16*
**communicates** 273:*1*
**communicating** 100:*1*
124:*10* 272:*14*
275:*24*
**communication** 88:*22*
148:*4* 149:*11* 162:*12,
16* 259:*24*
**communications**
232:*24*
**comp** 170:*25* 266:*3*
**companies** 96:*2* 97:*6*
**company** 9:*20* 10:*13*
11:*5, 23, 25* 25:*18*
28:*12* 31:*18* 36:*13*
75:*18, 23* 81:*21* 82:*1,
22* 83:*7, 16* 84:*12*
90:*1* 92:*20* 93:*6*
105:*4* 110:*18* 116:*18*
125:*2* 133:*7* 141:*17*
142:*10* 146:*19, 22, 23,
25* 158:*22* 161:*1, 4*
163:*9* 165:*6, 11*
174:*19* 191:*19*
198:*24* 204:*8* 209:*3,
5* 221:*19* 224:*20*

225:*25* 231:*18, 19*
232:*17* 246:*14*
250:*19* 251:*22, 24*
253:*12, 24* 254:*24*
255:*24* 259:*12* 260:*8,
9, 15* 261:*19, 22*
262:*6, 11* 268:*19*
271:*15*
**compare** 109:*10*
145:*15* 155:*12* 166:*9*
**Compared** 155:*14*
213:*20*
**comparing** 144:*3*
219:*15*
**compensated** 256:*1*
263:*24*
**compensation** 9:*21*
11:*16* 63:*10* 94:*12*
95:*21, 22* 96:*1* 154:*6*
168:*11* 175:*25* 207:*3*
248:*4* 251:*17* 252:*23*
263:*12, 18, 19* 278:*13*
279:*1, 3*
**compensations** 251:*18*
**competent** 76:*1* 89:*4*
212:*7, 10* 218:*7, 9*
**competition** 82:*6*
**competitors** 82:*7*
**complained** 32:*18*
248:*25*
**complaining** 41:*7*
249:*1*
**complaint** 271:*17*
**complete** 113:*6*
158:*5* 225:*19*
**completed** 62:*8*
157:*20* 190:*18*
**completely** 146:*13*
**completion** 62:*15*
196:*11, 22*
**complex** 59:*7*
**compliance** 11:*7*
61:*23*
**compliment** 33:*13, 21,
24, 25* 40:*17* 41:*3*
**complimentary**
254:*18*
**complying** 11:*7*
**component** 60:*25*
62:*14* 202:*1*

**components** 203:*13*
218:*5*
**Compound** 67:*15*
**Concentric** 202:*15*
203:*8, 17, 18* 214:*1, 3,
5, 6, 20* 215:*11*
**concepts** 272:*13*
**conceptual** 99:*14*
100:*6* 101:*22* 112:*11*
129:*9* 156:*1*
**concern** 30:*7* 34:*5*
237:*5, 11* 249:*4, 8, 15*
271:*6, 12, 16*
**concerned** 180:*24*
181:*11, 17* 182:*3, 12*
248:*23*
**concerns** 30:*3*
154:*13* 182:*19* 197:*3,
19* 237:*9*
**conclude** 230:*14*
**CONCLUDED**
280:*11*
**concludes** 279:*23*
**conclusion** 135:*5*
152:*14* 221:*21* 223:*8*
**conclusions** 170:*13*
222:*17*
**conducted** 63:*6*
**conducts** 99:*21*
**conference** 46:*19*
**CONFIDENTIAL**
1:*14* 4:*3* 15:*21, 22*
17:*1* 20:*10, 21, 22*
21:*1* 27:*1, 21* 36:*18*
40:*1* 85:*19* 86:*13*
91:*1* 183:*4* 188:*18*
200:*1* 257:*12* 264:*11*
278:*1*
**confirm** 71:*5, 6*
245:*5, 7, 13*
**confirmation** 245:*4,
18*
**confirmed** 241:*12*
245:*1*
**confirming** 112:*15*
138:*18*
**confirms** 230:*6, 10*
**confronted** 185:*14, 16*
**confused** 68:*25*

**conjunction** 34:*8*
**connected** 259:*7*
**connections** 112:*6*
119:*14*
**consecutive** 269:*10*
**consensus** 120:*10*
133:*8, 13, 20* 151:*5*
229:*11*
**consider** 149:*25*
159:*7* 230:*18* 242:*15,
19* 278:*14*
**consideration** 72:*1*
228:*10* 271:*20*
**considerations**
158:*19* 229:*17*
**considered** 29:*22, 23*
77:*15* 131:*1* 195:*9*
240:*19* 272:*6, 7, 16*
278:*15*
**considering** 94:*5*
246:*19*
**considers** 152:*10*
**consistent** 122:*10*
233:*3* 234:*6, 8* 269:*6*
**constantly** 121:*6*
**constitutes** 49:*12, 19*
**construction** 44:*23*
61:*20*
**constructively** 63:*15*
**consulting** 95:*22*
**consumer** 83:*9, 15*
147:*2* 221:*9, 11*
222:*8* 235:*12, 22*
237:*6, 10* 250:*14, 22,
24* 251:*4, 5* 252:*9*
253:*10* 255:*2, 18*
256:*22* 259:*3, 9*
261:*18* 262:*1* 263:*7,
13* 265:*12, 22* 270:*25*
274:*1, 4* 278:*16*
**contact** 261:*16*
**CONTAIN** 4:*3* 41:*4*
**CONTAINS** 1:*14*
184:*8*
**content** 60:*18* 132:*21*
**contest** 67:*22*
**context** 43:*7* 47:*8*
48:*5, 11* 49:*7, 15, 20*
50:*12, 19, 24* 51:*2, 4,
23* 52:*11, 14, 24* 53:*2,*

9 54:12, 17, 19 55:15, 18 56:17 57:4 58:1, 25 60:4 61:22 69:11 73:13 97:1 140:2 186:9 188:8, 10 225:3, 4 246:12 249:4, 15, 21 270:25

**continuation** 269:11

**continue** 77:22 157:23 220:4 222:5 225:17, 24 226:4, 24 253:22 258:9

**CONTINUED** 4:1 93:9 133:13 141:16, 17 221:4 222:24 225:13 253:23 262:1

**continues** 130:21 218:3, 18 219:3 275:6

**continuing** 136:21 155:24 157:4, 8, 9 194:3

**continuous** 121:5 142:13 169:20

**continuously** 63:12 142:8

**contract** 281:17

**contradictory** 34:25

**contrasting** 219:15

**control** 165:12 180:10, 15 182:20 236:24 248:14

**controlled** 182:4

**controlling** 181:6

**controls** 11:6

**conversation** 68:15, 16, 18 69:12, 16 70:11, 25 71:10, 20 72:22 73:12 79:1, 5, 10, 12, 21 80:3, 4, 16, 19, 20 134:16 136:19 142:12 150:15 187:12, 15 199:10 239:3, 25 241:1, 22 242:13 246:3 270:18, 20

**conversations** 31:17 69:7 70:22 73:2, 7 79:11 81:4 87:3 99:2 100:10 128:16

139:8, 13 140:3 141:1 142:14 143:13 151:15, 21 157:6 242:21 244:6 246:23 270:22

**conveyed** 69:12 217:16

**COO** 228:18 231:2, 8 263:23

**Cook** 95:22 191:6, 17

**cooks** 88:1

**coordination** 162:13

**copied** 113:10

**copies** 189:15

**copy** 98:23 114:5

**copying** 100:19 178:13

**corner** 22:8

**Coronavirus** 228:12

**corporate** 219:4

**correct** 9:11, 12 12:23 22:16 23:8, 11, 14, 15, 18 24:4, 13, 23 25:2 31:12 35:7 36:8 38:16, 19, 25 39:5 40:11, 20 41:4 44:17, 18 45:5, 15, 16 47:22 50:1, 16 51:19 55:9 64:13, 14, 20, 25 65:19 69:14 70:2 73:23 74:1 75:5 78:19, 20 79:3 81:8, 9 86:18, 19 88:16, 17 91:17 96:4, 8, 12, 16 100:21, 24, 25 101:11, 14 102:10, 11, 16, 17, 20, 25 103:1 104:21 105:10, 19, 22 108:15, 21 109:3, 4, 6 110:4, 11 111:4 112:19, 20 118:25 119:16 121:23 122:2, 13 125:6 126:22 127:5, 25 128:1, 8 129:1, 2, 6, 7, 13 130:2, 3, 6, 7 132:19, 20 136:9, 14 137:8, 12, 22, 23 138:2 140:12, 18 143:9 153:7 155:10, 18 156:2, 7, 14, 15

160:7, 21 164:2 168:23 171:11 172:22 176:9, 14, 20 178:17, 21 179:1, 7, 8 182:14 184:13, 18 189:19 190:7, 20, 21, 23, 24 191:5 193:20 194:12, 23 198:17 200:12, 13, 22 202:10, 11, 18, 19 203:1, 6, 16, 23 205:3, 21 209:12 213:11 217:2, 6, 19, 24 218:10, 14, 21 221:4, 15, 16 222:1, 2 227:5 229:23 230:12 231:5 232:2 233:21, 22 234:7 235:3, 4 236:7 237:19 239:4 243:15, 25 244:4, 12, 17 246:24 247:17, 20 252:15 253:8, 16, 19 259:25 260:1, 25 262:15 263:1, 3 264:1 267:25 269:14 270:3, 8, 11, 23 272:5, 17 273:3, 8, 12, 13 274:11

**corrected** 137:6

**corrections** 282:11

**correctly** 87:9 133:16 190:9 266:5

**correspondence** 13:9

**council** 35:20 36:3 39:3

**counsel** 5:8 8:10 20:9 27:13, 18, 22 30:25 31:2 35:24 37:10 38:11, 19 40:22 41:12, 24 45:6 46:10 47:14 48:16 53:7, 11 54:24 57:12 58:9 77:20 86:9 143:5, 24 184:7 186:24 188:15 217:7 229:25 236:5 255:6 258:8 259:20 264:9 269:3 274:13 276:1 281:12, 14

**country** 253:25

**COUNTY** 281:3

**couple** 8:2 43:10 76:19 92:15 93:4 95:23 98:17 158:12, 25 165:3 201:12 240:7 251:19

**courage** 163:5

**course** 84:3 188:20 214:11

**COURT** 1:2 5:4 6:13, 21 20:11, 20 27:23 46:12, 13, 15, 16, 19 281:16

**covered** 36:11 118:2 207:15

**covering** 96:10 158:25

**create** 94:17 112:6 119:14 237:5, 9

**created** 20:16 61:16, 17 92:12 101:15 113:13 195:11 199:8 247:22

**creating** 35:13 61:25 113:2

**creation** 44:21 92:6 93:24 98:1

**credit** 87:4, 22, 25 162:12 221:2 222:22

**crisis** 25:13

**critical** 89:23 197:20

**cross-section** 36:2

**CRR** 1:22 281:4, 24

**crying** 261:6

**cultivate** 196:9

**cultivated** 162:1 196:16

**current** 7:13 9:5, 7 82:20 85:9 93:12 101:9 124:13 228:6 247:12 263:13

**currently** 9:8 122:23

**curriculum** 60:16, 18

**customer** 197:2, 19 209:25 235:12, 21

**Cut** 145:12

**< D >**

**daily** 13:17 14:19 19:2, 5, 7, 17 23:3, 11,

Deposition of Robert Paul Shaffer

Philip R. McHugh v. Fifth Third Bancorp, et al.

*13*, *17*, *25* 24:*3*, *12*, *22*
25:*5*, *7*, *12*, *20* 171:*20*
**data** 104:*11*, *15*, *16*
105:*3* 124:*11* 138:*15*
154:*2* 161:*9*, *16*, *21*
162:*20* 163:*14* 191:*7*,
*10* 198:*20* 203:*14*
207:*5* 208:*3* 228:*12*
**Date** 1:*16* 7:*11* 10:*3*
15:*4* 23:*2* 67:*23*
68:*1*, *3*, *17* 69:*20*
96:*20* 101:*12* 106:*21*
107:*15* 176:*12*
178:*22* 227:*15* 241:*3*,
*18* 245:*6* 246:*2*
264:*18* 280:*8* 282:*2*
**dated** 44:*17* 101:*10*
102:*13* 128:*3* 137:*15*
155:*5* 166:*4* 172:*24*
175:*10*, *19* 176:*17*
179:*12* 202:*14*
205:*18* 209:*15*
227:*23* 238:*25*
**dates** 31:*16* 65:*12*
**daughters** 7:*4*
**day** 13:*7* 25:*16*
83:*17* 110:*14* 149:*21*
167:*12* 169:*21*
170:*15* 174:*25* 227:*4*,
*13* 228:*14*, *16*, *20*
229:*3*, *19* 233:*10*
248:*13* 250:*7* 258:*13*
259:*4* 261:*22* 263:*12*
281:*20* 282:*16*
**days** 179:*18*
**day-to-day** 14:*6*, *9*, *21*
171:*7* 198:*9*
**de** 214:*10*
**deal** 162:*17* 163:*18*
**debrief** 207:*16* 249:*3*,
*14*
**decade** 254:*9*
**December** 91:*23*
92:*5* 96:*11* 98:*8*
120:*20*, *21*, *23*, *24*
140:*4* 154:*11* 158:*8*
159:*5* 172:*24* 175:*10*,
*19*, *20*, *22* 176:*11*
179:*12*, *14*, *16*, *18*, *20*
180:*5* 184:*21* 186:*7*,

*13* 187:*11* 189:*10*
195:*2* 207:*6*, *15*
208:*3* 216:*11*, *21*
228:*14* 229:*9* 230:*3*
232:*15* 238:*9* 241:*4*,
*6* 242:*22* 281:*25*
**decide** 106:*10*
110:*25* 149:*17*
170:*16* 197:*24*
227:*14*
**decided** 106:*5*, *8*
110:*13* 133:*3* 167:*6*
234:*11* 250:*12*
**decides** 110:*22*
**deciding** 167:*9*
227:*12* 229:*3*
**decision** 71:*16*, *17*, *18*
72:*2*, *3*, *4*, *9* 85:*3*
104:*5*, *9* 135:*21*
143:*15* 145:*22*
152:*18*, *19*, *23* 167:*2*
169:*5* 174:*16*, *24*
175:*1* 182:*9* 197:*21*
208:*15*, *18* 227:*9*
230:*19* 233:*17*
243:*23* 245:*3* 250:*18*
260:*24*
**decision-maker**
230:*23*
**decisions** 60:*8*
135:*23* 163:*5* 229:*19*
273:*11*
**deck** 89:*7*, *9* 92:*2*, *5*,
*6*, *12*, *17* 93:*24* 94:*17*
96:*4*, *23* 98:*2*, *10*, *14*,
*23* 100:*2* 101:*10*, *15*,
*19* 102:*16* 103:*25*
104:*7* 106:*1*, *7*, *11*
109:*10* 114:*23*
118:*23* 119:*3* 125:*5*
128:*20* 130:*23* 132:*6*
141:*11* 146:*8* 149:*4*,
*7* 150:*5* 151:*16*, *20*
153:*1*, *15* 154:*13*
159:*11*, *13*, *16*, *21*
160:*7*, *11* 161:*11*
169:*11* 176:*11*, *13*
177:*5*, *7*, *12*, *15*, *18*, *21*,
*25* 178:*16* 179:*14*
181:*22* 190:*11* 193:*6*

197:*10* 206:*11*, *19*
207:*14*, *24* 208:*3*, *13*,
*17*, *20* 222:*21* 223:*13*
224:*1*
**decks** 89:*5*, *12* 91:*6*
159:*23*, *25* 160:*1*
185:*22*
**DECLARATION**
282:*5*
**declare** 282:*6*
**deem** 14:*8*, *21* 28:*2*
**deep** 174:*20*
**deepen** 226:*5*
**deeply** 218:*19*
**Defendants** 1:*11*
2:*14* 5:*7*, *16* 280:*1*
**define** 203:*3*
**defined** 85:*11*
225:*19* 281:*17*
**Definitely** 35:*4*
75:*16* 82:*17* 120:*11*
223:*14*, *15* 270:*14*
272:*8*
**definition** 115:*5*
116:*2*, *14* 208:*9*
243:*4*
**definitions** 116:*10*, *12*
**delayed** 236:*16*
**delete** 13:*7*, *23* 14:*11*
15:*7* 31:*4* 201:*15*
**deleted** 12:*11* 13:*3*, *8*,
*20* 14:*18* 15:*10* 18:*3*,
*9*, *15* 30:*23* 186:*17*
**deleting** 30:*24* 31:*7*
**deletions** 94:*13*
**deliver** 83:*21* 248:*16*
**delivered** 248:*18*
**delivering** 165:*15*
**demographics** 104:*17*,
*24*
**demonstrated** 113:*8*
**demoted** 250:*13*, *21*
**demotion** 255:*2*, *9*, *15*,
*22* 256:*6*, *21*, *23*
256:*15*
**department** 252:*9*
**departments** 201:*18*
**depend** 47:*20* 48:*3*,
*5*, *6*, *25* 49:*20* 50:*11*

56:*16* 60:*3* 64:*25*
**depended** 226:*6*
**depending** 236:*20*
**depends** 49:*14* 50:*18*,
*24* 54:*17* 56:*14*
165:*8*
**Deponent** 2:*14*
**depose** 281:*8*
**deposed** 5:*23*
**deposit** 25:*17*
**Deposition** 1:*16* 3:*4*,
*8*, *9*, *10*, *12*, *13*, *14*, *15*,
*16*, *17*, *18*, *19* 4:*15*, *18*,
*19*, *21* 5:*3* 6:*7* 7:*17*
8:*3*, *12*, *22* 20:*15*, *19*
22:*2* 27:*23* 37:*2*
44:*2* 78:*13* 86:*2*, *15*
91:*12* 95:*2* 100:*14*
102:*2* 123:*14* 127:*18*
136:*24* 154:*24*
165:*21* 172:*15* 175:*3*,
*13* 178:*6* 179:*2*
184:*2* 188:*13* 200:*7*
202:*4* 205:*12* 209:*6*
227:*17* 238:*19* 258:*2*
264:*2* 268:*21* 276:*8*
279:*23* 280:*11* 281:*7*,
*10*, *11* 282:*1*, *8*, *12*
283:*1* 284:*1*
**depth** 82:*3*
**derailed** 135:*11*
**described** 165:*3*
208:*21* 212:*13*
**describing** 218:*4*
**description** 217:*17*
**designate** 15:*21*
20:*10*, *21*
**designated** 20:*10*
**designed** 43:*20*
**desire** 196:*2*
**detail** 114:*2* 118:*15*
207:*20* 211:*19*
**detailed** 44:*23*
157:*24*
**details** 51:*4* 55:*15*,
*18* 74:*21* 101:*23*
112:*9* 113:*16* 116:*24*
119:*19* 121:*14*
129:*10* 130:*11*, *12*
131:*20* 138:*4*, *13*

Deposition of Robert Paul Shaffer                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

140:20 144:21 156:2
157:3, 4 196:8
235:16
**determination** 135:16
138:10
**determinations**
247:24
**determine** 54:12
55:16 81:14 241:10
242:6
**determined** 133:17
134:3 149:6 167:18
220:22 241:24
**develop** 81:10, 20
83:24 134:2
**development** 9:21
66:4, 6 77:18 92:22
93:18 130:22, 23
134:23 141:17
142:11 144:25
165:17 190:6 192:24
193:25 194:8, 20
196:9, 11 225:13
254:7
**dictated** 216:8
**died** 198:4
**different** 12:17
36:14 48:18, 23
98:17 103:8 104:24
105:2, 4, 5, 10 106:13
108:23 128:13
138:24 139:5 141:3
146:18 158:13
159:19 189:23 192:7
198:11 201:13
205:11 218:4, 5
222:6 226:4 229:17
244:6 245:10 250:23
259:19 272:13
**difficult** 6:16
**digest** 266:2
**digital** 130:19 131:2
135:3 158:17 225:18,
19
**dimension** 203:24
204:2
**dimensions** 203:11
**direct** 9:23 11:13
94:6 131:20 132:10
136:10 146:12, 20

163:8 164:15 205:20
206:6, 16 208:10
209:16 216:13
239:20
**directed** 43:15 45:4,
15 238:17
**direction** 8:15, 20
10:19 131:12 136:17
156:4, 14 247:11
**directly** 10:12, 25
41:16 42:1 124:7
206:18 243:11
**director** 12:6 94:11
154:5 168:10 171:15
175:24 190:20
191:12 195:7 196:7
**directors** 89:13
108:20 128:4 137:16
155:6 166:5 172:25
175:11 179:10
181:12, 18 182:5
189:9, 16 190:17
199:5 250:20
**disagree** 198:25
199:5
**disasters** 83:6
**disclosed** 27:18
184:10
**discoverable** 13:14
14:15
**discretion** 159:18
160:5
**discriminate** 43:25
107:20
**discrimination** 43:16,
21
**discuss** 28:10 65:22
96:13 207:2 239:9
**discussed** 7:24 8:4
68:19 96:21 139:9,
19 146:10 162:12
192:23 193:23 194:6
196:8 216:21 227:2
230:3 233:20 234:9
248:19 251:7 252:20,
21 264:12 277:3
**discussing** 151:25
186:6 273:19 274:2,
7, 25

**discussion** 63:4 65:6
67:7, 9 68:22 75:14
77:3 97:14 98:8, 25
120:21 131:16
134:16, 18 141:25
154:11 159:23 168:3
190:5 191:23 195:10,
23 206:12 232:10, 15,
20, 22 238:10 241:9
254:17 267:6
**discussions** 66:15
67:13, 17 68:4, 8, 9
73:13 94:6 100:11
114:19, 20 120:14, 18,
22 121:1, 3, 4 133:1,
14, 22 134:7 139:3, 8,
14 140:7 141:12
142:4 150:12, 19, 20
151:7, 19 153:12
157:22, 23 159:18
171:2 174:7 195:4, 5
197:16 198:22
228:10, 24 232:12
233:1 240:1 242:23
243:11 244:7, 24
271:4 273:14
**dismissive** 147:16, 24
148:6, 25 149:12
158:6 160:21, 23
161:3
**dispute** 24:2, 11, 21
25:6 38:25 39:1
**distinction** 253:2
**distorted** 127:13
**distributed** 174:23
**DISTRICT** 1:2, 3
5:4, 5
**diversity** 28:7, 9, 21
35:14, 19, 24 38:10,
19 39:2 61:19, 24
62:1
**DIVISION** 1:4 5:5
**DLC** 35:25
**doctor** 106:20 107:11
**doctors** 107:14
**document** 20:16, 23
27:14, 25 37:12, 13
44:19, 22 45:9 78:21,
22 86:11 92:23
93:12 95:14 98:7, 18

99:17 100:13 101:2,
22 102:18, 22 103:3,
6, 8, 21, 24 105:15
109:16 110:6, 12
112:12 113:13
120:10 121:19, 21
123:4, 25 124:7
128:2, 6, 10 129:10
130:15 137:13 146:2
149:25 153:1, 24
154:4, 8 156:3
157:17 159:5 166:3
167:4 173:25 175:9,
10, 18 179:9, 10
189:8 200:18 202:12,
22 204:7 206:5, 14
209:13 210:6 215:18,
21 216:2 217:20
229:6 230:1, 6 249:8
258:10 274:14
276:14, 17 277:7
**documentation** 60:21
65:3 67:10 142:19
143:1, 12 159:4, 7
163:20 207:19
233:23 245:17
279:15
**documented** 66:18
67:5 140:5, 7 142:14
220:18, 20 246:24
**documents** 8:11, 14,
19 20:25 27:20
37:18 92:23 95:23
97:7, 9, 13 98:17, 24
99:12, 15 100:6
109:17 112:10 113:2,
11 143:6, 8, 10
157:14 170:15
**document's** 92:14
**doing** 88:20, 23
97:12 164:9, 10
165:14 171:7 185:19
198:15 219:20
226:25
**dollars** 251:20
**double** 76:19
**double-check** 126:9
**doubt** 94:24 259:15
**draft** 94:10 98:6, 10,
14 101:9, 17, 19

Deposition of Robert Paul Shaffer

Philip R. McHugh v. Fifth Third Bancorp, et al.

