Case: 1:21-cv-00238-MRB Doc #: 77-15 Filed: 06/27/25 Page: 1 of 106 PAGEID #: 3723

Deposition of Timothy Spence                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

1               UNITED STATES DISTRICT COURT

2                SOUTHERN DISTRICT OF OHIO

3                   WESTERN DIVISION

4

5     ------------------------  :
                                :
6     PHILIP MCHUGH,            :
                                :
7          Plaintiff,           :
                                :   CASE NO. 1:21-CV-00238
8       vs.                     :
                                :
9     FIFTH THIRD BANCORP, et   :
      al.,                      :
10                              :
           Defendants.          :
11    ------------------------  :

12

13

14          Videotaped
            Deposition of:    Timothy Spence

15          Taken:           By the Plaintiff

16          Date:            October 11, 2023

17          Time:            Commencing at 9:30

18          Place:           Fifth Third Center
                             511 Walnut Street,
19                           Cincinnati, Ohio 45202

20          Before:          Sydney Jackson
                             Notary Public - State of Ohio
21                                  and
                             Bruce L. Sandy, Videographer

22

23

24

25

```
 1    APPEARANCES:

 2

             On behalf of the Plaintiff:
 3
             Peter A. Saba, Esq.
 4           Joshua M. Smith, Esq.
             Bailey Wharton, Esq., via videoconference
 5                   of
             Stagnaro, Saba & Patterson Co.,
 6           2623 Erie Avenue
             Cincinnati, Ohio 45208
 7           Phone:  513.533.2701
             E-mail: Pas@sspfirm.com
 8                   Jms@sspfirm.com

 9

             On behalf of the Defendants and the Deponent:
10
             Michael L. Cioffi, Esq.
11                   of
             Blank Rome LLP
12           1700 PNC Center
             201 East Fifth Street
13           Cincinnati, Ohio 45202
             Phone:  513.362.8700
14           E-mail: Michael@blankrome.com

15
             Also Present:
16
             Philip R. McHugh
17           Phenise Poole, Esq., Fifth Third Bancorp
             Brian C. Thomas, Esq., Fifth Third Bancorp
18

19

20

21

22

23

24

25
```

```
1                          I N D E X

2

3    TIMOTHY SPENCE                                    PAGE

4      Examination by Mr. Saba                            5

5

6    EXHIBITS                          MARKED      REFERENCED

7    Exhibit 1                           10           10
     Exhibit 2                           10           10
8    Exhibit 3                           12           12
     Exhibit 4                           14           14
9    Exhibit 5                           20           20
     Exhibit 6                           33           33
10   Exhibit 7                           36           36
     Exhibit 8                           38           38
11   Exhibit 9                           43           43
     Exhibit 10                          50           51
12
     Exhibit 11                          57           57
13   Exhibit 12                          57           57
     Exhibit 13                          63           63
14   Exhibit 14                          64           65
     Exhibit 15                          75           75
15   Exhibit 16                         113          114
     Exhibit 17                         119          119
16   Exhibit 18                         127          127
     Exhibit 19                         131          131
17   Exhibit 20                         138          138

18   Exhibit 21                         151          151
     Exhibit 22                         162          162
19   Exhibit 23                         174          174
     Exhibit 24                         185          185
20   Exhibit 25                         189          189
     Exhibit 26                         204          204
21   Exhibit 27                         233          233
     Exhibit 28                         233          233
22   Exhibit 29                         237          237
     Exhibit 30                         239          239
23

24

25
```

Deposition of Timothy Spence                                           Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 4

1    VIDEOGRAPHER: Today is October 11, 2023. The
2  time is 9:39 a.m. We're on the record for the
3  deposition of Timothy N. Spence for a case pending in
4  the United States District Court, Southern District of
5  Ohio Western Division, entitled Philip R. McHugh,
6  plaintiff, versus Fifth Third Bancorp, et al.,
7  Defendants, Case Number 1:21-cv-00238.
8      If at this time all counsel present would
9  introduce themselves for the record, then the witness
10 can be sworn in.
11     MR. SABA: Peter Saba on behalf of the
12 plaintiff, Philip McHugh.
13     MR. SMITH: Joshua Smith on behalf of the
14 plaintiff, Philip McHugh.
15     MR. CIOFFI: Michael Cioffi and Collin Hart of
16 Blank Rome on behalf of all the defendants, and also we
17 represent Mr. Spence personally.
18     MR. THOMAS: Brian Thomas for Fifth Third.
19     MS. POOLE: Phenise Poole for Fifth Third.
20     MR. CIOFFI: It looks as though you have
21 counsel participating by Zoom. Whoever's on the Zoom or
22 video, please identify yourselves.
23     MR. SABA: Bailey Wharton from our office is
24 attending is also attending via Zoom.
25     MR. CIOFFI: Anyone else?

Page 5

1      MR. SABA: No, not that I'm aware of.
2
3              EXAMINATION
4  BY MR. SABA:
5      Q. Mr. Spence, can you go ahead and state your
6  name for the record, please, and spell your last.
7
8              TIMOTHY SPENCE
9  of lawful age, a witness herein, being first duly sworn
10 as hereinafter certified, was examined and deposed as
11 follows:
12
13              EXAMINATION
14 BY MR. SABA:
15     Q. Mr. Spence, can you go ahead and state your
16 name for the record, please, and spell your last name.
17     A. Tim Spence. S-P-E-N-C-E.
18     Q. Have you had your deposition taken before?
19     A. Once.
20     Q. When did you have your deposition taken?
21     A. Eight, nine years ago.
22     Q. Why was your deposition taken?
23     A. There was a matter involving the U.S. Treasury
24 where I was asked to provide testimony as an expert
25 witness.

Page 6

1      Q. What was the nature of the case?
2      A. It related to IRS compliance practices.
3      Q. Who were the parties to that case?
4      A. I don't recall. I wasn't a subject of the
5  investigation. It was an internal -- it was TIGTA, the
6  Treasury Inspector General.
7      Q. Who was the subject of the investigation?
8      A. I don't recall. I don't think they ever
9  disclosed it to me.
10     Q. As a reminder, I'm going to be asking a series
11 of questions. If there's anything you don't hear or
12 don't understand, please feel free to ask me to repeat
13 or rephrase the question.
14     For the sake of the court reporter, although
15 we're taking this via video today, I do need you to
16 answer verbally. No shaking or nodding of the head or
17 uh-huhs or huh-uh's. It's difficult for her to take
18 that down.
19     A. I think I can manage that.
20     Q. Additionally, if you wait for me to finish my
21 question before you answer, and I'll also do the same in
22 waiting for you to finish your answer before I ask
23 another question, it also makes it easier for the court
24 reporter to take that information down.
25     Do you understand all those instructions?

Page 7

1      A. I do.
2      Q. Can you give me your address, please?
3      A. ███████████████████████████████
4      ██████████
5      Q. How long have you lived there?
6      A. A year and a half, roughly.
7      Q. Who do you live there with?
8      A. My wife and my three children.
9      Q. How long have you been married?
10     A. 16 years.
11     Q. What did you do to prepare for today's
12 deposition?
13     A. I met with my attorneys.
14     Q. Anything else?
15     A. No.
16     Q. Did you review any documents in preparation
17 for today's deposition?
18     MR. CIOFFI: Objection. I'm going to let him
19 answer the question as to whether he reviewed any
20 documents. Any documents he reviewed were at my
21 direction and I'm not going to let him describe those
22 documents to the extent any exist.
23     THE WITNESS: Only those documents provided by
24 my attorneys.
25

Deposition of Timothy Spence                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 8

1  BY MR. SABA:
2      Q.  Have you discussed this litigation with anyone
3  at Fifth Third other than legal counsel?
4      **A.  No, I have not.**
5      Q.  Have you discussed any of the issues with Phil
6  McHugh since his departure with anyone at Fifth Third
7  own than counsel?
8      **A.  Could you be more specific?**
9      Q.  Sure.  Have you discussed anything about Phil
10 McHugh with anyone at Fifth Third other than legal
11 counsel since Phil McHugh's departure from Fifth Third?
12     **A.  I have not.**
13         MR. CIOFFI:  Objection to the question.  You
14 said discuss anything about Phil McHugh, or you -- your
15 first question was about this, this lawsuit.
16         MR. SABA:  Correct.
17         MR. CIOFFI:  And now you made it broader to
18 anything about Phil McHugh.
19         MR. SABA:  Correct.
20         MR. CIOFFI:  Which question are you asking?
21         MR. SABA:  I already asked the litigation
22 question.  He answered that.  Now I'm asking about Phil
23 McHugh.
24 BY MR. SABA:
25     Q.  Have you had any conversations with anyone at

Page 9

1  Fifth Third other than legal counsel about Phil McHugh
2  since Phil McHugh's departure from Fifth Third?
3      **A.  Yeah, I had to communicate Phil McHugh's prior**
4  **direct reports that he had elected to leave the bank.**
5      Q.  Anybody else?
6      **A.  To -- I would imagine that I had to**
7  **communicate to other members of the management committee**
8  **that Phil McHugh had elected to leave the bank as well.**
9      Q.  When were those conversations?
10     **A.  Immediately following Phil McHugh's choice to**
11 **leave the bank, so they would have been in mid-October**
12 **roughly.**
13     Q.  Have you had any conversations with anyone at
14 Fifth Third Bank regarding Phil McHugh since mid-October
15 of 2020?
16     **A.  Not to my recollection.  Not to my -- not that**
17 **I recall.**
18     Q.  Have you discussed this litigation with anyone
19 outside Fifth Third other than legal counsel?
20     **A.  No.**
21     Q.  Have you had any discussions with anyone
22 outside Fifth Third regarding Phil McHugh since his
23 departure from Fifth Third Bank?
24     **A.  Not that I recall.**
25     Q.  What's your date of birth?

Page 10

1      **A.  ▓▓▓▓▓▓, 1979.**
2         (Exhibit 1 is marked for identification.)
3  BY MR. SABA:
4      Q.  Mr. Spence, I've handed you what's been marked
5  as Exhibit Number 1.  Are you able to identify that for
6  me, please?
7      **A.  It appears to be Phil's profile as it would**
8  **have been found on our website.**
9      Q.  Referring you to the second paragraph of
10 Phil's profile, it says Phil joined Fifth Third Bank in
11 1986 as a bank associate.
12         Do you see that?
13     **A.  I do.**
14     Q.  How old would you have been in 1986?
15     **A.  Seven.**
16         (Exhibit 2 is marked for identification.)
17 BY MR. SABA:
18     Q.  Mr. Spence, I've handed you what's been marked
19 as Exhibit 2.  Can you identify that for me, please?
20         MR. CIOFFI:  Objection.  What's the relevancy
21 of this photograph?
22         MR. SABA:  This is an age discrimination case,
23 as you know because you've litigated a lot of them.  The
24 primary issue in this case is age.  Do you understand
25 that?

Page 11

1         MR. CIOFFI:  No, that's not the primary issue.
2  The primary issue is whether age was a factor in the
3  decision by the board of directors.  Not Mr. Spence's
4  age.  That's not the issue.  That's why I'm raising the
5  relevancy objection.
6         MR. SABA:  Yes, it is an issue.  Your opinion.
7  You've raised your okay.  Go ahead, Mr. Spence.
8  BY MR. SABA:
9      Q.  Can you identify Exhibit 2, please?
10     **A.  That looks like a photo of me.**
11     Q.  And that's when you were 7-years-old; is that
12 right?
13     **A.  It appears so.**
14     Q.  And where were you at age 7?
15     **A.  In Portland, Oregon.**
16     Q.  And you would have been in the 2nd grade; is
17 that right?
18     **A.  I don't know.  I would have to go and look.**
19     Q.  Do you know what grade you were in?
20     **A.  Not without going back and looking at it, no.**
21     Q.  Were you --
22     **A.  I would have been in primary school.**
23         MR. CIOFFI:  Good-looking kid.
24         THE WITNESS:  Yeah.  Had to be one of a
25 thousand that looked all right.

Deposition of Timothy Spence                 Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 12

1       (Exhibit 3 is marked for identification.)
2 BY MR. SABA:
3     Q.  Mr. Spence, I've handed you what's been marked
4 as Exhibit Number 3.  Can you identify that for me,
5 please?
6     **A.  I've never seen it before.**
7     Q.  You're not familiar with this document?
8     **A.  Certainly not in this format.  It looks like**
9 **it vaguely like the talent cards that we would use**
10 **today, but I haven't seen this one.**
11     Q.  And with respect to the job history, it lists
12 for Phil McHugh on Exhibit Number 3, it indicates that
13 he became vice president institutional trust and
14 investment services in 1992.  Do you see that?
15       MR. CIOFFI:  Objection.  The document speaks
16 for itself.  The witness has testified that he's never
17 seen the document before.  It says what it says.  Do you
18 want him to read --
19 BY MR. SABA:
20     Q.  Go ahead, Mr. Spence, answer the question?
21       MR. CIOFFI:  -- what it says?
22       THE WITNESS:  Yes.  It says vice president
23 institutional trust and investment services in 1992.
24 BY MR. SABA:
25     Q.  And how old were you in 1992?

Page 13

1     **A.  13.**
2     Q.  Do you know how old Phil McHugh was in 1992?
3     **A.  I don't.**
4     Q.  Okay.  Let me represent to you he was
5 28-years-old in 1992.  Where would you have been when
6 you were 13-years-old in 1992?
7       MR. CIOFFI:  Objection.  Relevancy.  Waste of
8 time.
9       THE WITNESS:  Portland, Oregon.
10 BY MR. SABA:
11     Q.  And what grade would you have been in?
12     **A.  Again, I don't recall, but probably middle**
13 **school.  I certainly didn't need glasses to read these**
14 **things at that point in time.**
15     Q.  Referring again to Exhibit Number 3, it
16 indicates that in 1994 Mr. McHugh became the senior vice
17 president trust and investment services Fifth Third Bank
18 Louisville.
19     Do you see that?
20       MR. CIOFFI:  Continuing objection.  Same
21 objection.
22       THE WITNESS:  I do.
23 BY MR. SABA:
24     Q.  At that time, Phil McHugh was 30-years-old.
25 How old would you have been in 1994?

Page 14

1       MR. CIOFFI:  Objection.
2       THE WITNESS:  15.
3       (Exhibit 4 is marked for identification.)
4 BY MR. SABA:
5     Q.  Mr. Spence, can you identify Exhibit Number 4
6 for me, please?
7       MR. CIOFFI:  Objection.  Again, photographs of
8 the witness when he was an adolescent.  Totally
9 irrelevant and a waste of time.
10       THE WITNESS:  It appears to be a high school
11 year book.
12 BY MR. SABA:
13     Q.  And that's your high school year book photo;
14 is that correct?  You appear on the second row, third
15 photo from the left; is that correct?
16     **A.  I do.**
17     Q.  Okay.  How old are you in that photo?
18     **A.  I don't recall.  What year was it?**
19     Q.  This would have been in 1994.
20     **A.  15.**
21     Q.  In March of 2001, 37-year-old Phil McHugh was
22 promoted to vice president in charge of the commercial
23 division for Louisville.  How old would you have been in
24 March 2001?
25       MR. CIOFFI:  Objection.

Page 15

1       THE WITNESS:  22.
2       MR. CIOFFI:  Relevancy.
3 BY MR. SABA:
4     Q.  And where would you have been when you were
5 22?
6     **A.  At what month when I was 22?**
7     Q.  March of 2001?
8     **A.  At Colgate University in Hamilton, New York.**
9     Q.  What year did you graduate from Colgate
10 University?
11     **A.  2001.**
12     Q.  What was your major at Colgate University?
13     **A.  English with a minor in economics.**
14     Q.  Referring you back to Exhibit Number 1.  In
15 the second paragraph, the last sentence of the second
16 full paragraph indicates, in January 2005, Phil was
17 promoted to president and CEO of Fifth Third Bank
18 Louisville.
19     Do you see that sentence?
20     **A.  I do.**
21     Q.  How old were you in January 2005?
22       MR. CIOFFI:  Objection.
23       THE WITNESS:  When in January of 2005?  Before
24 or after the 23rd?
25

Deposition of Timothy Spence                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 16

BY MR. SABA:

Q. Assume it's after the 23rd.

A. 26.

Q. And where were you at that time?

A. Minneapolis, Minnesota.

Q. Were you employed?

A. I was.

Q. Where did you work?

A. I was the executive vice president of sales marketing and client strategy for John Ryan.

Q. What were your duties for John Ryan?

A. To manage sales marketing and client strategy for a company that provided technology solutions to retailers, and in particular large financial institutions.

Q. Who was your immediate supervisor?

A. Dean Silverman.

Q. How long had you been with John Ryan?

MR. CIOFFI: Objection. Timeframe.

MR. SABA: Let me finish my question.

MR. CIOFFI: I thought you were finished. You got it.

MR. SABA: Thank you.

BY MR. SABA:

Q. As of January 2005, how long had you been

Page 17

employed with John Ryan?

A. Only a few months, if a month. Call it one to two months. I joined John Ryan that winter.

Q. Where were you -- were you employed prior to working for John Ryan?

A. I was.

Q. Where did you work prior to working for John Ryan?

A. I company called Clarity in McMinville, Oregon.

Q. McMinville, is that what you said?

A. Yeah. South of Portland.

Q. What was your role for Clarity?

A. I was the market manager for financial services, and prior to that I worked in finance in incorporate development, ran product engineering.

Q. For Clarity?

A. Yeah. The product engineering process and financial planning, strategic planning, monthly and quarterly operations reviews for the board of directors there. Again, it was a technology services business.

Q. How long had you been employed with Clarity before leaving there?

A. I started working with Clarity when I was in college.

Page 18

Q. In what year of college did you start working with Clarity?

A. 1999, I believe. After my sophomore year.

Q. What were you doing for Clarity while you were in college?

A. Financial analysis. I was a financial analyst.

Q. Were you employed as an intern?

A. I don't remember how I was designated, but I was employed on an hourly basis working directly for the CFO there. It was a small company. It was 1,000 in terms of the fastest growing in the U.S. So there was a lot more work that needed to be done than there were people to do it.

Q. Does Clarity still exist today?

A. It does not.

Q. What happened to Clarity?

A. It was sold.

Q. Who was it sold to?

A. Planar. P-L-A-N-A-R.

Q. What year was that?

A. 2005.

Q. Why did you leave Clarity?

A. I think largely because the business, when it was founded, was designed to be an advertising

Page 19

technology business. It had developed a very strong government contracting offering, and it became clear that the future of the company was to be focused on the government contracting side of the equation, which is the reason that ultimately it was sold to Planar, which was a major government contractor. And I had an interest in the private sector more than the public sector.

Therefore, I moved from Clarity to another participant in the advertising technology space, which was John Ryan, which happened to be the largest provider at that time for merchandising and digital point of sale solutions for financial institutions in the world.

Q. How long did you remain with John Ryan?

A. Three years.

Q. Did your role with John Ryan change while you were there?

A. Not materially.

Q. Did your title change?

A. No, not that I recall.

Q. Did your immediate supervisor change?

A. No.

Q. Why did you leave John Ryan?

A. I had grown tired of working in a startup environment. There are unique sorts of stresses in

Deposition of Timothy Spence           Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 20

1 those environments that are different and apart from
2 what you face in larger institutions, and I had grown
3 frustrated that we could be only a component of a
4 solution that was required to solve much broader
5 problems for our clients.
6      As a result, I wanted to get more directly
7 involved in the crafting of the strategy as opposed to
8 just the delivery and execution in the markup.
9    Q. So if you remained there three years, you left
10 in 2008; is that correct?
11    A. 2007. Call it two and a half years.
12    Q. And where did you go in 2007?
13    A. Oliver Wyman and Company.
14      (Exhibit 5 is marked for identification.)
15 BY MR. SABA:
16    Q. Mr. Spence, I've handed you what's been marked
17 as Exhibit Number 5, which is Bates stamped Fifth Third
18 McHugh -- let me clarify this for you, in case you don't
19 know.
20      In the bottom right-hand corner of the
21 document, you see a number, Fifth Third McHugh 000304.
22 On the second page, Fifth Third McHugh 000305. We're
23 going to be referring to those numbers as we go through
24 some of these documents. That's what I'm referring
25 to --

Page 21

1    A. All right.
2    Q. -- to identify that. This is -- Exhibit
3 Number 5 is Bates stamped Fifth Third McHugh 000304
4 through 000305. Is that correct?
5    A. It is.
6    Q. Okay. Can you identify this document for me,
7 please?
8    A. I've never seen it before.
9    Q. Are you able to identify it?
10    A. It appears to be a letter communicating
11 compensation results for 2010 -- no, for 2009 and
12 January of 2010, but again, I haven't seen it before.
13    Q. If you read the first sentence, it says, Dear
14 Phil, it is my pleasure to provide you with a letter
15 formalizing our offer of employment with the investment
16 advisors division; do you see that?
17    A. I do.
18      MR. CIOFFI: Objection.
19 BY MR. SABA:
20    Q. Okay. And the letter goes on to say, with
21 your acceptance of this offer, you will assume the
22 position of senior vice president and head of investment
23 advisors reporting directly to me.
24      MR. CIOFFI: Objection.
25

Page 22

1 BY MR. SABA:
2    Q. And the person who signed the letter that is
3 Greg Carmichael; is that correct?
4      MR. CIOFFI: Objection. The document speaks
5 for itself, Counsel. He said he's never seen it before.
6 You're just wasting time.
7 BY MR. SABA:
8    Q. Mr. Spence, do you see that sentence?
9    A. I see the sentence, and I see that Greg signed
10 it.
11    Q. Okay. And I read that correctly, that they
12 were offering Phil, and he was accepting the position of
13 senior vice president and head of investment advisors;
14 is that correct?
15    A. It says, it's my pleasure to provide you with
16 this letter formalizing our offer of employment with the
17 investor -- investment advisors division. Your
18 acceptance of this offer, you will assume the position
19 of senior vice president and head of investment
20 advisors, reporting directly to me.
21    Q. Correct?
22    A. Yeah.
23    Q. Okay.
24    A. That's what it says.
25    Q. That's dated January 27, 2010. Is that right?

Page 23

1    A. It is.
2    Q. Okay. And at that point in time, Phil McHugh
3 would have been 45-years-old. How old were you in
4 January of 2010? January 27th, specifically.
5    A. 31.
6    Q. And where were you that point in time?
7    A. Physically, or in employment?
8    Q. Both.
9    A. I would have been at Oliver Wyman.
10 Physically, I don't know what day January 27th was, but
11 we worked quite frequently from our client's offices.
12 My office was in New York City.
13    Q. And what did you do for Oliver Wyman at that
14 time?
15    A. I provided consulting services to large
16 financial institutions.
17    Q. What was your official title?
18    A. I don't recall.
19    Q. Did you have a title while you were at Oliver
20 Wyman?
21    A. I had the title of partner and the title of
22 engagement manager and the title of principal.
23    Q. Do you know the respective dates when you held
24 those titles?
25    A. Not off of the top of my head, no.

Page 24

1  Q.  I think you've indicated you don't know what
2  title you held as of January 2010; is that right?
3  A.  No.
4  Q.  Do you recall what your duties would have been
5  as of January 2010?
6  A.  Yeah, leading the client engagements for large
7  financial institutions on matters of strategy
8  operations, risk management.
9  Q.  Who was your immediate supervisor at that
10  time?
11  A.  Consulting firms work a lot like law firms.
12  You don't have immediate supervisors in the same way
13  that you would in a more hierarchal corporate structure.
14      So I guess you could say that my immediate
15  supervisor was the head of the North American banking
16  practice, but for practical purposes, it was whatever
17  partner I was working with on a given assignment until I
18  was a partner, in which case I didn't really have an
19  immediate supervisor.
20  Q.  How many assignments would you have at one
21  time?
22  A.  As an engagement manager, principal, or
23  partner?
24  Q.  What would you have been doing in 2010?
25  A.  Again, I don't recall the specific dates

Page 25

1  there.  I would have to go back and look.  As an
2  engagement manager, it would be customary to be working
3  on one client engagement and potentially research
4  assignment.  As a principal, it would not be unusual to
5  be working on at least one, potentially two client
6  engagements in research assignment.  And as a partner,
7  your case load was dictated by your ability to either
8  generate client engagements or to generate intellectual
9  capital that was required in other client engagements.
10  So you could be working on several engagements at a
11  given time.
12  Q.  Do you recall how long you were a partner at
13  Oliver Wyman?
14  A.  Five, six years prior to my departure.
15  Q.  How many years were you with Oliver Wyman
16  total?
17  A.  Nine to ten years.
18  Q.  Do you recall how long -- for how long you
19  were an engagement manager?
20  A.  No.  One to two years.
21  Q.  Do you recall how long you were a principal
22  with Oliver Wyman?
23  A.  One to two years.  I was elected partner I
24  believe three and a half years into my time, maybe four.
25  One way or the other, it was one of the fastest partner

Page 26

1  elections in the financial services practices history.
2  Q.  On average, how long would the assignments
3  last?
4  A.  They could vary.  They could be as short as
5  three to four weeks, they could be as long as 6 to 12
6  months.
7  Q.  As an engagement manager, which financial
8  institutions did you work with?
9  

17  Q.  What did you do for Fifth Third Bank?
18  A.  A very wide range of things.  I think for
19  roughly 2011 through when I joined the bank in 2015, I
20  would say we ran the majority of the major strategy
21  product innovation and operations improvement programs
22  for the bank.  I was engaged by Kevin Kabat, the CEO,
23  and then indirectly the board to do the strategic
24  planning exercise in 2011.  2013, we ran the outside and
25  strategic assessments in '12 and '14, and then Greg

Page 27

1  Carmichael engaged Oliver Wyman in 2015, prior to my
2  joining the bank, to run the strategic planning exercise
3  at that point in time.
4      We led the projects to redesign the core
5  checking offerings and the consumer and small business
6  bank.  We ran the strategy engagement to redefine the
7  commercial sales strategy in the commercial bank.  We
8  ran the distribution strategies projects, both the
9  original digital project -- which I believe the bank
10  called the integrative channel strategy -- and the
11  second digital strategy project, which they called ICE.
12  I don't remember what that acronym stood for.
13      But ICE, we ran projects to improve
14  fulfillment and regulatory compliance in the mortgage
15  area.  We ran the exercise around risk culture.  We ran
16  -- the exercise, I held the pen and supported the
17  enterprise committee in 2011, in offering the bank's
18  current vision and purpose statement.  The one bank
19  people most value and trust.  And there were several
20  other engagements I'm sure that I'm just not
21  remembering.  Oh, the loss modeling deposit
22  characterization and the treasury, and for the chief
23  risk officer.
24  Q.  You were a partner during this time period
25  with Oliver Wyman?

Deposition of Timothy Spence                                         Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 28

1   A.  Yes.
2   Q.  Is that correct?
3   A.  Yes.
4   Q.  How many other people from Oliver Wyman were
5   working on the Fifth Third assignment between 2011 and
6   2015?
7   A.  Well, that would have depended at any given
8   time based on the nature of the assignment.
9   Q.  What was the most, what was the least?
10  A.  The least would probably be three.  The most,
11  probably five, potentially six.
12  Q.  Do those numbers include you or exclude you?
13  A.  They would include me.
14  Q.  During that time period that you were working
15  with Fifth Third from 2011 to 2015, how many other banks
16  or financial institutions were you working with as a
17  partner for Oliver Wyman?
18  A.  Several of the names that I mentioned
19  previously.  So at least five or six in any given year.
20  Q.  And what were you doing for those financial
21  institutions?
22      MR. CIOFFI:  By way of objection, I'm going to
23  designate this part confidential to the extent
24  Mr. Spence is still bound by, you know, trade secret and
25  other confidential agreements based on his tenure at

Page 29

1   Oliver Wyman.  I'll allow him to answer the question
2   generally, but as this specific advice to specific
3   clients, I'm going to caution you, Counsel, that that's
4   subject to some trade secrets.  But you may answer, go
5   ahead.
6       THE WITNESS:  Yeah, ask the question again,
7   please.
8   BY MR. SABA:
9   Q.  Sure.  What were the services you were
10  providing for these other institutions, these five to
11  six other financial institutions, during the time that
12  you were providing services to Fifth Third Bank from
13  2011 to 2015?
14  ███████████████████████████████████
    ██  ████████████████████████████████████
    ██  ████████████████████████████████████████
    ██  ██████████████████████████████████
    ██  ████████████████████████████████
    ██  ██████████
20  Q.  You mentioned Mr. Kabat and you mentioned the
21  board of directs and Mr. Carmichael.  Did you have any
22  other involvement with anybody else at Fifth Third
23  during that time?
24  A.  Absolutely.
25  Q.  Who else would you have had involvement?

Page 30

1   A.  Phil McHugh; Greg Kosch, who ran the
2   commercial bank at that point in time; Steve Alonso; and
3   then Chad Borton, who ran the retail bank; Ray Webb, who
4   ran the retail prior to that; Joe Robinson in the
5   technology organization; Paul Reynolds; and then Frank
6   Forrest; and Mary Tuuk in the risk management
7   organizations.  Who am I missing.  Theresa Tanner in her
8   capacity as the CHRO.  Many of the affiliate presidents
9   who we drafted into our engagements, either as sources
10  of input or sounding boards, folks that work deeper into
11  the organization who were subject matter experts, who
12  managed day-to-day activities.
13      An example for that might be the strategy work
14  that we did in mortgage, where Steve Alonso would have
15  been the executive sponsor, but Glen Lewis, who was the
16  president of the mortgage bank, and then Glen Brunker --
17  I'm sorry, Bob Lewis who was the president of the
18  mortgage bank, and then Glen Brunker, who ran
19  fulfillment would have been handling a lot of the
20  day-in, day-out work, along with whatever designee from
21  the EPMO, the bank's enterprise program office who would
22  have been involved at any given point in time.
23  Q.  What was your involvement with Phil McHugh
24  between 2011 and 2015?
25  A.  When the bank contracted with Oliver Wyman in

Page 31

1   2011 and 2013, 2015, and then '12 and '14 on market
2   intelligence -- so for strategic planning and market
3   intelligence, -- they were broad-based strategy
4   exercises for all of the lines of business, and I would
5   have interacted with Phil McHugh primarily in his
6   capacity as the head of investment advisors at that
7   point in time on his strategy for growth and
8   profitability.
9       And then Phil would have been present for any
10  of the executive readouts that involved the enterprise
11  members.  And where I presented directly to the board in
12  several of those occasions, Phil may have been present
13  for those presentations as well.
14  Q.  Did you ever meet one-on-one with Phil McHugh?
15  A.  Yes.
16  Q.  When did you meet one-on-one with Phil McHugh?
17  A.  I don't recall.
18  Q.  When did you first meet Phil McHugh?
19  A.  It would have been sometime in 2011.
20  Q.  Under what circumstances did you first meet
21  Phil McHugh?
22  A.  I don't recall specifically, but it's likely
23  it was involved with the work we were doing on vision
24  purpose and corporate strategy for the bank.
25  Q.  Do you recall any specific meetings or

Deposition of Timothy Spence                                      Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 32

1  conversations you had with Phil McHugh between 2011 and
2  2015?
3      A.  I recall the general substance of those
4  discussions, but I don't know that I could pinpoint a
5  specific conversation and a specific statement.
6      Q.  What were the general substance of those
7  conversations?
8      A.  They would have involved information
9  gathering, so we would have conducted executive
10 interviews to understand the current state inside the
11 bank to make sure we had an inventory of existing
12 strategies.  They would have involved readouts where we
13 provided Phil McHugh with external benchmarks on the
14 performance of the wealth business relative to what we
15 might see at peers based on either public or disguised
16 proprietary information.  They would have involved our
17 sharing conclusions, initial conclusions with Phil
18 McHugh for his input and feedback.
19         And then where Phil was making board
20 presentations attached to the strategy, we generally
21 were responsible for developing his strategy documents
22 that he then presented to the board, along with many of
23 the other strategy materials.  And we would have
24 reviewed those materials either to gather input or to
25 help him to develop the narrative that was attached to

Page 33

1  the materials themselves.
2         (Exhibit 6 is marked for identification.)
3  BY MR. SABA:
4      Q.  Mr. Spence, you've been handed what's marked
5  as Exhibit Number 6, and this is -- it's actually Bates
6  stamped Fifth Third McHugh 306, but it appears to be cut
7  off at the bottom.
8      A.  I can see that.
9      Q.  I'll represent to you that's what it is.
10     MR CIOFFI:  What were the numbers, Counsel?
11     MR. SABA:  306.
12 BY MR. SABA:
13     Q.  Have you ever seen this document before?
14     A.  I have not.
15     Q.  Referring to, it's a letter to Phil McHugh
16 dated June 21, 2011.  Do you see that?
17     A.  I do.
18     Q.  Okay.  And it indicates, I want to personally
19 congratulate on your appointment to executive vice
20 president.
21         Do you see that?
22     A.  I do.
23     MR. CIOFFI:  Objection.  Document speaks for
24 itself.
25

Page 34

1  BY MR. SABA:
2      Q.  All right.  And this is a letter from Kevin
3  Kabat who was the president and CEO at fifth Third Bank
4  at that time; is that right?
5      A.  It appears to be.
6      Q.  Phil McHugh was 46-years-old at this time.
7  How old would you have been on June 21, 2011?
8      MR. CIOFFI:  Objection.  Relevancy.  Go ahead.
9  You may answer.
10     THE WITNESS:  32.
11 BY MR. SABA:
12     Q.  And at this point in time, based on your prior
13 testimony, you were still with Oliver Wyman; is that
14 right?
15     A.  Yes.
16     Q.  Okay.  How long did you stay employed with
17 Oliver Wyman?
18     MR. CIOFFI:  Objection.  Asked and answered,
19 but you can answer it again.
20     THE WITNESS:  I answered it.  From -- call it
21 the beginning of 2007 until I joined the bank in late
22 2015.
23 BY MR. SABA:
24     Q.  Why did you leave Oliver Wyman?
25     A.  To accept a position at Fifth Third.

Page 35

1      Q.  Who first contacted you about a position at
2  Fifth Third?
3      A.  Uh, Kevin Kabat.
4      Q.  When did that occur?
5      A.  I don't remember now if it was 2012 or '13.
6  But Kevin tried to hire me on a few separate occasions.
7  Greg called to hire me at least one prior occasion.  And
8  then ultimately, in 2015, it would have either been
9  Theresa or Greg; I don't recall.  Theresa Tanner.
10     Q.  What was Theresa Tanner's role at that time?
11     A.  Chief human resources officer.
12     Q.  Why did you turn down Kevin Kabat and Greg
13 Carmichael prior to 2015?
14     A.  I had more I wanted to accomplish at Oliver
15 Wyman.
16     Q.  What specifically was that?
17     A.  I don't recall off the top of my head at this
18 stage.  But I had -- wasn't at a point in my career
19 there where I was prepared to leave and do something
20 else.
21     Q.  When did you first meet Greg Carmichael?
22     A.  2010 or 2011.
23     Q.  Under what circumstances did you meet Greg
24 Carmichael?
25     A.  We were asked by Tom Hoyer, who at the time

Page 36

1 was the head of the strategic planning group, to
2 facilitate an innovation offsite for the bank, several
3 of its key executives, and several members from other
4 industries who had agreed to participate, including
5 employees from Kroger and a data analytics firm here in
6 town.
7        And otherwise, if memory serves, and I believe
8 Greg joined us for a portion of that session, and then I
9 met him more formally through the engagement we did on
10 the vision purpose and the corporate strategy for the
11 bank coming out of the financial crisis in 2011.
12        Q. After you met Greg Carmichael, how frequently
13 would you communicate with him?
14        A. I guess that depends on what engagement we
15 were working on at any given point in time. Not more
16 frequently than monthly, not less frequently than every
17 six months.
18        (Exhibit 7 is marked for identification.)
19        THE WITNESS: May I have a bottle of water,
20 please? You're free to proceed.
21 BY MR. SABA:
22        Q. Mr. Spence, I've handed you what's been marked
23 as Exhibit Number 7, it's Bates stamped Fifth Third
24 McHugh 2 and 3. Can you identify this document for me,
25 please?

Page 37

1        A. This is an employment letter formalizing the
2 proposal that had been made to me for employment here at
3 Fifth Third. Although it's not on the company
4 letterhead, which I would have remembered it being on
5 nor does it include any signature line. At least in my
6 copy.
7        Q. Did you have -- do you recall that you signed
8 an offer letter --
9        A. I don't recall.
10        Q. -- from Fifth Third?
11        A. I don't recall one way or the other. I'm
12 merely comparing it to the other offer letter you gave
13 me earlier.
14        Q. Reviewing Exhibit Number 7, does this appear
15 to set forth the terms under which you were initially
16 hired with Fifth Third Bank?
17        A. Give me a moment to read it. I don't think
18 I've looked at it since 2015.
19        It does.
20        Q. Okay. How old were you at this time,
21 August 12, 2015?
22        A. 36.
23        Q. And the position you were offered was
24 executive vice president chief strategy officer
25 reporting directly to Greg Carmichael; is that correct?

Page 38

1        A. That's correct.
2        Q. Okay. At that point in time, when you were --
3 when you were hired by Fifth Third, Phil McHugh would
4 have been 51-years-old; is that correct?
5        A. I don't know.
6        Q. Okay. And he would have been the head of
7 wealth and asset management; isn't that right?
8        A. I think he was still the head of investment
9 advisors at that point in time. We reran the division
10 subsequently.
11        Q. And Phil McHugh was -- he had been with the
12 bank for 29 years at that point in time.
13        A. There again, I don't -- I don't know, Counsel.
14        (Exhibit 8 is marked for identification.)
15 BY MR. SABA:
16        Q. Mr. Spence I've handed you what's been marked
17 as Exhibit Number 8, Fifth Third McHugh 003167. Can you
18 identify this for me, please?
19        A. I've never seen it before.
20        Q. Do you recognize what it is?
21        MR. CIOFFI: Objection. The document speaks
22 for itself. He's testified he's never seen it before.
23        THE WITNESS: It appears to be in the format
24 of a board resolution, but again, I don't know because
25 I've never seen it before.

Page 39

1 BY MR. SABA:
2        Q. Okay. And what it indicates is that it's
3 Fifth Third Bancorp human capital compensation committee
4 resolution approving head of consumer bank compensation;
5 isn't that right?
6        MR. CIOFFI: Objection. Speaks for itself.
7 BY MR. SABA:
8        Q. And this is dated April 18, 2017; isn't that
9 right?
10        A. It appears to be, yes.
11        Q. Okay. And the first resolution indicates that
12 resolve that the compensation package payable to Phil
13 McHugh in connection with his promotion to the role of
14 executive vice president and head of the consumer bank
15 as included in the materials for this meeting are hereby
16 approved, ratified and confirmed.
17        Do you see that?
18        A. I do.
19        Q. Okay. So this would have been the date that
20 Phil McHugh was promoted to executive vice president and
21 head of the consumer bank.
22        MR. CIOFFI: Objection. Counsel, it speaks
23 for itself. Are you asking him does he have personal
24 knowledge if that's the date or are you asking if that's
25 what the document says?

Page 40

BY MR. SABA:

Q. Did you understand my question?

MR. CIOFFI: Objection. The question's unclear.

THE WITNESS: Well --

BY MR. SABA:

Q. Did you understand my question?

A. Please ask it again.

Q. Sure. The document indicates that on April 18, 2017, Phil McHugh was promoted to the role of executive vice president and head of the consumer bank.

Is that right?

A. Phil was promoted to the head of the consumer bank. You shared a document with me earlier that's dated June 21, 2011, that indicates that that is the date he was appointed to be an executive vice president.

Q. Correct.

A. That is what it appears to indicate, but you also gave me a different document.

Q. He was already an executive vice president is what you're pointing out. He was now made head of the consumer bank?

A. That's yes. Absolutely.

Q. Right? Correct?

Page 41

A. Yes.

Q. And that was effective April 18, 2017, correct?

A. It is.

Q. Okay. And at that time, Phil McHugh would have been 52-years-old; is that right?

A. I don't know.

Q. How old were you at that time?

MR. CIOFFI: Objection. Relevancy. You may answer.

THE WITNESS: 38.

BY MR. SABA:

Q. Okay. And what was your role with the bank as of April 2017?

A. I believe at that point in time I was the chief strategy officer and head of payments, but that is only because I had been offered the head of the consumer bank job in addition to retaining my strategy responsibilities in many of the payments positions, and had elected not to accept it at that time. At which point time it was offered to Phil McHugh.

Q. Do you have any documentation that reflects that?

A. Yes.

Q. Where is that?

Page 42

A. They were in some text messages that were provided to you that my counsel asked me to review.

Q. Do you recall the date of those text messages?

A. No.

Q. Who offered you that position?

A. Greg Carmichael and Theresa Tanner.

Q. And why'd you turn it down?

A. I had extenuating family circumstances. I had a young son who was in an intensive behavioral therapy program because of an autism spectrum disorder diagnosis, and I didn't feel comfortable taking on additional responsibility, even though I know I could do the job, in the event that my son needed more from me. The position, along with all the other additional responsibilities that I already had -- which Greg and Theresa had been clear would not be transferred to another executive -- would prove to be too much. Family first.

My recollection, for what it's worth, since I can see that you're looking for it, is that the text messages were between Greg Carmichael, Theresa Tanner, and potentially Bob Shaffer. I wasn't a part of the text thread.

I also recall having dinner with Phil McHugh either prior to this date or immediately afterward where

Page 43

Phil acknowledged that he was aware of the fact that the position had been offered to me first and where he asked for my help and support as he made the transition.

Q. When was that dinner?

A. In the vicinity of this announcement, whether it was immediately beforehand or immediately afterward. My guess is it was immediately afterward. This organizational change was brought about by an individual by the name of Chad Borton, who had been the head of the consumer bank, electing to leave the bank to become the president of USAA. And the byproduct of that is, we had to move relatively quickly to get a successor in place so that Chad's announcement could become public. So it was likely after that.

(Exhibit 9 is marked for identification.)

BY MR. SABA:

Q. I've handed you what's marked as Exhibit Number 9, which is Bates stamped Fifth Third McHugh 003652. Can you identify that for me, please?

A. Again, I haven't ever seen this before, but it appears to be in the same format as the other ones. So unless you tell me otherwise, I'm going to assume it's a resolution from the human capital and compensation committee.

Q. And that's dated December 18, 2017; is that

Case: 1:21-cv-00238-MRB Doc #: 77-15 Filed: 06/27/25 Page: 14 of 106 PAGEID #: 3736
Deposition of Timothy Spence
Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 44

1 right?

2    A. It is.

3    Q. And that resolution expanded Phil McHugh's

4 role to include head of wealth and asset management;

5 isn't that right?

6    A. I have never seen it before, but that is what

7 it appears to do.

8    Q. With respect to your performance in 2017, did

9 you receive a review, an annual review, for 2017?

10    A. I would have, yes.

11    Q. When did that occur?

12    A. It's part of the normal review and

13 compensation performance management cycle prior to the

14 filing of the proxy because I was a proxy employee. So

15 generally, probably the February timeframe, but I don't

16 recall the date specifically.

17    Q. And did you receive pay for performance detail

18 or paid for performance statement at that point in time?

19    A. I would assume so, yes.

20    Q. Do you know why Fifth Third has not been able

21 to produce a copy of that 2017 paid for performance

22 detail?

23    A. No, I don't. But I was one of the five proxy

24 employees of the bank at that point in time, and

25 therefore it would be included in the public proxy

Page 45

1 statement. That information was public.

2    Q. What was your performance rating for 2017?

3    A. That I don't recall. It would have been

4 exceeds or exceptional. I never received a rating, an

5 aggregate that was less than that, but I don't remember

6 now. I paid much less attention to the ratings than I

7 did the performance feedback and the development

8 objectives. I thought about how I improved my division

9 and myself personally.

10    Q. You were still having issues though in 2017,

11 weren't you, with respect to how to navigate a large

12 company and drive successful outcomes?

13    A. No.

14    MR. CIOFFI: Objection to the form of the

15 question. Definition of the issues. But you answered

16 it. Go ahead.

17    THE WITNESS: No.

18 BY MR. SABA:

19    Q. That wasn't something you were still learning?

20    A. No.

21    Q. Didn't you also need to focus on reengineering

22 positioning your organizations to effectively execute

23 and achieve desired results?

24    A. That I absolutely did. I think when I came

25 into the bank, the reason the bank hired me was because

Page 46

1 we had a non-performing strategy organization. We had

2 an analytics organization that was in the business of

3 generating, reporting. We had a digital organization

4 that was largely outsourced, and then we had declared

5 payments as a point of focus for growth, and we weren't

6 generating the growth and product innovation that we

7 wanted. So those businesses were explicitly given to me

8 to reposition and to change the trajectory. That was my

9 job.

10    Q. You also still needed to take on more business

11 line responsibilities to further develop your

12 operational leadership capabilities; isn't that right?

13    MR. CIOFFI: Objection to the form of the

14 question. You may answer.

15    THE WITNESS: My career aspiration was to be

16 the president and CEO of the company, and that would

17 have required, over time, taking on more business

18 responsibilities, yes.

19 BY MR. SABA:

20    Q. How many business responsibilities would that

21 have required over time?

22    A. I don't know that I understand that question.

23    Q. Sure. You said that would have required goal

24 and aspiration was to be president and CEO of Fifth

25 Third Bank, which would have required that you take over

Page 47

1 more responsibilities over time. Which responsibilities

2 would that have required?

3    A. My goal would have been to have direct

4 exposure to every one of the businesses inside Fifth

5 Third Bank at one point or another.

6    Q. How long would that have taken?

7    A. To have direct exposure to all of those

8 businesses?

9    Q. Yes.

10    A. Rotationally, at some point, a few years in

11 each place at a minimum.

12    Q. With respect to that direct exposure, what

13 role are you in?

14    A. At what point?

15    Q. You know, I'm asking. You said I would need

16 -- I would want to get exposure to all those various

17 areas, it would take a few years. And in terms of --

18 you referred to direct exposure?

19    A. You could get exposure in many different

20 roles. You could get direct exposure as the head of the

21 business, you could get direct exposure -- we had a

22 chief operating officer to whom Phil reported prior to

23 this change, I believe, who would have had direct

24 exposure to the wealth and -- excuse me -- who would

25 have had direct exposure to the wealth and asset

Deposition of Timothy Spence          Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 48

1 management business. You could get direct exposure by
2 working inside some of these businesses.
3     I elected in a few cases where we had
4 non-performing business units to remove the head of the
5 business, put them in a role that was better suited to
6 them and to run it directly for a period of time. So I
7 was effectively both superior and subordinate in those
8 relationships. You can develop a direct exposure in
9 many capacities.
10    Q. Do you still have a copy of your paid for
11 performance details for 2017?
12    A. I don't believe so.
13    Q. Do you know who would?
14    A. No.
15    Q. Referring you back to Exhibit 3, Fifth Third
16 McHugh 005436.
17    A. Hold on. Okay.
18    Q. Exhibit 3 indicates that in 2018, Phil McHugh
19 became the executive vice president, head of regional
20 banking, business banking, and wealth management.
21    Do you see that?
22    A. I do.
23    Q. Okay. And Phil McHugh would have been
24 54-years-old at that time; is that right?
25    A. I don't know. I didn't keep track of Phil's

Page 49

1 birthday.
2    Q. Okay. And Phil would have been with the bank
3 for 32 years at that time; is that right?
4    A. I didn't keep track of Phil's start date. But
5 I can confirm that I took over the consumer bank in
6 addition to retaining my other responsibilities, as had
7 been previously discussed --
8    Q. Correct?
9    A. -- back in 2017, at that point in 2018 --
10    Q. Okay.
11    A. -- when Phil became the head of regional
12 banking and wealth management.
13    Q. Correct. As part of Phil's promotion,
14 effectiveness August 24, 2018, the consumer bank
15 responsibilities were transferred to you, correct?
16    A. I wouldn't refer to it as a promotion, but as
17 part of the organizational change that resulted in Phil
18 becoming the head of regional banking, yes, his consumer
19 bank responsibilities were transferred to me.
20    Q. And you were 39-years-old at that point in
21 time; is that right?
22    A. Yes.
23    Q. Okay. And you had been with the bank for
24 three years; is that correct?
25    A. Yeah. Three to three and a half, four,

Page 50

1 somewhere in that range.
2    Q. And you were still the chief strategy officer
3 at that point in time; is that right?
4    A. And the head of the payments business.
5    Q. Okay. With respect to the role Phil did in --
6 with the consumer bank, you were amazed at what he was
7 able to do and with his leadership in getting the CFPB
8 rating improved; isn't that right?
9    A. I was not.
10    Q. You were not amazed by that?
11    A. No. Certainly not that I recall. During that
12 period of time, we were embroiled in the run-up to the
13 lawsuit that the CFPB ultimately filed, which included
14 sales practices, conduct, up to and through the end of
15 2017, which included a piece of the period of time when
16 Phil was the head of the consumer bank. And also within
17 auto servicing exam. I don't recall being directly
18 aware of any other dealings with the CFPB.
19    (Exhibit 10 is marked for identification.)
20 BY MR. SABA:
21    Q. Mr. Spence, I've handed you what's been marked
22 as Exhibit Number 11 {sic}, which is marked McHugh
23 005512. Do you see that?
24    A. I do.
25    Q. And this is a series of text messages between

Page 51

1 you and Mr. McHugh; do you see that?
2    MR. CIOFFI: Counsel, I think this is
3 Exhibit 10.
4    MR. SABA: Correction, you've been handed
5 number 10, sorry.
6    MR. CIOFFI: So just for the record, 00512 is
7 Exhibit 10?
8    MR. SABA: Correct. Exhibit 10.
9 BY MR. SABA:
10    Q. This is a text message exchange between you
11 and Mr. McHugh from October 13, 2018. Do you see that?
12    A. I do.
13    Q. And you sent a text message to Mr. McHugh at
14 8:10 p.m. on that day which indicates the following:
15 The CFPB rating is really -- excuse me -- CFPB rating
16 really is amazing news. I was thinking I would send a
17 note to the team from you and me. Would you mind
18 replying over the top to thank them? I think they would
19 really appreciate hearing from you, given your
20 leadership and getting us cleaned up.
21    Do you see that?
22    A. I do. So you stipulated that I stated
23 that Phil had done an amazing job. I said the news was
24 amazing, in this text message, and that Phil played a
25 part in the cleanup of the CFPB. This also is a rating

Page 52

1 that improved during the period of time when I was
2 leading the consumer bank, if this is 2018, in October.
3     Q.  And you acknowledged it's Phil's leadership in
4 getting this cleaned up; isn't that right?  That's why
5 you wanted to give him credit?
6         MR. CIOFFI:  Objection.  That's not what he
7 said.  It's argumentative.  You're trying to get him to
8 agree with your inference and interpretation, which you
9 always do.  I've stated my objection.
10        MR. SABA:  Which you always give a talking
11 objection.
12        (Cross talking.)
13        MR. CIOFFI:  I've stated my objection.  It's
14 argumentative.  You're trying to get the witness to
15 agree with your inference.  But I'm not instructing him
16 not to answer.  He may answer.  Go ahead.  Ask your
17 question.
18        THE WITNESS:  Please ask the question again.
19 BY MR. SABA:
20    Q.  Mr. Spence, you note it is Phil's leadership
21 that was used in getting it cleaned up; isn't that
22 right?
23    A.  I don't know if you've spent time inside a
24 large regulated organization, but maybe let me step back
25 and make sure that we're clear on how these things work.

Page 53

1        The ratings that we're talking about here are
2 roll-up ratings that cover multiple exams that will
3 generally involve hundreds of people, both in the
4 execution of the ongoing compliance management programs
5 as well as the preparation for the exams themselves, the
6 responses to those exams, and the completion.  You'll
7 note here, as an example, that Phil replies with
8 absolutely Tim Harden deserves a great deal of credit.
9        I think it was outstanding that the bank
10 received a ratings upgrade from the CFPB, and I
11 indicated very clearly by saying it's amazing news.
12        I also gave Phil some credit for his
13 leadership.  I did not suggest, nor would I ever
14 indicate, that it was exclusively Phil's leadership or
15 even principally Phil's leadership that would have
16 resulted in the CFPB rating being upgraded.  That would
17 involve Phil taking credit or being given credit for
18 the work of hundreds of people.  I don't think Phil
19 intended that, which is the reason he followed with Tim
20 Harden, and it's certainly not what I intended in my
21 text.
22    Q.  Sure.  But in every group like that, they need
23 a leader.  And in this case, the leader was Phil McHugh.
24 And it was his leadership --
25    A.  No.

Page 54

1    Q.  They need a leader -- let me finish.
2        They need a leader, don't they, Mr. Spence?
3        MR. CIOFFI:  Objection, counsel.  Argumentative.
4 You're trying to get him to agree with your position.
5 BY MR. SABA:
6    Q.  Mr. Spence --
7        MR. CIOFFI:  Look, you're entitled to take --
8        MR. SABA:  You can tell the same objection and
9 not give a speaking objection.  You're trying to coach
10 the witness.
11        MR. CIOFFI:  That's not a speaking objection.
12        MR. SABA:  Yes, it is.  You say the word
13 "objection," and that's it.
14        MR. CIOFFI:  I'm not coaching the witness, and
15 this witness hardly needs any coaching.  So go ahead and
16 answer.  Read the question back to him, and he can try
17 to answer it.
18        THE WITNESS:  I gave Phil a measure of the
19 leadership, absolutely.  He deserved a measure of the
20 credit for the leadership he provided.  He also was not
21 the only leader here, nor was he the majority
22 responsibility.  Which is the reason he follows with,
23 Tim Harden deserves a great deal of the credit.  It
24 appears that he himself is acknowledging that.
25

Page 55

1 BY MR. SABA:
2    Q.  What was Tim Harden's role at that time?
3    A.  Tim was the head of business controls.
4    Q.  And did he report to Phil McHugh?
5    A.  No, he reported to me on this data, I believe.
6    Q.  During the time that the CFPB's rating was
7 being corrected, he reported to Phil, correct?
8    A.  The CFPB rating was a multiyear rating, so it
9 would have predated Phil's leadership with the consumer
10 bank.  It would have included the credit card business,
11 which was attached to the payments business.  It would
12 have included the operations area, which at that point
13 in time, I believe, would have reported to Aravind
14 Immaneni, but possibly Theresa Tanner, and it would have
15 included the consumer bank and the wealth management
16 organization, because the CFPB touches everything that
17 involves either consumers or small businesses.
18        So it is the very definition of a team effort
19 to get an improvement and a rating from the CFPB
20 completed over a period of years.  Including years when
21 Chad Borton ran the consumer bank, when Phil McHugh ran
22 the consumer bank, and based on this date stamp, when I
23 was responsible --
24    Q.  Where was the --
25        MR. CIOFFI:  Counsel, don't cut the witness

Deposition of Timothy Spence

Philip R. McHugh v. Fifth Third Bancorp, et al.

---

Page 56

1 off. Please finish.
2     MR. SABA: I didn't cut him off.
3     MR. CIOFFI: You did. He wasn't finished.
4     THE WITNESS: -- and based on this date stamp,
5 when I was responsible for the consumer bank.
6 BY MR. SABA:
7     Q. Where was the CFPB rating before Phil McHugh
8 took over the consumer bank?
9     **A. That -- that's confidential and supervisory in**
10 **nature. Am I allowed to share it?**
11     MR. CIOFFI: We'll designate this as
12 confidential, and exclude it from public view.
13     THE WITNESS: ██████████████
14 BY MR. SABA:
15     Q. Okay. And did that improve after the time
16 that Phil McHugh was head of the consumer bank?
17     **A. It improved after Phil McHugh was the head of**
18 **the consumer bank in the sense that it was after Phil**
19 **McHugh was no longer the head of the consumer bank.**
20     Q. Okay. And how long after Phil McHugh was
21 the head of consumer bank did it improve?
22     **A. I don't recall specifically, but it would have**
23 **been a handful of months.**
24     Q. Okay. Sometime prior to this time in October
25 of 2018, correct?

Page 57

1     **A. My surprise here -- or surprise is the wrong**
2 **word -- my response would indicate that it probably was**
3 **this date when we received the news.**
4     Q. Okay.
5     **A. Normally those roll-ups come in the 4th**
6 **quarter.**
7     Q. Yeah, I believe it was your amazement, not
8 your surprise, correct?
9     **A. That is the word that I used.**
10     (Exhibit 11 is marked for identification.)
11 BY MR. SABA:
12     Q. Mr. Spence, I've handed you what's been marked
13 as Exhibit Number 11, Fifth Third McHugh 000476. Can
14 you identify that for me please?
15     **A. It's the paid for performance details for me**
16 **in 2018, and the 2019 compensation targets.**
17     Q. And what was your overall performance rating
18 for 2019?
19     **A. 4.**
20     (Exhibit 12 is marked for identification.)
21 BY MR. SABA:
22     Q. Mr. Spence, I've handed you what's been marked
23 as Exhibit Number 12, Fifth Third McHugh 000473. Can
24 you identify that for me, please?
25     **A. It appears to be the paid for performance**

Page 58

1 **details for Phil McHugh, but I haven't seen it**
2 **previously.**
3     Q. And this is for the same year, 2018; is that
4 right?
5     **A. It is.**
6     Q. And what was his overall performance rating
7 for that year?
8     **A. 4.**
9     Q. Okay. You both received the same; is that
10 correct?
11     **A. That's correct. Although we received**
12 **different variable compensation funding levels in terms**
13 **of a percent of our target. I received 135 percent,**
14 **Phil received 110.**
15     Q. By 2018, you recognize that your engagement
16 scores were a measure of your performance; isn't that
17 right?
18     **A. No.**
19     Q. You didn't recognize that?
20     **A. The engagement survey is an input into the way**
21 **that we think about how we manage our organizations, but**
22 **as a standalone measure, they're just a data point,**
23 **they're not a specific input to paid for performance.**
24     Q. You recognize that your engagement scores, as
25 of 2018, that they were deficient and needed to improve

Page 59

1 in the areas of strategy, digital, and the DSG digital
2 solutions function; isn't that right?
3     MR. CIOFFI: Objection. He's answered the
4 question. If you have a document you want to show him,
5 show him.
6 BY MR. SABA:
7     Q. Do you understand the question?
8     **A. I don't recall believing that they were**
9 **deficient. I do recall believing that we needed to**
10 **start to make progress as we had reformed that**
11 **organization and made the personnel changes that we**
12 **needed to make.**
13     Q. Do you know why it is important for an
14 employee to be engaged?
15     **A. Yes.**
16     Q. Why is it important for an employee to be
17 engaged?
18     **A. Because they will work harder and are more**
19 **likely to stay.**
20     Q. Anything else?
21     **A. I mean, I'm sure they feel more satisfaction**
22 **from their work as well, but certainly from the**
23 **company's perspective, you want people to be motivated**
24 **to work hard for your customers and you want them to**
25 **stay.**

Deposition of Timothy Spence                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 60

1  I would note, though, to say an employee is
2  engaged and to attempt to equate that with the
3  engagement score would be a false conclusion. We
4  surveyed people on over 80 different individual factors
5  as part of that engagement survey, ranging from the
6  quality of the tools and technology that they were
7  provided, the quality of the facilities, the growth
8  opportunities that were in front of them, their
9  understanding and sense for how the organization was
10 performing, and many other areas, including whether or
11 not they had a best friend at work.
12        What is more relevant in the engagement survey
13 process is the ingestion of all of those data points,
14 and then a discussion with a given leader's organization
15 and leadership team to identify ways in which we can
16 continue to support employees. The engagement survey
17 score that you're referencing specifically proved not to
18 correlate with employee retention, as an example, which
19 is a thing that we can measure quantitatively.
20        So it was not a good measure of the likelihood
21 that an employee would stay; it was just the composite
22 score that was selected at the point in time that the
23 bank implanted that new engagement methodology.
24    Q. And how much would Fifth Third Bank spend each
25 year on these engagement scores that were not a good

Page 61

1  measure?
2     A. I don't know.
3        MR. CIOFFI: Objection. Mischaracterizes his
4  testimony. He explained what the components were, but
5  you -- you may answer the question.
6        THE WITNESS: I wasn't directly responsible
7  for the engagement survey. I don't know what we spent.
8  But we didn't spend whatever we did for the engagement
9  score; we spent the money for the administration of an
10 80-question survey that our employees took that provided
11 a wealth of information on the ways in which the bank
12 was doing well and where it would improve.
13        MR. SABA: We can go off the record.
14        VIDEOGRAPHER: The time is 10:56 a.m. We're
15 going off the record.
16        (A recess was taken from 10:56 to 11:16.)
17        VIDEOGRAPHER: Time is 11:16 a.m. We're back
18 on the record.
19 BY MR. SABA:
20    Q. Mr. Spence, you indicated earlier that in 2017
21 you were offered the head of the consumer bank; is that
22 correct?
23    A. Yes.
24    Q. All right. And you turned that role down; you
25 explained that to us, correct?

Page 62

1     A. I did.
2     Q. Did you suffer any adverse employment action
3  as a result of turning that consumer bank role?
4     A. No.
5     Q. Where were you living at that time?
6     A. Minneapolis, Minnesota, and then here Monday
7  through Thursday.
8     Q. Your family was still up in Minneapolis; is
9  that right?
10    A. My son was completing the behavioral program I
11 referenced earlier.
12    Q. And so you were commuting Monday through
13 Thursday; is that right?
14    A. That's correct.
15    Q. Did you eventually move to Cincinnati full
16 time?
17    A. We did.
18    Q. When did that happen?
19    A. The kids enrolled in school for the 2019
20 school year. I don't remember the exact date that we
21 moved, but it would have been well before that because
22 we wanted to give them a few months to settle in.
23    Q. So when you say the 2019 school year, you're
24 referring to the fall?
25    A. The fall of 2019.

Page 63

1     Q. So sometime in 2019?
2     A. Call it the spring to early summer would be a
3  reasonable approximation. I should clarify. I didn't
4  turn the job down. What I told Greg and Theresa was
5  that if they needed me to take the position, I would be
6  happy to do it, but given my personal circumstances I
7  would prefer if there was another candidate to maintain
8  my existing responsibilities at that point in time, and
9  that is specifically what I said.
10       (Exhibit 13 is marked for identification.)
11 BY MR. SABA:
12    Q. Mr. Spence, I've handed you what's been marked
13 as Exhibit Number 13. This is Bates stamped Fifth Third
14 McHugh 000451 through Fifth Third McHugh 000453. Can
15 you identify this document for me, please?
16    A. It's the performance self assessment that I
17 completed in 2018.
18    Q. You prepared this document; is that right?
19    A. Yes, I would have.
20    Q. If I could refer you to the last page, Fifth
21 Third McHugh 000453. Do you see that?
22    A. Yes.
23    Q. And if I could refer you to the last bullet
24 point under talent optimization. If you could read that
25 please.

Deposition of Timothy Spence                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 64

1    A.  Areas for improvement, engagement scores and
2 strategy, digital and DSG functions, matching diversity
3 progress made in payments, and strategy in the broader
4 consumer banking organization.
5    Q.  And that first area for improvement, you're
6 acknowledging you need to improve your engagement scores
7 and strategy, digital, and DSG functions; isn't that
8 right?
9    A.  That was going to be an area of focus for me
10 for the coming year, yes.  Along with, it looks like,
11 matching the progress that I had made in payments and
12 strategy in the consumer banking organization, which
13 presumably would have been behind, if the goal was to
14 match those two.
15    Q.  You're referring to diversity products there?
16    A.  Yeah.
17    Q.  Okay.
18    A.  The engagement scores in the consumer bank
19 went up by 5 points in the year after Phil transitioned
20 the consumer bank to me, somewhat similarly to the way
21 that the scores in wealth and asset management went up a
22 few points in the year after Phil transitioned the
23 wealth and asset management division from himself to
24 Mike Michael or Brian Lamb.
25    (Exhibit 14 is marked for identification.)

Page 65

1 BY MR. SABA:
2    Q.  Mr. Spence, I've handed you what's been marked
3 as Exhibit Number 14, which is Fifth Third McHugh 071635
4 through Fifth Third McHugh 071709.  Is that right?
5    A.  Hold on.  Ending in 071709?
6    Q.  Yes.
7    A.  Yes.
8    Q.  Can you identify this document for me, please?
9    A.  It appears to be a document prepared by Aon,
10 which would have had their out-briefing of the employee
11 point survey.
12    Q.  Have you seen this document before?
13    A.  I don't recall specifically, but it's
14 reasonable to assume that I would have.
15    Q.  If I can refer you to Fifth Third McHugh
16 071707.
17    A.  0717 -- 1707?
18    Q.  Correct.
19    A.  Okay.
20    Q.  Have you seen this document before?
21    A.  I don't recall specifically on this document,
22 but I recall generally the Aon framework.
23    Q.  And this particular page, it has engagement
24 defined; isn't that right?
25    A.  Aon's definition of engagement, yes.

Page 66

1    Q.  Okay.  There's also a Fifth Third label on
2 there as well?
3    A.  But it was prepared, it says, on the front of
4 the document by Aon Consulting explicitly, so it would
5 have been Aon's -- the Fifth Third logo, I think, would
6 just denote that it was the work they did for Fifth
7 Third.
8    Q.  Okay.  And it indicates, engagement is
9 the state of emotional and intellectual involvement that
10 motivates employees to do their best work.
11    Do you see that?
12    A.  Yes.
13    Q.  Do you agree with that?
14    A.  I mean, I think you could define engagement in
15 many different ways, but that's a reasonable definition.
16    Q.  Okay.  And then under the point under say, it
17 says, employees consistently speak positively about the
18 organization to coworkers, potential employees, and
19 customers.
20    Do you agree with that?
21    A.  I -- that certainly is a positive attribute,
22 yes.
23    Q.  Of engagement, correct?
24    A.  As defined by this framework, yes.
25    Q.  Okay.  And engagement -- engaged employees

Page 67

1 also have an intense desire to be a member of the
2 organization.
3    Do you agree with that?  They stay?
4    A.  Yeah, I -- as I said in my earlier testimony,
5 engaged employees are more likely to stay.
6    Q.  It's consistent with what you said before,
7 correct?
8    A.  Yeah.
9    Q.  And the other thing they point out is
10 that employees are engaged or motivated to exert extra
11 effort and engage in work that contributes to business
12 success.
13    A.  Which is also consistent with what I said
14 previously.
15    Q.  Correct.
16    A.  I would note, however, that this is Aon's
17 framework.  We attempted to correlate engagement scores,
18 as you defined it earlier, the engagement score with our
19 own internal attrition data for employees, and it
20 doesn't correlate.  It's not predictive.
21    Q.  So in referring to the data, this is
22 October 11, 2018; is that right?
23    A.  Yes.
24    Q.  If I could refer you to 071653, please.
25    A.  Okay.

Deposition of Timothy Spence                                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 68

1  Q. Have you seen this page before?

2  A. I don't recall specifically, but this page in
3  general, yes.

4  Q. And this is a breakdown of the engagement
5  scores by line of business at Fifth Third Bank; isn't
6  that right?

7  A. That includes more than just the lines of
8  business, but it is a breakdown by organizational unit.

9  Q. Okay. In your organizational unit, you were
10 chief strategy officer; isn't that right?

11 A. That was one of my responsibilities at this
12 point in time, yes.

13 Q. Okay. All right. CSO is listed on this
14 charge; is that correct?

15 A. It is. That's correct.

16 Q. And as of 2018, you had the lowest engagement
17 score for the company at 54 percent; isn't that right?

18     MR. CIOFFI: Objection to the form of the
19 question. When you say "you," do you mean him
20 personally?

21 BY MR. SABA:

22 Q. You, as chief strategy officer, have the
23 lowest engagement score for line of business at 54
24 percent in the bank; isn't that right?

25     MR. CIOFFI: Objection to the form. You may

Page 69

1  answer.

2     THE WITNESS: My recollection is that my
3  direct reports had very high engagement score, so me
4  personally, my direct reports had high engagement
5  scores. My organization in this specific measure had
6  the lowest score on this page of the organizational
7  units that were broken out.

8  BY MR. SABA:

9  Q. And when you refer to your self-evaluation of
10 improving your engagement scores, these are the
11 engagement scores you're talking about; isn't that
12 right?

13 A. Absolutely. When I joined the bank in 2015,
14 as I mentioned earlier, the reason I was hired is
15 because we had a strategy organization that had
16 previously been run by a gentleman who was a head of
17 sourcing. He was a good guy, but he didn't know the
18 talent that was required. He didn't have any experience
19 working on strategy engagements outside the company. He
20 had struggled to recruit the right level of talent.

21     We had in our decision sciences group a very
22 capable individual who's gone on to do very good things
23 inside the bank, but who had been an accountant
24 previously and had worked in corporate development,
25 and he was responsible for the digital organization,

Page 70

1  among other things.

2     So job number one for me when I joined was to
3  reload the talent in these groups to be able to deliver
4  on the objectives that we set forth for Fifth Third, so
5  that we could move from being a bottom performing bank
6  to a top performing bank. Which again, was encapsulated
7  in the North Star strategy that we laid out.

8     So I introduced a lot of change to this
9  organization, and I actually think it's appropriate,
10 with as much change as we introduced to that
11 organization, for people to be feeling nervous and
12 concerned about the future and trying to figure out what
13 their place is and what their career path was.

14     That is certainly one of the things that I
15 took away from this discussion, and as a result, as I
16 was thinking about the future, with a new leadership
17 team in place, people who joined us who had previously
18 been the global head of consumer digital for Citigroup,
19 which is a bank larger than us, who had previously run
20 consumer analytics for JP Morgan, which, of course, is a
21 bank that is larger than us or who had joined, along
22 with me, another partner from Oliver Wyman joined to run
23 the strategy group, that we had the team in place. It
24 was important for us to now focus on making sure that
25 with the right talent and the organization, that they

Page 71

1  stayed and growed -- and grew, excuse me.

2  Q. And your employee engagement score, not
3  withstanding the fact that you were the lowest in
4  2018 -- it had actually dropped by 5 points from 2017.
5  Isn't that right?

6  A. Yes.

7  Q. Okay.

8  A. Again, as I stated, we were introducing a lot
9  of change into the organization.

10 Q. But you were already three years in, in your
11 role as chief strategy officer leader?

12 A. '16 and '17. This would have been a survey
13 that was conducted in the middle of '18. Because I
14 joined in September of '15, and didn't make any
15 significant personnel changes until the spring of the
16 following year. So it would have been half of '16, call
17 it, '17, now you've got the organization set, it's time
18 to really focus on making sure that we -- with the right
19 people in the chair that they're engaged and growing.

20 Q. Right. At this point, though, you've been
21 chief strategy officer for three years, correct?

22     MR. CIOFFI: Objection. Asked and answered.

23     THE WITNESS: Yes.

24 BY MR. SABA:

25 Q. Phil McHugh, at this time, was head of wealth

Deposition of Timothy Spence          Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 72

1 and asset management and consumer; is that right?
2     A. I don't believe so. I think by October of
3 2018, Phil McHugh was the head of regional banking
4 wealth and asset management.
5     Q. As you indicated, though, for purposes of
6 these scores, they were attributable to what -- when
7 Phil was head of consumer banking?
8     A. Yes.
9     Q. Okay. And those -- the wealth of asset
10 management consumer ratings -- were two of the highest
11 engagement scores in the bank for 2018. Isn't that
12 right?
13     A. I'm sorry, I flipped back for it. Can you
14 give me the number again?
15     Q. Sure. Fifth Third McHugh 071653.
16     A. I'm still getting there. But consumer and
17 wealth are generally high engagement scores, whether it
18 was when Chad Borton was running consumer, Steve Alonso
19 prior to that, or when Phil was running wealth and asset
20 management, or Mike Michael, Brian Lamb, now Kris
21 Garrett. So I wouldn't be surprised. Yeah, they were
22 above average.
23     Q. They were the third and fourth highest in the
24 bank, correct?
25     A. Based on this organizational breakdown, yes.

Page 73

1     Q. Sure. In 2018. And actually, both of those
2 areas had improved from 2017; isn't that right?
3     A. They had on this measure. I can't speak
4 definitively to the 80 questions in total that we asked
5 as part of this survey.
6     Q. But to be clear, these are the measures that
7 you ultimately used and reference in evaluations that
8 need to be improved, correct?
9     A. No, certainly not my self-evaluation. I was
10 referencing the more granular data.
11     Q. Which --
12     A. In terms of the engagement scores.
13     Q. Which the granular data is converted to this
14 percentage, right?
15     A. No, only, 5 of the 80 -- 5 or 6 of the 80
16 questions are converted to that particular percentage,
17 so 90-plus percent of the questions are not included in
18 that chart.
19     Q. Wasn't this the percentage that was being used
20 to measure you?
21     A. No, not to my knowledge. No. I think -- in
22 the conversations I had with Greg Carmichael about
23 engagement scores, he was always very clear that it was
24 a number. It was a thing that we wanted to look out
25 for, but it was one of a lot of different indicators,

Page 74

1 and that the big focus is making sure we have the right
2 talent in place, and that that talent was engaged and
3 working hard, and that while this could be an indicator,
4 we needed to be looking at all the answers to all 80
5 questions, and working on the specific issues, because
6 in some groups -- I'll take the decision sciences group.
7 One of the biggest challenges is the bank didn't have
8 computers during this period that could process the
9 sorts of large algorithms that we were asking that group
10 to build without overnight runs and it was very
11 frustrating to them.
12     That wasn't a problem in the strategy
13 organization, where the frustration was their since
14 that there was a reticence inside several of the lines
15 of business to take a more aggressive action.
16     Q. The percentages that we see in the Aon
17 reports, the concentric reports, those were the numbers
18 that were communicated to you to indicate how your
19 performance was for a particular year. Wasn't that
20 right?
21     A. No.
22     MR. CIOFFI: Objection. Asked and answered,
23 but answer again.
24     THE WITNESS: I don't ever remember Greg
25 Carmichael indicating anything about a specific score in

Page 75

1 my annual performance review.
2 BY MR. SABA:
3     Q. Okay.
4     (Exhibit 15 is marked for identification.)
5 BY MR. SABA:
6     Q. Mr. Spence, I've handed you what's been marked
7 as Exhibit Number 15, which is Bates stamped Fifth Third
8 McHugh 071710 through Fifth Third McHugh 071802. Is
9 that correct?
10     A. Yes.
11     Q. Are you able to identify this document for me,
12 please?
13     A. It appears to be the 2019 employee viewpoint
14 survey results, but this time prepared by Kincentric, a
15 Spencer Stuart company.
16     Q. If I can refer you to 071733.
17     A. 071733. Okay.
18     Q. And again, these are employee engagement
19 scores by line of business; is that correct?
20     A. Yeah. Line of business and functional units,
21 as I wouldn't call HR a line of business.
22     Q. Okay. And this is for 2019; is that right?
23     A. It is.
24     Q. Okay. And you were still the chief strategy
25 officer at that point in time, weren't you?

Deposition of Timothy Spence

Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 76

1    A. I was, at that point in time, the head of
2 consumer banking, payments, and strategy. So I had the
3 payments organization, the consumer bank, and the
4 strategy office.
5    Q. Okay. You were still chief strategy office
6 and you were payments, correct --
7    A. And the consumer bank.
8    Q. -- and consumer, correct? All right. And it
9 appears that payments would have been separated from
10 chief strategy office, compared to the prior year in
11 2018. Is that a fair statement?
12    A. I don't know. Because sometimes they
13 aggregated these things in different ways, so I can't
14 tell you that definitively. It definitely didn't appear
15 in the prior report.
16    Q. Okay. And just -- if I can refer you back to
17 a second to Exhibit Number 14 in Fifth Third McHugh
18 071653. Looking at that chart on Fifth Third McHugh
19 071653 for the lines of business in 2018, the number of
20 employees listed for chief strategy officer is 395.
21    Do you see that?
22    A. I do. I do.
23    Q. Okay. Is it fair to say that that would have
24 included payments within chief strategy officer?
25    A. I don't know. Because if you look at the

Page 77

1 following page where it's broken out, it says chief
2 strategy office 112. I'm sorry, the following year.
3 Your document Exhibit 15.
4    Q. Okay. Fifth Third McHugh 071733, you're
5 comparing it to that number, correct?
6    A. Yes. So it says chief strategy office 112,
7 and payments 375, which added together would be like,
8 what, 387?
9    Q. 487.
10    A. I'm sorry, 487. And here the strategy office
11 is 395, and I don't think we added 90 people over a
12 year, so I don't know how I would do a -- draw a
13 comparison between those things without more
14 information.
15    Q. Okay.
16    A. I don't know.
17    Q. Referring back to the engagement by line of
18 business for 2019, Fifth Third McHugh 071733, chief
19 strategy officer was still the lowest employee
20 engagement score for any area of Fifth Third Bank; isn't
21 that right?
22    A. Yes.
23    Q. Okay. And the second lowest was payments;
24 isn't that right?
25    A. It appears to be, yes. And then retail went

Page 78

1 up year over year. And consumer went up year over year.
2 And just to give you the point about reaggregation, I
3 don't even know if we can compare a few of these. I
4 don't even see the regions on here as an example, and
5 that was obviously a material part of the company.
6    Q. What we do see on there is business banking is
7 still on there, and Phil McHugh would have had business
8 banking for 2019. Isn't that right?
9    A. I believe so.
10    Q. And that was at 78 percent; is that correct?
11    A. Yes.
12    Q. And that's one of the highest in the bank; is
13 that right?
14    A. Yeah. But it's again, it's the highest on a
15 somewhat irrelevant measure, given that it's a composite
16 of five questions that don't predict attrition, that was
17 now generated by a different survey company, where at
18 least unless you show me there's no evidence that the
19 survey methodology or the wording was even the same in
20 terms of generating the questions. So it's hard to
21 draw -- my point of view -- any inference on this
22 without more detail on what else was going on inside the
23 organization.
24    Q. And wealth and asset management was also one
25 of the highest at 72 percent; is that right?

Page 79

1    A. By this measure, yes.
2    Q. What is the African American BRG?
3    A. It would be the employee group inside the
4 company for African American employees who elected to
5 participate in it and advocates. So not limited to, but
6 it would be an affinity group, which would generally
7 attract other members of the group or allies to the
8 group.
9    Q. And when did you serve as the enterprise
10 sponsor for the African American BRG?
11    A. I don't remember when we refreshed the
12 executive sponsorship of the BRG, but it would have been
13 not long after I joined, through to when I became CEO.
14    Q. If I can refer you back to Exhibit 13, and
15 again to 000 -- Fifth Third McHugh 000453.
16    A. Yes.
17    Q. Under the second -- on talent optimization,
18 second bullet point, diversity and inclusion, you note,
19 continue to serve as the enterprise sponsor for the
20 African American BRG and had a successful year on that
21 front. Of the eight people we discussed at talent
22 review for payment strategy and digital, half are women
23 or people of color.
24    Do you see that?
25    A. I do.

Deposition of Timothy Spence

Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 80

Q. Why is that a successful year for you as the enterprise sponsor for the African American BRG if eight of the people you discussed at talent review are women or people of color?

A. I was delineating two separate thoughts with the semicolon there, the same way the next row, the next bullet that you asked me to cover previously. I delineated two separate thoughts with the semicolon.

So one thought was, I wanted to continue to do a good job as the executive sponsor for the AABRG, and separately, we had an enterprise priority focused on diversity, on gender and racial diversity, and of the eight people that we talked about as being recent hires or promotes inside, my payment strategy and digital organization that year, half were women or people of color.

Q. What do you mean you had an enterprise priority for racial and gender, for people of race or gender?

A. Meaning --

MR. CIOFFI: Objection. That wasn't the answer and mischaracterizes his testimony. But --

THE WITNESS: We had an enterprise priority for the workforce, to continue to boost people of color and women in critical positions across the bank.

Page 81

BY MR. SABA:

Q. Was that expressed in writing somewhere?

A. That, I don't recall. But we definitely talked about it as part of our annual talent review process.

Q. Why was the priority limited to women and people of color?

A. Because those were two areas where we believed we could make significant progress on representation, and where we were underrepresented in the workforce.

Q. How is that priority being implemented at Fifth Third Bank?

A. A whole variety of ways. I don't know that I could answer that holistically. Because we agreed an as enterprise team that we would make progress on those measures, and there were enterprise level strategies, and then there were strategies that were developed in specific areas.

So as an example, an enterprise strategy was a women in leadership program that we developed, which is a leadership program for high potential women across the organization who were in a position to be able to step up into their next big role, and were nominees I believe from every organizational unit who would have been included and would have completed the course.

Page 82

In other places, we had very specific points of focus. So as an example, in the decision sciences group and the strategy organization, we developed a program to recruit from historically black colleges and universities as a complement to the recruiting we did at NC State and several other universities where we recruited for analytics talent. So it would have been a multi-pronged approach.

Q. When did the bank implement the priority for women and people of color?

A. I don't recall. And I would tell you that it probably pre-exists my arrival at the bank.

Q. Does the bank's priority for women and people of color still exist today?

A. It does. Priority -- it continues to be a point of focus, would probably be the right way to say it. We have a specific goal attached to some aspects of that and a general area of focus more broadly.

Q. This specific goal, where is that set forth?

A. The GOLD goals that were laid out and communicated publicly a few different occasions. I don't recall now which specific document, but they were publicly communicated.

Q. Set forth in writing somewhere; is that right?

A. Yeah.

Page 83

Q. Do you recall what the specific goal was?

A. Not off the top of my head. The goal, read broadly, in an industry where there is a larger demand for talent than there is talent availability is to try to achieve the sort of employee base which roughly corresponds with the footprint of the markets where we operate.

Q. Does the priority or goals -- do the priorities or the goals fluctuate from year to year?

A. Well, to the extent -- I gave you my -- the principled goal. So to the extent that the footprint would fluctuate, you could say that the goal would fluctuate. But in practice, the goal is to continue to boost representation among women and people of color.

Q. Has Fifth Third Bank ever placed as a priority hiring other protected classes other than women or people of color?

MR. CIOFFI: Objection. Can you be more specific? What do you mean by "other protected classes"?

BY MR. SABA:

Q. Are you aware that there's various protected classes?

A. I am.

Q. Okay. What protected classes are you aware

Deposition of Timothy Spence                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 84

1  of?
2     A.  I'm aware of protected classes related to
3  gender and race and age and -- I don't know what the
4  term is -- but disabilities.  Developmental status.
5     Q.  Are you aware that there is a protected class
6  for religion?
7     A.  I don't know.
8     Q.  Are you aware that there is a protected class
9  for sexual preference?
10    A.  Yes.
11    Q.  Has Fifth Third Bank ever had, as a priority,
12 the hiring of protected classes other than women and
13 people of color?
14    A.  I don't think I can answer that definitively.
15    Q.  To the extent of your knowledge, are you aware
16 of Fifth Third Bank ever having as a priority the hiring
17 of any protected classes other than women or people of
18 color?
19    A.  I don't know.
20    Q.  To the extent of your knowledge, are you aware
21 of Fifth Third Bank ever having as a priority the
22 advancement of protected classes other than women and
23 people of color?
24    MR. CIOFFI:  Objection; asked and answered.
25    THE WITNESS:  Yeah, I don't know.  I know we

Page 85

1  have programs in some cases, project search being an
2  example of that.  But I don't know.
3  BY MR. SABA:
4     Q.  I'm sorry, what programs are you aware?  I'm
5  sorry, what programs are you aware of?
6     A.  Project search would be an example of a
7  program that's designed to boost hiring among adults
8  with developmental disabilities.
9     Q.  Okay.  Anything else?
10    A.  Not off the top of my head.  But again, it's a
11 large company, and as I mentioned earlier, there are
12 programs that are running at any one point in time in a
13 lot of different places.
14    Q.  Are you aware of any programs at the bank, or
15 priorities, with respect to the employment or
16 advancement of people in the protected class of age?
17    A.  I don't know.
18    Q.  Who would know?
19    A.  Nancy Pinckney, our head of HR.
20    Q.  Anybody else?
21    A.  Likely Susan Zaunbrecher, our chief legal
22 officer.
23    Q.  Anyone else?
24    A.  I mean, I would suspect Nancy runs an
25 organization with several hundred people.  There would

Page 86

1  be folks inside that organization that had knowledge of
2  what was going on in different places, but not to my
3  knowledge.  Not specifically to my knowledge, I should
4  say.
5     Q.  I'm sorry.  I'm going to refer you back to
6  your self-assessment again, please.  Fifth Third McHugh
7  000453, it's the last page of that.  And again,
8  referring to the third bullet point, on areas of
9  improvement, after the first semicolon, you indicate,
10 matching diversify project made in payment strategy and
11 the consumer banking organization.
12    A.  Yes.
13    Q.  What did you mean by that?
14    A.  That I had made more progress on diversity and
15 payments and strategy than Phil on the leaders and
16 the consumer bank prior to him had made in the consumer
17 banking organization.
18    Q.  What -- what progress did you make in the
19 diversity of payments and strategy?
20    A.  Well, at a minimum, I identify above it
21 that of the eight people we discussed at the talent
22 review, which would be the most senior people in the
23 critical roles, half of those were women or people of
24 color.
25    Q.  How were you going to match the diversity

Page 87

1  progress you made in payments and strategy in the
2  consumer banking organization?
3     A.  Through very targeted areas of focus.  So we,
4  not long after -- well, we may have done it by now.
5  This is the 2018 performance self-assessment, so I would
6  have delivered it to Greg in January of '19.  We had
7  announced a program, as an example, to open a hundred
8  branches across the southeast.  That gave us a unique
9  opportunity because we were going to be doing a lot of
10 external recruiting and a lot of internal talent
11 development to create 100 new financial center managers
12 to be deliberate about our ability to attract a
13 population of candidates in that area that roughly
14 matched the makeup of the markets where we were building
15 those branches.  So that would be an example of a
16 strategy that we deployed to achieve this goal.
17    Q.  And with respect to that strategy, the focus
18 would be on hiring women or people of color, correct?
19    MR. CIOFFI:  Objection.
20    THE WITNESS:  Those -- that certainly would be
21 -- have been a focus of that strategy, yes.
22 BY MR. SABA:
23    Q.  What other focus would it have had?
24    A.  We had had a habit over the years of moving
25 people from certain regions of the country, as an

Page 88

1 example, into other regions of the country as we
2 expanded. And we concluded, ultimately, that that was
3 not the right practice because folks who lived in the
4 market -- in particular those that lived near the branch
5 where they were working -- understood the community
6 better. Could better tailor our products and services
7 to their unique needs.
8      So another example would be attempting to hire
9 people from the immediate surrounding areas and the
10 places where we build new branches.
11     Q.  In 2018, you received recognition from
12 American Banker Magazine as a digital banker of the
13 year. Is that right?
14     A.  Yeah. Yes.
15     Q.  Okay. Are you aware that American Banker
16 Magazine began giving out that recognition just a couple
17 years prior to that in 2012?
18     A.  I'm not aware of the history of that award.
19     Q.  Okay. Do you have any understanding of how
20 the process works to be recognized as a digital banker
21 of the a year by American Banker Magazine?
22     A.  No.
23     Q.  Do you recall submitting an online application
24 to be named and recognized as a digital banker of the
25 year?

Page 89

1      A.  I don't recall doing it personally, but there
2 definitely, at some point, was an application that had
3 to be completed because they needed specific
4 information, and it then fed the development of the news
5 article that you're referencing that ran in the
6 magazine. It was a lot of biographical data in there
7 that wouldn't have been otherwise available.
8      Q.  Do you know who completed your application to
9 be recognized as the digital banker of the year by the
10 American Banker Magazine?
11     A.  No.
12     Q.  Do you have a copy of the application that you
13 submitted to a bank -- American Banker Magazine?
14     A.  No.
15     Q.  Do you recognize -- just let me finish my
16 question.
17          Do you have a copy of the application that you
18 submitted to American Banker Magazine to be recognized
19 as digital banker --
20          MR. CIOFFI:  Objection to the form of the
21 question. He just testified he didn't submit it.
22          THE WITNESS:  No, I don't have a copy.
23 BY MR. SABA:
24     Q.  Okay. Or that somebody submitted on your
25 behalf, correct?

Page 90

1      A.  I don't have a copy of any application that
2 was submitted to the American Banker.
3      Q.  Okay. Do you know how many people submitted
4 applications to American Banker Magazine in 2018, to be
5 recognized as a digital banker of the year?
6      A.  No. I only know what the reporter who was
7 part of the selection committee told me when he called
8 to conduct the interview, which was that it was a fairly
9 broad field and there were a lot of very credible
10 applications, and that what stood out about mine was the
11 comprehensiveness of the response. That there were many
12 banks who were doing a single thing, running a digital
13 lending business, investing in their own digital
14 channels, or focusing on the commercial business, but
15 that it was the holistic nature of the digital
16 transformation that was underway at Fifth Third that
17 made it notable.
18     Q.  Do you know what criteria was used by Digital
19 Banker magazine in 2018 to select people who would be
20 recognized as a digital banker of the year?
21     A.  Not beyond what I just shared with you that
22 the reporter shared with me.
23     Q.  Are you aware of how many digital bankers of
24 the year they'll recognize -- that American Banker
25 Magazine recognizes each year?

Page 91

1      A.  No, I don't think it's a consistent number.
2 Or at least if it is, then there are honorable mentions
3 and then one digital banker of the year, but I don't --
4 I don't pay a lot of attention to those.
5      Q.  Are you aware of how many people at American
6 Banker Magazine are involved in picking who will be
7 recognized as a digital banker of the year?
8      A.  Only that the reporter said there was a
9 committee.
10     Q.  Are you aware that American Banker Magazine
11 describes the process as an editors choice of who should
12 be recognized as a digital banker of the year?
13          MR. CIOFFI:  Objection to the question, form
14 of the question. Assumes facts not in evidence. You
15 may answer.
16          THE WITNESS:  No. But I am aware that there
17 are multiple editors at the American Banker.
18 BY MR. SABA:
19     Q.  You don't know how many of those editors are
20 involved in this process, do you?
21     A.  No.
22     Q.  Okay. Are you aware of any objective criteria
23 that is used by American Banker Magazine to pick who
24 will be recognized as a digital banker of the year?
25          MR. CIOFFI:  Objection. Asked and answered.

Page 92

1  You already talked about the criteria, but you may
2  answer.
3      THE WITNESS:  I was not part of the selection
4  committee, nor did I have any indirect interaction with
5  the selection committee other than the individual
6  reporter who called to interview me once the decision
7  was final.  So I don't know what criteria the American
8  Banker utilizes.  I can't speak definitively one way or
9  the other.
10  BY MR. SABA:
11     Q.  And just to confirm, you have no recollection
12  of who would have prepared your application for -- to
13  apply to be recognized as digital banker of the year?
14     A.  No.
15     Q.  As of the end of 2018, you still had some
16  opportunity areas to work on; is that right?
17     **A.  As the CEO of a fortune 500 bank, today, I**
18  **have opportunity areas to focus on.  I think one of the**
19  **things that any good executive does is they're honest**
20  **about their performance and they're constantly looking**
21  **for ways to improve.  So I would expect that every one**
22  **of my self-evaluations included a reflection and a focus**
23  **on areas for improvement.**
24     Q.  Referring specifically to you, as of the end
25  of the 2018, you needed to focus significant attention

Page 93

1  to reduce elevated charge off levels in the consumer
2  bank, specifically in the credit card portfolios; is
3  that right?
4      **A.  Are you referring to -- it would be helpful to**
5  **me to have something specific.  I know we discussed**
6  **charge-off levels in the consumer bank, but I can't**
7  **speak to what year that would have been.  Is it in here?**
8      Q.  Do you have any recollection as of the end of
9  2018 what the opportunities were that you needed to work
10  on?
11     A.  In my self-assessment?
12         MR. CIOFFI:  Wait a minute.  Objection.  To be
13  clear, you're talking about the end of 2018?
14         MR. SABA:  Correct.
15         MR. CIOFFI:  After Exhibit 13; is that right?
16  Exhibit 13 is a document that's generated February of
17  2018.  Are you talking about after that?  Just so we get
18  the timeframe right.
19         THE WITNESS:  I believe this document was
20  generated at the end of 2018 and was presented in the
21  2019, because it would have -- I -- unless I misremember
22  how I would have titled this.  I would have titled it
23  for the performance year as opposed to the date when it
24  was completed.
25         MR. CIOFFI:  Could you clarify, just for the

Page 94

1  record, what timeframe you're talking about?
2  BY MR. SABA:
3      Q.  Sure.  I'm referring to the end of 2018, his
4  self-assessment for the -- as of -- for the year 2018,
5  I'm referring -- I'm asking specifically right now, do
6  you recall what any of your opportunities were as of the
7  end of 2018?
8      A.  In my self-assessment or in --
9      Q.  That would have been communicated to you in
10  your review with Greg Carmichael.
11     **A.  Do I have a review I can refer to?**
12     Q.  Well, first, do you have any recollection, as
13  you sit here now?
14     **A.  I don't recall specifically to 2018.  I do**
15  **recall the need to continue to focus on the credit card**
16  **business.  It was strategic growth priority as part of**
17  **North Star, that we would grow credit cards because the**
18  **bank hadn't able to grow them for several years prior to**
19  **that.  And in order to do that, we launched a whole**
20  **portfolio of strategies and tactics to grow the bank**
21  **card business.  Some of those worked well, some of them**
22  **didn't work.  The ones that didn't work generated**
23  **incremental charge off performance.  With that said,**
24  **even at the elevated levels, the credit card business**
25  **was still the single most profitable risk adjusted loan**

Page 95

1  **type of any type of loan we had in the bank.**
2      **So it's very possible that I indicated I**
3  **wanted to continue to get charge-off levels in the**
4  **credit card business back down to a 3.5 to 4 percent**
5  **range, and to continue to reduce the exposure that we**
6  **had to strategies that didn't work.**
7      **But it would have been in the context of**
8  **credit card being more profitable than any other loan we**
9  **made, including every loan we were making as a portfolio**
10  **in the private bank and the commercial lending portfolio**
11  **as well.**
12     **And again, I don't remember if that would have**
13  **been in my '18 or '19 self-assessment.  It doesn't**
14  **appear to be in here in '18, but it definitely was an**
15  **area of focus in that '18, '19 timeframe.**
16     Q.  Okay.  Do you recall being told that you need
17  to be mindful to ensure that people are able to follow
18  your communications so that you do not come across as
19  being dismissive?
20         MR. CIOFFI:  Objection to the form of the
21  question.  Told why whom, when, timeframe?
22  BY MR. SABA:
23     Q.  By Greg Carmichael at your review for 2018?
24         MR. CIOFFI:  Just to be clear, you're asking,
25  does he remember being told that?

Page 96

1    MR. SABA:  I asked if he recalls that by Greg
2 Carmichael.
3    MR. CIOFFI:  Objection.  The deposition's not
4 a memory test.  If you have a document, show it to him
5 and just be straightforward.
6 BY MR. SABA:
7    Q.  Do you recall --
8    MR. CIOFFI:  Why -- why are you being so
9 deceitful?  Show it to him.
10    MR. SABA:  Listen, nobody's being deceitful.
11 I know you're going to give talking objections.
12    MR. CIOFFI:  You're reading it from a
13 document.  Show it to him.
14    MR. SABA:  You're trying to be derogatory.
15 You're trying to take over the deposition because you're
16 unhappy with the way it's going.  That's all right.
17 Just state your objection and we'll move on, all right?
18 You don't need to tuter.
19    MR. CIOFFI:  I did state my objection.  Go
20 ahead.
21 BY MR. SABA:
22    Q.  Okay.  Do you recall Greg Carmichael
23 indicating to you that you need to be mindful to ensure
24 that people are able to follow his -- your
25 communications so you do not come across as being

Page 97

1 dismissive?
2    A.  In general, not specific to the 2018
3 performance evaluation?
4    Q.  Yes.
5    A.  Yes.  I remember Greg Carmichael encouraging
6 me to slow down because he had to remind me on a regular
7 basis that there were may executives who did not have
8 the broader industry view that I had.  Who had not spent
9 time outside of Fifth Third and, therefore, didn't know
10 the way that things got done in other places, and
11 couldn't use that basis of knowledge to draw inference
12 and comparisons when it came to crafting strategies in
13 other places.
14    So the feedback that I got from Greg, which I
15 think was actually quite valuable feedback, was that I
16 needed to slow down and made sure I brought those
17 executives along, and to give them the benefit of the
18 information that I had when I came to making a decision
19 versus communicating my recommendation and then moving
20 forward.
21    Q.  Were you aware that in June of 2019, Phil
22 McHugh's role was expanded to oversee community and
23 economic development and corporate communications?
24    A.  I don't recall the date specifically, but I do
25 know that at some point in time Phil picked up

Page 98

1 responsibility for CED and communications.
2    Q.  Are you aware that Phil would have been
3 55-years-old at that time?
4    A.  I was never aware of Phil's age.
5    Q.  In 2019, you would have been 40-years-old; is
6 that right?
7    MR. CIOFFI:  Objection.  Relevancy.
8    THE WITNESS:  After January 23, 2019, I would
9 have been 40-years-old.
10 BY MR. SABA:
11    Q.  Okay.  And you assumed responsibility for
12 marketing in that year; is that right?
13    A.  I did.
14    Q.  When did that occur?
15    A.  I don't recall.
16    Q.  As of September of 2019, you would have been
17 employed with Fifth Third for four years.  Is that
18 correct?
19    A.  Yes.
20    Q.  And Phil McHugh would have been there
21 33 years; is that right?
22    A.  Yes.  Based on what you've told me.  I, again,
23 I'm not aware of when Phil started at the company.
24    Q.  Were you ever made aware that during Phil
25 McHugh's mid-year review with Greg Carmichael on

Page 99

1 August 15, 2019, that Greg Carmichael indicated to Phil
2 McHugh that he would recommend him to be the next
3 president and chief executive officer for Fifth Third
4 Bank?
5    MR. CIOFFI:  Objection to the form of the
6 question.  Assumes facts not in evidence.
7    THE WITNESS:  Based on what I know, I don't
8 believe that's what Greg indicated.  But no, I was not
9 made aware.
10 BY MR. SABA:
11    Q.  What do you know?
12    A.  That Phil, as part of the review of the
13 documents that were provided to me by my attorney, that
14 Phil was flagged as a potential interim emergency
15 successor.  But at that point in time, I was unaware,
16 and I was not aware until the lawsuit was filed, that
17 that conversation ever had occurred.
18    Q.  What is an interim emergency successor?  What
19 does that mean?
20    A.  Those aren't my words, so I can't define them
21 for the person who would have put them in place.
22    Q.  Where did you --
23    A.  But the word "interim" means for a time
24 limited period.
25    Q.  So was it your understanding that Phil McHugh,

Deposition of Timothy Spence                                   Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 100

1  for a limited period, would be an emergency successor?
2      A.  No.  I had no understanding because I was
3  unaware the conversation ever occurred, and I did not
4  participate in the talent management process with the
5  board.
6      Q.  Did you ever discuss with Greg Carmichael any
7  of the conversations he had with Phil McHugh about CEO
8  succession?
9      A.  No.
10      Q.  Did you ever discuss with Bob Shaffer any of
11  the conversations he had with Phil McHugh about CEO
12  succession?
13      MR. CIOFFI:  Objection.  Assumes facts not in
14  evidence, if there were such conversations, but you may
15  answer.
16      THE WITNESS:  No.
17  BY MR. SABA:
18      Q.  Did you ever have a conversation with Greg
19  Carmichael about CEO succession at Fifth Third Bank?
20      A.  Yes.  I had a conversation with Greg about
21  succession for the president following -- the president
22  position following the December succession planning
23  discussion with the board, probably in January or
24  February, in the general timeframe when we were doing
25  performance management processes.

Page 101

1      Q.  You're saying the January/February timeframe
2  of 2020?
3      A.  2020, yes.
4      Q.  So just so I understand you correctly, so
5  you're saying the first time you ever spoke to Greg
6  Carmichael about you succeeding him as president and/or
7  CEO of Fifth Third Bank was in January or February of
8  2020.  Am I correct?
9      A.  You said about succession, the succession
10  process, is the way I interpreted it, and then yes,
11  that's the first time.  I had indicated to Greg at some
12  point after joining the bank that it was an aspiration
13  for me from a career perspective to be the president and
14  CEO of a large financial institution at some point in my
15  career.  That generally happened during the annual
16  performance management process, because I asked for
17  feedback on areas where I could continue to grow and to
18  improve because I want to be able to do a good job.
19      Q.  When was the first time that occurred?
20      A.  I don't remember, but it would have been in
21  the '16 or '17 timeframe most likely.
22      Q.  Was your aspiration ever set forth in writing
23  to anyone?
24      A.  I believe I put it in my talent card on
25  desired next position at some point in the process.

Page 102

1      Q.  When did you put it in your talent card?
2      A.  I don't recall.
3      Q.  When you're saying your talent card, what are
4  you referring to as your talent card?
5      A.  As part of the annual Bancorp talent review
6  process, every member of the company is asked to flag
7  potential next positions, positions that would be of
8  interest to them.  They're asked to update the community
9  involvement that they have.  They're asked to provide
10  input on whether or not they would be willing to
11  physically relocate.  There may be two or three other
12  things, but I don't recall at this stage, and that
13  information was provided -- at least for me -- I
14  provided it to my HR business partner, who then
15  populated the talent card, or provided the input into
16  the process that populated the talent cards.
17      But that was generally -- that's well known.
18  That's a thing that we review.  As enterprise members,
19  Phil would have been part of that review for all
20  non-enterprise employees on a annual basis, and those
21  next positions would be things that we would discuss
22  then with our employees, as we talked about their own
23  career development.
24      Q.  So the -- would you physically fill out the
25  talent card?

Page 103

1      A.  No.  No.
2      Q.  Would you see the talent card after it was
3  completed?
4      A.  No.  There's a lot of information on those
5  talent cards that wasn't provided to the employees.
6      Q.  What information on the talent card would not
7  be provided to the employees?
8      A.  The managers strengths and development areas,
9  as an example.
10      Q.  What else?
11      A.  I don't recall.  I'd have to look at a talent
12  card.
13      Q.  You indicated that the topic of you ultimately
14  wanting to be president and CEO of a bank would be
15  communicated around the time of your reviews; is that
16  right?
17      A.  Yeah.
18      MR. CIOFFI:  Objection to the form of the
19  question.
20      THE WITNESS:  Yes.
21  BY MR. SABA:
22      Q.  Okay.  And your reviews, for the entire time
23  you were with Fifth Third, those were all with Greg
24  Carmichael; is that right?
25      A.  They were.

Page 104

1  Q.  Okay.  And was that communication documented
2  anywhere in writing in those reviews?
3      A.  In terms of my -- those reviews consisted of
4  the performance self-assessment that you provided me; a
5  written review that Greg Carmichael would have provided
6  to me, which I wouldn't have seen previously; and then
7  paid for performance.
8          So there wasn't an attorney there taking
9  minutes, as an example.  It would have just been a
10 discussion that Greg and I had.  And it wasn't a long
11 discussion.  My focus was, was I making progress in my
12 key development areas, and did the board believe that I
13 had the potential to be a CEO of a publicly traded
14 company, or to be considered to be the CEO of Fifth
15 Third at some point in the future?
16     Q.  My question is, of any of that documentation
17 relating to the reviews that you had -- either
18 the semi-annual or annual reviews -- do any of those
19 reflect your aspiration to be CEO and president
20 expressly?
21     A.  It would be through a written talent card
22 where it wouldn't have materialized.  It would be in the
23 written talent card.
24     Q.  When's the first time that you saw any of your
25 talent cards?

Page 105

1      A.  I never saw any of my talent cards.
2      Q.  So is that an assumption on your part that it
3  was in the talent cards?
4      A.  I provided certain fields to HR partner, who
5  would have put them in my card, and yes, I assume that
6  she populated the talent card, or later he populated the
7  talent card on my career aspirations consistent with our
8  conversation.
9      Q.  Who was your HR partner?
10     A.  At what point in time?
11     Q.  Take me through from 2015 through 2020, who
12 were your HR partners?
13     A.  I had Tanya Kleindienst.
14     Q.  And how long was she your HR partner?
15     A.  I don't recall the exact dates.  I had Chris
16 Sonneman, and I had Stacy Lynch.  And then as president,
17 I had Tom Maxwell.
18     Q.  When did you have Stacy Lynch?
19     A.  Roughly, approximately, during the period when
20 I was the head of the consumer bank.
21     Q.  When did you have Chris Sonneman?
22     A.  Prior to that.
23     Q.  The consumer bank began in August of 2018?
24     A.  That sounds right.  Approximately.
25     Q.  Would Chris Sonneman have been your HR partner

Page 106

1  up until August 2018?
2      A.  I believe so.
3      Q.  And you became president in September/October
4  of 2020, correct?
5      A.  In October of 2020.
6      Q.  So Stacy Lynch would have been your HR partner
7  roughly from August 2018 to October 2020?
8      A.  That's a reasonable approximation.
9      Q.  Did you ever see drafts of the talent card?
10     A.  No.
11     Q.  Did you ever submit a formal application to
12 serve as president and CEO of Fifth Third Bank?
13     A.  No, not that I recall.
14     Q.  What was your understanding of the process?
15 Is there a formal application involved?
16     A.  No, not that I recall.  There may have been
17 some technical step in the process for me to accept my
18 employment letter in a system somewhere, but I would not
19 personally define that as an application.
20     Q.  Are you aware of any written application
21 that's used by Fifth Third Bank for anybody that's
22 interested in being president and CEO?
23     A.  No.
24     Q.  What's your understanding of the process?
25     A.  My understanding of the process is only what I

Page 107

1  experienced, which is in January or February following
2  the December talent discussion with the board of 2020.
3  Greg Carmichael came to me and indicated that the board
4  had had a discussion and that one of the topics on the
5  agenda was succession planning, and that he thought the
6  discussion had been fulsome, and that the board was
7  likely to be interested in moving forward with vetting
8  me for the potential role of president.
9          And either then or subsequently, he indicated
10 to me that the firm that was like -- the board was
11 likely to hire was RHR International to do the vetting.
12 And at some point, either then or then or subsequent to
13 that, he indicated that Bob Shaffer was working with our
14 RHR International, and I should expect to see a meeting
15 on my calendar for Bob to introduce me to the principals
16 at RHR and to initiate the process.
17     Q.  Any time prior to January -- any time prior to
18 the December 17, 2019, board meeting, did Mr. Carmichael
19 communicate to you that he was going to recommend to the
20 board that you should be the next president and CEO of
21 Fifth Third Bank?
22         MR. CIOFFI:  Objection.  Just to clarify, you
23 said December of 2017, I think.  That's not what he
24 testified to.
25         MR. SABA:  I'll repeat the question again.

Deposition of Timothy Spence                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 108

BY MR. SABA:

1    Q.  At any time prior to the December 17, 2019,
2  board meeting, did Mr. Carmichael ever indicate to you
3  that he was going to recommend that you be the next
4  president and CEO of Fifth Third Bank?
5       MR. CIOFFI:  Objection.  Assumes facts not in
6  evidence that he ever recommended.  But go ahead.
7       THE WITNESS:  Yeah.  No.  Greg never indicated
8  to me that he was going to recommend me for the
9  position.
10  BY MR. SABA:
11   Q.  Are you aware if Greg Carmichael ever did
12  recommend you for the role of president and CEO of Fifth
13  Third Bank?
14   A.  I don't know.  I wasn't involved in any of
15  those discussions between Greg and the board.
16   Q.  At any time, did Bob Shaffer communicate to
17  you -- let me rephrase the question.  Strike that.
18       At any time prior to the December 17, 2019,
19  board meeting, did Bob Shaffer communicate to you that
20  you were going to be recommended as the next president
21  and CEO of Fifth Third Bank?
22   A.  No.
23   Q.  Did you ever have any conversations with Bob
24  Shaffer prior to December 17, 2019, regarding you

Page 109

1  succeeding Greg Carmichael as the next president and CEO
2  of Fifth Third Bank?
3    A.  Not that I recall specifically.  But Bob would
4  have been aware, as the head of HR, that my career
5  aspiration was to be president and CEO of a large
6  financial institution.
7    Q.  At any time prior to the December 17, 2019,
8  board meeting, did you and Greg Carmichael ever have any
9  conversations regarding the timing of your aspiration to
10  be president and CEO of Fifth Third Bank?
11   A.  No.  My aspirations were not time limited.
12   Q.  Did you have a mid-year review with Greg
13  Carmichael in 2019?
14   A.  I don't recall it specifically, but it would
15  have been customary to have a mid-year review.  So I
16  think it's reasonable to assume that we did.
17   Q.  But you have no recollection of what happened
18  during that mid-year review?
19   A.  I don't.
20   Q.  At any time prior to the December 17, 2019,
21  board meeting, did Greg Carmichael ever indicate to you
22  that you were too young and lacked the banking
23  experience to be the next president and CEO of Fifth
24  Third Bank?
25   A.  No.

Page 110

1  board meeting, did you have a conversation with Bob
2  Shaffer where he indicated that Greg felt you were too
3  young and lacked bank experience to be the next
4  president and CEO of Fifth Third Bank?
5    A.  No.
6    Q.  How frequently were you meeting one-on-one
7  with Greg Carmichael in the fall of 2019?
8    A.  Oh, I don't recall.  I'm not going to be able
9  to recall that without some sort of a calendar, prompt,
10  or otherwise.  We met one-on-one relatively frequently
11  because at that point in time there were several
12  strategic initiatives that we were driving.  We had a
13  digital transformation underway.  We had completed the
14  acquisition of MB Financial.  We were driving the
15  build-out of 100 branches across the southeast markets.
16       So it would have been common.  I, today, when
17  I have an executive that has a number of ongoing
18  initiatives, meet with them one-on-one on a more
19  frequent basis than a period of time where, you know,
20  there was less going on, in which case we meet less
21  frequently one-on-one.  But I -- I just -- I'm not going
22  to be able to recall that.
23   Q.  Did you and Greg Carmichael have regularly
24  scheduled one-on-one meetings?

Page 111

1    A.  Possibly.  We definitely did at different
2  points during my time working with Greg.
3    Q.  Referring specifically to the fall of 2019?
4    A.  Again, I can't recall without some sort of
5  documentation to review.
6    Q.  How frequently did you meet with Bob Shaffer
7  in the fall of 2019 on a one-on-one basis?
8    A.  I -- I don't know.
9    Q.  During these one-on-one meetings that you
10  would have with Greg Carmichael in the fall of 2019, did
11  you ever discuss president and/or CEO succession of
12  Fifth Third Bank?
13   A.  No, I never discussed it with Greg beyond the
14  annual career development discussion we would have where
15  I asked, you know what my career aspiration is, what is
16  your point of view?  And what Greg would always say is,
17  it's not my decision, it's the board's decision who will
18  become president and CEO, but the board does believe
19  that you have the potential to one day be a president
20  and CEO of a large financial institution.
21   Q.  How frequently would you communicate by text
22  with Greg Carmichael in the fall of 2019?
23   A.  I don't know.
24   Q.  Who is your cell phone provider?
25   A.  AT&T.

Deposition of Timothy Spence

Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 112

1    Q. How frequently would you communicate by text
2 with Bob Shaffer in the fall of 2019?
3    A. I don't know.
4      MR. SABA: We can go off the record.
5      (A recess was taken from 12:26 to 1:07.)
6      VIDEOGRAPHER: Time is 1:07 p.m. We're back
7 on the record.
8 BY MR. SABA:
9    Q. Mr. Spence, you mentioned the Fifth Third
10 acquisition of MB Financial. How much did Fifth Third
11 spend to purchase MB Financial?
12    A. I don't recall exactly, but somewhere north of
13 4 billion dollars.
14    Q. And that deal, when did it close?
15    A. In the spring of 2019. May of 2019.
16    Q. And was that the second largest deal in Fifth
17 Third's history?
18    A. It was.
19    Q. Who were the three executives in charge of
20 overseeing MB Financial after the acquisition?
21    A. There weren't just three executives that were
22 responsible for overseeing MB Financial after the
23 acquisition. Jamie Leonard was the executive sponsor of
24 the MB Financial integration team. Charlie Bradley was
25 the integration project management lead, but then every

Page 113

1 enterprise member was responsible for their respective
2 areas and ensuring that the integration went
3 successfully, that we achieved our business outcomes,
4 including expenses and revenue growth, and that we
5 completed the process flawlessly, so that that the bank
6 was operating for its customers.
7    Q. What were the problems that developed
8 following the acquisition of MB Financial?
9    A. With the integration of MB Financial?
10 Following the acquisition during the integration
11 process?
12    Q. Yes.
13    A. We had difficulties in the regional banking
14 wealth management and business banking area. Those were
15 the areas where the integration didn't go smoothly.
16 There were systems issues, data conversion initially in
17 the commercial area, followed by a significant issue in
18 terms of loss of talent in the wealth and asset
19 management, which resulted in us missing our business
20 goal in terms of AUM growth attached to that.
21      And then there was an organizational issue
22 with regard to how to organize the business banking
23 group that we ultimately had to address a couple years
24 after the deal.
25      (Exhibit 16 is marked for identification.)

Page 114

1 BY MR. SABA:
2    Q. Mr. Spence, I've handed you what's been marked
3 as Exhibit Number 16, Fifth Third McHugh 0213203. This
4 is a text message exchange between Frank Ford -- Frank
5 Forrest, excuse me, and Bob Shaffer. And if I can refer
6 you to a text message from Bob Shaffer, who's designated
7 as "me" on this exhibit, from October 11, 2019, at 10:51
8 and 14 seconds. Do you see where I am on this page?
9    A. 10:51 and 14. Yes, I do.
10    Q. Okay. And the text message from Mr. Shaffer
11 reads, Heading to Chicago for some productive
12 conversations and problem resolution. I'll try to solve
13 the credit issues while I'm up there as well.
14      Do you see that?
15    A. I do.
16    Q. Do you know what credit issues he's referring
17 to?
18    A. It wasn't pertaining to credit performance, it
19 was pertaining to a data conversion issue related to C
20 Cass, which was the system that housed the credit data,
21 and the conversion itself had not gone well, and the MB
22 relationship managers and formal legal managers were
23 having to manually repopulate the information that would
24 have been in their equivalent system prior to the
25 conversion.

Page 115

1    Q. Frank Forrest responds, you need to do that.
2 We need one capable executive, not three overseeing MB.
3 That would be a great start. Make it happen.
4      Do you see that?
5    A. I do.
6    Q. Who are the three executives that he is
7 referring to overseeing MB?
8    A. Again, Frank sent this text message. Bob is
9 the recipient of the text message. I can't say
10 definitively what Frank meant, but based on the context,
11 I think what Frank means is there was an issue with
12 commercial banking, business banking, and wealth
13 management, which was reflected in our integration
14 scorecard as being yellow or red status during this
15 period. And that the lack of leadership demonstrated by
16 any one of Phil McHugh, Lars Anderson, or Richard Stein,
17 who would have been the chief credit officer and was
18 also involved in that process, had resulted in nobody at
19 MB or at Fifth Third on the ground in Chicago knowing
20 who was in charge.
21      And what Frank was advocating -- which when we
22 discussed it I agreed with -- was that we needed one of
23 Phil or Lars or Richard to step forward, and that the
24 logical executive to do it, given that he was directly
25 responsible for the regions wealth management and

Deposition of Timothy Spence                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 116

1  business banking -- which again were the only areas
2  where the MB Financial conversion was struggling -- was
3  Phil McHugh.
4      Q.   That Phil McHugh was the guy to fix that
5  problem, correct?
6      A.   Phil McHugh was the guy to fix the problem he
7  created through a lack of leadership as part of the
8  conversion process.
9      Q.   Why do you -- how do you claim that Phil
10 McHugh created the problem?
11     A.   Because the only area during the MB
12 integration that ran the risk of being in red status --
13 in the green, yellow, red classification that we use in
14 our enterprise program management office -- was the
15 commercial banking and wealth management and business
16 banking group.  That is the area where we lost more
17 talent than we expected to, that is the area where we
18 missed our business performance objectives, and that is
19 the area where we struggled with the data conversions.
20     The consumer bank, on the other hand, which I
21 was directly responsible for, had a few issues as part
22 of the conversion, because any conversion does.  But we
23 boat our household growth expectations, we beat our
24 deposit growth expectations, we were able to retain the
25 people that we wanted to, and brand awareness and

Page 117

1  consideration jumped materially after the deal for Fifth
2  Third in Chicago, which was the business objective for
3  consumer.
4      Q.   Do you have any documentation anywhere that
5  specifically states that Phil McHugh created the
6  problems at MB Financial?
7      A.   I didn't say Phil created the problems, I said
8  Phil was responsible for the areas where the integration
9  was not performing as expected at this point in time, in
10 October of 2019.
11     And yes, there would have been integration
12 scorecards that were created at that point that
13 the executive management would have reviewed that would
14 have at least reflected in written format the summary of
15 the issues that existed on the ground.
16     Q.   You're not testifying that Phil McHugh caused
17 those problems?
18     A.   I'm testifying that the problems existed in
19 the areas that Phil McHugh was responsible for prior to,
20 during, and after the integration.  And that those were
21 the only areas inside the bank that faced those sorts of
22 problems, as part of the acquisition subsequent
23 integration, and then go forward growth plan for MB
24 Financial.
25     Q.   You said -- you made the earlier comment, we

Page 118

1  discussed it and I agreed with it.
2      A.   Uh-huh.
3      Q.   Who is "we"?
4      A.   The enterprise committee, including Greg
5  Carmichael and Jamie Leonard, who wasn't an enterprise
6  member at that point in time, and likely Charlie
7  Bradley, who would have been the program manager at MB.
8      Q.   When and where did that discussion take place?
9      A.   It would have taken place in the boardroom
10 where we did our discussions on this topic.  I don't
11 remember now if they were daily, weekly, twice weekly,
12 but there was a regular integration checkpoint to look
13 at the status of the integration of MB and whether or
14 not we were achieving both the sort of technical
15 conversion goals or the business expectations, and would
16 have been discussed in those meetings.
17     Q.   Would you have had that discussion before
18 October 11, 2019, or after October 11, 2019?
19     A.   It would have been probably around the same
20 time, simultaneous to it.  Because once we made the
21 decision, we were able to clarify leadership.  It didn't
22 fix the execution entirely.  We still ultimately made
23 our goals in wealth and asset management.  We did okay
24 in middle market.  Business banking ended up being more
25 challenging.

Page 119

1      But we made a decision at some point during
2  this period to tell Lars Anderson to step back and to
3  tell Richard Stein to step back from the day-to-day
4  integration process, and to ask Phil to solve that
5  problem because Phil was the leader of that part of the
6  organization.
7      Q.   Were you present when Bob Shaffer met with
8  Greg Carmichael and told him Phil was the guy?
9      A.   No, not that I recall.
10     Q.   Did you ever discuss this issue with Bob
11 Shaffer?
12     A.   I mean, Bob would have joined us in those
13 daily, weekly, monthly M and A integration pull-ups, but
14 I don't recall discussing it with Bob Shaffer outside of
15 the regularly recurring integration meetings.
16     (Exhibit 17 is marked for identification.)
17 BY MR. SABA:
18     Q.   Mr. Spence, I've handed you what's been marked
19 as Exhibit Number 17, Fifth Third McHugh 006943 through
20 Fifth Third McHugh 006989.  Have you ever seen this
21 document before?
22     A.   No.
23     Q.   I think you indicated earlier you never saw
24 any talent decks for 2019; is that correct?
25     A.   That's correct.

Page 120

Q.  Referring you to Fifth Third McHugh 006971.
Can you identify that page for me, please?

A.  It appears to be my talent card, but I haven't
ever seen it before.

Q.  You indicated earlier that you would meet with
your HR partner and you would discuss or go through
certain information on the talent card that would go in
there?

A.  Yes.

Q.  What information would -- would you have seen,
or what information would you have been privy to that
went on the talent card?

A.  I recall providing -- prior to -- I recall
providing community and board service prior to the
talent review discussion.  I remember providing -- it
doesn't look like anything else on here in terms of the
annual discussion.  But I also would have provided what
role I was interested in the company.  I just -- not
having ever seen these talent cards before, I don't know
where that information went.

Q.  Did you ever indicate that you were interested
in being the head of regional banking in two-plus years,
and head of commercial banking in two-plus years?

A.  No, I don't think those were my populate.  I
didn't, no.  No.

Page 121

Q.  Did you ever review the -- or were you ever
provided with drafts of the key strengths areas or
the key focus areas?

A.  Not that I recall, no.

Q.  Do you know where the key strengths and key
focus areas come from?

A.  I would presume they come from my manager,
Greg Carmichael.  And they look like a synopsis of the
feedback I would have gotten in the performance review,
but I can't be certain.  I never saw the cards, and I
never participated in the development of them.

Q.  Did Greg ever provide that information to you
to review or revise?

A.  No.

Q.  Did Bob Shaffer ever provide the key strengths
and key focus areas to you to review and/or revise?

A.  No.

Q.  Were -- did you ever provide or were you --
did you ever review any of the talent information that
we see on the talent card?

A.  Where is that?

Q.  That's in --

A.  Oh, up top.

Q.  -- in the top box, on the right.

A.  No.

Page 122

Q.  And that would also be true for the boxes of
succession candidates and emergency successor; is that
right?

A.  Yeah, I don't think so.  As an enterprise
member, you are always asked to talk about your
successor as part of the annual bank core talent review
process, or the pipeline discussion, I think was the
name for it.  That occurred in the, call it July/August
timeframe.  It would have included all of the enterprise
members.  And we talked about, in our organization, who
did we perceive our successor or potential successors to
be, but certainly not in the text of the talent card.
It just -- that may have been used as an input; I don't
know.

Q.  Would Greg Carmichael be part of those
conversations?

A.  Yes.

Q.  Would he indicate who he would view to be his
successor during those meetings?

A.  No.  Nor did we review the individual
enterprise members.  That would have been inappropriate
with all their peers there in the room.

Q.  So just to help me understand that meeting
that you'd have about successors.

A.  Uh-huh.

Page 123

Q.  Are you communicating that to all the other
members of the enterprise committee?

A.  Yeah -- well -- okay.  So the management of
the talent pipeline in a 20,000 person company has to
run like a machine.  So you have a calendar that gets
established at the beginning of the year.  It starts
with the performance reviews from the prior year.  Then
the goals and objectives setting process follows, where
we have a cascade that gets generated systemically where
managers and their employees agree on their goals for
the year.

Then we do the mid-year review process at the
beginning of the summer, and that feeds a discussion on
the talent pipeline for the bank core in totality.  I
want to tell you we review the top 150 or 200 employees
on an annual basis below the enterprise.  So the direct
reports of the enterprise committee, then a select
handful of other folks who are either high potential or
in critical roles, and we discuss during that meeting
the strengths and development areas of those
individuals, which gives the entire enterprise committee
an opportunity to provide some input into the process,
as well as then the development plans and potential
successors.

And during that discussion, an enterprise

Deposition of Timothy Spence                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 124

1  member -- let's say it was me -- would be in a position
2  to say I believe the person who, in my organization, has
3  the potential to be the next chief strategy officer
4  would be, you know, Joe Smith or Jane Doe,
5  hypothetically. And the HR organization would gather
6  that information. We would agree on the top talent
7  priorities from that discussion, and then you would take
8  those away and execute them in your respective area.
9       So there's a possibility that this question on
10 succession candidates comes out of that process. But
11 again, I was not involved in the board talent
12 discussion. I don't know how this material was
13 developed, and I don't know where it was specifically
14 sourced from. I just know what I provided as an
15 employee of the bank and where I discussed talent and
16 talent cards for the level below the enterprise members
17 on an annual basis.
18      Q.  Going back to that meeting that would take
19 place sometime in the summer, with respect to pipeline
20 review, are there any minutes kept of those meetings?
21      A.  I don't believe there were minutes kept of
22 those meetings. There was a summary of key talent
23 actions, and there was a package of material that were
24 assembled for those meetings, which would includ the
25 talent cards. But on those talent cards, as an example,

Page 125

1  you would have a place where the employee could indicate
2  what their next desired position was.
3       So Kevin Lavender, who's the head of the
4  commercial bank right now, I can recall in this time
5  period having indicated that CEO was the position that
6  he was interested in next, and that he believed he was
7  ready, at that point in time.
8       Q.  And that's a talent card that you'd fill out
9  at that meeting?
10      A.  No, it would be provided to us in advance of
11 the meeting so that we could discuss each of the
12 individuals who reported to an enterprise member.
13      Q.  Did you ever see anybody else's talent card
14 from the enterprise committee?
15      A.  I never saw any other enterprise committee
16 member's talent card with the exception of Brian Lamb
17 because Brian worked for me at one point. And
18 therefore, as his manager, I had to provide input on
19 strengths and key focus areas. Similarly, Phil would
20 have provided that for Kris Garrett, as an example, when
21 Kris Garrett reported to Phil and also sat on the
22 enterprise committee.
23      Q.  Referring you to Fifth Third McHugh 006968 in
24 Exhibit 17. This is obviously the talent card for Phil
25 McHugh. Have you ever seen this talent card before?

Page 126

1       A.  No.
2       Q.  And just to confirm, have you ever seen any
3  talent cards for Phil McHugh before?
4       A.  No.
5       Q.  The talent card -- this particular talent card
6  for Phil McHugh references potential next positions,
7  president, ready now; CEO one to two years.
8           MR. CIOFFI:  Objection. Document speaks for
9  itself. He testified he's never seen it before.
10          MR. SABA:  I didn't finish my question.
11          MR. CIOFFI:  Oh, I thought you did. Go ahead.
12 I'll object afterwards.
13          MR. SABA:  I'm sure you will.
14 BY MR. SABA:
15      Q.  The talent card for Mr. McHugh indicates for
16 potential next positions, president, ready now; CEO, one
17 to two years. Have you ever seen any other documents
18 that reference Phil McHugh as having a potential next
19 position of president and/or CEO of Fifth Third Bank?
20      A.  No.
21      Q.  Do you have any idea where that information
22 would have come from?
23      A.  No. I mean, this is marked as a draft. But
24 as I said, I wasn't involved in the drafting process. I
25 wasn't involved in the review process. And I wasn't

Page 127

1  involved in the presentation process to the board, so I
2  have no idea.
3       Q.  Excuse me. Did you have any communications
4  with either Mr. Carmichael or Mr. Shaffer regarding the
5  talent decks in the fall of 2019?
6       A.  For the board talent discussion?
7       Q.  Correct. I'm talking about --
8       A.  This document?
9       Q.  Yes. Correct.
10      A.  No. No.
11      Q.  This document or any version of it?
12      A.  No.
13      Q.  Did you have any discussions with
14 Mr. Carmichael or Mr. Shaffer in the fall of 2019,
15 regarding your talent card?
16      A.  No, not that I recall.
17          (Exhibit 18 is marked for identification.)
18 BY MR. SABA:
19      Q.  Mr. Spence, I've just handed you what's been
20 marked as Exhibit Number 18, Fifth Third McHugh 0213147.
21 Let me represent to you this is a text message exchange
22 between you and Mr. Shaffer. And if I can refer you to
23 the text message from Mr. Shaffer to you dated
24 November 12, 2019, sent at 23:52:56 UTC. Do you see
25 that?

Page 128

1  MR. CIOFFI:  Counsel, before he answers, by
2  way of objection, again, like Exhibit 16, this is for
3  attorney's eyes only document.  The reason it was
4  designated, as you know, in pursuant to our discussion
5  of prior depositions is it contains a lot of irrelevant
6  but also personal health and other kinds of information
7  that's not appropriate for disclosure beyond attorney's
8  eyes only.  So I just ask for your stipulation, the same
9  as before, that our cocounsel will confer and then
10 redact all of that personal information from these
11 documents.
12     MR. SABA:  We'll proceed as we have before.
13     MR. CIOFFI:  You may answer.
14     THE WITNESS:  I'm sorry, give me the line
15 again.
16 BY MR. SABA:
17     Q.  Sure.  Referring to the text message sent by
18 Mr. Shaffer to you on November 12, 2019, 23:52:56 UTC.
19 Do you see that?
20     A.  I do.
21     Q.  And it says, just sent you your key strengths
22 and focus areas.  Let me know what you think.
23        Do you see that?
24     A.  I do.
25     Q.  Okay.  Do you recall receiving the key

Page 129

1  strengths and focus areas from Mr. Shaffer --
2     A.  I do --
3     Q.  -- on November 12th?
4     A.  I do not.
5     Q.  Did you ever provide any feedback to
6  Mr. Shaffer about your key strengths and focus areas?
7     A.  I don't recall.
8     Q.  Did you have any additional discussions with
9  Mr. Shaffer regarding your key strengths and focus areas
10 that you sent you on November 12, 2019?
11     A.  Not that I recall.  I don't recall having this
12 conversation.
13     Q.  Were you having any conversations around this
14 time, November 12, 2019, with Mr. Carmichael regarding
15 your key strengths and focus areas?
16     A.  Not that I recall.
17     Q.  Do you have any idea why Mr. Shaffer was
18 sending you your key strengths and focus areas?
19     A.  I mean, possibly to get my input on focus
20 areas, but I don't know.  And it doesn't elaborate here.
21     Q.  Did you ask Mr. Shaffer to send you the key
22 strengths and focus areas?
23     A.  No.
24     Q.  Five days before the December 17, 2019, board
25 meeting, did you attend the enterprise meeting on

Page 130

1  Thursday, December 12th?
2     A.  I -- I don't know.  That would be -- that's
3  years ago in the past.  I attended the majority of the
4  enterprise meetings, but occasionally I was absent
5  because I was sick or I had something going on.
6     Q.  Do you recall there were regular enterprise
7  meetings on Thursdays --
8     A.  Every Thursday morning, 9:00 or 9:30 to 11:00
9  at that time.
10    Q.  Do you recall attending enterprise meetings
11 where Greg Carmichael was not in attendance?
12    A.  On occasion, yes.
13    Q.  Do you recall a particular enterprise meeting
14 on December 12, 2019, attended by Frank Forrest?
15       MR. CIOFFI:  Objection.  Asked and answered.
16 He said he doesn't remember attending the meeting.
17       THE WITNESS:  I don't remember the specific
18 enterprise meeting, but I attended a lot of enterprise
19 meetings attended by Frank Forrest.
20 BY MR. SABA:
21    Q.  As of December 2019, Frank Forrest would have
22 been the chief risk officer for Fifth Third Bank; is
23 that correct?
24    A.  Frank was in the process of retiring around
25 that time.  I don't recall the exact date that we

Page 131

1  announced his retirement, but he would have been the
2  chief risk officer prior to retiring, and he would have
3  been an advisor to Greg or an advisor to the CRO
4  immediately afterward.  It would have been in a risk
5  capacity.
6     Q.  As part of his duties as chief risk officer,
7  Frank Forrest would meet separately with the board on
8  occasion outside the presence of Greg Carmichael.  Is
9  that correct?
10    A.  He would have had a executive committee
11 session, and then he prepared the -- that is the third
12 piece of the performance review package that we
13 discussed earlier that I think I neglected to mention.
14 He provided an executive risk assessment directly to the
15 board for every one of the enterprise members as well,
16 yes.
17    Q.  During an enterprise committee meeting, did
18 Frank Forrest indicate that, we all know that Greg likes
19 to control the message to the board?
20    A.  Not that I remember.
21       (Exhibit 19 is marked for identification.)
22 BY MR. SABA:
23    Q.  Mr. Spence, I've handed you what's been marked
24 as Exhibit Number 19, Fifth Third McHugh 0213148.  Let
25 me represent to you this is a text message exchange

Deposition of Timothy Spence                                     Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 132

1 between yourself and Mr. Shaffer.
2       MR. CIOFFI: Again, counsel, the same
3 objection with respect to attorney's eyes only, and same
4 stipulation.
5       MR. SABA: We'll treat it the same way.
6       MR. CIOFFI: You may answer.
7 BY MR. SABA:
8    Q. Referring you to the text message sent from
9 Mr. Shaffer to you on December 12, 2019, at 18:44:59
10 UTC. He states, how about that comment he made about GC
11 and enterprise?
12       Do you see that?
13    A. I do.
14    Q. Do you know what that's referring to?
15    A. I do not.
16    Q. You then respond on December 12, 2019, at
17 18:45, not good.
18       Do you see that?
19    A. I do.
20    Q. You then text to Mr. Shaffer, don't leave him
21 alone with the board.
22    A. I do see that.
23    Q. Are you referring to Frank Forrest?
24    A. I don't -- who is "he" or "him" here?
25    Q. That's what I'm asking you.

Page 133

1    A. I don't know who he or him is.
2    Q. Mr. Shaffer responds, agree. I already
3 confronted him on his comment. He backtracked.
4       Do you see that?
5    A. I do.
6    Q. You then respond, good. Thanks for doing
7 that. Do you see that?
8    A. I do.
9    Q. You then also say, he is a loose cannon
10 rolling around on the decks right now.
11    A. I see it.
12    Q. What did you mean by that?
13    A. I don't know. Again, I don't know who it's
14 about here, I don't have the rest of the context. But
15 that's a colloquialism for somebody's loose. They're
16 not precise, they're not focused.
17    Q. They can cause a lot of problems if they're a
18 loose cannon, correct?
19    A. I guess theoretically. But again, that would
20 context specific. I don't know what the text message is
21 about in this particular case.
22    Q. Your next text message reads, could blow the
23 mast off the ship.
24       Isn't that right?
25    A. That is what it reads.

Page 134

1    Q. Mr. Shaffer responds, I agree. Need to move
2 forward quickly.
3       You see that?
4    A. I do.
5    Q. Why did he need to move forward quickly?
6    A. You'd have to ask Bob. That was his text. I
7 don't know what it means. At this stage, Frank was
8 close to retirement or he was retired. And during
9 that process, as he stepped away, he was a pretty
10 colorful -- I mean, he was -- he had ESPN Sports Center
11 alerts going off during the enterprise meetings. He
12 removed a refrigerator from a conference room on the 5th
13 floor and moved it to his other office. He was not
14 moving his car, even though he had effectively moved
15 back to North Carolina. So he may not have even
16 attended this enterprise meeting. He wasn't attending
17 all the meetings at that point in time.
18       It's possible that I could have meant Frank,
19 but I loved Frank. And he was excellent and he had an
20 opportunity in any number of occasions to communicate
21 directly to the board, so I can't imagine I would be
22 suggesting that he shouldn't communicate with the board
23 directly, because by bylaws, he would have had an
24 executive committee meeting with the board during the
25 audit and risk committee, which nobody could have

Page 135

1 prevented him from having, and he submitted the risk
2 reviews directly to the board on an annual basis.
3       So again, it would be possible that it could
4 be about any member of the enterprise committee if, in
5 fact, there was an enterprise committee meeting on this
6 day. But there was nothing that Frank either would have
7 said, to my knowledge, that would be problematic on any
8 front, nor frankly that anyone could have prohibited him
9 from saying to begin with. I think this is just a
10 figure of speech for me.
11    Q. Weren't you concerned that Frank Forrest, if
12 he made a comment to the board about Greg trying to
13 influence the board, that it would affect your ability
14 to be appointed as president and CEO of Fifth Third
15 Bank?
16    A. No. I don't think Greg ever tried to
17 influence the board. Greg was very focused on making
18 sure that the communication that we provided to the
19 board as a team was concise and transparent. Because
20 when you added up all the pages we provided to the board
21 on an annual basis, there were literally thousands of
22 them.
23       So his focus was always, is the information
24 that's relevant to the board clear and easy to
25 understand, and are we presenting the information in a

Page 136

1  way that's constructive? He never, in my presence,
2  either to me or to anybody else, asked us not to say
3  something to the board that the board needed to hear.
4     Q. Did you attend the December 17, 2019, board
5  meeting?
6     A. Yes.
7     Q. Were you present for any of the discussions
8  regarding the talent deck or president and CEO
9  succession?
10     A. I did not attend any of the committee meetings
11  in any of the board meetings, so no.
12     Q. Have you ever seen the final version of the
13  2019 talent deck?
14     A. I have not seen any of the 2019 talent deck
15  drafts or the final versions, as I testified earlier.
16     Q. As of December 17, 2019, had you ever been the
17  president and CEO of a Fifth Third Bank region?
18     A. No.
19     Q. As of December 17, 2019, had you ever been the
20  head of all of the regions of Fifth Third Bank?
21     A. No.
22     Q. As of December 17, 2019, had you ever been the
23  head of community and economic development at Fifth
24  Third Bank?
25     A. No.

Page 137

1     Q. As of December 17, 2019, had you ever been the
2  head of business banking at Fifth Third Bank?
3     A. No.
4     Q. As of December 17, 2019, had you ever been the
5  head of wealth and asset management at Fifth Third Bank?
6     A. No.
7     Q. As of December 17, 2019, had you ever been the
8  head of wealth and asset management at Fifth Third Bank?
9     A. No.
10     Q. As of December 17, 2019, had you ever passed
11  the FINRA Series 7 General Securities Representative
12  exam?
13     A. No.
14     Q. As of December 17, 2019, had you ever passed
15  the FINRA Series 65 Uniform Investment Advisor exam?
16     A. No.
17     Q. As of December 17, 2019, had you ever passed
18  the FINRA Series 24 General Securities Principal exam?
19     A. No.
20     Q. As of December 17, 2019, had you ever served
21  as a member of YPO?
22     A. No.
23     Q. As of December 17, 2019, you had been with
24  Fifth Third Bank for just over four years; is that
25  right?

Page 138

1     A. Yeah, four years and a handful of months.
2     Q. And as of December 17, 2019, Phil McHugh would
3  have been with the bank for over 33 years; is that
4  correct?
5     A. I don't know when Phil started. I can't speak
6  to how long he had been with the bank.
7     Q. And as of December 17, 2019, you were
8  40-years-old. Is that right?
9     A. Yes.
10     Q. And Phil McHugh would have been 55-years-old;
11  isn't that right?
12     A. I don't know what Phil's birthday is, so I
13  don't know how old he would have been.
14     (Exhibit 20 is marked for identification.)
15  BY MR. SABA:
16     Q. Mr. Spence, I've handed you what's been marked
17  as Exhibit Number 20, Fifth Third McHugh 000461 through
18  Fifth Third McHugh 000462. Is that correct?
19     A. Yes.
20     Q. Can you identify this document for me, please?
21     A. Appears to be my performance review for the
22  2019 calendar year.
23     Q. And who would have prepared this performance
24  review?
25     A. Greg Carmichael.

Page 139

1     Q. And when did you have your 2019 performance
2  review?
3     A. The late January to mid-February timeframe. I
4  don't recall the date exactly.
5     Q. Was it during this review that you had the
6  conversation with Mr. Carmichael about the board being
7  inclined to appoint you as the next president and CEO of
8  Fifth Third Bank?
9     A. I never had a conversation with Greg in
10  January or February where he indicated that the board
11  was inclined to appoint me the next president. He
12  indicated to me either in this review discussion or
13  approximate to it that the board was likely to want to
14  vet me for that role.
15     But he never made a promise to me, he never
16  made a commitment, he never said it was certain. He
17  just said that I was going to be vetted, and then --
18  either then or afterward, that it would likely be RHR
19  who had done the vetting for the board previously, that
20  the board would retain to do the work.
21     Q. When he first communicate to you that you
22  would be vetted to be the next president and CEO of
23  Fifth Third Bank?
24     A. Roughly in the same timeframe as the delivery
25  of the review, January or February.

Deposition of Timothy Spence                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 140

1  Q.  Was that a separate meeting during which he
2  communicated that?
3  A.  I don't -- that, I don't recall.  I just
4  remember discussing it with him and him telling me that
5  Bob was working with RHR, and that he would set up a
6  meeting to introduce me to Guy Beaudin, who was the
7  person -- the principle from RHR who would be completing
8  the vetting.
9  Q.  Referring you to the first page of Exhibit 20,
10 Fifth Third McHugh 000461, if you could go down to the
11 fourth paragraph under the "what" category.
12 A.  Yes.
13 Q.  It indicates, Tim's 2019 employee viewpoint
14 survey score results were mixed.
15   Do you see that?
16 A.  I do.
17 Q.  Consumer was 74 percent, up 5 percent from
18 2018.  The chief strategy officer organization score was
19 56 -- excuse me, 46 percent, up 1 percent from 2018.
20 Payments was 57 percent, flat from 2018.  And mortgage
21 was 62 percent, down 3 percent from 2018.  Is that
22 right?
23 A.  I see it.
24 Q.  He goes on to say, Tim needs to ensure action
25 plans are identified and implemented to significantly

Page 141

1  improve employee engagement in these areas.
2    Isn't that right?
3  A.  I see it, yes.
4  Q.  Okay.  And the scores he's quoting, those are
5  exactly the scores that Kincentric reported for your
6  lines of business in 2019; is that right?
7  A.  They should be.  They certainly should be.
8  Q.  Okay.  You indicated before that those scores
9  weren't used as a part of your review.  They actually
10 were used as part of your review.
11 A.  I mean, my testimony previously is my
12 testimony on the matter.  This was one data point in a
13 much broader discussion that always has to occur, on
14 employee engagement, which is the reason we ask 80
15 questions and not 5 to generate a single composite.
16 Q.  And just to be specific, what we're referring
17 to is in Exhibit Number 15 --
18 A.  Yeah.
19 Q.  -- on pages Fifth Third McHugh 071733.  Is
20 that right?
21 A.  Yes, that's what we were reviewing earlier
22 when we --
23 Q.  Right?
24 A.  -- when I provided my testimony on it.
25 Q.  Correct.  And these scores that Mr. Carmichael

Page 142

1  refers to are exactly the same scores for you that we
2  see on 071733.  Is that right?
3  A.  Yes.
4  Q.  In the paragraph above that Mr. Carmichael
5  also notes in the last sentence, credit fraud loss is
6  related to the credit card portfolio were over-planned
7  by 10 percent and need continued significant focus.
8    Is that right?
9  A.  That's what we talked about.  That's right.
10 Q.  And both those issues were emphasized again in
11 your opportunities for 2020, as reflected by Fifth Third
12 McHugh 000462.  Is that right?
13 A.  Where is 462?
14 Q.  That is the second page of Exhibit 20.
15 A.  Ah, okay.  They should be.  You would expect
16 that the summary feedback and what's in the
17 opportunities for 2020 are the same.  Yeah, they're two
18 of the items that are mentioned here.
19 Q.  And just to be clear, your overall rating for
20 2019 was exceeds.  Is that correct?
21 A.  Yes, that's what it says.
22 Q.  Were you aware that in February of 2020,
23 Mr. Carmichael requested that Phil McHugh take on the
24 additional responsibility for middle market banking and
25 Fifth Third insurance?

Page 143

1  A.  I don't recall the date, but I remember that
2  we ultimately elected to move the middle market banking
3  group, which was a team of four or five people, out of
4  the commercial bank and over to Phil McHugh.  And I
5  recall our moving the insurance business as well.
6  Again, I don't remember when, but I know that it
7  happened.
8  Q.  Who do you mean by "we"?
9  A.  We, the company, made an organizational change
10 that impacted a broad range of people.
11 Q.  Are you referring to yourself as being --
12 A.  No.
13 Q.  -- part of that decision?
14 A.  I was not part of that decision.  I was not
15 consulted on the decision.
16 Q.  Were you aware that during Phil McHugh's
17 review of Mr. Carmichael in February of 2020, that
18 Mr. Carmichael indicated that the board had asked him to
19 stay on for two-plus years, and that Phil may be too old
20 for the CEO role at that time?
21 MR. CIOFFI:  Objection to the form of the
22 question.  It's at least a compound question.  Could you
23 break it down?
24 BY MR. SABA:
25 Q.  Do you understand the question?

Deposition of Timothy Spence          Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 144

1  A.  Repeat it, please.

2  Q.  Sure.  Were you aware that in February of

3 2020, during Phil McHugh's 2019 annual review,

4 Mr. Carmichael indicated that the board had asked him to

5 stay on for two-plus years, and that Phil may be too old

6 for the CEO role at that time?

7  A.  I have no awareness of any conversation that

8 Phil or Greg had during Phil's review.  That would have

9 been between Greg and his employee.

10  Q.  During your conversation with Mr. Carmichael

11 during which he indicated that you would be vetted for

12 the role of president and CEO, what specifically did he

13 indicate to you?

14  A.  That the board was -- he initially indicated

15 to me that the board was likely to want to vet me based

16 on the discussion in the December 2019 talent review

17 process.  He then indicated subsequently, in a later

18 conversation, that the board had decided to move

19 forward, and that the board would be engaging RHR

20 International, which was the firm the board had used in

21 the past for executive succession-related activities,

22 and that Bob Shaffer was going to be reaching out to Guy

23 Beaudin and to set up a meeting when Bob, Guy, and I

24 could get introduced so that Guy could begin his work

25 with me.

Page 145

1  Q.  What did they -- what did they specifically

2 indicate you were being assessed for?

3  A.  Potential role of president.

4  Q.  When did you first communicate with anybody

5 from RHR?

6  A.  It would have been after those initial

7 conversations, so it would have been in the spring.  I'm

8 going to guess March, but I don't recall a specific

9 date.  I just remember being introduced to Guy and

10 getting an e-mail from somebody on his team with a link

11 to set up an online profile so that I could complete a

12 series of behavioral and personality screening

13 quantitative -- behavioral and personality screening

14 exercises.

15  And then, subsequent to that, at some point

16 during the spring, he asked me for input into who from

17 my organization would be well positioned to provide

18 360-degree feedback, and I provided that to him.  I

19 recall asking that we expand the list.  I think I was

20 approaching this as a great opportunity to get

21 360-degree feedback, which as a senior person in a large

22 corporation, you very rarely get.

23  And I asked him to include some additional

24 people, including at least one that didn't report to me,

25 who I believed, because I had passed over him twice for

Page 146

1 a promotion, would be in a position to give me some good

2 constructive feedback on how I was handling some of

3 those discussions.

4  Then I did an interview with Guy, and I

5 believe Chuck Evans attended that discussion at some

6 point that summer or late spring.  And then I did a

7 meeting with Guy, or Guy and Chuck, where they provided

8 me with some anonymized summary feedback from the

9 360-degree review.

10  And then I met with Greg and Bob at some point

11 that summer, and Guy and potentially Chuck also, to

12 review a development plan based on the feedback that was

13 provided.  And I don't recall, other than a few e-mail

14 exchanges, I was having a hard time getting the portal

15 that they sent to work because of the firewall inside

16 our company, other than a company of e-mail exchanges.

17 I don't recall ever meeting with Guy or Chuck, who were

18 the two principals, again, not the associate who helped

19 me set up my profile to begin with.

20  Q.  The interview that you mentioned with Guy and

21 Chuck, when was that interview?

22  A.  Summer.  Early summer, mid-summer.  Late June

23 maybe.  Early June.

24  Q.  How long did that interview last?  Excuse me.

25  A.  Three hours maybe.  Two and a half to three

Page 147

1 and a half hours.

2  Q.  The subsequent meeting that you had with Guy

3 and Chuck to review the information, when did that take

4 place?

5  A.  After the initial meeting, but -- obviously.

6 If the initial meeting was mid-June, maybe late July.

7 Maybe four weeks, six weeks afterward.

8  Q.  How long did that meeting last?

9  A.  That, I don't recall.  It was significantly

10 shorter, so maybe it was an hour, maybe it was 45

11 minutes.  It -- this is a fairly standard process.  I

12 don't know for RHR because I had never worked with them

13 prior to that nor have I worked with them afterward.

14 But we use Spencer Stuart to do these sorts of reviews

15 for executives today.  And generally, that initial

16 interview is a handful of hours, because there's a lot

17 to discuss.  And then the feedback comes back to you in

18 the form of a 45-minute to an hour-long debrief.  So I'm

19 guessing at this.  I don't remember exactly how long it

20 was, but it's probably around that length.

21  Q.  The subsequent meeting that you then had with

22 Bob, Greg, and Chuck, how long did that --

23  A.  And Guy.

24  Q.  And Guy, excuse me.

25  -- how long did that meeting last?

Deposition of Timothy Spence                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 148

1   MR. CIOFFI: Objection. Asked and answered.
2   But you can answer it again.
3   BY MR. SABA:
4   Q.   Just to be clear, because I think Mr. Cioffi's
5   incorrect, you mentioned an interview, you mentioned a
6   meeting with Guy and Chuck, and then you said there was
7   another meeting with Guy, Chuck, Bob, and Greg.
8   A.   That's correct. There were three total.
9   Q.   Correct. I'm talking about --
10  A.   One, number one was call it three to four
11  hours.
12  Q.   Okay.
13  A.   Two and a half to three. Number two was I'm
14  estimating 45 minutes to an hour.
15  Q.   Okay.
16  A.   Number three would have been 30 to 45 minutes,
17  I think. Call it 30 minutes to an hour.
18  Q.   When did that third meeting take place?
19  A.   That I don't recall. But it wouldn't have
20  been a long time after the second meeting. It was a
21  draft development plan that we reviewed and discussed as
22  a group.
23  Q.   Did you make any changes to that development
24  plan?
25  A.   Not substantive ones. Not that I can -- I

Page 149

1   can't remember making any changes, but I definitely
2   didn't make any substantive ones.
3   Q.   Did you have any issues with RHR's assessment
4   of you?
5   A.   With the development plan, no.
6   Q.   With the results of any of their interviews or
7   any of the results of their assessment?
8   A.   Oh, I think whenever a third party is asked to
9   create a profile of you using information that they
10  gather from a broad range of sources, there are things
11  that you can see that you see in yourself. There are
12  things that you see that you think benefit from context.
13  And then there are things that are surprising.
14      I don't remember anything being surprising. I
15  do remember a few items where I thought to myself, you
16  know, actually, I think an item that was flagged here as
17  a opportunity is a strength in a lot of situations. But
18  in general, I thought that the feedback was
19  comprehensive and it was a very nice profile.
20  Q.   Were you ever informed that originally it was
21  contemplated that Phil McHugh and Tayfun Tuzun would
22  also be assessed by RHR at the same time?
23  A.   No.
24  Q.   The particular testing that you did, online
25  testing --

Page 150

1   A.   Mm-hm.
2   Q.   -- do you remember the titles of any of that
3   testing?
4   A.   No.
5   Q.   I think you indicated they were some type of
6   personality profile; is that correct?
7   A.   There was one that was designed to evaluate
8   how you made decisions, how you formulated decisions. I
9   recall that because there were a lot of questions about
10  the way that you would approach an issue, what you would
11  do. And you had to make choices. There was one that
12  was a problem-solving aptitude test, if memory serves.
13  And I have it in my head that there were three of them,
14  but I don't remember the third one. It's reasonable to
15  assume it was a, you know, a Myers-Briggs or a version
16  of that sort of a thing. But there were two or three of
17  these that I had to do in succession, start to finish.
18  I couldn't stop in the middle and leave. I was told at
19  the time to do them all the way through.
20      Also, I'm going to need a "one minute off the
21  record after lunch break." I'm happy to continue now,
22  but I need one at some point.
23      MR. SABA: We can go off the record.
24      (A recess was taken from 2:06 to 2:19.)
25      VIDEOGRAPHER: The time is 2:19 p.m. We're

Page 151

1   back on the record.
2      (Exhibit 21 is marked for identification.)
3   BY MR. SABA:
4   Q.   Mr. Spence, I've handed you what's been marked
5   as Exhibit Number 21. It's Bates stamped Fifth Third
6   McHugh 0213171 and Fifth Third McHugh 0213172. Is that
7   correct?
8   A.   It is.
9   Q.   I'm going to represent to you, this is a text
10  message exchange between you and Mr. Shaffer. It is --
11  and I'm going to refer you specifically to --
12  A.   And Bob is "me"? I'm sorry, Counsel.
13  Q.   Bob is me, that's correct. And I'm going to
14  refer you specifically to a text message from July 31,
15  2020, at 19:34:09 UTC from Bob Shaffer.
16  A.   Yes.
17  Q.   Do you see that? It starts with, how was your
18  discussion with Guy?
19      Do you see that?
20  A.   I do.
21  Q.   And you respond, long three hours.
22      Correct?
23  A.   Correct.
24  Q.   And then you two begin to discuss in detail
25  just sort of your reaction to some of the issues. Is

Page 152

1  that right?

2      A.  I wouldn't call it in detail, but yeah, we do

3  discuss them.

4      Q.  Okay.  You note at -- on August 1st at 001428

5  UTC, on constructive feedback he shared four items.

6  Number 1, make sure I bring people along.  Basically,

7  Greg, slow down.  Number 2, don't soften the blow, just

8  tell people when their work is not good enough.  Number

9  3, that my team feels I sometimes defer to my peers even

10 if I know they're wrong, and agree to suboptimal

11 outcomes.  And number 4, that sometimes I push people

12 and don't acknowledge how difficult it is to get

13 something done operationally, maybe because I'm not

14 close enough to it.  Do you see that?

15     A.  I do.

16     Q.  You then follow that up with a text that

17 reads, 1 and 2 are fine and fair.  And then Bob Shaffer

18 responds, 3 and 4 surprise me, especially 3.

19     A.  I see that.

20     Q.  And you indicate, 3 I don't really agree with.

21 Again, number 3 is that my team feels I sometimes defer

22 to my peers even if I know they are wrong and agree to

23 suboptimal outcomes.

24         Do you see that?

25     A.  I do.

Page 153

1      Q.  Okay.

2      A.  Where it says, it is basically a halo from

3  fighting for investment from with Lars and Phil.

4      Q.  Lars and Phil.

5      A.  That's right.

6      Q.  What -- what do you mean by that?

7      A.  Phil McHugh had a reputation for doing what

8  was in the best interest of Phil McHugh and for Phil's

9  organization first, and for the bank second.  And as a

10 byproduct of that, whenever we got to the point in the

11 annual planning process where there were more requests

12 for investment than there were investment resources to

13 go around, Phil always fought for his, and my team felt

14 like I tried to fight for what was in the best interest

15 of the bank overall.  The byproduct of that is, my

16 people felt like they were at a disadvantage to Phil's

17 people because Phil's people had somebody who was just

18 selfishly going after the resources, where my people got

19 challenged by me to say, is this in the best interests

20 of the bank core, or is it better that we give these to

21 a Lars or a Phil?  And Lars had much the same feedback

22 on that process.

23         MR. CIOFFI:  Counsel, just for the record,

24 before you ask your next question -- to help out the

25 court reporter, just talk a little more slowly.

Page 154

1      THE WITNESS:  I'm sorry.

2      MR. CIOFFI:  I can see where she's about ready

3  to say something to you.  So go slowly.

4      THE WITNESS:  Okay.

5  BY MR. SABA:

6      Q.  Why do you also mention Lars Anderson there?

7      A.  I said in my testimony a moment ago that Lars

8  had a similar reputation to Phil.

9      Q.  And what do you base that upon, that Phil had

10 a reputation of only making decisions for himself and

11 not in the best interest of the bank?

12     A.  Feedback I received from my team on their

13 frustrations on the way that we were managing the annual

14 resource allocation process as part of strategic and

15 financial planning.

16     Q.  Did you ever communicate that to Greg

17 Carmichael?

18     A.  Not that I recall.  I don't believe so.  I was

19 a believer, especially as it related to those sorts of

20 issues, of trying to deal with it at the peer level,

21 either directly with an individual like Phil or through

22 the HR leader, which was Bob.

23     Q.  Did you ever see any of Phil McHugh's reviews

24 that were performed by Greg Carmichael?

25     A.  No.

Page 155

1      Q.  Were you aware that Greg Carmichael would

2  indicate that Phil McHugh always does things the right

3  way?

4      A.  No.  I never saw any of Phil's reviews.

5      Q.  Were you aware that Greg Carmichael would

6  provide Phil with reviews that indicated that Phil

7  always did what was in the best interest of Fifth Third

8  Bank?

9         MR. CIOFFI:  Objection.  Asked and answered.

10 He never saw any.

11        THE WITNESS:  No, I never saw any of Phil's

12 reviews.

13 BY MR. SABA:

14     Q.  And what investment were you fighting for?

15     A.  Resources.  Dollars.  At the end of the day in

16 a business like ours, everything costs money.  It's

17 either capital and space capacity on the balance sheet,

18 or it's funding, which is capacity on the balance sheet.

19 Or it's expense and capital dollars, which get used to

20 build a branch or to invest in a new system or to hire a

21 person.

22        And we would set performance objectives for

23 the bank in terms of what we wanted to achieve

24 financially for the coming year.  And inevitably -- and

25 this is true, having run strategic planning processes

Page 156

1 for a lot of different institutions over the years --
2 this is true of essentially all institutions. The set
3 of asks for resources is always greater than the
4 capacity to invest, that's why they call it strategic
5 planning and not just budgeting. And so that is the
6 resources I would be referring to here.
7     Q.  With respect to your criticism in number 3 in
8 that text messaging, where you refer to it's basically a
9 halo from fighting for investment with Lars and Phil,
10 you then indicate to Bob Shaffer, you may want to set
11 that straight.
12     Do you see that?
13     A.  I do.
14     Q.  What did you mean by that?
15     A.  Just provide context.
16     Q.  Provide context to whom?
17     A.  To Guy and Chuck, who would be working on my
18 development plan.
19     Q.  You wanted Bob to provide that context to
20 them; is that right?
21     A.  That is what it says here.
22     Q.  You also indicate, number 4, I'm not totally
23 surprised at this moment in time. I've been
24 feeling impatient about the progress we're making in
25 several areas. I've told people it's like you are

Page 157

1 surfing and we are paddling behind the wave. I'm tired
2 of talking about this. I want to see action.
3     Is that correct?
4     A.  That is correct.
5     Q.  And number 4 again was that, sometimes I push
6 people and don't acknowledge how difficult it is to get
7 something done operationally, maybe because I'm not
8 close enough to it.
9     Correct?
10     A.  Yeah, that's right. I -- the period of time
11 here is, of course, shortly after the COVID lockdown,
12 and we had had to move very quickly to retool our
13 business to be able to support customers in an
14 environment where initially they couldn't come into our
15 branches, or in some cases because they were
16 immunocompromised, they couldn't leave their homes.
17 And that required us to really rapidly re-prioritize
18 in the consumer business. A lot of the resources
19 that we had dedicated to building new products --
20 and the digital team is an example -- to instead,
21 putting in a platform to process loan forbearances, so
22 that we could provide people with the peace of mind of
23 knowing that their loan payment was deferred at least
24 until the government programs were up.
25     And that's hard. It's hard for an

Page 158

1 organization to make a change quickly. It's hard to set
2 down work that has been 60 percent done and not done all
3 the way, and it's hard to assess when you're not close
4 to it what the implications of those things are. That
5 said, it is not the job of the leader to understand what
6 has been done; it's the job of the leader to define what
7 needs to be done.
8     In any sort of a large organization, and
9 particularly in a crisis situation like we had with
10 COVID, time was of the essence and we needed to move
11 quickly. So I was impatient about it. I had seen what
12 happened when we failed to launch the PPP program
13 successfully out of the gate. I had seen the complaints
14 come into our branches. I had been out in our branches
15 and had seen the toll that not having them open had on
16 customers who were either commuting by bicycle or by
17 bus, and I had challenged our people to make several
18 million phone calls to customers, just to do wellness
19 checks. And I'd heard the stories about people who were
20 stuck at home. And I was not content to wait for
21 something to be done simply and operationally. We
22 needed to take action, and we needed to take care of our
23 customers.
24     So that is -- when I say here, I'm not totally
25 surprised about it, it's because at that point in time,

Page 159

1 I was pushing really hard to get those capabilities in
2 place so that we could serve people in a COVID world.
3     Q.  Mr. Shaffer responds on August 1st, at
4 0:19:11 UTC, you read my mind. I was thinking the same
5 thing, that I will definitely talk to him about a couple
6 of these items. I want to understand what his basis is
7 for these items.
8     Do you see that?
9     A.  I do.
10     Q.  And by "him," was Mr. Shaffer referring to Guy
11 Beaudin?
12     A.  I mean, I don't know, I wasn't sending the
13 text. But that would make sense contextually.
14     Q.  Did Mr. Shaffer ever speak to Guy Beaudin?
15     A.  I don't know. This exchange between Bob and
16 me is just a leader talking with his HR partner. Bob
17 was integrally involved in my ongoing development,
18 holding me accountable, where there were development
19 opportunities. Providing encouragement. The way
20 that an HR organization does anywhere. So this is just
21 the two of us talking about my development plan and me
22 providing my feedback to my HR partner on what I
23 thought.
24     Q.  Was Bob your HR partner at this time?
25     A.  Bob was my HR peer. I then had a business

Deposition of Timothy Spence                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 160

1  partner that supported my organization.  I think at this
2  time it would have been Stacy Lynch was my business
3  partner.
4      Q.  Moving to the August 1, 2020, text message
5  from Bob Shaffer at 00:21:09.  He says to you, no, I
6  understand, this is not a written report yet.  I will
7  have a chance to debrief and give him context, plus, we
8  definitely want to have a couple development items or so
9  which we all do.
10         Do you see that?
11     A.  I do.
12     Q.  Okay.  And by, I will have a chance to debrief
13  and give "him" context.
14         The him would be Guy Beaudin; is that right?
15     A.  Yeah, I would assume this refers to the
16  meeting that Greg, Bob, and I had with Guy and Chuck.
17  But I don't know.  I don't know what Bob intended.
18     Q.  Do you know if Bob had a separate meeting with
19  Guy Beaudin where he debriefed him and gave him context
20  to any of the comments?
21     A.  Yeah, I don't.  I don't know.
22     Q.  What did Bob mean by we definitely want to
23  have a couple development items or so?
24     A.  I don't know.  As I responded, I have plenty
25  of those.

Page 161

1      Q.  Do you know what development items Bob had?
2      A.  I do not.
3      Q.  Do you know what, if any, changes Bob had them
4  make to the information that was provided?
5      A.  I do not.
6      Q.  Was any of that information shared with you?
7      A.  No.  The information that Guy and Chuck shared
8  with me as part of that development plan was very
9  consistent with what Chuck and Guy shared with me as
10  part of that initial debrief.  I don't recall there
11  being any substantive changes.
12     Q.  Did Bob Shaffer, Greg Carmichael ever share
13  with you the changes that they had Guy make to the RHR
14  documentation?
15     A.  No.  The only RHR documentation I can ever
16  recall seeing is what was shared with me by Guy or by
17  Chuck with Guy in the two meetings I participated in.
18     Q.  Did you ever see the CEO profile that was
19  prepared by RHR?
20     A.  Not that I recall.
21     Q.  Did you ever see the summary of the CEO
22  profile that was prepared by RHR?
23     A.  No, not that I recall.
24     Q.  Did you ever see any of the documentation that
25  was submitted to the board by RHR for the September 2020

Page 162

1  board meeting?
2      A.  No, I don't believe I ever saw any
3  documentation that was submitted by RHR to the board.
4         (Exhibit 22 is marked for identification.)
5  BY MR. SABA:
6      Q.  Mr. Spence, I've handed you what's been marked
7  as Exhibit Number 22, which is Bates stamped Fifth Third
8  McHugh 0213184 and Fifth Third McHugh 0213185.
9      A.  Okay.
10     Q.  I'll represent to you again this is a text
11  message exchange between you and Mr. Shaffer.
12     A.  Okay.
13     Q.  I'm going to refer you to a text message from
14  September 10, 2020, at 13:46:23 UTC from you.  Do you
15  see that?
16     A.  I do.
17     Q.  And you indicate ███ really botched their CEO
18  transition signalling.  we need to look at what they
19  have done and how we need to handle differently.
20         What did you mean by that?
21     A.  That ███ had recently undergone a CEO
22  transition and it was a mess.  The CEO of the company
23  was there, then he was gone, and the new person who came
24  in had not been visible to the market, was known behind
25  close doors, and it created a mess.  So that was on my

Page 163

1  mind and I thought whenever there is a CEO transition
2  here, we need to do better.
3      Q.  Referring to yourself, correct?
4      A.  Yep, that's my text message.
5      Q.  This is before you've ever been appointed
6  president though; is that correct?
7      A.  Correct.  I wasn't referring to myself as the
8  CEO here, I was merely saying that from a standpoint of
9  corporate succession, Fifth Third needed to do better
10  than ███ had whenever there was a CEO transition.
11     Q.  Why would you be involved in handling the CEO
12  transition?
13     A.  I said we, as in Fifth Third.  The bank needed
14  to do a better job.  I didn't say I needed to do a
15  better job.
16     Q.  Not you specifically?
17     A.  I never said me.  I said the bank, we, Fifth
18  Third, need to do a better job.  Not me specifically.
19     Q.  Did you attend the September 21, 2020 board
20  meeting?
21     A.  Yes.
22     Q.  You did.  Were you present when the
23  presentation was made to the board by RHR?
24     A.  No.
25     Q.  As of September 21, 2020, had you ever been

Deposition of Timothy Spence                                          Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 164

1 the president and CEO of a Fifth Third Bank region?
2    A.  No.
3    Q.  As of September 21, 2020, had you ever been
4 the head of all the regions of Fifth Third Bank?
5    A.  No.
6    Q.  As of September 21, 2020, had you ever been
7 the head of community and economic development at Fifth
8 Third Bank?
9    A.  No.
10   Q.  As of September 21, 2020, had you ever been
11 the head of business banking at Fifth Third Bank?
12   A.  No.
13   Q.  As of September 21, 2020, had you ever been
14 the head of wealth and asset management of Fifth Third
15 Bank?
16   A.  No.
17   Q.  As of September 21, 2020, had you ever passed
18 the FINRA Series 7 General Securities Representative
19 exam?
20   A.  I never took any FINRAs, FINRA exam.
21   Q.  So as of September 21, 2020, you had not
22 passed the FINRA Series 65 Uniform Investment Advisor
23 exam?
24   A.  I had not taken --
25      MR. CIOFFI:  Objection.  Asked and answered.

Page 165

1 You -- you can go ahead.
2      THE WITNESS:  I had never taken nor passed nor
3 failed.  I had just never taken any of those exams.
4 BY MR. SABA:
5    Q.  As of September 21, 2020, had you ever served
6 as a member of YPO?
7    A.  No.
8    Q.  When did you first start referring to Phil
9 McHugh as the "silver fox"?
10   A.  Shortly after I heard Phil refer to himself
11 that way.  It may have crossed my mind, but I don't
12 recall.
13   Q.  So how early on was that?
14   A.  I don't recall.  Phil referred to himself as
15 the silver fox with regularity in group settings and
16 casual social settings and in professional settings.  It
17 was a nickname that he used regularly, and that his
18 friends used regularly.  So I -- I don't recall when I
19 heard it the first time.
20   Q.  Do you recall what year you heard it the first
21 time?
22   A.  No.
23   Q.  Do you recall where you were when you heard it
24 the first time?
25   A.  No.

Page 166

1    Q.  You said Phil McHugh used the term regularly
2 to refer to himself.  How many times did you hear Phil
3 McHugh refer to himself as the silver fox?
4    A.  I can't recall the exact number, but it was
5 several.
6    Q.  During what time period did you hear Phil
7 McHugh refer to himself as the silver fox?
8    A.  From the time that I started employment at
9 Fifth Third through to the time when I -- Phil left the
10 bank.
11   Q.  Who else at the bank referred to Phil McHugh
12 as the silver fox?
13   A.  Jamie Leonard, Bob Shaffer, Tayfun Tuzun.  I
14 don't recall everybody, but those are a few that I can
15 recall.  Phil joking with, referring to himself as the
16 silver fox.
17   Q.  When communicating with Phil, did you ever
18 refer to him as the silver fox?
19   A.  I don't recall.
20   Q.  When communicating with other people, would
21 you refer to Phil as the silver fox?
22   A.  Possibly, but I don't recall.
23   Q.  Did you ever refer to any black employees at
24 Fifth Third as black fox?
25      MR. CIOFFI:  Objection.  Irrelevant.

Page 167

1      THE WITNESS:  What is a black fox?
2 BY MR. SABA:
3    Q.  I'm asking you if you ever used that term, for
4 anyone -- for any of the black employees at Fifth Third
5 Bank?
6    A.  I don't know what that term is, so not, I have
7 never used it.
8    Q.  Why wouldn't you?
9    A.  I didn't say that I wouldn't.  I just said I
10 didn't know what the term was.  I'd never heard it
11 before.
12   Q.  What is the extent of your involvement with
13 diversity and inclusion at Fifth Third Bank?
14   A.  I'm the president and CEO of the bank.  I'm
15 involved in one capacity or another in everything that
16 we do.
17   Q.  So what's the extent of your involvement in
18 diversity and inclusion?
19   A.  I approve the training and I take the
20 training.
21   Q.  When did you first start taking the training?
22   A.  Whenever the first annual cycle came up after
23 I joined the bank in 2015.  These things are done on an
24 annual cycle.  So if it was in the fourth quarter cycle,
25 I would have taken it in the 4th quarter of '15.  If it

Deposition of Timothy Spence                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 168

1  was the second quarter cycle, I would have taken it in
2  the second quarter of '16. But whenever during that
3  year.
4      Q.  How much of the diversity inclusion training
5  is specifically directed toward preventing age
6  discrimination?
7      A.  I mean, at the bank, we are against
8  discrimination of any kind, whether it is for customers
9  or employees. It's part of the training. I don't know
10 that I could quantify the exact percentage, but it's
11 also part of the dialogue and the way that we operate on
12 a day-in, day-out basis.
13     So age discrimination, along with the other
14 protected classes, would all be included in the way
15 that we think about diversity and inclusion.
16     Q.  Do you understand what microaggression is?
17     A.  I do.
18     Q.  What is microaggression?
19     A.  A comment that reflects an unconscious bias
20 against a protected group.
21     Q.  And you understand that a microaggression
22 could also be intended as a compliment, correct?
23         MR. CIOFFI:  Objection. Counsel, is that your
24 opinion? Are you asking if that's true? What is the
25 question exactly?

Page 169

1  BY MR. SABA:
2      Q.  Did you understand the question?
3      A.  No. Could you ask it again.
4      Q.  Do you understand that a microaggression could
5  also be intended as a compliment?
6      A.  That is not -- certainly not the way that I
7  think of -- oh, as intended as a compliment. It's
8  possible. It could be context specific.
9      But again, I want to be clear, this was Phil's
10 preferred name. I can remember sitting on a bus at
11 President Circle in Arizona when Phil was talking
12 boastfully about some things that he had accomplished to
13 a group of people, where he was referring to himself as
14 the silver fox. I can recall being in the enterprise
15 room after the PPP program initially failed to launch
16 and we managed to catch up, temporarily at least. We
17 ultimately ended up falling way far there behind in
18 terms of national rankings for the size of our business.
19 When Phil felt victorious and vindicated, and he
20 referred to himself as the silver fox, in those
21 particular settings.
22     So he wasn't using that term in response to
23 others; he was initiating it. And further, I moved to
24 Cincinnati from Minneapolis, as I mentioned earlier.
25 The quarterback of the Vikings at the time that I left

Page 170

1  or shortly before that was Bret Favre. The nickname
2  Bret Favre had was the silver fox, with his teammates.
3  And Bret Favre -- I don't know how old Bret Favre is,
4  but I would wager to believe that the compliment there
5  referred to a good-looking guy who happened to have
6  silver hair, and when an individual uses that name as a
7  -- their sort of triumphal victory cry, whenever they
8  feel like they've put one over on somebody. It, you
9  know, at that point it's a nickname. It's not a name
10 that's being imposed by somebody else.
11     Q.  Do you understand what implicit bias is?
12     A.  I do.
13     Q.  What is implicit bias?
14     A.  Bias that -- unconscious bias. Bias that is
15 embedded in a statement.
16     Q.  Do you understand that although someone may
17 welcome the use of a phrase, they don't welcome the
18 complete bias that may accompany that phrase?
19         MR. CIOFFI:  Objection. Counsel, are you
20 testifying? You're asking him to agree with that
21 statement? Is that it? What -- what is your question?
22 BY MR. SABA:
23     Q.  Did you understand the question?
24     A.  Repeat it, please.
25     Q.  Sure. Do you understand that although an

Page 171

1  individual may welcome use of a phrase, they may not
2  welcome the implicit bias that accompanies the phrase?
3         MR. CIOFFI:  Objection to the form of the
4  question.
5         THE WITNESS:  That's a hypothetical. I don't
6  know how to answer a hypothetical question.
7  The answer's going to be possibly, it could be possibly
8  not.
9         MR. SABA:  It's not a hypothetical.
10        MR. CIOFFI:  Objection. You're arguing with
11 the witness.
12        THE WITNESS:  Then you're answering
13 the question.
14 BY MR. SABA:
15     Q.  Did you understand the question.
16     A.  Apparently not. Please repeat it.
17     Q.  Do you understand that the mere fact that
18 somebody may welcome the use of a phrase doesn't mean
19 that they welcome the implicit bias that may accompany
20 the phrase?
21        MR. CIOFFI:  Objection to the form. He's
22 answered the question.
23        THE WITNESS:  Yeah, I understand that Phil
24 welcomed the use of phrase, the silver fox, because he
25 used that phrase himself.

Deposition of Timothy Spence

Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 172

1  BY MR. SABA:
2      Q.  That's your understanding?
3      A.  That -- I just said, I understand that Phil
4  welcomed the use of the phrase silver fox because he
5  used the phrase himself.
6      Q.  To the extent of any implicit bias associated
7  with that phrase, he didn't welcome that, though, did
8  he?
9          MR. CIOFFI:  Objection to the form of the
10 question.  It's impossible for him to know what Phil
11 McHugh did or did not welcome.
12         MR. SABA:  He just said he welcomed the use of
13 the phrase, so obviously he knew it to answer
14 that question.  He can answer the subsequent question.
15         MR. CIOFFI:  He explained why.
16         MR. SABA:  I understand your objection.  I
17 know you're doing speaking objections now, based on your
18 concern.
19         MR. CIOFFI:  It's not a speaking objection.
20         MR. SABA:  Yes, it is.  Anything over
21 objection is a speaking objection.
22         MR. CIOFFI:  That's not true.
23 BY MR. SABA:
24     Q.  Do you understand the question?
25         MR. CIOFFI:  Read the question back, please.

Page 173

1  BY MR. SABA:
2      Q.  Do you understand the question?
3      A.  I'm going to need the question read back or
4  repeated.
5      Q.  Sure.  I can repeat it to you, how about that?
6          With respect to Phil McHugh, he did not
7  welcome any implicit bias that accompanied or may not
8  have accompanied the phrase silver fox?
9          MR. CIOFFI:  Objection to the form of the
10 question.
11         THE WITNESS:  He did not welcome any implicit
12 bias attached to his use of the phrase silver fox?  Is
13 that what you're saying?
14 BY MR. SABA:
15     Q.  No.  To anybody else's use of the phrase?
16     A.  Okay.  Yeah, I -- I can't speak to what Phil
17 did or didn't welcome.  I wasn't not inside Phil's head.
18     Q.  Well, you just said that -- you said Phil
19 welcomed the use of the phrase silver fox?
20     A.  I said Phil used the phrase silver fox.
21     Q.  You also said he welcomed the use of it.
22     A.  I said he welcomed his use of the phrase
23 silver fox.  That was my testimony.
24     Q.  Okay.  Did he welcome your use of it?
25     A.  I don't know.

Page 174

1      Q.  But you used it anyway, correct?
2      A.  Possibly.
3      Q.  Possibly?
4      A.  Yeah.  I -- when Phil used the term the silver
5  fox, I may have used it back at some point.
6      Q.  You would use the phrase silver fox to refer
7  to Phil outside Phil's presence, correct?
8      A.  I don't know.
9      Q.  You don't recall?
10     A.  It's possible.
11     Q.  But you don't recall that?
12     A.  We're talking about years ago.  I do not
13 recall.
14     Q.  Okay.
15     A.  But it's very possible.
16     Q.  Did Phil McHugh ever welcome you using or
17 referenced him of silver fox outside his presence?
18     A.  I don't recall.
19         (Exhibit 23 is marked for identification.)
20 BY MR. SABA:
21     Q.  If I can refer you -- Mr. Spence, you've been
22 handed Exhibit Number 23, which is Bates stamped Fifth
23 Third McHugh 0213193 through Fifth Third McHugh 0213197.
24 Do you see that?
25     A.  Yes.

Page 175

1      Q.  If I can refer you to Fifth Third McHugh
2  0213195.  And there's a text from you from October 17,
3  2020, 14:52:50 UTC.  Do you see that?
4      A.  October 17th, 14 -- right, the second from the
5  bottom?
6      Q.  You got it.
7      A.  Yes.
8      Q.  Your statement is, any further word from the
9  silver fox.
10         Is that right?
11     A.  It is.
12     Q.  And you're referring to Phil McHugh there; is
13 that right?
14     A.  I would presume so, yes.
15     Q.  Okay.  So you would use that term for Phil
16 outside his presence; isn't that right?
17     A.  I said it was possible.  I did here.
18     Q.  In this conversation -- in this text message
19 exchange with Mr. Shaffer, this is all regarding Phil
20 McHugh and whether or not he's going to remain employed
21 with the bank; isn't that right?
22     A.  It was whether Phil was going to choose to
23 remain employed with the bank, yes.
24     Q.  To whom, besides Mr. Shaffer, would you refer
25 to Phil as the silver fox?

Page 176

1  A.  I don't recall.

2  Q.  Are you aware of any other employees at Fifth

3 Third on the enterprise committee who are referred to

4 using nicknames?

5  A.  Yes.

6  Q.  Who?

7  A.  Me.

8  Q.  What is your nickname?

9  A.  Fat Leo.

10  Q.  And what does that refer to?

11  A.  A compliment that was provided to me by an

12 equity research analysis.  And it's not really a

13 nickname, it's a joke.

14  Q.  And who refers to you as Fat Leo?

15  A.  Jamie Leonard.

16  Q.  Anyone else?

17  A.  I mean, I can't recall off the top of my head.

18 I don't spend a lot of time thinking about employee

19 nicknames.

20  Q.  Are there any other Fifth Third employees that

21 you refer to by nickname?

22  A.  I don't recall.  I don't recall referring to

23 other employees by nicknames.  But I also don't recall

24 any other employee introducing a nickname for themselves

25 in the workplace and in social settings both.

Page 177

1  Q.  When were you informed that you were going to

2 be the next president of Fifth Third Bank?

3  MR. CIOFFI:  Objection.  Informed by anybody?

4 Officially?  What's your question?

5 BY MR. SABA:

6  Q.  Do you understand the question?

7  A.  I think so.

8  Q.  Okay.

9  A.  I was formally informed that I would be the

10 next president of Fifth Third Bank after the board voted

11 in October.

12  Q.  Do you recall what date that was?

13  A.  I don't.

14  Q.  Do you recall -- strike that.

15     At any time prior to the board formally voting

16 you in as president, did anybody indicate to you that

17 the board will be voting you in as president in October?

18  A.  No.  I think coming out of the discussion in

19 September, where the board did their review with RHR and

20 had their meeting, I was informed that a consensus was

21 forming that the board would be likely to name me the

22 next president of Fifth Third.  But as with all these

23 things, which is true in any corporate setting, it's not

24 final until the board takes a final vote, and that that

25 vote would likely be in October.

Page 178

1  Q.  Who told you that?

2  A.  I believe it was Greg Carmichael.

3  Q.  When did he tell you that?

4  A.  After the September meeting.  I don't remember

5 if it was that evening or the next day or the day after

6 that, but it would have been in September following the

7 board meeting.

8  Q.  Did he advise you of any other organizational

9 changes that he wanted to make at that time?

10  A.  No.  He said that Bob had been working on some

11 hypothetical organizational charts and may have some

12 questions for me.  But other than that, no.

13  Q.  Did Bob ever have any questions for you about

14 his hypothetical organizational charts?

15  A.  Yeah, he was concerned about the number of

16 direct reports that I would have if the board formalized

17 the president title and I took on responsibility for the

18 regions while also maintaining responsibility for

19 payments, corporate strategy, DSG marketing, and the

20 variety of corporate development, the variety of other

21 things that I was responsible for at that point in time.

22 It would have had the effect of me having roughly 20 or

23 21 direct reports, and given that in the peer feedback

24 that I got from RHR, there was a comment that I needed

25 to spend time -- more time to invest in relationships

Page 179

1 with my peers, and to get to know them better

2 personally, he just felt that I wouldn't be able to live

3 my development agenda and provide the right level of

4 oversight and support to 21 different individual people.

5  Q.  When were you informed that you were going to

6 be taking over the regions?

7  A.  I was informed that that was one potential

8 organizational option.  But again, that decision wasn't

9 finalized until, I don't know, late in September, early

10 in October.  I was told that if the board elected to go

11 in that direction, that that would likely be the change.

12  Q.  Who informed you of that?

13  A.  I believe it was Greg.  It may have been Bob.

14  Q.  When did they inform you of that?

15  A.  As I said, I don't remember the exact date,

16 but I believe it was the early October, the end of

17 September.

18  Q.  In addition to the regions, did they indicate

19 anything else you would be taking over?

20  A.  Yeah.  As I said, he walked me through some

21 potential organizational options and asked me what of

22 the items that were there would either be better suited

23 to be a direct report to the CEO of Fifth Third, which

24 would be Greg Carmichael, or to another enterprise

25 member.  So I was aware that there was a possibility

Case: 1:21-cv-00238-MRB Doc #: 77-15 Filed: 06/27/25 Page: 48 of 106  PAGEID #: 3770

Deposition of Timothy Spence                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 180

1  that I would be responsible for all the lines of
2  business, and that Phil McHugh and Kris Garrett and
3  others would report to me.  I was aware that there was a
4  scenario where that would not be the case, and where I
5  would have responsibility for the regions in business
6  banking and wealth management, along with all of the
7  other things, corporate strategy, decision sciences,
8  marketing, and so on, that I listed earlier.
9       But under any of those scenarios, there was a
10  span of control issue that he wanted my input on, so
11  that he and Greg could formalize that in the
12  communication they were working on for the board.
13  Q.  "He," is Bob Shaffer?
14  A.  He, Bob.  Yeah.
15  Q.  Were there any scenarios provided to you by
16  Bob Shaffer where Phil McHugh was not head of the
17  consumer bank?
18  A.  Not that I recall.
19  Q.  When were those organizational changes
20  finalized?
21  A.  I guess after the board voted to name me
22  president, because it then created the waterfall that
23  was going to be require them to be finalized.
24  Q.  Well, a decision had been made prior to that
25  time as to what the organizational changes would be,

Page 181

1  hadn't it?
2  A.  Again, I don't recall.  That wasn't my
3  decision to make.  I was asked to provide some input,
4  and in particular, on what on my plate could come out.
5  I recommended that the digital organization is an
6  example.  Report directly into the CEO, given its
7  importance.  I believed that there was a value in having
8  an individual who was the chief corporate social
9  responsibility officer, that would have been a
10  collection of things that existed in different places.
11  But in any large company, sometimes those changes get
12  made all at once, sometimes they get made in a staged
13  way and over a period of time.  And often, they get made
14  following a round of consultation with people who will
15  be affected by the change, and whose role will change in
16  one capacity or another.  So I don't know when they were
17  finalized in that sense other than when they were
18  executed.
19  Q.  Were you aware that Greg Carmichael had to
20  meet with various executives before the board did the
21  final vote to inform them of what would be happening,
22  what changes they would have to go through?
23  A.  I was aware that he wanted to meet.  I don't
24  think he was required to do so, but he wanted to do it,
25  yeah, absolutely.

Page 182

1  Q.  So when he was meeting with them in advance,
2  he already knew what the organizational changes would
3  be?
4       MR. CIOFFI:  Objection to the form of the
5  question, unless there's some foundation for him to
6  know.  The witness, that is.  But you can answer, if I
7  can.
8       THE WITNESS:  Again, organizational changes
9  are never finalized until they happen.  They are often
10  affected by the discussions that I have as a leader, as
11  an example, if I effect an organizational change with
12  the folks who are going to be involved.  So he, I would
13  presume, had an idea of what the large organizational
14  changes were.  He clearly understood that he was going
15  to ask Fifth Third -- Phil McHugh to take on a larger
16  responsibility by becoming head of the consumer bank.
17  But I don't know that he, in his own head, was final on
18  every last one of the other changes that were to occur.
19  In fact, at least in my case, the two things that I
20  suggested be moved, one of those happened relatively
21  quickly after the announcement, and the other one didn't
22  happen until, I don't know, call it the turn of the
23  year.  So 2021, in the spring, or otherwise.
24       So that would be an example of an
25  organizational change that was discussed that wasn't

Page 183

1  finalized until well after Greg would have had to have
2  those discussions.
3  Q.  You were aware that before the board voted you
4  in as president, Greg Carmichael was going to meet with
5  Phil McHugh and inform him that the regions, business
6  banking, wealth and asset management, would all be
7  transferred to you, correct?
8  A.  I don't know whether -- I don't know the
9  timing of those meetings, no.  I can't speculate on
10  that.  You just said that I was aware that before he was
11  -- the board was going to vote.  I didn't know that.  I
12  was aware he was going to meet with Phil McHugh and ask
13  Phil McHugh to take on a larger responsibility from a
14  loan balance perspective, a deposit balance perspective,
15  a net income perspective, an employee perspective, and a
16  customer perspective, that he was responsible for when
17  he was the head of the regions.  By assuming
18  responsibility for the consumer bank.
19  Q.  But it's your position, none of those
20  organizational changes had been finalized yet?
21  A.  They would -- an organizational change is
22  finalized at the point of time that it's executed.
23  That's my position.
24  Q.  So were any of those organizational changes
25  finalized before the vote by the -- by the board to make

Page 184

1  you president of Fifth Third?
2     A. I wasn't involved in those conversations. I
3  wasn't involved in the vote that the board occurred. I
4  don't know the answer to that. You would have to ask
5  somebody who was directly involved in that process, and
6  therefore, had firsthand knowledge. I don't know.
7     Q. You would be aware, since you were the one
8  being voted in as president, you were aware of when that
9  took place?
10    A. Yes.
11    Q. Okay. And you were also aware of what was
12 going on before that?
13    A. I don't know when Greg talked to Phil the
14 first time. I don't know the dates. I couldn't
15 remember the day of the board vote when you asked
16 earlier. So I don't know.
17    Q. You're saying you don't know as you sit here
18 today. You knew it at that time but just don't know as
19 you sit here today?
20    MR. CIOFFI: Objection. He answered the
21 question. You're trying to get him to change his
22 answer. But you can answer it again.
23    MR. SABA: No, I'm not. I'm trying to
24 understand it.
25    THE WITNESS: At that time, I would have been

Page 185

1  aware of when the board meeting was to occur. I don't
2  know that I would have been aware as to when, in
3  advance, as to when Greg would be talking to Phil. It's
4  possible, but not certain. And I don't know in what
5  order those two things happened.
6     (Exhibit 24 is marked for identification.)
7  BY MR. SABA:
8     Q. Mr. Spence, you've been handed Exhibit
9  Number 24, which is Bates stamped Fifth Third McHugh
10 0213192. Do you see that?
11    A. I do.
12    Q. Okay. I'm going to refer you -- this is a
13 text message exchange between you and Mr. Shaffer. I'm
14 going to refer you to the last text message on the
15 bottom, October 12, 2020, 20:37:39 UTC. Do you see
16 that?
17    A. I do.
18    Q. He indicates, I hope you had a good long
19 weekend with your family. I want to catch up with you
20 tomorrow on a couple of items, including Ben Hoffman's
21 compensation. Greg and I are going to be talking to
22 Phil and Tayfun tomorrow.
23    Do you see that?
24    A. I do.
25    Q. Do you know what that meeting was about?

Page 186

1     A. Not given the context that's here, but I would
2  presume, given the timing, that it's about the board
3  vote and potential organizational change.
4     Q. If I can refer you back to Exhibit Number 23.
5  I'm going to refer you to the first page, Fifth Third
6  McHugh 0213193. And specifically, I'm going to refer
7  you to the text message from Mr. Shaffer from
8  October 13, 2020, at 11:19:57 UTC.
9     Do you see that?
10    A. I do.
11    Q. And it reads, Tayfun knows about the moves.
12 Very professional. Said he's not surprised and will be
13 supportive. Silver fox is next.
14    Do you see that?
15    A. I do.
16    Q. And you respond, nice. Do I need to reach out
17 to him right away? If not, I'll just come in early
18 tomorrow and see him in person.
19    Do you see that?
20    A. I do.
21    Q. Who were you talking about reaching out to?
22    A. I would presume, given the context here,
23 that it was Tayfun.
24    Q. Okay. Not Phil?
25    A. No.

Page 187

1     Q. Mr. Shaffer responds, tomorrow would be fine.
2     Do you see that?
3     A. I do.
4     Q. And then you indicate, thumbs up.
5     Is that right?
6     A. I do.
7     Q. Mr. Shaffer then responds in an
8  October 13, 2020, text at 13:10:48 UTC, Greg talked to
9  Phil. Said it went better than expected. Phil said he
10 gets it, makes sense, just needs to digest it. I expect
11 him to ask me for a comp increase.
12    Do you see that?
13    A. I do.
14    Q. Do you know what is meant by, it went better
15 than expected?
16    A. I do not. Sounds like what Bob means here is
17 that Phil understood the change, including my being
18 named president by the board, that he felt that change
19 makes sense and he just needed time to digest the move.
20 But I wasn't a party to the conversation between Greg
21 and Phil, and Bob isn't providing a lot of information
22 here. So it's just speculation.
23    Q. Referring you to Fifth Third McHugh 0213194,
24 it's the second page of Exhibit 23. Referring you to
25 the text message that you sent on October 15, 2020, at

Deposition of Timothy Spence                                              Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 188

1   14:58:01.  And you indicate, on the other front, I had a
2   very good talk with Tayfun.  We will be fine.
3       Do you see that?
4       A.  I do.
5       Q.  What did you mean by that?
6       A.  I meant that Tayfun and I had a nice
7   conversation.  He indicated that he was aware of the
8   organizational move, and that he was happy for me.
9       Q.  What did you mean by, we will be fine?
10      A.  That he and I will be fine.
11      Q.  Mr. Shaffer responds on October 15, 2020, at
12  14:58:34, good, how about Phil?
13      A.  Where's that?  Hold on.  There it is.  Got it.
14      Q.  It's the next text message.
15      A.  Yep.
16      Q.  You then respond on October 15, 2020 at
17  15:01:39, Phil will be interesting.  He has been sort of
18  avoiding me, as you would expect.  I finally e-mailed
19  him and asked for time.  Will forward his note and then
20  my response.  He went back to his I will give my
21  decision on Thursday.  I'm going to darken his doorstep
22  today as well.
23      Do you see that?
24      A.  I do.
25      Q.  What did you e-mail to Phil McHugh?

Page 189

1       A.  I sent him an e-mail asking for time to chat.
2   Said that I understood that he had -- my recollection is
3   I sent him an e-mail telling him that I understood that
4   he had talked to Greg, or Greg and Bob, and that I was
5   eager to sit down and talk with him, and that I valued
6   him as a leader and hoped that he would find time --
7   that we could find time to sit down and chat about how
8   to navigate going forward.
9       And then he responds here.  It says, I'll
10  forward his note, and that he responded with, I'll give
11  my decision on Thursday.  And that I responded to that.
12  And then I said, since I hadn't heard from him I'm going
13  to stop by his office today as well.  So I think that's
14  what I intended.
15      (Exhibit 25 is marked for identification.)
16  BY MR. SABA:
17      Q.  Mr. Spence, I've handed you what's been marked
18  as Exhibit Number 25, Fifth Third McHugh 007130.  Can
19  you identify that for me, please?
20      A.  It appears to be the e-mail I referenced in my
21  text message.  And Phil's response, and my response
22  to that e-mail, as I referenced in the text message.
23      Q.  In your first e-mail, which was sent on
24  October 14, 2020, at 12:50 p.m., you say, Phil, I hope
25  you are well.  I understand that you spoke with Greg and

Page 190

1   Bob yesterday, and I imagine you are still digesting the
2   discussion.  I wanted to reach out to see if it made
3   sense to find time when we could sit down and chat.  I
4   value your perspective and our working relationship, and
5   I'm eager to hear your thoughts.  Best, Tim.
6       Did I read that correctly?
7       A.  You did.  And that's consistent with my
8   recollection and my sentiment at the time.
9       Q.  And Phil responded at 1:38 p.m. on
10  October 14th, yes, I did speak with Greg and Bob
11  yesterday.  As I'm sure they told you, I was quite
12  surprised by the conversation and asked for time to
13  digest the discussion.  I told Greg that I would give
14  him an answer on Thursday, which I plan to do.  If you
15  have any information that was not shared that would be
16  helpful in making the decision, I will be happy to
17  listen.
18      Did I read that correctly?
19      A.  Yes.  And it's consistent with my
20  recollection.
21      Q.  And then you responded the next day,
22  October 15, 2020, at 12:47, and indicate, I'm sorry I
23  missed you at the end of the day today.  Greg did give
24  me a brief recap of your discussion.  If I were in your
25  shoes, I would have been surprised and also frustrated,

Page 191

1   given the speed of movement the past few years.  I don't
2   know that I have much in the way of additional
3   information, but I wanted to share a few thoughts if you
4   were open to it.  As I think I shared long ago at
5   that enterprise minus Greg offsite we did at the
6   Wiedemann Mansion, I very much value your leadership and
7   what you bring to the team.  I think we are a better
8   company because of it.
9       Did I read that correctly?
10      A.  You did.  It references -- we did on a
11  episodic basis team building exercises across the river
12  at the Wiedemann Mansion and occasionally in other
13  places where we had the opportunity to meet one-on-one.
14  I had I think two conversations; one that day at the
15  Wiedemann Mansion with Phil, and then a second one after
16  the organization change was finalized such that Phil
17  would run the regions and I would run the consumer bank,
18  where Phil confided in me that he didn't like change,
19  and in particular the speed of change.  That he felt it
20  was -- he was at a disadvantage in terms of adapting to
21  that change relative to other executives, and
22  specifically as it related to the consumer bank
23  organizational move, that he was frustrated that that
24  change was occurring less than two years after he went
25  into the position.  That he understood it.  But that it

Page 192

1  was frustrating nonetheless, because he had hoped to
2  make more of a mark on the consumer bank before rotating
3  out into the regions.
4         And I was attempting, in an effort to build a
5  bridge here, and to establish a dialogue in a period of
6  time where Phil was clearly emotional, based on the way
7  that he was behaving, that I was there to talk with him,
8  and that I hoped we could move forward because I thought
9  Phil was a valuable member of the team. So that's what
10  the message entails.
11     Q.  What was the brief recap that Greg Carmichael
12  gave you of his discussion with Phil McHugh?
13     A.  Very consistent with what we discussed in the
14  text messages. That he and Phil had spoken briefly.
15  That Phil had indicated that he understood the decision,
16  but that the timing had caught him by surprise, and that
17  he wanted an opportunity to go away and to think about
18  it, and then he would come back with his decision about
19  whether or not he wanted to take the leader role in the
20  consumer bank or choose to leave the bank.
21         And that is, again, the reason that Phil says
22  to me here, if you have any additional information that
23  wasn't shared in making that decision, he'd be happy to
24  listen to me. This was meant to be a very -- and I
25  think it was -- a very cordial exchange between two

Page 193

1  colleagues.
2     Q.  Why do you indicate that if you were in Phil's
3  shoes, you would be surprised?
4     A.  I just told you. Because he had indicated to
5  me at the Wiedemann Mansion that change was hard, and
6  that in particular change that occurred quickly he
7  didn't like. And then he subsequently indicated that to
8  me, when I replaced him as the head of the consumer
9  bank, and that this situation had some parallels because
10  he liked working with the regions and he had only been
11  in the regions for a period of a year and a half to two
12  years at that point in time -- or two years. Two years
13  and a few months maybe.
14     Q.  What year was the Wiedemann Mansion meeting?
15     A.  2017 or '18. 2017.
16     Q.  Do you know when it was in 2017?
17     A.  I don't. Not off the top of my head. It was
18  nice enough outside that we were able to do some of it
19  outdoors. So I would presume it was in the late
20  spring/summer or early fall, but...
21     Q.  And are you claiming at the time of the
22  Wiedemann Mansion meeting that Phil was no longer going
23  to be responsible for the consumer bank?
24     A.  No, I'm saying we had two separate
25  conversations. One at the Wiedemann Mansion, where we

Page 194

1  paired off to provide direct feedback to one another,
2  where I told Phil what I admired in him and where I
3  needed some support, and Phil did the same for me.
4         And where Phil indicated in that discussion
5  that the magnitude of change and in particular, the
6  pace, was difficult, and he needed me to work with him
7  on that, and he was asking me to slow down and work him
8  through those things.
9         Then subsequently, after we made the
10  announcement to do the hand-over of the consumer bank,
11  Phil was kind enough to provide his notes on prior
12  activities in the consumer bank to me, and I said, do we
13  need to have a talk? And he said no. He said, I am
14  frustrated by the decision here. I wanted more time
15  with the consumer bank, but I understand it, and I'm a
16  professional and I'll move forward.
17     Q.  Those statements that you indicate that Phil
18  made, are they documented anywhere in writing?
19     A.  No.
20     Q.  There's no notes that you have of those
21  meetings?
22     A.  No.
23     Q.  There was no communication by text or e-mail
24  between you and Phil McHugh confirming or discussing
25  that conversation?

Page 195

1     A.  Not that I recall.
2     Q.  Did Phil McHugh ever indicate to you that he
3  was surprised that you were being named president
4  instead of him?
5     A.  No. He merely indicated here that he was
6  quite surprised by the conversation. We never had a
7  discussion beyond this exchange after Greg and Phil
8  spoke.
9     Q.  You did acknowledge that the leadership that
10  Phil McHugh provides makes Fifth Third a better company?
11     A.  Yeah, absolutely. I hoped that Phil would
12  stay on. I wanted to continue to work with him.
13     Q.  During the recap that Greg Carmichael gave you
14  of his conversation with Phil, did he tell you that he
15  had apologized for Phil for not letting Phil know that
16  he was not going to recommend Phil as the next president
17  and CEO of Fifth Third Bank?
18     A.  No.
19     Q.  Did you e-mail Phil at all any time after this
20  e-mail exchange?
21     A.  I don't think so. I don't know that his
22  e-mail address was active after the 15th, because as a
23  matter of course when somebody chooses to leave the
24  bank, we restrict access.
25     Q.  When was the termination of Phil McHugh's

Case: 1:21-cv-00238-MRB Doc #: 77-15 Filed: 06/27/25 Page: 52 of 106 PAGEID #: 3774

Deposition of Timothy Spence                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 196

1  employment with Fifth Third Bank?  When did it end?

2      A.  We never terminated Phil's employment; he

3  chose to leave.

4      Q.  When did Phil's employment with Fifth Third

5  Bank end?

6      A.  I don't recall the exact date.

7      Q.  When was Phil McHugh's e-mail turned off?

8      A.  In conjunction with his employment ending at

9  the bank.  But again, I don't -- I'm not responsible for

10  that process.  I didn't run HR.  I don't know when that

11  happened.

12      Q.  Did you have any text exchange with Phil

13  McHugh after this e-mail exchange?

14      A.  I do not believe so.  I may have texted him

15  since I wasn't able to get ahold of him here, to see if

16  we could talk, but otherwise, no.  Outside of that.  And

17  I may not have.  I don't remember.

18      Q.  Did you see Phil at all at the bank after you

19  sent the e-mail on October 15, 2020?

20      A.  Yes.  I -- well, what time did I -- it's

21  possible.  We had a series of -- this would have been

22  during investor prep time, so we would have had a series

23  of meetings to do the preparation for our earnings call,

24  and Phil and I both participated in those.

25          I can remember a fairly awkward meeting, where

Page 197

1  Phil had indicated he wasn't going to leave his current

2  position, and that if he wasn't given what he wanted,

3  that we were firing him from the bank, and yet he was

4  there.  And pretending like nothing had happened.  So I

5  remember that vaguely because it seemed erratic, given

6  the other things that were going on during that period,

7  but I don't remember if that happened before this e-mail

8  or after this e-mail.

9      Q.  And those communications you just referred to,

10  those were communications between you and Phil McHugh?

11      A.  No, I'm saying those -- that was a meeting for

12  our -- prep for or earnings call.  On a quarterly basis,

13  we present our earnings to investors.  There are a

14  series of meetings that occur where we work on the

15  scripts, the presentation, and the Q and A.  Phil and I

16  both participated in those meetings, in those script

17  preparation meetings and those exercises, and I recall

18  there being a meeting in and around this time.  I just

19  don't remember whether it was October 14th or 15th or --

20  I don't -- without more context, I can't give you the,

21  whether it was immediately before or immediately after.

22  It was roughly in the same period.

23      Q.  When did you develop an understanding that

24  Phil was not going to accept the consumer bank position?

25      A.  When he informed Greg or Bob and Greg that he

Page 198

1  was not going to accept the consumer bank position, and

2  Bob and Greg -- or Bob or Greg and I debriefed

3  afterward.

4      Q.  Going back to Exhibit Number 23.

5      A.  Got it.

6      Q.  And at the end of your text message, dated

7  October 15, 2020 at 15:01:39 UTC, you indicate, I'm

8  going to darken his doorstep today as well.

9          Do you see that?

10      A.  I do.  We talked about that text message

11  earlier.  Same one we talked about earlier.

12      Q.  That's correct.  Did you go see Phil that day?

13      A.  I definitely tried.  He wasn't in his office.

14  Which is why I say here -- I think -- I don't know what

15  UTC means.  So I'm going to be candid.  I don't fully

16  understand -- I understand the date stamps of the text

17  message, I don't understand the time stamps.

18      Q.  Let me represent to you, that's Greenwich

19  Meantime.  So that --

20      A.  I don't know how to calculate Greenwich

21  Meantime to Cincinnati.

22      Q.  Yeah.  So the deduction is four hours during

23  non-daylight savings time, it's five hours during

24  daylight savings.

25      A.  Okay.  So this would be when?

Page 199

1      Q.  That would be 1:00, because it's prior to

2  daylight savings.

3      A.  Thank you.

4      Q.  Excuse me.  That would be --

5      A.  I -- I attempted to stop by Phil's office.  He

6  just wasn't there.

7      Q.  Excuse me.  That would be 11:00 in the

8  morning.

9      A.  Yeah.  I attempted to stop by, but he wasn't

10  there.  I just --

11      Q.  Okay.  You don't recall seeing him or speaking

12  to him that day?

13      A.  I saw him in one meeting.

14      Q.  Okay.

15      A.  Which was the earnings prep meeting --

16      Q.  Okay.

17      A.  -- with our -- that our investor relations

18  group organizes that I described earlier.  I don't

19  recall seeing him outside of that meeting.  And that

20  clearly would not have been an appropriate time to have

21  a confidential conversation.

22      Q.  Going back to the text messages --

23      A.  Yes.

24      Q.  -- Bob Shaffer responds on October 15, 2020,

25  at 15:02:19 UTC, yes, I'm waiting to hear from Greg on

Page 200

1  his response.  You then respond on October 15, 2020, at
2  18:27:33 UTC, just got out of RCC.  Try Phil now.
3      What is RCC?
4      A.  Risk and compliance committee.
5      Q.  Would Phil have been at that risk and
6  compliance committee meeting?
7      A.  I don't know.  I don't know.  But that would
8  be minuted.  There would be a record of who was in
9  attendance there, I just don't know.  There are a lot of
10  those every year.
11     Q.  On October 15, 2020, at 18:43:19 UTC,
12  Mr. Shaffer responds, I just talked to Phil.  Can you go
13  get Greg and I can debrief both of you.
14     Do you see that?
15     A.  I do.
16     Q.  Did you then have a meeting with Greg and Bob
17  Shaffer to debrief regarding his conversation with Phil?
18     A.  Yeah, I believe that's the meeting that I
19  testified on a minute ago, where I indicated they told
20  me that Phil was not going to accept the position in the
21  consumer bank.
22     Q.  What else did they say?
23     A.  That he was making demands.  That he had
24  indicated that he intended to leave the bank and was he
25  going to be treated fairly.  And Greg indicated that he

Page 201

1  would treat Phil the same way that we had treated other
2  enterprise level executives who had elected to leave the
3  bank in the past few years.
4      Phil indicated that that wasn't enough, that
5  Greg needed to do far more for him.  He indicated
6  that he wouldn't report to me, that he would not give up
7  the regions, and that we were -- and that we were
8  essentially -- we were in limbo at this point because he
9  had told Greg that he wasn't going to accept the
10  position, which entailed a raise and more responsibility
11  in a group that he had indicated to me previously that
12  he wanted to have more time in before rotating somewhere
13  else.  But he also wasn't leaving the bank.  And we
14  didn't know where that left us.
15     Q.  So you're saying that was during the debrief
16  meeting, and that was information coming from
17  Mr. Carmichael.
18     A.  I believe so.  Or Bob.  Could have been Bob.
19  Again, these are relatively short cycle discussions.
20  It's roughly in that period of time.  But those are
21  things that were relayed to me by either Greg -- or Greg
22  and Bob.  The discussion -- the comments that Phil made
23  to Greg about wanting more than we had done for any
24  other enterprise level executive, which is just a matter
25  of course when you're a Fortune 500 company, and as a

Page 202

1  leader there you have to be consistent.  Which Greg
2  couldn't do and wouldn't do, had to have come from Greg
3  because they were the conversation between Greg and
4  Phil.
5      The other comments could have come from Bob.
6  A debrief conversation that Susan, Bob, and Greg and I
7  have later, but I don't remember at this stage.  It's
8  three-plus years ago, and these were not extended
9  conversations, they were relatively brief because things
10  were pretty fluid.
11     Q.  On October 15, 2020, at 19:37:24 UTC, you text
12  Bob Shaffer and say -- indicate, have you called Phil
13  yet?
14     A.  So I would presume that the takeaway from this
15  discussion, that Greg -- that Bob -- so Bob texts me --
16  and again, I apologize on the UTC -- but at 18:43, and
17  says, I just talked to Phil.  Can you go get Greg so
18  that the three of us can debrief?  I mean, there's a
19  typo there, but I presume that's what Bob intended,
20  because Bob was away on vacation.
21     And I -- there's a gap then in time of about
22  45 minutes, where we would have had our debrief
23  conversation, and where the takeaway was for Bob to call
24  Phil.  And then I say, have you called Phil yet?  And
25  Bob says no, I'm scripting my notes.  I will call him in

Page 203

1  a couple of minutes.
2      Q.  He then responds back -- he responds again, do
3  you need something?  Bob Shaffer texts you that,
4  correct?
5      A.  Mm-hm.
6      Q.  And you respond, call me before you do.  Is
7  that right?  You respond to Bob Shaffer?
8      A.  I do.  Yeah, that's right.
9      Q.  And you're indicating he should call you
10  before he talks to Phil McHugh --
11     A.  Yes.
12     Q.  -- correct?
13     A.  Yes.
14     Q.  Why did you want Bob Shaffer to call you
15  before he talks to Phil McHugh?
16     A.  Because I wanted to make sure that he
17  indicated to Phil that I genuinely wanted him to be part
18  of the organization going forward.  I hadn't had the
19  opportunity to communicate what was in this e-mail to
20  Phil directly, because Phil and I hadn't spoken, and in
21  addition to the comments that Bob was going to -- the
22  discussion Bob was going to need to have about Phil
23  needing to make a decision so we could move forward one
24  way or the other, I wanted him to know that I genuinely
25  hoped that we would continue to work together.  At least

Page 204

1  that's my recollection.
2      MR. SABA:  We can go off the record.
3      (A recess was taken from 3:56 to 3:58.)
4      VIDEOGRAPHER:  The time is 3:58 p.m.  We're
5  back on the record.
6      (Exhibit 26 is marked for identification.)
7  BY MR. SABA:
8      Q.  Mr. Spence, I've handed you what's been marked
9  as Exhibit Number 26, Fifth Third McHugh 0213029.  Let
10  me represent to you, this is a text message exchange
11  between Mr. Carmichael, Mr. Shaffer, and yourself.  And
12  it also starts in October -- or runs through October 15,
13  2020, and coincides, in part, with some of the
14  conversation we were reviewing which is covered in
15  Exhibit 23.  And if I can refer you specifically to the
16  third line -- this is on Exhibit 26.
17      A.  26, okay.
18      Q.  There's a text message from Mr. Shaffer on
19  October 15, 2020, at 18:50:44 UTC.  I just talked to
20  Phil.  If you guys want to call me, I can debrief you.
21      That appears to be a repeat of the text
22  message he sent to you when he had just spoken to Phil.
23      A.  Where is -- I'm sorry, can you show me in
24  Exhibit 23 what you're referencing --
25      Q.  Sure.  Hang on a second.  Certainly.

Page 205

1      A.  -- just so I can square it.
2      Q.  If I can refer you to Fifth Third McHugh
3  0213194.  And listed on Exhibit Number 23 is a text
4  message --
5      A.  I'm sorry, I got my pages turned wrong because
6  I was looking for the back.  So it's page --
7      Q.  0213194.
8      A.  Yes.  Got it.
9      Q.  Okay.  If I can refer you down to the text
10  message for Mr. Shaffer on October 15, 2020, at
11  18:43:19 UTC.  And similarly, in the text just sent to
12  you, he says, I just talked to Phil.  Can you go get
13  Greg and I can debrief both of you.
14      Do you see that?
15      A.  Yeah, hold on.  I'm sorry.
16      Q.  Certainly.
17      A.  The text -- okay.  So one of them's 18:50:44
18  and one of them's 1843.  I do see that.
19      Q.  Correct.
20      A.  They look like -- yeah, they do look like
21  repeats.
22      Q.  Referring back to Exhibit 26.  There's a --
23  incomplete text message, it appears, from Mr. Shaffer
24  that just says 12 at 18:50:52.
25      A.  He appears to be correcting wanna from the

Page 206

1  prior row, would be my guess, but again, I didn't send
2  it.  I don't know.
3      Q.  Okay.  And then the next text message he sends
4  on Exhibit 26 is at 20:26:53 UTC, haven't talked to Phil
5  yet.  Expect to soon.  And that, going back again to
6  Exhibit 23, would appear to coincide with a time after
7  you send your text message where you say, call me before
8  you do.
9      Do you see that?
10      A.  Yes, chronologically, I agree with you.
11      Q.  Okay.
12      A.  Provided that there's nothing about the date
13  stamping that doesn't line up.  It appears to line up,
14  yes.
15      Q.  Going back to Exhibit 26 on October 15, 2020,
16  at 20:28:50 UTC, Mr. Carmichael responds, okay, sorry,
17  you have to deal with this during your time off.  I'm
18  very disappointed in Phil's handling of the situation.
19      Do you see that?
20      A.  I do.
21      Q.  And he's referring to Mr. Shaffer being off at
22  this point in time; is that correct?
23      A.  He is.  Bob was in Michigan.
24      Q.  Mr. Shaffer then responds, thanks, no problem.
25  Very disappointed in Phil.

Page 207

1      Correct?
2      A.  Yes.
3      Q.  Okay.  And October 15, 2020 at 20:58:40,
4  Mr. Shaffer texts both of you, talked to -- excuse me --
5  talked to Phil.  If you guys are both available, could
6  you call me back together?  Do you see that?
7      A.  I do.
8      Q.  Okay.  Do you recall calling Mr. Shaffer along
9  with Mr. Carmichael to discuss his conversation with
10  Phil on October 15th?
11      A.  I think that's the same conversation that I
12  referenced earlier in my testimony, where I said that
13  Bob -- Greg had talked to Phil, then Bob talked to Phil.
14  I couldn't remember what was relayed when, because as
15  you can see with the text messages, this was a pretty
16  fluid few hours.  But I don't specifically remember this
17  call, but I remember having a call, and it's very
18  possible that this is the call that we had.
19      Q.  Okay.  Not necessarily the older -- earlier
20  caller --
21      A.  I --
22      Q.  -- at some point in time --
23      A.  Yeah.
24      Q.  -- you're communicating with him.  It does
25  appear that Mr. Shaffer would have communicated or

Page 208

1  talked to Phil McHugh twice; is that right?

2      A.  It appears -- it appears he talked to him

3  twice, yeah.  Because he says I just talked to Phil once

4  at 1850 and once at 2058.  But this is -- this coupled

5  with the discussion that I had with Bob is the -- and

6  with Bob and Greg, I should say, is my only basis.  I

7  just -- I don't know.  You'd have to ask Bob.

8      Q.  Going back to Exhibit Number 23 and Fifth

9  Third McHugh 0213194.

10     A.  Okay.

11     Q.  On October 15, 2020, at 22:49:58 UTC,

12 Mr. Shaffer texts, this will do it tonight.  And sends

13 you some sort of imagine JPEG.  Do you see that?

14     A.  I do.

15     Q.  Do you recall what he sent to you?

16     A.  I have no idea.

17     Q.  You respond at 22:50:28 UTC.  Yes, it will.

18 Do you see that?

19     A.  I do.

20     Q.  You then indicate on October 16th at

21 00:26:50 UTC, my thoughts on the day.

22         And then it appears you send three different

23 gifs; is that right?

24     A.  That's certainly what it looks like.

25     Q.  Do you recall what you sent to Mr. Shaffer in

Page 209

1  that --

2      A.  No.

3      Q.  -- text message exchange?

4      A.  Nope.  I recall getting a photo from Bob --

5  Bob was in a lake house with a hot tub on it that had a

6  really beautiful view.  And I can recall getting a photo

7  of that, but is that this photo or a photo later in a

8  week or before?  I don't know.  So I really don't know

9  what this is.

10     Q.  And do you have any recollection of what you

11 sent to him?

12     A.  No.

13     Q.  Do you recall if it had anything to do with

14 Phil McHugh?

15     A.  I do not.

16     Q.  Moving forward to October 16, 2020, at

17 12:22:55 UTC, Mr. Shaffer texts you, my bet is Phil will

18 leave the company.

19         Do you see that?

20     A.  Yes.

21     Q.  And you respond, me too.

22     A.  Yep.  I was disappointed.  I hadn't heard from

23 Phil from the messages.  As I mentioned, I relayed what

24 I understood from Bob and Greg were the content of the

25 conversations they had with Phil the prior day where

Page 210

1  Phil was insistent that he did not want to be the head

2  consumer bank, or he did not want to report to me, and

3  the byproduct of that is having not heard from him after

4  I offered twice to talk, I assumed that that meant that

5  he was unlikely to continue on with the company.

6      Q.  Proceeding with October 16, 2020,

7  14:23:36 UTC, Bob Shaffer texts you, do you know if Phil

8  talked to Greg?  I haven't heard back from Greg yet.

9  And you respond, nope.

10         Is that correct?

11     A.  Yes.

12     Q.  And then you clarify, as in no, he hasn't

13 talked with him.

14     A.  Yes.

15     Q.  Mr. Shaffer responds, okay.  A few -- an hour

16 and a half later on October 16, 2020, 16:06:51 UTC, you

17 text, any news on Phil?  He just passed me in the hall

18 and talked to Troy.

19         Do you see that?

20     A.  Yes.

21     Q.  What does that mean?

22     A.  It means that Phil and I passed in the hall

23 and he talked something related to either our Detroit

24 market -- which I think is what he was talking about

25 because we had an open position there on the head of

Page 211

1  retail.

2      Q.  And just to be clear, October 16th was a

3  Friday, correct?

4      A.  It was.  Thank you.  That's helpful.  I didn't

5  know one way or the other.

6      Q.  Okay.

7      A.  I'm sorry.  Are you stipulating that that's a

8  Friday?

9      Q.  I'm representing to you it was a Friday.

10     A.  Okay.

11     Q.  Do you have an understanding that it's

12 different?

13     A.  No.

14     Q.  Okay.

15     A.  I have no understanding other than what you've

16 told me.

17     Q.  And with respect to that Friday, Phil McHugh

18 did come into the offices that Friday.  Do you recall

19 that?

20     A.  It certainly appears to be the case here, yes.

21     Q.  Mr. Shaffer responds, nothing.  Weird.

22         And then later at -- October 16, 2020, at

23 17:00:06 UTC Mr. Shaffer asks, anything yet?  You then

24 respond, nope.  And he is in the room for the earning

25 script review and laughing and telling jokes.

Page 212

1      I assume you're refer to Phil McHugh there; is
2 that correct?
3     **A.  I am.**
4     Q.  And do you recall that meeting, the earning
5 script review?
6     **A.  Yeah.  This is the meeting that I referenced**
7 **earlier when I said we were on a quarterly process to do**
8 **the review of the investor call and the earning script**
9 **and the slides.  So that is the meeting that I**
10 **referenced at that point in time.  And I was very**
11 **confused, because Phil had indicated on multiple**
12 **occasions that he would provide his decision on**
13 **Thursday, and here we are on Friday, and he's not**
14 **provided a decision one way or the other, and in what**
15 **very clearly from the commentary from Greg and Bob, was**
16 **in an elevated emotional state, and then pretending like**
17 **nothing else was going on.**
18     Q.  Bob Shaffer responds, jeeze; is that correct?
19     **A.  It is.**
20     Q.  He then follows that up -- Bob Shaffer follows
21 that up with text to you that reads, what time is that
22 meeting over?  Surely he will talk to Greg after it.
23      And you indicate on October 16, 2020, at
24 18:09:01 UTC, just finished the meeting.  You then text,
25 he has left the building.  Unless he is on the phone

Page 213

1 with you or Greg now, he is gone.
2      Do you see that?
3     **A.  I do.  And that's consistent with my**
4 **recollection that he's left the building without talking**
5 **to anybody.**
6     Q.  Referring to the bottom of Fifth Third McHugh
7 0213195, and a text message from you on
8 October 17, 2020, at 14:50 -- 14:52:50 UTC.
9      Do you see that?
10     **A.  I do.**
11     Q.  And we've discussed this earlier, that's where
12 you text, any further word from the silver fox, correct?
13     **A.  I recall that, yes.**
14     Q.  And you're referring to Phil McHugh; is that
15 right?
16     **A.  I am.**
17     Q.  And you then add, I'm terrified he will show
18 up on Monday and that Frank will need to escort him out.
19      Do you see that?
20     **A.  I do.**
21     Q.  And Bob Shaffer indicates in his text
22 2020/10/17 at 16:09:43 UTC -- excuse me, October 17,
23 2020 at 16:09:43 UTC, here's what I sent to Phil.  Phil,
24 I understand you reached out to Greg today.  Since you
25 indicated you were getting an attorney, please have your

Page 214

1 attorney contact Susan.  As I told you yesterday, since
2 you refused to take the consumer lead role, you're
3 voluntarily resigning from the company, as there is no
4 position available.  As such, and as I indicated
5 yesterday, you do not need to come to the office and
6 your last day with the company will be October 30th.
7      Do you see that?
8     **A.  I do.**
9     Q.  You respond, good note.  You then text on
10 October 17, 2020, at 16:13:02.  I talked to Greg quickly
11 about Melissa -- strike that.
12      Bob Shaffer then texts you October 17, 2020,
13 at 16:53:18 UTC, Phil did respond.  And then he forwards
14 you that response; is that right?
15      And it says, Bob, I was told by you and Greg
16 that I did not need an attorney, and told by you not to
17 report to work on Monday.
18      Do you see that.
19     **A.  I do.**
20     Q.  Okay.  And you respond, we need to know
21 whether or not he's gotten an attorney.  You definitely
22 did not tell him he didn't need one.
23      And Bob Shaffer responds to you, I did not
24 tell him that.  I told him I was surprised he was asking
25 in the first conversation if he needed one.  But in the

Page 215

1 third and fourth conversations he told me he was getting
2 one.
3      You then respond, ridiculous.  I would just
4 ask him point blank does have an attorney or not.
5 You then add, if so, the attorney needs to call Susan.
6 If not, Phil needs to call Susan.  You then also follow
7 that up with a text that reads, we are headed for a
8 place where he comes in on Monday, I'm telling you.
9      Bob Shaffer responds, I'm waiting for guidance
10 from Susan and if he comes in on Monday, Frank and I
11 will escort him out.
12      You then send a text on October 178, 2020, at
13 17:07:27 UTC, this is insane.  The silver fox, of all
14 people.
15      Is that right?
16     **A.  It is.  I think this -- I recall this entire**
17 **stream of text messages, and the context of what was**
18 **going on.  Bob and Phil had had a discussion where Phil**
19 **said, I am not going to accept the role of the consumer**
20 **bank.  I intend to continue on in the role as head of**
21 **the regions.  Bob said, then that means you're -- you**
22 **are resigning from the company, and Phil said, I'm**
23 **resigning from the company; you're firing me.  Bob said,**
24 **you're resigning from the company.  And Phil said, I'm**
25 **not resigning from the company; you're firing me.**

Deposition of Timothy Spence | Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 216

1   I was very concerned at that point because
2  again, Phil had been acting erratically and emotionally
3  during this period.  He had been seen throwing papers
4  against the wall a few months before this.  He had taken
5  Lars Anderson into a supply room and was yelling at Lars
6  so loudly that even with the door shut it could be heard
7  -- heard across the floor.  He had made specific threats
8  to Greg about, you know, what he was and wasn't willing
9  to do and what Greg needed to do for him, given what
10 Phil had done over the years.
11        And it felt very much like we were headed for
12 a place where Phil would come in on Monday morning.
13 That would be bad for a variety of reasons.  Most
14 immediately and importantly, emotional former employees
15 are dangerous.  That is true in any workplace,
16 regardless of their tenure, regardless of how they have
17 behaved previously on the job.  But as importantly, it
18 remained my goal throughout this period of time to find
19 a path where Phil would continue on with the company as
20 the head of the consumer bank.  And based on my
21 conversations with Bob Shaffer and Greg Carmichael, that
22 remained their goals as well.
23        So I was hopeful that there would be a
24 opportunity here at some point in this process for us to
25 reengage on the discussion about how to move forward.

Page 217

1  It just didn't materialize.  And Phil then left and was
2  insistent that he wasn't resigning, and we didn't know
3  where this was going to go from there.  We didn't know
4  whether this was an attorney-to-an-attorney discussion.
5  We didn't know -- which would be our corporate protocol
6  with any employee, whether it's Phil McHugh or
7  otherwise.
8        And that, I think, is reflected in this
9  exchange here.  And it was disappointing, because as I
10 mentioned earlier in my e-mail, I valued a lot about
11 Phil's leadership and I hope that he continued on with
12 the company.  I know Greg and Bob felt the same way,
13 because they said the same thing.
14     Q.   What was the throwing paper incident that you
15 said Phil was observed throwing papers?
16     A.   He was observed in his office at the end of
17 that week throwing a stack of papers against the wall.
18     Q.   At the end of what week?
19     A.   At the end of this week.  So during the period
20 of 14, 15, 16.
21     Q.   You testified earlier it was several weeks
22 earlier?
23     A.   No, I said there were two incidents.  He was
24 observed throwing papers this week.  Then several weeks
25 earlier, maybe two months earlier, he was observed going

Page 218

1  into a supply closet on the executive floor with Phil
2  Anderson, shutting the door, and then Phil's voice, he
3  was yelling so loudly that it could be heard up and down
4  the floor.  It was heard by me, and I know it was heard
5  by Susan Zaunbrecher because we chatted about it.
6        And those weren't the only occasions where
7  Phil had a difficult time when he had strong emotions.
8  You could read it in his fame and in his body language.
9  And he was insistent that he was neither leaving nor
10 accepting the new position, and we didn't know where
11 that would go from here.
12     Q.   Going back to the throwing papers incident.
13 On what day did that occur?
14     A.   I don't remember.
15     Q.   Who saw Phil McHugh throwing papers?
16     A.   I believe it was Jamie Leonard, but I don't
17 recall definitively.
18     Q.   And what time of day did it occur that Phil
19 McHugh threw papers?
20     A.   I don't recall.
21     Q.   How many papers did Phil McHugh throw?
22     A.   I don't recall.
23     Q.   Who was in Phil McHugh's office with him when
24 he threw the papers?
25     A.   I don't recall.  I wasn't there, as I said.

Page 219

1     Q.   How far did he throw the papers?
2     A.   I don't know.
3     Q.   Were the papers going toward a garbage can?
4     A.   Certainly not the way the story was related to
5  me.
6     Q.   Who relayed the story to you?
7        MR. CIOFFI:  Objection.  Asked and answered.
8  You can answer it again.
9        THE WITNESS:  I believe it was Jamie Leonard.
10 BY MR. SABA:
11     Q.   When did Jamie Leonard relay this paper
12 throwing story to you?
13     A.   I don't recall.
14     Q.   Do you recall a year that it was communicated
15 to you?
16     A.   Not definitively.
17     Q.   Do you recall if it was in 2020?
18     A.   I recall that it would have been in the
19 aftermath of Phil having elected to leave the bank, but
20 I don't recall whether it was in 2020 or 2021.
21     Q.   The supply room incident with Lars, you said
22 that occurred a couple months before?
23     A.   I believe so, yes.
24     Q.   What time of day was that?
25     A.   After an enterprise committee meeting on a

Deposition of Timothy Spence            Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 220

1 Thursday. So that would put anywhere from between 10:30
2 and 11:30.
3     Q. What was the nature of their discussion?
4     A. I attempted not to listen in. We all just
5 tried to give it a clear birth. But it was a strong
6 disagreement over something that had been discussed in
7 the enterprise committee meeting.
8     Q. Could you hear specifically what was being
9 discussed?
10     A. No. I walked away.
11     Q. Did anybody speak to Phil McHugh about the
12 alleged supply room incident?
13     A. I don't know.
14     Q. Did you speak to Phil McHugh about it?
15     A. I did not.
16     Q. Did anybody make a report about the alleged
17 supply room incident?
18     A. I don't know.
19     Q. Did Lars Anderson make any report about the
20 supply room incident?
21     A. I don't know. I didn't work in HR.
22     Q. Did you ever discuss the supply room incident
23 with Lars Anderson?
24     A. I did not.
25     Q. How long did the supply room incident last?

Page 221

1     A. I don't know because I walked away.
2     Q. How long were you standing there listening to
3 the supply room incident?
4     A. I was not standing there listening to the
5 supply room incident. I had an office that bordered the
6 supply room and when the volume got so loud that it was
7 disruptive, I walked away.
8     Q. How long did it take after they entered the
9 supply room for the volume to get so loud that you
10 walked away?
11     A. I don't recall. I don't know. I -- well, I
12 don't know when they walked into the supply room. I
13 merely know when I heard the volume rise and I walked
14 out and looked into the supply room, Phil and Lars was
15 standing there and Phil was yelling at Lars.
16     Q. Was Lars saying anything?
17     A. Not at the moment when I walked out of my
18 office and then when I walked away. But I can't be
19 definitive about whether or not he said anything in the
20 supply room.
21     Q. You mentioned Susan Zaunbrecher heard this
22 incident?
23     A. Yes.
24     Q. Do you know if she spoke to Phil McHugh about
25 incident at all?

Page 222

1     A. I do not.
2     Q. Did she discuss the incident with anyone?
3     A. I don't know.
4     Q. Other than Susan Zaunbrecher, who else would
5 have known about the incident?
6     A. Possibly Bob Shaffer.
7     Q. Have you ever discussed the incident with Bob
8 Shaffer?
9     A. I don't recall our discussing it specifically,
10 but Bob is in that same row of offices.
11     Q. When did you discuss the incident with Susan
12 Zaunbrecher?
13     A. Shortly after it occurred.
14     Q. What is "shortly after"?
15     A. I don't know.
16     Q. Same day?
17     A. Same day or the day after or the week -- the
18 week immediately after that. Probably the next time
19 that I saw her.
20     Q. And what did you and Susan Zaunbrecher
21 discuss?
22     A. We agreed it would be better for those sorts
23 of discussions to occur in other places, and that if it
24 occurred again that we would suggest that they would
25 move somewhere else.

Page 223

1     Q. Anything else?
2     A. No.
3     Q. Did either one of you report the incident to
4 anyone?
5     A. I can only speak for myself. I did not report
6 the incident.
7     Q. Do you know if Susan spoke to Lars about the
8 incident?
9     A. I don't.
10     Q. You mentioned that Phil McHugh made threats to
11 Greg. What specific threats did Phil McHugh make to
12 Greg Carmichael?
13     A. Well, he said, I won't work for Tim Spence.
14 He said, I won't accept this organizational change.
15 When he said to Greg, if I leave the company, will you
16 treat me fairly? Again, I am relaying what I was told
17 by Greg, so you would need to ask Greg to get a more
18 detailed answer. But my understanding is that when he
19 told Greg that -- when he asked Greg what would Greg do
20 for him? Greg said, I will treat you fairly and
21 consistent with the way that we've treated other
22 executives who've left the bank. And Phil said, no,
23 that's not enough.
24     Q. Anything else?
25     A. I think, what if I told you that I was the

Deposition of Timothy Spence                                                      Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 224

1  most respected executive on this floor. Which would
2  have included the -- which would have included Greg
3  Carmichael, who sat on the same floor. But that's my
4  recollection of the things that he'd said.
5      Q. I'm sorry, you're saying that Phil said that?
6      A. Phil said to Greg, what if I tell you that I
7  am the most respected executive on this floor? On the
8  floor that included Greg Carmichael.
9      Q. Okay. Anything else?
10     A. Not that I recall off the top of my head.
11     Q. How did those four statements constitute
12  threats?
13     A. He threatened not to accept the position. He
14  threatened that -- he said, point blank, that he --
15  that Greg needed to do more for him, which had an
16  insinuation that there was something that he had done
17  for Greg that required him to do more again. That's
18  just my interpretation, based on what I was told by Greg
19  Carmichael about that discussion. So that'd be a
20  question you'd have to ask Greg.
21     Q. Why is the statement if -- assuming you made
22  the statement, I won't work for Tim Spence -- why does
23  that constitute a threat to Greg Carmichael?
24     A. I didn't say he made a -- it was a threat that
25  was made verbally to Greg Carmichael because Greg was

Page 225

1  the audience.
2      Q. Why does that constitute a threat?
3      A. Because he was saying he wouldn't do a thing
4  that he needed to do in order to maintain his position
5  at the bank, but that he also wasn't leaving.
6      Q. When you said you weren't going to take the
7  consumer role and didn't want to take the consumer role,
8  was that a threat to Greg Carmichael?
9      MR. CIOFFI: Objection. Mischaracterizes his
10  testimony. But you can answer.
11     THE WITNESS: I told Greg that I would take
12  the consumer role if he needed me to, but that I would
13  prefer not to, given the extenuating circumstances in my
14  life at that point in time.
15  BY MR. SABA:
16     Q. Did that constitute a threat to Greg
17  Carmichael?
18     A. No, because I agreed to take the position if
19  he needed me to do it. It was the opposite of a threat.
20  It was an agreement to do what it was that Greg asked me
21  to do.
22     Q. So in your definition of the word "threat," if
23  somebody disagrees with Greg Carmichael or doesn't do
24  what he specifically tells them to do, that's a threat?
25     MR. CIOFFI: Objection to the form of the

Page 226

1  question. Mischaracterizes his testimony. But you may
2  answer.
3      THE WITNESS: That's all right. My definition
4  of a threat is a statement that says, I am going to do
5  X, if you do Y. Which is, if you proceed forward here,
6  I will not report to Tim, and I will not take on the
7  role as the head of the consumer bank. So that is my
8  definition of a threat. That is the way I was using the
9  word in my testimony.
10  BY MR. SABA:
11     Q. Going back to the text that you sent on
12  October 17, 2020, at 14:53:09 UTC, you said, I am
13  terrified he will show up on Monday.
14     Why were you terrified?
15     MR. CIOFFI: Objection. Asked and answered,
16  Counsel, we're wasting time. But you may answer it
17  again. Go ahead.
18     THE WITNESS: I provided my testimony on that
19  earlier. I was concerned that he would show up. Having
20  emotional employees who have elected to lose the bank,
21  coming into the bank is a situation that needs to be
22  managed and monitored, whether you are a large company
23  or a small company. There was a lot of uncertainty
24  about what would occur there, and I was concerned that
25  that is what he would do. As indicated by the text

Page 227

1  messages and my prior testimony.
2  BY MR. SABA:
3      Q. Referring to Fifth Third McHugh 0213196, the
4  text message from Mr. Shaffer on October 18, 2020, at
5  22:01:33 UTC. Do you see that?
6      A. Yes.
7      Q. It says, I just still can't believe we are
8  where we are with Phil.
9      A. Yes.
10     Q. And you respond, I know.
11     Is that right?
12     A. Yes.
13     Q. And you say, I wish we could just offer a
14  truce, but he put himself above the company. Made
15  dangerous accusations, and refused five -- and you put
16  three exclamation points -- opportunities to apologize
17  and move forward peacefully.
18     Do you see that?
19     A. I do.
20     Q. What were dangerous accusations that Phil
21  McHugh made?
22     A. I mean, I can't testify specifically to what I
23  was referring to here, but my recollection is they're
24  the same things that we just discussed that you objected
25  to my choice of the word "threat." So it's the same

Deposition of Timothy Spence          Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 228

1 subject matter, regardless of the way it's being
2 characterized.
3     Q.  Why would Phil McHugh saying I won't work for
4 Tim Spence constitute a dangerous accusation?
5     A.  I don't recall why I chose those words.  But
6 again, I've given you my testimony on what I recall
7 thinking during this period.  It's the same -- that's
8 the same discussion.
9     Q.  Are you able to identify anything today that
10 Phil McHugh said that constituted a dangerous
11 accusation?
12       MR. CIOFFI:  Objection.  Asked and answered.
13 He testified what he meant by threat.
14       THE WITNESS:  Yeah.  I -- I would repeat my
15 testimony from earlier about what I was referring to
16 here.
17 BY MR. SABA:
18     Q.  So how you use the word threat, anything that
19 you identify as a threat is also a dangerous accusation?
20     A.  No, I'm saying -- I'm telling you, I don't
21 remember specifically what I was referring to.  What I
22 recall is what I shared with you already in my
23 testimony.  Which was that Phil had indicated he would
24 not accept the organizational change, he would not
25 accept his new responsibilities, he would not leave the

Page 229

1 bank unless we did something for him that was above and
2 beyond what we had done for other enterprise level
3 executives who left, which included people from
4 protected classes, and we can't be inconsistent with our
5 treatment of people across the company.  Regardless of
6 age, regardless of gender, regardless of race.  We have
7 to treat everybody consistently.
8       And demanding that you are essentially saying,
9 I won't do what you need me to do unless you do this,
10 you give me something that is above and beyond what you
11 have provided anybody else, was the content that I can
12 recall thinking about when I was talking about the fact
13 that I would have preferred that we find a way to move
14 forward.  Because I valued the leadership that Phil
15 provided inside the company.  We talked about that when
16 we looked at my e-mail.  I talked about that as it
17 related to the one-on-one conversation that Phil and I
18 had at the Wiedemann house, and I would like for him to
19 have stayed inside the bank.  Or for us to find a way to
20 part amicably.
21     Q.  As you sit here today, are you claiming
22 that any of the statements that you are alleging Phil
23 McHugh made constitute dangerous accusations?
24       MR. CIOFFI:  Objection.  Asked and answered.
25 He explained it.

Page 230

1       MR. SABA:  Go ahead.
2       THE WITNESS:  Counsel, you can object to my
3 use of the vocabulary.  I'm not --
4       MR. SABA:  I'm not objecting, your counsel is.
5       THE WITNESS:  I'm sorry then.  I'm not
6 stipulating the definition of these words.  I'm giving
7 you the detail around the subject matter that I was
8 referencing, as I was thinking about what was going on
9 at that point in time.
10 BY MR. SABA:
11     Q.  You then indicate, Phil McHugh refused five
12 opportunities to apologize.  What were the five
13 opportunities?
14     A.  I don't recall at this point.
15     Q.  Why did Phil McHugh have to apologize?
16     A.  I don't recall at this point beyond what I
17 already shared with you.
18     Q.  You then indicate, we can't set a precedent
19 that people can behave that way.
20       Is that right?
21     A.  I do.
22     Q.  And you said, worst exit ever.
23       Is that right?
24     A.  I did.
25     Q.  Bob Shaffer responds, agree with all that.  He

Page 231

1 did this, not us.  Is that right?
2     A.  He does.
3     Q.  Does Fifth Third have a policy against
4 retaliation?
5     A.  Yes, absolutely.
6     Q.  What is Fifth Third's policy against
7 retaliation?
8     A.  I can't cite it off the top of my head.  But
9 it essentially says -- in principle it says you can't
10 retaliate.
11     Q.  Retaliate against whom?
12     A.  An employee or a customer I would imagine, or
13 anybody else.  A vendor to the bank.
14     Q.  For what reason?
15     A.  You would have to present me with the policy
16 for me to answer that question.
17     Q.  You don't know as you sit here today?
18     A.  I don't know the detail of the retaliation
19 policy, no.
20     Q.  Do you know if Fifth Third's policy against
21 retaliation permits retaliating against an employee for
22 making claims of age discrimination?
23       MR. CIOFFI:  Objection.  Irrelevant.  There's
24 no such claim in this case.
25       THE WITNESS:  I don't.

Page 232

MR. CIOFFI: Read the counterclaim. You laugh, but you haven't even read it and don't understand it. It has nothing to do with filing the came.

MR. SABA: We made a claim for retaliation. So there's a claim for retaliation.

MR. CIOFFI: Well, there now but there won't be eventually.

BY MR. SABA:

Q. Mr. Spence, going back to the question.

A. Yeah. I'm not a lawyer. I don't know what the policy stipulates as it relates to specific lawsuits, and whether or not it's appropriate to retaliate. My operating assumption would be that the policy suggests that it's not appropriate to retaliate, period.

Q. Were you aware that Fifth Third filed a counterclaim against Phil McHugh in this case?

A. Yes.

Q. Have you ever read the counterclaim?

A. I went through it with Susan Zaunbrecher at some point after it was filed. Not during. I wasn't involved in it's preparation, I wasn't involved in the filing. But when I became CEO of the company it was important to me that I understand the more significant pending legal matters.

Page 233

(Exhibit 27 is marked for identification.)

BY MR. SABA:

Q. Mr. Spence, I've handed you what's been marked as Exhibit Number 27. It's a text message exchange between you and Mr. Shaffer. It's from November 20, 2020, at 1:01:25 UTC. And you indicate, he is worn down though, and also furious at Phil.

Do you see that?

A. I do.

Q. Who were you referring to there?

A. I don't know. This is out of context. I don't know.

Q. Do you know if "he" is Greg Carmichael?

A. I don't.

Q. Do you know if Greg Carmichael was furious at Phil?

A. I'm not Greg Carmichael. No, I don't know.

Q. Who would you -- were you aware of anyone who was furious at Phil at that point in time?

A. I don't recall anybody who was furious at Phil. But again, this is out of context. I don't -- I don't know what it is.

(Exhibit 28 is marked for identification.)

BY MR. SABA:

Q. Mr. Spence, you've been handed Exhibit

Page 234

Number 28, which is Bates stamped Fifth Third McHugh 005851 through Fifth Third McHugh 005878. Can you identify this for me, please?

A. The top page appears to be either an e-mail or a calendar invitation for a meeting that Bob and I were having. I think it's an e-mail. And it says, please use this one for our meeting at 10:30, and then there's an attachment on it that's executive session successionplanning.PPTX. Which I presume is the attachment that behind here, unless you tell me otherwise.

Q. And that's is from August 18, 2020; is that right?

A. It is.

Q. Okay. Did you meet with Mr. Shaffer regarding executive succession planning on August 18, 2020?

A. I met with Bob to review the -- I testified to this earlier, so it's in the record. When I mentioned to you I met with Bob because he was working through some potential organizational options and he had concerns about my span of control, this would have been the meeting that I was referencing in that testimony.

Q. And the proposed organizational charts we see on 005854, 5855, and 5856, those are the organizational charts that he was proposing to you; is that correct?

Page 235

A. I wouldn't say he was proposing, they were the organizational charts that he shared with me.

Q. And did you have any opinion regarding the respective organizational charts?

MR. CIOFFI: Objection. Asked and answered. He discussed this already, Counsel. It's redundant.

MR. SABA: We haven't discussed these charts.

MR. CIOFFI: He did. He did. He explained it all to you before. But go ahead.

THE WITNESS: My opinion concern was that I was going to have too many direct reports under any one of these org structures, which was the reason that Bob asked me to review it in the meeting, and that we were going to need to move something out of my organization if the board concluded that they wanted to name me president. That was my observation. At least the one I can recall.

BY MR. SABA:

Q. With respect to option 1, and the duties that were -- are listed there for you as Tim Spence, president, were any of those areas assigned elsewhere?

A. Yes.

Q. Which ones?

A. The digital organization and the marketing organization were assigned elsewhere in this org chart.

Page 236

1  Q.  Anything else?
2  A.  Yeah.  The -- I -- there is a piece of the
3  wealth and asset management business, which involves the
4  management of the Fifth Third foundation, which is part
5  of our corporate and social responsibility group, which
6  was created and then reported directly to Greg
7  Carmichael subsequent to the organizational changes.
8      There's more.  We consolidated the middle
9  market banking group and then the business banking group
10 into commercial banking, so those are not treated as
11 separate standalone entities, and that change was made
12 either immediately following the announcement of the new
13 organization, when the board elected me president, or
14 subsequently, by the end of the year, call it.
15     So of the items here, 1, 2, 3, 4, 5, 6, 7, 8,
16 9 -- 1, 2, a piece of a third, and then a fourth and a
17 fifth were changed organizationally after the fact.
18 Q.  Who ultimately decided what organizational
19 structure would be implemented?
20 A.  Greg Carmichael.
21 Q.  And do you know the specific date when he
22 decided that?
23 A.  I do not.  But it wasn't decided all in one go
24 because not all of the organizational changes occurred
25 at the same time.

Page 237

1      (Exhibit 29 is marked for identification.)
2  BY MR. SABA:
3  Q.  Mr. Spence, I've handed you exhibit Number 29,
4  which is an excerpt from the Fifth Third 2023 proxy
5  statement compensation of named executive officers.
6      Do you see that?
7  A.  I do.
8  Q.  Does this document accurately reflect your
9  compensation for the years 2020 through 2022?
10 A.  Yes.
11 Q.  Do you know if your compensation is due to
12 increase in 2023?
13 A.  As in, in 2024, for the 2023 performance
14 period?  Or in 2023, based on the 2022 performance
15 period?
16 Q.  Based on the total compensation you'll receive
17 as of 4/20/23.
18 A.  That's an open question because we don't
19 settle the variable comp pool funding until the end of
20 the year, and then we don't award -- the board doesn't
21 make a decision on what my variable comp funding level
22 will be until after that is decided.  So there's a
23 possibility it could increase.  My based salary
24 increased by whatever the merit pool was for the company
25 last year, but again, it's all subject to the final

Page 238

1  decision of the board, and in particular, the variable
2  compensation pool funding and then the board's choice on
3  the award for me.
4  Q.  Other than salary, that's the one number that
5  has a fixed increase.  The others are going to depend on
6  that final determination, correct?
7  A.  Yeah.  Yes.  The fixed increase of the salary
8  is communicated in February as part of a conformance
9  process.
10 Q.  The balance will be communicated prior to the
11 issuance of the 2024 proxy; is that correct?
12 A.  Yes, that's correct.
13     MR. SABA:  We can go off the record.
14     (A recess was taken from 4:42 to 5:00.)
15     VIDEOGRAPHER:  The time is 5:00 p.m.  We're
16 back on the record.
17 BY MR. SABA:
18 Q.  Mr. Spence, we were talking briefly about
19 whether or not you had nicknames for other employees or
20 other members of the enterprise committee.
21     You did have a nickname for Frank Forrest,
22 isn't that right?
23 A.  Not that I recall, no.
24 Q.  You would refer to him as "Milton," from the
25 movie Office Space; isn't that right?

Page 239

1  A.  No.
2  Q.  You never did?
3  A.  I never referred to him as Milton.  I think I
4  complained at one point that we were going to be moving
5  Frank off of our floor and into another building, and I
6  think I complained at one point that that would be like
7  Milton from Office Space, in the sense that he would be
8  out of sight, out of mind.
9      (Exhibit 30 is marked for identification.)
10 BY MR. SABA:
11 Q.  Mr. Spence, you've been handed Exhibit
12 Number 30, which is Bates stamped Fifth Third
13 McHugh 0213149.  And again, this is another text
14 message exchange between you and Mr. Shaffer, and
15 referring to the text message at January 26, 2020, at
16 1:41:23 UTC.
17     Mr. Shaffer indicates, just watched Office
18 Space for the first time.  The Bobs are great and so is
19 Milton.  And you respond, Frank equals Milton once you
20 move him.  And you respond, the Bobs are priceless.
21     Who is the character Milton in Office
22 Space?
23 A.  The character who gets moved off of the main
24 floor and ends up out of sight, out of mind.
25 Q.  And they just put him away, right?  It's a

Deposition of Timothy Spence                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 240

1  derogatory indication, correct?
2      **A.  I don't think so.  He ends up being one of the**
3  **protagonists of the movie, if I remember.  I haven't**
4  **seen it in a long time, but...**
5      Q.  Was Frank Forrest aware that you referred to
6  him as Milton?
7      **A.  I wasn't referring to Frank as Milton.  I was**
8  **saying that is what -- I wasn't using Milton as a**
9  **nickname.  I was saying that was -- what Frank was going**
10  **to be in terms of being out of sight, out of mind, if we**
11  **moved him out of the building.**
12     Q.  Did you -- did you ever indicate that to Frank
13  Forrest?
14     **A.  I don't remember.**
15     Q.  Did you indicate that to anybody else besides
16  Frank Forrest and Bob Shaffer?
17     **A.  No, not that I remember.  But I don't**
18  **remember.**
19     Q.  Did you use any other terms or references for
20  any other members of the enterprise committee?
21     **A.  I only recall one other after you mentioned,**
22  **which was Tayfun referred to himself as the Turkish**
23  **tornado on occasion.**
24     Q.  When did he do that?
25     **A.  I mean, on -- I don't recall a specific**

Page 241

1  **occasion, I just remember that he referred to himself as**
2  **the Turkish tornado, which was a play on his name being**
3  **Tayfun.**
4      Q.  What about Lars Anderson?
5      **A.  I don't remember a nickname for Lars**
6  **Anderson.**
7      Q.  What about derogatory references toward Lars
8  Anderson?
9      **A.  It's possible, but I don't remember a specific**
10  **one.**
11         MR. SABA:  That's all I have at this time.
12  We'll continue in progress.
13         MR. CIOFFI:  Again, I recognize the fact that
14  you're attempting to continue this deposition in
15  progress.  I do not agree that you have the right to do
16  so.  You had one day with this witness, and that day's
17  over.
18         I have no further questions.  The witness will
19  read and sign the transcript.
20         VIDEOGRAPHER:  The time is 5:03 p.m.  This
21  concludes the deposition.
22         COURT REPORTER:  Mr. Saba, do you want the
23  transcript?
24         MR. SABA:  Yes.
25         COURT REPORTER:  You want it as well,

```
1    Mr Cioffi?

2            MR. CIOFFI:   Yes.

3

4

5

6                        _____

7                        Timothy Spence

8                        _____

9                        Date

10

11                       -  -  -

12              DEPOSITION CONCLUDED AT 5:04

13                       -  -  -

14

15

16

17

18

19

20

21

22

23

24

25
```

Deposition of Timothy Spence                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

1                          C E R T I F I C A T E

2

   STATE OF OHIO              :
3                            :              SS
   COUNTY OF HAMILTON         :

4

5          I, Sydney Jackson, the undersigned, a duly

6    qualified and commissioned notary public within and for

7    the State of Ohio, do hereby certify that I recorded in

8    stenotype and thereafter transcribed the within pages,

9    and that the foregoing transcript of proceedings is a

10   true, complete, and accurate transcript of my said

11   stenotype notes to the best of my ability.

12          IN WITNESS WHEREOF, I hereunto set my hand and

13   official seal of office at Cincinnati, Ohio, this 17th

14   day of October, 2023.

15

16

17

18                          _____
   My Commission expires     S/Sydney Jackson
19   February 17, 2026        Notary Public - State of Ohio

20

21

22

23

24

25

Deposition of Timothy Spence                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

1  1 DEPOSITION ERRATA SHEET

2  Date Taken:  October 11, 2023

3  Case Caption:  PHILIP MCHUGH

4  vs. FIFTH THIRD BANCORP, et al.

5  DECLARATION UNDER PENALTY OF PERJURY

6  I declare under penalty of perjury

7  that I have read the entire transcript of

8  my deposition taken in the captioned matter

9  or the same has been read to me, and

10  the same is true and accurate, save and

11  except for changes and/or corrections, if

12  any, as indicated by me on the DEPOSITION

13  ERRATA SHEET hereof, with the understanding

14  that I offer these changes as if still under

15  oath.

16  Signed on the _____ day of

17  _____, 20___.

18  _____

19  Timothy Spence

20

21

22

23

24

25

Deposition of Timothy Spence                                Philip R. McHugh v. Fifth Third Bancorp, et al.

```
 1    2 DEPOSITION ERRATA SHEET

 2    Page No._____Line No._____Change to:_____

 3    _____

 4    Reason for change:_____

 5    Page No._____Line No._____Change to:_____

 6    _____

 7    Reason for change:_____

 8    Page No._____Line No._____Change to:_____

 9    _____

10    Reason for change:_____

11    Page No._____Line No._____Change to:_____

12    _____

13    Reason for change:_____

14    Page No._____Line No._____Change to:_____

15    _____

16    Reason for change:_____

17    Page No._____Line No._____Change to:_____

18    _____

19    Reason for change:_____

20    Page No._____Line No._____Change to:_____

21    _____

22    Reason for change:_____

23    SIGNATURE:_____DATE:_____

24    Timothy Spence

25
```

Deposition of Timothy Spence                                         Philip R. McHugh v. Fifth Third Bancorp, et al.

1    3 DEPOSITION ERRATA SHEET

2    Page No._____Line No._____Change to:_____

3    _____

4    Reason for change:_____

5    Page No._____Line No._____Change to:_____

6    _____

7    Reason for change:_____

8    Page No._____Line No._____Change to:_____

9    _____

10   Reason for change:_____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change:_____

23   SIGNATURE:_____DATE:_____

24   Timothy Spence

25

## WORD INDEX

< 0 >
**0:19:11** 159:4
**00:21:09** 160:5
**00:26:50** 208:21
**000** 79:15
**000304** 20:21 21:3
**000305** 20:22 21:4
**000451** 63:14
**000453** 63:14, 21
79:15 86:7
**000461** 138:17
140:10
**000462** 138:18
142:12
**000473** 57:23
**000476** 57:13
**001428** 152:4
**003167** 38:17
**003652** 43:19
**00512** 51:6
**005436** 48:16
**005512** 50:23
**005851** 234:2
**005854** 234:24
**005878** 234:2
**006943** 119:19
**006968** 125:23
**006971** 120:1
**006989** 119:20
**007130** 189:18
**0213029** 204:9
**0213147** 127:20
**0213148** 131:24
**0213149** 239:13
**0213171** 151:6
**0213172** 151:6
**0213184** 162:8
**0213185** 162:8
**0213192** 185:10
**0213193** 174:23
186:6
**0213194** 187:23
205:3, 7 208:9
**0213195** 175:2 213:7
**0213196** 227:3
**0213197** 174:23
**0213203** 114:3
**071635** 65:3

**071653** 67:24 72:15
76:18, 19
**0717** 65:17
**071707** 65:16
**071709** 65:4, 5
**071710** 75:8
**071733** 75:16, 17
77:4, 18 141:19
142:2
**071802** 75:8

< 1 >
**1** 3:7 10:2, 5 15:14
140:19 152:6, 17
160:4 235:19 236:15,
16 244:1
**1,000** 18:11
**1:00** 199:1
**1:01:25** 233:6
**1:07** 112:5, 6
**1:21-CV-00238** 1:7
4:7
**1:38** 190:9
**1:41:23** 239:16
**10** 3:7, 11 50:19
51:3, 5, 7, 8 142:7
162:14
**10:30** 220:1 234:7
**10:51** 114:7, 9
**10:56** 61:14, 16
**100** 87:11 110:16
**11** 1:16 3:11 4:1
50:22 57:10, 13
67:22 114:7 118:18
244:2
**11:00** 130:8 199:7
**11:16** 61:16, 17
**11:19:57** 186:8
**11:30** 220:2
**110** 58:14
**112** 77:2, 6
**113** 3:15
**114** 3:15
**119** 3:15
**12** 3:8, 13 26:5, 25
31:1 37:21 57:20, 23
127:24 128:18
129:10, 14 130:14
132:9, 16 185:15

205:24
**12:22:55** 209:17
**12:26** 112:5
**12:47** 190:22
**12:50** 189:24
**127** 3:16
**12th** 129:3 130:1
**13** 3:13 13:1 35:5
51:11 63:10, 13
79:14 93:15, 16
186:8 187:8
**13:10:48** 187:8
**13:46:23** 162:14
**131** 3:16
**135** 58:13
**138** 3:17
**13-years-old** 13:6
**14** 3:8, 14 26:25
31:1 64:25 65:3
76:17 114:8, 9 175:4
189:24 217:20
**14:23:36** 210:7
**14:50** 213:8
**14:52:50** 175:3 213:8
**14:53:09** 226:12
**14:58:01** 188:1
**14:58:34** 188:12
**14th** 190:10 197:19
**15** 3:14 14:2, 20
71:14 75:4, 7 77:3
99:1 141:17 167:25
187:25 188:11, 16
190:22 196:19 198:7
199:24 200:1, 11
202:11 204:12, 19
205:10 206:15 207:3
208:11 217:20
**15:01:39** 188:17
198:7
**15:02:19** 199:25
**150** 123:15
**151** 3:18
**15th** 195:22 197:19
207:10
**16** 3:15 7:10 71:12,
16 101:21 113:25
114:3 128:2 168:2
209:16 210:6, 16
211:22 212:23

217:20
**16:06:51** 210:16
**16:09:43** 213:22, 23
**16:13:02** 214:10
**16:53:18** 214:13
**162** 3:18
**16th** 208:20 211:2
**17** 3:15 71:12, 17
101:21 107:18 108:2,
19, 25 109:7, 20
110:1 119:16, 19
125:24 129:24 136:4,
16, 19, 22 137:1, 4, 7,
10, 14, 17, 20, 23
138:2, 7 175:2 213:8,
22 214:10, 12 226:12
243:19
**17:00:06** 211:23
**17:07:27** 215:13
**1700** 2:12
**1707** 65:17
**174** 3:19
**178** 215:12
**17th** 175:4 243:13
**18** 3:16 39:8 40:10
41:2 43:25 71:13
95:13, 14, 15 127:17,
20 193:15 227:4
234:12, 16
**18:09:01** 212:24
**18:27:33** 200:2
**18:43** 202:16
**18:43:19** 200:11
205:11
**18:44:59** 132:9
**18:45** 132:17
**18:50:44** 204:19
205:17
**18:50:52** 205:24
**1843** 205:18
**185** 3:19
**1850** 208:4
**189** 3:20
**19** 3:16 87:6 95:13,
15 131:21, 24
**19:34:09** 151:15
**19:37:24** 202:11
**1979** 10:1
**1986** 10:11, 14

**1992** 12:*14*, *23*, *25*
13:2, *5*, *6*
**1994** 13:*16*, *25* 14:*19*
**1999** 18:*3*
**1st** 152:*4* 159:*3*

< 2 >
**2** 3:*7* 10:*16*, *19* 11:*9*
36:*24* 152:*7*, *17*
236:*15*, *16* 245:*1*
**2:06** 150:*24*
**2:19** 150:*24*, *25*
**20** 3:*9*, *17* 138:*14*, *17*
140:*9* 142:*14* 178:*22*
233:*6* 244:*17*
**20,000** 123:*4*
**20:26:53** 206:*4*
**20:28:50** 206:*16*
**20:37:39** 185:*15*
**20:58:40** 207:*3*
**200** 123:*15*
**2001** 14:*21*, *24* 15:*7*,
*11*
**2005** 15:*16*, *21*, *23*
16:*25* 18:*22*
**2007** 20:*11*, *12* 34:*21*
**2008** 20:*10*
**2009** 21:*11*
**201** 2:*12*
**2010** 21:*11*, *12* 22:*25*
23:*4* 24:*2*, *5*, *24*
35:*22*
**2011** 26:*19*, *24* 27:*17*
28:*5*, *15* 29:*13* 30:*24*
31:*1*, *19* 32:*1* 33:*16*
34:*7* 35:*22* 36:*11*
40:*15*
**2012** 35:*5* 88:*17*
**2013** 26:*24* 31:*1*
**2015** 26:*19* 27:*1*
28:*6*, *15* 29:*13* 30:*24*
31:*1* 32:*2* 34:*22*
35:*8*, *13* 37:*18*, *21*
69:*13* 105:*11* 167:*23*
**2017** 39:*8* 40:*10*
41:*2*, *14* 43:*25* 44:*8*,
*9*, *21* 45:*2*, *10* 48:*11*
49:*9* 50:*15* 61:*20*
71:*4* 73:*2* 107:*23*
193:*15*, *16*

**2018** 48:*18* 49:*9*, *14*
51:*11* 52:*2* 56:*25*
57:*16* 58:*3*, *15*, *25*
63:*17* 67:*22* 68:*16*
71:*4* 72:*3*, *11* 73:*1*
76:*11*, *19* 87:*5* 88:*11*
90:*4*, *19* 92:*15*, *25*
93:*9*, *13*, *17*, *20* 94:*3*,
*4*, *7*, *14* 95:*23* 97:*2*
105:*23* 106:*1*, *7*
140:*18*, *19*, *20*, *21*
**2019** 57:*16*, *18* 62:*19*,
*23*, *25* 63:*1* 75:*13*, *22*
77:*18* 78:*8* 93:*21*
97:*21* 98:*5*, *8*, *16*
99:*1* 107:*18* 108:*2*,
*19*, *25* 109:*7*, *13*, *20*
110:*1*, *8* 111:*3*, *7*, *10*,
*22* 112:*2*, *15* 114:*7*
117:*10* 118:*18*
119:*24* 127:*5*, *14*, *24*
128:*18* 129:*10*, *14*, *24*
130:*14*, *21* 132:*9*, *16*
136:*4*, *13*, *14*, *16*, *19*,
*22* 137:*1*, *4*, *7*, *10*, *14*,
*17*, *20*, *23* 138:*2*, *7*, *22*
139:*1* 140:*13* 141:*6*
142:*20* 144:*3*, *16*
**2020** 9:*15* 101:*2*, *3*, *8*
105:*11* 106:*4*, *5*, *7*
107:*2* 142:*11*, *17*, *22*
143:*17* 144:*3* 151:*15*
160:*4* 161:*25* 162:*14*
163:*19*, *25* 164:*3*, *6*,
*10*, *13*, *17*, *21* 165:*5*
175:*3* 185:*15* 186:*8*
187:*8*, *25* 188:*11*, *16*
189:*24* 190:*22*
196:*19* 198:*7* 199:*24*
200:*1*, *11* 202:*11*
204:*13*, *19* 205:*10*
206:*15* 207:*3* 208:*11*
209:*16* 210:*6*, *16*
211:*22* 212:*23* 213:*8*,
*23* 214:*10*, *12* 215:*12*
219:*17*, *20* 226:*12*
227:*4* 233:*6* 234:*12*,
*16* 237:*9* 239:*15*
**2020/10/17** 213:*22*

**2021** 182:*23* 219:*20*
**2022** 237:*9*, *14*
**2023** 1:*16* 4:*1* 237:*4*,
*12*, *13*, *14* 243:*14*
244:*2*
**2024** 237:*13* 238:*11*
**2026** 243:*19*
**204** 3:*20*
**2058** 208:*4*
**21** 3:*18* 33:*16* 34:*7*
40:*15* 151:*2*, *5*
163:*19*, *25* 164:*3*, *6*,
*10*, *13*, *17*, *21* 165:*5*
178:*23* 179:*4*
**22** 3:*18* 15:*1*, *5*, *6*
162:*4*, *7*
**22:01:33** 227:*5*
**22:49:58** 208:*11*
**22:50:28** 208:*17*
**23** 3:*19* 10:*1* 98:*8*
174:*19*, *22* 186:*4*
187:*24* 198:*4* 204:*15*,
*24* 205:*3* 206:*6*
208:*8*
**23:52:56** 127:*24*
128:*18*
**233** 3:*21*
**237** 3:*22*
**239** 3:*22*
**23rd** 15:*24* 16:*2*
**24** 3:*19* 49:*14*
137:*18* 185:*6*, *9*
**25** 3:*20* 189:*15*, *18*
**26** 3:*20* 16:*3* 204:*6*,
*9*, *16*, *17* 205:*22*
206:*4*, *15* 239:*15*
**2623** 2:*6*
**27** 3:*21* 22:*25* 233:*1*,
*4*
**27th** 23:*4*, *10*
**28** 3:*21* 233:*23*
234:*1*
**28-years-old** 13:*5*
**29** 3:*22* 38:*12* 237:*1*,
*3*
**2nd** 11:*16*

< 3 >
**3** 3:*8* 12:*1*, *4*, *12*
13:*15* 36:*24* 48:*15*,

*18* 56:*13* 140:*21*
152:*9*, *18*, *20*, *21*
156:*7* 236:*15* 246:*1*
**3.5** 95:*4*
**3:56** 204:*3*
**3:58** 204:*3*, *4*
**30** 3:*22* 148:*16*, *17*
239:*9*, *12*
**306** 33:*6*, *11*
**30th** 214:*6*
**30-years-old** 13:*24*
**31** 23:*5* 151:*14*
**32** 34:*10* 49:*3*
**33** 3:*9* 98:*21* 138:*3*
**36** 3:*10* 37:*22*
**360-degree** 145:*18*,
*21* 146:*9*
**375** 77:*7*
**37-year-old** 14:*21*
**38** 3:*10* 41:*11*
**387** 77:*8*
**395** 76:*20* 77:*11*
**39-years-old** 49:*20*

< 4 >
**4** 3:*8* 14:*3*, *5* 57:*19*
58:*8* 95:*4* 112:*13*
152:*11*, *18* 156:*22*
157:*5* 236:*15*
**4/20/23** 237:*17*
**4:42** 238:*14*
**40-years-old** 98:*5*, *9*
138:*8*
**43** 3:*11*
**45** 147:*10* 148:*14*, *16*
202:*22*
**45202** 1:*19* 2:*13*
**45208** 2:*6*
**45243** 7:*4*
**4575** 7:*3*
**45-minute** 147:*18*
**45-years-old** 23:*3*
**46** 140:*19*
**462** 142:*13*
**46-years-old** 34:*6*
**487** 77:*9*, *10*
**4th** 57:*5* 167:*25*

< 5 >

**5** 3:*4*, *9* 20:*14*, *17*
*21*:*3* 64:*19* 71:*4*
73:*15* 140:*17* 141:*15*
236:*15*
**5:00** 238:*14*, *15*
**5:03** 241:*20*
**5:04** 242:*12*
**50** 3:*11*
**500** 92:*17* 201:*25*
**51** 3:*11*
**511** 1:*18*
**513.362.8700** 2:*13*
**513.533.2701** 2:*7*
**51-years-old** 38:*4*
**52-years-old** 41:*6*
**54** 68:*17*, *23*
**54-years-old** 48:*24*
**55-years-old** 98:*3*
138:*10*
**56** 140:*19*
**57** 3:*11*, *13* 140:*20*
**5855** 234:*24*
**5856** 234:*24*
**5th** 134:*12*

**< 6 >**
**6** 3:*9* 26:*5* 33:2, *5*
73:*15* 236:*15*
**60** 158:2
**62** 140:*21*
**63** 3:*13*
**64** 3:*14*
**65** 3:*14* 137:*15*
164:22

**< 7 >**
**7** 3:*10* 11:*14* 36:*18*,
*23* 37:*14* 137:*11*
164:*18* 236:*15*
**72** 78:*25*
**74** 140:*17*
**75** 3:*14*
**78** 78:*10*
**7-years-old** 11:*11*

**< 8 >**
**8** 3:*10* 38:*14*, *17*
236:*15*
**8:10** 51:*14*

**80** 60:*4* 73:*4*, *15*
74:*4* 141:*14*
**80-question** 61:*10*

**< 9 >**
**9** 3:*11* 43:*15*, *18*
236:*16*
**9:00** 130:8
**9:30** 1:*17* 130:8
**9:39** 4:2
**90** 77:*11*
**90-plus** 73:*17*

**< A >**
**a.m** 4:2 61:*14*, *17*
**AABRG** 80:*10*
**ability** 25:7 87:*12*
135:*13* 243:*11*
**able** 10:5 21:*9*
44:20 50:7 70:*3*
75:*11* 81:22 94:*18*
95:*17* 96:24 101:*18*
110:*9*, *23* 116:24
118:*21* 157:*13* 179:2
193:*18* 196:*15* 228:*9*
**absent** 130:*4*
**Absolutely** 29:*24*
40:24 45:24 53:8
54:*19* 69:*13* 181:*25*
195:*11* 231:*5*
**accept** 34:25 41:20
106:*17* 197:24 198:*1*
200:20 201:9 215:*19*
223:*14* 224:*13*
228:24, 25
**acceptance** 21:*21*
22:*18*
**accepting** 22:*12*
218:*10*
**access** 195:*24*
**accompanied** 173:*7*, 8
**accompanies** 171:2
**accompany** 170:*18*
171:*19*
**accomplish** 35:*14*
**accomplished** 169:*12*
**accountable** 159:*18*
**accountant** 69:*23*
**accurate** 243:*10*

244:*10*
**accurately** 237:8
**accusation** 228:*4*, *11*,
*19*
**accusations** 227:*15*,
20 229:*23*
**achieve** 45:*23* 83:5
87:*16* 155:*23*
**achieved** 113:*3*
**achieving** 118:*14*
**acknowledge** 152:*12*
157:6 195:*9*
**acknowledged** 43:*1*
52:*3*
**acknowledging** 54:24
64:6
**acquisition** 110:*15*
112:*10*, 20, *23* 113:8,
*10* 117:22
**acronym** 27:*12*
**acting** 216:2
**action** 62:2 74:*15*
140:24 157:2 158:22
**actions** 124:*23*
**active** 195:22
**activities** 30:*12*
144:*21* 194:*12*
**adapting** 191:*20*
**add** 213:*17* 215:5
**added** 77:7, *11*
135:*20*
**addition** 41:*18* 49:6
179:*18* 203:*21*
**additional** 42:*12*, *14*
129:*8* 142:24 145:*23*
191:2 192:22
**Additionally** 6:*20*
**address** 7:2 113:*23*
195:22
**adjusted** 94:*25*
**administration** 61:*9*
**admired** 194:2
**adolescent** 14:8
**adults** 85:7
**advance** 125:*10*
182:*1* 185:*3*
**advancement** 84:22
85:*16*
**adverse** 62:2

**advertising** 18:*25*
19:*10*
**advice** 29:2
**advise** 178:8
**advisor** 131:*3*
137:*15* 164:22
**advisors** 21:*16*, *23*
22:*13*, *17*, 20 31:6
38:*9*
**advocates** 79:5
**advocating** 115:*21*
**affect** 135:*13*
**affiliate** 30:8
**affinity** 79:6
**African** 79:2, *4*, *10*,
20 80:2
**aftermath** 219:*19*
**afterward** 42:25
43:6, *7* 131:*4* 139:*18*
147:*7*, *13* 198:*3*
**age** 5:*9* 10:22, 24
11:*2*, *4*, *14* 84:*3*
85:*16* 98:*4* 168:5, *13*
229:6 231:22
**agenda** 107:5 179:*3*
**aggregate** 45:5
**aggregated** 76:*13*
**aggressive** 74:*15*
**ago** 5:*21* 130:*3*
154:7 174:*12* 191:*4*
200:*19* 202:8
**agree** 52:8, *15* 54:4
66:*13*, 20 67:*3*
123:*10* 124:6 133:2
134:*1* 152:*10*, 20, 22
170:20 206:*10*
230:25 241:*15*
**agreed** 36:4 81:*14*
115:22 118:*1* 222:22
225:*18*
**agreement** 225:*20*
**agreements** 28:25
**Ah** 142:*15*
**ahead** 5:5, *15* 11:7
12:20 29:5 34:8
45:*16* 52:*16* 54:*15*
96:20 108:7 126:*11*
165:*1* 226:*17* 230:*1*
235:9

Deposition of Timothy Spence
Philip R. McHugh v. Fifth Third Bancorp, et al.

ahold 196:*15*

al 1:*9* 4:*6* 244:*4*

alerts 134:*11*

algorithms 74:*9*

alleged 220:*12, 16*

alleging 229:*22*

allies 79:*7*

allocation 154:*14*

allow 29:*1*

allowed 56:*10*

Alonso 30:2, *14* 72:*18*

amazed 50:6, *11*

amazement 57:*7*

amazing 51:*16, 23, 24* 53:*11*

America 26:*12*

American 24:*15* 79:2, *4, 10, 20* 80:2 88:*12, 15, 21* 89:*10, 13, 18* 90:2, *4, 24* 91:*5, 10, 17, 23* 92:*7*

amicably 229:*20*

analysis 18:6 176:*12*

analyst 18:*7*

analytics 36:5 46:2 70:20 82:*7*

and/or 101:6 111:*11* 121:*16* 126:*19* 244:*11*

Anderson 115:*16* 119:2 154:6 216:*5* 218:2 220:*19, 23* 241:*4, 6, 8*

announced 87:*7* 131:*1*

announcement 43:*5, 13* 182:*21* 194:*10* 236:*12*

annual 44:9 75:*1* 81:*4* 101:*15* 102:*5, 20* 104:*18* 111:*14* 120:*17* 122:6 123:*16* 124:*17* 135:2, *21* 144:*3* 153:*11* 154:*13* 167:22, *24*

anonymized 146:*8*

answer 6:*16, 21, 22* 7:*19* 12:20 29:*1, 4* 34:*9, 19* 41:10 46:*14*

52:*16* 54:*16, 17* 61:*5* 69:*1* 74:*23* 80:22 81:*14* 84:*14* 91:*15* 92:2 100:*15* 128:*13* 132:6 148:2 171:*6* 172:*13, 14* 182:*6* 184:*4, 22* 190:*14* 219:8 223:*18* 225:*10* 226:2, *16* 231:*16*

answered 8:22 34:*18, 20* 45:*15* 59:*3* 71:22 74:22 84:*24* 91:*25* 130:*15* 148:*1* 155:*9* 164:*25* 171:22 184:*20* 219:*7* 226:*15* 228:*12* 229:*24* 235:*5*

answering 171:*12*

answers 74:*4* 128:*1*

answer's 171:*7*

Anybody 9:5 29:*22* 85:*20* 106:*21* 125:*13* 136:2 145:*4* 173:*15* 177:*3, 16* 213:*5* 220:*11, 16* 229:*11* 231:*13* 233:*20* 240:*15*

anyway 174:*1*

Aon 65:*9, 22* 66:*4* 74:*16*

Aon's 65:*25* 66:*5* 67:*16*

apart 20:*1*

apologize 202:*16* 227:*16* 230:*12, 15*

apologized 195:*15*

Apparently 171:*16*

appear 14:*14* 37:*14* 76:*14* 95:*14* 206:*6* 207:*25*

APPEARANCES 2:*1*

appears 10:*7* 11:*13* 14:*10* 21:*10* 33:*6* 34:*5* 38:*23* 39:*10* 40:*19* 43:*21* 44:*7* 54:*24* 57:*25* 65:*9* 75:*13* 76:*9* 77:*25* 120:*3* 138:*21* 189:*20* 204:*21* 205:*23, 25* 206:*13* 208:*2, 22* 211:*20* 234:*4*

application 88:*23* 89:2, *8, 12, 17* 90:*1* 92:*12* 106:*11, 15, 19, 20*

applications 90:*4, 10*

apply 92:*13*

appoint 139:*7, 11*

appointed 40:*16* 135:*14* 163:*5*

appointment 33:*19*

appreciate 51:*19*

approach 82:*8* 150:*10*

approaching 145:*20*

appropriate 70:*9* 128:*7* 199:*20* 232:*12, 14*

approve 167:*19*

approved 39:*16*

approving 39:*4*

approximate 139:*13*

approximately 105:*19, 24*

approximation 63:*3* 106:*8*

April 39:8 40:*10* 41:2, *14*

aptitude 150:*12*

Aravind 55:*13*

area 27:15 55:*12* 64:*5, 9* 77:20 82:18 87:*13* 95:*15* 113:*14, 17* 116:*11, 16, 17, 19* 124:*8*

areas 47:17 59:*1* 60:*10* 64:*1* 73:*2* 81:*8, 18* 86:8 87:*3* 88:*9* 92:*16, 18, 23* 101:*17* 103:8 104:*12* 113:2, *15* 116:*1* 117:*8, 19, 21* 121:2, *3, 6, 16* 123:20 125:*19* 128:22 129:*1, 6, 9, 15, 18, 20, 22* 141:*1* 156:*25* 235:*21*

arguing 171:*10*

argumentative 52:*14*

argumentive 52:*7* 54:*3*

Arizona 169:*11*

arrival 82:*12*

article 89:*5*

asked 5:*24* 8:*21* 34:*18* 35:25 42:2 43:*2* 71:22 73:*4* 74:22 80:*7* 84:*24* 91:*25* 96:*1* 101:*16* 102:*6, 8, 9* 111:*15* 122:*5* 130:*15* 136:2 143:*18* 144:*4* 145:*16, 23* 148:*1* 149:*8* 155:*9* 164:*25* 179:*21* 181:*3* 184:*15* 188:*19* 190:*12* 219:*7* 223:*19* 225:*20* 226:*15* 228:*12* 229:*24* 235:*5, 13*

asking 6:*10* 8:*20, 22* 39:*23, 24* 47:*15* 74:*9* 94:*5* 95:*24* 132:*25* 145:*19* 167:*3* 168:*24* 170:*20* 189:*1* 194:*7* 214:*24*

asks 156:*3* 211:*23*

aspects 82:*17*

aspiration 46:*15, 24* 101:*12, 22* 104:*19* 109:*5, 9* 111:*15*

aspirations 105:*7* 109:*11*

assembled 124:*24*

assess 158:*3*

assessed 145:*2* 149:*22*

assessment 63:*16* 131:*14* 149:*3, 7*

assessments 26:*25*

asset 38:*7* 44:*4* 47:*25* 64:*21, 23* 72:*1, 4, 9, 19* 78:24 113:*18* 118:*23* 137:*5, 8* 164:*14* 183:*6* 236:*3*

assigned 235:*21, 25*

assignment 24:*17* 25:*4, 6* 28:*5, 8*

assignments 24:*20* 26:*2*

associate 10:*11*

146:*18*
**associated** 172:6
**Assume** 16:2 21:*21*
22:*18* 43:22 44:*19*
65:*14* 105:5 109:*16*
150:*15* 160:*15* 212:*1*
**assumed** 98:*11* 210:*4*
**Assumes** 91:*14* 99:6
100:*13* 108:6
**assuming** 183:*17*
224:*21*
**assumption** 105:2
232:*13*
**AT&T** 111:*25*
**attached** 32:*20, 25*
55:*11* 82:*17* 113:*20*
173:*12*
**attachment** 234:*8, 10*
**attempt** 60:2
**attempted** 67:*17*
199:5, *9* 220:*4*
**attempting** 88:*8*
192:*4* 241:*14*
**attend** 129:*25* 136:*4,
10* 163:*19*
**attendance** 130:*11*
200:*9*
**attended** 130:*3, 14,
18, 19* 134:*16* 146:5
**attending** 4:*24*
130:*10, 16* 134:*16*
**attention** 45:6 91:*4*
92:*25*
**attorney** 99:*13* 104:8
213:25 214:*1, 16, 21*
215:*4, 5*
**attorneys** 7:*13, 24*
**attorney's** 128:*3, 7*
132:*3*
**attorney-to-an-**
**attorney** 217:*4*
**attract** 79:7 87:*12*
**attributable** 72:6
**attribute** 66:*21*
**attrition** 67:*19* 78:*16*
**audience** 225:*1*
**audit** 134:*25*
**August** 37:*21* 49:*14*
99:*1* 105:*23* 106:*1, 7*

152:*4* 159:*3* 160:*4*
234:*12, 16*
**AUM** 113:*20*
**Australia** 26:*14*
**autism** 42:*10*
**auto** 50:*17*
**availability** 83:*4*
**available** 89:7 207:5
214:*4*
**Avenue** 2:6
**average** 26:2 72:22
**avoiding** 188:*18*
**award** 88:*18* 237:*20*
238:*3*
**aware** 5:*1* 43:*1*
50:*18* 83:22, *25* 84:2,
*5, 8, 15, 20* 85:*4, 5, 14*
88:*15, 18* 90:23 91:5,
*10, 16, 22* 97:*21* 98:2,
*4, 23, 24* 99:*9, 16*
106:*20* 108:*12* 109:*4*
142:*22* 143:*16* 144:2
155:*1, 5* 176:2
179:*25* 180:*3* 181:*19,
23* 183:*3, 10, 12*
184:*7, 8, 11* 185:*1, 2*
188:7 232:*16* 233:*18*
240:5
**awareness** 116:*25*
144:7
**awkward** 196:*25*

**< B >**
**back** 11:*20* 15:*14*
25:*1* 48:*15* 49:*9*
52:*24* 54:*16* 61:*17*
72:*13* 76:*16* 77:*17*
79:*14* 86:5 95:*4*
112:6 119:2, *3*
124:*18* 134:*15*
147:*17* 151:*1* 172:*25*
173:*3* 174:5 186:*4*
188:*20* 192:*18* 198:*4*
199:22 203:2 204:5
205:6, *22* 206:5, *15*
207:6 208:8 210:8
218:*12* 226:*11* 232:9
238:*16*
**backtracked** 133:*3*

**bad** 216:*13*
**Bailey** 2:*4* 4:*23*
**balance** 155:*17, 18*
183:*14* 238:*10*
**BANCORP** 1:*9* 2:*17*
4:*6* 39:*3* 102:5
244:*4*
**bank** 9:*4, 8, 11, 14,
23* 10:*10, 11* 13:*17*
15:*17* 26:*11, 12, 13,
14, 17, 19, 22* 27:2, *6,
7, 9, 18* 29:*12* 30:2, *3,
16, 18, 25* 31:24
32:*11* 34:*3, 21* 36:2,
*11* 37:*16* 38:*12* 39:*4,
14, 21* 40:*11, 14, 23*
41:*13, 18* 43:*10*
44:24 45:25 46:25
47:5 49:2, *5, 14, 19,
23* 50:*6, 16* 52:2
53:9 55:*10, 15, 21, 22*
56:5, *8, 16, 18, 19, 21*
60:*23, 24* 61:*11, 21*
62:*3* 64:*18, 20* 68:*5,
24* 69:*13, 23* 70:5, *6,
19, 21* 72:*11, 24* 74:7
76:*3, 7* 77:*20* 78:*12*
80:*25* 81:*12* 82:9, *12*
83:*15* 84:*11, 16, 21*
85:*14* 86:*16* 89:*13*
92:*17* 93:2, 6 94:*18,
20* 95:*1, 10* 99:*4*
100:*19* 101:7, *12*
103:*14* 105:20, *23*
106:*12, 21* 107:*21*
108:5, *14, 22* 109:2,
*10, 24* 110:4, *5*
111:*12* 113:5 116:*20*
117:*21* 122:6 123:*14*
124:*15* 125:*4* 126:*19*
130:22 135:*15*
136:*17, 20, 24* 137:2,
*5, 8, 24* 138:*3, 6*
139:*8, 23* 143:*4*
153:*9, 15, 20* 154:*11*
155:*8, 23* 163:*13, 17*
164:*1, 4, 8, 11, 15*
166:*10, 11* 167:5, *13,
14, 23* 168:7 175:*21,
23* 177:*2, 10* 180:*17*

182:*16* 183:*18*
191:*17, 22* 192:2, *20*
193:*9, 23* 194:*10, 12,
15* 195:*17, 24* 196:*1,
5, 9, 18* 197:*3, 24*
198:*1* 200:*21, 24*
201:*3, 13* 210:2
215:20 216:20
219:*19* 223:22 225:5
226:7, *20, 21* 229:*1,
19* 231:*13*
**Banker** 88:*12, 15, 20,
21, 24* 89:*9, 10, 13, 18,
19* 90:2, *4, 5, 19, 20,
24* 91:*3, 6, 7, 10, 12,
17, 23, 24* 92:*8, 13*
**bankers** 90:*23*
**banking** 24:*15* 48:*20*
49:*12, 18* 64:4, *12*
72:*3, 7* 76:2 78:6, *8*
86:*11, 17* 87:2
109:22 113:*13, 14, 22*
115:*12* 116:*1, 15, 16*
118:*24* 120:22, *23*
137:2 142:24 143:2
164:*11* 180:6 183:6
236:*9, 10*
**banks** 28:*15* 90:*12*
**bank's** 27:*17* 30:*21*
82:*13*
**Barclays** 26:*14*
**base** 83:5 154:*9*
**based** 28:8, *25* 32:*15*
34:*12* 55:22 56:*4*
72:25 98:22 99:7
115:*10* 144:*15*
146:*12* 172:*17* 192:6
216:20 224:*18*
237:*14, 16, 23*
**Basically** 152:6
153:2 156:8
**basis** 18:*10* 97:7, *11*
102:20 110:20 111:7
123:*16* 124:*17* 135:2,
*21* 159:6 168:*12*
191:*11* 197:*12* 208:6
**Bates** 20:*17* 21:*3*
33:5 36:23 43:*18*
63:*13* 75:7 151:5

Deposition of Timothy Spence

Philip R. McHugh v. Fifth Third Bancorp, et al.

162:7 174:22 185:9
234:1 239:12
**beat** 116:23
**Beaudin** 140:6
144:23 159:11, 14
160:14, 19
**beautiful** 209:6
**becoming** 49:18
182:16
**began** 88:16 105:23
**beginning** 34:21
123:6, 13
**behalf** 2:1, 8 4:11,
13, 16 89:25
**behave** 230:19
**behaved** 216:17
**behaving** 192:7
**behavioral** 42:9
62:10 145:12, 13
**believe** 18:3 25:24
27:9 36:7 41:15
47:23 48:12 55:5, 13
56:13 57:7 72:2
78:9 81:23 93:19
99:8 101:24 104:12
106:2 111:18 124:2,
21 146:5 154:18
162:2 170:4 178:2
179:13, 16 196:14
200:18 201:18
218:16 219:9, 23
227:7
**believed** 81:8 125:6
145:25 181:7
**believer** 154:19
**believing** 59:8, 9
**Ben** 185:20
**benchmarks** 32:13
**benefit** 97:17 149:12
**best** 60:11 66:10
153:8, 14, 19 154:11
155:7 190:5 243:11
**bet** 209:17
**better** 48:5 88:6
153:20 163:2, 9, 14,
15, 18 179:1, 22
187:9, 14 191:7
195:10 222:22

**beyond** 90:21
111:13 128:7 195:7
229:2, 10 230:16
**bias** 168:19 170:11,
13, 14, 18 171:2, 19
172:6 173:7, 12
**bicycle** 158:16
**big** 74:1 81:23
**biggest** 74:7
**billion** 112:13
**biographical** 89:6
**birth** 9:25 220:5
**birthday** 49:1 138:12
**black** 82:4 166:23,
24 167:1, 4
**Blank** 2:11 4:16
215:4 224:14
**blow** 133:22 152:7
**board** 11:3 17:20
26:23 29:21 31:11
32:19, 22 38:24
100:5, 23 104:12
107:2, 3, 6, 10, 18, 20
108:3, 16, 20 109:8,
21 110:2 111:18
120:14 124:11 127:1,
6 129:24 131:7, 15,
19 132:21 134:21, 22,
24 135:2, 12, 13, 17,
19, 20, 24 136:3, 4, 11
139:6, 10, 13, 19, 20
143:18 144:4, 14, 15,
18, 19, 20 161:25
162:1, 3 163:19, 23
177:10, 15, 17, 19, 21,
24 178:7, 16 179:10
180:12, 21 181:20
183:3, 11, 25 184:3,
15 185:1 186:2
187:18 235:15
236:13 237:20 238:1
**boardroom** 118:9
**boards** 30:10
**board's** 111:17 238:2
**boastfully** 169:12
**boat** 116:23
**Bob** 30:17 42:22
100:10 107:13, 15
108:17, 20, 24 109:3
110:2 111:6 112:2

114:5, 6 115:8 119:7,
10, 12, 14 121:15
134:6 140:5 144:22,
23 146:10 147:22
148:7 151:12, 13, 15
152:17 154:22
156:10, 19 159:15, 16,
24, 25 160:5, 16, 17,
18, 22 161:1, 3, 12
166:13 178:10, 13
179:13 180:13, 14, 16
187:16, 21 189:4
190:1, 10 197:25
198:2 199:24 200:16
201:18, 22 202:5, 6,
12, 15, 19, 20, 23, 25
203:3, 7, 14, 21, 22
206:23 207:13 208:5,
6, 7 209:4, 5, 24
210:7 212:15, 18, 20
213:21 214:12, 15, 23
215:9, 18, 21, 23
216:21 217:12 222:6,
7, 10 230:25 234:5,
17, 19 235:12 240:16
**Bobs** 239:18, 20
**body** 218:8
**book** 14:11, 13
**boost** 80:24 83:14
85:7
**bordered** 221:5
**Borton** 30:3 43:9
55:21 72:18
**botched** 162:17
**bottle** 36:19
**bottom** 20:20 33:7
70:5 175:5 185:15
213:6
**bound** 28:24
**box** 121:24
**boxes** 122:1
**Bradley** 112:24
118:7
**branch** 88:4 155:20
**branches** 87:8, 15
88:10 110:16 157:15
158:14
**brand** 116:25
**break** 143:23 150:21

**breakdown** 68:4, 8
72:25
**Bret** 170:1, 2, 3
**BRG** 79:2, 10, 12, 20
80:2
**Brian** 2:17 4:18
64:24 72:20 125:16,
17
**bridge** 192:5
**brief** 190:24 192:11
202:9
**briefly** 192:14 238:18
**bring** 152:6 191:7
**broad** 90:9 143:10
149:10
**broad-based** 31:3
**broader** 8:17 20:4
64:3 97:8 141:13
**broadly** 82:18 83:3
**broken** 69:7 77:1
**brought** 43:8 97:16
**Bruce** 1:21
**Brunker** 30:16, 18
**budgeting** 156:5
**build** 74:10 88:10
155:20 192:4
**building** 87:14
157:19 191:11
212:25 213:4 239:5
240:11
**build-out** 110:16
**bullet** 63:23 79:18
80:7 86:8
**bus** 158:17 169:10
**business** 17:21 18:24
19:1 27:5 29:16
31:4 32:14 46:2, 10,
17, 20 47:21 48:1, 4,
5, 20 50:4 55:3, 10,
11 67:11 68:5, 8, 23
74:15 75:19, 20, 21
76:19 77:18 78:6, 7
90:13, 14 94:16, 21,
24 95:4 102:14
113:3, 14, 19, 22
115:12 116:1, 15, 18
117:2 118:15, 24
137:2 141:6 143:5
155:16 157:13, 18
159:25 160:2 164:11

169:18 180:2, 5
183:5 236:3, 9
**businesses** 46:7 47:4,
8 48:2 55:17
**bylaws** 134:23
**byproduct** 43:11
153:10, 15 210:3

**< C >**
**calculate** 198:20
**calendar** 107:15
110:10 123:5 138:22
234:5
**Call** 17:2 20:11
34:20 63:2 71:16
75:21 122:8 148:10,
17 152:2 156:4
182:22 196:23
197:12 202:23, 25
203:6, 9, 14 204:20
206:7 207:6, 17, 18
212:8 215:5, 6
236:14
**called** 17:9 27:10, 11
35:7 90:7 92:6
202:12, 24
**caller** 207:20
**calling** 207:8
**calls** 158:18
**Canada** 26:13
**candid** 198:15
**candidate** 63:7
**candidates** 87:13
122:2 124:10
**cannon** 133:9, 18
**capabilities** 46:12
159:1
**capable** 69:22 115:2
**capacities** 48:9
**capacity** 30:8 31:6
131:5 155:17, 18
156:4 167:15 181:16
**capital** 25:9 26:12
39:3 43:23 155:17,
19
**Caption** 244:3
**captioned** 244:8
**car** 134:14
**card** 55:10 93:2
94:15, 21, 24 95:4, 8

101:24 102:1, 3, 4, 15,
25 103:2, 6, 12
104:21, 23 105:5, 6, 7
106:9 120:3, 7, 12
121:20 122:12 125:8,
13, 16, 24, 25 126:5,
15 127:15 142:6
**cards** 12:9 94:17
102:16 103:5 104:25
105:1, 3 120:19
121:10 124:16, 25
126:3
**care** 158:22
**career** 35:18 46:15
70:13 101:13, 15
102:23 105:7 109:4
111:14, 15
**Carmichael** 22:3
27:1 29:21 35:13, 21,
24 36:12 37:25 42:6,
21 73:22 74:25
94:10 95:23 96:2, 22
97:5 98:25 99:1
100:6, 19 101:6
103:24 104:5 107:3,
18 108:3, 12 109:1, 8,
13, 21 110:8, 24
111:10, 22 118:5
119:8 121:8 122:15
127:4, 14 129:14
130:11 131:8 138:25
139:6 141:25 142:4,
23 143:17, 18 144:4,
10 154:17, 24 155:1,
5 161:12 178:2
179:24 181:19 183:4
192:11 195:13
201:17 204:11
206:16 207:9 216:21
223:12 224:3, 8, 19,
23, 25 225:8, 17, 23
233:13, 15, 17 236:7,
20
**Carolina** 134:15
**cascade** 123:9
**CASE** 1:7 4:3, 7
6:1, 3 10:22, 24
20:18 24:18 25:7
53:23 110:21 133:21

180:4 182:19 211:20
231:24 232:17 244:3
**cases** 48:3 85:1
157:15
**Cass** 114:20
**casual** 165:16
**catch** 169:16 185:19
**category** 140:11
**caught** 192:16
**cause** 133:17
**caused** 117:16
**caution** 29:3
**CED** 98:1
**cell** 111:24
**Center** 1:18 2:12
87:11 134:10
**CEO** 15:17 26:22
34:3 46:16, 24 79:13
92:17 100:7, 11, 19
101:7, 14 103:14
104:13, 14, 19 106:12,
22 107:20 108:5, 13,
22 109:1, 5, 10, 23
110:5 111:11, 18, 20
125:5 126:7, 16, 19
135:14 136:8, 17
139:7, 22 143:20
144:6, 12 161:18, 21
162:17, 21, 22 163:1,
8, 10, 11 164:1
167:14 179:23 181:6
195:17 232:23
**certain** 87:25 105:4
120:7 121:10 139:16
185:4
**Certainly** 12:8 13:13
50:11 53:20 59:22
66:21 70:14 73:9
87:20 122:12 141:7
169:6 204:25 205:16
208:24 211:20 219:4
**certified** 5:10
**certify** 243:7
**CFO** 18:11
**CFPB** 50:7, 13, 18
51:15, 25 53:10, 16
55:8, 16, 19 56:7
**CFPB's** 55:6
**Chad** 30:3 43:9

55:21 72:18
**Chad's** 43:13
**chair** 71:19
**challenged** 153:19
158:17
**challenges** 74:7
**challenging** 118:25
**chance** 160:7, 12
**change** 19:16, 19, 21
43:8 46:8 47:23
49:17 70:8, 10 71:9
143:9 158:1 179:11
181:15 182:11, 25
183:21 184:21 186:3
187:17, 18 191:16, 18,
19, 21, 24 193:5, 6
194:5 223:14 228:24
236:11 245:4, 7, 10,
13, 16, 19, 22 246:4, 7,
10, 13, 16, 19, 22
**changed** 236:17
**changes** 59:11 71:15
148:23 149:1 161:3,
11, 13 178:9 180:19,
25 181:11, 22 182:2,
8, 14, 18 183:20, 24
236:7, 24 244:11, 14
**channel** 27:10
**channels** 90:14
**character** 239:21, 23
**characterization**
27:22
**characterized** 228:2
**charge** 14:22 68:14
93:1 94:23 112:19
115:20
**charge-off** 93:6 95:3
**Charlie** 112:24 118:6
**chart** 73:18 76:18
235:25
**charts** 178:11, 14
234:23, 25 235:2, 4, 7
**chat** 189:1, 7 190:3
**chatted** 218:5
**checking** 27:5
**checkpoint** 118:12
**checks** 158:19
**Chicago** 114:11
115:19 117:2

Deposition of Timothy Spence                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

**chief** 27:22 35:*11*
37:*24* 41:*16* 47:22
50:2 68:*10*, 22 71:*11*,
*21* 75:24 76:5, *10, 20*,
*24* 77:*1, 6, 18* 85:*21*
99:*3* 115:*17* 124:*3*
130:22 131:2, *6*
140:*18* 181:8

**children** 7:8

**choice** 9:*10* 91:*11*
227:25 238:2

**choices** 150:*11*

**choose** 175:22 192:20

**chooses** 195:*23*

**chose** 196:*3* 228:5

**Chris** 105:*15, 21, 25*

**CHRO** 30:8

**chronologically**
206:*10*

**Chuck** 146:*5, 7, 11,*
*17, 21* 147:*3, 22*
148:*6, 7* 156:*17*
160:*16* 161:7, *9, 17*

**Cincinnati** 1:*19* 2:6,
*13* 7:3 62:15 169:24
198:*21* 243:*13*

**Cioffi** 2:*8* 4:*15, 20,*
*25* 7:*18* 8:*13, 17, 20*
10:*20* 11:*1, 23* 12:*15,*
*21* 13:7, *20* 14:*1, 7,*
*25* 15:*2, 22* 16:*19, 21*
21:*18, 24* 22:*4* 28:22
33:*10, 23* 34:8, *18*
38:*21* 39:6, *22* 40:*3*
41:*9* 45:*14* 46:*13*
51:2, *6* 52:6, *13* 54:*3,*
*7, 11, 14* 55:25 56:*3,*
*11* 59:*3* 61:*3* 68:*18,*
*25* 71:22 74:22
80:*21* 83:*18* 84:*24*
87:*19* 89:*20* 91:*13,*
*25* 93:*12, 15, 25*
95:*20, 24* 96:*3, 8, 12,*
*19* 98:*7* 99:*5* 100:*13*
103:*18* 107:22 108:6
126:8, *11* 128:*1, 13*
130:*15* 132:2, *6*
143:*21* 148:*1* 153:*23*
154:2 155:*9* 164:*25*
166:25 168:*23*

**Cioffi's** 148:*4*

**Circle** 169:*11*

**circumstances** 31:*20*
35:*23* 42:8 63:6
225:*13*

**cite** 231:*8*

**Citigroup** 26:*12*
70:*18*

**City** 23:*12* 162:*17,*
*21* 163:*10*

**claim** 116:9 231:*24*
232:*4, 5*

**claiming** 193:*21*
229:*21*

**claims** 231:22

**clarify** 20:*18* 63:*3*
93:*25* 107:22 118:*21*
210:*12*

**Clarity** 17:9, *13, 17,*
*22, 24* 18:2, *4, 15, 17,*
*23* 19:9

**class** 84:*5, 8* 85:*16*

**classes** 83:*16, 20, 23,*
*25* 84:2, *12, 17, 22*
168:*14* 229:4

**classification** 116:*13*

**cleaned** 51:*20* 52:*4,*
*21*

**cleanup** 51:25

**clear** 19:2 42:*16*
52:25 73:6, *23* 93:*13*
95:*24* 135:*24* 142:*19*
148:*4* 169:9 211:2
220:5

**clearly** 53:*11* 182:*14*
192:*6* 199:*20* 212:*15*

**client** 16:*10, 12* 24:6
25:*3, 5, 8, 9*

**clients** 20:*5* 29:*3*

**client's** 23:*11*

**close** 112:*14* 134:8
152:*14* 157:8 158:*3*
162:25

**closet** 218:*1*

**coach** 54:9

**coaching** 54:*14, 15*

**cocounsel** 128:9

**coincide** 206:6

**coincides** 204:*13*

**Colgate** 15:8, *9, 12*

**colleagues** 193:*1*

**collection** 181:*10*

**college** 17:25 18:*1, 5*

**colleges** 82:*4*

**Collin** 4:*15*

**colloquialism** 133:*15*

**color** 79:23 80:*4, 16,*
*24* 81:7 82:*10, 14*
83:*14, 17* 84:*13, 18,*
*23* 86:24 87:*18*

**colorful** 134:*10*

**come** 57:5 95:*18*
96:25 121:6, 7
126:22 157:*14*
158:*14* 181:4 186:*17*
192:*18* 202:2, *5*
211:*18* 214:5 216:*12*

**comes** 124:*10* 147:*17*
215:8, *10*

**comfortable** 42:*11*

**coming** 36:*11* 64:*10*
155:*24* 177:*18*
201:*16* 226:*21*

**Commencing** 1:*17*

**comment** 117:25
132:*10* 133:*3* 135:*12*
168:*19* 178:24

**commentary** 212:*15*

**comments** 160:*20*
201:22 202:*5* 203:*21*

**commercial** 14:22
27:*7* 30:2 90:*14*
95:*10* 113:*17* 115:*12*
116:*15* 120:*23* 125:*4*
143:*4* 236:*10*

**Commission** 243:*18*

**commissioned** 243:*6*

**commitment** 139:*16*

**committee** 9:*7* 27:*17*
39:*3* 43:24 90:7

**communicated** 74:*18*
82:*21, 23* 94:*9*
103:*15* 140:2 207:25
219:*14* 238:8, *10*

**communicating** 21:*10*
97:*19* 123:*1* 166:*17,*
*20* 207:24

**communication** 104:*1*
135:*18* 180:*12*
194:*23*

**communications**
95:*18* 96:25 97:*23*
98:*1* 127:*3* 197:9, *10*

**community** 88:*5*
97:22 102:*8* 120:*14*
136:*23* 164:7

**commuting** 62:*12*
158:*16*

**comp** 187:*11* 237:*19,*
*21*

**company** 16:*13* 17:9
18:*11* 19:*3* 20:*13*
37:*3* 45:*12* 46:*16*
68:*17* 69:*19* 75:*15*
78:*5, 17* 79:*4* 85:*11*
98:*23* 102:6 104:*14*
120:*18* 123:*4* 143:9
146:*16* 162:22
181:*11* 191:8 195:*10*
201:25 209:*18* 210:*5*
214:*3, 6* 215:22, *23,*
*24, 25* 216:*19* 217:*12*
223:*15* 226:22, *23*
227:*14* 229:5, *15*
232:23 237:24

**company's** 59:*23*

**91**:9 92:*4, 5* 118:*4*
123:2, *17, 21* 125:*14,*
*15, 22* 131:*10, 17*
134:*24, 25* 135:*4, 5*
136:*10* 176:*3* 200:*4,*
*6* 219:25 220:7
238:20 240:*20*

**common** 110:*17*

**communicate** 9:*3, 7*
36:*13* 107:*19* 108:*17,*
*20* 111:*21* 112:*1*
134:*20, 22* 139:*21*
145:*4* 154:*16* 203:*19*

compare 78:3
compared 76:10
comparing 37:12
77:5
comparison 77:13
comparisons 97:12
compensation 21:11
39:3, 4, 12 43:23
44:13 57:16 58:12
185:21 237:5, 9, 11,
16 238:2
complained 239:4, 6
complaints 158:13
complement 82:5
complete 145:11
170:18 243:10
completed 55:20
63:17 81:25 89:3, 8
93:24 103:3 110:14
113:5
completing 62:10
140:7
completion 53:6
compliance 6:2
27:14 53:4 200:4, 6
compliment 168:22
169:5, 7 170:4
176:11
component 20:3
components 61:4
composite 60:21
78:15 141:15
compound 143:22
comprehensive 149:19
comprehensiveness
90:11
computers 74:8
concentric 74:17
concern 172:18
235:10
concerned 70:12
135:11 178:15 216:1
226:19, 24
concerns 234:21
concise 135:19
concluded 88:2
235:15 242:12
concludes 241:21
conclusion 60:3

conclusions 32:17
conduct 50:14 90:8
conducted 32:9
71:13
confer 128:9
conference 134:12
confided 191:18
confidential 28:23, 25
56:9, 12 199:21
confirm 49:5 92:11
126:2
confirmed 39:16
confirming 194:24
conformance 238:8
confronted 133:3
confused 212:11
congratulate 33:19
conjunction 196:8
connection 39:13
consensus 177:20
consideration 117:1
considered 104:14
consisted 104:3
consistent 67:6, 13
91:1 105:7 161:9
190:7, 19 192:13
202:1 213:3 223:21
consistently 66:17
229:7
consolidated 236:8
constantly 92:20
constitute 224:11, 23
225:2, 16 228:4
229:23
constituted 228:10
constructive 136:1
146:2 152:5
consultation 181:14
consulted 143:15
consulting 23:15
24:11 29:15 66:4
consumer 27:5 39:4,
14, 21 40:11, 13, 23
41:17 43:10 49:5, 14,
18 50:6, 16 52:2
55:9, 15, 21, 22 56:5,
8, 16, 18, 19, 21 61:21
62:3 64:4, 12, 18, 20
70:18, 20 72:1, 7, 10,
16, 18 76:2, 3, 7, 8

78:1 86:11, 16 87:2
93:1, 6 105:20, 23
116:20 117:3 140:17
157:18 180:17
182:16 183:18
191:17, 22 192:2, 20
193:8, 23 194:10, 12,
15 197:24 198:1
200:21 210:2 214:2
215:19 216:20 225:7,
12 226:7
consumers 55:17
contact 214:1
contacted 35:1
contains 128:5
contemplated 149:21
content 158:20
209:24 229:11
context 95:7 115:10
133:14, 20 149:12
156:15, 16, 19 160:7,
13, 19 169:8 186:1,
22 197:20 215:17
233:11, 21
contextually 159:13
continue 60:16
79:19 80:9, 24 83:13
94:15 95:3, 5 101:17
150:21 195:12
203:25 210:5 215:20
216:19 241:12, 14
continued 142:7
217:11
continues 82:15
Continuing 13:20
contracted 30:25
contracting 19:2, 4
contractor 19:6
contributes 67:11
control 131:19
180:10 234:21
controls 55:3
conversation 32:5
99:17 100:3, 18, 20
105:8 110:2 129:12
139:6, 9 144:7, 10, 18
175:18 187:20 188:7
190:12 194:25 195:6,
14 199:21 200:17
202:3, 6, 23 204:14

207:9, 11 214:25
229:17
conversations 8:25
9:9, 13 32:1, 7 73:22
100:7, 11, 14 108:24
109:9 114:12 122:16
129:13 145:7 184:2
191:14 193:25 202:9
209:25 215:1 216:21
conversion 113:16
114:19, 21, 25 116:2,
8, 22 118:15
conversions 116:19
converted 73:13, 16
copy 37:6 44:21
48:10 89:12, 17, 22
90:1
cordial 192:25
core 27:4 122:6
123:14 153:20
corner 20:20
corporate 24:13
29:15 31:24 36:10
69:24 97:23 163:9
177:23 178:19, 20
180:7 181:8 217:5
236:5
corporation 145:22
Correct 8:16, 19
14:14, 15 20:10 21:4
22:3, 14, 21 28:2
37:25 38:1, 4 40:18,
25 41:3 49:8, 13, 15,
24 51:8 55:7 56:25
57:8 58:10, 11 61:22,
25 62:14 65:18
66:23 67:7, 15 68:14,
15 71:21 72:24 73:8
75:9, 19 76:6, 8 77:5
78:10 87:18 89:25
93:14 98:18 101:8
106:4 116:5 119:24,
25 127:7, 9 130:23
131:9 133:18 138:4,
18 141:25 142:20
148:8, 9 150:6 151:7,
13, 22, 23 157:3, 4, 9
163:3, 6, 7 168:22
174:1, 7 175:16
183:7 198:12 203:4,

*12* 205:*19* 206:*22*
207:*1* 210:*10* 211:*3*
212:2, *18* 213:*12*
234:*25* 238:*6, 11, 12*
240:*1*
**corrected** 55:7
**correcting** 205:*25*
**Correction** 51:*4*
**corrections** 244:*11*
**correctly** 22:*11*
101:*4* 190:6, *18*
191:9
**correlate** 60:*18*
67:*17*, 20
**corresponds** 83:*6*
**cost** 29:*18*
**costs** 155:*16*
**counsel** 4:8, *21* 8:*3,
7, 11* 9:*1, 19* 22:5
29:*3* 33:*10* 38:*13*
39:22 42:2 51:2
54:*3* 55:*25* 128:*1*
132:2 151:*12* 153:*23*
168:*23* 170:*19*
226:*16* 230:2, *4*
235:*6*
**counterclaim** 232:*1,
17, 19*
**country** 87:*25* 88:*1*
**COUNTY** 243:*3*
**couple** 88:*16* 113:*23*
159:5 160:8, *23*
185:*20* 203:*1* 219:22
**coupled** 208:*4*
**course** 70:*20* 81:*25*
157:*11* 195:*23*
201:*25*
**COURT** 1:*1* 4:*4*
6:*14, 23* 153:*25*
241:*22, 25*
**cover** 53:2 80:7
**covered** 204:*14*
**COVID** 157:*11*
158:*10* 159:2
**coworkers** 66:*18*
**crafting** 20:7 97:*12*
**create** 87:*11* 149:9
**created** 116:7, *10*
117:5, *7, 12* 162:*25*

180:*22* 236:*6*
**credible** 90:9
**credit** 52:5 53:8, *12,
17* 54:*20, 23* 55:*10*
93:2 94:*15, 17, 24*
95:*4, 8* 114:*13, 16, 18,
20* 115:*17* 142:5, *6*
**crisis** 36:*11* 158:9
**criteria** 90:*18* 91:*22*
92:*1, 7*
**critical** 80:*25* 86:*23*
123:*19*
**criticism** 156:7
**CRO** 131:*3*
**Cross** 52:*12*
**crossed** 165:*11*
**cry** 170:7
**CSO** 68:*13*
**culture** 27:*15*
**current** 27:*18* 32:*10*
197:*1*
**customary** 25:2
109:*15*
**customer** 183:*16*
231:*12*
**customers** 59:*24*
66:*19* 113:6 157:*13*
158:*16, 18, 23* 168:*8*
**cut** 33:6 55:*25* 56:2
**cutting** 29:*18*
**cycle** 44:*13* 167:*22,
24* 168:*1* 201:*19*

**< D >**
**daily** 118:*11* 119:*13*
**dangerous** 216:*15*
227:*15, 20* 228:*4, 10,
19* 229:*23*
**darken** 188:*21* 198:8
**data** 36:5 55:5
58:22 60:*13* 67:*19,
21* 73:*10, 13* 89:6
113:*16* 114:*19, 20*
116:*19* 141:*12*
**Date** 1:*16* 9:25
39:*19, 24* 40:*16* 42:*3,
25* 44:*16* 49:*4* 55:22
56:*4* 57:*3* 62:*20*
93:*23* 97:*24* 130:*25*
139:*4* 143:*1* 145:9

177:*12* 179:*15* 196:*6*
198:*16* 206:*12*
236:*21* 242:8 244:2
**dated** 22:*25* 33:*16*
39:8 40:*15* 43:*25*
127:*23* 198:*6*
**dates** 23:*23* 24:*25*
105:*15* 184:*14*
**day** 23:*10* 51:*14*
111:*19* 135:6 155:*15*
178:5 184:*15* 190:*21,
23* 191:*14* 198:*12*
199:*12* 208:*21*
209:*25* 214:6 218:*13,
18* 219:*24* 222:*16, 17*
241:*16* 243:*14*
244:*16*
**day-in** 30:*20* 168:*12*
**daylight** 198:*24*
199:2
**day-out** 30:*20* 168:*12*
**days** 129:*24*
**day's** 241:*16*
**day-to-day** 30:*12*
119:*3*
**deal** 53:8 54:*23*
112:*14, 16* 113:*24*
117:*1* 154:*20* 206:*17*
**dealings** 50:*18*
**Dean** 16:*17*
**Dear** 21:*13*
**debrief** 147:*18* 160:7,
*12* 161:*10* 200:*13, 17*
201:*15* 202:6, *18, 22*
204:*20* 205:*13*
**debriefed** 160:*19*
198:2
**deceitful** 96:9, *10*
**December** 43:*25*
100:22 107:2, *18, 23*
108:2, *19, 25* 109:7,
20 110:*1* 129:*24*
130:*1, 14, 21* 132:9,
16 136:4, *16, 19, 22*
137:*1, 4, 7, 10, 14, 17,
20, 23* 138:2, *7*
144:*16*
**decided** 144:*18*
236:*18, 22, 23* 237:22

**decision** 11:*3* 69:*21*
74:6 82:2 92:6
97:*18* 111:*17* 118:*21*
119:*1* 143:*13, 14, 15*
179:8 180:7, *24*
181:*3* 188:*21* 189:*11*
190:*16* 192:*15, 18, 23*
194:*14* 203:*23*
212:*12, 14* 237:*21*
238:*1*
**decisions** 150:8
154:*10*
**deck** 136:8, *13, 14*
**decks** 119:*24* 127:5
133:*10*
**DECLARATION**
244:5
**declare** 244:6
**declared** 46:*4*
**dedicated** 157:*19*
**deduction** 198:22
**deeper** 30:*10*
**Defendants** 1:*10* 2:8
4:7, *16*
**defer** 152:9, *21*
**deferred** 157:*23*
**deficient** 58:*25* 59:9
**define** 66:*14* 99:*20*
106:*19* 158:6
**defined** 65:*24* 66:*24*
67:*18*
**definitely** 76:*14* 81:*3*
89:2 95:*14* 111:*1*
149:*1* 159:5 160:8,
*22* 198:*13* 214:*21*
**Definition** 45:*15*
55:*18* 65:*25* 66:*15*
225:22 226:*3, 8*
230:6
**definitive** 221:*19*
**definitively** 73:*4*
76:*14* 84:*14* 92:8
115:*10* 218:*17*
219:*16*
**deliberate** 87:*12*
**delineated** 80:*8*
**delineating** 80:*5*
**deliver** 70:*3*
**delivered** 87:6

**delivery** 20:8 139:24
**demand** 83:3
**demanding** 229:8
**demands** 200:23
**demonstrated** 115:15
**denote** 66:6
**departure** 8:6, 11
9:2, 23 25:14
**depend** 238:5
**depended** 28:7
**depends** 36:14
**deployed** 87:16
**Deponent** 2:8
**deposed** 5:10
**deposit** 27:21 116:24
183:14
**Deposition** 1:14 4:3
5:18, 20, 22 7:12, 17
96:15 241:14, 21
242:12 244:1, 8, 12
245:1 246:1
**depositions** 128:5
**deposition's** 96:3
**derogatory** 96:14
240:1 241:7
**describe** 7:21
**described** 199:18
**describes** 91:11
**deserved** 54:19
**deserves** 53:8 54:23
**designate** 28:23
56:11
**designated** 18:9
114:6 128:4
**designed** 18:25 85:7
150:7
**designee** 30:20
**desire** 67:1
**desired** 45:23
101:25 125:2
**detail** 44:17, 22
78:22 151:24 152:2
230:7 231:18
**detailed** 223:18
**details** 48:11 57:15
58:1
**determination** 238:6
**Detroit** 210:23
**develop** 32:25 46:11
48:8 197:23

**developed** 19:1
81:17, 20 82:3 113:7
124:13
**developing** 32:21
**development** 17:16
29:15 45:7 69:24
87:11 89:4 97:23
102:23 103:8 104:12
111:14 121:11
123:20, 23 136:23
146:12 148:21, 23
149:5 156:18 159:17,
18, 21 160:8, 23
161:1, 8 164:7
178:20 179:3
**Developmental** 84:4
85:8
**diagnosis** 42:11
**dialogue** 168:11
192:5
**dictated** 25:7
**different** 20:1 40:20
47:19 58:12 60:4
66:15 73:25 76:13
78:17 82:21 85:13
86:2 111:1 156:1
179:4 181:10 208:22
211:12
**differently** 162:19
**difficult** 6:17 152:12
157:6 194:6 218:7
**difficulties** 113:13
**digest** 187:10, 19
190:13
**digesting** 190:1
**digital** 19:12 27:9,
11 46:3 59:1 64:2, 7
69:25 70:18 79:22
80:14 88:12, 20, 24
89:9, 19 90:5, 12, 13,
15, 18, 20, 23 91:3, 7,
12, 24 92:13 110:14
157:20 181:5 235:24
**dinner** 42:24 43:4
**direct** 9:4 47:3, 7, 12,
18, 20, 21, 23, 25 48:1,
8 69:3, 4 123:16
178:16, 23 179:23
194:1 235:11

**directed** 168:5
**direction** 7:21 179:11
**directly** 18:10 20:6
21:23 22:20 31:11
37:25 48:6 50:17
61:6 115:24 116:21
131:14 134:21, 23
135:2 154:21 181:6
184:5 203:20 236:6
**directors** 11:3 17:20
**directs** 29:21
**disabilities** 84:4 85:8
**disadvantage** 153:16
191:20
**disagreement** 220:6
**disagrees** 225:23
**disappointed** 206:18,
25 209:22
**disappointing** 217:9
**disclosed** 6:9
**disclosure** 128:7
**discrimination** 10:22
168:6, 8, 13 231:22
**discuss** 8:14 100:6,
10 102:21 111:11
119:10 120:6 123:19
125:11 147:17
151:24 152:3 207:9
220:22 222:2, 11, 21
**discussed** 8:2, 5, 9
9:18 49:7 79:21
80:3 86:21 93:5
111:13 115:22 118:1,
16 124:15 131:13
148:21 182:25
192:13 213:11 220:6,
9 222:7 227:24
235:6, 7
**discussing** 119:14
140:4 194:24 222:9
**discussion** 60:14
70:15 100:23 104:10,
11 107:2, 4, 6 111:14
118:8, 17 120:15, 17
122:7 123:13, 25
124:7, 12 127:6
128:4 139:12 141:13
144:16 146:5 151:18
177:18 190:2, 13, 24
192:12 194:4 195:7

201:22 202:15
203:22 208:5 215:18
216:25 217:4 220:3
224:19 228:8
**discussions** 9:21
32:4 108:16 118:10
127:13 129:8 136:7
146:3 182:10 183:2
201:19 222:23
**disguised** 32:15
**dismissive** 95:19 97:1
**disorder** 42:10
**disruptive** 221:7
**distribution** 27:8
**DISTRICT** 1:1, 2 4:4
**diversify** 86:10
**diversity** 64:2, 15
79:18 80:12 86:14,
19, 25 167:13, 18
168:4, 15
**DIVISION** 1:3 4:5
14:23 21:16 22:17
38:9 45:8 64:23
**document** 12:7, 15,
17 20:21 21:6 22:4
33:13, 23 36:24
38:21 39:25 40:9, 14,
20 59:4 63:15, 18
65:8, 9, 12, 20, 21
66:4 75:11 77:3
82:22 93:16, 19 96:4,
13 119:21 126:8
127:8, 11 128:3
138:20 237:8
**documentation** 41:22
104:16 111:5 117:4
161:14, 15, 24 162:3
**documented** 104:1
194:18
**documents** 7:16, 20,
22, 23 20:24 32:21
99:13 126:17 128:11
**Doe** 124:4
**doing** 18:4 24:24
28:20 31:23 61:12
87:9 89:1 90:12
100:24 133:6 153:7
172:17
**dollars** 112:13

Deposition of Timothy Spence                                          Philip R. McHugh v. Fifth Third Bancorp, et al.

155:*15*, *19*
**door**  216:*6*  218:*2*
**doors**  162:*25*
**doorstep**  188:*21*
198:*8*
**draft**  126:*23*  148:*21*
**drafted**  30:*9*
**drafting**  126:*24*
**drafts**  106:*9*  121:*2*
136:*15*
**draw**  77:*12*  78:*21*
97:*11*
**drive**  45:*12*
**driving**  110:*13*, *15*
**dropped**  71:*4*
**DSG**  59:*1*  64:*2*, *7*
178:*19*
**due**  237:*11*
**duly**  5:*9*  243:*5*
**duties**  16:*11*  24:*4*
131:*6*  235:*19*

< E >
**eager**  189:*5*  190:*5*
**earlier**  37:*13*  40:*14*
61:*20*  62:*11*  67:*4*, *18*
69:*14*  85:*11*  117:*25*
119:*23*  120:*5*  131:*13*
136:*15*  141:*21*
169:*24*  180:*8*  184:*16*
198:*11*  199:*18*
207:*12*, *19*  212:*7*
213:*11*  217:*10*, *21*, *22*,
*25*  226:*19*  228:*15*
234:*18*
**early**  63:*2*  146:*22*,
*23*  165:*13*  179:*9*, *16*
186:*17*  193:*20*
**earning**  211:*24*
212:*4*, *8*
**earnings**  196:*23*
197:*12*, *13*  199:*15*
**easier**  6:*23*
**East**  2:*12*
**easy**  135:*24*
**economic**  97:*23*
136:*23*  164:*7*
**economics**  15:*13*
**editors**  91:*11*, *17*, *19*

**effect**  178:*22*  182:*11*
**effective**  41:*2*
**effectively**  45:*22*
48:*7*  134:*14*
**effectiveness**  49:*14*
**effort**  55:*18*  67:*11*
192:*4*
**efforts**  29:*17*
**Eight**  5:*21*  79:*21*
80:*2*, *13*  86:*21*
**either**  25:*7*  30:*9*
32:*15*, *24*  35:*8*  42:*25*
55:*17*  104:*17*  107:*9*,
*12*  123:*18*  127:*4*
135:*6*  136:*2*  139:*12*,
*18*  154:*21*  155:*17*
158:*16*  179:*22*
201:*21*  210:*23*  223:*3*
234:*4*  236:*12*
**elaborate**  129:*20*
**elected**  9:*4*, *8*  25:*23*
41:*20*  48:*3*  79:*4*
143:*2*  179:*10*  201:*2*
219:*19*  226:*20*
236:*13*
**electing**  43:*10*
**elections**  26:*1*
**elevated**  93:*1*  94:*24*
212:*16*
**else's**  125:*13*  173:*15*
**E-mail**  2:*7*, *14*
145:*10*  146:*13*, *16*
188:*25*  189:*1*, *3*, *20*,
*22*, *23*  194:*23*  195:*19*,
*20*, *22*  196:*7*, *13*, *19*
197:*7*, *8*  203:*19*
217:*10*  229:*16*  234:*4*,
*6*
**e-mailed**  188:*18*
**embedded**  170:*15*
**embroiled**  50:*12*
**emergency**  99:*14*, *18*
100:*1*  122:*2*
**emotional**  66:*9*
192:*6*  212:*16*  216:*14*
226:*20*
**emotionally**  216:*2*
**emotions**  218:*7*
**emphasized**  142:*10*

**employed**  16:*6*  17:*1*,
*4*, *22*  18:*8*, *10*  34:*16*
98:*17*  175:*20*, *23*
**employee**  44:*14*
59:*14*, *16*  60:*1*, *18*, *21*
65:*10*  71:*2*  75:*13*, *18*
77:*19*  79:*3*  83:*5*
124:*15*  125:*1*  140:*13*
141:*1*, *14*  144:*9*
176:*18*, *24*  183:*15*
217:*6*  231:*12*, *21*
**employees**  36:*5*
44:*24*  60:*16*  61:*10*
66:*10*, *17*, *18*, *25*  67:*5*,
*10*, *19*  76:*20*  79:*4*
102:*20*, *22*  103:*5*, *7*
123:*10*, *15*  166:*23*
167:*4*  168:*9*  176:*2*,
*20*, *23*  216:*14*  226:*20*
238:*19*
**employment**  21:*15*
22:*16*  23:*7*  37:*1*, *2*
62:*2*  85:*15*  106:*18*
166:*8*  196:*1*, *2*, *4*, *8*
**encapsulated**  70:*6*
**encouragement**
159:*19*
**encouraging**  97:*5*
**ended**  118:*24*  169:*17*
**ends**  239:*24*  240:*2*
**engage**  67:*11*
**engaged**  26:*22*  27:*1*
59:*14*, *17*  60:*2*  66:*25*
67:*5*, *10*  71:*19*  74:*2*
**engagement**  23:*22*
24:*22*  25:*2*, *3*, *19*
26:*7*, *10*  27:*6*  36:*9*,
*14*  58:*15*, *20*, *24*  60:*3*,
*5*, *12*, *16*, *23*, *25*  61:*7*,
*8*  64:*1*, *6*, *18*  65:*23*,
*25*  66:*8*, *14*, *23*, *25*
67:*17*, *18*  68:*4*, *16*, *23*
69:*3*, *4*, *10*, *11*  71:*2*
72:*11*, *17*  73:*12*, *23*
75:*18*  77:*17*, *20*
141:*1*, *14*
**engagements**  24:*6*
25:*6*, *8*, *9*, *10*  27:*20*
30:*9*  69:*19*

**engaging**  144:*19*
**engineering**  17:*16*, *18*
**English**  15:*13*
**enrolled**  62:*19*
**ensure**  95:*17*  96:*23*
140:*24*
**ensuring**  113:*2*
**entailed**  201:*10*
**entails**  192:*10*
**entered**  221:*8*
**enterprise**  27:*17*
30:*21*  31:*10*  79:*9*, *19*
80:*2*, *11*, *17*, *23*  81:*15*,
*16*, *19*  102:*18*  113:*1*
116:*14*  118:*4*, *5*
122:*4*, *9*, *21*  123:*2*, *16*,
*17*, *21*, *25*  124:*16*
125:*12*, *14*, *15*, *22*
129:*25*  130:*4*, *6*, *10*,
*13*, *18*  131:*15*, *17*
132:*11*  134:*11*, *16*
135:*4*, *5*  169:*14*
176:*3*  179:*24*  191:*5*
201:*2*, *24*  219:*25*
220:*7*  229:*2*  238:*20*
240:*20*
**entire**  103:*22*  123:*21*
215:*16*  244:*7*
**entirely**  118:*22*
**entities**  236:*11*
**entitled**  4:*5*  54:*7*
**environment**  19:*25*
157:*14*
**environments**  20:*1*
**episodic**  191:*11*
**EPMO**  30:*21*
**equals**  239:*19*
**equate**  60:*2*
**equation**  19:*4*
**equity**  176:*12*
**equivalent**  114:*24*
**Erie**  2:*6*
**ERRATA**  244:*1*, *13*
245:*1*  246:*1*
**erratic**  197:*5*
**erratically**  216:*2*
**escort**  213:*18*  215:*11*
**especially**  152:*18*
154:*19*

Case: 1:21-cv-00238-MRB Doc #: 77-15 Filed: 06/27/25 Page: 81 of 106 PAGEID #: 3803
Deposition of Timothy Spence
Philip R. McHugh v. Fifth Third Bancorp, et al.

**ESPN** 134:*10*
**Esq** 2:*1, 4, 8, 17*
**essence** 158:*10*
**essentially** 156:2
 201:*8* 229:*8* 231:*9*
**establish** 192:5
**established** 123:*6*
**estimating** 148:*14*
**et** 1:*9* 4:*6* 244:*4*
**evaluate** 150:7
**evaluation** 97:*3*
**evaluations** 73:7
**Evans** 146:*5*
**evening** 178:*5*
**event** 42:*13*
**eventually** 62:*15*
 232:7
**everybody** 166:*14*
 229:7
**evidence** 78:*18*
 91:*14* 99:6 100:*14*
 108:7
**exact** 62:*20* 105:*15*
 130:*25* 166:*4* 168:*10*
 179:*15* 196:6
**exactly** 112:*12* 139:*4*
 141:*5* 142:*1* 147:*19*
 168:*25*
**exam** 50:*17* 137:*12,*
*15, 18* 164:*19, 20, 23*
**Examination** 3:*4* 5:*3,*
*13*
**examined** 5:*10*
**example** 30:*13* 53:7
 60:*18* 78:*4* 81:*19*
 82:2 85:2, *6* 87:*7, 15*
 88:*1, 8* 103:9 104:9
 124:*25* 125:*20*
 157:*20* 181:6 182:*11,*
*24*
**exams** 53:2, *5, 6*
 165:*3*
**exceeds** 45:*4* 142:*20*
**excellent** 134:*19*
**exception** 125:*16*
**exceptional** 45:*4*
**excerpt** 237:*4*
**exchange** 51:*10*
 114:*4* 127:*21* 131:*25*
 151:*10* 159:*15*

162:*11* 175:*19*
 185:*13* 192:*25* 195:7,
*20* 196:*12, 13* 204:*10*
 209:*3* 217:9 233:*4*
 239:*14*
**exchanges** 146:*14, 16*
**exclamation** 227:*16*
**exclude** 28:*12* 56:*12*
**exclusively** 53:*14*
**excuse** 47:*24* 51:*15*
 71:*1* 114:*5* 127:*3*
 140:*19* 146:*24*
 147:*24* 199:*4, 7*
 207:*4* 213:*22*
**execute** 45:*22* 124:*8*
**executed** 181:*18*
 183:*22*
**execution** 20:*8* 53:*4*
 118:*22*
**executive** 16:9 30:*15*
 31:*10* 32:9 33:*19*
 37:*24* 39:*14, 20*
 40:*11, 16, 21* 42:*17*
 48:*19* 79:*12* 80:*10*
 92:*19* 99:*3* 110:*18*
 112:*23* 115:2, *24*
 117:*13* 131:*10, 14*
 134:*24* 144:*21*
 201:*24* 218:*1* 224:*1,*
*7* 234:*8, 16* 237:*5*
**executives** 36:*3* 97:7,
*17* 112:*19, 21* 115:6
 147:*15* 181:*20*
 191:*21* 201:2 223:*22*
 229:*3*
**exercise** 26:*24* 27:2,
*15, 16*
**exercises** 29:*17* 31:*4*
 145:*14* 191:*11*
 197:*17*
**exert** 67:*10*
**Exhibit** 3:*7, 8, 9, 10,*
*11, 13, 14, 15, 16, 17,*
*18, 19, 20, 21, 22* 10:2,
*5, 16, 19* 11:9 12:*1, 4,*
*12* 13:*15* 14:*3, 5*
 15:*14* 20:*14, 17* 21:2
 33:2, *5* 36:*18, 23*
 37:*14* 38:*14, 17*
 43:*15, 17* 48:*15, 18*

50:*19, 22* 51:*3, 7, 8*
 57:*10, 13, 20, 23*
 63:*10, 13* 64:*25* 65:*3*
 75:*4, 7* 76:*17* 77:*3*
 79:*14* 93:*15, 16*
 113:*25* 114:*3, 7*
 119:*16, 19* 125:*24*
 127:*17, 20* 128:2
 131:*21, 24* 138:*14, 17*
 140:9 141:*17* 142:*14*
 151:2, *5* 162:*4, 7*
 174:*19, 22* 185:6, *8*
 186:*4* 187:*24* 189:*15,*
*18* 198:*4* 204:6, *9, 15,*
*16, 24* 205:*3, 22*
 206:*4, 6, 15* 208:*8*
 233:*1, 4, 23, 25* 237:*1,*
*3* 239:*9, 11*
**EXHIBITS** 3:6
**exist** 7:*22* 18:*15*
 82:*14*
**existed** 117:*15, 18*
 181:*10*
**existing** 32:*11* 63:8
**exit** 230:*22*
**expand** 145:*19*
**expanded** 44:*3* 88:2
 97:*22*
**expect** 92:*21* 107:*14*
 142:*15* 187:*10*
 188:*18* 206:*5*
**expectations** 116:*23,*
*24* 118:*15*
**expected** 116:*17*
 117:9 187:*9, 15*
**expense** 29:*18* 155:*19*
**expenses** 113:*4*
**experience** 69:*18*
 109:*23* 110:*4*
**experienced** 107:*1*
**expert** 5:*24*
**experts** 30:*11*
**expires** 243:*18*
**explained** 61:*4, 25*
 172:*15* 229:*25* 235:8
**explicitly** 46:7 66:*4*
**exposure** 47:*4, 7, 12,*
*16, 18, 19, 20, 21, 24,*
*25* 48:*1, 8* 95:*5*

**expressed** 81:2
**expressly** 104:*20*
**extended** 202:*8*
**extent** 7:*22* 28:*23*
 83:*10, 11* 84:*15, 20*
 167:*12, 17* 172:6
**extenuating** 42:*8*
 225:*13*
**external** 32:*13* 87:*10*
**extra** 67:*10*
**eyes** 128:*3, 8* 132:*3*

< F >
**face** 20:2
**faced** 117:*21*
**facilitate** 36:2
**facilities** 60:7
**fact** 43:*1* 71:*3*
 135:*5* 171:*17* 182:*19*
 229:*12* 236:*17*
 241:*13*
**factor** 11:2
**factors** 60:*4*
**facts** 91:*14* 99:6
 100:*13* 108:6
**failed** 158:*12* 165:*3*
 169:*15*
**fair** 76:*11, 23* 152:*17*
**fairly** 90:8 147:*11*
 196:*25* 200:*25*
 223:*16, 20*
**fall** 62:*24, 25* 110:8
 111:*3, 7, 10, 22* 112:2
 127:*5, 14* 193:*20*
**falling** 169:*17*
**false** 60:*3*
**fame** 218:*8*
**familiar** 12:7
**family** 42:*8, 17* 62:8
 185:*19*
**far** 169:*17* 201:*5*
 219:*1*
**fastest** 18:*12* 25:*25*
**Fat** 176:*9, 14*
**Favre** 170:*1, 2, 3*
**February** 44:*15*
 93:*16* 100:*24* 101:7
 107:*1* 139:*10, 25*
 142:*22* 143:*17* 144:2

Deposition of Timothy Spence                                                   Philip R. McHugh v. Fifth Third Bancorp, et al.

238:8  243:19
**fed**  89:4
**feedback**  32:18  45:7
97:14, 15  101:17
121:9  129:5  142:16
145:18, 21  146:2, 8,
12  147:17  149:18
152:5  153:21  154:12
159:22  178:23  194:1
**feeds**  123:13
**feel**  6:12  42:11
59:21  170:8
**feeling**  70:11  156:24
**feels**  152:9, 21
**felt**  110:3  153:13, 16
169:19  179:2  187:18
191:19  216:11
217:12
**field**  90:9
**fields**  105:4
**FIFTH**  1:9, 18  2:12,
17  4:6, 18, 19  8:3, 6,
10, 11  9:1, 2, 14, 19,
22, 23  10:10  13:17
15:17  20:17, 21, 22
21:3  26:11, 17  28:5,
15  29:12, 22  33:6
34:3, 25  35:2  36:23
37:3, 10, 16  38:3, 17
39:3  43:18  44:20
46:24  47:4  48:15
57:13, 23  60:24
63:13, 14, 20  65:3, 4,
15  66:1, 5, 6  68:5
70:4  72:15  75:7, 8
76:17, 18  77:4, 18, 20
79:15  81:12  83:15
84:11, 16, 21  86:6
90:16  97:9  98:17
99:3  100:19  101:7
103:23  104:14
106:12, 21  107:21
108:5, 13, 22  109:2,
10, 23  110:5  111:12
112:9, 10, 16  114:3
115:19  117:1  119:19,
20  120:1  125:23
126:19  127:20
130:22  131:24
135:14  136:17, 20, 23

137:2, 5, 8, 24  138:17,
18  139:8, 23  140:10
141:19  142:11, 25
151:5, 6  155:7  162:7,
8  163:9, 13, 17  164:1,
4, 7, 11, 14  166:9, 24
167:4, 13  174:22, 23
175:1  176:2, 20
177:2, 10, 22  179:23
182:15  184:1  185:9
186:5  187:23  189:18
195:10, 17  196:1, 4
204:9  205:2  208:8
213:6  227:3  231:3, 6,
20  232:16  234:1, 2
236:4, 17  237:4
239:12  244:4
**fight**  153:14
**fighting**  153:3
155:14  156:9
**figure**  70:12  135:10
**filed**  50:13  99:16
232:16, 21
**filing**  44:14  232:3, 23
**fill**  102:24  125:8
**final**  92:7  136:12, 15
177:24  181:21
182:17  237:25  238:6
**finalized**  179:9
180:20, 23  181:17
182:9  183:1, 20, 22,
25  191:16
**finally**  188:18
**finance**  17:15
**financial**  16:14
17:14, 19  18:6  19:13
23:16  24:7  26:1, 7
28:16, 20  29:11
36:11  87:11  101:14
109:6  110:15  111:20
112:10, 11, 20, 22, 24
113:8, 9  116:2  117:6,
24  154:15
**financially**  155:24
**find**  189:6, 7  190:3
216:18  229:13, 19
**fine**  152:17  187:1
188:2, 9, 10

**finish**  6:20, 22  16:20
54:1  56:1  89:15
126:10  150:17
**finished**  16:21  56:3
212:24
**FINRA**  137:11, 15,
18  164:18, 20, 22
**FINRAs**  164:20
**firewall**  146:15
**firing**  197:3  215:23,
25
**firm**  36:5  107:10
144:20
**firms**  24:11
**first**  5:9  8:15  21:13
31:18, 20  35:1, 21
39:11  42:18  43:2
64:5  86:9  94:12
101:5, 11, 19  104:24
139:21  140:9  145:4
153:9  165:8, 19, 20,
24  167:21, 22  184:14
186:5  189:23  214:25
239:18
**firsthand**  184:6
**Five**  25:14  28:11, 19
29:10  44:23  78:16
129:24  143:3  198:23
227:15  230:11, 12
**fix**  116:4, 6  118:22
**fixed**  125:5, 7
**flag**  102:6
**flagged**  99:14  149:16
**flat**  140:20
**flawlessly**  113:5
**flipped**  72:13
**floor**  134:13  216:7
218:1, 4  224:1, 3, 7, 8
239:5, 24
**fluctuate**  83:9, 12, 13
**fluid**  202:10  207:16
**focus**  45:21  46:5
64:9  70:24  71:18
74:1  82:2, 16, 18
87:3, 17, 21, 23  92:18,
22, 25  94:15  95:15
104:11  121:3, 6, 16
125:19  128:22  129:1,
6, 9, 15, 18, 19, 22
135:23  142:7

**focused**  19:3  80:11
133:16  135:17
**focusing**  90:14
**folks**  30:10  86:1
88:3  123:18  182:12
**follow**  95:17  96:24
152:16  215:6
**followed**  53:19
113:17
**following**  9:10  51:14
71:16  77:1, 2  100:21,
22  107:1  113:8, 10
178:6  181:14  236:12
**follows**  5:11  54:22
123:8  212:20
**footprint**  83:6, 11
**forbearances**  157:21
**Ford**  114:4
**foregoing**  243:9
**forgetting**  26:15
**form**  45:14  46:13
68:18, 25  89:20
91:13  95:20  99:5
103:18  143:21
147:18  171:3, 21
172:9  173:9  182:4
225:25
**formal**  106:11, 15
114:22
**formalize**  180:11
**formalized**  178:16
**formalizing**  21:15
22:16  37:1
**formally**  36:9  177:9,
15
**format**  12:8  38:23
43:21  117:14
**former**  216:14
**forming**  177:21
**formulated**  150:8
**Forrest**  30:6  114:5
115:1  130:14, 19, 21
131:7, 18  132:23
135:11  238:21  240:5,
13, 16
**forth**  37:15  70:4
82:19, 24  101:22
**fortune**  92:17  201:25
**forward**  97:20  107:7
115:23  117:23  134:2,

5 144:*19* 188:*19*
189:*8, 10* 192:*8*
194:*16* 203:*18, 23*
209:*16* 216:*25* 226:*5*
227:*17* 229:*14*
**forwards** 214:*13*
**fought** 153:*13*
**found** 10:*8*
**foundation** 182:*5*
236:*4*
**founded** 18:*25*
**four** 25:*24* 26:*5*
49:*25* 98:*17* 137:*24*
138:*1* 143:*3* 147:*7*
148:*10* 152:*5* 198:*22*
224:*11*
**fourth** 72:*23* 140:*11*
167:*24* 215:*1* 236:*16*
**fox** 165:*9, 15* 166:*3,
7, 12, 16, 18, 21, 24*
167:*1* 169:*14, 20*
170:*2* 171:*24* 172:*4*
173:*8, 12, 19, 20, 23*
174:*5, 6, 17* 175:*9, 25*
186:*13* 213:*12*
215:*13*
**framework** 65:*22*
66:*24* 67:*17*
**Frank** 30:*5* 114:*4*
115:*1, 8, 10, 11, 21*
130:*14, 19, 21, 24*
131:*7, 18* 132:*23*
134:*7, 18, 19* 135:*6,
11* 213:*18* 215:*10*
238:*21* 239:*5, 19*
240:*5, 7, 9, 12, 16*
**frankly** 135:*8*
**fraud** 142:*5*
**free** 6:*12* 36:*20*
**frequent** 110:*20*
**frequently** 23:*11*
36:*12, 16* 110:*7, 11,
22* 111:*6, 21* 112:*1*
**Friday** 211:*3, 8, 9, 17,
18* 212:*13*
**friend** 60:*11*
**friends** 165:*18*
**front** 60:*8* 66:*3*
79:*21* 135:*8* 188:*1*

**frustrated** 20:*3*
190:*25* 191:*23*
194:*14*
**frustrating** 74:*11*
192:*1*
**frustration** 74:*13*
**frustrations** 154:*13*
**fulfillment** 27:*14*
30:*19*
**full** 15:*16* 62:*15*
**fully** 198:*15*
**fulsome** 107:*6*
**function** 59:*2*
**functional** 75:*20*
**functions** 64:*2, 7*
**funding** 58:*12*
155:*18* 237:*19, 21*
238:*2*
**furious** 233:*7, 15, 19,
20*
**further** 46:*11* 169:*23*
175:*8* 213:*12* 241:*18*
**future** 19:*3* 70:*12,
16* 104:*15*

**< G >**
**gap** 202:*21*
**garbage** 219:*3*
**Garrett** 72:*21*
125:*20, 21* 180:*2*
**gate** 158:*13*
**gather** 32:*24* 124:*5*
149:*10*
**gathering** 32:*9*
**GC** 132:*10*
**gender** 80:*12, 18, 19*
84:*3* 229:*6*
**General** 6:*6* 32:*3, 6*
68:*3* 82:*18* 97:*2*
100:*24* 137:*11, 18*
149:*18* 164:*18*
**generally** 29:*2* 32:*20*
44:*15* 53:*3* 65:*22*
72:*17* 79:*6* 101:*15*
102:*17* 147:*15*
**generate** 25:*8* 141:*15*
**generated** 78:*17*
93:*16, 20* 94:*22*
123:*9*

**generating** 46:*3, 6*
78:*20*
**gentleman** 69:*16*
**genuinely** 203:*17, 24*
**getting** 50:*7* 51:*20*
52:*4, 21* 72:*16*
145:*10* 146:*14* 209:*4,
6* 213:*25* 215:*1*
**gifs** 208:*23*
**give** 7:*2* 37:*17* 52:*5,
10* 54:*9* 62:*22* 72:*14*
78:*2* 96:*11* 97:*17*
128:*14* 146:*1* 153:*20*
160:*7, 13* 188:*20*
189:*10* 190:*13, 23*
197:*20* 201:*6* 220:*5*
229:*10*
**given** 24:*17* 25:*11*
28:*7, 19* 30:*22* 36:*15*
46:*7* 51:*19* 53:*17*
60:*14* 63:*6* 78:*15*
115:*24* 178:*23* 181:*6*
186:*1, 2, 22* 191:*1*
197:*2, 5* 216:*9*
225:*13* 228:*6*
**gives** 123:*21*
**giving** 88:*16* 230:*6*
**glasses** 13:*13*
**Glen** 30:*15, 16, 18*
**global** 70:*18*
**go** 5:*5, 15* 11:*7, 18*
12:*20* 20:*12, 23* 25:*1*
29:*4* 34:*8* 45:*16*
52:*16* 54:*15* 61:*13*
96:*19* 108:*7* 112:*4*
113:*15* 117:*23* 120:*6,
7* 126:*11* 140:*10*
150:*23* 153:*13* 154:*3*
165:*1* 179:*10* 181:*22*
192:*17* 198:*12*
200:*12* 202:*17* 204:*2*
205:*12* 217:*3* 218:*11*
226:*17* 230:*1* 235:*9*
236:*23* 238:*13*
**goal** 46:*23* 47:*3*
64:*13* 82:*17, 19* 83:*1,
2, 11, 12, 13* 87:*16*
113:*20* 216:*18*

**goals** 82:*20* 83:*8, 9*
118:*15, 23* 123:*8, 10*
216:*22*
**goes** 21:*20* 140:*24*
**going** 6:*10* 7:*18, 21*
11:*20* 20:*23* 28:*22*
29:*3* 43:*22* 61:*15*
64:*9* 78:*22* 86:*2, 5,
25* 87:*9* 96:*11, 16*
107:*19* 108:*4, 9, 21*
110:*9, 21, 22* 124:*18*
130:*5* 134:*11* 139:*17*
144:*22* 145:*8* 150:*20*
151:*9, 11, 13* 153:*18*
162:*13* 171:*7* 173:*3*
175:*20, 22* 177:*1*
179:*5* 180:*23* 182:*12,
14* 183:*4, 11, 12*
184:*12* 185:*12, 14, 21*
186:*5, 6* 188:*21*
189:*8, 12* 193:*22*
195:*16* 197:*1, 6, 24*
198:*1, 4, 8, 15* 199:*22*
200:*20, 25* 201:*9*
203:*18, 21, 22* 206:*5,
15* 208:*8* 212:*17*
215:*18, 19* 217:*3, 25*
218:*12* 219:*3* 225:*6*
226:*4, 11* 230:*8*
232:*9* 235:*11, 14*
238:*5* 239:*4* 240:*9*
**GOLD** 82:*20*
**good** 60:*20, 25* 69:*17,
22* 80:*10* 92:*19*
101:*18* 132:*17* 133:*6*
146:*1* 152:*8* 185:*18*
188:*2, 12* 214:*9*
**Good-looking** 11:*23*
170:*5*
**gotten** 121:*9* 214:*21*
**government** 19:*2, 4, 6*
157:*24*
**grade** 11:*16, 19*
13:*11*
**graduate** 15:*9*
**granular** 73:*10, 13*
**great** 53:*8* 54:*23*
115:*3* 145:*20* 239:*18*
**greater** 156:*3*

**green** 116:*13*
**Greenwich** 198:*18, 20*
**Greg** 22:*3, 9* 26:*25*
30:*1* 35:*7, 9, 12, 21,
23* 36:*8, 12* 37:*25*
42:*6, 15, 21* 63:*4*
73:22 74:*24* 87:*6*
94:*10* 95:*23* 96:*1, 22*
97:*5, 14* 98:*25* 99:*1,
8* 100:*6, 18, 20* 101:*5,
11* 103:*23* 104:*5, 10*
107:*3* 108:*8, 12, 16*
109:*1, 8, 12, 21* 110:*3,
8, 24* 111:*2, 10, 13, 16,
22* 118:*4* 119:*8*
121:*8, 12* 122:*15*
130:*11* 131:*3, 8, 18*
135:*12, 16, 17* 138:*25*
139:*9* 144:*8, 9*
146:*10* 147:*22* 148:*7*
152:*7* 154:*16, 24*
155:*1, 5* 160:*16*
161:*12* 178:*2* 179:*13,
24* 180:*11* 181:*19*
183:*1, 4* 184:*13*
185:*3, 21* 187:*8, 20*
189:*4, 25* 190:*10, 13,
23* 191:*5* 192:*11*
195:*7, 13* 197:*25*
198:2 199:*25* 200:*13,
16, 25* 201:*5, 9, 21, 23*
202:*1, 2, 3, 6, 15, 17*
205:*13* 207:*13* 208:*6*
209:*24* 210:*8* 212:*15,
22* 213:*1, 24* 214:*10,
15* 216:*8, 9, 21*
217:*12* 223:*11, 12, 15,
17, 19, 20* 224:*2, 6, 8,
15, 17, 18, 20, 23, 25*
225:*8, 11, 16, 20, 23*
233:*13, 15, 17* 236:*6,
20*
**grew** 71:*1*
**ground** 115:*19*
117:*15*
**group** 36:*1* 53:22
69:*21* 70:*23* 74:*6, 9*
79:*3, 6, 7, 8* 82:*3*
113:*23* 116:*16* 143:*3*
148:22 165:*15*

168:*20* 169:*13*
199:*18* 201:*11* 236:*5,
9*
**groups** 70:*3* 74:*6*
**grow** 94:*17, 18, 20*
101:*17*
**growed** 71:*1*
**growing** 18:*12* 71:*19*
**grown** 19:*24* 20:*2*
**growth** 31:*7* 46:*5, 6*
60:*7* 94:*16* 113:*4, 20*
116:*23, 24* 117:*23*
**guess** 24:*14* 36:*14*
43:*7* 133:*19* 145:*8*
180:*21* 206:*1*
**guessing** 147:*19*
**guidance** 215:*9*
**guy** 69:*17* 116:*4, 6*
119:*8* 140:*6* 144:*22,
23, 24* 145:*9* 146:*4, 7,
11, 17, 20* 147:*2, 23,
24* 148:*6, 7* 151:*18*
156:*17* 159:*10, 14*
160:*14, 16, 19* 161:*7,
9, 13, 16, 17* 170:*5*
**guys** 204:*20* 207:*5*

**< H >**
**habit** 87:*24*
**hair** 170:*6*
**half** 7:*6* 20:*11*
25:*24* 49:*25* 71:*16*
79:22 80:*15* 86:*23*
146:*25* 147:*1* 148:*13*
193:*11* 210:*16*
**hall** 210:*17, 22*
**halo** 153:*2* 156:*9*
**Hamilton** 15:*8* 243:*3*
**hand** 116:*20* 243:*12*
**handed** 10:*4, 18*
12:*3* 20:*16* 33:*4*
36:22 38:*16* 43:*17*
50:*21* 51:*4* 57:*12, 22*
63:*12* 65:*2* 75:*6*
114:*2* 119:*18* 127:*19*
131:*23* 138:*16* 151:*4*
162:*6* 174:*22* 185:*8*
189:*17* 204:*8* 233:*3,
25* 237:*3* 239:*11*

**handful** 56:*23*
123:*18* 138:*1* 147:*16*
**handle** 162:*19*
**handling** 30:*19*
146:*2* 163:*11* 206:*18*
**hand-over** 194:*10*
**Hang** 204:*25*
**happen** 62:*18* 115:*3*
182:*9, 22*
**happened** 18:*17*
19:*11* 101:*15* 109:*17*
143:*7* 158:*12* 170:*5*
182:*20* 185:*5* 196:*11*
197:*4, 7*
**happening** 181:*21*
**happy** 63:*6* 150:*21*
188:*8* 190:*16* 192:*23*
**hard** 59:*24* 74:*3*
78:20 146:*14* 157:*25*
158:*1, 3* 159:*1* 193:*5*
**Harden** 53:*8, 20*
54:*23*
**Harden's** 55:*2*
**harder** 59:*18*
**Hart** 4:*15*
**head** 6:*16* 21:*22*
22:*13, 19* 23:*25*
24:*15* 31:*6* 35:*17*
36:*1* 38:*6, 8* 39:*4, 14,
21* 40:*11, 13, 22*
41:*16, 17* 43:*9* 44:*4*
47:*20* 48:*4, 19* 49:*11,
18* 50:*4, 16* 55:*3*
56:*16, 17, 19, 21*
61:*21* 69:*16* 70:*18*
71:*25* 72:*3, 7* 76:*1*
83:*2* 85:*10, 19*
105:*20* 109:*4* 120:*22,
23* 125:*3* 136:*20, 23*
137:*2, 5, 8* 150:*13*
164:*4, 7, 11, 14*
173:*17* 176:*17*
180:*16* 182:*16, 17*
183:*17* 193:*8, 17*
210:*1, 25* 215:*20*
216:*20* 224:*10* 226:*7*
231:*8*
**headed** 215:*7* 216:*11*
**Heading** 114:*11*
**health** 128:*6*

**hear** 6:*11* 136:*3*
166:*2, 6* 190:*5*
199:*25* 220:*8*
**heard** 158:*19* 165:*10,
19, 20, 23* 167:*10*
189:*12* 209:22 210:*3,
8* 216:*6, 7* 218:*3, 4*
221:*13, 21*
**hearing** 51:*19*
**he'd** 192:*23* 224:*4*
**held** 23:*23* 24:*2*
27:*16*
**help** 32:*25* 43:*3*
122:*23* 153:*24*
**helped** 146:*18*
**helpful** 93:*4* 190:*16*
211:*4*
**hereinafter** 5:*10*
**hereof** 244:*13*
**hereunto** 243:*12*
**hierarchal** 24:*13*
**high** 14:*10, 13* 69:*3,
4* 72:*17* 81:*21*
123:*18*
**highest** 72:*10, 23*
78:*12, 14, 25*
**Hills** 7:*3*
**hire** 35:*6, 7* 88:*8*
107:*11* 155:*20*
**hired** 37:*16* 38:*3*
45:*25* 69:*14*
**hires** 80:*13*
**hiring** 83:*16* 84:*12,
16* 85:*7* 87:*18*
**historically** 82:*4*
**history** 12:*11* 26:*1*
88:*18* 112:*17*
**Hoffman's** 185:*20*
**Hold** 48:*17* 65:*5*
188:*13* 205:*15*
**holding** 159:*18*
**holistic** 90:*15*
**holistically** 81:*14*
**home** 158:*20*
**homes** 157:*16*
**honest** 92:*19*
**honorable** 91:*2*
**hope** 185:*18* 189:*24*
217:*11*

Case: 1:21-cv-00238-MRB Doc #: 77-15 Filed: 06/27/25 Page: 85 of 106 PAGEID #: 3807

Deposition of Timothy Spence                              Philip R. McHugh v. Fifth Third Bancorp, et al.

**hoped** 189:6 192:1, 8 195:11 203:25
**hopeful** 216:23
**hot** 209:5
**hour** 147:10 148:14, 17 210:15
**hour-long** 147:18
**hourly** 18:10
**hours** 146:25 147:1, 16 148:11 151:21 198:22, 23 207:16
**house** 209:5 229:18
**housed** 114:20
**household** 116:23
**Hoyer** 35:25
**HR** 75:21 85:19 102:14 105:4, 9, 12, 14, 25 106:6 109:4 120:6 124:5 154:22 159:16, 20, 22, 24, 25 196:10 220:21
**huh-uh's** 6:17
**human** 35:11 39:3 43:23
**hundred** 85:25 87:7
**hundreds** 53:3, 18
**hypothetical** 171:5, 6, 9 178:11, 14
**hypothetically** 124:5

**< I >**
**ICE** 27:11, 13
**idea** 126:21 127:2 129:17 182:13 208:16
**identification** 10:2, 16 12:1 14:3 20:14 33:2 36:18 38:14 43:15 50:19 57:10, 20 63:10 64:25 75:4 113:25 119:16 127:17 131:21 138:14 151:2 162:4 174:19 185:6 189:15 204:6 233:1, 23 237:1 239:9
**identified** 140:25
**identify** 4:22 10:5, 19 11:9 12:4 14:5 21:2, 6, 9 36:24

**38:18** 43:19 57:14, 24 60:15 63:15 65:8 75:11 86:20 120:2 138:20 189:19 228:9, 19 234:3
**imagine** 9:6 134:21 190:1 208:13 231:12
**Immaneni** 55:14
**immediate** 16:16 19:21 24:9, 12, 14, 19 88:9
**Immediately** 9:10 42:25 43:6, 7 131:4 197:21 216:14 222:18 236:12
**immunocompromised** 157:16
**impacted** 143:10
**impatient** 156:24 158:11
**implanted** 60:23
**implement** 82:9
**implemented** 81:11 140:25 236:19
**implications** 158:4
**implicit** 170:11, 13 171:2, 19 172:6 173:7, 11
**importance** 181:7
**important** 59:13, 16 70:24 232:24
**importantly** 216:14, 17
**imposed** 170:10
**impossible** 172:10
**improve** 27:13 56:15, 21 58:25 61:12 64:6 92:21 101:18 141:1
**improved** 45:8 50:8 52:1 56:17 73:2, 8
**improvement** 26:21 29:17 55:19 64:1, 5 86:9 92:23
**improving** 69:10
**inappropriate** 122:21
**incident** 217:14 218:12 219:21 220:12, 17, 20, 22, 25 221:3, 5, 22, 25 222:2,

5, 7, 11 223:3, 6, 8
**incidents** 217:23
**inclined** 139:7, 11
**include** 28:12, 13 37:5 44:4 145:23
**included** 39:15 44:25 50:13, 15 55:10, 12, 15 73:17 76:24 81:25 92:22 122:9 124:24 168:14 224:2, 8 229:3
**includes** 68:7
**including** 36:4 55:20 60:10 95:9 113:4 118:4 145:24 185:20 187:17
**inclusion** 79:18 167:13, 18 168:4, 15
**income** 183:15
**incomplete** 205:23
**inconsistent** 229:4
**incorporate** 17:16
**incorrect** 148:5
**increase** 187:11 237:12, 23 238:5, 7
**increased** 237:24
**incremental** 94:23
**indicate** 40:19 53:14 57:2 74:18 86:9 108:3 109:21 120:21 122:18 125:1 131:18 144:13 145:2 152:20 155:2 156:10, 22 162:17 177:16 179:18 187:4 188:1 190:22 193:2 194:17 195:2 198:7 202:12 208:20 212:23 230:11, 18 233:6 240:12, 15
**indicated** 24:1 53:11 61:20 72:5 95:2 99:1, 8 101:11 103:13 107:3, 9, 13 108:8 110:3 119:23 120:5 125:5 139:10, 12 141:8 143:18 144:4, 11, 14, 17 150:5 155:6 188:7 192:15 193:4, 7

194:4 195:5 197:1 200:19, 24, 25 201:4, 5, 11 203:17 212:11 213:25 214:4 226:25 228:23 244:12
**indicates** 12:12 13:16 15:16 33:18 39:2, 11 40:9, 15 48:18 51:14 66:8 126:15 140:13 185:18 213:21 239:17
**indicating** 74:25 96:23 203:9
**indication** 240:1
**indicator** 74:3
**indicators** 73:25
**indirect** 92:4
**indirectly** 26:23
**individual** 43:8 60:4 69:22 92:5 122:20 154:21 170:6 171:1 179:4 181:8
**individuals** 123:21 125:12
**industries** 36:4
**industry** 83:3 97:8
**inevitably** 155:24
**inference** 52:8, 15 78:21 97:11
**influence** 135:13, 17
**inform** 179:14 181:21 183:5
**information** 6:24 32:8, 16 45:1 61:11 77:14 89:4 97:18 102:13 103:4, 6 114:23 120:7, 10, 11, 20 121:12, 19 124:6 126:21 128:6, 10 135:23, 25 147:3 149:9 161:4, 6, 7 187:21 190:15 191:3 192:22 201:16
**informed** 149:20 177:1, 3, 9, 20 179:5, 7, 12 197:25
**ingestion** 60:13
**initial** 32:17 145:6 147:5, 6, 15 161:10

Deposition of Timothy Spence          Philip R. McHugh v. Fifth Third Bancorp, et al.

**initially** 37:*15*
113:*16* 144:*14*
157:*14* 169:*15*
**initiate** 107:*16*
**initiating** 169:*23*
**initiatives** 110:*13, 19*
**innovation** 26:*21*
29:*16* 36:2 46:6
**input** 30:*10* 32:*18,*
*24* 58:*20, 23* 102:*10,*
*15* 122:*13* 123:22
125:*18* 129:*19*
145:*16* 180:*10* 181:*3*
**insane** 215:*13*
**inside** 32:*10* 47:4
48:*2* 52:*23* 69:*23*
74:*14* 78:22 79:*3*
80:*14* 86:*1* 117:*21*
146:*15* 173:*17*
229:*15, 19*
**insinuation** 224:*16*
**insistent** 210:*1* 217:2
218:9
**Inspector** 6:6
**institution** 101:*14*
109:6 111:*20*
**institutional** 12:*13, 23*
**institutions** 16:*15*
19:*13* 20:2 23:*16*
24:7 26:8 28:*16, 21*
29:*10, 11* 156:*1, 2*
**instructing** 52:*15*
**instructions** 6:*25*
**insurance** 142:*25*
143:5
**integrally** 159:*17*
**integration** 112:*24,*
*25* 113:2, 9, *10, 15*
115:*13* 116:*12* 117:*8,*
*11*, 20, *23* 118:*12, 13*
119:*4, 13, 15*
**integrative** 27:*10*
**intellectual** 25:8 66:9
**intelligence** 31:*2, 3*
**intend** 215:*20*
**intended** 53:*19, 20*
160:*17* 168:22 169:*5,*
*7* 189:*14* 200:*24*
202:*19*

**intense** 67:*1*
**intensive** 42:9
**interacted** 31:*5*
**interaction** 92:4
**interest** 19:*7* 102:8
153:8, *14* 154:*11*
155:*7*
**interested** 106:22
107:*7* 120:*18, 21*
125:6
**interesting** 188:*17*
**interests** 153:*19*
**interim** 99:*14, 18, 23*
**intern** 18:8
**internal** 6:*5* 67:*19*
87:*10*
**International** 107:*11,*
*14* 144:*20*
**interpretation** 52:8
224:*18*
**interpreted** 101:*10*
**interview** 90:8 92:6
146:*4, 20, 21, 24*
147:*16* 148:*5*
**interviews** 32:*10*
149:6
**introduce** 4:9
107:*15* 140:6
**introduced** 70:8, *10*
144:24 145:9
**introducing** 71:8
176:*24*
**inventory** 32:*11*
**invest** 155:*20* 156:4
178:*25*
**investigation** 6:*5, 7*
**investing** 90:*13*
**investment** 12:*14, 23*
13:*17* 21:*15, 22*
22:*13, 17, 19* 31:6
38:8 137:*15* 153:*3,*
*12* 155:*14* 156:9
164:22
**investor** 22:*17*
196:22 199:*17* 212:8
**investors** 197:*13*
**invitation** 234:*5*
**involve** 53:*3, 17*
**involved** 20:7 30:22
31:*10, 23* 32:8, *12, 16*

91:6, *20* 106:*15*
108:*15* 115:*18*
124:*11* 126:24, *25*
127:*1* 159:*17* 163:*11*
167:*15* 182:*12* 184:2,
*3, 5* 232:22
**involvement** 29:*22,*
*25* 30:23 66:9 102:9
167:*12, 17*
**involves** 55:*17* 236:*3*
**involving** 5:*23*
**irrelevant** 14:9
78:*15* 128:5 166:*25*
231:*23*
**IRS** 6:*2*
**issuance** 238:*11*
**issue** 10:24 11:*1, 2, 4,*
*6* 113:*17, 21* 114:*19*
115:*11* 119:*10*
150:*10* 180:*10*
**issues** 8:5 45:*10, 15*
74:5 113:*16* 114:*13,*
*16* 116:*21* 117:*15*
142:*10* 149:*3* 151:*25*
154:*20*
**item** 149:*16*
**items** 142:*18* 149:*15*
152:5 159:6, 7 160:*8,*
*23* 161:*1* 179:22
185:*20* 236:*15*
**its** 36:*3* 113:6 181:6

**< J >**
**Jackson** 1:*20* 243:*5,*
*18*
**Jamie** 112:*23* 118:*5*
166:*13* 176:*15*
218:*16* 219:*9, 11*
**Jane** 124:*4*
**January** 10:*1* 15:*16,*
*21, 23* 16:25 21:*12*
22:*25* 23:*4, 10* 24:*2,*
*5* 87:6 98:8 100:*23*
101:*7* 107:*1, 17*
139:*3, 10, 25* 239:*15*
**January/February**
101:*1*
**jeeze** 212:*18*
**Jms@sspfirm.com**
2:8

**job** 12:*11* 41:*18*
42:*13* 46:9 51:*23*
63:*4* 70:2 80:*10*
101:*18* 158:5, *6*
163:*14, 15, 18* 216:*17*
**Joe** 30:*4* 124:*4*
**John** 16:*10, 11, 18*
17:*1, 3, 5, 7* 19:*11, 14,*
*16, 23*
**joined** 10:*10* 17:*3*
26:*19* 34:*21* 36:8
69:*13* 70:2, *17, 21, 22*
71:*14* 79:*13* 119:*12*
167:*23*
**joining** 27:2 101:*12*
**joke** 176:*13*
**jokes** 211:*25*
**joking** 166:*15*
**Joshua** 2:*4* 4:*13*
**JP** 70:*20*
**JPEG** 208:*13*
**July** 147:6 151:*14*
**July/August** 122:*8*
**jumped** 117:*1*
**June** 33:*16* 34:*7*
40:*15* 97:*21* 146:*22,*
*23*

**< K >**
**Kabat** 26:22 29:*20*
34:*3* 35:*3, 12*
**keep** 48:*25* 49:*4*
**kept** 124:*20, 21*
**Kevin** 26:22 34:2
35:*3, 6, 12* 125:*3*
**key** 36:*3* 104:*12*
121:2, *3, 5, 15, 16*
124:22 125:*19*
128:*21, 25* 129:6, *9,*
*15, 18, 21*
**kid** 11:*23*
**kids** 62:*19*
**Kincentric** 75:*14*
141:*5*
**kind** 168:8 194:*11*
**kinds** 128:6
**Kleindienst** 105:*13*
**knew** 172:*13* 182:2
184:*18*

Deposition of Timothy Spence　　　　　　　　　　　　Philip R. McHugh v. Fifth Third Bancorp, et al.

**know** 10:*23* 11:*18*, *19* 13:2 20:*19* 23:*10*, *23* 24:*1* 26:9 28:*24* 32:4 38:5, *13*, *24* 41:7 42:*12* 44:*20* 46:22 47:*15* 48:*13*, *25* 52:23 59:*13* 61:2, 7 69:*17* 76:*12*, *25* 77:*12*, *16* 78:*3* 81:*13* 84:*3*, *7*, *19*, *25* 85:2, *17*, *18* 89:8 90:*3*, *6*, *18* 91:*19* 92:7 93:5 96:*11* 97:9, *25* 99:7, *11* 108:*15* 110:*20* 111:*8*, *15*, *23* 112:*3* 114:*16* 120:*19* 121:5 122:*14* 124:*4*, *12*, *13*, *14* 128:4, *22* 129:*20* 130:2 131:*18* 132:*14* 133:*1*, *13*, *20* 134:7 138:5, *12*, *13* 143:6 147:*12* 149:*16* 150:*15* 152:*10*, *22* 159:*12*, *15* 160:*17*, *18*, *21*, *24* 161:*1*, *3* 167:6, *10* 168:9 170:*3*, *9* 171:*6* 172:*10*, *17* 173:*25* 174:*8* 179:*1*, *9* 181:*16* 182:6, *17*, *22* 183:8, *11* 184:4, *6*, *13*, *14*, *16*, *17*, *18* 185:2, *4*, *25* 187:*14* 191:2 193:*16* 195:*15*, *21* 196:*10* 198:*14*, *20* 200:7, *9* 201:*14* 203:*24* 206:2 208:7 209:8 210:7 211:5 214:*20* 216:*8* 217:2, *3*, *5*, *12* 218:4, *10* 219:2 220:*13*, *18*, *21* 221:*1*, *11*, *12*, *13*, *24* 222:*3*, *15* 223:7 227:*10* 231:*17*, *18*, *20* 232:*10* 233:*11*, *12*, *13*, *15*, *17*, *22* 236:*21* 237:*11*
**knowing** 115:*19* 157:*23*

**knowledge** 39:*24* 73:*21* 84:*15*, *20* 86:*1*, *3* 97:*11* 135:7 184:6
**known** 102:*17* 162:*24* 222:5
**knows** 186:*11*
**Kosch** 30:*1*
**Kris** 72:*20* 125:*20*, *21* 180:2
**Kroger** 36:5

**< L >**
**label** 66:*1*
**lack** 115:*15* 116:7
**lacked** 109:22 110:*4*
**laid** 70:7 82:*20*
**lake** 209:5
**Lamb** 64:*24* 72:*20* 125:*16*
**Lane** 7:*3*
**language** 218:8
**large** 16:*14* 23:*15* 24:6 45:*11* 52:*24* 74:9 85:*11* 101:*14* 109:5 111:*20* 145:*21* 158:8 181:*11* 182:*13* 226:22
**largely** 18:*24* 46:*4*
**larger** 20:2 70:*19*, *21* 83:*3* 182:*15* 183:*13*
**largest** 19:*11* 26:*14* 112:*16*
**Lars** 115:*16*, *23* 119:2 153:*3*, *4*, *21* 154:6, *7* 156:9 216:5 218:*1* 219:*21* 220:*19*, *23* 221:*14*, *15*, *16* 223:7 241:*4*, *5*, *7*
**late** 34:*21* 139:*3* 146:6, *22* 147:6 179:9 193:*19*
**laugh** 232:2
**laughing** 211:*25*
**launch** 158:*12* 169:*15*
**launched** 94:*19*
**Lavender** 125:*3*
**law** 24:*11*
**lawful** 5:9

**lawsuit** 8:*15* 50:*13* 99:*16*
**lawsuits** 232:*12*
**lawyer** 232:*10*
**lead** 112:*25* 214:2
**leader** 53:*23* 54:*1*, *2*, *21* 71:*11* 119:5 154:*22* 158:5, *6* 159:*16* 182:*10* 189:6 192:*19* 202:*1*
**leaders** 86:*15*
**leader's** 60:*14*
**leadership** 46:*12* 50:7 51:*20* 52:*3*, *20* 53:*13*, *14*, *15*, *24* 54:*19*, *20* 55:9 60:*15* 70:*16* 81:*20*, *21* 115:*15* 116:7 118:*21* 191:*6* 195:9 217:*11* 229:*14*
**leading** 24:6 52:2
**learning** 45:*19*
**leave** 9:*4*, *8*, *11* 18:*23* 19:*23* 34:*24* 35:*19* 43:*10* 132:*20* 150:*18* 157:*16* 192:*20* 195:*23* 196:*3* 197:*1* 200:*24* 201:2 209:*18* 219:*19* 223:*15* 228:*25*
**leaving** 17:*23* 201:*13* 218:9 225:5
**led** 27:*4*
**left** 14:*15* 20:9 166:9 169:*25* 201:*14* 212:*25* 213:*4* 217:*1* 223:*22* 229:*3*
**legal** 8:*3*, *10* 9:*1*, *19* 85:*21* 114:22 232:*25*
**lending** 90:*13* 95:*10*
**length** 147:*20*
**Leo** 176:9, *14*
**Leonard** 112:*23* 118:5 166:*13* 176:*15* 218:*16* 219:9, *11*
**letter** 21:*10*, *14*, *20* 22:2, *16* 33:*15* 34:2 37:*1*, *8*, *12* 106:*18*
**letterhead** 37:*4*
**letting** 195:*15*

**lawsuit** (see above)
**level** 69:*20* 81:*16* 124:*16* 154:*20* 179:*3* 201:2, *24* 229:2 237:*21*
**levels** 58:*12* 93:*1*, *6* 94:*24* 95:*3*
**Lewis** 30:*15*, *17*
**Life** 26:*13* 225:*14*
**liked** 193:*10*
**likelihood** 60:*20*
**likes** 131:*18*
**limbo** 201:*8*
**limited** 79:5 81:6 99:*24* 100:*1* 109:*11*
**line** 37:5 46:*11* 68:5, *23* 75:*19*, *20*, *21* 77:*17* 128:*14* 204:*16* 206:*13*
**lines** 31:4 68:7 74:*14* 76:*19* 141:6 180:*1*
**link** 145:*10*
**list** 145:*19*
**listed** 68:*13* 76:*20* 180:8 205:*3* 235:*20*
**Listen** 96:*10* 190:*17* 192:*24* 220:*4*
**listening** 221:2, *4*
**lists** 12:*11*
**literally** 135:*21*
**litigated** 10:*23*
**litigation** 8:2, *21* 9:*18*
**little** 153:*25*
**live** 7:7 179:2
**lived** 7:5 88:*3*, *4*
**living** 62:5
**LLP** 2:*11*
**load** 25:7
**loan** 94:*25* 95:*1*, *8*, *9* 157:*21*, *23* 183:*14*
**lockdown** 157:*11*
**logical** 115:*24*
**logo** 66:5
**long** 7:5, *9* 16:*18*, *25* 17:*22* 19:*14* 25:*12*, *18*, *21* 26:2, *5* 34:*16* 47:6 56:*20* 79:*13* 87:4 104:*10* 105:*14* 138:6 146:*24* 147:*8*, *19*, *22*, *25* 148:*20*

Case: 1:21-cv-00238-MRB Doc #: 77-15 Filed: 06/27/25 Page: 88 of 106 PAGEID #: 3810
Deposition of Timothy Spence
Philip R. McHugh v. Fifth Third Bancorp, et al.

151:*21* 185:*18* 191:*4* 220:*25* 221:2, *8* 240:*4*

**longer** 56:*19* 193:22

**look** 11:*18* 25:*1* 54:7 73:*24* 76:25 103:*11* 118:*12* 120:*16* 121:8 162:*18* 205:*20*

**looked** 11:*25* 37:*18* 221:*14* 229:*16*

**looking** 11:*20* 42:*20* 74:*4* 76:*18* 92:*20* 205:*6*

**looks** 4:*20* 11:*10* 12:*8* 64:*10* 208:*24*

**loose** 133:*9*, *15*, *18*

**lose** 226:*20*

**loss** 27:*21* 113:*18* 142:*5*

**lost** 116:*16*

**lot** 10:*23* 18:*13* 24:*11* 30:*19* 70:8 71:*8* 73:25 85:*13* 87:9, *10* 89:6 90:9 91:*4* 103:*4* 128:5 130:*18* 133:*17* 147:*16* 149:*17* 150:*9* 156:*1* 157:*18* 176:*18* 187:*21* 200:*9* 217:*10* 226:*23*

**loud** 221:6, *9*

**loudly** 216:6 218:*3*

**Louisville** 13:*18* 14:*23* 15:*18*

**loved** 134:*19*

**lowest** 68:*16*, *23* 69:6 71:*3* 77:*19*, *23*

**lunch** 150:*21*

**Lynch** 105:*16*, *18* 106:*6* 160:2

**< M >**

**machine** 123:*5*

**Magazine** 88:*12*, *16*, *21* 89:6, *10*, *13*, *18* 90:*4*, *19*, *25* 91:6, *10*, *23*

**magnitude** 194:*5*

**main** 239:*23*

**maintain** 63:7 225:*4*

**maintaining** 178:*18*

**major** 15:*12* 19:6 26:*20*

**majority** 26:*20* 54:*21* 130:*3*

**makeup** 87:*14*

**making** 32:*19* 70:*24* 71:*18* 74:*1* 95:9 97:*18* 104:*11* 135:*17* 149:*1* 154:*10* 156:*24* 190:*16* 192:*23* 200:*23* 231:22

**manage** 6:*19* 16:*12* 58:*21*

**managed** 30:*12* 169:*16* 226:*12*

**management** 9:7 24:*8* 29:*15*, *18*, *19* 30:6 38:7 44:*4*, *13* 48:*1*, *20* 49:*12* 53:*4* 55:*15* 64:*21*, *23* 72:*1*, *4*, *10*, *20* 78:*24* 100:*4*, *25* 101:*16* 112:*25* 113:*14*, *19* 115:*13*, *25* 116:*14*, *15* 117:*13* 118:*23* 123:*3* 137:*5*, *8* 164:*14* 180:6 183:*6* 236:*3*, *4*

**manager** 17:*14* 23:*22* 24:*22* 25:*2*, *19* 26:*7*, *10* 118:7 121:7 125:*18*

**managers** 87:*11* 103:*8* 114:*22* 123:*10*

**managing** 154:*13*

**Mansion** 191:*6*, *12*, *15* 193:*5*, *14*, *22*, *25*

**manually** 114:*23*

**March** 14:*21*, *24* 15:7 145:*8*

**mark** 192:2

**MARKED** 3:6 10:*2*, *4*, *16*, *18* 12:*1*, *3* 14:*3* 20:*14*, *16* 33:*2*, *4* 36:*18*, *22* 38:*14*, *16* 43:*15*, *17* 50:*19*, *21*, *22* 57:*10*, *12*, *20*, *22* 63:*10*, *12* 64:*25* 65:*2*

75:*4*, *6* 113:*25* 114:*2* 119:*16*, *18* 126:*23* 127:*17*, *20* 131:*21*, *23* 138:*14*, *16* 151:*2*, *4* 162:*4*, *6* 174:*19* 185:*6* 189:*15*, *17* 204:6, *8* 233:*1*, *3*, *23* 237:*1* 239:*9*

**market** 17:*14* 31:*1*, *2* 88:*4* 118:*24* 142:*24* 143:*2* 162:*24* 210:*24* 236:*9*

**marketing** 16:*10*, *12* 98:*12* 178:*19* 180:*8* 235:*24*

**markets** 83:6 87:*14* 110:*16*

**markup** 20:*8*

**married** 7:9

**Mary** 30:6

**mast** 133:*23*

**match** 64:*14* 86:*25*

**matched** 87:*14*

**matching** 64:2, *11* 86:*10*

**material** 78:5 124:*12*, *23*

**materialize** 217:*1*

**materialized** 104:*22*

**materially** 19:*18* 117:*1*

**materials** 32:*23*, *24* 33:*1* 39:*15*

**matter** 5:*23* 30:*11* 141:*12* 195:*23* 201:*24* 228:*1* 230:7 244:*8*

**matters** 24:7 232:*25*

**Maxwell** 105:*17*

**MB** 110:*15* 112:*10*, *11*, *20*, *22*, *24* 113:*8*, *9* 114:*21* 115:*2*, *7*, *19* 116:*2*, *11* 117:*6*, *23* 118:*7*, *13*

**MCHUGH** 1:6 2:*14* 4:*5*, *12*, *14* 8:*6*, *10*, *14*, *18*, *23* 9:*1*, *8*, *14*, *22* 12:*12* 13:*2*, *16*, *24* 14:*21* 20:*18*, *21*, *22* 21:*3* 23:*2* 30:*1*, *23*

31:*5*, *14*, *16*, *18*, *21* 32:*1*, *13*, *18* 33:*6*, *15* 34:*6* 36:*24* 38:*3*, *11*, *17* 39:*13*, *20* 40:*10* 41:*5*, *21* 42:*24* 43:*18* 48:*16*, *18*, *23* 50:22 51:*1*, *11*, *13* 53:*23* 55:*4*, *21* 56:7, *16*, *17*, *19*, *20* 57:*13*, *23* 58:*1* 63:*14*, *21* 65:*3*, *4*, *15* 71:*25* 72:*3*, *15* 75:*8* 76:*17*, *18* 77:*4*, *18* 78:7 79:*15* 86:6 98:*20* 99:*2*, *25* 100:*7*, *11* 114:*3* 115:*16* 116:*3*, *4*, *6*, *10* 117:*5*, *16*, *19* 119:*19*, *20* 120:*1* 125:*23*, *25* 126:*3*, *6*, *15*, *18* 127:*20* 131:*24* 138:*2*, *10*, *17*, *18* 140:*10* 141:*19* 142:*12*, *23* 143:*4* 149:*21* 151:*6* 153:*7*, *8* 155:*2* 162:*8* 165:*9* 166:*1*, *3*, *7*, *11* 172:*11* 173:6 174:*16*, *23* 175:*1*, *12*, *20* 180:*2*, *16* 182:*15* 183:*5*, *12*, *13* 185:*9* 186:*6* 187:*23* 188:*25* 189:*18* 192:*12* 194:*24* 195:*2*, *10* 196:*13* 197:*10* 203:*10*, *15* 204:*9* 205:*2* 208:*1*, *9* 209:*14* 211:*17* 212:*1* 213:*6*, *14* 217:*6* 218:*15*, *19*, *21* 220:*11*, *14* 221:*24* 223:*10*, *11* 227:*3*, *21* 228:*3*, *10* 229:*23* 230:*11*, *15* 232:*17* 234:*1*, *2* 239:*13* 244:*3*

**McHugh's** 8:*11* 9:*2*, *3*, *10* 44:*3* 97:22 98:*25* 143:*16* 144:*3* 154:*23* 195:*25* 196:*7* 218:*23*

**McMinville** 17:*9*, *11*

Deposition of Timothy Spence                                      Philip R. McHugh v. Fifth Third Bancorp, et al.

**mean** 59:21 66:14
68:19 80:17 83:19
85:24 86:13 99:19
119:12 126:23
129:19 133:12
134:10 141:11 143:8
153:6 156:14 159:12
160:22 162:20 168:7
171:18 176:17 188:5,
9 202:18 210:21
227:22 240:25
**Meaning** 80:20
**means** 99:23 115:11
134:7 187:16 198:15
210:22 215:21
**meant** 115:10
134:18 187:14 188:6
192:24 210:4 228:13
**measure** 54:18, 19
58:16, 22 60:19, 20
61:1 69:5 73:3, 20
78:15 79:1
**measures** 73:6 81:16
**meet** 31:14, 16, 18, 20
35:21, 23 110:19, 21
111:6 120:5 131:7
181:20, 23 183:4, 12
191:13 234:15
**meeting** 39:15
107:14, 18 108:3, 20
109:8, 21 110:2, 7
122:23 123:19
124:18 125:9, 11
129:25 130:13, 16, 18
131:17 134:16, 24
135:5 136:5 140:1, 6
144:23 146:7, 17
147:2, 5, 6, 8, 21, 25
148:6, 7, 18, 20
160:16, 18 162:1
163:20 177:20 178:4,
7 182:1 185:1, 25
193:14, 22 196:25
197:11, 18 199:13, 15,
19 200:6, 16, 18
201:16 212:4, 6, 9, 22,
24 219:25 220:7
234:5, 7, 22 235:13
**meetings** 31:25
110:25 111:9 118:16

119:15 122:19
124:20, 22, 24 130:4,
7, 10, 19 134:11, 17
136:10, 11 161:17
183:9 194:21 196:23
197:14, 16, 17
**Melissa** 214:11
**member** 67:1 102:6
113:1 118:6 122:5
124:1 125:12 135:4
137:21 165:6 179:25
192:9
**members** 9:7 31:11
36:3 79:7 102:18
122:10, 21 123:2
124:16 131:15
238:20 240:20
**member's** 125:16
**memory** 36:7 96:4
150:12
**mention** 131:13
154:6
**mentioned** 28:18
29:20 69:14 85:11
112:9 142:18 146:20
148:5 169:24 209:23
217:10 221:21
223:10 234:18
240:21
**mentions** 91:2
**merchandising** 19:12
**mere** 171:17
**merely** 37:12 163:8
195:5 221:13
**merit** 237:24
**mess** 162:22, 25
**message** 51:10, 13, 24
114:4, 6, 10 115:8, 9
127:21, 23 128:17
131:19, 25 132:8
133:20, 22 151:10, 14
160:4 162:11, 13
163:4 175:18 185:13,
14 186:7 187:25
188:14 189:21, 22
192:10 198:6, 10, 17
204:10, 18, 22 205:4,
10, 23 206:3, 7 209:3
213:7 227:4 233:4
239:14, 15

**messages** 42:1, 3, 21
50:25 192:14 199:22
207:15 209:23
215:17 227:1
**messaging** 156:8
**met** 7:13 36:9, 12
110:11 119:7 146:10
234:17, 19
**methodology** 60:23
78:19
**MetLife** 26:12
**Michael** 2:8 4:15
64:24 72:20
**Michael@blankrome.c
om** 2:14
**Michigan** 206:23
**microaggression**
168:16, 18, 21 169:4
**middle** 13:12 71:13
118:24 142:24 143:2
150:18 236:8
**mid-February** 139:3
**mid-June** 147:6
**mid-October** 9:11, 14
**mid-summer** 146:22
**mid-year** 98:25
109:12, 15, 18 123:12
**Mike** 64:24 72:20
**million** 158:18
**Milton** 238:24 239:3,
7, 19, 21 240:6, 7, 8
**mind** 51:17 157:22
159:4 163:1 165:11
239:8, 24 240:10
**mindful** 95:17 96:23
**mine** 90:10
**minimum** 47:11
86:20
**Minneapolis** 16:5
62:6, 8 169:24
**Minnesota** 16:5 62:6
**minor** 15:13
**minus** 191:5
**minute** 93:12 150:20
200:19
**minuted** 200:8
**minutes** 104:9
124:20, 21 147:11
148:14, 16, 17 202:22
203:1

**Mischaracterizes**
61:3 80:22 225:9
226:1
**misremember** 93:21
**missed** 116:18
118:22 190:23
**missing** 30:7 113:19
**mixed** 140:14
**Mm-hm** 150:1 203:5
**model** 29:16
**modeling** 27:21
**moment** 26:16 37:17
154:7 156:23 221:17
**Monday** 62:6, 12
213:18 214:17 215:8,
10 216:12 226:13
**money** 61:9 155:16
**monitored** 226:22
**month** 15:6 17:2
**monthly** 17:19 36:16
119:13
**months** 17:2, 3 26:6
36:17 56:23 62:22
138:1 193:13 216:4
217:25 219:22
**Morgan** 70:20
**morning** 130:8
199:8 216:12
**mortgage** 27:14
30:14, 16, 18 140:20
**motivated** 59:23
67:10
**motivates** 66:10
**move** 43:12 62:15
70:5 96:17 134:1, 5
143:2 144:18 157:12
158:10 187:19 188:8
191:23 192:8 194:16
203:23 216:25
222:25 227:17
229:13 235:14
239:20
**moved** 19:9 62:21
134:13, 14 169:23
182:20 239:23
240:11
**movement** 191:1
**moves** 186:11
**movie** 238:25 240:3

Deposition of Timothy Spence                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

**moving** 87:*24* 97:*19*
107:*7* 134:*14* 143:*5*
160:*4* 209:*16* 239:*4*
**multiple** 53:2 91:*17*
212:*11*
**multi-pronged** 82:*8*
**multiyear** 55:*8*
**Myers-Briggs** 150:*15*

**< N >**
**name** 5:*6, 16* 43:*9*
122:*8* 169:*10* 170:*6,
9* 177:*21* 180:*21*
235:*15* 241:*2*
**named** 88:*24* 187:*18*
195:*3* 237:*5*
**names** 28:*18*
**Nancy** 85:*19, 24*
**narrative** 32:*25*
**national** 169:*18*
**nature** 6:*1* 28:*8*
56:*10* 90:*15* 220:*3*
**navigate** 45:*11* 189:*8*
**NC** 82:*6*
**near** 88:*4*
**necessarily** 207:*19*
**need** 6:*15* 13:*13*
45:*21* 47:*15* 53:*22*
54:*1, 2* 64:*6* 73:*8*
94:*15* 95:*16* 96:*18,
23* 115:*1, 2* 134:*1, 5*
142:*7* 150:*20, 22*
162:*18, 19* 163:*2, 18*
173:*3* 186:*16* 194:*13*
203:*3, 22* 213:*18*
214:*5, 16, 20, 22*
223:*17* 229:*9* 235:*14*
**needed** 18:*13* 42:*13*
46:*10* 58:*25* 59:*9, 12*
63:*5* 74:*4* 89:*3*
92:*25* 93:*9* 97:*16*
115:*22* 136:*3* 158:*10,
22* 163:*9, 13, 14*
178:*24* 187:*19* 194:*3,
6* 201:*5* 214:*25*
216:*9* 224:*15* 225:*4,
12, 19*
**needing** 203:*23*

**needs** 54:*15* 88:*7*
140:*24* 158:*7* 187:*10*
215:*5, 6* 226:*21*
**neglected** 131:*13*
**neither** 218:*9*
**nervous** 70:*11*
**net** 183:*15*
**never** 12:*6, 16* 21:*8*
22:*5* 38:*19, 22, 25*
44:*6* 45:*4* 98:*4*
105:*1* 108:*8* 111:*13*
119:*23* 121:*10, 11*
125:*15* 126:*9* 136:*1*
139:*9, 15, 16* 147:*12*
155:*4, 10, 11* 163:*17*
164:*20* 165:*2, 3*
167:*7, 10* 182:*9*
195:*6* 196:*2* 239:*2, 3*
**New** 15:*8* 23:*12*
26:*13* 29:*16* 60:*23*
70:*16* 87:*11* 88:*10*
155:*20* 157:*19*
162:*23* 218:*10*
228:*25* 236:*12*
**news** 51:*16, 23*
53:*11* 57:*3* 89:*4*
210:*17*
**nice** 149:*19* 186:*16*
188:*6* 193:*18*
**nickname** 165:*17*
170:*1, 9* 176:*8, 13, 21,
24* 238:*21* 240:*9*
241:*5*
**nicknames** 176:*4, 19,
23* 238:*19*
**nine** 5:*21* 25:*17*
**No.____Change**
245:*2, 5, 8, 11, 14, 17,
20* 246:*2, 5, 8, 11, 14,
17, 20*
**No.____Line** 245:*2,
5, 8, 11, 14, 17, 20*
246:*2, 5, 8, 11, 14, 17,
20*
**nobody's** 96:*10*
**nodding** 6:*16*
**nominees** 81:*23*
**non-daylight** 198:*23*
**non-enterprise** 102:*20*

**non-performing** 46:*1*
48:*4*
**Nope** 209:*4* 210:*9*
211:*24*
**normal** 44:*12*
**Normally** 57:*5*
**North** 24:*15* 70:*7*
94:*17* 112:*12* 134:*15*
**notable** 90:*17*
**Notary** 1:*20* 243:*6,
19*
**note** 51:*17* 52:*20*
53:*7* 60:*1* 67:*16*
79:*18* 152:*4* 188:*19*
189:*10* 214:*9*
**notes** 142:*5* 194:*11,
20* 202:*25* 243:*11*
**November** 127:*24*
128:*18* 129:*3, 10, 14*
233:*6*
**Number** 4:*7* 10:*5*
12:*4, 12* 13:*15* 14:*5*
15:*14* 20:*17, 21* 21:*3*
33:*5* 36:*23* 37:*14*
38:*17* 43:*18* 50:*22*
51:*5* 57:*13, 23* 63:*13*
65:*3* 70:*2* 72:*14*
73:*24* 75:*7* 76:*17, 19*
77:*5* 91:*1* 110:*18*
114:*3* 119:*19* 127:*20*
131:*24* 134:*20*
138:*17* 141:*17*
148:*10, 13, 16* 151:*5*
152:*6, 7, 8, 11, 21*
156:*7, 22* 157:*5*
162:*7* 166:*4* 174:*22*
178:*15* 185:*9* 186:*4*
189:*18* 198:*4* 204:*9*
205:*3* 208:*8* 233:*4*
234:*1* 237:*3* 238:*4*
239:*12*
**numbers** 20:*23*
28:*12* 33:*10* 74:*17*

**< O >**
**oath** 244:*15*
**object** 126:*12* 230:*2*
**objected** 227:*24*
**objecting** 230:*4*

**Objection** 7:*18* 8:*13*
10:*20* 11:*5* 12:*15*
13:*7, 20, 21* 14:*1, 7,
25* 15:*22* 16:*19*
21:*18, 24* 22:*4* 28:*22*
33:*23* 34:*8, 18* 38:*21*
39:*6, 22* 40:*3* 41:*9*
45:*14* 46:*13* 52:*6, 9,
11, 13* 54:*3, 8, 9, 11,
13* 59:*3* 61:*3* 68:*18,
25* 71:*22* 74:*22*
80:*21* 83:*18* 84:*24*
87:*19* 89:*20* 91:*13,
25* 93:*12* 95:*20* 96:*3,
17, 19* 98:*7* 99:*5*
100:*13* 103:*18*
107:*22* 108:*6* 126:*8*
128:*2* 130:*15* 132:*3*
143:*21* 148:*1* 155:*9*
164:*25* 166:*25*
168:*23* 170:*19* 171:*3,
10, 21* 172:*9, 16, 19,
21* 173:*9* 177:*3*
182:*4* 184:*20* 219:*7*
225:*9, 25* 226:*15*
228:*12* 229:*24*
231:*23* 235:*5*
**objections** 96:*11*
172:*17*
**objective** 91:*22* 117:*2*
**objectives** 45:*8* 70:*4*
116:*18* 123:*8* 155:*22*
**observation** 235:*16*
**observed** 217:*15, 16,
24, 25*
**obviously** 78:*5*
125:*24* 147:*5* 172:*13*
**occasion** 35:*7*
130:*12* 131:*8* 240:*23*
241:*1*
**occasionally** 130:*4*
191:*12*
**occasions** 31:*12* 35:*6*
82:*21* 134:*20* 212:*12*
218:*6*
**occur** 35:*4* 44:*11*
98:*14* 141:*13* 182:*18*
185:*1* 197:*14* 218:*13,
18* 222:*23* 226:*24*

Deposition of Timothy Spence

Philip R. McHugh v. Fifth Third Bancorp, et al.

**occurred** 99:*17*
100:*3* 101:*19* 122:8
184:*3* 193:6 219:*22*
222:*13, 24* 236:24
**occurring** 191:*24*
**October** 1:*16* 4:*1*
51:*11* 52:2 56:*24*
67:22 72:2 106:5, *7*
114:7 117:*10* 118:*18*
175:2, *4* 177:*11, 17,
25* 179:*10, 16* 185:15
186:8 187:8, *25*
188:*11, 16* 189:24
190:*10, 22* 196:*19*
197:*19* 198:7 199:*24*
200:*1, 11* 202:*11*
204:*12, 19* 205:*10*
206:*15* 207:*3, 10*
208:*11, 20* 209:*16*
210:6, *16* 211:2, *22*
212:*23* 213:8, *22*
214:6, *10, 12* 215:*12*
226:*12* 227:4 243:*14*
244:2
**offer** 21:*15, 21* 22:*16,
18* 37:8, *12* 227:*13*
244:*14*
**offered** 37:*23* 41:*17,
21* 42:5 43:2 61:*21*
210:*4*
**offering** 19:2 22:*12*
27:*17*
**offerings** 27:5
**office** 4:*23* 23:*12*
30:*21* 76:4, 5, *10*
77:2, *6, 10* 116:*14*
134:*13* 189:*13*
198:*13* 199:5 214:5
217:*16* 218:*23* 221:*5,
18* 238:*25* 239:7, *17,
21* 243:*13*
**officer** 27:*23* 35:*11*
37:*24* 41:*16* 47:22
50:2 68:*10, 22* 71:*11,
21* 75:*25* 76:*20, 24*
77:*19* 85:22 99:*3*
115:*17* 124:*3* 130:22
131:2, *6* 140:*18*
181:*9*
**officers** 237:5

**offices** 23:*11* 211:*18*
222:*10*
**official** 23:*17* 243:*13*
**Officially** 177:*4*
**offsite** 36:2 191:*5*
**Oh** 27:*21* 110:*9*
121:*23* 126:*11* 149:8
169:*7*
**OHIO** 1:*2, 19, 20*
2:*6, 13* 4:5 7:*3*
243:*1, 7, 13, 19*
**okay** 11:7 13:*4*
14:*17* 21:6, *20* 22:*11,
23* 23:2 33:*18* 34:*16*
37:20 38:2, *6* 39:*2,
11, 19* 41:5, *13* 48:*17,
23* 49:2, *10, 23* 50:5
56:*15, 20, 24* 57:*4*
58:*9* 64:*17* 65:*19*
66:*1, 8, 16, 25* 67:*25*
68:*9, 13* 71:*7* 72:*9*
75:*3, 17, 22, 24* 76:*5,
16, 23* 77:*4, 15, 23*
83:*25* 85:*9* 88:*15, 19*
89:*24* 90:*3* 91:*22*
95:*16* 96:*22* 98:*11*
103:*22* 104:*1* 114:*10*
118:*23* 123:*3* 128:*25*
141:*4, 8* 142:*15*
148:*12, 15* 152:*4*
153:*1* 154:*4* 160:*12*
162:*9, 12* 173:*16, 24*
174:*14* 175:*15* 177:8
184:*11* 185:*12*
186:*24* 198:*25*
199:*11, 14, 16* 204:*17*
205:*9, 17* 206:*3, 11,
16* 207:*3, 8, 19*
208:*10* 210:*15* 211:*6,
10, 14* 214:*20* 224:*9*
230:*5* 234:*16*
**old** 10:*14* 12:*25*
13:*2, 25* 14:*17, 23*
15:*21* 23:*3* 34:*7*
37:*20* 41:*8* 138:*13*
143:*19* 144:*5* 170:*3*
**older** 207:*19*
**Oliver** 20:*13* 23:*9,
13, 19* 25:*13, 15, 22*
27:*1, 25* 28:*4, 17*

29:*1* 30:*25* 34:*13, 17,
24* 35:*14* 70:22
**Once** 5:*19* 92:6
118:*20* 181:*12* 208:*3,
4* 239:*19*
**one-on-one** 31:*14, 16*
110:*7, 11, 19, 22, 25*
111:*7, 9* 191:*13*
229:*17*
**ones** 43:*21* 94:22
148:*25* 149:2 235:*23*
**ongoing** 53:*4* 110:*18*
159:*17*
**online** 88:*23* 145:*11*
149:*24*
**open** 87:7 158:*15*
191:*4* 210:*25* 237:*18*
**operate** 83:7 168:*11*
**operating** 47:22
113:*6* 232:*13*
**operational** 46:*12*
**operationally** 152:*13*
157:7 158:*21*
**operations** 17:*20*
24:8 26:*21* 29:*14, 17*
55:*12*
**opinion** 11:6 168:*24*
235:*3, 10*
**opportunities** 60:8
93:9 94:6 142:*11, 17*
159:*19* 227:*16*
230:*12, 13*
**opportunity** 87:9
92:*16, 18* 123:22
134:*20* 145:*20*
149:*17* 191:*13*
192:*17* 203:*19*
216:*24*
**opposed** 20:7 93:*23*
**opposite** 225:*19*
**optimization** 63:*24*
79:*17*
**option** 179:8 235:*19*
**options** 179:*21*
234:*20*
**order** 94:*19* 185:5
225:*4*
**Oregon** 11:*15* 13:9
17:*10*
**org** 235:*12, 25*

**organization** 30:5, *11*
46:*1, 2, 3* 52:*24*
55:*16* 59:*11* 60:9, *14*
64:*4, 12* 66:*18* 67:2
69:*5, 15, 25* 70:9, *11,
25* 71:9, *17* 74:*13*
76:*3* 78:*23* 80:*15*
81:22 82:*3* 85:*25*
86:*1, 11, 17* 87:2
119:6 122:*10* 124:*2,
5* 140:*18* 145:*17*
153:9 158:*1, 8*
159:*20* 160:*1* 181:*5*
191:*16* 203:*18*
235:*14, 24, 25* 236:*13*
**organizational** 43:8
49:*17* 68:8, *9* 69:6
72:*25* 81:*24* 113:*21*
143:9 178:8, *11, 14*
179:8, *21* 180:*19, 25*
182:2, *8, 11, 13, 25*
183:*20, 21, 24* 186:*3*
188:8 191:*23* 223:*14*
228:*24* 234:*20, 23, 24*
235:2, *4* 236:7, *18, 24*
**organizationally**
236:*17*
**organizations** 30:7
45:22 58:*21*
**organize** 113:22
**organizes** 199:*18*
**original** 27:9
**originally** 149:*20*
**out-briefing** 65:*10*
**outcomes** 45:*12*
113:*3* 152:*11, 23*
**outdoors** 193:*19*
**outside** 9:*19, 22*
26:24 69:*19* 97:9
119:*14* 131:8 174:7,
*17* 175:*16* 193:*18*
196:*16* 199:*19*
**outsourced** 46:*4*
**outstanding** 53:9
**overall** 57:*17* 58:*6*
142:*19* 153:*15*
**overnight** 74:*10*
**over-planned** 142:6
**oversee** 97:22

overseeing 112:20, 22
115:2, 7
oversight 179:4

< P >
p.m 51:14 112:6
150:25 189:24 190:9
204:4 238:15 241:20
pace 194:6
package 39:12
124:23 131:12
paddling 157:1
PAGE 3:3 20:22
63:20 65:23 68:1, 2
69:6 77:1 86:7
114:8 120:2 140:9
142:14 186:5 187:24
205:6 234:4 245:2, 5,
8, 11, 14, 17, 20 246:2,
5, 8, 11, 14, 17, 20
pages 135:20 141:19
205:5 243:8
paid 44:18, 21 45:6
48:10 57:15, 25
58:23 104:7
paired 194:1
paper 217:14 219:11
papers 216:3 217:15,
17, 24 218:12, 15, 19,
21, 24 219:1, 3
paragraph 10:9
15:15, 16 140:11
142:4
parallels 193:9
part 28:23 42:22
44:12 49:13, 17
51:25 60:5 73:5
78:5 81:4 90:7 92:3
94:16 99:12 102:5,
19 105:2 116:7, 21
117:22 119:5 122:6,
15 131:6 141:9, 10
143:13, 14 154:14
161:8, 10 168:9, 11
203:17 204:13
229:20 236:4 238:8
participant 19:10
participate 36:4
79:5 100:4

participated 121:11
161:17 196:24
197:16
participating 4:21
particular 16:14
65:23 73:16 74:19
88:4 126:5 130:13
133:21 149:24
169:21 181:4 191:19
193:6 194:5 238:1
particularly 158:9
parties 6:3
partner 23:21 24:17,
18, 23 25:6, 12, 23, 25
26:10 27:24 28:17
70:22 102:14 105:4,
9, 14, 25 106:6 120:6
159:16, 22, 24 160:1,
3
partners 105:12
party 149:8 187:20
Pas@sspfirm.com 2:7
passed 137:10, 14, 17
145:25 164:17, 22
165:2 210:17, 22
path 70:13 216:19
Patterson 2:5
Paul 30:5
pay 44:17 91:4
payable 39:12
payment 26:14
79:22 80:14 86:10
157:23
payments 41:16, 19
46:5 50:4 55:11
64:3, 11 76:2, 3, 6, 9,
24 77:7, 23 86:15, 19
87:1 140:20 178:19
peace 157:22
peacefully 227:17
peer 154:20 159:25
178:23
peers 32:15 122:22
152:9, 22 179:1
pen 27:16
PENALTY 244:5, 6
pending 4:3 232:25
people 18:14 27:19
28:4 53:3, 18 59:23
60:4 70:11, 17 71:19

77:11 79:21, 23 80:3,
4, 13, 15, 18, 24 81:7
82:10, 13 83:14, 17
84:13, 17, 23 85:16,
25 86:21, 22, 23
87:18, 25 88:9 90:3,
19 91:5 95:17 96:24
116:25 143:3, 10
145:24 152:6, 8, 11
153:16, 17, 18 156:25
157:6, 22 158:17, 19
159:2 166:20 169:13
179:4 181:14 215:14
229:3, 5 230:19
perceive 122:11
percent 58:13 68:17,
24 73:17 78:10, 25
95:4 140:17, 19, 20,
21 142:7 158:2
percentage 73:14, 16,
19 168:10
percentages 74:16
performance 32:14
44:8, 13, 17, 18, 21
45:2, 7 48:11 57:15,
17, 25 58:6, 16, 23
63:16 74:19 75:1
87:5 92:20 93:23
94:23 97:3 100:25
101:16 104:4, 7
114:18 116:18 121:9
123:7 131:12 138:21,
23 139:1 155:22
237:13, 14
performed 154:24
performing 60:10
70:5, 6 117:9
period 27:24 28:14
48:6 50:12, 15 52:1
55:20 74:8 99:24
100:1 105:19 110:20
115:15 119:2 125:5
157:10 166:6 181:13
192:5 193:11 197:6,
22 201:20 216:3, 18
217:19 228:7 232:15
237:14, 15
PERJURY 244:5, 6
permits 231:21

person 22:2 99:21
123:4 124:2 140:7
145:21 155:21
162:23 186:18
personal 39:23 63:6
128:6, 10
personality 145:12,
13 150:6
personally 4:17
33:18 45:9 68:20
69:4 89:1 106:19
179:2
personnel 59:11
71:15
perspective 59:23
101:13 183:14, 15, 16
190:4
pertaining 114:18, 19
Peter 2:1 4:11
Phenise 2:17 4:19
Phil 8:5, 9, 11, 14, 18,
22 9:1, 2, 3, 8, 10, 14,
22 10:10 12:12 13:2,
24 14:21 15:16
21:14 22:12 23:2
30:1, 23 31:5, 9, 12,
14, 16, 18, 21 32:1, 13,
17, 19 33:15 34:6
38:3, 11 39:12, 20
40:10, 13 41:5, 21
42:24 43:1 44:3
47:22 48:18, 23 49:2,
11, 17 50:5, 16 51:23,
24 53:7, 12, 17, 18, 23
54:18 55:4, 7, 21
56:7, 16, 17, 18, 20
58:1, 14 64:19, 22
71:25 72:3, 7, 19
78:7 86:15 97:21, 25
98:2, 20, 23, 24 99:1,
12, 14, 25 100:7, 11
102:19 115:16, 23
116:3, 4, 6, 9 117:5, 7,
8, 16, 19 119:4, 5, 8
125:19, 21, 24 126:3,
6, 18 138:2, 5, 10
142:23 143:4, 16, 19
144:3, 5, 8 149:21
153:3, 4, 7, 8, 13, 21
154:8, 9, 21, 23 155:2,

Deposition of Timothy Spence                                           Philip R. McHugh v. Fifth Third Bancorp, et al.

6 156:9 165:8, *10*, *14*
166:*1*, *2*, *6*, *9*, *11*, *15*,
*17*, *21* 169:*11*, *19*
171:*23* 172:*3*, *10*
173:*6*, *16*, *18*, *20*
174:*4*, *7*, *16* 175:*12*,
*15*, *19*, *22*, *25* 180:2,
*16* 182:*15* 183:5, *12*,
*13* 184:*13* 185:*3*, *22*
186:*24* 187:*9*, *17*, *21*
188:*12*, *17*, *25* 189:*24*
190:9 191:*15*, *16*, *18*
192:6, *9*, *12*, *14*, *15*, *21*
193:*22* 194:*2*, *3*, *4*, *11*,
*17*, *24* 195:2, *7*, *10*, *11*,
*14*, *15*, *16*, *19*, *25*
196:*7*, *12*, *18*, *24*
197:*1*, *10*, *15*, *24*
198:*12* 200:2, *5*, *12*,
*17*, *20* 201:*1*, *4*, *22*
202:*4*, *12*, *17*, *24*
203:*10*, *15*, *17*, *20*, *22*
204:*20*, *22* 205:*12*
206:*4*, *25* 207:*5*, *10*,
*13* 208:*1*, *3* 209:*14*,
*17*, *23*, *25* 210:*1*, *7*, *17*,
*22* 211:*17* 212:*1*, *11*
213:*14*, *23* 214:*13*
215:6, *18*, *22*, *24*
216:2, *10*, *12*, *19*
217:*1*, *6*, *15* 218:*7*, *15*,
*18*, *21*, *23* 219:*19*
220:*11*, *14* 221:*14*, *15*,
*24* 223:*10*, *11*, *22*
224:5, *6* 227:*8*, *20*
228:*3*, *10*, *23* 229:*14*,
*17*, *22* 230:*11*, *15*
232:*17* 233:*7*, *16*, *19*,
*21*

**PHILIP** 1:*6* 2:*14*
4:5, *12*, *14* 244:*3*
**Phil's** 10:*7*, *10* 48:*25*
49:*4*, *13* 52:*3*, *20*
53:*14*, *15* 55:9 98:*4*
138:*12* 144:*8* 153:*8*,
*16*, *17* 155:*4*, *11*
169:9 173:*17* 174:*7*
189:*21* 193:*2* 196:*2*,
*4* 199:*5* 206:*18*
217:*11* 218:2

**Phone** 2:*7*, *13*
111:*24* 158:*18*
212:*25*
**photo** 11:*10* 14:*13*,
*15*, *17* 209:*4*, *6*, *7*
**photograph** 10:*21*
**photographs** 14:*7*
**phrase** 170:*17*, *18*
171:*1*, *2*, *18*, *20*, *24*, *25*
172:*4*, *5*, *7*, *13* 173:*8*,
*12*, *15*, *19*, *20*, *22*
174:*6*
**Physically** 23:*7*, *10*
102:*11*, *24*
**pick** 91:*23*
**picked** 97:*25*
**picking** 91:*6*
**piece** 50:*15* 131:*12*
236:2, *16*
**Pinckney** 85:*19*
**pinpoint** 32:*4*
**pipeline** 122:7 123:*4*,
*14* 124:*19*
**Place** 1:*18* 43:*12*
47:*11* 70:*13*, *17*, *23*
74:2 99:*21* 118:8, *9*
124:*19* 125:*1* 147:*4*
148:*18* 159:2 184:*9*
215:8 216:*12*
**placed** 83:*15*
**places** 82:*1* 85:*13*
86:2 88:*10* 97:*10*, *13*
181:*10* 191:*13*
222:*23*
**Plaintiff** 1:*7*, *15* 2:*1*
4:6, *12*, *14*
**plan** 117:*23* 146:*12*
148:*21*, *24* 149:*5*
156:*18* 159:*21* 161:8
190:*14*
**Planar** 18:*20* 19:*5*
**P-L-A-N-A-R** 18:*20*
**planning** 17:*19*
26:*24* 27:*2* 31:*2*
36:*1* 100:*22* 107:*5*
153:*11* 154:*15*
155:*25* 156:*5* 234:*16*
**plans** 123:*23* 140:*25*
**plate** 181:*4*

**platform** 157:*21*
**play** 241:*2*
**played** 51:*24*
**please** 4:*22* 5:*6*, *16*
6:*12* 7:*2* 10:*6*, *19*
11:*9* 12:*5* 14:*6* 21:*7*
29:*7* 36:*20*, *25* 38:*18*
40:*8* 43:*19* 52:*18*
56:*1* 57:*14*, *24* 63:*15*,
*25* 65:*8* 67:*24* 75:*12*
86:*6* 120:*2* 138:*20*
144:*1* 170:*24* 171:*16*
172:*25* 189:*19*
213:*25* 234:*3*, *6*
**pleasure** 21:*14* 22:*15*
**plenty** 160:*24*
**plus** 160:*7*
**PNC** 2:*12*
**point** 13:*14* 19:*12*
23:*2*, *6* 27:*3* 30:*2*, *22*
31:*7* 34:*12* 35:*18*
36:*15* 38:*2*, *9*, *12*
41:*15*, *21* 44:*18*, *24*
46:*5* 47:*5*, *10*, *14*
49:*9*, *20* 50:*3* 55:*12*
58:*22* 60:*22* 63:*8*, *24*
65:*11* 66:*16* 67:*9*
68:*12* 71:*20* 75:*25*
76:*1* 78:*2*, *21* 79:*18*
82:*16* 85:*12* 86:*8*
89:*2* 97:*25* 99:*15*
101:*12*, *14*, *25* 104:*15*
105:*10* 107:*12*
110:*12* 111:*16* 117:*9*,
*12* 118:6 119:*1*
125:*7*, *17* 134:*17*
141:*12* 145:*15* 146:*6*,
*10* 150:*22* 153:*10*
158:*25* 170:9 174:*5*
178:*21* 183:*22*
193:*12* 201:8 206:*22*
207:*22* 212:*10* 215:*4*
216:*1*, *24* 224:*14*
225:*14* 230:9, *14*, *16*
232:*21* 233:*19* 239:*4*,
*6*
**pointing** 40:*22*
**points** 60:*13* 64:*19*,
*22* 71:*4* 82:*1* 111:2
227:*16*

**policy** 231:*3*, *6*, *15*, *19*,
*20* 232:*11*, *14*
**pool** 237:*19*, *24* 238:2
**Poole** 2:*17* 4:*19*
**populate** 120:*24*
**populated** 102:*15*, *16*
105:*6*
**population** 87:*13*
**portal** 146:*14*
**portfolio** 94:*20* 95:*9*,
*10* 142:*6*
**portfolios** 93:*2*
**portion** 36:*8*
**Portland** 11:*15* 13:*9*
17:*12*
**position** 21:22 22:*12*,
*18* 34:*25* 35:*1* 37:*23*
42:*5*, *14* 43:2 54:*4*
63:*5* 81:*22* 100:*22*
101:*25* 108:*10* 124:*1*
125:2, *5* 126:*19*
146:*1* 183:*19*, *23*
191:*25* 197:*2*, *24*
198:*1* 200:*20* 201:*10*
210:*25* 214:*4* 218:*10*
224:*13* 225:*4*, *18*
**positioned** 145:*17*
**positioning** 45:*22*
**positions** 41:*19*
80:*25* 102:*7*, *21*
126:*6*, *16*
**positive** 66:*21*
**positively** 66:*17*
**possibility** 124:*9*
179:*25* 237:*23*
**possible** 95:*2* 134:*18*
135:*3* 169:*8* 174:*10*,
*15* 175:*17* 185:*4*
196:*21* 207:*18* 241:*9*
**possibly** 55:*14* 111:*1*
129:*19* 166:*22* 171:*7*
174:*2*, *3* 222:*6*
**potential** 66:*18*
81:*21* 99:*14* 102:*7*
104:*13* 107:*8* 111:*19*
122:*11* 123:*18*, *23*
124:*3* 126:*6*, *16*, *18*
145:*3* 179:*7*, *21*
186:*3* 234:*20*

Deposition of Timothy Spence

Philip R. McHugh v. Fifth Third Bancorp, et al.

**potentially** 25:*3, 5*
28:*11* 42:22 146:*11*
**PPP** 158:*12* 169:*15*
**practical** 24:*16*
**practice** 24:*16* 83:*13*
88:*3*
**practices** 6:2 26:*1*
50:*14*
**precedent** 230:*18*
**precise** 133:*16*
**predated** 55:*9*
**predict** 78:*16*
**predictive** 67:*20*
**pre-exists** 82:*12*
**prefer** 63:7 225:*13*
**preference** 84:*9*
**preferred** 169:*10*
229:*13*
**prep** 196:22 197:*12*
199:*15*
**preparation** 7:*16*
53:*5* 196:23 197:*17*
232:22
**prepare** 7:*11*
**prepared** 35:*19*
63:*18* 65:*9* 66:*3*
75:*14* 92:*12* 131:*11*
138:*23* 161:*19, 22*
**presence** 131:*8*
136:*1* 174:7, *17*
175:*16*
**Present** 2:*14* 4:*8*
31:*9, 12* 119:7 136:7
163:22 197:*13*
231:*15*
**presentation** 127:*1*
163:*23* 197:*15*
**presentations** 31:*13*
32:*20*
**presented** 31:*11*
32:22 93:*20*
**presenting** 135:*25*
**president** 12:*13, 22*
13:*17* 14:22 15:*17*
16:*9* 21:22 22:*13, 19*
30:*16, 17* 33:20 34:*3*
37:24 39:*14, 20*
40:*11, 17, 21* 43:*11*
46:*16*, 24 48:*19* 99:*3*
100:*21* 101:*6, 13*

103:*14* 104:*19*
105:*16* 106:*3, 12, 22*
107:*8, 20* 108:*5, 13,*
*21* 109:*1, 5, 10, 23*
110:*5* 111:*11, 18, 19*
126:7, *16, 19* 135:*14*
136:*8, 17* 139:7, *11,*
*22* 144:*12* 145:*3*
163:*6* 164:*1* 167:*14*
169:*11* 177:*2, 10, 16,*
*17, 22* 178:*17* 180:22
183:*4* 184:*1, 8*
187:*18* 195:*3, 16*
235:*16, 21* 236:*13*
**presidents** 30:*8*
**presumably** 64:*13*
**presume** 121:7
175:*14* 182:*13* 186:*2,*
*22* 193:*19* 202:*14, 19*
234:*9*
**pretending** 197:*4*
212:*16*
**pretty** 134:*9* 202:*10*
207:*15*
**prevented** 135:*1*
**preventing** 168:*5*
**previously** 28:*19*
49:7 58:2 67:*14*
69:*16, 24* 70:*17, 19*
80:7 104:*6* 139:*19*
141:*11* 201:*11*
216:*17*
**priceless** 239:*20*
**primarily** 31:*5*
**primary** 10:*24* 11:*1,*
*2, 22*
**principal** 23:22
24:22 25:*4, 21* 26:*10*
137:*18*
**principally** 53:*15*
**principals** 107:*15*
146:*18*
**principle** 140:7 231:*9*
**principled** 83:*11*
**prior** 9:*3* 17:*4, 7, 15*
25:*14* 27:*1* 30:*4*
34:*12* 35:7, *13* 42:*25*
44:*13* 47:22 56:*24*
72:*19* 76:*10, 15*
86:*16* 88:*17* 94:*18*

105:22 107:*17* 108:*2,*
*19, 25* 109:7, *20*
110:*1* 114:*24* 117:*19*
120:*13, 14* 123:7
128:*5* 131:*2* 147:*13*
177:*15* 180:*24*
194:*11* 199:*1* 206:*1*
209:*25* 227:*1* 238:*10*
**priorities** 83:*9* 85:*15*
124:7
**priority** 80:*11, 18, 23*
81:*6, 11* 82:*9, 13, 15*
83:*8, 15* 84:*11, 16, 21*
94:*16*
**private** 19:7 95:*10*
**privy** 120:*11*
**probably** 13:*12*
28:*10, 11* 44:*15* 57:2
82:*12, 16* 100:*23*
118:*19* 147:*20*
222:*18*
**problem** 74:*12*
114:*12* 116:*5, 6, 10*
119:*5* 206:*24*
**problematic** 135:7
**problems** 20:*5* 113:7
117:*6, 7, 17, 18, 22*
133:*17*
**problem-solving**
150:*12*
**proceed** 36:*20*
128:*12* 226:*5*
**Proceeding** 210:*6*
**proceedings** 243:*9*
**process** 17:*18* 60:*13*
74:*8* 81:*5* 88:*20*
91:*11, 20* 100:*4*
101:*10, 16, 25* 102:*6,*
*16* 106:*14, 17, 24, 25*
107:*16* 113:*5, 11*
115:*18* 116:*8* 119:*4*
122:7 123:*8, 12, 22*
124:*10* 126:*24, 25*
127:*1* 130:*24* 134:*9*
144:*17* 147:*11*
153:*11, 22* 154:*14*
157:*21* 184:*5* 196:*10*
212:7 216:*24* 238:*9*
**processes** 100:*25*

**155**:25
**produce** 44:*21*
**product** 17:*16, 18*
26:*21* 29:*16* 46:6
**productive** 114:*11*
**products** 64:*15* 88:6
157:*19*
**professional** 165:*16*
186:*12* 194:*16*
**profile** 10:7, *10*
145:*11* 146:*19* 149:*9,*
*19* 150:*6* 161:*18, 22*
**profitability** 31:*8*
**profitable** 94:*25* 95:*8*
**program** 30:*21*
42:*10* 62:*10* 81:*20,*
*21* 82:*4* 85:7 87:7
116:*14* 118:7 158:*12*
169:*15*
**programs** 26:*21*
53:*4* 85:*1, 4, 5, 12, 14*
157:*24*
**progress** 59:*10* 64:*3,*
*11* 81:*9, 15* 86:*14, 18*
87:*1* 104:*11* 156:*24*
241:*12, 15*
**prohibited** 135:*8*
**project** 27:*9, 11* 85:*1,*
*6* 86:*10* 112:*25*
**projects** 27:*4, 8, 13*
**promise** 139:*15*
**promoted** 14:22
15:*17* 39:*20* 40:*10,*
*13*
**promotes** 80:*14*
**promotion** 39:*13*
49:*13, 16* 146:*1*
**prompt** 110:*10*
**proposal** 37:2
**proposed** 234:*23*
**proposing** 234:*25*
235:*1*
**proprietary** 32:*16*
**protagonists** 240:*3*
**protected** 83:*16, 19,*
*22, 25* 84:*2, 5, 8, 12,*
*17, 22* 85:*16* 168:*14,*
*20* 229:*4*
**protocol** 217:*5*

Deposition of Timothy Spence — Philip R. McHugh v. Fifth Third Bancorp, et al.

**prove** 42:*17*
**proved** 60:*17*
**provide** 5:*24* 21:*14* 22:*15* 102:9 121:*12, 15, 18* 123:22 125:*18* 129:5 145:*17* 155:6 156:*15, 16, 19* 157:22 179:*3* 181:*3* 194:*1, 11* 212:*12*
**provided** 7:*23* 16:*13* 23:*15* 32:*13* 42:2 54:*20* 60:7 61:*10* 99:*13* 102:*13, 14, 15* 103:*5, 7* 104:*4, 5* 105:*4* 120:*17* 121:2 124:*14* 125:*10, 20* 131:*14* 135:*18, 20* 141:*24* 145:*18* 146:*7, 13* 161:*4* 176:*11* 180:*15* 206:*12* 212:*14* 226:*18* 229:*11, 15*
**provider** 19:*11* 111:*24*
**provides** 195:*10*
**providing** 29:*10, 12* 120:*13, 14, 15* 159:*19, 22* 187:*21*
**proxy** 44:*14, 23, 25* 237:*4* 238:*11*
**Prudential** 26:*13*
**Public** 1:*20* 19:7 32:*15* 43:*13* 44:*25* 45:*1* 56:*12* 243:6, *19*
**publicly** 82:*21, 23* 104:*13*
**pull-ups** 119:*13*
**purchase** 112:*11*
**purpose** 27:*18* 31:*24* 36:*10*
**purposes** 24:*16* 72:5
**pursuant** 128:*4*
**push** 152:*11* 157:5
**pushing** 159:*1*
**put** 48:*5* 99:*21* 101:*24* 102:*1* 105:5 170:8 220:*1* 227:*14, 15* 239:*25*
**putting** 157:*21*

**< Q >**
**qualified** 243:*6*
**quality** 60:*6, 7*
**quantify** 168:*10*
**quantitative** 145:*13*
**quantitatively** 60:*19*
**quarter** 57:6 167:*24, 25* 168:*1, 2*
**quarterback** 169:*25*
**quarterly** 17:*20* 197:*12* 212:*7*
**question** 6:*13, 21, 23* 7:*19* 8:*13, 15, 20, 22* 12:*20* 16:*20* 29:*1, 6* 40:*2, 7* 45:*15* 46:*14, 22* 52:*17, 18* 54:*16* 59:*4, 7* 61:*5* 68:*19* 89:*16, 21* 91:*13, 14* 95:*21* 99:*6* 103:*19* 104:*16* 107:*25* 108:*18* 124:*9* 126:*10* 143:*22, 25* 153:*24* 168:*25* 169:*2* 170:*21, 23* 171:*4, 6, 13, 15, 22* 172:*10, 14, 24, 25* 173:*2, 3, 10* 177:*4, 6* 182:*5* 184:*21* 224:*20* 226:*1* 231:*16* 232:*9* 237:*18*
**questions** 6:*11* 73:*4, 16, 17* 74:5 78:*16, 20* 141:*15* 150:*9* 178:*12, 13* 241:*18*
**question's** 40:*3*
**quickly** 43:*12* 134:*2, 5* 157:*12* 158:*1, 11* 182:*21* 193:*6* 214:*10*
**quite** 23:*11* 97:*15* 190:*11* 195:*6*
**quoting** 141:*4*

**< R >**
**race** 80:*18* 84:*3* 229:*6*
**racial** 80:*12, 18*
**raise** 201:*10*
**raised** 11:*7*
**raising** 11:*4*

**ran** 17:*16* 26:*20, 24* 27:*6, 8, 13, 15* 30:*1, 3, 4, 18* 55:*21* 89:*5* 116:*12*
**range** 26:*18* 50:*1* 95:*5* 143:*10* 149:*10*
**ranging** 60:*5*
**rankings** 169:*18*
**rapidly** 157:*17*
**rarely** 145:*22*
**ratified** 39:*16*
**rating** 45:*2, 4* 50:*8* 51:*15, 25* 53:*16* 55:*6, 8, 19* 56:7 57:*17* 58:6 142:*19*
**ratings** 45:*6* 53:*1, 2, 10* 72:*10*
**Ray** 30:*3*
**RCC** 200:*2, 3*
**reach** 186:*16* 190:*2*
**reached** 213:*24*
**reaching** 144:*22* 186:*21*
**reaction** 151:*25*
**read** 12:*18* 13:*13* 21:*13* 22:*11* 37:*17* 54:*16* 63:*24* 83:*2* 159:*4* 172:*25* 173:*3* 190:*6, 18* 191:*9* 218:*8* 232:*1, 2, 19* 241:*19* 244:*7, 9*
**reading** 96:*12*
**readouts** 31:*10* 32:*12*
**reads** 114:*11* 133:22 152:*17* 186:*11* 212:*21* 215:*7*
**ready** 125:*7* 126:*7, 16* 154:*2*
**reaggregation** 78:*2*
**really** 24:*18* 51:*15, 16, 19* 71:*18* 152:*20* 157:*17* 159:*1* 162:*17* 176:*12* 209:*6, 8*
**reason** 19:*5* 45:*25* 53:*19* 54:*22* 69:*14* 128:*3* 141:*14* 192:*21* 231:*14* 235:*12* 245:*4, 7, 10, 13, 16, 19, 22* 246:*4, 7, 10, 13, 16, 19, 22*

**reasonable** 63:*3* 65:*14* 66:*15* 106:*8* 109:*16* 150:*14*
**reasons** 216:*13*
**recall** 6:*4, 8* 9:*17, 24* 13:*12* 14:*18* 19:*20* 23:*18* 24:*4, 25* 25:*12, 18, 21* 31:*17, 22, 25* 32:*3* 35:*9, 17* 37:*7, 9, 11* 42:*3, 24* 44:*16* 45:*3* 50:*11, 17* 56:*22* 59:*8, 9* 65:*13, 21, 22* 68:*2* 81:*3* 82:*11, 22* 83:*1* 88:*23* 89:*1* 94:*6, 14, 15* 95:*16* 96:*7, 22* 97:*24* 98:*15* 102:*2, 12* 103:*11* 105:*15* 106:*13, 16* 109:*3, 14* 110:*9, 10, 23* 111:*4* 112:*12* 119:*9, 14* 120:*13* 121:*4* 125:*4* 127:*16* 128:*25* 129:*7, 11, 16* 130:*6, 10, 13, 25* 139:*4* 140:*3* 143:*1, 5* 145:*8, 19* 146:*13, 17* 147:*9* 148:*19* 150:*9* 154:*18* 161:*10, 16, 20, 23* 165:*12, 14, 18, 20, 23* 166:*4, 14, 15, 19, 22* 169:*14* 174:*9, 11, 13, 18* 176:*1, 17, 22, 23* 177:*12, 14* 180:*18* 181:*2* 195:*1* 196:*6* 197:*17* 199:*11, 19* 207:*8* 208:*15, 25* 209:*4, 6, 13* 211:*18* 212:*4* 213:*13* 215:*16* 218:*17, 20, 22, 25* 219:*13, 14, 17, 18, 20* 221:*11* 222:*9* 224:*10* 228:*5, 6, 22* 229:*12* 230:*14, 16* 233:*20* 235:*17* 238:*23* 240:*21, 25*
**recalls** 96:*1*
**recap** 190:*24* 192:*11* 195:*13*
**receive** 44:9, *17* 237:*16*

**received** 45:*4* 53:*10*
57:*3* 58:*9, 11, 13, 14*
88:*11* 154:*12*
**receiving** 128:*25*
**recess** 61:*16* 112:*5*
150:*24* 204:*3* 238:*14*
**recipient** 115:*9*
**recognition** 88:*11, 16*
**recognize** 38:*20*
58:*15, 19, 24* 89:*15*
90:*24* 241:*13*
**recognized** 88:*20, 24*
89:*9, 18* 90:*5, 20*
91:*7, 12, 24* 92:*13*
**recognizes** 90:*25*
**recollection** 9:*16*
42:*19* 69:*2* 92:*11*
93:*8* 94:*12* 109:*17*
189:*2* 190:*8, 20*
204:*1* 209:*10* 213:*4*
224:*4* 227:*23*
**recommend** 99:*2*
107:*19* 108:*4, 9, 13*
195:*16*
**recommendation**
97:*19*
**recommended** 108:*7,
21* 181:*5*
**record** 4:*2, 9* 5:*6, 16*
51:*6* 61:*13, 15, 18*
94:*1* 112:*4, 7* 150:*21,
23* 151:*1* 153:*23*
200:*8* 204:*2, 5*
234:*18* 238:*13, 16*
**recorded** 243:*7*
**recruit** 69:*20* 82:*4*
**recruited** 82:*7*
**recruiting** 82:*5* 87:*10*
**recurring** 119:*15*
**red** 115:*14* 116:*12,
13*
**redact** 128:*10*
**redefine** 27:*6*
**redesign** 27:*4*
**reduce** 93:*1* 95:*5*
**redundant** 235:*6*
**reeds** 133:*25*
**reengage** 216:*25*
**reengineering** 45:*21*

**refer** 49:*16* 63:*20, 23*
65:*15* 67:*24* 69:*9*
75:*16* 76:*16* 79:*14*
86:*5* 94:*11* 114:*5*
127:*22* 151:*11, 14*
156:*8* 162:*13* 165:*10*
166:*2, 3, 7, 18, 21, 23*
174:*6, 21* 175:*1, 24*
176:*10, 21* 185:*12, 14*
186:*4, 5, 6* 204:*15*
205:*2, 9* 212:*1*
238:*24*
**reference** 73:*7*
126:*18*
**REFERENCED** 3:*6*
62:*11* 174:*17* 189:*20,
22* 207:*12* 212:*6, 10*
**references** 126:*6*
191:*10* 240:*19* 241:*7*
**referencing** 60:*17*
73:*10* 89:*5* 204:*24*
230:*8* 234:*22*
**referred** 47:*18*
165:*14* 166:*11*
169:*20* 170:*5* 176:*3*
197:*9* 239:*3* 240:*5,
22* 241:*1*
**Referring** 10:*9*
13:*15* 15:*14* 20:*23,
24* 33:*15* 48:*15*
62:*24* 64:*15* 67:*21*
77:*17* 86:*8* 92:*24*
93:*4* 94:*3, 5* 102:*4*
111:*3* 114:*16* 115:*7*
120:*1* 125:*23* 128:*17*
132:*8, 14, 23* 140:*9*
141:*16* 143:*11* 156:*6*
159:*10* 163:*3, 7*
165:*8* 166:*15* 169:*13*
175:*12* 176:*22*
187:*23, 24* 205:*22*
206:*21* 213:*6, 14*
227:*3, 23* 228:*15, 21*
233:*10* 239:*15* 240:*7*
**refers** 142:*1* 160:*15*
176:*14*
**reflect** 104:*19* 237:*8*
**reflected** 115:*13*
117:*14* 142:*11* 217:*8*

**reflection** 92:*22*
**reflects** 41:*22* 168:*19*
**reformed** 59:*10*
**refreshed** 79:*11*
**refrigerator** 134:*12*
**refused** 214:*2*
227:*15* 230:*11*
**regard** 113:*22*
**regarding** 9:*14, 22*
108:*25* 109:*9* 127:*4,
15* 129:*9, 14* 136:*8*
175:*19* 200:*17*
234:*15* 235:*3*
**regardless** 216:*16*
228:*1* 229:*5, 6*
**region** 136:*17* 164:*1*
**regional** 48:*19* 49:*11,
18* 72:*3* 113:*13*
120:*22*
**regions** 78:*4* 87:*25*
88:*1* 115:*25* 136:*20*
164:*4* 178:*18* 179:*6,
18* 180:*5* 183:*5, 17*
191:*17* 192:*3* 193:*10,
11* 201:*7* 215:*21*
**regular** 97:*6* 118:*12*
130:*6*
**regularity** 165:*15*
**regularly** 110:*24*
119:*15* 165:*17, 18*
166:*1*
**regulated** 52:*24*
**regulatory** 27:*14*
**related** 6:*2* 84:*2*
114:*19* 142:*6* 154:*19*
191:*22* 210:*23* 219:*4*
229:*17*
**relates** 232:*11*
**relating** 104:*17*
**relations** 199:*17*
**relationship** 114:*22*
190:*4*
**relationships** 48:*8*
178:*25*
**relative** 32:*14* 191:*21*
**relatively** 43:*12*
110:*11* 182:*20*
201:*19* 202:*9*
**relay** 219:*11*

**relayed** 201:*21*
207:*14* 209:*23* 219:*6*
**relaying** 223:*16*
**relevancy** 10:*20* 11:*5*
13:*7* 15:*2* 34:*8* 41:*9*
98:*7*
**relevant** 60:*12*
135:*24*
**religion** 84:*6*
**reload** 70:*3*
**relocate** 102:*11*
**remain** 19:*14* 175:*20,
23*
**remained** 20:*9*
216:*18, 22*
**remember** 18:*9*
27:*12* 35:*5* 45:*5*
62:*20* 74:*24* 79:*11*
95:*12, 25* 97:*5*
101:*20* 118:*11*
120:*15* 130:*16, 17*
131:*20* 140:*4* 143:*1,
6* 145:*9* 147:*19*
149:*1, 14, 15* 150:*2,
14* 169:*10* 178:*4*
179:*15* 184:*15*
196:*17, 25* 197:*5, 7,
19* 202:*7* 207:*14, 16,
17* 218:*14* 228:*21*
240:*3, 14, 17, 18*
241:*1, 5, 9*
**remembered** 37:*4*
**remembering** 27:*21*
**remind** 97:*6*
**reminder** 6:*10*
**remove** 48:*4*
**removed** 134:*12*
**repeat** 6:*12* 107:*25*
144:*1* 170:*24* 171:*16*
173:*5* 204:*21* 228:*14*
**repeated** 173:*4*
**repeats** 205:*21*
**rephrase** 6:*13* 108:*18*
**replaced** 193:*8*
**replies** 53:*7*
**replying** 51:*18*
**repopulate** 114:*23*
**report** 55:*4* 76:*15*
145:*24* 160:*6* 179:*23*
180:*3* 181:*6* 201:*6*

210:2 214:17 220:16, 19 223:3, 5 226:6
**reported** 47:22 55:5, 7, 13 125:12, 21 141:5 236:6
**reporter** 6:14, 24 90:6, 22 91:8 92:6 153:25 241:22, 25
**reporting** 21:23 22:20 37:25 46:3
**reports** 9:4 69:3, 4 74:17 123:17 178:16, 23 235:11
**reposition** 46:8
**represent** 4:17 13:4 33:9 127:21 131:25 151:9 162:10 198:18 204:10
**representation** 81:9 83:14
**Representative** 137:11 164:18
**representing** 211:9
**re-prioritize** 157:17
**reputation** 153:7 154:8, 10
**requested** 142:23
**requests** 153:11
**require** 180:23
**required** 20:4 25:9 46:17, 21, 23, 25 47:2 69:18 157:17 181:24 224:17
**reran** 38:9
**research** 25:3, 6 176:12
**resigning** 214:3 215:22, 23, 24, 25 217:2
**resolution** 38:24 39:4, 11 43:23 44:3 114:12
**resolve** 39:12
**resource** 154:14
**resources** 35:11 153:12, 18 155:15 156:3, 6 157:18
**respect** 12:11 44:8 45:11 47:12 50:5 85:15 87:17 124:19

132:3 156:7 173:6 211:17 235:19
**respected** 224:1, 7
**respective** 23:23 113:1 124:8 235:4
**respond** 132:16 133:6 151:21 186:16 188:16 200:1 203:6, 7 208:17 209:21 210:9 211:24 214:9, 13, 20 215:3 227:10 239:19, 20
**responded** 160:24 189:10, 11 190:9, 21
**responds** 115:1 133:2 134:1 152:18 159:3 187:1, 7 188:11 189:9 199:24 200:12 203:2 206:16, 24 210:15 211:21 212:18 214:23 215:9 230:25
**response** 57:2 90:11 169:22 188:20 189:21 200:1 214:14
**responses** 53:6
**responsibilities** 41:19 42:15 46:11, 18, 20 47:1 49:6, 15, 19 63:8 68:11 228:25
**responsibility** 42:12 54:22 98:1, 11 142:24 178:17, 18 180:5 181:9 182:16 183:13, 18 201:10 236:5
**responsible** 32:21 55:23 56:5 61:6 69:25 112:22 113:1 115:25 116:21 117:8, 19 178:21 180:1 183:16 193:23 196:9
**rest** 133:14
**restrict** 195:24
**result** 20:6 62:3 70:15
**resulted** 49:17 53:16 113:19 115:18

**results** 21:11 45:23 75:14 140:14 149:6, 7
**retail** 30:3, 4 77:25 211:1
**retailers** 16:14
**retain** 116:24 139:20
**retaining** 41:18 49:6
**retaliate** 231:10, 11 232:13, 14
**retaliating** 231:21
**retaliation** 231:4, 7, 18, 21 232:4, 5
**retention** 60:18
**reticence** 74:14
**retired** 134:8
**retirement** 131:1 134:8
**retiring** 130:24 131:2
**retool** 157:12
**revenue** 113:4
**review** 7:16 42:2 44:9, 12 75:1 79:22 80:3 81:4 86:22 94:10, 11 95:23 98:25 99:12 102:5, 18, 19 104:5 109:12, 15, 18 111:5 120:15 121:1, 9, 13, 16, 19 122:6, 20 123:12, 15 124:20 126:25 131:12 138:21, 24 139:2, 5, 12, 25 141:9, 10 143:17 144:3, 8, 16 146:9, 12 147:3 177:19 211:25 212:5, 8 234:17 235:13
**reviewed** 7:19, 20 32:24 117:13 148:21
**Reviewing** 37:14 141:21 204:14
**reviews** 17:20 103:15, 22 104:2, 3, 17, 18 123:7 135:2 147:14 154:23 155:4, 6, 12
**revise** 121:13, 16
**Reynolds** 30:5
**RHR** 107:11, 14, 16 139:18 140:5, 7

144:19 145:5 147:12 149:22 161:13, 15, 19, 22, 25 162:3 163:23 177:19 178:24
**RHR's** 149:3
**Richard** 115:16, 23 119:3
**ridiculous** 215:3
**right** 11:12, 17, 25 21:1 22:25 24:2 34:2, 4, 14 38:7 39:5, 9 40:12, 25 41:6 44:1, 5 46:12 48:24 49:3, 21 50:3, 8 52:4, 22 58:4, 17 59:2 61:24 62:9, 13 63:18 64:8 65:4, 24 67:22 68:6, 10, 13, 17, 24 69:12, 20 70:25 71:5, 18, 20 72:1, 12 73:2, 14 74:1, 20 75:22 76:8 77:21, 24 78:8, 13, 25 82:16, 24 88:3, 13 92:16 93:3, 15, 18 94:5 96:16, 17 98:6, 12, 21 103:16, 24 105:24 121:24 122:3 125:4 133:10, 24 137:25 138:8, 11 140:22 141:2, 6, 20, 23 142:2, 8, 9, 12 152:1 153:5 155:2 156:20 157:10 160:14 175:4, 10, 13, 21 179:3 186:17 187:5 203:7, 8 208:1, 23 213:15 214:14 215:15 226:3 227:11 230:20, 23 231:1 234:13 238:22, 25 239:25 241:15
**right-hand** 20:20
**rise** 221:13
**risk** 24:8 27:15, 23 29:14, 17 30:6 94:25 116:12 130:22 131:2, 4, 6, 14 134:25 135:1 200:4, 5
**river** 191:11
**Robinson** 30:4

Deposition of Timothy Spence                                                 Philip R. McHugh v. Fifth Third Bancorp, et al.

**role** 17:13 19:16 35:10 39:13 40:10 41:13 44:4 47:13 48:5 50:5 55:2 61:24 62:3 71:11 81:23 97:22 107:8 108:13 120:18 139:14 143:20 144:6, 12 145:3 181:15 192:19 214:2 215:19, 20 225:7, 12 226:7
**roles** 47:20 86:23 123:19
**rolling** 133:10
**roll-up** 53:2
**roll-ups** 57:5
**Rome** 2:11 4:16
**room** 122:22 134:12 169:15 211:24 216:5 219:21 220:12, 17, 20, 22, 25 221:3, 5, 6, 9, 12, 14, 20
**rotating** 192:2 201:12
**Rotationally** 47:10
**roughly** 7:6 9:12 26:19 83:5 87:13 105:19 106:7 139:24 178:22 197:22 201:20
**round** 181:14
**row** 14:14 80:6 206:1 222:10
**Royal** 26:13
**run** 27:2 48:6 69:16 70:19, 22 123:5 155:25 191:17 196:10
**running** 72:18, 19 85:12 90:12
**runs** 74:10 85:24 204:12
**run-up** 50:12
**Ryan** 16:10, 11, 18 17:1, 3, 5, 8 19:11, 14, 16, 23

**< S >**
**S/Sydney** 243:18

**Saba** 2:1, 5 3:4 4:11, 23 5:1, 4, 14 8:1, 16, 19, 21, 24 10:3, 17, 22 11:6, 8 12:2, 19, 24 13:10, 23 14:4, 12 15:3 16:1, 20, 23, 24 20:15 21:19 22:1, 7 29:8 33:3, 11, 12 34:1, 11, 23 36:21 38:15 39:1, 7 40:1, 6 41:12 43:16 45:18 46:19 50:20 51:4, 8, 9 52:10, 19 54:5, 8, 12 55:1 56:2, 6, 14 57:11, 21 59:6 61:13, 19 63:11 65:1 68:21 69:8 71:24 75:2, 5 81:1 83:21 85:3 87:22 89:23 91:18 92:10 93:14 94:2 95:22 96:1, 6, 10, 14, 21 98:10 99:10 100:17 103:21 107:25 108:1, 11 112:4, 8 114:1 119:17 126:10, 13, 14 127:18 128:12, 16 130:20 131:22 132:5, 7 138:15 143:24 148:3 150:23 151:3 154:5 155:13 162:5 165:4 167:2 169:1 170:22 171:9, 14 172:1, 12, 16, 20, 23 173:1, 14 174:20 177:5 184:23 185:7 189:16 204:2, 7 219:10 225:15 226:10 227:2 228:17 230:1, 4, 10 232:4, 8 233:2, 24 235:7, 18 237:2 238:13, 17 239:10 241:11, 22, 24
**sake** 6:14
**salary** 237:23 238:4, 7
**sales** 16:9, 12 19:13 27:7 50:14

**Sandy** 1:21
**sat** 125:21 224:3
**satisfaction** 59:21
**save** 244:10
**savings** 198:23, 24 199:2
**saw** 104:24 105:1 119:23 121:10 125:15 155:4, 10, 11 162:2 199:13 218:15 222:19
**saying** 53:11 101:1, 5 102:3 135:9 163:8 173:13 184:17 193:24 197:11 201:15 221:16 224:5 225:3 228:3, 20 229:8 240:8, 9
**says** 10:10 12:17, 21, 22 21:13 22:15, 24 39:25 66:3, 17 77:1, 6 128:21 142:21 153:2 156:21 160:5 189:9 192:21 202:17, 25 205:12, 24 208:3 214:15 226:4 227:7 231:9 234:6
**scenario** 180:4
**scenarios** 180:9, 15
**scheduled** 110:25
**school** 11:22 13:13 14:10, 13 62:19, 20, 23
**sciences** 69:21 74:6 82:2 180:7
**score** 60:3, 17, 22 61:9 67:18 68:17, 23 69:3, 6 71:2 74:25 77:20 140:14, 18
**scorecard** 115:14
**scorecards** 117:12
**scores** 58:16, 24 60:25 64:1, 6, 18, 21 67:17 68:5 69:5, 10, 11 72:6, 11, 17 73:12, 23 75:19 141:4, 5, 8, 25 142:1
**Scotia** 26:13
**screening** 145:12, 13

**script** 197:16 211:25 212:5, 8
**scripting** 202:25
**scripts** 197:15
**seal** 243:13
**search** 85:1, 6
**second** 10:9 14:14 15:15 20:22 27:11 76:17 77:23 79:17, 18 112:16 142:14 148:20 153:9 168:1, 2 175:4 187:24 191:15 204:25
**seconds** 114:8
**secret** 28:24
**secrets** 29:4
**sector** 19:7, 8
**Securities** 137:11, 18 164:18
**see** 10:12 12:14 13:19 15:19 20:21 21:16 22:8, 9 32:15 33:8, 16, 21 39:17 42:20 48:21 50:23 51:1, 11, 21 63:21 66:11 74:16 76:21 78:4, 6 79:24 103:2 106:9 107:14 114:8, 14 115:4 121:20 125:13 127:24 128:19, 23 132:12, 18, 22 133:4, 7, 11 134:3 140:15, 23 141:3 142:2 149:11, 12 151:17, 19 152:14, 19, 24 154:2, 23 156:12 157:2 159:8 160:10 161:18, 21, 24 162:15 174:24 175:3 185:10, 15, 23 186:9, 14, 18, 19 187:2, 12 188:3, 23 190:2 196:15, 18 198:9, 12 200:14 205:14, 18 206:9, 19 207:6, 15 208:13, 18 209:19 210:19 213:2, 9, 19 214:7, 18 227:5, 18 233:8 234:23 237:6

Case: 1:21-cv-00238-MRB Doc #: 77-15 Filed: 06/27/25 Page: 99 of 106 PAGEID #: 3821
Deposition of Timothy Spence
Philip R. McHugh v. Fifth Third Bancorp, et al.

**seeing** 161:*16*
199:*11, 19*
**seen** 12:*6, 10, 17*
21:*8, 12* 22:5 33:*13*
38:*19, 22, 25* 43:*20*
44:6 58:*1* 65:*12, 20*
68:*1* 104:6 119:*20*
120:*4, 10, 19* 125:25
126:2, *9, 17* 136:*12,
14* 158:*11, 13, 15*
216:*3* 240:*4*
**select** 90:*19* 123:*17*
**selected** 60:22
**selection** 90:7 92:*3, 5*
**self** 63:*16*
**self-assessment** 86:*6*
87:5 93:*11* 94:*4, 8*
95:*13* 104:*4*
**self-evaluation** 69:*9*
73:*9*
**self-evaluations** 92:22
**selfishly** 153:*18*
**semi-annual** 104:*18*
**semicolon** 80:*6, 8*
86:*9*
**send** 51:*16* 129:*21*
206:*1, 7* 208:22
215:*12*
**sending** 129:*18*
159:*12*
**sends** 206:*3* 208:*12*
**senior** 13:*16* 21:22
22:*13, 19* 86:22
145:*21*
**sense** 56:*18* 60:*9*
159:*13* 181:*17*
187:*10, 19* 190:*3*
239:7
**sent** 51:*13* 115:*8*
127:24 128:*17, 21*
129:*10* 132:8 146:*15*
187:25 189:*1, 3, 23*
196:*19* 204:22
205:*11* 208:*15, 25*
209:*11* 213:*23*
226:*11*
**sentence** 15:*15, 19*
21:*13* 22:*8, 9* 142:5
**sentiment** 190:*8*

**separate** 35:*6* 80:*5, 8*
140:*1* 160:*18* 193:*24*
236:*11*
**separated** 76:*9*
**separately** 80:*11*
131:*7*
**September** 71:*14*
98:*16* 161:*25* 162:*14*
163:*19, 25* 164:*3, 6,
10, 13, 17, 21* 165:5
177:*19* 178:*4, 6*
179:*9, 17*
**September/October**
106:*3*
**series** 6:*10* 50:25
137:*11, 15, 18* 145:*12*
164:*18, 22* 196:*21, 22*
197:*14*
**serve** 79:*9, 19*
106:*12* 159:2
**served** 137:*20* 165:5
**serves** 36:7 150:*12*
**service** 120:*14*
**services** 12:*14, 23*
13:*17* 17:*15, 21*
23:*15* 26:*1* 29:*9, 12*
88:6
**servicing** 50:*17*
**session** 36:8 131:*11*
234:*8*
**set** 37:*15* 70:*4*
71:*17* 82:*19, 24*
101:22 140:5 144:*23*
145:*11* 146:*19*
155:22 156:2, *10*
158:*1* 230:*18* 243:*12*
**setting** 123:8 177:*23*
**settings** 165:*15, 16*
169:*21* 176:25
**settle** 62:22 237:*19*
**Seven** 10:*15*
**sexual** 84:*9*
**Shaffer** 42:22
100:*10* 107:*13*
108:*17, 20, 25* 110:*3*
111:6 112:2 114:*5, 6,
10* 119:*7, 11, 14*
121:*15* 127:*4, 14, 22,
23* 128:*18* 129:*1, 6, 9,
17, 21* 132:*1, 9, 20*

133:2 134:*1* 144:22
151:*10, 15* 152:*17*
156:*10* 159:*3, 10, 14*
160:5 161:*12* 162:*11*
166:*13* 175:*19, 24*
180:*13, 16* 185:*13*
186:7 187:*1, 7*
188:*11* 199:24
200:*12, 17* 202:*12*
203:*3, 7, 14* 204:*11,
18* 205:*10, 23* 206:*21,
24* 207:*4, 8, 25*
208:*12, 25* 209:*17*
210:*7, 15* 211:*21, 23*
212:*18, 20* 213:*21*
214:*12, 23* 215:*9*
216:*21* 222:*6, 8*
227:*4* 230:25 233:5
234:*15* 239:*14, 17*
240:*16*
**shaking** 6:*16*
**share** 56:*10* 161:*12*
191:*3*
**shared** 40:*14* 90:*21,
22* 152:5 161:*6, 7, 9,
16* 190:*15* 191:*4*
192:*23* 228:22
230:*17* 235:2
**sharing** 32:*17*
**sheet** 155:*17, 18*
244:*1, 13* 245:*1*
246:*1*
**ship** 133:*23*
**shoes** 190:25 193:*3*
**short** 26:*4* 201:*19*
**shorter** 147:*10*
**shortly** 157:*11*
165:*10* 170:*1* 222:*13,
14*
**show** 59:*4, 5* 78:*18*
96:*4, 9, 13* 204:*23*
213:*17* 226:*13, 19*
**shut** 216:6
**shutting** 218:2
**sic** 50:22
**sick** 130:5
**side** 19:*4*
**sight** 239:*8, 24*
240:*10*

**sign** 241:*19*
**signalling** 162:*18*
**signature** 37:5
**SIGNATURE:**_____
_____DA
**TE** 245:*23* 246:*23*
**signed** 22:2, *9* 37:7
244:*16*
**significant** 71:*15*
81:*9* 92:25 113:*17*
142:7 232:24
**significantly** 140:25
147:*9*
**silver** 165:*9, 15*
166:*3, 7, 12, 16, 18, 21*
169:*14, 20* 170:2, *6*
171:24 172:*4* 173:*8,
12, 19, 20, 23* 174:*4, 6,
17* 175:*9, 25* 186:*13*
213:*12* 215:*13*
**Silverman** 16:*17*
**similar** 29:*14* 154:*8*
**similarly** 64:*20*
125:*19* 205:*11*
**simply** 158:*21*
**simultaneous** 118:*20*
**single** 90:*12* 94:25
141:*15*
**sit** 94:*13* 184:*17, 19*
189:*5, 7* 190:*3*
229:*21* 231:*17*
**sitting** 169:*10*
**situation** 158:*9*
193:*9* 206:*18* 226:*21*
**situations** 149:*17*
**six** 25:*14* 28:*11, 19*
29:*11* 36:*17* 147:*7*
**size** 169:*18*
**slides** 212:*9*
**slow** 97:*6, 16* 152:7
194:*7*
**slowly** 153:25 154:*3*
**small** 18:*11* 27:5
55:*17* 226:*23*
**Smith** 2:*4* 4:*13*
124:*4*
**smoothly** 113:*15*
**social** 165:*16* 176:25
181:*8* 236:5

Case: 1:21-cv-00238-MRB Doc #: 77-15 Filed: 06/27/25 Page: 100 of 106 PAGEID #: 3822

Deposition of Timothy Spence
Philip R. McHugh v. Fifth Third Bancorp, et al.

**soften** 152:7
**sold** 18:18, 19  19:5
**solution** 20:4
**solutions** 16:13
19:13  59:2
**solve** 20:4  114:12
119:4
**somebody** 89:24
145:10  153:17  170:8,
10  171:18  184:5
195:23  225:23
**somebody's** 133:15
**somewhat** 64:20
78:15
**son** 42:9, 13  62:10
**Sonneman** 105:16, 21,
25
**soon** 206:5
**sophomore** 18:3
**sorry** 30:17  51:5
72:13  77:2, 10  85:4,
5  86:5  128:14
151:12  154:1  190:22
204:23  205:5, 15
206:16  211:7  224:5
230:5
**sort** 83:5  110:10
111:4  118:14  150:16
151:25  158:8  170:7
188:17  208:13
**sorts** 19:25  74:9
117:21  147:14
154:19  222:22
**sounding** 30:10
**sounds** 105:24
187:16
**sourced** 124:14
**sources** 30:9  149:10
**sourcing** 69:17
**South** 17:12
**southeast** 87:8
110:16
**SOUTHERN** 1:2  4:4
**space** 19:10  155:17
238:25  239:7, 18, 22
**span** 180:10  234:21
**speak** 66:17  73:3
92:8  93:7  138:5
159:14  173:16

190:10  220:11, 14
223:5
**speaking** 54:9, 11
172:17, 19, 21  199:11
**speaks** 12:15  22:4
33:23  38:21  39:6, 22
126:8
**specific** 8:8  24:25
29:2  31:25  32:5
58:23  69:5  74:5, 25
81:18  82:1, 17, 19, 22
83:1, 19  89:3  93:5
97:2  130:17  133:20
141:16  145:8  169:8
216:7  223:11  232:11
236:21  240:25  241:9
**specifically** 23:4
31:22  35:16  44:16
56:22  60:17  63:9
65:13, 21  68:2  86:3
92:24  93:2  94:5, 14
97:24  109:3, 14
111:3  117:5  124:13
144:12  145:1  151:11,
14  163:16, 18  168:5
186:6  191:22  204:15
207:16  220:8  222:9
225:24  227:22
228:21
**specify** 26:9
**spectrum** 42:10
**speculate** 183:9
**speculation** 187:22
**speech** 135:10
**speed** 191:1, 19
**spell** 5:6, 16
**Spence** 1:14  3:3  4:3,
17  5:5, 8, 15, 17  10:4,
18  11:7  12:3, 20
14:5  20:16  22:8
28:24  33:4  36:22
38:16  50:21  52:20
54:2, 6  57:12, 22
61:20  63:12  65:2
75:6  112:9  114:2
119:18  127:19
131:23  138:16  151:4
162:6  174:21  185:8
189:17  204:8  223:13
224:22  228:4  232:9

233:3, 25  235:20
237:3  238:18  239:11
242:6  244:19  245:24
246:24
**S-P-E-N-C-E** 5:17
**Spencer** 75:15
147:14
**Spence's** 11:3
**spend** 60:24  61:8
112:11  176:18
178:25
**spent** 52:23  61:7, 9
97:8
**spoke** 101:5  189:25
195:8  221:24  223:7
**spoken** 192:14
203:20  204:22
**sponsor** 30:15  79:10,
19  80:2, 10  112:23
**sponsorship** 79:12
**Sports** 134:10
**spring** 63:2  71:15
112:15  145:7, 16
146:6  182:23
**spring/summer**
193:20
**square** 205:1
**SS** 243:3
**stack** 217:17
**Stacy** 105:16, 18
106:6  160:2
**stage** 35:18  102:12
134:7  202:7
**staged** 181:12
**Stagnaro** 2:5
**stamp** 55:22  56:4
**stamped** 20:17  21:3
33:6  36:23  43:18
63:13  75:7  151:5
162:7  174:22  185:9
234:1  239:12
**stamping** 206:13
**stamps** 198:16, 17
**standalone** 58:22
236:11
**standard** 147:11
**standing** 221:2, 4, 15
**standpoint** 163:8
**Star** 70:7  94:17

**start** 18:1  49:4
59:10  115:3  150:17
165:8  167:21
**started** 17:24  98:23
138:5  166:8
**starts** 123:6  151:17
204:12
**startup** 19:24
**State** 1:20  5:5, 15
32:10  66:9  82:6
96:17, 19  212:16
243:1, 7, 19
**stated** 51:22  52:9, 13
71:8
**statement** 27:18
32:5  44:18  45:1
76:11  170:15, 21
175:8  224:21, 22
226:4  237:5
**statements** 194:17
224:11  229:22
**STATES** 1:1  4:4
117:5  132:10
**status** 84:4  115:14
116:12  118:13
**stay** 34:16  59:19, 25
60:21  67:3, 5  143:19
144:5  195:12
**stayed** 71:1  229:19
**Stein** 115:16  119:3
**stenotype** 243:8, 11
**step** 52:24  81:22
106:17  115:23  119:2,
3
**stepped** 134:9
**Steve** 30:2, 14  72:18
**stipulated** 51:22
**stipulates** 232:11
**stipulating** 211:7
230:6
**stipulation** 128:8
132:4
**stood** 27:12  90:10
**stop** 150:18  189:13
199:5, 9
**stories** 158:19
**story** 219:4, 6, 12
**straight** 156:11
**straightforward** 96:5

**strategic** 17:*19* 26:*23, 25* 27:*2* 31:*2* 36:*1* 94:*16* 110:*13* 154:*14* 155:*25* 156:*4*

**strategies** 27:*8* 29:*16* 32:*12* 81:*16, 17* 94:*20* 95:*6* 97:*12*

**strategy** 16:*10, 12* 20:*7* 24:*7* 26:*20* 27:*6, 7, 10, 11* 29:*14* 30:*13* 31:*3, 7, 24* 32:*20, 21, 23* 36:*10* 37:*24* 41:*16, 18* 46:*1* 50:*2* 59:*1* 64:*2, 3, 7, 12* 68:*10, 22* 69:*15, 19* 70:*7, 23* 71:*11, 21* 74:*12* 75:*24* 76:*2, 4, 5, 10, 20, 24* 77:*2, 6, 10, 19* 79:*22* 80:*14* 81:*19* 82:*3* 86:*10, 15, 19* 87:*1, 16, 17, 21* 124:*3* 140:*18* 178:*19* 180:*7*

**stream** 215:*17*

**Street** 1:*18* 2:*12*

**strength** 149:*17*

**strengths** 103:*8* 121:*2, 5, 15* 123:*20* 125:*19* 128:*21* 129:*1, 6, 9, 15, 18, 22*

**stresses** 19:*25*

**Strike** 108:*18* 177:*14* 214:*11*

**strong** 19:*1* 218:*7* 220:*5*

**structure** 24:*13* 236:*19*

**structures** 235:*12*

**struggled** 69:*20* 116:*19*

**struggling** 116:*2*

**Stuart** 75:*15* 147:*14*

**stuck** 158:*20*

**subject** 6:*4, 7* 29:*4* 30:*11* 228:*1* 230:*7* 237:*25*

**submit** 89:*21* 106:*11*

**submitted** 89:*13, 18, 24* 90:*2, 3* 135:*1*

**submitting** 88:*23*

**suboptimal** 152:*10, 23*

**subordinate** 48:*7*

**subsequent** 107:*12* 117:*22* 145:*15* 147:*2, 21* 172:*14* 236:*7*

**subsequently** 38:*10* 107:*9* 144:*17* 193:*7* 194:*9* 236:*14*

**substance** 32:*3, 6*

**substantive** 148:*25* 149:*2* 161:*11*

**succeeding** 101:*6* 109:*1*

**success** 67:*12*

**successful** 45:*12* 79:*20* 80:*1*

**successfully** 113:*3* 158:*13*

**succession** 100:*8, 12, 19, 21, 22* 101:*9* 107:*5* 111:*11* 122:*2* 124:*10* 136:*9* 150:*17* 163:*9* 234:*16*

**successionplanning.PP TX** 234:*9*

**succession-related** 144:*21*

**successor** 43:*12* 99:*15, 18* 100:*1* 122:*2, 6, 11, 19*

**successors** 122:*11, 24* 123:*24*

**suffer** 62:*2*

**suggest** 53:*13* 222:*24*

**suggested** 182:*20*

**suggesting** 134:*22*

**suggests** 232:*14*

**suited** 48:*5* 179:*22*

**summary** 117:*14* 124:*22* 142:*16* 146:*8* 161:*21*

**summer** 63:*2* 123:*13* 124:*19* 146:*6, 11, 22*

**superior** 48:*7*

**supervisor** 16:*16* 19:*21* 24:*9, 15, 19*

**supervisors** 24:*12*

**supervisory** 56:*9*

**supply** 216:*5* 218:*1* 219:*21* 220:*12, 17, 20, 22, 25* 221:*3, 5, 6, 9, 12, 14, 20*

**support** 43:*3* 60:*16* 157:*13* 179:*4* 194:*3*

**supported** 27:*16* 160:*1*

**supportive** 186:*13*

**Sure** 8:*9* 26:*15* 27:*20* 29:*9* 32:*11* 40:*9* 46:*23* 52:*25* 53:*22* 59:*21* 70:*24* 71:*18* 72:*15* 73:*1* 74:*1* 94:*3* 97:*16* 126:*13* 128:*17* 135:*18* 144:*2* 152:*6* 170:*25* 173:*5* 190:*11* 203:*16* 204:*25*

**Surely** 212:*22*

**surfing** 157:*1*

**surprise** 57:*1, 8* 152:*18* 192:*16*

**surprised** 72:*21* 156:*23* 158:*25* 186:*12* 190:*12, 25* 193:*3* 195:*3, 6* 214:*24*

**surprising** 149:*13, 14*

**surrounding** 88:*9*

**survey** 58:*20* 60:*5, 12, 16* 61:*7, 10* 65:*11* 71:*12* 73:*5* 75:*14* 78:*17, 19* 140:*14*

**surveyed** 60:*4*

**Susan** 85:*21* 202:*6* 214:*1* 215:*5, 6, 10* 218:*5* 221:*21* 222:*4, 11, 20* 223:*7* 232:*20*

**suspect** 85:*24*

**sworn** 4:*10* 5:*9*

**Sydney** 1:*20* 243:*5*

**synopsis** 121:*8*

**system** 106:*18* 114:*20, 24* 155:*20*

**systemically** 123:*9*

**systems** 113:*16*

< T >

**tactics** 94:*20*

**tailor** 88:*6*

**take** 6:*17, 24* 46:*10, 25* 47:*17* 54:*7* 63:*5* 74:*6, 15* 96:*15* 105:*11* 118:*8* 124:*7, 18* 142:*23* 147:*3* 148:*18* 158:*22* 167:*19* 182:*15* 183:*13* 192:*19* 214:*2* 221:*8* 225:*6, 7, 11, 18* 226:*6*

**takeaway** 202:*14, 23*

**Taken** 1:*15* 5:*18, 20, 22* 47:*6* 61:*16* 112:*5* 118:*9* 150:*24* 164:*24* 165:*2, 3* 167:*25* 168:*1* 204:*3* 216:*4* 238:*14* 244:*2, 8*

**takes** 177:*24*

**talent** 12:*9* 63:*24* 69:*18, 20* 70:*3, 25* 74:*2* 79:*17, 21* 80:*3* 81:*4* 82:*7* 83:*4* 86:*21* 87:*10* 100:*4* 101:*24* 102:*1, 3, 4, 5, 15, 16, 25* 103:*2, 5, 6, 11* 104:*21, 23, 25* 105:*1, 3, 6, 7* 106:*9* 107:*2* 113:*18* 116:*17* 119:*24* 120:*3, 7, 12, 15, 19* 121:*19, 20* 122:*6, 12* 123:*4, 14* 124:*6, 11, 15, 16, 22, 25* 125:*8, 13, 16, 24, 25* 126:*3, 5, 15* 127:*5, 6, 15* 136:*8, 13, 14* 144:*16*

**talk** 96:*18* 122:*5* 153:*25* 159:*5* 188:*2* 189:*5* 192:*7* 194:*13* 196:*16* 210:*4* 212:*22*

**talked** 80:*13* 81:*4* 92:*1* 102:*22* 122:*10* 142:*9* 184:*13* 187:*8* 189:*4* 198:*10, 11* 200:*12* 202:*17* 204:*19* 205:*12* 206:*4* 207:*4, 5, 13* 208:*1, 2,*

Deposition of Timothy Spence                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

*3* 210:8, *13*, *18*, *23*
214:*10* 229:*15*, 16
**talking** 52:*10*, *12*
53:*1* 69:*11* 93:*13*, 17
94:*1* 96:*11* 127:7
148:9 157:2 159:*16*,
*21* 169:*11* 174:*12*
185:3, *21* 186:*21*
210:*24* 213:4 229:*12*
238:*18*
**talks** 203:*10*, 15
**Tanner** 30:7 35:*9*
42:6, *21* 55:14
**Tanner's** 35:*10*
**Tanya** 105:*13*
**target** 58:*13*
**targeted** 87:3
**targets** 57:*16*
**Tayfun** 149:*21*
166:*13* 185:22
186:*11*, *23* 188:2, *6*
240:22 241:*3*
**team** 51:*17* 55:18
60:*15* 70:*17*, *23*
81:*15* 112:*24* 135:*19*
143:*3* 145:*10* 152:9,
*21* 153:*13* 154:*12*
157:*20* 191:*7*, *11*
192:9
**teammates** 170:2
**technical** 106:*17*
118:*14*
**technology** 16:*13*
17:*21* 19:*1*, *10* 30:5
60:6
**tell** 43:22 54:8
76:*14* 82:*11* 119:2, *3*
123:*15* 152:8 178:*3*
195:*14* 214:22, *24*
224:6 234:*10*
**telling** 140:*4* 189:*3*
211:*25* 215:8 228:*20*
**tells** 225:*24*
**temporarily** 169:*16*
**ten** 25:*17*
**tenure** 28:25 216:*16*
**term** 84:4 166:*1*
167:*3*, *6*, *10* 169:22
174:*4* 175:15

**terminated** 196:2
**termination** 195:25
**terms** 18:*12* 37:*15*
47:*17* 58:*12* 73:*12*
78:20 104:3 113:*18*,
20 120:*16* 155:23
169:*18* 191:20
240:*10*, 19
**terrified** 213:*17*
226:*13*, 14
**test** 96:4 150:*12*
**testified** 12:*16* 38:22
89:*21* 107:24 126:9
136:*15* 200:*19*
217:*21* 228:*13*
234:*17*
**testify** 227:22
**testifying** 117:*16*, 18
170:20
**testimony** 5:*24*
34:*13* 61:4 67:4
80:22 141:*11*, *12*, 24
154:7 173:*23* 207:*12*
225:*10* 226:*1*, 9, *18*
227:*1* 228:6, *15*, 23
234:22
**testing** 149:*24*, 25
150:*3*
**text** 42:*1*, *3*, 20, *23*
50:25 51:*10*, *13*, 24
53:*21* 111:*21* 112:*1*
114:*4*, *6*, *10* 115:8, *9*
122:*12* 127:*21*, *23*
128:*17* 131:25 132:8,
*20* 133:20, 22 134:6
151:9, *14* 152:*16*
156:8 159:*13* 160:*4*
162:*10*, *13* 163:*4*
175:2, *18* 185:*13*, *14*
186:7 187:8, 25
188:*14* 189:*21*, 22
192:*14* 194:*23*
196:*12* 198:6, *10*, 16
199:22 202:*11*
204:*10*, *18*, *21* 205:*3*,
9, *11*, *17*, *23* 206:*3*, 7
207:*15* 209:*3* 210:*17*
212:*21*, *24* 213:7, *12*,
*21* 214:9 215:7, *12*,

*17* 226:*11*, 25 227:4
233:*4* 239:*13*, 15
**texted** 196:*14*
**texts** 202:*15* 203:3
207:4 208:*12* 209:*17*
210:7 214:*12*
**Thank** 16:*23* 51:*18*
199:*3* 211:4
**Thanks** 133:6 206:24
**that'd** 224:*19*
**them's** 205:*17*, 18
**theoretically** 133:*19*
**therapy** 42:9
**Theresa** 30:7 35:*9*,
10 42:6, *16*, *21* 55:*14*
63:4
**thing** 60:*19* 67:9
73:*24* 90:*12* 102:*18*
150:*16* 159:5 217:*13*
225:*3*
**things** 13:*14* 26:*18*
52:25 69:22 70:*1*, *14*
76:*13* 77:*13* 92:*19*
97:*10* 102:*12*, *21*
149:*10*, *12*, *13* 155:2
158:4 167:*23* 169:*12*
177:*23* 178:*21* 180:7
181:*10* 182:*19* 185:5
194:8 197:6 201:*21*
202:9 224:4 227:*24*
**think** 6:8, *19* 18:24
24:*1* 26:*18* 37:*17*
38:8 45:*24* 51:2, *18*
53:9, *18* 58:*21* 66:5,
*14* 70:9 72:*2* 73:*21*
77:*11* 84:*14* 91:*1*
92:*18* 97:*15* 107:*23*
109:*16* 115:*11*
119:*23* 120:*24* 122:*4*,
7 128:22 131:*13*
135:9, *16* 145:*19*
148:*4*, *17* 149:8, *12*,
*16* 150:5 160:*1*
168:*15* 169:7 177:*7*,
*18* 181:*24* 189:*13*
191:*4*, *7*, *14* 192:*17*,
25 195:*21* 198:*14*
207:*11* 210:24
215:*16* 217:8 223:25
234:6 239:*3*, 6 240:2

**thinking** 51:*16*
70:*16* 159:4 176:*18*
228:7 229:*12* 230:8
**THIRD** 1:*9*, *18* 2:*17*
4:6, *18*, *19* 8:*3*, 6, *10*,
*11* 9:*1*, 2, *14*, *19*, 22,
*23* 10:*10* 13:*17*
14:*14* 15:*17* 20:*17*,
*21*, 22 21:*3* 26:*11*, *17*
28:5, *15* 29:*12*, 22
33:6 34:*3*, 25 35:2
36:*23* 37:*3*, *10*, 16
38:*3*, *17* 39:*3* 43:*18*
44:20 46:25 47:5
48:*15* 57:*13*, 23
60:*24* 63:*13*, 14, *21*
65:*3*, *4*, 15 66:*1*, 5, 7
68:5 70:*4* 72:*15*, *23*
75:7, 8 76:*17*, *18*
77:*4*, *18*, *20* 79:*15*
81:*12* 83:*15* 84:*11*,
*16*, 21 86:6, 8 90:*16*
97:9 98:*17* 99:*3*
100:*19* 101:7 103:*23*
104:*15* 106:*12*, 21
107:*21* 108:5, *14*, 22
109:2, *10*, 24 110:5
111:*12* 112:9, *10*
114:*3* 115:*19* 117:2
119:*19*, 20 120:*1*
125:*23* 126:*19*
127:*20* 130:22
131:*11*, 24 135:*14*
136:*17*, 20, 24 137:*2*,
5, 8, 24 138:*17*, 18
139:8, *23* 140:*10*
141:*19* 142:*11*, 25
148:*18* 149:8 150:*14*
151:5, 6 155:7 162:7,
8 163:9, *13*, *18* 164:*1*,
4, 8, *11*, 14 166:9, 24
167:4, *13* 174:*23*
175:*1* 176:*3*, 20
177:2, *10*, 22 179:*23*
182:*15* 184:*1* 185:9
186:5 187:*23* 189:*18*
195:*10*, *17* 196:*1*, *4*
204:9, *16* 205:2
208:9 213:6 215:*1*
227:*3* 231:*3* 232:*16*

Deposition of Timothy Spence

Philip R. McHugh v. Fifth Third Bancorp, et al.

234:*1, 2* 236:*4, 16*
237:*4* 239:*12* 244:*4*
**Third's** 112:*17*
231:*6, 20*
**Thomas** 2:*17* 4:*18*
**thought** 16:*21* 45:*8*
80:*9* 107:*5* 126:*11*
149:*15, 18* 159:*23*
163:*1* 192:*8*
**thoughts** 80:*5, 8*
190:*5* 191:*3* 208:*21*
**thousand** 11:*25*
**thousands** 135:*21*
**thread** 42:*23*
**threat** 224:*23, 24*
225:*2, 8, 16, 19, 22, 24*
226:*4, 8* 227:*25*
228:*13, 18, 19*
**threatened** 224:*13, 14*
**threats** 216:*7* 223:*10,*
*11* 224:*12*
**three** 7:*8* 19:*15*
20:*9* 25:*24* 26:*5*
28:*10* 49:*24, 25*
71:*10, 21* 102:*11*
112:*19, 21* 115:*2, 6*
146:*25* 148:*8, 10, 13,*
*16* 150:*13, 16* 151:*21*
202:*18* 208:*22*
227:*16*
**three-plus** 202:*8*
**threw** 218:*19, 24*
**throw** 218:*21* 219:*1*
**throwing** 216:*3*
217:*14, 15, 17, 24*
218:*12, 15* 219:*12*
**thumbs** 187:*4*
**Thursday** 62:*7, 13*
130:*1, 8* 188:*21*
189:*11* 190:*14*
212:*13* 220:*1*
**Thursdays** 130:*7*
**TIGTA** 6:*5*
**Tim** 5:*17* 53:*8, 19*
54:*23* 55:*2, 3* 140:*24*
190:*5* 223:*13* 224:*22*
226:*6* 228:*4* 235:*20*
**Time** 1:*17* 4:*2, 8*
13:*8, 14, 24* 14:*9*
16:*4* 19:*12* 22:*6*

23:*2, 6, 14* 24:*10, 21*
25:*11, 24* 27:*3, 24*
28:*8, 14* 29:*11, 23*
30:*2, 22* 31:*7* 34:*4, 6,*
*12* 35:*10, 25* 36:*15*
37:*20* 38:*2, 9, 12*
41:*5, 8, 15, 20, 21*
44:*18, 24* 46:*17, 21*
47:*1* 48:*6, 24* 49:*3,*
*21* 50:*3, 12, 15* 52:*1,*
*23* 55:*2, 6, 13* 56:*15,*
*24* 60:*22* 61:*14, 17*
62:*5, 16* 63:*8* 68:*12*
71:*17, 25* 75:*14, 25*
76:*1* 85:*12* 97:*9, 25*
98:*3* 99:*15, 23* 101:*5,*
*11, 19* 103:*15, 22*
104:*24* 105:*10*
107:*17* 108:*2, 17, 19*
109:*7, 11, 20* 110:*1,*
*12, 20* 111:*2* 112:*6*
117:*9* 118:*6, 20*
125:*4, 7* 129:*14*
130:*9, 25* 134:*17*
143:*20* 144:*6* 146:*14*
148:*20* 149:*22*
150:*19, 25* 156:*23*
157:*10* 158:*10, 25*
159:*24* 160:*2* 165:*19,*
*21, 24* 166:*6, 8, 9*
169:*25* 176:*18*
177:*15* 178:*9, 21, 25*
180:*25* 181:*13*
183:*22* 184:*14, 18, 25*
187:*19* 188:*19* 189:*1,*
*6, 7* 190:*3, 8, 12*
192:*6* 193:*12, 21*
194:*14* 195:*19*
196:*20, 22* 197:*18*
198:*17, 23* 199:*20*
201:*12, 20* 202:*21*
204:*4* 206:*6, 17, 22*
207:*22* 212:*10, 21*
216:*18* 218:*7, 18*
219:*24* 222:*18*
225:*14* 226:*16* 230:*9*
233:*19* 236:*25*
238:*15* 239:*18* 240:*4*
241:*11, 20*

**Timeframe** 16:*19*
44:*15* 93:*18* 94:*1*
95:*15, 21* 100:*24*
101:*1, 21* 122:*9*
139:*3, 24*
**times** 166:*2*
**timing** 109:*9* 183:*9*
186:*2* 192:*16*
**Timothy** 1:*14* 3:*3*
4:*3* 5:*8* 242:*6*
244:*19* 245:*24*
246:*24*
**Tim's** 140:*13*
**tired** 19:*24* 157:*1*
**title** 19:*19* 23:*17, 19,*
*21, 22* 24:*2* 178:*17*
**titled** 93:*22*
**titles** 23:*24* 150:*2*
**Today** 4:*1* 6:*15*
12:*10* 18:*15* 82:*14*
92:*17* 110:*17* 147:*15*
184:*18, 19* 188:*22*
189:*13* 190:*23* 198:*8*
213:*24* 228:*9* 229:*21*
231:*17*
**today's** 7:*11, 17*
**told** 63:*4* 90:*7*
95:*16, 21, 25* 98:*22*
119:*8* 150:*18* 156:*25*
178:*1* 179:*10* 190:*11,*
*13* 193:*4* 194:*2*
200:*19* 201:*9* 211:*16*
214:*1, 15, 16, 24*
215:*1* 223:*16, 19, 25*
224:*18* 225:*11*
**toll** 158:*15*
**Tom** 35:*25* 105:*17*
**tomorrow** 185:*20, 22*
186:*18* 187:*1*
**tonight** 208:*12*
**tools** 60:*6*
**top** 23:*25* 35:*17*
51:*18* 70:*6* 83:*2*
85:*10* 121:*23, 24*
123:*15* 124:*6* 176:*17*
193:*17* 224:*10* 231:*8*
234:*4*
**topic** 103:*13* 118:*10*
**topics** 107:*4*

**tornado** 240:*23*
241:*2*
**total** 25:*16* 73:*4*
148:*8* 237:*16*
**totality** 26:*11* 123:*14*
**Totally** 14:*8* 156:*22*
158:*24*
**touches** 55:*16*
**town** 36:*6*
**track** 48:*25* 49:*4*
**trade** 28:*24* 29:*4*
**traded** 104:*13*
**training** 167:*19, 20,*
*21* 168:*4, 9*
**trajectory** 46:*8*
**transcribed** 243:*8*
**transcript** 241:*19, 23*
243:*9, 10* 244:*7*
**transferred** 42:*16*
49:*15, 19* 183:*7*
**transformation** 90:*16*
110:*14*
**transition** 43:*3*
162:*18, 22* 163:*1, 10,*
*12*
**transitioned** 64:*19, 22*
**transparent** 135:*19*
**Treasury** 5:*23* 6:*6*
27:*22*
**treat** 132:*5* 201:*1*
223:*16, 20* 229:*7*
**treated** 200:*25* 201:*1*
223:*21* 236:*10*
**treatment** 229:*5*
**tried** 35:*6* 135:*16*
153:*14* 198:*13* 220:*5*
**triumphal** 170:*7*
**Troy** 210:*18*
**truce** 227:*14*
**true** 122:*1* 155:*25*
156:*2* 168:*24* 172:*22*
177:*23* 216:*15*
243:*10* 244:*10*
**trust** 12:*13, 23* 13:*17*
27:*19*
**try** 54:*16* 83:*4*
114:*12* 200:*2*
**trying** 52:*7, 14* 54:*4,*
*9* 70:*12* 96:*14, 15*

Deposition of Timothy Spence          Philip R. McHugh v. Fifth Third Bancorp, et al.

135:*12*  154:*20*
184:*21, 23*
**tub** 209:*5*
**Turkish** 240:*22*
241:*2*
**turn** 35:*12*  42:7
63:*4*  182:22
**turned** 61:*24*  196:7
205:*5*
**turning** 62:*3*
**Tuuk** 30:*6*
**Tuzun** 149:*21*  166:*13*
**twice** 118:*11*  145:25
208:*1, 3*  210:*4*
**two** 17:*3*  20:*11*  25:*5,
20, 23*  64:*14*  72:*10*
80:*5, 8*  81:8  102:*11*
126:*7, 17*  142:*17*
146:*18, 25*  148:*13*
150:*16*  151:*24*
159:*21*  161:*17*
182:*19*  185:*5*  191:*14,
24*  192:25  193:*11, 12,
24*  217:*23, 25*
**two-plus** 120:*22, 23*
143:*19*  144:*5*
**type** 95:*1*  150:*5*
**typo** 202:*19*

**< U >**
**U.S** 5:*23*  18:*12*
26:*11*
**uh** 26:*9*  35:*3*
**Uh-huh** 118:*2*  122:25
**uh-huhs** 6:*17*
**UK** 26:*15*
**ultimately** 19:*5*  35:*8*
50:*13*  73:7  88:*2*
103:*13*  113:*23*
118:*22*  143:*2*  169:*17*
236:*18*
**unaware** 99:*15*  100:*3*
**uncertainty** 226:*23*
**unclear** 40:*4*
**unconscious** 168:*19*
170:*14*
**undergone** 162:*21*
**underrepresented**
81:*10*
**undersigned** 243:*5*

**understand** 6:*12, 25*
10:*24*  32:*10*  40:2, 7
46:*22*  59:7  101:*4*
122:*23*  135:25
143:*25*  158:*5*  159:*6*
160:*6*  168:*16, 21*
169:*2, 4*  170:*11, 16,
23, 25*  171:*15, 17, 23*
172:*3, 16, 24*  173:*2*
177:*6*  184:*24*  189:25
194:*15*  198:*16, 17*
213:*24*  232:2, *24*
**understanding** 60:*9*
88:*19*  99:25  100:*2*
106:*14, 24, 25*  172:*2*
197:*23*  211:*11, 15*
223:*18*  244:*13*
**understood** 88:*5*
182:*14*  187:*17*  189:2,
*3*  191:25  192:*15*
209:*24*
**underway** 90:*16*
110:*14*
**unhappy** 96:*16*
**Uniform** 137:*15*
164:*22*
**unique** 19:25  87:*8*
88:*7*
**unit** 68:*8, 9*  81:*24*
**UNITED** 1:*1*  4:*4*
**units** 48:*4*  69:*7*
75:*20*
**universities** 82:*5, 6*
**University** 15:*8, 10,
12*
**unusual** 25:*4*
**update** 102:*8*
**upgrade** 53:*10*
**upgraded** 53:*16*
**USAA** 43:*11*
**use** 12:*9*  97:*11*
116:*13*  147:*14*
170:*17*  171:*1, 18, 24*
172:*4, 12*  173:*12, 15,
19, 21, 22, 24*  174:*6*
175:*15*  228:*18*  230:*3*
234:*7*  240:*19*
**uses** 170:*6*
**UTC** 127:*24*  128:*18*
132:*10*  151:*15*  152:*5*

159:*4*  162:*14*  175:*3*
185:*15*  186:*8*  187:*8*
198:*7, 15*  199:25
200:2, *11*  202:*11, 16*
204:*19*  205:*11*  206:*4,
16*  208:*11, 17, 21*
209:*17*  210:*7, 16*
211:*23*  212:*24*  213:*8,
22, 23*  214:*13*  215:*13*
226:*12*  227:*5*  233:*6*
239:*16*
**utility** 26:*14*
**utilizes** 92:*8*

**< V >**
**vacation** 202:*20*
**vaguely** 12:*9*  197:*5*
**valuable** 97:*15*  192:*9*
**value** 27:*19*  181:*7*
190:*4*  191:*6*
**valued** 189:*5*  217:*10*
229:*14*
**variable** 58:*12*
237:*19, 21*  238:*1*
**variety** 81:*13*  178:*20*
216:*13*
**various** 47:*16*  83:*22*
181:*20*
**vary** 26:*4*
**vendor** 231:*13*
**verbally** 6:*16*  224:*25*
**version** 127:*11*
136:*12*  150:*15*
**versions** 136:*15*
**versus** 4:*6*  97:*19*
**vet** 139:*14*  144:*15*
**vetted** 139:*17, 22*
144:*11*
**vetting** 107:*7, 11*
139:*19*  140:*8*
**vice** 12:*13, 22*  13:*16*
14:*22*  16:*9*  21:*22*
22:*13, 19*  33:*19*
37:*24*  39:*14, 20*
40:*11, 16, 21*  48:*19*
**vicinity** 43:*5*
**victorious** 169:*19*
**victory** 170:*7*
**video** 4:*22*  6:*15*
**videoconference** 2:*4*

**Videographer** 1:*21*
4:*1*  61:*14, 17*  112:*6*
150:*25*  204:*4*  238:*15*
241:*20*
**Videotaped** 1:*11*
**view** 56:*12*  78:*21*
97:*8*  111:*16*  122:*18*
209:*6*
**viewpoint** 75:*13*
140:*13*
**Vikings** 169:*25*
**vindicated** 169:*19*
**visible** 162:*24*
**vision** 27:*18*  31:*23*
36:*10*
**vocabulary** 230:*3*
**voice** 218:*2*
**volume** 221:*6, 9, 13*
**voluntarily** 214:*3*
**vote** 177:*24, 25*
181:*21*  183:*11, 25*
184:*3, 15*  186:*3*
**voted** 177:*10*  180:*21*
183:*3*  184:*8*
**voting** 177:*15, 17*
**vs** 1:*8*  244:*4*

**< W >**
**wager** 170:*4*
**wait** 6:*20*  93:*12*
158:*20*
**waiting** 6:*22*  199:*25*
215:*9*
**walked** 179:*20*
220:*10*  221:*1, 7, 10,
12, 13, 17, 18*
**wall** 216:*4*  217:*17*
**Walnut** 1:*18*
**wanna** 205:*25*
**want** 12:*18*  33:*18*
47:*16*  59:*4, 23, 24*
101:*18*  123:*15*
139:*13*  144:*15*
156:*10*  157:*2*  159:*6*
160:*8, 22*  169:*9*
185:*19*  203:*14*
204:*20*  210:*1, 2*
225:*7*  241:*22, 25*
**wanted** 20:*6*  35:*14*
46:*7*  52:*5*  62:*22*

73:24  80:9  95:3
116:25  155:23
156:19  178:9  180:10
181:23, 24  190:2
191:3  192:17, 19
194:14  195:12  197:2
201:12  203:16, 17, 24
235:15
**wanting**  103:14
201:23
**Waste**  13:7  14:9
**wasting**  22:6  226:16
**watched**  239:17
**water**  36:19
**waterfall**  180:22
**wave**  157:1
**way**  24:12  25:25
28:22  37:11  58:20
64:20  80:6  82:16
92:8  96:16  97:10
101:10  128:2  132:5
136:1  150:10, 19
154:13  155:3  158:3
159:19  165:11
168:11, 14  169:6, 17
181:13  191:2  192:6
201:1  203:24  211:5
212:14  217:12  219:4
223:21  226:8  228:1
229:13, 19  230:19
**ways**  60:15  61:11
66:15  76:13  81:13
92:21
**wealth**  32:14  38:7
44:4  47:24, 25  48:20
49:12  55:15  61:11
64:21, 23  71:25  72:4,
9, 17, 19  78:24
113:14, 18  115:12, 25
116:15  118:23  137:5,
8  164:14  180:6
183:6  236:3
**Webb**  30:3
**website**  10:8
**week**  209:8  217:17,
18, 19, 24  222:17, 18
**weekend**  185:19
**weekly**  118:11
119:13

**weeks**  26:5  147:7
217:21, 24
**Weird**  211:21
**welcome**  170:17
171:1, 2, 18, 19  172:7,
11  173:7, 11, 17, 24
174:16
**welcomed**  171:24
172:4, 12  173:19, 21,
22
**well**  9:8  28:7  31:13
40:5  53:5  59:22
61:12  62:21  66:2
83:10  86:20  87:4
94:12, 21  95:11
102:17  114:13, 21
123:3, 23  131:15
143:5  145:17  173:18
180:24  183:1  188:22
189:13, 25  196:20
198:8  216:22  221:11
223:13  232:6  241:25
**wellness**  158:18
**went**  64:19, 21  77:25
78:1  113:2  120:12,
20  187:9, 14  188:20
191:24  232:20
**We're**  4:2  6:15
20:22  52:25  53:1
61:14, 17  112:6
141:16  150:25
156:24  174:12  204:4
226:16  238:15
**WESTERN**  1:3  4:5
**we've**  213:11  223:21
**Wharton**  2:4  4:23
**When's**  104:24
**WHEREOF**  243:12
**Whoever's**  4:21
**who've**  223:22
**why'd**  42:7
**wide**  26:18
**Wiedemann**  191:6,
12, 15  193:5, 14, 22,
25  229:18
**wife**  7:8
**willing**  102:10  216:8
**Willow**  7:3
**winter**  17:3

**wish**  227:13
**withstanding**  71:3
**witness**  4:9  5:9, 25
7:23  11:24  12:16, 22
13:9, 22  14:2, 8, 10
15:1, 23  29:6  34:10,
20  36:19  38:23  40:5
41:11  45:17  46:15
52:14, 18  54:10, 14,
15, 18  55:25  56:4, 13
61:6  69:2  71:23
74:24  80:23  84:25
87:20  89:22  91:16
92:3  93:19  98:8
99:7  100:16  103:20
108:8  128:14  130:17
154:1, 4  155:11
165:2  167:1  171:5,
11, 12, 23  173:11
182:6, 8  184:25
219:9  225:11  226:3,
18  228:14  230:2, 5
231:25  235:10
241:16, 18  243:12
**women**  79:22  80:3,
15, 25  81:6, 20, 21
82:10, 13  83:14, 16
84:12, 17, 22  86:23
87:18
**word**  54:12  57:2, 9
99:23  175:8  213:12
225:22  226:9  227:25
228:18
**wording**  78:19
**words**  99:20  228:5
230:6
**work**  16:8  17:7
18:13  24:11  26:8
30:10, 13, 20  31:23
52:25  53:18  59:18,
22, 24  60:11  66:6, 10
67:11  92:16  93:9
94:22  95:6  139:20
144:24  146:15  152:8
158:2  194:6, 7
195:12  197:14
203:25  214:17
220:21  223:13
224:22  228:3

**worked**  17:15  23:11
26:11  69:24  94:21
125:17  147:12, 13
**workforce**  80:24
81:10
**working**  17:5, 7, 24
18:1, 10  19:24  24:17
25:2, 5, 10  28:5, 14,
16  36:15  48:2  69:19
74:3, 5  88:5  107:13
111:2  140:5  156:17
178:10  180:12  190:4
193:10  234:19
**workplace**  176:25
216:15
**works**  88:20
**world**  19:13  159:2
**worn**  233:7
**worst**  230:22
**worth**  42:19
**writing**  81:2  82:24
101:22  104:2  194:18
**written**  104:5, 21, 23
106:20  117:14  160:6
**wrong**  57:1  152:10,
22  205:5
**Wyman**  20:13  23:9,
13, 20  25:13, 15, 22
27:1, 25  28:4, 17
29:1  30:25  34:13, 17,
24  35:15  70:22

**< Y >**
**Yeah**  9:3  11:24
17:12, 18  22:22  24:6
29:6  49:25  57:7
64:16  67:4, 8  72:21
75:20  78:14  82:25
84:25  88:14  103:17
108:8  122:4  123:3
138:1  141:18  142:17
152:2  157:10  160:15,
21  171:23  173:16
174:4  178:15  179:20
180:14  181:25
195:11  198:22  199:9
200:18  203:8  205:15,
20  207:23  208:3
212:6  228:14  232:10
236:2  238:7

Deposition of Timothy Spence                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

**year** 7:*6* 14:*11, 13, 18* 15:*9* 18:*1, 3, 21* 28:*19* 58:*3, 7* 60:*25* 62:*20, 23* 64:*10, 19, 22* 71:*16* 74:*19* 76:*10* 77:*2, 12* 78:*1* 79:*20* 80:*1, 15* 83:*9* 88:*13, 21, 25* 89:*9* 90:*5, 20, 24, 25* 91:*3, 7, 12, 24* 92:*13* 93:*7, 23* 94:*4* 98:*12* 123:*6, 7, 11* 138:*22* 155:*24* 165:*20* 168:*3* 182:*23* 193:*11, 14* 200:*10* 219:*14* 236:*14* 237:*20, 25*

**years** 5:*21* 7:*10* 19:*15* 20:*9, 11* 25:*14, 15, 17, 20, 23, 24* 38:*12* 47:*10, 17* 49:*3, 24* 55:*20* 71:*10, 21* 87:*24* 88:*17* 94:*18* 98:*17, 21* 113:*23* 120:*22, 23* 126:*7, 17* 130:*3* 137:*24* 138:*1, 3* 143:*19* 144:*5* 156:*1* 174:*12* 191:*1, 24* 193:*12* 201:*3* 202:*8* 216:*10* 237:*9*

**yelling** 216:*5* 218:*3* 221:*15*

**yellow** 115:*14* 116:*13*

**Yep** 163:*4* 188:*15* 209:*22*

**yesterday** 190:*1, 11* 214:*1, 5*

**York** 15:*8* 23:*12* 26:*13*

**young** 42:*9* 109:*22* 110:*4*

**YPO** 137:*21* 165:*6*


**< Z >**

**Zaunbrecher** 85:*21* 218:*5* 221:*21* 222:*4, 12, 20* 232:*20*

**Zoom** 4:*21, 24*