1          UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF OHIO

3                WESTERN DIVISION

4

5    --------------------------  :
                                 :
6    PHILIP MCHUGH,              :
                                 :
7          Plaintiff,            :
                                 :   CASE NO. 1:21-CV-00238
8       vs.                      :
                                 :
9    FIFTH THIRD BANCORP, et     :
     al.,                        :
10                               :
           Defendants.           :
11   --------------------------  :

12

13                    VOLUME II

14

15        Videotaped
          Deposition of:    Gregory Carmichael

16        Taken:            By the Plaintiff

17        Date:             September 27, 2023

18        Time:             Commencing at

19        Place:            Fifth Third Center
                            511 Walnut Street,
20                          Cincinnati, Ohio 45202

21        Before:           Sydney Jackson
                            Notary Public - State of Ohio
22

23

24

25

```
 1   APPEARANCES:

 2

             On behalf of the Plaintiff:
 3
             Peter A. Saba, Esq.
 4           Joshua M. Smith, Esq.
                     of
 5           Stagnaro, Saba & Patterson Co.,
             2623 Erie Avenue
 6           Cincinnati, Ohio 45208
             Phone:  513.533.2701
 7           E-mail: Pas@sspfirm.com
                     Jms@sspfirm.com
 8

 9           On behalf of the Defendants and the Deponent:

10           Michael L. Cioffi, Esq.
                     of
11           Blank Rome LLP
             1700 PNC Center
12           201 East Fifth Street
             Cincinnati, Ohio 45202
13           Phone:  513.362.8700
             E-mail: Michael@blankrome.com
14

15           Also Present:

16           Philip R. McHugh
             Phenise Poole, Esq., Fifth Third Bancorp
17           Brian C. Thomas, Esq., Fifth Third Bancorp

18

19

20

21

22

23

24

25
```

```
 1                    I N D E X

 2

 3   Gregory Carmichael                                PAGE

 4    Continued Examination by Peter Saba                271
      Examination by Michael Cioffi                      504
 5    Further Examination by Peter Saba                  520
      Further Examination                                532
 6

 7    EXHIBITS                        MARKED      REFERENCED

 8   Exhibit 30                         --            271
     Exhibit 31                         --            271
 9   Exhibit 32                         --            274
     Exhibit 33                        312            312
10   Exhibit 34                        316            316
     Exhibit 35                        316            316
11   Exhibit 36                        365            365
     Exhibit 37                        367            367
12   Exhibit 38                        369            369
     Exhibit 39                        369            369
13   Exhibit 40                        369            369
     Exhibit 41                        374            374
14   Exhibit 42                        374            374
     Exhibit 43                        389            389
15   Exhibit 44                        392            392
     Exhibit 45                        393            393
16   Exhibit 46                        396            396
     Exhibit 47                        402            402
17   Exhibit 48                        403            403
     Exhibit 49                        406            406
18   Exhibit 50                        407            407
     Exhibit 51                        408            408
19   Exhibit 52                        409            409
     Exhibit 53                        415            415
20   Exhibit 54                        419            419
     Exhibit 55                        422            422
21   Exhibit 56                        423            423
     Exhibit 57                        425            425
22   Exhibit 58                        428            428
     Exhibit 59                        429            429
23   Exhibit 60                        430            430
     Exhibit 61                        437            437
24   Exhibit 62                        438            438
     Exhibit 63                        438            438
25   Exhibit 64                        439            439
```

Case: 1:21-cv-00238-MRB Doc #: 77-16 Filed: 06/27/25 Page: 4 of 118  PAGEID #: 3832

Deposition of Gregory D. Carmichael, Volume II                    Philip R. McHugh v. Fifth Third Bancorp, et al.

```
 1                    I N D E X  (CONTINUED)

 2

 3     EXHIBITS                         MARKED      REFERENCED

 4     Exhibit 65                        443          443
       Exhibit 66                        443          443
 5     Exhibit 67                        466          466
       Exhibit 68                        481          481
 6     Exhibit 69                        485          485
       Exhibit 70                        487          487
 7     Exhibit 71                        489          489
       Exhibit 72                        491          491
 8     Exhibit 73                        500          500
       Exhibit 74                        532          532
 9     Exhibit 75                        532          532

10

11                        -  -  -

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Deposition of Gregory D. Carmichael, Volume II        Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 271

1    VIDEOGRAPHER: It is September 27, 2023, time
2 is 9:05 a.m. We're on the record for day two,
3 continuation of deposition of Gregory Carmichael
4 per the Court's order. Witness is still under
5 oath. You may proceed.
6
7      GREGORY CARMICHAEL
8 of lawful age, a witness herein, being first duly sworn
9 as hereinafter certified, was examined and deposed as
10 follows:
11
12      CONTINUED EXAMINATION
13 BY MR. SABA:
14    Q. Mr. Carmichael, if I could refer you back to
15 Exhibit 30, please. That's the December 17th final
16 talent deck.
17    A. Okay.
18    Q. And this was the talent deck you presented to
19 the board to the December 17th board meeting; is that
20 correct?
21    A. If it's the final version, that is correct.
22    Q. Okay. And referring, again, to Fifth Third
23 McHugh 001132, the talent card for Phil McHugh.
24    A. Okay.
25    Q. The age information for him was kept in there,

Page 272

1 correct?
2    A. I believe that's correct for everybody, it's
3 in his deck.
4    Q. By "everybody," you mean everybody who had a
5 talent card for the enterprise committee, correct?
6    A. That's what I'm referring to, correct.
7    Q. Referring to Fifth Third McHugh 001117.
8    A. Okay.
9    Q. That's the work force for the future five
10 generations in the work place Fifth Third Bank; is that
11 right?
12    A. Appears to be so, yes.
13    Q. Why was this card included in the talent deck?
14    A. That's a question for head of HR. At the time
15 it would have been Bob Shaffer. This deck was prepared
16 by them. This part of the deck, especially, was
17 prepared by them. I wasn't involved in it.
18    Q. You reviewed the talent deck, though, before
19 it was submitted to the board; is that correct?
20    A. I paged through it, but my focus was mainly on
21 talent card and succession planning. The majority of
22 this, I assume Bob Shaffer's team would take care of it.
23 So I would -- did a cursory review of it, but I didn't
24 get into any depth on this one.
25    Q. And you did not remove it from the talent

Page 273

1 deck; is that right?
2    A. It's in here, so I did not remove it.
3    Q. And this would also confirm, as based on the
4 Fifth Third breakdown of generations, that Phil McHugh
5 and Tim Spence are actually from two different
6 generations; isn't that right?
7      MR. CIOFFI: Objection. Relevancy, beyond the
8 scope of discovery. But you may answer, if you
9 have an answer.
10      THE WITNESS: Based on the -- I mean, I can
11 look at Phil's birth date and Tim's birth dates,
12 but based on the assumption on whether, where their
13 ages are, I would -- I believe that Tim would be in
14 -- looks like Phil would probably be in generation
15 X and Tim would probably be a millennial.
16 BY MR. SABA:
17    Q. Actually Phil would be a baby boomer; isn't
18 that right? He was born in 1964?
19    A. I guess I didn't have his birthday in front of
20 me, so. If he was born in 1964, he would be a baby
21 boomer, as I am.
22    Q. So just confirming. They would both be from
23 two different generations, correct?
24    A. That's how the math works and their age works,
25 so that would be correct.

Page 274

1    Q. Referring you back to Exhibit 31. Identify
2 these as the minutes of the meeting of the board of
3 directs for Fifth Third Bancorp. Exhibit 32 is
4 essentially the same minutes from the same simultaneous
5 meeting for the board of directors at Fifth Third Bank;
6 is that correct?
7    A. That's correct.
8    Q. Do you have any recollection of that meeting
9 independent of these minutes?
10    A. Can you restate the question?
11    Q. Sure. Do you have any recollection of that
12 December 17, 2019, board meeting, independent of
13 Exhibit 31 and Exhibit 32?
14    A. Are you asking me if things occurred that are
15 not in the minutes? I'm trying to understand the
16 question.
17    Q. I'm asking you if there's things that you
18 remember independent of these minutes, or do you need
19 the minutes to recall what happened at that meeting?
20    A. Well, it was in 2017 -- 2019, December 17th
21 meeting, I would probably need to go back to the minutes
22 to recall everything that took place.
23    Q. Do you recall anything independent of the
24 minutes?
25      MR. CIOFFI: By way of objection, the

Page 275

1  deposition is not a memory test. If you want to
2  direct his attention to something, you can. But
3  I'm going to let you answer whether you can
4  remember.
5      THE WITNESS: It was four years ago. I don't
6  recall anything that wasn't in the minutes. So I
7  mean, this -- I don't have that kind of recall I
8  can go back and remember everything that was said.
9  And I haven't gone through these minutes recently,
10 so I'm not sure what response you're looking for.
11 BY MR. SABA:
12     Q. Okay. Referring to Exhibit 31, it indicates
13 Mr. Carmichael presided and Ms. Somalya recorded. You
14 have presided over all the board meetings; is that
15 correct, during this time period?
16     A. I was the chairman of the board. I would
17 preside over the board meetings that involved the
18 non-independent executive chair. There's sessions that
19 the board has with independent directors that I do not
20 and am not involved in and do not preside over.
21     Q. Otherwise, outside that, you preside over the
22 board meetings; is that correct?
23     A. That would be correct. That doesn't mean
24 that I'm in every committee meeting that the board would
25 have, because I'm not, so I would not be involved in

Page 276

1  certain committee meetings, depending on the schedules
2  and how things came together.
3      So those -- I can't be in multiple places at
4  one time, so I would not be at every meeting.
5      Q. Referring to Exhibit 31, the first section is
6  executive performance review. Do you see that?
7      A. I do.
8      Q. Who would be present for that portion of the
9  meeting?
10     A. I believe Bob Shaffer, myself, and the full
11 board.
12     Q. Anybody besides that?
13     A. It would be us for the talent management deck,
14 then I believe FW Cook would come in and provide just a
15 market analysis of how our executives compensation
16 stacks up against the market with respect to our
17 position against the meeting point of compensation.
18 They would do that. They would come in at some point in
19 that meeting, either at the end -- I believe it's at the
20 end but I'm not a hundred percent sure -- and they would
21 provide that level of data because we're going to be
22 going into the first quarter of the year and that's
23 going to be a lot of conflict schedules in the first
24 quarter of the year. That's when comp gets solidified
25 and voted on by the board and distributed into the

Page 277

1  executives, old awards, new awards and so forth. So
2  they would have some foundational information provided
3  by FW Cook at that meeting.
4      Q. The second paragraph under the section
5  performance reviews says, Mr. Shaffer and Mr. Carmichael
6  began with the review of human capital strengths and
7  priorities across the organization, including a
8  discussion of employee viewpoint results, compensation
9  and pay equity, culture and key recruitment and
10 retention priorities.
11     With respect to that review, is that -- is
12 that going into employee detail or is that just a
13 broader scope of the corporation? What is that?
14     A. Where were you at again on this document?
15     Q. I'm in the first full paragraph under
16 executive performance review, the second sentence.
17     A. Okay, let me read this.
18     Okay, I read it. What's the question?
19     Q. My question is, I'm just trying to get an
20 understanding of what's covered in that section? Is
21 that an overall view of the corporation consistent with
22 some of the initial sections of the talent deck?
23     A. If you look at the talent deck, obviously the
24 first part of that section before you get into the
25 talent cards, where I talk -- really, when I step in and

Page 278

1  start to discuss the talent -- my part of that meeting
2  is Bob covers all the front end of it, I step in and
3  start to talk about each individual on the enterprise
4  team, then I talk through, with Bob's support, the
5  succession planning documentation. Bob handles all the
6  process stuff, company stuff, the viewpoint survey
7  stuff, all that compensation and pay equity, that would
8  be handled by our independent comp consultant, that
9  would be Charlie King from FW Cook, would talk about
10 that. I'm not sure exactly in a timeline, how that
11 flows in that multi-hour meeting, but that would be
12 covered by him, not me. And I would really focus on
13 discussions on talent, potential succession planning for
14 certain executives in my organization, and then it's
15 succession planning for the CEO.
16     Q. So referring back to that first section, you
17 said that would be covered by Mr. Shaffer. Is he
18 basically covering the information at the beginning of
19 the talent deck? Is that what he's providing?
20     A. Yes. My part starts typically when we get
21 into the talent cards, and talking about each executives
22 on the team. That's when I would step in, and my part
23 of the conversation would take place. Bob covers
24 everything else prior to that, that I can best recall.
25     Q. Is he providing any information outside what's

Page 279

provided in the talent deck?

A. No, he follows the deck, through the deck section by section, and we don't have another discussion. We only have so much time, so what's in that deck is what he felt was relevant to share with the board, information he thought the board would want to see, would need to see, and I think he does a fantastic job of that. He turns it over to me and we talking about each individual in the organization, and I cover the talent cards, as I mentioned earlier.

Q. With the second full paragraph, the first sentence reads, they then review the proposed performance review for each executive officer other than Mr. Carmichael, including a discussion of key achievements, strengths, opportunities and development planning priorities for such individuals. Do you see that?

A. I do.

Q. Okay. With respect to that, who's -- who's leading that part of the discussion? Is that when you're taking over?

A. This would be -- correct. This would be my part of the conversation with the board, as I mentioned earlier, in my responsibilities to go through the talent cards and talk about succession planning for certain key

Page 280

individuals, and some of the actions that may be coming up and potential moves that have come up that are retirement related, like Frank Forrest or something of that nature. That's when I would step in and have that conversation. Bob would engage, Bob would have input, but predominantly, I lead that part of the conversation.

Q. And each executive officer refers to everybody who has a talent card in the talent deck; is that correct?

A. That's who we're referring to, that's why we were meeting with the board.

Q. And are you providing any information outside what's in the talent card?

A. I do not.

Q. The next sentence indicates, for each of the achieve audit officer ask risk officer, the directors also review the results of such officers, complete a self review, individual risk assessment, and individual director reviews. Do you see that?

A. I do.

Q. Is that -- are those additional documents or information only with respect to the chief audit officer and the chief risk officer?

A. It's a regulatory requirement for those individuals because of the nature of their jobs to

Page 281

demonstrate more independence. Those reviews are also written by the board members. As I mentioned earlier, they have complete access to those individuals. They have independent meetings with those individuals that I'm not a part of, and they do reviews of those individuals. Once again, to demonstrate the independence of those entities from the rest of the executive team and their responsibilities to the board because of the key roles and critical roles they play around for risk management for the company.

Q. The next sentence reads, Mr. King from FW Cook provided aggregate data reporting on the performance of each officer.

What information is Mr. King providing?

A. It's not performance data, it's basically the compensation and how they stack up against the industry peers. And is our compensation in line with other banks, our peer banks that we look for compensation? There's a handful of those banks that we use in our peer group. He assesses those and the compensation information as provided under their in the proxies. He basically says your compensation is in line, not in line. You know, then he goes down position by position and talks about this position may or may not be aligned with the marketplace.

Page 282

There's a lot of factors that is go into that. You know, tenure in job. If someone is new in a job, obviously they're not expecting to get paid at the top quartile necessarily. You know, it also depends on the job itself. Not all jobs look the same. It's not an apple-to-apple comparison oftentimes. CEO jobs can look very different. My executives may have responsibility for one thing and then two additional things, that could be separate in other companies.

So it's -- it's data, it's directional, it's -- you know, data points, but you have to look at the total body of work to really understand someone's compensation. He just provides foundational information for the board in those key positions. It's not a performance review; it's really about their comp and how it stacks up against their peers for as much as possible like type of jobs.

Q. Referring to the third paragraph under executive performance review, the first full sentence, after Mr. Shaffer returned to the meeting, he and Mr. Carmichael also reviewed succession planning for each executive officer, including a discussion potential long-term and emergency succession planning candidates for each such position. Do you see that?

A. I do.

Deposition of Gregory D. Carmichael, Volume II                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 283

1  Q. And with respect to that, are you providing
2  any information other than what's provided in the talent
3  deck?
4     A. I don't believe we would.
5     Q. Further down in that paragraph, it indicates,
6  in response to director questions, Mr. Carmichael
7  discussed the key strengths and opportunities of the
8  various candidates to succeed Mr. Forrest as chief risk
9  officer and Mr. Anderson as chief operating and
10 commercial officer. Do you see that?
11    A. I do.
12    Q. Do you recall what the question was with
13 respect to that issue?
14    A. I do not.
15    Q. And do you recall what you discussed, at that
16 time?
17    A. I do not.
18    Q. Would you be providing any information
19 contrary to what's in the talent deck?
20    A. I would not be providing anything that's not
21 in the talent deck. So no, I would not be.
22    Q. Would you be providing any information in
23 addition to what's in the talent deck?
24    A. Not that I'm aware of, and I don't believe I
25 did. So no.

Page 284

1  Q. If you turn to page 2 of Exhibit 31. Fifth
2  Third McHugh 000254.
3     A. I'm there.
4     Q. Below the resolutions there's a paragraph that
5  begins, thereafter Mr. Carmichael and Mr. Shaffer
6  initiated review of potential succession timelines and
7  candidates for the chief executive officer position. Do
8  you see that?
9     A. I do.
10    Q. Who were the candidates that you reviewed for
11 the chief executive officer position?
12    A. Tim Spence would have been one. I think I had
13 Brian Lamb as a way out potential. So we would have
14 discussed Tim Spence and potential some day, kind of the
15 potential nature and capabilities of a guy like Brian
16 Lamb would have been discussed.
17    Q. Anybody else?
18    A. No.
19    Q. The next sentence reads, they reviewed top
20 succession candidates, including Mr. Spence, and
21 discussed the potential timelines for the readiness and
22 key development priorities for each such candidate. Do
23 you see that?
24    A. I do.
25    Q. Did you provide any information to the board

Page 285

1  regarding the potential timelines for readiness and key
2  development priorities for each such candidate other
3  than what appears in the talent deck?
4     A. I do not recall that -- and I don't believe I
5  would do that. But I don't have recollection exactly.
6  Something that happened multiple -- many years ago. I
7  don't exactly have anything beyond what's in the deck
8  that I would have presented. I can't recall anything
9  else I would have presented.
10    Q. The next sentence reads in response to
11 director questions, Mr. Carmichael and Mr. Shaffer
12 commented upon the potential external candidates that
13 could be considered for such a role, including a
14 discussion of the known capabilities of such candidates
15 and the potential challenges created by appointment of
16 an external candidate for the role. Do you see that?
17    A. I do.
18    Q. Do you recall what the director questions were
19 regarding external candidates?
20    A. I don't. The only thing I can recall that was
21 the directors were fairly unanimous about not wanting to
22 go outside for a CEO. That's really a failed succession
23 management process if you have to go outside. You take
24 a lot of risk going outside and trying to bring in a new
25 CEO to the company. And typically that is a situation

Page 286

1  where you have a -- creates stress in the company, seen
2  to be a performance issues, and you haven't done a good
3  job of succession planning, you haven't done a good job
4  of developing internal candidates. My job is to develop
5  internal opportunities for people to step up and if
6  somebody elevate to the CEO job, it's the board's
7  decision to make that call, whether they do or don't.
8        But ultimately, a good succession plan, a good
9  management team, a good board has internal candidates
10 that can someday eventually step up and become the CEO.
11 Going outside is high risk, and they all voiced a
12 concern that they would not want to have to do that.
13 And that's the only recollection I have of that
14 conversation.
15    Q. Who were the potential external candidates
16 that you discussed that could be considered for such a
17 role?
18    A. I don't recall, but generally I would discuss
19 potential other smaller bank CEOs if an emergency
20 situation came about and the board felt they would need
21 to go outside. I threw some names out there
22 potentially. I would have thrown some names. I can't
23 recall who they would have been. Of smaller banks who
24 would, CEOs who might want a bigger opportunity, and
25 they could probably potentially mitigate the risk of

Deposition of Gregory D. Carmichael, Volume II                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 287

1  stepping into a bigger bank role because they have bank
2  experience.
3        I would have given some names probably I
4  thought may have been relevant to the discussion. I may
5  not have. I don't recall. But that's what I would have
6  did at that point, if I thought there was somebody
7  that they ought to keep on their radar screen externally
8  if it was ever needed. But I don't recall giving any
9  names there.
10       Q. What were the potential challenges created by
11 appointment of external candidates for the role?
12       MR. CIOFFI: Objection. Asked and answered.
13 He just explained that, but go ahead. You can
14 answer.
15       THE WITNESS: I'll explain it again. When you
16 bring someone in from the outside and they don't
17 know the corporate organization, we haven't had a
18 chance to wash -- "we," meaning the board --
19 the board hasn't had a chance to watch this
20 individual through their career progression to
21 understand their strengths and weaknesses. They
22 may not be aware of potential culture issues. The
23 individual may not be proven to the extent that a
24 bank as complex and large as ours is. It just
25 opens up a lot of questions, and there's a high

Page 288

1  probability bringing someone in from the outside,
2  you're going to have a failed situation.
3       Data tells you that. I would tell you, any
4  other boards I've been associated with and on, that
5  is the last resort to bring someone in from the
6  outside because it creates a lot of risk Eurythmic.
7  It can have success, but you have a higher chance
8  that you could have failure. So it's best to watch
9  somebody develop in their career, know that they
10 are good culture fit, know that they're a good
11 leader, know that they can execute. That's the
12 ideal situation. You just introduce additional
13 risk if you go from the outside. It's been done,
14 it can be done. It's just a higher risk
15 proposition, and that's how the board felt about
16 it.
17 BY MR. SABA:
18       Q. The next sentence reads, in addition to
19 response to additional director questions,
20 Mr. Carmichael and Mr. Shaffer discussed details of
21 development priorities and planning to cultivate
22 internal candidates for the role, and expected timelines
23 for completion of such development plans and candidate
24 readiness. Do you see that?
25       A. I do.

Page 289

1       Q. And the internal candidates that you are
2  referring to, that was still Mr. Lamb and Mr. Spence?
3       A. Mr. Spence and somewhat, but not much
4  discussion on Brian Lamb, just because of the -- how far
5  Brian might be in -- that was just a place holder for a
6  high potential.
7       Q. And what were the expected timelines for
8  completion and candidate readiness?
9       A. I don't recall exactly what those timelines
10 were.
11       Q. Would there have been any information contrary
12 or in addition to what's in the talent deck?
13       A. Once again, there's a potential disposition or
14 potential, but there's no additional information I'm
15 aware that would have been provided. We had been
16 talking from that document. So I didn't have other
17 documents that would have been introduced. It was that
18 document.
19       Q. The next sentence reads, Mr. Shaffer also
20 reviewed the emergency planning succession candidates
21 and reviewed the readiness of Mr. Tuzun and other key
22 leaders to manage investor employee and customer
23 concerns in the event of an unplanned or emergency CEO's
24 succession scenario. Do you see that?
25       A. I do.

Page 290

1       Q. Who were the other key leaders that were
2  identified during that discussion?
3       A. I'm not quite sure on -- on the reference
4  here. What I will tell you is, we had -- we had three
5  candidates identified for emergency succession. Mr.
6  Tuzun was number one of them, Phil McHugh number two,
7  and then a board member, number three. Mr. Tuzun,
8  obviously as the CFO, would have been more likely the
9  preference of the board -- I'm not speaking for the
10 board -- but typically, because you're a financial
11 services company, and the CFO has full responsibility
12 for managing the shareholders, investors, managing the
13 analysts, and the street expectations, perceptions, and
14 communications, most emergency successor would come from
15 the CFO position because of managing that risk.
16       So any time you have an emergency situation
17 occur where you need an emergency CEO, it's lower risk
18 to have the CFO come in because they have that
19 responsibility, never had that connectivity through the
20 street. And the CFO also has to have the investment
21 relations reporting to the CFO position as the treasurer
22 and other roles that get exposure to the streets. So
23 that's probably what we're talking about there.
24       Q. At any point in time did you discuss
25 Mr. McHugh as one of the emergency CEO succession

Deposition of Gregory D. Carmichael, Volume II

Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 291

1 candidates?
2   A.  No.
3   Q.  Why?
4   A.  He was on the list -- he was on the list and I
5 discussed him as -- that I felt he was -- that he could
6 step in an emergency situation, as Tayfun could step in,
7 in an emergency situation.  I didn't recommend one over
8 the other.  Okay.  It was the board -- it was the board
9 who basically looked at the emergency successors and we
10 didn't have a lot of conversation about the emergency
11 successors.  If there was a need for that.  I know
12 certain board members felt, you know, I know Marsha
13 would have felt, and Eileen would have felt, and I'm
14 sure Gary would have felt that the best would be a CFO
15 because of the things I've just mentioned.  Just some of
16 the conversations that we had.
17       But we didn't spend a lot of time digging into
18 the emergency successor.  The focus was really on who
19 the next potential CEO was.  The emergency one because,
20 you know, at the end of the day, they're there and they
21 can step in, in an emergency case.  We didn't debate a
22 lot about that, or have a lot of discussion about that.
23   Q.  Okay.  And I'm just trying to understand your
24 answer.  At the beginning you seemed to indicate
25 that no, you didn't discuss Mr. McHugh.  You do not

Page 292

1 recall that.  Then it sounds like you did.  Would you
2 have mentioned Mr. McHugh or discussed Mr. McHugh at all
3 with the board?
4   A.  The only thing I could recall is he was on the
5 list and I made a comment that I think Phil could step
6 in, in an emergency situation, for a period of time and
7 keep the lights on.  I don't remember the conversation
8 after that.  But I was explaining why I put him on the
9 list.
10       But conversation-wise, I can't recall a lot of
11 conversations.  I do know that as I mentioned before,
12 Marsha and Eileen, both CFO's, I think they made a
13 somewhat comment that that would be -- that would be
14 their preference.  But once again, I don't have a
15 complete recollection of that conversation.  We didn't
16 spend a lot of time on emergency successors.
17   Q.  Do you remember anything else that you said
18 about Mr. McHugh as to why he would be able to step in?
19   A.  I just answered that.  I said, I believe he
20 has the skill sets to step in and keep the lights on,
21 keep things moving forward.  Something of that nature.
22 I wouldn't have put him on there if I didn't think he
23 could do that.
24   Q.  Did any of the board members disagree with the
25 recommendation of Mr. Spence as the next president and

Page 293

1 CEO of Fifth Third Bank?
2   A.  It was unanimous.  Everyone was -- was -- was
3 fully supportive, huge fan of Tim's, and excited to have
4 him as a candidate as the next CEO.  It was unanimous.
5   Q.  Was there a timeline discussed at that point
6 in time?
7   A.  There might have been.  I'm trying to recall.
8 There might have been some scenarios of timelines that
9 -- that -- that were discussed at that point.  I don't
10 recall.  If -- if that was discussed in that meeting or
11 not, I really don't have that recollection.  We've
12 talked about timelines.  We talked about his candidacy,
13 we talked his strengths, we talked about, you know,
14 rough timing.  I don't know if we put forth scenarios of
15 -- of timelines.
16   Q.  You indicated earlier where it refers to when
17 you were discussing cultivating internal candidates
18 expected timelines, that you would have provided
19 information in the talent deck.  Was there any
20 discussion during that board meeting to give Mr. Spence
21 a timeline that's different than what you were
22 recommending in the talent deck?
23   A.  The talent deck -- I wouldn't have deviated
24 from the talent deck, that I'm aware of.  The timeline
25 that I put in the talent deck, you know, one -- one year

Page 294

1 president, I think two-plus years as CEO.  I don't see
2 that I would have provided anything that would be
3 contrary to that.  That wouldn't be logical.  So I'm not
4 aware of doing anything of that nature or providing any
5 different information that wouldn't be supportive of the
6 timeline that was communicated in the talent deck.
7   Q.  Did the board discuss, recommend, or indicate
8 they wanted a timeline different than what you had in
9 the talent deck?
10   A.  I don't recall that.
11   Q.  Was there any discussion during that board
12 meeting about having Mr. Spence vetted for the role of
13 CEO and president?
14   A.  Not in that meeting I believe.  That
15 conversation to have him vetted by a third party --
16 Counsel, is that what you're referring to?  The third
17 party vetting?
18   Q.  Correct.  That's right.
19   A.  That was brought to me after the board meeting
20 by our lead director, Marsha Williams.  I guess it was
21 discussed -- I wasn't in it, so I can't say for sure --
22 my assumption is it was discussed at the -- at the
23 executive independent director meeting that I'm not part
24 of.  There was an ask at some point after that December
25 meeting that we engage RHR at the board's request,

Deposition of Gregory D. Carmichael, Volume II                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 295

1 communicate the meeting through Marsha.

2 Q. When was that communicated by Marsha to you?

3 A. I just stated somewhere after that meeting

4 occurred.

5 Q. How was that communicated?

6 A. She would have -- it would have been -- it was

7 either in my office after that meeting or shortly

8 thereafter it would have been a phone call.

9 Q. So either on December 17th, in your office, or

10 a couple days later?

11 A. Or some period after that. I'm not going to

12 say a couple days. Some period after that.

13 Q. What's the latest it would have been?

14 A. Before the RHR engagement started, that would

15 have been the latest.

16 Q. What did Marsha communicate to you about

17 having Tim Spence vetted?

18 A. I don't have a full recollection of the

19 conversation; it happened multiple years ago. But yes,

20 hey, the board's excited. Board's in full support, but

21 part of the due diligence for the board would be to do

22 exactly what they did with me. She referenced the --

23 they thought the process that I went through was

24 excellent. They really liked the firm that did it.

25 They wanted to know if I could get Guy to do it also.

Page 296

1 They wanted him in particular. And at the board's

2 request, would I -- would I get Bob Shaffer to

3 facilitate that process for Tim. That was the initial

4 ask, it was for Tim Spence.

5 Q. Did she also indicate that she want -- she

6 wanted them to vet Phil McHugh and Tayfun Tuzun as well?

7 A. Never.

8 Q. Did you subsequently decide that you wanted

9 Tayfun Tuzun and Phil McHugh to also be vetted?

10 A. Somewhere early in the process -- I did. This

11 was not the board. I thought it might make sense to

12 have the board have a comparison of other executives,

13 just to give them a comparison, give them additional

14 substance for who I thought was going to demonstrate the

15 strength of Tim as a comparison. You know, as just a

16 good hygiene of the process.

17 So I suggested that we do the two emergency

18 successors. Guy came back and asked me, said, Greg, are

19 these individuals being considered by the board? I said

20 absolutely not, they're never -- they're not considered

21 potentials for the CEO replacement. And he said, Greg,

22 do not put them through. I would recommend not putting

23 them through the process because if they're not going to

24 be considered for CEO, which the board made clear

25 that it was Tim, that they wanted -- we want to see an

Page 297

1 assessment of Tim -- if they're not going to be put

2 through that process, that it would be more harmful to

3 them personally and to the organization, to have the

4 organization disrupted and put them through a process

5 that at the end of the day the board is not interested

6 in having them assessed because they don't believe

7 they're or are qualified for the position. So I

8 wouldn't recommend you doing something I think that

9 would create more harm, if they're not legitimate

10 candidates the board wants to assess and feels it

11 can be their role.

12 So at that point somewhere alone the line, I

13 validated that with Marsha. I said, Marsha, here's

14 Guy's feedback. I was going to bring these two forth,

15 and she says no, they're not going to be -- they're not

16 considered, the board wouldn't accept that. The board

17 doesn't see them as viable candidates, just do Tim

18 Spence.

19 And that was a conversation we had over the

20 phone. I directed Bob back and said, Marsha doesn't

21 think we should do that and agrees with Guy's position

22 that we shouldn't do that. So therefore, it's only

23 going to be Tim. I can't tell you dates, timestamps,

24 but those were verbal conversations. That's how that

25 materialized. I was in favor of putting them on there,

Page 298

1 but after getting further education from the expert who

2 does this for a living, I saw his position, and I agreed

3 with his position that it would be more harmful. Marsha

4 felt that way also. We did not do anybody else but Tim

5 Spence.

6 Q. And to be clear, all three were going to be

7 vetted for the position of president and CEO with Fifth

8 Third Bank, correct?

9 MR. CIOFFI: Objection. Form of the question.

10 That's not his testimony.

11 THE WITNESS: Not -- not -- ask that question

12 again.

13 BY MR. SABA:

14 Q. Let's go back. Yes. You originally indicated

15 you thought that it would be good to have Tim -- to have

16 Phil McHugh and Tayfun Tuzun vetted as well by RHR as

17 comparisons to Tim Spence. All three were being vetted

18 for the president and CEO role, to compare them,

19 correct?

20 A. Absolutely not correct. Absolutely not

21 correct. They were basically being vetted against the

22 profile to demonstrate -- I was putting them on there to

23 demonstrate for the board just to have -- so they'd have

24 additional information to see the gap to the profile.

25 The board didn't want to do that. That's the board's

Page 299

1 decision. They didn't want to do that because they
2 weren't in serious consideration for either of those
3 individuals to be the CEO.
4      And as I just testified to, Guy thought that
5 would be more harmful. I was just using them for
6 comparison purposes. I wasn't vetting them to be the
7 CEO of the company. I was vetting them against the
8 profile, okay, for comparison purposes, that nobody
9 thought made sense, including the expert who brought
10 that forth, and the board.
11     Q. The profile. The whole purpose of the vetting
12 was to vet Tim Spence for the role of president and CEO
13 with Fifth Third Bank, correct?
14     A. That's correct.
15     Q. And so the whole profile that was established
16 was to determine what was required for the bank for the
17 person to be the next CEO; isn't that right?
18     A. It was for an evaluation of Tim against that
19 profile because they believed he was the only one that
20 was qualified against that profile, and the other ones
21 were not even close or considered ever for the CEO
22 position because they knew they didn't have those
23 experiences. They knew Phil McHugh didn't have any
24 technology experience, Fintech experience, strategic
25 experience. They were very vocal about that. They

Page 300

1 knew Tayfun didn't have that experience either.
2      SO they didn't want them vetted. All right.
3 I thought it might be of value to show that level of
4 differentiation against that profile, that was my
5 opinion. The experts disagreed with that approach, and
6 so did the board.
7      Q. So --
8      A. Once again, another decision that I would have
9 made that the board disagreed with.
10     Q. So it was your recommendation that Tayfun
11 Tuzun and Phil McHugh would also be vetted by RHR as a
12 comparison to Spence; correct?
13     A. It was my -- it was my thought process. My
14 thought process that that might be helpful. And I had
15 that conversation with Guy, and he said no, because if
16 they're not being considered you shouldn't put them in
17 there. We did not put them in there because the expert
18 said if they're not being considered for legitimate
19 successors, don't put them in there. And they weren't
20 being considered for legitimate successors. And the
21 board said no.
22     Q. I understand why they weren't put in, why
23 you're saying they weren't put in. My only question is,
24 you initially thought to have them included in that
25 assessment for CEO and president, whether it was for

Page 301

1 comparison to Tim Spence or not. They were going to be
2 vetted for CEO and president in that process to compare
3 them to Tim Spence, correct?
4      MR. CIOFFI: Objection.
5      THE WITNESS: They weren't being vetted for
6 the position.
7      MR. CIOFFI: Hold on. Objection. He's
8 answered the question and explained it. The
9 inference you're trying to create. It is the
10 truth, and your question's argumentative. But do you
11 understand the question?
12     THE WITNESS: I understand the question.
13     MR. CIOFFI: Okay.
14     THE WITNESS: I've answered it.
15     MR. CIOFFI: This is the third time.
16     THE WITNESS: I've answered it multiple times
17 and I'm not going to change my answer no matter how
18 many times you ask the question. I thought it
19 would be good to have a comparison. I wasn't
20 vetting them for the position. I was vetting them
21 for comparison purposes against the profile. I
22 knew they weren't going to be considered for the
23 CEO position. Therefore my thinking around that
24 was erroneous, faulted, and corrected by the
25 experts, and the board absolutely did not want them

Page 302

1 to go through that process.
2 BY MR. SABA:
3      Q. And the comparison you wanted them vetted for,
4 was for the role of CEO and president because you, in
5 your mind you wanted to show that Tim Spence was better;
6 isn't that right?
7      A. It wasn't a role, it was a profile.
8      Q. The profiles for CEO and president?
9      A. That's the profile I was looking at. Never,
10 never because I thought they were going to be CEO or
11 president. Never because they were never communicated
12 and the board's never communicate any interest in these
13 individuals being considered because they weren't
14 qualified. I never promoted them. They've never asked
15 to be the CEO, they never sought the position. They
16 were never in consideration, ever, beyond emergency
17 successor. I was thinking it would be helpful in a
18 process that maybe showed a difference in comparison of
19 emergency successors, but I was advised against that and
20 I agree with that a hundred percent I was making a
21 mistake, and they corrected it. And I was just trying
22 do what I was thought was thoughtful and comprehensive,
23 and I was wrong. That was corrected by the experts and
24 agreed to by the board.
25     Q. Part of the reason you did that is because the

Page 303

1  board had determined Tim Spence was the candidate and
2  Phil McHugh and Tayfun Tuzun were not candidates,
3  correct?
4      A.   The board determined they were not candidates
5  because they weren't qualified and there was no support
6  for them by anyone on the board, and it was unanimously
7  felt Tim was the right person to lead Fifth Third into
8  the future.
9          It's a board decision.  The board's had years
10 to look at these executives, talk to these executives,
11 evaluate these executives.  I've have years to do the
12 same.  And both those individuals were on emergency
13 successor.  Neither of them were qualified to be the CEO
14 in the board's eyes, and the board did not want to
15 proceed with being assessed for the reasons that Guy
16 stated.  It would create more harm than good in the
17 organization if they're not legitimate candidates, and
18 they weren't, in the board's eyes.  Never were, still
19 weren't.
20     Q.   You identified two conversations you had with
21 Marsha.  You talked about one that would have occurred
22 shortly after the December 17th meeting, and either she
23 came into your office or she called -- or you talked to
24 her on the phone before RHR was engaged.  Then you
25 talked about a second conversation you had with Marsha,

Page 304

1  with respect to the fact that only Tim Spence was going
2  to be vetted by RHR.
3      A.   That was my testimony.
4      Q.   And you're indicating -- I believe you said
5  you have no idea when that conversation occurred?
6      A.   Yeah.  I don't have my calendar in front of
7  me, I didn't write that down.  It's a phone call.
8      Q.   Did you make any notes from that phone call?
9      A.   I just said I didn't.
10     Q.   That you did not?  Right?  Sorry I didn't hear
11 it.
12     A.   I did not make any notes about it.  That's
13 what I said.
14     Q.   Did you confirm that conversation with Marsha
15 in writing at all?
16         MR. CIOFFI:  Objection.  Asked and answered.
17         THE WITNESS:  Counsel, I answered the
18     question.  I did not write anything down.  I did
19     not -- to the best of my knowledge, I'm not aware
20     of any text message or e-mail message back to
21     Marsha.  It was a phone call.
22 BY MR. SABA:
23     Q.   Did you e-mail Guy at RHR regarding your
24 conversation with Marsha?
25     A.   I would have communicated through Bob because

Page 305

1  Bob was facilitating the process.
2      Q.   How did you communicate that to Bob?
3      A.   I would either talk to him directly because he
4  sits right next to me or I would have sent him an
5  e-mail.  I don't recall, you know, three-plus years ago
6  what exactly what I did there.  But Bob was facilitating
7  the process and he would have been the one that I would
8  have had to instruct.  He was the one working on the
9  contract with Guy, so he would have been the one that
10 would have had to pen this transaction.  So he would
11 have been absolutely the person I talked to.
12     Q.   Going back to your first conversation with
13 Marsha, with respect to beginning the vetting process.
14 Did you then communicate to Bob Shaffer what you wanted
15 done based on your conversation with Marsha?
16     A.   First off, it's not what I wanted done, it's
17 what the board wanted done.  Marsha called me and
18 requested the board wanted Tim vetted through the RHR
19 process.  The board wanted to use the firm RHR, because
20 they were very pleased with the process that they went
21 through prior with me in 2015, and that would I start
22 that process.  So my communication with Bob Shaffer, is
23 this is what the board would like done, not Greg
24 Carmichael.
25     Q.   But you also added in vetting McHugh and

Page 306

1  Tayfun Tuzun as comparison, correct?
2      A.   Through that process I was asked, is there
3  anybody else that we should include in this process for
4  comparison purposes?  Once again, I've answered all
5  those questions prior, why I put -- I suggested maybe
6  two others, because for comparisons against the profile,
7  that was quickly, quickly challenged by Guy, supported
8  by Marsha, they did not want to do that for those
9  reasons.
10     Q.   Who asked you who you wanted to put up as
11 comparators to Tim Spence?  Who asked you that?
12     A.   Nobody asked me that, all right.
13     Q.   You just testified, I was asked who I wanted
14 to put up as comparison?
15     A.   I was asked if there's anybody that I wanted
16 to put up, you know, and I believe that was Bob, because
17 he was talking to Guy.  Somewhere in that
18 conversation -- I wasn't part of it -- I would have had
19 a conversation with Bob and he said, is there anybody
20 else you want to put up there?
21         And I said -- and I suggested we may want to
22 consider emergency successors for comparison purposes.
23 And I explained what happened after that.
24     Q.   When was that conversation with Bob Shaffer
25 when you indicated you may want to put up the emergency

Case: 1:21-cv-00238-MRB Doc #: 77-16 Filed: 06/27/25 Page: 14 of 118 PAGEID #: 3842

Deposition of Gregory D. Carmichael, Volume II                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 307

1 successor as comparators to Tim Spence?
2     A.  **Prior to the signing of the engagement with**
3 **RHR.  I don't have the exact timeframe.**
4     Q.  And did you indicate that Guy indicated that
5 would be a bad idea?  He said that to you?
6         MR. CIOFFI:  Objection.  Counsel, it's about
7     the fourth time you've asked that question.  He
8     answered it clearly.
9         MR. SABA:  No, I haven't asked --
10        MR. CIOFFI:  Yes, you did.
11        MR. SABA:  I haven't asked that question.
12        MR. CIOFFI:  He's answered it.  It's day two
13    and you're being redundant in your questioning.
14    It's a problem.
15 BY MR. SABA:
16    Q.  Mr. Carmichael --
17        MR. CIOFFI:  It's a problem.  I want to note
18    that on the record.
19        MR. SABA:  Your interruptions are a problem.
20        MR. CIOFFI:  No they're not.  I'm entitled to
21    object.
22        MR. SABA:  Yeah, object, not --
23        MR. CIOFFI:  And I am.
24        MR. SABA:  -- objection.  And then stop.
25        MR. CIOFFI:  No don't tell me -- don't tell me

Page 308

1 how to object.
2         MR. SABA:  Yes, you do.  You're trying to
3     coach.
4         MR. CIOFFI:  This is addressed to you.  It has
5     nothing to do with him.  It's about your redundant
6     questions.  That's what I'm --
7         MR. SABA:  It's about your ridiculous
8     objections.  Allow me to continue.  All right?
9     Thank you.
10 BY MR SABA:
11    Q.  When did Guy tell you that it was a bad idea
12 for you to include McHugh and Tuzun?
13        MR. CIOFFI:  Objection.  Asked and answered at
14    least twice.  Go ahead.
15        THE WITNESS:  Go back to the transcripts and
16    read me my answers to these questions.
17 BY MR. SABA:
18    Q.  When did Guy tell you that it was a bad idea
19 to include McHugh and Tuzun?
20    A.  **I'd like to have my response read back to me**
21 **that I gave you earlier.**
22        (Off-the-record discussion.)
23        THE WITNESS:  Listen, I can answer it again.
24    Go ahead and ask me the question and I'll answer
25    it.

Page 309

1 BY MR. SABA:
2     Q.  The question was, when did Guy tell you it was
3 a bad idea for you to interview McHugh -- I'm sorry --
4 to include McHugh and Tuzun as comparators to Tim
5 Spence?
6     A.  **Counsel, that was either a direct conversation**
7 **myself and Guy, or Guy and Bob came back from Bob or**
8 **directly from Guy to me that we should not put them**
9 **through if they were not being seriously vetted.  My**
10 **guess is it was probably -- Bob brought forth those two**
11 **individuals, I'm speculating here -- if they're not**
12 **being seriously vetted and considered, you shouldn't put**
13 **them through.  Bob may have had that conversation with**
14 **Guy, or I may have had that conversation.  That was the**
15 **outcome of the discussion with Guy.  He did not want us**
16 **to put them forth.  He thought it would do more harm to**
17 **the organization if we did if they weren't seriously**
18 **being considered.**
19        **I then reached out to Marsha to confirm that**
20 **we weren't going to put them through there if she was**
21 **okay with only just having Tim.  She said absolutely,**
22 **that's what the board's requested.  That was the**
23 **conversation I had with Marsha.  That's my recollection**
24 **of the situation.**
25    Q.  Who initiated the conversation -- who

Page 310

1 initiated the conversation that McHugh and Tuzun should
2 not be included as comparators to Spence?  Did you
3 initiate that or did Guy initiate that?
4     A.  **Guy initiated that.  It was Guy's -- when we**
5 **talked about who else might we put on the list for**
6 **vetting, Guy said, are these individuals -- I'm**
7 **paraphrasing, I wasn't in the conversation.  As I think**
8 **back through that period of time, Bob would have been**
9 **having these conversations.  So when Bob brought forth,**
10 **after Bob and I talked, Guy's response was, are these**
11 **individuals being considered for the CEO job, and if**
12 **they're not, you shouldn't put them through the process**
13 **because it will do more harm.  That conversation**
14 **occurred.  I'm pretty sure it was Bob and Guy that had**
15 **it.  But you should ask Bob Shaffer that, because I**
16 **think it was Bob that had that conversation.**
17        **I went back and was asked to verify that --**
18 **that they should be put through the process with Marsha**
19 **and it was just Tim.  I did that.  And I remember that**
20 **conversation.  But it was Guy who pushed back and said**
21 **not to put them through if they weren't being seriously**
22 **considered.**
23    Q.  Was that initiated by Guy or was that
24 initiated by you or Bob Shaffer?
25        MR. CIOFFI:  Objection.  Asked and answered.

Deposition of Gregory D. Carmichael, Volume II                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 311

1  Counsel, you know the e-mail --
2      MR. SABA:  Go ahead, I'm sorry.
3      MR. CIOFFI:  You know the e-mail record of
4  this.
5      MR. SABA:  Go ahead.  What did you say?  I
6  didn't hear your answer, Mr. Carmichael.
7      MR. CIOFFI:  Wait a minute.  He didn't answer
8  because I objected.  I said asked and answered.
9  And you know the e-mail record that supports it.
10  But anyway, go ahead.
11      THE WITNESS:  When you say initiated, at the
12  end of the day, Bob was working with Guy on this,
13  so I -- you have to ask Bob Shaffer if you have
14  documentation.  That conversation occurred and
15  Guy's the one who said not to put them through it
16  if they're not being considered -- seriously
17  considered.
18      Guy responded to that through Bob or me, not
19  to do that.  More harm to the company.  I don't
20  have that level of recollection.  When -- timeframe
21  that happened?  It was before we signed the
22  engagement, but I'm 90 percent sure Bob would have
23  had that conversation and communicated back to me.
24  I believe Bob asked me to verify that with Marsha,
25  that we wanted to just have Tim, and she was

Page 312

1  absolute in that.  That was all they asked for
2  because of that, and she agreed when I explained
3  what Guy's concern was.  She said absolutely, we
4  want to do that.
5      (Exhibit 33 is marked for identification.)
6  BY MR. SABA:
7      Q.  Mr. Carmichael, I've handed you what's been
8  marked as Exhibit Number 33, Fifth Third McHugh 071710
9  through Fifth Third McHugh 071802.  Are you able to
10  identify this document for me?
11      A.  Looks like a third-party firm we used to do
12  the 2019 Fifth Third Bank employee viewpoints survey
13  results briefing.
14      Q.  Have you ever seen this document before?
15      A.  I do not recall seeing this document.  I may
16  have seen summations from this document, but I do not
17  recall seeing this document in its entirety.  Which
18  wouldn't be surprising, I wouldn't see something of this
19  level of detail necessarily.
20      Q.  Who provided you with a summary?
21      A.  That would have been the HR department.
22      Q.  The employee viewpoint surveys are the only
23  objective measure of an enterprise committee member's
24  performance obtained from an outside third party; isn't
25  that right?

Page 313

1      MR. CIOFFI:  Objection.
2      THE WITNESS:  It's not necessarily an
3  employee's performance on something of this nature.
4  As I testified yesterday, in the viewpoint survey,
5  there's a tremendous amount of questions that are
6  asked reflecting the organization, status of the
7  organization.  Results could be skewed
8  substantially by the position the organization's
9  in, the challenges of the organization, turnover in
10  the organization, new leadership in the
11  organization.  It's data points that are used to
12  help us think about opportunities for improvement
13  in an area.  By no means does it necessarily
14  reflect the performance of the leader of that group
15  at any point in time.  It's a data point.  All
16  right.  It helps us think about how to send
17  information to the total organization itself.
18      Oftentimes a leader will go into an
19  organization that is completely broken, have to
20  make substantial changes, and part of the survey
21  that talks about leadership can be very low.  In my
22  personal career, I got some of the lowest scores
23  ever as a leader before I was promoted to the top
24  jobs in the company a year later because of the
25  outcomes I received because I had to go in and take

Page 314

1  people out, change the organization, and that's
2  unsettling for people.  People are concerned about
3  their jobs because they weren't doing their job.
4  And a good leader makes the changes and does the
5  heavy lifting.
6      And that can reflect negatively on a leader at
7  any point in time on one of these surveys.  So you
8  have to understand what this document and this
9  information provides.  It provides a point in time
10  about the organization and opportunities for
11  improvement in the organization.  Something we want
12  our leaders to continue to look at.  But by no mean
13  is it a grade of the leader itself.
14  BY MR. SABA:
15      Q.  You do use it for employee evaluations, and a
16  factor that an employee needs -- particularly an
17  executive needs to work on; isn't that right?
18      A.  It's something we include because it's
19  important, but once again, it's not -- it's not
20  necessarily indicative of their leadership of that
21  entity, but the outcomes are things they can, as a
22  leader, should work on.
23      Q.  And it's an issue used for their evaluation,
24  correct?
25      A.  It's a opportunity, an element of their

Deposition of Gregory D. Carmichael, Volume II           Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 315

1 evaluation to talk about opportunities for the
2 organization. That's why it's in there. Because they
3 lead the organization, but with the viewpoint survey
4 provides information that will help them be a better
5 leader of that organization. We want them to have that
6 and we want them to understand that score. If that
7 individual's in there for year after year, in the same
8 job, same organization, it helps us also understand
9 something about that leader that might then be
10 demonstrated in that document after multiple, multiple
11 years. But any one year can be very skewed.
12     Q. With respect to -- as you indicated, this is
13 provided by an outside third party; is that correct?
14     A. That's correct.
15     Q. Are there any other studies provided by an
16 outside third party on essentially an annual basis that
17 are used to evaluate any members of the enterprise
18 committee?
19       MR. CIOFFI: Objection to the form of the
20     question. Misstates his testimony. It's not used
21     to evaluate a leader. You may answer.
22       THE WITNESS: You said on a regular annual
23     basis is there anything we use to evaluate leaders
24     at the enterprise on regular annual basis?

Page 316

1 BY MR. SABA:
2     Q. Performed by an outside third party?
3     A. The answer is no.
4     Q. How much does Fifth Third pay each year for
5 these employee viewpoint surveys?
6     A. That's below my pay grade. I don't know.
7      (Exhibit 34 is marked for identification.)
8      (Exhibit 35 is marked for identification.)
9 BY MR. SABA:
10     Q. You've been handed what's been marked as
11 Exhibit Number 34, Fifth Third McHugh 000469. Do you
12 see that document?
13     A. I do.
14     Q. Can you identify that document for me, please?
15     A. Appears to be an e-mail from Bob Shaffer to
16 myself, subject Greg Carmichael direct report reviews.
17     Q. And he indicates attached is a Word document
18 with draft performance reviews for all of your direct
19 reports; is that right?
20     A. That's what the document says.
21     Q. He indicates that he included proposed ratings
22 for what goal category. The rating options are
23 exceptional, exceeds, achieves, needs improvement, or
24 unsatisfactory; is that right?
25     A. That's correct.

Page 317

1     Q. And he also includes the ratings for each how
2 goal category. And he indicates these ratings were
3 included in the deck we used for the talent discussion
4 with the board. Do you see that?
5     A. I do.
6     Q. He also attached an Excel document for a
7 summary for the proposed what and how ratings of each of
8 your direct reports; is that right?
9     A. Correct.
10     Q. He then indicates he directly leveraged
11 the key strengths and key opportunities for each person
12 from the deck we used for the board meeting. He added
13 in employee viewpoint survey scores for each person, and
14 then he doesn't have the manage risk ratings from Frank
15 yet. Is that right?
16     A. That's what it says.
17     Q. This documentation that Mr. Shaffer sent you,
18 this is for the annual reviews; is that correct? Of the
19 enterprise committee?
20     A. I would assume that's the case.
21     Q. You previously discussed the midyear reviews.
22 What do you do to prepare for the annual reviews?
23     A. Well, this would be the start of it. Bob
24 would pull together the different data using talent
25 deck, he would use information from -- from outside

Page 318

1 sources if I wanted to include, like, viewpoint surveys.
2 A lot of conversations about the year with Bob and on
3 strengths, weaknesses.
4      So he would do a first pass of this
5 information. Him and I would sit down every -- every
6 year we sit down and we would go through each
7 individual, talk about strength, weaknesses, go back and
8 look at what we had here before and see if anything's
9 changed, any additional information came forth. We'd
10 have a lengthy discussion. Bob would take all those
11 notes and prepare the initial draft for me to review.
12      I would then go in at that draft, sit down and
13 go through it myself and change the wording or add
14 wording. Or add -- if Bob didn't feel comfortable
15 taking the draft, pass to something, I would then add it
16 myself. At the end of the day, this would be my review
17 when it was complete, and what I believe to be factual
18 and true, any messages I wanted to communicate to my
19 executives.
20     Q. Can you identify Exhibit Number 35 for me,
21 please: That's Fifth Third McHugh 000492 through Fifth
22 Third McHugh 000591.
23     A. These forms have taken on many different --
24 different variations throughout the years, so this looks
25 like a summary or part of or summation of an annual

Deposition of Gregory D. Carmichael, Volume II                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 319

1  review, from the best I can tell by looking at a couple
2  pages here.
3      Q.  And is this annual reviews or summaries of
4  annual reviews for each of the enterprise committee
5  members?
6      A.  Um, no.  There's one review on here that's my
7  assistant, and she's not on the enterprise.
8      Q.  Okay.  She's one of your direct reports; is
9  that correct?
10     A.  She reports to me; she's my assistant.
11     Q.  And you would do her review as well?
12     A.  I would.
13     Q.  All right.  Referring you to Fifth Third
14  McHugh 000496 and 497.  Can you identify that for me,
15  please?
16     A.  Appears to be Phil McHugh, and with
17  identification of opportunities for 2020.  So this would
18  have been a review associated with his 2019 performance
19  and going into the 2020 year, that would have been given
20  to him in probably the February timeframe.  That's
21  typically when I do my reviews.
22     Q.  And who would have provided the information we
23  see under Phil McHugh?
24     A.  I just told you how this comes about.  So at
25  the end of the day, all the information here is my

Page 320

1  information that I have ownership for and
2  responsibility.  How it came together was from
3  different -- from Bob Shaffer pulling through different
4  sources and information to get us to this point.  I
5  would have the final review, this would be my final
6  review.
7      Q.  Can you read for me the first paragraph under
8  the what section for Phil McHugh, please.
9      A.  Phil was a seasoned versatile leader with
10  significant organizational knowledge and credibility.
11  He has a strong understanding of our businesses,
12  effectively drives execution, and is deeply committed to
13  the success of Fifth Third.  Phil always does what is in
14  the best interest of the company to achieve outcomes in
15  the right way.  Phil takes full accountability of his
16  area, and never makes excuses or distributes blame.
17  He's a great leader for his people, inspires fellowship,
18  and always -- and is always there to assist them in
19  their success.  Phil was a strong team player and
20  collaborates with all of his business partners and
21  appropriately addresses challenges.  Phil's 2019
22  employee survey viewpoint score for all of his areas
23  totals 73 percent compared to the Bancorp -- Bancorp
24  scores -- of 72 percent, exclusive of legacy MB
25  employees.

Page 321

1      Q.  If you can turn to -- on Exhibit 30, Fifth
2  Third McHugh, page 00132, and go ahead and keep this
3  other page open, please.
4      A.  I'm sorry.  What page was that?
5      Q.  Fifth Third McHugh 001132.  It should be the
6  talent card for Phil McHugh.
7      A.  I have that.
8      Q.  Some of the information we see on Fifth Third
9  McHugh 000496 was included on Mr. McHugh's talent card
10  and some was not.  Are you able to look at that first
11  full paragraph and compare it to the talent card and
12  tell me what information in Mr. McHugh's review was not
13  included in the talent card that was presented to the
14  board?
15     A.  Well, we use different -- refer things
16  differently, act like an owner, be a great coach,
17  leadership characteristics.  It doesn't -- in this first
18  paragraph, I highlight that -- that he has a strong
19  understanding of our business, takes full accountability
20  of his areas, collaborates and is a good business
21  partner.  So it fits in with key strengths.
22         I mean, directionally, it's -- it's -- it's
23  correct here, so I'm not sure if there's another
24  question I'm missing -- I'm not answering for you
25  correctly, but to the best of my knowledge, it's

Page 322

1  consistent messaging.
2      Q.  Let me be more specific, then.
3      A.  Please.
4      Q.  In terms of what we see under the what
5  section, strategic and financial management, operational
6  efficiency, customer experience, talent optimization.
7  Those are not included on the talent card, are they?
8      A.  Ask the question again.  You're jumping me
9  around here.
10     Q.  Sure.
11     A.  I'm looking at -- which deck am I looking at?
12  You want me to look at?
13     Q.  So I want you to -- I'm comparing Fifth Third
14  McHugh 00496.
15     A.  They're different -- they're different
16  documents and they're different formats.  There's --
17     Q.  Fair enough.
18     A.  So one's a summation of my -- my thoughts in
19  the what section, and one is a chart table of
20  information, so.
21     Q.  Correct.  And the chart table of information
22  is what we presented to the board.  The summary is what
23  was used for Mr. McHugh's review --
24     A.  Okay.
25     Q.  -- in February 2020, correct, two months

Deposition of Gregory D. Carmichael, Volume II                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 323

1  later; is that right?
2      A. Directionally, they should be -- they should
3  be consistent. I may change -- word things how I want
4  to communicate this, this is my wording to my -- to my
5  executive and this is to make conversation and
6  opportunity, recognition. So I would say things the way
7  I would want them said that may not be in a chart
8  format. So directionally, I think it's consistent.
9      Q. What I'm asking about is the information that
10 we see on the review for Mr. McHugh that was not
11 included on the talent card for the board.
12     So specifically, I'm going to refer you to
13 beginning with Phil McHugh under what strategic and
14 financial management, operational efficiency, customer
15 experience and talent optimization.
16     A. What paragraph are you looking in? Which deck
17 are you in?
18     Q. I'm looking -- look at 00496.
19     A. Okay. That's this one.
20     Q. Do you see that? Start at the top of the
21 page.
22     A. I see Phil's a seasoned leader.
23     Q. Above that there are four categories listed.
24     Do you see that?
25     A. I do. Right.

Page 324

1      Q. And he's given an evaluation for each of
2  exceeds, exceeds, and achieves. Do you see that?
3      A. Yeah.
4      Q. That's under strategic and financial
5  management.
6      A. I see talent optimization achieved. And if I
7  try to get a like comparison, be a great coach, would be
8  effective. So it's not a one for one. We don't use
9  necessarily the same -- the same phrases or how we
10 describe talent in this -- in this deck at this point in
11 time, in this deck's evolution. We're using be a great
12 coach, effective. Talent optimization --
13     Q. Well, let's -- let's be clear. That
14 information appears lower in his review. If you look
15 back at 00496, that information appears lower.
16     A. Okay. Then they have it down here on the how
17 section, okay.
18     Q. But the information in the first four sections
19 under what does not appear in the talent card; isn't
20 that right?
21     A. As far as strategic financial management,
22 operational efficiency, as far as a grading goes on this
23 card?
24     Q. We don't see that anywhere on the talent card,
25 do we?

Page 325

1      A. No, they're different documents. They're
2  different documents for different purposes. One's to
3  facilitate a conversation with the employee, ones to
4  facilitate a conversation with the board.
5      So that -- that's not on the talent card. The
6  key strengths are, the key areas of opportunities, which
7  is -- which is what's relevant to the board, and then
8  their potential and their next position opportunity,
9  which is relevant to the board. Okay.
10     And then their rating. I mean, we -- we did.
11 We summarized the rating for the board. I can't take
12 the board through every piece of data, so I summarize
13 the rating as exceeds. And you can see that on the
14 left-hand side of the talent card.
15     So he exceeds, so I summarize his exceeds for
16 the board, his performance. So I didn't re-copy the
17 performance management onto a talent card because I
18 can't give that level and cover every aspect. I gave a
19 summation of his performance to the board as exceeds. I
20 didn't list out every element of what made up the
21 exceeds.
22     Q. With respect to, again, referring to the end
23 of the first full paragraph. I'm on 00496. As we read
24 through your narrative description, certain portions of
25 that language are not included either in key strengths

Page 326

1  or key focus areas; isn't that right?
2      Specifically, the language, he has a strong
3  understanding of our businesses. Do you see that? Does
4  that appear anywhere in the talent card?
5      A. The talent card and the performance review are
6  different. I'm not going to say things necessarily
7  different. I may say things differently in these two
8  documents. One's the audience of the board, one's for
9  discussion with the executive. I wouldn't necessarily
10 verbatim copy from one deck to another deck. I may use
11 pieces of it, but it should be directionally correct.
12     This is my wording back to an executive for a
13 conversation. It's not meant for a conversation with
14 the board. The board sees the rating of exceeds, which
15 is what Phil received as exceeds. All right. If we're
16 going to sit here and pick back and forth a word on this
17 document versus a word on this document, we're going to
18 be here a long time, because that was never the intent,
19 to copy this verbatim onto this point. They're
20 different purposes.
21     Q. My only question, sir, is the language. "He
22 has a strong understanding of our businesses" does not
23 appear in the talent card, does it?
24     A. On this talent -- on this talent card -- okay.
25 It's said different. Seasoned versatile leader with

Page 327

1 significant organizational knowledge and credibility. I
2 didn't say it exactly the same. It's on there.
3     Q.  Referring down in that paragraph to the fourth
4 full sentence. He is a great leader for his people.
5 That doesn't appear --
6     A.  Are you talking about --
7     Q.  I am on -- I am referring to the review of
8 Mr. McHugh.
9     A.  I see it. Greatly inspires fellowship and
10 always assists them in their success. I think if you go
11 back and look at conversations in prior decks, you see
12 me refer to Phil -- Phil does a very, very good job of
13 working with his team and providing guidance and
14 leadership of his team. I've never said anything
15 different than that, all right. I believe that to be
16 true. I believe that to be true then, I believe it to
17 be true today. People has those skill to be a good
18 manager of his team. People like working for Phil
19 McHugh. That doesn't make him the CEO of the company.
20 All right. But he does a good job of that.
21     I've never communicated anything different to
22 the board in any conversations that may not have been on
23 a chart. But Phil -- that's why I had him as the
24 emergency successor. He has a deep experience with a
25 lot of our business lines. He's a good commercial

Page 328

1 banger, he knows wealth, he knew the regions. He can
2 keep the lights on, keep the trains on the track, and
3 keep it running. People like working for him. He's
4 good in that area. By no means does that make him the
5 next CEO of the company.
6     So I'm -- we could talk all day. I never said
7 he wasn't a good leader. You don't get to the executive
8 level of this organization at the enterprise level
9 without being a good leader of people in your
10 organizations. My documents should reflect that.
11     Q.  Mr. Carmichael, I'm just trying to point out
12 what was not included in the talent card. I'm just
13 going through that --
14     A.  And I'm going to point out to you that there's
15 going to be different documents for different audiences
16 and different purposes. What's important is, his rating
17 of exceeds was shared with the board. He exceeded
18 expectations. His review says he exceeded expectations.
19 I can't provide the board with an amount of data for
20 every executive. They'll lose -- they'll lose the
21 meaning and the intent of the discussion if I tried to
22 do that.
23     Q.  And more specifically -- again, going to more
24 of the information that was not included for the
25 board -- if we look at the last two sentences of that

Page 329

1 first full paragraph, it says, Phil's a strong team
2 player and collaborates with all of his business
3 partners and appropriately addresses challenges. Phil's
4 2019 employee viewpoint scores for all of his areas
5 totaled 73 percent compared to the Bancorp score of 72
6 percent, exclusive of legacy and the employee.
7     Do you see that?
8     A.  I do.
9     Q.  And none of that information was provided on
10 the talent card that was presented to the board, was it?
11     A.  Nor -- because it's not relevant. Viewpoint
12 survey score, as I mentioned earlier, because of the
13 nature of that score, it's used internally for us to
14 communicate to our -- with our leadership team how we
15 can be better as a company serving our organization. We
16 provide information to the leader of that line of
17 business or that area, where staff functions, so they
18 can be better at leading the organization forward, know
19 what the organization is concerned with, feels about it,
20 strengths and weaknesses.
21     For the board, because it's not about the
22 employee necessarily, as I mentioned before, because
23 it's going to be very misleading. I don't add it on
24 that list because it's not something the board should
25 see. They see a summation of that data in different --

Page 330

1 in different meanings and different structure.
2     But they see a summation of that data so they
3 can see how the organization performs. But on a
4 performance review, that's not relevant to them. And I
5 wouldn't put that on there. Okay. It's a data point
6 that I need to be aware of, the leadership needs to be
7 aware of. It's not a data point that's relevant for a
8 board discussion. Because these are going to ebb and
9 flow. Go back for throughout the years. These are
10 going to ebb and flow for these executives.
11     MR. SABA:  We can go off the record.
12     THE VIDEOGRAPHER:  Time is 10:25.
13     (A recess was taken from 10:25 to 10:42.)
14     VIDEOGRAPHER:  Time is 10:42 a.m. We're back
15     on the record.
16 BY MR. SABA:
17     Q.  Mr. Carmichael, staying with Exhibit 35, and
18 page Fifth Third McHugh 000496, which is your notes for
19 the annual review of Phil McHugh. And that last
20 sentence in the first full paragraph, Phil's 2019
21 employee viewpoint survey scores for all of his areas
22 totaled 73 percent compared to the Bancorp score of 72
23 percent, exclusive of legacy and the employees. That
24 sentence.
25     Were you aware Phil had the highest overall

Page 331

1 employee viewpoint survey score of any member of the
2 enterprise committee?
3     A. I am not aware that that was the highest
4 score, no.
5     Q. You didn't know that, at that time?
6     A. I did not know that at the time. And I'm not
7 suggesting it wasn't, but that was -- that was -- the
8 organization score was a good score, so I put it in here
9 and thought that was something important to point out.
10 Direction, organization had a nice score. Slightly
11 above the total score of the organization, so yes.
12     Q. Can you read the second full paragraph of the
13 narrative for Phil McHugh's review that you provided?
14     A. It was Phil's first full year having
15 leadership responsibilities of the region. He's highly
16 engaged with the regional leadership team. Ensures the
17 key business and talent issues are practicably
18 addressed. Phil did a great job leading the regional
19 ops review in 2019, and continues to visit each region
20 as needed to more deeply understand strengths and
21 opportunities as well as to assess talent.
22         Phil provided great leadership to build
23 support for key moves in the regions in 2019. This
24 included realigning in '20 from the Bancorp to the
25 regional presidents for the local business banking --

Page 332

1 local business banking and treasury management sales
2 teams, along with regional marketing and communication,
3 better leverage and competitive advantage of the
4 regional operating market.
5     Q. None of the information that you just read in
6 that second paragraph of Phil McHugh's review was
7 provided to the board during the December 17th meeting;
8 is that correct?
9     A. No, I disagree with that. If you look at key
10 strengths that I draw from when I prepare this, I was
11 very clear to the board, number one, making sure the
12 board understood Phil's key strength. Seasoned
13 versatile leader with significant organizational
14 knowledge and credibility. You see that's in the first
15 paragraph. Highly regarded, thoughtful, does a good job
16 of sewing up organizational direction and drives
17 execution. Drives execution. Holds himself and his
18 team accountable. Accountability to deliver results in
19 the right away. Inspires fellowship. If you go back
20 and look at the first paragraph, you'll see inspires
21 fellowship. I was very clear to the board on Phil's
22 strengths. Effectively represents Fifth Third and the
23 community and proactively builds our brand. Once again,
24 market leadership. I was being very clear and
25 articulate, and this summation describes exactly what

Page 333

1 his key strengths were, and that's captured in the key
2 strengths that was presented to the board, as was his
3 exceeds rating. I wanted to make sure the board clearly
4 understood his strengths. Good seasoned versatile
5 leader, drives execution, inspires fellowship. All
6 that of this is in review.
7     Q. As you pointed out, that portion of the key
8 strengths, we see some of that in the first paragraph of
9 the review. We don't see any of the information from
10 the second paragraph of the review in the talent card,
11 do we?
12     MR. CIOFFI: Objection to the form of the
13     question. Argumentative. Misstates the documents.
14     The documents speak for themselves. But go ahead.
15     You can answer.
16     THE WITNESS: States in here, he holds himself
17     and his team accountable to drive results in the
18     right way. His job was the regional job. So I'm
19     implying here, as it states here, he's a highly
20     engaged leader and drives outcomes in the regions.
21     Talk about -- we talk about his focus on
22     execution. All right. That's captured here in
23     paragraph 2. I mean, these -- these key strengths
24     absolutely reflect what I -- what I shared with
25     Phil in his review and I shared with the board. I

Page 334

1 went into more detail and descriptions with Phil in
2 the discussion, but the key strengths and the key
3 elements of his great leadership in this role,
4 performing this role, are all articulated here with
5 an exceeds rating to the board.
6 BY MR. SABA:
7     Q. Where does it indicate on the talent card that
8 Phil provides great leadership?
9     A. Seasoned versatile leader with significant
10 organizational knowledge and credibility.
11     Q. Where does it say great leadership?
12     A. Well, it doesn't say it verbatim, all right.
13 But in essence, when you are exceeds, you're doing a
14 good job for the organization.
15     Q. Do you have any --
16     A. I tried to articulate that.
17     Q. Yet in this review, you repeat over and over
18 again what a great leader Phil is, correct?
19     A. He exceeds expectation, he's a seasoned
20 versatile leader with significant organizational
21 knowledge and credibility. That's what I shared with
22 the board. Okay. That wouldn't be a statement I would
23 make for a leader who wasn't doing a very good, great
24 job for this company. With an exceeds rating.
25     Q. You don't use the word "great" with respect to

Page 335

your description of Phil, do you, in the talent card,
correct?

A.  In this talent card right now, the word great
is not here.  But all definitions I provided under key
strength describes what I'll call a very, very, very
strong leader that exceeded expectations.  And I shared
that with the board.

Q.  None of the detail that we see in photograph 2
of your review of Phil McHugh was provided to the board,
was it?

MR. CIOFFI:  Objection.  Misstates the
document.

BY MR. SABA:

Q.  Go ahead.

A.  I would have captured some of that in bullet
point 2 on good job selling the organization, direction,
setting organization direction and drives execution.
That would have come out.  I elaborated for once again a
conversation with Phil, but the board understood he did
a great job of setting organizational direction and
driving execution.  That's what was important for the
board to understand.  Once again indicating a very
strong leader here.

And then, obviously as a regional role
representing the organization in a marketplace and

Page 336

builds our brand.  Once again, very, very, very powerful
important conversation with the board.  I think these
bullet points I put on that define his key strengths.
Very complimentary to a good leader in the organization
with an exceeds rating.

Q.  As you said, that would be complimentary to a
good leader in the organization on the talent card.  But
what you actually indicate in his review is that he's a
great leader; isn't that right?

MR. CIOFFI:  Objection.  Misstates what's in
the talent card.  There are two adjectives before
the word leader.

MR. SABA:  We heard Mr. Cioffi's answer,
Mr. Carmichael.  You go ahead and answer the
question, please.

MR. CIOFFI:  You're misstating here -- you
know, you're misstating the document.

MR. SABA:  You're giving a talking objective.

MR. CIOFFI:  I'm not giving a talking
objection.

MR. SABA:  Yes, you are.  What do you think
that is?  Go ahead, Mr. Carmichael.  Answer the
question.

MR. CIOFFI:  You can't blatantly misstate
what's on a document.

Page 337

MR. SABA:  I'm asking him a question.  We're
not --

MR. CIOFFI:  You're misstating the question.
It's not proper.  You may answer.

THE WITNESS:  Sentence says, Phil provided
great leadership.  Phil provided great leadership
to build support for key moves in the region.  So
he provided great leadership on that subject of
building support for key moves in the region.
That's what he provided great leadership for.

BY MR. SABA:

Q.  He also did a great job leading the regional
ops in 2019; isn't that right?

A.  That's an activity.  That's an activity.

Q.  Which he did a great job leading; isn't that
right?

A.  He did a great job leading an activity.
That's what the document says.  And once again, if you
look at bullet 2, under key strengths, I tell the board
highly engaged, does a good job of setting
organizational direction and drives execution.

Driving execution happens in these ops
reviews.  This is more the how he is doing it, but the
board has clarity he does a good job of driving
execution.

Page 338

Q.  Let -- let me ask you a quick question.  In
terms of these talent cards, do you write the key
strengths and key focus areas for each talent card?

A.  These are my -- these are my -- my thoughts,
what I want to identify as his key strengths to the
board.

Q.  And the key focus areas?

A.  The same.

Q.  And you do that for every member of the
enterprise committee?

A.  I do.

Q.  So you wrote all these; is that correct?

A.  These are my -- my positions, what I wanted to
communicate to the board.

Q.  When -- when is the information of your
position of what you want to communicate to the board
put into the talent card?

A.  It would have been put in through the draft
process of the iterations of these cards.

Q.  You indicated yesterday that the first time
you see the draft is roughly around November 14, 2019.
Where does the information come before that with respect
to the key strengths and key focus areas?

A.  It would come from discussions that have been
had through the year.  We look at feedback that was

Page 339

received through the year, prior performance, talent cards would have been used as a foundation potentially. For that, Bob prepares that information in the draft form for me. Bob and I work very closely together. We understand the strengths and weaknesses of the executives. So he would take a first pass at that. He could -- he could prepare the draft of that, and would, his organization would, then I would get it and I would make changes as appropriate if necessary. I would make changes to it. But ultimately, at the end of the day, these would be my comments that I would want to communicate to the board.

Q. If you read the third paragraph of Phil McHugh's review that you prepared.

A. Phil did a nice job in 2019 of working with Chicago regional leadership team on integration of MB Financial and its employees. Phil practically assumed leadership of certain key integration activities and issues, and worked to develop and implement solutions that positively impacted the customers and employees.

Q. The information about the work Phil did with MB Financial in 2019, does that appear anywhere on the talent card?

A. It's under the key strengths. We captured that in the key strengths. I did not list for the

Page 340

board, and cannot list for the board practically every -- everything a leader has done successfully or not in this document. It's key strengths and key focus area document, and I try and capture the essence of the strength of that leader in this document.

So I have bullets that reflect those key strengths around execution, as you can see, credibility, inspires fellowship. Those are the key strengths. Elements that make up and create those key strengths and why I feel that way I will articulate more in the performance review with the -- with the employee itself. It's not practical that I will write the whole employee review and put it in on a talent card. That's not manageable for the board. So what is here is a summation of those strengths, and I think these strengths exactly what's in this review to a T.

Q. Can you read the last paragraph of that first section of Phil McHugh's review?

A. Phil continues to do a great job of providing outstanding executive leadership to many of our corporate activities and events, and willingly assumes such leadership responsibilities. One significant example is the annual president circle, was recognizes the top performers in our sales force who demonstrate strong performance on both the what and the how goals.

Page 341

Phil does a great job in leading such events to ensure they achieve the best outcomes and positively impacts our employees.

Q. And once again, that specific information does not appear in the talent card, does it?

A. I believe --

MR. CIOFFI: Objection. Mischaracterizes the documents. You may answer.

THE WITNESS: So it would be captured in the strengths in almost all the bullets. Seasoned, versatile leader with significant organizational knowledge and credibility. That's why he would be given a role like. Highly engaged, thoughtful, does a good job of setting organizational direction and drives execution. Another reason why he would be getting a role like that and that responsibility. Holds himself and his team accountable to deliver results in the right away. Inspires fellowship. Another reason why Phil would have been given that opportunity to step in and provide leadership that that function.

And effectively represents Fifth Third in the community, which is important, and positively builds our brand. All those would be strengths that we want to have a leader who oversaw this

Page 342

function for the group. So it's -- it's included in why he was given this opportunity and all the significant strengths that he has are listed here in support of his leadership.

BY MR. SABA:

Q. And again, as you indicated, it's not specifically set forth, you believe it's summarized within those key strengths; is that what you're saying?

A. I believe these are significant key strengths that articulate to the board the leadership of Phil McHugh and well represent his strengths. As I mentioned before, I touched on significant organizational knowledge and credibility. Going back to his years of experience in multiple forms. I touch on highly engaged, thoughtful, and does a good job setting organizational direction and driving execution. I'm talking about his execution skills. I'm talking about his ability to hold himself and his team accountable to drive and deliver results the right way and inspire fellowship. These are very, very strong strengths that I'm articulating to the board about Phil McHugh.

Q. Right.

A. Effectively represents Fifth Third in the community and proactively builds our brand. Those are huge strengths and representative of who Phil McHugh is,

Case: 1:21-cv-00238-MRB Doc #: 77-16 Filed: 06/27/25 Page: 23 of 118 PAGEID #: 3851

Deposition of Gregory D. Carmichael, Volume II                        Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 343

1 that I was communicating to the board that support his
2 exceed rating. I did not list in detail activities that
3 support those bullet points. That would not be
4 practical.
5    Q. And the distinction is, though, if you look at
6 your second bullet point on key strengths, you said
7 highly engaged, thoughtful, does a good job of setting
8 organizational direction, drives execution. Whereas,
9 once again, in the fourth full paragraph under your
10 review, indicate Phil continues to do a great job
11 providing outstanding executive leadership to many
12 corporate activities and events.
13       Again, the distinction is, when you do the
14 personal review, he's doing a great job. When you do
15 the review and information for the board of directors,
16 it's only a good job; isn't that right?
17       MR. CIOFFI: Objection. Mischaracterizes the
18    documents. They speak for themselves. It's
19    argumentive. You can answer.
20       THE WITNESS: I think the documents speak for
21    themselves. I think I portrayed and communicated
22    to the board the significant strengths of Phil
23    McHugh as I see them. I think they're very
24    complimentary. They're very accurate. And the way
25    we put this on the board, he exceeds expectation.

Page 344

1    He's a strong leader who was offered one of the top
2    five jobs in the company and the board supported
3    that because he was a strong leader. They would
4    not have supported him being the head of
5    the consumer bank, top five guy in the proxy,
6    highly compensated, if they didn't view him as a
7    strong, good leader in the roles that we were
8    asking him to fill. Not as the CEO.
9       This review reflects that, and this review
10    basically provides the substance for them to
11    support him being in the proxy top Five Guys in the
12    company. All right. There's nothing negative in
13    these key messages that isn't supportive of him
14    being a good leader and ready to step up and run
15    the consumer bank, 60-plus percent of the gross
16    revenue of the company. So this is very strong.
17 BY MR. SABA:
18    Q. Well, the distinction is, he wasn't just a
19 good leader, he was a great leader. Isn't that right?
20    A. In my -- in my summation and communicating
21 with Phil, he's a very good leader, great leader in
22 certain aspects of what he was doing. But overall, a
23 very good leader. I use the word great on certain
24 performance items and certain actions that he was
25 working on, which you would expect.

Page 345

1       But for the board, I'm doing a summation to
2 the board, that's exactly, exactly aligned with his
3 review, correctly reflects his strengths, and viewed --
4 and is viewed by the board as a very, very, very strong
5 leader, capable of taking one of the top five jobs in
6 the job. Which he was offered and refused to do, and
7 quit the company.
8    Q. You did not include any of the information
9 regarding his employee viewpoint survey scores, did you?
10    A. I didn't put employee viewpoint scores on this
11 summation on talent management, I don't believe, for any
12 of my executives because I don't find it to be a
13 relevant bullet point for the board when talking about
14 talent. I explained before in my prior testimony why
15 that's the case. It's used more truly for my team to
16 get better in the organization. I want them to
17 understand it, but it's not necessarily reflective of
18 the leader itself.
19    Q. Referring back to Phil McHugh's review in
20 000496, can you read the paragraph under the how
21 section, please?
22    A. First paragraph?
23    Q. Correct.
24    A. Phil lives our leadership capabilities and
25 core values. He approaches everything with the highest

Page 346

1 integrity, fully assesses the risk in every direct
2 decision and consistently leads and acts like an owner
3 of our business. He operates in a very clever manner
4 with peers, he partners well with the risk and
5 compliance groups to ensure decisions are consistent
6 with our risk appetite. Phil is our most tenured
7 executive and brings deep historical knowledge to all of
8 our key decisions to ensure prior learnings and results
9 are appropriately pursued.
10    Q. The specific information that Phil lives our
11 leadership capabilities and core values, he approaches
12 everything with the highest integrity and fully assesses
13 the risks in every decision, consistently leads and acts
14 like an owner of our business. That doesn't appear
15 anywhere in your key strengths, does it?
16    A. It does, it absolutely does. If you look down
17 here, holds himself and his team accountable to
18 the results in the right away. That's my -- that's my
19 way of stating for the board, he does things the right
20 way. That's the -- that's the ethical nature of Phil.
21 High integrity. Leads the right away, inspires
22 fellowship. That's what's in that bullet point, once
23 again, identifying a key strength. It's there. It's
24 right there. That's exactly what we're talking about,
25 the how part.

Page 347

1  Q.  Doesn't say anything about highest integrity,
2  does it?
3      A.  It's -- it's -- it's captured in that
4  statement.  The board.  The right way.  He wouldn't be
5  doing it the right away if he weren't high integrity.
6  That's what that means.
7          The other bullet point that's also telling,
8  that I put in here, a key strength that I shared with
9  the board, effectively represents Fifth Third in the
10 community and proactively builds our brand.
11         Once again, talking about the character,
12 talking about things that I mentioned in his review.  He
13 does it the right away.  He abides our core values.
14 That wouldn't exist if he didn't do what was in my
15 review with him.  That's my way of communicating to the
16 board.  I've only got so much space.  I try to summarize
17 this to a very concise statement of his strengths.  The
18 board clearly understood the strengths of Phil McHugh as
19 a strong leader for this organization and a top five
20 performer in the company, and one of the top five jobs
21 in the company that he was offered.  That's why, because
22 of those key strengths.
23     Q.  On Exhibit 35, if you could turn to Fifth
24 Third McHugh 000500.
25     A.  Okay.

Page 348

1      Q.  This is the annual review information of Tim
2  Spence that you prepared; is that correct?
3      A.  Appears so.
4      Q.  If you go to the third full paragraph under
5  the what section, it indicates on the last sentence,
6  credit fraud loss is related to the credit card
7  portfolio were over planned by 10 percent and need
8  continued significant focus.
9          Do you see that?
10     A.  I do.
11     Q.  If you can turn to Fifth Third McHugh 001135
12 on Exhibit 30.  That's the talent card for Tim Spence;
13 is that correct?
14     A.  That's correct.
15     Q.  Does that talent card make any mention of the
16 credit fraud losses related to the credit card portfolio
17 which were over-planned by 10 percent and needed
18 continued focus, significant focus?
19     A.  I captured the first bullet, continue to
20 execute on the consumer bank transformation and deliver
21 top financial performance results.  I would never -- and
22 haven't -- gone into level item details on a talent
23 deck.  That's an area of focus that Tim inherited.  He
24 inherited that area, those losses were higher and
25 elevating.  I wanted Tim to stay focused on it.  It's an

Page 349

1  element.  Once -- one element of his responsibilities, a
2  detail level that wouldn't show up on any type of talent
3  card.  But I captured in asking him to continue to
4  execute on the consumer bank transformation and deliver
5  top financial performance.
6          We had goals and objectives around credit card
7  losses, and I want him to continue to focus on that
8  because they weren't where we wanted them to be.  So
9  that was what was communicated there.  It's captured in
10 that bullet under a focus area that the board will see.
11 So when you put it as a focus area, we're not where we
12 want to be in that area.  Things aren't 100 percent
13 where we want it, and that's why it's a continued focus
14 area for Tim Spence, and that's why it's articulated
15 that way.  I do not get into that level of detail on a
16 talent card for a board.
17     Q.  Referring to the fourth full paragraph of his
18 review, it says, Tim's 2019 employee viewpoint survey
19 score results were mixed.  Consumer was 74 percent, up 5
20 percent in 2018.  The chief strategy officer
21 organization score was 46 percent, up 1 percent from
22 2018.  Payments was 57 percent, flat with 2018.  And
23 mortgage was 62 percent, down 3 percent for 2018.
24         Tim needs to ensure action plans are
25 identified and implemented to have significantly improve

Page 350

1  employee engagement in these areas.
2          Do you see that?
3      A.  I do.
4      Q.  That information was not provided to the
5  board, was it, in the 2019 talent deck?
6      A.  I think I've explained multiple times,
7  Counsel, in my testimony that I don't put that
8  information in the talent card because it's not
9  necessarily reflective of actions of the leadership.
10 The individual themself.  These are point in times of
11 the organization, issues with the organization,
12 strengths of the organization.  There's a lot of things
13 that go into this.  This information is used to help our
14 leaders understand opportunities for improvement in
15 their area.  That -- that viewpoint survey is a lot of
16 questions, all right, not all about leadership, either.
17         So depending on when that individual took over
18 that organization, the challenge that organization was
19 faced with, that they had to replace everybody in the
20 organization, it's very, very -- it can be very
21 misleading.  It's not relevant for the board on one data
22 point at one point in time, that can be very misleading.
23         So I do not put that in any, any -- I didn't
24 put it in Tim Spence's, I didn't put it in Phil
25 McHugh's.  All right.  Good or bad, they don't go in

Page 351

1  this deck because they're not necessarily representative
2  of the leader's actions.
3      Q.  Well, let's talk about Tim Spence and his
4  scores.
5          How long had Tim Spence been the chief
6  strategy officer as of the end of 2019?
7      A.  Ask the question again.
8      Q.  How long had Tim Spence been chief strategy
9  officer as of the end of 2019?
10     A.  He came in initially in 2015-16 with that
11 role, and then I believe he elevated Ben Hoffman to that
12 position.  He still reported up.  He had an oversight
13 responsibility, but that organization evolved, and I
14 think today Ben Hoffman runs that organization.  So I
15 don't know exactly certain timelines.
16     Q.  So his involvement in that role existed since
17 when he first came to Fifth Third in 2015; isn't that
18 right?
19     A.  His involvement in that role was in 2015,
20 that when he took over a very problematic, troubled
21 organization that had to be rebuilt.  So yes, he would
22 have been stepping into a very difficult organization
23 situation.
24     Q.  And four years later the employee viewpoint
25 scores were still bad; isn't that right?

Page 352

1      A.  Once again, organizations in the company
2  traditionally have -- score high, some traditionally
3  score low.
4          I'll give you another example, the mortgage
5  operation.  All right.  That mortgage company always has
6  some of the lowest scores.  Believe it or not, so does
7  the strategy organization.  So I can't say if that's a
8  bad score for a strategy organization or not.  I really
9  can't comment.  End of the day, they're up from 2018,
10 that's all I see here.
11         Once again, this data is very, very
12 challenging to make assumptions on based on a glance.
13 You have to understand what the organization is, what
14 type of organization it is, and what you would expect
15 the organization scores to be.  So this is -- this is a
16 lot to think about, but not necessarily reflective of
17 the leader himself.  That's why it doesn't make it into
18 these talent cards.
19     Q.  Wouldn't the fact that he needed to
20 significantly improve his employee engagement scores in
21 these areas indicate that they were bad?
22     A.  They need to -- I think there's room for
23 improvement, and that was the message I was trying to
24 communicate to Tim.  There's room for improvement in
25 these areas.  Continue to focus on this.  We'd like to

Page 353

1  see these scores go up.
2      Q.  But to be clear, you felt there was room for
3  significant improvement; isn't that right?
4      A.  That's what the document says, so I believe
5  there's room for significant improvement.
6          By the way, you may also notice that the
7  consumer was up since he took over.  By the way, he took
8  that over from Phil McHugh, and the score went up 5
9  percent after taking it over from Phil McHugh.
10     Q.  So it was already --
11     A.  Once again.
12     Q.  -- it was already high under Phil McHugh and
13 went a little bit higher under Tim Spence?
14     A.  Right.  So does that reflect the leader
15 himself?  No.  It reflects opportunities within an
16 organization that were -- that are undertaken to make
17 the organization stronger.  That's -- that's an example
18 of why you can't just jump to a conclusion.  Consumer
19 typically scores high, and it scored higher under Tim
20 Spence.
21     Q.  Do you recall performing Phil McHugh's annual
22 review, 2019 annual review on February 14, 2020?
23     A.  I recall doing his review in February.  I
24 don't know the exact date of that review.
25     Q.  Do you have any reason to dispute that it

Page 354

1  occurred on February 14, 2020?
2      A.  I don't have my calendar in front of me.  I
3  don't have a reason to dispute it, but I can't confirm
4  it either.
5      Q.  Do you recall what happened in that review?
6          MR. CIOFFI:  Objection to the form.  Other
7      than the document you've just reviewed, is that
8      what...
9          THE WITNESS:  I would have gone through his
10     review.
11 BY MR. SABA:
12     Q.  Is there anything else you recall about any
13 conversations you had with Phil McHugh during that
14 review in February of 2020?
15     A.  The only thing I recall that I mentioned to
16 Phil is that my personal situation had changed, and any
17 prior discussions of a potential need for emergency
18 successor I thought had abated, and the situation wasn't
19 as serious, and I would be moving forward and around for
20 a period of time.
21     Q.  Did you specifically indicate to Phil that the
22 board had asked you to stay for two-plus years, and that
23 Phil may be too old for the CEO role, at that time?
24     A.  Absolutely not.
25     Q.  Do you recall any comments made by Phil McHugh

Page 355

1 to what you said to him?
2    A.   Didn't respond at all.  Didn't acknowledge it,
3 didn't say anything.  Didn't ask, wasn't I going to be
4 president?  Didn't say a word.  Don't recall any
5 response from Phil McHugh on that subject.
6    Q.   Who was present for that February 2020 review
7 of Phil McHugh?
8    A.   It's always just myself and the executive.  So
9 it would just be Phil McHugh and myself.
10    Q.   Where did that take place?
11    A.   It would have been in my office.
12    Q.   Other than the review that we just went for --
13 went through, excuse me -- do you do anything else to
14 prepare for that annual review?
15    A.   No.  I work with Bob Shaffer on the
16 preparation of that, so no other discussions.  Not that
17 I recall.  And you may notice in that annual review,
18 there was never a mention or any discussion about Phil
19 being the president, CEO.  The roles of --
20 and opportunities didn't reflect anything with the
21 president, CEO.  So if there was ever a conversation he
22 was going to be the president or CEO, you would think
23 this review would reflect the elements of that nature
24 that he was going to be considered for that position, or
25 being considered for that position.  Also, there was

Page 356

1 never a conversation after the December 17th talent
2 management review meeting when I recommended him as an
3 emergency successor, did he ever come to me and ask me
4 how that conversation went.  There's nothing in his
5 review, never a conversation.  When I mentioned I was
6 going to be staying around longer and there wasn't
7 particularly a need to have to consider an emergency
8 successor, once again, board's decision, never a
9 response back about any type of promise or expectation
10 he was going to be CEO or president.  Never anywhere.
11    Q.   Is there any indication in Tim Spence's review
12 that he was being considered for or had already been
13 decided by the board, or indicated that he was the guy
14 to be president and CEO of Fifth Third Bank succeeding
15 you?
16    A.   If you look at Tim's performance review --
17 first off, the board hadn't made a decision.  It's the
18 board's decision.  They haven't made a decision yet.
19 There was more work to do as they continued to work the
20 process.  So there would have been nothing in Tim's
21 review that would state he was going to be the next CEO
22 or president.
23        But you will see in his review different
24 language about the board's spots on him.  You will also
25 see on his -- on his talent card that he was being

Page 357

1 considered by the board, and I was -- I was considering
2 him a ready now successor in a period of time.  So his
3 review will have very different wording than Phil's that
4 kind of indicate that the upward opportunities are there
5 for him and how the board thinks about him.
6        I don't have his review in front of me.  I'm
7 sure it's in here somewhere.  But I think if we go back
8 through that you'll see some different wording.  But I
9 would never state in a review you're going to be the
10 next CEO, or the board's going to elect you or that.
11 That would never happen.  That's not my job, that's not
12 my responsibility.
13        My job is to make sure the executive continues
14 on the path that's been set forth, continues to elevate
15 under the board's -- under the board's direction of a
16 potential successor.  And my job is to continue to
17 execute that plan.  I would never state in a review, I
18 would never tell someone they were promised something.
19 I can't do that.
20        So the review starts to reflect how the board
21 feels about that individual, and some of those comments
22 will start to show up in the review about that
23 individual and how the board thinks about them.
24    Q.   Prior to February of 2020, had you had any
25 discussions with Tim Spence about him becoming --

Page 358

1 succeeding you as president and CEO of Fifth Third Bank?
2    A.   I would never have a conversation with Tim
3 Spence.  That's the board's decision.  Tim understands
4 it's the board's decision, so does Phil McHugh, that the
5 board picks the next CEO.  All right.  I would share
6 with him how the board felt about him, about his
7 potential capabilities and strengths, but I would never
8 commit to him that he's going to be the next president
9 or any timeframe around that subject at that point in
10 time.
11    Q.   Did you ever ask Tim Spence, prior to February
12 of 2020, if he wanted to be the next president and CEO
13 of Fifth Third Bank?
14    A.   I asked -- I would have a conversation with
15 all my executives about their aspirations for next role
16 and so forth.  Tim aspired to be the president and CEO
17 some day.  He made that clear from the day he came into
18 the bank that he aspired to be in that position some day
19 and that role, and he was hoping he'd have the
20 opportunity some day.  But no more conversation than
21 that.
22    Q.   Other than when he first came?
23    A.   Yeah, it was -- at the end of the day, when he
24 first came in, you know, into the bank, you know, the
25 board thought very highly of him, and throughout --

Deposition of Gregory D. Carmichael, Volume II          Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 359

1  throughout his other performance reviews, we would have
2  talked about his potential aspirations.
3       Q.  Between when Mr. Spence first came to the bank
4  in 2015 and February of 2020, did you ever have a
5  conversation with Mr. Spence where you indicated that
6  you're going to recommend to the board that he would be
7  the next president and CEO of Fifth Third Bank bank?
8       A.  No, I did not.  I did not have a conversation
9  with Tim that I was going to recommend him.  I knew he
10 aspired to that position, but I wasn't going to tell him
11 I was recommending him to the board.  That's
12 the board's -- that's for the board to do that.  At the
13 end of the day, I put him on that talent card.  I did
14 not tell him I was going to recommend him to be the next
15 president of the bank.
16      Q.  Other than the indication that you said
17 Mr. Spence gave when he first came to Fifth Third in
18 2015, did you have any other conversations with him
19 where he indicated to you he wanted to be the next
20 president and CEO of Fifth Third Bank?
21      A.  I don't recall a meeting.  Tim aspired to be
22 the CEO of Fifth Third Bank.  He understood -- he
23 understood that was not my decision, the board.  He
24 thought he had the potential to do it, he thought he --
25 that some day he could -- he would -- elevate to that

Page 360

1  opportunity.  Given the opportunity to do that, he would
2  elevate to it.  It was just -- it was just something I
3  was aware of.  He was aware of he was interested in it.
4  I don't remember sitting down and ever talking about
5  that per se with him about timelines or anything like
6  that.  That never occurred.  Those conversations that
7  happened between myself and the board.
8       Q.  Did you ever show Tim Spence the talent card
9  that you presented to the board at the December 2019
10 board meeting which indicated that Tim Spence would be
11 ready to be president in one to two years, and ready to
12 be CEO in two-plus years?
13      A.  I don't believe so.  I don't share the talent
14 cards with the employees.  That's a board document for
15 the board's eyes.
16      Q.  Did you ever tell Tim Spence that you were
17 going to put on his talent card for 2019, that it would
18 indicate that his next potential position would be to be
19 president in one to two years, and CEO in two-plus
20 years?
21      A.  I do not believe I shared that directly with
22 Tim Spence.  I cannot recall sharing that with Tim
23 Spence.
24      Q.  During Tim Spence's February 2020 review, did
25 you share with him at all the results of the 2019 board

Page 361

1  meeting and the unanimous approval and agreement by the
2  board that Tim Spence is a candidate for the next
3  president and CEO?
4       A.  In the February timeframe in 2020, I would
5  have shared if the board was interested in having him
6  vetted by RHR for a potential elevation to the president
7  of the company, and they'd asked me to initiate -- Bob,
8  through me -- to initiate a process with RHR, and that
9  would be coming earlier this year, and we would start
10 that process.  So I made him aware of the board's
11 request to have that done at that point.
12      Q.  Did you do that during his review?
13      A.  I -- I can't say for sure if it was during his
14 review, but I would imagine it was probably during his
15 review.  But I can't say for sure.
16      Q.  Is there any reference in his review to him
17 being vetted by RHR?
18      A.  I don't believe that -- I would have put that
19 in the review.  The review is for the prior year.  The
20 review would have been for the prior year, and we
21 discussed opportunities going forward.  So I don't
22 believe -- I don't believe it would have been in his,
23 quote, review itself.  It would have been a conversation
24 based on what the board's asked me to facilitate and Bob
25 would facilitate, which was a review of him as the next

Page 362

1  potential president for Fifth Third Bank.
2       Q.  And referring you back to his review, which if
3  you go to Exhibit 35, please, Fifth Third McHugh 000500.
4       A.  Okay.
5       Q.  Is there any reference in that document
6  anywhere with respect to Tim Spence being the next CEO
7  or president of Fifth Third Bank?
8       A.  If you look at the last paragraph before the
9  how.  Once again, I'm having a conversation with an
10 executive.  I cannot commit and will not commit that he
11 will be the next president.  Tim is very highly thought
12 of by the board and has significant, significant
13 potential at Fifth Third.  He's already in the proxy,
14 he's already on the enterprise.  He has significant
15 potential at Fifth Third.  Underline that.  He is a
16 great business partner and I'm looking forward to
17 working with him in 2020, continues development and
18 growth.  So he's positioned to take on additional
19 responsibilities.  He's already in the proxy.  Second
20 highest paid individual in the organization.  Okay.
21 That paragraph right there, you would read into that.
22 The board things very highly of him and has significant
23 potential at Fifth Third.
24      Q.  And it makes no mention of president CEO?
25      A.  I wouldn't make a mention of president CEO.

Page 363

That's not my responsibility, that's not my job. That
would be a failure of my duties if I put something like
that in the performance review. That's the board's
decision.

Q. You wouldn't do that in any reviews, would
you?

A. I wouldn't do it in any review. I wouldn't
put -- I wouldn't put that they were going to be the
next president.

Q. Or CEO, correct? Correct?

A. Correct. You also might want to look at
paragraph 1, since we have that -- we have this document
open. Tim is an intelligent, forward thinking and
strategic leader with a high capacity for learning. He
has tremendous knowledge of the banking sector, our
peers, and their strategies. Tim is called on by key
industry stakeholders and media to help shape dialogue
around banking strategy and digital transformation. All
the things the board has highlighted to me, and RHR has
confirmed. Critical characteristics and talent
necessary for new -- the next successful CEO.

Q. When did the board highlight that to you?

A. The board highlighted that throughout multiple
discussions we had in talent review. The importance of
the digital sector, digital transformation, Fintech

Page 364

sector, the importance of understanding. Those were
communications between discussions I had with the board.
Through all talent management when we talk about the
next CEO and so forth, those are dialogues we'd have
with the board. It was crystallized in a winning
formula that those were very, very important things
that the board reviewed. The winning formula that was
the foundation for Tim being vetted.

But that wasn't a surprise. These were
conversations because the world we operate in as a bank
was drastically going through a transformation on the
digital -- digital front. From the majority of the
competitors now that we're facing, new competitors are
digital competitors. So someone that had that
significant strength was important to the bored.
Someone that had a network in that space, they viewed
that as very important. Someone had strategic agility
and innovative mindset to navigate those type of waters
was communicated to me multiple times during a talent
review when we'd talk about the CEO position.

Crystallized in the winning formula by Guy,
and these are the characteristics that Tim embodied and
has significant, significant strengths in.

Q. Was that ever set forth in writing anywhere
prior to February 2020?

Page 365

A. If you go back and look at the 2015 winning
formula, that was the basis. Elements of that were
there. More importantly, it was -- it was crystallized
because the world changed even more since 2025 {sic}
around the digital front and the need to have the
strength in digital Fintech and a complexity around
strategy change because we weren't competing necessarily
against traditional banks anymore. The landscape in
front of our business going forward was being
transformed by technology, so the height and need on
strategy was elevating even more in that profile.

But we had conversations about that, myself
and the board, during -- during the succession planning
and talent discussions every year that I became CEO.
How that was changing, how the needs were changing, and
so forth.

(Exhibit 36 is marked for identification.)

BY MR. SABA:

Q. Mr. Carmichael, I've handed you what's been
marked as Exhibit Number 36, Fifth Third McHugh 000592
through Fifth Third McHugh 00593. Let me represent to
you this was the final document of the 2019 performance
review for Phil McHugh.

A. Is that different than I was looking at prior?
Which I thought was the same?

Page 366

Q. You can look at -- I don't believe -- I think
it's word for word the same, it's just a different
format. But go ahead and please review it and you can
confirm it.

A. Why would it be a different format? I'm
trying to understand.

Q. The original packet you were given were the
drafts sent by Mr. Shaffer to you to review.

A. So these were drafts I'm looking at?

Q. Correct. So go ahead and review so you can
determine what it's signifying.

MR. CIOFFI: Counsel, just note for the record
that Exhibit 35, that you marked 000492, has a
heading of final 1/10/20. I mean, the documents
will speak for themselves --

MR. SABA: Correct.

MR. CIOFFI: -- are you representing those are
different?

MR. SABA: No, I'm not representing they're
different. I'm just marking it because it's
and was produced in that order, order that was
received from you and was previously identified as
the final review by Mr. Shaffer.

THE WITNESS: I can do a word count to see if
they're identical, but I don't know what you're --

Page 367

1  why are you giving me a different document
2  that we've already reviewed?  Is there something
3  here I'm supposed to be --
4      MR. SABA:  No, we're just looking at that for
5  the purposes --
6      THE WITNESS:  -- addressing?
7      MR. SABA:  No, sir.
8      (Exhibit 37 is marked for identification.)
9  BY MR. SABA:
10     Q.  Mr. Carmichael, you've been handed what's been
11 marked as Exhibit Number 37, Fifth Third McHugh 000594
12 through Fifth Third McHugh 000598.  Can you identify
13 that document for me, please?
14     A.  2019 annual review.  People leaders only.
15 Looks like maybe a system-generated review of -- of his
16 annual review of the document you sent me -- you
17 provided to me earlier.
18     Q.  Have you seen this document before?
19     A.  I don't know if I would have seen this
20 document.  I don't recall seeing this document.  The
21 document you shared with me earlier would be what I
22 would be working from for his review.  I would not -- I
23 would not see this document.  This is system generated.
24     Q.  Would Exhibit 37, would you have that
25 available when you did the review that you did of Phil

Page 368

1  McHugh in February of 2020?
2      A.  Counselor, typically, I work off of the review
3  that -- Exhibit 36 would have been the document I would
4  have worked from in my discussion.  Would I have had it
5  in the folder?  I could have.  Could it have been
6  provided for his folder -- the individual's folder
7  afterwards, probably.  But I work from the document,
8  Exhibit 36 would have been the consistent document I
9  would have worked from.
10         In addition to that, this document I would
11 have had a financial page that goes with it that showed
12 their compensation, how they performed against the
13 variable comp and so forth, and what their next year's
14 compensation would have been.  That would have been --
15 that would have been the two documents I would have had.
16 I don't use this type of format because it's tough to
17 talk from in this document here.  So I use the document
18 36, Exhibit 36.
19     Q.  You said Exhibit 37 would have been tough to
20 talk from?  That's what you said?
21     A.  Well, just for conversation, which is what
22 this is about, a conversation, on strengths, weaknesses,
23 areas of opportunity.  I would use a more -- a more word
24 document versus a form-created document.  It's just
25 easier to form for me.

Page 369

1      (Exhibit 38 is marked for identification.)
2  BY MR. SABA:
3      Q.  You've also been handed Exhibit Number 38,
4  Fifth Third McHugh 000574 through Fifth Third McHugh
5  000576.  Can you identify that document, please?
6      A.  Appears to be Phil's 2019 self evaluation.
7      Q.  Would you have reviewed Exhibit 38 as part of
8  Phil McHugh's review in February 2020?
9      A.  I would have -- I would have reviewed the
10 talent -- yes, I would have reviewed the self evaluation
11 they provided to me.  I would have done that.
12     (Exhibit 39 is marked for identification.)
13 BY MR. SABA:
14     Q.  Can you identify Exhibit 39 for me, please.
15     A.  This would have been a 2019 category 1
16 employee risk management assessment of Phil McHugh by
17 Frank Forrest, our chief risk officer at the time.
18     Q.  Would you have reviewed Exhibit 39 as part of
19 your review of Phil McHugh in February of 2020?
20     A.  I would not have reviewed it unless there was
21 an issue that the chief risk officer presented to me.  I
22 would have looked at the ready effective.  I would not
23 have looked at anything else beyond that.
24     (Exhibit 40 is marked for identification.)
25     THE WITNESS:  Once again, this document here

Page 370

1  is intended to be an independent review done by our
2  chief risk officer who reports down line into a
3  board committee, so the intent would be, this is
4  not to be altered or changed.  This is his review
5  of this individual.  I don't have input to it, just
6  for clarification.
7  BY MR. SABA:
8      Q.  Are you referring -- when you say "this
9  document," you're referring to Exhibit 39.
10     A.  39, correct.
11     Q.  You've also been handed Exhibit Number 40,
12 Fifth Third McHugh 000845.  Can you identify that for
13 me, please?
14     A.  2019 pay for performance details for Phil
15 McHugh.  This would have been the other document I would
16 have had in my hand when talking to Phil --
17 or any of my executives in 2019 -- on 2019 performance,
18 and go forward, pay expectations for 2020.
19     Q.  And looking at Exhibit 40, can you explain how
20 you reached the figure of $2,250,000.00 for how much
21 Phil McHugh would have earned in 2020?
22     A.  Is this a final -- final form?  Because if you
23 look at the information presented in 2019, by FW Cook,
24 Phil's compensation for 2019 was over 2 million dollars.
25 So there's something not right here.  I don't know what

Page 371

1 document I'm looking at. I know what the document's
2 supposed to be, I don't know what version or what this
3 is.
4    Q. So --
5    A. Because it doesn't line up for -- he -- so I'm
6 sorry. I'm sorry. I'm sorry. Okay.
7       This does -- I was looking at the wrong
8 information. So you have base -- base compensation,
9 this target VC would put him at over a million dollars,
10 then he would have LTI award -- there's the other
11 million dollars, okay. So this is the final. So his
12 total compensation, okay, would have been over 2 million
13 dollars, if you look at that. Once again, these are
14 targets. They're not guarantees. It's basically, you
15 know, guarantee unless there's any callback or anything
16 of that nature occurs. But the VC is a target VC, that
17 can be more than that, can be less than that. It can be
18 exactly that. And then the LTI award is a long-term
19 incentive award that is presented.
20       I'm sorry. So that -- that's how you get to
21 your 2 million dollars.
22    Q. And so looking back at that, in terms of -- of
23 what Phil McHugh would have earned in 2020, if we look
24 at 2020 compensation targets, we would have the base
25 salary to the BC target number to the LTI target number;

Page 372

1 is that correct?
2    A. Yes. And there's an additional -- yes, the
3 answer's correct. And then you can see his LTI, what
4 changed here, his base went up slightly, which would
5 have meant his VC target 110 would be more. Because
6 it's based off of base. So you can see his VC target
7 went up to 550 and then his LTI was actually bumped up
8 another $200,000. So then if you add that up you're
9 looking at roughly 2.2 million dollars-plus.
10    Q. The 2 million 250 is what you indicated
11 before?
12    A. That ties together, that's correct.
13    Q. With respect to those increases and base
14 salary, who determines that?
15    A. It's a recommendation that HR would make to
16 me, that I would support. Ultimately it is the final
17 approval happens by the human capital of the human comp
18 committee, the human capital comp committee. So they
19 would make the final decision. Call the HCC. Mike
20 McCallister chairs that, and they would make the final
21 decision on all awards to be paid out and increases.
22    Q. So they would make the determination on the VC
23 award percentage of target; is that right?
24    A. Excuse me, ask the question again.
25    Q. In terms of going down to variable

Page 373

1 compensation, who determines the percentage or the VC
2 award percentage of target and the amount of the target?
3    A. That is done working with FW Cook on for this
4 type of position, what is the appropriate VC target, as
5 I mentioned before, they provide that analysis and on
6 December 17th meeting, you can go in there and you can
7 see how all these elements stack up to the peer groups.
8 So we take input from them and basing it on how this
9 position is -- is -- the job itself is structured, and
10 how the comp stacks up in the industry, we come up with
11 what we believe is the right structure to reward that
12 individual.
13       So they would be part of that discussion, HR
14 would be part of that discussion. The board would
15 finalize that discussion in the February meeting when we
16 meet with the board on this topic, so that's how we get
17 to these numbers. And as you can see in this case,
18 Phil's compensation was going to go up $200,000 from
19 2019 to 2020. Also reflecting a strong performance that
20 I communicated to the board about Phil McHugh.
21    Q. As of March of 2020, were you and Mr. Shaffer
22 already determining the date upon which Tim Spence would
23 become president?
24    A. We don't make that determination when he would
25 become president. Once again, I'm going to be clear,

Page 374

1 that's the board's decision. The board may have asked
2 for some timelines that make sense based on the
3 environment we're operating in and wanting our input on
4 a logical timeline for succession planning, if they were
5 going to elevate him to the president, so I could easily
6 see us putting together some scenarios for the board,
7 but the board would ultimately make that decision. We
8 don't determine what it is, and if we put anything
9 together, that would be at the request of the board.
10       (Exhibit 41 is marked for identification.)
11       (Exhibit 42 is marked for identification.)
12 BY MR. SABA:
13    Q. Mr. Carmichael, I've handed you what's been
14 marked at Exhibit Number 41, Fifth Third McHugh 006260.
15 Can you identify that document for me, please?
16    A. It appears to be succession planning is the
17 subject from Bob Shaffer to Greg Carmichael, date
18 3/28/2020.
19    Q. And Mr. Shaffer attached three organizational
20 charts for you; is that right?
21    A. Apparently it says that, so I would assume I
22 had multiple charts attached to this.
23    Q. With respect to succession planning work; is
24 that right?
25    A. That's what it says here.

Case: 1:21-cv-00238-MRB Doc #: 77-16 Filed: 06/27/25 Page: 31 of 118 PAGEID #: 3859

Deposition of Gregory D. Carmichael, Volume II      Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 375

1   Q. The second paragraph starts, these work charts
2 and timing are based on our prior discussions and prior
3 to consideration of any timing impacts of our succession
4 plans related to the Coronavirus or the CFPB matter.
5     Do you see that?
6   A. I do.
7   Q. What impact would the CFPB matter have on any
8 succession planning?
9   A. I don't recall the -- the significance of the
10 CFPB matter in this planning process. It's 2020
11 timeframe. I can't recall offhand what the -- what the
12 CFPB matter -- I know what the CFPB matter was. I'm not
13 sure why it would be influential in our discussions of
14 this matter.
15   Q. Do you recall what was happening in the CFPB
16 matter as of March of 2020?
17   A. Not right at March of 2020. Obviously, that's
18 the point we'd been going back with the CFPB for some
19 time, literally a year plus, maybe more than that. So
20 we probably felt that they were going to move forward
21 because we were -- we were -- we were very comfortable
22 in our position that we've taken care of the issue and
23 addressed all the problems. Problems that were
24 identified, you know, in the suit that they eventually
25 brought forth was 2010 to 2016 timeframe. So there may

Page 376

1 have been something about the timing of that, that I may
2 have been thinking about, wondering about. I don't
3 know. I don't know if it was filed before then or not.
4   Q. You don't know if the litigation had begun --
5   A. I do not.
6   Q. -- with the CFPB prior to that.
7   A. I do not recall.
8   Q. Mr. Shaffer goes on to point out the following
9 are data points and assumptions. First is, investor day
10 is December 10, 2020. What is the significance of
11 investor day?
12   A. It's an opportunity for us to communicate with
13 our investors about our business and direction, and we
14 typically use that investor day to showcase our talent
15 in future strategies of the organization. Once again,
16 this is a meeting and a day discussion with our
17 investors to talk about our business and our go forward
18 thinking and our leadership.
19   Q. Second bullet point, is Tim to president on
20 either October 1, 2020, if we want to announce before
21 investor day or January 1, 2021. Do you see that?
22   A. I do.
23   Q. What are the pros and cons of those two dates,
24 October 1 , 2020 or January 1, 2021?
25   A. I don't recall the pros and cons of those

Page 377

1 dates and why those were important. It was some time
2 ago.
3   Q. Do you recall recommending a particular day
4 for Tim Spence to become president of Fifth Third Bank?
5   A. Can you please ask the question again?
6   Q. Certainly. What are the pros and cons of Tim
7 Spence becoming president on either October 1, 2020, or
8 January 1, 2021?
9   A. I'm not sure what the pros and cons would have
10 been at this time. What was going on, and I don't
11 recall what was more important October 1st or January 1.
12   Q. Did you make a recommendation before that Tim
13 Spence should become president on October 1, 2020?
14   A. I don't recall exactly how the recommendation
15 was made. I know the board's asked for some scenarios
16 and timing from us, so I'm sure this is part of that
17 exercise. I don't recall exactly when. I think we
18 ended up right around that date somewhere, so obviously
19 one of our scenarios and timelines to the board would
20 have had that date on there. But ultimately, the board
21 makes the call.
22   Q. Third bullet point, it's possible to indicate
23 that Phil at time of Tim's promotion to president that
24 he will be named COO upon Tim's promotion to CEO; do you
25 see that?

Page 378

1   A. I did see that.
2   Q. And "Phil" refers to Phil McHugh; is that
3 right?
4   A. Yes. He is the only Phil we have on the
5 enterprise team.
6   Q. Had you had any discussions with Bob Shaffer
7 about Phil McHugh becoming COO prior to this time?
8    MR. CIOFFI: Objection. Document speaks for
9 itself. It's from Bob Shaffer. But you may
10 answer.
11    THE WITNESS: This is from Bob Shaffer. I
12 think they were playing -- I think he was playing
13 with some organizational structures that might make
14 sense. So this was a memo from him to me. We
15 never did that. I didn't -- I'm sure I didn't
16 believe that was the right structure or I would
17 have responded that it was. We didn't go down that
18 path because I didn't think it was the right
19 structure or necessary, or the right move for the
20 company. This was probably something Bob was
21 considering in this scenario. Bob does scenario
22 playing. This is probably one of those scenarios.
23 We didn't go forth and execute it.
24 BY MR. SABA:
25   Q. Why did you feel that Phil would be -- not be

Page 379

1  the right person for COO?
2      A.  Once again, I just didn't think organizational
3  structure-wise we needed a COO, at that time, and I
4  didn't think that was the right decision for the
5  company.
6      Q.  In the sentence at the beginning of the
7  paragraph, Mr. Shaffer does indicate these org charts
8  and timing are based on our prior discussions.
9          Did you have any discussions with him about
10  Phil McHugh becoming COO?
11      A.  I don't recall if that was one -- he may have
12  thrown that scenario out to me.  We have a lot of
13  discussions.  As I mentioned before, we sit right next
14  to each other.  I don't remember drawing up anything
15  that had -- I don't remember drawing up anything with
16  Tim as COO, but Bob could have, and presented something.
17  Once again, we were doing scenario planning.  Bob's
18  responsible, as the head of human capital, in my
19  business partner, to put some scenarios in front of us
20  that might make sense, might not.  Ultimately, we
21  decided on the structure we thought was in the best
22  interest of the company.
23          But there was some -- there was work going on
24  at this point in time.  I know that COO position came
25  back, came up for discussion again.  Once again, I'm

Page 380

1  very leery about a COO position after we, you know, not
2  having as much success as I was hoping we'd have before,
3  and it puts a lot of responsibilities under one
4  individual that I believe should belong to the CEO.  And
5  president.  So I would push back on a structure like
6  that, and that's obviously what I did.
7      Q.  It was already anticipated at this time that
8  not only would Tim Spence being promoted to president,
9  but that he would be promoted to CEO; is that correct as
10  well?
11      A.  Once again, this is at the request of the
12  board.  We work on things.  So this is in February --
13  I'm sorry, March 28th.  The Guy exercise would be --
14  would be closest or underway or whatever.  The board was
15  asking for some scenarios because obviously they were
16  going through a process of considering Tim to president.
17  They would be asking for some scenarios from us.
18      Q.  My question is, at that point in time it was
19  anticipated that not only would Tim Spence become
20  president, but he would also become CEO, correct?
21      A.  At the end of the day, when you become
22  president there's one or two places you're going to
23  become the CEO or you're going to go out.  You don't
24  stay as president long term.  Most banks don't have a
25  president and CEO.  The CEO and the president are one

Page 381

1  and the same.  When you separate the two, it's used for
2  succession planning, and it acknowledges that you're --
3  you're underway, and having the CEO at some point retire
4  or step down from his position.  That's how it works in
5  a banking sector, corporate America.  So once you name
6  him president, I'm on the clock as CEO, he's on the
7  clock as president, it's a period of time -- this is not
8  a long-term structure.
9          So you would -- you would start to then think
10  about, okay, if he's successful as president and the
11  board elects him as CEO, what would that timing look
12  like and what could it look like?  That's what I believe
13  was happening here.  Nothing was determined and
14  finalized.
15      Q.  The next bullet point says, Greg retires on
16  the day of our annual shareholders meeting, April 2022.
17  Tim to CEO and president.
18          Do you see that?
19      A.  I did.  That did not happen.
20      Q.  When did you retire as CEO?
21      A.  July 5th.
22      Q.  Of 2022?
23      A.  Of 2023.  I'm sorry, 2022, yes.
24      Q.  How did you decide on that date?
25      A.  We felt it was in the best interest of the

Page 382

1  company, and that was the right date we identified.  The
2  board identified that date, actually.
3      Q.  Did you propose that date initially?
4      A.  I might have proposed it based on some
5  vacation schedules and so forth.  I mean, you don't want
6  to announce something like that when you're leader is
7  out on vacation.  So I'm sure as we looked at our
8  calendars the year in the summer months, that we were
9  probably working around the best day of an announcement
10  in that nature, if that's what the board wanted to do.
11      Q.  The last bullet point reads, Greg remains
12  the chairman of the board until April 2023; is that
13  right?
14      A.  That's correct.
15      Q.  And I believe you indicated earlier, did you
16  leave in March of 2023 or April of 2023?
17      A.  I left at the annual show hard meeting in
18  April of 2023.
19      Q.  Okay.  What day was ultimately picked for Tim
20  Spence to become president of Fifth Third Bank?
21      A.  I don't know what the exact day was when they
22  made him president.  It was in the third quarter
23  sometime, so you guys probably have that information.  I
24  don't have it right in front of me at my fingertips.
25      Q.  Why was that day picked?

Page 383

1    A. That was the day the board decided they wanted
2 to make him president and voted on.
3    Q. Referring to Exhibit Number 41, Fifth Third
4 McHugh 006031 through Fifth Third McHugh 006034. Can
5 you identify this document for me, please?
6    A. Looks like -- says enterprise organizational
7 succession planning draft 3/7/20, proposed
8 organizational structure number 1. So I assume this is
9 one of multiple proposed structures.
10    Q. Have you seen Exhibit Number 41 before?
11      MR. CIOFFI: Counsel, just for the record, do
12 you mean 41 or 42?
13      MR. SABA: 42, excuse me.
14      THE WITNESS: Um, I don't recall offhand, but
15 I would -- I might have seen this document. I just
16 don't recall going through this document. But it
17 appears what would have been -- been discussed at
18 this time. I can't say I've seen the document.
19 BY MR. SABA:
20    Q. And as indicated at the top, it says draft
21 March 7, 2020; is that right? It's on the first page of
22 Exhibit Number 42.
23    A. Says draft 3/7/20. Correct.
24    Q. Were these charts being prepared by
25 Mr. Shaffer?

Page 384

1    A. They would have been prepared by Mr. Shaffer,
2 correct.
3    Q. And in this March 7, 2020, scenario, if you
4 turn to the second page of Exhibit Number 42. In the
5 column proposed organization, proposed title 3 for Phil
6 McHugh, it indicates COO and head of regional banking.
7 Garrett reports to McHugh. Do you see that?
8    A. I do see that.
9    Q. Do you recall that as an option that was being
10 discussed in March of 2020, between you and Mr. Shaffer?
11    A. I do not -- as I mentioned earlier, I think
12 there was conversations about potential COO structure.
13 Obviously, I was not in favor of that structure, I
14 didn't go forward with that structure, I didn't think it
15 was in the best interest of the company to put that type
16 of structure in place. I thought it was more
17 detrimental to our leadership and success of the
18 corporation. So there was scenarios where that was
19 presented. It wasn't what I ended up doing.
20    Q. You indicated earlier that the board had
21 requested that you and Mr. Shaffer put together some
22 scenarios. How from the board specifically requested
23 that?
24    A. That would have been requested through the
25 lead director and me, Marsha Williams, that we prepare

Page 385

1 scenarios. I believe it would have been Marsha.
2    Q. And when did Marsha request that you prepare
3 the scenarios?
4    A. When we had the conversation -- not sure
5 exactly what timeframe, weeks or so forth. But once we
6 kicked off the RHR process, she would have been asking
7 for some scenarios at that time for the board.
8    Q. How was that request made to you?
9    A. More than likely a conversation over the
10 phone, or -- would be my guess.
11    Q. You don't recall specifically?
12    A. I do not.
13      MR. SABA: We can go off the record.
14      (A recess was taken from 12:01 to 12:25.)
15      VIDEOGRAPHER: Time is 12:25 p.m. We're back
16 on the record.
17 BY MR. SABA:
18    Q. Mr. Carmichael, I'm going to refer you back to
19 Exhibit Number 42, please.
20    A. Bear with me counsel, I have to dig up these.
21    Q. That is the document entitled enterprise
22 organizational succession planning draft, March 7 --
23    A. I do have that.
24    Q. Referring to the first page, and if you look
25 at the fourth column over, it says proposed organization

Page 386

1 and October 2020, January 2021.
2    A. Correct.
3    Q. And for Tim Spence, it says, president and
4 head of regional middle market and business banking and
5 WAM. Is that right?
6    A. It does.
7    Q. And Garrett reports to Spence; is that
8 correct?
9    A. Correct.
10    Q. And that is what happened in October of 2020;
11 isn't that right?
12    A. Tim became president. He would have the
13 regions reporting to him. Line of businesses would
14 all -- that weren't reporting to him would then report
15 to him. So middle market, business banking and WAM.
16 Yes. The line of businesses and markets would then
17 report to Tim Spence. Correct.
18    Q. And then, if we look at the next page, Fifth
19 Third McHugh 006032, for Phil McHugh, under that same
20 column it has head of consumer banking, Lamb reports to
21 McHugh. Is that correct?
22    A. That is correct.
23    Q. And that also is what happened in October of
24 2020; isn't that right?
25    A. That didn't happen because Phil refused do the

Page 387

1  job and quit. So that actually didn't happen.

2     Q.  That's the offer that was made to Phil McHugh;

3  is that right?

4     A.  Yes. Head of consumer bank, top five job in

5  the company. And Brian Lamb was running retail at the

6  time, and Brian -- retail reported to Phil McHugh, at

7  that time.

8     Q.  We've referenced RHR and Guy Beaudin. Is that

9  how you pronounce his name?

10    A.  I believe that's correct.

11    Q.  Several times. How did you first meet Guy

12 Beaudin?

13    A.  The chairman of Fifth Third Bank in 2015 was a

14 gentleman named Jim Hackett. Jim Hackett knew RHR on a

15 prior board and work that RHR had done for that board,

16 and he wanted to bring RHR in and look at succession

17 planning for the organization, at that time. And so he

18 introduced RHR to Fifth Third and brought them in. And

19 my first meeting with Guy was when I was told by the

20 chairman that I would be receiving a call from an

21 individual that was going to put me through and vet me

22 through a process to potentially become the next

23 president of Fifth Third.

24    And I believe that happened -- I'm not sure

25 exactly when it happened, but that was late 2014, early

Page 388

1  2015. I'm not sure exactly the timeframe when that

2  transpired. Because I was made -- I was made CEO in

3  November. I was already president, so this would have

4  been vetting for the CEO job, not the president job.

5  Would have been vetting for the CEO job. And I believe

6  that was probably somewhere in the first, second quarter

7  of 2015 is when that would occur. But it would have

8  been vetting for the CEO job because I was already

9  president.

10    Q.  And what services did Guy Beaudin provide to

11 you?

12    A.  He didn't provide any services to me, he

13 interviewed me. At the board's request against the

14 profile that I had not seen that the board put together.

15 Evaluated me for the potential to step in as the next

16 CEO of the company. It was a board process. I was not

17 involved in it. I was the subject of the review by RHR.

18    Q.  Other than Guy Beaudin interviewing you, did

19 you have any other involvement with him?

20    A.  Afterwards, when I became CEO, they kept him

21 on for one year as a coach, and I think I may have

22 spoken to him once or twice in a coaching capacity as

23 the new CEO.

24    Q.  And what coaching services did he provide?

25    A.  Checking in on how you're doing, Greg. Is

Page 389

1  there any -- any questions you have? How's the

2  organization? I don't remember that being a very robust

3  conversation, or that I needed a lot from Guy. It was

4  just more of a check-in to see how I was doing and

5  anything he can be of help with, on any process, thought

6  process, or anything. Any questions I might have as a

7  new CEO. The board used and leveraged him as a mentor

8  in my first year on the job. I really don't recall a

9  conversation, but I think I talked to him maybe once,

10 could have been twice.

11    Q.  Was that all in 2016, 2015?

12    A.  It would have been -- it would have been

13 early -- it would have been -- if I had a conversation,

14 which I believe I may have had one or two -- it would

15 have been sometime 2015, early 2016.

16    Q.  Between the time of those conversations that

17 you had with Guy Beaudin in early 2016, had you had any

18 other contact with him prior to the time that RHR was

19 retained with respect to vetting Tim Spence?

20    A.  I don't recall -- I don't recall any

21 conversations that I would have had with RHR, or reason

22 for a conversation with RHR, but I -- I just don't

23 recall having any conversations.

24    (Exhibit 43 is marked for identification.)

25

Page 390

1  BY MR. SABA:

2     Q.  Mr. Carmichael, I've handed you Exhibit Number

3  43, which is Bates stamp Fifth Third McHugh 005951

4  through Fifth Third McHugh 005957. Can you identify

5  these documents for me, please?

6     A.  The first document you handed me looks --

7  appears to be an e-mail from Bob Shaffer to Guy on

8  3/6/2020, and it looks like it's bios -- EVP bios of

9  McHugh, Spence, and Tuzun. So I would assume that's

10 what I'm going to find when I flip this page over. And

11 that is what I find. With the talent management cards

12 also.

13    Q.  And I believe you indicated earlier that

14 initially, RHR was going to do evaluations or vetting of

15 Mr. Spence, Mr. McHugh, and Mr. Tuzun; is that why these

16 documents were being sent to Guy Beaudin?

17    A.  Not exactly. I -- I, Greg Carmichael, thought

18 it would make sense to include to the emergency

19 successors for evaluation against the profile. So Bob

20 was sending these based on what would have been probably

21 my direction initially thinking that's what we should

22 do. Not the board's direction. Once -- as I testified

23 earlier, conversations pursued where Guy didn't think

24 that made sense, that these weren't viable candidates,

25 therefore they were taken out. So this was earlier in

Page 391

1 that process where Bob thought he was doing what I
2 wanted him to do, which was send additional bios for
3 potential assessments against a profile, which we
4 decided, for the reasons I stated earlier in my
5 testimony, didn't make sense and we changed course.
6     Q.  Bob Shaffer references that he spoke to Guy
7 Beaudin that morning on March the 6th.  Were you part of
8 that conversation?
9     A.  I would not have been part of that
10 conversation.
11     Q.  Do you have any understanding of what happened
12 during that conversation?
13     A.  I do not.  I wasn't part of the conversation.
14     For clarity purposes, I had very little
15 interaction in this process except to communicate when
16 Marsha wanted the board -- the board asked Marsha to
17 talk to me about, which was getting RHR involved.  I
18 turned it over to Bob Shaffer, and the only -- my
19 initial suggestion was they add these two emergency
20 successors, and that was changed.
21     Beyond that, I had very little interaction
22 with Guy through this process.  I did see the summations
23 at the end.  He did provide us a draft report at the
24 end, but I was really out of this process.  I did have
25 conversations to let people know they were going to be

Page 392

1 talked to, that were on the enterprise committee, but
2 beyond that, this was -- this was Bob Shaffer's
3 exercise.
4     (Exhibit 44 is marked for identification.)
5 BY MR. SABA:
6     Q.  Mr. Carmichael, I've handed you what's been
7 marked Exhibit Number 44.  Bates stamp Fifth Third
8 McHugh 005687 through Fifth Third McHugh 005688.  Can
9 you identify this document for me, please?
10     A.  Appears to be -- first part of this, e-mail
11 from Guy back to Bob Shaffer, and then -- that's it.  An
12 e-mail from Guy to Bob Shaffer.  I'm sorry, there's --
13 there's a couple elements on the e-mail.  But, yes,
14 that's what it is.
15     Q.  In the e-mail that Guy sends to Bob Shaffer,
16 he says I've attached an outline for work with
17 timelines, et cetera.  I'm happy to get on a call Monday
18 either 9:30 or 10:30 to answer any questions.
19     Do you see that?
20     A.  I do.
21     Q.  Have you ever seen the outline of work that
22 Guy Beaudin sent to Bob Shaffer on March 12, 2020?
23     A.  I do not believe I saw that outline.  Bob may
24 have sent it to me, I don't recall reviewing it or
25 seeing it.  I tried to leave this in Bob's hands.

Page 393

1     (Exhibit 45 is marked for identification.)
2 BY MR. SABA:
3     Q.  Mr. Carmichael, I've handed you what's been
4 marked as Exhibit Number 45.  It's Bates stamp Fifth
5 Third McHugh 0213078.  I'll represent to you it's a text
6 message exchange between you and Mr. Shaffer.
7     A.  Okay.
8     MR. CIOFFI:  Counsel, before you question,
9 again, pursuant to yesterday and earlier
10 depositions, this particular e-mail exchange, which
11 of course, as you know, is marked attorney's eyes
12 only because it contains a lot of personal and in
13 this particular case, medical information of people
14 that have no relationship to this case.  So if we
15 could have your agreement that we'll engage in the
16 same exercise as before, and that is, Mr. Hart,
17 Mr. Smith, will redact this information before it
18 gets into the permanent record of the deposition.
19     MR. SABA:  That's fine.
20     MR. CIOFFI:  Okay.  Please continue.
21 BY MR. SABA:
22     Q.  Mr. Carmichael, I'm going to refer to you the
23 second text message on Exhibit 45, which this is dated
24 May 4, 2020, sent at 4:10 p.m. from Mr. Shaffer to you.
25     Do you see that?

Page 394

1     A.  I do.
2     Q.  And it reads, I have my first monthly update
3 call with Guy Beaudin today since you and I talked to
4 him.  Unless you see differently, I think we should just
5 stay in the same mode of not getting anything
6 substantially started at this point.  Agree?  And you
7 respond as 4:12 p.m.  Yes, agreed.
8     Do you see that?
9     A.  I do.
10     Q.  Do you recall when you and Mr. Shaffer spoke
11 to Guy Beaudin prior to May 4, 2020?
12     A.  I cannot -- I do not know exactly when we
13 talked to Guy to kick this exercise off.  I don't
14 remember.  I'm not sure.  I don't have that in front of
15 me, so I don't know when I talked to Guy.
16     Q.  What does Mr. Shaffer mean when he says, I
17 think we should just stay in the same mode of not
18 getting anything substantially started at this point?
19     A.  I don't have the context around timeframe of
20 this text message and what was being discussed.  I
21 really have no clue as to the context and what this
22 would mean at this point.
23     Q.  Do you recall any reason why things would not
24 be substantially started in May of 2020?
25     A.  I do not.  I do not know why we wouldn't

Page 395

1  start.  There's obviously something that caused us to
2  take a pause, but I'm not sure what that something was.
3  Bob might remember that.  I -- I don't recall that.
4      Q.  Either way, you agreed with him that nothing
5  should be substantially started at that point; is that
6  correct?
7      A.  The text says I said yes, I agree.  I just
8  don't have the context of what -- why things were
9  occurring.  We weren't getting anything started -- I
10  don't know.  Obviously I said yes, I agree.  I just
11  don't know what the context was.
12      Q.  And you have no recollection of the prior
13  conversation you would have had with Guy Beaudin prior
14  to May 4, 2020?
15      A.  I would speculate.  I would have been on the
16  first call with Guy, because I know Guy.  And Guy did my
17  assessment and I'm the CEO.  And if we're going to be
18  bringing him in to assess one my direct reports, a guy
19  like Tim Spence, I'd probably introduce Guy, tell him
20  what the board was looking for.  Introduce Bob as the
21  head of the process and that he'd be working with Bob
22  mostly, going forward, and schedule all the meetings
23  with Bob's assistant because a lot of meetings had to be
24  scheduled.
25      My guess is it was just a kickoff meeting, an

Page 396

1  introduction meeting based on the request of the board
2  to get this process started.  That's what I would assume
3  that meeting was, but I don't recall.
4      Q.  You don't have any specific recollection,
5  right?
6      A.  I do not.  But you would assume I would make
7  that first call.  I mean, I would be introducing Bob in
8  that conversation.  That would have had to happen.
9      (Exhibit 46 is marked for identification.)
10  BY MR. SABA:
11      Q.  Mr. Carmichael, I've handed you what's been
12  marked as Exhibit Number 46, Fifth Third McHugh 006414.
13  Fifth Third McHugh 004615.  Can you identify this
14  document for me, please?
15      A.  It appears to be an e-mail from Bob Shaffer to
16  myself, subject matter Guy conversation, winning formula
17  attached, CEO profile.
18      Q.  Have you seen this document before?
19      A.  It was sent to me, yes.  I would have seen
20  this if it was sent to me.
21      Q.  The first bullet point reads, Guy agrees that
22  if Tim is the successor, don't add Tayfun and Phil
23  formally.  Although he would recommended at a minimum we
24  discuss with Marsha that she, the board, is okay with
25  only having Tim assessed by Guy.  He said he has seen a

Page 397

1  few boards surprised in the past with CEO, CHRO did have
2  at least one other internal candidate assessed.  Do you
3  see that?
4      A.  I do.
5      Q.  Did I read that correctly?
6      A.  You did.
7      Q.  Who was Guy agreeing with?
8      A.  Well, this is a text -- this is an e-mail from
9  Bob to me, so I would assume he was talking to Bob.
10      Q.  Was it Bob's suggestion to not add Tayfun and
11  Phil?
12      A.  That's not my understanding.  My understanding
13  was when I talked to Bob, that Guy -- either Guy talked
14  directly to me or Guy talked directly to Bob, and said
15  if they were not being seriously considered, you should
16  not put them through the process.  So somewhere in
17  this -- in this period of time, Guy basically came -- we
18  came back and said they're not being considered.  As I
19  stated before, Guy's recommendation was don't put them
20  through the process of not being seriously considered.
21      Q.  Well, the e-mail does indicate that Guy says
22  that if Tim is the successor, don't add Tayfun and Phil.
23  But it also indicates that he was agreeing with somebody
24  else, correct?
25      A.  I'm not going to try and interpret this --

Page 398

1  this sentence.  I can tell you what was being discussed.
2  I told you that I was recommending we add those two just
3  for comparison purposes.  I know Bob came back to me or
4  Tim said directly to me, don't add them if they're not
5  being seriously considered.  And I think that's what Guy
6  was agreeing with.  This is not my e-mail, it's Bob's.
7  So Bob would have a better understanding of that.  But
8  that's what -- that's what was occurring here.
9      Q.  The e-mail would indicate that the idea of not
10  adding Tayfun and Phil did not originate with Guy; is
11  that right?
12      A.  Ask the question again?
13      Q.  The e-mail would indicate that the idea of not
14  adding Tayfun and Phil to be assessed along with Tim
15  Spence did not agree with -- originate with Guy?
16      A.  Guy -- Guy said do not add anybody -- do not
17  ask someone -- I don't know the exact wording -- do not
18  add anybody -- we shouldn't assess anybody that you
19  don't believe -- the board doesn't believe would be in
20  consideration for the CEO position.  Don't add them
21  because it'll be more harmful than not.
22      Bob and I had this conversation.  It was -- it
23  was Guy's position not to add them if that's how they
24  were being thought of.  If they were being thought of
25  differently and they were seriously being considered,

Deposition of Gregory D. Carmichael, Volume II                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 399

1 then we should add them. So somewhere in this
2 conversation that's what's materialized here. And when
3 we went back and we told Guy -- apparently Bob did --
4 that they weren't being considered, you know, and Guy
5 probably agreed not to -- and he shouldn't add them.
6 That's my interpretation of what I'm reading here.
7 That's what's occurred.
8    Q.  Separate from this e-mail, did you have any
9 specific conversations with Guy regarding this issue?
10   A.  The conversation of not adding individuals who
11 weren't going to be assessed by the board and weren't
12 serious considerations by the board for CEO could have
13 happened with me, but I believe it happened with Bob. I
14 just don't recall who had the conversation with Guy.
15      But Bob and I talked about it and we said we
16 shouldn't put them through it because they're not being
17 considered. And then, as you can see in this statement,
18 Marsha -- I circled back to Marsha to make sure she
19 agreed with that -- and I remember the conversation with
20 Marsha, and Marsha saying absolutely, we're not
21 considering anyone but Tim and the board only wants Tim
22 assessed. She was very clear on that.
23   Q.  And there was no written documentation from
24 Marsha or you regarding that conversation between the
25 two of you?

Page 400

1    A.  It was a phone conversation, no written
2 documentation.
3    Q.  The second bullet point under key highlights
4 and next steps reads, schedule a 90-minute call for
5 Greg, Guy, and me to assess and modify the attached CEO
6 profile used in 2015. Guy would also use this time to
7 get feedback from each of us on Tim. We'll try to
8 schedule this -- schedule it for this week or next.
9      Do you see that?
10   A.  I do.
11   Q.  Did that 90-minute call ever take place
12 between you, Guy, and Bob Shaffer?
13   A.  I would make an assumption that it did. I
14 would -- I would expect a call of that nature to have to
15 occur before this process started. I don't have my
16 calendar in front of me. I can't confirm that a hundred
17 percent.
18   Q.  Were you actively involved in modifying the
19 CEO profile from 2015 to be used in 2020?
20   A.  I'm sure I was asked for my input, because I
21 was in a meeting. I'm sure I provided my input. To
22 that CEO profile. I was the sitting CEO. I was a very
23 successful CEO. I was viewed by the board as an
24 extremely successful CEO. So my input would be
25 important to that.

Page 401

1      As you can see on this e-mail, this was a
2 pretty extensive process. We had a lot of people to
3 talk to before we kicked this off. Phil included,
4 Tayfun, Jude, Susan, Kevin, Kris. That's a lot of peers
5 to have conversations with prior to this kicking off
6 about what it was about and what it was for. All them
7 were communicated. This is about the vetting and
8 assessment of Tim as the next potential president of
9 Fifth Third Bank. And then a lot of direct reports.
10     So you can appreciate the fact that if Phil
11 wasn't being considered, you wouldn't want to put that
12 level of effort and disruption in an organization if
13 they weren't considered.
14     And by the way, Marsha would never consider
15 Phil McHugh. She was -- she's always been very vocal,
16 and I think if you -- if you talk to Marsha, she would
17 not -- never had support for Phil McHugh. Even as a
18 emergency successor, she was being focused on Tayfun,
19 so...
20   Q.  Referring to the last bullet point on that
21 first page of Exhibit 46, it reads, Guy to send us a
22 revised proposal. He feels confident that we can
23 execute a similar timeline as the original proposal with
24 the full final board report in September. This will
25 likely require a call with the HCCC in August, since we

Page 402

1 will not have a preliminary report for them in June.
2      Do you see that?
3    A.  I do see that.
4    Q.  Why would it require a call with the HCCC in
5 August?
6    A.  Well, at the end of the day, the HCC has to
7 approve any -- any executive move of that nature of
8 president, CEO. So if we were intending, the board was
9 intending and they were going down the path of
10 announcing Tim in a certain timeframe, and it was prior
11 to the next board meeting, they would have to have a
12 call to get that approval. The HCC would be the first
13 one to make the approval, and then something significant
14 as the president would be a full board approval. Once
15 the full board approval is made you have 48 hours to
16 make that public.
17   Q.  What does it mean where it says, we will not
18 have a preliminary report for them in June?
19   A.  I think that's what it says. We will not have
20 a preliminary report for them in June. I can't
21 speculate beyond that, what that would mean.
22   Q.  Mr. Carmichael, you've been handed what's
23 marked as Exhibit Number 47, Fifth Third McHugh 005683
24 through Fifth Third McHugh 005685. Will you identify
25 this document for me, please?

Page 403

1    A.   E-mail from Guy to Bob Shaffer, says revised
2  proposal.
3    Q.   It's from June 10, 2020; is that correct?
4    A.   That's correct.
5    Q.   And in the first e-mail, Guy indicates to Bob,
6  I've rewritten the proposal to reflect our discussion
7  today.  Accordingly, I've reduced the fee for phase 1
8  and phase 4 in half to reflect the reduced complexity of
9  the assignment.  Looking forward to next steps.
10        Did you ever see the first or second proposal
11  presented by RHR?
12    A.   As I said before, this was handled by Bob
13  Shaffer.  I did not see any proposals, never.  I don't
14  recall ever seeing a proposal from Guy; that was handled
15  by Bob.
16    Q.   Are you aware that the fee was being reduced
17  because they were no longer going to be vetting
18  Mr. McHugh or Mr. Tuzun?
19    A.   I would assume that's why -- if I initially
20  put a request in to have three people assessed, then
21  after the understanding of the complexity and
22  the rationale for not wanting to do that at the
23  direction of Marsha, the head of the board, we probably
24  made an adjustment to that and the fee came down.
25        (Exhibit 48 is marked for identification.)

Page 404

1  BY MR. SABA:
2    Q.   Mr. Carmichael, I've handed you what's been
3  marked as Exhibit Number 48, Fifth Third McHugh 005674.
4  Can you identify that document for me, please?
5    A.   An e-mail from Guy to Bob Shaffer, subject for
6  our call on Friday.  So we apparently were having a call
7  on Friday about the winning formula CEO profile.
8    Q.   This is dated June 17, 2020; is that correct?
9    A.   It is.
10    Q.   And the winning formula CEO profile, that was
11  the profile from 2015 that was being updated to 2020; is
12  that right?
13    A.   Let me take a look at this.  I've read the
14  e-mail.  What was the question again?
15    Q.   This was addressing the revisions to the CEO
16  profile from 2015 to update it to 2020; is that correct?
17    A.   It says updating the profile attached.  The
18  profile's not attached, so I can't tell you what the
19  date of that profile is.  But obviously he's got some
20  structural questions he wants to understand around the
21  operating landscape, organizational evaluation,
22  leadership behaviors, including new unique qualities for
23  desired CEO.
24        So he's setting the stage to update a profile.
25  I assume it's probably the 2015 profile, but I can't say

Page 405

1  for sure since it's not attached.
2    Q.   It does reference 2015 in the attachment;
3  isn't that right?  Winning formula CEO profile FTD 2015?
4    A.   You're seeing that where?
5    Q.   Under attachments at the header.
6    A.   Oh, at the header.  It says that up there,
7  yes.  But it's not attached, so...
8    Q.   Did you participate in a call that Friday
9  that's referenced in the e-mail?
10    A.   I would assume I would have been in this
11  meeting.  I mean, you're talking four and a half years
12  ago.  I guess.  I don't have my calendar in front of me,
13  though.  I don't know why I wouldn't have been.
14    Q.   Do you have any recollection of that
15  conference call that you would have had with Guy and Bob
16  Shaffer?
17    A.   We would have gone -- we would have gone
18  through a profile and updated the profile based on some
19  of the questions he had put here.  But if -- can I
20  recall exactly the conversation verbatim?  No, I can't.
21        One would have had to happen, I would have
22  been part of it.  We would have been updating the
23  profile.  So nothing here is being inconsistent with
24  what I think would happen.  I just don't have a
25  recollection of four and half years ago of that

Page 406

1  conversation.
2        (Exhibit 49 is marked for identification.)
3  BY MR. SABA:
4    Q.   Mr. Carmichael, you've been handed Exhibit
5  Number 49, which is Bates stamp Fifth Third McHugh
6  005689.  Can you identify that for me, please?
7    A.   Another e-mail from Guy to Bob Shaffer dated
8  7/14/2020, subject CEO profile draft.
9    Q.   And Guy indicates in his e-mail to Bob, here's
10  a draft of the profile based on our discussion from a
11  few weeks ago.  Can you give it a once over before we
12  share with the members of the HRC?  I also want to
13  double-check you are okay with labeling it CEO profile.
14  We can call it executive leadership profile if you and
15  Greg prefer to keep a low profile, so to speak.
16        Do you see that?
17    A.   I do.
18    Q.   Did Bob Shaffer discuss with you whether or
19  not it would continue to be called CEO profile?
20    A.   I don't recall a conversation about that.  I'm
21  not saying it didn't happen, I just don't recall a
22  conversation about that.  I think we ended up calling it
23  the winning formula.  Once again, this was not an e-mail
24  to me and I didn't respond to it.
25    Q.   Would you have had an issue with it called CEO

Deposition of Gregory D. Carmichael, Volume II          Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 407

1  profile, at that time?
2     A.  I don't -- I'm not going to speculate what I
3  would have -- how I was thinking about this profile, at
4  that time, so...
5     Q.  You don't recall one way or another?
6     A.  I don't recall.
7     Q.  And you didn't have any conversations with Bob
8  Shaffer about that topic?
9     A.  I didn't say that.  I said I don't recall a
10 conversation on this topic.  I'm not saying it didn't
11 occur.
12    Q.  Okay.
13      (Exhibit 50 is marked for identification.)
14 BY MR. SABA:
15    Q.  Mr. Carmichael, I've handed you Exhibit Number
16 50, which is Bates stamp Fifth Third McHugh 001071
17 through Fifth Third McHugh 001073.  Can you identify
18 this for me, please?
19    A.  E-mail from Bob Shaffer dated 7/23/2020, to
20 Guy, copied Chuck Evans.  Subject matter, CEO profile
21 draft.  Attachments, Fifth Third CEO profile-final
22 7/23/20.
23    Q.  If you look down at the e-mail before that,
24 originally Bob had sent an e-mail to Guy on July 16,
25 2020, indicating, thanks for the updated profile.  I've

Page 408

1  reviewed and suggested some proposed changes.  I've
2  attached a markup version showing the suggested changes
3  and a clean version with the proposed changes
4  incorporated.  Please let me know if you're good with
5  the changes and I will quickly review with Greg to make
6  sure he is good with the profile.
7     Do you see that?
8     A.  I do.
9     Q.  Guy then approves of Bob's changes, then
10 ultimately the last e-mail's the one you reference on
11 July 23rd, that Bob Shaffer has reviewed the updated
12 profile with you and the human capital compensation
13 committee members.
14    A.  Yeah, Guy loved the change, loved the edits.
15 So he says that then, and then Bob responds to Guy, Guy,
16 hope all is well.  I reviewed the updated profile with
17 Greg and with the human capital compensation committee
18 members.  Only one minor tweak.  We consider it
19 finalized.
20    Q.  Did you review that profile in detail?
21    A.  Apparently, I would have.  I absolutely would
22 have reviewed this in detail.
23      (Exhibit 51 is marked for identification.)
24 BY MR. SABA:
25    Q.  Mr. Carmichael, I've handed you what's been

Page 409

1  marked as Exhibit Number 51, which is Bates stamp Fifth
2  Third McHugh 005938 through 005943.  Can you identify
3  this document for me, please?
4     A.  Appears to be a draft of the winning formula
5  Fifth Third Bank president chief executive officer
6  prepared on July 2020 by Guy Beaudin.
7     Q.  Looking through Exhibit Number 51, are you
8  able to determine if this is the draft that you
9  reviewed?  Mr. Carmichael?  Is it the draft you
10 reviewed?
11    A.  I'm reviewing it.  You asked me a question,
12 I'm trying to get through it.
13      This has the key elements from what I've read.
14 I would believe would be a draft that I potentially
15 could have seen.  I'm not sure if there's multiple
16 iterations of the draft.  Once again, this was
17 facilitated by Bob Shaffer, so I'm not sure if this was
18 the draft I've seen or if there's one that follows it.
19 I can't say for certain.
20    Q.  Do you recall Mr. Shaffer references one very
21 minor tweak in his July 23, 2020, e-mail to Guy Beaudin?
22 Do you recall what that one very minor tweak was?
23    A.  I would have to ask Bob Shaffer, since he made
24 that tweak.
25      (Exhibit 52 is marked for identification.)

Page 410

1  BY MR. SABA:
2     Q.  Mr. Carmichael, I've handed you what's been
3  marked as Exhibit Number 52 Fifth Third McHugh 001074
4  through Fifth Third McHugh 001079.  Can you identify
5  this document for me, please?
6     A.  It's a document from RHR.  Says final one on
7  the front of it, the winning formula Fifth Third Bank
8  president and chief executive officer dated July 2020,
9  from Guy.
10    Q.  In his July 23rd e-mail to Guy Beaudin,
11 Mr. Shaffer indicates that you had reviewed what was
12 considered the final form, along with the human capital
13 and compensation committee members for the winning
14 formula Fifth Third Bank president and chief executive
15 officer; is that correct?
16    A.  This says, hope all is well.  I reviewed the
17 updated profile with Greg and with the human capital and
18 compensation committee members.  Only one tweak.  We
19 consider it finalized.
20    Q.  This document was not submitted to the full
21 board for their review before being made final; is that
22 correct?
23    A.  When we say final here, this is the final
24 version we're sending to the board.  It's not
25 necessarily the final version that was sent to the full

Page 411

1 board. I don't -- how to -- when we say final, what
2 we're saying is it's final from our perspective. Now
3 we're asking for human capital and compensation
4 committee members to review it. They can -- they can
5 step in. The reason they review it first is because if
6 they have any questions, concerns, that is their role as
7 board members on that this committee, is to review this
8 type of stuff, it's human capital related. They would
9 be the first to see it before it went to the full board.
10     Q. This went -- go ahead.
11     A. This went to the HCC first, that's where this
12 is going oh next.
13     Q. And this winning formula was used for the
14 assessment of Tim Spence before it was presented to the
15 full board; isn't that right?
16     A. I don't have the timing in front of me. The
17 human capital and compensation committee members was
18 being sent this. I don't have the full timeline in
19 front of me when the assessment started. But this --
20 but this draft, and now the final we're sending to them
21 for review, would have happened -- would have happened
22 ahead of his review, I believe. From a process
23 perspective.
24     Q. Say that sentence again? This would have been
25 sent to them for review -- who's "them?

Page 412

1     A. I would believe -- well, the human capital
2 compensation committee members would have a chance to
3 review this profile before the review of Tim Spence
4 started. I believe that would be the logical timeline
5 without having it in front of me that would make sense.
6 But that's -- that's how I'm thinking about it. It's
7 four and a half years ago, so...
8     Q. But the full board did not review this before
9 it was used for the assessment of Tim Spence; isn't that
10 right?
11         MR. CIOFFI: Objection. Asked and answered.
12         THE WITNESS: Human capital and compensation
13     committee represents the full board on this topic.
14 BY MR. SABA:
15     Q. They are not the full board. They're members
16 of the board on the human capital --
17     A. They are responsible for the full board
18 responsibilities on human capital and compensation. Not
19 everything goes to the full board for approval. They
20 represent that. The full board will see this -- see the
21 winning formula prior to any decision being made on what
22 was assessed. But the human capital has a role that you
23 can't bring the full board in on every -- every type of
24 decision of this nature, every element of a process.
25 That's why we have committees, and this is the job of

Page 413

1 the human capital and compensation committee.
2     Q. And that's not my question. It was presented
3 to that committee. It was now presented to the full
4 board, correct?
5     A. It will eventually be provided to the full
6 board.
7     Q. Was this presented to the -- winning formula,
8 was that presented to the full board at the September
9 21, 2020, December board of directors meeting?
10     A. I don't know, I'd have to go back and look
11 through the notes and see if it was presented.
12         Guy came in and -- Guy came in did an update
13 presentation around that time. If that was that board
14 meeting, then he would have had this in their hands
15 and it they would have seen the winning formula.
16         MR. SABA: We can go off the record.
17         VIDEOGRAPHER: The time is 1:15.
18         (A recess was taken from 1:15 to 1:46.)
19         VIDEOGRAPHER: Time is 1:46 p.m. We're back
20     on the record.
21 BY MR. SABA:
22     Q. Mr. Carmichael, referring you back to
23 Exhibit 50, Fifth Third McHugh 001071 through 001073.
24 Looking at that e-mail chain, there's an indication
25 where Bob thanks Guy on July 16th for the updated

Page 414

1 profile and sends him his suggested changes. Which then
2 Guy reviews on that same day and gets back to him, and
3 says after you review with Greg and the relevant board
4 members, let us know if any other changes are needed.
5         There's then a week later when Bob Shaffer
6 gets back to Guy and indicates that he has reviewed it
7 with you and with human capital and compensation
8 committee members. Do you see that?
9     A. I do.
10     Q. Would there have been a human capital
11 compensation committee meeting between July 16th and
12 July 23rd?
13     A. Without seeing the calendar, I don't recall,
14 Counsel, if there was a meeting or not.
15     Q. Would there have been a board of directors
16 meeting between that time period?
17     A. The time period again you're referring to is?
18     Q. July 16, 2020, to July 23, 2020?
19     A. Well, our board meeting would have been --
20 prior board meeting was in June. If I'm correct there,
21 it's June. Does anyone have a calendar when the board
22 meeting was -- I think it was June timeframe. I'm not
23 sure. I'd have to go look at my calendar when the last
24 board meeting was. Or if the board meeting was in July.
25 Just don't have the calendar in front of me. That was

Page 415

1  four and a half years ago, so I can't tell you what
2  meetings occurred and didn't occur without the calendar.
3      Q.   And I'm assuming the same is true with the
4  human capital compensation committee meeting?  You don't
5  know if that was held during that meeting or not?
6      A.   I don't know offhand, off the top of my head.
7  It's four and a half years ago, if we had a board
8  meeting that fall or what we had at that point in time.
9  I'd have to see a calendar in front of me.
10     Q.   Okay.
11          (Exhibit 53 is marked for identification.)
12 BY MR. SABA:
13     Q.   Mr. Carmichael, I've handed you what's been
14 marked as Exhibit Number 53, which is Bates stamp Fifth
15 Third McHugh 0213171 through Fifth Third McHugh 0213172.
16          Do you see that?
17     A.   I do.
18     Q.   And let me represent to you this is a text
19 message exchange between Mr. Spence and Mr. Shaffer.
20 And this is from August 1, 2020; do you see that?
21     A.   I do.
22     Q.   Beginning -- the second half of the page.
23     A.   Yes, I see that.
24     Q.   And he's asking -- Mr. Shaffer asked
25 Mr. Spence, how was your discussion with Guy?  Do you

Page 416

1  see that?
2      A.   I do.
3      Q.   And as we go through this text message,
4  Mr. Spence expresses to Mr. Shaffer a couple areas where
5  he's surprised by responses that were given, correct?
6  And Mr. Shaffer as well; is that correct?
7      A.   Let me read this.  I mean, obviously what
8  appears to me that Tim's recanting for Bob, the
9  discussion he had with Guy and some of the feedback
10 that he had received from the process.  He talks about
11 constructive feedback, he's shared -- that Guy must have
12 shared four items with him, what this implies.  He lists
13 out what those four items were.
14     Q.   The four items are number 1, make sure I bring
15 people along.  Basically, Greg, slow down.
16     A.   He was extremely brilliant, very quick study,
17 and gets to the answers before anybody else does.  So my
18 coaching to him was, slow down a little bit and make
19 sure you bring everyone along with you.  At the end of
20 the day, just the fact that he's extremely bright.
21     Q.   All that is not expressed in the text message.
22 It just says, make sure I bring people along, basically,
23 Greg, slow down.  Is that right?
24     A.   Yeah, I was just defining why I told him to
25 slow down.

Page 417

1      Q.   Number 2 is, don't soften the blow, just tell
2  people when their work is not good enough; is that
3  correct three?
4      A.   That's what it says.
5      Q.   Number 3 is that my team feels I sometimes
6  defer to my peers, even if I know they are wrong and
7  agree to simple optimal outcomes.  Do you see that?
8      A.   I do see that.
9      Q.   Number 4 is that sometimes I push people and
10 don't acknowledge how difficult it is to get something
11 done operationally, maybe because I'm not close enough
12 to it.  Do you see that?
13     A.   I see that.
14     Q.   And he indicates 1 and 2 are fine and fair,
15 that's what Mr. Spence says; is that right?
16     A.   That's what the text says, but I didn't write
17 it.  That's what the text says.
18     Q.   Yeah, no, I'm saying what Mr. Spence says.
19     A.   That's what it says.
20     Q.   Okay.  And Mr. Shaffer responds, 3 and 4
21 surprised me, especially 3.  And then, Spence says, he
22 doesn't degree -- 3, I don't really agree with.  My
23 folks have said for a while that I try to do what is
24 right for the company, where some peers just care for
25 themselves.  I view that as a strength personally.  It's

Page 418

1  basically a halo from fighting for investment with Lars
2  and Phil.  You may want to set that straight.
3      A.   I see that.
4      Q.   Do you know what he means by just basically a
5  halo from fighting for investment with Lars and Phil?
6      A.   I do not.
7      Q.   Okay.  Number 4 is -- then Spence, 4 I'm not
8  totally surprised about at this moment in time.  I've
9  been feeling impatient about the progress we're making
10 in several areas.  I've told people it's like we are
11 surfing and we are paddling behind the wave.  I'm tired
12 of talking about this.  I want to see action.
13     A.   I see that.
14     Q.   Referring down to the text message that
15 Mr. Shaffer sends on August 1st, at -- it looks like
16 this is set for 12:30 at night.  2109; do you see that?
17     A.   I see 2109.
18     Q.   Mr. Shaffer says, no, I understand, this is
19 not a written report yet.  I will have a chance to
20 debrief and give him context.  Plus we definitely want
21 to have a couple development items or so, which we all
22 do.
23          Do you see that?
24     A.   I do.
25     Q.   What does it mean that, plus, we will

Deposition of Gregory D. Carmichael, Volume II          Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 419

1  definitely want to have a couple development items or
2  so? What does that mean?
3     A. I didn't write this, I'm not sure what he's
4  referring to. This is not my text, I'm not going to try
5  and interpret what this e-mail, text mail trail between
6  two of these individuals. I'm not sure what was meant
7  by that. I'm not going to speculate.
8     Q. Were you involved in the debriefing at all
9  with Guy Beaudin regarding the written report that would
10  be prepared regarding Tim Spence?
11     A. At some point I would have saw the outcome of
12  Guy's work, and what he was going to be recommending to
13  the board. At some point he would have shared that with
14  me and asked if we had any input, if I had any input. I
15  don't know where this is in this process here or
16  timeframe of when that would have occurred versus these
17  text messages.
18       Once again, I stayed very independent in this
19  process except for as we prepared the winning formula
20  and reviewing that with the board, getting the board's
21  input, getting that turned around. I had some comments
22  around that, and then this was a process they
23  facilitated.
24       (Exhibit 54 is marked for identification.)
25

Page 420

1  BY MR. SABA:
2     Q. Mr. Carmichael, I'm handing you what's been
3  marked as Exhibit Number 54, which is Bates stamp Fifth
4  Third McHugh 005695 through Fifth Third McHugh 005696.
5  Can you identify that document for me, please?
6     A. Appears to be an e-mail from Guy to Tim
7  Spence, Bob Shaffer, Greg Carmichael, Chuck Evans,
8  subject matter, for our call this morning. And dated
9  9/16/2020.
10     Q. And the e-mail reads, gentlemen, on our call
11  today, we want to align a list of key development goals
12  for Tim. A list below is from the discussions we've had
13  so far. I'm sending it so we can refer to it when we
14  connect this morning.
15       Do you see that?
16     A. I do.
17     Q. Do you recall having conversations with Guy
18  Beaudin about development goals for Tim Spence?
19     A. I don't recall the discussion itself, but it's
20  something we would have had.
21     Q. He references "the discussions we've had so
22  far." How many discussions did you have with Guy
23  Beaudin about development goals for Tim Spence?
24     A. I would have had very few discussions with Guy
25  prior to this call. He might have had discussions with

Page 421

1  Bob. I'm only speculating. Bob was running the
2  process. As I said before, testament has been, I've had
3  little engagement with Guy during this process except
4  for the final -- final part of the exercise, which is
5  reviewing his report, finalizing the winning formula.
6  So I don't recall having multiple discussions with Guy
7  on Tim's development. That more likely was Bob.
8     Q. Did you participate in the conversation on
9  September 16, 2020, regarding Tim Spence's development
10  goals?
11     A. It would appear so, based on this e-mail,
12  that I was in this meeting. I don't have my calendar in
13  front of me to confirm that. But I would assume I would
14  be in this meeting, so I wouldn't see any reason to
15  challenge that.
16     Q. Do you agree with the developmental goals that
17  were listed for Tim Spence on Exhibit 54?
18     A. These are from Guy. Let me have a moment to
19  read through them.
20       I believe the substance of these
21  recommendations and findings are -- are something I
22  would agree with, yes, for the most part. Like every
23  leader, there's opportunities to continue improving and
24  these are areas for Tim to continue to improve upon.
25  He's excellent in many of these areas. I think he can

Page 422

1  be better in some.
2     Q. Do you recall having any conversations with
3  Guy Beaudin about these developmental goals for Tim
4  Spence?
5     A. Once again, if I was in this meeting reviewing
6  them I would have had a chance to add my thoughts if
7  necessary. But once again, I was very mindful that this
8  was an independent review. Guy's going to be
9  independent no matter what. If he disagrees with any, I
10  would say he would not put it in a report. That's why
11  he's as good as he is, and that's why the board wanted
12  him and selected him to do this exercise. He wanted to
13  understand to make sure he had -- he had the information
14  correct. He was assessing it correctly.
15       But this is going to be his finding, these are
16  -- these are development goals as he sees them with
17  input potentially from Bob to make sure the wording is
18  consistent with how we talk about these things, but I
19  don't have anything direct. These are correct in my
20  mind. I think these are things he can do better at.
21       (Exhibit 55 is marked for identification.)
22  BY MR. SABA:
23     Q. Mr. Carmichael, I've handed you what's been
24  marked as Exhibit 55, Bates stamp Fifth Third McHugh
25  001041. Can you identify that for me, please?

Page 423

A. Looks like an e-mail from Guy dated 8/26/2020, with Mr. Shaffer and myself, copying Chuck Evans for our call this morning, is the subject, and it says, Bob and Greg, I can't recall if we sent you a copy of the report yet, but here it is just in case. No need for you to review before our call. We will go over it, the main points together.

Q. Do you recall receiving this e-mail?

A. I wouldn't have received an e-mail of this nature with the report as I mentioned before. I would have seen the report that they put together prior to going to the board.

Q. Do you recall the conversation you had with Guy Beaudin and Bob Shaffer to review the particular?

A. I don't recall the conversation by the process -- the definition of how the process is put together, I would have a conversation with Guy on that. I don't recall it. It was four and a half years ago. In this case, three and a half years ago.

(Exhibit 56 is marked for identification.)

BY MR. SABA:

Q. Mr. Carmichael, I've handed you Exhibit Number 56, which is Bates stamp Fifth Third McHugh 000952 through Fifth Third McHugh 000989. Can you identify that document for me, please?

Page 424

A. E-mail from Bob Shaffer to his assistant Paula Hennard, and subject, Fifth Third.

Q. And that's the -- the end of an e-mail chain; isn't that right? It actually starts earlier with an e-mail exchange from Guy Beaudin to Bob Shaffer. There's actually two copies of that e-mail exchange. September 10th e-mail from Guy Beaudin to Bob Shaffer; is that right?

A. So where do you want me to start on, on Exhibit 988?

Q. Just referring to -- just referring to the first page, Exhibit 56, 000952.

A. Okay.

Q. That's a September 10th e-mail from Guy to Beaudin; is that right?

A. This looks -- the one I'm looking at, September 10th, is from Guy to Bob.

Q. And the one below that is from Bob to Guy; is that right?

A. Okay. There's one prior to that -- yes. This one from's Bob to Guy, same day.

Q. And so the -- referring to the e-mail from Guy Beaudin to Bob Shaffer, on September 10th, he indicates, here's the updated report. I'll be sharing it in a debrief with Tim tomorrow. Nothing new or surprising

Page 425

with your feedback. Overall there was strong support for his being an exceptional talent, with some good advice on how to round out his leadership.

Do you see that there?

A. I do see this.

Q. Did you ever see this revised report?

A. If this is the final report before it went to the board, I would have seen it. I'm not sure if I would have -- I don't have this report in front of me, I don't have my calendar. I can't tell you if I saw this report or not. I would have seen the one that went to the board.

(Exhibit 57 is marked for identification.)

BY MR. SABA:

Q. Mr. Carmichael, I've given you Exhibit Number 57, Fifth Third McHugh 000954 through Fifth Third McHugh 000976. Can you identify that for me, please?

A. From RHR executive system development report for Tim Spence.

Q. Have you seen this document before?

A. I can't -- I'm not sure what -- what phase this is in, and what -- if this is a draft, not draft. I'm trying to go back to your prior exhibit where we have the development assessment of O8 -- September -- 8th of September 2020. This is dated July 31, 2020.

Page 426

So the attachment that Bob has in that prior e-mail trail you wanted me to look at is an assessment on September 8, 2020. This one's a document on July 31, 2020. So I'm not sure what I'm looking at.

Q. As you sit here today, do you recall whether or not Guy Beaudin ever changed the dates on the respective assessment report drafts for Mr. Spence?

A. I'm not aware of that and don't recall that at all.

Q. You don't -- as you sit here, you don't know if they were all dated July 31st, no matter when he prepared them?

A. I have no clue. No, I don't.

Q. Do you know if this full document, the executive assessment development report for Tim Spence, was presented to the board at the September 21, 2020, board meeting?

A. I don't know what version I'm looking at, if this is final or not. There's some inconsistencies here, so I can't answer with any -- any validity if this was the one presented. I'm not sure I would have come to that conclusion.

Q. Do you recall that instead of presenting the full executive assessment report, that you all decided that you would just have Guy Beaudin present a summary

Case: 1:21-cv-00238-MRB Doc #: 77-16 Filed: 06/27/25 Page: 44 of 118 PAGEID #: 3872

Deposition of Gregory D. Carmichael, Volume II                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 427

1  for the board?
2      MR. CIOFFI:  Objection to the form of the
3  question as to who you mean by "you all."  Can you
4  clarify that, Counselor?
5      MR. SABA:  Sure.
6  BY MR. SABA:
7      Q.  Do you recall that instead of presenting the
8  full assessment development report to the board, that
9  you and Mr. Beaudin and Mr. Shaffer discussed that the
10 board would just be presented with a summary by
11 Mr. Beaudin?
12     A.  I don't recall a discussion, but I think that
13 would be most appropriate for the board.  The board
14 likes to look at the summary, they do not like to go
15 through nauseating detail on any matter.  They've
16 coached me over and over again to make sure that I
17 provide summaries to the board, not -- not full decks.
18 Bring up the full -- most valid points forward.  Issues.
19     So summations is how the board wants us to
20 work with them.  But this is Guy's process again.  Guy's
21 going to present to the board.  Guy's working for the
22 board, not for me.  Or Fifth Third.  He works for the
23 board here, and he'll going to report to the board on
24 this process and the way he feels best suited to convey
25 the messages and meetings and outcomes to the board.

Page 428

1      So to have it done in summary form would not
2  be surprising to me, but I guarantee Guy wouldn't do
3  anything he didn't feel comfortable with or think was
4  appropriate.  So -- but I don't recall a conversation
5  driving how he was going to communicate to the board,
6  whether that was going to be a full board presentation,
7  full walkthrough of the assessment or summation.
8  Summations are typically the way things are presented to
9  boards.
10     (Exhibit 58 is marked for identification.)
11 BY MR. SABA:
12     Q.  Mr. Carmichael, I've handed you Exhibit 58,
13 Bates stamp Fifth Third McHugh 000977.  Can you identify
14 that document for me?
15     A.  E-mail from Guy to myself and Bob Shaffer.
16 Subject is board deck date, date is 9/16/2020.
17     Q.  And the attachments it indicates Spence,
18 Timothy, Fifth Third Bank board summary dated
19 September 16, 2020; do you see that?
20     A.  I do.
21     Q.  Do you recall receiving this e-mail?
22     A.  I don't recall receiving an e-mail, but it's
23 addressed to myself and Bob.  I would have received it.
24     Q.  Do you recall reviewing the Spence, Timothy,
25 Fifth Third Bank board summary from September 16, 2020?

Page 429

1      A.  Something of this nature, I would have
2  reviewed.  Once again, it's three-plus years ago.  I
3  would have reviewed something of this nature.
4      (Exhibit 59 is marked for identification.)
5  BY MR. SABA:
6      Q.  Mr. Carmichael, you've been handed Exhibit
7  Number 59, which is Bates stamp Fifth Third McHugh
8  000978 through 000985.  Can you identify that document
9  for me, please?
10     A.  Appears to be from RHR, titled board summary,
11 Timothy Spence, Fifth Third Bank.
12     Q.  Do you recall reviewing this version of the
13 board summary for Tim Spence?
14     A.  This was the one that was going to the board,
15 I would have reviewed it.  Just let me look through here
16 to make sure that there's nothing here that would be
17 surprising to me.  I believe this is the final -- if not
18 the final version I would have seen.
19     Q.  You think it is the final?
20     A.  It's final or one -- or close to the final.  I
21 can't tell for sure.
22     Q.  Okay.  Let me represent to you, sir, based
23 upon the Bates stamp numbers, this would appear to be
24 the version that Mr. Beaudin sent you on September 16,
25 2020, for review by you and Bob?

Page 430

1      A.  And the day of the board meeting would have
2  been -- help me with that date --
3      Q.  The meeting -- the board meeting would have
4  been September 21st.
5      A.  So we were close to the board meeting.  This
6  would have been most likely the final day.
7      (Exhibit 60 is marked for identification.)
8  BY MR. SABA:
9      Q.  Mr. Carmichael, I've handed you Exhibit Number
10 60, which is Bates stamp Fifth Third McHugh 006094
11 through Fifth Third McHugh 006095.  Can you identify
12 this document for me, please?
13     A.  Appears to be an e-mail -- excuse me -- from
14 Bob Shaffer dated 9/17/2020.  So after I would have
15 received a copy of this deck.  Refers to the board deck
16 that he's about to present to the board, the next board
17 meeting in September, and that's what it is.
18     Q.  And it's in response -- we see an e-mail from
19 Bob Shaffer to Guy Beaudin and Chuck Evans, which is in
20 response to the e-mail that was sent that's identified
21 as Exhibit 58; is that correct?
22     MR. CIOFFI:  Objection.  Question's confusing.
23 Can you repeat it and then refer to the Exhibit
24 numbers you're talking about?
25     MR. SABA:  Sure.

Page 431

BY MR. SABA:

Q. Mr. Carmichael, Exhibit 60 begins with an
e-mail from Bob Shaffer to Guy Beaudin and Chuck Evans
dated September 17, 2020. That is in response to the
same e-mail that was previously marked as Exhibit Number
58 from Guy Beaudin to yourself and Mr. Shaffer; is that
correct?

A. Appears so. Dates line up, so I imagine
that's correct.

Q. The e-mail that Mr. Shaffer sends on
September 17, 2020, at 11:32 a.m. indicates, thanks Guy
and Chuck for the quick response. Greg and I have
reviewed and have the following proposed changes. The
first change page 3, change each of driving execution
and leading teams from 5 to 4. Do you see that?

A. I do.

Q. Do you recall why you wanted to change driving
execution and leading teams from 5 to 4 with respect to
Tim Spence on the board deck?

A. I do. And I want to clarify, these are
suggestions and recommendations from feedback that Guy's
asking for, that ultimately, he can determine whether he
wants to make these changes or not. He works for the
board, not me. The reason we wanted to change is
because we thought that was too generous of a rating,

Page 432

leading teams, driving execution. We thought Tim was
good there -- if you go down and look at it, we thought
Tim was very good, but that's an area that Tim, in his
career, he could continue to elevate in that area and we
wanted to send a message that that's an area you could
continue to elevate towards. Very strong, very good.

But when I think of 5, I think there -- I
think -- of excellent. I think he's -- I felt he
that needed more opportunity there. Once again, I was
downgrading a rating that the independent assessment
process brought forth as a 5, I suggested it's a 4.

Q. The second suggested change that you made was
on page 6. Change is a great communicator with charisma
to, is a strong communicator with charisma; is that
right?

A. It's correct.

Q. Why did you want that change?

A. Once again, in conversations I've had with the
board, if you go back and look at his talent, in
conversations I've had in his performance reviews
there's an opportunity for Tim to bring others along, to
-- as I mentioned earlier in my prior testimony, he's
very intelligent and gets to the point very quickly. He
moves very fast.

It's important for him to continue to bring

Page 433

others along when he's communicating and speaking with
them. That's an opportunity for him. And great
seemed -- felt to me a little too generous, and I wanted
that to be something less generous.

Q. Your next change is on page 7. Page 7 sets
forth the developmental goals. I'm going to stop one
second and refer you back to Exhibit Number 59. And if
we look at Exhibit 59 first, depending with page 3.

A. Can you give me the --

Q. Certainly. Exhibit 59 is Fifth Third McHugh
000978.

A. Wait, is that 981 or is that --

Q. No, I'm referring to Fifth Third McHugh
000980.

A. Okay, I'm there.

Q. And you can see that this would appear
consistent with Bob Shaffer's e-mail and the changes
that you and Bob Shaffer wanted. This would appear to
be the draft you were modifying because it has driving
execution 5, leading teams 5. Is that correct?

A. Change each of driving execution leading teams
from 5 to 4. So we were suggesting both of those
ratings move from 5 to 4.

Q. Correct. And then referring to page 6, which
is Fifth Third McHugh 000983, the first bullet point

Page 434

under stakeholder feedback peers, under strength it
says, is a great communicator with charisma, and you
wanted to change that to, is a strong communicator with
charisma; is that right?

A. I saw for Bob wanting to change that. And
that, I believe, was probably a Bob comment, not a Greg
Carmichael comment. But we would have been in lock sync
on these recommendations. These were -- we were in lock
sync. This was our combined feedback. We wanted that
changed. We thought it was more appropriate to word it
that way than the way they had it worded. Strong versus
great.

Q. Referring to page 7, your next set of changes.
And that's Fifth Third McHugh 000984.

A. I'm there.

Q. Those are the developmental goals? Do you see
that?

A. Yep.

Q. You wanted to modify the third bullet from
adjust communication style to be more conversational,
and it currently says when appropriate. And you wanted
to change it to, and patient when appropriate and to
ensure to seek feedback. Is that right?

A. Okay. That's fourth bullet, one, two, three
-- so I want to get -- you're on the -- on the e-mail

Deposition of Gregory D. Carmichael, Volume II                          Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 435

1  Exhibit 60?
2      Q.  That's correct?
3      A.  Under page 7?
4      Q.  Yes.  The first -- in the first change on
5  page 7.  Modify the third bullet to say.  Do you see
6  where it says that?
7      A.  I do.  Just communication so it will be more
8  conversational and patient when appropriate to ensure to
9  seek feedback.  And we're asking to change that third
10  bullet, which says adjust communication style to be more
11  conversational when appropriate.  Okay.
12      Q.  Why did you want to make that change?
13      A.  I thought it was more clearly reflected how
14  I've communicated to Tim in the past, and I thought it
15  was more -- more appropriate for him to have the
16  feedback and more direction for him.  This isn't just
17  communication, this is being more conversational and
18  patient.  Because he moves quickly and can tend to move
19  quickly because he's so smart.  He gets there ahead of
20  everybody else.  So I wanted to put the word "patient"
21  in there when appropriate, because he doesn't do it all
22  the time, but there's opportunity for him to do more and
23  do better.  And to seek -- be sure and seek feedback and
24  make sure he's testing that he was heard in his clarity
25  and his messaging.

Page 436

1      So I thought there was a better way of saying
2  that for him, be consistent with how I spoke to him in
3  the past about this area of opportunity.
4      Q.  The next change you wanted to make is to the
5  fourth bullet point, which currently reads, further hone
6  judgment in responding to business challenges and social
7  issues.  And you wanted to change to that to further
8  hone judgment in responding to business challenges and
9  social issues, including consideration of all key
10  stakeholders.  Is that right?
11      A.  That's correct.
12      Q.  Why did you want to make that change?
13      A.  Because I think it's important for Tim to make
14  sure if he elevates to the CEO role, that he understands
15  that all stakeholders, not just those in his area of
16  responsibility, have to be considered when making a
17  decision.  Just want to keep him mindful, though, there
18  are a lot of stakeholders involved and consider them
19  before making the decision.  As he moves up in the
20  organization that stakeholder base gets larger.  I
21  thought that was an appropriate opportunity for him if
22  he's going to elevate to be the CEO of the company some
23  day.
24      Q.  The fifth bullet point currently reads, move
25  -- I'm sorry.

Page 437

1      Move on talent issues more quickly.  You
2  wanted to change that bullet point to read, increase
3  focus on talent selection and assessment processes and
4  moving on talent issues more quickly.  Is that correct?
5      A.  Yes.
6      Q.  Why did you want to make that change?
7      A.  I thought it was more clear.  More
8  understanding.
9      Q.  Do you recall whether or not the changes that
10  you wanted made to the board summary regarding Tim
11  Spence were made?
12      A.  I do not recall whether these were put in
13  there or not.
14      (Exhibit 61 is marked for identification.)
15  BY MR. SABA:
16      Q.  Mr. Carmichael, I've handed you what's been
17  marked as Exhibit Number 61, which is Bates stamp Fifth
18  Third McHugh 001061 through Fifth Third McHugh 001062.
19  Can you identify this for me, please?
20      A.  It starts off with an e-mail from myself to
21  Bob Shaffer dated 9/17/2020.  And subject matter is
22  updated deck for board on Monday.
23      Q.  And the attachment is the Tim Spence Fifth
24  Third Bank board summary dated September 16, 2020; is
25  that correct?  Volume III, correct?

Page 438

1      A.  That's correct.
2      Q.  And below that is an e-mail from Guy Beaudin
3  to Bob Shaffer dated Thursday, September 17th at 9:20
4  a.m.  And the subject is updated deck for board on
5  Monday.  Is that right?
6      A.  Correct.  That is correct.
7      Q.  And Guy says in his e-mail to Bob Shaffer, we
8  have made the changes you suggested, let us know if you
9  have any further comments; is that right?
10      A.  Appears like they agreed with those changes.
11      (Exhibit 62 is marked for identification.)
12  BY MR. SABA:
13      Q.  Mr. Carmichael, I've handed you Exhibit Number
14  62, which is Bates stamp Fifth Third McHugh 001063
15  through Fifth Third McHugh 001070.  Can you identify
16  this for me, please?
17      A.  Just says RHR board summary, Tim Spence.
18      Q.  Looking through Exhibit Number 62, can you
19  verify that the changes that you and Mr. Shaffer have
20  requested have been implemented into Exhibit Number 62?
21      A.  I see already changes have taken -- they
22  decided to go ahead and make those and agreed with us on
23  that.  Page 6 changes, they made that.  Appears those
24  changes have been made on the independent RHR.
25      (Exhibit 63 is marked for identification.)

Case: 1:21-cv-00238-MRB Doc #: 77-16 Filed: 06/27/25 Page: 47 of 118 PAGEID #: 3875

Deposition of Gregory D. Carmichael, Volume II      Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 439

1    (Exhibit 64 is marked for identification.)
2  BY MR. SABA:
3    Q.  Mr. Carmichael, I've handed you Exhibits 63
4  and Exhibit Number 64.  Exhibit 63 is the Fifth Third
5  Bank national association minutes of meeting of the
6  board of directors September 21, 2020.  Exhibit 64 is
7  for Fifth Third Bancorp.  Is that correct?
8    A.  That's correct.
9    Q.  You presided over both these meetings; is that
10 correct?
11   A.  They were not an executive session.  I would
12 have been the chair presiding over this meeting.  I
13 cannot tell if this was an executive session or not, but
14 my guess is the way it's submitted, it was not executive
15 session.  So yes, I would have presided over this.
16   Q.  The minutes for Fifth Third Bank, Exhibit
17 Number 63, start off with a discussion regarding talent
18 management, which are not included in the minutes for
19 Fifth Third Bancorp, even though it appears the meetings
20 occurred simultaneously.  Do you know why the talent
21 management information would not be included in the
22 Bancorp minutes?
23   A.  I do not know.  Unless this was done in an
24 executive session and they were extracted.  I don't
25 know.  That would be a great question for the board

Page 440

1  secretary who prepared these minutes.
2    Q.  Under talent management, the first sentence
3  reads, Mr. Shaffer, Mr. Beaudin, and Mr. Evans presented
4  the talent management update as included in the
5  materials provided for the meeting.  Do you see that?
6    A.  I do.
7    Q.  Do you recall what materials were provided for
8  the meeting?
9    A.  I do not.  I'm sure they're -- they're
10 available because they were -- they were provided ahead
11 of the time for the meeting.
12   Q.  Who was present for the presentation by
13 Mr. Shaffer, Mr. Beaudin, and Mr. Evans?
14   A.  I don't have that kind of recall, but I would
15 assume full board was there and myself, and those three
16 individuals.
17   Q.  If I can refer you to the second page of
18 Exhibit 63, Fifth Third McHugh 000518, and the last
19 sentence above CEO update key development issues and
20 opportunities; do you see that there?
21   A.  I do.
22   Q.  Does that confirm your -- your recollection or
23 perception.  Only the directors, Bob Shaffer, and
24 the presenters were present for this portion?
25   A.  That would be logical, make sense, and that's

Page 441

1  what that reflects.
2    Q.  Okay.  Following the presentation, Mr. Beaudin
3  and Mr. Evans left the meeting; is that right?
4    A.  That's what it says.
5    Q.  Okay.  Next indicates, Mr. Shaffer began by
6  reminding the directors of prior discussion --
7    A.  I'm sorry.  Where are you at?
8    Q.  I'm sorry, back to the first page of Exhibit
9  Number 63.
10   A.  Okay.
11   Q.  The second sentence under talent management.
12 Mr. Shaffer began by reminding the directors of prior
13 discussions related to executive succession planning,
14 including discussions related to Mr. Spence as possible
15 president and chief executive officer successor to
16 Mr. Carmichael.  Do you see that?
17   A.  I do.
18   Q.  What do you recall about that?  What did he
19 say?
20   A.  What exactly what it says here.  He began by
21 reminding the directors of prior discussions related to
22 executive succession planning, including discussions
23 related to Mr. Spence as a possible president and chief
24 executive officer and practicing CEO successor to
25 Mr. Carmichael.  That's what I remember.

Page 442

1    Q.  Referring to the second paragraph.  The third
2  full sentence.  Let's see.  Mr. Shaffer also reminded
3  the board members of the succession planning discussion
4  of the June 2020 board meeting, in which the board
5  approved the CEO profile to be used by Mr. Beaudin and
6  Mr. Evans to assess Mr. Spence.
7      Do you see that?
8    A.  I do.
9    Q.  Do you recall a CEO profile being approved at
10 the June 2020 meeting?
11   A.  I don't have that kind of recall, but if
12 that's what this documentation says, if that was when
13 the board meeting occurred, June 2020, it would be
14 logical they may have been provided a profile to start
15 with, and obviously it went through iterations after
16 that and was provided back to the HCC.  But it appears
17 that was what occurred here.
18   Q.  Would that appear in the minutes for that
19 board meeting, that approval?
20   A.  I don't have those minutes in front of me.
21   Q.  Would you expect that it would appear in the
22 minutes?
23   A.  I don't keep the minutes for the meeting, I
24 didn't prepare the minutes for the meeting.  And I would
25 -- I'd want to see that.  I don't know.

Deposition of Gregory D. Carmichael, Volume II                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 443

Q. Sure.

MR. CIOFFI: Counsel, which is which? The Fifth Third Bank minutes for June 16, 2020, is which exhibit?

MR. SABA: I think the Fifth Third Bank is the first I gave you, so that would be 65. And Bancorp would be 66.

(Exhibit 65 is marked for identification.)

(Exhibit 66 is marked for identification.)

BY MR. SABA:

Q. Mr. Carmichael, I've handed you Exhibit Number 65, which is the minutes of the meeting of the board of directors for Fifth Third Bank dated June 16, 2020, Bates stamp 000454 through 000495. You've also been handed Exhibit Number 66, which is the minutes of the board of directors meeting for Fifth Third Bancorp, Fifth Third McHugh 000426 through Fifth Third McHugh 000453.

And my question to you, sir, was, basically, referring to these two documents, Exhibit 65 and 66, do they reflect where the board approved the CEO profile to be utilized by Mr. Beaudin and Mr. Evans to assess Mr. Spence?

A. I'd have to read through these documents, but if that approval was done by the executive committee, it

Page 444

would not be in the minutes. I do not know when that approval for that profile was done, in what part of the meeting. If it was done in the executive session, it would not have been in the minutes.

Q. Would there be any record of that approval anywhere?

A. No, it's in the minutes. I mean it's in the executive session, that's not in a meeting. Never has been. So if it was approved then, in executive session, which it very well could have been, it will not be in these minutes.

Q. How would it be communicated to anybody, then, if it was approved in executive session if there's no written record of what happens in the executive session?

A. The board members are in that session. The executive session. The board secretary could have been in that session. It was not -- the minutes don't get taken of the executive session. So if that approval was sought and reviewed that document in the executive session, it would not have been admitted. There's never minutes of the executive session. Of any of the details of the executive session.

Q. How would Mr. Shaffer come to learn that the board had approved of the CEO profile?

A. He would have been informed of that.

Page 445

Q. How --

A. By myself or the head of the HCC, or Marsha Williams, would have been informed by them.

Q. What version of the CEO profile would the board have approved at the June -- June 16, 2020, meeting?

A. I don't recall what version that would have been.

Q. Referring you back to Exhibit 50.

A. Okay. I have it.

Q. We previously discussed this document. This is the e-mail exchange between Guy Beaudin and Mr. Shaffer regarding final approval of the form of the CEO profile. And it indicates that that final approval, that form was not until July 23, 2020; isn't that right?

MR. CIOFFI: Objection. Mischaracterizes Exhibit 50.

THE WITNESS: I don't know what version that would be referring to in the minutes that was approved by the board. Most likely an executive committee. But it might have been -- it might have been first version, start of a version. I have no clue. But obviously the version's gone through iterations after that and was sent back to the human capital compensation committee that

Page 446

represents the full board. Committee responsibilities would be in this area of responsibility for succession planning, they would be the ones reviewing this.

And by the way, the human capital committee is made up of -- chair would be Mike McCallister, Gary Heminger, Emerson Brumback, and Marsha Williams is also our lead director. All those would be on the human capital compensation committee and would have seen this draft on the e-mail you're referring to on 7/23/2020.

I do not know what draft was approved by the board -- apparently an executive session because there's no minutes of it -- at that time. I can't speak to something I don't recall or have any evidence of what was presented.

BY MR. SABA:

Q. Referring back to Exhibit Number 63, in the second full paragraph under talent management. The last sentence reads, Mr. Shaffer then asked Mr. Beaudin to describe the assessment process utilized by RHR International to assess Mr. Spence, and to review the assessment report distributed to the directors at today's meeting.

Do you see that?

Deposition of Gregory D. Carmichael, Volume II      Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 447

1    A. I do.

2    Q. Do you recall what was distributed to the

3 directors at that meeting?

4    A. I would be making an assumption it was what he

5 was going to be presenting on. That would be an

6 assumption. I don't have it in front of me. If he's

7 going to be talking to something, I would assume they

8 would have had something in their hand also. Even if he

9 was putting something on the screen.

10    Q. Was there any vote on whether or not

11 Mr. Spence should become the next president of Fifth

12 Third Bank at that point in time during that

13 September 21, 2020, meeting?

14    A. If it's not minuted, then it wasn't taken --

15 there wasn't a vote. If there would have been a vote on

16 that, which Tim was appointed in October, correct? So

17 no, there wouldn't have been a vote, at that time,

18 because it would have had to become public knowledge,

19 we'd have to and file the appropriate forms and

20 disclosures if that occurred. So there would not have

21 been a vote at this point for him to become president.

22    Q. On page 2 of Exhibit 63, Fifth Third McHugh

23 000518, the second heading on the minutes is CEO update

24 key developments, issues, and opportunities. And then

25 it says next, Mr. Carmichael provided the CEO update key

Page 448

1 developments, issues, and opportunities highlighting

2 material items for board review and update.

3    What would you be discussing during that

4 portion of the meeting?

5    A. Key developments, issues and opportunity

6 highlights, material items for the board to review and

7 for me to provide an update.

8    Q. Would that include CEO succession, president

9 succession?

10    A. That's not -- no. That doesn't occur in that

11 discussion. This is really about me giving an update on

12 the business, business environment, performance of key

13 business areas.

14    Q. During this meeting, is there any discussion

15 of the timing of when Mr. Spence would become president

16 and CEO?

17    A. I don't recall this board meeting in its

18 totality, if that was discussed or not.

19    Q. Did you recall having discussions with the

20 board, at that time, that if -- if Tim Spence is made

21 president, that Fifth Third would be at risk of losing

22 Phil McHugh?

23    A. I don't recall the conversation, but we always

24 assess the risk of these type of moves with individuals,

25 so I'm not sure when that -- when a conversation of that

Page 449

1 nature would have occurred or if I even had a

2 conversation of that nature. But something of that

3 nature could easily happen.

4    Q. Okay. So there could have been a situation

5 where you said to the board, at that time, that if -- if

6 Tim Spence is made president, that they're at risk of

7 losing Phil McHugh because of his expectations about

8 being --

9    A. Typically, what the board would ask me,

10 Counsel, is, Greg, when we make a move of this nature,

11 who should we be concerned with? What kind of risk is

12 it? Because it's a big -- it's a big action for the

13 organization. So they'd want to understand how it's

14 going to be received and if there's any concerns that I

15 would have for anyone at risk.

16    So, we would talk through that as a normal

17 course of something of this order of magnitude. They'd

18 want to understand it. If I was changing out a major

19 business head, they'd want to understand who potentially

20 could be concerned about that or react to that, and is

21 there any risk underneath that and am I taking

22 appropriate action to prepare for that. So that would

23 be a normal thing to discuss.

24    Q. Do you recall specifically indicating to the

25 board that you felt that Phil McHugh was at risk of

Page 450

1 leaving because you were making Tim Spence president?

2    A. I don't recall that discussion, but at the end

3 of the day, I knew that making Tim Spence president

4 would create some -- some anxiety in the organization

5 for certain individuals because I know that Phil had

6 voiced numerous times that he would not work for Tim

7 Spence. That was a concern of mine. So if he was at

8 risk or I had a concern of him leaving, it was because

9 he wouldn't work for Tim Spence.

10    Q. When did Phil McHugh voice to you that he

11 would not work for Tim Spence?

12    A. He's made that -- he's made that known to

13 other people in the organization, which got back for me.

14 And in my conversation when I decided to communicate to

15 him in his review -- not review, but when we were making

16 Tim president, when they were going to make Tim

17 president, he voiced that concern again to me that he

18 wouldn't work for Tim. I suspected he wouldn't because

19 I heard that from the organization. He was out there

20 saying that, and I got it come back to me.

21    Q. Who did you hear that from --

22    A. Jamie Leonard.

23    Q. And when did Jamie Leonard say that to you?

24    A. He's mentioned that to me numerous times. I

25 don't have a date stamp or document. But Jamie Leonard

Page 451

1 absolutely had communication with Phil, and he said, you
2 know Phil won't work for Tim Spence. I said, I suspect
3 that. So that's where that came from.
4        So I thought he may be. If that was the case
5 and I had doubt it might be, that he could be at risk.
6 By the way, when I mentioned that he was going to be
7 working for Tim Spence, first thing he asked about was,
8 does this report to Tim Spence? And I said, yes, it
9 does. Never -- never mentioned the president role.
10 And then it was, I need to think about it. Then came
11 back later and told me he wouldn't take the job.
12       Q. Who else -- who else besides Jamie Leonard
13 ever indicated to you that Phil McHugh would not work
14 for Tim Spence prior to September 21, 2020?
15       A. Jamie's the one that was -- that I recall
16 commenting to me on that. There might have been others,
17 but I know Jamie was the one that communicated that to
18 me.
19       Q. Phil McHugh never indicated to you prior to
20 September 21, 2020, that he would never work for Tim
21 Spence; is that right?
22       A. He did not -- he did not say that directly to
23 me prior to when I told him the change we were making
24 and asked him to step into the consumer role. He asked
25 who it was reporting to. I told him it was said Tim

Page 452

1 Spence. He said I'm not going to work for Tim Spence.
2 So it was consistent with what Jamie told me.
3       Q. Who else would you have identified was at risk
4 of leaving Fifth Third with Tim Spence becoming
5 president?
6       A. Well, at the end of the day I knew at some
7 point Tayfun aspired some day to be the CEO, and with --
8 if Tim stepped into that role, that would be a larger
9 challenge for him to eventually elevate to that
10 position, so he could potentially be at some level of
11 risk. I would have communicated that. I'm not sure if
12 I did or didn't, but I would see that as a potential
13 concern. You're talking about individuals who -- who
14 potentially could have aspirations. I know Tayfun has
15 to me before he'd like to be considered for that role,
16 so I thought he might be at risk too.
17       Q. So you thought Tayfun might be at risk because
18 some day he might want to be president and CEO; is that
19 right?
20       A. We had conversations and he said at some point
21 some day I might -- I would aspire to be the CEO. He
22 said not now, not in the near future, but some day I
23 would -- I would be interested in that role, in
24 conversations I've had with him, but, you know. Or
25 discussions, he brought that up once or twice to me.

Page 453

1 Tayfun was a very thoughtful leader. He wasn't
2 impatient, but, you know, if Tim got elevated to that
3 role, he could see that as a potential, okay, long-term,
4 I'm probably not going to have that consideration. So
5 he could be at risk. That's me speculating, based on
6 what I thought that -- that Tayfun had a long-term
7 interest in. So I would highlight him as a risk.
8       Q. That also would be true for Phil McHugh, as to
9 why he would be at risk because he wanted to be
10 president.
11       A. That wasn't I -- Phil knew he wasn't going to
12 be president. He never talked about it. He never
13 mentioned to me once he ever wanted to be considered as
14 the future successor and president of Fifth Third Bank.
15 Just an emergency, when I asked him. There's nothing in
16 any of his reviews, there's nothing in any board
17 discussions that would indicate he was ever qualified or
18 even considered himself to be the president and CEO of
19 this company some day. Nothing.
20       Q. Is it your position that Phil McHugh
21 indicated, I'd only want to be president and CEO in an
22 emergency situation but I'd never want to succeed to
23 that position permanently?
24       A. Phil McHugh had many opportunities. He sits
25 on the same floor I did. To come down and talk to me

Page 454

1 about being the CEO of the company. Never once did.
2 When Tim was being vetted for the president, never once
3 came in my office and asked me, what about me? Why am I
4 not being vetted?
5        When I told him he was going to report to Tim
6 and be head up -- head up the consumer bank operations,
7 he never said, I thought I was going to be president.
8 What about me? I want to be president. Never once made
9 any of those comments. This was an afterthought when he
10 filed his suit. Okay. If he had any belief he was
11 going to be CEO or any desires, he would have said it
12 then.
13       I asked him if he wanted to be an emergency
14 successor in the event I had to step out, which was a
15 higher probability when I asked him. I was going to put
16 him on a list, did he want to be considered for that
17 role. He said absolutely, I would like to do that.
18       No other conversation about him ever being the
19 future CEO of the company because he knew he wasn't
20 qualified. Never a conversation. And plenty of
21 opportunities throughout the years to say that. Plenty
22 of opportunities to challenge what was going on with
23 Tim. Never once, because it wasn't going to happen and
24 he knew it.
25       Q. You indicated Phil McHugh knew he wasn't

Page 455

1  qualified to be president and CEO?
2      A.  Yeah.
3      Q.  What do you base that upon?
4      A.  Based on the fact that he understood the
5  digital world that we were operating in, the way the
6  board valued strategy, digital experience, technology
7  experience.  All right.  Phil's had plenty of
8  interactions with the board strategy, all right.  Plenty
9  of strategy sessions.  He's presented them numerous
10  times.  He's never gotten any feedback that the board
11  thought he should be the next CEO of the company.  He's
12  never received any feedback from me that he should be
13  thinking about the next -- becoming the next CEO of the
14  company.  There was never any directional towards the
15  CEO of the company.  So -- and he's never questioned it,
16  never asked about it, all right.  Never challenged any
17  of that, and he had a litany of opportunities to do
18  that.  Just never happened.
19      Q.  And you don't recall during the August 15,
20  2019, midyear review of Phil McHugh where he indicated
21  that he absolutely wanted to be the next president and
22  CEO of Fifth Third Bank?
23      A.  He never said that.  That's not true at all.
24  Never was said.  Absolutely not true.
25      Q.  That's your position, right?

Page 456

1      A.  No, that's facts.  Show me one evidence of
2  that anywhere.
3      Q.  Did you have a meeting with Phil McHugh in
4  your office on Tuesday, October 13, 2020?
5      A.  I don't have my calendar in front of me.  I
6  have no clue if I met with him on that date.
7      Q.  Do you recall when it was going to be
8  announced that Tim Spence was going to be the next
9  president of Fifth Third Bank?
10      A.  It was in October, so I would have had a
11  conversation with Phil as I did with the other
12  executives that were going to be impacted and needed to
13  be communicated to prior to that type of announcement.
14  So I would have talked to Phil.  I had a conversation
15  with Phil, I just don't know if that was the date.
16      MR. SABA:  We'll go off the record.
17      VIDEOGRAPHER:  Time is 3:03 p.m.  We're going
18  off the record.
19      (A recess was taken from 3:03 to 3:20.)
20      VIDEOGRAPHER:  The time is 3:20 p.m.  We're
21  back on the record.
22  BY MR. SABA:
23      Q.  Mr. Carmichael, we were discussing a meeting
24  on October 13, 2020, between yourself and Phil McHugh.
25  You indicated you would need your calendar to verify

Page 457

1  what -- what date that meeting may have occurred on; is
2  that right?
3      A.  It was -- it was prior to Tim's announcement.
4  It would have been prior to that, some time in that
5  period of time.  So if that was the date of the meeting
6  I had with Phil to share with him what the plans were of
7  the organization and promotion of Tim Spence to
8  president, then I have no doubt it was around that time.
9      Q.  Okay.  But in order to verify the date, you
10  would need your calendar to do that; is that right?
11      A.  Yeah, it would be helpful.
12      Q.  I think you indicated before, you needed to
13  have a meeting with Phil before they would announce
14  about Tim Spence being the next president and CEO; is
15  that correct?
16      A.  I have a -- I have a meeting with all my
17  enterprise execs to prepare them for something of that
18  level of magnitude to incorporation.  I had a meeting
19  with everybody, not Phil McHugh.  I had a meeting with
20  everybody including Phil McHugh, that was on my
21  enterprise committee.
22      Q.  The first meeting you had with Phil McHugh
23  about that issue in October -- I'm representing to you
24  October 13 --
25      A.  Was that a Tuesday, Counselor?

Page 458

1      Q.  October 13 was a Tuesday.  Do you recall
2  meeting with him on a Tuesday?
3      A.  I recall those three days there, so yes.
4      Q.  Okay.  So that meeting on that Tuesday, that
5  took place in the morning; is that right?
6      A.  It took place that day.  I can't recall if it
7  was in the morning or afternoon.
8      Q.  What happened during that meeting?
9      A.  I informed Phil McHugh that Tim Spence was
10  going to be announced as the next president of Fifth
11  Third Bank, and that I would love to have him -- and
12  would ask him to step in and lead the consumer bank, and
13  that I was going to make sure that job was in the proxy,
14  it was a proxy position because of the increase in scope
15  of that group over a period of time, that division over
16  the period of the time, which was roughly 60 percent of
17  the gross revenue of the bank, and I wanted to make sure
18  he was in the proxy.  He deserved to be in the proxy.
19  And I was going to ensure that he was in the proxy, and
20  potentially needed to put another $100,000 in his
21  compensation, and I'd be willing to do that.  And I
22  highly encouraged him to take the position, needed him
23  in the position , asked him, please take the position.
24  He asked me who it was reporting to, I told him.  He did
25  not like that, as I mentioned.  He said I surprised him

Page 459

1  on the timing of what -- of this move.  Never a mention
2  whatsoever that, hey, I thought I was going to be
3  president or CEO, nothing of that nature.
4       He had plenty of time to do that when RHR was
5  going through the process.  Never did.  Because I didn't
6  -- he understood he was not being evaluated for the next
7  presidency of the company.
8       Then he told me he needed time to think about
9  it and he was going to go home and talk to his wife.
10  And we separated.  He left -- he left the discussion on
11  that Tuesday.  He came by my office to follow up the
12  rest of the week now.
13       On Wednesday, I believe he walked past my
14  office, and again put his head in my office and said,
15  you really surprised me on this timing.  All right.  I
16  didn't respond to that.  It was a flyby.  Thursday he
17  came in and said to me, I'm not taking the job.  I'm not
18  going to work for Tim Spence.  And I said, well, we're
19  moving forward, that's the opportunity I have for you.
20  He gets up and starts to walk out and says something
21  about being the most respected executive on the floor,
22  and I need to treat him fairly and something like that.
23  And then he walked out.
24       And I was taken back, I was disappointed.  I
25  wanted him to take that role.  I needed him to take that

Page 460

1  role.  It was important for the organization.  It was
2  the top five job in the company.  I had no doubt he'd be
3  very successful in that role.  As I said, it was a much
4  bigger role than he was given before.  There was more
5  money involved.  As I put on the table, but there was
6  definitely no money taken away.  There was more money
7  involved, and all the perks that were with it, so I was
8  hoping he would take that role, but he made the issue
9  working with -- with Tim a problem, and he said it
10  wasn't in his best interest to do it.  That's the last
11  conversation I had with Phil McHugh.
12       Q.  Going back to the October 13th, that Tuesday,
13  that you referenced.
14       A.  Okay.
15       Q.  Did Phil McHugh ask you if the changes you
16  were making were a result of any performance issues?
17       A.  No.
18       Q.  He did not?
19       A.  He did not.
20       Q.  Didn't you tell him that you stated that when
21  he -- when he asked that question, he alleges that you
22  stated that the regions and wealth were performing well,
23  and that you were pleased with the performance and that
24  these changes were not being made because of any
25  performance issues on behalf of Phil?

Page 461

1       A.  Once again, the regions aren't an entitlement.
2  That was a rotational role for development and exposure
3  to our markets for multiple leaders over the years.
4  This wasn't a reflection that Phil wasn't do a good job
5  in leading his organization.  I gave him a very high
6  mark.  I gave him exceeds.  If you look at the
7  performance review, this wasn't an issue he wasn't doing
8  a good job.  I only have so many jobs.  I have to align
9  -- I have to align the talent in the organization with
10  the needs of the business, and these jobs will ebb and
11  flow, they'll increase and decrease in scope and
12  responsibilities.  There's only top five of these jobs.
13  You're not entitled to keep the job as it is.  I need to
14  do what's in the best interest of the company.  The
15  employee should do what's in the best interest of the
16  company.  These are top five jobs.
17       I wasn't taking away compensation, I wasn't
18  taking away any benefits.  I was asking him to step into
19  a top five job.  Is the job going to be different?  Are
20  there things that are going to be given up?  Yes.  Every
21  executive goes through those types of transformation and
22  the roles as they evolve in the company and as their
23  jobs change.  And I've only got top five jobs, and those
24  jobs look potentially different year after year
25  depending on the individuals and the needs of the

Page 462

1  company.
2       Q.  Did Phil ask you if there was any alternatives
3  to the head of the consumer role?
4       A.  I don't recall any conversation about
5  alternatives.  At his compensation level, that's a top
6  job in the company.  I can only -- I can't afford to
7  just add useless positions at that compensation level,
8  and the consumer job needed to be in the proxy because
9  of the scope of that position.
10       Q.  Did you indicate to him that yes, there were
11  many other roles available?
12       A.  I did not have a conversation about other
13  roles in the company.  We talked about the consumer head
14  role.
15       Q.  When you indicate to Tim Spence that he was
16  going to be the next president of Fifth Third Bank?
17       A.  It would have been sometime in that timeframe
18  prior to probably talking to the executive team
19  directly.  I probably would have -- Tim would have been
20  probably my first conversation.  But once again, the
21  board was going to vote on that, and I'm
22  not sure if they'd already voted on that or not, but it
23  would have been somewhere in that timeframe.
24       Q.  Would you have spoken to Tim Spence about
25  being the next president to Fifth Third Bank prior to

Case: 1:21-cv-00238-MRB Doc #: 77-16 Filed: 06/27/25 Page: 53 of 118 PAGEID #: 3881

Deposition of Gregory D. Carmichael, Volume II                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 463

the time that you met with Phil McHugh on Tuesday, October 13th?

A. Tim would have been the conversation prior to when I started talking to the rest of the executives. So there would have been a conversation with Tim prior to that.

Q. How long --

A. But once again, that conversation would have been couched with -- as I couched all the conversations, including the one with Phil -- it's the board's intention. It hasn't been finalized yet, at that time.

Q. How long before your meeting with Phil McHugh on October 13, 2020, was your discussion with Tim Spence where you informed him that he would be the next president of Fifth Third Bank?

A. I told him that board was intending to go in that direction. It wasn't finalized. It's the board's decision and the board will vote on that. That's what I told him. I do not recall how -- what the time difference was between when I had that conversation with Tim Spence and when I had the follow-up conversation with Phil McHugh. There were other individuals I had to talk to also, not just Phil McHugh.

Q. Did you discuss your meeting with Phil McHugh with Bob Shaffer? And I'm referring to, did you discuss

Page 464

your meeting with Phil McHugh on October 13, 2020, with Bob Shaffer?

A. Absolutely.

Q. When did you discuss that with him?

A. It would have been very shortly after because of the reaction of Phil and what he said in that meeting, and I've shared that with Bob.

Q. And what did you share with Bob?

A. What I just said Phil told me. I reiterated what Phil told me, and I told him I'm not sure he's going to take the position. Working for Tim's going to be an issue for him. He told me he was going to take it home -- take that home and discuss it with his wife. I'm hopeful he comes back and accepts the position, but putting you on notice, Bob, I don't think he's -- I don't think -- he walked out of here in a good frame of mind. He's the head of HR, I had to share that with him. I don't know exactly verbatim what I said to him, but it was of that nature.

Q. Did you tell Bob that Phil acted in a fit of petulance?

MR. CIOFFI: Objection. Counsel, you're being redundant now. You covered all this yesterday. You're not permitted to just rehash everything.

BY MR. SABA:

Page 465

Q. Did you tell Bob that Phil acted in a fit of petulance?

A. Those aren't my words. I didn't write that.

Q. You didn't say that?

A. I didn't write that.

Q. Did you tell Bob that Phil got angry?

A. I don't know what I told Bob exactly. But you're talking about the 2013 -- you're talking about the Tuesday the 13th meeting. That's not what occurred there. That's not what I said occurred there. All right. That was a discussion on the -- on the Thursday meeting, when he came back in, that is when he was more angry, that's when he refused to take the job, and that's when he stormed out of my office telling me he was the most respected executive on the floor. That is when he got angry and walked out. That's a Thursday, not a Tuesday.

Q. What else did you tell Bob Shaffer about the October 13th meeting?

A. I just told you. I answered the question already.

Q. Did you tell him anything else?

A. I just answered the question. Told you exactly what I told him.

Q. My question is, did you tell him anything

Page 466

other than that?

A. No.

Q. Okay. Did you indicate to him that you thought the meeting went better than expected?

A. I don't recall necessarily saying it went better than expected. I expected it not to go well because I knew how Phil felt about Tim Spence and reporting to Tim Spence. On that Tuesday, I was still hopeful that Phil would take the role. But Thursday didn't go better than I expected, that's for sure.

So if I communicated that I felt Tuesday went better than expected, I may have been hopeful that Phil was still going to take the role. He didn't tell me he wasn't. So he could have told me at that point he didn't want to take it.

(Exhibit 67 is marked for identification.)

BY MR. SABA:

Q. Mr. Carmichael, I'm handing you what's been marked as Exhibit Number 67, Fifth Third McHugh 0213204. This is a text message exchange between Mr. Shaffer and Mr. Spence.

Let me ask you, during this week of October 12th, were you in regular communication with Mr. Shaffer and Mr. Spence regarding the various issues that were going on?

Deposition of Gregory D. Carmichael, Volume II                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 467

A. I would expect I was having conversations, given the nature that Tim was going to be -- when the board voted on it, expected to be the next president, and this was going to be his team. And the head of HR, I would be conversations getting the organization prepared for this type of transition and organizational change.

So I would be having conversations with both these guys during that period of time, as we line up these conversations to deal with the aftermath of any -- any outcome. Any time you have something of this sort of magnitude, you're going to have individuals in the organization who get uncomfortable or have concerns for various reasons, and there's a lot of organizational work to manage through a change of this nature.

So these would be individuals I would be speaking with. Head of HR and the new -- soon to be president after voted on, Tim Spence.

Q. I'm referring to the text message on October 13th, at 11:19 a.m. from Mr. Shaffer to Mr. Spence. Do you see where I am?

A. I do.

Q. Mr. Shaffer indicates, Tayfun knows it now about the moves. Very professional. Said he's not surprised and will be supportive. Silver fox is next.

Page 468

Do you see that?

A. Yeah, once again, Tayfun knows about the move because I communicated it to him. Once again, as you would expect Tayfun to be about this, and very professional. Understood that, even though he did, I know, at some point aspire some day to be the next president.

Q. When did you --

A. Said he's not surprised and supportive. Once again, professional. That's who Tayfun is. I have to read this. That's what that says.

Q. And silver fox is next; is that right?

A. That's what Bob says.

Q. Do you know who that's referring to?

A. Well, you guys have brought that forth to my attention that you're referring to Phil McHugh.

Q. We discussed that yesterday. You're aware of that reference of Phil McHugh?

A. I am as of now.

Q. What did that mean, silver fox is next?

A. That obviously means that I'm lining up this communications that I just testified earlier that Phil may not have been the first one, I have to talk to the whole team. So obviously I talked to Tayfun first and I was going to sit down with Phil next.

Page 469

Q. When did you meet with Tayfun?

A. I don't have my calendar in front of me. I don't know. It would have been in this timeframe.

Q. Tim Spence then responds, nice. Do I need to reach out to him right away? If not, I'll just come in early tomorrow and see him in person. Is that right?

A. That's what it says here.

Q. Okay. Do you know who Tim Spence is saying he's going to reach out?

A. Listen, I'm making assumptions or you can make assumptions here. I would assume he's talking about Tayfun, but that would be an assumption. I didn't write this. I'm not part of this text message trail. So I would be speculating. If I was speculating, I would think it was Tayfun.

Q. Bob Shaffer then says, tomorrow would be fine. Tim Spence responds, thumbs up. Bob Shaffer then says, Greg talked to -- this is at 1:10 p.m. on October 13th. Greg talked to Phil, said it went better than expected --

A. Okay. Look at that. Phil said he --

Q. Mr. Carmichael, one thing, these are original exhibits, you can't mark on them.

A. I apologize for that. I did not understand that. Just trying to follow along so I can know where

Page 470

I'm at on this text.

Q. Going back again to the October 13th -- 1310 text from Mr. Shaffer. Greg talked to Phil. Said it went better than expected. Phil said he gets it, makes sense, just needs to digest it. I expect him to ask me for comp increase.

Do you see that?

A. I do.

Q. And with respect to -- so you did -- do you recall now saying it went better than expected?

A. I said it went better than expected because that's what my -- what -- I mean, that's Bob's interpretation of what I said, so I'm not going to dispute that I thought it went better than it did.

Phil gets it and make sense, just wants to digest it. So Phil did not walk out in a fit of rage during that meeting. He said he needed time to digest it and think about it. So yeah, I thought it went reasonably well. I was stunned when he walked by on the next day and said he was surprised on timing. There again, still hopeful.

Thursday is when we had the problem when he came in said he won't do it. All right. And then I expect him to ask me for a comp increase. Bob would say that because that's always Phil's MO. He's going to

Page 471

1  come in and ask for more money.
2      So that's how -- Bob and I talked about that,
3  and we said expect that. I tried to front run that by
4  putting -- putting a more generous offer in front of
5  him, that there would be more comp increase if he took
6  this job.
7      Q.  Why would Phil be asking for a comp increase
8  if you said that you already offered him one?
9      A.  Because Phil's never satisfied with anything
10 he's been offered. It happens in every single role
11 we've ever asked him to take. It's been about
12 compensation. I don't know why Bob put that in there.
13 Bob and I already talked about me giving him an increase
14 in compensation, so that's Bob saying something here. I
15 did -- I did -- I've already intended to give him
16 something. I mentioned I would. I don't know why Bob
17 put that back in this e-mail, except for the fact that
18 maybe Bob expected him to come back around to him again
19 for more money. I can't -- I'd be speculating.
20     Q.  Did you ask Bob Shaffer to meet with Phil
21 McHugh?
22     A.  I don't recall doing that, but that wouldn't
23 be unheard of for me to ask him to circle back around
24 with Phil. That's his role in the organization, to help
25 me execute these moves. So I easily could have asked

Page 472

1  him to circle back around to Phil. I don't remember
2  doing it, but I easily could have.
3      Q.  The meeting on Thursday, October 15th, where
4  did that take place?
5      A.  I'm sorry, October 15th, is there --
6      Q.  That's the Thursday. You mentioned a
7  Thursday.
8      A.  Okay. That happened back in my office.
9      Q.  What time did that occur?
10     A.  I do not know exactly what time it occurred.
11     Q.  During that meeting, did you apologize to Phil
12 for not informing him that he would not be your
13 successor as president and CEO?
14     A.  Absolutely not. Man can go with any
15 information, any topics we've ever discussed or any
16 thought of him ever being the CEO was never discussed,
17 so absolutely not.
18     Q.  Did you say at that point in time that he was
19 surprised that you never informed Phil that he would not
20 be your successor?
21     A.  I'm sorry, can you repeat that question?
22     Q.  Yes. Did Phil tell you at the beginning of
23 that meeting on October 15th that he was surprised that
24 you never informed him that Phil -- that he would not be
25 your successor as president and CEO?

Page 473

1      MR. CIOFFI:  Objection. Redundant. You went
2  through all of these meetings at some length over
3  an hour or two yesterday. Go ahead. You may
4  answer.
5      THE WITNESS:  We've -- we've never a
6  discussion about him being my successor except in
7  an emergency capacity only at the direction of the
8  board, if that -- if an emergency successor was
9  necessary.
10     By the way, an emergency successor was never
11 necessary. They never had to execute that plan. I
12 stayed around for multiple years after that. I
13 never apologized. I never mentioned about him
14 being CEO or president. It never came up in
15 discussion. Even on that Thursday when he refused
16 to do that job, that discussion never came up
17 because he knew he was never being considered. He
18 never thought of himself in that capacity. That
19 was an afterthought after he stormed out and quit
20 the company.
21 BY MR. SABA:
22     Q.  Did he tell you, I've delivered for you in
23 every role that he's had, and again in 2020, with the
24 SBA paycheck protection program?
25     A.  All my executives deliver on the roles

Page 474

1  that they're expected to. That's why I was asking him
2  to step up and lead one of the largest -- the largest
3  LOB in the company and be in the top five positions in
4  the company financially and be in the proxy.
5      Phil easily could have said I've delivered
6  there for you all along the way. I would expect him to
7  deliver for me all along the way. That's why I was
8  giving him a promotion, more money, and he was going to
9  be in the proxy.
10     So absolutely Phil did a good job for us, or I
11 wouldn't have been having that conversation. This was
12 not an employee that wasn't doing a good job. I wanted
13 him to take that role. I offered him the top five job
14 in the company. He refused to do the job. Told me he
15 would not do the job, he would not work for Tim Spence,
16 and walked out of my office. That is exactly what
17 happened. I've never talked to him since. I was
18 advised not to after he informed Bob Shaffer that he was
19 getting legal counsel.
20     Q.  Did you indicate to him and acknowledge his
21 excellent performance and indicate that he is the most
22 experienced and most respected executive in the company?
23     A.  I would have never said he's the most
24 respected executive in the company. That's his words
25 that he used to me when he was walking out the door. I

Deposition of Gregory D. Carmichael, Volume II      Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 475

1 never said that. Phil was very well respected in the
2 company. I would not put a senior executive in the top
3 five position in the company, at his compensation level,
4 if he was not well respected. That -- never incongruent
5 with that type of move.
6      Q. Did he ask you why you did not inform him of
7 the decision to make Spence president and CEO instead of
8 recommending Phil as president and CEO?
9      A. Never had that conversation because there was
10 never any substance for that conversation because he
11 knew he was never going to be CEO and president long
12 term. He knew he was going to be would be recommended
13 at the emergency successor, which I did, which is in the
14 documentation. When he went through the RHR process for
15 Tim Spence, he never walked in my office and said what
16 about me, why not, because it was never talked about.
17 All the evidence supports that.
18      Q. Did you indicate to Phil that moving Phil's
19 responsibilities to Tim Spence was necessary in order
20 for Tim to gain the experience necessary to succeed you?
21      A. The board wanted Tim Spence to have the
22 regions in the line of businesses as a president should.
23 That's what I communicated to Phil McHugh. That
24 involved the regions. You're not entitled to the
25 regions. I use it as a rotational job. I've had five

Page 476

1 different leaders in ten years. He's not entitled.
2 He's not the king of the regions. I asked him to step
3 in and take one of the largest roles in the company
4 that had 60 percent of the gross P&L, and he refused to
5 do it.
6      Q. Did Phil ask you how you would feel if you
7 were in Phil's shoes?
8      A. No. I don't recall that at all.
9      Q. Do you recall indicating to him that you would
10 be disappointed, but that you would take the consumer
11 role?
12      A. Absolutely not. You can't be disappointed
13 over something you never sought, there was never any
14 indication he was ever qualified. We never talked about
15 it. It was never a subject -- a point of discussion.
16 If it was after December 17th meeting, he'd want to
17 understand how he was positioned for that role. In his
18 performance review, he'd be asking me about it, never
19 did. When they start the RHR process -- RHR process for
20 Tim Spence, he'd be asking about it. Never did. So why
21 would I feel like he was surprised and be disappointed?
22 It wouldn't make sense. Never happened.
23      Q. Were there any options for any other roles for
24 Phil McHugh, at that time?
25      A. I didn't have another top five role in the

Page 477

1 company at his compensation level. And by the way, we
2 work at -- at -- at will for the company. We do what's
3 best, in the interest of the company. And that's a top
4 job. He was being promoted and given more money, having
5 nothing taken away, so I don't know how you would ever
6 qualify that as a demotion, because it's not in any
7 technical definition. All right. A bigger consumer
8 role than he's ever had, 60 percent of the gross revenue
9 company. All right.
10      I didn't have a role of that magnitude for a
11 guy making that compensation level. Anything else would
12 have been viewed and would have probably been -- had to
13 be a demotion. I was not going to do that to what I
14 thought was a very, very good, strong leader in this
15 company. He deserved better than that. He has been a
16 great soldier for 34 years and he deserved a great
17 opportunity in the company, and I gave him that. He
18 refused to take it.
19      Q. Did Phil ask you if he needed to hire an
20 attorney?
21      A. Yeah. He did.
22      Q. What did you say to him?
23      A. I didn't respond to that. I would never tell
24 someone to go get an attorney. I said Phil , you do
25 what you think you need. I need you to take the

Page 478

1 consumer role. I want you to take the consumer role.
2 That's the last comment I -- the last statement I made
3 to Phil. I want you to take the consumer role.
4      He kept throwing this attorney in my face. Do
5 I have to get an attorney? You know, this or that.
6 That's typical Phil stuff, anger coming out. Same
7 threats he made to Bob. So I wasn't going to tell
8 someone to get an attorney or not get an attorney. I
9 was asking him to take the role. That's what I was
10 focused on.
11      Q. Did you discuss your conversation with Phil
12 McHugh on October 17th with Bob Shaffer?
13      A. Hang on.
14      Q. Excuse me. Strike that.
15      Did you discuss your conversation with Phil
16 McHugh on October 15th with Bob Shaffer?
17      A. Absolutely. I would have followed up with Bob
18 immediately and told him we have an issue, we have a
19 problem. And I would have shared with him the
20 conversation. And I didn't know what was going to
21 happen next, I really did not know what was going to
22 happen next.
23      I did not know Phil was getting an attorney.
24 He didn't tell me he was getting an attorney. I don't
25 know. So I didn't know what was going to happen next ,

Deposition of Gregory D. Carmichael, Volume II                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 479

1  so I put Bob on notice. I didn't talk to anybody else
2  after that. I may have mentioned to Tim there's an
3  issue here with Phil. I may have said that. I don't
4  recall that either. But I definitely would have talked
5  to Bob.
6      Q.  Did Phil come into work the next day?
7          MR. CIOFFI:  Objection. Clarification what
8      day are you talking about?
9  BY MR. SABA:
10     Q.  Meaning Friday, October 16th.
11     A.  I really don't know. I think -- I think I was
12 gone. I think -- I think I was out of the office that
13 day. I'm not sure. But I don't recall -- I don't
14 recall whether he came to work the next day or not. Bob
15 would probably know that more than I would.
16     Q.  Do you recall there being a preparation
17 meeting of the executive team for announcing third
18 quarter earnings on the morning of Friday, October 16th?
19     A.  I don't recall that.
20     Q.  You don't recall being in a meeting with Phil,
21 at that time?
22     A.  I don't recall that Friday, what occurred on
23 that Friday. That was years ago. By the way, with
24 everything else that was going on, I just -- that --
25 that may not have been the forefront of my mind, so...

Page 480

1      Q.  What do you mean by everything else that was
2  going on?
3      A.  Oh, the organizational changes that we're
4  talking about. The situation just emerged with Phil
5  walking out. I mean, there's -- there's a substantial
6  organizational issues. So I can't recall what the
7  Friday looked like. I don't recall seeing Phil on
8  Friday. Doesn't mean I didn't, I just don't recall if I
9  saw him on Friday or not.
10         I do know, I think it was on a Saturday, I got
11 a phone call -- I got a text -- I believe it was a text,
12 maybe a call from Phil's number. I did not pick up. I
13 wanted to understand what Bob -- where we were with Bob,
14 and what's occurred since I had a conversation with Bob.
15 Bob told me not to respond, Phil's got a lawyer, and any
16 communications need to be forwarded to Susan
17 Zaunbrecher. Something to that extent. Basically, I'm
18 not -- I'm not to have a conversation with Phil. But
19 Phil did reach out to me after that. I believe it was
20 on Saturday, trying to get ahold of me. I touched base
21 with Bob, I think he was in Michigan. Bob said not to
22 respond, he's got counsel.
23     Q.  When did Bob tell you not to respond to him?
24     A.  I think I just said that. When I -- when I
25 called him in Michigan and said that Phil reached out to

Page 481

1  me. Bob said, don't respond, he's -- he's got counsel.
2      Q.  That's on October 17th, that Saturday?
3      A.  I think that was a Saturday. I think that was
4  Saturday. I don't think it was Friday; I think it was
5  Saturday. It could have been Sunday. I mean, it was
6  one of those days over the weekend.
7          (Exhibit 68 is marked for identification.)
8  BY MR. SABA:
9      Q.  Mr. Carmichael, I've handed you Exhibit
10 Number 68, which is Bates stamp Fifth Third McHugh
11 0213246 through 0213248.
12     A.  Okay. I see that.
13     Q.  I'll refer to you the first page of that
14 exhibit.
15     A.  Okay.
16     Q.  This is a text message exchange between Bob
17 Shaffer and Nancy Pinckney.
18     A.  Okay. This is 10/16 would be a Saturday; is
19 that correct?
20     Q.  10/16 would be the Friday.
21     A.  Friday, okay.
22     Q.  And the 10/16/2020 at 2:16 p.m. text message,
23 there's a text message from Mr. Shaffer, the silver fox
24 could be --
25     A.  Hang on, I'm sorry, Counsel. Where -- let me

Page 482

1  get to that.
2      Q.  Fair enough.
3      A.  So I got 2020, 10:16. You're saying it's --
4      Q.  2:16 p.m. Do you see that?
5      A.  I see it.
6      Q.  I'm sorry, 2:16 a.m. is what it --
7      A.  Right. Okay. So 2:16. I see it right there.
8      Q.  You see it?
9      A.  Silver fox could be out tomorrow. So this is
10 Friday. Okay.
11     Q.  Correct. That's from Bob Shaffer indicating
12 that he could be out tomorrow on the 17th.
13     A.  Okay.
14     Q.  Do you know why Bob Shaffer would be saying he
15 could be out on the 17th?
16     A.  I told Bob he refused to do the job, stormed
17 out of my office, and refused to do the job. So my
18 guess is -- once again, I would be -- this is Bob's text
19 to Nancy. I didn't write it. I assume he's referring
20 to that situation that he quit the company.
21     Q.  So essentially, either he could accept that
22 position or he has no employment with Fifth Third; is
23 that right?
24     A.  The opportunity we were presenting to him was
25 the top five job in the company and we didn't have

Page 483

1 another opportunity at that compensation level, at that
2 time, that was in the best interest of the company, and
3 as him as an excellent employee over the years, good
4 employee over the years, deserved that opportunity. I
5 did not have another role of that magnitude for him to
6 step into.
7     Q.   Referring to the bottom of the first page of
8 Exhibit 68, 0213246. There's an October 17, 2020,
9 message from Bob Shaffer at 4:07 p.m. Do you see that?
10    A.   4:07. That's military time.
11    Q.   1607.
12    A.   It's 1607.
13    Q.   Correct.
14    A.   Okay. I see that right now.
15    Q.   It starts, I just sent this to Phil.
16         Do you see that?
17    A.   I do.
18    Q.   And then it goes to the next page. Phil, I
19 understand you reached out to Greg today. Since you
20 indicated --
21    A.   Is that -- is that a -- let's see, the 17th.
22 So now we're on Saturday. Thank you. I got it.
23    Q.   And now we're on the second page; do you see
24 that?
25    A.   I have that.

Page 484

1     Q.   Phil, I understand you reached out to Greg
2 today. Since you indicated you were getting an
3 attorney, please have your attorney contact Susan. As I
4 told you yesterday, since you refused to take the
5 consumer lead role you're voluntarily resigning from the
6 company as there is no other positions available; is
7 that right?
8          Then it goes on to say, as such, and as I
9 indicated yesterday, you do not need to come into the
10 office and your last day with the company will be
11 October 30th. Is that correct?
12    A.   That's what this text says.
13    Q.   Nancy Pinckney responds, So I take it we
14 instructed Greg not to speak with him, which makes a lot
15 of sense. I'm working with IT now. They are
16 monitoring, preserving his e-mail, but working on
17 getting the access. Reworking comps plans, but have
18 questions. Putting toward Howard in as interim but not
19 sure if CED and the U.S. banking and mortgage will
20 report to him on an interim basis. Thanks for the
21 update.
22         Do you see that?
23    A.   I do.
24    Q.   Okay. And I think you indicated already that
25 Bob had communicated to you not to return Phil's calls.

Page 485

1 Is that right?
2     A.   That's correct.
3     Q.   And you did not return Phil's call; is that
4 correct?
5     A.   I did not return Phil's calls, based on
6 that advice from head of HR and my legal counsel.
7          (Exhibit 69 is marked for identification.)
8 BY MR. SABA:
9     Q.   Mr. Carmichael, I've handed you Exhibit 69,
10 Bates stamp Fifth Third McHugh 0213195. This is a text
11 message exchange between Mr. Shaffer and Mr. Spence.
12 Starting at the top, October 16, 2020, 1701 p.m.
13         Do you see that?
14    A.   I do.
15    Q.   Bob Shaffer says, what time is that meeting
16 over? Surely he will talk to Greg after that -- after
17 it. Do you see that?
18    A.   I agree. This is -- this is October 16th.
19    Q.   October 16th. Correct.
20    A.   So this is Friday?
21    Q.   That's right.
22    A.   Okay.
23    Q.   Do you see that, Tim Spence responds, just
24 finished the meeting. Do you see that?
25    A.   I do.

Page 486

1     Q.   And then, after that it says, he has left the
2 building. Unless he is on the phone with you or Greg
3 now, he is gone. Do you see that?
4     A.   I do see that.
5     Q.   Does that refresh your recollection whether or
6 not there was a prep meeting with the executive team for
7 announcing third quarter earnings on October 16th?
8     A.   I'm not sure what the meeting was about, but I
9 have -- I don't know what the meeting was about. There
10 was a meeting obviously, and he was in or wasn't in it.
11 It looks like he was in it. So whatever that meeting
12 was, I don't know.
13    Q.   Referring to the bottom of Exhibit Number 69,
14 there's a text message on October 17, 2020, at 2:52 p.m.
15 14:52:50 --
16    A.   I see that.
17    Q.   -- from Tim Spence. It says, any further word
18 from the silver fox? Then he goes on to indicate, Tim
19 Spence sends a text message, I'm terrified he will show
20 up on Monday.
21         Do you see that?
22    A.   I do.
23    Q.   Do you know why Mr. Spence would be terrified
24 of Phil McHugh showing up on Monday?
25    A.   I'm not aware of why he would be concerned

Page 487

1 about that, but you can ask Mr. Spence when you speak
2 with him. I have no clue why.
3          (Exhibit 70 is marked for identification.)
4 BY MR. SABA:
5     Q. Mr. Carmichael, I've handed you what's been
6 marked as Exhibit 70, Bates stamp Fifth Third McHugh
7 0213207. I'm going to represent to you this is a
8 continuation of the text message exchange between
9 Mr. Spence and Mr. Shaffer. And specifically, with
10 respect to Mr. Spence's last text message on the bottom
11 of Exhibit 69 and continues on Exhibit 70 from, I'm
12 terrified he will show up on Monday, and then, Frank
13 will need to escort him out.
14          Do you see that?
15     A. I do.
16     Q. And then Bob Shaffer indicates that same text
17 message we read earlier about what he sent to Phil. Tim
18 Spence responds, good note. And then he sent --
19 and then Tim Spence indicates, I talked to Greg quickly
20 about Melissa in a different topic.
21          What then Mr. Shaffer, two texts later says,
22 Phil did respond. Bob, I was told by you and Greg I did
23 not need an attorney and told by you not to report to
24 work on Monday.
25          Tim Spence indicates, we need to know whether

Page 488

1 or not he's got an attorney. You definitely did not
2 tell me he didn't need one.
3     A. Is there a question?
4     Q. Hold on. Mr. Spence goes on to say on -- on
5 October 17th, at 5:07, this is insane. The silver fox,
6 of all people.
7     A. 5:07.
8     Q. 1707.
9     A. 1707. Military time transition. This is
10 saying the silver fox, of all people.
11     Q. Do you know why Mr. Spence would say the
12 silver fox, of all people?
13     A. Great question for Tim Spence. I have no
14 clue.
15     Q. Referring to the text message from Mr. Spence
16 on October 18, 2020, sent at 2221, he says, I wish we
17 could just offer a truce, but he put himself above the
18 company, made dangerous accusations, and refused five
19 opportunities to apologize and move forward peacefully.
20          Do you see that?
21     A. I do.
22     Q. Do you know what Mr. Spence is referring to
23 when he said, "he made dangerous accusations"?
24     A. I'm not going to speculate what he was
25 referring to. There's a -- I can't -- I'm not going to

Page 489

1 speculate. You'll have to opportunity to talk to Tim
2 Spence and he can answer that question. I don't -- I'm
3 not speculating.
4     Q. Do you know what he meant when he said, "and
5 he refused five opportunities to apologize"?
6     A. Same response.
7     Q. Do you know what the status of the CFPB
8 litigation was as of October 2020?
9     A. Pending.
10          (Exhibit 71 is marked for identification.)
11 BY MR. SABA:
12     Q. Mr. Carmichael, I've handed you what's been
13 marked as Exhibit Number 71, which is Bates stamp Fifth
14 Third McHugh 0213185. This is a text message exchange
15 between Mr. Spence and Mr. Shaffer, from September of
16 2020. If I can refer you to the September 12, 2020,
17 text message from Mr. Shaffer, sent at 1823.
18          Do you see that?
19     A. Can you repeat the number again?
20     Q. Certainly. September 12, 2020, 1823?
21     A. Yes, I see it on here.
22     Q. You see that? It says, Greg and I are
23 aligned. Susan is out after the shareholder meeting
24 2021. Joe Alter would be the guy. I've been working
25 with him extensively this weekend, and he is really

Page 490

1 good.
2          Do you see that?
3     A. I do see that.
4     Q. What referring to Susan, that's Susan
5 Zaunbrecher; is that right?
6     A. I don't know. I don't recall this at all.
7 Susan who? I don't know who he's talking about.
8     Q. Do you recall being in later with Bob Shaffer,
9 that Susan Zaunbrecher would be out after the
10 shareholder meeting on 2021?
11     A. No, I don't. I don't recall that at all.
12     Q. Tim Spence responds, one thing to keep in mind
13 is where we are with the CFPB. We'll look bad if we rip
14 Susan in the middle of that. I may have the timeline
15 Garvey put together somewhere at one point somewhere.
16          Do you see that text message?
17     A. I do.
18     Q. The CFPB is referring to the CFPB litigation;
19 is that right?
20     A. That would be the assumption, but that would
21 -- CFPB is the consumer finance protection bureau.
22     Q. And would it look bad for the litigation with
23 CFPB if you were to rip Susan in the middle of that
24 litigation?
25     A. I didn't write these texts, so.

Page 491

Q. I'm asking if that was your perception, at that time?

A. I don't -- no, it wasn't my perception, so I'm not sure where this came from.

Q. In other words, were you planning on having Susan Zaunbrecher fired but for the CFPB litigation?

MR. CIOFFI: Objection. Is that a question or you making an argument?

MR. SABA: Yes. It's a question. Were you planning on having Susan Zaunbrecher fired but for the CFPB litigation?

THE WITNESS: Susan Zaunbrecher is a great attorney. She's still here with us today, so I don't recall the situation whatsoever.

BY MR. SABA:

Q. And the CFPB litigation is still pending, isn't it?

A. Yeah. It's still pending.

Q. So that wouldn't necessarily be inconsistent with this text message exchange, that you cannot let her go or fire her during this CFPB litigation? Is that right?

A. I'm not concerned --

MR. CIOFFI: Objection. Argumentative.

(Exhibit 72 is marked for identification.)

Page 492

BY MR. SABA:

Q. Mr. Carmichael, I've handed you what's been marked as Exhibit Number 72. Can you identify that for me, please?

A. Heading of this document is unanimous written consent officer deployment October 21, 2020.

Q. This document, Exhibit Number 72, is Bates stamp Fifth Third McHugh 001216 through Fifth Third McHugh 001222. Is that right?

A. Appears so.

Q. Have you seen this document before?

A. These would be different documents that would have come out, so I didn't see this as a document, no. I mean, this is multiple documents here that would have been put together.

Q. Can you identify what the multiple documents are?

A. First one is from the office of the secretary. It's a memo from me there from myself to the board members talking about the -- that the succession planning session we're executing on the plan to promote Tim Spence to president, lines of business with regional banking and strategic planning will now report to Tim. So it's a message and communication from myself to the

Page 493

board.

Next one is a news release basically announcing, Fifth Third announces employment of Timothy Spence as president. So that's a news release that goes out on the wire. Page is that.

And then the unanimous consent. That would have to be approved by the board for the employment of president and you can see where the unanimous support of the board input their signatures.

Q. Going back to the first document, the letter from the office of the secretary. Did you prepare this document?

A. This is a document that typically gets written by either a member of the legal team or HR, and I would review it and make any adjustments to it, and it would be from me. It's from me basically, but I don't know if I prepared the first draft of it.

Q. Referring to the second paragraph, it indicates, as Bob Shaffer and I discussed with you at the September board meeting, we believe that Phil McHugh could be at risk with Tim's promotion. Is that correct?

A. That's exactly what it says.

Q. In fact, Phil has decided not to accept the role of head of consumer and business banking, and is leaving the company. Is that correct?

Page 494

A. That's correct.

Q. Didn't you and Bob Shaffer indicate that Phil McHugh was at risk of leaving because you knew you had offered him the position that you would recommend him for the position of president and CEO of the board and that he would be disappointed that he would not receive it?

A. I already answered that question. Absolutely not. I will answer it again. Absolutely not. Just the fact that he told another member and it got back to me that he wouldn't work for Tim Spence. I also know his ego. So at the end of the day, I thought he was at risk and he was at risk. He was the one that left the company in a fit of rage. Had nothing ever to do with him being offered any, because I never offered any, but being put on the emergency successor list, and that's what I did.

That's all evidence -- all opportunities suggest he was never considered for the president. Had nothing to do with that. Once again, I'll remind you, I surprised him on the timing, which he said multiple times, not the action.

Q. Say that again?

A. I surprised him on the time. That's what he said to me on day one. He walked past my offers and

Page 495

said, you surprised me on the timing, I wasn't expecting
this timing.  In other words, he knew Tim was going to
get promoted.  He thought that it would be multiple
years out and he was surprised he was being promoted was
now.  He knew I wasn't going anywhere.  He thought the
timeline, he wasn't expecting that timeline.  That's
what he -- that was what he said to me.

Q.  Was he actually expecting the timeline that
Tim Spence would succeed him --

A.  No.

Q.  -- as president and CEO?

A.  Absolutely not.  I communicated that I was not
in the situation I was in before and I would be staying
on longer, so there was not a need, the board was
probably not going to have to invoke an emergency
successor.  So that was not at all what he was thinking.
What he was thinking was I was going to be around a lot
longer and that that promotion of Tim would be down the
road.  That's what I believe he believed.

Q.  Did he say that to you?

A.  I just told you, that's what I believe he
believed.  He said I surprised him with the timing.

Q.  And I'm asking if he said that to you?

A.  I just said, I surprised him with the timing.
That's what he said.  I believe it's because he already

Page 496

knew I was staying around longer, but he wasn't
expecting me to announce Tim Spence as president this
soon.  Not that that's why he never challenged whether
Tim was going to be the president.  It was the timing he
brought forth to me.

Q.  I'm just clarifying that that's what you
believed he meant; he didn't say those other words to
you, correct?

A.  He said I surprised him on the timing.

Q.  Nothing else in addition that you interpreted,
correct?

A.  That's correct.

MR. SABA:  Let's go off the record.

VIDEOGRAPHER:  Time the 4:17 p.m.  We're going
off the record.

(A recess was taken from 4:17 to 4:33.)

VIDEOGRAPHER:  The time is 4:33, we're back on
the record.

BY MR. SABA:

Q.  Mr. Carmichael, what year did Fifth Third redo
the lobby and atrium downstairs?

A.  That was an ongoing project.  It covered a
couple years, project connect.  Theresa Tanner started
it.  My guess was some time in the 2015-16 timeframe.
Somewhere in there.  It's gone through multiple

Page 497

iterations of remodeling.

Q.  When was that completed?

A.  I don't know.

Q.  Why was that redone?

A.  Because it needed to be refreshed and have a
corporate office -- or a corporate entry, a corporate
lobby.  We didn't really have a corporate lobby, we had
separate buildings, so we wanted to connect the
buildings.  That's why it was called project connect.
To have a nice entryway for our customers and employees.
A more secure environment for entry into our offices
that we could control.

Q.  Who decided the atrium would be named after
you?

A.  I didn't ask who decided that.  I was just
told that's what it was going to be renamed.

Q.  Who told you that?

A.  Bob Shaffer, I believe, told me that was going
to be the case.  He was in charge of facilities.

Q.  Do you know why it was named after you?

A.  That was their decision.  That was the
company's decision, I didn't make that decision.  So
it's not inconsistent.  We named -- when George Shaffer
was retired, we named it the George Shaffer operation
center out there.  George A Shaffer Operational Center.

Page 498

When Kevin Kabat was retiring, we named the operation
center up in Grand Rapids after him, so this was
consistent with prior CEOs stepping down.  You got the
Brian Rowe Building, that was consistent with the prior
CEO.  So I thought they may have felt it was consistent
with prior experiences.

Q.  This -- this occurred several years before you
stepped down though, right?  You were still actively
involved as CEO when the atrium was named after you; is
that right?

A.  The project connect was completed, as I
mentioned before.  The atrium -- when it became the name
atrium was -- was at a different point in time.  So it
was -- it was getting closer.  I don't know the exact
timeframe when it was done.

Q.  Well, you were still here in April 2023, and
it was named after you well before April of 2023.

A.  I don't know the exact timing.  Interesting.

MR. CIOFFI:  Objection.  Counsel, this has no
relevancy -- let me just state my objection.
Counsel, this has no relevancy at all to this case.
You're wasting time.

MR. SABA:  It does.

MR. CIOFFI:  It doesn't.  What is the
relevancy?  It's beyond discovery.

Deposition of Gregory D. Carmichael, Volume II                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 499

1    MR. SABA:  No.  It deals with influence.
2    MR. CIOFFI:  Influence over who?
3    MR. SABA:  Influence over the bank.
4    MR. CIOFFI:  Over the bank?  He didn't make
5    the decision.  What are you -- I mean --
6    BY MR. SABA:
7    Q.   What was required in order to name the atrium
8    after you?
9    A.   I don't know.  I wasn't involved in the
10   process.  As I mentioned before, prior CEOs, you know,
11   had -- had George Shaffer was still here when we
12   named the George Shaffer Operation Center.  Kevin Kabat
13   was still here when we named the Kevin Kabat Operations
14   Center.  Brian Rowe may have been here when we named his
15   center.  This is -- this is typical.  I mean, this
16   was -- nothing unusual was done for me that wasn't done
17   for prior CEOs.
18   Q.   And as you indicated with those prior CEOs,
19   though, it was done in conjunction with their
20   retirement.
21   A.   No, I didn't say -- they were both -- they
22   were both active operating here when those -- when those
23   facilities were named after them.  It was not after they
24   retired.  I don't have all those dates and timeframes.
25   I think that George was there at the ceremony.  He was

Page 500

1    still the CEO.  I remember when we did that.  I was at
2    Kevin's, he was still the CEO when we did that.  So we
3    had two prior CEOs -- three prior CEOs that had
4    operations and facilities named after them prior to them
5    stepping down.
6    Q.   Did that require a board vote to name the
7    atrium after you?
8    A.   I don't know.  I wasn't involved in it.  I
9    didn't do it.  I didn't request it, so I don't know the
10   answer to that question.
11   (Exhibit 73 is marked for identification.)
12   BY MR. SABA:
13   Q.   Mr. Carmichael, I've handed you Exhibit
14   Number 73, which is Bates stamp 0213070 through 0213071.
15   This is a text message exchange between you and
16   Mr. Shaffer.  It begins May 31, 2019, and ends
17   December 15, 2019.  Do you see that?
18   A.   I do.
19   Q.   Turn to the second page for me, please.  Fifth
20   Third McHugh 0213071.  Looking at the entry of June 25,
21   2019, at 1507.  Do you see that?
22   A.   I see that.
23   Q.   It says, call me.  There's not another text
24   message until August 5, 2019, and it's from you and it
25   just says, agreed.  Do you see that?

Page 501

1    A.   I do.
2    Q.   Were there any text messages -- text messages
3    exchanged between you and Mr. Shaffer between June 25 of
4    2019 and August 5, 2019?
5    A.   I have no clue.  This is -- my phone was given
6    to an expert, we paid to have an expert and not a
7    brother-in-law or somebody come in, or son-in-law come
8    in and do something.  We had experts dump my phone, and
9    this is everything that was on my phone.  I gave the
10   experts my phone and this was it.  So if it's not in
11   here, the experts did their job.
12   Q.   Had you deleted any text messages between
13   yourself and Mr. Shaffer in the time period of June 25,
14   2019 through August 5, 2019?
15   A.   I would -- I would not delete text messages
16   except for normal text of housekeeping well before this
17   litigation.  So nothing outside the ordinary, nothing I
18   recall.
19   Q.   The next text message after your August 5,
20   2019, text message is a text message from Mr. Shaffer on
21   October 11, 2019.  Do you see that?
22   A.   I do.
23   Q.   Did you and Mr. Shaffer exchange any text
24   messages between August 5, 2019, and October 11, 2019?
25   A.   I don't recall deleting any texts.  Experts

Page 502

1    had access to my phone.  So there's nothing here, then I
2    have nothing here.  I don't know why there's nothing
3    here.  I'm not sure what we transpired in that period of
4    time, I don't have that kind of recall to go back four
5    years ago and remember a text.  So if it's not here,
6    it's not here.  We had an expert that we paid a lot of
7    money to, to dump our phones.  And at the end of the day
8    prior to any litigation, I keep normal -- I do normal
9    housekeeping, as anyone would, on a phone.  So I don't
10   know why there's a gap here in time.
11   Q.   Did you delete any of the text chains between
12   yourself and Mr. Shaffer?
13   A.   I just told you.
14   MR. CIOFFI:  Objection.  Asked and answered.
15   THE WITNESS:  I don't recall any deletion
16   that I would have made outside of any normal
17   housekeeping.  That's my answer.
18   MR. CIOFFI:  Counsel, this is totally
19   irrelevant to the litigation.  This is well before
20   any litigation.  Well before any document hold.
21   He's entitled to delete whatever he wants to before
22   then.
23   MR. SABA:  Based on Mr. Cioffi's objection,
24   are you representing that you did delete text
25   messages between --

Deposition of Gregory D. Carmichael, Volume II                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 503

1   THE WITNESS:  I've answered your question five
2   times.
3   MR. CIOFFI:  I'm saying this line of question
4   is irrelevant.  He's already answered it.
5   THE WITNESS:  I've answered it multiple times
6   for you.
7   BY MR. SABA:
8   Q.   This text message chain, as you can tell, is
9   from Mr. Shaffer's phone because it refers to you as
10  Greg Carmichael, and refers to Mr. Shaffer as "me."  Do
11  you see that?
12  A.   Okay.
13  Q.   Did you save any of the text chains between
14  yourself and Mr. Shaffer?
15  A.   I just answered your question multiple times.
16  I'm not going to answer it again.  I only do normal
17  housekeeping, as I would under any scenario.  I didn't
18  go back and delete anything intentionally.  This is what
19  my phone had on it when it was dumped.  All right.  I do
20  normal housekeeping.  I don't recall deleting anything
21  intentionally, purposefully.  I don't get rid of text
22  messages unless it's for housekeeping purposes, space
23  restrictions.  I don't recall anything out of the
24  ordinary I would have did here.
25  Q.   Mr. Carmichael, that's all the questions I

Page 504

1   have at this time.  We will continue in progress based
2   upon outstanding discovery issues.
3   MR. CIOFFI:  Again, counsel, we don't
4   recognize you have the right to continue, and I
5   represent that to the court.
6   I do have some questions.
7
8           EXAMINATION
9   BY MR. CIOFFI:
10  Q.   Mr. Carmichael, would you take out of the
11  stack of exhibits Exhibit Number 56.
12  A.   I have it, Counsel.
13  Q.   Would you read into the record the e-mail
14  that's displayed on Exhibit 56, and indicate who it's
15  from and to whom?
16  A.   From the beginning, the top of this?
17  Q.   Yeah.
18  A.   The first one's from Bob Shaffer to his
19  assistant Paula Hennard.  It Just says, please print,
20  thanks.  Underneath that's one from Guy -- from Guy, I'm
21  sorry, Beaudin to Bob Shaffer.  It says, hi, Bob.
22  Here's the updated report.  I'll be sharing it in a
23  debrief with Tim tomorrow.  Nothing new or surprising in
24  the peer feedback overall.  There was strong support for
25  him as being an exceptional talent but with some good

Page 505

1   advice on how to round out his leadership.  Let me --
2   Q.   That's fine.  Let me ask you this question.
3   The peer feedback involved the vetting of peers within
4   the enterprise group concerning the vetting process of
5   Tim to be president; isn't that correct?
6   A.   Correct.
7   MR. SABA:  Objection.
8   THE WITNESS:  That's correct.
9   BY MR. CIOFFI:
10  Q.   Was Phil McHugh one of those peers who was
11  vetted?
12  A.   Yes, he was.
13  Q.   Would you have expected if Phil McHugh had any
14  negative comments or anything other than strong support
15  for Tim Spence, would you have expected that to be
16  communicated in this e-mail from Guy Beaudin?
17  A.   Absolutely.
18  MR. SABA:  Objection.  Leading.
19  BY MR. CIOFFI:
20  Q.   Has anyone ever told you Phil McHugh said
21  anything of the vetting process that Tim Spence should
22  not be elevated to president?
23  A.   No.
24  Q.   Did anyone at RHR tell you that Phil McHugh or
25  any other peer who was vetted expressed the view that

Page 506

1   they should be president instead of Tim Spence?
2   A.   No.
3   Q.   Did anyone at RHR say to you that any peer who
4   was vetted told RHR that they should be vetted instead
5   of Tim Spence?
6   A.   No.
7   Q.   Did anyone at RHR tell you that any peer
8   communicated anything other than strong support for Tim
9   Spence to be president?
10  A.   No.
11  Q.   I want to direct your attention now to
12  Exhibit 59.  Would you look at that, please?
13  A.   59?
14  Q.   59.
15  A.   These are out of order for some reason.  57.
16  Q.   Take your time.
17  A.   I'm trying.  Do I not maybe not have it for
18  some reason?  Looks like I have everything but 59.
19  I have it.
20  Q.   So Exhibit 59.  I believe you testified
21  earlier that this is a next to final draft of the board
22  summary that was sent to you and Bob Shaffer for
23  comment; is that correct?
24  A.   I believe this is the draft that we were
25  referring to, yes.

Deposition of Gregory D. Carmichael, Volume II                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 507

1  Q.  And directing your attention to 0983, which is
2  page 6 of the document.  Do you see that?
3  A.  I have that.
4  Q.  Do you recall your earlier testimony about
5  your recommendation as to RHR, that a couple of these
6  characteristics be downgraded, like great communicator?
7  A.  I do.
8  Q.  You want a great communicator to be what, in
9  terms of communication?
10  A.  Well, I've thought Tim had opportunities to
11  continue to improve in that area and help bring people
12  along with his thinking and be patient, and make sure
13  that his communications were understood because once
14  again, he talks quickly at a high level, he gets to
15  the point quickly.  So I thought there was room for
16  opportunity here to say this better.  Still a strength,
17  but there was a opportunity to say it better.
18  Q.  Your recommendation was that "great
19  communicator" be changed to "strong communicator."  Is
20  that correct?
21  A.  Correct.
22  Q.  But page 6, this is the feedback from peers,
23  isn't that right?
24  A.  It is.
25  Q.  Read the first bullet, please.

Page 508

1  A.  Strengths.  Is a great communicator with
2  charisma.
3  Q.  So is it fair to say that the peers, including
4  Phil McHugh, had a higher opinion of Tim as a
5  communicator than you did?
6  MR. SABA:  Objection.
7  THE WITNESS:  Yes.
8  BY MR. CIOFFI:
9  Q.  Read the next bullet point?
10  A.  He's very innovative.
11  Q.  This is the feedback from the peers, including
12  Phil McHugh; is that right?
13  A.  Phil was included in the group, so yes.
14  Q.  What's the next bullet say?
15  A.  He's a good colleague and a great leader.
16  Q.  Again, this is feedback from Phil McHugh and
17  the other peers; is that correct?
18  A.  Yes, it is.
19  MR. SABA:  Objection.
20  BY MR. CIOFFI:
21  Q.  Read the next bullet, please.
22  A.  He's bright and insightful, and is a great
23  thinker and problem solver.
24  Q.  Is this feedback from the peers, including
25  Phil Hughes?

Page 509

1  MR. SABA:  Objection.
2  THE WITNESS:  It is.
3  BY MR. CIOFFI:
4  Q.  Read the next bullet, please.
5  A.  Has had great impact from a strategy
6  perspective.
7  Q.  Is that feedback from the peers, including
8  Phil McHugh?
9  MR. SABA:  Objection.
10  THE WITNESS:  It is.
11  BY MR. CIOFFI:
12  Q.  Now I want to direct your attention to
13  Exhibit 35.
14  A.  Okay.
15  Q.  Please turn to page 0500.
16  A.  0500.
17  Q.  Yes.
18  A.  I am there.
19  Q.  Opposing counsel asked you a lot of questions
20  about the employee viewpoints survey scores.  Do you
21  recall that line of questioning?
22  A.  I do.
23  Q.  And in that line of questioning, he boasted
24  that and asked you if you knew that Phil McHugh had the
25  highest scores of anyone in the bank.  Do you remember

Page 510

1  that?
2  A.  I do.
3  Q.  Directing your attention to the fourth
4  paragraph on this document, do you see the sentence,
5  consumer was 74 percent, up 5 percent from 2018?
6  A.  Yes.
7  Q.  This data that's being cited on page 0500 is
8  data from 2019; isn't that correct?
9  A.  Yes.
10  Q.  In 2019, who was the head of consumer?
11  A.  Tim Spence.
12  Q.  This 2018, who was the head of consumer?
13  A.  Phil McHugh.
14  Q.  Are you aware of any other employee viewpoint
15  survey score that measures the same line of business
16  operated and immediately succeeding years by Phil McHugh
17  and then Tim Spence?
18  A.  No.
19  Q.  Would it be fair to say that because this
20  particular data point measures immediately succeeding
21  years of a line of business that was operated by
22  McHugh and then by Spence, that it's the only apples to
23  apples comparison in the data center?
24  MR. SABA:  Objection.  Leading.
25  THE WITNESS:  Can you restate the question?

Page 511

1    MR. CIOFFI: Cross-examination.
2    MR. SABA: No, it's not cross-examination.
3  He's your witness.
4    MR. CIOFFI: You called him to the deposition.
5    MR. SABA: You called him as if I'm cross.
6  Anything you do is direct. Read the rules of
7  evidence. You cannot ask leading questions. You
8  have to know that by now. Please.
9    MR. CIOFFI: Counsel --
10   MR. SABA: Objection. Leading. Go ahead.
11   THE WITNESS: Mike, please repeat the
12  question.
13 BY MR. CIOFFI:
14  Q.  Are you aware of any other employee viewpoint
15 survey that measures a line of business operated first
16 by McHugh then by Spence other than what's appears on
17 page 500 of exhibit 35?
18   MR. SABA: Objection.
19   THE WITNESS: I'm not.
20 BY MR. CIOFFI:
21  Q.  How would you characterize this data point?
22  A.  Consumer scores went up 5 percent under Tim
23 Spence than they were with Phil McHugh. That's how I
24 would read this.
25  Q.  Is there any other data that you're aware of,

Page 512

1  of a line of business operated in one year by McHugh and
2  in the immediate successive year, succeeding year, by
3  Tim Spence?
4    A.  I can't recall any other ones offhand.
5    Q.  So in that only comparison of succeeding
6  years, who had the higher score --
7    A.  Well, the score went up.
8    Q.  -- Tim Spence or Phil McHugh?
9    A.  What the data says here, Counsel. The score
10 went up in 2019. Tim was the head of the consumer bank,
11 and it was up higher than the score in 2018, where Phil
12 McHugh was the head of consumer bank. That's what the
13 data says.
14   Q.  Directing your attention now to Exhibit
15 Number 2. Would you look at that, please?
16   A.  I'm there.
17   Q.  Directing your attention to page 21.
18   A.  Okay.
19   Q.  Would you read paragraph 9 into the record?
20   A.  At that time, plaintiff told each executive
21 separately that he would not accept the position of
22 president of one of Fifth Third's largest regions
23 because it was his intention to work only for the next
24 five years before he would enter retirement. He stated
25 he did not feel it would be fair to Fifth Third Bank

Page 513

1  because success in that position would take longer than
2  five years, and the need for continuity warranted
3  the installation of someone who would remain with Fifth
4  Third Bank for longer than five years.
5    Q.  I believe you testified in 2018, you
6  offered to Phil McHugh the presidency of the flagship
7  regional office, that is in Cincinnati, to be the
8  president of that particular region; is that correct?
9      MR. SABA: Objection, leading.
10     THE WITNESS: Yes, that's correct. At the
11 time I went back and verified this, and I was
12 pretty sure it was. I wanted just to verify that
13 that position was on enterprise, reporting --
14 reporting directly in to me as the CEO of the
15 Cincinnati, our flagship market. So it was an
16 opportunity for Phil McHugh to enter, and elevate
17 to the enterprise in the organization. He was not
18 in enterprise at the time I offered him that. And
19 he did not do it.
20 BY MR. CIOFFI:
21  Q.  Opposing counsel asked you, isn't it true
22 that that was a demotion? Do you remember that
23 question?
24   A.  I do.
25   Q.  Was it a demotion?

Page 514

1    A.  No money was taken away from Phil McHugh at
2  the time nor would there have been money taken away. It
3  was actually a position on enterprise, so an enterprise
4  position would not be viewed as a demotion.
5    Q.  Would it be viewed as a promotion?
6    A.  Could be, depending on where they're at in the
7  organization. If they're not on enterprise and they're
8  entering enterprise, the organization views enterprise
9  as the top leadership in the company.
10   Q.  Was Phil McHugh on enterprise, at that time?
11   A.  Mike, I got to -- Counsel, it got to -- I'll
12 be honest. I don't fully recall whether he was yet or
13 not, but that position definitely was. I don't recall
14 whether he was or not.
15   Q.  Did the Cincinnati presidency report to the
16 regional president?
17   A.  Not at that time it didn't.
18   Q.  In terms of salary and benefits, when you made
19 that offer, did it include salary and benefits remaining
20 the same?
21   A.  There would be no change in salary and
22 benefits.
23   Q.  Mr. Carmichael, do you remember a line of
24 questions concerning the recruitment of talent into
25 Fifth Third Bank?

Deposition of Gregory D. Carmichael, Volume II                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 515

1   A. I do.

2   Q. Do you remember opposing counsel asking you

3   about a number of individuals who were recruited into

4   Fifth Third Bank and hired by Fifth Third Bank?

5   A. I do.

6   Q. Do you remember that line of questioning being

7   preceded by a note being passed from Phil McHugh to

8   counsel?

9   A. Yes.

10  Q. The first individual that opposing counsel

11  asked you about was Kris Garrett; do you remember that

12  line of questioning?

13  A. I do.

14  Q. Do you remember the question of, do you -- do

15  you know Mr. Carmichael, and I'm quoting counsel,

16  opposing counsel. Do you know that Kris Garrett was

17  recruited by Phil McHugh?

18  A. I remember that.

19  Q. Do you remember that?

20  A. I do.

21  Q. Do you remember your answer?

22  A. Yeah, Mike Michaels recruited her.

23  Q. Since that line of questioning yesterday, have

24  you been able to investigate who, in fact, recruited

25  Kris Garrett to Fifth Third Bank? Was it Phil McHugh or

Page 516

1   Mike Michaels?

2   A. I absolutely have.

3   Q. What did do you to investigate --

4   A. HR investigated that. HR investigated that.

5   They talked directly, directly with Kris Garrett and

6   asked her who recruited her to Fifth Third. She said

7   Mike Michael. Mike Michael brought her to Fifth Third,

8   Mike Michael organized her coming in. Recruiters tried

9   to contact her earlier. She wouldn't respond. Mike

10  reached out to her, contacted her. She came into Fifth

11  Third. She interviewed with multiple people. She's not

12  sure but she believes Phil stopped by the office for a

13  flyby to say hello. Mike Michael is who recruited her.

14      MR. SABA: Objection. Go ahead.

15      MR. CIOFFI: What's the objection?

16      MR. SABA: Objection is it's all hearsay.

17      MR. CIOFFI: Counsel, it's a deposition.

18      MR. SABA: You understand what hearsay is,

19      right, Mike?

20  BY MR. CIOFFI:

21  Q. The next person you were asked about is Eric

22  Housman. Do you remember that?

23  A. Yes, I do remember.

24  Q. Do you remember that question?

25  A. I do.

Page 517

1   Q. And I'm now quoting opposing counsel that,

2   Mr. Carmichael, did you know that Phil McHugh recruited

3   Eric Housman into Fifth Third Bank?

4   A. I remember that.

5   Q. What was your answer?

6   A. I didn't believe so. I thought he was brought

7   in by the president. I wasn't sure if it was Tom Heiks

8   in that market. He joined us from BB&T. Joined us in

9   2010, and the person who hired him was Bob James. I had

10  HR reach out to Eric directly, asked him who brought him

11  into the bank. It was Bob James that recruited him.

12  Bob James had dinner with him. Bob James convinced him

13  to come to the bank. He doesn't recall ever meeting

14  with Phil McHugh.

15      MR. SABA: Objection. Move to strike.

16  BY MR. CIOFFI:

17  Q. And you learned that information --

18  A. HR reached out directly to Eric Housman,

19  because I was pretty sure Phil did not recruit him.

20  Phil just had taken over the I Head in 2010. That was

21  in the market disposition report to the president in the

22  market. It would have been very unusual for Phil to be

23  engaged at that point in the market for that type of

24  talent, and I didn't believe he was. And I confirmed

25  that with the conversation -- with the individual who

Page 518

1   we're talking about, Eric Housman.

2   Q. The last person opposing counsel asked you

3   about was Cary Putrino. Do you remember that?

4   A. I do remember that.

5   Q. Do you remember the question, Mr. Carmichael,

6   did you know that Phil McHugh recruited Cary Putrino

7   into Fifth Third Bank? Do you remember that question?

8   A. I absolutely do.

9   Q. Do you remember your answer? What was your

10  answer?

11  A. I wasn't sure who recruited him, but I didn't

12  think it was Phil McHugh. I wasn't aware of it being

13  Phil McHugh.

14  Q. Did you investigate who, in fact, actually

15  recruited Cary Putrino into Fifth Third Bank?

16  A. Absolutely. Cary Putrino said he was

17  recruited by Karen Dee and Brian Lamb, who was the

18  president of the north region of Florida. Karen Dee had

19  regional responsibilities overall. And Dave Call.

20  Those were the three individuals he said recruited him

21  into the bank.

22      MR. SABA: Objection. Move to strike.

23      THE WITNESS: As I said, I didn't recall any

24      executive that Tim -- that Phil McHugh hired on at

25      the management committee, and those three

Case: 1:21-cv-00238-MRB Doc #: 77-16 Filed: 06/27/25 Page: 67 of 118 PAGEID #: 3895

Deposition of Gregory D. Carmichael, Volume II                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 519

1  individuals were not hired by Phil McHugh. From
2  their own words, they will testify that they were
3  not hired by Phil McHugh.
4       MR. SABA:  Objection.  Move to strike.
5  BY MR. CIOFFI:
6       Q.  What conclusions, if any, did you draw after
7  learning that Phil McHugh misrepresented the fact that
8  he had hired or recruited these individuals into Fifth
9  Third Bank?
10      MR. SABA:  Objection.
11      THE WITNESS:  I think it's consistent with the
12  fact he will make up any information he needs to
13  support his position, even though it's not factual
14  and hopefully we don't find that out.  But I knew
15  he didn't hire those people.
16      MR. SABA:  Objection.  Move to strike.
17  BY MR. CIOFFI:
18      Q.  During the course of Phil McHugh's career at
19  Fifth Third Bank, were there other instances of Phil
20  McHugh taking credit for things he didn't do?
21      A.  Well, there was examples that I could point
22  out.  But Phil would take credit where -- where not
23  necessarily it was all his credit.  The example was the
24  PPP program.  That was a train wreck.  When we turned it
25  on, we had all kinds of substantial issues.  Customers

Page 520

1  were very upset.  We were behind the curve.  We weren't
2  punching our weight.  We had a lot of issues.
3       And then once it, you know, was resolved,
4  bringing in technology people with a lot of work and a
5  lot of lifting by a lot of people, Phil was out there
6  promoting e-mails out that this was resolved and what a
7  great -- looking for accolades.  So yeah, I mean, you
8  would se some of that.
9       MR. CIOFFI:  I have no further questions.
10      MR. SABA:  Give us one minute.
11      VIDEOGRAPHER:  Time the 5:04, we're going off
12  the record.
13      (A recess was taken from 5:04 to 5:08.)
14      VIDEOGRAPHER:  The time is 5:08 p.m., we are
15  back on the record.
16
17         FURTHER EXAMINATION
18  BY MR. SABA:
19      Q.  Mr. Carmichael, Mr. Cioffi was asking you
20  about the allegations in the counterclaim and he had you
21  read paragraph 9; do you recall that?
22      A.  I do.
23      Q.  And you were talking about the position of
24  being the president of the Cincinnati region back in
25  2018; do you recall that?

Page 521

1       A.  President CEO, yes.
2       Q.  Do you know who was the president of the
3  Cincinnati region back in 2018?
4       A.  We were transitioning.  I think Mike Michael
5  was going to be the chairman.  Mike was the president
6  prior to that.  We ended up making Tim Elsbrock the
7  president at some point.
8       Q.  And actually, Tim Elsbrock was the president
9  of the Cincinnati region at the time that you came to
10  Phil and wanted him to take over the Cincinnati region;
11  isn't that right?
12      A.  Might have been.  Like I said, I was between
13  Mike Michael and Tim Elsbrock.  There was a transition
14  going on there.
15      Q.  And Tim Elsbrock has never been on the
16  enterprise committee, has he?
17      A.  I don't think Tim was -- we put Tim on.  We
18  had like -- Mike was the representative of the market
19  for the region for many years in Cincinnati.  So I don't
20  believe Tim was on that.
21      Q.  Tim wasn't on there.  So when you were
22  offering that position to Phil McHugh, it was not an
23  enterprise committee position?
24      A.  Yeah, it was an enterprise committee.  We were
25  going to make it -- the reason that Tim didn't hold an

Page 522

1  enterprise was because I didn't feel Tim should be on
2  the enterprise because Mike was really the head of the
3  market, and he was the head of market.  I didn't believe
4  Tim had the qualifications to be at enterprise, but I
5  wanted to elevate that position, and it was going to be
6  back on the enterprise.
7       Q.  But it wasn't at that time, correct?
8       A.  It wasn't at that time.  It was prior, but
9  because of the individual holding that position and
10  that we still had Mike Michael as the executive chair.
11  That's why it wasn't.
12      Q.  And Phil McHugh, you put him on the enterprise
13  committee beginning back in 2015; isn't that right?
14      A.  I don't have the exact dates when he was on
15  there.  Like I said, I think he might have been on
16  there, at that time.  We elevated these positions at
17  different points.  So I didn't dispute that he was on
18  enterprise.
19      Q.  You indicated that Phil McHugh -- you were
20  bringing up the situation where he would take credit for
21  things that he didn't do; is that right?
22      A.  I gave one example where that situation
23  existed, based on what counsel asked me if I had an
24  example.  I gave one.
25      Q.  You never indicated that in any of the reviews

Case: 1:21-cv-00238-MRB Doc #: 77-16 Filed: 06/27/25 Page: 68 of 118 PAGEID #: 3896

Deposition of Gregory D. Carmichael, Volume II         Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 523

1  that you did of him, did you?

2       A. I gave one example. He's not the only

3  **executive that might take credit for something that they**

4  **didn't do. But I didn't feel like it was necessary to**

5  **point that out because I'm -- because they're egregious**

6  **situations.**

7       Q. In fact, you indicated the exact opposite;

8  isn't that right? You indicated Phil approaches

9  everything with the highest integrity; isn't that right?

10      A. If I wrote that in his review, I believe that.

11 **That has nothing to do with taking -- with promoting**

12 **himself for an outcome, that was probably over his skis**

13 **a little bit and didn't fully deserve.**

14      Q. He -- you indicated he operates in very

15 collaborative manner with his peers. He partners well

16 with risk and compliance to ensure decisions are

17 consistent with our risk appetite. Isn't that right?

18      MR. CIOFFI: Objection.

19 BY MR. SABA:

20      Q. Isn't that right?

21      A. I said yes.

22      Q. You also indicated Phil lives our leadership

23 capabilities and core values; isn't that right?

24      A. I can repeat it all again. I said yes. It's

25 **in the document.**

Page 524

1       Q. Nothing about, he takes credit for things that

2  he doesn't deserve; is that right?

3       MR. CIOFFI: Objection. Two different things.

4       Apples and oranges.

5       THE WITNESS: It's apples oranges. Two

6       different things.

7  BY MR. SABA:

8       Q. You're adopting Mr. Cioffi's answer, is that

9  right?

10      MR. CIOFFI: It's the truth.

11 BY MR. SABA:

12      Q. Nowhere have you ever indicated in writing

13 that he ever took credit for anything he didn't do;

14 isn't that right?

15      A. I didn't -- I didn't -- I didn't articulate

16 **that in any of his reviews because I didn't think it was**

17 **that egregious of a situation. But it does happen. I**

18 **was asked for an example.**

19      Q. And you agree everything you've indicated is

20 completely the opposite about Phil, correct?

21      MR. CIOFFI: Objection. He's already answered

22      that question.

23 BY MR. SABA:

24      Q. Did you indicate to Phil McHugh that no one

25 was to be hired without Phil's approval?

Page 525

1       A. Ask me that question again?

2       Q. Did you indicate to Phil McHugh that no one

3  was to be hired for IA leadership without Phil's

4  approval?

5       A. I never recall having that conversation.

6  **Ever.**

7       Q. In your -- you referenced your investigation;

8  is that right? With respect to the three employees that

9  were identified yesterday that were recruited by Phil

10 McHugh?

11      A. They weren't recruited by Phil McHugh. I made

12 **that clear. They made it clear they weren't recruited**

13 **by Phil McHugh.**

14      Q. That's based on your --

15      A. No, that's based on what they said. When

16 **asked who recruited you.**

17      Q. -- your recent investigation. Did you go back

18 and review any of the documentation regarding who

19 performed the interviews of those three?

20      A. We asked who were the individuals who

21 **recruited them to the company. Only thing in the system**

22 **is the hiring manager. The hiring manager isn't the**

23 **person necessarily who recruited them. We asked**

24 **those individuals directly, because I knew they weren't**

25 **hired by Phil, who recruited you to the company? The**

Page 526

1  **whole issue was, who brought you into the company? Who**

2  **did you bring into the company? He did not bring those**

3  **individuals into the company. He might have been the**

4  **person over at IA at the time and signed off on it, but**

5  **he was not the person the recruited them into the**

6  **company. They all three made that very clear. It was**

7  **not Phil McHugh.**

8       Q. These three employees, they're all still

9  employed with Fifth Third? Is that right?

10      A. That would be correct.

11      Q. Okay. When you say "we" asked them, who's we?

12      A. I didn't. HR reached out to them and asked

13 **them directly. That's who did it. I thought that was**

14 **clear already.**

15      Q. Did you speak to them?

16      A. I just told you, HR reached out to them. I

17 **didn't say I did.**

18      Q. Okay. So you didn't speak to them directly;

19 is that right?

20      A. I just said HR reached out to them.

21      Q. So who from HR did you speak to?

22      A. Head of HR.

23      Q. Who's the head of HR?

24      A. I think you know who the head of HR is. It's

25 **Nancy Pinckney.**

Page 527

Q. Okay. So you spoke to Nancy Pinckney who you said spoke to those people, and then she spoke back to you and that's where you're getting this daisy chain of information. Is that right?

A. Counsel, I gave you my answer. I told you how the information came about. I knew I want wasn't factual. We reached out and we asked them directly. That was their response.

Q. Yeah, it's not -- you didn't speak to them, did you?

A. I just told you how it happened.

Q. That's right. You did not speak to them. So "we" didn't speak to them, did we? Nancy Pinckney spoke to them, you did not, correct?

A. I gave you my answer.

Q. Answer the question.

MR. CIOFFI: He answered the question, Counsel.

MR. SABA: Answer the question.

MR. CIOFFI: It doesn't change the truth.

THE WITNESS: You keep the same question asking over and over, thinking I'm going to give you a different answer.

MR. SABA: No, no. I want you to give the correct answer, which is, you didn't speak to them,

Page 528

did you?

MR. CIOFFI: He answered that. He didn't.

THE WITNESS: I gave you the answer.

BY MR. SABA:

Q. And you didn't review any documentation, did you, about when these people came in, did you?

A. I didn't need to. I asked the head of HR to reach out to them and ask them directly, because I knew Phil was not telling the true.

Q. What documentation did you review? None, isn't that right?

MR. CIOFFI: Counsel, you're being argumentive. He answered the question of how he learned this information. We can reduce it by deposing them or affidavits.

BY MR. SABA:

Q. What information did Nancy Pinckney review? Did she review any documents?

A. I told you how the information came about multiple time. I'm not going to keep repeating myself. You keep asking the same question over and over again.

Q. I asked if did Nancy Pinckney reviewed any documents?

A. I gave you -- ask -- I suggest you ask Nancy Pinckney.

Page 529

Q. I'm asking you.

A. I don't know.

Q. You're the one who did the investigation. You led your big investigation. We're trying to find out what you did?

MR. CIOFFI: He told you. He answered the question. Now you want to argue with him.

THE WITNESS: Yes, he does. That's fine.

BY MR. SABA:

Q. Just answer the question, Mr. Carmichael. I want to hear about the investigation.

A. I asked HR to reach out to them. That's all I did. Okay. You can characterize that anyway you want. HR reached out to them. You don't like the outcome because your client is lying. All right. That's the facts.

Q. You don't have any firsthand information. You're accusing --

A. I would suggest you --

(Massive crosstalk)

Q. Referring you back to Exhibit 59. And specifically to stakeholder feedback of the peers. That's page 000983.

You don't know which peer this specific information came from, do you?

Page 530

A. It's a summary. It says right there at the bottom. Board summary.

Q. Board summary. But you can't identify which peer said what about Mr. Spence, can you?

A. This is not my report, Counsel. This is an independent RHR report, a summary, all right? So you can ask these questions all day. I don't know who put what on this page.

Q. So you can't say if any of these strengths were indicated by Mr. McHugh, can you?

A. It's a summary of the peer feedback. That's what this is, if you can understand that.

Q. Mr. Cioffi tried to ask you that this came from Mr. McHugh. You can't say --

A. I don't believe that's correct counsel.

Q. You don't know what Mr. McHugh said in response to the interview, do you?

MR. CIOFFI: Objection. The record will speak for itself. That wasn't my question. The question was --

MR. SABA: Mr. Carmichael --

MR. CIOFFI: No. Counsel, you can't miss -- always mischaracterize --

MR. SABA: I'm asking a question.

MR. CIOFFI: The record will speak for itself.

Deposition of Gregory D. Carmichael, Volume II                    Philip R. McHugh v. Fifth Third Bancorp, et al.

Page 531

1    MR. SABA:  Right.
2  BY MR. SABA:
3    Q.  So, Mr. Carmichael, you can't say what
4  Mr. McHugh said about Mr. Spence during his interview
5  with the representative from RHR, can you?
6    A.  I don't recall saying Mr. McHugh said
7  anything.  This is a summation of peer feedback by an
8  independent expert.  I never said anything that Phil
9  said anything.  So keep trying to mischaracterize
10  testimony all you want, Counsel, I know what you're
11  trying to do.  That's not what was said.
12    Q.  I'm glad you could clarify that.
13    A.  I'm glad I could help.
14    Q.  Oh, no, I appreciate your help.  You're doing
15  much better.
16    A.  I'll send you a bill later.
17    Q.  You're doing a fine job.
18    MR. CIOFFI was asking you about the employee
19  engagement scores for Mr. Spence; isn't that right?
20    A.  That's correct.
21    Q.  Do you know what -- they list the separate
22  scores for the various divisions that Mr. Spence was
23  responsible for in 2019.  Do you know what his
24  individual score was?
25    A.  I don't have that in front of me.

Page 532

1    Q.  Did you have that at any time?
2    A.  I don't recall having that in front of me.
3    MR. CIOFFI:  Counsel, anymore questions?
4    MR. SABA:  One second.  That's all I have for
5  now.  We will continue in progress.
6    MR. CIOFFI:  I have a couple questions.
7    (Exhibit 74 is marked for identification.)
8    (Exhibit 75 is marked for identification.)
9
10    FURTHER EXAMINATION
11  BY MR. CIOFFI:
12    Q.  Mr. Carmichael, I'm directing your attention
13  to what's been marked as Exhibit 74.  What is that?
14    A.  United States District Court Southern District
15  of Ohio Western Division.  It's a notice of deposition
16  of Gregory D Carmichael.
17    Q.  What date is that deposition for; do you see
18  it on the third line?
19    A.  On Tuesday, September 26th at 9:30 at the
20  Fifth Third Center.
21    Q.  May I direct your attention to Exhibit 75; do
22  you see that?
23    A.  I do.
24    Q.  What date is that for?
25    A.  On Wednesday, September 27, 2023.

Page 533

1    Q.  And read both Exhibits 74 and 75?
2    A.  Please take notice by pursuant to Rule 30(b)1
3  of the Federal Rules of Civil Procedure, plaintiff Phil
4  R. McHugh, plaintiff by and through counsel will take
5  the videotaped deposition of Gregory D. Carmichael on
6  Tuesday, September 26, 2023 beginning at 9:30 a.m. at
7  the Fifth Third Center, 511 Walnut Street, Cincinnati,
8  Ohio 45202.  Said deposition will be taken in the
9  presence of a notary public or some officer authorized
10  by law to take depositions.  The deposition will be
11  stenographically and video recorded, and shall continue
12  day-to-day until completed.  Plaintiff is taking said
13  deposition according to the Federal Rules of Civil
14  Procedure and said deposition shall be used for any
15  purpose contemplated by the Federal Rules of civil
16  procedure.  Plaintiff reserves the right to conduct such
17  further deposition in discovery from Gregory D.
18  Carmichael as may arise at a later date.
19    Q.  And looking at Exhibit 75.  Is it identical
20  except for the date?
21    A.  It is.
22    Q.  Is it written anywhere in Exhibit 74 or 75
23  that your deposition is being taken as if on
24  cross-examination?
25    MR. SABA:  Objection.

 1             THE WITNESS:  It does not.

 2        MR. CIOFFI:  No further questions.

 3        MR. SABA:  No further questions.  Continued in

 4    progress.

 5

 6

 7

 8                          _____

                           Gregory Carmichael
 9

10                          _____

                           Date
11

12                  - - -

13

14          DEPOSITION ADJOURNED AT 5:25 P.M.

15                  - - -

16

17

18

19

20

21

22

23

24

25

Deposition of Gregory D. Carmichael, Volume II                    Philip R. McHugh v. Fifth Third Bancorp, et al.

```
 1                    C E R T I F I C A T E

 2

    STATE OF OHIO          :
 3                         :            SS
    COUNTY OF HAMILTON      :
 4

 5          I, Sydney Jackson, the undersigned, a duly

 6   qualified and commissioned notary public within and for

 7   the State of Ohio, do hereby certify that I recorded in

 8   stenotype and thereafter transcribed the within pages,

 9   and that the foregoing transcript of proceedings is a

10   true, complete, and accurate transcript of my said

11   stenotype notes to the best of my ability.

12          IN WITNESS WHEREOF, I hereunto set my hand and

13   official seal of office at Cincinnati, Ohio, this 11th

14   day of October, 2023.

15

16

17

18                          _____
    My Commission expires      S/Sydney Jackson
19   February 17, 2026          Notary Public - State of Ohio

20

21

22

23

24

25
```

1  1 DEPOSITION ERRATA SHEET

2  Date Taken:  September 27, 2023

3  Case Caption:  PHILIP MCHUGH

4  vs. FIFTH THIRD BANCORP, et al.

5  DECLARATION UNDER PENALTY OF PERJURY

6  I declare under penalty of perjury

7  that I have read the entire transcript of

8  my deposition taken in the captioned matter

9  or the same has been read to me, and

10 the same is true and accurate, save and

11 except for changes and/or corrections, if

12 any, as indicated by me on the DEPOSITION

13 ERRATA SHEET hereof, with the understanding

14 that I offer these changes as if still under

15 oath.

16 Signed on the _____ day of

17 _____, 20___.

18 _____

19 Gregory Carmichael

20

21

22

23

24

25

Deposition of Gregory D. Carmichael, Volume II                    Philip R. McHugh v. Fifth Third Bancorp, et al.

```
 1    2 DEPOSITION ERRATA SHEET

 2    Page No._____Line No._____Change to:_____

 3    _____

 4    Reason for change:_____

 5    Page No._____Line No._____Change to:_____

 6    _____

 7    Reason for change:_____

 8    Page No._____Line No._____Change to:_____

 9    _____

10    Reason for change:_____

11    Page No._____Line No._____Change to:_____

12    _____

13    Reason for change:_____

14    Page No._____Line No._____Change to:_____

15    _____

16    Reason for change:_____

17    Page No._____Line No._____Change to:_____

18    _____

19    Reason for change:_____

20    Page No._____Line No._____Change to:_____

21    _____

22    Reason for change:_____

23    SIGNATURE:_____DATE:_____

24    Gregory Carmichael

25
```

 1 3 DEPOSITION ERRATA SHEET

 2 Page No._____Line No._____Change to:_____

 3 _____

 4 Reason for change:_____

 5 Page No._____Line No._____Change to:_____

 6 _____

 7 Reason for change:_____

 8 Page No._____Line No._____Change to:_____

 9 _____

10 Reason for change:_____

11 Page No._____Line No._____Change to:_____

12 _____

13 Reason for change:_____

14 Page No._____Line No._____Change to:_____

15 _____

16 Reason for change:_____

17 Page No._____Line No._____Change to:_____

18 _____

19 Reason for change:_____

20 Page No._____Line No._____Change to:_____

21 _____

22 Reason for change:_____

23 SIGNATURE:_____DATE:_____

24 Gregory Carmichael

25

Case: 1:21-cv-00238-MRB Doc #: 77-16 Filed: 06/27/25 Page: 76 of 118 PAGEID #: 3904
Deposition of Gregory D. Carmichael, Volume II
Philip R. McHugh v. Fifth Third Bancorp, et al.

## WORD INDEX

**< $ >**
**$100,000** 458:20
**$2,250,000.00** 370:20
**$200,000** 372:8
373:18

**< 0 >**
**000254** 284:2
**000426** 443:17
**000453** 443:18
**000454** 443:14
**000469** 316:11
**000492** 318:21
366:13
**000495** 443:14
**000496** 319:14 321:9
330:18 345:20
**000500** 347:24 362:3
**000518** 440:18
447:23
**000574** 369:4
**000576** 369:5
**000591** 318:22
**000592** 365:20
**000594** 367:11
**000598** 367:12
**000845** 370:12
**000952** 423:23
424:12
**000954** 425:16
**000976** 425:17
**000977** 428:13
**000978** 429:8 433:11
**000980** 433:14
**000983** 433:25
529:23
**000984** 434:14
**000985** 429:8
**000989** 423:24
**001041** 422:25
**001061** 437:18
**001062** 437:18
**001063** 438:14
**001070** 438:15
**001071** 407:16
413:23
**001073** 407:17

413:23
**001074** 410:3
**001079** 410:4
**001117** 272:7
**001132** 271:23 321:5
**001135** 348:11
**001216** 492:9
**001222** 492:10
**00132** 321:2
**004615** 396:13
**00496** 322:14 323:18
324:15 325:23
**005674** 404:3
**005683** 402:23
**005685** 402:24
**005687** 392:8
**005688** 392:8
**005689** 406:6
**005695** 420:4
**005696** 420:4
**00593** 365:21
**005938** 409:2
**005943** 409:2
**005951** 390:3
**005957** 390:4
**006031** 383:4
**006032** 386:19
**006034** 383:4
**006094** 430:10
**006095** 430:11
**006260** 374:14
**006414** 396:12
**0213070** 500:14
**0213071** 500:14, 20
**0213078** 393:5
**0213171** 415:15
**0213172** 415:15
**0213185** 489:14
**0213195** 485:10
**0213204** 466:19
**0213207** 487:7
**0213246** 481:11
483:8
**0213248** 481:11
**0500** 509:15, 16
510:7
**071710** 312:8
**071802** 312:9
**0983** 507:1

**< 1 >**
**1** 349:21 363:12
369:15 376:20, 21, 24
377:7, 8, 11, 13 383:8
403:7 415:20 416:14
417:14 536:1
**1/10/20** 366:14
**1:10** 469:18
**1:15** 413:17, 18
**1:21-CV-00238** 267:7
**1:46** 413:18, 19
**10** 348:7, 17 376:10
403:3
**10/16** 481:18, 20
**10/16/2020** 481:22
**10:16** 482:3
**10:25** 330:12, 13
**10:30** 392:18
**10:42** 330:13, 14
**100** 349:12
**10th** 424:7, 14, 17, 23
**11** 501:21, 24
**11:19** 467:20
**11:32** 431:11
**110** 372:5
**11th** 535:13
**12** 392:22 489:16, 20
**12:01** 385:14
**12:25** 385:14, 15
**12:30** 418:16
**12th** 466:23
**13** 456:4, 24 457:24
458:1 463:13 464:1
**1310** 470:2
**13th** 460:12 463:2
465:9, 19 467:20
469:18 470:2
**14** 338:21 353:22
354:1
**14:52:50** 486:15
**15** 455:19 500:17
**1507** 500:21
**15th** 472:3, 5, 23
478:16
**16** 407:24 414:18
421:9 428:19, 25
429:24 437:24 443:3,
13 445:5 485:12
**1607** 483:11, 12

**16th** 413:25 414:11
479:10, 18 485:18, 19
486:7
**17** 274:12 404:8
431:4, 11 483:8
486:14 535:19
**1700** 268:11
**1701** 485:12
**1707** 488:8, 9
**17th** 271:15, 19
274:20 295:9 303:22
332:7 356:1 373:6
438:3 476:16 478:12
481:2 482:12, 15
483:21 488:5
**18** 488:16
**1823** 489:17, 20
**1964** 273:18, 20
**1st** 377:11 418:15

**< 2 >**
**2** 284:1 333:23
335:8, 16 337:19
370:24 371:12, 21
372:10 417:1, 14
447:22 512:15 537:1
**2.2** 372:9
**2:16** 481:22 482:4, 6,
7
**2:52** 486:14
**20** 331:24 536:17
**201** 268:12
**2010** 375:25 517:9,
20
**2013** 465:8
**2014** 387:25
**2015** 305:21 351:17,
19 359:4, 18 365:1
387:13 388:1, 7
389:11, 15 400:6, 19
404:11, 16, 25 405:2,
3 522:13
**2015-16** 351:10
496:24
**2016** 375:25 389:11,
15, 17
**2017** 274:20
**2018** 349:20, 22, 23
352:9 510:5, 12

Deposition of Gregory D. Carmichael, Volume II                    Philip R. McHugh v. Fifth Third Bancorp, et al.

512:*11*  513:*5*  520:*25*
521:*3*
**2019**  274:*12, 20*
312:*12*  319:*18*
320:*21*  329:*4*  330:*20*
331:*19, 23*  337:*13*
338:*21*  339:*15, 22*
349:*18*  350:*5*  351:*6,
9*  353:*22*  360:*9, 17,
25*  365:*22*  367:*14*
369:*6, 15*  370:*14, 17,
23, 24*  373:*19*  455:*20*
500:*16, 17, 21, 24*
501:*4, 14, 20, 21, 24*
510:*8, 10*  512:*10*
531:*23*
**2020**  319:*17, 19*
322:*25*  353:*22*  354:*1,
14*  355:*6*  357:*24*
358:*12*  359:*4*  360:*24*
361:*4*  362:*17*  364:*25*
368:*1*  369:*8, 19*
370:*18, 21*  371:*23, 24*
373:*19, 21*  375:*10, 16,
17*  376:*10, 20, 24*
377:*7, 13*  383:*21*
384:*3, 10*  386:*1, 10,
24*  392:*22*  393:*24*
394:*11, 24*  395:*14*
400:*19*  403:*3*  404:*8,
11, 16*  407:*25*  409:*6,
21*  410:*8*  413:*9*
414:*18*  415:*20*  421:*9*
425:*25*  426:*3, 4, 16*
428:*19, 25*  429:*25*
431:*4, 11*  437:*24*
439:*6*  442:*4, 10, 13*
443:*3, 13*  445:*5, 15*
447:*13*  451:*14, 20*
456:*4, 24*  463:*13*
464:*1*  473:*23*  482:*3*
483:*8*  485:*12*  486:*14*
488:*16*  489:*8, 16, 20*
492:*7*
**2021**  376:*21, 24*
377:*8*  386:*1*  489:*24*
490:*10*
**2022**  381:*16, 22, 23*
**2023**  267:*17*  271:*1*
381:*23*  382:*12, 16, 18*

498:*16, 17*  532:*25*
533:*6*  535:*14*  536:*2*
**2025**  365:*4*
**2026**  535:*19*
**21**  413:*9*  426:*16*
439:*6*  447:*13*  451:*14,
20*  492:*7*  512:*17*
**2109**  418:*16, 17*
**21st**  430:*4*
**2221**  488:*16*
**23**  409:*21*  414:*18*
445:*15*
**23rd**  408:*11*  410:*10*
414:*12*
**25**  500:*20*  501:*3, 13*
**250**  372:*10*
**26**  533:*6*
**2623**  268:*5*
**26th**  532:*19*
**27**  267:*17*  271:*1*
532:*25*  536:*2*
**271**  269:*4, 8*
**274**  269:*9*
**28th**  380:*13*

< 3 >
**3**  349:*23*  384:*5*
417:*5, 20, 21, 22*
431:*14*  433:*8*  538:*1*
**3/28/2020**  374:*18*
**3/6/2020**  390:*8*
**3/7/20**  383:*7, 23*
**3:03**  456:*17, 19*
**3:20**  456:*19, 20*
**30**  269:*8*  271:*15*
321:*1*  348:*12*
**30(b)1**  533:*2*
**30th**  484:*11*
**31**  269:*8*  274:*1, 13*
275:*12*  276:*5*  284:*1*
425:*25*  426:*3*  500:*16*
**312**  269:*9*
**316**  269:*10*
**31st**  426:*11*
**32**  269:*9*  274:*3, 13*
**33**  269:*9*  312:*5, 8*
**34**  269:*10*  316:*7, 11*
477:*16*
**35**  269:*10*  316:*8*
318:*20*  330:*17*

347:*23*  362:*3*  366:*13*
509:*13*  511:*17*
**36**  269:*11*  365:*17, 20*
368:*3, 8, 18*
**365**  269:*11*
**367**  269:*11*
**369**  269:*12, 13*
**37**  269:*11*  367:*8, 11,
24*  368:*19*
**374**  269:*13, 14*
**38**  269:*12*  369:*1, 3, 7*
**389**  269:*14*
**39**  269:*12*  369:*12, 14,
18*  370:*9, 10*
**392**  269:*15*
**393**  269:*15*
**396**  269:*16*

< 4 >
**4**  393:*24*  394:*11*
395:*14*  403:*8*  417:*9,
20*  418:*7*  431:*15, 18*
432:*11*  433:*22, 23*
**4:07**  483:*9, 10*
**4:10**  393:*24*
**4:12**  394:*7*
**4:17**  496:*14, 16*
**4:33**  496:*16, 17*
**40**  269:*13*  369:*24*
370:*11, 19*
**402**  269:*16*
**403**  269:*17*
**406**  269:*17*
**407**  269:*18*
**408**  269:*18*
**409**  269:*19*
**41**  269:*13*  374:*10, 14*
383:*3, 10, 12*
**415**  269:*19*
**419**  269:*20*
**42**  269:*14*  374:*11*
383:*12, 13, 22*  384:*4*
385:*19*
**422**  269:*20*
**423**  269:*21*
**425**  269:*21*
**428**  269:*22*
**429**  269:*22*
**43**  269:*14*  389:*24*

390:*3*
**430**  269:*23*
**437**  269:*23*
**438**  269:*24*
**439**  269:*25*
**44**  269:*15*  392:*4, 7*
**443**  270:*4*
**45**  269:*15*  393:*1, 4,
23*
**45202**  267:*20*  268:*12*
533:*8*
**45208**  268:*6*
**46**  269:*16*  349:*21*
396:*9, 12*  401:*21*
**466**  270:*5*
**47**  269:*16*  402:*23*
**48**  269:*17*  402:*15*
403:*25*  404:*3*
**481**  270:*5*
**485**  270:*6*
**487**  270:*6*
**489**  270:*7*
**49**  269:*17*  406:*2, 5*
**491**  270:*7*
**497**  319:*14*

< 5 >
**5**  349:*19*  353:*8*
431:*15, 18*  432:*7, 11*
433:*20, 22, 23*  500:*24*
501:*4, 14, 19, 24*
510:*5*  511:*22*
**5:04**  520:*11, 13*
**5:07**  488:*5, 7*
**5:08**  520:*13, 14*
**5:25**  534:*14*
**50**  269:*18*  407:*13, 16*
413:*23*  445:*9, 17*
**500**  270:*8*  511:*17*
**504**  269:*4*
**51**  269:*18*  408:*23*
409:*1, 7*
**511**  267:*19*  533:*7*
**513.362.8700**  268:*13*
**513.533.2701**  268:*6*
**52**  269:*19*  409:*25*
410:*3*
**520**  269:*5*
**53**  269:*19*  415:*11, 14*
**532**  269:*5*  270:*8, 9*

**54** 269:*20* 419:*24*
420:*3* 421:*17*
**55** 269:*20* 422:*21, 24*
**550** 372:*7*
**56** 269:*21* 423:*20, 23*
424:*12* 504:*11, 14*
**57** 269:*21* 349:*22*
425:*13, 16* 506:*15*
**58** 269:*22* 428:*10, 12*
430:*21* 431:*6*
**59** 269:*22* 429:*4, 7*
433:*7, 8, 10* 506:*12,*
*13, 14, 18, 20* 529:*21*
**5th** 381:*21*

**< 6 >**
**6** 432:*13* 433:*24*
438:*23* 507:*2, 22*
**60** 269:*23* 430:*7, 10*
431:*2* 435:*1* 458:*16*
476:*4* 477:*8*
**60-plus** 344:*15*
**61** 269:*23* 437:*14, 17*
**62** 269:*24* 349:*23*
438:*11, 14, 18, 20*
**63** 269:*24* 438:*25*
439:*3, 4, 17* 440:*18*
441:*9* 446:*18* 447:*22*
**64** 269:*25* 439:*1, 4, 6*
**65** 270:*4* 443:*6, 8, 12,*
*20*
**66** 270:*4* 443:*7, 9, 15,*
*20*
**67** 270:*5* 466:*16, 19*
**68** 270:*5* 481:*7, 10*
483:*8*
**69** 270:*6* 485:*7, 9*
486:*13* 487:*11*
**6th** 391:*7*

**< 7 >**
**7** 383:*21* 384:*3*
385:*22* 433:*5* 434:*13*
435:*3, 5*
**7/14/2020** 406:*8*
**7/23/20** 407:*22*
**7/23/2020** 407:*19*
446:*11*
**70** 270:*6* 487:*3, 6, 11*
**71** 270:*7* 489:*10, 13*

**72** 270:*7* 320:*24*
329:*5* 330:*22* 491:*25*
492:*4, 8*
**73** 270:*8* 320:*23*
329:*5* 330:*22* 500:*11,*
*14*
**74** 270:*8* 349:*19*
510:*5* 532:*7, 13*
533:*1, 22*
**75** 270:*9* 532:*8, 21*
533:*1, 19, 22*

**< 8 >**
**8** 426:*3*
**8/26/2020** 423:*1*
**8th** 425:*25*

**< 9 >**
**9** 512:*19* 520:*21*
**9/16/2020** 420:*9*
428:*16*
**9/17/2020** 430:*14*
437:*21*
**9:05** 271:*2*
**9:20** 438:*3*
**9:30** 392:*18* 532:*19*
533:*6*
**90** 311:*22*
**90-minute** 400:*4, 11*
**981** 433:*12*
**988** 424:*10*

**< A >**
**a.m** 271:*2* 330:*14*
431:*11* 438:*4* 467:*20*
482:*6* 533:*6*
**abated** 354:*18*
**abides** 347:*13*
**ability** 342:*18* 535:*11*
**able** 292:*18* 312:*9*
321:*10* 409:*8* 515:*24*
**absolute** 312:*1*
**absolutely** 296:*20*
298:*20* 301:*25*
305:*11* 309:*21* 312:*3*
333:*24* 346:*16*
354:*24* 399:*20*
408:*21* 451:*1* 454:*17*
455:*21, 24* 464:*3*
472:*14, 17* 474:*10*

476:*12* 478:*17* 494:*8,*
*9* 495:*12* 505:*17*
516:*2* 518:*8, 16*
**accept** 297:*16*
482:*21* 493:*23*
512:*21*
**accepts** 464:*14*
**access** 281:*3* 484:*17*
502:*1*
**accolades** 520:*7*
**accountability** 320:*15*
321:*19* 332:*18*
**accountable** 332:*18*
333:*17* 341:*18*
342:*18* 346:*17*
**accurate** 343:*24*
535:*10* 536:*10*
**accusations** 488:*18,*
*23*
**accusing** 529:*18*
**achieve** 280:*16*
320:*14* 341:*2*
**achieved** 324:*6*
**achievements** 279:*15*
**achieves** 316:*23*
324:*2*
**acknowledge** 355:*2*
417:*10* 474:*20*
**acknowledges** 381:*2*
**act** 321:*16*
**acted** 464:*20* 465:*1*
**action** 349:*24*
418:*12* 449:*12, 22*
494:*22*
**actions** 280:*1* 344:*24*
350:*9* 351:*2*
**active** 499:*22*
**actively** 400:*18* 498:*8*
**activities** 339:*18*
340:*21* 343:*2, 12*
**activity** 337:*14, 17*
**acts** 346:*2, 13*
**add** 318:*13, 14, 15*
329:*23* 372:*8* 391:*19*
396:*22* 397:*10, 22*
398:*2, 4, 16, 18, 20, 23*
399:*1, 5* 422:*6* 462:*7*
**added** 305:*25* 317:*12*
**adding** 398:*10, 14*
399:*10*

**addition** 283:*23*
288:*18* 289:*12*
368:*10* 496:*10*
**additional** 280:*21*
282:*8* 288:*12, 19*
289:*14* 296:*13*
298:*24* 318:*9* 362:*18*
372:*2* 391:*2*
**addressed** 308:*4*
331:*18* 375:*23*
428:*23*
**addresses** 320:*21*
329:*3*
**addressing** 367:*6*
404:*15*
**adjectives** 336:*11*
**ADJOURNED** 534:*14*
**adjust** 434:*20* 435:*10*
**adjustment** 403:*24*
**adjustments** 493:*15*
**admitted** 444:*20*
**adopting** 524:*8*
**advantage** 332:*3*
**advice** 425:*3* 485:*6*
505:*1*
**advised** 302:*19*
474:*18*
**affidavits** 528:*15*
**afford** 462:*6*
**aftermath** 467:*10*
**afternoon** 458:*7*
**afterthought** 454:*9*
473:*19*
**age** 271:*8, 25* 273:*24*
**ages** 273:*13*
**aggregate** 281:*12*
**agility** 364:*17*
**ago** 275:*5* 285:*6*
295:*19* 305:*5* 377:*2*
405:*12, 25* 406:*11*
412:*7* 415:*1, 7*
423:*18, 19* 429:*2*
479:*23* 502:*5*
**agree** 302:*20* 394:*6*
395:*7, 10* 398:*15*
417:*7, 22* 421:*16, 22*
485:*18* 524:*19*
**agreed** 298:*2* 302:*24*
312:*2* 394:*7* 395:*4*

Case: 1:21-cv-00238-MRB Doc #: 77-16 Filed: 06/27/25 Page: 79 of 118 PAGEID #: 3907

Deposition of Gregory D. Carmichael, Volume II                    Philip R. McHugh v. Fifth Third Bancorp, et al.

399:*5, 19*  438:*10, 22*
500:*25*
**agreeing**  397:*7, 23*
398:*6*
**agreement**  361:*1*
393:*15*
**agrees**  297:*21*  396:*21*
**ahead**  287:*13*  308:*14,
24*  311:*2, 5, 10*  321:*2*
333:*14*  335:*14*
336:*14, 22*  366:*3, 10*
411:*10, 22*  435:*19*
438:*22*  440:*10*  473:*3*
511:*10*  516:*14*
**ahold**  480:*20*
**al**  267:*9*  536:*4*
**align**  420:*11*  461:*8, 9*
**aligned**  281:*24*
345:*2*  489:*23*
**allegations**  520:*20*
**alleges**  460:*21*
**Allow**  308:*8*
**Alter**  489:*24*
**altered**  370:*4*
**alternatives**  462:*2, 5*
**America**  381:*5*
**amount**  313:*5*
328:*19*  373:*2*
**analysis**  276:*15*
373:*5*
**analysts**  290:*13*
**and/or**  536:*11*
**Anderson**  283:*9*
**anger**  478:*6*
**angry**  465:*6, 13, 16*
**announce**  376:*20*
382:*6*  457:*13*  496:*2*
**announced**  456:*8*
458:*10*
**announcement**  382:*9*
456:*13*  457:*3*
**announces**  493:*3*
**announcing**  402:*10*
479:*17*  486:*7*  493:*3*
**annual**  315:*16, 22, 24*
317:*18, 22*  318:*25*
319:*3, 4*  330:*19*
340:*23*  348:*1*  353:*21,
22*  355:*14, 17*  367:*14,
16*  381:*16*  382:*17*

**answer**  273:*8, 9*
275:*3*  287:*14*  291:*24*
301:*17*  308:*23, 24*
311:*6, 7*  315:*21*
316:*3*  333:*15*  336:*13,
14, 22*  337:*4*  341:*8*
343:*19*  378:*10*
392:*18*  426:*20*  473:*4*
489:*2*  494:*9*  500:*10*
502:*17*  503:*16*
515:*21*  517:*5*  518:*9,
10*  524:*8*  527:*5, 15,
16, 19, 23, 25*  528:*3*
529:*10*
**answered**  287:*12*
292:*19*  301:*8, 14, 16*
304:*16, 17*  306:*4*
307:*8, 12*  308:*13*
310:*25*  311:*8*  412:*11*
465:*20, 23*  494:*8*
502:*14*  503:*1, 4, 5, 15*
524:*21*  527:*17*  528:*2,
13*  529:*6*
**answering**  321:*24*
**answers**  308:*16*
416:*17*
**answer's**  372:*3*
**anticipated**  380:*7, 19*
**anxiety**  450:*4*
**Anybody**  276:*12*
284:*17*  298:*4*  306:*3,
15, 19*  398:*16, 18*
416:*17*  444:*12*  479:*1*
**anymore**  365:*8*  532:*3*
**anything's**  318:*8*
**anyway**  311:*10*
529:*13*
**apologize**  469:*24*
472:*11*  488:*19*  489:*5*
**apologized**  473:*13*
**Apparently**  374:*21*
399:*3*  404:*6*  408:*21*
446:*13*
**appear**  324:*19*  326:*4,
23*  327:*5*  339:*22*
341:*5*  346:*14*  421:*11*
429:*23*  433:*16, 18*
442:*18, 21*
**APPEARANCES**
268:*1*

**Appears**  272:*12*
285:*3*  316:*15*  319:*16*
324:*14, 15*  348:*3*
369:*6*  374:*16*  383:*17*
390:*7*  392:*10*  396:*15*
409:*4*  416:*8*  420:*6*
429:*10*  430:*13*  431:*8*
438:*10, 23*  439:*19*
442:*16*  492:*11*
511:*16*
**appetite**  346:*6*
523:*17*
**apples**  510:*22, 23*
524:*4, 5*
**apple-to-apple**  282:*6*
**appointed**  447:*16*
**appointment**  285:*15*
287:*11*
**appreciate**  401:*10*
531:*14*
**approach**  300:*5*
**approaches**  345:*25*
346:*11*  523:*8*
**appropriate**  339:*9*
373:*4*  427:*13*  428:*4*
434:*10, 21, 22*  435:*8,
11, 15, 21*  436:*21*
447:*19*  449:*22*
**appropriately**  320:*21*
329:*3*  346:*9*
**approval**  361:*1*
372:*17*  402:*12, 13, 14,
15*  412:*19*  442:*19*
443:*25*  444:*2, 5, 18*
445:*13, 14*  524:*25*
525:*4*
**approve**  402:*7*
**approved**  442:*5, 9*
443:*21*  444:*9, 13, 24*
445:*5, 20*  446:*12*
493:*7*
**approves**  408:*9*
**April**  381:*16*  382:*12,
16, 18*  498:*16, 17*
**area**  313:*13*  320:*16*
328:*4*  329:*17*  340:*4*
348:*23, 24*  349:*10, 11,
12, 14*  350:*15*  432:*3,
4, 5*  436:*3, 15*  446:*2*
507:*17*

**areas**  320:*22*  321:*20*
325:*6*  326:*1*  329:*4*
330:*21*  338:*3, 7, 23*
350:*1*  352:*21, 25*
368:*23*  416:*4*  418:*10*
421:*24, 25*  448:*13*
**argue**  529:*7*
**argument**  491:*8*
**argumentative**  301:*10*
333:*13*  343:*19*
491:*24*  528:*13*
**articulate**  332:*25*
334:*16*  340:*10*
342:*10*  524:*15*
**articulated**  334:*4*
349:*14*
**articulating**  342:*21*
**Asked**  287:*12*
296:*18*  302:*14*
304:*16*  306:*2, 10, 11,
12, 13, 15*  307:*7, 9, 11*
308:*13*  310:*17, 25*
311:*8, 24*  312:*1*
313:*6*  354:*22*  358:*14*
361:*7, 24*  374:*1*
377:*15*  391:*16*
400:*20*  409:*11*
412:*11*  415:*24*
419:*14*  446:*20*  451:*7,
24*  453:*15*  454:*3, 13,
15*  455:*16*  458:*23, 24*
460:*21*  471:*11, 25*
476:*2*  502:*14*  509:*19,
24*  513:*21*  515:*11*
516:*6, 21*  517:*10*
518:*2*  522:*23*  524:*18*
525:*16, 20, 23*  526:*11,
12*  527:*7*  528:*7, 22*
529:*12*
**asking**  274:*14, 17*
323:*9*  337:*1*  344:*8*
349:*3*  380:*15, 17*
385:*6*  411:*3*  415:*24*
431:*22*  435:*9*  461:*18*
471:*7*  474:*1*  476:*18,
20*  478:*9*  491:*1*
495:*23*  515:*2*  520:*19*
527:*22*  528:*21*  529:*1*
530:*24*  531:*18*

**aspect** 325:*18*

**aspects** 344:*22*

**aspirations** 358:*15*
359:*2* 452:*14*

**aspire** 452:*21* 468:*6*

**aspired** 358:*16*, *18*
359:*10*, *21* 452:*7*

**assess** 297:*10* 331:*21*
395:*18* 398:*18* 400:*5*
442:*6* 443:*22* 446:*22*
448:*24*

**assessed** 297:*6*
303:*15* 396:*25* 397:*2*
398:*14* 399:*11*, *22*
403:*20* 412:*22*

**assesses** 281:*20*
346:*1*, *12*

**assessing** 422:*14*

**assessment** 280:*18*
297:*1* 300:*25* 369:*16*
395:*17* 401:*8* 411:*14*,
*19* 412:*9* 425:*24*
426:*2*, *7*, *15*, *24* 427:*8*
428:*2* 432:*10* 437:*3*
446:*21*, *23*

**assessments** 391:*3*

**assignment** 403:*9*

**assist** 320:*18*

**assistant** 319:*7*, *10*
395:*23* 424:*1* 504:*19*

**assists** 327:*10*

**associated** 288:*4*
319:*18*

**association** 439:*5*

**assume** 272:*22*
317:*20* 374:*21* 383:*8*
390:*9* 396:*2*, *6* 397:*9*
403:*19* 404:*25*
405:*10* 421:*13*
440:*15* 447:*7* 469:*11*
482:*19*

**assumed** 339:*17*

**assumes** 340:*21*

**assuming** 415:*3*

**assumption** 273:*12*
294:*22* 400:*13* 447:*4*,
*6* 469:*12* 490:*20*

**assumptions** 352:*12*
376:*9* 469:*10*, *11*

**atrium** 496:*21*
497:*13* 498:*9*, *12*, *13*
499:*7* 500:*7*

**attached** 316:*17*
317:*6* 374:*19*, *22*
392:*16* 396:*17* 400:*5*
404:*17*, *18* 405:*1*, *7*
408:*2*

**attachment** 405:*2*
426:*1* 437:*23*

**attachments** 405:*5*
407:*21* 428:*17*

**attention** 275:*2*
468:*16* 506:*11* 507:*1*
509:*12* 510:*3* 512:*14*,
*17* 532:*12*, *21*

**attorney** 477:*20*, *24*
478:*4*, *5*, *8*, *23*, *24*
484:*3* 487:*23* 488:*1*
491:*13*

**attorney's** 393:*11*

**audience** 326:*8*

**audiences** 328:*15*

**audit** 280:*16*, *22*

**August** 401:*25* 402:*5*
415:*20* 418:*15*
455:*19* 500:*24* 501:*4*,
*14*, *19*, *24*

**authorized** 533:*9*

**available** 367:*25*
440:*10* 462:*11* 484:*6*

**Avenue** 268:*5*

**award** 371:*10*, *18*, *19*
372:*23* 373:*2*

**awards** 277:*1* 372:*21*

**aware** 283:*24* 287:*22*
289:*15* 293:*24* 294:*4*
304:*19* 330:*6*, *7*, *25*
331:*3* 360:*3* 361:*10*
403:*16* 426:*8* 468:*17*
486:*25* 510:*14*
511:*14*, *25* 518:*12*

**< B >**

**baby** 273:*17*, *20*

**back** 271:*14* 274:*1*,
*21* 275:*8* 278:*16*
296:*18* 297:*20*
298:*14* 304:*20*
305:*12* 308:*15*, *20*

**309**:*7* 310:*8*, *17*, *20*
311:*23* 318:*7* 324:*15*
326:*12*, *16* 327:*11*
330:*9*, *14* 332:*19*
342:*13* 345:*19* 356:*9*
357:*7* 362:*2* 365:*1*
371:*22* 375:*18*
379:*25* 380:*5* 385:*15*,
*18* 392:*11* 397:*18*
398:*3* 399:*3*, *18*
413:*10*, *19*, *22* 414:*2*,
*6* 425:*23* 432:*19*
433:*7* 441:*8* 442:*16*
445:*9*, *24* 446:*18*
450:*13*, *20* 451:*11*
456:*21* 459:*24*
460:*12* 464:*14*
465:*12* 470:*2* 471:*17*,
*18*, *23* 472:*1*, *8*
493:*10* 494:*10*
496:*17* 502:*4* 503:*18*
513:*11* 520:*15*, *24*
521:*3* 522:*6*, *13*
525:*17* 527:*2* 529:*21*

**bad** 307:*5* 308:*11*,
*18* 309:*3* 350:*25*
351:*25* 352:*8*, *21*
490:*13*, *22*

**BANCORP** 267:*9*
268:*16*, *17* 274:*3*
320:*23* 329:*5* 330:*22*
331:*24* 439:*7*, *19*, *22*
443:*6*, *16* 536:*4*

**banger** 328:*1*

**Bank** 272:*10* 274:*5*
286:*19* 287:*1*, *24*
293:*1* 298:*8* 299:*13*,
*16* 312:*12* 344:*5*, *15*
348:*20* 349:*4* 356:*14*
358:*1*, *13*, *18*, *24*
359:*3*, *7*, *15*, *20*, *22*
362:*1*, *7* 364:*10*
377:*4* 382:*20* 387:*4*,
*13* 401:*9* 409:*5*
410:*7*, *14* 428:*18*, *25*
429:*11* 437:*24* 439:*5*,
*16* 443:*3*, *5*, *13*
447:*12* 453:*14* 454:*6*
455:*22* 456:*9* 458:*11*,
*12*, *17* 462:*16*, *25*

**463**:*15* 499:*3*, *4*
509:*25* 512:*10*, *12*, *25*
513:*4* 514:*25* 515:*4*,
*25* 517:*3*, *11*, *13*
518:*7*, *15*, *21* 519:*9*,
*19*

**banking** 331:*25*
332:*1* 363:*15*, *18*
381:*5* 384:*6* 386:*4*,
*15*, *20* 484:*19* 492:*24*
493:*24*

**banks** 281:*18*, *19*
286:*23* 365:*8* 380:*24*

**base** 371:*8*, *24* 372:*4*,
*6*, *13* 436:*20* 455:*3*
480:*20*

**based** 273:*3*, *10*, *12*
305:*15* 352:*12*
361:*24* 372:*6* 374:*2*
375:*2* 379:*8* 382:*4*
390:*20* 396:*1* 405:*18*
406:*10* 421:*11*
429:*22* 453:*5* 455:*4*
485:*5* 502:*23* 504:*1*
522:*23* 525:*14*, *15*

**basically** 278:*18*
281:*15*, *22* 291:*9*
298:*21* 344:*10*
371:*14* 397:*17*
416:*15*, *22* 418:*1*, *4*
443:*19* 480:*17* 493:*2*,
*16*

**basing** 373:*8*

**basis** 315:*16*, *23*, *24*
365:*2* 484:*20*

**Bates** 390:*3* 392:*7*
393:*4* 406:*5* 407:*16*
409:*1* 415:*14* 420:*3*
422:*24* 423:*23*
428:*13* 429:*7*, *23*
430:*10* 437:*17*
438:*14* 443:*14*
481:*10* 485:*10* 487:*6*
489:*13* 492:*8* 500:*14*

**BB&T** 517:*8*

**BC** 371:*25*

**Bear** 385:*20*

**Beaudin** 387:*8*, *12*
388:*10*, *18* 389:*17*
390:*16* 391:*7* 392:*22*

394:3, 11  395:13
409:6, 21  410:10
419:9  420:18, 23
422:3  423:14  424:5,
7, 15, 23  426:6, 25
427:9, 11  429:24
430:19  431:3, 6
438:2  440:3, 13
441:2  442:5  443:22
445:12  446:20
504:21  505:16
**becoming**  357:25
377:7  378:7  379:10
452:4  455:13
**began**  277:6  441:5,
12, 20
**beginning**  278:18
291:24  305:13
323:13  379:6  415:22
472:22  504:16
522:13  533:6
**begins**  284:5  431:2
500:16
**begun**  376:4
**behalf**  268:1, 9
460:25
**behaviors**  404:22
**belief**  454:10
**believe**  272:2  273:13
276:10, 14, 19  283:4,
24  285:4  292:19
294:14  297:6  304:4
306:16  311:24
318:17  327:15, 16
341:6  342:7, 9
345:11  351:11  352:6
353:4  360:13, 21
361:18, 22  366:1
373:11  378:16  380:4
381:12  382:15  385:1
387:10, 24  388:5
389:14  390:13
392:23  398:19
399:13  409:14
411:22  412:1, 4
421:20  429:17  434:6
459:13  480:11, 19
493:20  495:19, 21, 25
497:18  506:20, 24
513:5  517:6, 24

521:20  522:3  523:10
530:15
**believed**  299:19
495:19, 22  496:7
**believes**  516:12
**belong**  380:4
**Ben**  351:11, 14
**benefits**  461:18
514:18, 19, 22
**best**  278:24  288:8
291:14  304:19  319:1
320:14  321:25  341:2
379:21  381:25  382:9
384:15  427:24
460:10  461:14, 15
477:3  483:2  535:11
**better**  302:5  315:4
329:15, 18  332:3
345:16  398:7  422:1,
20  435:23  436:1
466:4, 6, 10, 12
469:19  470:4, 10, 11,
14  477:15  507:16, 17
531:15
**beyond**  273:7  285:7
302:16  369:23
391:21  392:2  402:21
498:25
**big**  449:12  529:4
**bigger**  286:24  287:1
460:4  477:7
**bill**  531:16
**bios**  390:8  391:2
**birth**  273:11
**birthday**  273:19
**bit**  353:13  416:18
523:13
**blame**  320:16
**Blank**  268:11
**blatantly**  336:24
**blow**  417:1
**board**  271:19  272:19
274:2, 5, 12  275:14,
16, 17, 19, 22, 24
276:11, 25  279:6, 23
280:11  281:2, 8
282:14  284:25  286:9,
20  287:18, 19  288:15
290:7, 9, 10  291:8, 12
292:3, 24  293:20

294:7, 11, 19  295:21
296:11, 12, 19, 24
297:5, 10, 16  298:23,
25  299:10  300:6, 9,
21  301:25  302:24
303:1, 4, 6, 9, 14
305:17, 18, 19, 23
317:4, 12  321:14
322:22  323:11  325:4,
7, 9, 11, 12, 16, 19
326:8, 14  327:22
328:17, 19, 25  329:10,
21, 24  330:8  332:7,
11, 12, 21  333:2, 3, 25
334:5, 22  335:7, 9, 19,
22  336:2  337:19, 24
338:6, 14, 16  339:12
340:1, 14  342:10, 21
343:1, 15, 22, 25
344:2  345:1, 2, 4, 13
346:19  347:4, 9, 16,
18  349:10, 16  350:5,
21  354:22  356:13, 17
357:1, 5, 20, 23  358:5,
6, 25  359:6, 11, 12, 23
360:7, 9, 10, 14, 25
361:2, 5  362:12, 22
363:19, 22, 23  364:2,
5, 7  365:13  370:3
373:14, 16, 20  374:1,
6, 7, 9  377:19, 20
380:12, 14  381:11
382:2, 10, 12  383:1
384:20, 22  385:7
387:15  388:14, 16
389:7  391:16  395:20
396:1, 24  398:19
399:11, 12, 21  400:23
401:24  402:8, 11, 14,
15  403:23  410:21, 24
411:1, 7, 9, 15  412:8,
13, 15, 16, 17, 19, 20,
23  413:4, 6, 8, 9, 13
414:3, 15, 19, 20, 21,
24  415:7  419:13, 20
422:11  423:12  425:8,
12  426:16, 17  427:1,
8, 10, 13, 17, 19, 21, 22,
23, 25  428:5, 6, 16, 18,
25  429:10, 13, 14

430:1, 3, 5, 15, 16
431:19, 24  432:19
437:10, 22, 24  438:4,
17  439:6, 25  440:15
442:3, 4, 13, 19
443:12, 16, 21  444:15,
16, 24  445:5, 20
446:1, 13  448:2, 6, 17,
20  449:5, 9, 25
453:16  455:6, 8, 10
462:21  463:16, 18
467:3  473:8  475:21
492:20  493:1, 7, 9, 20
494:5  495:14  500:6
506:21  530:2, 3
**boards**  288:4  397:1
428:9
**board's**  286:6
294:25  295:20  296:1
298:25  302:12  303:9,
14, 18  309:22  356:8,
18, 24  357:10, 15
358:3, 4  359:12
360:15  361:10, 24
363:3  374:1  377:15
388:13  390:22
419:20  463:10, 17
**boasted**  509:23
**Bob**  272:15, 22
276:10  278:2, 5, 23
280:5  296:2  297:20
304:25  305:1, 2, 6, 14,
22  306:16, 19, 24
309:7, 10, 13  310:8, 9,
10, 14, 15, 16, 24
311:12, 13, 18, 22, 24
316:15  317:23  318:2,
10, 14  320:3  339:3, 4
355:15  361:7, 24
374:17  378:6, 9, 11,
20, 21  379:16  390:7,
19  391:1, 6, 18  392:2,
11, 12, 15, 22, 23
395:3, 20, 21  396:7,
15  397:9, 13, 14
398:3, 7, 22  399:3, 13,
15  400:12  403:1, 5,
12, 15  404:5  405:15
406:7, 9, 18  407:7, 19,
24  408:11, 15  409:17,

*23* 413:25  414:5
416:8  420:7  421:*1*, 7
422:*17*  423:3, *14*
424:*1*, 5, 7, 14, 17, 18,
21, 23  426:*1*  428:*15*,
23  429:25  430:*14*, *19*
431:*3*  433:*17*, 18
434:5, 6  437:*21*
438:*3*, 7  440:23
463:25  464:2, 7, 8, 15,
20  465:*1*, 6, 7, 18
468:*13*  469:*16*, 17
470:24  471:2, 12, 13,
14, 16, 18, 20  474:*18*
478:*7*, 12, 16, 17
479:*1*, 5, 14  480:*13*,
14, 15, 21, 23  481:*1*,
16  482:*11*, 14, 16
483:*9*  484:25  485:*15*
487:*16*, 22  490:8
493:*19*  494:2  497:*18*
504:*18*, 21  506:22
517:*9*, 11, 12
**Bob's**  278:4  379:17
392:25  395:*23*
397:*10*  398:6  408:9
470:*12*  482:*18*
**body**  282:*12*
**boomer**  273:*17*, 21
**bored**  364:*15*
**born**  273:*18*, 20
**bottom**  483:7  486:*13*
487:*10*  530:2
**brand**  332:*23*  336:*1*
341:*24*  342:24
347:*10*
**breakdown**  273:4
**Brian**  268:*17*  284:*13*,
15  289:4, 5  387:5, 6
498:4  499:*14*  518:*17*
**briefing**  312:*13*
**bright**  416:*20*  508:22
**brilliant**  416:*16*
**bring**  285:24  287:*16*
288:5  297:*14*  387:*16*
412:*23*  416:*14*, 19, 22
427:*18*  432:*21*, 25
507:*11*  526:2
**bringing**  288:*1*

395:*18*  520:4  522:*20*
**brings**  346:7
**broader**  277:*13*
**broken**  313:*19*
**brother-in-law**  501:7
**brought**  294:*19*
299:9  309:*10*  310:9
375:25  387:*18*
432:*11*  452:25
468:*15*  496:5  516:7
517:6, *10*  526:*1*
**Brumback**  446:7
**build**  331:22  337:7
**building**  337:9  486:2
498:4
**buildings**  497:8, 9
**builds**  332:23  336:*1*
341:24  342:24
347:*10*
**bullet**  335:*15*  336:3
337:*19*  343:3, 6
345:*13*  346:22  347:7
348:*19*  349:*10*
376:*19*  377:22
381:*15*  382:*11*
396:*21*  400:3  401:*20*
433:25  434:*19*, 24
435:5, *10*  436:5, 24
437:2  507:*25*  508:9,
14, 21  509:4
**bullets**  340:6  341:*10*
**bumped**  372:7
**bureau**  490:*21*
**business**  320:*20*
321:*19*, 20  327:25
329:2, *17*  331:*17*, 25
332:*1*  346:3, 14
362:16  365:9  376:*13*,
17  379:19  386:*4*, 15
436:6, 8  448:*12*, 13
449:*19*  461:*10*
492:23  493:*24*
510:*15*, 21  511:*15*
512:*1*
**businesses**  320:*11*
326:3, 22  386:*13*, 16
475:22

< C >

**calendar**  304:6
354:2  400:*16*  405:*12*
414:*13*, 21, 23, 25
415:2, 9  421:*12*
425:*10*  456:5, 25
457:*10*  469:2
**calendars**  382:8
**call**  286:7  295:8
304:7, 8, 21  335:5
372:*19*  377:*21*
387:*20*  392:*17*  394:*3*
395:*16*  396:7  400:*4*,
11, 14  401:25  402:*4*,
12  404:6  405:8, 15
406:*14*  420:8, 10, 25
423:3, 6  480:*11*, 12
485:*3*  500:*23*  518:*19*
**callback**  371:*15*
**called**  303:23  305:17
363:*16*  406:*19*, 25
480:25  497:9  511:*4*,
5
**calling**  406:22
**calls**  484:25  485:5
**candidacy**  293:*12*
**candidate**  284:22
285:2, 16  288:*23*
289:8  293:4  303:*1*
361:2  397:2
**candidates**  282:*23*
283:8  284:7, 10, 20
285:12, 14, 19  286:*4*,
9, 15  287:*11*  288:22
289:*1*, 20  290:5
291:*1*  293:*17*  297:*10*,
17  303:2, 4, 17
390:24
**capabilities**  284:*15*
285:14  345:24
346:*11*  358:7  523:*23*
**capable**  345:5
**capacity**  363:*14*
388:22  473:7, 18
**capital**  277:6  372:*17*,
18  379:*18*  408:*12*, 17
410:*12*, 17  411:*3*, 8,
17  412:*1*, 12, 16, 18,
22  413:*1*  414:7, 10
415:*4*  445:25  446:5,

9
**Caption**  536:*3*
**captioned**  536:8
**capture**  340:*4*
**captured**  333:*1*, 22
335:*15*  339:24  341:9
347:*3*  348:*19*  349:*3*,
9
**card**  271:*23*  272:5,
13, 21  280:8, 13
321:6, 9, 11, 13  322:7
323:*11*  324:*19*, 23, 24
325:5, 17  326:*4*, 5, 23,
24  328:*12*  329:*10*
333:*10*  334:7  335:*1*,
3  336:7, 11  338:*3*, 17
339:*23*  340:*13*  341:5
348:6, 12, 15, 16
349:*3*, 6, 16  350:8
356:25  359:*13*  360:8,
17
**cards**  277:*25*  278:*21*
279:*10*, 25  338:2, *19*
339:2  352:*18*  360:*14*
390:*11*
**care**  272:22  375:22
417:*24*
**career**  287:*20*  288:9
313:22  432:4  519:*18*
**Carmichael**  267:*15*
269:*3*  271:*3*, 7, 14
275:*13*  277:5  279:*14*
282:*21*  283:6  284:5
285:*11*  288:*20*
305:24  307:*16*  311:6
312:7  316:*16*  328:*11*
330:*17*  336:*14*, 22
365:*19*  367:*10*
374:*13*, 17  385:*18*
390:2, 17  392:6
393:3, 22  396:*11*
402:22  404:2  406:*4*
407:*15*  408:*25*  409:9
410:2  413:22  415:*13*
420:2, 7  422:*23*
423:22  425:*15*
428:*12*  429:6  430:9
431:*2*  434:7  437:*16*
438:*13*  439:*3*  441:*16*,
25  443:*11*  447:25

Deposition of Gregory D. Carmichael, Volume II | Philip R. McHugh v. Fifth Third Bancorp, et al.

456:23 466:18
469:22 481:9 485:9
487:5 489:12 492:3
496:20 500:13
503:10, 25 504:10
514:23 515:15 517:2
518:5 520:19 529:10
530:21 531:3 532:12,
16 533:5, 18 534:8
536:19 537:24
538:24
**Cary** 518:3, 6, 15, 16
**CASE** 267:7 291:21
317:20 345:15
373:17 393:13, 14
423:5, 19 451:4
497:19 498:21 536:3
**categories** 323:23
**category** 316:22
317:2 369:15
**caused** 395:1
**CED** 484:19
**Center** 267:19
268:11 497:25 498:2
499:12, 14, 15 510:23
532:20 533:7
**CEO** 278:15 282:6
285:22, 25 286:6, 10
290:17, 25 291:19
293:1, 4 294:1, 13
296:21, 24 298:7, 18
299:3, 7, 12, 17, 21
300:25 301:2, 23
302:4, 8, 10, 15
303:13 310:11
327:19 328:5 344:8
354:23 355:19, 21, 22
356:10, 14, 21 357:10
358:1, 5, 12, 16 359:7,
20, 22 360:12, 19
361:3 362:6, 24, 25
363:10, 21 364:4, 20
365:14 377:24 380:4,
9, 20, 23, 25 381:3, 6,
11, 17, 20 388:2, 4, 5,
8, 16, 20, 23 389:7
395:17 396:17 397:1
398:20 399:12 400:5,
19, 22, 23, 24 402:8
404:7, 10, 15, 23

405:3 406:8, 13, 19,
25 407:20, 21 436:14,
22 440:19 441:24
442:5, 9 443:21
444:24 445:4, 14
447:23, 25 448:8, 16
452:7, 18, 21 453:18,
21 454:1, 11, 19
455:1, 11, 13, 15, 22
457:14 459:3 472:13,
16, 25 473:14 475:7,
8, 11 494:5 495:11
498:5, 9 500:1, 2
513:14 521:1
**CEOs** 286:19, 24
498:3 499:10, 17, 18
500:3
**CEO's** 289:23
**ceremony** 499:25
**certain** 276:1 278:14
279:25 291:12
325:24 339:18
344:22, 23, 24 351:15
402:10 409:19 450:5
**Certainly** 377:6
433:10 489:20
**certified** 271:9
**certify** 535:7
**cetera** 392:17
**CFO** 290:8, 11, 15, 18,
20, 21 291:14
**CFO's** 292:12
**CFPB** 375:4, 7, 10, 12,
15, 18 376:6 489:7
490:13, 18, 21, 23
491:6, 11, 16, 21
**chain** 413:24 424:3
503:8 527:3
**chains** 502:11 503:13
**chair** 275:18 439:12
446:6 522:10
**chairman** 275:16
382:12 387:13, 20
521:5
**chairs** 372:20
**challenge** 350:18
421:15 452:9 454:22
**challenged** 306:7
455:16 496:3

**challenges** 285:15
287:10 313:9 320:21
329:3 436:6, 8
**challenging** 352:12
**chance** 287:18, 19
288:7 412:2 418:19
422:6
**change** 301:17 314:1
318:13 323:3 365:7
408:14 431:14, 17, 24
432:12, 13, 17 433:5,
21 434:3, 5, 22 435:4,
9, 12 436:4, 7, 12
437:2, 6 451:23
461:23 467:7, 15
514:21 527:20 537:4,
7, 10, 13, 16, 19, 22
538:4, 7, 10, 13, 16, 19,
22
**changed** 318:9
354:16 365:4 370:4
372:4 391:5, 20
426:6 434:10 507:19
**changes** 313:20
314:4 339:9, 10
408:1, 2, 3, 5, 9 414:1,
4 431:13, 23 433:17
434:13 437:9 438:8,
10, 19, 21, 23, 24
460:15, 24 480:3
536:11, 14
**changing** 365:15
449:18
**character** 347:11
**characteristics**
321:17 363:20
364:22 507:6
**characterize** 511:21
529:13
**charge** 497:19
**charisma** 432:13, 14
434:2, 4 508:2
**Charlie** 278:9
**chart** 322:19, 21
323:7 327:23
**charts** 374:20, 22
375:1 379:7 383:24
**check-in** 389:4
**Checking** 388:25
**Chicago** 339:16

**chief** 280:22, 23
283:8, 9 284:7, 11
349:20 351:5, 8
369:17, 21 370:2
409:5 410:8, 14
441:15, 23
**CHRO** 397:1
**Chuck** 407:20 420:7
423:2 430:19 431:3,
12
**Cincinnati** 267:20
268:6, 12 513:7, 15
514:15 520:24 521:3,
9, 10, 19 533:7
535:13
**Cioffi** 268:10 269:4
273:7 274:25 287:12
298:9 301:4, 7, 13, 15
304:16 307:6, 10, 12,
17, 20, 23, 25 308:4,
13 310:25 311:3, 7
313:1 315:19 333:12
335:11 336:10, 16, 19,
24 337:3 341:7
343:17 354:6 366:12,
17 378:8 383:11
393:8, 20 412:11
427:2 430:22 443:2
445:16 464:22 473:1
479:7 491:7, 24
498:19, 24 499:2, 4
502:14, 18 503:3
504:3, 9 505:9, 19
508:8, 20 509:3, 11
511:1, 4, 9, 13, 20
513:20 516:15, 17, 20
517:16 519:5, 17
520:9, 19 523:18
524:3, 10, 21 527:17,
20 528:2, 12 529:6
530:13, 18, 22, 25
531:18 532:3, 6, 11
534:2
**Cioffi's** 336:13
502:23 524:8
**circle** 340:23 471:23
472:1
**circled** 399:18
**cited** 510:7
**Civil** 533:3, 13, 15

Case: 1:21-cv-00238-MRB Doc #: 77-16 Filed: 06/27/25 Page: 84 of 118 PAGEID #: 3912

Deposition of Gregory D. Carmichael, Volume II      Philip R. McHugh v. Fifth Third Bancorp, et al.

**clarification** 370:6
479:7
**clarify** 427:4 431:20
531:12
**clarifying** 496:6
**clarity** 337:24
391:14 435:24
**clean** 408:3
**clear** 296:24 298:6
324:13 332:11, 21, 24
353:2 358:17 373:25
399:22 437:7 525:12
526:6, 14
**clearly** 307:8 333:3
347:18 435:13
**clever** 346:3
**client** 529:15
**clock** 381:6, 7
**close** 299:21 417:11
429:20 430:5
**closely** 339:4
**closer** 498:14
**closest** 380:14
**clue** 394:21 426:13
445:23 456:6 487:2
488:14 501:5
**coach** 308:3 321:16
324:7, 12 388:21
**coached** 427:16
**coaching** 388:22, 24
416:18
**collaborates** 320:20
321:20 329:2
**collaborative** 523:15
**colleague** 508:15
**column** 384:5
385:25 386:20
**combined** 434:9
**come** 276:14, 18
280:2 290:14, 18
335:18 338:22, 24
356:3 373:10 426:21
444:23 450:20
453:25 469:5 471:1,
18 479:6 484:9
492:14 501:7 517:13
**comes** 319:24 464:14
**comfortable** 318:14
375:21 428:3

**coming** 280:1 361:9
478:6 516:8
**Commencing** 267:18
**comment** 292:5, 13
352:9 358:8 434:6, 7
478:2 506:23
**commented** 285:12
**commenting** 451:16
**comments** 339:11
354:25 357:21
419:21 438:9 454:9
505:14
**commercial** 283:10
327:25
**Commission** 535:18
**commissioned** 535:6
**commit** 362:10
**committed** 320:12
**committee** 272:5
275:24 276:1 312:23
315:18 317:19 319:4
331:2 338:10 370:3
372:18 392:1 408:13,
17 410:13, 18 411:4,
7, 17 412:2, 13 413:1,
3 414:8, 11 415:4
443:25 445:21, 25
446:1, 5, 9 457:21
518:25 521:16, 23, 24
522:13
**committees** 412:25
**communicate** 295:1,
16 302:12 305:2, 14
318:18 323:4 329:14
338:14, 16 339:12
352:24 376:12
391:15 428:5 450:14
**communicated** 294:6
295:2, 5 302:11
304:25 311:23
327:21 343:21 349:9
364:19 373:20 401:7
435:14 444:12
451:17 452:11
456:13 466:11 468:3
475:23 484:25
495:12 505:16 506:8
**communicating** 343:1
344:20 347:15 433:1

**communication**
305:22 332:2 434:20
435:7, 10, 17 451:1
466:23 492:25 507:9
**communications**
290:14 364:2 468:22
480:16 507:13
**communicator**
432:13, 14 434:2, 3
507:6, 8, 19 508:1, 5
**community** 332:23
341:23 342:24
347:10
**comp** 276:24 278:8
282:15 368:13
372:17, 18 373:10
470:6, 24 471:5, 7
**companies** 282:9
**company** 278:6
281:10 285:25 286:1
290:11 299:7 311:19
313:24 320:14
327:19 328:5 329:15
334:24 344:2, 12, 16
345:7 347:20, 21
352:1, 5 361:7
378:20 379:5, 22
382:1 384:15 387:5
388:16 417:24
436:22 453:19 454:1,
19 455:11, 14, 15
459:7 460:2 461:14,
16, 22 462:1, 6, 13
473:20 474:3, 4, 14,
22, 24 475:2, 3 476:3
477:1, 2, 3, 9, 15, 17
482:20, 25 483:2
484:6, 10 488:18
493:25 494:14 514:9
525:21, 23, 25 526:1,
2, 3, 6
**company's** 497:22
**comparators** 306:11
307:1 309:4 310:2
**compare** 298:18
301:2 321:11
**compared** 320:23
329:5 330:22
**comparing** 322:13

**comparison** 282:6
296:12, 13, 15 299:6,
8 300:12 301:1, 19,
21 302:3, 18 306:1, 4,
14, 22 324:7 398:3
510:23 512:5
**comparisons** 298:17
306:6
**compensated** 344:6
**compensation** 276:15,
17 277:8 278:7
281:16, 17, 18, 20, 22
282:13 368:12, 14
370:24 371:8, 12, 24
373:1, 18 408:12, 17
410:13, 18 411:3, 17
412:2, 12, 18 413:1
414:7, 11 415:4
445:25 446:9 458:21
461:17 462:5, 7
471:12, 14 475:3
477:1, 11 483:1
**competing** 365:7
**competitive** 332:3
**competitors** 364:13,
14
**complete** 280:17
281:3 292:15 318:17
535:10
**completed** 497:2
498:11 533:12
**completely** 313:19
524:20
**completion** 288:23
289:8
**complex** 287:24
**complexity** 365:6
403:8, 21
**compliance** 346:5
523:16
**complimentary** 336:4,
6 343:24
**comprehensive** 302:22
**comps** 484:17
**concern** 286:12
312:3 450:7, 8, 17
452:13
**concerned** 314:2
329:19 449:11, 20
486:25 491:23

concerning 505:4
514:24
concerns 289:23
411:6 449:14 467:13
concise 347:17
conclusion 353:18
426:22
conclusions 519:6
conduct 533:16
conference 405:15
confident 401:22
confirm 273:3
304:14 309:19 354:3
366:4 400:16 421:13
440:22
confirmed 363:20
517:24
confirming 273:22
conflict 276:23
confusing 430:22
conjunction 499:19
connect 420:14
496:23 497:8, 9
498:11
connectivity 290:19
cons 376:23, 25
377:6, 9
consent 492:7 493:6
consider 306:22
356:7 401:14 408:18
410:19 436:18
consideration 299:2
302:16 375:3 398:20
436:9 453:4
considerations 399:12
considered 285:13
286:16 296:19, 20, 24
297:16 299:21
300:16, 18, 20 301:22
302:13 309:12, 18
310:11, 22 311:16, 17
355:24, 25 356:12
357:1 397:15, 18, 20
398:5, 25 399:4, 17
401:11, 13 410:12
436:16 452:15
453:13, 18 454:16
473:17 494:19

considering 357:1
378:21 380:16
399:21
consistent 277:21
322:1 323:3, 8 346:5
368:8 422:18 433:17
436:2 452:2 498:3, 4,
5 519:11 523:17
consistently 346:2, 13
constructive 416:11
consultant 278:8
consumer 344:5, 15
348:20 349:4, 19
353:7, 18 386:20
387:4 451:24 454:6
458:12 462:3, 8, 13
476:10 477:7 478:1,
3 484:5 490:21
493:24 510:5, 10, 12
511:22 512:10, 12
contact 389:18 484:3
516:9
contacted 516:10
contains 393:12
contemplated 533:15
context 394:19, 21
395:8, 11 418:20
continuation 271:3
487:8
continue 308:8
314:12 348:19 349:3,
7 352:25 357:16
393:20 406:19
421:23, 24 432:4, 6,
25 504:1, 4 507:11
532:5 533:11
Continued 269:4
270:1 271:12 348:8,
18 349:13 356:19
534:3
continues 331:19
340:19 343:10
357:13, 14 362:17
487:11
continuity 513:2
contract 305:9
contrary 283:19
289:11 294:3
control 497:12

conversation 278:23
279:23 280:5, 6
286:14 291:10 292:7,
15 294:15 295:19
297:19 300:15
303:25 304:5, 14, 24
305:12, 15 306:18, 19,
24 309:6, 13, 14, 23,
25 310:1, 7, 13, 16, 20
311:14, 23 323:5
325:3, 4 326:13
335:19 336:2 355:21
356:1, 4, 5 358:2, 14,
20 359:5, 8 361:23
362:9 368:21, 22
385:4, 9 389:3, 9, 13,
22 391:8, 10, 12, 13
395:13 396:8, 16
398:22 399:2, 10, 14,
19, 24 400:1 405:20
406:1, 20, 22 407:10
421:8 423:13, 15, 17
428:4 448:23, 25
449:2 450:14 454:18,
20 456:11, 14 460:11
462:4, 12, 20 463:3, 5,
8, 20, 21 474:11
475:9, 10 478:11, 15,
20 480:14, 18 517:25
525:5
conversational
434:20 435:8, 11, 17
conversations 291:16
292:11 297:24
303:20 310:9 318:2
327:11, 22 354:13
359:18 360:6 364:10
365:12 384:12
389:16, 21, 23 390:23
391:25 399:9 401:5
407:7 420:17 422:2
432:18, 20 452:20, 24
463:9 467:1, 5, 8, 10
conversation-wise
292:10
convey 427:24
convinced 517:12
COO 377:24 378:7
379:1, 3, 10, 16, 24
380:1 384:6, 12

Cook 276:14 277:3
278:9 281:11 370:23
373:3
copied 407:20
copies 424:6
copy 326:10, 19
423:4 430:15
copying 423:2
core 345:25 346:11
347:13 523:23
Coronavirus 375:4
corporate 287:17
340:21 343:12 381:5
497:6, 7
corporation 277:13,
21 384:18
correct 271:20, 21
272:1, 2, 5, 6, 19
273:23, 25 274:6, 7
275:15, 22, 23 279:22
280:9 294:18 298:8,
19, 20, 21 299:13, 14
300:12 301:3 303:3
306:1 314:24 315:13,
14 316:25 317:9, 18
319:9 321:23 322:21,
25 326:11 332:8
334:18 335:2 338:12
345:23 348:2, 13, 14
363:10, 11 366:10, 16
370:10 372:1, 3, 12
380:9, 20 382:14
383:23 384:2 386:2,
8, 9, 17, 21, 22 387:10
395:6 397:24 403:3,
4 404:8, 16 410:15,
22 413:4 414:20
416:5, 6 417:3
422:14, 19 430:21
431:7, 9 432:16
433:20, 24 435:2
436:11 437:4, 25
438:1, 6 439:7, 8, 10
447:16 457:15
481:19 482:11
483:13 484:11 485:2,
4, 19 493:21, 25
494:1 496:8, 11, 12
505:5, 6, 8 506:23
507:20, 21 508:17

510:8  513:8, 10
522:7  524:20  526:10
527:14, 25  530:15
531:20
**corrected**  301:24
302:21, 23
**corrections**  536:11
**correctly**  321:25
345:3  397:5  422:14
**couched**  463:9
**Counsel**  294:16
304:17  307:6  309:6
311:1  350:7  366:12
383:11  385:20  393:8
414:14  443:2  449:10
464:22  474:19
480:22  481:1, 25
485:6  498:19, 21
502:18  504:3, 12
509:19  511:9  512:9
513:21  514:11  515:2,
8, 10, 15, 16  516:17
517:1  518:2  522:23
527:5, 18  528:12
530:5, 15, 22  531:10
532:3  533:4
**Counselor**  368:2
427:4  457:25
**count**  366:24
**counterclaim**  520:20
**COUNTY**  535:3
**couple**  295:10, 12
319:1  392:13  416:4
418:21  419:1  496:23
507:5  532:6
**course**  391:5  393:11
449:17  519:18
**COURT**  267:1
504:5  532:14
**Court's**  271:4
**cover**  279:9  325:18
**covered**  277:20
278:12, 17  464:23
496:22
**covering**  278:18
**covers**  278:2, 23
**create**  297:9  301:9
303:16  340:9  450:4
**created**  285:15

287:10
**creates**  286:1  288:6
**credibility**  320:10
327:1  332:14  334:10,
21  340:7  341:12
342:13
**credit**  348:6, 16
349:6  519:20, 22, 23
522:20  523:3  524:1,
13
**critical**  281:9  363:20
**cross**  511:5
**Cross-examination**
511:1, 2  533:24
**crosstalk**  529:20
**crystallized**  364:5, 21
365:3
**cultivate**  288:21
**cultivating**  293:17
**culture**  277:9  287:22
288:10
**currently**  434:21
436:5, 24
**cursory**  272:23
**curve**  520:1
**customer**  289:22
322:6  323:14
**customers**  339:20
497:10  519:25

< D >
**daisy**  527:3
**dangerous**  488:18, 23
**data**  276:21  281:12,
15  282:10, 11  288:3
313:11, 15  317:24
325:12  328:19
329:25  330:2, 5, 7
350:21  352:11  376:9
510:7, 8, 20, 23
511:21, 25  512:9, 13
**Date**  267:17  273:11
353:24  373:22
374:17  377:18, 20
381:24  382:1, 2, 3
404:19  428:16  430:2
450:25  456:6, 15
457:1, 5, 9  532:17, 24
533:18, 20  534:10
536:2

**dated**  393:23  404:8
406:7  407:19  410:8
420:8  423:1  425:25
426:11  428:18
430:14  431:4  437:21,
24  438:3  443:13
**dates**  273:11  297:23
376:23  377:1  426:6
431:8  499:24  522:14
**Dave**  518:19
**day**  271:2  284:14
291:20  297:5  307:12
311:12  318:16
319:25  328:6  339:10
352:9  358:17, 18, 20,
23  359:13, 25  376:9,
11, 14, 16, 21  377:3
380:21  381:16  382:9,
19, 21, 25  383:1
402:6  414:2  416:20
424:21  430:1, 6
436:23  450:3  452:6,
7, 18, 21, 22  453:19
458:6  468:6  470:20
479:6, 8, 13, 14
484:10  494:12, 25
502:7  530:7  535:14
536:16
**days**  295:10, 12
458:3  481:6
**day-to-day**  533:12
**deal**  467:10
**deals**  499:1
**debate**  291:21
**debrief**  418:20
424:25  504:23
**debriefing**  419:8
**December**  271:15, 19
274:12, 20  294:24
295:9  303:22  332:7
356:1  360:9  373:6
376:10  413:9  476:16
500:17
**decide**  296:8  381:24
**decided**  356:13
379:21  383:1  391:4
426:24  438:22
450:14  493:23
497:13, 15

**decision**  286:7  299:1
300:8  303:9  346:2,
13  356:8, 17, 18
358:3, 4  359:23
363:4  372:19, 21
374:1, 7  379:4
412:21, 24  436:17, 19
463:18  475:7  497:21,
22  499:5
**decisions**  346:5, 8
523:16
**deck**  271:16, 18
272:3, 13, 15, 16, 18
273:1  276:13  277:22,
23  278:19  279:1, 2, 5
280:8  283:3, 19, 21,
23  285:3, 7  289:12
293:19, 22, 23, 24, 25
294:6, 9  317:3, 12, 25
322:11  323:16
324:10  325:14
326:10  348:23  350:5
351:1  428:16  430:15
431:19  437:22  438:4
**decks**  327:11  427:17
**deck's**  324:11
**DECLARATION**
536:5
**declare**  536:6
**decrease**  461:11
**Dee**  518:17, 18
**deep**  327:24  346:7
**deeply**  320:12  331:20
**Defendants**  267:10
268:9
**defer**  417:6
**define**  336:3
**defining**  416:24
**definitely**  418:20
419:1  460:6  479:4
488:1  514:13
**definition**  423:16
477:7
**definitions**  335:4
**degree**  417:22
**delete**  501:15  502:11,
21, 24  503:18
**deleted**  501:12
**deleting**  501:25

503:*20*
**deletion** 502:*15*
**deliver** 332:*18*
341:*18* 342:*19*
348:*20* 349:*4* 473:*25*
474:*7*
**delivered** 473:*22*
474:*5*
**demonstrate** 281:*1, 6*
296:*14* 298:*22, 23*
340:*24*
**demonstrated** 315:*10*
**demotion** 477:*6, 13*
513:*22, 25* 514:*4*
**department** 312:*21*
**depending** 276:*1*
350:*17* 433:*8* 461:*25*
514:*6*
**depends** 282:*4*
**deployment** 492:*7*
**Deponent** 268:*9*
**deposed** 271:*9*
**deposing** 528:*15*
**Deposition** 267:*15*
271:*3* 275:*1* 393:*18*
511:*4* 516:*17* 532:*15,*
*17* 533:*5, 8, 10, 13, 14,*
*17, 23* 534:*14* 536:*1,*
*8, 12* 537:*1* 538:*1*
**depositions** 393:*10*
533:*10*
**depth** 272:*24*
**describe** 324:*10*
446:*21*
**describes** 332:*25*
335:*5*
**description** 325:*24*
335:*1*
**descriptions** 334:*1*
**deserve** 523:*13* 524:*2*
**deserved** 458:*18*
477:*15, 16* 483:*4*
**desired** 404:*23*
**desires** 454:*11*
**detail** 277:*12* 312:*19*
334:*1* 335:*8* 343:*2*
349:*2, 15* 408:*20, 22*
427:*15*

**details** 288:*20*
348:*22* 370:*14*
444:*21*
**determination** 372:22
373:*24*
**determine** 299:*16*
366:*11* 374:*8* 409:*8*
431:*22*
**determined** 303:*1, 4*
381:*13*
**determines** 372:*14*
373:*1*
**determining** 373:22
**detrimental** 384:*17*
**develop** 286:*4* 288:*9*
339:*19*
**developing** 286:*4*
**development** 279:*15*
284:*22* 285:*2* 288:*21,*
*23* 362:*17* 418:*21*
419:*1* 420:*11, 18, 23*
421:*7, 9* 422:*16*
425:*18, 24* 426:*15*
427:*8* 440:*19* 461:*2*
**developmental**
421:*16* 422:*3* 433:*6*
434:*16*
**developments** 447:*24*
448:*1, 5*
**deviated** 293:*23*
**dialogue** 363:*17*
**dialogues** 364:*4*
**difference** 302:*18*
463:*20*
**different** 273:*5, 23*
282:*7* 293:*21* 294:*5,*
*8* 317:*24* 318:*23, 24*
320:*3* 321:*15* 322:*15,*
*16* 325:*1, 2* 326:*6, 7,*
*20, 25* 327:*15, 21*
328:*15, 16* 329:*25*
330:*1* 356:*23* 357:*3,*
*8* 365:*24* 366:*2, 5, 18,*
*20* 367:*1* 461:*19, 24*
476:*1* 487:*20* 492:*13*
498:*13* 522:*17* 524:*3,*
*6* 527:*23*
**differentiation** 300:*4*
**differently** 321:*16*
326:*7* 394:*4* 398:*25*

**difficult** 351:*22*
417:*10*
**dig** 385:*20*
**digest** 470:*5, 16, 17*
**digging** 291:*17*
**digital** 363:*18, 25*
364:*12, 14* 365:*5, 6*
455:*5, 6*
**diligence** 295:*21*
**dinner** 517:*12*
**direct** 275:*2* 309:*6*
316:*16, 18* 317:*8*
319:*8* 346:*1* 395:*18*
401:*9* 422:*19* 506:*11*
509:*12* 511:*6* 532:*21*
**directed** 297:*20*
**directing** 507:*1*
510:*3* 512:*14, 17*
532:*12*
**Direction** 331:*10*
332:*16* 335:*16, 17, 20*
337:*21* 341:*14*
342:*16* 343:*8* 357:*15*
376:*13* 390:*21, 22*
403:*23* 435:*16*
463:*17* 473:*7*
**directional** 282:*10*
455:*14*
**directionally** 321:*22*
323:*2, 8* 326:*11*
**directly** 305:*3* 309:*8*
317:*10* 360:*21*
397:*14* 398:*4* 451:*22*
462:*19* 513:*14* 516:*5*
517:*10, 18* 525:*24*
526:*13, 18* 527:*7*
528:*8*
**director** 280:*19*
283:*6* 285:*11, 18*
288:*19* 294:*20, 23*
384:*25* 446:*8*
**directors** 274:*5*
275:*19* 280:*16*
285:*21* 343:*15* 413:*9*
414:*15* 439:*6* 440:*23*
441:*6, 12, 21* 443:*13,*
*16* 446:*23* 447:*3*
**directs** 274:*3*
**disagree** 292:*24*

332:*9*
**disagreed** 300:*5, 9*
**disagrees** 422:*9*
**disappointed** 459:*24*
476:*10, 12, 21* 494:*6*
**disclosures** 447:*20*
**discovery** 273:*8*
498:*25* 504:*2* 533:*17*
**discuss** 278:*1* 286:*18*
290:*24* 291:*25* 294:*7*
396:*24* 406:*18*
449:*23* 463:*24, 25*
464:*4, 13* 478:*11, 15*
**discussed** 283:*7, 15*
284:*14, 16, 21* 286:*16*
288:*20* 291:*5* 292:*2*
293:*5, 9, 10* 294:*21,*
*22* 317:*21* 361:*21*
383:*17* 384:*10*
394:*20* 398:*1* 427:*9*
445:*11* 448:*18*
468:*17* 472:*15, 16*
493:*19*
**discussing** 293:*17*
448:*3* 456:*23*
**discussion** 277:*8*
279:*4, 14, 20* 282:*22*
285:*14* 287:*4* 289:*4*
290:*2* 291:*22* 293:*20*
294:*11* 308:*22*
309:*15* 317:*3* 318:*10*
326:*9* 328:*21* 330:*8*
334:*2* 355:*18* 368:*4*
373:*13, 14, 15* 376:*16*
379:*25* 403:*6* 406:*10*
415:*25* 416:*9* 420:*19*
427:*12* 439:*17* 441:*6,*
*22* 442:*3* 448:*11, 14*
450:*2* 459:*10* 463:*13*
465:*11* 473:*6, 15, 16*
476:*15*
**discussions** 278:*13*
338:*24* 354:*17*
355:*16* 357:*25*
363:*24* 364:*2* 365:*14*
375:*2, 13* 378:*6*
379:*8, 9, 13* 420:*12,*
*21, 22, 24, 25* 421:*6*
441:*13, 14, 21* 448:*19*

452:*25* 453:*17*
**displayed** 504:*14*
**disposition** 289:*13* 517:*21*
**dispute** 353:*25* 354:*3* 470:*14* 522:*17*
**disrupted** 297:*4*
**disruption** 401:*12*
**distinction** 343:*5, 13* 344:*18*
**distributed** 276:*25* 446:*23* 447:*2*
**distributes** 320:*16*
**DISTRICT** 267:*1, 2* 532:*14*
**DIVISION** 267:*3* 458:*15* 532:*15*
**divisions** 531:*22*
**document** 277:*14* 289:*16, 18* 312:*10, 14, 15, 16, 17* 314:*8* 315:*10* 316:*12, 14, 17, 20* 317:*6* 326:*17* 335:*12* 336:*17, 25* 337:*18* 340:*3, 4, 5* 353:*4* 354:*7* 360:*14* 362:*5* 363:*12* 365:*22* 367:*1, 13, 16, 18, 20, 21, 23* 368:*3, 7, 8, 10, 17, 24* 369:*5, 25* 370:*9, 15* 371:*1* 374:*15* 378:*8* 383:*5, 15, 16, 18* 385:*21* 390:*6* 392:*9* 396:*14, 18* 402:*25* 404:*4* 409:*3* 410:*5, 6, 20* 420:*5* 423:*25* 425:*20* 426:*3, 14* 428:*14* 429:*8* 430:*12* 444:*19* 445:*11* 450:*25* 492:*6, 8, 12, 14* 493:*10, 12, 13* 502:*20* 507:*2* 510:*4* 523:*25*
**documentation** 278:*5* 311:*14* 317:*17* 399:*23* 400:*2* 442:*12* 475:*14* 525:*18* 528:*5, 10*
**documents** 280:*21* 289:*17* 322:*16* 325:*1,*

*2* 326:*8* 328:*10, 15* 333:*13, 14* 341:*8* 343:*18, 20* 366:*14* 368:*15* 390:*5, 16* 443:*20, 24* 492:*13, 15, 17* 528:*18, 23*
**document's** 371:*1*
**doing** 294:*4* 297:*8* 314:*3* 334:*13, 23* 337:*23* 343:*14* 344:*22* 345:*1* 347:*5* 353:*23* 379:*17* 384:*19* 388:*25* 389:*4* 391:*1* 461:*7* 471:*22* 472:*2* 474:*12* 531:*14, 17*
**dollars** 370:*24* 371:*9, 11, 13, 21*
**dollars-plus** 372:*9*
**door** 474:*25*
**double-check** 406:*13*
**doubt** 451:*5* 457:*8* 460:*2*
**downgraded** 507:*6*
**downgrading** 432:*10*
**downstairs** 496:*21*
**draft** 316:*18* 318:*11, 12, 15* 338:*18, 21* 339:*3, 7* 383:*7, 20, 23* 385:*22* 391:*23* 406:*8, 10* 407:*21* 409:*4, 8, 9, 14, 16, 18* 411:*20* 425:*22* 433:*19* 446:*10, 12* 493:*17* 506:*21, 24*
**drafts** 366:*8, 9* 426:*7*
**drastically** 364:*11*
**draw** 332:*10* 519:*6*
**drawing** 379:*14, 15*
**drive** 333:*17* 342:*19*
**drives** 320:*12* 332:*16, 17* 333:*5, 20* 335:*17* 337:*21* 341:*15* 343:*8*
**driving** 335:*21* 337:*22, 24* 342:*16* 428:*5* 431:*14, 17* 432:*1* 433:*19, 21*
**due** 295:*21*

**duly** 271:*8* 535:*5*
**dump** 501:*8* 502:*7*
**dumped** 503:*19*
**duties** 363:*2*

**< E >**
**earlier** 279:*10, 24* 281:*2* 293:*16* 308:*21* 329:*12* 361:*9* 367:*17, 21* 382:*15* 384:*11, 20* 390:*13, 23, 25* 391:*4* 393:*9* 424:*4* 432:*22* 468:*22* 487:*17* 506:*21* 507:*4* 516:*9*
**early** 296:*10* 387:*25* 389:*13, 15, 17* 469:*6*
**earned** 370:*21* 371:*23*
**earnings** 479:*18* 486:*7*
**easier** 368:*25*
**easily** 374:*5* 449:*3* 471:*25* 472:*2* 474:*5*
**East** 268:*12*
**ebb** 330:*8, 10* 461:*10*
**edits** 408:*14*
**education** 298:*1*
**effective** 324:*8, 12* 369:*22*
**effectively** 320:*12* 332:*22* 341:*22* 342:*23* 347:*9*
**efficiency** 322:*6* 323:*14* 324:*22*
**effort** 401:*12*
**ego** 494:*12*
**egregious** 523:*5* 524:*17*
**Eileen** 291:*13* 292:*12*
**either** 276:*19* 295:*7, 9* 299:*2* 300:*1* 303:*22* 305:*3* 309:*6* 325:*25* 350:*16* 354:*4* 376:*20* 377:*7* 392:*18* 395:*4* 397:*13* 479:*4* 482:*21* 493:*14*
**elaborated** 335:*18*
**elect** 357:*10*
**elects** 381:*11*

**element** 314:*25* 325:*20* 349:*1* 412:*24*
**elements** 334:*3* 340:*9* 355:*23* 365:*2* 373:*7* 392:*13* 409:*13*
**elevate** 286:*6* 357:*14* 359:*25* 360:*2* 374:*5* 432:*4, 6* 436:*22* 452:*9* 513:*16* 522:*5*
**elevated** 351:*11* 453:*2* 505:*22* 522:*16*
**elevates** 436:*14*
**elevating** 348:*25* 365:*11*
**elevation** 361:*6*
**Elsbrock** 521:*6, 8, 13, 15*
**E-mail** 268:*7, 13* 304:*20, 23* 305:*5* 311:*1, 3, 9* 316:*15* 390:*7* 392:*10, 12, 13, 15* 393:*10* 396:*15* 397:*8, 21* 398:*6, 9, 13* 399:*8* 401:*1* 403:*1, 5* 404:*5, 14* 405:*9* 406:*7, 9, 23* 407:*19, 23, 24* 409:*21* 410:*10* 413:*24* 419:*5* 420:*6, 10* 421:*11* 423:*1, 8, 9* 424:*1, 3, 5, 6, 7, 14, 22* 426:*2* 428:*15, 21, 22* 430:*13, 18, 20* 431:*3, 5, 10* 433:*17* 434:*25* 437:*20* 438:*2, 7* 445:*12* 446:*10* 471:*17* 484:*16* 504:*13* 505:*16*
**e-mails** 520:*6*
**e-mail's** 408:*10*
**embodied** 364:*22*
**emerged** 480:*4*
**emergency** 282:*23* 286:*19* 289:*20, 23* 290:*5, 14, 16, 17, 25* 291:*6, 7, 9, 10, 18, 19, 21* 292:*6, 16* 296:*17* 302:*16, 19* 303:*12* 306:*22, 25* 327:*24* 354:*17* 356:*3, 7* 390:*18* 391:*19*

---

Deposition of Gregory D. Carmichael, Volume II                    Philip R. McHugh v. Fifth Third Bancorp, et al.

401:*18*  453:*15, 22*
454:*13*  473:*7, 8, 10*
475:*13*  494:*16*
495:*15*
**Emerson**  446:*7*
**employed**  526:*9*
**employee**  277:*8, 12*
289:*22*  312:*12, 22*
314:*15, 16*  316:*5*
317:*13*  320:*22*  325:*3*
329:*4, 6, 22*  330:*21*
331:*1*  340:*11, 12*
345:*9, 10*  349:*18*
350:*1*  351:*24*  352:*20*
369:*16*  461:*15*
474:*12*  483:*3, 4*
509:*20*  510:*14*
511:*14*  531:*18*
**employees**  320:*25*
330:*23*  339:*17, 20*
341:*3*  360:*14*  497:*10*
525:*8*  526:*8*
**employee's**  313:*3*
**employment**  482:*22*
493:*3, 7*
**encouraged**  458:*22*
**ended**  377:*18*  384:*19*
406:*22*  521:*6*
**ends**  500:*16*
**engage**  280:*5*  294:*25*
393:*15*
**engaged**  303:*24*
331:*16*  333:*20*
337:*20*  341:*13*
342:*15*  343:*7*  517:*23*
**engagement**  295:*14*
307:*2*  311:*22*  350:*1*
352:*20*  421:*3*  531:*19*
**ensure**  341:*1*  346:*5,*
*8*  349:*24*  434:*23*
435:*8*  458:*19*  523:*16*
**Ensures**  331:*16*
**enter**  512:*24*  513:*16*
**entering**  514:*8*
**enterprise**  272:*5*
278:*3*  312:*23*  315:*17,*
*24*  317:*19*  319:*4, 7*
328:*8*  331:*2*  338:*10*
362:*14*  378:*5*  383:*6*
385:*21*  392:*1*  457:*17,*

*21*  505:*4*  513:*13, 17,*
*18*  514:*3, 7, 8, 10*
521:*16, 23, 24*  522:*1,*
*2, 4, 6, 12, 18*
**entire**  536:*7*
**entirety**  312:*17*
**entities**  281:*7*
**entitled**  307:*20*
385:*21*  461:*13*
475:*24*  476:*1*  502:*21*
**entitlement**  461:*1*
**entity**  314:*21*
**entry**  497:*6, 11*
500:*20*
**entryway**  497:*10*
**environment**  374:*3*
448:*12*  497:*11*
**equity**  277:*9*  278:*7*
**Eric**  516:*21*  517:*3,*
*10, 18*  518:*1*
**Erie**  268:*5*
**ERRATA**  536:*1, 13*
537:*1*  538:*1*
**erroneous**  301:*24*
**escort**  487:*13*
**especially**  272:*16*
417:*21*
**Esq**  268:*1, 4, 10, 16,*
*17*
**essence**  334:*13*  340:*4*
**essentially**  274:*4*
315:*16*  482:*21*
**established**  299:*15*
**et**  267:*9*  392:*17*
536:*4*
**ethical**  346:*20*
**Eurythmic**  288:*6*
**evaluate**  303:*11*
315:*17, 21, 23*
**Evaluated**  388:*15*
459:*6*
**evaluation**  299:*18*
314:*23*  315:*1*  324:*1*
369:*6, 10*  390:*19*
404:*21*
**evaluations**  314:*15*
390:*14*
**Evans**  407:*20*  420:*7*
423:*2*  430:*19*  431:*3*

440:*3, 13*  441:*3*
442:*6*  443:*22*
**event**  289:*23*  454:*14*
**events**  340:*21*  341:*1*
343:*12*
**eventually**  286:*10*
375:*24*  413:*5*  452:*9*
**everybody**  272:*2, 4*
280:*7*  350:*19*  435:*20*
457:*19, 20*
**evidence**  446:*16*
456:*1*  475:*17*  494:*18*
511:*7*
**evolution**  324:*11*
**evolve**  461:*22*
**evolved**  351:*13*
**EVP**  390:*8*
**exact**  307:*3*  353:*24*
382:*21*  398:*17*
498:*14, 18*  522:*14*
523:*7*
**exactly**  278:*10*  285:*5,*
*7*  289:*9*  295:*22*
305:*6*  327:*2*  332:*25*
340:*16*  345:*2*  346:*24*
351:*15*  371:*18*
377:*14, 17*  385:*5*
387:*25*  388:*1*  390:*17*
394:*12*  405:*20*
441:*20*  464:*18*  465:*7,*
*24*  472:*10*  474:*16*
493:*22*
**Examination**  269:*4, 5*
271:*12*  504:*8*  520:*17*
532:*10*
**examined**  271:*9*
**example**  340:*23*
352:*4*  353:*17*  519:*23*
522:*22, 24*  523:*2*
524:*18*
**examples**  519:*21*
**exceed**  343:*2*
**exceeded**  328:*17, 18*
335:*6*
**exceeds**  316:*23*
324:*2*  325:*13, 15, 19,*
*21*  326:*14, 15*  328:*17*
333:*3*  334:*5, 13, 19,*
*24*  336:*5*  343:*25*

461:*6*
**Excel**  317:*6*
**excellent**  295:*24*
421:*25*  432:*8*  474:*21*
483:*3*
**exceptional**  316:*23*
425:*2*  504:*25*
**exchange**  393:*6, 10*
415:*19*  424:*5, 6*
445:*12*  466:*20*
481:*16*  485:*11*  487:*8*
489:*14*  491:*20*
500:*15*  501:*23*
**exchanged**  501:*3*
**excited**  293:*3*  295:*20*
**exclusive**  320:*24*
329:*6*  330:*23*
**excuse**  355:*13*
372:*24*  383:*13*
430:*13*  478:*14*
**excuses**  320:*16*
**execs**  457:*17*
**execute**  288:*11*
348:*20*  349:*4*  357:*17*
378:*23*  401:*23*
471:*25*  473:*11*
**executing**  492:*22*
**execution**  320:*12*
332:*17*  333:*5, 22*
335:*17, 21*  337:*21, 22,*
*25*  340:*7*  341:*15*
342:*16, 17*  343:*8*
431:*14, 18*  432:*1*
433:*20, 21*
**executive**  275:*18*
276:*6*  277:*16*  279:*13*
280:*7*  281:*8*  282:*19,*
*22*  284:*7, 11*  294:*23*
314:*17*  323:*5*  326:*9,*
*12*  328:*7, 20*  340:*20*
343:*11*  346:*7*  355:*8*
357:*13*  362:*10*  402:*7*
406:*14*  409:*5*  410:*8,*
*14*  425:*18*  426:*15, 24*
439:*11, 13, 14, 24*
441:*13, 15, 22, 24*
443:*25*  444:*3, 8, 9, 13,*
*14, 16, 18, 19, 21, 22*
445:*20*  446:*13*
459:*21*  461:*21*

462:*18* 465:*15*
474:*22, 24* 475:*2*
479:*17* 486:*6* 512:*20*
518:*24* 522:*10* 523:*3*
**executives** 276:*15*
277:*1* 278:*14, 21*
282:*7* 296:*12* 303:*10,*
*11* 318:*19* 330:*10*
339:*6* 345:*12* 358:*15*
370:*17* 456:*12* 463:*4*
473:*25*
**exercise** 377:*17*
380:*13* 392:*3* 393:*16*
394:*13* 421:*4* 422:*12*
**Exhibit** 269:*8, 9, 10,*
*11, 12, 13, 14, 15, 16,*
*17, 18, 19, 20, 21, 22,*
*23, 24, 25* 270:*4, 5, 6,*
*7, 8, 9* 271:*15* 274:*1,*
*3, 13* 275:*12* 276:*5*
284:*1* 312:*5, 8* 316:*7,*
*8, 11* 318:*20* 321:*1*
330:*17* 347:*23*
348:*12* 362:*3* 365:*17,*
*20* 366:*13* 367:*8, 11,*
*24* 368:*3, 8, 18, 19*
369:*1, 3, 7, 12, 14, 18,*
*24* 370:*9, 11, 19*
374:*10, 11, 14* 383:*3,*
*10, 22* 384:*4* 385:*19*
389:*24* 390:*2* 392:*4,*
*7* 393:*1, 4, 23* 396:*9,*
*12* 401:*21* 402:*23*
403:*25* 404:*3* 406:*2,*
*4* 407:*13, 15* 408:*23*
409:*1, 7, 25* 410:*3*
413:*23* 415:*11, 14*
419:*24* 420:*3* 421:*17*
422:*21, 24* 423:*20, 22*
424:*10, 12* 425:*13, 15,*
*23* 428:*10, 12* 429:*4,*
*6* 430:*7, 9, 21, 23*
431:*2, 5* 433:*7, 8, 10*
435:*1* 437:*14, 17*
438:*11, 13, 18, 20, 25*
439:*1, 4, 6, 16* 440:*18*
441:*8* 443:*4, 8, 9, 11,*
*15, 20* 445:*9, 17*
446:*18* 447:*22*
466:*16, 19* 481:*7, 9,*

*14* 483:*8* 485:*7, 9*
486:*13* 487:*3, 6, 11*
489:*10, 13* 491:*25*
492:*4, 8* 500:*11, 13*
504:*11, 14* 506:*12, 20*
509:*13* 511:*17*
512:*14* 529:*21* 532:*7,*
*8, 13, 21* 533:*19, 22*
**EXHIBITS** 269:*7*
270:*3* 439:*3* 469:*23*
504:*11* 533:*1*
**exist** 347:*14*
**existed** 351:*16*
522:*23*
**expect** 344:*25*
352:*14* 400:*14*
442:*21* 467:*1* 468:*4*
470:*5, 24* 471:*3*
474:*6*
**expectation** 334:*19*
343:*25* 356:*9*
**expectations** 290:*13*
328:*18* 335:*6* 370:*18*
449:*7*
**expected** 288:*22*
289:*7* 293:*18* 466:*4,*
*6, 10, 12* 467:*3*
469:*20* 470:*4, 10, 11*
471:*18* 474:*1* 505:*13,*
*15*
**expecting** 282:*3*
495:*1, 6, 8* 496:*2*
**experience** 287:*2*
299:*24, 25* 300:*1*
322:*6* 323:*15* 327:*24*
342:*14* 455:*6, 7*
475:*20*
**experienced** 474:*22*
**experiences** 299:*23*
498:*6*
**expert** 298:*1* 299:*9*
300:*17* 501:*6* 502:*6*
531:*8*
**experts** 300:*5* 301:*25*
302:*23* 501:*8, 10, 11,*
*25*
**expires** 535:*18*
**explain** 287:*15*
370:*19*

**explained** 287:*13*
301:*8* 306:*23* 312:*2*
345:*14* 350:*6*
**explaining** 292:*8*
**exposure** 290:*22*
461:*2*
**expressed** 416:*21*
505:*25*
**expresses** 416:*4*
**extensive** 401:*2*
**extensively** 489:*25*
**extent** 287:*23* 480:*17*
**external** 285:*12, 16,*
*19* 286:*15* 287:*11*
**externally** 287:*7*
**extracted** 439:*24*
**extremely** 400:*24*
416:*16, 20*
**eyes** 303:*14, 18*
360:*15* 393:*11*

**< F >**
**face** 478:*4*
**faced** 350:*19*
**facilitate** 296:*3*
325:*3, 4* 361:*24, 25*
**facilitated** 409:*17*
419:*23*
**facilitating** 305:*1, 6*
**facilities** 497:*19*
499:*23* 500:*4*
**facing** 364:*13*
**fact** 304:*1* 352:*19*
401:*10* 416:*20* 455:*4*
471:*17* 493:*23*
494:*10* 515:*24*
518:*14* 519:*7, 12*
523:*7*
**factor** 314:*16*
**factors** 282:*1*
**facts** 456:*1* 529:*16*
**factual** 318:*17*
519:*13* 527:*7*
**failed** 285:*22* 288:*2*
**failure** 288:*8* 363:*2*
**Fair** 322:*17* 417:*14*
482:*2* 508:*3* 510:*19*
512:*25*
**fairly** 285:*21* 459:*22*

**fall** 415:*8*
**fan** 293:*3*
**fantastic** 279:*7*
**far** 289:*4* 324:*21, 22*
420:*13, 22*
**fast** 432:*24*
**faulted** 301:*24*
**favor** 297:*25* 384:*13*
**February** 319:*20*
322:*25* 353:*22, 23*
354:*1, 14* 355:*6*
357:*24* 358:*11* 359:*4*
360:*24* 361:*4* 364:*25*
368:*1* 369:*8, 19*
373:*15* 380:*12*
535:*19*
**Federal** 533:*3, 13, 15*
**fee** 403:*7, 16, 24*
**feedback** 297:*14*
338:*25* 400:*7* 416:*9,*
*11* 425:*1* 431:*21*
434:*1, 9, 23* 435:*9, 16,*
*23* 455:*10, 12* 504:*24*
505:*3* 507:*22* 508:*11,*
*16, 24* 509:*7* 529:*22*
530:*11* 531:*7*
**feel** 318:*14* 340:*10*
378:*25* 428:*3* 476:*6,*
*21* 512:*25* 522:*1*
523:*4*
**feeling** 418:*9*
**feels** 297:*10* 329:*19*
357:*21* 401:*22* 417:*5*
427:*24*
**fellowship** 320:*17*
327:*9* 332:*19, 21*
333:*5* 340:*8* 341:*19*
342:*20* 346:*22*
**felt** 279:*5* 286:*20*
288:*15* 291:*5, 12, 13,*
*14* 298:*4* 303:*7*
353:*2* 358:*6* 375:*20*
381:*25* 432:*8* 433:*3*
449:*25* 466:*7, 11*
498:*5*
**FIFTH** 267:*9, 19*
268:*12, 16, 17* 271:*22*
272:*7, 10* 273:*4*
274:*3, 5* 284:*1* 293:*1*
298:*7* 299:*13* 303:*7*

Deposition of Gregory D. Carmichael, Volume II           Philip R. McHugh v. Fifth Third Bancorp, et al.

312:8, 9, 12   316:4, 11
318:21   319:13
320:13   321:1, 5, 8
322:13   330:18
332:22   341:22
342:23   347:9, 23
348:11   351:17
356:14   358:1, 13
359:7, 17, 20, 22
362:1, 3, 7, 13, 15, 23
365:20, 21   367:11, 12
369:4   370:12   374:14
377:4   382:20   383:3,
4   386:18   387:13, 18,
23   390:3, 4   392:7, 8
393:4   396:12, 13
401:9   402:23, 24
404:3   406:5   407:16,
17, 21   409:1, 5   410:3,
4, 7, 14   413:23
415:14, 15   420:3, 4
422:24   423:23, 24
424:2   425:16   427:22
428:13, 18, 25   429:7,
11   430:10, 11   433:10,
13, 25   434:14   436:24
437:17, 18, 23   438:14,
15   439:4, 7, 16, 19
440:18   443:3, 5, 13,
16, 17   447:11, 22
448:21   452:4   453:14
455:22   456:9   458:10
462:16, 25   463:15
466:19   481:10
482:22   485:10   487:6
489:13   492:9   493:3
496:20   500:19
512:22, 25   513:3
514:25   515:4, 25
516:6, 7, 10   517:3
518:7, 15   519:8, 19
526:9   532:20   533:7
536:4
**fighting**   418:1, 5
**figure**   370:20
**file**   447:19
**filed**   376:3   454:10
**fill**   344:8
**final**   271:15, 21
320:5   365:22   366:14,

23   370:22   371:11
372:16, 19, 20   401:24
410:6, 12, 21, 23, 25
411:1, 2, 20   421:4
425:7   426:19   429:17,
18, 19, 20   430:6
445:13, 14   506:21
**finalize**   373:15
**finalized**   381:14
408:19   410:19
463:11, 17
**finalizing**   421:5
**finance**   490:21
**financial**   290:10
322:5   323:14   324:4,
21   339:17, 22   348:21
349:5   368:11
**financially**   474:4
**find**   345:12   390:10,
11   519:14   529:4
**finding**   422:15
**findings**   421:21
**fine**   393:19   417:14
469:16   505:2   529:8
531:17
**fingertips**   382:24
**finished**   485:24
**Fintech**   299:24
363:25   365:6
**fire**   491:21
**fired**   491:6, 10
**firm**   295:24   305:19
312:11
**first**   271:8   276:5, 22,
23   277:15, 24   278:16
279:11   282:19
305:12, 16   318:4
320:7   321:10, 17
324:18   325:23   329:1
330:20   331:14
332:14, 20   333:8
338:20   339:6   340:17
345:22   348:19
351:17   356:17
358:22, 24   359:3, 17
376:9   383:21   385:24
387:11, 19   388:6
389:8   390:6   392:10
394:2   395:16   396:7,
21   401:21   402:12

403:5, 10   411:5, 9, 11
424:12   431:14   433:8,
25   435:4   440:2
441:8   443:6   445:22
451:7   457:22   462:20
468:23, 24   481:13
483:7   492:19   493:10,
17   504:18   507:25
510:21   511:15
515:10
**firsthand**   529:17
**fit**   288:10   464:20
465:1   470:16   494:14
**fits**   321:21
**five**   272:9   344:2, 5,
11   345:5   347:19, 20
387:4   460:2   461:12,
16, 19, 23   474:3, 13
475:3, 25   476:25
482:25   488:18   489:5
503:1   512:24   513:2,
4
**flagship**   513:6, 15
**flat**   349:22
**flip**   390:10
**floor**   453:25   459:21
465:15
**Florida**   518:18
**flow**   330:9, 10   461:11
**flows**   278:11
**flyby**   459:16   516:13
**focus**   272:20   278:12
291:18   326:1   333:21
338:3, 7, 23   340:4
348:8, 18, 23   349:7,
10, 11, 13   352:25
437:3
**focused**   348:25
401:18   478:10
**folder**   368:5, 6
370:16
**folks**   417:23
**follow**   459:11   469:25
**followed**   478:17
**following**   376:8
431:13   441:2
**follows**   271:10   279:2
409:18
**follow-up**   463:21

**force**   272:9   340:24
**forefront**   479:25
**foregoing**   535:9
**Form**   298:9   315:19
333:12   339:4   354:6
368:25   370:22
410:12   427:2   428:1
445:13, 15
**formally**   396:23
**format**   323:8   366:3,
5   368:16
**formats**   322:16
**form-created**   368:24
**forms**   318:23   342:14
447:19
**formula**   364:6, 7, 21
365:2   396:16   404:7,
10   405:3   406:23
409:4   410:7, 14
411:13   412:21   413:7,
15   419:19   421:5
**Forrest**   280:3   283:8
369:17
**forth**   277:1   293:14
297:14   299:10
309:10, 16   310:9
318:9   326:16   342:7
357:14   358:16   364:4,
24   365:16   368:13
375:25   378:23   382:5
385:5   432:11   433:6
468:15   496:5
**forward**   292:21
329:18   354:19
361:21   362:16
363:13   365:9   370:18
375:20   376:17
384:14   395:22   403:9
427:18   459:19
488:19
**forwarded**   480:16
**foundation**   339:2
364:8
**foundational**   277:2
282:13
**four**   275:5   323:23
324:18   351:24
405:11, 25   412:7
415:1, 7   416:12, 13,
14   423:18   502:4

Deposition of Gregory D. Carmichael, Volume II                    Philip R. McHugh v. Fifth Third Bancorp, et al.

**fourth** 307:7 327:3
343:9 349:17 385:25
434:24 436:5 510:3
**fox** 467:25 468:12,
20 481:23 482:9
486:18 488:5, 10, 12
**frame** 464:16
**Frank** 280:3 317:14
369:17 487:12
**fraud** 348:6, 16
**Friday** 404:6, 7
405:8 479:10, 18, 22,
23 480:7, 8, 9 481:4,
20, 21 482:10 485:20
**from's** 424:21
**front** 273:19 278:2
304:6 354:2 357:6
364:12 365:5, 9
379:19 382:24
394:14 400:16
405:12 410:7 411:16,
19 412:5 414:25
415:9 421:13 425:9
442:20 447:6 456:5
469:2 471:3, 4
531:25 532:2
**FTD** 405:3
**full** 276:10 277:15
279:11 282:19
290:11 295:18, 20
320:15 321:11, 19
325:23 327:4 329:1
330:20 331:12, 14
343:9 348:4 349:17
401:24 402:14, 15
410:20, 25 411:9, 15,
18 412:8, 13, 15, 17,
19, 20, 23 413:3, 5, 8
426:14, 24 427:8, 17,
18 428:6, 7 440:15
442:2 446:1, 19
**fully** 293:3 346:1, 12
514:12 523:13
**function** 341:21
342:1
**functions** 329:17
**Further** 269:5 283:5
298:1 436:5, 7 438:9
486:17 520:9, 17

532:10 533:17 534:2,
3
**future** 272:9 303:8
376:15 452:22
453:14 454:19
**FW** 276:14 277:3
278:9 281:11 370:23
373:3

**< G >**
**gain** 475:20
**gap** 298:24 502:10
**Garrett** 384:7 386:7
515:11, 16, 25 516:5
**Garvey** 490:15
**Gary** 291:14 446:6
**generally** 286:18
**generated** 367:23
**generation** 273:14
**generations** 272:10
273:4, 6, 23
**generous** 431:25
433:3, 4 471:4
**gentleman** 387:14
**gentlemen** 420:10
**George** 497:23, 24, 25
499:11, 12, 25
**getting** 298:1 341:16
391:17 394:5, 18
395:9 419:20, 21
467:5 474:19 478:23,
24 484:2, 17 498:14
527:3
**give** 293:20 296:13
325:18 352:4 406:11
418:20 433:9 471:15
520:10 527:22, 24
**given** 287:3 319:19
324:1 341:13, 20
342:2 360:1 366:7
416:5 425:15 460:4
461:20 467:2 477:4
501:5
**giving** 287:8 336:18,
19 367:1 448:11
471:13 474:8
**glad** 531:12, 13
**glance** 352:12
**go** 274:21 275:8
279:24 282:1 285:22,

23 286:21 287:13
288:13 298:14 302:1
308:14, 15, 24 311:2,
5, 10 313:18, 25
318:6, 7, 12, 13 321:2
327:10 330:9, 11
332:19 333:14
335:14 336:14, 22
348:4 350:13, 25
353:1 357:7 362:3
365:1 366:3, 10
370:18 373:6, 18
376:17 378:17, 23
380:22, 23 384:14
385:13 411:10
413:10, 16 414:23
416:3 423:6 425:23
427:14 432:2, 19
438:22 456:16 459:9
463:16 466:6, 10
472:14 473:3 477:24
491:21 496:13 502:4
503:18 511:10
516:14 525:17
**goal** 316:22 317:2
**goals** 340:25 349:6
420:11, 18, 23 421:10,
16 422:3, 16 433:6
434:16
**goes** 281:23 324:22
368:11 376:8 412:19
461:21 483:18 484:8
486:18 488:4 493:4
**going** 275:3 276:21,
22, 23 277:12 285:24
286:11 288:2 295:11
296:14, 23 297:1, 14,
15, 23 298:6 301:1,
17, 22 302:10 304:1
305:12 309:20
319:19 323:12 326:6,
16, 17 328:13, 14, 15,
23 329:23 330:8, 10
342:13 355:3, 22, 24
356:6, 10, 21 357:9,
10 358:8 359:6, 9, 10,
14 360:17 361:21
363:8 364:11 365:9
372:25 373:18, 25
374:5 375:18, 20

377:10 379:23
380:16, 22, 23 383:16
385:18 387:21
390:10, 14 391:25
393:22 395:17, 22
397:25 399:11 402:9
403:17 407:2 411:12
419:4, 7, 12 422:8, 15
423:12 427:21, 23
428:5, 6 429:14
433:6 436:22 447:5,
7 449:14 450:16
451:16 452:1 453:4,
11 454:5, 7, 11, 15, 22,
23 456:7, 8, 12, 17
458:10, 13, 19 459:2,
5, 9, 18 460:12
461:19, 20 462:16, 21
464:11, 12 466:13, 25
467:2, 4, 12 468:25
469:9 470:2, 13, 25
474:8 475:11, 12
477:13 478:7, 20, 21,
25 479:24 480:2
487:7 488:24, 25
493:10 495:2, 5, 15,
17 496:4, 14 497:16,
18 503:16 520:11
521:5, 14, 25 522:5
527:22 528:20
**good** 286:2, 3, 8, 9
288:10 296:16
298:15 301:19
303:16 314:4 321:20
327:12, 17, 20, 25
328:4, 7, 9 331:8
332:15 333:4 334:14,
23 335:16 336:4, 7
337:20, 24 341:14
342:15 343:7, 16
344:7, 14, 19, 21, 23
350:25 408:4, 6
417:2 422:11 425:2
432:2, 3, 6 461:4, 8
464:16 474:10, 12
477:14 483:3 487:18
490:1 504:25 508:15
**gotten** 455:10
**grade** 314:13 316:6

Deposition of Gregory D. Carmichael, Volume II | Philip R. McHugh v. Fifth Third Bancorp, et al.

**grading** 324:22
**Grand** 498:2
**great** 320:17 321:16
324:7, 11 327:4
331:18, 22 334:3, 8,
11, 18, 23, 25 335:3,
20 336:9 337:6, 8, 10,
12, 15, 17 340:19
341:1 343:10, 14
344:19, 21, 23 362:16
432:13 433:2 434:2,
12 439:25 477:16
488:13 491:12 507:6,
8, 18 508:1, 15, 22
509:5 520:7
**Greatly** 327:9 340:16
**Greg** 296:18, 21
305:23 316:16
374:17 381:15
382:11 388:25
390:17 400:5 406:15
408:5, 17 410:17
414:3 416:15, 23
420:7 423:4 431:12
434:6 449:10 469:18,
19 470:3 483:19
484:1, 14 485:16
486:2 487:19, 22
489:22 503:10
**Gregory** 267:15
269:3 271:3, 7
532:16 533:5, 17
534:8 536:19 537:24
538:24
**gross** 344:15 458:17
476:4 477:8
**group** 281:20 313:14
342:1 458:15 505:4
508:13
**groups** 346:5 373:7
**growth** 362:18
**guarantee** 371:15
428:2
**guarantees** 371:14
**guess** 273:19 294:20
309:10 385:10
395:25 405:12
439:14 482:18
496:24
**guidance** 327:13

**guy** 284:15 295:25
296:18 299:4 300:15
303:15 304:23 305:9
306:7, 17 307:4
308:11, 18 309:2, 7, 8,
14, 15 310:3, 4, 6, 14,
20, 23 311:12, 18
344:5 356:13 364:21
380:13 387:8, 11, 19
388:10, 18 389:3, 17
390:7, 16, 23 391:6,
22 392:11, 12, 15, 22
394:3, 11, 13, 15
395:13, 16, 18, 19
396:16, 21, 25 397:7,
13, 14, 17, 21 398:5,
10, 15, 16 399:3, 4, 9,
14 400:5, 6, 12
401:21 403:1, 5, 14
404:5 405:15 406:7,
9 407:20, 24 408:9,
14, 15 409:6, 21
410:9, 10 413:12, 25
414:2, 6 415:25
416:9, 11 419:9
420:6, 17, 22, 24
421:3, 6, 18 422:3
423:1, 14, 17 424:5, 7,
14, 17, 18, 21, 22
426:6, 25 428:2, 15
430:19 431:3, 6, 11
438:2, 7 445:12
477:11 489:24
504:20 505:16
**Guys** 344:11 382:23
467:9 468:15
**Guy's** 297:14, 21
310:4, 10 311:15
312:3 397:19 398:23
419:12 422:8 427:20,
21 431:21

< H >
**Hackett** 387:14
**half** 403:8 405:11,
25 412:7 415:1, 7, 22
423:18, 19
**halo** 418:1, 5
**HAMILTON** 535:3

**hand** 370:16 447:8
535:12
**handed** 312:7
316:10 365:19
367:10 369:3 370:11
374:13 390:2, 6
392:6 393:3 396:11
402:22 404:2 406:4
407:15 408:25 410:2
415:13 422:23
423:22 428:12 429:6
430:9 437:16 438:13
439:3 443:11, 15
481:9 485:9 487:5
489:12 492:3 500:13
**handful** 281:19
**handing** 420:2
466:18
**handled** 278:8
403:12, 14
**handles** 278:5
**hands** 392:25 413:14
**Hang** 478:13 481:25
**happen** 357:11
381:19 386:25 387:1
396:8 405:21, 24
406:21 449:3 454:23
478:21, 22, 25 524:17
**happened** 274:19
285:6 295:19 306:23
311:21 354:5 360:7
386:10, 23 387:24, 25
391:11 399:13
411:21 455:18 458:8
472:8 474:17 476:22
527:11
**happening** 375:15
381:13
**happens** 337:22
372:17 444:14
471:10
**happy** 392:17
**hard** 382:17
**harm** 297:9 303:16
309:16 310:13
311:19
**harmful** 297:2 298:3
299:5 398:21
**Hart** 393:16

**HCC** 372:19 402:6,
12 411:11 442:16
445:2
**HCCC** 401:25 402:4
**head** 272:14 344:4
379:18 384:6 386:4,
20 387:4 395:21
403:23 415:6 445:2
449:19 454:6 459:14
462:3, 13 464:17
467:4, 17 485:6
493:24 510:10, 12
512:10, 12 517:20
522:2, 3 526:22, 23,
24 528:7
**header** 405:5, 6
**heading** 366:14
447:23 492:6
**hear** 304:10 311:6
450:21 529:11
**heard** 336:13 435:24
450:19
**hearsay** 516:16, 18
**heavy** 314:5
**he'd** 358:19 395:21
452:15 460:2 476:16,
18, 20
**height** 365:10
**Heiks** 517:7
**held** 415:5
**he'll** 427:23
**hello** 516:13
**help** 313:12 315:4
350:13 363:17 389:5
430:2 471:24 507:11
531:13, 14
**helpful** 300:14
302:17 457:11
**helps** 313:16 315:8
**Heminger** 446:7
**Hennard** 424:2
504:19
**hereinafter** 271:9
**hereof** 536:13
**hereunto** 535:12
**hey** 295:20 459:2
**hi** 504:21
**high** 286:11 287:25
289:6 346:21 347:5

352:2 353:12, 19
363:14 461:5 507:14
**higher** 288:7, 14
348:24 353:13, 19
454:15 508:4 512:6,
11
**highest** 330:25 331:3
345:25 346:12 347:1
362:20 509:25 523:9
**highlight** 321:18
363:22 453:7
**highlighted** 363:19, 23
**highlighting** 448:1
**highlights** 400:3
448:6
**highly** 331:15
332:15 333:19
337:20 341:13
342:14 343:7 344:6
358:25 362:11, 22
458:22
**hire** 477:19 519:15
**hired** 515:4 517:9
518:24 519:1, 3, 8
524:25 525:3, 25
**hiring** 525:22
**historical** 346:7
**Hoffman** 351:11, 14
**Hold** 301:7 342:18
488:4 502:20 521:25
**holder** 289:5
**holding** 522:9
**Holds** 332:17 333:16
341:17 346:17
**home** 459:9 464:13
**hone** 436:5, 8
**honest** 514:12
**hope** 408:16 410:16
**hopeful** 464:14
466:9, 12 470:21
**hopefully** 519:14
**hoping** 358:19 380:2
460:8
**hour** 473:3
**hours** 402:15
**housekeeping** 501:16
502:9, 17 503:17, 20,
22
**Housman** 516:22

517:3, 18 518:1
**Howard** 484:18
**How's** 389:1
**HR** 272:14 312:21
372:15 373:13
464:17 467:4, 17
485:6 493:14 516:4
517:10, 18 526:12, 16,
20, 21, 22, 23, 24
528:7 529:12, 14
**HRC** 406:12
**huge** 293:3 342:25
**Hughes** 508:25
**human** 277:6 372:17,
18 379:18 408:12, 17
410:12, 17 411:3, 8,
17 412:1, 12, 16, 18,
22 413:1 414:7, 10
415:4 445:25 446:5,
9
**hundred** 276:20
302:20 400:16
**hygiene** 296:16

< I >
**IA** 525:3 526:4
**idea** 304:5 307:5
308:11, 18 309:3
398:9, 13
**ideal** 288:12
**identical** 366:25
533:19
**identification** 312:5
316:7, 8 319:17
365:17 367:8 369:1,
12, 24 374:10, 11
389:24 392:4 393:1
396:9 403:25 406:2
407:13 408:23
409:25 415:11
419:24 422:21
423:20 425:13
428:10 429:4 430:7
437:14 438:11, 25
439:1 443:8, 9
466:16 481:7 485:7
487:3 489:10 491:25
500:11 532:7, 8
**identified** 290:2, 5
303:20 349:25

366:22 375:24 382:1,
2 430:20 452:3
525:9
**Identify** 274:1
312:10 316:14
318:20 319:14 338:5
367:12 369:5, 14
370:12 374:15 383:5
390:4 392:9 396:13
402:24 404:4 406:6
407:17 409:2 410:4
420:5 422:25 423:24
425:17 428:13 429:8
430:11 437:19
438:15 492:4, 17
530:3
**identifying** 346:23
**II** 267:13
**III** 437:25
**imagine** 361:14
431:8
**immediate** 512:2
**immediately** 478:18
510:16, 20
**impact** 375:7 509:5
**impacted** 339:20
456:12
**impacts** 341:2 375:3
**impatient** 418:9
453:2
**implement** 339:19
**implemented** 349:25
438:20
**implies** 416:12
**implying** 333:19
**importance** 363:24
364:1
**important** 314:19
328:16 331:9 335:21
336:2 341:23 364:6,
15, 17 377:1, 11
400:25 432:25
436:13 460:1
**importantly** 365:3
**improve** 349:25
352:20 421:24
507:11
**improvement** 313:12
314:11 316:23

350:14 352:23, 24
353:3, 5
**improving** 421:23
**incentive** 371:19
**include** 306:3
308:12, 19 309:4
314:18 318:1 345:8
390:18 448:8 514:19
**included** 272:13
300:24 310:2 316:21
317:3 321:9, 13
322:7 323:11 325:25
328:12, 24 331:24
342:1 401:3 439:18,
21 440:4 508:13
**includes** 317:1
**including** 277:7
279:14 282:22
284:20 285:13 299:9
404:22 436:9 441:14,
22 457:20 463:10
508:3, 11, 24 509:7
**incongruent** 475:4
**inconsistencies** 426:19
**inconsistent** 405:23
491:19 497:23
**incorporated** 408:4
**incorporation** 457:18
**increase** 437:2
458:14 461:11 470:6,
24 471:5, 7, 13
**increases** 372:13, 21
**independence** 281:1, 7
**independent** 274:9,
12, 18, 23 275:19
278:8 281:4 294:23
370:1 419:18 422:8,
9 432:10 438:24
530:6 531:8
**indicate** 291:24
294:7 296:5 307:4
334:7 336:8 343:10
352:21 354:21 357:4
360:18 377:22 379:7
397:21 398:9, 13
453:17 462:10, 15
466:3 474:20, 21
475:18 486:18 494:2
504:14 524:24 525:2

Deposition of Gregory D. Carmichael, Volume II — Philip R. McHugh v. Fifth Third Bancorp, et al.

**indicated** 293:*16*
298:*14* 306:*25* 307:*4*
315:*12* 338:*20* 342:*6*
356:*13* 359:*5, 19*
360:*10* 372:*10*
382:*15* 383:*20*
384:*20* 390:*13*
451:*13, 19* 453:*21*
454:*25* 455:*20*
456:*25* 457:*12*
483:*20* 484:*2, 9, 24*
499:*18* 522:*19, 25*
523:*7, 8, 14, 22*
524:*12, 19* 530:*10*
536:*12*

**indicates** 275:*12*
280:*15* 283:*5* 316:*17,
21* 317:*2, 10* 348:*5*
384:*6* 397:*23* 403:*5*
406:*9* 410:*11* 414:*6*
417:*14* 424:*23*
428:*17* 431:*11* 441:*5*
445:*14* 467:*23*
487:*16, 19, 25* 493:*19*

**indicating** 304:*4*
335:*22* 407:*25*
449:*24* 476:*9* 482:*11*

**indication** 356:*11*
359:*16* 413:*24*
476:*14*

**indicative** 314:*20*

**individual** 278:*3*
279:*9* 280:*18* 287:*20,
23* 318:*7* 350:*10, 17*
357:*21, 23* 362:*20*
370:*5* 373:*12* 380:*4*
387:*21* 515:*10*
517:*25* 522:*9* 531:*24*

**individuals** 279:*16*
280:*1, 25* 281:*3, 4, 6*
296:*19* 299:*3* 302:*13*
303:*12* 309:*11* 310:*6,
11* 399:*10* 419:*6*
440:*16* 448:*24* 450:*5*
452:*13* 461:*25*
463:*22* 467:*12, 16*
515:*3* 518:*20* 519:*1,
8* 525:*20, 24* 526:*3*

**individual's** 315:*7*
368:*6*

**industry** 281:*16*
363:*17* 373:*10*

**inference** 301:*9*

**influence** 499:*1, 2, 3*

**influential** 375:*13*

**inform** 475:*6*

**information** 271:*25*
277:*2* 278:*18, 25*
279:*6* 280:*12, 22*
281:*14, 21* 282:*13*
283:*2, 18, 22* 284:*25*
289:*11, 14* 293:*19*
294:*5* 298:*24* 313:*17*
314:*9* 315:*4* 317:*25*
318:*5, 9* 319:*22, 25*
320:*1, 4* 321:*8, 12*
322:*20, 21* 323:*9*
324:*14, 15, 18* 328:*24*
329:*9, 16* 332:*5*
333:*9* 338:*15, 22*
339:*3, 21* 341:*4*
343:*15* 345:*8* 346:*10*
348:*1* 350:*4, 8, 13*
370:*23* 371:*8* 382:*23*
393:*13, 17* 422:*13*
439:*21* 472:*15*
517:*17* 519:*12* 527:*4,
6* 528:*14, 17, 19*
529:*17, 25*

**informed** 444:*25*
445:*3* 458:*9* 463:*14*
472:*19, 24* 474:*18*

**informing** 472:*12*

**inherited** 348:*23, 24*

**initial** 277:*22* 296:*3*
318:*11* 391:*19*

**initially** 300:*24*
351:*10* 382:*3* 390:*14,
21* 403:*19*

**initiate** 310:*3* 361:*7,
8*

**initiated** 284:*6*
309:*25* 310:*1, 4, 23,
24* 311:*11*

**innovative** 364:*18*
508:*10*

**input** 280:*5* 370:*5*
373:*8* 374:*3* 400:*20,
21, 24* 419:*14, 21*

**insane** 488:*5*

**insightful** 508:*22*

**inspire** 342:*19*

**inspires** 320:*17*
327:*9* 332:*19, 20*
333:*5* 340:*8* 341:*19*
346:*21*

**installation** 513:*3*

**instances** 519:*19*

**instruct** 305:*8*

**instructed** 484:*14*

**integration** 339:*16, 18*

**integrity** 346:*1, 12,
21* 347:*1, 5* 523:*9*

**intelligent** 363:*13*
432:*23*

**intended** 370:*1*
471:*15*

**intending** 402:*8, 9*
463:*16*

**intent** 326:*18* 328:*21*
370:*3*

**intention** 463:*11*
512:*23*

**intentionally** 503:*18,
21*

**interaction** 391:*15, 21*

**interactions** 455:*8*

**interest** 302:*12*
320:*14* 379:*22*
381:*25* 384:*15* 453:*7*
460:*10* 461:*14, 15*
477:*3* 483:*2*

**interested** 297:*5*
360:*3* 361:*5* 452:*23*

**Interesting** 498:*18*

**interim** 484:*18, 20*

**internal** 286:*4, 5, 9*
288:*22* 289:*1* 293:*17*
397:*2*

**internally** 329:*13*

**International** 446:*22*

**interpret** 397:*25*
419:*5*

**interpretation** 399:*6*
470:*13*

**interpreted** 496:*10*

**interruptions** 307:*19*

**interview** 309:*3*
530:*17* 531:*4*

**interviewed** 388:*13*
516:*11*

**interviewing** 388:*18*

**interviews** 525:*19*

**introduce** 288:*12*
395:*19, 20*

**introduced** 289:*17*
387:*18*

**introducing** 396:*7*

**introduction** 396:*1*

**investigate** 515:*24*
516:*3* 518:*14*

**investigated** 516:*4*

**investigation** 525:*7,
17* 529:*3, 4, 11*

**investment** 290:*20*
418:*1, 5*

**investor** 289:*22*
376:*9, 11, 14, 21*

**investors** 290:*12*
376:*13, 17*

**invoke** 495:*15*

**involved** 272:*17*
275:*17, 20, 25* 388:*17*
391:*17* 400:*18* 419:*8*
436:*18* 460:*5, 7*
475:*24* 498:*9* 499:*9*
500:*8* 505:*3*

**involvement** 351:*16,
19* 388:*19*

**irrelevant** 502:*19*
503:*4*

**issue** 283:*13* 314:*23*
369:*21* 375:*22* 399:*9*
406:*25* 457:*23* 460:*8*
461:*7* 464:*12* 478:*18*
479:*3* 526:*1*

**issues** 286:*2* 287:*22*
331:*17* 339:*19*
350:*11* 427:*18* 436:*7,
9* 437:*1, 4* 440:*19*
447:*24* 448:*1, 5*
460:*16, 25* 466:*24*
480:*6* 504:*2* 519:*25*
520:*2*

**item** 348:*22*

**items** 344:*24* 416:*12, 13, 14* 418:*21* 419:*1* 448:2, *6*
**iterations** 338:*19* 409:*16* 442:*15* 445:*24* 497:*1*
**it'll** 398:*21*
**its** 312:*17* 339:*17* 448:*17*

**< J >**
**Jackson** 267:*21* 535:5, *18*
**James** 517:*9, 11, 12*
**Jamie** 450:22, *23, 25* 451:*12, 17* 452:2
**Jamie's** 451:*15*
**January** 376:*21, 24* 377:8, *11* 386:*1*
**Jim** 387:*14*
**Jms@sspfirm.com** 268:7
**job** 279:8 282:2, *5* 286:*3, 4, 6* 310:*11* 314:*3* 315:8 327:*12, 20* 331:*18* 332:*15* 333:*18* 334:*14, 24* 335:*16, 20* 337:*12, 15, 17, 20, 24* 339:*15* 340:*19* 341:*1, 14* 342:*15* 343:*7, 10, 14, 16* 345:6 357:*11, 13, 16* 363:*1* 373:9 387:*1, 4* 388:*4, 5, 8* 389:*8* 412:*25* 451:*11* 458:*13* 459:*17* 460:2 461:*4, 8, 13, 19* 462:*6, 8* 465:*13* 471:6 473:*16* 474:*10, 12, 13, 14, 15* 475:*25* 477:*4* 482:*16, 17, 25* 501:*11* 531:*17*
**jobs** 280:*25* 282:*5, 6, 17* 313:*24* 314:*3* 344:2 345:5 347:*20* 461:*8, 10, 12, 16, 23, 24*
**Joe** 489:*24*
**joined** 517:*8*

**Joshua** 268:*4*
**Jude** 401:*4*
**judgment** 436:6, *8*
**July** 381:*21* 407:*24* 408:*11* 409:6, *21* 410:*8, 10* 413:*25* 414:*11, 12, 18, 24* 425:*25* 426:*3, 11* 445:*15*
**jump** 353:*18*
**jumping** 322:*8*
**June** 402:*1, 18, 20* 403:*3* 404:*8* 414:*20, 21, 22* 442:*4, 10, 13* 443:*3, 13* 445:5 500:*20* 501:*3, 13*

**< K >**
**Kabat** 498:*1* 499:*12, 13*
**Karen** 518:*17, 18*
**keep** 287:7 292:7, *20, 21* 321:2 328:*2, 3* 406:*15* 436:*17* 442:*23* 461:*13* 490:*12* 502:8 527:*21* 528:*20, 21* 531:9
**kept** 271:*25* 388:*20* 478:*4*
**Kevin** 401:*4* 498:*1* 499:*12, 13*
**Kevin's** 500:2
**key** 277:9 279:*14, 25* 281:9 282:*14* 283:7 284:*22* 285:*1* 289:*21* 290:*1* 317:*11* 321:*21* 325:6, *25* 326:*1* 331:*17, 23* 332:9, *12* 333:*1, 7, 23* 334:2 335:*4* 336:*3* 337:*7, 9, 19* 338:*2, 3, 5, 7, 23* 339:*18, 24, 25* 340:*3, 6, 8, 9* 342:*8, 9* 343:6 344:*13* 346:*8, 15, 23* 347:*8, 22* 363:*16* 400:*3* 409:*13* 420:*11* 436:9 440:*19* 447:*24, 25* 448:5, *12*
**kick** 394:*13*

**kicked** 385:6 401:*3*
**kicking** 401:*5*
**kickoff** 395:*25*
**kind** 275:7 284:*14* 357:*4* 440:*14* 442:*11* 449:*11* 502:*4*
**kinds** 519:*25*
**King** 278:9 281:*11, 14* 476:2
**knew** 299:22, *23* 300:*1* 301:22 328:*1* 359:9 387:*14* 450:*3* 452:6 453:*11* 454:*19, 24, 25* 466:7 473:*17* 475:*11, 12* 494:*3* 495:2, *5* 496:*1* 509:*24* 519:*14* 525:*24* 527:6 528:8
**know** 281:*23* 282:2, *4, 11* 287:*17* 288:9, *10, 11* 291:*11, 12, 20* 292:*11* 293:*13, 14, 25* 295:*25* 296:*15* 305:5 306:*16* 311:*1, 3, 9* 316:6 329:*18* 331:5, *6* 336:*17* 351:*15* 353:*24* 358:*24* 366:*25* 367:*19* 370:*25* 371:*1, 2, 15* 375:*12, 24* 376:*3, 4* 377:*15* 379:*24* 380:*1* 382:*21* 391:*25* 393:*11* 394:*12, 15, 25* 395:*10, 11, 16* 398:*3, 17* 399:*4* 405:*13* 408:*4* 413:*10* 414:*4* 415:5, *6* 417:6 418:*4* 419:*15* 426:*10, 14, 18* 438:8 439:20, *23, 25* 442:*25* 444:*1* 445:*18* 446:*12* 450:5 451:2, *17* 452:*14, 24* 453:2 456:*15* 464:*18* 465:7 468:6, *14* 469:*3, 8, 25* 471:*12, 16* 472:*10* 477:5 478:5, *20, 21, 23, 25* 479:*11, 15* 480:*10* 482:*14* 486:9, *12, 23* 487:*25* 488:*11, 22* 489:*4, 7* 490:6, 7

493:*16* 494:*11* 497:*3, 20* 498:*14, 18* 499:9, *10* 500:8, *9* 502:2, *10* 511:8 515:*15, 16* 517:2 518:6 520:*3* 521:2 526:*24* 529:2, *24* 530:8, *16* 531:*10, 21, 23*
**knowledge** 304:*19* 320:*10* 321:*25* 327:*1* 332:*14* 334:*10, 21* 341:*12* 342:*13* 346:7 363:*15* 447:*18*
**known** 285:*14* 450:*12*
**knows** 328:*1* 467:*23* 468:2
**Kris** 401:*4* 515:*11, 16, 25* 516:5

**< L >**
**labeling** 406:*13*
**Lamb** 284:*13, 16* 289:2, *4* 386:*20* 387:5 518:*17*
**landscape** 365:8 404:*21*
**language** 325:*25* 326:2, *21* 356:*24*
**large** 287:*24*
**larger** 436:*20* 452:8
**largest** 474:2 476:*3* 512:22
**Lars** 418:*1, 5*
**late** 387:*25*
**latest** 295:*13, 15*
**law** 533:*10*
**lawful** 271:*8*
**lawyer** 480:*15*
**lead** 280:6 294:*20* 303:7 315:*3* 384:*25* 446:8 458:*12* 474:2 484:5
**leader** 288:*11* 313:*14, 18, 23* 314:*4, 6, 13, 22* 315:*5, 9, 21* 320:9, *17* 323:22 326:*25* 327:4 328:*7, 9* 329:*16* 332:*13* 333:*5, 20* 334:9, *18,*

20, 23 335:6, 23
336:4, 7, 9, 12 340:2,
5 341:11, 25 344:1, 3,
7, 14, 19, 21, 23 345:5,
18 347:19 352:17
353:14 363:14 382:6
421:23 453:1 477:14
508:15
**leaders** 289:22 290:1
314:12 315:23
350:14 367:14 461:3
476:1
**leader's** 351:2
**leadership** 313:10, 21
314:20 321:17
327:14 329:14 330:6
331:15, 16, 22 332:24
334:3, 8, 11 337:6, 8,
10 339:16, 18 340:20,
22 341:21 342:4, 10
343:11 345:24
346:11 350:9, 16
376:18 384:17
404:22 406:14 425:3
505:1 514:9 523:22
525:3
**leading** 279:20
329:18 331:18
337:12, 15, 17 341:1
431:15, 18 432:1
433:20, 21 461:5
505:18 510:24 511:7,
10 513:9
**leads** 346:2, 13, 21
**learn** 444:23
**learned** 517:17
528:14
**learning** 363:14
519:7
**learnings** 346:8
**leave** 382:16 392:25
**leaving** 450:1, 8
452:4 493:25 494:3
**led** 529:4
**leery** 380:1
**left** 382:17 441:3
459:10 486:1 494:13
**left-hand** 325:14
**legacy** 320:24 329:6
330:23

**legal** 474:19 485:6
493:14
**legitimate** 297:9
300:18, 20 303:17
**length** 473:2
**lengthy** 318:10
**Leonard** 450:22, 23,
25 451:12
**letter** 493:10
**level** 276:21 300:3
311:20 312:19
325:18 328:8 348:22
349:2, 15 401:12
452:10 457:18 462:5,
7 475:3 477:1, 11
483:1 507:14
**leverage** 332:3
**leveraged** 317:10
389:7
**lifting** 314:5 520:5
**lights** 292:7, 20 328:2
**liked** 295:24
**likes** 427:14
**line** 281:17, 22, 23
297:12 329:16 370:2
371:5 386:13, 16
431:8 467:9 475:22
490:8 503:3 509:21,
23 510:15, 21 511:15
512:1 514:23 515:6,
12, 23 532:18
**lines** 327:25 492:23
**lining** 468:21
**list** 291:4 292:5, 9
310:5 325:20 329:24
339:25 340:1 343:2
420:11, 12 454:16
494:16 531:21
**listed** 323:23 342:3
421:17
**Listen** 308:23 469:10
**lists** 416:12
**litany** 455:17
**literally** 375:19
**litigation** 376:4
489:8 490:18, 22, 24
491:6, 11, 16, 21
501:17 502:8, 19, 20

**little** 353:13 391:14,
21 416:18 421:3
433:3 523:13
**lives** 345:24 346:10
523:22
**living** 298:2
**LLP** 268:11
**LOB** 474:3
**lobby** 496:21 497:7
**local** 331:25 332:1
**lock** 434:7, 8
**logical** 294:3 374:4
412:4 440:25 442:14
**long** 326:18 351:5, 8
380:24 463:7, 12
475:11
**longer** 356:6 403:17
495:14, 18 496:1
513:1, 4
**long-term** 282:23
371:18 381:8 453:3,
6
**look** 273:11 277:23
281:18 282:5, 7, 11
303:10 314:12 318:8
321:10 322:12
323:18 324:14
327:11 328:25 332:9,
20 337:19 338:25
343:5 346:16 356:16
362:8 363:11 365:1
366:1 370:23 371:13,
23 381:11, 12 385:24
386:18 387:16
404:13 407:23
413:10 414:23 426:2
427:14 429:15 432:2,
19 433:8 461:6, 24
469:21 490:13, 22
506:12 512:15
**looked** 291:9 369:22,
23 382:7 480:7
**looking** 275:10
302:9 319:1 322:11
323:16, 18 362:16
365:24 366:9 367:4
370:19 371:1, 7, 22
372:9 395:20 403:9
409:7 413:24 424:16

426:4, 18 438:18
500:20 520:7 533:19
**looks** 273:14 312:11
318:24 367:15 383:6
390:6, 8 418:15
423:1 424:16 486:21
506:18
**lose** 328:20
**losing** 448:21 449:7
**loss** 348:6
**losses** 348:16, 24
349:7
**lot** 276:23 282:1
285:24 287:25 288:6
291:10, 17, 25 292:10,
16 318:2 327:25
350:12, 15 352:16
379:12 380:3 389:3
393:12 395:23 401:2,
4, 9 436:18 467:14
484:14 495:17 502:6
509:19 520:2, 4, 5
**love** 458:11
**loved** 408:14
**low** 313:21 352:3
406:15
**lower** 290:17 324:14,
15
**lowest** 313:22 352:6
**LTI** 371:10, 18, 25
372:3, 7
**lying** 529:15

**< M >**
**magnitude** 449:17
457:18 467:12
477:10 483:5
**mail** 419:5
**main** 423:6
**major** 449:18
**majority** 272:21
364:12
**making** 302:20
332:11 418:9 436:16,
19 447:4 450:1, 3, 15
451:23 460:16
469:10 477:11 491:8
521:6
**Man** 472:14

Deposition of Gregory D. Carmichael, Volume II      Philip R. McHugh v. Fifth Third Bancorp, et al.

**manage** 289:22 317:14 467:15

**manageable** 340:14

**management** 276:13 281:10 285:23 286:9 322:5 323:14 324:5, 21 325:17 332:1 345:11 356:2 364:3 369:16 390:11 439:18, 21 440:2, 4 441:11 446:19 518:25

**manager** 327:18 525:22

**managing** 290:12, 15

**manner** 346:3 523:15

**March** 373:21 375:16, 17 380:13 382:16 383:21 384:3, 10 385:22 391:7 392:22

**mark** 461:6 469:23

**MARKED** 269:7 270:3 312:5, 8 316:7, 8, 10 365:17, 20 366:13 367:8, 11 369:1, 12, 24 374:10, 11, 14 389:24 392:4, 7 393:1, 4, 11 396:9, 12 402:23 403:25 404:3 406:2 407:13 408:23 409:1, 25 410:3 415:11, 14 419:24 420:3 422:21, 24 423:20 425:13 428:10 429:4 430:7 431:5 437:14, 17 438:11, 25 439:1 443:8, 9 466:16, 19 481:7 485:7 487:3, 6 489:10, 13 491:25 492:4 500:11 532:7, 8, 13

**market** 276:15, 16 332:4, 24 386:4, 15 513:15 517:8, 21, 22, 23 521:18 522:3

**marketing** 332:2

**marketplace** 281:25 335:25

**markets** 386:16 461:3

**marking** 366:20

**markup** 408:2

**Marsha** 291:12 292:12 294:20 295:1, 2, 16 297:13, 20 298:3 303:21, 25 304:14, 21, 24 305:13, 15, 17 306:8 309:19, 23 310:18 311:24 384:25 385:1, 2 391:16 396:24 399:18, 20, 24 401:14, 16 403:23 445:2 446:7

**Massive** 529:20

**material** 448:2, 6

**materialized** 297:25 399:2

**materials** 440:5, 7

**math** 273:24

**matter** 301:17 375:4, 7, 10, 12, 14, 16 396:16 407:20 420:8 422:9 426:11 427:15 437:21 536:8

**MB** 320:24 339:16, 22

**McCallister** 372:20 446:6

**MCHUGH** 267:6 268:16 271:23 272:7 273:4 284:2 290:6, 25 291:25 292:2, 18 296:6, 9 298:16 299:23 300:11 303:2 305:25 308:12, 19 309:3, 4 310:1 312:8, 9 316:11 318:21, 22 319:14, 16, 23 320:8 321:2, 5, 6, 9 322:14 323:10, 13 327:8, 19 330:18, 19 335:9 342:11, 21, 25 343:23 347:18, 24 348:11 353:8, 9, 12 354:13, 25 355:5, 7, 9 358:4 362:3 365:20, 21, 23 367:11, 12 368:1

369:4, 16, 19 370:12, 15, 21 371:23 373:20 374:14 378:2, 7 379:10 383:4 384:6, 7 386:19, 21 387:2, 6 390:3, 4, 9, 15 392:8 393:5 396:12, 13 401:15, 17 402:23, 24 403:18 404:3 406:5 407:16, 17 409:2 410:3, 4 413:23 415:15 420:4 422:24 423:23, 24 425:16 428:13 429:7 430:10, 11 433:10, 13, 25 434:14 437:18 438:14, 15 440:18 443:17 447:22 448:22 449:7, 25 450:10 451:13, 19 453:8, 20, 24 454:25 455:20 456:3, 24 457:19, 20, 22 458:9 460:11, 15 463:1, 12, 22, 23, 24 464:1 466:19 468:16, 18 471:21 475:23 476:24 478:12, 16 481:10 485:10 486:24 487:6 489:14 492:9, 10 493:20 494:3 500:20 505:10, 13, 20, 24 508:4, 12, 16 509:8, 24 510:13, 16, 22 511:16, 23 512:1, 8, 12 513:6, 16 514:1, 10 515:7, 17, 25 517:2, 14 518:6, 12, 13, 24 519:1, 3, 7, 20 521:22 522:12, 19 524:24 525:2, 10, 11, 13 526:7 530:10, 14, 16 531:4, 6 533:4 536:3

**McHugh's** 321:9, 12 322:23 331:13 332:6 339:14 340:18 345:19 350:25 353:21 369:8 519:18

**mean** 272:4 273:10 275:7, 23 314:12 321:22 325:10 333:23 366:14 382:5 383:12 394:16, 22 396:7 402:17, 21 405:11 416:7 418:25 419:2 427:3 444:7 468:20 470:12 480:1, 5, 8 481:5 492:15 499:5, 15 520:7

**meaning** 287:18 328:21 479:10

**meanings** 330:1

**means** 313:13 328:4 347:6 418:4 468:21

**meant** 326:13 372:5 419:6 489:4 496:7

**measure** 312:23

**measures** 510:15, 20 511:15

**media** 363:17

**medical** 393:13

**meet** 373:16 387:11 469:1 471:20

**meeting** 271:19 274:2, 5, 8, 12, 19, 21 275:22, 24 276:4, 9, 17, 19 277:3 278:1, 11 280:11 282:20 293:10, 20 294:12, 14, 19, 23, 25 295:1, 3, 7 303:22 317:12 332:7 356:2 359:21 360:10 361:1 373:6, 15 376:16 381:16 382:17 387:19 395:25 396:1, 3 400:21 402:11 405:11 413:9, 14 414:11, 14, 16, 19, 20, 22, 24 415:4, 5, 8 421:12, 14 422:5 426:17 430:1, 3, 5, 17 439:5, 12 440:5, 8, 11 441:3 442:4, 10, 13, 19, 23, 24 443:12, 16 444:3, 8 445:6 446:24 447:3, 13 448:4, 14, 17 456:3,

Case: 1:21-cv-00238-MRB Doc #: 77-16 Filed: 06/27/25 Page: 99 of 118 PAGEID #: 3927

Deposition of Gregory D. Carmichael, Volume II        Philip R. McHugh v. Fifth Third Bancorp, et al.

**23** 457:1, 5, 13, 16, 18, 19, 22 458:2, 4, 8 463:12, 24 464:1, 7 465:9, 12, 19 466:4 470:17 472:3, 11, 23 476:16 479:17, 20 485:15, 24 486:6, 8, 9, 10, 11 489:23 490:10 493:20 517:13

**meetings** 275:14, 17 276:1 281:4 395:22, 23 415:2 427:25 439:9, 19 473:2

**Melissa** 487:20

**member** 290:7 331:1 338:9 493:14 494:10

**members** 281:2 291:12 292:24 315:17 319:5 406:12 408:13, 18 410:13, 18 411:4, 7, 17 412:2, 15 414:4, 8 442:3 444:15 492:21

**member's** 312:23

**memo** 378:14 492:20

**memory** 275:1

**mention** 348:15 355:18 362:24, 25 459:1

**mentioned** 279:10, 23 281:2 291:15 292:2, 11 329:12, 22 342:11 347:12 354:15 356:5 373:5 379:13 384:11 423:10 432:22 450:24 451:6, 9 453:13 458:25 471:16 472:6 473:13 479:2 498:12 499:10

**mentor** 389:7

**message** 304:20 352:23 393:6, 23 394:20 415:19 416:3, 21 418:14 432:5 466:20 467:19 469:13 481:16, 22, 23 483:9 485:11 486:14, 19 487:8, 10, 17 488:15 489:14, 17 490:16 491:20

**492:25** 500:15, 24 501:19, 20 503:8

**messages** 318:18 344:13 419:17 427:25 501:2, 12, 15, 24 502:25 503:22

**messaging** 322:1 435:25

**met** 456:6 463:1

**Michael** 268:10 269:4 516:7, 8, 13 521:4, 13 522:10

**Michael@blankrome.c om** 268:13

**Michaels** 515:22 516:1

**Michigan** 480:21, 25

**middle** 386:4, 15 490:14, 23

**midyear** 317:21 455:20

**Mike** 372:19 446:6 511:11 514:11 515:22 516:1, 7, 8, 9, 13, 19 521:4, 5, 13, 18 522:2, 10

**military** 483:10 488:9

**millennial** 273:15

**million** 370:24 371:9, 11, 12, 21 372:9, 10

**mind** 302:5 422:20 464:17 479:25 490:12

**mindful** 422:7 436:17

**mindset** 364:18

**mine** 450:7

**minimum** 396:23

**minor** 408:18 409:21, 22

**minute** 311:7 520:10

**minuted** 447:14

**minutes** 274:2, 4, 9, 15, 18, 19, 21, 24 275:6, 9 439:5, 16, 18, 22 440:1 442:18, 20, 22, 23, 24 443:3, 12, 15 444:1, 4, 7, 11, 17,

**21** 445:19 446:14 447:23

**mischaracterize** 530:23 531:9

**Mischaracterizes** 341:7 343:17 445:16

**misleading** 329:23 350:21, 22

**misrepresented** 519:7

**missing** 321:24

**misstate** 336:24

**Misstates** 315:20 333:13 335:11 336:10

**misstating** 336:16, 17 337:3

**mistake** 302:21

**mitigate** 286:25

**mixed** 349:19

**MO** 470:25

**mode** 394:5, 17

**modify** 400:5 434:19 435:5

**modifying** 400:18 433:19

**moment** 418:8 421:18

**Monday** 392:17 437:22 438:5 486:20, 24 487:12, 24

**money** 460:5, 6 471:1, 19 474:8 477:4 502:7 514:1, 2

**monitoring** 484:16

**monthly** 394:2

**months** 322:25 382:8

**morning** 391:7 420:8, 14 423:3 458:5, 7 479:18

**mortgage** 349:23 352:4, 5 484:19

**move** 375:20 378:19 402:7 433:23 435:18 436:24 437:1 449:10 459:1 468:2 475:5 488:19 517:15 518:22 519:4, 16

**moves** 280:2 331:23 337:7, 9 432:24 435:18 436:19

**448:24** 467:24 471:25

**moving** 292:21 354:19 437:4 459:19 475:18

**multi-hour** 278:11

**multiple** 276:3 285:6 295:19 301:16 315:10 342:14 350:6 363:23 364:19 374:22 383:9 409:15 421:6 461:3 473:12 492:15, 17 494:21 495:3 496:25 503:5, 15 516:11 528:20

**< N >**

**name** 381:5 387:9 498:12 499:7 500:6

**named** 377:24 387:14 497:13, 20, 23, 24 498:1, 9, 17 499:12, 13, 14, 23 500:4

**names** 286:21, 22 287:3, 9

**Nancy** 481:17 482:19 484:13 526:25 527:1, 13 528:17, 22, 24

**narrative** 325:24 331:13

**national** 439:5

**nature** 280:4, 25 284:15 292:21 294:4 313:3 329:13 346:20 355:23 371:16 382:10 400:14 402:7 412:24 423:10 429:1, 3 449:1, 2, 3, 10 459:3 464:19 467:2, 15

**nauseating** 427:15

**navigate** 364:18

**near** 452:22

**necessarily** 282:4 312:19 313:2, 13 314:20 324:9 326:6, 9 329:22 345:17 350:9 351:1 352:16

365:7 410:25 466:5
491:19 519:23
525:23
**necessary** 339:9
363:21 378:19 422:7
473:9, 11 475:19, 20
523:4
**need** 274:18, 21
279:7 286:20 290:17
291:11 330:6 348:7
352:22 354:17 356:7
365:5, 10 423:5
451:10 456:25
457:10 459:22
461:13 469:4 477:25
480:16 484:9 487:13,
23, 25 488:2 495:14
513:2 528:7
**needed** 287:8 331:20
348:17 352:19 379:3
389:3 414:4 432:9
456:12 457:12
458:20, 22 459:8, 25
462:8 470:17 477:19
497:5
**needs** 314:16, 17
316:23 330:6 349:24
365:15 461:10, 25
470:5 519:12
**negative** 344:12
505:14
**negatively** 314:6
**Neither** 303:13
**network** 364:16
**never** 290:19 296:7,
20 302:9, 10, 11, 12,
14, 15, 16 303:18
320:16 326:18
327:14, 21 328:6
348:21 355:18 356:1,
5, 8, 10 357:9, 11, 17,
18 358:2, 7 360:6
378:15 401:14, 17
403:13 444:8, 20
451:9, 19, 20 453:12,
22 454:1, 2, 7, 8, 20,
23 455:10, 12, 14, 15,
16, 18, 23, 24 459:1, 5
471:9 472:16, 19, 24
473:5, 10, 11, 13, 14,

16, 17, 18 474:17, 23
475:1, 4, 9, 10, 11, 15,
16 476:13, 14, 15, 18,
20, 22 477:23 494:15,
19 496:3 521:15
522:25 525:5 531:8
**new** 277:1 282:2
285:24 313:10
363:21 364:13
388:23 389:7 404:22
424:25 467:17
504:23
**news** 493:2, 4
**nice** 331:10 339:15
469:4 497:10
**night** 418:16
**No.____Change**
537:2, 5, 8, 11, 14, 17,
20 538:2, 5, 8, 11, 14,
17, 20
**No.____Line** 537:2,
5, 8, 11, 14, 17, 20
538:2, 5, 8, 11, 14, 17,
20
**non-independent**
275:18
**normal** 449:16, 23
501:16 502:8, 16
503:16, 20
**north** 518:18
**Notary** 267:21 533:9
535:6, 19
**note** 307:17 366:12
487:18 515:7
**notes** 304:8, 12
318:11 330:18
413:11 535:11
**notice** 353:6 355:17
464:15 479:1 532:15
533:2
**November** 338:21
388:3
**number** 290:6, 7
312:8 316:11 318:20
332:11 365:20
367:11 369:3 370:11
371:25 374:14 383:3,
8, 10, 22 384:4
385:19 390:2 392:7
393:4 396:12 402:23

404:3 406:5 407:15
409:1, 7 410:3
415:14 416:14 417:1,
5, 9 418:7 420:3
423:22 425:15 429:7
430:9 431:5 433:7
437:17 438:13, 18, 20
439:4, 17 441:9
443:11, 15 446:18
466:19 480:12
481:10 486:13
489:13, 19 492:4, 8
500:14 504:11
512:15 515:3
**numbers** 373:17
429:23 430:24
**numerous** 450:6, 24
455:9

**< O >**
**O8** 425:24
**oath** 271:5 536:15
**object** 307:21, 22
308:1
**objected** 311:8
**Objection** 273:7
274:25 287:12 298:9
301:4, 7 304:16
307:6, 24 308:13
310:25 313:1 315:19
333:12 335:11
336:10, 20 341:7
343:17 354:6 378:8
412:11 427:2 430:22
445:16 464:22 473:1
479:7 491:7, 24
498:19, 20 502:14, 23
505:7, 18 508:6, 19
509:1, 9 510:24
511:10, 18 513:9
516:14, 15, 16 517:15
518:22 519:4, 10, 16
523:18 524:3, 21
530:18 533:25
**objections** 308:8
**objective** 312:23
336:18
**objectives** 349:6
**obtained** 312:24

**obviously** 277:23
282:3 290:8 335:24
375:17 377:18 380:6,
15 384:13 395:1, 10
404:19 416:7 442:15
445:23 468:21, 24
486:10
**occur** 290:17 388:7
400:15 407:11 415:2
448:10 472:9
**occurred** 274:14
295:4 303:21 304:5
310:14 311:14 354:1
360:6 399:7 415:2
419:16 439:20
442:13, 17 447:20
449:1 457:1 465:9,
10 472:10 479:22
480:14 498:7
**occurring** 395:9
398:8
**occurs** 371:16
**October** 376:20, 24
377:7, 11, 13 386:1,
10, 23 447:16 456:4,
10, 24 457:23, 24
458:1 460:12 463:2,
13 464:1 465:19
466:23 467:20
469:18 470:2 472:3,
5, 23 478:12, 16
479:10, 18 481:2
483:8 484:11 485:12,
18, 19 486:7, 14
488:5, 16 489:8
492:7 501:21, 24
535:14
**offer** 387:2 471:4
488:17 514:19
536:14
**offered** 344:1 345:6
347:21 471:8, 10
474:13 494:4, 15
513:6, 18
**offering** 521:22
**offers** 494:25
**offhand** 375:11
383:14 415:6 512:4
**office** 295:7, 9
303:23 355:11 454:3

Deposition of Gregory D. Carmichael, Volume II                    Philip R. McHugh v. Fifth Third Bancorp, et al.

456:4  459:11, 14
465:14  472:8  474:16
475:15  479:12
482:17  484:10
492:19  493:11  497:6
513:7  516:12  535:13
**officer**  279:13  280:7,
16, 22, 23  281:13
282:22  283:9, 10
284:7, 11  349:20
351:6, 9  369:17, 21
370:2  409:5  410:8,
15  441:15, 24  492:7
533:9
**officers**  280:17
**offices**  497:11
**official**  535:13
**Off-the-record**  308:22
**oftentimes**  282:6
313:18
**Oh**  405:6  411:12
480:3  531:14
**OHIO**  267:2, 20, 21
268:6, 12  532:15
533:8  535:1, 7, 13, 19
**Okay**  271:17, 22, 24
272:8  275:12  277:17,
18  279:19  291:8, 23
299:8  301:13  309:21
319:8  322:24  323:19
324:16, 17  325:9
326:24  330:5  334:22
347:25  362:4, 20
371:6, 11, 12  381:10
382:19  393:7, 20
396:24  406:13
407:12  415:10
417:20  418:7  424:13,
20  429:22  433:15
434:24  435:11  441:2,
5, 10  445:10  449:4
453:3  454:10  457:9
458:4  460:14  466:3
469:8, 21  472:8
481:12, 15, 18, 21
482:7, 10, 13  483:14
484:24  485:22
503:12  509:14
512:18  526:11, 18

527:1  529:13
**old**  277:1  354:23
**Once**  281:6  289:13
292:14  300:8  306:4
314:19  332:23
335:18, 22  336:1
337:18  341:4  343:9
346:22  347:11  349:1
352:1, 11  353:11
356:8  362:9  369:25
371:13  373:25
376:15  379:2, 17, 25
380:11  381:5  385:5
388:22  389:9  390:22
402:14  406:11, 23
409:16  419:18  422:5,
7  429:2  432:9, 18
452:25  453:13  454:1,
2, 8, 23  461:1  462:20
463:8  468:2, 3, 9
482:18  494:20
507:13  520:3
**ones**  299:20  325:3
446:4  512:4
**one's**  322:18  325:2
326:8  426:3  504:18
**ongoing**  496:22
**open**  321:3  363:13
**opens**  287:25
**operate**  364:10
**operated**  510:16, 21
511:15  512:1
**operates**  346:3
523:14
**operating**  283:9
332:4  374:3  404:21
455:5  499:22
**operation**  352:5
497:24  498:1  499:12
**operational**  322:5
323:14  324:22
497:25
**operationally**  417:11
**operations**  454:6
499:13  500:4
**opinion**  300:5  508:4
**opportunities**  279:15
283:7  286:5  313:12
314:10  315:1  317:11
319:17  325:6  331:21

350:14  353:15
355:20  357:4  361:21
421:23  440:20
447:24  448:1  453:24
454:21, 22  455:17
488:19  489:5  494:18
507:10
**opportunity**  286:24
314:25  323:6  325:8
341:20  342:2  358:20
360:1  368:23  376:12
432:9, 21  433:2
435:22  436:3, 21
448:5  459:19  477:17
482:24  483:1, 4
489:1  507:16, 17
513:16
**Opposing**  509:19
513:21  515:2, 10, 16
517:1  518:2
**opposite**  523:7
524:20
**ops**  331:19  337:13,
22
**optimal**  417:7
**optimization**  322:6
323:15  324:6, 12
**option**  384:9
**options**  316:22
476:23
**oranges**  524:4, 5
**order**  271:4  366:21
449:17  457:9  475:19
499:7  506:15
**ordinary**  501:17
503:24
**org**  379:7
**organization**  277:7
278:14  279:9  287:17
297:3, 4  303:17
309:17  313:6, 7, 9, 10,
11, 17, 19  314:1, 10,
11  315:2, 3, 5, 8
328:8  329:15, 18, 19
330:3  331:8, 10, 11
334:14  335:16, 17, 25
336:4, 7  339:8
345:16  347:19
349:21  350:11, 12, 18,
20  351:13, 14, 21, 22

352:7, 8, 13, 14, 15
353:16, 17  362:20
376:15  384:5  385:25
387:17  389:2  401:12
436:20  449:13  450:4,
13, 19  457:7  460:1
461:5, 9  467:5, 13
471:24  513:17  514:7,
8
**organizational**
320:10  327:1  332:13,
16  334:10, 20  335:20
337:21  341:11, 14
342:12, 16  343:8
374:19  378:13  379:2
383:6, 8  385:22
404:21  467:6, 14
480:3, 6
**organizations**  328:10
352:1
**organization's**  313:8
**organized**  516:8
**original**  366:7
401:23  469:22
**originally**  298:14
407:24
**originate**  398:10, 15
**ought**  287:7
**outcome**  309:15
419:11  467:11
523:12  529:14
**outcomes**  313:25
314:21  320:14
333:20  341:2  417:7
427:25
**outline**  392:16, 21, 23
**outside**  275:21
278:25  280:12
285:22, 23, 24  286:11,
21  287:16  288:1, 6,
13  312:24  315:13, 16
316:2  317:25  501:17
502:16
**outstanding**  340:20
343:11  504:2
**overall**  277:21
330:25  344:22  425:1
504:24  518:19
**over-planned**  348:17

oversaw 341:*25*
oversight 351:*12*
owner 321:*16* 346:2, 14
ownership 320:*1*

< P >
P&L 476:*4*
p.m 385:*15* 393:*24* 394:*7* 413:*19* 456:*17, 20* 469:*18* 481:*22* 482:*4* 483:*9* 485:*12* 486:*14* 496:*14* 520:*14* 534:*14*
packet 366:*7*
paddling 418:*11*
PAGE 269:*3* 284:*1* 321:*2, 3, 4* 323:*21* 330:*18* 368:*11* 383:*21* 384:*4* 385:*24* 386:*18* 390:*10* 401:*21* 415:*22* 424:*12* 431:*14* 432:*13* 433:5, 8, 24* 434:*13* 435:3, 5* 438:*23* 440:*17* 441:*8* 447:*22* 481:*13* 483:*7, 18, 23* 493:*5* 500:*19* 507:*2, 22* 509:*15* 510:*7* 511:*17* 512:*17* 529:*23* 530:*8* 537:2, 5, 8, 11, 14, 17, 20* 538:2, 5, 8, 11, 14, 17, 20*
paged 272:*20*
pages 319:*2* 535:*8*
paid 282:*3* 362:*20* 372:*21* 501:*6* 502:*6*
paragraph 277:*4, 15* 279:*11* 282:*18* 283:*5* 284:*4* 320:*7* 321:*11, 18* 323:*16* 325:*23* 327:*3* 329:*1* 330:*20* 331:*12* 332:*6, 15, 20* 333:*8, 10, 23* 339:*13* 340:*17* 343:*9* 345:*20, 22* 348:*4* 349:*17* 362:*8, 21* 363:*12* 375:*1* 379:*7* 442:*1*

446:*19* 493:*18* 510:*4* 512:*19* 520:*21*
paraphrasing 310:*7*
part 272:*16* 277:*24* 278:*1, 20, 22* 279:*20, 23* 280:*6* 281:*5* 294:*23* 295:*21* 302:*25* 306:*18* 313:*20* 318:*25* 346:*25* 369:*7, 18* 373:*13, 14* 377:*16* 391:*7, 9, 13* 392:*10* 405:*22* 421:*4, 22* 444:*2* 469:*13*
participate 405:*8* 421:*8*
particular 296:*1* 377:*3* 393:*10, 13* 423:*14* 510:*20* 513:*8*
particularly 314:*16* 356:*7*
partner 321:*21* 362:*16* 379:*19*
partners 320:*20* 329:*3* 346:*4* 523:*15*
party 294:*15, 17* 312:*24* 315:*13, 16* 316:*2*
Pas@sspfirm.com 268:*7*
pass 318:*4, 15* 339:*6*
passed 515:*7*
path 357:*14* 378:*18* 402:*9*
patient 434:*22* 435:*8, 18, 20* 507:*12*
Patterson 268:*5*
Paula 424:*1* 504:*19*
pause 395:*2*
pay 277:*9* 278:*7* 316:*4, 6* 370:*14, 18*
paycheck 473:*24*
Payments 349:*22*
peacefully 488:*19*
peer 281:*18, 19* 373:*7* 504:*24* 505:*3, 25* 506:*3, 7* 529:*24* 530:*4, 11* 531:*7*
peers 281:*17* 282:*16* 346:*4* 363:*16* 401:*4*

417:*6, 24* 434:*1* 505:*3, 10* 507:*22* 508:*3, 11, 17, 24* 509:*7* 523:*15* 529:*22*
pen 305:*10*
PENALTY 536:5, 6*
Pending 489:*9* 491:*16, 18*
people 286:*5* 314:*1, 2* 320:*17* 327:*4, 17, 18* 328:*3, 9* 367:*14* 391:*25* 393:*13* 401:*2* 403:*20* 416:*15, 22* 417:*2, 9* 418:*10* 450:*13* 488:*6, 10, 12* 507:*11* 516:*11* 519:*15* 520:*4, 5* 527:*2* 528:*6*
percent 276:*20* 302:*20* 311:*22* 320:*23, 24* 329:*5, 6* 330:*22, 23* 344:*15* 348:*7, 17* 349:*12, 19, 20, 21, 22, 23* 353:*9* 400:*17* 458:*16* 476:*4* 477:*8* 510:*5* 511:*22*
percentage 372:*23* 373:*1, 2*
perception 440:*23* 491:*1, 3*
perceptions 290:*13*
performance 276:*6* 277:5, 16* 279:*13* 281:*12, 15* 282:*15, 19* 286:*2* 312:*24* 313:*3, 14* 316:*18* 319:*18* 325:*16, 17, 19* 326:*5* 330:*4* 339:*1* 340:*11, 25* 344:*24* 348:*21* 349:*5* 356:*16* 359:*1* 363:*3* 365:*22* 370:*14, 17* 373:*19* 432:*20* 448:*12* 460:*16, 23, 25* 461:*7* 474:*21* 476:*18*
Performed 316:*2* 368:*12* 525:*19*
performer 347:*20*
performers 340:*24*
performing 334:*4*

353:*21* 460:*22*
performs 330:*3*
period 275:*15* 292:*6* 295:*11, 12* 310:*8* 354:*20* 357:*2* 381:*7* 397:*17* 414:*16, 17* 457:*5* 458:*15, 16* 467:*9* 501:*13* 502:*3*
PERJURY 536:5, 6*
perks 460:*7*
permanent 393:*18*
permanently 453:*23*
permitted 464:*24*
person 299:*17* 303:*7* 305:*11* 317:*11, 13* 379:*1* 469:*6* 516:*21* 517:*9* 518:*2* 525:*23* 526:*4, 5*
personal 313:*22* 343:*14* 354:*16* 393:*12*
personally 297:*3* 417:*25*
perspective 411:*2, 23* 509:*6*
Peter 268:*1* 269:*4, 5*
petulance 464:*21* 465:*2*
phase 403:*7, 8* 425:*21*
Phenise 268:*16*
Phil 271:*23* 273:*4, 14, 17* 290:*6* 292:*5* 296:*6, 9* 298:*16* 299:*23* 300:*11* 303:*2* 319:*16, 23* 320:*8, 9, 13, 15, 19* 321:*6* 323:*13* 326:*15* 327:*12, 18, 23* 330:*19, 25* 331:*13, 18, 22* 332:*6* 333:*25* 334:*1, 8, 18* 335:*1, 9, 19* 337:*5, 6* 339:*13, 15, 17, 21* 340:*18, 19* 341:*1, 19* 342:*10, 21, 25* 343:*10, 22* 344:*21* 345:*19, 24* 346:*6, 10, 20* 347:*18* 350:*24* 353:*8, 9, 12, 21* 354:*13, 16, 21, 23, 25*

355:5, 7, 9, 18   358:4
365:23   367:25   369:8,
16, 19   370:14, 16, 21
371:23   373:20
377:23   378:2, 4, 7, 25
379:10   384:5   386:19,
25   387:2, 6   396:22
397:11, 22   398:10, 14
401:3, 10, 15, 17
418:2, 5   448:22
449:7, 25   450:5, 10
451:1, 2, 13, 19   453:8,
11, 20, 24   454:25
455:20   456:3, 11, 14,
15, 19   457:6, 13, 19,
20, 22   458:9   460:11,
15, 25   461:4   462:2
463:1, 10, 12, 22, 23,
24   464:1, 6, 9, 10, 20
465:1, 6   466:7, 9, 12
468:16, 18, 22, 25
469:19, 21   470:3, 4,
15, 16   471:7, 20, 24
472:1, 11, 19, 22, 24
474:5, 10   475:1, 8, 18,
23   476:6, 24   477:19,
24   478:3, 6, 11, 15, 23
479:3, 6, 20   480:4, 7,
18, 19, 25   483:15, 18
484:1   486:24   487:17,
22   493:20, 23   494:2
505:10, 13, 20, 24
508:4, 12, 13, 16, 25
509:8, 24   510:13, 16
511:23   512:8, 11
513:6, 16   514:1, 10
515:7, 17, 25   516:12
517:2, 14, 19, 20, 22
518:6, 12, 13, 24
519:1, 3, 7, 18, 19, 22
520:5   521:10, 22
522:12, 19   523:8, 22
524:20, 24   525:2, 9,
11, 13, 25   526:7
528:9   531:8   533:3

**PHILIP**   267:6
268:16   536:3

**Phil's**   273:11   320:21
323:22   329:1, 3
330:20   331:14

332:12, 21   357:3
369:6   370:24   373:18
455:7   470:25   471:9
475:18   476:7   480:12,
15   484:25   485:3, 5
524:25   525:3

**Phone**   268:6, 13
295:8   297:20   303:24
304:7, 8, 21   385:10
400:1   480:11   486:2
501:5, 8, 9, 10   502:1,
9   503:9, 19

**phones**   502:7
**photograph**   335:8
**phrases**   324:9
**pick**   326:16   480:12
**picked**   382:19, 25
**picks**   358:5
**piece**   325:12
**pieces**   326:11
**Pinckney**   481:17
484:13   526:25   527:1,
13   528:17, 22, 25
**Place**   267:19   272:10
274:22   278:23   289:5
355:10   384:16
400:11   458:5, 6
472:4
**places**   276:3   380:22
**Plaintiff**   267:7, 16
268:1   512:20   533:3,
4, 12, 16
**plan**   286:8   357:17
473:11   492:22
**planned**   348:7
**planning**   272:21
278:5, 13, 15   279:16,
25   282:21, 23   286:3
288:21   289:20
365:13   374:4, 16, 23
375:8, 10   379:17
381:2   383:7   385:22
387:17   441:13, 22
442:3   446:3   491:5,
10   492:22, 24
**plans**   288:23   349:24
375:4   457:6   484:17
**play**   281:9
**player**   320:19   329:2
**playing**   378:12, 22

**please**   271:15
316:14   318:21
319:15   320:8   321:3
322:3   336:15   345:21
362:3   366:3   367:13
369:5, 14   370:13
374:15   377:5   383:5
385:19   390:5   392:9
393:20   396:14
402:25   404:4   406:6
407:18   408:4   409:3
410:5   420:5   422:25
423:25   425:17   429:9
430:12   437:19
438:16   458:23   484:3
492:5   500:19   504:19
506:12   507:25
508:21   509:4, 15
511:8, 11   512:15
533:2
**pleased**   305:20
460:23
**plenty**   454:20, 21
455:7, 8   459:4
**plus**   375:19   418:20,
25
**PNC**   268:11
**point**   276:17, 18
287:6   290:24   293:5,
9   294:24   297:12
313:15   314:7, 9
320:4   324:10   326:19
328:11, 14   330:5, 7
331:9   335:16   343:6
345:13   346:22   347:7
350:10, 22   358:9
361:11   375:18   376:8,
19   377:22   379:24
380:18   381:3, 15
382:11   394:6, 18, 22
395:5   396:21   400:3
401:20   415:8   419:11,
13   432:23   433:25
436:5, 24   437:2
447:12, 21   452:7, 20
466:14   468:6   472:18
476:15   490:15
498:13   507:15   508:9
510:20   511:21

517:23   519:21   521:7
523:5
**pointed**   333:7
**points**   282:11
313:11   336:3   343:3
376:9   423:7   427:18
522:17
**Poole**   268:16
**portfolio**   348:7, 16
**portion**   276:8   333:7
440:24   448:4
**portions**   325:24
**portrayed**   343:21
**position**   276:17
281:23, 24   282:24
284:7, 11   290:15, 21
297:7, 21   298:2, 3, 7
299:22   301:6, 20, 23
302:15   313:8   325:8
338:16   351:12
355:24, 25   358:18
359:10   360:18
364:20   373:4, 9
375:22   379:24   380:1
381:4   398:20, 23
452:10   453:20, 23
455:25   458:14, 22, 23
462:9   464:11, 14
475:3   482:22   494:4,
5   512:21   513:1, 13
514:3, 4, 13   519:13
520:23   521:22, 23
522:5, 9
**positioned**   362:18
476:17
**positions**   282:14
338:13   462:7   474:3
484:6   522:16
**positively**   339:20
341:2, 25
**possible**   282:16
377:22   441:14, 23
**potential**   278:13
280:2   282:22   284:6,
13, 14, 15, 21   285:1,
12, 15   286:15, 19
287:10, 22   289:6, 13,
14   291:19   325:8
354:17   357:16   358:7
359:2, 24   360:18

Deposition of Gregory D. Carmichael, Volume II                              Philip R. McHugh v. Fifth Third Bancorp, et al.

361:*6*  362:*1, 13, 15, 23*  384:*12*  388:*15*  391:*3*  401:*8*  452:*12*  453:*3*

**potentially** 286:*22, 25*  339:*2*  387:*22*  409:*14*  422:*17*  449:*19*  452:*10, 14*  458:*20*  461:*24*

**potentials** 296:*21*

**powerful** 336:*1*

**PPP** 519:*24*

**practicably** 331:*17*

**practical** 340:*12*  343:*4*

**practically** 339:*17*  340:*1*

**practicing** 441:*24*

**preceded** 515:*7*

**predominantly** 280:*6*

**prefer** 406:*15*

**preference** 290:*9*  292:*14*

**preliminary** 402:*1, 18, 20*

**prep** 486:*6*

**preparation** 355:*16*  479:*16*

**prepare** 317:*22*  318:*11*  332:*10*  339:*7*  355:*14*  384:*25*  385:*2*  442:*24*  449:*22*  457:*17*  493:*11*

**prepared** 272:*15, 17*  339:*14*  348:*2*  383:*24*  384:*1*  409:*6*  419:*10, 19*  426:*12*  440:*1*  467:*6*  493:*17*

**prepares** 339:*3*

**presence** 533:*9*

**Present** 268:*15*  276:*8*  355:*6*  426:*25*  427:*21*  430:*16*  440:*12, 24*

**presentation** 413:*13*  428:*6*  440:*12*  441:*2*

**presented** 271:*18*  285:*8, 9*  321:*13*  322:*22*  329:*10*  333:*2*  360:*9*  369:*21*  370:*23*

371:*19*  379:*16*  384:*19*  403:*11*  411:*14*  413:*2, 3, 7, 8, 11*  426:*16, 21*  427:*10*  428:*8*  440:*3*  446:*16*  455:*9*

**presenters** 440:*24*

**presenting** 426:*23*  427:*7*  447:*5*  482:*24*

**preserving** 484:*16*

**preside** 275:*17, 20, 21*

**presided** 275:*13, 14*  439:*9, 15*

**presidency** 459:*7*  513:*6*  514:*15*

**president** 292:*25*  294:*1, 13*  298:*7, 18*  299:*12*  300:*25*  301:*2*  302:*4, 8, 11*  340:*23*  355:*4, 19, 21, 22*  356:*10, 14, 22*  358:*1, 8, 12, 16*  359:*7, 15, 20*  360:*11, 19*  361:*3, 6*  362:*1, 7, 11, 24, 25*  363:*9*  373:*23, 25*  374:*5*  376:*19*  377:*4, 7, 13, 23*  380:*5, 8, 16, 20, 22, 24, 25*  381:*6, 7, 10, 17*  382:*20, 22*  383:*2*  386:*3, 12*  387:*23*  388:*3, 4, 9*  401:*8*  402:*8, 14*  409:*5*  410:*8, 14*  441:*15, 23*  447:*11, 21*  448:*8, 15, 21*  449:*6*  450:*1, 3, 16, 17*  451:*9*  452:*5, 18*  453:*10, 12, 14, 18, 21*  454:*2, 7, 8*  455:*1, 21*  456:*9*  457:*8, 14*  458:*10*  459:*3*  462:*16, 25*  463:*15*  467:*3, 18*  468:*7*  472:*13, 25*  473:*14*  475:*7, 8, 11, 22*  492:*23*  493:*4, 8*  494:*5, 19*  495:*11*  496:*2, 4*  505:*5, 22*  506:*1, 9*  512:*22*  513:*8*  514:*16*  517:*7,*

*21*  518:*18*  520:*24*  521:*1, 2, 5, 7, 8*

**presidents** 331:*25*

**presiding** 439:*12*

**pretty** 310:*14*  401:*2*  513:*12*  517:*19*

**previously** 317:*21*  366:*22*  431:*5*  445:*11*

**print** 504:*19*

**prior** 278:*24*  305:*21*  306:*5*  307:*2*  327:*11*  339:*1*  345:*14*  346:*8*  354:*17*  357:*24*  358:*11*  361:*19, 20*  364:*25*  365:*24*  375:*2*  376:*6*  378:*7*  379:*8*  387:*15*  389:*18*  394:*11*  395:*12, 13*  401:*5*  402:*10*  412:*21*  414:*20*  420:*25*  423:*11*  424:*20*  425:*23*  426:*1*  432:*22*  441:*6, 12, 21*  451:*14, 19, 23*  456:*13*  457:*3, 4*  462:*18, 25*  463:*3, 5*  498:*3, 4, 6*  499:*10, 17, 18*  500:*3, 4*  502:*8*  521:*6*  522:*8*

**priorities** 277:*7, 10*  279:*16*  284:*22*  285:*2*  288:*21*

**proactively** 332:*23*  342:*24*  347:*10*

**probability** 288:*1*  454:*15*

**probably** 273:*14, 15*  274:*21*  286:*25*  287:*3*  290:*23*  309:*10*  319:*20*  361:*14*  368:*7*  375:*20*  378:*20, 22*  382:*9, 23*  388:*6*  390:*20*  395:*19*  399:*5*  403:*23*  404:*25*  434:*6*  453:*4*  462:*18, 19, 20*  477:*12*  479:*15*  495:*15*  523:*12*

**problem** 307:*14, 17, 19*  460:*9*  470:*22*  478:*19*  508:*23*

**problematic** 351:*20*

**problems** 375:*23*

**Procedure** 533:*3, 14, 16*

**proceed** 271:*5*  303:*15*

**proceedings** 535:*9*

**process** 278:*6*  285:*23*  295:*23*  296:*3, 10, 16, 23*  297:*2, 4*  300:*13, 14*  301:*2*  302:*1, 18*  305:*1, 7, 13, 19, 20, 22*  306:*2, 3*  310:*12, 18*  338:*19*  356:*20*  361:*8, 10*  375:*10*  380:*16*  385:*6*  387:*22*  388:*16*  389:*5, 6*  391:*1, 15, 22, 24*  395:*21*  396:*2*  397:*16, 20*  400:*15*  401:*2*  411:*22*  412:*24*  416:*10*  419:*15, 19, 22*  421:*2, 3*  423:*15, 16*  427:*20, 24*  432:*11*  446:*21*  459:*5*  475:*14*  476:*19*  499:*10*  505:*4, 21*

**processes** 437:*3*

**produced** 366:*21*

**professional** 467:*24*  468:*5, 10*

**profile** 298:*22, 24*  299:*8, 11, 15, 19, 20*  300:*4*  301:*21*  302:*7, 9*  306:*6*  365:*11*  388:*14*  390:*19*  391:*3*  396:*17*  400:*6, 19, 22*  404:*7, 10, 11, 16, 17, 19, 24, 25*  405:*3, 18, 23*  406:*8, 10, 13, 14, 15, 19*  407:*1, 3, 20, 25*  408:*6, 12, 16, 20*  410:*17*  412:*3*  414:*1*  442:*5, 9, 14*  443:*21*  444:*2, 24*  445:*4, 14*

**profile-final** 407:*21*

**profiles** 302:*8*

**profile's** 404:*18*

**program** 473:*24*  519:*24*

Case: 1:21-cv-00238-MRB Doc #: 77-16 Filed: 06/27/25 Page: 105 of 118 PAGEID #: 3933
Deposition of Gregory D. Carmichael, Volume II
Philip R. McHugh v. Fifth Third Bancorp, et al.

progress 418:*9*
504:*1* 532:*5* 534:*4*
progression 287:*20*
project 496:22, *23*
497:*9* 498:*11*
promise 356:*9*
promised 357:*18*
promote 492:22
promoted 302:*14*
313:*23* 380:*8, 9*
477:*4* 495:*3, 4*
promoting 520:*6*
523:*11*
promotion 377:*23, 24*
457:*7* 474:*8* 493:*21*
495:*18* 514:*5*
pronounce 387:*9*
proper 337:*4*
proposal 401:22, *23*
403:*2, 6, 10, 14*
proposals 403:*13*
propose 382:*3*
proposed 279:*12*
316:*21* 317:*7* 382:*4*
383:*7, 9* 384:*5*
385:*25* 408:*1, 3*
431:*13*
proposition 288:*15*
pros 376:*23, 25*
377:*6, 9*
protection 473:*24*
490:*21*
proven 287:*23*
provide 276:*14, 21*
284:*25* 328:*19*
329:*16* 341:*21* 373:*5*
388:*10, 12, 24* 391:*23*
427:*17* 448:*7*
provided 277:*2*
279:*1* 281:*12, 21*
283:*2* 289:*15* 293:*18*
294:*2* 312:*20* 315:*13,
15* 319:22 329:*9*
331:*13, 22* 332:*7*
335:*4, 9* 337:*5, 6, 8,
10* 350:*4* 367:*17*
368:*6* 369:*11* 400:*21*
413:*5* 440:*5, 7, 10*
442:*14, 16* 447:*25*

provides 282:*13*
314:9 315:*4* 334:*8*
344:*10*
providing 278:*19, 25*
280:*12* 281:*14* 283:*1,
18, 20, 22* 294:*4*
327:*13* 340:*19*
343:*11*
proxies 281:*21*
proxy 344:*5, 11*
362:*13, 19* 458:*13, 14,
18, 19* 462:*8* 474:*4, 9*
Public 267:*21*
402:*16* 447:*18* 533:*9*
535:*6, 19*
pull 317:*24*
pulling 320:*3*
punching 520:*2*
purpose 299:*11*
533:*15*
purposefully 503:*21*
purposes 299:*6, 8*
301:*21* 306:*4, 22*
325:*2* 326:*20* 328:*16*
367:*5* 391:*14* 398:*3*
503:22
pursuant 393:*9*
533:*2*
pursued 346:*9*
390:*23*
push 380:*5* 417:*9*
pushed 310:*20*
put 292:*8, 22* 293:*14,
25* 296:22 297:*1, 4*
300:*16, 17, 19, 22, 23*
306:*5, 10, 14, 16, 20,
25* 309:*8, 12, 16, 20*
310:*5, 12, 18, 21*
311:*15* 330:*5* 331:*8*
336:*3* 338:*17, 18*
340:*13* 343:*25*
345:*10* 347:*8* 349:*11*
350:*7, 23, 24* 359:*13*
360:*17* 361:*18* 363:*2,
8* 371:*9* 374:*8*
379:*19* 384:*15, 21*
387:*21* 388:*14*
397:*16, 19* 399:*16*
401:*11* 403:*20*
405:*19* 422:*10*

423:*11, 16* 435:20
437:*12* 454:*15*
458:20 459:*14* 460:*5*
471:*12, 17* 475:*2*
479:*1* 488:*17* 490:*15*
492:*16* 494:*16*
521:*17* 522:*12* 530:*8*
Putrino 518:*3, 6, 15,
16*
puts 380:*3*
putting 296:22
297:*25* 298:22 374:*6*
447:*9* 464:*15* 471:*4*
484:*18*

< Q >
qualifications 522:*4*
qualified 297:*7*
299:*20* 302:*14* 303:*5,
13* 453:*17* 454:*20*
455:*1* 476:*14* 535:*6*
qualify 477:*6*
qualities 404:22
quarter 276:22, *24*
382:22 388:*6* 479:*18*
486:*7*
quartile 282:*4*
question 272:*14*
274:*10, 16* 277:*18, 19*
283:*12* 298:*9, 11*
300:*23* 301:*8, 11, 12,
18* 304:*18* 307:*7, 11*
308:*24* 309:*2* 315:*20*
321:*24* 322:*8* 326:*21*
333:*13* 336:*15, 23*
337:*1, 3* 338:*1* 351:*7*
372:*24* 377:*5* 380:*18*
393:*8* 398:*12* 404:*14*
409:*11* 413:*2* 427:*3*
439:*25* 443:*19*
460:*21* 465:*20, 23, 25*
472:*21* 488:*3, 13*
489:*2* 491:*7, 9* 494:*8*
500:*10* 503:*1, 3, 15*
505:*2* 510:*25* 511:*12*
513:*23* 515:*14*
516:*24* 518:*5, 7*
524:22 525:*1* 527:*16,
17, 19, 21* 528:*13, 21*

529:*7, 10* 530:*19, 24*
questioned 455:*15*
questioning 307:*13*
509:*21, 23* 515:*6, 12,
23*
questions 283:*6*
285:*11, 18* 287:*25*
288:*19* 306:*5* 308:*6,
16* 313:*5* 350:*16*
389:*1, 6* 392:*18*
404:*20* 405:*19* 411:*6*
484:*18* 503:*25* 504:*6*
509:*19* 511:*7* 514:*24*
520:*9* 530:*7* 532:*3, 6*
534:*2, 3*
question's 301:*10*
430:22
quick 338:*1* 416:*16*
431:*12*
quickly 306:*7* 408:*5*
432:*23* 435:*18, 19*
437:*1, 4* 487:*19*
507:*14, 15*
quit 345:*7* 387:*1*
473:*19* 482:*20*
quite 290:*3*
quote 361:*23*
quoting 515:*15* 517:*1*

< R >
radar 287:*7*
rage 470:*16* 494:*14*
Rapids 498:*2*
rating 316:22
325:*10, 11, 13* 326:*14*
328:*16* 333:*3* 334:*5,
24* 336:*5* 343:*2*
431:*25* 432:*10*
ratings 316:*21* 317:*1,
2, 7, 14* 433:*23*
rationale 403:*22*
reach 469:*5, 9*
480:*19* 517:*10* 528:*8*
529:*12*
reached 309:*19*
370:*20* 480:*25*
483:*19* 484:*1* 516:*10*
517:*18* 526:*12, 16, 20*
527:*7* 529:*14*

Case: 1:21-cv-00238-MRB Doc #: 77-16 Filed: 06/27/25 Page: 106 of 118 PAGEID #: 3934

Deposition of Gregory D. Carmichael, Volume II      Philip R. McHugh v. Fifth Third Bancorp, et al.

**react** 449:*20*
**reaction** 464:*6*
**read** 277:*17, 18*
308:*16, 20* 320:7
325:*23* 331:*12* 332:5
339:*13* 340:*17*
345:*20* 362:*21* 397:5
404:*13* 409:*13* 416:7
421:*19* 437:2 443:*24*
468:*11* 487:*17*
504:*13* 507:*25* 508:*9,
21* 509:*4* 511:*6, 24*
512:*19* 520:*21* 533:*1*
536:*7, 9*
**readiness** 284:*21*
285:*1* 288:*24* 289:*8,
21*
**reading** 399:*6*
**reads** 279:*12* 281:*11*
284:*19* 285:*10*
288:*18* 289:*19*
382:*11* 394:*2* 396:*21*
400:*4* 401:*21* 420:*10*
436:*5, 24* 440:*3*
446:*20*
**ready** 344:*14* 357:2
360:*11* 369:22
**realigning** 331:*24*
**really** 277:*25* 278:*12*
282:*12, 15* 285:22
291:*18* 293:*11*
295:24 352:*8* 389:*8*
391:*24* 394:*21*
417:22 448:*11*
459:*15* 478:*21*
479:*11* 489:*25* 497:7
522:2
**reason** 302:*25*
341:*15, 19* 353:*25*
354:*3* 389:*21* 394:*23*
411:5 421:*14* 431:*24*
506:*15, 18* 521:*25*
537:*4, 7, 10, 13, 16, 19,
22* 538:*4, 7, 10, 13, 16,
19, 22*
**reasonably** 470:*19*
**reasons** 303:*15*
306:9 391:*4* 467:*14*
**rebuilt** 351:*21*

**recall** 274:*19, 22, 23*
275:6, 7 278:*24*
283:*12, 15* 285:4, 8,
*18, 20* 286:*18, 23*
287:5, 8 289:9 292:*1,
4, 10* 293:7, *10*
294:*10* 305:5 312:*15,
17* 353:*21, 23* 354:*5,
12, 15, 25* 355:*4, 17*
359:*21* 360:22
367:*20* 375:9, *11, 15*
376:7, *25* 377:*3, 11,
14, 17* 379:*11* 383:*14,
16* 384:9 385:*11*
389:8, *20, 23* 392:*24*
394:*10, 23* 395:*3*
396:*3* 399:*14* 403:*14*
405:*20* 406:*20, 21*
407:5, 6, 9 409:*20, 22*
414:*13* 420:*17, 19*
421:6 422:2 423:*4, 8,
13, 15, 18* 426:*5, 8, 23*
427:*7, 12* 428:*4, 21,
22, 24* 429:*12* 431:*17*
437:*9, 12* 440:*7, 14*
441:*18* 442:*9, 11*
445:7 446:*15* 447:2
448:*17, 19, 23* 449:*24*
450:2 451:*15* 455:*19*
456:7 458:*1, 3, 6*
462:*4* 463:*19* 466:*5*
470:*10* 471:22 476:*8,
9* 479:*4, 13, 14, 16, 19,
20, 22* 480:6, 7, 8
490:6, 8, *11* 491:*14*
501:*18, 25* 502:*4, 15*
503:*20, 23* 507:*4*
509:*21* 512:*4* 514:*12,
13* 517:*13* 518:*23*
520:*21, 25* 525:*5*
531:6 532:2
**recanting** 416:*8*
**receive** 494:*6*
**received** 313:*25*
326:*15* 339:*1* 366:22
416:*10* 423:9 428:*23*
430:*15* 449:*14*
455:*12*
**receiving** 387:*20*
423:8 428:*21, 22*

**recess** 330:*13* 385:*14*
413:*18* 456:*19*
496:*16* 520:*13*
**recognition** 323:6
**recognize** 504:*4*
**recognizes** 340:*23*
**recollection** 274:*8, 11*
285:5 286:*13* 292:*15*
293:*11* 295:*18*
309:*23* 311:*20*
395:*12* 396:*4* 405:*14,
25* 440:*22* 486:5
**recommend** 291:7
294:7 296:22 297:*8*
359:6, 9, *14* 494:*4*
**recommendation**
292:*25* 300:*10*
372:*15* 377:*12, 14*
397:*19* 507:5, *18*
**recommendations**
421:*21* 431:*21* 434:*8*
**recommended** 356:2
396:*23* 475:*12*
**recommending**
293:22 359:*11* 377:*3*
398:2 419:*12* 475:*8*
**re-copy** 325:*16*
**record** 271:2 307:*18*
311:*3, 9* 330:*11, 15*
366:*12* 383:*11*
385:*13, 16* 393:*18*
413:*16, 20* 444:*5, 14*
456:*16, 18, 21* 496:*13,
15, 18* 504:*13* 512:*19*
520:*12, 15* 530:*18, 25*
**recorded** 275:*13*
533:*11* 535:7
**recruit** 517:*19*
**recruited** 515:*3, 17,
22, 24* 516:*6, 13*
517:*2, 11* 518:*6, 11,
15, 17, 20* 519:*8*
525:9, *11, 12, 16, 21,
23, 25* 526:5
**Recruiters** 516:*8*
**recruitment** 277:*9*
514:*24*
**redact** 393:*17*
**redo** 496:*20*

**redone** 497:*4*
**reduce** 528:*14*
**reduced** 403:*7, 8, 16*
**redundant** 307:*13*
308:*5* 464:*23* 473:*1*
**refer** 271:*14* 321:*15*
323:*12* 327:*12*
385:*18* 393:22
420:*13* 430:*23* 433:7
440:*17* 481:*13*
489:*16*
**reference** 290:*3*
361:*16* 362:*5* 405:2
408:*10* 468:*18*
**REFERENCED**
269:7 270:*3* 295:22
387:*8* 405:*9* 460:*13*
525:7
**references** 391:*6*
409:*20* 420:*21*
**referring** 271:22
272:6, 7 274:*1*
275:*12* 276:5 278:*16*
280:*10* 282:*18* 289:2
294:*16* 319:*13*
325:22 327:*3, 7*
345:*19* 349:*17* 362:2
370:8, *9* 383:*3*
385:*24* 401:*20*
413:22 414:*17*
418:*14* 419:*4* 424:*11,
22* 433:*13, 24* 434:*13*
442:*1* 443:*20* 445:*9,
19* 446:*10, 18* 463:*25*
467:*19* 468:*14, 16*
482:*19* 483:7 486:*13*
488:*15, 22, 25* 490:*4,
18* 493:*18* 506:*25*
529:*21*
**refers** 280:7 293:*16*
378:2 430:*15* 503:*9,
10*
**reflect** 313:*14* 314:6
328:*10* 333:24 340:6
353:*14* 355:*20, 23*
357:*20* 403:6, *8*
443:*21*
**reflected** 435:*13*
**reflecting** 313:6

373:*19*

**reflection** 461:*4*

**reflective** 345:*17*
350:*9* 352:*16*

**reflects** 344:*9* 345:*3*
353:*15* 441:*1*

**refresh** 486:*5*

**refreshed** 497:*5*

**refused** 345:*6*
386:*25* 465:*13*
473:*15* 474:*14* 476:*4*
477:*18* 482:*16, 17*
484:*4* 488:*18* 489:*5*

**regarded** 332:*15*

**regarding** 285:*1, 19*
304:*23* 345:*9* 399:*9,*
*24* 419:*9, 10* 421:*9*
437:*10* 439:*17*
445:*13* 466:*24*
525:*18*

**region** 331:*15, 19*
337:*7, 9* 513:*8*
518:*18* 520:*24* 521:*3,*
*9, 10, 19*

**regional** 331:*16, 18,*
*25* 332:*2, 4* 333:*18*
335:*24* 337:*12*
339:*16* 384:*6* 386:*4*
492:*23* 513:*7* 514:*16*
518:*19*

**regions** 328:*1*
331:*23* 333:*20*
386:*13* 460:*22* 461:*1*
475:*22, 24, 25* 476:*2*
512:*22*

**regular** 315:*22, 24*
466:*23*

**regulatory** 280:*24*

**rehash** 464:*24*

**reiterated** 464:*9*

**related** 280:*3* 348:*6,*
*16* 375:*4* 411:*8*
441:*13, 14, 21, 23*

**relations** 290:*21*

**relationship** 393:*14*

**release** 493:*2, 4*

**Relevancy** 273:*7*
498:*20, 21, 25*

**relevant** 279:*5* 287:*4*
325:*7, 9* 329:*11*

330:*4, 7* 345:*13*
350:*21* 414:*3*

**remain** 513:*3*

**remaining** 514:*19*

**remains** 382:*11*

**remember** 274:*18*
275:*4, 8* 292:*7, 17*
310:*19* 360:*4* 379:*14,*
*15* 389:*2* 394:*14*
395:*3* 399:*19* 441:*25*
472:*1* 500:*1* 502:*5*
509:*25* 513:*22*
514:*23* 515:*2, 6, 11,*
*14, 18, 19, 21* 516:*22,*
*23, 24* 517:*4* 518:*3, 4,*
*5, 7, 9*

**remind** 494:*20*

**reminded** 442:*2*

**reminding** 441:*6, 12,*
*21*

**remodeling** 497:*1*

**remove** 272:*25* 273:*2*

**renamed** 497:*16*

**repeat** 334:*17*
430:*23* 472:*21*
489:*19* 511:*11*
523:*24*

**repeating** 528:*20*

**replace** 350:*19*

**replacement** 296:*21*

**report** 316:*16*
386:*14, 17* 391:*23*
401:*24* 402:*1, 18, 20*
418:*19* 419:*9* 421:*5*
422:*10* 423:*4, 10, 11*
424:*24* 425:*6, 7, 9, 11,*
*18* 426:*7, 15, 24*
427:*8, 23* 446:*23*
451:*8* 454:*5* 484:*20*
487:*23* 492:*24*
504:*22* 514:*15*
517:*21* 530:*5, 6*

**reported** 351:*12*
387:*6*

**reporting** 281:*12*
290:*21* 386:*13, 14*
451:*25* 458:*24* 466:*8*
513:*13, 14*

**reports** 316:*19* 317:*8*
319:*8, 10* 370:*2*

384:*7* 386:*7, 20*
395:*18* 401:*9*

**represent** 342:*11*
365:*21* 393:*5* 412:*20*
415:*18* 429:*22* 487:*7*
504:*5*

**representative** 342:*25*
351:*1* 521:*18* 531:*5*

**representing** 335:*25*
366:*17, 19* 457:*23*
502:*24*

**represents** 332:*22*
341:*22* 342:*23* 347:*9*
412:*13* 446:*1*

**request** 294:*25*
296:*2* 361:*11* 374:*9*
380:*11* 385:*2, 8*
388:*13* 396:*1* 403:*20*
500:*9*

**requested** 305:*18*
309:*22* 384:*21, 22, 24*
438:*20*

**require** 401:*25*
402:*4* 500:*6*

**required** 299:*16*
499:*7*

**requirement** 280:*24*

**reserves** 533:*16*

**resigning** 484:*5*

**resolutions** 284:*4*

**resolved** 520:*3, 6*

**resort** 288:*5*

**respect** 276:*16*
277:*11* 279:*19*
280:*22* 283:*1, 13*
304:*1* 305:*13* 315:*12*
325:*22* 334:*25*
338:*22* 362:*6* 372:*13*
374:*23* 389:*19*
431:*18* 470:*9* 487:*10*
525:*8*

**respected** 459:*21*
465:*15* 474:*22, 24*
475:*1, 4*

**respective** 426:*7*

**respond** 355:*2* 394:*7*
406:*24* 459:*16*
477:*23* 480:*15, 22, 23*
481:*1* 487:*22* 516:*9*

**responded** 311:*18*
378:*17*

**responding** 436:*6, 8*

**responds** 408:*15*
417:*20* 469:*4, 17*
484:*13* 485:*23*
487:*18* 490:*12*

**response** 275:*10*
283:*6* 285:*10* 288:*19*
308:*20* 310:*10* 355:*5*
356:*9* 430:*18, 20*
431:*4, 12* 489:*6*
527:*8* 530:*17*

**responses** 416:*5*

**responsibilities**
279:*24* 281:*8* 331:*15*
340:*22* 349:*1* 362:*19*
380:*3* 412:*18* 446:*2*
461:*12* 475:*19*
518:*19*

**responsibility** 282:*8*
290:*11, 19* 320:*2*
341:*17* 351:*13*
357:*12* 363:*1* 436:*16*
446:*3*

**responsible** 379:*18*
412:*17* 531:*23*

**rest** 281:*7* 459:*12*
463:*4*

**restate** 274:*10*
510:*25*

**restrictions** 503:*23*

**result** 460:*16*

**results** 277:*8* 280:*17*
312:*13* 313:*7* 332:*18*
333:*17* 341:*18*
342:*19* 346:*8, 18*
348:*21* 349:*19*
360:*25*

**retail** 387:*5, 6*

**retained** 389:*19*

**retention** 277:*10*

**retire** 381:*3, 20*

**retired** 497:*24*
499:*24*

**retirement** 280:*3*
499:*20* 512:*24*

**retires** 381:*15*

**retiring** 498:*1*

**return** 484:*25* 485:*3,
5
**returned** 282:*20*
**revenue** 344:*16*
458:*17* 477:*8*
**review** 272:*23* 276:*6*
277:*6, 11, 16* 279:*12,
13* 280:*17, 18* 282:*15,
19* 284:*6* 318:*11, 16*
319:*1, 6, 11, 18* 320:*5,
6* 321:*12* 322:*23*
323:*10* 324:*14* 326:*5*
327:*7* 328:*18* 330:*4,
19* 331:*13, 19* 332:*6*
333:*6, 9, 10, 25*
334:*17* 335:*9* 336:*8*
339:*14* 340:*11, 13, 16,
18* 343:*10, 14, 15*
344:*9* 345:*3, 19*
347:*12, 15* 348:*1*
349:*18* 353:*22, 23, 24*
354:*5, 10, 14* 355:*6,
12, 14, 17, 23* 356:*2, 5,
11, 16, 21, 23* 357:*3, 6,
9, 17, 20, 22* 360:*24*
361:*12, 14, 15, 16, 19,
20, 23, 25* 362:*2*
363:*3, 7, 24* 364:*20*
365:*23* 366:*3, 8, 10,
23* 367:*14, 15, 16, 22,
25* 368:*2* 369:*8, 19*
370:*1, 4* 388:*17*
408:*5, 20* 410:*21*
411:*4, 5, 7, 21, 22, 25*
412:*3, 8* 414:*3* 422:*8*
423:*6, 14* 429:*25*
446:*22* 448:*2, 6*
450:*15* 455:*20* 461:*7*
476:*18* 493:*15*
523:*10* 525:*18* 528:*5,
10, 17, 18*
**reviewed** 272:*18*
282:*21* 284:*10, 19*
289:*20, 21* 354:*7*
364:*7* 367:*2* 369:*7, 9,
10, 18, 20* 408:*1, 11,
16, 22* 409:*9, 10*
410:*11, 16* 414:*6*
429:*2, 3, 15* 431:*13*
444:*19* 528:*22*

**reviewing** 392:*24*
409:*11* 419:*20* 421:*5*
422:*5* 428:*24* 429:*12*
446:*4*
**reviews** 277:*5*
280:*19* 281:*1, 5*
316:*16, 18* 317:*18, 21,
22* 319:*3, 4, 21*
337:*23* 359:*1* 363:*5*
414:*2* 432:*20* 453:*16*
522:*25* 524:*16*
**revised** 401:*22* 403:*1*
425:*6*
**revisions** 404:*15*
**reward** 373:*11*
**Reworking** 484:*17*
**rewritten** 403:*6*
**RHR** 294:*25* 295:*14*
298:*16* 300:*11*
303:*24* 304:*2, 23*
305:*18, 19* 307:*3*
361:*6, 8, 17* 363:*19*
385:*6* 387:*8, 14, 15,
16, 18* 388:*17* 389:*18,
21, 22* 390:*14* 391:*17*
403:*11* 410:*6* 425:*18*
429:*10* 438:*17, 24*
446:*21* 459:*4* 475:*14*
476:*19* 505:*24* 506:*3,
4, 7* 507:*5* 530:*6*
531:*5*
**rid** 503:*21*
**ridiculous** 308:*7*
**right** 272:*11* 273:*1,
6, 18* 294:*18* 299:*17*
300:*2* 302:*6* 303:*7*
304:*10* 305:*4* 306:*12*
308:*8* 312:*25* 313:*16*
314:*17* 316:*19, 24*
317:*8, 15* 319:*13*
320:*15* 323:*1, 25*
324:*20* 326:*1, 15*
327:*15, 20* 332:*19*
333:*18, 22* 334:*12*
335:*3* 336:*9* 337:*13,
16* 341:*18* 342:*19, 22*
343:*16* 344:*12, 19*
346:*18, 19, 21, 24*
347:*4, 5, 13* 350:*16,
25* 351:*18, 25* 352:*5*

353:*3, 14* 358:*5*
362:*21* 370:*25*
372:*23* 373:*11*
374:*20, 24* 375:*17*
377:*18* 378:*3, 16, 18,
19* 379:*1, 4, 13* 382:*1,
13, 24* 383:*21* 386:*5,
11, 24* 387:*3* 396:*5*
398:*11* 404:*12* 405:*3*
411:*15* 412:*10*
416:*23* 417:*15, 24*
424:*4, 8, 15, 19*
432:*15* 434:*4, 23*
436:*10* 438:*5, 9*
441:*3* 445:*15* 451:*21*
452:*19* 455:*7, 8, 16,
25* 457:*2, 10* 458:*5*
459:*15* 465:*11*
468:*12* 469:*5, 6*
470:*23* 477:*7, 9*
482:*7, 23* 483:*14*
484:*7* 485:*1, 21*
490:*5, 19* 491:*22*
492:*10* 498:*8, 10*
503:*19* 504:*4* 507:*23*
508:*12* 516:*19*
521:*11* 522:*13, 21*
523:*8, 9, 17, 20, 23*
524:*2, 9, 14* 525:*8*
526:*9, 19* 527:*4, 12*
528:*11* 529:*15* 530:*1,
6* 531:*1, 19* 533:*16*
**rip** 490:*13, 23*
**risk** 280:*16, 18, 23*
281:*10* 283:*8* 285:*24*
286:*11, 25* 288:*6, 13,
14* 290:*15, 17* 317:*14*
346:*1, 4, 6* 369:*16, 17,
21* 370:*2* 448:*21, 24*
449:*6, 11, 15, 21, 25*
450:*8* 451:*5* 452:*3,
11, 16, 17* 453:*5, 7, 9*
493:*21* 494:*3, 13*
523:*16, 17*
**risks** 346:*13*
**road** 495:*19*
**robust** 389:*2*
**role** 285:*13, 16*
286:*17* 287:*1, 11*
288:*22* 294:*12*

297:*11* 298:*18*
299:*12* 302:*4, 7*
334:*3, 4* 335:*24*
341:*13, 16* 351:*11, 16,
19* 354:*23* 358:*15, 19*
411:*6* 412:*22* 436:*14*
451:*9, 24* 452:*8, 15,
23* 453:*3* 454:*17*
459:*25* 460:*1, 3, 4, 8*
461:*2* 462:*3, 14*
466:*9, 13* 471:*10, 24*
473:*23* 474:*13*
476:*11, 17, 25* 477:*8,
10* 478:*1, 3, 9* 483:*5*
484:*5* 493:*24*
**roles** 281:*9* 290:*22*
344:*7* 355:*19* 461:*22*
462:*11, 13* 473:*25*
476:*3, 23*
**Rome** 268:*11*
**room** 352:*22, 24*
353:*2, 5* 507:*15*
**rotational** 461:*2*
475:*25*
**rough** 293:*14*
**roughly** 338:*21*
372:*9* 458:*16*
**round** 425:*3* 505:*1*
**Rowe** 498:*4* 499:*14*
**Rule** 533:*2*
**rules** 511:*6* 533:*3,
13, 15*
**run** 344:*14* 471:*3*
**running** 328:*3* 387:*5*
421:*1*
**runs** 351:*14*

**< S >**
**S/Sydney** 535:*18*
**Saba** 268:*1, 5* 269:*4,
5* 271:*13* 273:*16*
275:*11* 288:*17*
298:*13* 302:*2* 304:*22*
307:*9, 11, 15, 19, 22,
24* 308:*2, 7, 10, 17*
309:*1* 311:*2, 5* 312:*6*
314:*14* 316:*1, 9*
330:*11, 16* 334:*6*
335:*13* 336:*13, 18, 21*
337:*1, 11* 342:*5*

344:*17* 354:*11* 365:*18* 366:*16, 19* 367:*4, 7, 9* 369:*2, 13* 370:*7* 374:*12* 378:*24* 383:*13, 19* 385:*13, 17* 390:*1* 392:*5* 393:*2, 19, 21* 396:*10* 404:*1* 406:*3* 407:*14* 408:*24* 410:*1* 412:*14* 413:*16, 21* 415:*12* 420:*1* 422:*22* 423:*21* 425:*14* 427:*5, 6* 428:*11* 429:*5* 430:*8, 25* 431:*1* 437:*15* 438:*12* 439:*2* 443:*5, 10* 446:*17* 456:*16, 22* 464:*25* 466:*17* 473:*21* 479:*9* 481:*8* 485:*8* 487:*4* 489:*11* 491:*9, 15* 492:*2* 496:*13, 19* 498:*23* 499:*1, 3, 6* 500:*12* 502:*23* 503:*7* 505:*7, 18* 508:*6, 19* 509:*1, 9* 510:*24* 511:*2, 5, 10, 18* 513:*9* 516:*14, 16, 18* 517:*15* 518:*22* 519:*4, 10, 16* 520:*10, 18* 523:*19* 524:*7, 11, 23* 527:*19, 24* 528:*4, 16* 529:*9* 530:*21, 24* 531:*1, 2* 532:*4* 533:*25* 534:*3*

**salary** 371:*25* 372:*14* 514:*18, 19, 21*

**sales** 332:*1* 340:*24*

**satisfied** 471:*9*

**Saturday** 480:*10, 20* 481:*2, 3, 4, 5, 18* 483:*22*

**save** 503:*13* 536:*10*

**saw** 298:*2* 392:*23* 419:*11* 425:*10* 434:*5* 480:*9*

**saying** 300:*23* 342:*8* 399:*20* 406:*21* 407:*10* 411:*2* 417:*18* 436:*1* 450:*20* 466:*5* 469:*8* 470:*10* 471:*14*

482:*3, 14* 488:*10* 503:*3* 531:*6*

**says** 277:*5* 281:*22* 297:*15* 316:*20* 317:*16* 328:*18* 329:*1* 337:*5, 18* 349:*18* 353:*4* 374:*21, 25* 381:*15* 383:*6, 20, 23* 385:*25* 386:*3* 392:*16* 394:*16* 395:*7* 397:*21* 402:*17, 19* 403:*1* 404:*17* 405:*6* 408:*15* 410:*6, 16* 414:*3* 416:*22* 417:*4, 15, 16, 17, 18, 19, 21* 418:*18* 423:*3* 434:*2, 21* 435:*6, 10* 438:*7, 17* 441:*4, 20* 442:*12* 447:*25* 459:*20* 468:*11, 13* 469:*7, 16, 17* 484:*12* 485:*15* 486:*1, 17* 487:*21* 488:*16* 489:*22* 493:*22* 500:*23, 25* 504:*19, 21* 512:*9, 13* 530:*1*

**SBA** 473:*24*

**scenario** 289:*24* 378:*21* 379:*12, 17* 384:*3* 503:*17*

**scenarios** 293:*8, 14* 374:*6* 377:*15, 19* 378:*22* 379:*19* 380:*15, 17* 384:*18, 22* 385:*1, 3, 7*

**schedule** 395:*22* 400:*4, 8*

**scheduled** 395:*24*

**schedules** 276:*1, 23* 382:*5*

**scope** 273:*8* 277:*13* 458:*14* 461:*11* 462:*9*

**score** 315:*6* 320:*22* 329:*5, 12, 13* 330:*22* 331:*1, 4, 8, 10, 11* 349:*19, 21* 352:*2, 3, 8* 353:*8* 510:*15* 512:*6, 7, 9, 11* 531:*24*

**scored** 353:*19*

**scores** 313:*22* 317:*13* 320:*24* 329:*4* 330:*21* 345:*9, 10* 351:*4, 25* 352:*6, 15, 20* 353:*1, 19* 509:*20, 25* 511:*22* 531:*19, 22*

**screen** 287:*7* 447:*9*

**se** 360:*5* 520:*8*

**seal** 535:*13*

**seasoned** 320:*9* 323:*22* 326:*25* 332:*12* 333:*4* 334:*9, 19* 341:*10*

**second** 277:*4, 16* 279:*11* 303:*25* 331:*12* 332:*6* 333:*10* 343:*6* 362:*19* 375:*1* 376:*19* 384:*4* 388:*6* 393:*23* 400:*3* 403:*10* 415:*22* 432:*12* 433:*7* 440:*17* 441:*11* 442:*1* 446:*19* 447:*23* 483:*23* 493:*18* 500:*19* 532:*4*

**secretary** 440:*1* 444:*16* 492:*19* 493:*11*

**section** 276:*5* 277:*4, 20, 24* 278:*16* 279:*3* 320:*8* 322:*5, 19* 324:*17* 340:*18* 345:*21* 348:*5*

**sections** 277:*22* 324:*18*

**sector** 363:*15, 25* 364:*1* 381:*5*

**secure** 497:*11*

**see** 276:*6* 279:*7, 16* 280:*19* 282:*24* 283:*10* 284:*8, 23* 285:*16* 288:*24* 289:*24* 294:*1* 296:*25* 297:*17* 298:*24* 312:*18* 316:*12* 317:*4* 318:*8* 319:*23* 321:*8* 322:*4* 323:*10, 20, 22, 24* 324:*2, 6, 24* 325:*13* 326:*3* 327:*9, 11* 329:*7, 25* 330:*2, 3* 332:*14, 20* 333:*8, 9*

335:*8* 338:*21* 340:*7* 343:*23* 348:*9* 349:*10* 350:*2* 352:*10* 353:*1* 356:*23, 25* 357:*8* 366:*24* 367:*23* 372:*3, 6* 373:*7, 17* 374:*6* 375:*5* 376:*21* 377:*25* 378:*1* 381:*18* 384:*7, 8* 389:*4* 391:*22* 392:*19* 393:*25* 394:*4, 8* 397:*3* 399:*17* 400:*9* 401:*1* 402:*2, 3* 403:*10, 13* 406:*16* 408:*7* 411:*9* 412:*20* 413:*11* 414:*8* 415:*9, 16, 20, 23* 416:*1* 417:*7, 8, 12, 13* 418:*3, 12, 13, 16, 17, 23* 420:*15* 421:*14* 425:*4, 5, 6* 428:*19* 430:*18* 431:*15* 433:*16* 434:*16* 435:*5* 438:*21* 440:*5, 20* 441:*16* 442:*2, 7, 25* 446:*25* 452:*12* 453:*3* 467:*21* 468:*1* 469:*6* 470:*7* 481:*12* 482:*4, 5, 7, 8* 483:*9, 14, 16, 21, 23* 484:*22* 485:*13, 17, 23, 24* 486:*3, 4, 16, 21* 487:*14* 488:*20* 489:*18, 21, 22* 490:*2, 3, 16* 492:*14* 493:*8* 500:*17, 21, 22, 25* 501:*21* 503:*11* 507:*2* 510:*4* 532:*17, 22*

**seeing** 312:*15, 17* 367:*20* 392:*25* 403:*14* 405:*4* 414:*13* 480:*7*

**seek** 434:*23* 435:*9, 23*

**seen** 286:*1* 312:*14, 16* 367:*18, 19* 383:*10, 15, 18* 388:*14* 392:*21* 396:*18, 19, 25* 409:*15, 18* 413:*15* 423:*11* 425:*8, 11, 20* 429:*18* 446:*10* 492:*12*

**sees** 326:*14* 422:*16*

Deposition of Gregory D. Carmichael, Volume II                    Philip R. McHugh v. Fifth Third Bancorp, et al.

**selected** 422:*12*
**selection** 437:*3*
**self** 280:*18* 369:6, *10*
**selling** 335:*16*
**send** 313:*16* 391:2
401:*21* 432:5 531:*16*
**sending** 390:*20*
410:*24* 411:*20*
420:*13*
**sends** 392:*15* 414:*1*
418:*15* 431:*10*
486:*19*
**senior** 475:2
**sense** 296:*11* 299:9
374:2 378:*14* 379:*20*
390:*18, 24* 391:5
412:5 440:*25* 470:5,
*15* 476:22 484:*15*
**sent** 305:4 317:*17*
366:8 367:*16* 390:*16*
392:22, *24* 393:*24*
396:*19, 20* 407:*24*
410:*25* 411:*18, 25*
423:*4* 429:*24* 430:*20*
445:*24* 483:*15*
487:*17, 18* 488:*16*
489:*17* 506:22
**sentence** 277:*16*
279:*12* 280:*15*
281:*11* 282:*19*
284:*19* 285:*10*
288:*18* 289:*19* 327:*4*
330:2*0, 24* 337:*5*
348:5 379:6 398:*1*
411:*24* 440:2, *19*
441:*11* 442:2 446:*20*
510:*4*
**sentences** 328:*25*
**separate** 282:9 381:*1*
399:*8* 497:*8* 531:*21*
**separated** 459:*10*
**separately** 512:*21*
**September** 267:*17*
271:*1* 401:*24* 413:*8*
421:9 424:7, *14, 17,
23* 425:*24, 25* 426:*3,
16* 428:*19, 25* 429:*24*
430:*4, 17* 431:*4, 11*
437:*24* 438:*3* 439:6
447:*13* 451:*14, 20*

489:*15, 16, 20* 493:*20*
532:*19, 25* 533:6
536:2
**serious** 299:2 354:*19*
399:*12*
**seriously** 309:9, *12,
17* 310:*21* 311:*16*
397:*15, 20* 398:5, *25*
**services** 290:*11*
388:*10, 12, 24*
**serving** 329:*15*
**session** 439:*11, 13, 15,
24* 444:*3, 8, 9, 13, 14,
15, 16, 17, 18, 20, 21,
22* 446:*13* 492:22
**sessions** 275:*18* 455:9
**set** 342:7 357:*14*
364:*24* 418:2, *16*
434:*13* 535:*12*
**sets** 292:*20* 433:5
**setting** 335:*17, 20*
337:*20* 341:*14*
342:*15* 343:7 404:*24*
**sewing** 332:*16*
**Shaffer** 272:*15*
276:*10* 277:5 278:*17*
282:*20* 284:5 285:*11*
288:*20* 289:*19* 296:2
305:*14, 22* 306:*24*
310:*15, 24* 311:*13*
316:*15* 317:*17* 320:*3*
355:*15* 366:8, *23*
373:2*1* 374:*17, 19*
376:8 378:6, 9, *11*
379:7 383:*25* 384:*1,
10, 21* 390:7 391:*6,
18* 392:*11, 12, 15, 22*
393:6, *24* 394:*10, 16*
396:*15* 400:*12* 403:*1,
13* 404:5 405:*16*
406:7, *18* 407:8, *19*
408:*11* 409:*17, 20, 23*
410:*11* 414:5 415:*19,
24* 416:4, 6 417:*20*
418:*15, 18* 420:7
423:2, *14* 424:*1, 5, 7,
23* 427:9 428:*15*
430:*14, 19* 431:*3, 6,
10* 433:*18* 437:*21*
438:*3, 7, 19* 440:*3, 13,

*23* 441:*5, 12* 442:2
444:*23* 445:*13*
446:*20* 463:*25* 464:2
465:*18* 466:*20, 24*
467:*20, 23* 469:*16, 17*
470:*3* 471:*20* 474:*18*
478:*12, 16* 481:*17, 23*
482:*11, 14* 483:9
485:*11, 15* 487:*9, 16,
21* 489:*15, 17* 490:8
493:*19* 494:2 497:*18,
23, 24, 25* 499:*11, 12*
500:*16* 501:*3, 13, 20,
23* 502:*12* 503:*10, 14*
504:*18, 21* 506:22
**Shaffer's** 272:22
392:2 433:*17* 503:9
**shape** 363:*17*
**share** 279:5 358:5
360:*13, 25* 406:*12*
457:6 464:*8, 17*
**shared** 328:*17*
333:2*4, 25* 334:2*1*
335:6 347:8 360:2*1*
361:5 367:*21* 416:*11,
12* 419:*13* 464:7
478:*19*
**shareholder** 489:*23*
490:*10*
**shareholders** 290:*12*
381:*16*
**sharing** 360:22
424:*24* 504:22
**SHEET** 536:*1, 13*
537:*1* 538:*1*
**shoes** 476:7
**shortly** 295:7 303:22
464:5
**show** 300:*3* 302:5
349:2 357:22 360:8
382:*17* 456:*1* 486:*19*
487:*12*
**showcase** 376:*14*
**showed** 302:*18*
368:*11*
**showing** 408:2
486:*24*
**sic** 365:*4*
**side** 325:*14*

**SIGNATURE:**_____
_____**DA**
**TE** 537:*23* 538:*23*
**signatures** 493:9
**signed** 311:*21* 526:4
536:*16*
**significance** 375:9
376:*10*
**significant** 320:*10*
327:*1* 332:*13* 334:9,
*20* 340:22 341:*11*
342:*3, 9, 12* 343:22
348:8, *18* 353:*3, 5*
362:*12, 14, 22* 364:*15,
23* 402:*13*
**significantly** 349:*25*
352:*20*
**signifying** 366:*11*
**signing** 307:2
**Silver** 467:*25* 468:*12,
20* 481:*23* 482:9
486:*18* 488:5, *10, 12*
**similar** 401:*23*
**simple** 417:7
**simultaneous** 274:*4*
**simultaneously**
439:*20*
**single** 471:*10*
**sir** 326:*21* 367:7
429:22 443:*19*
**sit** 318:5, 6, *12*
326:*16* 379:*13* 426:*5,
10* 468:*25*
**sits** 305:*4* 453:*24*
**sitting** 360:*4* 400:22
**situation** 285:*25*
286:*20* 288:2, *12*
290:*16* 291:6, 7
292:6 309:*24* 351:*23*
354:*16, 18* 449:*4*
453:22 480:*4* 482:*20*
491:*14* 495:*13*
522:*20, 22* 524:*17*
**situations** 523:6
**skewed** 313:7 315:*11*
**skill** 292:*20* 327:*17*
**skills** 342:*17*
**skis** 523:*12*
**Slightly** 331:*10* 372:*4*

Deposition of Gregory D. Carmichael, Volume II      Philip R. McHugh v. Fifth Third Bancorp, et al.

**slow** 416:*15, 18, 23, 25*
**smaller** 286:*19, 23*
**smart** 435:*19*
**Smith** 268:*4* 393:*17*
**social** 436:*6, 9*
**soften** 417:*1*
**soldier** 477:*16*
**solidified** 276:*24*
**solutions** 339:*19*
**solver** 508:*23*
**Somalya** 275:*13*
**somebody** 286:*6* 287:*6* 288:*9* 397:*23* 501:*7*
**someday** 286:*10*
**someone's** 282:*12*
**somewhat** 289:*3* 292:*13*
**son-in-law** 501:*7*
**soon** 467:*17* 496:*3*
**Sorry** 304:*10* 309:*3* 311:*2* 321:*4* 371:*6, 20* 380:*13* 381:*23* 392:*12* 436:*25* 441:*7, 8* 472:*5, 21* 481:*25* 482:*6* 504:*21*
**sort** 467:*11*
**sought** 302:*15* 444:*19* 476:*13*
**sounds** 292:*1*
**sources** 318:*1* 320:*4*
**SOUTHERN** 267:*2* 532:*14*
**space** 347:*16* 364:*16* 503:*22*
**speak** 333:*14* 343:*18, 20* 366:*15* 406:*15* 446:*15* 484:*14* 487:*1* 526:*15, 18, 21* 527:*9, 12, 13, 25* 530:*18, 25*
**speaking** 290:*9* 433:*1* 467:*17*
**speaks** 378:*8*
**specific** 322:*2* 341:*4* 346:*10* 396:*4* 399:*9* 529:*24*
**specifically** 323:*12* 326:*2* 328:*23* 342:*7* 354:*21* 384:*22*

385:*11* 449:*24* 487:*9* 529:*22*
**speculate** 395:*15* 402:*21* 407:*2* 419:*7* 488:*24* 489:*1*
**speculating** 309:*11* 421:*1* 453:*5* 469:*14* 471:*19* 489:*3*
**Spence** 273:*5* 284:*12, 14, 20* 289:*2, 3* 292:*25* 293:*20* 294:*12* 295:*17* 296:*4* 297:*18* 298:*5, 17* 299:*12* 300:*12* 301:*1, 3* 302:*5* 303:*1* 304:*1* 306:*11* 307:*1* 309:*5* 310:*2* 348:*2, 12* 349:*14* 351:*3, 5, 8* 353:*13, 20* 357:*25* 358:*3, 11* 359:*3, 5, 17* 360:*8, 10, 16, 22, 23* 361:*2* 362:*6* 373:*22* 377:*4, 7, 13* 380:*8, 19* 382:*20* 386:*3, 7, 17* 389:*19* 390:*9, 15* 395:*19* 398:*15* 411:*14* 412:*3, 9* 415:*19, 25* 416:*4* 417:*15, 18, 21* 418:*7* 419:*10* 420:*7, 18, 23* 421:*17* 422:*4* 425:*19* 426:*7, 15* 428:*17, 24* 429:*11, 13* 431:*19* 437:*11, 23* 438:*17* 441:*14, 23* 442:*6* 443:*23* 446:*22* 447:*11* 448:*15, 20* 449:*6* 450:*1, 3, 7, 9, 11* 451:*2, 7, 8, 14, 21* 452:*1, 4* 456:*8* 457:*7, 14* 458:*9* 459:*18* 462:*15, 24* 463:*13, 21* 466:*7, 8, 21, 24* 467:*18, 21* 469:*4, 8, 17* 474:*15* 475:*7, 15, 19, 21* 476:*20* 485:*11, 23* 486:*17, 19, 23* 487:*1, 9, 18, 19, 25* 488:*4, 11, 13, 15, 22* 489:*2, 15* 490:*12*

492:*23* 493:*4* 494:*11* 495:*9* 496:*2* 505:*15, 21* 506:*1, 5, 9* 510:*11, 17, 22* 511:*16, 23* 512:*3, 8* 530:*4* 531:*4, 19, 22*
**Spence's** 350:*24* 356:*11* 360:*24* 421:*9* 487:*10*
**spend** 291:*17* 292:*16*
**spoke** 391:*6* 394:*10* 436:*2* 527:*1, 2, 13*
**spoken** 388:*22* 462:*24*
**spots** 356:*24*
**SS** 535:*3*
**stack** 281:*16* 373:*7* 504:*11*
**stacks** 276:*16* 282:*16* 373:*10*
**staff** 329:*17*
**stage** 404:*24*
**Stagnaro** 268:*5*
**stakeholder** 434:*1* 436:*20* 529:*22*
**stakeholders** 363:*17* 436:*10, 15, 18*
**stamp** 390:*3* 392:*7* 393:*4* 406:*5* 407:*16* 409:*1* 415:*14* 420:*3* 422:*24* 423:*23* 428:*13* 429:*7, 23* 430:*10* 437:*17* 438:*14* 443:*14* 450:*25* 481:*10* 485:*10* 487:*6* 489:*13* 492:*9* 500:*14*
**start** 278:*1, 3* 305:*21* 317:*23* 323:*20* 357:*22* 361:*9* 381:*9* 395:*1* 424:*9* 439:*17* 442:*14* 445:*22* 476:*19*
**started** 295:*14* 394:*6, 18, 24* 395:*5, 9* 396:*2* 400:*15* 411:*19* 412:*4* 463:*4* 496:*23*
**Starting** 485:*12*

**starts** 278:*20* 357:*20* 375:*1* 424:*4* 437:*20* 459:*20* 483:*15*
**State** 267:*21* 356:*21* 357:*9, 17* 498:*20* 535:*1, 7, 19*
**stated** 295:*3* 303:*16* 391:*4* 397:*19* 460:*20, 22* 512:*24*
**statement** 334:*22* 347:*4, 17* 399:*17* 478:*2*
**STATES** 267:*1* 333:*16, 19* 532:*14*
**stating** 346:*19*
**status** 313:*6* 489:*7*
**stay** 348:*25* 354:*22* 380:*24* 394:*5, 17*
**stayed** 419:*18* 473:*12*
**staying** 330:*17* 356:*6* 495:*13* 496:*1*
**stenographically** 533:*11*
**stenotype** 535:*8, 11*
**step** 277:*25* 278:*2, 22* 280:*4* 286:*5, 10* 291:*6, 21* 292:*5, 18, 20* 341:*20* 344:*14* 381:*4* 388:*15* 411:*5* 451:*24* 454:*14* 458:*12* 461:*18* 474:*2* 476:*2* 483:*6*
**stepped** 452:*8* 498:*8*
**stepping** 287:*1* 351:*22* 498:*3* 500:*5*
**steps** 400:*4* 403:*9*
**stop** 307:*24* 433:*6*
**stopped** 516:*12*
**stormed** 465:*14* 473:*19* 482:*16*
**straight** 418:*2*
**strategic** 299:*24* 322:*5* 323:*13* 324:*4, 21* 363:*14* 364:*17* 492:*24*
**strategies** 363:*16* 376:*15*
**strategy** 349:*20* 351:*6, 8* 352:*7, 8*

363:*18*  365:*7, 11*
455:*6, 8, 9*  509:*5*
**Street**  267:*19*  268:*12*
290:*13, 20*  533:*7*
**streets**  290:*22*
**strength**  296:*15*
318:*7*  332:*12*  335:*5*
340:*5*  346:*23*  347:*8*
364:*15*  365:*6*  417:*25*
434:*1*  507:*16*
**strengths**  277:*6*
279:*15*  283:*7*  287:*21*
293:*13*  317:*11*  318:*3*
321:*21*  325:*6, 25*
329:*20*  331:*20*
332:*10, 22*  333:*1, 2, 4,*
*8, 23*  334:*2*  336:*3*
337:*19*  338:*3, 5, 23*
339:*5, 24, 25*  340:*3, 7,*
*8, 9, 15, 16*  341:*10, 24*
342:*3, 8, 9, 11, 20, 25*
343:*6, 22*  345:*3*
346:*15*  347:*17, 18, 22*
350:*12*  358:*7*  364:*23*
368:*22*  508:*1*  530:*9*
**stress**  286:*1*
**Strike**  478:*14*
517:*15*  518:*22*  519:*4,*
*16*
**strong**  320:*11, 19*
321:*18*  326:*2, 22*
329:*1*  335:*6, 23*
340:*25*  342:*20*  344:*1,*
*3, 7, 16*  345:*4*  347:*19*
373:*19*  425:*1*  432:*6,*
*14*  434:*3, 11*  477:*14*
504:*24*  505:*14*  506:*8*
507:*19*
**stronger**  353:*17*
**structural**  404:*20*
**structure**  330:*1*
373:*11*  378:*16, 19*
379:*21*  380:*5*  381:*8*
383:*8*  384:*12, 13, 14,*
*16*
**structured**  373:*9*
**structures**  378:*13*
383:*9*
**structure-wise**  379:*3*

**studies**  315:*15*
**study**  416:*16*
**stuff**  278:*6, 7*  411:*8*
478:*6*
**stunned**  470:*19*
**style**  434:*20*  435:*10*
**subject**  316:*16*  337:*8*
355:*5*  358:*9*  374:*17*
388:*17*  396:*16*  404:*5*
406:*8*  407:*20*  420:*8*
423:*3*  424:*2*  428:*16*
437:*21*  438:*4*  476:*15*
**submitted**  272:*19*
410:*20*  439:*14*
**subsequently**  296:*8*
**substance**  296:*14*
344:*10*  421:*20*
475:*10*
**substantial**  313:*20*
480:*5*  519:*25*
**substantially**  313:*8*
394:*6, 18, 24*  395:*5*
**succeed**  283:*8*
453:*22*  475:*20*  495:*9*
**succeeding**  356:*14*
358:*1*  510:*16, 20*
512:*2, 5*
**success**  288:*7*  320:*13,*
*19*  327:*10*  380:*2*
384:*17*  513:*1*
**successful**  363:*21*
381:*10*  400:*23, 24*
460:*3*
**successfully**  340:*2*
**succession**  272:*21*
278:*5, 13, 15*  279:*25*
282:*21, 23*  284:*6, 20*
285:*22*  286:*3, 8*
289:*20, 24*  290:*5, 25*
365:*13*  374:*4, 16, 23*
375:*3, 8*  381:*2*  383:*7*
385:*22*  387:*16*
441:*13, 22*  442:*3*
446:*3*  448:*8, 9*
492:*21*
**successive**  512:*2*
**successor**  290:*14*
291:*18*  302:*17*
303:*13*  307:*1*  327:*24*
354:*18*  356:*3, 8*

357:*2, 16*  396:*22*
397:*22*  401:*18*
441:*15, 24*  453:*14*
454:*14*  472:*13, 20, 25*
473:*6, 8, 10*  475:*13*
494:*16*  495:*16*
**successors**  291:*9, 11*
292:*16*  296:*18*
300:*19, 20*  302:*19*
306:*22*  390:*19*
391:*20*
**suggest**  494:*19*
528:*24*  529:*19*
**suggested**  296:*17*
306:*5, 21*  408:*1, 2*
414:*1*  432:*11, 12*
438:*8*
**suggesting**  331:*7*
433:*22*
**suggestion**  391:*19*
397:*10*
**suggestions**  431:*21*
**suit**  375:*24*  454:*10*
**suited**  427:*24*
**summaries**  319:*3*
427:*17*
**summarize**  325:*12,*
*15*  347:*16*
**summarized**  325:*11*
342:*7*
**summary**  312:*20*
317:*7*  318:*25*  322:*22*
426:*25*  427:*10, 14*
428:*1, 18, 25*  429:*10,*
*13*  437:*10, 24*  438:*17*
506:*22*  530:*1, 2, 3, 6,*
*11*
**summation**  318:*25*
322:*18*  325:*19*
329:*25*  330:*2*  332:*25*
340:*15*  344:*20*  345:*1,*
*11*  428:*7*  531:*7*
**summations**  312:*16*
391:*22*  427:*19*  428:*8*
**summer**  382:*8*
**Sunday**  481:*5*
**support**  278:*4*
295:*20*  303:*5*  331:*23*
337:*7, 9*  342:*4*  343:*1,*
*3*  344:*11*  372:*16*

401:*17*  425:*1*  493:*8*
504:*24*  505:*14*  506:*8*
519:*13*
**supported**  306:*7*
344:*2, 4*
**supportive**  293:*3*
294:*5*  344:*13*  467:*25*
468:*9*
**supports**  311:*9*
475:*17*
**supposed**  367:*3*
371:*2*
**Sure**  274:*11*  275:*10*
276:*20*  278:*10*  290:*3*
291:*14*  294:*21*
310:*14*  311:*22*
321:*23*  322:*10*
332:*11*  333:*3*  357:*7,*
*13*  361:*13, 15*  375:*13*
377:*9, 16*  378:*15*
382:*7*  385:*4*  387:*24*
388:*1*  394:*14*  395:*2*
399:*18*  400:*20, 21*
405:*1*  408:*6*  409:*15,*
*17*  414:*23*  416:*14, 19,*
*22*  419:*3, 6*  422:*13,*
*17*  425:*8, 21*  426:*4,*
*21*  427:*5, 16*  429:*16,*
*21*  430:*25*  435:*23, 24*
436:*14*  440:*9*  443:*1*
448:*25*  452:*11*
458:*13, 17*  462:*22*
464:*10*  466:*10*
479:*13*  484:*19*  486:*8*
491:*4*  502:*3*  507:*12*
513:*12*  516:*12*  517:*7,*
*19*  518:*11*
**Surely**  485:*16*
**surfing**  418:*11*
**surprise**  364:*9*
**surprised**  397:*1*
416:*5*  417:*21*  418:*8*
458:*25*  459:*15*
467:*25*  468:*9*  470:*20*
472:*19, 23*  476:*21*
494:*21, 24*  495:*1, 4,*
*22, 24*  496:*9*
**surprising**  312:*18*
424:*25*  428:*2*  429:*17*
504:*23*

**survey** 278:6 312:*12* 313:*4*, *20* 315:*3* 317:*13* 320:22 329:*12* 330:*21* 331:*1* 345:9 349:*18* 350:*15* 509:*20* 510:*15* 511:*15*

**surveys** 312:22 314:7 316:5 318:*1*

**Susan** 401:*4* 480:*16* 484:*3* 489:*23* 490:*4*, *7*, *9*, *14*, *23* 491:6, *10*, *12*

**suspect** 451:2

**suspected** 450:*18*

**sworn** 271:8

**Sydney** 267:*21* 535:5

**sync** 434:7, 9

**system** 367:23 425:*18* 525:*21*

**system-generated** 367:*15*

**< T >**

**table** 322:*19*, 21 460:5

**take** 272:22 278:*23* 285:*23* 313:25 318:*10* 325:*11* 339:6 355:*10* 362:*18* 373:8 395:2 400:*11* 404:*13* 451:*11* 458:22, 23 459:*25* 460:8 464:*11*, *12*, *13* 465:*13* 466:9, *13*, *15* 471:*11* 472:4 474:*13* 476:3, *10* 477:*18*, *25* 478:*1*, *3*, 9 484:*4*, *13* 504:*10* 506:*16* 513:*1* 519:22 521:*10* 522:20 523:*3* 533:2, *4*, *10*

**Taken** 267:*16* 318:*23* 330:*13* 375:22 385:*14* 390:25 413:*18* 438:*21* 444:*18* 447:*14* 456:*19* 459:*24* 460:6 477:5 496:*16* 514:*1*, 2

517:*20* 520:*13* 533:8, *23* 536:2, 8

**takes** 320:*15* 321:*19* 524:*1*

**talent** 271:*16*, *18*, *23* 272:5, *13*, *18*, *21*, 25 276:*13* 277:22, *23*, 25 278:*1*, *13*, *19*, 21 279:*1*, *10*, 24 280:8, *13* 283:2, *19*, *21*, *23* 285:*3* 289:*12* 293:*19*, 22, *23*, 24, 25 294:6, 9 317:*3*, 24 321:6, 9, *11*, *13* 322:6, 7 323:*11*, *15* 324:6, *10*, *12*, *19*, 24 325:5, *14*, *17* 326:*4*, 5, *23*, 24 328:*12* 329:*10* 331:*17*, 21 333:*10* 334:7 335:*1*, *3* 336:7, *11* 338:2, *3*, *17* 339:*1*, *23* 340:*13* 341:5 345:*11*, *14* 348:*12*, *15*, 22 349:2, *16* 350:5, 8 352:*18* 356:*1*, 25 359:*13* 360:8, *13*, *17* 363:*20*, 24 364:*3*, *19* 365:*14* 369:*10* 376:*14* 390:*11* 425:2 432:*19* 437:*1*, *3*, 4 439:*17*, 20 440:2, 4 441:*11* 446:*19* 461:9 504:*25* 514:*24* 517:*24*

**talk** 277:*25* 278:*3*, *4*, 9 279:*25* 303:*10* 305:*3* 315:*1* 318:7 328:6 333:*21* 351:*3* 364:*3*, 20 368:*17*, 20 376:*17* 391:*17* 401:*3*, *16* 422:*18* 449:*16* 453:*25* 459:9 463:*23* 468:*23* 479:*1* 485:*16* 489:*1*

**talked** 293:*12*, *13* 303:*21*, *23*, 25 305:*11* 310:5, *10* 359:2 389:9 392:*1* 394:*3*, *13*, *15* 397:*13*, *14* 399:*15* 453:*12*

**456:14** 462:*13* 468:24 469:*18*, *19* 470:*3* 471:2, *13* 474:*17* 475:*16* 476:*14* 479:*4* 487:*19* 516:5

**talking** 278:*21* 279:8 289:*16* 290:*23* 306:*17* 327:6 336:*18*, *19* 342:*17* 345:*13* 346:24 347:*11*, *12* 360:*4* 370:*16* 397:9 405:*11* 418:*12* 430:*24* 447:7 452:*13* 462:*18* 463:*4* 465:8 469:*11* 479:8 480:*4* 490:7 492:*21* 518:*1* 520:*23*

**talks** 281:*24* 313:*21* 416:*10* 507:*14*

**Tanner** 496:*23*

**target** 371:9, *16*, 25 372:5, 6, *23* 373:2, 4

**targets** 371:*14*, 24

**Tayfun** 291:6 296:*6*, 9 298:*16* 300:*1*, *10* 303:2 306:*1* 396:22 397:*10*, 22 398:*10*, *14* 401:*4*, *18* 452:7, *14*, *17* 453:*1*, 6 467:*23* 468:2, *4*, *10*, 24 469:*1*, *12*, *15*

**team** 272:22 278:*4*, 22 281:8 286:9 320:*19* 327:*13*, *14*, *18* 329:*1*, *14* 331:*16* 332:*18* 333:*17* 339:*16* 341:*17* 342:*18* 345:*15* 346:*17* 378:5 417:5 462:*18* 467:*4* 468:*24* 479:*17* 486:6 493:*14*

**teams** 332:2 431:*15*, *18* 432:*1* 433:*20*, 21

**technical** 477:7

**technology** 299:*24* 365:*10* 455:6 520:*4*

**tell** 288:*3* 290:*4* 297:*23* 307:25 308:*11*, *18* 309:2

319:*1* 321:*12* 337:*19* 357:*18* 359:*10*, *14* 360:*16* 395:*19* 398:*1* 404:*18* 415:*1* 417:*1* 425:*10* 429:*21* 439:*13* 460:*20* 464:*20* 465:*1*, 6, *18*, 22, 25 466:*13* 472:22 473:*22* 477:*23* 478:*7*, *24* 480:*23* 488:2 503:8 505:*24* 506:7

**telling** 347:7 465:*14* 528:9

**tells** 288:*3*

**ten** 476:*1*

**tend** 435:*18*

**tenure** 282:2

**tenured** 346:*6*

**term** 380:24 475:*12*

**terms** 322:4 338:2 371:22 372:25 507:9 514:*18*

**terrified** 486:*19*, *23* 487:*12*

**test** 275:*1*

**testament** 421:2

**testified** 299:*4* 306:*13* 313:*4* 390:22 468:22 506:*20* 513:5

**testify** 519:2

**testimony** 298:*10* 304:*3* 315:*20* 345:*14* 350:7 391:5 432:22 507:*4* 531:*10*

**testing** 435:24

**text** 304:*20* 393:5, *23* 394:*20* 395:7 397:8 415:*18* 416:*3*, *21* 417:*16*, *17* 418:*14* 419:*4*, 5, *17* 466:*20* 467:*19* 469:*13* 470:*1*, *3* 480:*11* 481:*16*, 22, *23* 482:*18* 484:*12* 485:*10* 486:*14*, *19* 487:8, *10*, *16* 488:*15* 489:*14*, *17* 490:*16* 491:*20* 500:*15*, *23* 501:2, *12*, *15*, *16*, *19*, *20*, *23* 502:5, *11*, *24* 503:8, *13*, 21

Deposition of Gregory D. Carmichael, Volume II                    Philip R. McHugh v. Fifth Third Bancorp, et al.

**texts** 487:*21* 490:*25*
501:*25*
**Thank** 308:*9* 483:*22*
**thanks** 407:*25*
413:*25* 431:*11*
484:*20* 504:*20*
**themself** 350:*10*
**Theresa** 496:*23*
**thing** 282:*8* 285:*20*
292:*4* 354:*15* 449:*23*
451:*7* 469:*22* 490:*12*
525:*21*
**things** 274:*14, 17*
276:*2* 282:*9* 291:*15*
292:*21* 314:*21*
321:*15* 323:*3, 6*
326:*6, 7* 346:*19*
347:*12* 349:*12*
350:*12* 362:*22*
363:*19* 364:*6* 380:*12*
394:*23* 395:*8* 422:*18,
20* 428:*8* 461:*20*
519:*20* 522:*21* 524:*1,
3, 6*
**think** 279:*7* 284:*12*
292:*5, 12, 22* 294:*1*
297:*8, 21* 310:*7, 16*
313:*12, 16* 323:*8*
327:*10* 336:*2, 21*
340:*15* 343:*20, 21, 23*
350:*6* 351:*14* 352:*16,
22* 355:*22* 357:*7*
366:*1* 377:*17* 378:*12,
18* 379:*2, 4* 381:*9*
384:*11, 14* 388:*21*
389:*9* 390:*23* 394:*4,
17* 398:*5* 401:*16*
402:*19* 405:*24*
406:*22* 414:*22*
421:*25* 422:*20*
427:*12* 428:*3* 429:*19*
432:*7, 8* 436:*13*
443:*5* 451:*10* 457:*12*
459:*8* 464:*15, 16*
469:*15* 470:*18*
477:*25* 479:*11, 12*
480:*10, 21, 24* 481:*3,
4* 484:*24* 499:*25*
518:*12* 519:*11* 521:*4,*

*17* 522:*15* 524:*16*
526:*24*
**thinker** 508:*23*
**thinking** 301:*23*
302:*17* 363:*13* 376:*2,
18* 390:*21* 407:*3*
412:*6* 455:*13* 495:*16,
17* 507:*12* 527:*22*
**thinks** 357:*5, 23*
**THIRD** 267:*9, 19*
268:*16, 17* 271:*22*
272:*7, 10* 273:*4*
274:*3, 5* 282:*18*
284:*2* 293:*1* 294:*15,
16* 298:*8* 299:*13*
301:*15* 303:*7* 312:*8,
9, 12, 24* 315:*13, 16*
316:*2, 4, 11* 318:*21,
22* 319:*13* 320:*13*
321:*2, 5, 8* 322:*13*
330:*18* 332:*22*
339:*13* 341:*22*
342:*23* 347:*9, 24*
348:*4, 11* 351:*17*
356:*14* 358:*1, 13*
359:*7, 17, 20, 22*
362:*1, 3, 7, 13, 15, 23*
365:*20, 21* 367:*11, 12*
369:*4* 370:*12* 374:*14*
377:*4, 22* 382:*20, 22*
383:*3, 4* 386:*19*
387:*13, 18, 23* 390:*3,
4* 392:*7, 8* 393:*5*
396:*12, 13* 401:*9*
402:*23, 24* 404:*3*
406:*5* 407:*16, 17, 21*
409:*2, 5* 410:*3, 4, 7,
14* 413:*23* 415:*15*
420:*4* 422:*24* 423:*23,
24* 424:*2* 425:*16*
427:*22* 428:*13, 18, 25*
429:*7, 11* 430:*10, 11*
433:*10, 13, 25* 434:*14,
19* 435:*5, 9* 437:*18,
24* 438:*14, 15* 439:*4,
7, 16, 19* 440:*18*
442:*1* 443:*3, 5, 13, 16,
17* 447:*12, 22* 448:*21*
452:*4* 453:*14* 455:*22*
456:*9* 458:*11* 462:*16,*

*25* 463:*15* 466:*19*
479:*17* 481:*10*
482:*22* 485:*10* 486:*7*
487:*6* 489:*14* 492:*9*
493:*3* 496:*20* 500:*20*
512:*25* 513:*4* 514:*25*
515:*4, 25* 516:*6, 7, 11*
517:*3* 518:*7, 15*
519:*9, 19* 526:*9*
532:*18, 20* 533:*7*
536:*4*
**third-party** 312:*11*
**Third's** 512:*22*
**tho** 526:*5*
**Thomas** 268:*17*
**thought** 279:*6* 287:*4,
6* 295:*23* 296:*11, 14*
298:*15* 299:*4, 9*
300:*3, 13, 14, 24*
301:*18* 302:*10, 22*
309:*16* 331:*9* 354:*18*
358:*25* 359:*24*
362:*11* 365:*25*
379:*21* 384:*16* 389:*5*
390:*17* 391:*1* 398:*24*
431:*25* 432:*1, 2*
434:*10* 435:*13, 14*
436:*1, 21* 437:*7*
451:*4* 452:*16, 17*
453:*6* 454:*7* 455:*11*
459:*2* 466:*4* 470:*14,
18* 472:*16* 473:*18*
477:*14* 494:*12* 495:*3,
5* 498:*5* 507:*10, 15*
517:*6* 526:*13*
**thoughtful** 302:*22*
332:*15* 341:*13*
342:*15* 343:*7* 453:*1*
**thoughts** 322:*18*
338:*4* 422:*6*
**threats** 478:*7*
**three** 290:*4, 7* 298:*6,
17* 374:*19* 403:*20*
417:*3* 423:*19* 434:*24*
440:*15* 458:*3* 500:*3*
518:*20, 25* 525:*8, 19*
526:*6, 8*
**three-plus** 305:*5*
429:*2*

**threw** 286:*21*
**throwing** 478:*4*
**thrown** 286:*22*
379:*12*
**thumbs** 469:*17*
**Thursday** 438:*3*
459:*16* 465:*11, 16*
466:*9* 470:*22* 472:*3,
6, 7* 473:*15*
**ties** 372:*12*
**Tim** 273:*5, 13, 15*
284:*12, 14* 295:*17*
296:*3, 4, 15, 25* 297:*1,
17, 23* 298:*4, 15, 17*
299:*12, 18* 301:*1, 3*
302:*5* 303:*1, 7* 304:*1*
305:*18* 306:*11* 307:*1*
309:*4, 21* 310:*19*
311:*25* 348:*1, 12, 23,
25* 349:*14, 24* 350:*24*
351:*3, 5, 8* 352:*24*
353:*13, 19* 356:*11*
357:*25* 358:*2, 3, 11,
16* 359:*9, 21* 360:*8,
10, 16, 22, 24* 361:*2*
362:*6, 11* 363:*13, 16*
364:*8, 22* 373:*22*
376:*19* 377:*4, 6, 12*
379:*16* 380:*8, 16, 19*
381:*17* 382:*19* 386:*3,
12, 17* 389:*19* 395:*19*
396:*22, 25* 397:*22*
398:*4, 14* 399:*21*
400:*7* 401:*8* 402:*10*
411:*14* 412:*3, 9*
419:*10* 420:*6, 12, 18,
23* 421:*9, 17, 24*
422:*3* 424:*25* 425:*19*
426:*15* 429:*13*
431:*19* 432:*1, 3, 21*
435:*14* 436:*13*
437:*10, 23* 438:*17*
447:*16* 448:*20* 449:*6*
450:*1, 3, 6, 9, 11, 16,
18* 451:*2, 7, 8, 14, 20,
25* 452:*1, 4, 8* 453:*2*
454:*2, 5, 23* 456:*8*
457:*7, 14* 458:*9*
459:*18* 460:*9* 462:*15,
19, 24* 463:*3, 5, 13, 21*

Deposition of Gregory D. Carmichael, Volume II

Philip R. McHugh v. Fifth Third Bancorp, et al.

466:7, 8  467:2, 18
469:4, 8, 17  474:15
475:15, 19, 20, 21
476:20  479:2  485:23
486:17, 18  487:17, 19,
25  488:13  489:1
490:12  492:23, 24
494:11  495:2, 9, 18
496:2, 4  504:23
505:5, 15, 21  506:1, 5,
8  507:10  508:4
510:11, 17  511:22
512:3, 8, 10  518:24
521:6, 8, 13, 15, 17, 20,
21, 25  522:1, 4

**Time**  267:18  271:1
272:14  275:15  276:4
279:4  283:16  290:16,
24  291:17  292:6, 16
293:6  301:15  307:7
310:8  313:15  314:7,
9  324:11  326:18
330:12, 14  331:5, 6
338:20  350:22
354:20, 23  357:2
358:10  369:17
375:19  377:1, 10, 23
378:7  379:3, 24
380:7, 18  381:7
383:18  385:7, 15
387:6, 7, 17  389:16,
18  397:17  400:6
407:1, 4  413:13, 17,
19  414:16, 17  415:8
418:8  435:22  440:11
446:14  447:12, 17
448:20  449:5  456:17,
20  457:4, 5, 8  458:15,
16  459:4, 8  463:1, 11,
19  467:9, 11  470:17
472:9, 10, 18  476:24
479:21  483:2, 10
485:15  488:9  491:2
494:24  496:14, 17, 24
498:13, 22  501:13
502:4, 10  504:1
506:16  512:20
513:11, 18  514:2, 10,
17  520:11, 14  521:9

522:7, 8, 16  526:4
528:20  532:1
**timeframe**  307:3
311:20  319:20  358:9
361:4  375:11, 25
385:5  388:1  394:19
402:10  414:22
419:16  462:17, 23
469:3  496:24  498:15
**timeframes**  499:24
**timeline**  278:10
293:5, 21, 24  294:6, 8
374:4  401:23  411:18
412:4  490:14  495:6,
8
**timelines**  284:6, 21
285:1  288:22  289:7,
9  293:8, 12, 15, 18
351:15  360:5  374:2
377:19  392:17
**times**  301:16, 18
350:6, 10  364:19
387:11  450:6, 24
455:10  494:22  503:2,
5, 15
**timestamps**  297:23
**timing**  293:14  375:2,
3  376:1  377:16
379:8  381:11  411:16
448:15  459:1, 15
470:20  494:21  495:1,
2, 22, 24  496:4, 9
498:18
**Timothy**  428:18, 24
429:11  493:3
**Tim's**  273:11  293:3
349:18  356:16, 20
377:23, 24  416:8
421:7  457:3  464:11
493:21
**tired**  418:11
**title**  384:5
**titled**  429:10
**today**  327:17  351:14
394:3  403:7  420:11
426:5  483:19  484:2
491:13
**today's**  446:24
**told**  319:24  387:19
398:2  399:3  416:24

418:10  451:11, 23, 25
452:2  454:5  458:24
459:8  463:16, 19
464:9, 10, 12  465:7,
20, 23, 24  466:14
474:14  478:18
480:15  482:16  484:4
487:22, 23  494:10
495:21  497:16, 17, 18
502:13  505:20  506:4
512:20  526:16  527:5,
11  528:19  529:6
**Tom**  517:7
**tomorrow**  424:25
469:6, 16  482:9, 12
504:23
**top**  282:3  284:19
313:23  323:20
340:24  344:1, 5, 11
345:5  347:19, 20
348:21  349:5  383:20
387:4  415:6  460:2
461:12, 16, 19, 23
462:5  474:3, 13
475:2  476:25  477:3
482:25  485:12
504:16  514:9
**topic**  373:16  407:8,
10  412:13  487:20
**topics**  472:15
**total**  282:12  313:17
331:11  371:12
**totaled**  329:5
**totality**  448:18
**totalled**  330:22
**totally**  418:8  502:18
**totals**  320:23
**touch**  342:14
**touched**  342:12
480:20
**tough**  368:16, 19
**track**  328:2
**traditional**  365:8
**traditionally**  352:2
**trail**  419:5  426:2
469:13
**train**  519:24
**trains**  328:2
**transaction**  305:10
**transcribed**  535:8

**transcript**  535:9, 10
536:7
**transcripts**  308:15
**transformation**
348:20  349:4  363:18,
25  364:11  461:21
**transformed**  365:10
**transition**  467:6
488:9  521:13
**transitioning**  521:4
**transpired**  388:2
502:3
**treasurer**  290:21
**treasury**  332:1
**treat**  459:22
**tremendous**  313:5
363:15
**tried**  328:21  334:16
392:25  471:3  516:8
530:13
**troubled**  351:20
**truce**  488:17
**true**  318:18  327:16,
17  415:3  453:8
455:23, 24  513:21
528:9  535:10  536:10
**truly**  345:15
**truth**  301:10  524:10
527:20
**try**  324:7  340:4
347:16  397:25  400:7
417:23  419:4
**trying**  274:15
277:19  285:24
291:23  293:7  301:9
302:21  308:2  328:11
352:23  366:6  409:12
425:23  469:25
480:20  506:17  529:4
531:9, 11
**Tuesday**  456:4
457:25  458:1, 2, 4
459:11  460:12  463:1
465:9, 17  466:8, 11
532:19  533:6
**turn**  284:1  321:1
347:23  348:11  384:4
500:19  509:15
**turned**  391:18

419:*21*  519:*24*
**turnover**  313:*9*
**turns**  279:*8*
**Tuzun**  289:*21*  290:*6, 7*  296:*6, 9*  298:*16*  300:*11*  303:*2*  306:*1*  308:*12, 19*  309:*4*  310:*1*  390:*9, 15*  403:*18*
**tweak**  408:*18*  409:*21, 22, 24*  410:*18*
**twice**  308:*14*  388:22  389:*10*  452:25
**two**  271:2  273:5, *23*  282:8  290:6  296:*17*  297:*14*  303:20  306:6  307:12  309:*10*  322:25  326:7  328:25  336:*11*  360:*11, 19*  368:*15*  376:23  380:22  381:*1*  389:*14*  391:*19*  398:2  399:25  419:6  424:6  434:*24*  443:*20*  473:*3*  487:*21*  500:*3*  524:3, *5*
**two-plus**  294:*1*  354:22  360:*12, 19*
**type**  282:*17*  349:2  352:*14*  356:9  364:*18*  368:*16*  373:4  384:*15*  411:8  412:*23*  448:*24*  456:*13*  467:6  475:5  517:*23*
**types**  461:*21*
**typical**  478:6  499:*15*
**typically**  278:*20*  285:25  290:*10*  319:*21*  353:*19*  368:2  376:*14*  428:8  449:9  493:*13*

**< U >**
**U.S**  484:*19*
**ultimately**  286:*8*  339:*10*  372:16  374:7  377:*20*  379:*20*  382:*19*  408:*10*  431:22
**Um**  319:6  383:*14*

**unanimous**  285:*21*  293:2, *4*  361:*1*  492:6  493:6, *8*
**unanimously**  303:*6*
**uncomfortable**  467:*13*
**Underline**  362:*15*
**underneath**  449:*21*  504:*20*
**undersigned**  535:*5*
**understand**  274:*15*  282:*12*  287:*21*  291:*23*  300:22  301:*11, 12*  314:8  315:*6, 8*  331:*20*  335:22  339:*5*  345:*17*  350:*14*  352:*13*  366:*6*  404:*20*  418:*18*  422:*13*  449:*13, 18, 19*  469:*24*  476:*17*  480:*13*  483:*19*  484:*1*  516:*18*  530:*12*
**understanding**  277:*20*  320:*11*  321:*19*  326:*3, 22*  364:*1*  391:*11*  397:*12*  398:7  403:*21*  437:*8*  536:*13*
**understands**  358:*3*  436:*14*
**understood**  332:*12*  333:*4*  335:*19*  347:*18*  359:*22, 23*  455:*4*  459:*6*  468:*5*  507:*13*
**undertaken**  353:*16*
**underway**  380:*14*  381:*3*
**unheard**  471:*23*
**unique**  404:*22*
**UNITED**  267:*1*  532:*14*
**unplanned**  289:*23*
**unsatisfactory**  316:*24*
**unsettling**  314:*2*
**unusual**  499:*16*  517:22
**update**  394:2  404:*16, 24*  413:*12*  440:*4, 19*  447:*23, 25*  448:2, *7, 11*  484:*21*

**updated**  404:*11*  405:*18*  407:*25*  408:*11, 16*  410:*17*  413:*25*  424:*24*  437:*22*  438:*4*  504:*22*
**updating**  404:*17*  405:22
**upset**  520:*1*
**upward**  357:*4*
**use**  281:*19*  305:*19*  314:*15*  315:*23*  317:*25*  321:*15*  324:8  326:*10*  334:*25*  344:*23*  368:*16, 17, 23*  376:*14*  400:6  475:*25*
**useless**  462:7
**utilized**  443:22  446:*21*

**< V >**
**vacation**  382:*5, 7*
**valid**  427:*18*
**validated**  297:*13*
**validity**  426:*20*
**value**  300:*3*
**valued**  455:*6*
**values**  345:25  346:*11*  347:*13*  523:*23*
**variable**  368:*13*  372:25
**variations**  318:*24*
**various**  283:8  466:*24*  467:*14*  531:22
**VC**  371:*9, 16*  372:*5, 6, 22*  373:*1, 4*
**verbal**  297:*24*
**verbatim**  326:*10, 19*  334:*12*  405:*20*  464:*18*
**verified**  513:*11*
**verify**  310:*17*  311:24  438:*19*  456:*25*  457:9  513:*12*
**versatile**  320:*9*  326:*25*  332:*13*  333:*4*  334:*9, 20*  341:*11*
**version**  271:*21*  371:*2*  408:*2, 3*

410:*24, 25*  426:*18*  429:*12, 18, 24*  445:*4, 7, 18, 22*
**version's**  445:*23*
**versus**  326:*17*  368:*24*  419:*16*  434:*11*
**vet**  296:*6*  299:*12*  387:*21*
**vetted**  294:*12, 15*  295:*17*  296:*9*  298:*7, 16, 17, 21*  300:*2, 11*  301:*2, 5*  302:*3*  304:2  305:*18*  309:*9, 12*  361:*6, 17*  364:*8*  454:*2, 4*  505:*11, 25*  506:*4*
**vetting**  294:*17*  299:*6, 7, 11*  301:*20*  305:*13, 25*  310:*6*  388:*4, 5, 8*  389:*19*  390:*14*  401:7  403:*17*  505:*3, 4, 21*
**viable**  297:*17*  390:*24*
**video**  533:*11*
**VIDEOGRAPHER**  271:*1*  330:*12, 14*  385:*15*  413:*17, 19*  456:*17, 20*  496:*14, 17*  520:*11, 14*
**Videotaped**  267:*13*  533:*5*
**view**  277:*21*  344:6  417:*25*  505:*25*
**viewed**  345:*3, 4*  364:*16*  400:*23*  477:*12*  514:*4, 5*
**viewpoint**  277:*8*  278:6  312:22  313:*4*  315:*3*  316:*5*  317:*13*  318:*1*  320:22  329:*4, 11*  330:*21*  331:*1*  345:*9, 10*  349:*18*  350:*15*  351:*24*  510:*14*  511:*14*
**viewpoints**  312:*12*  509:*20*
**views**  514:*8*
**visit**  331:*19*
**vocal**  299:*25*  401:*15*
**voice**  450:*10*

**voiced** 286:*11* 450:*6,*
*17*
**VOLUME** 267:*13*
437:*25*
**voluntarily** 484:*5*
**vote** 447:*10, 15, 17,*
*21* 462:*21* 463:*18*
500:*6*
**voted** 276:*25* 383:*2*
462:*22* 467:*3, 18*
**vs** 267:*8* 536:*4*

**< W >**
**Wait** 311:*7* 433:*12*
**walk** 459:*20* 470:*16*
**walked** 459:*13, 23*
464:*16* 465:*16*
470:*19* 474:*16*
475:*15* 494:*25*
**walking** 474:*25*
480:*5*
**walkthrough** 428:*7*
**Walnut** 267:*19* 533:*7*
**WAM** 386:*5, 15*
**want** 275:*1* 279:*6*
286:*12, 24* 296:*5, 25*
298:*25* 299:*1* 300:*2*
301:*25* 303:*14* 306:*8,*
*20, 21, 25* 307:*17*
309:*15* 312:*4* 314:*11*
315:*5, 6* 322:*12, 13*
323:*3, 7* 338:*5, 16*
339:*11* 341:*25*
345:*16* 349:*7, 12, 13*
363:*11* 376:*20* 382:*5*
401:*11* 406:*12* 418:*2,*
*12, 20* 419:*1* 420:*11*
424:*9* 431:*20* 432:*17*
434:*25* 435:*12*
436:*12, 17* 437:*6*
442:*25* 449:*13, 18, 19*
452:*18* 453:*21, 22*
454:*8, 16* 466:*15*
476:*16* 478:*1, 3*
506:*11* 507:*8* 509:*12*
527:*6, 24* 529:*7, 11,*
*13* 531:*10*
**wanted** 294:*8*
295:*25* 296:*1, 6, 8, 25*
302:*3, 5* 305:*14, 16,*

*17, 18, 19* 306:*10, 13,*
*15* 311:*25* 318:*1, 18*
333:*3* 338:*13* 348:*25*
349:*8* 358:*12* 359:*19*
382:*10* 383:*1* 387:*16*
391:*2, 16* 422:*11, 12*
426:*2* 431:*17, 24*
432:*5* 433:*3, 18*
434:*3, 9, 19, 21*
435:*20* 436:*4, 7*
437:*2, 10* 453:*9, 13*
454:*13* 455:*21*
458:*17* 459:*25*
474:*12* 475:*21*
480:*13* 497:*8* 513:*12*
521:*10* 522:*5*
**wanting** 285:*21*
374:*3* 403:*22* 434:*5*
**wants** 297:*10* 399:*21*
404:*20* 427:*19*
431:*23* 470:*15*
502:*21*
**warranted** 513:*2*
**wash** 287:*18*
**wasting** 498:*22*
**watch** 287:*19* 288:*8*
**waters** 364:*18*
**wave** 418:*11*
**way** 274:*25* 284:*13*
298:*4* 320:*15* 323:*6*
333:*18* 340:*10*
342:*19* 343:*24*
346:*19, 20* 347:*4, 15*
349:*15* 353:*6, 7*
395:*4* 401:*14* 407:*5*
427:*24* 428:*8* 434:*11*
436:*1* 439:*14* 446:*5*
451:*6* 455:*5* 473:*10*
474:*6, 7* 477:*1*
479:*23*
**weaknesses** 287:*21*
318:*3, 7* 329:*20*
339:*5* 368:*22*
**wealth** 328:*1* 460:*22*
**Wednesday** 459:*13*
532:*25*
**week** 400:*8* 414:*5*
459:*12* 466:*22*
**weekend** 481:*6*

489:*25*
**weeks** 385:*5* 406:*11*
**weight** 520:*2*
**Well** 274:*20* 296:*6*
298:*16* 317:*23*
319:*11* 321:*15*
324:*13* 331:*21*
334:*12* 342:*11*
344:*18* 346:*4* 351:*3*
368:*21* 380:*10* 397:*8,*
*21* 402:*6* 408:*16*
410:*16* 412:*1* 414:*19*
416:*6* 444:*10* 452:*6*
459:*18* 460:*22* 466:*6*
468:*15* 470:*19* 475:*1,*
*4* 498:*16, 17* 501:*16*
502:*19, 20* 507:*10*
512:*7* 519:*21* 523:*15*
**went** 295:*23* 305:*20*
310:*17* 334:*1* 353:*8,*
*13* 355:*12, 13* 356:*4*
372:*4, 7* 399:*3* 411:*9,*
*10, 11* 425:*7, 11*
442:*15* 466:*4, 5, 11*
469:*19* 470:*4, 10, 11,*
*14, 18* 473:*1* 475:*14*
511:*22* 512:*7, 10*
513:*11*
**We're** 271:*2* 276:*21*
280:*10* 290:*23*
324:*11* 326:*15, 17*
330:*14* 337:*1* 346:*24*
349:*11* 364:*13* 367:*4*
374:*3* 385:*15* 395:*17*
399:*20* 410:*24* 411:*2,*
*3, 20* 413:*19* 418:*9*
435:*9* 456:*17, 20*
459:*18* 480:*3* 483:*22,*
*23* 492:*22* 496:*14, 17*
518:*1* 520:*11* 529:*4*
**WESTERN** 267:*3*
532:*15*
**We've** 293:*11* 367:*2*
375:*22* 387:*8* 420:*12,*
*21* 471:*11* 472:*15*
473:*5*
**whatsoever** 459:*2*
491:*14*
**WHEREOF** 535:*12*
**wife** 459:*9* 464:*13*

**Williams** 294:*20*
384:*25* 445:*3* 446:*7*
**willing** 458:*21*
**willingly** 340:*21*
**winning** 364:*5, 7, 21*
365:*1* 396:*16* 404:*7,*
*10* 405:*3* 406:*23*
409:*4* 410:*7, 13*
411:*13* 412:*21* 413:*7,*
*15* 419:*19* 421:*5*
**wire** 493:*5*
**wish** 488:*16*
**Witness** 271:*4, 8*
273:*10* 275:*5* 287:*15*
298:*11* 301:*5, 12, 14,*
*16* 304:*17* 308:*15, 23*
311:*11* 313:*2* 315:*22*
333:*16* 337:*5* 341:*9*
343:*20* 354:*9* 366:*24*
367:*6* 369:*25* 378:*11*
383:*14* 412:*12*
445:*18* 473:*5* 491:*12*
502:*15* 503:*1, 5*
505:*8* 508:*7* 509:*2,*
*10* 510:*25* 511:*3, 11,*
*19* 513:*10* 518:*23*
519:*11* 524:*5* 527:*21*
528:*3* 529:*8* 534:*1*
535:*12*
**wondering** 376:*2*
**Word** 316:*17* 323:*3*
326:*16, 17* 334:*25*
335:*3* 336:*12* 344:*23*
355:*4* 366:*2, 24*
368:*23* 434:*10*
435:*20* 486:*17*
**worded** 434:*11*
**wording** 318:*13, 14*
323:*4* 326:*12* 357:*3,*
*8* 398:*17* 422:*17*
**words** 465:*3* 474:*24*
491:*5* 495:*2* 496:*7*
519:*2*
**work** 272:*9, 10*
282:*12* 314:*17, 22*
339:*4, 21* 355:*15*
356:*19* 368:*2, 7*
374:*23* 375:*1* 379:*23*
380:*12* 387:*15*
392:*16, 21* 417:*2*

419:*12* 427:*20* 450:*6,*
*9, 11, 18* 451:*2, 13, 20*
452:*1* 459:*18* 467:*15*
474:*15* 477:*2* 479:*6,*
*14* 487:*24* 494:*11*
512:*23* 520:*4*
**worked** 339:*19*
368:*4, 9*
**working** 305:*8*
311:*12* 327:*13, 18*
328:*3* 339:*15* 344:*25*
362:*17* 367:*22* 373:*3*
382:*9* 395:*21* 427:*21*
451:*7* 460:*9* 464:*11*
484:*15, 16* 489:*24*
**works** 273:*24* 381:*4*
427:*22* 431:*23*
**world** 364:*10* 365:*4*
455:*5*
**wreck** 519:*24*
**write** 304:*7, 18*
338:*2* 340:*12* 417:*16*
419:*3* 465:*3, 5*
469:*12* 482:*19*
490:*25*
**writing** 304:*15*
364:*24* 524:*12*
**written** 281:*2* 399:*23*
400:*1* 418:*19* 419:*9*
444:*14* 492:*6* 493:*13*
533:*22*
**wrong** 302:*23* 371:*7*
417:*6*
**wrote** 338:*12* 523:*10*

**< Y >**
**Yeah** 304:*6* 307:*22*
324:*3* 358:*23* 408:*14*
416:*24* 417:*18* 455:*2*
457:*11* 468:*2* 470:*18*
477:*21* 491:*18*
504:*17* 515:*22* 520:*7*
521:*24* 527:*9*
**year** 276:*22, 24*
293:*25* 313:*24* 315:*7,*
*11* 316:*4* 318:*2, 6*
319:*19* 331:*14*
338:*25* 339:*1* 361:*9,*
*19, 20* 365:*14* 375:*19*
382:*8* 388:*21* 389:*8*

461:*24* 496:*20* 512:*1,*
*2*
**years** 275:*5* 285:*6*
294:*1* 295:*19* 303:*9,*
*11* 305:*5* 315:*11*
318:*24* 330:*9* 342:*13*
351:*24* 354:*22*
360:*11, 12, 19, 20*
405:*11, 25* 412:*7*
415:*1, 7* 423:*18, 19*
429:*2* 454:*21* 461:*3*
473:*12* 476:*1* 477:*16*
479:*23* 483:*3, 4*
495:*4* 496:*23* 498:*7*
502:*5* 510:*16, 21*
512:*6, 24* 513:*2, 4*
521:*19*
**year's** 368:*13*
**Yep** 434:*18*
**yesterday** 313:*4*
338:*20* 393:*9* 464:*23*
468:*17* 473:*3* 484:*4,*
*9* 515:*23* 525:*9*

**< Z >**
**Zaunbrecher** 480:*17*
490:*5, 9* 491:*6, 10, 12*