**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **PHILIP R. MCHUGH,** | : | |
| | : | Case No. 1:21-cv-00238 |
| Plaintiff, | : | |
| | : | Judge Michael R. Barrett |
| v. | : | |
| | : | |
| **FIFTH THIRD BANCORP, ET AL.** | : | **PLAINTIFF'S MEMORANDUM IN** |
| | : | **OPPOSITION TO DEFENDANTS'** |
| Defendants. | : | **MOTION FOR SANCTIONS** |

I.      **Introduction**

In an effort to make a mountain out of a molehill, Defendants feign shock and extreme prejudice at having received 44 pages of supplemental discovery documents pertaining to Plaintiff's job search efforts since this case began and the identity of two witnesses meant to verify a handful of those documents. Yet Defendants fail to disclose to the Court that following Plaintiff's production of various mitigation-related documents on July 30, 2021 (McHugh01010-01030),[1] Defendants deposed Plaintiff regarding his job search efforts on August 30-31, 2021. During the deposition, Plaintiff disclosed the information contained in both the original and the supplementally-produced emails, LinkedIn messages, and calendar appointments from the date of Plaintiff's termination (October 26, 2020) up to the date of Plaintiff's deposition (August 30-31, 2021). (*See* McHugh Dep. 29:1-32:25, **Exhibit 3** to Smith Dec.). Despite having that information in 2021, Defendants chose not to pursue further investigation or discovery on the matter.

Defendants chose not to pursue it because, from the start of this litigation, Defendants were actively seeking to <u>prevent</u> Plaintiff from obtaining comparable employment. Significantly, Plaintiff had a broad, post-employment non-compete agreement with Fifth Third which barred him

---

[1] Attached as **Exhibit 1-2** to Smith Dec.

1

from obtaining any competitive employment for a 12-month period following his termination. (*See* **Exhibit 4** to Smith Dec.). Fifth Third knew this and was evaluating the non-compete at the time of Plaintiff's termination. (*See* **Exhibit 5** to Smith Dec.). Moreover, within two days of Plaintiff filing his age discrimination claims, Defendants countersued him for abuse of process in a textbook example of a retaliatory counterclaim. (*See* Doc. # 1-11, PAGEID # 51-59). That counterclaim was very public,[2] highly disparaging to Plaintiff's character and reputation, and was filed on the heels of Defendants threatening Plaintiff with "harm and discomfort" and other actions for pursuing his claims. (*See* **Exhibits 6-7** to Smith Dec.). Despite these actions, Defendants now want to argue that Plaintiff's failure to find a comparable job in banking for 14 months is somehow "facial evidence" of a failure to mitigate. (*See* Doc. # 88, PAGEID # 4053).

Defendants also ignore the fact that the vast majority of the 44 pages of supplemental production are from <u>after</u> Plaintiff's August 30-31, 2021 deposition and, as is typical in employment litigation, would not be the subject of further depositions. Ignoring this fact, Defendants attempt to distract the Court by improperly parsing a single statement made by Plaintiff's counsel during an informal conference, calling it a "misrepresentation" (p.3) or "misleading"(p.12-13), and seeking sanctions against counsel. (*See* Doc. # 88, PAGEID # 4052, 4061-4062). When read in context, however, the statement is accurate, and it is Defendants who made misrepresentations to the Court.[3]

Defendants also misrepresent the purported importance of the supplemental production to reports and testimony of Plaintiff's economist expert and Defendants' rebuttal expert. Yet, a

---

[2] https://www.bizjournals.com/cincinnati/news/2020/11/03/fifth-third-countersues-departed-executive-officer.html
[3] *See* Doc. # 86, PAGEID # 4030)(Falsely representing that, "none of the supplemental documents are to Tim Spence, from Tim Spence, about Tim Spence. They had nothing to do with it. So we would ask the Court to modify its Order to except Tim Spence from the targeted depositions.").

cursory review of the reports and testimony makes clear that such documents have absolutely no bearing on the experts' opinions or any rebuttal thereto. To the contrary, both experts have unequivocally confirmed that they are providing no opinions as to Plaintiff's job search efforts.

Finally, throughout their motion Defendants wrongfully try to equate Defendants' sanctionable conduct of  intentionally withholding documents (March-June 2020 communications with RHR) which refute Defendants' position in this case (that the plan to promote Tim Spence to President and CEO was "no secret"), with Plaintiff's recent supplementation of mitigation-related evidence which is consistent with Plaintiff's deposition testimony in this case, and which had been substantially disclosed to Defendants in 2021. Contrary to Defendants' intentional and wrongful withholding of evidence, the delay in Plaintiff's supplementation did not benefit Plaintiff in any way, and did not prejudice Defendants.

The fact is, Plaintiff supplemented prior document production during the discovery period. It was not untimely, but even if it is, the disclosure is harmless and substantially justified given the lack of prejudice to Defendants which could be cured by minimal targeted discovery.

## I.     Plaintiff disclosed his job search efforts in 2021 in documents and testimony, and Defendants failed to follow up.

Defendants claim that "for over four years, Fifth Third has sought discovery on Plaintiff's mitigation of damages[,]" and Plaintiff "responded with boilerplate objections, suggested that all documents had been produced, and failed to state that documents were being withheld." (Doc. # 88, PAGEID # 4052).

