1      A.   I don't think he told me anything about

2  his efforts.  I didn't ask him anything about his

3  efforts.  I am not sure what you mean --

4      Q.   You asked him about his salary and his

5  employment and his emoluments I think you said.

6      A.   Yes, just a term for fringe benefits.

7  None of that is efforts.

8      Q.   What -- what did he tell you about his

9  salary?

10      A.   He told me about his base pay, and he told

11  me about his fringe benefits.  I recorded those in

12  my report.

13      Q.   That's the base pay at CISE.  Is that

14  it?

15      A.   Yes.

16      Q.   Did you in this interview talk to him

17  about his mitigation efforts?

18              MR. SMITH:  Objection.  Outside the

19  scope of his report.

20              MR. CIOFFI:  It is absolutely not.

21  Mitigation is included in his report in the offset

22  income.

23              MR. SMITH:  You are asking him about

24  efforts in mitigating, and he said at the very

25  beginning that is not something he reviewed as part



1   of his opinion.

2   BY MR. CIOFFI:

3       Q.   Well, did you discuss with Phil McHugh his

4   mitigation efforts?

5                MR. SMITH:   I am going to object

6   unless --

7                MR. CIOFFI:   There is no basis for an

8   objection.   There is no privilege.

9                MR. SMITH:   You are only permitted to

10  obtain communications to the extent at what he

11  relied upon in forming his opinions.   He has not

12  stated any opinions on mitigation efforts.

13  BY MR. CIOFFI:

14      Q.   You may answer.   Did you ask him about

15  mitigation efforts?

16      A.   I asked him about mitigation, but to me

17  mitigation means what are you being paid now.   What

18  are your wages and fringe benefits?   That's what I

19  asked him about.   That's mitigation.

20      Q.   Well, you understand in an economic loss

21  case that mitigation efforts are at issue?

22                MR. SMITH:   Objection as to scope.

23      A.   I understand they are an issue but not for

24  an economist.   They are not an economic issue.   I

25  can't measure effort.



1          I am not a vocationally trained person.

2     Economists, in general, are not vocational experts.

3     I only know what is, and what is, is wage and his

4     fringe benefits.  That's what I was interested in.

5     And that to me is mitigation.

6          Q.   How would you define offset income?

7          A.   Mitigation.  Offset income, they would

8     kind of be the same.  They would kind of be

9     synonyms.

10         Q.   And Mr. McHugh, when he left the bank, was

11    earning, as you said, more than $2 million a year.

12    Is that right?

13         A.   Yes, sir.

14         Q.   Why did you not include that as his offset

15    income?

16              MR. SMITH:  Objection.

17         A.   I do have that in my report.

18         Q.   But you didn't include it in your offset

19    calculation?

20              MR. SMITH:  Objection.

21    Mischaracterizes the record.

22         A.   I think he earned that, didn't he?  If he

23    earned it, he earned it.  It is not an offset.  He

24    earned it.

25         Q.   Right.



1    A.    So I looked at his alternative source of

2  income after he left the bank.

3    Q.    Did you look at his alternative income in

4  the banking industry?

5              MR. SMITH:  Objection.

6    A.    No.

7    Q.    Why not?

8    A.    That's not my assignment, and as I have

9  said a couple times, economists are not

10  vocationally trained people.  So I don't know what

11  his other options are.  I just assumed he had

12  another option.  He took it.

13    Q.    An option at a much lower amount.

14    A.    Much lower.  I kind of I sympathize with

15  him a little bit.  It is going to be a kick in the

16  pants to go from $2 million to $250,000.

17    Q.    It is ten percent.

18    A.    Yeah, that's awful.  It has got to be a

19  kick in the pants, but it is what it is.  My job is

20  to say what is, what's the forecast of that, what

21  is, and that's what I did.

22    Q.    Isn't it true that an economist would in

23  calculating earning capacity look at what the last

24  salary was that an individual was making?

25    A.    Yes, sir.



1  else other than that.

2          And again, some people may use a five-year

3  average.  Some people may use, as you have

4  suggested, the bill rate, the 90-day rate.  That's

5  probably the safest.  Some people may use

6  exclusively the long-term, but they all come back

7  to these treasury rates.

8     Q.   And I just want your testimony.  Your

9  testimony is that that's generally accepted in the

10  economic sciences?

