**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

Philip R. McHugh,

      *Plaintiff*,

v.

Fifth Third Bancorp, *et al.*,

      *Defendants*.

Hon. Michael R. Barrett

Case No.1:21-cv-00238-MRB

# EXPERT REPORT OF

# DAVID LEWIN, Ph.D.

## October 3, 2025

**TABLE OF CONTENTS**

I.      QUALIFICATIONS ............................................................................................ 1

II.    CASE BACKGROUND ...................................................................................... 3

III.   TASK ADDRESSED .......................................................................................... 4

IV.   SUMMARY OF OPINIONS .............................................................................. 4

V.    ANALYTICAL BASES OF OPINIONS .......................................................... 5

VI.   CONCLUSIONS .............................................................................................. 21

## I. QUALIFICATIONS

1.     I, Dr. David Lewin, am the Neil H. Jacoby Professor Emeritus of Management, Human Resources and Organizational Behavior in the Anderson School of Management at the University of California at Los Angeles (UCLA) and a Managing Director of the Berkeley Research Group (BRG). My curriculum vitae (CV) is attached hereto as Exhibit 1. My primary areas of expertise are human resource management, employment relations, and executive compensation. I have published more than 25 books and more than 100 articles in such journals as *Industrial and Labor Relations Review*; *Human Resource Management*; *Industrial Relations*; *British Journal of Industrial Relations*; *The Review of Economics and Statistics*; *Journal of Conflict Resolution*; *Labor History*; *Harvard Business Review*; and *California Management Review*. Among my books are *International Perspectives and Challenges in Human Resource Management*; *Human Resource Management: An Economic Approach*; *The Human Resource Management Handbook*; *Contemporary Issues in Employment Relations*; *Advances in Industrial and Labor Relations, Vol. 27*; *The Oxford Handbook of Participation in Organizations*; and *Handbook of Qualitative Research Methods on Human Resource Management: Innovative Techniques*.

2.     I have held research grants from the National Science Foundation, Ford Foundation, National Institute for Dispute Resolution, Society for Human Resource Management (SHRM), Human Resource Planning Society, and the U.S. Department of Labor. I previously served as President of the Labor and Employment Relations Association (LERA), President of the University Council on Industrial Relations and Human Resource Programs, Director of the UCLA Human Resources Round Table, Director of the UCLA Institute of Industrial Relations, Senior Associate Dean for the UCLA Anderson School's MBA Program, Director of the Columbia Business School's Ph.D. Program, Director of the Columbia Business School's Human Resources Research Center, and Co-Chair of Los Angeles Mayor Riordan's Task Force on General Manager Compensation and Performance Evaluation. I am an elected Fellow of the National Academy of Human Resources (NAHR). I am also senior editor of *Advances in Industrial and Labor Relations* and a member of the editorial boards of several peer reviewed journals, including *Industrial Relations*; *California Management Review*; *Journal of Change Management*; and *Work, Organization, and Employment*.

3.     I have taught numerous MBA and Ph.D. courses at the Columbia University Graduate School of Business, where I served as a faculty member for 20 years, and at the UCLA Anderson School of Management, where I served as a faculty member for 35 years. These courses include Human Resource Management, Labor Market Analysis, Pay & Rewards in Organizations, Managing Employment Relations, Leadership Foundations, Regulation of the Employment Relationship, and Research Methods.

4.     I have consulted widely with business, government, and not-for-profit organizations in the U.S. and abroad. I also served for many years as Faculty Director of the UCLA Anderson School's Advanced Program in Human Resource Management and Faculty Director of the Columbia University Business School's Senior Executive Program. Further, for eight years I served as a Director of K-Swiss, Inc. and member of the Board's Compensation and Stock Options Committee and the Board's Governance Committee. I presently serve as a Director of the NAHR, a member of The Conference Board's Evidence-Based Human Resources Advisory Panel, and Co-chair of the LERA Membership Committee. I previously served as a member of the Research Advisory Board of World at Work, Inc. (formerly The American Compensation Association).

5.     I hold a Ph.D. degree in Management, with a specialization in human resource management and industrial relations, as well as an MBA degree and a B.S. degree (with a specialization in accounting). I received extensive training during my Ph.D. studies in primary research methods (i.e., experimental designs, observational and participant-observation research methods, interviewing, and survey design and analysis); secondary research methods (i.e., the use and analysis of published databases and reference sources in conducting research); and quantitative research methods (i.e., probability theory, univariate statistics, and multivariate statistics). I have taught primary research methods courses to Ph.D. students at the Columbia Business School and the UCLA Anderson School.

6.     I have served as a consulting and testifying expert in litigation for 46 years (1979–2025), having been retained on 489 occasions. In these cases, I have served as an expert for defendants 290 times, for plaintiffs 198 times, and jointly for plaintiff and defendant once. Also in these cases, I have rendered deposition testimony on 161 occasions and trial testimony on 76 occasions. My testimony has been rendered in federal, state, and local courts; administrative law courts; U.S. Tax Court; and arbitration hearings.

7. The subject matter of the cases in which I have been retained is as follows: (1) executive compensation, including executive contracts, incentive compensation, and stock option usage and backdating; (2) employee compensation, including bonus, commission and piece-rate pay systems and practices; (3) organizational governance and business ethics, including the role of board members and executive officers; (4) no poaching and non-compete agreements; (5) wrongful termination and retaliation; (6) independent contractor versus employee status; (7) human resource management practices, including hiring, transfer, demotion, discipline, and performance management; (8) age, race, gender, religious, national origin, and disability discrimination; and (9) wage and hour, including off-the-clock work, managerial and employee misclassification, overtime, waiting time, and meal and rest breaks.

8. In particular, I have extensive experience in the area of executive compensation, both in the litigation and consulting contexts. I have authored expert reports involving analyses of executive compensation in 36 matters. I have served as a consulting expert on executive compensation issues in 12 engagements. I have provided deposition testimony on executive compensation 20 times and have testified at trial (and, therefore, was admitted as an expert) in 13 cases. I have taught MBA and Ph.D. courses that include sessions and modules on executive compensation, and have made presentations and video lectures on this topic for various institutions.

