# Exhibit A

1          UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF OHIO

3               WESTERN DIVISION

4

5    ------------------------------:
                                   :
6    PHILIP R. MCHUGH,             :
                                   :
7           Plaintiff,             :
                                   :
8       vs.                        :  CASE NO.
                                   :  1:21-cv-00238
9    FIFTH THIRD BANCORP, et       :
     al.,                          :
10                                 :
            Defendants.            :
11                                 :
     ------------------------------:
12

13

14        REMOTE ZOOM VIDEOTAPED DEPOSITION OF
                  DAVID LEWIN, PH.D.
15
          Taken:           By the Plaintiff
16
                           Pursuant to Notice
17
          Date:            November 4, 2025
18
          Time:            Commencing at 1:07 p.m.
19
          Place:           Witness appearing via
20                         Videoconference

21        Before:          Wendy L. Raymer, RPR, CRR
                           Notary Public-State of Ohio
22                         (Reporting via
                           videoconference in
23                         Cincinnati, Ohio)
                                    and
24                         Arthur W. Funk, Videographer
                           (Appearing via
25                         videoconference)

```
 1    APPEARANCES:

 2

          On behalf of the Plaintiff:
 3
               Appearing via Videoconference in Cincinnati,
 4             Ohio:

 5             Peter A. Saba, Esq.
                         and
 6             Joshua M. Smith, Esq.
                         and
 7             Bailey E. Sharpe, Esq.
                         of
 8             Stagnaro, Saba & Patterson Co., L.P.A.
               2623 Erie Avenue
 9             Cincinnati, Ohio  45208
               Phone:  (513) 533-2701
10             Email:  pas@sspfirm.com
                       jms@sspfirm.com
11                     bes@sspfirm.com

12

          On behalf of the Defendants and the Witness:
13
               Appearing via Videoconference in Cincinnati,
14             Ohio:

15             Michael L. Cioffi, Esq.
                         and
16             Collin D. Hart, Esq.
                         of
17             Blank Rome LLP
               1700 PNC Center
18             201 East Fifth Street
               Cincinnati, Ohio  45202
19             Phone:  (513) 362-8700
                       (513) 362-8746
20             Email:  michael.cioffi@blankrome.com
                       collin.hart@blankrome.com
21
                         and
22

23

24

25
```

Deposition of David Lewin, Ph.D.                    Philip R. McHugh v. Fifth Third Bancorp, et al.

```
 1   APPEARANCES:   (CONTINUED)

 2
              Appearing via Videoconference:
 3
              Jeffrey W. DeBeer, Esq.
 4                    of
              Blank Rome LLP
 5            1700 PNC Center
              201 East Fifth Street
 6            Cincinnati, Ohio  45202
              Phone:  (513) 362-8703
 7            Email:  Jeffrey.debeer@blankrome.com

 8
         Also Present:
 9
              Appearing via Videoconference in Cincinnati,
10            Ohio:

11            Leighton E. Heiner, Paralegal with SSP Law Co.,
              L.P.A.
12

13                            -  -  -

14

15

16

17

18

19

20

21

22

23

24

25
```

1                        I N D E X

2

3    DAVID LEWIN, PH.D.                              PAGE

4       Examination by Mr. Saba                         6

5

6    EXHIBITS                        MARKED    REFERENCED

7       Plaintiff's Exhibit 1          19         19
        Plaintiff's Exhibit 2          39         39
8

9

10                          -  -  -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Deposition of David Lewin, Ph.D.                    Philip R. McHugh v. Fifth Third Bancorp, et al.

1           THE VIDEOGRAPHER:  The time is 1:07 p.m.,

2     Eastern Standard Time.  We are now on the record.

3           THE COURT REPORTER:  Good afternoon.  My name

4     is Wendy Raymer.  I am a certified court reporter.

5           Today's date is November 4, 2025, and the time

6     is approximately 1:08 p.m.

7           This is the deposition of Donald (sic) Lewin,

8     Ph.D., in the case of Philip R. McHugh vs. Fifth

9     Third Bancorp.  This case is venued in the United

10    States District Court, Southern District of Ohio,

11    Western Division.  The case number is

12    1:21-cv-00238.

13          At this time, I will ask counsel to identify

14    yourselves and whom you represent, and agree on the

15    record that there is no objection to this

16    deposition officer administering a binding oath to

17    the witness via Zoom.

18          Please state your agreement on the record,

19    starting with the noticing attorney.

20          MR. SABA:  Peter Saba, Josh Smith, and Bailey

21    Sharpe on behalf of the Plaintiff Philip R. McHugh,

22    and we have no objection to you administering the

23    oath in this case.

24          MR. CIOFFI:  On behalf of the defendants,

25    Michael Cioffi and Jeff DeBeer of Blank Rome.  We

Deposition of David Lewin, Ph.D.                    Philip R. McHugh v. Fifth Third Bancorp, et al.

1       also represent the witness personally, pursuant to

2       a joint representation agreement.

3           THE COURT REPORTER:  David, please raise your

4       right hand.

5           MR. SABA:  Michael, I think you've got to make

6       sure you say you don't object on the record to

7       Wendy administering the oath.

8           MR. CIOFFI:  No objection to the

9       administration of the oath.

10          THE WITNESS:  Wendy, you need to go back and

11      correct something you said in the opening of your

12      remarks.  You said Donald Lewin.

13          THE COURT REPORTER:  Oh, did I?  I'm so sorry.

14          THE WITNESS:  That's all right.

15          THE COURT REPORTER:  I will fix that.

16          THE WITNESS:  Good.  Thanks.

17                  DAVID LEWIN, PH.D.,

18  of lawful age, a witness herein, being first duly sworn

19  as hereinafter certified, was examined and deposed as

20  follows:

21                  EXAMINATION

22  BY MR. SABA:

23      Q.  Dr. Lewin, could you go ahead and state your

24  name for the record, please, and spell your last name?

25      A.  Yes.  David Lewin, L-e-w-i-n.

```
1          Q.   And can I call you David?

2          A.   You certainly can.

3          Q.   David, can you tell us when you were first

4    contacted regarding this case?

5          A.   I think it would have been early August of

6    this year, counsel.

7          Q.   Who contacted you?

8          A.   Mr. DeBeer.

9          Q.   How did he contact you?

10         A.   I think he sent me an email message, and I

11   think I replied and then we had a Zoom call or a

12   telephone call, something on that order.

13         Q.   What did he communicate to you in that email

14   message?

15         A.   Well, I think basically that he had a matter

16   that I might be suitable for in terms of expertise, and

17   would I be willing to consider it, things of that sort.

18         Q.   How long was your Zoom call or telephone call

19   with Jeff DeBeer?

20         A.   Oh, it's a guesstimate.  I think the Zoom

21   call, if I can refer to it that way, was oh, I don't

22   know, probably half an hour, something on that order.

23         Q.   What did you discuss during that call?

24         A.   I believe we discussed the nature of the case.

25   He was telling me what the case was about because it was
```

 1  a case that was new to me, and so I think that's what

 2  the call was about.

 3      Q.    What did he tell you about the case?

 4      A.    Well, that there was a plaintiff who had

 5  worked at a bank for a while and held various positions

 6  when he was there, and later on was separated from the

 7  bank or discharged from the bank or whatever term you

 8  want to use, and he felt, he, the plaintiff, I was told,

 9  felt that he had been discriminated against, and he was

10  suing the bank for damages.

11      Q.    Did you take any notes during that Zoom call?

12      A.    No.

13      Q.    Have you done any work before with Blank Rome

14  or with Mr. Cioffi?

15      A.    No and no.

16      Q.    Have you done any work before with Fifth Third

17  Bank?

18      A.    No.

19      Q.    What is your area of expertise?

20      A.    Oh, I think -- I think the term that's mostly

21  used in legal circles is labor and employment.

22      Q.    You are not an economist; is that correct?

23      A.    Well, technically my Ph.D. is from the

24  Anderson School of Management.  So technically I am not

25  an economist, but I have published in economics

1   journals.

2        Q.    What have you published in economist journals?

3        A.    Well, I published in The Review of Economics

4   and Statistics, that's one of the top oh, three or four

5   journals in economics.

6             An article on the effects of police unionism

7   on police wages.  I've published several articles in The

8   Industrial and Labor Relations Review, which publishes

9   articles principally by economists.

10            And I have done quite a bit of work on labor

11  economics, both in terms of the academic side, because

12  I've been a professor my entire career, and in terms of

13  work as an expert.

14       Q.    Have you ever been recognized as an expert on

15  work-life expectancy?

16       A.    I've done a number of reports that were

17  accepted by courts and by arbitrators that among other

18  things had calculations based in part on work-life

19  expectancy.  So I think the answer to your question is

20  yes.

21       Q.    Has there ever been a situation where a court

22  has determined that you are not an expert on economics?

23       A.    Not that I'm aware of.

24       Q.    Has there ever been a situation where a court

25  has determined that you're not an expert on work-life

1   expectancy?

2        A.    Not as far as I know, no.

3        Q.    Do you hold yourself out as an expert on age

4   discrimination?

5        A.    Well, it's amongst the areas that I am

6   retained in as an expert.  It's among the areas.  It's

7   by no means the only one.  So if that's a yes, that's a

8   yes.

9        Q.    And what makes you an expert on age

10  discrimination?

11       A.    My ability to analyze data and render

12  testimony on it.  My very first trial testimony in the

13  southern district of New York, quite a long time ago,

14  was in an age discrimination case in which four

15  insurance agents of a particular company, Home

16  Insurance, who had been terminated as part of reductions

17  in force, sued the insurance company, claiming they were

18  discriminated against on the basis of age.

19            I did a statistical analysis of the age of the

20  insurance company's workforce before and after each of

21  the two workforce reductions.  My report, which was

22  filed with the court, reported my findings.

23            I then testified about those findings, and the

24  main opinion I rendered was that there was not evidence

25  of an adverse impact on older employees at the insurance

1   company, agents or others, and in fact, after the first

2   workforce reduction, the average age of the insurance

3   company's workforce increased slightly, not

4   statistically significantly, but at the end of the

5   second workforce reduction, the same phenomenon

6   occurred, the same direction.  The age of the workforce

7   increased and that was statistically significant at the

8   5 percent probability level.

9           So I rendered my opinion and I was

10  cross-examined about it until the judge eventually

11  rendered a decision, cited my testimony, interestingly

12  enough.

13          So that was my very first trial testimony and

14  I'm being a little long-winded, but I hope it's

15  responsive to your question.

16      Q.   What do you consider to be a statistically

17  significant increase or decrease in age in an employment

18  setting?

19      A.   Well, the answer to your question is, it

20  doesn't much matter whether it's an employment setting

21  or a consumer setting or a capital market setting.

22  Basic statistical analysis, probability theory,

23  indicates that if a phenomenon is likely to occur less

24  than one time out of 20, 5 percent or less, it is

25  clearly statistically significant.  That's what

```
 1    statistics tells us.

 2            If a phenomenon occurs between 5 and 10

 3    percent of the time, it's marginally statistically

 4    significant.  So that's what statistics tells us.

 5        Q.   Do you consider yourself an expert in

 6    constructive discharge?

 7        A.   Well, it's part of my field.  It's part of

 8    labor and employment.  So I guess my answer to your

 9    question would be yes.

10        Q.   And what is the basis for your expertise in

11    constructive discharge?

12        A.   My training, my Ph.D., with a specialty in

13    labor and employment.  My teaching labor and employment

14    in virtually all of its aspects for decades at the

15    Columbia University Business School and at the UCLA

16    Anderson School of Management.

17            I've written many books and many papers,

18    especially on dispute resolution, including grievance

19    procedures.  My 1988 book, for example, is the modern

20    grievance procedure in the United States, and I've

21    discussed constructive discharge in numerous settings,

22    including at annual meetings of the Labor and Employment

23    Relations Association, which is the leading organization

24    in my field.  So those would be amongst the things I

25    would cite to you.
```

```
1        Q.   What is your understanding of the elements of

2   constructive discharge?

3        A.   Well, my understanding and my experience with

4   cases in which I have been retained is that basically

5   the parties agree that a person will leave employment

6   with a company or a non-profit organization.

7             It won't officially be a termination.  It

8   won't officially be a resignation.  It's called a

9   constructive discharge.  But it is a separation.  And in

10  that sense, the importance to me is no different than

11  the importance of whether someone was terminated or

12  someone quit because there's a separation from

13  employment.

14       Q.   Are you able to explain to me what the legal

15  elements of constructive discharge are?

16            MR. CIOFFI:  Objection.  Objection.  He's not

17       a lawyer.  It's outside the scope of his opinion,

18       and I'm going to allow him to answer, but only very

19       limitedly.

20            THE WITNESS:  I was about to say I am not

21       rendering legal opinions and I'm not citing law, so

22       that's beyond my scope.

23  BY MR. SABA:

24       Q.   Okay.  With respect to age discrimination,

25  what are the legal elements of age discrimination?
```

1          MR. CIOFFI:  Objection.  Same objection.  He's

2      not a lawyer.  Counsel, let's move on.  He's not

3      rendering an opinion as a lawyer.  You may answer

4      if you can.

5  BY MR. SABA:

6      Q.    Go ahead, David.

7      A.    That is correct.  I mean, I know about the Age

8  Discrimination in Employment Act, which is different

9  from the 1964 Civil Rights Act, I know about that.  I've

10 written about that act.  But I am not a lawyer and I'm

11 not rendering legal opinions.

12     Q.    Other than providing a statistical

13 determination of whether or not age discrimination may

14 have occurred, based upon the change in the average age

15 of employees, are you otherwise able to render an expert

16 opinion as to whether or not age discrimination has

17 occurred?

18         MR. CIOFFI:  Objection.  Again, he's not a

19     lawyer.  He's not rendering that opinion, and it's

20     beyond the scope of his work in this case as an

21     expert.

22         THE WITNESS:  In my experience, it's the

23     courts or in some circumstances the arbitrator

24     authorities who make those determinations.  Those

25     are legal judgments.  I don't make those.

Deposition of David Lewin, Ph.D.                    Philip R. McHugh v. Fifth Third Bancorp, et al.

```
 1    BY MR. SABA:

 2         Q.   So, for example, in this particular case,

 3    you're not able to provide an expert opinion as to

 4    whether or not Mr. McHugh has been the victim of age

 5    discrimination; is that correct?

 6              MR. CIOFFI:  Objection.  It's beyond the

 7         scope.  He's not been asked to do that, whether

 8         he's able or not.

 9              THE WITNESS:  I haven't -- it's absolutely

10         correct.  I have not been asked to do that, and I

11         don't do that.

12    BY MR. SABA:

13         Q.   You previously identified that you had one

14    email exchange with Mr. DeBeer.  You also had a Zoom

15    call.  What other communications have you had with

16    defense counsel in this case regarding this litigation?

17         A.   We had some discussions I think via Zoom and

18    perhaps another call or two, typical, at least in my

19    experience, of what an expert does when retained by

20    counsel.  There are communications between the parties.

21         Q.   How many Zoom calls did you have total?

22         A.   I don't recall, counsel.  Probably a single

23    digit number, four or something like that, but I don't

24    really recall.

25         Q.   Did you take any notes from any of those Zoom
```

1    calls?

2          A.    I did not.

3          Q.    What information was provided to you during

4    those Zoom calls?

5          MR. CIOFFI:  Objection.  I'm going to allow

6          him to answer it, so long as it doesn't invade the

7          privilege and is discoverable under civil Rule 26.

8          THE WITNESS:  During the course of my

9          retention in this matter, this is the way I would

10         answer your question.

11         Various documents were sent to me.  I -- and

12         that -- those provided information to me that would

13         include, for example, Dr. Burke's report.  I don't

14         recall that additional information was provided to

15         me in Zoom calls.

16   BY MR. SABA:

17         Q.    How were the other documents provided to you?

18         A.    Either through Box or as email attachments.

19         Q.    And did you receive both boxes of information

20   and email attachments?

21         MR. CIOFFI:  Objection to the form of the

22         question.  He didn't say he received boxes of

23         documents.

24         THE WITNESS:  There is a -- Box is known as

25         Dropbox.  It's a file.  And I'd have to go through

```
 1        Blank Rome, which has like other firms I'm familiar

 2        with security protocols.  So I would have to

 3        register my name and have a password and then I

 4        could download those documents.  That's the way

 5        that that works.

 6             And I use Box as a kind of a reference for

 7        that, because Dropbox is often used for this

 8        purpose.  But it's online.

 9   BY MR. SABA:

10        Q.   You did not receive any documents through

11   physical mail or physical delivery; is that correct?

12        A.   That is correct.

13        Q.   Everything was sent electronically, either

14   through some sort of Dropbox form, some shared folder,

15   or email; is that right?

16        A.   Yes, I believe that is correct.

17        Q.   David, are you a vocational expert?

18        A.   I think you would have to define the term.  I

19   don't hold myself out as a vocational expert.

20        Q.   Do you have an understanding of what a

21   vocational expert is?

22        A.   I think that I do.

23        Q.   What is that?

24        A.   A vocational expert, and I have worked with

25   several, typically assesses an individual or
```

1  individuals, plural, skills, abilities, and other

2  characteristics with a view to helping the individual

3  determine what kind of work that individual is capable

4  of, and the vocational expert can also advise employers

5  or potential employers about what an individual is

6  capable of.  That is separate.

7          This is my concluding point about it, from

8  labor market expertise, which is the analysis of supply

9  and demand in labor markets.  So that's my understanding

10  of what vocational expertise is.

11      Q.   And you indicated you do not hold yourself out

12  as a vocational expert, correct?

13      A.   Correct.

14      Q.   David, I'm going to share a folder -- excuse

15  me, a file with you on my screen.  Let's see.

16          THE VIDEOGRAPHER:  Hold on for a minute.  I

17      need to get his video back up.

18          MR. SABA:  All right.

19          THE VIDEOGRAPHER:  Okay.  Okay.

20          MR. DEBEER:  Peter, this is Jeff DeBeer.

21      Could you zoom in on that a little bit?

22          MR. SABA:  Certainly.  Just let me know if you

23      need me to go up or down with that.

24          MR. DEBEER:  That's better.

25          MR. SABA:  Does that work?

```
 1              MR. DEBEER:  Yeah.  If you could center it.
 2        Yeah, there you go.  Thank you.
 3              (Plaintiff's Exhibit 1 is marked for
 4              identification.)
 5   BY MR. SABA:
 6        Q.   David, I'm sharing what will be marked as
 7   Exhibit Number 1 in this deposition.  Can you go ahead
 8   and identify this document for me?
 9        A.   Yes.  It's what the title indicates it is,
10   lists of documents relied upon.  And in my materials,
11   which you obviously have, it is Exhibit 3, but I
12   understand what you said about making it for this
13   purpose Exhibit 1.
14        Q.   And just to go through this list, the first
15   item you have listed is Legal Documents; is that
16   correct?
17        A.   Yes.
18        Q.   And this was provided by defense counsel; is
19   that correct?
20        A.   Yes.
21        Q.   Okay.  And just to make sure I'm understanding
22   this correctly, the documents, legal documents,
23   depositions, and other expert reports, those were all
24   provided by defense counsel; is that correct?
25        A.   Yes.
```

1      Q.    The other documents, were those all obtained

2   on your own?

3      A.    I believe that is correct.

4      Q.    And does what we are marking as Exhibit 1,

5   does this list reflect all the documents that you would

6   have reviewed in rendering the report that you provided

7   in this case?

8      A.    I understand your question.  I may well have

9   looked at other documents including those that I found

10  when I was searching externally, but if I did, I didn't

11  rely upon them, and that's why this list says "relied

12  upon."  I think basically the closest answer I could

13  give to you, based on yes or no, is no.

14     Q.    Okay.  Because you may have referenced some

15  other documents, but you did not rely upon those

16  documents, correct?

17     A.    I'll be a little persnickety here.  If I

18  reference it, it's in my report and I would have

19  included it in the list.  If I didn't, it would not be

20  in this list.

21     Q.    Okay.  Is it fair to say that you did rely

22  upon all the documents that are listed in this Exhibit 1

23  for the -- preparing the report that you provided in

24  this litigation; is that correct?

25     A.    I think that is correct.

 1      Q.   With respect to the legal documents, were you

 2   provided with a copy of the defendant's answer and

 3   counterclaim in this case?

 4      A.   I don't recall.

 5      Q.   Do you know if that's a document that you

 6   referenced but did not rely upon?

 7           MR. CIOFFI:  Objection.  The report speaks for

 8       itself.  But you may answer.

 9           THE WITNESS:  I don't recall.

10   BY MR. SABA:

11      Q.   Were you aware that the defendants in this

12   case had filed a counterclaim against Philip McHugh?

13      A.   Was I aware?  I'm going to say I don't recall.

14      Q.   With respect to the depositions listed, did

15   you read each of the depositions that we see listed here

16   on Exhibit 1?

17      A.   I read portions of the depositions.  My staff

18   read the entire depositions.

19      Q.   Who do you mean by your "staff"?

20      A.   People who work with me at the Berkeley

21   Research Group who assist me in matters like this.

22      Q.   And what are their specific names?

23      A.   Well, the main person in this particular

24   matter was Mia, M-i-a, Kim, K-i-m.  She is a senior

25   managing consultant and is the case manager for

1    virtually all of my matters.

2        Q.    Any other staff members that were involved in

3    reviewing the depositions that are listed on Exhibit 1?

4        A.    Well, Ms. Kim is in charge of assigning staff

5    to matters like this, and I believe that Alex, A-l-e-x,

6    Sun, S-u-n, was one of those staff members.

7        Q.    Any other staff members that were assigned to

8    reviewing the depositions that are listed on Exhibit 1?

9        A.    Not that I recall.

10       Q.    Which portions of the depositions identified

11   on Exhibit 1 did you review?

12       A.    Oh, I don't know that I could quote them to

13   you exactly sitting here.  I do recall reading through

14   considerable parts of Mr. Carmichael's deposition, which

15   was two volumes.  I did the same thing with Mr. McHugh,

16   which was also two volumes.  That's about as much as I

17   can recall, sitting here today.

18       Q.    How did you determine which portions of the

19   depositions listed on Exhibit 1 that you would review?

20       A.    Well, I would start to read the depositions

21   and if -- if it was mostly personal information and

22   things like that, I would move along and see if there

23   was a discussion later of the circumstances that

24   surrounded his -- what I regard as Mr. McHugh's

25   separation from the bank.  That's kind of how I decided

```
 1    that.  And I also had discussions with my staff about

 2    what they concluded from reading parts of the

 3    deposition.  We would go back and forth on that.

 4          I was particularly interested in Mr. Shaffer's

 5    deposition because as I recall, he was the head of human

 6    resources, and in my experience, the person in charge of

 7    human resources typically plays an important role in

 8    matters like this.  So that's as -- that's my answer to

 9    your question.

10    Q.   How did your staff communicate to you the

11    portions of the depositions listed on Exhibit Number 1

12    that they reviewed?

13    A.   We would have phone calls or an occasional

14    memo or the nature of those kinds of communications.

15    It's common to matters I work on as an expert.

16    Q.   How many memos were prepared with respect to

17    the depositions that are listed on Exhibit Number 1?

18    A.   I don't recall that, Counsel.

19    Q.   Who would have prepared those memos?

20    A.   The staff.

21    Q.   Where are those memos saved?

22    A.   Pardon me?

23    Q.   Where are those memos saved?

24    A.   Did you say "saved"?

25    Q.   Yes, correct.
```

1      A.   The Berkeley Research Group maintains a case

2  file for each and every case, and it would be there.

3      Q.   Okay.  While we're discussing it, can you

4  provide us with a copy of your case file?

5           MR. CIOFFI:  Objection.  Counsel, for any

6      documents, please file a formal request with us and

7      we'll take it under consideration as defense

8      counsel and counsel for the witness.

9  BY MR. SABA:

10     Q.   Can you explain to me what documents would be

11 in the Berkeley Research Group case file for this

12 particular case?

13     A.   Any documents that we received or that we

14 created during our retention in this matter, beginning

15 with the original conflict check.

16     Q.   Other than the memos that you just referenced

17 that would have been prepared by your staff regarding

18 the depositions listed on Exhibit 1, what other

19 documents would have been created by the Berkeley

20 Research Group with respect to this litigation?

21     A.   As I recall, no other documents.

22     Q.   You didn't prepare any reports?

23     A.   You're showing me an exhibit from my report.

24 So I think you understand that I wrote a report and

25 submitted it.

1          Q.    I'm asking you --

2          A.    Maybe I don't understand your question.

3          Q.    Okay.  Let me clarify the question.  I'm

4    asking, in the case file you previously indicated that

5    that would contain all of the documents that you

6    received and any documents that were created with

7    respect to this matter would be maintained in the case

8    file with the Berkeley Research Group.

9               And my question was, other than the memos

10   you've already identified, what other documents would

11   have been created in this matter by the Berkeley

12   Research Group that are maintained in the case file?

13         A.    My report.

14         Q.    Anything besides your report?

15         A.    I don't think so.

16         Q.    What about communications with defense

17   counsel?

18         A.    Those are not contained in the BRG case file.

19   If I have a phone call with counsel, that's a phone call

20   with counsel.

21         Q.    What about written communications?

22         A.    The engagement letter that was issued and

23   signed in this matter would be in the case file.  Beyond

24   that, I can't add anything.

25         Q.    What about emails?

1        A.    I don't know.

2        Q.    Is the Berkeley Research Group case file, is

3   that a hard paper file or is that an electronic file?

4        A.    Electronic.

5        Q.    Where would you maintain your email

6   communications with defense counsel with respect to this

7   matter?

8        A.    Where?

9        Q.    Yes.

10       A.    On my email account.

11       Q.    Did you review any other portions of the

12   depositions listed on Exhibit 1 as a result of any of

13   the memos provided by your staff?

14       A.    I don't recall.

15       Q.    You mentioned reviewing part of Mr. McHugh's

16   deposition, Mr. Carmichael's, and Mr. Shaffer's.  Did

17   you review any portions of the other depositions that

18   are listed there, Marsha Williams, Nicholas Akins, or

19   Emerson Brumback?

20       A.    Some.

21       Q.    How did you determine which portions of those

22   depositions you would review?

23       A.    Discussions with my staff, and that would be

24   my answer to your question.

25       Q.    Did you take any notes while you reviewed the

1    depositions that are listed on Exhibit 1?

2         A.    No.

3         Q.    Would you mark in the depositions any time

4    that you were reviewing them?

5         A.    No.

6         Q.    What did you do to make sure that you can

7    recall portions of depositions for use in your reports?

8              MR. CIOFFI:  Objection to the form of the

9         question.  No evidence that he did that.

10             THE WITNESS:  In preparing my report, if I

11        identified something that I thought was germane or

12        ultimately germane to my opinion or opinions, I

13        would include a line about it or a citation about

14        it or something in the shell of the document I was

15        preparing, the Word document.

16   BY MR. SABA:

17        Q.    Who determined that the depositions that are

18   listed on Exhibit 1 would be the depositions that would

19   be provided to you?

20        A.    Well, I believe I said that counsel provided

21   me the documents that are listed here, including the

22   depositions.  That's what occurred.

23        Q.    Did you ask to see any other depositions in

24   this case?

25        A.    I don't believe that I did.

1     Q.   Were you aware that there were 17 other

2   depositions taken in this case?

3     A.   I don't recall that.

4     Q.   Do you have any idea what testimony is

5   contained in those depositions?

