UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| PHILIP R. MCHUGH,<br>Plaintiff,<br>vs.<br>FIFTH THIRD BANCORP, et al.,<br>Defendants. | CASE NO. 1:21-cv-00238 |

Videotaped Deposition of: NICHOLAS KEVIN AKINS

Taken: By the Plaintiff
Pursuant to Notice

Date: July 2, 2024

Time: Commencing at 9:39 a.m.

Place: Fifth Third Center
511 Walnut Street
Cincinnati, Ohio 45202

Before: Wendy L. Raymer, RPR, CRR
and
Connie Ihle-Adkins, Videographer
Notaries Public-State of Ohio

APPEARANCES:

On behalf of the Plaintiff:

Peter A. Saba, Esq.
and
Joshua M. Smith, Esq.
of
Stagnaro, Saba & Patterson Co., L.P.A.
2623 Erie Avenue
Cincinnati, Ohio 45208
Phone: (513) 533-2701
Email: Pas@sspfirm.com
jms@sspfirm.com

On behalf of the Defendants and the Deponent:

Michael L. Cioffi, Esq.
and
Collin D. Hart, Esq.
of
Blank Rome LLP
1700 PNC Center
201 East Fifth Street
Cincinnati, Ohio 45202
Phone: (513) 362-8700
Email: Michael.cioffi@blankrome.com
Collin.hart@blankrome.com

Also Present:

Philip R. McHugh
Brian Thomas, Esq., Fifth Third Bancorp

\- - -

# I N D E X


| NICHOLAS KEVIN AKINS | PAGE |
|---|---|
| Examination by Mr. Saba | 7 |
| Examination by Mr. Cioffi | 121 |
| Further Examination by Mr. Saba | 130 |

| EXHIBITS | MARKED | REFERENCED |
|---|---|---|
| Plaintiff's Exhibit 1 | 10 | 11 |
| Plaintiff's Exhibit 2 | 71 | 71 |
| Plaintiff's Exhibit 3 | 71 | 71 |
| Plaintiff's Exhibit 4 | 77 | 77 |
| Plaintiff's Exhibit 5 | 102 | 102 |
| Plaintiff's Exhibit 6 | 103 | 103 |
| Plaintiff's Exhibit 7 | 104 | 104 |
| Plaintiff's Exhibit 8 | 104 | 104 |
| Plaintiff's Exhibit 9 | 105 | 105 |
| Plaintiff's Exhibit 10 | 106 | 106 |
| Plaintiff's Exhibit 11 | 106 | 107 |
| Plaintiff's Exhibit 12 | 107 | 107 |
| Plaintiff's Exhibit 13 | 108 | 108 |
| Plaintiff's Exhibit 14 | 109 | 109 |
| Plaintiff's Exhibit 15 | 109 | 109 |
| Plaintiff's Exhibit 16 | 111 | 111 |
| Plaintiff's Exhibit 17 | 111 | 112 |
| Plaintiff's Exhibit 18 | 115 | 115 |


\- - -

Page 4

THE VIDEOGRAPHER: We are on the videotape record. Today is Tuesday, July 2, 2024. The time is 9:42 a.m. We're here today to take the deposition of Nicholas K. Akins pursuant to Rule 30(b)(1) deposition, and the case style is Philip R. McHugh versus Fifth Third Bancorp, et al., United States District Court, Southern District of Ohio, Western Division, Case No. 1:21-cv-00238.
Will the attorneys now introduce themselves and state who they represent?
MR. SABA: Peter Saba on behalf of the Plaintiff Philip R. McHugh.
MR. SMITH: Joshua Smith on behalf of the Plaintiff Philip R. McHugh.
MR. CIOFFI: On behalf of the defendant, Fifth Third Bank, Michael Cioffi and Collin Hart of Blank Rome, and Brian Thomas of Fifth Third Bank.
MR. SABA: And additionally attending via Zoom is Attorney Bailey Sharpe from our office.
THE VIDEOGRAPHER: And would the court reporter please swear in the witness?
(Witness sworn.)
MR. CIOFFI: Peter, before you begin, let me say something on the record. This deposition is being taken over the defendant's objection given

Page 5

the fact that we're beyond now the limit under the civil rules for the number of depositions, and also given the fact that this is the fourth director deposition. So the defendant objected.
The court permitted this deposition, and the record is pretty clear about this, provided that the scope of the deposition is limited. It doesn't repeat everything you've asked the other directors and the other witnesses.
And you agreed in a couple of conferences in December of 2023 and in 2024 that the scope would be limited and it would not be repetitive or redundant. It would concern this particular witness's understanding of the decision and the decision-making process. And while the court speculated that perhaps it could be done in 30 minutes, the court did not limit the deposition to 30 minutes.
However, the court said the following, and I'm reading from the court statement. At the February 20, 2024 conference in which the court said, but I think if you get straight to the point, I mean, it's really simple. Was there any discussion of age? What information did you rely on? I mean, it's not complex.

Page 6

And, Peter, as counsel for the plaintiff, you agreed that the scope of this would be limited, that it would be focused, and this would not be a simple repetition of the three other director depositions.
MR. SABA: Michael, we completely disagree with your summary of the purpose for this deposition, and there was no limitation specifically as to scope. The only discussion was we would try and keep this under six hours and that would be the goal, and that was the representation that was made. There was no ruling. There was no requirement. There was no limitation.
We're going to seek to do this in as efficient manner as possible, but we disagree with your representation of what brings us here today and what the parameters are for the deposition.
MR. CIOFFI: Well, the record will speak for itself, but please go ahead.

NICHOLAS KEVIN AKINS,

of lawful age, a witness herein, being first duly sworn as hereinafter certified, was examined and deposed as follows:

Page 7

EXAMINATION

BY MR. SABA:

Q. Mr. Akins, can you go ahead and state your name for the record, please?
**A. Nicholas K. Akins.**
Q. Have you ever had your deposition taken before?
**A. Yes.**
Q. How many times have you had your deposition taken?
**A. Twice.**
Q. As a reminder, I'm going to be asking you a series of questions. For the sake of the court reporter, I need you to answer verbally, no shaking or nodding of the head, notwithstanding that we're going to have this on video.
**A. Yes.**
Q. For the transcription record, we still need that verbally. Additionally, if you can wait for me to finish my question before you answer, and I'll try to do the same before I ask you another question, also makes for a clearer record.
With respect to if you need to take a break at any time, you can just let us know that and we can go ahead and take a break, but I'll need you to answer the

Page 8

question that's standing at that point in time before we take the break. Do you understand all those instructions?
**A. Yes.**
Q. What is your address?
**A. 6 Highgrove Farms, New Albany, Ohio 43054.**
Q. How long have you lived there?
**A. Since 2017.**
Q. Who do you live there with?
**A. My wife.**
Q. How long have you been married?
**A. 41 years.**
Q. What's your date of birth?
**A. 8/26/60.**
Q. Who recommend -- excuse me.
You explained that you've been deposed twice before; is that right?
**A. Yes.**
Q. What were the purpose of those two depositions?
**A. One was a US bankruptcy case. The company I worked for was trying to acquire another utility that was going through bankruptcy, so I was deposed in that case. And then the other is an SEC case with AEP, American Electric Power, who I was the former chair and**

Page 9

**CEO. That was a case involving the company's interactions relative to HB6.**
Q. What did you do to prepare for today's deposition?
**A. I looked at materials that fit the -- that was supplied by my counsel.**
Q. Did you review any of the prior depositions that were taken in this case?
MR. CIOFFI: Objection. Whatever he reviewed was at the instruction of counsel. I should say at the beginning, as I did in the other depositions, we represent the defendant Fifth Third Bank, but we also represent Mr. Akins personally pursuant to a joint representation agreement. So whatever he reviewed was reviewed at our request and I'm not going to let him describe those documents.
BY MR. SABA:
Q. Did you speak to any board members in advance of this deposition regarding the case with Phil McHugh?
**A. There were a couple of conversations where I talked about the deposition, the timing of depositions, things like that.**
Q. What about the content of the deposition?
**A. No content.**
Q. Any testimony -- who did you speak to?

Page 10

**A. I believe it was Marsha Ryan at the board meetings, saying I was about to be deposed.**
Q. Marsha Ryan?
**A. Excuse me. Marsha --**
Q. Williams?
**A. Williams.**
Q. Anyone else?
**A. No.**
Q. Did you speak to any employees at Fifth Third Bank about the Philip R. McHugh case?
**A. Well, I mentioned to Tim I was being deposed.**
Q. Tim Spence is who you're referring to?
**A. Tim Spence, yeah.**
Q. Other than these conversations with Mr. Spence or Ms. Williams with respect to your deposition, have you had any conversations with any of the other board members about the Phil McHugh litigation?
**A. No.**
Q. Have you had any conversations with any employees at Fifth Third Bank about the Phil McHugh litigation?
**A. No.**
(Plaintiff's Exhibit 1 is marked for identification.)

Page 11

BY MR. SABA:
Q. Mr. Akins, I've handed you what has been marked as Exhibit Number 1. Have you ever seen this document before?
**A. Yes.**
Q. When did you see this document?
**A. In preparation for this deposition.**
Q. Let me represent to you this is an amended notice for your deposition for today, and it includes attached to it a request for production of documents which begins on page 3 of Exhibit 1; do you see that?
**A. Which page?**
Q. Page 3.
**A. I don't remember seeing this one.**
Q. You do not see where at the top --
**A. No, I don't remember seeing the document. I don't know that I have seen this, but go ahead.**
Q. You don't recall seeing this before, just to be clear for the record?
**A. No, I don't recall seeing it.**
Q. All right. Let me represent to you, this was a document that was sent to -- who is now represented to be your counsel with respect to producing documents for today's deposition. Do you have any documents with you today?

Page 12

**A. No.**
MR. CIOFFI: Let me say for the record in response to that question that the documents were searched by -- for by counsel and provided to you, either in response to this particular production or as a result of the earlier productions, but there is nothing in response to this particular request for production of documents that exists that has not been produced.
BY MR. SABA:
Q. Mr. Akins, let me represent to you, this was a request directed specifically to you for today's deposition. And if I could refer you to page 6 of this document, please.
**A. Uh-huh.**
Q. Of Exhibit 1.
MR. CIOFFI: And I'm going to say for the record that as his counsel, we responded to this particular request.
BY MR. SABA:
Q. And referring to request for production of documents number 1, do you see where that is, about two-thirds of the way down on page 6?
**A. Yes.**
Q. The first request refers to "communications

Page 13

between you and any other director or officer of Fifth Third which refers, mentions, or otherwise relates to:" and the first subtitle, "Succession planning for the position of president and/or CEO of Fifth Third"; do you see that?
**A. Yes.**
Q. Did you ever actively look for or search out any such communications?
**A. I didn't have any.**
Q. Did you look for them?
**A. I didn't need to. I didn't have any.**
Q. Okay. Subcategory B is, "Identified and/or selected candidates for the position of president and/or CEO of Fifth Third."
Did you have any documents in response to that category?
**A. I did not have any.**
Q. Subcategory C is, "Processes or timelines, whether proposed or final, with respect to the identification and/or selection of candidates for the position of president and/or CEO of Fifth Third."
**A. I didn't have any.**
Q. With respect to 1D, "Development of potential candidates for the position of president and/or CEO of Fifth Third."

Page 14

**A. I didn't have any there neither.**
Q. Subcategory E is, "Any facts upon which you and any other director relied upon when identifying and/or selecting candidates for the position of president and/or CEO of Fifth Third."
**A. No, I didn't have any.**
Q. Subcategory F would be any documents regarding that refer to Phil McHugh.
**A. I didn't have any.**
Q. And subcategory G is any documents that would refer to Tim Spence.
**A. No, I didn't have any.**
MR. CIOFFI: Counsel, I'm going to state again for the record to the extent these documents exit in the books and records of Fifth Third Bank or the board, they have been produced to you, to the extent they exist.
MR. SABA: Okay.
BY MR. SABA:
Q. And specifically, we're asking for your documents, Mr. Akins.
**A. Right, that's what I understand.**
MR. CIOFFI: You're asking for his personal documents?
MR. SABA: Correct.

Page 15

THE WITNESS: That's the way I understand the question.
MR. CIOFFI: As long as it's clear on the record that's what you're requesting.
THE WITNESS: Yeah.
BY MR. SABA:
Q. With respect to number 2, it asks for, "Any communications as defined above between you and Philip McHugh."
**A. I didn't have any.**
Q. The third category is, "Any communications between you and Timothy Spence."
**A. I didn't have any.**
Q. And just to be clear, "The words communications or communicate mean any correspondence, disclosure, transfer, exchange of information, whether oral or written, and whether in person, by telephone, mail, email, telecopy, text message, or other document form."
Did you understand that in responding to that question?
MR. CIOFFI: Again, objection to the form. It's overbroad and includes information that is not discoverable.

Page 16

BY MR. SABA:
Q. Did you understand that being the definition of communication in responding to that question?
**A. Can you repeat the question?**
Q. Sure. The definition of communication as provided in this document means any correspondence, disclosure, transfer or exchange of information whether oral or written and whether in person, by telephone, mail, email, telecopy, text message, or other document form.
**A. I haven't had any communication relative to the details of this case.**
Q. And going back again with respect to that understanding of communication, do you have any communications between you and Philip McHugh?
**A. No.**
Q. Did you ever have any communications between you and Philip McHugh?
**A. No.**
Q. Number 3 is, "Any communications between you and Timothy Spence"; do you see that?
**A. Yes.**
Q. Did you have any communications between you and Tim Spence?
**A. About this case?**

Page 17

MR. CIOFFI: Yeah, objection to the form of the question. It's overbroad. It's not discoverable. Irrelevant. If you confine it to the issues in this case, I'll allow him to answer.
THE WITNESS: Can you be more specific?
BY MR. SABA:
Q. Well, generally speaking, have you communicated with Tim Spence by text message or phone or email?
**A. No.**
Q. Okay. Did you have any communications with Mr. Spence regarding any aspect of this litigation of this case?
**A. No. Other than I'm having a deposition.**
Q. Request number 4 asks for, "All documents created, received, or obtained by you which refer, mention, or otherwise relate to:" and the first under category A, "Succession planning for the position of president and/or CEO of Fifth Third."
**A. I don't have any documents for that.**
Q. Subcategory 4B is, "Identified and/selected candidates for the position of president and/or CEO of Fifth Third."
**A. I don't have any documents on that.**
Q. Subcategory 4C is, "Processes or timelines,

Page 18

whether proposed or final, with respect to the identification and/or selection of candidates for the position of president and/or CEO of Fifth Third."
**A. I don't have those documents.**
Q. Subcategory D is, "Development of potential candidates for the position of president and/or CEO of Fifth Third."
**A. I don't have those.**
Q. Subcategory 4E is, "Any facts upon which you or any other director relied upon when identifying and/or selecting candidates for the position of president and/or CEO of Fifth Third."
**A. I don't have that.**
Q. Subcategory F is referring specifically to Philip McHugh.
**A. No, I don't have that.**
Q. And any documents you retained regarding Timothy Spence?
**A. No.**
Q. You don't have any documents?
**A. I don't have any documents.**
Q. What's the extent of your education?
**A. I have a master's in science and electrical engineering, a bachelor of science in electrical engineering as well.**

Page 19

Q. Where did you obtain those?
**A. Louisiana Tech University.**
Q. When did you obtain those?
**A. Bachelor's in 1982. Master's in 1986.**
Q. When did you first become a board member at Fifth Third?
**A. I believe it was October of 2013.**
Q. Were you employed at that time?
**A. Yes.**
Q. Where did you work?
**A. American Electric Power.**
Q. What was your position with American Electric Power?
**A. Chairman, president, and the CEO.**
Q. When did you become president of American Electric Power?
**A. November 12, 2011. Oh, excuse me, January 1, 2011 for president.**
Q. How long had you been employed with American Electric Power before you became president?
**A. Well, that was 2011. So 29 years. 1982 to 2011 is -- I think that's right.**
Q. You went to work for American Electric Power out of college?
**A. Yes. Well, actually, I went to work for**

Page 20

**Southwestern Electric Power Company, which was part of Central and Southwest Corporation. And then AEP acquired Central and Southwest in 2000. So technically, yes.**
Q. Essentially you worked for the same company up until the time that you became president; is that right?
**A. That's right.**
Q. You were a lifer there; is that right?
**A. Yes.**
Q. And they still made you CEO and president even though you were a lifer; is that right?
**A. Yes.**
Q. What's the benefit of making a lifer the CEO and president of the company?
MR. CIOFFI: Objection.
THE WITNESS: Well, actually, I would say that while it's not a necessity, I certainly had the benefit of knowing the internal operations of the company. I had been in various operating utilities, and then with the experiences of being in the utility business.
BY MR. SABA:
Q. You ran several different branches of the company; is that right?
**A. Yes.**

Page 21

Q. You understood the history of the company; is that right?
**A. Yes.**
Q. And as you indicated, that the utility industry is heavily regulated; is that a fair statement?
**A. Yes.**
Q. As a result of your history with the company, you had an understanding of the regulations affecting that industry; is that correct?
**A. Yes.**
Q. Was your mother a flight attendant?
**A. No.**
Q. Okay. And they still made you CEO and president?
**A. Yes.**
Q. Okay. How large is AEP?
**A. Depends on what measure you use. Are you asking market cap or --**
Q. Sure, let's start with market cap.
**A. Market cap's about 46, 47 billion. It was 50 when I was there. It's over 11 states, one of the largest electric utilities in the country.**
Q. Number of employees?
**A. 18,000.**
Q. Number of customers served?

Page 22

**A. 5.6 million.**
Q. Where does AEP currently stand on the Forbes 500?
**A. It varies from year to year, but it's a Fortune 200 company.**
Q. Roughly around 185, around that number; does that sound right?
**A. That sounds about right.**
Q. How long did you remain chairman, president -- let me go back.
How long did you remain president of AEP?
**A. From 2011 to January -- let's see. January 1st of '23. August, excuse me.**
**I get president -- it all changed with the transition. So president, August of '23.**
Q. And what about with respect to CEO, how long did you remain CEO for AEP?
**A. I was CEO -- hold on a second. August of '22 for president. January 1st of '23, I turned over the CEO title and stayed on as executive chair of AEP until October of '24 -- or excuse me, October of '23.**
Q. Is it a fair statement that your role in -- as president and CEO of AEP was a demanding job; is that right?
**A. Yes. Much different than an executive vice**

Page 23

**president. There is no comparison.**
Q. What do you mean by that?
**A. As an executive vice president, I always thought, you know, I worked as hard and as many hours, that kind of thing, I could be CEO of the company. After I became CEO of the company, I realized it's a very different position. You're in a glass house. Employees are looking at every mannerism, every comment you make. Investors are looking at every comment you make. The commitment relative to the schedule is significant.**
**You have to be quick on your feet and you have to be very adaptable. You have to be able to talk to the president or the governor, in the same day talk to the -- talk to the frontline employees and be able to identify with them. Very different role.**
Q. And it's 24/7; is that correct?
**A. Yes.**
Q. You're constantly on with respect to issues that may arise; is that right?
**A. That's correct. Just to be clear, I am sleeping sometimes. Okay. All right. I'm using 24/7 as --**
Q. I understand.
**A. All right.**

Page 24

Q. During the period of 2015 through October of 2020, how many different boards did you serve on?
**A. Only the -- it was an AEP board, obviously, American Electric Power board, and Fifth Third's board. I was only as an active CEO, typically you can only be on one additional board, and Fifth Third was that board. There were other not-for-profit boards that I was involved with.**
Q. What were the not-for-profit boards?
**A. I was chair of the Ohio Health board. The board of the Rock and Roll Hall of Fame. Let's see. Several industry-related boards.**
Q. Would that be the Institute of Nuclear Power Operators?
**A. Institute of Nuclear Power Operators, the Edison Electric Institute, the Global Sustainable Energy Partnership, the -- let's see, INPO, Institute of Nuclear Power Operators. Let's see, there was the business round table, US Business Round Table, the Ohio Business Round Table. I'm trying to think of the others. I think that's about it.**
Q. OBRT?
**A. The Ohio Business Round Table. I chaired that as well.**
Q. How often would each of those charitable

Page 25

boards meet?
**A. Typically on a quarterly basis.**
Q. Going back to the demanding nature of your job with AEP, at times it would become very time consuming; is that correct?
**A. Yes, of course.**
Q. The -- you had some issues, and I believe you referenced it with respect to your deposition in July of 2020, is that right, with certain allegations made against AEP's involvement with House Speaker Householder and HB6; is that correct?
**A. I didn't have any depositions at that point in time.**
Q. No, let me rephrase the question.
There was, beginning in July of 2020, the Columbus Dispatch reported that AEP may have contributed money to a group called Empowering Ohio's Economy, Inc., which was labeled as potential dark money with respect to some of the actions between First Energy and House Speaker Larry Householder; is that correct?
MR. CIOFFI: Objection. Beyond the scope of discovery. You may answer yes or no.
THE WITNESS: There was an article in the Columbus Dispatch about that time.

Page 26

BY MR. SABA:
Q. Okay. It also eventually led to litigation against you personally with respect to a shareholder claim against AEP and you; is that correct?
**A. There were derivative shareholder claims.**
Q. Okay. That began in August of 2020; is that right?
**A. I believe that's about right.**
Q. Okay. How many times have you been sued personally?
**A. I've never been sued personally other than through my role as CEO of AEP and as a board member of AEP.**
Q. How often did that happen as a board member or CEO of AEP?
MR. CIOFFI: Objection. Beyond the scope of discovery in this case. I'll allow you to answer, if you know.
THE WITNESS: I don't recall how many times.
BY MR. SABA:
Q. When did you first meet Greg Carmichael?
**A. I don't recall specifically, but it would be about 2014, maybe.**
Q. How would you describe your relationship with Greg Carmichael?

Page 27

**A. Just professional.**
Q. How frequently would you meet personally with Greg Carmichael?
**A. I didn't. Are you asking during the time of the -- of the period in question or -- because I would meet with Greg when he became CEO.**
Q. Sure. Sure. Let me rephrase the question.
You first met him in 2014; is that correct?
**A. That's about right, I think.**
Q. All right. Did you ever meet with Greg Carmichael outside his duties as a president or CEO or employee of Fifth Third Bank?
**A. When he was CEO of Fifth Third Bank, I would meet with him because I was chair of the governance committee and I would meet with him on governance committee matters, scheduling, logistics, those kinds of things, but I never met with him until -- individually until he became CEO.**
Q. Okay. And how frequently would you meet with him after he became CEO of Fifth Third Bank?
MR. CIOFFI: Again, objection. Time frame. Are you talking 2015 to 2020, is that the time frame you're asking him about?
MR. SABA: During the time he was CEO of Fifth Third Bank, correct.

Page 28

THE WITNESS: During the time he was CEO, rarely, but when I did meet him, it was -- or have a call with him, it was because of the governance committee matters. So it may be once a year, maybe twice a year.
BY MR. SABA:
Q. Other than those once or twice a year conversations or meetings with Mr. Carmichael regarding governance, were all your other meetings with Mr. Carmichael at Fifth Third board meetings?
**A. Yes. Fifth Third board meetings, and that includes the dinners and other events of the Fifth Third board.**
Q. And encompassed in that one to two times a year, that would include any phone calls you may have with Mr. Carmichael or text messages, any other communications; is that right?
MR. CIOFFI: Objection. Assumes facts not in evidence. Lack of foundation. He's never testified there were any such things. In fact, I think he testified that there weren't. But do you understand the question?
THE WITNESS: No. Can you repeat it?
MR. SABA: Sure.

Page 29

BY MR. SABA:
Q. You mentioned these one to two communications a year of meeting with Greg Carmichael. I'm just trying -- let me go back a second.
Would you communicate with him by phone?
**A. Typically by phone, in preparation for governance committee matters.**
Q. All right. Would you communicate with him by text?
**A. No, I don't recall that.**
Q. All right. Would you communicate with Mr. Carmichael by email?
**A. I don't recall that.**
Q. So going back to my question again, that one to two times a year that you would communicate directly with Mr. Carmichael outside any Fifth Third board meetings and related board meeting events, that would include any emails or text messages or other communications to the extent there were any; is that correct?
MR. CIOFFI: Objection to the form of the question. I believe you said outside of board matters in your question, and he testified there weren't any such communications. Is that what you intended to say? I'm not clear about the question.

Page 30

BY MR. SABA:
Q. I'm just trying to clarify the nature and volume of communications that you had had with Mr. Carmichael.
**A. My communications with Greg after he became the CEO, I would meet with him occasionally just to see how he was doing as a new CEO because somewhat of a mentor relationship as lead director. So I would have calls occasionally with him just to see how he is doing, those types of things, and then when I took over the governance committee, it was really governance committee logistics and those types of things. So it was all bank business. There was nothing -- I mean, nothing personal.**
Q. And in terms of volume, that would be one to two times a year that you would have those communications?
**A. Yes, I think so.**
Q. What about with respect to Robert Schaffer, when did you first meet Robert Schaffer?
**A. I met Bob during the time of -- I think it was during TFT, Transforming Fifth Third, and it was really around those kinds of matters that were occurring at that particular time.**
Q. Do you recall what year that was?

Page 31

**A. I don't recall what year. It was probably 2015, '16, I suppose.**
Q. How would you describe your relationship with Mr. Schaffer?
**A. Just professional.**
Q. How frequently would you directly communicate with Mr. Schaffer?
**A. I don't recall communicating with him. I mean, other than board settings.**
Q. Was there an occasion where would you separately communicate with him by cell phone or by email?
**A. I don't recall that.**
Q. What was your relationship with Phil McHugh prior to January 1, 2020?
**A. Prior to January 1, 2020?**
Q. Correct.
**A. Professional.**
Q. What was your understanding of Phil McHugh's role at Fifth Third Bank prior to January 1, 2020?
**A. Well, he had various -- various roles, the consumer bank, and then he had wealth management for a period of time. So he had different roles at the company.**
Q. How frequently did you meet with Phil McHugh

Page 32

prior to January 1, 2020?
**A. I didn't, other than board settings.**
Q. How frequently did you communicate with Phil McHugh prior to January 1, 2020?
**A. I'm sorry, that sounded like the same question, but --**
Q. Yeah, I'll rephrase the question.
Did you ever communicate with Mr. McHugh by cell phone or email?
**A. No, I did not.**
Q. Other than the board settings, did you ever observe Phil McHugh in the workplace?
**A. Not that I recall.**
Q. Prior to January 1, 2020, did you ever meet with or interview any of Phil McHugh's direct reports?
**A. No.**
Q. Prior to January 1, 2020, did you ever participate in any of Phil McHugh's annual or midyear reviews?
**A. No. Other than the talent management reviews for the board.**
Q. You're referring to the talent management that would take place in December of each year, talent management reviews?
**A. Yes.**

Page 33

Q. But with respect to Mr. McHugh's annual reviews or midyear reviews, you would not participate in those; is that right?
**A. No, I didn't see those.**
Q. Did you ever see the materials from Mr. McHugh's annual reviews or midyear reviews?
**A. No.**
Q. Did you ever review Phil McHugh's employee engagement surveys?
**A. No.**
Q. Did you ever review Phil McHugh's customer experience surveys?
**A. No.**
Q. Did you ever review Phil McHugh's financial performance relative to goals for his divisions?
**A. No, not specifically. I mean, we would obviously see the rollup of how the company was doing at the board meeting settings. And then as far as the, you know, his skills and abilities and things that I presume came out of the reviews, we would see in the talent review deck synopsis of it, but that's it.**
Q. You never saw the specifics of how he did with respect to his divisions, correct?
**A. No.**
Q. Did you ever see income statements and balance

Page 34

sheets specifically broken out for the divisions managed by Mr. McHugh?
**A. No. I would have to say we would see the rollup of -- I mean, there would be discussions during board meetings of how the consumer bank was doing, how wealth management was doing. So we would -- it wouldn't be the income and balance sheets, but certainly we'd get a synopsis of how those areas were doing.**
Q. Do you recall any specific criticisms of how those areas were doing during the time that Mr. McHugh was managing those areas?
**A. No.**
Q. In 2015, how often would the Fifth Third board meet?
**A. In 2015? Six, seven times a year, something like that, yeah.**
Q. And would those be -- when you say six to seven times a year, are those six different sessions in terms of they may meet one time, it would be for two separate days, meet for a few hours?
**A. It would be committee meetings, generally the first day and then start of the board meeting, and then finish up of the board meeting the next day. So primarily two-day meetings.**
Q. So just to be clear, when you say six to seven

Page 35

times, are you saying six to seven two-day meetings a year?
**A. The annual meeting was a meeting, too. So whether that's six or seven, I'd have to count up.**
Q. And during that year, do you recall how many of those meetings did you attend in person and how many did you attend by phone?
**A. I don't recall specifically, but whenever there was a physical meeting, I was at the physical meetings, with the exception of occasionally the September meeting because my board meeting conflicted with that one. And then obviously during COVID, we went to virtual meetings during that period.**
Q. Is it fair to say that each year there would be a certain number of meetings you would attend by phone between 2015 and 2020? Let me rephrase the question.
Is it a fair statement that between the dates of January 1, 2015 and October of 2020, there would be a number of meetings that you would just attend by phone; is that correct?
**A. There may have been. I mean, during COVID there was. I don't -- there may have been call-in meetings, but most were physical meetings.**
Q. Do you recall how many times the board would

Page 36

have met in 2016?
**A. It would be the same estimate I gave earlier, six to seven.**
Q. Would that be true for 2017, 2018, 2019, and 2020?
**A. Yeah, I think that's about right.**
Q. As you sit here today, it's a fair statement you don't recall how many meetings that you attended by phone or how many you may have been absent for?
**A. Oh, I was -- the only time I was absent was the September meeting on a few occasions where it conflicted with the AEP board meeting. The other meetings I was at.**
Q. Either by phone or in person?
**A. Yes.**
Q. When did you first meet Tim Spence?
**A. I don't recall specifically, but I would say maybe 2015, 2016.**
Q. And how did you first meet Mr. Spence?
**A. He was reporting to the board on a strategy.**
Q. Prior to January 1, 2020, how frequently did you meet with Mr. Spence?
**A. I met with him -- I mean, I saw him at board meetings. I didn't meet with him outside the board meetings.**

Page 37

Q. Did you ever communicate with Mr. Spence outside board meetings between January 1, 2015 and October of 2020?
**A. No, I don't recall.**
Q. Other than board meetings, did you ever observe Mr. Spence in the workplace at Fifth Third prior to January 1, 2020?
**A. No.**
Q. Prior to January 1, 2020, did you ever meet with or interview any of Mr. Spence's direct reports or subordinates?
**A. No, nothing other than board meetings, if he brought people that reported to him to the board meetings, but I dont know if Ben Hoffman was doing that at that point in time or not, but it would be people who reported from a strategy standpoint.**
Q. Do you specifically recall ever speaking to any of Mr. Spence's direct reports?
**A. No.**
Q. Or subordinates at any board meetings?
**A. No.**
Q. Did you participate in or perform at any of Mr. Spence's annual or midyear reviews?
**A. No, I did not.**
Q. Did you review any documentation for

Page 38

Mr. Spence's annual reviews?
**A. No.**
Q. Did you --
**A. Other than what came up through the talent review process.**
Q. Again, you're referring to what we've called as -- what we've referred to as the talent deck; is that right?
**A. Yes.**
Q. Okay. Did you ever review any of Tim Spence's employee engagement surveys?
**A. No.**
Q. Did you ever review any of Tim Spence's customer experience surveys?
**A. No.**
Q. Did you ever review Tim Spence's financial performance relative to the goals for his divisions?
**A. No.**
Q. Did you ever review any or see any income statements and balance sheets specifically broken out for just the divisions managed by Mr. Spence?
**A. No.**
Q. Going back to your reference to the board meeting process, and you said there were activities accompanying the board meetings, is that right, dinners;

Page 39

is that correct?
**A. Yes, uh-huh.**
Q. How would that take place or what would be -- your involvement be if you were attending the board meeting by phone?
**A. If I was attending the board meeting by phone, it would be primarily the board meeting itself, not the dinner.**
Q. Would you attend any committee meetings by phone?
**A. Yes.**
Q. Okay. During the period from January 1, 2015 through October 2020, do you recall how frequently Phil McHugh attended board meetings?
**A. He was at most -- most of the board meetings because he had a major part of the bank business. He'd give reports like the rest of the executive leadership team.**
Q. Between January 1, 2015 and October 2020, do you recall how many board meetings were attended by Mr. Spence?
**A. He also attended the same -- same meetings as part of the executive team.**
Q. Do you understand what the term "enterprise committee" means?

