UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

PHILIP R. MCHUGH,
Plaintiff,
vs.
FIFTH THIRD BANCORP, et al.,
Defendants.

CASE NO. 1:21-cv-00238

Videotaped Deposition of: BIRCH EVANS BAYH, III
Taken: By the Plaintiff
Pursuant to Notice
Date: February 13, 2025
Time: Commencing at 10:09 a.m.
Place: Fifth Third Center
511 Walnut Street
Cincinnati, Ohio 45202
Before: Wendy L. Raymer, RPR, CRR
and
Connie Ihle-Adkins, Videographer
Notaries Public-State of Ohio

APPEARANCES:

On behalf of the Plaintiff:

Peter A. Saba, Esq.
and
Joshua M. Smith, Esq.
and
Bailey E. Sharpe, Esq.
(Appearing via Zoom Videoconference)
of
Stagnaro, Saba & Patterson Co., L.P.A.
2623 Erie Avenue
Cincinnati, Ohio 45208
Phone: (513) 533-2701
Email: pas@sspfirm.com
jms@sspfirm.com
bes@sspfirm.com

On behalf of the Defendants and the Witness:

Michael L. Cioffi, Esq.
and
Collin D. Hart, Esq.
of
Blank Rome LLP
1700 PNC Center
201 East Fifth Street
Cincinnati, Ohio 45202
Phone: (513) 362-8700
Email: michael.cioffi@blankrome.com
collin.hart@blankrome.com

and

Phenise Poole, Esq.
and
Brian Thomas, Esq.
of
Fifth Third Bank
Fifth Third Center
511 Walnut Street
Cincinnati, Ohio 45202
Phone: (513) 629-2716
Email: Brian.Thomas@53.com

APPEARANCES: (CONTINUED)

Also Present:

Philip R. McHugh, Plaintiff

- - -

# I N D E X


| BIRCH EVANS BAYH, III | PAGE |
| --- | --- |
| Examination by Mr. Saba | 6 |
| Examination by Mr. Cioffi | 83 |
| Further Examination by Mr. Saba | 88 |

| EXHIBITS | MARKED | REFERENCED |
| --- | --- | --- |
| Plaintiff's Exhibit 1 | 10 | 10 |
| Plaintiff's Exhibit 2 | 24 | 25 |
| Plaintiff's Exhibit 3 | 27 | 27 |
| Plaintiff's Exhibit 4 | 47 | 47 |
| Plaintiff's Exhibit 5 | 53 | 53 |
| Plaintiff's Exhibit 6 | 65 | 65 |
| Plaintiff's Exhibit 7 | 68 | 68 |
| Plaintiff's Exhibit 8 | 69 | 69 |
| Plaintiff's Exhibit 9 | 73 | 73 |
| Plaintiff's Exhibit 10 | 76 | 76 |
| Plaintiff's Exhibit 11 | 81 | 81 |


\- - -

Page 5

THE VIDEOGRAPHER: We are on videotape record. Today is Thursday, February the 13th, 2025. The time is 10:09 a.m. We're here today to take the deposition of B. Evan Bayh, III, in the case styled Philip R. McHugh versus Fifth Third Bancorp, et al., United States District Court, Southern District of Ohio, Western Division, Case Number 1:21-cv-00238.

Would the attorneys now introduce themselves and state who they represent.

MR. SABA: Peter Saba on behalf of the plaintiff, Philip McHugh.

MR. SMITH: Joshua Smith on behalf of the plaintiff, Philip McHugh.

MR. CIOFFI: Michael Cioffi and Collin Hart from Blank Rome on behalf of the defendants. We also represent the witness, Senator Bayh, pursuant to a joint representation agreement.

Also representing the defendants and Senator Bayh are Brian Thomas and Phenise Poole, both lawyers, both lawyers working on this case at Fifth Third Bank.

THE VIDEOGRAPHER: Would the court reporter please swear in the witness?

Page 6

BIRCH EVANS BAYH, III,

of lawful age, a witness herein, being first duly sworn as hereinafter certified, was examined and deposed as follows:

EXAMINATION

BY MR. SABA:

Q. Mr. Bayh or Senator Bayh, what is your preference? I noticed Mr. Cioffi referred to you as Senator Bayh. Is that your preference?

**A. That sounds kind of honorific, Peter. You can call me Mr. Bayh. I don't stand on formalities.**

Q. If you could state your full name for the record, please.

**A. Yes. My full legal name is Birch Evans Bayh, III. I usually go by an abbreviation of my middle name, Evan, but as we just heard, I'm listed on the board as B. Evan Bayh, III.**

Q. And Bayh is spelled B-a-y-h; is that correct?

**A. Yes, sir.**

Q. Could I have your address, please?

**A. Yes. 781 Crandon, C-r-a-n-d-o-n, Boulevard, and that's in Key Biscayne, Florida, and the ZIP code is 33149.**

Q. How long have you lived there?

**A. Well, we've owned the place there for about 14 years. It's been my principal residence since my wife passed away about four years ago.**

Page 7

Q. Who do you live there with?

**A. Myself.**

Q. Have you had your deposition taken before?

**A. No. This is a first. I was thinking about -- the judge I clerked for allowed us to be bailiffs in the courtroom, so we got to be in the courtroom and see that, take care of the jury and all that.**

**And then when you're governor, which I was privileged to be for eight years, you get sued a lot by the inmates. They tend to file actions and so forth, but this is the first time I've ever been deposed.**

Q. So as a brief introduction, I'm going to be asking you a series of questions. If there's anything you don't hear or don't understand, please feel free to ask me to repeat or rephrase the questions.

For the sake of the court reporter, although we're taking this by video, I do need you to answer verbally. No shaking or nodding of the heads, or uh-uh or uh-huhs. It's difficult for her to take that down.

Additionally, if you can wait for me to finish my question before you answer, and I'll try to do the same before I ask you another question. It also makes for a clear record.

Page 8

**A. You would never make it in the media, Peter.**

Q. I don't think I would.

Do you understand those instructions?

**A. Yes, sir.**

MR. CIOFFI: Peter, before you begin, I think you have one other lawyer from your firm. Could you announce her and state whether there's anyone else participating by video?

MR. SABA: No. The only person participating by video is Bailey Wharton from our office.

MR. CIOFFI: Thank you.

BY MR. SABA:

Q. What did you do to prepare for today's deposition?

**A. Well, I thought a lot about it. And other than that --**

THE WITNESS: What am I allowed to say?

MR. CIOFFI: Yeah, I'll instruct him not to talk about any meetings we had. You can identify the fact that -- whether you met with us and your lawyers and that's --

THE WITNESS: That's it?

MR. CIOFFI: -- that's it.

THE WITNESS: So I met with counsel.

BY MR. SABA:
Q. Did you review any documents in preparation for today's deposition?
MR. CIOFFI: Objection. I'm going to instruct the witness not to answer to the extent he reviewed any documents that we supplied to him as his lawyers. If he reviewed other documents, I'm going to allow him to answer that question.
BY MR. SABA:
Q. Did you review any other documents other than what was supplied by your attorneys?
**A. No, sir.**
Q. Did you speak to any other board members about your deposition today?
**A. No.**
Q. Have you discussed this case with any of the other board members at Fifth Third?
**A. No.**
Q. Have you discussed this case with any other employees at Fifth Third?
**A. No.**
Q. Have you discussed this case with anybody outside Fifth Third?
**A. No.**



(Plaintiff's Exhibit 1 is marked for identification.)
BY MR. SABA:
Q. Senator Bayh, I've handed you what's been marked as Exhibit Number 1.
MR. CIOFFI: I'm going to object to the use of this exhibit because it was served on this particular witness, even though he's not a party, so it's improperly served on him.
Nevertheless, as you know, and I'll just state this for the record, the bank responded to it so that discovery wouldn't be held up, but it's improper service on him and this line of questioning.
Nevertheless, as we've done before, I'm not going to instruct him not to answer, so go ahead and question.
BY MR. SABA:
Q. Senator Bayh, along with a notice of deposition that was sent to you, we also sent a request for production of documents, which as Mr. Cioffi has indicated that he has responded to on your behalf, and we did want to ask you specific questions about those.
If I could have you turn to page 5 of Exhibit Number 1, please.



**A. The one that says Specific Objections and Responses?**
Q. That's correct. That's correct. And the first request sent to you was for you to produce communications between you and any other director or officer of Fifth Third, which refers, mentions, or otherwise relates to, and there's a number of things that are listed there.
And just for purposes of reference, the words "communications" or "communicate" mean any correspondence, disclosure, transfer, exchange of information, whether oral or written, and whether in person, by telephone, mail, email, telecopy, text message, or other document form, including but not limited to discussions, statements, negotiations, inquiries, requests, notices, responses, or demands.
The first item that's asked for is any communication "between you and any other director or officer at Fifth Third which refers, mentions, or otherwise relates to succession planning for the position of president and/or CEO of Fifth Third."
Do you have any of those documents?
**A. I do not.**
Q. Okay. The next request is -- and did you ever have those documents?



**A. No.**
Q. The next item listed is communications again "between you and any other director, officer of Fifth Third which refers, mentions, or other otherwise relates to identified and/or selected candidates for the position of president and/or CEO of Fifth Third."
Did you -- do you have any of those documents?
**A. No.**
Q. Have you ever had any of those documents?
**A. I have not.**
Q. The third item listed is "Processes or timelines, whether proposed or final, with respect to the identification and/or selection of candidates for the position of president and/or CEO of Fifth Third."
Do you have any of those documents?
**A. No.**
Q. Have you ever had any of those documents?
**A. No.**
Q. Okay. Were there ever communications between you and any other director or officer of Fifth Third regarding succession planning for the position of president and/or CEO of Fifth Third Bank?
**A. No. I assume you don't mean during the succession planning meetings that we have annually and that sort of thing where the board will discuss those**

**topics, but --**
Q. Outside those board meetings, were there any communications with other board members?
**A. No.**
Q. Outside those board meetings, were there any communications regarding identified and/or selected candidates for the position of president and/or CEO of Fifth Third?
**A. No.**
Q. Outside those board meetings, were there any communications between you and any other board members regarding processes or timelines, whether proposed or final, with respect to identification and/or selection of candidates for the position of president and/or CEO of Fifth Third?
**A. No.**
Q. Outside your board meetings with other directors, were there any communications between you and other board members regarding development of potential candidates for the position of president and/or CEO of Fifth Third?
**A. I'm thinking about your question. Did board members ever discuss? I have no documents along those lines, no.**
Q. Do you recall discussions outside board



meetings regarding development of potential candidates for the position --
**A. No, I don't.**
Q. -- of president and/or CEO of Fifth Third?
**A. No. I'm trying to be responsive to your question, searching my memory.**
Q. Okay. Do you have any communications between you and any other directors or officers of Fifth Third which refers, mentions, or otherwise relate to Phil McHugh?
**A. I do not.**
Q. Do you have any communications between you and any other director, officer of Fifth Third which refers, mentions, or otherwise relates to Timothy Spence?
**A. No.**
Q. Did you ever have any communications with any other board members outside any board meetings regarding Phil McHugh?
**A. No.**
Q. Did you ever have any communications with any other board meetings outside -- excuse me -- with any other directors outside of board meetings regarding Tim Spence?
**A. No.**
Q. Did you have any communications between you



and Phil McHugh?
**A. No.**
Q. Did you ever have any communications with Philip McHugh?
**A. I don't believe so, no.**
Q. Did you have any communications between yourself and Timothy Spence?
**A. Have I ever talked to Tim Spence?**
Q. Did you have any -- well, let me first refer to this.
Prior to January 1st of 2020, did you have any communications with Tim Spence outside any Fifth Third board meetings?
**A. No.**
Q. What's the extent of your education?
**A. Well, I graduated from secondary school, from a school called St. Albans School for boys. It's in Washington, DC.**
**I then got my undergraduate degree from the business school at Indiana University, and then I went on and got my law degree from the University of Virginia.**
Q. And as referenced earlier, the bulk of your career has been spent in politics; is that correct?
**A. Well, I spent 22 years in elected office.**



**Politics is a part of that. I prefer to think of it as public service, but I guess that's getting a little semantical but, yeah, I was in elected office for 22 years and other than that, have been law and business and a variety of other things.**
Q. Which offices did you hold?
**A. The first office I was privileged to be elected to was secretary of state of Indiana. I served in that from December of 1986 until January of 1989. In November of '88, I was privileged to be elected as governor of our state, and I served in that office from January of -- it would have been '89 to January of '97.**
**I was then in the private sector for two years and in November of -- gosh, this is a walk down memory lane here -- November of '98 was elected to the United States Senate. Was reelected to the United States Senate six years later in November 2004, and then I retired from the United States Senate in January of 2011. Wow, that's -- you're testing my memory here today, sir.**
Q. You did a nice job. Those match with all my notes.
And did you run again for office subsequent to your retirement?
**A. I did, and was unsuccessful in that election.**

Page 17

**That would have been for the United States Senate in 2016 -- yeah, 2016.**

**So as my father once said -- my father had the privilege of serving in the senate for three terms and lost his last election -- at his election eve to thank all his supporters, he said, I want to thank more than a million of my fellow citizens for encouraging me to take up the practice of law. And I had a similar experience.**

Q. And with respect to that, what was your employment after you retired from the senate?

**A. Well, I became a senior adviser at a sizable financial institution called Apollo Global Management. I became a partner in the law firm of McGuireWoods, and then was selected to be a member of the board on several publicly-traded companies, including Fifth Third Bank, which has brought us here today.**

Q. On which boards do you currently hold a seat?

**A. In addition to Fifth Third Bank, Marathon Petroleum. And that's Marathon Petroleum, not Marathon Oil. People sometimes mistake those two, but Marathon Petroleum is headquartered in Findlay, Ohio. And I'm on the board of RLJ Lodging Trust, which is a REIT comprised of hotels.**

**And I'm on the board of directors of a company called Berry Global, which is headquartered in**

Page 18

**Evansville, Indiana.**

**To be fulsome in my response, we recently voted to merge Berry Global with a large international company called Amcor, that's A-m-c-o-r. It has not been finally approved by the shareholders yet, but if it is, Berry Global will be subsumed into Amcor upon that event.**

**Of course if the merger does not go forward for some reason, Berry would continue as an independent entity and I hopefully would remain on that board. But the reason I'm giving you that detail is it's possible sometime later this year, Berry will go out of existence and I will no longer be serving on that board of directors.**

**Those are the publicly-traded companies. I do serve on one private board. It's called Lifepoint. It's headquartered in Nashville, Tennessee. But as I mentioned, it's not -- not publicly traded.**

Q. When did you receive your board seat at Fifth Third?

**A. As best I can recall, it would have been around July, somewhere in there, the middle of 2011.**

Q. What is your understanding of the executive succession process for president and CEO of Fifth Third Bank?

Page 19

**A. Well, it's a very important part of our responsibilities. As a matter of fact, I think in addition to long-term strategic planning and that sort of thing, selecting the CEO is maybe the most important responsibility of the board.**

**So we have an annual meeting that's usually in December where we spend most of an entire board meeting going over the succession planning process, not only for CEO, but for the other top positions in the bank, hopefully grooming people for those positions so that we'd have some depth of talent at the bank. And it's -- it's an important responsibility of the -- of any large enterprise, but particularly at the bank for the board.**

Q. Did Fifth Third notify employees that there would be a position opening for president and CEO of the bank?

**A. I --**

MR. CIOFFI: Objection. Lack of foundation. But if you know, you may answer.

THE WITNESS: I don't recall.

BY MR. SABA:

Q. Do you ever recall seeing a notice going out that Fifth Third would have an opening for president and CEO to put --

MR. CIOFFI: Objection.

Page 20

BY MR. SABA:

Q. -- employees on notice?

MR. CIOFFI: Asked and answered, but you may answer.

THE WITNESS: Well, no, but at some point Greg Carmichael announced he was stepping down, so one might infer from that there was going to be an opening in the CEO's position, but I don't recall there was a specific announcement separate from Greg's announcement that he was going to be retiring.

BY MR. SABA:

Q. When did Greg Carmichael announce that he was retiring?

**A. I don't recall. Would that have been in 2020? I don't recall. I'm sorry.**

Q. How was that announcement made?

**A. As I said, I don't recall. I don't recall whether there was an announcement or how that came about, but at some point it became a matter of public knowledge that Greg was retiring.**

Q. And you don't know how that became public knowledge; is that correct?

**A. No, sir.**

Q. And just to be clear, you don't recall if

there was an actual announcement of his retirement; is that right?
**A. I do not.**
Q. Was there a formal mechanism by which employees could apply to be president and CEO of Fifth Third?
**A. A formal mechanism? Not that I know, but I assume that people can communicate with the human resources department if they've got an interest like that, just like they could apply for any other position.**
**I'm not being facetious. Obviously, not anybody is just going to apply to be the CEO, but I don't -- I frankly don't know if there's a formal mechanism where you go to apply to be CEO.**
Q. How many times have you been involved in the process of selecting a new president and CEO at Fifth Third Bank?
**A. Well, let's see. We went from Kevin Kabat, who was the CEO when I joined the board to Greg Carmichael, and now we've gone from Mr. Carmichael to Mr. Spence, our current CEO. So those were the two transitions I was involved in.**
**I've been involved in other transitions with my -- the boards I've been on but, you know, also, when you're governor of a state, it's kind of like being the**


**CEO of a state.**
**And so I've been responsible for selecting department heads and things like that on many, many occasions. So there's some analogies there. It's not exactly the same.**
Q. Greg Carmichael became president of Fifth Third Bank in 2015; is that correct?
**A. I'll trust your statement on that.**
Q. What --
**A. That sounds about right. I can't recall precisely when Kevin stepped down and Greg stepped in, but that sounds about like the right time frame.**
Q. What do you recall about that process?
**A. Not much, frankly. You know, Greg had been our -- in the technology, our head of technology. He presented to the board on numerous occasions, but I don't recall the precise details of the succession there.**
**I think, you'd have to check me on this, I'm sure you'll correct me if I'm in error, but I do think -- I think we may have hired the same outside adviser to assess the situation. I could be wrong on that, but I seem to recall that maybe the same firm was involved in that succession that we then later retained to advise the board about the succession when**


**Mr. Carmichael decided to retire.**
Q. That group you're referring to, is that RHR International?
**A. That sounds right, yes, sir.**
Q. And why was RHR International hired by the board?
**A. That I couldn't say.**
Q. What role did RHR International serve?
**A. They do usually a market survey to assess -- well, they can go one of several ways, and I don't recall exactly how it went with regard to Mr. Carmichael, but what they'll usually do is do a full -- a fulsome assessment of an individual.**
**If you're putting an individual forward to be considered, they'll assess their various strengths, and I think they sometimes refer to opportunities for improvement. We all have those, interesting euphemism. And then occasionally they'll do a market search outside to see is there an outside candidate that might be suitable for this, and there've been some other boards I've been on where you go through a lot of those.**
**But all those being equal, it's usually better to select someone from inside if that person is, in the judgment of the board, has what it takes to be the CEO.**
**So -- but that's -- that's -- the consultant**


**does a couple things. It assesses any internal candidate and it brings you external candidates, and the board can use that to supplement its own evaluation. It's nice -- it's like a belt and suspenders. You know, we all at least know the inside candidates, but it's nice to have a third-party from outside come in and give us the benefit of their thinking, too, just to double-check.**
Q. Who are the internal candidates that the board considered for president at Fifth Third Bank in 2015?
**A. Other than Mr. Carmichael, I don't recall.**
Q. Were there any other candidates considered other than Mr. Carmichael?
**A. I don't recall that either.**
Q. Did the board have RHR International assess any other candidates other than Mr. Carmichael in 2015?
**A. I have no memory of that.**
THE WITNESS: Are we done with this document, sir?
MR. SABA: If you can just keep it there. We may refer back to it. Thank you.
(Plaintiff's Exhibit 2 is marked for identification.)
THE WITNESS: Thank you.

Page 25

BY MR. SABA:
Q. Senator Bayh, I have handed you what has been marked as Exhibit Number 2, which is Bates stamped -- if you look at the bottom right-hand corner when I refer to Bates stamps, those are the numbers you see in the bottom right-hand corner on each page of the document?
**A. Uh-huh.**
Q. Exhibit 2 is Bates stamped Fifth Third-McHugh 005707 through Fifth Third-McHugh 005711; is that correct?
**A. 00571, yes, sir.**
Q. Have you seen Exhibit Number 2 before?
**A. Let's see here. Not that I recall. It's possible. I assume this was shown to the board -- this was involving the Carmichael succession?**
Q. This document is dated February 2015, if you look at the first page.
**A. Right. No, I don't recall seeing this document, but if they were presenting to the board and using this document, I assume that they must have shown us this. But I have no active memory of it.**
Q. Do you recall a winning formula being developed for president and chief operating officer of Fifth Third Bank in 2015?
**A. No. Oh, I see, I'm just -- I'm leafing through it here as we're talking.**

Page 26

MR. CIOFFI: Yeah, take your time, read it.
THE WITNESS: Well, so essential leadership behaviors and -- yeah. So was this the document that they gave us kind of outlining for us what the process they were going to go through and the things that they think we should look for?
BY MR. SABA:
Q. So unfortunately I'm the only one that gets to ask questions today, but --
**A. Okay. Well, I was hoping you might refresh my memory here a little bit.**
Q. We'll --
**A. This looks to me like, you know when you hire one of these firms, they give you one of these things and it's, you know, basically it's what I would call aspirational. It's if you could find the ideal, you know, human being, what would that person look like? And that sounds -- this looks like that's one of those things.**
Q. Do you know how this profile was developed back in 2015?
**A. No, I do not.**
Q. Do you know who was involved with the development of this profile from Fifth Third Bank back in 2015?

Page 27

**A. I do not.**
MR. CIOFFI: By way of objection, I'll note for the record the document speaks for itself and answers many of those questions, but be that as it may, let's continue.
(Plaintiff's Exhibit 3 is marked for identification.)
THE WITNESS: Thank you.
BY MR. SABA:
Q. Senator Bayh, I've handed you what's been marked as Exhibit Number 3. Again, this is Bates stamped Fifth Third-McHugh 006552 through Fifth Third-McHugh 006554.
**A. Yes.**
Q. This document is titled Enterprise DDI Competencies, dated October 2015. Do you recall seeing this document before?
**A. I do not.**
Q. Referring to the second page of Exhibit Number 3, it's titled Enterprise Leadership Team Individual Competency Ratings; do you see that?
**A. Yes.**
Q. And it references three categories, Development Focus, CEO Job Profile, Target Strength to Leverage; do you see that?

Page 28

**A. Yes. From left to right, yes.**
Q. Do you have any idea why these enterprise DDI competencies were being evaluated for each member of the enterprise committee back in October of 2015?
MR. CIOFFI: Objection to the form of the question. Assumes facts not in evidence, lack of foundation. No one has testified in this case at all that they were being evaluated. This witness has testified he hasn't seen the document before, but that's my objection.
THE WITNESS: So the answer is no, I have no idea. I mean, I can guess, but I don't -- I'm not sure I'm here to guess.
MR. CIOFFI: I'll instruct the witness not to guess and not to speculate.
THE WITNESS: But no, I have no knowledge of how this is put together or --
BY MR. SABA:
Q. Do you know who at Fifth Third would have been involved in the preparation of this document?
**A. No. I assume it would have been the human resources department, but I have no direct knowledge.**
MR. CIOFFI: Again, I'm going to instruct the witness --

Page 29

THE WITNESS: Sorry about that.
MR. CIOFFI: -- not to assume, not to guess, not to speculate.
THE WITNESS: You've got a rogue witness on your hands here. Sorry about that.
MR. CIOFFI: Testify based on what you know.
BY MR. SABA:
Q. Prior to January 1, 2020, what is your understanding of Phil McHugh's role at Fifth Third Bank?
**A. January 1st of 2020. Well, Phil had been in a variety of capacities, wealth management, consumer regions. I think Phil had been at the bank substantially before I arrived, but he had been in a variety of executive capacities.**
Q. How often would you meet with Phil McHugh prior to January 1, 2020?
MR. CIOFFI: Objection. Is there any time frame limit on that?
BY MR. SABA:
Q. Any time prior to January 1, 2020?
MR. CIOFFI: Again, by way of objection, inside board meetings, outside board meetings, board dinners?
BY MR. SABA:
Q. Any time.

