UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

| | |
|---|---|
| PHILIP R. MCHUGH,<br>Plaintiff,<br>vs.<br>FIFTH THIRD BANCORP, et al.,<br>Defendants. | CASE NO. 1:21-cv-00238 |

***THIS TRANSCRIPT CONTAINS CONFIDENTIAL -- SUBJECT TO PROTECTIVE ORDER TESTIMONY***

| | |
|---|---|
| Videotaped Deposition of: | JORGE BENITEZ |
| Taken: | By the Plaintiff<br>Pursuant to Notice |
| Date: | January 24, 2025 |
| Time: | Commencing at 11:06 a.m. |
| Place: | Fifth Third Center<br>511 Walnut Street<br>Cincinnati, Ohio 45202 |
| Before: | Pamela L. Jackson<br>and<br>Connie Adkins-Ihle, Videographer<br>Notaries Public-State of Ohio |

APPEARANCES:

On behalf of the Plaintiff:

Joshua M. Smith, Esq.
and
Bailey E. Sharpe, Esq.
of
Stagnaro, Saba & Patterson Co., L.P.A.
2623 Erie Avenue
Cincinnati, Ohio 45208
Phone: (513) 533-2701
Email: Jms@sspfirm.com
Bes@sspfirm.com

On behalf of the Defendants and the Deponent:

Michael L. Cioffi, Esq.
and
Collin D. Hart, Esq.
of
Blank Rome LLP
1700 PNC Center
201 East Fifth Street
Cincinnati, Ohio 45202
Phone: (513) 362-8700
Email: Michael.cioffi@blankrome.com
Collin.hart@blankrome.com

Also Present:

Philip R. McHugh
Phenise Poole, Esq., Fifth Third Bancorp
Brian Thomas, Esq., Fifth Third Bancorp

# I N D E X


| JORGE BENITEZ | PAGE |
|---|---|
| Examination by Mr. Smith | 6 |
| Examination by Mr. Cioffi | 79 |
| Further Examination by Mr. Smith | 97 |
| Further Examination by Mr. Cioffi | 110 |

| EXHIBITS | MARKED | REFERENCED |
|---|---|---|
| Deposition Exhibit 9 | 7 | 8 |
| Deposition Exhibit 12 | 53 | 53 |
| Deposition Exhibit 13 | 53 | 53 |
| Deposition Exhibit 14 | 65 | 65 |

# I N D E X (CONTINUED)

***THE FOLLOWING PAGES CONTAIN CONFIDENTIAL -- SUBJECT TO PROTECTIVE ORDER TESTIMONY***

Pages 50 - 52
Pages 66 - 75
Pages 79 - 111

***THE FOLLOWING EXHIBITS ARE CONFIDENTIAL -- SUBJECT TO PROTECTIVE ORDER***


| EXHIBITS | MARKED | REFERENCED |
|---|---|---|
| Deposition Exhibit 3 | | 73 |
| Deposition Exhibit 4 | | 74 |
| Deposition Exhibit 7 | | 68 |
| Deposition Exhibit 8 | | 80 |
| Deposition Exhibit 10 | 50 | 50 |
| Deposition Exhibit 11 | 50 | 50 |


- - -

Page 5

THE VIDEOGRAPHER: We are on videotape record. Today is Friday, January the 24th, 2025. The time is 11:06 a.m. We're here today to take the deposition of Jorge Benitez in the case styled Philip R. McHugh versus Fifth Third Bancorp, et al., United States District Court, Southern District of Ohio, Western Division, Case No. 1:21-cv-00238.

Would the attorneys now introduce themselves and state who you represent?

MR. SMITH: Joshua Smith, Counsel for the Plaintiff Philip McHugh.

MS. SHARPE: Bailey Sharpe for Plaintiff Phil McHugh.

MR. CIOFFI: Michael Cioffi and Collin Hart of Blank Rome on behalf of all Defendants including the witness, Mr. Benitez, who we represent personally and individually pursuant to a Joint Defense Agreement. Also representing the Defendants and Mr. Benitez are Brian Thomas and Phenise Poole, lawyers inside Fifth Third Bank.

THE VIDEOGRAPHER: And would the

Page 6

court reporter please swear the witness?

JORGE BENITEZ

of lawful age, a witness herein, being first duly sworn as hereinafter certified, was examined and deposed as follows:

EXAMINATION

BY MR. SMITH:

Q Could you please state your full name for the record, please?

**A Jorge L. Benitez.**

Q And, Mr. Benitez, what is your current address?

**A It's 1517 NE Outrigger Landings Drive, and that's Jensen Beach, Florida, 34957.**

Q What is your date of birth?

**A August 21, 1959.**

Q What did you do to prepare for today's deposition?

**A I actually spoke with my attorney and -- to try to understand the process and be as prepared as I could be.**

Q Did you review any documents?

MR. CIOFFI: Objection. I'm going to instruct the witness not to answer with respect to any documents provided by Counsel

Page 7

as we have discussed in prior depositions. Those documents provided by Counsel are protected by the attorney-client privilege and by the work product privilege.

Q Were there any documents reviewed that were not -- that you were not directed to review by Counsel?

**A No.**

Q Did you speak with any current or former Fifth Third Board members regarding your deposition today?

**A No.**

Q Have you discussed this case with any other Board members, current or former, at any time?

**A I have not.**

Q Have you discussed Phil McHugh with any other Board members, current or former?

**A No.**

Q Have you discussed this case with any current or former Fifth Third employees?

**A No.**

(Deposition Exhibit 9 was marked for identification.)

Page 8

BY MR. SMITH:

Q Mr. Benitez, I have handed you what's been designated as Exhibit 9. Have you --

MR. CIOFFI: Counsel, I'm -- I'm sorry to interrupt you. Because it's a separate deposition --

MR. SMITH: Uh-huh.

MR. CIOFFI: -- let's -- let's number it as No. 1.

MR. SMITH: Do you want to start -- Let's go off the record a minute.

THE VIDEOGRAPHER: That's fine.

MR. CIOFFI: Otherwise it gets too confusing.

THE VIDEOGRAPHER: Off the record.

(Off-the-record discussion.)

THE VIDEOGRAPHER: We are back on the record 11:10.

BY MR. SMITH:

Q I have handed you what's been marked as Exhibit 9. Have you seen this document before?

MR. CIOFFI: By way of objection as stated in prior depositions this particular document, a Request For Production Of

Page 9

Documents, was improperly served on this witness because he's not a party to the case. It -- It should have been served in a different manner as -- as we have discussed in the past. I am, however, not going to issue an instruction not to answer and allow him to answer questions about this particular document which was responded to by the bank and by Counsel.
BY MR. SMITH:
Q Have you seen this document before?
**A Let me just --**
Q Yeah.
**A -- understand it here. (Reviewing document.) Mr. Smith, I am not familiar with -- with the document.**
Q Okay. And that's -- that's fine.
Let me represent to you this is a Request For Production Of Documents directed to you and I'm going to first direct you to a couple of the definitions. So there's not page numbers on this one, but if you go to Page 6 of the document.
**A The documents are not paged.**
Q Yeah, you'll -- you may have to page through it. It's right above Request For

Page 10

Production Of Documents, that label. That's it.
**A Okay.**
Q If you see No. 14 above that it defines the words "Communications" or "Communicate" meaning, "any correspondence, disclosure, transfer or exchange of information, whether oral or written, and whether in person, by telephone, mail, email, telecopy text message, or other 'Document' form, including but not limited to discussions, statements, negotiations, inquiries, requests, notices, responses, or demands."
Now, directing you to the requests No. 1 seeks, "Communications between You and any other Director or Officer of Fifth Third which refers, mentions, or otherwise relates to," and there are a number of subparts. We can go through those, but initially do you have any responsive documents in your possession, custody, or control as to those categories?
**A What do you mean by "responsive"?**
Q The -- Do you have those communications, any of those? Do you have copies of those?
**A We -- We don't -- I mean I -- I don't believe I do --**
Q Okay.

Page 11

**A -- other than the Board materials that we get. I don't have any other communications or conduct any business with Board members or the bank other than through the Board.**
Q Okay. Yeah, and that's fine.
No. 2, "Any communications between You and Philip McHugh" -- Do you have any responsive documents --
**A No.**
Q -- to that?
No. 3, "Any Communications between You and Timothy Spence"?
**A No.**
Q No. 4, "All documents created, received, or obtained by You which refer, mention, or otherwise relate to" -- Then we have a number of subcategories. We can go through those -- but as you review those do you have any responsive documents?
**A Again other than what I get through the Board I don't have anything else that we used as conducting business on the Board other than through the Board materials.**
Q Okay. Mr. Benitez, are you currently employed?
**A I serve a number of Boards.**

Page 12

Q What Boards do you serve on?
**A I serve obviously on Fifth Third Board. I serve on two other corporate boards. One is World Kinect Corporation.**
Q Uh-huh.
**A They're an energy management company headquartered in Miami --**
Q Uh-huh.
**A -- and I serve on the Board of Interpublic Group which is an advertising and managing company, a holding company, on a global scale based in New York.**
Q Okay.
**A I also serve on a private transportation services company named Simplex Transportation Services.**
Q Was that Simplex?
**A Simplex with an x.**
Q How long have you been a Board member at Fifth Third Bank?
**A Going on my 11th year. I joined the -- the -- Well, it would be 10th -- 10th year -- Sorry. I joined in 2015, so 10. That's 10 years, yes.**
Q And World Kinect, how long have you

Page 13

been on --
A **Similar time frame.**
Q Like 2015?
A **Both Boards at the same -- in the same year.**
Q Interpublic Group?
A **I have been on the Board there a year and a half.**
Q And Simplex?
A **Two and a half to three years, I think.**
Q Any other Boards?
A **Not private or corporate.**
Q Okay.
A **Those are the only ones.**
Q Outside of Board membership when was your -- when was your last employment?
A **So I worked for a company called Accenture --**
Q Uh-huh.
A **-- and retired from that company in 2014.**
Q How long did you work at Accenture prior to your retirement?
A **For almost 34 years. I started**

Page 14

**with what was known as Arthur Andersen in the consulting and systems integration practice and then that led to the company being restructured into Anderson Consulting and I became part of that and Anderson Consulting ultimately had an IPO in 2001 and became Accenture at that point in time and I served there since that point until the time I retired.**
Q And, Mr. Benitez, I -- I skipped over a couple instructions just to go over with you regarding your deposition today.
First have you ever had your deposition taken before?
A **I have.**
Q Okay. When was the last time you had your deposition taken?
A **While I was at Accenture probably 2010, so that's what, 14 years ago.**
Q Uh-huh.
A **That was one. And the last time in a deposition was in 2015 as part of a divorce.**
Q Other than those two occasions are there any other times you have had your deposition taken?
A **No.**
Q Tell me about the 2010 when you

Page 15

testified during your time at Accenture what type of case was that?
A **It was a claim that was brought forth by one of the jurisdictions outside the U.S. and I was deposed as part of that process.**
Q Do you recall the type of claim it was?
A **Not really, no. It was a while back.**
Q Well, this will be a bit of a refresher since it's been some years, but the first which -- which you have been doing well is just one of us speaking at a time, so I'll give you the courtesy of letting you finish your answer if you just let me finish my question and that way the court reporter can capture everything. Another is that all answers need to be verbalized, so yes, nos, no nodding of the head or shaking of the head, no uh-huhs or unh-unhs.
If you need a break just ask for one. Not an endurance test. We are under a two-hour time here today, but notwithstanding we can take a break. If you need one just let us know. If you don't understand a question please ask me to repeat it and we'll -- we'll do that. Otherwise I'll assume that you -- you understood it. Do you understand

Page 16

those instructions?
A **Yes.**
Q At Fifth Third Bank -- You know, when -- when I refer to Fifth Third Bank I'm -- I'm referring to both the Fifth Third Bancorp and Fifth Third Bank National Association. Do you understand that you -- Are you a Director of both entities?
A **I am Director of Fifth Third Bank.**
Q Okay. Both of those entities --
A **Yes.**
Q -- is that correct?
Okay. And I'll refer to that just as Fifth Third Bank for simplicity for the deposition today.
What committees have you served on at Fifth Third Bank?
A **When I joined the bank I served on the Risk Committee --**
Q Uh-huh.
A **-- and did that for a number of years. I also served on the -- and still serve on the Audit Committee --**
Q Uh-huh.
A **-- and served on the Nom/Gov**

Page 17

**Committee and I chair the Technology Committee which I am still the Chair and have served on since its inception -- inception.**

Q You said "Nom/Gov". Is that Nominating and Governance --

A **Yes.**

Q -- Committee?

Have you ever served on the Human Capital and Compensation Committee?

A **I was recently added to the Human Capital and Compensation Committee this past year.**

Q Okay. Prior to this past year you were -- you had -- had no involvement in that committee?

A **That's correct.**

Q I assume you're familiar with Greg Carmichael?

A **Yes.**

Q And when did you first meet Mr. Carmichael?

A **I met him in 2015 as part of the Board interviewing process where he interviewed me as a candidate to join the Board.**

Q Did anyone else interview besides Mr. Carmichael?

Page 18

A **Yes.**

Q Who else?

A **I started with Jim Hackett who was the Chair of the Board at the time or the -- the Director. I also met with Kevin Kabat who was the CEO. And there may have been a couple of others as part of the management team. I -- I don't recall them now.**

Q How would you describe your relationship with Greg Carmichael?

A **It was a professional relationship. Greg was -- After I joined the Board, you know, he was the CEO and we met as part of Board meetings.**

Q When did he become the CEO, if you recall?

A **I believe it was in 2015 shortly before I joined -- I'm sorry -- shortly after I joined. I think the first meeting that I attended he -- he may have been named the CEO just recently.**

Q Did you have any involvement as a Board member in the selection of Greg Carmichael as CEO?

A **I did not.**

Q How frequently do you meet personally with Greg Carmichael?

Page 19

MR. CIOFFI: Objection to the form of the question, lacks foundation. He said the relationship was professional, not personal.

Q You can answer if you know.

A **I don't meet personally with Greg Carmichael.**

Q Have you ever met personally with him?

A **I have met Greg as part of Board meetings or Board dinners. I have never met him personally.**

Q Have you ever had any one-on-ones with Greg Carmichael --

MR. CIOFFI: Objection, asked and answered, but you may answer.

Q -- besides your onboarding?

A **Other than the initial interview I don't recall having one-on-one sessions with Greg.**

Q Do you ever speak with Greg Carmichael on the phone?

A **No.**

MR. CIOFFI: Objection, beyond the scope of this, but he's answered.

Page 20

Q Is the answer no?

A **No.**

Q Do you ever exchange text messages with Greg Carmichael?

A **No.**

Q Have you ever exchanged emails with Greg Carmichael?

A **I don't believe I have.**

Q Do you know who Robert Shaffer is?

A **Yes.**

Q And he goes by Bob; is that right?

A **Yes.**

Q How would you describe your relationship with Bob Shaffer?

A **Again professional.**

Q Have you ever had any meetings with Bob Shaffer just the two of you, one-on-one meetings?

A **I don't -- I don't recall one-on-one meetings with Bob Shaffer and the meetings I have had with officers have been in the context of the Board meetings when we have dinners or events.**

Q And is that -- is that the case with all Fifth Third officers, employees -- It would only be in the context of a Board meeting is the only time you would have met with them or seen them?

A **Pretty much, yeah. I mean I can't think of -- Let me think about this for a second --**
Q Yeah.
A **-- right --**
Q Sure.
A **-- because I -- Other than Board meetings or dinners or events -- And by events I mean dinners --**
Q Uh-huh.
A **-- or -- or, for example, going to a Bengals game where we have been together -- those kinds of sessions which are really all part of being on the Board I don't recall having met with any of the bank officers or anyone else on a personal level.**
**I do have an account with Fifth Third and I meet with the teller and I meet with the bank manager on occasion, but that's just a personal account --**
Q Uh-huh.
A **-- that has nothing to do with the business of the bank.**
Q And does that include -- At least prior to January 1st of 2020 does that include Tim Spence -- You have never met with him outside the context of a Board meeting?



A **It's the same for him and everyone else --**
Q Okay.
A **-- yes.**
Q Phil McHugh as well?
A **I -- I met Phil as part of Board meetings, as part of dinners --**
Q Uh-huh.
A **-- and events of that nature. Those are the only times.**
Q How often does the Board of Directors of Fifth Third meet?
A **Typically quarterly. We may have some meetings also by phone there in between for committee meetings or other meetings, but it's typically quarterly in person.**
Q And what -- what is the Board's role with respect to executive succession at Fifth Third?
A **So as a Board we meet typically once a year to go through the succession planning process which addresses succession planning for the Enterprise Team, the folks that report to the CEO, as well as the CEO.**
Q And you said once a year. Is that



in December?
A **Typically it's been in December, yes.**
Q And I think you said this at the tail end of your answer, but correct me if I'm wrong. That includes the President and CEO for succession planning?
A **Yes.**
Q Okay. Can you tell me when the Board first began the process of identifying a successor to Greg Carmichael as President and CEO?
A **I don't know that I recall a specific date, but I recall a number of conversations that we have had throughout the years about succession planning --**
Q Uh-huh.
A **-- and it's typically as part of that talent management review process which takes place in December.**
Q What conversations do you recall?
A **I recall conversations going through the discussions of each of the Enterprise Team members in terms of their current roles, their performance, strengths, and opportunities for development. I recall having discussions about what



we would do if we had a need for an emergency CEO change, and I recall conversations about folks that were being considered that had potential to become CEO.**
Q Regarding conversations about individuals with the potential to become CEO can you tell me the substance of those, what you recall?
A **We would have conversations amongst the Board members about what we thought about those people and their ability to meet the needs that we had for the CEO role, had conversations with them about, you know, the things that they had -- the strengths and how their skill sets were able to meet our needs and also areas for development.**
Q And what candidates were identified -- And I'm referring to prior to January 1st, 2020 -- so beginning of your time as a Board member through that time period what candidates do you recall discussing?
A **I -- I recall conversations that we had where we discussed the potential for who might take over from Greg and the two individuals for a more permanent CEO transition there were only two that we discussed and they were Tim Spence and Brian Lamb.**
Q And just to be clear that

Page 25

includes -- that's from 2015 when you became a Board member all the way through January 1st, 2020?

A I recall more vividly the discussions we have had over the last several years. To be very candid in my first year as a Board member I am not sure -- There may have been other names -- but -- but I don't recall those as well so I don't want to just go on what may be incomplete memory, but I am sure there were other people at the time because -- I -- I don't know who they were. I don't recall who they were.

Q When do you recall Tim Spence and Brian Lamb's names coming up as potential successors?

A I don't have a particular date, so it would have been sometime probably in the last -- Well, before Tim became CEO it would have been some number of years back that we have had those conversations.

Q And Tim Spence became CEO in 2022; is that right?

A I think that's correct.

Q Okay. So we have named these two candidates' names you -- you have referenced. How does the Board go about identifying potential successors or candidates?

Page 26

A Well, it -- it's a -- one of the most important things a Board can do --

Q Uh-huh --

A -- is to go through this exercise and process which often takes several years to figure out how to transition the existing CEO to a new CEO. The process starts with identification of people -- Well, it really starts with a definition of what we're looking for in terms of a CEO, what are the skills and capabilities and things that we need to have as we see that Board and that role in the future.

It then goes into an assessment of potential candidates, people that we feel have the potential and have the skills and capabilities to be able to do that role. And then we deliberate. We -- We -- We get input on those individuals from management, but we as a Board deliberate and figure out what we think are the right answers and ultimately come to a consensus about both the individual and the timing.

Q Is there a pool of potential candidates you're drawing from where you get these individuals?

A Typically we look at folks that are in the bank, but we have been blessed that we have had

Page 27

individuals we can consider and sometimes Boards don't have enough talent inside and you have got to go outside. That has not been the case here.

Q So those would be internal candidates; is that fair?

A Yes.

Q Is that limited in any way like to the Enterprise Committee, for example, or broader than that?

A It's typically people that are direct reports to the CEO. While -- While there may be some individuals that are, you know, ready underneath that level it's not typical.

Q Is there a formal application process or a formal application that someone submits to be considered for CEO?

A In my experience at my old company and also on the other Boards I served there's not an application to become CEO. There's a clear definition of what the Board wants, is looking for --

Q Uh-huh.

A -- and then that's the assessment we go through to figure out based on the internal candidates -- You know how that works -- and ultimately we make a decision that we feel is the best

Page 28

for the organization.

Q Yeah.

And -- Yeah, and I understand your experience. Is -- Was that the case with the -- the process of identifying a successor to Greg Carmichael -- There was no formal application; is that right?

A Not that I recall.

Q Okay.

A It's not a formal application process. It's really one where we sort of figure out who the players might be and then we go through deliberation and then assessment as a Board --

Q Uh-huh.

A -- to ultimately make the selection.

Q Yeah.

And similarly there's no -- Was there any notification to employees that, Hey, there is a position opening here, anything like that that was ever put out there?

A No.

Q Okay.

A We don't -- We don't open up for everybody to decide they want to be CEO.

Q Sure.
**A That's not practical.**
Q Uh-huh.
**A So the process involves input from -- from management, but ultimately the Board gets to decide and, as I said before, this is one of the most important things that a Board can do is figure out how to not only identify the next CEO but also go through a proper transition.**
Q Uh-huh.
**A There's lots of factors that influence that.**
Q You had mentioned it starts with the identification of the skills necessary for the role. What in -- in this situation, referring to Tim Spence eventually receiving the promotion to President and then CEO -- what -- what did the Board do to identify those skills and abilities at the first step?
**A We had -- We had a series of discussions about what we were looking for --**
Q Uh-huh.
**A -- and -- and ultimately arrived at what we thought were the right skill sets and -- and capabilities to -- to ultimately have -- have**



**transition from Greg to the next CEO.**
Q And were those put -- set forth in writing anywhere?
**A I don't know that they were put in writing. I don't think so.**
Q What were those skills and abilities?
**A Well, there are several. No. 1, it was having a -- a strategic mind-set, having both a vision and the ability to articulate a strategy for how the bank would continue to grow and develop and prosper.**
Q Uh-huh.
**A Secondly it would be having, you know, banking contacts and knowledge of -- of what other banks were doing and what's happening in the marketplace so that as we chart our future we would be able to sort of consider those things.**
Q Uh-huh.
**A It would have included having, you know, MA experience because a bank our size we see a growth potential by being able to acquire other banks, and what I mean by that is identifying both opportunities but also being able to leverage contacts to develop those opportunities and ultimately figure**



**out how you integrate other banks and -- and get the value out of those integrations.**
**We recognized also that banking was changing dramatically through digital channels and so having technology, digital, you know, banking understanding and how we as an organization would morph to apply more of those capabilities particularly down the future that was also something we talked about that was important.**
**We also wanted somebody that had executive presence and the ability to exercise that and sort of -- of within a peer set in the industry, somebody that understood the regulatory side of things. I mean there was a long list of things that we considered.**
Q Anything else that you can recall?
**A That's a long list already, but I'll -- I'll give that some more thought. Give me a second and see if I missed anything.**
Q Sure.
**A Well, I would probably add something that I mentioned but just to kind of expand on it. You know, having the leadership skills, right, to be able to sort of be the bank leader overall in terms of being able to articulate a vision, being able**



**to communicate, be an effective communicator, being able to justify positions and opinions based on facts, I mean those kinds of things --**
Q Uh-huh.
**A -- is what makes a good leader.**
Q Anything else that you recall?
**A If you give me enough time I am sure I can add some other things, but I -- I think that's enough.**
Q And you're saying the Board discussed these and -- and agreed on these -- I'm counting six; right?
**A I mean I may be missing one or two, but we discussed --**
Q Uh-huh.
**A -- generally all of these capability sets to ultimately figure out who we would select, yes.**
Q Okay. When did that discussion occur and when did you develop this list as a Board, when was that developed?
**A I don't recall the exact date of when it was developed, but I remember conversations, you know, along multiple years where we actually went through this exercise and -- and we would refine**

Page 33

**and -- and sort of get a better sense for how we thought this would play out --**
Q Uh-huh.
A **-- as part of that process.**
Q Okay. But again that list was never put down in writing; correct?
A **I -- I believe we each talked about it. I don't remember it being written down anywhere.**
Q Okay. Prior to January 1st, 2020, was Phil McHugh ever discussed as a possible candidate for CEO?
A **No.**
Q Do you recall any discussions about Phil McHugh whatsoever regarding a CEO role or President role?
MR. CIOFFI: Objection, asked and answered. He said "no".
Q What's your answer?
MR. CIOFFI: You have been redundant. Your question is the same question, but --
A **There were no --**
MR. CIOFFI: -- you may answer.
A **There were no conversations that I was part of as part of Board meetings where Phil was**

Page 34

**being considered to be CEO or discussed a potential to be CEO.**
Q What's your understanding of Phil McHugh's role at Fifth Third bank prior to January 1st, 2020?
A **Phil had a series of roles at the bank at that time -- And I -- And I may not be current on this -- but -- correct on this rather -- but I believe he had the Consumer Bank and perhaps had responsibility over the Regional Presidents and maybe one other role. He may have had Wealth or had that at some point. I don't recall specifically all the things that he was responsible at that time, but I know he had a series of jobs throughout the bank having been at the bank for a long time.**
Q Other than Board meetings did you ever observe Phil McHugh in the workplace at Fifth Third?
A **Board meetings would be one, the primary way, and also committee meetings where the individuals were meeting and he was presenting at some point. That could have been another.**
Q Other than those committee meetings or Board meetings did you ever observe Phil McHugh in the workplace?

