UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DISTRICT

WESTERN DIVISION

| | |
|---|---|
| PHILIP R. MCHUGH,<br>Plaintiff,<br>vs.<br>FIFTH THIRD BANCORP, et al.,<br>Defendants. | CASE NO. 1:21-cv-00238 |

| | |
|---|---|
| Videotaped Deposition of: | KATHERINE B. BLACKBURN |
| Taken: | By the Plaintiff<br>Pursuant to Notice |
| Date: | December 3, 2024 |
| Time: | Commencing at 10:11 a.m. |
| Place: | Fifth Third Center<br>511 Walnut Street<br>Cincinnati, Ohio 45202 |
| Before: | Wendy L. Raymer, RPR, CRR<br>Notary Public - State of Ohio<br>and<br>Connie Ihle-Adkins, Videographer<br>Notaries Public-State of Ohio |

APPEARANCES:

On behalf of the Plaintiff:

Peter A. Saba, Esq.
and
Joshua M. Smith, Esq.
and
Bailey E. Sharpe, Esq.
(Appearing via Zoom Videoconference)
of
Stagnaro, Saba & Patterson Co., L.P.A.
2623 Erie Avenue
Cincinnati, Ohio 45208
Phone: (513) 533-2701
Email: pas@sspfirm.com
jms@sspfirm.com

On behalf of the Defendants and the Deponent:

Michael L. Cioffi, Esq.
and
Collin D. Hart, Esq.
of
Blank Rome LLP
1700 PNC Center
201 East Fifth Street
Cincinnati, Ohio 45202
Phone: (513) 362-8700
Email: michael.cioffi@blankrome.com
collin.hart@blankrome.com

Also Present:

Philip R. McHugh, Plaintiff

Phenise Poole, Esq., In-House Counsel for Fifth Third Bancorp

Brian Thomas, Esq., In-House Counsel for Fifth Third Bancorp

\- - -

# I N D E X


| KATHERINE B. BLACKBURN | PAGE |
|---|---|
| Examination by Mr. Saba | 5 |
| Examination by Mr. Cioffi | 75 |

| EXHIBITS | MARKED | REFERENCED |
|---|---|---|
| Plaintiff's Exhibit 1 | 7 | 7 |
| Plaintiff's Exhibit 2 | 28 | 28 |
| Plaintiff's Exhibit 3 | 30 | 30 |
| Plaintiff's Exhibit 4 | 43 | 43 |
| Plaintiff's Exhibit 5 | 69 | 69 |


\- - -

Page 4

THE VIDEOGRAPHER: We are on videotape record. Today is Tuesday, December the 3rd, 2024. The time is 10:12 a.m. We are here today to take the deposition of Katherine Blackburn in the case of Philip R. McHugh versus Fifth Third Bancorp, et al., United States District Court, Southern District of Ohio, Western Division, Case Number 1:21-cv-00238.

Would the attorneys now introduce themselves and state who they represent?

MR. SABA: Peter Saba on behalf of Plaintiff Phil McHugh.

MR. SMITH: Joshua Smith on behalf of the Plaintiff Philip McHugh.

MR. CIOFFI: On behalf of the defendants, Michael Cioffi and Collin Hart of Blank Rome. We also represent Mrs. Blackburn personally, pursuant to a joint defense agreement. With us are co-counsel Brian Thomas and Phenise Poole, both in-house lawyers at Fifth Third.

THE VIDEOGRAPHER: Would the court reporter please swear in the witness?

KATHERINE B. BLACKBURN,

of lawful age, a witness herein, being first duly sworn as hereinafter certified, was examined and deposed as

Page 5

follows:

EXAMINATION

BY MR. SABA:

Q. Could you go ahead and state your name for the record and spell your last name, please?
**A. Katherine, I go by Katie, Blackburn, B-l-a-c-k-b-u-r-n.**
Q. And what is your date of birth?
**A. Date of birth is September 25, 1965.**
Q. And what is your current address?
**A. My home address is 5155 Stone Barn Road, Cincinnati, Ohio 45243.**
Q. Have you ever had your deposition taken before?
**A. I have not.**
Q. Okay. I'm going to be asking you a series of questions. If there's anything you don't hear or don't understand, please feel free to ask me to repeat or rephrase the question. Notwithstanding the fact that we're taking this via video, for the sake of the court reporter, I do need you to answer verbally, no shaking or nodding the head, or uh-uhs or uh-huhs. Additionally, if you can wait for me to finish my question before you answer, and I'll try and do the same before I ask another question. It also makes for a

Page 6

clearer record.

Do you understand those instructions?
**A. I do.**
Q. Are you currently employed?
**A. I am.**
Q. Where do you work?
**A. I work for the Cincinnati Bengals.**
Q. And what is your position?
**A. I am the executive vice president.**
Q. With -- what did you do to prepare for today's deposition?
**A. I had a meeting with my counsel here, one phone call and one meeting in person.**
Q. Anything else?
**A. That's it.**
Q. Did you speak to any current or former Fifth Third board members regarding your deposition today?
**A. I did not.**
Q. Have you discussed this case with any Fifth Third board members, either former or current?
**A. Other than mentioning -- the case being mentioned in board meetings, no.**
Q. Have you discussed Phil McHugh with any of the other board members, either current or former?
**A. I have not.**

Page 7

(Plaintiff's Exhibit 1 is marked for identification.)

BY MR. SABA:

Q. I've handed you what's been marked as Exhibit Number 1. Have you seen this document before?
**A. No.**
Q. You don't recall being served with this document back in -- sometime in February of this year? Has anybody provided you a copy of this?

MR. CIOFFI: For the record, let me state this objection. The witness, Katherine Blackburn, is not a party to this case and the notice is inappropriate. In addition, the request for production is inappropriate directed towards her. I will say for the record that this document was responded to by counsel on behalf of our client, Mrs. Blackburn.

BY MR. SABA:

Q. This document requested that you bring certain documents with you. You don't have any documents with you today; is that correct?
**A. I do not.**
Q. Okay. The request made in Exhibit Number 1 was with respect to various communications. And just to be clear, the words "communications" or "communicate"

are defined in the document, and on page 6 of 9 of the document, at subparagraph 14, and it says, "The words 'communications' or 'communicate' mean any correspondence, disclosure, transfer, or exchange of information, whether oral or written, whether in person, by telephone, mail, email, telecopy, text message, or other document form, including, but not limited to, discussions, statements, negotiations, inquiries, requests, notices, responses, or demands."

If I can direct your attention to page 7 of 9 and the second request, and that asked for you to produce "any communications (as defined above) between you and Philip McHugh."

Do you have any communications between you and Phil McHugh?

**A. I do not have any communications with Phil.**

Q. Paragraph 3 asks for "any communications (as defined above) between you and Timothy Spence."

Do you have any communications between you and Timothy Spence?

**A. I do not have any communications with Tim Spence.**

Q. And just to be clear, I'm not just asking whether or not you have them here today. Do you have any record of any communications or any communications



that you had in the past with him?

**A. Can you be -- I don't -- I mean, other than with regard to board matters, I would not have any. And in all honesty, I don't have any communications outside of the material that comes with regard to the board with Tim.**

Q. Okay. And just to be clear, based upon the exception you've given, outside of any conversations you may have had with Phil McHugh or Mr. Spence during a board meeting, would you have any other communications with him?

**A. I have not.**

Q. And have you had any?

**A. I have not had any.**

Q. More, I'm just asking to be clear, have you had any past other than those communications you had at board meetings?

**A. I mean, I'd have to go back here. With regard to this matter or with regard to --**

Q. Anything.

**A. Anything? I had very limited other conversations with Tim outside, but it would be, you know, we -- he's going on a Bengals trip with us. It may be regarding -- related to other matters, or pass him when he's out running occasionally but not -- you**



**know, I don't have any communications that I feel would be responsive to this.**

Q. Nothing that would be relevant to any of the issues in this litigation or dealing with CEO succession at Fifth Third Bank?

**A. I have nothing, no.**

Q. Okay. Outside of any board meetings, would you have any communications with any other board members regarding CEO succession at Fifth Third?

**A. I've had none.**

Q. Have you ever worked in banking?

**A. I have not, other than being on the board.**

Q. Is the Cincinnati Bengals franchise a customer of Fifth Third?

**A. They are.**

Q. How long have you been on the board at Fifth Third?

**A. I believe since approximately -- sometime in 2014.**

Q. Do you serve on any other boards?

**A. No public boards.**

Q. What is your understanding of the board's role with respect to executive succession at Fifth Third Bank?

**A. Can you say that one more time?**



Q. Sure. What is your understanding of the board's role with respect to executive succession at Fifth Third?

**A. I think one of the board's main roles is hiring the CEO and making sure that there is a plan in place, succession plan. It's certainly something that is one of the most important roles the board has.**

Q. Is there a formal mechanism at Fifth Third by which way employees could apply to be president and CEO of Fifth Third Bank?

MR. CIOFFI: Objection to the form of the question. What do you mean by "formal mechanism"? Definition.

BY MR. SABA:

Q. Is there any mechanism whatsoever by which an employee can apply to be president and CEO of Fifth Third Bank?

**A. So what happens if there is the need to determine who the next CEO will be, at that point in time the board would meet and determine a process at that time.**

Q. And does the -- is there an application process by which employees actually apply to be president and CEO?

**A. I think the board decides who the candidates**

Page 12

**would be that they would consider.**
Q. So are applications ever presented by employees to be president and CEO of Fifth Third Bank?
**A. I've never seen such a thing as a specific application as you're referencing that.**
Q. Does Fifth Third notify employees that there will be a position opening for president and CEO of Fifth Third Bank?
**A. Does Fifth Third Bank notify them?**
Q. Yes.
**A. As a board member, I'm not aware of any process like that that exists.**
Q. Prior to January 1, 2020, what was your relationship with Phil McHugh?
**A. Phil worked at Fifth Third and would appear at the board meetings presenting his line of business material and would usually or sometimes be present at some of the board dinners that took place as part of the board meetings.**
Q. And with respect to those board meetings that Phil attended, would you speak to him at each of those board meetings?
**A. Perhaps briefly, casually.**
Q. Do you have a specific recollection of speaking to him at each of the meetings that he

Page 13

attended?
**A. I don't know that I had any conversation at each meeting with him, but he would present, so I would hear him present. I may or may not have talked to him directly.**
Q. Other than board meetings, did you ever observe Phil McHugh in the workplace at Fifth Third?
**A. No.**
Q. Did you ever meet with or interview any of Phil McHugh's direct reports or subordinates?
**A. Unless they were at the board meetings, no, I did not interview them.**
Q. Did you participate in or perform any of Phil McHugh's annual reviews or midyear reviews?
**A. I did not perform those reviews.**
Q. Did you review any of the documentation from Phil McHugh's annual reviews or midyear reviews?
**A. I mean, the only thing the board would at each year review, do a management -- a talent assessment each year and at that meeting, there would be a summary of the top executives or the, you know, certain group of executives that would be reviewed, and there would be some -- there would be some material that you might consider for review in that material.**
Q. The talent assessment that you reference, what

Page 14

time of year would that take place?
**A. In December.**
Q. And the document you're referencing, is that called the talent deck?
**A. I don't recall the specific name.**
Q. Okay. You don't recall any name referring to it necessarily?
**A. No.**
Q. Can you describe this document to me that you're referencing that would be used to assess talent during a December meeting?
**A. It was just the presentation made to the board. It was in the board material.**
Q. Who would make the presentation to the board?
**A. We would meet and it would usually be the HR person as well as the CEO, so it was Greg and some of the prior, you know, Bob. These days it's Tim and Nancy.**
Q. In December of 2019, who would it have been?
**A. It would have been Greg and Bob Shaffer, I believe.**
Q. And Greg is Greg Carmichael, correct?
**A. Greg Carmichael, sorry.**
Q. Did you ever review Phil McHugh's employee engagement reviews or surveys?

Page 15

**A. I did not.**
Q. Did you ever review Phil McHugh's customer experience surveys?
**A. I did not.**
Q. Did you ever review Phil McHugh's financial performance relative to goals for his divisions?
**A. Not that I recall, no.**
Q. Did you ever review or see income statements and balance sheets specifically broken out for the divisions managed by Phil McHugh?
**A. Not on a specific basis, no.**
Q. During the period from January 1 of 2015 through October 2020, do you recall how frequently Phil McHugh would attend board meetings?
**A. I believe he was at -- I think he was at pretty much every board meeting, as I recall.**
Q. If I use the term "enterprise committee," do you know what that means?
**A. I -- the top leadership at Fifth Third would be what I would interpret that as.**
Q. Who determined which members of the enterprise committee would attend board meetings?
**A. The CEO.**
Q. Who determined which members of the enterprise committee would make presentations at a board meeting?

Page 16

**A. Presumably the CEO or someone else on the enterprise committee at Fifth Third. I was not part of that process, so --**
Q. Did you ever discuss with any members of the board the topic of Phil McHugh succeeding Greg Carmichael as president and/or CEO of Fifth Third?
MR. CIOFFI: Objection to the form of the question. You mean during a board meeting? Outside of a board meeting? Time frame?
BY MR. SABA:
Q. Any time.
**A. I did not.**
Q. Prior to January 1, 2020, what was the nature of your relationship with Tim Spence?
**A. Tim would appear at board meetings and make presentations to the board and that would be it.**
Q. Other than board meetings, did you ever observe Tim Spence in the workplace at Fifth Third?
**A. I did not.**
Q. Did you ever meet with or interview any of Tim Spence's direct reports or subordinates?
**A. I did not.**
Q. Prior to January 1, 2020, did you ever participate in any of Tim Spence's annual or midyear reviews?

Page 17

**A. Did not. That would have been the job -- that was not the job of the board.**
Q. Did you ever see the materials from Tim Spence's annual reviews or midyear reviews?
**A. I did not.**
Q. Did you ever review Tim Spence's employee engagement surveys?
**A. Those were -- occasionally there would be maybe some reference to those, maybe the December, but I wouldn't recall specifically. But occasionally some of that information would be shared at the December meetings. I couldn't recall any specifics, but I do feel that from time to time those things would have perhaps been covered when they did the December assessment.**
Q. Do you recall if they were broken out by individual?
**A. They would have been -- it would have come up when an individual was being discussed if it was brought up.**
Q. Employee engagement surveys would have been?
**A. I mean, I can't remember specifically if they were. But if they were discussed, that would have been the time that they would have been referenced.**
Q. Do you recall any specific discussion of what

Page 18

Tim Spence's employee engagement survey results were?
**A. I do not.**
Q. Do you recall any specific discussion of what Phil McHugh's employee engagement survey results were?
**A. I don't remember.**
Q. Did you ever review Tim Spence's customer experience surveys?
**A. Did not.**
Q. Did you ever review Tim Spence's financial performance relative to goals for his divisions?
**A. Again, I think those were more the role of the CEO than the board to make all of those reviews, aside from the December assessments where some of it may have been touched upon, and it was more of a -- a December -- the December assessment meetings would be more of a here's how this person has been doing, here's what we think they aspire to, here's where they can, you know, where we think their ability might take them, but I think all those other reviews were more something that management used.**
Q. With respect to Phil McHugh and as of December 2019, what was discussed with respect to how he was doing?
**A. I think Phil was a good -- was good at filling his job. He -- he had a number of roles, as I recall.**

Page 19

**I couldn't specifically name them, to be fair, but he -- he had -- he was a good operator at the bank and had performed his job well for the bank.**
Q. What was discussed in December 2019 with respect to what Phil McHugh aspired to?
**A. Well, I don't know that we said -- asked what they aspired to. We would -- it was more of a -- what the opinion of the CEO might be. And, again, this is them sharing their thoughts with the board of what the potential of different people at the bank could be.**
Q. You said "them sharing their thoughts." Who are them?
**A. The CEO and the HR and the -- director of HR.**
Q. Which I think you indicated in December --
**A. In --**
Q. -- 2019 would have been Greg Carmichael, Bob Shaffer. I'm sorry. I didn't mean to cut you off.
**A. Okay.**
Q. As of December 2019, what was -- what was discussed with respect to Phil McHugh in terms of where his ability might take him?
**A. I don't recall anything specific at that time being discussed.**
Q. As of December 2019, what was discussed with respect to Tim Spence in terms of how he was doing?

Page 20

**A. I do believe at that time it was -- and, again, the -- what was presented at the December assessment, which was an annual process, I know that the -- Greg thought extremely highly of Tim Spence, and I know that they did, their opinion, Greg and Bob's, was that he was well qualified to be a potential, you know, a future CEO of the company.**

Q. Did Greg indicate that anybody else was qualified to be a future CEO of the company?

**A. I don't recall. I just -- I know that Tim stood out, but I don't recall there being discussions, to be fair, about others.**

Q. To be specific, were there any discussions about Phil McHugh being qualified to serve as CEO of Fifth Third Bank?

**A. I don't believe there were any.**

Q. Did Greg Carmichael ever make a recommendation or indicate that Phil McHugh was qualified to be CEO at Fifth Third Bank?

**A. I mean, again, Greg's opinion -- I guess I want to make sure. The December meeting, the December presentation was their opinion. When it comes to selecting a CEO, that's a process that the board undertakes separately.**

**So Greg's opinion on that, I do not recall him**

Page 21

**ever saying that Phil would be a potential CEO.**

Q. You indicated that that CEO selection process is a process that the board undertakes separately. Explain to me what that process is?

**A. So if you get to the point in time where you -- where the board is going to have to decide who the, you know, who the CEO will be -- and there can be a number of ways where that can come about -- each case might be different. Someone can retire, someone could have health issues, someone can leave and go somewhere else. There are obviously many, many different circumstances where the process would come about.**

**But at the point in time that it comes up, the board would meet and come up with a process. I think there is a process, but they go through there's -- they obviously need to decide, and we've hired -- or we -- I know an outside consultant has been used sometimes in the past. And it depends if you're looking for external candidates versus if you have a good internal candidate.**

**So each -- each time that happens, I think it would be slightly dependent on the circumstances at that time as to perhaps how the process would play out.**

Q. Do you recall the specific process that was used after the December 2019 meeting?

**A. For?**

Page 22

Q. For selecting a CEO for Fifth Third Bank and president?

MR. CIOFFI: Objection to the form of the question. There's no evidence in the record that the CEO selection was considered in the December 2019 meeting.

BY MR. SABA:

Q. Was CEO succession ever discussed in the December 2019 meeting?

MR. CIOFFI: Objection to the form. It wasn't your prior question, but go ahead, you may answer if you can.

THE WITNESS: Well, so ask -- well, so Greg -- Greg informed the board -- and I don't know the exact time exactly. I do not believe at the December 19th meeting that it was 100 percent clear. Greg had talked about wanting to move on to do something else, and it was he had talked about it over some period of time. He was wanting to only do it at a time that he felt the next successor could be put in place in a way that would be productive and successful for Fifth Third Bank.

So he was very flexible in terms of his timing. And so I can't clarify the date, but I know as we went into 2020, at some point in time he

Page 23

eventually decided that he was going to move on. And so it was time for the board to consider who the next CEO -- president and CEO would be.

BY MR. SABA:

Q. And you don't recall the date when that occurred?

MR. CIOFFI: Objection. She answered it, sometime in early 2020. She did recall it. Are you asking for a specific date, calendar date?

