UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

PHILIP R. MCHUGH,
Plaintiff,
vs.
FIFTH THIRD BANCORP, et al.,
Defendants.

CASE NO. 1:21-cv-00238

Videotaped Deposition of: EMERSON LEE BRUMBACK
Taken: By the Plaintiff
Pursuant to Notice
Date: November 22, 2024
Time: Commencing at 10:12 a.m.
Place: Fifth Third Center
511 Walnut Street
Cincinnati, Ohio 45202
Before: Wendy L. Raymer, RPR, CRR
Notary Public - State of Ohio
and
Connie Ihle-Adkins, Videographer
Notaries Public-State of Ohio

APPEARANCES:

On behalf of the Plaintiff:

Peter A. Saba, Esq.
and
Joshua M. Smith, Esq.
and
Bailey E. Sharpe, Esq.
(Appearing via Zoom Videoconference)
of
Stagnaro, Saba & Patterson Co., L.P.A.
2623 Erie Avenue
Cincinnati, Ohio 45208
Phone: (513) 533-2701
Email: pas@sspfirm.com
jms@sspfirm.com

On behalf of the Defendants and the Deponent:

Michael L. Cioffi, Esq.
and
Collin D. Hart, Esq.
of
Blank Rome LLP
1700 PNC Center
201 East Fifth Street
Cincinnati, Ohio 45202
Phone: (513) 362-8700
Email: michael.cioffi@blankrome.com
collin.hart@blankrome.com

Also Present:

Philip R. McHugh, Plaintiff

Phenise Poole, Esq., In-House Counsel for Fifth Third Bancorp

Brian Thomas, Esq., In-House Counsel for Fifth Third Bancorp

\- - -

# I N D E X


| EMERSON LEE BRUMBACK | PAGE |
|---|---|
| Examination by Mr. Saba | 5 |

| EXHIBITS | MARKED | REFERENCED |
|---|---|---|
| Plaintiff's Exhibit 1 | 8 | 8 |
| Plaintiff's Exhibit 2 | 34 | 34 |
| Plaintiff's Exhibit 3 | 34 | 34 |
| Plaintiff's Exhibit 4 | 46 | 46 |
| Plaintiff's Exhibit 5 | 64 | 65 |
| Plaintiff's Exhibit 6 | 66 | 66 |
| Plaintiff's Exhibit 7 | 66 | 67 |
| Plaintiff's Exhibit 8 | 68 | 68 |
| Plaintiff's Exhibit 9 | 80 | 80 |
| Plaintiff's Exhibit 10 | 83 | 83 |
| Plaintiff's Exhibit 11 | 85 | 85 |
| Plaintiff's Exhibit 12 | 86 | 86 |


\- - -

THE VIDEOGRAPHER: We are on videotape record. Today is Friday, November the 22nd, 2024. The time is 10:12 a.m. We are here today to take the deposition of Emerson Brumback in the case styled Philip R. McHugh versus Fifth Third Bancorp, et al., United States District Court, Southern District of Ohio, Western Division, Case Number 1:21-cv-00238.

Would the attorneys now introduce themselves and state who they represent?

MR. SABA: Peter Saba on behalf of Plaintiff Philip McHugh.

MR. SMITH: Joshua Smith on behalf of the Plaintiff Philip McHugh.

MR. CIOFFI: Michael Cioffi and Collin Hart of Blank Rome on behalf of the defendants, but also on behalf of the witness, Mr. Brumback personally, pursuant to a joint defense agreement.

Also with us is counsel for Mr. Brumback and also for the bank is Brian Thomas and Phenise Poole.

MR. SMITH: Oh, we also have Bailey Sharpe on -- attending via Zoom, an associate at our office.

MR. CIOFFI: Thanks, Counsel. That's the only



person on remote?

MR. SMITH: That's our understanding, yes.

THE VIDEOGRAPHER: And would the court reporter please swear in the witness?

(Witness sworn.)

MR. CIOFFI: Counsel, let me say one more thing at the beginning. Mr. Brumback has some eye injuries historically, and he has loss -- total loss of vision in his right eye and partial loss in his left eye. That makes reading very, very difficult for him.

To the extent you want him to review documents, and I understand you might, it may be necessary for you to read portions to him. If you don't want to do that, I'm happy to do it, but he has some problems quickly reading documents because of that vision loss.

MR. SABA: Understood.

EMERSON LEE BRUMBACK,

of lawful age, a witness herein, being first duly sworn as hereinafter certified, was examined and deposed as follows:

EXAMINATION

BY MR. SABA:

Q. Mr. Brumback, could you go ahead and state



your name for the record, please, and spell your last name?

**A. Yes. Emerson Brumback, B-r-u-m-b-a-c-k.**

Q. What's your date of birth?

**A. 6/30/1951.**

Q. What is your address?

**A. 13635 Carnoustie Circle, that's C-a-r-n-o-u-s-t-i-e, Circle, Dade City, Florida 33525.**

Q. How long have you lived there?

**A. About 14 years.**

Q. Have you ever had your deposition taken before?

**A. No.**

Q. Just so you know, I'm going to be asking you a series of questions. If there's anything you don't hear or don't understand, please feel free to ask me to repeat or rephrase the question. Although this is being taken via video, for the court reporter's sake I need you to answer verbally. No shaking or nodding of the head or uh-uhs or uh-huhs. It's difficult for her to take that down.

Additionally, if you could wait for me to finish my question before you answer, and I'll try and do the same before I ask another question. It also makes for a clearer record.



Do you understand all those instructions?

**A. I do.**

Q. What did you do to prepare for today's deposition?

**A. I came to the -- I came to the meeting. I reviewed the documents that my counsel asked me to see if I had any. Other than that --**

Q. Did you review any depositions?

MR. CIOFFI: Objection. I'm going to instruct the witness not to answer what he reviewed at our request because, again, as we have stated in prior depositions, that invades the attorney-client privilege, but also the work product privilege.

If you'll rephrase your question to documents other than provided by counsel, then I'll permit him to answer.

BY MR. SABA:

Q. Did you review any documents other than provided by counsel for today's deposition?

**A. No.**

Q. Did you speak to any former or current board members from Fifth Third about today's deposition?

**A. No.**

Q. Have you discussed this case at all with any of the board members of Fifth Third?

A. **No.**
Q. Have you discussed this case at all with any employees of Fifth Third?
A. **No.**
Q. Have you discussed Phil McHugh with any of the other board members?
A. **No.**
(Plaintiff's Exhibit 1 is marked for identification.)
BY MR. SABA:
Q. Mr. Brumback, I've handed you what's been marked as Exhibit Number 1. And let me represent to you, this was a notice of deposition and request for documents that was to be served on you back in February of this year, which counsel for Fifth Third and yourself had responded to. The specific requests were for you to bring certain documents with you.
Have you ever seen this document before? Have you ever been provided with Exhibit Number 1?
A. **I've been informed by my counsel.**
Q. This particular document requests that you provide -- I'm going to specifically read to you the second request that's made in here, "Any communications between you and Philip McHugh."
And let me just clarify for you the definition



of communications mean "any correspondence, disclosure, transfer, or exchange of information, whether oral or written, whether in person, by telephone, mail, email, telecopy, text message, or other document form including, but not limited to, discussions, statements, negotiations, inquiries, requests, notices, responses, or demands."
MR. CIOFFI: Counsel, thanks for reading that, pursuant to what I said earlier, but you may answer.
THE WITNESS: Yeah, thank you. Yeah, I understand. I have none.
BY MR. SABA:
Q. You have no communications in response to that second request between yourself and Phil McHugh?
A. **No.**
Q. The third request is "Any communications between you and Timothy Spence."
A. **I had no communications.**
Q. The first request asked for "Communications between you and any other director or officer of Fifth Third which refers, mentions, other otherwise relates to," and the first request is "succession planning for the position of president and/or CEO of Fifth Third."
A. **Yes, I had no --**



Q. The second request is for "communications between you and any other director, officer of Fifth Third which refers, mentions, or otherwise relates to identified and/or selected candidates for the position of president and/or CEO of Fifth Third."
A. **No, I had none.**
Q. The fourth request under number 1 is -- excuse me -- third request under number one, "Communications between you and any other director or officer of Fifth Third which refers, mentions, or otherwise relates to processes or timelines, whether proposed or final, with respect to the identification and/or selection --
THE VIDEOGRAPHER: Hang on just a second. We're off the record.
(Off-the-record discussion.)
THE VIDEOGRAPHER: We are back on record.
BY MR. SABA:
Q. Mr. Brumback, I was asking you if you had -- referring back to Exhibit Number 1, request 1C, whether or not you have "Communications between you and any other director or officer of Fifth Third which refers, mentions, or otherwise relates to processes or timelines, whether proposed or final, with respect to the identification and/or selection of candidates for the position of president and/or CEO of Fifth Third."



A. **I had none.**
Q. Request 1D refers to "Communications between you and any other director or officer of Fifth Third which refers, mentions, or otherwise relates to development of potential candidates for the position of president and/or CEO of Fifth Third."
A. **I had none.**
Q. Request 1E request "Communications between you and any other director or officer of Fifth Third which refers, mentions, or otherwise relates to any facts upon which you or any other director relied upon when identifying and/or selecting candidates for the position of president and/or CEO of Fifth Third."
A. **I had none.**
Q. Request 1F asks for "Communications between you and any other director or officer of Fifth Third which refers, mentions, or otherwise relates to Phil McHugh."
A. **I had none.**
Q. And request 1G asked for "Communications between you and any other director or officer of Fifth Third which refers, mentions, or otherwise relates to Timothy Spence."
A. **I had none.**
Q. What is the extent of your education?

Page 12

**A. I have a bachelor's degree from Northern Kentucky University.**
Q. When did you obtain that?
**A. I'm sorry?**
Q. When did you obtain that?
**A. 1973.**
Q. Are you currently employed?
**A. No.**
Q. When was your last employment?
**A. Would have been July 2006.**
Q. Where did you work?
**A. M&T Bank Corporation.**
Q. What was your position there?
**A. President.**
Q. How long did you hold that position?
**A. Five years.**
Q. Do you currently sit on any boards?
**A. I sit on Fifth Third's board corporation of the bank and I sit on Ascendium Education Group's board.**
Q. What is the second one, I'm sorry?
**A. Ascendium Education Group.**
Q. Ascendium education?
**A. Uh-huh.**
Q. How long have you sat on the board of Ascendium Education?

Page 13

**A. 37 years.**
Q. What does Ascendium Education do?
**A. We are a servicer of education loans and education -- postsecondary education philanthropy company.**
Q. How long have you sat on the board of Fifth Third?
**A. I think about ten years, I think, maybe a little longer.**
Q. Roughly 2014, is that your recollection?
**A. No. I think I came on in 2009, '9 or '10 I think is what it was, actually.**
Q. Okay. Who was the president and CEO of Fifth Third Bank when you started on the board?
**A. Yeah. Kevin Kabat.**
Q. Do you sit on any committees currently with the Fifth Third board?
**A. At this time I sit on the risk committee.**
Q. How long have you been on the risk committee?
**A. Jeez, probably five or six years.**
Q. Have you sat on any other committees?
**A. I have sat on -- I chaired the audit committee. I chaired the risk committee for a number of years. I sat on the HCC, Human Capital Compensation Committee, I think two different times.**

Page 14

Q. During what period -- during what periods of time were you on the HCCC?
**A. When I first got on the board, I was on audit and HCC for probably two years and then was off for probably three or four years and came back on for a couple years.**
Q. Do you remember when you came back on?
**A. I think probably -- probably maybe '19, '20, '18, '19, '20. And I sat on the finance committee at the time I was chairing the audit committee, at the time I chaired the risk committee. So probably for ten -- ten years or so I sat on the finance committee.**
Q. How many board members are there at Fifth Third?
**A. Right now probably around 15.**
Q. Has that number fluctuated during the time you've been a board member?
**A. It has.**
Q. How much has it fluctuated by?
**A. Normally probably -- the normal board contingent would be around 12 people.**
Q. During 2019 and 2020, how many board members were there at Fifth Third?
**A. Probably -- probably around 12.**
Q. What is the board's role at Fifth Third with

Page 15

respect to executive succession, specifically for president and CEO?
**A. Well, the most important job of a board is to select the CEO of the organization. So a board's job is to make sure that they have a full understanding of the requirements of the job, what's entailed in that job, and make sure that they select the right candidate.**
Q. What is the human capital and compensation committee's role with respect to executive succession, specifically president and CEO at Fifth Third?
**A. I don't know that it's any different than the board's responsibility with respect to the CEO's position. It's different in respect to other positions in the organization in that there's a division of duties among the different committees. The board as a whole can't do everything, so it's divided into the different committees, and the HCC would have the role of working with human resources to make sure that the compensation levels of the various executives are set effectively and competitively to make sure that the reviews are being done properly on an annual basis. That we have bench strength, depth in the company, and that it's reviewed by the management and set to the standards that we have for our executives.**
Q. You said the HCC's -- HCCC's role. With

respect to the CEO selection process at Fifth Third, that's the same as the board's?
**A. There's -- the CEO selection is a board responsibility, not a committee responsibility.**
Q. What involvement does the HCCC have in the CEO selection process?
**A. As regular board members, they're involved in the process, but we're all involved in the process. It's not a committee process for the -- for the CEO job.**
Q. Does the HCCC have any specific role with respect to CEO selection at Fifth Third?
MR. CIOFFI: Objection. Asked and answered. If you -- if there's something you didn't understand about his earlier answer?
THE WITNESS: Yeah.
BY MR. SABA:
Q. Is there anything specifically the HCCC does with respect to CEO selection that's different from any of the other committees?
**A. No.**
Q. Prior to January 1, 2020, what was the nature of your relationship with Phil McHugh?
**A. Professional.**
Q. How often did you meet with Phil McHugh prior to January 1, 2020?



MR. CIOFFI: Objection. Just for clarification, do you include board meetings or outside board meetings?
THE WITNESS: Yeah.
MR. SABA: Any time he personally interacted with Phil McHugh.
THE WITNESS: I can't tell you specifically how many times in the board meetings, those things. Phil and I, I think, I know we had lunch at least once, and I think we had breakfast once. I can't tell you -- I mean, most board meetings Phil was at I think most board meetings, maybe not all, but at most board meetings. So I would have interacted with him there. We have dinners following the board meetings.
So at some of those dinners I probably would have sat with Phil some. We probably would have interacted before the dinners, but I can't tell you the specific number.
MR. SABA: And, Michael, just to confirm, I'm assuming the same stipulation applies that we entered into during Mr. Akins' deposition that whatever the minutes reflect with respect to who attended or did not attend board meetings, whether live or by teleconference, that those minutes are



accurate; is that correct?
MR. CIOFFI: Yes, confirmed.
MR. SABA: All right.
BY MR. SABA:
Q. With -- so just to clarify, Mr. Brumback, in terms of your personal meetings with or your meetings with Phil McHugh, you mentioned the board meetings and the associated if there were dinners or cocktail parties, you may have interacted with him there. And then you also recall that there were two occasions at least where you had a lunch and breakfast with Phil McHugh; is that right?
**A. I think that's accurate. And I believe at a meeting in Florida, I think I played golf with Phil.**
Q. Any other interactions?
**A. Not that I recall, no.**
Q. Do you recall why you met with Phil for lunch on one occasion?
**A. No, I don't recall the circumstances, no.**
Q. What about with respect to the breakfast that you had with him, do you recall why you met for breakfast with Phil McHugh?
**A. Not specifically, no.**
Q. Do you recall when those took place?
**A. Probably -- I don't recall the exact dates.**



**Probably would have -- when Phil took over responsibility for the consumer bank, whatever that date would have been. Probably would have coincided somewhere around that time frame, I would say. So probably -- I'm not sure. Maybe '15, '16, 2015, '16, maybe, I'm not sure.**
Q. And why did you have lunch and/or breakfast with Phil McHugh?
**A. I don't recall why. It was not unusual to have lunch or breakfast with some of the management staff. In fact, it was -- it was encouraged for us to have interactions with management by Greg Carmichael. He wanted us to get to know the staff and for them to get to know the board. So it wasn't unusual.**
Q. Other than what you identified at the board meetings, whether it was cocktail parties or dinners, the one lunch, the one breakfast, and the one time playing golf with Phil McHugh, do you recall any other meetings or personal interactions you had with Phil McHugh?
**A. No.**
Q. What year was -- would that have been that you played golf with Phil down in Florida?
**A. Let's see. We had a -- we had our board meeting -- it had to be the September meeting because we**

**normally have those in our regions, and so it was a September meeting, and I don't remember the year it was, to be honest with you.**

**The meeting was down in Naples, Florida, and the board put together, management put together a golf outing for some of the board members.**

Q. Other than the personal interactions you've just identified, did you ever observe Phil McHugh in the workplace at Fifth Third?

**A. Not outside of the board meetings, no.**

Q. Did you ever meet with or interview any of Phil McHugh's direct reports or subordinates?

**A. No.**

Q. Did you ever participate in or perform any of Phil McHugh's annual reviews or midyear reviews?

**A. No.**

Q. Did you ever review any of the documentation from Phil McHugh's annual reviews?

**A. No. That wasn't our responsibility as a board.**

Q. Did you ever review Phil McHugh's employee engagement surveys?

**A. No.**

Q. Did you ever review Phil McHugh's customer experience surveys?



**A. No.**

Q. Did you ever review Phil McHugh's financial performance relative to goals for his divisions?

**A. No.**

Q. Did you ever see income statements and balance sheets specifically broken out for the divisions managed by Phil McHugh?

**A. I don't recall. We might have, but I don't recall, no.**

Q. Do you recall what Phil McHugh's role was at Fifth Third Bank?

**A. My recollection is Phil had a few different roles. I believe at one point in time Phil was our regional president in Louisville. I don't know the time frame on that. He then had responsibility for wealth management at one point in time. He had consumer -- his consumer bank for a point in time. And I think he had the regionals reported in to him for a period of time.**

Q. Did you ever discuss with Greg Carmichael the topic of Phil McHugh succeeding Greg Carmichael as the president and/or CEO of Fifth Third?

**A. Never.**

Q. Did you ever have any conversations with any other board members about Phil McHugh succeeding Greg Carmichael as the president and/or CEO of Fifth Third?



**A. No.**

Q. Did Greg Carmichael ever recommend to you or any other board member at Fifth Third that Phil McHugh should succeed him as president and CEO of Fifth Third?

**A. No.**

Q. Did you ever discuss with any members of the enterprise committee the topic of Phil McHugh succeeding Greg Carmichael as president and CEO of Fifth Third Bank?

**A. No. No.**

Q. My previous question had asked about the period prior to January 1st of 2020. What was the nature of your relationship with Phil McHugh after January 1st of 2020?

**A. There was no difference in my relationship with Phil.**

Q. Okay. What's the nature of your relationship with Tim Spence prior to January 1st of 2020?

**A. Professional.**

Q. How often did you personally meet with Tim Spence prior to January 1st of 2020?

**A. Again, are we talking about board meetings and those things or just personal?**

Q. Any personal -- or any interactions with Tim Spence that you personally had?



**A. Board meeting, and I recall one dinner I had with Tim Spence prior to one of the board meetings.**

Q. When was your dinner with Tim Spence?

**A. I don't recall the date on that at all. I just recall the dinner. It would have been probably maybe a December meeting, but I'm not sure.**

Q. What was the purpose of the dinner with Tim Spence?

**A. Tim had made -- was making a proposal for a program and I had some questions, some issues, and Tim and I met to discuss those and talk about where they were at and --**

Q. What was the program?

**A. It was GreenSky.**

Q. What was GreenSky?

**A. GreenSky is a Fintech loan company that does home improvement lending.**

MR. CIOFFI: Counsel, for the record, I'm going to designate this part of the deposition as confidential to the extent that it concerns business trade issues and potential secrets.

BY MR. SABA:

Q. What was Tim Spence's role with Fifth Third when you met with him for dinner?

**A. I think at that point in time he had assumed**

Page 24

**the consumer bank responsibility.**
Q. Other than your one dinner with Tim Spence and seeing him at board meetings, did you ever observe Tim Spence in the workplace at Fifth Third?
**A. No.**
Q. Did you ever meet with or interview any of Tim Spence's direct reports or subordinates?
**A. No.**
Q. Prior to January 1, 2020, did you ever participate in any of Tim Spence's annual or midyear reviews?
**A. Could we go back to the last question? Could you repeat the last question? I'm sorry.**
Q. Sure. Certainly. Did you ever meet with or interview any of Tim Spence's direct reports or subordinates? This would be prior to January 1, 2020?
**A. No. No.**
Q. Prior to January 1, 2020, and then I think you already answered the question about midyear and annual reviews, you didn't participate in those. Did you ever see the materials from Tim Spence's annual reviews or midyear reviews?
**A. No.**
Q. Did you ever review Tim Spence's employee engagement surveys?

