UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

| | |
|---|---|
| PHILIP R. MCHUGH,<br>Plaintiff,<br>vs.<br>FIFTH THIRD BANCORP, et al.,<br>Defendants. | CASE NO. 1:21-cv-00238 |

***THIS TRANSCRIPT CONTAINS CONFIDENTIAL -- SUBJECT TO PROTECTIVE ORDER TESTIMONY***

| | |
|---|---|
| Videotaped Deposition of: | LINDA W. CLEMENT-HOLMES |
| Taken: | By the Plaintiff<br>Pursuant to Notice |
| Date: | January 24, 2025 |
| Time: | Commencing at 8:39 a.m. |
| Place: | Fifth Third Center<br>511 Walnut Street<br>Cincinnati, Ohio 45202 |
| Before: | Pamela L. Jackson<br>and<br>Connie Adkins-Ihle, Videographer<br>Notaries Public-State of Ohio |

APPEARANCES:

On behalf of the Plaintiff:

Joshua M. Smith, Esq.
and
Bailey E. Sharpe, Esq.
of
Stagnaro, Saba & Patterson Co., L.P.A.
2623 Erie Avenue
Cincinnati, Ohio 45208
Phone: (513) 533-2701
Email: Jms@sspfirm.com
Bes@sspfirm.com

On behalf of the Defendants and the Deponent:

Michael L. Cioffi, Esq.
and
Collin D. Hart, Esq.
of
Blank Rome LLP
1700 PNC Center
201 East Fifth Street
Cincinnati, Ohio 45202
Phone: (513) 362-8700
Email: Michael.cioffi@blankrome.com
Collin.hart@blankrome.com

Also Present:

Philip R. McHugh
Phenise Poole, Esq., Fifth Third Bancorp
Brian Thomas, Esq., Fifth Third Bancorp

# I N D E X


| LINDA W. CLEMENT-HOLMES | PAGE |
|---|---|
| Examination by Mr. Smith | 6 |
| Examination by Mr. Cioffi | 53 |
| Further Examination by Mr. Smith | 74 |
| Further Examination by Mr. Cioffi | 84 |

| EXHIBITS | MARKED | REFERENCED |
|---|---|---|
| Deposition Exhibit 1 | 9 | 9 |
| Deposition Exhibit 2 | 27 | 28 |
| Deposition Exhibit 5 | 48 | 48 |

# I N D E X (CONTINUED)

***THE FOLLOWING PAGES CONTAIN CONFIDENTIAL -- SUBJECT TO PROTECTIVE ORDER TESTIMONY***

Pages 33 - 35

Pages 45 - 50

Pages 52 - 75

Pages 77 - 83

***THE FOLLOWING EXHIBITS ARE CONFIDENTIAL -- SUBJECT TO PROTECTIVE ORDER***


| EXHIBITS | MARKED | REFERENCED |
|---|---|---|
| Deposition Exhibit 3 | 33 | 33 |
| Deposition Exhibit 4 | 47 | 48 |
| Deposition Exhibit 6 | 49 | 49 |
| Deposition Exhibit 7 | 52 | 52 |
| Deposition Exhibit 8 | 55 | 55 |


- - -

Page 5

THE VIDEOGRAPHER: We are on videotape record. Today is Friday, January 24th, 2025. The time is 8:39 a.m. We're here today to take the deposition of Linda Clement-Holmes in the case styled Philip R. McHugh versus Fifth Third Bancorp, et al., United States District Court, Southern District of Ohio, Western Division, Case No. 1:21-cv-00238.

Would the attorneys now introduce themselves and state who you represent?

MR. SMITH: Joshua Smith, Counsel for Plaintiff Phil -- Philip McHugh.

MS. SHARPE: Bailey Sharpe, Counsel for Plaintiff Phil McHugh.

MR. CIOFFI: Michael Cioffi and Collin Hart of Blank Rome on behalf of all the Defendants. We also represent Ms. Clement-Holmes individually and personally pursuant to a Joint Representation Agreement.

Also representing the witness, Ms. Clement-Holmes, is Brian Thomas and Phenise Poole of Blank -- or of -- not Blank Rome -- but of Fifth Third's

Page 6

Legal Department, both lawyers.

THE VIDEOGRAPHER: And would the court reporter please swear in the witness?

LINDA W. CLEMENT-HOLMES

of lawful age, a witness herein, being first duly sworn as hereinafter certified, was examined and deposed as follows:

EXAMINATION

BY MR. SMITH:

Q Ma'am, could you state your full name for the record, please?

A **Linda Clement-Holmes.**

Q And what's -- what is your current address?

A **8175 Remington Road, Cincinnati, Ohio, 45242.**

Q What's your date of birth?

A **March 31st, 1962.**

Q Have you ever had your deposition taken before?

A **No.**

Q Okay. I'm just going to go over some ground rules. I am sure your attorney may have discussed those with you. First we need to have verbalized answers. Notwithstanding that we do have a

Page 7

videographer, it's just good for the court reporter, so no nodding of the head, no uh-huhs or unh-unhs, if we could just make sure if it's a yes/no yes or no.

Second if just one of us makes sure one of us is speaking at a time, so if you could just allow me to finish my question I'll give you the same courtesy as far as your answers to allow you to finish your answer before I ask my next question. If you don't understand a question please ask me to repeat it or rephrase it.

And then if you -- This -- This is subject to a two-hour limit, but if you need a break at any time just ask for one. It's not an endurance test.

Do you have any questions about those instructions and do you understand those instructions?

A **No, I don't have any questions and, yes, I understand.**

Q What did you do to prepare for today's deposition?

A **Met with my attorneys.**

Q Okay. Did you review any documents?

MR. CIOFFI: Objection. I am going

Page 8

to instruct the witness not to answer with respect to any documents that her lawyers showed to her. Those are protected by the attorney-client privilege and also the work product privilege.

Q Did you review any documents outside of what you were instructed to review by your Counsel?

A **Just in terms of -- of --**

Q In preparation for the deposition today.

A **No.**

Q Did you speak to any current or former Fifth Third Board members regarding your deposition today?

A **No.**

Q Have you discussed this case with any other Board members, current or former, at any time?

A **No.**

Q Have you discussed Phil McHugh with any other Board members, current or former?

A **No.**

Q Have you discussed this case with any current or former Fifth Third employees?

Page 9

**A No.**
(Deposition Exhibit 1 was marked for identification.)
BY MR. SMITH:
Q Ms. Clement-Holmes, I have handed you what's been marked as Exhibit 1. Have you ever seen this document before?
**A No.**
Q Okay. I'll represent to you that this is a Notice Of Deposition and a Request For Production Of Documents and I'm just going to run through some of these with you to see if you are aware of any and if you have any with you today.
Well, I'd ask more generally do you have any documents with you today?
MR. CIOFFI: By way of objection, Counsel, I am not going to issue an instruction to the witness not to answer, but as we have stated before this document is not properly served on this witness as she's not a party to this case -- She's a third-party witness -- so it's an improper service. Having said that I am going to allow you to ask questions about it.

Page 10

BY MR. SMITH:
Q Do you have any documents with you today?
**A No. Can I read this? I don't -- I don't know what this --**
Q Yeah --
**A Thank --**
Q -- please.
**A Thank you. (Reviewing document.) Thank you.**
Q Okay. And, Ms. Clement-Holmes, as -- as I'm sure you read these are a number of requests for production of documents directed to you. I'll read the first one for you. It's, "Communications between You and any other Officer or Director of Fifth Third which refers, mentions, or otherwise relates to" -- And we have a number of subtopics.
I also wanted to note that under the Instructions And Definitions Paragraph 14, "The words 'Communications' or 'Communicate' mean any correspondence, disclosure, transfer or exchange of information, whether oral or written, whether in person, by telephone, email, mail, telecopy, text message or other 'Document' form, including but not limited to discussions, statements, negotiations,

Page 11

inquiries, requests, notices, responses, or demands."
In reviewing the first request --
And we can go through the subparts if you'd like -- but do you have any documents responsive to those requests?
**A No.**
Q Are you aware of any that are in your possession, custody, or control?
**A No.**
Q Okay. Request No. 2 seeks, "Any Communications between You and Philip McHugh." Do you have any documents, including communications, in your possession, custody, or control responsive to that request?
**A No.**
Q No. 3 requests, "Any Communications between You and Timothy Spence." Do you have any documents, including communications, between you and Timothy Spence in your possession, custody, or control?
**A No.**
Q Request No. 4 seeks, "All documents created, received, or obtained by You which refer, mention, or otherwise relate to" -- And there's a number of subparts, a, b, c, d, e, f, and g. In

Page 12

reviewing this document, this -- these requests, do you have any documents in your possession, custody, or control that are responsive to this request?
**A No.**
Q Are you currently employed?
**A No.**
Q What was your last place of employment?
**A Procter & Gamble.**
Q Did you retire from Procter & Gamble?
**A Yes.**
Q What was your date of retirement?
**A January 31st, 2018.**
Q What was the last position you held at Procter & Gamble?
**A The exact title was Chief Information Officer and Advisor to the Chief Executive Officer, CEO.**
Q How long were you in that role?
**A In that particular role?**
Q Uh-huh.
**A Two and a half years for CIO and nine months for Advisor to the CEO.**
Q How long were you employed at

Page 13

Procter & Gamble?
A **35 years.**
Q You are currently a Director of Fifth Third; is that correct?
A **That's correct.**
Q And that includes both Fifth Third Bancorp and Fifth Third Bank National Association; is that correct?
A **Yeah, yes.**
Q Other than -- And I'm going to refer to those collectively as Fifth Third -- Do you understand that? Is that okay?
A **As opposed to saying them both --**
Q Right.
A **-- each time?**
Q Right.
Other than Fifth Third are there any other boards that you currently serve on?
A **Yes, I'm on the Board of Cincinnati Financial Corporation.**
Q Uh-huh.
Any others?
A **No.**
Q How long have you been on the Board of Cincinnati Financial Corporation?

Page 14

A **Since January of 2010.**
Q And when was your -- when were you appointed to -- as a Director of Fifth Third?
A **I interviewed in July. My first Board meeting was in September of 2020.**
Q And is that July of 2020 when you --
A **Correct.**
Q -- interviewed?
A **Correct.**
Q Who did you interview with?
A **I interviewed with Greg Carmichael, Marsha Williams, and Nick Akins.**
Q And was it just -- was it one interview or were there multiple?
A **There were multiple, each person.**
Q Separately?
A **Separately.**
Q Okay. Prior to that -- those interviews had you ever met Greg Carmichael before?
A **No.**
Q Had you ever met Marsha Williams before?
A **No.**
Q Nick Akins?

Page 15

A **No.**
Q Understanding you hadn't met with any of the three did you have any -- Prior to that interview had you had any communications with any of the three either via email, text message, or otherwise?
A **No.**
Q Are you familiar with Robert Shaffer?
A **Yes.**
Q Okay. And who is he?
A **He is currently the Chief Risk Officer.**
Q When did you first meet Robert -- And I'll call him Bob Shaffer -- When did you first meet him?
A **September, 2020, as part of my onboarding which was the same week as the Directors' meeting.**
Q How would you describe your relationship with Bob Shaffer?
A **Professional.**
Q I assume you're familiar with Tim Spence, the current CEO of Fifth Third?
A **Yes.**

Page 16

Q When did you first meet Tim Spence?
A **As part of my onboarding during that first week as Director in September of 2020.**
Q Okay. Did you know who Tim Spence was prior to first meeting him?
A **I'm not sure I understand. You mean know who he was in regard to what?**
Q Did you know he was an employee at the bank --
A **Oh, yes.**
Q -- prior to then?
A **No. You mean --**
Q Prior to --
A **-- prior to --**
Q -- to meeting him during your onboarding did you know -- did you know his name, did you know who he was?
A **No.**
Q Okay. Have you ever met Phil McHugh before?
A **Yes.**
Q When did you meet Phil McHugh?
A **During that same week, that first week in September.**
Q Okay. Similar question to

Tim Spence did you know who Phil McHugh was? Had you heard his name prior to that first week when you met him --
A **No.**
Q -- pre-orientation?
A **No.**
Q Do you currently serve on any committees in your role as a Director at Fifth Third?
A **Yes, I'm on the Audit Committee and the HCCC -- I can't remember what those -- all those Cs stand for, so --**
Q Yeah, no problem.
A **Yeah.**
Q Is that the Human Capital and Compensation Committee?
A **Yes, that would be the one.**
Q And how long have you been on each of those committees?
A **Audit since -- What is this, '25 -- so May, '24 -- I -- I am not exactly sure. It may be May, '24, May, '23. Time goes so fast sometimes, so --**
Q Uh-huh.
And what about the HCCC?
A **They were about the same --**



Q About the same.
A **-- about the same time.**
Q Were you on any other committees prior to either 2022 -- or May, 2022 or 2023?
A **Yes, I was on the Risk and Compliance Committee.**
Q Uh-huh.
A **I'm also on the Technology Committee which I -- I have -- I have been on the whole time. I forgot about that one -- the Technology Committee -- so that one didn't change.**
Q You were on the Technology Committee from the time you started as a Director?
A **Correct.**
Q What about Risk and Compliance?
A **Risk and Compliance I was on from the time I started until I switched to Audit and HCCC.**
Q What's -- What is your understanding of your duties as a Director of Fifth -- at Fifth Third?
MR. CIOFFI: Objection, vague and broad. With respect to what subject matter?
Q Just your understanding what are -- what's your job as a -- as a Director?



MR. CIOFFI: Again I am going to object. You may answer if you -- if you can.
A **Are you asking in terms of responsibilities or -- or -- I am not exactly sure I understand specifically what you're looking for.**
Q Yeah, responsibilities. What's your -- What are your responsibilities as a Director at Fifth Third?
A **I guess responsibility that I have for any -- any Director for any Board which is you're there to govern, not operate for that particular company. You're there to help guide and advise the management of the company. You have a fiduciary responsibility to make sure that, you know, the finances are audited, accurate, those kinds of things, that you're abiding by what the regulate -- the regulators and the regulations and the laws, you know, are there.**
**You're there to basically protect the interests also of the shareholders, provide help, support, to management in terms of what they may need in terms of rights for their consumers and their employees. Generally that's what most Board Directors are there for. And you bring with you your expertise that you have from wherever you came, so you bring**



**that knowledge with you and you help share that to help guide the management of the company.**
**You also have really a responsibility too to make sure that you have the right CEO that is needed for the company and that's the job of the Directors is to make sure. That's like fundamentally it's the -- the responsibility of the Directors to make sure to -- to -- to help pick the right CEO at the right time and that they have everything they need to be successful.**
Q On that last point have you had any involvement in that during your time as a Director at Fifth Third?
A **Yes.**
Q When did you first get involved with selection of the CEO at Fifth Third?
A **During that first week in September of 2020.**
Q And what was -- Let me ask it this way: Was -- Was Fifth Third at a particular stage in selecting a CEO at the time you came on board?
A **"Stage" -- When you say "stage" what do you mean, like as in -- Say some more about what you would --**
Q Sure.

Page 21

Were the -- Was the bank looking at potential CEO candidates? Had they selected a CEO? Were they in a succession process? I'm just trying to understand when you came on was the bank -- had they -- Who was the CEO at the time? Let's start there.
A **The CEO at the time was Greg Carmichael.**
Q Okay. Did the bank have a plan to transition Mr. Carmichael to a -- out and have a new CEO begin?
MR. CIOFFI: Counsel, by way of objection you're using the term "CEO". In this time frame as you know there was a selection of a President and a CEO was later. I just want to make sure the record's not confused.
Q Do you understand my question?
A **No. So are -- are you asking about CEO, President, both? What are you -- What are you asking?**
Q I'm asking about both.
A **Okay. So -- So I'm sorry. So reask what you're asking me about for that particular time when I came on. I am not exactly sure --**
Q Yeah.

Page 22

A **-- what you're looking for.**
Q Did -- At the time you came on board to the bank in July of 2020 -- Well, that's when you interviewed.
A **Correct.**
Q And September, 2020, that first week, did you at some point gain an understanding of if the bank had any succession plans for their current CEO?
MR. CIOFFI: You may answer that question. Go ahead.
A **Yeah. So the -- the bank had been in process for looking at successors for the President and then ultimately CEO. They were in the process of doing that. There was none selected when I joined in September yet.**
Q What stage of the process were they in?
A **There were none selected yet, so it was in the process of -- They had identified the candidate, the one candidate, that they felt would be a -- the potential best candidate, but they were going through the process of vetting that to make sure that that was indeed the case.**
Q And who informed you of that?

Page 23

A **I don't know. You mean who informed me of what?**
Q Well, you -- you became aware that they were at that -- they had identified a candidate; correct?
A **Yeah, they were in the process -- right, in the process of -- Yeah, we -- they had narrowed it down --**
Q Uh-huh.
A **-- you know, which is what companies do; right? So you get to the point where over the years, you know, you're constantly sort of looking for who could be, you know, the next, you know, generation of leaders and things like that and -- and, you know, President/CEO was one of those that they looked for, so they had gotten to a point where they believe they had the right best candidate and they were at a point of assessing is that really the case and so coming to some conclusion they had not yet done that, but we're just getting to that point.**
Q Yeah and -- Well, and my question really just goes to how did you become aware of that? Did someone tell you this? Did they communicate it to you?
A **It was part of the Board**

Page 24

**discussions for that week, so it wasn't like there was some message from on high, you know, that says, "This is it."**
Q Uh-huh.
A **It was part of the discussions for the week that I remember.**
Q Yeah.
A **Now, I don't remember exactly, you know, the order of who said what. I don't -- I don't remember that --**
Q Okay.
A **-- because that was --**
Q Well, and let's --
A **-- three and a half years ago.**
Q Yeah, I understand.
And let's break that down. This is during your week of onboarding; right?
A **It was onboarding plus Director meetings.**
Q Okay. Is that a full Board of Director meeting you're referring to?
A **Correct.**
Q Okay. And that would have been in September, 2020?
A **Correct.**

Page 25

Q Okay. Let's start with the onboarding. Did you -- You met -- You mentioned Phil McHugh. You met him. You mentioned Tim Spence that you met during onboarding. Did you meet all the Directors as well?
**A Not during onboarding.**
Q Okay.
**A Onboarding is usually with the management team --**
Q Okay.
**A -- so you learn about the company, you know, and what each --**
Q Uh-huh.
**A -- you know, business area does. That's what onboarding that I'm referring to.**
Q Okay.
**A That's what that means. And for me that was right before the Directors' meeting.**
Q Uh-huh.
And either during onboarding or during the Directors' meeting is when you became aware of where the bank was at in terms of success -- their succession plan; is that right?
**A During the Directors' meeting.**
Q During the Directors' meeting.

