UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

------------------------------:
PHILIP R. MCHUGH, :
Plaintiff, :
vs. : CASE NO. 1:21-cv-00238
FIFTH THIRD BANCORP, et al., :
Defendants. :
------------------------------:

Videotaped Deposition of: C. BRYAN DANIELS
Taken: By the Plaintiff
Pursuant to Notice
Date: February 13, 2025
Time: Commencing at 1:01 p.m.
Place: Fifth Third Center
511 Walnut Street
Cincinnati, Ohio 45202
Before: Wendy L. Raymer, RPR, CRR
and
Connie Ihle-Adkins, Videographer
Notaries Public-State of Ohio

APPEARANCES:

On behalf of the Plaintiff:

Peter A. Saba, Esq.
and
Joshua M. Smith, Esq.
and
Bailey E. Sharpe, Esq.
(Appearing via Zoom Videoconference)
of
Stagnaro, Saba & Patterson Co., L.P.A.
2623 Erie Avenue
Cincinnati, Ohio 45208
Phone: (513) 533-2701
Email: pas@sspfirm.com
jms@sspfirm.com
bes@sspfirm.com

On behalf of the Defendants and the Witness:

Michael L. Cioffi, Esq.
and
Collin D. Hart, Esq.
of
Blank Rome LLP
1700 PNC Center
201 East Fifth Street
Cincinnati, Ohio 45202
Phone: (513) 362-8700
Email: michael.cioffi@blankrome.com
collin.hart@blankrome.com

and

Phenise Poole, Esq.
and
Brian Thomas, Esq.
of
Fifth Third Bank
Fifth Third Center
511 Walnut Street
Cincinnati, Ohio 45202
Phone: (513) 629-2716
Email: Brian.Thomas@53.com

APPEARANCES: (CONTINUED)

Also Present:

Philip R. McHugh, Plaintiff

- - -

# I N D E X


| C. BRYAN DANIELS | PAGE |
|---|---|
| Examination by Mr. Saba | 6 |
| Examination by Mr. Cioffi | 81 |

| EXHIBITS | MARKED | REFERENCED |
|---|---|---|
| Plaintiff's Exhibit 5 | -- | 63 |
| Plaintiff's Exhibit 8 | -- | 65 |
| Plaintiff's Exhibit 11 | -- | 79 |


\- - -

Page 5

THE VIDEOGRAPHER: We are on videotape record. Today is Thursday, February the 13th, 2025. The time is 1:01 p.m. We're here today to take the deposition of C. Bryan Daniels in a case styled Philip R. McHugh versus Fifth Third Bancorp, et al., United States District Court, Southern District of Ohio, Western Division, Case Number 1:21-cv-00238.

Would the attorneys now introduce themselves and state who they represent.

MR. SABA: Peter Saba on behalf of Plaintiff Philip McHugh.

MR. SMITH: Joshua Smith on behalf of the plaintiff, Philip McHugh, and we also have Bailey Sharpe on behalf of plaintiff Philip McHugh on Zoom.

MR. CIOFFI: Michael Cioffi and Collin Hart of Blank Rome on behalf of the defendants in this case. We also represent the witness, Mr. Daniels, personally as a result of a joint defense agreement. Also representing Mr. Daniels of the Fifth Third Legal Department are additional lawyers Brian Thomas and Phenise Poole.

THE VIDEOGRAPHER: Would the court reporter please swear in the witness?

Page 6

C. BRYAN DANIELS,

of lawful age, a witness herein, being first duly sworn as hereinafter certified, was examined and deposed as follows:

EXAMINATION

BY MR. SABA:

Q. Mr. Daniels, can you go ahead and state your name for the record, please, and spell your last name?
**A. C. Bryan Daniels, D-a-n-i-e-l-s.**
Q. What is your address?
**A. 1420 Tower Road, and that's Winnetka, with two n's, Illinois 60093.**
Q. Have you ever had your deposition taken before?
**A. I have.**
Q. As a reminder, I'm going to be asking you a series of questions. If there's anything you don't hear or understand, please feel free to ask me to repeat or rephrase the question.
For the sake of the court reporter, though we're taking this via video as well, I do need you to answer verbally. No shaking of the head or -- or nuh-uhs or uh-uhs, if you'd please answer clearly.
Additionally, if you'd wait for me to finish my question before you answer, and I'll try and do the

Page 7

same before I ask another question. It makes for a clearer record.
Do you understand those instructions?
**A. I do.**
Q. What's your date of birth?
**A. 2/3/59.**
Q. How long have you lived at the Winnetka, Illinois address?
**A. I moved to Winnetka in 20 -- 2000. We lived someplace else first, but I don't know, we probably moved three years later.**
Q. Who lives there with you?
**A. Well, that's a longer story. My wife, and then I've got three adult kids and they come and go. So right now it's my wife, myself, and my son.**
Q. What did you do to prepare for today's deposition?
**A. Met with counsel.**
Q. Did you speak to any of the other Fifth Third board members about your deposition today?
**A. No.**
Q. What about any other employees or officers of Fifth Third Bank?
**A. No.**
Q. Have you discussed this case with any other

Page 8

board directors at Fifth Third?
**A. No.**
Q. Have you discussed this case with any of the officers or employees at Fifth Third Bank?
**A. No.**
Q. Did you review any documents in preparation for today's deposition?

MR. CIOFFI: Objection. I'm going to instruct the witness not to answer that question as it pertains to documents that he reviewed at our request as his lawyers. I'll allow him to answer about documents that he might have reviewed other than documents we provided.

BY MR. SABA:

Q. What's the extent of your education?
**A. I've got an undergraduate degree in math and chemistry. I've got an MBA from the University of Chicago. I've got a master's in computer science from the University of Chicago, and I've got a master's in biotechnology from Johns Hopkins.**
Q. Did you review any documents today in preparation for the deposition that were not provided to you by counsel?
**A. No.**
Q. Are you currently employed?

Page 9

A. **Self-employed. I own my own business, started -- started a business called Prairie Capital.**
Q. What does Prairie Capital do?
A. **Prairie Capital is a private equity fund. We were formed in 1997, focused on the low end to middle market. We're in our seventh fund. My partner and I have stepped back from day to day, but we continue on as the founding partners and are, you know, partially active, but not totally active at Prairie.**
Q. What did you do before starting your private equity fund at Prairie Capital?
A. **Well, I've been kind of a lifelong banker. I started in 1981 at a bank called American National Bank, which was -- which was acquired by First -- FNB of Chicago.**
**Subsequently that merged with -- well, there was a lot of mergers along the way, but I -- I was there for 17 years, and I worked my way up from, you know, a low-level management trainee to officer, assistant vice president, vice president, senior vice president.**
**I spent the majority of my time in a group called Financial Institutions, and my customers were banks. So in Chicago there were a lot of independent banks, and those were my customers. And so I got to know banking well. I've kind of been a lifelong student**

Page 10

**of banking, and that's what I did for 17 years before starting Prairie in 1997 or 1998.**
Q. Do you sit on any boards other than Fifth Third?
A. **Yes.**
Q. What boards do you sit on?
A. **I sit on a board -- well, first of all, no public boards. I sit on a board in Akron, Ohio called Sergeant Clean. It's a chain of 17 car washes. And if any of you are in northwest Ohio, please -- or northeast Ohio, please use our cash wash.**
**I'm on the board of Acceleration Academies, which is a business my partner and I started. We subsequently sold -- or sold part of our interest. I continue on that board.**
**I am on the advisory board of a group called Sienna Capital and -- I'm thinking. That might be it. But I've probably served on 25 to 50 boards over my years at Prairie. Because each of the companies we would invest in, I would typically be on those boards if it was a deal that I worked on. So I've had a lot of board experience -- oh, and the public board experience also included Cole Taylor, which was a bank that MB acquired, so that was a public board. And then also MB, public company, obviously before being acquired by Fifth**

Page 11

**Third. So those were -- so I had three public board experiences.**
Q. How long were you on the board at MB Financial?
A. **Well, let's see. Probably -- I'd have to fact check it. Probably 2000 -- five or six years, but I'd have to fact check that. But, you know, five or six years.**
Q. Five to six years?
A. **Something like that.**
Q. And did you become a member of Fifth Third's board as a result of Fifth Third's acquisition of MB Financial?
A. **Yes. So, you know, when you're going through an acquisition and, you know, it was an acquisition, though, I think for legal purposes it's called a merger, consideration is largely stock. And so a large part of the negotiations outside of financial terms concern themselves with post transaction governance, and so the determination of who's going to be on the board, what's the board composition, is an important part of the negotiations. And two of us joined immediately and then a third joined later. So --**
Q. Who were the two that joined immediately?
A. **Myself and Hal Harvey.**

Page 12

Q. And who joined later?
A. **Mitch Fieger, who was the CEO and would have probably joined earlier except for the fact that there were some SEC restrictions on independents because he was considered management, whereas Hal and I were not management. We were just directors, outside independent directors.**
Q. And that was April 2019 when you joined the Fifth Third board; is that correct?
A. **Yeah. I think so, but it was -- whether that was my first meeting or -- because it was at or around the annual meeting. So I can't really remember whether I was officially on the board then or the following -- the following, you know, meeting, but, you know, it was sometime between April and June and we could certainly find that out.**
Q. Based on the minutes that we have from the April 2019 meeting, it indicates that you were present.
A. **That sounds right, but I couldn't recall whether I had been officially put on the board or was there, you know, as a guest. The nuance of that, I don't remember, but I do remember being at that meeting because it was my first.**
Q. Prior to April 2019, did you have any interaction with or involvement with Tim Spence?

Page 13

A. Yes. I mean, as part of the acquisition, there was a group comprised of Tim, Greg, and Tayfun, who were active, you know, first and -- you know, first with management with Mitch Fieger, Hal Harvey as the board chair. But then the three of the officers I just mentioned did visit us, talk to the board, and that was, you know, prior to that date because that was during the merger negotiations.
Q. How many times did you meet with Tim Spence, Greg Carmichael, and Tayfun Tuzun prior to April --
A. At least once --
Q. Oh, let me just finish my question.
A. Sorry.
Q. How many times did you meet with Tim Spence, Greg Carmichael, and Tayfun Tuzun prior to April 2019?
A. I'm sorry, to Zoom?
Q. Tayfun Tuzun.
A. Oh, I'm sorry. I thought you said Zoom.
At least once, perhaps twice.
Q. When would those meetings have taken place?
A. Probably 2019. I -- we had a long time between the approval of the deal and regulatory approval. So the dates are murky.
Q. What happened at those meetings?
A. Well, they're key meetings because the -- you

Page 14

know, we were not in the market. Fifth Third approached us and it was really, you know, pitching and selling the fact that we would, as investors, be better off with Fifth Third than with either going alone or going with somebody else.
So -- and it's not infrequent for public companies or at least I can't speak generally, but it's not uncommon to get inbound interest. But I know for sure Mitch and Hal, having met with Fifth Third, were impressed enough that they thought this was a deal that the board should look at, which we did.
And so the importance of meeting management for the board was to understand what's the opportunity for us on either go alone or go with Fifth Third strategy. And so really making a business judgment about that was a pretty important one.
So, yeah, we got to know Greg and Tim, I mean, over that period of time, and Tayfun as well.
Q. How long did those meetings last, or meeting?
A. You know, several hours.
Q. Outside that meeting or meetings that may have occurred in 2018, did you have any other contact with Tim Spence?
A. Not that I recall.
Q. Did MB Financial have another suitor at

Page 15

that same time?
A. You know, good governances suggest that if you are considering an inbound offer to -- to bring in some other suitors to make sure that, you know, you've got honesty and transparency in pricing. So we had several -- we had several other interested parties. BMO was really the -- the other one that was the final bidder.
Q. That's Bank of Montreal; is that correct?
A. Bank of Montreal. But, yeah, this is a -- this is a huge deal, you know, making a decision as to, you know, what to do and huge fiduciary, you know, responsibility. I mean -- I mean, arguably the most important duties of the director are sort of hiring the CEO, working with the CEO, or seeing the CEO, and then secondly making decisions about, you know, dispositions, you know, acquisitions, perhaps secondary. But if you're going to make a merger decision, that's a key decision.
So we had -- we had an investment banker represent us. We had pitches from other banks, but for me, personally, there was really no question that the better opportunity was with -- was with Fifth Third.
And -- and my rationale -- and I can't speak for the rest of the board -- was that the opportunity as

Page 16

laid out by the management team -- and I would accentuate Tim in that, because it was clear to me that Tim was a deep thinker, had come out of strategy in his prior life, and articulated very well to us the benefits and the sort of plan that Fifth Third was, you know, pursuing presently and how they thought we would fit into that, and it was very compelling.
And so we actually -- and this is me, personally. I said we had a higher bid from BMO, and it's a -- it's a tough thing to do, and it was a cash bid, too. And to sort of -- so to turn down a cash bid at a higher price to choose an equity deal, which by definition has risk, you know, but also has upsides, but it's a risk return that isn't present with cash was a pretty big deal.
And I remember saying I think we were better off and I think the shareholders were better off doing the deal with Fifth Third as -- you know, with that thesis really, you know, laid out by Tim. And so my decisioning for this transaction was in big part due to the Fifth Third sort of course it was on and the accelerated trajectory with which Tim explained to us with confidence and -- you know, and we ultimately believed him and put our money where our mouth is by taking the higher-risk deal and taking the all-cash deal

**for, you know, for more money.**
Q. Did Bank of Montreal offer you a board seat?
**A. No.**
Q. Did they offer any board seats?
**A. They did not. Which I would say is, you know, given the size disparity, would not be uncommon. Oftentimes, the apportionment of board seats is usually a function of market capitalization and BMO has a much larger market capitalization than MB.**
**So from a size perspective, that wouldn't even really have been something that would have been a market, you know, would have been entertained. Now, we didn't pursue the conversations and negotiations, so could we have gotten that? I don't know. That's hypothetical. But it really -- it was not something that was on the table. And our ability to influence BMO from afar was really -- was really small.**
**Now, I will say with MB, it was a -- with Fifth Third, it was a very important point of negotiations, and we really pushed for three seats. Ultimately we settled for two with a -- with a view that we had a number of older directors that were likely to retire, and based on merit, there would be due consideration of bringing in another director, but that was not -- that was not part of the deal, per se, and**



**that's how we got the third board seat. It wasn't -- when I said "we," I mean, once the deal was done, it's just us, but that was the term of it.**
**So with MB and Fifth Third, the board thing was a very big deal, and we spent a lot of time talking about that.**
Q. Did you ever meet with Phil McHugh prior to April 2019?
**A. I don't believe so.**
Q. Did you ever speak with Phil McHugh prior to April 2019?
**A. It's possible, but I don't really believe so. He was not part of the team that was pitching us. Post -- let me rethink about that.**
**In -- because I kind of see the world as before decision and after decision. There was also this time in between of regulatory approval, and during that period of time I might have met with him, but I don't recall. But certainly before decision that he had not been part of the -- part of the team that was visiting with us.**
Q. As of January 1, 2020, what is your understanding of Phil McHugh's role with Fifth Third Bank at that time?
**A. So post transaction -- yeah. So I think -- I**



**think Phil was running, if memory serves me, was running the regions and wealth, but exact timing of which I'm not totally sure.**
Q. Do you recall when you first met Phil McHugh?
**A. No.**
Q. Prior to January 1, 2020, how frequently would you have communicated with Phil McHugh?
**A. So just -- so when did we close the deal? I don't know. Can someone answer that for me? Because, I mean, if you can provide some more --**
Q. Well, let me represent to you, you came on the board in April of 2019.
**A. Right.**
Q. So you would have only come on the board if the transaction was completed; is that correct?
**A. Okay. Okay. I'm sorry. I thought you meant January of '19. I'm sorry, I misunderstood.**
Q. No, I'm asking about now January of 2020.
**A. Okay. I'm sorry.**
Q. So this is approximately eight months later?
**A. Okay. So after the transaction --**
MR. CIOFFI: Counsel, after that colloquy, could you repeat your question, please?
MR. SABA: Certainly.



BY MR. SABA:
Q. How frequently would -- how frequently would you have communicated with Phil McHugh prior to January 1, 2020?
MR. CIOFFI: Objection to the form of the question in that it assumes there was communication, but you may answer.
THE WITNESS: You know, I'm not sure. I know that -- I mean, I -- I -- my role, as I saw it with coming in as a director for MB, was to ensure a smooth transition and to make sure that MB's interests, both customer -- or not just, but customer, employees, and other constituents were being properly represented. And certainly management was doing its job, but I -- I sort of felt an extra responsibility.
So during that process, given the importance of middle market, I'm sure I met with -- with Phil at some point, just because the middle market was central to what we did. Exactly when or how, I don't know.
BY MR. SABA:
Q. You don't know if it was prior to April 1st -- excuse me, prior to January 1, 2020?
**A. It probably was because, you know, the -- the**

date of acquisition was in '19. And so, yes, I'm sure I did, but I don't recall specifically.
Q. Do you ever recall meeting with Phil McHugh in Chicago regarding issues with the MB acquisition?
MR. CIOFFI: Objection to the form. Time frame?
BY MR. SABA:
Q. Any time after April of 2019.
A. I don't know. I mean, I probably did. Do I specifically remember location, dates, details? No. But I think, as I said, Phil was responsible and a key player in the middle market in the regions which was part of MB, and so I would have had conversations with a number of managers involved in that. Specifically on what date or when? I don't remember. But it's highly likely that I would have had conversations with them.
Q. What metrics do you use to determine the success of the MB acquisition?
A. Well, shareholder price post transaction would be the best, and, you know, it's actually a pretty complicated question. I'm not sure how much detail you want me to get into, but, you know, you could look at what percent of your customers you retain, you know, post transaction, and that would be one metric. What would be the percent of employees in key -- or employees



that you keep post transaction.
You know, ultimately, though, what would be the share price, you know, post transaction. We recently had a presentation done by one of the investment banks where they did a postmortem on the acquisition, and they asserted that the MB transaction was one of the most creative transactions in sort of, you know, recent times for a bank transaction of this type. So by that metric, it was a very good transaction.
Q. Did Fifth Third Bank Chicago region lose customers following the merger?
A. Of course.
Q. And did Fifth Third Bank Chicago region lose employees following the merger?
A. Of course. I mean, and that's just, you know, more than one would answer that question. There definitely were, you know, any time there's change -- I mean, look, even if there's no transaction, my answer to that would have been yes, right? I mean, we have turnover of customers and employees.
Was there a flight? If your point is really was there a massive outflow? Then no. I mean, I think the transaction went very well. The -- sort of the industrial logic for Fifth Third coming to Chicago was



that, you know, with all due respect to the Fifth Third colleagues here, they were weak in Chicago. We were strong. Chicago was a very strong middle market region and, you know, they were coming not to, you know, take us over and sort of mash us into their organization but to acquire our franchise and to build upon that franchise.
And so that was -- you know, that was the business logic for them, you know, for them doing that. And so, yeah, they were very concerned and I wanted to be articulating those concerns as well to ensure that we didn't lose customers and we didn't lose employees. There clearly were those who were poaching our customers and our employees, other banks, you know, we had a lot of banks that were coming inbound trying to steal. There were certainly bankers that self-selected out. There were a couple banks that, you know, hired some perhaps junior bankers or bankers that were maybe just not front and center with what MB was focussed on and Fifth Third was going to be focused on that we lost, but by and large it was very successful.
And I would contrast that with -- not that it's relevant -- but there have been some major fumbles by banks during acquisitions. And in Chicago, BA's -- Bank of America's acquisition of LaSalle was an absolute



blood bath, which caused the formation of private bank, which, you know, which prospered and now it's part of one of the, you know, CIBC. So I would say in the continuum, that would have been a disastrous acquisition. I would say the Fifth Third MB acquisition was a very successful acquisition.
Q. Did Fifth Third Bank Chicago region lose deposits by market share after the acquisition?
A. You know, I'm not sure. I mean, because I -- on a combined basis, it would have been creative because, you know, we had -- they had their deposits, we had our deposits. We probably lost some, maybe a little bit, but I wouldn't say it was anything that was alarming.
I mean, a customer's natural reaction post transaction -- and I've been through a lot of these, so this is not my first rodeo because I lived through the acquisition for Chicago of American National and then later, you know, the merger with NBD and the typical reaction is, there's a -- there's a -- there's a focus on PR, you know, during the transaction to comfort customers and employees that all is going to be good and, you know, even they would have made that assertion with LaSalle. But customers usually say I'm going to wait and see, you know, show me, don't, you know, show