102:13, 23  111:18
112:9, 17  114:6
116:25  119:1, 17
121:15, 24  125:6
128:3, 13  129:5
132:20  136:7, 23
137:15  138:4  143:20
144:22  149:20  153:1
154:3  155:5  157:11
166:4  167:24  168:1,
12  172:24  173:17, 21,
25  174:21  175:10
176:1  206:5  216:15
248:5  250:4
**drafting** 94:3  103:15
136:20  155:25  157:9
166:23  168:17
**drafts** 98:6  101:21
112:14  114:7  119:20
123:5  129:10  153:14,
21  156:1  157:5
168:16  173:15, 16, 18,
24
**dress** 29:25
**dresses** 32:24
**Drive** 6:25  203:10
226:1
**driver's** 107:14
**drives** 131:12
**driving** 229:11
**duly** 5:22  281:5, 8
**duties** 9:17  11:3
253:7

< E >
**earlier** 25:10  32:22
33:12  37:11  40:8
41:6, 18  48:10  73:15
77:7, 14  81:19  84:20
88:9  97:6  98:16, 24
124:10  129:8, 19
131:15  133:8  135:14
138:9  139:10  140:24
142:10  144:18, 20
145:11  151:6, 20
153:14  156:9  158:14,
22  159:4  160:24
161:23  162:12  163:7
164:6  168:9  174:22
176:15  182:9  208:21

210:16, 23  212:13
220:21  222:4  242:13
251:7  263:10  269:6
271:8  278:12
**early** 99:13  101:21
112:14  119:20  123:5
129:9  132:20  133:17
148:8  156:1  207:4
252:21  265:3
**earnings** 118:5
143:22  152:4
**ease** 97:13  98:25
**easier** 6:21
**easily** 135:11
**East** 2:19
**easy** 82:12
**editing** 249:24
**education** 7:6
**effect** 59:22  60:1
**effective** 110:3, 20
119:16  138:1, 11, 25
145:17, 23  206:13
**effectively** 146:19
158:1
**effectiveness** 146:4
**efficiency** 209:24
**effort** 28:20  262:17
**either** 12:1  61:19
68:18  130:9  136:20
164:9  169:23  228:7,
15  233:9  246:20
257:8  259:23  274:25
**eliminate** 149:11
**Elizabeth** 100:18
102:19  103:4
**Email** 2:7, 21  8:9
12:15, 18, 20, 21
13:17, 19  14:21
15:13, 15, 18  17:4, 8,
11, 14  95:15, 17, 19,
20  100:18  101:1, 6, 9
102:22  103:7, 9, 11
122:21, 22  123:21, 23
125:17  128:7, 12
129:20  135:24  136:6,
18  156:9  175:19, 22
176:6, 16, 18  178:12,
14, 19, 22, 24  205:18,
24  207:7  216:9
227:23, 25  229:2

241:19  261:10
262:16  275:23
**e-mail** 238:25
**emailed** 102:19
103:3  179:14
**emails** 13:3, 7, 8, 9,
13, 23  14:7, 11, 18
15:7, 10
**embarking** 251:9
**embedded** 147:5
**embraced** 32:14, 16
**emergency** 68:13, 24
69:14, 18  70:13  71:8,
14, 17, 23  72:2, 12, 19,
20  73:13  74:14
75:15, 24  76:2, 15, 25
77:6, 16  84:14, 18, 20
85:4, 7  98:19  99:6
109:13  121:25
125:21  131:15
135:22  141:23
151:24  154:15
169:23  191:24  192:4
193:14, 16  194:14
196:25  197:3, 7, 14,
15, 20  198:5, 12
240:8  243:4
**emoji** 261:6, 7
**emotional** 82:10
135:7, 12  203:4
**emphasis** 226:2, 25
**emphasize** 147:6
174:15
**emphasizes** 223:20
**employ** 201:14
**employee** 46:6, 9
47:1, 3  48:13, 14
49:1, 2, 3  50:14  51:1
52:1, 16  53:23  54:9
55:8  56:12  57:22, 23
59:9, 10  108:2, 9
124:17, 19, 24  139:11
164:2, 5, 7, 13, 17, 25
165:1  197:2, 18
200:16, 20  201:7, 10,
17, 21  202:14, 24, 25
203:3, 16  206:21
207:7, 10, 12, 17, 20,
25  208:2, 12, 15, 20
209:4  213:17  214:4,

7  219:23, 25  221:6,
24  222:17, 20  223:20,
22  252:12  281:13
**employees** 36:14
46:4, 8  47:3, 11, 21
48:4  107:16  110:18
124:21  139:16
146:17  147:15, 23
148:5  165:5  203:5,
12, 22  208:8  212:15,
16, 18  213:21  214:9,
10  215:13  222:13
224:21  226:13
252:14  263:25
**employee's** 209:5
**employment** 34:8, 15,
22  107:23  108:14
236:16  260:3, 13
273:11, 15, 20, 25
274:3, 7, 8, 25  275:3
**enacted** 85:10  198:13
**endearment** 29:23
32:23  42:12  43:11
**ended** 111:16  236:21
**engage** 238:18  240:3
**engaged** 164:25
165:6  203:23  211:12
**engagement** 124:22
165:1, 18  201:17
203:1, 3  209:4
221:24  222:17, 20
223:20, 23  242:17
**enjoyed** 32:14, 16
**ensued** 134:7
**ensure** 64:3  139:21
210:12  213:12
221:22
**ensuring** 11:5  91:8
249:20
**enterprise** 25:16, 20,
21  33:4  62:20  63:2,
4, 7  64:1, 5, 10  65:5,
23  66:4, 17, 24  77:16
89:12, 20  92:21  99:4
105:18, 25  106:6
110:25  111:3  124:13
126:7  138:17  141:3
142:5, 7  151:22
171:6  179:19, 23
180:1, 2, 4, 7, 14, 19

184:23  186:7, 21
187:13  201:19, 23
204:5  207:21  208:1,
25  214:12  215:15, 22
216:3, 19, 24  220:1, 6
226:14  228:6, 7, 8
254:20  255:23  256:2
262:20
enters  27:9  40:3
91:3  188:12  276:7
entire  134:17  161:24
163:8  189:22  221:18
248:4  282:7
entitled  5:6  44:15
47:16  103:22  166:5
172:24  175:11
179:10  202:13
environment  93:7
equate  164:18
Erie  2:6
ERRATA  282:1, 13
283:1  284:1
error  113:10, 12
114:5  145:12
escort  269:16
escorting  274:8
275:1, 8
especially  153:22
Esq  2:1, 4, 10, 14, 17,
24, 25
essentially  104:20
190:10
et  1:10  5:7  282:4
ethics  30:5
evaluating  260:19
evaluation  157:20
277:5
Evans  276:21
evening  79:7
event  197:3
events  219:5  252:6, 7
eventually  232:7
everybody  271:9
everybody's  111:9
evidence  34:25
163:12  169:15  170:4
231:14  254:15  279:8
evolved  60:17
EVP  122:23
EVS  124:12, 16

exact  10:3  32:1, 6
68:3, 17  69:20  96:20
115:4  116:2  133:21
134:5  176:16  241:3,
18  245:6  246:2
Exactly  42:11  43:9
114:10  141:6  144:20
167:21  243:14
244:25  257:1
Examination  3:4  6:1
examined  5:23
example  83:8  105:22
109:1  118:5  143:21
147:25  152:4  157:15
163:17
examples  82:18
147:6
exceeds  206:8
209:23  211:23
219:14
Excel  206:14
exceptional  206:8
exchange  37:25
86:17  184:17  186:11
187:18, 24  258:17
264:15  267:20  269:1,
11
excited  77:10
exclusive  213:21
excuse  72:16  82:1
172:20  175:20
197:14  206:21
242:25  270:18
executes  161:22
213:13
executing  227:16
execution  9:19
131:12  134:24
139:20  210:13
211:12
executive  9:3, 4  64:2,
4  66:11  82:11  87:6
88:7  89:1  92:24
93:19, 20  97:4  99:5
100:22  102:14
106:16  116:18
124:12, 16  125:5
128:4  135:7, 13
137:16  141:13, 15
142:8  155:6  166:6

170:12, 19, 23  172:25
175:12  176:2  179:11
189:20, 25  190:3
191:23  192:21  193:4,
5  198:16  215:12
219:4  227:2  234:5,
10  237:12, 23  249:19,
20  253:23, 24
executives  32:7  84:1
97:15  212:15  252:25
253:1  254:8
Exhibit  3:4, 8, 9, 10,
12, 13, 14, 15, 16, 17,
18, 19  4:15, 18, 19, 21
8:22  9:1  22:2, 6
27:14  37:2, 6  44:2, 6
78:13, 17  86:2, 6
91:12, 16, 21  95:2, 6,
9  100:14, 17, 23
101:7  102:2, 5, 12, 23
103:3, 12, 14  105:12
111:23  115:7  116:7
119:6  121:18  122:20
123:14, 18  125:17
127:18, 22  128:25
130:1, 15  132:12
136:24  137:3, 4, 7
144:5, 10  145:14
146:1  150:5  152:25
154:24  155:9, 12
158:7  161:13, 18
165:21, 25  166:8, 10
172:15, 19, 20  175:3,
7, 13, 16  176:5, 14, 16
178:6, 10  179:2, 6
184:2, 6  188:13
189:5  200:7, 10, 14
202:4, 8, 18  205:12,
15  209:6, 10  215:14
220:4  227:17, 20
232:21, 25  233:3
238:19, 22  258:2, 6
261:2  264:2, 6
267:18  268:21, 25
269:10, 12, 13, 15, 25
272:25  276:8, 12
EXHIBITS  3:4  4:3,
14  20:25  188:16
264:5  273:6

existed  143:20
148:24  222:7
exits  20:13  36:17
85:18  183:3  257:11
expand  116:19
expanded  263:7
expect  204:8  219:17
266:2, 10
expectation  132:22
expectations  11:8
63:5  163:4  211:22
expected  92:9
196:10, 22  250:4
266:1, 8, 11, 20, 21
267:7, 9
expense  223:6
experience  34:22
75:25  84:22  96:1
209:5, 25  219:18
254:5, 10
experienced  34:8
experiences  83:25
expert  131:2  158:17
expires  281:24
Explain  92:11  235:5
explained  32:22
255:9
explaining  235:2
explicitly  61:12
explore  46:16
exposure  118:4
143:21  144:25  152:3
226:5, 7  254:5, 7
express  139:6  211:19
expressed  140:21
extensive  95:25
extent  7:6  28:2
65:24
external  93:11  95:21
134:25  195:8, 12, 15,
22, 25  199:7, 9, 11
externally  83:3
163:24
eyes  20:11  27:15, 20
37:12  86:11  184:8
188:17  258:10
264:10  269:4

< F >

**face** 53:*12*

**face-to-face** 67:*7*

**facilitate** 66:*13, 25*
227:*15*

**fact** 6:*14* 9:*8* 43:*12*
54:*22* 68:*9* 73:*14*
109:*5* 129:*5* 134:*19*
163:*7* 173:*16* 181:*7*
182:*12, 19* 193:*13*
213:*10* 246:*19*
250:*22* 271:*7*

**factor** 106:*25* 108:*4,
14, 17*

**factors** 57:*6* 222:*6*

**facts** 34:*24* 54:*10*
56:*17, 21* 57:*4* 58:*1,
24* 60:*5* 122:*15*
169:*15* 170:*4* 231:*14*
254:*15* 260:*6*

**factual** 93:*8* 138:*18*

**failed** 211:*20*

**fair** 12:*7, 10* 273:*5*

**fairly** 82:*12*

**familiar** 44:*25*

**family** 206:*4* 278:*25*

**fantastic** 148:*11*

**far** 168:*8*

**fast** 148:*9*

**fault** 212:*13*

**February** 9:*14* 63:*7*
241:*8* 252:*23* 263:*12*

**feed** 278:*25*

**feedback** 63:*12* 64:*6*
65:*1* 66:*9* 83:*21*
94:*12* 95:*25* 96:*22*
97:*16, 24* 124:*25*
135:*8* 148:*9, 12, 25*
150:*19* 154:*7* 161:*5*
164:*7* 168:*13* 176:*20,
23* 191:*15* 203:*12*
239:*16* 248:*6* 249:*19,
22*

**feel** 6:*12* 82:*9* 84:*7,
9, 13* 146:*21* 165:*15,
17* 188:*5*

**Feiger** 162:*4*

**felt** 81:*7* 133:*24*
134:*9* 181:*9*

**FIFTH** 1:*10, 16* 2:*19,
24, 25* 5:*7, 19, 20*

7:*13, 21, 25* 8:*8* 9:*3*
10:*17* 11:*18, 22* 12:*3,
8, 15, 22* 15:*2* 22:*8*
29:*17, 19* 32:*7* 33:*12*
37:*7* 43:*15* 44:*6, 15*
45:*3, 8, 13, 14* 46:*4, 6,
8* 47:*1, 3* 49:*22*
50:*13, 25* 51:*19* 52:*2,
16* 53:*21, 23* 54:*7*
55:*5, 8* 56:*9* 57:*22,
23* 59:*10* 60:*16*
61:*16* 76:*12, 16, 17,
25* 77:*2* 78:*18* 81:*11,
16* 83:*18* 86:*6* 87:*14*
91:*16, 19* 95:*6, 9*
100:*23* 102:*6, 7*
103:*16, 23* 104:*6*
105:*12* 107:*16* 108:*1,
10, 25* 111:*22* 115:*7*
119:*7* 121:*17* 123:*19*
124:*15* 127:*22, 23*
128:*23* 129:*18, 22, 25*
132:*12* 134:*1* 135:*18*
137:*3, 7, 10, 18*
142:*22* 143:*4, 17*
144:*3, 7, 13, 15* 145:*7,
14, 15* 146:*12* 149:*9*
150:*4* 152:*24* 155:*3,
8, 13* 157:*16* 161:*13,
18* 162:*5, 15* 164:*23*
165:*25* 166:*1, 9, 10,
16* 172:*19, 20, 21*
173:*2* 174:*18* 175:*7,
8, 17* 178:*10* 179:*6, 7*
181:*2* 184:*12* 189:*5,
6* 198:*21* 200:*11, 16,
24* 201:*3* 202:*8, 9, 13,
16* 203:*20* 205:*16*
209:*10, 11, 17, 18*
215:*10, 25* 216:*5*
219:*22* 220:*8* 227:*5,
21* 229:*4* 233:*16*
235:*20* 238:*1, 23*
251:*3* 258:*6, 7* 260:*3*
262:*17, 19* 264:*6*
266:*12, 22* 267:*11, 16,
18* 268:*25* 273:*20*
276:*13* 282:*4*

**figure** 87:*15*

**filed** 15:*8, 11* 271:*17*

**fill** 107:*13* 157:*24*
163:*24*

**filling** 106:*21*

**final** 94:*9* 96:*4*
118:*19* 136:*23*
152:*22, 23* 154:*3*
159:*13* 174:*21* 175:*1*
178:*15* 179:*13*
190:*11* 209:*15* 220:*5,
23* 230:*23* 232:*9*
233:*20* 247:*21* 248:*6*
249:*25*

**finalized** 152:*18*

**finalizing** 154:*8*
168:*14*

**financial** 12:*6* 87:*12,
23* 161:*23, 25* 162:*4,
22* 163:*17, 19* 209:*24*
223:*3, 5, 9, 16* 251:*7*

**find** 262:*17* 267:*24*

**fine** 166:*24* 188:*20*
199:*18* 265:*4*

**finish** 6:*18* 78:*1*
188:*23* 199:*16*

**finished** 77:*23*
199:*14*

**Fintech** 82:*4*

**firm** 95:*22* 237:*22*
281:*16*

**first** 5:*22* 15:*1* 32:*1*
34:*7* 44:*8* 79:*8*
81:*13, 19* 101:*17, 19*
106:*20* 111:*17* 112:*9*
114:*6* 119:*1, 17*
121:*15, 22, 24* 124:*5*
132:*17* 137:*9* 143:*19*
144:*12* 145:*8* 153:*5*
187:*15* 192:*12* 198:*3*
205:*23* 211:*3, 24*
213:*16* 218:*11* 219:*2*
220:*8* 238:*9* 239:*5*
240:*3* 250:*18, 24*
264:*6* 265:*7, 8*
270:*20* 275:*7* 278:*23*
281:*8*

**firsthand** 271:*14*

**five** 17:*6* 54:*22* 78:*3*
103:*22* 104:*6* 179:*18*
214:*10* 251:*21*

252:*14* 254:*8* 260:*8*
262:*5* 263:*9*

**fix** 162:*9, 10*

**fixed** 127:*15*

**floor** 32:*8*

**flustered** 82:*12*

**focus** 99:*13* 117:*16,
24* 118:*4* 130:*20*
131:*4* 135:*4* 139:*19*
140:*14* 141:*21*
143:*19* 144:*11, 13, 21,
25* 145:*4* 146:*5*
152:*5, 9* 155:*19, 22*
156:*17, 21* 157:*1*
158:*18* 162:*11* 221:*4*
222:*24* 225:*17, 24*
226:*4*

**focused** 100:*5*
101:*21* 114:*7* 119:*19*
129:*8* 135:*2* 156:*2*

**Focusing** 119:*10*

**focussed** 157:*5*

**folks** 93:*4* 161:*2*
171:*16*

**follow** 65:*25* 66:*7,
23* 67:*4* 233:*7*

**followership** 158:*2*
212:*2, 12* 218:*12*

**FOLLOWING** 4:*3*
15:*22* 21:*1* 36:*18*
66:*17* 85:*19* 136:*7*
183:*4* 228:*12* 229:*8*
257:*12* 275:*9* 279:*24*

**follows** 5:*24*

**follow-up** 66:*16*

**font** 173:*23*

**footprint** 36:*14* 251:*8*

**force** 53:*5* 146:*25*

**foregoing** 281:*10*

**form** 24:*14* 34:*23*
37:*13, 21* 75:*11*
107:*13* 122:*14*
147:*17* 159:*18* 168:*1*
242:*2, 4* 244:*1, 13*
247:*4* 248:*5* 249:*6*
250:*15* 254:*14* 255:*8*
256:*9* 266:*14* 271:*21*
273:*21* 275:*5, 25*

**formal** 63:*6* 116:*12,*

*14*
**formally** 239:*8*
**format** 101:*22* 102:*1*
113:*5, 15, 18* 117:*1*
123:*4* 153:*23* 156:*1*
**formatting** 173:*22*
**former** 53:*20* 54:*6*
144:*19* 162:*3* 174:*18,*
*19*
**forming** 35:*21*
170:*13*
**formula** 247:*18*
**Forrest** 79:*12, 14, 22*
86:*18* 87:*5* 180:*9, 13,*
*18* 181:*11, 17* 182:*20*
185:*15* 186:*7*
**Forrest's** 88:*5* 180:*20*
**forth** 12:*18* 28:*14*
32:*9* 39:*3* 63:*10*
88:*4* 100:*8* 101:*24*
105:*6* 120:*15* 139:*5,*
*13* 142:*11* 146:*23*
151:*23* 152:*16*
153:*21* 154:*2* 158:*12,*
*24* 162:*21* 165:*16*
190:*14* 208:*19* 216:*1,*
*21* 217:*5* 230:*15*
242:*24* 243:*3* 277:*2*
278:*16* 279:*5*
**forward** 75:*23* 81:*21*
99:*17* 116:*22* 130:*18*
135:*2* 176:*5* 178:*25*
182:*22* 186:*4* 188:*5*
**forwarded** 176:*1*
**forward-thinking**
130:*25* 158:*15*
**found** 231:*19*
**foundation** 34:*10, 24*
35:*8* 38:*20* 74:*15*
107:*2* 108:*5* 121:*11*
147:*18* 148:*21*
160:*12, 13* 168:*24*
169:*14* 170:*4* 171:*21*
180:*21* 181:*3, 14, 24,*
*25* 182:*7, 15, 25*
188:*7* 201:*24* 215:*17,*
*18* 223:*1* 225:*2*
227:*6* 229:*24* 231:*13,*
*25* 235:*13* 236:*4*
247:*5* 248:*10* 249:*7*

250:*2, 16* 252:*5, 16*
266:*15, 24* 267:*12*
271:*22*
**four** 110:*18* 128:*21*
176:*24* 181:*20*
225:*17* 239:*19, 20*
**fourth** 163:*10*
211:*25* 218:*11*
270:*21*
**fox** 29:*16, 19, 22*
30:*1, 3, 8, 11, 12, 17,*
*18* 31:*1, 5, 9, 11, 15,*
*19* 32:*3, 12* 33:*2, 10,*
*13* 34:*9, 17, 21* 35:*6*
40:*5, 7, 13* 41:*8* 42:*9,*
*20, 23* 43:*1, 4, 8*
45:*20, 21* 46:*2, 3, 7, 9*
47:*2, 4* 48:*9, 14, 15*
49:*2, 3, 12, 18* 50:*13,*
*15* 51:*2* 52:*2, 17*
53:*23* 54:*9* 55:*9*
56:*12* 57:*24* 59:*11*
258:*25* 259:*25*
264:*23* 265:*16* 268:*7*
273:*2, 8, 19* 274:*11,*
*25* 275:*12, 21, 24*
**frame** 98:*5*
**framework** 99:*14*
100:*6* 110:*17* 112:*11*
129:*9*
**Frank** 79:*12, 14, 19,*
*22* 86:*18* 87:*5* 88:*5*
180:*9, 13, 17, 18, 20,*
*24* 181:*11, 17, 22*
182:*3, 13, 19* 185:*15*
186:*6* 206:*24* 208:*5*
269:*16*
**frankly** 42:*16*
**fraud** 85:*9* 221:*2*
222:*22*
**free** 6:*12* 46:*16, 22*
181:*7*
**frequently** 18:*19, 23,*
*25* 19:*20* 20:*5* 25:*24*
26:*2, 3, 5* 30:*10, 13*
48:*10* 171:*3*
**Friday** 228:*4*
**front** 33:*10* 82:*14*
92:*14* 174:*25* 198:*19*

**full** 94:*14* 96:*11*
120:*20* 154:*9, 11, 12*
168:*3* 190:*1* 191:*20*
192:*12* 211:*3, 24*
213:*16* 221:*1*
**fully** 148:*11*
**functions** 215:*23*
**further** 72:*1* 86:*10*
133:*9* 175:*22* 232:*23*
233:*1* 267:*22* 268:*6*
**Future** 103:*22* 104:*6*
146:*6* 273:*11, 25*
**FW** 95:*22* 191:*6, 17*

**< G >**
**Garrett** 125:*19*
126:*3, 4, 7, 12, 16*
127:*1* 129:*23*
**Garrett's** 129:*15*
**gather** 205:*5, 10*
**gathering** 25:*17*
205:*7*
**GC** 184:*22* 186:*21*
187:*12*
**Gee** 237:*15, 16*
**general** 141:*3*
168:*19* 237:*12*
**generally** 92:*24*
93:*19* 116:*1* 156:*10*
230:*10* 234:*6, 8*
235:*16*
**generated** 62:*7* 65:*19*
**generation** 104:*19*
105:*9*
**generations** 43:*18*
103:*23* 104:*6, 25*
105:*2, 4* 124:*11*
**gentleman** 83:*3*
**geographic** 36:*13*
**getting** 30:*16* 61:*21*
66:*5* 136:*18* 139:*12*
146:*16* 152:*1* 198:*10*
226:*7* 228:*2* 229:*14*
242:*17* 249:*19*
261:*15* 262:*10, 12*
270:*22*
**giant** 116:*21*
**give** 6:*24* 14:*3* 16:*4*
32:*5, 6* 57:*10* 82:*19*
107:*17* 149:*18*

202:*20* 204:*14* 214:*3,*
*6, 8* 233:*4* 249:*3, 14*
253:*18* 255:*19* 256:*7*
279:*3*
**given** 37:*13, 20*
115:*17, 23* 146:*22*
150:*20* 207:*20*
231:*17* 279:*10, 17*
281:*10*
**gives** 215:*21*
**giving** 14:*8* 132:*11*
147:*15, 23* 161:*4*
256:*19* 281:*7*
**Glass** 96:*7* 98:*18*
**go** 6:*3* 16:*3* 20:*1*
24:*7* 27:*3* 33:*19*
34:*13* 35:*3, 16* 37:*22*
41:*15* 42:*2, 4* 45:*23*
47:*5* 49:*7* 50:*7, 19*
52:*8, 22* 55:*13* 58:*24*
60:*14* 61:*4, 11* 63:*13*
72:*8* 78:*3* 86:*9, 15*
97:*22* 98:*7* 104:*1, 3*
106:*19* 107:*13* 109:*9,*
*24* 113:*16, 24* 115:*1*
117:*20* 125:*8* 127:*12*
134:*25* 135:*2* 138:*23*
146:*1* 147:*5, 20*
154:*16, 18* 158:*7*
162:*19* 163:*6* 169:*18*
170:*6* 171:*13, 19*
177:*9* 186:*25* 194:*10*
205:*10* 210:*9, 11, 22*
220:*8* 223:*2* 227:*25*
234:*17* 240:*6, 25*
241:*14* 242:*8* 254:*16*
260:*6* 261:*13* 264:*13*
266:*8, 11, 21* 267:*1, 9*
269:*6* 274:*17* 278:*3*
**goal** 206:*7, 11*
**goals** 63:*5* 77:*19*
**goes** 76:*6* 86:*14*
107:*10* 148:*16* 175:*1*
190:*16* 191:*17*
193:*23* 213:*2* 221:*10,*
*22* 258:*14*
**going** 6:*10* 8:*13*
9:*16* 15:*20* 20:*9, 23*
22:*6, 18* 25:*11* 27:*6,*
*19* 32:*8* 37:*10, 14*