Contrary to Defendants' representations, however, Plaintiff *did* disclose his job search efforts to Defendants in 2021, including in documents and in testimony. On July 30, 2021, Plaintiff produced documents relating to his job search efforts, including the following:

- Updated Resume (McHugh01010-01011)



- 1/11/2021 E-mail with ███████ at ███████████ (McHugh01012)
- 12/14/2020-12/17/2020 E-mails and Texts with ███████ at ██████ ("█████")(McHugh01013-01014)
- 6/18/2021 E-mail with ███████ at ██████████ (McHugh01015-01016)
- 12/2/2020 Calendar Invite Meeting with ██████ at █████ (McHugh01017)
- 12/3/2020 - 3/2/2021 E-mails with ██████ at ████████████ (McHugh01018-01023)
- 1/6/2021 E-mails with ███████ confirming call with ████████ (████) (McHugh01024-01030)

(*See* Response to RFP 17 and McHugh01010-01030, **Exhibits 1-2** to Smith Dec.).[4]

A month later, Defendants took Plaintiff's deposition over a two-day period (August 30-31, 2021). During the questioning, Plaintiff testified to his job search efforts consistent with the above production and the supplemental production. (*See* McHugh Dep. 28:1-31:25, **Exhibit 3** to Smith Dec.). This included testimony that Plaintiff had looked for other work since his termination, which included many conversations with potential employers. (*Id.*) Plaintiff also testified to the employers and others he had contact with, including executive recruiters:

> To the best of my recollection this morning, I'm talking to the financial institutions; ████████████████. **There have been executive recruiters who have called me about potential positions with other financial services**. I have talked to wealth management firms in Cincinnati by the name of ████████████. I can't recall their specific name at the moment. ████████ in Louisville, Kentucky. And I have had conversations with charitable organizations, including CISE, which is the C-I-S-E, Cincinnati Inner-City School Education Fund, as well as ████████.

(*Id.* at 29:18-30:20)(emphasis added). Plaintiff went on to identify the specific individuals he could recall speaking with during his job search, and the positions discussed:

> For CISE, the Cincinnati Inter – Inner-City School Education Fund, I have spoken to ████████████████. For █████. For ████, I think it's ████████ – ████████████████, I don't recall their names off the top of my head. For ██████. For ████████████. For



---

[4] In Plaintiff's response, he also reserved the right to supplement such production in the event additional information was discovered. (*See* **Exhibit 1** to Smith Dec.).



. Those are all the names that I recall at the moment.

[…]

For CISE…the role of president and executive director. For ███████████, the role of business advisor. For ███████████, a partner in that firm. For B ███████ their wealth management firm, a partner in that company. For ███████, the position of – of their wealth leader, I guess they do not have a wealth division. And for ███████████, a senior advisor. And for ██ ███████, position of senior advisor.

(*Id.* at 30:11-31:7).

Despite Plaintiff's testimony, for four years Defendants never followed up on any of it. They never inquired as to who the executive recruiters were, whether Plaintiff had continued those discussions since his deposition, whether he had any other discussions with prospective employers, or whether Plaintiff had engaged in any other job search efforts.

Contrary to Defendants' baseless arguments, this is not a case of Plaintiff <u>deliberately</u> withholding evidence that damages his case or <u>intentionally</u> representing that he had produced all evidence relating to mitigation when he was actually aware he had not. Plaintiff was fully forthcoming, to the best of his knowledge, both in response to the document requests in 2021, and in his deposition. Defendants simply chose not to follow up on the information he provided.

## II. Defendants sought to *deter* Plaintiff's job search efforts in the banking industry via a broad non-compete and a retaliatory counterclaim for abuse of process

Defendants' failure to follow up makes sense when considering the Bank was engaging in efforts to *deter* Plaintiff from finding subsequent employment. First, in 2020, the Bank required Plaintiff to sign a broad, 12-month non-compete in exchange for a "Performance Share Award." (*See* **Exhibit 4** to Smith Dec.). That non-compete was attached to the award, with a Section II regarding "covenant prohibiting competition and solicitation" stating in relevant part:

> Employee agrees that during his or her employment and for a period of one (1) year thereafter he or she will not…(A) enter into an ownership, consulting or

employment arrangement with, or render services for, **any individual or entity rendering services or handling products competitive with the Company in any geographic region or territory in which Employee worked or for which I had responsibility during the twenty-four (24) month period preceding Employee's departure from the company**[.]

(*Id.*). Given Plaintiff's responsibilities included oversight of all 12 of Fifth Third's regions, this non-compete restricted him from employment in banking throughout Ohio, Alabama, Florida, Georgia, Illinois, Indiana, Kentucky, Michigan, North Carolina, South Carolina, Tennessee, and West Virginia, and any other "geographic region" or territory for which McHugh was responsible.[5]

In text messages between Nancy Pinckney (Current Chief HR Officer) and Bob Shaffer (prior Chief HR Officer) at the time of Plaintiff's termination, the two discussed that the Bank's deputy general counsel, Phenise Poole, had asked Ms. Pinckney to pull these agreements to evaluate the non-compete clause referenced above. (*See* **Exhibit 5** to Smith Dec.).