11     A.   Yes.

12          MR. SMITH:  Objection.  Asked and

13  answered.

14     A.   Yes, yes, yes.  Yes.

15     Q.   In calculating your damages, you reduced

16  the plaintiff's projected past and future earnings

17  by his projected mitigation efforts, correct?

18          MR. SMITH:  Objection.  Misstates

19  testimony in the report.

20     A.   I don't know about his mitigation efforts;

21  I know about his mitigation salary and fringe

22  benefits.

23     Q.   When you had your interview with him, did

24  you ask him about his mitigation efforts?

25     A.   No.  That's not my terminology.  That's



1    your terminology.  I asked him what he was being

2    paid.

3         Q.   Did you ask him why it is that he didn't

4    seek employment in the financial sector?

5                    MR. SMITH:  Objection.  Asked and

6    answered.

7         A.   I don't remember asking that.

8                    MR. SMITH:  Asked and answered a

9    couple of times a couple you hours ago.

10   BY MR. CIOFFI:

11        Q.   That would be in your notes, right?

12        A.   If I asked him, it would be in the notes.

13        Q.   In assessing the plaintiff's mitigation

14   efforts or his offset income as you used the term,

15   right?

16        A.   Yes.

17        Q.   Did you take into consideration his

18   earnings as an experienced executive vice president

19   for a major financial institution?

20                   MR. SMITH:  Objection.  Asked and

21   answered.

22        A.   I made two forecasts here.  In one of

23   those forecasts, I took that into consideration,

24   and one of those forecasts, I did not.

25        Q.   In your opinion, what is the more reliable



1  BY MR. CIOFFI:

2      Q.   I am asking you, as a damages expert in

3  calculating damages, you should take into

4  consideration the facts that I just told you.

5      A.   It is the same bank that he was fired

6  from.

7      Q.   He wasn't fired, but anyway --

8           MR. SMITH:  Objection.

9      A.   I was told he was fired.

10     Q.   Okay.  You assumed that fact?

11     A.   Yes.

12     Q.   But he has testified that he could have

13  continued working at that bank earning more than

14  $2 million a year.

15           MR. SMITH:  Objection.

16  Mischaracterizes his testimony again.

17     Q.   Hypothetically, if that's true, you should

18  take that into consideration?

19           MR. SMITH:  Hypothetical that assumes

20  facts contrary to evidence and the testimony again.

21     A.   If I have more facts, perhaps I should

22  take it into consideration.

23     Q.   Do you believe that the plaintiff

24  adequately mitigated his economic loss by accepting

25  a job --



1                MR. SMITH:  Objection.

2       Q.   -- at a much lower, ten percent of what he

3  could have earned in the financial sector?

4       A.   Adequate.

5                MR. SMITH:  Objection.  Asked and

6  answered hours ago.

7       A.   Adequate is not a scientific term.  I

8  don't know what "adequate" is.  I am not an expert

9  in that area.  I only know what actually happened.

10 That's what I used.

11      Q.   Well, you know what you were asked to

12 assume happened.

13      A.   No, no, no.  I am talking about the job he

14 ended up in.

15      Q.   Right.

16      A.   I found that out on my own.

17      Q.   I am asking you to assume a job that he

18 refused to take.

19      A.   Yeah.

20      Q.   That you should take that into

21 consideration?

22                MR. SMITH:  Objection.

23      A.   No, no.  Your last question was about an

24 adequate alternative job.  I can't measure

25 adequate.



1    Q.    Did you investigate what he did to

2    mitigate his economic loss?

3                 MR. SMITH:  Objection.  Counsel, you

4    have asked this like five times.

5    A.    Not my job.  I am not a vocational

6    rehabilitation -- I never studied that area.  I

7    don't have any degrees in that area.  I have never

8    published in that area.  I have never taught in

9    that area.

10         If somebody asked me those kind of

11   questions, I have a couple of good vocational

12   people I can refer you to, and none of them are

13   me.

14   Q.    That's not my question; my question is to

15   calculate a reliable economic loss you have to take

16   into consideration a job that the plaintiff himself

17   turned down at a higher salary.

18                 MR. SMITH:  Objection.

19   A.    I don't know that.  That was not part of

20   the information I was given, so I don't know that.

21   But if I know different things.  The result may be

22   different.

23   Q.    I will try to supply that to you.

24   A.    Thank you.

25                 MR. CIOFFI:  I have no further