9. A list of the deposition and trial testimony that I have rendered during the past five years is attached hereto as Exhibit 2. BRG is being compensated for my time at $1,075 per hour. My compensation is not contingent upon the outcome of this litigation.

## II.    CASE BACKGROUND

10. It is my understanding that this matter involves claims by Plaintiff, Philip McHugh, that he was allegedly discriminated against on the basis of age when he failed to be promoted to a more senior position at Fifth Third Bancorp ("Fifth Third"), was purportedly terminated, and was subject to alleged retaliation, which according to Plaintiff, caused him to incur damages.[1]

---

[1] Amended Complaint in *McHugh v. Fifth Third Bancorp*, ¶¶ 29, 31, 34–35, 38, 42–43, and 53.

### III. TASK ADDRESSED

11.     I have been asked by counsel for Defendants (Fifth Third; Fifth Third Bank, NA; and Gregory D. Carmichael) to analyze the report of John F. Burke, Jr., Ph.D. (the "Burke Report") submitted on behalf of Plaintiff. This document constitutes my rebuttal report.

12.     I have reviewed the Burke Report and its opinion that Mr. McHugh's estimated damages are $103,233,423. I further understand that this opinion is based on several assumptions, including that Mr. McHugh was not promoted and then wrongfully terminated due to alleged age discrimination.

13.     The fact that I focus on certain aspects of the Burke Report and the assumptions and errors in that report should not be taken to mean or imply that I necessarily agree with analyses and conclusions contained in that report that I do not explicitly discuss herein.

14.     A list of the documents that I relied upon in this matter is attached hereto as Exhibit 3. I reserve the right to supplement my analyses and related opinions, including to the extent that other relevant information becomes available.

### IV. SUMMARY OF OPINIONS

15.     Based on my extensive experience as a researcher, journal editor, peer reviewer, teacher, consultant, and expert witness in the area of executive contracts and executive compensation, and my analysis of the materials provided to me in this matter, it is my expert opinion that the Burke Report's estimate of Mr. McHugh's damages in this matter is incorrect and unreliable because it is based on faulty assumptions.

16.     It is also my opinion that if Mr. McHugh resigned or was not terminated due to age discrimination, his damages are zero ($0). If it is determined by the court that Mr. McHugh was the subject of age discrimination, it is my opinion that his damages range from $0 to $14,073,414. The analytical bases of my opinions are elaborated below.

## V.    ANALYTICAL BASES OF OPINIONS

The Burke Report's Improper Assumptions

17.    The Burke Report defines the damages period as approximately 12 years, spanning from Mr. McHugh's resignation on October 26, 2020, through August 2, 2032, when Mr. McHugh would be 68 years old.

18.    The Burke Report's estimate relies on the assumptions that (1) Mr. McHugh would have been promoted to President of Fifth Third; (2) Mr. McHugh's performance as President would have been successful and led to his subsequent promotion to CEO; (3) Mr. McHugh's promotions and earnings would have mirrored those of Mr. Timothy Spence during his tenure as President and then CEO; (4) Mr. McHugh would retain the roles of President and CEO, and continue to earn substantial compensation in line with Mr. Spence's earnings, until Mr. McHugh reached the retirement age of an average working American; (5) Mr. McHugh sufficiently mitigated his alleged damages by obtaining employment outside the banking sector, at a fraction of his prior earnings or desired compensation as Fifth Third's President and CEO, and without any evidence that Mr. McHugh performed an extensive or intensive job search; and (6) it is appropriate to calculate present value of Mr. McHugh's economic losses by applying a tiered discount rate structure based on Daily Treasury Real Yield Curve Rates as of September 20, 2025.

19.    These assumptions are flawed. First, Mr. McHugh was not designated to assume the roles of President or, subsequently, CEO. Second, even if he had been, projecting his future promotions and earnings in that capacity would involve a high degree of uncertainty and volatility, meaning it is not methodologically sound to use Mr. Spence's promotions or compensation as a direct proxy for Mr. McHugh's potential earnings, particularly considering that Mr. Spence was already compensated higher than Mr. McHugh when they were both serving as Fifth Third executives. Third, there is no basis for assuming that Mr. McHugh's tenure as President and CEO would have lasted until the retirement age of an average working American, given the unique nature of these positions and the fact that Plaintiff alleges that he would have been President and CEO, at the very longest, until 2024, when Mr. Spence would be ready to take over these roles. Fourth, the Burke Report provides no facts or data sufficient to assume that Mr. McHugh—who alleges that his unique skillset as a banking executive warrants nearly $10 million per year in compensation—sufficiently mitigated his damages by taking a position in the education sector and

earning a mere fraction of his purported lost earnings. Fifth, the Burke Report inappropriately inflates Mr. McHugh's alleged damages by applying the Daily Treasury Real Yield Curve Rates.

The Burke Report Inappropriately Assumes Mr. McHugh Was Considered as a President and CEO Candidate.

20.     Multiple deposition testimonies given in this case and related documents consistently indicate that Fifth Third's Board of Directors (the "Board")—those who were responsible for selecting the President and CEO—never considered Mr. McHugh for either role, directly contradicting the Burke Report's assumption that Mr. McHugh would have been considered for, selected for, and served in such roles and retained them for nearly 12 years.