6     A.   I do not.

7         MR. CIOFFI:   Objection.   Asked and answered,

8     but he may answer.

9         THE WITNESS:   Sorry, Counsel.   I do not.

10   BY MR. SABA:

11     Q.   With respect to the depositions that aren't

12   listed on Exhibit Number 1, were you provided with any

13   of the exhibits that go to those depositions?

14     A.   I think so.

15     Q.   Which exhibits were you provided with?

16     A.   I don't recall.

17     Q.   Those exhibits are not listed on Exhibit 1,

18   are they?

19     A.   No.

20     Q.   Do you know if you were provided with all of

21   the exhibits that go to the respective depositions

22   listed on Exhibit 1?

23     A.   I don't recall.

24     Q.   Do you recall any of the exhibits that you've

25   been provided with?

1       A.    Not as I sit here.

2       Q.    Did you rely upon any of the exhibits to the

3   depositions listed on Exhibit Number 1 for any of the

4   opinions you've rendered in this case?

5       A.    I don't believe so.

6       Q.    Were you provided with a copy of the talent

7   deck from December 17, 2019?

8       A.    Did you say talent deck?

9       Q.    That is correct.

10      A.    I recognized the phrase, I just want to be

11  sure I understood the phrase.  I don't recall.

12      Q.    If you were, where would that document be?

13      A.    In the BRG case file.

14      Q.    Were you provided with any copies of any of

15  the board minutes?

16      A.    I may have been.

17      Q.    As you sit here today, do you recall any of

18  the board minutes that you were provided with copies of?

19      A.    As I said here today, no.

20      Q.    What would you need to do to determine which

21  board minutes you were provided with?

22      A.    Check the case file.

23      Q.    Do you have access to that case file today?

24      A.    No.

25      Q.    What would you have to do to have access to

1    that case file?

2         A.    Make an arrangement with the Berkeley Research

3    Group.

4         Q.    Were you provided with any of the performance

5    reviews of either Phil McHugh or Tim Spence?

6         A.    The performance reviews per se, I don't

7    recall.

8         Q.    Were you provided with any of the employee

9    engagement surveys for Phil McHugh or Tim Spence?

10        A.    I don't recall.

11        Q.    Were you provided with either Mr. McHugh's or

12   Mr. Spence's customer experience surveys?

13        A.    I don't recall.

14        Q.    Were you provided with any of the financial

15   performance for each of the divisions managed by

16   Mr. McHugh and Mr. Spence?

17        A.    I don't recall.

18        Q.    Were you provided with any of the income

19   statements and balance sheets for the divisions

20   specifically managed by Mr. McHugh and Mr. Spence?

21        A.    Right, I don't recall.

22        Q.    What would you have to do to refresh your

23   recollection to determine if these documents were ever

24   provided to you by counsel for your review?

25        A.    Check the case file.

```
 1        Q.   Is it fair to say, based upon the fact that
 2   you don't recall any of these documents, that you did
 3   not rely upon any of these documents with respect to the
 4   opinions that you've rendered in this case?
 5        A.   To use your words, what I think it's fair to
 6   say is what I relied upon is listed in this exhibit
 7   that's on the screen.
 8        Q.   Okay.
 9        A.   And if it's not listed, I didn't rely upon it.
10        Q.   What would you have to do to specifically
11   determine what exhibits you were provided with from the
12   depositions that are listed on Exhibit 1?
13        A.   Check the case file.
14        Q.   And if they are not in the case file, then you
15   were never provided with those documents; is that a fair
16   statement?
17        A.   Presumably, yes.
18        Q.   Who determined what exhibits you would be
19   provided with, with respect to each of the depositions
20   listed on Exhibit 1?
21        A.   Well, as I think I indicated previously, I
22   received the deposition transcripts and -- from counsel.
23   So that would be the source.
24        Q.   Were you ever provided with any drafts of the
25   December 2019 talent deck?
```

1    A.    The December 2019 talent deck?

2    Q.    Correct.

3    A.    Drafts of it?

4    Q.    Correct.

5    A.    I don't think so.

6    Q.    Okay.  What did you do to prepare for today's

7    deposition?

8    A.    I had a Zoom meeting with Mr. DeBeer and

9    Mr. Hart a few days ago.  I reviewed my report.  I

10   reviewed Dr. Burke's report.  Those would be things I

11   did in preparation for today's deposition.

12          Mr. Cioffi was also in that meeting with Mr.

13   DeBeer and Mr. Hart.  I should have mentioned that

14   previously.

15   Q.    Did defense counsel provide you with any

16   assumptions that you were to take with respect to

17   preparing a report in this case?

18   A.    Assumptions?

19   Q.    Yes.

20   A.    No.

21   Q.    None?

22   A.    None.

23   Q.    Take me through the steps you went through to

24   prepare your report.

25   A.    I'm sorry, what was your question?

1    Q.    Take me through the steps that you went

2    through to prepare your report.

3    A.    Oh, take you through the steps?

4    Q.    Yes.

5    A.    Well, I read materials about the matter.  I

6    discussed the matter with counsel.  I discussed the

7    matter with my staff.  I began to put together a bullet

8    point-type outline of what I think I would eventually

9    include in a report and then I would fill in the

10   sections of that report and I would come to a final

11   version of that report and I would then provide it to

12   counsel.  So those would be the steps.

13   Q.    Do you still have your bullet point outline?

14   A.    I don't think that I do.

15   Q.    What would have happened to the bullet point

16   outline?

17   A.    What happens is what happens to any prior

18   draft.  I use one shell and if I have a bullet point,

19   the next time around I now write real sentences around

20   that bullet point and the bullet point goes away.  So

21   that's how I do my reports.

22   Q.    Are any portions of the report written by your

23   staff?

24   A.    No.  I write the report.  It's my name that's

25   on it, not theirs.

1      Q.    Are any portions of your report provided by

2  defense counsel?

3      A.    By defense counsel?

4      Q.    Correct.

5      A.    No.

6      Q.    You were discussing before that you have

7  provided expert testimony in an employment setting with

8  cases involving age discrimination, correct?

9      A.    Yes.

10      Q.    Okay.  Have you provided an expert opinion in

11  a case involving age discrimination in the banking

12  sector?

13      A.    Yes.

14      Q.    Have you provided an expert opinion in a case

15  in which you did a statistical analysis to determine if

16  unlawful age discrimination had occurred in the banking

17  sector?

18      A.    Yes.

19      Q.    Have you rendered an expert opinion in a case

20  involving age discrimination in the banking sector where

21  you determined there was an inference of age

22  discrimination based upon the fact that the average

23  employees at the bank had decreased in the relevant time

24  period but the number of the employees at the bank had

25  increased during that same time period?

```
 1              MR. CIOFFI:  Objection to the form of the
 2         question.  If you can answer, you may.
 3              THE WITNESS:  I'm not sure what the question
 4         was.  It was very long and you can repeat it if you
 5         like, I'll try my best to understand it.
 6    BY MR. SABA:
 7         Q.   Sure.  I'll explain that to you.
 8              You've already indicated that you provided an
 9    expert opinion regarding statistical data analysis in
10    the banking sector.
11              And my specific question is, have you provided
12    an expert opinion that there was an inference of age
13    discrimination where the average age of employees at the
14    bank had decreased in the relevant time period, but the
15    number of employees at the bank had increased?
16              MR. CIOFFI:  Same objection.  Objection to the
17         form.  You may answer if you can.
18              THE WITNESS:  Yes, I'm thinking.
19              MR. CIOFFI:  Take your time.
20              THE WITNESS:  I will.  Yes.
21    BY MR. SABA:
22         Q.   Yes, you have provided that opinion, correct?
23         A.   I believe that I have.
24         Q.   Did you do a statistical analysis of unlawful
25    age discrimination at Fifth Third Bank?
```

```
 1            MR. CIOFFI:  Objection.  Asked and answered.
 2        You've asked that about 45 minutes ago.  You may
 3        answer.
 4            THE WITNESS:  I did not -- the answer is no.
 5   BY MR. SABA:
 6        Q.   Were you asked to do a statistical analysis of
 7   unlawful age discrimination at Fifth Third Bank?
 8            MR. CIOFFI:  Objection.  Asked and answered.
 9        But you may answer again.
10            THE WITNESS:  I was not, and let me just add
11        that unlawful, in my experience, that's not a
12        determination that I make.  I have been asked many
13        times to do an analysis of alleged age
14        discrimination, but lawful, unlawful, that's not
15        for me to make a judgment.
16   BY MR. SABA:
17        Q.   And what is the conclusion you will reach
18   about doing a statistical analysis about age
19   discrimination?
20            MR. CIOFFI:  Objection to the form.  Beyond
21        the scope of Rule 26 in this deposition, but you
22        may answer if you can.
23            THE WITNESS:  It depends on what the findings
24        are.
25
```

```
 1   BY MR. SABA:

 2        Q.   What would the findings have to be to

 3   determine that there was age discrimination?

 4             MR. CIOFFI:  Objection to the form.

 5        Hypothetical.

 6             THE WITNESS:  It is hypothetical for sure.  I

 7        can't answer that question.  I would have to know

 8        the circumstances of a particular matter.

 9   BY MR. SABA:

10        Q.   So with respect to Fifth Third Bank, if the

11   total number of employees had increased by over 6

12   percent during the relevant time period, but the number

13   of employees over -- excuse me, under the age of 40 had

14   increased by 11.45 percent during that same time period,

15   would that be indicative of age discrimination?

16             MR. CIOFFI:  Objection to the form of the

17        question.  He already testified that he has done no

18        statistical analysis at Fifth Third Bank.

19             THE WITNESS:  I can't answer that question.

20   BY MR. SABA:

21        Q.   Why can't you answer that?

22        A.   Because --

23             MR. CIOFFI:  Objection.  Objection.  He said

24        he can't answer it.

25
```

 1    BY MR. SABA:

 2         Q.   Why can't you answer that?

 3         A.   It's incomplete.  I would have to know a lot

 4    more than what you've put in your hypothetical, and I

 5    haven't been asked to do any of that kind of work.  So

 6    that's the basis -- pardon me, let me finish.  That's

 7    the basis of my answer.

 8         Q.   What would you have to know?

 9         A.   For what purpose?

10         Q.   To determine whether or not there had been age

11    discrimination?

12              MR. CIOFFI:  Objection to the form of the

13         question.  He said he can't answer it based on the

14         limited facts you provided him.  Counsel, I'm going

15         to -- I'm not going to instruct him at this point

16         not to answer, but you're way, way far afield of

17         anything that's discoverable under Rule 26 related

18         to his report.  It's beyond the scope of what he's

19         done, but I'm going to allow him to answer one more

20         time.

21    BY MR. SABA:

22         Q.   What would you have to know?

23         A.   The totality of the employment data for the

24    bank or a bank, the hiring patterns, the separations,

25    the time period involved, whether there was any other

1    type of discrimination allegedly that occurred beyond

2    that of age, the tenure of employment, those kinds of

3    things.

4        Q.   Well, you've previously testified and given

5    the opinion that it's a comparison of average age of

6    employees that can determine and the change in that that

7    can determine whether or not there's been age

8    discrimination; isn't that correct?

9            MR. CIOFFI:  Objection to the form of the

10           question.  It's not what he testified to, number

11           one.  And number two, it's beyond the scope of his

12           report.

13           THE WITNESS:  I don't think I did use the

14           phrase "average age."  Beyond that, I have nothing

15           to add really, I don't think.

16           (Plaintiff's Exhibit 2 is marked for

17           identification.)

18   BY MR. SABA:

19       Q.   David, I'm sharing on the screen what will be

20   marked as Exhibit Number 2.  Are you able to identify

21   that for me, please?

22       A.   Yes.  As the title indicates, it says, "Expert

23   Report of David Lewin, Ph.D.," and it's dated October 3

24   of this year, 2025.

25       Q.   And this is the only report that you prepared

Deposition of David Lewin, Ph.D.                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

```
 1    for this case; is that correct?

 2         A.    Yes.

 3         Q.    And your report is a total of 24 pages; is

 4    that correct?

 5         A.    Well, I can't see that on the screen, but I

 6    take -- I can take your representation of it, if you

 7    like.

 8         Q.    Well, my reference is to this area over here.

 9    I don't know if you can see that on your screen.

10         A.    Oh, I can see the number 24, yes.

11         Q.    Okay.  That's what I'm basing that upon.

12         A.    Sure.  I can see that, yes.

13         Q.    Referring you to page 4, paragraph number 16.

14         A.    Yes.

15         Q.    It says, "It is also my opinion that if

16    Mr. McHugh resigned or was not terminated due to age

17    discrimination, his damages are zero"; is that correct?

18         A.    Yes.

19         Q.    And just to be clear, you're not making a

20    determination of whether or not Phil McHugh was

21    terminated because of age discrimination; is that

22    correct?

23         A.    That is correct.

24         Q.    You're just making the determination that if

25    there was no wrongful act taken against him with respect
```

1    to age discrimination, he didn't suffer damages; is that

2    right?

3        A.    Well, I expressed it the way I did in the

4    sentence you read, so yes.

5        Q.    Okay.  Are you an expert on retaliation?

6        A.    Well, I would answer you the same way as I did

7    some other previous questions.  It's within the scope of

8    my labor and employment expertise, and I have testified

9    about retaliation, and I have written about retaliation.

10       Q.    What testimony have you provided regarding

11   retaliation?

12       A.    In this instance, none.

13       Q.    You're saying in this case you were not asked

14   to provide any opinions regarding Mr. McHugh's

15   retaliation claim against Fifth Third Bank and

16   Mr. Carmichael?

17       A.    Correct.

18       Q.    Previously, what expert opinions have you

19   provided regarding retaliation?

20       A.    In matters where the question of job

21   assignments, responses to grievances and related matters

22   were at issue, I examined the evidence that I was

23   provided to determine if there was evidence of

24   retaliation.  That's what I opined about in matters

25   where I had been retained to give an opinion.

1      Q.   What is your understanding of what constitutes

2  retaliation?

3           MR. CIOFFI:  Objection.  Beyond the scope of

4       his opinion and this deposition.  I'm going to

5       allow him to answer.

6           THE WITNESS:  It's when, for example, an

7       employer takes action against an individual for

8       raising a complaint.  And in the field of

9       marketing, where I have colleagues, if a customer

10      raises a complaint and the company retaliates

11      against that customer by cutting them off, that is

12      considered a form of -- an example of retaliation.

13  BY MR. SABA:

14      Q.   Have you written any articles or journals

15  about retaliation?

16      A.   Several.

17      Q.   In any of these several articles or journals,

18  have you ever advised an employer that they should file

19  a counterclaim against an employee that brings a

20  discrimination claim?

21      A.   No.

22          MR. CIOFFI:  Object.  Objection to the form of

23      the question.  Those facts are not the facts of

24      this case, and it's totally irrelevant.

25          THE WITNESS:  My answer was no.

1   BY MR. SABA:

2       Q.   I heard your answer.  Why haven't you given

3   that advice before?

4           MR. CIOFFI:  Objection.  Totally hypothetical,

5       and has nothing to do with this case and beyond the

6       scope of his opinion.  Counsel, could you ask

7       something that's relevant to this case?

8           Go ahead, you can answer it one more time.

9           THE WITNESS:  I don't attempt to substitute my

10      judgment for that of the parties involved in a

11      matter.  That's not what expert opinion is about,

12      okay?  I wasn't retained in cases where I have been

13      retained to provide that advice and I wouldn't

14      accept it if I was.  I'm not doing that sort of

15      work.

16  BY MR. SABA:

17      Q.   Have you calculated any of the damages that

18  Phil McHugh has suffered as a result of his retaliation

19  claim?

20          MR. CIOFFI:  Objection to the form of the

21      question.  If you can answer, you may answer.

22          THE WITNESS:  No.

23  BY MR. SABA:

24      Q.   Is that within your area of expertise?

25      A.   If I was asked to render an opinion, I would

1   attempt to do it.

2        Q.   Well, my question wasn't whether or not you'd

3   attempt to render an opinion.  My question is, is that

4   within your area of expertise?

5        A.   Calculating damages is within my area of

6   expertise.

7        Q.   And are you able to calculate damages that

8   somebody has suffered as a result of a retaliation

9   claim?

10       A.   I can't answer that in the abstract.  It

11  depends on the context and the specifics and other

12  factors.

13       Q.   Were you aware that Phil McHugh had raised a

14  retaliation claim against the defendants?

15       A.   I believe I was.

16       Q.   What is your understanding of that claim?

17            MR. CIOFFI:  Objection, counsel.  It's beyond

18       the scope.  He said he wasn't retained to render

19       any opinion with respect to that claim.

20            THE WITNESS:  I don't have an opinion about

21       it.

22  BY MR. SABA:

23       Q.   I'm now referring you to page 7 of your

24  report, paragraph 17, and it's titled, "The Burke

25  Report's Improper Assumptions."  And paragraph 17 reads,

1   "The Burke report defines the damages period as

2   approximately 12 years, spanning from Mr. McHugh's

3   resignation on October 26, 2020, through August 2, 2032,

4   when Mr. McHugh would be 68 years old."

5           Do you see that?

6       A.   Yes.

7       Q.   And you wrote that opinion; is that correct?

8       A.   Yes.

9       Q.   First with respect to your reference of

10  Mr. McHugh's resignation, did you -- have you determined

11  whether or not Mr. McHugh was constructively discharged?

12      A.   I have not made that determination.

13      Q.   Were you provided with information that would

14  make you -- give you the ability to make that

15  determination?

16          MR. CIOFFI:  Objection, counsel.  He's

17      answered the question that he wasn't asked to do

18      it.  Go ahead, you may answer.

19          THE WITNESS:  What was the question?

20  BY MR. SABA:

21      Q.   The question was whether or not you were

22  provided with adequate information for you to be able to

23  make a determination whether or not Mr. McHugh was

24  wrongfully discharged, constructively discharged?

25  Excuse me.

```
 1        A.    I don't know.  I wasn't asked to opine about

 2    that.

 3        Q.    Going back to your sentence in paragraph 17 on

 4    page 7 of your report, what about Mr. Burke's assumption

 5    is improper?

 6        A.    Well, I think you've got to read the

 7    subsequent paragraphs.  Paragraph 17 is a summary

 8    statement.

 9        Q.    Okay.  Well, that's what I'm asking.  What

10    about it is improper?  Why is that improper?

11        A.    With respect, read paragraph 18.  It says --

12    it spells it out.

13        Q.    Okay.  Then let's go through that.

14              "The Burke report's estimate relies on the

15    assumption that, one, Mr. McHugh would have been

16    promoted to president of Fifth Third."

17              And what about that assumption is improper?

18        A.    Counsel, with respect, there are half a dozen

19    items listed in that paragraph.  It's a summary

20    paragraph, and I'm saying that it's the Burke report

21    that makes these assumptions, and I believe they are

22    improper based on everything I have considered in my

23    retention as an expert in this matter.

24        Q.    And that's why I'm asking you why is that

25    improper?  Why is that an improper assumption that
```

 1    Mr. Burke makes?

 2         A.   It's improper because there is no evidence

 3    that I saw that Mr. McHugh was going to be promoted to

 4    president of Fifth Third.  Mr. Burke just takes that as

 5    a given.

 6         Q.   And to be clear, you didn't review all the

 7    evidence in this case, did you?

 8         A.   All the evidence?  No.

 9         Q.   Yes?  Correct?  David?

10         A.   Yes, is there a question pending?

11         Q.   Yeah, there was.  My question was, to be fair,

12    you said you didn't see any evidence of age

13    discrimination against Mr. McHugh.  And my question was,

14    you did not review all the evidence in this case; isn't

15    that correct?

16         MR. CIOFFI:  Objection.  Misstates his prior

17         testimony.  If you can answer, you may.

18         THE WITNESS:  I thought you asked me have I

19         seen all of the evidence in this matter, and I

20         think the answer that I gave to that was no.

21    BY MR. SABA:

22         Q.   Okay.  In fact, the vast majority of the

23    evidence in this case you have not seen; isn't that

24    right?

25         MR. CIOFFI:  Objection to the form of the

```
 1        question.  There is no foundation as to what the
 2        universe of evidence is or that he knows what it
 3        is.  So how could he answer that question?  You may
 4        try.
 5             THE WITNESS:  I can't, other than to say I do
 6        not know.
 7   BY MR. SABA:
 8        Q.   You've also indicated you were not retained to
 9   make a determination of whether or not Mr. McHugh was
10   the victim of age discrimination; is that correct?
11        A.   I believe you asked me that before and I think
12   I said that is correct.
13        Q.   Okay.  And you understand that Mr. Burke was
14   asked to provide a calculation of the work-life
15   expectancy for Mr. McHugh, assuming that he would
16   prevail on his age discrimination claim; isn't that
17   right?
18        A.   I don't believe that is quite right, Counsel.
19   I think Mr. Burke -- or Dr. Burke, to be fair to him --
20   didn't calculate a work-life expectancy.  He used one
21   which would result in Mr. McHugh working until age 68,
22   but he didn't himself, I think, come up with that
23   number.
24             And his calculation wasn't of that number.
25   His calculation was of the total damages he believes
```

Deposition of David Lewin, Ph.D.                    Philip R. McHugh v. Fifth Third Bancorp, et al.

 1   Mr. McHugh is owed.  That's my reading of the Burke or

 2   my recollection from reading the Burke report.

 3        Q.    That's your interpretation of it?

 4        A.    It is not my interpretation.  I'm not

 5   interpreting anything.  I'm giving you my best

 6   recollection of what it is that Mr. Burke did.

 7        Q.    Going back to your paragraph 18, item number

 8   2, "Mr. McHugh's performance as president would have

 9   been successful and led to a subsequent promotion to

10   CEO."

11        Why is that an improper assumption?

12        A.    Because it is an assumption.  I don't think

13   there's evidence to support that.  Mr. Burke or

14   Dr. Burke chooses to make that assumption, and I think

15   it's an improper assumption.

16        Q.    What is the basis for your opinion that there

17   is not evidence to support that assumption?

18        A.    My recollection of some of the deposition

19   transcripts in which board members indicated that

20   Mr. McHugh was not considered to be -- for president or

21   CEO.  Other documents in the case, that's what my

22   recollection is, and I think that Dr. Burke just passes

23   over that.  And, therefore, makes this assumption, which

24   I think is improper.

25        Q.    And once again, your review is based upon a

Deposition of David Lewin, Ph.D.                     Philip R. McHugh v. Fifth Third Bancorp, et al.

```
 1   very limited review of the total number of depositions
 2   and exhibits and evidence in this case; isn't that
 3   correct?
 4            MR. CIOFFI:  Objection, Counsel.  Misstates
 5        his testimony.  His opinion is based on his review
 6        of Dr. Burke's opinion, which is what he just said,
 7        but you're trying to mischaracterize it.
 8            MR. SABA:  That's not what he said.
 9            MR. CIOFFI:  You may answer the question
10        again.
11            THE WITNESS:  I would not concur with the
12        phrase "very limited."  I have said I relied upon
13        documents that were provided to me.  I just gave
14        you an example of testimony from a couple board
15        members about this matter of whether Mr. McHugh
16        would have been promoted or not, that's what I'm
17        saying.  And I am, you understand, rebutting
18        Dr. Burke.
19   BY MR. SABA:
20        Q.  Going back to your comment that you don't
21   think it's a limited review, you don't know how limited
22   your review is because you haven't seen 17 of the
23   depositions in this case and you have not seen the vast
24   majority of documents in this case?
25        A.  I don't know that to be true, and I am a
```

 1   rebuttal witness to Dr. Burke.

 2        Q.   Correct.  And you're trying to render an

 3   opinion based upon what you've reviewed.  You've made a

 4   determination that Mr. McHugh would not have been

 5   successful in becoming the CEO if he became president of

 6   Fifth Third Bank; is that correct?

 7        A.   No.

 8        Q.   Then what's the basis of your criticism of

 9   that assumption by Mr. Burke?

10        A.   Because it's Mr. Burke that is making that

11   assumption, Counsel, it's not me who is making that

12   assumption.

13        Q.   And as you sit here today, you can't say

14   whether or not that assumption is correct; isn't that

15   right?

16        A.   An assumption is an assumption.  I have

17   already said to you it's Dr. Burke who made that

18   assumption, and I think it's improper to make that

19   assumption along with several others.

20        Q.   And your opinion that it's improper is just

21   based upon what you've reviewed, correct?

22        A.   It would be based on what I have reviewed.  I

23   think that is correct.

24             MR. CIOFFI:  Counsel, we've been going almost

25        an hour and a half or so.  When you finish this

```
 1        line of questioning, let's take a break.

 2             MR. SABA:  Oh, we can take a break right now,

 3        that's fine.

 4             MR. CIOFFI:  Do you know how much more you

 5        have?  Counsel?

 6             MR. SABA:  I would say I have a few more

 7        hours.

 8             MR. CIOFFI:  Are you sure?  Because it's been

 9        pretty redundant so far.  But maybe you can check

10        your notes during this break.  Why don't we take a

11        15-minute break and come back.

12             MR. SABA:  That's fine.

13             THE VIDEOGRAPHER:  The time is 2:24 p.m.  We

14        are off the record.

15             (A recess was taken from 2:24 p.m. to

16             2:38 p.m.)

17             THE VIDEOGRAPHER:  The time is 2:38.  We are

18        on the record.

19   BY MR. SABA:

20        Q.   Referring back, David, to paragraph 18 of your

21   report, which is marked as Exhibit Number 2, on page 7,

22   and specifically, I believe we are on paragraph 3,

23   "Mr. McHugh's promotions and earnings would have

24   mirrored those of Mr. Timothy Spence during his tenure

25   as president and then CEO."
```

Deposition of David Lewin, Ph.D.                    Philip R. McHugh v. Fifth Third Bancorp, et al.

1          What is improper about that assumption by

2     Dr. Burke?

3          A.   He's merely assuming it.  That's what I

4     believe is improper about it.

5          Q.   Why is it improper for him to assume that?

6          A.   Because you can't simply say that this person

7     would have the exact same compensation as another person

8     who held that position.  I say it later in my report and

9     show that there is a wide variation in the terms of

10    compensation for both Mr. McHugh and Mr. Spence.  So I

11    think that Dr. Burke's assumption is improper.

12         Q.   But the analysis of what somebody would earn

13    as the president and CEO of Fifth Third Bank, that's

14    based on that position, correct?

15         A.   You'd have to ask the bank about that.  In

16    general, the position matters when it comes to

17    determining compensation.

18         Q.   If you were determining whether or not

19    compensation would be reasonable for a role of president

20    and CEO of a Fortune 500 bank, you would look at other

21    Fortune 500 banks, wouldn't you?

22              MR. CIOFFI:  Objection to the form of the

23         question.  You may answer if you can.