Page 40

**A. Yes.**
Q. What does that mean?
**A. It's the executive leadership team at the bank reporting to the CEO.**
Q. Mr. McHugh and Mr. Spence both would have been members of the enterprise committee between 2015 -- between January 1, 2015 and October 2020; is that correct?
**A. Yes, I believe so.**
Q. Okay. Is it your understanding that all members of the enterprise committee would attend each board meeting?
**A. Yes, that's what I assumed, yep.**
Q. Do you know who determined which members of the enterprise committee would attend board meetings between the period of January 1, 2015 through October 2020?
**A. The CEO.**
Q. Mr. Carmichael?
**A. Greg Carmichael.**
Q. Is that right? Do you know who it was who would determine which members of the enterprise committee would make presentations at a board meeting between January 1, 2015 and October 2020?
**A. Usually it's the CEO. I assume Greg**

Page 41

**Carmichael did that. I don't know for sure who decides that or not, but I am sure it's cleared through the CEO.**
Q. What is your understanding of the executive succession process at Fifth Third for president and CEO?
**A. The executive succession process is typically that the talent management review goes together with the succession planning and individuals would be identified for particular positions, at least potential for positions and developmental goals associated with that.**
**Are you talking about the CEO or just generally executive?**
Q. For president and CEO.
**A. Okay. For president and CEO, it's a much more detailed process that we go through, particularly as it relates to analysis that's done by outside consultants, certainly the internal analysis of the talent review, the -- certainly the focus on developmental activities.**
Q. You referred to outside consultants. What do you mean by the use of outside consultants?
**A. Typically every board I've been involved with, whenever there is an executive succession planning, an outside consultant is brought in to do outside analysis, analytics associated with whether a person is capable of taking on the CEO role, and it's used as -- just like the talent management, used as a tool to get outside**

Page 42

**expertise on -- that focused on this kind of -- this kind of activity.**
**And it either validates what you're thinking or it doesn't, and in many cases, boards have their views of whether -- what candidates are suitable for CEO, they make that determination, and then the outside -- the outside consultant is brought in to help facilitate and validate the process, and it's just part of the analytics that the board uses, along with the talent management activities that we talked about earlier.**
**So -- and, of course, every board member has their own interpretation during this whole process of -- from their own experiences of what they expect from a CEO perspective. My view may be different than other board members' views based on my knowledge about what it takes to be a CEO, and -- and -- but the board comes together with those various perspectives to determine what the next steps are.**
Q. Did Fifth Third use an outside consultant in 2015 when Greg Carmichael was being assessed for president and CEO?
**A. They did.**
Q. Who did they use?
**A. RHR. I forgot the exact name, but it was an**

Page 43

**outside consultant that had been used previously.**
Q. In 2015, how many potential candidates were there for president and CEO at Fifth Third?
**A. In 2000 --**
Q. '15.
**A. '15. Let's see. In '15, I think there were -- at that point, in '15, I -- I believe that this was where the -- can you repeat your question?**
Q. Certainly. In 2015, how many potential candidates were there for president and CEO of Fifth Third Bank?
**A. Yeah. In '15, there's really only one that we felt like was -- had the skills and abilities to be CEO.**
Q. And that --
**A. And this is -- when I talk about this, I talk about long-term CEO for the bank, not emergency CEO.**
Q. And what is the distinction?
**A. There's a huge distinction between emergency CEO and a CEO that you want to be able to have for the long term. Emergency CEO can be anyone. It could be someone from the operational area. It could be the CFO. It could be the general counsel. That person is specifically put in place to keep the wheels on the -- on the wagon while the board decides who a long-term CEO would be.**

Page 44

**The qualifications for a long-term CEO are very different. The emergency CEO is more tactical. Long-term CEO is much more strategic in terms of where the direction for the bank, the vision for the bank in the future, whether it fits the life of the bank at that particular time or not.**

**And in a lot of cases, someone may be suitable as an emergency CEO but not suitable as a long-term CEO.**

Q. What do you mean by the term "fits the life of the bank"?

**A. Well, I can tell you, I mean -- I have experienced this in my own company. I've experienced it in other companies that I've been on the not-for-profit boards and so forth, Fifth Third in particular. When Kevin Kabat was CEO, Kevin had come out of the financial crisis and he would -- admittedly so, he was tired. The regulatory activities of the bank were not good.**

**We always characterize that we were in the regulatory doghouse, and it was important to have a CEO put in place that -- that was very focused on the processes and procedures of the bank to improve our regulatory outcome and ensure that we were in the position where we could do M&A and other activities.**

**Greg Carmichael fit the bill from that perspective, and that's why I mean the company needed**

Page 45

**someone who was very focused on the internal workings of the bank, the processes to improve the vitality of the bank moving forward, and you get the fundamentals in place to ensure that we could continue on from a strategic standpoint.**

**So when I talk about the life of the company, you had moved from Kevin to Greg. Greg was for that specific purpose. The question was, you know, was he -- and he turned out to be strategic as well. We didn't know that at the time, but we didn't really need that as much. But fast forward to when Tim Spence became CEO, we were very much in the process where the fundamentals were in place, the process was in place, and the strategic activities of the bank were extremely important. You even saw it in our board settings where it was more tactical, focused on how we rehabilitate the bank and then we move to more -- the strategic aspects.**

**And then you had Fintech and everything else going on at the time, and that's why I say the life of the bank at that particular point was to make sure that there was a strategic vision and the analytics in place, the knowledge base in place, to ensure that we could continue to progress in the face of competition from Fintechs and others.**

**So that's why I say the life of the bank. You**

Page 46

**see that in every company, the CEO is chosen based upon where the company is at the time, what the conditions are externally, and who best fits the major criteria in place to ensure that the bank can move forward, or any company.**

Q. Between January 1, 2016 and January 1 of 2020, did you ever discuss with Greg Carmichael the topic of Phil McHugh succeeding him as president and CEO of Fifth Third?

**A. No.**

Q. Between January 1, 2016 and January 1, 2020, did you ever discuss with Greg Carmichael the topic of Tim Spence succeeding him as president and CEO of Fifth Third?

**A. Of 2020?**

Q. January 1 of 2020, correct.

**A. Yes, he had that discussion with the board, that Tim was very strategic and that he was well thought of in terms of his further development.**

Q. You said "he" had that discussion with the board. You're saying Greg Carmichael had the discussion with the board?

**A. Greg gave us regular updates of progress.**

Q. Go ahead. Did I cut you off? I'm sorry.

**A. No.**

Page 47

Q. So just to clarify my previous question, you were saying that Greg Carmichael was the one who discussed with the board about Tim Spence being the next president and CEO of Fifth Third; is that correct?

**A. No. He would say he's a potential candidate as he progresses in his development. He could succeed to the CEO role. Now, he did talk about Phil in the context of this is a person that could step in on an emergency basis, potentially.**

**I think Tayfun or Phil could step into the role and the board would have to look at it based upon what condition was occurring at the time because, you know, Phil -- you know, Phil was a Steady Eddie -- my words -- utility player that could continue the operation of the bank from a tactical sense. So he fit well potentially as a, you know, as an emergency temporary interim CEO while the board determined who the long-term CEO should be.**

**So the context of Greg's discussion was really around long-term CEO. Because we didn't know how long Greg would be there.**

Q. These reports that Greg Carmichael gave to the board first with respect to Mr. Spence, when did those occur?

**A. I don't recall specifically, but various times**

Page 48

**during -- during executive sessions of the boards, he would give his latest thinking. And that could change. That could change from time to time, but he was very -- very supportive of Tim and his development.**

Q. And with respect to Mr. Carmichael's comments regarding Mr. McHugh to the board, when did those occur?

**A. When we talked about emergency CEO. So you can have a conversation that says this is the person that really fits the bill for the long-term view of the bank, but if you have something that happens to me, if I get run over by a bus, these are the people that you could look at potentially to fill that role until you can -- until you can get established who the next CEO would be.**

**So it was really a view of the trajectory of development, which that's typical. In a lot of cases you see executives that have a high trajectory, they just need time to develop that. You see it pretty clearly, and his name was put forward at given times of being a long-term CEO of the bank because he knew so much about strategy. He knew so much about Fintech, digital banking, all those things that would be -- that would have an impact on the bank from a strategic sense going forward. And he had the skills, the acumen, certainly in the conversations we had in the board**

Page 49

**setting, he knew the details, was very fluent, typically didn't have to use notes at all, and he was very quick on his feet. So he met a lot of those -- a lot of those objectives. So the board -- the board was very supportive of him and his development, and Greg knew that.**

Q. And just to be clear, because you used the pronouns he, him, he, him, you're referring to Tim Spence during that --

**A. Tim.**

Q. -- period?

**A. Yes.**

Q. And you indicated that this was what would be reported to the board, you're saying this is what Greg Carmichael would report to the board about Tim Spence; is that correct?

MR. CIOFFI: Objection. Mischaracterizes his testimony. He testified about what the board thought.

BY MR. SABA:

Q. Mr. Akins, I'm just trying to get clarification of -- you just went through a series of referring to somebody as he, him, he has. You're referring to Mr. Spence during that time?

**A. I'm referring to Tim Spence. Greg would give**

Page 50

**regular updates of really all his employees, all of his direct reports. Occasionally it was in a lot of detail, occasionally it wasn't. He would give his views of how people were developing in different roles, and he was very -- I mean, certainly we saw it from a Tim Spence perspective, and the board wanted to know more about his development as time went on.**

Q. You said "regular updates." How frequent was the regular updates?

**A. I'd say they -- I mean, they weren't like at every meeting, but certainly when we were considering as a board -- a board has a significant responsibility to make sure that if something were to happen to Greg or if -- when Greg decided to retire or whatever, that we were ready for were there internal candidates in the company that could succeed to that CEO role. So he would occasionally give us updates on his thinking, and his thinking was pretty consistent.**

Q. Are you --

**A. As was the board's.**

Q. Are you able to identify something more frequently than occasionally?

**A. Well, I don't know. I don't recall the frequency.**

Q. With respect to those updates regarding

Page 51

Mr. Spence, when did those begin by Mr. Carmichael?

**A. I don't -- I don't recall specifically. Yeah, I just don't recall when it originally started.**

Q. And with respect to the regular updates regarding Mr. McHugh, when did those begin?

**A. Well, when he gave updates of individuals, he would say, you know, Phil is -- I mean, Phil was doing well in his job. He performed well. And Greg, you know, was confident in his abilities to move from one area of the bank to another, and that's why I say he was a real utility player and one that could move from one area to another, had broad experience with the bank, and Greg was very supportive of Phil in his roles as well, and the board was, too. I'm not saying that, you know -- you know, certainly Phil could do the jobs that he was given and -- but that's not what we needed as a CEO of the bank, moving forward.**

Q. Did you ever discuss with any members of the board the topic of Phil McHugh succeeding Greg Carmichael as the president and/or CEO of Fifth Third?

**A. No.**

Q. Why is that?

**A. Because Phil was viewed -- at least in my view, I never asked others -- but in my view he was a utility player. He very much knew, and I've had -- I've**

Page 52

**had executives that worked for me, at least two that I can think of -- that were -- that were in that vein. They were utility players. They enjoyed what they were doing. They were very good at what they did and they could be very supportive to a CEO in terms of the internal workings that were occurring. You know, you typically -- and that's -- and the board and Greg felt good about Phil in that respect.**

**When you talk about CEO, that's a totally different thing. You can -- when you're evaluating for a CEO, you've got investors, you have external market conditions of -- that are occurring in the industry, you have contacts in the industry, all those types of things that are incredibly important.**

**And where the bank was, and, again, in the life of the bank, Tim Spence had those skills and abilities. What we wanted to see more of was his -- how he would perform in various areas of the bank, and given time and experience and Greg stayed so that could be done. I mean, Greg was staying anyway, but certainly Tim's development was -- was something that we looked at.**

MR. SABA: Can we go off the record?

(A recess was taken from 11:01 a.m. to 11:14 a.m.)

Page 53

THE VIDEOGRAPHER: We are back on the record. This is media 2 of today's deposition. The time is 11:14.

BY MR. SABA:

Q. Mr. Akins, before we went off the record, you made a reference to Mr. McHugh as a "utility player"; is that correct?

**A. Yes.**

Q. Okay. And by that reference to utility player, are you indicating that Mr. McHugh was not suitable to succeed Greg Carmichael as president and CEO of Fifth Third Bank?

**A. Yes.**

MR. CIOFFI: I --

THE WITNESS: Oh.

MR. CIOFFI: By way of objection, when you say suitable, do you mean qualified?

BY MR. SABA:

Q. Do you understand my question?

**A. Yeah, I understand the question.**

Q. Okay.

**A. He -- he was -- he did not have the skill sets for what we viewed, the board viewed, as what the CEO for the future would need. He had very good operational skills, very good convening authority skills within the -- within the enterprise.**

Page 54

**As a utility player, what I'm saying is, it that he's more internally focused, more focused on his experiences around internal to the banking environment, and that's -- by someone who can -- is relatively portable from one place to another in the bank, because of their knowledge of the internal operations of the bank. That's what I meant.**

Q. When did the board determine that Phil McHugh did not have the skill set to be the next president and CEO of Fifth Third?

**A. Phil McHugh was never considered to be the future CEO of the bank. He was viewed to be, as I said earlier, if emergency arose because of his experiential level within the bank, there's a big difference between keeping the wheels on versus progressing the bank into the future, particularly with the environment that the banking industry is in.**

**That's -- that's the way I looked at it. I mean, other board members may look at it differently, but that's the way I look at it, and that's based on my experience.**

Q. With respect to Mr. McHugh, you said he was never considered to be the next president and CEO of Fifth Third Bank; is that right?

Page 55

**A. Well, I mean, as long as I've been with the board, he was never considered. Now, he may have been considered earlier, I don't know.**

Q. During the time that you were with Fifth Third Bank, who were the individuals that were considered to be the next president and CEO of Fifth Third Bank?

**A. Well, keep in mind, we went -- we went from Kevin to Greg and the focus was on Greg to become CEO. Well, he had just become CEO. So then the board is really focused on Greg's development and emergency setting for CEO, not so much on long term at that point in time. Then it sort of crescendos over time base upon how long the sitting CEO is in place.**

**So you really had -- and then when Tim came to the company, it was, I mean, Greg certainly was very positive about it and we were very positive, the board was positive about what we were seeing, and if anyone in the bank, internal to the bank, was someone to take a look at for the future, it was Tim Spence. I mean, that's how things developed. You don't have to have multiple candidates for -- internal candidates for a CEO role.**

**Really, you're thinking about making sure that the -- that the bank is ready if emergency condition existed, and then as time develops, you're watching the**

Page 56

**development of people -- in this case it was Tim Spence -- and he was successful in that. And the bank has been hugely successful afterwards. So it turned out to be a great selection.**
Q. So is it fair to say during your time at the bank, the only two people that have ever been considered for CEO and president of Fifth Third Bank were Greg Carmichael and Tim Spence?
**A. I don't recall others in a serious sense.**
Q. What do you mean by "a serious sense"? What does that mean?
**A. Where the board was actually convening around someone who could fill that role.**
Q. Well, was anybody considered in a non-serious sense?
**A. Well, you always have -- you always have names that are -- that are potential, but nothing was -- nothing was, like I said, serious at that point.**
Q. Was Phil McHugh ever one of the names that was potential?
**A. Well, I mean, if you looked at it from an emergency CEO perspective, he was. For long-term CEO, I don't remember -- I just don't remember his name being involved in that discussion.**
Q. For long-term CEO, who were the other

Page 57

potential names?
**A. Well, there was discussion about Tayfun naturally because he's CFO, but he really didn't have the skills to become CEO. And the board sort of recognized that. Greg recognized that. And typically you'll look at individuals and say no, they're -- we just don't see them as a future CEO and, you know, that's the way it works within the board setting.**
Q. Was it ever communicated to Phil McHugh that the board would never consider him a long-term CEO or president of Fifth Third Bank?
**A. I don't know. The board -- to my knowledge, the board never communicated to Phil McHugh that he was going to be the next CEO, the board never did that. And the board's responsibility is to do that, not the CEO. And that's the independent board members.**
**And as far as the independent board members are concerned, we were very, you know, we had certainly seen Tim, his adaptability, the work he has done, the things he had done, and I think the board wanted to see further development of him to see if he could be potential CEO.**
Q. My question is, did any of the independent board members ever communicate to Phil McHugh that he would never be considered to be the future long-term

Page 58

president and/or CEO of Fifth Third Bank?
**A. I don't think -- I don't know what other board members have done, whether they had individual communications or not. I have not heard of any of those. I certainly did not, and I don't think any board member would tell somebody, you know, you're not -- I mean, you're not being considered because there's no reason to do it. You don't just go walk up to any employee and say, you know, you're not -- you're not suitable for CEO. Especially if you weren't considered.**
Q. Are you aware of anyone at Fifth Third Bank communicating to Phil McHugh -- Greg Carmichael or otherwise -- that he would never be considered for president and/or CEO of Fifth Third Bank --
**A. No.**
Q. -- on a long-term basis?
**A. No.**
Q. The determination that Phil McHugh did not have the skill set to be the next president and CEO of Fifth Third Bank on a long-term basis, what was that based upon?
**A. We didn't determine that Phil did not have the skill set. He just never was in the conversation for long-term CEO.**
Q. Didn't you testify earlier that Phil McHugh

Page 59

did not have the skill set that the bank would need for the next --
**A. And that's my impression, you asked me. And I imagine other board members may have their own views of that as well. But it never was my view of Phil being CEO, the long-term CEO. I think perfectly appropriate could have been the emergency CEO, but not the long-term CEO based upon where the bank was at that particular time.**
Q. In your determination. What is your -- excuse me. What is your determination based upon?
**A. So board members -- board members see individuals at the board meeting setting. They also, there is certainly views of how they position themselves in board meetings. I really felt like that Phil -- this is my view -- Phil was more introverted and more focused on the operations of the bank and more internal for the bank. And for, you know, for him, it would be a very difficult proposition to ask him to do, you know, strategic development when he didn't have the skill sets to do it.**
Q. Your conclusion that Phil did not have the skill sets to do strategic, what is that based upon?
**A. Because everything he had done was primarily tactical within the organization. I used my experience**

Page 60

**as a CEO to think about, okay, what does the bank need to do in the future, what's important to the bank, what are the -- what are the competitive environment for the bank and particularly when you're talking about technical skill sets, when you're talking about certainly the market and what's happening in the market with Fintechs, contacts are very important in the market as well, and actually Tim's demeanor.**

**Tim struck me as someone he could go as deep as you wanted to in terms of a discussion without any notes or anything, but also he could carry on, you know, you know, a conversation on just about any topic that's specific to areas of the bank. So Tim was the person that I felt like would be prepared to be running the bank.**

Q. Other than seeing Phil McHugh at the board meetings and the regular updates, what other information was available to you to determine that Phil McHugh did not have the skill set to become the next president and CEO of Fifth Third Bank on a long-term basis?

**A. Well, okay, I can tell you my thinking, okay? As a CEO, a CEO is responsible for putting the right people in the right positions to get the maximum output from the team. And you can tell from a CEO where they place people, where they move people around, what**

Page 61

**they're -- what they're thinking in terms of who best fits any particular picture.**

**So if there was an operational issue, if there was something associated with -- and I believe Phil was involved with TFT, a good thing for him to do. Because it was right down -- right down his alley.**

**But when you get to dealing with investors, dealing with changes in the marketplace, having a conversation, more of a conversation that's almost casual as opposed to a conversation that's canned, that's really important for a CEO.**

**And so that -- I just observed him, certainly the talent reviews that we saw were consistent with that, and -- and the rest of the board members I assume felt that way as well, because the focus very much was on Tim and his development.**

**It was also focused on other people's development, I'm not downplaying that at all, because when you see -- when you see the development activities of Tim, it was more focused on, okay, getting operational experience. And if you were to look at Phil's, you know, Phil's was really different parts of the bank, moving to different parts of the bank, because he was readily able to move over to those roles and be, in my mind -- this is my mind only -- but he could have**

Page 62

**been a very effective chief operating officer of the bank, because he knew so much about the internal workings.**

**I had a chief operating officer when I was CEO. I had people who were enterprise-wide that could get around very well to support me. Matter of fact, the chief operating officer of my previous company, he was one of the -- one of those and actually, in a lot of views, was a front runner to be CEO, but he didn't get it. I did. But he stayed with the company, because it was important to him to see the company do well, and he did fantastic. He's now on the external boards, and so I'm just saying that not everybody can be CEO.**

**There's only one position, and there's executive and senior VPs that are very good at doing their roles, very good at moving from one role to another. That doesn't mean they can be CEO, and you just sort of have to get over it. And I think it's -- there's people that don't get the CEO role and -- but they stay with the company.**

Q. You indicated that you observed him, meaning Phil, at the board meetings, correct?

**A. Yes.**

Q. Okay. You're not referring to any observations outside any board settings, correct?

Page 63

**A. Of Phil?**

Q. Correct.

**A. No.**

Q. And then you also, you referred to the talent reviews or talent decks; is that correct?

**A. Yes.**

Q. And I believe earlier you referenced the regular updates were Greg Carmichael, correct?

**A. There were updates from Greg Carmichael.**

Q. Okay.

**A. I walked back the regular, because you had questions of, you know, was that frequently and that. It was not that -- it was occasionally and about different people.**

Q. Fair enough.

**A. Okay.**

Q. There were updates from Greg Carmichael?

**A. Yeah.**

Q. You don't recall specifically how frequently they were?

**A. Right.**

Q. Okay. Other than those three things, your observations of Phil at the board meetings, board settings, the talent decks, and the updates from Greg Carmichael, anything else that you had regarding Phil

Page 64

McHugh, received regarding Phil McHugh, that helped you to determine that he did not have the skill set to be the next president and CEO of Fifth Third Bank?

**A. I'd say those were the primary -- the primary inputs to my decision process, along with you'd have to add my experience as a CEO and observing other individuals in the same genre, and that's what each and every board member does. I mean, the independent board members decide who the next CEO is based upon the inputs that are provided to them, and the management team and the CEO is there as the conduit to the board. That's the responsibility of the CEO, to make sure that the board knows and understands the talent levels of the executive management team and all that kind of stuff.**

**And I think it is really important for the board members to get that input. But the board is also pulling on their own experience based upon their own -- that's why you have the diversity of board members and experiences so that they can come to the table and say oh, maybe this person is not right for it or this person is.**

**But in this case, in this case, there is no doubt the board members were very, very focused on the development of Tim because if there was an internal candidate for CEO in the future, he was it.**

Page 65

Q. Was there a particular date or time period that occurred when the board determined that Phil McHugh would never have the skill set to be the next president and CEO of Fifth Third Bank?

MR. CIOFFI: Objection. Asked and answered. You can answer it again.

THE WITNESS: We had a candidate that we felt like was far above -- and the internal candidate, because there's really not a comparison that was -- that was done. This was really focused on who fits the skills and abilities for the bank going forward, and Tim Spence fit the bill. So there's no need for us to go back and say, okay, what about Phil McHugh or what about Tayfun or what about this person or that person?

When you have a person who -- who is readily able to assume that role in the future and really the entire board recognizes that, the verdict is still out. I'd have to say, you know, you initially see that and then you form a developmental plan, talk to the CEO about it, that continues over time, and if that were to falter, then we'd be back at ground zero, probably an external candidate, but nevertheless, that's -- that's what's done in general board settings.

Page 66

BY MR. SABA:

Q. At what point in time did the board determine that Tim Spence was far and above any other internal candidate for president and CEO of Fifth Third Bank?

**A. I don't know the exact time -- time or anything like that. I think -- I think it was seeing him in action with the M&A transactions, the other transactions that were done, but also his discussion from a strategic sense from a banking standpoint, I think that evolved over time. We were very positive about him and -- with our impressions of him, but the board wanted Greg to know that we were -- we were very supportive of his further development and -- and we eventually were getting reports on his development even after he became president of the bank, because we wanted to make absolutely sure that he was -- he was ready to be CEO. That's why -- that's how transitions work.**

**I became president. I became CEO. Then I became chairman of the board. Same for Tim. And Greg stayed around during that transition period so that he would have the value of his mentorship. And I also mentored Greg and him during the process as well.**

Q. Do you recall a particular year when the board determined that Tim Spence was far and above any other internal candidate?

Page 67

**A. I don't recall the particular year because all those 2015, '16, '17 sort of -- '18 sort of comes -- it sort of comes together. There was -- I mean, you have initial discussions and then things gradually -- gradually grow, and that's why I said earlier, Greg would occasionally give updates on developmental activities.**

**The interesting thing, I think, is no board member ever said, well, you know, maybe we should look at Phil McHugh. I never heard that. And I never heard -- as a matter of fact, I only heard support for Tim and Tim's continued development. That's -- except in the case of emergency CEO.**

Q. The updates that Greg Carmichael would provide to the board, were those documented anywhere in writing?

**A. No.**

Q. Were those always during an executive session of the board?

**A. Typically during executive session. Because the rest of the management team would leave at that particular time, and that's when the CEO can have conversations with the independent board members.**

Q. With respect to the updates that Greg Carmichael would provide regarding Tim Spence, did he ever provide any criticisms or negatives regarding Tim

Page 68

Spence?
A. I don't think there was negatives or criticisms. There was always discussions of, you know, development activities. And really every one of the talent management reviews, none of that is meant to be critical or anything, it's meant to be development. Everybody has developmental activities.
I had development activities for my board as a ten-year CEO. I would have, you know, 26 pages of review and development activities. So everybody has those. And he would comment that, you know, he wanted to get exposed to this area or that area, and we were fine with that.
Q. Do you recall any of the specific development activities that Greg Carmichael referred to for Tim Spence?
A. I think it was the ones that were primarily in the -- you know, in the general updates we received in talent management. For example, I mean, he was very quick on his feet, very knowledgeable. Sometimes he would move, you know, too fast for people. And as a CEO, you have to sort of learn how to communicate in a very deliberate fashion and one that recognizes that your audience is keeping up with you and, you know, there is generally things like that. Nothing -- nothing

Page 69

that he had in terms of development was a fatal flaw at all. They were all constructive in terms of development and actually the same for Phil.
I mean, each one of the -- each one of the -- the executive team would not be in their positions if they were, you know, not good at what they did and -- but every one of them had developmental activities and that's what -- that's the kind of thing Greg would occasionally report on.
Q. Were you ever aware that in August of 2019 there was a chance that Greg Carmichael would have to step down earlier than desired because of situations going on with him that were personal in nature?
A. No.
Q. That was never communicated to you?
A. No. Greg always reiterated to us he would stay with the bank as long as it took for us to be comfortable with who the new leader would be. He -- as with any conversation that occurs with a CEO, the board has to have conversations about, you know, what's your time frame, what are you thinking in terms of -- in terms of retirement? Not set in stone, but certainly comments like that.
And during that period, I guess it was, you know, 2018 or so -- I can't remember exactly -- but he

Page 70

was saying, hey, you know, I have done a lot of great things here and -- and at some point I need to be looking at moving on, and I'm willing to work with the board on the transition of that. He committed to stay as long as it needed -- as long as we needed. So really it is up to a CEO to initiate that process in earnest, and that's what Greg was doing. He never -- he never indicated that there was some personal issue that he had to -- he had to step down or anything like that, I never heard any of that.
Q. You've been making the reference to a long-term CEO. What's the time period required to constitute a long-term CEO?
A. I think -- I mean, typically the average CEO today is about 3 1/2 years, and my industry it's about seven. In banking, it tends to be about that, but you're probably looking for, you know, three to five years at least for a new CEO because if you -- if you -- if you have something less than that, you're completing a process and then walking right back into the same process, and the bank never has a chance to -- and its employees and stakeholders don't have a chance to get their footing with a new CEO. So it has to be at least three to five years.
Q. Prior to December of 2019, had the board

Page 71

already determined that Tim Spence was the only candidate to be the next president and CEO of Fifth Third Bank?
A. Are you meaning internally?
Q. Or anyone.
A. Well, I don't know that the board had made -- we felt like -- we felt like that he was the person that we wanted to focus on in terms of development to give him the opportunity to develop where he could be considered to be CEO. He was the lead -- he was very much the lead internal candidate.
(Plaintiff's Exhibit 2 is marked for identification.)
THE WITNESS: Thank you. Do you want that one back?
MR. SABA: You can just put it right there.
MR. CIOFFI: Put it right there.
(Plaintiff Exhibit 3 is marked for identification.)
BY MR. SABA:
Q. Mr. Akins, I've handed you two documents which are marked as Exhibits 2 and 3, respectively.
A. Yes.
Q. And first referring to Exhibit 2, just for point of reference, you'll see at the bottom of the

Page 72

first page there's a stamp that says Fifth Third-McHugh-Minutes 000253; do you see that?
**A. Yes.**
Q. And if you look at the last page, it should say Fifth Third-McHugh-Minutes 000265; is that correct?
**A. That's correct.**
Q. All right. And with respect to Exhibit 3, the first page is Bates stamped at the bottom Fifth Third-McHugh-Minutes 000266; do you see that?
**A. Yes.**
Q. And the last page is Bates stamped Fifth Third-McHugh-Minutes 000283; is that correct?
**A. Yes.**
Q. Going back to Exhibit Number 2, can you identify Exhibit Number 2 for me, please?
**A. It's the minutes of the board of directors of Fifth Third dated December 17, 2019.**
Q. Have you seen this document before?
**A. Yes.**
Q. And can you identify Exhibit 3 for me, please?
**A. Minutes of the board of directors Fifth Third Bank December 17, 2019.**
Q. And have you seen Exhibit 3 before?
**A. I believe so, yes.**
Q. When would you typically see the minutes from

Page 73

a meeting?
**A. Typically they'll show up at the succeeding meeting afterwards, and then we review the minutes and approve them at that board meeting.**
Q. All right. Referring you to Exhibit 2 and to the second page, Fifth Third-McHugh-Minutes 000254, two-thirds of the way down the page, the paragraph begins after the resolutions, "Thereafter, Mr. Carmichael and Mr. Schaffer initiated a review of potential succession timelines and candidates for the chief executive officer position. They reviewed top succession candidates, including Mr. Spence, and discussed the potential time lines for their readiness and key development priorities for each such candidate."
Do you see that?
**A. Yes.**
Q. Do you recall who the candidates were that Mr. Schaffer and Mr. Carmichael discussed at that December 17, 2019 meeting?
**A. I don't. I don't recall. Typically it would have been the CFO, I suppose, Tayfun; I just don't recall.**
Q. Do you recall them discussing more than one candidate?
**A. I don't. I don't recall.**

Page 74

MR. CIOFFI: I'm going to instruct the witness to read the whole paragraph before you answer any additional questions.
THE WITNESS: There's external candidates, okay. Yeah, I thought he was talking about the long-term CEO because -- I mean, it sort of tells you something when you read this to say including Mr. Spence, and then a discussion of external candidates.
So there -- I don't know if there was other names or not, I don't recall that. And then it falls into the emergency succession discussions. I think it's exactly what I've been saying.
BY MR. SABA:
Q. So going back to the third sentence, I believe it is, which indicates, "In response to director questions, Mr. Carmichael and Mr. Schaffer commented upon the potential external candidates that could be considered for such a role --
**A. Uh-huh.**
Q. -- including a discussion of the known capabilities of such candidates and the potential challenges created by appointment of an external candidate for the role."
Do you see that?