Page 30

**A. Well, I don't have an exact memory, but it would have been in conjunction with board meetings, board dinners, formal activities surrounding the board of -- the functioning of the board of directors.**
Q. Prior to January 1, 2020, did you ever meet with Phil McHugh outside any of those events in conjunction with board meetings?
**A. Not that I recall.**
Q. How frequently would you communicate with Phil McHugh outside of board meetings prior to January 1, 2020?
MR. CIOFFI: Objection. Asked and answered. But --
THE WITNESS: Not that I recall.
BY MR. SABA:
Q. Other than board meetings, did you ever observe Phil McHugh in the workplace at Fifth Third?
**A. Did I ever observe him?**
Q. Yes, in the workplace.
**A. I would have interacted with Phil and observed Phil only in my capacity as a member of the board and during official board functions or informal board functions like, you know, dinners or receptions. You know, occasionally we'll visit an off-site location, that sort of thing.**

Page 31

Q. Did you ever -- when did you visit an off-site -- you said for board meetings you'd visit an off-site location?
**A. Yeah. And I can't recall exactly when we implemented this. Maybe it's been more recently, but in recent years. And I honestly can't recall whether it's since Phil left or previous to Phil leaving.**
**We'll usually take one meeting a year and go to -- this last year was Nashville, the year before that was Chicago. So we'll visit one of the regions that we serve.**
Q. Did you ever meet with or interview any of Phil McHugh's direct reports or subordinates prior to January 1, 2020?
**A. We might have heard from them occasionally during board meetings, but other than that, no.**
Q. So just to be clear, you never would have had any discussions with any of Phil McHugh's direct reports or subordinates about Phil McHugh, correct?
**A. No.**
Q. Did you participate in or perform any of Phil McHugh's annual reviews or midyear reviews?
**A. No.**
Q. Did you ever see or review any of the materials from Phil McHugh's midyear or annual reviews?

Page 32

**A. Well, I referenced earlier the annual succession planning meetings that we have, which is -- recently has been in December. It's usually the end of the year. And materials of that nature, not just for Phil, but for some of the other executives, might have been circulated, might have been seen.**
**I have no specific memory, but it's possible during one of those things. And it would have been singling out Phil, it's -- I might have seen something during those times, but I have no memory of it. Sorry. I guess I'm not supposed to speculate.**
MR. CIOFFI: Again, I'll remind the witness not to speculate, not to guess. Only based on what you know.
THE WITNESS: Okay.
BY MR. SABA:
Q. As you sit here today, you don't know if you saw any materials from Phil McHugh's annual or midyear reviews, correct?
**A. I do not.**
Q. Did you ever review Phil McHugh's employee engagement surveys?
**A. No.**
Q. Did you ever review Phil McHugh's customer experience surveys?

Page 33

**A. No.**
Q. Did you ever review Phil McHugh's financial performance relative to goals for his divisions?
**A. No.**
Q. Did you ever see income statements and balance sheets specifically broken out for the divisions managed by Phil McHugh?
**A. No.**
Q. Do you recall any specific criticisms of how the divisions Phil McHugh was managing or performing during the time that Phil McHugh was managing those areas?
**A. No.**
Q. During the time that you were on the board prior to October 2020, how frequently would Phil McHugh attend board meetings?
MR. CIOFFI: Objection to the form of the question. It's confusing. You said prior to the time you were on the board in 2020. He came on the board in 2011. Your question is unclear. Could you rephrase it?
MR. SABA: I'll rephrase.
BY MR. SABA:
Q. Do you know the question or would you like me to rephrase?

Page 34

**A. I think you're asking me how often did Phil appear before the board?**
Q. Correct. Correct.
**A. Regularly. I can't recall with precision how many times, but it would have been, you know, regularly.**
Q. And when you say "appear before the board," that means more than just attending a board meeting, he would do presentations at a board meeting?
**A. Yes. Again, I don't recall with precision. This goes back many years and a lot of meetings, but many of the meetings Phil would have presented. There might have been some, a handful, where he was in attendance but didn't present for some reason. But, you know, ordinarily Phil would be there and presenting in some fashion.**
Q. During the period from June of 2015 through October 2020, who would have determined which members of the enterprise committee would attend board meetings?
MR. CIOFFI: Objection. Lack of foundation. This witness doesn't have the basis of knowing, but --
THE WITNESS: I don't know.
BY MR. SABA:
Q. Do you know who would determine which members of the enterprise committee would make presentations at

Page 35

board meetings?
MR. CIOFFI: Objection. Same objection.
THE WITNESS: No.
BY MR. SABA:
Q. Prior to January 1, 2020, did you ever discuss with Greg Carmichael the topic of Phil McHugh succeeding Carmichael as president and CEO of Fifth Third?
**A. No.**
Q. Prior to January 1, 2020, did you ever discuss with any other members of the board the topic of Phil McHugh succeeding Greg Carmichael as president and CEO of Fifth Third?
**A. No.**
Q. As of January 1, 2020, who were the candidates that were being considered for replacing Greg Carmichael as president and CEO of Fifth Third Bank?
MR. CIOFFI: By way of objection, you said before 2020?
MR. SABA: As of.
MR. CIOFFI: What does that mean? Before?
MR. SABA: As of that date.
MR. CIOFFI: As of January 1, 2020, on that date? Prior to that date? You know there's a meeting in December. Why don't you just ask him about that?

Page 36

BY MR. SABA:
Q. I'll ask this question first. As of January 1, 2020?
**A. By the way, I should have asked this previously, but I've been looking at you. Do I need to look at the camera when I'm answering your questions or should I look at you?**
Q. You can look whichever way you want. It's up to you. There's no rule.
**A. There's not a customary thing?**
Q. No.
**A. Okay. Well, I think there -- you know, there are these annual succession planning meetings, and in the course of those, there will usually be a discussion, occasionally a document, that will itemize people who might be considered to be potential CEO candidates for succession some day. But precisely -- so you're asking me about January, which would have been after the --**
Q. December 2019 board meeting, correct.
**A. Right. So, you know, clearly Tim Spence was considered to be a very able person who had the potential to be a successful CEO some day, that I do know.**
**There may have been other people, and normally what they'll say is -- and for all positions, not just**

Page 37

**CEO, they'll say who's the current person? And then is there somebody who can step in immediately if that person is kind of hit by a bus, to use the unfortunate but common term for an emergency.**

**And then, okay, if -- after that person, who in the organization would be capable of developing to the point where they could step in as -- into that role? And so we do that for most of the major roles and do that for CEO.**

**So I do remember Tim Spence was on the list. There might have been others, but I do remember Tim was on there.**

Q. Do you recall any other names, as you sit here today?

MR. CIOFFI: Objection. The deposition is not a memory test. You've used this document before the December 17, 2019, which does list various names, including board members.

But, again, I'm going to object. It's not a memory test. The information exists.

BY MR. SABA:

Q. Go ahead. Do you recall any other names?

**A. The only other name that might come to mind was a Brian Lamb, but Brian would have been listed with a longer period of development than -- than Tim Spence.**

Page 38

**Brian was very talented. It was unfortunate that he was hired away.**

Q. Prior to January 1, 2020, how often did you meet with Tim Spence outside of any board meeting settings?

MR. CIOFFI: Objection. Asked and answered.

THE WITNESS: I didn't.

BY MR. SABA:

Q. Other than board meetings, did you ever observe Tim Spence in the workplace at Fifth Third prior to January 1, 2020?

**A. No.**

Q. Did you ever meet with or interview any of Tim Spence's direct reports or subordinates prior to January 1, 2020?

**A. No.**

Q. Prior to January 1, 2020, did you ever participate in any of Tim Spence's annual or midyear reviews?

**A. I think I know what you're asking, and the answer is no. Again, at the succession planning meeting at the end of every year, you're discussing the top executives and you discuss in general how they're doing and there's some back and forth and all of that, but other than that, no.**

Page 39

Q. Did you ever see the materials from Tim Spence's annual reviews or midyear reviews prior to January 1, 2020?

**A. No.**

Q. Did you ever review Tim Spence's employee engagement surveys prior to January 1, 2020?

**A. No.**

Q. Did you ever review Tim Spence's customer experience surveys prior to January 1, 2020?

**A. No.**

Q. Did you ever review Tim Spence's financial performance relative to goals for his divisions prior to January 1, 2020?

**A. No.**

Q. Did you ever see income statements and balance sheets specifically broken out for the divisions managed by Tim Spence prior to January 1, 2020?

**A. No.**

Q. Prior to January 1, 2020, did you ever discuss Tim Spence with Greg Carmichael outside of a board seat -- excuse me, setting?

**A. No.**

Q. As of January 1, 2020, why wasn't Phil McHugh considered by the board as a candidate to replace Greg Carmichael as president and CEO of Fifth Third Bank?

Page 40

MR. CIOFFI: Objection to the form of the question. Lack of foundation.

THE WITNESS: Well, it's a complex analysis and it's a complex question.

So your specific question was about Phil, not about Phil compared to Tim? Because it's a choice, right? You're not just, you know, looking at people in a vacuum.

BY MR. SABA:

Q. So was Phil compared to Tim?

**A. Well, actually, let me retract that. No, I don't think Phil -- Phil was never considered to be on the track to be a potential CEO at the bank.**

Q. Why was Phil never considered on the track to be a potential president and/or CEO of Fifth Third Bank?

**A. Well, you know, again, I'm not here to say bad things about Phil. I like Phil. But the general feeling, and I think maybe the unanimous feeling of the board, was that he had performed the functions that he had been assigned in a, you know, a good manner, but did not have the attributes necessary to be an effective or permanent CEO of the bank. And, you know, again, that's a complex process you go through.**

**Again, I analogize to when I was governor. I had people who were the head of department of**

**transportation. I had people who were the head of the department of environmental management, emergency response, state budgeting, et cetera, et cetera, et cetera. They were good people. And very often they'd be doing a good job, but none of them had what it took to be governor.**

**So it's somewhat analogous to that. So the general consensus was that Phil was fine as hitting the wealth management and the other responsibilities that he had, but he didn't have the other attributes that we were looking for in a successful CEO, but that Tim Spence did.**

Q. What were the other attributes that Phil McHugh did not have to be president and CEO of Fifth Third Bank?

**A. So, again, sir, it's a complicated situation, and when you're choosing a CEO, it's not really reducible to a mathematical formula or, you know, just strictly quantitative analysis. A number of intangibles played an important role. Someone's strategic thinking.**

**You know, the industry's going through a period of rapid change right now. And so does someone have a real understanding of potential M&A activities out there? How the, you know, combinations might work going forward. That's going to be very important for an**



**institution like Fifth Third.**

**Technology is rapidly transforming the financial services landscape. What role can that play for the bank and how is that going to affect our traditional way of operating? Communication skills, leadership style. You know, all those sorts of things.**

**And it's -- you know, can somebody sort of command the room, I guess would be one way to put it, inspire, you know, confidence in the board of their employees and that sort of thing.**

**And it was the judgment of the board, I think unanimously, that Tim was exemplary in those respects and that, you know, Phil had performed well in his current capacity, but did not have those attributes sufficient to be the CEO one day.**

Q. What was the objective basis for determining that Phil did not have the attributes of being aware of potential M&A activity?

**A. Well, again, we put -- we hired -- let's step back for a second.**

**We hired Tim Spence and brought him in around the time of the M&B transaction. So by virtue of his work in consulting, he was very, very knowledgeable about the merger landscape within the banking sector. And, in fact, had consulted with several other major**



**financial institutions, and so he was very, very knowledgeable.**

**You know, Phil had never -- I'm trying to think of how best to say this. Tim was very, very -- he's one of the best. I mean, one of the best nationally, and I think the firm we hired said he was what, top quartile. So he was just exemplary in this regard.**

**Same thing with technology, just exemplary. And, you know, Phil had never had an opportunity perhaps to present at that level, but he just had not demonstrated that knowledge.**

Q. What about with respect to technology? What is your objective basis for saying that Phil lacked the attributes for addressing technology at Fifth Third Bank?

MR. CIOFFI: Objection. Asked and answered. He didn't demonstrate any of those skills, but you can answer if you have something else to say.

THE WITNESS: Well, again, you know, Tim is just exceptional with regard to that. Understands it in, you know, pretty granular detail. And Phil had never been able to present to the board those kind of -- those kind of skills. So it's hard for me to -- yeah, Tim was exemplary and Phil had never



really demonstrated that at the board.

BY MR. SABA:

Q. And you say "demonstrated that at the board," meaning during board meetings; is that correct?

**A. Yes.**

Q. And what about with respect to communication skills? What is the objective basis for why Phil McHugh lacked the communication skills to be president and CEO of Fifth Third Bank?

MR. CIOFFI: Again, asked and answered, but please continue.

THE WITNESS: Well, I don't want to be overly semantical about it, but, you know, when you're taking -- selecting a CEO, you know, a little bit like sometimes in public life, you're voting for a president or for a governor or something like that, an element of, for lack of a better term, charisma, the ability to inspire people, is important. And Tim is very good at that.

Phil made good presentations to the board. I think they can be described as, you know, fairly workmanlike and that sort of thing, but just not, you know, with the charismatic leadership that ideally you're going to have in the leader of a large institution.

Page 45

BY MR. SABA:
Q. And that's based purely upon presentations made during board meetings; is that correct?
**A. Yes, sir.**
Q. What about with respect to leadership skills? What is the objective basis for your indication that Phil lacked the attribute of leadership skills necessary to be president and CEO of Fifth Third Bank?
MR. CIOFFI: Again, same objection, asked and answered, but please continue.
THE WITNESS: Well, just through, you know, observations of his presentations at board levels and that sort of thing. And, again, Tim is just exemplary at that sort of thing.
And I do think that what I'm conveying to you here, as far as I know, I'm not -- as I indicated initially, not communicated with any of the board members about it -- but I think the, sort of the succession planning and the ultimate selection of Mr. Spence and the fact that Phil was on the sort of break the glass emergency only category, was not on the chart for development as a successful CEO, shows that that was the unanimous feeling of the board.

Page 46

BY MR. SABA:
Q. Again, you're basing that determination on presentations made during board meetings, correct?
**A. Yes, sir.**
Q. Okay. And the document you're referring to about Phil being an emergency successor, was that in the talent deck or document that's referred to as the talent deck?
**A. I can't recall. It would have been shown and discussed during the annual succession planning meeting.**
Q. The other attribute you identified that Phil lacked with respect to having enough to be the president and CEO of Fifth Third Bank was command the room. What is the objective basis for that determination?
**A. It would be the same as my response to your question about leadership.**
Q. And, again, that's based upon presentations made during board meetings, correct?
**A. Yes.**
Q. Were you aware that as of August of 2019 there was a chance that Greg Carmichael would have to step down earlier than his desires or the board's desires would have been?
MR. CIOFFI: Objection. Lack of foundation.
THE WITNESS: I'm sorry. There were some ruffling papers over here. Can you repeat the question?

Page 47

MR. SABA: Certainly.
BY MR. SABA:
Q. Were you aware that as of August 2019, there was a chance that Greg Carmichael would have to step down earlier than his desires or the board's desires would have been?
**A. No.**
(Ms. Poole leaves the deposition room.)
(Plaintiff's Exhibit 4 is marked for identification.)
THE WITNESS: Thank you.
BY MR. SABA:
Q. Senator, I've handed you what's been marked as Exhibit 4, which is Bates stamped Fifth Third-McHugh minutes 000266 through Fifth Third-McHugh minutes 000283; is that correct?
**A. It looks like it. Let me leaf over here. Yes, yes, uh-huh.**
Q. Let me represent to you this is a document titled Fifth Third Bank Minutes of Meeting of the Board of Directors December 17, 2019.
Have you seen these minutes before?
**A. Well, we -- at every board meeting we review and approve the minutes from the previous board meeting. So I assume I would have seem it in that context. But other than that, no.**

Page 48

Q. If I can refer you to the second page of Exhibit Number 4, please, Fifth Third-McHugh minutes 000267?
**A. 267?**
Q. Correct.
**A. Yes.**
Q. And the first full paragraph just below the halfway point of the page reads, "Thereafter Mr. Carmichael and Mr. Shaffer initiated review of potential success and timelines and candidates for the chief executive officer position."
Do you see that?
**A. I do.**
Q. "They reviewed top succession candidates, including Mr. Spence, and discussed the potential timelines for their readiness and key development priorities for each such candidate."
Do you see that?
**A. I do.**
Q. Who were the candidates that Mr. Carmichael and Mr. Shaffer discussed with the board?
**A. Well, my old grammar professor, Ferdinand Ruge**

Page 49

**at St. Albans School, would give you a demerit to whoever put this together because I think there's an error here. It should have been candidate, not candidates. And so I think the candidate that was discussed was Mr. Spence.**

Q. Was Mr. Lamb discussed at all?

**A. I don't recall. I don't recall when Brian was hired away.**

(Ms. Poole enters the deposition room.)

BY MR. SABA:

Q. Going down two sentences, in the middle of that paragraph, it reads, "In addition, in response to additional director questions, Mr. Carmichael and Mr. Shaffer discussed details of development priorities and planning to cultivate internal candidates for the role and expected timelines for completion of such development plans and candidate readiness."

Do you see that?

**A. I do.**

Q. With respect to that sentence, do you recall who the candidates are that Mr. Carmichael and Mr. Shaffer were discussing?

**A. No, but, again, I think that the use of the word -- the plural candidates is probably mistaken. It was probably just Mr. Spence, but I don't recall**

Page 50

**exactly.**

**Let me read the sentence here for just a second here. I'm trying to find it. In addition -- where --**

THE WITNESS: Mike, can you show me what --

MR. CIOFFI: Take your time. If you read the whole -- read that whole section.

THE WITNESS: Oh, here it is. In addition -- yeah, that's just a general statement, which, again, to the best of my recollection, probably referred solely to Mr. Spence. That's the best of my recollection.

BY MR. SABA:

Q. Had the board determined at that point in time --

**A. But sometimes there is a discussion, you know, is there anybody else? And if there's nobody else, then you say well, are we going to have to look outside for some potential successors?**

**So that -- there may have been some discussion along those lines, but I don't recall any other potential CEOs being discussed.**

Q. Had the board essentially determined that Mr. Spence would be the replacement for Mr. Carmichael as president and CEO?

Page 51

MR. CIOFFI: Objection to the form of the question. Is your question is there some sort of formal vote or decision or was there a consensus? Your -- "determined" is unclear, and this is a really heavily regulated industry, as you know, so I don't want the record to be at all confusing on this line.

So could you clarify your question?

BY MR. SABA:

Q. Senator, as of December 2019, had the board determined that Mr. Spence would be the next president and CEO to replace Mr. Carmichael?

MR. CIOFFI: Objection. Go ahead.

THE WITNESS: Not with finality, no. You know, it's an evolutionary process and to the best of my recollection, it was sometime in the next year there was another meeting to kind of assess how things were going and Mr. Spence's development. And then sometime, you know, after, but no formal decision was taken and it was sometime after that a formal decision was taken that, yes, Mr. Spence was the person to be selected for the position of CEO.

BY MR. SABA:

Q. Had the board determined as of December 2019 that Phil McHugh would not be the person to replace Greg

Page 52

Carmichael as the next president and CEO of Fifth Third?

MR. CIOFFI: Objection. Asked and answered. Explain why Phil McHugh was never considered.

THE WITNESS: Right, so have we -- no formal decision --

MR. CIOFFI: I will restate my --

THE WITNESS: Thank you.

MR. CIOFFI: -- my objection to the form of the question. It's confusing and --

THE WITNESS: I'm trying to be too forthcoming here.

MR. CIOFFI: And assumes a fact that's just -- doesn't exist.

THE WITNESS: Phil --

MR. CIOFFI: You may answer, please.

THE WITNESS: Phil was not under consideration to be the CEO for the reasons that we had outlined, that we discussed previously and as was demonstrated on the document about succession planning, where you had Tim Spence on there. That was, to the best of my recollection, the assessment was that there was -- and I can't remember when that -- the timing of that document, you showed it to me -- but somewhere there was a document. There was nobody who was prepared to immediately step in.

Tim Spence was the person who was furthest along and most likely with further development to be able to assume that role.

Brian Lamb was then -- also had what we perceived as the potential, but it was going to take even more development than Tim Spence.

And then there were the folks, you know, in the -- hit by a car, plane goes down scenario, you know, who could step in to kind of just keep the ship afloat until we could find a permanent CEO. Then there was that.

So to answer your question directly, Phil was never under consideration. So, yes, at that time, he had been -- was not being considered. So I think you used the word "rule out" or I can't remember, but he was not being considered for that. I hope I got my chronology correct.

(Plaintiff's Exhibit 5 is marked for identification.)

BY MR. SABA:

Q. Senator, I've handed you what's been marked as Exhibit Number 5, Fifth Third-McHugh 001105 through Fifth Third-McHugh you 001154; do you see that?

**A. 001105 is the first page and the last page is 001154, yes.**



Q. Okay. I use the term talent deck. You referenced a document before that would be presented at board meetings. Are you able to identify Exhibit Number 5?

**A. You mean this whole thing?**

Q. Correct.

**A. No.**

Q. Have you seen this document before?

THE WITNESS: Am I allowed to answer that, Mike?

MR. CIOFFI: Yes, you may answer if you've seen it before.

THE WITNESS: Well, certainly not outside of conversations with my counsel, is that --

BY MR. SABA:

Q. Did you ever see this in the course of a board meeting for Fifth Third?

**A. I have no specific recollection of that, but I assume so. Depending on whether it's the final draft or not that would have been presented to the board at the succession planning meeting.**

Q. Let me represent to you, this is the final document that was presented to the board at the December 2019 meeting.

**A. So I have no active memory, but it would have**



**been customary, yes, that this would have been presented to all of us on the board at that time.**

Q. Do you know who would have prepared this document?

**A. Human resources department. Usually this is -- again, it's -- I said it's an evolutionary process. So normally what happens is, management takes the lead in presenting a document like this, but it's for really initiating a conversation at the board level. The board obviously makes the final decisions, but this is just kind of their first cut about where to begin and then the board sort of takes it from there.**

(Mr. Thomas leaves the deposition room.)

BY MR. SABA:

Q. If I can refer you to Fifth Third-McHugh 001141, please.

**A. Forgive me, 001141?**

Q. That is correct.

**A. Okay. Let me flip back through here. Okay. 41, it just says CEO Succession Plan?**

Q. Correct.

**A. Okay.**

Q. And then if you could turn the page to 001142.

**A. Yes.**

Q. Is this the CEO succession plan you were



referencing earlier?

**A. Yes.**

Q. Is it your position that this CEO succession chart that we see on 001142, that that accurately reflected the opinion of the board with respect to CEO succession as of December 2019 at Fifth Third Bank?

MR. CIOFFI: Objection to the form of the question. This document, as he said, was prepared by human resources, but please answer if you can.

THE WITNESS: Yes.