Page 35

A **I don't recall that I did, no.**
Q Okay. Did you ever participate in or perform any of Phil McHugh's annual reviews or mid-year reviews?
A **No, but that wouldn't typically be appropriate for a Board member to do anyways.**
Q Did you review any of the documentation from Phil McHugh's annual reviews?
A **I don't believe I did, no.**
Q Have you ever reviewed Phil McHugh's employee engagement scores or customer experience scores?
A **No.**
Q Did you ever see any of the materials from Phil McHugh's annual reviews?
A **I don't know what you mean by materials.**
Q It's -- It's a similar question, but any underlying materials from his performance reviews, ever seen anything like that?
A **The -- The only thing that I would have read about Phil McHugh would have been as part of the talent score card process that we go through across all of the Enterprise members.**
Q Uh-huh.

Page 36

In December; is that right?
A **Typically done in December.**
Q And who -- who provides you that information?
A **It's provided through the HR team into the Board.**
Q In December, 2019, would that have been Bob Shaffer?
A **I don't remember but probably.**
Q As their direct supervisor does Mr. Carmichael also present on -- on -- at that December, 2019, meeting as to those individuals?
A **He is present and then we have an executive session where it's just the independent Directors.**
Q Other than Board meetings did you ever observe Tim Spence in the workplace at Fifth Third?
A **No.**
Q Did you ever meet with or interview any of Tim Spence's direct reports or subordinates?
A **No.**
Q Did you participate in or perform any of Tim Spence's annual reviews or mid-year reviews?

Page 37

A No.
Q Did you review any of the documentation from Tim Spence's annual reviews?
A No.
Q Have you ever reviewed Tim Spence's employee engagement scores or customer experience scores?
A No.
Q Did you ever review either Phil McHugh or Tim Spence's financial performance relative to goals for their respective divisions?
A I -- I don't think I did. Let -- Let me just add --
Q Uh-huh.
A -- we did review the performance of different aspects of the bank --
Q Uh-huh.
A -- right, the Consumer Bank I was doing and the Commercial Bank, so we did that in the context of annual planning --
Q Uh-huh.
A -- but I don't recall that we actually reviewed the specific goals that they were assigned.
Q Okay.

Page 38

A Does that help?
Q Yeah.
A Because I want to be clear.
Q Yeah, I think that answers it.
Did you ever see income statements or balance sheets broken out for the divisions managed by either of those executives?
A No.
Q Was there ever a determination by the Board that Phil McHugh was not qualified to be President or CEO of the bank?
MR. CIOFFI: Objection, asked and answered.
Q Was there ever a determination made?
A The determination that we made is that we only had one candidate to be the -- the CEO from our perspective and that candidate was Tim Spence who met all of the qualifications and criteria that we defined and I listed for you in terms of what we as a Board felt would be the best candidate to become CEO.
The Board coalesced around Tim very quickly over a number of years and ultimately that was the decision we made, and we're very happy with the decision we made because we have had great success

Page 39

since that time with Tim at the helm.
Q You said the Board coalesced over a number of years. How many years?
A Several years, three to four years. This is a process that takes time and it wasn't that we were not aligned. It's just that we needed to see other things and needed to make sure that we were on a path. We also had to consider when Greg's, you know, ready to resign or -- or leave the bank, and so there are a number of factors that play here to ultimately drive the outcome that we selected.
Q Tim Spence started at the bank in 2015 -- Is that your recollection, if you know?
A Yes, it was shortly after I joined the bank.
Q Okay. So when you say three to four years I am just trying to pinpoint when this coalesce as best I can. Is that 2018 to 2019?
A I can't give you an exact date --
Q Uh-huh.
A -- but it would have been, you know, probably in the 2016 to 2020 range, somewhere around that time -- I can't remember exactly the dates -- but it was a several-year process that we went through to ultimately align a number of factors,

Page 40

as I said, when Greg would depart who we thought was the person qualified and we selected Tim in ultimately going through that process.
Q The determination that Spence was your only candidate, when did the Board actually make that determination? I understand it was coalescing, but when -- when was that determination made, if at all?
A Well, we concluded ultimately on that as part of the process that led to his appointment, right --
Q Uh-huh.
A -- but I can't give you a specific date, This was the Date X that we all decided that, because there was a process that we went through to ultimately drive to that answer.
Q Did Greg Carmichael ever recommend to you or any member of the Board that Phil McHugh should succeed him as President of Fifth Third?
A No.
Q Did he ever recommend to you or any member of the Board that Tim Spence should succeed him as President of Fifth Third?
A I don't know about the others on the Board, but I can only talk about my aspects of it,

Page 41

**right, but Greg -- Greg did have a view that Tim would be the -- should be considered as the next CEO, but the Board makes the decision, right, and so we take that as input and we deliberate and ultimately we concluded that Tim was the best choice.**
Q Did Greg Carmichael provide you feedback on Tim Spence's performance at the bank?
**A As part of the talent management discussions he provided and others shared information about feedback across everybody on the Enterprise Team.**
Q Okay. Did that factor into the succession --
**A That is input --**
Q -- discussions?
**A That is input to the ultimate decision, yes.**
Q Okay. And just a reminder let me finish the question before you answer just so it's not jumbled up.
You had mentioned emergency successor was also a point of discussion?
**A Correct.**
Q Was Phil McHugh ever discussed as an emergency successor?

Page 42

**A Yes.**
Q Uh-huh.
When?
**A As part of a number of annual planning -- Sorry -- talent planning discussions that we had we would talk about CEO succession and we would talk about sort of emergency CEO succession planning and I believe Phil was one of a couple candidates that would be considered under that scenario.**
**The difficulty in that whole exercise of emergency is we don't know the nature of the emergency until it happens, right, so we have got to look at who are the people that could step in on an interim basis and that's what we did.**
Q And did you support Phil McHugh as an interim or emergency CEO?
MR. CIOFFI: Objection, asked and answered the -- the process.
Q Go ahead.
**A He was one of the candidates that would be considered in that scenario, yes.**
Q Did you support him as a candidate in that scenario?
**A In the -- In the context of an overall plan of having a couple of names, yes, he was**

Page 43

**one of the two names.**
Q Did you support that? That's my question.
**A I don't know what you mean by support.**
Q Did you voice any opposition to it? Were you -- I mean you saw his name as -- as one of a couple of candidates; correct?
**A Yes.**
Q Did you have any issue with him as a potential emergency or interim candidate?
MR. CIOFFI: Objection, asked and answered. It didn't come to that. It's a matter of what the context was which was unknown.
Q Go ahead.
**A I did not have an issue with him being one of the candidates.**
Q Okay. What skills or abilities are necessary to become the -- to be an emergency or interim CEO candidate?
**A There -- There are several things -- And -- And I preface this before I answer in more detail with it depends on what happens that causes an emergency; right?**

Page 44

Q Uh-huh.
**A But it's the ability to, you know, operate the bank until as a Board we nominate someone else to be CEO. Emergency CEO says if there's some reason why the existing CEO is unable to perform his or her duties. Under that scenario we have got to look to people on the Enterprise Team to figure out who can come in and step in on an interim basis and do the job until we can transition to someone else.**
**So the -- the skills and capabilities to answer your question directly would be knowledge of the bank, understanding how to get stuff done, being able to step in into specific, you know, activities as may be required.**
Q Communication skills?
**A Would that be a skill set, yeah, but --**
Q Uh-huh.
**A -- you don't -- you don't get to be on the Enterprise Team unless you have communication skills, so for me that's -- Selecting from the Enterprise Team to be able to do that those people have that.**
Q Uh-huh.
What about strategic agility --

Page 45

Have you heard that term before?
A **I have heard the term before.**
Q Is that one of the skills you would need to be an emergency or interim CEO?
A **In my opinion the emergency CEO is much more of a tactical how do I do what I got to do now to keep the bank running and it's less about trying to chart the future, be strategic and try to figure out, you know, how -- where we go to over the next three to five years. It's an emergency --**
Q Uh-huh.
A **-- right, and emergency means you have got to deal with the day to day and the more -- sort of the -- the -- the specifics of the day to day.**
Q Tim Spence and Brian Lamb were the two candidates you identified as between 2015 when you came on board and up through January 1st, 2020; right?
A **Roughly.**
Q Yeah.
Were both being assessed equally or considered equally?
A **No.**
Q Okay. What was the difference between the two?
A **While they both had the potential**

Page 46

**it was our view that -- that Tim had -- was -- was closer to being ready than Brian was.**
Q What was that based upon?
A **Our discussions as a Board, interactions with the two candidates, our deliberations on, you know, succession planning and timing.**
Q Can you tell me the substance of those discussions why -- why Tim Spence was closer than Brian Lamb?
A **We actually used the criteria that I shared with you before and said, "How do they stack up? Is there -- Is there something that we need to sort of figure out a -- a role change or something different to allow them to be able to get other experience they may not have or other things that they're doing well? Are there developmental areas they need to consider?" There were a lot of discussions about making sure that we felt good we had at least two viable candidates.**
Q Was Tim Spence designated as an emergency successor?
A **I don't recall that we talked about him being an emergency successor. We certainly talked about him as being the -- you know, the transition**

Page 47

**from Greg's successor.**
Q Uh-huh.
In your opinion would he be qualified as an emergency successor prior to January 1st, 2020?
A **You know, because we were talking about him in the context of a transition, yeah, I think he could have done it as well. In my opinion I think he would have been a candidate also. So much of that depends on the nature of what causes the emergency, right, and how we need to interact with shareholders, investors, and other groups, so, yeah, I would think he would be one of them.**
Q Who presides over the Board meetings?
A **So if we have a Chair the Chair presides. If we have -- don't have a Chair -- or we do have a Chair that -- that leads, directs, and presides, and it depends on what aspect of the Board meetings you mean.**
Q Let's go to 2019. Who would -- Who is the Chair at that time?
A **Greg was Chair, I believe, at the time.**
Q Who sets the agenda for the Board

Page 48

meetings?
A **The Chair.**
Q Who decides who is going to present to the Board?
A **I'm assuming the Chair and/or the CEO or they could be the same person and they work with their team to figure that out. That's typically how it's done in any of the boards I sit on.**
Q Were you aware that as of August, 2019, there was a chance that Greg Carmichael would have to step down earlier than he or the Board's desires would have been because of some situations going on at the time that were personal in nature?
A **I was not aware of that.**
Q Okay. You were never made aware of that?
A **I don't recall --**
Q Okay.
A **-- a situation where he would have to step down for personal reasons.**
Q In 2019 did the Board ever discuss with Mr. Carmichael his -- his timeline in terms of when he would be leaving the bank, leaving the CEO role?
A **It was something that, I believe,**

Page 49

**was -- was done by the lead Director --**
Q Uh-huh.
**A -- in terms of trying to gauge, you know, sort of a rough timeline.**
Q Who was the lead Director at that time?
**A Well, Greg was the Chair.**
Q Uh-huh.
**A So I think the lead Director was -- I can't remember if it was Nick or Marsha, probably Nick is what I remember, but one of the two.**
Q And so Nick or Marsha had -- You're saying they had a discussion with Greg?
**A They would have had the conversation --**
Q Okay.
**A -- with him about time frames.**
Q And was that --
**A I wasn't -- I wasn't part of that.**
Q I see.
Was that ever reported back to you? Were you ever told what his timeline was?
**A I -- I don't recall a particular timeline given other than we just need to prepare as we typically always do anyways to have someone, you**

Page 50

**know, ready to -- as part of a normal transition.**
(Deposition Exhibit 10 was marked for identification.)
(Deposition Exhibit 11 was marked for identification.)
BY MR. SMITH:
Q Mr. Benitez, I have handed you two exhibits that have been marked Exhibit 10 and Exhibit 11 which I'll represent are both minutes of the meeting of the Board of Directors. One is Fifth Third Bank. One is Fifth Third Bancorp. I want to direct you to the topic of Executive Performance Review which at the bottom you'll see a Bates No. FifthThird-McHugh-Minutes-000266 -- Do you see that?
**A I see that at the bottom of one of the documents.**
Q Okay. And turning actually to FifthThird-McHugh-Minutes-00267 --
**A I don't have that.**
Q You don't have that?
**A I have 266 and 253.**
Q Turn -- Turn to the second page of 26 -- right after 266.
**A Sorry.**
Q Yeah, no problem.

Page 51

Under -- There's a number of resolutions and then in the middle of the page do you see where it starts, "Thereafter"?
**A Uh-huh.**
Q It indicates, "Thereafter, Mr. Carmichael and Mr. Shaffer initiated a review of potential succession timelines and candidates for the Chief Executive Officer position." Who were the candidates that were reviewed at this meeting?
**A I don't remember in detail, but for the CEO position it would have only been two candidates. It would have been Tim Spence and potentially Brian Lamb. I can't remember if Brian Lamb had already left the bank at that time. So those would have been the only two.**
Q And then what about the -- What do you recall about the potential succession timelines?
**A Well, it -- I don't recall specifics, but it was something that -- along the lines of, This is something we're going to do over the next, you know, couple of years, and -- and we just are -- It really led to a subsequent conversation with the Board in terms of trying to figure out, you know, do we feel like we have got the right candidate and we concluded that we did in terms of Tim.**

Page 52

Q Were there multiple timelines discussed?
**A I don't recall multiple timelines, no.**
Q And again in terms of Mr. Spence and Mr. Lamb Mr. Spence was considered by the Board to be closer to being ready for the CEO role versus Mr. Lamb; is that right?
**A Yes.**
Q Okay. If you keep reading along that same paragraph, "They reviewed top succession candidates, including Mr. Spence, and discussed the potential timelines for their readiness and key development priorities for each such candidate." What were the key development priorities for Mr. Spence?
**A I don't remember specifically. As -- As I reflect on my -- my memory of the discussion he had done most, if not all, the things that we had talked about, but I don't remember if there was one or two things that were discussed.**
Q And you were provided materials for purposes of this -- this particular discussion we're looking at here; is that right?
**A I don't remember what we were provided. Given that this was in December we might**

**have -- Obviously we would have had that talent management discussion.**
Q For that talent management discussion are there typically materials given to you from -- I think you had referenced before the Human Resources -- HR group?
**A Yes.**
Q Okay.
(Deposition Exhibit 12 was marked for identification.)
(Deposition Exhibit 13 was marked for identification.)
BY MR. SMITH:
Q Handing you what -- two exhibits marked as Exhibit 11 and Exhibit 12, 11 appears to be an email --
THE REPORTER: Wait a minute. It's 12 and 13.
MR. SMITH: 12 and 13. Sorry.
BY MR. SMITH:
Q Exhibit 12, Mr. Benitez, appears to be an email to yourself and the other Board members. First does -- does that appear accurate? Is your -- Do you see your email in there?
**A Yes, I see my email in the To --**



Q Uh-huh.
**A -- form.**
Q And then Exhibit 12 is a document labeled "Board of Directors" -- 13 -- I'm sorry -- "Human Capital and Executive Talent Management and Succession Plan Updates" dated December 17th, 2019. First does this appear to be the document that was attached to this email to the best of your --
**A Let me --**
Q -- recollection?
**A Let me just look through it, please.**
Q Sure, yeah.
**A (Reviewing document.) I think this appears to be the document --**
Q Okay.
**A -- that we have been discussing.**
Q What role does this document serve with respect to succession planning for President and CEO?
MR. CIOFFI: Counsel, let me note for the record by way of objection there are no Bates numbers on here. Can you represent where this document came from because it -- it didn't -- it appears not to have come from



the production of documents which we have used extensively throughout all the other depositions?
MR. SMITH: Yeah, let me represent my understanding. This -- this is from the discovery produced by Fifth Third to us. It appears that the Bates numbers were cut off is all, but we can -- we can certainly confirm and -- and stipulate on the Bates -- what the Bates numbers are to this once we go back and review. I wasn't aware they were cut off until -- until just now.
MR. CIOFFI: Typically as you know the Bates numbers are -- are pretty high up in the document so I -- I am questioning the authenticity of this particular document. I don't want to stop the deposition and -- and waste time. I'm going to allow questioning about this document noting my objection about the authenticity and whether it is, in fact, the documents that were provided and actually used at the Board meeting. Subject to after the deposition actually going through -- And I would ask you and Mr. Hart to do this and confirm that each page was, in fact, produced



and it is, in fact, authentic in -- in what was part of production.
MR. SMITH: That's fine.
MR. CIOFFI: Is that agreeable to you?
MR. SMITH: Yeah, that's fine.
MR. CIOFFI: And if there's not -- if it's not authentic then we'll object to these lines of questioning; okay?
MR. SMITH: Yep, agree.
BY MR. SMITH:
Q I think I had a question. How was this document used for purposes of President and/or CEO succession planning?
**A It was considered as input by the Board. It was a process that is pretty standard at the bank and on other Boards where we actually go through the leadership team in -- in detail and try to get an understanding of what's -- what's going on with each of them which we did and then we go through a process which, I believe, is here later on in the document where we have a conversation about succession as -- as a Board, so this was prepared by management, but it was used by the Board and the Board deliberated and we had extensive discussion about lots of things**

Page 57

**in that process.**
Q And specific to management who -- specific to this document who is presenting this to the Board?
A **It's typically the HR leader that is presenting the information to get us to at least understand what's here and then they exit and we have an executive session where we have the bulk of the deliberations.**
Q Does the CEO have any involvement in that presentation?
A **I don't know. I'm sorry. Could I just pause?**
Q Yeah.
A **Involvement in what, in the actual discussion or in the preparing of the materials?**
Q In the presentation of these materials to the Board.
A **It's typically led by the HR leader. The CEO is present along with the Board.**
Q And does the CEO give input during the discussion?
A **Where requested, yeah.**
Q Turning your attention to Page 37 of the materials this is labeled "CEO Succession Plan

Page 58

December 2019" -- Do you see that?
A **I do.**
Q Does the HR -- Does the Chief Human Resources Officer also present this portion of the Board materials to the Board?
A **Typically I think they're present before we then have an executive session.**
Q They're present you said?
A **Before. So they're present to take us through this --**
Q Yeah.
A **-- and then we have an executive session with just the Board.**
Q I see.
My question is are they actually presenting this, the Chief Human Resources Officer, or is it someone else?
A **It's typically -- Well, I'm trying to remember. I -- I don't recall if it's the -- the CHRO or if it's the CEO that's presenting it. I don't remember.**
Q Okay. In turning to the following page, 38, labeled "CEO Succession" do you recall seeing this particular page of the materials?
A **Yes.**

Page 59

Q And it looks like we have here Tim Spence 3+ years and Brian Lamb 7+ years. This was -- This was a timeline; is that right -- Would you agree with that?
A **I -- I think this was a -- a -- a framing of a discussion --**
Q Uh-huh.
A **-- that we then deliberated as an independent Director Board meeting.**
Q Did the Board ultimately agree with this timeline?
A **It made sense to us that this is something that -- that seemed adequate.**
Q Did Greg Carmichael have any input into this timeline?
MR. CIOFFI: Objection, lack of foundation.
A **I -- I don't know if he did or did not.**
Q Okay. Did he provide any recommendations as to this timeline?
MR. CIOFFI: Same objection, no foundation, objection to the form. If you know you may answer.
A **It -- It was clear that as we began

Page 60

having these conversations Greg was in alignment with this kind of presentation. He clearly felt along with the rest of the Board that both Tim and Brian were potential successors to the CEO.**
Q Do you recall ever seeing Board materials -- So this is December, 2019. Do you recall any prior Board meetings where there were similar timelines presented to the Board regarding CEO succession?
A **I remember having conversation about it. I can't remember if the actual same slides were used or not. I do remember that for purposes of the talent management discussions these kinds of talent management slides have been part of the process we have used throughout at least what I recall as my tenure on the -- on the Board. It's a -- It's a very standard process that frankly I use in other Boards where we actually get a chance to talk about the leadership team --**
Q Uh-huh.
A **-- talk about how they're doing, talk about their potential and all that, so that -- that's a pretty standard process and I remember we've -- we've used that before.**
Q Now, just to be clear so I

Page 61

understand those discussions about individuals, talent, potential expositions, that's not necessarily CEO succession; is that right?
A It's part of it because it gives you a sense for what's going on --
Q Uh-huh.
A -- with the entire leadership team from which we extract people that would be considered then for CEO, but in terms of this particular slide, did we use this same slide before, I don't remember.
Q Are you familiar with RHR International?
A I am not familiar with them, but I think we used them to do an assessment.
Q When did the bank use them to do an assessment?
A It would have been around this time frame, 2019, 2020.
Q And just to be specific what was RHR assessing?
A They were assessing Tim Spence in terms of being the CEO from a perspective of a number of factors.
Q Who made the decision to retain RHR to assess Mr. Spence?

Page 62

A I don't remember who it was. I know we as a Board talked about having a -- a -- sort of a validation -- once we had coalesced around Tim being the CEO having a validation on -- which is a normal process that a lot of boards use and I have used on other boards as well to basically get a sense for, you know, is there anything that might stick out, any concerns, any issues, and what I recall from that report is that it was a pretty glowing assessment about Tim and his capabilities.
Q Is that in 2020 when that assessment was done?
A I'm -- I'm remembering that it's around that time frame, so, yeah, probably 2020.
Q Was anyone else assessed by RHR in 2020?
A Not that I remember.
Q Were you aware that RHR was originally contacted by Fifth Third to assess three candidates?
MR. CIOFFI: Objection, assumes facts not in evidence and not accurate, but you may answer if you know.
A Not aware.
Q Did the Board ever have a

Page 63

discussion about how many candidates to assess -- to have RHR assess?
A I don't remember the specifics of who would have had assessment. I think we as a Board were already pretty aligned is what I remember on Tim, so I -- my memory is that it would have been just Tim.
Q Okay. Do you recall -- You don't recall any discussion like that?
MR. CIOFFI: Objection, asked and answered.
A Honestly the same thing I just said. I remember that as a Board we were pretty aligned about Tim and I recall that it was really Tim that we wanted the assessment for.
Q Uh-huh.
A I don't remember the exact date when that happened, but I remember that.
Q And -- And my question more goes to did the Board ever discuss whether they wanted to have multiple candidates or not?
A I don't recall that.
Q Okay. I want to go back to Exhibit 13 and Page 31 of that which should be the Tim Spence.
A Yes.