BY MR. SABA:

Q. What month do you recall that occurring in?

**A. He would have referenced it at the board meeting. So it may have been one of the board meetings in 20 -- I mean, he would talk about it at the board meeting. So it would have been at some of the board meetings.**

Q. Once Mr. Carmichael informed you that he wanted to go on and do something else sometime in early 2020, what process did the board engage in to select a successor to Greg Carmichael?

**A. The board, there is obvious -- there is the HCC committee. There are some, you know, different committees on the board. Some of them play somewhat of a role, too, but the process was discussed with the board, and the board, because of their impressions of**

Page 24

**Tim, thought that Tim would be a good candidate to consider. And I believe the process or the thought was to have a consultant do an assessment of Tim because the board had been highly, highly impressed with his work at the board, and he -- Tim is -- Tim presents in a very impressive manner. He is very well-spoken.**

**He can recite facts and corporate -- he can -- he can tell the story of what's happening financially at the business in a way that was very impressive. He -- obviously his strength was his strategic thought. That was where he came from. His background was a consultant.**

**I think he began working at Fifth Third in a strategy component, and his presentations and the way he had focused on the Fintech, the mergers, his understanding of the regulatory environment and how to handle that, he just had very much impressed the board. So in this particular instance, the board thought the best approach was to follow up with another assessment.**

**I think we had a company do an assessment of his fit and, you know, his skill set. And as I believe that came back very favorable and so the board in this particular instance decided that Tim should be the next CEO, president.**

**I think he was elected president first and**

Page 25

**then CE -- he did fill that role for a couple of years and then was named CEO a couple of years later.**

Q. Who was the outside consultant that Fifth Third used to assess Tim Spence?

**A. I believe it was RHR.**

Q. Had Fifth Third used RHR in the past to assess candidates for president and CEO?

**A. I think so, but I'm not 100 percent sure.**

Q. Had Fifth Third used other consultants in the past to assess candidates for president and CEO?

MR. CIOFFI: Objection to the form. Time frame?

MR. SABA: Right. Any time in the past that she would be aware of.

THE WITNESS: I don't recall.

BY MR. SABA:

Q. Do you recall Fifth Third using a consulting firm called DDI to assess candidates?

**A. I don't recall.**

Q. You were on the board in 2015 when Greg Carmichael was selected to succeed Mr. Kabat; is that right?

**A. I was.**

Q. But you don't recall if RHR was used at that time?

Page 26

**A. I don't remember.**

Q. During the December 2019 meeting, was there a discussion about Phil McHugh serving as an emergency successor for president and CEO?

MR. CIOFFI: Objection to the form. What was the time frame again, Counsel?

BY MR. SABA:

Q. The December 2019 meeting, was there a discussion by the board about Phil McHugh serving as an emergency successor to -- for president and CEO?

**A. I don't recall.**

Q. Do you recall any discussions by the board about Phil McHugh serving as an emergency successor for president and CEO of Fifth Third Bank?

MR. CIOFFI: Again, by way of objection, you mean at any time?

MR. SABA: Any time.

MR. CIOFFI: She's aware of, even if she wasn't on the board? I'm just trying to -- you're --

MR. SABA: My question stands. It's not --

MR. CIOFFI: The question's improper. You need to give a time frame.

THE WITNESS: I don't -- without -- the emergency successors were discussed. I don't

Page 27

remember -- I wouldn't be able to tell you like I have a specific recollection of those exact conversations in any way as to who was discussed or what was discussed along those lines.

BY MR. SABA:

Q. In early 2020 -- strike that.

Were you aware that in early 2020, Fifth Third had originally contracted with RHR to assess Tim Spence, Mr. McHugh, and Tayfun Tuzun with respect to serving as president and CEO of Fifth Third Bank?

MR. CIOFFI: Objection to the form of the question. Misstates the record and assumes facts not in evidence about contracting for those evaluations. But if you -- if you have knowledge, you may answer.

THE WITNESS: So can you say that one more time?

MR. SABA: Certainly.

BY MR. SABA:

Q. Are you aware that in early 2020, Fifth Third contracted with RHR to have Phil McHugh and Tayfun Tuzun assessed, along with Mr. Spence, for the role of president and CEO of Fifth Third Bank?

MR. CIOFFI: Same objection.

THE WITNESS: My only recollection is deciding

Page 28

to do it for Tim. That's all I recall, but --
BY MR. SABA:
Q. And when was that decision made?
**A. I believe it was sometime in 2020. I don't -- couldn't tell you the exact month.**
(Plaintiff's Exhibit 2 is marked for identification.)
BY MR. SABA:
Q. I've handed you what has been marked as Exhibit Number 2. Can you identify that for me, please?
**A. It says it is the Fifth Third Bancorp's minutes of meeting of the board of directors from December 17, 2019.**
Q. Have you seen this document before?
**A. I would have seen it back -- sometime back in this time frame.**
Q. The board would have approved of these minutes; is that correct?
**A. Correct.**
Q. And you would have received a copy to review and approve of them; is that right?
**A. Yes.**
Q. Okay. And by way of reference, you'll see in the bottom of the center of each page it says "Fifth Third-McHugh Minutes," and then there's a Bates

Page 29

stamp number 000253, and Exhibit 2 should run from 000253 through 000265; is that correct?
**A. Yes.**
Q. If I can refer you to the second page of Exhibit Number 2, in the paragraph that appears just below the middle of the page --
**A. The one that starts with "thereafter"?**
Q. That's correct. And that reads, "Thereafter, Mr. Carmichael and Mr. Shaffer initiated a review of potential succession timelines and candidates for the chief executive officer ('CEO') position. They reviewed top succession candidates, including Mr. Spence, and discussed the potential timelines for their readiness and key development priorities for each such candidate."
Do you see that?
**A. I do.**
Q. Okay. With respect to the candidates that Mr. Carmichael and Mr. Shaffer discussed, who were the candidates?
**A. Well, it says we discussed Mr. Spence.**
Q. Who else?
**A. I would have to have more material to remember. I just -- I mean, this would be -- this says that Mr. Carmichael and Mr. Shaffer reviewed potential**

Page 30

**succession timelines and candidates for CEO, which is a part of the process that they go through every December, and who else was discussed at that particular meeting or if anyone else was discussed, I would have to have those materials from the board meeting or something to see.**
Q. What materials would you need from the board meeting?
**A. If there was a presentation that they went over.**
(Plaintiff's Exhibit 3 is marked for identification.)
BY MR. SABA:
Q. I've handed you what's been marked as Exhibit Number 3, which is Bates stamped Fifth Third-McHugh 001105 through Fifth Third-McHugh 001154; is that correct?
**A. Yes.**
Q. Can you identify Exhibit 3 for me, please?
**A. It says, "Board of Directors, Human Capital and Executive Talent Management and Succession Plan Updates."**
Q. Have you seen this document before?
**A. Presumably this is the presentation that was shared with the board in December of 2019 to review talent management.**

Page 31

Q. As you sit here today, do you recall Exhibit 3 being used for that purpose at that December 2019 meeting?
**A. That was a long time ago. So specifics, I -- this would be a presentation. Do I recall it specifically? In fairness, that was five years ago. No.**
Q. Let me represent to you that this has been identified as the talent deck that was presented at that meeting by the other deponents in this case and by Fifth Third as a party.
With respect to this document, are you able to identify, looking through it, who the other candidates were that were presented by Mr. Carmichael and Mr. Shaffer at the December 2019 meeting?
MR. CIOFFI: Counsel, the deposition is not a memory test. If you have a page you want to direct her attention to, please do so. Otherwise, she said she doesn't recall. Do you want her to look through every page right now in this deposition?
MR. SABA: She testified that she'd have to see the materials from that December 2019 meeting to identify who the candidates were that were presented, so I'm providing her with those materials. I don't want her to restrict her review

of any of the pages in the materials. If there's any -- if she wants to look through the materials and identify what they are, we can refer you to the separate talent pages if you want to look at those that are in this document, and specifically those begin at --

MR. CIOFFI: That wasn't your question. Could you repeat his question?

MR. SABA: No, I can repeat my question.

MR. CIOFFI: Well --

BY MR. SABA:

Q. My specific question to you was -- you said you needed to see the materials to determine who the candidates that were discussed at that meeting. So I'm asking you, look at these materials from the December 2019 meeting, and identify for us who were the candidates that were presented by Mr. Carmichael and Mr. Shaffer during the December 2019 meeting?

MR. CIOFFI: First of all, objection. That wasn't her testimony. She said she couldn't recall if there were any candidates other than Tim Spence. She said she would have to look at materials. This document you handed to her is about 40 pages long and it contains a lot of other material. If you want her to look through it all right now and tell



you what page is pertinent to refreshing her recollection, then she'll do that. If you want to direct her to a page, you can do that.

But she's already answered the question. She doesn't recall other than Mr. Spence. If you want to direct her to a page, please do so.

MR. SABA: She indicated she would need to see this document.

MR. CIOFFI: Okay, then. Give her time to look through it.

MR. SABA: That's fine. That's fine.

MR. CIOFFI: Go ahead.

BY MR. SABA:

Q. So if you want to -- I can refer you to beginning at 001125 or -- and beginning at 001141, if you want to look through those documents?

**A. What was your second page, 1141?**

Q. 001141.

MR. CIOFFI: Counsel, you know from about two or three years of this litigation, there's only one page that talks about CEO succession, and that's 1142.

MR. SABA: Well, that's your testimony. That's your interpretation.

MR. CIOFFI: You're playing games. Why don't



you direct her to that page?

MR. SABA: We're not playing games. This is the talent deck that was identified. These are the individuals in that talent deck. We didn't prepare this. Your client did.

MR. CIOFFI: Yeah. There's one page that deals with the CEO succession. Direct her to that.

MR. SABA: Based on your testimony.

THE WITNESS: It looks like, having gotten to page 1141, that page 1142 has what Greg and Bob would have presented as their thoughts on CEO succession.

BY MR. SABA:

Q. And does that help you identify who the candidates were that they identified for that?

**A. Well, when you say "identified for" --**

Q. Excuse me. I asked you earlier about who the candidates were that Mr. Shaffer and Mr. Carmichael discussed at the December 2019 meeting, and you indicated you would have to see the materials from that meeting to determine who the other candidates were that they would have discussed other than Mr. Spence?

**A. So to be clear, these are their thoughts on if something happens where they see the future going. Every December, it's good governance with the**



**regulators, I think it's almost required and is required that you discuss each year a future succession plan, and so they offer their thoughts as to what they think would be options for the board to consider if that happened. And so on this page, they put down Tim and Brian as their thoughts on future CEOs.**

Q. Do you recall Mr. Shaffer and Mr. Carmichael also discussing Brian Lamb at that December 2019 meeting?

MR. CIOFFI: Objection. Asked and answered. She said she didn't remember, but if you have a different answer, you can give it. Please give it.

THE WITNESS: See, on here I'm sure they discussed his future. I mean, as I look at this and they say, you know, Tim would be ready in three years, Brian would be a little further off. I think -- obviously, I do remember them thinking highly of Brian, as I look at this now, but I don't recall any more specifics than that.

BY MR. SABA:

Q. Do you know why they felt highly of Brian Lamb at that point in time?

**A. He had obviously performed well and they thought he had leadership abilities and thought he had a bright future. That's all I recall at the time, at this**

Page 36

**time.**
Q. In the box below Brian Lamb, do you see where it says emergency successor?
**A. Yes.**
Q. And you see it identifies Mr. Tuzun, Phil McHugh, and a board member; is that correct?
**A. Yep.**
Q. Having now seen these materials, does that refresh your recollection of any discussion regarding the emergency successor during that December 2019 meeting?
**A. Well, I mean, I think we've always -- like I said, there's two discussions that happen. One is who a future CEO is likely to be and who they think would be appropriate for that role.**
**And emergency successor is a different discussion that really centers around if something unexpected happens or there's more of a sudden change, and that would be someone who filled in temporarily, you know, to keep the business operating and going while the board considered who a future CEO would be.**
Q. Was there any discussion that Phil McHugh would not be an appropriate emergency successor to Greg Carmichael?
**A. I don't recall any specific discussions. I**

Page 37

**can just -- I just know that the discussion about emergency successor -- I don't really remember any discussion of any specifics on that.**
Q. The document that's marked as Exhibit Number 3, do you recall when you would have received that for a board meeting?
**A. We usually get it about a week before the board meeting. I mean, that's based on historical practice. I obviously don't remember exactly the date we got it.**
Q. Do you recall any other documents you would have received for that December 2019 board meeting?
MR. CIOFFI: Objection to the form. You mean related to succession planning or otherwise?
BY MR. SABA:
Q. Any other documents you would have received for that meeting?
**A. All the board meeting materials are sent to us. I do believe these might be broken out separately from some of the other material, but all of the materials are generally sent to us about a week before the meeting.**
Q. If I can refer you back to Exhibit Number 2, which are the minutes, in the second page of that document again, and referring back to that same

Page 38

paragraph that we were previously discussing, the third sentence reads, "In response to director questions Mr. Carmichael and Mr. Shaffer commented upon the potential external candidates that could be considered for such a role, including a discussion of the known capabilities of such candidates and the potential challenges created by an appointment of an external candidate for the role."
Do you see that sentence?
**A. I do.**
Q. Do you know who the potential external candidates were that Mr. Carmichael and Mr. Shaffer discussed during that December 2019 meeting?
**A. I don't recall any specific names, but, again, every year when this discussion comes up, or when this review is done, they will reference other bankers that they are aware of and talk about them a little bit and give their opinion of whether they might be someone to consider if there was an opening and the board had to -- had to find a successor CEO.**
Q. But as you sit here today, you don't recall the specific names of any external candidates; is that correct?
**A. I don't recall any specific names.**
Q. You previously indicated that the board had

Page 39

decided sometime in 2020 that the only person that would be assessed by RHR to succeed Greg Carmichael as president of and potential CEO of Fifth Third Bank was Tim Spence, correct?
**A. I recall -- I recall the board approving or agreeing to have RHR assess Tim, correct, and I think that that's the only one I recall the board deciding to assess.**
Q. That was the only candidate they were considering at that point in time; is that correct?
**A. That's my recollection, yes.**
Q. No other candidates were being considered for succeeding Greg Carmichael; is that correct?
**A. The board thought Tim was a great candidate, highly qualified, and felt that he had exhibited many characteristics and qualities that we thought we would put -- make him the best candidate to look at, and so we had -- I believe we agreed to the assessment.**
Q. Why did the board have Tim Spence assessed by RHR?
MR. CIOFFI: Objection. She just answered the question as to why. The board says he's the best candidate.
MR. SABA: I'll rephrase my question.

Page 40

BY MR. SABA:
Q. What was the purpose of having Tim Spence assessed by RHR?
**A. RHR was going to do an assessment of Tim's skills as a potential president, potential CEO. That's the business that they're in and they -- we -- they do a -- an assessment that comes back and gives you a third-party's opinion of his potential and certain, you know, certain -- their opinion of certain qualities or skills that he has.**
Q. Why did the board feel it was necessary to have a third-party give the board an opinion regarding Tim Spence's potential qualities and skills?
**A. Well, it's always good practice for the board to get an outside assessment or a third-party assessment when they're looking at a potential future leader of the company.**
Q. Why is that?
**A. I view it as good practice to be responsible and make sure there's not something out there that maybe we're missing, or I just view it as sound corporate practice.**
Q. As you sit here today, do you know if there's a requirement that a candidate needs to be vetted by an independent third-party?

Page 41

MR. CIOFFI: Objection. She answered the question as to why the board decided. When you say "requirement," you mean requirement by the board? By a member of the board? Or the government? I mean, what do you mean requirement?
MR. SABA: I'm asking for her knowledge.
MR. CIOFFI: Objection to the form. If you can answer it, you may answer.
THE WITNESS: Can you ask that one more time?
MR. SABA: Sure.
BY MR. SABA:
Q. Do you have an understanding as to whether or not there's a requirement that an individual who's going to serve as president and CEO needs to be vetted by an independent third-party?
MR. CIOFFI: Same objection.
THE WITNESS: I mean, when you say "requirement," by who would be my question. But I feel that the board has decided to do the assessment to get an outside party's opinion as to -- on the candidate, a candidate, or a person that you might -- you could be assessing a person for some other role, I suppose, too.
BY MR. SABA:
Q. My question is as you sit here, do you have

Page 42

any understanding whether or not that's a requirement, whether or not it's sound practice or otherwise for a board, to have the future president and CEO vetted by a third-party?
MR. CIOFFI: Objection to the form of the question. The word requirement has no definition. The board required it in this particular case. Do you mean other than that, some requirement other than the board's insistence?
BY MR. SABA:
Q. Are you adopting Mr. Carmichael's answer to the question?
MR. CIOFFI: Cioffi.
MR. SABA: Cioffi, sorry. Mr. Cioffi's answer to the question?
THE WITNESS: If you'll ask the question again, I will consider. Go ahead, ask again.
MR. SABA: Sure.
BY MR. SABA:
Q. My question is: Do you have an understanding whether or not there is a requirement, whether it's good, sound practice required by a board for due diligence or otherwise, to have an independent third-party vet an individual to be a future president and CEO of the bank?

Page 43

MR. CIOFFI: Objection to the form of the question. The term requirement is vague. She's answered it as to what the board required. But if you have another additional answer, you can answer.
THE WITNESS: I don't know that I have another answer at the moment.
BY MR. SABA:
Q. And I'm just asking to the extent of your knowledge. You know -- you either know or you wouldn't know.
**A. All I know is that the board decided to do this assessment. I don't -- the word "required" may or may not have been used at the time, but I just know that the board felt it was appropriate and responsible to have this assessment done.**
(Plaintiff's Exhibit 4 is marked for identification.)
BY MR. SABA:
Q. I've handed you what's been marked as Exhibit Number 4, which is Bates stamp Fifth Third-McHugh 001074 through Fifth Third-McHugh 001079. Are you able to identify that document for me, please?
**A. This says it is "The Winning Formula Fifth Third Bank President and Chief Executive Officer." It has RHR in the upper right-hand corner. And it will**

Page 44

**take me another second to identify this further.**
Q. Sure.
**A. I'm not sure that I would use the right term if I tried to describe it, but it seems to be a document RHR used in doing the assessment.**
Q. Have you ever seen this document before?
**A. If I have, I don't recall.**
Q. Do you know who was involved in creating this winning formula document?
**A. I don't know. I don't recall.**
Q. Do you know how this document was used by Fifth Third?
MR. CIOFFI: Objection to the form of the question. There is no evidence that Fifth Third used it. It's an RHR document. But you can answer.
THE WITNESS: Do I have an idea how this document was used by Fifth Third or by a person at Fifth Third or --
(Ms. Poole leaves the deposition room.)
BY MR. SABA:
Q. By anyone at Fifth Third.
**A. I believe it's the document they worked on with RHR in order to have RHR do the assessment.**
Q. Who's "they" that worked on it with RHR?