Page 25

**A. No.**
Q. Did you ever review Tim Spence's customer experience surveys?
**A. No.**
Q. Did you ever review Tim Spence's financial performance relative to goals for his divisions?
**A. No.**
Q. Did you ever see income statements and balance sheets specifically broken out for the divisions managed by Tim Spence?
**A. I don't recall any, no.**
Q. After January 1, 2020, what was the nature of your relationship with Tim Spence?
**A. It never changed.**
Q. What is your past experience with the CEO succession process at Fifth Third?
**A. I was there when we transitioned from Kevin Kabat to Greg Carmichael. Other than that -- and this transition, that's it.**
Q. What was your personal involvement in that process in 2015 when Greg Carmichael became CEO of Fifth Third?
**A. My personal involvement?**
Q. Yes.
**A. It was no personal involvement. This was**

Page 26

**involvement just as a board member.**
Q. What was your involvement as a board member?
**A. The discussions that we had as board members and our feelings about transition and Greg's strengths and areas of any concern that anybody might have. I believe I met with or talked with RHR when they did the assessment on Greg. I may have had some input probably in the assessment that was developed for him.**
Q. Who is RHR?
**A. RHR is a consulting firm that we used to evaluate the strengths and weaknesses of the candidate, Greg Carmichael.**
Q. Why did Fifth Third hire a consultant firm to assess the candidate?
**A. Well, it's very common in any board to make certain that you get an external opinion, just to validate or to bring up red flags that may occur. You know, I'm a banker, I believe in dual control. You just don't let one teller balance a drawer, you have a couple.**
**So doing a belt and suspenders on a process, and it's the most critical process in the board's role, was crucial for all of us to get that second opinion and make sure that it brought an external look into what we were doing.**

Page 27

**They also have a view of other CEOs that we may not have to compare our candidate against other candidates that have been out there in other CEO searches that they've gone on. So to us it was important to get that second opinion as we made that decision.**
Q. In 2015, were any other candidates assessed other than Greg Carmichael --
**A. No.**
Q. -- by RHR?
**A. No.**
Q. In 2015, were there any other candidates for CEO other than Greg Carmichael?
**A. No.**
Q. What are the steps you take to prepare for a Fifth Third board meeting?
**A. We receive the material for the committees that we're on. Usually about a week ahead for -- as chairman of the audit committee and chairman of the risk committee, I would receive that a few days before that.**
**I would then have a conference call with the respective people on those committees, the chief auditor or the chief risk officer, whoever it may be at that point in time, and we would go through the agenda, review what they were going to be discussing. They**

**would lay out their presentation. I would review that, make any suggestions as to things I thought they needed to add or things I thought they needed to address at that point in time in the committee, things that we'd discussed at prior committee meetings.**

**So I would go through the full deck on those individual committees. Then usually a few days after that, we would get the full board report. I would review that in detail, make any notes that I had for questions on the diligent board book so that I would remember those questions that I would have, but it was a full review. It would take several days to get through all of the information that was provided to us and understand that information.**

Q. When would the board do a review, during what meetings would they do a review for executive succession?

**A. Generally that's in our December meeting, I believe.**

Q. And what would happen during that December meeting with respect to executive succession?

**A. There would be a talent review book that was presented to us. There would be -- management would discuss with us the information that was in that book, talk to us about the progress the employees were making**



**in the various areas that had been identified as opportunities for them. Talk about where they saw the organization, where they saw possible movement within management opportunities. New people coming on that were -- had not been in the previous books that had potential. There would be a thorough discussion. The board would weigh in whether they had information that they thought was pertinent and give their opinions on various people.**

**We would lay out processes for emergency succession planning so that we understood if something were to occur what process we would use in such an emergency, and we would try to get an idea as to the current CEO's position as to how they were feeling, not just about their staff, but about themselves and their performance.**

Q. You referred to a talent book. Have you also heard that referred to as a talent deck?

**A. Yeah. Yes.**

Q. But those terms would be synonymous, in your opinion?

**A. I would say so, yes, pretty much.**

Q. As of December 1, 2019, who were the potential candidates for president and CEO to succeed Greg Carmichael at Fifth Third?



MR. CIOFFI: Objection to the form of the question. Assumes that there were such candidates, and you might want to ask him that first if there were candidates at that point in time.

THE WITNESS: At that point in time, my recollection there was only one candidate, and that was Tim Spence.

BY MR. SABA:

Q. And why was Tim Spence the only candidate to succeed Greg Carmichael as president and CEO as of December 1, 2019?

**A. I think that was in -- that was the belief of the board as a whole that Tim had the qualifications that we were looking for that demonstrated the abilities that we were looking for. He had done a nice job proving himself. We had gotten to know him for several years. He helped us with our strategic plan even before he worked for the bank. He was critical in putting that together.**

**He had brought to us our largest acquisition in years in MB and his relationship with Mitch Feiger, and that was a big move for us. He had done an outstanding job in developing our strategic plan. He had great verbal skills. He had great knowledge of the industry and demonstrated that repeatedly. He had a**



**vision for the bank, a good -- a good plan to execute it, that vision. So all those things combined, our observations of Tim over the years made him the candidate.**

Q. How long had Tim Spence been the only candidate for president and CEO of Fifth Third Bank?

**A. Well, there wasn't a position. So we weren't looking for a president and CEO prior to that. And we basically -- when Greg told us that he was in a position that he thought he would at some point in time in the near future might be interested in moving on that we needed to pursue that. So I'm not sure there was anybody that was put forth prior to that.**

Q. When did Greg Carmichael communicate to the board that he was going to be moving on?

**A. Well, he didn't communicate that he was going to be moving on. He communicated that he might consider moving on in the future, and I can't tell you the exact date, but it was sometime prior to that. But he -- Greg was not at that point in time definitively moving on.**

Q. Do you recall what year Greg Carmichael would have communicated that he might be moving on?

**A. No, I don't.**

Q. How long after Greg Carmichael communicated that he might be moving on was it determined that Tim

Page 32

Spence was the only candidate to succeed?
MR. CIOFFI: Objection to the form of the question.
BY MR. SABA:
Q. Let me --
MR. CIOFFI: No foundation. Go ahead.
THE WITNESS: Could you repeat it for me, please?
MR. SABA: Yes.
BY MR. SABA:
Q. You previously indicated that after Greg Carmichael communicated to the board that he might be moving on, it was then that the board determined that Tim Spence was the only potential candidate to succeed Greg as president and CEO of Fifth Third Bank.
**A. Uh-huh.**
Q. My question is, although you can't recall the specific date of when Greg Carmichael communicated that he might be moving on, how long after Greg Carmichael communicated that he might be moving on was it that the board determined that Tim Spence was the only candidate to potentially succeed Greg Carmichael as president and CEO of Fifth Third Bank?
**A. I don't think I can give you a specific timeline on it, but it was fairly quick. When you have**

Page 33

**that issue come up, you don't hesitate to take action to make sure that you have the right people in place.**
**And it was fairly quickly determined within the board, the discussions that we had with each other, that all of us were very comfortable with Tim Spence, that he had done everything that we thought he would do when he came into the bank and more, and that he was ready or close to being ready to assume that position. So it wasn't long after Greg had that conversation with us that we made that determination.**
Q. Did the board ever specifically determine that Phil McHugh was not a candidate to succeed Greg Carmichael as president and CEO of Fifth Third?
**A. He was never discussed.**
Q. Why was he never discussed?
**A. Because the board never saw him as filling that position. There was no one on the board that ever put his name forth in any way for that position. So there would have been no discussion. Were his name to have been put forth by a board member, then it would have been discussed. But there wasn't anybody that put his name forth.**
Q. Was there -- were there ever any other names other than Tim Spence put forth before the board as potential candidates to succeed Greg Carmichael as

Page 34

president and CEO of Fifth Third?
**A. Within what timeline?**
Q. Any time after Greg Carmichael communicated to the board that he might be moving on?
**A. No.**
Q. Were you aware that in August of 2019 Greg Carmichael indicated that he might have to step down earlier than he desired or that the board desired because of situations that were going on with him that were personal in nature?
**A. No. No.**
(Plaintiff's Exhibit 2 and Exhibit 3 are marked for identification.)
MR. SABA: That's 2.
MR. CIOFFI: This is 2, all right.
MR. SABA: That's 3.
BY MR. SABA:
Q. Mr. Brumback, I have handed you two documents. One is marked as Exhibit Number 2. And just for purposes of reference, down at the bottom at the center of each page there is what's called a Bates stamp. First page is marked Fifth Third-McHugh 000253 through Fifth Third-McHugh 000265. It's somewhat small print.
**A. Yeah, I can't see -- I'm sorry.**
Q. I understand. And then you were also handed

Page 35

Exhibit Number 3, which is Bates stamped Fifth Third-McHugh 000266 through Fifth Third-McHugh 000283.
**A. Okay.**
Q. Those are down at the bottom in the center.
**A. Okay.**
Q. Let me ask you first, I'll represent to you that Exhibit Number 2 is the December 17, 2019 minutes from the meeting of the board of the directors for Fifth Third Bancorp. Does that appear to be what it is?
**A. Yes.**
Q. And Exhibit Number 3 is the December 17, 2019 minutes of the meeting of board of directors for Fifth Third Bank; is that correct?
**A. That's correct.**
Q. Okay. And although there are two separate sets of minutes, these meetings take place simultaneously --
**A. That's correct.**
Q. -- is that correct?
**A. That's correct.**
Q. And you sit on the board of both the Bancorp and the bank; is that right?
**A. That's correct.**
Q. And that's true for all the board members --
**A. Yes.**

Q. -- is that correct?
**A. That's correct.**
Q. Referring to Exhibit Number 2 -- and let me also make the representation to you, sir -- these minutes are essentially for the most part in the beginning are identical. There is some additional information at the end that's a distinction. Have you reviewed these minutes before?
**A. Yes.**
Q. Okay.
**A. We review them prior to every meeting.**
Q. And they've been subsequently approved by the board; is that right?
**A. That's correct.**
Q. Okay. I'm going to refer to Exhibit 2, sir, the second page of Exhibit 2. And the minutes indicate, "Thereafter, Mr. Carmichael and Mr. Shaffer initiated a review of potential succession timelines and candidates for the chief executive officer position. They reviewed top succession candidates, including Mr. Spence, and discussed the potential timelines for their readiness and key development priorities for each such candidate."
The language in the minutes specifically indicates to candidates, plural, for the chief executive officer position. Do you know who the candidates were



that Mr. Carmichael and Mr. Shaffer referred to?
**A. There were no other candidates that I was aware of at any point in time.**
Q. Other than Mr. Spence; is that correct?
**A. Other than Mr. Spence.**
Q. Do you have any recollection of Mr. Carmichael, Mr. Shaffer referring to people other than Mr. Spence as candidates for chief executive officer during the December 17, 2019 meeting?
**A. I have no recollection of that at all, no.**
Q. The second sentence I read refers to the potential timelines for their readiness and key development priorities for each such candidate. What were the development priorities for Mr. Spence?
**A. I'm not sure I can tell you that by recollection. Every candidate that's in any position has development opportunities. I don't care if they've been in their position for years, they have development opportunities. Nobody's perfect.**
**So there are always areas that we want people to address, that we think might be -- they could be more effective in. So I've never seen anybody not have a development opportunity someplace, but I can't specifically speak to what Tim's were at that point in time; I really don't recall.**



Q. Do you recall there being some development priorities?
**A. Oh, like I said, I've never seen any candidate in any position I've ever been in, no matter how long that candidate may be in that position. I mean, I've been on the board at Ascendium for 37 years, and the CEO has been the CEO for 35 of those, and I still give development opportunities every year when I sit down with him. So there's areas for improvement for anybody.**
**Again, perfection is not something you're going to achieve in a lifetime. So I'm not sure that I can recall what Tim's were, but I'm sure there were some there.**
Q. The next sentence reads, "In response to director questions, Mr. Carmichael and Mr. Shaffer commented upon the potential external candidates that could be considered for such a role, including a discussion of the known capabilities of such candidates and the potential challenges created by appointment of an external candidate for the role."
Do you recall who the potential external candidates were that were discussed by Mr. Carmichael and Mr. Shaffer?
**A. There were no external candidates that I was ever aware of. There would have been, I'm sure it would**



**have been prudent of us to ask if anybody was aware of any potential external candidates.**
**But there were none that were ever identified, to my knowledge, that were there, and I have to believe that I would have known about it because of my knowledge of the industry and the people in the industry.**
**So I doubt that there would have been somebody bringing a candidate up and not having at least talked to me or brought to my attention. So I don't ever remember anybody bringing up any external candidates at all. But it would not have been prudent for us to not say does anybody know of any external candidates?**
Q. The next sentence reads, "In addition, in response to additional director questions, Mr. Carmichael and Mr. Shaffer discussed details of development priorities and planning to cultivate internal candidates for the role and the expected timelines for completion of such development plans and candidate readiness."
Do you recall what other candidates that Mr. Carmichael and Mr. Shaffer were discussing to cultivate internally?
**A. I don't recall if this is at that point in time. At one point in time, we had a fellow that worked for the bank by the name of Brian Lamb that we thought**

Page 40

had tremendous potential, a lot of -- several years away, but maybe could have that potential.
So there might have been a discussion there, but that was -- that was a long shot, and he left the bank. But he would not have been a candidate in 2019 or 2020. He was several years away from any potential at that level.
There was also a young man probably years before that even by the name of Borton, I think, but he also left the bank, and he was years away from having that potential.
Q. What was that person's name?
A. I think Chad Borton, I think was his name.
Q. When you say "years away from having that potential" --
A. Uh-huh.
Q. -- how many years away would it have been for Brian Lamb to have that potential?
A. You know, there's no specifics in these things. This is not -- not a science. This is an art form, when you're evaluating some of these people. I mean, it depends on how they do, how -- how their interactions with the board goes, how their success in their businesses go.
So it's hard to say how many years it could

Page 41

be. You know, it could be five, it could be seven, it could be longer. I mean, it depends. I mean, some people take longer to develop than others. So there's really not a scientific number that you can put on that. You can guess at it, but that's really what it is. It's pretty much a guess.
Q. Did you personally think that Brian Lamb had potential to ultimately be considered as a candidate to succeed as president and CEO at Fifth Third?
A. I personally thought that Brian was a talented individual, and I thought that he had potential to do a lot more in the bank. How long that would take and where it would end up, I wasn't sure, but I thought he should be given opportunity at different roles in the bank to prove his worth.
So, yes, I thought he had talent. Whether he would ever be the CEO, I have no idea. I have no idea. He had some of the traits that you would want, but he needed development.
Q. Your opinion about Brian Lamb that he had talent, what was that based upon?
A. My interactions with Brian. Brian was president of our Florida bank. So I got to watch him in the Florida marketplace interact with the businesses there. I watched him present to the board. He had

Page 42

great respect throughout the state of Florida. He was well connected in several areas in the state of Florida, had built a great reputation down there.
And he did a great job in his presentations to the board. He had great presence, he had a great communication skill, he had a great vision for the bank and for the state of Florida operation. So it was based on those things.
Q. You mentioned before and you used the phrase "it is more art than science" --
A. Uh-huh.
Q. -- when identifying a time period that Brian Lamb would have needed to be considered a candidate for the role of president and CEO. Is there a typical runway that you've seen for somebody to be prepared to become a candidate for president and CEO?
A. Can you define what you mean by "runway"?
Q. Have you ever heard that term before?
A. I've heard it, but I'm never sure I know what it means.
Q. Do you have an understanding of -- your own personal understanding of what that means --
A. No.
Q. -- when somebody says what the runway is?
A. Depends on -- it can depend on -- it can

Page 43

change, depending on the person, in my opinion, you know, so, no, I guess I don't have a thorough understanding of what it means until you put it in the context of a specific individual.
Q. With respect to discussions by the board at Fifth Third, was there ever a discussion of what the typical runway is, or what the runway would be for particular people?
A. There probably was discussion as to runway from the standpoint, like with Brian Lamb, as an instance, maybe not specifically with him, but in that instance where you would want to give them opportunities, what positions could they fill that might give them exposure to different skill sets and opportunities and things.
So could he go from that to a business line, running a business line, what business lines, what he might be able to perform that he could prove himself in and different areas like that, that kind of a runway is something.
Give him more responsibilities to expand on what he had, that would be one area that I would use runway for. But to say there was a runway to a CEO, no, I'm not sure I could put that in that context.
Q. The December 17, 2019 meeting, that's one

Page 44

where you would have been provided with the talent deck that we talked about before; is that correct?
**A. Yes.**
Q. With respect to executive succession, and specifically CEO succession, what other documents would you have been provided with at that December meeting for that discussion?
**A. Other than the talent deck?**
Q. Correct.
**A. I don't believe we would have been provided with any other documents at that point in time.**
Q. Okay.
MR. CIOFFI: Counsel, before you go into this line of questioning, we've been going a little over an hour. Mindful of the two-hour limit.
MR. SABA: We can take a break.
MR. CIOFFI: Do you think you'll take another hour or --
MR. SABA: It will probably take another hour so we can take a break right now.
MR. CIOFFI: Yeah, that's -- I don't want to go the full two hours without a break, if you're going to take two hours.
MR. SABA: No, that's fine.
THE VIDEOGRAPHER: Off the record, 11:13.

Page 45

(A recess was taken from 11:13 a.m. to 11:27 a.m.)
THE VIDEOGRAPHER: We are back on the record. This is media 2 of today's deposition. The time is 11:27.
BY MR. SABA:
Q. Mr. Brumback, you indicated before that your last employment was with M&T Bank; is that correct?
**A. Yes.**
Q. How many years did you work in banking?
**A. In banking?**
Q. Correct. Yes.
**A. Counting my time on the Fifth Third board?**
Q. No, just as -- other than Fifth Third board?
**A. Other than Fifth Third board, since 1973. So I retired in 2006.**
Q. And as a banker, what were the success measurements you used for a bank?
**A. For a bank?**
Q. Yes.
**A. It would be return on assets, return on equity, share price, market share, shareholder return.**
Q. What about with respect to divisions of the bank?
**A. Well, every division has different -- has**

Page 46

**different measurements. They're all different. I mean, each one have different return capabilities. So it would depend on the division.**
**You know, you have -- a consumer would have a separate, totally separate success factors than you would have in the commercial bank, and wealth would have a separate on that. There are some areas that don't have bottom line responsibilities, and you have success factors for those things. So it would depend on the individual divisions as to how they did it.**
Q. Any common measurements for divisions of the bank?
**A. Common?**
Q. Yes.
**A. Return on equity. Return on assets would be some. Market share that you would gain, those kind of areas, yeah. Customer satisfaction, penetrations, retention of customers. There is thousands of them.**
(Plaintiff's Exhibit 4 is marked for identification.)
MR. CIOFFI: 4, right?
MR. SABA: Correct.
BY MR. SABA:
Q. Mr. Brumback, I've handed you what's been marked as Exhibit Number 4. And let me represent to you

Page 47

that this document is Bates stamped on the first page Fifth Third McHugh 001105 through Fifth Third McHugh 001154. Again, that's in the bottom right-hand corner.
**A. Okay.**
Q. Do you recognize what Exhibit 4 is?
**A. Yeah. It's the talent deck for the bank. I think it's dated December 17th.**
Q. Correct. Of 2019; is that correct?
**A. Yes.**
Q. And this is the document that would have been provided to the board for the December 2019 meeting; is that correct?
**A. I'm assuming, yes.**
Q. Okay. When would you typically receive the talent deck for a December meeting?
**A. You know, Counsel, I'm not sure. I'm not sure we received it -- didn't receive it at the meeting. I don't think we received it prior to the meeting, but we may have, but I don't recall that.**
Q. Okay. Did you have any involvement in the creation of the 2019 talent deck?
**A. No. No.**
Q. Would you have seen any drafts of the 2019 talent deck?
**A. No. No.**

Page 48

Q. Who at Fifth Third would have prepared the talent deck for the board?
MR. CIOFFI: Objection. Lack of foundation. But if you know, you may answer.
THE WITNESS: I don't know, I don't think. I mean, human resources, but I can't tell you specific people in human resources, so I don't know.
BY MR. SABA:
Q. Okay. Do you know who the head of human resources was as of December 2019?
**A. I think Bob Shaffer was.**
Q. Do you recall having any changes or edits to the information in the talent deck?
**A. No. No, none.**
Q. Mr. Brumback, I need you to turn to page 001135, and I can direct it there or Mr. Cioffi can turn it there for you.
MR. CIOFFI: Here, we'll find it for you.
THE WITNESS: Is this Tim Spence's?
MR. SABA: That's correct.
THE WITNESS: Okay.
BY MR. SABA:
Q. And I'll represent to you that is the talent page for Tim Spence.

Page 49

**A. Okay.**
Q. All right. And the print here is somewhat small.
MR. CIOFFI: I can't read it. But go ahead. Counsel will read for him as needed.
BY MR. SABA:
Q. With respect to Mr. Spence, there's a reference to -- excuse me -- there is a reference to, in the center column under talent information, potential, and it says to the right of that, "high potential." With respect to that information, who would have inserted that information on the talent card for Mr. Spence?
MR. CIOFFI: Objection. Lack of foundation. If you know, you can --
THE WITNESS: I have no idea.
BY MR. SABA:
Q. Under "potential next position," which is right below potential, it says, "President one to two years. CEO three-plus years." Who would have inserted that information?
MR. CIOFFI: Same objection. Lack of foundation. If you know, you may answer.
THE WITNESS: I don't know who would have done it.

Page 50

BY MR. SABA:
Q. Mr. Brumback, I need you to turn to Fifth Third McHugh 001141.
**A. Okay.**
Q. This is the CEO succession plan for 2019.
**A. Okay.**
Q. If you can turn to the next page, 001142. Are you able to read the CEO succession plan, the chart that appears on 001142?
**A. Yes. Yeah, I can see it okay, I think.**
Q. And you can see under -- it indicates first board of directors, CEO, it says, "ready now," and in the box next to that, "not applicable," three-plus years, it has Tim Spence listed; do you see that?
**A. I can't read the three-plus.**
Q. Okay.
**A. But I can read the Tim Spence, yeah.**
Q. All right. And then next it says, "seven-plus years" and says, "Brian Lamb."
**A. Okay.**
Q. All right. And then under emergency successor, it says, "Tayfun Tuzun, Phil McHugh," and then "board member"; do you see where it says that?
**A. Yes, uh-huh.**
Q. Who would have prepared this CEO succession

Page 51

chart?
MR. CIOFFI: Objection. Lack of foundation. You may answer if you know.
THE WITNESS: I don't know.
BY MR. SABA:
Q. Did the board have any changes to be made to the CEO succession chart?
**A. There were none that I know of.**
Q. Was there any objection or criticisms of Phil McHugh being listed as an emergency successor or CEO?
MR. CIOFFI: Again, objection. Lack of foundation. Assumes that that was an issue presented to the board. But if you know, go ahead.
THE WITNESS: I am not aware of anything.
BY MR. SABA:
Q. Did you agree with Phil McHugh being listed as an emergency successor for CEO?
**A. I didn't object. This is -- this is an emergency CEO document. There was no emergency. So there was no need for an emergency CEO.**
**The purpose of this document -- and I think I may have testified to it earlier -- when I view this document, this document, and I can't see it, but there's in here a process that we always developed in an event of an emergency.**

Page 52

**But putting names on this document is irrelevant until there's an emergency. Understanding that an emergency can be a lot of different things. You could have an emergency, the CEO could be hit by a bus and you have to put somebody in, has to run the bank day to day until you find a permanent CEO. Emergency could be you had a fraud that occurred in the bank, and the CEO gets terminated. We can put every name on this list you want.**

**Nobody in management is going to be put in that emergency position, because there was a fraud in the bank and they're all suspect until proven otherwise in the banking industry.**

**So it depends on the emergency as to what names are on here. That's why it's a broad list of individuals that get put on this list. It really holds no context into a reality that is occurring at that time. When the emergency occurs, the board would come together in immediacy. The finance committee could act in the interim in their place. They would discuss the emergency, discuss the needs in the situation in the institution at that point in time. At that point in time make a decision as to what's needed and do we have anyone that could potentially fill that position.**

**There are on here, I think, I said about 15 --**

Page 53

**15 to 12 board members, I can't recall exactly what we had because we had some that were retiring, some that stayed on. But if you look, there's board member down there. There were numerous CEOs and people on that board that could potentially fill this position.**

**So you make it broad so that you have a broad base to consider when you do this, but I had no objections to Phil being on there. I had no objections to Tayfun being on there. I had no objections to this at all.**

**I focus as an individual -- myself personally, I can't speak for other board members -- my -- my look at these things was the process, that we made sure we knew if something happens who calls who, when do they call, what's the meetings get called in, those kinds of things. So just for clarification as to how I use this document.**

Q. Was Phil McHugh qualified to serve as an emergency CEO for Fifth Third Bank as of December 2019?

**A. Depend on the circumstances. I think -- I go back to my original answer, it depends on the circumstances as to who was qualified to serve as a CEO, as the interim CEO at that point in time.**

Q. Under what --

**A. I had no reasons to say he couldn't.**

Page 54

Q. Okay. You have no reason to say he couldn't. Under what circumstances would you say that he would be qualified to serve as emergency or interim successor as CEO?