Page 26

Okay.
And who during the Directors' meeting informed you of that? Did -- Did any particular person tell you?
**A Again there was no voice of God that kind of came out and said the answer. Nobody said, no.**
Q Uh-huh.
**A It was part of the discussion in the Directors' meeting that I'm aware of. There was no -- That I can recall I don't remember anybody, you know, sort of emphatically saying, "This is the answer." It was part of the discussion.**
Q Uh-huh.
Did you have any questions about the succession process or where the bank was at that you asked?
**A I'm sure I probably did. I don't remember.**
Q Okay.
**A I'm not one to like not ask questions.**
Q And did -- the one candidate that was identified, is that Tim Spence?
**A Yes.**

Page 27

Q Do you recall when Tim Spence was made President of Fifth Third Bank?
**A No. The exact time, no, I don't know the exact date.**
Q Do you recall if it was in 2020?
**A As far as I can remember, yes, it would be sometime in 2020 after -- sometime after those meetings.**
Q And did the Board take a vote to promote Tim Spence to President?
**A At some point. It wasn't during that meeting, I don't believe, but it -- it wasn't -- You know, it's -- it's part of the process that you -- that even the regulator require that you do --**
Q Uh-huh.
**A -- but it wasn't during that week, I don't believe. From what I can remember it was probably later, a couple weeks later, is what I would guess.**
Q Uh-huh.
**A I don't remember exact dates.**
Q Yeah.
(Deposition Exhibit 2 was marked for identification.)

Page 28

BY MR. SMITH:
Q I have handed you what's been marked as Exhibit 2. Have you seen this document before?
**A No.**
Q I'm going to direct you to Page 6 of the document.
**A I'm sorry. Could I --**
Q Yeah.
**A Before you just talk can I read --**
Q Sure.
**A -- what this is, please?**
Q In reading if you do recall that you have seen this before let me know.
**A (Reviewing document.) Thank you.**
Q Okay. In reviewing this does that refresh your recollection have you seen this document before?
**A Yes. I haven't seen it like this, but --**
Q Okay.
**A -- I mean -- And obviously because I signed it, so --**
Q Yeah, that's what I want to direct you to Page 6 and 7 which do you recognize that

Page 29

portion of the document?
A **Yes.**
Q And what is that?
A **It's the Unanimous Written Consent Of The Board of Directors Appointing President.**
Q Okay. And that's your signature on the -- the following page?
A **On Page 7 --**
Q Correct.
A **-- yes.**
Q Is this the official vote to promote Tim Spence to President?
A **Yes.**
Q Okay. And you voted in favor of that?
A **Correct.**
Q What had you reviewed prior to voting in favor of promoting Tim Spence to President which informed your decision?
A **What do you mean "reviewed"?**
Q Any documents that you reviewed, any -- anyone you spoke with? Did you do anything before taking this vote that would help you inform your decision whether you were going to vote in favor?
MR. CIOFFI: Objection, asked and

Page 30

answered. She talked that -- that this was the topic of discussion at the September 21, 2020, Board meeting and -- and they're reflected in those minutes as you know, so I'd ask you to show her those minutes if you want her to talk about that particular topic.
Q Go ahead and answer.
A **We talked about it at the Board meeting. I can't tell you exactly what was said and when without -- I just don't remember three and a half years ago a conversation, but we did talk about it at the Board meeting.**
Q Okay. So you discussed it at the Board meeting. Is there anything else you reviewed outside of discussions at the Board meeting that informed your decision to vote in favor of promoting Tim Spence to President?
MR. CIOFFI: Objection to the form of the question. Does it include documents that were discussed at the Board meeting?
Q Did you discuss any documents at the Board meeting?
A **Did we discuss documents at the Board meeting? I mean we might have. I mean I don't -- It was three and a half years ago, so I mean --**

Page 31

Q Yeah.
Well, what I'm -- what I'm really trying to understand is just what you had reviewed, looked at, who you spoke with, that would have helped you make a decision to vote in favor of promoting Tim Spence --
A **What I remember --**
Q -- and --
MR. CIOFFI: Let him finish. Then --
Q -- and --
MR. CIOFFI: -- let me make my objection.
Q And maybe this helps simplify. Was it all at the September Board meeting? Is that everything that informed your decision?
MR. CIOFFI: Objection. You asked three different questions, No. 1. No. 2, the deposition is not a memory test. All of this is set forth in the minutes. You have reviewed those minutes in other depositions. Why don't you share with her the minutes and let her talk about it.
Q Do you have an answer?
MR. CIOFFI: She's -- She's already

Page 32

testified she can't -- she doesn't remember three and a half years ago what's -- what's in the minutes or the nature of the -- the discussions. That's why they're written down in minutes. So if you want her testimony show her the document.
Q My question's more basic. I'm -- I'm really trying to know and understand what informed your decision when you took this vote. If that's limited to just the September meeting we can go into that. But is there anything outside of that meeting that informed your decision?
A **It would --**
MR. CIOFFI: Objection. That's a different question. I am going to allow her to answer that question.
A **It was in the September meeting which was my first meeting --**
Q Uh-huh.
A **-- and I can't tell you exactly because it was three and a half years ago.**
Q Anything outside of that meeting?
A **It was at the September meeting we talked about it and it was a robust discussion, but I can't tell you exactly what. It was three and a half**

Page 33

**years ago.**
MR. SMITH: Okay. Get the minutes.
(Deposition Exhibit 3 was marked for identification.)
MR. CIOFFI: This is Exhibit 3; is that right?
THE REPORTER: Yes.
MR. SMITH: Yes.
BY MR. SMITH:
Q You have been handed Exhibit 3. Do these appear to be a true and accurate copy of the minutes taken from the September 21st, 2020, Board meeting of the Fifth Third Bank National Association?
**A I need to read them to be able to answer that question.**
Q Go ahead.
**A (Reviewing document.)**
Q If it helps save time I am only going to be asking you questions about the first two pages under Talent Management, Ms. Clement-Holmes.
**A Okay. Can you --**
MR. CIOFFI: But you asked her if she identified this as a true and accurate copy of the minutes.
MR. SMITH: Yeah, I can withdraw

Page 34

the question. I don't -- I mean I'm -- I'm really just asking about those first two pages, that portion of the minutes, Talent Management.
MR. CIOFFI: You may continue reading if -- if --
THE WITNESS: Yeah, I just --
MR. CIOFFI: -- that's what you need to do.
THE WITNESS: Yeah, I do. I just -- I want to make sure that there's not something that came up that I'm missing.
**A (Reviewing document.) Oh, I'm sorry, I'm sorry. Okay. I was --**
Q Yeah, and if --
**A -- looking at the wrong place. Okay. Got it.**
Q Let me just for the record --
**A Okay.**
Q -- at the bottom of this exhibit there's some what are called Bates numbers, FifthThird-McHugh-Minutes-000517 -- Do you see that?
**A Yeah, okay.**
Q And I am going to be asking you about 000517 to 000518 with the heading,

Page 35

Talent Management.
**A Yeah.**
Q In reviewing the Talent Management portion does that refresh your recollection at all as to what you reviewed, relied on, looked at, before casting your vote to promote Tim Spence to President?
**A Yes. We -- We -- I remember now we did have a -- a good presentation, a discussion, from the outside firm.**
Q And that was RHR International?
**A Yeah, now that it's -- I'm seeing it now. I couldn't -- I couldn't have told you the name, but, yeah.**
Q Okay. So that presentation. Anything else you relied on?
**A A -- A discussion we had after -- You know, usually after you -- something like this after you have a presentation --**
Q Uh-huh.
**A -- and usually every Board meeting we have executive session with just the Directors, independent Directors, and we had a discussion in that meeting about the presentation, about each of the Directors' opinions and perspectives and things like that.**

Page 36

Q And tell me about that discussion, anything you recall?
**A Yeah, it was a really positive discussion about Tim, why we, you know, thought he was the right choice, you know, what strengths, qualifications he had. You know, each of the Directors shared their opinion about that.**
Q Tell me which Directors you recall sharing opinions?
**A That's three and a half years ago. I can't tell you who said what.**
Q Do you recall any?
**A I can tell you mine, but I -- I mean that's the only one I can probably -- I -- I don't know if I could say who said what.**
Q Sure. And we'll get to yours in a minute.
But you don't recall any others -- any other particular Directors, who they were and what opinion they voiced?
**A I can't give you specifics of who said what, no.**
Q Okay.
**A I can -- But it was general. I can give you general tone, but I can't give you specifics.**

Page 37

Q And did you voice your opinion?
A **Yes.**
Q And what was your opinion?
A **My opinion was -- And -- And I do remember being toward the end after listening -- was that we had an extraordinary opportunity to have not only a really good CEO but a great CEO, and that was based on the discussion, based on what I heard from the external company that did the in-depth evaluation, and not only did I think the opportunity was extraordinary, that he could be a great CEO for lots of companies, not just a bank, and I come from a consumer goods company. I have worked for four CEOs directly, some of them legendary, so I know what a good CEO is, I know what a not good CEO is, and he was extraordinary, and I could tell that just by the conversation. I could tell that just by the -- what they said at the -- The external consultant said it was -- it was amazing. I do remember that. It was -- I remember this feeling of being amazed.**
Q So the RHR presentation and then the discussion with other Board members?
A **Uh-huh.**
Q Anything else that fed into your opinion?

Page 38

A **Well, my own interaction with him in the onboarding. I --**
Q Go ahead.
A **No. Go ahead.**
Q Well, how long was that onboarding meeting with Tim Spence?
A **I don't know exactly. I couldn't tell you. Like I -- I couldn't -- I don't know. It was three and a half years ago.**
Q Was it a full day?
A **No, it was not a full day, but I couldn't tell you if it was 30 minutes, an hour. I couldn't tell you that.**
Q Okay. Do you recall anything from that discussion during your onboarding with Tim Spence?
A **I remember being really impressed. You know, it doesn't take much to, you know -- particularly when you have his kind of talent to be impressed. And I talk to a lot of people. I have talked to a lot of people over the years so I know -- When I say I'm impressed I don't use those words lightly.**
Q Okay. So the RHR presentation, the discussions among Board members during executive

Page 39

session, and then your discussion with Tim Spence during onboarding. Anything else that fed into your opinion?
A **Nothing specific that I can recall.**
Q Okay. At the time you cast your vote in favor of promoting Tim Spence how many times had you met Tim Spence?
A **I met him at the on -- the onboarding session we talked about --**
Q Uh-huh.
A **-- and the Board meetings --**
Q Okay.
A **-- that week of September.**
Q And at the time you cast your vote in favor of promoting Tim Spence had you ever met with or interviewed any of his direct reports or subordinates?
A **Yes, during the Board meeting.**
Q You -- You met with and interviewed them --
A **Now --**
Q -- during the Board meeting?
A **Now, when you say "interviewed" what do you mean, like a -- What does that mean?**
Q Interviewed them regarding

Page 40

Tim Spence for the position. Did you do any interviews?
A **Now -- Now I'm confused. Okay. So did I interview his direct reports about Tim -- Is that what you're asking?**
Q Correct, before deciding to promote him to President.
A **No.**
Q Okay. And I know you said you met with his direct reports during Board meetings. Did you ever meet with them outside of Board meeting?
A **Not outside, on -- during onboarding --**
Q Uh-huh.
A **-- and Director meetings, so it was all that same week --**
Q Okay.
A **-- so, no, not outside that.**
Q Had you reviewed any of Tim Spence's annual reviews, performance reviews?
A **No.**
Q Had you reviewed any of Tim Spence's Employee Engagement Surveys?
A **No.**
Q Are you familiar with what those

Page 41

are?
A I know -- I know in general what they are.
Q Okay. Did you review any of Tim Spence's Customer Experience Surveys at the -- prior to you voting in favor of promoting him to President?
A No, but I have done this before.
Q What do you mean by that?
A At Cincinnati Financial I have done it twice.
Q Done what?
A When we have been through a process of selecting a CEO twice --
Q Okay.
A -- and we never look at engagement scores or that kind of thing because it's -- it's -- it's -- We -- We just -- It's not necessary because you see at a higher level than that.
Q What about --
A So let me -- let me say it this way: The process of going through, identifying, in this case President and CEO -- Cincinnati Financial is CEO more than it is President -- but every company is different. You develop a perception or perspective

Page 42

over time in most cases. Now, I didn't have the benefit of that because I wasn't there until September, but you can still do that even on a short amount of time.
It's just like when you -- like if up go to a D.C. -- Well, maybe not these days -- but if you go to D.C. and you have to meet with a lawmaker you don't have months, you don't have days, you don't have weeks. You have got a few minutes. And in that few minutes you have to impress upon the House of Representative person, a Senator, somebody, something that you want them to do, and you have got to be able to have that ability to come across and impress upon somebody, and I -- I got that from Tim pretty easily in my onboarding which was all the same week because that was the first week I was there, all that same week of December [sic], so you could easily tell.
Like a lot of times with these, you know, engagements what somebody has sort of behind them, so to speak, in terms of capability and talent and understanding about their business you get a lot of that in a few minutes. It really doesn't take very long. You also get the opposite of that if they don't have it too sometimes.
Q Did you ever see any specifics as

Page 43

to Tim Spence's -- Tim Spence's financial performance relative to goals for his divisions?
A During the Board meetings there were presentations by the business lines, so within that, you know, they -- I don't know if they talked about it that particular meeting because that's usually a strategy meeting, but often they do talk about whatever, you know, the results are. I don't remember for that particular meeting.
Q Okay. You don't recall if Tim Spence's financial performance relative to goals for his divisions were good, bad, average, indifferent?
A I don't remember the specifics of that meeting.
Q Okay. Did you ever see income statements or balance sheets broken out for the divisions managed by Tim Spence?
A No.
Q Did you review any prior -- I understand your first Board meeting was September, 2020?
A Yes.
Q Did you review any prior meetings' minutes or materials before voting in favor of

Page 44

promoting Tim Spence to President?
A I -- I may have. I don't remember.
Q Do you know at the time did the bank have a succession timeline in place in terms of promoting Tim Spence to President and then to CEO?
A What do you mean by "timeline"?
Q Well, that's my question to you. Did the bank have a timeline?
A I mean but I am not sure -- What do you mean, like as in -- timeline for what, like --
Q Number, months, years, in terms of promotion to President, promotion to CEO, were you aware of anything like that?
MR. CIOFFI: Objection to form of the question. It's confusing especially because you sort of changed it. Could you just ask the question again what --
Q Are you aware of any timeline at Fifth Third Bank for purposes of CEO succession?
MR. CIOFFI: Objection. It's vague and confusing to me. If -- If you can answer you can try to answer.
A I don't know that I can answer that --
Q Okay.

Page 45

**A -- because I don't know what -- I don't know what you're looking for. It's hard -- I don't know. I don't think I can answer that.**
Q My question is really are you aware was there any timeline in terms of Tim Spence will be promoted to President in these amount of months or years and will be promoted to CEO in these amount of months or years -- Were you aware of anything like that?
MR. CIOFFI: Same objection. When you say "timeline" what's the time frame? Are you talking about in September of 2020 because they were voting?
Q Do you understand my question?
**A No. I'm sorry. I don't.**
Q Okay. When was Tim Spence promoted to CEO?
MR. CIOFFI: Objection, beyond the scope of discovery. It's irrelevant to this case. It happened after the filing of the lawsuit. If you know you may answer.
**A I don't know the exact date.**
Q I am going to direct you back to the minutes on Exhibit 3. In the first paragraph under Talent Management it states, "Mr. Shaffer,

Page 46

Mr. Beaudin and Mr. Evans presented the Talent Management Update as included in the materials provided for the meeting. Mr. Shaffer began by reminding the Directors of prior discussions related to executive succession planning, including discussions related to Mr. Spence as a possible President and Chief Executive Officer successor to Mr. Carmichael."
Do you recall what Mr. Shaffer reminded the Board of? Do you recall the prior discussions that he reminded the Board of at that time?
**A You mean the specifics of what he said?**
Q Correct.
**A No.**
Q Do you recall anything about what he said?
**A It was three and a half years ago. No. I mean --**
Q Okay.
**A -- I couldn't tell you exactly.**
Q Is the answer no?
**A No.**
Q Okay.

Page 47

(Deposition Exhibit 4 was marked for identification.)
BY MR. SMITH:
Q Handing you Exhibit 4 have you seen this document before, Ms. Clement-Holmes?
**A No, not that I recall, no.**
Q Can you read what it states on the first page? And that's FifthThird-McHugh-001063.
**A "Board Summary: Tim Spence Fifth Third Bank."**
Q There's an indication or letters at the top right, RHR; is that right?
**A Correct.**
Q Okay. But you -- you have never -- You don't recall seeing this before?
**A I -- I guess I possibly did, but again, as I said, three and a half -- It's actually four and a half years ago -- I don't -- I don't recall the exact document, no.**
Q Okay. So you can't recall if this factored into your decision to promote Tim Spence to President, vote in favor of that?
**A That's -- That's not what I said. What I said is --**
Q Okay.

Page 48

**A -- I don't recall this exact document.**
Q Okay.
**A What I believe I said was that based on the presentation that they made and the discussion I felt it was -- I felt really good about the result that they had come up with based on all the interviews and everything else that they had done in the presentation. I couldn't -- I just don't remember the exact presentation.**
Q Okay. Prior to the September, 2020, Board meeting do you recall if either Bob Shaffer or Greg Carmichael reached out to you and had a discussion with you about succession planning?
**A So prior to the meeting?**
Q Prior to the meeting, yes.
**A I don't recall that.**
Q Okay.
(Deposition Exhibit 5 was marked for identification.)
MR. CIOFFI: This is Exhibit 5?
THE REPORTER: Yes.
BY MR. SMITH:
Q Ms. Clement-Holmes, this Exhibit 5, let me represent to you is an email from

Bob Shaffer -- appears to be an email from Bob Shaffer to Greg Carmichael on August 18, 2020, and it's subject matter is the September Board Meeting, and in it Mr. Shaffer conveys to Mr. Carmichael, "Follow-up items from this morning's Talent Management Update discussion," and under the second bullet point there's an indication, "Talk to each Board member about the succession discussion and Saema." Your name is listed in there, but you don't recall any discussion about succession?

A I don't remember. That doesn't mean it doesn't happen.

Q Right.

A I just don't remember.

Q Yeah.

And my question is just do you recall it?

A No, I don't recall.

Q Okay.

(Deposition Exhibit 6 was marked for identification.)

BY MR. SMITH:

Q I have handed you what's been marked as Exhibit 6, Bates Stamped FifthThird-McHugh-005350 through 005373. I'll give



you a minute if you want to review it, but have you -- do you recall this document?

A No, I don't recall it. Do you got a magnifying glass? This is teeny tiny.

Q I do not.

A This is super tiny.

Q Let me direct you to FifthThird-McHugh-005354.

A Okay.

Q Looking at that page does that refresh your recollection as to any kind of timeline you had seen or reviewed?

A No, I don't recall it.

Q Okay. Do you recall during the September, 2020, Board meeting any discussion of Phil McHugh potentially being at risk with Tim Spence's promotion?

A I don't recall that being any part of the discussion.

Q Okay.

A It could be. I just don't recall.

Q Okay. Yeah. And again I'm just asking for your recollection, so --

A Uh-huh.

Q Prior to voting on the resolution



to appoint Tim Spence to President of Fifth Third had you reviewed a -- And I'm going to call it -- It's been labeled as CEO Profile that had been put together at Fifth Third on which -- well, on which Tim Spence was reviewed by RHR. Do you recall that document? Had you ever looked at that before?

A Not that I recall.

Q Okay. Prior to voting on the resolution to appoint Tim Spence to President were you ever made aware of any other candidates for either President or CEO?