Page 25

**me, don't trust.**
**And so it probably takes a year to really know. And after a year, I think we were in very good shape and I would hazard to guess that our deposits were probably growing, but you'd have to fact check me on that.**
Q. Haven't the deposits by market share actually dropped each year since the acquisition?
A. **Not to my knowledge.**
Q. You don't know? The FDIC would indicate that; is that correct?
A. **They would know that.**
MR. CIOFFI: Objection. He answered the question.
BY MR. SABA:
Q. Do you recall that after the acquisition, Phil was sent to run the middle market in Chicago?
A. **I don't. I know that he was a key player in the middle market, you know. At what point he became head of the middle market, I don't recall, but I -- I have a lot of respect for Phil. He grew up in the middle market. He was a, you know, a great middle market banker.**
**And so I, you know, respected what he's done over the years and he was an important person that I**

Page 26

**would -- you know, in those conversations, the one thing, I can't remember the specific details -- but I viewed him as a key player in being able to assure and communicate that, you know, the importance of the MB customers and employees, you know.**
Q. Did you communicate that same sentiment to Greg Carmichael by email?
A. **Whether by email or verbally, I would have -- I think I was positive, you know. I -- I'm not a big emailer, but I probably -- I may well have. I am -- as I said, I was most focused on making sure that we got this right and that the acquisition -- and I remember quantifying. I thought it was -- I thought it was sort of a billion dollars of market cap risk that we had, you know, if they failed the acquisition, if they did what they did to what to LaSalle, it would have been a billion dollar mistake. And so I remember talking to Greg. I remember talking to Frank, our chief credit officer. I can't remember his last name.**
Q. Would that be Frank Forrest?
A. **Yeah, I remember -- yes, Frank Forrest about the importance of making sure the credit flowed properly, all of those things. So it was a billion dollar risk, and I was very clear in wanting to make sure that that was handled smoothly and that we got it**

Page 27

**right, as opposed to trying to fix it later.**
Q. Were you aware that Frank Forrest communicated to Greg Carmichael that Phil McHugh is the guy with respect to fixing credit problems in Chicago?
A. **Well, I guess I -- I guess I would take exception with your statement of credit problems in Chicago. That's a matter of perspective or opinion. You know, Fifth Third as I think a -- Frank is a B of A guy, was a B of A guy, came -- come from large corporate, and large corporate and middle market are very different. If you put a filter on big corporate, with a big corporate filter on middle market, you're going to say these are all bad loans.**
**Frank had that bias. And so one of my concerns with Frank was that he didn't bring a B of A, Citi, JPMorgan, you know, rated corporate kind of vantage or viewpoint on -- on the middle market.**
**So if he says there was a problem, I would -- I would take exception to that, because I don't think we had problems, and I don't think that the losses would bear that out in terms of, you know, post transaction. And I would, you know, I would assert -- and you'd have to figure this out -- but I would assert that our credit problems were or credit quality was as good if not better than Fifth Third's in Chicago for sure, and maybe**

Page 28

**across the country. But I'm not going to be able to say that with confidence, but I take real exception to say that there were problems in Chicago.**
**This wasn't a fix-it-up bank. MB was a premier bank in Chicago. It took care of middle market customers extraordinarily well, net promoters scores and others were very strong. So to suggest that there were problems with the credit, you know, I take personally.**
Q. During essentially that eight-month period between April and January -- April 2019, January 2020, other than maybe meeting with Phil McHugh up in Chicago, do you recall any other meetings, outside board meetings that you had with Phil McHugh?
MR. CIOFFI: Objection. Asked and answered. But you may answer again if you --
THE WITNESS: I'm sorry, the time frames were --
BY MR. SABA:
Q. April 2019, January 2020.
A. **Outside of board meetings?**
Q. Correct.
A. **I -- just what I said. I don't -- the specificity of those meetings, it's been a number of years ago. When -- I definitely had conversations with Phil. As I've said, it was important we got this thing**

Page 29

**right. The exact timing and occurrence of those, locations of those, you know, I can't recall.**
Q. Did you ever meet with or interview any of Phil McHugh's direct reports?
**A. Someone would have to remind me as to who those were and I could tell you then. I mean, if you give me a list of who those are, I could tell you if I had met with them.**
Q. Let me rephrase the question.
Did you ever meet with or interview any of Phil McHugh's direct reports or subordinates regarding Phil McHugh?
**A. No, I wouldn't have talked to any of them.**
Q. Did you participate in or perform any of Phil McHugh's annual reviews or midyear reviews?
**A. No.**
Q. Did you ever see or review any of the materials from Phil McHugh's midyear or annual reviews?
**A. Yeah. Once a year there is a, you know, very important meeting that takes place. It's usually in December, and that is the meeting in which management, you know, this was management's meeting to present to the board their view as to the state of the management at Fifth Third.**
**And so in that context, management -- when I**

Page 30

**say management, it primarily would be, you know, the CEO, plus HR -- presenting to the board their own views as to the management, and I presume within that, you know, they would provide or they would provide appraisals of each of the enterprise teams and within that there would be, you know, comments that would be suggestive of performance and performance reviews. But those were not board reviews. Those were management's reviews that they presented and we reviewed.**
Q. Do you know if those were the materials from Phil McHugh's midyear or annual reviews that were included in that information provided in the December meetings?
**A. Don't know where those came from.**
Q. Did you ever review Phil McHugh's employee engagement surveys?
**A. If they were in the diligent board package, which is what's, you know, which is what's presented to the meeting, I would have. If they weren't, I would not have. I -- or let me say it this way.**
**Unless it was presented to the board, I would not have seen any of those materials for any of the -- for any of the managers.**
Q. Is that also true for Phil McHugh's customer experience surveys?

Page 31

**A. Ditto. I mean, if it was in the board package, I would have reviewed it.**
Q. If it wasn't, you wouldn't have seen it.
**A. I've got -- you know. I -- with all due respect to Fifth Third, there's a copious amount of material that's presented to the board. I don't need to look for more outside of that. And the channel of communications was, you know, we have the board meetings, we have governance through the committees, and that's the time in which information comes from management to the board. It would be the exception to the rule that there'd be communications outside of those channels.**
**And for me to go out and seek or for management to otherwise present that to us, like, would be rare, and I don't remember, and certainly with regards to the assessments. The only -- the only time we were involved with assessments generally of management would occur in December, in the December time frame, and this would be only of the CEO, which as I said is probably the most important responsibility of the board is to review, apprise the CEO. And then to the extent one is on one of the other committees, like the risk committee, one would review the chief risk officer, the chief credit officer, and head of loan**

Page 32

**review, but those would only be as a result of being on the committee.**
**And then if you're on audit committee, you would review the -- and I can only speak -- because those are the only -- you'd review the chief auditor.**
**So those would be the -- so those -- and those are different, because those actually do have reporting -- reporting lines directly to those committees. And so from an SEC perspective and everything else, you would actually be involved in those reviews.**
**But other than those, we would not be involved in, you know, the performance reviews or -- or annual reviews of any of the managers. Everything we would have seen would have been the board package and presented to us, you know, for our review of management's view.**
Q. What about Phil McHugh's financial performance relative to goals for his divisions, would you have reviewed those?
**A. If it was in the -- you know, I'll just say it again. I mean, if you're asking anything outside of the board package, I -- I would say that the answer is no.**
Q. Okay. Do you recall any specific criticisms of how the divisions Phil McHugh was managing were

Page 33

performing during the time that Phil McHugh was managing those areas?
**A. No. In fact, I was complimentary. I -- you know, I've walked in Phil's shoes, and I have been in the middle market, and he was a lifelong journeyman banker, and I had a lot of respect for him. I had -- I didn't hear any criticism of him as a banker, as -- you know, as a middle market banker or wealth manager. So, no, I wasn't apprised of any critiques or criticism.**
Q. Between April of 2019 and December -- and excuse me, January 1, 2020, did you have any discussions with Greg Carmichael regarding CEO and president succession at Fifth Third Bank?
MR. CIOFFI: Objection. You mean outside of the board meetings?
MR. SABA: Or during board meetings.
MR. CIOFFI: We talked about the December board meeting already, but --
THE WITNESS: Yeah, I mean --
MR. CIOFFI: You can -- you may answer.
THE WITNESS: Yeah. Once again, I mean, the timing of this, I -- you know, this was years ago. So what happened on January versus what happened in December, I -- you know, I'm unsure, but certainly at the annual performance in that December meeting,

Page 34

there would have been kind of discussions, and -- and during, you know, during, you know -- you know, regular board meetings, I mean, succession planning is something that we discussed, and, I mean, it wouldn't be agenda items, but, you know, the only important thing to know is what is the -- what is your CEO's view of retirement and what's happening.
And Greg had indicated that he wasn't going to do this until he was 70. And so, you know, there would be discussions about, you know, what are you thinking, Greg? Where's your head at? What's the timing. So I don't know if that's answered the question.
BY MR. SABA:
Q. Were you aware that as of August 2019 there was a chance that Greg Carmichael would have to step down earlier than his desires or the board's desires would have been?
MR. CIOFFI: Now, objection to the form of the question. Assumes facts not in evidence. No foundation. If you know of your own knowledge, you may answer.
THE WITNESS: No. I mean, I was not a confidante of Greg's.

Page 35

BY MR. SABA:
Q. He didn't communicate to you in August of 2019 that he might step down earlier?
**A. I don't recall.**
Q. Did any other board member communicate that to you?
**A. No.**
Q. Between April of 2019, January 1, 2020, how often would you have met with Tim Spence?
**A. Say that again, between --**
Q. April 2019, when you come on the board --
**A. Okay.**
Q. -- and January 1, 2020, eight months later, how often would you have met with Tim Spence?
**A. It would have been during, you know, the board meeting time. So we'd have -- you know, typically we'd have two days of meetings, either in person or we'd have the telephonic, and I would have interacted with him there socially before at a dinner.**
**And then, you know, to the extent he was sitting in on any of the committee meetings, I would have interacted then. Outside of that channel, I don't think I would have had much interaction. I mean, I don't recall interaction with him outside of those meetings.**

Page 36

Q. Did you ever observe Tim Spence in the workplace at Fifth Third outside board meetings or committee meetings?
**A. In the workplace?**
Q. Correct.
**A. No.**
Q. Did you ever meet with or interview any of Tim Spence's direct reports or subordinates regarding Tim Spence?
**A. Interview suggests that there was a, I mean, maybe define "interview." What do you mean by that?**
Q. What do you understand interview to mean?
**A. Well, I mean, an interview suggests a formal process by which one is doing some sort of evaluation with a goal as contrasted with a conversation about how are things going and Tim's name coming up in passing, I think.**
**Was there -- were there purposeful meetings to discuss Tim and his performance or his, you know, how he's fitting in with his subordinates? Not that I recall. Would he have come up in conversation about how's it going? How, you know -- and those wouldn't be different from others, you know, when you're in a social setting at dinner. I mean, that's the reason for those dinners is to have a chance to talk to -- to talk to**

**management. And, you know, a topic would be, how are things going? And if there's -- there were issues, you know, that would be a forum for those discussions.**

**And I think -- I think the feedback on Tim was very good. And so in the context of, you know, Tim, you know, how -- how is Tim doing or how -- how are things going? I think that was all positive, but those wouldn't have been interviews. Those would have been social interaction. That's why I was asking the question.**

Q. And who would have those conversations been with?

**A. It could have been with anyone on the management team.**

Q. And did you have similar conversations regarding Phil McHugh?

**A. Probably not.**

Q. Why is that?

**A. Well, let me restate that. The -- I mean, let me just -- let me go back to Tim. I -- I met a lot of bankers in my life, okay? So, I mean, as I said, I started in banking in 1981. I knew a lot of folks at America National. I met a lot of bankers at First Chicago. I told you my customers were banks and bankers, and so I -- I go to the annual -- the ABA, you**



**know, American Bankers Association meeting in that capacity. I'd host meetings with lots of bankers, so I'd meet lots of bankers.**

**So my -- my sort of experience in visiting with bankers was pretty profound. When I met Tim during diligence, he was, with one possible exception, the most impressive banker that I had met. Not in the context of, you know, being a lender or a banker in the -- you know, doing the work, but as someone who could see around corners, a strategic deep thinker, someone who could have high EQ and IQ, have the ability to sort of deal with regulation.**

**So Tim was the guy, and -- and that I really was so impressed with during our conversations. And just to go back to that, if -- if it weren't for Tim, I'm not sure I would have -- would have voted for the deal. I mean, Greg -- Greg was an important guy to the transaction, but Greg -- Greg's job was a different job, and Greg -- and I got a ton of respect for him in the sense that by the grace of -- grace of God, Fifth Third could have gone the way of Nat City here in Cleveland, and Greg was the one who -- who turned that around. And he was an expert technician, but he was an executor, and he got into the weeds, and he did the right things to fix the bank.**



**But we weren't really interested -- and that was history. We weren't interested in fixing a bank. We were interested in what's going to happen going forward. And it was Tim who really articulated that strategy.**

**And so I just want to be clear on this point. Tim, for me, made the difference between us going with Fifth Third and not. And so I would be very interested -- you know, so in conversations following up and hopefully ratifying my decision that Tim was the guy, I think a natural part of that conversation was how is Tim doing? Because to me, it was self-evident.**

Q. And that was based on the one or two meetings you would have had with him in 2018, correct?

**A. Yeah. I met with Jamie Dimon in 2020 when he came to Chicago, and in an hour I had the same -- same perspective. He was the only caveat that I gave to having met someone similar, and within an hour I knew that Jamie Dimon was going places. And within an hour, I knew Tim Spence was going places.**

Q. Had you already decided at that point in time that Tim Spence should be the next president and CEO of Fifth Third Bank?

**A. If -- I'm sorry.**

MR. CIOFFI: I'm going to object. When you



say "that time," what time frame are you talking about? At the time of the MB due diligence? Could you put a time frame on your question, please.

MR. SABA: Sure.

BY MR. SABA:

Q. When Tim Spence first impressed you.

**A. He impressed me immediately. And if the deal had been set forth as Tim is going to be the CEO and does that change your view, I would have said hell yes, let's do it. I would not have hesitated at all.**

**I think that would probably have not been a prudent negotiation from a merger perspective because, you know, the dance of who is CEO and who is chairman and how that would work with Mitch and others I think gets complicated. You don't want to have too many moving pieces, but I think it was clear to myself for sure and I don't know if you've talked to Mitch or Hal yet, but I think our consensus was that it was obvious to us that Tim was going to be the successor, and if we had doubts about that, it might have cast doubts on our decision to invest in the Fifth Third transaction. So, yeah, I think I probably would have been ready to make him the CEO at that time.**

Q. When did it become obvious to you that Tim was the successor?

**A. To me it was obvious at the time of the deal, you know. I mean, in '18 or '19, whenever that was. I mean, there was no one else there. I mean, he was a class of his -- he was a set of one who had the requisite skills of strategy, you know, tactics -- well, strategy, technology.**

**I mean, there's a lot of CEOs out there who have absolutely no -- they've got a blind spot with technology, and Tim had that. A lot of CEOs out there who, you know, sort of were good tactically but not good strategically. There were a lot of CEOs out there that, you know -- I mean, I grew up under CEOs that still were of the, you know, kiss my ring, you know, sort of king and -- and commoner sort of view, and Tim was none of that, none of those.**

**And so I thought, you know, early on he was -- he was, in my mind, clearly going to be the guy, and I had no -- nothing to dissuade me. So I -- in my perspective, he was in a class of one, and I would have been disappointed if that wasn't what happened, and I'm glad it did.**

Q. As -- as of that time that you had determined that Tim was the obvious successor in 2018 or '19, at the time of the deal, how many other Fifth Third executives and officers had you met with?



**A. Just the other two that I mentioned.**

Q. Tayfun Tuzun and Greg Carmichael?

**A. Right.**

Q. You had not met with Phil McHugh at all at that point in time?

**A. No, to the best of my knowledge. But as I said, I've met a lot of bankers over the years, and so it's not like it's a -- it's not like my sampling of, you know, the distribution of bankers was based on, you know, 40-some years of working with bankers.**

**And so I didn't need to sort of meet more bankers in order to enrich my probability distribution. I sort of knew that he was an amazing, you know, upper 1 percentile, 1 percenter. I would have been pleasantly surprised if there were others at Fifth Third.**

**I would have thought that if there were, they would have brought them out because they're selling. If they had talent at that level, why wouldn't they have brought that person out to have helped in their sales process? But if there were more, I would have been delighted to have met them.**

Q. Did you ever look into Tim Spence's annual or midyear reviews to see how he did there?

**A. Prior to the acquisition?**

Q. Prior to the acquisition or prior to the time



that Tim Spence was -- that you determined that he should be the next president and CEO?

**A. I'm confused as to the time.**

Q. Well, have you at any time reviewed Tim Spence's annual or midyear reviews?

**A. Well, we would prepare them as -- when he was CEO for sure. We would review the material in December at the board meetings for sure, actually doing them or the detail -- so whatever is in the diligent books, we would have seen at the board meetings.**

Q. You're talking about materials presented at the December board meeting?

**A. Correct. Correct.**

Q. Okay.

**A. But -- yeah. And so Tim -- and that's why I was asking about timing. If Tim is CEO, we would, because we were actually preparing them.**

Q. Right. Right.

**A. As an executive vice president, outside of -- you know, we wouldn't have reviewed any executive vice president's performance reviews.**

Q. Okay. Just to be clear, prior to January 1 of 2020, you never would have reviewed any of his midyear annual reviews unless the information was in the talent deck given to you of December?



**A. That's correct.**

Q. Did you ever review any of Tim Spence's employee engagement scores?

**A. I would -- if it's going to be the same questions with Phil --**

Q. Correct. Prior to the January --

**A. -- I'll have the same -- I'll give you the same answers. You know, unless it was in the deck, I would not have had -- had the opportunity to review any of those.**

Q. And that would have been true for Tim Spence's financial performance relative to goals for his divisions; is that correct?

**A. Correct.**

Q. And that also would have been true for income statements and balance sheets specifically broken out for the divisions managed by Tim Spence, correct?

**A. Yeah. If it was in the board deck, I would have reviewed it.**

Q. As of that December 2019 board meeting, in your mind were there any other potential candidates for president and CEO to succeed Greg Carmichael other than Tim Spence?