40:5  46:10, 22  54:23
62:18  76:9  77:20
78:8  86:20  93:6
99:17  107:22  108:1,
10  111:19  117:6
125:10  130:18
136:21  145:15  150:4
155:15, 25  156:6
158:25  162:16
166:23  170:1  184:16
188:15, 24  199:20
216:5, 23  219:23
222:8, 12  223:8
228:25  231:10
232:10, 17  234:19
240:3  245:4  247:16
252:12, 13  266:11, 12,
21  267:10  269:23
271:9, 15  272:11
278:6, 24  279:1
**good**  11:6  76:1  83:8,
17  97:10  116:4
125:20  131:11  164:6,
21  165:9, 12, 15, 17
185:2, 18  205:8
218:7, 10  219:9
**gotten**  114:3  117:2
119:2, 25  130:13
132:4  270:14
**grab**  264:6
**graduated**  7:10
**granular**  224:3, 16,
22, 24
**great**  87:7  88:8
112:5  119:15  124:6
137:25  138:11, 25
139:7  145:18, 23
147:8, 9, 15, 23
148:15, 19  149:6, 18
206:4  212:1, 9  217:6,
18  218:3, 12, 17, 23
219:3, 11  254:12, 21
**Greg**  10:1, 2, 12, 14
13:9, 18  23:19  25:8
33:6, 7, 10  64:12, 15
68:10, 12  71:5, 6, 24,
25  72:10, 12  73:4, 9,
14, 20, 21  74:8, 9, 13
75:1, 8  77:4, 6, 15
79:2, 15, 25  80:8, 12,

23  83:10  88:9, 12
93:23, 25  111:2, 12
114:11, 14  117:19
121:7  122:11  138:6,
7, 17  140:8  141:10,
12, 14, 19, 25  149:21
150:1, 13, 20, 22
151:15, 21  153:13
157:6, 20, 22  175:25
176:7  177:6, 11, 14,
20, 24  178:13  180:10,
15, 20, 25  181:6
182:4, 9, 23  197:22
204:6, 9, 14  205:8, 19
206:1, 3  209:21
210:24  216:8, 10
217:1, 4  218:4
220:18, 24  224:4, 20
225:23  226:6, 23, 25
227:3, 24  228:2, 20,
22  229:3, 16, 22
231:7, 22  232:5, 11,
19, 24  234:2, 9
236:16, 21  239:1, 14
240:22, 23  241:12, 16
245:1, 5, 7, 22, 25
246:1, 15  247:1, 8, 23
249:23  251:16  254:4,
12, 17  259:4  260:24
261:14  262:7, 8, 9
263:4, 6  265:13, 14,
18, 19, 25  266:10
267:6  270:7  271:11
272:1, 4, 9  278:18, 19
279:1, 9, 16
**Greg's**  140:12  141:2
182:20  209:15
236:20  245:4, 18
**group**  45:15  83:12
93:21  105:10  147:1
222:13
**groups**  45:2, 4, 14
**growth**  131:1  158:17
161:22, 25  225:14
**guarantee**  162:2
237:25
**guess**  12:16  60:3
64:5  65:16  117:22
141:6  158:7  193:13

198:5  222:9  223:4
236:9  257:7  272:18
**guides**  61:3
**guy**  88:10, 16, 18
162:8  228:3  229:15
237:14, 15, 17  239:2,
7, 11, 14, 16, 19, 21, 23
240:1, 5, 15  241:1, 23,
24, 25  242:10  243:8,
23  244:10, 22, 25
247:23  248:18, 20
249:3, 14  250:4, 5, 6
276:25
**G-u-y**  237:14
**Guy's**  247:25

< H >
**hair**  42:17
**halfway**  192:17
**hall**  18:25
**HAMILTON**  281:3
**hand**  119:11  281:18
**handed**  8:25  22:5
37:5  44:5  78:16
86:5  91:15  95:5
102:5  123:17  127:21
137:2  155:2  165:24
172:18  175:6, 16
178:9  179:5  184:5
189:4  200:10  202:7
205:15  209:9  227:20
236:23  238:22  258:5
264:5  268:24  276:11
**handling**  252:10
**hands**  252:8
**happen**  85:8  87:8
88:8  252:7, 24
**happened**  67:16
96:25  136:8  141:6
252:6
**happening**  60:4
87:25  97:18
**happy**  32:19, 20
206:3
**hard**  83:20
**Hart**  2:17  5:15
**Harter**  11:14
**HCCC**  207:6
**head**  6:16  54:23
94:11  119:22  130:4,

5  134:6  140:17, 24
141:8, 14  142:2, 7, 16
144:23  154:6  175:24
250:24, 25  253:9
263:14  279:1
**Heading**  87:2
**health**  74:20
**hear**  6:11
**heard**  32:1, 2  89:7
135:5, 8  150:13
151:6  154:1  243:11
244:5, 24
**hearing**  36:13  244:8
**heavily**  169:11
**he'd**  267:15
**held**  179:23  180:5
**help**  66:1, 11, 13
77:11  97:3  204:6
209:4  247:13
**helping**  85:5
**Hennard**  100:19, 20
175:20  176:6
**hereinafter**  5:23
**hereof**  282:13
**hereunto**  281:18
**hey**  240:16  278:24
**high**  83:1  116:6
120:3, 12  122:23
123:11  131:9, 18
145:2  163:2
**higher**  83:2
**highest**  90:1  112:18
162:6  219:25  252:14
**highlighted**  138:9
**highly**  37:17  255:25
**hire**  81:23  135:1
147:10  253:1
**hired**  81:24  82:23
133:9, 10  146:24
147:1, 3, 4  163:23
**hires**  93:11
**hiring**  43:25  83:2
107:20, 23
**Hoffman**  147:1
**hold**  10:8  48:4
194:1  267:24
**holding**  163:3
**holds**  131:12, 16
**holiday**  206:4

holidays  216:15
holistic  107:5
holistically  150:3
home  15:14
honor  29:23  32:23
42:12  275:16
hope  53:18  76:7
206:3
hoped  80:16
HR  30:5  43:24  62:2
92:25  93:20  111:10
134:6  141:14  142:7
154:2  216:24
human  9:13, 16, 19,
22  10:15  11:12  28:6
34:5  43:14  51:18, 24
53:21  54:6  55:5
56:9  63:23  84:4
92:15, 19  93:3, 6, 14
94:1, 12  96:1  97:1
98:5  104:11  116:12
130:18  154:6  155:6
166:5  168:11  170:25
172:25  175:11, 24
176:2  179:11  189:21
207:6  247:12  248:4
249:18
hundred  251:19
hundreds  251:10
hypothetical  48:11,
23  52:4  56:6
hypotheticals  49:9

< I >
idea  18:22  28:25
30:21  42:17  114:14
159:22  179:21  186:9
187:14  188:9
identification  8:23
22:3  37:3  44:3
78:14  86:3  91:13
95:3  100:15  102:3
123:15  127:19
136:25  154:25
165:22  172:16  175:4,
14  178:7  179:3
184:3  188:14  200:8
202:5  205:13  209:7
227:18  238:20  258:3
264:3  268:22  276:9

identified  45:3  59:25
85:2  221:23
identify  9:1  44:14
57:15, 21  58:5, 15, 22
59:4, 8  78:21  91:21
95:7, 12  100:17
102:12  103:21
105:15  111:25
121:18  123:19  128:2
129:21  137:13
139:22, 25  151:11
153:1  155:4  166:3
172:23  175:8, 18
178:11  179:9  189:8
200:14  202:12
205:17  209:13, 18
220:13  227:21
238:24  276:14
ignored  148:18
III  2:10
immediately  180:20
impacts  25:18  228:11
implement  81:20
implemented  221:23
implementing  28:11
209:3
implicit  49:25  59:16,
19, 22  60:1, 2, 7, 12
61:7
important  93:7
174:15  209:1
importantly  151:23
impression  271:19
improve  83:21  148:4
149:10  209:4  221:24
improvement  206:9
212:23
inaccurate  140:23
inappropriate  37:17
48:12  49:1  52:1
53:24  54:8, 15, 20
55:7, 19, 22, 24  56:11,
22  57:7, 11, 16, 22
58:6  59:9  244:15
inbox  13:17  14:10
incapacitated  198:4
include  29:1  40:19
106:9, 10  107:7, 22
108:2, 3, 19  111:7
140:13  215:15

included  36:3  41:9
92:22  105:25  106:14
139:9, 14  176:10
202:2  204:10, 12
206:6, 10, 11  208:13,
17  223:6
includes  124:15
including  35:19  82:2
106:25  133:12  162:3
190:4  191:23  192:22
194:9  195:9  207:16
222:15  239:20
inclusion  28:7, 8, 17,
21  35:14, 24  44:15
45:3  61:18, 24  62:1
inclusive  148:15, 24
158:12
inconsistencies  123:6,
13
incorporated  248:6
incorrect  170:8
227:8
incorrectly  113:25
270:19
increase  266:3
increased  251:8, 18
278:22
incredibly  148:8
independent  94:11
95:21  124:21  154:5
168:10  169:22
171:14  175:23
190:25  191:15  208:7
229:14  237:22
245:20
in-depth  82:6
indicate  38:24  50:11
71:22  73:3, 8  76:10,
14, 23  79:14  80:7, 11,
15, 23  95:17, 19
96:10  101:1  112:17
123:23  131:24
134:21  141:4  142:1
150:22  151:2  158:1
207:25  210:4, 21
221:22  228:17
230:25  231:6, 7
249:2, 13  262:14
265:4  270:5

indicated  30:9  33:12
45:17  47:20  66:20
69:6, 12  70:12  72:11,
23  74:9  80:8, 12, 24
81:3, 7  103:10
113:19  122:12
123:10  133:24
142:20  143:2  145:17
152:14  203:4  220:20
222:4, 19  225:8
229:2  261:15, 21
262:25  282:12
indicates  46:21
112:16  114:24  118:4
119:13  149:10
169:11  178:24  191:6
193:11  209:14  224:9
225:16  233:8  266:20
267:22
indicating  77:8
142:15  143:20  180:9
278:13
indication  23:16
116:3  211:11  213:4
indications  208:22
indicative  35:6
115:12  164:24
indicator  128:10
131:9  213:15
individual  54:8
56:12  57:9  59:6
61:11  62:3  66:1, 7
67:4  92:22  93:18
107:6  111:9  125:2
130:22, 23  142:11
164:12  170:11, 22
190:19  191:12  215:7,
9, 15, 21  216:13
219:24  221:10
222:17  224:4  227:2
individually  161:21
215:24
individuals  49:21
51:5  52:12, 15  55:16,
18  57:5  59:21  83:6
169:12  190:7  208:20
263:16
industry  25:14  82:5
131:2  158:17

**inference** 187:1
**influence** 180:25
**influencing** 130:18
182:5
**information** 6:22
9:4 10:21, 23 12:11
13:20 14:8 20:22
27:16, 19, 22 37:16
63:10 64:11 79:20,
24 85:6 86:13 89:15,
17 91:9 92:9, 18, 21
93:1, 3, 8, 12 99:15
100:1, 10 104:10, 14
106:5, 12, 15, 18, 23
107:7 108:18, 23
109:3, 6, 13 110:2, 8,
16 111:5, 19 112:2
113:3, 20 114:2, 9
117:5, 15, 21, 23
118:16 119:3, 10, 18
120:1, 4 121:9 122:3
130:13 131:7, 20, 24
132:4, 8 137:24
138:15, 18 140:19, 23
144:20 150:1 151:25
153:25 154:13
156:18, 25 157:12, 14,
24 162:23 163:1, 19
164:2 166:24 167:25
169:19, 21, 25 171:25
172:1, 10 174:9, 24
184:9 188:18 190:10
191:18 193:6 198:23
199:1, 6 201:16
204:10, 16, 19 205:1,
2, 5, 8, 10 207:13, 23
220:3 222:19, 21, 24
223:3, 5, 9, 13 224:8
276:22, 25 277:5
**informational** 14:22
105:8
**informed** 15:6
135:14
**inherent** 29:2, 5
40:19 41:4
**inherited** 146:12
**in-house** 61:20
133:11
**initial** 35:18 233:19
238:16 241:8

**Initially** 9:25 99:9,
13 154:8 222:4
240:15 243:7
**initiate** 85:14
**initiated** 192:20
**initiative** 251:10
**initiatives** 23:21
25:17
**Inn** 73:19 74:7, 25
80:17, 20
**in-person** 19:17
**input** 93:25
**ins** 237:1
**insane** 273:2
**insert** 151:16
**inserted** 100:2 157:1
**insight** 36:15 96:13
97:19
**insignificant** 248:2
**inspire** 75:23 81:21
**inspires** 212:2, 12
218:12
**inspiring** 158:2
160:18 163:25
**instance** 25:13
170:24 222:8
**institution** 87:13
**institutional** 83:5
**instruct** 8:13
**instructed** 114:2
262:13
**integrated** 165:6
**integrating** 162:14
**integration** 87:21
**intellectual** 203:5
**intelligence** 29:25
32:25 42:13 43:12
82:10 135:7, 13
**Intelligent** 130:24
148:8 158:15
**intended** 40:17 41:3
211:6, 9
**intent** 153:22 265:19
**intention** 168:19
**interact** 105:6
**interest** 68:11, 12, 23
69:13, 17 71:8 72:11
77:5 222:11 281:14

**interested** 68:11
70:13 71:13 73:3
76:11, 15, 24 77:1
**Interestingly** 271:3
**internal** 165:11
194:24 196:3, 10, 15,
18 239:13
**internally** 243:12
**International** 229:15
**Internet** 61:5
**interpreted** 212:12
**interrupt** 77:21
**interview** 239:19
**interviewed** 271:10
**interviewees** 239:21
**introduce** 5:9
**introduced** 37:23
**introducing** 276:25
**invested** 66:4
**investigation** 235:10,
17 236:1, 8, 18
**investments** 225:18
**investor** 197:2, 18
228:14, 16 233:10
**investors** 82:14
118:5 143:21 152:4
198:8
**involved** 28:16
31:17 35:18 36:1
44:21 48:8 53:10
60:5 62:11 120:14
133:23 153:20
159:25 160:1, 8, 9
181:7 201:6 247:2, 9,
15 248:8 249:23
**involvement** 28:6
63:16, 18, 25 92:5
93:23 203:5 204:4, 6
**issue** 46:23 148:13,
17 255:10, 13
**issues** 23:21 67:4
87:4 139:23 148:3
170:24 223:25
273:19
**issuing** 154:8
**item** 146:9 211:23
237:3
**items** 14:22 109:22
206:6 223:6, 7, 20, 23

225:11, 13, 15
**iterate** 155:24 157:4
**iterated** 173:22
**iterating** 167:23, 25
174:6
**iterations** 153:21
**iterative** 166:23
168:17 173:15
**its** 52:24 54:10

**< J >**
**Jamie** 33:3 83:4
**January** 12:7, 12, 22
13:4, 24 14:12 17:23
18:18, 21 19:16 20:7
25:25 61:9 62:18, 22
63:24 64:17 84:7, 9
205:18 209:15
216:16 217:5, 18
220:17 228:7, 16
229:5 233:10
**jms@sspfirm.com** 2:8
**job** 88:21, 24 107:16
108:10 131:11
141:14 142:6, 7
148:11 165:16 169:2
171:7 197:22 198:10
216:18 218:3, 4, 17
219:3, 20 227:14, 15
231:17 251:15, 21
254:19 262:19 263:7
271:1
**jobs** 260:9
**John** 2:10
**joined** 146:12 161:1
163:8
**joint** 5:18
**Joshua** 2:4 5:13
**Jula** 11:15
**July** 44:17 234:1
**jumps** 186:12
**June** 38:3 98:21
238:25 239:1
**junk** 13:7, 8

**< K >**
**keep** 13:17 14:25
20:24 41:12 47:14
48:17 49:14 53:15
62:12 75:24 76:7, 8

Deposition of Robert Paul Shaffer

Philip R. McHugh v. Fifth Third Bancorp, et al.

78:5  84:21, 22, 23, 24
153:9  228:24  232:9
255:10  256:13
259:10
**kept** 65:9
**Kevin** 146:14  257:7
**key** 89:20  109:12
117:16, 23, 24  118:4,
5  130:20  134:24
139:19, 21  143:19, 21
144:11, 13  145:4
146:25  152:3, 5, 9
155:18, 22  156:17, 21
157:1, 15, 25  160:16
161:9, 17  163:13
190:5  192:24  193:24
194:7  197:1, 18
206:18, 19  210:14
211:13  213:14
218:24  224:19  226:5
**killed** 85:9
**kind** 19:10  27:18
32:14  60:23  75:22
76:2, 5, 8  84:25
99:12  100:5  107:5
115:3  132:7  142:12
147:13  163:10
180:16, 17
**kinds** 165:16
**King** 95:16, 20  96:3,
17, 22  98:3  191:6, 10
**kit** 28:17  44:16  45:3
**kitchen** 88:1
**knew** 73:20  74:8
75:1  216:24  231:9,
22  242:14  271:9
272:2, 4, 6, 10, 21
**know** 11:25  12:17,
24  14:20, 23, 24  17:5,
21  23:19  24:20  25:8
26:2, 5  28:12, 18
29:6, 8, 24  30:14
31:25  32:7, 16, 18
33:7  42:16, 17  43:2,
6, 18  47:7, 8, 9  48:6
49:4, 6  51:3, 8, 9, 12,
22  52:19, 23, 25  53:5,
6, 8, 20, 25  54:11, 22
55:6  56:23  57:2
58:17  62:4, 15  65:15,

25  66:1, 2, 5, 10, 12
68:17  70:19  71:11,
13  74:16, 18, 21  76:1,
3  77:18  78:6  83:10
84:5, 21, 25  85:5, 8,
10  87:22  88:1, 20
89:15, 21  91:7, 9
93:5, 10  94:3, 9, 18
95:24  96:19  97:2, 7
99:1, 16  100:7, 8
104:13  105:3, 4, 5
106:13, 19, 20  107:3,
6, 7, 10, 14, 18  112:9
113:1, 2, 9  114:1, 4,
15, 18  115:1, 15, 18
116:2, 3  117:12, 21
118:10  119:2, 19
120:2, 11  121:3, 6, 12,
14  122:6  123:6, 9
124:9, 25  126:14, 17
127:2, 11, 16  130:12,
14, 17, 19, 21, 24
131:5, 14  132:21, 25
134:6, 16, 22  135:4, 6,
10, 12  136:5, 19, 21
138:14, 17  140:8, 21,
25  141:2, 19  145:12
152:12  153:24
155:25  156:10  157:3,
6, 9, 19, 21  158:8, 11,
17  159:4  160:2, 14
161:22  162:22  163:3,
20  164:5, 16  166:22,
24  167:4, 10  169:10
170:21  171:23
173:14, 16, 23, 24
174:5, 6, 7, 8, 9, 12
175:21  176:19, 25
177:1  178:23  180:9
184:25  186:9  188:3,
8, 24, 25  191:10
195:5  196:2, 20, 23
198:20  201:3, 6, 25
203:12  204:13
206:25  207:12
208:23  214:1, 2
215:7, 9  216:12, 20,
22, 23  218:7  220:2
222:5, 6  223:2  224:3,
17  225:5, 6, 14  227:1

228:25  229:10, 14
231:16, 18, 19  234:9
235:14, 15  239:22
240:5, 7, 10, 16
241:18  242:19
243:18  245:6, 14, 15
249:20  252:18  253:2,
21  255:6  256:1
257:4  259:17  261:8
267:1, 6, 15  268:12,
19  270:13  271:23
275:18  278:25  279:2
**knowing** 146:3
**knowledge** 34:14
54:23  60:25  82:4, 6,
8  130:25  131:10
134:7  158:16  235:12,
22  271:14
**known** 195:10, 20
**knows** 198:7, 8
215:19  226:3  264:21
265:8, 10
**Kris** 125:19  126:3, 4,
7, 11, 12, 15, 25
129:14, 23

**< L >**
**L.P.A** 2:5
**labeling** 148:18
**Lack** 34:10  35:8
74:15  81:17  83:8
107:2  121:11  147:18
148:21  160:12
168:24  169:14
171:21  180:21  181:3,
14, 24  182:7, 15, 25
188:7, 8  201:24
215:17  223:1  225:1
227:6  229:24  231:13,
25  235:13  236:4
248:10  250:2  252:5,
16  266:24  267:12
271:22
**lacking** 226:24
**Lacks** 34:24  38:20
81:19, 22  82:3, 4, 6,
10  108:5  247:5
249:7  266:15
**laid** 215:18

**Lamb** 80:20, 23
126:18  127:1
**Lamb's** 126:21
**language** 217:2
220:16
**large** 96:2  234:16
**largest** 215:25  260:9
**Lars** 88:10  105:16,
21  109:1
**Lastly** 125:18
**late** 259:15
**lateral** 208:24  256:1
278:15
**laughing** 261:7
**Lavender's** 257:7
**law** 255:12
**lawful** 5:22
**law's** 255:10
**lawsuit** 15:2
**lead** 9:18  60:8
75:23  81:21  94:11
95:20  112:6  119:14
154:5  158:23  164:25
168:10  171:12, 14
175:23  237:6, 10
250:14  255:2, 18
256:22  261:18
**leader** 83:10  109:2
110:2, 10, 19  112:3
119:11  130:25
131:10  137:25  142:6
145:16  164:22  212:1,
9  217:6, 18  218:1, 12
224:5  225:25  254:13
**leaders** 139:21  197:2,
18  210:14  211:13
213:14  254:21
**leader's** 165:19
**leadership** 35:19, 20
116:23  218:24  219:4,
6  222:15  253:19
254:2, 19  255:3, 19
256:7, 20  257:7
**leading** 28:10, 11
35:21  83:11  88:20,
24  218:17  254:11
**leads** 85:12
**leap** 116:21
**learn** 29:4

learned 29:6
learning 9:21
leave 73:9, 21 74:10
83:7 185:5, 8
leaving 231:9, 23
232:6 252:25 272:11,
22
led 28:20 36:16
left 10:13 181:12, 18
275:9
left-hand 22:8
legacy 213:21
legal 62:2 236:11, 25
252:9
legitimate 246:20
Leonard 33:3
letting 124:8
level 82:24 83:1, 2
89:20 116:17 141:20
164:8, 12 196:1, 5
202:25 203:23
208:23, 24 212:8
214:12 216:1 219:18
224:22 231:17
236:10 237:23
255:23 256:2
levels 90:1
leveraged 206:18
license 107:14
lights 75:25 76:8
84:21
likability 164:19
liked 34:3 212:16
275:16
likes 180:10 236:21
Limited 2:12 64:7
line 30:5 77:22, 23
78:1 163:8 164:15
178:24 188:23
199:14, 16 223:6, 7
230:20, 21 268:4
lines 93:8 192:20, 23
193:24 194:7, 12, 19
196:11 198:16
210:25 215:23
links 61:4
liquidity 198:9
list 113:20 153:5
listed 118:21, 22
121:25 122:23

151:17 152:2 161:10,
17 223:19
listing 118:23 122:4
lists 112:21 115:11
118:11 119:22 120:3
121:21 129:5, 11
130:4 132:17 209:23
litigation 15:8, 11
234:15 235:8 236:8
237:13 252:3
little 64:2 94:20
135:12 158:24
164:18 250:23
live 7:3
lived 7:1 211:22
Liz 93:16 99:10
104:9 111:19 113:3,
19 114:2 117:2, 7, 21
119:2, 25 121:9
122:3, 20 123:5, 22,
24 130:12 131:6, 20
135:24 136:11, 12
145:4 156:4, 5
173:21 174:2, 8
Liz's 113:10
LLP 2:18
long 7:1 11:21 17:4,
19 31:25 99:19
120:11 142:25 165:9
177:3 235:18
longer 17:6 146:23
161:4 163:23
Long-seasoned 131:10
longstanding 237:2
long-term 75:22
191:24 192:4
look 53:11 61:11
82:20 99:12 100:9
104:1, 3 106:2
108:20 115:1, 19
116:17, 18 117:20
127:14 130:15, 17, 21,
24 131:5, 9 132:21
138:5, 12 141:15
149:9 150:2 157:11,
18 158:12, 14, 20
159:2 160:22 161:6,
20 164:8 168:12
169:5 178:24 198:1
206:16 213:8 215:20