Beyond the non-compete, Defendants also filed a retaliatory counterclaim against Plaintiff which deterred his ability to obtain a comparable job in banking. That counterclaim falsely alleged Plaintiff:

(i)   had stated in 2018 that "it was his intention to work only for the next five years before he would enter retirement," (¶ 9)

(ii)  had "intricate knowledge" of plans to assess only Tim Spence for the President and CEO role, which the Bank claimed was "widely known across the Bank" (¶ 11-16);

(iii) of acting "in a fit of petulance" when he was told Spence was being promoted to President while Plaintiff was being re-assigned to a prior role he was promoted from, and that he "boastfully bellowed" at Carmichael that Plaintiff should be President and CEO (¶ 21); and

(iv) engaged in "guerrilla litigation tactics" by raising age discrimination claims, and filing those claims against Defendants (¶ 23-25). (*See* Doc. # 10, PAGEID # 1791-1817).

The counterclaim goes on to allege that Plaintiff's discrimination claim was "cloaked in the veneer of a properly-pleaded age discrimination claim," but in actuality is "a mere pretext" and "designed

---

[5] https://www.53.com/content/fifth-third/en/personal-banking/about/regions-we-serve.html.

to achieve an ulterior purpose" of coercing the Bank "to abandon their decision about Tim Spence[.]"(*Id.* at ¶ 26-27). The counterclaim was filed *two days* after Plaintiff filed his age discrimination claims, and was reported on by the Cincinnati Business Journal as "Fifth Third countersues departed executive."[6]

Notably, the counterclaim was filed on the heels of Defendants' threats to Plaintiff of "harm and discomfort" if he dared to pursue his claims. (*See* Oct. 23, 2020 Zaunbrecher Letter, **Exhibit 6** to Smith Dec.). Defendants also threatened Rule 11 sanctions and claims for defamation simply for pursuing the claims. (*See* Oct. 27, 2020 Defense Counsel Email, **Exhibit 7** to Smith Dec.). Texts from Susan Zaunbrecher to Bob Shaffer and Tim Spence, which the Court previously reviewed in-camera, confirm these intentions, with Ms. Zaunbrecher stating that if Plaintiff sued, he "would never work in banking again." (*See* Feb. 2, 2024 E-mail to Court Recounting Text Message from Zaunbrecher, **Exhibit 8** to Smith Dec.).[7]

This counterclaim is factually and legally baseless and gives rise to actionable retaliation, all of which will be addressed in Plaintiff's forthcoming Motion for Summary Judgment. However, for purposes of the present motion, it is important to note that Defendants actively sought to *prevent* Plaintiff from obtaining a substantially equivalent job in the banking industry, both via the non-compete and the retaliatory counterclaim. Further, in their initial disclosures, Defendants made clear that they sought $2,250,000.00,[8] which "accomplishes the twin aims of punishment and deterrence as to Plaintiff." (Defendants' Initial Disclosures, **Exhibit 9** to Smith Dec.).

---

[6] https://www.bizjournals.com/cincinnati/news/2020/11/03/fifth-third-countersues-departed-executive-officer.html

[7] *See also* February 8, 2024 Notation Order ("As a precautionary measure, defense counsel to provide to the court an additional copy of all emails sent to or by [Susan Zaunbrecher], to include emails on which she is coped, subject, of course, to the agreed-upon search terms; defense counsel also to provide the Court with a log of the Zaunbrecher emails that Defendants believe are protected by attorney-client privilege.").

[8] According to the Bank, this is "the total annual compensation Plaintiff would have received from the Bank in 2021 had he not voluntarily resigned his position and then immediately thereafter initiated this baseless, malicious litigation." (**Exhibit 9** to Smith Dec.).

7

Yet now, Defendants want to use Plaintiff's inability to find comparable employment in banking with a comparable compensation package as an affirmative defense to Plaintiff's discrimination claims. In light of the above, it makes sense that Defendants would not seek to follow up regarding any job search efforts that Plaintiff engaged in, as they were actively seeking to prevent and deter such subsequent employment in retaliation for Plaintiff having initiated the present lawsuit.

### III. Defendants completely mischaracterize a statement made during an informal discovery conference as a basis for sanctions against Plaintiff's counsel.

Not satisfied with seeking sanctions against Plaintiff himself, Defendants also inappropriately seek sanctions against Plaintiff's *counsel* pursuant to 28 USC § 1927, which states:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case <u>unreasonably and vexatiously</u> may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

Defendants base this request on a single statement made during an informal discovery conference on November 6, 2025, which Defendants mischaracterize in their motion. (*See* Doc. # 88, PAGEID # 4052 ("Among other misrepresentations, Plaintiff's counsel represented to the court that the 'vast majority of the [supplemental production] go through today's date. That representation was false."); *See also* # 4055-4056, 4059).[9]