21.     The Board regularly reviewed and evaluated succession candidates, discussing their views among themselves, typically at least annually.[2] This process involved assessing the entire Enterprise team (Fifth Third Bank's twelve most senior executives) to determine appropriate successors; thinking through necessary skills; and evaluating candidates' performance, capabilities, experience, and education.[3] The Board was provided with a written "talent management deck" prepared by the HR department, usually at the December Board meetings, which included profiles of the enterprise committee members, outlining their backgrounds, strengths, weaknesses, and suitability for promotions, which the Board used as a reference material.[4]

22.     The Human Capital and Compensation (HCC) committee, with support from RHR International, developed a framework of guidelines and principles (known internally as "the winning formula") defining the qualities sought in a new President or CEO.[5] This framework identified essential behaviors related to business management, leadership, interpersonal skills, and personal attributes,[6] and was "deemed critical to assess Fifth Third Bank president and CEO successor candidates."[7]

---

[2] Deposition of Marsha Williams, February 16, 2023, 18:21:19:6, 52:20–22.
[3] Deposition of Marsha Williams, February 16, 2023, 19:15–20:2, 52:19–53:8.
[4] Deposition of Marsha Williams, February 16, 2023, 31:19–23, 53:9–22, 56:20–57:4.
[5] Deposition of Marsha Williams, February 16, 2023, 26:4–14, 27:8–12.
[6] Deposition of Marsha Williams, February 16, 2023, 91:9–17.
[7] Deposition of Marsha Williams, February 16, 2023, 91:12–17.

23.     In terms of decision-making, the collective judgment of the independent directors, who possessed hundreds of years of business experience, was crucial to the CEO selection process.[8] Although formal decisions were reserved for when regulatory filings were necessary, the Board reached a unanimous consensus that Mr. Spence was "by far and away the only internal candidate who was qualified" to be the next President.[9] Conversely, the Board unanimously determined that Phil McHugh was not a viable candidate due to observed deficiencies in such areas as strategic thinking, communication skills (often reading presentations), and digital banking knowledge.[10] This testimony is consistent with Board documents indicating that Mr. Spence, but not Mr. McHugh, was being considered as a potential future President and CEO. Further, there is no testimony or documentation supporting Mr. McHugh's position that he was somehow young enough to be considered a President and CEO candidate as a 55 year old in 2019 (when Plaintiff alleges Mr. Carmichael "promised that he would recommend McHugh to be the next President and Chief Executive Officer" for a three to five year term) but that Plaintiff would have suddenly been "too old" to be President and CEO as a 57–58 year old, i.e., when in 2020 the Board allegedly asked Mr. Carmichael (then himself a 58-year-old) to extend his CEO term to 2021–22.[11] In fact, the Board members' deposition testimony that I reviewed and considered confirms that age was not a factor at all in their decision making. Other evidence supports this testimony, including Board documents indicating that Mr. McHugh, unlike Mr. Spence, was never considered as a permanent CEO candidate. Further, Mr. McHugh's allegation that he was "too old" to be President and CEO is also inconsistent with Fifth Third offering Plaintiff a proxy-level position, and total compensation well over $2 million per year, upon Mr. Spence's elevation to President in 2020.

24.     Marsha Williams, the Board's Lead Independent Director, testified that both she and the Board viewed Mr. Spence as the "only viable internal candidate who was qualified," adding that at "no time did we ever consider Phil McHugh a viable candidate for that role."[12] When comparing Mr. Spence and Mr. McHugh, Ms. Williams alluded to each of their communication skills during Board presentations. She described McHugh's answers when answering questions from the Board as "guarded and carefully worded to tell the board what the board wanted to hear"

---

[8] Deposition of Marsha Williams, February 16, 2023, 94:11–17, 124:11–14, 152:17–21.
[9] Deposition of Marsha Williams, February 16, 2023, 78:24–79:11, 156:8–22.
[10] Deposition of Marsha Williams, February 16, 2023, 65:2–11, 65:25-66:14, 133:7–16, 145:18–146:8, 169:5–9.
[11] Amended Complaint in *McHugh v. Fifth Third Bancorp.*, ¶¶ 15–17.
[12] Deposition of Marsha Williams, February 16, 2023, 64:20–23, 93:7–14.

and he "tended to read his board presentations rather than having a conversation."[13] This was a "recurring theme" with McHugh and other executives.[14] Ms. Williams provided an example of Mr. McHugh giving a "charcoal sketch" versus Mr. Spence's "oil painting." McHugh's presentations and answers were often "superficial" and lacked depth.[15]

25.     Another Board member, Emerson Brumback, who served on the Risk Committee, also confirmed that there was "only one candidate, and that was Tim Spence,"[16] and that the other Board members were "very comfortable with Tim Spence" feeling "that he was ready or close to being ready to assume that position."[17] Moreover, Nicholas Akins, another member of the Board, stated that "Phil McHugh was never considered to be the future CEO of the bank."[18] The Board ultimately viewed that Mr. McHugh "did not have the skill set" and that, "[H]e just never was in the conversation for long-term CEO."[19]

26.     More specifically, Mr. Spence possessed far greater expertise and a significantly deeper understanding of digital banking and fintech than Mr. McHugh. Ms. Williams described how Mr. Spence "had a deep understanding of Fintech, and we hired Tim in 2015 because . . . we needed a head of strategy."[20] He understood "Fintechs [and] had worked in—in the digital space, and [he] could help us lead our strategy."[21] He was named "digital banker of the year in 2018… by the American Banker Magazine." [22] He "understood both the . . . dot com and Fintech industries, and was able to communicate the future of digital banking."[23] Mr. Spence displayed an "extraordinary grasp of the future of banking" and actively pursued and could "speak to various Fintech players."[24]

27.     Additionally, Mr. Spence brought to the table a wealth of transactional expertise that set him apart from his peers. "He had significant M&A experience" from his nine years as a consultant with Oliver Wyman, working on "multiple bank M&A transactions, both domestically

---

[13] Deposition of Marsha Williams, February 16, 2023, 46:5–21.
[14] Deposition of Marsha Williams, February 16, 2023, 68:8–14, 84:21–25, 150:4–8.
[15] Deposition of Marsha Williams, February 16, 2023, 66:23–67:20.
[16] Deposition of Emerson Lee Brumback, November 22, 2024, 30:5–7.
[17] Deposition of Emerson Lee Brumback, November 22, 2024, 33:4–8.
[18] Deposition of Nicholas Kevin Akins, July 2, 2024, 54:12–22.
[19] Deposition of Nicholas Kevin Akins, July 2, 2024, 58:22–24.
[20] Deposition of Marsha Williams, February 16, 2023, 35:6–23.
[21] Deposition of Marsha Williams, February 16, 2023, 35:14–23.
[22] Deposition of Marsha Williams, February 16, 2023, 99:3–12.
[23] Deposition of Marsha Williams, February 16, 2023, 69:7–18.
[24] Deposition of Marsha Williams, February 16, 2023, 143:22–144:6.

and internationally." He was "critical in MB wanting to sell themselves to Fifth Third" and "opened up the doors for Fifth Third to ultimately acquire MB."[25] In contrast, Mr. McHugh had not demonstrated comparable involvement or experience in these types of transactions.