24              THE WITNESS:  I can.  I well might do so.

25

```
 1   BY MR. SABA:

 2       Q.   So is it your opinion that it would be more

 3   appropriate then to use the median income of Fortune 500

 4   bank CEOs to determine what a president and CEO of Fifth

 5   Third Bank would earn during the relevant period of 2022

 6   to 2025?

 7       A.   I have not rendered that opinion.  I was not

 8   asked to render that opinion, and I'm not rendering that

 9   opinion.

10       Q.   But you've previously testified that the

11   empirical evidence shows that the size is the single

12   strongest correlate of executive compensation in U.S.

13   companies, public and private, correct?

14       A.   Yes.

15       Q.   So the best indication of what someone at a

16   particular size company, in this case a particular size

17   bank, would be what they're paying at comparably sized

18   banks to the CEO and president; isn't that right?

19           MR. CIOFFI:  Objection to the form of the

20       question.

21           THE WITNESS:  It's possible.  I wouldn't

22       characterize it as right or wrong.  It's possible.

23   BY MR. SABA:

24       Q.   And if that analysis indicated that the role

25   of president and CEO at Fifth Third Bank could very well
```

 1 earn far more than what Mr. Spence was paid, then those

 2 could be even greater damages that what would be

 3 indicated; isn't that right?

 4     MR. CIOFFI: Objection to the form of the

 5   question.

 6     THE WITNESS: That hypothetical went beyond

 7   me. There's nothing right or wrong about

 8   determining what other companies are paying. So

 9   maybe I just don't understand your question.

10 BY MR. SABA:

11   Q. Let me ask you this. Are you aware, as you

12 sit here today, what the median total compensation is

13 for CEOs in the financial services industry in 2024?

14   A. No. I would have to look that up.

15   Q. Okay. And that's something you could just

16 readily look up and that would be available; isn't that

17 right?

18   A. One could readily look it up, yes, but whether

19 that information is complete and, therefore, reliable,

20 is a different matter.

21   Q. Okay. But going back again, by looking up

22 what the median total compensation would be for a CEO of

23 a Fortune 500 financial services industry company, you

24 would be able to determine whether or not that's

25 reasonable compensation for a president and CEO of Fifth

Deposition of David Lewin, Ph.D.                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

```
 1   Third Bank as a Fortune 500 financial services company?
 2           MR. CIOFFI:  Objection to the form of the
 3       question.
 4           THE WITNESS:  I can't really give you an
 5       answer to that, counsel.  If one wants to determine
 6       reasonableness -- you used the word "reasonable"
 7       and you used it in the prior question -- I can't
 8       tell you because I testified about this, that
 9       reasonable can be a one-factor criterion such as
10       would I invest in this company, any company, any
11       bank or any other company, knowing what say the CEO
12       is making?  That has been taken, including by
13       courts, I happen to know this, as a test of
14       reasonableness.
15           At the other extreme are 9 and 12-factor
16       criteria for determining reasonableness, including
17       size of company, location of company, range of
18       services of the company, tenure of executives of
19       the company.  So reasonable is a difficult and
20       tricky matter.  It doesn't lend itself to an easy
21       yes or no answer.
22   BY MR. SABA:
23       Q.   Going back to Fifth Third Bank specifically,
24   Mr. McHugh, Mr. Spence, as you sit here today, you can't
25   say that if Mr. McHugh was made the president and CEO of
```

```
 1   Fifth Third Bank back in 2022 that he wouldn't have made
 2   more than Mr. Spence; isn't that right?
 3           MR. CIOFFI:  Objection to the form of the
 4       question.  Counsel, it's confusing.  Are you --
 5       what aspect of the compensation are you talking
 6       about?  Are you talking about equity?  Are you
 7       talking about base compensation?  Are you talking
 8       about --
 9           MR. SABA:  We're talking about total
10       compensation.  Go ahead, David.
11           MR. CIOFFI:  Well, if you're able to answer
12       the question, you may.
13           THE WITNESS:  Well, did you just say,
14       Mr. Saba, in response to Mr. Cioffi, did you say
15       total compensation?
16           MR. SABA:  Correct.
17           THE WITNESS:  Well, I am not making a
18       determination of anybody's actual compensation,
19       total or otherwise, in this matter.  So I think the
20       answer is no.
21   BY MR. SABA:
22       Q.   No, you can't say one way or another; is that
23   right?
24       A.   Can't say one way or another about what?
25       Q.   Whether or not Mr. McHugh, if he was appointed
```

1    to president and CEO of Fifth Third Bank in 2022 would

2    have earned more total compensation than Mr. Spence --

3         A.    I cannot say that.

4         Q.    -- as president and CEO?

5         A.    I cannot say that.  It's the board's

6    determination of compensation for executives.  I'm not

7    making such a determination.

8         Q.    I know you're not making a determination, but

9    you couldn't say whether or not he would have earned

10   more than Mr. Spence or earned less than Mr. Spence;

11   isn't that right?

12        A.    I am not saying anything about that.

13        Q.    Isn't the best determination of what would

14   have been paid what Fifth Third actually paid in this

15   situation?

16        A.    What's the question?  I don't understand.

17             MR. CIOFFI:  Objection to the form of the

18        question.  Paid -- paid to who?

19             MR. SABA:  Sure, I'll rephrase the question.

20   BY MR. SABA:

21        Q.    Isn't the best determination of what Fifth

22   Third would have paid a president and CEO from 2022 up

23   through the current date, 2025, the actual amounts that

24   they paid their president and CEO during that time

25   period?

```
 1              MR. CIOFFI:  Objection to the form.
 2              THE WITNESS:  I don't understand the question.
 3         Are you asking me if they paid what they paid, is
 4         that what you're asking me?  Do they pay what they
 5         paid to the people who held those positions?  They
 6         did.  And I said before, that's board decisions to
 7         make.  I don't have anything to add to that.
 8    BY MR. SABA:
 9         Q.   Let me rephrase my question for you to help
10    you understand what I'm asking you.
11              With respect to what Mr. McHugh may have
12    earned if he were appointed president and CEO in 2022,
13    the best way to determine that is what Fifth Third
14    actually paid to its president and CEO from 2022 through
15    2025?
16         A.   I have no opinion about that.
17         Q.   Why is that?
18         A.   Because I have no opinion about it.  You asked
19    about a best way.  I'm not substituting my judgment for
20    that of the board, so I have nothing to add.
21         Q.   So you would defer to the judgment of the
22    board of what to pay the president and CEO during those
23    years, correct?
24         A.   I am saying that is the -- one of the
25    functions of a board of directors.
```

1      Q.    Your fourth assumption -- excuse me, the

2    fourth assumption that you're critical of, as set forth

3    in paragraph 18, page 7, is that "Mr. McHugh would

4    retain the roles of president and CEO, and continue to

5    earn substantial compensation in line with Mr. Spence's

6    earnings, until Mr. McHugh reached the retirement age of

7    an average working American"; do you see that?

8      A.    I do.

9      Q.    Why is that an improper assumption?

10      A.    My understanding is that Mr. McHugh was

11    offered a position to return to the head of consumer

12    banking.  He didn't want that.  He's not an "average

13    working American," so I don't know why Mr. Burke or

14    Dr. Burke would have offered this as part of his

15    opinion, but I say I believe it is improper, the

16    assumption is improper.

17      Q.    Are you saying the assumption that he would

18    retain the role of president and CEO until he reached

19    retirement age is improper because they failed to give

20    him the role of president and CEO?

21      A.    I'm not saying anything beyond what I have

22    said here.  It's Dr. Burke who is assuming that

23    Mr. McHugh would have retained the roles of president

24    and CEO, continue to earn substantial compensation in

25    line with Mr. Spence's earnings, and do so until

1   Mr. McHugh reached the retirement age of an average

2   working American.  That multicomponent assumption is, in

3   my view, improper.

4          Q.   Okay.  And I asked you why and you said

5   because he was offered a consumer banking role.  Is that

6   the basis for why that's improper?

7          A.   No.  I was simply recalling it as a point that

8   I remembered from the materials that I read.

9          Q.   Does that have anything to do with why you

10  think that assumption number 4 is improper?

11         A.   Well, it's Dr. Burke who is assuming that

12  Mr. McHugh would remain president and then CEO of the

13  bank.  I just think that's an improper assumption.  I

14  don't think there's a basis for it.

15         Q.   And what is the basis for saying that that's

16  improper?

17              MR. CIOFFI:  Objection.  Asked and answered.

18              THE WITNESS:  I am a rebuttal witness.  I've

19       given you my answer.  I stand by my answer.

20  BY MR. SABA:

21         Q.   You do understand that this is an age

22  discrimination, failure to promote case; is that right?

23         A.   It's my understanding that that's the

24  allegation.

25         Q.   Have you ever provided testimony, expert

1    testimony, in an age discrimination, failure to promote

2    case?

3              MR. CIOFFI:  Objection to the form of the

4         question.

5              THE WITNESS:  I believe that I have.

6    BY MR. SABA:

7         Q.   Okay.  Have you ever provided expert testimony

8    regarding damage calculations in a failure -- in an age

9    discrimination, failure to promote case?

10        A.   I believe I have.

11        Q.   Okay.  Have you ever done -- have you ever

12   provided expert testimony on behalf of the plaintiff in

13   an age discrimination, failure to promote case?

14        A.   I believe that I have.

15        Q.   Do you have an understanding that the

16   calculation of damages in an age discrimination, failure

17   to promote case requires the assumption of what would

18   the plaintiff have received if they were actually given

19   the promotion that they claim that they were denied as a

20   result of the discrimination?

21        A.   Yes.

22        Q.   Have you done that calculation before?

23        A.   In other matters, yes.

24        Q.   And in those other matters, you would make the

25   assumption that the plaintiff actually received the

1   position in order to calculate their damages; isn't that

2   right?

3        A.   I didn't make an assumption.  I took what the

4   data in any particular matter I had showed me where the

5   compensation rates for various positions, and I used

6   those rates.

7        Q.   Assumption number 5, you indicate "Mr. McHugh

8   sufficiently mitigated his alleged damages by obtaining

9   employment outside the banking sector, at a fraction of

10  his prior earnings or desired compensation as Fifth

11  Third's president and CEO, and without any evidence that

12  Mr. McHugh performed an extensive or intensive job

13  search."

14        What about that fifth listed assumption is

15  improper?

16        A.   The whole thing.

17        Q.   And why is that?

18        A.   Because Dr. Burke did not do a mitigation

19  analysis.  It isn't that he did one and I disagree with

20  it.  He didn't do one.  So, therefore, he is, in my

21  opinion, unable to authoritatively render an opinion

22  about mitigation in this particular case.

23        His assumption is highly improper.

24        Q.   Dr. Burke did do a calculation of the total

25  earnings earned by Mr. McHugh in his position at CISE;

1    isn't that correct?

2         A.   He did that.  That is not mitigation.

3         Q.   Why isn't that mitigation?

4         A.   It's an offset, comparing one number to

5    another.  He did not -- he, Dr. Burke, did not analyze

6    what, if any, Mr. McHugh did to search the labor market

7    for a position in the banking sector or in any other

8    sector at any level.  He simply didn't do that work.

9              So I don't believe that Dr. Burke can -- and

10   I'll repeat it -- authoritatively opine about mitigation

11   in this matter.  Doing a calculation of what somebody

12   received going to another position somewhere else is not

13   a mitigation analysis.

14        Q.   What is your understanding of the mitigation

15   efforts that Mr. McHugh took on in this particular case?

16        A.   I don't know what they are because I do not

17   recall having information about that.  That's a question

18   for Mr. McHugh, or Dr. Burke, for that matter.

19        Q.   Were you provided with a copy of Mr. McHugh's

20   deposition?  You indicated you were.

21        A.   I was.

22        Q.   Did you review any of that testimony regarding

23   any of his mitigation efforts?

24        A.   I think that I did, but my report is not about

25   him.  It is a rebuttal report to Dr. Burke, and it's

1  Dr. Burke who limits what he says about mitigation to

2  saying oh, this is what Mr. McHugh earned when he went

3  to this other organization, a non-profit organization.

4  I don't consider that a mitigation analysis.

5       Q.   Well, if that is the best job that Mr. McHugh

6  was able to obtain regarding after reasonable mitigation

7  efforts, then that would be a proper calculation of his

8  mitigation; isn't that correct?

9       A.   But I don't believe that Dr. Burke, as an

10  expert, has sufficiently analyzed the mitigation.  That

11  is the point that I'm making here.

12      Q.   But if the facts properly support that that is

13  the total mitigation and reasonable mitigation that

14  Mr. McHugh is able to obtain, then those calculations

15  are correct; isn't that right?

16      A.   I'm not arguing the calculation.  I'm arguing

17  about the assumption that Dr. Burke has made here, and I

18  will repeat that answer if you'd like, but that is my

19  critique of this particular assumption.

20      Q.   Well, let me rephrase my question then.

21           The assumption is correct if Mr. McHugh's

22  mitigation efforts were reasonable and the best job he

23  was able to obtain was the employment with CISE?

24      A.   I am not opining about reasonableness.  I'm

25  not opining about best job or not best job.  I'm simply

1    opining about what I believe is the assumption that

2    Dr. Burke made here.

3         Q.   You have an understanding of what Mr. McHugh's

4    obligation was with respect to mitigation?

5         A.   Mr. McHugh --

6              MR. CIOFFI:  Object to the form of the

7         question.

8              THE WITNESS:  Mr. McHugh's obligation?  I

9         don't understand your question.

10   BY MR. SABA:

11        Q.   Okay.  What is your understanding of what

12   "mitigation" means?

13        A.   I thought I answered this before, and I

14   defined it in the -- in my report.  And, for example,

15   discussed the well-known concepts of labor economics of

16   extensive and intensive margins of search.

17             It refers to have you looked for another

18   position or positions?  How extensively did you look?

19   For how long did you look?  What particular steps did

20   you take to look?  If you're an executive, did you

21   retain a search firm or a headhunter?  And you could do

22   that extensively, geographically, or you could do it

23   intensively in a local or regional labor market.

24             Those are the analytical underpinnings of

25   mitigation, okay?  And as I point out in that number 5

Deposition of David Lewin, Ph.D.                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

```
 1   that you read, there's nothing that Dr. Burke did that
 2   even approached the kind of mitigation analysis I just
 3   described to you.
 4        Q.   As you sit here today, are you able to say how
 5   Mr. McHugh looked for additional employment?
 6        A.   I am not.
 7        Q.   Are you able to say how extensively he looked?
 8        A.   I am not.
 9        Q.   Are you able to say whether or not he retained
10   a headhunter or recruiter to help him look?
11        A.   I am not.  I'm not commenting on Mr. McHugh.
12        Q.   Are you commenting upon whether or not
13   Mr. McHugh's employment with CISE was the best
14   employment he was able to obtain?
15        A.   Same answer, I'm not commenting on Mr. McHugh.
16        Q.   As you sit here today, you can't say whether
17   or not Mr. McHugh properly mitigated his damages, can
18   you?
19             MR. CIOFFI:  Objection to the form of the
20        question.  He's already answered it.
21             THE WITNESS:  I'm not commenting on
22        Mr. McHugh's mitigation efforts or lack thereof.
23   BY MR. SABA:
24        Q.   Okay.  So you can't give an opinion one way or
25   another regarding that; is that right?
```

1        A.   I am giving you my opinions as a rebuttal

2   expert to Dr. Burke.

3        Q.   Okay.

4        A.   That is correct.

5        Q.   Okay.  But you're not giving an opinion as to

6   whether or not Mr. McHugh properly mitigated his

7   damages, correct?

8             MR. CIOFFI:  Counsel, asked and answered.  You

9        don't have to keep repeating your questions three

10       or four times.

11            THE WITNESS:  I haven't given that opinion and

12       I don't intend to.

13  BY MR. SABA:

14       Q.   The next assumption that's listed there on

15  page 7 under paragraph 18 is, "It is appropriate to

16  calculate present value of Mr. McHugh's economic losses

17  by applying a tiered discount rate structure based on

18  daily treasury real yield curve rates as of September

19  20, 2025"; is that correct?

20       A.   You've read it correctly, yes.

21       Q.   Okay.  And are you aware that during

22  Dr. Burke's deposition, he indicated that the

23  September 20 of 2025 date was a typo and the rate he

24  actually provided was from July 2025?

25       A.   I believe I heard that recently because I

1   believe Dr. Burke's deposition was very recent, at least

2   I think I have heard that.

3       Q.   Okay.  So I want to ask you again, but reading

4   that as July 20, 2025, is that still an improper

5   assumption?

6       A.   Well, it's an assumption that Dr. Burke makes,

7   irrespective of the dates.  I believe it is not

8   appropriate.

9       Q.   And why is that?

10      A.   Because a treasury rate or a T bill rate is a

11  riskless rate.  The treasury itself defines treasury

12  rates as riskless rates.  That's why they're usually

13  lower than other rates, okay?  Mr. McHugh was in the

14  banking business.  He was in positions where risk is

15  part of everyday life, as I understand banking, based on

16  my exposure to it and experience with it.

17          So I would expect an expert such as Dr. Burke

18  to use -- not use a risk-free rate or a riskless rate,

19  but instead to use a rate that carries some risk.  A

20  very good example of that is the Standard & Poor's rate

21  of change over short or long periods of time.  And as I

22  point out in my, later in this report of mine, if one

23  takes the Standard & Poor's rates of change of increase

24  since what was it, 1957, that's 6.68 percent per year,

25  okay?  It's not 1.27 per year.

1          And I think -- and there are other rates that

2    could be used.  When one uses the lowest rate possible

3    to discount, it increases the present value, or in other

4    words, the net damages calculation.  If one uses a

5    higher rate, not necessarily the highest, but a higher

6    rate, it reduces the net present value and hence the

7    estimated damages.  That's what happens in these kinds

8    of circumstances.

9          So Dr. Burke could have provided a range of

10   discount rates, but he chose to use, as he says, the T

11   bill rate.

12      Q.   Correct.  He uses the rate of interest that

13   would be earned on the best and safest investments;

14   isn't that right?

15      A.   You can put it that way, yes.

16      Q.   And are you aware that the US Supreme Court

17   has determined that the discount rate used when

18   calculating income streams for employees should be based

19   upon the best and safest investments; isn't that right?

20          MR. CIOFFI:  Objection to the form of the

21      question.

22          THE WITNESS:  I'm not opining about the

23      supreme court.  I'm opining about Dr. Burke.

24   BY MR. SABA:

25      Q.   So in your opinion, Dr. Burke should ignore

Deposition of David Lewin, Ph.D.                    Philip R. McHugh v. Fifth Third Bancorp, et al.

1    the instructions of the US Supreme Court when

2    calculating the present value of an income stream for an

3    employee?

4            MR. CIOFFI:  Objection to the form of the

5        question.

6            THE WITNESS:  I'm not saying that at all.

7    BY MR. SABA:

8        Q.   Are you aware that the supreme court has

9    rendered that decision with the proper method for how to

10   calculate the present value of an income stream and the

11   discount rate that should be used?

12           MR. CIOFFI:  Objection to the form of the

13       question.  Misrepresents the supreme court's

14       holding.  And, Counsel, you're testifying and

15       arguing with the witness.

16           THE WITNESS:  I don't recall it.

17   BY MR. SABA:

18       Q.   Are you aware of any treatise and literature,

19   any court decisions, supreme court or otherwise, that

20   indicate that the best and safest investments and the

21   rate associated with those should not be used when

22   calculating the present value of an income stream?

23       A.   I have nothing to add beyond what I've said to

24   this point.

25       Q.   You can't -- you can't direct me to any

1    treatise, any reference, any authoritative article

2    regarding that?

3         A.    Correct.

4         Q.    Referring you to page 8 of your report,

5    paragraph 20, you indicate, "Multiple deposition

6    testimonies given in this case and related documents

7    consistently indicate that Fifth Third's board of

8    directors -- those who were responsible for selecting

9    the president and CEO -- never considered Mr. McHugh for

10   either role, directly contradicting the Burke report's

11   assumption that Mr. McHugh would have been considered

12   for, selected for, and served in such roles and retained

13   them for nearly 12 years."

14           Is that correct?

15        A.    Yes.

16        Q.    You only reviewed -- you were only provided

17   with four director's depositions; isn't that right?

18        A.    That could be right.

19        Q.    Just confirm.  Mr. Williams, Mr. Carmichael,

20   Mr. Akins, and Mr. Brumback.  You were not provided with

21   and therefore did not review the depositions of any of

22   the other board members; is that correct?

23        A.    If it's not listed --

24           MR. CIOFFI:  Objection to the form of the

25        question.  His report speaks for itself.  It does

```
 1        reference other depositions.

 2   BY MR. SABA:

 3        Q.   Well, just to be clear, you didn't review any

 4   other depositions; is that right?

 5        A.   What I reviewed is listed on what you've

 6   labeled Exhibit 1 previously.

 7        Q.   Okay.  So the multiple depositions you

 8   referenced are limited to those four depositions which

 9   you didn't review all of those; isn't that right?

10        A.   You asked me about this before.  I read parts

11   of those.  My staff read parts of those.  There are four

12   depositions.  That's why it says multiple deposition

13   testimonies.  It's in plain English.

14        Q.   Referring you down to paragraphs 21 and 22,

15   you make a number of footnote references in your report,

16   all to the deposition of Marsha Williams.  Who would

17   have provided you with those list of citations to the

18   deposition of Marsha Williams?

19        A.   They were in the pages indicated in her

20   deposition transcript.

21        Q.   Did you separately determine that you would be

22   citing those specific references or did somebody else on

23   your staff or defense counsel provide them to you?

24        A.   My staff member, Ms. Kim, assisted me in

25   preparing these footnote citations.
```

Deposition of David Lewin, Ph.D.                    Philip R. McHugh v. Fifth Third Bancorp, et al.

1      Q.    Had you previously reviewed these portions of

2   Marsha Williams' deposition or did she?

3      A.    I believe both of us did.

4      Q.    Referring to what is identified on the right

5   as page 9 and paragraphs 23 and 24, again, these are all

6   citations from Marsha Williams' deposition; is that

7   correct?

8      A.    What you're seeing there, down at the bottom

9   of page 7, the first three are, yes, is the answer to

10  your question.  And so is the fifth one, citation on

11  that page.

12     Q.    Okay.  Referring to paragraph 29, it reads,

13  "Mr. McHugh was viewed, at best, as a potential interim

14  CEO candidate for a limited term in the event of an

15  emergency.  In the December 17, 2019 Human Capital

16  and Executive Talent Management and Succession Plan

17  update, only Mr. Spence's and Mr. Lamb's talent cards

18  identified them as 'high potential,' while Mr. McHugh's

19  talent card indicated 'moderate potential,' a view with

20  which the board unanimously agreed."

21           Do you see that?

22     A.    I do.

23     Q.    Does that refresh your recollection of whether

24  or not you received and reviewed the December 17, 2019

25  Human Capital and Executive Talent Management and

 1   Succession Plan Update?

 2        A.   Well, it looks like I did receive it.

 3        Q.   Or was that just based on deposition

 4   testimony?

 5        A.   Or let me put it this way -- you can see --

 6   what is that, footnote 31?  I am there quoting the

 7   deposition of Mr. Carmichael, volume 1, okay?  So that's

 8   my source for that particular sentence.

 9        Q.   Were you aware that Mr. Spence and Mr. Lamb,

10   that what they're referring to there as -- as members of

11   the enterprise committee, they were the only ones

12   identified with high potential; do you understand that?

13        A.   Well, that's what I think it says right there.

14        Q.   Okay.  And were you also aware that Mr. Spence

15   and Mr. Lamb were not only the two youngest members of

16   the enterprise committee, but they were substantially

17   younger than all other members of the enterprise

18   committee?

19             MR. CIOFFI:  Objection to the form of the

20        question.  It assumes facts not in evidence and not

21        accurate.  But if you can answer, you may answer.

22             THE WITNESS:  I don't recall their ages,

23        Counsel.

24   BY MR. SABA:

25        Q.   Were you aware that the earlier versions of

1    the December 2019 Human Capital and Executive Management

2    Succession Plan Update listed Mr. McHugh as having high

3    potential and Mr. Spence as having moderate potential?

4         A.    No, I don't recall.

5         Q.    Were you aware that earlier versions of the

6    December 17, 2019 Human Capital and Executive Talent

7    Management and Succession Plan Update listed Mr. McHugh

8    as the next potential CEO, as opposed to -- and

9    president -- as opposed to Mr. Spence?

10         A.    Same answer, I don't recall.

11         Q.    On page 16, in paragraph 49, you are

12    discussing Mr. McHugh's mitigation efforts.  And you put

13    in, "For example, imagine a professional football player

14    who has spent his entire career perfecting his game on

15    the field.  One day, he becomes a free agent.  But

16    instead of negotiating on the open market with football

17    teams, he decides to switch paths and become a

18    basketball coach."

19              Do you see that example?

20         A.    I do.

21         Q.    And that situation would not be comparable to

22    Mr. McHugh because in McHugh's situation, he has an

23    employer that is actually suing him with a counterclaim

24    at this point in time; isn't that right?

25              MR. CIOFFI:  Objection to the form of the

Deposition of David Lewin, Ph.D.                    Philip R. McHugh v. Fifth Third Bancorp, et al.

 1          question.  You may answer if you can.
 2                  THE WITNESS:  The last part, I will take your
 3          representation of it.  Beyond that, I can't -- I
 4          don't think I have an answer.
 5     BY MR. SABA:
 6          Q.   You would agree that whether or not an
 7     employee is being sued by their past employer would
 8     affect their ability to mitigate their damages; isn't
 9     that right?
10          A.   It could.
11                  MR. CIOFFI:  Objection to the form of the
12          question.
13                  THE WITNESS:  It could.
14     BY MR. SABA:
15          Q.   Your hypothetical scenario, in order for it to
16     be more like Mr. McHugh's it would have to be the story
17     of Colin Kaepernick, wouldn't it?
18          A.   I don't think so.
19          Q.   Do you know who Colin Kaepernick is?
20          A.   I do.  He was a former quarterback in the
21     National Football League.
22          Q.   Former quarterback, led a team to the Super
23     Bowl, becomes a free agent, but because he had kneeled
24     in protest to racial discrimination issues, he was
25     banned from the league and nobody else would hire him,

1   despite his ability and actions they took against him;

2   isn't that right?

3           MR. CIOFFI:  Objection to the form of the

4       question.  Counsel, you're testifying in most of

5       your questions, I'll note inaccurately in terms of

6       the facts, and solely for the purposes of arguing

7       with the witness.

8           This is an expert deposition.  Ask him what

9       his opinion is and his basis, but refrain from

10      arguing with him.

11          MR. SABA:  Oh, no, I'm drawing this --

12          MR. CIOFFI:  You're arguing with him.

13          MR. SABA:  -- from the events.  We're just

14      trying to understand them accurately.

15  BY MR. SABA:

16      Q.   In his, Mr. McHugh's situation, in light of

17  the fact that he is being sued by his past employer, is

18  closer to that of Colin Kaepernick; isn't that right?

19          MR. CIOFFI:  Objection to the form of the

20      question.  You may answer if you're able to answer.

21          THE WITNESS:  Counsel, you can make that

22      argument as counsel for your client.  I have

23      nothing to say or add to it.  I am familiar with

24      Kaepernick.  That's as far as I will go.

25

1   BY MR. SABA:

2        Q.   Referring to what we have marked here as

3   page 22 of your report, David, just above paragraph 58,

4   you have listed mitigation assumption.

5             "I assumed Mr. McHugh would have reasonably

6   obtained a comparable executive role in the banking

7   sector, similar to his previous EVP position at Fifth

8   Third Bank after six months of job search.  This

9   assumption is supported by the career trajectories of

10  similarly situated peers and labor market trends."

11            Do you see that there?

12       A.   Yes.

13       Q.   And I believe you indicated the two peers that

14  you are referring to is Tayfun Tuzun and Mr. Lamb; is

15  that correct?