Page 75

**A. Yes.**
Q. Do you recall who the potential external candidates were?
**A. I don't recall the names, but I'm pretty sure it was other bank CEOs that could potentially be interested in a Fifth Third Bank role.**
Q. Do you recall any of the discussion of the known capabilities of such candidates?
**A. I don't recall.**
Q. Do you recall the discussion of the potential challenges created by appointment of an external candidate for the role?
**A. Yes.**
Q. And what was that discussion?
**A. Well, any time you bring an external candidate in, it's -- you don't know exactly what you're getting. You interview in the process and that kind of thing, but you don't know exactly what you're getting. You do know their qualifications on paper and that kind of thing. This is really more the initiating of a soft question or a soft search to say, do you know, Greg, of any other people in the industry who could fit the bill relative to being CEO of the company?**
**So it would be an active CEO that falls into the role, but they may or may not know about Fifth Third**

Page 76

**Bank. So a lot of those issues are -- they are always brought up in a succession planning process. Sometimes it is a soft search, sometimes it is a hard search. In this case it was asking Greg, it wasn't even a soft search at this point.**
Q. Referring back to the first page of Exhibit Number 2, it indicates the directors present and it indicates you were present in person at that meeting; is that correct?
**A. Yes.**
Q. Okay. Phil McHugh was not present at that meeting; is that right?
**A. I don't recall. Yeah, it doesn't look like he was. His name's not on there.**
Q. The minutes indicated that the meeting started at 10:00 a.m. How long did the meeting last?
**A. I don't know if it said at the end or not, but typically they wind up around noon, 12:30, something like that. Does it say anywhere at the end? Here is resolutions. Yeah, typically it is around 12:00 or 12:30.**
Q. And for clarification, referring to Exhibit 3, these are the minutes for Fifth Third Bank as compared to Exhibit 2, which are the minutes for Fifth Third Bancorp; is that correct?

Page 77

**A. That's correct.**
Q. What's your understanding of the relationship between Fifth Third Bank and Fifth Third Bancorp?
**A. Well, Fifth Third Bancorp is the overall holding company. Fifth Third National is the bank itself.**
Q. And also for clarification, these meetings are held simultaneously; is that right?
**A. Yes.**
Q. Notwithstanding the two separate sets of minutes, it's all taking place at the same time?
**A. That's correct. There are some specific actions that may be dealt with one versus the other. I've actually forgotten what they were, but bank regulations require -- seemed like there was one area that is dealt with by the national bank, so we purposely do that, but it doesn't happen all the time.**
(Plaintiff's Exhibit 4 is marked for identification.)
BY MR. SABA:
Q. Mr. Akins, I have handed you what has been marked as Exhibit Number 4, which is Bates stamped Fifth Third-McHugh-001105 through Fifth Third-McHugh-001154. Are you able to identify this document for me?
**A. Well, it appears to be the human capital and**

Page 78

**executive talent management and succession plan update document.**
Q. Is this the talent deck that you were referring to before that would be used at the December board meetings?
**A. Typically, yes.**
Q. Do you recognize this as being the particular talent deck for the December 2019 board meeting?
**A. Yeah, uh-huh.**
Q. How would this document be used at the meeting?
**A. Well, typically it was a dinner or later on it was in the meeting itself, but in the executive session we would go through each individual and look at the succession planning for various important positions and then, of course, that would move to, you know, the development activities, discussion of that. Greg and whoever the chief human resource officer at the time would be would go through the deck in terms of each individual person, what their developmental needs were, what their potential next positions could be, those were -- it was a typical update that was done.**
Q. The talent deck would be prepared -- just so we're on the same page -- I'm referring to Exhibit 4 as the talent deck?

Page 79

**A. Yes.**
Q. Is that a fair description?
**A. Yes.**
Q. This talent deck that we see marked as Exhibit 4, that would be prepared in advance of the board meeting; is that correct?
**A. That's correct.**
Q. Do you know who prepared the talent deck?
**A. Management.**
Q. Who do you mean by management? Who had prepared that?
**A. Well, I don't know who exactly prepares it, but the presenters are usually the CEO and the head of human resources.**
Q. Who was the head of human resources as of December 2019?
**A. I have to look at the -- it should have an organization chart in here somewhere.**
Q. Would it have been --
**A. It changed -- it changed during that time after the --**
Q. Would it have been Bob Schaffer?
**A. Maybe at that time. Because it was sort of an interim thing after -- there was a -- I forgot her name, she was there and she left. And then he had it**

Page 80

**and then -- so I guess, yes, it was Bob. Yeah, he's shown as chief human resources officer.**
Q. Okay.
**A. Yeah, he had all this for a while, so --**
Q. All right. So just to be clear, your understanding would that this would have been prepared by Mr. Carmichael and Mr. Schaffer, correct?
**A. That it would have been sponsored by them. I don't know who prepared them.**
Q. Okay. As a board member, did you have any involvement in the preparation of the talent deck marked as Exhibit 4?
**A. No.**
Q. Would you have seen any drafts of the talent deck marked as Exhibit 4?
**A. No.**
Q. Would the board make any changes to the talent deck during the board meeting?
**A. There was discussions of each person. I can't recall any specific change that was made by the board. I don't recall that.**
Q. Referring specifically to Fifth Third-McHugh 001135, it's -- I'm sorry, let me be clear.
On Exhibit 4, I'm just trying to give you a page reference --

Page 81

**A. Oh, okay.**
Q. -- so you can get there.
**A. 1135, got it.**
Q. So Exhibit 4, Fifth Third-McHugh 001135; do you see that there?
**A. Yes.**
Q. Can you identify that page for me?
**A. That's the individual page for Tim Spence.**
Q. And again, as we determined, this information was filled out for the board prior to the meeting; is that correct?
**A. Yes, that's correct.**
Q. Under the talent information and potential category, it has high potential for Mr. Spence; is that correct?
**A. Yes.**
Q. Who would have put that information in?
**A. I don't know who would have initially put those in, but I presume -- I mean, certainly it would have to go through the chief human resource officer and the CEO, particularly the CEO.**
Q. Below that, under potential next positions, it has president one to two years, CEO three-plus years; do you see that?
**A. Yes.**

Page 82

Q. Do you know where that information came from?
**A. My previous answer holds on that, but it would have eventually been sponsored by the CEO and chief human resource officer.**
Q. Did the board make any changes to that information?
**A. No, not that I'm aware of.**
Q. If you could turn to Fifth Third-McHugh 001132.
**A. Okay.**
Q. Can you identify that page for me, please?
**A. That's the individual sheet for Phil McHugh.**
Q. Potential for Phil McHugh it lists moderate potential; do you see that?
**A. Yes.**
Q. And who would have put that information in there for Mr. McHugh as being moderate potential?
**A. I don't -- I don't know initially, but it would have been sponsored by the CEO and the CHRO.**
Q. And with respect to potential next positions, it says, "Expand current responsibilities to include middle market leadership."
Do you see that?
**A. Yes.**
Q. And who would have put that information in

Page 83

there?
**A. It would have been sponsored by the CEO and the CHRO. I don't know who specifically, but that's -- it would have to go through them.**
Q. If you could turn to Fifth Third-McHugh 001141?
**A. 1141. 1141?**
Q. Correct.
**A. Yeah. That's the CEO succession plan.**
Q. Correct. That's the title page for the CEO succession plan; is that right?
**A. Yes.**
Q. This also would have also been reviewed during the close of the December 2019 board meeting, correct?
**A. Yes.**
Q. Turning to the next page, Fifth Third-McHugh 001142, can you identify that for me, please?
**A. That's -- that's the -- we're on the same page, right?**
Q. Correct.
**A. That's the CEO succession view, just shows different blocks, different readiness, that kind of thing.**
Q. And it's an indication of who would potentially succeed to CEO; is that correct?

Page 84

**A. It's an indication of who had the opportunity to eventually become CEO, yes.**
Q. Who would have completed this CEO succession chart that we see on Fifth Third-McHugh 001142?
**A. I don't know who specifically, but, again, it would be sponsored by the CEO and CHRO.**
Q. And this particular plan indicates that nobody is ready now with respect to CEO succession; is that correct?
**A. That's correct.**
Q. And then it indicates three-plus years of Tim Spence; is that correct?
**A. That's correct.**
Q. Seven-plus years of Brian Lamb; is that right?
**A. That's correct.**
Q. And then for emergency successor, it has Tayfun Tuzun, Phil McHugh, and a board member; is that right?
**A. That's correct.**
Q. Did the board make any changes to the CEO succession plan we see on Fifth Third-McHugh 001142?
**A. No, not that I'm aware of.**
Q. Did the board have any criticisms of the CEO succession plan we see on Fifth Third-McHugh 001142?
**A. Not that I'm aware of. And I would keep in**

Page 85

**mind these are living, breathing documents. I've been through this a lot as CEO, but these can change at any given time. So what you're seeing is basically a snapshot.**
Q. With respect to this particular talent deck, did you see another revision of this talent deck?
**A. No, I did not.**
Q. When you say "these can change at any time," are you referring specifically to the CEO succession plan or for all the information we see in the talent deck?
**A. Well, generally -- this is generally how the process works, that I'm accustomed to. There are people that come together in the organization, whether it's the executive team or whatever, they come together with their views of individual -- individual people, and they have disagreements about those views.**
**And so it's sort of how the sausage is made for this type of activity before it gets to the CEO, and the CEO, as part of that process, evaluates it, can make changes to it, that kind of thing. Then it goes to the board level.**
**Typically, the board has been -- enough discussion where there's not a lot of, you know, comments, we'll comment about people and that kind of**

Page 86

**thing, what we've seen -- what we've seen, but that's another step. Because when it comes to CEO succession, it, again, is the lead -- it's the lead director's responsibility to do the CEO succession. So this is really done -- there's just several filters you go through to get there. So -- and there could be a lot of drafts. In my experience, you typically get that, and -- and then you go through it and you come up with the best -- the best case you have and present to the board.**
Q. Are you aware of any other drafts of this CEO succession plan that appeared either before this document 001142 or after 001142?
**A. I did not see any of the previous drafts.**
Q. What about after this particular draft?
**A. After?**
Q. Correct. Did you see any revisions --
**A. No, I did not.**
Q. Okay. Are you aware of any revisions being made to the CEO succession plan we see marked as 001142?
**A. I'm not aware of any revisions to this document.**
Q. With respect to Phil McHugh being identified as an emergency successor --
**A. I'm sorry, what page was that?**

Page 87

Q. I'm still on 001142.
**A. I was paging ahead with you. Sorry about that.**
Q. No, you're all right.
Going back to Fifth Third-McHugh 001142.
**A. Okay. Got it.**
Q. Were -- were there any criticisms of Phil McHugh being listed as an emergency successor on the CEO succession plan we see identified on 01142?
**A. Not that I recall.**
Q. Do you recall any criticisms of him being an emergency successor during that December 2019 meeting?
**A. These are positioned as potential candidates to look at if there was emergency successions. There was no negative comments about that. This is -- the only distinction I'm trying to make here is that we weren't choosing an emergency person at that time.**
Q. Prior to December 2019, are you aware of any other written CEO succession plans like we see in Fifth Third-McHugh 001142?
**A. No. Before this?**
Q. Correct.
**A. There could have been previous board reviews in previous years. I just don't recall them. I mean, we had decks for each time we went through these**

**annually, but I just don't recall.**
Q. As you sit here today, do you recall if any of the prior talent decks for 2016, 2017, 2018, if they had any CEO succession plan set forth in them?
**A. I don't recall.**
Q. Other than what we've identified as the talent deck, marked as Exhibit 4, was the board provided with any other documentation with respect to CEO succession?
**A. None other than the consultant analysis, that I recall.**
Q. The "consultant analysis." You're referring to the assessment done by RHR; is that correct?
**A. Yes.**
Q. Okay. Is it -- excuse me. What is your understanding of when RHR did their assessment?
**A. That was an initial -- I don't recall exactly what the time frame was. Let's see, I'm backing up from when -- let's see, Tim took -- I guess it was like 2019, 2020.**
Q. You don't recall specifically as you sit here today?
**A. No, I don't.**
Q. What involvement did you have in the RHR assessment?
**A. I didn't have an involvement other than their**



**presenting to the board in executive session.**
Q. When did they present to the board in executive session?
**A. I don't recall. Either '19 or '20, I believe.**
Q. Were you present for that presentation?
**A. Yes.**
Q. You were present for the presentation?
**A. I was there -- well, I was not there the first time. I was there the second time. Because it was done in a September board meeting that, again, that was when I had my own board meeting, so I was not there, but I was made aware of the presentation. I can't recall exactly how I was made aware of it. It was afterwards.**
Q. In what way were you made aware of the presentation?
**A. I can't recall. Either Marsha may have given me a call to update me. The presentation -- I remember a presentation by RHR, but I can't remember specifically which one.**
Q. How many presentations were there by RHR?
**A. Well, I was involved with the first one so that sort of runs together.**
Q. Just to be clear, by "the first one," you're year referring to when RHR did an assessment of Mr. Carmichael?



**A. Yes. Yes.**
Q. And this was back in 2015?
**A. Right.**
Q. Did RHR assess anyone else back in 2015?
**A. Not that I recall. I just don't recall.**
Q. Who dealt directly with RHR in terms of the parameters of what they would do and the assessment they would perform in 2015?
**A. Management.**
Q. What would -- what was your role in 2015 with respect to RHR?
**A. I didn't have a role with RHR. I was just a board member. But listen to their report.**
Q. What do you recall specifically about RHR's assessment in 2020?
**A. I remember that it pretty much confirmed our views of Tim Spence. There was some discussion I remember with the board and that's why I think there was an initial discussion with RHR that -- and then they went off and did their thing and then they came back and they presented on Tim Spence, and it was consistent with what the board's views were.**
Q. When you said "there was an initial discussion with RHR," who had an initial discussion with RHR?
**A. I think we were introduced. I'm fuzzy on**



**this, but I think we were introduced to them, and then they were told to go off and do their thing and they did. There was some discussion by the board at that particular time, you know, are we comfortable with just going with one person in terms of analysis, and I was completely comfortable with it and the board was as well.**
Q. When was that discussion?
**A. I don't recall specifically. It seems like it was a dinner, that executive -- executive session that we had. I just don't recall.**
Q. Do you know what year that was?
**A. It was the year they were doing the analysis. So it would be in that '19 to '20 time frame.**
Q. Who was present for that?
MR. CIOFFI: Objection. What do you mean by "that"?
MR. SABA: Who was -- who -- I'll rephrase the question.
BY MR. SABA:
Q. Who was present for the executive session where you discussed how many people RHR should assess?
**A. The board was there.**
Q. Including Greg Carmichael?
**A. Including Greg.**

Page 92

Q. Okay.
**A. That's my recollection. Now, it may be faulty, but that's my recollection.**
Q. And you're not able to pin it down, a month or year when that occurred?
**A. No. It all sort of runs together during that period of time.**
Q. Would there be any documentation in writing of that session?
MR. CIOFFI: Objection to the form of the question. Lack of foundation. That he knows of?
MR. SABA: The deposition is his personal knowledge, so yeah.
MR. CIOFFI: Well --
THE WITNESS: I just don't recall. I just don't recall.
BY MR. SABA:
Q. Did you read Marsha Williams' deposition in preparation for this deposition today?
MR. CIOFFI: Objection. Instruct him not to answer.
BY MR. SABA:
Q. Did you read Greg Carmichael's deposition in preparation for this deposition today?
MR. CIOFFI: Objection. Again, as I said

Page 93

earlier, we represent him personally and whatever he read, he read at our instruction as his counsel. You can -- I'll let him answer the question did he read anything outside of what we instructed him to read.
BY MR. SABA:
Q. Did you review any documents or reports from RHR?
MR. CIOFFI: Again, same objection.
THE WITNESS: In what context are you asking?
BY MR. SABA:
Q. As a board member.
**A. Oh, yes.**
Q. When did you review those?
**A. I probably would have seen it after the board meeting.**
Q. After the board meeting in September of 2020?
**A. It's either September or December, I forgot which. September is the one I missed. So I would have seen it after that, I presume.**
Q. Did you ever communicate directly with anyone from RHR?
**A. No.**
Q. Did you ever -- I'm referring to the time span of 2019 or 2020 -- ever personally see any presentations

Page 94

made by the individuals from RHR?
**A. I don't recall.**
MR. SABA: If we can go off the record for a second.
THE VIDEOGRAPHER: Off the record at 12:22.
(A recess was taken from 12:24 p.m. to 12:40 p.m.)
THE VIDEOGRAPHER: We are back on the record. This is media 3 today's deposition. The time is 12:40.
BY MR. SABA:
Q. Mr. Akins, you gave me a time period before for the long-term CEO. What would be the time period that the emergency successor would serve?
**A. Typically it's just a few months.**
Q. Did you or any other board member communicate to Mr. Spence at any time that he was far and above any other internal candidate to be the next president and CEO of Fifth Third Bank?
**A. No. Not during the time that he was being considered, no.**
Q. Why not?
**A. Because -- at least I can speak for me, not the other board members, you'd have to talk to them, but I don't have those kinds of conversations with**

Page 95

**individuals before it's right, and it wasn't right. And you're talking about during the period of when the evaluation was occurring, right, before he became president?**
Q. Correct.
**A. Yeah, okay. Okay.**
Q. I'm talking about any time he -- I believe the resolution or the resolution signed in October 2020 and the meeting discussing the resolution is September 2020. So let's take it any time prior to September 2020.
**A. Yeah. Well, the resolution was done -- because it's an AK issue from an SEC perspective -- so when -- that's when the board ultimately decides when they -- and to have a conversation beforehand would not be appropriate.**
Q. Would there have been a discussion with Mr. Spence during the time that he was assessed by RHR that he was being assessed to be CEO and president of Fifth Third Bank?
**A. I don't know the answer to that.**
Q. Go ahead. Sorry.
**A. He would have -- he would have known that he was at least in the mix, I guess, because of the evaluation, but that's all supposition on my part.**
Q. Okay. You referenced an executive session or

Page 96

dinner wherein it was discussed how many individuals would be assessed by RHR in 2020 to be president and CEO and that a determination would be that it was just one person. Was Greg Carmichael present for that conversation?
A. Yes.
Q. Okay. Do you recall any comments he made during that conversation?
A. He asked the board -- at least this is my recollection -- but he asked the board, are you comfortable with either one or multiple candidates, and the board responded that we were comfortable with one candidate.
Q. And why was the board just comfortable with one candidate?
A. Because we had our guy. I mean, he -- we felt very positively toward his progression, and we felt like that from the internal -- internal from Fifth Third, he was the right person to really focus on from that aspect.
Q. And this determination that was made because you had your guy, that was before RHR did their assessment?
A. No. I think, you know, board members have conversations with each other in board member settings,

Page 97

and if we're impressed by someone, you'll talk to someone and say, hey, I'm really impressed by this person. That's a progression that occurs over time, and then by the time it got to that meeting, it was very clear that Tim Spence was favorable from a board perspective and that's why the board said we're comfortable with only one person.
Q. You don't recall the date of that meeting, but it would have been before RHR did their assessment?
A. It was -- and I may be totally off base, but I remember -- I remember an introduction meeting with RHR, it seems like, and there was a discussion about whether there was a single candidate or multiple candidates, and we -- the board decided a single candidate was fine.
Q. And my question is, that was before RHR did their assessment, correct?
A. That was before -- let's see. I think -- I'm just not sure if it was before or when they came -- when they did the other presentation; I'm just not sure.
Q. Well, it wouldn't have made sense for them to come to you after they've already done all the assessments to say --
A. Right.
Q. So this would, from all practical standpoints, it sounds like you had this meeting that you're talking

Page 98

about before RHR did their assessment, correct?
A. I would -- I would think that it was done when they were initiated to do their review, because they have to know what their scope is, and they have to know what -- what they're going to look at. And the board felt comfortable with looking at one person. And, remember, this is not -- this is not final. I mean, RHR goes off and does their thing focused on Tim Spence. If they came back with some fatal flaw, something we need to look at, we'd look at it.
So there was no deadline, no timeline or anything like that. It was really, okay, give us the information that you have, we're comfortable with looking at one person at this point, and we'll see where it goes. Then it became a discussion we're comfortable with moving forward with Tim and then under these developmental actions and that falls on the transition process. That's the way the transition process works.
Q. Do you know if at any time RHR was retained to review three people?
A. I don't recall that. I don't know.
Q. Other than the RHR assessment, what else did the board base their determination on that Tim Spence should succeed Greg Carmichael as the next president and CEO of Fifth Third Bank?

Page 99

MR. CIOFFI: Objection. Asked and answered a couple of times, but --
THE WITNESS: So observations -- I can't speak for the other board members -- but observations that I had during the board meeting settings, observations that I had during the board dinners, because it's just as much -- it's just as important of, you know, seeing people in those kinds of settings, too. And then of course you had the talent review process and you had the RHR analysis and my own experience, just drawing from my own experience and observing people, and then my own thought process of where bank leadership needed to be in the future and what they need to be focused on and who had those skill sets that match that. That's my thinking.
Now -- and it's really important to note that no matter how I came up with my thinking, the other board members from their perspective came up with the same thing.
BY MR. SABA:
Q. With respect to your reference to the talent review process, you're referring to the talent decks that we were looking through earlier; is that correct?
A. Yes.

Page 100

Q. With respect to the board dinners, explain to me how those are conducted.
**A. They're in the evenings. Usually there's a reception beforehand, the executive team, leadership team is there in a very casual environment, and then we sit down for dinner with everyone, the board and executive, and just it's really a way of meeting and talking to people in a more casual environment.**
Q. Are you all sitting at one table?
**A. Generally not, depending on what the space was. Sometimes it was the same table, long table, sometimes it was smaller tables that people had assignments to sit at.**
Q. Throughout the years between 2015 and September of 2020, how often did you sit with Tim Spence at these dinners?
**A. I don't recall. Nothing unusual. It's not like I sat with Tim Spence every time or anything like that. Matter of fact, it appeared to me it was the same as what I did as CEO, I made sure board members were scattered with people who were different than the previous time. I kept track of that. I don't know if they did or not, but it seemed that way because I'd be sitting with different people depending on the -- depending on which night it was. I mean, there never**

Page 101

**was any consistency, if that's what you're getting at.**
Q. Did you have assigned seats at dinner?
**A. Generally yes, we had assigned seats.**
Q. Who would determine who would sit where?
**A. I have no idea.**
Q. How frequently did you sit next to Phil McHugh at the board dinners?
**A. I don't recall.**
Q. So other than your own personal experience and opinions as CEO, the other information that you based your decision on with respect to Tim Spence are the observation during board meetings and dinners, the talent decks, the RHR assessment. Is there anything else?
**A. Oh, and of course the CEO feedback on individuals as well.**
Q. The Greg Carmichael comments that we discussed earlier, correct?
**A. Yes.**
Q. Anything else?
**A. Not that I can think of.**
MR. SABA: Can we go off the record for one second?
THE VIDEOGRAPHER: Yes. Off the record at 12:52.

Page 102

(A recess was taken from 12:53 p.m. to 12:55 p.m.)
(Mr. McHugh exits the room.)
THE VIDEOGRAPHER: Back on the record, 12:54.
(Plaintiff's Exhibit 5 is marked for identification.)
BY MR. SABA:
Q. Mr. Akins, I've handed you what has been marked as Exhibit Number 5, which is Bates stamped Fifth Third-McHugh-0213249 through Fifth Third-McHugh-0213254; is that correct?
**A. Yes, that's correct.**
Q. Let me represent to you these are the board of directors minutes for Fifth Third Bancorp for January 5, 2015; is that correct?
**A. Yes. Special joint meeting, yes.**
Q. Okay. And with respect to that meeting, you attended that meeting via teleconference; is that correct?
**A. Yes, that's what it says.**
Q. Okay. And that would have been a conference call, that's not a Zoom call, correct?
**A. Correct.**
Q. Okay. And also as indicated by the other people present, neither Phil McHugh nor Tim Spence were

Page 103

present for that meeting, correct?
**A. That's correct.**
MR. CIOFFI: Peter, as I said, the documents speak for themselves who was there and who wasn't so it seems a waste of time to go through it, but go ahead.
(Plaintiff's Exhibit 6 is marked for identification.)
THE WITNESS: Thank you.
BY MR. SABA:
Q. Mr. Akins, you've been handed what's been marked as Exhibit Number 6, Fifth Third-McHugh-0213255 through Fifth Third-McHugh-0213275; is that correct?
**A. That's correct.**
Q. Let me represent to you these are the minutes for Firth Third Bancorp for January 20, 2015; is that correct?
**A. That's correct.**
Q. Okay. And you attended that meeting live; is that correct?
**A. Yes. It appears so, yes.**
Q. And indicating looking at who else was also present, Mr. McHugh -- neither Mr. McHugh nor Mr. Spence were present for that meeting; is that correct?
**A. That's correct.**

Page 104

(Plaintiff's Exhibit 7 is marked for identification.)
THE WITNESS: Thank you.
BY MR. SABA:
Q. Mr. Akins, I have handed you what has been marked as Exhibit Number 7, Fifth Third-McHugh-0213292 through Fifth Third-McHugh-0213303; is that correct?
**A. Yes, that's correct.**
Q. And Exhibit 7 is the board of directors minutes for Fifth Third Bancorp for March 16, 2015; is that correct?
**A. Yes.**
Q. And you attended that meeting live; is that correct?
**A. Yes.**
Q. Okay. Neither Mr. Spence nor Mr. McHugh were present for that meeting; is that correct?
**A. That's correct.**
(Plaintiff's Exhibit 8 is marked for identification.)
THE WITNESS: Thank you.
BY MR. SABA:
Q. Mr. Akins, I've handed you what's been marked as Exhibit Number 8, Fifth Third-McHugh-0213326 through Fifth Third-McHugh-0213329; is that correct?

Page 105

**A. Yes, that's correct.**
Q. And Exhibit 8 is the minutes for the board of directors meeting for Fifth Third Bank on Tuesday, March 17, 2015; is that correct?
**A. Yes, that's correct.**
Q. And you attended that meeting via teleconference; is that right?
**A. Yes.**
Q. Okay. Neither Mr. Spence nor Mr. McHugh was present for that meeting; is that right?
**A. That's correct.**
(Plaintiff's Exhibit 9 is marked for identification.)
BY MR. SABA:
Q. Mr. Akins, you have been handed what's marked as Exhibit Number 9, Fifth Third-McHugh-0213330 through 0213335; is that correct?
**A. Yes.**
Q. And these are the minutes from a special joint meeting at Fifth Third Bancorp and Fifth Third Bank of directors held on April 14, 2015; is that correct?
**A. That's correct.**
Q. And you were present live for that meeting; is that right?
**A. Yes.**

Page 106

Q. And neither Mr. Spence nor Mr. McHugh were present for that meeting; is that correct?
**A. That's correct.**
(Plaintiff's Exhibit 10 is marked for identification.)
THE WITNESS: Thank you.
BY MR. SABA:
Q. Mr. Akins, you've been handed what's been marked as Exhibit Number 10, Fifth Third-McHugh-0213336 through 0213337; is that correct?
**A. Yes, that's correct.**
Q. And Exhibit Number 10 is the minutes of the joint meeting of the board of directors for Fifth Third Bancorp and Fifth Third Bank from May 27, 2015; is that correct?
**A. Yes, that's correct.**
Q. And you attended that via teleconference; is that right?
**A. Yes.**
Q. Okay. And neither Mr. McHugh nor Mr. Spence were present for that meeting; is that right?
**A. That's correct.**
(Plaintiff's Exhibit 11 is marked for identification.)

Page 107

BY MR. SABA:
Q. Mr. Akins, you've been handed what's been marked as Exhibit Number 11, Fifth Third-McHugh-0213338 through Fifth Third-McHugh-0213343; is that correct?
**A. Yes, that's correct.**
Q. And Exhibit Number 11 is the minutes of the meeting of the board of directors for Fifth Third Bancorp dated June 15, 2015; is that correct?
**A. Yes, that's correct.**
Q. Okay. And you attended that meeting live; is that correct?
**A. Yes.**
Q. And neither Mr. Spence nor Mr. McHugh attended that meeting; is that correct?
**A. That's correct.**
(Plaintiff's Exhibit 12 is marked for identification.)
THE WITNESS: Thank you.
BY MR. SABA:
Q. Mr. Akins, you've been handed what has been marked as Exhibit Number 12, Fifth Third-McHugh-0213362 through Fifth Third-McHugh-0213371; is that correct?
**A. Yes, that's correct.**
Q. And Exhibit Number 12 is the minutes of the meeting of the board of directors for Fifth Third

Page 108

Bancorp for June 16, 2015; is that correct?
**A. That's correct.**
Q. And you attended that meeting live; is that correct?
**A. Yes.**
Q. And neither Mr. Spence nor Mr. McHugh attended that meeting; is that right?
**A. Yes, that's correct.**
(Plaintiff's Exhibit 13 is marked for identification.)
THE WITNESS: Thank you.
BY MR. SABA:
Q. Mr. Akins, you've been handed what's been marked as Exhibit Number 13, Fifth Third-McHugh-0213380 through Fifth Third-McHugh-0213383; is that correct?
**A. Yes, that's correct.**
Q. All right. And Exhibit Number 13 is the minutes of the joint meeting of the board of directors for Fifth Third Bancorp and Fifth Third Bank for July 6, 2015; is that right?
**A. Yes, that's correct.**
Q. And you attended that meeting via teleconference; is that correct?
**A. That's correct.**
Q. Okay. And neither Mr. McHugh nor Mr. Spence

Page 109

were present for that meeting; is that right?
**A. That's correct.**
(Plaintiff's Exhibit 14 is marked for identification.)
THE WITNESS: Thank you.
BY MR. SABA:
Q. Mr. Akins, you've been handed what's been marked as Exhibit Number 14, Fifth Third-McHugh-0213400 through Fifth Third-McHugh-0213413; is that correct?
**A. Yes, that's correct.**
Q. And Exhibit Number 14 is the minutes of the meeting of the board of directors for Fifth Third Bancorp for September 14, 2015; is that correct?
**A. That's correct.**
Q. Okay. And you attended that meeting live; is that correct?
**A. Yes.**
Q. Okay. Neither Mr. McHugh nor Mr. Spence attended that meeting; is that right?
**A. That's correct.**
(Plaintiff's Exhibit 15 is marked for identification.)
BY MR. SABA:
Q. Mr. Akins, you've been handed Exhibit Number 15, Fifth Third-McHugh-0213442 through Fifth

Page 110

Third-McHugh-0213447; is that correct?
**A. That's correct.**
Q. Exhibit Number 15 is the minutes of the meeting of the board of directors for Fifth Third Bancorp, dated September 15, 2015; is that right?
**A. Yes.**
Q. And you attended that meeting live; is that right?
**A. Yes.**
Q. Okay. And Mr. McHugh and Mr. Spence also attended that meeting; is that right?
**A. Yes.**
Q. Do you recall if there was a dinner following that meeting?
**A. Typically there is. Not following the meeting, but in the middle.**
Q. The meeting indicates it was in North Carolina, started at 8:00 a.m.; do you see that?
**A. Yeah. That was on Tuesday. There may have been committee meetings on Monday and a dinner and then the meeting started at 8:00 a.m. I don't -- does it say when it finished? I don't know if there was a dinner after this, that's what I'm saying.**
Q. Okay.

Page 111

(Plaintiff's Exhibit 16 is marked for identification.)
BY MR. SABA:
Q. Mr. Akins, you've been handed Exhibit Number 16, which is Bates stamped 0213455 through Fifth Third-McHugh-0213464; is that correct?
**A. Yes.**
Q. And Exhibit Number 16 is the minutes of the meeting of the board of directors for December 14, 2015 for Fifth Third Bancorp; is that right?
**A. That's correct.**
Q. Okay. And you were present live for that meeting; is that correct?
**A. Yes.**
Q. And Phil McHugh was also present for that meeting; is that right?
**A. Yes.**
Q. And Tim Spence was not present for that meeting; is that correct?
**A. I don't see his name, so I assume he was not.**
(Plaintiff's Exhibit 17 is marked for identification.)
THE WITNESS: Thank you.
BY MR. SABA:
Q. Mr. Akins, you've been handed what's been

Page 112

marked as Exhibit Number 17, Fifth Third-McHugh-0213475 through Fifth Third-McHugh-0213494; is that correct?
**A. That's correct.**
Q. And Exhibit Number 17 is the minutes of meeting of board of directors for Fifth Third Bancorp for December 15, 2015; is that correct?
**A. Yes.**
Q. And you were present for that meeting; is that correct?
**A. Yes.**
Q. And Mr. Spence was also present for that meeting; is that correct?
**A. That's correct.**
Q. Mr. McHugh was not present for that meeting; is that right?
**A. His name is not on there so I assume he wasn't.**
MR. CIOFFI: Counsel, we've been doing this for about half an hour. We're happy to stipulate that the documents speak for themselves, and whoever they indicate was present was present, and if someone is not indicated as present, they weren't present. It is just a waste of time. Is there a purpose to this?
MR. SABA: There is a purpose to it.