BY MR. SABA:

Q. And the document indicates that it would be three-plus years for Tim Spence to be CEO; is that correct?

**A. It does.**

Q. And that would be seven-plus years for Brian Lamb to be CEO; is that correct?

**A. That's correct.**

Q. And then under emergency successors, it lists Tayfun Tuzun, Phil McHugh, and then a board member; is that correct?

**A. One of the members of the board, yes.**

Q. Okay. Did you agree that Phil McHugh was an appropriate choice for emergency successor to CEO?

MR. CIOFFI: Object to the form of the

question. There was never such a choice or a decision brought before the board, but you may answer if you can.

THE WITNESS: Well, so a couple of things about this. Your question to me, was he an acceptable emergency successor?

BY MR. SABA:

Q. Was an appropriate choice for an emergency successor for CEO?

**A. So, again, this is a discussion document. And so what they're doing is they're -- so by definition, you're dealing with an emergency. I mean, you know, a plane's gone down. People have been killed in an auto accident. You're just scrambling to try and stabilize things.**

**And so it would depend on the nature of the emergency about who the right emergency CEO would be. I mean, the board's on here, so, you know, I would be one of the names listed because I was on the board.**

**So you might imagine a scenario where let's say there was something involving, you know, some bad acting with regard to a regulatory agency or the government in some respect. Perhaps they would have said oh, you know, he's been a top-ranking government official. Hopefully he has a good reputation for**



**honesty. Maybe he would be a person to step in for the next two or three months to kind of stabilize things until we find the right person to lead us going forward.**

**So it's just -- you throw all these names out there but you don't know who the right person's going to be, if any of them are the right person, until you're, you know, know what the facts are you're dealing with. And then above that box are the ones who we had assessed had the potential to be the long-term CEO.**

Q. With respect to Phil McHugh being listed as a potential emergency successor, did you agree with that identification?

MR. CIOFFI: Objection. He just answered that question, exactly the same question. If you want to re-answer it further, please go ahead.

THE WITNESS: Again, yes, but, again, this is just for discussion purposes. It's possible we would have considered people not on this page either if there was someone in the organization who, hey, given the specifics of the emergency we're dealing with, if it was some huge IT, you know, meltdown, then maybe the -- and the CEO had been killed contemporaneously, so maybe you have the IT person.

So this is all dealing with the hypothetical



situation we don't know the specifics of, but yes. Yes, and possibly other people as well.

BY MR. SABA:

Q. And why would Phil McHugh be an appropriate emergency successor for CEO but not an appropriate long-term successor for CEO?

MR. CIOFFI: Objection to the form of the question, but you may answer if you can.

THE WITNESS: Well, we've discussed that before and same reason for Tayfun or same reason that, you know, any of the other people who might have been listed on here for a temporary situation it's -- you're just looking for something different for someone who's just stabilizing the company versus someone to provide the long-term hopefully visionary leadership for the company.

I would analogize it to there's a car cash and someone's grievously injured. Medics arrive on the spot. They are there to stabilize the patient, to triage the patient, and then get the patient to the hospital where the, you know, doctors take over and provide a higher level of care in dealing with the long-term well-being of the patient.

So they're just -- they're two different things. What you look for in someone who can just



step in, stabilize things for a temporary period of time is going to be different than someone who's going to be a long-term leader of the organization.

BY MR. SABA:

Q. How do you define long term versus temporary?

**A. There's no precise definition to that. It's, you know, ideally, you have a temporary leader who's -- as briefly as possible because, you know, it creates uncertainty any time you don't have the -- something as important as the CEO's position filled on a permanent basis, but, you know, you'd have to conduct a search, how long would that take? You know, it's just -- there's no way to know, but just you'd like to fill the position as expeditiously, consistent with making a wise decision, as you can.**

(Mr. Thomas enters the deposition room.)

BY MR. SABA:

Q. Could you turn to Fifth Third-McHugh 001131, please.

**A. 31?**

Q. Uh-huh.

**A. We're going back here. Yes. This is the one entitled Brian Lamb?**

Q. Correct. This is a profile page for Brian Lamb; is that correct?

Page 61

**A. Yes, appears to be.**
Q. Referring you to the boxes in the upper right-hand portion of this profile for Brian Lamb, under the boxes categorized talent information.
**A. Yes. Well, some of this print's getting pretty small here, but, yes, I see it.**
Q. And the center column in the middle refers to potential; is that correct?
**A. Potential is -- so I see the -- I see the -- talent information, I'm having trouble reading it, the print's so small. And so where's the -- is it on the left hand here where it's --**
Q. It would be in the center under talent information. Do you see this, senator?
**A. I see.**
Q. I can show right here?
**A. Okay. Oh, yes, yes, thank you. Yes.**
Q. And next to that indicates high potential; is that right?
**A. Yes.**
Q. Who would have made that determination?
**A. Well, again, that's going to be the first assessment of human resources, but then it goes to the board and the board, you know, debates it around and kind of determines whether we agree with that assessment or not.**

Page 62

Q. Did the board agree with that assessment?
**A. I assume so. I thought very highly of Brian. I thought he was just a real great talent and I thought it was a shame. I think it was JPMorgan kind of hired him away.**
Q. Turning to the next page, Fifth Third-McHugh 00132.
**A. Yes.**
Q. And this is the profile page for Phil McHugh; is that correct?
**A. It is.**
Q. And, again, going to talent information, the box marked potential, it says moderate potential; do you see that?
**A. I do.**
Q. Who would have made that determination with respect to Phil McHugh?
**A. Again, this was, you know, the assessment of human resources and a place for discussion to begin at the board level, and then we would discuss the individuals and decide whether we agreed with that or not, whether we had a different take on it or not, but this was just sort of the basis for beginning the conversation.**

Page 63

Q. And did the board agree with that determination?
**A. I believe so.**
Q. If I can refer you to Fifth Third-McHugh 001135.
**A. Tim Spence.**
Q. As you indicated, that's the profile page for Tim Spence; is that correct?
**A. Yes, it is.**
Q. And, again, referring to potential, it indicates high potential for Mr. Spence; is that correct?
**A. It does, and then there were a number of sub points under that that are so small they are hard to discern.**
Q. And, again, who would have made that determination?
**A. Well, once again, that would have been the initial assessment of the human resources department and the starting point for discussion by the board.**
Q. And did the board agree with that assessment?
**A. Yes.**
Q. Was there any discussion that Phil McHugh's name should be removed from the emergency successor list by the board?

Page 64

**A. I don't recall any.**
Q. Do you recall any criticism of Phil McHugh being listed as an emergency successor?
MR. CIOFFI: Objection. Asked and answered, but you may answer further.
THE WITNESS: No, I don't.
MR. SABA: We can go off the record. We'll just take a brief break for about --
THE VIDEOGRAPHER: Off the record at 11:24.
(A recess was taken from 11:24 a.m. to 11:39 a.m.)
THE VIDEOGRAPHER: We are back on the record. This is media 2 of today's deposition. The time is 11:39.
BY MR. SABA:
Q. Senator, what's your date of birth?
**A. December 26, 1955. I was almost a Christmas baby.**
Q. Did you ever work in banking?
**A. Did I ever work in banking? No, sir.**
Q. Whose decision was it in 2020 to hire RHR to do an independent assessment of president and CEO candidates?
**A. I don't know. I would assume that was vetted by the human resources department and recommended to the**

Page 65

**board and then we agreed to it, but I don't recall exactly who.**

Q. Do you know why there was the original request for RHR to vet candidates was for RHR to vet three candidates?

MR. CIOFFI: Objection. Assumes facts not in evidence and misstates the record, but if you know, if you have knowledge about it.

THE WITNESS: The answer is no, and let me go back to your previous question. The time frame on that when you were asking about the Tim Spence succession process or the Greg Carmichael succession process?

BY MR. SABA:

Q. I'm in 2020 now.

**A. Okay. So to complete my answer to your first question, I assume part of the reason to retain them had to do with the way they performed in the Carmichael evaluation, that we were pleased with that and therefore decided to, you know, hire them again. But in answer to your second question, no, I don't know.**

(Plaintiff's Exhibit 6 is marked for identification.)

BY MR. SABA:

Q. Senator, you've been handed Exhibit Number 6.

Page 66

The first page is marked Fifth Third-McHugh 005951 and it goes -- excuse me, it's 005951 through 005957.

**A. Yes, sir.**

Q. Is that correct?

**A. Yes.**

Q. The first page is an email from Bob Shaffer at Fifth Third to Guy Beaudin at RHR International, dated March 6, 2020 at 3:04 p.m. Do you know who Bob Shaffer is?

**A. I do.**

Q. Who is Bob Shaffer?

**A. Bob has been a long-time employee of Fifth Third, and at this time was the head of human resources, I think.**

Q. And as indicated by Exhibit 6, Mr. Shaffer is sending Guy Beaudin bios and one-pagers from PowerPoint documents that were used at the board in talent discussions in December 2019, and he's asking for a CEO profile. Do you know why -- excuse me -- strike that.

In looking at the documents attached to that email, it's a profile for Phil McHugh, Tayfun Tuzun, and Tim Spence; do you see that?

**A. I see Phil, Tayfun, Tim Spence. Yes, I do.**

Q. Do you know why Mr. Shaffer was sending Guy Beaudin profiles for Mr. McHugh and Mr. Tuzun as well as

Page 67

Tim Spence?

**A. I do not.**

Q. Were you aware that Fifth Third was originally looking at having all three of these men assessed by RHR for president and CEO of Fifth Third Bank?

MR. CIOFFI: Objection. Misstates the record. It's a misleading question. He's already answered he doesn't know, but you may answer if you have any knowledge.

THE WITNESS: I don't know anything about that.

BY MR. SABA:

Q. Were you involved in this process at all, the RHR assessment of potential candidates for president and CEO of Fifth Third Bank in 2020?

**A. I was a consumer of their assessment, so, I mean, I was not involved in creating the assessment, but eventually I saw it and, you know, was a part of the board discussion. So if that's what you mean by involved, I was involved that way, but not before then.**

Q. When did you see the assessment?

**A. It would have been at a board meeting when we began to discuss -- following their assessment. It would have been the next board meeting we discussed CEO succession following the completion of their assessment.**

Page 68

Q. As you sit here today, do you recall what board meeting that was?

**A. I don't.**

Q. Were you aware that a determination was made to just assess -- strike that.

Were you aware that a determination was made for RHR to just assess Tim Spence for president and CEO of Fifth Third Bank instead of also assessing Phil McHugh and Tayfun Tuzun?

**A. No.**

Q. Do you recall any board meetings where it was discussed how many candidates should be assessed by RHR to succeed Greg Carmichael?

**A. No.**

(Plaintiff's Exhibit 7 is marked for identification.)

BY MR. SABA:

Q. Senator, I've handed you what's been marked as Exhibit Number 7. This is Bates stamped Fifth Third-McHugh 007133 through Fifth Third-McHugh 007134. I represent to you it's an email from Bob Shaffer to Greg Carmichael dated August 18, 2020 at 1:55 p.m., and he indicates to Greg Carmichael, "Follow-Up items from this morning's talent management update discussion."

Under the second bullet point it indicates,

Page 69

"Talk to each board member about the succession discussion and SAEMA."
And you're listed there as the third board member to talk to.
**A. I am. I think it's in alphabetical order.**
Q. Do you recall any discussions that you had with Greg Carmichael and/or Bob Shaffer about succession in August of 2020?
**A. I don't.**
(Plaintiff's Exhibit 8 is marked for identification.)
BY MR. SABA:
Q. Senator, I've handed you what's been marked as Exhibit Number 8. This is Bates stamped Fifth Third-McHugh 001074 through Fifth Third-McHugh 001079; is that correct?
**A. Yes.**
Q. Have you seen Exhibit 8 before?
**A. Let me open it up here. The first page is blank. The Winning Formula, Essential Leadership Behaviors. No. This seems somewhat similar to a previous document you showed me from these folks. Didn't you show me something a lot like this, what I referred to as aspirational, where they're sort of describing what the perfect CEO might look like?**

Page 70

Q. Correct. Senator, do you recognize this as a document from RHR?
MR. CIOFFI: Take your time to look at it.
THE WITNESS: Well, no, but it does say RHR International on here, so I'm assuming it's from them.
BY MR. SABA:
Q. Did you have any understanding that this was -- strike that.
With respect to Exhibit Number 8, do you know who prepared Exhibit Number 8?
**A. I don't.**
Q. Do you know who from Fifth Third -- whether it be board members or officers at Fifth Third -- were involved in the preparation of Exhibit Number 8?
MR. CIOFFI: Objection to the form of the question. Lack of foundation. Assumes facts not in evidence or accurate, but you may answer, if you can, based on your knowledge.
THE WITNESS: Well, the answer is no, but it would be unusual for a board member to be involved in creating a document of this nature.
BY MR. SABA:
Q. Are you aware if any board members were given the opportunity to review this document and/or make

Page 71

changes to it?
**A. No.**
MR. CIOFFI: Objection in terms of time frame. This document was first created in 2015. Are you talking about 2015 or 2020 or --
BY MR. SABA:
Q. I'm referring to Exhibit Number 8. Do you understand that?
MR. CIOFFI: Well --
THE WITNESS: It's July 2020 here.
MR. SABA: Correct.
THE WITNESS: That's what it's dated. And yeah, again, this is -- your question to me is?
BY MR. SABA:
Q. My question to you is whether or not you are aware if any board members were given the opportunity to review Exhibit Number 8 and make any changes to it?
**A. No.**
Q. You don't know one way or another, correct?
**A. I do not.**
Q. Do you know what this document was used for?
MR. CIOFFI: Objection. Asked and answered with respect to 2015, but --
THE WITNESS: Yeah, I --
MR. CIOFFI: You may answer.

Page 72

THE WITNESS: Well, again, this is -- obviously they tailored it to Fifth Third, but it's -- I was going to use the word generic, but that would be not very precise.
So this was an aspirational, you know, what are all the things you're looking for in a future CEO and leader. If you could just get the perfect person, what would that be? And this looks to me like it's that kind of document.
And so the challenge is always, we can agree that we'd all like to find the perfect human being. The problem is, no such creature exists. And, you know, therein lies the importance of the search process.
BY MR. SABA:
Q. Do you know if Fifth Third hired -- strike that.
In 2020, did Fifth Third hire any other independent agencies to do an assessment of potential candidates to be the next president and CEO of Fifth Third Bank?
**A. Not that I'm aware of.**
Q. Is it fair to say that there was never an independent assessment done of Phil McHugh to be the next president and CEO of Fifth Third Bank?

MR. CIOFFI: Objection to the form of the question. Do you mean by the board? By an outside organization? What is the scope of your question?

BY MR. SABA:

Q. Do you understand my question?

**A. Could you repeat it for me?**

Q. Sure. At any time -- and I'll rephrase the question just to make it clear -- was there ever an independent third-party assessment of Phil McHugh to be the next president and CEO of Fifth Third Bank?

**A. Not that I'm aware of. You showed me a previous document that Phil and Tayfun were appended to, in addition to Tim, so -- but your -- you said that that didn't go forward, so I would assume -- as far as I know, no.**

MR. SABA: Okay.

(Plaintiff's Exhibit 9 is marked for identification.)

BY MR. SABA:

Q. Senator, I've handed you what's been marked as Exhibit Number 9, which is Bates stamped Fifth Third-McHugh 00517 through Fifth Third-McHugh 000527; is that correct?

**A. Yes.**

Q. And I will represent to you these are the



board of directors minutes for the September 21, 2020 board meeting. Have you seen these -- have you seen this document before?

THE WITNESS: Am I allowed to answer that, Mike?

MR. CIOFFI: You may, if you saw them before at the board meeting or whatever it was.

THE WITNESS: Well, yes, sir. As I previously indicated, it's customary to review and approve the minutes of board meetings at the next board meeting. So I would assume at the meeting following September 21st, I reviewed these, and along with the other board members, voted to accept them.

BY MR. SABA:

Q. You attended this meeting by phone; is that correct?

**A. I don't recall. It looks like it would have been in the height of the COVID period, so that may very well have been the case.**

Q. If you look under the category marked directors present by telephone, you're the first person listed; is that correct?

**A. Yeah. During -- that was a very difficult period. My wife had terminal brain cancer at that time,**



**and so I was trying to take care of her, discharge my other responsibilities as well, so I may have very well attended by phone for that reason.**

Q. Was that by telephone? Was that by a Zoom or Teams meeting? How was that done?

**A. You know, I don't recall. I didn't discover Teams until more recently, so it would have been either Zoom or telephonic. If you put a gun to my head, I'd guess and say it was by phone, but it might have been by Zoom.**

Q. Being just by phone, you weren't able to observe any documents that were presented during any presentations during that meeting; is that correct?

MR. CIOFFI: Objection to the form of the question. If they were provided some other time. Answer the question fully.

THE WITNESS: Well, if it had been by phone, you know, be definition, you can't see things. However, there are sometimes when they will, if they know you can't attend and you're going to be remote, that they do forward you some materials that will be considered by the board for your review before the board call. But I have no memory specifically of that at that time. As I said, there was a lot going on.



(Plaintiff's Exhibit 10 is marked for identification.)

BY MR. SABA:

Q. Senator, I've handed you what's been marked as Exhibit Number 10, which is Bates stamped Fifth Third-McHugh 005350 through Fifth Third-McHugh 005373.

**A. Yes.**

Q. It's titled Executive Succession Planning September 2020.

**A. Yes.**

Q. Have you seen this document before?

**A. I'd have to look through it to try and refresh my memory. So, I mean, it looks generally familiar, but I have no specific recollection of it.**

Q. Referring you to the second page of Exhibit 10, Fifth Third-McHugh 005351, there's an organizational chart listed there for Fifth Third Bancorp current; do you see that?

**A. I do. Some of this type is getting real small.**

Q. And it's noted revised 9/22/20; is that correct?

**A. Yes, sir.**

Q. And under the people reporting to Greg Carmichael is listed as chairman, president, and chief

Page 77

executive officer, just below him and reporting directly to him are Phil McHugh and Tim Spence; is that correct?
**A. Yes, and half a dozen other individuals.**
Q. Okay. Was that your understanding of the structure at Fifth Third as of September 2020?
**A. Yes.**
Q. Turning to the third page of Exhibit 10, Fifth Third-McHugh 005352, and this says Proposed Organizational Structure November 2020 draft; do you see that?
**A. Yes.**
Q. And, again, it refers to Greg Carmichael. At this point, though, he's chairman and chief executive officer. One of the people reporting to him directly is Tim Spence, who is listed as president, head of regional, middle market and business banking, and wealth and asset management; do you see that?
**A. I do. As I said, some of that type below the shaded-in area for Tim and the other individuals is getting pretty small, but, yeah, it looks like there are eight different things listed there.**
Q. And with respect to this structure, it indicates that instead of reporting to Greg Carmichael, Phil McHugh would be reporting to Tim Spence; is that correct?

Page 78

**A. Yes, that's Phil and it looks like five other people.**
Q. And Phil McHugh is listed as head of consumer and business banking; is that right?
**A. Head of -- yes.**
Q. Okay. Was there a decision made in September 2020 by the board that this was the type of structure they wanted to go to in November?
**A. Well, this is a draft. What did the final thing look like? I guess I'm not allowed to ask a question. So I don't -- I don't recall.**
Q. Do you recall any discussions about what the structure would be for Fifth Third in November 2020 during the September 2020 meeting?
**A. No, not really.**
Q. Referring to the fourth page of Exhibit 10, Fifth Third-McHugh 005353, and, again, listed proposed organizational structure for April 2022 --
**A. I'm sorry, sir, which page? I was just noticing that this says November of 2020 but on the front of the document it says September of 2020. So I'm wondering how something dated in November could have been presented to us in September.**
Q. If you look next to that, senator, it says proposed organizational structure.

Page 79

**A. Yes. Oh, I see what you're saying. So they're saying -- so in September, it would have been presented to us, and so this was what we're proposing to initiate in November; is that what you're saying?**
Q. Well, I'm asking you the questions, sir.
**A. Well, I've gone far afield here. No, I have no memory of that.**
Q. All right. And just referring you to page 4 of Exhibit 10, Fifth Third-McHugh 005353, it indicates Proposed Organizational Structure for April 2022, and at that point in time Tim Spence is then made president and chief executive officer; do you see that?
**A. I do.**
Q. Do you recall any discussions during the September 2020 meetings during which they discussed Tim Spence eventually becoming CEO as well as president and having that effective as of April 2022?
**A. Well, there were certainly no final decisions made. I would assume there was some general discussion about whether things were heading in the right direction or not and whether -- as I said, it's an evolutionary process. And I assume there was some general discussion, but no final decisions would have been made. I have no memory of these changes in these org charts being presented to us.**

Page 80

Q. Referring you to page 5 of Exhibit 10, Fifth Third-McHugh 005354, that's a CEO succession chart; is that correct?
**A. It is.**
Q. And it indicates that Phil McHugh's name has been removed from emergency successor; do you see that?
**A. I don't see it there.**
Q. In other words, his name's not listed there, correct?
**A. Correct.**
Q. Do you recall there being discussion during that September 2020 meeting of removing Phil McHugh from the list of potential emergency successors?
MR. CIOFFI: Objection to the form of the question. Assumes that it was presented to the board and assumes other facts not in evidence, lack of foundation. If you can answer, you may answer.
THE WITNESS: I don't recall any discussion about removing Phil, no.
BY MR. SABA:
Q. You don't recall any discussion?
**A. (Shaking head.)**
Q. Do you recall that at any time?
**A. No.**

Page 81

(Plaintiff's Exhibit 11 is marked for identification.)
BY MR. SABA:
Q. Senator, I've handed you what's been marked as Exhibit Number 11, Fifth Third-McHugh 001216 to Fifth Third-McHugh 001222; is that correct?
**A. Yes.**
Q. Have you seen this document before?
**A. I don't recall seeing this one, no.**
Q. Referring you to the last page of Exhibit Number 11, Fifth Third-McHugh 001222.
**A. Excuse me, you said the last page?**
Q. That's correct.
**A. You mean where the signature page?**
Q. That's correct. That's your electronic signature we see on that page; is that correct?
**A. Yes, not a sterling example of penmanship, but that is mine.**
Q. And referring to the page before that, Fifth Third-McHugh 001221, it's a unanimous written consent of the board of directors appointing president, dated October 26, 2020; do you see that?
**A. I do.**
Q. Have you seen this document before?
**A. I have no active memory of it, but since my**

Page 82

**signature is appended to it, I assume at some point I saw it.**
Q. Referring you to page 3 of Exhibit Number 11, Fifth Third-McHugh 001218, if you could turn to that page, please.
**A. Yes.**
Q. And this is a correspondence from Greg Carmichael to the board. In the second paragraph, he indicates, "As Bob Shaffer and I discussed with you at the September board meeting, we believed that Phil McHugh could be at risk with Tim's promotion. And, in fact, Phil has decided not to accept the role of head of consumer and business banking and is leaving the company."
Do you see that?
**A. I do.**
Q. Do you recall Bob Shaffer and Greg Carmichael discussing that Phil McHugh would be at risk with Tim Spence's promotion?
**A. I don't, but that's what this communication says.**
Q. Do you have any understanding as to why Phil McHugh was leaving the bank?
**A. No. I'd be speculating with regard to that, and I've been told not to speculate.**

Page 83

MR. SABA: We can go off the record.
THE VIDEOGRAPHER: We are off the record, 12:07.
(A recess was taken from 12:07 to 12:13 p.m.)
THE VIDEOGRAPHER: Back on the record, 12:13.
BY MR. SABA:
Q. Senator, at this point in time that's all the questions I have. We'll continue in progress.
**A. Thank you.**
MR. CIOFFI: I know you've attempted to reserve any rights you have to continue in progress. We disagree that you have that right, but note that you've tried to preserve it.
Senator, I have a couple questions for you.