Page 64

Q The information on this card, how does that factor into discussions regarding CEO succession?
A It's input that we get. It's information on the individuals in terms of a bunch of different things, strengths, areas of focus, roles, you know, talent information. All of that factors in as input and then we deliberate as a Board.
Q Are you basing any decisions on this input?
A It's input.
Q Uh-huh.
A It's not a decision-making tool. It's input that we then in addition to our own experiences, our own insights, our discussions at Board meetings and all of that stuff, we factor all of that into account.
Q Okay. Who makes the determination -- Well, I see there's "Potential" right about the middle of this card. It says "High Potential" -- Do you see that?
A I do.
Q And who -- who makes that determination?
A So it's typically a discussion --

Page 65

**Let me back up. I don't know who does it --**
Q Uh-huh.
**A -- but I would have expected it would have been, you know, a combination of Greg and the HR leader in going through that process.**
Q Okay. Is that the same for "Potential Next Positions" immediately below that?
**A Yes.**
(Deposition Exhibit 14 was marked for identification.)
MR. SMITH: This document also does not have Bates numbers. I -- I think same agreement as last time regarding this, Collin and I will go back and just confirm this is an accurate copy?
MR. CIOFFI: Yes, based on that representation and stipulation we won't stop the deposition based on the lack of authenticity, so please proceed.
BY MR. SMITH:
Q Mr. Benitez, I have handed you Exhibit 14, an email from Bob Shaffer to Greg Carmichael dated June 8th, 2020. Under the first bullet point it states, "Guy agrees that if Tim is the successor don't add Tayfun and Phil formally.

Page 66

Although, he would recommend, at a minimum, we discuss with Marsha that she and the Board are okay with only having Tim assessed by Guy."
First do you know who Guy is referring to?
**A I don't know.**
Q Do you recall Guy Beaudin with RHR?
**A The last name I remember.**
Q Okay.
**A Sorry. I didn't remember the Guy part.**
Q Okay. And based on that did -- did Greg discuss with you, the Board, or Marsha to your knowledge whether they're okay with having -- only having Tim Spence assessed by RHR?
MR. CIOFFI: Objection, lack of foundation. You may answer if you can.
**A I don't know what Greg discussed with Marsha.**
Q Uh-huh.
**A I don't recall a conversation with the Board on -- on this topic.**
Q Okay. There's a stack of exhibits in front of you from the prior deposition. I'm going to refer you to No. 7 in that. Have you ever seen

Page 67

this document before?
MR. CIOFFI: Counsel, before you continue I didn't know you were going to refer back to those other exhibits, so let me grab my set.
MR. SMITH: Oh, yeah. Do you want to take a short break or --
MR. CIOFFI: Yeah, why don't we -- We can.
MS. POOLE: Let me just grab them.
MR. CIOFFI: We have about 30 more minutes.
MS. POOLE: I can just grab them really quickly for you or do you want to take a break?
MR. SMITH: Either way.
MR. CIOFFI: Sure, no, yeah.
MS. POOLE: I'll just get them really quickly.
MR. CIOFFI: I think they're in my -- my folder in there.
THE VIDEOGRAPHER: Do you want to go off the record?
MR. SMITH: Yeah, we can go off record.

Page 68

MR. CIOFFI: No, we can continue.
MR. SMITH: Yeah, I'm just having her take us off the record.
(Deposition stood in recess at 12:27 p.m.)
(Deposition reconvened at 12:29 p.m.)
THE VIDEOGRAPHER: We are back on the record. This is Media 2 of today's deposition. The time is 12:27.
BY MR. SMITH:
Q Mr. Benitez, I have referred you to Exhibit 7. Do you have that document in front of you?
**A Yes.**
Q And have you seen this document before?
**A Let me look through it. (Reviewing document.) Yes.**
Q And what is this document?
**A I think this is the report that RHR developed on Tim Spence.**
Q Let me represent to you I don't believe that's what this is. It looks like it's the -- It's labeled "The Winning Formula".
**A It's the criteria or the format**

Page 69

**that they would use to evaluate --**
Q And --
**A -- a candidate.**
Q And if you're aware how are these criteria developed?
**A I don't know.**
Q Does the bank have any input in these criteria that you're aware of?
**A I would think so.**
Q Do you know whether Phil McHugh was ever assessed under these criteria?
**A I don't know.**
Q The criteria listed in here labeled "Essential Leadership Behaviors" I'm seeing, "Business Management," as one, "Leadership, Interpersonal," and, "Personal Attributes" -- Do you see that?
**A Yes.**
Q And under "Business Management" do you see, "The main -- The main idea reflected under this dimension is that the CEO needs to be able to drive innovative thinking on the strategic side while simultaneously maintaining a close eye on rigorous execution."
What objective data or information

Page 70

did you -- have you ever seen or reviewed to indicate that Phil -- or that Tim Spence was superior to Phil McHugh as to that leadership behavior?
MR. CIOFFI: Objection to the form of the question. This is a document that RHR, another company, used to assess Tim Spence and that's in the assessments, Counsel, which I assume you will get to -- They have been marked as exhibits earlier today -- but it's pretty clear how they tied together.
Q Do you have any objective information?
**A The information that I -- Repeat the question.**
Q Yeah. What objective information or data do you have to indicate that Tim Spence was superior to Phil McHugh with respect to "driving innovative thinking on the strategic side while simultaneously maintaining a close eye on rigorous execution"?
**A I can tell you that my interactions with Tim Spence at Board meetings and interactions that we had with him at Board dinners and those kind of settings he showed great strength in -- in all the**

Page 71

**categories that I had mentioned before that the Board was looking for.**
**I -- I assume that this was the precursor to the RHR Report in terms of how that was structured. On that basis I would say to you that we asked RHR to do this as an additional validation on Tim once we had already coalesced on Tim being the right person to succeed Greg.**
Q At the point -- So the Board had already coalesced at this point before RHR is ever doing this work --
**A Yes.**
Q -- is that right?
**A Yes.**
Q Okay. So there were no other -- other candidates that the Board was even considering at this point; is that right?
**A We had coalesced by this point -- This is mid 2020 --**
Q Uh-huh.
**A -- that Tim would be the next CEO. That's my recollection.**
Q And on the second page under Leadership it states, "The main idea reflected under this dimension is to effectively manage the strength

Page 72

of the existing team while continuing to attract a more diverse group of executives." Based on your prior answers I'm -- is there any objective evidence that Tim Spence was superior to Phil McHugh in this? Was that analysis ever done is really my -- what I'm getting at?
MR. CIOFFI: Objection to the form --
**A I'm not understanding --**
MR. CIOFFI: Objection to the form of the question.
MR. SMITH: Yeah -- Well, let me -- let me --
MR. CIOFFI: Could you rephrase it, please?
MR. SMITH: Yeah.
BY MR. SMITH:
Q Was there ever a comparative analysis done by either the Board or RHR on this leadership quality that I just read? Was that a --
**A Comparative analysis on what?**
Q Between Tim Spence and Phil McHugh.
**A Not -- Not that I'm aware of.**
Q Is that the same with all of these factors? Are you aware of any comparative analysis?

Page 73

**A I don't believe there was one done and the reason there wasn't one done is we had already made our decision or at least we had an indication of what we wanted; right?**
Q Uh-huh.
**A This is not a contest; right? The Board had gone through a very deliberate process as I mentioned before on trying to go and imagine what the next CEO would look like. We looked at that criteria, those qualifications that I have read to you -- that I have shared with you --**
Q Uh-huh.
**A -- and it was very clear that Tim was the guy. There was no one else.**
Q I want to direct you, Mr. Benitez, to Exhibit 3 from that same pile from the prior deposition. Let me represent these are minutes of the meeting of the Board of Directors from September 21st, 2020, that indicates you were in attendance in person at that meeting; is that right?
**A Let me look through this, please.**
Q Sure.
**A (Reviewing document.) That appears to be the case.**
Q Okay. And in looking at the first

Page 74

page, FifthThird-McHugh-Minutes-000517, under Talent Management it states, "Mr. Shaffer, Mr. Beaudin and Mr. Evans presented the Talent Management Update as included in the materials provided for the meeting. Mr. Shaffer began by reminding the Directors of prior discussions related to executive succession planning, including discussions related to Mr. Spence as a possible President and Chief Executive Officer successor to Mr. Carmichael."
First do you recall what Mr. Shaffer reminded the Directors of specifically as to those prior discussions?
**A No.**
Q Okay. And it would appear from the minutes at this meeting RHR International presented their results of the assessment; is that right?
**A That's what appears to be the case.**
Q Okay. Now, did they present you the -- a full report or was it in a summary of a report, if you recall?
**A I don't remember.**
Q Okay. If you could go to Exhibit 4 it's a document labeled "Board Summary Tim Spence". Does this refresh -- Was this presented to you at that Board meeting -- Do you recall?

Page 75

**A Let me look at it.**
Q Yeah.
**A (Reviewing document.) I don't remember if it was the summary or the detailed report.**
Q Okay. Do you recall ever seeing the detailed report?
**A I recall getting a report that had information on what RHR had done --**
Q Uh-huh.
**A -- but looking through this now I don't remember if it was the detail or the summary.**
Q Okay. Following this report the Board voted to promote Mr. Spence to President; is that right?
**A Afterwards, yes.**
Q Did -- During this September, 2020, Board meeting was it ever discussed that Mr. McHugh could be at risk with Mr. Spence's promotion to President?
**A I don't remember a Board discussion where that was shared.**
Q Uh-huh.
You were eventually made aware that with Tim Spence's promotion Mr. McHugh's employment ended at the bank; is that right?

Page 76

MR. CIOFFI: Objection to the form of the question. You may answer if you can.
**A I recall hearing that Phil had left the bank, decided to leave the bank.**
Q Who told you that?
**A I don't remember if it was at a Board meeting. It would have had to be at a Board meeting. I just don't remember.**
Q Okay. What do you recall being told specifically, just that he left the bank -- Was that it?
**A Yeah.**
Q Okay. And any indication why?
**A He had left the bank. That's what I remember.**
Q Okay. You voted in favor of promoting Tim Spence to President along with the other Board members; right?
**A Yes.**
Q What was -- At the time you voted what was your -- what information did you have, what did you base your vote upon?
**A A series of conversations and discussions and deliberations that we had had at a Board meeting -- at a series of Board meetings over**

Page 77

**the past few years. It was clear to me and to the rest of the Board that Tim was the best qualified, the only qualified person, to actually become CEO and that's why we were positioning him by giving him the President job and then ultimately the CEO job which is what we did.**
Q Did the RHR assessment factor into your decision?
A **It was an external sort of validation that there was nothing surprising and it confirmed a lot of what we had frankly deliberated, so it wasn't -- There was nothing in the report that led us to think otherwise. It -- It really helped to -- not -- not convince because we were already convinced, but it was another validation point.**
Q And again at -- at the time that report the Bank -- the Board was not even considering anyone else for CEO succession at least as to Greg Carmichael's successor; is that right?
MR. CIOFFI: Object -- Objection, asked and answered, redundant.
A **My recollection is that at the time we had already sort of coalesced around an answer and that was Tim Spence.**
MR. SMITH: Okay. Let's go off the

Page 78

record.
THE VIDEOGRAPHER: He are off the record 12:43.
(Deposition stood in recess at 12:43 p.m.)
(Deposition reconvened at 12:53 p.m.)
THE VIDEOGRAPHER: We're back on the record. Time is 12:53.
BY MR. SMITH:
Q Mr. Benitez, was there -- did the Board ever discuss a runway necessary for a particular CEO candidate?
A **What do you mean by a runway?**
Q Well, that's my -- that's my question to you. Did the -- Was there a runway or was that term ever thrown out --
Q I don't remember.
A **-- in Board meetings, discussions?**
A **I don't remember.**
MR. SMITH: Okay. I don't have anything further for this deposition.
MR. CIOFFI: We have a few questions.
MR. SMITH: Okay.

Page 79

EXAMINATION
BY MR. CIOFFI:
Q Mr. Benitez, I want to direct your attention back to Exhibit No. 3. We were looking at it a few minutes ago. If you look at the first page which is -- has the numbers at the bottom 0517 the last paragraph on that page if you could read that, sir -- read it into the record, please?
A **Yes. "Next, Mr. Beaudin reviewed the process utilized to assess Mr. Spence. Mr. Beaudin described the leadership, personality style, problem solving and critical thinking online assessment tools utilized by RHR International. He also discussed the extensive structured behavior interview process completed by Mr. -- completed with Mr. Spence and the stakeholder input received through the interviews with Mr. Carmichael and Mr. Spence's peers and direct reports. Mr. Beaudin then reviewed the assessment report of Mr. Spence."**
Q Let me -- Let me stop you there and direct your attention to Exhibits No. 4 and No. 8. Do you have the two of them in front of you, Exhibit 4 and Exhibit No. 8?
A **Yes, sir.**
Q And they're both part of the

Page 80

assessment of Mr. Spence as recorded in the minutes; is that true?
A **Yes.**
Q What's the relationship between the two? Is --
A **I --**
Q And look through them. Take -- Take your time.
MR. SMITH: I am going to object.
A **(Reviewing documents.) It -- It appears that one is a summary document of the other.**
Q And more specifically is 4 what you're referring to as a summary of Exhibit 8?
A **4 appears to be the summary of 8.**
Q You testified a little bit earlier you're not sure if -- if the Board actually received physical copies of both assessments or one or the other or both -- Is that your testimony?
A **Yes.**
Q Regardless of whether you received the actual copies is the substance of both exhibits what was communicated at the Board meeting by Mr. Boudin?
MR. SMITH: Objection. Go ahead. You can answer.

Page 81

A **Yes.**
Q Just to be clear did -- did Mr. Beaudin communicate the substance of -- of these assessments?
A **Yes.**
MR. SMITH: Objection. Go ahead.
Q I want to direct your attention to Exhibit No. 8 and on the next page which is 0991, if you look at that.
A **Yes.**
Q You can see at the bottom it says, "RHR International interviewed the following people as part of the 360 process." As part of -- As part of the report to the Board did Mr. Beaudin explain what a 360 process was?
A **Yes.**
Q And -- And what is that process and -- and how is it reflected at the bottom of Page 0991?
MR. SMITH: Objection. The document speaks for itself. Go ahead.
Q You may answer.
A **Well, the process entails talking to not only the individual but the people that report to that individual as well as their peers.**

Page 82

Q Would you read into the record the direct reports who were interviewed as part of this 360 process?
A **"Mike Butera, Ben Hoffman, Peter Kidd, Shawn Niehaus, Christopher Shroat, Melissa Stevens," and, "Arthur Weston."**
Q Would you read into the record, please, the peers who were evaluated as part of the 360 process?
A **Yes, "Lars Anderson, Kevin Lavender, Jamie Leonard, Phil McHugh, Jude Schramm, Taylor Tuzun," and, "Susan Zaunbrecher."**
Q I want to direct your attention back to Page 9 of Exhibit No. 8 and do you see the heading there?
A **Yes, sir.**
Q And read that into the record?
A **"Stakeholder Feedback: Strengths."**
Q As part of the 360 process where -- where did this feedback come from?
A **It came from discussions that RHR had with the candidate's direct reports, the candidate's peers. That's how it's done.**
Q Yeah. Let's -- Let's start with the direct reports on Page 9 and then we'll go back.

Page 83

I -- I do want to refer you back -- take a look later in the document on Page 13. You see the Peer Feedback?
A **Yes.**
Q So we'll start with Stakeholder Feedback. Are stakeholders the direct reports?
A **Yes.**
Q Could you read the headers on the left-hand column and then the comments through the bullet points?
A **"The Strengths:**
**Is A Visionary And Strategic Leader; Is A Change Agent," and then lists a series of Illustrations where he's done that. Do you want me to read everything?**
Q Yeah, read them, please, yeah.
A **"He is gifted and has owned -- honed his ability to play out his decisions before he has made his first move. He is a strong strategic thinker--he thinks about the impact of his decisions and tactical issues as well. He sees the downstream implications of decisions much more quickly than others do.**
**Demonstrates a true fire and passion for what we do.**

Page 84

**Breaks down old paradigms and challenges the status quo.**
**Demonstrates an ability to challenge our historical way of doing things--brings a fresh perspective to the business.**
**He builds a case for change and gets the investment to make it happen; his work on our digital business is an example of that.**
**Approach to change is very diplomatic--he seeks your input and is very conclusive."**
Q If you could continue through the next header.
A **"Is An Empathetic Leader:**
**Truly cares about us. He is willing to have any conversation with you and works to understand and be there with you.**
**He is very open and accessible as a leader.**
**He is a good read of people and applies a leadership approach that is individually based on what each person finds most motivating.**
**He appears to have no ego. He comes across as genuinely interested in others and**

Page 85

**what they have to say."**
Q And please continue.
**A "He's A Values-Based Leader:**
**He connects business and society and demonstrates a strong community commitment.**
**He Makes A Strong Contribution To The Business:**
**He has retooled major business areas such as consumer credit cards and moved away from silos of products to encourage greater cross-selling. He is a supporter of the transformation of Digital First -- the transformation of Digital First and influenced the Board of Directors on a three-year capital investment to catch up and get ahead in this area.**
**He drives processes to outcomes; he really leans in to make great things happen.**
**He puts the talent and structure in place to get things done.**
**He's clear that he does not know about my business, but he does not make assumptions about it but is able to ask me questions about it that advance my thinking--and, if he comes up with an idea, he has a way of making me feel like it was my own.**
**Provides Feedback; Has Strong**

Page 86

**Communication Skills.**
**He is good at delivering difficult feedback when needed.**
**He is very conscientious about delivering performance feedback--you know where you stand.**
**He can be very direct when performance issues need to be addressed.**
**He presents very well and is able to debate effectively.**
**Handles Stress And Pressure:**
**He handles pressure very well.**
**He remains calm under pressure.**
**Focuses On What Matters Most:**
**He knows what matters most and is able to remain focused on it and drive it forward.**
**He knows what each of the direct reports is working on--if you were to call him right now and ask him what the top three priorities for anyone on his team are, he would be able to tell you.**
**Possesses An Extraordinary Intellect And Knowledge About The Business:**
**His knowledge of the business and ability to recall what we have done in the past is exceptional--he remembers everything.**

Page 87

**He's very smart and able to communicate to people at any level within the business.**
**Even with little experience in operations, his intellect allows him to learn the business and figure out what needs to be done.**
**He has a strong ability to retain information and keep up to date on industry trends.**
**He is very smart but not intimidating--he remains approachable."**
Q These comments and feedback from direct reports, how did they align to the consensus that you were talking about that had developed among the Directors that Tim Spence should be named the next President?
**A It's further validation that we thought he was the best leader and the only one that could take over from -- from Carmichael.**
Q Were these comments and this feedback from direct reports consistent with those views of the Board?
**A Yes.**
MR. SMITH: Objection. Go ahead.
Q All right. I want to direct your attention now back to Page 13 which is the

Page 88

Peer Feedback.
**A Okay.**
Q Just for the record explain the difference between direct reports and peers.
**A Direct reports are people that work for the individual that's being assessed and peers are the people that are at the same level as the person being assessed.**
Q And one of the peers providing this feedback was Phil McHugh; is that correct?
**A I believe that's correct. Yes, he's listed on Page 1.**
Q Go ahead again and -- and read into the record the header on the left-hand column and then the comments from the peers.
**A "The Strengths: Is A Great Communicator With Charisma:**
**He is very charismatic in advocating for his ideas.**
**He's very articulate and has a great ability to present in a way that conveys his knowledge of the topics at hand.**
**He is very clear and articulate and is a good storyteller--he's clear on vision, expectations, and telling the FTB story.**

Page 89

His ability to grasp concepts and relate them to real-life examples is incredible; he is strategic and intelligent and brings a level of empathy and authenticity to his conversations. He is a genuine and kind human being.

He's Very Innovative:

He is one of those people who is always looking forward and has incredible ideas for the company.

He knows the banking business and thinks outside the box; he thinks of how we can do things differently and how we can use data differently.

He challenges everyone--not from a competitive standpoint but from the perspective of having seen many different businesses.

He brings a fresh pair of eyes and a new way of thinking; he has seen what other banks do and is able to bring that lens to the team.

He's A Good Colleague And A Great Leader:

He is open to constructive feedback, and he is always looking to grow.

His intelligence, his charisma, and his care for employees and the community are all

Page 90

exceptional.

He really stands out; he has the whole package.

He's very collaborative with his peers.

He's one of those people whom people are drawn to.

He is impressive and unique--he will rise to the top.

I think he would make a great CEO.

He is a very impressive guy; I think he is a wonderful leader.

He Is Bright And Insightful; Is A Great Thinker And Problem Solver:

He has a strong ability to use data, technology, and analytics to enhance what we are doing with the business--he has a very good 30,000-foot understanding and view of what the company should look like.

He's very bright and insightful.

He's intellectually curious on a variety of topics.

He possesses a deep knowledge in banking, technical specialty -- especially.

He quickly gets to the root cause

Page 91

of an issue; a lot of imperfect information comes at us fast, but he can process it quickly and effectively.

He Has Had A Great Impact From A Strategic Perspective:

He is the best at being able to look out into the future.

He is dynamic, and he positions his team and the bank to take advantage of opportunities.

He has been instrumental in guiding the digital strategy.

Before him, we had strategy officers, but it did not have the impact we needed until Tim.

He's spent time with everyone on their own strategic portfolios. He's a good facilitator among the team, and he has -- and he was able to formulate strategies in different business lines."

Q Did these comments, this feedback from the peer group, including Mr. McHugh, align with the Board's assessment of Mr. Spence?

A Yes.

MR. SMITH: Objection. Go ahead.

Page 92

A Yes, very much so.

Q And what do you base that comment on?

A I base it personally in my own interactions with Tim. I base it on the interactions that I had with my fellow Board members and the discussions that we had with him and his ability to present to take us through a -- a story that made sense, to be very future oriented, a very strategic thinker, and he did it with humility.

Q Okay. The comments from both the direct reports and also the -- the peers in your mind did they form objective evidence, objective facts, as to Mr. McHugh's -- or Mr. Spence's capabilities as President and CEO?

MR. SMITH: Objection.

A Yes.

Q You testified a little bit earlier that the assessment as reported by Mr. Beaudin was an additional factor, an additional validation?

A Yes.

Q Does that include this feedback from the peers and this -- the direct reports?

A Absolutely.

MR. SMITH: Objection.

Page 93

Q I want to direct you to Exhibit No. 4, and in that Executive Summary would you read that on the first page inside the cover page, again read that back into the record, please?

A **"Tim Spence demonstrates a strong fit to the leadership characteristics desired in a chief executive officer at Fifth Third Bank. He is a creative, forward-thinking strategic thinker who balances objective data with his subjective experience to derive innovative solutions to business challenges. He demonstrates exceptional abilities in dealing with complexity and ambiguity and a capacity to exercise the business levers most material to having an impact on the bottom line. He is a thoughtful and thorough decision maker who is disciplined and structured in his approach to work. He holds himself to high standards of performance but also knows when good enough is good enough.**

**A values-based leader, he cares deeply about organizational culture and the well-being of his -- of its employees. He is admired for his ability to adjust his leadership approach based on what is required by the individual and the circumstance at hand. He is a compelling speaker who projects a passionate message to his audience. His**

Page 94

**diplomatic manner allows him to challenge the ideas of others without creating defensiveness or resistance, which facilitates his ability to gain buy-in to his strategies and objectives. He perseveres in the face of difficulties and has effective strategies in place to manage the stresses and strains inherent in an executive position.**

**As a continuous learner, Tim pushes himself to further hone his skills. He is very insightful regarding his strengths and weaknesses and remains open to feedback and ongoing development."**

Q Does this Executive Summary as explained by Mr. Beaudin at the September 21st, 2020, meeting align with the Board's view and consensus that Tim Spence should be the next President and eventually CEO?