Page 45

**A. I don't recall. I don't know if I know. I don't know if I did know. I don't remember.**
Q. Do you know how RHR used Exhibit Number 4?
**A. I believe they would have used this document to do their assessment.**
Q. Of Tim Spence; is that correct?
**A. Of -- or anyone else that we might have asked them to assess. But of Tim, yeah.**
Q. Okay.
**A. I don't know if this is the one. It says July of 2020. I don't know for a fact that this is the exact one they used, but it would be a document that Fifth Third would have used with RHR to do an assessment of whoever we asked them to assess.**
Q. As you sit here today, do you have any idea what the results would have been if RHR did an assessment of Phil McHugh?
MR. CIOFFI: Objection to the form of the question. Hypothetical. It's impossible for her to answer a hypothetical question.
THE WITNESS: It is very hypothetical. I would have no idea.
BY MR. SABA:
Q. Okay. When was the decision made by the board that Phil McHugh was not a viable candidate for

Page 46

president and/or CEO of Fifth Third?
MR. CIOFFI: Objection to the form of the question. Again, assumes facts not in evidence that that issue of his qualification was ever presented to the board, but you may answer.
THE WITNESS: Ask your question one more time.
MR. SABA: Sure.
BY MR. SABA:
Q. When was the decision made by the board that Phil McHugh was not a viable candidate for president and/or CEO of Fifth Third?
**A. As I recall, the board believed that Tim Spence was the best candidate and that was the person that the board chose to focus on. I don't recall Phil ever coming up in the conversation.**
Q. Was there ever a specific determination made by the board that Phil McHugh was not a viable candidate to be the next president and CEO of Fifth Third Bank?
MR. CIOFFI: Objection to the form of the question. Asked and answered. She just answered it. It never came up.
THE WITNESS: It didn't come up, so it was not --
BY MR. SABA:
Q. So no specific decision was made regarding

Page 47

Phil McHugh one way or the other; is that correct?
MR. CIOFFI: Objection, counsel. That's your characterization. She's answered the question.
THE WITNESS: The board did not believe -- the board was focused on Tim, because Tim was the best candidate. I don't believe -- if we thought there were other candidates who could have competed and been equally as good as Tim, we would have probably assessed and looked at more than one person, but we thought Tim was the only -- Tim was the one guy that we wanted to pursue and thought he was the one who was best to fill the role, and others did not meet -- or others did not -- I think the board did not feel that any of the others that were on the executive team at that time were certainly comparable to Tim.
And you would have to break it down further to go beyond that. But Phil was not discussed. I don't believe that the board thought he was qualified to be the CEO, and so he was not considered.
(Ms. Poole enters the deposition room.)
MR. CIOFFI: Counsel, we've been going for a little more than an hour. Do you think you can finish in the next ten minutes? I don't want to

break if you can.
MR. SABA: We can go off the record for five minutes and start again.
MR. CIOFFI: How much longer do you think you have?
THE VIDEOGRAPHER: We are off the record at 11:17.
(A recess was taken from 11:17 a.m. to 11:26 a.m.)
THE VIDEOGRAPHER: We are back on the record. This is media 2 of today's deposition. The time is 11:27.
BY MR. SABA:
Q. Mrs. Blackburn, if I could direct your attention to Exhibit Number 4 and the page that is Bates stamped Fifth Third-McHugh 001076.
**A. Okay.**
Q. And under the first heading of "Business Management," do you see that, in the highlighted line?
**A. I do.**
Q. Below that it reads, "The main idea reflected under this dimension is that the CEO needs to be able to drive innovative thinking on the strategic side while simultaneously maintaining a close eye on rigorous execution."



Do you have any objective information or data indicating that as of September 22, 2020, Tim Spence was superior to or better than Phil McHugh with respect to driving innovative thinking on the strategic side while simultaneously maintaining a close eye on rigorous execution?
MR. CIOFFI: Objection to the form of the question. She's already asked and answered the fact that the board considered Phil McHugh not to be qualified, period. So there was no -- there was no comparison. She already testified that they were never -- Phil McHugh was never discussed because he wasn't qualified. You're trying to change her answer to that.
MR. SABA: I'm not trying to change her answer to anything. You're trying to give a speaking objection to create an answer. Let me repeat --
MR. CIOFFI: No, you're creating a hypothetical situation that is not --
MR. SABA: I'm asking specifically what she knew.
BY MR. SABA:
Q. Let me ask again.
Did you understand the question?
**A. Definitely need you to repeat it.**



Q. Sure. Do you have any objective information or data indicating that as of September 22, 2020, Tim Spence was superior to or better than Phil McHugh with respect to driving innovative thinking on the strategic side, while simultaneously maintaining a close eye on rigorous execution?
MR. CIOFFI: Same objection. It assumes facts not in evidence that there was some sort of comparison of the two.
THE WITNESS: There was never a comparison of the two. I don't think the board ever looked -- looked at it from that angle. The board purely looked at the fact that Tim was exactly this, able to drive innovative thinking on the strategic side, and that is the main thing that I would say the board was focused on.
I don't know that there was ever a discussion on Phil with regard to that matter. I think Tim was extraordinarily unique in his strategic thinking and his ability to incorporate that into the business, and to be quite honest, there just was no discussion of Phil with regard to these leadership behaviors because he wasn't considered.
BY MR. SABA:
Q. My specific question is: Do you have any



objective information or data indicating that Tim Spence was superior to Phil McHugh with respect to that?
MR. CIOFFI: Objection. She answered the question.
THE WITNESS: Do you want to --
MR. SABA: Yeah.
BY MR. SABA:
Q. Do you have any objective information or data to indicate that Tim Spence was superior to Phil McHugh as of September 22, 2020, with respect to driving innovative thinking on the strategic side, while simultaneously maintaining a close eye on rigorous execution?
**A. It's the board's opinion that Tim was uniquely strong in the area of strategic thinking. There was never a comparison of the two, but the board's opinion of Phil would have been more that he had operated in his role of the bank in an effective manner for a long time, but they did not see the -- they did not consider him the right candidate to be the CEO -- to be a future CEO of Fifth Third.**
Q. Is there any strategic -- excuse me.
Is there any objective information or data that would have supported the board's assessment of Phil McHugh?

Page 52

**A. I mean, the board had a lot of experience with Phil. Phil had been at Fifth Third for a long time. He had made presentations to the board. He had filled a number of roles at Fifth Third over his tenure, and had done a good job in those roles. And I think there was certainly respect for Phil in that role. But I don't believe that the board felt he was a candidate to be a successor, you know, a CEO.**

Q. And do you have any objective information or data upon which that determination is based?

MR. CIOFFI: Objection. She answered it in terms of the board's observations. You mean in addition to that?

THE WITNESS: It's based purely on his appearance, his presentations and being in front of the board at the board meetings.

BY MR. SABA:

Q. First, referring back to Exhibit Number 4 on that same page of business management, the first subheading is "Establishing Strategic Direction." Do you have any objective information or data indicating that as of September 22, 2020, Tim Spence was superior to or better than Phil McHugh with respect to establishing strategic direction?

MR. CIOFFI: Objection. Asked and answered.

Page 53

You may answer.

THE WITNESS: This does seem -- this seems like the same question as before. I feel like I have already answered it. I've said numerous times I think Tim's -- Tim came into the bank with a focus on strategy and leading the bank strategically, and he impressed the board very much with the way he focused on the strategy. And obviously strategic direction is, I think, in my opinion and I think the whole board's opinion, an important part of the CEO's role, and that was Tim's strength.

I think -- yeah, I could tell you, you know, Phil, in my opinion, did not -- was certainly not considered to be a strategic -- he was not considered to have the same skills in developing a strategy. He was excellent, like I said, at the roles he filled, leading the different divisions of the bank, but I don't believe the board -- we did -- I didn't view him as having those same skills to strategically lead the bank going forward.

BY MR. SABA:

Q. Other than the presentations made by Phil McHugh during board meetings, is -- do you have any

Page 54

other objective data or evidence upon which your opinion is based?

**A. That is what I'm basing my opinion on is the board meetings.**

Q. Just the presentations?

**A. Well, his -- his presentations and -- I guess it's mainly his presentations. I don't know if he spoke just, you know, and answered questions and covering -- just reviewing things at the board meetings, but --**

Q. The first bullet point under establishing strategic direction reads, "The CEO must possess the vision to outline a balanced strategy of organic growth, acquisitions, and optimization, rooted in deep knowledge of the banking industry."

Do you have any objective information or data indicating that as of September 22, 2020, Tim Spence was superior to Phil McHugh with respect to possessing the vision to outline a balanced organic growth, acquisitions, and optimization rooted in deep knowledge of the banking industry?

MR. CIOFFI: Objection. Redundant. Asked and answered. You may answer if you can.

THE WITNESS: I'm going to make you ask the question again --

MR. SABA: Sure.

Page 55

THE WITNESS: -- if you don't mind.

MR. SABA: Sure.

BY MR. SABA:

Q. Do you have any objective information or data indicating that as of September 22, 2020, Tim Spence was superior to Phil McHugh with respect to possessing the vision to outline a balanced organic growth, acquisitions and optimization, rooted in deep knowledge of the banking industry?

**A. My answer is the same as what I've said before. Do you want me to say it again?**

**Tim's -- Tim was extremely strong in the strategy area, and was uniquely talented I think in the board's perspective in that area, and I do not -- no one ever compared the two, but no one -- or but the board, I do not believe, felt that Phil was qualified in that area.**

Q. And that was based on the presentations they made during board meetings; is that correct?

**A. Based on our interactions with him at the board meeting.**

Q. What other interaction did you have other than his board presentations?

**A. It would -- my -- I'm basing it -- I didn't have -- I mean, other than maybe interacting with him at**

**board dinners, I did not have other interactions with Phil.**

Q. Did that form part of the basis with respect to your feeling that Tim Spence was superior to Phil McHugh with respect to possessing the vision to outline a balanced organic growth or positions in optimization rooted in deep knowledge of the banking industry?

**A. That was a long -- having read that, what was the beginning of the question?**

Q. The question is, with respect to your conversations with him at dinners, did that form part of your basis for determining that Tim Spence was superior to -- superior to Phil McHugh with respect to possessing the vision to outline a balanced organic growth, acquisitions and optimization, rooted in deep knowledge of the banking industry?

**A. It's really based more on what happened at the board meetings.**

Q. If you could turn to Fifth Third-McHugh 001077. Under leadership it indicates, "The main idea reflected under this dimension is to effectively manage the strength of the existing team while continuing to attract a more diverse group of executives."

Do you have any objective information or data indicating that as of September 22, 2020, Tim Spence was



superior to Phil McHugh with respect to effectively managing the strength of the existing team while continuing to attract a more diverse group of executives?

MR. CIOFFI: Objection. Redundant, assumes facts not in evidence that there was some comparisons. She has already testified numerous times that McHugh was not considered qualified in these areas, but you may answer.

THE WITNESS: I do believe that the report that came back from RHR confirmed that Tim was, well -- was, well -- well, I think Tim rated very well in the report that came back.

And so that, I think, reflects and backed up what the board's position was in each of these areas that were assessed. And, again, there was no assessment of Phil. It was not discussed so it's -- that's just all -- all that happened was we assessed Tim. We did not -- we did not decide to assess Phil because we didn't think he was the right -- right one.

Well, we didn't really -- we never got addressed. I don't even -- that's unfair. That's not right because his name never came up. He was not discussed as a potential CEO, so these things



were not specifically discussed.

BY MR. SABA:

Q. So there was no determination made regarding Phil McHugh's ability to effectively manage the strength of the existing team while continuing to attract a more diverse group of executives?

MR. CIOFFI: Objection. Misstates her prior testimony and the evidence in the record. Testified numerous times the board thought he was not qualified. But you can answer, if you can. Could you read the question back, please?

THE WITNESS: Can you ask the question one more time.

MR. SABA: Yeah, I'll ask the question, sure.

BY MR. SABA:

Q. So was there ever a determination made that Phil McHugh was not able to effectively manage the strength of the existing team while continuing to attract a more diverse group of executives?

**A. The board did not consider Phil a CEO candidate, and so with regard to this type of further assessment and discussion, it never happened because the board did not get to the point where they thought they needed to break down each of these things to -- to further evaluate Phil.**



Q. Mr. Cioffi keeps objecting, saying the board determined that Phil McHugh was not qualified. Is that correct?

MR. CIOFFI: Objection. Mischaracterizes what I said in the record. I said the board never considered him qualified.

THE WITNESS: The board and, you know, there are 15 people on the board. So obviously everyone can have their own opinion, but as a whole, there was no -- no one raised Phil. No one ever said Phil should -- would be someone that we should consider. I think many people did not feel Phil was qualified because I think they felt he was excellent operationally, but I don't believe there was a general consensus on the board that strategically he would be what the board -- or what Fifth Third should have as their next CEO.

BY MR. SABA:

Q. Was there ever a specific determination made by the board that Phil McHugh is not qualified to be president and CEO of Fifth Third Bank?

**A. No one -- the board doesn't go through and say everyone is not qualified. We decided who we wanted to -- who we thought was qualified, and Tim was qualified.**

**Obviously, there are thousands of employees at Fifth Third. They -- we did not -- we did not have a formal, broader -- well, I don't know. Phil -- Phil just never came up as a candidate, and I can only explain that he wasn't considered because I don't -- I think generally speaking, the board didn't view his strategic vision as being in the same vein as what we saw out of Tim. There were a lot of factors, but --**

Q. And once again, that's based on the presentations that they would have made during board meetings, correct?

**A. It's based on our interaction from board meetings, correct.**

Q. And you mentioned earlier that RHR gave results of their review of Tim Spence with respect to leadership and how he did there.

Just to be clear, there was no indication made by RHR whether or not Tim Spence was superior to Phil McHugh because they didn't compare the two, correct?

**A. RHR just did an assessment of Tim.**

Q. Okay. And did not compare him to Phil McHugh, correct?

**A. They did not.**

Q. The next heading under that second page is "Interpersonal." It indicates, "Maintaining



Fifth Third Bank's standing with the regulators and managing the implications of the rise of ESG issues are core to the CEO's role in 2020 and beyond."

Do you see that?

**A. I do.**

Q. Do you have any objective information or data indicating that as of September 22, 2020, Tim Spence was superior to Phil McHugh with respect to maintaining Fifth Third Bank's standing with the regulators and managing implications of the rise of ESG issues in 2020 and beyond?

MR. CIOFFI: Objection to the form of the question. Redundant. She's answered this question a number of times, and it assumes facts not in evidence. You may answer if you can.

THE WITNESS: I mean, I would say that I know the board -- the regulators are a very important part of the banking business, and Fifth Third certainly had had its share of issues and had for a while a long ways to go to get in better standing with the regulators. And Tim's approach with the regulators was one that I think the board had a lot of confidence in to get Fifth Third to be in a better standing than it had been in a long time.

So that would be what we felt was another



strength of Tim in that area. And, again, no discussion was had with regard to Phil, but obviously Phil would have been around a long time and -- when a lot of these issues with regulators were ongoing, and that probably -- Fifth Third was looking to move forward and have a future that took us in a positive moving direction.

So I would say there was a little bit of that, but, again, no one was comparing the two. I'm just giving you my opinion of thought -- my thoughts in that area with regard to Tim.

BY MR. SABA:

Q. What specifically did Tim Spence present with respect to handling regulators?

**A. He was just his -- he had an appreciation of the role that the regulators played and the way that the bank had to be accepting and deal with them in a way that managed the regulators so that we got to be in good standing. There -- you get -- they assess you every year. You get ratings every year, and Fifth Third, certainly when I joined the board, had a ways to go to improve their ratings.**

**Tim would speak, to my recollection, just of the importance of that and how in order for Fifth Third to be able to make strides in the future, we had to be**



**in a position where we were in better standing than certainly when I had come on the board.**

**But just to be -- it was important to address the regulators in a way that so that their matters -- he just dealt with it in a way that actually addressed things and kept issues getting addressed in a timely and prompt manner, not being past due. He saw the importance of that and I think felt that it was important because things like mergers and such can't happen if those ratings aren't at a certain level and so, therefore, he talked about the strategy and some of those lines. That's where I remember it coming up in particular.**

Q. Do you have any evidence of Phil McHugh failing to deal with regulators in a timely and prompt manner?

MR. CIOFFI: Objection. Asked and answered. She's answered the question already, but you can repeat it if you want to.

THE WITNESS: Like, Phil ran several lines of business. Like I said, the bank over time had had a ways to go to get to the standing that the bank was going to feel good about. And so I can't point to specifics, but obviously any issues that would have been in any of, you know, his areas in getting

Page 64

them addressed, but I can't point to any specifics.
BY MR. SABA:
Q. Were there ever any issues in any of the areas that Phil -- that Phil was managing?
MR. CIOFFI: Objection. Asked and answered.
THE WITNESS: I just know there were -- there were improvements that could be made and -- but I can't point to anything specifically.
BY MR. SABA:
Q. And were those in Phil McHugh's divisions or other candidates' divisions?
**A. They were in numerous divisions, but I have to believe several of them were in Phil's divisions. But they were in -- they were, you know, in all divisions to a certain extent.**
Q. So that would have been in Tim Spence's divisions as well, correct?
**A. Strategy, Tim -- well, as -- I think as Tim came around was when we started -- my memory is that the board -- or that the bank started actually getting to a better place with the regulators and in better standing.**
Q. Did you ever actually witness or observe Phil McHugh dealing with any regulators?
**A. No.**
Q. Did you ever actually witness or observe

Page 65

Tim Spence dealing with any regulators?
**A. They would have maybe interacted with some of the regulators when the regulators reported to the board, but other than that, not on a day-to-day basis.**
Q. Do you have a specific recollection of when the regulators reported to the board of either Tim Spence or Phil McHugh interacting with them?
**A. The regulators primarily would come in and give a report on the issues, where things stood. They might reference certain areas that they were focusing on, which may have been in certain people's -- but there really wasn't interaction between the executive team and the regulators when -- when they were -- when the regulators came in and talked to the board. It was more a presentation by the regulators. So if that answers your question.**
Q. So there wouldn't have been interaction between the other -- other times -- excuse me, Tim Spence or Mr. McHugh with the regulators when they did presentations to the board?
MR. CIOFFI: Objection. Asked and answered. Misstating her testimony. The record will speak for itself, but --
THE WITNESS: Those --
MR. CIOFFI: -- you may answer.

Page 66

THE WITNESS: I'll answer. I mean, the line of business people obviously dealt with the regulators and issues, MRAs that came up. That was not handled in front of the board. That was just reported to the board. So there was no firsthand viewing of any interaction per se, but we would get the reports of the status of issues that came up and those would be reported to the board.
BY MR. SABA:
Q. And do you recall any specific issues that were reported to the board with respect to Phil McHugh's divisions?
**A. I cannot point to specific -- I mean, I cannot point to anything specific without having more material in front of me or having seen something else that would have more information on that.**
Q. And what about with respect to Mr. Spence, do you recall any issues being reported to the board with respect to regulators in the divisions that Mr. Spence was managing?
**A. I don't have anything specific. Like I said, I just know Tim's approach to how to handle the regulators impressed the board and how overall his role was to make sure the bank was in good standing and how important that was in his thoughts on how to make that**

Page 67

**happen.**
Q. Referring to Fifth Third-McHugh 001078, the next category for assessing candidates for -- to be CEO or president of Fifth Third Bank is "Personal attributes." Do you see that?
**A. I do.**
Q. And it reads, "The issues associated with the uncertainty of the economic recovery and the external scrutiny of the CEO will require an ability to navigate complexity and demonstrate resilience in a challenging world."
As of -- excuse me. Do you have any objective information or data indicating that as of September 22, 2020, Tim Spence was superior to Phil McHugh with respect to the ability to navigate complexity and demonstrate resilience in a challenging world?
MR. CIOFFI: Objection to the form of the question. Redundant. Assumes facts not in evidence. You may answer, if you can.
THE WITNESS: Can you ask that one more time?
MR. SABA: Sure.
BY MR. SABA:
Q. Do you have any objective information or data indicating that as of September 22, 2020, Tim Spence was

superior to Phil McHugh with respect to the ability to navigate complexity and demonstrate resilience in a challenging world?