MR. CIOFFI: Objection. Hypothetical question. If you can formulate an answer, you may answer. I'm not going to instruct you not to answer, but --

THE WITNESS: I think I -- I think I'll elaborate.

If there was a bank fraud, I wouldn't support anybody from management to step into that position until we found out the circumstances, the details, those things. It could have been other things that occurred. I mean, it is hypothetical and it's hard, but there could be circumstances where there -- people aren't qualified to step in, they just can't.

BY MR. SABA:

Q. No, no, my question was, under what circumstances would you say that Phil McHugh was qualified to serve as an emergency successor for Fifth Third Bank?

**A. If somebody got hit by a bus, he could fill in for a temporary period of time. I look at an interim**

Page 55

**CEO in an emergency to be a three-month period at the most. It's meant to make sure that the wheels don't fall off the bus, that things continue on.**

Q. As of December 2019, was Phil McHugh qualified to be a candidate for president and CEO of Fifth Third Bank?

**A. Not in my opinion, no.**

Q. Why is that?

**A. He didn't give me any reason to believe he was a candidate or qualified for it. I mean, he did a good job in his businesses, but he didn't do standout above Tim Spence.**

Q. What do you base that upon, that he did not do standout compared to Tim Spence?

**A. I didn't say he didn't do standout, I said he didn't stand out. There's a difference. Phil did presentations to the board, he brought his business to the board, talked to us about his business. I didn't see the strategic vision, the innovation, the creativity that I think a board member wants a CEO to have. I didn't think that was there.**

**I thought he ran a good business. I thought he understood his businesses, but I didn't see that additional capability that's required there. The innovation, the creativity, the vision, those things**

**just didn't stand out for me on that. And it has to stand out.**

**And you don't go through -- I don't go through and evaluate management based on deficiencies. People stand out to you. And if they don't stand out to you, then in my opinion they're not ready for those positions in many cases.**

**And there was nothing that Phil did that made me uncomfortable with Phil or think he wasn't doing his job, but there was nothing that he did that made me think he was a standout, stand above anybody else, so --**

Q. Other than the presentations that Mr. McHugh or Mr. Spence would give, what else is that based upon?

**A. That's primarily what I looked at, the presentation and how he conducted himself in the board meetings with other board members. I think if you talk to the other board members, they would tell you the same thing. There was nothing that he ever did.**

**You know, a lot of -- a CEO stands before a lot of people. They stand before their employees. They stand before shareholders. They stand before investment analysts. You can't stand before those people and just give a presentation off of a slide.**

**Tim Spence never read his presentation. Phil read his presentation. They were -- they were**



**presentations. I called them the old IBM foil presentations. Doesn't make them bad, but it doesn't stand out. It doesn't -- it doesn't distinguish you in that way, shape, or form.**

**I didn't think that through those presentations my interactions with Phil, I think Phil is a very personable person, I think he's a good person, but he didn't stand out to me in that way. To have the presence of the CEO in circumstances that they have to be in, those things didn't -- didn't come out to me.**

Q. As of December 2019, how did the divisions managed by Tim Spence perform relative to the divisions managed by Phil McHugh?

**A. I have no idea. The only thing I can speak to in those different divisions would be any audit issues that might exist, any risk issues that we had, and I don't think there was anything that stood out to me in those positions, either one. I don't think -- when we're evaluating somebody to be a CEO of a company, I've said it a lot, that there are people who run a business better than other people, but they can't run a bank better than other people.**

**Running a division, running a line of business, is a lot different than running a bank. The skill sets that are required are a lot different. A**



**division may have outstanding results. It's not just the division head that gets the outstanding results, it's the people that may work for them. They may have inherited it. I mean, I think Phil had consumer bank and I can't tell you exactly what, but two years. I think that was about the time frame that he had it.**

**It's difficult to make a lot of true great innovations and progress in two years. So to take a look at -- and somebody tell me, well, somebody had a great year in their division, good, they had a great year and they'll get rewarded for it, they'll get compensated for, it, but that doesn't mean they're eligible or that they're capable of doing more than what they're doing in that particular division. That's not an indicator that would be positive. It might be an indicator, but it's not one that be would be heavily weighted, in my opinion.**

Q. Did you ever communicate to Phil McHugh your criticisms of his presentation style?

**A. I don't think I ever had an opportunity in the time that I did that, no.**

Q. Why is that?

**A. I don't think it was a criticism of his style. I don't think I ever criticized it. I don't think in this I criticized it. I simply said it didn't stand**



**out. That doesn't mean I thought it was bad. It just didn't stand out.**

Q. Did you ever indicate to Phil McHugh that you did not think he stood out enough to be considered for president and CEO of Fifth Third Bank?

**A. No.**

MR. CIOFFI: Objection. Lack of foundation. It assumes that that issue was ever presented to this witness or to the board, but if you can answer that hypothetical, you may.

THE WITNESS: I can't answer. It's not my job to do that for him.

BY MR. SABA:

Q. Are you aware of anyone, of any members of the board ever indicating to Phil McHugh that either his presentation style or -- that his presentation style did not stand out enough to -- for him to be considered a candidate for president and CEO of Fifth Third Bank?

**A. I don't think any board member would have. I don't think it's their job.**

Q. Why is that?

**A. They don't work for the board. Phil McHugh reported to Greg Carmichael.**

Q. And what is your point being?

MR. CIOFFI: Objection.

Page 60

THE WITNESS: I think I answered.
MR. CIOFFI: Asked and answered.
THE WITNESS: He didn't work for --
MR. CIOFFI: Do you have another question, Counsel?
BY MR. SABA:
Q. Who determined who would make presentations to the board at board meetings?
**A. I would -- obviously, the CEO and the chairman or the lead director would have that. At times, as chairman of the audit committee or chairman of the risk committee, I would make suggestions or recommendations for things from the committee to be put before the board specifically that I thought needed to be addressed and ask for different presentations to be done if we had concerns about various areas.**
**There were times that there were continual issues in areas that I would want those people to come before the full board to talk about those issues because I felt they were critical, whether they be an audit, a regulatory issue or a risk issue.**
**So it was probably multiple people that would have input into that, but I can't -- I mean, it would vary probably from meeting to meeting, but primarily it would be the CEO, would be the lead director, the**

Page 61

**chairman, and then any regulatory requirements that we had to bring certain items on a regular basis before the board that would set the agenda. There are certain things that the board has to do, certain obligations and requirements we have that would set part of the agenda as well in those board meetings that would come up on a quarterly basis that we would have. Those would be regularly scheduled in there.**
Q. And who would determine which members of the enterprise committee would attend board meetings?
MR. CIOFFI: Objection. Asked and answered.
MR. SABA: No, that was a different question. I asked who decided to make presentations.
MR. CIOFFI: I don't think it was.
BY MR. SABA:
Q. That says who would decide which members of the enterprise committee --
**A. I have no idea.**
Q. -- would attend board meetings?
**A. I have no idea. I should -- I should go back. There would be times I would require members of the enterprise committee, as I said, to address certain issues.**
**Sometimes it would be their subordinates as well if it -- if it was one of those that we would say**

Page 62

**they have to come before the board to present an issue. But on a regular basis, I had no idea.**
Q. Did you ever require that Phil McHugh attend a board meeting?
**A. No. Not that I can recall, no.**
Q. Did you ever request that Tim Spence attend a board meeting?
**A. No.**
Q. Do you know who Jamie Leonard is?
**A. Yeah. Yes.**
Q. And at one point in time Jamie Leonard served as chief risk officer; is that correct?
**A. That's correct.**
Q. Did you meet with Jamie Leonard outside of a board of director's meeting in February of 2020 after he became chief risk officer?
**A. I may have. I can't recall. I very well may have. I met with a lot of management outside of board meetings, particularly when I was sharing the risk with the audit committee. So it's possible.**
Q. Do you have any recollection of meeting Jamie Leonard in February of 2020 and discussing some of the other members of the enterprise committee?
**A. No. No.**
Q. Do you have any recollection of meeting with

Page 63

Jamie Leonard in February of 2020 and indicating to him that Phil McHugh was the best banker in the company?
**A. No. In February of 2020 -- I'm not saying I didn't meet with him, I don't recall it -- but I live in Florida. I didn't make it a habit to come up unless it was a board meeting, and I don't ever remember having meetings around that, so --**
Q. Was RHR retained by Fifth Third again in 2020 to do an assessment for the next president and CEO of Fifth Third Bank?
**A. They were hired to do an assessment of Tim Spence.**
Q. Do you know if RHR was originally retained to do an assessment of Tim Spence, Phil McHugh, and Tayfun Tuzun in 2020?
**A. Not to my knowledge, no.**
Q. When did you first become aware that RHR was going to be doing an assessment in 2020?
**A. I think at a board meeting we discussed that we wanted an RHR assessment done of Tim Spence.**
Q. When was that board meeting?
**A. I can't recall those dates. I'm not sure.**
Q. Was that at the December 2019 board meeting?
**A. I don't recall the dates.**
Q. What was your involvement in the 2020

assessment that RHR did?
**A. I reviewed it. I opined on it. I think I made a suggestion for one change, one individual change on it, minor change. Other than that, that would have been it.**
Q. With respect to that, you're saying that in terms of the -- you reviewed RHR's assessment or did you review a CEO profile?
**A. The profile.**
Q. And what is a CEO profile?
**A. It was what we gave RHR as to what we thought the criteria was that we wanted the CEO to be.**
Q. You indicated that only Tim Spence was assessed by RHR in 2020. Why was Tim Spence the only person assessed by RHR?
**A. Because the board had decided at that point in time, we had one candidate that we felt could fill the position as CEO and that candidate was Tim Spence.**
Q. Were there any other independent assessments done of Tim Spence or anybody else in 2020 for the position of president and CEO of Fifth Third Bank?
**A. Not that I'm aware of, no. No.**
(Plaintiff's Exhibit 5 is marked for identification.)



BY MR. SABA:
Q. Mr. Brumback, I've handed you Exhibit Number 5, which is Bates stamped Fifth Third-McHugh 001457. Let me represent to you it's an email message from Bob Shaffer to various individuals, including yourself, dated July 17, 2020. The subject is Fifth Third CEO profile. The attachment is draft Fifth Third CEO profile.
Are you able to read the email or do you need me to read it to you?
**A. You'll need to read it to me. I'm sorry.**
Q. And it's addressed, "Human Capital and Compensation Committee members, As a follow-up to our discussion at the June HCCC meeting, we are continuing with our CEO succession planning work by having an independent assessment of Tim Spence, as a key potential successor to Greg, completed by Guy Beaudin of RHR International, LLP. (Guy worked with us on Greg's transition to CEO). This work will include assessing Tim's strength and development needs and implementing any actions to help Tim continue to develop his capabilities. Greg, Guy, and I have worked to develop the attached CEO profile, which Guy will utilize as one component to assess Tim's capabilities. I would appreciate your review of the attached and confirmation



back to me that you are either okay with the profile or have any changes to the components of it, so I can give Guy the go ahead to continue his assessment work."
Do you recall receiving this email?
**A. Yes.**
(Plaintiff's Exhibit 6 is marked for identification.)
BY MR. SABA:
Q. Mr. Brumback, I have handed you what has been marked as Exhibit Number 6, which is Bates stamped Fifth Third-McHugh 005938 through Fifth Third-McHugh 005943. Do you recognize what this document is?
**A. It's -- yeah, it's our recommendations for the CEO profile, yeah.**
Q. And how was the CEO profile to be used? What's the purpose of it?
**A. To assess the candidate to make sure that we had the right candidate, to go through and make sure that the board also agreed on what we thought the candidates's skill sets and those things should be, what we were looking for.**
(Plaintiff's Exhibit 7 is marked for identification.)
BY MR. SABA:
Q. Mr. Brumback, I've handed you what's been



marked as Exhibit Number 7, which is Bates stamped Fifth Third-McHugh 006096 through Fifth Third-McHugh 006097. Let me represent to you this is an email exchange between yourself and Bob Shaffer which is following up on the email that he sent you which is marked as Exhibit Number 5. Do you see that?
**A. Uh-huh.**
Q. And is this what you referenced earlier that you had one change to the CEO profile as reflected in the second email we see on the first page of Exhibit Number 7?
**A. Yes, that's correct.**
Q. Okay. And that was an email you sent back to Mr. Shaffer on July 20, 2020 at 3:11 p.m.; is that right?
**A. That's correct, yeah.**
Q. Okay. And you indicate to him in your email, "Bob, I am generally okay with the profile. I am only a little concerned about the line under leadership which says 'without getting into the weeds.' I understand the view that the CEO cannot and should not be in the weeds and run the business all the time but there are times where the CEO has to get into the weeds. To address a serious issue or crisis, the CEO has to obtain detailed information and facts. The people have to believe that

Page 68

the CEO has the ability, scope, and willingness to inject themselves into an area requiring significant focus and attention."
Is that right?
**A. That's correct.**
Q. And Mr. Shaffer responded to your email with response from Emerson -- excuse me, he then sends an email to Mr. Carmichael, "Response from Emerson. Easy fix."
Do you see that?
**A. Yes.**
Q. Is it your understanding that the CEO profile was modified to include your change; is that correct?
**A. That's correct.**
(Plaintiff's Deposition Exhibit 8 is marked for identification.)
BY MR. SABA:
Q. Mr. Brumback, I've handed you what's been marked as Exhibit Number 8, which is Bates stamped Fifth Third-McHugh 006414 through Fifth Third-McHugh 006415. And I'll represent to you it's an email from Bob Shaffer to Greg Carmichael. The subject is Guy conversation. The attachment is, "Winning formula, CEO profile, Fifth Third Bank 2015."
In the first bullet point, Guy highlights and

Page 69

next steps that Mr. Shaffer points out to Mr. Carmichael. He indicates, "Guy agrees that if Tim is "the" successor, don't add Tayfun and Phil formerly." And I think it's supposed to say formally, but either way it says formerly. "Although, he would recommend, at a minimum we discuss with Marsha that she, the board, is okay with only having Tim assessed by Guy. He said he had seen a few boards surprised that the past CEO/CHRO did -- didn't have at least one other internal candidate assessed."
Do you see that?
**A. Yes, uh-huh.**
Q. Okay. Does this give you some insight as to -- strike that.
Does this give you some insight as to when there would have been a meeting when it was discussed that only Tim Spence would be assessed by RHR in 2020?
MR. CIOFFI: Objection to form. Lack of foundation. I don't know about whether any such meeting took place, but is your question does he know about any such meeting?
BY MR. SABA:
Q. You previously testified that you felt -- you thought there was a board meeting when the board indicated that you wanted just an assessment of Tim

Page 70

Spence?
**A. We discussed at a board meeting whether there should be additional candidates, and the board determined that there should not be.**
Q. When was that board meeting?
**A. I can't tell you that date.**
Q. Okay.
**A. I don't know that date, but I do recall that meeting, yes.**
Q. Do you recall any specifics of that discussion?
**A. Yeah. Yeah, I do. There were no individuals that were discussed other than Tim. The discussion was should we see if there are other individuals? And the board adamantly said no. The board had determined they had a candidate. They wanted a second opinion on that candidate. We thought that was critical, that we get that second opinion.**
**But to include other people when there was no chance they were going to be considered was not fair to those people. It would be inappropriate for those people. We would be building their expectations where there was no reality to the expectation, and that's not good for employees to do that.**
**And that was the discussion that took place.**

Page 71

**If they're not being considered, why would you go through the evaluation and make them think they were being considered? That's -- that's not how our board operates.**
**Our board is straight up that we don't believe that that's an appropriate way to do things, and that was the discussion that took place. And I totally agree with that. I don't think it's appropriate to lead people down a path that's not going anyplace. I don't think it's a good idea. And there were no other candidates that had been discussed prior to that.**
**So there was really no one that you could reach out you were just creating something out of air if you did that, and that's not an appropriate way to conduct our business.**
Q. And that meeting and that determination would have been done before RHR --
**A. Yes.**
Q. -- performed their assessment, correct?
**A. Yes.**
Q. But you can't recall when in 2020 or 2019 that meeting took place, correct?
**A. No, I really can't. No. No. It was when we were agreeing to bring RHR in, it would have been in that meeting, but I'd have to go back through the**

**minutes to identify which meeting that was.**
Q. Do you know if that discussion was during a meeting where there would be minutes or was it during an executive session?
**A. I would believe it would have been an executive session. That would be my belief because that's when we had these discussions was in executive session for the most part.**
Q. And are there minutes for executive sessions?
**A. No. No.**
Q. So there aren't any minutes that would reflect that conversation; is that correct?
**A. No.**
Q. Is it a fair statement that this meeting where the decision was made to only assess Tim Spence, that that would have been prior to Exhibit Number 5, the July 17, 2020 email from Bob Shaffer, where he only references that Tim Spence is being assessed?
MR. CIOFFI: Objection to the form of the question. Confusing and lack of foundation. But if you understand it, you can answer it.
THE WITNESS: I'm not sure I understand it. So I'm sorry.
BY MR. SABA:
Q. I'm just trying to get a general understanding



from you when that meeting would have taken place. Clearly it was before RHR did their assessment, correct?
**A. Yes. Yes.**
Q. Okay.
**A. Yes.**
Q. On July 17, 2020, as indicated by Exhibit Number 5, Bob Shaffer emails you a draft of the Fifth Third CEO profile which he indicates will be used to assess Tim Spence.
**A. So it would have been prior to that, yes.**
Q. Okay. That's my question.
**A. Okay.**
Q. Do you have any understanding, as you sit here today, how Phil McHugh would have done if he were assessed by RHR in 2020 using the winning formula that had been developed by Fifth Third?
MR. CIOFFI: Objection to the form of the question. It's purely hypothetical.
THE WITNESS: I never even thought about it.
BY MR. SABA:
Q. You don't know one way or another; is that right?
**A. No. No. I can tell you that based on what happened when he didn't get the job, we're probably pretty lucky that he didn't get the job.**



Q. And why do you say that?
**A. Because he acted rashly, and that's something that a CEO can't do.**
Q. What do you mean, "he acted rashly"?
**A. He was given an opportunity to stay with the bank in a senior executive position of extreme responsibility, making a significant sum of money, and he resigned. That, to me, is not a wise decision, and it's certainly not a decision that would be made by anybody who's the caliber of a CEO.**
Q. Who told you that Phil McHugh resigned?
**A. I believe it was Greg Carmichael informed us that Greg -- that he had resigned.**
Q. And what specifically did he say?
**A. He said that Phil McHugh had resigned when we named Tim president.**
Q. Did -- prior to the time that Phil McHugh had left the bank and that Greg Carmichael had told you that Phil McHugh resigned when Tim Spence was made president, had Greg Carmichael previously indicated to the board that Phil McHugh was at risk if Tim Spence was named president?
**A. I was never knowledgeable about that, no. I don't recall that at all.**
Q. You don't recall him communicating that to you



in a September 2020 meeting?
**A. I do not, no.**
Q. Was there ever a comparative analysis done between Tim Spence and Phil McHugh by any internal committee of the bank?
MR. CIOFFI: Objection to the form of the question. Lacks foundation that there was ever a reason to do that, but you may answer if --
THE WITNESS: There wasn't by the board. I don't know if the bank did any -- I have no idea. The board didn't do it.
BY MR. SABA:
Q. Okay. Was there ever a comparative analysis done between Tim Spence and Phil McHugh by any independent third-party?
MR. CIOFFI: Objection. Same objection. Lack of foundation.
THE WITNESS: Not that I'm aware of, no.
BY MR. SABA:
Q. When specifically did the board determine that Phil McHugh did not have the potential to be president and CEO of Fifth Third Bank?
MR. CIOFFI: Objection again. Lack of foundation that the question was ever presented.
THE WITNESS: I don't know that I can

even answer. He was never considered. He never -- there was no point in time where people said he's not going to be considered. He wasn't considered. He wasn't -- he wasn't -- nobody on the board put him forth to say Phil McHugh should be considered for this position. Nobody did. And that would have -- that would have had to have happened for him to be considered, and it didn't happen.

That doesn't make it a negative that it didn't happen. Phil was not considered for the CEO position by the board. You know, there's only one position of CEO. That doesn't mean the other people in the management aren't important and that the work they do isn't critical for the bank. It doesn't mean they're not good people.

As I said, I liked Phil. I thought Phil did a good job. He didn't stand out. There's a lot of us that don't stand out sometimes. That doesn't make us less than something else. Because we're not considered for something doesn't make us insufficient, but there were no negatives that people came out and said Phil's just not qualified.

He wasn't ever considered because he never stood out from the crowd. And if you want to run a bank or run a company in a CEO position, you have



to stand out from the crowd. You have to be differentiated.

You talk about the scores. No, I didn't see them. They weren't important to me. I mean, just because somebody has a good score on a report of employees or engagements and something doesn't make them qualified to be CEO. There were positions that I came in, in senior executive positions where let me tell you, there wasn't going to be good scores because my job was to turn things around. My job was to fix things. Are you going to -- after I fix them, are you going to criticize me because I ticked somebody off? No. Those things happen.

Running a good business is different than running a bank. Phil did an okay job in running his businesses. I didn't have any complaints, but he didn't stand out to run the bank.