A Prior to voting --

Q Uh-huh.

A I'm sorry. Repeat the question again, please.

Q Yeah.

Prior to -- Prior to voting on the resolution to appoint Tim Spence to CEO were you -- were you made aware of any other candidates for the position?

A No.

Q And that would be President or CEO?

A Well, we talked President during that --

Q Uh-huh.



A -- so, no.

MR. SMITH: Let's go off the record.

(Deposition stood in recess at 9:49 a.m.)

(Deposition reconvened at 10:05 a.m.)

THE VIDEOGRAPHER: We are back on the record. The time is 10:05.

(Deposition Exhibit 7 was marked for identification.)

BY MR. SMITH:

Q Ms. Clement-Holmes, you have been handed Exhibit 7. Earlier we were discussing the CEO Profile, what I called it, but this document -- have you seen this document before?

A No.

Q You have not. Okay.

As far as your vote on the resolution to appoint Tim Spence to President of Fifth Third my understanding based on your prior testimony is you relied on the RHR presentation, your discussion with Board members during executive session at the September, 2020, Board meeting, and then your discussion with Tim Spence during onboarding. Is

there anything else that factored into your decision to vote on that resolution?
A Yes, my own experience.
Q Your own experience, tell me about that?
A My own experience in terms of, like I said earlier, working for -- directly for 4 CEOs, one of at least who was legendary, really good -- I worked for both good ones and bad ones -- and also my experience of going through selecting CEOS at Cincinnati Financial twice. At the time it was once, but now it's been twice.
Q Other than your own experience and the other items I just mentioned is there anything else that factored into your decision?
A No.
MR. SMITH: Okay. That's all the questions I have.
MR. CIOFFI: We have a few questions.
EXAMINATION
BY MR. CIOFFI:
Q Ms. Clements-Holmes, I want to direct your attention back to Exhibit No. 3. Would you look at that? It's the minutes from September 21,



2020. I want to direct your attention to the last paragraph on the first page.
A Uh-huh.
Q Would you -- Go ahead and read into the record that last paragraph, if you would?
A The one that starts with "Next"?
Q Yeah, uh-huh.
A "Next, Mr. Beaudin reviewed the process utilized to assess Mr. Spence. Mr. Beaudin described the leadership, personality style, problem solving and critical thinking online assessment tools utilized by RHR International. He also discussed the extensive structured behavior interview process completed with Mr. Spence and the stakeholder input received through interviews with Mr. Carmichael and Mr. Spence's peers and direct reports. Mr. Beaudin then reviewed the assessment report of Mr. Spence. He noted that RHR International's assessment concluded that Mr. Spence demonstrates a strong fit to the leadership characteristics desired in a President and Chief Executive Officer at Fifth Third Bank. Mr. Beaudin specifically reviewed the drivers of the Essential Leadership Behavior Ratings included in the assessment report. He also discussed Mr. Spence's Benchmark Rating and Stakeholder Feedback included in



the assessment report," and, "Lastly, Mr. Beaudin reviewed the Development Goals for Mr. Spence included in the assessment report."
Q Now, I'm handing you what's been marked at Exhibit No. 8 -- Would you mark that, please?
(Deposition Exhibit 8 was marked for identification.)
BY MR. CIOFFI:
Q I want you to look at Exhibit No. 8 and Exhibit No. 4 together, if you would, please. With reference to the paragraph you just read from the Board minutes do these two documents accurately reflect the assessment by RHR as described in the minutes?
MR. SMITH: Objection. Go ahead. You can answer.
A Yes, I believe so, yes.
Q What's the relationship between the -- the two documents?
A This one is the summary of -- of the assessment and this is the actual -- it looks like the in-depth report.
Q Okay. In the review of the Board minutes as reflected in the Board minutes at the Board



meeting on September 21, 2020, did Mr. Beaudin review the entire assessment?
A Yes.
MR. SMITH: Objection. Go ahead.
A Yes.
Q Let me direct your attention first to Exhibit No. 4, back to Exhibit No. 4.
A Uh-huh.
Q If you turn to that page which is No. 2 in the -- in the -- the exhibit itself but is Bates numbered 1064 --
A Okay.
Q -- you see it says "Executive Summary"?
A Yes.
Q Would you read into the record those first two paragraphs -- actually read the whole -- the whole Executive Summary.
A Okay. "Executive Summary. Tim Spence demonstrates a strong fit to the leadership characteristics desired in a chief executive officer at Fifth Third Bank. He is a creative, forward-thinking strategic thinker who balances objective data with his subjective experience to derive innovative solutions to business challenges.

**He demonstrates exceptional abilities in dealing with complexity and ambiguity and a capacity to exercise the business levers most material to having an impact on the bottom line. He is a thoughtful and thorough decision maker who is disciplined and structured in his approach to work. He holds himself to high standards of performance but also knows when good enough is good enough.**

**A values-based leader, he cares deeply about the organizational culture and the well-being of its employees. He's admired for his ability to adjust his leadership approach based on what is required by the individual and the circumstance at hand. He is a compelling speaker who projects a passionate message to his audience. His diplomatic manner allows him to challenge the ideas of others without creating defensiveness or resistance, which facilitates his ability to gain buy-in to his strategies and objectives. He perseveres in the face of difficulties and has effective strategies in place to manage the stresses and strains inherent in an executive position.**

**As a continuous learner, Tim pushes himself to further hone his skills. He is very insightful regarding his strengths and weaknesses and**



**remains open to feedback and ongoing development."**

Q Is this part of the assessment that Mr. Beaudin presented at the meeting on September 21, 2020?

MR. SMITH: Objection. Go ahead.

You can answer.

**A Yes.**

Q Did the Board discuss this assessment?

**A Yes.**

Q Based on what you heard during the Board discussion how would you characterize the Board's reaction to this assessment?

**A The Board's reaction was incredibly positive. Every single Board member that spoke about Tim and the assessment was very positive. I'd say unanimous from what I recall. I don't recall anyone having anything opposite basically of what they heard, so they didn't have a different experience, they didn't have a different perspective.**

**From what I recall everybody was -- was highly supportive and it either confirmed what they knew. In some cases it supplemented what they knew.**

Q During his presentation did



Mr. Beaudin describe part of the basis of this assessment, who he interviewed and -- and who he talked to?

**A Yes. From what I recall it was more of what I'll call 360, you know, kind of review where he talks to -- or they talk to the person's direct reports, they talk to their peers. You know, it's basically who are the key stakeholders' rights and there's a lot of times it's the people who the person worked with and the people who report to them because they are going to have the best point of view in terms of how the person really is.**

Q With respect to what you have just said I want to direct your attention to Exhibit No. 8, and if you look at the Page No. 1 which is the second page actually of that exhibit, Bates No. 0991, and if you look at the bottom of that page does -- what's written there?

**A "RHR International interviewed the following people as part of the 360 process."**

Q Let me stop you there. This is the 360 process you were just describing?

**A Correct, correct.**

MR. SMITH: Objection. Go ahead.

Q Is that correct?



**A Correct. That's a typical industry standard, 360.**

Q And did -- Was the 360 process as you described it presented by Mr. Beaudin at the Board meeting?

**A Yes.**

MR. SMITH: Objection. Go ahead.

**A Yes.**

Q Who are the direct reports who were interviewed as part of this 360 process?

**A As listed there Mike Butera, Ben Hoffman, Peter Kidd, Shawn Niehaus, Christopher Shroat, Melissa Stevens, and Arthur Weston.**

Q And who were the peers who were interviewed as part of this 360 process as reported by Mr. Beaudin?

**A Peers were Lars Anderson, Kevin Lavender, Jamie Leonard, Phil McHugh, Jude Schramm, Tayfun Tuzun -- Tuzun, and Susan Zaunbrecher.**

Q Now, directing your attention to Page 10 of that exhibit which is Bates No. 1000 --

**A Okay.**

Q -- it says at the top

Page 61

"Stakeholder Feedback Strengths" -- Do you see that?
A **Uh-huh.**
Q What's your understanding of this particular section of the assessment?
MR. SMITH: Objection. Go ahead.
Q You may answer.
A **This is the strengths as gathered in their discussions with the people listed, you know, that we just talked about like the direct reports and the peers.**
Q Right.
A **This is what people saw. Like everybody on that list all their input is in here in terms of what they saw as their strengths.**
Q Turning to -- And the Stakeholder Feedback includes the direct reports; is that correct?
A **Correct, direct reports and peers.**
Q And the peers -- But I want to --
A **Oh, yeah.**
Q There's a separate -- separate section --
A **Oh, yeah.**
Q -- is their peers and is -- and is that on Page 13?

Page 62

A **That is, yes, 13.**
Q It's Bates numbered 1003; is that right?
A **Yes.**
Q In his assessment during the Board meeting did Mr. Beaudin discuss the feedback from stakeholders and the feedback from peers?
A **Yes.**
MR. SMITH: Objection.
A **Yes, he did.**
Q Looking at Bates 1000, the, "Stakeholder Feedback: Strengths," under that first category -- Read the category and then the feedback?
A **"Provides Feedback; Has Strong Communication Skills." The feedback was:**
**"He is good at delivering difficult feedback when needed.**
**He is very conscientious about delivering performance feedback--you know where you stand.**
**He can be very direct when performance issues need to be addressed.**
**He presents very well and is able to debate effectively."**
**Under "Handling Stress And Pressure:**
**He handles pressure very well.**
**He remains calm under pressure.**
**Focuses On What Matters Most," the feedback is:**
**"He knows what matters most and is able to remain focused on it and drive it forward.**
**He knows what each of his direct reports is working on--if you were to call him right now and ask him what the top three priorities for anyone on his team are, he would be able to tell you."**
**And the last category is, "Possesses An Extraordinary Intellect And Knowledge About The Business.**
**His knowledge of the business and ability to recall what we have done in the past is exceptional--he remembers everything.**
**He is very smart and able to communicate to people at any level within the business.**
**Even with little experience in operations, his intellect allows him to learn the business and figure out what needs to be done.**
**He has a strong ability to retain information and keep up to date on industry trends.**

Page 63 (continued above)

Page 64

**He is very smart but not intimidating--he remains approachable."**
Q As Mr. Beaudin explained this Stakeholder Feedback, the -- the feedback from direct reports at the September 21, 2020, meeting, did this feedback from direct reports and stakeholders influence your decision to vote for President?
A **Yes, one of the -- Absolutely it was one of the things that I sort of counted into my thinking.**
Q And why was this feedback from -- from stakeholders and direct reports important to your decision to vote for Mr. Spence?
A **Because at the end of the day you have got to be able to lead an organization, you have got to be able to motivate people, set the right strategy, and have people buy into that, engage, and follow that, and if the -- if it came back that, you know, he wasn't motivating, that he didn't handle pressure, that he didn't know what was going on, that would not be a good thing and that's not what's here.**
**So was he -- You know, he came out -- The feedback suggests that he knows what's going on, he's very quick, he's very intelligent, he's very smart, he's able to handle complex situations.**

Page 65

**He gives -- People know where they stand. That's a -- That's another really big deal. If people don't know where they stand they're not going to be able to perform well because they don't know what they're working on. So I very much did along with again additional comments by Board members and my own like interaction with him.**

Q Based on your own interaction and based on comments from Board members were -- was your experience and the experience of other Board members consistent with -- with this feedback from stakeholders?

A **Absolutely. It was absolutely consistent.**

Q All right. Now I want to turn to the, "Peer Feedback: Strengths," and that's on Bates 1003 -- Can you see that?

A **Uh-huh.**

Q And go ahead and read those categories and those comments from -- from peers -- And before you do that peers included Mr. McHugh; is that right?

A **Yes.**

MR. SMITH: Objection. Go ahead.

A **Yes, that's correct.**

Page 66

Q Go ahead.

A **"Peer Feedback: Strengths.**

**Strengths Category: Is A Great Communicator With Charisma.**

**He is very charismatic in advocating for his ideas.**

**He's very articulate and has a great ability to present in a way that conveys his knowledge of the topic at hand.**

**He is very clear and articulate and is a good storyteller--he's clear on vision, expectations, and telling the FTB, Fifth Third Bank, story.**

**His ability to grasp concepts and relate them to real-life examples is incredible; he is strategic and intelligent and brings a level of empathy and authenticity to his conversations.**

**He is a genuine and kind human being."**

**Category of "Is Very Innovative:**

**He is one of those people who is always looking forward and has incredible ideas for the company.**

**He knows the banking business and thinks outside the box; he thinks of how we can do things differently and how we can use data differently.**

Page 67

**He challenges everyone--not from a competitive standpoint but from the perspective of having seen many different businesses.**

**He brings a fresh pair of eyes and a new way of thinking; he has seen what other banks do and is able to bring that lens to the team."**

**In the category of "He Is A Good Colleague And A Great Leader:**

**He is open to constructive feedback, and he is always looking to grow.**

**His intelligence, his charisma, and his care for employees and the community are all exceptional.**

**He really stands out; he has the whole package.**

**He's very collaborative with his peers.**

**He's one of those people whom people are drawn to.**

**He is impressive and unique--he will rise to the top.**

**I think he would make a great CEO.**

**He is a very impressive guy; I think he is a wonderful leader."**

Page 68

**And in the category of "Is Bright And Insightful; Is A Great Thinker and Problem Solver:**

**He has a strong ability to use data, technology, and analytics to enhance what we are doing with the business--he has a very good 30,000-foot understanding and view of what the company should look like.**

**He's very bright and insightful.**

**He's intellectually curious on a variety of topics.**

**He possesses a deep knowledge in banking, technical especially.**

**He quickly gets to the root cause of an issue; a lot of imperfect info comes at us fast, but he can process it quickly and effectively."**

Q And there's more on the next page.

A **The last category is "Has Had A Great Impact From A Strategy Perspective:**

**He is the best at being able to look out into the future.**

**He is dynamic, as he positions his team and the bank to take advantage of opportunities.**

**He has been instrumental in guiding the digital strategy.**

Page 69

**Before him, we had strategy officers, but it did not have the impact we needed until Tim.**

**He spent time with everyone on their own strategic portfolios. He's a good facilitator among the team, and he was able to formulate strategies in difference business lines."**

Q Did these comments from peers, including Mr. McHugh, influence your decision to vote for Mr. Spence?

A **Absolutely.**

MR. SMITH: Objection.

A **Absolutely.**

Q How so?

A **To have peers say these kind of things is extraordinary, very extraordinary. You don't often hear executives at this level who are peers say the kind of things that were listed in the strengths. It was actually -- It was -- Like I said, it's -- it's -- it was extraordinary.**

Q Did these comments from peers including Mr. McHugh align with the Board's assessment of Mr. Spence's strengths?

MR. SMITH: Objection.

A **Yes, yes.**

Page 70

Q What was the Board's discussion vis-a-vis these strengths as -- as set forth in the Peer Feedback?

A **From what I recall there was a lot of consensus around, Yes, this is what I have experienced. Yes, this is confirmed what their perception was based on their months and, you know, years in some cases working with him or talking with others on the management team. It was basically supported what their own perception was.**

**The whole point of this process is to confirm, vet, make sure that, you know, as a Board we're not missing something, you know, that we're not -- and it's an independent view. It's not a view that has any bias whatsoever. It's totally independent. So what I do remember is -- is how cohesive the Board seemed to be in terms of their opinion based on their experiences and it was validated by this assessment.**

Q Did you and the other Directors ask Mr. Beaudin and RHR if there was any negative feedback?

A **Yeah, of course. I mean, yes, absolutely.**

Q All right. I want to direct your attention to Page 2 of Exhibit No. 3 and read that

Page 71

first three sentences of the first full paragraph.

A **"Directors asked if any concerns related to support or followership of Mr. Spence were identified in the peer feedback interviews. Mr. Beaudin responded that no such concerns were identified. Directors inquired of Mr. Spence's capabilities and potential related to other President and CEO successor candidates for large public companies evaluated by RHR International."**

Q Keep -- Keep reading.

A **"Mr. Beaudin responded that Mr. Spence would be considered in the top quartile of all President and CEO successor candidates assessed by RHR International."**

Q I want you to stop there and I want to ask you first about the first two sentences. Did the fact that the Directors asked specifically about any concerns reported by peers and Mr. Beaudin responded that there were no concerns did that influence your decision to vote for Mr. Spence?

A **Absolutely.**

MR. SMITH: Objection. Go ahead.

A **Absolutely.**

Q And please explain?

A **Because again, as I said earlier,**

Page 72

**when you -- you're going to be at the top you want to have people support, engage, and follow the direction that you're trying to set. If there are concerns that people are not going to do that -- And we need to know that kind of up front -- and there were none. I mean there was no concerns. Those would have come out. And again this was an independent assessment so there was no bias kind of going in. That's what their job is.**

Q Based on the discussion you heard at the Board meeting on this particular point that no concerns for support of Mr. Spence were raised by any of the peers did that influence other Board members?

MR. SMITH: Objection.

A **Yeah. Again Board members asked, you know, "Are there concerns?" I don't remember exactly what people asked, but I remember again a very thorough robust conversation about this and, you know, poking at holes everywhere we could and there were no concerns that came up, and that's one of our jobs is to make sure we have got the best person for the job and that -- that would have come out if that wasn't the case.**

Q The Directors ask another question of RHR and Mr. Beaudin as they were thinking about the

Page 73

assessment in the presentation and that's in the -- and that's the next two sentences of that particular paragraph I want to ask you about.

It says, "The Directors inquired of Mr. Spence's capabilities and potential related to other President and CEO successor candidates for large public -- public companies evaluated by RHR International. Mr. Beaudin responded that Mr. Spence would be considered in the top quartile of all President and CEO successor candidates assessed by RHR International."

Did that response by Mr. Beaudin influence your decision to vote for Mr. Spence?

MR. SMITH: Objection. Go ahead.

**A Yes, absolutely.**

Q And please explain?

**A So coming from -- I am not from a banking -- Sorry. I'm messing with the mic -- I'm not from a banking background. My background is in Procter & Gamble which is consumer goods. So to hear in particular that he would fit in the top quartile, which I agree, by the way, now, you know, four and a half years later -- We have seen the proof of that -- that is huge, that is reaffirming that is -- Again I keep using the word "extraordinary" because to know**

Page 74

**that this is the person that we have as the top candidate is incredibly powerful for the company because it's -- it's -- you can't get much better than this, and, like I said, you know, kind of looking now with our glasses on forward it's turned out to be the case. It's been phenomenal.**

Q In any of the Board discussions you heard and participated in as a Director concerning the successor to Mr. Carmichael as President was age ever discussed as a factor?

**A No. I don't -- I don't know anybody's age.**

Q Was -- Was age considered in -- in any way whatsoever in the decision-making process to appoint Tim Spence as President?

MR. SMITH: Objection.

**A Absolutely not.**

MR. CIOFFI: We have no further questions.

EXAMINATION

BY MR. SMITH:

Q Ms. Clement-Holmes, Mr. Cioffi asked you to read from the minutes of the September 21st, 2020, Board meeting, specifically on FifthThird-McHugh-Minutes-000518, that first full

Page 75

paragraph.