**A. In a -- for a long-term successor, no. I mean, there really wasn't. I mean, it was -- in my**

Page 45

**mind, he was -- I mean, my opinion hadn't changed from when we did the deal. And so that -- and to be clear, and to remind you, I mean, that was a multibillion dollar decision, and that was in large part predicated on Tim being an integral part of that.**

**So, yeah, I would have -- I had pretty much concluded that he was the guy and having then met other officers at the bank, I didn't think there was anyone who was in that class, which in no way is really meant to disrespect any others. It's just that when, you know, given Tim's, you know, as I said, the only person in his class was Jamie Dimon from the people I've met in my experience in banking, and there was no one else that was at that level at Fifth Third that I had met.**

Q. You said as long-term successor. What about other than long-term successor for the role of president and CEO at Fifth Third Bank?

**A. Well, you know, that's the, you know, you'd have to tease that apart, but, you know, succession planning, just from a prudence and risk management perspective, would require, you know, contingencies for, you know, CEO gets hit by a bus, there's been a charge of, you know, accounting irregularities or other forms of, you know, personal misconduct or, you know, there would be a myriad of things out there that would require**

Page 46

**an emergency action.**

**And in that context, it's really a different decisioning. In that context, it's no one's driving the bus and someone's got to drive the bus, you know. It doesn't mean that you've got to drive the bus very far, but you've got to be able to sort of keep the bus from crashing.**

**So that is a different question. And yeah, in the context of that, there were other potential successors for emergency CEOs that were considered and discussed.**

Q. And who were those?

**A. You know, best of my knowledge, I think Tayfun was on the list. I believe Phil was on the list, or may have been on the list. Lamb may have been on the list. And it may have changed over the years. And then always -- the board, you know, is on the list, because if it's a -- you know, it's an Enron issue and you've got -- you know, you've got -- you've got problems that are suggestive of -- of gross malfeasance or insider embezzlement or -- or misrepresentations, then -- you know, then you got to take a serious action.**

**And that's sort of, you know, Warren Buffett coming in for Salomon. I mean, he needed to bring confidence to the street. So certainly one of the --**

Page 47

**you know, under certain scenarios, you wouldn't bring anyone from the inside, you'd have to bring a director in to step in under those types of scenarios.**

**So you've got to think, generally speaking, you've got the hit by the bus successor. You've got the, you know, sort of fact and circumstance successors. And then you've got gross malfeasance and, you know, you've got to bring confidence-type successors. And so in those emergencies there would have been other candidates that would have been on the list.**

Q. Did you disagree with Phil McHugh being listed as an emergency successor for CEO and president of Fifth Third Bank?

**A. No. I mean, I -- the -- but the more -- you know, when that happens, the very common practice is to put the CFO in because you want to assure the street. And, you know, Phil probability wouldn't have been known to the street as well. Internally, he would have been a, you know, or Brian Lamb would have been, you know, better known internally.**

**But if you want to bring, you know, once again, it depends on the situation, but if you wanted to bring confidence to the street, you know, Greg gets hit by a bus, you want to make sure that there's someone that knows the bank well, knows the investors well, then**

Page 48

**Tayfun probably would have been higher on the list, but I didn't object. I mean, I did not object to Phil being on that list.**

Q. Did you feel that Phil McHugh possessed the attributes to be an emergency successor as president and CEO of Fifth Third Bank?

MR. CIOFFI: Objection to the form of the question. He's answered. It depends on the circumstances, so -- but you can elaborate if you want.

THE WITNESS: Yeah. If there was a plane crash and -- and Greg and Tim and Tayfun had died and Phil was on the list, for sure I would have been comfortable with Phil on that list. If there was gross malfeasance that was indicative of management, you know, misrepresenting numbers, you know, overestimating, you know, or underestimating loan losses, that would have, you know, spooked the street and I think you wouldn't have put anyone from management in, and he wouldn't have been on that list just because he would have been on the lending side.

But, yeah, there are circumstances in which he would have been a consideration and a candidate, but not under all.

BY MR. SABA:
Q. What did the Fifth Third board do to determine that Tim Spence was a better long-term candidate than Phil McHugh to succeed Greg Carmichael as president and CEO of Fifth Third Bank?
MR. CIOFFI: Objection to the form of the question. He's already testified Phil was never considered.
MR. SABA: He didn't testify to that yet. Go ahead. You've testified to it several times.
THE WITNESS: Phil or Tim? I'm sorry.
MR. SABA: Well, I'll state the question again.
BY MR. SABA:
Q. What did the Fifth Third board do to determine that Tim Spence was a better long-term candidate than Phil McHugh to succeed Greg Carmichael as president and CEO of Fifth Third Bank?
**A. Well, I can't speak for all the board. I mean, I know there was certain -- there were certain actions taken by the board to, you know, get an outside assessment of Tim's -- of Tim's skills and assessment. You know, we would have had conversations amongst ourselves. I mean, all of us had independent opportunities to visit and meet with Tim at the board**



**meetings, during the dinners. As I mentioned during the December meetings, there would have been discussion, there would have been -- amongst us as well as, you know, Greg and the head of HR.**
**So the determination that Tim was the guy, I think, you know, I mean, it's -- I didn't need an outside third-party to tell me that. I mean, it was good practice. I mean, I don't -- you buy a house, you don't start with doing an inspector review of all the houses in the neighborhood. You start with which house do you want? And then you do -- and then it's -- and then you have the inspector make sure that you don't have a leaky roof or -- or faulty plumbing.**
**And I think that was, from my perspective -- and I can't speak for the whole board -- why we engaged in the value of having the third-party give us an assessment of how -- how Tim, you know, stood up against a broader audience, but I -- I -- if we had to make a decision, I would have done it without that, but I'm glad we did. It's good governance and good practice.**
**One of the things that did come out of that I think which we probably wouldn't have had a chance to participate in or visit as well, would have been the -- the -- you know, the view of other managers of Phil. I mean, I hired probably 50 CEOs in my days. Maybe that's**



**an overstatement, but it's not -- I'm not far off. And, you know, organ -- you can look at the qualifications, but one of the things that really is important is, you know, how well do they get along with the culture and the other people? And I've seen many CEOs get fired from below. You hire from above and you get fired from below.**
**And so I think probably the most valuable thing we got out of the third-party was what are their -- what did Tim's peers and subordinates think of him, and I don't recall all the specifics, but that was a very positive piece of information which I probably wouldn't have had, I wasn't surprised with, because I certainly didn't pick up on any -- you know, I mean, you can read body language and, you know, people are, you know, even in meetings doing, you know, looking at their notes or looking at their phones when someone is speaking. I mean, you can tell, but -- so the signals within his peer group and those that I saw interacting were all generally very positive for Tim.**
**But I think the benefit of that report was really getting good feedback from those constituents and that was -- that was probably new information. I probably wouldn't have independently been able to assert that.**



Q. Wouldn't that actually be best indicated by Tim Spence's employee engagement scores?
MR. CIOFFI: Objection. Argumentative, but you may answer.
THE WITNESS: I don't -- you know, I don't know. I mean, I -- you know, I think you look at -- you look at the whole, and I -- as I said, I had no -- I had no evidence of any issues with peers or subordinates. I mean, as I said now, I wasn't -- to your point, I wasn't, you know, at Fifth Third, you know, 365 days a year watching and observing, but I don't -- you know, I don't do that with any of the companies that I oversee or have overseen. And you know. I mean, there are lots of ways to know if there's a problem, not the least of which is complaints, hot lines, and none of those signals were there.
So I -- I had no reason to think that there was anything but a positive level of support from peers and subordinates for Tim, and I think -- and so the engagement scores or the peer reviews, you know, those are details I wouldn't have seen unless they were in the board deck that I would have reviewed, which I would have reviewed.

Page 53

BY MR. SABA:
Q. Did MB Financial ever have a president or CEO change during the time that you were on the board?
**A. Yes. When -- when -- I mean, Mitch Fieger had been the CEO, and when we merged, Mark Hoppe came in as president, as the number two.**
Q. What about prior to the Fifth Third merger, was there ever a president or CEO change at MB Financial during the time that you were on the board?
**A. Well, I joined the board with the acquisition. So my joining the Fifth -- the MB board was analogous to my joining the Fifth Third board. I -- it was part of the deal. There were board members that were brought -- that were invited to join, and that was when I joined. So I was not involved with the MB board prior to that. And, as I said, as part of the deal, Mark came in as the president.**
Q. Going back again to the December 2019 meeting, with respect to long-term candidates for president, in your mind or at the time of that meeting for any of the board members -- let me rephrase this question.
As of the December 2019 meeting, were there any other long-term candidates for president and CEO of Fifth Third Bank other than Tim Spence?
MR. CIOFFI: Objection to the form of the

Page 54

question. Given your previous formulation of the question, are you talking about in his mind did the board discuss others? As you know, there is a document that lists other candidates that was considered by the board. It's not a memory test. If you want him to talk about that, you should show it to him.
But are you asking from memory, in his own mind, or did some other board member mention someone? It's really a vague, unfair question because you're trying to create a particular inference.
MR. SABA: No, I'm not.
MR. CIOFFI: You are, but go --
MR. SABA: No, I'm not.
MR. CIOFFI: That's okay. I mean, you're an advocate, you can do that.
MR. SABA: Did you understand the question?
THE WITNESS: I thought I did. I'm not sure I do now.
MR. CIOFFI: That's because it's indecipherable in terms of the question. Why don't you show him the document and ask him a question about it? Why are you doing this as a memory test?
MR. SABA: Do you want me to restate the

Page 55

question again?
MR. CIOFFI: Wait a minute. Let me state my objection.
It's not a memory test. There's a document that lists particular names. You should show it to him and ask him about that. My question to you is can you clarify it? Are you asking him from memory of his own opinion, number one, or did some other board member mention other names, number two? What are you asking him?
MR. SABA: Okay. He can ask you all those questions later. I'll ask you my question again.
MR. CIOFFI: Ask it, please, clearly, though.
MR. SABA: Okay. You can ask him.
BY MR. SABA:
Q. I'll ask you the same clear question I asked before.
As of the December 2019 board meeting, were there any other long-term candidates for president and CEO at Fifth Third Bank other than Tim Spence?
**A. You know, I don't recall. I will go back to my original statement, which was, in my mind, I decided at the time of the merger that Tim was in a class of one, and so if there were others, I probably wouldn't have paid much attention to them because in my mind I**

Page 56

**was already made up. I mean -- and there was no evidence of his conduct performance or interactions with peers or subordinates that would have changed my initial view.**
**So might we have? Maybe. I don't recall. And as I said, my -- my -- look, I'm the second largest shareholder on the board. Maybe for a while I was the first, and I say this only because I want you to understand that this is not -- this is not a casual thing. I'm not on the board for the board fees. And I wouldn't typically mention numbers, but it's a public record.**
**I've got 360,000 shares of this bank, that's $15 million. When I'm making the decision here, this isn't a casual decision. I was making the decision that was going to be, you know, important not just to the fiduciary -- my fiduciary duties, but I think ideally aligned with the other shareholders because I wasn't doing this to sort of cover my ass. I was doing this to pick the right place in which I could have my own shares appreciate significantly in value. And that was a decision I made then, and I continue to believe and I had mentioned that this has been one of the best acquisitions done as evidenced by some investment banking research, and I've had substantial appreciation.**

Page 57

**So I am -- I stand by my original decision. Nothing has changed my mind from that initial meeting when I met with Tim to -- through the process in which we, you know, may or may not have considered others. I was steadfast in my view that Tim was going to sort of create significant shareholder value, which he has. And, you know, I mean, that -- that -- that -- this is not -- and so just -- this is not a casual discussion for me because I think -- I don't know, banking is arguably the second oldest profession. Maybe it's been around, you know, for a very long time and it's also probably the most -- one of the most commoditized professions.**

**When you're in a commodity -- when you're in a commodity industry, you don't have IP and you don't have -- you don't have, you know, software to differentiate. And so what you differentiate with is, you know, superior strategy -- or I shouldn't say superior. You have differentiated strategy, you have superior management, and then you've got superior execution. And that's how you compete in a competitive industry like banking.**

**And for me to have sort of decided that Tim was the guy to sort of, you know, essentially manage and be in charge of this, you know, substantial amount of**

Page 58

**wealth for me was not a casual decision. And my decision ultimately to continue with Tim is predicated on that, and it in no way reflects poorly on any other -- anybody else who might have potentially been in the running.**

**But, you know, this was a financial decision for me as well as a fiduciary responsibility that I was making for the other shareholders. But with that kind of money on the table, I felt like I was doing my job as a director, as a shareholder, and as a -- and as a, you know, just looking out for all the possible constituents.**

**Sorry to get on that bit of a rant, but I just feel pretty strongly that Tim was an exceptional guy, I made a decision that was extraordinary to turn down an all cash offer at a premium, and I did it in large part because of Tim. And so everything that happened from there really all -- if something -- if facts would have changed my mind, I would have been open to them, but facts did not change my mind.**

Q. What facts would have been required to change your mind?

**A. Well, if I had found out that Tim was a great, you know, great talker but couldn't -- couldn't get along with his -- with the team, if he were -- if he**

Page 59

**were -- excuse me -- if he were one who was of the royal CEO type where he expected hierarchy and privilege to be what was required to lead, that would have -- that might have changed my mind, probably would have changed my mind. If he were arrogant, if he were -- if it was clear that he had lost the faith and confidence of those that he was going to ultimately be leading, those would have been significant issues, because as I said, CEOs often get fired from the bottom. And if there was evidence to that, that would have been a red flag. But none of that presented itself.**

Q. Anything else?

**A. Yeah. I mean, yeah, he'd come up -- I could come up with other things. I mean, I found out that he was an indicted felon and we didn't know about it. If he had -- yes, I could come up with a list of, you know, what I would call "bad actor" things, if we found out that he had, you know, embezzled, if he had misrepresented, you know, his work history or -- I mean, yeah, I could come up with things that would have been different than that, but those that would have been in the ordinary course of business, I think those are probably the ones that I would have focused on.**

MR. SABA: Can we go off the record and take five minutes?

Page 60

MR. CIOFFI: Okay. Are you about finished, you think?

MR. SABA: No, we are going to take five.

THE VIDEOGRAPHER: We are off the record at 2:19.

(A recess was taken from 2:19 p.m. to 2:38 p.m.)

THE VIDEOGRAPHER: We are back on the record. This is media 2 of today's deposition. The time is 2:38.

BY MR. SABA:

Q. Mr. Daniels, you were talking before about not accepting the Bank of Montreal offer when they were offering to buy out MB Financial; is that right?

**A. Correct.**

Q. And I think you indicated they were offering a premium; is that correct?

**A. Yeah. It wasn't -- you know, it wasn't like 50 percent more, but it was more.**

Q. Okay. And I think you indicated that was a cash deal; is that correct?

**A. I believe so. I don't recall the nuance, but it was -- there was a -- I mean, they were being -- their role was really stalking horse, which is a term of art, I suppose, in which you want a competitive process**

**and so you want to be able to, in good faith, tell the party that you are, you know, most interested in that you've got competition. So we had -- had BMO or Bank of Montreal as our stalking horse. It might have been a nickel more or ten cents more, it wasn't a huge amount, and I -- you know, and maybe there could have been a stalking point.**

**I mean, we went back on various formulations, but -- but it was more, and I thought it was primarily principally cash, but it wasn't heavily negotiated because that really wasn't the desired party. You know, we really wanted it to be Fifth Third, and BMO was the stalking horse. But they would have done it. And BMO's got a big problem in Chicago because they've been in -- they bought Harris years ago and, you know, I interviewed at Harris in 1981, ended up going to America National Bank, and they had a problem, you know, they came in and bought Harrison, really haven't done much with it. And so Bank of Montreal I think was -- had a lot of strategic desire, but not a lot of strategic benefit for us.**

Q. And for you personally, a cash deal would have been less tax beneficial, correct?

MR. CIOFFI: Objection to the form of question and the relevancy, but go ahead.



THE WITNESS: Sure, it would have been less -- it would have been capital -- it would have been treated as capital gains, but it would have -- it would have been less in terms of --

MR. SABA: Right.

THE WITNESS: There would have been taxes.

MR. SABA: Right.

BY MR. SABA:

Q. Whereas the stock deal would have deferred that tax, correct?

**A. It would have. Sure. But it would have been that for all shareholders, too. You know, I -- any shareholder who chose to roll would have benefited from the deferral, and so that would have been a, you know, frankly a choice, you know, because you could -- if you wanted cash, you could take the stock and sell the cash and so, you know, they -- they could have done that, but you couldn't have -- you couldn't have done it the other way. You couldn't have taken the cash deal, had less stock, and then bought, you know, Fifth Third, in addition the Fifth -- the Fifth Third stock wouldn't have benefited from the merger of MB.**

Q. Right.

**A. So -- and I just -- on the tax thing, I've met a lot of business folks who sort of think taxes drive**



**things, and every single one who has taken a point of view that taxes drive structure usually sort of mess things up. I mean, it's a secondary consequential issue.**

Q. I've handed you what's been marked as Exhibit Number 5, which is Bates stamped Fifth Third-McHugh 00154; is that correct, sir?