216:16 220:4 221:20
222:6, 14 223:3
233:22 247:23
255:23 263:13
269:23
looked 97:9 120:9
131:7, 8, 22 139:2
141:4 146:15 157:19
168:8 193:7 202:1
looking 84:5 100:12
101:21 107:5 110:1
112:10 115:6 116:25
118:16 121:6 123:3
131:14, 23 137:24
146:9 149:7 223:8
224:13 240:8
looks 29:24 32:24
169:19 259:16, 18
loose 181:22 185:22
Lorin 207:4
losing 255:3
loss 223:7
losses 221:2 222:22
lost 194:1
lot 25:9 27:15 32:8
75:25 82:8 83:17
84:2, 3, 21 93:8 97:5,
8 99:2 138:3 148:15
149:3 163:11, 16
174:18 203:14
212:16 226:6 229:25
232:16
lots 23:21 25:11
88:1 222:5 224:19
255:25 263:8
Loveland 6:25
lowest 212:24 221:18
LTI 260:19

< M >
macro 125:2 164:8
magazine 131:4
maintaining 254:1
major 93:6
making 29:11 40:18
53:18 59:20 88:21
141:22 148:10
153:20 156:6 160:6
164:21 167:5 168:20
169:7 173:22 177:15,

17 180:13 186:25
231:18 240:21
248:24 251:21
manage 197:2, 18
198:8 206:23
managed 208:5
management 11:5, 6
61:24 82:9, 20, 22
83:4 89:19, 25 91:23
97:4, 15 98:22 99:3
102:14, 24 111:8
126:6 128:4 137:16
139:20 140:3 146:2
154:10 155:7 158:8
162:1 166:6 173:1
175:12 176:2 179:11
209:24 210:13, 18
211:12, 14 213:13
215:3, 5 232:18
237:12 244:6 252:22
255:4, 21 256:8, 21
257:5
management's 198:19
manager 30:4 63:11
65:15 76:1, 2 89:4
110:23 111:1 116:4
141:14 149:22, 23
164:12 202:3 212:7,
10 214:8 218:7
224:20
managing 212:7
255:25
March 25:15 198:2
227:3, 23 229:2
232:15, 16 241:8
MARKED 3:4 4:14
8:22 9:1 22:2, 6
37:2, 6 44:2, 6 78:13,
17 86:2, 6 91:12, 16
95:2, 6 100:14 101:6
102:2 123:14, 18
125:17 127:18, 22
136:24 137:2 154:24
155:3 165:21, 24
172:15, 19 175:3, 7,
13 176:13 178:6, 9
179:2, 5 184:2, 6
188:13 189:4 200:7
202:4 205:12 209:6,
10 227:17 238:19

258:2, 6  264:3
268:21, 25  276:8, 12
**market** 87:23  140:17,
24  141:9  142:2, 16
144:23  207:5  255:4,
20  256:7, 20  257:1, 6
**Marsha** 154:4  168:9
171:18  175:23  176:7,
18  177:5  239:9
240:22, 23, 24  241:12,
16, 17  245:1, 5, 7, 13,
18, 23  246:15, 18
**Marybeth** 127:8
**Maryland** 71:4  75:7
77:3, 9
**mast** 182:13  185:25
187:20
**material** 258:11
264:10  269:5
**materials** 61:20
177:9  184:9  207:16
**matter** 106:19  169:3
170:16  228:12
234:13  235:3, 6
236:2, 13  237:2
252:8, 10  282:8
**matters** 237:4
**mature** 85:11
**Maureen** 11:14
**MB** 87:7, 11, 12, 14,
19, 22  88:7, 18, 24
89:2  124:15  161:23,
24  162:4, 6, 9, 13
163:17  213:21  251:6
**McCallister** 154:5
168:10  175:24  176:7,
19  177:6
**McCarthy** 2:12
**MCHUGH** 1:7  2:10,
12, 24  5:6, 12, 14
14:12  15:2  17:15
18:12, 16  20:13  22:8
27:9  30:2, 7, 9  31:6,
15  32:11  34:7, 20
36:5, 17  37:7  38:18
40:3, 6  42:10, 20, 23
43:1, 3, 7  44:7  45:9,
19  46:2  69:2, 8
70:13, 23  71:1, 23
72:24  73:3, 8, 20

74:1, 8, 24  75:6
76:10, 14, 23  77:8
78:18  79:2, 6, 11, 12,
21, 22  82:23  85:18
86:6  88:16  91:3, 17,
19  95:6, 9  100:23
102:6, 7  103:16
105:13  108:25
111:22  112:7  113:20
114:9, 10  115:3, 7, 10
117:3, 9, 16  118:24
119:4, 7  121:17, 21
122:5  123:19  126:1
127:22, 23  128:23
129:1, 4, 14, 22, 25
131:25  132:13, 17
133:6, 18  135:16
137:3, 8, 10, 19, 21
142:16, 21  143:3
144:3, 7, 10, 13, 15
145:5, 8, 15, 16
149:10  150:4  152:3,
13, 24  153:6  155:3, 4,
8, 13  157:16  158:10
161:14, 18  162:8
165:25  166:1, 9, 10,
16  168:22  171:19
172:11, 19, 20, 21
173:2  175:7, 8, 17
178:10  179:6, 7
183:3  184:12  188:12
189:5, 6  197:11, 13
200:11  202:9, 16
205:16  209:10, 11, 17,
18, 22  211:5  213:5
216:5  217:6, 17, 18
220:8  225:10  226:16
227:21  231:4, 11
232:5  238:23  250:13,
21  257:9, 11  258:7
259:24  262:18  264:7
266:11, 22  267:10, 19
268:13, 25  272:21
273:7, 19  274:24
275:20  276:7, 13
278:14  279:10, 16
282:3
**McHugh's** 35:7
67:11, 23  68:2, 5
69:22  112:1  122:11

129:16  142:1  209:20
273:14
**McKay** 93:16
100:18  102:19  103:4
113:19  114:2  117:2,
7  119:2, 25  121:9
122:3  123:22, 24
128:17  136:11  145:4
**McKay's** 122:21
**mean** 13:5, 12  19:9
25:9  30:10  32:4
42:12  58:13  60:15
61:15  62:9  66:7
69:1  74:16  75:21
89:10  99:22  106:8
111:17, 18  116:17
127:10  131:5, 13
136:6, 18  141:20
146:11  147:21  148:8
154:11  158:18  159:1
160:24  163:5, 15, 16
164:16, 17  167:3
172:13  173:14
197:25  201:8  205:9
211:7  219:20  220:18
234:8  235:15  236:14
254:17, 19, 22  255:23
259:1  267:4  278:23
**Meaning** 260:15
**means** 127:16  211:21
**meant** 259:2  265:16
266:7, 9  267:8
**measure** 201:18, 22
202:25
**medical** 27:16, 21
37:16  86:13
**meet** 18:19, 22, 23
19:21  20:6  26:3
65:21
**meeting** 19:10  23:3,
20  25:7, 16  64:3
67:7  71:3  74:24
75:6  77:9  94:15, 20
96:17, 21, 25  98:3
99:8, 10, 19, 21, 23
100:3  101:16  113:14
117:25  118:2  136:22
152:20  163:3  171:15
178:16, 20  179:16, 19
180:3, 5, 8, 9, 14, 19

186:8  189:10, 19, 23,
24  191:21  195:2
204:13  206:20
228:21  233:6, 19
241:6  276:20
**meetings** 8:3  19:2, 5,
7, 11, 17  23:11, 13, 17,
25  24:3, 12, 22  25:6,
12, 20  32:9  84:2
128:17  135:8  170:21,
22  171:4, 5  172:2, 12
177:11  179:23
204:13  216:11
**meets** 204:9
**member** 63:4, 7  64:5
66:17  77:16  105:18
106:6  111:3  143:2
193:15  197:11
215:15, 22  216:3, 20
220:1  238:12, 15
249:19
**members** 33:4  62:20
63:1  64:1, 10  65:5,
23  66:24  89:12  98:5
105:24  110:24
136:23  138:17
139:17, 23  140:8
142:5, 9, 20  151:11
153:15, 16  162:2, 13,
14  168:2  170:23
171:5, 6, 18  174:22
178:13, 15  179:15
181:9  191:16  198:21,
25  201:19, 22  205:9
220:5  226:14
**membership** 82:21
**memberships** 253:25
**men** 230:17
**mentioned** 98:13
135:14  142:10
158:14, 22  164:6
174:22  229:18
237:14  263:10
**merely** 230:2
**message** 8:9  17:25
18:7, 13  22:19  23:1,
4  37:25  38:4, 24
39:5  86:17, 21  87:1
88:6  180:10, 15, 16
181:6  182:21  184:17,

Deposition of Robert Paul Shaffer                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

*20* 186:*11* 187:*10*, *18*, *24* 258:*17*, *19* 259:*8* 261:*3* 264:*15* 265:*8* 267:*20* 269:*1*, *11*, *14*, *19*, *21* 273:*6* 275:*23*

**messages** 18:*3*, *9*, *15* 22:*12* 30:*16*, *17*, *20* 31:*1*, *5*, *7*, *9*, *11* 165:*15* 186:*17* 273:*9*, *22*

**met** 26:*6* 88:*9* 96:*19* 177:*4* 216:*21* 248:*19*

**methodology** 201:*14* 214:*2*

**Michael** 2:*14* 5:*15* 55:*2*

**Michael.cioffi@blankr ome.com** 2:*21*

**Michigan** 259:*16* 262:*7*

**micro** 41:*1*

**microaggression** 29:*2*, *4*, *7*, *9*, *16*, *18* 40:*16* 41:*2* 49:*12*, *19*, *23* 60:*12* 61:*7*

**Microsoft** 11:*20* 12:*9*, *16*

**mid** 94:*20*

**mid-December** 94:*21*

**middle** 87:*23* 127:*7* 140:*17*, *24* 141:*8* 142:*2*, *16* 144:*23* 187:*11*, *14* 236:*18* 255:*3*, *20* 256:*7*, *20* 257:*1*, *5*

**mid-October** 271:*16*

**midyear** 63:*3*, *17* 64:*1*, *16*, *23*, *24* 65:*4*, *7*, *9*, *12*, *17*, *19*, *23* 66:*18*, *21* 67:*11*, *20*, *23* 68:*2*, *5* 69:*8* 70:*1*, *16*, *17*, *23* 71:*1* 79:*2* 122:*12* 204:*3*

**Mike** 83:*9*, *11*, *16*, *17* 146:*15* 154:*5* 168:*10* 175:*24* 176:*7*, *19* 177:*6*

**military** 22:*21* 259:*17*

**million** 231:*18* 251:*20*

**mindset** 131:*1* 158:*17*

**mine** 136:*10* 141:*4* 261:*8*

**minimis** 214:*11*

**minimum** 37:*19* 239:*9*

**minimus** 214:*12*

**minor** 248:*1*

**minutes** 35:*16* 77:*21* 78:*4* 135:*19* 152:*20* 188:*25* 189:*9*, *13*, *16* 190:*13* 196:*20* 276:*15*

**Mischaracterizes** 24:*5* 117:*11* 194:*14*

**miscommunication** 113:*9* 114:*5*

**missed** 98:*12* 279:*13*

**Misstates** 244:*2*, *14* 260:*6*

**mistake** 113:*6*

**misunderstood** 273:*16*

**Mitch** 162:*4*

**mixed** 221:*7*

**model** 82:*8*

**moderate** 113:*6* 114:*16*, *22*, *25* 115:*5*, *13*, *16*, *18*, *20*, *25* 116:*6*, *14*, *18* 117:*3* 120:*7* 122:*25* 123:*8* 131:*17* 144:*22*

**modified** 248:*1*

**modify** 239:*15*

**modifying** 247:*16*

**modules** 61:*12*, *14* 62:*3*, *4*

**Monday** 207:*2* 268:*8*, *13* 269:*16* 270:*8* 275:*9*

**money** 209:*2*

**moniker** 275:*15*

**monitored** 62:*13*

**Monroe** 2:*13*

**month** 94:*18* 186:*18*

**months** 94:*18*, *19*, *22*

**morning** 23:*3* 275:*17*

**mornings** 179:*24*

**mortgage** 221:*14* 222:*10*

**motivates** 203:*5*

**move** 23:*2*, *3* 47:*17* 54:*24* 182:*22* 186:*3* 188:*5*, *15* 199:*16* 208:*24* 233:*24* 254:*4* 278:*15*

**moved** 146:*17* 161:*5* 253:*20* 254:*3* 256:*24*, *25* 257:*8* 262:*24* 263:*4*

**moves** 146:*11* 163:*20* 218:*24* 256:*1* 264:*21* 265:*9*, *11*, *21*

**Moving** 191:*20* 218:*16* 219:*2* 265:*12*

**multiple** 11:*13* 25:*8* 56:*16* 93:*21* 97:*12* 112:*9* 203:*13* 244:*5* 275:*17*

**mutually** 158:*11*

**< N >**

**nail** 253:*1*

**name** 6:*4*, *5* 49:*24* 62:*5* 231:*10* 237:*14*, *17*

**named** 228:*18* 231:*2*, *8*, *23* 266:*22*

**names** 12:*17* 62:*6* 99:*16*

**Nancy** 11:*14* 93:*16* 99:*10* 100:*19* 104:*9* 123:*21*, *23* 124:*10* 128:*7* 135:*24* 136:*10*, *12* 156:*4*, *5* 173:*21* 174:*2*, *7* 258:*17* 260:*18* 269:*21*, *24*

**narrative** 210:*3*, *20* 213:*2* 216:*6*

**near** 251:*20*

**necessarily** 29:*6* 30:*14* 123:*9* 132:*7* 164:*3* 165:*19* 173:*20* 205:*7* 211:*7*

**necessary** 28:*3* 88:*11* 224:*10*, *25*

**necessitate** 107:*4*

**necessitated** 106:*25* 107:*3*, *8*

**need** 6:*15* 14:*25* 37:*18* 54:*24* 57:*7* 71:*7* 73:*14* 74:*14* 87:*5*, *6* 88:*6* 127:*14* 141:*17* 146:*16* 162:*10* 165:*7* 186:*3* 188:*17* 198:*7* 221:*3* 225:*12* 241:*25* 261:*21* 262:*9* 265:*1* 269:*16* 270:*7*, *13*, *15*

**needed** 10:*22*, *24* 14:*9*, *22* 63:*14* 66:*6*, *11* 83:*12* 88:*3* 92:*19* 113:*17* 148:*7* 149:*22* 162:*9*, *11* 163:*4* 168:*1* 182:*22* 188:*5* 198:*5* 218:*19* 222:*23* 225:*17* 226:*3*, *24* 259:*7* 270:*18*, *21*

**needs** 88:*10* 89:*16* 138:*8* 141:*18* 157:*11* 206:*8* 212:*23* 213:*12* 221:*22* 224:*9*, *18* 258:*11*, *13* 264:*12* 266:*2* 269:*5*

**negative** 211:*4* 213:*10* 226:*6*, *9*

**negatively** 213:*5*

**negatives** 76:*20* 211:*6*, *8* 225:*9*, *12* 226:*17*, *19*

**neighborhood** 254:*8*

**neither** 241:*13* 266:*20* 281:*13*

**Never** 19:*4* 30:*2* 32:*17* 34:*4*, *14*, *15* 35:*10* 41:*6* 51:*6*, *9* 73:*16* 81:*4* 83:*12*, *20* 114:*1* 140:*21* 181:*9* 260:*16* 271:*7*, *10*, *11*, *16* 275:*7*

**new** 29:*7* 94:*17* 109:*8*, *11*, *12*, *15*, *19*, *22* 110:*9*, *11* 163:*23* 206:*3* 238:*5* 253:*11* 278:*22*

**nice** 209:*2* 218:*3*

Deposition of Robert Paul Shaffer          Philip R. McHugh v. Fifth Third Bancorp, et al.

265:*1*
**Nick** 171:*15*
**night** 79:*8*
**No._____Change**
283:2, *5, 8, 11, 14, 17,*
*20* 284:2, *5, 8, 11, 14,*
*17, 20*
**No._____Line** 283:*2,*
*5, 8, 11, 14, 17, 20*
284:2, *5, 8, 11, 14, 17,*
*20*
**non-compete** 260:*19*
**Nope** 65:*20*
**normal** 60:*15* 157:*9*
**Notaries** 1:*25*
**notary** 281:*5, 25*
**note** 115:*15* 207:7
220:*25* 261:*11*
262:*13* 270:2
**noted** 114:*16* 254:*12*
**nothing's** 152:22
**Notice** 1:*16* 109:*17*
**notwithstanding** 6:*14*
149:*17* 253:6
**November** 9:*10* 12:8,
*13, 23* 13:4, 25 14:*13*
18:*18, 21* 19:*15, 16*
20:7 25:25 26:*1*
61:*10* 62:*19, 21, 24*
63:24 64:20 125:5,
*18* 127:2 128:*3, 7, 14,*
*18* 130:*1* 135:25
137:*15* 142:2*1* 143:*3,*
*20* 145:*10, 19* 150:5
152:6, *25* 155:5, *20*
156:22, *24* 161:*11*
166:4, *16, 18* 186:*12*
202:*15*
**Number** 22:6, *7, 15*
23:*24* 25:*19* 30:5, *14*
37:6 78:*17* 81:*17*
83:*10* 86:6 91:*16, 18,*
*21* 95:6, *8, 9* 102:6
105:*12* 116:7 121:*18*
122:22 123:*18*
125:*17* 127:22
128:25 132:*9, 12*
137:*3, 4* 138:*23*
155:*9, 13* 161:*13, 18*
165:25 175:*16*

176:*14* 178:*10* 179:6
184:*6* 189:*5* 192:7
196:2 200:*10, 14*
202:8, *20* 203:*11*
209:*10* 214:*9, 11, 13,*
*19, 20* 220:5 227:*20*
233:*3, 5* 234:*16*
235:23 237:*3* 238:22
258:6 264:6 268:25
269:*10* 276:*12*
**numbers** 44:*8* 102:9
269:*10*
**numerous** 58:*8*

**< O >**
**oath** 282:*15*
**object** 20:9 271:6
**Objection** 8:*13*
13:*11, 14* 14:2, *14*
15:*20* 19:9, *23* 24:5,
*14, 24* 33:*14* 34:*10,*
*23* 35:8, *15* 37:*11*
38:20 40:2*1* 41:*11,*
*23* 45:22 46:*10* 47:5,
*13* 48:*16* 49:4, *13*
50:2, *17* 51:*10* 52:*3,*
*18* 53:4, *25* 54:*16, 24*
55:*10, 20* 56:*13, 23*
57:*13, 17* 58:7 59:*12*
60:*13* 63:*18* 67:*15*
68:25 69:*24* 72:6
74:*15* 75:*11* 76:*19*
86:*10* 97:*21* 101:2
107:2 108:5 109:*16*
113:22 117:*10*
121:*11* 122:*14*
123:25 143:*24*
147:*17* 148:2*1*
160:*12* 168:*24*
169:*14* 170:*3* 171:8,
*21* 172:*3* 174:*13*
180:2*1* 181:3, *14, 24*
182:7, *15, 25* 184:7
186:*24* 187:22 188:7
194:*13* 201:*24* 210:6
212:*20* 215:*17* 217:7,
*20* 223:*1* 225:*1*
227:6 229:6, *24*
230:*13* 231:*13, 25*
235:*13* 236:4 242:2

243:*16* 244:*1, 13*
245:8 246:7 247:*4*
248:*10* 249:6 250:2,
*15* 252:5, *16* 254:*14*
255:8 256:9 258:9
260:5 266:*14, 24*
267:*12* 269:4 271:2*1*
273:2*1* 274:*12* 275:5,
*25*
**objections** 269:6
**objective** 161:9, *16,*
*21* 162:*20, 25* 163:*1,*
*12, 14, 17, 22* 203:22
**observations** 65:*1*
135:9
**observe** 170:*19*
171:6, *19*
**observing** 75:*3, 10*
84:5
**obtain** 7:9
**obtained** 157:*14*
172:*1*
**obtaining** 62:*1* 201:7
**obviously** 28:*13*
81:23 94:6 111:*13*
113:6, 7 138:*4* 159:6
164:*1* 189:*18* 216:*14*
225:*16*
**occasion** 66:2*0*
**occasions** 64:6
**occur** 69:*17* 70:*16*
73:*17* 140:8
**occurred** 31:*24*
65:*13, 17* 152:*20*
**October** 86:2*1* 87:*19*
94:*23, 24* 98:*4*
101:*10, 13* 102:*13, 19,*
*24* 103:*4* 118:22
122:2*1* 128:*18* 129:*4*
130:8 136:22 228:7,
*15* 229:5 233:9, *18,*
*21* 258:*18, 19* 259:5
260:*17* 261:*3, 23*
264:*16, 18, 19* 265:*24*
267:2*1, 24* 269:2
270:5 272:25
**offer** 274:*1* 282:*14*
**offered** 250:2*1, 23*
251:*1, 16* 259:*3, 4*

260:8 263:7 278:*14*
**offering** 265:*12*
**office** 50:*12* 99:*11*
113:*14* 171:*15, 20*
253:23 261:22
281:*19*
**officer** 7:*15* 9:9, *10,*
*13, 17* 10:9, *15* 11:*3,*
*9, 12* 28:6, 9 34:6
43:*14* 51:*19, 24*
53:2*1* 54:7 55:5
56:9 63:23 84:*4*
97:2 141:6 189:22,
*24* 190:*4, 17, 23*
191:8, *13, 14, 23*
192:2*1* 193:*4, 5*
198:*17* 208:6 216:*1*
221:*12* 247:*13*
249:*18*
**officer's** 190:*18*
**offices** 18:24
**official** 10:*10* 281:*19*
**offsite** 71:*3* 73:*18*
74:6 75:7 77:9
78:2*3, 25* 80:5
**Oh** 38:*10* 66:9
137:5 178:*1* 184:*14*
**OHIO** 1:*3, 22, 25*
2:6, *10, 13, 20* 5:5
6:25 281:2, *6, 19, 25*
**Okay** 6:*24* 22:*18*
31:*14* 45:20 46:*3, 6,*
*8* 47:2 50:*11* 51:2*1*
57:6 58:*3* 70:*3*
101:9 103:2 108:*16*
144:6, *8* 184:*25*
188:22 189:2 200:2*4*
202:23 220:*12, 16*
226:*11* 239:*10*
240:22 260:*23* 264:*8*
268:5 270:*1*
**Oliver** 81:23 133:*10*
135:*1*
**Olson** 207:*4*
**onboard** 148:*11*
**once** 14:*24* 152:*17*
230:7, *11* 240:*15*
**one-and-done** 142:*12*
**one-on-one** 23:25

**ones** 141:*22* 151:*14*
 156:*6* 160:*8* 226:*21*
**One's** 7:*4* 212:*6*
**one-stop** 100:*12*
**ongoing** 232:*11*
 234:*14* 236:*1* 252:*2*
**online** 60:*23* 61:*6*
**open** 134:*16* 145:*20*
 155:*16*
**opened** 235:*11*, *24*
**opening** 196:*5*
 235:*21*
**operating** 99:*23*
 254:*21*
**operational** 209:*24*
 254:*18*
**operationalization**
 225:*18*
**operations** 9:*22* 14:*9*
 84:*24*
**operators** 254:*21*
**opinion** 72:*15* 81:*10*,
 *14* 169:*4*
**opportunities** 23:*22*
 63:*5* 64:*9* 109:*12*
 110:*21* 125:*1* 138:*8*
 141:*2* 158:*11* 159:*8*
 161:*25* 165:*18* 190:*6*,
 *14* 206:*19* 211:*9*
 218:*20* 223:*18* 224:*7*
 225:*8* 226:*8*
**opportunity** 63:*8*
 110:*3* 149:*15* 162:*17*
 168:*12* 206:*13*
 210:*22* 211:*17*, *21*
 213:*7* 248:*20* 249:*3*,
 *14*
**opposed** 167:*19*
 221:*10*
**opposite** 30:*8* 134:*19*
 158:*5* 160:*20*
**ops** 218:*18*
**optimization** 210:*1*, *5*
 211:*3* 212:*5*, *19*
 213:*6*
**optional** 233:*4*
**options** 206:*8*, *13*
 229:*17* 230:*3*, *15*
**ORDER** 1:*14* 4:*3*,
 *12* 15:*23* 17:*2* 21:*2*

27:*2* 36:*19* 40:*2*
 85:*20* 91:*2* 183:*5*
 200:*2* 201:*9* 257:*13*
 278:*2*
**org** 228:*6*, *7*, *8*, *9*
**organization** 131:*11*
**organizational**
 222:*16* 228:*5*
**originally** 240:*5*
 250:*25*
**outline** 230:*17*
**Outlook** 11:*20* 12:*9*,
 *16*
**outs** 237:*1*
**outside** 8:*10* 40:*10*,
 *14* 171:*4* 215:*11*
 236:*23* 273:*8*
**outstanding** 219:*4*
 235:*9*, *18* 236:*9*
 237:*13*
**overall** 94:*1* 101:*25*
 148:*16* 159:*9* 164:*21*
 165:*19* 213:*15*
 219:*14*
**overarching** 92:*19*
**Overbroad** 13:*11*
 14:*15*
**overlap** 99:*2*
**oversaw** 10:*22*
**oversee** 88:*18* 89:*18*
**overseeing** 11:*4* 87:*7*
 88:*7* 89:*2*
**oversees** 85:*12* 90:*2*
**oversight** 92:*8*
**owner** 112:*5* 119:*13*