---

[9] This request for sanctions based upon counsel's statements is ironic, considering that in the very same conference Defendants' counsel made a very *material* and *false* representation to the Court regarding Tim Spence's involvement in the improperly withheld RHR communications. (*See* Doc. # 86, PAGEID # 4030 ("The deposition of Tim Spence is scheduled for tomorrow at 1:30…none of the supplemental documents are to Tim Spence, from Tim Spence, about Tim Spence. They had nothing to do with it. So we would ask the Court to modify its Order to except Tim Spence from the targeted depositions.")). This was false, as RHR produced withheld communications both to and from Tim Spence. (*See* Spence Dep. Excerpt 264:1-12. **Exhibit 10** to Smith Dec. ("Q. My question to you, Mr. Spence, do you recognize these emails? A. I mean, I don't – I'm sure that I had seen them. I think you asked originally is if I had seen them. I'm sure I had – I did. Because they either came from me or there's one here – there are four from me and one to me. I don't remember them, but I remember sending a message out to the folks who were meant to be interviewed by Guy Beeaudin inside my organization. So I'm assuming that's what these are; that's what they look like.")).

Below is the actual statement from Plaintiff's counsel, in its entirety:

> Plaintiff's Counsel: Judge, this is Josh Smith speaking. They have been involved. <u>But, you know, the additional e-mail communications that were produced – you know. I want to clarify. *We are not talking about just 2020 or '21.* The vast majority of those go through today's date. And it's 45 pages. But it's primarily calendar invites, e-mail communications that are regarding job search efforts</u> and it's –

(Doc. # 86, PAGEID # 4026). When read in context (particularly considering this was a telephone conference), it is obvious that counsel is referring to the fact that these are not *solely* 2020-2021 documents, but instead that the majority are documents dated post-2021 through the present (i.e., a supplementation of 2021 production). Counsel's additional statements to the Court clarified this further, "Judge, they – we did produce documents at that time in 2021. We produced 30 pages of mitigation documents similar to supplemental production we produced more recently." (*Id.* at PAGEID # 4028). In other words, the production is 44 pages of documents supplemental to 30 pages that were produced in 2021.

And the statement is accurate in that the majority of documents are dated after initial production (July 30, 2021), and span from 2022-2025. Below is a breakdown of the 44 documents, highlighting the documents that are duplicate reproductions of the 2021 production:

| Bates Number | Date | Content |
|---|---|---|
| McHugh01855 | 1/11/2021 | E-mail with ▮▮▮▮▮▮<br>-Repeat of prior production (McHugh01012) but with Plaintiff's response "looking forward to" the call. |
| McHugh01856-01857 | 5/11/2023, 5/20/2025 | E-mail with Becky Popenoe (recruiter) regarding potential positions (2023) and Plaintiff requesting a call (2025) |
| McHugh01858-01863 | 5/3-5/5/2021, 7/21/2021 | E-mails with Becky Popenoe (recruiter) regarding a phone call to discuss potential recruitment services, and a follow-up e-mail with potential position leads. |
| McHugh01864 | 12/17/2020 | E-mail from ▮▮▮▮▮▮ (▮▮▮) (McHugh01864)<br>-Repeat of prior production (McHugh01013) |
| McHugh01865 | 12/18/2020 | Microsoft Teams invitation for call with ▮▮▮▮▮▮ (▮▮▮)<br>-Consistent with prior production discussing teams call (McHugh01013, 01023-01025) |
| McHugh01866-01886 | 4/11/2022 – 10/21/2024 | Calendar Invite confirmations of meetings with business contacts / prospective employers. |

| McHugh01887-01888 | 6/2/2025 – 7/7/2025 | LinkedIn Messages with ███████ (executive recruiter) regarding an EVP Private Banking Position |
| McHugh01889-01890 | 8/23/2022 – 8/25/2022 | LinkedIn Message with ███████ regarding Executive Coaching Opportunity at ███ |
| McHugh01891-01892 | 2/10/2022 – 2/17/2022 | LinkedIn Message with ███████ regarding a potential position of President & CEO at ██████ (██) |
| McHugh01893-01894 | 9/28/2021 | LinkedIn Message with ███████ regarding potential CEO role with ████ |
| McHugh01895-01896 | 3/23/2021 – 3/28/2021 | LinkedIn Message with ███████ regarding a potential Region President role in financial services |
| McHugh01897-01899 | 4/8/2021 – 4/12/2021 | LinkedIn Message with ███████ regarding potential speaking and consulting opportunities |

Bottom line, the statement that Defendants point to—taken completely out of context and made during an informal discovery phone conference—is hardly a basis for sanctions under 28 U.S.C. § 1927 for unreasonably and vexatiously multiplying proceedings. *See Boynton v. Headwaters, Inc.*, No. 02-1111 MI/An, 2005 U.S. Dist. LEXIS 37192 at *3 (W.D. Tenn. Aug. 23, 2005), citing *Ridder v. City of Springfield,* 109 F.3d 288, 298 (6th Cir. 1997)(to find conduct sanctionable under § 1927, "there must be some conduct on the part of the subject attorney that trial judges, applying the collective wisdom of their experience on the bench, could agree falls short of the obligations owed by a member of the bar to the court and which, as a result, causes additional expense to the opposing party.").

## IV. Defendants completely misrepresent their expert's opinion and testimony in an effort to "re-open expert discovery"

Significantly, Defendants' motion also misrepresents the purported need to re-open expert discovery based on Plaintiff's supplemental production. This is just not true, and for Defendants to repeatedly emphasize it confirms their motion is a sham.