28.     The Board hired an outside firm, RHR International (specifically Guy Beaudin and Chuck Evans), to conduct an independent assessment of Tim Spence. This independent review was seen as offering a "Good Housekeeping seal of approval" and a "different kind of analysis" compared to the Board's continuous, real-time observation.[26] The Board chose not to hire an outside firm to assess Mr. McHugh because they did not feel he was qualified and "would not have been comfortable with him as president."[27] In the assessment of the Board, Mr. McHugh was viewed as not having "the capabilities to be the CEO, which is why [they] did not have him do the RHR assessment."[28] When Guy Beaudin, a Partner at RHR International conducting the executive vetting process at the bank, approached Mr. Carmichael to ask if Tayfun Tuzun and Phil McHugh were being considered by the board for CEO, Mr. Carmichael responded, "[A]bsolutely not, they're not considered potentials for the CEO replacement."[29] Mr. Shaffer also affirmed that no other candidates were reviewed for CEO, other than Mr. Spence, and that it was "the board's view that Tim was the only qualified potential successor candidate for that position."[30]

29.     Mr. McHugh was viewed, at best, as a potential interim CEO candidate for a limited term in the event of an emergency. In the December 17, 2019 Human Capital and Executive Talent Management and Succession Plan Update, only Mr. Spence's and Mr. Lamb's talent cards identified them as "high potential," while Mr. McHugh's talent card indicated "moderate potential," a view with which the Board "unanimously agreed."[31] Mr. Spence was also listed first to be the permanent successor as CEO ("ready in 3+ years"), a prediction that ended up being accurate, as Mr. Spence was elevated to CEO in 2022. Mr. Lamb was listed in the talent cards as a potential CEO, after Mr. Spence and on a longer timeline ("7+ years"). Mr. McHugh, on the

[25] Deposition of Marsha Williams, February 16, 2023, 33:14–25, 102:18-103:3, 151:15–23.
[26] Deposition of Marsha Williams, February 16, 2023, 95:1–7, 96:9–23.
[27] Deposition of Marsha Williams, February 16, 2023, 98:22–99:2.
[28] Deposition of Marsha Williams, February 16, 2023, 124:15–20.
[29] Deposition of Gregory Carmichael Vol. II, September 27, 2023, 296:17–22.
[30] Deposition of Robert Shaffer, August 24, 2023, 193:5–10, 193:18:22.
[31] Deposition of Gregory Carmichael Vol. II, September 27, 2023, 284:10–18, 289: 1-6; Deposition of Gregory Carmichael Vol. 1, September 26, 2023, 237:15-238:2, 227:21-229:14; Deposition of Marsha Williams, February 16, 2023, 173:17-174:7, Exhibit 4.

other hand, was listed as only a second emergency successor, after Tayfun Tuzun.[32,33] Even if Mr. McHugh had been slotted as the emergency successor to the CEO position under rare and exceptional circumstances, he would not have been able to assume the permanent role because the Board did not view him to be a qualified successor.[34] Robert Shaffer, the head of HR at the time, iterated that "by definition emergency successor doesn't have the qualifications to be the permanent successor."[35] Yet the Burke Report assumes that the Board would have voted for Mr. McHugh to become President and CEO (and, relatedly, that an RHR assessment would have concluded that he was qualified to assume such positions, etc.). It is thus my expert opinion that the Burke Report's damages estimate is speculative and unsupported because it assumes that Mr. McHugh would have been the permanent President or CEO.

<u>The Burke Report Inappropriately Assumes Mr. McHugh's Promotions and Compensation Would Have Been Identical to Those of Mr. Spence.</u>

30.     The Burke Report fails to account for the fact that appointment to a permanent CEO position is never guaranteed. In Mr. Spence's case, his two-year tenure as President prior to becoming CEO effectively served as a probationary period—a test of his leadership capabilities. Mr. Carmichael made clear that there was no guarantee that the role of president would automatically translate to becoming CEO.[36] He explained that when someone becomes President, "[T]here's only one or two places you're going to go become the CEO or you're going to go out" because "[y]ou don't stay as president long term."[37] He further stated, "Most banks don't have a president and CEO" because the "CEO and the president are one and the same."[38] He further emphasized that the separation of titles is "used for succession planning, and it acknowledges that you're underway, and having the CEO at some point retire or step down from his position," which is "how it works in a banking sector, corporate America."[39] Mr. Spence earned the CEO role through demonstrated performance, while there is no evidence that Mr. McHugh would have

---

[32] Deposition of Marsha Williams, February 16, 2023, 173:17–174:7, Exhibit 4; Deposition of Gregory Carmichael Vol. I, September 26, 2023, Exhibit 30.
[33] Deposition of Gregory Carmichael Vol. I, September 26, 2023, 259:2–23, Exhibit 30; Deposition of Gregory Carmichael Vol. II, September 27, 2023, 271:14–24, Exhibit 30.
[34] Deposition of Robert Shaffer, August 24, 2023, 242:13–23.
[35] Deposition of Robert Shaffer, August 24, 2023, 243:3–5.
[36] Deposition of Gregory Carmichael Vol. II, September 27, 2023, 380:21–381:1.
[37] Deposition of Gregory Carmichael Vol. II, September 27, 2023, 380:21–24.
[38] Deposition of Gregory Carmichael Vol. II, September 27, 2023, 381:1–5.
[39] Deposition of Gregory Carmichael Vol. II, September 27, 2023, 380:21-381:8.

succeeded similarly. The Burke Report's assumption that Mr. McHugh would have automatically become CEO and remained in that role through average retirement ignores additional layer of uncertainty and risk that should be reflected in any estimate of potential lost earnings.