16       A.   Yeah, I believe that's right.

17       Q.   Okay.  Do you know if either Mr. Lamb or

18  Mr. Tuzun was sued by Fifth Third Bank after they left

19  their employment with Fifth Third Bank?

20       A.   No.

21       Q.   The labor market trends that you looked at,

22  did any of those labor markets trends take into

23  consideration whether or not the employee was being sued

24  by their prior employer?

25       A.   I don't know the answer to that question.

1      Q.   Did you specifically look at any data with

2   respect to the ability of somebody to regain employment,

3   particularly in the banking sector, if they are being

4   sued by their prior employer?

5      A.   Not for the purpose of this matter.

6      Q.   Have you ever done that?

7      A.   Yes.

8      Q.   When did you do that?

9      A.   A couple times a few years ago.

10      Q.   What was the nature of that case?

11      A.   Those were termination cases in which the

12   plaintiff sued the employers and the employers

13   countersued the plaintiffs.

14      Q.   And what effect did that countersuit have on

15   the ability of the employee to obtain gainful

16   employment?

17      A.   In the -- in my recollection, and that's what

18   it is -- is in one case it extended the duration of

19   unemployment before the individual found employment in

20   the same sector, as I recall.  And in the other, it

21   didn't seem to have any effect whatsoever.  And I think

22   that was because of a high demand in the labor market

23   for the kind of work that those individuals perform.

24           So it's not -- I don't mean to get off track

25   here.  It's not a cut and dried issue of whether if you,

1   as a former employee, are sued by a former employer.  It

2   is necessarily going to hinder or hamper your job search

3   or cut off all opportunities.  That could happen, but

4   you have to be careful about this sort of thing because

5   labor markets are dynamic, very much so.

6       Q.   Going back to page 19 -- excuse me, it's

7   marked page 21 to the right of your report -- you list

8   at the bottom of the page your Tenure Assumption, and

9   you indicate, "I considered three alternative scenarios

10  from Mr. McHugh's potential tenure as CEO.  After each

11  of these time periods, I assumed Mr. McHugh would have

12  returned to his prior role as EVP rather than continuing

13  as CEO through 2032."

14       And your three scenarios are one, for "two

15  years reflecting a transition from president to CEO for

16  two years before Mr. Spence was ready to assume the

17  role."

18       Number two is "three years reflecting the

19  middle range of when Mr. Spence would be ready to assume

20  the roles."

21       And number three is "four years representing

22  the maximum period based on Mr. McHugh's claim that he

23  was promised the CEO role until Mr. Spence was ready to

24  take over, which would be approximately three to five

25  years from August 2019, which is equivalent to two to

1   four years from October 2020."

2           Is that correct?

3       A.   Yes.

4       Q.   The testimony you're referencing about the

5   three to five years from August 2019, you're talking

6   about what Mr. McHugh said about a statement by

7   Mr. Carmichael; is that right?

8       A.   I think that is.  I don't recall precisely, as

9   I sit here today, but I think that is.

10      Q.   That's not necessarily a limit or indication

11  of how long Mr. McHugh would have served in the role as

12  president and CEO, is it?

13      A.   I'm not saying that it is on Mr. McHugh's

14  part.  And, again, this is a critique of Dr. Burke, who

15  I think has nothing to say about this.

16      Q.   But you're inserting that as a limitation

17  yourself?  You're making the judgment that the maximum

18  amount of time he would have served in that role was

19  four years; is that correct?

20      A.   In that specification right there that you

21  read, yes.

22      Q.   Okay.  But as we've already reviewed, you

23  haven't reviewed all the evidence in this case, and even

24  the evidence you have wouldn't necessarily indicate that

25  that would be the limit of time that Mr. McHugh would

```
 1   serve as president and CEO of Fifth Third Bank if he was

 2   put in that position, correct?

 3        A.   I haven't gone beyond anything I've said in

 4   response to your questions or anything I wrote in this

 5   report that we are scrolling through.

 6        Q.   Did you do any historical analysis of how long

 7   the previous presidents and CEOs of Fifth Third Bank had

 8   served?

 9        A.   No.  And I was not asked to do so.

10        Q.   Okay.  You did offer opinions about what you

11   believe the national average of CEOs is; isn't that

12   right?

13        A.   If you'd like to point me to the specifics in

14   my report, I'd be happy to answer your question.

15             MR. DEBEER:  And while you look

16        that up here -- this is Jeff DeBeer -- I know it's

17        3:30 or 3:29 where you guys are, but it's 12:29,

18        and we had lunch arrive, so whenever you get to a

19        good stopping point, just let us know.

20             MR. SABA:  Okay.  We can take a break right

21        now, Jeff.  How much time do you all need?

22             MR. DEBEER:  Well, the food's already here.

23        So --

24             THE WITNESS:  You specify.

25             MR. DEBEER:  A half hour, 45 minutes.
```

Deposition of David Lewin, Ph.D.                    Philip R. McHugh v. Fifth Third Bancorp, et al.

```
 1        Something like that.  Sound good to you?  Or do you
 2        want more time?
 3             THE WITNESS:  Half hour.  Do we want to ask
 4        this guy how much longer he thinks he's going to go
 5        or --
 6             MR. DEBEER:  I'll leave that to Michael.
 7             MR. CIOFFI:  We know we should do that.
 8             Peter, can you finish up quickly or do you
 9        want to take a break?
10             MR. SABA:  Why don't we take a little break.
11        I mean, if I'm guessing, I would say I'm in the 45
12        minutes to an hourish range, depending upon
13        responses.
14             If you want to take a quick break and you can
15        get something to eat and then we can start up
16        and hopefully finish up shortly.
17             MR. CIOFFI:  Maybe you could streamline it if
18        we take a break.
19             Jeff and David, do you think you can, without
20        causing any distress, be back in about 20 minutes?
21             MR. DEBEER:  Well, so yeah, we're going to do
22        our best and I can -- we'll put our stream back on
23        as soon as we're ready to go.  But, yeah, we'll
24        shoot for 20 and maybe a little bit longer.
25             THE WITNESS:  20 minutes with a 10-minute
```

Deposition of David Lewin, Ph.D.                    Philip R. McHugh v. Fifth Third Bancorp, et al.

```
 1        standard deviation.

 2              MR. SABA:  That works.

 3              MR. CIOFFI:  Sounds like an economist.  All

 4        right.  Thank you.

 5              THE VIDEOGRAPHER:  The time is 3:31 p.m.  We

 6        are off the record.

 7              (A recess was taken from 3:31 p.m. to

 8              3:52 p.m.)

 9              THE VIDEOGRAPHER:  The time is 3:52 p.m.

10        Eastern.  We are now on the record.

11   BY MR. SABA:

12        Q.   David, if I can refer you to what is page 15,

13   paragraph 38 of your report; do you see that?

14        A.   Yes.

15        Q.   And you indicate, "Further, the Burke report

16   inappropriately uses the average American retirement

17   age, which bears little relevance in the context of CEO

18   tenure.  CEO roles are characterized by significantly

19   shorter tenures and elevated turnover rates compared to

20   traditional employment positions.  As of 2025, the

21   average tenure for S&P 500 CEOs has declined to

22   approximately 7.2 years, with a median of 4.8 years,

23   with many CEOs leaving their roles within three years,

24   particularly in publicly-traded companies -- far shorter

25   than the Burke report's presumed tenure."
```

1          And then you go on to say, "This trend

2    reflects the increasing volatility and

3    performance-driven nature of executive leadership, where

4    heightened scrutiny from boards, shareholders, and the

5    public accelerates turnover."

6          And you have, "Research from Korn Ferry in

7    2023 further supports this conclusion, noting that 34

8    percent of newly appointed CEOs exit within three years,

9    a phenomenon often referred to as the 'three-year itch.'

10   Relatedly, the shorter average tenure highlights the

11   flaws in the Burke report's assumption that

12   Mr. McHugh -- even accepting the allegation that he

13   would be promoted in the first instance -- would remain

14   president and CEO for 12 years until age 68."

15         Is that correct?

16   A.    Yes.

17   Q.    Initially going back to the first sentence, in

18   the clause where you say, "with many CEOs leaving their

19   roles within three years, particularly in

20   publicly-traded companies," what is the basis of that

21   phrase?

22   A.    I want to scroll down to the footnote 48.

23   Q.    Okay.

24   A.    Let's see.  Yeah, I cite the Chen article on

25   CEO Tenure Rates and give the citation there.  So that's

1  a source.

2          And then I give in the footnote after that, I

3  give the Korn Ferry, I cite the Korn Ferry report, and

4  so that's what I'm doing.

5      Q.   Are either of those reports specific to the

6  financial services industry?

7      A.   Would you mind scrolling back down, please?

8      Q.   Certainly.  Hold on.  I want to make sure you

9  can see it.

10     A.   I'm sorry, your question was are they specific

11  to the financial services industry?

12     Q.   Correct.  Correct.  Or the banking industry,

13  yeah.

14     A.   My recollection is they include it, that

15  industry, but are not limited to it.

16     Q.   Okay.  And did you look at any past history of

17  the tenure of Fifth Third CEOs?

18     A.   The tenure of the -- which CEO?

19     Q.   The previous CEOs at Fifth Third Bank?

20     A.   Oh, you asked me about this before, I believe.

21  No.

22     Q.   Were you aware that over the 41 years prior to

23  Mr. Spence becoming CEO that Fifth Third only had four

24  CEOs?

25     A.   No.

1     Q.   Which would equate to an average of almost

2  10.3 years per CEO; isn't that right?

3     A.   If you want to go back 40 years, sure.  Sure,

4  in the sense I would accept what the data told me, but

5  we know that CEO tenure has been declining.  It used to

6  be far longer.  And your example helps actually to

7  support the point.

8     Q.   Well, do you know how long Mr. Carmichael is

9  CEO for Fifth Third Bank?

10     A.   I can't recall that number.

11     Q.   Okay.  What about the individual who was CEO

12  prior to Mr. Carmichael, do you know how long he was a

13  CEO at Fifth Third?

14     A.   No.

15     Q.   Did you look at any of the data for the

16  average tenure of Fortune 500 CEOs in the banking

17  finance sector?

18     A.   Specifically in the banking finance sector, I

19  don't believe so.

20     Q.   Correct.  Correct.  Are you familiar with an

21  ABA banking journal article and study in August 2024

22  that indicated that the average tenure of Fortune 500

23  CEOs in the banking finance sector is 11.4 years?

24     A.   Am I familiar with it, you ask?

25     Q.   Yes.

Deposition of David Lewin, Ph.D.                    Philip R. McHugh v. Fifth Third Bancorp, et al.

1        A.    No.

2        Q.    Are you aware of that statistic, that the

3   average for CEOs in the banking finance sector, at least

4   Fortune 500 CEOs, is 11.4 years?

5        A.    I am not aware of that number.

6        Q.    That data and the historical data at Fifth

7   Third Bank would be far more consistent with what

8   Dr. Burke's report indicates of Mr. McHugh holding a CEO

9   position for 12 years until age 68; isn't that correct?

10       A.    I don't think so.  I've given you the bases of

11  my critique of Dr. Burke and my opinion stands as it is.

12       Q.    Do you agree that a more reliable statistic

13  for determining how long somebody may serve as president

14  and CEO of Fifth Third Bank would be to look at the

15  historical tenure for that particular bank?

16       A.    Not necessarily.  It might.  It might not.  I

17  think I recall Mr. McHugh saying that if he were CEO, he

18  didn't expect to be CEO for more than three to five

19  years or words like that, to that effect.  I think I may

20  have cited them elsewhere in my report.  But my critique

21  is what it is.  I stand by it.

22       Q.    Is it your position here today that it's your

23  belief that Phil McHugh testified that he would only be

24  CEO for three to five years?

25       A.    I was just giving you what I thought was a

Deposition of David Lewin, Ph.D.                    Philip R. McHugh v. Fifth Third Bancorp, et al.

1   recollection.  I didn't put it in as an opinion and it's

2   not part of my opinion of Mr. -- Dr. Burke's expert

3   report.

4        Q.   Okay.

5        A.   Which is what I am rebutting in this

6   deposition.

7        Q.   Would you agree that it would be far more

8   accurate when trying to determine what an appropriate

9   tenure would be for a CEO of a Fortune 500 bank is to

10  use the actual historical CEO tenures for Fortune 500

11  banks?

12            MR. CIOFFI:  Objection.  Counsel has already

13       answered that question.  You're arguing with the

14       witness.  He's given you the basis of his opinion.

15       You simply want him to agree with you.

16            MR. SABA:  No, no.  I didn't ask that

17       question.

18            MR. CIOFFI:  That's really inappropriate.

19            MR. SABA:  This is a different question.

20            MR. CIOFFI:  No it isn't.

21            MR. SABA:  Yeah, it is.

22            MR. CIOFFI:  You may answer, if you are able

23       to answer, Dr. Lewin.

24            THE WITNESS:  I have nothing to add to my

25       previous answer.  I really have nothing to add to

```
 1        that -- for that question.

 2   BY MR. SABA:

 3        Q.   Well, this is a different -- I previously

 4   asked you about the historical tenure of actual Fifth

 5   Third CEOs.

 6             Now I'm talking about using the statistical

 7   data for Fortune 500 CEOs in the banking industry as

 8   opposed to just general data for Fortune 500 CEOs in all

 9   industries.

10        A.   Well, I think, with respect, you did ask me

11   about this before, and appropriate for what?  It doesn't

12   affect my critique of Dr. Burke's report.  That's my

13   response to the question.

14        Q.   Why doesn't it affect your critique of

15   Dr. Burke's report?

16        A.   Because of what I have said in the report,

17   such as in paragraph 38.

18        Q.   Dr. Burke (sic), refer you to page 21 of your

19   report, just below paragraph 57.  You put in your

20   Inventive Compensation Assumption, and you indicate, "I

21   applied three scenarios for Mr. McHugh's incentive

22   compensation relative to Mr. Spence's while the base

23   salary, benefits, and social security figures were held

24   constant at Mr. Spence's level across all scenarios."

25             Number one, "zero percent of Mr. Spence's
```

1  incentive compensation, reflecting the possibility that

2  Mr. McHugh may not have received any comparable

3  incentive-based awards."

4          Number two, "50 percent of Mr. Spence's

5  incentive compensation, consistent with

6  the performance-based and uncertain nature of executive

7  incentive awards."

8          And number three, "64 percent of Mr. Spence's

9  incentive compensation, based on the average of

10  Mr. McHugh's total incentive compensation as a

11  percentage of Mr. Spence's total incentive compensation

12  between 2016 and 2019."

13          Did I read that correctly?

14     A.   You did.

15     Q.   In each of these scenarios, starting with

16  scenario number one, why would you select a zero percent

17  incentive compensation scenario for Mr. McHugh?

18     A.   Because it's a possibility.  Incentive

19  compensation is not guaranteed.  So I wanted to take

20  examples, and I used these three.

21     Q.   In the 34 years that Phil McHugh was employed

22  with Fifth Third Bank, did he ever fail to receive his

23  incentive compensation?

24     A.   I don't know the answer to that question.

25     Q.   What is the supporting basis for believing

Deposition of David Lewin, Ph.D.                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

```
 1   that Mr. McHugh would receive zero incentive

 2   compensation?

 3          MR. CIOFFI:  Objection.  You just asked that

 4       and he just answered it, but --

 5          THE WITNESS:  I did, in fact, answer the

 6       question, and you can see as you, yourself stated

 7       correctly, Counsel, there are three specifications

 8       here, ranging from zero to 64 percent.

 9   BY MR. SABA:

10       Q.   Have you developed an opinion of what you

11   think the possibility is that Mr. McHugh may not receive

12   any comparable incentive-based awards?

13       A.   I have not gone beyond what I show on the page

14   here, no.

15       Q.   You've not quantified that possibility in any

16   way?

17       A.   I haven't gone beyond what I have on this page

18   here.

19       Q.   Are you able to quantify that possibility?

20       A.   I've quantified it to the extent that I used

21   these three scenarios or these 3 percentages in

22   scenarios to estimate a range of damages.

23       Q.   Moving on to scenario two, why did you select

24   50 percent as opposed to any other number?

25       A.   Because I chose it.  It's part of the
```

1  threefold set of specifications here in these scenarios.

2  It's no different from choosing any one of them.  I

3  wanted to see what would happen if the rates were to

4  vary from zero to 64 percent.

5      Q.   But why 50 percent as opposed to any other

6  number?

7      A.   That's a choice that I chose to make.

8      Q.   Other than your random choice of 50 percent,

9  is that tied to any specific fact why you believe 50

10  percent would be a particular number that Mr. McHugh

11  would receive?

12      A.   Oh, I have nothing to add to my statement

13  there.  So no.

14      Q.   The third scenario, the 64 percent of

15  Mr. Spence's incentive compensation, what is the basis

16  of that number?

17      A.   That is the percentage that Mr. McHugh's

18  incentive compensation represented as a percentage of

19  Mr. Spence's incentive compensation during the time

20  period indicated therein.

21      Q.   And the time period is 2016 to 2019?

22      A.   Correct.

23      Q.   And during that time period, neither

24  Mr. Spence nor Mr. McHugh were in the role of president

25  and/or CEO of Fifth Third Bank; isn't that right?

Deposition of David Lewin, Ph.D.                    Philip R. McHugh v. Fifth Third Bancorp, et al.

1        A.    That's my understanding.

2        Q.    Okay.  In fact, at no time during that time

3   period did Mr. McHugh or Mr. Spence hold the same

4   position with Fifth Third Bank, did they?

5        A.    I believe that's correct.

6        Q.    You did create a chart of historical income at

7   Fifth Third Bank; isn't that right?

8        A.    Did I create an income chart?  No, I did not.

9        Q.    One second, please.

10            David, are you able to see this summary

11   compensation table?

12        A.    I think that I have.

13        Q.    Okay.  Did you prepare this summary

14   compensation table from Fifth Third Bank proxy reports?

15        A.    Yes, I think so.

16        Q.    Okay.  Was that done by you or someone on your

17   staff?

18        A.    My staff.

19        Q.    And this is just based on the list of reported

20   incomes; is that correct?

21        A.    Yes, I believe so.

22        Q.    Okay.  And you'd agree that each of the

23   respective executives that are listed, they all received

24   different income; isn't that right?  Both earned and

25   incentive-wise?

1       A.    It looks like it, yes.

2       Q.    Okay.  Did you do an analysis of the

3   historical incentive income that was given to the

4   position of president and CEO at Fifth Third Bank?

5       A.    Nothing beyond what is contained in my

6   rebuttal report.

7       Q.    Okay.  Historically, the numbers for incentive

8   compensation paid to CEOs, as set forth in the breakdown

9   that you have here, those are consistent with the

10   numbers used by Dr. Burke; isn't that right?

11       A.    I don't recall.

12       Q.    Have you ever calculated that to see if they

13   were?

14       A.    I haven't gone beyond what is contained in my

15   report.

16       Q.    Wouldn't the best way to determine what the

17   actual compensation that would be paid to a Fifth Third

18   CEO and president be the historical base and intended

19   compensation that was paid for that position?

20       A.    I don't understand the question.  You want me

21   to -- use historical data to see what somebody was paid;

22   is that the question?

23       Q.    Use historical data to determine what would be

24   paid for that position going forward?

25       A.    Well, you can use historical data for all

Deposition of David Lewin, Ph.D.                    Philip R. McHugh v. Fifth Third Bancorp, et al.

1   sorts of purposes.

2        Q.   Wouldn't it be the -- wouldn't that be the

3   best data for determining what would be paid by Fifth

4   Third for the years 2022 through 2025?

5        A.   It depends on what else was going on during

6   those periods -- during those periods.

7             You wouldn't ignore those data, but there

8   could be other factors that would go into it.

9        Q.   What other factors?

10       A.   And -- just a second.

11            And incentive compensation, by definition, is

12   not guaranteed, whereas salary is closer to that.  So --

13   and there are other factors that occur that affect

14   compensation, too.

15            Mergers and acquisitions, for example.

16   Other -- other factors that go on that are oftentimes

17   hard to predict, but there are variables that could come

18   into the predict.

19            So historical data can be useful, but there

20   are other data as well.

21       Q.   Have you seen any reports by the AFL-CIO

22   regarding the average executive compensation for Fortune

23   500 CEOs in the financial sector?

24       A.   Have I seen any reports?

25       Q.   Yes.

Deposition of David Lewin, Ph.D.                    Philip R. McHugh v. Fifth Third Bancorp, et al.

```
 1        A.    And did you limit that to the financial

 2   sector?

 3        Q.    Correct, yes.

 4        A.    I think I have seen some historical documents

 5   from the AFL-CIO, but nothing recent.

 6        Q.    Okay.  Are you aware that based on the AFL-CIO

 7   reports for the average executive compensation for CEOs

 8   in the financial sector, that they would receive an

 9   annual of over $19 million a year?

10             MR. CIOFFI:  Objection to the form of the

11        question.  You may answer, if you're able to do so.

12             THE WITNESS:  Are you asking if I'm aware?  I

13        said in response to your prior question I haven't

14        seen recent AFL-CIO reports.

15             MR. SABA:  Okay.

16             THE WITNESS:  I think that would cover it.

17   BY MR. SABA:

18        Q.    By "recent," how far back would that go?

19        A.    Last three or four years.

20        Q.    Are you familiar with any Equilar reports

21   regarding the median total compensation for financial

22   services in the CEO industry?

23        A.    Not off the top of my head.

24        Q.    Have you ever heard of them before?

25        A.    I've heard of Equilar.
```

1      Q.    Okay.  Have you reviewed their reports in the

2  past?

3      A.    Oh, maybe from time to time.  It depends.

4      Q.    Are you aware that their studies indicate that

5  in 2024, Fortune 500 CEOs in the banking industry

6  received a median of 18.8 million dollars a year before

7  compensation?

8      A.    No.

9      Q.    You would at least agree that all those

10  numbers are far higher than what Tim Spence was paid; is

11  that right?

12      A.    Are far higher than what?

13      Q.    Than what Tim Spence received; is that right?

14      A.    Well, I'd have to see those numbers and how

15  they were calculated.  It could be that they are higher.

16      Q.    Would that also indicate that if Phil McHugh

17  were serving as president and CEO, he may have earned

18  more and received more than Tim Spence did during 2022

19  to 2025?

20      A.    If you're putting that out as a hypothetical,

21  hypothetically almost anything is possible.

22      Q.    With respect to Mr. McHugh's mitigation

23  efforts, were you aware that Phil McHugh was subject to

24  a noncompete that would preclude him from working in the

25  banking industry for two years?

Deposition of David Lewin, Ph.D.                    Philip R. McHugh v. Fifth Third Bancorp, et al.

```
 1            MR. CIOFFI:  Objection to the form of the
 2       question.  Counsel is testifying.
 3            THE WITNESS:  I believe there was a noncompete
 4       agreement.
 5  BY MR. SABA:
 6       Q.   What's your understanding of it?
 7       A.   I don't have any particular understanding of
 8  it as I sit here.  I don't have the document in front of
 9  me.
10       Q.   To what extent should a noncompete agreement
11  be considered in calculating or determining what
12  mitigation efforts should have been used by Phil McHugh?
13       A.   That's a question for him, not for me.
14       Q.   How does the effect -- how does the presence
15  of a noncompete agreement affect whether or not an
16  expert calculating damages an individual's suffered
17  weigh into that calculation?
18       A.   It may be something to consider.  It may not
19  be something to consider.
20            And noncompetes, as my experience with them
21  indicates, are enforceable in some instances and not
22  enforceable in other instances.  So it would depend a
23  lot on the circumstances.
24            MR. SABA:  If we can go off the record for one
25       minute.
```

```
 1              Michael, I'm just going to review my notes and
 2         see if I have anything more.  Just give me a minute
 3         or two and we should be ready to go.
 4              MR. CIOFFI:  All right.  We appreciate your
 5         diligence of doing so, Counsel.
 6              THE VIDEOGRAPHER:  We're off the record at
 7         4:19.
 8              (A recess was taken from 4:19 p.m. to
 9              4:21 p.m.)
10              THE VIDEOGRAPHER:  The time is 4:21.  We are
11         on the record.
12              MR. SABA:  David, that's all the questions I
13         have at this time.
14              We are going to continue this in progress,
15         pending resolution of the current discovery issue
16         and dispute that I believe Judge Barrett's going to
17         address tomorrow regarding additional documents and
18         information that we've requested.
19              THE WITNESS:  Okay.  Can I add one thing,
20         Counsel?
21              MR. CIOFFI:  I'm sorry.  Go ahead, David.
22              THE WITNESS:  It goes back to the start, and I
23         should have remembered this.
24              Counsel, it's when you asked me what I did to
25         prepare for this meeting.
```

```
 1              MR. SABA:  Yes.

 2              THE WITNESS:  I mentioned meeting with counsel

 3         and I named them, but that was -- I remembered it

 4         because there was a calendar invite, Zoom invites.

 5              Yesterday, I telephoned Mr. DeBeer and we

 6         spoke for about a half an hour.  It was a phone

 7         call, it wasn't on Zoom, and that's why I didn't

 8         recall it.

 9              So I wanted you to know that.

10              MR. SABA:  Okay.  Thank you.

11              THE WITNESS:  Yeah.

12              MR. CIOFFI:  The defendants have no questions

13         at this time.

14              We do not agree that you have the right to

15         continue this deposition in progress, but we

16         recognize the Court will likely deal with that

17         issue later this week.

18              THE VIDEOGRAPHER:  That is all?  The time

19         is --

20              MR. SABA:  Yeah, I agree.  I'm sorry.

21              THE VIDEOGRAPHER:  Oh, okay.  Okay.

22              If that is all, then the time is 4:23.  We are

23         off the record.

24              (The following was recorded stenographically

25         only.)
```

```
 1              MR. SABA:  Thank you.

 2              THE COURT REPORTER:  And, Peter, are you going

 3        to order the transcript?

 4              MR. SABA:  Yes.

 5              THE COURT REPORTER:  Regular delivery?

 6              MR. SABA:  Yes.

 7              MR. CIOFFI:  The witness will read and sign

 8        the transcript.  We'll also order the transcript

 9        and the video for the defendant.

10

11

12

13                       _____
                                 DAVID LEWIN, PH.D.
14

15                       _____
                                 DATE
16

17                            - - -

18          DEPOSITION CONCLUDED AT 4:24 P.M.

19                            - - -

20

21

22

23

24

25
```

```
 1                    C E R T I F I C A T E

 2    STATE OF OHIO           :
                              :              SS
 3    COUNTY OF HAMILTON      :

 4              I, Wendy L. Raymer, RPR, CRR, the undersigned,

 5    a duly qualified and commissioned notary public within

 6    and for the State of Ohio, do hereby certify that before

 7    the giving of his aforesaid deposition, DAVID LEWIN,

 8    PH.D. was by me first duly sworn to depose the truth,

 9    the whole truth and nothing but the truth; that the

10    foregoing is the deposition given at said time and place

11    by DAVID LEWIN, PH.D.; that said deposition was taken in

12    all respects pursuant to stipulation of counsel; that I

13    am neither a relative of nor employee of any of the

14    parties or their counsel, and have no interest whatever

15    in the result of the action; that I am not, nor is the

16    court reporting firm with which I am affiliated, under a

17    contract as defined in Civil Rule 28 (D).

18              IN WITNESS WHEREOF, I hereunto set my hand and

19    official seal of office at Cincinnati, Ohio, this 18th

20    day of November, 2025.

21

22

23

24                                  _____
      My Commission expires        S/Wendy L. Raymer, RPR, CRR
25    December 6, 2026              Notary Public - State of Ohio
```