Page 113

MR. CIOFFI: Well --
MR. SABA: We can go off the record one second.
MR. CIOFFI: It's hard to see.
MR. SABA: Hold on.
THE VIDEOGRAPHER: Off the record, 1:10.
(A recess was taken from 1:11 p.m. to 1:13 p.m.)
THE VIDEOGRAPHER: Back on the record, 1:11.
MR. SABA: So confirming your stipulation, you will stipulate that with respect to any of the minutes provided, that they accurately depict who was present, who was absent, and who was present via teleconference or present live; is that correct?
MR. CIOFFI: So stipulated.
MR. SABA: And just to confirm, that would be for all minutes from January 2015 through December of 2020, correct?
MR. CIOFFI: Yes, correct.
(Phil McHugh enters the room.)
BY MR. SABA:
Q. Mr. Akins, you indicated before that you were not present for the September 2020 board meetings, correct?

Page 114

**A. Not all of them. I think there is a few that I was not because it would match up with AEPs and so --**
Q. My question specifically --
**A. It wasn't every one.**
Q. Was the year 2020?
**A. 2020?**
Q. Yes.
**A. If it shows I wasn't there, the minutes, I wasn't there.**
Q. Okay. Let me represent to you that they show that you were not in attendance in September 2020.
**A. Okay.**
Q. As was previously stipulated. With respect to that particular meeting, do you recall being provided any supplemental information or having any contact or communications with any board members regarding that meeting?
**A. I mean, at some point I probably asked Marsha how it went and I was told it went fine, so if there was an update, it was a very general update.**
Q. Would you have spoken to anybody other than Marsha Williams?
**A. Marsha Williams. Did I say Marsha Ryan again?**
MR. CIOFFI: No, you said --

Page 115

BY MR. SABA:
Q. No, you just said Marsha.
**A. She used to work for me at AEP, that's why --**
Q. All right.
**A. No, it probably would have been Marsha.**
Q. Did you have any conversation with Greg Carmichael regarding that meeting?
**A. I don't recall.**
Q. Would you have been provided with the board materials for that meeting?
**A. It would have been through Boardvantage or whatever the -- that they would have been provided beforehand. May have been Diligent, one or the other.**
(Plaintiff's Exhibit 18 is marked for identification.)
BY MR. SABA:
Q. Mr. Akins, you've been handed what's been marked as Exhibit Number 18, which is Bates stamped Fifth Third-McHugh-001216 through Fifth Third-McHugh-001222; is that correct?
**A. Yes.**
Q. Are you able to identify these documents for me?
**A. Yes. The information in the news release, the note to the board on unanimous consent concerning the**

Page 116

**appointment of Tim Spence as president of the Bancorp.**
Q. Have you seen these documents before?
**A. Yes. I signed it.**
Q. How was the unanimous consent circulated?
**A. It was sent through the -- either Diligent or Boardvantage, whichever, it was sent through -- in that fashion, and then electronically signed.**
Q. And -- I'm sorry. The unanimous consent portion is marked Fifth Third-McHugh-001221 and Fifth Third-McHugh-001222; is that correct?
**A. Yes.**
Q. And the unanimous consent is dated October 26, 2020; is that right?
**A. That's correct.**
Q. Did you have any discussion with any of the other board members regarding the unanimous consent prior to signing?
**A. Yes.**
Q. When would you have had that discussion?
**A. It would have been a previous board discussion that to expect a unanimous consent to come out and if you agreed with it, then that's when the vote would be taken.**
Q. When did that meeting take place?
**A. Was there an October board meeting? I can't**

Page 117

**recall. I don't recall.**
Q. Let me represent to you the records we have is that the prior meeting was the September meeting, the one you did not attend.
**A. So I must have been informed of it after -- after the meeting.**
Q. Do you recall any specific conversations with anybody about this unanimous consent?
MR. CIOFFI: Objection. Asked and answered. He just described it.
THE WITNESS: Yeah. I knew it was coming out. I was put on notice that it would come out and it was consistent with, you know, all the board activity leading up to that point.
BY MR. SABA:
Q. Who put you on notice that the unanimous consent was coming out?
**A. I don't recall.**
Q. Referring you to the third page of Exhibit 18, Fifth Third-McHugh-001218.
**A. Yes, I have it.**
Q. This is a letter from Greg Carmichael to the board; is that correct?
**A. Yes.**
Q. In the second paragraph it indicates, "As Bob

Page 118

Schaffer and I discussed with you at the September board meeting, we believe that Phil McHugh could be at risk with Tim's promotion. And, in fact, Phil has decided not to accept the role of head of consumer and business banking and is leaving the company."
Do you see that?
**A. Yes.**
Q. Did you ever have any conversations with Bob Schaffer and/or Greg Carmichael where they indicated to you that they believe Phil McHugh could be at risk with Tim's promotion?
**A. I don't recall that.**
Q. What is your understanding of why Phil McHugh was leaving the company?
**A. My understanding was he was upset with -- that he didn't get the -- didn't get to move to president and he quit.**
Q. Do you have any understanding of the details of the timing of Phil McHugh's departure?
**A. The only understanding I had was when Tim was selected, this note came out and we were put on notice that Phil had gotten upset and he decided to not accept the role that was offered to him, which was a great role in the company. He got upset, left, and he resigned.**
Q. Did you ever discuss Phil McHugh's departure

Page 119

with Greg Carmichael?
**A. I don't recall. I mean, after this came out, I mean, it pretty much spoke for itself. I don't know that anyone anticipated Phil deciding to resign. I mean, that was somewhat of a surprise to me, because, I mean, like I said earlier, I mean, Phil was well thought of, great utility player, should have stayed with the company, but he didn't. He got upset, resigned, probably didn't think it all the way through, that's my opinion, but I never had a conversation, you know, with Greg about why he left or anything like that.**
Q. Obviously Greg Carmichael and Bob Schaffer knew that Phil was at risk even as of September 2020; isn't that right?
MR. CIOFFI: Objection. Lack of foundation.
THE WITNESS: I don't know the answer to that.
MR. CIOFFI: You can answer.
THE WITNESS: Anybody could be at risk, I don't know.
BY MR. SABA:
Q. That's what the letter indicates, correct?
**A. Well, this letter says --**
MR. CIOFFI: Objection to the lack of foundation.

Page 120

BY MR. SABA:
Q. Go ahead. You can answer.
MR. CIOFFI: Do you want to repeat your question, please?
MR. SABA: Sure.
THE WITNESS: Go ahead.
BY MR. SABA:
Q. Obviously based on the wording of the letter, Greg Carmichael and Bob Schaffer knew as of September 2020 that Phil McHugh would be at risk as a result of Tim Spence's promotion?
MR. CIOFFI: Objection. Lack of foundation. If you can answer.
THE WITNESS: Yeah. I mean, I don't know the individual discussions or any of that, but the letter seems to indicate that -- that they discussed it previously with the board that he may be at risk. I mean, any senior executive could be at risk when there's only one job. And when you don't get it, there are people upset, people can live with it, people who can't, and that's obviously what happened, in my opinion.
MR. SABA: We can go off the record.
THE VIDEOGRAPHER: Off the record, 1:24.

Page 121

(A recess was taken from 1:24 p.m. to 1:33 p.m.)
THE VIDEOGRAPHER: Back on the record, 1:33.
BY MR. SABA:
Q. Mr. Akins, did you ever hear any of the board members or any of the enterprise committee or Fifth Third employees refer to Phil McHugh as the Silver Fox?
**A. No, I did not.**
MR. SABA: That is all the questions I have at this time, continued in progress with respect to other issues that may arise, but that's all I have.
MR. CIOFFI: As you know our position, it is that you don't have the right to continue it in progress, but the court will eventually decide. I do have a couple of questions.
THE WITNESS: Yeah.
EXAMINATION
BY MR. CIOFFI:
Q. And if you look at Exhibit Number 4, please, first turn to page 1135 if you would. You testified previously that this is the talent card that was prepared by management concerning Tim Spence; is that correct?
**A. Yes, that's correct.**
Q. Looking at the box that's captioned potential

Page 122

as you testified before, it says high potential; do you see that?
**A. Yes.**
Q. My question for you as a member of the board, separate and apart and independent of this particular document, did you have an opinion about Tim Spence's potential in December of 2019?
**A. Yes, I did.**
Q. And what was that opinion?
**A. His trajectory was high, and there's no question that he had the skills required for a CEO at that particular time looking forward into the future. He was very adept, very communicative. He certainly could go to any level of detail that you wanted to go in, very attuned to the strategic aspects of the banking industry, but he as a person -- you could tell he was a constant learner, but also somebody who would be a great cultural fit as a CEO.**
**And that was my own personal feelings as he developed, and there's no question in my mind that it ultimately was the right decision.**
Q. Did you have discussions with your fellow board members about Tim Spence's potential?
**A. Well, I -- you have regular board chatter, and there was no question that people were impressed by Tim**

Page 123

**Spence.**
Q. Based on those discussions, do you know what the other board members' opinions were with respect to Tim Spence's potential?
**A. Yes. Yes, it was clear.**
Q. And what was it?
**A. Board members are looking for -- based on the conditions we're in, based the state of the company, the life of the company and where he is, but also the skills necessary, the things that we were trying to approach from a competitive standpoint, particularly the online banking when COVID hit, that even further accentuated it, there is no question that he had those abilities.**
**But apart from that, his temperament, the way he approached things that we saw, certainly the depth of understanding of the strategic nature of the banking industry, the ins and outs, the contacts, all those things, they seemed very fluid to him and that said to us that, I mean, he was impressive from that perspective. And when you're thinking about the future of the bank, particularly in that environment, you needed a CEO with a vision, and he actually did a strategic plan. So it was really important to have that kind of skill set at the CEO level.**
Q. Separate and apart from this particular

Page 124

document, 1135, did your fellow board members share those opinions about Tim Spence?
**A. Yes, they did.**
Q. Looking at the next box right below that, it talks about potential next positions.
**A. Yes.**
Q. And then it says, "President one to two years, CEO three-plus years." Separate and apart from this document and independent of this document, did you have an opinion about Tim Spence's potential in terms of these positions?
**A. Yes.**
Q. And what was your opinion?
**A. I thought that -- and, again, this is a snapshot, and my only impression that was he was on a steep trajectory and these time frames could change. And it was very flexible given where Greg was and where he was at that particular time.**
Q. And, in fact, did these time frames articulated in 2019 in fact come to be true?
**A. Yes, that's correct.**
Q. Based on your discussions with your fellow board members, did they also share the opinions you just expressed about Tim Spence's potential for next positions?

Page 125

MR. SABA: Objection.
THE WITNESS: Yes, as far as I know.
BY MR. CIOFFI:
Q. I want to direct your attention to 1132 in the lower right-hand corner. Fifth Third-McHugh-001132, would you look at that?
**A. Yes.**
Q. And what is that particular document?
**A. That's Phil McHugh's sheet for the talent management.**
Q. Again, looking at the box which is captioned potential, it says next to that moderate potential; do you see that?
**A. Yes.**
Q. Separate and apart from this document and independent of this document, did you have an opinion in December of 2019 about Phil McHugh's potential?
**A. Yes. And I said this previously, I felt he was a utility player. He was sort of a Steady Eddie in his role. He could move to other roles because of his ability to work with multiple parts of the organization. He obviously knew many people in the organization, could bring them together. To me, he was -- he was more of a chief operating officer type and, you know, he was -- to me, he was more introverted, more focused internally to**

Page 126

**the company. I think that bode well for his future in terms of his ability to help Tim. I had the same condition at AEP, and I recognized that in Phil. The moderate potential just says that he's reached a plateau that's appropriate for him and he's well placed.**
Q. Did you agree with the assessment of moderate potential in December of 2019?
**A. Yes.**
Q. Based on your discussions with the other board members and separate and independent of this particular document, did they share that view of yours?
MR. SABA: Objection.
THE WITNESS: Yes.
BY MR. CIOFFI:
Q. If you look at the next box where it says potential next positions, you see --
**A. Yes.**
Q. -- it says, "Expand current responsibilities to include middle market leadership."
**A. Yes.**
Q. Again, separate and independent of this document, did you have an opinion as to the appropriate next positions for Phil McHugh?
**A. Well, I certainly felt like that this would be a really great move to expand his abilities to look at a**

Page 127

**broad view of the enterprise from an operational perspective. I was very comfortable when he made the change to include wealth management and because he had that ability to go across the organization.**
**So the middle marketing piece was the part that he could continue to develop with and continue being a great employee for the future. I mean, that's what I was thinking.**
Q. And separate and apart from this particular document, did your fellow board members, based on your discussions with them, have similar views as yours about his next positions?
MR. SABA: Objection.
THE WITNESS: Yes, so far as I know.
BY MR. CIOFFI:
Q. Yeah. In any of the discussions about Greg Carmichael's successor, did the board at any time discuss age as a factor in making that decision?
**A. No.**
Q. Did --
**A. No.**
Q. -- in fact age play any factor in the board's determination of who should succeed Greg Carmichael as president and then eventually CEO?
**A. No.**

Q. I have no --
**A. It was clearly based upon the factors we felt like in the market, as I've said several times, how Tim fit within those primary areas that were important for the bank moving forward. That was -- that was the focus there. But if someone else were to have those, then they would have been included in the list, but they weren't.**
Q. And what were those areas again, just for the record?
**A. Well, first of all, he had many contacts within the industry, banking. He also had very fluent knowledge of the state of banking and the issues that we're dealing with. Certainly the technical side, technology side of it with Fintech, with other aspects from a strategic nature with M&A, those were clearly areas that he was well-versed in.**
**And he also had a great ability to communicate those variances within the banking industry, who was thinking what and who's likely to move this way or that way in terms of banking, you know, bank M&A and so forth. He had a very good understanding.**
**So there's no question in my mind that he would have hit the ground running with investors and would have -- because I've been involved with a lot of**



**one-on-ones, a lot of investor conferences, a lot of activities that the CEO has to be -- have the foundation to think on his feet or -- his or her feet, and make sure that they can respond very quickly, very adeptly, and communicate in a very clear and concise fashion. He had those skills.**
Q. I want to direct your attention to Exhibit Number 18, if you would, please, which is the unanimous written consent; do you see that?
**A. Yes.**
Q. And prior to this unanimous written consent in October of 2020, for how many years prior to this appointment as president had Tim Spence been making the strategic plan for the bank?
**A. Well, he made a strategic plan even before he joined the bank with Oliver Wyman, and then -- and then after that, he was involved with every step of the way and brought in other strategic people to support him as well. So he's -- he was, certainly from a talent perspective, he brought in the right talent.**
Q. So when --
**A. Several years.**
Q. Do you know when he was hired from Oliver Wyman by the bank?
**A. I don't know the exact year.**



Q. Okay. Does 2014, '15 sound about right?
**A. Yeah. It's been several years. Particularly I sort of mark things when Greg became CEO, and there you saw Tim start to really -- really show up, but -- and obviously for obvious reasons.**
Q. Yeah. And prior to being hired by the bank, for how many years at Oliver Wyman had Tim Spence been making and developing the strategic plan for the bank?
**A. Several years.**
Q. So by the time the decision was made in 2020, he had been, in fact, creating the strategic plan and vision for the bank for six to eight years; is that correct?
**A. Yes. Yes.**
MR. SABA: Objection.
MR. CIOFFI: I have no further questions.
FURTHER EXAMINATION
BY MR. SABA:
Q. Mr. Akins, you previously indicated that the input for making your determinations regarding Mr. Spence were your observations during the board settings, the talent deck, the RHR assessment, and then your own experience, correct?
**A. Yes. Did you mention Greg Carmichael's --**
Q. And Greg Carmichael's comments.



**A. Okay. All right.**
Q. And Mr. Cioffi then asked you about the high potential given to Mr. Spence that's referenced in the talent deck, and he said separate and apart from that talent deck, did you have an opinion regarding his potential, correct?
**A. Yes.**
Q. Okay. Which would mean if you remove the talent deck, then the only other inputs would be the observations during the board settings, the RHR assessment, and the comments from Greg Carmichael, correct?
**A. And my own experience.**
Q. And your own experience, correct?
**A. Yes.**
Q. But the inputs regarding Mr. Spence, the objective data, is the observations, the RHR assessment, and the comments from Mr. Carmichael, correct?
**A. Can you repeat that question?**
Q. Sure. The -- you're bringing your own personal experience in, you said that, you know --
**A. Yes.**
Q. -- from what you have seen. You're using your own personal experience to evaluate the information you're given about Tim Spence, correct?

Page 132

**A. That's correct.**
Q. Okay. And the information, the sources of information about Tim Spence, you had identified four sources. You identified the comments by Mr. Carmichael, the observations made of Mr. Spence during board settings, the talent deck, and the RHR assessment, correct?
**A. Yes.**
Q. Okay. So in Mr. Cioffi's question, if we take away the talent deck, that just leaves the three other portions of the assessment, the observations --
**A. Was it three or four?**
Q. Well, there were four total, the RHR assessment, Mr. Carmichael's comments, the talent deck, and the observations at the board setting, correct?
**A. And my own experience.**
Q. Yeah.
**A. Did you cover that?**
Q. Your own experience. As we discussed, your own experience is taking those inputs and determining that, correct?
**A. No. My own experience, too, is observing executive talent. It's a lot more than just looking at objective -- objective data.**
Q. Without any --

Page 133

**A. I don't -- I don't view my -- I don't view my --**
Q. Well, so let me ask the question --
MR. CIOFFI: Counsel, let him answer the question.
MR. SABA: Let me ask the question this way.
MR. CIOFFI: No, no, no, no, let him finish. Were you finished with your answer?
MR. SABA: I have a different question.
MR. CIOFFI: Were you finished with your answer?
MR. SABA: Here's my question.
MR. CIOFFI: No, Counsel, he wasn't finished. Let him finish.
MR. SABA: I wasn't finished with my question.
MR. CIOFFI: He was answering your last question when you started another question.
MR. SABA: Let's --
MR. CIOFFI: Allow him to finish.
MR. SABA: Allow me to finish.
MR. CIOFFI: No. Allow him to finish.
MR. SABA: No. Allow me to finish. We can go on for hours, but let -- just --
MR. CIOFFI: Why are you doing that?

Page 134

MR. SABA: Because you're interrupting me. It's my deposition, not yours.
MR. CIOFFI: You're interrupting the witness.
BY MR. SABA:
Q. Mr. Akins --
MR. CIOFFI: He's allowed to finish his answer.
BY MR. SABA:
Q. Mr. Akins --
MR. CIOFFI: Do you have more to say?
THE WITNESS: Yes.
MR. SABA: Okay.
MR. CIOFFI: Please finish your answer.
MR. SABA: Look, I'll let you finish your --
BY MR. SABA:
Q. Mr. Akins, without --
MR. CIOFFI: No, finish your answer.
BY MR. SABA:
Q. Without -- without -- are you --
MR. CIOFFI: Counsel --
BY MR. SABA:
Q. I want to know this question, Mr. Akins.
MR. CIOFFI: Counsel --

Page 135

BY MR. SABA:
Q. Without any input regarding Mr. Spence, so if you take away the observations from the board meetings, if you take away the information in the talent deck, you take away the RHR assessment, you take away any comments from Mr. Carmichael, what information would you have available to you to decide that Mr. Spence should be the next president and CEO of Fifth Third Bank?
MR. CIOFFI: And I'm going to instruct the witness, before he answers that question, to finish your answer to the previous question.
THE WITNESS: I was going to say that it's important -- I don't view my experiences as being entirely subjective. There's objective things that I see in people, how they're utilized within an organization, how the CEO decides how to utilize that talent within the organization, and so I don't view that as subjective. So you can add that to the objective list.
The other things you mentioned, yes, outside of -- outside, if you took one out, there's still, in my mind, four to go.
BY MR. SABA:
Q. So let's go back then. Take away the observations you made of Mr. Spence at any board

settings, take away the RHR assessments, take away the talent deck, and take away Mr. Carmichael's comments to you, are you then in a position to decide oh, yeah Mr. Spence should be the next CEO and president of Fifth Third Bank, if you take away all that information?
**A. That's speculative because it never happened.**
Q. Well, there would be nothing to base a decision on; isn't that right?
**A. I didn't have that. I had all those that you mentioned.**
Q. That's correct. And without those, without that information, there would be nothing to base that decision on?
MR. CIOFFI: Objection. It's argumentative and calls for speculation.
BY MR. SABA:
Q. You used your own experience to process that information, right?
**A. My job as a board member is to have those inputs. I had the inputs. The decision was made. So to say one's missing or another's missing, they're not missing, they're there.**
Q. So going back to Mr. Cioffi's question, you couldn't say that that was missing, how that affected



your decision because you had the talent deck indicating high potential; is that right?
**A. Could you repeat that, please?**
Q. Sure. You said, I can't -- I can't speculate if one of those items are missing. The premise of Mr. Cioffi's question to you was, take away the talent deck and would you still evaluate Mr. Spence as having high potential? And you said yes. And you said you can speculate --
**A. No, no.**
MR. CIOFFI: Hold on.
THE WITNESS: Okay.
MR. CIOFFI: Objection to the form of the question, it's compound. That wasn't my question. Misstates the question. My question was, did he form an opinion separate and independent of the talent deck, not that it didn't exist. But your question is totally argumentative and calls for speculation. That's my objection. Do you have an answer to his question?
THE WITNESS: Yeah. I'll say as a former CEO and certainly as a board member, the job really is making a decision based upon the facts that are available to you. I make a lot of decisions based upon whether this thing is missing or that thing is



missing, I make a decision based upon the input available to me. That's what I did here.
BY MR. SABA:
Q. Okay. And the facts available to you were the observations that you made of Mr. Spence during the board settings, the RHR assessments, correct?
**A. Correct.**
Q. And the talent deck, correct?
**A. Correct.**
Q. And the comments from Mr. Carmichael, correct?
**A. Yes. And my own experiences.**
MR. CIOFFI: Objection to the form of the question. It's incomplete. It's also the observations of Mr. McHugh. He testified about that. So, you know, you're mischaracterizing his testimony and arguing with him. The record's clear what he already testified to.
MR. SABA: It is. We are just talking about Mr. Spence right now.
BY MR. SABA:
Q. In terms of those inputs regarding Mr. Spence, if you take away the observations at the board meetings, if you take away the talent deck, the RHR assessment, and Mr. Carmichael's comments, you have no information



regarding Mr. Spence, correct?
MR. CIOFFI: Objection. Speculative. If you can answer, you can answer. If you can't, you can't.
THE WITNESS: I can't answer that. It's pretty meaningless.
BY MR. SABA:
Q. But what other sources of information did you have --
**A. I don't need other sources. I have all these sources you just mentioned.**
Q. That's correct. What other -- you had no other sources of information specifically regarding Mr. Spence other than those four, correct?
**A. I had -- I had all the ones that you listed.**
Q. Correct. Those four items, correct?
**A. Was it four or five? Go through the list again.**
Q. Sure. It's the observations you made during the board settings. It is the talent deck. It is the RHR assessment and the comments made by Mr. Carmichael?
**A. And my own experiences, five.**
Q. Okay. But you had no independent experiences

Page 140

with Mr. Spence outside those four sources of information, did you?

**A. No independent experiences, what does that mean?**

Q. Correct. You had no interaction with Mr. Spence other than the information provided from your observations, from the talent deck, the RHR assessment, and the comments made by Mr. Carmichael, you had no other interactions or communications with Mr. Spence in any fashion?

**A. I don't recall any, other than the board dinners, that kind of thing.**

Q. Correct. Which we included in those observations.

**A. Included in the board observations.**

Q. Correct. Whenever those would happen to occur, correct.

**A. So that's correct.**

Q. Okay. And that's also true for Mr. McHugh?

**A. That's true.**

Q. It's the same information, excluding the RHR assessment. There was no RHR assessment regarding Mr. McHugh, correct?

**A. That's correct.**

Q. With respect to the strategic plans that are

Page 141

prepared for Fifth Third Bank, are you aware of the involvement that all the members in the enterprise committee have in the preparation of those strategic plans?

**A. I'm not aware to what extent, no.**

Q. You don't know what the sources of all the information is that creates those strategic plans; is that right?

**A. No.**

MR. SABA: That's all I have. Continued in progress.

MR. CIOFFI: Same objection to continuing in progress. I have no further questions.

MR. SABA: Thank you Mr. Akins.

THE VIDEOGRAPHER: We are off the record at 1:55.

THE COURT REPORTER: Mr. Cioffi, do you want signature?

MR. CIOFFI: Yes, we will review and sign.

THE COURT REPORTER: And, Peter, are you going to order the transcript?

MR. SABA: Yes.

THE COURT REPORTER: Regular delivery?

MR. SABA: Yes, thank you.

THE COURT REPORTER: And, Mike, do you want a

copy?

MR. CIOFFI: Yes, same with us.

______________________________
NICHOLAS KEVIN AKINS

______________________________
DATE

\- - -

DEPOSITION ADJOURNED AT 1:57 p.m.

\- - -

C E R T I F I C A T E

STATE OF OHIO :
: SS
COUNTY OF HAMILTON :

I, Wendy L. Raymer, RPR, CRR, the undersigned, a duly qualified and commissioned notary public within and for the State of Ohio, do hereby certify that before the giving of his aforesaid deposition, NICHOLAS KEVIN AKINS was by me first duly sworn to depose the truth, the whole truth and nothing but the truth; that the foregoing is the deposition given at said time and place by NICHOLAS KEVIN AKINS; that said deposition was taken in all respects pursuant to stipulation of counsel; that I am neither a relative of nor employee of any of the parties or their counsel, and have no interest whatever in the result of the action; that I am not, nor is the court reporting firm with which I am affiliated, under a contract as defined in Civil Rule 28 (D).

IN WITNESS WHEREOF, I hereunto set my hand and official seal of office at Cincinnati, Ohio, this 17th day of July, 2024.

My Commission expires December 6, 2026

S/Wendy L. Raymer, RPR, CRR
Notary Public - State of Ohio

1 DEPOSITION ERRATA SHEET

Date Taken: July 2, 2024

Case Caption: PHILIP R. MCHUGH vs. FIFTH THIRD BANCORP, et al.

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the ______ day of ____________, 20___.

___________________________________

NICHOLAS KEVIN AKINS

2 DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

SIGNATURE:_______________________DATE:___________

NICHOLAS KEVIN AKINS

3 DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:_______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:_______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:_______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:_______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:_______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:_______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:_______________

__________________________________________________

Reason for change:________________________________

SIGNATURE:_______________________DATE:___________

NICHOLAS KEVIN AKINS

**WORD INDEX**


< 0 >
**000253** 72:2
**000254** 73:6
**000265** 72:5
**000266** 72:9
**000283** 72:12
**001132** 82:9
**001135** 80:23 81:4
**001141** 83:6
**001142** 83:17 84:4, 21, 24 86:13, 20 87:1, 5, 20
**01142** 87:9
**0213335** 105:17
**0213337** 106:10
**0213455** 111:5

< 1 >
**1** 3:5 10:23 11:3, 11 12:16, 22 19:17 31:15, 16, 20 32:1, 4, 14, 17 35:19 36:21 37:2, 7, 9 39:12, 19 40:7, 16, 24 46:6, 11, 16 144:1
**1/2** 70:15
**1:10** 113:6
**1:11** 113:7, 9
**1:13** 113:8
**1:21-cv-00238** 1:9 4:8
**1:24** 120:24 121:1
**1:33** 121:1, 3
**1:55** 141:16
**1:57** 142:11
**10** 3:5, 12 106:4, 9, 12
**10:00** 76:16
**102** 3:9
**103** 3:10
**104** 3:10, 11
**105** 3:11
**106** 3:12, 13
**107** 3:13
**108** 3:14
**109** 3:14, 15
**11** 3:5, 13 21:21 106:23 107:3, 6
**11:01** 52:24
**11:14** 52:24 53:3
**111** 3:15, 16
**112** 3:16
**1132** 125:4
**1135** 81:3 121:20 124:1
**1141** 83:7
**115** 3:16
**12** 3:13 19:17 107:16, 21, 24
**12:00** 76:20
**12:22** 94:5
**12:24** 94:6
**12:30** 76:18, 21
**12:40** 94:7, 10
**12:52** 101:25
**12:53** 102:1
**12:54** 102:4
**12:55** 102:1
**121** 3:4
**13** 3:14 108:9, 14, 17
**130** 3:5
**14** 3:14 105:21 109:3, 8, 11, 13 111:9
**15** 3:15 43:5, 6, 7, 12 107:8 109:21, 25 110:3, 5 112:6 130:1
**16** 3:15 31:2 67:2 104:10 108:1 111:1, 5, 8
**17** 3:16 67:2 72:17, 22 73:19 105:4 111:21 112:1, 4
**1700** 2:13
**17th** 143:19
**18** 3:16 67:2 115:14, 18 117:19 129:8
**18,000** 21:24
**185** 22:6
**19** 89:4 91:14
**1982** 19:4, 21
**1986** 19:4
**1D** 13:23
**1st** 22:13, 19

< 2 >
**2** 1:14 3:8 4:2 15:7 53:2 71:12, 22, 24 72:14, 15 73:5 76:7, 24 144:2 145:1
**20** 5:21 89:4 91:14 103:16 144:17
**200** 22:5
**2000** 20:3 43:4
**201** 2:13
**2011** 19:17, 18, 21, 22 22:12
**2013** 19:7
**2014** 26:23 27:8 130:1
**2015** 24:1 27:22 31:2 34:13, 15 35:16, 19 36:18 37:2 39:12, 19 40:6, 7, 16, 24 42:21 43:2, 9 67:2 90:2, 4, 8, 10 100:14 102:15 103:16 104:10 105:4, 21 106:14 107:8 108:1, 20 109:13 110:5 111:9 112:6 113:18
**2016** 36:1, 18 46:6, 11 88:3
**2017** 8:8 36:4 88:3
**2018** 36:4 69:25 88:3
**2019** 36:4 69:10 70:25 72:17, 22 73:19 78:8 79:16 83:14 87:12, 18 88:18 93:25 122:7 124:20 125:17 126:7
**2020** 24:2 25:9, 15 26:6 27:22 31:15, 16, 20 32:1, 4, 14, 17 35:16, 19 36:5, 21 37:3, 7, 9 39:13, 19 40:7, 17, 24 46:6, 11, 15, 16 88:19 90:15 93:17, 25 95:8, 9, 10 96:2 100:15 113:19, 24 114:5, 6, 11 116:13 119:13 120:10 129:12 130:10
**2023** 5:11
**2024** 1:14 4:2 5:11, 21 143:20 144:2
**2026** 143:25
**22** 22:18
**23** 22:13, 15, 19, 21
**24** 22:21
**24/7** 23:17, 22
**26** 68:9 116:12
**2623** 2:6
**27** 106:14
**28** 143:17
**29** 19:21

< 3 >
**3** 3:8 11:11, 13 16:20 70:15 71:18, 22 72:7, 20, 23 76:22 94:9 146:1
**30** 5:16, 18
**30(b)(1** 4:5
**362-8700** 2:14

< 4 >
**4** 3:9 17:15 77:18, 22 78:24 79:5 80:12, 15, 24 81:4 88:7 121:19
**41** 8:12
**43054** 8:6
**45202** 1:20 2:14
**45208** 2:6
**46** 21:20
**47** 21:20
**4B** 17:21
**4C** 17:25
**4E** 18:9