EXAMINATION

BY MR. CIOFFI:
Q. If you turn to Exhibit Number 9, please.
**A. This is 11. Let's see. It's like an archeological dig I've got here.**
Q. There you go.
**A. Here's 9. The board minutes from September the 21st?**
Q. That's correct. And I want to direct your attention to the second page of this.
**A. Okay.**

Page 84

Q. Would you read the first two sentences of the first full paragraph? And read that out loud into the record.
**A. The one that begins with "directors asked"?**
Q. Right.
**A. "Directors asked if any concerns related to support or followership of Mr. Spence were identified in the peer feedback interviews. Mr. Beaudin responded that no such concerns were identified."**
Q. I'm going to have you stop there.
Do you recall that part of the presentation at the board meeting?
**A. I don't.**
Q. Looking at it, did the board, based on the discussions of the board, rely on this particular statement by Mr. Beaudin in making its assessment and decision to promote Tim Spence to being president?
MR. SABA: Objection. Go ahead, you can answer.
THE WITNESS: Well, as I said a couple of times before, board minutes are reviewed and approved at the next board meeting.
So contemporaneous to this document being created, I would have reviewed it and approved it and so, yes, I assume we did rely upon that and

took that into consideration.
BY MR. CIOFFI:
Q. I want to read -- because you made reference to the next sentence in your earlier testimony -- would you read that, please?
**A. The one that begins "directors inquired"?**
Q. Yes.
**A. "Directors inquired of Mr. Spence's capabilities and potential related to other president and CEO successor candidates for large public companies evaluated by RHR International."**
**Do you want me to keep going?**
Q. Yes, yes, please do.
**A. "Mr. Beaudin responded that Mr. Spence would be considered in the top quartile of all president and CEO successor candidates assessed by RHR International. He noted" --**
Q. Keep going, yeah.
**A. "He noted that Mr. Spence is a creative, forward-thinking strategic thinker who balances objective data with his subjective experience to derive innovative solutions to business challenges."**
Q. Keep reading.
**A. "Mr. Beaudin also discussed that Mr. Spence demonstrates exceptional abilities in dealing with**



**complexity and ambiguity and a capacity to exercise the business levers most material to impact the business. The directors thanked Mr. Beaudin and Mr. Evans for their extensive and thoughtful assessment of Mr. Spence."**
Q. Did the facts you just read form part of the basis for your decision as a director to promote Tim Spence to president?
**A. Well, yes. As I indicated previously, we hire a company like RHR to do an independent assessment, to sort of confirm the board's thinking in this particular case because we already thought very highly of Mr. Spence, just take an independent look and say look, looking out there at all the potential people, how would this individual stack up?**
**And then evaluate the individual just based on their own abilities, and I certainly agree with and well, just say, you said did I rely upon it? Well, this confirmed my preexisting assessment. It's clearly in line with what I had been thinking about Mr. Spence.**
Q. And based on your discussions with the other board members, was there a consensus or was there an agreement with your testimony just now in that it confirmed that Tim Spence should be promoted to the position of president for these reasons?



MR. SABA: Objection.
THE WITNESS: Can I go ahead?
MR. CIOFFI: Yes, you may answer.
THE WITNESS: You said did they give us confidence? Well, yes, you know, it's always good. I don't remember the exact number of people on the board. Is it 14 or whatever, you know, and it was a unanimous decision.
So 14 individuals with a variety of different backgrounds and experiences arrived at the same conclusion, which by itself would suggest a higher confidence level, but it's nice to have folks who are out there assessing every CEO candidate, every president candidate, say just compared to all of them, how does this individual stack up?
And the fact that he'd be in the top quartile, then I read the description here of his capabilities, yes. That would give a significant amount of additional confidence.
BY MR. CIOFFI:
Q. During the discussion in board meetings with your fellow board members about who should be promoted to president to succeed Greg Carmichael, was age ever a factor in those discussions?
MR. SABA: Objection. Go ahead, you can



answer.
THE WITNESS: No, never.
BY MR. CIOFFI:
Q. Did any board member suggest that the board should consider age in making its decision to promote Tim Spence to the role of president of Fifth Third Bank?
MR. SABA: Objection.
THE WITNESS: No, never.
MR. CIOFFI: I have no further questions.

FURTHER EXAMINATION

BY MR. SABA:
Q. Senator?
**A. Yes.**
Q. Mr. Cioffi was pointing out the value that the RHR assessment had to the board.
Do you have any idea what RHR's assessment of Phil McHugh would have resulted in?
MR. CIOFFI: Objection to the form of the question, calls for --
MR. SABA: I'll rephrase it.
MR. CIOFFI: Speculation.
BY MR. SABA:
Q. Do you have any idea what the results would have been if RHR would have assessed Phil McHugh?
**A. I don't. You'd be asking me to speculate, and**

Page 89

**I've been advised not to speculate.**
Q. You indicated it was helpful because looking at all the potential people for president and CEO compared to Tim Spence; is that right?
MR. CIOFFI: Objection to the form of the question. What are you referring to, he said?
I don't understand the question. Are you referring to what --
BY MR. SABA:
Q. Do you understand my question?
MR. CIOFFI: Are you asking him something within the scope of my questioning or are you doing a different question?
BY MR. SABA:
Q. Do you understand my question?
MR. CIOFFI: I don't understand it. I don't know if it's within the scope of my question.
THE WITNESS: Why don't you -- why don't you restate it. I think I might, but I think we may be conflating two things and maybe I wasn't as precise as I should have been in my response.
BY MR. SABA:
Q. You indicated earlier that with respect to the RHR assessment, it was helpful because it's looking at all the potential people that could perform as CEO and president; is that right?

Page 90

**A. What did --**
MR. CIOFFI: Objection. Will you point to what you're referring to?
MR. SABA: It's his statement. Go ahead.
MR. CIOFFI: No, it's not his statement. He didn't say that.
MR. SABA: He did.
MR. CIOFFI: What are you referring to?
BY MR. SABA:
Q. Go ahead.
**A. So the role of RHR was to -- we had an internal candidate, Mr. Spence. And by evaluating all the people, potential candidates, I should have amplified upon that by saying external -- external candidates not already within Fifth Third Bank, looking at that universe, and assessing that Mr. Spence would have been in the top quartile of all of those folks.**
**So that's what I was attempting to say.**
Q. But you don't know how Mr. Spence would have done if he was compared to any of the internal candidates at Fifth Third; is that correct?
MR. CIOFFI: Objection to the form of the question. Compared by whom? The board did its decision-making.

THE WITNESS: The answer is no because that assessment was not done. I can only speculate by saying they agreed with my assessment about Mr. Spence that may indicate that they might have agreed with our collective assessment of the other possible internal folks as well.

BY MR. SABA:

Q. But you don't know?

**A. I do not know.**

MR. SABA: That's all I have.

MR. CIOFFI: I have no further questions. We'll review the transcript and sign it.

THE VIDEOGRAPHER: Off the record, 12:22.

______________________________
BIRCH EVANS BAYH, III

______________________________
DATE

\- - -

DEPOSITION CONCLUDED AT 12:22 P.M.

\- - -

# C E R T I F I C A T E

STATE OF OHIO :
: SS
COUNTY OF HAMILTON :

I, Wendy L. Raymer, RPR, CRR, the undersigned, a duly qualified and commissioned notary public within and for the State of Ohio, do hereby certify that before the giving of his aforesaid deposition, BIRCH EVANS BAYH, III was by me first duly sworn to depose the truth, the whole truth and nothing but the truth; that the foregoing is the deposition given at said time and place by BIRCH EVANS BAYH, III; that said deposition was taken in all respects pursuant to stipulation of counsel; that I am neither a relative of nor employee of any of the parties or their counsel, and have no interest whatever in the result of the action; that I am not, nor is the court reporting firm with which I am affiliated, under a contract as defined in Civil Rule 28 (D).

IN WITNESS WHEREOF, I hereunto set my hand and official seal of office at Cincinnati, Ohio, this 20th day of February, 2025.

My Commission expires December 6, 2026

S/Wendy L. Raymer, RPR, CRR
Notary Public - State of Ohio

1 DEPOSITION ERRATA SHEET

Date Taken: February 13, 2025

Case Caption: PHILIP R. MCHUGH

vs. FIFTH THIRD BANCORP, et al.

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the ______ day of

____________, 20___.

___________________________________

BIRCH EVANS BAYH, III

2 DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:_________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:_________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:_________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:_________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:_________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:_________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:_________________________________

SIGNATURE:_______________________DATE:___________

BIRCH EVANS BAYH, III

3 DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

SIGNATURE:_______________________DATE:___________

BIRCH EVANS BAYH, III

## WORD INDEX


< 0 >
**000266** 47:*17*
**000267** 48:*6*
**000283** 47:*18*
**000527** 73:*22*
**001074** 69:*15*
**001079** 69:*15*
**001105** 53:*22, 24*
**001131** 60:*18*
**001135** 63:*5*
**001141** 55:*16, 17*
**001142** 55:*23* 56:*4*
**001154** 53:*23, 25*
**001216** 81:*5*
**001218** 82:*4*
**001221** 81:*20*
**001222** 81:*6, 11*
**00132** 62:*8*
**00517** 73:*22*
**005350** 76:*6*
**005351** 76:*16*
**005352** 77:*8*
**005353** 78:*17* 79:*9*
**005354** 80:*2*
**005373** 76:*6*
**005707** 25:*9*
**00571** 25:*11*
**005711** 25:*9*
**005951** 66:*1, 2*
**005957** 66:*2*
**006552** 27:*13*
**006554** 27:*14*
**007133** 68:*20*
**007134** 68:*20*

< 1 >
**1** 4:*8* 10:*1, 5, 25* 29:*8, 16, 20* 30:*5, 10* 31:*14* 35:*5, 9, 14, 22* 36:*3* 38:*3, 11, 15, 17* 39:*3, 6, 9, 13, 17, 19, 23* 93:*1*
**1:21-cv-00238** 1:*9* 5:*8*
**1:55** 68:*22*
**10** 4:*8, 12* 76:*1, 5, 16* 77:*7* 78:*16* 79:*9* 80:*1*
**10:09** 1:*19* 5:*3*
**11** 4:*12* 81:*1, 5, 11* 82:*3* 83:*18*
**11:24** 64:*9, 10*
**11:39** 64:*10, 14*
**12:07** 83:*3, 4*
**12:13** 83:*4, 5*
**12:22** 91:*13, 22*
**13** 1:*18* 93:*2*
**13th** 5:*2*
**14** 6:*25* 87:*7, 9*
**17** 37:*17* 47:*23*
**1700** 2:*15*
**18** 68:*22*
**1955** 64:*17*
**1986** 16:*9*
**1989** 16:*9*
**1st** 15:*11* 29:*10*

< 2 >
**2** 4:*8* 24:*22* 25:*3, 8, 12* 64:*13* 94:*1*
**20** 93:*17*
**2004** 16:*17*
**201** 2:*15*
**2011** 16:*19* 18:*22* 33:*20*
**2015** 22:*7* 24:*10, 16* 25:*16, 24* 26:*22* 27:*1, 17* 28:*5* 34:*16* 71:*4, 5, 23*
**2016** 17:*2*
**2019** 36:*19* 37:*17* 46:*20* 47:*5, 23* 51:*10, 24* 54:*24* 56:*6* 66:*18*
**2020** 15:*11* 20:*15* 29:*8, 10, 16, 20* 30:*5, 11* 31:*14* 33:*15, 19* 34:*17* 35:*5, 9, 14, 18, 22* 36:*3* 38:*3, 11, 15, 17* 39:*3, 6, 9, 13, 17, 19, 23* 64:*21* 65:*15* 66:*8* 67:*15* 68:*22* 69:*8* 71:*5, 10* 72:*18* 74:*1* 76:*9* 77:*5, 9* 78:*7, 13, 14, 20, 21* 79:*15* 80:*12* 81:*22*
**2022** 78:*18* 79:*10, 17*
**2025** 1:*18* 5:*2* 92:*21* 93:*2*
**2026** 92:*25*
**20th** 92:*20*
**21** 74:*1*
**21st** 74:*12* 83:*22*
**22** 15:*25* 16:*3*
**24** 4:*8*
**25** 4:*8*
**26** 64:*17* 81:*22*
**2623** 2:*7*
**267** 48:*7*
**27** 4:*9*
**28** 92:*17*

< 3 >
**3** 4:*9* 27:*7, 12, 21* 82:*3* 95:*1*
**3:04** 66:*8*
**31** 60:*20*
**33149** 6:*23*
**362-8700** 2:*16*

< 4 >
**4** 4:*9* 47:*11, 16* 48:*5* 79:*8*
**41** 55:*20*
**45202** 1:*21* 2:*16, 23*
**45208** 2:*8*
**47** 4:*9*

< 5 >
**5** 4:*10* 10:*24* 53:*18, 22* 54:*4* 80:*1*
**511** 1:*20* 2:*22*
**513** 2:*8, 16, 23*
**53** 4:*10*
**533-2701** 2:*8*

< 6 >
**6** 4:*4, 10* 65:*22, 25* 66:*8, 15* 92:*25*
**629-2716** 2:*23*
**65** 4:*10*
**68** 4:*11*
**69** 4:*11*

< 7 >
**7** 4:*11* 68:*15, 19*
**73** 4:*12*
**76** 4:*12*
**781** 6:*21*

< 8 >
**8** 4:*11* 69:*10, 14, 18* 70:*10, 11, 15* 71:*7, 17*
**81** 4:*12*
**83** 4:*4*
**88** 4:*5* 16:*10*
**89** 16:*12*

< 9 >
**9** 4:*12* 73:*17, 21* 83:*17, 21*
**9/22/20** 76:*21*
**97** 16:*12*
**98** 16:*15*

< A >
**a.m** 1:*19* 5:*3* 64:*10, 11*
**abbreviation** 6:*15*
**abilities** 85:*25* 86:*17*
**ability** 44:*18*
**able** 36:*21* 43:*23* 53:*2* 54:*3* 75:*11*
**accept** 74:*13* 82:*12*
**acceptable** 57:*6*
**accident** 57:*14*
**accurate** 70:*18* 93:*10*
**accurately** 56:*4*
**acting** 57:*22*
**action** 92:*15*
**actions** 7:*12*
**active** 25:*21* 54:*25* 81:*25*
**activities** 30:*3* 41:*23*
**activity** 42:*18*
**actual** 21:*1*
**addition** 17:*18* 19:*3* 49:*12* 50:*3, 8* 73:*13*
**additional** 49:*13* 87:*19*
**Additionally** 7:*22*
**address** 6:*20*
**addressing** 43:*15*
**advise** 22:*25*
**advised** 89:*1*

**adviser** 17:11 22:22
**affect** 42:4
**affiliated** 92:17
**afield** 79:6
**afloat** 53:10
**aforesaid** 92:7
**age** 6:2 87:23 88:5
**agencies** 72:19
**agency** 57:22
**ago** 7:2
**agree** 56:23 58:11 61:25 62:2 63:1, 21 72:10 86:17
**agreed** 62:22 65:1 91:3, 5
**agreement** 5:18 86:23
**ahead** 10:16 37:22 51:13 58:15 84:18 87:2, 25 90:5, 11
**al** 1:10 5:6 93:4
**Albans** 15:17 49:1
**allow** 9:8
**allowed** 7:7 8:17 54:9 74:4 78:10
**alphabetical** 69:5
**ambiguity** 86:1
**Amcor** 18:4, 6
**A-m-c-o-r** 18:4
**amount** 87:19
**amplified** 90:15
**analogies** 22:4
**analogize** 40:24 59:17
**analogous** 41:7
**analysis** 40:3 41:19
**and/or** 11:21 12:5, 6, 13, 14, 22 13:6, 7, 13, 14, 20 14:4 40:15 69:7 70:25 93:11
**announce** 8:7 20:13
**announced** 20:6
**announcement** 20:9, 10, 17, 19 21:1
**annual** 19:6 31:22, 25 32:1, 18 36:13 38:18 39:2 46:10
**annually** 12:24
**answer** 7:19, 23 9:5, 8 10:16 19:19 20:4 28:12 38:21 43:19 52:15 53:12 54:9, 11 56:9 57:3 59:8 64:5 65:9, 16, 20 67:8 70:18, 20 71:25 74:4 75:16 80:17 84:19 87:3 88:1 91:1
**answered** 20:3 30:12 38:6 43:17 44:10 45:10 52:2 58:13 64:4 67:7 71:22
**answering** 36:6
**answers** 27:5
**anybody** 9:22 21:12 50:17
**Apollo** 17:12
**appear** 34:2, 6
**APPEARANCES** 2:1 3:1
**Appearing** 2:6
**appears** 61:1
**appended** 73:12 82:1
**apply** 21:5, 10, 12, 14
**appointing** 81:21
**appropriate** 56:24 57:8 59:4, 5
**approve** 48:1 74:9
**approved** 18:5 84:22, 24
**April** 78:18 79:10, 17
**archeological** 83:19
**area** 77:19
**areas** 33:12
**arrive** 59:18
**arrived** 29:13 87:10
**asked** 11:17 20:3 30:12 36:4 38:6 43:17 44:10 45:9 52:2 64:4 71:22 84:4, 6
**asking** 7:15 34:1 36:17 38:20 65:11 66:18 79:5 88:25 89:11
**aspirational** 26:17 69:24 72:5
**assess** 22:22 23:9, 15 24:15 51:17 68:5, 7
**assessed** 58:8 67:4 68:12 85:16 88:24
**assesses** 24:1
**assessing** 68:8 87:13 90:17
**assessment** 23:13 52:21 61:23, 25 62:2, 19 63:19, 21 64:22 67:14, 16, 17, 21, 23, 25 72:19, 24 73:9 84:16 86:4, 10, 19 88:15, 16 89:24 91:2, 3, 5
**asset** 77:17
**assigned** 40:20
**assume** 12:23 21:8 25:14, 20 28:22 29:2 48:2 53:3 54:19 62:3 64:24 65:17 73:14 74:11 79:19, 22 82:1 84:25
**Assumes** 28:7 52:12 65:6 70:17 80:15, 16
**assuming** 70:5
**attached** 66:20
**attempted** 83:10
**attempting** 90:19
**attend** 33:16 34:18 75:20
**attendance** 34:13
**attended** 74:16 75:3
**attending** 34:7
**attention** 83:24
**attorneys** 5:9 9:11
**attribute** 45:7 46:11
**attributes** 40:21 41:10, 13 42:14, 17 43:15
**August** 46:20 47:5 68:22 69:8
**auto** 57:13
**Avenue** 2:7
**aware** 42:17 46:20 47:5 67:3 68:4, 6 70:24 71:16 72:22 73:11

< B >
**baby** 64:18
**back** 24:21 26:22, 25 28:5 34:10 38:24 42:20 55:19 60:22 64:12 65:10 83:5
**backgrounds** 87:10
**bad** 40:16 57:21
**Bailey** 2:5 8:10
**bailiffs** 7:7
**balance** 33:5 39:15
**balances** 85:20
**BANCORP** 1:10 5:5 76:18 93:4
**Bank** 2:21 5:22 10:11 12:22 17:15, 18 18:25 19:9, 11, 13, 16 21:17 22:7 24:10 25:24 26:25 29:9, 12 35:16 39:25 40:13, 15, 22 41:15 42:4 43:16 44:9 45:8 46:13 47:22 56:6 67:5, 15 68:8 72:21, 25 73:10 82:23 88:6 90:16
**banking** 42:24 64:19, 20 77:16 78:4 82:13
**based** 29:6 32:13 45:2 46:17 70:19 84:14 86:16, 21
**basically** 26:16
**basing** 46:2
**basis** 34:20 42:16 43:14 44:7 45:6 46:14 60:11 62:24 86:7
**Bates** 25:3, 5, 8 27:12 47:16 68:19 69:14 73:21 76:5
**BAYH** 1:15 4:3 5:4, 17, 20 6:1, 7, 9, 11, 14, 17, 18 10:4, 19 25:2 27:11 91:17 92:8, 11 93:19 94:24 95:24
**B-a-y-h** 6:18
**Beaudin** 66:7, 16, 25 84:8, 16 85:14, 24 86:3
**becoming** 79:16
**began** 67:23
**beginning** 62:24
**begins** 84:4 85:6

**behalf** 2:1, 10 5:11, 13, 16 10:22
**behaviors** 26:4 69:21
**believe** 15:5 63:3
**believed** 82:10
**belt** 24:4
**benefit** 24:7
**Berry** 17:25 18:3, 6, 9, 12
**bes@sspfirm.com** 2:10
**best** 18:21 43:4, 5 50:10, 11 51:15 52:21
**better** 23:22 44:17
**bios** 66:16
**BIRCH** 1:15 4:3 6:1, 14 91:17 92:7, 11 93:19 94:24 95:24
**birth** 64:16
**Biscayne** 6:22
**bit** 26:12 44:14
**Blank** 2:14 5:16 69:20
**board** 6:16 9:13, 17 12:25 13:2, 3, 5, 10, 11, 17, 19, 22, 25 14:17, 21, 22 15:13 17:14, 22, 24 18:10, 13, 16, 19 19:5, 7, 13 21:19 22:16, 25 23:6, 24 24:3, 9, 15 25:14, 19 29:22, 23 30:2, 3, 4, 7, 10, 16, 21, 22 31:2, 16 33:14, 16, 19, 20 34:2, 6, 7, 8, 18 35:1, 10 36:19 37:18 38:4, 9 39:20, 24 40:19 42:9, 11 43:23 44:1, 3, 4, 20 45:3, 12, 17, 24 46:3, 18 47:22, 25 48:1, 24 50:14, 23 51:10, 24 54:3, 16, 20, 23 55:2, 9, 10, 12 56:5, 20, 22 57:2, 19 61:24 62:2, 21 63:1, 20, 21, 25 65:1 66:17 67:19, 22, 24 68:2, 11 69:1, 3 70:14, 21, 24 71:16 73:2 74:1, 2, 7, 10, 13 75:22, 23 78:7 80:16 81:21 82:8, 10 83:21 84:12, 14, 15, 21, 22 86:22 87:7, 21, 22 88:4, 15 90:24
**boards** 17:17 21:24 23:20
**board's** 46:22 47:7 57:18 86:11
**Bob** 66:6, 8, 11, 12 68:21 69:7 82:9, 17
**bottom** 25:4, 6
**Boulevard** 6:21
**box** 58:8 62:14
**boxes** 61:2, 4
**boys** 15:17
**brain** 74:25
**break** 45:21 64:8
**Brian** 2:20 5:20 37:24 38:1 49:7 53:4 56:16 60:23, 24 61:3 62:3
**Brian.Thomas@53.com** 2:24
**brief** 7:14 64:8
**briefly** 60:8
**brings** 24:2
**broken** 33:6 39:16
**brought** 17:16 42:21 57:2
**budgeting** 41:3
**bulk** 15:23
**bullet** 68:25
**bus** 37:3
**business** 15:20 16:4 77:16 78:4 82:13 85:22 86:2