MR. SMITH: Objection.

A **Very much so.**

Q Is it further objective evidence supporting that consensus on the Board?

MR. SMITH: Objection.

A **Yes.**

Q I want to direct your attention back to Exhibit No. 3, please, and on the second page which is 0518 I would like to direct your attention to

Page 95

the first full paragraph on that page and read, if you would, please, the first two sentences.

A **"Directors asked if any concerns related to support or followership of Mr. Spence were identified in the peer review -- in the peer feedback interviews. Mr. Beaudin responded that no such concerns were identified."**

Q What, if anything, is the significance of the Directors' inquiry about Mr. Spence put to Mr. Boudin in these sentences?

A **I think it was a -- a good validation for us that, in fact, no one had issues with Tim being the CEO, him being a leader.**

Q Was that an important factor to your deliberations about --

A **It was confirmation of what we already needed -- wanted to do.**

Q The decision?

A **The decision that we made, yeah.**

Q If you could please read the next two sentences?

A **"Directors inquired of Mr. Spence's capabilities and potential related to other Presidents and CEO successor candidates for large public companies evaluated by RHR International. Mr. Beaudin**

Page 96

**responded that Mr. Spence would be considered in the top quartile of all President and CEO successor candidates assessed by RHR International."**

Q Did you and your fellow Board members as you understood their views through your discussions believe that this was further objective evidence to support your decision in promoting Tim Spence to be President?

MR. SMITH: Objection.

A **Yes.**

Q Explain, how so?

A **Well, it was what we already felt, right, and he's at the top of -- of the people that we had interacted with or had seen and -- and frankly he was more than capable to move to the President role.**

Q Mr. Benitez, in any of the discussions among the Board of Directors was age ever discussed in connection with who should be the next President or CEO of Fifth Third?

A **Absolutely not. It was never a factor.**

MR. CIOFFI: I have no further questions.

Page 97

EXAMINATION
BY MR. SMITH:
Q Mr. Benitez, I'll refer you to Exhibit 8 Mr. Cioffi did and it would be FifthThird-McHugh-001001.
**A I'm sorry. I'm not -- I'm not following you. 8?**
Q Exhibit 8.
**A Yeah.**
Q Uh-huh.
And see at the -- yeah, the bottom right --
**A Yeah.**
Q -- FifthThird-McHugh-001001.
**A Oh, sorry. It's further back, yeah. So 001001.**
Q And can you read the top of that page?
**A "Stakeholder Feedback: Opportunities."**
Q Okay. And why don't you go ahead and read the categories into the record along with all the bullet points.
**A "Is" --**
THE REPORTER: Read a little bit

Page 98

slower because I'm getting tired.
THE WITNESS: Okay.
**A "Is Reactive:**
**At times he can be reactive and needs to remember that just because everyone is not happy, that doesn't mean he has to deal with it.**
**Should Avoid -- Should Avoid Deferring To Others:**
**He believes in negotiating with his peers and senior leaders, but at times this results in a solution that is suboptimal, and he ends up agreeing to execute it even though he knows it is not the right approach. He should -- He could take more risk in pushing his solutions.**
**He appears conflict -- He appears conflict avoidant--there can be conflicting guidance at times because he avoids the hard conversation.**
**Can Lose Focus On Issues:**
**Although he can be highly focused on those areas that matter the most to him, if your area is not of interest, it can feel that you are not getting his attention.**
**Today's topic may be of great interest to him, and you will move mountains to achieve it, but then you don't -- you won't hear from**

Page 99

**him for weeks regarding it. He needs to ensure he doesn't create work that is not critical.**
**He can overplay his ideation superpower when he should be keeping us focused on the key things that will move the needle the most.**
**Needs To Bring Others Along:**
**He can struggle to find the balance between helping others learn to get to the solution and just telling them what to do.**
**He does not appreciate how exceptional he is, and as a result, he can leave others behind in his thinking. This can be frustrating for others and make people feel that they are not smart enough to understand.**
**Needs To Work With The Team And Advocate For Them:**
**He can focus too tightly on individuals to address issues and can neglect to talk to us as a team.**
**He could be more present with employees who are two or three layers below him by visiting other floors more frequently.**
**When he wants something done, he can have two people working on the same thing, which becomes unproductive, as we don't know who is taking**

Page 100

**the lead.**
**He is more demanding of his people than on others.**
**I am -- I know I am doing a better job than others who are getting promotions, and I am left wondering why I am not.**
**Can Move Too Quickly:**
**He constantly wants to move faster, and our company is not good at that. He doesn't recognize that what he demands can be demotivating for others--he can underestimate the effort required to implement.**
**He should be sure not to overcommit--he can neglect to allow enough time to get things done. He could help evolve the overall capabilities of the organization (such as analytics for sales tools).**
**He needs to gain a better appreciation for what it takes to get operations going and consider the blocking and tackling that needs to happen to get it right.**
**He can overwhelm others with his new ideas.**
**He needs to tone down his strategic narrative, as it can intimidate his peers, and that**

Page 101

**can have blowback for his direct reports.**
**He needs to consider that his appetite for change and our resources are not always aligned, which impacts what we are able to accomplish."**
Q Do those comments and feedback from stakeholders align with the Board's views of Mr. Spence?
**A In some areas.**
Q Not all?
**A Not all.**
Q Which ones do -- do -- does the Board not align with?
**A I don't think he can be reactive, at least my -- my interactions with Tim. He hasn't been that way. I -- I don't think he avoids conflict. I -- I think he takes it head-on. I think Tim is very present. I have seen him be present in interactions with the Board, I have seen him be present with the management team, and I have also seen him to address in -- in specific settings the -- the folks here at Fifth Third, so I have seen a different side than this.**
**I personally don't think that being demanding is a bad thing, but that's a different**

Page 102

**point. I don't think he's overwhelming with his ideas. I think fresh ideas and creative thinking is exactly what we need in the organization. Those are just some.**
Q To be clear those are the ones you don't agree with?
**A Those are the ones that don't -- I don't have -- I don't agree with, yes.**
Q Okay. And -- And that's feedback from his direct reports --
**A Yes.**
Q -- that he works with every day; is that right?
**A Yeah, the stakeholders.**
Q And then let's go to peers -- Peer Feedback on FifthThird-McHugh-001005.
**A Do you want me to read them all?**
Q Yeah, similar to your -- what your Counsel did.
**A I'll get a little bit of water here.**
Q Sure.
**A "Opportunities: Can Lack Structure And Organization:**
**Accessibility is an issue, as so**

Page 103

**much is on his plate.**
**He has 10 to 12 direct reports; this prevents him from creating the right kind of followership among his peers.**
**He needs to focus his resources--he could say no to -- to more things and invest more in doubling down on the things that we owe -- or that we know are going to hit. This would increase his impact.**
**He needs to be more mindful of responding to messages; he often doesn't respond, which creates the impression that he's not interested in my opinion.**
**Needs To Communicate More Clearly And Succinctly -- More Directly And Succinctly:**
**He needs to reduce the consultant speak and be more direct in his communication, e.g., expense optimization versus expense cuts.**
**He will dilute the point after a while because he is not succinct.**
**He should spend more time learning the details of an issue. His answers sometimes indicate a lack of depth of thinking, which undermines his credibility.**
**Can Be Defensive When Challenged:**

Page 104

**When challenged about an idea, he grabs on to what he considers as supporting information for his thesis. He elaborates his perspective and becomes too defensive.**
**He should admit when he does not have the answer. His replies can be vague when this happens, which makes us more hesitant to trust his answer. It's okay to be vulnerable; he has the credibility.**
**Can Make Questionable Talent Decisions:**
**He likes people who are like him--curious, idea people--and not every job suits those people well.**
**He is coming along, but he needs to surround himself for complementarity, especially around operations.**
**He has done a good job of repositioning his talent on the team but has not brought in as much talent as he might need.**
**To be successful and not burn out, he needs better people around him.**
**Does Not Invest Enough Time In Personal Relationships:**
**There's not a lot of interaction**

Page 105

**with the team, and it would mean a lot for him to go out of his way to talk to people about their lives. It would create more of the experience that he cares about you.**

**He is very personable once he makes the effort.**

**He has strong relationships in the bank, but if he is going to take on a more-senior leadership role, he is going to need to create a more complete followership in the organization.**

**Should Bring Others Along And Give People Time To Catch Up:**

**It is hard for others to meet his standard--he is in a class by himself. It can be difficult for others to perform at his level of expectation.**

**He should be careful that he does not come across as dominating group discussions and overwhelming others--there are times when he should just sit back and listen.**

**He needs to help others to get to the end point and bring them along in his--with his thinking. Everyone agrees with the end point and the outcome, but they need to understand how he got there and each step taken along the way."**

Page 106

Q Do those comments and feedback align with the Board's views of Mr. Spence?

**A As I did in the prior question I think some may be valid, others not.**

Q Which ones are valid, which ones are not, in your opinion?

**A I have not found him to ever be --**

MR. THOMAS: We're over.

MR. CIOFFI: We're over.

MR. THOMAS: It's up to you if you want to --

MR. CIOFFI: No, this -- this is follow-up to my questioning, so he's -- he's permitted.

MR. SMITH: Yeah. I mean is the video -- Are you out of --

THE VIDEOGRAPHER: No, I'm not out of space.

MR. SMITH: Okay.

THE VIDEOGRAPHER: It's over two hours.

MR. SMITH: Gotcha. Okay.

BY MR. SMITH:

Q Go ahead.

**A So this says that -- that he**

Page 107

**doesn't respond to messages and he's not responsive. I have never seen him --**

Q Uh-huh.

**A -- not be responsive.**

**Reducing the consultant speak -- I'm a consultant -- I don't know what consultant speak means, but I think Tim's a -- a very effective communicator and -- and I don't see that as an issue and have never done so.**

**"He will dilute the point after a while because he is not succinct," I think he can be very succinct.**

**"When challenged about an idea, he grabs on to what he considers as supporting information for his thesis. He elaborates his perspective and becomes too defensive." I have never seen him -- Tim be defensive.**

**"He likes people who likes -- who like him--curious, idea people," nothing wrong with liking curious people, "and not every job suits those people well" -- Again I -- I have not seen that.**

**"He has done a good job of repositioning his talent," I think that's positive, "but he has not brought in as much talent as he might need." I think he's done a great job of bringing in**

Page 108

**talent.**

**"He is very personable once he makes the effort." I see him make the effort all the time. I don't know when he's not making the effort.**

**"He has strong relationships in the bank, but if he is going to take on a more-senior leadership role, he is going to need to create a more complete followership in the organization." I have seen him do that over and over again.**

**"It is hard for others to meet his standard." I believe he's exceptional, so that's easy to understand.**

**"But it can be difficult for others to perform at his level of expectation," I don't see that as a drawback. I think that's a strength. He's going to pull people up.**

**Those are just some of the ones I can see.**

Q Okay. And that is -- to be clear that's feedback from Mr. Spence's peers, including Phil McHugh and that list that work with him every day; is that right?

**A Yes.**

Q And so from your answers to Mr. Cioffi's questions you agree with all the

Page 109

strengths that are listed in here from both peers and direct reports; is that right?
A I think it's a valid summary.
Q But you don't agree with all the opportunities; is that right?
A I -- When you asked me which ones I don't agree with I said I didn't agree with those --
Q Yes.
A -- yes.
Q Okay. And then in the minutes that Mr. Cioffi referred you to -- And that would be Exhibit 3, turning to FifthThird -- You got it?
A Yes.
Q The second page, FifthThird-McHugh-Minutes-000518, that first full paragraph, there was, "Directors inquired" -- Do you see this sentence, "Directors inquired of Mr. Spence's capabilities and potential need related to others," and -- I'm sorry. Going back to the very first, "Directors asked if any concerns related to support or followership of Mr. Spence were identified in the peer feedback interviews. Mr. Beaudin responded that no such concerns were identified" -- Do you see that?
A Yes.
Q Were these concerns ever identified

Page 110

for the Board? The -- The opportunities listed on Exhibit 8, were those ever --
A It -- It was part of the report.
Q Uh-huh.
A I -- I think they were shared, but frankly none of them rose to the level of significance that would have made me change my mind about Tim.
Q Okay. None of the 20?
A None.
Q Okay.
A I have yet to meet a perfect individual that has everything right, does nothing wrong. Do you know people like that?
Q I am asking the questions.
But my question is none of these were concerns to the Board?
A No.
MR. SMITH: Okay. That's all I have.

EXAMINATION

BY MR. CIOFFI:
Q Directing your attention back to Exhibit 8 and on Page 11, the, "Stakeholder Feedback: Opportunities," and then also if you look at the, "Peer Feedback: Opportunities," the word

Page 111

"Opportunities" is used; is that correct?
A Yes.
Q Are opportunities weaknesses or opportunities mean that those are areas to work on and improve?
MR. SMITH: Objection. Go ahead.
Q What -- What does opportunities mean in relationship to weaknesses?
MR. SMITH: Objection.
A Opportunities are areas where the individual can do better. There's an opportunity to -- to -- to even become a better individual in those areas.
Q Okay. I believe you testified to this, but in your experience have you ever met an individual that doesn't have opportunities?
A No.
MR. CIOFFI: No further questions.
THE VIDEOGRAPHER: We are off the record. Time is 1:26.
THE REPORTER: Josh, are you ordering these transcribed?
MR. SMITH: Yes, yeah.
THE REPORTER: Is normal delivery okay?

Page 112

MR. SMITH: Yeah, standard's fine.
THE REPORTER: Mr. Cioffi, do you want a copy of these?
MR. CIOFFI: Yeah, a copy of these.
THE REPORTER: And signature as well?
MR. CIOFFI: Yeah, signature, yeah.
THE REPORTER: Okay.
MR. CIOFFI: Put on the record signature will be required.

____________________________________
JORGE BENITEZ

____________________________________
DATE

- - -

(DEPOSITION CONCLUDED AT 1:26 P.M.)

- - -

C E R T I F I C A T E

STATE OF OHIO :
SS:
COUNTY OF BUTLER :

I, Pamela L. Jackson, a duly qualified and commissioned notary public in and for the State of Ohio, do hereby certify that prior to the giving of his deposition, the within named JORGE BENITEZ, was by me first duly sworn to testify to the truth, the whole truth, and nothing but the truth; that the foregoing pages constitute a true and correct transcript of testimony given at said time and place by said deponent; that said deposition was taken by me in stenotypy and transcribed under my supervision; that I am neither a relative of nor attorney for any of the parties to this litigation, nor relative of nor employee of any of their counsel, have no interest whatsoever in the result of this litigation, and am not, nor is the court reporting firm for which I am affiliated, under a contract as defined in Civil Rule 28(D).

IN WITNESS WHEREOF, I hereunto set my hand and official seal of office at Hamilton, Ohio, this 7th day of February, 2025.

______________________________

Commission Expires 11/17/28

1 DEPOSITION ERRATA SHEET

Date Taken: January 24, 2025

Case Caption: PHILIP R. MCHUGH vs. FIFTH THIRD BANCORP, et al.

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the ______ day of ____________, 20___.

___________________________________

JORGE BENITEZ

2 DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:_______________

______________________________________________________

Reason for change:___________________________________

Page No._____Line No._____Change to:_______________

______________________________________________________

Reason for change:___________________________________

Page No._____Line No._____Change to:_______________

______________________________________________________

Reason for change:___________________________________

Page No._____Line No._____Change to:_______________

______________________________________________________

Reason for change:___________________________________

Page No._____Line No._____Change to:_______________

______________________________________________________

Reason for change:___________________________________

Page No._____Line No._____Change to:_______________

______________________________________________________

Reason for change:___________________________________

Page No._____Line No._____Change to:_______________

______________________________________________________

Reason for change:___________________________________

SIGNATURE:_________________________DATE:____________

JORGE BENITEZ

3 DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

SIGNATURE:_______________________DATE:___________

JORGE BENITEZ

## WORD INDEX

< 0 >
**001001** 97:16
**0517** 79:6
**0518** 94:25
**0991** 81:8, 19

< 1 >
**1** 8:9 10:12 30:8 88:12 115:1
**1:21-cv-00238** 1:8 5:9
**1:26** 111:20 113:9
**10** 4:18 12:23 50:2, 8 103:2
**10th** 12:22
**11** 4:19 50:4, 9 53:15 110:23
**11/17/28** 114:25
**11:06** 1:14 5:3
**11:10** 8:18
**110** 3:5
**111** 4:7
**11th** 12:21
**12** 3:9 53:9, 15, 18, 19, 21 54:3 103:2
**12:27** 68:5, 10
**12:29** 68:7
**12:43** 78:3, 5
**12:53** 78:7, 9
**13** 3:10 53:11, 18, 19 54:4 63:23 83:2 87:25
**14** 3:11 10:3 14:17 65:9, 22
**1517** 6:13
**1700** 2:13
**17th** 54:6
**1959** 6:16
**1st** 21:23 24:17 25:2 33:9 34:5 45:17 47:5

< 2 >
**2** 11:6 68:9 116:1
**20** 110:8 115:17
**2001** 14:5
**201** 2:13
**2010** 14:17, 25
**2014** 13:22
**2015** 12:23 13:3 14:20 17:22 18:17 25:1 39:13 45:16
**2016** 39:22
**2018** 39:18
**2019** 36:7, 12 39:18 47:21 48:10, 21 54:6 58:1 60:6 61:18
**2020** 21:23 24:17 25:2 33:9 34:5 39:22 45:17 47:5 61:18 62:11, 14, 16 65:23 71:19 73:19 75:16 94:13
**2022** 25:19
**2025** 1:14 5:3 114:23 115:2
**21** 6:16
**21st** 73:18 94:13
**24** 1:14 115:2
**24th** 5:3
**253** 50:21
**26** 50:23
**2623** 2:6
**266** 50:21, 23
**28(D** 114:20

< 3 >
**3** 4:14 11:11 59:2 73:16 79:4 94:24 109:12 117:1
**30** 67:11
**30,000-foot** 90:18
**31** 63:23
**34** 13:25
**34957** 6:14
**360** 81:13, 15 82:3, 9, 19
**362-8700** 2:14
**37** 57:24
**38** 58:23

< 4 >
**4** 4:15 11:14 74:22 79:21, 22 80:12, 14 93:2
**45202** 1:20 2:14
**45208** 2:6

< 5 >
**50** 4:5, 18, 19
**511** 1:20
**513** 2:7, 14
**52** 4:5
**53** 3:9, 10
**533-2701** 2:7

< 6 >
**6** 3:4 9:22
**65** 3:11
**66** 4:6
**68** 4:16

< 7 >
**7** 3:8 4:16 59:2 66:25 68:13
**73** 4:14
**74** 4:15
**75** 4:6
**79** 3:4 4:7
**7th** 114:23

< 8 >
**8** 3:8 4:17 79:21, 23 80:13, 14 81:8 82:14 97:4, 7, 8 110:2, 23
**80** 4:17
**8th** 65:23

< 9 >
**9** 3:8 7:23 8:3, 21 82:14, 25
**97** 3:5

< A >
**a.m** 1:14 5:3
**abilities** 29:18 30:7 43:19 93:11
**ability** 24:10 30:10 31:11 44:2 83:19 84:4 86:24 87:7 88:21 89:1 90:15 92:7 93:22 94:3
**able** 24:13 26:15 30:18, 22, 24 31:24, 25 32:2 44:13, 22 46:15 69:21 85:22 86:9, 16, 20 87:1 89:19 91:6, 19 101:4
**Absolutely** 92:24 96:20
**Accenture** 13:19, 23 14:6, 16 15:1
**Accessibility** 102:25
**accessible** 84:19
**accomplish** 101:5
**account** 21:15, 18 64:17
**accurate** 53:23 62:22 65:15 115:10
**achieve** 98:25
**acquire** 30:22
**activities** 44:14
**actual** 57:15 60:11 80:21
**add** 31:21 32:8 37:13 65:25
**added** 17:10
**addition** 64:14
**additional** 71:6 92:20
**address** 6:12 99:18 101:20
**addressed** 86:8
**addresses** 22:22
**adequate** 59:13
**adjust** 93:22
**Adkins-Ihle** 1:22
**admired** 93:21
**admit** 104:5
**advance** 85:23
**advantage** 91:9
**advertising** 12:10
**Advocate** 99:16
**advocating** 88:19
**affiliated** 114:19
**age** 6:3 96:17
**agenda** 47:25
**Agent** 83:14
**agility** 44:25
**ago** 14:17 79:5
**agree** 56:10 59:4, 10 102:6, 8 108:25 109:4, 7
**agreeable** 56:4
**agreed** 32:11
**agreeing** 98:11

**Agreement** 5:21 65:13
**agrees** 65:24 105:23
**ahead** 42:19 43:16 80:24 81:6, 21 85:15 87:23 88:13 91:25 97:21 106:24 111:6
**al** 1:9 5:6 115:4
**align** 39:25 87:12 91:22 94:14 101:7, 13 106:2
**aligned** 39:6 63:5, 13 101:4
**alignment** 60:1
**allow** 9:6 46:15 55:18 100:14
**allows** 87:5 94:1
**ambiguity** 93:12
**analysis** 72:5, 19, 21, 25
**analytics** 90:16 100:16
**and/or** 48:5 56:13 115:11
**Andersen** 14:1
**Anderson** 14:4, 5 82:10
**annual** 35:3, 8, 15 36:24 37:3, 20 42:4
**answer** 6:24 9:6, 7 15:14 19:6, 17 20:1 23:5 33:18, 23 40:16 41:19 43:23 44:11 59:24 62:23 66:17 76:2 77:23 80:25 81:22 104:6, 8
**answered** 19:17, 25 33:17 38:13 42:18 43:13 63:10 77:21
**answers** 15:16 26:18 38:4 72:3 103:22 108:24
**anyways** 35:6 49:25
**appear** 53:23 54:7 74:14
**APPEARANCES** 2:1
**appears** 53:15, 21 54:15, 25 55:7 73:23 74:17 80:11, 14 84:24 98:15
**appetite** 101:3
**application** 27:14, 15, 19 28:6, 10
**applies** 84:22
**apply** 31:7
**appointment** 40:11
**appreciate** 99:10
**appreciation** 100:19
**Approach** 84:10, 22 93:16, 22 98:13
**approachable** 87:10
**appropriate** 35:6
**area** 85:15 98:21
**areas** 24:14 46:17 64:6 85:9 98:20 101:9 111:4, 10, 13
**arrived** 29:23
**Arthur** 14:1 82:6
**articulate** 30:10 31:25 88:20, 23
**asked** 19:16 33:16 38:12 42:17 43:12 63:9 71:6 77:21 95:3 109:6, 20
**asking** 110:14
**aspect** 47:19
**aspects** 37:16 40:25
**assess** 61:25 62:19 63:1, 2 70:6 79:10
**assessed** 45:20 62:15 66:3, 15 69:11 88:6, 8 96:3
**assessing** 61:20, 21
**assessment** 26:12 27:22 28:13 61:14, 16 62:9, 12 63:4, 14 74:16 77:7 79:13, 19 80:1 91:23 92:19
**assessments** 70:7 80:17 81:4
**assigned** 37:24
**Association** 16:6
**assume** 15:24 17:17 70:8 71:3
**assumes** 62:21
**assuming** 48:5
**assumptions** 85:21
**attached** 54:8
**attendance** 73:19
**attended** 18:19
**attention** 57:24 79:4, 21 81:7 82:13 87:25 94:23, 25 98:22 110:22
**attorney** 6:19 114:14
**attorney-client** 7:3
**attorneys** 5:10
**attract** 72:1
**Attributes** 69:16
**audience** 93:25
**Audit** 16:23
**August** 6:16 48:9
**authentic** 56:1, 8
**authenticity** 55:16, 20 65:19 89:4
**Avenue** 2:6
**Avoid** 98:7
**avoidant--there** 98:16
**avoids** 98:17 101:16
**aware** 48:9, 14, 15 55:11 62:18, 24 69:4, 8 72:23, 25 75:23