**A. I can state again that Tim is a uniquely -- maybe intelligent isn't exactly the right word, but his ability to deal with complexity is rare in the way he can take some very complex situations and fully describe them, whether that might be to the board or to the investment community. He is extremely unique in being able to, I think, break things down and deal with very complex issues.**

**When -- so I think Tim made a big impression in being able to deal with those complex issues in a very strong manner, and I -- I just would say that I know Phil operated and made things happen at the bank and did a very great job in the role he filled, but I don't know that people saw his ability to handle complex issues in a manner that would have been at all comparable to Tim. But it was not compared ever. I'm just giving you my sort of assessment of the two.**

Q. Other than presentations made by Mr. Spence and/or Mr. McHugh to the board, what is your opinion based upon?

**A. That would be what my -- my opinion is based on our interaction and -- at the board meetings.**



(Plaintiff's Exhibit 5 is marked for identification.)

BY MR. SABA:

Q. I've handed you what has been marked as Exhibit Number 5, which is Bates stamped Fifth Third-McHugh 001216 through Fifth Third-McHugh 001222; is that correct?

**A. Yes.**

Q. Can you identify this document for me, please?

**A. It says, "Unanimous Written Consent: Officer Appointment."**

Q. Have you seen this document before?

**A. Maybe back at the time, but no -- I would have seen -- obviously signed the unanimous written consent, but I haven't reviewed it or seen it since -- since then.**

Q. If I can refer you to the third page, Fifth Third-McHugh 001218.

**A. Okay.**

Q. Have you seen this document before?

**A. It says, "Dear board members," so I presumably would have received it maybe when they sent us -- when unanimous written consent was ready to sign. But do I have a recollection of it other -- specifically? No.**

Q. And this is a letter from Greg Carmichael to



the board; is that correct?

**A. That's what it looks like, yes.**

Q. In the second paragraph of this letter, it indicates, "As Bob Shaffer and I discussed with you at the September board meeting, we believed that Phil McHugh could be at risk with Tim's promotion. And, in fact, Phil has decided not to accept the role of head of consumer business banking and is leaving the company."

Do you see that?

**A. I do.**

Q. Do you recall Bob Shaffer and Greg Carmichael discussing with the board at the September meeting that Phil McHugh could be at risk with Tim's promotion?

**A. The only thing I recall -- and I couldn't tell you the time -- was when we were told that Phil had decided to leave. That's the only thing I specifically recall, and I was surprised at the time, but that's all I recall.**

Q. Who had -- who had told you that Phil -- excuse me, that Phil had decided to leave?

**A. It would have been at a board meeting. I don't recall who.**

Q. Do you recall which board meeting that occurred?

**A. I don't.**



Q. Do you recall anything else that was said about Phil leaving?

**A. Not specifically.**

Q. Do you have an understanding of why Phil McHugh left the bank?

**A. Phil would be the best one to answer that. I just remember being told that he had decided to leave, and to be fair, that's all I would be -- I don't remember any further specifics, that I would have enough confidence to say I have any basis for.**

Q. If I can refer you to the last two pages of Exhibit 5, McHugh 001221 through McHugh 001222. Can you identify that for me, please?

**A. This says, "Fifth Third Bank Unanimous Written Consent of the Board of Directors Appointing President."**

Q. And what is this document?

**A. This is the unanimous written consent of the board appointing -- let me double-check and read -- that Tim Spence be promoted and appointed to the position of president.**

Q. And was that effective immediately?

**A. I believe it was effective once we signed it. I know there are regulatory requirements in terms of reporting this kind of stuff, so in fairness, if there were those types of things that had to be done in**

Page 72

**association with this, that could have come into play, but basically this made it effective.**

MR. SABA: We can go off the record.

THE VIDEOGRAPHER: Off the record.

(A recess was taken from 12:04 p.m. to 12:10 p.m.)

THE VIDEOGRAPHER: We are back on the record. 12:10.

BY MR. SABA:

Q. Do you know what TFT was, or the Transforming Fifth Third was?

**A. I mean, I'm familiar with TFT, and I'm trying to remember the specifics of the project, but I -- I could use a bit of a refresher.**

Q. Do you recall that the primary goal for TFT was to improve the risk management for the bank so that the regulators would raise the CAMEL ratings for the bank?

MR. CIOFFI: Objection to the form of the question. Assumes facts not in evidence or part of the record.

THE WITNESS: I just remember TFT, I -- in fairness, I'm just -- honestly, I don't remember the specific goal of it or purpose behind it. I should maybe, but I just don't specifically recall.

Page 73

BY MR. SABA:

Q. Do you recall that Phil McHugh and Frank Forrest were responsible for leading TFT?

MR. CIOFFI: Objection to the form. Assumes facts not in evidence or part of the record.

THE WITNESS: I know Phil was involved. I remember him being -- being a -- one of the leaders of their being involved with TFT.

BY MR. SABA:

Q. Do you recall that as a result of that management of TFT, the regulators ultimately raised the CAMEL ratings for the bank?

**A. Well, there are CAMEL ratings every year for the bank, so it's an ongoing process continuously, but I don't remember any of the -- I mean, I just know there was TFT as a whole -- it was an effort by the bank, I do recall that, and I can't say that I recall any of the other specifics in terms of timing, you know, when it started officially, when it officially wrapped up, what the final outcome was. I just know that it -- I do recall it happening.**

Q. Do you recall the regulators coming to a board meeting in Florida to announce that they will be raising the CAMEL ratings for the bank as a result of the Transforming Fifth Third efforts?

Page 74

**A. I don't specifically remember that, to be fair, no.**

Q. Is Fifth Third a sponsor of the Bengals?

**A. They are.**

Q. And what is the cost of that sponsorship?

MR. CIOFFI: Objection. It's irrelevant. You may answer, if you know.

And I'll also designate this part of the transcript as confidential because it involves proprietary business information for both organizations, both Fifth Third and the Bengals.

THE WITNESS: Fifth Third, I couldn't tell you the year they first became a sponsor. The sponsorship has changed over time and grown, but we -- but they are a sponsor, and it's a significant number. I don't know that I can state the exact number off the top of my head.

BY MR. SABA:

Q. Do you know if it's in excess of 3 million?

**A. I don't believe it's in excess of 3 million. Well, it depends if you total, like, over multiple years. Over multiple years it probably might add up to that, but on an annual basis, I don't believe it exceeds that amount.**

Q. Do you have an understanding of what it is on an annual basis, the range?

Page 75

MR. CIOFFI: Objection. Asked and answered. She said she didn't, but if your recollection has improved or changed in the last minute, you may answer.

THE WITNESS: I don't recall the specific amount.

MR. SABA: That's all the questions I have. Thank you.

MR. CIOFFI: I have a couple questions.

EXAMINATION

BY MR. CIOFFI:

Q. During the board's deliberations and discussions about who should succeed Greg Carmichael as president, was age ever a factor in those deliberations or discussions?

MR. SABA: Objection. Go ahead, you may answer.

BY MR. CIOFFI:

Q. You may answer.

**A. It was not.**

Q. Was age ever a factor in the board's decision to appoint Tim Spence as president of Fifth Third?

MR. SABA: Objection.

THE WITNESS: There was no discussion of age.

MR. CIOFFI: I have no further questions.

MR. SABA: I have no questions.

MR. CIOFFI: We'll read and sign the transcript.

THE VIDEOGRAPHER: Off the record at 12:15.

______________________________
KATHERINE B. BLACKBURN

______________________________
DATE

\- - -

DEPOSITION CONCLUDED AT 12:15 P.M.

\- - -

C E R T I F I C A T E

STATE OF OHIO :
: SS
COUNTY OF HAMILTON :

I, Wendy L. Raymer, RPR, CRR, the undersigned, a duly qualified and commissioned notary public within and for the State of Ohio, do hereby certify that before the giving of his aforesaid deposition, KATHERINE B. BLACKBURN was by me first duly sworn to depose the truth, the whole truth and nothing but the truth; that the foregoing is the deposition given at said time and place by KATHERINE B. BLACKBURN; that said deposition was taken in all respects pursuant to stipulation of counsel; that I am neither a relative of nor employee of any of the parties or their counsel, and have no interest whatever in the result of the action; that I am not, nor is the court reporting firm with which I am affiliated, under a contract as defined in Civil Rule 28 (D).

IN WITNESS WHEREOF, I hereunto set my hand and official seal of office at Cincinnati, Ohio, this 17th day of December, 2024.

My Commission expires December 6, 2026

S/Wendy L. Raymer, RPR, CRR
Notary Public - State of Ohio

1 DEPOSITION ERRATA SHEET

Date Taken: December 3, 2024

Case Caption: PHILIP R. MCHUGH

vs. FIFTH THIRD BANCORP, et al.

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the ______ day of

____________, 20___.

___________________________________

KATHERINE B. BLACKBURN

2 DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

SIGNATURE:_______________________DATE:___________

KATHERINE B. BLACKBURN

3 DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

SIGNATURE:_______________________DATE:___________

KATHERINE B. BLACKBURN

**WORD INDEX**

< 0 >
**000253** 29:1, 2
**000265** 29:2
**001074** 43:20
**001076** 48:16
**001077** 56:20
**001078** 67:2
**001079** 43:21
**001105** 30:15
**001125** 33:15
**001141** 33:15, 18
**001154** 30:15
**001216** 69:6
**001218** 69:18
**001221** 71:12
**001222** 69:7 71:12

< 1 >
**1** 3:7 7:1, 5, 23 12:13 15:12 16:13, 23 78:1
**1:21-cv-00238** 1:9 4:8
**10:11** 1:19
**10:12** 4:3
**100** 22:16 25:8
**11:17** 48:7, 8
**11:26** 48:9
**11:27** 48:12
**1141** 33:17 34:10
**1142** 33:22 34:10
**12:04** 72:5
**12:10** 72:6, 8
**12:15** 76:5, 14
**14** 8:2
**15** 59:8
**17** 28:13
**1700** 2:14
**17th** 77:20
**1965** 5:9
**19th** 22:16

< 2 >
**2** 3:7 28:6, 10 29:1, 5 37:23 48:11 79:1
**20** 23:14 78:17
**201** 2:15
**2014** 10:19
**2015** 15:12 25:20
**2019** 14:19 18:22 19:4, 16, 19, 24 21:24 22:6, 9 26:2, 8 28:13 30:24 31:2, 15, 22 32:16, 18 34:19 35:8 36:10 37:12 38:13
**2020** 12:13 15:13 16:13, 23 22:25 23:8, 19 27:6, 7, 20 28:4 39:1 45:11 49:2 50:2 51:10 52:22 54:16 55:5 56:25 61:3, 7, 10 67:14, 25
**2024** 1:18 4:2 77:21 78:2
**2026** 77:25
**22** 49:2 50:2 51:10 52:22 54:16 55:5 56:25 61:7 67:14, 25
**25** 5:9
**2623** 2:7
**28** 3:7 77:17

< 3 >
**3** 1:18 3:8 8:17 30:10, 14, 18 31:1 37:5 74:19, 20 78:2 80:1
**30** 3:8
**362-8700** 2:16
**3rd** 4:2

< 4 >
**4** 3:8 43:16, 20 45:3 48:15 52:18
**40** 32:23
**43** 3:8
**45202** 1:21 2:15
**45208** 2:8
**45243** 5:12

< 5 >
**5** 3:4, 9 69:1, 5 71:12
**511** 1:20
**513** 2:8, 16
**5155** 5:11
**533-2701** 2:8

< 6 >
**6** 8:1 77:25
**69** 3:9

< 7 >
**7** 3:7 8:10
**75** 3:4

< 9 >
**9** 8:1, 10

< A >
**a.m** 1:19 4:3 48:8, 9
**abilities** 35:24
**ability** 18:18 19:21 50:20 58:4 67:9, 15 68:1, 6, 17
**able** 27:1 31:12 43:21 48:22 50:13 58:17 62:25 68:10, 13
**accept** 70:7
**accepting** 62:17
**accurate** 78:10
**acquisitions** 54:13, 19 55:8 56:15
**action** 77:15
**add** 74:22
**addition** 7:13 52:13
**additional** 43:4
**Additionally** 5:23
**address** 5:10, 11 63:3
**addressed** 57:23 63:5, 6 64:1
**adopting** 42:11
**affiliated** 77:17
**aforesaid** 77:7
**age** 4:24 75:15, 22, 25
**ago** 31:4, 6
**agreed** 39:18
**agreeing** 39:6
**agreement** 4:18
**ahead** 5:4 22:11 33:12 42:17 75:17
**al** 1:10 4:6 78:4
**amount** 74:24 75:7
**and/or** 16:6 46:1, 11 68:22 78:11
**angle** 50:12
**announce** 73:23
**annual** 13:14, 17 16:24 17:4 20:3 74:23 75:1
**answer** 5:21, 24 22:11 27:15 35:12 41:8 42:11, 14 43:4, 6 44:16 45:20 46:5 49:14, 15, 17 53:1 54:22 55:10 57:9 58:10 61:15 65:25 66:1 67:20 71:6 74:7 75:5, 18, 20
**answered** 23:7 33:4 35:10 39:21 41:1 43:3 46:20 47:3 49:8 51:3 52:11, 25 53:4 54:8, 22 61:13 63:17, 18 64:5 65:21 75:2
**answers** 65:15
**anybody** 7:9 20:8
**appear** 12:15 16:15
**appearance** 52:15
**APPEARANCES** 2:1
**Appearing** 2:6
**appears** 29:5
**application** 11:22 12:5
**applications** 12:2
**apply** 11:9, 16, 23
**appoint** 75:23
**appointed** 71:19
**Appointing** 71:15, 18
**appointment** 38:7 69:11
**appreciation** 62:15
**approach** 24:19 61:21 66:22
**appropriate** 36:15, 23 43:14
**approve** 28:21
**approved** 28:17
**approving** 39:5
**approximately** 10:18
**area** 51:15 55:13, 14, 17 62:1, 11

**areas** 57:9, 16 63:25 64:3 65:10
**aside** 18:12
**asked** 8:11 19:6 34:17 35:10 45:7, 14 46:20 49:8 52:25 54:21 63:17 64:5 65:21 75:2
**asking** 5:16 8:23 9:15 23:9 32:15 41:6 43:8 49:20
**asks** 8:17
**aspire** 18:17
**aspired** 19:5, 7
**assess** 14:10 25:4, 6, 10, 18 27:8 39:6, 8 45:8, 14 57:20 62:19
**assessed** 27:22 39:2, 19 40:3 47:9 57:16, 19
**assessing** 41:22 67:3
**assessment** 13:19, 25 17:15 18:15 20:3 24:3, 19, 20 39:18 40:4, 7, 15 41:20 43:12, 15 44:5, 24 45:5, 13, 17 51:24 57:17 58:22 60:20 68:20
**assessments** 18:13
**associated** 67:7
**association** 72:1
**assumes** 27:12 46:3 50:7 57:5 61:14 67:19 72:20 73:4
**attend** 15:14, 22
**attended** 12:21 13:1
**attention** 8:10 31:18 48:15
**attorneys** 4:9
**attract** 56:23 57:3 58:5, 19
**attributes** 67:5
**Avenue** 2:7
**aware** 12:11 25:14 26:18 27:7, 20 38:17

**< B >**
**back** 7:8 9:18 24:22 28:15 37:23, 25 40:7 48:10 52:18 57:11, 13 58:11 69:13 72:7
**backed** 57:14
**background** 24:11
**Bailey** 2:5
**balance** 15:9
**balanced** 54:12, 18 55:7 56:6, 14
**BANCORP** 1:10 2:21, 22 4:5 78:4
**Bancorp's** 28:11
**Bank** 10:5, 24 11:10, 17 12:3, 8, 9 19:2, 3, 10 20:15, 19 22:1, 22 26:14 27:10, 23 39:3 42:25 43:24 46:18 51:18 53:5, 6, 19, 21 59:21 62:17 63:21, 22 64:20 66:24 67:4 68:15 71:5, 14 72:16, 18 73:12, 14, 16, 24
**bankers** 38:16
**banking** 10:11 54:14, 20 55:9 56:7, 16 61:18 70:8
**Bank's** 61:1, 9
**Barn** 5:11
**based** 9:7 34:8 37:8 52:10, 14 54:2 55:18, 20 56:17 60:9, 12 68:23, 24
**basically** 72:2
**basing** 54:3 55:24
**basis** 15:11 56:3, 12 65:4 71:10 74:23 75:1
**Bates** 28:25 30:14 43:20 48:15 69:5
**began** 24:13
**beginning** 33:15 56:9
**behalf** 2:1, 11 4:11, 13, 15 7:16
**behaviors** 50:23
**believe** 10:18 14:21 15:15 20:1, 16 22:15 24:2, 21 25:5 28:4 37:19 39:18 44:23 45:4 47:4, 6, 19 52:7 53:19 55:16 57:10 59:14 64:13 71:22 74:20, 23
**believed** 46:12 70:5
**Bengals** 6:7 9:23 10:13 74:3, 11
**best** 24:19 39:17, 22 46:13 47:5, 12 71:6
**better** 49:3 50:3 52:23 61:20, 24 63:1 64:21
**beyond** 47:18 61:3, 11
**big** 68:12
**birth** 5:8, 9
**bit** 38:17 62:8 72:14
**BLACKBURN** 1:15 3:3 4:4, 17, 23 5:6 7:11, 17 48:14 76:9 77:8, 11 78:19 79:24 80:24
**B-l-a-c-k-b-u-r-n** 5:7
**Blank** 2:14 4:16
**board** 6:17, 20, 22, 24 9:3, 5, 10, 17 10:7, 8, 12, 16 11:7, 20, 25 12:11, 16, 18, 19, 20, 22 13:6, 11, 18 14:13, 14 15:14, 16, 22, 25 16:5, 8, 9, 15, 16, 17 17:2 18:12 19:9 20:23 21:3, 6, 14 22:14 23:2, 12, 13, 14, 15, 19, 21, 23, 25 24:4, 5, 17, 18, 22 25:20 26:9, 12, 19 28:12, 17 30:5, 6, 19, 24 35:4 36:6, 21 37:6, 8, 12, 18 38:19, 25 39:5, 7, 14, 19, 22 40:11, 12, 14 41:2, 3, 4, 19 42:3, 7, 22 43:3, 11, 14 45:24 46:5, 9, 12, 14, 17 47:4, 5, 13, 19 49:9 50:11, 12, 16 52:1, 3, 7, 16 53:7, 19, 25 54:4, 9 55:15, 19, 21, 23 56:1, 18 58:9, 20, 23 59:1, 5, 7, 8, 15, 16, 20, 22 60:6, 10, 12 61:17, 22 62:21 63:2 64:20 65:4, 6, 14, 20 66:4, 5, 8, 11, 18, 23 68:8, 22, 25 69:21 70:1, 5, 12, 21, 23 71:15, 18 73:22
**boards** 10:20, 21
**board's** 10:22 11:2, 4 42:9 51:14, 16, 24 52:12 53:10 55:14 57:15 75:13, 22
**Bob** 14:17, 20 19:16 34:10 70:4, 11
**Bob's** 20:5
**bottom** 28:24
**box** 36:2
**break** 47:17 48:1 58:24 68:10
**Brian** 2:22 4:19 35:5, 8, 16, 18, 21 36:2
**briefly** 12:23
**bright** 35:25
**bring** 7:19
**broader** 60:3
**broken** 15:9 17:16 37:19
**brought** 17:19
**bullet** 54:10
**business** 12:16 24:9 36:20 40:6 48:18 50:21 52:19 61:18 63:21 66:2 70:8 74:10