BY MR. SABA:

Q. What specifically would Phil McHugh have had to do to stand out to run a bank?

**A. He would have had to have a strategic vision for the bank, not just for his division, for his business. He would have had to have demonstrated where he thought the bank needed to go, what things the bank**



**needed to do to improve, what areas we needed to go.**

**He would have had to demonstrate that he had the ability to see where the bank needed to go, to look at the general environment we were in, our competitors, and understand what things were necessary for us to execute on and develop. He never did any of that. He didn't present those things. He had the opportunities.**

Q. Was Phil McHugh ever asked to do a presentation regarding strategy for the bank?

**A. He was asked to do a presentation on his business virtually at almost every meeting. He had every opportunity to talk about the future and the development of the business industry, strategic issues that were before us that needed to be addressed. Fifth Third had a lot of opportunities.**

**They had -- every bank has opportunities, just like every individual has opportunities for improvement. Those things didn't come out in his presentation. Didn't make him bad, it just didn't stand out for him.**

Q. Is there a separate position at Fifth Third regarding strategy?

**A. Yeah, we have one now. Tim Spence came in to be a -- to develop strategy. But when I ran businesses in my banking career, I had to develop strategy.**

**You know, I carry in my den a gift from my**



**management team at M&T when I retired, and it's a golden chess set. Because I taught my team of people that I thought everybody that -- we're not playing a game of checkers, we're playing a game of chess. And the truly successful people play chess, not checkers.**

**I think Phil was a good checkers player. I think Tim Spence is an outstanding chess master. And it's been proven, since we've made him CEO, that he's been a good chess master.**

**So that's kind of where I came out on it. It's not disproving something about Phil. Tim proved himself. Tim stood out. His presentations were outstanding. They were future looking. He had great, great grasp of those businesses and the things that we needed to do and the areas we need to be in. He saw the industry differently than the rest of the management team did.**

Q. And that's based on the presentations that Tim Spence would give at the board meetings?

**A. At the board meetings.**

Q. At that time he was responsible for strategy?

**A. No. At that time he was -- he had taken over -- it was throughout his entire career. He did presentations to the consumer bank the same as Phil did when he took over the consumer bank. His presentations**

**were different. They weren't the same as Phil's.**
(Plaintiff's Exhibit 9 is marked for identification.)
MR. CIOFFI: Counsel, by my count, you have about five more minutes.
MR. SABA: No, I've got 15. She just gave me the mark.
THE VIDEOGRAPHER: Oh, no, it's 49 minutes right now.
MR. SABA: Okay.
MR. CIOFFI: So you have 11 minutes?
MR. SABA: 11.
BY MR. SABA:
Q. Mr. Brumback, you've been handed Exhibit Number 9. Are you able to identify that for me?
**A. I'm going to try to. It's the board of directors meeting, September 22nd.**
Q. 21st and 22nd, 2020?
**A. 21st and 22nd, 2020.**
Q. And this is Bates stamped Fifth Third-McHugh 001155 through Fifth Third-McHugh 001211. Do you see that?
**A. Yes, sir.**
Q. And this is a board -- if you turn to page 2, this is a board of directors agenda?



**A. Yes.**
Q. Okay. Would you have received an agenda packet at each meeting?
**A. Yeah.**
Q. Okay. Same as this that we see for September 21st and 22nd, correct?
**A. Yes.**
Q. And the agenda sets forth certain timelines for the presentation; is that right?
**A. Yes.**
Q. Would the board meetings typically stick to the timelines?
**A. At this time, we would have. Earlier on, no.**
Q. Okay.
**A. In the beginning, in my board tenure here, the timelines got thrown out the window a lot of because of regulatory issues that were going on.**
Q. Okay. And looking at that, which is Fifth Third-McHugh 001156, it refers on Monday, September 21st, 2020 under the full board meeting there was at 12:30 a talent management update; do you see that?
**A. I'm sorry. Oh, yeah.**
Q. Okay.
**A. Yes, I do.**



Q. All right. And under that, in smaller print, it says, Robert P. Shaffer and Guy Beaudin, RHR International, LLP.
**A. Okay.**
Q. And the next presentation after that was CEO update, key developments by Greg Carmichael.
**A. Uh-huh.**
Q. So the RHR International presentation was just about 45 minutes; is that correct?
**A. That's correct.**
Q. Okay. And included with this packet are the exhibits that you would receive as part of the agenda; is that correct?
**A. Yes.**
Q. Okay. And I'm going to refer to -- it's the last attachment, which is Fifth Third McHugh 001204, which is at the very end, Fifth Third McHugh 001211; do you see that?
**A. Give me time to get to it.**
Q. Sure.
MR. CIOFFI: Counsel, can you repeat those numbers?
MR. SABA: Sure. Fifth Third-McHugh -- should look like this. Fifth Third-McHugh 001204.
THE WITNESS: 001204?



MR. SABA: Correct.
THE WITNESS: Board summary, Tim Spence?
MR. SABA: Correct.
MR. CIOFFI: Counsel, just so we have the right number, 001204 is a document that has a caption, 75 years RHR, then board summary, Tim Spence. Is that --
MR. SABA: Correct. Correct.
MR. CIOFFI: So it's an RHR document.
MR. SABA: Yeah. It's the board summary provided by RHR.
BY MR. SABA:
Q. My question is, this is what was provided to the board as part of the RHR presentation on September 21st; is that right?
**A. Yes.**
Q. Do you recall any other documents being provided by RHR at that September 21st meeting?
**A. No, I don't.**
(Plaintiff's Exhibit 10 is marked for identification.)
BY MR. SABA:
Q. Mr. Brumback, I've handed you a new exhibit --
**A. Oh, I'm sorry.**

Page 84

Q. -- which is marked as Exhibit 10. This is Bates stamped Fifth Third-McHugh 001216 through Fifth Third-McHugh 001222, and it is titled, "Unanimous Written Consent Officer Appointment." And I'm going to refer you to the third page of Exhibit 10, which is a note from Greg Carmichael to the board; do you see that?
**A. Yes.**
Q. In the second paragraph it reads, "As Bob Shaffer and I discussed with you at the September board meeting, we believed that Phil McHugh could be at risk with Tim's promotion. And, in fact, Phil has decided not to accept the role of head of consumer and business banking and is leaving the company."
Do you see that?
**A. Yes.**
Q. Okay. Does that refresh your recollection of Bob Shaffer and Greg Carmichael indicating to the board that they believe Phil McHugh was at risk during the September 2020 meeting?
**A. No. It doesn't, no. I don't recall that discussion taking place. I'm not saying it didn't, but it's not in my recollection.**
Q. Do you have an understanding as to why Phil McHugh was at risk as a result of Tim Spence's promotion?

Page 85

**A. No.**
Q. Are you aware of any representations that were made to Greg Carmichael to -- made by Greg Carmichael to Phil McHugh regarding president and CEO succession at Fifth Third?
**A. No. No.**
THE WITNESS: Are we done with these?
MR. SABA: Yes.
(Plaintiff's Exhibit 11 is marked for identification.)
BY MR. SABA:
Q. Mr. Brumback, I've handed you what's been marked as Exhibit Number 11, Bates stamped Fifth Third-McHugh 005076 through Fifth Third-McHugh 005084.
Let me represent to you this is the Charter of the Human Capital Compensation Joint Committee Board of Directors of Fifth Third -- Fifth Third National Bank Association.
**A. Uh-huh.**
Q. Have you seen this document before?
**A. Yes. Uh-huh.**
Q. What is this document?
**A. This basically establishes what the role, the charter of the human capital committee is.**
Q. Is it a red line of the changes that were made

Page 86

to the human capital compensation committee in June of 2020?
**A. It appears to be, yes.**
Q. Do you recall there being a change to the documents from the human capital compensation committee?
**A. There are generally changes on a regular basis, so it wouldn't be unusual.**
Q. Do you recall the changes that were being made in June of 2020?
**A. No, I don't.**
(Plaintiff's Exhibit 12 is marked for identification.)
BY MR. SABA:
Q. Mr. Brumback, I've handed you what's been marked as Exhibit Number 12, which is Bates stamped Fifth Third-McHugh 005163 through Fifth Third-McHugh 005167, and it is captioned Fifth Third Bancorp Minutes of the Human Capital Compensation Committee, June 16, 2020.
Do you recall being in attendance at that meeting?
**A. I would have been, yes. I don't recall if I was in person or by phone, but I would have been at the meeting one way, but I can't tell you which way.**
Q. According to the notes you were in attendance

Page 87

by phone; is that correct?
**A. If that's what it says. I can't see that.**
MR. HART: Can you check the time?
THE VIDEOGRAPHER: It's one hour.
MR. HART: Is that two hours?
THE VIDEOGRAPHER: Yeah, it's two hours.
MR. CIOFFI: Thank you, Counsel.
MR. SABA: Yeah, we'll continue in progress.
THE VIDEOGRAPHER: Okay. We are off the record.
MR. CIOFFI: Let's keep on the record for a minute.
THE VIDEOGRAPHER: Okay. Just one second. Let me get back on.
MR. CIOFFI: I recognize you're trying to reserve some sort of right that you don't have, which is to continue this in progress. The Court has been quite clear this is a two-hour deposition.
MR. SABA: Subject to the Court expanding it if we indicate that there's additional time needed, as indicated in the order.
MR. HART: Just same process for extending any deposition besides the one-day limit under the civil rules. There's no unilateral authority to extend a deposition, per court order. That's why

there's a court order.

MR. SMITH: We've seen it, Collin.

MR. SABA: Thank you.

MR. CIOFFI: Before we close the record one more time, we'll read and sign the transcript.

THE VIDEOGRAPHER: Off the record?

MR. SABA: Yeah, we're off the record. Thank you.

THE VIDEOGRAPHER: Off the record, 12:29.

________________________________
EMERSON LEE BRUMBACK

________________________________
DATE

\- - -

DEPOSITION CONCLUDED AT 12:29 P.M.

\- - -

# C E R T I F I C A T E

STATE OF OHIO :
: SS
COUNTY OF HAMILTON :

I, Wendy L. Raymer, RPR, CRR, the undersigned, a duly qualified and commissioned notary public within and for the State of Ohio, do hereby certify that before the giving of his aforesaid deposition, EMERSON LEE BRUMBACK was by me first duly sworn to depose the truth, the whole truth and nothing but the truth; that the foregoing is the deposition given at said time and place by EMERSON LEE BRUMBACK; that said deposition was taken in all respects pursuant to stipulation of counsel; that I am neither a relative of nor employee of any of the parties or their counsel, and have no interest whatever in the result of the action; that I am not, nor is the court reporting firm with which I am affiliated, under a contract as defined in Civil Rule 28 (D).

IN WITNESS WHEREOF, I hereunto set my hand and official seal of office at Cincinnati, Ohio, this 9th day of December, 2024.

My Commission expires December 6, 2026

S/Wendy L. Raymer, RPR, CRR
Notary Public - State of Ohio

1 DEPOSITION ERRATA SHEET

Date Taken: November 22, 2024

Case Caption: PHILIP R. MCHUGH

vs. FIFTH THIRD BANCORP, et al.

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the ______ day of

____________, 20___.

___________________________________

EMERSON LEE BRUMBACK

2 DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

SIGNATURE:_______________________DATE:___________

EMERSON LEE BRUMBACK

3 DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:_______________

__________________________________________________________

Reason for change:__________________________________

Page No._____Line No._____Change to:_______________

__________________________________________________________

Reason for change:__________________________________

Page No._____Line No._____Change to:_______________

__________________________________________________________

Reason for change:__________________________________

Page No._____Line No._____Change to:_______________

__________________________________________________________

Reason for change:__________________________________

Page No._____Line No._____Change to:_______________

__________________________________________________________

Reason for change:__________________________________

Page No._____Line No._____Change to:_______________

__________________________________________________________

Reason for change:__________________________________

Page No._____Line No._____Change to:_______________

__________________________________________________________

Reason for change:__________________________________

SIGNATURE:_________________________DATE:____________

EMERSON LEE BRUMBACK

## WORD INDEX

< 0 >
**000253** 34:22
**000265** 34:23
**000266** 35:2
**000283** 35:2
**001105** 47:2
**001135** 48:17
**001141** 50:3
**001142** 50:7, 9
**001154** 47:3
**001155** 80:21
**001156** 81:19
**001204** 82:16, 24, 25 83:5
**001211** 80:21 82:17
**001216** 84:2
**001222** 84:3
**001457** 65:4
**005076** 85:14
**005084** 85:14
**005163** 86:16
**005167** 86:17
**005938** 66:11
**005943** 66:11
**006096** 67:2
**006097** 67:2
**006414** 68:20
**006415** 68:20

< 1 >
**1** 3:7 8:8, 12, 19 10:7, 19 16:21, 25 24:9, 16, 18 25:12 29:23 30:11 90:1
**1:21-cv-00238** 1:9 4:8
**10** 3:11 13:11 83:20 84:1, 5
**10:12** 1:19 4:3
**11** 3:11 80:11, 12 85:9, 13
**11:13** 44:25 45:1
**11:27** 45:2, 5
**12** 3:13 14:21, 24 53:1 86:11, 15
**12:29** 88:9, 18
**12:30** 81:21
**13635** 6:7
**14** 6:10
**15** 14:15 19:5 52:25 53:1 80:6
**16** 19:5 86:18
**17** 35:7, 11 37:9 43:25 65:6 72:17 73:6
**1700** 2:14
**17th** 47:7
**18** 14:9
**19** 14:8, 9
**1973** 12:6 45:15
**1C** 10:19
**1D** 11:2
**1E** 11:8
**1F** 11:15
**1G** 11:20
**1st** 22:12, 14, 18, 21

< 2 >
**2** 3:7 34:12, 14, 15, 19 35:7 36:3, 15, 16 45:4 80:24 91:1
**20** 14:8, 9 67:14 90:17
**2006** 12:10 45:16
**2009** 13:11
**201** 2:15
**2014** 13:10
**2015** 19:5 25:21 27:7, 12 68:24
**2019** 14:22 29:23 30:11 34:6 35:7, 11 37:9 40:5 43:25 47:8, 11, 21, 23 48:11 50:5 53:19 55:4 57:11 63:23 71:21
**2020** 14:22 16:21, 25 22:12, 14, 18, 21 24:9, 16, 18 25:12 40:6 62:15, 22 63:1, 3, 8, 15, 18, 25 64:14, 20 65:6 67:14 69:17 71:21 72:17 73:6, 15 75:1 80:18, 19 81:20 84:19 86:2, 9, 19
**2024** 1:18 4:2 89:20 90:2
**2026** 89:25
**21st** 80:18, 19 81:6, 20 83:15, 18
**22** 1:18 90:2
**22nd** 4:2 80:17, 18, 19 81:6
**2623** 2:7
**28** 89:17

< 3 >
**3** 3:8 34:12, 16 35:1, 11 92:1
**3:11** 67:14
**33525** 6:8
**34** 3:7, 8
**35** 38:7
**362-8700** 2:16
**37** 13:1 38:6

< 4 >
**4** 3:8 46:19, 21, 25 47:5
**45** 82:9
**45202** 1:21 2:15
**45208** 2:8
**46** 3:8
**49** 80:8

< 5 >
**5** 3:4, 9 64:23 65:3 67:6 72:16 73:7
**511** 1:20
**513** 2:8, 16
**533-2701** 2:8

< 6 >
**6** 3:9 66:6, 10 89:25
**6/30/1951** 6:5
**64** 3:9
**65** 3:9
**66** 3:9, 10
**67** 3:10
**68** 3:10

< 7 >
**7** 3:10 66:22 67:1, 11
**75** 83:6

< 8 >
**8** 3:7, 10 68:15, 19
**80** 3:11
**83** 3:11
**85** 3:11
**86** 3:13

< 9 >
**9** 3:11 13:11 80:2, 15
**9th** 89:19

< A >
**a.m** 1:19 4:3 45:1, 2
**abilities** 30:14
**ability** 68:1 78:3
**able** 43:18 50:8 65:9 80:15
**accept** 84:12
**accurate** 18:1, 13 90:10
**achieve** 38:11
**acquisition** 30:20
**act** 52:19
**acted** 74:2, 4
**action** 33:1 89:15
**actions** 65:21
**adamantly** 70:15
**add** 28:3 69:3
**addition** 39:13
**additional** 36:6 39:14 55:24 70:3 87:20
**Additionally** 6:22
**address** 6:6 28:3 37:21 61:22 67:23
**addressed** 60:14 65:12 78:14
**affiliated** 89:16
**aforesaid** 89:7
**age** 5:20
**agenda** 27:24 61:3, 5 80:25 81:2, 8 82:12
**agree** 51:16 71:7
**agreed** 66:19
**agreeing** 71:24
**agreement** 4:18
**agrees** 69:2
**ahead** 5:25 27:18 32:6 49:4 51:13

66:3
**air** 71:13
**Akins** 17:22
**al** 1:10 4:6 90:4
**analysis** 75:3, 13
**analysts** 56:22
**and/or** 9:24 10:4, 5, 12, 24, 25 11:6, 12, 13 19:7 21:21, 25 90:11
**annual** 15:21 20:15, 18 24:10, 19, 21
**answer** 6:19, 23 7:10, 16 9:10 16:14 48:4 49:23 51:3 53:21 54:6, 7, 8 59:9, 11 72:21 75:8 76:1
**answered** 16:12 24:19 60:1, 2 61:11
**anybody** 26:5 31:13 33:21 37:22 38:9 39:1, 10, 12 54:12 56:11 64:20 74:10
**anyplace** 71:9
**appear** 35:9
**APPEARANCES** 2:1
**Appearing** 2:6
**appears** 50:9 86:3
**applicable** 50:13
**applies** 17:21
**appointment** 38:19 84:4
**appreciate** 65:25
**appropriate** 71:6, 8, 14
**approved** 36:12
**area** 43:22 68:2
**areas** 26:5 29:1 37:20 38:9 42:2 43:19 46:7, 17 60:16, 18 78:1 79:15
**art** 40:20 42:10
**Ascendium** 12:19, 21, 22, 25 13:2 38:6
**asked** 7:6 9:20 11:20 16:12 22:11 60:2 61:11, 13 78:8, 10
**asking** 6:14 10:18
**asks** 11:15
**assess** 26:14 65:24 66:17 72:15 73:9
**assessed** 27:7 64:14, 15 69:7, 10, 17 72:18 73:15
**assessing** 65:19
**assessment** 26:7, 8 63:9, 11, 14, 18, 20 64:1, 7 65:16 66:3 69:25 71:19 73:2
**assessments** 64:19
**assets** 45:21 46:15
**associate** 4:23
**associated** 18:8
**Association** 85:18
**assume** 33:8
**assumed** 23:25
**Assumes** 30:2 51:12 59:8
**assuming** 17:21 47:13
**attached** 65:23, 25
**attachment** 65:7 68:23 82:16
**attend** 17:24 61:10, 19 62:3, 6
**attendance** 86:20, 25
**attended** 17:24
**attending** 4:23
**attention** 39:9 68:3
**attorney-client** 7:12
**attorneys** 4:9
**audit** 13:22 14:3, 10 27:19 57:15 60:11, 20 62:20
**auditor** 27:22
**August** 34:6
**authority** 87:24
**Avenue** 2:7
**aware** 34:6 37:3 38:25 39:1 51:14 59:14 63:17 64:22 75:18 85:2

**< B >**
**bachelor's** 12:1
**back** 8:14 10:16, 19 14:5, 7 24:12 45:3 53:21 61:20 66:1
67:13 71:25 87:14
**bad** 57:2 59:1 78:19
**Bailey** 2:5 4:22
**balance** 21:5 25:8 26:19
**BANCORP** 1:10 2:21, 22 4:5 35:9, 21 86:17 90:4
**bank** 4:20 12:12, 19 13:14 19:2 21:11, 17 22:9 24:1 30:18 31:1, 6 32:15, 23 33:7 35:13, 22 39:25 40:5, 10 41:12, 15, 23 42:6 45:8, 18, 19, 24 46:6, 12 47:6 52:5, 7, 12 53:19 54:11, 23 55:6 57:21, 24 58:4 59:5, 18 63:10 64:21 68:24 74:6, 18 75:5, 10, 22 76:14, 25 77:16, 18, 21, 23, 25 78:3, 9, 16 79:24, 25 85:17
**banker** 26:18 45:17 63:2
**banking** 45:10, 11 52:13 78:24 84:13
**base** 53:7 55:13
**based** 41:21 42:7 56:4, 13 73:23 79:18
**basically** 31:9 85:23
**basis** 15:21 61:2, 7 62:2 86:7
**Bates** 34:21 35:1 47:1 65:3 66:10 67:1 68:19 80:20 84:2 85:13 86:15
**Beaudin** 65:17 82:2
**beginning** 5:7 36:6 81:15
**behalf** 2:1, 11 4:11, 13, 16, 17
**belief** 30:12 72:6
**believe** 18:13 21:13 26:6, 18 28:19 39:4 44:10 55:9 67:25 71:5 72:5 74:12 84:18
**believed** 84:10
**belt** 26:21
**bench** 15:21
**best** 63:2
**better** 57:21, 22
**big** 30:22
**birth** 6:4
**Blank** 2:14 4:16
**board** 7:21, 25 8:6 12:18, 19, 24 13:6, 14, 17 14:3, 13, 17, 20, 22 15:3, 15 16:3, 7 17:2, 3, 8, 11, 12, 13, 15, 24 18:7 19:14, 15, 24 20:5, 6, 10, 20 21:24 22:3, 22 23:1, 2 24:3 26:1, 2, 3, 15 27:16 28:8, 10, 15 29:7 30:13 31:15 32:12, 13, 21 33:4, 11, 16, 17, 20, 24 34:4, 8 35:8, 12, 21, 24 36:13 38:6 40:23 41:25 42:5 43:5 45:13, 14, 15 47:11 48:2 50:12, 23 51:6, 13 52:18 53:1, 3, 5, 12 55:17, 18, 20 56:15, 16, 17 59:9, 15, 19, 22 60:8, 13, 19 61:3, 4, 6, 10, 19 62:1, 4, 7, 15, 18 63:6, 19, 21, 23 64:16 66:19 69:6, 24 70:2, 3, 5, 15 71:3, 5 74:20 75:9, 11, 20 76:4, 11 79:19, 20 80:16, 24, 25 81:11, 15, 20 83:2, 6, 10, 14 84:6, 9, 17 85:16
**boards** 12:17 69:8
**board's** 14:25 15:4, 12 16:2 26:22
**Bob** 48:12 65:5 67:4, 18 68:21 72:17 73:7 84:8, 17
**book** 28:10, 22, 24 29:17
**books** 29:5
**Borton** 40:9, 13