**A Uh-huh.**

Q And it indicates, "Directors asked if any concerns related to support or followership of Mr. Spence were identified in the peer feedback interviews," and, "Mr. Beaudin responded that no such concerns were identified," and that's your recollection he said that during the Board meeting?

**A As -- As far as I know. I mean I can't be specific about he said those exact words, but --**

Q Okay.

**A -- but I -- but I do remember us talking about, you know -- because you're always -- you always want to make sure that there's no red flags --**

Q Uh-huh.

**A -- you know, somewhere, and there weren't --**

Q Uh-huh.

**A -- there weren't any, especially from the peers, and that's one of the places that you would look, you know, for red flags is from the peers, and there weren't any and Mr. McHugh was part of that group, so I would have thought that I would have heard**

Page 76

**something. I didn't hear anything.**

Q Uh-huh.

No concerns, no red flags, nothing -- nothing that Mr. Beaudin presented; is that right?

**A No. In -- In fact, what I -- what I do recall is like any of the opportunity areas are things that you would expect from somebody like him. They are things like, He's so fast we can't keep up. That's because the kind of talent he is. He's a -- He's a unicorn in a lot of cases. He's -- He's well -- He's well-rounded. He compare -- He's compassionate about people. He's got empathy.**

**He's -- You want CEOs to be a both/and person. They have got to be able to be both/and. They have got to be able to understand complex things but be able to communicate them simply. He does that. They have got to be able to know a wide range of things but able to dig deeply. He does that.**

**So when you look for things that are concerns you look for things like, Well, he can't go deep, can't do that. That's not what happened. So we -- we were asking those kind of questions and we did not get any of those red flags at all. You can't be one-dimensional as a CEO.**

Q I want to direct your attention back to Exhibit 8, FifthThird-McHugh-001005.
**A I'm sorry. You say -- I'm sorry. So Exhibit 8?**
Q 8, yes.
**A 8. All right. Okay.**
Q And this is labeled "Peer Feedback: Opportunities." Can you just count up how many bullet points there are here? And it continues on to the second page.
**A You mean on the whole page?**
Q Uh-huh.
**A I think 20 maybe if I counted correctly.**
Q And why don't you go ahead and read the categories of opportunities, if you could.
**A "Can Lack Structure And Organization.**
**Needs To Communicate More Directly And Succinctly.**
**Can Be Defensive When Challenged.**
**Can Make Questionable Talent Decisions.**
**Does Not Invest Enough Time In Personal Relationships."**



**And, "Should Bring Others Along And Give People Time To Catch Up."**
Q And let's go to the second category, "Needs To Communicate More Directly And Succinctly." Why don't you go ahead and read the first bullet point?
**A "He needs to reduce the consultant speak and be more direct in his communication, expense optimization versus expense cuts."**
Q And the second one?
**A "He will dilute the point after a while because he is not succinct."**
Q And then the third one?
**A "He should spend more time learning the details of an issue. His answers sometimes indicate a lack of depth of thinking, which undermines his credibility."**
Q Okay. And there were -- That last bullet point any concerns about that?
**A No. Again -- Again these are -- First of all, anyone is going to have opportunity errors. If there -- In -- In fact, if there were no opportunity errors I'd be more suspect. I would be way more suspect about the analysis if there were no opportunity errors because that says to me that they**



**really didn't go in-depth in terms of their vetting, so, no, no concerns.**
**Everybody has things to work on. And these things can change over time. So nothing here is a showstopper to me. A showstopper would be, He doesn't understand the business at all. I don't see that. You know, a showstopper would be, you know, He looks confused every time. You don't see any of that. A showstopper would be, He has no charisma which is a problem for a CEO who has to be able to communicate internally and externally to the media, to lawmakers, to regulators, to the community, to -- You know, the list kind of goes on and on. That's not what's here.**
Q This Exhibit 8 RHR didn't present this to you; is that right?
MR. CIOFFI: Objection, asked and answered. She said it was part of the presentation of the assessment, not the document itself, but the substance.
Q Was this document presented to you?
**A I don't recall how the document was presented. I don't recall that. It could be that it was in the Board books to read. It could be that it was presented. I don't remember. But I remember**



**the -- the substance of the content.**
Q And directing you to Exhibit 4 you had testified earlier you couldn't recall this document -- you had never seen this document before; is that right?
**A Correct.**
Q Okay.
**A And, by the way, this is the way you usually do things for Boards. You don't -- You know, you often may give them the detail, but then in the discussion you don't go through every single slide of the detail. You may give them a summary. So this is not unusual.**
Q Yeah.
My question was just you couldn't recall if this was presented to you?
**A And I don't remember all the stuff that's presented, no.**
Q I want to direct you to FifthThird-McHugh-001064 on that same exhibit.
**A 4?**
Q Correct.
Mr. Cioffi had you read this whole Executive Summary, but I want to direct your attention to the second paragraph right in the middle there.

You see where it starts -- it says, "diplomatic manner"?
A Uh-huh.
Q Why don't you go ahead and read that sentence to me?
A "His diplomatic manner allows him to challenge the ideas of others without creating defensiveness or resistance."
Q And you can stop there at the comma.
Directing you to FifthThird-McHugh-001068 and that's -- This is the summary of shareholder -- I'm sorry -- stakeholder feedback from peers; correct?
A Yes.
Q And under Opportunities can you read the third bullet point?
A "Can be defensive when challenged."
Q Okay. And then Mr. Cioffi directed you to some Board minutes back on Exhibit 3 about Mr. Spence being -- Mr. Beaudin referencing him being in the top quartile --
A Okay. Wait. Hang on. Hang on. I'm sorry. So --
Q Yeah.


A So Exhibit --
Q Exhibit 3.
A Okay. And then where?
Q Go to the second page, FifthThird-McHugh-Minutes-00518.
A Okay.
Q And if you go to the first full paragraph where it starts, "Mr. Beaudin responded that Mr. Spence would be considered in the top quartile of all President and CEO" --
A Uh-huh.
Q -- "successor candidates assessed," what did Mr. Beaudin base that top quartile opinion on -- Do you know?
A I don't know specifically. I would assume it's based on their years of experience and the amount of companies that they have done this work with.
Q Right.
But you don't know -- You're assuming. You don't know that; right?
A Correct.
Q Okay.
A I'm sorry. Why -- Why -- You told me to look at -- I'm -- I'm missing what the -- Were


you trying to ask a question related to 10 --
Q No.
A No?
Q You answered my question.
A Okay.
Q Yeah.
Were you aware of what executives at Fifth Third were working with RHR International, if any, on this Executive Assessment Report?
MR. CIOFFI: Objection, asked and answered. You talked about the stakeholders and the peers.
Q Was anyone working directly with Mr. Beaudin that you're aware of?
A Well, assuming all the people that they interviewed. Is that -- Is that what you mean?
Q No.
I'm referring to developing this report, putting it together, and actually drafting or revising it, making suggestions on it?
A No, I don't know.
Q Are you aware?
A No.
Q Okay. Were you aware that in 2020 RHR was originally contacted to assess three


candidates for President and CEO?
A No.
MR. SMITH: That's all the questions I have.
EXAMINATION
BY MR. CIOFFI:
Q There was a discussion about opportunities for development. What's the difference between -- in your experience both on the Fifth Third Board and also other Boards the difference between opportunities for development and weaknesses?
MR. SMITH: Objection.
A Opportunities for development are not necessarily the bad thing. It's where you may be -- you need to grow in areas. That doesn't necessarily mean weakness at all. Weakness could be a very detrimental thing in a lot of cases. But opportunities -- And again everybody should have opportunities to grow. It could be new areas. It could be new experiences, whatever.
That's different than a weakness which could be -- you know, doesn't lead people well or the organization doesn't follow him. That could be -- That's a weakness as -- as opposed to an opportunity.

MR. CIOFFI: I have no further questions.

THE VIDEOGRAPHER: Josh?

MR. SMITH: No, nothing.

THE VIDEOGRAPHER: We're off the record. The time is 10:42.

____________________________________
LINDA W. CLEMENT-HOLMES

__________________________________
DATE

\- - -

(DEPOSITION CONCLUDED AT 10:42 A.M.)

\- - -

C E R T I F I C A T E

STATE OF OHIO :
SS:
COUNTY OF BUTLER :

I, Pamela L. Jackson, a duly qualified and commissioned notary public in and for the State of Ohio, do hereby certify that prior to the giving of her deposition, the within named LINDA W. CLEMENT-HOLMES, was by me first duly sworn to testify to the truth, the whole truth, and nothing but the truth; that the foregoing pages constitute a true and correct transcript of testimony given at said time and place by said deponent; that said deposition was taken by me in stenotypy and transcribed under my supervision; that I am neither a relative of nor attorney for any of the parties to this litigation, nor relative of nor employee of any of their counsel, have no interest whatsoever in the result of this litigation, and am not, nor is the court reporting firm for which I am affiliated, under a contract as defined in Civil Rule 28(D).

IN WITNESS WHEREOF, I hereunto set my hand and official seal of office at Hamilton, Ohio, this 7th day of February, 2025.

______________________________

Commission Expires 11/17/28

1 DEPOSITION ERRATA SHEET

Date Taken: January 24, 2025

Case Caption: PHILIP R. MCHUGH

vs. FIFTH THIRD BANCORP, et al.

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the ______ day of

____________, 20___.

___________________________________

LINDA W. CLEMENT-HOLMES

2 DEPOSITION ERRATA SHEET

Page No.______Line No.______Change to:_________________

___________________________________________________________

Reason for change:_______________________________________

Page No.______Line No.______Change to:_________________

___________________________________________________________

Reason for change:_______________________________________

Page No.______Line No.______Change to:_________________

___________________________________________________________

Reason for change:_______________________________________

Page No.______Line No.______Change to:_________________

___________________________________________________________

Reason for change:_______________________________________

Page No.______Line No.______Change to:_________________

___________________________________________________________

Reason for change:_______________________________________

Page No.______Line No.______Change to:_________________

___________________________________________________________

Reason for change:_______________________________________

Page No.______Line No.______Change to:_________________

___________________________________________________________

Reason for change:_______________________________________

SIGNATURE:____________________________DATE:_____________

LINDA W. CLEMENT-HOLMES

3 DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

SIGNATURE:_______________________DATE:___________

LINDA W. CLEMENT-HOLMES

**WORD INDEX**

< 0 >
**000517** 34:25
**000518** 34:25
**005373** 49:25
**0991** 59:16

< 1 >
**1** 3:5 9:2, 6 31:18 59:15 88:1
**1:21-cv-00238** 1:8 5:9
**10** 60:23 83:1
**10:05** 52:7, 9
**10:42** 85:6 86:9
**1000** 60:23 62:11
**1003** 62:2 65:17
**1064** 56:11
**11/17/28** 87:25
**13** 61:25 62:1
**14** 10:19
**1700** 2:13
**18** 49:2
**1962** 6:18

< 2 >
**2** 3:5 11:10 27:23 28:3 31:18 56:10 70:25 89:1
**20** 77:13 88:17
**201** 2:13
**2010** 14:1
**2018** 12:14
**2020** 14:5, 6 15:17 16:3 20:18 22:3, 6 24:24 27:5, 7 30:3 33:12 43:22 45:12 48:12 49:2 50:15 52:24 54:1 56:1 58:4 64:5 74:24 83:24
**2022** 18:4
**2023** 18:4
**2025** 1:14 5:3 87:23 88:2
**21** 30:2 53:25 56:1 58:3 64:5
**21st** 33:12 74:24
**23** 17:21
**24** 1:14 17:20, 21 88:2
**24th** 5:3
**25** 17:19
**2623** 2:6
**27** 3:5
**28** 3:5
**28(D** 87:20

< 3 >
**3** 4:14 11:16 33:3, 5, 10 45:24 53:24 70:25 81:20 82:2 90:1
**30** 38:12
**30,000-foot** 68:7
**31st** 6:18 12:14
**33** 4:5, 14
**35** 4:5 13:2
**360** 59:5, 20, 22 60:2, 3, 10, 16
**362-8700** 2:14

< 4 >
**4** 4:15 11:22 47:1, 4 53:7 55:11 56:7 80:2, 21
**45** 4:6
**45202** 1:20 2:14
**45208** 2:6
**45242** 6:16
**47** 4:15
**48** 3:5 4:15
**49** 4:16

< 5 >
**5** 3:5 48:19, 21, 24
**50** 4:6
**511** 1:20
**513** 2:7, 14
**52** 4:7, 17
**53** 3:4
**533-2701** 2:7
**55** 4:18

< 6 >
**6** 3:4 4:16 28:6, 25 49:20, 24

< 7 >
**7** 4:17 28:25 29:8 52:10, 14
**74** 3:5
**75** 4:7
**77** 4:8
**7th** 87:23

< 8 >
**8** 4:18 55:5, 7, 10 59:14 77:2, 4, 5, 6 79:15
**8:39** 1:14 5:3
**8175** 6:15
**83** 4:8
**84** 3:5

< 9 >
**9** 3:5
**9:49** 52:5

< A >
**a.m** 1:14 5:3 52:5, 7 86:9
**abiding** 19:16
**abilities** 57:1
**ability** 42:13 57:12, 18 63:16, 24 66:8, 14 68:4
**able** 33:14 42:12 62:23 63:7, 11, 18 64:15, 16, 25 65:3 67:8 68:20 69:6 76:15, 16, 17, 18, 19 79:10
**Absolutely** 64:8 65:13 69:11, 13 70:23 71:21, 23 73:15 74:17
**accurate** 19:15 33:11, 23 88:10
**accurately** 55:13
**actual** 55:22
**additional** 65:6
**address** 6:14
**addressed** 62:22
**adjust** 57:12
**Adkins-Ihle** 1:22
**admired** 57:11
**advantage** 68:23
**advise** 19:12
**Advisor** 12:18, 24
**advocating** 66:6
**affiliated** 87:19
**age** 6:5 74:9, 12, 13
**ago** 24:14 30:11, 25 32:2, 21 33:1 36:10 38:9 46:19 47:18
**agree** 73:22
**Agreement** 5:21
**ahead** 22:11 30:7 33:16 38:3, 4 54:4 55:16 56:4 58:5 59:24 60:7 61:5 65:19, 24 66:1 71:22 73:14 77:15 78:5 81:4
**Akins** 14:13, 25
**al** 1:9 5:7 88:4
**align** 69:22
**allow** 7:6, 7 9:23 32:15
**allows** 57:16 63:22 81:6
**amazed** 37:20
**amazing** 37:19
**ambiguity** 57:2
**amount** 42:4 45:6, 7 82:17
**analysis** 78:24
**analytics** 68:5
**and/or** 88:11
**Anderson** 60:18
**annual** 40:20
**answer** 7:8 8:1 9:18 19:2 22:10 26:6, 13 30:7 31:24 32:16 33:15 44:21, 22, 23 45:3, 21 46:23 55:17 58:6 61:6
**answered** 30:1 79:18 83:4, 11
**answers** 6:25 7:7 78:15
**anybody** 26:11
**anybody's** 74:12
**appear** 33:11
**APPEARANCES** 2:1
**appears** 49:1

**appoint** 51:1, 9, 18 52:20 74:15
**appointed** 14:3
**Appointing** 29:5
**approach** 57:6, 12
**approachable** 64:2
**area** 25:14
**areas** 76:7 84:15, 19
**Arthur** 60:14
**articulate** 66:7, 10
**asked** 26:17 29:25 31:17 33:22 71:2, 17 72:15, 17 74:23 75:3 79:17 83:10
**asking** 19:3 21:18, 20, 21, 23 33:19 34:2, 24 40:5 50:23 76:23
**assess** 54:9 83:25
**assessed** 71:13 73:10 82:12
**assessing** 23:18
**assessment** 54:11, 17, 18, 24 55:1, 3, 14, 22 56:2 58:2, 9, 13, 16 59:2 61:4 62:5 69:22 70:18 72:7 73:1 79:19 83:9
**Association** 13:7 33:13
**assume** 15:23 82:16
**assuming** 82:21 83:15
**attention** 53:24 54:1 56:6 59:14 60:22 70:25 77:1 80:24
**attorney** 6:23 87:15
**attorney-client** 8:4
**attorneys** 5:10 7:22
**audience** 57:15
**Audit** 17:9, 19 18:18
**audited** 19:15
**August** 49:2
**authenticity** 66:17
**Avenue** 2:6
**average** 43:12
**aware** 9:12 11:7 23:3, 22 25:21 26:10 44:13, 18 45:4, 8 51:10, 19 83:7, 14, 22, 24

**< B >**
**back** 45:23 52:8 53:24 56:7 64:18 77:2 81:20
**background** 73:19
**bad** 43:12 53:9 84:14
**Bailey** 2:4 5:14
**balance** 43:17
**balances** 56:23
**BANCORP** 1:9 2:18, 19 5:6 13:7 88:4
**Bank** 13:7 16:9 21:1, 4, 8 22:3, 8, 12 25:22 26:16 27:2 33:13 37:12 44:4, 8, 19 47:10 54:21 56:22 66:12 68:23
**banking** 66:24 68:13 73:18, 19
**banks** 67:7
**base** 82:13
**based** 37:8 48:5, 7 52:21 57:12 58:11 65:8, 9 70:7, 17 72:10 82:16
**basic** 32:7
**basically** 19:19 58:18 59:8 70:9
**basis** 59:1
**Bates** 34:21 49:24 56:11 59:16 60:23 62:2, 11 65:17
**Beaudin** 46:1 54:8, 9, 16, 22 55:1 56:1 58:3 59:1 60:4, 17 62:6 64:3 70:20 71:5, 11, 18 72:25 73:8, 12 75:6 76:4 81:21 82:8, 13 83:14
**began** 46:3
**behalf** 2:1, 8 5:17
**behavior** 54:13, 23
**believe** 23:17 27:12, 17 48:4 55:18
**Ben** 60:12
**Benchmark** 54:25
**benefit** 42:2
**Bes@sspfirm.com** 2:8
**best** 22:22 23:17 59:11 68:20 72:21
**better** 74:3
**beyond** 45:18
**bias** 70:15 72:8
**big** 65:2
**birth** 6:17
**Blank** 2:12 5:17, 24, 25
**Board** 8:14, 18, 22 13:19, 24 14:5 19:10, 23 20:21 22:3 23:25 24:20 27:9 29:5 30:3, 8, 12, 14, 15, 20, 22, 24 31:15 33:12 35:20 37:22 38:25 39:11, 18, 22 40:10, 11 43:3, 21 46:10, 11 47:9 48:12 49:3, 7 50:15 52:23, 24 55:13, 24, 25 58:8, 12, 15 60:4 62:5 65:6, 9, 10 70:12, 16 72:11, 13, 15 74:7, 24 75:8 79:24 81:20 84:10
**boards** 13:18 80:9 84:10
**Board's** 58:13, 14 69:22 70:1
**Bob** 15:15, 21 48:13 49:1
**books** 79:24
**both/and** 76:15, 16
**bottom** 34:20 57:4 59:17
**box** 66:25
**break** 7:12 24:16
**Brian** 2:19 5:23
**Bright** 68:2, 9
**bring** 19:24, 25 67:8 78:1
**brings** 66:16 67:6
**broad** 18:23
**broken** 43:17
**bullet** 49:6 77:8 78:6, 19 81:17
**business** 25:14 42:21 43:4 56:25 57:3 63:14, 15, 20, 23 66:24 69:7 79:6
**businesses** 67:5
**business--he** 68:6
**Butera** 60:11
**BUTLER** 87:3
**buy** 64:17
**buy-in** 57:18