**A. Yes.**

Q. Do you recognize this document?

**A. I believe it's the document that would have been presented in the diligent work package. If that's what this is, then, yes, I would recognize it.**

Q. From the December 2019 board meeting; is that correct?

**A. Without looking at each page, I am assuming it is.**

Q. And have you referred -- have you heard this referred to before as a talent deck?

**A. I have.**

Q. You had mentioned before that there was an independent assessment done of Tim Spence; is that correct?

**A. Yes.**

Q. By an outside body, correct?

**A. Correct.**



Q. Do you recall the name of the company that did that outside assessment?

**A. No, I don't.**

Q. Does the name RHR International ring a bell to you?

**A. It does.**

Q. Does that refresh your recollection that RHR International was the entity that performed that?

**A. It does.**

Q. Whose decision was it that there would be an outside assessment of Tim Spence?

**A. Not sure.**

Q. Do you know whose decision it was to hire RHR in 2020 to do that outside assessment of Tim Spence?

**A. Not sure. I -- not sure. I mean, I know that we -- we had a -- and I wasn't there, but I know that there was a similar assessment done by RHR -- RHR, by -- for Greg, and I believe it made sense to have -- I believe that there was a desire to have a comparable study done for Tim, but exactly who -- you know, who signed the engagement letter and all of that, I don't know if that was -- I mean, I don't have the recollection of the details there.**

**I mean, it's good corporate practice, right? I mean, you want to -- like I said, if you buy a house,**

Page 65

**you want to get an inspection, but who ordered the inspection, I don't know.**
Q. Did you know that RHR was originally contacted by Fifth Third in March of 2020 to do an assessment, not just of Tim Spence, but of Phil McHugh and Tayfun Tuzun as well?
MR. CIOFFI: Objection to the form of the question. It misstates the record and facts in evidence, but if you know, you may answer.
THE WITNESS: I did not know.
BY MR. SABA:
Q. Were you part of any of those conversations?
**A. No.**
Q. Do you recall any board meetings where it was discussed how many people should be assessed by RHR?
**A. Not that I recall.**
Q. Mr. Daniels, I've handed you what's been marked as Exhibit Number 8, which is Bates stamped Fifth Third-McHugh 001074 through Fifth Third-McHugh 001079; is that correct, sir?
**A. Yes, it is.**
Q. Have you seen this document before?
**A. I don't know if I have or not. If it was in a board deck, I would have seen it. If it's not, I don't think I would have.**

Page 66

Q. Do you know --
**A. And this is just -- this -- and this is -- no, I don't -- I don't recall -- I mean, if it was in a board deck, yes. This looks like a generic sort of piece that RHR would use for, you know, how they would assess a CEO, but I don't recall ever seeing it, no.**
Q. Do you know who created Exhibit 8?
**A. Well, my guess, RHR.**
MR. CIOFFI: Objection.
THE WITNESS: It says RHR, but I don't -- I mean, I don't know.
BY MR. SABA:
Q. Do you know if any Fifth Third executives were involved in the creation of Exhibit 8?
MR. CIOFFI: Objection. Asked and answered, but you may answer further.
THE WITNESS: I don't know.
BY MR. SABA:
Q. Do you know if any Fifth Third board members were involved in the creation of Exhibit 8?
**A. I don't know.**
Q. Do you know what Exhibit 8 was used for?
MR. CIOFFI: Objection. Asked and answered, but you may answer further.
THE WITNESS: I mean, do I know? I mean, it

Page 67

says the winning formula, it looks like an RHR piece to evaluate a president and CEO. So, I mean, but do I know that? I mean, it seems like it's sort of obvious from what this is, but I have not any outside knowledge beyond what you presented with me.
BY MR. SABA:
Q. Do you have any objective information or data indicating that as of September 22, 2020, Tim Spence was superior to or better than Phil McHugh with respect to driving innovative thinking on the strategic side while simultaneously maintaining a close eye and rigorous execution?
MR. CIOFFI: Objection. Asked and answered, but you may answer further, please.
THE WITNESS: Can you restate?
MR. SABA: Sure.
BY MR. SABA:
Q. Do you have any objective information or data indicating that as of September 22, 2020, Tim Spence was superior to or better than Phil McHugh with respect to driving innovative thinking on the strategic side while simultaneously maintaining a close eye on rigorous execution?
**A. Well, I don't know. I mean, I think business**

Page 68

**judgment, I mean, that -- that is what I would -- I would have. I mean, business judgment from the time I spent with both would have been the basis for -- now, define "objective." I would think that's pretty objective in my mind. Is there a scorecard that someone has presented from someplace else? Not that I recall. But my objective, my perspective on that is, you know, Tim objectively, for the reasons that I talked about earlier, was the clear superior strategic thinker and innovator as you've described there.**
Q. What specifically did Tim Spence indicate to you about business judgment that would show that his business judgment was superior to or better than Phil McHugh's?
MR. CIOFFI: Objection. Again, asked and answered, but please answer further if you can.
THE WITNESS: Well, I mean, let me think. On the -- you know, in the -- either in the -- in consumer banking or technology, which is where he had -- and strategy, where he had focused, his -- he had a broad depth of experiences where I think, as far as I was concerned, he was making sound decisions. Are you asking -- you're asking for some specific example?

Page 69

BY MR. SABA:
Q. Correct. What were those broad breadth of experiences that you're referring to?
**A. Well, I would say probably most importantly, defining a strategy for a bank like Fifth Third to articulate a clear strategy, a clear differentiate, not just a strategy because anyone can have a strategy, but a differentiated strategy that would allow you to compete in, you know, one of the oldest professions and one of the most competitive industries out there. And so the strategy that I think that was presented to us as early as the deal was largely Tim's, and I'd say that was very specific.**
Q. Do you know if that was solely created by Tim Spence, or was that created in cooperation with other members of the enterprise committee?
**A. I don't know.**
Q. Do you have any other examples of or -- of Tim Spence's broad breadth of experiences?
**A. At the time or now?**
Q. Prior to September 22, 2020?
**A. 2020. Yeah, you know, I don't know if I can recall specific examples. As I said, my -- my exposure to him would have been at board meetings for sure and at the dinners before. And so his articulation of -- and**

Page 70

**questioning -- and answering the questions at the meetings would have demonstrated that. But outside of that -- outside of this context, I'm not sure what I would have -- what would have come up in examples.**
**But it was clear that his strategic perspective technology, just a grasp of a complicated environment, I mean, it was clear that he had it, and we watched it, and we -- at least I saw it firsthand. If you're looking for a, you know, he did A, B, or C, I don't -- my memory doesn't provide that level of granularity.**
Q. Do you have any objective information or data indicating that as of September 22, 2020, Tim Spence was superior to Phil McHugh with respect to effectively managing the strength of the existing team while continuing to attract a more diverse group of executives?
MR. CIOFFI: Objection. Again, asked and answered in previous questions, but you may answer further if you can.
THE WITNESS: I think the -- if you want to go back, could you restate that question --
MR. SABA: Sure. Absolutely.
THE WITNESS: -- because there are a lot of pieces to it?

Page 71

BY MR. SABA:
Q. I'm asking for any objective information or data indicating that again as of September 22, 2020, Tim Spence was superior to Phil McHugh with respect to effectively managing the strength of the existing team while continuing to attract a more diverse group of executives?
**A. If you're asking for third-party validation, I mean, if it was in the -- if it was in the -- if it was in one of the quarterly books, I would have reviewed it. I don't recall anything specific right now.**
Q. Okay. Do you have any objective information or data indicating that as of September 22, 2020, Tim Spence was superior to Phil McHugh with respect to maintaining Fifth Third Bank's standing with the regulators and managing the implications of the rise of ESG issues in 2020 and beyond?
MR. CIOFFI: Again, same objection. He's answered these questions previously in his testimony, but you can answer further. Could you restate the question, please?
MR. SABA: Sure.
BY MR. SABA:
Q. Do you have any objective information or data indicating that as of September 22, 2020, Tim Spence was

Page 72

superior to Phil McHugh with respect to maintaining Fifth Third Bank's standing with the regulators and managing the implications of the rise of ESG issues in 2020 and beyond?
**A. If it was in the board deck, I would have reviewed it. If it wasn't, then I wouldn't have.**
Q. As you sit here, do you have any examples of any situations where Tim Spence indicated that with respect to maintaining FTB's standing with the regulators and managing implications of the rise of ESG issues that he was superior to Phil McHugh?
**A. The timing of that is unclear. I -- my -- because, you know, regulation is probably the biggest threat to banking, and Tim has -- and I can't tell you when it started. So, I mean, you're asking me to tease apart timelines here, but Tim's relationship with the regulators is -- is really very strong, evidenced by the fact that Jerome Powell is on his speed dial and he calls him Jay.**
**And so as a result of his -- you know, and when that began, I don't know -- but with the OCC, he's on a first name basis with the examiners in charge. The world has changed, and so today I don't know who's who, we don't know, any of us do. But with the fed, the OCC, and the -- and the FDIC, his relationships were really**

Page 73

**differentiated.**
**And so I would say that's a pretty concrete example, to the best of my knowledge. He's -- he's probably more well regarded than many CEOs. Now, I can't -- you know, a lot of that information is confidential, but I've been involved with several other banks, and there was absolutely no one in those banks that had the regulation -- or the reputation with the regulators that I dealt with that Tim has.**
Q. Is that --
**A. Now, when that began, I don't know.**
Q. So you don't know if that's true prior to September 22, 2020, correct?
MR. CIOFFI: Objection to the form of the question. That's -- he --
THE WITNESS: I don't know when the time is. I mean, I can tell you that that reputation exists today. I don't think it was a step function. I don't think it was suddenly turned on. When he started interacting with the regulators, I don't know, but I tell you this, if you cross a regulator, they've got a very long memory. So if he had foot faulted, if he had caused problems prior to, you know, his promotion, he wouldn't have been president or CEO.

Page 74

And so that sort of finding -- you know, sort of by an absence of, but, you know, it's pretty clear before you -- before you, you know, you give -- you give the regulators a heads-up. So he clearly had a history with the regulators.
My personal knowledge of when that started, I don't know, but his reputation right now, when he called Jay Powell and talked to him on a one-on-one basis, when he's been consulted by regulators in Washington on a regular basis as to how Basel and other bank regulation is going to be rolled out. I think he is -- once again, I've referenced Jamie Dimon, but I think Tim Spence is going to be the Jamie Dimon in the next, you know, after Jamie's retirement. I think he's going to be the go-to.
So I think those would be very concrete examples. I can't tell you when that started and I don't think it just -- there's a light that goes off, but as a -- all the senior managers would have had exposure to regulators. And all of the senior managers would have had, you know, exposures, and so all of them have been, you know, they've got a scorecard internally as to how they think.
But I -- I haven't met anyone who's got the reputation with -- I met a lot of bankers, who had

Page 75

the reputation that Tim has with regulators. So on the point of -- ESG, I don't have a view on ESG.
BY MR. SABA:
Q. Prior to September 22, 2020, what was your knowledge of Phil McHugh's involvement with regulators?
**A. I would presume that it would have been, you know, that as a senior manager, he would have had exposure, that regulators will come in and they've got a myriad of exams and they'll -- they'll do their examinations of different business units. So I wouldn't -- once again, I wouldn't know what specifically they -- they would have thought at the time, but, you know, clearly now he's not, you know -- it's a comparison that I can't make because at the time, I had no knowledge of what the regulators thought of Phil. At the time, I didn't know what the regulators thought of Tim. At the present, I can use a priori Bayesian sort of logic to say it wouldn't have been the case that he is in the stead that he is today if he hadn't had strong regulatory support, but that's a logical argument, it's not a statement of fact.**
(Mr. Thomas leaves the deposition room.)
BY MR. SABA:
Q. Do you have any objective information or data indicating that as of September 22, 2020, Tim Spence was

Page 76

superior to Phil McHugh with respect to the ability to navigate complexity and demonstrate resilience in a challenging world?
MR. CIOFFI: Again, objection, asked and answered in previous testimony today, but you can answer further.
THE WITNESS: Yeah, I think -- there I think Tim's -- you know, I mean, Tim had had a broader set of experiences, and with breadth comes complexity. And so his success with -- I mean, I think he started as a -- you know, in technology, I think he might have been a coder. He was in the valley for some time. He was -- he was in consulting. He came in as a strategist at Fifth Third. He became an operator. A myriad of different experiences with -- with lots of complexity associated with that. I'd say that would be a pretty concrete example of managing complexity to which he, you know, wouldn't have moved to the next if he hadn't handled the complexity of the prior set of responsibilities.
BY MR. SABA:
Q. And what complexity would he have managed?
**A. Well, comes into Fifth Third as a -- as a consultant, part of a team, charged with, you know, I**

Page 77

**wasn't there so I don't know exactly what his marching orders were, but coming into an organization of the size of Fifth Third with, you know, a myriad of business units, you know, you've got -- you've got commercial, large and small, you've got business banking, you've got mortgage banking, you've got treasury, you've got treasury services, you know, you've got auto, you've got a lot of different lines of business, and he's coming in as the consultant trying to figure that all out. Obviously he did in that they offered him a job to become the -- the EVP of strategy.**

**For him to absorb that level of complexity from a cold start I think is a real testament to his ability to learn fast and deal with very complicated matters in a, you know, way that resulted in him being offered a job internally. That's not something that happens all the time. I think the real testament to Tim that he did such a good job that they said let's just hire him as opposed to hire him -- I mean, let's hire him, let's just not use him as a consultant.**

(Mr. Thomas enters the deposition room.)

BY MR. SABA:

Q. As of September 22, 2020, what knowledge did you have of Phil McHugh's ability to manage complexity?

**A. I probably wouldn't have been exposed to it.**

Page 78

Q. Say it again. I'm sorry?

**A. I probably wouldn't have been exposed to it, so I guess I wouldn't have any knowledge.**

Q. And as you indicated, you weren't present at Fifth Third when Tim Spence was acting as a consultant for Fifth Third; is that correct?

**A. Correct.**

Q. Who would have communicated to you what Tim Spence did for Fifth Third as a consultant?

**A. I don't think anyone would have sat down and said here's kind of what Tim did. I mean, I've hired a lot of management consultants. It's not -- you know, it's not like it's some esoteric project. Usually they're brought in for a specific purpose, and I don't know what that specific purpose was. You know, the bank was in a difficult position, it was under, you know, regulatory scrutiny, and I think they had to evolve a strategy of, you know, there were a variety of strategies to evolve out of that, and I can only presume that that was what his focus was, but I don't -- no one sat down and told me that.**

**But a management consultant typically comes in with some, you know, defined strategy to turn the bank -- you know, turn the company around, reduce costs, involve a growth strategy, and I'm guessing that, you know, he could have been involved in all those, but do I know specifically which one of those he was hired for? I don't know.**

Page 79

Q. Mr. Daniels, I've handed you what's been marked as Exhibit Number 11, which is Bates stamp Fifth Third-McHugh 001216 through Fifth Third-McHugh 001222; is that correct?

**A. Let me check. Yes, it appears to be.**

Q. Have you seen this document before?

**A. I would have seen it, yes. I mean, it was sent to the board.**

Q. If you could turn to page 3, which is Bates stamp Fifth Third-McHugh 001218. Do you have that page?

**A. I do.**

Q. And this was a letter written by Greg Carmichael to the board. Referring to the second paragraph of this letter, it indicates, "As Bob Shaffer and I discussed with you at the September board meeting, we believe that Phil McHugh could be at risk with Tim's promotion. And, in fact, Phil has decided not to accept the role of head of consumer and business banking and is leaving the company."

Do you see that?

**A. I do.**

Q. Do you recall Bob Shaffer and Greg Carmichael

Page 80

discussing with the board that Phil McHugh could be at risk with Tim's promotion?

**A. I don't in specific, no.**

Q. Do you recall any discussion during the September board meetings about Phil McHugh potentially leaving if Tim Spence is named president of Fifth Third Bank?

**A. You know, not that I recall, no.**

Q. Do you recall any discussions about Phil McHugh during the September meetings, September 2020, specifically?

**A. Yeah, I mean, I think -- I mean -- I mean, no. I guess -- I guess no. I mean, not in specific. I mean, I know that we would have talked about him, but, you know, that was a while ago. So no. I mean, if I think -- if you ask me what happened at that meeting and what did we talk about with Phil, I wouldn't have known.**

MR. SABA: Can we go off the record? I think I'm about finished. Just give me one minute.

THE VIDEOGRAPHER: We are off the record.

(A recess was taken from 3:07 p.m. to 3:10 p.m.)

THE VIDEOGRAPHER: We are back on the record. The time is 3:10.

Page 81

BY MR. SABA:
Q. Mr. Daniels, that's all the questions that I have. We'll continue in progress.
MR. CIOFFI: As stated before, I recognize that you're attempting to reserve some kind of right to continue in progress. There is no such right. So we would object to any further continuation of the deposition.
Mr. Daniels, I have a couple questions for you.
THE WITNESS: Okay.

EXAMINATION

BY MR. CIOFFI:
Q. At the board discussions concerning who should succeed and be appointed to the position of president after Greg Carmichael stepped down, was age ever a factor in those discussions as to who should succeed Greg Carmichael?
MR. SABA: Objection.
MR. CIOFFI: You can answer.
THE WITNESS: Can I answer?
MR. CIOFFI: You may answer.
THE WITNESS: No.
BY MR. CIOFFI:
Q. Did any board member ever suggest at any

meeting about who should succeed Greg Carmichael that age should be considered in any way?

MR. SABA: Objection.

THE WITNESS: It was not discussed.

BY MR. CIOFFI:

Q. Was age ever considered in any way about who should succeed Greg Carmichael?

MR. SABA: Objection.

THE WITNESS: No.

MR. CIOFFI: No further questions.

MR. SABA: I have no further questions.

THE VIDEOGRAPHER: We are off the record at 3:12.

______________________________
C. BRYAN DANIELS

______________________________
DATE

\- - -

DEPOSITION CONCLUDED AT 3:12 P.M.

\- - -

C E R T I F I C A T E

STATE OF OHIO : 
: SS
COUNTY OF HAMILTON :

I, Wendy L. Raymer, RPR, CRR, the undersigned, a duly qualified and commissioned notary public within and for the State of Ohio, do hereby certify that before the giving of his aforesaid deposition, C. BRYAN DANIELS was by me first duly sworn to depose the truth, the whole truth and nothing but the truth; that the foregoing is the deposition given at said time and place by C. BRYAN DANIELS; that said deposition was taken in all respects pursuant to stipulation of counsel; that I am neither a relative of nor employee of any of the parties or their counsel, and have no interest whatever in the result of the action; that I am not, nor is the court reporting firm with which I am affiliated, under a contract as defined in Civil Rule 28 (D).

IN WITNESS WHEREOF, I hereunto set my hand and official seal of office at Cincinnati, Ohio, this 27th day of February, 2025.

My Commission expires December 6, 2026

S/Wendy L. Raymer, RPR, CRR
Notary Public - State of Ohio

1 DEPOSITION ERRATA SHEET

Date Taken: February 13, 2025

Case Caption: PHILIP R. MCHUGH

vs. FIFTH THIRD BANCORP, et al.