**< P >**
**p.m** 22:*20* 38:*4*, *9*
 125:*9*, *11*, *12*, *13*
 154:*17*, *20*, *21*, *22*
 184:*21* 199:*19* 200:*3*,
 *4*, *5* 234:*18*, *21*, *22*, *23*
 258:*20* 260:*17* 261:*3*
 265:*24* 267:*22* 270:*5*
 273:*1* 278:*5*, *7*, *8*, *9*
 279:*22* 280:*11*
**paced** 148:*9*
**package** 253:*23*
**PAGE** 3:*3* 4:*3* 45:*7*,
 *8*, *9* 115:*7*, *20* 124:*11*,

*14* 125:*19* 126:*11*, *15*,
 *24* 127:*12* 129:*15*, *16*
 130:*17*, *23* 135:*10*
 137:*9* 144:*19* 146:*2*
 149:*9* 192:*10*, *17*
 202:*20*, *21* 203:*4*
 206:*16* 210:*11*
 224:*13* 261:*11* 283:*2*,
 *5*, *8*, *11*, *14*, *17*, *20*
 284:*2*, *5*, *8*, *11*, *14*, *17*,
 *20*
**pager** 129:*20*
**PAGES** 4:*3* 143:*25*
 145:*19* 155:*16*
 209:*19* 220:*14*
**paragraph** 123:*9*
 124:*5* 125:*16*, *18*
 127:*7* 190:*1* 191:*20*
 192:*12*, *15* 211:*24*
 213:*16* 218:*11*, *17*
 219:*2* 221:*1*
**paragraphs** 123:*7*
 211:*3*
**parking** 253:*24*
**part** 28:*23* 60:*15*, *21*
 86:*11* 103:*15*, *24*
 113:*10* 114:*23* 126:*7*
 144:*5* 152:*25* 156:*8*
 233:*6* 236:*20* 244:*8*
 255:*2*, *15* 256:*6*, *21*
 278:*14*
**participated** 243:*10*
**participation** 242:*21*
**particular** 20:*23*
 27:*24* 37:*12* 45:*7*
 62:*4* 91:*24* 92:*4*
 101:*20* 170:*2* 200:*23*
 215:*21* 216:*2*, *9*
 222:*16* 225:*4*, *6*
**particularly** 20:*15*
 87:*22* 89:*22* 154:*14*
 161:*3* 164:*14* 166:*25*
 247:*24*
**parties** 281:*14*
**partner** 95:*21*
**partners** 92:*25* 93:*21*
**parts** 109:*15*
**Pas@sspfirm.com** 2:*7*
**passed** 62:*16*

**paste** 114:*5* 145:*12*
**pasted** 113:*10*
**path** 46:*11*
**Patterson** 2:*5*
**PAUL** 1:*16* 3:*3*
 5:*21* 6:*5* 280:*6*
 281:*7*, *11* 282:*19*
 283:*24* 284:*24*
**Paula** 100:*19*, *20*
 175:*20* 176:*6*
**paying** 112:*8*, *12*
 113:*4*
**payments** 147:*4*, *5*
 221:*14* 251:*6*
**pays** 200:*24* 201:*3*
**peers** 32:*13* 33:*1*
 47:*12* 82:*6* 96:*2*
 239:*20*
**Peg** 11:*15*
**PENALTY** 282:*5*, *6*
**pending** 5:*3*
**people** 25:*8* 28:*19*
 30:*4* 35:*23* 36:*3*, *4*
 47:*9* 48:*7* 49:*8*
 75:*23* 81:*21* 83:*2*
 92:*15* 93:*14*, *22*
 110:*20* 146:*20*
 148:*10* 163:*22*, *23*
 164:*16* 165:*12*, *14*
 174:*20* 198:*14* 212:*1*,
 *8* 218:*7*, *12* 224:*19*
 225:*12* 254:*20*
 255:*25* 273:*2*
**perceive** 34:*2*
**perceived** 33:*24*, *25*
 34:*3* 158:*6* 160:*20*
 230:*10* 243:*21* 244:*9*
**percent** 213:*18*, *21*,
 *25* 221:*3*, *11*, *12*, *14*,
 *15*, *17*, *18* 222:*9*, *23*
 251:*23* 253:*12*
**percentages** 127:*13*
**perception** 147:*16*, *23*
 149:*11* 243:*6*, *10*, *14*,
 *17*, *19*, *22* 244:*8*, *10*,
 *21*
**perform** 64:*16*
**performance** 63:*5*, *9*,
 *25* 83:*22* 109:*7*, *11*
 111:*8*, *9*, *20* 117:*19*

Deposition of Robert Paul Shaffer

Philip R. McHugh v. Fifth Third Bancorp, et al.

138:5, *16* 139:2
140:*12* 146:22
157:*20* 189:*20, 25*
190:*3, 13* 191:7
201:*18, 22* 204:*9, 11,*
*12, 22* 205:9 206:5
209:*16* 211:4 216:*19*
218:5 219:*19* 232:*18*
252:22 254:*17*

**performing** 146:*19*
208:7

**period** 11:*11* 12:*12,*
*22* 13:*4, 5, 6, 10, 24*
14:*12* 15:7 18:*20*
19:*6, 15, 22* 20:6
26:*4* 31:*23, 25* 32:*5,*
*6, 10* 43:*13* 62:*18*
64:*17* 71:2 84:*4*
85:*1, 15* 118:*21*
167:*11* 172:9 174:*16*
198:*3, 6* 214:22
232:*16* 234:*10*
235:*18* 252:*20*

**periods** 233:2

**PERJURY** 282:*5, 6*

**perks** 263:8

**permanent** 71:*18*
85:*1, 4, 14* 141:*24*
151:*24* 169:*23*
194:22 241:*14* 243:*1,*
*5* 258:*14*

**permitted** 20:*12*

**Perry's** 73:*19* 74:7,
*25* 80:*17, 21*

**person** 28:*19* 35:*19*
82:22 123:*11* 146:*15*
196:*4* 206:*19, 22*
207:*8, 21* 208:*1, 13,*
*16* 243:*7, 24* 245:*23*
265:*3*

**persona** 32:*15*

**personal** 15:*15* 17:*8,*
*11, 14* 27:16 37:*16*
73:*14* 74:*20* 86:*13*
188:*18*

**personally** 5:*17*
11:*23* 12:*1*

**perspective** 28:*18*
29:7 43:*24* 44:*1*
66:6 81:*16* 82:*16*

84:6 93:7 94:2, 7
104:*11, 19* 111:*11*
143:*12* 158:*13* 164:9
174:*15* 216:25
232:*17* 236:*11, 14*
247:25 250:*10*

**perspectives** 36:*15*
64:8

**pertaining** 13:*12*

**Peter** 2:*1* 5:*11*

**Phenise** 2:*24* 5:*20*
260:*18*

**Phil** 14:*12, 21* 17:*15*
18:*12* 29:*21* 30:*2, 6,*
*9* 31:*6, 8, 10, 14*
32:*11, 14* 33:*2, 9*
34:*3, 7, 20* 35:6 36:*4,*
*7, 10, 11* 38:*13, 18*
39:*2* 40:6 42:*10, 11,*
*20, 23, 25* 43:*3, 7, 11*
67:*11* 68:5, *10, 15*
70:22 71:*2, 4, 8, 11,*
*22* 72:*1, 5, 15, 24*
73:*3, 8, 10, 19, 22*
74:*1, 8, 9, 10, 24, 25*
75:*3, 6, 7, 10, 14, 16,*
*25* 76:*4, 10, 14, 23*
77:*8, 10, 11, 14, 15*
79:*1, 6, 12, 15, 19, 21,*
*25* 80:*4, 8, 12, 16, 20,*
*24* 81:*7, 10, 14, 16*
82:*2, 3, 10, 23* 83:*2, 9,*
*10, 12, 19, 23* 84:*5, 10,*
*21* 85:*16* 88:*10, 11,*
*15, 18, 19* 89:*3* 112:*1,*
*7* 113:*7, 20* 114:*9, 10,*
*14, 16, 18, 24* 115:*10*
116:*3* 117:*3, 8, 16, 19*
118:*11, 24* 119:*3*
121:*21* 122:*4, 10*
125:*19* 126:*1, 4*
129:*1, 3, 14, 15, 22*
131:25 132:*5, 17*
133:*5, 12, 18, 24*
134:*3, 9, 18, 24* 135:*6,*
*9, 16* 137:*21* 139:*23*
140:*21* 142:*1, 16, 21*
143:*3, 16* 144:*9*
145:*5* 152:*3, 13*
153:6 158:*10, 23*

159:*8* 162:*8, 10, 16*
168:22 171:*19*
172:*11* 193:*15*
197:*11, 13, 17* 209:*20,*
*22* 210:*4* 211:5
212:*7, 14* 213:*4*
214:*15, 21* 217:*5, 17,*
*18* 218:*2, 3, 6, 17, 23*
219:*3, 13, 16, 24*
222:*10* 225:*10*
226:*16, 23* 228:*17*
231:*1, 3, 7, 8, 9, 11, 15,*
*22* 232:5 239:*8, 24*
240:*9, 14, 18* 241:*2,*
*11, 13, 23* 242:*1, 11,*
*15, 20, 25* 243:*9, 25*
244:*11, 23* 246:*6, 11,*
*16* 250:*13, 21, 23*
251:*14, 16* 252:*12*
254:*11, 12* 255:*3, 19*
256:6 257:*8, 11*
259:*2, 9, 24* 260:*23*
261:*4, 9, 10, 14, 25*
262:*8, 9, 13, 18, 23, 25*
263:*7, 11* 265:*12, 14,*
*15, 22, 25* 266:*1, 11,*
*21* 267:*1, 7, 10, 15*
268:*17* 269:*20* 270:*6,*
*25* 271:*4, 9, 14, 19*
272:*10, 12, 15, 21, 23*
273:*7, 14, 18* 275:*20*
278:*19, 21, 22, 23*
279:*3, 10, 16*

**PHILIP** 1:*7* 2:*24*
5:*6, 12, 14* 282:*3*

**Phil's** 40:*14* 41:6
42:*13* 68:*10, 11, 12,*
*23* 69:*13, 17* 72:*11*
75:*21* 82:*17* 83:*8*
122:*16, 17* 131:*9*
138:*5, 8* 139:*6, 10*
210:*17* 213:*17* 218:5
254:*18* 260:*19*
273:25

**Phone** 2:*7, 14, 20*
17:*17, 19, 22* 22:*15*
31:2 245:*14* 271:5

**phrase** 89:7, *9*
163:*15*

**physically** 156:6

**pick** 239:*21*

**picked** 111:*11, 20*

**picking** 227:4 229:*23*

**picture** 224:*18*

**piece** 108:*18, 22*
160:*23*

**pieces** 159:*1* 256:*23*

**Pinckney** 11:*14*
93:*16* 100:*19* 123:*21*
128:*7, 17* 258:*18*
260:*18* 269:*21*

**pipelines** 92:*21*

**Place** 1:*16* 11:7
50:*12* 62:*19* 71:*17*
81:*4, 6* 90:*1* 97:*13*
99:*13* 107:*13* 216:*10*
242:*17* 281:*10*

**Plaintiff** 1:*8, 16* 2:*1*
5:*6, 12, 14*

**plan** 85:7 102:*14*
122:*4* 125:22 128:*5*
130:22, *23* 133:*11*
134:*23* 137:*17* 153:*4*
155:7 166:6 173:*1*
175:*12* 176:*3* 179:*12*
182:*4* 198:*12* 221:*3*
222:*23* 225:*20*

**planned** 73:*15* 77:7
135:*11*

**planning** 10:*16* 71:*3*
78:*23* 89:*19, 22, 25*
98:*20* 99:*4* 121:6
134:*23* 143:*14* 190:6
191:*22, 24* 192:*4*
196:*9, 25* 197:*7, 15*
228:*3*

**plans** 92:22 93:*19*
196:*11* 221:*23*
228:*11*

**player** 218:2

**please** 6:*4, 12, 24*
9:2 42:6 44:*14*
63:*21* 70:8 76:*21*
77:22 80:*10* 87:*1*
91:22 95:7 100:*17*
102:*12* 105:*15* 106:*3*
108:7 111:*25* 115:2
121:*19* 123:*20*
124:*10* 127:*14* 128:2

137:*14* 153:2 155:*4*
156:*19* 161:*15* 166:*3*
172:6, *23* 175:9, *18*
178:*11* 179:9 202:*12*,
*17* 205:*17*, *24* 206:2,
*25* 209:*13*, *19* 217:*12*
227:22 228:*1* 238:24
239:6 261:*16* 273:*17*
274:*19*, 20
**plenty** 82:*17* 248:*20*
**plugged** 64:8 216:*18*
**plural** 196:*19*
**plus** 82:*21* 119:22,
*23* 122:25 123:*11*
216:22
**PM** 110:5 115:*11*
**PNC** 2:*19*
**point** 19:*1* 20:*18*
23:*10*, *16* 24:*13*
27:23 34:20 53:6
64:*12* 76:*10*, *14*, *23*
101:*24* 104:*15*, *16*
105:*3* 114:*8* 117:22
123:*1* 130:*11* 133:*3*
140:*10* 143:*19*, *23*
144:*12* 145:8 152:2
153:*11* 157:*25* 161:*8*
163:*11* 167:*24*
197:*20*, *25* 198:*11*
210:*12* 211:*15* 224:8,
*14*, *15* 225:*17* 226:*20*,
*25* 230:*25* 233:5, *8*
236:*11* 263:*10*
**pointing** 123:6, *12*
**points** 104:*12*
205:*24*, *25* 206:2
228:*13* 232:*20*, *25*
234:7 239:5
**policies** 43:*24* 61:*3*
107:*19* 116:*13*
**Poole** 2:*24* 5:*20*
**poorly** 210:*21*
**portfolio** 221:*3*
222:*23*
**portion** 37:*14* 124:*1*
**portions** 28:*3* 37:*21*
**position** 9:*16*, *24*
20:*14* 31:*4* 45:*19*
46:*1* 72:2 73:*18*
74:6 113:24 114:*1*

117:7, *13* 129:6
139:*12* 140:*15* 142:2,
*16* 191:*25* 192:5, *21*
193:9, *22* 194:*17*, *22*
238:5 240:*14* 253:8
259:*3*, *10* 261:*20*
262:*18*, *22* 263:*1*, *21*
274:4, *5* 279:2
**positions** 47:*21* 48:*3*
112:*21* 114:*10* 117:6
119:*21* 122:*24*
123:*10* 130:4 139:*21*
141:5, *16* 142:9
150:*8* 151:22 161:*5*
191:*1*, *4*, *18* 192:7
210:*15* 211:*14*
213:*14* 237:24
246:*21* 262:5, *14*, *20*
263:*20*
**positive** 213:*15*
226:*3*, 9
**positively** 63:*14*
**positives** 226:*18*
**possess** 134:*3*, *25*
135:*17*
**possibility** 132:*11*
**Possibly** 228:*17*
230:*25*
**potential** 68:*13*
71:*14*, *17* 82:*14* 99:6
105:5 112:*21* 113:7
114:*10*, *17*, 22, *25*
115:5, *13*, *16*, *18*, *20*,
*25* 116:5, 6, *15*, *19*
117:*3*, 6 118:*20*
119:*21* 120:*3*, 4, *8*, *12*
121:*1*, *10* 122:*23*, *24*,
*25* 123:8, *11*, *12*
129:5 130:4 131:9,
*17*, *18* 132:*2* 140:*13*,
*15* 141:5, *15* 142:2, 9,
*15* 144:22 145:2
150:7, *8* 151:8, *22*, *24*
159:*1*, *3*, 9 167:*10*
191:*24* 192:*20*, *23*
193:*16*, *21*, *24* 194:7
195:8, *11*, *21*, *24*
198:*15* 199:7, *8*
208:*19* 237:*23* 238:5
274:8

**potentially** 68:*11*
74:20 77:6 130:*14*
133:*20* 146:9 169:*13*
195:25
**practices** 95:*24*
234:*15* 235:8
**preferences** 105:6
**preparation** 8:*11*
10:23 65:4
**prepare** 7:*16* 92:*16*
98:6, *10*, *14*
**prepared** 78:22 91:8
92:*24* 93:*20* 174:*1*
**preparing** 92:8 207:5
**presence** 40:*10*, *14*
82:*11* 135:7, *13*
253:*19* 254:*3* 273:8
**Present** 2:23 5:8
92:9 189:*18*, 20
197:*23* 198:*20*
276:24
**presentation** 249:*24*
**presentations** 198:*15*
**presented** 98:*20*
138:*18* 196:*3* 199:*1*,
6 276:*21*
**presenting** 135:*10*
277:5
**presents** 236:*11*
**president** 10:*17*
71:23 72:25 73:4, *11*,
*22* 74:*11* 75:2, *3*, 8,
*10*, *18* 76:*11*, *16*, *17*,
*25* 77:2, *10* 79:*16*
80:*1*, 9, *13*, *25* 81:8,
*11*, *15* 84:*12*, *14*, *18*
99:5 112:22 113:*8*,
*20* 114:*12* 117:8
129:6 131:*25* 132:5
133:7, *18*, *25* 134:*4*
135:*18* 140:*16*, *22*
142:22 143:*4*, *17*
145:*3* 150:*17*, *23*
151:2, 9, *17* 152:*11*,
*15* 158:*21* 164:*23*
168:*21*, *23* 169:6, *13*
175:2 181:2 182:6,
*24* 219:*21* 227:5, *13*
228:*15*, *18*, 22 229:4,
*13* 230:7, *11* 231:*1*,

*11*, *23* 232:7 233:5, *9*,
*15*, *17*, *24*, *25* 237:*24*
240:*13* 243:2 245:*19*
246:*13* 250:*1*, *13*, *19*
254:*23* 266:*12*, 22
267:*11*, *16* 271:7, *20*
272:*12*, *16*, *23* 279:*12*,
*18*
**President/CEO** 150:*8*
**presidents** 89:*23*
**pretty** 13:*17* 126:*10*
135:*11* 201:2 216:*24*
229:22 230:6 251:2,
*13*
**prevent** 43:*21*
**preventing** 43:*16*
**previous** 17:*1* 27:*1*
40:*1* 91:*1* 200:*1*
258:9 278:*1*
**previously** 77:*4*
91:*10* 141:*1* 145:*17*
152:2 177:*4*, 5 193:7
253:*10* 277:*3*
**primary** 9:*18* 28:*19*
**prior** 92:*17* 93:*13*
94:2 98:*19* 110:6
111:*11*, *12*, 20 114:*19*
117:*19* 139:2 142:*20*
143:2 151:7, *16*
154:7 157:6, *18*, 21
168:*13* 172:9 176:6
177:5 195:2, *4*
228:*10* 241:4 244:*14*
263:8
**priorities** 131:7
190:6 192:24 193:*25*
194:8, *20* 196:9
**privilege** 8:*16*, *17*
**privileged** 20:22
184:9
**proactive** 224:9
**proactively** 218:*3*
**probably** 23:*24* 62:2
64:5 94:*19*, 24
101:*17* 110:*15*
111:*10* 139:*1* 157:*4*
159:7 167:*23* 173:22
174:7 198:6 207:*16*
216:*14* 241:8 248:*12*
254:7

Deposition of Robert Paul Shaffer

Philip R. McHugh v. Fifth Third Bancorp, et al.

**problem** 87:*3* 148:*3* 149:*14* 188:*21*
**problems** 87:*18* 162:9, *11* 222:2, *3*
**procedures** 43:*24* 116:*13*
**process** 10:*22* 85:*11, 13* 89:*25* 92:*11* 93:*24* 94:*3, 16* 98:*3* 99:*14* 101:*18* 103:*15* 107:*20, 21* 121:*5* 136:*21* 142:*13* 153:*21* 155:*25* 157:*9* 166:*23* 168:*17* 169:*20* 173:*15* 177:*8* 191:*14* 201:6, *9* 216:*10* 227:*16* 232:*10* 233:*20* 238:*11, 18* 240:*3, 7, 19, 25* 247:*2, 14* 248:*14* 271:8, *9, 10, 13* 277:*1*
**processes** 9:*20* 11:*6* 85:*6* 88:*23* 89:*20* 96:*14* 97:*4, 20* 228:*25*
**product** 8:*17* 12:*16* 147:*2*
**productive** 87:*2* 165:*7*
**professional** 248:*15* 250:9 264:*22*
**profile** 239:*15* 247:*16, 18* 248:*6* 277:*2*
**profiles** 105:*18*
**profitability** 162:*21*
**program** 28:*23*
**programs** 43:*14, 17, 20, 23* 61:*23*
**progress** 63:*4* 66:*2*
**projects** 23:*21*
**prolong** 199:*15*
**promote** 250:*19*
**promoted** 208:*23* 232:6 250:*13* 272:*11, 22* 279:*11, 17*
**promotion** 43:*25* 107:*21* 228:*17, 18*

231:*1, 2*
**promotions** 93:*11*
**pronounced** 237:*15, 16*
**proposed** 190:*3, 13* 206:6, *15* 207:*3* 228:6, *8* 248:*12* 250:5, *7*
**protected** 8:*15* 29:*11, 12* 59:*21*
**PROTECTIVE** 1:*14* 4:*3, 12* 15:*23* 17:*2* 21:2 27:2 36:*19* 40:2 85:*20* 91:2 183:*5* 200:2 257:*13* 278:2
**provide** 63:8, *9, 11* 64:*11* 65:*3* 95:*24* 96:*14* 97:*16, 19* 107:*11* 108:*10* 154:*3* 168:*13* 170:*1* 194:*18, 19* 203:*12* 204:*17, 20* 207:*12*
**provided** 10:*21* 30:*25* 31:2 89:*16, 17* 97:*24* 98:*23* 113:*19* 117:*15* 136:7 156:*3* 172:*1, 11* 189:*15* 191:*7* 207:*11* 214:*19, 20* 218:*23* 222:*20, 25* 223:9, *13, 15, 16* 224:8, *17* 250:5 276:6
**provider** 17:*17, 20, 22*
**provides** 61:*14, 15* 105:22 191:*18* 204:*10* 205:2 215:*11* 237:22
**providing** 85:6 162:*19* 165:*11* 191:*11* 219:*3*
**proxy** 251:22 252:*13* 263:*11, 13, 14, 15, 16*
**PS** 260:*18*
**public** 86:*12* 96:2 174:*18* 198:*24* 281:*5, 25*
**publications** 14:*24*
**publicly** 106:*17*

184:*10*
**Public-State** 1:*25*
**published** 106:*16*
**pull** 162:22 167:*14* 260:*19*
**pulse** 205:*8*
**purported** 279:*5*
**purpose** 202:*24*
**purposes** 20:*15* 23:*23* 105:*8* 206:*17*
**Pursuant** 1:*16* 5:*17* 281:*12*
**pursue** 46:*17, 22*
**put** 27:*12* 30:*16* 37:*17* 38:*18* 39:2 54:*23* 65:*11* 72:*10* 76:6 82:*13* 91:*11* 93:*4* 97:*13* 99:*17* 112:*25* 114:2, *9* 116:2 119:*3* 131:*20* 141:9, *10* 149:*20* 150:*11, 12* 170:*14* 196:*4* 198:*18* 201:*10* 230:*17* 237:6 251:*3, 4* 257:6
**putting** 28:*16, 19* 113:*3* 118:*15* 123:*5* 216:*15* 229:*16* 230:2

**< Q >**
**qualifications** 75:*16, 17, 21* 76:4 81:*17* 84:*11, 13* 133:*6, 21, 25* 134:*4, 9, 19* 135:*17* 140:22 143:*16* 145:*1* 151:8 158:*20* 164:22 170:*11* 208:22 219:*21* 229:*12* 243:5 246:*13* 254:*23*
**qualified** 81:*8, 11, 15* 133:*18* 143:*3* 152:*10, 15* 158:*21* 169:*6, 23* 193:*8, 21* 194:*24* 196:*3, 17* 240:*13, 17* 241:*13* 242:*7, 15, 20* 243:*1, 12* 245:2 246:*20* 281:*5*
**qualities** 158:*19*

164:*21*
**quarterback** 76:6
**quarterly** 223:*17*
**question** 6:*13, 19, 20* 19:*13, 24* 20:*3* 24:*9, 15, 18, 20* 34:*13, 18, 24* 40:*22, 24* 41:*15* 42:2, *5* 45:*11, 24* 46:*1, 25* 47:*14, 15, 17, 19* 48:*2, 17, 19, 20* 49:*16* 50:6, *9, 18, 22, 25* 51:*11, 12, 23* 54:*1, 2, 17, 21* 55:*21, 22, 24* 56:*4, 5, 6, 14, 15* 57:*20* 58:*18* 59:*24, 25* 60:*14* 63:*20* 66:*19* 67:*3, 15* 69:*1, 4* 70:*7, 11* 72:*7* 74:*2, 3* 79:*18, 20* 95:*18* 109:*21* 142:*25* 147:*18, 21* 152:*12* 155:*15* 159:*1* 160:*16* 161:*15* 171:*9* 172:*5* 176:*4* 177:*20* 181:*15* 187:*3, 6, 8, 25* 194:*15* 201:*20* 213:2 217:8, *11, 15* 233:*7* 237:8 242:*3* 244:*14, 15, 19* 245:*10, 11* 246:*8* 247:*5, 6* 249:*7, 10* 250:*16* 254:*15* 255:8, *17* 256:*4, 5, 10, 16, 17, 19* 266:*15, 16* 271:*5, 22* 272:*18, 19* 273:*16, 22* 274:*15, 17, 18, 21* 275:6 276:*1*
**questioned** 188:*19*
**questioning** 77:*23* 79:*19* 188:*24* 199:*15*
**questions** 6:*11* 28:*13* 41:*12, 24* 47:*15* 77:*22* 78:2 81:2 122:22 123:2 124:9 132:*9* 154:*13* 176:*20, 22* 195:*7* 196:*7* 198:22 201:*15* 203:9 207:*1* 248:*21* 250:*18* 256:*13* 279:*20* 280:2
**quickly** 85:*10* 182:22 186:4 188:6

Deposition of Robert Paul Shaffer							Philip R. McHugh v. Fifth Third Bancorp, et al.