Defendants make the following misrepresentations in their motion:

- "Both sides' experts issued reports on mitigation and were deposed extensively on the subject." (Doc. # 88, PAGEID # 4052)
- "Mitigation of damages was an important issue in the respective expert reports." (*Id.*, at PAGEID # 4054)

- "Dr. Burke's calculation of Plaintiff's damages <u>specifically incorporated mitigation efforts,</u> what Dr. Burke labeled 'offset income.'" (*Id.*)
- "Mitigation was also <u>a key issue during these experts' depositions.</u>" (*Id.*)
- Plaintiff's supplemental production is "an apparent attempt to undermine <u>Dr. Lewin's opinions.</u>" (*Id.*, at PAGEID # 4054-4055).
- "Plaintiff's conduct deprived Fifth Third of the opportunity to…present it to its experts, and examine Plaintiff's expert on it." (*Id.*, at PAGEID # 4057-4058)
- "The mitigation evidence <u>would have been relevant to expert analyses of job search reasonableness, availability of comparable positions, and earning capacity.</u>" (*Id.*, at PAGEID # 4058)
- "Curing could require…<u>reopening expert discovery for both sides</u>—all at substantial expense and delay." (*Id.* )
- Fifth Third requests the Court to establish as true that Plaintiff failed to mitigate his damages and that Plaintiff made no effort, whatsoever, to mitigate his damages after 2021. This instruction is consistent with the record evidence (or lack thereof), <u>as well as Dr. Lewin's expert opinions.</u>" (*Id.*, at PAGEID # 4063)

In reality, neither expert—Dr. Burke (Plaintiff) nor Dr. Lewin (Defendants)—has <u>ever</u> assessed Plaintiff's mitigation efforts, including reviewing Plaintiff's testimony or original production.

As to Dr. Burke, his report provides a simple lost earnings calculation based upon the denial of Plaintiff's promotion to President and CEO and subsequent termination from the bank, *offset by* Plaintiff's *actual* income at his subsequent employment as Executive Director at CISE. (*See* Burke Expert Report, **Exhibit 11** to Smith Dec.). While Dr. Burke's report opines on Plaintiff's lost earnings minus his actual offset income, he in no way opined on Plaintiff's mitigation *efforts.* Based upon Plaintiff's work-life expectancy at the time, the amounts paid to Spence, and deductions of Plaintiff's offset income, Dr. Burke calculated Plaintiff's net loss to be $103,233,423 ($40,252,428 representing backpay and $62,980,995 representing front pay). (*Id.*).

At his deposition, Dr. Burke confirmed that his opinion <u>in no way</u> assesses Plaintiff's job search efforts:

Q.     You may answer. Did you ask him about mitigation efforts?

A.     I asked him about mitigation, but to me mitigation means what are you being paid now. What are your wages and fringe benefits. That's what I asked him about. That's mitigation.

Q.     Well, you understand in an economic loss case that mitigation efforts are at issue.

A.     I understand they are an issue but not for an economist. They are not an economic issue. I can't measure effort. I am not a vocationally trained person. Economists, in general, are not vocational experts. I only know what is, and what is, is his wage and his fringe benefits. That's what I was interested in. And that to me is mitigation.

(Burke Dep. Excerpts, 37:14-38:5, **Exhibit 12** to Smith Dec.). Despite repeating this question

throughout, Dr. Burke provided the same answer—he in no way assessed job search efforts:

39:8-12 ("[A]s I have said a couple times, economists are not vocationally trained people. So I don't know what his other options are. I just assumed he had another option. He took it."); 139:20-140:7 ("A. I don't know about his mitigation efforts; I know about his mitigation salary and fringe benefits. Q. When you had your interview with him, did you ask him about his mitigation efforts? A. No. That's not my terminology. That's your terminology. I asked him what he was being paid."); 147:23-148:10 ("Q. Do you believe that the plaintiff adequately mitigated his economic loss by accepting a job at a much lower, ten percent of what he could have earned in the financial sector? A. Adequate is not a scientific term. I don't know what 'adequate' is. I am not an expert in that area. I only know what actually happened. That's what I used."); 149:1-13 ("Q. Did you investigate what he did to mitigate his economic loss? A. Not my job. I am not a vocational rehabilitation – I never studied that area. I don't have any degrees in that area. I have never published in that area. I have never taught in that area. If somebody asked me those kind of questions, I have a couple of good vocational people I can refer you to, and none of them are me."). (*Id.*).