31.     Indeed, the Burke Report disregards all these contexts. It instead assumes that Mr. McHugh would have served as the President for two years (October 27, 2020–December 31, 2021) and as CEO for over 10 years (January 1, 2022 – August 2, 2032). Moreover, the Burke Report compounds this error by simply assuming Mr. McHugh would have earned the compensation equivalent to that of Mr. Spence throughout this period. This projection is not only speculative, but also highly volatile, especially given the performance-based nature of CEO retention and compensation, which are notoriously volatile year-to-year.

32.     CEO compensation is highly variable and predominantly performance-based, making it inherently uncertain. In fact, from 2021 to 2024, more than 80% of Mr. Spence's compensation was derived from short-term and long-term performance-based incentives, which are not guaranteed, and in more recent years that proportion has approached nearly 90%.[40] His base salary accounted for only 20% of his total compensation in 2021, 11% in 2022–23, and 12% in 2024.[41] These figures underscore that Mr. Spence's earnings were heavily contingent on individual and organizational performance.

33.     As an example, if Mr. Spence's performance had been below expectations, his incentive compensation could have been zero, resulting in total annual compensation of around $1 million. Without any evidence or reasoning that Mr. McHugh would have performed as well as Mr. Spence, the Burke Report is speculative and unjustified in assuming that he would simply have received compensation equivalent to 100% of Mr. Spence's earnings.

34.     Historical compensation data further undermine the Burke Report's assumption that Mr. McHugh would have earned compensation equivalent to that of Mr. Spence if Mr. McHugh had been appointed as President and subsequently as CEO. During Mr. Spence's entire tenure at Fifth Third, he was compensated higher than Mr. McHugh, reflecting clear differences in role and performance. Specifically, from 2016 to 2019, when both Mr. Spence and Mr. McHugh

---

[40] *See* Exhibit 4.
[41] *See* Exhibit 4. Year 2021: 20% = ($620,915 / $3,031,399); Year 2022: 11% = ($826,923 / $7,576,910); Year 2023: 11% = ($1,025,385 / $9,028,374); Year 2024: 12% = ($1,073,577 / $9,114,382).

served as Executive Vice Presidents, Mr. Spence's salary was always slightly higher but still roughly similar to Mr. McHugh's salary. However, Mr. Spence consistently received higher performance-based incentive compensation. In 2016, for example, Mr. Spence earned a salary of $450,008 compared to Mr. McHugh's $424,986, yet Mr. Spence's incentive compensation was $900,000 versus $550,000. In 2017, their salaries were $461,950 and $459,992, respectively, while Mr. Spence's incentives reached $715,000 compared to Mr. McHugh's $525,000. In 2018, their salaries remained close—$479,902 for Mr. Spence and $478,400 for Mr. McHugh—but Spence received $1.2 million in incentives, significantly above Mr. McHugh's $975,000. Finally, in 2019, Mr. Spence earned $492,694 to Mr. McHugh's $490,360, with incentive compensation of $670,000 versus $540,000. Across all four years, Mr. Spence's incentive compensation was consistently higher than Mr. McHugh's earnings.[42] Notably, between 2016 and 2019, Mr. McHugh's total incentive compensation averaged only 64% of Mr. Spence's total incentive compensation.[43] Thus, even if Mr. McHugh had been appointed CEO, it is unreasonable to assume that his compensation would match what Mr. Spence received as CEO, based on their prior compensation, that reflects a clear difference in their respective historical performance.

35.     Further highlighting the difference in relative position, compensation, and performance, Mr. Spence had been one of Fifth Third's Named Executive Officers[44] in its yearly proxy statements since 2015, when he first joined Fifth Third as the Executive Vice President and Chief Strategy Officer. Conversely, Mr. McHugh was never compensated high enough to be deemed a Named Executive Officer in any of the Bank's proxy statements, further reflecting a difference in relative performance between Mr. Spence and Mr. McHugh.[45]

36.     Given the clear difference in asserted performance and, accordingly, performance-based compensation between Mr. Spence and Mr. McHugh, it is analytically unsound for the Burke Report to assume, with certainty, that Mr. McHugh's hypothetical compensation as President and CEO would exactly match that of Mr. Spence.

---

[42] See Exhibit 4 and Burke Report Table 1.
[43] See Exhibit 5.
[44] Pursuant to SEC regulations, Fifth Third must disclose certain compensation information for its "Named Executive Officers," which include the Bank's principal executive officer (e.g., CEO), principal financial officer (e.g., CFO), and the next three highest compensated executive officers. See CFR § 229.402.
[45] See Exhibit 4.

The Burke Report Makes Unsupported Assumptions About Mr. McHugh's Potential Tenure as President and CEO and Future Earnings.

37.     The Burke Report's assumption on Mr. McHugh's tenure (that he would serve as President and CEO until retirement age) is also deeply flawed. Mr. McHugh's himself admits that, at most, he would be CEO for a range of 3–5 years, notably until Mr. Spence "was ready for the assignment" to these roles.[46] This date range is consistent with Mr. McHugh expressing to his colleagues that he expected to work for only 5 more years.[47] There is no evidence to suggest or support the Burke Report's assumption that McHugh would have served as Fifth Third's CEO for more than ten years, in addition to a multi-year stint as President.