Deposition of David Lewin, Ph.D.                                        Philip R. McHugh v. Fifth Third Bancorp, et al.

```
 1   1 DEPOSITION ERRATA SHEET

 2   Date Taken:  November 4, 2025

 3   Case Caption:  PHILIP R. MCHUGH

 4   vs. FIFTH THIRD BANCORP, et al.

 5   DECLARATION UNDER PENALTY OF PERJURY

 6   I declare under penalty of perjury

 7   that I have read the entire transcript of

 8   my deposition taken in the captioned matter

 9   or the same has been read to me, and

10   the same is true and accurate, save and

11   except for changes and/or corrections, if

12   any, as indicated by me on the DEPOSITION

13   ERRATA SHEET hereof, with the understanding

14   that I offer these changes as if still under

15   oath.

16   Signed on the _____ day of

17   _____, 20___.

18   _____

19   DAVID LEWIN, PH.D.

20

21

22

23

24

25
```

```
 1    2 DEPOSITION ERRATA SHEET

 2    Page No._____Line No._____Change to:_____

 3    _____

 4    Reason for change:_____

 5    Page No._____Line No._____Change to:_____

 6    _____

 7    Reason for change:_____

 8    Page No._____Line No._____Change to:_____

 9    _____

10    Reason for change:_____

11    Page No._____Line No._____Change to:_____

12    _____

13    Reason for change:_____

14    Page No._____Line No._____Change to:_____

15    _____

16    Reason for change:_____

17    Page No._____Line No._____Change to:_____

18    _____

19    Reason for change:_____

20    Page No._____Line No._____Change to:_____

21    _____

22    Reason for change:_____

23    SIGNATURE:_____DATE:_____

24    DAVID LEWIN, PH.D.

25
```

```
 1   3 DEPOSITION ERRATA SHEET

 2   Page No._____Line No._____Change to:_____

 3   _____

 4   Reason for change:_____

 5   Page No._____Line No._____Change to:_____

 6   _____

 7   Reason for change:_____

 8   Page No._____Line No._____Change to:_____

 9   _____

10   Reason for change:_____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change:_____

23   SIGNATURE:_____DATE:_____

24   DAVID LEWIN, PH.D.

25
```

## WORD INDEX

**< $ >**
**$19** 98:9

**< 1 >**
**1** 4:7 19:3, 7, 13
20:4, 22 21:16 22:3,
8, 11, 19 23:11, 17
24:18 26:12 27:1, 18
28:12, 17, 22 29:3
31:12, 20 73:6 75:7
105:1
**1.27** 69:25
**1:07** 1:14 5:1
**1:08** 5:6
**1:21-cv-00238** 1:8
5:12
**10** 12:2
**10.3** 88:2
**10-minute** 84:25
**11.4** 88:23 89:4
**11.45** 37:14
**12** 45:2 72:13 86:14
89:9
**12:29** 83:17
**12-factor** 56:15
**15** 85:12
**15-minute** 52:11
**16** 40:13 76:11
**17** 28:1 29:7 44:24,
25 46:3, 7 50:22
74:15, 24 76:6
**1700** 2:17 3:5
**18** 46:11 49:7 52:20
60:3 68:15
**18.8** 99:6
**18th** 104:19
**19** 4:7 81:6
**1957** 69:24
**1964** 14:9
**1988** 12:19

**< 2 >**
**2** 4:7 39:16, 20 45:3
49:8 52:21 106:1
**2:24** 52:13, 15
**2:38** 52:16, 17

**20** 11:24 68:19, 23
69:4 72:5 84:20, 24,
25 105:17
**201** 2:18 3:5
**2016** 92:12 94:21
**2019** 29:7 31:25
32:1 74:15, 24 76:1,
6 81:25 82:5 92:12
94:21
**2020** 45:3 82:1
**2022** 54:5 57:1 58:1,
22 59:12, 14 97:4
99:18
**2023** 86:7
**2024** 55:13 88:21
99:5
**2025** 1:14 5:5 39:24
54:6 58:23 59:15
68:19, 23, 24 69:4
85:20 97:4 99:19
104:20 105:2
**2026** 104:25
**2032** 45:3 81:13
**21** 73:14 81:7 91:18
**22** 73:14 79:3
**23** 74:5
**24** 40:3, 10 74:5
**26** 16:7 36:21 38:17
45:3
**2623** 2:8
**28** 104:17
**29** 74:12

**< 3 >**
**3** 19:11 39:23 52:22
93:21 107:1
**3:29** 83:17
**3:30** 83:17
**3:31** 85:5, 7
**3:52** 85:8, 9
**31** 75:6
**34** 86:7 92:21
**362-8700** 2:19
**362-8703** 3:6
**362-8746** 2:19
**38** 85:13 91:17
**39** 4:7

**< 4 >**

**4** 1:14 5:5 40:13
61:10 105:2
**4.8** 85:22
**4:19** 101:7, 8
**4:21** 101:9, 10
**4:23** 102:22
**4:24** 103:18
**40** 37:13 88:3
**41** 87:22
**45** 36:2 83:25 84:11
**45202** 2:18 3:6
**45208** 2:9
**48** 86:22
**49** 76:11

**< 5 >**
**5** 11:8, 24 12:2 63:7
66:25
**50** 92:4 93:24 94:5,
8, 9
**500** 53:20, 21 54:3
55:23 56:1 85:21
88:16, 22 89:4 90:9,
10 91:7, 8 97:23
99:5
**513** 2:9, 19 3:6
**533-2701** 2:9
**57** 91:19
**58** 79:3

**< 6 >**
**6** 4:4 37:11 104:25
**6.68** 69:24
**64** 92:8 93:8 94:4,
14
**68** 45:4 48:21 86:14
89:9

**< 7 >**
**7** 44:23 46:4 52:21
60:3 68:15 74:9
**7.2** 85:22

**< 8 >**
**8** 72:4

**< 9 >**
**9** 56:15 74:5

**< A >**
**ABA** 88:21
**abilities** 18:1
**ability** 10:11 45:14
77:8 78:1 80:2, 15
**able** 13:14 14:15
15:3, 8 39:20 44:7
45:22 55:24 57:11
65:6, 14, 23 67:4, 7, 9,
14 78:20 90:22
93:19 95:10 98:11
**absolutely** 15:9
**abstract** 44:10
**academic** 9:11
**accelerates** 86:5
**accept** 43:14 88:4
**accepted** 9:17
**accepting** 86:12
**access** 29:23, 25
**account** 26:10
**accurate** 75:21 90:8
105:10
**accurately** 78:14
**acquisitions** 97:15
**Act** 14:8, 9, 10 40:25
**action** 42:7 104:15
**actions** 78:1
**actual** 57:18 58:23
90:10 91:4 96:17
**add** 25:24 36:10
39:15 59:7, 20 71:23
78:23 90:24, 25
94:12 101:19
**additional** 16:14
67:5 101:17
**address** 101:17
**adequate** 45:22
**administering** 5:16,
22 6:7
**administration** 6:9
**adverse** 10:25
**advice** 43:3, 13
**advise** 18:4
**advised** 42:18
**affect** 77:8 91:12, 14
97:13 100:15
**affiliated** 104:16
**afield** 38:16
**AFL-CIO** 97:21

98:5, *6, 14*
**aforesaid** 104:*7*
**afternoon** 5:*3*
**age** 6:*18* 10:*3, 9, 14, 18, 19* 11:*2, 6, 17* 13:*24, 25* 14:*7, 13, 14, 16* 15:*4* 34:*8, 11, 16, 20, 21* 35:*12, 13, 25* 36:*7, 13, 18* 37:*3, 13, 15* 38:*10* 39:*2, 5, 7, 14* 40:*16, 21* 41:*1* 47:*12* 48:*10, 16, 21* 60:*6, 19* 61:*1, 21* 62:*1, 8, 13, 16* 85:*17* 86:*14* 89:*9*
**agent** 76:*15* 77:*23*
**agents** 10:*15* 11:*1*
**ages** 75:*22*
**ago** 10:*13* 32:*9* 36:*2* 80:*9*
**agree** 5:*14* 13:*5* 77:*6* 89:*12* 90:*7, 15* 95:*22* 99:*9* 102:*14, 20*
**agreed** 74:*20*
**agreement** 5:*18* 6:*2* 100:*4, 10, 15*
**ahead** 6:*23* 14:*6* 19:*7* 43:*8* 45:*18* 57:*10* 101:*21*
**Akins** 26:*18* 72:*20*
**al** 1:*9* 105:*4*
**Alex** 22:*5*
**A-l-e-x** 22:*5*
**allegation** 61:*24* 86:*12*
**alleged** 36:*13* 63:*8*
**allegedly** 39:*1*
**allow** 13:*18* 16:*5* 38:*19* 42:*5*
**alternative** 81:*9*
**American** 60:*7, 13* 61:*2* 85:*16*
**amount** 82:*18*
**amounts** 58:*23*
**analysis** 10:*19* 11:*22* 18:*8* 34:*15* 35:*9, 24* 36:*6, 13, 18* 37:*18* 53:*12* 54:*24* 63:*19*

64:*13* 65:*4* 67:*2* 83:*6* 96:*2*
**analytical** 66:*24*
**analyze** 10:*11* 64:*5*
**analyzed** 65:*10*
**and/or** 94:*25* 105:*11*
**Anderson** 8:*24* 12:*16*
**annual** 12:*22* 98:*9*
**answer** 9:*19* 11:*19* 12:*8* 13:*18* 14:*3* 16:*6, 10* 20:*12* 21:*2, 8* 23:*8* 26:*24* 28:*8* 35:*2, 17* 36:*3, 4, 9, 22* 37:*7, 19, 21, 24* 38:*2, 7, 13, 16, 19* 41:*6* 42:*5, 25* 43:*2, 8, 21* 44:*10* 45:*18* 47:*17, 20* 48:*3* 50:*9* 53:*23* 56:*5, 21* 57:*11, 20* 61:*19* 65:*18* 67:*15* 74:*9* 75:*21* 76:*10* 77:*1, 4* 78:*20* 79:*25* 83:*14* 90:*22, 23, 25* 92:*24* 93:*5* 98:*11*
**answered** 28:*7* 36:*1, 8* 45:*17* 61:*17* 66:*13* 67:*20* 68:*8* 90:*13* 93:*4*
**anybody's** 57:*18*
**APPEARANCES** 2:*1* 3:*1*
**appearing** 1:*14, 24* 2:*1, 11* 3:*1, 7*
**applied** 91:*21*
**applying** 68:*17*
**appointed** 57:*25* 59:*12* 86:*8*
**appreciate** 101:*4*
**approached** 67:*2*
**appropriate** 54:*3* 68:*15* 69:*8* 90:*8* 91:*11*
**approximately** 5:*6* 45:*2* 81:*24* 85:*22*
**arbitrator** 14:*23*
**arbitrators** 9:*17*
**area** 8:*19* 40:*8* 43:*24* 44:*4, 5*
**areas** 10:*5, 6*

**arguing** 65:*16* 71:*15* 78:*6, 10, 12* 90:*13*
**argument** 78:*22*
**arrangement** 30:*2*
**arrive** 83:*18*
**Arthur** 1:*24*
**article** 9:*6* 72:*1* 86:*24* 88:*21*
**articles** 9:*7, 9* 42:*14, 17*
**asked** 15:*7, 10* 28:*7* 36:*1, 2, 6, 8, 12* 38:*5* 41:*13* 43:*25* 45:*17* 46:*1* 47:*18* 48:*11, 14* 54:*8* 59:*18* 61:*4, 17* 68:*8* 73:*10* 83:*9* 87:*20* 91:*4* 93:*3* 101:*24*
**asking** 25:*1, 4* 46:*9, 24* 59:*3, 4, 10* 98:*12*
**aspect** 57:*5*
**aspects** 12:*14*
**assesses** 17:*25*
**assigned** 22:*7*
**assigning** 22:*4*
**assignments** 41:*21*
**assist** 21:*21*
**assisted** 73:*24*
**associated** 71:*21*
**Association** 12:*23*
**assume** 53:*5* 81:*16, 19*
**assumed** 79:*5* 81:*11*
**assumes** 75:*20*
**assuming** 48:*15* 53:*3* 60:*22* 61:*11*
**assumption** 46:*4, 15, 17, 25* 49:*11, 12, 14, 15, 17, 23* 51:*9, 11, 12, 14, 16, 18, 19* 53:*1, 11* 60:*1, 2, 9, 16, 17* 61:*2, 10, 13* 62:*17, 25* 63:*3, 7, 14, 23* 65:*17, 19, 21* 66:*1* 68:*14* 69:*5, 6* 72:*11* 79:*4, 9* 81:*8* 86:*11* 91:*20*
**assumptions** 32:*16, 18* 44:*25* 46:*21*
**attachments** 16:*18, 20*

**attempt** 43:*9* 44:*1, 3*
**attorney** 5:*19*
**August** 7:*5* 45:*3* 81:*25* 82:*5* 88:*21*
**authoritative** 72:*1*
**authoritatively** 63:*21* 64:*10*
**authorities** 14:*24*
**available** 55:*16*
**Avenue** 2:*8*
**average** 11:*2* 14:*14* 34:*22* 35:*13* 39:*5, 14* 60:*7, 12* 61:*1* 83:*11* 85:*16, 21* 86:*10* 88:*1, 16, 22* 89:*3* 92:*9* 97:*22* 98:*7*
**awards** 92:*3, 7* 93:*12*
**aware** 9:*23* 21:*11, 13* 28:*1* 44:*13* 55:*11* 68:*21* 70:*16* 71:*8, 18* 75:*9, 14, 25* 76:*5* 87:*22* 89:*2, 5* 98:*6, 12* 99:*4, 23*

**< B >**
**back** 6:*10* 18:*17* 23:*3* 46:*3* 49:*7* 50:*20* 52:*11, 20* 55:*21* 56:*23* 57:*1* 81:*6* 84:*20, 22* 86:*17* 87:*7* 88:*3* 98:*18* 101:*22*
**Bailey** 2:*7* 5:*20*
**balance** 30:*19*
**BANCORP** 1:*9* 5:*9* 105:*4*
**bank** 8:*5, 7, 10, 17* 22:*25* 34:*23, 24* 35:*14, 15, 25* 36:*7* 37:*10, 18* 38:*24* 41:*15* 51:*6* 53:*13, 15, 20* 54:*4, 5, 17, 25* 56:*1, 11, 23* 57:*1* 58:*1* 61:*13* 79:*8, 18, 19* 83:*1, 7* 87:*19* 88:*9* 89:*7, 14, 15* 90:*9* 92:*22* 94:*25* 95:*4, 7, 14* 96:*4*
**banking** 34:*11, 16, 20* 35:*10* 60:*12* 61:*5*

Deposition of David Lewin, Ph.D.                                          Philip R. McHugh v. Fifth Third Bancorp, et al.

63:9  64:7  69:*14*, *15*
79:6  80:3  87:12
88:*16*, *18*, *21*, *23*  89:3
91:7  99:5, *25*
**banks**  53:*21*  54:*18*
90:*11*
**banned**  77:*25*
**Barrett's**  101:*16*
**base**  57:7  91:*22*
96:*18*
**based**  9:*18*  14:*14*
20:*13*  31:*1*  34:*22*
38:*13*  46:*22*  49:*25*
50:5  51:*3*, *21*, *22*
53:*14*  68:*17*  69:*15*
70:*18*  75:3  81:*22*
92:9  95:*19*  98:6
**bases**  89:*10*
**Basic**  11:*22*
**basically**  7:*15*  13:4
20:*12*
**basing**  40:*11*
**basis**  10:*18*  12:*10*
38:*6*, 7  49:*16*  51:8
61:6, *14*, *15*  78:9
86:*20*  90:*14*  92:*25*
94:*15*
**basketball**  76:*18*
**bears**  85:*17*
**becoming**  51:5  87:*23*
**began**  33:7
**beginning**  24:*14*
**behalf**  2:*1*, *11*  5:*21*,
*24*  62:*12*
**belief**  89:*23*
**believe**  7:*24*  17:*16*
20:*3*  22:5  27:*20*, *25*
29:5  35:*23*  44:*15*
46:*21*  48:*11*, *18*
52:*22*  53:*4*  60:*15*
62:5, *10*, *14*  64:9
65:9  66:*1*  68:*25*
69:*1*, 7  74:*3*  79:*13*,
*16*  83:*11*  87:*20*
88:*19*  94:9  95:5, *21*
100:3  101:*16*
**believes**  48:*25*
**believing**  92:*25*
**benefits**  91:*23*

**Berkeley**  21:*20*  24:*1*,
*11*, *19*  25:*8*, *11*  26:2
30:*2*
**bes@sspfirm.com**
2:*11*
**best**  35:5  49:5
54:*15*  58:*13*, *21*
59:*13*, *19*  65:5, *22*, *25*
67:*13*  70:*13*, *19*
71:*20*  74:*13*  84:*22*
96:*16*  97:*3*
**better**  18:*24*
**beyond**  13:*22*  14:*20*
15:6  25:*23*  36:*20*
38:*18*  39:*1*, *11*, *14*
42:*3*  43:*5*  44:*17*
55:6  60:*21*  71:*23*
77:*3*  83:*3*  93:*13*, *17*
96:*5*, *14*
**bill**  69:*10*  70:*11*
**binding**  5:*16*
**bit**  9:*10*  18:*21*  84:*24*
**Blank**  2:*17*  3:*4*  5:*25*
8:*13*  17:*1*
**board**  29:*15*, *18*, *21*
49:*19*  50:*14*  59:6, *20*,
*22*, *25*  72:7, *22*  74:*20*
**boards**  86:*4*
**board's**  58:*5*
**book**  12:*19*
**books**  12:*17*
**bottom**  74:8  81:8
**Bowl**  77:*23*
**Box**  16:*18*, *24*  17:6
**boxes**  16:*19*, *22*
**break**  52:*1*, 2, *10*, *11*
83:*20*  84:9, *10*, *14*, *18*
**breakdown**  96:8
**BRG**  25:*18*  29:*13*
**brings**  42:*19*
**Brumback**  26:*19*
72:*20*
**bullet**  33:*7*, *13*, *15*, *18*,
*20*
**Burke**  44:*24*  45:*1*
46:*14*, *20*  47:*1*, 4
48:*13*, *19*  49:*1*, 2, 6,
*13*, *14*, *22*  50:*18*  51:*1*,
*9*, *10*, *17*  53:2  60:*13*,
*14*, *22*  61:*11*  63:*18*,

*24*  64:5, *9*, *18*, *25*
65:*1*, *9*, *17*  66:2  67:*1*
68:2  69:6, *17*  70:*9*,
*23*, *25*  72:*10*  82:*14*
85:*15*, *25*  86:*11*
89:*17*  91:*18*  96:*10*
**Burke's**  16:*13*  32:*10*
46:*4*  50:*6*  53:*11*
68:*22*  69:*1*  89:8
90:2  91:*12*, *15*
**Business**  12:*15*  69:*14*

**< C >**
**calculate**  44:7  48:*20*
63:*1*  68:*16*  71:*10*
**calculated**  43:*17*
96:*12*  99:*15*
**Calculating**  44:5
70:*18*  71:2, *22*
100:*11*, *16*
**calculation**  48:*14*, *24*,
*25*  62:*16*, *22*  63:*24*
64:*11*  65:7, *16*  70:4
100:*17*
**calculations**  9:*18*
62:8  65:*14*
**calendar**  102:*4*
**call**  7:*1*, *11*, *12*, *18*, *21*,
*23*  8:*2*, *11*  15:*15*, *18*
25:*19*  102:*7*
**called**  13:8
**calls**  15:*21*  16:*1*, 4,
*15*  23:*13*
**candidate**  74:*14*
**capable**  18:*3*, 6
**capital**  11:*21*  74:*15*,
*25*  76:*1*, 6
**Caption**  105:*3*
**captioned**  105:*8*
**card**  74:*19*
**cards**  74:*17*
**career**  9:*12*  76:*14*
79:*9*
**careful**  81:*4*
**Carmichael**  41:*16*
72:*19*  75:7  82:7
88:*8*, *12*
**Carmichael's**  22:*14*
26:*16*
**carries**  69:*19*

**CASE**  1:*8*  5:8, 9, *11*,
*23*  7:*4*, *24*, *25*  8:*1*, 3
10:*14*  14:*20*  15:*2*, *16*
20:7  21:*3*, *12*, *25*
24:*1*, 2, 4, *11*, *12*  25:*4*,
*7*, *12*, *18*, *23*  26:2
27:*24*  28:2  29:*4*, *13*,
*22*, *23*  30:*1*, *25*  31:*4*,
*13*, *14*  32:*17*  34:*11*,
*14*, *19*  40:*1*  41:*13*
42:*24*  43:5, 7  47:*7*,
*14*, *23*  49:*21*  50:*2*, *23*,
*24*  54:*16*  61:*22*  62:*2*,
*9*, *13*, *17*  63:*22*  64:*15*
72:6  80:*10*, *18*  82:*23*
105:*3*
**cases**  13:*4*  34:*8*
43:*12*  80:*11*
**causing**  84:*20*
**Center**  2:*17*  3:5
19:*1*
**CEO**  49:*10*, *21*  51:5
52:*25*  53:*13*, *20*  54:*4*,
*18*, *25*  55:*22*, *25*
56:*11*, *25*  58:*1*, 4, *22*,
*24*  59:*12*, *14*, *22*  60:*4*,
*18*, *20*, *24*  61:*12*
63:*11*  72:9  74:*14*
76:8  81:*10*, *13*, *15*, *23*
82:*12*  83:*1*  85:*17*, *18*
86:*14*, *25*  87:*18*, *23*
88:*2*, 5, 9, *11*, *13*  89:*8*,
*14*, *17*, *18*, *24*  90:*9*, *10*
94:*25*  96:*4*, *18*  98:*22*
99:*17*
**CEOs**  54:*4*  55:*13*
83:*7*, *11*  85:*21*, *23*
86:*8*, *18*  87:*17*, *19*, *24*
88:*16*, *23*  89:*3*, 4
91:5, 7, 8  96:8  97:*23*
98:7  99:5
**certainly**  7:2  18:*22*
87:8
**certified**  5:4  6:*19*
**certify**  104:*6*
**change**  14:*14*  39:6
69:*21*, *23*  106:*4*, 7, *10*,
*13*, *16*, *19*, *22*  107:*4*, *7*,
*10*, *13*, *16*, *19*, *22*

Deposition of David Lewin, Ph.D.                                                   Philip R. McHugh v. Fifth Third Bancorp, et al.

**changes** 105:*11, 14*
**characteristics** 18:*2*
**characterize** 54:*22*
**characterized** 85:*18*
**charge** 22:*4* 23:*6*
**chart** 95:*6, 8*
**check** 24:*15* 29:*22*
30:*25* 31:*13* 52:*9*
**Chen** 86:*24*
**choice** 94:*7, 8*
**chooses** 49:*14*
**choosing** 94:*2*
**chose** 70:*10* 93:*25*
94:*7*
**Cincinnati** 1:*23* 2:*1,*
*9, 11, 18* 3:*6, 7*
*104:19*
**Cioffi** 2:*15* 5:*24, 25*
*6:8* 8:*14* 13:*16* 14:*1,*
*18* 15:*6* 16:*5, 21*
*21:7* 24:*5* 27:*8* 28:*7*
*32:12* 35:*1, 16, 19*
*36:1, 8, 20* 37:*4, 16,*
*23* 38:*12* 39:*9* 42:*3,*
*22* 43:*4, 20* 44:*17*
*45:16* 47:*16, 25* 50:*4,*
*9* 51:*24* 52:*4, 8*
*53:22* 54:*19* 55:*4*
*56:2* 57:*3, 11, 14*
*58:17* 59:*1* 61:*17*
*62:3* 66:*6* 67:*19*
*68:8* 70:*20* 71:*4, 12*
*72:24* 75:*19* 76:*25*
*77:11* 78:*3, 12, 19*
*84:7, 17* 85:*3* 90:*12,*
*18, 20, 22* 93:*3* 98:*10*
*100:1* 101:*4, 21*
*102:12* 103:*7*
**circles** 8:*21*
**circumstances** 14:*23*
*22:23* 37:*8* 70:*8*
*100:23*
**CISE** 63:*25* 65:*23*
*67:13*
**citation** 27:*13* 74:*10*
*86:25*
**citations** 73:*17, 25*
*74:6*
**cite** 12:*25* 86:*24*

*87:3*
**cited** 11:*11* 89:*20*
**citing** 13:*21* 73:*22*
**Civil** 14:*9* 16:*7*
*104:17*
**claim** 41:*15* 42:*20*
*43:19* 44:*9, 14, 16, 19*
*48:16* 62:*19* 81:*22*
**claiming** 10:*17*
**clarify** 25:*3*
**clause** 86:*16*
**clear** 40:*19* 47:*6*
*73:3*
**clearly** 11:*25*
**client** 78:*22*
**closer** 78:*18* 97:*12*
**closest** 20:*12*
**coach** 76:*18*
**Colin** 77:*17, 19* 78:*18*
**colleagues** 42:*9*
**Collin** 2:*16*
**collin.hart@blankrom**
**e.com** 2:*20*
**Columbia** 12:*15*
**come** 33:*10* 48:*22*
*52:11* 97:*17*
**comes** 53:*16*
**Commencing** 1:*14*
**comment** 50:*20*
**commenting** 67:*11,*
*12, 15, 21*
**Commission** 104:*24*
**commissioned** 104:*5*
**committee** 75:*11, 16,*
*18*
**common** 23:*15*
**communicate** 7:*13*
*23:10*
**communications**
*15:15, 20* 23:*14*
*25:16, 21* 26:*6*
**companies** 54:*13*
*55:8* 85:*24* 86:*20*
**company** 10:*15, 17*
*11:1* 13:*6* 42:*10*
*54:16* 55:*23* 56:*1, 10,*
*11, 17, 18, 19*
**company's** 10:*20*
*11:3*

**comparable** 76:*21*
*79:6* 92:*2* 93:*12*
**comparably** 54:*17*
**compared** 85:*19*
**comparing** 64:*4*
**comparison** 39:*5*
**compensation** 53:*7,*
*10, 17, 19* 54:*12*
*55:12, 22, 25* 57:*5, 7,*
*10, 15, 18* 58:*2, 6*
*60:5, 24* 63:*5, 10*
*91:20, 22* 92:*1, 5, 9,*
*10, 11, 17, 19, 23* 93:*2*
*94:15, 18, 19* 95:*11,*
*14* 96:*8, 17, 19* 97:*11,*
*14, 22* 98:*7, 21* 99:*7*
**complaint** 42:*8, 10*
**complete** 55:*19*
**concepts** 66:*15*
**concluded** 23:*2*
*103:18*
**concluding** 18:*7*
**conclusion** 36:*17*
*86:7*
**concur** 50:*11*
**confirm** 72:*19*
**conflict** 24:*15*
**confusing** 57:*4*
**consider** 7:*17* 11:*16*
*12:5* 65:*4* 100:*18, 19*
**considerable** 22:*14*
**consideration** 24:*7*
*79:23*
**considered** 42:*12*
*46:22* 49:*20* 72:*9, 11*
*81:9* 100:*11*
**consistent** 89:*7* 92:*5*
*96:9*
**consistently** 72:*7*
**constant** 91:*24*
**constitutes** 42:*1*
**constructive** 12:*6, 11,*
*21* 13:*2, 9, 15*
**constructively** 45:*11,*
*24*
**consultant** 21:*25*
**consumer** 11:*21*
*60:11* 61:*5*
**contact** 7:*9*