< 5 >
**5** 3:9 102:5, 9, 14
**5.6** 22:1
**50** 21:20
**500** 22:3
**511** 1:20
**513** 2:7, 14
**533-2701** 2:7

< 6 >
**6** 3:10 8:6 12:13, 23 103:7, 12 108:19 143:25

< 7 >
**7** 3:4, 10 104:1, 6, 9
**71** 3:8
**77** 3:9

< 8 >
**8** 3:11 104:19, 24 105:2
**8/26/60** 8:14
**8:00** 110:18, 21

< 9 >
**9** 3:11 105:12, 16
**9:39** 1:14
**9:42** 4:3

< A >
**a.m** 1:14 4:3 52:24, 25 76:16 110:18, 21
**abilities** 33:19 43:13 51:9 52:17 65:11 123:13 126:25
**ability** 125:21 126:2 127:4 128:18
**able** 23:13, 15 43:19 50:21 61:24 65:17 77:24 92:4 115:22
**absent** 36:9, 10 113:13
**absolutely** 66:16
**accentuated** 123:12
**accept** 118:4, 22
**accompanying** 38:25
**accurate** 144:10
**accurately** 113:12
**accustomed** 85:13
**acquire** 8:22
**acquired** 20:3
**action** 66:7 143:15
**actions** 25:19 77:13 98:17
**active** 24:5 75:24
**actively** 13:7
**activities** 38:24 41:17 42:10 44:17, 23 45:14 61:19 67:7 68:4, 7, 8, 10, 15 69:7 78:17 129:2
**activity** 42:2 85:19 117:14
**acumen** 48:24
**adaptability** 57:19
**adaptable** 23:13
**add** 64:6 135:18
**additional** 24:6 74:3
**additionally** 4:18 7:19
**address** 8:5
**adept** 122:13
**adeptly** 129:4
**ADJOURNED** 142:11
**admittedly** 44:16
**advance** 9:18 79:5
**AEP** 8:24 20:2 21:16 22:2, 11, 17, 20, 23 24:3 25:4, 16 26:4, 12, 13, 15 36:12 115:3 126:3
**AEPs** 114:2
**AEP's** 25:10
**affiliated** 143:16
**aforesaid** 143:7
**age** 5:24 6:21 127:18, 22
**agree** 126:6
**agreed** 5:10 6:2 116:22
**agreement** 9:14
**ahead** 6:19 7:3, 25 11:17 46:24 87:2 95:21 103:6 120:2, 6
**AK** 95:12
**AKINS** 1:14 3:3 4:4 6:20 7:3, 5 9:13 11:2 12:11 14:21 49:21 53:5 71:21 77:21 94:12 102:8 103:11 104:5, 23 105:15 106:8 107:2, 20 108:13 109:7, 24 111:4, 25 113:23 115:17 121:5 130:19 134:6, 10, 18, 24 141:14 142:6 143:8, 11 144:19 145:24 146:24
**al** 1:10 4:6 144:4
**Albany** 8:6
**allegations** 25:9
**alley** 61:6
**allow** 17:4 26:17 133:20, 21, 22, 23
**allowed** 134:7
**amended** 11:8
**American** 8:25 19:11, 12, 15, 19, 23 24:4
**analysis** 41:15, 16, 22 88:9, 11 91:5, 13 99:10
**analytics** 41:23 42:9 45:21
**and/or** 13:4, 12, 13, 20, 21, 24 14:4, 5 17:19, 22 18:2, 3, 6, 11, 12 51:20 58:1, 14 118:9 144:11
**and/selected** 17:21
**annual** 32:18 33:1, 6 35:3 37:23 38:1
**annually** 88:1
**another's** 136:22
**answer** 7:14, 20, 25 17:4 25:22 26:17 65:6 74:2 82:2 92:21 93:3 95:20 119:16, 17 120:2, 13 133:4, 8, 11 134:8, 14, 19 135:11 137:20 139:3, 5
**answered** 65:5 99:1 117:9
**answering** 133:17
**answers** 135:10
**anticipated** 119:4
**anybody** 56:14 114:21 117:8 119:18
**anyway** 52:20
**apart** 122:5 123:14, 25 124:8 125:15 127:9 131:4
**APPEARANCES** 2:1
**appeared** 86:12 100:19
**appears** 77:25 103:21
**appointment** 74:23 75:11 116:1 129:13
**approach** 123:10
**approached** 123:15
**appropriate** 59:6 95:15 126:5, 22
**approve** 73:4
**April** 105:21
**area** 43:21 51:10, 12 68:12 77:15
**areas** 34:8, 10, 11 52:18 60:13 128:4, 9, 17
**arguing** 138:17
**argumentative** 136:15 137:18
**arose** 54:14
**article** 25:23
**articulated** 124:20
**asked** 5:8 51:24 59:3 65:5 96:9, 10 99:1 114:18 117:9 131:2
**asking** 7:12 14:20, 23 21:18 27:4, 23 76:4 93:10
**asks** 15:7 17:15
**aspect** 17:12 96:20
**aspects** 45:17 122:15 128:15
**assess** 90:4 91:22
**assessed** 42:21 95:17, 18 96:2
**assessment** 88:12, 15, 24 89:24 90:7, 15 96:23 97:9, 16 98:1, 22 101:13 126:6 130:22 131:11, 17 132:6, 11, 14 135:5 138:24 139:22 140:7, 22
**assessments** 97:22 136:1 138:6
**assigned** 101:2, 3
**assignments** 100:13
**associated** 41:9, 23 61:4
**assume** 40:25 61:14 65:17 111:20 112:16

**assumed** 40:*13*
**Assumes** 28:*18*
**attached** 11:*10*
**attend** 35:*6, 7, 15, 20* 39:*9* 40:*11, 15* 117:*4*
**attendance** 114:*11*
**attendant** 21:*11*
**attended** 36:*8* 39:*14, 20, 22* 102:*18* 103:*19* 104:*13* 105:*6* 106:*17* 107:*10, 13* 108:*3, 6, 22* 109:*15, 19* 110:*7, 11*
**attending** 4:*18* 39:*4, 6*
**attention** 125:*4* 129:*7*
**Attorney** 4:*19*
**attorneys** 4:*9*
**attuned** 122:*15*
**audience** 68:*24*
**August** 22:*13, 15, 18* 26:*6* 69:*10*
**authority** 53:*25*
**available** 60:*18* 135:*7* 137:*24* 138:*2, 4*
**Avenue** 2:*6*
**average** 70:*14*
**aware** 58:*11* 69:*10* 82:*7* 84:*22, 25* 86:*11, 19, 21* 87:*18* 89:*12, 13, 14* 141:*1, 5*

**< B >**
**bachelor** 18:*24*
**Bachelor's** 19:*4*
**back** 16:*13* 22:*10* 25:*3* 29:*4, 14* 38:*23* 53:*1* 63:*11* 65:*13, 23* 70:*20* 71:*15* 72:*14* 74:*15* 76:*6* 87:*5* 90:*2, 4, 20* 94:*8* 98:*9* 102:*4* 113:*9* 121:*3* 135:*24* 136:*24*
**backing** 88:*17*
**Bailey** 4:*19*
**balance** 33:*25* 34:*7* 38:*20*
**BANCORP** 1:*10* 2:*18* 4:*6* 76:*25* 77:*3, 4* 102:*14* 103:*16* 104:*10* 105:*20* 106:*14* 107:*8* 108:*1, 19* 109:*13* 110:*5* 111:*10* 112:*5* 116:*1* 144:*4*
**Bank** 4:*16, 17* 9:*12* 10:*10, 20* 14:*15* 27:*12, 13, 20, 25* 30:*12* 31:*20, 22* 34:*5* 39:*16* 40:*3* 43:*11, 16* 44:*4, 5, 10, 17, 21* 45:*2, 3, 14, 17, 20, 25* 46:*4* 47:*15* 48:*10, 20, 23* 51:*10, 12, 17* 52:*15, 16, 18* 53:*12* 54:*6, 8, 13, 15, 16, 25* 55:*5, 6, 18, 24* 56:*2, 6, 7* 57:*11* 58:*1, 11, 14, 20* 59:*1, 8, 17, 18* 60:*1, 2, 4, 13, 15, 20* 61:*23* 62:*2* 64:*3* 65:*4, 11* 66:*4, 15* 69:*17* 70:*21* 71:*3* 72:*22* 75:*5, 6* 76:*1, 23* 77:*3, 5, 14, 16* 94:*19* 95:*19* 98:*25* 99:*13* 105:*3, 20* 106:*14* 108:*19* 123:*21* 128:*5, 21* 129:*14, 16, 24* 130:*6, 8, 12* 135:*8* 136:*5* 141:*1*
**banking** 48:*22* 54:*4, 18* 66:*9* 70:*16* 118:*5* 122:*15* 123:*12, 16* 128:*12, 13, 19, 21*
**bankruptcy** 8:*21, 23*
**base** 45:*22* 55:*12* 97:*10* 98:*23* 136:*8, 13*
**based** 42:*16* 46:*1* 47:*11* 54:*21* 58:*21* 59:*8, 11, 23* 64:*9, 17* 101:*10* 120:*8* 123:*2, 7, 8* 124:*22* 126:*9* 127:*10* 128:*2* 137:*23, 24* 138:*1*
**basically** 85:*3*
**basis** 25:*2* 47:*9* 58:*16, 20* 60:*20*
**Bates** 72:*8, 11* 77:*22* 102:*9* 111:*5* 115:*18*
**began** 26:*6*
**beginning** 9:*11* 25:*15*
**begins** 11:*11* 73:*8*
**behalf** 2:*1, 8* 4:*11, 13, 15*
**believe** 10:*1* 19:*7* 25:*7* 26:*8* 29:*22* 40:*9* 43:*7* 61:*4* 63:*7* 72:*24* 74:*15* 89:*4* 95:*7* 118:*2, 10*
**Ben** 37:*14*
**benefit** 20:*13, 18*
**best** 46:*3* 61:*1* 86:*9*
**beyond** 5:*1* 25:*21* 26:*16*
**big** 54:*15*
**bill** 44:*24* 48:*9* 65:*12* 75:*22*
**billion** 21:*20*
**birth** 8:*13*
**Blank** 2:*12* 4:*16*
**blocks** 83:*22*
**board** 9:*18* 10:*1, 16* 14:*16* 19:*5* 24:*3, 4, 6, 10, 11* 26:*12, 14* 28:*10, 11, 13* 29:*16, 17, 22* 31:*9* 32:*2, 11, 21* 33:*18* 34:*5, 13, 22, 23* 35:*11, 25* 36:*12, 20, 23, 24* 37:*2, 5, 12, 13, 20* 38:*23, 25* 39:*4, 6, 7, 14, 15, 20* 40:*12, 15, 23* 41:*20* 42:*9, 12, 16, 17* 43:*24* 45:*15* 46:*17, 21, 22* 47:*3, 11, 17, 23* 48:*6, 25* 49:*4, 14, 15, 18* 50:*6, 12* 51:*14, 19* 52:*7* 53:*23* 54:*9, 20* 55:*2, 9, 16* 56:*12* 57:*4, 8, 10, 12, 13, 14, 16, 17, 20, 24* 58:*2, 5* 59:*4, 12, 13, 15* 60:*16* 61:*14* 62:*22, 25* 63:*23* 64:*8, 11, 13, 16, 18, 23* 65:*2, 18, 25* 66:*2, 12, 19, 23* 67:*8, 15, 18, 22* 68:*8* 69:*19* 70:*4, 25* 71:*6* 72:*16, 21* 73:*4* 78:*5, 8* 79:*6* 80:*10, 17, 18, 20* 81:*10* 82:*5* 83:*14* 84:*17, 20, 23* 85:*22, 23* 86:*10* 87:*23* 88:*7* 89:*1, 2, 10, 11* 90:*13, 18* 91:*3, 6, 23* 93:*12, 15, 17* 94:*16, 24* 95:*13* 96:*9, 10, 12, 14, 24, 25* 97:*5, 6, 14* 98:*5, 23* 99:*4, 5, 6, 19* 100:*1, 6, 20* 101:*7, 12* 102:*13* 104:*9* 105:*2* 106:*13* 107:*7, 25* 108:*18* 109:*12* 110:*4* 111:*9* 112:*5* 113:*24* 114:*16* 115:*9, 25* 116:*16, 20, 25* 117:*13, 23* 118:*1* 120:*17* 121:*5* 122:*4, 23, 24* 123:*3, 7* 124:*1, 23* 126:*9* 127:*10, 17* 130:*21* 131:*10* 132:*5, 15* 135:*3, 25* 136:*20* 137:*22* 138:*6, 23* 139:*21* 140:*11, 15*
**boards** 24:*2, 7, 9, 12* 25:*1* 42:*4* 44:*14* 48:*1* 62:*12*
**board's** 50:*20* 57:*15* 90:*22* 127:*22*
**Boardvantage** 115:*11* 116:*6*
**Bob** 30:*21* 79:*22* 80:*1* 117:*25* 118:*8* 119:*12* 120:*9*
**bode** 126:*1*
**books** 14:*15*
**bottom** 71:*25* 72:*8*
**box** 121:*25* 124:*4* 125:*11* 126:*15*
**branches** 20:*23*
**break** 7:*23, 25* 8:*2*
**breathing** 85:*1*
**Brian** 2:*18* 4:*17* 84:*14*
**bring** 75:*15* 125:*23*

**bringing** 131:20
**brings** 6:16
**broad** 51:12 127:1
**broken** 34:1 38:20
**brought** 37:13 41:22 42:7 76:2 129:18, 20
**bus** 48:11
**business** 20:21 24:19, 20, 23 30:13 39:16 118:4

< C >
**call** 28:3 89:17 102:22
**called** 25:17 38:7
**call-in** 35:23
**calls** 28:15 30:9 136:16 137:18
**candidate** 47:5 64:25 65:7, 8, 24 66:4, 25 71:2, 11 73:14, 24 74:24 75:12, 15 94:18 96:13, 15 97:13, 14
**candidates** 13:13, 20, 24 14:4 17:22 18:2, 6, 11 42:5 43:2, 10 50:15 55:21 73:10, 12, 17 74:4, 9, 18, 22 75:3, 8 87:13 96:11 97:13
**canned** 61:10
**cap** 21:18, 19
**capabilities** 74:22 75:8
**capable** 41:23
**capital** 77:25
**cap's** 21:20
**Caption** 144:3
**captioned** 121:25 125:11 144:8
**card** 121:21
**Carmichael** 26:21, 25 27:3, 11 28:8, 10, 16 29:3, 12, 16 30:4 40:19, 20 41:1 42:21 44:24 46:7, 12, 21 47:2, 22 49:15 51:1, 20 53:11 56:8 58:12 63:8, 9, 17, 25 67:14, 24 68:15 69:11 73:9, 18 74:17 80:7 89:25 91:24 96:4 98:24 101:17 115:7 117:22 118:9 119:1, 12 120:9 127:23 131:11, 18 132:4 135:6 138:10 139:23 140:8
**Carmichael's** 48:5 92:23 127:17 130:24, 25 132:14 136:2 138:25
**Carolina** 110:18
**carry** 60:11
**CASE** 1:9 4:5, 8 8:21, 24 9:1, 8, 19 10:10 16:12, 25 17:4, 13 26:17 56:1 64:22 67:13 76:4 86:9 144:3
**cases** 42:4 44:7 48:16
**casual** 61:10 100:5, 8
**category** 13:16 15:11 17:18 81:14
**cell** 31:11 32:9
**Center** 1:14 2:13
**Central** 20:2, 3
**CEO** 9:1 13:4, 14, 21, 24 14:5 17:19, 22 18:3, 6, 12 19:14 20:10, 13 21:13 22:16, 17, 18, 20, 23 23:5, 6 24:5 26:12, 15 27:6, 11, 13, 18, 20, 24 28:1 30:6, 7 40:4, 18, 25 41:2, 4, 10, 12, 13, 24 42:6, 15, 17, 22 43:3, 10, 13, 16, 19, 20, 24 44:1, 2, 3, 8, 15, 19 45:11 46:1, 8, 13 47:4, 7, 17, 18, 20 48:7, 13, 20 50:16 51:17, 20 52:5, 9, 11 53:11, 23 54:11, 13, 24 55:6, 8, 9, 11, 13, 21 56:7, 22, 25 57:4, 7, 10, 14, 15, 22 58:1, 10, 14, 19, 24 59:6, 7, 8 60:1, 20, 22, 24 61:11 62:5, 9, 13, 17, 19 64:3, 6, 9, 11, 12, 25 65:4, 21 66:4, 17, 18 67:13, 21 68:9, 22 69:19 70:6, 12, 13, 14, 18, 23 71:2, 10 74:6 75:23, 24 79:13 81:21, 23 82:3, 19 83:2, 9, 10, 21, 25 84:2, 3, 6, 8, 20, 23 85:2, 9, 19, 20 86:2, 4, 11, 20 87:8, 19 88:4, 8 94:13, 19 95:18 96:2 98:25 100:20 101:10, 15 122:11, 18 123:22, 24 124:8 127:24 129:2 130:3 135:8, 16 136:4 137:21
**CEOs** 75:5
**certain** 25:9 35:15
**certainly** 20:17 34:7 41:16, 17 43:9 48:25 50:5, 11 51:15 52:20 55:15 57:18 58:5 59:14 60:6 61:12 69:22 81:19 122:13 123:15 126:24 128:14 129:19 137:22
**certified** 6:22
**certify** 143:6
**CFO** 43:21 57:3 73:21
**chair** 8:25 22:20 24:10 27:14
**chaired** 24:23
**Chairman** 19:14 22:9 66:19
**challenges** 74:23 75:11
**chance** 69:11 70:21, 22
**change** 48:2, 3 80:20 85:2, 8 124:16 127:3 145:4, 7, 10, 13, 16, 19, 22 146:4, 7, 10, 13, 16, 19, 22
**changed** 22:14 79:20
**changes** 61:8 80:17 82:5 84:20 85:21 144:11, 14
**characterize** 44:18
**charitable** 24:25
**chart** 79:18 84:4
**chatter** 122:24
**chief** 62:1, 4, 7 73:11 78:18 80:2 81:20 82:3 125:24
**choosing** 87:17
**chosen** 46:1
**CHRO** 82:19 83:3 84:6
**Cincinnati** 1:20 2:6, 14 143:19
**Cioffi** 2:8 3:4 4:15, 16, 23 6:18 9:9 12:2, 17 14:13, 23 15:3, 22 17:1 20:15 25:21 26:16 27:21 28:18 29:21 49:17 53:14, 16 65:5 71:17 74:1 91:16 92:10, 14, 20, 25 93:9 99:1 103:3 112:18 113:1, 4, 16, 20 114:24 117:9 119:15, 17, 23 120:3, 12 121:12, 18 125:3 126:14 127:15 130:16 131:2 133:4, 7, 10, 13, 17, 20, 22, 25 134:3, 7, 11, 14, 19, 22, 25 135:9 136:15 137:11, 13 138:13 139:2 141:12, 17, 19 142:2
**Cioffi's** 132:9 136:24 137:6
**circulated** 116:4
**civil** 5:2 143:17
**claim** 26:4
**claims** 26:5
**clarification** 49:22 76:22 77:7
**clarify** 30:2 47:1
**clear** 5:6 11:19 15:3, 14 23:21 29:25 34:25 49:7 80:5, 23

89:23 97:5 123:5 129:5 138:17
**cleared** 41:2
**clearer** 7:22
**clearly** 48:19 128:2, 16
**close** 83:14
**college** 19:24
**Collin** 2:11 4:16
**Collin.hart@blankrome.com** 2:15
**Columbus** 25:16, 24
**come** 44:15 64:19 85:14, 15 86:8 97:21 116:21 117:12 124:20
**comes** 42:17 67:2, 3 86:2
**comfortable** 69:18 91:4, 6 96:11, 12, 14 97:7 98:6, 13, 15 127:2
**coming** 117:11, 17
**Commencing** 1:14
**comment** 23:8, 9 68:11 85:25
**commented** 74:17
**comments** 48:5 69:23 85:25 87:15 96:7 101:17 130:25 131:11, 18 132:4, 14 135:5 136:2 138:10, 25 139:22 140:8
**Commission** 143:24
**commissioned** 143:5
**commitment** 23:10
**committed** 70:4
**committee** 27:15, 16 28:4 29:7 30:11 34:21 39:9, 25 40:6, 11, 15, 23 110:20 121:6 141:3
**communicate** 15:15 29:5, 8, 11, 15 31:6, 11 32:3, 8 37:1 57:24 68:22 93:21 94:16 128:18 129:5
**communicated** 17:8 57:9, 13 69:15
**communicating** 31:8 58:12
**communication** 16:3, 5, 11, 14
**communications** 12:25 13:8 15:8, 11, 15 16:15, 17, 20, 23 17:11 28:17 29:2, 19, 24 30:3, 5, 17 58:4 114:16 140:9
**communicative** 122:13
**companies** 44:13
**company** 8:21 20:1, 5, 14, 19, 24 21:1, 7 22:5 23:5, 6 31:24 33:17 44:12, 25 45:6 46:1, 2, 5 50:16 55:15 62:7, 10, 11, 20 75:23 77:5 118:5, 14, 24 119:8 123:8, 9 126:1
**company's** 9:1
**compared** 76:23
**comparison** 23:1 65:9
**competition** 45:23
**competitive** 60:3 123:11
**completed** 84:3
**completely** 6:6 91:6
**completing** 70:19
**complex** 5:25
**compound** 137:14
**concern** 5:13
**concerned** 57:18
**concerning** 115:25 121:22
**concise** 129:5
**conclusion** 59:22
**condition** 47:12 55:24 126:3
**conditions** 46:2 52:12 123:8
**conducted** 100:2
**conduit** 64:11
**conference** 5:21 102:21
**conferences** 5:10
129:1
**confident** 51:9
**confine** 17:3
**confirm** 113:17
**confirmed** 90:16
**confirming** 113:10
**conflicted** 35:11 36:12
**Connie** 1:22
**consent** 115:25 116:4, 8, 12, 16, 21 117:8, 17 129:9, 11
**consider** 57:10
**considered** 54:12, 24 55:2, 3, 5 56:6, 14 57:25 58:7, 10, 13 71:10 74:19 94:21
**considering** 50:11
**consistency** 101:1
**consistent** 50:18 61:13 90:21 117:13
**constant** 122:17
**constantly** 23:19
**constitute** 70:13
**constructive** 69:2
**consultant** 41:22 42:7, 20 43:1 88:9, 11
**consultants** 41:15, 18, 19
**consumer** 31:22 34:5 118:4
**consuming** 25:4
**contact** 114:15
**contacts** 52:13 60:7 123:17 128:11
**content** 9:23, 24
**context** 47:8, 19 93:10
**continue** 45:4, 23 47:14 121:13 127:6
**continued** 67:12 121:10 141:10
**continues** 65:22
**continuing** 141:12
**contract** 143:17
**contributed** 25:16
**convening** 53:25 56:12
**conversation** 48:8 58:23 60:12 61:9, 10 69:19 95:14 96:5, 8 115:6 119:10
**conversations** 9:20 10:14, 16, 19 28:8 48:25 67:22 69:20 94:25 96:25 117:7 118:8
**copy** 142:1
**corner** 125:5
**Corporation** 20:2
**Correct** 14:25 21:9 23:17, 21 25:5, 11, 20 26:4 27:8, 25 29:20 31:17 33:23 35:21 39:1 40:8 46:16 47:4 49:16 53:7 62:22, 25 63:2, 5, 8 72:5, 6, 12 76:9, 25 77:1, 12 79:6, 7 80:7 81:11, 12, 15 83:8, 10, 14, 20, 25 84:9, 10, 12, 13, 15, 19 86:17 87:22 88:12 95:5 97:16 98:1 99:24 101:18 102:11, 12, 15, 19, 22, 23 103:1, 2, 13, 14, 17, 18, 20, 24, 25 104:7, 8, 11, 14, 17, 18, 25 105:1, 4, 5, 11, 17, 21, 22 106:2, 3, 10, 11, 15, 16, 22 107:4, 5, 8, 9, 11, 14, 15, 22, 23 108:1, 2, 4, 8, 15, 16, 21, 23, 24 109:2, 9, 10, 13, 14, 16, 20 110:1, 2 111:6, 11, 13, 19 112:2, 3, 6, 9, 12, 13 113:15, 19, 20, 25 115:20 116:10, 14 117:23 119:21 121:23, 24 124:21 130:13, 23 131:6, 12, 14, 18, 25 132:1, 7, 15, 21 136:12 138:6, 7, 8, 9, 11 139:1, 12, 14, 17 140:5, 13, 16, 17, 18, 23, 24
**corrections** 144:11

**correspondence** 15:15 16:6
**counsel** 6:1 9:6, 10 11:23 12:4, 18 14:13 43:22 93:2 112:18 133:4, 13 134:22, 25 143:12, 14
**count** 35:4
**country** 21:22
**COUNTY** 143:3
**couple** 5:10 9:20 99:2 121:15
**course** 25:6 42:12 78:16 99:9 101:15
**COURT** 1:2 4:7, 20 5:5, 15, 17, 19, 20, 21 7:13 121:14 141:17, 20, 23, 25 143:16
**cover** 132:18
**COVID** 35:12, 22 123:12
**created** 17:16 74:23 75:11
**creates** 141:7
**creating** 130:11
**crescendos** 55:12
**crisis** 44:16
**criteria** 46:3
**critical** 68:6
**criticisms** 34:9 67:25 68:3 84:23 87:7, 11
**CRR** 1:20 143:4, 24
**cultural** 122:18
**current** 82:21 126:18
**currently** 22:2
**customer** 33:11 38:14
**customers** 21:25
**cut** 46:24

< D >
**dark** 25:18
**data** 131:17 132:24
**Date** 1:14 8:13 65:1 97:8 142:8 144:2
**dated** 72:17 107:8 110:5 116:12
**dates** 35:18
**day** 23:14 34:22, 23 143:20 144:16
**days** 34:20
**deadline** 98:11
**dealing** 61:7, 8 128:14
**dealt** 77:13, 16 90:6
**December** 5:11 32:23 70:25 72:17, 22 73:19 78:4, 8 79:16 83:14 87:12, 18 93:18 111:9 112:6 113:18 122:7 125:17 126:7 143:25
**decide** 64:9 121:14 135:7 136:3
**decided** 50:14 97:14 118:3, 22
**decides** 41:1 43:24 95:13 135:16
**deciding** 119:4
**decision** 5:14 64:5 101:11 122:21 127:18 130:10 136:9, 14, 21 137:1, 23 138:1
**decision-making** 5:15
**decisions** 137:24
**deck** 33:21 38:7 78:3, 8, 19, 23, 25 79:4, 8 80:11, 15, 18 85:5, 6, 11 88:7 130:22 131:4, 5, 9 132:6, 10, 14 135:4 136:2 137:1, 7, 17 138:8, 24 139:21 140:7
**decks** 63:5, 24 87:25 88:3 99:23 101:13
**DECLARATION** 144:5
**declare** 144:6
**deep** 60:9
**defendant** 4:15 5:4 9:12
**Defendants** 1:11 2:8
**defendant's** 4:25
**defined** 15:8 143:17
**definition** 16:2, 5
**deliberate** 68:23
**delivery** 141:23
**demanding** 22:23 25:3
**demeanor** 60:8
**departure** 118:19, 25
**depending** 100:10, 24, 25
**Depends** 21:17
**depict** 113:12
**Deponent** 2:8
**depose** 143:8
**deposed** 6:22 8:16, 23 10:2, 11
**Deposition** 1:14 4:4, 5, 24 5:4, 5, 7, 17 6:8, 17 7:6, 9 9:4, 19, 21, 23 10:15 11:7, 9, 24 12:13 17:14 25:8 53:2 92:12, 18, 19, 23, 24 94:9 134:2 142:11 143:7, 10, 11 144:1, 8, 12 145:1 146:1
**depositions** 5:2 6:5 8:20 9:7, 11, 21 25:12
**depth** 123:15
**derivative** 26:5
**describe** 9:16 26:24 31:3
**described** 117:10
**description** 79:2
**desired** 69:12
**detail** 50:2 122:14
**detailed** 41:14
**details** 16:12 49:1 118:18
**determination** 42:6 58:18 59:10, 11 96:3, 21 98:23 127:23
**determinations** 130:20
**determine** 40:22 42:18 54:9 58:22 60:18 64:2 66:2 101:4
**determined** 40:14 47:17 65:2 66:24 71:1 81:9
**determining** 132:20
**develop** 48:18 71:9 127:6
**developed** 55:20 122:20
**developing** 50:4 130:8
**Development** 13:23 18:5 46:19 47:6 48:4, 16 49:5 50:7 52:21 55:10 56:1 57:21 59:20 61:16, 18, 19 64:24 66:13, 14 67:12 68:4, 6, 8, 10, 14 69:1, 2 71:8 73:14 78:17
**developmental** 41:9, 17 65:21 67:6 68:7 69:7 78:20 98:17
**develops** 55:25
**difference** 54:15
**different** 20:23 22:25 23:7, 16 24:2 31:23 34:18 42:15 44:2 50:4 52:10 61:22, 23 63:14 83:22 100:21, 24 133:9
**differently** 54:20
**difficult** 59:19
**digital** 48:22
**Diligent** 115:13 116:5
**dinner** 39:8 78:12 91:10 96:1 100:6 101:2 110:13, 20, 22
**dinners** 28:12 38:25 99:6 100:1, 16 101:7, 12 140:12
**direct** 32:15 37:10, 18 50:2 125:4 129:7
**directed** 12:12
**direction** 44:4
**directly** 29:15 31:6 90:6 93:21
**director** 5:3 6:4 13:1 14:3 18:10 30:8 74:16
**directors** 5:8 72:16, 21 76:7 102:14 104:9 105:3, 21

106:13 107:7, 25 108:18 109:12 110:4 111:9 112:5
**director's** 86:3
**disagree** 6:6, 15
**disagreements** 85:17
**disclosure** 15:16 16:7
**discoverable** 15:24 17:3
**discovery** 25:22 26:17
**discuss** 46:7, 12 51:18 118:25 127:18
**discussed** 47:3 73:13, 18 91:22 96:1 101:17 118:1 120:17 132:19
**discussing** 73:23 95:9
**discussion** 5:24 6:9 46:17, 20, 21 47:19 56:24 57:2 60:10 66:8 74:8, 21 75:7, 10, 14 78:17 85:24 90:17, 19, 23, 24 91:3, 8 95:16 97:12 98:15 116:15, 19, 20
**discussions** 34:4 67:4 68:3 74:12 80:19 120:15 122:22 123:2 124:22 126:9 127:11, 16
**Dispatch** 25:16, 24
**distinction** 43:17, 18 87:16
**DISTRICT** 1:2, 3 4:7
**diversity** 64:18
**DIVISION** 1:4 4:8
**divisions** 33:15, 23 34:1 38:17, 21
**document** 11:4, 6, 16, 22 12:14 15:18 16:6, 9 72:18 77:24 78:2, 10 86:13, 22 122:6 124:1, 9 125:8, 15, 16 126:11, 22 127:10
**documentation** 37:25 88:8 92:8
**documented** 67:15
**documents** 9:16 11:10, 23, 24 12:3, 8, 22 13:15 14:7, 10, 14, 21, 24 17:15, 20, 24 18:4, 17, 20, 21 71:21 85:1 93:7 103:3 112:20 115:22 116:2
**doghouse** 44:19
**doing** 30:7, 9 33:17 34:5, 6, 8, 10 37:14 51:7 52:4 62:15 70:7 91:13 112:18 133:25
**dont** 37:14
**doubt** 64:23
**downplaying** 61:18
**draft** 86:15
**drafts** 80:14 86:7, 11, 14
**drawing** 99:11
**duly** 6:21 143:5, 8
**duties** 27:11