< C >
**call** 6:11 26:16 75:23
**called** 15:17 17:12, 25 18:4, 16
**calls** 88:19
**camera** 36:6
**cancer** 74:25
**candidate** 23:19 24:2 39:24 48:20 49:3, 4, 17 87:13, 14 90:13
**candidates** 12:5, 13 13:7, 14, 20 14:1 24:2, 5, 9, 12, 16 35:14 36:16 48:13, 17, 23 49:4, 15, 21, 24 64:23 65:4, 5 67:14 68:12 72:20 85:10, 16 90:14, 16, 22
**capabilities** 85:9 87:18
**capable** 37:6
**capacities** 29:11, 14
**capacity** 30:21 42:14 86:1
**Caption** 93:3
**captioned** 93:8
**car** 53:8 59:17
**care** 7:9 59:22 75:1
**career** 15:24
**Carmichael** 20:6, 13 21:20 22:6 23:1, 12 24:11, 13, 16 25:15 35:6, 7, 11, 15 39:20, 25 46:21 47:6 48:12, 23 49:13, 21 50:24 51:12 52:1 65:12, 18 68:13, 22, 23 69:7 76:25 77:12, 23 82:8, 17 87:23
**CASE** 1:9 5:4, 7, 21 9:16, 19, 22 28:8 74:20 86:12 93:3
**cash** 59:17
**categories** 27:24
**categorized** 61:4
**category** 45:21 74:21
**Center** 1:20 2:15, 22 61:7, 13
**CEO** 11:21 12:6, 14, 22 13:7, 14, 20 14:4 18:24 19:4, 9, 15, 24 21:5, 12, 14, 16, 19, 21 22:1 23:24 27:25 35:7, 11, 16 36:16, 22 37:1, 9 39:25 40:13, 15, 22 41:11, 14, 17 42:15 44:8, 14 45:8, 22 46:13 50:25 51:12, 22 52:1, 17 53:10 55:20, 25 56:3, 5, 13, 17, 24 57:9, 17 58:9, 22 59:5, 6 64:22 66:18 67:5, 15, 24 68:7 69:25 72:7, 20, 25 73:10 79:16 80:2 85:10, 16 87:13 89:3, 25
**CEOs** 50:22
**CEO's** 20:8 60:10
**Certainly** 47:3 54:13 79:18 86:17
**certified** 6:3
**certify** 92:6
**cetera** 41:3, 4
**chairman** 76:25 77:13
**challenge** 72:10
**challenges** 85:22
**chance** 46:21 47:6
**change** 41:22 94:4, 7, 10, 13, 16, 19, 22 95:4, 7, 10, 13, 16, 19, 22
**changes** 71:1, 17 79:24 93:11, 14
**charisma** 44:17
**charismatic** 44:23
**chart** 45:22 56:4 76:17 80:2
**charts** 79:24
**check** 22:19
**Chicago** 31:10
**chief** 25:23 48:14 76:25 77:13 79:12
**choice** 40:6 56:24 57:1, 8
**choosing** 41:17
**Christmas** 64:17
**chronology** 53:17
**Cincinnati** 1:21 2:8, 16, 23 92:20
**Cioffi** 2:10 4:4 5:15 6:8 8:5, 11, 18, 23 9:4 10:6, 21 19:18, 25 20:3 26:2 27:3 28:6, 15, 24 29:2, 6, 17, 21 30:12 32:12 33:17 34:19 35:2, 17, 20, 22 37:15 38:6

40:1 43:17 44:10 45:9 46:24 50:6 51:1, 13 52:2, 6, 8, 12, 15 54:11 56:7, 25 58:13 59:7 64:4 65:6 67:6 70:3, 16 71:3, 9, 22, 25 73:1 74:6 75:14 80:14 83:10, 16 85:2 87:3, 20 88:3, 9, 14, 18, 21 89:5, 11, 16 90:3, 6, 9, 23 91:11
**circulated** 32:6
**citizens** 17:7
**Civil** 92:17
**clarify** 51:8
**clear** 7:25 20:25 31:17 73:8
**clearly** 36:20 86:19
**clerked** 7:7
**code** 6:22
**collective** 91:5
**Collin** 2:13 5:15
**collin.hart@blankrome.com** 2:17
**column** 61:7
**combinations** 41:24
**come** 24:6 37:23
**command** 42:8 46:13
**Commencing** 1:19
**Commission** 92:24
**commissioned** 92:5
**committee** 28:5 34:18, 25
**common** 37:4
**communicate** 11:10 21:8 30:9
**communicated** 45:17
**communication** 11:18 42:5 44:6, 8 82:20
**communications** 11:5, 10 12:2, 19 13:3, 6, 11, 18 14:7, 12, 16, 20, 25 15:3, 6, 12
**companies** 17:15 18:15 85:10
**company** 17:24 18:4 59:14, 16 82:14 86:10
**compared** 40:6, 10 87:14 89:4 90:21, 24
**Competencies** 27:17 28:4
**Competency** 27:22
**complete** 65:16
**completion** 49:16 67:25
**complex** 40:3, 4, 23
**complexity** 86:1
**complicated** 41:16
**comprised** 17:23
**concerns** 84:6, 9
**CONCLUDED** 91:22
**conclusion** 87:11
**conduct** 60:11
**confidence** 42:9 87:5, 12, 19
**confirm** 86:11
**confirmed** 86:19, 24
**conflating** 89:20
**confusing** 33:18 51:6 52:9
**conjunction** 30:2, 7
**Connie** 1:23
**consensus** 41:8 51:3 86:22
**consent** 81:20
**consider** 88:5
**consideration** 52:16 53:13 85:1
**considered** 23:15 24:10, 12 35:15 36:16, 21 39:24 40:12, 14 52:3 53:14, 16 58:18 75:22 85:15
**consistent** 60:14
**consultant** 23:25
**consulted** 42:25
**consulting** 42:23
**consumer** 29:11 67:16 78:3 82:13
**contemporaneous** 84:23
**contemporaneously** 58:23
**context** 48:2
**continue** 18:9 27:6 44:11 45:10 83:8, 11
**CONTINUED** 3:1
**contract** 92:17
**conversation** 55:9 62:25
**conversations** 54:14
**conveying** 45:15
**corner** 25:4, 6
**correct** 6:18 11:3 15:24 20:23 22:7, 20 25:10 31:19 32:19 34:3 36:19 44:4 45:3 46:3, 18 47:18 48:8 53:17 54:6 55:18, 21 56:14, 17, 18, 21 60:24, 25 61:8 62:11 63:8, 12 66:4 69:16 70:1 71:11, 19 73:23 74:17, 23 75:13 76:22 77:2, 25 80:3, 9, 10 81:6, 13, 15, 16 83:23 90:22
**corrections** 93:11
**correspondence** 11:11 82:7
**counsel** 8:24 54:14 92:13, 14
**COUNTY** 92:3
**couple** 24:1 57:4 83:14 84:20
**course** 18:8 36:14 54:16
**COURT** 1:2 5:6, 23 7:18 92:16
**courtroom** 7:8
**COVID** 74:19
**Crandon** 6:21
**C-r-a-n-d-o-n** 6:21
**created** 71:4 84:24
**creates** 60:8
**creating** 67:17 70:22
**creative** 85:19
**creature** 72:12
**criticism** 64:2
**criticisms** 33:9
**CRR** 1:22 92:4, 24
**cultivate** 49:15
**current** 21:21 37:1 42:14 76:18
**currently** 17:17
**customary** 36:10 55:1 74:9
**customer** 32:24 39:8
**cut** 55:11

**< D >**
**data** 85:21
**Date** 1:18 35:21, 23 64:16 91:19 93:2
**dated** 25:16 27:17 66:7 68:22 71:12 78:22 81:21
**day** 36:17, 22 42:15 92:21 93:16
**DC** 15:18
**DDI** 27:16 28:3
**dealing** 57:12 58:7, 21, 25 59:22 85:25
**debates** 61:24
**December** 16:9 19:7 32:3 35:24 36:19 37:17 47:23 51:10, 24 54:23 56:6 64:17 66:18 92:25
**decide** 62:22
**decided** 23:1 65:20 82:12
**decision** 51:3, 20, 21 52:5 57:2 60:15 64:21 78:6 84:17 86:7 87:8 88:5
**decision-making** 90:25
**decisions** 55:10 79:18, 23
**deck** 46:7, 8 54:1
**DECLARATION** 93:5
**declare** 93:6
**Defendants** 1:11 2:10 5:16, 19
**define** 60:5
**defined** 92:17
**definition** 57:11 60:6 75:18
**degree** 15:19, 21
**demands** 11:16
**demerit** 49:1
**demonstrate** 43:18

**demonstrated** 43:12 44:1, 3 52:19
**demonstrates** 85:25
**department** 21:9 22:3 28:23 40:25 41:2 55:5 63:19 64:25
**depend** 57:16
**Depending** 54:19
**depose** 92:8
**deposed** 6:3 7:13
**Deposition** 1:15 5:4 7:5 8:14 9:3, 14 10:20 37:15 47:10 49:9 55:13 60:16 64:13 91:22 92:7, 10, 11 93:1, 8, 12 94:1 95:1
**depth** 19:11
**derive** 85:21
**described** 44:21
**describing** 69:25
**description** 87:17
**desires** 46:22 47:7
**detail** 18:11 43:22
**details** 22:17 49:14
**determination** 46:2, 14 61:21 62:17 63:2, 17 68:4, 6
**determine** 34:24
**determined** 34:17 50:14, 23 51:4, 11, 24
**determines** 61:25
**determining** 42:16
**developed** 25:23 26:21
**developing** 37:6
**development** 13:19 14:1 26:25 27:25 37:25 45:22 48:19 49:14, 17 51:18 53:2, 6
**different** 59:13, 24 60:2 62:23 77:21 87:9 89:13
**difficult** 7:21 74:24
**dig** 83:19
**dinners** 29:23 30:3, 23
**direct** 28:23 31:13, 18 38:14 83:23
**direction** 79:20
**directly** 53:12 77:1, 14
**director** 11:5, 18 12:3, 20 14:13 49:13 86:7
**directors** 13:18 14:8, 22 17:24 18:14 30:4 47:23 74:1, 22 81:21 84:4, 6 85:6, 8 86:3
**disagree** 83:12
**discern** 63:15
**discharge** 75:1
**disclosure** 11:11
**discover** 75:6
**discovery** 10:12
**discuss** 12:25 13:23 35:5, 9 38:23 39:19 62:21 67:23
**discussed** 9:16, 19, 22 46:10 48:18, 24 49:5, 6, 14 50:22 52:18 59:9 67:24 68:12 79:15 82:9 85:24
**discussing** 38:22 49:22 82:18
**discussion** 36:14 50:16, 20 57:10 58:17 62:20 63:20, 23 67:19 68:24 69:2 79:19, 23 80:11, 18, 21 87:21
**discussions** 11:15 13:25 31:18 66:18 69:6 78:12 79:14 84:15 86:21 87:24
**DISTRICT** 1:2, 3 5:6, 7
**DIVISION** 1:4 5:7
**divisions** 33:3, 6, 10 39:12, 16
**doctors** 59:21
**document** 11:14 24:18 25:6, 16, 19, 20 26:4 27:4, 16, 18 28:10, 21 36:15 37:16 46:5, 7 47:21 52:19, 23, 24 54:2, 8, 23 55:4, 8 56:8, 12 57:10 69:22 70:2, 22, 25 71:4, 21 72:9 73:12 74:3 76:11 78:21 81:8, 24 84:23
**documents** 9:2, 6, 7, 10 10:21 11:22, 25 12:7, 9, 15, 17 13:23 66:17, 20 75:12
**doing** 38:23 41:5 57:11 89:12
**double-check** 24:8
**dozen** 77:3
**draft** 54:19 77:9 78:9
**duly** 6:2 92:5, 8

< E >
**earlier** 15:23 32:1 46:22 47:7 56:1 85:4 89:23
**East** 2:15
**education** 15:15
**effective** 40:21 79:17
**eight** 7:11 77:21
**either** 24:14 58:19 75:7
**elected** 15:25 16:3, 8, 10, 15
**election** 16:25 17:5
**electronic** 81:15
**element** 44:17
**Email** 2:9, 17, 24 11:13 66:6, 21 68:21
**emergency** 37:4 41:2 45:21 46:6 56:19, 24 57:6, 8, 12, 17 58:11, 20 59:5 63:24 64:3 80:6, 13
**employee** 32:21 39:5 66:12 92:13
**employees** 9:20 19:14 20:2 21:5 42:10
**employment** 17:10
**encouraging** 17:7
**engagement** 32:22 39:6
**enterprise** 19:13 27:16, 21 28:3, 5 34:18, 25
**enters** 49:9 60:16
**entire** 19:7 93:7
**entitled** 60:23
**entity** 18:10
**environmental** 41:2
**equal** 23:22
**Erie** 2:7
**ERRATA** 93:1, 13 94:1 95:1
**error** 22:20 49:3
**Esq** 2:1, 4, 5, 10, 13, 17, 20
**essential** 26:3 69:20
**essentially** 50:23
**et** 1:10 5:5 41:3 93:4
**euphemism** 23:17
**evaluate** 86:16
**evaluated** 28:4, 9 85:11
**evaluating** 90:13
**evaluation** 24:3 65:19
**Evan** 5:4 6:16, 17
**EVANS** 1:15 4:3 6:1, 14 86:3 91:17 92:7, 11 93:19 94:24 95:24
**Evansville** 18:1
**eve** 17:5
**event** 18:7
**events** 30:6
**eventually** 67:18 79:16
**evidence** 28:7 65:7 70:18 80:16
**evolutionary** 51:15 55:6 79:21
**exact** 30:1 87:6
**exactly** 22:5 23:11 31:4 50:1 58:14 65:2
**Examination** 4:4, 5 6:5 83:15 88:10
**examined** 6:3
**example** 81:17

**exceptional** 43:21 85:25
**exchange** 11:11
**excuse** 14:21 39:21 66:2, 19 81:12
**executive** 18:23 29:14 48:14 76:8 77:1, 13 79:12
**executives** 32:5 38:23
**exemplary** 42:12 43:7, 9, 25 45:14
**exercise** 86:1
**Exhibit** 4:8, 9, 10, 11, 12 10:1, 5, 7, 24 24:22 25:3, 8, 12 27:7, 12, 20 47:11, 16 48:5 53:18, 22 54:3 65:22, 25 66:15 68:15, 19 69:10, 14, 18 70:10, 11, 15 71:7, 17 73:17, 21 76:1, 5, 16 77:7 78:16 79:9 80:1 81:1, 5, 10 82:3 83:17
**EXHIBITS** 4:7
**exist** 52:13
**existence** 18:12
**exists** 37:20 72:12
**expected** 49:16
**expeditiously** 60:14
**experience** 17:8 32:25 39:9 85:21
**experiences** 87:10
**expires** 92:24
**Explain** 52:3
**extensive** 86:4
**extent** 9:5 15:15
**external** 24:2 90:15

< F >
**facetious** 21:11
**fact** 8:20 19:2 42:25 45:20 52:12 82:12 87:16
**factor** 87:24
**facts** 28:7 58:7 65:6 70:17 80:16 86:6
**fair** 72:23
**fairly** 44:21
**familiar** 76:13
**far** 45:16 73:14 79:6
**fashion** 34:15
**father** 17:3
**February** 1:18 5:2 25:16 92:21 93:2
**feedback** 84:8
**feel** 7:16
**feeling** 40:18 45:23
**fellow** 17:7 87:22
**Ferdinand** 48:25
**FIFTH** 1:10, 20 2:15, 21, 22 5:5, 21 9:17, 20, 23 11:6, 19, 21 12:3, 6, 14, 20, 22 13:8, 15, 21 14:4, 8, 13 15:12 17:15, 18 18:19, 24 19:14, 23 21:5, 16 22:6 24:10 25:8, 9, 24 26:25 27:13 28:20 29:9 30:17 35:7, 12, 16 38:10 39:25 40:15 41:14 42:1 43:15 44:9 45:8 46:13 47:16, 17, 22 48:5 52:1 53:22, 23 54:17 55:15 56:6 60:18 62:7 63:4 66:1, 7, 12 67:3, 5, 15 68:8, 19, 20 69:14, 15 70:13, 14 72:2, 16, 18, 20, 25 73:10, 21, 22 76:5, 6, 16, 17 77:5, 7 78:13, 17 79:9 80:1 81:5, 11, 19 82:4 88:6 90:16, 22 93:4
**file** 7:12
**fill** 60:13
**filled** 60:10
**final** 12:12 13:13 54:19, 22 55:10 78:9 79:18, 23
**finality** 51:14
**finally** 18:5
**financial** 17:12 33:2 39:11 42:3 43:1
**find** 26:17 50:3 53:10 58:3 72:11
**Findlay** 17:21
**fine** 41:8
**finish** 7:22
**firm** 8:6 17:13 22:23 43:6 92:16
**firms** 26:15
**first** 6:2 7:6, 13 11:4, 17 15:9 16:7 25:17 36:2 48:10 53:24 55:11 61:22 65:16 66:1, 6 69:19 71:4 74:22 84:1, 2 92:8
**five** 78:1
**flip** 55:19
**Florida** 6:22
**Focus** 27:25
**folks** 53:7 69:22 87:12 90:18 91:6
**followership** 84:7
**following** 67:23, 25 74:12
**follows** 6:4
**Follow-Up** 68:23
**foregoing** 92:10
**Forgive** 55:17
**form** 11:14 28:6 33:17 40:1 51:1 52:8 56:7, 25 59:7 70:16 73:1 75:14 80:14 86:6 88:18 89:5 90:23
**formal** 21:4, 7, 13 30:3 51:3, 19, 21 52:4
**formalities** 6:11
**formula** 25:22 41:18 69:20
**forth** 7:12 38:24
**forthcoming** 52:10
**forward** 18:8 23:14 41:25 58:3 73:14 75:21
**forward-thinking** 85:20
**foundation** 19:18 28:8 34:19 40:2 46:24 70:17 80:17
**four** 7:2
**fourth** 78:16
**frame** 22:12 29:18 65:10 71:3
**frankly** 21:13 22:14
**free** 7:16
**frequently** 30:9 33:15
**front** 78:21
**full** 6:12, 14 23:12 48:10 84:2
**fully** 75:16
**fulsome** 18:2 23:13
**functioning** 30:4
**functions** 30:22, 23 40:19
**Further** 4:5 53:2 58:15 64:5 88:9, 10 91:11
**furthest** 53:1
**future** 72:6

< G >
**general** 38:23 40:17 41:8 50:9 79:19, 22
**generally** 76:13
**generic** 72:3
**getting** 16:2 61:5 76:19 77:20
**give** 24:6 26:15 49:1 87:4, 18
**given** 58:20 70:24 71:16 92:10
**giving** 18:11 92:7
**glass** 45:21
**Global** 17:12, 25 18:3, 6
**go** 6:15 10:16 18:8, 12 21:14 23:10, 21 26:6 31:8 37:22 40:23 51:13 58:15 64:7 65:9 73:14 78:8 83:1, 20 84:18 87:2, 25 90:5, 11
**goals** 33:3 39:12
**goes** 34:10 53:8 61:23 66:2
**going** 7:14 9:4, 7 10:6, 16 19:8, 22 20:7, 10 21:12 26:6 28:24 37:19 41:21, 25 42:4 44:24 49:11

50:18 51:18 53:5 58:3, 5 60:2, 3, 22 61:22 62:13 72:3 75:20, 25 84:10 85:12, 18
**good** 40:20 41:4, 5 44:19, 20 57:25 87:5
**gosh** 16:14
**government** 57:23, 24
**governor** 7:10 16:11 21:25 40:24 41:6 44:16
**graduated** 15:16
**grammar** 48:25
**granular** 43:22
**great** 62:4
**Greg** 20:5, 13, 21 21:19 22:6, 11, 14 35:6, 11, 15 39:20, 24 46:21 47:6 51:25 65:12 68:13, 22, 23 69:7 76:24 77:12, 23 82:7, 17 87:23
**Greg's** 20:10
**grievously** 59:18
**grooming** 19:10
**group** 23:2
**guess** 16:2 28:13, 14, 16 29:2 32:11, 13 42:8 75:9 78:10
**gun** 75:8
**Guy** 66:7, 16, 24

**< H >**
**half** 77:3
**halfway** 48:11
**HAMILTON** 92:3
**hand** 61:12 92:19
**handed** 10:4 25:2 27:11 47:15 53:21 65:25 68:18 69:13 73:20 76:4 81:4
**handful** 34:12
**hands** 29:5
**happens** 55:7
**hard** 43:24 63:14
**Hart** 2:13 5:15
**head** 22:15 40:25 41:1 66:13 75:8 77:15 78:3, 5 80:22 82:12
**heading** 79:20
**headquartered** 17:21, 25 18:17
**heads** 7:20 22:3
**hear** 7:16
**heard** 6:16 31:15
**heavily** 51:5
**he'd** 87:16
**height** 74:19
**held** 10:12
**helpful** 89:2, 24
**hereinafter** 6:3
**hereof** 93:13
**hereunto** 92:19
**hey** 58:20
**high** 61:18 63:11
**higher** 59:22 87:11
**highly** 62:3 86:12
**hire** 26:14 64:21 65:20 72:18 86:9
**hired** 22:21 23:5 38:2 42:19, 21 43:6 49:8 62:5 72:16
**hit** 37:3 53:8
**hitting** 41:8
**hold** 16:6 17:17
**honestly** 31:6
**honesty** 58:1
**honorific** 6:10
**hope** 53:17
**hopefully** 18:10 19:10 57:25 59:15
**hoping** 26:11
**hospital** 59:21
**hotels** 17:23
**huge** 58:21
**human** 21:8 26:18 28:22 55:5 56:9 61:23 62:20 63:19 64:25 66:13 72:11
**hypothetical** 58:25

**< I >**
**idea** 28:3, 13 88:16, 23
**ideal** 26:17
**ideally** 44:24 60:7
**identification** 10:2 12:13 13:13 24:23 27:8 47:12 53:19 58:12 65:23 68:16 69:11 73:18 76:2 81:2
**identified** 12:5 13:6 46:11 84:7, 9
**identify** 8:19 54:3
**Ihle-Adkins** 1:23
**III** 1:15 4:3 5:4 6:1, 15, 17 91:17 92:8, 11 93:19 94:24 95:24
**imagine** 57:20
**immediately** 37:2 52:25
**impact** 86:2
**implemented** 31:5
**importance** 72:13
**important** 19:1, 4, 12 41:20, 25 44:18 60:10
**improper** 10:13
**improperly** 10:9
**improvement** 23:17
**including** 11:14 17:15 37:18 48:18
**income** 33:5 39:15
**independent** 18:9 64:22 72:19, 24 73:9 86:10, 13
**Indiana** 15:20 16:8 18:1
**indicate** 91:4
**indicated** 10:22 45:16 63:7 66:15 74:9 86:9 89:2, 23 93:12
**indicates** 56:12 61:18 63:11 68:23, 25 77:23 79:9 80:5 82:9
**indication** 45:6
**individual** 23:13, 14 27:22 86:15, 16 87:15
**individuals** 62:22 77:3, 19 87:9
**industry** 51:5
**industry's** 41:21
**infer** 20:7
**informal** 30:22
**information** 11:12 37:20 61:4, 10, 14 62:13
**initial** 63:19
**initially** 45:17
**initiate** 79:4
**initiated** 48:12
**initiating** 55:9
**injured** 59:18
**inmates** 7:12
**innovative** 85:22
**inquired** 85:6, 8
**inquiries** 11:16
**inside** 23:23 24:5 29:22
**inspire** 42:9 44:18
**institution** 17:12 42:1 44:25
**institutions** 43:1
**instruct** 8:18 9:4 10:16 28:15, 24
**instructions** 8:3
**intangibles** 41:19
**interacted** 30:20
**interest** 21:9 92:15
**interesting** 23:17
**internal** 24:1, 9 49:15 90:13, 21 91:6
**international** 18:3 23:3, 5, 8 24:15 66:7 70:5 85:11, 16
**interview** 31:12 38:13
**interviews** 84:8
**introduce** 5:9
**introduction** 7:14
**involved** 21:15, 22, 23 22:24 26:24 28:21 67:13, 17, 20 70:15, 21
**involving** 25:15 57:21
**item** 11:17 12:2, 11
**itemize** 36:15
**items** 68:23