**< B >**
**back** 8:17 15:9 25:17 49:21 55:11 63:22 65:1, 14 67:4 68:8 78:8 79:4 82:14, 25 83:1 87:25 93:4 94:24 97:15 105:20 109:19 110:22
**bad** 101:25
**Bailey** 2:4 5:14
**balance** 38:6 99:7
**balances** 93:9
**BANCORP** 1:9 2:18, 19 5:6 16:5 50:11 115:4
**Bank** 5:24 9:8 11:3 12:20 16:3, 4, 6, 9, 14, 17, 18 21:14, 17, 21 26:25 30:11, 21 31:24 34:4, 7, 9, 14, 15 37:16, 18, 19 38:11 39:9, 12, 15 41:7 44:3, 12 45:7 48:23 50:11 51:14 56:17 61:15 69:7 75:25 76:4, 10, 14 77:17 91:9 93:7 105:8 108:6
**banking** 30:15 31:3, 5 89:10 90:24
**banks** 30:16, 22 31:1 89:18
**base** 76:22 92:2, 4, 5
**based** 12:11 27:23 32:2 46:3 65:16, 18 66:12 72:2 84:23 93:22
**basically** 62:6
**basing** 64:9
**basis** 42:14 44:8 71:5
**Bates** 50:13 54:23 55:7, 9, 10, 14 65:12
**Beach** 6:14
**Beaudin** 66:7 74:2 79:9, 11, 18 81:3, 14 92:19 94:13 95:6, 25 109:22
**began** 23:10 59:25 74:5
**beginning** 24:17
**behalf** 2:1, 8 5:17
**behavior** 70:3 79:14
**Behaviors** 69:14
**believe** 10:24 18:17 20:8 33:7 34:9 35:9 42:8 47:23 48:25 56:21 68:23 73:1 88:11 96:6 108:11 111:14
**believes** 98:9
**Ben** 82:4
**Bengals** 21:11
**BENITEZ** 1:14 3:3 5:5, 19, 22 6:2, 10, 11 8:2 11:23 14:8 50:7 53:21 65:21 68:12 73:15 78:11 79:3 96:16 97:3 113:3 114:7 115:19 116:24 117:24
**Bes@sspfirm.com** 2:8

**best** 27:25 38:21 39:18 41:5 54:8 77:2 87:17 91:6
**better** 33:1 100:4, 18 104:22 111:11, 12
**beyond** 19:24
**birth** 6:15
**bit** 15:10 80:15 92:18 97:25 102:20
**Blank** 2:12 5:17
**blessed** 26:25
**blocking** 100:20
**blowback** 101:1
**Board** 7:10, 14, 18 11:1, 3, 4, 20, 21, 22 12:3, 9, 19 13:7, 16 17:23, 24 18:5, 13, 14, 22 19:11, 12 20:21, 24 21:6, 13, 25 22:6, 11, 20 23:10 24:9, 18 25:1, 5, 24 26:2, 11, 17 27:20 28:13 29:5, 7, 17 32:10, 20 33:25 34:16, 19, 24 35:6 36:6, 16 38:10, 21, 22 39:2 40:5, 18, 22, 25 41:3 44:3 45:17 46:4 47:14, 19, 25 48:4, 21 50:10 51:23 52:6 53:22 54:4 55:22 56:16, 23, 24 57:4, 18, 20 58:5, 13 59:9, 10 60:3, 5, 7, 8, 16 62:2, 25 63:4, 12, 19 64:8, 16 66:2, 13, 22 70:23, 24 71:1, 9, 16 72:19 73:7, 18 74:23, 25 75:13, 17, 20 76:7, 18, 25 77:2, 17 78:12, 19 80:16, 22 81:14 85:13 87:21 92:6 94:20 96:4, 17 101:13, 19 110:1, 16
**Boards** 11:25 12:1, 3 13:4, 12 27:1, 18 48:8 56:17 60:17 62:5, 6
**Board's** 22:17 48:11 91:23 94:14 101:7 106:2
**Bob** 20:11, 14, 17, 19 36:8 65:22
**bottom** 50:13, 15 79:6 81:11, 18 93:14 97:11
**Boudin** 80:23 95:10
**box** 89:11
**break** 15:19, 22 67:7, 15
**Breaks** 84:2
**Brian** 2:19 5:22 24:24 25:13 45:15 46:2, 10 51:13, 14 59:2 60:3
**Bright** 90:13, 20
**bring** 89:19 99:6 105:11, 22
**bringing** 107:25
**brings** 89:3, 17
**broader** 27:8
**broken** 38:6
**brought** 15:3 104:20 107:24
**builds** 84:7
**bulk** 57:8
**bullet** 65:24 83:11 97:23
**bunch** 64:5
**burn** 104:21
**business** 11:3, 21 21:21 69:15, 19 84:6, 9 85:4, 7, 8, 21 86:22, 23 87:3, 6 89:10 91:19 93:10, 13
**businesses** 89:16
**business--he** 90:17
**Butera** 82:4
**BUTLER** 114:3
**buy-in** 94:3

**< C >**
**call** 86:18
**called** 13:18
**calm** 86:13
**candid** 25:5
**candidate** 17:24 33:10 38:17, 18, 21 40:5 42:22 43:11, 21 47:9 51:24 52:14 69:3 78:13
**candidates** 24:15, 18 25:23, 25 26:13, 22 27:5, 24 42:8, 20 43:8, 18 45:16 46:5, 20 51:7, 9, 12 52:12 62:20 63:1, 20 71:16 95:24 96:3
**candidate's** 82:22, 23
**capabilities** 26:10, 14 29:25 31:7 44:11 62:10 92:14 95:23 100:16 109:18
**capability** 32:17
**capable** 96:15
**capacity** 93:12
**Capital** 17:9, 11 54:5 85:14
**Caption** 115:3
**captioned** 115:8
**capture** 15:16
**card** 35:23 64:1, 20
**cards** 85:9
**care** 89:25
**careful** 105:17
**cares** 84:16 93:19 105:3
**Carmichael** 17:18, 21 18:1, 11, 22 19:1, 8, 15, 22 20:4, 7 23:11 28:6 36:11 40:17 41:6 48:10, 22 51:6 59:14 65:23 74:9 79:17 87:18
**Carmichael's** 77:19
**CASE** 1:8 5:5, 9 7:13, 20 9:2 15:2 20:22 27:3 28:4 73:24 74:17 84:7 115:3
**catch** 85:14 105:12
**categories** 10:18 71:1 97:22
**cause** 90:25
**causes** 43:25 47:10
**Center** 1:14 2:13
**CEO** 18:7, 14, 15, 20, 23 22:23, 24 23:6, 11 24:1, 4, 6, 11, 23 25:16, 19 26:6, 9 27:11, 16, 19 28:25 29:8, 17 30:1 33:11, 14 34:1, 2 38:11, 17, 21 41:2 42:6, 7, 16 43:21 44:4, 5 45:4, 5 48:6, 23 51:11 52:7 54:20 56:14 57:10, 20, 21, 25 58:20, 23 60:4, 8 61:3, 9, 22 62:4 64:2 69:21 71:21 73:9 77:3, 5, 18 78:13 90:10 92:15 94:16 95:13, 24 96:2, 19
**certainly** 46:24 55:8
**certified** 6:4
**certify** 114:6
**chair** 17:1, 2 18:5 47:16, 17, 18, 22, 23 48:2, 5 49:7
**challenge** 84:5 94:1
**Challenged** 103:25 104:1 107:13
**challenges** 84:3 89:14 93:10
**chance** 48:10 60:18
**change** 24:2 46:14 83:14 84:7, 10 101:3 110:7 116:4, 7, 10, 13, 16, 19, 22 117:4, 7, 10, 13, 16, 19, 22
**changes** 115:11, 14
**changing** 31:4
**channels** 31:4
**characteristics** 93:6
**Charisma** 88:17 89:24
**charismatic** 88:18
**chart** 30:17 45:8
**Chief** 51:8 58:4, 16 74:8 93:7
**choice** 41:5
**Christopher** 82:5
**CHRO** 58:20
**Cincinnati** 1:20 2:6, 14
**Cioffi** 2:8 3:4, 5 5:16 6:23 8:4, 8, 13,

23 19:2, 16, 24 33:16, 19, 23 38:12 42:17 43:12 54:21 55:13 56:4, 7 59:16, 22 62:21 63:9 65:16 66:16 67:2, 8, 11, 17, 20 68:1 70:4 72:7, 10, 14 76:1 77:20 78:23 79:2 96:22 97:4 106:9, 12 109:11 110:21 111:18 112:2, 4, 7, 9
**Cioffi's** 108:25
**circumstance** 93:24
**Civil** 114:19
**claim** 15:3, 6
**class** 105:14
**clear** 24:25 27:19 38:3 59:25 60:25 70:10 73:13 77:1 81:2 85:20 88:23, 24 102:5 108:19
**clearly** 60:2 103:14
**close** 69:23 70:20
**closer** 46:2, 9 52:7
**coalesce** 39:18
**coalesced** 38:22 39:2 62:3 71:7, 10, 18 77:23
**coalescing** 40:6
**collaborative** 90:4
**Colleague** 89:20
**Collin** 2:11 5:17 65:13
**Collin.hart@blankrome.com** 2:15
**column** 83:10 88:14
**combination** 65:4
**come** 26:19 43:13 44:8 54:25 82:20 105:18
**comes** 84:25 85:23 91:1
**coming** 25:13 104:15
**Commencing** 1:14
**comment** 92:2
**comments** 83:10 87:11, 19 88:15 91:21 92:11 101:6 106:1
**Commercial** 37:19
**Commission** 114:25
**commissioned** 114:5
**commitment** 85:5
**Committee** 16:19, 23 17:1, 7, 9, 11, 15 22:15 27:8 34:20, 23
**committees** 16:16
**Communicate** 10:4 32:1 81:3 87:2 103:14
**communicated** 80:22
**Communication** 44:15, 20 86:1 103:17
**Communications** 10:4, 12, 21 11:2, 6, 11
**communicator** 32:1 88:17 107:8
**community** 85:5 89:25
**companies** 95:25
**company** 12:7, 11, 15 13:18, 21 14:3 27:17 70:6 89:9 90:18 100:9
**comparative** 72:18, 21, 25
**compelling** 93:24
**Compensation** 17:9, 11
**competitive** 89:15
**complementarity** 104:16
**complete** 105:10 108:8
**completed** 79:15
**complexity** 93:12
**concepts** 89:1
**concerns** 62:8 95:3, 7 109:20, 23, 25 110:16
**concluded** 40:9 41:5 51:25 113:9
**conclusive** 84:12
**conduct** 11:3
**conducting** 11:21
**CONFIDENTIAL** 1:12 4:3, 11
**confirm** 55:9, 25 65:14
**confirmation** 95:16
**confirmed** 77:11
**conflict** 98:15, 16 101:16
**conflicting** 98:16
**confusing** 8:14
**connection** 96:18
**connects** 85:4
**Connie** 1:22
**conscientious** 86:4
**consensus** 26:19 87:12 94:14, 20
**consider** 27:1 30:18 39:8 46:18 100:20 101:2
**considered** 24:3 27:16 31:15 34:1 41:2 42:9, 21 45:21 52:6 56:15 61:8 96:1
**considering** 71:16 77:17
**considers** 104:2 107:14
**consistent** 87:20
**constantly** 100:8
**constitute** 114:10
**constructive** 89:22
**consultant** 103:16 107:5, 6
**consulting** 14:2, 4, 5
**Consumer** 34:9 37:18 85:9
**contacted** 62:19
**contacts** 30:15, 24
**CONTAIN** 4:3
**CONTAINS** 1:12
**contest** 73:6
**context** 20:20, 24 21:25 37:20 42:24 43:14 47:7
**continue** 30:11 67:3 68:1 84:13 85:2
**CONTINUED** 4:1
**continuing** 72:1
**continuous** 94:8
**contract** 114:19
**Contribution** 85:6
**control** 10:17
**conversation** 49:15 51:22 56:22 60:10 66:21 84:17 98:17
**conversations** 23:13, 20, 21 24:2, 5, 8, 11, 20 25:18 32:23 33:24 60:1 76:23 89:4
**conveys** 88:21
**convince** 77:14
**convinced** 77:14
**copies** 10:21 80:17, 21
**copy** 65:15 112:3, 4
**corporate** 12:3 13:13
**Corporation** 12:4
**correct** 16:12 17:16 23:5 25:21 33:6 34:8 41:23 43:8 88:10, 11 111:1 114:10
**corrections** 115:11
**correspondence** 10:5
**Counsel** 5:12 6:25 7:2, 7 8:4 9:9 54:21 67:2 70:8 102:19 114:16
**counting** 32:12
**COUNTY** 114:3
**couple** 9:20 14:9 18:7 42:8, 25 43:8 51:21
**COURT** 1:1 5:7 6:1 15:15 114:18
**courtesy** 15:13
**cover** 93:3
**create** 99:2 105:3, 9 108:7
**created** 11:14
**creates** 103:12
**creating** 94:2 103:3
**creative** 93:8 102:2
**credibility** 103:24 104:9
**credit** 85:9

**criteria** 38:19 46:11 68:25 69:5, 8, 11, 13 73:9
**critical** 79:12 99:2
**cross-selling** 85:11
**culture** 93:20
**curious** 90:21 107:20
**current** 6:12 7:9, 14, 18, 21 23:23 34:7
**currently** 11:24
**custody** 10:17
**customer** 35:11 37:6
**cut** 55:7, 12
**cuts** 103:18

< D >
**data** 69:25 70:17 89:12 90:16 93:9
**Date** 1:14 6:15 23:13 25:14 32:22 39:19 40:14 63:16 87:8 113:6 115:2
**dated** 54:6 65:23
**dates** 39:24
**day** 45:13, 14 102:12 108:22 114:23 115:16
**deal** 45:13 98:6
**dealing** 93:11
**debate** 86:10
**December** 23:1, 2, 19 36:1, 2, 7, 12 52:25 54:6 58:1 60:6
**decide** 28:25 29:6
**decided** 40:14 76:4
**decides** 48:3
**decision** 27:25 38:24, 25 41:3, 17 61:24 73:3 77:8 93:15 95:18, 19 96:7
**decision-making** 64:13
**decisions** 64:9 83:19, 21, 23 104:11
**DECLARATION** 115:5
**declare** 115:6
**deep** 90:23
**deeply** 93:20
**Defendants** 1:10 2:8 5:18, 21
**Defense** 5:20
**Defensive** 103:25 104:4 107:16, 17
**defensiveness** 94:2
**Deferring** 98:8
**defined** 38:20 114:19
**defines** 10:4
**definition** 26:8 27:19
**definitions** 9:21
**deliberate** 26:15, 17 41:4 64:8 73:7
**deliberated** 56:24 59:8 77:11
**deliberation** 28:13
**deliberations** 46:6 57:9 76:24 95:15
**delivering** 86:2, 5
**delivery** 111:24
**demanding** 100:2 101:25
**demands** 10:10 100:10
**Demonstrates** 83:25 84:4 85:5 93:5, 11
**demotivating** 100:10
**depart** 40:1
**depends** 43:24 47:10, 19
**Deponent** 2:8 114:12
**deposed** 6:5 15:5
**Deposition** 1:14 3:8, 9, 10, 11 4:14, 15, 16, 17, 18, 19 5:4 6:18 7:11, 23 8:6 14:10, 12, 15, 20, 22 16:14 50:2, 4 53:9, 11 55:17, 23 65:9, 18 66:24 68:4, 6, 10 73:17 78:4, 6, 22 113:9 114:7, 12 115:1, 8, 12 116:1 117:1
**depositions** 7:1 8:24 55:3
**depth** 103:23
**derive** 93:10
**describe** 18:10 20:13
**described** 79:11
**designated** 8:3 46:21
**desired** 93:6
**desires** 48:12
**detail** 43:24 51:10 56:18 75:11
**detailed** 75:4, 6
**details** 103:22
**determination** 38:9, 14, 16 40:4, 6, 7 64:19, 24
**develop** 30:11, 25 32:20
**developed** 32:21, 23 68:21 69:5 87:13
**development** 23:25 24:14 52:14, 15 94:11
**developmental** 46:17
**difference** 45:23 88:4
**different** 9:4 37:16 46:15 64:6 89:16 91:19 101:22, 25
**differently** 89:12, 13
**difficult** 86:2 105:15 108:13
**difficulties** 94:5
**difficulty** 42:10
**digital** 31:4, 5 84:9 85:12, 13 91:12
**dilute** 103:19 107:10
**dimension** 69:21 71:25
**dinners** 19:12 20:21 21:7, 8 22:7 70:24
**diplomatic** 94:1
**diplomatic--he** 84:11
**direct** 9:20 27:11 36:10, 21 50:12 73:15 79:3, 18, 21 81:7 82:2, 13, 22, 25 83:6 86:7, 17 87:12, 20, 24 88:4, 5 92:12, 23 93:1 94:23, 25 101:1 102:10 103:2, 17 109:2
**directed** 7:6 9:19
**directing** 10:11 110:22
**directly** 44:11 103:15
**Director** 10:13 16:7, 9 18:6 49:1, 5, 9 59:9
**Directors** 22:12 36:15 50:10 54:4 73:18 74:5, 11 85:13 87:14 95:3, 9, 22 96:17 109:16, 17, 20
**directs** 47:18
**disciplined** 93:15
**disclosure** 10:5
**discovery** 55:6
**discuss** 48:21 63:19 66:1, 13 78:12
**discussed** 7:1, 13, 17, 20 9:4 24:21, 24 32:11, 14 33:10 34:1 41:24 52:2, 12, 20 66:18 75:17 79:14 96:18
**discussing** 24:19 54:17
**discussion** 8:16 32:19 41:22 49:13 52:18, 22 53:2, 4 56:25 57:16, 22 59:6 63:1, 8 64:25 75:20
**discussions** 10:9 23:22, 25 25:4 29:21 33:13 41:9, 15 42:5 46:4, 9, 19 60:13 61:1 64:2, 15 74:6, 7, 12 76:24 78:19 82:21 92:7 96:6, 17 105:18
**DISTRICT** 1:1, 2 5:7, 8
**diverse** 72:2
**DIVISION** 1:3 5:8
**divisions** 37:11 38:6
**divorce** 14:20
**document** 8:21, 25 9:8, 11, 15, 16, 22 10:8 54:3, 7, 14, 15, 18, 24 55:15, 16, 19 56:13, 22 57:3 65:11 67:1 68:13, 15, 18, 19 70:5 73:23 74:23 75:3 80:11 81:21 83:2

**documentation** 35:8 37:3
**documents** 6:22, 25 7:2, 5 9:1, 19, 23 10:1, 16 11:8, 14, 18 50:16 55:1, 21 80:10
**doing** 15:12 30:16 37:19 46:17 60:21 71:11 84:5 90:17 100:4
**dominating** 105:18
**doubling** 103:7
**downstream** 83:22
**dramatically** 31:4
**drawback** 108:15
**drawing** 26:22
**drawn** 90:7
**Drive** 6:14 39:11 40:16 69:22 86:16
**drives** 85:16
**driving** 70:18
**duly** 6:3 114:4, 8
**duties** 44:6
**dynamic** 91:8

< E >
**e.g** 103:17
**earlier** 48:11 70:9 80:15 92:18
**East** 2:13
**easy** 108:11
**effective** 32:1 94:5 107:7
**effectively** 71:25 86:10 91:3
**effort** 100:11 105:6 108:3, 4
**ego** 84:24
**either** 37:9 38:7 67:16 72:19
**elaborates** 104:3 107:15
**Email** 2:7, 15 10:7 53:16, 22, 24, 25 54:8 65:22
**emails** 20:6
**emergency** 24:1 41:21, 25 42:7, 11, 12, 16 43:11, 20, 25 44:4 45:4, 5, 10, 12 46:22, 24 47:4, 11
**Empathetic** 84:15
**empathy** 89:4
**employed** 11:24
**employee** 35:11 37:6 114:16
**employees** 7:21 20:23 28:19 89:25 93:21 99:21
**employment** 13:17 75:24
**encourage** 85:10
**ended** 75:25
**ends** 98:11
**endurance** 15:20
**energy** 12:6
**engagement** 35:11 37:6
**enhance** 90:16
**ensure** 99:1
**entails** 81:23
**Enterprise** 22:23 23:22 27:8 35:24 41:11 44:7, 20, 22
**entire** 61:7 115:7
**entities** 16:8, 10
**equally** 45:20, 21
**Erie** 2:6
**ERRATA** 115:1, 13 116:1 117:1
**especially** 90:24 104:16
**Esq** 2:1, 4, 8, 11, 18, 19
**Essential** 69:14
**et** 1:9 5:6 115:4
**evaluate** 69:1
**evaluated** 82:8 95:25
**Evans** 74:3
**events** 20:21 21:7 22:9
**eventually** 29:16 75:23 94:15
**everybody** 28:25 41:10
**everyone--not** 89:14
**evidence** 62:22 72:3 92:13 94:19 96:7
**evolve** 100:15
**exact** 32:22 39:19 63:16
**exactly** 39:23 102:3
**Examination** 3:4, 5 6:6 79:1 97:1 110:20
**examined** 6:4
**example** 21:10 27:8 84:9
**examples** 89:2
**exceptional** 90:1 93:11 99:11 108:11
**exceptional--he** 86:25
**exchange** 10:6 20:3
**exchanged** 20:6
**execute** 98:12
**execution** 69:24 70:21
**executive** 22:18 31:11 36:14 50:12 51:8 54:5 57:8 58:7, 12 74:6, 8 93:2, 7 94:7, 12
**executives** 38:7 72:2
**exercise** 26:4 31:11 32:25 42:11 93:12
**Exhibit** 3:8, 9, 10, 11 4:14, 15, 16, 17, 18, 19 7:23 8:3, 21 50:2, 4, 8, 9 53:9, 11, 15, 21 54:3 63:23 65:9, 22 68:13 73:16 74:22 79:4, 22, 23 80:13 81:8 82:14 93:2 94:24 97:4, 8 109:12 110:2, 23
**EXHIBITS** 3:7 4:11, 13 50:8 53:14 66:23 67:4 70:9 79:21 80:21
**existing** 26:6 44:5 72:1
**exit** 57:7
**expand** 31:22
**expectation** 105:16 108:14
**expectations** 88:25
**expected** 65:3
**expense** 103:18
**experience** 27:17 28:4 30:21 35:12 37:6 46:16 87:4 93:9 105:3 111:15
**experiences** 64:15
**Expires** 114:25
**explain** 81:14 88:3 96:11
**explained** 94:13
**expositions** 61:2
**extensive** 56:25 79:14
**extensively** 55:2
**external** 77:9
**extract** 61:8
**Extraordinary** 86:21
**eye** 69:23 70:20
**eyes** 89:17

< F >
**face** 94:4
**facilitates** 94:3
**facilitator** 91:18
**fact** 55:20, 25 56:1 95:12
**factor** 41:12 64:2, 16 77:7 92:20 95:14 96:21
**factors** 29:11 39:10, 25 61:23 64:7 72:25
**facts** 32:2 62:22 92:13
**fair** 27:5
**familiar** 9:15 17:17 61:11, 13
**fast** 91:2
**faster** 100:8
**favor** 76:16
**February** 114:23
**feedback** 41:7, 10 82:18, 20 83:3, 6 85:25 86:3 87:11, 20 88:1, 10 89:23 91:21 92:22 94:11 95:5 97:19 101:6 102:9, 16 106:1 108:20 109:22 110:23, 25
**feedback--you** 86:5