**< C >**
**calendar** 23:9
**call** 6:13
**called** 14:4 25:18
**CAMEL** 72:17 73:12, 13, 24
**candidate** 21:19 24:1 29:15 38:8 39:9, 14, 17, 23 40:24 41:21 45:25 46:10, 13, 17 47:6 51:20 52:7 58:21 60:4
**candidates** 11:25 21:19 25:7, 10, 18 29:10, 12, 18, 20 30:1 31:13, 23 32:14, 17,

21 34:15, 18, 21 38:4, 6, 12, 22 39:12 47:7 64:11 67:3
**capabilities** 38:6
**Capital** 30:19
**Caption** 78:3
**captioned** 78:8
**Carmichael** 14:22, 23 16:6 19:16 20:17 23:17, 20 25:21 29:9, 19, 25 31:14 32:17 34:18 35:7 36:24 38:3, 12 39:2, 13 69:25 70:11 75:14
**Carmichael's** 42:11
**CASE** 1:9 4:4, 7 6:19, 21 7:12 21:8 31:10 42:7 78:3
**casually** 12:23
**category** 67:3
**CE** 25:1
**Center** 1:20 2:14 28:24
**centers** 36:17
**CEO** 10:4, 9 11:5, 9, 16, 19, 24 12:3, 7 14:16 15:23 16:1, 6 18:12 19:8, 13 20:7, 9, 14, 18, 23 21:1, 2, 7 22:1, 5, 8 23:3 24:24 25:2, 7, 10 26:4, 10, 14 27:10, 23 29:11 30:1 33:21 34:7, 11 36:14, 21 38:20 39:3 40:5 41:14 42:3, 25 46:1, 11, 18 47:20 48:22 51:20 52:8 54:11 57:25 58:20 59:17, 21 67:3, 9
**CEOs** 35:6
**CEO's** 53:11 61:3
**certain** 7:19 13:21 40:8, 9 63:10 64:15 65:10, 11
**certainly** 11:6 27:18 47:15 52:6 53:14 61:19 62:21 63:2
**certified** 4:25
**certify** 77:6
**challenges** 38:7
**challenging** 67:10, 16 68:3
**change** 36:18 49:14, 15 79:4, 7, 10, 13, 16, 19, 22 80:4, 7, 10, 13, 16, 19, 22
**changed** 74:14 75:4
**changes** 78:11, 14
**characteristics** 39:16
**characterization** 47:3
**chief** 29:11 43:24
**chose** 46:14
**Cincinnati** 1:21 2:8, 15 5:12 6:7 10:13 77:20
**Cioffi** 2:12 3:4 4:15, 16 7:10 11:11 16:7 22:3, 10 23:7 25:11 26:5, 15, 18, 22 27:11, 24 31:16 32:7, 10, 19 33:9, 12, 19, 25 34:6 35:10 37:13 39:21 41:1, 7, 16 42:5, 13, 14 43:1 44:13 45:18 46:2, 19 47:2, 23 48:4 49:7, 18 50:7 51:3 52:11, 25 54:21 57:5 58:7 59:1, 4 61:12 63:17 64:5 65:21, 25 67:18 72:19 73:4 74:6 75:2, 10, 12, 19 76:1, 3
**Cioffi's** 42:14
**circumstances** 21:12, 21
**Civil** 77:17
**clarify** 22:24
**clear** 7:25 8:23 9:7, 15 22:17 34:23 60:17
**clearer** 6:1
**client** 7:16 34:5
**close** 48:24 49:5 50:5 51:12
**co-counsel** 4:19
**Collin** 2:13 4:16
**collin.hart@blankrome.com** 2:17
**come** 17:18 21:8, 12, 14 46:22 63:2 65:8 72:1
**comes** 9:5 20:22 21:13 38:15 40:7
**coming** 46:15 63:12 73:22
**Commencing** 1:19
**commented** 38:3
**Commission** 77:24
**commissioned** 77:5
**committee** 15:17, 22, 25 16:2 23:22
**committees** 23:23
**communicate** 7:25 8:3
**communications** 7:24, 25 8:3, 12, 14, 16, 17, 19, 21, 25 9:4, 10, 16 10:1, 8
**community** 68:9
**company** 20:7, 9 24:20 40:17 70:8
**comparable** 47:16 68:19
**compare** 60:19, 21
**compared** 55:15 68:19
**comparing** 62:9
**comparison** 49:11 50:9, 10 51:16
**comparisons** 57:7
**competed** 47:7
**complex** 68:7, 11, 13, 17
**complexity** 67:10, 16 68:2, 6
**component** 24:14
**CONCLUDED** 76:14
**confidence** 61:23 71:10
**confidential** 74:9
**confirmed** 57:11
**Connie** 1:23
**consensus** 59:15
**Consent** 69:10, 14, 23 71:15, 17
**consider** 12:1 13:24 23:2 24:2 35:4 38:19 42:17 51:19 58:20 59:12
**considered** 22:5 36:21 38:4 39:12 47:21 49:9 50:23 53:15, 16 57:8 59:6 60:5
**considering** 39:10
**consultant** 21:17 24:3, 12 25:3
**consultants** 25:9
**consulting** 25:17
**consumer** 70:8
**contains** 32:24
**continuing** 56:22 57:3 58:5, 18
**continuously** 73:14
**contract** 77:17
**contracted** 27:8, 21
**contracting** 27:13
**conversation** 13:2 46:15
**conversations** 9:8, 22 27:3 56:11
**copy** 7:9 28:20
**core** 61:3
**corner** 43:25
**corporate** 24:7 40:21
**correct** 7:21 14:22 28:18, 19 29:2, 8 30:16 36:6 38:23 39:4, 6, 10, 13 45:6 47:1 55:19 59:3 60:11, 13, 19, 22 64:17 69:7 70:1
**corrections** 78:11
**correspondence** 8:4
**cost** 74:5
**Counsel** 2:17, 22 6:12 7:16 26:6 31:16 33:19 47:2, 23 77:13, 14
**COUNTY** 77:3
**couple** 25:1, 2 75:10
**COURT** 1:2 4:6, 21 5:20 77:16
**covered** 17:14
**covering** 54:8
**create** 49:17

**created** 38:7
**creating** 44:8 49:18
**CRR** 1:22 77:4, 24
**current** 5:10 6:16, 20, 24
**currently** 6:4
**customer** 10:13 15:2 18:6
**cut** 19:17

< D >
**data** 49:1 50:2 51:1, 8, 23 52:10, 21 54:1, 15 55:4 56:24 61:6 67:13, 24
**Date** 1:18 5:8, 9 22:24 23:5, 9 37:9 76:11 78:2
**day** 77:21 78:16
**days** 14:17
**day-to-day** 65:4
**DDI** 25:18
**deal** 62:17 63:15 68:6, 10, 13
**dealing** 10:4 64:23 65:1
**deals** 34:7
**dealt** 63:5 66:2
**Dear** 69:21
**December** 1:18 4:2 14:2, 11, 19 17:9, 11, 14 18:13, 14, 15, 21 19:4, 14, 19, 24 20:2, 21 21:24 22:5, 9, 16 26:2, 8 28:13 30:2, 24 31:2, 15, 22 32:15, 18 34:19, 25 35:8 36:10 37:12 38:13 77:21, 25 78:2
**decide** 21:6, 16 57:19
**decided** 23:1 24:23 39:1 41:2, 19 43:11 59:23 70:7, 16, 20 71:7
**decides** 11:25
**deciding** 27:25 39:7
**decision** 28:3 45:24 46:9, 25 75:22
**deck** 14:4 31:9 34:3, 4
**DECLARATION** 78:5
**declare** 78:6
**deep** 54:13, 19 55:8 56:7, 15
**Defendants** 1:11 2:11 4:15
**defense** 4:18
**defined** 8:1, 12, 18 77:17
**Definitely** 49:25
**Definition** 11:13 42:6
**deliberations** 75:13, 15
**demands** 8:9
**demonstrate** 67:10, 16 68:2
**dependent** 21:21
**depends** 21:18 74:21
**Deponent** 2:11
**deponents** 31:10
**depose** 77:8
**deposed** 4:25
**Deposition** 1:15 4:4 5:13 6:11, 17 31:16, 20 44:20 47:22 48:11 76:14 77:7, 10, 11 78:1, 8, 12 79:1 80:1
**describe** 14:9 44:4 68:7
**designate** 74:8
**determination** 46:16 52:10 58:3, 16 59:19
**determine** 11:19, 20 32:13 34:21
**determined** 15:21, 24 59:2
**determining** 56:12
**developing** 53:16
**development** 29:14
**different** 19:10 21:9, 11 23:22 35:12 36:16 53:18
**diligence** 42:23
**dimension** 48:22 56:21
**dinners** 12:18 56:1, 11
**direct** 8:10 13:10 16:21 31:17 33:3, 6 34:1, 7 48:14
**directed** 7:14
**Direction** 52:20, 24 53:9 54:11 62:7
**directly** 13:5
**director** 19:13 38:2
**directors** 28:12 30:19 71:15
**disclosure** 8:4
**discuss** 16:4 35:2
**discussed** 6:19, 23 17:19, 23 18:22 19:4, 20, 23, 24 22:8 23:24 26:25 27:3, 4 29:13, 19, 21 30:3, 4 32:14 34:19, 22 35:14 38:13 47:18 49:12 57:17, 25 58:1 70:4
**discussing** 35:8 38:1 70:12
**discussion** 17:25 18:3 26:3, 9 36:9, 17, 22 37:1, 3 38:5, 15 50:17, 22 58:22 62:2 75:25
**discussions** 8:8 20:11, 13 26:12 36:13, 25 75:14, 16
**DISTRICT** 1:2, 3 4:6, 7
**diverse** 56:23 57:3 58:6, 19
**DIVISION** 1:4 4:7
**divisions** 15:6, 10 18:10 53:18 64:10, 11, 12, 13, 14, 17 66:12, 19
**document** 7:5, 8, 15, 19 8:1, 2, 7 14:3, 9 28:14 30:22 31:12 32:5, 23 33:8 37:4, 25 43:22 44:4, 6, 9, 11, 15, 18, 23 45:4, 12 69:9, 12, 20 71:16
**documentation** 13:16
**documents** 7:20 33:16 37:11, 16
**doing** 18:16, 23 19:25 44:5
**double-check** 71:18
**drive** 48:23 50:14
**driving** 49:4 50:4 51:10
**due** 42:22 63:7
**duly** 4:24 77:5, 8

< E >
**earlier** 34:17 60:14
**early** 23:8, 18 27:6, 7, 20
**East** 2:15
**economic** 67:8
**effective** 51:18 71:21, 22 72:2
**effectively** 56:21 57:1 58:4, 17
**effort** 73:16
**efforts** 73:25
**either** 6:20, 24 43:9 65:6
**elected** 24:25
**Email** 2:9, 16 8:6
**emergency** 26:3, 10, 13, 25 36:3, 10, 16, 23 37:2
**employed** 6:4
**employee** 11:16 14:24 17:6, 21 18:1, 4 77:13
**employees** 11:9, 23 12:3, 6 60:1
**engage** 23:19
**engagement** 14:25 17:7, 21 18:1, 4
**enterprise** 15:17, 21, 24 16:2
**enters** 47:22
**entire** 78:7
**environment** 24:16
**equally** 47:8
**Erie** 2:7
**ERRATA** 78:1, 13 79:1 80:1
**ESG** 61:2, 10
**Esq** 2:1, 4, 5, 12, 13, 17, 22

**Establishing** 52:20, 24 54:10
**et** 1:10 4:6 78:4
**evaluate** 58:25
**evaluations** 27:14
**eventually** 23:1
**evidence** 22:4 27:13 44:14 46:3 50:8 54:1 57:6 58:8 61:15 63:14 67:20 72:20 73:5
**exact** 22:15 27:2 28:5 45:11 74:17
**exactly** 22:15 37:9 50:13 68:5
**Examination** 3:4 5:2 75:11
**examined** 4:25
**exceeds** 74:23
**excellent** 53:17 59:14
**exception** 9:8
**excess** 74:19, 20
**exchange** 8:4
**Excuse** 34:17 51:22 65:18 67:12 70:20
**execution** 48:25 49:6 50:6 51:13
**executive** 6:9 10:23 11:2 29:11 30:20 43:24 47:15 65:12
**executives** 13:21, 22 56:23 57:4 58:6, 19
**Exhibit** 3:7, 8, 9 7:1, 5, 23 28:6, 10 29:1, 5 30:10, 13, 18 31:1 37:5, 23 43:16, 19 45:3 48:15 52:18 69:1, 5 71:12
**exhibited** 39:15
**EXHIBITS** 3:6
**existing** 56:22 57:2 58:5, 18
**exists** 12:12
**experience** 15:3 18:7 52:1
**expires** 77:24
**Explain** 21:4 60:5
**extent** 43:8 64:15
**external** 21:18 38:4, 7, 11, 22 67:8
**extraordinarily** 50:19
**extremely** 20:4 55:12 68:9
**eye** 48:24 49:5 50:6 51:12

< F >
**fact** 5:19 45:11 49:9 50:13 70:7
**factor** 75:15, 22
**factors** 60:8
**facts** 24:7 27:12 46:3 50:7 57:6 61:14 67:19 72:20 73:5
**failing** 63:15
**fair** 19:1 20:12 71:8 74:2
**fairness** 31:6 71:24 72:23
**familiar** 72:12
**favorable** 24:22
**February** 7:8
**feel** 5:18 10:1 17:13 40:11 41:19 47:14 53:3 59:12 63:23
**feeling** 56:4
**felt** 22:20 35:21 39:15 43:14 52:7 55:16 59:13 61:25 63:8
**FIFTH** 1:10, 20 2:15, 17, 22 4:5, 20 6:16, 19 10:5, 9, 14, 16, 23 11:3, 8, 10, 16 12:3, 6, 8, 9, 15 13:7 15:19 16:2, 6, 18 20:15, 19 22:1, 22 24:13 25:3, 6, 9, 17 26:14 27:7, 10, 20, 23 28:11, 25 30:14, 15 31:10 39:3 43:20, 21, 23 44:12, 14, 18, 19, 22 45:12 46:1, 11, 18 48:16 51:21 52:2, 4 56:19 59:17, 21 60:2 61:1, 9, 18, 23 62:5, 20, 24 67:2, 4 69:6, 18 71:14 72:11 73:25 74:3, 11, 12 75:23 78:4
**fill** 25:1 47:12
**filled** 36:19 52:3 53:18 68:16
**filling** 18:24
**final** 73:20
**financial** 15:5 18:9
**financially** 24:8
**find** 38:20
**fine** 33:11
**finish** 5:23 47:25
**Fintech** 24:15
**firm** 25:18 77:16
**first** 4:24 24:25 32:19 48:18 52:18, 19 54:10 74:13 77:8
**firsthand** 66:5
**fit** 24:21
**five** 31:6 48:2
**flexible** 22:23
**Florida** 73:23
**focus** 46:14 53:6
**focused** 24:15 47:5 50:16 53:8
**focusing** 65:10
**follow** 24:19
**follows** 5:1
**foregoing** 77:10
**form** 8:7 11:11 16:7 22:3, 10 25:11 26:5 27:11 37:13 41:7 42:5 43:1 44:13 45:18 46:2, 19 49:7 56:3, 11 61:12 67:18 72:19 73:4
**formal** 11:8, 12 60:3
**former** 6:16, 20, 24
**Formula** 43:23 44:9
**Forrest** 73:3
**forward** 53:22 62:6
**frame** 16:9 25:12 26:6, 23 28:16
**franchise** 10:13
**Frank** 73:3
**free** 5:18
**frequently** 15:13
**front** 52:15 66:4, 15
**fully** 68:7
**further** 35:16 44:1 47:17 58:21, 25 71:9 76:1
**future** 20:7, 9 34:24 35:2, 6, 14, 25 36:14, 21 40:16 42:3, 24 51:20 62:6, 25

< G >
**games** 33:25 34:2
**general** 59:15
**generally** 37:21 60:6
**getting** 63:6, 25 64:20
**give** 26:23 33:9 35:12 38:18 40:12 49:16 65:9
**given** 9:8 77:10
**gives** 40:7
**giving** 62:10 68:20 77:7
**go** 5:4, 6 9:18 21:10, 15 22:11 23:18 30:2 33:12 42:17 47:18 48:2 59:22 61:20 62:21 63:22 72:3 75:17
**goal** 72:15, 24
**goals** 15:6 18:10
**going** 5:16 9:23 21:6 23:1 34:24 36:20 40:4 41:13 47:23 53:21 54:23 63:23
**good** 18:24 19:2 21:19 24:1 34:25 40:14, 19 42:22 47:8 52:5 62:18 63:23 66:24
**gotten** 34:9
**governance** 34:25
**government** 41:4
**great** 39:14 68:16
**Greg** 14:16, 20, 22, 23 16:5 19:16 20:4, 5, 8, 17 22:13, 14, 17 23:20 25:20 34:10 36:24 39:2, 13 69:25 70:11 75:14
**Greg's** 20:20, 25

**group** 13:21 56:23 57:3 58:6, 19
**grown** 74:14
**growth** 54:12, 18 55:7 56:6, 14
**guess** 20:20 54:6
**guy** 47:10

< H >
**HAMILTON** 77:3
**hand** 77:19
**handed** 7:4 28:9 30:13 32:23 43:19 69:4
**handle** 24:17 66:22 68:17
**handled** 66:4
**handling** 62:14
**happen** 36:13 63:10 67:1 68:15
**happened** 35:4 56:17 57:18 58:22
**happening** 24:8 73:21
**happens** 11:18 21:20 34:24 36:18
**Hart** 2:13 4:16
**HCC** 23:22
**head** 5:22 70:7 74:17
**heading** 48:18 60:24
**health** 21:10
**hear** 5:17 13:4
**help** 34:14
**hereinafter** 4:25
**hereof** 78:13
**hereunto** 77:19
**highlighted** 48:19
**highly** 20:4 24:4 35:18, 21 39:15
**hired** 21:16
**hiring** 11:5
**historical** 37:8
**home** 5:11
**honest** 50:21
**honestly** 72:23
**honesty** 9:4
**hour** 47:24
**HR** 14:15 19:13
**Human** 30:19
**Hypothetical** 45:19, 20, 21 49:19