**bottom** 34:*20* 35:*4* 46:*8* 47:*3*
**box** 50:*13*
**break** 44:*16, 20, 22*
**breakfast** 17:*10* 18:*11, 20, 22* 19:*7, 10, 17*
**Brian** 2:*22* 4:*20* 39:*25* 40:*18* 41:*7, 10, 20, 22* 42:*12* 43:*10* 50:*19*
**bring** 8:*17* 26:*17* 61:*2* 71:*24*
**bringing** 39:*8, 10*
**broad** 52:*15* 53:*6*
**broken** 21:*6* 25:*9*
**brought** 26:*24* 30:*20* 39:*9* 55:*17*
**BRUMBACK** 1:*15* 3:*3* 4:*4, 17, 19* 5:*7, 19, 25* 6:*3* 8:*11* 10:*18* 18:*5* 34:*18* 45:*7* 46:*24* 48:*16* 50:*2* 65:*2* 66:*9, 25* 68:*18* 80:*14* 83:*23* 85:*12* 86:*14* 88:*13* 89:*8, 11* 90:*19* 91:*24* 92:*24*
**B-r-u-m-b-a-c-k** 6:*3*
**building** 70:*22*
**built** 42:*3*
**bullet** 68:*25*
**bus** 52:*4* 54:*24* 55:*3*
**business** 23:*21* 43:*16, 17* 55:*17, 18, 22* 57:*20, 24* 67:*22* 71:*15* 77:*15, 24* 78:*11, 13* 84:*12*
**businesses** 40:*24* 41:*24* 55:*11, 23* 77:*17* 78:*23* 79:*14*

**< C >**
**caliber** 74:*10*
**call** 27:*21* 53:*15*
**called** 34:*21* 53:*15* 57:*1*
**calls** 53:*14*
**candidate** 15:*7* 26:*11, 14* 27:*2* 30:*6, 9* 31:*4, 6* 32:*1, 14, 21* 33:*12* 36:*22* 37:*13, 16* 38:*3, 5, 20* 39:*8, 19* 40:*5* 41:*8* 42:*13, 16* 55:*5, 10* 59:*18* 64:*17, 18* 66:*17, 18* 69:*9* 70:*16, 17*
**candidates** 10:*4, 24* 11:*5, 12* 27:*3, 7, 12* 29:*24* 30:*2, 4* 33:*25* 36:*18, 20, 24, 25* 37:*2, 8* 38:*16, 18, 22, 24* 39:*2, 10, 12, 17, 20* 70:*3* 71:*11*
**candidates's** 66:*20*
**capabilities** 38:*18* 46:*2* 65:*22, 24*
**capability** 55:*24*
**capable** 58:*13*
**Capital** 13:*24* 15:*8* 65:*12* 85:*16, 24* 86:*1, 5, 18*
**caption** 83:*6* 90:*3*
**captioned** 86:*17* 90:*8*
**card** 49:*12*
**care** 37:*17*
**career** 78:*24* 79:*23*
**Carmichael** 19:*12* 21:*19, 20, 25* 22:*2, 8* 25:*18, 21* 26:*12* 27:*8, 13* 29:*25* 30:*10* 31:*14, 21, 24* 32:*12, 18, 19, 22* 33:*13, 25* 34:*3, 7* 36:*17* 37:*1, 7* 38:*15, 22* 39:*15, 21* 59:*23* 68:*8, 22* 69:*2* 74:*12, 18, 20* 82:*6* 84:*6, 17* 85:*3*
**Carnoustie** 6:*7*
**C-a-r-n-o-u-s-t-i-e** 6:*8*
**carry** 78:*25*
**CASE** 1:*9* 4:*4, 7* 7:*24* 8:*2* 90:*3*
**cases** 56:*7*
**Center** 1:*20* 2:*14* 34:*20* 35:*4* 49:*9*
**CEO** 9:*24* 10:*5, 25* 11:*6, 13* 13:*13* 15:*2, 4, 10* 16:*1, 3, 5, 9, 11, 18* 21:*21, 25* 22:*4, 8* 25:*15, 21* 27:*3, 13* 29:*24* 30:*10* 31:*6, 8* 32:*15, 23* 33:*13* 34:*1* 38:*6, 7* 41:*9, 17* 42:*14, 16* 43:*23* 44:*5* 49:*20* 50:*5, 8, 12, 25* 51:*7, 10, 17, 19, 20* 52:*4, 6, 8* 53:*19, 22, 23* 54:*4* 55:*1, 5, 20* 56:*19* 57:*9, 19* 59:*5, 18* 60:*9, 25* 63:*9* 64:*8, 10, 12, 18, 21* 65:*7, 8, 15, 19, 23* 66:*14, 15* 67:*9, 21, 23, 24* 68:*1, 12, 23* 73:*8* 74:*3, 10* 75:*22* 76:*10, 12, 25* 77:*7* 79:*8* 82:*5* 85:*4*
**CEO/CHRO** 69:*8*
**CEOs** 27:*1* 53:*4*
**CEO's** 15:*12* 29:*14*
**certain** 8:*17* 26:*16* 61:*2, 3, 4, 22* 81:*8*
**Certainly** 24:*14* 74:*9*
**certified** 5:*21*
**certify** 89:*6*
**Chad** 40:*13*
**chaired** 13:*22, 23* 14:*11*
**chairing** 14:*10*
**chairman** 27:*19* 60:*9, 11* 61:*1*
**challenges** 38:*19*
**chance** 70:*20*
**change** 43:*1* 64:*3, 4* 67:*9* 68:*13* 86:*4* 91:*4, 7, 10, 13, 16, 19, 22* 92:*4, 7, 10, 13, 16, 19, 22*
**changed** 25:*14*
**changes** 48:*13* 51:*6* 66:*2* 85:*25* 86:*6, 8* 90:*11, 14*
**chart** 50:*8* 51:*1, 7*
**Charter** 85:*15, 24*
**check** 87:*3*
**checkers** 79:*4, 5, 6*
**chess** 79:*2, 4, 5, 7, 9*
**chief** 27:*22, 23* 36:*19, 24* 37:*8* 62:*12, 16*
**Cincinnati** 1:*21* 2:*8, 15* 89:*19*
**Cioffi** 2:*12* 4:*15, 25* 5:*6* 7:*9* 9:*8* 16:*12* 17:*1* 18:*2* 23:*18* 30:*1* 32:*2, 6* 34:*15* 44:*13, 17, 21* 46:*21* 48:*3, 17, 19* 49:*4, 14, 22* 51:*2, 11* 54:*5* 59:*7, 25* 60:*2, 4* 61:*11, 14* 69:*18* 72:*19* 73:*17* 75:*6, 16, 23* 80:*4, 11* 82:*21* 83:*4, 9* 87:*7, 11, 15* 88:*4*
**Circle** 6:*7, 8*
**circumstances** 18:*19* 53:*20, 22* 54:*2, 13, 16, 21* 57:*9*
**City** 6:*8*
**civil** 87:*24* 89:*17*
**clarification** 17:*2* 53:*16*
**clarify** 8:*25* 18:*5*
**clear** 87:*18*
**clearer** 6:*25*
**Clearly** 73:*2*
**close** 33:*8* 88:*4*
**cocktail** 18:*8* 19:*16*
**coincided** 19:*3*
**Collin** 2:*13* 4:*15* 88:*2*
**collin.hart@blankrome.com** 2:*17*
**column** 49:*9*
**combined** 31:*2*
**come** 33:*1* 52:*18* 57:*10* 60:*18* 61:*6* 62:*1* 63:*5* 78:*18*
**comfortable** 33:*5*
**coming** 29:*4*
**Commencing** 1:*19*
**commented** 38:*16*
**commercial** 46:*6*
**Commission** 89:*24*
**commissioned** 89:*5*
**committee** 13:*18, 19, 23, 25* 14:*9, 10, 11, 12* 16:*4, 9* 22:*7* 27:*19, 20* 28:*4, 5* 52:*19*

60:11, 12, 13 61:10, 17, 22 62:20, 23 65:13 75:5 85:16, 24 86:1, 5, 18
**committees** 13:16, 21 15:15, 17 16:19 27:17, 22 28:7
**committee's** 15:9
**common** 26:15 46:11, 13
**communicate** 31:14, 16 58:18
**communicated** 31:17, 22, 24 32:12, 18, 20 34:3
**communicating** 74:25
**communication** 42:6
**communications** 8:23 9:1, 14, 17, 19, 20 10:1, 8, 20 11:2, 8, 15, 20
**company** 13:5 15:22 23:16 57:19 63:2 76:25 84:13
**comparative** 75:3, 13
**compare** 27:2
**compared** 55:14
**compensated** 58:12
**Compensation** 13:24 15:8, 18 65:13 85:16 86:1, 5, 18
**competitively** 15:20
**competitors** 78:4
**complaints** 77:17
**completed** 65:17
**completion** 39:18
**component** 65:24
**components** 66:2
**concern** 26:5
**concerned** 67:19
**concerns** 23:20 60:16
**CONCLUDED** 88:18
**conduct** 71:15
**conducted** 56:15
**conference** 27:21
**confidential** 23:20
**confirm** 17:20
**confirmation** 65:25
**confirmed** 18:2
**Confusing** 72:20
**connected** 42:2
**Connie** 1:23
**Consent** 84:4
**consider** 31:17 53:7
**considered** 38:17 41:8 42:13 59:4, 17 70:20 71:1, 3 76:1, 3, 5, 8, 10, 20, 23
**consultant** 26:13
**consulting** 26:10
**consumer** 19:2 21:16, 17 24:1 46:4 58:4 79:24, 25 84:12
**context** 43:4, 24 52:17
**contingent** 14:21
**continual** 60:17
**continue** 55:3 65:21 66:3 87:8, 17
**continuing** 65:15
**contract** 89:17
**control** 26:18
**conversation** 33:9 68:22 72:12
**conversations** 21:23
**corner** 47:3
**Corporation** 12:12, 18
**correct** 18:1 35:13, 14, 18, 19, 20, 23 36:1, 2, 14 37:4 44:2, 9 45:8, 12 46:22 47:8, 12 48:21 62:12, 13 67:12, 16 68:5, 13, 14 71:19, 22 72:12 73:2 81:6 82:9, 10, 13 83:1, 3, 8 87:1
**corrections** 90:11
**correspondence** 9:1
**Counsel** 2:17, 22 4:19, 25 5:6 7:6, 15, 19 8:15, 20 9:8 23:18 44:13 47:16 49:5 60:5 80:4 82:21 83:4 87:7 89:12, 14
**count** 80:4
**Counting** 45:13
**COUNTY** 89:3
**couple** 14:6 26:20
**COURT** 1:2 4:6 5:3 6:18 87:17, 19, 25 88:1 89:16
**created** 38:19
**creating** 71:13
**creation** 47:21
**creativity** 55:19, 25
**crisis** 67:24
**criteria** 64:12
**critical** 26:22 30:18 60:20 70:17 76:14
**criticism** 58:23
**criticisms** 51:9 58:19
**criticize** 77:12
**criticized** 58:24, 25
**crowd** 76:24 77:1
**CRR** 1:22 89:4, 24
**crucial** 26:23
**cultivate** 39:16, 22
**current** 7:21 29:14
**currently** 12:7, 17 13:16
**customer** 20:24 25:2 46:17
**customers** 46:18

**< D >**
**Dade** 6:8
**Date** 1:18 6:4 19:2 23:4 31:19 32:18 70:6, 8 88:15 90:2
**dated** 47:7 65:6
**dates** 18:25 63:22, 24
**day** 52:5, 6 89:20 90:16
**days** 27:20 28:7, 12
**December** 23:6 28:18, 20 29:23 30:11 35:7, 11 37:9 43:25 44:6 47:7, 11, 15 48:11 53:19 55:4 57:11 63:23 89:20, 25
**decide** 61:16
**decided** 61:13 64:16 84:11
**decision** 27:6 52:23 72:15 74:8, 9
**deck** 28:6 29:18 44:1, 8 47:6, 15, 21, 24 48:2, 14
**DECLARATION** 90:5
**declare** 90:6
**Defendants** 1:11 2:11 4:16
**defense** 4:18
**deficiencies** 56:4
**define** 42:17
**defined** 89:17
**definition** 8:25
**definitively** 31:20
**degree** 12:1
**demands** 9:7
**demonstrate** 78:2
**demonstrated** 30:14, 25 77:24
**den** 78:25
**depend** 42:25 46:3, 9 53:20
**depending** 43:1
**depends** 40:22 41:2 42:25 52:14 53:21
**Deponent** 2:11
**depose** 89:8
**deposed** 5:21
**Deposition** 1:15 4:4 6:11 7:4, 19, 22 8:13 17:22 23:19 45:4 68:15 87:18, 23, 25 88:18 89:7, 10, 11 90:1, 8, 12 91:1 92:1
**depositions** 7:8, 12
**depth** 15:22
**designate** 23:19
**desired** 34:8
**detail** 28:9
**detailed** 67:24
**details** 39:15 54:13
**determination** 33:10 71:16
**determine** 33:11 61:9 75:20
**determined** 31:25 32:13, 21 33:3 60:7 70:4, 15
**develop** 41:3 65:21, 22 78:6, 23, 24

**developed** 26:8 51:24 73:16
**developing** 30:23
**development** 11:5 36:22 37:13, 14, 17, 18, 23 38:1, 8 39:16, 18 41:19 65:20 78:13
**developments** 82:6
**difference** 22:15 55:16
**different** 13:25 15:11, 13, 15, 16 16:18 21:12 41:14 43:14, 19 45:25 46:1, 2 52:3 57:15, 24, 25 60:15 61:12 77:15 80:1
**differentiated** 77:2
**differently** 79:16
**difficult** 5:11 6:20 58:7
**diligent** 28:10
**dinner** 23:1, 3, 5, 7, 24 24:2
**dinners** 17:14, 16, 18 18:8 19:16
**direct** 20:12 24:7, 15 48:17
**director** 9:21 10:2, 9, 21 11:3, 9, 11, 16, 21 38:15 39:14 60:10, 25
**directors** 35:8, 12 50:12 80:17, 25 85:17
**director's** 62:15
**disclosure** 9:1
**discuss** 21:19 22:6 23:11 28:24 52:20, 21 69:6
**discussed** 7:24 8:2, 5 28:5 33:14, 15, 21 36:21 38:22 39:15 63:19 69:16 70:2, 13 71:11 84:9
**discussing** 27:25 39:21 62:22
**discussion** 10:15 29:6 33:19 38:18 40:3 43:6, 9 44:7 65:14 70:11, 13, 25 71:7 72:2 84:21
**discussions** 9:5 26:3 33:4 43:5 72:7
**disproving** 79:11
**distinction** 36:7
**distinguish** 57:3
**DISTRICT** 1:2, 3 4:6, 7
**divided** 15:16
**DIVISION** 1:4 4:7 15:14 45:25 46:3 57:23 58:1, 2, 10, 14 77:23
**divisions** 21:3, 6 25:6, 9 45:23 46:10, 11 57:11, 12, 15
**document** 8:18, 21 9:4 47:1, 10 51:19, 21, 23 52:1 53:17 66:12 83:5, 9 85:20, 22
**documentation** 20:17
**documents** 5:13, 16 7:6, 14, 18 8:14, 17 34:18 44:5, 11 83:17 86:5
**doing** 26:21, 25 56:9 58:13, 14 63:18
**doubt** 39:7
**draft** 65:7 73:7
**drafts** 47:23
**drawer** 26:19
**dual** 26:18
**duly** 5:20 89:5, 8
**duties** 15:14

< E >
**earlier** 9:9 16:14 34:8 51:22 67:8 81:13
**East** 2:15
**Easy** 68:8
**edits** 48:13
**education** 11:25 12:19, 21, 22, 25 13:2, 3, 4
**effective** 37:22
**effectively** 15:19
**either** 57:18 59:15 66:1 69:4
**elaborate** 54:10
**eligible** 58:13
**Email** 2:9, 16 9:3 65:4, 9 66:4 67:3, 5, 10, 13, 17 68:6, 8, 21 72:17
**emails** 73:7
**emergency** 29:10, 13 50:21 51:10, 17, 19, 20, 25 52:2, 3, 4, 6, 11, 14, 18, 21 53:19 54:3, 22 55:1
**EMERSON** 1:15 3:3 4:4 5:19 6:3 68:7, 8 88:13 89:7, 11 90:19 91:24 92:24
**employed** 12:7
**employee** 20:21 24:24 89:13
**employees** 8:3 28:25 56:20 70:24 77:6
**employment** 12:9 45:8
**encouraged** 19:11
**engagement** 20:22 24:25
**engagements** 77:6
**entailed** 15:6
**entered** 17:22
**enterprise** 22:7 61:10, 17, 22 62:23
**entire** 79:23 90:7
**environment** 78:4
**equity** 45:22 46:15
**Erie** 2:7
**ERRATA** 90:1, 13 91:1 92:1
**Esq** 2:1, 4, 5, 12, 13, 17, 22
**essentially** 36:5
**establishes** 85:23
**et** 1:10 4:5 90:4
**evaluate** 26:11 56:4
**evaluating** 40:21 57:19
**evaluation** 71:2
**event** 51:24
**everybody** 79:3
**exact** 18:25 31:18
**exactly** 53:1 58:5
**Examination** 3:4 5:23
**examined** 5:21
**exchange** 9:2 67:3
**excuse** 10:7 49:8 68:7
**execute** 31:1 78:6
**executive** 15:1, 9 28:16, 21 36:19, 24 37:8 44:4 72:4, 6, 7, 9 74:6 77:8
**executives** 15:19, 24
**Exhibit** 3:7, 8, 9, 10, 11, 13 8:8, 12, 19 10:19 34:12, 19 35:1, 7, 11 36:3, 15, 16 46:19, 25 47:5 64:23 65:2 66:6, 10, 22 67:1, 5, 10 68:15, 19 72:16 73:7 80:2, 15 83:20, 24 84:1, 5 85:9, 13 86:11, 15
**EXHIBITS** 3:6 82:12
**exist** 57:16
**expand** 43:21
**expanding** 87:19
**expectation** 70:23
**expectations** 70:22
**expected** 39:17
**experience** 20:25 25:3, 15
**expires** 89:24
**exposure** 43:14
**extend** 87:25
**extending** 87:22
**extent** 5:12 11:25 23:20
**external** 26:16, 24 38:16, 20, 21, 24 39:2, 10, 12
**extreme** 74:6
**eye** 5:7, 9, 10

< F >
**fact** 19:11 84:11
**factors** 46:5, 9

**facts** 11:10 67:25
**fair** 70:20 72:14
**fairly** 32:25 33:3
**fall** 55:3
**February** 8:14 62:15, 22 63:1, 3
**feel** 6:16
**feeling** 29:14
**feelings** 26:4
**Feiger** 30:21
**fellow** 39:24
**felt** 60:20 64:17 69:23
**FIFTH** 1:10, 20 2:15, 17, 22 4:5 7:22, 25 8:3, 15 9:21, 24 10:2, 5, 9, 21, 25 11:3, 6, 9, 13, 16, 21 12:18 13:6, 13, 17 14:13, 23, 25 15:10 16:1, 11 20:9 21:11, 21, 25 22:3, 4, 8 23:23 24:4 25:16, 21 26:13 27:16 29:25 31:6 32:15, 23 33:13 34:1, 22, 23 35:1, 2, 8, 13 41:9 43:6 45:13, 14, 15 47:2 48:1 50:2 53:19 54:22 55:5 59:5, 18 63:8, 10 64:21 65:3, 6, 7 66:10, 11 67:1, 2 68:19, 20, 23 73:8, 16 75:22 78:14, 20 80:20, 21 81:18 82:16, 17, 23, 24 84:2 85:5, 13, 14, 17 86:16, 17 90:4
**fill** 43:13 52:24 53:5 54:24 64:17
**filling** 33:16
**final** 10:11, 23
**finance** 14:9, 12 52:19
**financial** 21:2 25:5
**find** 48:19 52:6
**fine** 44:24
**finish** 6:23
**Fintech** 23:16
**firm** 26:10, 13 89:16
**first** 5:20 9:20, 23 14:3 30:3 34:22 35:6 47:1 50:11 63:17 67:10 68:25 89:8
**Five** 12:16 13:20 41:1 80:5
**fix** 68:9 77:11, 12
**flags** 26:17
**Florida** 6:8 18:14 19:23 20:4 41:23, 24 42:1, 2, 7 63:5
**fluctuated** 14:16, 19
**focus** 53:11 68:3
**foil** 57:1
**following** 17:14 67:4
**follows** 5:22
**follow-up** 65:13
**foregoing** 89:10
**form** 9:4 30:1 32:2 40:21 57:4 69:18 72:19 73:17 75:6
**formally** 69:4
**former** 7:21
**formerly** 69:3, 5
**formula** 68:23 73:15
**formulate** 54:6
**forth** 31:13 33:18, 20, 22, 24 76:5 81:8
**found** 54:13
**foundation** 32:6 48:3 49:14, 23 51:2, 12 59:7 69:19 72:20 75:7, 17, 24
**four** 14:5
**fourth** 10:7
**frame** 19:4 21:15 58:6
**fraud** 52:7, 11 54:11
**free** 6:16
**Friday** 4:2
**full** 15:5 28:6, 8, 12 44:22 60:19 81:20
**future** 31:11, 18 78:12 79:13

**< G >**
**gain** 46:16
**game** 79:3, 4
**general** 72:25 78:4
**Generally** 28:18 67:18 86:6
**getting** 67:20
**gift** 78:25
**give** 29:8 32:24 38:7 43:12, 14, 21 55:9 56:13, 23 66:2 69:13, 15 79:19 82:19
**given** 41:14 74:5 89:10
**giving** 89:7
**go** 5:25 24:12 27:24 28:6 32:6 40:24 43:16 44:13, 22 49:4 51:13 53:20 56:3 61:20 66:3, 18 71:1, 25 77:25 78:1, 3
**goals** 21:3 25:6
**goes** 40:23
**going** 6:14 7:9 8:22 23:19 27:25 31:15, 16 34:9 36:15 38:11 44:14, 23 52:10 54:7 63:18 70:20 71:9 76:3 77:9, 11, 12 80:16 81:17 82:15 84:4
**golden** 79:1
**golf** 18:14 19:18, 23 20:5
**good** 31:1 55:10, 22 57:7 58:10 70:24 71:10 76:15, 17 77:5, 9, 15 79:6, 9
**gotten** 30:16
**grasp** 79:14
**great** 30:24 42:1, 3, 4, 5, 6 58:7, 10 79:13, 14
**GreenSky** 23:14, 15, 16
**Greg** 19:12 21:19, 20, 24 22:2, 8 25:18, 21 26:7, 12 27:8, 13 29:24 30:10 31:9, 14, 19, 21, 24 32:12, 15, 18, 19, 22 33:9, 12, 25 34:3, 7 59:23 65:17, 22 68:22 74:12, 13, 18, 20 82:6 84:6, 17 85:3
**Greg's** 26:4 65:18
**Group** 12:21
**Group's** 12:19
**guess** 41:5, 6 43:2
**Guy** 65:17, 18, 22, 23 66:3 68:22, 25 69:2, 7 82:2