**< C >**
**call** 15:15 51:2 59:5 63:9
**called** 34:21 52:15
**calm** 63:3
**candidate** 22:21, 22 23:4, 17 26:23 74:2
**candidates** 21:2 51:10, 19 71:8, 13 73:6, 10 82:12 84:1
**capabilities** 71:7 73:5
**capability** 42:20
**capacity** 57:2
**Capital** 17:14
**Caption** 88:3
**captioned** 88:8
**care** 67:14
**cares** 57:9
**Carmichael** 14:12, 20 21:7, 9 46:8 48:13 49:2, 4 54:15 74:9
**CASE** 1:8 5:5, 9 8:17, 24 9:21 22:24 23:19 41:23 45:20 72:23 74:6 88:3
**cases** 42:1 58:23 70:8 76:11 84:17
**cast** 39:5, 14
**casting** 35:6
**Catch** 78:2
**categories** 65:20 77:16
**category** 62:13 63:12 66:3, 20 67:9 68:2, 18 78:4
**cause** 68:14
**Center** 1:14 2:13
**CEO** 12:19, 24 15:24 20:5, 9, 16, 21 21:2, 5, 6, 10, 12, 14, 19 22:9, 14 37:7, 11,

15 41:14, 23, 24 44:5, 12, 19 45:7, 17 51:3, 11, 18, 22 52:15 67:24 71:8, 13 73:6, 10 76:25 79:10 82:10 84:1
**CEOs** 37:13 53:7, 10 76:14
**certified** 6:6
**certify** 87:6
**challenge** 57:16 81:7
**Challenged** 77:21 81:18
**challenges** 56:25 67:3
**change** 18:11 79:4 89:4, 7, 10, 13, 16, 19, 22 90:4, 7, 10, 13, 16, 19, 22
**changed** 44:16
**changes** 88:11, 14
**characteristics** 54:20 56:21
**characterize** 58:12
**Charisma** 66:4 67:13 79:9
**charismatic** 66:5
**Chief** 12:18, 19 15:12 46:7 54:21 56:21
**choice** 36:5
**Christopher** 60:13
**Cincinnati** 1:20 2:6, 14 6:15 13:20, 25 41:10, 23 53:11
**CIO** 12:23
**Cioffi** 2:8 3:4, 5 5:16 7:25 9:16 18:22 19:1 21:11 22:10 29:25 30:18 31:9, 12, 17, 25 32:14 33:5, 22 34:5, 8 44:14, 20 45:10, 18 48:21 53:19, 22 55:9 74:18, 22 79:17 80:23 81:19 83:10 84:6 85:1
**circumstance** 57:14
**Civil** 87:20
**clear** 66:10, 11
**CLEMENT-HOLMES** 1:14 3:3 5:5, 19, 23 6:4, 12 9:5 10:11 33:20 47:5 48:24 52:13 74:22 86:3 87:8 88:19 89:24 90:24
**Clements-Holmes** 53:23
**cohesive** 70:16
**collaborative** 67:18
**Colleague** 67:10
**collectively** 13:11
**Collin** 2:11 5:17
**Collin.hart@blankrome.com** 2:15
**come** 37:12 42:13 48:7 72:6, 22
**comes** 68:15
**coming** 23:19 73:17
**comma** 81:10
**Commencing** 1:14
**comments** 65:6, 9, 20 69:8, 21
**Commission** 87:25
**commissioned** 87:5
**Committee** 17:9, 15 18:6, 9, 11, 13
**committees** 17:8, 18 18:3
**Communicate** 10:20 23:23 63:19 76:17 77:19 78:4 79:11
**Communication** 62:15 78:8
**Communications** 10:14, 20 11:11, 12, 16, 18 15:4
**Communicator** 66:4
**community** 67:14 79:12
**companies** 23:11 37:12 71:9 73:7 82:17
**company** 19:12, 13 20:2, 5 25:11 37:9, 13 41:24 66:23 68:7 74:2
**compare** 76:12
**compassionate** 76:13
**compelling** 57:14
**Compensation** 17:15
**competitive** 67:4
**completed** 54:14
**complex** 64:25 76:17
**complexity** 57:2
**Compliance** 18:6, 16, 17
**concepts** 66:14
**concerning** 74:8
**concerns** 71:2, 5, 18, 19 72:3, 6, 12, 16, 20 75:4, 7 76:3, 21 78:19 79:2
**concluded** 54:18 86:9
**conclusion** 23:19
**CONFIDENTIAL** 1:12 4:3, 11
**confirm** 70:12
**confirmed** 58:22 70:6
**confused** 21:16 40:3 79:8
**confusing** 44:15, 21
**Connie** 1:22
**conscientious** 62:18
**consensus** 70:5
**Consent** 29:4
**considered** 71:12 73:9 74:13 82:9
**consistent** 65:11, 14
**constantly** 23:12
**constitute** 87:10
**constructive** 67:11
**consultant** 37:18 78:7
**consumer** 37:13 73:20
**consumers** 19:22
**contacted** 83:25
**CONTAIN** 4:3
**CONTAINS** 1:12
**content** 80:1
**continue** 34:5
**CONTINUED** 4:1
**continues** 77:9
**continuous** 57:23
**contract** 87:19
**control** 11:8, 13, 20 12:3
**conversation** 30:11 37:17 72:18
**conversations** 66:17
**conveys** 49:4 66:8
**copy** 33:11, 24
**Corporation** 13:20, 25
**correct** 13:4, 5, 8 14:8, 10 18:15 22:5 23:5 24:22, 25 29:9, 16 40:6 46:15 47:13 59:23, 25 60:1 61:17, 18 65:25 80:6, 22 81:14 82:22 87:11
**corrections** 88:11
**correctly** 77:14
**correspondence** 10:21
**Counsel** 5:12, 14 8:8 9:17 21:11 87:16
**count** 77:8
**counted** 64:9 77:13
**COUNTY** 87:3
**couple** 27:18
**course** 70:22
**COURT** 1:1 5:7 6:3 7:1 87:18
**courtesy** 7:7
**created** 11:23
**creating** 57:17 81:7
**creative** 56:22
**credibility** 78:17
**critical** 54:11
**Cs** 17:11
**culture** 57:10
**curious** 68:10
**current** 6:13 8:13, 18, 22, 25 15:24 22:8
**currently** 12:5 13:3, 18 15:12 17:7
**custody** 11:8, 13, 19 12:2
**Customer** 41:5
**cuts** 78:9

**< D >**
**D.C** 42:6, 7
**data** 56:24 67:1 68:5

**Date** 1:14 6:17 12:13 27:4 45:22 63:25 86:6 88:2
**dates** 27:21
**day** 38:10, 11 64:14 87:23 88:16
**days** 42:6, 8
**deal** 65:2
**dealing** 57:1
**debate** 62:24
**December** 42:17
**deciding** 40:6
**decision** 29:19, 24 30:16 31:5, 16 32:9, 12 47:21 53:1, 15 57:5 64:7, 13 69:9 71:20 73:13
**decision-making** 74:14
**Decisions** 77:23
**DECLARATION** 88:5
**declare** 88:6
**deep** 68:12 76:22
**deeply** 57:10 76:19
**Defendants** 1:10 2:8 5:18
**Defensive** 77:21 81:18
**defensiveness** 57:17 81:8
**defined** 87:20
**Definitions** 10:19
**delivering** 62:16, 19
**demands** 11:1
**demonstrates** 54:19 56:20 57:1
**Department** 6:1
**Deponent** 2:8 87:12
**deposed** 6:7
**Deposition** 1:14 3:5 4:14, 15, 16, 17, 18 5:4 6:19 7:21 8:10, 15 9:2, 10 27:23 31:19 33:3 47:1 48:19 49:20 52:4, 6, 10 55:7 86:9 87:7, 12 88:1, 8, 12 89:1 90:1
**depositions** 31:21
**depth** 78:16
**derive** 56:25
**describe** 15:20 59:1
**described** 54:10 55:14 60:4
**describing** 59:22
**desired** 54:20 56:21
**detail** 80:10, 12
**details** 78:15
**detrimental** 84:17
**develop** 41:25
**developing** 83:18
**Development** 55:2 58:1 84:8, 11, 13
**difference** 69:7 84:8, 10
**different** 31:18 32:15 41:25 58:19, 20 67:5 84:21
**differently** 67:1, 2
**difficult** 62:16
**difficulties** 57:20
**dig** 76:19
**digital** 68:25
**dilute** 78:11
**diplomatic** 57:16 81:1, 6
**direct** 28:6, 24 39:16 40:4, 10 45:23 50:7 53:24 54:1, 16 56:6 59:7, 14 60:9 61:9, 16, 18 62:21 63:8 64:4, 6, 12 70:24 77:1 78:8 80:19, 24
**directed** 10:13 81:19
**directing** 60:22 80:2 81:11
**direction** 72:2
**directly** 37:14 53:7 77:19 78:4 83:13
**Director** 10:15 13:3 14:3 16:3 17:8 18:14, 20, 25 19:7, 10 20:12 24:18, 21 40:15 74:8
**Directors** 15:18 19:23 20:6, 8 25:5, 18, 21, 24, 25 26:2, 10 29:5 35:21, 22, 24 36:7, 8, 19 46:4 70:19 71:2, 6, 17 72:24 73:4 75:3
**disciplined** 57:5
**disclosure** 10:21
**discovery** 45:19
**discuss** 30:21, 23 58:8 62:6
**discussed** 6:24 8:17, 21, 24 30:13, 20 54:12, 24 74:10
**discussing** 52:14
**discussion** 26:9, 13 30:2 32:24 35:8, 16, 22 36:1, 4 37:8, 22 38:15 39:1 48:6, 14 49:6, 8, 9 50:15, 19 52:23, 25 58:12 70:1 72:10 80:11 84:7
**discussions** 10:25 24:1, 5 30:15 32:4 38:25 46:4, 6, 11 61:8 74:7
**DISTRICT** 1:1, 2 5:7, 8
**DIVISION** 1:3 5:8
**divisions** 43:2, 12, 18
**document** 9:7, 19 10:9, 24 12:1 28:3, 7, 15, 17 29:1 32:6 33:17 34:13 47:5, 19 48:2 50:2 51:5 52:15, 16 79:20, 21, 22 80:4
**documents** 7:24 8:2, 6 9:11, 15 10:2, 13 11:4, 12, 18, 22 12:2 29:21 30:19, 21, 23 55:13, 20
**doing** 22:15 68:6
**drafting** 83:19
**drawn** 67:21
**drive** 63:7
**drivers** 54:22
**duly** 6:5 87:4, 8
**duties** 18:20
**dynamic** 68:22

< E >
**Earlier** 52:14 53:7 71:25 80:3
**easily** 42:14, 17
**East** 2:13
**effective** 57:20
**effectively** 62:24 68:16
**either** 15:5 18:4 25:20 48:12 51:10 58:22
**Email** 2:7, 15 10:23 15:5 48:25 49:1
**empathy** 66:17 76:13
**emphatically** 26:12
**employed** 12:5, 25
**employee** 16:8 40:23 87:16
**employees** 8:25 19:23 57:11 67:14
**employment** 12:8
**endurance** 7:13
**engage** 64:17 72:2
**Engagement** 40:23 41:16
**engagements** 42:19
**enhance** 68:5
**entire** 56:2 88:7
**Erie** 2:6
**ERRATA** 88:1, 13 89:1 90:1
**errors** 78:22, 23, 25
**especially** 44:15 68:13 75:21
**Esq** 2:1, 4, 8, 11, 18, 19
**Essential** 54:23
**et** 1:9 5:7 88:4
**evaluated** 71:9 73:7
**evaluation** 37:9
**Evans** 46:1
**everybody** 58:21 61:13 79:3 84:18
**everyone--not** 67:3
**exact** 12:17 27:3, 4, 21 45:22 47:19 48:1, 10 75:10
**exactly** 17:20 19:4 21:24 24:8 30:9 32:20, 25 38:7 46:22 72:17

**Examination** 3:4, 5 6:8 53:21 74:20 84:5
**examined** 6:6
**examples** 66:15
**exceptional** 57:1 67:15
**exceptional--he** 63:17
**exchange** 10:21
**Executive** 12:19 35:21 38:25 46:5, 7 52:23 54:21 56:14, 18, 19, 21 57:22 80:24 83:9
**executives** 69:17 83:7
**exercise** 57:2
**Exhibit** 3:5 4:14, 15, 16, 17, 18 9:2, 6 27:23 28:3 33:3, 5, 10 34:20 45:24 47:1, 4 48:19, 21, 24 49:20, 24 52:10, 14 53:24 55:5, 7, 10, 11 56:7, 10 59:14, 16 60:23 70:25 77:2, 4 79:15 80:2, 20 81:20 82:1, 2
**EXHIBITS** 3:5 4:11, 13
**expect** 76:8
**expectations** 66:12
**expense** 78:8, 9
**Experience** 41:5 53:3, 4, 6, 10, 13 56:24 58:19 63:21 65:10 82:16 84:9
**experienced** 70:6
**experiences** 70:18 84:20
**expertise** 19:24
**Expires** 87:25
**explain** 71:24 73:16
**explained** 64:3
**extensive** 54:13
**external** 37:9, 18
**externally** 79:11
**extraordinary** 37:6, 11, 16 63:13 69:16, 20 73:25
**eyes** 67:6

**< F >**
**face** 57:19
**facilitates** 57:18
**facilitator** 69:6
**fact** 71:17 76:6 78:22
**factor** 74:10
**factored** 47:21 53:1, 15
**familiar** 15:8, 23 40:25
**far** 7:7 27:6 52:19 75:9
**fast** 17:21 68:15 76:9
**favor** 29:14, 18, 24 30:16 31:5 39:6, 15 41:6 43:25 47:22
**February** 87:23
**fed** 37:24 39:2
**Feedback** 54:25 58:1 61:1, 16 62:6, 7, 12, 13, 14, 15, 17 63:5 64:4, 6, 11, 23 65:11, 16 66:2 67:12 70:3, 21 71:4 75:5 77:7 81:14
**feedback--you** 62:19
**feeling** 37:20
**felt** 22:21 48:6
**fiduciary** 19:13
**FIFTH** 1:9, 14 2:13, 18, 19 5:6, 25 8:14, 25 10:16 13:4, 6, 7, 11, 17 14:3 15:24 17:8 18:20, 21 19:8 20:13, 16, 20 27:2 33:13 44:19 47:10 51:1, 4 52:21 54:21 56:22 66:12 83:8 84:9 88:4
**FifthThird-McHugh-001005** 77:2
**FifthThird-McHugh-001063** 47:8
**FifthThird-McHugh-001064** 80:20
**FifthThird-McHugh-001068** 81:12
**FifthThird-McHugh-005350** 49:25
**FifthThird-McHugh-005354** 50:8
**FifthThird-McHugh-Minutes-000517** 34:22
**FifthThird-McHugh-Minutes-000518** 74:25
**FifthThird-McHugh-Minutes-00518** 82:5
**figure** 63:23
**filing** 45:20
**finances** 19:15
**Financial** 13:20, 25 41:10, 23 43:1, 11 53:11
**finish** 7:6, 7 31:9
**firm** 35:9 87:19
**first** 6:5, 24 10:14 11:2 14:4 15:14, 15 16:1, 3, 5, 23 17:2 20:15, 17 22:6 32:18 33:19 34:2 42:16 43:21 45:24 47:8 54:2 56:6, 17 62:12 71:1, 16 74:25 78:6, 21 82:7 87:8
**fit** 54:19 56:20 73:21
**flags** 75:16, 23 76:3, 24
**focused** 63:7
**Focuses** 63:4
**follow** 64:18 72:2 84:23
**followership** 71:3 75:4
**FOLLOWING** 4:3, 11 29:7 59:20
**follows** 6:7
**Follow-up** 49:4
**foregoing** 87:10
**forgot** 18:10
**form** 10:24 30:18 44:14
**former** 8:14, 18, 22, 25
**formulate** 69:7
**forth** 31:20 70:2
**forward** 63:7 66:22 74:5
**forward-thinking** 56:23
**four** 37:13 47:18 73:22
**frame** 21:13 45:11
**fresh** 67:6
**Friday** 5:2
**front** 72:5
**FTB** 66:12
**full** 6:10 24:20 38:10, 11 71:1 74:25 82:7
**fundamentally** 20:7
**Further** 3:5 57:24 74:18 85:1
**future** 68:21

**< G >**
**gain** 22:7 57:18
**Gamble** 12:9, 11, 16 13:1 73:20
**gathered** 61:7
**general** 36:24, 25 41:2
**generally** 9:14 19:23
**generation** 23:14
**genuine** 66:18
**getting** 23:20
**give** 7:6 36:21, 25 49:25 78:2 80:10, 12
**given** 87:11
**gives** 65:1
**giving** 87:6
**glass** 50:4
**glasses** 74:5
**go** 6:22 11:3 22:11 30:7 32:10 33:16 38:3, 4 42:6, 7 52:2 54:4 55:16 56:4 58:5 59:24 60:7 61:5 65:19, 24 66:1 71:22 73:14 76:22 77:15 78:3, 5 79:1 80:11 81:4 82:4, 7
**goals** 43:2, 11 55:2
**God** 26:5

**goes** 17:21 23:22 79:13
**going** 6:22 7:25 9:11, 17, 23 13:10 19:1 22:22 28:6 29:24 32:15 33:19 34:24 41:22 45:23 51:2 53:10 59:11 64:20, 24 65:3 72:1, 4, 8 78:21
**good** 7:1 35:8 37:7, 15 43:12 48:6 53:8, 9 57:7, 8 62:16 64:21 66:11 67:9 68:6 69:5
**goods** 37:13 73:20
**gotten** 23:16
**govern** 19:11
**grasp** 66:14
**great** 37:7, 11 66:3, 8 67:10, 24 68:3, 19
**Greg** 14:12, 20 21:7 48:13 49:2
**ground** 6:23
**group** 75:25
**grow** 67:12 84:15, 19
**guess** 19:9 27:19 47:16
**guide** 19:12 20:2
**guiding** 68:24
**guy** 67:25

< H >
**half** 12:23 24:14 30:10, 25 32:2, 21, 25 36:10 38:9 46:19 47:17, 18 73:23
**Hamilton** 87:22
**hand** 57:14 66:9 87:22
**handed** 9:5 28:2 33:10 49:23 52:14
**Handing** 47:4 55:4
**handle** 64:19, 25
**handles** 63:2
**Handling** 62:25
**Hang** 81:23
**happen** 49:12
**happened** 45:20 76:22
**hard** 45:2
**Hart** 2:11 5:17
**HCCC** 17:10, 24 18:18
**head** 7:2
**heading** 34:25
**hear** 69:17 73:20 76:1
**heard** 17:2 37:8 58:11, 18 72:10 74:8 75:25
**held** 12:15
**help** 19:12, 20 20:1, 2, 8 29:23
**helped** 31:4
**helps** 31:14 33:18
**hereinafter** 6:6
**hereof** 88:13
**hereunto** 87:21
**high** 24:2 57:6
**higher** 41:19
**highly** 58:22
**Hoffman** 60:12
**holds** 57:6
**holes** 72:19
**hone** 57:24
**hour** 38:12
**House** 42:10
**huge** 73:24
**Human** 17:14 66:18