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the ______ day of

____________, 20___.

___________________________________

C. BRYAN DANIELS

2 DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

SIGNATURE:_______________________DATE:___________

C. BRYAN DANIELS

3 DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:______________

______________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

______________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

______________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

______________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

______________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

______________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

______________________________________________________

Reason for change:________________________________

SIGNATURE:_______________________DATE:___________

C. BRYAN DANIELS

**WORD INDEX**

< $ >
**$15** 56:14

< 0 >
**001074** 65:19
**001079** 65:19
**001216** 79:6
**001218** 79:13
**001222** 79:6
**00154** 63:7

< 1 >
**1** 18:22 19:6 20:4, 24 33:11 35:8, 13 42:13, 14 43:22 84:1
**1:01** 1:19 5:3
**1:21-cv-00238** 1:9 5:8
**11** 4:9 79:5
**13** 1:18 84:2
**13th** 5:2
**1420** 6:11
**17** 9:18 10:1, 9
**1700** 2:15
**18** 41:2
**19** 19:17 21:1 41:2, 23
**1981** 9:13 37:22 61:16
**1997** 9:5 10:2
**1998** 10:2
**1st** 20:23

< 2 >
**2** 60:9 85:1
**2/3/59** 7:6
**2:19** 60:5, 6
**2:38** 60:7, 10
**20** 7:9 84:17
**2000** 7:9 11:6
**201** 2:15
**2018** 14:22 39:14 41:23
**2019** 12:8, 18, 24 13:15, 21 18:8, 11 19:12 21:8 28:10, 19 33:10 34:15 35:2, 8, 11 44:20 53:18, 22 55:18 63:13
**2020** 18:22 19:6, 18 20:4, 24 28:10, 19 33:11 35:8, 13 39:15 43:23 64:14 65:4 67:9, 20 69:21, 22 70:13 71:3, 13, 17, 25 72:4 73:13 75:4, 25 77:23 80:10
**2025** 1:18 5:2 83:20 84:2
**2026** 83:25
**22** 67:9, 20 69:21 70:13 71:3, 13, 25 73:13 75:4, 25 77:23
**25** 10:18
**2623** 2:7
**27th** 83:19
**28** 83:17

< 3 >
**3** 79:12 86:1
**3:07** 80:21
**3:10** 80:22, 24
**3:12** 82:13, 22
**360,000** 56:13
**362-8700** 2:16
**365** 52:11

< 4 >
**40-some** 42:10
**45202** 1:21 2:16, 23
**45208** 2:8

< 5 >
**5** 4:8 63:6
**50** 10:18 50:25 60:19
**511** 1:20 2:22
**513** 2:8, 16, 23
**533-2701** 2:8

< 6 >
**6** 4:4 83:25
**60093** 6:12
**629-2716** 2:23
**63** 4:8
**65** 4:8

< 7 >
**70** 34:9
**79** 4:9

< 8 >
**8** 4:8 65:18 66:7, 14, 20, 22
**81** 4:4

< A >
**ABA** 37:25
**ability** 17:16 38:11 76:1 77:14, 24
**able** 26:3 28:1 46:6 51:24 61:1
**absence** 74:2
**absolute** 23:25
**absolutely** 41:8 70:23 73:7
**absorb** 77:12
**Academies** 10:12
**accelerated** 16:22
**Acceleration** 10:12
**accentuate** 16:2
**accept** 79:20
**accepting** 60:13
**accounting** 45:23
**accurate** 84:10
**acquire** 23:6
**acquired** 9:14 10:24, 25
**acquisition** 11:12, 15 13:1 21:1, 4, 18 22:6 23:25 24:5, 6, 8, 18 25:8, 16 26:12, 15 42:24, 25 53:10
**acquisitions** 15:17 23:24 56:24
**acting** 78:5
**action** 46:1, 22 83:15
**actions** 49:21
**active** 9:9 13:3
**actor** 59:17
**addition** 62:21
**additional** 5:22
**Additionally** 6:24
**address** 6:10 7:8
**adult** 7:14
**advisory** 10:16
**advocate** 54:17
**afar** 17:17
**affiliated** 83:16
**aforesaid** 83:7
**age** 6:2 81:16 82:2, 6
**agenda** 34:5
**ago** 28:24 33:22 61:15 80:15
**agreement** 5:21
**ahead** 6:7 49:10 61:25
**Akron** 10:8
**al** 1:10 5:6 84:4
**alarming** 24:14
**aligned** 56:18
**all-cash** 16:25
**allow** 8:11 69:8
**amazing** 42:13
**America** 37:23 61:16
**American** 9:13 24:18 38:1
**America's** 23:25
**amount** 31:5 57:25 61:5
**analogous** 53:11
**and/or** 84:11
**annual** 12:12 29:15, 18 30:11 32:13 33:25 37:25 42:22 43:5, 24
**answer** 6:22, 23, 25 8:9, 11 19:9 20:7 22:17, 19 28:15 32:23 33:20 34:22 52:4 65:9 66:16, 24 67:15 68:16 70:19 71:20 76:6 81:20, 21, 22
**answered** 25:13 28:14 34:12 48:8 66:15, 23 67:14 68:16 70:19 71:19 76:5
**answering** 70:1
**answers** 44:8
**anybody** 58:4
**apart** 45:19 72:16

**APPEARANCES** 2:1 3:1
**Appearing** 2:6
**appears** 79:8
**appointed** 81:15
**apportionment** 17:7
**appraisals** 30:5
**appreciate** 56:21
**appreciation** 56:25
**apprise** 31:22
**apprised** 33:9
**approached** 14:1
**approval** 13:22, 23 18:17
**approximately** 19:20
**April** 12:8, 15, 18, 24 13:10, 15 18:8, 11 19:12 20:23 21:8 28:10, 19 33:10 35:8, 11
**areas** 33:2
**arguably** 15:13 57:10
**argument** 75:21
**Argumentative** 52:3
**arrogant** 59:5
**art** 60:25
**articulate** 69:6
**articulated** 16:4 39:4
**articulating** 23:11
**articulation** 69:25
**Asked** 28:14 55:16 66:15, 23 67:14 68:15 70:18 76:4
**asking** 6:16 19:18 32:22 37:9 43:16 54:8 55:7, 10 68:23 71:2, 8 72:15
**ass** 56:19
**assert** 27:22, 23 51:24
**asserted** 22:6
**assertion** 24:23
**assess** 66:6
**assessed** 65:15
**assessment** 49:22 50:17 63:21 64:2, 11, 14, 17 65:4
**assessments** 31:17, 18
**assistant** 9:19
**associated** 76:17
**Association** 38:1
**assumes** 20:6 34:20
**assuming** 63:15
**assure** 26:3 47:16
**attempting** 81:5
**attention** 55:25
**attorneys** 5:9
**attract** 70:16 71:6
**attributes** 48:5
**audience** 50:18
**audit** 32:3
**auditor** 32:5
**August** 34:15 35:2
**auto** 77:7
**Avenue** 2:7
**aware** 27:2 34:15

**< B >**
**back** 9:7 37:20 38:15 53:18 55:21 60:8 61:8 70:22 80:23
**bad** 27:13 59:17
**Bailey** 2:5 5:14
**balance** 44:16
**BANCORP** 1:10 5:5 84:4
**Bank** 2:21 7:23 8:4 9:13 10:23 15:9, 10 17:2 18:24 22:8, 11, 14 23:25 24:1, 7 28:4, 5 33:13 38:25 39:2, 23 45:8, 17 47:13, 25 48:6 49:5, 18 53:24 55:20 56:13 60:13 61:3, 17, 19 69:5 74:11 78:15, 24 80:7
**banker** 9:12 15:20 25:23 33:6, 7, 8 38:7, 8
**bankers** 23:16, 18 37:21, 23, 25 38:1, 2, 3, 5 42:7, 9, 10, 12 74:25
**banking** 9:25 10:1 37:22 45:13 56:25 57:9, 22 68:19 72:14 77:5, 6 79:21
**banks** 9:23, 24 15:21 22:5 23:14, 15, 17, 24 37:24 73:7
**Bank's** 71:15 72:2
**BA's** 23:24
**Based** 12:17 17:23 39:13 42:9
**Basel** 74:10
**basis** 24:10 68:3 72:22 74:9, 10
**Bates** 63:6 65:18 79:5, 12
**bath** 24:1
**Bayesian** 75:18
**bear** 27:21
**began** 72:21 73:11
**behalf** 2:1, 10 5:11, 13, 15, 18
**believe** 18:9, 12 46:14 56:22 60:22 63:10 64:18, 19 79:19
**believed** 16:24
**bell** 64:4
**beneficial** 61:23
**benefit** 51:21 61:21
**benefited** 62:13, 22
**benefits** 16:4
**bes@sspfirm.com** 2:10
**best** 21:20 42:6 46:13 52:1 56:23 73:3
**better** 14:3 15:23 16:16, 17 27:25 47:20 49:3, 16 67:10, 21 68:13
**beyond** 67:5 71:17 72:4
**bias** 27:14
**bid** 16:9, 11
**bidder** 15:8
**big** 16:15, 20 18:5 26:9 27:11, 12 61:14
**biggest** 72:13
**billion** 26:14, 17, 23
**biotechnology** 8:20
**birth** 7:5
**bit** 24:13 58:13
**Blank** 2:14 5:18
**blind** 41:8
**blood** 24:1
**BMO** 15:6 16:9 17:8, 16 61:3, 12
**BMO's** 61:13
**board** 7:20 8:1 10:7, 8, 12, 15, 16, 22, 24 11:1, 3, 12, 20, 21 12:9, 13, 20 13:5, 6 14:11, 13 15:25 17:2, 4, 7 18:1, 4 19:12, 14 28:12, 20 29:23 30:2, 8, 17, 21 31:1, 6, 8, 11, 22 32:15, 23 33:15, 16, 18 34:3 35:5, 11, 15 36:2 43:8, 10, 12 44:18, 20 46:17 49:2, 15, 19, 21, 25 50:15 52:23 53:3, 9, 10, 11, 12, 13, 15, 21 54:3, 5, 9 55:9, 18 56:7, 10 63:13 65:14, 24 66:4, 19 69:24 72:5 79:11, 16, 18 80:1, 5 81:14, 25
**boards** 10:3, 6, 8, 18, 20
**board's** 34:17
**Bob** 79:17, 25
**body** 51:15 63:24
**books** 43:9 71:10
**bottom** 59:9
**bought** 61:15, 18 62:20
**breadth** 69:2, 19 76:9
**Brian** 2:20 5:23 47:19
**Brian.Thomas@53.com** 2:24
**bring** 15:3 27:15 46:24 47:1, 2, 8, 21, 23
**bringing** 17:24
**broad** 68:21 69:2, 19
**broader** 50:18 76:8
**broken** 44:16
**brought** 42:17, 19 53:13 78:14

**BRYAN** 1:15 4:3 5:4 6:1, 9 82:17 83:7, 11 84:19 85:24 86:24
**Buffett** 46:23
**build** 23:6
**bus** 45:22 46:4, 5, 6 47:5, 24
**business** 9:1, 2 10:13 14:15 23:9 59:22 62:25 67:25 68:2, 12, 13 75:10 77:3, 5, 8 79:21
**buy** 50:8 60:14 64:25

< C >
**call** 59:17
**called** 9:2, 13, 22 10:8, 16 11:16 74:8
**calls** 72:19
**candidate** 48:24 49:3, 16
**candidates** 44:21 47:10 53:19, 23 54:4 55:19
**cap** 26:14
**capacity** 38:2
**Capital** 9:2, 3, 4, 11 10:17 62:2, 3
**capitalization** 17:8, 9
**Caption** 84:3
**captioned** 84:8
**car** 10:9
**care** 28:5
**Carmichael** 13:10, 15 26:7 27:3 33:12 34:16 42:2 44:22 49:4, 17 79:16, 25 81:16, 18 82:1, 7
**CASE** 1:9 5:4, 7, 19 7:25 8:3 75:19 84:3
**cash** 10:11 16:10, 11, 14 58:16 60:21 61:10, 22 62:16, 19
**cast** 40:20
**casual** 56:9, 15 57:8 58:1
**caused** 24:1 73:23
**caveat** 39:17
**Center** 1:20 2:15, 22 23:19
**central** 20:20
**cents** 61:5
**CEO** 12:2 15:15 30:2 31:20, 22 33:12 39:22 40:8, 13, 23 43:2, 7, 16 44:22 45:17, 22 47:12 48:6 49:5, 18 53:2, 5, 8, 23 55:20 59:2 66:6 67:2 73:25
**CEOs** 41:7, 9, 11, 12 46:10 50:25 51:5 59:8 73:4
**CEO's** 34:7
**certain** 47:1 49:20
**certainly** 12:15 18:19 19:24 20:14 23:16 31:16 33:24 46:25 51:14
**certified** 6:3
**certify** 83:6
**CFO** 47:16
**chain** 10:9
**chair** 13:5
**chairman** 40:13
**challenging** 76:3
**chance** 34:16 36:25 50:22
**change** 22:18 40:9 53:3, 8 58:20, 21 85:4, 7, 10, 13, 16, 19, 22 86:4, 7, 10, 13, 16, 19, 22
**changed** 45:1 46:16 56:3 57:2 58:19 59:4 72:23
**changes** 84:11, 14
**channel** 31:7 35:22
**channels** 31:13
**charge** 45:22 57:25 72:22
**charged** 76:25
**check** 11:6, 7 25:5 79:8
**chemistry** 8:17
**Chicago** 8:18, 19 9:15, 23 21:4 22:11, 14, 25 23:2, 3, 24 24:7, 18 25:17 27:4, 7, 25 28:3, 5, 11 37:24 39:16 61:14
**chief** 26:18 31:24, 25 32:5
**choice** 62:15
**choose** 16:12
**chose** 62:13
**CIBC** 24:3
**Cincinnati** 1:21 2:8, 16, 23 83:19
**Cioffi** 2:10 4:4 5:17 8:8 19:22 20:5 21:5 25:13 28:14 33:14, 17, 20 34:19 39:25 48:7 49:6 52:3 53:25 54:14, 16, 21 55:2, 13 60:1 61:24 65:7 66:9, 15, 23 67:14 68:15 70:18 71:18 73:14 76:4 81:4, 13, 20, 22, 24 82:5, 10
**circumstance** 47:6
**circumstances** 48:9, 23
**Citi** 27:16
**City** 38:21
**Civil** 83:17
**clarify** 55:7
**class** 41:4, 19 45:9, 12 55:23
**Clean** 10:9
**clear** 16:2 26:24 39:6 40:16 43:22 45:2 55:16 59:6 68:9 69:6 70:5, 7 74:3
**clearer** 7:2
**clearly** 6:23 23:13 41:17 55:13 74:5 75:13
**Cleveland** 38:21
**close** 19:8 67:12, 23
**coder** 76:12
**cold** 77:13
**Cole** 10:23
**colleagues** 23:2
**Collin** 2:13 5:17
**collin.hart@blankrome.com** 2:17
**colloquy** 19:22
**combined** 24:10
**come** 7:14 16:3 19:14 27:9 35:11 36:21 50:21 59:13, 14, 16, 20 70:4 75:8
**comes** 31:10 76:9, 24 78:22
**comfort** 24:21
**comfortable** 48:14
**coming** 20:10 22:25 23:4, 15 36:16 46:24 77:2, 8
**Commencing** 1:19
**comments** 30:6
**commercial** 77:4
**Commission** 83:24
**commissioned** 83:5
**committee** 31:24 32:2, 3 35:21 36:3 69:16
**committees** 31:9, 23 32:9
**commoditized** 57:12
**commodity** 57:14, 15
**common** 47:15
**commoner** 41:14
**communicate** 26:4, 6 35:2, 5
**communicated** 19:7 20:3 27:2 78:8
**communication** 20:7
**communications** 31:8, 12
**companies** 10:19 14:7 52:13
**company** 10:25 64:1 78:24 79:22
**comparable** 64:19
**comparison** 75:14
**compelling** 16:7
**compete** 57:21 69:9
**competition** 61:3
**competitive** 57:21 60:25 69:10
**complaints** 52:16
**completed** 19:15

**complexity** 76:2, 10, 17, 19, 21, 23 77:12, 24
**complicated** 21:21 40:15 70:6 77:14
**complimentary** 33:3
**composition** 11:21
**comprised** 13:2
**computer** 8:18
**concern** 11:18
**concerned** 23:10 68:22
**concerning** 81:14
**concerns** 23:11 27:15
**concluded** 45:7 82:22
**concrete** 73:2 74:16 76:18
**conduct** 56:2
**confidante** 34:24
**confidence** 16:23 28:2 46:25 47:23 59:6
**confidence-type** 47:8
**confidential** 73:6
**confused** 43:3
**Connie** 1:23
**consensus** 40:18
**consequential** 63:3
**consideration** 11:17 17:24 48:24
**considered** 12:5 46:10 49:8 54:5 57:4 82:2, 6
**considering** 15:3
**constituents** 20:13 51:22 58:12
**consultant** 76:25 77:9, 20 78:5, 9, 22
**consultants** 78:12
**consulted** 74:9
**consulting** 76:14
**consumer** 68:19 79:21
**contact** 14:22
**contacted** 65:3
**context** 29:25 37:5 38:7 46:2, 3, 9 70:3
**contingencies** 45:21
**continuation** 81:8
**continue** 9:7 10:15 56:22 58:2 81:3, 6
**CONTINUED** 3:1
**continuing** 70:16 71:6
**continuum** 24:4
**contract** 83:17
**contrast** 23:22
**contrasted** 36:15
**conversation** 36:15, 21 39:11
**conversations** 17:13 21:13, 16 26:1 28:24 37:11, 15 38:14 39:9 49:23 65:12
**cooperation** 69:15
**copious** 31:5
**corners** 38:10
**corporate** 27:10, 11, 12, 16 64:24
**correct** 12:9 15:9 19:15 25:11 28:21 36:5 39:14 43:13 44:1, 6, 13, 14, 17 60:15, 17, 21 61:23 62:10 63:7, 14, 22, 24, 25 65:20 69:2 73:13 78:6, 7 79:7
**corrections** 84:11
**costs** 78:24
**counsel** 7:18 8:23 19:22 83:12, 14
**country** 28:1
**COUNTY** 83:3
**couple** 23:17 81:9
**course** 16:21 22:13, 16 59:22
**COURT** 1:2 5:6, 24 6:20 83:16
**cover** 56:19
**crash** 48:12
**crashing** 46:7
**create** 54:11 57:6
**created** 66:7 69:14, 15
**creation** 66:14, 20
**creative** 22:7 24:10
**credit** 26:18, 22 27:4, 6, 23, 24 28:8 31:25 40:21 45:4 50:19 56:14, 15, 22 57:1 58:1, 2, 6, 15 64:10, 13
**criticism** 33:7, 9
**criticisms** 32:24
**critiques** 33:9
**cross** 73:21
**CRR** 1:22 83:4, 24
**culture** 51:4
**currently** 8:25
**customer** 20:12, 13 30:24
**customers** 9:22, 24 21:23 22:12, 21 23:12, 13 24:22, 24 26:5 28:6 37:24
**customer's** 24:15

**< D >**
**dance** 40:13
**DANIELS** 1:15 4:3 5:4, 19, 21 6:1, 7, 9 60:12 65:17 79:4 81:2, 9 82:17 83:7, 11 84:19 85:24 86:24
**D-a-n-i-e-l-s** 6:9
**data** 67:8, 19 70:12 71:3, 13, 24 75:24
**Date** 1:18 7:5 13:7 21:1, 15 82:19 84:2
**dates** 13:23 21:10
**day** 9:7 83:20 84:16
**days** 35:17 50:25 52:11
**deal** 10:21 13:22 14:10 15:11 16:12, 15, 18, 25 17:25 18:2, 5 19:8 38:12, 17 40:7 41:1, 24 45:2 53:13, 16 60:21 61:22 62:9, 19 69:12 77:14
**dealt** 73:9
**December** 29:21 30:12 31:19 33:10, 17, 24, 25 43:7, 12, 25 44:20 50:2 53:18, 22 55:18 63:13 83:25
**decided** 39:21 55:22 57:23 79:20
**decision** 15:11, 18, 19 18:16, 19 39:10
**decisioning** 16:20 46:3
**decisions** 15:16 68:23
**deck** 43:25 44:8, 18 52:23 63:18 65:24 66:4 72:5
**DECLARATION** 84:5
**declare** 84:6
**deep** 16:3 38:10
**Defendants** 1:11 2:10 5:18
**defense** 5:20
**deferral** 62:14
**deferred** 62:9
**define** 36:11 68:4
**defined** 78:23 83:17
**defining** 69:5
**definitely** 22:18 28:24
**definition** 16:13
**degree** 8:16
**delighted** 42:21
**demonstrate** 76:2
**demonstrated** 70:2
**Department** 5:22
**depends** 47:22 48:8
**depose** 83:8
**deposed** 6:3
**Deposition** 1:15 5:4 6:13 7:17, 20 8:7, 22 60:9 75:22 77:21 81:8 82:22 83:7, 10, 11 84:1, 8, 12 85:1 86:1
**deposits** 24:8, 11, 12 25:4, 7
**depth** 68:21
**described** 68:10
**desire** 61:20 64:19
**desired** 61:11
**desires** 34:17
**detail** 21:21 43:9
**details** 21:10 26:2 52:22 64:23