**quit** 231:*19* 260:*15* 268:*18* 275:*9*

**quite** 18:*25* 30:*1, 8* 42:*16*

**quitting** 259:*11* 271:*15*

**quo** 76:*9* 84:*24*

**< R >**

**race** 49:*25*

**raise** 154:*12* 271:*6*

**raised** 30:*2, 7* 34:*5* 271:*16*

**ran** 83:*4, 9*

**range** 104:*22*

**ranking** 112:*18* 117:*2* 145:*22* 146:*7*

**rankings** 116:*6*

**Rashty** 83:*3*

**rates** 222:*11*

**rating** 63:*10* 82:*15* 109:*11* 110:*5* 115:*11* 118:*6* 119:*15, 16* 143:*22* 149:*18* 152:*4* 165:*11, 12* 206:*7, 13* 212:*22, 24* 213:*9* 219:*14*

**ratings** 109:*7* 111:*12* 204:*11* 206:*7, 10, 11, 15, 23* 208:*5* 216:*21*

**raw** 154:*2*

**Raymer** 1:*22* 281:*4, 24*

**reach** 265:*2*

**reached** 261:*14*

**read** 14:*25* 22:*25* 38:*7* 39:*2* 46:*20* 87:*1, 9* 101:*3* 124:*1, 5* 190:*9* 193:*23* 205:*23, 25* 217:*22* 218:*11* 226:*20* 227:*25* 239:*2, 5* 261:*13* 266:*5* 270:*18* 282:*7, 9*

**readiness** 122:*24* 192:*24* 193:*24* 194:*7, 20* 196:*12* 197:*1, 13*

**reading** 135:*10* 260:*17* 261:*2*

**ready** 75:*1, 8* 112:*22* 113:*17, 20* 114:*12* 117:*8* 118:*24* 129:*6* 131:*25* 132:*5* 140:*16, 17* 142:*17* 167:*13, 16, 19*

**real** 83:*1* 130:*18*

**realized** 113:*5*

**really** 29:*10* 35:*20* 46:*11* 83:*19, 20, 21* 84:*24* 86:*12* 87:*21* 97:*10* 99:*13* 130:*20* 131:*14, 16* 146:*24* 147:*13* 148:*9* 153:*24* 158:*9* 159:*2* 169:*3* 198:*7* 199:*10* 208:*10* 211:*8* 212:*16* 225:*24* 229:*8, 10* 232:*14* 240:*19* 248:*1* 249:*1* 253:*1* 271:*17*

**reask** 273:*17*

**reason** 38:*18* 67:*22* 97:*11* 103:*2, 5* 104:*12* 106:*14* 161:*24* 162:*5* 231:*6* 278:*21* 283:*4, 7, 10, 13, 16, 19, 22* 284:*4, 7, 10, 13, 16, 19, 22*

**reasonable** 187:*1*

**reasons** 25:*19* 73:*15* 74:*20, 21* 236:*15*

**recall** 10:*3, 4, 6* 11:*15, 25* 13:*16* 15:*5* 17:*10, 13, 16* 19:*19* 23:*12, 25* 25:*5* 30:*24* 31:*7, 16, 20, 21, 23* 33:*8, 11* 40:*13* 42:*19, 22, 24* 43:*3* 62:*3, 6* 68:*1, 21* 69:*21* 70:*19, 21* 71:*11, 19* 73:*6* 75:*13* 76:*13* 77:*8* 79:*5, 13, 23* 80:*2, 6, 14, 18, 22* 81:*1, 3, 5, 6* 88:*19* 97:*18, 23* 99:*20* 101:*6, 8* 103:*8, 10, 11* 104:*1, 2, 8*

123:*3* 127:*2* 128:*21* 129:*17, 24* 134:*15* 136:*1, 7, 16, 18, 20* 138:*20* 150:*25* 151:*13, 19* 166:*22* 167:*22* 176:*24* 177:*2, 13, 14, 16, 17, 19* 178:*5* 180:*7, 8, 11, 13, 16, 18, 22, 24* 181:*5, 6, 20* 182:*1, 8, 17* 183:*2* 185:*1, 17* 186:*19* 189:*14* 193:*15* 195:*17, 19, 20, 23* 196:*23* 197:*12, 16* 199:*11* 205:*7, 11* 207:*23* 208:*14, 18* 214:*21* 225:*4* 232:*3, 8, 22, 23* 233:*2, 13* 238:*16* 257:*4* 266:*9, 25* 267:*2, 4, 8, 14* 268:*14, 19* 272:*14, 15, 24* 276:*19, 20* 277:*9*

**receive** 28:*21, 24* 60:*11, 21* 62:*15* 168:*11* 263:*17*

**received** 31:*5* 34:*15* 101:*18* 215:*12* 219:*14* 223:*4, 5* 252:*23*

**receiving** 101:*6, 8* 262:*5*

**recess** 27:*7* 78:*9* 125:*11* 154:*20* 200:*3* 234:*21* 278:*7*

**recognize** 29:*12, 15* 53:*22*

**recognizes** 236:*2*

**recollection** 19:*20* 20:*5* 30:*23* 97:*8* 180:*4, 6* 187:*17* 207:*18*

**recommend** 239:*9*

**recommendation** 72:*7* 182:*23*

**recommendations** 97:*17* 147:*24* 199:*1* 207:*4* 239:*22*

**recommended** 68:*12* 69:*13, 18* 71:*9, 13*

72:*12* 77:*5, 14* 240:*18*

**recommending** 71:*25*

**record** 5:*2, 9* 6:*4* 27:*3, 6, 11, 12* 33:*17* 35:*9* 37:*17* 62:*11, 12* 65:*9* 69:*25* 78:*8, 12* 86:*15* 101:*4* 122:*15* 125:*8, 10, 14* 143:*25* 154:*16, 18, 23* 199:*20* 200:*6* 228:*1* 234:*17, 19, 24* 258:*14* 261:*13* 275:*18* 278:*4, 6, 10*

**recorded** 80:*16* 279:*24*

**red** 127:*8*

**redact** 27:*18, 24* 37:*18* 188:*17*

**redacted** 37:*13, 19, 21* 86:*14* 258:*12* 264:*12* 269:*5*

**redundantly** 256:*14*

**refer** 22:*6, 18* 31:*15, 18* 32:*2, 11* 33:*1, 9* 40:*6* 41:*19, 22* 42:*10, 15, 25* 45:*8, 21* 46:*3, 8* 47:*3* 48:*13* 49:*1* 50:*14* 51:*1* 52:*1, 16* 53:*23* 54:*8* 55:*8* 56:*12* 57:*23* 59:*10* 86:*20* 88:*12, 15* 92:*1* 93:*15* 102:*23* 103:*16* 105:*17* 109:*9* 118:*17, 19* 137:*18* 155:*8* 157:*13* 184:*16* 202:*16* 226:*19* 258:*16, 18* 273:*7, 18* 274:*24*

**reference** 35:*6* 41:*9* 229:*15*

**REFERENCED** 3:*4* 4:*14* 61:*3* 127:*7* 144:*19*

**references** 125:*4*

**referencing** 121:*2*

**referred** 34:*9, 21* 45:*20* 46:*2, 7* 47:*1* 48:*14* 49:*3* 129:*20* 139:*23* 182:*12* 231:*3* 275:*21*

Deposition of Robert Paul Shaffer                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

**referring** 31:*10* 33:7 38:*3* 42:*19*, 22 43:*3*, 7 45:6 48:6, *22* 64:*12*, 17 79:*1* 89:6, *11* 98:*1* 102:*15* 105:*12* 108:25 110:7 111:22 112:2 116:7 118:*14* 119:6 121:*17* 122:*20* 126:*18*, *21* 127:*4* 128:*23* 129:*25* 132:2, *12* 139:*15* 144:2, *11* 145:6, 7 148:25 149:*3* 153:9 173:2 184:*20*, 25 189:*25* 190:2 193:*17* 197:*17* 209:*17* 211:*24* 226:*17* 259:*24* 260:2 264:*16* 265:7 267:*18*, *19*, *21* 272:*25* 274:*10* 275:*12*

**refers** 31:*10* 49:*25* 124:*17* 193:*13* 275:8

**refine** 157:*23*

**reflect** 132:*23* 150:*1* 153:25 165:*19* 167:*15*

**reflected** 91:8 94:2 120:*11* 135:*18* 139:*17*, *18* 153:*10* 160:*3*

**reflecting** 153:7, *24*

**reflective** 115:*18* 157:*10* 161:8 166:25 167:25

**reflects** 140:*11*

**refuse** 261:*18* 262:*1*

**refused** 259:4, *5*, 6, 9

**refusing** 259:2 260:9

**regarding** 8:8 29:2 41:2 60:*11* 66:*16* 67:*13* 68:5 80:*20* 96:22 97:*19* 128:*19* 129:*23* 172:*11* 177:*12* 181:*1* 182:*19* 198:*15* 199:7 211:*4* 222:22 232:*12*, *20*, 25 235:*11* 249:5, *15* 273:*11* 276:22

**region** 88:*24* 215:*24* 218:*19*

**regional** 119:*22* 130:5 218:*18* 253:*19* 254:2, *11* 262:22

**regions** 36:*12* 88:*20*, 25 214:*23* 215:*1* 218:*24* 253:*13* 254:5 259:*10* 262:2 263:*14* 265:*12*, *22* 271:*1*

**region's** 254:9

**regrettably** 273:7

**regulators** 174:*20*

**regulatory** 11:7 89:*24* 190:*24* 208:9

**rein** 181:7

**reinforce** 164:9

**reject** 250:6

**relate** 195:25 209:*20*

**related** 28:*12*, *14* 68:9 87:*21* 92:*19* 98:*19* 107:*23* 108:*14* 141:*13* 151:*20* 193:7 222:22 228:*11* 235:7, *8* 237:*3* 274:*3*

**relates** 34:*17* 89:*22* 92:*3*, *13* 111:*17* 151:*23* 210:*12* 218:*15* 234:*14* 240:2

**relation** 275:*13*

**relationship** 48:7 49:*8*, *21* 51:5 52:*14*, *24* 53:2, 9 54:*12* 58:25 275:*1*, *3*

**relationships** 47:9 52:*11* 55:*16*, *18* 56:*18*, *21* 57:5 58:2 162:*1*

**relative** 281:*13*

**relayed** 221:2

**relevant** 37:*14*, *21* 92:*18* 104:*11*, *14* 258:*11* 264:*11*

**relies** 169:*11*

**rely** 169:*21*, *22*, 25

**relying** 149:*3*

**remain** 164:25

**remained** 247:*1*, 8 248:*13*

**remains** 228:22

**remediated** 235:*25*

**remember** 15:*4* 24:6 30:*16* 32:*1* 33:5, 7 60:*16* 69:*20* 77:*13* 83:2 87:*16*, *17*, *20* 134:5 151:*4* 157:2 167:5, *21* 199:*10* 222:*11* 225:*3* 226:22 241:*3* 246:2 249:*1* 257:*1*, *2*, 5

**reminding** 277:*1*

**remove** 139:*16*

**removed** 143:*23* 144:*14*, 17

**renew** 37:*10* 258:9

**repeat** 6:*12* 41:*24* 42:5 66:*19* 70:6 75:*4* 80:*10* 95:8 101:*12* 107:25 108:7 142:*23* 156:*19* 161:*15* 172:5 177:*23* 184:*14* 194:*15* 246:8 247:6 249:9 256:5 266:*16* 272:*18*

**repeating** 242:*3*, *4* 255:6

**repeats** 219:8

**rephrase** 6:*13* 45:*18* 51:*23* 63:*20* 74:*3*

**replace** 79:*16* 124:*13*

**repopulate** 163:7

**report** 11:9 62:7, 9, *10* 106:*17* 108:*24* 136:*10* 146:*13*, *21* 163:8 164:*15* 205:*21* 214:*3*, 6 215:*14* 231:*20* 250:4, 9 253:*15* 259:*11* 262:*3* 270:*8* 271:2

**reported** 11:*12*, *14*, 15 28:9 36:*1* 136:9, *12*

**reporter** 6:*14*, *21* 20:20 27:24

**reporting** 10:*11*, *12*, *14* 126:*4* 191:7 248:*15* 281:*16*

**reports** 11:*13* 65:*18* 206:6, *16* 208:*10*

209:*16* 216:*13* 239:*20*

**represent** 5:*17* 22:*11* 122:*16*

**representation** 5:*18* 42:*13* 43:*11*, *18* 122:*11*, *17*, *18*

**representative** 32:*24* 164:*19*, *20*

**representatives** 201:*11* 277:*4*

**represented** 29:*25* 72:*24*

**representing** 67:*19* 215:*12* 240:*24*

**represents** 105:*10*

**Republic** 198:*3*

**request** 10:*23* 67:*3* 91:*10* 159:*15*, 17 247:*23*

**requested** 10:*22* 136:*4* 159:*12*, *20*, *24* 177:*1*

**requesting** 160:*10*

**require** 25:*12*

**required** 62:*13* 107:*17* 253:*18* 255:*19* 256:6 263:*20*, *21*, *22*, *23*

**requirement** 65:*13* 190:*25*

**requirements** 11:8 89:*24*

**reschedule** 8:2

**resignation** 275:*14*

**resigned** 275:*10*

**resigning** 261:*19*

**resolution** 87:*3* 233:*20*

**resolutions** 192:*13*, *14*

**resolved** 236:*21*, *22*

**resource** 45:*2*, *4*, *14*, *15*

**resources** 9:*13*, *17* 10:*15* 11:*12* 28:6 34:6 43:*14* 51:*19*, *24* 53:*21* 54:6 55:5 56:9 63:*23* 84:*4* 97:2, *3* 189:*22*

247:*12* 249:*18*
255:*25*

**respect** 10:*16* 12:*20*
28:5, *7* 35:5, *13*
40:*18* 41:*1* 45:2, *13*
48:2 51:*21* 61:6
63:*16*, *19*, *25* 64:22
66:*21* 72:*21* 79:*10*
81:2 91:5, *24* 92:4
105:*21* 108:*20*
110:*24* 111:*3* 116:5
117:*15* 122:4 129:*3*,
*5*, *18* 140:*15* 148:*17*,
*18* 152:*13* 156:*16*, *20*
160:*16* 166:8, *15*
169:*12* 182:22
194:*17* 197:*13* 199:2,
*3* 203:*15* 204:22
209:23 210:4 213:5
220:25 221:6, *17*
223:*18* 225:*10*
226:*16* 259:23 260:2
266:*19* 273:*10*, *20*

**respective** 48:*4* 64:4

**respects** 281:*12*

**respond** 88:8 123:2
135:*24* 136:*3* 186:*3*
270:6

**responded** 136:*16*
185:2, *5* 270:*16*

**responding** 186:22
214:9

**responds** 23:7 38:*12*
87:5 185:*18*, *21*
265:*1* 270:*13*

**response** 14:*3* 38:*15*
88:5 149:*11* 195:6
196:7 260:23 261:*1*,
*24* 272:*17*

**responsibilities** 9:*18*
116:*20*, *22* 144:*24*
219:6 251:*14* 253:*11*
278:*23*

**responsibility** 89:*18*,
*21* 92:8 158:*24*
198:*19* 230:*16*
247:*13* 248:*16*
249:*17* 250:8, *9*

**responsible** 11:*4*
61:*25* 66:*3* 111:*18*

113:*1* 149:*23* 162:*23*
167:*4* 181:8 191:*2*
208:7 214:*15*, *21*
215:2 252:*3* 263:*5*
277:*4*

**responsive** 100:*12*

**restate** 76:*20*, *21*

**restructuring** 153:23

**result** 101:*16* 113:*13*
117:*24* 122:7 181:*13*,
*18* 207:*13* 279:*11*
281:*15*

**resulted** 148:9

**results** 65:22 93:*10*
164:*20* 165:*10*
190:*18* 200:*17*, *20*
202:*14* 203:*15*
207:*17* 208:*21* 209:*3*
221:7 223:*16* 248:*14*,
*16*, *19* 250:*10*

**retail** 83:*10* 87:*24*
251:8

**retain** 238:*1* 262:*19*

**retake** 62:*16*

**retire** 234:2

**retired** 234:*3*

**retires** 228:*20*

**returned** 191:*21*

**revenue** 223:6
251:*24* 253:*12*, *13*

**review** 8:*11*, *19*
20:*24* 28:2, *18* 63:6,
*9*, *17* 64:*24* 65:*19*
66:*18* 67:*11*, *14*, *19*,
*20*, *23* 68:2, *5* 69:8,
*23* 70:*1*, *16*, *17*, *23*
71:*1* 79:2 94:9
95:23 97:*14* 109:*18*
111:*10*, *21* 117:*19*
122:*12* 125:*19*, *20*, *21*
129:*14*, *15*, *22* 140:*13*
148:*3* 149:*1* 168:2
173:*14*, *17*, *24*, *25*
177:7, *9* 189:*21*
190:*1*, *3*, *13* 192:*20*
194:*11* 206:*25*
209:*20* 218:*18*
219:*19* 220:*15*, *17*
223:*19* 227:*1* 229:*14*
248:5 254:*17* 273:*5*

**reviewed** 8:*14*, *15*
44:24 97:6 98:*20*
111:*13* 136:23 159:5,
*13* 174:*21* 178:2
190:2, *18* 191:22
192:*3*, *22* 193:*3*, *6*, *11*,
*19* 194:*4* 195:*16*
196:25 197:*1*, 8
250:*3* 277:*3*

**reviewing** 124:8
126:25 130:*11*
140:*20* 173:*18*, *19*
197:*12* 247:*16*

**reviews** 62:*19* 63:*1*
64:*1*, *16*, *23* 65:5, *7*,
*10*, *12*, *17*, *23* 66:*21*
136:*4* 138:5, *16*
139:*3* 190:*20* 191:*13*
204:*3*, *5*, *9*, *11*, *12*, *15*,
*23* 205:*21* 206:5
209:*16* 210:*24*
216:*14* 217:*1* 220:5

**revising** 151:*16*
248:8 249:*24*

**revisions** 168:*20*

**rewritten** 155:*19*

**rewrote** 155:22

**RHR** 229:*15* 237:*19*,
*20*, *21*, *22* 238:*1*, *4*, *8*,
*10*, *18* 240:*4* 245:24
246:6 247:2, *22*
248:*13* 249:*24* 271:8,
*9*, *11* 276:22 277:*4*

**RHR's** 247:9 248:9
250:8

**Rick** 146:*14*

**rid** 83:*16*

**ridiculous** 54:*25*

**right** 9:*14* 11:*16*
23:5 33:*13* 36:5
38:25 41:9 44:25
50:*12* 51:2 53:*18*
58:23 59:2, *14* 70:*1*
71:2 77:25 84:*15*
88:*3*, *13*, *14*, *23* 89:2
96:*11*, *15* 101:*16*
107:*12*, *22* 108:*4*, *12*
110:7, 8 111:*15*
112:7, *16* 113:*18*
114:*13* 115:8, *9*, *21*

119:*11* 120:8 122:*1*
126:*1*, *13*, *19* 127:*13*
129:*12*, *23* 130:9
137:*11* 139:*12*
145:*11* 149:*19* 150:9
153:6 158:*3* 162:9
168:5, *15*, *16* 169:*10*,
*13* 170:2 176:*3*, 8, *11*
177:7 178:25 181:*23*
182:6, *24* 185:9, *12*,
*16*, *22* 186:*4*, 8, *23*
187:*13*, *21* 188:*3*
191:*4* 192:8 194:*21*
200:25 201:*19*, *23*
203:*18* 217:*10*
218:25 219:*12* 220:*1*,
6 221:25 224:*11*, *25*
225:9, *21*, *22* 226:*13*
229:5 231:*4*, *12*, *24*
235:*12* 236:*3*, *13*
237:7, *10* 239:*3*
247:*3*, *10* 248:9, *25*
249:*21* 250:*1* 252:*4*,
*9* 254:*13* 255:5, *21*
256:8 257:9 260:*4*,
*14* 263:*17* 265:2, *17*
269:22 275:*14*

**riled** 82:*12*

**risk** 7:*15* 9:8, *10*
11:*3*, *5*, 6, *9* 61:23
141:5 171:*1* 189:*23*
190:*17*, *19*, *23* 191:*13*,
*16* 206:23 208:5, *6*, *7*
231:9, *16*, *17*, *23*
232:5 272:*11*, *22*

**risky** 196:*1*

**ROBERT** 1:*16* 3:*3*
5:*3*, *21* 6:5 280:6
281:7, *11* 282:*19*
283:24 284:24

**role** 7:*13* 10:8, *13*,
*15* 12:5 28:5, 8 30:2
34:5 35:*13* 65:24
66:*3*, *12* 67:*1* 72:5,
*10*, *17*, *18* 77:*10*, *12*
81:*18* 82:*11* 83:*18*
88:24 91:5, *7* 115:*16*
116:*20* 118:*21*
133:*21* 139:*13*
143:*12* 146:*16* 147:*3*

152:*21* 157:*21*
165:*10* 175:2 189:*21*
195:9, *12* 196:5, *10,*
*16* 198:7 216:*23*
219:*17* 229:20 237:6,
*10* 240:20 250:*14, 22*
251:*23* 253:5, *22*
254:6, *9* 255:*3, 18*
256:22 261:*19* 262:*1,*
*2* 263:8, *9, 13, 14*
274:*1* 278:16, *22*
279:*4*
**roles** 99:5 109:*14*
146:*18* 163:*22, 23, 24*
197:*22* 219:*16*
255:*23, 24*
**roll** 164:8
**rolling** 181:*22* 185:22
**Rome** 2:*18* 5:*16*
**room** 20:*13, 18* 27:9
36:*17* 40:3 85:*18*
91:*3* 134:*17* 183:*3*
188:*12* 257:*11* 276:7
**Rosen** 146:*14*
**roughly** 63:6 94:*18*
**RPR** 1:*22* 281:*4, 24*
**rpshaffer65@gmail.co**
**m** 16:*5*
**Ruben** 83:*3*
**Rule** 281:*17*
**ruling** 58:*4*
**run** 88:2 240:*18*
245:2
**running** 36:*12* 84:*24*
126:5 254:5
**runs** 99:*23* 147:2, *3,*
*4*

**< S >**
**S/Wendy** 281:*24*
**Saba** 2:*1,* 5 3:*4*
5:*11* 6:2 8:*18, 24*
13:*13, 22* 14:*4, 17*
16:*2* 17:*3* 19:*12, 25*
20:*4, 14* 22:*4* 24:*10,*
*17, 19* 25:*1, 23* 27:*3*
28:*1, 4* 33:*17, 18, 23*
34:*12* 35:2, *12, 22*
37:*4, 24* 38:*23* 40:*4,*
*23* 41:*15, 20* 42:2, *7,*