The same is true of Defendants' rebuttal expert, Dr. Lewin. Contrary to Defendants'

misrepresentations, Dr. Lewin <u>did not</u> assess Plaintiff's mitigation efforts in any way. Instead, his

report simply (and wrongly) criticizes Dr. Burke for an "improper assumption" that Plaintiff

"sufficiently mitigated his alleged damages by obtaining employment outside the banking sector,

at a fraction of his prior earnings or desired compensation as Fifth Third's President and CEO, and

without any evidence that Mr. McHugh performed an extensive or intensive job search." (Lewin

Expert Report at ¶ 18, attached as **Exhibit 13** to Smith Dec.). But this assessment says *nothing*

about Plaintiff's mitigation efforts, the fact that he was under a 12-month non-compete, or that

there was a public counterclaim filed against him with a news article written about it. Instead, Dr. Lewin's opinion is based upon an incorrect assumption that the burden is on *Plaintiff* to establish that he sufficiently mitigated his damages by obtaining employment in the banking sector at a comparable compensation level. As this Court is well aware, however, it is Defendants' burden to establish a failure to mitigate, not Plaintiff's.[10]

Dr. Lewin's deposition testimony confirms he did not review any information or provide an opinion as to Plaintiff's mitigation efforts. (*See* Lewin Dep. Excerpts, 64:14-18, 65:24-66:2, **Exhibit 14** to Smith Dec.)("I don't know what they are because I do not recall having information about that" and "I am not opining reasonableness. I'm not opining about best job or not best job. I'm simply opining about what I believe is the assumption that Dr. Burke made here."). Testifying further:

> Q. As you sit here today, are you able to say how Mr. McHugh looked for additional employment?
> A. I am not.
> Q. Are you able to say how extensively he looked?
> A. I am not.
> Q. Are you able to say whether or not he retained a headhunter or recruiter to help him look?
> A. I am not. I'm not commenting on Mr. McHugh.
> Q. Are you commenting upon whether or not Mr. McHugh's employment with CISE was the best employment he was able to obtain?
> A. Same answer, I'm not commenting on Mr. McHugh.
> Q. As you sit here today, you can't say whether or not Mr. McHugh properly mitigated his damages, can you?
> A. I'm not commenting on Mr. McHugh's mitigation efforts or lack thereof.
> Q. Okay. So you can't give an opinion one way or another regarding that; is that right?
> A. I am giving you my opinions as a rebuttal expert to Dr. Burke.
> Q. Okay.

---

[10] While "the plaintiff bears the initial burden of establishing a prima facie case and presenting evidence on the issue of damages, the defendant bears the subsequent burden of establishing the amount of interim earnings or lack of diligence," and "the Defendant may satisfy his burden *only* if he establishes that (1) there were substantially equivalent positions which were available; and (2) the claimant failed to use reasonable care and diligence in seeking such positions." *Pittington v. Great Smoky Mt. Lumberjack Feud, LLC,* 880 F.3d 791, 800 (6th Cir. 2018)("We have been quite clear that a claimant is not required to submit evidence of diligence and reasonable care in seeking employment until the defendant has met its burden.").

> A.  That is correct.
> Q.  Okay. But you're not giving an opinion as to whether or not Mr. McHugh properly mitigated his damages, correct?
> A.  I haven't given that opinion and I don't intend to.

(*Id.* at 67:4-68:12).

Despite all this, Defendants repeatedly argue that these 44 pages of supplemental communications somehow require supplementations to expert reports and re-opening of depositions, and that all those expenses should fall on Plaintiff. That is simply not the case.

## V.  Plaintiff's supplemental production of mitigation-related documents vs. Defendants' intentional withholding of RHR communications.

Defendants also repeatedly attempt to equate their <u>intentional withholding</u> of RHR communications (on which they were sanctioned), to Plaintiff's <u>supplemental production</u> of mitigation documents and witnesses. But the two issues are worlds apart and Defendants know it.

On the one hand, Defendants withheld discovery which they *knew* contradicted a position they have taken throughout this case (that CEO succession was "no secret"), including in their Counterclaim (*See* ¶ 11-16, Doc # 10, PAGEID # 1811-1812), and in testimony (Carmichael Dep. 68:2-9; Shaffer Dep. 271:7-18). As Defendants have stated, they withheld these communications <u>intentionally</u>, and did so based upon boilerplate relevance objections, despite the communications being obviously relevant. (*See* Doc. # 77, PAGEID # 3418-3419). Not only that, but Defendants *misrepresented* the fact that they had produced all such communications, including in a call with Plaintiff's counsel and RHR's counsel in 2024.[11] RHR's counsel then relied on that statement in refusing to search for or produce such communications.[12] It was only after the motion to compel

---

[11] *See* Nov. 12, 2024 Defense Counsel E-mail, Doc. 76-16, PAGEID # 3405 ("As it pertains to communications between RHR and Defendants, Defendants have already produced all known, relevant communications responsive to Plaintiff's requests for production.")

[12] *See* Nov. 20, 2024 RHR Counsel E-mail, Doc. 76-17, PAGEID # 3408 ("As we indicated to you during the conferral, RHR believes that these requests, which seek communications involving a party to the lawsuit, are most properly directed to Fifth Third Bank…").

was filed and RHR produced the 200 pages of communications that Defendants "supplemented" their production with those same documents. Had RHR not done so, Defendants *never* would have disclosed the evidence. This intentional withholding was prejudicial to Plaintiff because he had already taken the depositions of relevant individuals on the withheld e-mails (Carmichael, Shaffer, Spence) and had spent significant resources seeking such communications from RHR.