38.     Further, the Burke Report inappropriately uses the average American retirement age, which bears little relevance in the context of CEO tenure. CEO roles are characterized by significantly shorter tenures and elevated turnover rates compared to traditional employment positions. As of 2025, the average tenure for S&P 500 CEOs has declined to approximately 7.2 years with a median of 4.8 years[48], with many CEOs leaving their roles within three years, particularly in publicly traded companies—far shorter than the Burke Report's presumed tenure. This trend reflects the increasing volatility and performance-driven nature of executive leadership, where heightened scrutiny from boards, shareholders, and the public accelerates turnover. Research from Korn Ferry in 2023 further supports this conclusion, noting that 34% of newly appointed CEOs exit within three years, a phenomenon often referred to as the "three-year itch."[49] Relatedly, the shorter average tenure highlights the flaws in the Burke Report's assumption that Mr. McHugh—even accepting the allegation that he would be promoted in the first instance—would remain President and CEO for 12 years until age 68.

39.     The Burke Report's assumption that Mr. McHugh's compensation will remain relatively stable from 2026 to 2032—based solely on Mr. Spence's 2024 earnings—is fundamentally flawed. CEO compensation is inherently volatile and influenced by a range of factors, including market dynamics and macroeconomic conditions. Mr. Spence's most recent

[46] Deposition of Philip McHugh Vol. I, August 31, 2021, 21:11–18, 33:9–12, Exhibit 22, Exhibit 23.
[47] Deposition of Gregory Carmichael Vol. I, September 27, 2023, 40:16–24, 45:14–46:6.
[48] Chen, J. "CEO Tenure Rates," Harvard Law School Forum on Corporate Governance, (2023, August 4), https://corpgov.law.harvard.edu/2023/08/04/ceo-tenure-rates-2/.
[49] "The Three-Year Itch," *Korn Ferry* (2023, October 16), https://www.kornferry.com/insights/briefings-for-the-boardroom/the-three-year-itch.

compensation was earned during a period of post-pandemic economic recovery, marked by strong performance across major U.S. stock indices, many of which have reached record highs. It is therefore unrealistic to project Mr. Spence's current compensation forward without accounting for the potential variability in CEO pay, including the possibility of adverse market conditions or a recession.

<u>The Burke Report Uses an Unjustified Discount Rate.</u>

40.    To convert Mr. McHugh's future economic losses to present value, the Burke Report applies a tiered discount rate structure based on Daily Treasury Real Yield Curve Rates as of September 20, 2025. Specifically in this regard, he uses the following:

- 1.73%, the 0–10 year period to the 7-year rate;

- 2.41%, the 11–29 year period to the 20-year rate; and

- 2.63%, the 30+ year period to the 30-year rate.[50]

41.    However, this approach is problematic for several reasons.

42.    In performing this type of calculation, whether done by the Burke Report or anyone else, it is important to understand that the higher the discount rate used, the lower the estimated economic loss and, conversely, the lower the discount rate used the higher the estimated economic loss.

43.    The sensitivity of the calculation of present value of (putative) future economic loss can be further illustrated by assuming a different discount rate from the 1.73% used by the Burke Report.[51] One such rate is 6.68%, which was the average annual real rate of return on the Standard & Poor's 500 ("S&P 500") stock portfolio since 1957.[52] Alternatively, other such rates are 5.7%, which was the average annual net rate of return between 2004 and 2024 on the S&P 500, and 8.9%, which was the average annual net rate of return between 2019 and 2024 on the S&P 500.[53] If any of these rates had been used by the Burke Report to determine the present value of Plaintiff's

---

[50] Burke Report, Table 8.

[51] In practice, Dr. Burke's damages period ends in 2032, which falls within 10 years of 2025. As a result, only 1.73% of the three-tiered discount rate is actually applied.

[52] Maverick, J. "S&P 500 Average Returns and Historical Performance," *Investopedia* (2025, September 22), https://www.investopedia.com/ask/answers/042415/what-average-annual-return-sp-500.asp.

[53] Lake, R. "What Is the Average Stock Market Return?" *SoFi* (2025, September 4), https://www.sofi.com /learn/content/average-stock-market-return/.

economic loss, they would have resulted in far lower estimates of such losses. To illustrate, application of the 6.68% discount rate to Mr. McHugh's future economic loss decreases the present value by more than $10 million, from the present value of $103,233,423 estimated by the Burke Report using the aforementioned 1.73% discount rate to a present value of $93,177,169.[54] The Burke Report completely ignores this source (as well as other potential sources) of discount rates in his calculations of the present values of Plaintiff's ostensible future economic loss.

44.     The rate the Burke Report selected, the Daily Treasury Real Yield Curve Rates are designed for inflation-indexed securities (TIPS) and reflect market expectations for real returns on government debt. In other words, while Mr. McHugh's income comes from private employment which carries more risk and uncertainty of future earnings, the Burke Report chose the lowest available rate that reflects risk-free government securities and therefore inflates the alleged damages. Further, the Burke Report's use of a single as-of date (September 20, 2025) for discount rate selection introduces a significant methodological flaw. Using a single date for economic damages analyses involving long-term forecasts ignores the fact that discount rates fluctuate over time due to changes in inflation expectations, monetary policy, and market conditions. A more robust approach would involve using averaged rates over a relevant historical period. Additionally, the Burke Report's use of tiered rates, assigning specific yield curve rates to a certain period, such as the 7-year rate to a 10-year period, is arbitrary and lacks economic (or any other) justification. There is no clear rationale for using these time periods or rates, and there is no evidence that they appropriately reflect the risk or time value of money in the context of executive compensation damages.

The Burke Report Fails to Address Mr. McHugh's Lack of Mitigation Efforts.

45.     Since January 1, 2022 Mr. McHugh has been employed as an Executive Director at the Cleveland Inner-City School Education (CISE) organization, earning an annual salary of $250,000. The Burke Report uses this compensation as a component of his analysis of Mr. McHugh's past earnings and future earnings, with no changes until the end of his damages period.

---

[54] *See* Exhibit 6.