**contacted** 7:*4, 7*
**contain** 25:*5*
**contained** 25:*18*
*28:5* 96:*5, 14*
**context** 44:*11* 85:*17*
**continue** 60:*4, 24*
*101:14* 102:*15*
**CONTINUED** 3:*1*
**continuing** 81:*12*
**contract** 104:*17*
**contradicting** 72:*10*
**copies** 29:*14, 18*
**copy** 21:*2* 24:*4* 29:*6*
*64:19*
**correct** 6:*11* 8:*22*
*14:7* 15:*5, 10* 17:*11,*
*12, 16* 18:*12, 13*
*19:16, 19, 24* 20:*3, 16,*
*24, 25* 23:*25* 29:*9*
*32:2, 4* 34:*4, 8* 35:*22*
*39:8* 40:*1, 4, 17, 22,*
*23* 41:*17* 45:*7* 47:*9,*
*15* 48:*10, 12* 50:*3*
*51:2, 6, 14, 21, 23*
*53:14* 54:*13* 57:*16*
*59:23* 64:*1* 65:*8, 15,*
*21* 68:*4, 7, 19* 70:*12*
*72:3, 14, 22* 74:*7*
*79:15* 82:*2, 19* 83:*2*
*86:15* 87:*12* 88:*20*
*89:9* 94:*22* 95:*5, 20*
*98:3*
**corrections** 105:*11*
**correctly** 19:*22*
*68:20* 92:*13* 93:*7*
**correlate** 54:*12*
**counsel** 5:*13* 7:*6*
*14:2* 15:*16, 20, 22*
*19:18, 24* 23:*18* 24:*5,*
*8* 25:*17, 19, 20* 26:*6*
*27:20* 28:*9* 30:*24*
*31:22* 32:*15* 33:*6, 12*
*34:2, 3* 38:*14* 43:*6*
*44:17* 45:*16* 46:*18*
*48:18* 50:*4* 51:*11, 24*
*52:5* 56:*5* 57:*4* 68:*8*
*71:14* 73:*23* 75:*23*
*78:4, 21, 22* 90:*12*
*93:7* 100:*2* 101:*5, 20,*
*24* 102:*2* 104:*12, 14*

**counterclaim** 21:3, *12* 42:*19* 76:23
**countersued** 80:*13*
**countersuit** 80:*14*
**COUNTY** 104:*3*
**couple** 50:*14* 80:9
**course** 16:8
**COURT** 1:*1* 5:3, 4, 10 6:3, 13, 15 9:21, 24 10:22 70:*16*, 23 71:*1, 8, 19* 102:*16* 103:2, 5 104:*16*
**courts** 9:*17* 14:23 56:*13*
**court's** 71:*13*
**cover** 98:*16*
**create** 95:6, 8
**created** 24:*14, 19* 25:6, *11*
**criteria** 56:*16*
**criterion** 56:9
**critical** 60:*2*
**criticism** 51:8
**critique** 65:*19* 82:*14* 89:*11, 20* 91:*12, 14*
**cross-examined** 11:*10*
**CRR** 1:*21* 104:*4, 24*
**current** 58:23 101:*15*
**curve** 68:*18*
**customer** 30:*12* 42:9, *11*
**cut** 80:*25* 81:*3*
**cutting** 42:*11*

**< D >**
**daily** 68:*18*
**damage** 62:8
**damages** 8:*10* 40:*17* 41:*1* 43:*17* 44:5, 7 45:*1* 48:25 55:2 62:*16* 63:*1, 8* 67:*17* 68:7 70:4, 7 77:8 93:22 100:*16*
**data** 10:*11* 35:9 38:23 63:4 80:*1* 88:*4, 15* 89:6 91:7, 8 96:*21, 23, 25* 97:3, 7, 19, 20
**Date** 1:*14* 5:5 58:23

**68**:23 103:*15* 105:2
**dated** 39:23
**dates** 69:7
**DAVID** 1:*14* 4:3 6:3, *17*, 25 7:*1, 3* 14:6 17:*17* 18:*14* 19:6 39:*19, 23* 47:9 52:20 57:*10* 79:3 84:*19* 85:*12* 95:*10* 101:*12, 21* 103:*13* 104:7, *11* 105:*19* 106:24 107:*24*
**day** 76:*15* 104:20 105:*16*
**days** 32:9
**deal** 102:*16*
**DeBeer** 3:*1* 5:25 7:8, *19* 15:*14* 18:20, 24 19:*1* 32:8, *13* 83:*15, 16, 22, 25* 84:6, 21 102:5
**decades** 12:*14*
**December** 29:7 31:25 32:*1* 74:15, 24 76:*1, 6* 104:25
**decided** 22:25
**decides** 76:*17*
**decision** 11:*11* 71:9
**decisions** 59:6 71:*19*
**deck** 29:7, 8 31:25 32:*1*
**DECLARATION** 105:5
**declare** 105:6
**declined** 85:*21*
**declining** 88:5
**decrease** 11:*17*
**decreased** 34:23 35:*14*
**defendant** 103:9
**Defendants** 1:*10* 2:*11* 5:24 21:*11* 44:*14* 102:*12*
**defendant's** 21:2
**defense** 15:*16* 19:*18, 24* 24:7 25:*16* 26:6 32:*15* 34:2, 3 73:23
**defer** 59:*21*
**define** 17:*18*

**defined** 66:*14* 104:*17*
**defines** 45:*1* 69:*11*
**definition** 97:*11*
**delivery** 17:*11* 103:5
**demand** 18:9 80:22
**denied** 62:*19*
**depend** 100:*22*
**depending** 84:*12*
**depends** 36:23 44:*11* 97:5 99:3
**depose** 104:8
**deposed** 6:*19*
**DEPOSITION** 1:*14* 5:7, 16 19:7 22:*14* 23:3, 5 26:*16* 31:22 32:7, *11* 36:21 42:4 49:*18* 64:20 68:22 69:*1* 72:5 73:*12, 16, 18, 20* 74:2, 6 75:3, 7 78:8 90:6 102:*15* 103:*18* 104:7, *10, 11* 105:*1, 8, 12* 106:*1* 107:*1*
**depositions** 19:23 21:*14, 15, 17, 18* 22:3, 8, 10, 19, 20 23:*11, 17* 24:*18* 26:*12, 17, 22* 27:*1, 3, 7, 17, 18, 22, 23* 28:2, 5, *11, 13, 21* 29:3 31:*12, 19* 50:*1, 23* 72:*17, 21* 73:*1, 4, 7, 8, 12*
**described** 67:3
**desired** 63:*10*
**despite** 78:*1*
**determination** 14:*13* 36:*12* 40:20, 24 45:*12, 15, 23* 48:9 51:4 57:*18* 58:6, 7, 8, 13, 21
**determinations** 14:24
**determine** 18:3 22:18 26:21 29:20 30:23 31:*11* 34:*15* 37:3 38:*10* 39:6, 7 41:23 54:4 55:24 56:5 59:*13* 73:21 90:8 96:*16, 23*

**determined** 9:*22, 25* 27:*17* 31:*18* 34:*21* 45:*10* 70:*17*
**determining** 53:*17, 18* 55:8 56:*16* 89:*13* 97:3 100:*11*
**developed** 93:*10*
**deviation** 85:*1*
**different** 13:*10* 14:8 55:20 90:*19* 91:3 94:2 95:24
**difficult** 56:*19*
**digit** 15:23
**diligence** 101:5
**direct** 71:25
**direction** 11:6
**directly** 72:*10*
**directors** 59:25 72:8
**director's** 72:*17*
**disagree** 63:*19*
**discharge** 12:6, *11, 21* 13:2, 9, 15
**discharged** 8:7 45:*11, 24*
**discount** 68:*17* 70:3, 10, 17 71:*11*
**discoverable** 16:7 38:*17*
**discovery** 101:*15*
**discriminated** 8:9 10:*18*
**discrimination** 10:*4, 10, 14* 13:*24, 25* 14:8, 13, 16 15:5 34:8, *11, 16, 20, 22* 35:*13, 25* 36:7, *14, 19* 37:3, *15* 38:*11* 39:*1, 8* 40:*17, 21* 41:*1* 42:20 47:*13* 48:*10, 16* 61:22 62:*1, 9, 13, 16, 20* 77:24
**discuss** 7:23
**discussed** 7:24 12:*21* 33:6 66:*15*
**discussing** 24:3 34:6 76:*12*
**discussion** 22:23
**discussions** 15:*17* 23:*1* 26:23
**dispute** 12:*18* 101:*16*
**distress** 84:20

Deposition of David Lewin, Ph.D.                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

**DISTRICT** 1:*1, 2*
5:*10* 10:*13*
**DIVISION** 1:*3* 5:*11*
**divisions** 30:*15, 19*
**document** 19:*8* 21:*5*
27:*14, 15* 29:*12*
100:*8*
**documents** 16:*11, 17,*
*23* 17:*4, 10* 19:*10, 15,*
*22* 20:*1, 5, 9, 15, 16,*
*22* 21:*1* 24:*6, 10, 13,*
*19, 21* 25:*5, 6, 10*
27:*21* 30:*23* 31:*2, 3,*
*15* 49:*21* 50:*13, 24*
72:*6* 98:*4* 101:*17*
**doing** 36:*18* 43:*14*
64:*11* 87:*4* 101:*5*
**dollars** 99:*6*
**Donald** 5:*7* 6:*12*
**download** 17:*4*
**dozen** 46:*18*
**Dr** 6:*23* 16:*13*
32:*10* 48:*19* 49:*14,*
*22* 50:*6, 18* 51:*1, 17*
53:*2, 11* 60:*14, 22*
61:*11* 63:*18, 24* 64:*5,*
*9, 18, 25* 65:*1, 9, 17*
66:*2* 67:*1* 68:*2, 22*
69:*1, 6, 17* 70:*9, 23,*
*25* 82:*14* 89:*8, 11*
90:*2, 23* 91:*12, 15, 18*
96:*10*
**draft** 33:*18*
**drafts** 31:*24* 32:*3*
**drawing** 78:*11*
**dried** 80:*25*
**Dropbox** 16:*25* 17:*7,*
*14*
**due** 40:*16*
**duly** 6:*18* 104:*5, 8*
**duration** 80:*18*
**dynamic** 81:*5*

**< E >**
**earlier** 75:*25* 76:*5*
**early** 7:*5*
**earn** 53:*12* 54:*5*
55:*1* 60:*5, 24*

**earned** 58:*2, 9, 10*
59:*12* 63:*25* 65:*2*
70:*13* 95:*24* 99:*17*
**earnings** 52:*23* 60:*6,*
*25* 63:*10, 25*
**East** 2:*18* 3:*5*
**Eastern** 5:*2* 85:*10*
**easy** 56:*20*
**eat** 84:*15*
**economic** 68:*16*
**economics** 8:*25* 9:*3,*
*5, 11, 22* 66:*15*
**economist** 8:*22, 25*
9:*2* 85:*3*
**economists** 9:*9*
**effect** 80:*14, 21*
89:*19* 100:*14*
**effects** 9:*6*
**efforts** 64:*15, 23*
65:*7, 22* 67:*22* 76:*12*
99:*23* 100:*12*
**Either** 16:*18* 17:*13*
30:*5, 11* 72:*10* 79:*17*
87:*5*
**electronic** 26:*3, 4*
**electronically** 17:*13*
**elements** 13:*1, 15, 25*
**elevated** 85:*19*
**Email** 2:*10, 20* 3:*7*
7:*10, 13* 15:*14* 16:*18,*
*20* 17:*15* 26:*5, 10*
**emails** 25:*25*
**emergency** 74:*15*
**Emerson** 26:*19*
**empirical** 54:*11*
**employed** 92:*21*
**employee** 30:*8* 42:*19*
71:*3* 77:*7* 79:*23*
80:*15* 81:*1* 104:*13*
**employees** 10:*25*
14:*15* 34:*23, 24*
35:*13, 15* 37:*11, 13*
39:*6* 70:*18*
**employer** 42:*7, 18*
76:*23* 77:*7* 78:*17*
79:*24* 80:*4* 81:*1*
**employers** 18:*4, 5*
80:*12*
**employment** 8:*21*
11:*17, 20* 12:*8, 13, 22*

13:*5, 13* 14:*8* 34:*7*
38:*23* 39:*2* 41:*8*
63:*9* 65:*23* 67:*5, 13,*
*14* 79:*19* 80:*2, 16, 19*
85:*20*
**enforceable** 100:*21,*
*22*
**engagement** 25:*22*
30:*9*
**English** 73:*13*
**enterprise** 75:*11, 16,*
*17*
**entire** 9:*12* 21:*18*
76:*14* 105:*7*
**equate** 88:*1*
**Equilar** 98:*20, 25*
**equity** 57:*6*
**equivalent** 81:*25*
**Erie** 2:*8*
**ERRATA** 105:*1, 13*
106:*1* 107:*1*
**especially** 12:*18*
**Esq** 2:*5, 6, 7, 15, 16*
3:*1*
**estimate** 46:*14* 93:*22*
**estimated** 70:*7*
**et** 1:*9* 105:*4*
**event** 74:*14*
**events** 78:*13*
**eventually** 11:*10*
33:*8*
**everyday** 69:*15*
**evidence** 10:*24* 27:*9*
41:*22, 23* 47:*2, 7, 8,*
*12, 14, 19, 23* 48:*2*
49:*13, 17* 50:*2* 54:*11*
63:*11* 75:*20* 82:*23,*
*24*
**EVP** 79:*7* 81:*12*
**exact** 53:*7*
**exactly** 22:*13*
**Examination** 4:*4*
6:*21*
**examined** 6:*19* 41:*22*
**example** 12:*19* 15:*2*
16:*13* 42:*6, 12* 50:*14*
66:*14* 69:*20* 76:*13,*
*19* 88:*6* 97:*15*
**examples** 92:*20*
**exchange** 15:*14*

**excuse** 18:*14* 37:*13*
45:*25* 60:*1* 81:*6*
**executive** 54:*12*
66:*20* 74:*16, 25* 76:*1,*
*6* 79:*6* 86:*3* 92:*6*
97:*22* 98:*7*
**executives** 56:*18*
58:*6* 95:*23*
**Exhibit** 4:*7* 19:*3, 7,*
*11, 13* 20:*4, 22* 21:*16*
22:*3, 8, 11, 19* 23:*11,*
*17* 24:*18, 23* 26:*12*
27:*1, 18* 28:*12, 17, 22*
29:*3* 31:*6, 12, 20*
39:*16, 20* 52:*21* 73:*6*
**EXHIBITS** 4:*6*
28:*13, 15, 17, 21, 24*
29:*2* 31:*11, 18* 50:*2*
**exit** 86:*8*
**expect** 69:*17* 89:*18*
**expectancy** 9:*15, 19*
10:*1* 48:*15, 20*
**experience** 13:*3*
14:*22* 15:*19* 23:*6*
30:*12* 36:*11* 69:*16*
100:*20*
**expert** 9:*13, 14, 22,*
*25* 10:*3, 6, 9* 12:*5*
14:*15, 21* 15:*3, 19*
17:*17, 19, 21, 24* 18:*4,*
*12* 19:*23* 23:*15* 34:*7,*
*10, 14, 19* 35:*9, 12*
39:*22* 41:*5, 18* 43:*11*
46:*23* 61:*25* 62:*7, 12*
65:*10* 68:*22* 69:*17*
78:*8* 90:*2* 100:*16*
**expertise** 7:*16* 8:*19*
12:*10* 18:*8, 10* 41:*8*
43:*24* 44:*4, 6*
**expires** 104:*24*
**explain** 13:*14* 24:*10*
35:*7*
**exposure** 69:*16*
**expressed** 41:*3*
**extended** 80:*18*
**extensive** 63:*12*
66:*16*
**extensively** 66:*18, 22*
67:*7*

Deposition of David Lewin, Ph.D.                                Philip R. McHugh v. Fifth Third Bancorp, et al.

extent 93:20 100:10
externally 20:10
extreme 56:15

< F >
fact 11:1 31:1
34:22 47:22 78:17
93:5 94:9 95:2
factors 44:12 97:8, 9,
13, 16
facts 38:14 42:23
65:12 75:20 78:6
fail 92:22
failed 60:19
failure 61:22 62:1, 8,
9, 13, 16
fair 20:21 31:1, 5, 15
47:11 48:19
familiar 17:1 78:23
88:20, 24 98:20
far 10:2 38:16 52:9
55:1 78:24 85:24
88:6 89:7 90:7
98:18 99:10, 12
felt 8:8, 9
Ferry 86:6 87:3
field 12:7, 24 42:8
76:15
FIFTH 1:9 2:18 3:5
5:8 8:16 35:25 36:7
37:10, 18 41:15
46:16 47:4 51:6
53:13 54:4, 25 55:25
56:23 57:1 58:1, 14,
21 59:13 63:10, 14
72:7 74:10 79:7, 18,
19 83:1, 7 87:17, 19,
23 88:9, 13 89:6, 14
91:4 92:22 94:25
95:4, 7, 14 96:4, 17
97:3 105:4
figures 91:23
file 16:25 18:15
24:2, 4, 6, 11 25:4, 8,
12, 18, 23 26:2, 3
29:13, 22, 23 30:1, 25
31:13, 14 42:18
filed 10:22 21:12
fill 33:9
final 33:10

finance 88:17, 18, 23
89:3
financial 30:14
55:13, 23 56:1 87:6,
11 97:23 98:1, 8, 21
findings 10:22, 23
36:23 37:2
fine 52:3, 12
finish 38:6 51:25
84:8, 16
firm 66:21 104:16
firms 17:1
first 6:18 7:3 10:12
11:1, 13 19:14 45:9
74:9 86:13, 17 104:8
five 81:24 82:5
89:18, 24
fix 6:15
flaws 86:11
folder 17:14 18:14
following 102:24
follows 6:20
food's 83:22
football 76:13, 16
77:21
footnote 73:15, 25
75:6 86:22 87:2
force 10:17
foregoing 104:10
form 16:21 17:14
27:8 35:1, 17 36:20
37:4, 16 38:12 39:9
42:12, 22 43:20
47:25 53:22 54:19
55:4 56:2 57:3
58:17 59:1 62:3
66:6 67:19 70:20
71:4, 12 72:24 75:19
76:25 77:11 78:3, 19
98:10 100:1
formal 24:6
former 77:20, 22
81:1
forth 23:3 60:2 96:8
Fortune 53:20, 21
54:3 55:23 56:1
88:16, 22 89:4 90:9,
10 91:7, 8 97:22
99:5

forward 96:24
found 20:9 80:19
foundation 48:1
four 9:4 10:14
15:23 68:10 72:17
73:8, 11 81:21 82:1,
19 87:23 98:19
fourth 60:1, 2
fraction 63:9
free 76:15 77:23
front 100:8
functions 59:25
Funk 1:24
Further 85:15 86:7

< G >
gainful 80:15
game 76:14
general 53:16 91:8
geographically 66:22
germane 27:11, 12
give 20:13 41:25
45:14 56:4 60:19
67:24 86:25 87:2, 3
101:2
given 39:4 43:2
47:5 61:19 62:18
68:11 72:6 89:10
90:14 96:3 104:10
giving 49:5 68:1, 5
89:25 104:7
go 6:10, 23 14:6
16:25 18:23 19:2, 7,
14 23:3 28:13, 21
43:8 45:18 46:13
57:10 78:24 84:4, 23
86:1 88:3 97:8, 16
98:18 100:24 101:3,
21
goes 33:20 101:22
going 13:18 16:5
18:14 21:13 38:14,
15, 19 42:4 46:3
47:3 49:7 50:20
51:24 55:21 56:23
64:12 81:2, 6 84:4,
21 86:17 96:24 97:5
101:1, 14, 16 103:2
Good 5:3 6:16

69:20 83:19 84:1
greater 55:2
grievance 12:18, 20
grievances 41:21
Group 21:21 24:1,
11, 20 25:8, 12 26:2
30:3
guaranteed 92:19
97:12
guess 12:8
guessing 84:11
guesstimate 7:20
guy 84:4
guys 83:17

< H >
half 7:22 46:18
51:25 83:25 84:3
102:6
HAMILTON 104:3
hamper 81:2
hand 6:4 104:18
happen 56:13 81:3
94:3
happened 33:15
happens 33:17 70:7
happy 83:14
hard 26:3 97:17
Hart 2:16 32:9, 13
head 23:5 60:11
98:23
headhunter 66:21
67:10
heard 43:2 68:25
69:2 98:24, 25
heightened 86:4
Heiner 3:11
held 8:5 53:8 59:5
91:23
help 59:9 67:10
helping 18:2
helps 88:6
hereinafter 6:19
hereof 105:13
hereunto 104:18
high 74:18 75:12
76:2 80:22
higher 70:5 99:10,
12, 15

Deposition of David Lewin, Ph.D.                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

highlights **70**:5
highlights **86**:10
highly **63**:23
hinder **81**:2
hire **77**:25
hiring **38**:24
historical **83**:6 **89**:6,
15 **90**:10 **91**:4 **95**:6
**96**:3, 18, 21, 23, 25
**97**:19 **98**:4
Historically **96**:7
history **87**:16
hold **10**:3 **17**:19
**18**:11, 16 **87**:8 **95**:3
holding **71**:14 **89**:8
Home **10**:15
hope **11**:14
hopefully **84**:16
hour **7**:22 **51**:25
**83**:25 **84**:3 **102**:6
hourish **84**:12
hours **52**:7
human **23**:5, 7 **74**:15,
25 **76**:1, 6
Hypothetical **37**:5, 6
**38**:4 **43**:4 **55**:6
**77**:15 **99**:20
hypothetically **99**:21

< I >
idea **28**:4
identification **19**:4
**39**:17
identified **15**:13
**22**:10 **25**:10 **27**:11
**74**:4, 18 **75**:12
identify **5**:13 **19**:8
**39**:20
ignore **70**:25 **97**:7
imagine **76**:13
impact **10**:25
importance **13**:10, 11
important **23**:7
Improper **44**:25
**46**:5, 10, 17, 22, 25
**47**:2 **49**:11, 15, 24
**51**:18, 20 **53**:1, 4, 5,
11 **60**:9, 15, 16, 19
**61**:3, 6, 10, 13, 16

**63**:15, 23 **69**:4
inaccurately **78**:5
inappropriate **90**:18
inappropriately **85**:16
incentive **91**:21 **92**:1,
5, 7, 9, 10, 11, 17, 18,
23 **93**:1 **94**:15, 18, 19
**96**:3, 7 **97**:11
incentive-based **92**:3
**93**:12
incentive-wise **95**:25
include **16**:13 **27**:13
**33**:9 **87**:14
included **20**:19
including **12**:18, 22
**20**:9 **27**:21 **56**:12, 16
income **30**:18 **54**:3
**70**:18 **71**:2, 10, 22
**95**:6, 8, 24 **96**:3
incomes **95**:20
incomplete **38**:3
increase **11**:17 **69**:23
increased **11**:3, 7
**34**:25 **35**:15 **37**:11,
14
increases **70**:3
increasing **86**:2
indicate **63**:7 **71**:20
**72**:5, 7 **81**:9 **82**:24
**85**:15 **91**:20 **99**:4, 16
indicated **18**:11 **25**:4
**31**:21 **35**:8 **48**:8
**49**:19 **54**:24 **55**:3
**64**:20 **68**:22 **73**:19
**74**:19 **79**:13 **88**:22
**94**:20 **105**:12
indicates **11**:23 **19**:9
**39**:22 **89**:8 **100**:21
indication **54**:15
**82**:10
indicative **37**:15
individual **17**:25
**18**:2, 3, 5 **42**:7 **80**:19
**88**:11
individuals **18**:1
**80**:23
individual's **100**:16
Industrial **9**:8
industries **91**:9

industry **55**:13, 23
**87**:6, 11, 12, 15 **91**:7
**98**:22 **99**:5, 25
inference **34**:21
**35**:12
information **16**:3, 12,
14, 19 **22**:21 **45**:13,
22 **55**:19 **64**:17
**101**:18
Initially **86**:17
inserting **82**:16
instance **41**:12 **86**:13
instances **100**:21, 22
instruct **38**:15
instructions **71**:1
insurance **10**:15, 16,
17, 20, 25 **11**:2
intend **68**:12
intended **96**:18
intensive **63**:12 **66**:16
intensively **66**:23
interest **70**:12 **104**:14
interested **23**:4
interestingly **11**:11
interim **74**:13
interpretation **49**:3, 4
interpreting **49**:5
invade **16**:6
Inventive **91**:20
invest **56**:10
investments **70**:13, 19
**71**:20
invite **102**:4
invites **102**:4
involved **22**:2 **38**:25
**43**:10
involving **34**:8, 11, 20
irrelevant **42**:24
irrespective **69**:7
issue **41**:22 **80**:25
**101**:15 **102**:17
issued **25**:22
issues **77**:24
itch **86**:9
item **19**:15 **49**:7
items **46**:19
its **12**:14 **59**:14

< J >

Jeff **5**:25 **7**:19
**18**:20 **83**:16, 21
**84**:19
Jeffrey **3**:1
Jeffrey.debeer@blank
rome.com **3**:7
jms@sspfirm.com
**2**:10
job **41**:20 **63**:12
**65**:5, 22, 25 **79**:8
**81**:2
joint **6**:2
Josh **5**:20
Joshua **2**:6
journal **88**:21
journals **9**:1, 2, 5
**42**:14, 17
judge **11**:10 **101**:16
judgment **36**:15
**43**:10 **59**:19, 21
**82**:17
judgments **14**:25
July **68**:24 **69**:4

< K >
Kaepernick **77**:17, 19
**78**:18, 24
keep **68**:9
Kim **21**:24 **22**:4
**73**:24
K-i-m **21**:24
kind **17**:6 **18**:3
**22**:25 **38**:5 **67**:2
**80**:23
kinds **23**:14 **39**:2
**70**:7
kneeled **77**:23
know **7**:22 **10**:2
**14**:7, 9 **18**:22 **21**:5
**22**:12 **26**:1 **28**:20
**37**:7 **38**:3, 8, 22 **40**:9
**46**:1 **48**:6 **50**:21, 25
**52**:4 **56**:13 **58**:8
**60**:13 **64**:16 **77**:19
**79**:17, 25 **83**:16, 19
**84**:7 **88**:5, 8, 12
**92**:24 **102**:9
knowing **56**:11
known **16**:24

Deposition of David Lewin, Ph.D.                    Philip R. McHugh v. Fifth Third Bancorp, et al.