< **E** >
**earlier** 12:6 36:2 42:11 54:14 55:3 58:25 63:7 67:5 69:12 93:1 99:24 101:18 119:6
**earnest** 70:6
**East** 2:13
**Economy** 25:17
**Eddie** 47:13 125:19
**Edison** 24:16
**education** 18:22
**effective** 62:1
**efficient** 6:14
**eight** 130:12
**either** 12:5 36:14 42:3 86:12 89:4, 16 93:18 96:11 116:5
**Electric** 8:25 19:11, 12, 16, 20, 23 20:1 21:22 24:4, 16
**electrical** 18:23, 24
**electronically** 116:7
**Email** 2:7, 15 15:18 16:9 17:9 29:12 31:12 32:9
**emails** 29:18
**emergency** 43:16, 18, 20 44:2, 8 47:9, 16 48:7 54:14 55:10, 24 56:22 59:7 67:13 74:12 84:16 86:24 87:8, 12, 14, 17 94:14
**employed** 19:8, 19
**employee** 27:12 33:8 38:11 58:9 127:7 143:13
**employees** 10:9, 20 21:23 23:8, 15 50:1 70:22 121:7
**Empowering** 25:17
**encompassed** 28:14
**Energy** 24:16 25:19
**engagement** 33:9 38:11
**engineering** 18:24, 25
**enjoyed** 52:3
**ensure** 44:22 45:4, 22 46:4
**enterprise** 39:24 40:6, 11, 15, 22 54:1 121:6 127:1 141:2
**enterprise-wide** 62:5
**enters** 113:21
**entire** 65:18 144:7
**entirely** 135:14
**environment** 54:4, 17 60:3 100:5, 8 123:21
**Erie** 2:6
**ERRATA** 144:1, 13 145:1 146:1
**Especially** 58:10
**Esq** 2:1, 4, 8, 11, 18
**Essentially** 20:5
**established** 48:13
**estimate** 36:2
**et** 1:10 4:6 144:4
**evaluate** 131:24 137:7
**evaluates** 85:20
**evaluating** 52:10
**evaluation** 95:3, 24
**evenings** 100:3
**events** 28:12 29:17
**eventually** 26:2 66:14 82:3 84:2 121:14 127:24
**everybody** 62:13
68:7, 10
**evidence** 28:19
**evolved** 66:10
**exact** 42:25 66:5 129:25
**exactly** 69:25 74:13 75:16, 18 79:12 88:16 89:13
**Examination** 3:4, 5 7:1 121:17 130:17
**examined** 6:22
**example** 68:19
**exception** 35:10
**exchange** 15:16 16:7
**excluding** 140:21
**excuse** 8:15 10:4 19:17 22:13, 21 59:10 88:14
**executive** 22:20, 25 23:3 39:17, 23 40:3 41:3, 5, 11, 21 48:1 62:15 64:14 67:17, 19 69:5 73:11 78:1, 13 85:15 89:1, 3 91:10, 21 95:25 100:4, 7 120:18 132:23
**executives** 48:17 52:1
**Exhibit** 3:5, 8, 9, 10, 11, 12, 13, 14, 15, 16 10:23 11:3, 11 12:16 71:12, 18, 24 72:7, 14, 15, 20, 23 73:5 76:7, 22, 24 77:18, 22 78:24 79:5 80:12, 15, 24 81:4 88:7 102:5, 9 103:7, 12 104:1, 6, 9, 19, 24 105:2, 12, 16 106:4, 9, 12, 23 107:3, 6, 16, 21, 24 108:9, 14, 17 109:3, 8, 11, 21, 24 110:3 111:1, 4, 8, 21 112:1, 4 115:14, 18 117:19 121:19 129:7
**EXHIBITS** 3:5 71:22
**exist** 14:17 137:17
**existed** 55:25
**exists** 12:8
**exit** 14:14
**exits** 102:3

**Expand** 82:21 126:18, 25
**expect** 42:14 116:21
**experience** 33:12 38:14 51:12 52:19 54:22 59:25 61:21 64:6, 17 86:7 99:11, 12 101:9 130:23 131:13, 14, 21, 24 132:16, 19, 20, 22 136:18
**experienced** 44:12
**experiences** 20:20 42:14 54:4 64:19 135:13 138:12 139:24, 25 140:3
**experiential** 54:14
**expertise** 42:1
**expires** 143:24
**explain** 100:1
**explained** 8:16
**exposed** 68:12
**expressed** 124:24
**extent** 14:14, 17 18:22 29:19 141:5
**external** 52:11 62:12 65:24 74:4, 8, 18, 23 75:2, 11, 15
**externally** 46:3
**extremely** 45:14

< F >
**face** 45:23
**facilitate** 42:8
**fact** 5:1, 3 28:20 62:6 67:11 100:19 118:3 124:19, 20 127:22 130:11
**factor** 127:18, 22
**factors** 128:2
**facts** 14:2 18:9 28:18 137:23 138:4
**fair** 21:5 22:22 35:14, 18 36:7 56:5 63:15 79:2
**falls** 74:12 75:24 98:17
**falter** 65:22
**Fame** 24:11
**fantastic** 62:12
**far** 33:18 57:17 65:8 66:3, 24 94:17 125:2 127:14
**Farms** 8:6
**fashion** 68:23 116:7 129:5 140:10
**fast** 45:11 68:21
**fatal** 69:1 98:9
**faulty** 92:3
**favorable** 97:5
**February** 5:21
**feedback** 101:15
**feelings** 122:19
**feet** 23:12 49:3 68:20 129:3
**fellow** 122:22 124:1, 22 127:10
**felt** 43:13 52:7 59:15 60:14 61:15 65:7 71:7 96:16, 17 98:6 125:18 126:24 128:2
**FIFTH** 1:10, 14 2:13, 18 4:6, 15, 17 9:12 10:9, 20 13:1, 4, 14, 21, 25 14:5, 15 17:19, 23 18:3, 7, 12 19:6 24:4, 6 27:12, 13, 20, 24 28:10, 11, 12 29:16 30:22 31:20 34:13 37:6 41:4 42:20 43:3, 10 44:14 46:8, 13 47:4 51:20 53:12 54:11, 25 55:4, 6 56:7 57:11 58:1, 11, 14, 20 60:20 64:3 65:4 66:4 71:2 72:1, 5, 8, 11, 17, 21 73:6 75:6, 25 76:23, 24 77:3, 4, 5, 22, 23 80:22 81:4 82:8 83:5, 16 84:4, 21, 24 87:5, 19 94:19 95:19 96:18 98:25 102:9, 10, 14 103:12, 13 104:6, 7, 10, 24, 25 105:3, 16, 20 106:9, 13, 14 107:3, 4, 7, 21, 22, 25 108:14, 15, 19 109:8, 9, 12, 25 110:4 111:5, 10 112:1, 2, 5 115:19 116:9 117:20 121:6 125:5 135:8 136:4 141:1 144:4
**fill** 48:12 56:13
**filled** 81:10
**filters** 86:5
**final** 13:19 18:1 98:7
**financial** 33:14 38:16 44:15
**fine** 68:13 97:14 114:19
**finish** 7:20 34:23 133:7, 14, 20, 21, 22, 23 134:7, 14, 15, 19 135:10
**finished** 110:22 133:8, 10, 13, 15
**Fintech** 45:18 48:21 128:15
**Fintechs** 45:24 60:7
**firm** 143:16
**first** 6:21 12:25 13:3 17:17 19:5 25:19 26:21 27:8 30:20 34:22 36:16, 19 47:23 71:24 72:1, 8 76:6 89:8, 21, 23 121:20 128:11 143:8
**Firth** 103:16
**fit** 9:5 44:24 47:15 65:12 75:22 122:18 128:4
**fits** 44:5, 9 46:3 48:9 61:2 65:10
**five** 70:17, 24 139:18, 24
**flaw** 69:1 98:9
**flexible** 124:17
**flight** 21:11
**fluent** 49:1 128:12
**fluid** 123:18
**focus** 41:17 55:8 61:15 71:8 96:19 128:5
**focused** 6:3 42:1 44:20 45:1, 16 54:3 55:10 59:16 61:17, 20 64:23 65:10 98:8 99:14 125:25
**following** 5:19 110:13, 15
**follows** 6:23
**footing** 70:23
**Forbes** 22:2
**foregoing** 143:10
**forgot** 42:25 79:24 93:18
**forgotten** 77:14
**form** 15:19, 22 16:10 17:1 29:21 65:20 92:10 137:13, 16 138:13
**former** 8:25 137:21
**forth** 44:14 88:4 128:22
**Fortune** 22:5
**forward** 45:3, 11 46:4 48:19, 24 51:17 65:12 98:16 122:12 128:5
**foundation** 28:19 92:11 119:15, 24 120:12 129:2
**four** 132:3, 12, 13 135:22 139:14, 17, 18 140:1
**fourth** 5:3
**Fox** 121:7
**frame** 27:21, 23 69:21 88:17 91:14
**frames** 124:16, 19
**frequency** 50:24
**frequent** 50:8
**frequently** 27:2, 19 31:6, 25 32:3 36:21 39:13 50:22 63:12, 19 101:6
**front** 62:9
**frontline** 23:15
**fundamentals** 45:3, 12
**Further** 3:5 46:19 57:21 66:13 123:12 130:16, 17 141:13
**future** 44:5 53:24 54:13, 17 55:19 57:7, 25 60:2 64:25 65:17

99:14 122:12 123:20 126:1 127:7
**fuzzy** 90:25

< G >
**general** 43:22 65:25 68:18 114:20
**generally** 17:7 34:21 41:11 68:25 85:12 100:10 101:3
**genre** 64:7
**getting** 61:20 66:14 75:16, 18 101:1
**give** 39:17 48:2 49:25 50:3, 17 67:6 71:8 80:24 98:12
**given** 4:25 5:3 48:19 51:16 52:18 85:3 89:16 124:17 131:3, 25 143:10
**giving** 143:7
**glass** 23:7
**Global** 24:16
**go** 6:19 7:3, 24 11:17 22:10 29:4 41:14 46:24 52:23 58:8 60:9 65:13 78:14, 19 81:20 83:4 86:5, 8 91:2 94:3 95:21 101:22 103:5, 6 113:2 120:2, 6, 23 122:14 127:4 133:23 135:22, 24 139:18
**goal** 6:11
**goals** 33:15 38:17 41:9
**goes** 41:6 85:21 98:8, 15
**going** 6:14 7:12, 15 8:23 9:16 12:17 14:13 16:13 25:3 29:14 38:23 45:19 48:24 57:14 65:11 69:13 72:14 74:1, 15 87:5 91:5 98:5 135:9, 12 136:24 141:20
**good** 44:17 52:4, 8 53:24, 25 61:5 62:15, 16 69:6 128:22
**gotten** 118:22
**governance** 27:14, 15 28:3, 9 29:7 30:11
**governor** 23:14
**gradually** 67:4, 5
**great** 56:4 70:1 118:23 119:7 122:17 126:25 127:7 128:18
**Greg** 26:21, 25 27:3, 6, 10 29:3 30:5 40:20, 25 42:21 44:24 45:7 46:7, 12, 21, 23 47:2, 21, 22 49:5, 14, 25 50:13, 14 51:8, 13, 19 52:7, 19, 20 53:11 55:8, 15 56:7 57:5 58:12 63:8, 9, 17, 24 66:12, 19, 22 67:5, 14, 23 68:15 69:8, 11, 16 70:7 75:21 76:4 78:17 91:24, 25 92:23 96:4 98:24 101:17 115:6 117:22 118:9 119:1, 11, 12 120:9 124:17 127:16, 23 130:3, 24, 25 131:11
**Greg's** 47:19 55:10
**ground** 65:23 128:24
**group** 25:17
**grow** 67:5
**guess** 69:24 80:1 88:18 95:23
**guy** 96:16, 22

< H >
**half** 112:19
**Hall** 24:11
**HAMILTON** 143:3
**hand** 143:18
**handed** 11:2 71:21 77:21 102:8 103:11 104:5, 23 105:15 106:8 107:2, 20 108:13 109:7, 24 111:4, 25 115:17
**happen** 26:14 50:13 77:17 140:16
**happened** 120:22 136:7
**happening** 60:6
**happens** 48:10
**happy** 112:19
**hard** 23:4 76:3 113:4
**Hart** 2:11 4:16
**HB6** 9:2 25:11
**head** 7:15 79:13, 15 118:4
**Health** 24:10
**hear** 121:5
**heard** 58:4 67:10, 11 70:10
**heavily** 21:5
**He'd** 39:16
**held** 77:8 105:21
**help** 42:7 126:2
**helped** 64:1
**hereinafter** 6:22
**hereof** 144:13
**hereunto** 143:18
**hey** 70:1 97:2
**high** 48:17 81:14 122:1, 10 131:2 137:2, 8
**Highgrove** 8:6
**hired** 129:23 130:6
**history** 21:1, 7
**hit** 123:12 128:24
**Hoffman** 37:14
**hold** 22:18 113:5 137:11
**holding** 77:5
**holds** 82:2
**hour** 112:19
**hours** 6:10 23:4 34:20 133:24
**house** 23:7 25:10, 19
**Householder** 25:10, 20
**huge** 43:18
**hugely** 56:3
**human** 77:25 78:18 79:14, 15 80:2 81:20 82:4

< I >
**idea** 101:5
**identification** 10:24 13:20 18:2 71:13, 19 77:19 102:6 103:8 104:2, 20 105:13 106:5, 24 107:17 108:10 109:4, 22 111:2, 22 115:15
**Identified** 13:12 17:21 41:7 86:23 87:9 88:6 132:3, 4
**identify** 23:16 50:21 72:15, 20 77:24 81:7 82:11 83:17 115:22
**identifying** 14:3 18:10
**Ihle-Adkins** 1:22
**imagine** 59:4
**impact** 48:23
**important** 44:19 45:15 52:14 60:2, 7 61:11 62:11 64:15 78:15 99:7, 17 123:23 128:4 135:13
**impressed** 97:1, 2 122:25
**impression** 59:3 124:15
**impressions** 66:11
**impressive** 123:19
**improve** 44:21 45:2
**include** 28:15 29:18 82:21 126:19 127:3
**included** 128:7 140:13, 15
**includes** 11:9 15:23 28:12
**including** 73:12 74:7, 21 91:24, 25
**income** 33:25 34:7 38:19
**incomplete** 138:14
**incredibly** 52:14
**independent** 57:16, 17, 23 64:8 67:22 122:5 124:9 125:16 126:10, 21 137:16 139:25 140:3
**indicate** 112:21 120:16

**indicated** 21:4 49:13 62:21 70:8 76:15 102:24 112:22 113:23 118:9 130:19 144:12
**indicates** 74:16 76:7, 8 84:7, 11 110:17 117:25 119:21
**indicating** 53:10 103:22 137:1
**indication** 83:24 84:1
**individual** 58:3 78:14, 20 81:8 82:12 85:16 120:15
**individually** 27:17
**individuals** 41:7 51:6 55:5 57:6 59:13 64:7 94:1 95:1 96:1 101:16
**industry** 21:5, 9 52:12, 13 54:18 70:15 75:22 122:16 123:17 128:12, 19
**industry-related** 24:12
**information** 5:24 15:16, 23 16:7 60:17 81:9, 13, 17 82:1, 6, 16, 25 85:10 98:13 101:10 114:15 115:24 131:24 132:2, 3 135:4, 6 136:5, 13, 19 138:25 139:8, 13 140:2, 6, 21 141:7
**informed** 117:5
**initial** 67:4 88:16 90:19, 23, 24
**initially** 65:20 81:18 82:18
**initiate** 70:6
**initiated** 73:9 98:3
**initiating** 75:20
**INPO** 24:17
**input** 64:16 130:20 135:2 138:1
**inputs** 64:5, 9 131:9, 16 132:20 136:21 138:22
**ins** 123:17
**Institute** 24:13, 15, 16, 17
**instruct** 74:1 92:20 135:9
**instructed** 93:4
**instruction** 9:10 93:2
**instructions** 8:3
**intended** 29:25
**interaction** 140:5
**interactions** 9:2 140:9
**interest** 143:14
**interested** 75:6
**interesting** 67:8
**interim** 47:17 79:24
**internal** 20:18 41:16 45:1 50:15 52:6 54:4, 7 55:18, 21 59:17 62:2 64:24 65:8 66:3, 25 71:11 94:18 96:18
**internally** 54:3 71:4 125:25
**interpretation** 42:13
**interrupting** 134:1, 3
**interview** 32:15 37:10 75:17
**introduce** 4:9
**introduced** 90:25 91:1
**introduction** 97:11
**introverted** 59:16 125:25
**investor** 129:1
**Investors** 23:9 52:11 61:7 128:24
**involved** 24:8 41:20 56:24 61:5 89:21 128:25 129:17
**involvement** 25:10 39:4 80:11 88:23, 25 141:2
**involving** 9:1
**Irrelevant** 17:3
**issue** 61:3 70:8 95:12
**issues** 17:4 23:19 25:7 76:1 121:11 128:13
**items** 137:5 139:17
**its** 70:21

< J >
**January** 19:17 22:12, 13, 19 31:15, 16, 20 32:1, 4, 14, 17 35:19 36:21 37:2, 7, 9 39:12, 19 40:7, 16, 24 46:6, 11, 16 102:14 103:16 113:18
**jms@sspfirm.com** 2:8
**job** 22:23 25:3 51:8 120:19 136:20 137:22
**jobs** 51:15
**joined** 129:16
**joint** 9:14 102:16 105:19 106:13 108:18
**Joshua** 2:4 4:13
**July** 1:14 4:2 25:8, 15 108:19 143:20 144:2
**June** 107:8 108:1

< K >
**Kabat** 44:15
**keep** 6:10 43:23 55:7 84:25
**keeping** 54:16 68:24
**kept** 100:22
**KEVIN** 1:14 3:3 6:20 44:15 45:7 55:8 142:6 143:7, 11 144:19 145:24 146:24
**key** 73:14
**kind** 23:5 42:1, 2 64:14 69:8 75:17, 19 83:22 85:21, 25 123:24 140:12
**kinds** 27:16 30:23 94:25 99:8
**knew** 48:20, 21 49:1, 5 51:25 62:2 117:11 119:13 120:9 125:22
**know** 7:24 11:17 23:4 26:18 33:19 37:14 40:14, 21 41:1 45:8, 10 47:13, 16, 20 50:6, 23 51:7, 9, 15 52:6 55:3 57:7, 12, 18 58:2, 6, 9 59:18, 19 60:11, 12 61:22 63:12 65:19 66:5, 12 67:9 68:3, 9, 11, 18, 21, 24 69:6, 20, 25 70:1, 17 71:6 74:10 75:16, 18, 21, 25 76:17 78:16 79:8, 12 80:9 81:18 82:1, 18 83:3 84:5 85:24 91:4, 12 95:20 96:24 98:4, 19, 21 99:8 100:22 110:22 117:13 119:3, 10, 16, 19 120:14 121:12 123:2 125:2, 24 127:14 128:21 129:23, 25 131:21 134:24 138:16 141:6
**knowing** 20:18
**knowledge** 42:16 45:22 54:7 57:12 92:13 128:13
**knowledgeable** 68:20
**known** 74:21 75:8 95:22
**knows** 64:13 92:11

< L >
**L.P.A** 2:5
**labeled** 25:18
**Lack** 28:19 92:11 119:15, 23 120:12
**Lamb** 84:14
**large** 21:16
**largest** 21:22
**Larry** 25:20
**latest** 48:2
**lawful** 6:21
**lead** 30:8 71:10, 11 86:3
**leader** 69:18
**leadership** 39:17 40:3 82:22 99:13 100:4 126:19
**leading** 117:14

**learn** 68:22
**learner** 122:17
**leave** 67:20
**leaves** 132:10
**leaving** 118:5, 14
**led** 26:2
**left** 79:25 118:24 119:11
**letter** 117:22 119:21, 22 120:8, 16
**level** 54:15 85:22 122:14 123:24
**levels** 64:13
**life** 44:5, 9 45:6, 19, 25 52:16 123:9
**lifer** 20:8, 11, 13
**limit** 5:1, 17
**limitation** 6:8, 13
**limited** 5:7, 12 6:2
**lines** 73:13
**list** 128:7 135:19 139:18
**listed** 87:8 139:16
**listen** 90:13
**lists** 82:13
**litigation** 10:17, 21 17:12 26:2
**live** 8:9 103:19 104:13 105:23 107:10 108:3 109:15 110:7 111:12 113:14 120:21
**lived** 8:7
**living** 85:1
**LLP** 2:12
**logistics** 27:16 30:12
**long** 8:7, 11 15:3 19:19 22:9, 11, 16 43:20 47:20 55:1, 11, 13 69:17 70:5 76:16 100:11
**long-term** 43:16, 24 44:1, 3, 8 47:18, 20 48:9, 20 56:22, 25 57:10, 25 58:16, 20, 24 59:6, 7 60:20 70:12, 13 74:6 94:13
**look** 13:7, 10 47:11 48:12 54:20, 21 55:19 57:6 61:21 67:9 72:4 76:13 78:14 79:17 87:14 98:5, 10 121:19 125:6 126:15, 25 134:15
**looked** 9:5 52:21 54:19 56:21
**looking** 23:8, 9 70:3, 17 98:6, 14 99:24 103:22 121:25 122:12 123:7 124:4 125:11 132:23
**lot** 44:7 48:16 49:3 50:2 62:8 70:1 76:1 85:2, 24 86:6 128:25 129:1 132:23 137:24
**Louisiana** 19:2
**lower** 125:5

**< M >**
**M&A** 44:23 66:7 128:16, 21
**mail** 15:18 16:9
**major** 39:16 46:3
**making** 20:13 55:23 70:11 127:18 129:13 130:8, 20 137:23
**managed** 34:1 38:21
**management** 31:22 32:20, 22, 24 34:6 41:6, 25 42:10 64:10, 14 67:20 68:5, 19 78:1 79:9, 10 90:9 121:22 125:10 127:3
**managing** 34:11
**manner** 6:15
**mannerism** 23:8
**March** 104:10 105:4
**mark** 130:3
**MARKED** 3:5 10:23 11:3 71:12, 18, 22 77:18, 22 79:4 80:11, 15 86:20 88:7 102:5, 9 103:7, 12 104:1, 6, 19, 23 105:12, 15 106:4, 9, 23 107:3, 16, 21 108:9, 14 109:3, 8, 21 111:1, 21 112:1 115:14, 18 116:9
**market** 21:18, 19, 20 52:11 60:6, 7 82:22 126:19 128:3
**marketing** 127:5
**marketplace** 61:8
**married** 8:11
**Marsha** 10:1, 3, 4 89:16 92:18 114:18, 22, 23 115:2, 5
**master's** 18:23 19:4
**match** 99:15 114:2
**materials** 9:5 33:5 115:10
**Matter** 62:6 67:11 99:18 100:19 144:8
**matters** 27:16 28:4 29:7, 23 30:23
**maximum** 60:23
**MCHUGH** 1:7 2:18 4:6, 12, 14 9:19 10:10, 17, 20 14:8 15:9 16:15, 18 18:15 31:14, 25 32:4, 8, 12 34:2, 10 39:14 40:5 46:8 48:6 51:5, 19 53:6, 10 54:9, 12, 23 56:19 57:9, 13, 24 58:12, 18, 25 60:16, 18 64:1 65:2, 14 67:10 76:11 82:12, 13, 17 84:17 86:23 87:8 101:6 102:3, 25 103:23 104:16 105:9 106:1, 20 107:13 108:6, 25 109:18 110:10 111:15 112:14 113:21 118:2, 10, 13 120:10 121:7 126:23 138:15 140:19, 23 144:3
**McHugh's** 31:19 32:15, 18 33:1, 6, 8, 11, 14 118:19, 25 125:9, 17
**mean** 5:23, 25 15:15 23:2 30:13 31:9 33:16 34:4 35:22 36:23 40:2 41:19 44:9, 11, 25 50:5, 10 51:7 52:20 53:17 54:20 55:1, 15, 19 56:10, 11, 21 58:7 62:17 64:8 67:3 68:19 69:4 70:14 74:6 79:10 81:19 87:24 91:16 96:16 98:7 100:25 114:18 119:2, 3, 5, 6 120:14, 18 123:19 127:7 131:8 140:4
**meaning** 62:21 71:4
**meaningless** 139:6
**means** 16:6 39:25
**meant** 54:8 68:5, 6
**measure** 21:17
**media** 53:2 94:9
**meet** 25:1 26:21 27:2, 6, 10, 14, 15, 19 28:2 30:6, 20 31:25 32:14 34:14, 19, 20 36:16, 19, 22, 24 37:9
**meeting** 29:3, 17 33:18 34:22, 23 35:3, 9, 11 36:11, 12 38:24 39:5, 6, 7 40:12, 23 50:11 59:13 73:1, 3, 4, 19 76:8, 12, 15, 16 78:8, 11, 13 79:6 80:18 81:10 83:14 87:12 89:10, 11 93:16, 17 95:9 97:4, 8, 11, 25 99:5 100:7 102:16, 17, 18 103:1, 19, 24 104:13, 17 105:3, 6, 10, 20, 23 106:2, 13, 21 107:7, 10, 14, 25 108:3, 7, 18, 22 109:1, 12, 15, 19 110:4, 7, 11, 14, 16, 17, 21 111:9, 13, 16, 19 112:5, 8, 12, 14 114:14, 17 115:7, 10 116:24, 25 117:3, 6 118:2
**meetings** 10:2 28:8, 9, 10, 11 29:17 34:5, 21, 24 35:1, 6, 10, 13, 15, 20, 24 36:8, 13, 24, 25 37:2, 5, 12, 14, 20 38:25 39:9, 14, 15, 20,

22 40:15 59:15 60:17 62:22 63:23 77:7 78:5 101:12 110:20 113:24 135:3 138:23
**member** 19:5 26:12, 14 42:12 58:6 64:8 67:9 80:10 84:17 90:13 93:12 94:16 96:25 122:4 136:20 137:22
**members** 9:18 10:17 40:6, 11, 14, 22 42:16 51:18 54:20 57:16, 17, 24 58:3 59:4, 12 61:14 64:9, 16, 18, 23 67:22 94:24 96:24 99:4, 19 100:20 114:16 116:16 121:6 122:23 123:3, 7 124:1, 23 126:10 127:10 141:2
**mention** 17:17 130:24
**mentioned** 10:11 29:2 135:20 136:11 139:11
**mentions** 13:2
**mentor** 30:8
**mentored** 66:22
**mentorship** 66:21
**message** 15:18 16:9 17:8
**messages** 28:16 29:18
**met** 27:8, 17 30:21 36:1, 23 49:3
**Michael** 2:8 4:16 6:6
**Michael.cioffi@blankrome.com** 2:15
**middle** 82:22 110:16 126:19 127:5
**midyear** 32:18 33:2, 6 37:23
**Mike** 141:25
**million** 22:1
**mind** 55:7 61:25 85:1 122:20 128:23 135:22
**minutes** 5:17, 18 72:16, 21, 25 73:3 76:15, 23, 24 77:11 102:14 103:15 104:10 105:2, 19 106:12 107:6, 24 108:18 109:11 110:3 111:8 112:4 113:12, 18 114:8
**Mischaracterizes** 49:17
**mischaracterizing** 138:16
**missed** 93:19
**missing** 136:22, 23, 25 137:5, 25 138:1
**Misstates** 137:15
**mix** 95:23
**moderate** 82:13, 17 125:12 126:4, 6
**Monday** 110:20
**money** 25:17, 18
**month** 92:4
**months** 94:15
**mother** 21:11
**move** 45:17 46:4 51:9, 11 60:25 61:24 68:21 78:16 118:16 125:20 126:25 128:20
**moved** 45:7
**moving** 45:3 51:17 61:23 62:16 70:3 98:16 128:5
**multiple** 55:21 96:11 97:13 125:21

< N >
**name** 7:4 42:25 48:19 56:23 79:24 111:20 112:16
**names** 56:16, 19 57:1 74:11 75:4
**name's** 76:14
**National** 77:5, 16
**naturally** 57:3
**nature** 25:3 30:2 69:13 123:16 128:16
**necessary** 123:10
**necessity** 20:17
**need** 7:14, 18, 23, 25 13:11 45:10 48:18 53:24 59:1 60:1 65:13 70:2 98:9 99:14 139:10
**needed** 44:25 51:16 70:5 99:13 123:22
**needs** 78:20
**negative** 87:15
**negatives** 67:25 68:2
**neither** 14:1 102:25 103:23 104:16 105:9 106:1, 20 107:13 108:6, 25 109:18 143:13
**never** 26:11 27:17 28:19 33:22 51:24 54:12, 24 55:2 57:10, 13, 14, 25 58:13, 23 59:5 65:3 67:10 69:15 70:7, 9, 21 100:25 119:10 136:6
**nevertheless** 65:24
**New** 8:6 30:7 69:18 70:18, 23
**news** 115:24
**NICHOLAS** 1:14 3:3 4:4 6:20 7:5 142:6 143:7, 11 144:19 145:24 146:24
**night** 100:25
**No._____Change** 145:2, 5, 8, 11, 14, 17, 20 146:2, 5, 8, 11, 14, 17, 20
**No._____Line** 145:2, 5, 8, 11, 14, 17, 20 146:2, 5, 8, 11, 14, 17, 20
**nodding** 7:15
**non-serious** 56:14
**noon** 76:18
**North** 110:17
**Notaries** 1:23
**notary** 143:5, 25
**note** 99:17 115:25 118:21
**notes** 49:2 60:11
**not-for-profit** 24:7, 9 44:13
**Notice** 1:14 11:9 117:12, 16 118:21
**notwithstanding** 7:15 77:10
**November** 19:17
**Nuclear** 24:13, 15, 18
**number** 5:2 11:3 12:22 15:7 16:20 17:15 21:23, 25 22:6 35:15, 20 72:14, 15 76:7 77:22 102:9 103:12 104:6, 24 105:16 106:9, 12 107:3, 6, 21, 24 108:14, 17 109:8, 11, 25 110:3 111:4, 8 112:1, 4 115:18 121:19 129:8

< O >
**oath** 144:15
**objected** 5:4
**objection** 4:25 9:9 15:22 17:1 20:15 25:21 26:16 27:21 28:18 29:21 49:17 53:16 65:5 91:16 92:10, 20, 25 93:9 99:1 117:9 119:15, 23 120:12 125:1 126:12 127:13 130:15 136:15 137:13, 19 138:13 139:2 141:12
**objective** 131:17 132:24 135:14, 19
**objectives** 49:4
**OBRT** 24:22
**observation** 101:12
**observations** 62:25 63:23 99:3, 4, 6 130:21 131:10, 17 132:5, 11, 15 135:3, 25 138:5, 15, 23 139:20 140:7, 14, 15
**observe** 32:12 37:6
**observed** 61:12 62:21

**observing** 64:6 99:12 132:22
**obtain** 19:1, 3
**obtained** 17:16
**obvious** 130:5
**obviously** 24:3 33:17 35:12 119:12 120:8, 22 125:22 130:5
**occasion** 31:10
**occasionally** 30:6, 9 35:10 50:2, 3, 17, 22 63:13 67:6 69:9
**occasions** 36:11
**occur** 47:24 48:6 140:17
**occurred** 65:2 92:5
**occurring** 30:23 47:12 52:6, 12 95:3
**occurs** 69:19 97:3
**October** 19:7 22:21 24:1 35:19 37:3 39:13, 19 40:7, 16, 24 95:8 116:12, 25 129:12
**offer** 144:14
**offered** 118:23
**office** 4:19 143:19
**officer** 13:1 62:1, 4, 7 73:11 78:18 80:2 81:20 82:4 125:24
**official** 143:19
**Oh** 19:17 36:10 53:15 64:20 81:1 93:13 101:15 136:3
**OHIO** 1:3, 20, 23 2:6, 14 4:8 8:6 24:10, 19, 23 143:2, 6, 19, 25
**Ohio's** 25:17
**Okay** 13:12 14:18 17:11 21:13, 16 23:22 26:2, 6, 9 27:19 38:10 39:12 40:10 41:13 53:9, 21 60:1, 21 61:20 62:24 63:10, 16, 22 65:13 74:5 76:11 80:3, 10 81:1 82:10 86:19 87:6 88:14 92:1 95:6, 25 96:7 98:12 102:17, 21, 24 103:19 104:16 105:9 106:20 107:10 108:25 109:15, 18 110:10, 24 111:12 114:10, 12 130:1 131:1, 8 132:2, 9 134:13 137:12 138:4 139:25 140:19
**Oliver** 129:16, 23 130:7
**once** 28:4, 7
**one-on-ones** 129:1
**ones** 68:17 139:15
**one's** 136:22
**online** 123:11
**operating** 20:19 62:1, 4, 7 125:24
**operation** 47:15
**operational** 43:21 53:24 61:3, 21 127:1
**operations** 20:18 54:7 59:17
**Operators** 24:14, 15, 18
**opinion** 119:10 120:22 122:6, 9 124:10, 13 125:16 126:22 131:5 137:16
**opinions** 101:10 123:3 124:2, 23
**opportunity** 71:9 84:1
**opposed** 61:10
**oral** 15:17 16:8
**order** 141:21
**organization** 59:25 79:18 85:14 125:21, 22 127:4 135:16, 17
**originally** 51:3
**outcome** 44:22
**output** 60:23
**outs** 123:17
**outside** 27:11 29:16, 22 36:24 37:2 41:15, 18, 19, 22, 25 42:7, 20 43:1 62:25 93:4 135:20, 21 140:1
**overall** 77:4
**overbroad** 15:23 17:2