**its** 24:3 84:16 88:5 90:24

< J >
**January** 15:11 16:9, 12, 18 29:8, 10, 16, 20 30:5, 10 31:14 35:5, 9, 14, 22 36:3, 18 38:3, 11, 15, 17 39:3, 6, 9, 13, 17, 19, 23
**jms@sspfirm.com** 2:9
**job** 16:21 27:25 41:5
**joined** 21:19
**joint** 5:18
**Joshua** 2:4 5:13
**JPMorgan** 62:5
**judge** 7:7
**judgment** 23:24 42:11
**July** 18:22 71:10
**June** 34:16
**jury** 7:9

< K >
**Kabat** 21:18
**keep** 24:20 53:9 85:12, 18, 23
**Kevin** 21:18 22:11
**Key** 6:22 48:19
**killed** 57:13 58:23
**kind** 6:10 21:25 26:5 37:3 43:24 51:17 53:9 55:11 58:2 61:25 62:5 72:9
**know** 10:10 19:19 20:22 21:7, 13, 24 22:14 24:4, 5 26:14, 16, 18, 21, 24 28:20 29:6 30:23, 24 32:14, 17 33:24 34:5, 14, 22, 24 35:23 36:12, 20, 23 38:20 40:7, 16, 20, 22 41:18, 21, 24 42:6, 7, 9, 13 43:3, 10, 20, 22 44:13, 14, 21, 23 45:11, 16 50:16 51:5, 15, 19 53:7, 9 55:3 57:12, 18, 21, 24 58:5, 7, 22 59:1, 11, 21 60:7, 8, 11, 12, 13 61:24 62:19 64:24 65:3, 7, 20, 21 66:8, 19, 24 67:8, 10, 18 70:10, 13 71:19, 21 72:5, 13, 16 73:15 75:6, 18, 20 83:10 87:5, 7 89:17 90:20 91:8, 9
**knowing** 34:20
**knowledge** 20:21, 23 28:17, 23 43:12 65:8 67:9 70:19
**knowledgeable** 42:23 43:2

< L >
**L.P.A** 2:7
**Lack** 19:18 28:7 34:19 40:2 44:17 46:24 70:17 80:16
**lacked** 43:14 44:8 45:7 46:12
**Lamb** 37:24 49:6 53:4 56:17 60:23, 25 61:3
**landscape** 42:3, 24
**lane** 16:15
**large** 18:3 19:12 44:25 85:10
**law** 15:21 16:4 17:8, 13
**lawful** 6:2
**lawyer** 8:6
**lawyers** 5:21 8:21 9:7
**lead** 55:8 58:3
**leader** 44:24 60:3, 7 72:7
**leadership** 26:3 27:21 42:6 44:23 45:5, 7 46:16 59:16 69:20
**leaf** 47:19
**leafing** 25:25
**leaves** 47:10 55:13
**leaving** 31:7 82:13, 23
**left** 28:2 31:7 61:12
**legal** 6:14
**level** 43:11 55:9 59:22 62:21 87:12
**levels** 45:12
**Leverage** 28:1
**levers** 86:2
**lies** 72:13
**life** 44:15
**Lifepoint** 18:16
**limit** 29:18
**limited** 11:15
**line** 10:13 51:7 86:20
**lines** 13:24 50:21
**list** 37:10, 17 63:24 80:13
**listed** 6:16 11:8 12:2, 11 37:24 57:19 58:10 59:12 64:3 69:3 74:23 76:17, 25 77:15, 21 78:3, 17 80:8
**lists** 56:19
**little** 16:2 26:12 44:14
**live** 7:3
**lived** 6:24
**LLP** 2:14
**location** 30:24 31:3
**Lodging** 17:22
**long** 6:24 60:5, 12
**longer** 18:13 37:25
**long-term** 19:3 58:9 59:6, 15, 23 60:3
**long-time** 66:12
**look** 25:4, 17 26:7, 18 36:6, 7, 8 50:18 59:25 69:25 70:3 74:21 76:12 78:10, 24 86:13
**looking** 36:5 40:7 41:11 59:13 66:20 67:4 72:6 84:14 86:14 89:2, 24 90:16
**looks** 26:14, 19 47:19 72:8 74:18 76:13 77:20 78:1
**lost** 17:5
**lot** 7:11 8:15 23:21 34:10 69:23 75:25
**loud** 84:2

< M >
**M&A** 41:23 42:18
**M&B** 42:22
**mail** 11:13
**major** 37:8 42:25
**making** 60:14 84:16 88:5
**managed** 33:6 39:16
**Management** 17:12 29:11 41:2, 9 55:7 68:24 77:17
**managing** 33:10, 11
**manner** 40:20
**Marathon** 17:18, 19, 20
**March** 66:8
**MARKED** 4:7 10:1, 5 24:22 25:3 27:7, 12 47:11, 15 53:18, 21 62:14 65:22 66:1 68:15, 18 69:10, 13 73:17, 20 74:21 76:1, 4 81:1, 4
**market** 23:9, 18 77:16
**match** 16:21
**material** 86:2
**materials** 31:25 32:4, 18 39:1 75:21
**mathematical** 41:18
**matter** 19:2 20:20 93:8
**McGuireWoods** 17:13
**MCHUGH** 1:7 3:4 5:5, 12, 14 14:10, 18 15:1, 4 29:15 30:6, 10, 17 31:19 33:7, 10, 11, 15 35:6, 11 39:23 41:14 44:7 51:25 52:3 56:20, 23 58:10 59:4 62:10, 18 64:2 66:21, 25 68:9 72:24 73:9 77:2, 24 78:3 80:12 82:11, 18, 23 88:17, 24 93:3

**McHugh's** 29:9 31:13, 18, 22, 25 32:18, 21, 24 33:2 63:23 80:5
**mean** 11:10 12:23 28:13 35:20 43:5 54:5 57:12, 18 67:17, 19 73:2 76:13 81:14
**meaning** 44:4
**means** 34:7
**mechanism** 21:4, 7, 14
**media** 8:1 64:13
**Medics** 59:18
**meet** 29:15 30:5 31:12 38:4, 13
**meeting** 19:6, 7 31:8 34:7, 8 35:24 36:19 38:4, 21 46:10 47:22, 25 48:1 51:17 54:17, 21, 24 67:22, 24 68:2 74:2, 7, 11, 16 75:5, 13 78:14 80:12 82:10 84:12, 22
**meetings** 8:19 12:24 13:2, 5, 10, 17 14:1, 17, 21, 22 15:13 29:22 30:2, 7, 10, 16 31:2, 16 32:2 33:16 34:10, 11, 18 35:1 36:13 38:9 44:4 45:3 46:3, 18 54:3 68:11 74:10 79:15 87:21
**meltdown** 58:22
**member** 17:14 28:4 30:21 56:20 69:1, 4 70:21 88:4
**members** 9:13, 17 13:3, 11, 19, 23 14:17 34:17, 24 35:10 37:18 45:18 56:22 70:14, 24 71:16 74:13 86:22 87:22
**memory** 14:6 16:14, 19 24:17 25:21 26:12 30:1 32:7, 10 37:16, 20 54:25 75:23 76:13 79:7, 24 81:25
**men** 67:4
**mentioned** 18:18
**mentions** 11:6, 19 12:4 14:9, 14
**merge** 18:3
**merger** 18:8 42:24
**message** 11:14
**met** 8:20, 24
**Michael** 2:10 5:15
**michael.cioffi@blankrome.com** 2:17
**middle** 6:15 18:22 49:11 61:7 77:16
**midyear** 31:22, 25 32:18 38:18 39:2
**Mike** 50:5 54:10 74:5
**million** 17:7
**mind** 37:23
**mine** 81:18
**minutes** 47:17, 22, 24 48:1, 5 74:1, 10 83:21 84:21
**misleading** 67:7
**misstates** 65:7 67:6
**mistake** 17:20
**mistaken** 49:24
**moderate** 62:14
**months** 58:2
**morning's** 68:24

**< N >**
**name** 6:12, 14, 15 37:23 63:24 80:5
**names** 37:13, 18, 22 57:19 58:4
**name's** 80:8
**Nashville** 18:17 31:9
**nationally** 43:6
**nature** 32:4 57:16 70:22
**necessary** 40:21 45:7
**need** 7:19 36:5
**negotiations** 11:15
**neither** 92:13
**never** 8:1 31:17 40:12, 14 43:3, 10, 23, 25 52:3 53:13 57:1 72:23 88:2, 8
**Nevertheless** 10:10, 15
**new** 21:16
**nice** 16:21 24:4, 6 87:12
**No._____Change** 94:2, 5, 8, 11, 14, 17, 20 95:2, 5, 8, 11, 14, 17, 20
**No._____Line** 94:2, 5, 8, 11, 14, 17, 20 95:2, 5, 8, 11, 14, 17, 20
**nodding** 7:20
**normally** 36:24 55:7
**Notaries** 1:24
**notary** 92:5, 25
**note** 27:3 83:13
**noted** 76:21 85:17, 19
**notes** 16:22
**Notice** 1:17 10:19 19:22 20:2
**noticed** 6:8
**notices** 11:16
**noticing** 78:20
**notify** 19:14
**November** 16:10, 14, 15, 17 77:9 78:8, 13, 20, 22 79:4
**Number** 5:7 10:5, 25 11:7 25:3, 12 27:12, 21 41:19 48:5 53:22 54:4 63:13 65:25 68:19 69:14 70:10, 11, 15 71:7, 17 73:21 76:5 81:5, 11 82:3 83:17 87:6
**numbers** 25:5
**numerous** 22:16

**< O >**
**oath** 93:15
**object** 10:6 37:19 56:25
**Objection** 9:4 19:18, 25 27:3 28:6, 11 29:17, 21 30:12 33:17 34:19 35:2, 17 37:15 38:6 40:1 43:17 45:9 46:24 51:1, 13 52:2, 8 56:7 58:13 59:7 64:4 65:6 67:6 70:16 71:3, 22 73:1 75:14 80:14 84:18 87:1, 25 88:7, 18 89:5 90:3, 23
**Objections** 11:1
**objective** 42:16 43:14 44:7 45:6 46:14 85:21
**observations** 45:12
**observe** 30:17, 18 38:10 75:12
**observed** 30:20
**Obviously** 21:11 55:10 72:2
**occasionally** 23:18 30:24 31:15 36:15
**occasions** 22:4, 16
**October** 27:17 28:5 33:15 34:17 81:22
**offer** 93:14
**office** 8:10 15:25 16:3, 7, 11, 23 92:20
**officer** 11:6, 19 12:3, 20 14:13 25:23 48:14 77:1, 14 79:12
**officers** 14:8 70:14
**offices** 16:6
**official** 30:22 57:25 92:20
**off-site** 30:24 31:2, 3
**Oh** 25:25 50:8 57:24 61:17 79:1
**OHIO** 1:3, 21, 24 2:8, 16, 23 5:7 17:21 92:2, 6, 20, 25
**Oil** 17:20
**Okay** 11:24 12:19 14:7 26:11 32:15 36:12 37:5 46:5 54:1 55:19, 22 56:23 61:17 65:16 73:16 77:4 78:6 83:25
**old** 48:25
**once** 17:3 63:18
**one-pagers** 66:16
**ones** 58:8
**open** 69:19

**opening** 19:15, 23 20:8
**operating** 25:23 42:5
**opinion** 56:5
**opportunities** 23:16
**opportunity** 43:10 70:25 71:16
**oral** 11:12
**order** 69:5
**ordinarily** 34:14
**org** 79:24
**organization** 37:6 58:19 60:3 73:3
**organizational** 76:17 77:9 78:18, 25 79:10
**original** 65:3
**originally** 67:3
**outlined** 52:17
**outlining** 26:5
**outside** 9:23 13:2, 5, 10, 17, 25 14:17, 21, 22 15:12 22:21 23:18, 19 24:6 29:22 30:6, 10 38:4 39:20 50:18 54:13 73:2
**overly** 44:12
**owned** 6:25

< P >
**p.m** 66:8 68:22 83:4 91:22
**PAGE** 4:3 10:24 25:6, 17 27:20 48:4, 11 53:24 55:23 58:18 60:24 62:7, 10 63:7 66:1, 6 69:19 76:15 77:7 78:16, 19 79:8 80:1 81:10, 12, 14, 16, 19 82:3, 5 83:24 94:2, 5, 8, 11, 14, 17, 20 95:2, 5, 8, 11, 14, 17, 20
**papers** 47:1
**paragraph** 48:10 49:12 82:8 84:2
**part** 16:1 19:1 65:17 67:18 84:11 86:6
**participate** 31:21 38:18
**participating** 8:8, 9
**particular** 10:8 84:15 86:11
**particularly** 19:13
**parties** 92:14
**partner** 17:13
**party** 10:8
**pas@sspfirm.com** 2:9
**passed** 7:2
**patient** 59:19, 20, 23
**Patterson** 2:7
**peer** 84:8
**PENALTY** 93:5, 6
**penmanship** 81:17
**People** 17:20 19:10 21:8 36:15, 24 40:8, 25 41:1, 4 44:18 57:13 58:18 59:2, 11 76:24 77:14 78:2 86:14 87:6 89:3, 25 90:14
**perceived** 53:5
**perfect** 69:25 72:7, 11
**perform** 31:21 89:25
**performance** 33:3 39:12
**performed** 40:19 42:13 65:18
**performing** 33:10
**period** 34:16 37:25 41:22 60:1 74:19, 25
**PERJURY** 93:5, 6
**permanent** 40:22 53:10 60:10
**person** 8:9 11:13 23:23 26:18 36:21 37:1, 3, 5 51:22, 25 53:1 58:1, 3, 6, 24 72:8 74:22
**person's** 58:5
**Peter** 2:1 5:11 6:10 8:1, 5
**Petroleum** 17:19, 21
**Phenise** 2:17 5:20
**Phil** 14:9, 18 15:1 29:9, 10, 12, 15 30:6, 9, 17, 20, 21 31:7, 13, 18, 19, 21, 25 32:5, 9, 18, 21, 24 33:2, 7, 10, 11, 15 34:1, 11, 14 35:6, 10 39:23 40:5, 6, 10, 12, 14, 17 41:8, 13 42:13, 17 43:3, 10, 14, 22, 25 44:7, 20 45:7, 20 46:6, 11 51:25 52:3, 14, 16 53:12 56:20, 23 58:10 59:4 62:10, 18 63:23 64:2 66:21, 23 68:8 72:24 73:9, 12 77:2, 24 78:1, 3 80:5, 12, 19 82:10, 12, 18, 22 88:17, 24
**PHILIP** 1:7 3:4 5:5, 12, 14 15:4 93:3
**Phone** 2:8, 16, 23 74:16 75:3, 9, 11, 17
**Place** 1:20 6:25 62:20 92:11
**Plaintiff** 1:8, 16 2:1 3:4 5:12, 14
**Plaintiff's** 4:8, 9, 10, 11, 12 10:1 24:22 27:7 47:11 53:18 65:22 68:15 69:10 73:17 76:1 81:1
**Plan** 55:20, 25
**plane** 53:8
**plane's** 57:13
**planning** 11:20 12:21, 24 19:3, 8 32:2 36:13 38:21 45:19 46:10 49:15 52:20 54:21 76:8
**plans** 49:17
**play** 42:3
**played** 41:20
**please** 5:24 6:13, 20 7:16 10:25 44:11 45:10 48:5 52:15 55:16 56:9 58:15 60:19 82:5 83:17 85:5, 13
**pleased** 65:19
**plural** 49:24
**PNC** 2:15
**point** 20:5, 20 37:7 48:11 50:14 63:20 68:25 77:13 79:11 82:1 83:7 90:3
**pointing** 88:14
**points** 63:14
**politics** 15:24 16:1
**Poole** 2:17 5:20 47:10 49:9
**portion** 61:3
**position** 11:21 12:6, 14, 21 13:7, 14, 20 14:2 19:15 20:8 21:10 48:14 51:22 56:3 60:10, 14 86:25
**positions** 19:9, 10 36:25
**possible** 18:11 25:14 32:7 58:17 60:8 91:6
**possibly** 59:2
**potential** 13:19 14:1 36:16, 22 40:13, 15 41:23 42:18 48:13, 18 50:19, 22 53:5 58:9, 11 61:8, 9, 18 62:14 63:10, 11 67:14 72:19 80:13 85:9 86:14 89:3, 25 90:14
**PowerPoint** 66:16
**practice** 17:8
**precise** 22:17 60:6 72:4 89:20
**precisely** 22:11 36:17
**precision** 34:4, 9
**preexisting** 86:19
**prefer** 16:1
**preference** 6:8, 9
**preparation** 9:2 28:21 70:15
**prepare** 8:13
**prepared** 52:25 55:3 56:8 70:11
**Present** 3:3 34:13 43:11, 23 74:22
**presentation** 84:11
**presentations** 34:8, 25 44:20 45:2, 12 46:3, 17 75:13
**presented** 22:16 34:11 54:2, 20, 23

55:1 75:12 78:23 79:3, 25 80:15
**presenting** 25:19 34:14 55:8
**preserve** 83:13
**president** 11:21 12:6, 14, 22 13:7, 14, 20 14:4 18:24 19:15, 23 21:5, 16 22:6 24:10 25:23 35:7, 11, 16 39:25 40:15 41:14 44:8, 16 45:8 46:12 50:25 51:11 52:1 64:22 67:5, 14 68:7 72:20, 25 73:10 76:25 77:15 79:11, 16 81:21 84:17 85:9, 15 86:8, 25 87:14, 23 88:6 89:3 90:1
**pretty** 43:22 61:6 77:20
**previous** 31:7 48:1 65:10 69:22 73:12
**previously** 36:5 52:18 74:8 86:9
**principal** 7:1
**print's** 61:5, 11
**Prior** 15:11 29:8, 16, 20 30:5, 10 31:13 33:15, 18 35:5, 9, 23 38:3, 10, 14, 17 39:2, 6, 9, 12, 17, 19
**priorities** 48:20 49:14
**private** 16:13 18:16
**privilege** 17:4
**privileged** 7:11 16:7, 10
**probably** 49:24, 25 50:10
**problem** 72:12
**process** 18:24 19:8 21:16 22:13 26:6 40:23 51:15 55:7 65:12, 13 67:13 72:14 79:22
**Processes** 12:11 13:12
**produce** 11:4
**production** 10:21
**professor** 48:25
**profile** 26:21, 25 27:25 60:24 61:3 62:10 63:7 66:19, 21
**profiles** 66:25
**progress** 83:8, 12
**promote** 84:17 86:7 88:5
**promoted** 86:24 87:22
**promotion** 82:11, 19
**proposed** 12:12 13:12 77:8 78:17, 25 79:10
**proposing** 79:3
**provide** 59:15, 22
**provided** 75:15
**public** 16:2 20:20, 22 44:15 85:10 92:5, 25
**publicly** 18:18
**publicly-traded** 17:15 18:15
**Public-State** 1:24
**purely** 45:2
**purposes** 11:9 58:17
**Pursuant** 1:17 5:17 92:12
**put** 19:24 28:18 42:8, 19 49:2 75:8
**putting** 23:14

**< Q >**
**qualified** 92:5
**quantitative** 41:19
**quartile** 43:7 85:15 87:16 90:18
**question** 7:23, 24 9:8 10:17 13:22 14:6 28:7 33:18, 20, 24 36:2 40:2, 4, 5 46:16 47:2 51:2, 8 52:9 53:12 56:8 57:1, 5 58:14 59:8 65:10, 17, 21 67:7 70:17 71:13, 15 73:2, 3, 5, 8 75:15, 16 78:11 80:15 88:19
89:6, 7, 10, 13, 15, 17 90:24
**questioning** 10:14 89:12
**questions** 7:15, 17 10:23 26:10 27:5 36:6 49:13 79:5 83:8, 14 88:9 91:11

**< R >**
**rapid** 41:22
**rapidly** 42:2
**Ratings** 27:22
**Raymer** 1:22 92:4, 24
**read** 26:2 50:2, 6, 7 84:1, 2 85:3, 5 86:6 87:17 93:7, 9
**readiness** 48:19 49:17
**reading** 61:10 85:23
**reads** 48:11 49:12
**real** 41:23 62:4 76:19
**really** 41:17 44:1 51:5 55:9 78:15
**re-answer** 58:15
**reason** 18:9, 11 34:13 59:10 65:17 75:3 94:4, 7, 10, 13, 16, 19, 22 95:4, 7, 10, 13, 16, 19, 22
**reasons** 52:17 86:25
**recall** 13:25 18:21 19:20, 22 20:8, 15, 16, 18, 25 22:10, 13, 17, 23 23:11 24:11, 14 25:13, 18, 22 27:17 30:8, 14 31:4, 6 33:9 34:4, 9 37:13, 22 46:9 49:7, 20, 25 50:21 64:1, 2 65:1 68:1, 11 69:6 74:18 75:6 78:11, 12 79:14 80:11, 18, 21, 23 81:9 82:17 84:11
**receive** 18:19
**receptions** 30:23
**recess** 64:10 83:4
**recognize** 70:1
**recollection** 50:10, 12 51:16 52:21 54:18 76:14
**recommended** 64:25
**record** 5:1 6:13 7:25 10:11 27:4 51:6 64:7, 9, 12 65:7 67:6 83:1, 2, 5 84:3 91:13
**reducible** 41:18
**reelected** 16:16
**refer** 15:9 23:16 24:21 25:4 48:4 55:15 63:4
**reference** 11:9 85:3
**REFERENCED** 4:7 15:23 32:1 54:2
**references** 27:24
**referencing** 56:1
**referred** 6:8 46:7 50:11 69:24
**referring** 23:2 27:20 46:5 61:2 63:10 71:7 76:15 78:16 79:8 80:1 81:10, 19 82:3 89:6, 8 90:4, 9
**refers** 11:6, 19 12:4 14:9, 13 61:7 77:12
**reflected** 56:5
**refresh** 26:11 76:12
**regard** 23:11 43:8, 21 57:22 82:24
**regarding** 12:21 13:6, 12, 19 14:1, 17, 22
**regional** 77:16
**regions** 29:12 31:10
**Regularly** 34:4, 5
**regulated** 51:5
**regulatory** 57:22
**REIT** 17:22
**relate** 14:9
**related** 84:6 85:9
**relates** 11:7, 20 12:4 14:14
**relative** 33:3 39:12 92:13
**rely** 84:15, 25 86:18
**remain** 18:10