**feel** 26:13 27:25 51:24 85:24 98:21 99:13
**fellow** 92:6 96:4
**felt** 38:21 46:19 60:2 96:12
**FIFTH** 1:9, 14 2:13, 18, 19 5:6, 23 7:10, 21 10:13 12:2, 20 16:3, 4, 5, 6, 9, 14, 17 20:23 21:16 22:12, 19 34:4, 18 36:18 40:19, 23 50:11 55:6 62:19 93:7 96:19 101:22 115:4
**FifthThird** 109:12
**FifthThird-McHugh-001001** 97:5, 14
**FifthThird-McHugh-001005** 102:16
**FifthThird-McHugh-Minutes-000266** 50:14
**FifthThird-McHugh-Minutes-000517** 74:1
**FifthThird-McHugh-Minutes-000518** 109:15
**FifthThird-McHugh-Minutes-00267** 50:18
**figure** 26:5, 17 27:23 28:11 29:7 30:25 32:17 44:7 45:9 46:14 48:7 51:23 87:6
**financial** 37:10
**find** 99:7
**finds** 84:23
**fine** 8:12 9:17 11:5 56:3, 6 112:1
**finish** 15:14, 15 41:19
**fire** 83:25
**firm** 114:18
**first** 6:3 9:20 14:11 15:11 17:20 18:19 23:10 25:5 29:18 53:23 54:7 65:23 66:4 73:25 74:10 79:5 83:20 85:12, 13 93:3 95:1, 2 109:15, 19 114:8
**fit** 93:6
**five** 45:10
**floors** 99:22
**Florida** 6:14
**focus** 64:6 98:18 99:17 103:5
**focused** 86:16 98:19 99:4
**Focuses** 86:14
**folder** 67:21
**folks** 22:23 24:2 26:24 101:21
**followership** 95:4 103:4 105:10 108:8 109:21
**FOLLOWING** 4:3, 11 58:22 75:12 81:12 97:7
**follows** 6:5
**follow-up** 106:13
**foregoing** 114:9
**form** 10:8 19:2 54:2 59:23 70:4 72:8, 10 76:1 92:13
**formal** 27:14, 15 28:6, 10
**formally** 65:25
**format** 68:25
**former** 7:10, 14, 18, 21
**Formula** 68:24
**formulate** 91:19
**forth** 15:4 30:2
**forward** 86:16 89:8
**forward-thinking** 93:8
**found** 106:7
**foundation** 19:3 59:17, 23 66:17
**four** 39:4, 17
**frame** 13:2 61:18 62:14
**frames** 49:17
**framing** 59:6
**frankly** 60:17 77:11 96:14 110:6
**frequently** 18:25 99:22
**fresh** 84:6 89:17 102:2
**Friday** 5:2
**front** 66:24 68:13 79:22
**frustrating** 99:13
**FTB** 88:25
**full** 6:8 74:19 95:1 109:15
**Further** 3:5 78:22 87:16 94:9, 19 96:6, 22 97:15 111:18
**future** 26:11 30:17 31:8 45:8 91:7 92:9

< G >
**gain** 94:3 100:18
**game** 21:11
**gauge** 49:3
**generally** 32:16
**genuine** 89:5
**genuinely** 84:25
**getting** 72:6 75:7 98:1, 22 100:5
**gifted** 83:18
**give** 15:13 31:18 32:7 39:19 40:13 57:21 105:11
**given** 49:24 52:25 53:4 114:11
**gives** 61:4
**giving** 77:4 114:6
**global** 12:11
**glowing** 62:9
**go** 8:11 9:22 10:15 11:17 14:9 22:21 25:8, 24 26:4 27:2, 23 28:12 29:8 35:23 42:19 43:16 45:9 47:21 55:10 56:17, 20 63:22 65:14 67:23, 24 73:8 74:22 77:25 80:24 81:6, 21 82:25 87:23 88:13 91:25 97:21 102:15 105:1 106:24 111:6
**goals** 37:11, 23
**goes** 20:11 26:12 63:18
**going** 6:23 9:5, 20 12:21 21:10 23:21 40:3 48:3, 13 51:20 55:18, 23 56:19 61:5 65:5 66:24 67:3 80:9 100:19 103:8 105:8, 9 108:6, 7, 16 109:19
**good** 32:5 46:19 84:21 86:2 88:24 89:20 90:17 91:17 93:17, 18 95:11 100:9 104:18 107:22
**Gotcha** 106:22
**Governance** 17:5
**grab** 67:5, 10, 13
**grabs** 104:2 107:14
**grasp** 89:1
**great** 38:25 70:25 85:17 88:16, 21 89:20 90:10, 14 91:4 98:23 107:25
**greater** 85:10
**Greg** 17:18 18:11, 13, 22 19:1, 8, 11, 15, 20, 22 20:4, 7 23:11 24:22 28:6 30:1 40:1, 17 41:1, 6 47:23 48:10 49:7, 13 59:14 60:1 65:4, 23 66:13, 18 71:8 77:19
**Greg's** 39:8 47:1
**Group** 12:10 13:6 53:6 72:2 91:22 105:18
**groups** 47:12
**grow** 30:11 89:23
**growth** 30:22
**guidance** 98:16
**guiding** 91:11
**Guy** 65:24 66:3, 4, 7, 10 73:14 90:11

< H >
**Hackett** 18:4
**half** 13:8, 10
**Hamilton** 114:22
**hand** 88:22 93:24 114:22

**handed** 8:2, 20 50:7 65:21
**Handing** 53:14
**Handles** 86:11, 12
**happen** 84:8 85:17 100:21
**happened** 63:17
**happening** 30:16
**happens** 42:12 43:24 104:7
**happy** 38:24 98:6
**hard** 98:17 105:13 108:10
**Hart** 2:11 5:17 55:24
**head** 15:17, 18
**header** 84:14 88:14
**headers** 83:9
**heading** 82:15
**head-on** 101:17
**headquartered** 12:7
**hear** 98:25
**heard** 45:1, 2
**hearing** 76:3
**helm** 39:1
**help** 38:1 100:15 105:21
**helped** 77:13
**helping** 99:8
**hereinafter** 6:4
**hereof** 115:13
**hereunto** 114:21
**hesitant** 104:7
**Hey** 28:19
**high** 55:14 64:20 93:16
**highly** 98:19
**him--curious** 104:13 107:19
**historical** 84:5
**his--with** 105:22
**hit** 103:8
**Hoffman** 82:4
**holding** 12:11
**holds** 93:16
**hone** 94:9
**honed** 83:19
**Honestly** 63:11
**hours** 106:21
**HR** 36:5 53:6 57:5, 19 58:3 65:5
**Human** 17:9, 11 53:6 54:5 58:4, 16 89:5
**humility** 92:10

**< I >**
**idea** 69:20 71:24 85:23 104:1, 13 107:13, 19
**ideas** 88:19 89:8 94:1 100:23 102:2
**ideation** 99:3
**identification** 7:24 26:7 29:14 50:3, 5 53:10, 12 65:10
**identified** 24:16 45:16 95:5, 7 109:21, 23, 25
**identify** 29:8, 18
**identifying** 23:10 25:24 28:5 30:23
**Illustrations** 83:15
**imagine** 73:8
**immediately** 65:7
**impact** 83:21 91:4, 14 93:13 103:9
**impacts** 101:4
**imperfect** 91:1
**implement** 100:12
**implications** 83:23
**important** 26:2 29:7 31:9 95:14
**impression** 103:12
**impressive** 90:8, 11
**improperly** 9:1
**improve** 111:5
**inception** 17:3
**include** 21:22, 23 92:22
**included** 30:20 74:4
**includes** 23:6 25:1
**including** 5:18 10:8 52:12 74:7 91:22 108:20
**income** 38:5
**incomplete** 25:8
**increase** 103:8
**incredible** 89:2, 8
**independent** 36:14 59:9
**indicate** 70:1, 17 103:23
**indicated** 115:12
**indicates** 51:5 73:19
**indication** 73:3 76:13
**individual** 26:19 81:24, 25 88:6 93:23 110:12 111:11, 12, 16
**individually** 5:20 84:22
**individuals** 24:6, 22 26:16, 23 27:1, 12 34:21 36:12 61:1 64:5 99:18
**industry** 31:12 87:8
**influence** 29:12
**influenced** 85:13
**information** 10:6 36:4 41:9 57:6 64:1, 5, 7 69:25 70:13, 14, 16 75:8 76:21 87:8 91:1 104:3 107:15
**inherent** 94:6
**initial** 19:19
**initially** 10:16
**initiated** 51:6
**innovative** 69:22 70:19 89:6 93:10
**input** 26:16 29:4 41:4, 14, 16 56:15 57:21 59:14 64:4, 8, 10, 11, 14 69:7 79:16 84:11
**inquired** 95:22 109:16, 17
**inquiries** 10:10
**inquiry** 95:9
**inside** 5:23 27:2 93:3
**Insightful** 90:13, 20 94:10
**insights** 64:15
**instruct** 6:24
**instruction** 9:6
**instructions** 14:9 16:1
**instrumental** 91:11
**integrate** 31:1
**integration** 14:2
**integrations** 31:2
**Intellect** 86:22 87:5
**intellectually** 90:21
**intelligence** 89:24
**intelligent** 89:3
**interact** 47:11
**interacted** 96:14
**interaction** 104:25
**interactions** 46:5 70:22, 23 92:5 101:15, 18
**interest** 98:21, 24 114:16
**interested** 84:25 103:12
**interim** 42:14, 16 43:11, 21 44:8 45:4
**internal** 27:4, 23
**International** 61:12 74:15 79:13 81:12 95:25 96:3
**Interpersonal** 69:16
**Interpublic** 12:10 13:6
**interrupt** 8:5
**interview** 17:25 19:19 36:20 79:15
**interviewed** 17:23 81:12 82:2
**interviewing** 17:23
**interviews** 79:17 95:6 109:22
**intimidate** 100:25
**intimidating--he** 87:10
**introduce** 5:10
**invest** 103:6 104:23
**investment** 84:8 85:14
**investors** 47:12
**involvement** 17:14 18:21 57:10, 15
**involves** 29:4
**IPO** 14:5
**issue** 9:6 43:10, 17 91:1 102:25 103:22 107:8

**issues** 62:8 83:22 86:8 95:12 98:18 99:18
**its** 17:2 93:21

< J >
**Jackson** 1:20 114:4
**Jamie** 82:11
**January** 1:14 5:2 21:23 24:17 25:2 33:9 34:5 45:17 47:5 115:2
**Jensen** 6:14
**Jim** 18:4
**Jms@sspfirm.com** 2:7
**job** 44:9 77:5 100:5 104:13, 18 107:20, 22, 25
**jobs** 34:14
**join** 17:24
**joined** 12:21, 23 16:18 18:13, 18, 19 39:14
**Joint** 5:20
**JORGE** 1:14 3:3 5:5 6:2, 10 113:3 114:7 115:19 116:24 117:24
**Josh** 111:21
**Joshua** 2:1 5:12
**Jude** 82:12
**jumbled** 41:20
**June** 65:23
**jurisdictions** 15:4
**justify** 32:2

< K >
**Kabat** 18:6
**keep** 45:7 52:10 87:8
**keeping** 99:4
**Kevin** 18:6 82:11
**key** 52:13, 15 99:5
**Kidd** 82:5
**kind** 31:22 60:2 70:24 89:5 103:3
**kinds** 21:12 32:3 60:13
**Kinect** 12:4, 25
**know** 15:22 16:3 18:13 19:6 20:9 23:12 24:12 25:10 27:12, 24 30:4, 15, 21 31:5, 23 32:24 34:14 35:16 39:8, 13, 22 40:24 42:11 43:4 44:2, 13 45:9 46:6, 25 47:6 49:4 50:1 51:21, 23 55:13 57:12 59:18, 24 62:2, 7, 23 64:7 65:1, 4 66:4, 6, 18 67:3 69:6, 10, 12 85:20 86:5 99:25 100:4 103:8 107:6 108:4 110:13
**knowledge** 30:15 44:12 66:14 86:22, 23 88:22 90:23
**known** 14:1
**knows** 86:15, 17 89:10 93:17 98:12

< L >
**L.P.A** 2:5
**label** 10:1
**labeled** 54:4 57:25 58:23 68:24 69:13 74:23
**lack** 59:16 65:18 66:16 102:23 103:23
**lacks** 19:3
**Lamb** 24:24 45:15 46:10 51:13, 14 52:6, 8 59:2
**Lamb's** 25:13
**Landings** 6:13
**large** 95:24
**Lars** 82:10
**Lavender** 82:11
**lawful** 6:3
**lawyers** 5:23
**layers** 99:21
**lead** 49:1, 5, 9 100:1
**leader** 31:24 32:5 57:5, 20 65:5 83:14 84:15, 20 85:3 87:17 89:21 90:12 93:19 95:13
**leaders** 98:10
**leadership** 31:23 56:18 60:19 61:7 69:14, 15 70:3 71:24 72:20 79:11 84:22 93:6, 22 105:9 108:7
**leads** 47:18
**leans** 85:17
**learn** 87:5 99:8
**learner** 94:8
**learning** 103:21
**leave** 39:9 76:4 99:11
**leaving** 48:23
**led** 14:3 40:10 51:22 57:19 77:12
**left** 51:14 76:3, 10, 14 100:6
**left-hand** 83:10 88:14
**lens** 89:19
**Leonard** 82:11
**letting** 15:14
**level** 21:14 27:13 87:2 88:7 89:3 105:15 108:14 110:6
**leverage** 30:24
**levers** 93:13
**likes** 104:12 107:18
**liking** 107:20
**limited** 10:9 27:7
**line** 93:14
**lines** 51:20 56:9 91:20
**list** 31:14, 17 32:20 33:5 108:21
**listed** 38:20 69:13 88:12 109:1 110:1
**listen** 105:20
**lists** 83:14
**litigation** 114:15, 17
**little** 80:15 87:4 92:18 97:25 102:20
**lives** 105:2
**LLP** 2:12
**long** 12:19, 25 13:23 31:14, 17 34:15
**look** 26:24 42:13 44:7 54:11 68:17 73:9, 21 75:1 79:5 80:7 81:9 83:1 90:19 91:7 110:24
**looked** 73:9
**looking** 26:9 27:20 29:21 52:23 71:2 73:25 75:10 79:4 89:8, 23
**looks** 59:1 68:23
**Lose** 98:18
**lot** 46:18 62:5 77:11 91:1 104:25 105:1
**lots** 29:11 56:25

< M >
**MA** 30:21
**mail** 10:7
**main** 69:20 71:24
**maintaining** 69:23 70:20
**major** 85:8
**maker** 93:15
**making** 46:19 85:24 108:4
**manage** 71:25 94:6
**managed** 38:6
**management** 12:6 18:8 23:18 26:17 29:5 41:8 53:2, 3 54:5 56:23 57:2 60:13, 14 69:15, 19 74:2, 3 101:20
**manager** 21:17
**managing** 12:10
**manner** 9:4 94:1
**MARKED** 3:7 4:13 7:23 8:21 50:2, 4, 8 53:9, 11, 15 65:9 70:9
**marketplace** 30:17
**Marsha** 49:10, 12 66:2, 13, 19
**material** 93:13
**materials** 11:1, 22 35:15, 17, 19 52:21 53:4 57:16, 18, 25 58:5, 24 60:6 74:4
**matter** 43:14 98:20 115:8
**Matters** 86:14, 15

**MCHUGH** 1:6 2:18 5:6, 13, 15 7:17 11:7 22:5 33:10, 14 34:17, 24 35:22 37:10 38:10 40:18 41:24 42:15 69:10 70:3, 18 72:4, 22 75:17 82:11 88:10 91:22 108:21 115:3
**McHugh's** 34:4 35:3, 8, 11, 15 75:24 92:14
**mean** 10:19, 23 21:1, 7 30:23 31:14 32:3, 13 35:16 43:4, 7 47:20 78:14 98:6 105:1 106:15 111:4, 8
**meaning** 10:5
**means** 45:12 107:7
**Media** 68:9
**meet** 17:20 18:25 19:7 21:16 22:12, 20 24:10, 13 36:20 105:13 108:10 110:11
**meeting** 18:19 20:24 21:25 34:21 36:12 50:10 51:9 55:22 59:9 73:18, 20 74:4, 15, 25 75:17 76:7, 8, 25 80:22 94:14
**meetings** 18:14 19:12 20:16, 17, 19, 21 21:7 22:7, 14, 15 33:25 34:16, 19, 20, 23, 24 36:16 47:15, 20 48:1 60:7 64:16 70:23 76:25 78:19
**Melissa** 82:6
**member** 12:20 18:22 24:18 25:2, 5 35:6 40:18, 22
**members** 7:10, 14, 18 11:3 23:23 24:9 35:24 53:22 76:18 92:6 96:5
**membership** 13:16
**memory** 25:8 52:17 63:6
**mention** 11:15
**mentioned** 29:13 31:22 41:21 71:1 73:8
**mentions** 10:14
**message** 10:8 93:25
**messages** 20:3 103:11 107:1
**met** 17:22 18:6, 14 19:9, 11, 12 20:25 21:13, 24 22:6 38:19 111:15
**Miami** 12:7
**Michael** 2:8 5:16
**Michael.cioffi@blankrome.com** 2:15
**mid** 71:19
**middle** 51:2 64:20
**mid-year** 35:4 36:24
**Mike** 82:4
**mind** 92:12 110:7
**mindful** 103:10
**mind-set** 30:9
**minimum** 66:1
**minute** 8:11 53:17
**minutes** 50:9 67:12 73:17 74:15 79:5 80:1 109:10
**missed** 31:19
**missing** 32:13
**more-senior** 105:8 108:6
**morph** 31:7
**motivating** 84:23
**mountains** 98:24
**move** 83:20 96:15 98:24 99:5 100:7, 8
**moved** 85:9
**multiple** 32:24 52:1, 3 63:20

< N >
**name** 6:9 43:7 66:8
**named** 12:15 18:20 25:22 87:14 114:7
**names** 25:6, 13, 23 42:25 43:1
**narrative** 100:25
**National** 16:6
**nature** 22:9 42:11 47:10 48:13
**NE** 6:13
**necessarily** 61:2
**necessary** 29:14 43:20 78:12
**need** 15:16, 19, 22 24:1 26:10 45:4 46:13, 18 47:11 49:24 86:8 102:3 104:20 105:9, 24 107:25 108:7 109:18
**needed** 39:6, 7 86:3 91:14 95:17
**needle** 99:5
**needs** 24:10, 13 69:21 87:6 98:5 99:1, 6, 15 100:18, 20, 24 101:2 103:5, 10, 14, 16 104:15, 22 105:21
**neglect** 99:18 100:14
**negotiating** 98:9
**negotiations** 10:9
**neither** 114:14
**never** 19:12 21:24 33:6 48:15 96:20 107:2, 9, 16
**New** 12:12 26:6 89:18 100:23
**Nick** 49:10, 11, 12
**Niehaus** 82:5
**No._____Change** 116:2, 5, 8, 11, 14, 17, 20 117:2, 5, 8, 11, 14, 17, 20
**No._____Line** 116:2, 5, 8, 11, 14, 17, 20 117:2, 5, 8, 11, 14, 17, 20
**nodding** 15:17
**Nom/Gov** 16:25 17:4
**nominate** 44:3
**Nominating** 17:5
**normal** 50:1 62:5 111:24
**nos** 15:17
**Notaries** 1:23
**notary** 114:5
**note** 54:21
**Notice** 1:14
**notices** 10:10
**notification** 28:19
**noting** 55:19
**notwithstanding** 15:21
**number** 8:9 10:15 11:16, 25 16:21 23:13 25:17 38:23 39:3, 10, 25 42:4 51:1 61:22
**numbers** 9:21 54:23 55:7, 10, 14 65:12 79:6

< O >
**oath** 115:15
**object** 56:8 77:20 80:9
**Objection** 6:23 8:23 19:2, 16, 24 33:16 38:12 42:17 43:12 54:22 55:19 59:16, 22, 23 62:21 63:9 66:16 70:4 72:7, 10 76:1 77:20 80:24 81:6, 20 87:23 91:25 92:16, 25 94:17, 21 96:9 111:6, 9
**objective** 69:25 70:12, 16 72:3 92:13 93:9 94:19 96:6
**objectives** 94:4
**observe** 34:17, 24 36:17
**obtained** 11:15
**obviously** 12:2 53:1
**occasion** 21:17
**occasions** 14:21
**occur** 32:20
**offer** 115:14
**office** 114:22
**Officer** 10:13 51:8 58:4, 16 74:8 93:7
**officers** 20:20, 23 21:14 91:14
**official** 114:22
**Off-the-record** 8:16
**Oh** 67:6 97:15

**OHIO** 1:2, 20, 23 2:6, 14 5:8 114:2, 6, 22
**Okay** 9:17 10:2, 25 11:5, 23 12:13 13:14 14:14 16:10, 13 17:13 22:3 23:9 25:22 28:9, 23 32:19 33:5, 9 35:2 37:25 39:16 41:12, 18 43:19 45:23 48:15, 18 49:16 50:17 52:10 53:8 54:16 56:9 58:22 59:20 63:7, 22 64:18 65:6 66:2, 9, 12, 14, 23 71:15 73:25 74:14, 18, 22 75:5, 12 76:9, 13, 16 77:25 78:21, 25 88:2 92:11 97:21 98:2 102:9 104:8 106:19, 22 108:19 109:10 110:8, 10, 18 111:14, 25 112:8
**old** 27:17 84:2
**onboarding** 19:18
**once** 22:21, 25 55:10 62:3 71:7 105:5 108:2
**one-on-one** 19:20 20:17, 19
**one-on-ones** 19:14
**ones** 13:15 101:12 102:5, 7 106:5 108:17 109:6
**ongoing** 94:11
**on--if** 86:18
**online** 79:12
**open** 28:24 84:19 89:22 94:11
**opening** 28:20
**operate** 44:3
**operations** 87:5 100:19 104:17
**opinion** 45:5 47:3, 8 103:13 106:6
**opinions** 32:2
**opportunities** 23:24 30:24, 25 91:10 97:20 102:23 109:5 110:1, 24, 25 111:1, 3, 4, 7, 10, 16
**opportunity** 111:11
**opposition** 43:6
**optimization** 103:18
**oral** 10:6
**ORDER** 1:12 4:3, 11
**ordering** 111:22
**organization** 28:1 31:6 100:16 102:3, 24 105:10 108:8
**organizational** 93:20
**oriented** 92:9
**originally** 62:19
**others--he** 100:11
**others--there** 105:19
**outcome** 39:11 105:24
**outcomes** 85:16
**Outrigger** 6:13
**Outside** 13:16 15:4 21:24 27:3 89:11
**overall** 31:24 42:25 100:15
**overcommit--he** 100:14
**overplay** 99:3
**overwhelm** 100:22
**overwhelming** 102:1 105:19
**owe** 103:7
**owned** 83:18