< I >
**idea** 44:17 45:15, 22 48:21 56:20
**identification** 7:2 28:7 30:11 43:17 69:2
**identified** 31:9 34:3, 15, 16
**identifies** 36:5
**identify** 28:10 30:18 31:13, 23 32:3, 16 34:14 43:22 44:1 69:9 71:13
**Ihle-Adkins** 1:23
**immediately** 71:21
**implications** 61:2, 10
**importance** 62:24 63:8
**important** 11:7 53:11 61:17 63:3, 9 66:25
**impossible** 45:19
**impressed** 24:4, 17 53:7 66:23
**impression** 68:12
**impressions** 23:25
**impressive** 24:6, 9
**improper** 26:22
**improve** 62:22 72:16
**improved** 75:4
**improvements** 64:7
**inappropriate** 7:13, 14
**including** 8:7 29:12 38:5
**income** 15:8
**incorporate** 50:20
**independent** 40:25 41:15 42:23
**indicate** 20:8, 18 51:9
**indicated** 19:14 21:2 33:7 34:20 38:25 78:12
**indicates** 56:20 60:25 70:4
**indicating** 49:2 50:2 51:1 52:21 54:16 55:5 56:25 61:7 67:13, 25
**indication** 60:17
**individual** 17:17, 19 41:13 42:24
**individuals** 34:4
**industry** 54:14, 20 55:9 56:7, 16
**information** 8:5 17:11 49:1 50:1 51:1, 8, 23 52:9, 21 54:15 55:4 56:24 61:6 66:16 67:13, 24 74:10
**informed** 22:14 23:17
**In-House** 2:17, 22 4:20
**initiated** 29:9
**innovative** 48:23 49:4 50:4, 14 51:11
**inquiries** 8:8
**insistence** 42:9
**instance** 24:18, 23
**instructions** 6:2
**intelligent** 68:5
**interacted** 65:2
**interacting** 55:25 65:7
**interaction** 55:22 60:12 65:12, 17 66:6 68:25
**interactions** 55:20 56:1
**interest** 77:15
**internal** 21:19
**Interpersonal** 60:25
**interpret** 15:20
**interpretation** 33:24
**interview** 13:9, 12 16:20
**introduce** 4:9
**investment** 68:9
**involved** 44:8 73:6, 8
**involves** 74:9
**irrelevant** 74:6
**issue** 46:4
**issues** 10:4 21:10 61:2, 10, 19 62:4 63:6, 24 64:3 65:9 66:3, 7, 10, 18 67:7 68:11, 13, 18
**its** 61:19

< J >
**January** 12:13 15:12 16:13, 23
**jms@sspfirm.com** 2:9
**job** 17:1, 2 18:25 19:3 52:5 68:16
**joined** 62:21
**joint** 4:18
**Joshua** 2:4 4:13
**July** 45:10

< K >
**Kabat** 25:21
**KATHERINE** 1:15 3:3 4:4, 23 5:6 7:11 76:9 77:7, 11 78:19 79:24 80:24
**Katie** 5:6
**keep** 36:20
**keeps** 59:1
**kept** 63:6
**key** 29:14
**kind** 71:24
**knew** 49:21
**know** 9:23 10:1 13:2, 21 14:17 15:18 18:17 19:6 20:3, 5, 6, 10 21:7, 17 22:14, 25 23:22 24:21 33:19 35:15, 21 36:20 37:1 38:11 40:9, 23 43:5, 9, 10, 11, 13 44:8, 10, 11 45:1, 2, 3, 10, 11 50:17 52:8 53:13 54:7, 8 59:7 60:3 61:16 63:25 64:6, 14 66:22 68:15, 17 71:23 72:10 73:6, 15, 18, 20 74:7, 16, 19
**knowledge** 27:14 41:6 43:9 54:13, 19 55:8 56:7, 15

**known** 38:5

< L >
**L.P.A** 2:7
**Lamb** 35:8, 21 36:2
**lawful** 4:24
**lawyers** 4:20
**lead** 53:21
**leader** 40:16
**leaders** 73:7
**leadership** 15:19 35:24 50:23 56:20 60:16
**leading** 53:6, 18 73:3
**leave** 21:10 70:16, 20 71:7
**leaves** 44:20
**leaving** 70:8 71:2
**left** 71:5
**letter** 69:25 70:3
**level** 63:10
**limited** 8:7 9:21
**line** 12:16 48:19 66:1
**lines** 27:4 63:12, 20
**litigation** 10:4 33:20
**little** 35:16 38:17 47:24 62:8
**LLP** 2:14
**long** 10:16 31:4 32:23 51:18 52:2 56:8 61:20, 24 62:3
**longer** 48:4
**look** 31:19 32:2, 4, 15, 22, 25 33:10, 16 35:14, 18 39:17
**looked** 47:9 50:11, 12, 13
**looking** 21:18 31:13 40:16 62:6
**looks** 34:9 70:2
**lot** 32:24 52:1 60:8 61:22 62:4

< M >
**mail** 8:6
**main** 11:4 48:21 50:15 56:20
**maintaining** 48:24 49:5 50:5 51:12 60:25 61:8
**making** 11:5
**manage** 56:21 58:4, 17
**managed** 15:10 62:18
**management** 13:19 18:20 30:20, 25 48:19 52:19 72:16 73:11
**managing** 57:2 61:2, 10 64:4 66:20
**manner** 24:6 51:18 63:7, 16 68:14, 18
**MARKED** 3:6 7:1, 4 28:6, 9 30:10, 13 37:4 43:16, 19 69:1, 4
**material** 9:5 12:17 13:23, 24 14:13 29:23 32:24 37:20 66:14
**materials** 17:3 30:5, 6 31:22, 25 32:1, 2, 13, 15, 22 34:20 36:8 37:18, 21
**matter** 9:19 50:18 78:8
**matters** 9:3, 24 63:4
**MCHUGH** 1:7 2:17 4:5, 12, 14 6:23 8:13, 15 9:9 12:14 13:7 15:10, 14 16:5 18:21 19:5, 20 20:14, 18 26:3, 9, 13 27:9, 21 36:6, 22 45:17, 25 46:10, 17 47:1 49:3, 9, 12 50:3 51:2, 9, 25 52:23 53:25 54:17 55:6 56:5, 13 57:1, 8 58:17 59:2, 20 60:19, 21 61:8 63:14 64:23 65:7, 19 67:15 68:1, 22 70:6, 13 71:5, 12 73:2 78:3
**McHugh's** 13:10, 14, 17 14:24 15:2, 5 18:4 58:4 64:10 66:11
**mean** 8:3 9:2, 18 11:12 13:18 16:8 17:22 19:17 20:20 23:14 26:16 29:24 35:14 36:12 37:8, 13 41:3, 5, 17 42:8 52:1, 12 55:25 61:16 66:1, 13 72:12 73:15
**means** 15:18
**mechanism** 11:8, 12, 15
**media** 48:11
**meet** 11:20 13:9 14:15 16:20 21:14 47:13
**meeting** 6:12, 13 9:10 13:3, 20 14:11 15:16, 25 16:8, 9 20:21 21:24 22:6, 9, 16 23:13, 15 26:2, 8 28:12 30:3, 5, 7 31:3, 10, 15, 22 32:14, 16, 18 34:19, 21 35:9 36:11 37:6, 8, 12, 17, 18, 22 38:13 55:21 70:5, 12, 21, 23 73:23
**meetings** 6:22 9:17 10:7 12:16, 19, 20, 22, 25 13:6, 11 15:14, 22 16:15, 17 17:12 18:15 23:13, 16 52:16 53:25 54:4, 9 55:19 56:18 60:11, 13 68:25
**member** 12:11 36:6 41:4
**members** 6:17, 20, 24 10:8 15:21, 24 16:4 69:21
**memory** 31:17 64:19
**mentioned** 6:22 60:14
**mentioning** 6:21
**mergers** 24:15 63:9
**message** 8:6
**Michael** 2:12 4:16
**michael.cioffi@blankrome.com** 2:16
**middle** 29:6
**midyear** 13:14, 17 16:24 17:4
**million** 74:19, 20
**mind** 55:1
**minute** 75:4
**minutes** 28:12, 18, 25 37:24 47:25 48:3
**Mischaracterizes** 59:4
**missing** 40:21
**Misstates** 27:12 58:7
**Misstating** 65:22
**moment** 43:6
**month** 23:11 28:5
**move** 22:17 23:1 62:6
**moving** 62:7
**MRAs** 66:3
**multiple** 74:21, 22

< N >
**name** 5:4, 5 14:5, 6 19:1 57:24
**named** 25:2
**names** 38:14, 22, 24
**Nancy** 14:18
**nature** 16:13
**navigate** 67:9, 15 68:2
**necessarily** 14:7
**necessary** 40:11
**need** 5:21 11:18 21:16 26:23 30:6 33:7 49:25
**needed** 32:13 58:24
**needs** 40:24 41:14 48:22
**negotiations** 8:8
**neither** 77:13
**never** 12:4 46:21 49:12 50:10 51:16 57:22, 24 58:22 59:5 60:4
**No.______Change** 79:2, 5, 8, 11, 14, 17, 20 80:2, 5, 8, 11, 14, 17, 20

**No._____Line** 79:2, 5, 8, 11, 14, 17, 20 80:2, 5, 8, 11, 14, 17, 20
**nodding** 5:22
**Notaries** 1:24
**Notary** 1:22 77:5, 25
**Notice** 1:17 7:12
**notices** 8:9
**notify** 12:6, 9
**Notwithstanding** 5:19
**Number** 4:7 7:5, 23 18:25 21:8 28:10 29:1, 5 30:14 37:5, 23 43:20 45:3 48:15 52:4, 18 61:14 69:5 74:16, 17
**numerous** 53:4 57:7 58:9 64:12

**< O >**
**oath** 78:15
**objecting** 59:1
**objection** 7:11 11:11 16:7 22:3, 10 23:7 25:11 26:5, 15 27:11, 24 32:19 35:10 37:13 39:21 41:1, 7, 16 42:5 43:1 44:13 45:18 46:2, 19 47:2 49:7, 17 50:7 51:3 52:11, 25 54:21 57:5 58:7 59:4 61:12 63:17 64:5 65:21 67:18 72:19 73:4 74:6 75:2, 17, 24
**objective** 49:1 50:1 51:1, 8, 23 52:9, 21 54:1, 15 55:4 56:24 61:6 67:12, 24
**observations** 52:12
**observe** 13:7 16:18 64:22, 25
**obvious** 23:21
**obviously** 21:11, 16 24:10 35:17, 23 37:9 53:9 59:8 60:1 62:3 63:24 66:2 69:14
**occasionally** 9:25 17:8, 10
**occurred** 23:6 70:24
**occurring** 23:11
**October** 15:13
**offer** 35:3 78:14
**office** 77:20
**officer** 29:11 43:24 69:10
**official** 77:20
**officially** 73:19
**OHIO** 1:3, 21, 22, 24 2:8, 15 4:7 5:12 77:2, 6, 20, 25
**Okay** 5:16 7:23 9:7 10:7 14:6 19:18 28:23 29:18 33:9 45:9, 24 48:17 60:21 69:19
**Once** 23:17 60:9 71:22
**ongoing** 62:5 73:14
**opening** 12:7 38:19
**operated** 51:17 68:15
**operating** 36:20
**operationally** 59:14
**operator** 19:2
**opinion** 19:8 20:5, 20, 22, 25 38:18 40:8, 9, 12 41:20 51:14, 16 53:10, 14 54:1, 3 59:9 62:10 68:22, 24
**optimization** 54:13, 19 55:8 56:6, 15
**options** 35:4
**oral** 8:5
**order** 44:24 62:24
**organic** 54:12, 18 55:7 56:6, 14
**organizations** 74:11
**originally** 27:8
**outcome** 73:20
**outline** 54:12, 18 55:7 56:5, 14
**outside** 9:4, 8, 22 10:7 16:9 21:17 25:3 40:15 41:20
**overall** 66:23

**< P >**
**p.m** 72:5, 6 76:14
**PAGE** 3:3 8:1, 10 28:24 29:4, 6 31:17, 20 33:1, 3, 6, 17, 21 34:1, 6, 10 35:5 37:24 48:15 52:19 60:24 69:17 79:2, 5, 8, 11, 14, 17, 20 80:2, 5, 8, 11, 14, 17, 20
**pages** 32:1, 4, 23 71:11
**Paragraph** 8:17 29:5 38:1 70:3
**part** 12:18 16:2 30:2 53:11 56:3, 11 61:18 72:20 73:5 74:8
**participate** 13:13 16:24
**particular** 24:18, 23 30:3 42:7 63:13
**parties** 77:14
**party** 7:12 31:11
**party's** 41:20
**pas@sspfirm.com** 2:9
**pass** 9:24
**Patterson** 2:7
**PENALTY** 78:5, 6
**people** 19:10 59:8, 12 66:2 68:17
**people's** 65:11
**percent** 22:16 25:8
**perform** 13:13, 15
**performance** 15:6 18:10
**performed** 19:3 35:23
**period** 15:12 22:19 49:10
**PERJURY** 78:5, 6
**person** 6:13 8:5 14:16 18:16 39:1 41:21, 22 44:18 46:14 47:9
**Personal** 67:4
**personally** 4:17
**perspective** 55:14
**pertinent** 33:1
**Peter** 2:1 4:11
**Phenise** 2:17 4:19
**Phil** 4:12 6:23 8:15, 16 9:9 12:14, 15, 21 13:7, 10, 13, 17 14:24 15:2, 5, 10, 13 16:5 18:4, 21, 24 19:5, 20 20:14, 18 21:1 26:3, 9, 13 27:21 36:5, 22 45:17, 25 46:10, 15, 17 47:1, 18 49:3, 9, 12 50:3, 18, 22 51:2, 9, 17, 24 52:2, 6, 23 53:14, 25 54:17 55:6, 16 56:2, 4, 13 57:1, 17, 20 58:4, 17, 20, 25 59:2, 10, 11, 12, 20 60:3, 18, 21 61:8 62:2, 3 63:14, 20 64:4, 10, 23 65:7 66:11 67:15 68:1, 15 70:5, 7, 13, 15, 19, 20 71:2, 5, 6 73:2, 6
**PHILIP** 1:7 2:17 4:5, 14 8:13 78:3
**Phil's** 64:13
**Phone** 2:8, 16 6:13
**Place** 1:20 11:6 12:18 14:1 22:21 64:21 77:11
**Plaintiff** 1:8, 16 2:1, 17 4:11, 14
**Plaintiff's** 3:7, 8, 9 7:1 28:6 30:10 43:16 69:1
**plan** 11:5, 6 30:20 35:2
**planning** 37:14
**play** 21:22 23:23 72:1
**played** 62:16
**playing** 33:25 34:2
**please** 4:22 5:5, 18 28:10 30:18 31:18 33:6 35:12 43:22 58:11 69:9 71:13
**PNC** 2:14
**point** 11:19 21:5, 13 22:25 35:22 39:10 54:10 58:23 63:23 64:1, 8 66:13, 14

**Poole** 2:17 4:19 44:20 47:22
**position** 6:8 12:7 29:11 57:15 63:1 71:19
**positions** 56:6
**positive** 62:7
**possess** 54:11
**possessing** 54:17 55:6 56:5, 13
**potential** 19:10 20:6 21:1 29:10, 13, 25 38:4, 6, 11 39:3 40:5, 8, 13, 16 57:25
**practice** 37:9 40:14, 19, 22 42:2, 22
**prepare** 6:10 34:4
**Present** 2:17 12:17 13:3, 4 62:13
**presentation** 14:12, 14 20:22 30:8, 23 31:5 65:15
**presentations** 15:25 16:16 24:14 52:3, 15 53:24 54:5, 6, 7 55:18, 23 60:10 65:20 68:21
**presented** 12:2 20:2 31:9, 14, 24 32:17 34:11 46:5
**presenting** 12:16
**presents** 24:5
**president** 6:9 11:9, 16, 24 12:3, 7 16:6 22:2 23:3 24:24, 25 25:7, 10 26:4, 10, 14 27:10, 23 39:3 40:5 41:14 42:3, 24 43:24 46:1, 10, 18 59:21 67:4 71:15, 20 75:15, 23
**Presumably** 16:1 30:23 69:21
**pretty** 15:16
**previously** 38:1, 25
**primarily** 65:8
**primary** 72:15
**Prior** 12:13 14:17 16:13, 23 22:11 58:7
**priorities** 29:14
**probably** 47:8 62:5 74:22
**process** 11:20, 23 12:12 16:3 20:3, 23 21:2, 3, 4, 12, 14, 15, 22, 23 23:19, 24 24:2 30:2 73:14
**produce** 8:12
**production** 7:14
**productive** 22:22
**project** 72:13
**promoted** 71:19
**promotion** 70:6, 13
**prompt** 63:7, 15
**proprietary** 74:10
**provided** 7:9
**providing** 31:24
**Public** 1:22 10:21 77:5, 25
**Public-State** 1:24
**purely** 50:12 52:14
**purpose** 31:2 40:2 72:24
**Pursuant** 1:17 4:17 77:12
**pursue** 47:11
**put** 22:21 35:5 39:17

**< Q >**
**qualification** 46:4
**qualified** 20:6, 9, 14, 18 39:15 47:20 49:10, 13 55:16 57:8 58:10 59:2, 6, 13, 20, 23, 24, 25 77:5
**qualities** 39:16 40:9, 13
**question** 5:19, 24, 25 11:12 16:8 22:4, 11 26:21 27:12 32:7, 8, 9, 12 33:4 39:22, 24 41:2, 18, 25 42:6, 12, 15, 16, 20 43:2 44:14 45:19, 20 46:3, 6, 20 47:3 49:8, 24 50:25 51:4 53:3 54:24 56:9, 10 58:11, 12, 14 61:13 63:18 65:16 67:19 72:20
**questions** 5:17 38:2 54:8 75:8, 10 76:1, 2
**question's** 26:22
**quite** 50:21