**< H >**
**habit** 63:5
**HAMILTON** 89:3
**hand** 89:18
**handed** 8:11 34:18, 25 46:24 65:2 66:9, 25 68:18 80:14 83:23 85:12 86:14
**Hang** 10:13
**happen** 28:20 76:8, 10 77:14
**happened** 73:24 76:7
**happens** 53:14
**happy** 5:15
**hard** 40:25 54:16
**Hart** 2:13 4:15 87:3, 5, 22
**HCC** 13:24 14:4 15:17
**HCCC** 14:2 16:5, 10, 17 65:14
**HCCC's** 15:25
**HCC's** 15:25
**head** 6:20 48:10 58:2 84:12
**hear** 6:15
**heard** 29:18 42:18, 19
**heavily** 58:16
**help** 65:21
**helped** 30:17
**hereinafter** 5:21
**hereof** 90:13
**hereunto** 89:18
**hesitate** 33:1
**high** 49:10
**highlights** 68:25
**hire** 26:13
**hired** 63:11

**historically** 5:8
**hit** 52:4 54:24
**hold** 12:15
**holds** 52:16
**home** 23:17
**honest** 20:3
**hour** 44:15, 18, 19 87:4
**hours** 44:22, 23 87:5, 6
**Human** 13:24 15:8, 18 48:6, 7, 10 65:12 85:16, 24 86:1, 5, 18
**Hypothetical** 54:5, 15 59:10 73:18

< I >
**IBM** 57:1
**idea** 29:13 41:17 49:16 57:14 61:18, 20 62:2 71:10 75:10
**identical** 36:6
**identification** 8:9 10:12, 24 34:13 46:20 64:24 66:7, 23 68:16 80:3 83:21 85:10 86:12
**identified** 10:4 19:15 20:8 29:1 39:3
**identify** 72:1 80:15
**identifying** 11:12 42:12
**Ihle-Adkins** 1:23
**immediacy** 52:19
**implementing** 65:20
**important** 15:3 27:5 76:13 77:4
**improve** 78:1
**improvement** 23:17 38:9 78:17
**inappropriate** 70:21
**include** 17:2 65:19 68:13 70:19
**included** 82:11
**including** 9:5 36:20 38:17 65:5
**income** 21:5 25:8
**independent** 64:19 65:16 75:15
**indicate** 36:16 59:3 67:17 87:20
**indicated** 32:11 34:7 45:7 64:13 69:25 73:6 74:20 87:21 90:12
**indicates** 36:24 50:11 69:2 73:8
**indicating** 59:15 63:1 84:17
**indicator** 58:15, 16
**individual** 28:7 41:11 43:4 46:10 53:11 64:3 78:17
**individuals** 52:16 65:5 70:12, 14
**industry** 30:25 39:6 52:13 78:13 79:16
**information** 9:2 28:13, 14, 24 29:7 36:7 48:14 49:9, 11, 12, 21 67:25
**informed** 8:20 74:12
**inherited** 58:4
**In-House** 2:17, 22
**initiated** 36:17
**inject** 68:2
**injuries** 5:8
**innovation** 55:19, 25
**innovations** 58:8
**input** 26:7 60:23
**inquiries** 9:6
**inserted** 49:12, 20
**insight** 69:13, 15
**instance** 43:11, 12
**institution** 52:22
**instruct** 7:9 54:7
**instructions** 7:1
**insufficient** 76:21
**interact** 41:24
**interacted** 17:5, 13, 18 18:9
**interactions** 18:15 19:12, 19 20:7 22:24 40:23 41:22 57:6
**interest** 89:14
**interested** 31:11
**interim** 52:20 53:23 54:3, 25
**internal** 39:17 69:9 75:4
**internally** 39:22
**International** 65:18 82:3, 8
**interview** 20:11 24:6, 15
**introduce** 4:9
**invades** 7:12
**investment** 56:21
**involved** 16:7, 8
**involvement** 16:5 25:20, 23, 25 26:1, 2 47:20 63:25
**irrelevant** 52:2
**issue** 33:1 51:12 59:8 60:21 62:1 67:24
**issues** 23:10, 21 57:15, 16 60:18, 19 61:23 78:13 81:17
**items** 61:2

< J >
**Jamie** 62:9, 11, 14, 22 63:1
**January** 16:21, 25 22:12, 14, 18, 21 24:9, 16, 18 25:12
**Jeez** 13:20
**jms@sspfirm.com** 2:9
**job** 15:3, 4, 6 16:9 30:15, 23 42:4 55:11 56:10 59:11, 20 73:24, 25 76:17 77:10, 11, 16
**joint** 4:18 85:16
**Joshua** 2:4 4:13
**July** 12:10 65:6 67:14 72:17 73:6
**June** 65:14 86:1, 9, 18

< K >
**Kabat** 13:15 25:18
**keep** 87:11
**Kentucky** 12:2
**Kevin** 13:15 25:17
**key** 36:22 37:12 65:16 82:6
**kind** 43:19 46:16 79:10
**kinds** 53:15
**knew** 53:14
**know** 6:14 15:11 17:9 19:13, 14 21:14 26:18 30:16 36:25 39:12 40:19 41:1 42:19 43:2 46:4 47:16 48:4, 5, 8, 10 49:15, 23, 24 51:3, 4, 8, 13 56:19 62:9 63:13 69:19, 21 70:8 72:2 73:21 75:10, 25 76:11 78:25
**knowledge** 30:24 39:4, 5 63:16
**knowledgeable** 74:23
**known** 38:18 39:5

< L >
**L.P.A** 2:7
**Lack** 48:3 49:14, 22 51:2, 11 59:7 69:18 72:20 75:16, 23
**Lacks** 75:7
**Lamb** 39:25 40:18 41:7, 20 42:13 43:10 50:19
**language** 36:23
**largest** 30:20
**lawful** 5:20
**lay** 28:1 29:10
**lead** 60:10, 25 71:8
**leadership** 67:19
**leaving** 84:13
**LEE** 1:15 3:3 5:19 88:13 89:7, 11 90:19 91:24 92:24
**left** 5:10 40:4, 10 74:18
**lending** 23:17
**Leonard** 62:9, 11, 14, 22 63:1
**level** 40:7
**levels** 15:19
**lifetime** 38:11
**liked** 76:16
**limit** 44:15 87:23
**limited** 9:5

**line** 43:16, 17 44:14 46:8 57:23 67:19 85:25
**lines** 43:17
**list** 52:8, 15, 16
**listed** 50:14 51:10, 16
**little** 13:9 44:14 67:19
**live** 17:25 63:4
**lived** 6:9
**LLP** 2:14 65:18 82:3
**loan** 23:16
**loans** 13:3
**long** 6:9 12:15, 24 13:6, 19 31:5, 24 32:19 33:9 38:4 40:4 41:12
**longer** 13:9 41:2, 3
**look** 26:24 53:3, 12 54:25 58:9 78:3 82:24
**looked** 56:14
**looking** 30:14, 15 31:8 66:21 79:13 81:18
**loss** 5:8, 9, 17
**lot** 40:1 41:12 52:3 56:19, 20 57:20, 24, 25 58:7 62:18 76:17 78:15 81:16
**Louisville** 21:14
**lucky** 73:25
**lunch** 17:9 18:11, 17 19:7, 10, 17

**< M >**
**M&T** 12:12 45:8 79:1
**mail** 9:3
**making** 23:9 28:25 74:7
**man** 40:8
**managed** 21:6 25:9 57:12, 13
**management** 15:23 19:10, 12 20:5 21:16 28:23 29:4 52:10 54:12 56:4 62:18 76:13 79:1, 16 81:21
**mark** 80:7
**MARKED** 3:6 8:8, 12 34:13, 19, 22 46:19, 25 64:23 66:6, 10, 22 67:1, 5 68:15, 19 80:2 83:20 84:1 85:9, 13 86:11, 15
**market** 45:22 46:16
**marketplace** 41:24
**Marsha** 69:6
**master** 79:7, 9
**material** 27:17
**materials** 24:21
**matter** 38:4 90:8
**MB** 30:21
**MCHUGH** 1:7 2:17 4:5, 12, 14 8:5, 24 9:15 11:18 16:22, 24 17:6 18:7, 12, 22 19:8, 18, 20 20:8 21:7, 20, 24 22:3, 7, 13 33:12 47:2 50:3, 22 51:10, 16 53:18 54:21 55:4 56:12 57:13 58:18 59:3, 15, 22 62:3 63:2, 14 73:14 74:11, 15, 17, 19, 21 75:4, 14, 21 76:5 77:20 78:8 82:16, 17 84:10, 18, 24 85:4 90:3
**McHugh's** 20:12, 15, 18, 21, 24 21:2, 10
**mean** 9:1 17:11 38:5 40:22 41:2 42:17 46:1 48:6 54:15 55:10 58:4, 12 59:1 60:23 74:4 76:12, 15 77:4
**means** 42:20, 22 43:3
**meant** 55:2
**measurements** 45:18 46:1, 11
**media** 45:4
**meet** 16:24 20:11 22:20 24:6, 14 62:14 63:4
**meeting** 7:5 18:14 19:25 20:2, 4 23:1, 6 27:16 28:18, 21 35:8, 12 36:11 37:9 43:25 44:6 47:11, 15, 17, 18 60:24 62:4, 7, 15, 21, 25 63:6, 19, 21, 23 65:14 69:16, 20, 21, 24 70:2, 5, 9 71:16, 22, 25 72:1, 3, 14 73:1 75:1 78:11 80:17 81:3, 20 83:18 84:10, 19 86:21, 24
**meetings** 17:2, 3, 8, 11, 12, 13, 15, 24 18:6, 7 19:16, 19 20:10 22:22 23:2 24:3 28:5, 16 35:16 53:15 56:16 60:8 61:6, 10, 19 62:19 63:7 79:19, 20 81:11
**member** 14:17 22:3 26:1, 2 33:20 50:23 53:3 55:20 59:19
**members** 7:22, 25 8:6 14:13, 22 16:7 20:6 21:24 22:6 26:3 35:24 53:1, 12 56:16, 17 59:14 61:9, 16, 21 62:23 65:13
**mentioned** 18:7 42:9
**mentions** 9:22 10:3, 10, 22 11:4, 10, 17, 22
**message** 9:4 65:4
**met** 18:17, 21 23:11, 24 26:6 62:18
**Michael** 2:12 4:15 17:20
**michael.cioffi@blankrome.com** 2:16
**midyear** 20:15 24:10, 19, 22
**Mindful** 44:15
**minimum** 69:6
**minor** 64:4
**minute** 87:12
**minutes** 17:23, 25 35:7, 12, 16 36:5, 8, 16, 23 72:1, 3, 9, 11 80:5, 8, 11 82:9 86:17
**Mitch** 30:21
**modified** 68:13
**Monday** 81:19
**money** 74:7
**move** 30:22
**movement** 29:3
**moving** 31:11, 15, 17, 18, 20, 22, 25 32:13, 19, 20 34:4
**multiple** 60:22

**< N >**
**name** 6:1, 2 33:18, 19, 22 39:25 40:9, 12, 13 52:8
**named** 74:16, 21
**names** 33:23 52:1, 15
**Naples** 20:4
**National** 85:17
**nature** 16:21 22:13, 17 25:12 34:10
**near** 31:11
**necessary** 5:14 78:5
**need** 6:18 48:16 50:2 51:20 65:9, 11 79:15
**needed** 28:2, 3 31:12 41:19 42:13 49:5 52:23 60:14 77:25 78:1, 3, 14 79:15 87:20
**needs** 52:21 65:20
**negative** 76:9
**negatives** 76:21
**negotiations** 9:6
**neither** 89:13
**Never** 21:22 25:14 33:14, 15, 16 37:22 38:3 42:19 56:24 73:19 74:23 76:1, 23 78:6
**New** 29:4 83:23
**nice** 30:15
**No._____Change** 91:2, 5, 8, 11, 14, 17, 20 92:2, 5, 8, 11, 14, 17, 20
**No._____Line** 91:2, 5, 8, 11, 14, 17, 20 92:2,

5, 8, 11, 14, 17, 20
**Nobody's** 37:19
**nodding** 6:19
**normal** 14:20
**Normally** 14:20 20:1
**Northern** 12:2
**Notaries** 1:24
**Notary** 1:22 89:5, 25
**note** 84:6
**notes** 28:9 86:25
**Notice** 1:17 8:13
**notices** 9:6
**November** 1:18 4:2 90:2
**Number** 4:7 8:12, 19 10:7, 8, 19 13:23 14:16 17:19 34:19 35:1, 7, 11 36:3 41:4 46:25 65:3 66:10 67:1, 6, 11 68:19 72:16 73:7 80:15 83:5 85:13 86:15
**numbers** 82:22
**numerous** 53:4

**< O >**
**oath** 90:15
**object** 51:18
**Objection** 7:9 16:12 17:1 30:1 32:2 48:3 49:14, 22 51:2, 9, 11 54:5 59:7, 25 61:11 69:18 72:19 73:17 75:6, 16, 23
**objections** 53:8, 9
**obligations** 61:4
**observations** 31:3
**observe** 20:8 24:3
**obtain** 12:3, 5 67:24
**obviously** 60:9
**occasion** 18:18
**occasions** 18:10
**occur** 26:17 29:12
**occurred** 52:7 54:15
**occurring** 52:17
**occurs** 52:18
**offer** 90:14
**office** 4:24 89:19
**officer** 9:21 10:2, 9, 21 11:3, 9, 16, 21
27:23 36:19, 25 37:9 62:12, 16 84:4
**official** 89:19
**Off-the-record** 10:15
**Oh** 4:22 38:3 80:8 81:23 83:25
**OHIO** 1:3, 21, 22, 24 2:8, 15 4:7 89:2, 6, 19, 25
**Okay** 13:13 22:17 35:3, 5, 15 36:10, 15 44:12 47:4, 14, 20 48:10, 22 49:1 50:4, 6, 10, 16, 20 54:1 66:1 67:13, 17, 18 69:7, 13 70:7 73:4, 11, 12 75:13 77:16 80:10 81:2, 5, 14, 18, 24 82:4, 11, 15 84:16 87:9, 13
**old** 57:1
**once** 17:10
**one-day** 87:23
**operates** 71:4
**operation** 42:7
**opined** 64:2
**opinion** 26:16, 23 27:5 29:21 41:20 43:1 55:7 56:6 58:17 70:16, 18
**opinions** 29:8
**opportunities** 29:2, 4 37:17, 19 38:8 43:13, 15 78:7, 15, 16, 17
**opportunity** 37:23 41:14 58:20 74:5 78:12
**oral** 9:2
**order** 87:21, 25 88:1
**organization** 15:4, 14 29:3
**original** 53:21
**originally** 63:13
**outing** 20:6
**outside** 17:3 20:10 62:14, 18
**outstanding** 30:23 58:1, 2 79:7, 13

**< P >**
**p.m** 67:14 88:18
**packet** 81:3 82:11
**PAGE** 3:3 34:21, 22 36:16 47:1 48:16, 25 50:7 67:10 80:24 84:5 91:2, 5, 8, 11, 14, 17, 20 92:2, 5, 8, 11, 14, 17, 20
**paragraph** 84:8
**part** 23:19 36:5 61:5 72:8 82:12 83:14
**partial** 5:9
**participate** 20:14 24:10, 20
**particular** 8:21 43:8 58:14
**particularly** 62:19
**parties** 18:9 19:16 89:14
**pas@sspfirm.com** 2:9
**path** 71:9
**Patterson** 2:7
**PENALTY** 90:5, 6
**penetrations** 46:17
**people** 14:21 27:22 29:4, 9 33:2 37:7, 20 39:6 40:21 41:3 43:8 48:7 53:4 54:17 56:4, 20, 22 57:20, 21, 22 58:3 60:18, 22 67:25 70:19, 21, 22 71:9 76:2, 13, 15, 22 79:2, 5
**perfect** 37:19
**perfection** 38:10
**perform** 20:14 43:18 57:12
**performance** 21:3 25:6 29:16
**performed** 71:19
**period** 14:1 21:18 22:12 42:12 54:25 55:1
**periods** 14:1
**PERJURY** 90:5, 6
**permanent** 52:6
**permit** 7:15
**person** 5:1 9:3 43:1 57:7 64:15 86:23
**personable** 57:7
**personal** 18:6 19:19 20:7 22:23, 24 25:20, 23, 25 34:10 42:22
**personally** 4:17 17:5 22:20, 25 41:7, 10 53:11
**person's** 40:12
**pertinent** 29:8
**Peter** 2:1 4:11
**Phenise** 2:17 4:20
**Phil** 8:5 9:15 11:17 16:22, 24 17:6, 9, 11, 17 18:7, 11, 14, 17, 22 19:1, 8, 18, 20, 23 20:8, 12, 15, 18, 21, 24 21:2, 7, 10, 12, 13, 20, 24 22:3, 7, 13, 16 33:12 50:22 51:9, 16 53:8, 18 54:21 55:4, 16 56:8, 9, 24 57:6, 13 58:4, 18 59:3, 15, 22 62:3 63:2, 14 69:3 73:14 74:11, 15, 17, 19, 21 75:4, 14, 21 76:5, 10, 16 77:16, 20 78:8 79:6, 11, 24 84:10, 11, 18, 24 85:4
**philanthropy** 13:4
**PHILIP** 1:7 2:17 4:5, 12, 14 8:24 90:3
**Phil's** 76:22 80:1
**Phone** 2:8, 16 86:23 87:1
**phrase** 42:9
**Place** 1:20 18:24 33:2 35:16 52:20 69:20 70:25 71:7, 22 73:1 84:21 89:10
**Plaintiff** 1:8, 16 2:1, 17 4:11, 14
**Plaintiff's** 3:7, 8, 9, 10, 11, 13 8:8 34:12 46:19 64:23 66:6, 22 68:15 80:2 83:20 85:9 86:11
**plan** 30:17, 23 31:1 50:5, 8

**planning** 9:23 29:11 39:16 65:15
**plans** 39:18
**play** 79:5
**played** 18:14 19:23
**player** 79:6
**playing** 19:18 79:3, 4
**please** 5:4 6:1, 16 32:8
**plural** 36:24
**PNC** 2:14
**point** 21:13, 16, 17 23:25 27:24 28:4 30:4, 5 31:10, 20 37:3, 24 39:23, 24 44:11 52:22 53:23 59:24 62:11 64:16 68:25 76:2
**points** 69:1
**Poole** 2:17 4:21
**portions** 5:14
**position** 9:24 10:4, 25 11:5, 12 12:13, 15 15:13 29:14 31:7, 9 33:8, 17, 18 36:19, 25 37:16, 18 38:4, 5 49:18 52:11, 24 53:5 54:12 64:18, 21 74:6 76:6, 11, 12, 25 78:20
**positions** 15:13 43:13 56:6 57:18 77:7, 8
**positive** 58:15
**possible** 29:3 62:20
**postsecondary** 13:4
**potential** 11:5 23:21 29:6, 23 32:14 33:25 36:18, 21 37:12 38:16, 19, 21 39:2 40:1, 2, 6, 11, 15, 18 41:8, 11 49:9, 10, 18, 19 65:17 75:21
**potentially** 32:22 52:24 53:5
**prepare** 7:3 27:15
**prepared** 42:15 48:1 50:25
**presence** 42:5 57:9
**Present** 2:17 41:25 62:1 78:7
**presentation** 28:1 56:15, 23, 24, 25 58:19 59:16 78:9, 10, 18 81:9 82:5, 8 83:14
**presentations** 42:4 55:17 56:12 57:1, 2, 6 60:7, 15 61:13 79:12, 18, 24, 25
**presented** 28:23 51:13 59:8 75:24
**president** 9:24 10:5, 25 11:6, 13 12:14 13:13 15:2, 10 21:14, 21, 25 22:4, 8 29:24 30:10 31:6, 8 32:15, 22 33:13 34:1 41:9, 23 42:14, 16 49:19 55:5 59:5, 18 63:9 64:21 74:16, 19, 22 75:21 85:4
**pretty** 29:22 41:6 73:25
**previous** 22:11 29:5
**previously** 32:11 69:23 74:20
**price** 45:22
**primarily** 56:14 60:24
**print** 34:23 49:2 82:1
**prior** 7:11 16:21, 24 22:12, 18, 21 23:2 24:9, 16, 18 28:5 31:8, 13, 19 36:11 47:18 71:11 72:16 73:10 74:17
**priorities** 36:22 37:13, 14 38:2 39:16
**privilege** 7:13
**probably** 13:20 14:4, 5, 8, 11, 15, 20, 24 17:16, 17 18:25 19:1, 3, 5 23:5 26:7 40:8 43:9 44:19 60:22, 24 73:24
**problems** 5:16
**process** 16:1, 6, 8, 9 25:16, 21 26:21, 22 29:12 51:24 53:13 87:22
**processes** 10:11, 22 29:10
**product** 7:13
**Professional** 16:23 22:19
**profile** 64:8, 9, 10 65:7, 8, 23 66:1, 14, 15 67:9, 18 68:12, 23 73:8
**program** 23:10, 13
**progress** 28:25 58:8 87:8, 17
**promotion** 84:11, 25
**properly** 15:21
**proposal** 23:9
**proposed** 10:11, 23
**prove** 41:15 43:18
**proved** 79:11
**proven** 52:12 79:8
**provide** 8:22
**provided** 7:15, 19 8:19 28:13 44:1, 6, 10 47:11 83:11, 13, 18
**proving** 30:16
**prudent** 39:1, 11
**Public** 1:22 89:5, 25
**Public-State** 1:24
**purely** 73:18
**purpose** 23:7 51:21 66:16
**purposes** 34:20
**Pursuant** 1:17 4:18 9:9 89:12
**pursue** 31:12
**put** 20:5 31:13 33:18, 20, 21, 24 41:4 43:3, 24 52:5, 8, 10, 16 60:13 76:4
**putting** 30:18 52:1

**< Q >**
**qualifications** 30:13
**qualified** 53:18, 22 54:3, 17, 22 55:4, 10 76:22 77:7 89:5
**quarterly** 61:7
**question** 6:17, 23, 24 7:14 22:11 24:12, 13, 19 30:2 32:3, 17 54:6, 20 60:4 61:12 69:20 72:20 73:11, 18 75:7, 24 83:13
**questioning** 44:14
**questions** 6:15 23:10 28:10, 11 38:15 39:14
**quick** 32:25
**quickly** 5:16 33:3
**quite** 87:18