< I >
**ideas** 57:16 66:6, 22 81:7
**identification** 9:3 27:24 33:4 47:2 48:20 49:21 52:11 55:8
**identified** 22:20 23:4 26:24 33:23 71:4, 6 75:5, 7
**identifying** 41:22
**impact** 57:3 68:19 69:2
**imperfect** 68:15
**important** 64:12
**impress** 42:10, 13
**impressed** 38:17, 20, 22
**impressive** 67:22, 25
**improper** 9:22
**include** 30:19
**included** 46:2 54:23, 25 55:2 65:21
**includes** 13:6 61:16
**including** 10:24 11:12, 18 46:5 69:9, 22
**income** 43:17
**incredible** 66:15, 22
**incredibly** 58:14 74:2
**independent** 35:22 70:14, 15 72:7
**in-depth** 37:9 55:23 79:1
**indicate** 78:16
**indicated** 88:12
**indicates** 75:3
**indication** 47:11 49:7
**indifferent** 43:13
**individual** 57:13
**individually** 5:19
**industry** 60:1 63:25
**influence** 64:7 69:9 71:20 72:13 73:13
**info** 68:15
**inform** 29:23
**information** 10:22 12:18 63:25
**informed** 22:25 23:2 26:3 29:19 30:16 31:16 32:8, 12
**inherent** 57:21
**innovative** 56:25 66:20
**input** 54:14 61:13
**inquired** 71:6 73:4
**inquiries** 11:1
**insightful** 57:25 68:3, 9
**instruct** 8:1
**instructed** 8:7
**instruction** 9:18
**instructions** 7:16, 17 10:19
**instrumental** 68:24
**Intellect** 63:13, 22
**intellectually** 68:10
**intelligence** 67:13
**intelligent** 64:24 66:16
**interaction** 38:1 65:7, 8
**interest** 87:17
**interests** 19:20
**internally** 79:11
**International** 35:10 54:12 59:19 71:9, 14 73:8, 11 83:8
**International's** 54:18
**interview** 14:11, 15 15:4 40:4 54:13
**interviewed** 14:4, 9, 12 22:4 39:16, 19, 23, 25 59:2, 19 60:10, 16 83:16
**interviews** 14:20 40:2 48:8 54:15 71:4 75:6
**intimidating--he** 64:2
**introduce** 5:10
**Invest** 77:24
**involved** 20:15
**involvement** 20:12
**irrelevant** 45:19
**issue** 9:17 68:15 78:15
**issues** 62:22
**items** 49:5 53:14
**its** 57:11

< J >
**Jackson** 1:20 87:4
**Jamie** 60:19
**January** 1:14 5:3 12:14 14:1 88:2
**Jms@sspfirm.com** 2:7
**job** 18:25 20:6 72:8, 21
**jobs** 72:20
**joined** 22:15
**Joint** 5:20
**Josh** 85:3
**Joshua** 2:1 5:12
**Jude** 60:20

**July** 14:4, 6 22:3

< K >
**keep** 63:25 71:10 73:25 76:9
**Kevin** 60:19
**key** 59:8
**Kidd** 60:12
**kind** 26:6 38:19 41:17 50:11 59:5 66:18 69:15, 18 72:5, 8 74:4 76:10, 23 79:13
**kinds** 19:15
**knew** 58:23, 24
**know** 10:5 16:4, 7, 8, 16, 17 17:1 19:14, 17 21:13 23:1, 10, 12, 13, 14, 15 24:2, 9 25:12, 14 26:12 27:4, 13 28:14 30:4 32:8 35:17 36:4, 5, 6, 15 37:14, 15 38:7, 8, 18, 21 40:9 41:2 42:19 43:5, 8 44:3, 23 45:1, 2, 3, 21, 22 59:5, 7 61:8 62:19 64:19, 20, 22 65:1, 2, 4 70:7, 12, 13 72:4, 16, 18 73:22, 25 74:4, 11 75:9, 14, 18, 23 76:18 79:7, 13 80:10 82:14, 15, 20, 21 83:21 84:22
**knowledge** 20:1 63:13, 15 66:9 68:12
**knows** 57:7 63:6, 8 64:23 66:24

< L >
**L.P.A** 2:5
**labeled** 51:3 77:7
**Lack** 77:17 78:16
**large** 71:8 73:6
**Lars** 60:18
**Lastly** 55:1
**Lavender** 60:19
**lawful** 6:5
**lawmaker** 42:7
**lawmakers** 79:12
**laws** 19:17
**lawsuit** 45:21
**lawyers** 6:1 8:2
**lead** 64:15 84:22
**leader** 57:9 67:10 68:1
**leaders** 23:14
**leadership** 54:10, 20, 23 56:20 57:12
**learn** 25:11 63:22
**learner** 57:23
**learning** 78:14
**Legal** 6:1
**legendary** 37:14 53:8
**lens** 67:8
**Leonard** 60:19
**letters** 47:11
**level** 41:19 63:19 66:16 69:17
**levers** 57:3
**lightly** 38:23
**limit** 7:12
**limited** 10:25 32:10
**LINDA** 1:14 3:3 5:5 6:4, 12 86:3 87:7 88:19 89:24 90:24
**line** 57:4
**lines** 43:4 69:7
**list** 61:13 79:13
**listed** 49:8 60:11 61:8 69:18
**listening** 37:5
**litigation** 87:15, 18
**little** 63:21
**LLP** 2:12
**long** 12:20, 25 13:24 17:17 38:5 42:23
**look** 41:16 53:25 55:10 59:15, 17 68:8, 21 75:23 76:20, 21 82:25
**looked** 23:16 31:4 35:5 51:6
**looking** 19:5 21:1 22:1, 13 23:13 34:16 45:2 50:10 62:11 66:22 67:12 74:4
**looks** 55:22 79:8
**lot** 38:20, 21 42:18, 21 59:9 68:15 70:4 76:11 84:17
**lots** 37:11

< M >
**Ma'am** 6:10
**magnifying** 50:4
**mail** 10:23
**maker** 57:5
**making** 83:20
**manage** 57:21
**managed** 43:18
**management** 19:13, 21 20:2 25:9 33:20 34:4 35:1, 3 45:25 46:2 49:5 70:9
**manner** 57:16 81:2, 6
**March** 6:18
**mark** 55:5
**MARKED** 3:5 4:13 9:2, 6 27:23 28:3 33:3 47:1 48:19 49:20, 24 52:10 55:5, 7
**Marsha** 14:13, 22
**material** 57:3
**materials** 43:25 46:2
**matter** 18:23 49:3 88:8
**Matters** 63:4, 6
**MCHUGH** 1:6 2:18 5:6, 13, 15 8:21 11:11 16:20, 22 17:1 25:3 50:16 60:19 65:21 69:9, 22 75:24 88:3
**mean** 10:20 16:7, 12 20:23 23:1 28:22 29:20 30:24, 25 34:1 36:14 39:24 41:9 44:6, 9, 10 46:13, 20 49:12 70:22 72:5 75:9 77:11 83:16 84:16
**means** 25:17
**media** 79:11
**meet** 15:14, 16 16:1, 22 25:4 40:11 42:7
**meeting** 14:5 15:19 16:5, 15 24:21 25:18, 21, 24, 25 26:3, 10 27:12 30:3, 9, 12, 14, 15, 20, 22, 24 31:15 32:10, 11, 17, 18, 22, 23 33:13 35:20, 23 38:6 39:18, 22 40:11 43:6, 7, 9, 15, 21 46:3 48:12, 15, 16 49:3 50:15 52:24 56:1 58:3 60:5 62:6 64:5 72:11 74:24 75:8
**meetings** 24:19 27:8 39:11 40:10, 15 43:3, 24
**Melissa** 60:13
**member** 49:7 58:15
**members** 8:14, 18, 22 37:22 38:25 52:23 65:6, 9, 10 72:13, 15
**memory** 31:19
**mention** 11:24
**mentioned** 25:2, 3 53:14
**mentions** 10:16
**message** 10:24 15:5 24:2 57:15
**messing** 73:18
**Met** 7:22 14:20, 22 15:2 16:19 17:2 25:2, 3, 4 39:7, 8, 15, 19 40:9
**mic** 73:18
**Michael** 2:8 5:16
**Michael.cioffi@blankrome.com** 2:15
**middle** 80:25
**Mike** 60:11
**mine** 36:13
**minute** 36:17 50:1
**minutes** 30:4, 5 31:20, 21, 22 32:3, 5 33:2, 12, 24 34:3 38:12 42:9, 10, 22 43:25 45:24 53:25 55:13, 15, 25 74:23 81:20
**missing** 34:12 70:13 82:25

**months** 12:24 42:8 44:11 45:6, 8 70:7
**morning's** 49:5
**motivate** 64:16
**motivating** 64:19
**multiple** 14:15, 16

< N >
**name** 6:11 16:16 17:2 35:13 49:8
**named** 87:7
**narrowed** 23:8
**National** 13:7 33:13
**nature** 32:3
**necessarily** 84:14, 16
**necessary** 41:18
**need** 6:24 7:12 19:21 20:10 33:14 34:9 62:22 72:4 84:15
**needed** 20:5 62:17 69:2
**needs** 63:23 77:19 78:4, 7
**negative** 70:20
**negotiations** 10:25
**neither** 87:14
**never** 41:16 47:14 80:4
**new** 21:9 67:7 84:19, 20
**Nick** 14:13, 25
**Niehaus** 60:12
**nine** 12:24
**No._____Change** 89:2, 5, 8, 11, 14, 17, 20 90:2, 5, 8, 11, 14, 17, 20
**No._____Line** 89:2, 5, 8, 11, 14, 17, 20 90:2, 5, 8, 11, 14, 17, 20
**nodding** 7:2
**Notaries** 1:23
**notary** 87:5
**note** 10:18
**noted** 54:18
**Notice** 1:14 9:10
**notices** 11:1
**Notwithstanding** 6:25
**number** 10:12, 17 11:25 44:11
**numbered** 56:11 62:2
**numbers** 34:21

< O >
**oath** 88:15
**object** 19:2
**Objection** 7:25 9:16 18:22 21:12 29:25 30:18 31:13, 17 32:14 44:14, 20 45:10, 18 55:16 56:4 58:5 59:24 60:7 61:5 62:9 65:24 69:12, 24 71:22 72:14 73:14 74:16 79:17 83:10 84:12
**objective** 56:24
**objectives** 57:19
**obtained** 11:23
**obviously** 28:22
**offer** 88:14
**office** 87:22
**Officer** 10:15 12:18, 19 15:13 46:7 54:21 56:21
**officers** 69:2
**official** 29:11 87:22
**Oh** 16:10 34:13 61:20, 23
**OHIO** 1:2, 20, 23 2:6, 14 5:8 6:16 87:2, 6, 22
**Okay** 6:22 7:23 9:9 10:11 11:10 13:12 14:19 15:11 16:4, 19, 25 21:8, 22 24:11, 20, 23 25:1, 7, 10, 16 26:1, 20 28:16, 21 29:6, 14 30:13 33:2, 21 34:14, 17, 19, 23 35:14 36:23 38:14, 24 39:5, 12 40:3, 9, 17 41:4, 15 43:10, 16 44:25 45:16 46:21, 25 47:14, 20, 25 48:3, 11, 18 49:19 50:9, 14, 20, 22 51:8 52:18 53:17 55:24 56:12, 19 60:24 75:12 77:6 78:18 80:7 81:19, 23 82:3, 6, 23 83:5, 24
**onboarding** 15:18 16:2, 16 24:17, 18 25:2, 4, 6, 8, 15, 20 38:2, 5, 15 39:2, 9 40:13 42:15 52:25
**once** 53:11
**one-dimensional** 76:25
**ones** 53:9
**ongoing** 58:1
**on--if** 63:9
**online** 54:11
**open** 58:1 67:11
**operate** 19:11
**operations** 63:22
**opinion** 36:7, 20 37:1, 3, 4, 25 39:3 70:17 82:13
**opinions** 35:24 36:9
**opportunities** 68:23 77:8, 16 81:16 84:8, 11, 13, 18, 19
**opportunity** 37:6, 10 76:7 78:21, 23, 25 84:25
**opposed** 13:13 84:24
**opposite** 42:23 58:18
**optimization** 78:9
**oral** 10:22
**ORDER** 1:12 4:3, 11 24:9
**organization** 64:15 77:18 84:23
**organizational** 57:10
**originally** 83:25
**outside** 8:7 30:15 32:11, 22 35:9 40:11, 12, 18 66:25

< P >
**package** 67:17
**PAGE** 3:3 28:6, 25 29:7, 8 47:8 50:10 54:2 56:9 59:15, 16, 17 60:23 61:25 68:17 70:25 77:10, 11 82:4 89:2, 5, 8, 11, 14, 17, 20 90:2, 5, 8, 11, 14, 17, 20
**PAGES** 4:3, 5, 6, 7, 8 33:20 34:3 87:10
**pair** 67:6
**Pamela** 1:20 87:4
**Paragraph** 10:19 45:24 54:2, 5 55:12 71:1 73:3 75:1 80:25 82:8
**paragraphs** 56:17
**part** 15:17 16:2 23:25 24:5 26:9, 13 27:13 50:18 58:2 59:1, 20 60:10, 16 75:24 79:18
**participated** 74:8
**particular** 12:21 19:11 20:20 21:23 26:4 30:6 36:19 43:6, 9 61:4 72:11 73:2, 21
**particularly** 38:19
**parties** 87:15
**party** 9:21
**passionate** 57:15
**Patterson** 2:5
**Peer** 65:16 66:2 70:3 71:4 75:5 77:7
**peers** 54:16 59:7 60:15, 18 61:10, 18, 19, 24 62:7 65:20, 21 67:19 69:8, 15, 18, 21 71:18 72:13 75:22, 23 81:14 83:12
**PENALTY** 88:5, 6
**people** 38:20, 21 59:9, 10, 20 61:8, 12 63:19 64:16, 17 65:1, 2 66:21 67:20, 21 72:2, 4, 17 76:13 78:2 83:15 84:22
**perception** 41:25 70:7, 10
**perform** 65:4
**performance** 40:20 43:1, 11 57:7 62:19, 22

**PERJURY** 88:5, 6
**perseveres** 57:19
**person** 10:23 14:16 26:4 42:11 59:10, 12 72:21 74:1 76:15
**Personal** 77:25
**personality** 54:10
**personally** 5:20
**person's** 59:6
**perspective** 41:25 58:20 67:4 68:19
**perspectives** 35:24
**Peter** 60:12
**Phenise** 2:18 5:24
**phenomenal** 74:6
**Phil** 5:13, 15 8:21 16:20, 22 17:1 25:3 50:16 60:19
**PHILIP** 1:6 2:18 5:6, 13 11:11 88:3
**Phone** 2:7, 14
**pick** 20:8
**Place** 1:14 12:7 34:16 44:4 57:20 87:12
**places** 75:22
**Plaintiff** 1:7, 14 2:1 5:13, 15
**plan** 21:8 25:23
**planning** 46:5 48:14
**plans** 22:8
**please** 6:3, 11 7:9 10:8 28:12 51:15 55:6, 11 71:24 73:16
**plus** 24:18
**PNC** 2:13
**point** 20:11 22:7 23:11, 16, 18, 20 27:11 49:6 59:11 70:11 72:11 78:6, 11, 19 81:17
**points** 77:9
**poking** 72:19
**Poole** 2:18 5:24
**portfolios** 69:5
**portion** 29:1 34:3 35:4
**position** 12:15 40:1 51:20 57:22
**positions** 68:22
**positive** 36:3 58:15, 16
**Possesses** 63:13 68:12
**possession** 11:8, 13, 19 12:2
**possible** 46:6
**possibly** 47:16
**potential** 21:2 22:22 71:7 73:5
**potentially** 50:16
**powerful** 74:2
**pre-orientation** 17:5
**preparation** 8:10
**prepare** 7:20
**Present** 2:17 66:8 79:15
**presentation** 35:8, 14, 18, 23 37:21 38:24 48:5, 9, 10 52:22 58:25 73:1 79:19
**presentations** 43:4
**presented** 46:1 58:3 60:4 76:4 79:21, 23, 25 80:16, 18
**presents** 62:23
**President** 21:14, 19 22:13 27:2, 10 29:5, 12, 18 30:17 35:6 40:7 41:7, 23, 24 44:1, 5, 12 45:6 46:7 47:22 51:1, 9, 11, 22, 23 52:20 54:20 64:7 71:7, 13 73:6, 10 74:9, 15 82:10 84:1
**President/CEO** 23:15
**Pressure** 63:1, 2, 3 64:20
**pretty** 42:14
**Prior** 14:19 15:3 16:5, 11, 13, 14 17:2 18:4 29:17 41:6 43:20, 24 46:4, 10 48:11, 15, 16 50:25 51:8, 12, 17 52:21 87:6
**priorities** 63:10
**privilege** 8:4, 5
**probably** 26:18 27:18 36:14
**problem** 17:12 54:10 68:3 79:10
**process** 21:3 22:13, 14, 17, 20, 23 23:6, 7 26:16 27:13 41:13, 22 54:9, 13 59:20, 22 60:3, 10, 16 68:16 70:11 74:14
**Procter** 12:9, 10, 16 13:1 73:20
**product** 8:5
**Production** 9:11 10:13
**Professional** 15:22
**Profile** 51:3 52:15
**projects** 57:15
**promote** 27:10 29:12 35:6 40:6 47:21
**promoted** 45:6, 7, 16
**promoting** 29:18 30:16 31:5 39:6, 15 41:6 44:1, 5
**promotion** 44:12 50:17
**proof** 73:23
**properly** 9:20
**protect** 19:19
**protected** 8:3
**PROTECTIVE** 1:12 4:3, 11
**provide** 19:20
**provided** 46:3
**Provides** 62:14
**public** 71:8 73:7 87:5
**Public-State** 1:23
**purposes** 44:19
**Pursuant** 1:14 5:20
**pushes** 57:23
**put** 51:3
**putting** 83:19

**< Q >**
**qualifications** 36:6
**qualified** 87:4
**quartile** 71:12 73:9, 21 81:22 82:9, 13
**question** 7:6, 8, 9 16:25 21:17 22:11 23:21 30:19 32:15, 16 33:15 34:1 44:7, 15, 17 45:4, 14 49:16 51:14 72:24 80:15 83:1, 4
**Questionable** 77:22
**questions** 7:15, 18 9:24 26:15, 22 31:18 33:19 53:18, 20 74:19 76:23 84:4 85:2
**question's** 32:7
**quick** 64:24
**quickly** 68:14, 16