**determination** 11:20 50:5
**determine** 21:17 49:2, 15
**determined** 41:22 43:1
**dial** 72:18
**died** 48:12
**difference** 39:7
**different** 27:11 32:7 36:23 38:18 46:2, 8 59:21 75:10 76:16 77:8
**differentiate** 57:17 69:6
**differentiated** 57:19 69:8 73:1
**difficult** 78:16
**diligence** 38:6 40:2
**diligent** 30:17 43:9 63:11
**Dimon** 39:15, 19 45:12 74:13, 14
**dinner** 35:19 36:24
**dinners** 36:25 50:1 69:25
**direct** 29:4, 11 36:8
**directly** 32:8
**director** 15:14 17:24 20:10 47:2 58:10
**directors** 8:1 12:6, 7 17:22
**disagree** 47:11
**disappointed** 41:20
**disastrous** 24:4
**discuss** 36:19 54:3
**discussed** 7:25 8:3 34:4 46:11 65:15 79:18 82:4
**discussing** 80:1
**discussion** 50:2 57:8 80:4
**discussions** 33:11 34:1, 10 37:3 80:9 81:14, 17
**disparity** 17:6
**dispositions** 15:16
**disrespect** 45:10
**dissuade** 41:18
**distribution** 42:9, 12
**DISTRICT** 1:2, 3 5:6, 7
**Ditto** 31:1
**diverse** 70:16 71:6
**DIVISION** 1:4 5:7
**divisions** 32:19, 25 44:13, 17
**document** 54:4, 23 55:4 63:9, 10 65:22 79:9
**documents** 8:6, 10, 12, 13, 21
**doing** 16:17 20:15 23:9 36:14 37:6 38:9 39:12 43:8 50:9 51:16 54:24 56:19 58:9
**dollar** 26:17, 24 45:4
**dollars** 26:14
**doubts** 40:20
**drive** 46:4, 5 62:25 63:2
**driving** 46:3 67:11, 22
**dropped** 25:8
**due** 16:20 17:23 23:1 31:4 40:2
**duly** 6:2 83:5, 8
**duties** 15:14 56:17

< E >
**earlier** 12:3 34:17 35:3 68:9
**early** 41:16 69:12
**East** 2:15
**education** 8:15
**effectively** 70:14 71:5
**eight** 19:20 35:13
**eight-month** 28:9
**either** 14:4, 14 35:17 68:18
**elaborate** 48:9
**Email** 2:9, 17, 24 26:7, 8
**emailer** 26:10
**embezzled** 59:18
**embezzlement** 46:21
**emergencies** 47:9
**emergency** 46:1, 10
47:12 48:5
**employed** 8:25
**employee** 30:15 44:3 52:2 83:13
**employees** 7:22 8:4 20:13 21:25 22:15, 21 23:12, 14 24:22 26:5
**ended** 61:16
**engaged** 50:15
**engagement** 30:16 44:3 52:2, 21 64:21
**enrich** 42:12
**Enron** 46:18
**ensure** 20:10 23:11
**enterprise** 30:5 69:16
**enters** 77:21
**entertained** 17:12
**entire** 84:7
**entity** 64:8
**environment** 70:7
**EQ** 38:11
**equity** 9:4, 11 16:12
**Erie** 2:7
**ERRATA** 84:1, 13 85:1 86:1
**ESG** 71:17 72:3, 10 75:2
**esoteric** 78:13
**Esq** 2:1, 4, 5, 10, 13, 17, 20
**essentially** 28:9 57:24
**et** 1:10 5:5 84:4
**evaluate** 67:2
**evaluation** 36:14
**evidence** 34:20 52:8 56:2 59:10 65:9
**evidenced** 56:24 72:17
**evolve** 78:17, 19
**EVP** 77:11
**exact** 19:2 29:1
**Exactly** 20:20 64:20 77:1
**Examination** 4:4 6:5 81:12
**examinations** 75:10
**examined** 6:3
**examiners** 72:22
**example** 68:24 73:3 76:18
**examples** 69:18, 23 70:4 72:7 74:17
**exams** 75:9
**exception** 27:6, 19 28:2 31:11 38:6
**exceptional** 58:14
**excuse** 20:24 33:11 59:1
**execution** 57:21 67:13, 24
**executive** 43:19, 20
**executives** 41:25 66:13 70:17 71:7
**executor** 38:23
**Exhibit** 4:8, 9 63:5 65:18 66:7, 14, 20, 22 79:5
**EXHIBITS** 4:7
**existing** 70:15 71:5
**exists** 73:17
**expected** 59:2
**experience** 10:22 30:25 38:4 45:13
**experiences** 11:2 68:21 69:3, 19 76:9, 16
**expert** 38:23
**expires** 83:24
**explained** 16:22
**exposed** 77:25 78:2
**exposure** 69:23 74:20 75:8
**exposures** 74:21
**extent** 8:15 31:23 35:20
**extra** 20:16
**extraordinarily** 28:6
**extraordinary** 58:15
**eye** 67:12, 23

< F >
**fact** 11:5, 7 12:3 14:3 25:5 33:3 47:6 72:18 75:21 79:20
**factor** 81:17
**facts** 34:20 58:18, 20, 21 65:8

**failed** 26:15
**faith** 59:6 61:1
**far** 46:5 51:1 68:22
**fast** 77:14
**faulted** 73:23
**faulty** 50:13
**FDIC** 25:10 72:25
**February** 1:18 5:2 83:20 84:2
**fed** 72:24
**feedback** 37:4 51:22
**feel** 6:18 48:4 58:14
**fees** 56:10
**felon** 59:15
**felt** 20:16 58:9
**fiduciary** 15:12 56:17 58:7
**Fieger** 12:2 13:4 53:4
**FIFTH** 1:10, 20 2:15, 21, 22 5:5, 22 7:19, 23 8:1, 4 10:3, 25 11:11, 12 12:9 14:1, 4, 9, 14 15:23 16:5, 18, 21 17:19 18:4, 23 22:11, 14, 25 23:1, 20 24:5, 7 27:8, 25 29:24 31:5 33:13 36:2 38:20 39:8, 23 40:21 41:24 42:15 45:14, 17 47:12 48:6 49:2, 5, 15, 18 52:11 53:7, 11, 12, 24 55:20 61:12 62:20, 21 63:6 65:4, 18, 19 66:13, 19 69:5 71:15 72:2 76:14, 24 77:3 78:5, 6, 9 79:5, 6, 13 80:6 84:4
**figure** 27:23 77:9
**filter** 27:11, 12
**final** 15:7
**Financial** 9:22 11:4, 13, 18 14:25 32:18 44:12 53:2, 8 58:6 60:14
**find** 12:16
**finding** 74:1
**finish** 6:24 13:12
**finished** 60:1 80:19
**fired** 51:5, 6 59:9
**firm** 83:16
**first** 6:2 7:10 9:14 10:7 12:11, 23 13:3 19:4 24:17 37:23 40:6 56:8 72:22 83:8
**firsthand** 70:8
**fit** 16:6
**fitting** 36:20
**five** 11:6, 7, 9 59:25 60:3
**fix** 27:1 38:25
**fixing** 27:4 39:2
**fix-it-up** 28:4
**flag** 59:10
**flight** 22:22
**flowed** 26:22
**FNB** 9:14
**focus** 24:20 78:20
**focused** 9:5 23:20 26:11 59:23 68:20
**focussed** 23:19
**folks** 37:22 62:25
**following** 12:13, 14 22:12, 15 39:9
**follows** 6:4
**foot** 73:23
**foregoing** 83:10
**form** 20:5 21:5 34:19 48:7 49:6 53:25 61:24 65:7 73:14
**formal** 36:13
**formation** 24:1
**formed** 9:5
**forms** 45:23
**formula** 67:1
**formulation** 54:1
**formulations** 61:8
**Forrest** 26:20, 21 27:2
**forth** 40:8
**forum** 37:3
**forward** 39:4
**found** 58:23 59:14, 17
**foundation** 34:21
**founding** 9:8
**frame** 21:6 31:20 40:1, 3
**frames** 28:16
**franchise** 23:6, 7
**Frank** 26:18, 20, 21 27:2, 8, 14, 15
**frankly** 62:15
**free** 6:18
**frequently** 19:6 20:2
**front** 23:19
**FTB's** 72:9
**fumbles** 23:23
**function** 17:8 73:18
**fund** 9:4, 6, 11
**further** 66:16, 24 67:15 68:16 70:20 71:20 76:6 81:7 82:10, 11

< G >
**gains** 62:3
**generally** 14:7 31:18 47:4 51:20
**generic** 66:4
**getting** 51:22
**give** 29:7 44:7 50:16 74:4 80:19
**given** 17:6 20:17 43:25 45:11 54:1 83:10
**giving** 83:7
**glad** 41:21 50:20
**go** 6:7 7:14 14:14 31:14 37:20, 25 38:15 49:9 54:14 55:21 59:24 61:25 70:21 80:18
**goal** 36:15
**goals** 32:19 44:12
**God** 38:20
**goes** 74:18
**going** 6:16 8:8 11:14, 20 14:4 15:18 23:20 24:22, 24 27:13 28:1 34:8 36:16, 22 37:2, 7 39:3, 7, 19, 20, 25 40:8, 19 41:17 44:4 53:18 56:16 57:5 59:7 60:3 61:16 74:11, 13, 15
**good** 15:2 22:9 24:22 25:3 27:24 37:5 41:10 50:8, 20 51:22 61:1 64:24 77:18
**go-to** 74:15
**gotten** 17:14
**governance** 11:19 31:9 50:20
**governances** 15:2
**grace** 38:20
**granularity** 70:11
**grasp** 70:6
**great** 25:22 58:23, 24
**Greg** 13:2, 10, 15 14:17 26:7, 18 27:3 33:12 34:8, 11, 16 38:17, 18, 19, 22 42:2 44:22 47:23 48:12 49:4, 17 50:4 64:18 79:15, 25 81:16, 18 82:1, 7
**Greg's** 34:24 38:18
**grew** 25:21 41:12
**gross** 46:20 47:7 48:15
**group** 9:21 10:16 13:2 51:19 70:16 71:6
**growing** 25:5
**growth** 78:25
**guess** 25:4 27:5 66:8 78:3 80:13
**guessing** 78:25
**guest** 12:21
**guy** 27:3, 9 38:13, 17 39:11 41:17 45:7 50:5 57:24 58:14

< H >
**Hal** 11:25 12:5 13:4 14:9 40:17
**HAMILTON** 83:3
**hand** 83:18
**handed** 63:5 65:17 79:4
**handled** 26:25 76:20
**happen** 39:3

**happened** 13:24 33:23 41:20 58:17 80:16
**happening** 34:7
**happens** 47:15 77:17
**Harris** 61:15, 16
**Harrison** 61:18
**Hart** 2:13 5:17
**Harvey** 11:25 13:4
**hazard** 25:4
**head** 6:22 25:20 31:25 34:11 50:4 79:21
**heads-up** 74:4
**hear** 6:17 33:7
**heard** 63:17
**heavily** 61:10
**he'd** 59:13
**hell** 40:9
**helped** 42:19
**hereinafter** 6:3
**hereof** 84:13
**hereunto** 83:18
**hesitated** 40:10
**hierarchy** 59:2
**high** 38:11
**higher** 16:9, 12 48:1
**higher-risk** 16:25
**highly** 21:15
**hire** 51:6 64:13 77:19
**hired** 23:17 50:25 78:11 79:2
**hiring** 15:14
**history** 39:2 59:19 74:5
**hit** 45:22 47:5, 23
**honesty** 15:5
**hopefully** 39:10
**Hopkins** 8:20
**Hoppe** 53:5
**horse** 60:24 61:4, 13
**host** 38:2
**hot** 52:16
**hour** 39:16, 18, 19
**hours** 14:20
**house** 50:8, 10 64:25
**houses** 50:10
**how's** 36:22
**HR** 30:2 50:4
**huge** 15:11, 12 61:5
**hypothetical** 17:15

**< I >**
**ideally** 56:17
**Ihle-Adkins** 1:23
**Illinois** 6:12 7:8
**immediately** 11:22, 24 40:7
**implications** 71:16 72:3, 10
**importance** 14:12 20:17 26:4, 22
**important** 11:21 14:16 15:14 17:19 25:25 28:25 29:20 31:21 34:6 38:17 51:3 56:16
**importantly** 69:4
**impressed** 14:10 38:14 40:6, 7
**impressive** 38:7
**inbound** 14:8 15:3 23:15
**included** 10:23 30:12
**income** 44:15
**indecipherable** 54:22
**independent** 9:23 12:6 49:24 63:21
**independently** 51:24
**independents** 12:4
**indicate** 25:10 68:11
**indicated** 34:8 52:1 60:16, 20 72:8 78:4 84:12
**indicates** 12:18 79:17
**indicating** 67:9, 20 70:13 71:3, 13, 25 75:25
**indicative** 48:15
**indicted** 59:15
**industrial** 22:25
**industries** 69:10
**industry** 57:15, 22
**inference** 54:12
**influence** 17:16
**information** 30:12 31:10 43:24 51:12, 23 67:8, 19 70:12 71:2, 12, 24 73:5 75:24
**infrequent** 14:6
**initial** 56:3 57:2
**innovative** 67:11, 22
**innovator** 68:10
**inside** 47:2
**insider** 46:20
**inspection** 65:1, 2
**inspector** 50:9, 12
**Institutions** 9:22
**instruct** 8:8
**instructions** 7:3
**integral** 45:5
**interacted** 35:18, 22
**interacting** 51:19 73:20
**interaction** 12:25 35:23, 24 37:9
**interactions** 56:2
**interest** 10:14 14:8 83:14
**interested** 15:6 39:1, 2, 3, 9 61:2
**interests** 20:12
**Internally** 47:18, 20 74:23 77:16
**International** 64:4, 8
**interview** 29:3, 10 36:7, 10, 11, 12, 13
**interviewed** 61:16
**interviews** 37:8
**introduce** 5:9
**invest** 10:20 40:21
**investment** 15:20 22:5 56:24
**investors** 14:3 47:25
**invited** 53:14
**involve** 78:25
**involved** 21:14 31:18 32:10, 12 53:15 66:14, 20 73:6 79:1
**involvement** 12:25 75:5
**IP** 57:15
**IQ** 38:11
**irregularities** 45:23
**issue** 46:18 63:4
**issues** 21:4 37:2 52:8 59:8 71:17 72:3, 11
**items** 34:5
**its** 20:15

**< J >**
**Jamie** 39:15, 19 45:12 74:12, 14
**Jamie's** 74:14
**January** 18:22 19:6, 17, 18 20:4, 24 28:10, 19 33:11, 23 35:8, 13 43:22 44:6
**Jay** 72:19 74:8
**Jerome** 72:18
**jms@sspfirm.com** 2:9
**job** 20:15 38:18 58:9 77:10, 16, 18
**Johns** 8:20
**join** 53:14
**joined** 11:22, 23, 24 12:1, 3, 8 53:10, 14
**joining** 53:11, 12
**joint** 5:20
**Joshua** 2:4 5:13
**journeyman** 33:5
**JPMorgan** 27:16
**judgment** 14:15 68:1, 2, 12, 13
**June** 12:15
**junior** 23:18

**< K >**
**keep** 22:1 46:6
**key** 13:25 15:18 21:11, 25 25:18 26:3
**kids** 7:14
**kind** 9:12, 25 18:15 27:16 34:1 58:8 78:11 81:5
**king** 41:13
**kiss** 41:13
**knew** 37:22 39:18, 20 42:13
**know** 7:10 9:8, 18, 25 11:7, 14, 15 12:14, 21 13:3, 7 14:1, 2, 8, 17, 20 15:2, 4, 11, 12, 16, 17 16:5, 13, 18, 19,

23 17:1, 5, 12, 14 19:9 20:8, 21, 23, 25 21:9, 20, 22, 23 22:2, 3, 8, 16, 18 23:1, 4, 8, 9, 14, 17 24:2, 3, 9, 11, 19, 21, 23, 25 25:3, 10, 12, 18, 19, 22, 24 26:1, 4, 5, 9, 15 27:8, 16, 21, 22 28:8 29:2, 19, 22 30:1, 4, 6, 10, 14, 18 31:4, 8 32:13, 16, 21 33:4, 8, 22, 24 34:2, 5, 6, 9, 10, 12, 21 35:15, 16, 20 36:19, 22, 23 37:1, 3, 5, 6 38:1, 8, 9 39:9 40:13, 17 41:2, 5, 10, 12, 13, 16 42:9, 10, 13 43:20 44:8 45:11, 18, 19, 21, 22, 23, 24 46:4, 13, 17, 18, 19, 22, 23 47:1, 6, 7, 15, 17, 19, 21, 23 48:16, 17, 18 49:20, 21, 23 50:4, 6, 17, 24 51:2, 4, 14, 15, 16 52:5, 6, 10, 11, 12, 14, 15, 22 54:3 55:21 56:16 57:4, 7, 9, 11, 16, 18, 24, 25 58:6, 11, 24 59:15, 16, 18, 19 60:18 61:2, 6, 11, 15, 17 62:12, 14, 15, 17, 20 64:13, 15, 16, 20, 22 65:2, 3, 9, 10, 23 66:1, 5, 7, 11, 13, 17, 19, 21, 22, 25 67:3, 25 68:7, 18 69:9, 14, 17, 22 70:9 72:13, 20, 21, 23, 24 73:5, 11, 12, 16, 21, 24 74:1, 2, 3, 7, 14, 21, 22 75:7, 11, 13, 16 76:8, 11, 19, 25 77:1, 3, 4, 7, 15 78:12, 15, 16, 18, 23, 24 79:1, 2, 3 80:8, 14, 15
**knowledge** 25:9 34:21 42:6 46:13 67:5 73:3 74:6 75:5, 15 77:23 78:3
**known** 47:17, 20 80:17
**knows** 47:25

< L >
**L.P.A** 2:7
**laid** 16:1, 19
**Lamb** 46:15 47:19
**language** 51:15
**large** 11:17 23:21 27:9, 10 45:4 58:16 77:5
**largely** 11:17 69:12
**larger** 17:9
**largest** 56:6
**LaSalle** 23:25 24:24 26:16
**lawful** 6:2
**lawyers** 5:22 8:11
**lead** 59:3
**leading** 59:7
**leaky** 50:13
**learn** 77:14
**leaves** 75:22
**leaving** 79:22 80:6
**Legal** 5:22 11:16
**lender** 38:8
**lending** 48:22
**letter** 64:21 79:15, 17
**level** 42:18 45:14 52:19 70:10 77:12
**life** 16:4 37:21
**lifelong** 9:12, 25 33:5
**light** 74:18
**lines** 32:8 52:16 77:8
**list** 29:7 46:14, 15, 17 47:10 48:1, 3, 13, 14, 21 59:16
**listed** 47:11
**lists** 54:4 55:5
**little** 24:12
**lived** 7:7, 9 24:17
**lives** 7:12
**LLP** 2:14
**loan** 31:25 48:18
**loans** 27:13
**location** 21:10
**locations** 29:2
**logic** 22:25 23:9 75:18
**logical** 75:21
**long** 7:7 11:3 13:21 14:19 57:11 73:22
**longer** 7:13
**long-term** 44:24 45:15, 16 49:3, 16 53:19, 23 55:19
**look** 14:11 21:22 22:19 31:7 42:22 51:2 52:6, 7 56:6
**looking** 51:16, 17 58:11 63:15 70:9
**looks** 66:4 67:1
**lose** 22:11, 14 23:12 24:7
**losses** 27:20 48:18
**lost** 23:20 24:12 59:6
**lot** 9:17, 23 10:21 18:5 23:14 24:16 25:21 33:6 37:20, 22, 23 41:7, 9, 11 42:7 61:20 62:25 70:24 73:5 74:25 77:8 78:12
**lots** 38:2, 3 52:14 76:16
**low** 9:5
**low-level** 9:19