8 44:*4* 45:*8, 12, 23,*
*25* 46:*15, 21, 24*
47:*10, 18* 48:*1, 19, 21*
49:*10, 16, 17* 50:5, *7,*
*10, 21* 51:*14, 17* 52:7,
*13, 21* 53:*14, 17, 19*
54:*4, 5, 18* 55:*1, 3, 12,*
*24* 56:2, *8, 19* 57:*1,*
*14, 18* 58:*10, 15, 19*
59:*13* 60:20 63:*20,*
*22* 67:*18* 69:*3* 70:*2,*
*4, 9, 10* 72:*14* 74:*23*
75:*19* 76:22 77:*25*
78:*3, 15* 86:*4, 16*
91:*4, 14* 95:*4* 97:*25*
100:*16* 101:5 102:*4*
107:*9* 108:*8* 109:*23*
113:*23* 117:*14*
121:*16* 122:*19*
123:*16* 124:*3, 4*
125:*8, 15* 127:*20*
137:*1* 143:*8, 18*
144:*2, 5, 7, 9* 147:*19*
149:*2* 154:*16* 155:*1*
160:*15* 165:*23* 169:*9,*
*17* 170:*5, 18* 171:*10,*
*17, 24* 172:*7, 8, 17*
175:*5, 15* 178:*8*
179:*4* 180:*23* 181:*10,*
*16* 182:2, *11, 18*
184:*4, 11* 187:*4, 7, 23*
188:2, *21* 189:*2, 3*
194:*16* 199:*12, 18*
200:*9* 202:6 205:*14*
209:*8* 210:*8, 19*
213:*1* 216:*4* 217:*9,*
*13, 23* 223:*11* 225:7
227:*11, 19* 230:*5, 24*
231:*21* 232:*1* 234:*17*
235:*1, 19* 236:*6*
238:*21* 242:*9* 243:*18,*
*20* 244:*3, 16, 20*
245:*9, 12* 246:*9*
247:*7* 248:22 249:*11,*
*12* 250:*11* 252:*1, 11*
253:*4* 255:*1, 12, 15,*
*18* 256:*3, 12, 16, 18*
258:*4, 15* 259:22
260:*11* 264:*4, 14*
266:*17, 18* 267:*3, 17*

268:*23* 269:*8* 271:*25*
274:*6, 17, 23* 275:*11*
276:2, *4, 10* 278:*3, 11*
279:*20*
**Saema** 125:*21*
**sake** 6:*13* 143:*6*
**salary** 263:*17*
**sales** 234:*14* 235:8
**Sandy** 1:*24*
**sausage** 153:*20*
**save** 14:*9, 22* 282:*10*
**saw** 89:2
**saying** 14:*18* 50:*13*
51:*6* 53:*2* 73:*25*
74:*4* 81:*3* 111:*14*
115:*12* 120:25
126:*11* 133:*17*
147:*10* 193:*18*
194:*10* 211:*16*
212:*21* 223:*14* 243:7,
*15* 260:*13*
**says** 23:*12* 24:2, *11,*
*16* 25:7 38:25 39:*1*
115:*11, 23* 119:*1, 17*
121:*24* 166:*17*
185:*10, 25* 188:*3, 4*
190:*8* 191:*21* 203:7
211:*15, 16* 212:*9*
221:*1* 223:22 230:*1*
232:9 262:*16* 264:*21*
265:5, *8* 270:24
273:*4* 274:*14*
**scenario** 48:*3* 197:*4*
**schedule** 19:7
239:*14, 17*
**scheduled** 207:*1*
**scope** 116:*23*
**score** 124:*15* 203:*10*
213:*18, 20, 24* 215:6,
*7, 9* 219:*25* 221:7, *11*
**scores** 201:*17, 21*
206:22 207:8, *10, 21,*
*25* 208:*13, 16* 214:*14*
215:*7, 11, 12, 16, 22,*
*24, 25* 219:24 221:*20*
222:*18, 20*
**screw** 182:*4*
**seal** 281:*19*
**search** 85:*14* 237:24
**season** 206:*4*

**second** 27:*4* 76:6
123:*8* 190:*1* 218:*17*
233:*8* 268:*4*
**Secondly** 83:*1* 250:*20*
**secret** 106:*15*
**secretary** 196:*21*
**section** 205:*23* 211:6,
*10* 213:*3, 8* 216:6
251:*11*
**sections** 27:24
**sector** 131:*1* 158:*16*
**securities** 251:*3*
**see** 18:24 20:*16, 17*
22:*8, 9, 13, 20, 23*
37:*6, 8* 38:*1, 3, 4*
44:7 61:*12* 66:*24*
77:*10* 86:7, *21* 87:*9*
92:*10* 94:*2* 95:*10*
102:7 112:*23* 116:*8*
118:6, *12* 119:*8, 23*
125:*24* 127:*14*
132:*22* 141:*15*
144:*10, 14, 15* 148:*12*
155:*20* 156:*16, 20*
157:*15* 164:*1* 166:*10,*
*19* 168:*4* 173:*5, 11*
184:*23* 185:*3, 19, 23*
186:*1, 15* 187:*5, 24*
189:*6* 192:*1, 13*
193:*1* 195:*13* 196:*13*
197:*5* 206:*14* 213:22
215:*14* 216:2, *6*
220:*17* 223:*19*
232:*12, 20, 25* 233:*11*
258:*20* 260:*21*
264:*17, 24* 265:*3*
268:*4, 10* 269:2, *12,*
*17* 270:*9, 12*
**seeing** 11:*4* 178:*25*
**seen** 44:*19* 103:*12,*
*14* 189:*13* 200:*18*
239:*11* 276:*1, 17*
277:7
**sees** 141:*20* 161:22
**segregated** 20:*24*
**select** 36:*10* 182:5
**selected** 35:*23* 36:*4,*
*7, 11*
**selection** 181:*1*

Deposition of Robert Paul Shaffer                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

self-assessments 202:2
self-identified 235:24
self-review 63:8
 190:19
send 22:19 94:10
 258:19 259:13
 262:13 269:19
sending 13:20 95:22
 168:14 177:5 178:15
senior 92:25 93:20
 218:1
sense 138:3 141:16
 142:10 266:2
sensitive 27:21
sent 13:19 14:7
 23:4 38:4 94:14
 96:3, 7 101:9 125:17
 176:6 178:14, 20, 23
 187:16 216:16 248:3,
 4 261:4, 9 269:20, 21,
 24 270:2
sentence 193:11, 17,
 23 194:1, 3 195:6
 196:6, 24 212:1
 213:17 218:11, 15, 16,
 23 219:2 224:14
 225:5 232:9 265:8
separate 15:13 98:22
 171:1 214:3, 6
September 94:23, 25
 95:15 96:18 98:21
 172:9 178:16 233:6,
 18 276:15 281:20
series 6:10 22:11
serious 236:2, 12
seriousness 236:10
serve 10:16 77:6
 84:24
served 10:18 75:2, 9
 253:9
services 238:1
serving 72:5
session 99:11 122:8
 189:21 229:9 230:4
sessions 120:15
set 64:3 66:5
 152:16 228:3 242:24
 243:3 278:16 279:5
 281:18

sets 146:22 217:5
 219:15
setting 65:16 131:11
 163:2
SHAFFER 1:16 3:3
 5:3, 17, 21 6:3, 5
 8:25 20:16 22:5
 24:21 28:5 37:5, 25
 44:5 46:25 48:22
 50:7 51:15 53:20
 55:4 57:19 58:20
 78:16 86:5, 17 89:5
 91:15 95:5 102:5
 123:17 125:16
 127:21 137:2 155:2
 165:24 172:18 175:6,
 16 178:9 179:5
 184:5, 16 187:5
 189:4 191:21 192:19
 195:7 196:8, 24
 200:10 202:7 205:15
 209:9 217:14 227:20
 235:2 238:22 258:5,
 16 264:5 268:24
 276:4, 11 278:12
 280:6 281:8, 11
 282:19 283:24
 284:24
S-h-a-f-f-e-r 6:6
Shaffer's 8:20
shaking 6:15
share 14:23 79:20,
 24 121:7
shared 207:5
shareholders 82:14
 141:18 143:21
 228:21
Shawn 11:14
she/the 239:10
SHEET 282:1, 13
 283:1 284:1
ship 182:13 186:1
 187:21
short 85:1, 15
show 104:16 153:14
 207:19 268:8, 13
 269:16
showing 104:20, 24
 105:1

sic 80:4 82:25
 184:15 202:15
sick 85:9
side 82:18 87:25
 110:8 119:11
sign 82:25
SIGNATURE:_____
 _____DA
TE 283:23 284:23
signed 233:21 282:16
significance 105:1
significant 131:10
 146:25 161:1, 7
 221:4 222:24 251:2,
 10, 13, 22 253:11, 13,
 22 255:24
significantly 221:24
 251:8
Silicon 25:15 198:2
silver 29:15, 19, 22
 30:1, 3, 8, 11, 12, 17,
 18 31:1, 5, 9, 11, 15,
 18 32:2, 12 33:2, 9,
 13 34:9, 17, 21 35:6
 40:5, 6, 13 41:8 42:9,
 15, 20, 23 43:1, 4, 8
 45:20, 21 46:2, 3
 48:9 258:25 259:25
 264:23 265:16
 267:23 268:7 273:2,
 8, 19 274:11, 25
 275:12, 21, 24
similar 237:3
simple 106:12, 22
simply 132:2 229:16
 230:15 275:15
 276:25
single 82:22 173:17
 222:14
Sir 6:10 187:10
sit 43:6 51:21, 25
 55:4 81:4 204:8
site 61:5
sitting 133:1
situation 48:8, 12, 23
 49:8 51:23 52:23
 53:10 54:10, 14 55:7,
 15 56:11, 16 57:5, 10,
 15, 21 58:1, 5, 16, 22

59:8 60:4, 6 66:8
 198:1 225:6
situations 31:20
 53:22 54:7 56:20
 57:9 84:2 212:14
size 173:23
skill 66:5 146:22
 219:15
skills 82:3, 4 83:9,
 17 135:17 148:4
slide 124:12, 13, 16
slightly 222:10
small 235:23
smaller 25:21
Smith 2:4 5:13 28:9
 35:20
sole 165:10
solely 101:21 147:11
solution 225:19
solve 87:3
somebody 30:6
 40:19 62:7 75:24
 82:13 113:6 116:19,
 21 118:20 123:8
 131:15, 17 139:12
 144:22 145:1 152:10
 158:5, 21 169:5
 175:1 186:22 198:7
 219:17 262:11
somebody's 62:12
Sonneman 11:16
sophisticated 174:17
sorry 11:16 18:20
 24:8 34:19 38:8
 44:8 45:10 54:2
 59:24 62:21 63:13
 66:19 70:4, 5 74:2
 75:4 79:18 80:10
 95:8, 18 98:12
 101:12 107:25
 109:21 120:24
 130:22 137:5 156:19
 177:23 184:14
 189:12 192:14 201:8,
 20 204:18 214:5
 215:4 217:15 224:12
 230:9 232:15 233:7
 237:8 239:1 245:11
 249:9 253:21 256:5

Deposition of Robert Paul Shaffer                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

261:25 264:18 272:3
279:14
**sort** 186:24
**sound** 89:25
**source** 61:17 138:24
203:21
**sources** 138:15, 24
**southeast** 251:11
**SOUTHERN** 1:3 5:4
**space** 253:24
**speak** 33:20 61:18
92:13 94:25 138:6
273:22
**speaking** 116:1
156:10
**speaks** 33:17 101:2
109:16 123:25 210:6
215:18 217:20 229:6
**specific** 15:4 31:16,
20 32:9 43:17, 23, 24
52:11 61:22 62:6
73:16 92:20 96:3
97:16, 23 98:18
110:19 115:6 138:15,
24 147:25 150:25
151:4, 11, 13 155:15
157:13, 17 197:16
201:15 204:24
232:12 279:2
**specifically** 10:20
13:1 22:19 43:15
46:21 61:18 62:3
70:21 79:24 87:17,
20 94:25 98:1, 10, 15
101:8 102:21 104:8
108:1 111:22 117:17
119:11 120:16, 17
128:9, 11 134:8, 13,
15, 21 137:18, 24
138:20 139:22 140:3
141:8 144:11 149:10
150:15, 22 151:1, 19
157:2 166:22 167:5
197:12 203:8 204:25
226:22 247:15 259:6
272:1
**specifics** 31:21 33:5
205:11 233:2

**speculate** 49:9 52:20
56:1, 2, 24 57:8, 13
58:13 59:3, 5
**speculated** 130:14
**speculating** 131:6, 19
132:8 268:17
**speculation** 52:4, 19
55:11, 21 56:7
**spell** 6:4
**spelled** 6:5
**Spence** 11:10 13:24
17:12 18:6, 10 25:25
26:3 42:19, 22, 25
43:7 75:1, 8, 9 81:24
83:14 115:19 118:12,
23 119:8, 14, 21
120:3 121:10 127:5
130:2 133:20 145:17
150:16, 23 151:2, 17
152:13, 14 153:5
155:10, 19, 23 156:21
157:16 158:10
160:17 161:10, 18
162:5, 17 166:15
167:7 168:20 173:7
174:3 181:1 182:5,
23 184:17 185:2, 8,
18, 21 186:12, 18
192:23 193:7, 19
194:6, 11, 12, 19, 21
196:17 199:3 220:25
225:16 227:4 229:3
230:7, 11 231:11, 20,
23 232:6 233:5, 15,
24 241:2 245:18
246:17 247:9 248:9,
23 249:2, 5, 13, 15, 25
250:12 253:15, 20
254:3, 4, 10 257:3
259:11 262:24 263:4
264:16 265:1, 5, 25
267:20, 22 268:6, 12
269:2, 20 270:2, 13
271:2 272:11, 22
273:1, 7 274:24
276:23 277:6 279:11,
17
**Spence's** 121:1
148:2 150:7 152:5

156:17 220:15, 17
**spend** 209:2 216:11
**spent** 216:14
**spoke** 225:5 241:25
**sports** 76:5
**spring** 238:2
**square** 47:16
**squarely** 53:13
**SS** 281:2
**stability** 88:4, 21
**staff** 215:23
**Stagnaro** 2:5
**stakeholders** 118:5
152:3 198:11 226:5
**stamp** 22:7 205:16
**stamped** 37:7 44:6
78:18 91:16 100:23
102:6 123:18 184:12
200:11 202:8 238:23
258:6 276:12
**stand** 137:5
**standard** 177:8
201:14
**standards** 163:2
**start** 10:12 12:3
19:1 87:7 88:8
92:16 94:16 99:8
110:1 227:13
**started** 12:1, 2 60:17
94:24 133:22 138:12
140:20 247:21
**starting** 25:15 76:6
94:3 117:22 211:2
**starts** 261:4
**state** 6:3 73:25
74:12 143:25 203:4
232:4 252:13 281:2,
6, 25
**stated** 73:9 208:2
241:12 242:13
275:17
**statement** 180:11
185:11 211:4 224:23
244:2 266:19
**statements** 59:20
163:19
**STATES** 1:2 5:4
251:12
**status** 76:9 84:24

**stay** 203:9 234:10
**stayed** 73:20
**Staying** 213:16
**stems** 232:14
**stenographically**
279:24
**step** 20:18 73:15
77:7 85:13 98:2
**Stephanie** 28:9, 20
35:20, 25
**Stephanie's** 28:14
**steps** 85:7
**stipulation** 281:12
**stop** 10:11
**straightforward** 47:16
**strategic** 9:19 71:3
78:23 81:22, 25 82:2
130:25 133:11
134:22, 23 158:16
161:21 209:23
225:20 251:10
**strategies** 9:20 28:10,
14 82:9 161:23
**strategy** 75:22 135:3
147:1, 2 221:12
226:1
**straw** 230:17
**Street** 1:22 2:13, 19
198:8
**strength** 82:17 110:3
112:18 119:15 138:1,
11, 25 145:18, 23
146:5 147:8 148:18
149:18 159:2 160:17
163:21 190:14
206:13 212:25
**strengths** 64:9
109:12 110:20 112:7
117:16, 24 130:24
131:8, 10, 18 140:13
155:18, 22 156:17, 21
157:1, 15, 25 158:10,
15, 22 159:8 161:7,
10, 17 163:13 190:5
206:18 210:18
218:19
**stress** 222:13
**strides** 209:2
**strike** 66:14 72:21

Deposition of Robert Paul Shaffer                                      Philip R. McHugh v. Fifth Third Bancorp, et al.

**91**:*25* **238**:*13*

**stringer** 76:7
**strive** 203:9
**Strong** 131:*4* 146:*5*
158:*18* 218:2
**structure** 88:2 99:*14*
100:*6* 101:*22*, *25*
112:*11* 113:*4*, *15*, *18*
117:*1* 123:*4* 129:9
153:*23* 156:*1* 222:*15*,
*16*
**stuff** 148:*16* 160:*23*
**SUBJECT** 1:*14* 4:*3*,
*12* 15:*23* 17:2 21:2
27:2 36:*19* 40:2
85:*20* 91:2 183:*5*
200:2 205:*20* 239:2
257:*13* 278:2
**subordinates** 136:*13*
**subsequent** 232:*19*
**subsequently** 10:*1*
79:*11* 132:*23* 230:*12*
**substantial** 8:*1*
116:*22*
**substantive** 97:*8*
**succeed** 72:*25* 73:*10*,
*22* 74:*10* 75:*1*, *8*
77:*12* 79:*16*, *25* 80:*9*,
*12*, *24* 118:*24*
**succeeding** 73:*4*
**success** 212:*3*, *18*
218:*13*
**succession** 10:*16*
85:7 89:*19*, *21*, *25*
96:*14* 97:*4*, *15*, *20*
98:*19* 99:*4* 102:*14*
118:*11*, *18* 121:5, *20*
122:*4* 125:*22* 128:*4*
137:*16* 141:*22*
143:*14* 153:*3*, *4*
154:*14*, *15* 155:7
166:*6*, *17* 167:*1*
173:*1*, *4*, 7 175:*12*
176:2 179:*11* 191:*22*,
*24* 192:*4*, *20*, *22*
193:*12* 194:*4* 196:*25*
197:*4*, *8*, *14*, *15*, *20*
198:*12*, *16* 227:*16*
228:*2*, *11* 238:*11*
242:*22*

**successor** 68:*14*, *24*
69:*14*, *19* 70:*14* 71:*8*,
*14*, *23* 72:*3*, *13*, *19*, *20*
73:*13* 74:*14* 75:*15*,
*24* 76:*3*, *16*, *25* 77:*6*,
*16* 84:*14*, *18* 85:*1*, *4*,
*14* 99:*6* 109:*13*
113:9 118:*20* 121:*22*,
*25* 122:5 131:*16*
132:*18* 133:*4* 135:*22*
141:*24* 151:*24*
152:*11*, *16* 153:5
164:*23* 169:*24*
182:*23* 193:*8*, *16*, *21*
194:*22*, *24* 197:*25*
239:*7*, *24* 240:*8*, *17*
242:*7*, *11* 243:*4*, *5*, *12*
245:2
**successors** 71:*18*
109:*14* 193:*14*
194:*15* 241:*14*
242:*16*, *20* 243:*1*
**suggestion** 238:*12*, *14*,
*16*
**suggestions** 124:9
147:*24*
**suitable** 142:*21*
**suites** 12:*17*
**Sullivan** 146:*14*
**summary** 124:*12*, *16*
206:*14* 224:*17*
**supervisor** 9:*23*
**support** 28:*13* 71:*12*,
*22* 72:*7*, 9 77:*14*, *17*
161:*17* 218:*24*
**supported** 71:*15*, *25*
72:5, *10*
**supportive** 264:*23*
**supports** 161:9
163:*12*
**supposed** 108:*3*, *13*
**sure** 13:*16*, *21* 25:*4*
38:*10* 40:*8*, *12*, *15*
42:7 60:*10*, *17* 65:*13*
66:*10*, *20* 70:*19* 88:*3*,
*21* 96:*19* 97:*11*
105:*11* 113:*17* 114:*6*
117:5 118:9 124:*3*
126:*10*, *14*, *23*, *24*
127:*11* 129:*19*

**133**:*21* 136:5, *15*
142:*24* 144:*20*
145:*11*, *13* 147:*21*
148:*10* 149:*16*
161:*16* 162:*15* 167:*3*
169:*1*, *19* 172:7
188:*4* 204:*1* 205:*18*
206:*3* 207:*12* 210:*24*
213:*13* 214:*10*
216:*20* 226:*15* 233:*1*
240:*21* 244:*8* 247:*11*
249:*11*, *17* 267:*8*
272:*20* 273:*18*, *24*
**surmising** 265:*13*
**surprised** 129:7
130:*10* 239:*11*
264:*22* 270:*17*, *20*
**survey** 124:*17*, *19*, *20*,
*21* 164:5, *13*, *18*, *19*
165:*10* 200:*17*
201:*21* 202:*14*
203:*13*, *15* 206:*22*
207:*10*, *13*, *17*, *21*, *25*
208:*3*, *12*, *16*, *21*
213:*18* 214:*14*
219:*24*, *25* 221:7
**surveys** 164:2 165:*1*
200:*21* 201:*7*, *10*
202:*25*
**Susan** 236:*17* 261:*16*,
*17* 262:9, *13*
**sworn** 5:*10*, *22* 281:8
**Sylvania** 2:*10*, *13*
**system** 11:*18*, *22*
12:*15*, *20*, *21* 65:*12*
111:9
**systems** 12:9 154:2

**< T >**
**take** 6:*17*, *21* 62:*19*
77:*24*, *25* 83:*19*
97:*12* 98:*24* 115:*4*,
*12*, *13*, *17*, *22* 116:*4*,
*15*, *20*, *21*, *22* 124:*24*
139:*11* 144:*23*
158:*24* 198:*1* 199:*12*
212:*14* 259:*3* 260:*10*
261:*18* 262:*1*
**Taken** 1:*16* 6:*7*, *14*
27:7 62:*12* 78:9

**125**:*11* 152:*20*
154:*20* 200:*3* 234:*21*
263:*3* 278:7 281:*11*
282:2, *8*
**takes** 164:*17* 165:*4*
**tale** 82:*25*
**talent** 9:*21* 82:*16*, *18*
83:*8* 89:5, 7, 9, *12*, *19*,
*25* 91:5, *23* 92:*1*, *4*, *6*,
*11* 93:9, *10*, *24* 94:*17*
96:*4*, *22* 97:*3*, *4*, *15*
98:2, *10*, *14*, *22* 99:*3*
100:2, 9 101:*10*, *15*,
*19* 102:*14*, *16*, *24*
103:*24* 104:7 105:*16*,
*18* 106:*1*, *7*, *11*, *25*
109:*1*, *3*, 5, *10* 110:*1*,
*8* 112:*1*, *2* 114:*20*, *23*
118:*23* 119:*3*, 7, *10*
120:*15*, *20*, *22* 125:5
126:*12*, *16*, *21*, *23*
127:*1* 128:*4*, *20*
129:*1*, *3*, *20* 130:*1*, *15*
131:*4* 132:*6* 133:*1*,
*14* 134:*16* 137:*16*, *21*,
*24* 138:*8*, *13* 139:*8*,
*20* 140:*3* 141:*11*
142:*1* 143:*14* 144:*9*,
*14* 146:*2*, *4*, *5*, *8*, *11*,
*25* 147:*8*, *14* 148:*14*
149:*4*, 7 150:5, *19*
151:*16* 153:*1*, *15*
154:*10* 155:6, 9
156:*18*, *24*, *25* 158:*1*,
*8*, *18* 159:*11*, *12*, *16*,
*21*, *23*, *24* 160:*1*, 7, *11*
161:2, *11* 163:6, *20*
166:6 169:*11* 172:*25*
175:*12* 176:2, *11*, *13*
177:5, 7, *12*, *15*, *18*, *21*,
*25* 178:*15* 179:*11*, *14*
190:*11*, *15* 193:6
195:*4* 197:*10* 206:*12*
207:*14*, *24* 208:*3*, *13*,
*17*, *19*, *20* 209:*25*
210:5, *13*, *17* 211:*3*,
*12* 212:5, *18* 213:5,
*13* 218:*20* 222:*21*
223:*13* 224:*1*, *10*, *24*
226:*20* 229:9 230:*4*