Contrast this with Plaintiff's voluntary, 44-page supplementation of responsive documents he originally produced on July 30, 2021, relating to his job search efforts and identification of two minor witnesses relating to a handful of those documents. Defendants never followed up for supplementation, including for documents after July 30, 2021, and never inquired to Plaintiff whether all such documents had been produced. Defendants never sought out any third-party discovery as to those documents either. Contrary to Defendants' conduct, Plaintiff did <u>not</u> intentionally withhold such documents, including on the basis of any objection. Rather, Plaintiff supplemented his original production from 2021 with documentation of his ongoing job search efforts, including e-mails, calendar appointments, and LinkedIn Messages spanning from 2021-2025, shortly after receiving a rebuttal expert's report touching on mitigation and a purported "improper assumption" regarding mitigation efforts. Plaintiff also identified two minor witnesses to corroborate those efforts, and repeatedly offered to discuss targeted discovery with Defendants to the extent any was needed.

While Defendants attempt to equate the two issues, context matters, and there is nothing intentional about Plaintiff's supplemental production, particularly given the delay in no way benefits Plaintiff nor prejudices Defendants.

**VI.    Plaintiff's supplemental production was not untimely under Rule 26(e), but in any event was substantially justified and harmless**

The real thrust of Defendants' motion for sanctions is that the supplemental production was untimely, meaning exclusion under Rule 37(c)(1) could apply if the purportedly late disclosure was not substantially justified or harmless. However, this remedy is not warranted because the disclosure was not untimely, and even if it was, it was substantially justified and harmless.

Per Rule 26(e), a party who has responded to a request for production is obligated to timely supplement its response "<u>if the party learns</u> that <u>in some material respect</u> the disclosure or response is incomplete or incorrect, and <u>if the additional or corrective information has not otherwise been made known</u> to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e) (emphasis added). If such supplementation is not made, the party "is not allowed to use that information or witness to supply evidence on a motion…<u>unless the failure was substantially justified or harmless</u>. Fed. R. Civ. P. 37(c)(1) (emphasis added).

In the Sixth Circuit, whether a late disclosure is substantially justified or harmless is assessed using five factors, including: "(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party' explanation for its failure to disclose the evidence." *Howe v. City of Akron*, 801 F.3d 718, 748 (6th Cir. 2015). Further, "district courts have broad discretion in applying these factors, and need not apply each one rigidly." *Bisig v. Time Warner Cable, Inc.*, 940 F.3d 205, 219 (6th Cir. 2019). "The factors simply lend themselves to the task at the heart of Rule 37(c)(1): separating 'honest,' harmless mistakes from the type of 'underhanded gamesmanship' that warrants the harsh remedy of exclusion." *Id.* And, even if a violation is found, the court has discretion to impose appropriate sanctions in lieu of or in addition to exclusion. *Id.*

A. <u>Plaintiff's supplemental production was not untimely as defined under Rule 26(e).</u>

16

Here, Plaintiff's supplemental production is not untimely as contemplated by Rule 26(e). The rule is clear that a party is only obligated to timely supplement "if the party learns in some material respect" that a "disclosure or response is incomplete or incorrect." Fed. R. Civ. P. 26(e). The issue of mitigation—an affirmative defense on which *Defendants* owe the burden of proof— was not touched on by Defendants until October 3, 2025, when for the first time, Defendants identified Dr. Lewin as a rebuttal expert to Plaintiff's damages expert. In Dr. Lewin's rebuttal report, he opined that Dr. Burke "improperly assumed" that Plaintiff had "sufficiently mitigated his alleged damages." (**Exhibit 13** to Smith Dec.).

Shortly thereafter, Plaintiff conducted a search of his e-mails and LinkedIn account, and produced supplemental documents and identified supplemental witnesses relating to those documents. In other words, Plaintiff's supplemental production and disclosure of the witnesses was within the discovery period, and occurred just a few weeks after Defendants' disclosed an expert opinion touching on a purported failure to mitigate (notwithstanding that this expert is in fact providing <u>no</u> opinion on mitigation, as he later testified). Such a supplemental disclosure is timely in these circumstances, and certainly does not rise to the level of sanctionable conduct warranting exclusion of the evidence. That is particularly so given discovery is ongoing at this stage, and no dispositive motion deadline has been set.

Further, Rule 26(e) limits the supplementation obligation to situations where "the information has not otherwise been made known to the other parties during the discovery process." Here, Defendants were well aware of Plaintiff's job search efforts in 2021, given Plaintiff testified that he had "many conversations with potential employers," and originally produced documents consistent with those efforts. (**Exhibit 3** to Smith Dec.). Defendants never followed up with

supplemental requests for updates as to these conversations or documents, or the identity of the recruiters at issue. That failure is no one's fault but their own.

B. <u>Even assuming the supplementation was untimely, it was substantially justified and harmless under the circumstances.</u>

As indicated above, assuming a supplemental production/disclosure is found to be untimely, the next question is whether that untimely disclosure was substantially justified or harmless under the five factors set forth in *Howe.* All of those are met here.

First, there was no surprise given Defendants had notice of Plaintiff's mitigation efforts and information in 2021, but chose not to follow up on it. The purported surprise claimed by Defendants is exaggerated, and also belied by the fact that Plaintiff testified to his job search efforts in 2021 including referencing recruiters that had contacted him. (*See* **Exhibit 3** to Smith Dec.). Plaintiff also produced documents indicating his mitigation efforts through July 30, 2021. (*See* **Exhibit 2** to Smith Dec.). Defendants had no reason to believe that Plaintiff suddenly ceased those efforts following his August 30-31, 2021 deposition.