46.     While Mr. McHugh has secured post-resignation employment after more than 14 months of unemployment,[55] his mitigation efforts appear insufficient when compared to peers of similar rank and experience at Fifth Third, who transitioned to executive roles within the banking sector near the time of Mr. Spence's appointment to President in 2020.

47.     For example, Brian Lamb, former EVP and Head of Retail Banking & Brokerage at Fifth Third, joined JPMorgan Chase in May 2020 as Global Head of Diversity, Equity & Inclusion, and in 2022 was promoted to Northeast Segment Head for Middle Market Banking & Specialized Industries.[56] In another example, Tayfun Tuzun, former EVP and Chief Financial Officer at Fifth Third, became Chief Financial Officer at BMO Financial Group in January 2021.[57]

48.     Further in this regard, Mr. McHugh did not face any apparent restrictions that would have prevented him from pursuing comparable roles in the banking industry following his separation from Fifth Third. Nevertheless, unlike his peers, he opted to take a position in the public education sector, which is outside his prior industry domain and professional experience. Given that Mr. McHugh's career has been exclusively in banking and that executive compensation is considerably lower in public than in private organizations, his skills and experience are not directly transferable to his current role, resulting in a substantial reduction in compensation.

49.     For example, imagine a professional football player who has spent his entire career perfecting his game on the field. One day, he becomes a free agent. But instead of negotiating on the open market with football teams, he decides to switch paths and become a basketball coach. While both roles fall under the broad umbrella of sports, the skills he honed in football—such as play execution, physical strength, and tackling—do not translate neatly to basketball strategy, player management, or in-game tactics. Because his expertise is not directly transferable, he cannot command the same salary or recognition as he would playing professional football. Nor could the player command the same salary or recognition as those who have built their entire careers coaching basketball, resulting in a significant drop in compensation compared to his future (basketball) and former (football) peers. To illustrate, in 2019, Mr. McHugh's total compensation

---

[55] From October 27, 2020 to December 31, 2021.
[56] "LinkedIn—Brian Lamb," *LinkedIn* (Accessed October 1, 2025), https://www.linkedin.com/in/lambbrian.
[57] "LinkedIn—Tayfun Tuzun," *LinkedIn* (Accessed October 1, 2025), https://www.linkedin.com/in/tayfun-tuzun-7455834.

exceeded $2 million; his current salary represents less than 13% of that amount.[58] As a further illustration, Mr. McHugh claims that his talents as a banking executive should have—absent alleged age discriminations—warranted compensation that is identical to what Mr. Spence has earned as President and CEO. Yet his current salary in the education sector represents a mere fraction of what Mr. Spence has earned.

50.     This significant difference raises questions about the adequacy of Mr. McHugh's mitigation efforts, specifically about whether he pursued job opportunities aligned with his alleged expertise and purported earning potential. In this regard, labor market search theory and concepts are especially germane. There are essentially two margins of search, the extensive and the intensive.[59]

51.     Extensive search refers to the width or geographic scope of an individual's search for employment.[60] The labor market for executives (and high-level professionals) in the banking industry is national (even international) in scope. How widely did Mr. McHugh search for employment following his separation from Fifth Third? The evidence that I reviewed does not provide an answer to this question. Put differently, there is nothing in the record to indicate that Mr. McHugh pursued even a modest let alone an extensive external labor market search.

52.     Intensive search refers to the depth of an individual's search for employment in a local (or regional) labor market.[61] How intensively did Mr. McHugh search for employment following his separation from Fifth Third? Once again, the evidence that I have reviewed does not provide an answer to this question, meaning that there is nothing in the record to indicate that Mr. McHugh pursued even a modest let alone an intensive labor market search. Rather, he seems simply to have obtained employment as Executive Director of the CISE following his separation from Fifth Third.

53.     Notably, there is nothing in the Burke Report to indicate that it considered Mr. McHugh's labor market search activity in estimating Mr. McHugh's damages. In other words, the

---

[58] ($250,000 / $2,030,360) = ~12.3%
[59] *See* Rees, A. (1966, May), "Information Networks in Labor Markets," *American Economic Review*, Vol. 56 at 559–566.
[60] *Ibid.*
[61] *Ibid.*

Burke Report's analysis of Mr. McHugh's mitigation efforts in this matter is inadequate, to put it mildly, rendering the damages calculations unreliable and not based on sufficient facts and data.

54.    Further, Mr. McHugh's extended unemployment period of over 14 months following his resignation (October 27, 2020–December 31, 2021) raises additional concerns about the sufficiency of his mitigation efforts. For executive-level candidates, a typical job search spans approximately four months to one year, depending on market conditions, individual engagement, and the talent of the executive team.[62] This timeline aligns with the standard duration of executive searches conducted by recruiting firms, which generally take about four to eight months to place executives, such as CEOs.[63] Notably, 2021 was widely recognized as "a boom year for banking jobs."[64] The executive recruiting market rebounded strongly in Q4 of 2020 and "continue[d] to perform well in 2021," with many firms approaching or exceeding their pre-COVID business performance.[65] Despite these favorable conditions, Mr. McHugh did not appear to actively pursue alternative employment and did not engage a recruiting firm—an approach commonly used in executive-level placements. This lack of effort further undermines the assumption of reasonable mitigation by Mr. McHugh.

<u>Revised Damages Calculations to Correct the Burke Report's Inappropriate Assumptions.</u>

55.    Based on my consideration of sufficient facts and data, as applied to reliable principles and methods, I have recalculated Mr. McHugh's lost earnings and benefits following his resignation from Fifth Third, correcting for the flawed assumptions and deficits in the Burke Report's analysis.

56.    First, it is my expert opinion that Mr. McHugh's damages are $0. There is simply no basis for the Burke Report's assumption that Mr. McHugh ever would have been elevated to

---

[62] Madden, T. "Why It Takes So Long To Land A Job, Especially For Executives," *Forbes* (2022, February 15), https://www.forbes.com/councils/forbescoachescouncil/2022/02/15/why-it-takes-so-long-to-land-a-job-especially-for-executives/.