**knows** 48:*2*
**Korn** 86:*6* 87:*3*

**< L >**
**L.P.A** 2:*8* 3:*11*
**labeled** 73:*6*
**labor** 8:*21* 9:*8, 10*
12:*8, 13, 22* 18:*8, 9*
41:*8* 64:*6* 66:*15, 23*
79:*10, 21, 22* 80:*22*
81:*5*
**lack** 67:*22*
**Lamb** 75:*9, 15* 79:*14,*
*17*
**Lamb's** 74:*17*
**Law** 3:*11* 13:*21*
**lawful** 6:*18* 36:*14*
**lawyer** 13:*17* 14:*2, 3,*
*10, 19*
**leadership** 86:*3*
**leading** 12:*23*
**League** 77:*21, 25*
**leave** 13:*5* 84:*6*
**leaving** 85:*23* 86:*18*
**led** 49:*9* 77:*22*
**left** 79:*18*
**legal** 8:*21* 13:*14, 21,*
*25* 14:*11, 25* 19:*15,*
*22* 21:*1*
**Leighton** 3:*11*
**lend** 56:*20*
**letter** 25:*22*
**level** 11:*8* 64:*8*
91:*24*
**LEWIN** 1:*14* 4:*3*
5:*7* 6:*12, 17, 23, 25*
39:*23* 90:*23* 103:*13*
104:*7, 11* 105:*19*
106:*24* 107:*24*
**L-e-w-i-n** 6:*25*
**life** 69:*15*
**light** 78:*16*
**limit** 82:*10, 25* 98:*1*
**limitation** 82:*16*
**limited** 38:*14* 50:*1,*
*12, 21* 73:*8* 74:*14*
87:*15*
**limitedly** 13:*19*
**limits** 65:*1*

**line** 27:*13* 52:*1* 60:*5,*
*25*
**list** 19:*14* 20:*5, 11,*
*19, 20* 73:*17* 81:*7*
95:*19*
**listed** 19:*15* 20:*22*
21:*14, 15* 22:*3, 8, 19*
23:*11, 17* 24:*18*
26:*12, 18* 27:*1, 18, 21*
28:*12, 17, 22* 29:*3*
31:*6, 9, 12, 20* 46:*19*
63:*14* 68:*14* 72:*23*
73:*5* 76:*2, 7* 79:*4*
95:*23*
**lists** 19:*10*
**literature** 71:*18*
**litigation** 15:*16*
20:*24* 24:*20*
**little** 11:*14* 18:*21*
20:*17* 84:*10, 24*
85:*17*
**LLP** 2:*17* 3:*4*
**local** 66:*23*
**location** 56:*17*
**long** 7:*18* 10:*13*
16:*6* 35:*4* 66:*19*
69:*21* 82:*11* 83:*6*
88:*8, 12* 89:*13*
**longer** 84:*4, 24* 88:*6*
**long-winded** 11:*14*
**look** 53:*20* 55:*14, 16,*
*18* 66:*18, 19, 20*
67:*10* 80:*1* 83:*15*
87:*16* 88:*15* 89:*14*
**looked** 20:*9* 66:*17*
67:*5, 7* 79:*21*
**looking** 55:*21*
**looks** 75:*2* 96:*1*
**losses** 68:*16*
**lot** 38:*3* 100:*23*
**lower** 69:*13*
**lowest** 70:*2*
**lunch** 83:*18*

**< M >**
**mail** 17:*11*
**main** 10:*24* 21:*23*
**maintain** 26:*5*
**maintained** 25:*7, 12*

**maintains** 24:*1*
**majority** 47:*22* 50:*24*
**making** 19:*12* 40:*19,*
*24* 51:*10, 11* 56:*12*
57:*17* 58:*7, 8* 65:*11*
82:*17*
**managed** 30:*15, 20*
**Management** 8:*24*
12:*16* 74:*16, 25* 76:*1,*
*7*
**manager** 21:*25*
**managing** 21:*25*
**marginally** 12:*3*
**margins** 66:*16*
**mark** 27:*3*
**MARKED** 4:*6* 19:*3,*
*6* 39:*16, 20* 52:*21*
79:*2* 81:*7*
**market** 11:*21* 18:*8*
64:*6* 66:*23* 76:*16*
79:*10, 21* 80:*22*
**marketing** 42:*9*
**markets** 18:*9* 79:*22*
81:*5*
**marking** 20:*4*
**Marsha** 26:*18* 73:*16,*
*18* 74:*2, 6*
**materials** 19:*10* 33:*5*
61:*8*
**matter** 7:*15* 11:*20*
16:*9* 21:*24* 24:*14*
25:*7, 11, 23* 26:*7*
33:*5, 6, 7* 37:*8* 43:*11*
46:*23* 47:*19* 50:*15*
55:*20* 56:*20* 57:*19*
63:*4* 64:*11, 18* 80:*5*
105:*8*
**matters** 21:*21* 22:*1,*
*5* 23:*8, 15* 41:*20, 21,*
*24* 53:*16* 62:*23, 24*
**maximum** 81:*22*
82:*17*
**MCHUGH** 1:*6* 5:*8,*
*21* 15:*4* 21:*12* 22:*15*
30:*5, 9, 16, 20* 40:*16,*
*20* 43:*18* 44:*13* 45:*4,*
*11, 23* 46:*15* 47:*3, 13*
48:*9, 15, 21* 49:*1, 20*
50:*15* 51:*4* 53:*10*
56:*24, 25* 57:*25*

59:*11* 60:*3, 6, 10, 23*
61:*1, 12* 63:*7, 12, 25*
64:*6, 15, 18* 65:*2, 5,*
*14* 66:*5* 67:*5, 11, 15,*
*17* 68:*6* 69:*13* 72:*9,*
*11* 74:*13* 76:*2, 7, 22*
79:*5* 81:*11* 82:*6, 11,*
*25* 86:*12* 89:*8, 17, 23*
92:*2, 17, 21* 93:*1, 11*
94:*10, 24* 95:*3* 99:*16,*
*23* 100:*12* 105:*3*
**McHugh's** 22:*24*
26:*15* 30:*11* 41:*14*
45:*2, 10* 49:*8* 52:*23*
64:*19* 65:*21* 66:*3, 8*
67:*13, 22* 68:*16*
74:*18* 76:*12, 22*
77:*16* 78:*16* 81:*10,*
*22* 82:*13* 91:*21*
92:*10* 94:*17* 99:*22*
**mean** 14:*7* 21:*19*
80:*24* 84:*11*
**means** 10:*7* 66:*12*
**median** 54:*3* 55:*12,*
*22* 85:*22* 98:*21* 99:*6*
**meeting** 32:*8, 12*
101:*25* 102:*2*
**meetings** 12:*22*
**member** 73:*24*
**members** 22:*2, 6, 7*
49:*19* 50:*15* 72:*22*
75:*10, 15, 17*
**memo** 23:*14*
**memos** 23:*16, 19, 21,*
*23* 24:*16* 25:*9* 26:*13*
**mentioned** 26:*15*
32:*13* 102:*2*
**merely** 53:*3*
**Mergers** 97:*15*
**message** 7:*10, 14*
**method** 71:*9*
**Mia** 21:*24*
**M-i-a** 21:*24*
**Michael** 2:*15* 5:*25*
6:*5* 84:*6* 101:*1*
**michael.cioffi@blankr**
**ome.com** 2:*20*
**middle** 81:*19*
**million** 98:*9* 99:*6*

Deposition of David Lewin, Ph.D.                                Philip R. McHugh v. Fifth Third Bancorp, et al.

**mind**  87:*7*
**mine**  69:*22*
**minute**  18:*16*  100:*25*
101:*2*
**minutes**  29:*15, 18, 21*
36:*2*  83:*25*  84:*12, 20,*
*25*
**mirrored**  52:*24*
**mischaracterize**  50:*7*
**Misrepresents**  71:*13*
**Misstates**  47:*16*  50:*4*
**mitigate**  77:*8*
**mitigated**  63:*8*  67:*17*
68:*6*
**mitigation**  63:*18, 22*
64:*2, 3, 10, 13, 14, 23*
65:*1, 4, 6, 8, 10, 13, 22*
66:*4, 12, 25*  67:*2, 22*
76:*12*  79:*4*  99:*22*
100:*12*
**moderate**  74:*19*  76:*3*
**modern**  12:*19*
**months**  79:*8*
**move**  14:*2*  22:*22*
**Moving**  93:*23*
**multicomponent**  61:*2*
**Multiple**  72:*5*  73:*7,*
*12*

**< N >**
**name**  5:*3*  6:*24*  17:*3*
33:*24*
**named**  102:*3*
**names**  21:*22*
**National**  77:*21*  83:*11*
**nature**  7:*24*  23:*14*
80:*10*  86:*3*  92:*6*
**nearly**  72:*13*
**necessarily**  70:*5*
81:*2*  82:*10, 24*  89:*16*
**need**  6:*10*  18:*17, 23*
29:*20*  83:*21*
**negotiating**  76:*16*
**neither**  94:*23*  104:*13*
**net**  70:*4, 6*
**never**  31:*15*  72:*9*
**new**  8:*1*  10:*13*
**newly**  86:*8*
**Nicholas**  26:*18*

**No._____Change**
106:*2, 5, 8, 11, 14, 17,*
*20*  107:*2, 5, 8, 11, 14,*
*17, 20*
**No._____Line**  106:*2,*
*5, 8, 11, 14, 17, 20*
107:*2, 5, 8, 11, 14, 17,*
*20*
**noncompete**  99:*24*
100:*3, 10, 15*
**noncompetes**  100:*20*
**non-profit**  13:*6*  65:*3*
**Notary**  1:*21*  104:*5,*
*25*
**note**  78:*5*
**notes**  8:*11*  15:*25*
26:*25*  52:*10*  101:*1*
**Notice**  1:*14*
**noticing**  5:*19*
**noting**  86:*7*
**November**  1:*14*  5:*5*
104:*20*  105:*2*
**number**  5:*11*  9:*16*
15:*23*  19:*7*  23:*11, 17*
28:*12*  29:*3*  34:*24*
35:*15*  37:*11, 12*
39:*10, 11, 20*  40:*10,*
*13*  48:*23, 24*  49:*7*
50:*1*  52:*21*  61:*10*
63:*7*  64:*4*  66:*25*
73:*15*  81:*18, 21*
88:*10*  89:*5*  91:*25*
92:*4, 8, 16*  93:*24*
94:*6, 10, 16*
**numbers**  96:*7, 10*
99:*10, 14*
**numerous**  12:*21*

**< O >**
**oath**  5:*16, 23*  6:*7, 9*
105:*15*
**object**  6:*6*  42:*22*
66:*6*
**objection**  5:*15, 22*
6:*8*  13:*16*  14:*1, 18*
15:*6*  16:*5, 21*  21:*7*
24:*5*  27:*8*  28:*7*  35:*1,*
*16*  36:*1, 8, 20*  37:*4,*
*16, 23*  38:*12*  39:*9*
42:*3, 22*  43:*4, 20*

44:*17*  45:*16*  47:*16,*
*25*  50:*4*  53:*22*  54:*19*
55:*4*  56:*2*  57:*3*
58:*17*  59:*1*  61:*17*
62:*3*  67:*19*  70:*20*
71:*4, 12*  72:*24*  75:*19*
76:*25*  77:*11*  78:*3, 19*
90:*12*  93:*3*  98:*10*
100:*1*
**obligation**  66:*4, 8*
**obtain**  65:*6, 14, 23*
67:*14*  80:*15*
**obtained**  20:*1*  79:*6*
**obtaining**  63:*8*
**obviously**  19:*11*
**occasional**  23:*13*
**occur**  11:*23*  97:*13*
**occurred**  11:*6*  14:*14,*
*17*  27:*22*  34:*16*  39:*1*
**occurs**  12:*2*
**October**  39:*23*  45:*3*
82:*1*
**offer**  83:*10*  105:*14*
**offered**  60:*11, 14*
61:*5*
**office**  104:*19*
**officer**  5:*16*
**official**  104:*19*
**officially**  13:*7, 8*
**offset**  64:*4*
**oftentimes**  97:*16*
**Oh**  6:*13*  7:*20, 21*
8:*20*  9:*4*  22:*12*  33:*3*
40:*10*  52:*2*  65:*2*
78:*11*  87:*20*  94:*12*
99:*3*  102:*21*
**OHIO**  1:*2, 21, 23*
2:*4, 9, 14, 18*  3:*6, 10*
5:*10*  104:*2, 6, 19, 25*
**Okay**  13:*24*  18:*19*
19:*21*  20:*14, 21*  24:*3*
25:*3*  31:*8*  32:*6*
34:*10*  40:*11*  41:*5*
43:*12*  46:*9, 13*  47:*22*
48:*13*  55:*15, 21*  61:*4*
62:*7, 11*  66:*11, 25*
67:*24*  68:*3, 5, 21*
69:*3, 13, 25*  73:*7*
74:*12*  75:*7, 14*  79:*17*
82:*22*  83:*10, 20*

86:*23*  87:*16*  88:*11*
90:*4*  95:*2, 13, 16, 22*
96:*2, 7*  98:*6, 15*  99:*1*
101:*19*  102:*10, 21*
**old**  45:*4*
**older**  10:*25*
**once**  49:*25*
**one-factor**  56:*9*
**ones**  75:*11*
**online**  17:*8*
**open**  76:*16*
**opening**  6:*11*
**opine**  46:*1*  64:*10*
**opined**  41:*24*
**opining**  65:*24, 25*
66:*1*  70:*22, 23*
**opinion**  10:*24*  11:*9*
13:*17*  14:*3, 16, 19*
15:*3*  27:*12*  34:*10, 14,*
*19*  35:*9, 12, 22*  39:*5*
40:*15*  41:*25*  42:*4*
43:*6, 11, 25*  44:*3, 19,*
*20*  45:*7*  49:*16*  50:*5,*
*6*  51:*3, 20*  54:*2, 7, 8,*
*9*  59:*16, 18*  60:*15*
63:*21*  67:*24*  68:*5, 11*
70:*25*  78:*9*  89:*11*
90:*1, 2, 14*  93:*10*
**opinions**  13:*21*
14:*11*  27:*12*  29:*4*
31:*4*  41:*14, 18*  68:*1*
83:*10*
**opportunities**  81:*3*
**opposed**  76:*8, 9*  91:*8*
93:*24*  94:*5*
**order**  7:*12, 22*  63:*1*
77:*15*  103:*3, 8*
**organization**  12:*23*
13:*6*  65:*3*
**original**  24:*15*
**outline**  33:*8, 13, 16*
**outside**  13:*17*  63:*9*
**owed**  49:*1*

**< P >**
**p.m**  1:*14*  5:*1, 6*
52:*13, 15, 16*  85:*5, 7,*
*8, 9*  101:*8, 9*  103:*18*
**PAGE**  4:*3*  40:*13*
44:*23*  46:*4*  52:*21*

60:*3*  68:*15*  72:*4*
74:*5, 9, 11*  76:*11*
79:*3*  81:*6, 7, 8*  85:*12*
91:*18*  93:*13, 17*
106:*2, 5, 8, 11, 14, 17,
20*  107:*2, 5, 8, 11, 14,
17, 20*
**pages**  40:*3*  73:*19*
**paid**  55:*1*  58:*14, 18,
22, 24*  59:*3, 5, 14*
96:*8, 17, 19, 21, 24*
97:*3*  99:*10*
**paper**  26:*3*
**papers**  12:*17*
**paragraph**  40:*13*
44:*24, 25*  46:*3, 7, 11,
19, 20*  49:*7*  52:*20, 22*
60:*3*  68:*15*  72:*5*
74:*12*  76:*11*  79:*3*
85:*13*  91:*17, 19*
**paragraphs**  46:*7*
73:*14*  74:*5*
**Paralegal**  3:*11*
**Pardon**  23:*22*  38:*6*
**part**  9:*18*  10:*16*
12:*7*  26:*15*  60:*14*
69:*15*  77:*2*  82:*14*
90:*2*  93:*25*
**particular**  10:*15*
15:*2*  21:*23*  24:*12*
37:*8*  54:*16*  63:*4, 22*
64:*15*  65:*19*  66:*19*
75:*8*  89:*15*  94:*10*
100:*7*
**particularly**  23:*4*
80:*3*  85:*24*  86:*19*
**parties**  13:*5*  15:*20*
43:*10*  104:*14*
**parts**  22:*14*  23:*2*
73:*10, 11*
**pas@sspfirm.com**
2:*10*
**passes**  49:*22*
**password**  17:*3*
**paths**  76:*17*
**patterns**  38:*24*
**Patterson**  2:*8*
**pay**  59:*4, 22*
**paying**  54:*17*  55:*8*

**peers**  79:*10, 13*
**PENALTY**  105:*5, 6*
**pending**  47:*10*
101:*15*
**People**  21:*20*  59:*5*
**percent**  11:*8, 24*
12:*3*  37:*12, 14*  69:*24*
86:*8*  91:*25*  92:*4, 8,
16*  93:*8, 24*  94:*4, 5, 8,
10, 14*
**percentage**  92:*11*
94:*17, 18*
**percentages**  93:*21*
**perfecting**  76:*14*
**perform**  80:*23*
**performance**  30:*4, 6,
15*  49:*8*
**performance-based**
92:*6*
**performance-driven**
86:*3*
**performed**  63:*12*
**period**  34:*24, 25*
35:*14*  37:*12, 14*
38:*25*  45:*1*  54:*5*
58:*25*  81:*22*  94:*20,
21, 23*  95:*3*
**periods**  69:*21*  81:*11*
97:*6*
**PERJURY**  105:*5, 6*
**persnickety**  20:*17*
**person**  13:*5*  21:*23*
23:*6*  53:*6, 7*
**personal**  22:*21*
**personally**  6:*1*
**Peter**  2:*5*  5:*20*
18:*20*  84:*8*  103:*2*
**PH.D**  1:*14*  4:*3*  5:*8*
6:*17*  8:*23*  12:*12*
39:*23*  103:*13*  104:*8,
11*  105:*19*  106:*24*
107:*24*
**phenomenon**  11:*5, 23*
12:*2*  86:*9*
**Phil**  30:*5, 9*  40:*20*
43:*18*  44:*13*  89:*23*
92:*21*  99:*16, 23*
100:*12*
**PHILIP**  1:*6*  5:*8, 21*
21:*12*  105:*3*

**Phone**  2:*9, 19*  3:*6*
23:*13*  25:*19*  102:*6*
**phrase**  29:*10, 11*
39:*14*  50:*12*  86:*21*
**physical**  17:*11*
**Place**  1:*14*  104:*10*
**plain**  73:*13*
**Plaintiff**  1:*7, 14*  2:*1*
5:*21*  8:*4, 8*  62:*12, 18,
25*  80:*12*
**plaintiffs**  80:*13*
**Plaintiff's**  4:*7*  19:*3*
39:*16*
**Plan**  74:*16*  75:*1*
76:*2, 7*
**player**  76:*13*
**plays**  23:*7*
**Please**  5:*18*  6:*3, 24*
24:*6*  39:*21*  87:*7*
95:*9*
**plural**  18:*1*
**PNC**  2:*17*  3:*5*
**point**  18:*7*  33:*13, 15,
18, 20*  38:*15*  61:*7*
65:*11*  66:*25*  69:*22*
71:*24*  76:*24*  83:*13,
19*  88:*7*
**point-type**  33:*8*
**police**  9:*6, 7*
**Poor's**  69:*20, 23*
**portions**  21:*17*  22:*10,
18*  23:*11*  26:*11, 17,
21*  27:*7*  33:*22*  34:*1*
74:*1*
**position**  53:*8, 14, 16*
60:*11*  63:*1, 25*  64:*7,
12*  66:*18*  79:*7*  83:*2*
89:*9, 22*  95:*4*  96:*4,
19, 24*
**positions**  8:*5*  59:*5*
63:*5*  66:*18*  69:*14*
85:*20*
**possibility**  92:*1, 18*
93:*11, 15, 19*
**possible**  54:*21, 22*
70:*2*  99:*21*
**potential**  18:*5*  74:*13,
18, 19*  75:*12*  76:*3, 8*
81:*10*

**precisely**  82:*8*
**preclude**  99:*24*
**predict**  97:*17, 18*
**preparation**  32:*11*
**prepare**  24:*22*  32:*6,
24*  33:*2*  95:*13*
101:*25*
**prepared**  23:*16, 19*
24:*17*  39:*25*
**preparing**  20:*23*
27:*10, 15*  32:*17*
73:*25*
**presence**  100:*14*
**Present**  3:*7*  68:*16*
70:*3, 6*  71:*2, 10, 22*
**president**  46:*16*  47:*4*
49:*8, 20*  51:*5*  52:*25*
53:*13, 19*  54:*4, 18, 25*
55:*25*  56:*25*  58:*1, 4,
22, 24*  59:*12, 14, 22*
60:*4, 18, 20, 23*  61:*12*
63:*11*  72:*9*  76:*9*
81:*15*  82:*12*  83:*1*
86:*14*  89:*13*  94:*24*
96:*4, 18*  99:*17*
**presidents**  83:*7*
**Presumably**  31:*17*
**presumed**  85:*25*
**pretty**  52:*9*
**prevail**  48:*16*
**previous**  41:*7*  79:*7*
83:*7*  87:*19*  90:*25*
**previously**  15:*13*
25:*4*  31:*21*  32:*14*
39:*4*  41:*18*  54:*10*
73:*6*  74:*1*  91:*3*
**principally**  9:*9*
**prior**  33:*17*  47:*16*
56:*7*  63:*10*  79:*24*
80:*4*  81:*12*  87:*22*
88:*12*  98:*13*
**private**  54:*13*
**privilege**  16:*7*
**probability**  11:*8, 22*
**probably**  7:*22*  15:*22*
**procedure**  12:*20*
**procedures**  12:*19*
**professional**  76:*13*
**professor**  9:*12*

Deposition of David Lewin, Ph.D.                                    Philip R. McHugh v. Fifth Third Bancorp, et al.

**progress** 101:*14*
102:*15*
**promised** 81:*23*
**promote** 61:*22* 62:*1,*
*9, 13, 17*
**promoted** 46:*16*
47:*3* 50:*16* 86:*13*
**promotion** 49:*9*
62:*19*
**promotions** 52:*23*
**proper** 65:7 71:*9*
**properly** 65:*12*
67:*17* 68:6
**protest** 77:*24*
**protocols** 17:*2*
**provide** 15:*3* 24:*4*
32:*15* 33:*11* 41:*14*
43:*13* 48:*14* 73:*23*
**provided** 16:*3, 12, 14,*
*17* 19:*18, 24* 20:6, *23*
21:*2* 26:*13* 27:*19, 20*
28:*12, 15, 20, 25* 29:6,
*14, 18, 21* 30:*4, 8, 11,*
*14, 18, 24* 31:*11, 15,*
*19, 24* 34:*1, 7, 10, 14*
35:*8, 11, 22* 38:*14*
41:*10, 19, 23* 45:*13,*
*22* 50:*13* 61:*25* 62:7,
*12* 64:*19* 68:*24* 70:*9*
72:*16, 20* 73:*17*
**providing** 14:*12*
**proxy** 95:*14*
**public** 54:*13* 86:5
104:5, *25*
**publicly-traded** 85:*24*
86:*20*
**Public-State** 1:*21*
**published** 8:*25* 9:*2,*
*3, 7*
**publishes** 9:*8*
**purpose** 17:*8* 19:*13*
38:*9* 80:5
**purposes** 78:6 97:*1*
**Pursuant** 1:*14* 6:*1*
104:*12*
**put** 33:7 38:*4* 70:*15*
75:5 76:*12* 83:*2*
84:*22* 90:*1* 91:*19*
**putting** 99:*20*

**< Q >**
**qualified** 104:5
**quantified** 93:*15, 20*
**quantify** 93:*19*
**quarterback** 77:*20, 22*
**question** 9:*19* 11:*15,*
*19* 12:*9* 16:*10, 22*
20:*8* 23:*9* 25:*2, 3, 9*
26:*24* 27:*9* 32:*25*
35:*2, 3, 11* 37:7, *17,*
*19* 38:*13* 39:*10*
41:*20* 42:*23* 43:*21*
44:*2, 3* 45:*17, 19, 21*
47:*10, 11, 13* 48:*1, 3*
50:*9* 53:*23* 54:*20*
55:5, *9* 56:*3, 7* 57:*4,*
*12* 58:*16, 18, 19* 59:*2,*
*9* 62:*4* 64:*17* 65:*20*
66:7, *9* 67:*20* 70:*21*
71:5, *13* 72:*25* 74:*10*
75:*20* 77:*1, 12* 78:*4,*
*20* 79:*25* 83:*14*
87:*10* 90:*13, 17, 19*
91:*1, 13* 92:*24* 93:6
96:*20, 22* 98:*11, 13*
100:*2, 13*
**questioning** 52:*1*
**questions** 41:7 68:*9*
78:5 83:*4* 101:*12*
102:*12*
**quick** 84:*14*
**quickly** 84:*8*
**quit** 13:*12*
**quite** 9:*10* 10:*13*
48:*18*
**quote** 22:*12*
**quoting** 75:6

**< R >**
**racial** 77:*24*
**raise** 6:*3*
**raised** 44:*13*
**raises** 42:*10*
**raising** 42:*8*
**random** 94:*8*
**range** 56:*17* 70:*9*
81:*19* 84:*12* 93:*22*
**ranging** 93:*8*

**rate** 68:*17, 23* 69:*10,*
*11, 18, 19, 20* 70:*2, 5,*
6, *11, 12, 17* 71:*11, 21*
**rates** 63:5, 6 68:*18*
69:*12, 13, 23* 70:*1, 10*
85:*19* 86:*25* 94:*3*
**Raymer** 1:*21* 5:*4*
104:*4, 24*
**reach** 36:*17*
**reached** 60:6, *18*
61:*1*
**read** 21:*15, 17, 18*
22:*20* 33:5 41:*4*
46:6, *11* 61:*8* 67:*1*
68:*20* 73:*10, 11*
82:*21* 92:*13* 103:7
105:7, *9*
**readily** 55:*16, 18*
**reading** 22:*13* 23:*2*
49:*1, 2* 69:*3*
**reads** 44:*25* 74:*12*
**ready** 81:*16, 19, 23*
84:*23* 101:*3*
**real** 33:*19* 68:*18*
**really** 15:*24* 39:*15*
56:*4* 90:*18, 25*
**Reason** 106:*4, 7, 10,*
*13, 16, 19, 22* 107:*4, 7,*
*10, 13, 16, 19, 22*
**reasonable** 53:*19*
55:*25* 56:6, *9, 19*
65:6, *13, 22*
**reasonableness** 56:6,
*14, 16* 65:*24*
**reasonably** 79:5
**rebuttal** 51:*1* 61:*18*
64:*25* 68:*1* 96:6
**rebutting** 50:*17* 90:5
**recall** 15:*22, 24*
16:*14* 21:*4, 9, 13*
22:*9, 13, 17* 23:5, *18*
24:*21* 26:*14* 27:7
28:*3, 16, 23, 24* 29:*11,*
*17* 30:7, *10, 13, 17, 21*
31:*2* 64:*17* 71:*16*
75:*22* 76:*4, 10* 80:*20*
82:*8* 88:*10* 89:*17*
96:*11* 102:*8*
**recalling** 61:7

**rate** (see above)
**receive** 16:*19* 17:*10*
75:*2* 92:*22* 93:*1, 11*
94:*11* 98:*8*
**received** 16:*22* 24:*13*
25:6 31:*22* 62:*18, 25*
64:*12* 74:*24* 92:*2*
95:*23* 99:6, *13, 18*
**recess** 52:*15* 85:7
101:*8*
**recognize** 102:*16*
**recognized** 9:*14*
29:*10*
**recollection** 30:*23*
49:*2, 6, 18, 22* 74:*23*
80:*17* 87:*14* 90:*1*
**record** 5:*2, 15, 18*
6:6, *24* 52:*14, 18*
85:6, *10* 100:*24*
101:6, *11* 102:*23*
**recorded** 102:*24*
**recruiter** 67:*10*
**reduces** 70:6
**reduction** 11:*2, 5*
**reductions** 10:*16, 21*
**redundant** 52:*9*
**refer** 7:*21* 85:*12*
91:*18*
**reference** 17:6 20:*18*
40:*8* 45:*9* 72:*1* 73:*1*
**REFERENCED** 4:6
20:*14* 21:6 24:*16*
73:*8*
**references** 73:*15, 22*
**referencing** 82:*4*
**referred** 86:*9*
**Referring** 40:*13*
44:*23* 52:*20* 72:*4*
73:*14* 74:*4, 12* 75:*10*
79:*2, 14*
**refers** 66:*17*
**reflect** 20:5
**reflecting** 81:*15, 18*
92:*1*
**reflects** 86:*2*
**refrain** 78:*9*
**refresh** 30:*22* 74:*23*
**regain** 80:*2*
**regard** 22:*24*
**regarding** 7:*4* 15:*16*
24:*17* 35:*9* 41:*10, 14,*

Deposition of David Lewin, Ph.D.                                         Philip R. McHugh v. Fifth Third Bancorp, et al.