**< P >**
**p.m** 94:6, 7 102:1, 2 113:7, 8 121:1, 2 142:11
**PAGE** 3:3 11:11, 12, 13 12:13, 23 72:1, 4, 8, 11 73:6, 7 76:6 78:24 80:25 81:7, 8 82:11 83:10, 16, 19 86:25 117:19 121:20 145:2, 5, 8, 11, 14, 17, 20 146:2, 5, 8, 11, 14, 17, 20
**pages** 68:9
**paging** 87:2
**paper** 75:19
**paragraph** 73:7 74:2 117:25
**parameters** 6:17 90:7
**part** 20:1 39:16, 23 42:8 85:20 95:24 127:5
**participate** 32:18 33:2 37:22
**particular** 5:13 12:5, 7, 19 30:24 41:8 44:6, 14 45:20 59:8 61:2 65:1 66:23 67:1, 21 78:7 84:7 85:5 86:15 91:4 114:14 122:5, 12 123:25 124:18 125:8 126:10 127:9
**particularly** 41:14 54:17 60:4 81:21 123:11, 21 130:2
**parties** 143:14
**Partnership** 24:17
**parts** 61:22, 23 125:21
**Pas@sspfirm.com** 2:7
**Patterson** 2:5
**PENALTY** 144:5, 6
**people** 37:13, 15 48:11 50:4 56:1, 6 60:23, 25 62:5, 19 63:14 68:21 75:22 85:13, 16, 25 91:22 98:20 99:8, 12 100:8, 12, 21, 24 102:25 120:20, 21 122:25 125:22 129:18 135:15
**people's** 61:17
**perfectly** 59:6
**perform** 37:22 52:18 90:8
**performance** 33:15 38:17
**performed** 51:8
**period** 24:1 27:5 31:23 35:13 39:12 40:16 49:11 65:1 66:20 69:24 70:12 92:7 94:12, 13 95:2
**PERJURY** 144:5, 6
**permitted** 5:5
**person** 15:17 16:8 35:6 36:14 41:23 43:22 47:8 48:8 60:13 64:20 65:15, 16 71:7 76:8 78:20 80:19 87:17 91:5 96:4, 19 97:3, 7 98:6, 14 122:16
**personal** 14:23 30:14 69:13 70:8 92:12 101:9 122:19 131:21, 24
**personally** 9:13 26:3, 10, 11 27:2 93:1, 25
**perspective** 42:15 44:25 50:6 56:22 95:12 97:6 99:19 123:20 127:2 129:20
**perspectives** 42:18
**Peter** 2:1 4:11, 23 6:1 103:3 141:20
**Phil** 9:19 10:17, 20 14:8 31:14, 19, 25 32:3, 12, 15, 18 33:8, 11, 14 39:13 46:8 47:7, 10, 13 51:7, 13, 15, 19, 23 52:8 54:9, 12 56:19 57:9, 13, 24 58:12, 18, 22, 25 59:5, 15, 16, 22 60:16, 18

61:4 62:22 63:1, 23, 25 64:1 65:2, 14 67:10 69:3 76:11 82:12, 13 84:17 86:23 87:7 101:6 102:25 111:15 113:21 118:2, 3, 10, 13, 19, 22, 25 119:4, 6, 13 120:10 121:7 125:9, 17 126:3, 23
**PHILIP** 1:7 2:18 4:5, 12, 14 10:10 15:8 16:15, 18 18:15 144:3
**Phil's** 61:22
**Phone** 2:7, 14 17:8 28:15 29:5, 6 31:11 32:9 35:7, 16, 20 36:9, 14 39:5, 6, 10
**physical** 35:9, 24
**picture** 61:2
**piece** 127:5
**pin** 92:4
**Place** 1:14 32:23 39:3 43:23 44:20 45:4, 13, 21, 22 46:4 54:6 55:13 60:25 77:11 116:24 143:10
**placed** 126:5
**Plaintiff** 1:8, 14 2:1 4:12, 14 6:1 71:18
**Plaintiff's** 3:5, 8, 9, 10, 11, 12, 13, 14, 15, 16 10:23 71:12 77:18 102:5 103:7 104:1, 19 105:12 106:4, 23 107:16 108:9 109:3, 21 111:1, 21 115:14
**plan** 65:21 78:1 83:9, 11 84:7, 21, 24 85:10 86:12, 20 87:9 88:4 123:23 129:14, 15 130:8, 11
**planning** 13:3 17:18 41:7, 21 76:2 78:15
**plans** 87:19 140:25 141:4, 7
**plateau** 126:4
**play** 127:22
**player** 47:14 51:11, 25 53:6, 10 54:2 119:7 125:19
**players** 52:3
**please** 4:21 6:19 7:4 12:14 72:15, 20 82:11 83:17 120:4 121:19 129:8 134:14 137:3
**PNC** 2:13
**point** 5:22 8:1 25:12 37:15 43:7 45:20 55:11 56:18 66:2 70:2 71:25 76:5 98:14 114:18 117:14
**portable** 54:6
**portion** 116:9
**portions** 132:11
**position** 13:4, 13, 21, 24 14:4 17:18, 22 18:3, 6, 11 19:12 23:7 44:23 59:14 62:14 73:11 121:12 136:3
**positioned** 87:13
**positions** 41:8, 9 60:23 69:5 78:15, 21 81:22 82:20 124:5, 11, 25 126:16, 23 127:12
**positive** 55:16, 17 66:10
**positively** 96:17
**possible** 6:15
**potential** 13:23 18:5 25:18 41:8 43:2, 9 47:5 56:17, 20 57:1, 22 73:10, 13 74:18, 22 75:2, 10 78:21 81:13, 14, 22 82:13, 14, 17, 20 87:13 121:25 122:1, 7, 23 123:4 124:5, 10, 24 125:12, 17 126:4, 7, 16 131:3, 6 137:2, 8
**potentially** 47:9, 16 48:12 75:5 83:25
**Power** 8:25 19:11, 13, 16, 20, 23 20:1 24:4, 13, 15, 18
**practical** 97:24
**premise** 137:5
**preparation** 11:7 29:6 80:11 92:19, 24 141:3
**prepare** 9:3
**prepared** 60:14 78:23 79:5, 8, 11 80:6, 9 121:22 141:1
**prepares** 79:12
**Present** 2:17 76:7, 8, 11 86:9 89:2, 5, 7 91:15, 21 96:4 102:25 103:1, 23, 24 104:17 105:10, 23 106:2, 21 109:1 111:12, 15, 18 112:8, 11, 14, 21, 22, 23 113:13, 14, 24
**presentation** 89:5, 7, 12, 15, 17, 18 97:19
**presentations** 40:23 89:20 93:25
**presented** 90:21
**presenters** 79:13
**presenting** 89:1
**president** 13:4, 13, 21, 24 14:5 17:19, 22 18:3, 6, 12 19:14, 15, 18, 20 20:6, 10, 14 21:14 22:9, 11, 14, 15, 19, 23 23:1, 3, 14 27:11 41:4, 12, 13 42:22 43:3, 10 46:8, 13 47:4 51:20 53:11 54:10, 24 55:6 56:7 57:11 58:1, 14, 19 60:19 64:3 65:3 66:4, 15, 18 71:2 81:23 94:18 95:4, 18 96:2 98:24 116:1 118:16 124:7 127:24 129:13 135:8 136:4
**presume** 33:19 81:19 93:20
**pretty** 5:6 48:18 50:18 75:4 90:16 119:3 139:6
**previous** 47:1 62:7 82:2 86:14 87:23, 24 100:22 116:20 135:11
**previously** 43:1 114:13 120:17 121:21 125:18 130:19
**primarily** 34:24 39:7 59:24 68:17
**primary** 64:4 128:4
**prior** 9:7 31:15, 16, 20 32:1, 4, 14, 17 36:21 37:6, 9 70:25 81:10 87:18 88:3 95:10 116:17 117:3 129:11, 12 130:6
**priorities** 73:14
**probably** 31:1 65:23 70:17 93:15 114:18 115:5 119:9
**procedures** 44:21
**process** 5:15 38:5, 24 41:4, 5, 14 42:8, 13 45:12, 13 64:5 66:22 70:6, 20, 21 75:17 76:2 85:13, 20 98:18 99:10, 13, 23 136:18
**Processes** 13:18 17:25 44:21 45:2
**produced** 12:9 14:16
**producing** 11:23
**production** 11:10 12:5, 8, 21
**productions** 12:6
**professional** 27:1 31:5, 18
**progress** 45:23 46:23 121:10, 14 141:11, 13
**progresses** 47:6
**progressing** 54:16
**progression** 96:17 97:3
**promotion** 118:3, 11

120:11
**pronouns** 49:8
**proposed** 13:19 18:1
**proposition** 59:19
**provide** 67:14, 24, 25
**provided** 5:6 12:4 16:6 64:10 88:7 113:12 114:14 115:9, 12 140:6
**public** 143:5, 25
**Public-State** 1:23
**pulling** 64:17
**purpose** 6:7 8:19 45:8 112:24, 25
**purposely** 77:16
**Pursuant** 1:14 4:4 9:13 143:12
**put** 43:23 44:20 48:19 71:16, 17 81:17, 18 82:16, 25 117:12, 16 118:21
**putting** 60:22

**< Q >**
**qualifications** 44:1 75:19
**qualified** 53:17 143:5
**quarterly** 25:2
**question** 7:20, 21 8:1 12:3 15:2, 21 16:3, 4 17:2 25:14 27:5, 7 28:22 29:14, 22, 23, 25 32:6, 7 35:17 43:8 45:8 47:1 53:19, 20 57:23 75:20 91:19 92:11 93:3 97:15 114:3 120:4 122:4, 11, 20, 25 123:13 128:23 131:19 132:9 133:3, 5, 6, 9, 12, 16, 18 134:24 135:10, 11 136:24 137:6, 14, 15, 18, 20 138:14
**questions** 7:13 63:12 74:3, 17 121:9, 15 130:16 141:13
**quick** 23:12 49:2 68:20
**quickly** 129:4
**quit** 118:17

**< R >**
**ran** 20:23
**rarely** 28:2
**Raymer** 1:20 143:4, 24
**reached** 126:4
**read** 74:2, 7 92:18, 23 93:2, 4, 5 144:7, 9
**readily** 61:24 65:16
**readiness** 73:13 83:22
**reading** 5:20
**ready** 50:15 55:24 66:16 84:8
**real** 51:11
**realized** 23:6
**really** 5:23 30:11, 22 43:12 45:10 47:19 48:9, 15 50:1 55:10, 14, 23 57:3 59:15 61:11, 22 64:15 65:9, 10, 17 68:4 70:5 75:20 86:5 96:19 97:2 98:12 99:17 100:7 123:23 126:25 130:4 137:22
**reason** 58:8 145:4, 7, 10, 13, 16, 19, 22 146:4, 7, 10, 13, 16, 19, 22
**reasons** 130:5
**recall** 11:18, 20 26:19, 22 29:10, 13 30:25 31:1, 8, 13 32:13 34:9 35:5, 8, 25 36:8, 17 37:4, 17 39:13, 20 47:25 50:23 51:2, 3 56:9 63:19 66:23 67:1 68:14 73:17, 20, 22, 23, 25 74:11 75:2, 4, 7, 9, 10 76:13 80:20, 21 87:10, 11, 24 88:1, 2, 5, 10, 16, 20 89:4, 12, 16 90:5, 14 91:9, 11 92:15, 16 94:2 96:7 97:8 98:21 100:17 101:8 110:13 114:14 115:8 117:1, 7, 18 118:12 119:2 140:11
**received** 17:16 64:1 68:18
**reception** 100:4
**recess** 52:24 94:6 102:1 113:7 121:1
**recognize** 78:7
**recognized** 57:5 126:3
**recognizes** 65:18 68:23
**recollection** 92:2, 3 96:10
**recommend** 8:15
**record** 4:2, 24 5:6 6:18 7:4, 18, 22 11:19 12:2, 18 14:14 15:4 52:23 53:1, 5 94:3, 5, 8 101:22, 24 102:4 113:2, 6, 9 120:23, 24 121:3 128:10 141:15
**records** 14:15 117:2
**record's** 138:17
**redundant** 5:13
**refer** 12:13 14:8, 11 17:16 121:7
**reference** 38:23 53:6, 9 70:11 71:25 80:25 99:22
**REFERENCED** 3:5 25:8 63:7 95:25 131:3
**referred** 38:7 41:18 63:4 68:15
**referring** 10:12 12:21 18:14 32:22 38:6 49:8, 23, 24, 25 62:24 71:24 73:5 76:6, 22 78:4, 24 80:22 85:9 88:11 89:24 93:24 99:23 117:19
**refers** 12:25 13:2
**regarding** 9:19 14:7 17:12 18:17 28:8 48:6 50:25 51:5 63:25 64:1 67:24, 25 114:16 115:7 116:16 130:20 131:5, 16 135:2 138:22 139:1, 13 140:22
**regular** 46:23 50:1, 8, 9 51:4 60:17 63:8, 11 122:24 141:23
**regulated** 21:5
**regulations** 21:8 77:15
**regulatory** 44:17, 19, 22
**rehabilitate** 45:16
**reiterated** 69:16
**relate** 17:17
**related** 29:17
**relates** 13:2 41:15
**relationship** 26:24 30:8 31:3, 14 77:2
**relative** 9:2 16:11 23:10 33:15 38:17 75:22 143:13
**relatively** 54:5
**release** 115:24
**relied** 14:3 18:10
**rely** 5:24
**remain** 22:9, 11, 17
**remember** 11:14, 16 56:23 69:25 89:17, 18 90:16, 18 97:11 98:7
**reminder** 7:12
**remove** 131:8
**repeat** 5:8 16:4 28:23 43:8 120:3 131:19 137:3
**repetition** 6:4
**repetitive** 5:12
**rephrase** 25:14 27:7 32:7 35:16 91:18
**report** 49:15 69:9 90:13
**reported** 25:16 37:13, 16 49:14
**reporter** 4:21 7:14 141:17, 20, 23, 25
**reporting** 36:20 40:4 143:16

**reports** 32:15 37:10, 18 39:17 47:22 50:2 66:14 93:7
**represent** 4:10 9:12, 13 11:8, 21 12:11 93:1 102:13 103:15 114:10 117:2
**representation** 6:11, 16 9:14
**represented** 11:22
**request** 9:15 11:10 12:7, 12, 19, 21, 25 17:15
**requesting** 15:4
**require** 77:15
**required** 70:12 122:11
**requirement** 6:13
**resign** 119:4
**resigned** 118:24 119:8
**resolution** 95:8, 9, 11
**resolutions** 73:8 76:20
**resource** 78:18 81:20 82:4
**resources** 79:14, 15 80:2
**respect** 7:23 10:15 11:23 13:19, 23 15:7 16:13 18:1 22:16 23:19 25:8, 18 26:3 30:19 33:1, 23 47:23 48:5 50:25 51:4 52:8 54:23 67:23 72:7 82:20 84:8 85:5 86:23 88:8 90:11 99:22 100:1 101:11 102:17 113:11 114:13 121:10 123:3 140:25
**respectively** 71:22
**respects** 143:12
**respond** 129:4
**responded** 12:18 96:12
**responding** 15:20 16:3
**response** 12:3, 5, 7 13:15 74:16
**responsibilities** 82:21 126:18
**responsibility** 50:12 57:15 64:12 86:4
**responsible** 60:22
**rest** 39:17 61:14 67:20
**result** 12:6 21:7 120:10 143:15
**retained** 18:17 98:19
**retire** 50:14
**retirement** 69:22
**review** 9:7 33:8, 11, 14, 21 37:25 38:5, 10, 13, 16, 19 41:6, 16 68:10 73:3, 9 93:7, 14 98:3, 20 99:10, 23 141:19
**reviewed** 9:9, 15 73:11 83:13
**reviews** 32:19, 20, 24 33:2, 6, 20 37:23 38:1 61:13 63:5 68:5 87:23
**revision** 85:6
**revisions** 86:17, 19, 21
**RHR** 42:25 88:12, 15, 23 89:18, 20, 24 90:4, 6, 11, 12, 19, 24 91:22 93:8, 22 94:1 95:17 96:2, 22 97:9, 11, 15 98:1, 7, 19, 22 99:10 101:13 130:22 131:10, 17 132:6, 13 135:5 136:1 138:6, 24 139:22 140:7, 21, 22
**RHR's** 90:14
**right** 8:17 11:21 14:22 19:22 20:6, 7, 8, 11, 24 21:2 22:7, 8, 24 23:20, 22, 25 25:9 26:7, 8 27:9, 10 28:17 29:8, 11 33:3 36:6 38:8, 25 40:21 54:25 60:22, 23 61:6 63:21 64:20 70:20 71:16, 17 72:7 73:5 76:12 77:8 80:5 83:11, 19 84:14, 18 87:4 90:3 95:1, 3 96:19 97:23 105:7, 10, 24 106:18, 21 108:7, 17, 20 109:1, 19 110:5, 8, 11 111:10, 16 112:15 115:4 116:13 119:14 121:13 122:21 124:4 129:20 130:1 131:1 136:9, 19 137:2 138:20 141:8
**right-hand** 125:5
**risk** 118:2, 10 119:13, 18 120:10, 18, 19
**Robert** 30:19, 20
**Rock** 24:11
**role** 22:22 23:16 26:12 31:20 41:24 47:7, 11 48:12 50:16 55:22 56:13 62:16, 19 65:17 74:19, 24 75:6, 12, 25 90:10, 12 118:4, 23 125:20
**roles** 31:21, 23 50:4 51:13 61:24 62:16 125:20
**Roll** 24:11
**rollup** 33:17 34:4
**Rome** 2:12 4:17
**room** 102:3 113:21
**Roughly** 22:6
**round** 24:19, 20, 23
**RPR** 1:20 143:4, 24
**Rule** 4:4 143:17
**rules** 5:2
**ruling** 6:12
**run** 48:11
**runner** 62:9
**running** 60:14 128:24
**runs** 89:22 92:6
**Ryan** 10:1, 3 114:23

< S >
**S/Wendy** 143:24
**Saba** 2:1, 5 3:4, 5 4:11, 18 6:6 7:2 9:17 11:1 12:10, 20 14:18, 19, 25 15:6 16:1 17:6 20:22 26:1, 20 27:24 28:6, 24 29:1 30:1 49:20 52:23 53:4, 18 66:1 71:16, 20 74:14 77:20 91:18, 20 92:12, 17, 22 93:6, 11 94:3, 11 99:21 101:22 102:7 103:10 104:4, 22 105:14 106:7 107:1, 19 108:12 109:6, 23 111:3, 24 112:25 113:2, 5, 10, 17, 22 115:1, 16 117:15 119:20 120:1, 5, 7, 23 121:4, 9 125:1 126:12 127:13 130:15, 18 133:6, 9, 12, 15, 19, 21, 23 134:1, 5, 9, 13, 15, 17, 20, 23 135:1, 23 136:17 138:3, 19, 21 139:7 141:10, 14, 22, 24
**sake** 7:13
**sat** 100:18
**sausage** 85:18
**save** 144:10
**saw** 33:22 36:23 45:15 50:5 61:13 123:15 130:4
**saying** 10:2 35:1 46:21 47:2 49:14 51:14 54:2 62:13 70:1 74:13 110:23
**says** 48:8 72:1 82:21 102:20 119:22 122:1 124:7 125:12 126:4, 15, 18
**scattered** 100:21
**Schaffer** 30:19, 20 31:4, 7 73:9, 18 74:17 79:22 80:7 118:1, 9 119:12 120:9
**schedule** 23:10
**scheduling** 27:16
**science** 18:23, 24

**scope** 5:7, 11 6:2, 9 25:21 26:16 98:4
**seal** 143:19
**search** 13:7 75:21 76:3, 5
**searched** 12:4
**seats** 101:2, 3
**SEC** 8:24 95:12
**second** 22:18 29:4 73:6 89:9 94:4 101:23 113:3 117:25
**see** 11:6, 11, 15 12:22 13:5 16:21 22:12 24:11, 17, 18 30:6, 9 33:4, 5, 17, 20, 25 34:3 38:19 43:6 46:1 48:17, 18 52:17 57:7, 20, 21 59:12 61:19 62:11 65:20 71:25 72:2, 9, 25 73:15 74:25 79:4 81:5, 24 82:14, 23 84:4, 21, 24 85:6, 10 86:14, 17, 20 87:9, 19 88:17, 18 93:25 97:17 98:14 110:18 111:20 113:4 118:6 122:2 125:13 126:16 129:9 135:15
**seeing** 11:14, 16, 18, 20 55:17 60:16 66:6 85:3 99:8
**seek** 6:14
**seen** 11:3, 17 57:19 72:18, 23 80:14 86:1 93:15, 20 116:2 131:23
**selected** 13:13 118:21
**selecting** 14:4 18:11
**selection** 13:20 18:2 56:4
**senior** 62:15 120:18
**sense** 47:15 48:23 56:9, 10, 15 66:9 97:20
**sent** 11:22 116:5, 6
**sentence** 74:15
**separate** 34:20 77:10 122:5 123:25 124:8 125:15 126:10, 21 127:9 131:4 137:16
**separately** 31:11
**September** 35:11 36:11 89:10 93:17, 18, 19 95:9, 10 100:15 109:13 110:5 113:24 114:11 117:3 118:1 119:13 120:9
**series** 7:13 49:22
**serious** 56:9, 10, 18
**serve** 24:2 94:14
**served** 21:25
**session** 67:17, 19 78:13 89:1, 3 91:10, 21 92:9 95:25
**sessions** 34:18 48:1
**set** 54:10 58:19, 23 59:1 60:19 64:2 65:3 69:22 88:4 123:24 143:18
**sets** 53:22 59:20, 23 60:5 77:10 99:15
**setting** 49:1 55:11 57:8 59:13 132:15
**settings** 31:9 32:2, 11 33:18 45:15 62:25 63:24 65:25 96:25 99:5, 9 130:22 131:10 132:6 136:1 138:6 139:21
**seven** 34:15, 18, 25 35:1, 4 36:3 70:16
**Seven-plus** 84:14
**shaking** 7:14
**share** 124:1, 23 126:11
**shareholder** 26:3, 5
**Sharpe** 4:19
**sheet** 82:12 125:9 144:1, 13 145:1 146:1
**sheets** 34:1, 7 38:20
**show** 73:2 114:10 130:4
**shown** 80:2
**shows** 83:21 114:8
**side** 128:14, 15
**sign** 141:19
**signature** 141:18
**SIGNATURE:________________________DATE** 145:23 146:23
**signed** 95:8 116:3, 7 144:16
**significant** 23:11 50:12
**signing** 116:17
**Silver** 121:7
**similar** 127:11
**simple** 5:23 6:4
**simultaneously** 77:8
**single** 97:13, 14
**sit** 36:7 88:2, 20 100:6, 13, 15 101:4, 6
**sitting** 55:13 100:9, 24
**situations** 69:12
**six** 6:10 34:15, 17, 18, 25 35:1, 4 36:3 130:12
**skill** 53:22 54:10 58:19, 23 59:1, 20, 23 60:5, 19 64:2 65:3 99:15 123:24
**skills** 33:19 43:13 48:24 52:16 53:25 57:4 65:11 122:11 123:9 129:6
**sleeping** 23:22
**smaller** 100:12
**Smith** 2:4 4:13
**snapshot** 85:4 124:15
**soft** 75:20, 21 76:3, 4
**somebody** 49:23 58:6 122:17
**somewhat** 30:7 119:5
**sorry** 32:5 46:24 80:23 86:25 87:2 95:21 116:8
**sort** 55:12 57:4 62:18 67:2, 3 68:22 74:6 79:23 85:18 89:22 92:6 125:19 130:3
**sound** 22:7 130:1
**sounded** 32:5
**sounds** 22:8 97:25
**sources** 132:2, 4 139:8, 10, 11, 13 140:1 141:6
**SOUTHERN** 1:3 4:7
**Southwest** 20:2, 3
**Southwestern** 20:1
**space** 100:10
**span** 93:24
**speak** 6:18 9:18, 25 10:9 94:23 99:3 103:4 112:20
**Speaker** 25:10, 20
**speaking** 17:7 37:17
**Special** 102:16 105:19
**specific** 17:5 34:9 45:8 60:13 68:14 77:12 80:20 117:7
**specifically** 6:9 12:12 14:20 18:14 26:22 33:16 34:1 35:8 36:17 37:17 38:20 43:23 47:25 51:2 63:19 80:22 83:3 84:5 85:9 88:20 89:18 90:14 91:9 114:3 139:13
**specifics** 33:22
**speculate** 137:4, 9
**speculated** 5:16
**speculation** 136:16 137:19
**speculative** 136:6 139:2
**Spence** 10:12, 13, 14 14:11 15:12 16:21, 24 17:8, 12 18:18 36:16, 19, 22 37:1, 6 38:21 39:21 40:5 45:11 46:13 47:3, 23 49:9, 15, 24, 25 50:5 51:1 52:16 55:19 56:2, 8 65:12 66:3, 24 67:24 68:1, 16 71:1 73:12 74:8 81:8, 14 84:12 90:17, 21 94:17 95:17 97:5 98:8, 23 100:15, 18 101:11 102:25 103:23 104:16 105:9

106:1, 20 107:13 108:6, 25 109:18 110:10 111:18 112:11 116:1 121:22 123:1 124:2 129:13 130:7, 21 131:3, 16, 25 132:3, 5 135:2, 7, 25 136:4 137:7 138:5, 20, 22 139:1, 14 140:1, 6, 9
**Spence's** 37:10, 18, 23 38:1, 10, 13, 16 120:11 122:6, 23 123:4 124:10, 24
**spoke** 119:3
**spoken** 114:21
**sponsored** 80:8 82:3, 19 83:2 84:6
**SS** 143:2
**Stagnaro** 2:5
**stakeholders** 70:22
**stamp** 72:1
**stamped** 72:8, 11 77:22 102:9 111:5 115:18
**stand** 22:2
**standing** 8:1
**standpoint** 37:16 45:5 66:9 123:11
**standpoints** 97:24
**start** 21:19 34:22 130:4
**started** 51:3 76:15 110:18, 21 133:18
**state** 4:10 7:3 14:13 123:8 128:13 143:2, 6, 25
**statement** 5:20 21:5 22:22 35:18 36:7
**statements** 33:25 38:20
**STATES** 1:2 4:7 21:21
**stay** 62:20 69:17 70:4
**stayed** 22:20 52:19 62:10 66:20 119:7
**staying** 52:20
**Steady** 47:13 125:19
**steep** 124:16
**step** 47:8, 10 69:12 70:9 86:2 129:17
**steps** 42:19
**stipulate** 112:19 113:11
**stipulated** 113:16 114:13
**stipulation** 113:10 143:12
**stone** 69:22
**straight** 5:22
**strategic** 44:3 45:5, 9, 14, 17, 21 46:18 48:23 59:20, 23 66:9 122:15 123:16, 23 128:16 129:14, 15, 18 130:8, 11 140:25 141:3, 7
**strategy** 36:20 37:16 48:21
**Street** 1:20 2:13
**struck** 60:9
**stuff** 64:14
**style** 4:5
**Subcategory** 13:12, 18 14:2, 7, 10 17:21, 25 18:5, 9, 14
**subjective** 135:14, 18
**subordinates** 37:11, 20
**subtitle** 13:3
**succeed** 47:6 50:16 53:11 83:25 98:24 127:23
**succeeding** 46:8, 13 51:19 73:2
**successful** 56:2, 3
**Succession** 13:3 17:18 41:4, 5, 7, 21 73:10, 12 74:12 76:2 78:1, 15 83:9, 11, 21 84:3, 8, 21, 24 85:9 86:2, 4, 12, 20 87:9, 19 88:4, 8
**successions** 87:14
**successor** 84:16 86:24 87:8, 12 94:14 127:17
**sued** 26:9, 11
**suitable** 42:5 44:7, 8 53:11, 17 58:10
**summary** 6:7
**supplemental** 114:15
**supplied** 9:6
**support** 62:6 67:11 129:18
**supportive** 48:4 49:5 51:13 52:5 66:13
**suppose** 31:2 73:21
**supposition** 95:24
**Sure** 16:5 21:19 27:7 28:24 41:1, 2 45:20 50:13 55:23 64:12 66:16 75:4 97:18, 19 100:20 120:5 129:4 131:20 137:4 139:20
**surprise** 119:5
**surveys** 33:9, 12 38:11, 14
**Sustainable** 24:16
**swear** 4:21
**sworn** 4:22 6:21 143:8
**synopsis** 33:21 34:8

**< T >**
**table** 24:19, 20, 23 64:19 100:9, 11
**tables** 100:12
**tactical** 44:2 45:16 47:15 59:25
**take** 4:3 7:23, 25 8:2 32:23 39:3 55:18 95:10 116:24 132:9 135:3, 4, 5, 24 136:1, 2, 5 137:6 138:23, 24
**Taken** 1:14 4:25 7:6, 10 9:8 52:24 94:6 102:1 113:7 116:23 121:1 143:11 144:2, 8
**takes** 42:17
**talent** 32:20, 22, 23 33:20 38:4, 7 41:6, 16, 25 42:10 61:13 63:4, 5, 24 64:13 68:5, 19 78:1, 3, 8, 23, 25 79:4, 8 80:11, 14, 17 81:13 85:5, 6, 10 88:3, 6 99:10, 22, 23 101:13 121:21 125:9 129:19, 20 130:22 131:4, 5, 9 132:6, 10, 14, 23 135:4, 17 136:2 137:1, 6, 17 138:8, 24 139:21 140:7
**talk** 23:13, 14, 15 43:15 45:6 47:7 52:9 65:21 94:24 97:1
**talked** 9:21 42:10 48:7
**talking** 27:22 41:10 60:4, 5 74:5 95:2, 7 97:25 100:8 138:19
**talks** 124:5
**Tayfun** 47:10 57:2 65:14 73:21 84:17
**team** 39:18, 23 40:3 60:24 64:10, 14 67:20 69:5 85:15 100:4, 5
**Tech** 19:2
**technical** 60:5 128:14
**technically** 20:3
**technology** 128:15
**teleconference** 102:18 105:7 106:17 108:23 113:14
**telecopy** 15:18 16:9
**telephone** 15:17 16:8
**tell** 44:11 58:6 60:21, 24 122:16
**tells** 74:6
**temperament** 123:14
**temporary** 47:17
**tends** 70:16
**ten-year** 68:9
**term** 39:24 43:20 44:9 55:11
**terms** 30:15 34:19 44:3 46:19 52:5 60:10 61:1 69:1, 2, 21, 22 71:8 78:19 90:6 91:5 124:10 126:2 128:21 138:22