**remember** 37:10, 11 52:22 53:16 87:6
**remind** 32:12
**remote** 75:21
**removed** 63:24 80:6
**removing** 80:12, 19
**repeat** 7:17 47:1 73:6
**rephrase** 7:17 33:21, 22, 25 73:7 88:20
**replace** 39:24 51:12, 25
**replacement** 50:24
**replacing** 35:15
**reporter** 5:23 7:18
**reporting** 76:24 77:1, 14, 23, 24 92:16
**reports** 31:13, 18 38:14
**represent** 5:10, 17 47:21 54:22 68:21 73:25
**representation** 5:18
**representing** 5:19
**reputation** 57:25
**request** 10:20 11:4, 24 65:3
**requests** 11:16
**reserve** 83:11
**residence** 7:1
**resources** 21:9 28:23 55:5 56:9 61:23 62:20 63:19 64:25 66:13
**respect** 12:12 13:13 17:9 43:13 44:6 45:5 46:12 49:20 56:5 57:23 58:10 62:18 70:10 71:23 77:22 89:23
**respects** 42:12 92:12
**responded** 10:11, 22 84:8 85:14
**response** 18:2 41:3 46:15 49:12 89:21
**Responses** 11:2, 16
**responsibilities** 19:2 41:9 75:2
**responsibility** 19:5, 12
**responsible** 22:2
**responsive** 14:5
**restate** 52:6 89:19
**result** 92:15
**resulted** 88:17
**results** 88:23
**retain** 65:17
**retained** 22:24
**retire** 23:1
**retired** 16:18 17:10
**retirement** 16:24 21:1
**retiring** 20:11, 14, 21
**retract** 40:11
**review** 9:2, 10 31:24 32:21, 24 33:2 39:5, 8, 11 47:25 48:12 70:25 71:17 74:9 75:23 91:12
**reviewed** 9:5, 7 48:17 74:12 84:21, 24
**reviews** 31:22, 25 32:19 38:19 39:2
**revised** 76:21
**RHR** 23:2, 5, 8 24:15 64:21 65:4 66:7 67:4, 14 68:7, 12 70:2, 4 85:11, 16 86:10 88:15, 24 89:24 90:12
**RHR's** 88:16
**right** 21:2 22:10, 12 23:4 25:18 28:2 36:20 40:7 41:22 52:4 57:17 58:3, 5, 6 61:16, 19 78:4 79:8, 20 83:12 84:5 89:4 90:1
**right-hand** 25:4, 6 61:3
**rights** 83:11
**risk** 82:11, 18
**RLJ** 17:22
**rogue** 29:4
**role** 23:8 29:9 37:7 41:20 42:3 49:16 53:3 82:12 88:6 90:12
**roles** 37:8
**Rome** 2:14 5:16
**room** 42:8 46:13 47:10 49:9 55:13 60:16
**RPR** 1:22 92:4, 24
**ruffling** 47:1
**Ruge** 48:25
**rule** 36:9 53:15 92:17
**run** 16:23

**< S >**
**S/Wendy** 92:24
**Saba** 2:1, 7 4:4, 5 5:11 6:6 8:9, 12 9:1, 9 10:3, 18 19:21 20:1, 12 24:20 25:1 26:8 27:10 28:19 29:7, 19, 24 30:15 32:16 33:22, 23 34:23 35:4, 19, 21 36:1 37:21 38:8 40:9 44:2 45:1 46:1 47:3, 4, 14 49:10 50:13 51:9, 23 53:20 54:15 55:14 56:11 57:7 59:3 60:4, 17 64:7, 15 65:14, 24 67:12 68:17 69:12 70:7, 23 71:6, 11, 14 72:15 73:4, 16, 19 74:15 76:3 80:20 81:3 83:1, 6 84:18 87:1, 25 88:7, 11, 20, 22 89:9, 14, 22 90:5, 8, 10 91:7, 10
**SAEMA** 69:2
**sake** 7:18
**save** 93:10
**saw** 32:18 67:18 74:6 82:2
**saying** 43:14 79:1, 2, 4 90:15 91:3
**says** 11:1 55:20 62:14 77:8 78:20, 21, 24 82:21
**scenario** 53:8 57:20
**school** 15:16, 17, 20 49:1
**scope** 73:3 89:12, 17
**scrambling** 57:14
**seal** 92:20
**search** 23:18 60:11 72:13
**searching** 14:6
**seat** 17:17 18:19 39:21
**second** 27:20 42:20 48:4 50:3 65:21 68:25 76:15 82:8 83:24
**secondary** 15:16
**secretary** 16:8
**section** 50:7
**sector** 16:13 42:24
**see** 7:8 21:18 23:19 25:5, 13, 25 27:22 28:1 31:24 33:5 39:1, 15 48:15, 21 49:18 53:23 54:16 56:4 61:6, 9, 14, 15 62:15 66:22, 23 67:21 75:18 76:18 77:9, 17 79:1, 12 80:6, 7 81:16, 22 82:15 83:18
**seeing** 19:22 25:18 27:17 81:9
**seen** 25:12 28:10 32:6, 9 47:24 54:8, 12 69:18 74:2 76:11 81:8, 24
**select** 23:23
**selected** 12:5 13:6 17:14 51:22
**selecting** 19:4 21:16 22:2 44:14
**selection** 12:13 13:13 45:19
**semantical** 16:3 44:13
**Senate** 16:16, 17, 18 17:1, 4, 10
**Senator** 5:17, 19 6:7, 9 10:4, 19 25:2 27:11 47:15 51:10 53:21 61:14 64:16 65:25 68:18 69:13

70:1 73:20 76:4 78:24 81:4 83:7, 14 88:12
**sending** 66:16, 24
**senior** 17:11
**sent** 10:20 11:4
**sentence** 49:20 50:2 85:4
**sentences** 49:11 84:1
**separate** 20:9
**September** 74:1, 12 76:9 77:5 78:6, 14, 21, 23 79:2, 15 80:12 82:10 83:21
**series** 7:15
**serve** 18:16 23:8 31:11
**served** 10:7, 9 16:8, 11
**service** 10:13 16:2
**services** 42:3
**serving** 17:4 18:13
**set** 92:19
**setting** 39:21
**settings** 38:5
**seven-plus** 56:16
**shaded-in** 77:19
**Shaffer** 48:12, 24 49:14, 22 66:6, 8, 11, 15, 24 68:21 69:7 82:9, 17
**shaking** 7:20 80:22
**shame** 62:5
**shareholders** 18:5
**Sharpe** 2:5
**SHEET** 93:1, 13 94:1 95:1
**sheets** 33:6 39:16
**ship** 53:10
**show** 50:5 61:16 69:23
**showed** 52:23 69:22 73:11
**shown** 25:14, 20 46:9
**shows** 45:23
**sign** 91:12
**signature** 81:14, 16 82:1
**SIGNATURE:________________________DATE** 94:23 95:23
**Signed** 93:16
**significant** 87:18
**similar** 17:8 69:21
**singling** 32:9
**sir** 6:19 8:4 9:12 16:20 20:24 23:4 24:19 25:11 41:16 45:4 46:4 64:20 66:3 74:8 76:23 78:19 79:5
**sit** 32:17 37:13 68:1
**situation** 22:22 41:16 59:1, 12
**six** 16:17
**sizable** 17:11
**skills** 42:5 43:18, 24 44:7, 8 45:5, 7
**small** 61:6, 11 63:14 76:20 77:20
**Smith** 2:4 5:13
**solely** 50:11
**solutions** 85:22
**somebody** 37:2 42:7
**Someone's** 41:20 59:18
**somewhat** 41:7 69:21
**sorry** 20:16 29:1, 5 32:10 46:25 78:19
**sort** 12:25 19:3 30:25 42:7, 10 44:22 45:13, 14, 18, 20 51:2 55:12 62:24 69:24 86:11
**sorts** 42:6
**sounds** 6:10 22:10, 12 23:4 26:19
**SOUTHERN** 1:3 5:6
**speak** 9:13
**speaks** 27:4
**specific** 10:23 11:1 20:9 32:7 33:9 40:5 54:18 76:14
**specifically** 33:6 39:16 75:24
**specifics** 58:20 59:1
**speculate** 28:16 29:3 32:11, 13 82:25 88:25 89:1 91:2
**speculating** 82:24
**Speculation** 88:21
**spelled** 6:18
**Spence** 14:14, 23 15:7, 8, 12 21:21 36:20 37:10, 25 38:4, 10 39:17, 20 41:12 42:21 45:20 48:18 49:5, 25 50:11, 24 51:11, 21 52:20 53:1, 6 56:13 63:6, 8, 11 65:11 66:22, 23 67:1 68:7 77:2, 15, 24 79:11, 16 84:7, 17 85:14, 19, 24 86:5, 8, 13, 20, 24 88:6 89:4 90:13, 17, 20 91:4
**Spence's** 38:14, 18 39:2, 5, 8, 11 51:18 82:19 85:8
**spend** 19:7
**spent** 15:24, 25
**spot** 59:19
**SS** 92:2
**St** 15:17 49:1
**stabilize** 57:14 58:2 59:19 60:1
**stabilizing** 59:14
**stack** 86:15 87:15
**Stagnaro** 2:7
**stamped** 25:3, 8 27:13 47:16 68:19 69:14 73:21 76:5
**stamps** 25:5
**stand** 6:11
**starting** 63:20
**state** 5:10 6:12 8:7 10:10 16:8, 11 21:25 22:1 41:3 92:2, 6, 25
**statement** 22:8 50:9 84:16 90:5, 6
**statements** 11:15 33:5 39:15
**STATES** 1:2 5:6 16:16, 18 17:1
**step** 37:2, 7 42:19 46:21 47:6 52:25 53:9 58:1 60:1
**stepped** 22:11
**stepping** 20:6
**sterling** 81:17
**stipulation** 92:12
**stop** 84:10
**strategic** 19:3 41:20 85:20
**Street** 1:20 2:15, 22
**Strength** 27:25
**strengths** 23:15
**strictly** 41:19
**strike** 66:19 68:5 70:9 72:16
**structure** 77:5, 9, 22 78:7, 13, 18, 25 79:10
**style** 42:6
**styled** 5:4
**sub** 63:13
**subjective** 85:21
**subordinates** 31:13, 19 38:14
**subsequent** 16:23
**substantially** 29:13
**subsumed** 18:6
**succeed** 68:13 87:23
**succeeding** 35:6, 11
**success** 48:13
**successful** 36:22 41:11 45:22
**succession** 11:20 12:21, 24 18:24 19:8 22:17, 24, 25 25:15 32:2 36:13, 17 38:21 45:19 46:10 48:17 52:19 54:21 55:20, 25 56:3, 6 65:12, 13 67:25 69:1, 7 76:8 80:2
**successor** 46:6 56:24 57:6, 9 58:11 59:5, 6 63:24 64:3 80:6 85:10, 16
**successors** 50:19 56:19 80:13
**sued** 7:11
**sufficient** 42:15

**suggest** 87:11 88:4
**suitable** 23:20
**supplement** 24:3
**supplied** 9:6, 11
**support** 84:7
**supporters** 17:6
**supposed** 32:11
**sure** 22:20 28:14 73:7
**surrounding** 30:3
**survey** 23:9
**surveys** 32:22, 25 39:6, 9
**suspenders** 24:4
**swear** 5:24
**sworn** 6:2 92:8

< T >
**tailored** 72:2
**take** 5:3 7:9, 21 17:7 26:2 31:8 50:6 53:6 59:21 60:12 62:23 64:8 70:3 75:1 86:13
**Taken** 1:16 7:5 51:20, 21 64:10 83:4 92:12 93:2, 8
**takes** 23:24 55:7, 12
**talent** 19:11 46:7 54:1 61:4, 10, 13 62:4, 13 66:17 68:24
**talented** 38:1
**talk** 8:19 69:1, 4
**talked** 15:8
**talking** 26:1 71:5
**Target** 27:25
**Tayfun** 56:20 59:10 66:21, 23 68:9 73:12
**Team** 27:21
**Teams** 75:5, 7
**technology** 22:15 42:2 43:9, 13, 15
**telecopy** 11:13
**telephone** 11:13 74:22 75:4
**telephonic** 75:8
**temporary** 59:12 60:1, 5, 7
**tend** 7:12
**Tennessee** 18:17
**term** 37:4 44:17 54:1 60:5
**terminal** 74:25
**terms** 17:4 71:3
**test** 37:16, 20
**testified** 28:8, 10
**Testify** 29:6
**testimony** 85:4 86:23
**testing** 16:19
**text** 11:13
**Thank** 8:11 17:5, 6 24:21, 24 27:9 47:13 52:7 61:17 83:9
**thanked** 86:3
**thing** 12:25 19:4 30:25 36:10 42:10 43:9 44:22 45:13, 14 54:5 78:10
**things** 11:7 16:5 22:3 24:1 26:7, 15, 20 32:8 40:17 42:6 51:18 57:4, 15 58:2 59:25 60:1 72:6 75:18 77:21 79:20 89:20
**think** 8:2, 5 16:1 19:2 22:19, 21 23:16 26:7 29:12 34:1 36:12 38:20 40:12, 18 42:11 43:4, 6 44:21 45:15, 18 49:2, 4, 23 53:15 62:5 66:14 69:5 89:19
**thinker** 85:20
**thinking** 7:6 13:22 24:7 41:20 86:11, 20
**THIRD** 1:10, 20 2:21, 22 5:5, 22 9:17, 20, 23 11:6, 19, 21 12:4, 6, 11, 14, 20, 22 13:8, 15, 21 14:4, 8, 13 15:12 17:15, 18 18:20, 24 19:14, 23 21:6, 17 22:7 24:10 25:24 26:25 28:20 29:9 30:17 35:7, 12, 16 38:10 39:25 40:15 41:15 42:1 43:15 44:9 45:8 46:13 47:22 52:1 54:17 56:6 66:7, 13 67:3, 5, 15 68:8 69:3 70:13, 14 72:2, 16, 18, 21, 25 73:10 76:17 77:5, 7 78:13 88:6 90:16, 22 93:4
**Third-McHugh** 25:8, 9 27:13, 14 47:16, 17 48:5 53:22, 23 55:15 60:18 62:7 63:4 66:1 68:20 69:15 73:22 76:6, 16 77:8 78:17 79:9 80:2 81:5, 6, 11, 20 82:4
**third-party** 24:6 73:9
**Thomas** 2:20 5:20 55:13 60:16
**thought** 8:15 62:3, 4 86:12
**thoughtful** 86:4
**three** 17:4 27:24 58:2 65:4 67:4
**three-plus** 56:13
**throw** 58:4
**Thursday** 5:2
**Tim** 14:22 15:8, 12 36:20 37:10, 11, 25 38:4, 10, 13, 18 39:1, 5, 8, 11, 17, 20 40:6, 10 41:11 42:12, 21 43:4, 20, 25 44:19 45:13 52:20 53:1, 6 56:13 63:6, 8 65:11 66:22, 23 67:1 68:7 73:13 77:2, 15, 19, 24 79:11, 15 82:18 84:17 86:7, 24 88:6 89:4
**Time** 1:19 5:3 7:13 22:12 26:2 29:17, 20, 25 33:11, 14, 19 42:22 50:6, 15 53:13 55:2 60:2, 9 64:13 65:10 66:13 70:3 71:3 73:7 74:25 75:15, 24 79:11 80:23 83:7 92:10
**timelines** 12:12 13:12 48:13, 19 49:16
**times** 21:15 32:10 34:5 84:21
**timing** 52:23
**Timothy** 14:14 15:7
**Tim's** 82:11
**titled** 27:16, 21 47:22 76:8
**Today** 5:2, 3 9:14 16:20 17:16 26:10 32:17 37:14 68:1
**today's** 8:13 9:3 64:13
**told** 82:25
**top** 19:9 38:22 43:7 48:17 85:15 87:16 90:18
**topic** 35:6, 10
**topics** 13:1
**top-ranking** 57:24
**track** 40:13, 14
**traded** 18:18
**traditional** 42:5
**transaction** 42:22
**transcript** 91:12 93:7
**transfer** 11:11
**transforming** 42:2
**transitions** 21:22, 23
**transportation** 41:1
**triage** 59:20
**tried** 83:13
**trouble** 61:10
**true** 93:10
**Trust** 17:22 22:8
**truth** 92:9
**try** 7:23 57:14 76:12
**trying** 14:5 43:3 50:3 52:10 75:1
**turn** 10:24 55:23 60:18 82:4 83:17
**Turning** 62:7 77:7
**Tuzun** 56:20 66:21, 25 68:9
**two** 16:13 17:20 21:21 49:11 58:2 59:24 84:1 89:20
**type** 76:19 77:18 78:7

< U >

**Uh-huh** 25:7 47:20 60:21
**uh-huhs** 7:21
**uh-uh** 7:20
**ultimate** 45:19
**unanimous** 40:18 45:23 81:20 87:8
**unanimously** 42:12
**uncertainty** 60:9
**unclear** 33:20 51:4
**undergraduate** 15:19
**undersigned** 92:4
**understand** 7:16 8:3 71:8 73:5 89:7, 10, 15, 16
**understanding** 18:23 29:9 41:23 70:8 77:4 82:22 93:13
**Understands** 43:21
**unfortunate** 37:3 38:1
**unfortunately** 26:9
**UNITED** 1:2 5:6 16:15, 16, 18 17:1
**universe** 90:17
**University** 15:20, 21
**unsuccessful** 16:25
**unusual** 70:21
**update** 68:24
**upper** 61:2
**use** 10:6 24:3 37:3 49:23 54:1 72:3
**usually** 6:15 19:6 23:9, 12, 22 31:8 32:3 36:14 55:5

< V >
**vacuum** 40:8
**value** 88:14
**variety** 16:5 29:11, 14 87:9
**various** 23:15 37:17
**verbally** 7:20
**versus** 5:5 59:15 60:5
**vet** 65:4
**vetted** 64:24
**video** 7:19 8:8, 10
**Videoconference** 2:6
**Videographer** 1:23 5:1, 23 64:9, 12 83:2, 5 91:13
**videotape** 5:1
**Videotaped** 1:12
**Virginia** 15:22
**virtue** 42:22
**visionary** 59:16
**visit** 30:24 31:1, 2, 10
**vote** 51:3
**voted** 18:3 74:13
**voting** 44:15
**vs** 1:9 93:4

< W >
**wait** 7:22
**walk** 16:14
**Walnut** 1:20 2:22
**want** 10:23 17:6 36:8 44:12 51:6 58:14 83:23 85:3, 12
**wanted** 78:8
**Washington** 15:18
**way** 27:3 29:21 35:17 36:4, 8 42:5, 8 60:13 65:18 67:20 71:19
**ways** 23:10
**wealth** 29:11 41:9 77:16
**Well** 6:25 8:15 15:9, 16, 25 17:11 19:1 20:5 21:18 23:10 26:3, 11 29:10 30:1 32:1 36:12 40:3, 11, 16 42:13, 19 43:20 44:12 45:11 47:25 48:25 50:18 54:13 57:4 59:2, 9 61:5, 22 63:18 66:25 70:4, 20 71:9 72:1 74:8, 20 75:2, 17 78:9 79:5, 6, 16, 18 84:20 86:9, 18 87:5 91:6
**well-being** 59:23
**Wendy** 1:22 92:4
**went** 15:20 21:18 23:11
**We're** 5:3 7:19 26:1 58:21 60:22 79:3
**WESTERN** 1:4 5:7
**we've** 6:25 10:15 21:20 59:9
**Wharton** 8:10
**WHEREOF** 92:19
**whichever** 36:8
**wife** 7:1 74:25
**winning** 25:22 69:20
**wise** 60:14
**Witness** 2:10 5:17, 24 6:2 8:17, 22, 24 9:5 10:8 19:20 20:5 24:18, 24 26:3 27:9 28:9, 12, 15, 17, 25 29:1, 4 30:14 32:12, 15 34:20, 22 35:3 38:7 40:3 43:20 44:12 45:11 46:25 47:13 50:5, 8 51:14 52:4, 7, 10, 14, 16 54:9, 13 56:10 57:4 58:16 59:9 64:6 65:9 67:10 70:4, 20 71:10, 12, 24 72:1 74:4, 8 75:17 80:18 84:20 87:2, 4 88:2, 8 89:18 91:1 92:19
**wondering** 78:22
**word** 49:24 53:15 72:3
**words** 11:9 80:8
**work** 41:24 42:23 64:19, 20
**working** 5:21
**workmanlike** 44:22
**workplace** 30:17, 19 38:10
**Wow** 16:19
**written** 11:12 81:20
**wrong** 22:22

< Y >
**Yeah** 8:18 16:3 17:2 26:2, 4 31:4 43:25 50:9 71:13, 24 74:24 77:20 85:18
**year** 18:12 31:8, 9 32:4 38:22 51:17
**years** 7:1, 2, 11 15:25 16:4, 13, 17 31:6 34:10 56:13, 16

< Z >
**ZIP** 6:22
**Zoom** 2:6 75:4, 8, 10

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| PHILIP R. McHUGH,<br><br>Plaintiff,<br><br>vs.<br><br>FIFTH THIRD BANCORP, *et al.*,<br><br>Defendants. | Case No. 1:21-cv-00238-MRB<br><br>Judge: Hon. Michael R. Barrett |

**DEFENDANTS/COUNTERCLAIMANTS FIFTH THIRD BANCORP'S, FIFTH THIRD BANK, NATIONAL ASSOCIATION'S & GREGORY D. CARMICHAEL'S OBJECTIONS & RESPONSES TO PLAINTIFF'S REQUESTS FOR PRODUCTION OF DOCUMENTS DIRECTED TOWARDS B. EVAN BAYH III AND DEFENDANTS**

Pursuant to Federal Rule of Civil Procedure 34, Defendants/Counterclaimants Fifth Third Bancorp; Fifth Third Bank, National Association; and Gregory D. Carmichael (collectively "Fifth Third Bank" or the "Bank"), by and through their undersigned counsel, Blank Rome LLP, hereby serve the within Objections and Responses to Plaintiff Philip McHugh's ("Plaintiff") Requests for Production of Documents directed towards B. Evan Bayh III and Defendants ("Requests").

**PRELIMINARY STATEMENT**

These responses to Plaintiff's Requests are based upon discovery and investigation conducted to date. Fifth Third Bank reserves the right to supplement these responses with, and/or introduce at trial, evidence and documents not identified at this time that are subsequently discovered and/or the relevance of which is subsequently ascertained. The fact that Fifth Third Bank has responded in part or at all to any of the Requests herein is not intended to be and shall

PENGAD 800-631-6989 PLAINTIFF'S EXHIBIT 1 wek 2-13-25

not be construed as a waiver by Fifth Third Bank of all or any part of any objection to any such Request.

## GENERAL OBJECTIONS

The following objections are incorporated into each and every response to Plaintiff's Requests:

1. Fifth Third Bank objects to these Requests as plainly improper and in violation of Civil Rule 34. Pursuant to Civil Rule 34, "a party may serve on *any other party* a request within the scope of Rule 26(b) . . . ." Fed. R. Civ. P. 34(a) (emphasis added). Conversely, a party has no authority under Rule 34 to serve requests for production on a nonparty. B. Evan Bayh III is not a party to this litigation. Accordingly, given that Plaintiff's Requests are directed towards, and demand production from, nonparty B. Evan Bayh III,[1] Plaintiff's Requests are improper under Civil Rule 34.

2. Fifth Third Bank has not completed its investigation of the facts relating to this case, its discovery in this case, or its preparation for trial. The responses contained herein are based only upon the information and documents presently available to and known by Fifth Third Bank. Nothing contained herein shall be used to preclude Fifth Third Bank from further research and investigation of the facts or from presentation of the results of that research and investigation to the trier of fact at the time of trial.

3. The following responses are provided without prejudice to the right of Fifth Third Bank to produce and introduce at the time of trial subsequently discovered evidence relating to the

---

[1] Plaintiff's requests are styled as "Request for Production of Documents Directed to Defendants Fifth Third Bancorp, Fifth Third Bank N.A. (jointly "Fifth Third"), *and their Director B. Evan Bayh III.*" *See* Requests, p. 1 (emphasis added). Further, Instruction No. 2 to Plaintiff's Requests specifically instructs that "In answering these Requests for the Production of Documents, Defendants *and their Director* are to divulge all information in their possession, custody, or control . . . ." *See* Requests, p. 2, Instruction No. 2 (emphasis added).

proof of presently unknown material facts, and to produce and introduce all evidence when discovered relating to proof of subsequently discovered material facts. Moreover, because the facts and evidence now known may be imperfectly understood, or the relevance or consequence of certain facts and evidence may be imperfectly understood, such facts and evidence in good faith may not be included in the following responses. Fifth Third Bank reserves the right to refer to, conduct discovery with reference to, or offer into evidence at the time of trial, any and all documents and things notwithstanding the responses and objections interposed herein.

4. To the extent that a Request has not been objected to, Fifth Third Bank has used reasonable diligence to obtain facts, documents, and things responsive to the Requests responded to herein. To the extent that Plaintiff seeks to require Fifth Third Bank to do more than the foregoing, the Requests are objected to on the grounds that they are not relevant to any party's claim or defense, not proportional to the needs of the case, and impose an undue burden and expense not commensurate with any legitimate discovery need.