< P >
**p.m** 68:5, 7 78:5, 7 113:9
**package** 90:3
**PAGE** 3:3 9:21, 22, 25 50:22 51:2 55:25 57:24 58:23, 24 63:23 71:23 74:1 79:5, 7 81:8, 19 82:14, 25 83:2 87:25 88:12 93:3 94:24 95:1 97:18 109:14 110:23 116:2, 5, 8, 11, 14, 17, 20 117:2, 5, 8, 11, 14, 17, 20
**paged** 9:23
**PAGES** 4:3, 5, 6, 7 114:10
**pair** 89:17
**Pamela** 1:20 114:4
**paradigms** 84:2
**paragraph** 52:11 79:7 95:1 109:16
**part** 14:4, 20 15:5 17:22 18:8, 14 19:11 21:12 22:6, 7 23:17 33:4, 25 35:22 40:10 41:8 42:4 49:19 50:1 56:2 60:14 61:4 66:11 79:25 81:13 82:2, 8, 19 110:3
**participate** 35:2 36:23
**particular** 8:24 9:7 25:14 49:23 52:22 55:16 58:24 61:9 78:12
**particularly** 31:7
**parties** 114:15
**party** 9:2
**passion** 84:1
**passionate** 93:25
**path** 39:8
**Patterson** 2:5
**pause** 57:13
**peer** 31:12 83:3 88:1 91:22 95:5 102:16 109:21 110:25
**peers** 79:18 81:25 82:8, 23 88:4, 6, 9, 15 90:5 92:12, 23 98:10 100:25 102:15 103:4 108:20 109:1
**PENALTY** 115:5, 6
**people** 24:10 25:9 26:7, 13 27:10 42:13 44:7, 22 61:8 81:12, 24 84:21 87:2 88:5, 7 89:7 90:6, 7 96:13 99:13, 24 100:2 104:12, 14, 22 105:2, 12 107:18, 19, 20, 21 108:16 110:13
**people--and** 104:13
**perfect** 110:11
**perform** 35:3 36:23 44:5 105:15 108:14
**performance** 23:24 35:19 37:10, 15 41:7 50:12 86:5, 8 93:17
**period** 24:18
**PERJURY** 115:5, 6
**permanent** 24:23
**permitted** 106:14
**perseveres** 94:4
**person** 10:7 22:16 40:2 48:6 71:8 73:19 77:3 84:23 88:7
**personable** 105:5 108:2
**personal** 19:5 21:14, 18 48:13, 20 69:16 104:24
**personality** 79:11
**personally** 5:19 19:1, 7, 9, 13 92:4 101:24
**perspective** 38:18 61:22 84:6 89:15 91:5 104:4 107:16
**Peter** 82:5
**Phenise** 2:18 5:23
**Phil** 5:15 7:17 22:5, 6 33:10, 14, 25 34:4, 6, 17, 24 35:3, 8, 11, 15, 22 37:10 38:10 40:18 41:24 42:8, 15 65:25 69:10 70:2, 3, 18 72:4, 22 76:3 82:11 88:10 108:21
**PHILIP** 1:6 2:18 5:5, 13 11:7 115:3
**Phone** 2:7, 14 19:22 22:14
**physical** 80:17
**pile** 73:16
**pinpoint** 39:17
**Place** 1:14 23:19 85:19 94:5 114:11
**Plaintiff** 1:7, 14 2:1 5:13, 15
**plan** 42:25 54:6 57:25

**planning** 22:21, 22 23:7, 15 37:20 42:5, 7 46:6 54:19 56:14 74:6
**plate** 103:1
**play** 33:2 39:10 83:19
**players** 28:12
**please** 6:1, 8, 9 15:23 54:12 65:19 72:15 73:21 79:8 82:8 83:17 85:2 93:4 94:24 95:2, 20
**PNC** 2:13
**point** 14:6, 7 34:12, 22 41:22 65:24 71:9, 10, 17, 18 77:15 102:1 103:19 105:22, 23 107:10
**points** 83:11 97:23
**pool** 26:21
**Poole** 2:18 5:23 67:10, 13, 18
**portfolios** 91:17
**portion** 58:5
**position** 28:20 51:8, 11 94:7
**positioning** 77:4
**positions** 32:2 65:7 91:8
**positive** 107:23
**Possesses** 86:21 90:23
**possession** 10:17
**possible** 33:10 74:8
**potential** 24:3, 6, 21 25:13, 24 26:13, 14, 21 30:22 34:1 43:11 45:25 51:7, 17 52:13 60:4, 22 61:2 64:19, 21 65:7 95:23 109:18
**potentially** 51:13
**practical** 29:2
**practice** 14:2
**precursor** 71:4
**preface** 43:23
**prepare** 6:17 49:24
**prepared** 6:21 56:23
**preparing** 57:16
**presence** 31:11
**Present** 2:17 36:11, 13 48:3 57:20 58:4, 6, 8, 9 74:18 88:21 92:8 99:20 101:18, 19
**presentation** 57:11, 17 60:2
**presented** 60:8 74:3, 15, 24
**presenting** 34:21 57:3, 6 58:16, 20
**presents** 86:9
**President** 23:6, 11 29:17 33:15 38:11 40:19, 23 54:19 56:13 74:8 75:13, 19 76:17 77:5 87:15 92:15 94:15 96:2, 8, 15, 19
**Presidents** 34:10 95:23
**presides** 47:14, 17, 19
**Pressure** 86:11, 12, 13
**Pretty** 21:1 55:14 56:16 60:23 62:9 63:5, 12 70:10
**prevents** 103:3
**primary** 34:20
**prior** 7:1 8:24 13:24 17:13 21:23 24:16 33:9 34:4 47:4 60:7 66:24 72:3 73:16 74:5, 12 106:3 114:6
**priorities** 52:14, 15 86:19
**private** 12:14 13:13
**privilege** 7:3, 4
**probably** 14:16 25:15 31:21 36:9 39:22 49:10 62:14
**problem** 50:25 79:12 90:14
**proceed** 65:19
**process** 6:20 15:5 17:23 22:22 23:10, 18 26:5, 7 27:15 28:5, 11 29:4 33:4 35:23 39:5, 24 40:3, 10, 15 42:18 56:16, 21 57:1 60:14, 17, 23 62:5 65:5 73:7 79:10, 15 81:13, 15, 17, 23 82:3, 9, 19 91:2
**processes** 85:16
**produced** 55:6, 25
**product** 7:4
**Production** 8:25 9:19 10:1 55:1 56:2
**products** 85:10
**professional** 18:12 19:4 20:15
**projects** 93:25
**promote** 75:13
**promoting** 76:17 96:7
**promotion** 29:16 75:18, 24
**promotions** 100:5
**proper** 29:9
**prosper** 30:12
**protected** 7:3
**PROTECTIVE** 1:12 4:3, 11
**provide** 41:6 59:20
**provided** 6:25 7:2 36:5 41:9 52:21, 25 55:21 74:4
**provides** 36:3 85:25
**providing** 88:9
**public** 95:24 114:5
**Public-State** 1:23
**pull** 108:16
**purposes** 52:22 56:13 60:12
**Pursuant** 1:14 5:20
**pushes** 94:9
**pushing** 98:14
**put** 28:21 30:2, 4 33:6 95:10 112:9
**puts** 85:18

**< Q >**
**qualifications** 38:19 73:10
**qualified** 38:10 40:2 47:4 77:2, 3 114:4
**quality** 72:20
**quarterly** 22:13, 16
**quartile** 96:2
**question** 15:15, 23 19:3 33:20, 21 35:18 41:19 43:3 44:11 56:12 58:15 63:18 70:5, 15 72:11 76:2 78:16 106:3 110:15
**Questionable** 104:10
**questioning** 55:15, 18 56:9 106:13
**questions** 9:7 78:24 85:22 96:23 108:25 110:14 111:18
**quickly** 38:23 67:14, 19 83:23 90:25 91:2 100:7
**quo** 84:3

**< R >**
**range** 39:22
**Reactive** 98:3, 4 101:14
**read** 35:22 72:20 73:10 79:7, 8 82:1, 7, 17 83:9, 16, 17 84:21 88:13 93:3, 4 95:1, 20 97:17, 22, 25 102:17 115:7, 9
**readiness** 52:13
**reading** 52:10
**ready** 27:12 39:9 46:2 50:1 52:7
**real-life** 89:2
**really** 15:8 21:12 26:8 28:11 51:22 63:13 67:14, 19 72:5 77:13 85:17 90:2
**reason** 44:5 73:2 116:4, 7, 10, 13, 16, 19, 22 117:4, 7, 10, 13, 16, 19, 22
**reasons** 48:20
**recall** 15:6 18:8, 16 19:20 20:18 21:13 23:12, 13, 20, 21, 25 24:2, 7, 19, 20 25:3, 7, 10, 12 28:8 31:16

32:6, 22 33:13 34:12 35:1 37:22 46:23 48:17 49:23 51:17, 18 52:3 58:19, 23 60:5, 6, 15 62:8 63:7, 8, 13, 21 66:7, 21 74:10, 20, 25 75:5, 7 76:3, 9 86:24
**received** 11:15 79:16 80:16, 20
**receiving** 29:16
**recess** 68:4 78:4
**recognize** 100:10
**recognized** 31:3
**recollection** 39:13 54:10 71:22 77:22
**recommend** 40:17, 21 66:1
**recommendations** 59:21
**reconvened** 68:6 78:6
**record** 5:2 6:9 8:11, 15, 18 54:22 67:23, 25 68:3, 9 78:1, 3, 9 79:8 82:1, 7, 17 88:3, 14 93:4 97:22 111:20 112:9
**recorded** 80:1
**reduce** 103:16
**Reducing** 107:5
**redundant** 33:20 77:21
**refer** 11:15 16:4, 13 66:25 67:4 83:1 97:3
**REFERENCED** 3:7 4:13 25:23 53:5
**referred** 68:12 109:11
**referring** 16:5 24:16 29:15 66:5 80:13
**refers** 10:14
**refine** 32:25
**reflect** 52:17
**reflected** 69:20 71:24 81:18
**refresh** 74:24
**refresher** 15:11
**regarding** 7:10 14:10 24:5 33:14 60:8 64:2 65:13 94:10 99:1
**Regardless** 80:20
**Regional** 34:10
**regulatory** 31:13
**relate** 11:16 89:2
**related** 74:6, 7 95:4, 23 109:18, 20
**relates** 10:14
**relationship** 18:11, 12 19:4 20:14 80:4 111:8
**Relationships** 104:24 105:7 108:5
**relative** 37:11 114:14, 15
**remain** 86:16
**remains** 86:13 87:10 94:11
**remember** 32:23 33:8 36:9 39:23 49:10, 11 51:10, 13 52:16, 19, 24 58:19, 21 60:10, 11, 12, 23 61:10 62:1, 17 63:3, 5, 12, 16, 17 66:8, 10 74:21 75:4, 11, 20 76:6, 8, 15 78:18, 20 98:5
**remembering** 62:13
**remembers** 86:25
**reminded** 74:11
**reminder** 41:18
**reminding** 74:5
**repeat** 15:23 70:14
**rephrase** 72:14
**replies** 104:6
**report** 22:23 62:9 68:20 71:4 74:19, 20 75:4, 6, 7, 12 77:12, 17 79:19 81:14, 24 110:3
**reported** 49:21 92:19
**reporter** 6:1 15:15 53:17 97:25 111:21, 24 112:2, 5, 8
**reporting** 114:18
**reports** 27:11 36:21 79:18 82:2, 22, 25 83:7 86:18 87:12, 20 88:4, 5 92:12, 23 101:1 102:10 103:2 109:2
**repositioning** 104:19 107:23
**represent** 5:11, 19 9:18 50:9 54:23 55:4 68:22 73:17
**representation** 65:17
**representing** 5:21
**Request** 8:25 9:19, 25
**requested** 57:23
**requests** 10:10, 12
**required** 44:14 93:23 100:11 112:10
**resign** 39:9
**resistance** 94:2
**resolutions** 51:2
**Resources** 53:6 58:4, 16 101:3
**resources--he** 103:5
**respect** 6:25 22:18 54:19 70:18
**respective** 37:11
**respond** 103:11 107:1
**responded** 9:8 95:6 96:1 109:22
**responding** 103:11
**responses** 10:10
**responsibility** 34:10
**responsible** 34:13
**responsive** 10:16, 19 11:7, 18 107:1, 4
**rest** 60:3 77:2
**restructured** 14:3
**result** 99:11 114:17
**results** 74:16 98:10
**retain** 61:24 87:7
**retired** 13:21 14:7
**retirement** 13:24
**retooled** 85:8
**review** 6:22 7:6 11:18 23:18 35:7 37:2, 9, 15 50:13 51:6 55:11 95:5
**reviewed** 7:5 35:10 37:5, 23 51:9 52:11 70:1 79:9, 18
**Reviewing** 9:14 54:14 68:17 73:23 75:3 80:10
**reviews** 35:3, 4, 8, 15, 20 36:24, 25 37:3
**RHR** 61:12, 20, 24 62:15, 18 63:2 66:7, 15 68:20 70:6 71:4, 6, 10 72:19 74:15 75:8 77:7 79:13 81:12 82:21 95:25 96:3
**right** 9:25 20:11 21:4 25:20 26:18 28:7 29:24 31:23 32:12 36:1 37:18 40:11 41:1, 3 42:12 43:25 45:12, 17 47:11 50:23 51:24 52:8, 23 59:3 61:3 64:19 71:8, 13, 17 73:4, 6, 20 74:16 75:14, 25 76:18 77:19 86:18 87:24 96:13 97:12 98:12 100:21 102:13 103:3 108:22 109:2, 5 110:12
**rigorous** 69:23 70:20
**rise** 90:9
**Risk** 16:19 75:18 98:13
**Robert** 20:9
**role** 22:18 24:11 26:11, 15 29:15 33:14, 15 34:4, 11 46:14 48:24 52:7 54:18 96:15 105:9 108:7
**roles** 23:23 34:6 64:6
**Rome** 2:12 5:17
**root** 90:25
**rose** 110:6
**rough** 49:4
**Roughly** 45:18

**Rule** 114:19
**running** 45:7
**runway** 78:12, 14, 16

< S >
**Saba** 2:5
**sales** 100:17
**save** 115:10
**saw** 43:7
**saying** 32:10 49:13
**says** 44:4 64:20 81:11 106:25
**scale** 12:11
**scenario** 42:9, 21, 23 44:6
**Schramm** 82:12
**scope** 19:25
**score** 35:23
**scores** 35:11, 12 37:6, 7
**seal** 114:22
**second** 21:2 31:19 50:22 71:23 94:24 109:14
**Secondly** 30:14
**see** 10:3 26:10 30:21 31:19 35:14 38:5 39:6 49:20 50:13, 14, 15 51:3 53:24, 25 58:1, 14 64:19, 21 69:17, 20 81:11 82:14 83:2 97:11 107:8 108:3, 14, 18 109:17, 23
**seeing** 58:24 60:5 69:14 75:5
**seeks** 10:12 84:11
**seen** 8:21 9:11 20:25 35:20 66:25 68:15 70:1 89:16, 18 96:14 101:18, 19, 20, 22 107:2, 17, 21 108:9
**sees** 83:22
**select** 32:18
**selected** 39:11 40:2
**Selecting** 44:21
**selection** 18:22 28:16
**senior** 98:10
**sense** 33:1 59:12 61:5 62:6 92:9
**sentence** 109:17
**sentences** 95:2, 10, 21
**separate** 8:6
**September** 73:18 75:16 94:13
**series** 29:20 34:6, 14 76:23, 25 83:14
**serve** 11:25 12:1, 2, 3, 9, 14 16:22 54:18
**served** 9:1, 3 14:6 16:16, 18, 22, 25 17:2, 8 27:18
**services** 12:15, 16
**session** 36:14 57:8 58:7, 13
**sessions** 19:20 21:12
**set** 30:2 31:12 44:16 67:5 114:21
**sets** 24:13 29:24 32:17 47:25
**settings** 70:25 101:21
**several-year** 39:24
**Shaffer** 20:9, 14, 17, 19 36:8 51:6 65:22 74:2, 5, 11
**shaking** 15:18
**shared** 41:9 46:12 73:11 75:21 110:5
**shareholders** 47:12
**Sharpe** 2:4 5:14
**Shawn** 82:5
**SHEET** 115:1, 13 116:1 117:1
**sheets** 38:6
**short** 67:7
**shortly** 18:17, 18 39:14
**showed** 70:25
**Shroat** 82:5
**side** 31:13 69:22 70:19 101:22
**signature** 112:5, 7, 10
**SIGNATURE:_______ ________________DATE** 116:23 117:23
**Signed** 115:16
**significance** 95:9
110:6
**silos** 85:10
**Similar** 13:2 35:18 60:7 102:18
**similarly** 28:18
**Simplex** 12:16, 17, 18 13:9
**simplicity** 16:14
**simultaneously** 69:23 70:20
**sir** 79:8, 24 82:16
**sit** 48:8 105:20
**situation** 29:15 48:19
**situations** 48:12
**six** 32:12
**size** 30:21
**skill** 24:13 29:24 44:16
**skills** 26:9, 14 29:14, 18 30:6 31:23 43:19 44:10, 15, 21 45:3 86:1 94:9
**skipped** 14:8
**slide** 61:9, 10
**slides** 60:11, 14
**slower** 98:1
**smart** 87:1, 9 99:14
**Smith** 2:1 3:4, 5 5:12 6:7 8:1, 7, 10, 19 9:10, 15 50:6 53:13, 19, 20 55:4 56:3, 6, 10, 11 65:11, 20 67:6, 16, 24 68:2, 11 72:12, 16, 17 77:25 78:10, 21, 25 80:9, 24 81:6, 20 87:23 91:25 92:16, 25 94:17, 21 96:9 97:2 106:15, 19, 22, 23 110:18 111:6, 9, 23 112:1
**society** 85:4
**solution** 98:11 99:8
**solutions** 93:10 98:14
**Solver** 90:14
**solving** 79:12
**somebody** 31:10, 13
**sorry** 8:5 12:23 18:18 42:5 50:24 53:19 54:4 57:12 66:10 97:6, 15 109:19
**sort** 28:11 30:18 31:12, 24 33:1 42:7 45:14 46:14 49:4 62:2 77:9, 23
**SOUTHERN** 1:2 5:8
**space** 106:18
**speak** 7:9 19:21 103:17 107:5, 6
**speaker** 93:24
**speaking** 15:13
**speaks** 81:21
**specialty** 90:24
**specific** 23:13 37:23 40:13 44:13 57:2, 3 61:19 101:21
**specifically** 34:12 52:16 74:11 76:10 80:12
**specifics** 45:14 51:19 63:3
**Spence** 11:12 21:24 24:24 25:12, 19 29:16 36:17 38:18 39:12 40:4, 22 45:15 46:9, 21 51:12 52:5, 6, 12, 15 59:2 61:21, 25 63:24 66:15 68:21 70:2, 7, 17, 23 72:4, 22 74:7, 23 75:13 76:17 77:24 79:10, 16, 19 80:1 87:14 91:23 93:5 94:15 95:4, 10 96:1, 8 101:8 106:2 109:21
**Spence's** 36:21, 24 37:3, 5, 10 41:7 75:18, 24 79:17 92:14 95:22 108:20 109:17
**spend** 103:21
**spent** 91:16
**spoke** 6:19
**SS** 114:2
**stack** 46:12 66:23
**Stagnaro** 2:5

**stakeholder** 79:16 82:18 83:6 97:19 110:23
**stakeholders** 83:6 101:7 102:14
**stand** 86:6
**standard** 56:16 60:17, 23 108:11
**standard--he** 105:14
**standards** 93:17
**standard's** 112:1
**standpoint** 89:15
**stands** 90:2
**start** 8:10 82:24 83:5
**started** 13:25 18:4 39:12
**starts** 26:7, 8 29:13 51:3
**state** 5:11 6:8 114:2, 5
**stated** 8:24
**statements** 10:9 38:5
**STATES** 1:1 5:7 65:24 71:24 74:2
**status** 84:3
**stenotypy** 114:13
**step** 29:19 42:13 44:8, 13 48:11, 20 105:25
**Stevens** 82:6
**stick** 62:7
**stipulate** 55:9
**stipulation** 65:17
**stood** 68:4 78:4
**stop** 55:17 65:17 79:20
**story** 88:25 92:8
**storyteller--he's** 88:24
**strains** 94:6
**strategic** 30:9 44:25 45:8 69:22 70:19 83:13, 20 89:3 91:5, 17 92:9 93:8 100:24
**strategies** 91:19 94:4, 5
**strategy** 30:10 91:12, 13
**Street** 1:20 2:13
**strength** 70:25 71:25 108:15
**strengths** 23:24 24:12 64:6 82:18 83:12 88:16 94:10 109:1
**Stress** 86:11
**stresses** 94:6
**strong** 83:20 85:5, 6, 25 87:7 90:15 93:5 105:7 108:5
**structure** 85:18 102:23
**structured** 71:5 79:14 93:15
**struggle** 99:7
**stuff** 44:12 64:16
**style** 79:12
**styled** 5:5
**subcategories** 11:17
**SUBJECT** 1:12 4:3, 11 55:22
**subjective** 93:9
**submits** 27:15
**suboptimal** 98:11
**subordinates** 36:21
**subparts** 10:15
**subsequent** 51:22
**substance** 24:7 46:8 80:21 81:3
**succeed** 40:19, 22 71:8
**success** 38:25
**successful** 104:21
**succession** 22:18, 21, 22 23:6, 14 41:13 42:6, 7 46:6 51:7, 17 52:11 54:6, 19 56:14, 22 57:25 58:23 60:9 61:3 64:3 74:6 77:18
**successor** 23:11 28:5 41:22, 25 46:22, 24 47:1, 4 65:25 74:9 77:19 95:24 96:2
**successors** 25:13, 25 60:4
**succinct** 103:20 107:11, 12
**Succinctly** 103:15
**suits** 104:13 107:20
**summary** 74:19, 23 75:4, 11 80:11, 13, 14 93:2 94:12 109:3
**superior** 70:2, 18 72:4
**superpower** 99:4
**supervision** 114:13
**supervisor** 36:10
**support** 42:15, 22 43:2, 5 95:4 96:7 109:20
**supporter** 85:11
**supporting** 94:20 104:2 107:14
**Sure** 21:5 25:6, 9 29:1 31:20 32:8 39:7 46:19 54:13 67:17 73:22 80:16 100:13 102:22
**surprising** 77:10
**surround** 104:16
**Susan** 82:12
**swear** 6:1
**sworn** 6:4 114:8
**systems** 14:2

**< T >**
**tackling** 100:20
**tactical** 45:6 83:22
**tail** 23:5
**take** 5:4 15:21 24:22 41:3 58:9 67:7, 15 68:3 80:7, 8 83:1 87:18 91:9 92:8 98:13 105:8 108:6
**Taken** 1:14 14:12, 15, 23 105:25 114:12 115:2, 8
**takes** 23:18 26:5 39:5 100:19 101:17
**talent** 23:18 27:2 35:23 41:8 42:5 53:1, 3 54:5 60:13, 14 61:2 64:7 74:2, 3 85:18 104:10, 19, 20 107:23, 24 108:1
**talk** 40:25 42:6, 7 60:18, 21, 22 99:18 105:2
**talked** 31:8 33:7 46:23, 24 52:19 62:2
**talking** 47:6 81:23 87:13
**Tayfun** 65:25
**Taylor** 82:12
**team** 18:8 22:23 23:22 36:5 41:11 44:7, 20, 22 48:7 56:18 60:19 61:7 72:1 86:20 89:19 91:9, 18 99:15, 19 101:20 104:19 105:1
**technical** 90:24
**Technology** 17:1 31:5 90:16
**telecopy** 10:7
**telephone** 10:7
**Tell** 14:25 23:9 24:7 46:8 70:22 86:20
**teller** 21:16
**telling** 88:25 99:9
**tenure** 60:16
**term** 45:1, 2 78:17
**terms** 23:23 26:9 31:25 38:20 48:22 49:3 51:23, 25 52:5 61:9, 22 64:5 71:4
**test** 15:20
**testified** 15:1 80:15 92:18 111:14
**testify** 114:8
**TESTIMONY** 1:12 4:3 80:18 114:11
**text** 10:8 20:3
**thesis** 104:3 107:15
**thing** 35:21 63:11 99:24 101:25
**things** 24:12 26:2, 10 29:7 30:18 31:14 32:3, 8 34:13 39:7 43:23 46:16 52:18, 20 56:25 64:6 85:17, 19 89:12 99:5 100:15 103:6, 7
**things--brings** 84:5