**< R >**
**raise** 72:17
**raised** 59:10 73:11
**raising** 73:23
**ran** 63:20
**range** 75:1
**rare** 68:6
**rated** 57:12
**ratings** 62:20, 22 63:10 72:17 73:12, 13, 24
**Raymer** 1:22 77:4, 24
**read** 56:8 58:11 71:18 76:3 78:7, 9
**readiness** 29:14
**reads** 29:8 38:2 48:21 54:11 67:7
**ready** 35:15 69:23
**really** 36:17 37:2 56:17 57:22 65:12
**Reason** 79:4, 7, 10, 13, 16, 19, 22 80:4, 7, 10, 13, 16, 19, 22
**recall** 7:7 14:5, 6 15:7, 13, 16 17:10, 12, 16, 25 18:3, 25 19:22 20:10, 11, 25 21:23 23:5, 8, 11 25:15, 17, 19, 24 26:11, 12 28:1 31:1, 5, 19 32:20 33:5 35:7, 19, 25 36:25 37:5, 11 38:14, 21, 24 39:5, 7 44:7, 10 45:1 46:12, 14 66:10, 18 70:11, 14, 17, 18, 22, 23 71:1 72:15, 25 73:2, 10, 17, 21, 22 75:6
**received** 28:20 37:6, 12, 16 69:22
**recess** 48:8 72:5
**recite** 24:7
**recollection** 12:24 27:2, 25 33:2 36:9 39:11 62:23 65:5 69:24 75:3
**recommendation** 20:17
**record** 4:1 5:5 6:1 7:10, 15 8:25 22:4 27:12 48:2, 6, 10 58:8 59:5 65:22 72:3, 4, 7, 21 73:5 76:5
**recovery** 67:8
**Redundant** 54:21 57:5 61:13 67:19
**refer** 29:4 32:3 33:14 37:23 69:17 71:11
**reference** 13:25 17:9 28:23 38:16 65:10
**REFERENCED** 3:6 17:24 23:12
**referencing** 12:5 14:3, 10
**referring** 14:6 37:25 52:18 67:2
**reflected** 48:21 56:21
**reflects** 57:14
**refresh** 36:9
**refresher** 72:14
**refreshing** 33:1
**regard** 9:3, 5, 18, 19 50:18, 22 58:21 62:2, 11
**regarding** 6:17 9:24 10:9 36:9 40:12 46:25 58:3
**regulators** 35:1 61:1, 9, 17, 21, 22 62:4, 14, 16, 18 63:4, 15 64:21, 23 65:1, 3, 6, 8, 13, 14, 15, 19 66:3, 19, 23 72:17 73:11, 22
**regulatory** 24:16 71:23
**related** 9:24 37:14
**relationship** 12:14 16:14
**relative** 15:6 18:10 77:13
**relevant** 10:3

**remember** 17:22 18:5 26:1 27:1 29:24 35:11, 17 37:2, 9 45:2 63:12 71:7, 9 72:13, 22, 23 73:7, 15 74:1
**repeat** 5:18 32:8, 9 49:17, 25 63:19
**rephrase** 5:19 39:24
**report** 57:10, 13 65:9
**reported** 65:3, 6 66:5, 8, 11, 18
**reporter** 4:21 5:21
**reporting** 71:24 77:16
**reports** 13:10 16:21 66:7
**represent** 4:10, 17 31:8
**request** 7:13, 23 8:11
**requested** 7:19
**requests** 8:9
**require** 67:9
**required** 35:1 42:7, 22 43:3, 12
**requirement** 40:24 41:3, 5, 13, 18 42:1, 6, 8, 21 43:2
**requirements** 71:23
**resilience** 67:10, 16 68:2
**respect** 7:24 10:23 11:2 12:20 18:21, 22 19:5, 20, 25 27:9 29:18 31:12 49:3 50:4 51:2, 10 52:6, 23 54:17 55:6 56:3, 5, 10, 13 57:1 60:15 61:8 62:14 66:11, 17, 19 67:15 68:1
**respects** 77:12
**responded** 7:16
**response** 38:2
**responses** 8:9
**responsible** 40:19 43:14 73:3
**responsive** 10:2
**restrict** 31:25
**result** 73:10, 24 77:15
**results** 18:1, 4 45:16 60:15
**retire** 21:9
**review** 13:16, 19, 24 14:24 15:2, 5, 8 17:6 18:6, 9 28:20 29:9 30:24 31:25 38:16 60:15
**reviewed** 13:22 29:12, 25 69:15
**reviewing** 54:9
**reviews** 13:14, 15, 17 14:25 16:25 17:4 18:12, 19
**RHR** 25:5, 6, 24 27:8, 21 39:2, 6, 20 40:3, 4 43:25 44:5, 15, 24, 25 45:3, 13, 16 57:11 60:14, 18, 20
**Right** 25:13, 22 28:21 31:20 32:25 44:3 51:20 57:21, 24 68:5
**right-hand** 43:25
**rigorous** 48:24 49:5 50:6 51:12
**rise** 61:2, 10
**risk** 70:6, 13 72:16
**Road** 5:11
**role** 10:22 11:2 18:11 23:24 25:1 27:22 36:15 38:5, 8 41:23 47:12 51:18 52:6 53:11 61:3 62:16 66:23 68:16 70:7
**roles** 11:4, 7 18:25 52:4, 5 53:18
**Rome** 2:14 4:16
**room** 44:20 47:22
**rooted** 54:13, 19 55:8 56:7, 15
**RPR** 1:22 77:4, 24
**Rule** 77:17
**run** 29:1
**running** 9:25

**< S >**
**S/Wendy** 77:24
**Saba** 2:1, 7 3:4 4:11 5:3 7:3, 18 11:14 16:10 22:7 23:4, 10 25:13, 16 26:7, 17, 21 27:5, 18, 19 28:2, 8 30:12 31:21 32:9, 11 33:7, 11, 13, 23 34:2, 8, 13 35:20 37:15 39:24 40:1 41:6, 10, 11, 24 42:10, 14, 18, 19 43:7, 18 44:21 45:23 46:7, 8, 24 48:2, 13 49:15, 20, 22 50:24 51:6, 7 52:17 53:23 54:25 55:2, 3 58:2, 14, 15 59:18 62:12 64:2, 9 66:9 67:22, 23 69:3 72:3, 9 73:1, 9 74:18 75:8, 17, 24 76:2
**sake** 5:20
**save** 78:10
**saw** 60:8 63:7 68:17
**saying** 21:1 59:1
**says** 8:2 28:11, 24 29:21, 24 30:19 36:3 39:22 43:23 45:10 69:10, 21 71:14
**scrutiny** 67:9
**se** 66:6
**seal** 77:20
**second** 8:11 29:4 33:17 37:24 44:1 60:24 70:3
**see** 15:8 17:3 28:23 29:16 30:5 31:22 32:13 33:7 34:20, 24 35:13 36:2, 5 38:9 48:19 51:19 61:4 67:5 70:9
**seen** 7:5 12:4 28:14, 15 30:22 36:8 44:6 66:15 69:12, 14, 15, 20
**select** 23:19
**selected** 25:21
**selecting** 20:23 22:1
**selection** 21:2 22:5
**sent** 37:18, 21 69:22
**sentence** 38:2, 9
**separate** 32:4
**separately** 20:24 21:3 37:19
**September** 5:9 49:2 50:2 51:10 52:22 54:16 55:5 56:25 61:7 67:14, 25 70:5, 12
**series** 5:16
**serve** 10:20 20:14 41:14
**served** 7:7
**serving** 26:3, 9, 13 27:9
**set** 24:21 77:19
**Shaffer** 14:20 19:17 29:9, 19, 25 31:15 32:18 34:18 35:7 38:3, 12 70:4, 11
**shaking** 5:21
**share** 61:19
**shared** 17:11 30:24
**sharing** 19:9, 11
**Sharpe** 2:5
**she'd** 31:21
**SHEET** 78:1, 13 79:1 80:1
**sheets** 15:9
**she'll** 33:2
**side** 48:23 49:4 50:5, 14 51:11
**sign** 69:23 76:3
**SIGNATURE:_________________________DATE** 79:23 80:23
**signed** 69:14 71:22 78:16
**significant** 74:16
**simultaneously** 48:24 49:5 50:5 51:12
**sit** 31:1 38:21 40:23 41:25 45:15
**situation** 49:19
**situations** 68:7
**skill** 24:21
**skills** 40:5, 10, 13 53:16, 21
**slightly** 21:21

**Smith** 2:4 4:13
**somewhat** 23:23
**sorry** 14:23 19:17 42:14
**sort** 50:8 68:20
**sound** 40:21 42:2, 22
**SOUTHERN** 1:3 4:6
**speak** 6:16 12:21 62:23 65:22
**speaking** 12:25 49:16 60:6
**specific** 12:4, 24 14:5 15:11 17:25 18:3 19:22 20:13 21:23 23:9 27:2 32:12 36:25 38:14, 22, 24 46:16, 25 50:25 59:19 65:5 66:10, 13, 14, 21 72:24 75:6
**specifically** 15:9 17:10, 22 19:1 31:6 32:5 49:20 58:1 62:13 64:8 69:24 70:16 71:3 72:25 74:1
**specifics** 17:12 31:4 35:19 37:3 63:24 64:1 71:9 72:13 73:18
**spell** 5:5
**Spence** 8:18, 20, 22 9:9 16:14, 18 19:25 20:4 25:4 27:8, 22 29:13, 21 32:21 33:5 34:22 39:4, 19 40:2 45:6 46:13 49:2 50:3 51:1, 9 52:22 54:16 55:5 56:4, 12, 25 60:15, 18 61:7 62:13 65:1, 7, 19 66:17, 19 67:14, 25 68:21 71:19 75:23
**Spence's** 16:21, 24 17:4, 6 18:1, 6, 9 40:13 64:16
**spoke** 54:7
**sponsor** 74:3, 13, 15
**sponsorship** 74:5, 14
**SS** 77:2
**Stagnaro** 2:7
**stamp** 29:1 43:20
**stamped** 30:14 48:16 69:5
**standing** 61:1, 9, 20, 24 62:19 63:1, 22 64:21 66:24
**stands** 26:21
**start** 48:3
**started** 64:19, 20 73:19
**starts** 29:7
**State** 1:22 4:10 5:4 7:10 68:4 74:16 77:2, 6, 25
**statements** 8:8 15:8
**STATES** 1:2 4:6
**status** 66:7
**stipulation** 77:12
**Stone** 5:11
**stood** 20:11 65:9
**story** 24:8
**strategic** 24:10 48:23 49:4 50:5, 14, 19 51:11, 15, 22 52:20, 24 53:9, 15 54:11 60:7
**strategically** 53:7, 21 59:16
**strategy** 24:14 53:6, 8, 17 54:12 55:13 63:11 64:18
**Street** 1:20 2:15
**strength** 24:10 53:12 56:22 57:2 58:4, 18 62:1
**strides** 62:25
**strike** 27:6
**strong** 51:15 55:12 68:14
**stuff** 71:24
**subheading** 52:20
**subordinates** 13:10 16:21
**subparagraph** 8:2
**succeed** 25:21 39:2 75:14
**succeeding** 16:5
39:13
**successful** 22:22
**succession** 10:4, 9, 23 11:2, 6 22:8 29:10, 12 30:1, 20 33:21 34:7, 12 35:2 37:14
**successor** 22:21 23:20 26:4, 10, 13 36:3, 10, 16, 23 37:2 38:20 52:8
**successors** 26:25
**sudden** 36:18
**summary** 13:20
**superior** 49:3 50:3 51:2, 9 52:22 54:17 55:6 56:4, 12, 13 57:1 60:18 61:8 67:14 68:1
**supported** 51:24
**suppose** 41:23
**Sure** 11:1, 5 20:21 25:8 35:13 40:20 41:10 42:18 44:2, 3 46:7 50:1 54:25 55:2 58:14 66:24 67:22
**surprised** 70:17
**survey** 18:1, 4
**surveys** 14:25 15:3 17:7, 21 18:7
**swear** 4:22
**sworn** 4:24 77:8

< T >
**take** 4:3 14:1 18:18 19:21 44:1 68:7
**Taken** 1:16 5:13 48:8 72:5 77:12 78:2, 8
**talent** 13:19, 25 14:4, 10 30:20, 25 31:9 32:4 34:3, 4
**talented** 55:13
**talk** 23:14 38:17
**talked** 13:4 22:17, 18 63:11 65:14
**talks** 33:21
**Tayfun** 27:9, 21
**team** 47:15 56:22 57:2 58:5, 18 65:12
**telecopy** 8:6
**telephone** 8:6
**tell** 24:8 27:1 28:5 32:25 53:13 70:14 74:12
**temporarily** 36:19
**ten** 47:25
**tenure** 52:4
**term** 15:17 43:2 44:3
**terms** 19:20, 25 22:23 52:12 71:23 73:18
**test** 31:17
**testified** 31:21 49:11 57:7 58:9
**testimony** 32:20 33:23 34:8 58:8 65:22
**text** 8:6
**TFT** 72:10, 12, 15, 22 73:3, 8, 11, 16
**Thank** 75:9
**thing** 12:4 13:18 50:15 70:14, 16
**things** 17:13 54:9 57:25 58:24 63:6, 9 65:9 68:10, 15 71:25
**think** 11:4, 25 15:15 18:11, 17, 18, 19, 24 19:14 21:14, 20 24:13, 20, 25 25:8 35:1, 3, 17 36:12, 14 39:6 47:13, 24 48:4 50:11, 18 52:5 53:5, 9, 10, 13 55:13 57:12, 14, 20 59:12, 13 60:6 61:22 63:8 64:18 68:10, 12
**thinking** 35:17 48:23 49:4 50:4, 14, 20 51:11, 15
**THIRD** 1:10, 20 2:21, 22 4:5, 20 6:17, 20 10:5, 9, 14, 17, 23 11:3, 8, 10, 17 12:3, 6, 8, 9, 15 13:7 15:19 16:2, 6, 18 20:15, 19 22:1, 22 24:13 25:4,

6, 9, 17 26:14 27:7, 10, 20, 23 28:11 31:11 38:1 39:3 43:24 44:12, 14, 18, 19, 22 45:13 46:1, 11, 18 51:21 52:2, 4 59:17, 21 60:2 61:1, 9, 18, 23 62:5, 20, 24 67:4 69:17 71:14 72:11 73:25 74:3, 11, 12 75:23 78:4
**Third-McHugh** 28:25 30:14, 15 43:20, 21 48:16 56:19 67:2 69:6, 18
**third-party** 40:12, 15, 25 41:15 42:4, 24
**third-party's** 40:8
**Thomas** 2:22 4:19
**thought** 20:4 24:1, 2, 10, 18 35:24 39:14, 16 47:6, 10, 11, 19 58:9, 23 59:24 62:10
**thoughts** 19:9, 11 34:11, 23 35:3, 6 62:10 66:25
**thousands** 60:1
**three** 33:20 35:15
**Tim** 8:22 9:6, 22 14:17 16:14, 15, 18, 20, 24 17:3, 6 18:1, 6, 9 19:25 20:4, 10 24:1, 3, 5, 23 25:4 27:8 28:1 32:21 35:5, 15 39:4, 6, 14, 19 40:2, 13 45:6, 8 46:13 47:5, 8, 10, 16 49:2 50:3, 13, 18 51:1, 9, 14 52:22 53:5 54:16 55:5, 12 56:4, 12, 25 57:11, 12, 19 59:24 60:8, 15, 18, 20 61:7 62:1, 11, 13, 23 64:16, 18 65:1, 7, 19 67:14, 25 68:4, 12, 19 71:19 75:23
**Time** 1:19 4:2 10:25 11:20, 21 14:1 16:9, 11 17:13, 24 19:22 20:1 21:5, 13, 20, 22 22:15, 19, 20, 25 23:2 25:11, 13, 25 26:6, 16, 17, 23 27:17 28:16 31:4 33:9 35:22, 25 36:1 39:10 41:9 43:13 46:6 47:15 48:11 51:18 52:2 58:13 61:24 62:3 63:21 67:21 69:13 70:15, 17 74:14 77:10
**timelines** 29:10, 13 30:1
**timely** 63:6, 15
**times** 53:4 57:8 58:9 61:14 65:18
**timing** 22:24 73:18
**Timothy** 8:18, 20
**Tim's** 40:4 53:5, 12 55:12 61:21 66:22 70:6, 13
**Today** 4:2, 3 6:17 7:21 8:24 31:1 38:21 40:23 45:15
**today's** 6:10 48:11
**told** 70:15, 19 71:7
**top** 13:21 15:19 29:12 74:17
**topic** 16:5
**total** 74:21
**touched** 18:14
**transcript** 74:9 76:4 78:7
**transfer** 8:4
**Transforming** 72:10 73:25
**tried** 44:4
**trip** 9:23
**true** 78:10
**truth** 77:9
**try** 5:24
**trying** 26:19 49:13, 15, 16 72:12
**Tuesday** 4:2
**turn** 56:19
**Tuzun** 27:9, 21 36:5
**two** 33:19 36:13 50:9, 11 51:16 55:15 60:19 62:9 68:20 71:11
**type** 58:21
**types** 71:25

< U >
**uh-huhs** 5:22
**uh-uhs** 5:22
**ultimately** 73:11
**Unanimous** 69:10, 14, 23 71:14, 17
**uncertainty** 67:8
**undersigned** 77:4
**understand** 5:18 6:2 49:24
**understanding** 10:22 11:1 24:16 41:12 42:1, 20 71:4 74:25 78:13
**undertakes** 20:24 21:3
**unexpected** 36:18
**unfair** 57:23
**unique** 50:19 68:9
**uniquely** 51:14 55:13 68:4
**UNITED** 1:2 4:6
**Updates** 30:21
**upper** 43:25
**use** 15:17 44:3 72:14
**usually** 12:17 14:15 37:7

< V >
**vague** 43:2
**various** 7:24
**vein** 60:7
**verbally** 5:21
**versus** 4:5 21:19
**vet** 42:24
**vetted** 40:24 41:14 42:3
**viable** 45:25 46:10, 17
**vice** 6:9
**video** 5:20
**Videoconference** 2:6
**Videographer** 1:24 4:1, 21 48:6, 10 72:4, 7 76:5
**videotape** 4:1
**Videotaped** 1:12
**view** 40:19, 21 53:20 60:6
**viewing** 66:6
**vision** 54:12, 18 55:7 56:5, 14 60:7
**vs** 1:9 78:4

< W >
**wait** 5:23
**Walnut** 1:20
**want** 20:21 31:17, 19, 25 32:4, 25 33:2, 5, 14, 16 47:25 51:5 55:11 63:19
**wanted** 23:18 47:11 59:23
**wanting** 22:17, 19
**wants** 32:2
**way** 11:9 22:21 24:9, 14 26:15 27:3 28:23 47:1 53:8 62:16, 17 63:4, 5 68:6
**ways** 21:8 61:20 62:21 63:22
**week** 37:7, 21
**well** 14:16 19:3, 6 20:6 22:13 29:21 32:10 33:23 34:16 35:23 36:12 40:14 54:6 57:12, 13, 22 60:3 64:17, 18 73:13 74:21
**well-spoken** 24:6
**Wendy** 1:22 77:4
**went** 22:25 30:8
**we're** 5:20 34:2 40:21
**WESTERN** 1:4 4:7
**we've** 21:16 36:12 47:23
**whatsoever** 11:15
**WHEREOF** 77:19
**Winning** 43:23 44:9
**witness** 4:22, 24 7:11 22:13 25:15 26:24 27:16, 25 34:9

35:*13* 41:9, *17* 42:*16* 43:*5* 44:*17* 45:*21* 46:*6*, *22* 47:*4* 50:*10* 51:*5* 52:*14* 53:*2* 54:*23* 55:*1* 57:*10* 58:*12* 59:*7* 61:*16* 63:*20* 64:*6*, *22*, *25* 65:*24* 66:*1* 67:*21* 72:*22* 73:*6* 74:*12* 75:*6*, *25* 77:*19*
**word** 42:*6* 43:*12* 68:*5*
**words** 7:*25* 8:*2*
**work** 6:*6*, *7* 24:*4*
**worked** 10:*11* 12:*15* 44:*23*, *25*
**working** 24:*13*
**workplace** 13:*7* 16:*18*
**world** 67:*11*, *17* 68:*3*
**wrapped** 73:*19*
**written** 8:*5* 69:*10*, *14*, *23* 71:*14*, *17*

**< Y >**
**Yeah** 34:*6* 45:*8* 51:*6* 53:*13* 58:*14*
**year** 7:*8* 13:*19*, *20* 14:*1* 35:*2* 38:*15* 62:*20* 73:*13* 74:*13*
**years** 25:*1*, *2* 31:*6* 33:*20* 35:*16* 74:*22*
**Yep** 36:*7*

**< Z >**
**Zoom** 2:*6*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| **PHILIP R. MCHUGH** | : Case No. 1:21-cv-00238 |
| | : |
| Plaintiff, | : Judge Michael R. Barrett |
| | : |
| v. | : |
| | : **NOTICE OF DEPOSITION OF** |
| **FIFTH THIRD BANCORP, ET AL.,** | : **KATHERINE B. BLACKBURN** |
| | : **and** |
| Defendants. | : **REQUEST FOR PRODUCTION OF** |
| | : **DOCUMENTS** |

Please take notice that pursuant to Rule 30(b)(1) of the Federal Rules of Civil Procedure, Plaintiff Philip R. McHugh ("Plaintiff"), by and through counsel, will take the videotaped deposition of KATHERINE B. BLACKBURN, a Director of Defendants Fifth Third Bancorp and Fifth Third Bank, N.A., on Tuesday, June 11, 2024, beginning at 9:00 a.m. at the Fifth Third Center, 511 Walnut Street, Cincinnati, OH 45202. Said deposition will be taken in the presence of a Notary Public or some officer authorized by law to take depositions. The deposition will be stenographically and video recorded and shall continue from day to day until completed, and may be continued in progress as necessary in order to accommodate other scheduled director depositions in the same time frame. For clarification to defense counsel, this deposition will be taken as if on cross examination.