**< R >**
**ran** 55:22 78:23
**rashly** 74:2, 4
**Raymer** 1:22 89:4, 24
**reach** 71:13
**read** 5:14 8:22 37:11 49:4, 5 50:8, 15, 17 56:24, 25 65:9, 10, 11 88:5 90:7, 9
**readiness** 36:21 37:12 39:19
**reading** 5:10, 16 9:8
**reads** 38:14 39:13 84:8
**ready** 33:8 50:12 56:6
**reality** 52:17 70:23
**really** 37:25 41:4, 5 52:16 71:12, 23
**reason** 54:1 55:9 75:8 91:4, 7, 10, 13, 16, 19, 22 92:4, 7, 10, 13, 16, 19, 22
**reasons** 53:25
**recall** 18:10, 16, 17, 19, 21, 24, 25 19:9, 18 21:8, 9, 10 23:1, 4, 5 25:11 31:21 32:17 37:25 38:1, 12, 21 39:20, 23 47:19 48:13 53:1 62:5, 17 63:4, 22, 24 66:4 70:8, 10 71:21 74:24, 25 83:17 84:20 86:4, 8, 20, 22

**receive** 27:17, 20 47:14, 17 82:12
**received** 47:17, 18 81:2
**receiving** 66:4
**recess** 45:1
**recognize** 47:5 66:12 87:15
**recollection** 13:10 21:12 30:6 37:6, 10, 16 62:21, 25 84:16, 22
**recommend** 22:2 69:5
**recommendations** 60:12 66:13
**record** 4:1 6:1, 25 10:14, 16 23:18 44:25 45:3 87:10, 11 88:4, 6, 7, 9
**red** 26:17 85:25
**refer** 36:15 82:15 84:5
**reference** 34:20 49:8
**REFERENCED** 3:6 67:8
**references** 72:18
**referred** 29:17, 18 37:1
**referring** 10:19 36:3 37:7
**refers** 9:22 10:3, 10, 21 11:2, 4, 10, 17, 22 37:11 81:19
**reflect** 17:23 72:11
**reflected** 67:9
**refresh** 84:16
**regarding** 78:9, 21 85:4
**regional** 21:14
**regionals** 21:18
**regions** 20:1
**regular** 16:7 61:2 62:2 86:6
**regularly** 61:8
**regulatory** 60:21 61:1 81:17
**relates** 9:22 10:3, 10, 22 11:4, 10, 17, 22
**relationship** 16:22 22:13, 15, 17 25:13 30:21
**relative** 21:3 25:6 57:12 89:13
**relied** 11:11
**remember** 14:7 20:2 28:11 39:10 63:6
**remote** 5:1
**repeat** 6:17 24:13 32:7 82:21
**repeatedly** 30:25
**rephrase** 6:17 7:14
**report** 28:8 77:5
**reported** 21:18 59:23
**reporter** 5:4
**reporter's** 6:18
**reporting** 89:16
**reports** 20:12 24:7, 15
**represent** 4:10 8:12 35:6 46:25 48:24 65:4 67:3 68:21 85:15
**representation** 36:4
**representations** 85:2
**reputation** 42:3
**request** 7:11 8:13, 23 9:15, 17, 20, 23 10:1, 7, 8, 19 11:2, 8, 15, 20 62:6
**requests** 8:16, 21 9:6
**require** 61:21 62:3
**required** 55:24 57:25
**requirements** 15:6 61:1, 5
**requiring** 68:2
**reserve** 87:16
**resigned** 74:8, 11, 13, 15, 19
**resources** 15:18 48:6, 7, 11
**respect** 10:12, 23 15:1, 9, 12, 13 16:1, 11, 18 17:23 18:20 28:21 42:1 43:5 44:4 45:23 49:7, 11 64:6
**respective** 27:22
**respects** 89:12
**responded** 8:16 68:6
**response** 9:14 38:14 39:14 68:7, 8
**responses** 9:6
**responsibilities** 43:21 46:8
**responsibility** 15:12 16:4 19:2 20:19 21:15 24:1 74:7
**responsible** 79:21
**rest** 79:16
**result** 84:24 89:15
**results** 58:1, 2
**retained** 63:8, 13
**retention** 46:18
**retired** 45:16 79:1
**retiring** 53:2
**return** 45:21, 22 46:2, 15
**review** 5:12 7:8, 18 20:17, 21, 24 21:2 24:24 25:2, 5 27:25 28:1, 9, 12, 15, 16, 22 36:11, 18 64:8 65:25
**reviewed** 7:6, 10 15:22 36:8, 19 64:2, 7
**reviews** 15:20 20:15, 18 24:11, 20, 21, 22
**rewarded** 58:11
**RHR** 26:6, 9, 10 27:10 63:8, 13, 17, 20 64:1, 11, 14, 15 65:18 69:17 71:17, 24 73:2, 15 82:3, 8 83:6, 9, 11, 14, 18
**RHR's** 64:7
**right** 5:9 14:15 15:7 18:3, 12 33:2 34:15 35:22 36:13 44:20 46:21 49:2, 10, 19 50:18, 21 66:18 67:15 68:4 73:22 80:9 81:9 82:1 83:5, 15 87:16
**right-hand** 47:3
**risk** 13:18, 19, 23 14:11 27:19, 23 57:16 60:11, 21 62:12, 16, 19 74:21 84:10, 18, 24
**Robert** 82:2
**role** 14:25 15:9, 17, 25 16:10 21:10 23:23 26:22 38:17, 20 39:17 42:14 84:12 85:23
**roles** 21:13 41:14
**Rome** 2:14 4:16
**Roughly** 13:10
**RPR** 1:22 89:4, 24
**Rule** 89:17
**rules** 87:24
**run** 52:5 57:20, 21 67:22 76:24, 25 77:18, 21
**running** 43:17 57:23, 24 77:15, 16
**runway** 42:15, 17, 24 43:7, 9, 19, 23

< S >
**S/Wendy** 89:24
**Saba** 2:1, 7 3:4 4:11 5:18, 24 7:17 8:10 9:13 10:17 16:16 17:5, 20 18:3, 4 23:22 30:8 32:4, 9, 10 34:14, 16, 17 44:16, 19, 24 45:6 46:22, 23 48:9, 21, 23 49:6, 17 50:1 51:5, 15 54:19 59:13 60:6 61:12, 15 65:1 66:8, 24 68:17 69:22 72:24 73:20 75:12, 19 77:19 80:6, 10, 12, 13 82:23 83:1, 3, 8, 10, 12, 22 85:8, 11 86:13 87:8, 19 88:3, 7
**sake** 6:18
**sat** 12:24 13:6, 21, 22, 24 14:9, 12 17:17
**satisfaction** 46:17
**save** 90:10
**saw** 29:2, 3 33:16 79:15

**saying** 63:3 64:6 84:21
**says** 42:24 49:10, 19 50:12, 18, 19, 22, 23 61:16 67:20 69:5 82:2 87:2
**scheduled** 61:8
**science** 40:20 42:10
**scientific** 41:4
**scope** 68:1
**score** 77:5
**scores** 77:3, 10
**seal** 89:19
**searches** 27:4
**second** 8:23 9:15 10:1, 13 12:20 26:23 27:5 36:16 37:11 67:10 70:16, 18 84:8 87:13
**secrets** 23:21
**see** 7:6 19:24 21:5 24:21 25:8 34:24 50:10, 11, 14, 23 51:23 55:19, 23 67:6, 10 68:10 69:11 70:14 77:3 78:3 80:21 81:5, 21 82:18 84:6, 14 87:2
**seeing** 24:3
**seen** 8:18 37:22 38:3 42:15 47:23 69:8 85:20 88:2
**select** 15:4, 7
**selected** 10:4
**selecting** 11:12
**selection** 10:12, 24 16:1, 3, 6, 11, 18
**sends** 68:7
**senior** 74:6 77:8
**sent** 67:5, 13
**sentence** 37:11 38:14 39:13
**separate** 35:15 46:5, 7 78:20
**September** 19:25 20:2 75:1 80:17 81:6, 20 83:15, 18 84:9, 19
**series** 6:15
**serious** 67:24
**serve** 53:18, 22 54:3, 22
**served** 8:14 62:11
**servicer** 13:3
**session** 72:4, 6, 8
**sessions** 72:9
**set** 15:19, 23 61:3, 5 79:2 89:18
**sets** 35:16 43:14 57:25 66:20 81:8
**seven** 41:1
**seven-plus** 50:18
**Shaffer** 36:17 37:1, 7 38:15, 23 39:15, 21 48:12 65:5 67:4, 14 68:6, 21 69:1 72:17 73:7 82:2 84:9, 17
**shaking** 6:19
**shape** 57:4
**share** 45:22 46:16
**shareholder** 45:22
**shareholders** 56:21
**sharing** 62:19
**Sharpe** 2:5 4:22
**SHEET** 90:1, 13 91:1 92:1
**sheets** 21:6 25:9
**shot** 40:4
**sign** 88:5
**SIGNATURE:________________________DATE** 91:23 92:23
**Signed** 90:16
**significant** 68:2 74:7
**simply** 58:25
**simultaneously** 35:17
**sir** 36:4, 15 80:23
**sit** 12:17, 18, 19 13:16, 18 35:21 38:8 73:13
**situation** 52:21
**situations** 34:9
**six** 13:20
**skill** 42:6 43:14 57:25 66:20
**skills** 30:24
**slide** 56:23
**small** 34:23 49:3
**smaller** 82:1
**Smith** 2:4 4:13, 22 5:2 88:2
**somebody** 39:7 42:15, 24 52:5 54:24 57:19 58:9 77:5, 13
**someplace** 37:23
**somewhat** 34:23 49:2
**sorry** 12:4, 20 24:13 34:24 65:11 72:23 81:23 83:25
**sort** 87:16
**SOUTHERN** 1:3 4:6
**speak** 7:21 37:24 53:12 57:14
**specific** 8:16 16:10 17:19 32:18, 24 43:4 48:7
**specifically** 8:22 15:1, 10 16:17 17:7 18:23 21:6 25:9 33:11 36:23 37:24 43:11 44:5 60:14 74:14 75:20 77:20
**specifics** 40:19 70:10
**spell** 6:1
**Spence** 9:18 11:23 22:18, 21, 25 23:2, 3, 8 24:2, 4 25:10, 13 30:7, 9 31:5 32:1, 14, 21 33:5, 24 36:20 37:4, 5, 8, 14 48:25 49:7, 13 50:14, 17 55:12, 14 56:13, 24 57:12 62:6 63:12, 14, 20 64:13, 14, 18, 20 65:16 69:17 70:1 72:15, 18 73:9 74:19, 21 75:4, 14 78:22 79:7, 19 83:2, 7
**Spence's** 23:23 24:7, 10, 15, 21, 24 25:2, 5 48:20 84:24
**SS** 89:2
**staff** 19:11, 13 29:15
**Stagnaro** 2:7
**stamp** 34:21
**stamped** 35:1 47:1 65:3 66:10 67:1 68:19 80:20 84:2 85:13 86:15
**stand** 55:16 56:1, 2, 5, 11, 20, 21, 22 57:3, 8 58:25 59:2, 17 76:17, 18 77:1, 18, 21 78:19
**standards** 15:23
**standout** 55:11, 14, 15 56:11
**standpoint** 43:10
**stands** 56:19
**started** 13:14
**State** 1:22 4:10 5:25 42:1, 2, 7 89:2, 6, 25
**stated** 7:11
**statement** 72:14
**statements** 9:5 21:5 25:8
**STATES** 1:2 4:6
**stay** 74:5
**stayed** 53:3
**step** 34:7 54:12, 17
**steps** 27:15 69:1
**stick** 81:11
**stipulation** 17:21 89:12
**stood** 57:17 59:4 76:24 79:12
**straight** 71:5
**strategic** 30:17, 23 55:19 77:22 78:13
**strategy** 78:9, 21, 23, 24 79:21
**Street** 1:20 2:15
**strength** 15:22 65:20
**strengths** 26:4, 11
**strike** 69:14
**style** 58:19, 23 59:16
**styled** 4:4
**subject** 65:6 68:22 87:19
**subordinates** 20:12 24:7, 16 61:24
**subsequently** 36:12
**succeed** 22:4 29:24 30:10 32:1, 14, 22 33:12, 25 41:9
**succeeding** 21:20, 24 22:7

**success** 40:23 45:17 46:5, 8
**successful** 79:5
**succession** 9:23 15:1, 9 25:16 28:17, 21 29:11 36:18, 20 44:4, 5 50:5, 8, 25 51:7 65:15 85:4
**successor** 50:22 51:10, 17 54:3, 22 65:17 69:3
**suggestion** 64:3
**suggestions** 28:2 60:12
**sum** 74:7
**summary** 83:2, 6, 10
**support** 54:11
**supposed** 69:4
**sure** 15:5, 7, 18, 20 19:5, 6 23:6 24:14 26:24 31:12 33:2 37:15 38:11, 12, 25 41:13 42:19 43:24 47:16 53:13 55:2 63:22 66:17, 18 72:22 82:20, 23
**surprised** 69:8
**surveys** 20:22, 25 24:25 25:3
**suspect** 52:12
**suspenders** 26:21
**swear** 5:4
**sworn** 5:5, 20 89:8
**synonymous** 29:20

< T >
**take** 4:3 6:21 27:15 28:12 33:1 35:16 41:3, 12 44:16, 17, 19, 20, 23 58:8
**Taken** 1:16 6:11, 18 45:1 73:1 79:22 89:11 90:2, 8
**talent** 28:22 29:17, 18 41:16, 21 44:1, 8 47:6, 15, 21, 24 48:2, 14, 24 49:9, 12 81:21
**talented** 41:10
**talk** 23:11 28:25 29:2 56:16 60:19 77:3 78:12
**talked** 26:6 39:8 44:2 55:18
**talking** 22:22
**taught** 79:2
**Tayfun** 50:22 53:9 63:15 69:3
**team** 79:1, 2, 17
**teleconference** 17:25
**telecopy** 9:4
**telephone** 9:3
**tell** 17:7, 11, 18 31:18 37:15 48:6 56:17 58:5, 9 70:6 73:23 77:9 86:24
**teller** 26:19
**temporary** 54:25
**ten** 13:8 14:11, 12
**tenure** 81:15
**term** 42:18
**terminated** 52:8
**terms** 18:6 29:20 64:7
**testified** 51:22 69:23
**text** 9:4
**thank** 9:11 87:7 88:3, 7
**Thanks** 4:25 9:8
**thing** 5:7 56:18 57:14
**things** 17:8 22:23 28:2, 3, 4 31:2 40:20 42:8 43:15 46:9 52:3 53:13, 16 54:14 55:3, 25 57:10 60:13 61:4 66:20 71:6 77:10, 11, 13, 25 78:5, 7, 18 79:14
**think** 13:8, 11, 12, 25 14:8 17:9, 10, 12 18:13, 14 21:17 23:25 24:18 30:12 32:24 37:21 40:9, 13 41:7 44:17 47:7, 18 48:5, 12 50:10 51:21 52:25 53:20 54:9 55:20, 21 56:9, 11, 16 57:5, 6, 7, 17, 18 58:4, 6, 20, 23, 24 59:4, 19, 20 60:1 61:14 63:19 64:2 69:4 71:2, 8, 10 79:6, 7
**THIRD** 1:10, 20 2:21, 22 4:5 7:22, 25 8:3, 15 9:17, 22, 24 10:3, 5, 8, 10, 21, 25 11:3, 6, 9, 13, 16, 22 13:7, 14, 17 14:14, 23, 25 15:10 16:1, 11 20:9 21:11, 21, 25 22:3, 4, 8 23:23 24:4 25:16, 22 26:13 27:16 29:25 31:6 32:15, 23 33:13 34:1 35:9, 13 41:9 43:6 45:13, 14, 15 47:2 48:1 50:3 53:19 54:23 55:5 59:5, 18 63:8, 10 64:21 65:7 68:24 73:8, 16 75:22 78:15, 20 82:16, 17 84:5 85:5, 17 86:17 90:4
**Third-McHugh** 34:22, 23 35:2 65:3 66:11 67:2 68:20 80:20, 21 81:19 82:23, 24 84:2, 3 85:14 86:16
**third-party** 75:15
**Third's** 12:18
**Thomas** 2:22 4:20
**thorough** 29:6 43:2
**thought** 28:2, 3 29:8 31:10 33:6 39:25 41:10, 11, 13, 16 55:22 59:1 60:14 64:11 66:19 69:24 70:17 73:19 76:16 77:25 79:3
**thousands** 46:18
**three** 14:5
**three-month** 55:1
**three-plus** 49:20 50:13, 15
**thrown** 81:16
**ticked** 77:13
**Tim** 22:18, 20, 24 23:2, 3, 7, 9, 10, 23 24:2, 3, 6, 10, 15, 21, 24 25:2, 5, 10, 13 30:7, 9, 13 31:3, 5, 25 32:14, 21 33:5, 24 48:20, 25 50:14, 17 55:12, 14 56:24 57:12 62:6 63:11, 14, 20 64:13, 14, 18, 20 65:16, 21 69:2, 7, 17, 25 70:13 72:15, 18 73:9 74:16, 19, 21 75:4, 14 78:22 79:7, 11, 12, 18 83:2, 6 84:24
**Time** 1:19 4:2 13:18 14:2, 10, 16 17:5 19:4, 17 21:13, 14, 16, 17, 18 23:25 27:24 28:4 30:4, 5 31:10, 20 34:3 37:3, 25 39:24 42:12 44:11 45:4, 13 52:18, 22, 23 53:23 54:25 58:6, 21 62:11 64:17 67:22 74:17 76:2 79:21, 22 81:13 82:19 87:3, 20 88:5 89:10
**timeline** 32:25 34:2
**timelines** 10:11, 23 36:18, 21 37:12 39:18 81:8, 12, 16
**times** 13:25 17:8 60:10, 17 61:21 67:22
**Timothy** 9:18 11:23
**Tim's** 37:24 38:12 65:20, 24 84:11
**titled** 84:3
**Today** 4:2, 3 73:14
**today's** 7:3, 19, 22 45:4
**told** 31:9 74:11, 18
**top** 36:20
**topic** 21:20 22:7
**total** 5:8
**totally** 46:5 71:7
**trade** 23:21
**traits** 41:18

**transcript** 88:5 90:7
**transfer** 9:2
**transition** 25:19 26:4 65:19
**transitioned** 25:17
**tremendous** 40:1
**true** 35:24 58:7 90:10
**truly** 79:4
**truth** 89:8, 9
**try** 6:23 29:13 80:16
**trying** 72:25 87:15
**turn** 48:16, 17 50:2, 7 77:10 80:24
**Tuzun** 50:22 63:15
**two** 13:25 14:4 18:10 34:18 35:15 44:22, 23 49:19 58:5, 8 87:5, 6
**two-hour** 44:15 87:18
**typical** 42:14 43:7
**typically** 47:14 81:11

< U >
**Uh-huh** 12:23 32:16 40:16 42:11 50:24 67:7 69:12 82:7 85:19, 21
**uh-huhs** 6:20
**uh-uhs** 6:20
**ultimately** 41:8
**Unanimous** 84:3
**uncomfortable** 56:9
**undersigned** 89:4
**understand** 5:13 6:16 7:1 9:12 16:14 28:14 34:25 67:20 72:21, 22 78:5
**understanding** 5:2 15:5 42:21, 22 43:3 52:2 68:12 72:25 73:13 84:23 90:13
**Understood** 5:18 29:11 55:23
**unilateral** 87:24
**UNITED** 1:2 4:6
**University** 12:2
**unusual** 19:9, 14
86:7
**update** 81:21 82:6
**use** 29:12 43:22 53:16
**Usually** 27:18 28:7
**utilize** 65:23

< V >
**validate** 26:17
**various** 15:19 29:1, 9 60:16 65:5
**vary** 60:24
**verbal** 30:24
**verbally** 6:19
**versus** 4:5
**video** 6:18
**Videoconference** 2:6
**Videographer** 1:24 4:1 5:3 10:13, 16 44:25 45:3 80:8 87:4, 6, 9, 13 88:6, 9
**videotape** 4:1
**Videotaped** 1:12
**view** 27:1 51:22 67:21
**virtually** 78:11
**vision** 5:9, 17 31:1, 2 42:6 55:19, 25 77:22
**vs** 1:9 90:4

< W >
**wait** 6:22
**Walnut** 1:20
**want** 5:12, 15 30:3 37:20 41:18 43:12 44:21 52:9 60:18 76:24
**wanted** 19:13 63:20 64:12 69:25 70:16
**wants** 55:20
**watch** 41:23
**watched** 41:25
**way** 33:18 57:4, 8 69:5 71:6, 14 73:21 86:24
**weaknesses** 26:11
**wealth** 21:15 46:6
**weeds** 67:20, 21, 23
**week** 27:18
**weigh** 29:7
**weighted** 58:17
**Well** 15:3 26:15 31:7, 16 42:2 45:25 58:9 61:6, 25 62:17
**Wendy** 1:22 89:4
**We're** 10:14 16:8 27:18 57:19 73:24 76:19 79:3, 4 88:7
**WESTERN** 1:4 4:7
**we've** 44:14 79:8 88:2
**wheels** 55:2
**WHEREOF** 89:18
**willingness** 68:1
**window** 81:16
**Winning** 68:23 73:15
**wise** 74:8
**witness** 4:17 5:4, 5, 20 7:10 9:11 16:15 17:4, 7 30:5 32:7 48:5, 20, 22 49:16, 24 51:4, 14 54:9 59:9, 11 60:1, 3 72:22 73:19 75:9, 18, 25 82:25 83:2 85:7 89:18
**work** 7:13 12:11 45:10 58:3 59:22 60:3 65:15, 19 66:3 76:14
**worked** 30:18 39:24 65:18, 22
**working** 15:17
**workplace** 20:9 24:4
**worth** 41:15
**written** 9:3 84:4

< Y >
**Yeah** 9:11 13:15 16:15 17:4 29:19 34:24 44:21 46:17 47:6 50:10, 17 62:10 66:13, 14 67:16 70:12 78:22 81:4, 23 83:10 87:6, 8 88:7
**year** 8:15 19:22 20:2 31:21 38:8 58:10, 11
**years** 6:10 12:16 13:1, 8, 20, 24 14:4, 5, 6, 12 30:17, 21 31:3 37:18 38:6 40:1, 6, 8, 10, 14, 17, 25 45:10 49:20 50:14, 19 58:5, 8 83:6
**young** 40:8

< Z >
**Zoom** 2:6 4:23

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **PHILIP R. MCHUGH,** | : | Case No. 1:21-cv-00238 |
| Plaintiff, | : | Judge Michael R. Barrett |
| v. | : | |
| **FIFTH THIRD BANCORP, *et al.*,** | : | **PLAINTIFF'S REQUEST FOR PRODUCTION OF DOCUMENTS** |
| Defendants. | : | |

Pursuant to Fed. R. Civ. P. 34, Plaintiff Philip R. McHugh ("Plaintiff") hereby submits the following Request for Production of Documents Directed to Defendants Fifth Third Bancorp, Fifth Third Bank N.A. (jointly "Fifth Third"), and their Director Emerson L. Brumback. Plaintiff respectfully requests that Defendants provide responses to the offices of Stagnaro, Saba & Patterson Co., L.P.A., 2623 Erie Avenue, Cincinnati, Ohio 45208, **no later than thirty (30) days of the service of these Requests.**

Each of the following Requests for the Production of Documents shall be deemed continuing and Defendants and Director Emerson L. Brumback are requested, pursuant to Rules 26(a) and 26(e) of the Federal Rules of Civil Procedure, to provide, by way of supplementary answers thereto, such additional information as may hereafter be obtained by the Defendants or persons acting on their behalf.