**< R >**
**raised** 72:12
**range** 76:19
**Rating** 54:25
**Ratings** 54:23
**reached** 48:13
**reaction** 58:13, 14
**read** 10:4, 12, 14 28:10 33:14 47:7 54:4 55:12 56:16, 17 62:13 65:19 70:25 74:23 77:15 78:5 79:24 80:23 81:4, 17 88:7, 9
**reading** 28:13 34:6 71:10
**reaffirming** 73:24
**real-life** 66:15
**really** 20:3 23:18, 22 31:2 32:8 34:2 36:3 37:7 38:17 42:22 45:4 48:6 53:8 59:12 65:2 67:16 79:1
**reask** 21:23
**Reason** 89:4, 7, 10, 13, 16, 19, 22 90:4, 7, 10, 13, 16, 19, 22
**recall** 26:11 27:1, 5 28:13 36:2, 8, 12, 18 38:14 39:4 43:10 46:9, 10, 17 47:6, 15, 18, 20 48:1, 12, 17 49:9, 17, 18 50:2, 3, 13, 14, 18, 21 51:5, 7 58:17, 21 59:4 63:16

70:4 76:7 79:22, 23 80:3, 16
**received** 11:23 54:15
**recess** 52:4
**recognize** 28:25
**recollection** 28:17 35:4 50:11, 23 75:8
**reconvened** 52:6
**record** 5:2 6:11 34:18 52:3, 9 54:5 56:16 85:6
**record's** 21:15
**red** 75:15, 23 76:3, 24
**reduce** 78:7
**refer** 11:23 13:11
**reference** 55:12
**REFERENCED** 3:5 4:13
**referencing** 81:21
**referring** 24:21 25:15 83:18
**refers** 10:16
**reflect** 55:14
**reflected** 30:4 55:25
**refresh** 28:17 35:4 50:11
**regard** 16:7
**regarding** 8:14 39:25 57:25
**regulate** 19:16
**regulations** 19:17
**regulator** 27:14
**regulators** 19:17 79:12
**relate** 11:24 66:15
**related** 46:4, 6 71:3, 7 73:5 75:4 83:1
**relates** 10:17
**relationship** 15:21 55:19
**Relationships** 77:25
**relative** 43:2, 11 87:14, 16
**relied** 35:5, 15 52:22
**remain** 63:7
**remains** 58:1 63:3 64:2
**remember** 17:10 24:6, 8, 10 26:11, 19 27:6, 17, 21 30:10 31:7 32:1 35:7 37:5, 19, 20 38:17 43:9, 14 44:2 48:9 49:11, 14 70:16 72:16, 17 75:13 79:25 80:17
**remembers** 63:17
**reminded** 46:10, 11
**reminding** 46:4
**Remington** 6:15
**repeat** 7:9 51:14
**rephrase** 7:10
**report** 54:17, 24 55:1, 3, 23 59:10 83:9, 19
**reported** 60:16 71:18
**reporter** 6:3 7:1 33:7 48:22
**reporting** 87:18
**reports** 39:16 40:4, 10 54:16 59:7 60:9 61:9, 16, 18 63:9 64:5, 6, 12
**represent** 5:11, 18 9:9 48:25
**Representation** 5:20
**Representative** 42:11
**representing** 5:22
**Request** 9:10 11:2, 10, 14, 22 12:3
**requests** 10:12 11:1, 5, 16 12:1
**require** 27:14
**required** 57:13
**resistance** 57:17 81:8
**resolution** 50:25 51:9, 18 52:20 53:2
**respect** 8:2 18:23 59:13
**responded** 71:5, 11, 19 73:8 75:6 82:8
**response** 73:12
**responses** 11:1
**responsibilities** 19:4, 6, 7
**responsibility** 19:9, 14 20:4, 7
**responsive** 11:4, 13 12:3
**result** 48:7 87:17
**results** 43:8
**retain** 63:24
**retire** 12:10
**retirement** 12:13
**review** 7:23 8:6, 7 41:4 43:20, 24 50:1 55:24 56:1 59:5
**reviewed** 29:17, 20, 21 30:14 31:3, 21 35:5 40:19, 22 50:12 51:2, 5 54:8, 17, 22 55:2
**Reviewing** 10:9 11:2 12:1 28:15, 16 33:17 34:13 35:3
**reviews** 40:20
**revising** 83:20
**RHR** 35:10 37:21 38:24 47:12 51:5 52:22 54:12, 18 55:14 59:19 70:20 71:9, 14 72:25 73:8, 11 79:15 83:8, 25
**Right** 13:14, 16 20:5, 9 23:7, 11, 17 24:17 25:18, 23 33:6 36:5 47:12 49:13 61:11 62:3 63:9 64:16 65:15, 22 70:24 76:5 77:6 79:16 80:5, 25 82:19, 21
**rights** 19:22 59:8
**rise** 67:23
**Risk** 15:12 18:5, 16, 17 50:16
**Road** 6:15
**Robert** 15:9, 14
**robust** 32:24 72:18
**role** 12:20, 21 17:8
**Rome** 2:12 5:17, 25
**root** 68:14
**Rule** 87:20
**rules** 6:23
**run** 9:11

< S >
**Saba** 2:5
**Saema** 49:8
**save** 33:18 88:10
**saw** 61:12, 14
**saying** 13:13 26:12
**says** 24:2 56:13 60:25 73:4 78:25 81:1
**Schramm** 60:20
**scope** 45:19
**scores** 41:17
**seal** 87:22
**Second** 7:4 49:6 59:15 77:10 78:3, 10 80:25 82:4
**section** 61:4, 22
**see** 9:12 34:22 41:19 42:25 43:16 56:13 61:1 65:17 79:7, 8 81:1
**seeing** 35:11 47:15
**seeks** 11:10, 22
**seen** 9:7 28:3, 14, 17, 19 47:4 50:12 52:16 67:5, 7 73:23 80:4
**selected** 21:2 22:15, 19
**selecting** 20:21 41:14 53:10
**selection** 20:16 21:14
**Senator** 42:11
**sentence** 81:5
**sentences** 71:1, 16 73:2
**separate** 61:21
**Separately** 14:17, 18
**September** 14:5 15:17 16:3, 24 20:17 22:6, 16 24:24 30:2 31:15 32:10, 17, 23 33:12 39:13 42:3 43:21 45:12 48:11 49:3 50:15 52:24 53:25 56:1 58:3 64:5 74:24
**serve** 13:18 17:7
**served** 9:20
**service** 9:22
**session** 35:21 39:1, 9 52:23
**set** 31:20 64:16 70:2 72:3 87:21

**Shaffer** 15:9, 15, 21 45:25 46:3, 9 48:13 49:1, 4
**share** 20:1 31:22
**shared** 36:7
**shareholder** 81:13
**shareholders** 19:20
**sharing** 36:9
**Sharpe** 2:4 5:14
**Shawn** 60:12
**SHEET** 88:1, 13 89:1 90:1
**sheets** 43:17
**short** 42:3
**show** 30:5 32:6
**showed** 8:3
**showstopper** 79:5, 7, 9
**Shroat** 60:13
**sic** 42:17
**signature** 29:6
**SIGNATURE:__________________________DATE** 89:23 90:23
**signed** 28:23 88:16
**Similar** 16:25
**simplify** 31:14
**simply** 76:17
**single** 58:15 80:11
**situations** 64:25
**skills** 57:24 62:15
**slide** 80:11
**smart** 63:18 64:1, 25
**Smith** 2:1 3:4, 5 5:12 6:9 9:4 10:1 28:1 33:2, 8, 9, 25 47:3 48:23 49:22 52:2, 12 53:17 55:16 56:4 58:5 59:24 60:7 61:5 62:9 65:24 69:12, 24 71:22 72:14 73:14 74:16, 21 84:3, 12 85:4
**solutions** 56:25
**Solver** 68:3
**solving** 54:11
**somebody** 42:11, 14, 19 76:8
**sorry** 21:22 28:8 34:14 45:15 51:14 73:18 77:3 81:13, 24 82:24
**sort** 23:12 26:12 42:19 44:16 64:9
**SOUTHERN** 1:2 5:8
**speak** 8:13 42:20 78:8
**speaker** 57:14
**speaking** 7:5
**specific** 39:4 75:10
**specifically** 19:5 54:22 71:17 74:24 82:15
**specifics** 36:21, 25 42:25 43:14 46:13
**Spence** 11:17, 19 15:24 16:1, 5 17:1 25:3 26:24 27:1, 10 29:12, 18 30:17 31:6 35:6 38:6, 16 39:1, 6, 7, 15 40:1 43:18 44:1, 5 45:5, 16 46:6 47:9, 21 51:1, 4, 9, 18 52:20, 25 54:9, 14, 17, 19 55:2 56:20 64:13 69:10 71:3, 12, 20 72:12 73:9, 13 74:15 75:5 81:21 82:9
**Spence's** 40:20, 23 41:5 43:1, 11 50:17 54:16, 24 69:23 71:6 73:5
**spend** 78:14
**spent** 69:4
**spoke** 29:22 31:4 58:15
**SS** 87:2
**stage** 20:20, 22 22:17
**Stagnaro** 2:5
**stakeholder** 54:14, 25 61:1, 16 62:12 64:4 81:13
**stakeholders** 59:8 62:7 64:6, 12 65:12 83:11
**Stamped** 49:24
**stand** 17:11 62:20 65:1, 3
**standard** 60:2
**standards** 57:7
**standpoint** 67:4
**stands** 67:16
**start** 21:5 25:1
**started** 18:13, 18
**starts** 54:6 81:1 82:8
**state** 5:11 6:10 87:2, 5
**stated** 9:19
**statements** 10:25 43:17
**STATES** 1:1 5:7 45:25 47:7
**stenotypy** 87:13
**Stevens** 60:13
**stood** 52:4
**stop** 59:21 71:15 81:9
**story** 66:13
**storyteller--he's** 66:11
**strains** 57:21
**strategic** 56:23 66:16 69:5
**strategies** 57:19, 20 69:7
**strategy** 43:7 64:17 68:19, 25 69:1
**Street** 1:20 2:13
**strengths** 36:5 57:25 61:1, 7, 14 62:12 65:16 66:2, 3 69:19, 23 70:2
**Stress** 62:25
**stresses** 57:21
**strong** 54:19 56:20 62:14 63:24 68:4
**Structure** 77:17
**structured** 54:13 57:5
**stuff** 80:17
**style** 54:10
**styled** 5:5
**SUBJECT** 1:12 4:3, 11 7:12 18:23 49:3
**subjective** 56:24
**subordinates** 39:17
**subparts** 11:3, 25
**substance** 79:20 80:1
**subtopics** 10:17
**success** 25:22
**successful** 20:10
**succession** 21:3 22:8 25:23 26:16 44:4, 19 46:5 48:14 49:8, 10
**successor** 46:7 71:8, 13 73:6, 10 74:9 82:12
**successors** 22:13
**succinct** 78:12
**Succinctly** 77:20 78:5
**suggestions** 83:20
**suggests** 64:23
**Summary** 47:9 55:21 56:14, 18, 19 80:12, 24 81:13
**super** 50:6
**supervision** 87:14
**supplemented** 58:23
**support** 19:21 71:3 72:2, 12 75:4
**supported** 70:10
**supportive** 58:22
**sure** 6:23 7:3, 4 10:12 16:6 17:20 19:4, 14 20:4, 6, 8, 25 21:15, 24 22:23 26:18 28:11 34:11 36:16 44:9 70:12 72:21 75:15
**Surveys** 40:23 41:5
**Susan** 60:21
**suspect** 78:23, 24
**swear** 6:3
**switched** 18:18
**sworn** 6:6 87:8

**< T >**
**take** 5:4 27:9 38:18 42:22 68:23
**Taken** 1:14 6:20 33:12 87:12 88:2, 8
**Talent** 33:20 34:4 35:1, 3 38:19 42:20 45:25 46:2 49:5 76:10 77:22

**talk** 28:10 30:6, 11 31:23 38:20 43:7 49:7 59:6, 7
**talked** 30:1, 8 32:24 38:21 39:9 43:5 51:23 59:3 61:9 83:11
**talking** 45:12 70:8 75:14
**talks** 59:6
**Tayfun** 60:20
**team** 25:9 63:11 67:8 68:23 69:6 70:9
**technical** 68:13
**Technology** 18:9, 11, 13 68:5
**teeny** 50:4
**telecopy** 10:23
**telephone** 10:23
**tell** 23:23 26:4 30:9 32:20, 25 36:1, 8, 11, 13 37:16, 17 38:8, 12, 13 42:17 46:22 53:4 63:11
**telling** 66:12
**term** 21:12
**terms** 8:9 19:3, 21, 22 25:22 42:20 44:4, 11 45:5 53:6 59:12 61:14 70:17 79:1
**test** 7:14 31:19
**testified** 32:1 80:3
**testify** 87:8
**TESTIMONY** 1:12 4:3 32:5 52:22 87:11
**text** 10:23 15:5
**Thank** 10:7, 9, 10 28:15
**thing** 41:17 64:21 84:14, 17
**things** 19:15 23:14 35:24 64:9 67:1 69:16, 18 76:8, 9, 17, 19, 20, 21 79:3, 4 80:9
**think** 37:10 45:3 67:24 68:1 77:13
**thinker** 56:23 68:3
**thinking** 54:11 64:10 67:7 72:25 78:16
**thinks** 66:25
**THIRD** 1:9, 14 2:18, 19 5:6 8:14, 25 10:16 13:4, 6, 7, 11, 17 14:3 15:24 17:8 18:21 19:8 20:13, 16, 20 27:2 33:13 44:19 47:10 51:1, 4 52:21 54:21 56:22 66:12 78:13 81:17 83:8 84:9 88:4
**third-party** 9:21
**Third's** 5:25
**Thomas** 2:19 5:23
**thorough** 57:4 72:18
**thought** 36:4 75:25
**thoughtful** 57:4
**three** 15:3, 5 24:14 30:10, 25 31:18 32:2, 21, 25 36:10 38:9 46:19 47:17 63:10 71:1 83:25
**Tim** 15:24 16:1, 5 17:1 25:3 26:24 27:1, 10 29:12, 18 30:17 31:6 35:6 36:4 38:6, 16 39:1, 6, 7, 15 40:1, 4, 20, 23 41:5 42:14 43:1, 11, 18 44:1, 5 45:5, 16 47:9, 21 50:17 51:1, 4, 9, 18 52:20, 25 56:20 57:23 58:16 69:3 74:15
**Time** 1:14 5:3 7:5, 13 8:19 13:15 17:21 18:2, 10, 13, 18 20:9, 12, 21 21:5, 6, 13, 24 22:2 27:3 33:18 39:5, 14 42:1, 4 44:3 45:11 46:12 52:9 53:11 69:4 77:24 78:2, 14 79:4, 8 85:6 87:11
**timeline** 44:4, 6, 8, 10, 18 45:5, 11 50:11
**times** 39:6 42:18 59:9
**Timothy** 11:17, 19
**tiny** 50:4, 6
**title** 12:17
**Today** 5:2, 4 8:11, 15 9:13, 15 10:3
**today's** 7:21
**told** 35:12 82:24
**tone** 36:25
**tools** 54:11
**top** 47:12 60:25 63:10 67:23 71:12 72:1 73:9, 21 74:1 81:22 82:9, 13
**topic** 30:2, 6 66:9
**topics** 68:11
**totally** 70:15
**transcribed** 87:13
**TRANSCRIPT** 1:12 87:11 88:7
**transfer** 10:21
**transition** 21:9
**trends** 63:25
**true** 33:11, 23 87:10 88:10
**truth** 87:9, 10
**try** 44:22
**trying** 21:3 31:3 32:8 72:3 83:1
**turn** 56:9 65:15
**turned** 74:5
**Turning** 61:15
**Tuzun** 60:20
**twice** 41:11, 14 53:11, 12
**Two** 12:23 33:19 34:2 55:13, 20 56:17 71:16 73:2
**two-hour** 7:12
**typical** 60:1

< U >

**Uh-huh** 12:22 13:21 17:23 18:7 23:9 24:4 25:13, 19 26:8, 14 27:15, 20 32:19 35:19 37:23 39:10 40:14 50:24 51:13, 25 54:3, 7 56:8 61:2 65:18 75:2, 17, 20 76:2 77:12 81:3 82:11
**uh-huhs** 7:2
**ultimately** 22:14
**Unanimous** 29:4 58:17
**undermines** 78:16
**understand** 7:9, 16, 19 13:12 16:6 19:5 21:4, 17 24:15 31:3 32:8 43:21 45:14 76:16 79:6
**Understanding** 15:2 18:20, 24 22:7 42:21 52:21 61:3 68:7 88:13
**unh-unhs** 7:2
**unicorn** 76:11
**unique--he** 67:22
**UNITED** 1:1 5:7
**unusual** 80:13
**Update** 46:2 49:5
**use** 38:22 67:1 68:4
**usually** 25:8 35:17, 20 43:7 80:9
**utilized** 54:9, 12

< V >

**vague** 18:22 44:20
**validated** 70:18
**values-based** 57:9
**variety** 68:11
**verbalized** 6:25
**versus** 5:6 78:9
**vet** 70:12
**vetting** 22:23 79:1
**Videographer** 1:23 5:1 6:2 7:1 52:8 85:3, 5
**videotape** 5:2
**Videotaped** 1:14
**view** 59:11 68:7 70:14
**vis-a-vis** 70:2
**vision** 66:11
**voice** 26:5 37:1
**voiced** 36:20
**vote** 27:9 29:11, 23, 24 30:16 31:5 32:9

35:6 39:6, 14 47:22 52:19 53:2 64:7, 13 69:9 71:20 73:13
**voted** 29:14
**voting** 29:18 41:6 43:25 45:13 50:25 51:8, 12, 17
**vs** 1:8 88:4

< W >
**Wait** 81:23
**Walnut** 1:20
**want** 21:15 28:24 30:6 32:5 34:11 42:12 50:1 53:23 54:1 55:10 59:14 61:19 65:15 70:24 71:15 72:1 73:3 75:15 76:14 77:1 80:19, 24
**wanted** 10:18
**way** 9:16 20:20 21:11 41:22 66:8 67:7 73:22 74:14 78:24 80:8
**weakness** 84:16, 21, 24
**weaknesses** 57:25 84:11
**week** 15:18 16:3, 23, 24 17:2 20:17 22:7 24:1, 6, 17 27:16 39:13 40:16 42:15, 16, 17
**weeks** 27:18 42:9
**Well** 9:14 22:3 23:3, 21 24:13 25:5 31:2 38:1, 5 42:6 44:7 51:4, 23 62:23 63:2 65:4 76:12, 21 83:15 84:22
**well-being** 57:11
**well-rounded** 76:12
**We're** 5:4 23:20 70:13 85:5
**WESTERN** 1:3 5:8
**Weston** 60:14
**whatsoever** 70:15 74:14 87:17
**WHEREOF** 87:21
**wide** 76:18
**Williams** 14:13, 22
**withdraw** 33:25
**witness** 5:22 6:3, 5 8:1 9:18, 20, 22 34:7, 10 87:21
**wonderful** 68:1
**word** 73:25
**words** 10:20 38:22 75:10
**work** 8:4 57:6 79:3 82:17
**worked** 37:13 53:9 59:10
**working** 53:7 63:9 65:5 70:8 83:8, 13
**written** 10:22 29:4 32:4 59:18
**wrong** 34:16

< Y >
**Yeah** 10:6 13:9 17:12, 13 19:6 21:25 22:12 23:6, 7, 21 24:7, 15 27:22 28:9, 24 31:1 33:25 34:7, 10, 15, 23 35:2, 11, 13 36:3 49:15 50:22 51:16 54:7 61:20, 23 70:22 72:15 80:14 81:25 83:6
**years** 12:23 13:2 23:12 24:14 30:11, 25 32:2, 21 33:1 36:10 38:9, 21 44:11 45:7, 8 46:19 47:18 70:8 73:23 82:16
**yes/no** 7:3

< Z >
**Zaunbrecher** 60:21

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **PHILIP R. MCHUGH** | : | Case No. 1:21-cv-00238 |
| | : | |
| Plaintiff, | : | Judge Michael R. Barrett |
| | : | |
| v. | : | |
| | : | **NOTICE OF DEPOSITION OF** |
| **FIFTH THIRD BANCORP, ET AL.,** | : | **LINDA W. CLEMENT-HOLMES** |
| | : | **and** |
| Defendants. | : | **REQUEST FOR PRODUCTION OF** |
| | : | **DOCUMENTS** |

Please take notice that pursuant to Rule 30(b)(1) of the Federal Rules of Civil Procedure, Plaintiff Philip R. McHugh ("Plaintiff"), by and through counsel, will take the videotaped deposition of LINDA W. CLEMENT-HOLMES, a Director of Defendants Fifth Third Bancorp and Fifth Third Bank, N.A., on Monday, June 3, 2024, beginning at 2:30 p.m. at the Fifth Third Center, 511 Walnut Street, Cincinnati, OH 45202. Said deposition will be taken in the presence of a Notary Public or some officer authorizedby law to take depositions. The deposition will be stenographically and video recorded and shall continue from day to day until completed, and may be continued in progress as necessary in order to accommodate other scheduled director depositions in the same time frame. For clarification to defense counsel, this deposition will be taken as if on cross examination.