< M >
**maintaining** 67:12, 23 71:15 72:1, 9
**major** 23:23
**majority** 9:21
**making** 14:15 15:11, 16 26:11, 22 56:14, 15 58:8 68:22
**malfeasance** 46:20 47:7 48:15
**manage** 57:24 77:24
**managed** 44:17 76:23
**management** 9:19 12:5, 6 13:4 14:12 16:1 20:15 29:21, 23, 25 30:1, 3 31:11, 15, 19 37:1, 14 45:20 48:16, 20 57:20 78:12, 22
**management's** 29:22 30:8 32:17
**manager** 33:8 75:7
**managers** 21:14 30:23 32:14 50:24 74:19, 21
**managing** 32:25 33:1 70:15 71:5, 16 72:3, 10 76:18
**March** 65:4
**marching** 77:1
**Mark** 53:5, 16
**MARKED** 4:7 63:5 65:18 79:5
**market** 9:6 14:1 17:8, 9, 12 20:18, 19 21:12 23:3 24:8 25:7, 17, 19, 20, 22, 23 26:14 27:10, 12, 17 28:5 33:5, 8
**mash** 23:5
**massive** 22:23
**master's** 8:18, 19
**material** 31:6 43:7
**materials** 29:18 30:10, 22 43:11
**math** 8:16
**matter** 27:7 84:8
**matters** 77:15
**MB** 10:23, 24 11:3, 12 14:25 17:9, 18 18:4 20:10 21:4, 13, 18 22:6 23:19 24:5 26:4 28:4 40:2 53:2, 8, 11, 15 60:14 62:22
**MBA** 8:17
**MB's** 20:11
**MCHUGH** 1:7 3:4 5:5, 12, 14, 15 18:7, 10 19:4, 7 20:3 21:3 27:3 28:11, 13 29:12 32:25 33:1 37:16 42:4 47:11 48:4 49:4, 17 65:5 67:10, 21 70:14 71:4, 14 72:1, 11 76:1 79:19 80:1, 5, 10 84:3

**McHugh's** 18:23 29:4, 11, 15, 18 30:11, 15, 24 32:18 68:14 75:5 77:24
**mean** 13:1 14:17 15:13 18:2 19:10 20:9 21:9 22:16, 19, 20, 23 24:9, 15 29:6 31:1 32:22 33:14, 19, 21 34:3, 4, 23 35:23 36:10, 11, 12, 13, 24 37:19, 21 38:17 41:2, 3, 7, 12 44:25 45:1, 3 46:5, 24 47:14 48:2 49:20, 24 50:6, 7, 8, 25 51:14, 18 52:6, 9, 14 53:4 54:16 56:1 57:7 59:13, 14, 19 60:23 61:8 63:3 64:15, 22, 24, 25 66:3, 11, 25 67:2, 3, 25 68:1, 2, 17 70:7 71:9 72:15 73:17 76:8, 10 77:19 78:11 79:10 80:12, 13, 14, 15
**meant** 19:16 45:9
**media** 60:9
**meet** 13:9, 14 18:7 29:3, 10 36:7 38:3 42:11 49:25
**meeting** 12:11, 12, 14, 18, 22 14:12, 19, 21 21:3 28:11 29:20, 21, 22 30:19 33:18, 25 35:16 38:1 43:12 44:20 53:18, 20, 22 55:18 57:2 63:13 79:18 80:16 82:1
**meetings** 13:20, 24, 25 14:19, 21 28:12, 20, 23 30:13 31:9 33:15, 16 34:3 35:17, 21, 25 36:2, 3, 18 38:2 39:13 43:8, 10 50:1, 2 51:16 65:14 69:24 70:2 80:5, 10
**member** 11:11 35:5 54:9 55:9 81:25
**members** 7:20 53:13, 21 66:19 69:16
**memory** 19:1 54:5, 8, 24 55:4, 7 70:10 73:22
**mention** 54:9 55:9 56:11
**mentioned** 13:6 42:1 50:1 56:23 63:20
**merged** 9:16 53:5
**merger** 11:16 13:8 15:18 22:12, 15 24:19 40:12 53:7 55:23 62:22
**mergers** 9:17
**merit** 17:23
**mess** 63:2
**Met** 7:18 14:9 18:18 19:4 20:18 29:8 35:9, 14 37:20, 23 38:5, 7 39:15, 18 41:25 42:4, 7, 21 45:7, 12, 14 57:3 62:24 74:24, 25
**metric** 21:24 22:9
**metrics** 21:17
**Michael** 2:10 5:17
**michael.cioffi@blankrome.com** 2:17
**middle** 9:5 20:18, 19 21:12 23:3 25:17, 19, 20, 22 27:10, 12, 17 28:5 33:5, 8
**midyear** 29:15, 18 30:11 42:23 43:5, 23
**million** 56:14
**mind** 41:17 44:21 45:1 53:20 54:2, 9 55:22, 25 57:2 58:19, 20, 22 59:4, 5 68:5
**minute** 55:2 80:19
**minutes** 12:17 59:25
**misconduct** 45:24
**misrepresentations** 46:21
**misrepresented** 59:19
**misrepresenting** 48:16
**misstates** 65:8
**mistake** 26:17
**misunderstood** 19:17
**Mitch** 12:2 13:4 14:9 40:14, 17 53:4
**money** 16:24 17:1 58:9
**months** 19:20 35:13
**Montreal** 15:9, 10 17:2 60:13 61:4, 19
**mortgage** 77:6
**mouth** 16:24
**moved** 7:9, 11 76:20
**moving** 40:16
**multibillion** 45:3
**murky** 13:23
**myriad** 45:25 75:9 76:15 77:3

< N >
**name** 6:8 26:19 36:16 64:1, 4 72:22
**named** 80:6
**names** 55:5, 9
**Nat** 38:21
**National** 9:13 24:18 37:23 61:17
**natural** 24:15 39:11
**navigate** 76:2
**NBD** 24:19
**need** 6:21 31:6 42:11 50:6
**needed** 46:24
**negotiated** 61:10
**negotiation** 40:12
**negotiations** 11:18, 22 13:8 17:13, 20
**neighborhood** 50:10
**neither** 83:13
**net** 28:6
**never** 43:23 49:7
**new** 51:23
**nickel** 61:5
**No._____Change** 85:2, 5, 8, 11, 14, 17, 20 86:2, 5, 8, 11, 14, 17, 20
**No._____Line** 85:2, 5, 8, 11, 14, 17, 20 86:2, 5, 8, 11, 14, 17, 20
**northeast** 10:10
**northwest** 10:10
**Notaries** 1:24
**notary** 83:5, 25
**notes** 51:17
**Notice** 1:17
**n's** 6:12
**nuance** 12:21 60:22
**nuh-uhs** 6:23
**Number** 5:7 17:22 21:14 28:23 53:6 55:8, 9 63:6 65:18 79:5
**numbers** 48:16 56:11

< O >
**oath** 84:15
**object** 39:25 48:2 81:7
**Objection** 8:8 20:5 21:5 25:13 28:14 33:14 34:19 48:7 49:6 52:3 53:25 55:3 61:24 65:7 66:9, 15, 23 67:14 68:15 70:18 71:18 73:14 76:4 81:19 82:3, 8
**objective** 67:8, 19 68:4, 5, 7 70:12 71:2, 12, 24 75:24
**objectively** 68:8
**observe** 36:1
**observing** 52:12
**obvious** 40:18, 24 41:1, 23 67:4
**obviously** 10:25 77:10
**OCC** 72:21, 24
**occur** 31:19
**occurred** 14:22
**occurrence** 29:1
**offer** 15:3 17:2, 4 58:16 60:13 84:14
**offered** 77:10, 16
**offering** 60:14, 16
**office** 83:19
**officer** 9:19 26:19 31:25
**officers** 7:22 8:4 13:5 41:25 45:8
**official** 83:19
**officially** 12:13, 20

**Oftentimes** 17:7
**oh** 10:22 13:12, 18
**OHIO** 1:3, 21, 24 2:8, 16, 23 5:7 10:8, 10, 11 83:2, 6, 19, 25
**Okay** 19:16, 19, 21 32:24 35:12 37:21 43:14, 22 54:16 55:11, 14 60:1, 20 71:12 81:11
**older** 17:22
**oldest** 57:10 69:9
**once** 13:11, 19 18:2 29:19 33:21 47:21 74:12 75:11
**one-on-one** 74:8
**ones** 59:23
**one's** 46:3
**open** 58:19
**operator** 76:15
**opinion** 27:7 45:1 55:8
**opportunities** 49:25
**opportunity** 14:13 15:23, 25 44:9
**opposed** 27:1 77:19
**order** 42:12
**ordered** 65:1
**orders** 77:2
**ordinary** 59:22
**organ** 51:2
**organization** 23:5 77:2
**original** 55:22 57:1
**originally** 65:3
**outflow** 22:23
**outside** 11:18 12:6 14:21 28:12, 20 31:7, 12 32:22 33:14 35:22, 24 36:2 43:19 49:21 50:7 63:24 64:2, 11, 14 67:5 70:2, 3
**overestimating** 48:17
**oversee** 52:13
**overseen** 52:14
**overstatement** 51:1

**< P >**

**p.m** 1:19 5:3 60:6, 7 80:21, 22 82:22
**package** 30:17 31:2 32:15, 23 63:11
**PAGE** 4:3 63:15 79:12, 13 85:2, 5, 8, 11, 14, 17, 20 86:2, 5, 8, 11, 14, 17, 20
**paid** 55:25
**paragraph** 79:17
**part** 10:14 11:17, 21 13:1 16:20 17:25 18:13, 20 21:13 24:2 39:11 45:4, 5 53:12, 16 58:16 65:12 76:25
**partially** 9:8
**participate** 29:14 50:23
**particular** 54:11 55:5
**parties** 15:6 83:14
**partner** 9:6 10:13
**partners** 9:8
**party** 61:2, 11
**pas@sspfirm.com** 2:9
**passing** 36:16
**Patterson** 2:7
**peer** 51:19 52:21
**peers** 51:10 52:9, 20 56:3
**PENALTY** 84:5, 6
**people** 45:12 51:5, 15 65:15
**percent** 21:23, 25 60:19
**percenter** 42:14
**percentile** 42:14
**perform** 29:14
**performance** 30:7 32:13, 18 33:25 36:19 43:21 44:12 56:2
**performed** 64:8
**performing** 33:1
**period** 14:18 18:18 28:9
**PERJURY** 84:5, 6
**person** 25:25 35:17 42:19 45:11
**personal** 45:24 74:6
**personally** 5:20 15:22 16:9 28:8 61:22
**perspective** 17:10 27:7 32:9 39:17 40:12 41:19 45:21 50:14 68:7 70:6
**pertains** 8:10
**Peter** 2:1 5:11
**Phenise** 2:17 5:23
**Phil** 18:7, 10, 23 19:1, 4, 7 20:3, 18 21:3, 11 25:16, 21 27:3 28:11, 13, 25 29:4, 11, 12, 14, 18 30:11, 15, 24 32:18, 25 33:1 37:16 42:4 44:5 46:14 47:11, 17 48:2, 4, 13, 14 49:4, 7, 11, 17 50:24 65:5 67:10, 21 68:13 70:14 71:4, 14 72:1, 11 75:5, 16 76:1 77:24 79:19, 20 80:1, 5, 9, 17
**PHILIP** 1:7 3:4 5:5, 12, 14, 15 84:3
**Phil's** 33:4
**Phone** 2:8, 16, 23
**phones** 51:17
**pick** 51:14 56:20
**piece** 51:12 66:5 67:2
**pieces** 40:16 70:25
**pitches** 15:21
**pitching** 14:2 18:13
**Place** 1:20 13:20 29:20 56:20 83:10
**places** 39:19, 20
**Plaintiff** 1:8, 16 2:1 3:4 5:11, 14, 15
**Plaintiff's** 4:8, 9
**plan** 16:5
**plane** 48:11
**planning** 34:3 45:20
**player** 21:12 25:18 26:3
**pleasantly** 42:14
**please** 5:25 6:8, 18, 23 10:10, 11 19:23 40:3 55:13 67:15 68:16 71:21
**plumbing** 50:13
**plus** 30:2
**PNC** 2:15
**poaching** 23:13
**point** 17:19 20:19 22:22 25:19 39:6, 21 42:5 52:10 61:7 63:1 75:2
**Poole** 2:17 5:23
**poorly** 58:3
**position** 78:16 81:15
**positive** 26:9 37:7 51:12, 20 52:19
**possessed** 48:4
**possible** 18:12 38:6 58:11
**post** 11:19 18:14, 25 21:19, 24 22:1, 3 24:15 27:21
**postmortem** 22:5
**potential** 44:21 46:9
**potentially** 58:4 80:5
**Powell** 72:18 74:8
**PR** 24:21
**practice** 47:15 50:8, 20 64:24
**Prairie** 9:2, 3, 4, 9, 11 10:2, 19
**predicated** 45:4 58:2
**premier** 28:5
**premium** 58:16 60:17
**preparation** 8:6, 22
**prepare** 7:16 43:6
**preparing** 43:17
**Present** 3:3 12:18 16:14 29:22 31:15 75:17 78:4
**presentation** 22:4
**presented** 30:9, 18, 21 31:6 32:16 43:11 59:11 63:11 67:5 68:6 69:11
**presenting** 30:2
**presently** 16:6
**president** 9:20 33:12 39:22 43:2, 19 44:22 45:16 47:12 48:5

49:4, 17 53:2, 6, 8, 17, 19, 23 55:19 67:2 73:25 80:6 81:15
**president's** 43:21
**presume** 30:3 75:6 78:19
**pretty** 14:16 16:15 21:20 38:5 45:6 58:14 68:4 73:2 74:2 76:18
**previous** 54:1 70:19 76:5
**previously** 71:19
**price** 16:12 21:19 22:3
**pricing** 15:5
**primarily** 30:1 61:9
**principally** 61:10
**Prior** 12:24 13:7, 10, 15 16:4 18:7, 10 19:6 20:3, 23, 24 42:24, 25 43:22 44:6 53:7, 15 69:21 73:12, 24 75:4 76:21
**priori** 75:17
**private** 9:4, 10 24:1
**privilege** 59:2
**probability** 42:12 47:17
**probably** 7:10 10:18 11:5, 6 12:3 13:21 20:25 21:9 24:12 25:2, 5 26:10 31:21 37:17 40:11, 22 48:1 50:22, 25 51:8, 12, 23, 24 55:24 57:12 59:4, 23 69:4 72:13 73:4 77:25 78:2
**problem** 27:18 52:15 61:14, 17
**problems** 27:4, 6, 20, 24 28:3, 8 46:19 73:23
**process** 20:17 36:14 42:20 57:3 60:25
**profession** 57:10
**professions** 57:13 69:9
**profound** 38:5
**progress** 81:3, 6
**project** 78:13
**promoters** 28:6
**promotion** 73:24 79:20 80:2
**properly** 20:14 26:23
**prospered** 24:2
**provide** 19:10 30:4 70:10
**provided** 8:13, 22 30:12
**prudence** 45:20
**prudent** 40:12
**public** 10:8, 22, 24, 25 11:1 14:6 56:11 83:5, 25
**Public-State** 1:24
**purpose** 78:14, 15
**purposeful** 36:18
**purposes** 11:16
**Pursuant** 1:17 83:12
**pursue** 17:13
**pursuing** 16:6
**pushed** 17:20
**put** 12:20 16:24 27:11 40:3 47:16 48:19

**< Q >**
**qualifications** 51:2
**qualified** 83:5
**quality** 27:24
**quantifying** 26:13
**quarterly** 71:10
**question** 6:19, 25 7:1 8:9 13:12 15:22 19:23 20:6 21:21 22:17 25:14 29:9 34:13, 20 37:10 40:3 46:8 48:8 49:7, 12 53:21 54:1, 2, 10, 18, 22, 23 55:1, 6, 12, 16 61:24 65:8 70:22 71:21 73:15
**questioning** 70:1
**questions** 6:17 44:5 55:12 70:1, 19 71:19 81:2, 9 82:10, 11

**< R >**
**rant** 58:13
**rare** 31:16
**rated** 27:16
**ratifying** 39:10
**rationale** 15:24
**Raymer** 1:22 83:4, 24
**reaction** 24:15, 20
**read** 51:15 84:7, 9
**ready** 40:22
**real** 28:2 77:13, 17
**really** 12:12 14:2, 15 15:7, 22 16:19 17:11, 15, 17, 20 18:12 22:22 25:2 38:13 39:1, 4 44:25 45:9 46:2 51:3, 22 54:10 58:18 60:24 61:11, 12, 18 72:17, 25
**reason** 36:24 52:18 85:4, 7, 10, 13, 16, 19, 22 86:4, 7, 10, 13, 16, 19, 22
**reasons** 68:8
**recall** 12:19 14:24 18:19 19:4 21:2, 3 25:16, 20 28:12 29:2 32:24 35:4, 24 36:21 51:11 55:21 56:5 60:22 64:1 65:14, 16 66:3, 6 68:6 69:23 71:11 79:25 80:4, 8, 9
**recess** 60:6 80:21
**recognize** 63:9, 12 81:4
**recollection** 64:7, 23
**record** 5:1 6:8 7:2 56:12 59:24 60:4, 8 65:8 80:18, 20, 23 82:12
**red** 59:10
**reduce** 78:24
**REFERENCED** 4:7 74:12
**referred** 63:17, 18
**referring** 69:3 79:16
**reflects** 58:3
**refresh** 64:7
**regarded** 73:4
**regarding** 21:4 29:11 33:12 36:8 37:16
**regards** 31:17
**region** 22:11, 14 23:3 24:7
**regions** 19:2 21:12
**regular** 34:3 74:10
**regulation** 38:12 72:13 73:8 74:11
**regulator** 73:22
**regulators** 71:16 72:2, 10, 17 73:9, 20 74:4, 5, 9, 20 75:1, 5, 8, 15, 16
**regulatory** 13:22 18:17 75:20 78:17
**relationship** 72:16
**relationships** 72:25
**relative** 32:19 44:12 83:13
**relevancy** 61:25
**relevant** 23:23
**remember** 12:12, 22 16:16 21:10, 15 26:2, 12, 17, 18, 19, 21 31:16
**remind** 29:5 45:3
**reminder** 6:16
**repeat** 6:18 19:23
**rephrase** 6:19 29:9 53:21
**report** 51:21
**reporter** 5:24 6:20
**reporting** 32:8 83:16
**reports** 29:4, 11 36:8
**represent** 5:10, 19 15:21 19:11
**represented** 20:14
**representing** 5:21
**reputation** 73:8, 17 74:7, 25 75:1
**request** 8:11
**require** 45:21, 25
**required** 58:21 59:3
**requisite** 41:5
**research** 56:25