232:15  238:10
242:22  244:6
talk  7:21  25:16
30:4, 5  68:10  71:4
82:18  121:7  130:12
236:9, 25  244:5
262:9  265:15, 18, 19
talked  7:18  77:4
83:10  131:15  134:22
140:23  157:7  160:23
161:23  163:6  204:3
205:1  229:13  238:9
240:5  246:18  259:6
260:24  261:25
265:13, 14, 25  271:8
278:18, 19
talking  47:8  61:8
94:22  99:3  143:6, 8
144:1  148:1  155:14
200:21  240:15
247:18  262:11  265:9
274:2
talks  218:1  221:9
223:25
tall  82:25
Tanner  9:25  10:8, 11
Tayfun  33:3  38:1, 8,
12, 15  39:3  68:16
80:4, 7, 11, 15  122:1
193:15  197:10, 17
239:8, 24  240:9, 14,
18  241:2, 11, 13, 23
242:1, 11, 15, 20
243:1, 9, 24  244:11,
23  246:6, 11, 16
264:21  265:8, 10, 14
team  25:16, 20, 21
33:4  84:22  92:21
98:6, 9, 13, 15  99:4, 9
106:16  131:8, 13
141:3, 13, 15  142:7, 8
146:12, 13, 21  151:22
162:1, 13, 14  163:3
165:4  170:12, 19, 23
205:9  208:25  216:24
218:2  236:25  237:12
249:19, 20  254:20
263:6
teams  82:9  125:3

team's  66:4
technologies  12:24
technology  82:3
135:4  174:20
tell  53:11  55:6
162:4  177:21, 24
178:4  216:13  246:1
270:15, 16, 19
telling  55:14
temperature  124:24
ten  56:25
Teresa  9:25  10:8, 11,
13
term  29:19, 23  30:10
32:23  33:13  40:5, 13
41:8, 21  42:9, 12
43:11  49:11, 18
50:13  52:1  53:22
255:11
terminated  260:7, 16
262:4  275:4, 7
terminating  236:16
termination  260:3
terms  43:10  46:18
49:23  60:18  71:12
88:2  89:21  91:7
99:3  107:20  120:9
139:11  140:24
142:11  147:7  152:18
165:17  204:21
219:24  224:24
226:23  240:10
247:15  252:25  279:5
terrible  46:11
terrified  268:8, 12, 16
269:15
test  62:16
testified  25:10  35:1
40:8  41:6, 18  43:10
48:10  77:13  81:19
84:20  97:6  98:16
113:25  114:4, 11, 15
121:13  129:8  133:8
144:19  145:11  168:9
182:9  188:9  210:16
testify  187:2
testifying  217:8
229:25  236:5
TESTIMONY  1:14
4:3  15:22  17:1  21:1

24:6  27:1  36:18
40:1, 22  85:19  91:1
138:9  143:7  183:4
200:1  242:3  244:14
257:12  278:1
testing  60:24  62:11,
14
tests  60:23, 24
text  8:9  17:25  18:3,
7, 9, 13, 15  22:12, 19,
25  23:4, 14  24:2, 11,
15  30:16, 20  31:1, 5,
7, 9, 11  37:25  38:4,
24  39:1, 5  86:17, 20
87:1  88:5  184:17, 20,
22  186:11, 17, 23
187:10, 16, 17, 24
188:10  258:17, 19
259:8  261:3, 9
264:15, 17  265:7, 24
267:19, 20, 21  269:1,
11, 14, 19, 21  273:6, 9
275:23  276:1, 2
texted  180:20  261:11
texts  260:18  268:6, 7
271:4
Thank  55:1  137:6, 7,
13
Thanks  23:7  124:6
185:18  228:25
theme  217:4, 16, 25
thing  25:22  89:23
148:7  222:14  259:13
278:23
things  9:20  13:6, 7
14:24  25:11  84:3
99:16  106:20  134:22
135:14  136:6  146:10
158:13  159:1  163:16
164:8  165:16  224:5,
18, 19, 20  226:12
236:22
think  29:22, 24
32:13, 19, 20, 22
33:25  63:11  64:7
65:11, 24  82:24
87:16, 20, 25  88:19
93:5  94:4  116:17
123:5  140:25  148:7
156:8  158:12, 25

159:2  160:2, 22
161:20  163:11, 16
167:9, 23  178:1
195:24  197:17
198:10  201:11  204:8
212:11  222:4  235:7
236:19  237:11
239:22  246:16
250:17  254:7  259:16
263:22, 23  267:1
271:24  272:13, 15
thinking  28:11
104:10  142:8  158:9
226:23
thinks  146:3
THIRD  1:10, 16
2:24, 25  5:7, 19, 20
7:13, 21, 25  8:8  9:3
10:17  11:19, 22  12:3,
8, 15, 22  15:2  22:8
29:17, 20  32:7  33:12
37:7  43:15  44:6, 15
45:3, 4, 8, 14  46:4, 6,
8  47:1, 3  49:22
50:14, 25  51:19  52:2,
16  53:21, 24  54:7
55:5, 8  56:10  57:22,
23  59:10, 11  60:16
61:16  76:12, 16, 18,
25  77:2  78:18  81:11,
16  83:18  86:6  87:14
91:17, 19  95:6, 9
100:23  102:6, 7
103:16, 23  104:7
105:13  107:17  108:1,
10, 25  111:22  115:7
119:7  121:17  123:19
124:15  127:22, 23
128:23  129:18, 25
132:13  134:1  135:18
137:3, 7, 10, 18
142:22  143:4, 17
144:3, 7, 13, 15  145:7,
14, 16  146:12  149:9
150:4  152:24  155:3,
8, 13  157:16  161:14,
18  162:5, 15  164:23
165:25  166:1, 9, 10,
16  172:19, 20, 21
173:2  174:18  175:7,

Deposition of Robert Paul Shaffer                                         Philip R. McHugh v. Fifth Third Bancorp, et al.

8, 17 178:10 179:6, 7
181:2 184:12 189:5,
6 191:20 198:21
200:11, 16, 24 201:3
202:8, 9, 13, 16
203:20 205:16
209:10, 11, 17, 18
215:10, 25 216:5, 23
218:16 219:22 220:8
221:1 224:13, 14
227:5, 21 229:4
230:25 233:16
235:21 238:1, 23
251:3 256:11 258:7
260:3 262:17, 19
264:6 266:12, 23
267:11, 16, 18 268:25
270:21 273:20
276:13 282:4
third-parties 201:13
third-party 61:17, 21
124:21 149:1 201:12
203:21 240:4 245:20
Third's 45:13
Thomas 2:25 5:19
thought 29:24 32:22
92:18 97:9 100:11
130:13 141:2 228:24
232:10 267:15 272:7
thoughtful 131:11
thoughts 64:7 83:23
123:1 207:1 228:25
236:19
thousand 251:20
three 7:4 50:18
55:6 56:10 87:6
88:7 116:5 162:2
166:18 167:7, 19
173:8 174:3 228:5
239:5 262:3, 4
263:24
three-plus 173:8
174:4, 10
Thumbs 265:5
Thursday 179:20, 23
228:4
ties 163:10
tight 78:5
Tim 11:10 13:24
14:6 25:24 26:3

42:19, 22, 25 43:7
75:1, 2, 8, 9 81:24, 25
83:14, 15, 18 115:19
118:12, 23 119:8
120:12, 19 121:1, 10
125:20 127:4 130:1,
24 133:9, 20 135:1
145:16 146:3, 11, 15,
21 147:4, 6, 7 148:2,
7, 8, 10 150:7, 16, 22
151:2, 7, 17 152:5, 13,
14 153:5 155:10
158:10, 15 159:9
160:25 161:24 162:4,
17, 23 163:18 165:3
166:15 167:6 168:20
173:7 174:3 181:1
182:5, 23 184:17
185:2, 8, 18, 21 193:7,
10, 21 196:17 220:15,
17, 25 221:22 222:9
225:16, 24 226:2, 7
227:4 228:14, 21
229:3 230:7, 11, 21,
22 231:8, 10, 20, 23
232:6 233:5, 8, 15, 24
234:4, 11 239:7, 10,
17, 23 240:6, 12, 17,
25 241:2, 14, 23, 24
242:7, 10, 15 243:8,
11, 23 244:11, 22
245:1, 18, 23 246:17
247:9 248:9, 23
249:2, 5, 13, 15, 25
250:12, 19 253:15, 20
254:3, 4 257:3
259:11 262:3, 24
263:4 264:16 265:1,
5, 12, 22 267:22
269:23 270:2, 13
271:2, 6 272:11, 22
273:1 279:11, 17
Time 1:16 5:2, 8
11:11 12:12, 22, 25
13:3, 5, 10, 24 14:12
15:7 18:20 19:1, 6,
15, 21 20:7 22:21
23:10, 17 24:3, 13
26:4 27:5, 10 30:6,
15 31:23, 25 32:5, 6,

10 34:7, 20 36:16
41:17 43:13 46:23
50:20 60:17 61:9
62:18 64:12, 17
68:17 71:3 72:22
73:2, 7 76:10, 14, 23
78:7, 11 83:25 84:4
85:1, 15, 16 87:19, 25
88:19 93:8 98:4
114:19 115:17, 23
116:4 118:21 120:11
121:4 123:1 125:9,
13 126:5 133:2, 8, 13
134:5 136:8, 12, 22
143:14 146:11, 24
147:1 148:24 150:25
151:4, 10 152:21, 22
153:11 154:17, 22
163:2 164:17 165:5,
9 167:11 170:24
174:8, 16 177:3
179:25 192:20, 23
193:24 194:7, 11, 19
196:5, 10 197:21, 25
198:3, 6, 11, 16
199:19 200:5 201:13
205:10 207:1 214:22
216:12, 14 222:7, 12
228:17 229:13
230:20, 21 231:1, 16
232:16 233:2 234:3,
10, 18, 23 235:18
236:11 237:12 238:4
239:16 240:3, 9
245:6 246:2 250:24,
25 251:16 252:19, 21,
22 256:11 257:2, 6, 7
259:7, 8, 17, 19
262:21 263:8 271:5
274:10 278:5, 9, 21
279:22 281:10
timeline 73:16 173:7
174:3 196:22 233:4
timelines 233:4
timely 139:11, 16, 20
210:12 211:12
212:14 213:12
times 18:22 30:14
31:16 42:25 43:10
49:22 50:15, 18, 25

51:7 54:23 56:16, 24,
25 58:8 64:4 83:11
165:3 262:3, 4
275:17
timing 133:22 228:9,
10 229:20
Tim's 131:18 146:3,
5 157:20 161:7
164:14 167:13 221:6
228:17, 18 229:11
231:1, 2 239:19
title 10:10 96:5
121:20 153:3
Today 5:1 8:3, 12
43:6 51:22, 25 55:4
81:5 135:3 146:18
171:15 229:25
232:13 260:24
261:15
today's 7:16
told 71:14 88:10
114:11, 14 245:25
261:17 267:10 270:6,
7, 17, 19, 22
tolerable 262:18
tomorrow 23:3
125:23 258:25
260:12, 14, 16 265:3,
4
tool 28:17 44:15
45:3 164:6
Toolkit 96:8 98:18
top 82:21 192:22
193:11 194:4 231:17
251:21 252:14
261:11 262:5 263:9,
24
topic 25:9 46:17
198:18
topics 23:24 28:12
61:13, 22 100:8
170:23 205:11
232:12
top-level 89:19
Total 263:18, 19
totaled 213:18
totaling 213:24
totality 160:23 161:6
tough 83:21 139:13

163:5
**train** 30:4 43:21
**training** 28:22, 23
29:1 40:17 41:1
60:11, 22, 24 61:4, 6,
12, 14, 19, 23 62:1, 8,
13, 17
**trainings** 61:2 62:14
**TRANSCRIPT** 1:14
46:20 282:7
**transformation**
130:19 135:4 158:18
**tree** 167:12
**tremendous** 130:25
158:16
**trends** 130:18
**tried** 262:8
**tries** 274:9
**trigger** 167:14
**true** 226:13 255:7
259:21 273:10
282:10
**truth** 281:8, 9
**try** 6:19 13:17 50:3
77:18 87:3 165:17
239:17
**trying** 53:1 87:15
97:2, 12 101:24
166:24 187:2
**tuning** 166:24
**turn** 145:14 152:24
166:8
**Turning** 192:10
**Tuzun** 33:3 38:1, 12
68:16 80:3, 7, 11, 15
122:1 193:15 197:1,
9, 10
**two** 7:5 72:25 73:4,
10, 21 74:10 79:17
80:1, 9, 13, 25 83:1
94:18, 19, 22 98:5, 24
109:17 112:22
113:21 114:13 117:8
118:12, 24 119:22, 23
121:22 122:5, 24, 25
123:7, 11 129:11
132:1, 6, 18 140:16
143:25 146:20 150:9,
17, 24 151:3, 18
153:6 166:17, 18

167:7, 8, 11, 19, 20
168:1 173:8 174:3,
22 191:1, 3, 18
197:22 209:18
220:13 221:18 233:5
234:7 240:11 250:17
253:25 264:5 272:13
**two-part** 272:19
**type** 100:9 107:6
144:25 204:9, 14
205:1, 6 219:16
240:4 274:3
**types** 161:25 225:14
**typical** 136:3
**typically** 60:23
61:19 63:3 98:20
159:15 189:17, 24
201:12

< U >
**Uh-huh** 22:22 38:6,
14 44:11 62:25
64:19 66:22 67:2, 21
69:10 70:15 86:19,
25 87:10 112:4
119:12 130:16 149:5
150:6 155:21 156:23
158:4 160:19 173:3,
10 186:14 192:11, 16
193:2 205:4 207:9
210:2 212:4 213:19
219:10 221:8, 13
223:21 233:12 265:6
268:9
**uh-huhs** 6:16
**uh-uhs** 6:16
**ultimate** 92:7 135:22
227:15 229:19
**ultimately** 71:16
77:15 81:13, 24 98:7
106:8 135:1 141:22
149:21, 23 167:3
168:2 170:1 197:23
217:1 230:18 249:2,
23 273:1
**unattractive** 169:4
**uncommon** 254:6
**unconscious** 59:16,
19, 22 60:1, 2, 7, 12

61:7
**unconsciously** 29:10
**underneath** 164:16
**undersigned** 281:4
**understand** 6:12, 22
19:13 24:21 29:9
40:24 50:8, 22 51:4,
11 52:10 53:1, 9
54:11 55:14 57:4
58:1, 11, 13 59:16, 24
60:7 69:4 74:4
79:18 82:7 89:10
133:16 141:20
163:14 187:8 201:9
211:16 216:19
217:15 218:19
249:18, 21 256:19
261:14 274:21
**understanding** 29:1
60:5 134:2 148:11
170:10 218:2 282:13
**understands** 243:18
**understood** 40:16
41:2, 8 236:12
**Unfortunately** 236:23
**unilaterally** 174:2
**UNITED** 1:2 5:4
251:11
**University** 7:8
**unknowingly** 29:10
59:20
**unplanned** 197:3
**unsatisfactory** 206:9
**upcoming** 228:4
**Update** 91:23 92:17
102:14, 24 128:5
137:17 146:2 158:8
**updated** 125:5 136:6
**updates** 13:2 155:7
166:7 173:1 175:12
179:12 223:16
**upgrade** 12:24
**upset** 30:18
**urgency** 197:24
**use** 11:18 12:15
15:13 17:8, 11, 14
20:14, 19 27:19 29:2
33:13 37:19 40:5
41:6, 21 42:9 49:23,
24 52:1 86:12 89:9,

12 93:9 124:13, 20
163:15 201:12 207:2
238:8 239:16
**uses** 203:20
**usual** 23:23 76:8
84:23
**utilize** 97:2 110:17
164:6 238:10 248:7
**utilized** 157:19 238:4

< V >
**vacation** 259:16
**validate** 122:17
160:4
**Valley** 25:15 198:2
**valuable** 36:15
146:17
**variable** 251:18
**various** 28:10 100:8
105:24 170:23
201:17
**verbal** 140:10 246:3
**verbally** 6:15 271:5
**Verizon** 17:18, 19, 22
**versatile** 218:1
**version** 13:2 94:10
106:1, 11 118:19, 23
144:14 145:19
155:20 157:18
159:13 166:16, 19
167:22 168:12
178:15 179:13
190:11 209:15
220:23 247:22
**versions** 37:20 168:5,
8
**versus** 5:7 12:18
131:17 145:1
**vetted** 271:13
**vetting** 271:8
**video** 6:15
**Videoconference** 2:10
**Videographer** 1:24
5:1 27:5, 10 78:7, 11
125:9, 13 154:17, 22
199:19 200:5 234:18,
23 278:5, 9 279:22
**Videotaped** 1:16
**view** 36:13 97:5
147:6, 7 150:2

Deposition of Robert Paul Shaffer
Philip R. McHugh v. Fifth Third Bancorp, et al.

160:24 161:8 166:25
167:6, 15, 18 169:4
193:21 194:23
203:22
viewed 85:15 158:2
159:3, 8 160:18
161:3 163:25 193:8
196:18
viewing 37:22
viewpoint 124:17, 19
164:2, 5, 13, 17
200:21 201:7, 10, 21
202:25 207:8, 10, 13,
17, 20, 25 208:3, 12,
16, 21 213:17 219:23,
25 221:7
Viewpoints 200:17
202:14 206:22
views 84:10 88:1
121:7 132:23, 25
138:14 139:4, 6
153:8, 9 159:19
160:3
visibility 97:5
vision 75:22 81:20
161:22
visit 218:18
visual 221:10
volume 222:12
voluntarily 261:19
275:10
voluntary 275:13
voted 233:5
vs 1:9 282:4

< W >
wait 6:18
Walnut 1:22
WAM 126:5 215:1, 4
want 23:2 27:12
30:18 33:15 38:10
41:13, 25 46:12
47:16 49:24 50:4
51:13 57:8, 25 58:10
59:3, 5 72:24 76:17
77:21 82:13 83:16
94:7 100:2 101:3
124:1, 14 152:23
154:14 164:10
170:14, 16 174:17, 24

198:22 199:15, 16
201:15 228:15, 24
231:7, 20 232:9
233:9 236:17 241:11
246:6, 11, 21 256:15
259:11 262:2, 10
271:1 274:14
wanted 36:2 65:25
66:10, 16 67:4 68:10
71:5 73:9, 21 74:9
77:18 79:15, 25
80:12, 24 88:2 92:10,
18 96:13 98:24
99:12 160:5 168:13
178:2 197:24 199:12
216:9 220:18 225:24
226:2 231:6 238:3, 8,
17 240:5, 6, 10, 12
241:14 242:16, 18
248:21 254:4, 10
259:10 262:2 263:6
265:21 271:1 278:25
279:2
wanting 180:15
270:25
wants 89:15 157:12
204:10, 11, 15 216:13
239:19, 21 240:25
waste 46:23
watch 171:19
way 54:13 81:5
83:12 84:7, 9 86:10
143:24 165:7 223:12
240:2 257:8 259:23
269:3
ways 155:14 218:4
weakness 212:18, 22
wealth 83:3 126:5
215:2, 4 255:4, 20
256:8, 21 257:4
website 61:5
week 88:10 178:20,
25 207:4 228:4
239:18
Well 23:19 29:6
48:2 53:1 60:3, 23
70:20 75:2, 9 77:20
81:13, 22 82:11 87:4
88:19 89:1, 11 92:13,
20, 22 93:3, 18 94:8,

11 98:4 99:1, 5
100:5 101:20 104:19
105:9 110:7 111:7
118:19 121:2, 8
124:25 125:2, 21
126:15 131:17
133:15 135:9 136:13
138:14 139:1, 3
140:10, 20 144:18
146:1 149:15, 20
157:21 163:11
164:10, 11 168:7
173:18, 20 179:25
192:5 202:2 203:24
207:2 208:11 211:21
215:24 216:24
218:20 220:4 224:23
225:15 229:22
231:22 236:12, 15
237:25 248:23
253:25 256:24
260:12 266:11, 21
267:1, 6, 9 271:19
272:18
Wendy 1:22 281:4
went 25:13 61:1
106:13 127:8 149:4
168:1 178:12 198:1
222:8, 10 236:20
240:16 244:10 257:2,
3 265:25 266:7, 19
267:7
We're 5:2 18:23
25:15, 21 46:10 53:1
64:12 94:22 99:15
106:21 107:15 115:6
149:24 161:12 164:9,
10 167:23 174:6
208:19 212:21
234:19, 24
WESTERN 1:4 5:5
We've 20:17 76:1
77:20 93:11 102:15
139:3 152:12 154:1
157:7 168:8 170:23
176:13 188:24
234:15 235:9 236:24
264:12
WHEREOF 281:18

whiteboard 99:11, 24,
25 101:16 113:14
117:25 118:2 122:7
whiteboarding 100:7
104:10
wholesale 165:4
wife 7:4
Williams 154:4
168:9 171:18 175:23
176:7, 18 177:6
willing 219:5
winning 247:18
wins 93:10
witness 5:10, 22
13:16 14:3, 16 16:5
20:3 24:8 25:3, 5
33:21 35:1, 10, 18
37:15 38:22 41:18
42:5 45:10, 24 47:7
49:6 50:8 52:10
53:8 54:2 55:25
56:4, 15 60:15 70:5
72:9 74:17, 19 75:13
76:21 97:23 107:4
108:7 109:19, 21
117:13 121:13
122:16 143:11
148:23 160:14 169:1
170:8 171:14, 23
172:5 174:14 180:22
181:5, 15 182:1, 8, 17
183:2 188:9, 20
202:1 210:11 212:21
215:20 223:2 225:3
227:8 229:8 230:2,
14 231:15 235:15
242:6 244:19 245:11
246:8 247:6 248:12
249:9 250:3, 17
252:7, 18 254:16
255:22 259:21 260:7
266:16, 25 267:14
271:23 273:24
274:19, 22 275:7
281:18
witnessed 163:2
won 131:2
Word 206:5 219:13
243:19 267:22 268:6

Deposition of Robert Paul Shaffer Philip R. McHugh v. Fifth Third Bancorp, et al.

**wording** 178:*19*
**words** 101:*23* 269:*14*
**work** 8:*16* 10:25
23:22 28:*15* 67:5
88:*11* 98:*9, 14, 15*
105:5, *6* 124:6 148:8
149:*15* 165:5, *14*
201:*12* 203:6 215:25
224:5, *19, 21* 225:12
228:*3* 235:*17* 240:4
263:*1* 270:8
**worked** 66:2 84:*3*
93:4 98:5 126:*10*
170:*12*
**workforce** 43:*19*
103:22 104:5, *6, 17,
20* 105:2 146:6
201:*16*
**working** 25:2*1* 32:8
92:*15* 124:25 149:*24*
227:12 228:*3* 236:*24*
237:*1*
**workplace** 43:*22*
50:*15* 59:*23* 60:2, *8,
9* 103:*23* 170:*20*
**world** 148:*14*
**worried** 101:*23*
**write** 126:*23* 196:*20*
258:*24*
**writing** 67:6 134:*11*
139:*17, 18* 140:5, *11*
142:*15, 19* 143:*1*
152:16 153:*10* 195:*1,
3* 242:25 243:*3*
244:*10* 245:*17*
246:*24* 275:*19, 20, 22*
278:*17, 18* 279:6
**written** 5:*18* 22:*21*
63:9 220:*16* 279:*8,
15*
**wrong** 113:*11*
218:*10* 242:5
**wrongly** 113:*25*
**wrote** 23:*14* 39:5
190:*12* 216:6
**Wyman** 81:*23*
133:*10* 135:*1*

**< Y >**

**Yeah** 22:*24* 35:*25*
62:*23* 65:*1, 2* 74:5
78:5 84:*10* 89:3
95:*13* 101:*17* 108:22
109:*11, 20, 25* 110:9
111:*17* 112:*15*
113:*15* 115:*3, 15, 23,
24* 116:*1* 132:2, *3*
148:7 149:*8, 13*
155:*17* 160:22
162:*21* 165:2 167:*17*
168:*17, 18* 170:8
178:*1, 3* 179:*1*
190:*13, 15* 192:9
193:*13* 194:9 198:*18*
199:*18* 201:*11*
203:*24, 25* 206:*1*
209:*14* 212:*11*
214:*24* 218:*15* 222:*3*
223:*24* 224:*3* 236:*19*
241:*21* 242:6 247:*21*
254:*16* 264:*20*
265:*18* 269:*23*
270:*24* 274:*19*
**year** 7:9 10:4 61:*12*
63:*7, 12* 92:*17* 93:*11,
13* 94:*16* 95:*1* 98:22
101:*20* 104:22
106:*17* 110:6 111:*10,
11, 12, 20* 117:*19*
120:*23* 131:*3* 139:*2*
140:*4* 142:5 150:*9,
17, 23* 151:*3, 18, 21*
157:*21* 169:*20*
200:*23, 25* 201:*1, 2, 4*
206:*3* 209:*2* 216:*23*
218:6 219:*17* 223:*4,
15* 231:*18* 252:*21, 22,
25* 253:*3* 263:*11*
**yearend** 159:*23*
232:*17*
**years** 7:2 17:6 32:*2,
4* 55:6 56:*10* 72:25
73:*4, 10, 22* 74:*10*
79:*17* 80:*1, 9, 13, 25*
82:23 112:22 113:2*1*
114:*13* 117:8 118:*12,
25* 119:22, *23* 121:22
122:5, *25* 123:*11*
128:22 129:*11* 132:*1,

6, 18* 140:*17* 150:*9,
17, 24* 151:*3, 18*
153:6 165:9 166:*17,
18* 167:7, 8, *11, 12, 19,
20* 170:*13* 173:8, *9*
174:*4, 10* 176:*24*
181:*20* 234:*16* 252:*6,
8*
**year's** 157:*18*
**Yep** 234:*8*
**yesterday** 261:*18, 21*

**< Z >**
**Zaunbrecher** 236:*17*
261:*17*
**zone** 259:*19*