As to the ability to cure, that ability existed at the time of production and still exists today. This matter has not been set for trial, and the parties remain actively engaged in discovery on targeted issues. Indeed, Defendants have insisted that the dispositive motion deadline must be stayed until "30 days after the close of discovery," and this Court has indicated that discovery is extended to December 31, 2025 including for purposes of producing expert communications. Thus, there still ample time to cure purported surprise via targeted discovery, if any is actually necessary. *See, e.g. Morris v. Tyson Chicken, Inc.*, No. 4:15-CV_00077, 2019 U.S. Dist. LEXIS 208057 at *5-6 (W.D. Ky. Dec. 2, 2019)("Since there is no trial date set, the situation can easily be cured by modifying the scheduling order in this case. Additional time for discovery will be allowed and all other deadlines extended.").

As to the third factor, trial disruption is non-existent given no trial date has been set. As mentioned, the parties do not even have a dispositive motion deadline and are currently engaged in ongoing targeted discovery.

As to the importance of the evidence, contrary to Defendants' arguments, this does not always "cut against the violator." *See Presidio, Inc. v. People Driven Tech., Inc.*, No. 2:21-CV-05779, 2023 U.S. Dist. LEXIS 141160 at *11 (S.D. Ohio Aug. 11, 2023)(finding that the fourth factor "can cut both ways," and concluding that "this Court—in light of the strong preference for trials on the merits in the federal courts—concludes that the importance of the evidence favors Plaintiffs."). Here, the evidence includes documents that largely corroborate Plaintiff's job search efforts both in 2021 and in the years that followed. Plaintiff can of course testify to these efforts even without documentation, but the meeting invitations, LinkedIn messages, and e-mails will confirm some of those efforts, particularly if Defendants intend to assert that Plaintiff "never bothered" to search for a job. Given the importance of this information, the lack of prejudice that is caused to Defendants, and the preference to try cases on the merits, this factor also cuts in Plaintiff's favor.

Finally, Plaintiff has provided his explanation for the late production of documents above. The issue of mitigation came up in Defendants' rebuttal expert's report. Notwithstanding that their expert has now testified that he is *not* providing any opinion on mitigation, Plaintiff produced the documents and disclosed the witnesses prior to the discovery cutoff and has offered to permit targeted discovery given they were produced at the cut-off date. That date has since been extended to December 31, 2025, and there is still an opportunity to conduct such discovery. But instead, Defendants want to waste the Court's time on a sanctions motion.

**VII.** **Defendants' other arguments regarding boilerplate objections and redactions**

Defendants make a number of other arguments that warrant a brief response. First, Defendants also appear to seek sanctions based upon arguments that Plaintiff intentionally withheld such documents under boilerplate objections, without notifying Defendants. Plaintiff did not do this—Defendants did, and admitted they did so in opposition to a motion for sanctions. Here, Plaintiff produced all responsive documents known to him, and has never intentionally withheld any documents based upon objections. Defendants request for sanctions based upon intentional withholding of documents based upon boilerplate objections is based upon a flawed premise.

Defendants also criticize the redactions in a handful of Plaintiff's documents. However, these were redacted based upon Rule 26(b)(3)(A) as trial-preparation materials. With this opposition, Plaintiff is providing a privilege log describing the nature of the documents, communications, or tangible items not produced or disclosed. (*See* **Exhibit 15** to Smith Dec.).[13] Plaintiff is also willing to submit unredacted copies of such documents to the Court for an in-camera review to affirm their protection under Rule 26(b)(3).

## VIII. Conclusion

For the foregoing reasons, Plaintiff respectfully requests that Defendants' Motion for Sanctions be denied.


      Respectfully Submitted,

      */s/ Peter A. Saba*_____
      Peter A. Saba, Esq. (0055535)
      Joshua M. Smith, Esq. (0092360)

---

[13] *See also* Fed. R. Civ. P. 26(b)(5)(A)("When a party withholds information otherwise discoverable by claiming that the information is privileged or subject to protection as trial-preparation material, the party must: (i) expressly make the claim; and (ii) describe the nature of the documents, communications, or tangible things not produced or disclosed—and do so in a manner that, without revealing the information itself privileged or protected, will enable other parties to assess the claim.").

Bailey E. Sharpe, Esq. (0103565)
SSP LAW CO., L.P.A.
2623 Erie Avenue
Cincinnati, Ohio 45208
(513) 533-2701
(513) 533-2711 (fax)
pas@sspfirm.com
jms@sspfirm.com
bes@sspfirm.com

*/s/ John J. McHugh*
John J. McHugh, III
McHUGH & McCARTHY, LTD
5580 Monroe Street
Sylvania, Ohio 43560
(419) 885-3597
(419) 885-3861 (fax)

**Co-Counsel for Plaintiff Philip R. McHugh**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing motion was served on all counsel of record this 10th day of December, 2025, via the Court's CM/ECF system and/or via ordinary or electronic mail.

*/s/ Peter A. Saba*
Peter A. Saba, Esq. (0055535)