[63] Corlett, B. "Why CEO Searches Take 6 Months to Complete," *Staffing Advisors* (2023, December 1), https://www.staffingadvisors.com/blog/why-ceo-searches-take-6-months-to-complete/. *See also*, Lev-Aviv, Riviera. "The CEO's Guide to Hiring Executives—According to Someone Who Has Hired Hundreds," *OPENVIEW* (2021, April 14), https://openviewpartners.com/blog/how-to-hire-executives/.

[64] Odyssey Search Partners, "2021 Has Been A Boom Year For Banking Jobs. Can this Continue?" (2021, September 20), https://www.odysseysearchpartners.com/news/2021-has-been-a-boom-year-for-banking-jobs-can-this-continue/.

[65] The Association of Executive Search and Leadership Consultants, "How Executive Search Is Adapting to Serve Post-Covid Organizations," *AESC* (Accessed September 30, 2025), https://www.aesc.org/insights/magazine/article/how-executive-search-adapting-serve-post-covid-organizations.

the positions of President or CEO. The Board never even considered Mr. McHugh as a candidate—not at age 40, 50, or otherwise—or concluded that Mr. McHugh somehow became "too old" for the position between the years of 2019 and 2020.

57.    Second, even assuming Mr. McHugh is able to prove that age was a factor that hindered his ability to be promoted, then it is my opinion that the Burke Report's calculations would need to be revised to account for the following adjustments:

- Incentive Compensation Assumption: I applied three scenarios for Mr. McHugh's incentive compensation relative to Mr. Spence's while the base salary, benefits, and social security figures were held constant at Mr. Spence's level across all scenarios.

  1) **0%** of Mr. Spence's incentive compensation, reflecting the possibility that Mr. McHugh may not have received any comparable incentive-based awards.

  2) **50%** of Mr. Spence's incentive compensation, consistent with the performance-based and uncertain nature of executive incentive awards.

  3) **64%** of Mr. Spence's incentive compensation, based on the average of Mr. McHugh's total incentive compensation as a percentage of Mr. Spence's total incentive compensation between 2016 and 2019.[66]

- Tenure Assumption: I considered three alternative scenarios for Mr. McHugh's potential tenure as CEO. After each of these time periods, I assumed Mr. McHugh would have returned to his prior role as EVP rather than continuing as CEO through 2032.

  1) **2 years:** Reflecting a transition from President to CEO for two years before Mr. Spence was ready to assume the role.

---

[66] *See* Exhibit 5.

2)    **3 years:** Reflecting the middle range of when Mr. Spence would be ready to assume the roles.

3)    **4 years:** Representing the maximum period based on Mr. McHugh's claim that he was promised the CEO role until Mr. Spence was ready to take over, which would be approximately 3-5 years from August 2019, which is equivalent to 2-4 years from October 2020.

- <u>Mitigation Assumption:</u> I assumed Mr. McHugh would have reasonably obtained a comparable executive role in the banking sector, similar to his previous EVP position at Fifth Third Bancorp after 6 months of job search. This assumption is supported by the career trajectories of similarly situated peers and labor market trends.

58.    The combination of three incentive compensation assumptions, three tenure assumptions, and one mitigation assumption yields nine distinct scenarios for estimating Mr. McHugh's potential economic damages. These estimates are presented in Table 1 below. [67] Notably, in the three scenarios where Mr. McHugh's incentive compensation is assumed to be $0, the resulting damages estimates are negative. This outcome underscores the substantial uncertainty surrounding Mr. McHugh's alleged future earnings and highlights the extent to which they could have varied under different assumptions.

*Table 1 Summary of Economic Damages based on Assumptions*

|  |  | Tenure Assumption | | |
|---|---|---|---|---|
|  |  | **2 Years** | **3 Years** | **4 Years** |
| **% Incentive Assumption** | **0%** | $ (890,167) | $ (1,133,948) | $ (1,392,011) |
|  | **50%** | $ 3,285,235 | $ 6,931,380 | $ 10,690,352 |
|  | **64%** | $ 4,454,348 | $ 9,189,672 | $ 14,073,414 |

59.    Based on these corrected assumptions and methodologies, the estimated damages ranges from $0[68] to $14,073,414.

---

[67] *See* Exhibits 8–17 for calculation for each estimate.

[68] In the three scenarios where the estimate damages are negative, the damages are considered as zero ($0).

## VI.     CONCLUSIONS

60.     Based on the analyses presented above, it is my opinion that the Burke Report's estimate of Mr. McHugh's damages in this matter is incorrect because it is based on several faulty assumptions. First, the Burke Report's analysis incorrectly assumes, with certainty, that McHugh's hypothetical compensation as President and CEO would exactly match Mr. Spence's even though such compensation is comprised mainly of equity and incentive-based compensation which is performance-based—both on the individual and the company—and even though Mr. Spence was always compensated higher than Mr. McHugh. Additionally, the Burke Report's analysis incorrectly calculates Mr. McHugh's potential future earnings as a single, certain number rather than a range of possibilities.

61.     Second, the Burke Report's analysis incorrectly assumes, with certainty, that had the Board not appointed Mr. Spence as President and then CEO, Mr. McHugh would have served as President for two years and then as CEO for more than 10 years when neither his own allegations nor the applicable statistics support such a lengthy tenure.

62.     Third, the Burke Report's analysis does not use an appropriate discount rate when calculating Mr. McHugh's damages.

63.     Fourth, the Burke Report's analysis does not properly account for Mr. McHugh's failure to adequately mitigate his damages by seeking and obtaining a comparable position with similar compensation.

64.     If Mr. McHugh was not terminated due to age discrimination, his damages are zero ($0). If it is determined by the court that Mr. McHugh was the subject of age discrimination, it is my opinion that his estimated damages range from $0 to $14,073,414.

Respectfully submitted,

BERKELEY RESEARCH GROUP (BRG)

_____

David Lewin, Ph.D.