*19* 62:8 64:22 65:6
67:25 72:2 97:22
98:21 101:17
**regional** 66:23
**register** 17:3
**Regular** 103:5
**related** 38:17 41:21
72:6
**Relatedly** 86:10
**Relations** 9:8 12:23
**relative** 91:22 104:13
**relevance** 85:17
**relevant** 34:23 35:14
37:12 43:7 54:5
**reliable** 55:19 89:12
**relied** 19:10 20:11
31:6 50:12
**relies** 46:14
**rely** 20:11, 15, 21
21:6 29:2 31:3, 9
**remain** 61:12 86:13
**remarks** 6:12
**remembered** 61:8
101:23 102:3
**REMOTE** 1:14
**render** 10:11 14:15
43:25 44:3, 18 51:2
54:8 63:21
**rendered** 10:24 11:9,
11 29:4 31:4 34:19
54:7 71:9
**rendering** 13:21
14:3, 11, 19 20:6
54:8
**repeat** 35:4 64:10
65:18
**repeating** 68:9
**rephrase** 58:19 59:9
65:20
**replied** 7:11
**report** 10:21 16:13
20:6, 18, 23 21:7
24:23, 24 25:13, 14
27:10 32:9, 10, 17, 24
33:2, 9, 10, 11, 22, 24
34:1 38:18 39:12, 23,
25 40:3 44:24 45:1
46:4, 20 49:2 52:21
53:8 64:24, 25 66:14
69:22 72:4, 25 73:15

*79:3* 81:7 83:5, 14
85:13, 15 87:3 89:8,
20 90:3 91:12, 15, 16,
19 96:6, 15
**reported** 10:22 95:19
**REPORTER** 5:3, 4
6:3, 13, 15 103:2, 5
**Reporting** 1:22
104:16
**reports** 9:16 19:23
24:22 27:7 33:21
87:5 95:14 97:21, 24
98:7, 14, 20 99:1
**Report's** 44:25
46:14 72:10 85:25
86:11
**represent** 5:14 6:1
**representation** 6:2
40:6 77:3
**represented** 94:18
**representing** 81:21
**request** 24:6
**requested** 101:18
**requires** 62:17
**Research** 21:21 24:1,
11, 20 25:8, 12 26:2
30:2 86:6
**resignation** 13:8
45:3, 10
**resigned** 40:16
**resolution** 12:18
101:15
**resources** 23:6, 7
**respect** 13:24 21:1,
14 23:16 24:20 25:7
26:6 28:11 31:3, 19
32:16 37:10 40:25
44:19 45:9 46:11, 18
59:11 66:4 80:2
91:10 99:22
**respective** 28:21
95:23
**respects** 104:12
**response** 57:14 83:4
91:13 98:13
**responses** 41:21
84:13
**responsible** 72:8
**responsive** 11:15

**result** 26:12 43:18
44:8 48:21 62:20
104:15
**retain** 60:4, 18 66:21
**retained** 10:6 13:4
15:19 41:25 43:12,
13 44:18 48:8 60:23
67:9 72:12
**retaliates** 42:10
**retaliation** 41:5, 9, 11,
15, 19, 24 42:2, 12, 15
43:18 44:8, 14
**retention** 16:9 24:14
46:23
**retirement** 60:6, 19
61:1 85:16
**return** 60:11
**returned** 81:12
**Review** 9:3, 8 22:11,
19 26:11, 17, 22
30:24 47:6, 14 49:25
50:1, 5, 21, 22 64:22
72:21 73:3, 9 101:1
**reviewed** 20:6 23:12
26:25 32:9, 10 51:3,
21, 22 72:16 73:5
74:1, 24 82:22, 23
99:1
**reviewing** 22:3, 8
26:15 27:4
**reviews** 30:5, 6
**right** 6:4, 14 17:15
18:18 30:21 41:2
47:24 48:17, 18
51:15 52:2 54:18, 22
55:3, 7, 17 57:2, 23
58:11 61:22 63:2
65:15 67:25 70:14,
19 72:17, 18 73:4, 9
74:4 75:13 76:24
77:9 78:2, 18 79:16
81:7 82:7, 20 83:12,
20 85:4 88:2 94:25
95:7, 24 96:10 99:11,
13 101:4 102:14
**Rights** 14:9
**risk** 69:14, 19
**risk-free** 69:18
**riskless** 69:11, 12, 18

**role** 23:7 53:19
54:24 60:18, 20 61:5
72:10 79:6 81:12, 17,
23 82:11, 18 94:24
**roles** 60:4, 23 72:12
81:20 85:18, 23
86:19
**Rome** 2:17 3:4 5:25
8:13 17:1
**RPR** 1:21 104:4, 24
**Rule** 16:7 36:21
38:17 104:17

**< S >**
**S&P** 85:21
**S/Wendy** 104:24
**Saba** 2:5, 8 4:4
5:20 6:5, 22 13:23
14:5 15:1, 12 16:16
17:9 18:18, 22, 25
19:5 21:10 24:9
27:16 28:10 35:6, 21
36:5, 16 37:1, 9, 20
38:1, 21 39:18 42:13
43:1, 16, 23 44:22
45:20 47:21 48:7
50:8, 19 52:2, 6, 12,
19 54:1, 23 55:10
56:22 57:9, 14, 16, 21
58:19, 20 59:8 61:20
62:6 66:10 67:23
68:13 70:24 71:7, 17
73:2 75:24 77:5, 14
78:11, 13, 15 79:1
83:20 84:10 85:2, 11
90:16, 19, 21 91:2
93:9 98:15, 17 100:5,
24 101:12 102:1, 10,
20 103:1, 4, 6
**safest** 70:13, 19
71:20
**salary** 91:23 97:12
**save** 105:10
**saved** 23:21, 23, 24
**saw** 47:3
**saying** 41:13 46:20
50:17 58:12 59:24
60:17, 21 61:15 65:2
71:6 82:13 89:17

Deposition of David Lewin, Ph.D.                                       Philip R. McHugh v. Fifth Third Bancorp, et al.

says  20:*11*  39:*22*
40:*15*  46:*11*  65:*1*
70:*10*  73:*12*  75:*13*
scenario  77:*15*  92:*16*,
*17*  93:*23*  94:*14*
scenarios  81:*9, 14*
91:*21, 24*  92:*15*
93:*21, 22*  94:*1*
School  8:*24*  12:*15, 16*
scope  13:*17, 22*
14:*20*  15:*7*  36:*21*
38:*18*  39:*11*  41:*7*
42:*3*  43:*6*  44:*18*
screen  18:*15*  31:*7*
39:*19*  40:*5, 9*
scroll  86:*22*
scrolling  83:*5*  87:*7*
scrutiny  86:*4*
se  30:*6*
seal  104:*19*
search  63:*13*  64:*6*
66:*16, 21*  79:*8*  81:*2*
searching  20:*10*
second  11:*5*  95:*9*
97:*10*
sections  33:*10*
sector  34:*12, 17, 20*
35:*10*  63:*9*  64:*7, 8*
79:*7*  80:*3, 20*  88:*17,
18, 23*  89:*3*  97:*23*
98:*2, 8*
security  17:*2*  91:*23*
see  18:*15*  21:*15*
22:*22*  27:*23*  40:*5, 9,
10, 12*  45:*5*  47:*12*
60:*7*  74:*21*  75:*5*
76:*19*  79:*11*  85:*13*
86:*24*  87:*9*  93:*6*
94:*3*  95:*10*  96:*12, 21*
99:*14*  101:*2*
seeing  74:*8*
seen  47:*19, 23*  50:*22,
23*  97:*21, 24*  98:*4, 14*
select  92:*16*  93:*23*
selected  72:*12*
selecting  72:*8*
senior  21:*24*
sense  13:*10*  88:*4*
sent  7:*10*  16:*11*
17:*13*

sentence  41:*4*  46:*3*
75:*8*  86:*17*
sentences  33:*19*
separate  18:*6*
separated  8:*6*
separately  73:*21*
separation  13:*9, 12*
22:*25*
separations  38:*24*
September  68:*18, 23*
serve  83:*1*  89:*13*
served  72:*12*  82:*11,
18*  83:*8*
services  55:*13, 23*
56:*1, 18*  87:*6, 11*
98:*22*
serving  99:*17*
set  60:*2*  94:*1*  96:*8*
104:*18*
setting  11:*18, 20, 21*
34:*7*
settings  12:*21*
Shaffer's  23:*4*  26:*16*
share  18:*14*
shared  17:*14*
shareholders  86:*4*
sharing  19:*6*  39:*19*
Sharpe  2:*7*  5:*21*
SHEET  105:*1, 13*
106:*1*  107:*1*
sheets  30:*19*
shell  27:*14*  33:*18*
shoot  84:*24*
short  69:*21*
shorter  85:*19, 24*
86:*10*
shortly  84:*16*
show  53:*9*  93:*13*
showed  63:*4*
showing  24:*23*
shows  54:*11*
sic  5:*7*  91:*18*
side  9:*11*
sign  103:*7*
SIGNATURE:_____
_____DA
TE  106:*23*  107:*23*
signed  25:*23*  105:*16*
significant  11:*7, 17,
25*  12:*4*

significantly  11:*4*
85:*18*
similar  79:*7*
similarly  79:*10*
simply  53:*6*  61:*7*
64:*8*  65:*25*  90:*15*
single  15:*22*  54:*11*
sit  29:*1, 17*  51:*13*
55:*12*  56:*24*  67:*4, 16*
82:*9*  100:*8*
sitting  22:*13, 17*
situated  79:*10*
situation  9:*21, 24*
58:*15*  76:*21, 22*
78:*16*
six  79:*8*
size  54:*11, 16*  56:*17*
sized  54:*17*
skills  18:*1*
slightly  11:*3*
Smith  2:*6*  5:*20*
social  91:*23*
solely  78:*6*
somebody  44:*8*
53:*12*  64:*11*  73:*22*
80:*2*  89:*13*  96:*21*
soon  84:*23*
sorry  6:*13*  28:*9*
32:*25*  87:*10*  101:*21*
102:*20*
sort  7:*17*  17:*14*
43:*14*  81:*4*
sorts  97:*1*
Sound  84:*1*
Sounds  85:*3*
source  31:*23*  75:*8*
87:*1*
SOUTHERN  1:*2*
5:*10*  10:*13*
spanning  45:*2*
speaks  21:*7*  72:*25*
specialty  12:*12*
specific  21:*22*  35:*11*
73:*22*  87:*5, 10*  94:*9*
specifically  30:*20*
31:*10*  52:*22*  56:*23*
80:*1*  88:*18*
specification  82:*20*
specifications  93:*7*

94:*1*
specifics  44:*11*  83:*13*
specify  83:*24*
spell  6:*24*
spells  46:*12*
Spence  30:*5, 9, 16, 20*
52:*24*  53:*10*  55:*1*
56:*24*  57:*2*  58:*2, 10*
75:*9, 14*  76:*3, 9*
81:*16, 19, 23*  87:*23*
94:*24*  95:*3*  99:*10, 13,
18*
Spence's  30:*12*  60:*5,
25*  74:*17*  91:*22, 24,
25*  92:*4, 8, 11*  94:*15,
19*
spent  76:*14*
spoke  102:*6*
SS  104:*2*
SSP  3:*11*
staff  21:*17, 19*  22:*2,
4, 6, 7*  23:*1, 10, 20*
24:*17*  26:*13, 23*  33:*7,
23*  73:*11, 23, 24*
95:*17, 18*
Stagnaro  2:*8*
stand  61:*19*  89:*21*
Standard  5:*2*  69:*20,
23*  85:*1*
stands  89:*11*
start  22:*20*  84:*15*
101:*22*
starting  5:*19*  92:*15*
state  5:*18*  6:*23*
104:*2, 6, 25*
stated  93:*6*
statement  31:*16*
46:*8*  82:*6*  94:*12*
statements  30:*19*
STATES  1:*1*  5:*10*
12:*20*
statistic  89:*2, 12*
statistical  10:*19*
11:*22*  14:*12*  34:*15*
35:*9, 24*  36:*6, 18*
37:*18*  91:*6*
statistically  11:*4, 7,
16, 25*  12:*3*
Statistics  9:*4*  12:*1, 4*

Deposition of David Lewin, Ph.D.

Philip R. McHugh v. Fifth Third Bancorp, et al.

**stenographically** 102:*24*
**steps** 32:*23* 33:*1, 3, 12* 66:*19*
**stipulation** 104:*12*
**stopping** 83:*19*
**story** 77:*16*
**stream** 71:*2, 10, 22* 84:*22*
**streamline** 84:*17*
**streams** 70:*18*
**Street** 2:*18* 3:*5*
**strongest** 54:*12*
**structure** 68:*17*
**studies** 99:*4*
**study** 88:*21*
**subject** 99:*23*
**submitted** 24:*25*
**subsequent** 46:*7* 49:*9*
**substantial** 60:*5, 24*
**substantially** 75:*16*
**substitute** 43:*9*
**substituting** 59:*19*
**successful** 49:*9* 51:*5*
**Succession** 74:*16* 75:*1* 76:*2, 7*
**sued** 10:*17* 77:*7* 78:*17* 79:*18, 23* 80:*4, 12* 81:*1*
**suffer** 41:*1*
**suffered** 43:*18* 44:*8* 100:*16*
**sufficiently** 63:*8* 65:*10*
**suing** 8:*10* 76:*23*
**suitable** 7:*16*
**summary** 46:*7, 19* 95:*10, 13*
**Sun** 22:*6*
**S-u-n** 22:*6*
**Super** 77:*22*
**supply** 18:*8*
**support** 49:*13, 17* 65:*12* 88:*7*
**supported** 79:*9*
**supporting** 92:*25*
**supports** 86:*7*
**Supreme** 70:*16, 23* 71:*1, 8, 13, 19*

**sure** 6:*6* 19:*21* 27:*6* 29:*11* 35:*3, 7* 37:*6* 40:*12* 52:*8* 58:*19* 87:*8* 88:*3*
**surrounded** 22:*24*
**surveys** 30:*9, 12*
**switch** 76:*17*
**sworn** 6:*18* 104:*8*

**< T >**
**table** 95:*11, 14*
**take** 8:*11* 15:*25* 24:*7* 26:*25* 32:*16, 23* 33:*1, 3* 35:*19* 40:*6* 52:*1, 2, 10* 66:*20* 77:*2* 79:*22* 81:*24* 83:*20* 84:*9, 10, 14, 18* 92:*19*
**Taken** 1:*14* 28:*2* 40:*25* 52:*15* 56:*12* 85:*7* 101:*8* 104:*11* 105:*2, 8*
**takes** 42:*7* 47:*4* 69:*23*
**talent** 29:*6, 8* 31:*25* 32:*1* 74:*16, 17, 19, 25* 76:*6*
**talking** 57:*5, 6, 7, 9* 82:*5* 91:*6*
**Tayfun** 79:*14*
**teaching** 12:*13*
**team** 77:*22*
**teams** 76:*17*
**technically** 8:*23, 24*
**telephone** 7:*12, 18*
**telephoned** 102:*5*
**tell** 7:*3* 8:*3* 56:*8*
**telling** 7:*25*
**tells** 12:*1, 4*
**tenure** 39:*2* 52:*24* 56:*18* 81:*8, 10* 85:*18, 21, 25* 86:*10, 25* 87:*17, 18* 88:*5, 16, 22* 89:*15* 90:*9* 91:*4*
**tenures** 85:*19* 90:*10*
**term** 8:*7, 20* 17:*18* 74:*14*
**terminated** 10:*16* 13:*11* 40:*16, 21*

**termination** 13:*7* 80:*11*
**terms** 7:*16* 9:*11, 12* 53:*9* 78:*5*
**test** 56:*13*
**testified** 10:*23* 37:*17* 39:*4, 10* 41:*8* 54:*10* 56:*8* 89:*23*
**testifying** 71:*14* 78:*4* 100:*2*
**testimonies** 72:*6* 73:*13*
**testimony** 10:*12* 11:*11, 13* 28:*4* 34:*7* 41:*10* 47:*17* 50:*5, 14* 61:*25* 62:*1, 7, 12* 64:*22* 75:*4* 82:*4*
**Thank** 19:*2* 85:*4* 102:*10* 103:*1*
**Thanks** 6:*16*
**theirs** 33:*25*
**theory** 11:*22*
**thereof** 67:*22*
**thing** 22:*15* 63:*16* 81:*4* 101:*19*
**things** 7:*17* 9:*18* 12:*24* 22:*22* 32:*10* 39:*3*
**think** 6:*5* 7:*5, 10, 11, 15, 20* 8:*1, 20* 9:*19* 15:*17* 17:*18, 22* 20:*12, 25* 24:*24* 25:*15* 28:*14* 31:*5, 21* 32:*5* 33:*8, 14* 39:*13, 15* 46:*6* 47:*20* 48:*11, 19, 22* 49:*12, 14, 22, 24* 50:*21* 51:*18, 23* 53:*11* 57:*19* 61:*10, 13, 14* 64:*24* 69:*2* 70:*1* 75:*13* 77:*4, 18* 80:*21* 82:*8, 9, 15* 84:*19* 89:*10, 17, 19* 91:*10* 93:*11* 95:*12, 15* 98:*4, 16*
**thinking** 35:*18*
**thinks** 84:*4*
**THIRD** 1:*9* 5:*9* 8:*16* 35:*25* 36:*7* 37:*10, 18* 41:*15* 46:*16* 47:*4* 51:*6*

53:*13* 54:*5, 25* 56:*1, 23* 57:*1* 58:*1, 14, 22* 59:*13* 79:*8, 18, 19* 83:*1, 7* 87:*17, 19, 23* 88:*9, 13* 89:*7, 14* 91:*5* 92:*22* 94:*14, 25* 95:*4, 7, 14* 96:*4, 17* 97:*4* 105:*4*
**Third's** 63:*11* 72:*7*
**thought** 27:*11* 47:*18* 66:*13* 89:*25*
**three** 9:*4* 68:*9* 74:*9* 81:*9, 14, 18, 21, 24* 82:*5* 85:*23* 86:*8, 19* 89:*18, 24* 91:*21* 92:*8, 20* 93:*7, 21* 98:*19*
**threefold** 94:*1*
**three-year** 86:*9*
**tied** 94:*9*
**tiered** 68:*17*
**Tim** 30:*5, 9* 99:*10, 13, 18*
**Time** 1:*14* 5:*1, 2, 5, 13* 10:*13* 11:*24* 12:*3* 27:*3* 33:*19* 34:*23, 25* 35:*14, 19* 37:*12, 14* 38:*20, 25* 43:*8* 52:*13, 17* 58:*24* 69:*21* 76:*24* 81:*11* 82:*18, 25* 83:*21* 84:*2* 85:*5, 9* 94:*19, 21, 23* 95:*2* 99:*3* 101:*10, 13* 102:*13, 18, 22* 104:*10*
**times** 36:*13* 68:*10* 80:*9*
**Timothy** 52:*24*
**title** 19:*9* 39:*22*
**titled** 44:*24*
**today** 22:*17* 29:*17, 19, 23* 51:*13* 55:*12* 56:*24* 67:*4, 16* 82:*9* 89:*22*
**Today's** 5:*5* 32:*6, 11*
**told** 8:*8* 88:*4*
**tomorrow** 101:*17*
**top** 9:*4* 98:*23*
**total** 15:*21* 37:*11* 40:*3* 48:*25* 50:*1* 55:*12, 22* 57:*9, 15, 19*

Deposition of David Lewin, Ph.D.

Philip R. McHugh v. Fifth Third Bancorp, et al.

58:2 63:24 65:13
92:10, 11 98:21
**totality** 38:23
**totally** 42:24 43:4
**track** 80:24
**traditional** 85:20
**training** 12:12
**trajectories** 79:9
**transcript** 73:20
103:3, 8 105:7
**transcripts** 31:22
49:19
**transition** 81:15
**treasury** 68:18 69:10,
11
**treatise** 71:18 72:1
**trend** 86:1
**trends** 79:10, 21, 22
**trial** 10:12 11:13
**tricky** 56:20
**true** 50:25 105:10
**truth** 104:8, 9
**try** 35:5 48:4
**trying** 50:7 51:2
78:14 90:8
**turnover** 85:19 86:5
**Tuzun** 79:14, 18
**two** 10:21 15:18
22:15, 16 39:11
75:15 79:13 81:14,
16, 18, 25 92:4 93:23
99:25 101:3
**type** 39:1
**typical** 15:18
**typically** 17:25 23:7
**typo** 68:23

**< U >**
**U.S** 54:12
**UCLA** 12:15
**ultimately** 27:12
**unable** 63:21
**unanimously** 74:20
**uncertain** 92:6
**underpinnings** 66:24
**undersigned** 104:4
**understand** 19:12
20:8 24:24 25:2
35:5 48:13 50:17
55:9 58:16 59:2, 10

61:21 66:9 69:15
75:12 78:14 96:20
**understanding** 13:1,
3 17:20 18:9 19:21
42:1 44:16 60:10
61:23 62:15 64:14
66:3, 11 95:1 100:6,
7 105:13
**understood** 29:11
**unemployment** 80:19
**unionism** 9:6
**UNITED** 1:1 5:9
12:20
**universe** 48:2
**University** 12:15
**unlawful** 34:16
35:24 36:7, 11, 14
**update** 74:17 75:1
76:2, 7
**use** 8:8 17:6 27:7
31:5 33:18 39:13
54:3 69:18, 19 70:10
90:10 96:21, 23, 25
**useful** 97:19
**uses** 70:2, 4, 12 85:16
**usually** 69:12

**< V >**
**value** 68:16 70:3, 6
71:2, 10, 22
**variables** 97:17
**variation** 53:9
**various** 8:5 16:11
63:5
**vary** 94:4
**vast** 47:22 50:23
**venued** 5:9
**version** 33:11
**versions** 75:25 76:5
**victim** 15:4 48:10
**video** 18:17 103:9
**Videoconference** 1:20,
22, 25 2:1, 11 3:1, 7
**Videographer** 1:24
5:1 18:16, 19 52:13,
17 85:5, 9 101:6, 10
102:18, 21
**VIDEOTAPED** 1:14
**view** 18:2 61:3

74:19
**viewed** 74:13
**virtually** 12:14 22:1
**vocational** 17:17, 19,
21, 24 18:4, 10, 12
**volatility** 86:2
**volume** 75:7
**volumes** 22:15, 16
**vs** 1:8 5:8 105:4

**< W >**
**wages** 9:7
**want** 8:8 29:10
60:12 69:3 84:2, 3, 9,
14 86:22 87:8 88:3
90:15 96:20
**wanted** 92:19 94:3
102:9
**wants** 56:5
**way** 7:21 16:9 17:4
38:16 41:3, 6 57:22,
24 59:13, 19 67:24
70:15 75:5 93:16
96:16
**week** 102:17
**weigh** 100:17
**Well** 7:15 8:4, 23
9:3 10:5 11:19 12:7
13:3 20:8 21:23
22:4, 20 27:20 31:21
33:5 39:4 40:5, 8
41:3, 6 44:2 46:6, 9
53:24 54:25 57:11,
13, 17 61:11 65:5, 20
69:6 73:3 75:2, 13
83:22 84:21 88:8
91:3, 10 96:25 97:20
99:14
**well-known** 66:15
**Wendy** 1:21 5:4 6:7,
10 104:4
**went** 32:23 33:1
55:6 65:2
**we're** 24:3 57:9
78:13 84:21, 23
101:6
**WESTERN** 1:3 5:11
**we've** 51:24 82:22
101:18

**whatsoever** 80:21
**WHEREOF** 104:18
**wide** 53:9
**Williams** 26:18
72:19 73:16, 18 74:2,
6
**willing** 7:17
**Witness** 1:14 2:11
5:17 6:1, 10, 14, 16,
18 13:20 14:22 15:9
16:8, 24 21:9 24:8
27:10 28:9 35:3, 18,
20 36:4, 10, 23 37:6,
19 39:13 42:6, 25
43:9, 22 44:20 45:19
47:18 48:5 50:11
51:1 53:24 54:21
55:6 56:4 57:13, 17
59:2 61:18 62:5
66:8 67:21 68:11
70:22 71:6, 15, 16
75:22 77:2, 13 78:7,
21 83:24 84:3, 25
90:14, 24 93:5 98:12,
16 100:3 101:19, 22
102:2, 11 103:7
104:18
**Word** 27:15 56:6
**words** 31:5 70:4
89:19
**work** 8:13, 16 9:10,
13 14:20 18:3, 25
21:20 23:15 38:5
43:15 64:8 80:23
**worked** 8:5 17:24
**workforce** 10:20, 21
11:2, 3, 5, 6
**working** 48:21 60:7,
13 61:2 99:24
**work-life** 9:15, 18, 25
48:14, 20
**works** 17:5 85:2
**write** 33:19, 24
**written** 12:17 14:10
25:21 33:22 41:9
42:14
**wrong** 54:22 55:7
**wrongful** 40:25
**wrongfully** 45:24

**wrote**  24:*24*  45:*7*
83:*4*

**< Y >**
**Yeah**  19:*1, 2*  47:*11*
79:*16*  84:*21, 23*
86:*24*  87:*13*  90:*21*
102:*11, 20*
**year**  7:*6*  39:*24*
69:*24, 25*  98:*9*  99:*6*
**years**  45:*2, 4*  59:*23*
72:*13*  80:*9*  81:*15, 16,*
*18, 21, 25*  82:*1, 5, 19*
85:*22, 23*  86:*8, 14, 19*
87:*22*  88:*2, 3, 23*
89:*4, 9, 19, 24*  92:*21*
97:*4*  98:*19*  99:*25*
**Yesterday**  102:*5*
**yield**  68:*18*
**York**  10:*13*
**younger**  75:*17*
**youngest**  75:*15*

**< Z >**
**zero**  40:*17*  91:*25*
92:*16*  93:*1, 8*  94:*4*
**ZOOM**  1:*14*  5:*17*
7:*11, 18, 20*  8:*11*
15:*14, 17, 21, 25*  16:*4,*
*15*  18:*21*  32:*8*  102:*4,*
*7*