**testified** 28:20, 21 29:23 49:18 121:20 122:1 138:15, 18
**testify** 58:25
**testimony** 9:25 49:18 138:17
**text** 15:18 16:9 17:8 28:16 29:9, 18
**TFT** 30:22 61:5
**Thank** 71:14 103:9 104:3, 21 106:6 107:18 108:11 109:5 111:23 141:14, 24
**thing** 23:5 52:10 61:5 67:8 69:8 75:17, 19 79:24 83:23 85:21 86:1 90:20 91:2 98:8 99:20 137:25 140:12
**things** 9:22 27:17 28:20 30:10, 12 33:19 48:22 52:13 55:20 57:20 63:22 67:4 68:25 70:2 123:10, 15, 18 130:3 135:14, 20
**think** 5:22 19:22 24:20, 21 27:9 28:21 30:18, 21 36:6 43:6 47:10 52:2 57:20 58:2, 5 59:6 60:1 62:18 64:15 66:6, 10 67:8 68:2, 17 70:14 74:13 90:18, 25 91:1 96:24 97:17 98:2 101:21 114:1 119:9 126:1 129:3
**thinking** 42:3 48:2 50:17, 18 55:23 60:21 61:1 69:21 99:16, 18 123:20 127:8 128:20
**THIRD** 1:10, 14 2:18 4:6, 16, 17 9:12 10:9, 20 13:2, 4, 14, 21, 25 14:5, 15 15:11 17:19, 23 18:3, 7, 12 19:6 24:6 27:12, 13, 20, 25 28:10, 11, 12 29:16 30:22 31:20 34:13 37:6 41:4 42:20 43:3, 11 44:14 46:9, 14 47:4 51:20 53:12 54:11, 25 55:4, 6 56:7 57:11 58:1, 11, 14, 20 60:20 64:3 65:4 66:4 71:3 72:17, 21 74:15 75:6, 25 76:23, 24 77:3, 4, 5 94:19 95:19 96:18 98:25 102:14 103:16 104:10 105:3, 20 106:13, 14 107:7, 25 108:19 109:12 110:4 111:10 112:5 117:19 121:7 135:8 136:5 141:1 144:4
**Third-McHugh** 80:22 81:4 82:8 83:5, 16 84:4, 21, 24 87:5, 20
**Third-McHugh-001105** 77:23
**Third-McHugh-001132** 125:5
**Third-McHugh-001154** 77:23
**Third-McHugh-001216** 115:19
**Third-McHugh-001218** 117:20
**Third-McHugh-001221** 116:9
**Third-McHugh-001222** 115:20 116:10
**Third-McHugh-0213249** 102:10
**Third-McHugh-0213254** 102:10
**Third-McHugh-0213255** 103:12
**Third-McHugh-0213275** 103:13
**Third-McHugh-0213292** 104:6
**Third-McHugh-0213303** 104:7
**Third-McHugh-0213326** 104:24
**Third-McHugh-0213329** 104:25
**Third-McHugh-0213330** 105:16
**Third-McHugh-0213336** 106:9
**Third-McHugh-0213338** 107:3
**Third-McHugh-0213343** 107:4
**Third-McHugh-0213362** 107:21
**Third-McHugh-0213371** 107:22
**Third-McHugh-0213380** 108:14
**Third-McHugh-0213383** 108:15
**Third-McHugh-0213400** 109:8
**Third-McHugh-0213413** 109:9
**Third-McHugh-0213442** 109:25
**Third-McHugh-0213447** 110:1
**Third-McHugh-0213464** 111:6
**Third-McHugh-0213475** 112:1
**Third-McHugh-0213494** 112:2
**Third-McHugh-Minutes** 72:2, 5, 9, 12 73:6
**Third's** 24:4
**Thomas** 2:18 4:17
**thought** 23:4 46:18 49:19 74:5 99:13 119:6 124:14
**three** 6:4 63:22 70:17, 24 98:20 132:10, 12
**three-plus** 81:23 84:11 124:8
**Tim** 10:11, 12, 13 14:11 16:24 17:8 36:16 38:10, 13, 16 45:11 46:13, 18 47:3 48:4 49:8, 10, 15, 25 50:5 52:16 55:14, 19 56:1, 8 57:19 60:9, 13 61:16, 20 64:24 65:12 66:3, 19, 24 67:12, 24, 25 68:15 71:1 81:8 84:11 88:18 90:17, 21 97:5 98:8, 16, 23 100:15, 18 101:11 102:25 111:18 116:1 118:20 120:11 121:22 122:6, 23, 25 123:4 124:2, 10, 24 126:2 128:3 129:13 130:4, 7 131:25 132:3
**Time** 1:14 4:2 7:24 8:1 19:8 20:6 25:4, 13, 24 27:4, 21, 22, 24 28:1 30:21, 24 31:23 34:10, 19 36:10 37:15 44:6 45:10, 19 46:2 47:12 48:3, 18 49:24 50:7 52:19 53:2 55:4, 12, 25 56:5 59:9 65:1, 22 66:2, 5, 10 67:21 69:21 70:12 73:13 75:15 77:11, 17 78:18 79:20, 23 85:3, 8 87:17, 25 88:17 89:9 91:4, 14 92:7 93:24 94:9, 12, 13, 17, 20 95:7, 10, 17 97:3, 4 98:19 100:18, 22 103:5 112:23 121:10 122:12 124:16, 18, 19 127:17 130:10 143:10
**timeline** 98:11
**timelines** 13:18 17:25 73:10
**times** 7:9 25:4 26:9, 19 28:14 29:15 30:16 34:15, 18 35:1, 25 47:25 48:19 99:2 128:3
**timing** 9:21 118:19
**Timothy** 15:12 16:21 18:18

**Tim's** 52:21 60:8 67:12 118:3, 11
**tired** 44:16
**title** 22:20 83:10
**Today** 4:2, 3 6:16 11:9, 25 36:7 70:15 88:2, 21 92:19, 24
**today's** 9:3 11:24 12:12 53:2 94:9
**told** 91:2 114:19
**tool** 41:25
**top** 11:15 73:11
**topic** 46:7, 12 51:19 60:12
**total** 132:13
**totally** 52:9 97:10 137:18
**track** 100:22
**trajectory** 48:15, 17 122:10 124:16
**transactions** 66:7, 8
**transcript** 141:21 144:7
**transcription** 7:18
**transfer** 15:16 16:7
**Transforming** 30:22
**transition** 22:15 66:20 70:4 98:17, 18
**transitions** 66:17
**true** 36:4 124:20 140:19, 20 144:10
**truth** 143:8, 9
**try** 6:10 7:20
**trying** 8:22 24:20 29:4 30:2 49:21 80:24 87:16 123:10
**Tuesday** 4:2 105:3 110:19
**turn** 82:8 83:5 121:20
**turned** 22:19 45:9 56:3
**Turning** 83:16
**Tuzun** 84:17
**Twice** 7:11 8:16 28:5, 7
**two** 8:19 28:14 29:2, 15 30:16 34:19 52:1 56:6 71:21 77:10 81:23 124:7
**two-day** 34:24 35:1
**two-thirds** 12:23 73:7
**type** 85:19 125:24
**types** 30:10, 12 52:13
**typical** 48:16 78:22
**typically** 24:5 25:2 29:6 41:5, 20 49:1 52:7 57:5 67:19 70:14 72:25 73:2, 20 76:18, 20 78:6, 12 85:23 86:7 94:15 110:15

< U >
**Uh-huh** 12:15 39:2 74:20 78:9
**ultimately** 95:13 122:21
**unanimous** 115:25 116:4, 8, 12, 16, 21 117:8, 16 129:8, 11
**undersigned** 143:4
**understand** 8:2 14:22 15:1, 20 16:2 23:24 28:22 39:24 53:19, 20
**understanding** 5:14 16:14 21:8 31:19 40:10 41:3 77:2 80:6 88:15 118:13, 15, 18, 20 123:16 128:22 144:13
**understands** 64:13
**understood** 21:1
**UNITED** 1:2 4:7
**University** 19:2
**unusual** 100:17
**update** 78:1, 22 89:17 114:20
**updates** 46:23 50:1, 8, 9, 17, 25 51:4, 6 60:17 63:8, 9, 17, 24 67:6, 14, 23 68:18
**upset** 118:15, 22, 24 119:8 120:20
**use** 21:17 41:19 42:20, 24 49:2
**uses** 42:9
**Usually** 40:25 79:13 100:3
**utilities** 20:20 21:22
**utility** 8:22 20:21 21:4 47:14 51:11, 25 52:3 53:6, 9 54:2 119:7 125:19
**utilize** 135:16
**utilized** 135:15

< V >
**validate** 42:8
**validates** 42:3
**value** 66:21
**variances** 128:19
**varies** 22:4
**various** 20:19 31:21 42:18 47:25 52:18 78:15
**vein** 52:2
**verbally** 7:14, 19
**verdict** 65:18
**versus** 4:6 54:16 77:13
**vice** 22:25 23:3
**video** 7:16
**Videographer** 1:23 4:1, 20 53:1 94:5, 8 101:24 102:4 113:6, 9 120:24 121:3 141:15
**videotape** 4:1
**Videotaped** 1:14
**view** 42:15 48:9, 15 51:24 59:5, 16 83:21 126:11 127:1 133:1 135:13, 18
**viewed** 51:23 53:23 54:13
**views** 42:5, 16 50:3 59:4, 14 62:9 85:16, 17 90:17, 22 127:11
**virtual** 35:13
**vision** 44:4 45:21 123:22 130:12
**vitality** 45:2
**volume** 30:3, 15
**vote** 116:22
**VPs** 62:15
**vs** 1:9 144:4

< W >
**wagon** 43:24
**wait** 7:19
**walk** 58:8
**walked** 63:11
**walking** 70:20
**Walnut** 1:20
**want** 43:19 71:14 120:3 125:4 129:7 134:24 141:17, 25
**wanted** 50:6 52:17 57:20 60:10 66:12, 15 68:11 71:8 122:14
**waste** 103:5 112:23
**watching** 55:25
**way** 12:23 15:1 53:16 54:19, 21 57:8 61:15 73:7 89:14 98:18 100:7, 23 119:9 123:14 128:20, 21 129:17 133:6
**wealth** 31:22 34:6 127:3
**Well** 6:18 10:11 17:7 18:25 19:21, 25 20:16 24:24 31:21 44:11 45:9 46:18 47:16 50:23 51:6, 8, 13 55:1, 7, 9 56:14, 16, 21 57:2 59:5 60:8, 21 61:15 62:6, 11 66:22 67:9 71:6 75:15 77:4, 25 78:12 79:12 85:12 89:8, 21 91:7 92:14 95:11 97:20 101:16 113:1 119:6, 22 122:24 126:1, 5, 24 128:11 129:15, 19 132:13 133:3 136:8
**well-versed** 128:17
**Wendy** 1:20 143:4
**went** 19:23, 25 35:12 49:22 50:7 53:5 55:7 87:25 90:20 114:19

**We're** 4:*3* 5:*1* 6:*14* 7:*15* 14:*20* 78:*24* 83:*18* 97:*1, 6* 98:*13, 15* 112:*19* 123:*8* 128:*14*
**WESTERN** 1:*4* 4:*8*
**we've** 38:*6, 7* 86:*1* 88:*6* 112:*18*
**wheels** 43:*23* 54:*16*
**WHEREOF** 143:*18*
**whichever** 116:*6*
**wife** 8:*10*
**Williams** 10:*5, 6, 15* 92:*18* 114:*22, 23*
**willing** 70:*3*
**wind** 76:*18*
**witness** 4:*21, 22* 6:*21* 15:*1, 5* 17:*5* 20:*16* 25:*23* 26:*19* 28:*1, 23* 53:*15* 65:*7* 71:*14* 74:*1, 4* 92:*15* 93:*10* 99:*3* 103:*9* 104:*3, 21* 106:*6* 107:*18* 108:*11* 109:*5* 111:*23* 117:*11* 119:*16, 18* 120:*6, 14* 121:*16* 125:*2* 126:*13* 127:*14* 134:*4, 12* 135:*10, 12* 137:*12, 21* 139:*5* 143:*18*
**witnesses** 5:*9*
**witness's** 5:*14*
**wording** 120:*8*
**words** 15:*14* 47:*14*
**work** 19:*10, 23, 25* 57:*19* 66:*17* 70:*3* 115:*3* 125:*21*
**worked** 8:*22* 20:*5* 23:*4* 52:*1*
**workings** 45:*1* 52:*6* 62:*3*
**workplace** 32:*12* 37:*6*
**works** 57:*8* 85:*13* 98:*18*
**writing** 67:*15* 92:*8*
**written** 15:*17* 16:*8* 87:*19* 129:*9, 11*
**Wyman** 129:*16, 24* 130:*7*

< Y >
**yeah** 10:*13* 15:*5* 17:*1* 32:*7* 34:*16* 36:*6* 43:*12* 51:*2* 53:*20* 63:*18* 74:*5* 76:*13, 20* 78:*9* 80:*1, 4* 83:*9* 92:*13* 95:*6, 11* 110:*19* 117:*11* 120:*14* 121:*16* 127:*16* 130:*2, 6* 132:*17* 136:*3* 137:*21*
**year** 22:*4* 28:*4, 5, 7, 15* 29:*3, 15* 30:*16, 25* 31:*1* 32:*23* 34:*15, 18* 35:*2, 5, 14* 66:*23* 67:*1* 89:*24* 91:*12, 13* 92:*5* 114:*5* 129:*25*
**years** 8:*12* 19:*21* 70:*15, 18, 24* 81:*23* 84:*11, 14* 87:*24* 100:*14* 124:*7, 8* 129:*12, 22* 130:*2, 7, 9, 12*
**yep** 40:*13*

< Z >
**zero** 65:*23*
**Zoom** 4:*18* 102:*22*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| **PHILIP R. MCHUGH** | : Case No. 1:21-cv-00238 |
| Plaintiff, | : Judge Michael R. Barrett |
| v. | : |
| **FIFTH THIRD BANCORP, ET AL.,** | : **AMENDED NOTICE OF DEPOSITION OF NICHOLAS K. AKINS and REQUEST FOR PRODUCTION OF DOCUMENTS** |
| Defendants. | |

Please take amended notice that pursuant to Rule 30(b)(1) of the Federal Rules of Civil Procedure, Plaintiff Philip R. McHugh ("Plaintiff"), by and through counsel, will take the videotaped deposition of NICHOLAS K. AKINS, a Director of Defendants Fifth Third Bancorp and Fifth Third Bank, N.A., on Tuesday, July 2, 2024, beginning at 9:30 a.m. at the Fifth Third Center, 511 Walnut Street, Cincinnati, OH 45202. Said deposition will be taken in the presence of a Notary Public or some officer authorizedby law to take depositions. The deposition will be stenographically and video recorded and shall continue from day to day until completed, and may be continued in progress as necessary in order to accommodate other scheduled director depositions in the same time frame. For clarification to defense counsel, this deposition will be taken as if on cross examination.

Plaintiffs are taking said deposition according to the Federal Rules of Civil Procedure and said deposition shall be used for any purpose contemplated by the Federal Rules of Civil Procedure. Plaintiff reserves the right to conduct such further depositions and discovery from Nicholas K. Akins as may arise at a later date.

Pursuant to Fed. R. Civ. P. 30(b)(2), this notice is accompanied by a request to produce documents and tangible things under Rule 34.



PLAINTIFF'S EXHIBIT
Akins 1
7-2-24
PENGAD 800-631-6989

Respectfully submitted,

*/s/ Joshua M. Smith*
Peter A. Saba (0055535)
Joshua M. Smith (0092360)
STAGNARO, SABA
& PATTERSON CO., L.P.A.
2623 Erie Avenue
Cincinnati, Ohio 45208
(513) 533-2701
(513) 533-2711 (fax)
pas@sspfirm.com
jms@sspfirm.com

*/s/ John J. McHugh*
John J. McHugh, III
McHUGH & McCARTHY, LTD
5580 Monroe Street
Sylvania, Ohio 43560
(419) 885-3597
(419) 885-3861 (fax)

**Co-Counsel for Plaintiff Philip R. McHugh**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| **PHILIP R. MCHUGH,** | : Case No. 1:21-cv-00238 |
| Plaintiff, | : Judge Michael R. Barrett |
| v. | : |
| **FIFTH THIRD BANCORP, *et al.*,** | : **PLAINTIFF'S REQUEST FOR PRODUCTION OF DOCUMENTS** |
| Defendants. | : |

Pursuant to Fed. R. Civ. P. 34, Plaintiff Philip R. McHugh ("Plaintiff") hereby submits the following Request for Production of Documents Directed to Defendants Fifth Third Bancorp, Fifth Third Bank N.A. (jointly "Fifth Third"), and their Director Nicholas K. Akins. Plaintiff respectfully requests that Defendants provide responses to the offices of Stagnaro, Saba & Patterson Co., L.P.A., 2623 Erie Avenue, Cincinnati, Ohio 45208, **no later than thirty (30) days of the service of these Requests**.

Each of the following Requests for the Production of Documents shall be deemed continuing and Defendants and Director Nicholas K. Akins are requested, pursuant to Rules 26(a) and 26(e) of the Federal Rules of Civil Procedure, to provide, by way of supplementary answers thereto, such additional information as may hereafter be obtained by the Defendants or persons acting on their behalf.

## INSTRUCTIONS AND DEFINITIONS

1. These discovery requests must be answered in accordance with the requirements in and policies of Civ.R. 1, Civ.R. 11, Civ.R. 26 through 37, and any other applicable laws or rules. These requirements and policies include but are not limited to: effecting just results by eliminating delay, unnecessary expense, and all other impediments to the administration of justice; encouraging parties

to fully and thoroughly prepare and investigate their cases for trial and/or settlement; fairly responding to the substance of discovery requests without obfuscation or unjustified objection; fostering openness, honesty, and professionalism in litigation; and seeking truth. Consistent with this instruction, discovery requests should not be considered vague or unanswerable due to any grammatical, syntactical, typographical, capitalization, or semantic errors or idiosyncrasies, and all responses should fairly meet the substance of the discovery request.

2. In answering these Requests for the Production of Documents, Defendants and their Director are to divulge all information in their possession, custody, or control, or which are available to them, including information in the control of its attorneys, investigators, employees, agents or other representatives, or any other person or persons acting on its behalf.

3. Should Defendants deem as objectionable party, but not all, of any request to which an objection is made, it should consider the various parts and aspects of such request as being severable for that purpose. If any information is claimed as privileged or protected, please include a log identifying the nature of the claimed privilege or protection and the information or items claimed to be privileged.

4. Unless otherwise indicated, the scope of the requests for production of documents is the time period of January 1, 2015 to December 31, 2020.

5. Unless indicated to the contrary, "You" and "Your" shall refer to Nicholas Akins.

6. "Defendants" shall include Fifth Third Bancorp, Fifth Third Bank, N.A., Gregory Carmichael, and/or any person or entity acting on its or his behalf, including, but not limited to, officers, directors, attorneys, investigators, employees, agents, or other representatives.

7. "Director" shall include any individual who was a member of Defendants' Board of Directors during the scope of these requests.

8. "Officer" shall include any individual designated as an officer of Defendants during the scope of these requests, including, but not limited to, Defendant Gregory D. Carmichael, Robert Shaffer, or Timothy Spence.

9. "McHugh" or "Plaintiff" shall mean Plaintiff Philip R. McHugh.

10. "Document" or "documents" includes all written or graphic matter of every kind or description, however produced or reproduced, whether drafted or final, original or copy, signed or unsigned, and regardless of whether approved, sent, received, redrafted or executed, including but not limited to correspondence, letters, memorandum, summaries of conversations or telephone conversations, minutes or records of meetings, conferences or seminars, notebooks, diaries, desk calendar, contracts, agreements, preliminary and final reports, opinions or reports of consultants, projections, estimates, financial statements, bills, invoices, receipts, loan sheets, checks, checkbooks, purchase orders, change orders, confirmations, facsimiles, e-mails, text messages, telegrams, telexes, computer disks, digital or analog recordings, tape recordings, video recordings, photographs, drawings, charts, and plans. The term "document" means every document as above defined known to Defendant and in Defendant's possession, custody, or control or under the control of its agents, attorneys, employers, employees, or other persons related by total or partial common ownership and includes every such document which can be located or discovered by diligent effort.

11. "Document" also includes electronically stored information ("ESI"). Where possible, ESI should be produced in its native form, except that ESI which is only accessible through proprietary software that is not commonly available in office software suites should be produced in a readily accessible electronic form (such as PDF, Word or similar text document, or Excel or similar spreadsheet). By way of example only:

a. documents created using Microsoft Word must be produced as a .doc or .docx file;

b. documents created using Microsoft Excel must be produced as a .slx or. xlsx file;

c. documents created using Microsoft PowerPoint must be produced as .ppt or .pptx files; and

d. e-mails or outlook calendars must be produced as .msg or .pst files.

12. "Person" and "persons" include natural persons, corporations, companies, firms, proprietorships, partnerships, associations, joint ventures, government agency or organization, and any other type of legal entity, whether formal or informal.

13. The words "relate to", "relating to" or "related to" shall mean that which implicitly or explicitly refers to, concerns, reflects, embodies or in any manner describes the subject matter of the document request.

14. The words "Communications" or "Communicate" mean any correspondence, disclosure, transfer or exchange of information, whether oral or written, and whether in person, by telephone, mail, e-mail, telecopy, text message or other "Document" form, including but not limited to discussions, statements, negotiations, inquiries, requests, notices, responses, or demands.

## REQUEST FOR PRODUCTION OF DOCUMENTS

1. Communications (as defined above) between You and any other Director or Officer of Fifth Third which refers, mentions, or otherwise relates to:

a. Succession planning for the position of President and/or CEO of Fifth Third;

b. Identified and/or selected candidates for the position of President and/or CEO of Fifth Third;

c. Processes or timelines, whether proposed or final, with respect to the identification and/or selection of candidates for the position of President and/or CEO of Fifth Third.

d. Development of potential candidates for the position of President and/or CEO

of Fifth Third; and

e. Any facts upon which You or any other Director relied upon when identifying and/or selecting candidates for the position of President and/or CEO of Fifth Third.

f. Philip McHugh

g. Timothy Spence

**RESPONSE:**

2. Any Communications (as defined above) between You and Philip McHugh.

**RESPONSE:**

3. Any Communications (as defined above) between You and Timothy Spence.

**RESPONSE:**

4. All Documents created, received or obtained by You which refer, mention, or otherwise relate to:

a. Succession planning for the position of President and/or CEO of Fifth Third;

b. Identified and/or selected candidates for the position of President and/or CEO of Fifth Third;

c. Processes or timelines, whether proposed or final, with respect to the

identification and/or selection of candidates for the position of President and/or CEO of Fifth Third;

d. Development of potential candidates for the position of President and/or CEO of Fifth Third; and

e. Any facts upon which You or any other Director relied upon when identifying and/or selecting candidates for the position of President and/or CEO of Fifth Third.

f. Philip McHugh

g. Timothy Spence

**RESPONSE:**

Respectfully submitted,

*/s/ Joshua M. Smith*
Peter A. Saba (0055535)
Joshua M. Smith (0092360)
STAGNARO, SABA
& PATTERSON CO., L.P.A.
2623 Erie Avenue
Cincinnati, Ohio 45208
(513) 533-2701
(513) 533-2711 (fax)
pas@sspfirm.com
jms@sspfirm.com

*/s/ John J. McHugh*
John J. McHugh, III
McHUGH & McCARTHY, LTD
5580 Monroe Street
Sylvania, Ohio 43560
(419) 885-3597
(419) 885-3861 (fax)

**Co-Counsel for Plaintiff Philip R. McHugh**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was served on all counsel of record this ___ day of March, 2024 via the Court's CM/ECF system.

/s/ Joshua M. Smith
Joshua M. Smith (0092360)

# EXHIBIT 2

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 3

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 4

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 5

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 6

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 7

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 8

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 9

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 10

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 11

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 12

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 13

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 14

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 15

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 16

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 17

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

FIFTH THIRD BANK

# Unanimous Written Consent: Officer Appointment

October 21, 2020

PLAINTIFF'S EXHIBIT
Akins 18
7-2-24
PENGAD 800-631-6989

Classification: Restricted

FIFTH THIRD BANK

Fifth Third Bancorp & Fifth Third Bank, N.A.

## Board of Directors

### Unanimous Written Consent: Officer Appointment

TABLE OF CONTENTS


CEO Note Regarding Officer Appointment

Press Release

Unanimous Written Consent: Board of Directors*


** Denotes items requiring unanimous written consent.*

FIFTH THIRD BANK
**OFFICE OF THE SECRETARY**

FIFTH THIRD BANK

Dear Board Members:

As previously discussed in our talent management and succession planning sessions, we are executing on the plan to promote Tim Spence to President. The lines of business, regional banking and strategic planning will now report to Tim. We plan to announce this on Monday, October 26. Attached is a draft of the external release.

As Bob Shaffer and I discussed with you at the September Board meeting, we believed that Phil McHugh could be at risk with Tim's promotion. And, in fact, Phil has decided not to accept the role of Head of Consumer and Business Banking and is leaving the company. This is unfortunate as this is one of the largest roles we have. However, we have a very capable leader, Howard Hammond, who will serve as the interim Head of Consumer and Business Banking. Howard currently leads our Retail Banking business and Fifth Third Securities. As Howard has the opportunity to work in this role, we will also test the market and conduct an external search for this position.

Included with this message is a request for unanimous consent to approve the promotion of Tim to President. I appreciate your prompt approval as we will be announcing his promotion on Monday morning. I am very excited for Tim and look forward to working with him as he further develops in his new role. Please let me know if you have any questions.

Thanks,

Greg

© Fifth Third Bank | All Rights Reserved | For Internal Use Only

Classification: Restricted



Confidential

FIFTH THIRD BANCORP
NEWS RELEASE

***DRAFT 10/21/20***

October 26, 2020

CONTACTS
Ed Loyd (Media Relations)
email.address@53.com | 123-456-7890
Chris Doll (Investor Relations)
Christopher.Doll@53.com | 513-534-2345

## Fifth Third Announces Appointment of Timothy N. Spence as President

CINCINNATI – Fifth Third Bancorp (Nasdaq: FITB) today announced the appointment of Tim Spence as president. His promotion will support the Company's ongoing successful execution of its strategic initiatives and further strengthen its position as a leading regional bank.

In his new role, effective immediately, Spence will oversee all business lines and regional banking, while continuing his leadership of the Bank's strategy. It was Spence's strength in strategy that first brought him to Fifth Third in 2015. He led that area as chief strategy officer and then advanced in 2017 to head consumer banking and payments as well. Before joining Fifth Third, Spence was a senior partner in the financial services practice at Oliver Wyman, a global strategy and risk management consulting firm. Spence will continue to report to Greg Carmichael, the Company's chairman and chief executive officer.

"Tim has demonstrated extraordinary leadership and vision in driving the strategy and execution to transform Fifth Third through innovation and technology," said Carmichael. "Over the past several years, he has been a principal architect and catalyst of many of the Company's most important strategic initiatives. Those initiatives include organic growth investments, numerous partnerships with fintechs and other third parties, and the 2019 acquisition of MB Financial Inc. in Chicago – a move that dramatically changed the competitive landscape and positioned us for success in one of our most important markets. Tim is keenly focused on solutions that enable Fifth Third to best serve our customers – from individuals to small and large businesses – and help them achieve their goals."

Spence long has been heralded for his commitment to innovation and has helped the Bank significantly advance its digital transformation. In 2018, American Banker recognized him as Digital Banker of the Year, an award whose past honorees have included forward-thinking leaders from the nation's largest financial institutions. In addition to recognizing his many achievements to date, that award highlighted his customer-centric approach, which has been the hallmark of Spence's banking career.

Originally from the Pacific Northwest, Spence and his family make their home in Cincinnati. Spence devotes time to several local community and economic development organizations, including serving on the executive committee of the board at Cintrifuse, a public-private partnership that exists to build a sustainable tech-based economy in Greater Cincinnati, on the advisory board for Miami University's Altman Institute for Entrepreneurship, and as member and co-chair of the commerce committee for the

FIFTH THIRD BANCORP
NEWS RELEASE

Cincinnati Chamber's RESTART Taskforce. He also serves as a board member for the Consumer Bankers Association.

**About Fifth Third**

Fifth Third Bancorp is a diversified financial services company headquartered in Cincinnati, Ohio, and the indirect parent company of Fifth Third Bank, National Association, a federally chartered institution. As of September 30, 2020, the Company had $202 billion in assets and operates 1,122 full-service Banking Centers, and 2,414 Fifth Third branded ATMs in Ohio, Kentucky, Indiana, Michigan, Illinois, Florida, Tennessee, West Virginia, Georgia, North Carolina and South Carolina. In total, Fifth Third provides its customers with access to approximately 52,000 fee-free ATMs across the United States. Fifth Third operates four main businesses: Commercial Banking, Branch Banking, Consumer Lending, and Wealth & Asset Management. Fifth Third is among the largest money managers in the Midwest and, as of September 30, 2020, had $427 billion in assets under care, of which it managed $53 billion for individuals, corporations and not-for-profit organizations through its Trust and Registered Investment Advisory businesses. Investor information and press releases can be viewed at www.53.com. Fifth Third's common stock is traded on the NASDAQ® Global Select Market under the symbol "FITB."

###



Confidential

FIFTHTHIRD-MCHUGH-001220

**FIFTH THIRD BANCORP**

**UNANIMOUS WRITTEN CONSENT OF THE BOARDS OF DIRECTORS APPOINTING PRESIDENT**

**October 26, 2020**

The undersigned, being all of the Directors of Fifth Third Bancorp, an Ohio Corporation ("Bancorp"), in accordance with Section 1701.54 of the Ohio Revised Code, do hereby authorize, consent, and agree to the adoption, without a meeting, of the following resolutions through this unanimous written consent (this "Consent"), effective as of the date first set forth above:

**WHEREAS,** the members of the Board, in connection with succession and leadership planning, have discussed potential promotions and appointments to senior officer positions of Bancorp at previous meetings;

**WHEREAS,** the members of the Board have determined that it is appropriate to implement one such promotion and appointment at this time;

**NOW, THEREFORE**, it is hereby:

**OFFICER APPOINTMENT**

**RESOLVED**, that Timothy N. Spence be promoted and appointed to the position of President of Bancorp;

**GENERAL RESOLUTIONS**

**RESOLVED FURTHER,** that the officers of the Bancorp be, and each are hereby, authorized, directed and empowered to perform any and all other acts and things as in such officer's opinion may be necessary or appropriate in order to carry out the intent and purposes of the foregoing resolution with respect to the Bancorp; and

**RESOLVED FURTHER,** that any act of any Director or officer of the Bancorp and of any person designated or authorized to act by any officer of the Bancorp, which act would have been authorized by the foregoing resolutions except that such act was taken prior to the adoption of such resolutions is hereby ratified, confirmed, approved, and adopted as the act of the Bancorp.

[Remainder of page intentionally left blank. Signature page follows.]

Classification: Protected



Confidential

In Witness Whereof, the undersigned Directors have executed this signature page as of the date first set forth above in this Unanimous Written Consent.

Nicholas K. Akins October 22, 2020 3:38 PM

B. Evan Bayh III October 22, 2020 9:53 AM

Jorge L. Benitez October 22, 2020 6:27 AM

Katherine B. Blackburn October 21, 2020 9:05 PM

Emerson L. Brumback October 22, 2020 9:22 AM

Greg D. Carmichael October 22, 2020 6:41 AM

Linda W. Clement-Holmes October 21, 2020 7:17 PM

C. Bryan Daniels October 21, 2020 7:07 PM

Mitchell S. Feiger October 22, 2020 4:25 PM

Thomas H. Harvey October 21, 2020 11:04 PM

Gary R. Heminger October 22, 2020 6:00 PM

Jewell D. Hoover October 21, 2020 7:25 PM

Eileen L. Mallesch October 21, 2020 8:04 PM

Michael B. McCallister October 22, 2020 12:49 PM

Marsha C. Williams October 21, 2020 7:01 PM

Classification: Restricted



Confidential