5. Fifth Third Bank generally objects to the Requests, and specifically to each Request contained therein, to the extent that they seek disclosure of facts or other information that is protected from disclosure by the attorney-client privilege, the attorney work product privilege, any other applicable privilege or protection, or that is otherwise protected from discovery. Fifth Third Bank will not undertake to produce any such privileged or protected information, and nothing contained herein is intended as, or shall be deemed, a waiver of any attorney-client privilege, attorney work product privilege, or any other applicable privilege.

6. Fifth Third Bank generally objects to the Requests, and specifically to each Request contained therein, on the grounds that they are overbroad, unduly burdensome, unreasonable, vexatious, harassing, and oppressive, in that they seek information that is not relevant to any

party's claim or defense in this case, including by seeking documents or communications created or utilized after Fifth Third Bank voted to appoint Timothy Spence to the Position of Bank President and Plaintiff filed the lawsuit at issue here. By responding to the Requests and each Request as set forth herein, Fifth Third Bank will not undertake to provide any facts or documents that are not relevant to any party's claim or defense or not proportional to the needs of this case, and Fifth Third Bank expressly disavows any obligation or undertaking not interposed by the Federal Rules of Civil Procedure, the Local Rules of the U.S. District Court for the Southern District of Ohio, or any other applicable law.

7. Fifth Third Bank generally objects to the Requests, and specifically to each Request contained therein, to the extent they seek information protected by rights of privacy of any person or entity.

8. Fifth Third Bank generally objects to the Requests, and specifically to each Request contained therein, to the extent that they purport to require Fifth Third Bank to disclose information, documents, or other materials constituting or containing, in whole or in part, confidential data, proprietary information, non-public information, and/or financial information relating or pertaining to Fifth Third Bank, its past or present employees, or other persons or entities.

9. Fifth Third Bank generally objects to the Requests, and specifically to each Request contained therein, to the extent that the information called for in the Requests is at least equally available to Plaintiff, or is already in the possession of Plaintiff or his counsel.

10. Fifth Third Bank hereby expressly reserves its right to supplement or amend this response, or any of the various responses contained herein, in the future should Fifth Third Bank discover additional information that may be responsive to the Requests. Nothing contained herein

shall obligate or commit Fifth Third Bank to supplement or amend this response, or any of the various responses contained herein.

Subject to and without waiving the foregoing Preliminary Statement and General Objections, Fifth Third Bank makes the following specific objections and responses to Plaintiff's Requests:

## SPECIFIC OBJECTIONS & RESPONSES TO REQUESTS FOR PRODUCTION

1. Communications (as defined above) between You and any other Director or Officer of Fifth Third which refers, mentions, or otherwise relates to:

a. Succession planning for the position of President and/or CEO of Fifth Third;

b. Identified and/or selected candidates for the position of President and/or CEO of Fifth Third;

c. Processes or timelines, whether proposed or final, with respect to the identification and/or selection of candidates for the position of President and/or CEO of Fifth Third.

d. Development of potential candidates for the position of President and/or CEO of Fifth Third; and

e. Any facts upon which You or any other Director relied upon when identifying and/or selecting candidates for the position of President and/or CEO of Fifth Third.

f. Philip McHugh

g. Timothy Spence

**RESPONSE:** Fifth Third Bank objects to this Request on the grounds that it demands production of documents by a nonparty, B. Evan Bayh III, and that it seeks documents that are not presently known to be in the possession, custody or control of Fifth Third Bank or any Defendant. Fifth Third Bank objects to this Request on the grounds that it violates the Court's prior rulings as to the scope of relevance (and discovery) in this case, including Plaintiff's entitlement to the personal communications of Bank employees. Fifth Third Bank objects to this Request on the grounds that it is duplicative—and therefore not proportional to the needs to the needs of the case—of Plaintiff's previously served requests for production of documents. As such, Fifth Third Bank objects to this Request because the Bank has already produced all relevant communications concerning succession planning, the Bank's decision to promote Timothy Spence to the position of Bank President, Philip McHugh, and Timothy Spence which are currently known to be within the Bank's possession, custody or control. Fifth Third Bank objects to this Request because any documents created after the Plaintiff was no longer employed by the Bank (October 26, 2020) and after the Complaint was filed (October 28, 2020) are not relevant to any allegations in the Complaint or otherwise discoverable. *See Tibbs v. Calvary United Methodist Church*, 505 Fed. App'x 508, 515-516 (6th Cir. 2012) (holding that documents created after Plaintiff's termination were not temporally connected or relevant to Plaintiff's wrongful termination claims); *West v. Tyson Foods*, 374 Fed. App'x 624, 635-36 (6th Cir. 2010) (concluding that evidence related to Plaintiff's exit interview with her supervisor was not relevant to Plaintiff's constructive discharge claim because the exit interview occurred after Plaintiff's constructive discharge); *Kaveler v. U.S. Bancorp Ins. Serv.*, No. 06-CV-04-DRH, 2008 U.S. Dist. LEXIS 45769. *5-7 (S.D. Ill. June 12, 2008) (holding that post-dismissal evidence was not admissible to demonstrate employer's motivation relative to Plaintiff's termination).

Furthermore, Fifth Third Bank incorporates by reference herein its Preliminary Statement and General Objections. Fifth Third Bank objects to this Request because it is unreasonable, vexatious, harassing, and oppressive, in that the Request seeks information and documentation that is not relevant to any party's claim or defense, is not relevant to any of the issues in dispute in this case as framed by the parties' pleadings, and is not proportional to the needs of the case. Fifth Third Bank objects to this Request because it is overly broad, unduly burdensome, and not reasonably limited in scope, and is therefore harassing and oppressive. Fifth Third Bank objects to this Request because it seeks confidential and/or commercial sensitive business information that bears no relevance to this case as framed by the pleadings.

2. Any Communications (as defined above) between You and Philip McHugh.

**RESPONSE:** Fifth Third Bank objects to this Request on the grounds that it demands production of documents by a nonparty, B. Evan Bayh III, and that it seeks documents that are not presently known to be in the possession, custody or control of Fifth Third Bank or any Defendant. Fifth Third Bank objects to this Request on the grounds that it demands production of documents to which Plaintiff was a party and, therefore, to which Plaintiff has direct and equal access. Accordingly, Plaintiff's Request is not proportional to the needs of the case pursuant to Civil Rule 26(b) considering the parties' (Plaintiff's direct) relative access to

relevant information sought by this Request. Fifth Third Bank objects to this Request because any documents created after the Plaintiff was no longer employed by the Bank (October 26, 2020) and after the Complaint was filed (October 28, 2020) are not relevant to any allegations in the Complaint or otherwise discoverable. *See Tibbs v. Calvary United Methodist Church*, 505 Fed. App'x 508, 515-516 (6th Cir. 2012) (holding that documents created after Plaintiff's termination were not temporally connected or relevant to Plaintiff's wrongful termination claims); *West v. Tyson Foods*, 374 Fed. App'x 624, 635-36 (6th Cir. 2010) (concluding that evidence related to Plaintiff's exit interview with her supervisor was not relevant to Plaintiff's constructive discharge claim because the exit interview occurred after Plaintiff's constructive discharge); *Kaveler v. U.S. Bancorp Ins. Serv.*, No. 06-CV-04-DRH, 2008 U.S. Dist. LEXIS 45769. *5-7 (S.D. Ill. June 12, 2008) (holding that post-dismissal evidence was not admissible to demonstrate employer's motivation relative to Plaintiff's termination).

Furthermore, Fifth Third Bank incorporates by reference herein its Preliminary Statement and General Objections. Fifth Third Bank objects to this Request because it is unreasonable, vexatious, harassing, and oppressive, in that the Request seeks information and documentation that is not relevant to any party's claim or defense, is not relevant to any of the issues in dispute in this case as framed by the parties' pleadings, and is not proportional to the needs of the case. Fifth Third Bank objects to this Request because it is overly broad, unduly burdensome, and not reasonably limited in scope, and is therefore harassing and oppressive. Fifth Third Bank objects to this Request because it seeks confidential and/or commercial sensitive business information that bears no relevance to this case as framed by the pleadings.

3. Any Communications (as defined above) between You and Timothy Spence.

**RESPONSE:** Fifth Third Bank objects to this Request on the grounds that it demands production of documents by a nonparty, B. Evan Bayh III, and that it seeks documents that are not presently known to be in the possession, custody or control of Fifth Third Bank or any Defendant. Fifth Third Bank objects to this Request on the grounds that it violates the Court's prior rulings as to the scope of relevance (and discovery) in this case, including Plaintiff's entitlement to the personal communications of Bank employees. Fifth Third Bank objects to this Request on the grounds that it is duplicative—and therefore not proportional to the needs of the case—of Plaintiff's previously served requests for production of documents. As such, Fifth Third Bank objects to this Request because the Bank has already produced all relevant communications between Timothy Spence and any Bank Director. Fifth Third Bank objects to this Request because any documents created after the Plaintiff was no longer employed by the Bank (October 26, 2020) and after the Complaint was filed (October 28, 2020) are not relevant to any allegations in the Complaint or otherwise discoverable. *See Tibbs v. Calvary United Methodist Church*, 505 Fed. App'x 508, 515-516 (6th Cir. 2012) (holding that documents created after Plaintiff's termination were not temporally connected or relevant to Plaintiff's wrongful termination claims); *West v. Tyson Foods*, 374 Fed. App'x 624, 635-36 (6th Cir. 2010) (concluding that evidence related to Plaintiff's exit interview with her supervisor was not relevant to Plaintiff's constructive discharge claim because the exit interview occurred after Plaintiff's constructive discharge); *Kaveler*

*v. U.S. Bancorp Ins. Serv.*, No. 06-CV-04-DRH, 2008 U.S. Dist. LEXIS 45769. *5-7 (S.D. Ill. June 12, 2008) (holding that post-dismissal evidence was not admissible to demonstrate employer's motivation relative to Plaintiff's termination).

Furthermore, Fifth Third Bank incorporates by reference herein its Preliminary Statement and General Objections. Fifth Third Bank objects to this Request because it is unreasonable, vexatious, harassing, and oppressive, in that the Request seeks information and documentation that is not relevant to any party's claim or defense, is not relevant to any of the issues in dispute in this case as framed by the parties' pleadings, and is not proportional to the needs of the case. Fifth Third Bank objects to this Request because it is overly broad, unduly burdensome, and not reasonably limited in scope, and is therefore harassing and oppressive. Fifth Third Bank objects to this Request because it seeks confidential and/or commercial sensitive business information that bears no relevance to this case as framed by the pleadings.

4. All Documents created, received, or obtained by You which refer, mention, or otherwise relate to:

a. Succession planning for the position of President and/or CEO of Fifth Third;

b. Identified and/or selected candidates for the position of President and/or CEO of Fifth Third;

c. Processes or timelines, whether proposed or final, with respect to the identification and/or selection of candidates for the position of President and/or CEO of Fifth Third;

d. Development of potential candidates for the position of President and/or CEO of Fifth Third; and

e. Any facts upon which You or any other Director relied upon when identifying and/or selecting candidates for the position of President and/or CEO of Fifth Third.

f. Philip McHugh

g. Timothy Spence

**RESPONSE:** Fifth Third Bank objects to this Request on the grounds that it demands production of documents by a nonparty, B. Evan Bayh III, and that it seeks documents that are not presently known to be in the possession, custody or control of Fifth Third Bank or any Defendant. Fifth Third Bank objects to this Request on the grounds that it violates the Court's prior rulings as to the scope of relevance (and discovery) in this case. Fifth Third Bank objects to this Request on the grounds that it is duplicative—and therefore not proportional to the needs to the needs of the case—of Plaintiff's previously served requests for production of documents. As such, Fifth Third Bank objects to this Request because the Bank has already produced all relevant documents concerning succession planning, the Bank's decision to promote Timothy Spence to the position of Bank President, Philip McHugh, and Timothy Spence which are currently known to be within the Bank's possession, custody or control. Fifth Third Bank objects to this Request because any documents created after the Plaintiff was no longer employed by the Bank (October 26, 2020) and after the Complaint was filed (October 28, 2020) are not relevant to any allegations in the Complaint or otherwise discoverable. *See Tibbs v. Calvary United Methodist Church*, 505 Fed. App'x 508, 515-516 (6th Cir. 2012) (holding that documents created after Plaintiff's termination were not temporally connected or relevant to Plaintiff's wrongful termination claims); *West v. Tyson Foods*, 374 Fed. App'x 624, 635-36 (6th Cir. 2010) (concluding that evidence related to Plaintiff's exit interview with her supervisor was not relevant to Plaintiff's constructive discharge claim because the exit interview occurred after Plaintiff's constructive discharge); *Kaveler v. U.S. Bancorp Ins. Serv.*, No. 06-CV-04-DRH, 2008 U.S. Dist. LEXIS 45769, *5-7 (S.D. Ill. June 12, 2008) (holding that post-dismissal evidence was not admissible to demonstrate employer's motivation relative to Plaintiff's termination).

Furthermore, Fifth Third Bank incorporates by reference herein its Preliminary Statement and General Objections. Fifth Third Bank objects to this Request because it is unreasonable, vexatious, harassing, and oppressive, in that the Request seeks information and documentation that is not relevant to any party's claim or defense, is not relevant to any of the issues in dispute in this case as framed by the parties' pleadings, and is not proportional to the needs of the case. Fifth Third Bank objects to this Request because it is overly broad, unduly burdensome, and not reasonably limited in scope, and is therefore harassing and oppressive. Fifth Third Bank objects to this Request because it seeks confidential and/or commercial sensitive business information that bears no relevance to this case as framed by the pleadings.

**DATE:** April 1, 2024

Respectfully submitted,

**BLANK ROME LLP**

*s/ Michael L. Cioffi*
Michael L. Cioffi (0031098)
Thomas H. Stewart (0059246)
Collin D. Hart (0099869)
1700 PNC Center
201 E. Fifth Street

Cincinnati, Ohio 45202
Tel.: (513) 362-8701
Fax: (513) 362-8702
Email: michael.cioffi@blankrome.com
Email: tom.stewart@blankrome.com
Email: collin.hart@blankrome.com

*Attorneys for Defendants/Counterclaimants Fifth Third Bancorp, Fifth Third Bank, National Association, and Gregory D. Carmichael*

**CERTIFICATE OF SERVICE**

I, Michael L. Cioffi, hereby certify that on April 1, 2024, a copy of the foregoing Objections and Responses to Plaintiff's [Seventh] Set of Requests for Production of Documents of B. Evan Bayh III and Defendants/Counterclaimants Fifth Third Bancorp, Fifth Third Bank, National Association, and Gregory D. Carmichael was served by electronic email at the following address:

John J. McHugh
McHugh & McCarthy, LTD
5580 Monroe Street
Sylvania, Ohio 43560
mchugh@mchughlaw.com

Peter A. Saba
Joshua M. Smith
Stagnaro, Saba & Patterson Co., L.P.A.
2623 Erie Avenue
Cincinnati, Ohio 45208
pas@sspfirm.com
jms@sspfirm.com

*Counsel for Plaintiff,*
*Philip McHugh*

**BLANK ROME LLP**

*s/ Michael L. Cioffi*
Michael L. Cioffi (0031098)

*Attorney for Defendants/Counterclaimants Fifth Third Bancorp, Fifth Third Bank, National Association, and Gregory D. Carmichael*

# EXHIBIT 2

**[PRODUCED FOR**

***IN CAMERA* INSPECTION]**

# EXHIBIT 3

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 4

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 5

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 6

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 7

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 8

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 9

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 10

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

FIFTH THIRD BANK

# Unanimous Written Consent: Officer Appointment

October 21, 2020

PENGAD 800-631-6989
PLAINTIFF'S EXHIBIT
11
Wlen 2-13-25

Classification: Restricted

FIFTH THIRD BANK

Fifth Third Bancorp & Fifth Third Bank, N.A.

## Board of Directors

### Unanimous Written Consent: Officer Appointment

TABLE OF CONTENTS


CEO Note Regarding Officer Appointment

Press Release

Unanimous Written Consent: Board of Directors*


** Denotes items requiring unanimous written consent.*

FIFTH THIRD BANK
**OFFICE OF THE SECRETARY**

FIFTH THIRD BANK

Dear Board Members:

As previously discussed in our talent management and succession planning sessions, we are executing on the plan to promote Tim Spence to President. The lines of business, regional banking and strategic planning will now report to Tim. We plan to announce this on Monday, October 26. Attached is a draft of the external release.

As Bob Shaffer and I discussed with you at the September Board meeting, we believed that Phil McHugh could be at risk with Tim's promotion. And, in fact, Phil has decided not to accept the role of Head of Consumer and Business Banking and is leaving the company. This is unfortunate as this is one of the largest roles we have. However, we have a very capable leader, Howard Hammond, who will serve as the interim Head of Consumer and Business Banking. Howard currently leads our Retail Banking business and Fifth Third Securities. As Howard has the opportunity to work in this role, we will also test the market and conduct an external search for this position.

Included with this message is a request for unanimous consent to approve the promotion of Tim to President. I appreciate your prompt approval as we will be announcing his promotion on Monday morning. I am very excited for Tim and look forward to working with him as he further develops in his new role. Please let me know if you have any questions.

Thanks,

Greg

© Fifth Third Bank | All Rights Reserved | For Internal Use Only

Classification: Restricted

FIFTH THIRD BANCORP

# NEWS RELEASE

*DRAFT 10/21/20*

October 26, 2020

CONTACTS
Ed Loyd (Media Relations)
email.address@53.com | 123-456-7890
Chris Doll (Investor Relations)
Christopher.Doll@53.com | 513-534-2345

## Fifth Third Announces Appointment of Timothy N. Spence as President

CINCINNATI – Fifth Third Bancorp (Nasdaq: FITB) today announced the appointment of Tim Spence as president. His promotion will support the Company's ongoing successful execution of its strategic initiatives and further strengthen its position as a leading regional bank.

In his new role, effective immediately, Spence will oversee all business lines and regional banking, while continuing his leadership of the Bank's strategy. It was Spence's strength in strategy that first brought him to Fifth Third in 2015. He led that area as chief strategy officer and then advanced in 2017 to head consumer banking and payments as well. Before joining Fifth Third, Spence was a senior partner in the financial services practice at Oliver Wyman, a global strategy and risk management consulting firm. Spence will continue to report to Greg Carmichael, the Company's chairman and chief executive officer.

"Tim has demonstrated extraordinary leadership and vision in driving the strategy and execution to transform Fifth Third through innovation and technology," said Carmichael. "Over the past several years, he has been a principal architect and catalyst of many of the Company's most important strategic initiatives. Those initiatives include organic growth investments, numerous partnerships with fintechs and other third parties, and the 2019 acquisition of MB Financial Inc. in Chicago – a move that dramatically changed the competitive landscape and positioned us for success in one of our most important markets. Tim is keenly focused on solutions that enable Fifth Third to best serve our customers – from individuals to small and large businesses – and help them achieve their goals."

Spence long has been heralded for his commitment to innovation and has helped the Bank significantly advance its digital transformation. In 2018, American Banker recognized him as Digital Banker of the Year, an award whose past honorees have included forward-thinking leaders from the nation's largest financial institutions. In addition to recognizing his many achievements to date, that award highlighted his customer-centric approach, which has been the hallmark of Spence's banking career.

Originally from the Pacific Northwest, Spence and his family make their home in Cincinnati. Spence devotes time to several local community and economic development organizations, including serving on the executive committee of the board at Cintrifuse, a public-private partnership that exists to build a sustainable tech-based economy in Greater Cincinnati, on the advisory board for Miami University's Altman Institute for Entrepreneurship, and as member and co-chair of the commerce committee for the

FIFTH THIRD BANCORP

NEWS RELEASE

Cincinnati Chamber's RESTART Taskforce. He also serves as a board member for the Consumer Bankers Association.

**About Fifth Third**

Fifth Third Bancorp is a diversified financial services company headquartered in Cincinnati, Ohio, and the indirect parent company of Fifth Third Bank, National Association, a federally chartered institution. As of September 30, 2020, the Company had $202 billion in assets and operates 1,122 full-service Banking Centers, and 2,414 Fifth Third branded ATMs in Ohio, Kentucky, Indiana, Michigan, Illinois, Florida, Tennessee, West Virginia, Georgia, North Carolina and South Carolina. In total, Fifth Third provides its customers with access to approximately 52,000 fee-free ATMs across the United States. Fifth Third operates four main businesses: Commercial Banking, Branch Banking, Consumer Lending, and Wealth & Asset Management. Fifth Third is among the largest money managers in the Midwest and, as of September 30, 2020, had $427 billion in assets under care, of which it managed $53 billion for individuals, corporations and not-for-profit organizations through its Trust and Registered Investment Advisory businesses. Investor information and press releases can be viewed at www.53.com. Fifth Third's common stock is traded on the NASDAQ® Global Select Market under the symbol "FITB."

###

**FIFTH THIRD BANCORP**

**UNANIMOUS WRITTEN CONSENT OF THE BOARDS OF DIRECTORS APPOINTING PRESIDENT**

**October 26, 2020**

The undersigned, being all of the Directors of Fifth Third Bancorp, an Ohio Corporation ("Bancorp"), in accordance with Section 1701.54 of the Ohio Revised Code, do hereby authorize, consent, and agree to the adoption, without a meeting, of the following resolutions through this unanimous written consent (this "Consent"), effective as of the date first set forth above:

**WHEREAS,** the members of the Board, in connection with succession and leadership planning, have discussed potential promotions and appointments to senior officer positions of Bancorp at previous meetings;

**WHEREAS,** the members of the Board have determined that it is appropriate to implement one such promotion and appointment at this time;

**NOW, THEREFORE**, it is hereby:

**OFFICER APPOINTMENT**

**RESOLVED**, that Timothy N. Spence be promoted and appointed to the position of President of Bancorp;

**GENERAL RESOLUTIONS**

**RESOLVED FURTHER,** that the officers of the Bancorp be, and each are hereby, authorized, directed and empowered to perform any and all other acts and things as in such officer's opinion may be necessary or appropriate in order to carry out the intent and purposes of the foregoing resolution with respect to the Bancorp; and

**RESOLVED FURTHER,** that any act of any Director or officer of the Bancorp and of any person designated or authorized to act by any officer of the Bancorp, which act would have been authorized by the foregoing resolutions except that such act was taken prior to the adoption of such resolutions is hereby ratified, confirmed, approved, and adopted as the act of the Bancorp.

[Remainder of page intentionally left blank. Signature page follows.]

In Witness Whereof, the undersigned Directors have executed this signature page as of the date first set forth above in this Unanimous Written Consent.

Nicholas K. Akins October 22, 2020 3:38 PM

B. Evan Bayh III October 22, 2020 9:53 AM

Jorge L. Benitez October 22, 2020 6:27 AM

Katherine B. Blackburn October 21, 2020 9:05 PM

Emerson L. Brumback October 22, 2020 9:22 AM

Greg D. Carmichael October 22, 2020 8:41 AM

Linda W. Clement-Holmes October 21, 2020 7:17 PM

C. Bryan Daniels October 21, 2020 7:07 PM

Mitchell S. Feiger October 22, 2020 4:25 PM

Thomas H. Harvey October 21, 2020 11:04 PM

Gary R. Heminger October 22, 2020 6:00 PM

Jewell D. Hoover October 21, 2020 7:25 PM

Eileen L. Mallesch October 21, 2020 8:04 PM

Michael B. McCallister October 22, 2020 12:49 PM

Marsha C. Williams October 21, 2020 7:01 PM