**think** 13:11 18:19 21:2 23:4 25:21 26:18 30:5 32:8 37:12 38:4 47:8, 9, 13 49:9 53:5 54:14 56:12 58:6 59:5 61:14 63:4 65:12 67:20 68:20 69:9 77:13 90:10, 12 95:11 101:14, 16, 17, 24 102:1, 2 106:4 107:7, 11, 23, 25 108:15 109:3 110:5
**Thinker** 90:14 92:10 93:8
**thinker--he** 83:21
**thinking** 69:22 70:19 79:12 89:18 99:12 102:2 103:23 105:23
**thinking--and** 85:23
**thinks** 83:21 89:11
**THIRD** 1:9, 14 2:18, 19 5:6, 23 7:10, 21 10:13 12:2, 20 16:3, 4, 5, 6, 9, 14, 17 20:23 21:16 22:12, 19 34:4, 18 36:18 40:19, 23 50:11 55:6 62:19 93:7 96:19 101:22 115:4
**Thomas** 2:19 5:22 106:8, 10
**thorough** 93:14
**thought** 24:9 29:24 31:18 33:2 40:1 87:17
**thoughtful** 93:14
**three** 13:10 39:4, 16 45:10 62:19 86:19 99:21
**three-year** 85:14
**thrown** 78:17
**tied** 70:10
**tightly** 99:17
**Tim** 21:24 24:24 25:12, 16, 19 29:16 36:17, 21, 24 37:3, 5, 10 38:18, 22 39:1, 12 40:2, 22 41:1, 5, 7 45:15 46:1, 9, 21 51:12, 25 59:2 60:3 61:21 62:3, 10 63:5, 6, 13, 24 65:24 66:3, 15 68:21 70:2, 7, 17, 23 71:7, 21 72:4, 22 73:13 74:23 75:24 76:17 77:2, 24 87:14 91:15 92:5 93:5 94:8, 15 95:13 96:8 101:15, 17 107:17 110:7
**Time** 1:14 5:3 7:15 13:2 14:6, 7, 14, 19 15:1, 13, 21 18:5 20:25 24:17, 18 25:9 32:7 34:7, 13, 15 39:1, 5, 23 47:22, 24 48:13 49:6, 17 51:14 55:18 61:17 62:14 65:13 68:10 76:20 77:16, 22 78:9 80:8 91:16 100:14 103:21 104:23 105:12 108:4 111:20 114:11
**timeline** 48:22 49:4, 22, 24 59:3, 11, 15, 21
**timelines** 51:7, 17 52:1, 3, 13 60:8
**times** 14:22 22:10 98:4, 10, 17 105:19
**timing** 26:20 46:7
**Timothy** 11:12
**Tim's** 107:7
**tired** 98:1
**Today** 5:2, 4 7:11 14:10 15:21 16:15 70:10
**today's** 6:18 68:9 98:23
**told** 49:22 76:5, 10
**tone** 100:24
**tool** 64:13
**tools** 79:13 100:17
**top** 52:11 86:19 90:9 96:2, 13 97:17
**topic** 50:12 66:22 98:23
**topics** 88:22 90:22
**transcribed** 111:22 114:13
**TRANSCRIPT** 1:12 114:10 115:7
**transfer** 10:5
**transformation** 85:12
**transition** 24:23 26:6 29:9 30:1 44:9 46:25 47:7 50:1
**transportation** 12:15, 16
**trends** 87:8
**true** 80:2 83:25 114:10 115:10
**Truly** 84:16
**trust** 104:7
**truth** 114:8, 9
**try** 6:20 45:8 56:18
**trying** 39:17 45:8 49:3 51:23 58:18 73:8
**Turn** 50:22
**turning** 50:17 57:24 58:22 109:12
**Tuzun** 82:12
**two** 12:3 13:10 14:21 20:17 24:22, 23 25:22 32:13 43:1 45:16, 24 46:5, 20 49:11 50:7 51:11, 15 52:20 53:14 79:22 80:5 95:2, 21 99:21, 24 106:20
**two-hour** 15:20
**type** 15:1, 6
**typical** 27:13
**Typically** 22:13, 16, 20 23:2, 17 26:24 27:10 35:5 36:2 48:7 49:25 53:4 55:13 57:5, 19 58:6, 18 64:25

**< U >**
**U.S** 15:4
**Uh-huh** 8:7 12:5, 8 13:20 14:18 16:20, 24 21:9, 19 22:8 23:16 26:3 27:21 28:14 29:3, 10, 22 30:13, 19 32:4, 15 33:3 35:25 37:14, 17, 21 39:20 40:12 42:2 44:1, 18, 24 45:11 47:2 49:2, 8 51:4 54:1 59:7 60:20 61:6 63:15 64:12 65:2 66:20 71:20 73:5, 12 75:9, 22 97:10 107:3 110:4
**uh-huhs** 15:18
**ultimate** 41:16
**ultimately** 14:5 26:18 27:25 28:15 29:5, 23, 25 30:25 32:17 38:23 39:10, 25 40:2, 9, 16 41:4 59:10 77:5
**unable** 44:5
**underestimate** 100:11
**underlying** 35:19
**undermines** 103:23
**underneath** 27:13
**understand** 6:20 9:14 15:23, 25 16:7 28:3 40:6 57:7 61:1 84:18 99:14 105:24 108:12
**understanding** 31:6 34:3 44:12 55:5 56:19 72:9 90:18 115:13
**understood** 15:25 31:13 96:5
**unh-unhs** 15:18
**unique--he** 90:8
**UNITED** 1:1 5:7
**unknown** 43:15
**unproductive** 99:25
**Update** 74:3
**Updates** 54:6
**use** 60:17 61:10, 15 62:5 69:1 89:12 90:15
**utilized** 79:10, 13

**< V >**
**vague** 104:6
**valid** 106:4, 5 109:3

**validation** 62:3, 4 71:6 77:10, 15 87:16 92:20 95:12
**value** 31:2
**Values-Based** 85:3 93:19
**variety** 90:22
**verbalized** 15:17
**versus** 5:6 52:7 103:18
**viable** 46:20
**video** 106:16
**Videographer** 1:23 5:1, 25 8:12, 15, 17 67:22 68:8 78:2, 8 106:17, 20 111:19
**videotape** 5:2
**Videotaped** 1:14
**view** 41:1 46:1 90:18 94:14
**views** 87:21 96:5 101:7 106:2
**vision** 30:10 31:25 88:24
**Visionary** 83:13
**visiting** 99:22
**vividly** 25:3
**voice** 43:6
**vote** 76:22
**voted** 75:13 76:16, 20
**vs** 1:8 115:4
**vulnerable** 104:8

< W >
**Wait** 53:17
**Walnut** 1:20
**want** 8:10 25:8 28:25 38:3 50:11 55:17 63:22 67:6, 14, 22 73:15 79:3 81:7 82:13 83:1, 15 87:24 93:1 94:23 102:17 106:11 112:3
**wanted** 31:10 63:14, 19 73:4 95:17
**wants** 27:20 99:23 100:8
**waste** 55:18
**water** 102:20
**way** 8:23 15:15 25:2 27:7 34:20 54:22 67:16 84:5 85:24 88:21 89:18 101:16 105:2, 25
**weaknesses** 94:10 111:3, 8
**Wealth** 34:11
**weeks** 99:1
**Well** 12:22 15:10, 12 22:5, 24 25:7, 16 26:1, 8 30:8 31:21 40:9 46:17 47:8 49:7 51:18 58:18 62:6 64:19 72:12 78:15 81:23, 25 83:22 86:9, 12 96:12 104:14 107:21 112:6
**well-being** 93:20
**went** 32:24 39:25 40:15
**We're** 5:4 26:8 38:24 51:20 52:22 78:8 106:8, 9
**WESTERN** 1:3 5:8
**Weston** 82:6
**we've** 60:24
**whatsoever** 33:14 114:17
**WHEREOF** 114:21
**willing** 84:17
**Winning** 68:24
**witness** 5:18 6:1, 3, 24 9:2 98:2 114:21
**wonderful** 90:12
**wondering** 100:6
**word** 110:25
**words** 10:4
**work** 7:4 13:23 48:6 71:11 84:8 88:5 93:16 99:2, 15 108:21 111:4
**worked** 13:18
**working** 86:18 99:24
**workplace** 34:17, 25 36:17
**works** 27:24 84:17 102:12
**World** 12:4, 25
**writing** 30:3, 5 33:6
**written** 10:6 33:8
**wrong** 23:5 107:19 110:13

< Y >
**Yeah** 9:13, 24 11:5 21:1, 3 28:2, 3, 17 38:2, 4 44:16 45:19 47:7, 12 50:25 54:13 55:4 56:6 57:14, 23 58:11 62:14 67:6, 8, 17, 24 68:2 70:16 72:12, 16 75:2 76:12 82:24 83:17 95:19 97:9, 11, 13, 16 102:14, 18 106:15 111:23 112:1, 4, 7
**year** 12:21, 22 13:5, 8 17:12, 13 22:21, 25 25:5
**years** 12:23 13:10, 25 14:17 15:11 16:22 23:14 25:4, 17 26:5 32:24 38:23 39:3, 4, 17 45:10 51:21 59:2 77:1
**Yep** 56:10
**York** 12:12

< Z >
**Zaunbrecher** 82:12

# EXHIBIT 3

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 4

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 7

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 8

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

EXHIBIT
9

PENGAD 800-631-6989

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **PHILIP R. MCHUGH** | : | Case No. 1:21-cv-00238 |
| | : | |
| Plaintiff, | : | Judge Michael R. Barrett |
| | : | |
| v. | : | |
| | : | **NOTICE OF DEPOSITION OF** |
| **FIFTH THIRD BANCORP, ET AL.,** | : | **JORGE L. BENITEZ** |
| | : | **and** |
| Defendants. | : | **REQUEST FOR PRODUCTION OF** |
| | : | **DOCUMENTS** |

Please take notice that pursuant to Rule 30(b)(1) of the Federal Rules of Civil Procedure, Plaintiff Philip R. McHugh ("Plaintiff"), by and through counsel, will take the videotaped deposition of JORGE L. BENITEZ, a Director of Defendants Fifth Third Bancorp and Fifth Third Bank, N.A., on Tuesday, June 11, 2024, beginning at 2:30 p.m. at the Fifth Third Center, 511 Walnut Street, Cincinnati, OH 45202. Said deposition will be taken in the presence of a Notary Public or some officer authorized by law to take depositions. The deposition will be stenographically and video recorded and shall continue from day to day until completed, and may be continued in progress as necessary in order to accommodate other scheduled director depositions in the same time frame. For clarification to defense counsel, this deposition will be taken as if on cross examination.

Plaintiffs are taking said deposition according to the Federal Rules of Civil Procedure and said deposition shall be used for any purpose contemplated by the Federal Rules of Civil Procedure. Plaintiff reserves the right to conduct such further depositions and discovery from Jorge L. Benitez as may arise at a later date.

Pursuant to Fed. R. Civ. P. 30(b)(2), this notice is accompanied by a request to produce documents and tangible things under Rule 34.

Respectfully submitted,

*/s/ Joshua M. Smith*
Peter A. Saba (0055535)
Joshua M. Smith (0092360)
STAGNARO, SABA
& PATTERSON CO., L.P.A.
2623 Erie Avenue
Cincinnati, Ohio 45208
(513) 533-2701
(513) 533-2711 (fax)
pas@sspfirm.com
jms@sspfirm.com

*/s/ John J. McHugh*
John J. McHugh, III
McHUGH & McCARTHY, LTD
5580 Monroe Street
Sylvania, Ohio 43560
(419) 885-3597
(419) 885-3861 (fax)

**Co-Counsel for Plaintiff Philip R. McHugh**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **PHILIP R. MCHUGH,** | : | Case No. 1:21-cv-00238 |
| | : | |
| Plaintiff, | : | Judge Michael R. Barrett |
| | : | |
| v. | : | |
| | : | **PLAINTIFF'S REQUEST FOR** |
| **FIFTH THIRD BANCORP, *et al.*,** | : | **PRODUCTION OF DOCUMENTS** |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |

Pursuant to Fed. R. Civ. P. 34, Plaintiff Philip R. McHugh ("Plaintiff") hereby submits the following Request for Production of Documents Directed to Defendants Fifth Third Bancorp, Fifth Third Bank N.A. (jointly "Fifth Third"), and their Director Jorge L. Benitez. Plaintiff respectfully requests that Defendants provide responses to the offices of Stagnaro, Saba & Patterson Co., L.P.A., 2623 Erie Avenue, Cincinnati, Ohio 45208, **no later than thirty (30) days of the service of these Requests**.

Each of the following Requests for the Production of Documents shall be deemed continuing and Defendants and Director Jorge L. Benitez are requested, pursuant to Rules 26(a) and 26(e) of the Federal Rules of Civil Procedure, to provide, by way of supplementary answers thereto, such additional information as may hereafter be obtained by the Defendants or persons acting on their behalf.

## INSTRUCTIONS AND DEFINITIONS

1. These discovery requests must be answered in accordance with the requirements in and policies of Civ.R. 1, Civ.R. 11, Civ.R. 26 through 37, and any other applicable laws or rules. These requirements and policies include but are not limited to: effecting just results by eliminating delay, unnecessary expense, and all other impediments to the administration of justice; encouraging parties

to fully and thoroughly prepare and investigate their cases for trial and/or settlement; fairly responding to the substance of discovery requests without obfuscation or unjustified objection; fostering openness, honesty, and professionalism in litigation; and seeking truth. Consistent with this instruction, discovery requests should not be considered vague or unanswerable due to any grammatical, syntactical, typographical, capitalization, or semantic errors or idiosyncrasies, and all responses should fairly meet the substance of the discovery request.

2. In answering these Requests for the Production of Documents, Defendants and their Director are to divulge all information in their possession, custody, or control, or which are available to them, including information in the control of its attorneys, investigators, employees, agents or other representatives, or any other person or persons acting on its behalf.

3. Should Defendants deem as objectionable part, but not all, of any request to which an objection is made, it should consider the various parts and aspects of such request as being severable for that purpose. If any information is claimed as privileged or protected, please include a log identifying the nature of the claimed privilege or protection and the information or items claimed to be privileged.

4. Unless otherwise indicated, the scope of the requests for production of documents is the time period of January 1, 2015 to December 31, 2020.

5. Unless indicated to the contrary, "You" and "Your" shall refer to Jorge L. Benitez.

6. "Defendants" shall include Fifth Third Bancorp, Fifth Third Bank, N.A., Gregory Carmichael, and/or any person or entity acting on its or his behalf, including, but not limited to, officers, directors, attorneys, investigators, employees, agents, or other representatives.

7. "Director" shall include any individual who was a member of Defendants' Board of Directors during the scope of these requests.

8. "Officer" shall include any individual designated as an officer of Defendants during the scope of these requests, including, but not limited to, Defendant Gregory D. Carmichael, Robert Shaffer, or Timothy Spence.

9. "McHugh" or "Plaintiff" shall mean Plaintiff Philip R. McHugh.

10. "Document" or "documents" includes all written or graphic matter of every kind or description, however produced or reproduced, whether drafted or final, original or copy, signed or unsigned, and regardless of whether approved, sent, received, redrafted or executed, including but not limited to correspondence, letters, memorandum, summaries of conversations or telephone conversations, minutes or records of meetings, conferences or seminars, notebooks, diaries, desk calendar, contracts, agreements, preliminary and final reports, opinions or reports of consultants, projections, estimates, financial statements, bills, invoices, receipts, loan sheets, checks, checkbooks, purchase orders, change orders, confirmations, facsimiles, e-mails, text messages, telegrams, telexes, computer disks, digital or analog recordings, tape recordings, video recordings, photographs, drawings, charts, and plans. The term "document" means every document as above defined known to Defendant and in Defendant's possession, custody, or control or under the control of its agents, attorneys, employers, employees, or other persons related by total or partial common ownership and includes every such document which can be located or discovered by diligent effort.

11. "Document" also includes electronically stored information ("ESI"). Where possible, ESI should be produced in its native form, except that ESI which is only accessible through proprietary software that is not commonly available in office software suites should be produced in a readily accessible electronic form (such as PDF, Word or similar text document, or Excel or similar spreadsheet). By way of example only:

a. documents created using Microsoft Word must be produced as a .doc or .docx file;

b. documents created using Microsoft Excel must be produced as a .slx or. xlsx file;

c. documents created using Microsoft PowerPoint must be produced as .ppt or .pptx files; and

d. e-mails or outlook calendars must be produced as .msg or .pst files.

12. "Person" and "persons" include natural persons, corporations, companies, firms, proprietorships, partnerships, associations, joint ventures, government agency or organization, and any other type of legal entity, whether formal or informal.

13. The words "relate to", "relating to" or "related to" shall mean that which implicitly or explicitly refers to, concerns, reflects, embodies or in any manner describes the subject matter of the document request.

14. The words "Communications" or "Communicate" mean any correspondence, disclosure, transfer or exchange of information, whether oral or written, and whether in person, by telephone, mail, e-mail, telecopy, text message or other "Document" form, including but not limited to discussions, statements, negotiations, inquiries, requests, notices, responses, or demands.

## REQUEST FOR PRODUCTION OF DOCUMENTS

1. Communications (as defined above) between You and any other Director or Officer of Fifth Third which refers, mentions, or otherwise relates to:

a. Succession planning for the position of President and/or CEO of Fifth Third;

b. Identified and/or selected candidates for the position of President and/or CEO of Fifth Third;

c. Processes or timelines, whether proposed or final, with respect to the identification and/or selection of candidates for the position of President and/or CEO of Fifth Third.

d. Development of potential candidates for the position of President and/or CEO

of Fifth Third; and

e. Any facts upon which You or any other Director relied upon when identifying and/or selecting candidates for the position of President and/or CEO of Fifth Third.

f. Philip McHugh

g. Timothy Spence

**RESPONSE:**

2. Any Communications (as defined above) between You and Philip McHugh.

**RESPONSE:**

3. Any Communications (as defined above) between You and Timothy Spence.

**RESPONSE:**

4. All Documents created, received, or obtained by You which refer, mention, or otherwise relate to:

a. Succession planning for the position of President and/or CEO of Fifth Third;

b. Identified and/or selected candidates for the position of President and/or CEO of Fifth Third;

c. Processes or timelines, whether proposed or final, with respect to the

identification and/or selection of candidates for the position of President and/or CEO of Fifth Third;

d. Development of potential candidates for the position of President and/or CEO of Fifth Third; and

e. Any facts upon which You or any other Director relied upon when identifying and/or selecting candidates for the position of President and/or CEO of Fifth Third.

f. Philip McHugh

g. Timothy Spence

**RESPONSE:**

Respectfully submitted,

*/s/ Joshua M. Smith*
Peter A. Saba (0055535)
Joshua M. Smith (0092360)
STAGNARO, SABA
& PATTERSON CO., L.P.A.
2623 Erie Avenue
Cincinnati, Ohio 45208
(513) 533-2701
(513) 533-2711 (fax)
pas@sspfirm.com
jms@sspfirm.com

*/s/ John J. McHugh*
John J. McHugh, III
McHUGH & McCARTHY, LTD
5580 Monroe Street
Sylvania, Ohio 43560
(419) 885-3597
(419) 885-3861 (fax)

**Co-Counsel for Plaintiff Philip R. McHugh**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was served on all counsel of record this 29th day of February, 2024 via the Court's CM/ECF system.

/s/ Joshua M. Smith
Joshua M. Smith (0092360)

# EXHIBIT 10

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 11

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

Message

**To:** nkakins@aep.com; evanbayh1@gmail.com; Jorge@jorgebenitez.com; Katie.blackburn@bengals.nfl.net; embrumback@aol.com; jb5nupe@yahoo.com; bdaniels@prairie-capital.com; hal@energyinnovation.org; garyheminger@marathonpetroleum.com; jhoover5@carolina.rr.com; emallesch@gmail.com; mbm2045@gmail.com; Marshawilliams@outlook.com

**CC:** Carmichael, Greg [/O=FIFTH THIRD BANK/OU=Cincinnati/cn=Recipients/cn=Greg.Carmichael]; Wires, Lisa [/O=FIFTH THIRD BANK/OU=Cincinnati/cn=Recipients/cn=E513863]; Hennard, Paula [/O=FIFTH THIRD BANK/OU=Cincinnati/cn=Recipients/cn=Paula.Hennard]; lrharris@aep.com; christi.mayer@gmail.com; leichler@praire-capital.com; giselle@energyinnovation.org; aaberger@marathonpetroleum.com; p.denning@yahoo.com

**BCC:** Shaffer, Bob [/O=FIFTH THIRD BANK/OU=Cincinnati/cn=Recipients/cn=Bob.Shaffer]; Shaffer, Bob [/o=fifth third bank/ou=cincinnati/cn=recipients/cn=bob.shaffer]

**Subject:** Fifth Third Talent Management and Succession Planning Document for Board Meeting on December 17

**Attachments:** FIANLExecutive Talent Management_Update-2019_121019.pptx

Board Members:

Attached is the document Greg and I will utilize for the Human Capital and Executive Talent Management and Succession Plan Updates discussion on 12/17/19, starting at 7:00AM. This discussion will focus on our Human Capital strategies, talent management processes, key 2019 talent actions, discussions of our Enterprise Team members and our executive pipeline. I look forward to seeing you next week.

Bob

EXHIBIT
12
PENGAD 800-631-6989

# EXHIBIT 13

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

Message

**From:** Shaffer, Bob [/O=FIFTH THIRD BANK/OU=CINCINNATI/CN=RECIPIENTS/CN=BOB.SHAFFER]
**Sent:** 6/8/2020 9:16:28 PM
**To:** Carmichael, Greg [/o=Fifth Third Bank/ou=Cincinnati/cn=Recipients/cn=Greg.Carmichael]
**Subject:** Guy Conversation
**Attachments:** Winning Formula - CEO Profile FTB -2015.docx

**Key Highlights/next Steps:**

- Guy agrees that if Tim is "the" successor don't add Tayfun and Phil formerly. Although, he would recommend, at a minimum, we discuss with Marsha that she/the Board is ok with only having Tim assessed by Guy. He said he has seen a few Boards surprised in the past the CEO/CHRO did have at least one other internal candidate assessed.

- Schedule a 90 minute call for Greg, Guy and me to assess and modify the attached CEO Profile used in 2015. Guy would also use this time to get feedback from each of us on Tim. We will try to schedule for this week or next.

- Guy wants to interview four of Tim's other peers, not including me, and four of his direct reports. Guy wants us to pick the interviewees. My recommendations are below. Let me know what you think.

  Enterprise
  - Phil - Yes
  - Tayfun - Yes
  - Jude - Yes
  - Susan – Yes

  - Kevin - No
  - Kris - No
  - Jamie - No
  - Lars - No
  - Shellie – No

  Direct Reports
  - Chris Shroat - Yes
  - Melissa Stevens - Yes
  - Howard Hammond - Yes
  - Art Weston - Yes

  - Ben Hoffman - No
  - Ben Smith - No
  - Matt Jauchius - No
  - Peter Kidd - No
  - Mike Butera – No
  - Tim Harden - No

EXHIBIT 14
PENGAD 800-631-6989

- Bob to send Tim and Guy an introductory email so they can set up their three hour assessment discussion.

- Guy to send us a revised proposal. He feels confident that we can execute a similar timeline as the original proposal with a full/final Board report in September. This will likely require a call with the HCCC in August since we will not have a preliminary report for them in June.

Please let me know of any questions.

Bob