Plaintiffs are taking said deposition according to the Federal Rules of Civil Procedure and said deposition shall be used for any purpose contemplated by the Federal Rules of Civil Procedure. Plaintiff reserves the right to conduct such further depositions and discovery from Katherine B. Blackburn as may arise at a later date.

Pursuant to Fed. R. Civ. P. 30(b)(2), this notice is accompanied by a request to produce documents and tangible things under Rule 34.

PENGAD 800-631-6989
PLAINTIFF'S
EXHIBIT
Blackburn 1
12-3-24

Respectfully submitted,

*/s/ Joshua M. Smith*
Peter A. Saba (0055535)
Joshua M. Smith (0092360)
STAGNARO, SABA
& PATTERSON CO., L.P.A.
2623 Erie Avenue
Cincinnati, Ohio 45208
(513) 533-2701
(513) 533-2711 (fax)
pas@sspfirm.com
jms@sspfirm.com

*/s/ John J. McHugh*
John J. McHugh, III
McHUGH & McCARTHY, LTD
5580 Monroe Street
Sylvania, Ohio 43560
(419) 885-3597
(419) 885-3861 (fax)

**Co-Counsel for Plaintiff Philip R. McHugh**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| **PHILIP R. MCHUGH,** | : Case No. 1:21-cv-00238 |
| Plaintiff, | : Judge Michael R. Barrett |
| v. | : |
| **FIFTH THIRD BANCORP, *et al.*,** | : **PLAINTIFF'S REQUEST FOR PRODUCTION OF DOCUMENTS** |
| Defendants. | : |

Pursuant to Fed. R. Civ. P. 34, Plaintiff Philip R. McHugh ("Plaintiff") hereby submits the following Request for Production of Documents Directed to Defendants Fifth Third Bancorp, Fifth Third Bank N.A. (jointly "Fifth Third"), and their Director Katherine B. Blackburn. Plaintiff respectfully requests that Defendants provide responses to the offices of Stagnaro, Saba & Patterson Co., L.P.A., 2623 Erie Avenue, Cincinnati, Ohio 45208, **no later than thirty (30) days of the service of these Requests.**

Each of the following Requests for the Production of Documents shall be deemed continuing and Defendants and Director Katherine B. Blackburn are requested, pursuant to Rules 26(a) and 26(e) of the Federal Rules of Civil Procedure, to provide, by way of supplementary answers thereto, such additional information as may hereafter be obtained by the Defendants or persons acting on their behalf.

**INSTRUCTIONS AND DEFINITIONS**

1. These discovery requests must be answered in accordance with the requirements in and policies of Civ.R. 1, Civ.R. 11, Civ.R. 26 through 37, and any other applicable laws or rules. These requirements and policies include but are not limited to: effecting just results by eliminating delay, unnecessary expense, and all other impediments to the administration of justice; encouraging parties

to fully and thoroughly prepare and investigate their cases for trial and/or settlement; fairly responding to the substance of discovery requests without obfuscation or unjustified objection; fostering openness, honesty, and professionalism in litigation; and seeking truth. Consistent with this instruction, discovery requests should not be considered vague or unanswerable due to any grammatical, syntactical, typographical, capitalization, or semantic errors or idiosyncrasies, and all responses should fairly meet the substance of the discovery request.

2. In answering these Requests for the Production of Documents, Defendants and their Director are to divulge all information in their possession, custody, or control, or which are available to them, including information in the control of its attorneys, investigators, employees, agents or other representatives, or any other person or persons acting on its behalf.

3. Should Defendants deem as objectionable part, but not all, of any request to which an objection is made, it should consider the various parts and aspects of such request as being severable for that purpose. If any information is claimed as privileged or protected, please include a log identifying the nature of the claimed privilege or protection and the information or items claimed to be privileged.

4. Unless otherwise indicated, the scope of the requests for production of documents is the time period of January 1, 2015 to December 31, 2020.

5. Unless indicated to the contrary, "You" and "Your" shall refer to Katherine B. Blackburn.

6. "Defendants" shall include Fifth Third Bancorp, Fifth Third Bank, N.A., Gregory Carmichael, and/or any person or entity acting on its or his behalf, including, but not limited to, officers, directors, attorneys, investigators, employees, agents, or other representatives.

7. "Director" shall include any individual who was a member of Defendants' Board of Directors during the scope of these requests.

8. "Officer" shall include any individual designated as an officer of Defendants during the scope of these requests, including, but not limited to, Defendant Gregory D. Carmichael, Robert Shaffer, or Timothy Spence.

9. "McHugh" or "Plaintiff" shall mean Plaintiff Philip R. McHugh.

10. "Document" or "documents" includes all written or graphic matter of every kind or description, however produced or reproduced, whether drafted or final, original or copy, signed or unsigned, and regardless of whether approved, sent, received, redrafted or executed, including but not limited to correspondence, letters, memorandum, summaries of conversations or telephone conversations, minutes or records of meetings, conferences or seminars, notebooks, diaries, desk calendar, contracts, agreements, preliminary and final reports, opinions or reports of consultants, projections, estimates, financial statements, bills, invoices, receipts, loan sheets, checks, checkbooks, purchase orders, change orders, confirmations, facsimiles, e-mails, text messages, telegrams, telexes, computer disks, digital or analog recordings, tape recordings, video recordings, photographs, drawings, charts, and plans. The term "document" means every document as above defined known to Defendant and in Defendant's possession, custody, or control or under the control of its agents, attorneys, employers, employees, or other persons related by total or partial common ownership and includes every such document which can be located or discovered by diligent effort.

11. "Document" also includes electronically stored information ("ESI"). Where possible, ESI should be produced in its native form, except that ESI which is only accessible through proprietary software that is not commonly available in office software suites should be produced in a readily accessible electronic form (such as PDF, Word or similar text document, or Excel or similar spreadsheet). By way of example only:

a. documents created using Microsoft Word must be produced as a .doc or .docx file;

b. documents created using Microsoft Excel must be produced as a .slx or. xlsx file;

c. documents created using Microsoft PowerPoint must be produced as .ppt or .pptx files; and

d. e-mails or outlook calendars must be produced as .msg or .pst files.

12. "Person" and "persons" include natural persons, corporations, companies, firms, proprietorships, partnerships, associations, joint ventures, government agency or organization, and any other type of legal entity, whether formal or informal.

13. The words "relate to", "relating to" or "related to" shall mean that which implicitly or explicitly refers to, concerns, reflects, embodies or in any manner describes the subject matter of the document request.

14. The words "Communications" or "Communicate" mean any correspondence, disclosure, transfer or exchange of information, whether oral or written, and whether in person, by telephone, mail, e-mail, telecopy, text message or other "Document" form, including but not limited to discussions, statements, negotiations, inquiries, requests, notices, responses, or demands.

**REQUEST FOR PRODUCTION OF DOCUMENTS**

1. Communications (as defined above) between You and any other Director or Officer of Fifth Third which refers, mentions, or otherwise relates to:

a. Succession planning for the position of President and/or CEO of Fifth Third;

b. Identified and/or selected candidates for the position of President and/or CEO of Fifth Third;

c. Processes or timelines, whether proposed or final, with respect to the identification and/or selection of candidates for the position of President and/or CEO of Fifth Third.

d. Development of potential candidates for the position of President and/or CEO

of Fifth Third; and

e. Any facts upon which You or any other Director relied upon when identifying and/or selecting candidates for the position of President and/or CEO of Fifth Third.

f. Philip McHugh

g. Timothy Spence

**RESPONSE:**

2. Any Communications (as defined above) between You and Philip McHugh.

**RESPONSE:**

3. Any Communications (as defined above) between You and Timothy Spence.

**RESPONSE:**

4. All Documents created, received, or obtained by You which refer, mention, or otherwise relate to:

a. Succession planning for the position of President and/or CEO of Fifth Third;

b. Identified and/or selected candidates for the position of President and/or CEO of Fifth Third;

c. Processes or timelines, whether proposed or final, with respect to the

identification and/or selection of candidates for the position of President and/or CEO of Fifth Third;

d. Development of potential candidates for the position of President and/or CEO of Fifth Third; and

e. Any facts upon which You or any other Director relied upon when identifying and/or selecting candidates for the position of President and/or CEO of Fifth Third.

f. Philip McHugh

g. Timothy Spence

**<u>RESPONSE</u>:**

Respectfully submitted,

*<u>/s/ Joshua M. Smith</u>*
Peter A. Saba (0055535)
Joshua M. Smith (0092360)
STAGNARO, SABA
& PATTERSON CO., L.P.A.
2623 Erie Avenue
Cincinnati, Ohio 45208
(513) 533-2701
(513) 533-2711 (fax)
pas@sspfirm.com
jms@sspfirm.com

*<u>/s/ John J. McHugh</u>*
John J. McHugh, III
McHUGH & McCARTHY, LTD
5580 Monroe Street
Sylvania, Ohio 43560
(419) 885-3597
(419) 885-3861 (fax)

**Co-Counsel for Plaintiff Philip R. McHugh**

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the foregoing was served on all counsel of record this 29th day of February, 2024 via the Court's CM/ECF system.

/s/ Joshua M. Smith
Joshua M. Smith (0092360)

# EXHIBIT 2

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 3

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 4

# [PRODUCED FOR *IN CAMERA* INSPECTION]

FIFTH THIRD BANK

# Unanimous Written Consent: Officer Appointment

October 21, 2020

PLAINTIFF'S EXHIBIT
Blackburn 5
12-3-24
PENGAD 800-631-6989

Classification: Restricted

FIFTH THIRD BANK

Fifth Third Bancorp & Fifth Third Bank, N.A.

## Board of Directors

### Unanimous Written Consent: Officer Appointment

TABLE OF CONTENTS

CEO Note Regarding Officer Appointment

Press Release

Unanimous Written Consent: Board of Directors*

*Denotes items requiring unanimous written consent.*

FIFTH THIRD BANK
OFFICE OF THE SECRETARY

FIFTH THIRD BANK

Dear Board Members:

As previously discussed in our talent management and succession planning sessions, we are executing on the plan to promote Tim Spence to President. The lines of business, regional banking and strategic planning will now report to Tim. We plan to announce this on Monday, October 26. Attached is a draft of the external release.

As Bob Shaffer and I discussed with you at the September Board meeting, we believed that Phil McHugh could be at risk with Tim's promotion. And, in fact, Phil has decided not to accept the role of Head of Consumer and Business Banking and is leaving the company. This is unfortunate as this is one of the largest roles we have. However, we have a very capable leader, Howard Hammond, who will serve as the interim Head of Consumer and Business Banking. Howard currently leads our Retail Banking business and Fifth Third Securities. As Howard has the opportunity to work in this role, we will also test the market and conduct an external search for this position.

Included with this message is a request for unanimous consent to approve the promotion of Tim to President. I appreciate your prompt approval as we will be announcing his promotion on Monday morning. I am very excited for Tim and look forward to working with him as he further develops in his new role. Please let me know if you have any questions.

Thanks,

Greg

© Fifth Third Bank | All Rights Reserved | For Internal Use Only

Classification: Restricted



Confidential

FIFTH THIRD BANCORP
# NEWS RELEASE

***DRAFT 10/21/20***

CONTACTS
Ed Loyd (Media Relations)
email.address@53.com | 123-456-7890
Chris Doll (Investor Relations)
Christopher.Doll@53.com | 513-534-2345

October 26, 2020

## Fifth Third Announces Appointment of Timothy N. Spence as President

CINCINNATI – Fifth Third Bancorp (Nasdaq: FITB) today announced the appointment of Tim Spence as president. His promotion will support the Company's ongoing successful execution of its strategic initiatives and further strengthen its position as a leading regional bank.

In his new role, effective immediately, Spence will oversee all business lines and regional banking, while continuing his leadership of the Bank's strategy. It was Spence's strength in strategy that first brought him to Fifth Third in 2015. He led that area as chief strategy officer and then advanced in 2017 to head consumer banking and payments as well. Before joining Fifth Third, Spence was a senior partner in the financial services practice at Oliver Wyman, a global strategy and risk management consulting firm. Spence will continue to report to Greg Carmichael, the Company's chairman and chief executive officer.

"Tim has demonstrated extraordinary leadership and vision in driving the strategy and execution to transform Fifth Third through innovation and technology," said Carmichael. "Over the past several years, he has been a principal architect and catalyst of many of the Company's most important strategic initiatives. Those initiatives include organic growth investments, numerous partnerships with fintechs and other third parties, and the 2019 acquisition of MB Financial Inc. in Chicago – a move that dramatically changed the competitive landscape and positioned us for success in one of our most important markets. Tim is keenly focused on solutions that enable Fifth Third to best serve our customers – from individuals to small and large businesses – and help them achieve their goals."

Spence long has been heralded for his commitment to innovation and has helped the Bank significantly advance its digital transformation. In 2018, American Banker recognized him as Digital Banker of the Year, an award whose past honorees have included forward-thinking leaders from the nation's largest financial institutions. In addition to recognizing his many achievements to date, that award highlighted his customer-centric approach, which has been the hallmark of Spence's banking career.

Originally from the Pacific Northwest, Spence and his family make their home in Cincinnati. Spence devotes time to several local community and economic development organizations, including serving on the executive committee of the board at Cintrifuse, a public-private partnership that exists to build a sustainable tech-based economy in Greater Cincinnati, on the advisory board for Miami University's Altman Institute for Entrepreneurship, and as member and co-chair of the commerce committee for the

Classification: Internal Use

FIFTH THIRD BANCORP
NEWS RELEASE

Cincinnati Chamber's RESTART Taskforce. He also serves as a board member for the Consumer Bankers Association.

**About Fifth Third**

Fifth Third Bancorp is a diversified financial services company headquartered in Cincinnati, Ohio, and the indirect parent company of Fifth Third Bank, National Association, a federally chartered institution. As of September 30, 2020, the Company had $202 billion in assets and operates 1,122 full-service Banking Centers, and 2,414 Fifth Third branded ATMs in Ohio, Kentucky, Indiana, Michigan, Illinois, Florida, Tennessee, West Virginia, Georgia, North Carolina and South Carolina. In total, Fifth Third provides its customers with access to approximately 52,000 fee-free ATMs across the United States. Fifth Third operates four main businesses: Commercial Banking, Branch Banking, Consumer Lending, and Wealth & Asset Management. Fifth Third is among the largest money managers in the Midwest and, as of September 30, 2020, had $427 billion in assets under care, of which it managed $53 billion for individuals, corporations and not-for-profit organizations through its Trust and Registered Investment Advisory businesses. Investor information and press releases can be viewed at www.53.com. Fifth Third's common stock is traded on the NASDAQ® Global Select Market under the symbol "FITB."

###

Classification: Internal Use



Confidential

FIFTHTHIRD-MCHUGH-001220

**FIFTH THIRD BANCORP**

**UNANIMOUS WRITTEN CONSENT OF THE BOARDS OF DIRECTORS APPOINTING PRESIDENT**

**October 26, 2020**

The undersigned, being all of the Directors of Fifth Third Bancorp, an Ohio Corporation ("Bancorp"), in accordance with Section 1701.54 of the Ohio Revised Code, do hereby authorize, consent, and agree to the adoption, without a meeting, of the following resolutions through this unanimous written consent (this "Consent"), effective as of the date first set forth above:

**WHEREAS,** the members of the Board, in connection with succession and leadership planning, have discussed potential promotions and appointments to senior officer positions of Bancorp at previous meetings;

**WHEREAS,** the members of the Board have determined that it is appropriate to implement one such promotion and appointment at this time;

**NOW, THEREFORE**, it is hereby:

**OFFICER APPOINTMENT**

**RESOLVED**, that Timothy N. Spence be promoted and appointed to the position of President of Bancorp;

**GENERAL RESOLUTIONS**

**RESOLVED FURTHER,** that the officers of the Bancorp be, and each are hereby, authorized, directed and empowered to perform any and all other acts and things as in such officer's opinion may be necessary or appropriate in order to carry out the intent and purposes of the foregoing resolution with respect to the Bancorp; and

**RESOLVED FURTHER,** that any act of any Director or officer of the Bancorp and of any person designated or authorized to act by any officer of the Bancorp, which act would have been authorized by the foregoing resolutions except that such act was taken prior to the adoption of such resolutions is hereby ratified, confirmed, approved, and adopted as the act of the Bancorp.

[Remainder of page intentionally left blank. Signature page follows.]

In Witness Whereof, the undersigned Directors have executed this signature page as of the date first set forth above in this Unanimous Written Consent.

Nicholas K. Akins October 22, 2020 3:38 PM

Mitchell S. Feiger October 22, 2020 4:25 PM

B. Evan Bayh III October 22, 2020 9:53 AM

Thomas H. Harvey October 21, 2020 11:04 PM

Jorge L. Benitez October 22, 2020 6:27 AM

Gary R. Heminger October 22, 2020 6:00 PM

Katherine B. Blackburn October 21, 2020 9:05 PM

Jewell D. Hoover October 21, 2020 7:25 PM

Emerson L. Brumback October 22, 2020 9:22 AM

Eileen L. Mallesch October 21, 2020 6:04 PM

Greg D. Carmichael October 22, 2020 8:41 AM

Michael B. McCallister October 22, 2020 12:49 PM

Linda W. Clement-Holmes October 21, 2020 7:17 PM

Marsha C. Williams October 21, 2020 7:01 PM

C. Bryan Daniels October 21, 2020 7:07 PM