## INSTRUCTIONS AND DEFINITIONS

1. These discovery requests must be answered in accordance with the requirements in and policies of Civ.R. 1, Civ.R. 11, Civ.R. 26 through 37, and any other applicable laws or rules. These requirements and policies include but are not limited to: effecting just results by eliminating delay, unnecessary expense, and all other impediments to the administration of justice; encouraging parties

PLAINTIFF'S EXHIBIT
Brumback 1
11-22-24
PENGAD 800-631-6989

to fully and thoroughly prepare and investigate their cases for trial and/or settlement; fairly responding to the substance of discovery requests without obfuscation or unjustified objection; fostering openness, honesty, and professionalism in litigation; and seeking truth. Consistent with this instruction, discovery requests should not be considered vague or unanswerable due to any grammatical, syntactical, typographical, capitalization, or semantic errors or idiosyncrasies, and all responses should fairly meet the substance of the discovery request.

2. In answering these Requests for the Production of Documents, Defendants and their Director are to divulge all information in their possession, custody, or control, or which are available to them, including information in the control of its attorneys, investigators, employees, agents or other representatives, or any other person or persons acting on its behalf.

3. Should Defendants deem as objectionable party, but not all, of any request to which an objection is made, it should consider the various parts and aspects of such request as being severable for that purpose. If any information is claimed as privileged or protected, please include a log identifying the nature of the claimed privilege or protection and the information or items claimed to be privileged.

4. Unless otherwise indicated, the scope of the requests for production of documents is the time period of January 1, 2015 to December 31, 2020.

5. Unless indicated to the contrary, "You" and "Your" shall refer to Emerson L. Brumback.

6. "Defendants" shall include Fifth Third Bancorp, Fifth Third Bank, N.A., Gregory Carmichael, and/or any person or entity acting on its or his behalf, including, but not limited to, officers, directors, attorneys, investigators, employees, agents, or other representatives.

7. "Director" shall include any individual who was a member of Defendants' Board of Directors during the scope of these requests.

8. "Officer" shall include any individual designated as an officer of Defendants during the scope of these requests, including, but not limited to, Defendant Gregory D. Carmichael, Robert Shaffer, or Timothy Spence.

9. "McHugh" or "Plaintiff" shall mean Plaintiff Philip R. McHugh.

10. "Document" or "documents" includes all written or graphic matter of every kind or description, however produced or reproduced, whether drafted or final, original or copy, signed or unsigned, and regardless of whether approved, sent, received, redrafted or executed, including but not limited to correspondence, letters, memorandum, summaries of conversations or telephone conversations, minutes or records of meetings, conferences or seminars, notebooks, diaries, desk calendar, contracts, agreements, preliminary and final reports, opinions or reports of consultants, projections, estimates, financial statements, bills, invoices, receipts, loan sheets, checks, checkbooks, purchase orders, change orders, confirmations, facsimiles, e-mails, text messages, telegrams, telexes, computer disks, digital or analog recordings, tape recordings, video recordings, photographs, drawings, charts, and plans. The term "document" means every document as above defined known to Defendant and in Defendant's possession, custody, or control or under the control of its agents, attorneys, employers, employees, or other persons related by total or partial common ownership and includes every such document which can be located or discovered by diligent effort.

11. "Document" also includes electronically stored information ("ESI"). Where possible, ESI should be produced in its native form, except that ESI which is only accessible through proprietary software that is not commonly available in office software suites should be produced in a readily accessible electronic form (such as PDF, Word or similar text document, or Excel or similar spreadsheet). By way of example only:

a. documents created using Microsoft Word must be produced as a .doc or .docx file;

b. documents created using Microsoft Excel must be produced as a .slx or. xlsx file;

c. documents created using Microsoft PowerPoint must be produced as .ppt or .pptx files; and

d. e-mails or outlook calendars must be produced as .msg or .pst files.

12. "Person" and "persons" include natural persons, corporations, companies, firms, proprietorships, partnerships, associations, joint ventures, government agency or organization, and any other type of legal entity, whether formal or informal.

13. The words "relate to", "relating to" or "related to" shall mean that which implicitly or explicitly refers to, concerns, reflects, embodies or in any manner describes the subject matter of the document request.

14. The words "Communications" or "Communicate" mean any correspondence, disclosure, transfer or exchange of information, whether oral or written, and whether in person, by telephone, mail, e-mail, telecopy, text message or other "Document" form, including but not limited to discussions, statements, negotiations, inquiries, requests, notices, responses, or demands.

**REQUEST FOR PRODUCTION OF DOCUMENTS**

1. Communications (as defined above) between You and any other Director or Officer of Fifth Third which refers, mentions, or otherwise relates to:

a. Succession planning for the position of President and/or CEO of Fifth Third;

b. Identified and/or selected candidates for the position of President and/or CEO of Fifth Third;

c. Processes or timelines, whether proposed or final, with respect to the identification and/or selection of candidates for the position of President and/or CEO of Fifth Third.

d. Development of potential candidates for the position of President and/or CEO

of Fifth Third; and

e. Any facts upon which You or any other Director relied upon when identifying and/or selecting candidates for the position of President and/or CEO of Fifth Third.

f. Philip McHugh

g. Timothy Spence

**RESPONSE:**

2. Any Communications (as defined above) between You and Philip McHugh.

**RESPONSE:**

3. Any Communications (as defined above) between You and Timothy Spence.

**RESPONSE:**

4. All Documents created, received, or obtained by You which refer, mention, or otherwise relate to:

a. Succession planning for the position of President and/or CEO of Fifth Third;

b. Identified and/or selected candidates for the position of President and/or CEO of Fifth Third;

c. Processes or timelines, whether proposed or final, with respect to the

identification and/or selection of candidates for the position of President and/or CEO of Fifth Third;

d. Development of potential candidates for the position of President and/or CEO of Fifth Third; and

e. Any facts upon which You or any other Director relied upon when identifying and/or selecting candidates for the position of President and/or CEO of Fifth Third.

f. Philip McHugh

g. Timothy Spence

**RESPONSE:**

Respectfully submitted,

*/s/ Joshua M. Smith*
Peter A. Saba (0055535)
Joshua M. Smith (0092360)
STAGNARO, SABA
& PATTERSON CO., L.P.A.
2623 Erie Avenue
Cincinnati, Ohio 45208
(513) 533-2701
(513) 533-2711 (fax)
pas@sspfirm.com
jms@sspfirm.com

*/s/ John J. McHugh*
John J. McHugh, III
McHUGH & McCARTHY, LTD
5580 Monroe Street
Sylvania, Ohio 43560
(419) 885-3597
(419) 885-3861 (fax)

**Co-Counsel for Plaintiff Philip R. McHugh**

Case: 1:21-cv-00238-MRB Doc #: 48 Filed: 02/29/24 Page: 9 of 9 PAGEID #: 2439

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the foregoing was served on all counsel of record this 29th day of February, 2024 via the Court's CM/ECF system.

/s/ Joshua M. Smith
Joshua M. Smith (0092360)

# EXHIBIT 2

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 3

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 4

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

Message

**From:** Shaffer, Bob [/O=FIFTH THIRD BANK/OU=CINCINNATI/CN=RECIPIENTS/CN=BOB.SHAFFER]
**Sent:** 7/17/2020 1:05:59 PM
**To:** mbm2045@gmail.com; Marshawilliams@outlook.com; garyheminger@marathonpetroleum.com; emallesch@gmail.com; embrumback@aol.com
**Subject:** Fifth Third - CEO Profile
**Attachments:** DRAFT - Fifth Third CEO Profile 7.16.20.docx

Human Capital and Compensation Committee Members,

As a follow-up to our discussion at the June HCCC meeting, we are continuing with our CEO succession planning work by having an independent assessment of Tim Spence, as a key potential successor to Greg, completed by Guy Beaudin of RHR International LLP (Guy worked with us on Greg's transition to CEO). This work will include assessing Tim's strengths and development needs and implementing any actions to help Tim continue to develop his capabilities. Greg, Guy and I have worked to develop the attached CEO profile, which Guy will utilize as one component to assess Tim's capabilities. I would appreciate your review of the attached and confirmation back to me that you are either ok with the profile or have any changes to the components of it, so I can give Guy the go head to continue his assessment work. Please respond to me by July 24th. I appreciate your time on this and please let me know if you have any questions. My cell is 513-470-8400.

Thanks,

Bob

PLAINTIFF'S EXHIBIT
Brumback 5
11-22-24
PENGAD 800-631-6989

# EXHIBIT 6

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

Message

|  |  |
|---|---|
| **From:** | Shaffer, Bob [/O=FIFTH THIRD BANK/OU=CINCINNATI/CN=RECIPIENTS/CN=BOB.SHAFFER] |
| **Sent:** | 7/20/2020 7:23:51 PM |
| **To:** | Carmichael, Greg [/O=FIFTH THIRD BANK/OU=Cincinnati/cn=Recipients/cn=Greg.Carmichael] |
| **Subject:** | FW: Fifth Third - CEO Profile |

Response from Emerson. Easy fix.

**From:** Emerson Brumback <embrumback@aol.com>
**Sent:** Monday, July 20, 2020 3:11 PM
**To:** Shaffer, Bob <Bob.Shaffer@53.com>
**Subject:** Re: Fifth Third - CEO Profile

**CAUTION EXTERNAL EMAIL**

**DO NOT open attachments or click on links from unknown senders or unexpected emails**

Bob,

I am generally ok with the Profile. I am only a little concerned about the line under leadership which says "without getting into the weeds". I understand the view that the CEO cannot and should not be in the weeds and run the business all the time but there are times where the CEO has to get in the weeds. To address a serious issue or crisis the CEO has to obtain detailed information and facts The people have to believe that the CEO has the ability, skill and willingness to inject themselves into an area requiring significant focus and attention.

Emerson

Sent from my iPad

> On Jul 17, 2020, at 9:06 AM, Shaffer, Bob <Bob.Shaffer@53.com> wrote:
>
> Human Capital and Compensation Committee Members,
>
> As a follow-up to our discussion at the June HCCC meeting, we are continuing with our CEO succession planning work by having an independent assessment of Tim Spence, as a key potential successor to Greg, completed by Guy Beaudin of RHR International LLP (Guy worked with us on Greg's transition to CEO). This work will include assessing Tim's strengths and development needs and implementing any actions to help Tim continue to develop his capabilities. Greg, Guy and I have worked to develop the attached CEO profile, which Guy will utilize as one component to assess Tim's capabilities. I would appreciate your review of the attached and confirmation back to me that you are either ok with the profile or have any changes to the components of it, so I can give Guy the go head to continue his assessment work. Please respond to me by July 24th. I appreciate your time on this and please let me know if you have any questions. My cell is 513-470-8400.
>
> Thanks,
>
> Bob
>
> This e-mail transmission contains information that is confidential and may be privileged. It is intended only for the addressee(s) named above. If you receive this e-mail in error,

PLAINTIFF'S EXHIBIT 7 Brumback wle 11-22-24 PENGAD 800-631-6989

please do not read, copy or disseminate it in any manner. If you are not the intended recipient, any disclosure, copying, distribution or use of the contents of this information is prohibited. Please reply to the message immediately by informing the sender that the message was misdirected. After replying, please erase it from your computer system. Your assistance in correcting this error is appreciated.

<DRAFT - Fifth Third CEO Profile 7.16.20.docx>

CAUTION EXTERNAL EMAIL
DO NOT open attachments or click on links from unknown senders or unexpected emails

Message

**From:** Shaffer, Bob [/O=FIFTH THIRD BANK/OU=CINCINNATI/CN=RECIPIENTS/CN=BOB.SHAFFER]
**Sent:** 6/8/2020 9:16:28 PM
**To:** Carmichael, Greg [/o=Fifth Third Bank/ou=Cincinnati/cn=Recipients/cn=Greg.Carmichael]
**Subject:** Guy Conversation
**Attachments:** Winning Formula - CEO Profile FTB -2015.docx

**Key Highlights/next Steps:**

- Guy agrees that if Tim is "the" successor don't add Tayfun and Phil formerly. Although, he would recommend, at a minimum, we discuss with Marsha that she/the Board is ok with only having Tim assessed by Guy. He said he has seen a few Boards surprised in the past the CEO/CHRO did have at least one other internal candidate assessed.

- Schedule a 90 minute call for Greg, Guy and me to assess and modify the attached CEO Profile used in 2015. Guy would also use this time to get feedback from each of us on Tim. We will try to schedule for this week or next.

- Guy wants to interview four of Tim's other peers, not including me, and four of his direct reports. Guy wants us to pick the interviewees. My recommendations are below. Let me know what you think.

  Enterprise
  - Phil - Yes
  - Tayfun - Yes
  - Jude - Yes
  - Susan – Yes

  - Kevin - No
  - Kris - No
  - Jamie - No
  - Lars - No
  - Shellie – No

  Direct Reports
  - Chris Shroat - Yes
  - Melissa Stevens - Yes
  - Howard Hammond - Yes
  - Art Weston - Yes

  - Ben Hoffman - No
  - Ben Smith - No
  - Matt Jauchius - No
  - Peter Kidd - No
  - Mike Butera – No
  - Tim Harden - No

PENGAD 800-631-6989
PLAINTIFF'S EXHIBIT 8
Brumback
11-22-24

- Bob to send Tim and Guy an introductory email so they can set up their three hour assessment discussion.

- Guy to send us a revised proposal. He feels confident that we can execute a similar timeline as the original proposal with a full/final Board report in September. This will likely require a call with the HCCC in August since we will not have a preliminary report for them in June.

Please let me know of any questions.

Bob

# EXHIBIT 9

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

FIFTH THIRD BANK

# Unanimous Written Consent: Officer Appointment

October 21, 2020

PLAINTIFF'S EXHIBIT 10
Brumback
11-22-24
PENGAD 800-631-6989

Classification: Restricted

FIFTH THIRD BANK

Fifth Third Bancorp & Fifth Third Bank, N.A.

## Board of Directors

### Unanimous Written Consent: Officer Appointment

TABLE OF CONTENTS

CEO Note Regarding Officer Appointment

Press Release

Unanimous Written Consent: Board of Directors*

** Denotes items requiring unanimous written consent.*

FIFTH THIRD BANK
**OFFICE OF THE SECRETARY**

FIFTH THIRD BANK

Dear Board Members:

As previously discussed in our talent management and succession planning sessions, we are executing on the plan to promote Tim Spence to President. The lines of business, regional banking and strategic planning will now report to Tim. We plan to announce this on Monday, October 26. Attached is a draft of the external release.

As Bob Shaffer and I discussed with you at the September Board meeting, we believed that Phil McHugh could be at risk with Tim's promotion. And, in fact, Phil has decided not to accept the role of Head of Consumer and Business Banking and is leaving the company. This is unfortunate as this is one of the largest roles we have. However, we have a very capable leader, Howard Hammond, who will serve as the interim Head of Consumer and Business Banking. Howard currently leads our Retail Banking business and Fifth Third Securities. As Howard has the opportunity to work in this role, we will also test the market and conduct an external search for this position.

Included with this message is a request for unanimous consent to approve the promotion of Tim to President. I appreciate your prompt approval as we will be announcing his promotion on Monday morning. I am very excited for Tim and look forward to working with him as he further develops in his new role. Please let me know if you have any questions.

Thanks,

Greg

© Fifth Third Bank | All Rights Reserved | For Internal Use Only

Classification: Restricted

FIFTH THIRD BANCORP
# NEWS RELEASE

***DRAFT 10/21/20***

CONTACTS
Ed Loyd (Media Relations)
email.address@53.com | 123-456-7890
Chris Doll (Investor Relations)
Christopher.Doll@53.com | 513-534-2345

October 26, 2020

## Fifth Third Announces Appointment of Timothy N. Spence as President

CINCINNATI – Fifth Third Bancorp (Nasdaq: FITB) today announced the appointment of Tim Spence as president. His promotion will support the Company's ongoing successful execution of its strategic initiatives and further strengthen its position as a leading regional bank.

In his new role, effective immediately, Spence will oversee all business lines and regional banking, while continuing his leadership of the Bank's strategy. It was Spence's strength in strategy that first brought him to Fifth Third in 2015. He led that area as chief strategy officer and then advanced in 2017 to head consumer banking and payments as well. Before joining Fifth Third, Spence was a senior partner in the financial services practice at Oliver Wyman, a global strategy and risk management consulting firm. Spence will continue to report to Greg Carmichael, the Company's chairman and chief executive officer.

"Tim has demonstrated extraordinary leadership and vision in driving the strategy and execution to transform Fifth Third through innovation and technology," said Carmichael. "Over the past several years, he has been a principal architect and catalyst of many of the Company's most important strategic initiatives. Those initiatives include organic growth investments, numerous partnerships with fintechs and other third parties, and the 2019 acquisition of MB Financial Inc. in Chicago – a move that dramatically changed the competitive landscape and positioned us for success in one of our most important markets. Tim is keenly focused on solutions that enable Fifth Third to best serve our customers – from individuals to small and large businesses – and help them achieve their goals."

Spence long has been heralded for his commitment to innovation and has helped the Bank significantly advance its digital transformation. In 2018, American Banker recognized him as Digital Banker of the Year, an award whose past honorees have included forward-thinking leaders from the nation's largest financial institutions. In addition to recognizing his many achievements to date, that award highlighted his customer-centric approach, which has been the hallmark of Spence's banking career.

Originally from the Pacific Northwest, Spence and his family make their home in Cincinnati. Spence devotes time to several local community and economic development organizations, including serving on the executive committee of the board at Cintrifuse, a public-private partnership that exists to build a sustainable tech-based economy in Greater Cincinnati, on the advisory board for Miami University's Altman Institute for Entrepreneurship, and as member and co-chair of the commerce committee for the

FIFTH THIRD BANCORP
NEWS RELEASE

Cincinnati Chamber's RESTART Taskforce. He also serves as a board member for the Consumer Bankers Association.

**About Fifth Third**

Fifth Third Bancorp is a diversified financial services company headquartered in Cincinnati, Ohio, and the indirect parent company of Fifth Third Bank, National Association, a federally chartered institution. As of September 30, 2020, the Company had $202 billion in assets and operates 1,122 full-service Banking Centers, and 2,414 Fifth Third branded ATMs in Ohio, Kentucky, Indiana, Michigan, Illinois, Florida, Tennessee, West Virginia, Georgia, North Carolina and South Carolina. In total, Fifth Third provides its customers with access to approximately 52,000 fee-free ATMs across the United States. Fifth Third operates four main businesses: Commercial Banking, Branch Banking, Consumer Lending, and Wealth & Asset Management. Fifth Third is among the largest money managers in the Midwest and, as of September 30, 2020, had $427 billion in assets under care, of which it managed $53 billion for individuals, corporations and not-for-profit organizations through its Trust and Registered Investment Advisory businesses. Investor information and press releases can be viewed at www.53.com. Fifth Third's common stock is traded on the NASDAQ® Global Select Market under the symbol "FITB."

###

**FIFTH THIRD BANCORP**

**UNANIMOUS WRITTEN CONSENT OF THE BOARDS OF DIRECTORS APPOINTING PRESIDENT**

**October 26, 2020**

The undersigned, being all of the Directors of Fifth Third Bancorp, an Ohio Corporation ("Bancorp"), in accordance with Section 1701.54 of the Ohio Revised Code, do hereby authorize, consent, and agree to the adoption, without a meeting, of the following resolutions through this unanimous written consent (this "Consent"), effective as of the date first set forth above:

**WHEREAS,** the members of the Board, in connection with succession and leadership planning, have discussed potential promotions and appointments to senior officer positions of Bancorp at previous meetings;

**WHEREAS,** the members of the Board have determined that it is appropriate to implement one such promotion and appointment at this time;

**NOW, THEREFORE**, it is hereby:

**OFFICER APPOINTMENT**

**RESOLVED**, that Timothy N. Spence be promoted and appointed to the position of President of Bancorp;

**GENERAL RESOLUTIONS**

**RESOLVED FURTHER,** that the officers of the Bancorp be, and each are hereby, authorized, directed and empowered to perform any and all other acts and things as in such officer's opinion may be necessary or appropriate in order to carry out the intent and purposes of the foregoing resolution with respect to the Bancorp; and

**RESOLVED FURTHER,** that any act of any Director or officer of the Bancorp and of any person designated or authorized to act by any officer of the Bancorp, which act would have been authorized by the foregoing resolutions except that such act was taken prior to the adoption of such resolutions is hereby ratified, confirmed, approved, and adopted as the act of the Bancorp.

[Remainder of page intentionally left blank. Signature page follows.]

In Witness Whereof, the undersigned Directors have executed this signature page as of the date first set forth above in this Unanimous Written Consent.

Nicholas K. Akins October 22, 2020 3:38 PM

Mitchell S. Feiger October 22, 2020 4:25 PM

B. Evan Bayh III October 22, 2020 9:53 AM

Thomas H. Harvey October 21, 2020 11:04 PM

Jorge L. Benitez October 22, 2020 6:27 AM

Gary R. Heminger October 22, 2020 6:00 PM

Katherine B. Blackburn October 21, 2020 9:05 PM

Jewell D. Hoover October 21, 2020 7:25 PM

Emerson L. Brumback October 22, 2020 9:22 AM

Eileen L. Mallesch October 21, 2020 8:04 PM

Greg D. Carmichael October 22, 2020 8:41 AM

Michael B. McCallister October 22, 2020 12:49 PM

Linda W. Clement-Holmes October 21, 2020 7:17 PM

Marsha C. Williams October 21, 2020 7:03 PM

C. Bryan Daniels October 21, 2020 7:07 PM

# EXHIBIT 11

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 12

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]