Plaintiffs are taking said deposition according to the Federal Rules of Civil Procedure and said deposition shall be used for any purpose contemplated by the Federal Rules of Civil Procedure. Plaintiff reserves the right to conduct such further depositions and discovery from Linda W. Clement-Holmes as may arise at a later date.

Pursuant to Fed. R. Civ. P. 30(b)(2), this notice is accompanied by a request to produce documents and tangible things under Rule 34.

EXHIBIT
1
PENGAD 800-631-6989

Respectfully submitted,

*/s/ Joshua M. Smith*
Peter A. Saba (0055535)
Joshua M. Smith (0092360)
STAGNARO, SABA
& PATTERSON CO., L.P.A.
2623 Erie Avenue
Cincinnati, Ohio 45208
(513) 533-2701
(513) 533-2711 (fax)
pas@sspfirm.com
jms@sspfirm.com

*/s/ John J. McHugh*
John J. McHugh, III
McHUGH & McCARTHY, LTD
5580 Monroe Street
Sylvania, Ohio 43560
(419) 885-3597
(419) 885-3861 (fax)

**Co-Counsel for Plaintiff Philip R. McHugh**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **PHILIP R. MCHUGH,** | : | Case No. 1:21-cv-00238 |
| | : | |
| Plaintiff, | : | Judge Michael R. Barrett |
| | : | |
| v. | : | |
| | : | **PLAINTIFF'S REQUEST FOR** |
| **FIFTH THIRD BANCORP, *et al.*,** | : | **PRODUCTION OF DOCUMENTS** |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |

Pursuant to Fed. R. Civ. P. 34, Plaintiff Philip R. McHugh ("Plaintiff") hereby submits the following Request for Production of Documents Directed to Defendants Fifth Third Bancorp, Fifth Third Bank N.A. (jointly "Fifth Third"), and their Director Linda W. Clement-Holmes. Plaintiff respectfully requests that Defendants provide responses to the offices of Stagnaro, Saba & Patterson Co., L.P.A., 2623 Erie Avenue, Cincinnati, Ohio 45208, **no later than thirty (30) days of the service of these Requests**.

Each of the following Requests for the Production of Documents shall be deemed continuing and Defendants and Director Linda W. Clement-Holmes are requested, pursuant to Rules 26(a) and 26(e) of the Federal Rules of Civil Procedure, to provide, by way of supplementary answers thereto, such additional information as may hereafter be obtained by the Defendants or persons acting on their behalf.

## INSTRUCTIONS AND DEFINITIONS

1. These discovery requests must be answered in accordance with the requirements in and policies of Civ.R. 1, Civ.R. 11, Civ.R. 26 through 37, and any other applicable laws or rules. These requirements and policies include but are not limited to: effecting just results by eliminating delay, unnecessary expense, and all other impediments to the administration of justice; encouraging parties

to fully and thoroughly prepare and investigate their cases for trial and/or settlement; fairly responding to the substance of discovery requests without obfuscation or unjustified objection; fostering openness, honesty, and professionalism in litigation; and seeking truth. Consistent with this instruction, discovery requests should not be considered vague or unanswerable due to any grammatical, syntactical, typographical, capitalization, or semantic errors or idiosyncrasies, and all responses should fairly meet the substance of the discovery request.

2. In answering these Requests for the Production of Documents, Defendants and their Director are to divulge all information in their possession, custody, or control, or which are available to them, including information in the control of its attorneys, investigators, employees, agents or other representatives, or any other person or persons acting on its behalf.

3. Should Defendants deem as objectionable party, but not all, of any request to which an objection is made, it should consider the various parts and aspects of such request as being severable for that purpose. If any information is claimed as privileged or protected, please include a log identifying the nature of the claimed privilege or protection and the information or items claimed to be privileged.

4. Unless otherwise indicated, the scope of the requests for production of documents is the time period of January 1, 2020 to December 31, 2020.

5. Unless indicated to the contrary, "You" and "Your" shall refer to Linda W. Clement-Holmes.

6. "Defendants" shall include Fifth Third Bancorp, Fifth Third Bank, N.A., Gregory Carmichael, and/or any person or entity acting on its or his behalf, including, but not limited to, officers, directors, attorneys, investigators, employees, agents, or other representatives.

7. "Director" shall include any individual who was a member of Defendants' Board of Directors during the scope of these requests.

8. "Officer" shall include any individual designated as an officer of Defendants during the scope of these requests, including, but not limited to, Defendant Gregory D. Carmichael, Robert Shaffer, or Timothy Spence.

9. "McHugh" or "Plaintiff" shall mean Plaintiff Philip R. McHugh.

10. "Document" or "documents" includes all written or graphic matter of every kind or description, however produced or reproduced, whether drafted or final, original or copy, signed or unsigned, and regardless of whether approved, sent, received, redrafted or executed, including but not limited to correspondence, letters, memorandum, summaries of conversations or telephone conversations, minutes or records of meetings, conferences or seminars, notebooks, diaries, desk calendar, contracts, agreements, preliminary and final reports, opinions or reports of consultants, projections, estimates, financial statements, bills, invoices, receipts, loan sheets, checks, checkbooks, purchase orders, change orders, confirmations, facsimiles, e-mails, text messages, telegrams, telexes, computer disks, digital or analog recordings, tape recordings, video recordings, photographs, drawings, charts, and plans. The term "document" means every document as above defined known to Defendant and in Defendant's possession, custody, or control or under the control of its agents, attorneys, employers, employees, or other persons related by total or partial common ownership and includes every such document which can be located or discovered by diligent effort.

11. "Document" also includes electronically stored information ("ESI"). Where possible, ESI should be produced in its native form, except that ESI which is only accessible through proprietary software that is not commonly available in office software suites should be produced in a readily accessible electronic form (such as PDF, Word or similar text document, or Excel or similar spreadsheet). By way of example only:

a. documents created using Microsoft Word must be produced as a .doc or .docx file;

b. documents created using Microsoft Excel must be produced as a .slx or. xlsx file;

c. documents created using Microsoft PowerPoint must be produced as .ppt or .pptx files; and

d. e-mails or outlook calendars must be produced as .msg or .pst files.

12. "Person" and "persons" include natural persons, corporations, companies, firms, proprietorships, partnerships, associations, joint ventures, government agency or organization, and any other type of legal entity, whether formal or informal.

13. The words "relate to", "relating to" or "related to" shall mean that which implicitly or explicitly refers to, concerns, reflects, embodies or in any manner describes the subject matter of the document request.

14. The words "Communications" or "Communicate" mean any correspondence, disclosure, transfer or exchange of information, whether oral or written, and whether in person, by telephone, mail, e-mail, telecopy, text message or other "Document" form, including but not limited to discussions, statements, negotiations, inquiries, requests, notices, responses, or demands.

## REQUEST FOR PRODUCTION OF DOCUMENTS

1. Communications (as defined above) between You and any other Director or Officer of Fifth Third which refers, mentions, or otherwise relates to:

a. Succession planning for the position of President and/or CEO of Fifth Third;

b. Identified and/or selected candidates for the position of President and/or CEO of Fifth Third;

c. Processes or timelines, whether proposed or final, with respect to the identification and/or selection of candidates for the position of President and/or CEO of Fifth Third.

d. Development of potential candidates for the position of President and/or CEO

of Fifth Third; and

e. Any facts upon which You or any other Director relied upon when identifying and/or selecting candidates for the position of President and/or CEO of Fifth Third.

f. Philip McHugh

g. Timothy Spence

**RESPONSE:**

2. Any Communications (as defined above) between You and Philip McHugh.

**RESPONSE:**

3. Any Communications (as defined above) between You and Timothy Spence.

**RESPONSE:**

4. All Documents created, received, or obtained by You which refer, mention, or otherwise relate to:

a. Succession planning for the position of President and/or CEO of Fifth Third;

b. Identified and/or selected candidates for the position of President and/or CEO of Fifth Third;

c. Processes or timelines, whether proposed or final, with respect to the

identification and/or selection of candidates for the position of President and/or CEO of Fifth Third;

d. Development of potential candidates for the position of President and/or CEO of Fifth Third; and

e. Any facts upon which You or any other Director relied upon when identifying and/or selecting candidates for the position of President and/or CEO of Fifth Third.

f. Philip McHugh

g. Timothy Spence

**RESPONSE:**

Respectfully submitted,

/s/ *Joshua M. Smith*
Peter A. Saba (0055535)
Joshua M. Smith (0092360)
STAGNARO, SABA
& PATTERSON CO., L.P.A.
2623 Erie Avenue
Cincinnati, Ohio 45208
(513) 533-2701
(513) 533-2711 (fax)
pas@sspfirm.com
jms@sspfirm.com

/s/ *John J. McHugh*
John J. McHugh, III
McHUGH & McCARTHY, LTD
5580 Monroe Street
Sylvania, Ohio 43560
(419) 885-3597
(419) 885-3861 (fax)

**Co-Counsel for Plaintiff Philip R. McHugh**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was served on all counsel of record this 29th day of February, 2024 via the Court's CM/ECF system.

/s/ Joshua M. Smith
Joshua M. Smith (0092360)

FIFTH THIRD BANK

# Unanimous Written Consent: Officer Appointment

October 21, 2020

EXHIBIT
2
PENGAD 800-631-6989

Classification: Restricted

FIFTH THIRD BANK

Fifth Third Bancorp & Fifth Third Bank, N.A.

## Board of Directors

### Unanimous Written Consent: Officer Appointment

TABLE OF CONTENTS

CEO Note Regarding Officer Appointment

Press Release

Unanimous Written Consent: Board of Directors*

** Denotes items requiring unanimous written consent.*

FIFTH THIRD BANK
OFFICE OF THE SECRETARY

FIFTH THIRD BANK

Dear Board Members:

As previously discussed in our talent management and succession planning sessions, we are executing on the plan to promote Tim Spence to President. The lines of business, regional banking and strategic planning will now report to Tim. We plan to announce this on Monday, October 26. Attached is a draft of the external release.

As Bob Shaffer and I discussed with you at the September Board meeting, we believed that Phil McHugh could be at risk with Tim's promotion. And, in fact, Phil has decided not to accept the role of Head of Consumer and Business Banking and is leaving the company. This is unfortunate as this is one of the largest roles we have. However, we have a very capable leader, Howard Hammond, who will serve as the interim Head of Consumer and Business Banking. Howard currently leads our Retail Banking business and Fifth Third Securities. As Howard has the opportunity to work in this role, we will also test the market and conduct an external search for this position.

Included with this message is a request for unanimous consent to approve the promotion of Tim to President. I appreciate your prompt approval as we will be announcing his promotion on Monday morning. I am very excited for Tim and look forward to working with him as he further develops in his new role. Please let me know if you have any questions.

Thanks,

Greg

© Fifth Third Bank | All Rights Reserved | For Internal Use Only

Classification: Restricted

FIFTH THIRD BANCORP
NEWS RELEASE

***DRAFT 10/21/20***

CONTACTS
Ed Loyd (Media Relations)
email.address@53.com | 123-456-7890
Chris Doll (Investor Relations)
Christopher.Doll@53.com | 513-534-2345

October 26, 2020

## Fifth Third Announces Appointment of Timothy N. Spence as President

CINCINNATI – Fifth Third Bancorp (Nasdaq: FITB) today announced the appointment of Tim Spence as president. His promotion will support the Company's ongoing successful execution of its strategic initiatives and further strengthen its position as a leading regional bank.

In his new role, effective immediately, Spence will oversee all business lines and regional banking, while continuing his leadership of the Bank's strategy. It was Spence's strength in strategy that first brought him to Fifth Third in 2015. He led that area as chief strategy officer and then advanced in 2017 to head consumer banking and payments as well. Before joining Fifth Third, Spence was a senior partner in the financial services practice at Oliver Wyman, a global strategy and risk management consulting firm. Spence will continue to report to Greg Carmichael, the Company's chairman and chief executive officer.

"Tim has demonstrated extraordinary leadership and vision in driving the strategy and execution to transform Fifth Third through innovation and technology," said Carmichael. "Over the past several years, he has been a principal architect and catalyst of many of the Company's most important strategic initiatives. Those initiatives include organic growth investments, numerous partnerships with fintechs and other third parties, and the 2019 acquisition of MB Financial Inc. in Chicago – a move that dramatically changed the competitive landscape and positioned us for success in one of our most important markets. Tim is keenly focused on solutions that enable Fifth Third to best serve our customers – from individuals to small and large businesses – and help them achieve their goals."

Spence long has been heralded for his commitment to innovation and has helped the Bank significantly advance its digital transformation. In 2018, American Banker recognized him as Digital Banker of the Year, an award whose past honorees have included forward-thinking leaders from the nation's largest financial institutions. In addition to recognizing his many achievements to date, that award highlighted his customer-centric approach, which has been the hallmark of Spence's banking career.

Originally from the Pacific Northwest, Spence and his family make their home in Cincinnati. Spence devotes time to several local community and economic development organizations, including serving on the executive committee of the board at Cintrifuse, a public-private partnership that exists to build a sustainable tech-based economy in Greater Cincinnati, on the advisory board for Miami University's Altman Institute for Entrepreneurship, and as member and co-chair of the commerce committee for the

Classification: Internal Use

Officer Appointment - Unanimous Written Consent: Officer Appointment

FIFTH THIRD BANCORP
# NEWS RELEASE

Cincinnati Chamber's RESTART Taskforce. He also serves as a board member for the Consumer Bankers Association.

**About Fifth Third**

Fifth Third Bancorp is a diversified financial services company headquartered in Cincinnati, Ohio, and the indirect parent company of Fifth Third Bank, National Association, a federally chartered institution. As of September 30, 2020, the Company had $202 billion in assets and operates 1,122 full-service Banking Centers, and 2,414 Fifth Third branded ATMs in Ohio, Kentucky, Indiana, Michigan, Illinois, Florida, Tennessee, West Virginia, Georgia, North Carolina and South Carolina. In total, Fifth Third provides its customers with access to approximately 52,000 fee-free ATMs across the United States. Fifth Third operates four main businesses: Commercial Banking, Branch Banking, Consumer Lending, and Wealth & Asset Management. Fifth Third is among the largest money managers in the Midwest and, as of September 30, 2020, had $427 billion in assets under care, of which it managed $53 billion for individuals, corporations and not-for-profit organizations through its Trust and Registered Investment Advisory businesses. Investor information and press releases can be viewed at www.53.com. Fifth Third's common stock is traded on the NASDAQ® Global Select Market under the symbol "FITB."

###

**FIFTH THIRD BANCORP**

**UNANIMOUS WRITTEN CONSENT OF THE BOARDS OF DIRECTORS APPOINTING PRESIDENT**

**October 26, 2020**

The undersigned, being all of the Directors of Fifth Third Bancorp, an Ohio Corporation ("Bancorp"), in accordance with Section 1701.54 of the Ohio Revised Code, do hereby authorize, consent, and agree to the adoption, without a meeting, of the following resolutions through this unanimous written consent (this "Consent"), effective as of the date first set forth above:

**WHEREAS,** the members of the Board, in connection with succession and leadership planning, have discussed potential promotions and appointments to senior officer positions of Bancorp at previous meetings;

**WHEREAS,** the members of the Board have determined that it is appropriate to implement one such promotion and appointment at this time;

**NOW, THEREFORE**, it is hereby:

**OFFICER APPOINTMENT**

**RESOLVED**, that Timothy N. Spence be promoted and appointed to the position of President of Bancorp;

**GENERAL RESOLUTIONS**

**RESOLVED FURTHER,** that the officers of the Bancorp be, and each are hereby, authorized, directed and empowered to perform any and all other acts and things as in such officer's opinion may be necessary or appropriate in order to carry out the intent and purposes of the foregoing resolution with respect to the Bancorp; and

**RESOLVED FURTHER,** that any act of any Director or officer of the Bancorp and of any person designated or authorized to act by any officer of the Bancorp, which act would have been authorized by the foregoing resolutions except that such act was taken prior to the adoption of such resolutions is hereby ratified, confirmed, approved, and adopted as the act of the Bancorp.

[Remainder of page intentionally left blank. Signature page follows.]

Classification: Restricted

In Witness Whereof, the undersigned Directors have executed this signature page as of the date first set forth above in this Unanimous Written Consent.

Nicholas K. Akins October 22, 2020 3:38 PM

Mitchell S. Feiger October 22, 2020 4:25 PM

B. Evan Bayh III October 22, 2020 9:53 AM

Thomas H. Harvey October 21, 2020 11:04 PM

Jorge L. Benitez October 22, 2020 6:27 AM

Gary R. Heminger October 22, 2020 6:30 PM

Katherine B. Blackburn October 21, 2020 8:05 PM

Jewell D. Hoover October 21, 2020 7:25 PM

Emerson L. Brumback October 22, 2020 9:22 AM

Eileen L. Mallesch October 21, 2020 6:04 PM

Greg D. Carmichael October 22, 2020 8:41 AM

Michael B. McCallister October 22, 2020 12:49 PM

Linda W. Clement-Holmes October [illegible], 2020 2:17 PM

Marsha C. Williams October 21, 2020 7:01 PM

C. Bryan Daniels October 21, 2020 7:07 PM

# EXHIBIT 3

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 4

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 5

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 6

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 7

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 8

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]