**reserve** 81:5
**resilience** 76:2
**respect** 23:1 25:21 27:4 31:5 33:6 38:19 53:19 67:10, 21 70:14 71:4, 14 72:1, 9 76:1
**respected** 25:24
**respects** 83:12
**responsibilities** 76:21
**responsibility** 15:13 20:16 31:21 58:7
**responsible** 21:11
**rest** 15:25
**restate** 37:19 54:25 67:16 70:22 71:21
**restrictions** 12:4
**result** 5:20 11:12 32:1 72:20 83:15
**resulted** 77:15
**retain** 21:23
**rethink** 18:14
**retire** 17:23
**retirement** 34:7 74:15
**return** 16:14
**review** 8:6, 21 29:17 30:15 31:22, 24 32:1, 4, 5, 16 43:7 44:2, 9 50:9
**reviewed** 8:10, 12 30:9 31:2 32:20 43:4, 20, 23 44:19 52:24 71:10 72:6
**reviews** 29:15, 18 30:7, 8, 9, 11 32:11, 13, 14 42:23 43:5, 21, 24 52:21
**RHR** 64:4, 7, 13, 17 65:3, 15 66:5, 8, 10 67:1
**right** 7:15 12:19 19:13 22:20 26:12 27:1 29:1 38:24 42:3 43:18 56:20 60:14 62:5, 7, 23 64:24 71:11 74:7 81:6, 7
**rigorous** 67:12, 23
**ring** 41:13 64:4
**rise** 71:16 72:3, 10
**risk** 16:13, 14 26:14, 24 31:24 45:20 79:19 80:2
**Road** 6:11
**rodeo** 24:17
**role** 18:23 20:9 45:16 60:24 79:21
**roll** 62:13
**rolled** 74:11
**Rome** 2:14 5:18
**roof** 50:13
**room** 75:22 77:21
**royal** 59:1
**RPR** 1:22 83:4, 24
**rule** 31:12 83:17
**run** 25:17
**running** 19:1 58:5

**< S >**
**S/Wendy** 83:24
**Saba** 2:1, 7 4:4 5:11 6:6 8:14 19:24 20:1, 22 21:7 25:15 28:18 33:16 34:14 35:1 40:4, 5 49:1, 9, 12, 14 53:1 54:13, 15, 18, 25 55:11, 14, 15 59:24 60:3, 11 62:5, 7, 8 65:11 66:12, 18 67:7, 17, 18 69:1 70:23 71:1, 22, 23 75:3, 23 76:22 77:22 80:18 81:1, 19 82:3, 8, 11
**sake** 6:20
**sales** 42:19
**Salomon** 46:24
**sampling** 42:8
**sat** 78:10, 21
**save** 84:10
**saw** 20:9 51:19 70:8
**saying** 16:16
**says** 27:18 66:10 67:1
**scenarios** 47:1, 3
**science** 8:18
**scorecard** 68:5 74:23
**scores** 28:6 44:3 52:2, 21
**scrutiny** 78:17
**se** 17:25
**seal** 83:19
**seat** 17:2 18:1
**seats** 17:4, 7, 20
**SEC** 12:4 32:9
**second** 56:6 57:10 79:16
**secondary** 15:17 63:3
**secondly** 15:16
**see** 11:5 18:15 24:25 29:17 38:9 42:23 79:23
**seeing** 15:15 66:6
**seek** 31:14
**seen** 30:22 31:3 32:15 43:10 51:5 52:22 65:22, 24 79:9, 10
**Self-employed** 9:1
**self-evident** 39:12
**self-selected** 23:16
**sell** 62:16
**selling** 14:2 42:17
**senior** 9:20 74:19, 20 75:7
**sense** 38:20 64:18
**sent** 25:17 79:11
**sentiment** 26:6
**September** 67:9, 20 69:21 70:13 71:3, 13, 25 73:13 75:4, 25 77:23 79:18 80:5, 10
**Sergeant** 10:9
**series** 6:17
**serious** 46:22
**served** 10:18
**serves** 19:1
**services** 77:7
**set** 40:8 41:4 76:9, 21 83:18
**setting** 36:24
**settled** 17:21
**seventh** 9:6
**Shaffer** 79:17, 25
**shaking** 6:22
**shape** 25:4
**share** 22:3 24:8 25:7
**shareholder** 21:19 56:7 57:6 58:10 62:13
**shareholders** 16:17 56:18 58:8 62:12
**shares** 56:13, 20
**Sharpe** 2:5 5:15
**SHEET** 84:1, 13 85:1 86:1
**sheets** 44:16
**shoes** 33:4
**show** 24:25 54:6, 23 55:5 68:12
**side** 48:22 67:11, 22
**Sienna** 10:17
**signals** 51:18 52:17
**SIGNATURE:_________________________DATE** 85:23 86:23
**signed** 64:21 84:16
**significant** 57:6 59:8
**significantly** 56:21
**similar** 37:15 39:18 64:17
**simultaneously** 67:12, 23
**single** 63:1
**sir** 63:7 65:20
**sit** 10:3, 6, 7, 8 72:7
**sitting** 35:21
**situation** 47:22
**situations** 72:8
**six** 11:6, 7, 9
**size** 17:6, 10 77:2
**skills** 41:5 49:22
**small** 17:17 77:5
**Smith** 2:4 5:13
**smooth** 20:11
**smoothly** 26:25
**social** 36:23 37:9
**socially** 35:19
**software** 57:16
**sold** 10:14
**solely** 69:14
**somebody** 14:5
**someone's** 46:4
**someplace** 7:10 68:6
**son** 7:15

**Sorry** 13:13, 16, 18 19:16, 17, 19 28:16 39:24 49:11 58:13 78:1
**sort** 15:14 16:5, 11, 21 20:15 22:7, 24 23:5 26:13 36:14 38:4, 11 41:10, 13, 14 42:11, 13 46:6, 23 47:6 56:19 57:5, 23, 24 62:25 63:2 66:4 67:4 74:1 75:18
**sound** 68:22
**sounds** 12:19
**SOUTHERN** 1:3 5:6
**speak** 7:19 14:7 15:24 18:10 32:4 49:19 50:15
**speaking** 47:4 51:18
**specific** 26:2 32:24 68:24 69:13, 23 71:11 78:14, 15 80:3, 13
**specifically** 21:2, 10, 14 44:16 68:11 75:12 79:2 80:11
**specificity** 28:23
**specifics** 51:11
**speed** 72:18
**spell** 6:8
**Spence** 12:25 13:9, 14 14:23 35:9, 14 36:1, 9 39:20, 22 40:6 43:1 44:17, 23 49:3, 16 53:24 55:20 63:21 64:11, 14 65:5 67:9, 20 68:11 69:15 70:13 71:4, 14, 25 72:8 74:13 75:25 78:5, 9 80:6
**Spence's** 36:8 42:22 43:5 44:2, 11 52:2 69:19
**spent** 9:21 18:5 68:3
**spooked** 48:18
**spot** 41:8
**SS** 83:2
**Stagnaro** 2:7
**stalking** 60:24 61:4, 7, 13
**stamp** 79:5, 13
**stamped** 63:6 65:18
**stand** 57:1
**standing** 71:15 72:2, 9
**start** 50:9, 10 77:13
**started** 9:2, 13 10:13 37:22 72:15 73:20 74:6, 17 76:11
**starting** 9:10 10:2
**state** 5:10 6:7 29:23 49:12 55:2 83:2, 6, 25
**stated** 81:4
**statement** 27:6 55:22 75:21
**statements** 44:16
**STATES** 1:2 5:6
**stead** 75:19
**steadfast** 57:5
**steal** 23:15
**step** 34:16 35:3 47:3 73:18
**stepped** 9:7 81:16
**stipulation** 83:12
**stock** 11:17 62:9, 16, 20, 21
**stood** 50:17
**story** 7:13
**strategic** 38:10 61:20 67:11, 22 68:9 70:5
**strategically** 41:11
**strategies** 78:19
**strategist** 76:14
**strategy** 14:15 16:3 39:5 41:5, 6 57:18, 19 68:20 69:5, 6, 7, 8, 11 77:11 78:18, 23, 25
**Street** 1:20 2:15, 22 46:25 47:16, 18, 23 48:19
**strength** 70:15 71:5
**strong** 23:3 28:7 72:17 75:20
**strongly** 58:14
**structure** 63:2
**student** 9:25
**study** 64:20
**styled** 5:4
**subordinates** 29:11 36:8, 20 51:10 52:9, 20 56:3
**Subsequently** 9:16 10:14
**substantial** 56:25 57:25
**succeed** 44:22 49:4, 17 81:15, 17 82:1, 7
**success** 21:18 76:10
**successful** 23:21 24:6
**succession** 33:13 34:3 45:19
**successor** 40:19, 25 41:23 44:24 45:15, 16 47:5, 12 48:5
**successors** 46:10 47:6, 8
**suddenly** 73:19
**suggest** 15:2 28:7 81:25
**suggestive** 30:7 46:20
**suggests** 36:10, 13
**suitor** 14:25
**suitors** 15:4
**superior** 57:18, 19, 20 67:10, 21 68:9, 13 70:14 71:4, 14 72:1, 11 76:1
**support** 52:19 75:20
**suppose** 60:25
**sure** 14:9 15:4 19:3 20:8, 11, 18 21:1, 21 24:9 26:11, 22, 25 27:25 38:16 40:4, 17 43:7, 8 47:24 48:13 50:12 54:19 62:1, 11 64:12, 15 67:17 69:24 70:3, 23 71:22
**surprised** 42:15 51:13
**surveys** 30:16, 25
**swear** 5:25
**sworn** 6:2 83:8

< T >

**table** 17:16 58:9
**tactically** 41:10
**tactics** 41:5
**take** 5:3 23:4 27:5, 19 28:2, 8 46:22 59:24 60:3 62:16
**Taken** 1:16 6:13 13:20 49:21 60:6 62:19 63:1 80:21 83:11 84:2, 8
**takes** 25:2 29:20
**talent** 42:18 43:24 63:18
**talk** 13:6 36:25 54:6 80:17
**talked** 29:13 33:17 40:17 68:8 74:8 80:14
**talker** 58:24
**talking** 18:5 26:17, 18 40:1 43:11 54:2 60:12
**tax** 61:23 62:10, 24
**taxes** 62:6, 25 63:2
**Tayfun** 13:2, 10, 15, 17 14:18 42:2 46:13 48:1, 12 65:5
**Taylor** 10:23
**team** 16:1 18:13, 20 37:14 58:25 70:15 71:5 76:25
**teams** 30:5
**tease** 45:19 72:15
**technician** 38:23
**technology** 41:6, 9 68:19 70:6 76:11
**telephonic** 35:18
**tell** 29:6, 7 50:7 51:18 61:1 72:14 73:17, 21 74:17
**ten** 61:5
**term** 18:3 60:24
**terms** 11:18 27:21 54:22 62:4
**test** 54:5, 24 55:4
**testament** 77:13, 17
**testified** 49:7, 10
**testify** 49:9
**testimony** 71:20 76:5
**thesis** 16:19

**thing** 16:10 18:4 26:2 28:25 34:6 51:9 56:10 62:24
**things** 26:23 36:16 37:2, 6 38:24 45:25 50:21 51:3 59:14, 17, 20 63:1, 3
**think** 11:16 12:10 16:16, 17 18:25 19:1 21:11 22:23 25:3 26:9 27:8, 19, 20 35:23 36:17 37:4, 7 39:11 40:11, 14, 16, 18, 22 45:8 46:13 47:4 48:19 50:6, 14, 22 51:8, 10, 21 52:6, 18, 20 56:17 57:9 59:22 60:2, 16, 20 61:19 62:25 65:25 67:25 68:4, 17, 21 69:11 70:21 73:18, 19 74:12, 13, 15, 16, 18, 23 76:7, 11, 12 77:13, 17 78:10, 17 80:12, 16, 18
**thinker** 16:3 38:10 68:9
**thinking** 10:17 34:11 67:11, 22
**THIRD** 1:10, 20 2:21, 22 5:5, 22 7:19, 23 8:1, 4 10:4 11:1, 23 12:9 14:1, 4, 9, 14 15:23 16:5, 18, 21 17:19 18:1, 4, 23 22:11, 14, 25 23:1, 20 24:5, 7 27:8 29:24 31:5 33:13 36:2 38:20 39:8, 23 40:21 41:24 42:15 45:14, 17 47:13 48:6 49:2, 5, 15, 18 52:11 53:7, 12, 24 55:20 61:12 62:20, 21 65:4 66:13, 19 69:5 71:15 72:2 76:15, 24 77:3 78:5, 6, 9 80:6 84:4
**Third-McHugh** 63:6 65:19 79:6, 13
**third-party** 50:7, 16 51:9 71:8
**Third's** 11:11, 12 27:25
**Thomas** 2:20 5:23 75:22 77:21
**thought** 13:18 14:10 16:6 19:16 26:13 41:16 42:16 54:19 61:9 75:12, 15, 17
**threat** 72:14
**three** 7:11, 14 11:1 13:5 17:20
**Thursday** 5:2
**Tim** 12:25 13:2, 9, 14 14:17, 23 16:2, 3, 19, 22 35:9, 14 36:1, 7, 8, 19 37:4, 5, 6, 20 38:5, 13, 15 39:4, 7, 10, 12, 20, 22 40:6, 8, 19, 24 41:9, 14, 23 42:22 43:1, 4, 15, 16 44:2, 11, 17, 23 45:5 48:12 49:3, 11, 16, 25 50:5, 17 51:20 52:2, 20 53:24 55:20, 23 57:3, 5, 23 58:2, 14, 17, 23 63:21 64:11, 14, 20 65:5 67:9, 20 68:8, 11 69:14, 18 70:13 71:3, 13, 25 72:8, 14 73:9 74:13 75:1, 17, 25 76:8 77:17 78:5, 8, 11 80:6
**Time** 1:19 5:3 9:21 13:21 14:18 15:1 18:5, 17, 18, 24 21:5, 8 22:18 28:16 31:10, 17, 19 33:1 35:16 39:21 40:1, 2, 3, 23 41:1, 22, 24 42:5, 25 43:3, 4 53:3, 9, 20 55:23 57:11 60:9 68:2 69:20 73:16 75:13, 14, 16 76:13 77:17 80:24 83:10
**timelines** 72:16
**times** 13:9, 14 22:8 49:10
**timing** 19:2 29:1 33:22 34:12 43:16 72:12
**Tim's** 36:16 45:11 49:22 51:10 69:12 72:16 76:8 79:19 80:2
**Today** 5:2, 3 7:20 8:21 72:23 73:18 75:19 76:5
**today's** 7:16 8:7 60:9
**told** 37:24 78:21
**ton** 38:19
**topic** 37:1
**totally** 9:9 19:3
**tough** 16:10
**Tower** 6:11
**trainee** 9:19
**trajectory** 16:22
**transaction** 11:19 16:20 18:25 19:15, 21 21:19, 24 22:1, 3, 6, 8, 10, 19, 24 24:16, 21 27:21 38:18 40:21
**transactions** 22:7
**transcript** 84:7
**transition** 20:11
**transparency** 15:5
**treasury** 77:6, 7
**treated** 62:3
**true** 30:24 44:11, 15 73:12 84:10
**trust** 25:1
**truth** 83:8, 9
**try** 6:25
**trying** 23:15 27:1 54:11 77:9
**turn** 16:11 58:15 78:23, 24 79:12
**turned** 38:22 73:19
**turnover** 22:21
**Tuzun** 13:10, 15, 17 42:2 65:5
**twice** 13:19
**two** 6:11 11:22, 24 17:21 35:17 39:13 42:1 53:6 55:9
**type** 22:9 59:2
**types** 47:3
**typical** 24:19
**typically** 10:20 35:16 56:11 78:22

< U >

**uh-uhs** 6:23
**ultimately** 16:23 17:21 22:2 58:2 59:7
**unclear** 72:12
**uncommon** 14:8 17:6
**underestimating** 48:17
**undergraduate** 8:16
**undersigned** 83:4
**understand** 6:18 7:3 14:13 36:12 54:18 56:9
**understanding** 18:23 84:13
**unfair** 54:10
**UNITED** 1:2 5:6
**units** 75:10 77:4
**University** 8:17, 19
**unsure** 33:24
**upper** 42:13
**upsides** 16:13
**use** 10:11 21:17 66:5 75:17 77:20
**usually** 17:7 24:24 29:20 63:2 78:13

< V >

**vague** 54:10
**validation** 71:8
**valley** 76:13
**valuable** 51:8
**value** 50:16 56:21 57:6
**vantage** 27:17
**variety** 78:18
**various** 61:8
**verbally** 6:22 26:8
**versus** 5:5 33:23
**vice** 9:19, 20 43:19, 20
**video** 6:21
**Videoconference** 2:6

**Videographer** 1:23 5:1, 24 60:4, 8 80:20, 23 82:12
**videotape** 5:1
**Videotaped** 1:12
**view** 17:21 29:23 32:17 34:7 40:9 41:14 50:24 56:4 57:5 63:2 75:2
**viewed** 26:3
**viewpoint** 27:17
**views** 30:2
**visit** 13:6 49:25 50:23
**visiting** 18:20 38:4
**voted** 38:16
**vs** 1:9 84:4

< W >
**wait** 6:24 24:25 55:2
**walked** 33:4
**Walnut** 1:20 2:22
**want** 21:22 39:6 40:15 47:16, 21, 24 48:10 50:11 54:6, 25 56:8 60:25 61:1 64:25 65:1 70:21
**wanted** 23:10 47:22 61:12 62:16
**wanting** 26:24
**Warren** 46:23
**wash** 10:11
**washes** 10:9
**Washington** 74:10
**watched** 70:8
**watching** 52:11
**way** 9:17, 18 30:20 38:21 45:9 58:3 62:19 77:15 82:2, 6
**ways** 52:15
**weak** 23:2
**wealth** 19:2 33:8 58:1
**weeds** 38:24
**well** 6:21 7:13 9:12, 16, 25 10:7 11:5 13:25 14:18 16:4 19:11 21:19 22:24 23:11 26:10 27:5 28:6 36:13 37:19 41:5 43:4, 6 45:18 47:18, 25 49:12, 19 50:3, 23 51:4 53:10 58:7, 23 65:6 66:8 67:25 68:17 69:4 73:4 76:24
**Wendy** 1:22 83:4
**went** 22:24 61:8
**We're** 5:3 6:21 9:6
**WESTERN** 1:4 5:7
**WHEREOF** 83:18
**wife** 7:13, 15
**Winnetka** 6:11 7:7, 9
**winning** 67:1
**Witness** 2:10 5:19, 25 6:2 8:9 20:8 28:16 33:19, 21 34:23 48:11 49:11 52:5 54:19 62:1, 6 65:10 66:10, 17, 25 67:16 68:17 70:21, 24 73:16 76:7 81:11, 21, 23 82:4, 9 83:18
**work** 38:9 40:14 59:19 63:11
**worked** 9:18 10:21
**working** 15:15 42:10
**workplace** 36:2, 4
**world** 18:15 72:23 76:3
**written** 79:15

< Y >
**Yeah** 12:10 14:17 15:10 18:25 23:10 26:21 29:19 33:19, 21 39:15 40:22 43:15 44:18 45:6 46:8 48:11, 23 59:13, 20 60:18 69:22 76:7 80:12
**year** 25:2, 3, 8 29:19 52:11
**years** 7:11 9:18 10:1, 19 11:6, 8, 9 25:25 28:24 33:22 42:7, 10 46:16 61:15

< Z >
**Zoom** 2:6 5:16 13:16, 18

# EXHIBIT 5

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 8

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 11

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]