UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

PHILIP R. MCHUGH,
Plaintiff,
vs.
FIFTH THIRD BANCORP, et al.,
Defendants.

CASE NO. 1:21-cv-00238

***THIS TRANSCRIPT CONTAINS CONFIDENTIAL -- SUBJECT TO PROTECTIVE ORDER TESTIMONY***

Videotaped Deposition of: MITCHELL FEIGER

Taken: By the Plaintiff
Pursuant to Notice

Date: February 21, 2025

Time: Commencing at 10:09 a.m.

Place: Fifth Third Center
511 Walnut Street
Cincinnati, Ohio 45202

Before: Pamela L. Jackson
and
Connie Adkins-Ihle, Videographer
Notaries Public-State of Ohio

APPEARANCES:

On behalf of the Plaintiff:

Peter A. Saba, Esq.
Joshua M. Smith, Esq.
and
Bailey E. Sharpe, Esq. (Via Zoom)
of
Stagnaro, Saba & Patterson Co., L.P.A.
2623 Erie Avenue
Cincinnati, Ohio 45208
Phone: (513) 533-2701
Email: Pas@sspnfirm.com
Jms@sspfirm.com
Bes@sspfirm.com

On behalf of the Defendants and the Deponent:

Michael L. Cioffi, Esq.
of
Blank Rome LLP
1700 PNC Center
201 East Fifth Street
Cincinnati, Ohio 45202
Phone: (513) 362-8700
Email: Michael.cioffi@blankrome.com

Also Present:

Philip R. McHugh
Brian Thomas, Esq., Fifth Third Bancorp

# I N D E X


| MITCHELL FEIGER | PAGE |
|---|---|
| Examination by Mr. Saba | 6 |
| Examination by Mr. Cioffi | 99 |

| EXHIBITS | MARKED | REFERENCED |
|---|---|---|
| Deposition Exhibit 1 | 9 | 9 |
| Deposition Exhibit 2 | 60 | 60 |
| Deposition Exhibit 3 | 62 | 62 |
| Deposition Exhibit 5 | 75 | 75 |
| Deposition Exhibit 8 | 87 | 87 |

I N D E X (CONTINUED)

***THE FOLLOWING PAGES CONTAIN CONFIDENTIAL -- SUBJECT TO PROTECTIVE ORDER TESTIMONY***

Pages 72 - 75

Pages 82 - 87

Pages 89 - 99

***THE FOLLOWING EXHIBITS ARE CONFIDENTIAL -- SUBJECT TO PROTECTIVE ORDER***

| EXHIBITS | MARKED | REFERENCED |
| --- | --- | --- |
| Deposition Exhibit 4 | 72 | 72 |
| Deposition Exhibit 6 | 82 | 82 |
| Deposition Exhibit 7 | 86 | 86 |
| Deposition Exhibit 9 | 90 | 90 |
| Deposition Exhibit 10 | 97 | 97 |

- - -

Page 5

THE VIDEOGRAPHER: We're on videotape record. Today is Friday, February the 21st, 2025. The time is 10:09 a.m. We're here today to take the deposition of Mitchell Feiger in the case styled Philip R. McHugh versus Fifth Third Bancorp, et al., United States District Court, Southern District of Ohio, Western Division, Case No. 1:21-cv-00238.

Would the attorneys now introduce themselves and state who you represent?

MR. SABA: Peter Saba on behalf of the Plaintiff, Phil McHugh. We also have Bailey Sharpe from my office watching on Zoom.

MR. SMITH: Joshua Smith on behalf of the Plaintiff, Phil McHugh.

MR. CIOFFI: Michael Cioffi of Blank Rome on behalf of all the Defendants and also on behalf of the witness, Mr. Feiger, personally pursuant to a Joint Defense Agreement. Also representing Mr. Feiger of the Fifth Third Legal Department is Brian Thomas with us today.

THE VIDEOGRAPHER: And would the court reporter please swear in the witness.

Page 6

MITCHELL FEIGER

of lawful age, a witness herein, being first duly sworn as hereinafter certified, was examined and deposed as follows:

EXAMINATION

BY MR. SABA:

Q Mr. Feiger, could you go ahead and state your name for the record, please, and spell your last name?

A **Mitchell Feiger, F-e-i-g-e-r.**

Q Have you ever had your deposition taken before?

A **Yes.**

Q Okay. As a reminder I'm going to be asking you a series of questions. If there's anything you don't hear, don't understand, please feel free to ask me to repeat or rephrase the question. For the sake of the court reporter although we're taking this down via video I will need you to answer verbally, no shaking of the head or unh-unhs or uh-huhs.

Additionally if you could wait for me to finish my question before you answer and I'll try and do the same before I ask you another question. It also makes for a clearer record. Do you understand those instructions?

Page 7

A **Yes.**

Q Could I have your address, please?

A **6897 Grenadier Boulevard.**

Q How do you spell --

A **G-r-e-n-a-d-i-e-r Boulevard, Unit 701, Naples, Florida, 34108.**

Q How long have you lived at that address?

A **Permanent -- My permanent residence there two years.**

Q Who do you live there with?

A **My wife.**

Q What's the extent of your education?

A **I have a Bachelor's Degree in Engineering from the University of Illinois. I passed the CPA exam and I have an MBA from the University of Chicago.**

Q What did you do to prepare for today's deposition?

A **I met with Counsel.**

Q Did you speak to any of the other Board members at Fifth Third regarding your deposition?

Page 8

A **No.**

Q Have you discussed this case with -- with any of the other Board members at Fifth Third?

A **No.**

Q Have you discussed this case with any employees of Fifth Third?

A **No.**

Q Have you discussed this case with anyone other than employees or Directors of Fifth Third?

A **No.**

Q Did you review any documents in preparation for today's deposition?

MR. CIOFFI: Objection. I am going to instruct the witness not to answer that question as it pertains to documents that were supplied -- may have been supplied by me, my firm, or by the Fifth Third Legal Department. I'll allow him to answer any questions about documents he may have reviewed other than that universe of documents.

Q Did you review any documents other

Page 9

than those that were provided to you by Counsel?
A No.
(Deposition Exhibit 1 was marked for identification.)
BY MR. SABA:
Q Mr. Feiger, I have handed you what's been marked as Exhibit 1 which is your -- your responses provided by Counsel to a Notice Of Deposition requesting that you provide some documents with you.
MR. CIOFFI: Objection to any questions as I have stated previously about the service of this particular document and -- and the Request For Production Of Documents, improperly served as that this particular witness is not a party to the case and can't just be served. Nevertheless, as we have done before I am going to allow you to ask questions about this particular response just so we can move ahead with the case.
Q Mr. Feiger, specifically this asks that you produce documentation that you may have specifically referring to No. 1 which is on Page 5 of Exhibit 1.

Page 10

**A Page 5 of Exhibit 1.**
Q And under No. 1 it refers to, "Communications (as defined above) between You and any other Director or Officer of Fifth Third which refers, mentions, or otherwise relates to," and the definition of Communications is, "Any correspondence, disclosure, transfer or exchange of information, whether oral or written, and whether in person, by telephone, mail, email, telecopy, text message or other 'Document' form, including but not limited to discussions, statements, negotiations, inquiries, requests, notices, responses, or demands."
The -- The first subquestion under No. 1 is, "Communications regarding succession planning for the position of President and CEO of Fifth Third." Do you have any of those documents?
MR. CIOFFI: Same -- Same objection. I am going to allow him to answer that question as it pertains to succession planning. And I assume you mean outside the -- the Board meetings?
MR. SABA: Correct, or any other communications he may have written to another Board member during the Board meeting.
MR. CIOFFI: You may answer.

Page 11

**A No.**
Q Do you have any, "Communications between You and any other Director or Officer of Fifth Third which -- which refers, mentions, or otherwise relates to identified and/or selected candidates for the position of President and/or CEO of Fifth Third"?
MR. CIOFFI: Again same objection, continuing objection. You may answer subject to -- to that --
**A No --**
MR. CIOFFI: -- reformulation.
**A -- if you're looking for written or emailed or some other form of communication.**
Q Do you have any, "Communications (as defined above) between You and any other Director or Officer of Fifth Third which refers, mentions, or otherwise relates to" -- And I'm going to refer down to Paragraph f, "Philip McHugh"?
**A No.**
Q Do you have any, "Communications between You and any other Director or Officer of Fifth Third which refers, mentions, or otherwise relates to Timothy Spence"?
**A No.**

Page 12

Q Were there ever communications between you and any other Director, Officer, of Fifth Third which refer, mention, or otherwise relate to Phil McHugh?
MR. CIOFFI: Same objection. You may answer subject to that objection to form.
**A No.**
Q What about with respect to Timothy Spence -- Were there ever communications between you and any other Director?
**A About Tim Spence, no, no, no.**
Q Referring to Page 6, No. 2, did you have any, "Communications (as defined above) between You and Philip McHugh"?
**A Referring to No. 2 on Page 6 "as defined above", so I need to read this?**
Q Again Communications -- Again it's the definition I read to you earlier, "Communication means any correspondence, disclosure, transfer" --
**A Between me and Phil McHugh?**
Q Correct.
**A No.**
Q Were there ever communications between you and Phil McHugh?
**A Yes.**

Page 13

Q When were there communications between you and Phil McHugh?
**A We both worked at that company, Fifth Third, at the same time. I am sure in the past there were some emails that went across I imagine. I don't have them.**
Q Did you ever communicate with -- with Phil McHugh via text message?
**A Not that I recall.**
Q Referring to No. 3 on Page 7, "Any Communications between You and Timothy Spence"?
**A On any subject?**
MR. CIOFFI: No. As it relates to this case.
**A No.**
Q Well, I think this is, "Any Communications Between" -- Let me ask you this question: "Any Communications between You and Timothy Spence," and I'm going to put a timeline before October 1 of 2020?
MR. CIOFFI: You -- You may answer that question.
**A Yes. Do I have any, no. Were there some, yes.**
Q Do those communications still

Page 14

exist?
**A I don't have any. Do they exist elsewhere I -- I wouldn't know.**
Q How did you communicate with Mr. Spence?
**A I mean we're talking about reasonably a long business relationship, a period when I was employed at the bank and a period when I was a Director of the bank, so how did they occur, they occurred in phone calls, personal direct discussions, emails, perhaps texts -- I'm not a big texter, so I don't remember that -- any number of ways you would communicate with any other human being probably.**
Q Do you still have any of those emails that you would have communicated with Mr. Spence regarding prior to January -- Excuse me -- October 1, 2020?
**A No.**
Q What's your current employment?
**A I'm retired.**
Q When did you retire?
**A May, 2020.**
Q May 29th to be specific; is that right?
**A I believe that's correct, May 29 or**

Page 15

**31, uh-huh.**
Q What position did you retire from?
**A Chairman and CEO of Fifth Third Bank Chicago, something like that.**
Q How long did you hold that position?
**A One year.**
Q What was your position prior to being Chairman and CEO of Fifth Third Bank Chicago?
**A CEO and President of MB Financial, Inc., and MB Financial Bank.**
Q How long did you hold that position?
**A Good question. I guess I was CEO and/or President since 1999 and then -- and -- and President of a predecessor company before that.**
Q What was the predecessor company that you were President of?
**A It was MB Financial, Inc., as well, but we went through a merger in 1999 where we merged into another company, changed the name of the other company. I could go into that if you like.**
Q How long have you been employed with MB Financial?
**A Since 1992 -- No -- Yeah, 1992,**

Page 16

**that's correct.**
Q And at all times you have been employed in Chicago; is that correct?
**A With MB Financial?**
Q Correct.
**A Yes, that's correct.**
Q So you were working in the -- in the Chicago banking industry at the time when First Chicago would have merged with NBD back in the nineties -- Do you recall that?
**A Yes.**
Q And you would have also been working there when they eventually merged with Banc One; is that correct?
**A Yes.**
Q And you were obviously working there as well when Bank of America bought LaSalle Bank in 2007; is that right?
**A Yes.**
Q Okay. And obviously in 2017 when CICB bought PrivateBank?
**A Yes.**
Q When did you first meet Tim Spence?
**A I think in 2016.**
Q What were the circumstances that

you met Tim Spence?
A He called and wanted to get to know me, our company. It was a I get to know you call. I think in our industry it's a pretty tight industry. People like to know each other. We end up doing business with each -- Fifth Third had a presence in Chicago. We end up doing business with each other on and off. I think Tim was interested in learning more about our company, more about the Chicago market.
I was interested in learning more about Fifth Third. Since we competed against Fifth Third we had seen Fifth Third go through a number of iterations over the years, so it was a get to know you meeting.
Q How often have you -- Strike that.
How often did you meet with or talk to Tim Spence up until May of 2018?
MR. CIOFFI: By way -- By way of objection just clarification. So from this first meeting now you're -- you're in this time frame --
MR. SABA: Correct.
MR. CIOFFI: -- up to May of 2018; is that correct?
MR. SABA: Correct, over the next



two years.
MR. CIOFFI: '16, '17, '18.
A I don't remember how many times we spoke to May of 2018 which is when our -- our -- our acquisition was announced, so it probably starts slowly, but as we got into 2018 it would be quite frequent. The number of times I -- I don't remember.
Q Okay. Is it your opinion that Tim Spence is responsible for the Fifth Third/MB Financial merger?
MR. CIOFFI: Objection to the form of the question. If you understand it you can answer.
A Well, you'll have to define what "responsible" means.
Q What role do you feel Tim Spence had with respect to the Fifth Third/MB Financial merger?
A Oh, it was a critical -- critical role. I don't -- I don't think the merger would have happened without Tim and his involvement beginning with his reachout in 2016, many discussions we had, his representation of Fifth Third, what -- what -- you know, he -- what he meant to us at Fifth Third, so was he responsible -- I guess the flip side of the



question may be would it happen -- would it have happened without him probably not, but it's hard to know for sure.
Q What was your impression of Tim Spence?
A Oh, he is a brilliant well-rounded high emotionally -- emotional intelligence person who -- You know, I -- I think there are people in the world who have an ability to look at complex issues and break them down to the fundamental basics that explain them. He is -- He is an amazing person -- And I say "person" all the way around. I think he's an amazing businessman, a brilliant businessman, a brilliant banker, and -- and a very good person.
And, by the way, all those things were important to me and our Board at MB in choosing to -- to be acquired by -- by -- by Fifth Third. My company at MB was rooted in -- in values. We were a values-driven company that would try to be very forward -- forward looking and forward thinking, and if we were going to combine with any company we were going to combine with a company that was like that.
And I might add that in the early days -- Let's go back prior to Tim Spence and Greg Carmichael's arrival at Fifth Third -- I wouldn't



characterize Fifth Third necessarily as a values-driven company. I think particularly in the Chicago market its reputation was poor. The way it treated its employees was poor. Maybe elsewhere in the country it was better, but in Chicago it wasn't, and --
Q What time period are you referring to?
A Prior to 2015 especially and especially prior to the Great Recession of 2008 -- 2008 and 2009. And so I -- I -- I bring that up because when someone from Fifth Third calls me and says they want to talk the first impression most people would have in Chicago is, That's not a company we want to be associated with, and Tim comes along and -- and starts to explain to me that this isn't the same company that we were 5 years ago, 10 years ago, 15 years ago. We are becoming a values-driven company. We are reorienting the way we run the company, the way we treat employees, the way we treat our customers.
And, by the way, we're doing all these other things which are going to be the forefront of the banking industry. and those other things happen to be things I was very -- I was very interested in

Page 21

**and our company was very interested and we're -- and we -- Even at -- at our company we were pursuing many of those same things because we thought that was the way to go. And so, you know, without Tim, you know, I just -- I -- I don't -- I don't think we would have got there.**

Q Your opinion that he was brilliant, had an ability to look at complex issues and simplify them, what was that based upon?

**A Oh, the many discussions I had about the banking industry. He clearly had then and -- and -- and -- and has developed since a deep understanding of the banking industry. I think his time at Oliver Wyman served him very well. It's -- It's one thing to work inside a single company and to learn about an industry and the way things work. It's another thing to have a view into many different companies, both good and bad, and -- and learn how things -- how things work.**

**And he had -- he had that advantage and he took full advantage of it, and his knowledge of the way the industry worked, the way successful financial services companies worked, was very impressive, and -- and the way he saw the industry evolving I thought was spot on at the time.**

Page 22

**As I said I think our company was rather forward looking for a company particularly of our size and the things we were trying to do and I felt and our Board felt that being an ordinary bank doing business the old-fashioned way and only the old-fashioned way going into the future would not provide good returns for shareholders and good opportunities for employees and stakeholders, and we felt it was critical to be focused on these more advanced things that required complex -- a -- an understanding of the complexities of the banking industry, particularly things around payments, deposit gathering, bank as a service, sophisticated treasury, especially sophisticated treasury products and stability of deposits, all these things which I felt most banks in the United States -- I still feel -- most banks in the United States do not do a good job at, and here was a guy that's coming along and sees the world the way we see it and has thought about it and seen it, and it was just amazingly impressive.**

**And I wasn't the only one who thought that I might add. As he -- As he was introduced to other members of the MB management team and -- and some of our Directors they independently came to the same conclusion, and we had people on the**

Page 23

**MB Board who had been -- who had been bankers before and had a deep understanding of our industry, more than -- more than a handful, and so the fact that they had the same reaction that I did to him, one, made me feel a lot better about what I thought but also encouraged us to continue our dialogue and -- and deepen it.**

Q Is it your opinion that Tim Spence brought his deep understanding of the banking industry with respect to trying to bring forward the merger between Fifth Third and MB Financial?

MR. CIOFFI: Objection to the form of the question. It's confusing. I --

THE WITNESS: Yeah, I don't understand.

MR. CIOFFI: Can you rephrase it? I don't understand it. The witness doesn't understand it.

BY MR. SABA:

Q You indicated that Tim Spence had a deep understanding of the banking industry; is that right?

**A That's right.**

Q Okay. Is that reflected in him bringing together MB Financial and Fifth Third?

Page 24

**A I still don't understand.**

MR. CIOFFI: Objection, asked and answered. He explained Tim Spence's role --

**A I want to answer -- I want to --**

MR. CIOFFI: -- in the -- in the merger and -- but if you -- if you understand the question and can answer it without speculating or guessing what it means please do so. If you need it to be rephrased consistent with Counsel's statement at the beginning of the deposition ask him to rephrase it.

**A I -- I -- I want to answer your question -- I do -- but I don't -- really I don't understand it. Try -- Try one more time.**

Q I'm just trying -- You said that -- You went back before that the MB Financial/Fifth Third merger doesn't happen without Tim Spence probably --

**A Uh-huh.**

Q -- correct?

**A Yes.**

Q All right. And is this whole process of -- of Tim Spence initiating this merger, is that a reflection of his deep understanding of the banking industry? I'm just trying to understand

Page 25

this -- where does that play in all this?
A **You're asking me to speculate on -- on what he thought?**
Q Whether he brought that attribute to the table with respect to bringing together Fifth Third and MB Financial?
A **Well, he clearly brought his skills to the table and that's one -- that is a major component what convinced us to do the transaction. I am sorry.**
Q Okay.
A **I'm still not understanding.**
MR. CIOFFI: Counsel, do you want him to answer what skills he brought to the table or do you think that's been sufficiently answered?
MR. SABA: Oh, no, he answered my question.
MR. CIOFFI: Okay.
BY MR. SABA:
Q When did you first meet Phil McHugh?
A **Oh, I don't remember the first time. It was probably around the time we combined the companies. I can't remember if Phil was involved in**

Page 26

**due diligence. He may have been. But I don't remember the exact first time.**
Q Do you recall any interactions with Phil McHugh prior to the merger between MB Financial and Fifth Third?
A **No, I don't.**
Q What involvement did you have with Phil McHugh after the MB Financial and Fifth Third merger?
A **From a business sense I think -- So when -- when we came together in May, 2020 -- May, 2019 -- Sorry -- MB continued to operate on its own computer systems for a while, so we ran it separate. If I remember right Lars Anderson was first assigned to kind of over -- over -- oversee us. We weren't integrated into Fifth Third, right, so if you think about it just because you complete a merger doesn't mean the two companies are instantly integrated and all its operations are combined, and so we continue to operate somewhat -- somewhat separately until those systems are combined which happens later.**
**During that period -- If I -- If I remember right -- I may not have this right -- Lars Anderson, I think, was assigned to kind of help us, watch over us, do the things that, you know, help**

Page 27

**us work within the company until the systems are converted.**
**At some point along the way I think Phil gained not -- gained responsibility for the Chicago region or was more intimately involved in what we were doing in the Chicago region, so someplace in that May, 2019, to May, 2020, time frame. Maybe it was midway through. I don't remember exactly. We went through a series of executives early on who were helping us.**
Q Do you know why Phil became involved?
A **I assume it was because he was -- I think he was responsible for the regions and we were a region.**
Q When you were employed with Fifth Third who did you report to?
A **That's a good question. I think I reported to Greg Carmichael technically. I can't say I felt like I had a boss, but I guess when you're used to working for -- for a couple of decades with -- without a boss other than a Board of Directors you get used to it.**
Q What was your involvement with Phil McHugh after he became more involved with the MB

Page 28

transaction sometime between May, 2019, and May, 2020?
MR. CIOFFI: Objection to the form of the question. The transaction already occurred. You mean the integration of the companies?
MR. SABA: He said he had -- he had involvement with Phil McHugh --
MR. CIOFFI: After --
MR. SABA: -- after --
MR. CIOFFI: -- the transaction.
MR. SABA: -- after May of 2019 to May, 2020.
A **I think it was --**
MR. CIOFFI: Objection to the form of the question. If you want him to answer that he can.
A **I think it was just a normal inside company business relationship. Phil was responsible for the regions. We were a region. If we needed things Phil may be able to help us get some things done on -- on an occasion.**
**I think the -- the most intense interaction we had was during COVID, so you may remember, right -- So this one-year period from May, 2019, to May, 2020, COVID struck right around -- in**

Page 29

**force around what, the end of February, beginning of March, 2020, and all of a sudden everybody's -- everybody's working at home.**

**And one of -- one of the incidences that did not go well in my opinion that I remember where -- where Phil had a lot of involvement was when we had these PPP loans -- You may remember that -- that the government was dishing out money, Payroll Protection Program loans for businesses who were shut down because of COVID and businesses could apply through -- generally through a financial institution and had a relationship with the SBA to get these loans, and the challenge was getting our clients those loans, and this was a particularly crazed period because we were in a situation at the bank where we really couldn't make those loans and our competitors were, and Phil was -- We -- We were having daily or -- This is the most interaction, intense interaction, I think I had.**

**We had -- We were having daily or twice -- maybe twice daily region President calls about this program. The reason -- I think the challenge here was that our competitors were already making loans to our own clients, these PPP loans, and we were unable to do that, and I think that was the**

Page 30

**most interaction, but Phil was not able to help us with that, and it's one of those -- it's one of those things that sticks in my memory during that one-year period.**

Q Why was the bank in a position where you could not make those loans?

**A I'm not sure because our competitors were making them.**

Q And why do you say Phil was unable to help you make those loans?

**A Well, we get on these -- we get on these daily calls and -- and generally there was a -- a lack of information about what was happening, when we're going to be able to make these -- these loans, why our competitors could make them and we couldn't. There were systems-related issues, I'm sure, but nobody had systems for those things because they came on so suddenly.**

**And, you know, this was a situation we were looking -- we were looking to Phil for assistance inside the company to help us get these things done and -- and we couldn't get them done. So when you asked -- The reason I bring this up when you asked about interaction that's -- that's one of the main ones that I remember. The other ones were -- I**

Page 31

**don't even remember any specifics about the other ones to tell you the truth.**

Q So as of June 1 of 2020 what's your impression of Phil McHugh?

**A As of June 1, 2020 -- So you're asking me post retirement?**

Q Correct.

And just to be clear post retirement you then went on the Board at Fifth Third; is that correct?

**A Shortly after that --**

Q Okay.

**A -- yeah. It was a couple weeks in between, I think, where I wasn't. I think -- My impression of Phil. I think Phil is a -- I -- I don't work with these guys, but I -- I -- I imagine him to be -- I think he was, maybe still is, a -- a good middle market banker, a good manager of middle market bankers, a good mid level -- maybe upper mid level manager.**

**I think with a reasonably limited span of responsibility I think he's probably effective. I think beyond that the ability to drive significant change I think not so much. I think a decent ability to work inside -- inside the**

Page 32

**organization but dependent on others, highly dependent on others. I think -- I just characterize him as a B -- you know, a B player at a -- at a mid or mid to upper level range.**

Q Other than your -- your interaction with Phil during that somewhere between May, 2020, and -- I'm sorry -- May, 2019, and May, 2020, time period and you may have had a meeting with him prior to the acquisition did you have any other interactions with Phil?

MR. CIOFFI: Objection to the form of the question, misstates his prior testimony in that you may have had something, but if you understand the question you may answer.

**A Tell -- Tell me the dates again.**

Q You indicated before that sometime between May, 2019, and May, 2020 --

**A Yeah.**

Q -- that Phil became more involved with the Chicago region?

**A Yeah.**

Q And you also indicated that you may have met him -- You don't recall -- prior to the acquisition going through. Other than those

interactions what other interactions did you have with Phil outside that?
A None -- None that I remember.
Q What was your involvement with the executive succession process at Fifth Third with respect to the President and CEO to replace Greg Carmichael?
MR. CIOFFI: Objection, time frame. I assume after he came on to the Board; is that correct?
MR. SABA: Unless he had involvement before that.
BY MR. SABA:
Q What was your involvement?
MR. CIOFFI: Could you ask one question at a time --
MR. SABA: Yeah.
MR. CIOFFI: -- please?
BY MR. SABA:
Q I asked what was your involvement with the executive succession process at Fifth Third for the President and CEO to replace Greg Carmichael?
MR. CIOFFI: Object to the form. You may answer if you understand it.
**A I think I understand it. I had no**



**involvement until I came on the Board. I came on the Board June, 2020. Tim became President in October, 2020, right, 2020, and so I participated at Board meetings.**
Q How many Board meetings did you participate in?
**A I think -- I think there was a June and a September Board meeting perhaps 2020. That's when they usually would be.**
Q What was your understanding of who the candidates were to replace Greg Carmichael as President and CEO of Fifth Third Bank?
MR. CIOFFI: Objection to the form of the question. You're asking in the -- in the plural. It -- It assumes facts not in evidence and incorrectly, but you may answer if you understand.
**A Okay. So can you say it again?**
Q Sure.
What is your understanding of who the potential candidates were to replace Greg Carmichael as President and CEO of Fifth Third Bank?
MR. CIOFFI: Same objection, objection to form. You may answer if you



understand.
**A At what time are you asking?**
Q At any time that you were involved.
**A Well, prior to June, 2020, I had no understanding of succession plans. Post 2020 it was only one candidate.**
Q And who was the one candidate?
**A Tim Spence.**
Q And who communicated to you that Tim Spence was the only candidate for President and CEO to replace Greg Carmichael?
**A I don't know that anybody said, "Tim is the only candidate." They said, "Tim, the candidate." I think I heard it first probably at a -- at a Board -- at the June Board meeting.**
Q And who would have communicated that at the June Board meeting?
**A Don't know. I would have to read the minutes.**
Q Did you ever develop an understanding that there were any other candidates that were being considered for President and CEO of Fifth Third Bank to replace Greg Carmichael?
MR. CIOFFI: Objection to the form of the question. If you understand you may



answer.
**A No, I never heard of any other -- any other candidates. By the way, nor would I want to see any other candidates.**
Q Why is that?
**A Well -- Okay. So let's go back to 2015. So my view is that when Greg Carmichael became CEO in 2015 he became -- he became CEO with a mission to -- Fix isn't the right word -- but to -- to reorient the company to one that had solid processes and practices, complied with laws and regulations, significantly improve financial performance, significantly improve customer satisfaction, and Greg was exactly the right guy to do that.**
**He was a guy with a deep operational background. I think prior to that he was in charge of IT or like the CIO or something like that, and his background prior to Fifth Third was heavily operations based, and so when he became CEO in 2015 he set about doing that and he did it successfully. He did it -- He did a fantastic job.**
**And so what you have -- This goes back to the -- my thinking when MB and Fifth Third were -- were -- were discussing combining as well as -- as -- as -- as -- as Greg was making progress**

and the company's making good -- good progress on those things and building a solid foundation, a really solid foundation, for a bank to operate from, good processes, good procedures, compliance with laws and regulations -- regulations, efficient -- efficient operations, you know, radically improved customer service, so he built the foundation of what could be a great bank, and then it's time in my view -- And this was my thinking and I told our Board at MB that this was my thinking at the time in 20 -- This was probably in 2018 -- my view was that the company, Fifth Third, had a little bit more work to do on that to finish which it did and then after that it would be time for a different CEO, and my view is the best -- At that time I hoped -- I hoped that it would be Tim Spence, that he had and he has all the right skills and all the right qualities to build on that strong foundation that's -- that was laid by Greg Carmichael and the team, and putting a -- a pure old school traditional banker in the role would be exactly the wrong thing to do, and so when a question of CEO succession came up and I -- I learned that Tim Spence was the candidate this was fantastic, and it was the -- if you will, it was the execution of the play that the MB Board and shareholders had hoped would happen, and it happened,



and so this was a fantastic thing.

Now, I might say, by the way, that I had a big stake in this and business decisions very well might have been different at MB and my personal decision may have been very different too. When I went on the Fifth Third Board in June, 2020, I was either the first or second -- probably the second largest individual shareholder on the Board. Greg Carmichael probably had a larger ownership position than I did. But -- So this thing -- this thing was really important to me and I was very pleased that the Fifth Third Board really did all -- most of the work before me, looked like they were going to get it exactly right.

Q Would you consider Phil McHugh to be an old school traditional banker?

A Yes.

Q Why is that?

A I think the banking industry is changing in a way that's a lot of society but particularly in the banking industry driven by technology, technology changes. If you look at -- If you think about a bank the way it used to be, the traditional -- the traditional way -- way it ran, it would raise money from consumers and savings accounts



and it would make loans to businesses or mortgage loans or -- or -- or -- or things like that, and the way they gathered those deposits was people walking in the branch or going through the drive-thru and the way they made loans was people came into a lender's office and sat down and filled out a -- In those days it was probably a two-page application -- Today it's 22 pages -- and -- and make the loans.

Today -- And not only today, but back in -- It was clear -- It was clear already in the mid -- You know, I would say 2015/2017 time frame -- Actually it was clear before that, maybe the 2015 time frame -- that technology was going to radically change the industry.

Banks have two given advantages over every other kind of business entity in the United States. One is we have access to FDIC insurance, and so we can raise -- the bank can raise deposits at lower costs than any other entity in the United States and use that money to make loans at lower costs and -- and make -- make money doing that. That's the inter -- intermediation process.

The other thing that banks have that nobody else has is access -- direct access to the U.S. payment systems. So you think about wire



transfers, ACHs. Today it's -- it's -- it's -- it's -- it's what was Zelle through an intermediary, new products like FedNow and things like that.

Technology was changing both of those rapidly, and if you were -- if you are a bank and -- and you -- and you don't keep up with those, keeping up it would be a necessary minimum to stay even to be an average bank. To be a great bank you have to get -- you have to get ahead of those things, and that's what Tim -- that's what Tim brought, and I don't think -- I shouldn't compare them because I don't think Phil was qualified to be CEO in any means, but that's what Phil doesn't have in my view and -- and -- and didn't have the experience and couldn't have the experience and -- but he's not alone in that.

That -- That -- What I just described would describe almost everybody else -- almost everybody else in the banking business, but here we had this guy, Tim Spence, who had that exact on point experience and knowledge and understanding, and, you know, the -- the -- the great thing as I looked at it, I think, as a -- and the MB Board looked at it and then when I became a Fifth Third Director the way I thought about it was to build on the foundation that Greg Carmichael and team built and

**have a guy like Tim Spence take this bank in -- as a leader into the future was invaluable and would be fantastic for -- for shareholders and employees and customers alike.**

Q What's your understanding of Phil McHugh's experience with technology in the past?

**A I don't -- I don't know what his direct experience was, but he never struck me as a person who had that kind of deep understanding about technology and the -- and the -- and the changes that were happening in the marketplace.**

Q What is that based upon?

**A Just my -- my impression of Phil.**

Q Did you do any investigation into his background?

**A No.**

Q Do you know what roles he served at Fifth Third?

**A Yes, I know some of them.**

Q Which were those?

**A Well, I think he had -- he was the President of -- of -- of a region. He ran consumer banking and he was responsible for the regions, perhaps a -- a variety of other things. I -- Listen, I would characterize Phil as like a utility infielder**



**in baseball. He could play a number of positions, but he's not going to be the manager. It's a different skillset entirely.**

Q My question goes to what specific knowledge do you have of Phil McHugh's technical experience?

**A Well --**

MR. CIOFFI: Objection, asked and answered. He talked about the PPP program and other things. He has talked about it --

MR. SABA: Thank you for your talking answer, Michael, but let him answer the question.

MR. CIOFFI: He has been talking about it all day.

MR. SABA: I appreciate your testimony.

**A Let me explain one thing --**

MR. CIOFFI: Wait a minute. Let's -- One -- One person speaks at a time.

MR. SABA: Well, you're only supposed to object --

MR. CIOFFI: I am -- I am objecting --

THE REPORTER: Wait a minute.



Yeah, seriously one at a time. It's getting out of hand.

MR. CIOFFI: So I'm -- I'll make my objection. You can -- You can oppose the objection, but don't talk over me.

MR. SABA: Well, just say "objection" and we'll move on.

MR. CIOFFI: No.

MR. SABA: No. You're trying to coach the witness.

MR. CIOFFI: I am not trying to coach the witness.

MR. SABA: Yes, you are. You made up an answer to try and --

MR. CIOFFI: I did not make up any answer.

MR. SABA: Yes, you are.

MR. CIOFFI: Objection. He's testified all morning about the answer to your question, including the PPP Program, and you're -- you're trying to act like there's no answer --

MR. SABA: PPP Program hadn't --

MR. CIOFFI: -- there's no answer. He's been answering that question all



morning.

MR. SABA: No -- No, he hasn't.

MR. CIOFFI: Counsel --

MR. SABA: There's been no -- You're just trying to create answers --

MR. CIOFFI: I'm not.

MR. SABA: -- that aren't responsive to the question.

MR. CIOFFI: Objection. The record speaks for itself what he's already testified to, but if you want to keep asking him ask him another question.

BY MR. SABA:

Q Go ahead. What specific knowledge do you have of Phil McHugh's background with respect to his technical experience?

**A The only thing I can tell you is people who are interested in these kinds of things in the industry love to talk about them. These are interesting things to people like me, Tim Spence, who -- who -- who watched very closely for -- you know, who are technology focused who watched changes in the marketplace, who watched changes in banks and see who's successful, and when you run into somebody like this the topic comes up. It just comes up.**

Page 45

**I bring it up a lot and most people I bring it up with they don't want -- they don't have an understanding and want to talk about it. I don't remember ever having a discussion with Phil on -- on -- on -- on this subject, and frankly I think we would have -- only because I like to talk about these things so much we would have had he had that skill and that knowledge. That's my impression.**

Q That's all it's based upon --

A **That's it.**

Q -- that you haven't had a conversation with him about technology; correct?

A **If you're asking me if I investigated his background I have not investigated his background.**

Q Other than not having had a conversation with Phil McHugh about technology are you aware of anything else that would indicate that Phil McHugh does not have knowledge of technology in banking?

MR. CIOFFI: Objection, mischaracterizes his testimony, but your characterization doesn't mean anything because the record speaks for itself, but you may answer.

Page 46

A **Like I said I haven't investigated his -- his background.**

Q Other than your conversations with Tim Spence did you investigate his background?

A **Not -- Well, did I personally investigate his background?**

Q Yes.

A **No.**

Q Have you ever reviewed his employee engagement scores?

A **His employee engagement scores?**

Q Yes.

A **Perhaps at a Board meeting, but if they didn't come in a Board meeting the answer would be no.**

Q Did you ever review his -- Tim Spence's customer experience surveys?

A **Again if it came to a Board meeting I would have seen it, but otherwise, no.**

Q Did you ever review -- And I'm referring specifically to the time that Tim Spence would then be selected as President -- so within those two Board meetings or otherwise did you ever review Tim Spence's financial performance relative to goals for his divisions?

Page 47

A **Not unless it was in those two Board meetings.**

Q Did you ever review income statements and balance sheets specifically broken out for the divisions managed by Tim Spence?

A **Same answer.**

Q Did you ever meet with or interview any of Tim Spence's direct reports or subordinates?

A **Yes.**

Q Who did you meet with?

A **Oh, I don't know. I'd have to see -- I mean he has a number of subordinates in -- in -- at that time and I am sure I have spent -- I had spoken with them either during Board meetings, in between Board meetings, but don't remember who or what those conversations were about.**

Q And you're saying that was specifically during the two meetings prior to the time of Tim Spence's --

A **I mean you have to understand what -- you have to understand -- Sorry -- I'm sorry about that. You have to understand when we're having Board meetings often times we have presenters who come in and they mingle around before the Board meeting or after the Board meeting or during breaks and you talk,**

Page 48

**right, you talk with people, and that's an important thing -- that's an important thing for a Board member to do, to talk to people to get a sense of, you know, what they're thinking and what they're feeling.**

**Sometimes you talk about their boss. Sometimes you talk about other challenges that they have or other things. So if you're asking me is it likely that those things happened it is. Do I remember the conversations, no.**

Q As you sit here today do you know if any of Tim Spence's subordinates were present for either the June, 2020, Board meetings or the September, 2020, Board meetings?

A **I don't remember. I'd have to look at the minutes.**

Q And obviously if the minutes reflect that none of his subordinates were present then you would not have spoken to any of his subordinates?

A **Not -- That's not necessarily true because people are outside the Board room. It's a general -- right -- It's -- It's the executive floor. There can be people coming and going. I just don't remember. It's -- It's -- It's -- It's not likely -- It's likely that I did, but -- but I can't tell you**

Page 49

**that I did.**
Q Did you ever view Phil McHugh's employee engagement scores?
**A Again same answer, only if it came to a Board meeting.**
Q Did you ever review Phil McHugh's customer experience surveys?
**A Same answer.**
Q Did you ever review any of Phil McHugh's financial performance relative to goals for his divisions?
**A Same answer.**
Q Did you ever review income statements and balance sheets specifically broken out for the divisions managed by Phil McHugh?
**A Same answer.**
Q The Fifth Third/MB Financial merger, that was announced in May of 2018; is that correct?
**A Yes.**
Q And it would be another year before it would close; is that correct?
**A Yeah, I think that's right.**
Q Okay. And that -- that deal essentially started going sideways right after it was

Page 50

announced; didn't it?
MR. CIOFFI: Objection to the form of the question.
**A That's ridiculous.**
MR. CIOFFI: The term, sideways, if you could explain that. Is that -- Is that a term of art, Counsel, or what do you mean by that?
Q Are you able to respond to the question?
MR. CIOFFI: Could you --
**A It's -- It's a ridiculous question.**
Q Why?
**A Because the premise is not true. You said, "When did it turn sideways" -- or, "It started to go sideways immediately afterwards."**
Q Correct.
**A That's just a false statement.**
Q What happened to Fifth Third stock after it was announced?
**A It went down.**
Q It went way down; didn't it?
**A No, no, I don't think it went way down.**
Q Didn't it --

Page 51

**A The -- The -- The decline was within the range that -- that the MB team expected.**
Q It dropped 30 percent by Christmas Eve of 2018; correct?
**A Yeah, but not -- not as -- not as a -- a result of the transaction.**
Q Didn't Wall Street react negatively to the transaction?
**A Not in my opinion.**
Q By the stock dropping 30 percent?
**A That's not a result of the transaction.**
Q Isn't that what the reports were that the -- Wall Street was reacting negatively to the transaction and that's why the stock dropped by 30 percent?
MR. CIOFFI: Objection to the form of the question.
Q Go ahead. I'm sorry.
MR. CIOFFI: You -- You may answer.
**A That's flat out wrong.**
Q Why do you say, "That's flat out wrong"?
**A Because it didn't happen that way and you're -- you're implying that the 30 percent**

Page 52

**decline of Fifth Third stock was a result of the -- of the MB merger transaction. That's just wrong.**
Q And why do you say that's wrong? What's your basis for saying that's wrong?
**A Well, I have been a bank CEO for a very long time. I have been involved in more than 25 bank acquisitions and mergers, maybe over 30 or 35 other kinds of acquisitions of public companies and private companies. I have been watching the industry for -- Well, I started in banking in -- when I was 15, so I have been watching the industry -- Well, what does that make it -- 50 years now, I suppose. Back then it was 45 years.**
**I am intimately familiar with bank stocks, how they trade and how they move, bank stock investors as well, who they are, how they think, and it just didn't happen. The -- The transaction was not responsible for a 30 percent decline of Fifth Third stock. I have to go back and look at the economics at the time and what was happening in the -- in the industry at the time to tell you.**
**In every -- In every merger of this type when -- when -- when a company is buying a premium franchise like MB was and paying a high price the FIRE stock declines period. Everybody knows this.**

**Everyone expects it. It's built into the deal economics. It's built in the expectations. The MB Board expected it. I expected it. Our investment bankers expected it. It happened exactly the way we thought it would happen.**

**So your implying that the transaction was a failed transaction or didn't work, that's untrue at that time and it's untrue today.**

Q Well, wasn't the deal destined to go sideways from the beginning?

MR. CIOFFI: Objection, Counsel. You're -- You're being argumentative and your argument's based upon rank hearsay. You're citing with -- with no documentation at all, but -- and he's already answered it. With that objection you can answer it again.

**A Okay. Please repeat.**

Q Sure.

Wasn't the deal destined to go sideways from the beginning based upon the structure?

**A You will have to explain what you mean by "the structure".**

Q Well, you understood that Fifth Third planned on eliminating over 400, close to 500, jobs from MB after the acquisition; correct?



**A Yes.**

Q And a lot of that would be in the back house infrastructure; is that correct?

**A Yes.**

Q Okay. You also understand that in any type of transactions like this there's computer systems that must be melded, a process that can freeze customer accounts' external bank transactions; correct?

**A Yes.**

Q Okay. You also understand that with two banks like this you could have disparate lending standards and customer service practices and other policies that must be reconciled; correct?

**A Yes.**

Q Okay. And this becomes far more difficult when you eliminate the infrastructure of one of the banks; isn't that right?

**A What becomes far more difficult?**

Q Becomes far more difficult to meld those computer systems to deal with disparate lending issues; isn't that right?

**A No.**

Q You can also have -- With respect to loss of that infrastructure you have the bankers



who manage relationships may become frustrated with respect to the lack of support they get with the lack of infrastructure and so they start to leave the bank and take the relationships with them; isn't that right?

MR. CIOFFI: Objection to the form -- the form of the question. Counsel, you're just making arguments. It's argumentative.

Q Did you understand that?

**A What -- What -- What you say is correct and what you say is planned for in transactions of this nature. As I have said I have done dozens of these and you always plan for a certain level of departure of employees afterward. If a person signs up to come to work at MB, right, I sign my papers, I'm going to work at MB, that's an agreement between MB and the employee. That's what they agree to.**

**When the company is sold and be -- in this case becomes part of Fifth Third that relationship changes. It's foolish to not expect some people to say, "I made my deal with MB. I don't want to make my deal with Fifth Third. I'm out." This is completely normal. And anybody who doesn't plan for**



**such things is a fool, and sometimes you see acquisitions that are done in the banking industry where they forget that, forget that that happens, but we didn't. We knew it was going to happen.**

**We planned for it. We expected it. It wasn't any different. That doesn't mean it's not a battle. You fight, right -- I think maybe where you're going is you fight for every employee. We want to retain every one of them instead of -- Well, every one of the good ones -- and you fight, and some you win and some you lose, but the predicate of the deal is based on an expectation that a certain number of employees and a certain number of customers are going to leave.**

Q Wasn't this deal based upon a representative of Fifth Third shareholders that by combining Fifth Third and MB it would combine market share in the Chicago region?

MR. CIOFFI: Objection to the form of the question, argumentative, but you may answer.

**A Well, surely if you have two companies present -- that are present in the same market and you put them together you have combined market share.**

Page 57

Q But in this case because of the management method structure of the deal and the number of relationship managers that were lost there was actually a loss in market share; wasn't there?
**A Well, yes, and -- and that's expect -- that's expected. If you -- If as I said you expect to lose a certain number of customers in the merger you would expect to have a lower market share. That's just math. But you don't do these deals for the first day or the first week or the first year or even the first three years. This is a long-term investment decision by MB shareholders and a long-term investment decision by Fifth Third.**
**We don't -- If we thought -- For example, if we thought it was going to be great, we weren't going to lose any customers, we were successful for three years and then our customers were going to decline you wouldn't do the deal. On the other hand if you think, yeah, we expect some customer attrition, we expect some employee attrition, and then when things settle in and we get the benefits of the combination which we have in full force and then some -- In fact, the benefits are more than I expected them to be -- and then you -- after -- after that decline period ends and you start to grow that's where the**

Page 58

**money is and that's where -- that's where the payoff is, and, in fact, I'm pretty sure this is true. Our market share is up particularly in the consumer side and I believe it's also up in the middle market banking center which is exactly what we thought would happen. If you're trying to imply that the transaction was a failure or went sideways in some fashion it's just wrong.**
Q Isn't your total market share down?
**A No.**
Q It's not?
**A Well, I don't -- I don't know what this -- the statistics are at this very moment, but, no, our consumer banking market share is up and our middle market market share where we want to have it is up as well.**
Q The FDIC would report the total market share; is that correct?
**A Yes -- No, that is incorrect.**
Q Why is that incorrect?
**A They don't report market share. They report deposits.**
Q Do they report market share based on deposits?
**A No. They report deposits. When --**

Page 59

**When I think of market share I think of it in -- in -- in -- in a number of different ways and I think an informed banker would do the same thing. You might look at the number -- the dollar amount of deposits someone has, a bank has. You may look at the dollar amount of consumer deposits a bank has. You most surely look at the number of customers, the number of household relationships that a bank has in the market. That is not reported by the FDIC. You look at the number of business accounts, small business, mid size businesses, that a bank has in the marketplace. That's not reported by the FDIC.**
**The FDIC reports one number, total deposits by branch. They may report -- Yeah, I think it's just total deposits by branch. And that tells you something about market share but not anywhere close to a real explanation of what the market share is.**
**And let me give you an example of that. Many banks when they look at market share, right, they carve out the very largest -- Well, for example, if you were looking for market share that Chase has in the Chicago area you'd find one branch has -- I'll pick a number -- $50 billion of deposits, all right. I don't know if it's that high, but it**

Page 60

**could be $20 billion, $50 billion, $10 billion. Those are not in market deposits. Those are wholesale deposits. They're deposits that come from other parts of the country that happen to be assigned to a particular branch, and so an informed analysis would take -- would remove that branch from a market share analysis to say how many deposits or depositors or households or relationships or businesses we have in this defined geographic area. You can't get that from an FDIC report.**
(Deposition Exhibit 2 was marked for identification.)
BY MR. SABA:
Q Mr. Feiger, I have handed you what's been marked as Exhibit 2 and it's Bates stamped in the bottom right-hand corner MCHUGH 01526 through MCHUGH 01540. Have you seen this document before?
**A Let me look. This is May 21, 2018. Okay. Let me just look at this. (Reviewing document.) Uh-huh, okay.**
Q Referring you to Page -- Have you seen this before?
**A I have.**
Q Okay. When did you see this document?

A **Around the time of merger.**
Q Why would you have seen this document?
A **This document, I believe, was prepared in conjunction with a press release announcing the merger, so this was a -- a -- a -- more information for the investment community to help them understand what this merger was and why we were doing it.**
Q Referring to -- And this was also an Edgar filing, is that correct, SEC filing?
A **I think so.**
Q Referring you to Page 6 of 15, McHugh 01531, this is a chart, correct, that creates a -- "Combination creates a leading Chicago franchise" is the heading on that; is that right?
A **Yes.**
Q Okay. And the anticipation was that looking at leading Chicago market position and they're talking about retail deposits, total branches, that MB Financial and Fifth Third would combine to be the second largest in Chicago; is that correct?
A **I think that's correct.**
Q Okay. And -- And the second largest in market share for that area; is that



correct?
A **On this -- On -- On this market share measure the way this is computed --**
Q Right.
A **-- for deposits I think that's correct.**
Q That -- That didn't happen; did it?
A **I don't know.**
Q You're not aware if that happened or not?
A **No. Now, this -- I'll -- I'll -- I'll expand a little bit. I mean this chart is -- is -- is -- is good for investors. It's easy to understand. It isn't the way I would judge success, but I -- so I don't know if -- if -- what happened in this. Things go up and down, people who have deposits around it, yeah. The -- I don't know if in here -- There might be a definition of what retail deposits is, but I am not sure. I'd have to look -- look at the document more closely to understand it.**
(Deposition Exhibit 3 was marked for identification.)
BY MR. SABA:
Q Mr. Feiger, you have been handed Exhibit No. 3 which is Bates stamped



FIFTHTHIRD-MCHUGH-01557 through 01573. If you can confirm that -- Is that correct?
A **1557 through 73 you're saying?**
Q Correct.
A **That's what I have.**
Q And this is a list of market share numbers from the FDIC in summary on the first page and then listed out with every other bank on the other pages -- Do you see that?
MR. CIOFFI: Objection to the form of the question. Counsel, you're not permitted to identify the document and explain what it is. You can ask this witness to explain, but you can't explain it to him. There's no foundation for this document unless he's said he's seen it before, but you should -- you need to ask him that as a foundational question.
Q Have you ever seen FDIC reports of market share before?
A **Yes.**
Q Okay. This document I'm assuming you did not review in preparation for today's meeting; is that correct?
MR. CIOFFI: Objection. I am not



going to allow him to answer anything he's -- he's reviewed that we might have provided to him. You can ask him if he's ever seen it before. Ask him. That's -- That's the basic foundational question. You know that. Why don't you ask him that?
MR. SABA: I think -- You can do your deposition later.
MR. CIOFFI: No. But you -- you know you have to ask basic foundational questions before you ask the next question.
MR. SABA: I have already asked that question, Are you familiar with FDIC deposits, and I have represented this is from the FDIC database, so --
MR. CIOFFI: You're not a witness. Your representation doesn't mean anything if he doesn't know what it is.
MR. SABA: You can go ahead and ask questions too.
MR. CIOFFI: No. Objection, lack of foundation. Please proceed.
MR. SABA: That's your shortest objection ever, Michael.

Page 65

BY MR. SABA:
Q Mr. Feiger, do you have any reason to dispute the -- the list of market share numbers for Fifth Third from June 30, 2018, up through June 30, 2024, for the Chicago region?
**A I don't -- I mean I'm assuming the data that you have given me is -- is -- is correct, but it's worthless.**
Q Why --
**A It doesn't -- It doesn't -- Looking at these numbers doesn't tell me anything useful.**
Q Why does the FDIC report worthless numbers?
MR. CIOFFI: Objection to the form of the question. It's -- It's your assumption and testimony that's an FDIC document. No one's identified it as such. Lack of foundation. You may answer.
**A I'm not sure where this data came from, but if -- if it is from the FDIC as I mentioned earlier the FDIC includes all deposits in their branch reporting. When a merger happens banks move large wholesale deposits around. In -- In -- In the MB/Fifth Third case I'm certain -- I don't know how much -- but I am certain that large wholesale deposits**

Page 66

**were relocated from the Chicago -- old MB Chicago offices to the Cincinnati offices, so you're going to see a decline no matter what and it doesn't reflect market share or anything of the sort, so you can call it what you want, but this as I -- as I said earlier this kind of analysis is quite useless.**
Q And do you have any knowledge of Fifth Third moving actual deposits?
**A Yeah, yes, I'm -- I'm quite certain Fifth Third moved our wholesale deposits to Cincinnati which is appropriate -- They should -- because that's where the Treasury Department is now. When MB -- right -- MB is a stand-alone company. We had a Treasurer. His name was Dave Crilley. He was a brilliant Treasurer. He managed our wholesale deposits. They were located in the Rosemont, Illinois, office, most of them. Come together. The Treasury Department at MB is eliminated. All the work is transferred to the Fifth Third Treasury Department. The deposits move. That effects these numbers. I tried to explain that earlier.**
Q Mr. Feiger, after the merger was completed in May of 1990 -- Excuse me -- April of -- Excuse me. Strike that.
After the merger was completed in

Page 67

April of 2020 --
**A May of 2020.**
Q May of 2020.
**A May, 2019, it was completed; right? The merger was completed in May of 2019.**
Q I'm sorry. May, 2019. Excuse me. May, 2019. Strike that.
After the merger was completed in May, 2019, what were the infrastructure problems that existed in the operation of the merged Fifth Third/MB up in Chicago?
MR. CIOFFI: Objection to the form of the question, assumes that there were such problems, and you're testifying, Counsel, and being argumentative, but you may answer. I am not going to instruct you not to answer.
**A I'm sorry. Say the question again.**
Q What were the infrastructure problems at the merged Fifth Third Bank and MB Financial?
**A On -- In May, 2019?**
Q Beginning after May, 2019.
**A There weren't any.**
Q Were there any problems with credit?

Page 68

**A No.**
Q No issues?
**A Well -- Well, what do you mean by "problems with credit"? Be more specific.**
Q Did you have any issues or problems with credit?
**A Sure. Every bank has bad loans, problem loans, non-performing loans, watchlist loans, classified loans.**
Q Just with the infrastructure the ability to even get wire transfers out?
**A I don't remember. I don't remember problems. It wouldn't surprise me if there were some. It depends. Particularly wire transfers it's -- it's an odd thing in a -- in a merger date. Is it -- Is it possible there were operational problems, I would be surprised if there weren't operational problems. There's always operational problems in -- in -- in -- in combining two banks.**
**You got to remember the operating systems even in a small bank from -- the systems themselves from an operational perspective are very complex. There's dozens and dozens and dozens -- Even in a small bank today there's dozens and dozens and dozens of small systems that are all talking to each**

**other, and when you talk about -- And then they're talking to other entities as well, one of which happens to be the Federal Reserve.**
**When you combine two companies the Federal Reserve -- This is an example -- the Federal Reserve has certain rules about how you initiate wire transfers, who's responsible, what authorities to do what, and it's very possible, even likely, some of those roles transfer from MB -- some of those authorities transfer from MB to Fifth Third and there may have been operational problems, but that doesn't -- that really doesn't concern me in the least. I mean these kinds of things happen and people work through them.**
Q As of June of 2019 were you familiar with the process of preparing a Board of Directors page for the Fifth Third Board of Directors which assessed the various aspects of the MB Financial merger?
MR. CIOFFI: Objection. It's a compound confusing question, but can you ask it again?
A **Yeah. Say it one more time.**
Q Sure.
As of June of 2019 were you



familiar with the process of preparing a Board of Directors page for the Fifth Third Board of Directors which assessed various aspects of the MB Financial merger?
A **I -- I don't remember that happening. I may have been involved, but I don't recall.**
Q But do you recall that the Board of Directors page reviews the assessments of coding things in green, yellow, or red?
A **I'd have to see the page.**
Q Do you know who Charlie Bradley is?
A **I do.**
Q Who's Charlie Bradley?
A **Charlie -- Charlie Bradley -- Charlie Bradley worked in or lead the project management office at Fifth Third, so essentially a -- a unit of people who helped the company make change, managed projects.**
MR. CIOFFI: Counsel, before you ask your next question we have been going about close to 90 minutes.
MR. SABA: We can take a break, five minutes.
MR. CIOFFI: Take -- Take five



minutes, just a restroom break.
MR. SABA: Sure.
MR. CIOFFI: Thanks.
THE VIDEOGRAPHER: Off the record 11:28.
(Deposition stood in recess at 11:28 a.m.)
(Deposition reconvened at 11:45 a.m.)
THE VIDEOGRAPHER: We are back on the record. This is Media 2 of today's deposition. The time is 11:45.
BY MR. SABA:
Q In -- In June of 2019, Mr. Feiger, what would Lars Anderson's role have been with respect to the post merger of Fifth Third and MB Financial?
A **June of 2019 I think -- I think Lars was assigned to Chicago basically as a -- you know, a -- to watch over us, to help us get things done as a contact point, because remember June of 2019 MB was still kind of operating on its own, its own computer systems and its own processes and things like that, so Lars was -- was our -- I think our main contact and our -- our main oversight. I think that was June, 2019.**



(Deposition Exhibit 4 was marked for identification.)
(Mr. McHugh exiting conference room.)
BY MR. SABA:
Q Mr. Feiger, I have handed you what's been marked as Exhibit No. 4 which is FIFTHTHIRD-MCHUGH-0213143; is that correct?
A **Yes.**
Q Let me represent to you this is a copy of text messages exchanged between Lars Anderson and Greg Carmichael, and if I can refer you down about three quarters down the page to a text message from Lars Anderson to Mr. Carmichael which it's listed as June 12th, 2019, and says --
A **What -- What time?**
Q 18:32:07 Universal Time Clock.
A **Okay.**
Q Do you see that?
A **Uh-huh.**
Q And the text message reads, "Just had a 1 hour call and had Tim, Jude, and Charlie. We are getting more updated info and prepare to have a productive discussion with Mitch. Charlie shares with me a Board of Directors page with an integration

update he shared with Mitch Friday which he supported and had wholesale at Yellow. He was very surprised Mitch had moved to 'red'. Tim and Jude and I are aligned on what needs to be done" -- Do you see that?
A Yes.
Q Do you know what they're referring to with respect to the Board of Directors page with an integration update?
A I'd have to see it --
Q Okay.
A -- to be sure. I'm sure as would be appropriate in transactions of this type there should be regular reporting back to the Board of Directors probably at every meeting and an integration update is probably how it's referred to. It would be various key milestones and activities that would be graded in some fashion, are they -- are we on schedule, are we slightly behind schedule, are we seriously behind schedule, are there -- so they're going, right, are there big problems, little problems, things like that, and so I'm guessing that's what this is, but I'd have to see it to be sure.
Q As you sit here today do you recall why you would have removed some of those -- or excuse me -- moved some of those issues to red?



A Not on this. I don't know what the specific issue is, but I would be surprised if I didn't move some to red.
Q Why is that?
A Well, okay, so -- so you're going through an integration and the integration literally has 5,000 items on it, 5,000, 10,000 -- I mean thousands of things that need -- need -- need to be done, and they aggregate in various silos to different more macro reporting steps. You can't report 5,000 activities to the Board of Directors, if 5,000 is the right number. You have to -- You have to aggregate -- aggregate them up. And so there are always things down below that are problematic.
My -- What -- What I wanted to do was I wanted to make sure this -- this integration when is the best it could possibly be, and so I was driving both MB and Fifth Third people whenever given the opportunity to do more, to do it better, and to do it faster, and so my -- my objection -- my objective in a lot of this reporting was to reduce the perceived level of performance so that we would get more resources, we would get more attention. That's not uncommon.
And it's -- it's entirely



possible -- I don't know what this is -- that I moved something to red to say, "Look, I think we need more resources." And, by the way, just because something is red doesn't mean it's gone bad. These are -- right? If something's being -- If you have a milestone to achieve -- Let's say it needs to be done -- it could -- it could be completed in 18 months, okay, and you're four months in and you're slightly behind on the task, right, and somebody raises their hand and says, "Wait. We're behind. We need to -- We need to add resources. We need to do something different. We need" -- whatever the change is. That would cause a -- a -- a -- a rating like yellow and red to move from green to yellow or yellow to red or whatever the appropriate rating is, and you apply more resources, you do something different, red turns to yellow and then yellow turns to green, you get 18 months and you're done on schedule.
(Mr. McHugh re-entering conference room.)
(Deposition Exhibit 5 was marked for identification.)
BY MR. SABA:
Q Mr. Feiger, I have handed you what's been marked as Exhibit No. 5 which is



Bates stamped MCHUGH 01554 through 01556, and it's a newsletter from Financing & Banking Magazine titled "Fifth Third bankers' exodus to rivals picks up speed" -- Do you see that?
A Yes.
Q And it indicates that, "In the biggest mass movement of bankers in years, more than 30 bankers formerly with acquired MB Financial have decamped for BMO Harris. And an MB veteran has been brought in to stem the defections" -- Do you recall that?
MR. CIOFFI: Objection to the form of the question. The document's not been identified by the witness and there's no foundation, but you may answer. Could you ask it again?
A So -- Okay. First off you have the publication wrong; correct?
MR. CIOFFI: Yeah.
Q Sure.
MR. CIOFFI: Sure.
Q Go ahead.
A It's Crain's Chicago Business.
Q Okay.
A It's the Finance & Banking Section.

Page 77

**I am not sure why the heading is missing. I remember the article. I have to read it again to get a full --**
MR. CIOFFI: Take your time and look at it.
A **Let me -- Let me look at it again.**
(Reviewing document.)
MR. SABA: Connie, we can go off the record.
MR. CIOFFI: No, we're not going off the record.
MR. SABA: We can go off the record.
MR. CIOFFI: Stay on the record.
MR. SABA: No, no, if he wants to read he can read, but we're not going to burn up time --
MR. CIOFFI: No. Look, he's -- You asked him to read a document. That --
MR. SABA: No, no, no.
MR. CIOFFI: -- stays on the record.
MR. SABA: You said he should read it.
MR. CIOFFI: No.
MR. SABA: I didn't ask him to read

Page 78

it. I asked him a question about a sentence being accurate.
MR. CIOFFI: We're not going to go off the record.
MR. SABA: We're off the record already. I -- I called it.
MR. CIOFFI: You can't unilaterally go off the record.
MR. SABA: Yeah, you can. Yes, you can.
THE VIDEOGRAPHER: We are off the record.
MR. SABA: We're off the record. That's exactly how it works.
MR. CIOFFI: It's not. We're going to stop the deposition in two hours, so --
(Deposition stood in recess at 11:54 a.m.)
(Deposition reconvened at 11:55 a.m.)
THE VIDEOGRAPHER: Back on the record.
BY MR. SABA:
Q Go ahead.
A **I haven't read the whole thing, but**

Page 79

**if I need to read more I will.**
Q Mr. Feiger, referring back to Exhibit No. 5 the article in the first line indicates, "In the biggest mass movement of bankers in years, more than 30 bankers formerly with acquired MB Financial have decamped for BMO Harris. And an MB veteran has been brought in to stem the defections." Is that statement accurate?
A **No.**
Q Why is that not accurate?
A **Because an MB veteran wasn't brought in to stem the defections and I don't even know if the 30 bankers is correct.**
Q How many bankers had departed Fifth Third that were former MB Financial bankers as of October, 2019?
A **I don't -- I don't know.**
Q Are you at least aware of whether or not bankers were departing MB Financial -- Excuse me -- Fifth Third that were former MB Financial bankers?
A **Bankers were departing, but you have to understand the author of this article, Steve Daniels and Crain's Chicago Business. There was a -- I don't call it a war -- There were hard**

Page 80

**feelings, let's say, at that -- between MB Financial and Steve Daniels and Crain's Chicago Business.**
**If you looked at -- If you were to look at other articles that this -- this publication wrote about MB what you'd find is 100 percent of them were negative. This was a publication in my opinion who was out to get MB, who was -- who was -- who was unhappy with us because we withdrew our advertising from the publication, so when Steve Daniels writes articles in my opinion they are filled with innuendo, misstatements of fact, overstatements, wrong heaviness, and lack of explanation.**
**Now, I could read this and give you chapter and verse on this. I can -- but that's -- that's what you're dealing with in -- in -- in -- in this article.**
Q And you're saying that's true for any article written by Steve Daniels?
A **Any article written by Steve Daniels published in Chicago Crain's maybe in the 10 years leading up to this, 8 years, something like that, yes.**
**My point is you have a very biased author here. I have known Steve Daniels for 30 years. We have had extensive dialogue. I have spoken with**

**the editor and the publisher of Crain's when I was a CEO of MB about this subject and I can tell you the answer I got back was this is just their voice, this is what they do, so me I put almost no credence into this article and articles for Crain's.**

Q Who's Mark Hoppe?

**A Mark Hoppe is a -- was -- was -- He's retired now -- an employee of MB and then Fifth Third. Prior to that he was the CEO and President of Cole Taylor Bank. Prior to that he was an Executive Vice President at LaSalle Bank and has a long and storied career in Chicago banking. He's one of the most respected -- In my opinion he's one of the most respected bankers in -- in the Chicago marketplace for probably 40 years and we were thrilled to have him on our team when we acquired Cole Taylor in -- I don't remember when that was -- 2013 or something like that.**

Q Referring you to the second page of this article, MCHUGH 01555 --

**A Uh-huh.**

Q -- the second to the last paragraph reads, "One of Hoppe's key jobs, sources inside and outside of Fifth Third say, is to stem the banker defections. In this high-touch business, the loss of



relationship managers after a merger often leads to the departure of business clients who follow their old bankers to their new bankers" --

**A Yeah.**

Q -- do you see that?

**A I do. So this is classic Chicago Crain's, Steve Daniels. Hoppe's job, my job, the job of all of senior management at MB, was to stem any defections. You may remember I -- I mentioned to you that in every merger, in every integration of this type, there's going to be departures. Our mission as an executive management team is to retain as many high talent people as we possibly can.**

**So this is simply a statement of fact. It doesn't -- He was doing that before. It doesn't -- It doesn't say anything of real substance to people who know what's going on and this is my problem with Crain's and Steve Daniels.**

(Deposition Exhibit 6 was marked for identification.)

BY MR. SABA:

Q Mr. Feiger, I have handed you what's been marked as Exhibit No. 6 which is four pages. Please note the first page is marked FIFTHTHIRD-MCHUGH-0212883. The next three pages are



marked consecutively FIFTHTHIRD-MCHUGH-0213203 -- I'm sorry. Correction. It is just two pages. Sorry about that.

The second page is 0213203; is that correct?

**A Yes.**

MR. CIOFFI: Yeah, Counsel, I note this is for attorneys' eyes only.

(Mr. McHugh exiting conference room.)

BY MR. SABA:

Q If I can refer you first to the second page of Exhibit No. 6, FIFTHTHIRD-MCHUGH-0213203, and actually beginning with the first text message above the two highlighted text messages let me represent to you this is a text message exchange between Frank Forrest and Bob Shaffer. I'm referring first to the text message sent at -- on October 11th, 2019, and 10:51:14 Universal Time Clock, "Heading to Chicago for some productive conversations and problem resolution. I'll try to solve the credit issues while I'm up there as well" -- Do you see that?

**A Yes.**

MR. CIOFFI: Counsel, objection for



lack of foundation. Your -- Your testimony as to what the document is or is not is not a foundation. But with that objection you may answer.

Q Do you know what Bob Shaffer is referring to in that text message?

**A No.**

Q Frank Forrest then responds, "You need to do that. We need one capable executive, not three, overseeing MB. That would be a great start. Make it happen."

Bob Shaffer responds, "I already did. I met with Greg earlier this week and told him Phil is the guy. And that Lars needs to work through Phil when necessary in Chicago" -- Do you see that?

**A Uh-huh, yes.**

Q Do you recall in October of 2019 is when Phil began to take over in Chicago?

MR. CIOFFI: Objection to -- to the form of the question, lack of foundation. It assumes facts not in evidence. But you -- you may answer.

**A I don't remember the exact and it feels -- it feels about right. I -- I felt it was about -- about six months after the May closing date,**

**so this would be consistent with that.**
Q At that time do you recall there being any issues regarding credit or otherwise at MB that needed to be fixed?
**A Well, when you say "fixed" what do you mean by "fixed".**
Q Let -- Let me use the phrase of -- of Bob Shaffer that that needed to be resolved, problem with resolution.
**A I mean I -- I'm not sure what he's referring to. If he -- He could be referring to processes how credits get approved and the people involved in that and the complexity and who approves what and when, who -- what goes to committee, who's on committee, who's -- what credit person's assigned to Chicago and how the work is done or he could be referring to a particular problem credit or a series of problem credits that arose that need to be resolved, so I'm not -- Frank -- Frank was -- was head of Risk Management and so he would be -- he would have his -- you know, a foot on both sides, process -- credit process side as well as -- as well as the actual credit performance side, so I don't know what this is.**
Q Do you recall how frequently



Phil McHugh would come to Chicago after October, 2019?
**A No, I don't -- I don't remember.**
(Deposition Exhibit 7 was marked for identification.)
BY MR. SABA:
Q Mr. Feiger, I have handed you what's been marked as Exhibit No. 7 and it is an email exchange between Bob Shaffer and yourself dated February 5th, 2020. It indicates, "Do you have a minute to talk to Phil McHugh and me," and you respond, "Can I call you in 10 minutes" -- Do you see that?
MR. CIOFFI: Objection, lack of foundation. Again, Counsel, your testimony about what the document is is not a foundation. The question was improper, but you may answer.
**A Can you repeat the question?**
Q Sure.
First of all, Exhibit 7 is Bates stamped FIFTHTHIRD-MCHUGH-212499 through FIFTHTHIRD-MCHUGH-212500?
**A Yes.**
Q Have you seen these documents before?



**A No.**
Q Have you seen these text messages before?
MR. CIOFFI: Objection to the form, mischaracterizes what it is.
**A Well, not only that, you said they were emails a minute ago.**
Q Excuse me. Emails.
**A Well, which are they?**
Q Have you seen these before? Have you seen this document --
**A I -- I don't remember seeing these.**
Q Do you remember communicating with Mr. Shaffer indicating, "Do you have a minute to talk to Phil McHugh and me," and you said, "Can I call you in 10 minutes"?
**A No, I don't remember this.**
Q Do you recall having conversations with them back in February of 2020?
**A No.**
(Deposition Exhibit 8 was marked for identification.)
(Mr. McHugh re-entering conference room.)



BY MR. SABA:
Q Mr. Feiger, you have been handed what's marked as Exhibit No. 8, FIFTHTHIRD-MCHUGH -- It's marked MCHUGH 01574 through MCHUGH 01578. Are you able to identify this document?
**A It looks like an article from Crain's Chicago Business again by Steve Daniels.**
Q The title indicates "Fifth Third inherits $400 million headache" and this is dated July 22nd, 2020?
**A Yeah.**
Q Do you know what that's referring to?
MR. CIOFFI: Objection to the form of the question, lack of foundation, based on hearsay. The whole document is hearsay, of course, but you may answer.
**A I just need to look at the article for a minute and make sure -- I think I know what it is, but let me make sure. (Reviewing document.) Okay.**
Q My question was the title indicates "Fifth Third inherits $400 million headache". Do you know what that's referring to?
**A I think so. The article is**

**woefully incomplete. It's a classic Chicago Crain's, Steve Daniels', article. I think it has to do with a borrower at Broadway Bank that was unhappy with the way he was treated by the FDIC and he filed a series -- If it's the one I'm thinking of he filed a series of lawsuits that were completely crazy, went through many different attorneys, was sanctioned -- I believe sanctioned by a judge in New York for filing -- for filing frivolous lawsuits or something like that -- I'm not an attorney -- ultimately completely lost the case and interestingly all his assets in the process. I believe that's what this is. I'd have to read it more carefully and maybe have to investigate a little bit, but you wouldn't know that from reading this.**

Q Was there litigation pending that Fifth Third became the party in?

**A I'm sure there was litigation pending at Fifth -- at MB that Fifth Third became a party to when they acquired MB. Unfortunately today any company the size of MB and certainly Fifth Third, but at MB we always had some form of litigation going on and Fifth Third by nature of the merger would inherit that. This -- This appears to be -- be one of them. If it's the one I'm thinking of it had -- it**



**was of no consequence whatsoever.**

(Deposition Exhibit 9 was marked for identification.)

BY MR. SABA:

Q Mr. Feiger, I have handed you what's been marked as Exhibit No. 9 which is Bates stamped FIFTHTHIRD-MCHUGH-001074 through FIFTHTHIRD-MCHUGH-001079. Are you able to identify this document?

**A (Reviewing document.) No. I mean I may have seen it before, but I don't remember seeing it.**

Q Do you know who RHR International is?

**A Yes.**

Q Who is RHR International?

**A I think it's an assessment firm or it helps companies do talent assessments, perhaps other things too.**

Q Prior to joining Fifth Third's Board had you ever been involved with RHR International?

**A No, I don't think so.**

Q Mr. Feiger, do you have any objective information or data indicating that as of



September 22nd, 2020, Tim Spence was superior to or better than Phil McHugh with respect to driving innovative thinking on the strategic side while simultaneously maintaining a close eye in rigorous execution?

MR. CIOFFI: Objection to the form of -- of the question and it's already been answered in his assessment of both people in his earlier testimony, but you can answer it again.

**A You're -- You're reading from a particular clause in this document?**

Q Well, I'm reading from my -- my notes here.

**A Oh.**

Q Do you have any objective information or data indicating as of September 22nd, 2020, Tim Spence was superior to or better than Phil McHugh with respect to driving innovative thinking on the strategic side while simultaneously maintaining a close eye on rigorous execution?

MR. CIOFFI: Objection, asked and answered, but you -- you may answer.

**A I don't have any objective information. I -- I never compared -- Frankly I never**



**compared Phil and Tim especially in -- in -- in that regard until you asked the question. This is -- This -- This -- This looks like a document that spells out the skills and requirements and attributes that a CEO should have, right -- I -- I believe this is probably -- I haven't read this thing -- of a financial institution. Oh, so I guess it's Fifth Third -- it looks like it mentions Fifth Third.**

**I never considered Phil qualified for that role and so I never thought of him in -- in the sense of comparing him to Tim in that way, so if you're asking me does Tim have superior skills in the items that you mentioned the answer is absolutely, yes.**

Q Do you have any objective information or data indicating that?

MR. CIOFFI: Objection. He's already testified at some length about all these topics, but you may answer. Go ahead.

**A I don't have any objective information. I just have my own common sense and -- and it's based on, you know, 40 plus years in banking. I have met with and spent time with probably over 100 bank CEOs, maybe more, maybe close to 200 bank CEOs at length over my career. I think I have a pretty good**

**sense of what it takes to be a good CEO. I was a CEO myself so I experienced it first -- firsthand. I -- I think I know what -- what it means to be CEO. Phil's not qualified, wasn't qualified, and Tim was a fantastic candidate, a brilliant candidate, as I mentioned earlier.**

Q Do you have any objective information or data indicating that as of September 22nd, 2020, Tim Spence was superior to Phil McHugh with respect to -- to effectively managing the strength of the existing team while continuing to attract a more diverse group of executives?

A **Like I said, I never compared them. I don't -- I don't have any objective information. I don't have any studies or reports that were done. So I have -- I have some -- my own subjective opinion on things that I have told you already.**

Q Do you have any objective information or data indicating that as of September 22nd, 2020, Tim Spence was superior to Phil McHugh with respect to maintaining Fifth Third Bank's standing with the regulators and managing the implications of the rise of ESG issues in 2020 and beyond?

A **I do not have objective information**



**about that. I haven't seen any reports about that. Compare -- Comparing the two on similar standards or anything of the sort I have my own opinion. I know who's better.**

Q Do you have any objective information or data indicating that as of September 22nd, 2020, Tim Spence was superior to Phil McHugh with respect to cultivating networks?

A **I have my own opinion on that which I had mentioned. By the way, you know, it's an interesting question you ask about networks. So, you know, there's networks for doing business, conducting business. Say -- Let's -- Let's take middle market banking, for example. Middle -- Good middle market bankers get referrals from CPAs, from attorneys, from other business owners, and that's a -- that's a network that they develop that -- that makes -- helps their career, helps -- helps them be successful in the -- in the jobs that they have.**

**That's an entirely different network than a bank CEO needs to have to be successful, especially one that's going to take the company through the kind of change that I'm talking about, the technological change, the change in the payment systems, the -- the -- the regulatory**



**implications of those. Those are two different kinds of networks. And if you're asking me who had the right network to be CEO there's no question in my mind it was Tim.**

Q But do you have any objective information that supports that?

MR. CIOFFI: Objection, asked and answered.

A **No, I don't have any reports, my -- my own subjective opinion.**

MR. CIOFFI: Counsel, by my count you're over your two hours.

THE VIDEOGRAPHER: No. We're at an hour and 54 minutes.

BY MR. SABA:

Q Do you have any objective information or data indicating that as of September 22nd, 2020, Tim Spence was superior to Phil McHugh with respect to the ability to navigate complexity and demonstrate resilience in a challenging world?

A **Any objective?**

Q Yes.

A **I don't even know what form that would take, by the way, in all these questions. What**



**would be objective evidence of these things?**

Q Do you have any objective information or data indicating --

A **Define "objective" then for me.**

Q The -- The fortunate thing is I get to ask the questions. You just get -- get to give answers, so --

A **Well, that's my answer.**

Q Do you -- Do you have any objective information or data that would indicate that?

A **I don't think any exists.**

Q Do you agree with Eileen Mallesch's testimony that she viewed Jamie Dimon -- Excuse me -- she viewed Tim Spence as a young Jamie Dimon?

MR. CIOFFI: Objection to the form of the question. You -- You may answer.

A **I -- I do agree with that. It's funny that she said that. I think that that's -- I think that that's an excellent -- excellent comparison, and time will tell if it ends up that way. I mean Jamie Dimon, you know, was -- entered his role at Bank One, NBD, Firstar, all of that, at a particularly interesting time in banking when regional banks were coming together, merging together, to form these national trillion -- what people call**

trillionaire banks today, and Jamie's a brilliant manager. I know him some, a little bit. I spent some time with him.

And he's a brilliant -- a brilliant person and a brilliant manager and I think that Tim has many of the same qualities, the same attributes, his ability to -- This is -- It was particularly essential in Jamie's ascent in the -- in the building of JPMorgan Chase today. His ability to look at the -- the competitive landscape and the complexity in it and to reduce it to its fundamental nature and -- and -- and decide, These are the actions we should take. These are the companies we should buy. These are the things we should invest in for the future, is exactly what Tim has, so I think that's a -- that's a -- that's a -- that's a very good comparison.

(Deposition Exhibit 10 was marked for identification.)

BY MR. SABA:

Q Mr. Feiger, I have handed you what's been marked as Exhibit No. 10, FIFTHTHIRD-MCHUGH-001216 through FIFTHTHIRD-MCHUGH-001222. If I could refer you to the third page of Exhibit 10, FIFTHTHIRD-MCHUGH-001218, have you seen this document before?



A Probably, but I -- I don't remember seeing it.

Q Okay. It's a letter from Greg Carmichael to the Board and in the second paragraph it indicates, "As Bob Shaffer and I discussed with you at the September Board meeting, we believed that Phil McHugh could be at risk with Tim's promotion. And, in fact, Phil has decided not to accept the role of Head of Consumer and Business Banking and is leaving the company" -- Do you see that?

A Yes.

Q Do you recall Bob Shaffer and Greg Carmichael indicating at the September meeting that they believe that Phil McHugh could be at risk with Tim's promotion?

A I don't remember -- I don't remember them mentioning -- It's a long time ago. I don't remember them specifically mentioning Phil, though -- though they might have. However, I think it would be common when you're promoting someone to be President or CEO of a company, right, that others on the executive management team might be at risk. I don't think that's a uncommon thing.

People were working for



Greg Carmichael. Now you tell them that Tim is -- we're going to tell Tim is going to be President and that means, you know, this -- you know, these -- these things for you personally. Maybe people like that, maybe they don't, and -- -- And they choose. So -- So any time -- It seems to me any time someone's promoted particularly to President and CEO and -- President and then seeming then a -- a -- an indication to the market -- public marketplace and inside the company an heir apparent to CEO, any time you do that I think people could react and -- and say, "Well, I -- I would rather not work -- work there or work for that person, work that way," whatever, "anymore."

Q As you sit here today do you recall Greg Carmichael or Bob Shaffer indicating that anybody else would be at risk besides Phil McHugh during that September, 2020, meeting?

A I don't remember them mentioning Phil. So did they mention anybody else, I don't remember that either.

MR. SABA: That's all I have at this time. We'll continue in progress.

MR. CIOFFI: Again I'll note for the record as we have before that you have no right to continue it in progress, but I



recognize that you have tried to preserve whatever right you think you have.

I do have a couple of questions.

EXAMINATION

BY MR. CIOFFI:

Q Mr. Feiger, you testified earlier today that your opinion of Phil McHugh is that he was a -- a B-level banker. Would you describe what you meant by that and -- and the basis for your assessment?

A There's nothing wrong with being a B-level banker or a B-level attorney or a B-level, you know, client services or personal banker or whatever. In fact, most of the people in the world, I think, who work in companies are B -- B -- on an ABC scale kind of B-level performers. We need -- We need people like that. But there are -- But there are certain jobs in companies that require A level or A+ level performers, and in -- in MB we used to do this. We actually -- We ranked our people on a scale like A, B, C, and we ranked our jobs A, B, or C jobs, and -- and -- and the company's going to be successful. There are certain A jobs that need A players, and that's -- that's -- that's what I was referring. There's nothing wrong with being a B player, but B players don't move into

Page 101

**critical roles in my opinion like President or CEO of a company.**

Q What did you base that assessment that Phil McHugh was a B-level banker on?

**A Just my personal interactions with him, my experience over at that point -- I don't know -- 40ish years in commercial banking, dealing with a lot of commercial -- commercial bankers, middle market managers, managers of other styles and departments. That's the impression that I was left with and I feel pretty confident in that. We -- We -- We had enough -- enough interaction over that one-year period that I was an employee of the bank, I think, to come to a -- a reasonable conclusion on that.**

Q You testified earlier about Phil McHugh's lack of performance with respect to the PPP Program. Does that form part of your basis for the B-level assessment?

**A No. I would say if I based it on that it would be a C-level performance, not a B-level performance, and it was a difficult time and difficult circumstances. I bring it up that it just wasn't helpful and I think if you had a person that had CEO attributes, qualities, to them they would have been much more aggressive and I feel -- I feel like there**

Page 102

**were solutions that were possible that -- that weren't surface.**

Q You testified earlier this morning that your opinion of Phil McHugh was that he was an old school traditional banker. Would you please elaborate and explain what you meant by that testimony?

**A An old -- An old school banker is one that thinks about banks pure -- not purely -- but almost entirely gather deposits, make loans, gather deposits, make loans, maybe have some fee for services businesses like mortgage lending or something like that. It has nothing to do with age at all. There's a lot of young people -- In fact, probably most of the young people -- in a bank who really don't understand the full breadth of banking today probably think that way too, but that -- I said -- By "old school" I meant that's the way banking used to be done. But as I mentioned my opinion to be successful today you need to be -- the bank needs to be much more than that.**

Q You joined the Board in June of 2020; is that correct?

**A Yes.**

Q And you had a Board meeting in June of 2020 and then again in September of 2020. In any

Page 103

of those Board meetings or any Board meetings in which the successor to Greg Carmichael was discussed was age ever a factor --

MR. SABA: Objection.

Q -- in any of those discussions?

MR. SABA: Objection.

MR. CIOFFI: Counsel, let me finish my question, please. Quit talking over me you have been doing the whole day.

BY MR. CIOFFI:

Q Do you understand my question?

MR. SABA: Objection.

Q Do you understand my question?

**A I understand your question.**

Q All right. Please answer.

**A Age -- Age never came up in -- in -- in -- in -- in the discussions.**

Q Did --

**A It just wasn't a factor.**

Q Did -- Did any Board member in any of the discussions about the successor to Greg Carmichael say that age should be considered as -- as a factor?

MR. SABA: Objection.

**A Not that I recall.**

Page 104

Q Did any -- And did any of the deliberations involve a discussion of age as a factor in choosing the successor to Greg Carmichael?

MR. SABA: Objection.

**A Not that I recall.**

MR. CIOFFI: I have no further questions.

MR. SABA: I have no questions. We'll continue in progress.

THE VIDEOGRAPHER: We're off the record 12:30.

MR. CIOFFI: We'll read the -- the deposition and sign it. She gets those.

THE REPORTER: Peter, are you ordering this typed up?

MR. SABA: Yes.

THE REPORTER: Okay.

THE REPORTER: Mr. Cioffi, are you ordering a copy?

MR. CIOFFI: Yes.

________________________________
MITCHELL FEIGER

________________________________
DATE

(DEPOSITION CONCLUDED AT 12:30 P.M.)

\- - -

C E R T I F I C A T E

STATE OF OHIO :
SS:
COUNTY OF BUTLER :

I, Pamela L. Jackson, a duly qualified and commissioned notary public in and for the State of Ohio, do hereby certify that prior to the giving of his deposition, the within named MITCHELL FEIGER, was by me first duly sworn to testify to the truth, the whole truth, and nothing but the truth; that the foregoing pages constitute a true and correct transcript of testimony given at said time and place by said deponent; that said deposition was taken by me in stenotypy and transcribed under my supervision; that I am neither a relative of nor attorney for any of the parties to this litigation, nor relative of nor employee of any of their counsel, have no interest whatsoever in the result of this litigation, and am not, nor is the court reporting firm for which I am affiliated, under a contract as defined in Civil Rule 28(D).

IN WITNESS WHEREOF, I hereunto set my hand and official seal of office at Hamilton, Ohio, this 10th day of March, 2025.

______________________________

Commission Expires 11/17/28

1 DEPOSITION ERRATA SHEET

Date Taken: February 21, 2025

Case Caption: PHILIP R. MCHUGH

vs. FIFTH THIRD BANCORP, et al.

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the ______ day of

____________, 20___.

___________________________________

MITCHELL FEIGER

2 DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

SIGNATURE:_______________________DATE:___________

MITCHELL FEIGER

3 DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

SIGNATURE:_______________________DATE:___________

MITCHELL FEIGER

## WORD INDEX


< $ >
**$10** 60:*1*
**$20** 60:*1*
**$400** 88:*9, 23*
**$50** 59:*24* 60:*1*

< 0 >
**01526** 60:*16*
**01531** 61:*14*
**01540** 60:*17*
**01554** 76:*1*
**01555** 81:*20*
**01556** 76:*1*
**01573** 63:*1*
**01574** 88:*4*
**01578** 88:*4*
**0213203** 83:*4*

< 1 >
**1** 3:*4* 9:*3, 7, 24, 25* 10:*1, 2, 14* 13:*20* 14:*17* 31:*3, 5* 72:*22* 107:*1*
**1:21-cv-00238** 1:*8* 5:*9*
**10** 4:*17* 20:*17* 80:*21* 86:*11* 87:*16* 97:*17, 21, 24*
**10,000** 74:*7*
**10:09** 1:*14* 5:*3*
**10:51:14** 83:*19*
**100** 80:*5* 92:*23*
**10th** 106:*23*
**11/17/28** 106:*25*
**11:28** 71:*5, 7*
**11:45** 71:*9, 12*
**11:54** 78:*18*
**11:55** 78:*20*
**11th** 83:*19*
**12:30** 104:*11* 105:*5*
**12th** 72:*15*
**15** 20:*18* 52:*10* 61:*13*
**1557** 63:*3*
**16** 18:*2*
**17** 18:*2*
**1700** 2:*13*
**18** 18:*2* 75:*7, 18*
**18:32:07** 72:*17*
**1990** 66:*23*
**1992** 15:*25*
**1999** 15:*15, 20*

< 2 >
**2** 3:*4* 12:*12, 15* 60:*11, 15* 71:*11* 108:*1*
**20** 37:*10* 107:*17*
**200** 92:*24*
**2007** 16:*18*
**2008** 20:*10, 11*
**2009** 20:*11*
**201** 2:*13*
**2013** 81:*17*
**2015** 20:*9* 36:*7, 8, 20* 39:*12*
**2015/2017** 39:*11*
**2016** 16:*24* 18:*22*
**2017** 16:*20*
**2018** 17:*17, 23* 18:*4, 6* 37:*11* 49:*18* 51:*4* 60:*18* 65:*4*
**2019** 26:*12* 27:*7* 28:*1, 11, 25* 32:*7, 18* 67:*4, 5, 6, 7, 9, 21, 22* 69:*15, 25* 71:*14, 17, 20, 25* 72:*15* 79:*16* 83:*19* 84:*17* 86:*1*
**2020** 13:*20* 14:*17, 22* 26:*11* 27:*7* 28:*1, 12, 25* 29:*2* 31:*3, 5* 32:*6, 7, 18* 34:*2, 3, 8* 35:*4, 5* 38:*6* 48:*12, 13* 67:*1, 2, 3* 86:*9* 87:*19* 88:*10* 91:*1, 18* 93:*9, 20, 23* 94:*7* 95:*18* 99:*17* 102:*22, 25*
**2024** 65:*5*
**2025** 1:*14* 5:*3* 106:*23* 107:*2*
**21** 1:*14* 60:*18* 107:*2*
**21st** 5:*3*
**22** 39:*7*
**22nd** 88:*10* 91:*1, 17* 93:*9, 20* 94:*7* 95:*18*
**25** 52:*6*
**2623** 2:*6*
**28(D** 106:*20*
**29** 14:*25*
**29th** 14:*23*

< 3 >
**3** 3:*4* 13:*10* 62:*21, 25* 109:*1*
**30** 51:*3, 10, 16, 25* 52:*7, 18* 65:*4* 76:*8* 79:*5, 13* 80:*24*
**31** 15:*1*
**34108** 7:*8*
**35** 52:*7*
**362-8700** 2:*14*

< 4 >
**4** 4:*13* 72:*1, 7*
**40** 81:*15* 92:*22*
**400** 53:*24*
**40ish** 101:*7*
**45** 52:*13*
**45202** 1:*20* 2:*14*
**45208** 2:*7*

< 5 >
**5** 3:*4* 9:*24* 10:*1* 20:*17* 75:*21, 25* 79:*3*
**5,000** 74:*7, 10, 11*
**50** 52:*12*
**500** 53:*25*
**511** 1:*20*
**513** 2:*7, 14*
**533-2701** 2:*7*
**54** 95:*14*
**5th** 86:*9*

< 6 >
**6** 3:*4* 4:*14* 12:*12, 15* 61:*13* 82:*19, 23* 83:*13*
**60** 3:*4*
**62** 3:*4*
**6897** 7:*5*

< 7 >
**7** 4:*15* 13:*10* 86:*3, 7, 20*
**701** 7:*8*
**72** 4:*5, 13*
**73** 63:*3*
**75** 3:*4* 4:*5*

< 8 >
**8** 3:*4* 80:*21* 87:*21* 88:*3*
**82** 4:*6, 14*
**86** 4:*15*
**87** 3:*4* 4:*6*
**89** 4:*7*

< 9 >
**9** 3:*4* 4:*16* 90:*2, 6*
**90** 4:*16* 70:*22*
**97** 4:*17*
**99** 3:*4* 4:*7*

< A >
**a.m** 1:*14* 5:*3* 71:*7, 9* 78:*18, 20*
**ABC** 100:*15*
**ability** 19:*9* 21:*8* 31:*23, 25* 68:*11* 95:*19* 97:*7, 9*
**able** 28:*20* 30:*1, 14* 50:*9* 88:*5* 90:*8*
**absolutely** 92:*13*
**accept** 98:*9*
**access** 39:*17, 24*
**accounts** 38:*25* 54:*8* 59:*10*
**accurate** 78:*2* 79:*8, 10* 107:*10*
**achieve** 75:*6*
**ACHs** 40:*1*
**acquired** 19:*17* 76:*8* 79:*5* 81:*16* 89:*20*
**acquisition** 18:*5* 32:*9, 25* 53:*25*
**acquisitions** 52:*7, 8* 56:*2*
**act** 43:*21*
**actions** 97:*12*
**activities** 73:*16* 74:*11*
**actual** 66:*8* 85:*23*
**add** 19:*23* 22:*22* 75:*11*
**Additionally** 6:*23*

**address** 7:4, 10
**Adkins-Ihle** 1:22
**advanced** 22:10
**advantage** 21:20, 21
**advantages** 39:15
**advertising** 80:8
**affiliated** 106:19
**afterward** 55:15
**age** 6:3 102:13 103:2, 16, 22 104:2
**aggregate** 74:9, 12, 13
**aggressive** 101:25
**ago** 20:17, 18 87:7 98:18
**agree** 55:19 96:12, 17
**Agreement** 5:22 55:18
**ahead** 6:8 9:20 40:9 44:14 51:19 64:19 76:22 78:24 92:19
**al** 1:9 5:6 107:4
**aligned** 73:4
**alike** 41:4
**allow** 8:21 9:18 10:18 64:1
**amazing** 19:11, 13
**amazingly** 22:20
**America** 16:17
**amount** 59:4, 6
**analysis** 60:5, 7 66:6
**and/or** 11:5, 6 15:15 107:11
**Anderson** 26:14, 24 72:11, 14
**Anderson's** 71:15
**announced** 18:5 49:18 50:1, 20
**announcing** 61:6
**answer** 6:20, 24 8:17, 21 10:18, 25 11:9 12:6 13:21 18:13 24:4, 7, 13 25:14 28:15 32:15 33:24 34:16, 25 36:1 42:12 43:14, 16, 19, 22, 24 45:25 46:14 47:6 49:4, 8, 12, 16 51:20 53:16 56:21 64:1 65:18 67:15, 16 76:15 81:3 84:4, 22 86:17 88:17 91:9, 23 92:13, 19 96:8, 16 103:15
**answered** 24:3 25:16, 17 42:9 53:15 91:8, 23 95:8
**answering** 43:25
**answers** 44:5 96:7
**anticipation** 61:18
**anybody** 35:12 55:25 99:15, 19
**anymore** 99:13
**apparent** 99:10
**APPEARANCES** 2:1
**appears** 89:24
**application** 39:7
**apply** 29:11 75:16
**appreciate** 42:16
**appropriate** 66:11 73:12 75:15
**approved** 85:12
**approves** 85:13
**April** 66:23 67:1
**area** 59:23 60:9 61:25
**argumentative** 53:12 55:9 56:20 67:15
**arguments** 55:8
**argument's** 53:13
**arose** 85:18
**arrival** 19:25
**art** 50:7
**article** 77:2 79:3, 23 80:16, 18, 19 81:5, 20 88:6, 18, 25 89:2
**articles** 80:4, 10 81:5
**ascent** 97:8
**asked** 24:2 30:23, 24 33:20 42:8 64:12 77:18 78:1 91:22 92:2 95:7
**asking** 6:16 25:2 31:6 34:14 35:2 44:11 45:13 48:7 92:12 95:2
**asks** 9:22
**aspects** 69:18 70:3
**assessed** 69:18 70:3
**assessment** 90:17 91:8 100:10 101:3, 18
**assessments** 70:9 90:18
**assets** 89:12
**assigned** 26:14, 24 60:4 71:18 85:15
**assistance** 30:21
**associated** 20:15
**assume** 10:20 27:13 33:9
**assumes** 34:15 67:13 84:21
**assuming** 63:22 65:6
**assumption** 65:16
**attention** 74:23
**attorney** 89:10 100:12 106:14
**attorneys** 5:10 83:8 89:7 94:15
**attract** 93:12
**attribute** 25:4
**attributes** 92:4 97:6 101:24
**attrition** 57:20
**author** 79:23 80:24
**authorities** 69:8, 10
**Avenue** 2:6
**average** 40:8
**aware** 45:18 62:9 79:18

**< B >**
**Bachelor's** 7:17
**back** 16:9 19:24 24:17 36:6, 23 39:10 52:12, 19 54:3 71:10 73:13 78:21 79:2 81:3 87:19
**background** 36:16, 18 41:15 44:15 45:14, 15 46:2, 4, 6
**bad** 21:18 68:7 75:4
**Bailey** 2:5 5:14
**balance** 47:4 49:14
**Banc** 16:14
**BANCORP** 1:9 2:18 5:6 107:4
**bank** 14:8, 9 15:4, 9, 11 16:17 22:4, 13 29:15 30:5 34:12, 23 35:23 37:3, 8 38:23 39:18 40:5, 8 41:1 52:5, 7, 14, 15 54:8 55:3 59:5, 6, 8, 11 63:8 67:19 68:7, 21, 24 81:10, 11 89:3 92:24 94:21 96:22 101:13 102:15, 20
**banker** 19:14 31:18 37:20 38:16 59:3 81:24 100:8, 12, 13 101:4 102:5, 8
**bankers** 23:1 31:19 53:4 54:25 76:3, 7, 8 79:4, 5, 13, 14, 15, 19, 21, 22 81:14 82:3 94:15 101:8
**banking** 16:8 20:24 21:11, 13 22:11 23:9, 21 24:25 38:19, 21 40:18 41:23 45:20 52:10 56:2 58:5, 14 76:2, 25 81:12 92:22 94:14 96:23 98:10 101:7 102:16, 18
**banks** 22:16, 17 39:15, 23 44:23 54:12, 18 59:20 65:22 68:19 96:24 97:1 102:9
**Bank's** 93:22
**base** 101:3
**baseball** 42:1
**based** 21:9 36:19 41:12 45:9 53:13, 20 56:12, 15 58:23 88:15 92:22 101:19
**basic** 64:4, 10
**basically** 71:18
**basics** 19:10
**basis** 52:4 100:9 101:17
**Bates** 60:15 62:25 76:1 86:21 90:7
**battle** 56:7
**becoming** 20:18
**began** 84:18

**beginning** 18:*21* 24:*11* 29:*1* 53:*10, 20* 67:*22* 83:*14*
**behalf** 2:*1, 9* 5:*12, 16, 19, 20*
**believe** 14:*25* 58:*4* 61:*4* 89:*8, 12* 92:*5* 98:*15*
**believed** 98:*7*
**benefits** 57:*21, 23*
**Bes@sspfirm.com** 2:*9*
**best** 37:*14* 74:*17*
**better** 20:*5* 23:*5* 74:*19* 91:*2, 18* 94:*4*
**beyond** 31:*23* 93:*24*
**biased** 80:*23*
**big** 14:*11* 38:*3* 73:*20*
**biggest** 76:*7* 79:*4*
**billion** 59:*24* 60:*1*
**bit** 37:*12* 62:*12* 89:*14* 97:*2*
**Blank** 2:*12* 5:*19*
**B-level** 100:*8, 12, 16* 101:*4, 18, 20*
**BMO** 76:*9* 79:*6*
**Board** 7:*25* 8:*4* 10:*21, 24* 19:*16* 22:*4* 23:*1* 27:*22* 31:*9* 33:*9* 34:*1, 2, 3, 5, 8* 35:*15, 17* 37:*9, 24* 38:*6, 8, 12* 40:*22* 46:*13, 14, 18, 23* 47:*2, 14, 15, 22, 24, 25* 48:*2, 12, 13, 21* 49:*5* 53:*3* 69:*16, 17* 70:*1, 2, 9* 72:*25* 73:*7, 13* 74:*11* 90:*21* 98:*4, 6* 102:*21, 24* 103:*1, 20*
**Bob** 83:*18* 84:*5, 12* 85:*8* 86:*8* 98:*5, 13* 99:*15*
**borrower** 89:*3*
**boss** 27:*20, 22* 48:*6*
**bottom** 60:*16*
**bought** 16:*17, 21*
**Boulevard** 7:*5, 7*
**Bradley** 70:*12, 14, 15, 16*
**branch** 39:*4* 59:*14, 15, 23* 60:*5, 6* 65:*21*
**branches** 61:*20*
**breadth** 102:*16*
**break** 19:*10* 70:*23* 71:*1*
**breaks** 47:*25*
**Brian** 2:*18* 5:*24*
**brilliant** 19:*6, 13, 14* 21:*7* 66:*15* 93:*5* 97:*1, 4, 5*
**bring** 20:*11* 23:*10* 30:*23* 45:*1, 2* 101:*22*
**bringing** 23:*25* 25:*5*
**Broadway** 89:*3*
**broken** 47:*5* 49:*15*
**brought** 23:*9* 25:*4, 7, 14* 40:*10* 76:*10* 79:*7, 12*
**build** 37:*17* 40:*24*
**building** 37:*2* 97:*8*
**built** 37:*7* 40:*25* 53:*1, 2*
**burn** 77:*15*
**business** 14:*7* 17:*6, 7* 22:*5* 26:*10* 28:*18* 38:*3* 39:*16* 40:*18* 59:*10* 76:*23* 79:*24* 80:*2* 81:*25* 82:*2* 88:*7* 94:*12, 13, 16* 98:*9*
**businesses** 29:*9, 10* 39:*1* 59:*11* 60:*8* 102:*12*
**businessman** 19:*13*
**BUTLER** 106:*3*
**buy** 97:*13*
**buying** 52:*23*

**< C >**
**call** 17:*3* 66:*4* 72:*22* 79:*25* 86:*11* 87:*15* 96:*25*
**called** 17:*2* 78:*6*
**calls** 14:*10* 20:*12* 29:*21* 30:*12*
**candidate** 35:*6, 7, 10, 13, 14* 37:*22* 93:*5*
**candidates** 11:*6* 34:*11, 21* 35:*21* 36:*3, 4*
**capable** 84:*9*
**Caption** 107:*3*
**captioned** 107:*8*
**career** 81:*12* 92:*25* 94:*18*
**carefully** 89:*13*
**Carmichael** 27:*19* 33:*7, 22* 34:*11, 22* 35:*11, 23* 36:*7* 37:*18* 38:*9* 40:*25* 72:*12, 14* 98:*4, 14* 99:*1, 15* 103:*2, 22* 104:*3*
**Carmichael's** 19:*25*
**carve** 59:*21*
**CASE** 1:*8* 5:*5, 9* 8:*3, 7, 10* 9:*16, 21* 13:*14* 55:*21* 57:*1* 65:*24* 89:*11* 107:*3*
**cause** 75:*13*
**Center** 1:*14* 2:*13* 58:*5*
**CEO** 10:*15* 11:*6* 15:*3, 9, 10, 14* 33:*6, 22* 34:*12, 22* 35:*11, 22* 36:*8, 19* 37:*14, 21* 40:*12* 52:*5* 81:*2, 9* 92:*5* 93:*1, 3* 94:*21* 95:*3* 98:*22* 99:*7, 10* 101:*1, 23*
**CEOs** 92:*24*
**certain** 55:*14* 56:*12, 13* 57:*7* 65:*24, 25* 66:*9* 69:*6* 100:*17, 22*
**certainly** 89:*21*
**certified** 6:*4*
**certify** 106:*6*
**Chairman** 15:*3, 9*
**challenge** 29:*13, 23*
**challenges** 48:*6*
**challenging** 95:*20*
**change** 31:*24* 39:*13* 70:*18* 75:*12* 94:*23, 24* 108:*4, 7, 10, 13, 16, 19, 22* 109:*4, 7, 10, 13, 16, 19, 22*
**changed** 15:*21*
**changes** 38:*22* 41:*10* 44:*22, 23* 55:*22* 107:*11, 14*
**changing** 38:*20* 40:*4*
**chapter** 80:*14*
**characterization** 45:*23*
**characterize** 20:*1* 32:*2* 41:*25*
**charge** 36:*17*
**Charlie** 70:*12, 14, 15, 16* 72:*22, 24*
**chart** 61:*14* 62:*12*
**Chase** 59:*23* 97:*9*
**Chicago** 7:*20* 15:*4, 9* 16:*3, 8, 9* 17:*7, 9* 20:*3, 5, 14* 27:*5, 6* 32:*21* 56:*18* 59:*23* 61:*15, 19, 22* 65:*5* 66:*1* 67:*11* 71:*18* 76:*23* 79:*24* 80:*2, 20* 81:*12, 14* 82:*7* 83:*20* 84:*15, 18* 85:*16* 86:*1* 88:*7* 89:*1*
**choose** 99:*5*
**choosing** 19:*16* 104:*3*
**Christmas** 51:*4*
**CICB** 16:*21*
**Cincinnati** 1:*20* 2:*7, 14* 66:*2, 10*
**CIO** 36:*17*
**Cioffi** 2:*9* 3:*4* 5:*18* 8:*16* 9:*11* 10:*17, 25* 11:*8, 12* 12:*5* 13:*13, 21* 17:*18, 23* 18:*2, 11* 23:*12, 16* 24:*2, 5* 25:*13, 19* 28:*2, 8, 10, 14* 32:*11* 33:*8, 15, 18, 23* 34:*13, 24* 35:*24* 42:*8, 14, 19, 23* 43:*3, 8, 11, 15, 18, 24* 44:*3, 6, 9* 45:*21* 50:*2, 5, 11* 51:*17, 20* 53:*11* 55:*6* 56:*19* 63:*10, 25* 64:*9, 16, 21* 65:*14* 67:*12* 69:*20* 70:*20, 25* 71:*3* 76:*12, 19, 21* 77:*3, 9, 13, 17, 20, 24* 78:*3, 7, 15* 83:*7, 25* 84:*19* 86:*13* 87:*4* 88:*14*

91:6, 22 92:17 95:7, 11 96:15 99:23 100:5 103:7, 10 104:6, 12, 18, 20
**circumstances** 16:25 101:22
**citing** 53:14
**Civil** 106:19
**clarification** 17:19
**classic** 82:6 89:1
**classified** 68:9
**clause** 91:12
**clear** 31:8 39:10, 12
**clearer** 7:1
**clearly** 21:11 25:7
**C-level** 101:20
**client** 100:13
**clients** 29:13, 24 82:2
**Clock** 72:17 83:20
**close** 49:22 53:24 59:17 70:22 91:4, 21 92:24
**closely** 44:21 62:20
**closing** 84:25
**coach** 43:10, 12
**coding** 70:10
**Cole** 81:10, 16
**combination** 57:22 61:15
**combine** 19:21, 22 56:17 61:21 69:4
**combined** 25:24 26:19, 21 56:24
**combining** 36:24 56:17 68:19
**come** 46:14 47:23 55:16 60:3 66:17 86:1 101:14
**comes** 20:15 44:25
**coming** 22:18 48:23 96:24
**Commencing** 1:14
**commercial** 101:7, 8
**Commission** 106:25
**commissioned** 106:5
**committee** 85:14, 15
**common** 92:21 98:21
**communicate** 13:7 14:4, 13
**communicated** 14:15 35:9, 16
**communicating** 87:13
**communication** 11:14 12:18
**Communications** 10:3, 6, 14, 23 11:2, 15, 21 12:1, 9, 13, 17, 23 13:1, 11, 17, 18, 25
**community** 61:7
**companies** 21:18, 23 25:25 26:18 28:5 52:8, 9 56:23 69:4 90:18 97:13 100:15, 18
**company** 13:3 15:16, 17, 21, 22 17:3, 9 19:18, 19, 21, 22 20:2, 14, 17, 19, 20 21:1, 2, 15 22:1, 2 27:1 28:18 30:21 36:10 37:11 52:23 55:20 66:13 70:18 89:21 94:23 98:10, 22 99:9 101:2
**company's** 37:1 100:22
**compare** 40:11 94:2
**compared** 91:25 92:1 93:13
**comparing** 92:11 94:2
**comparison** 96:20 97:16
**competed** 17:11
**competitive** 97:10
**competitors** 29:16, 23 30:8, 15
**complete** 26:17
**completed** 66:23, 25 67:4, 5, 8 75:7
**completely** 55:25 89:6, 11
**complex** 19:9 21:8 22:10 68:23
**complexities** 22:11
**complexity** 85:13 95:20 97:10
**compliance** 37:4
**complied** 36:11
**component** 25:9
**compound** 69:21
**computed** 62:3
**computer** 26:13 54:6, 21 71:22
**concern** 69:12
**CONCLUDED** 105:5
**conclusion** 22:25 101:14
**conducting** 94:12
**conference** 72:3 75:19 83:9 87:23
**confident** 101:11
**CONFIDENTIAL** 1:12 4:3, 10
**confirm** 63:2
**confusing** 23:13 69:21
**conjunction** 61:5
**Connie** 1:22 77:7
**consecutively** 83:1
**consequence** 90:1
**consider** 38:15
**considered** 35:22 92:9 103:22
**consistent** 24:10 85:1
**constitute** 106:10
**consumer** 41:22 58:3, 14 59:6 98:9
**consumers** 38:25
**contact** 71:20, 24
**CONTAIN** 4:3
**CONTAINS** 1:12
**continue** 23:6 26:19 99:22, 25 104:9
**CONTINUED** 4:1 26:12
**continuing** 11:9 93:11
**contract** 106:19
**conversation** 45:12, 17
**conversations** 46:3 47:16 48:9 83:21 87:18
**converted** 27:2
**convinced** 25:9
**copy** 72:11 104:19
**corner** 60:16
**Correct** 10:22 12:21 14:25 16:1, 3, 5, 6, 14 17:22, 24, 25 24:20 31:7, 10 33:10 45:12 49:19, 22 50:17 51:4 53:25 54:3, 9, 14 55:12 58:18 61:11, 14, 22, 23 62:1, 6 63:2, 4, 24 65:7 72:8 76:18 79:13 83:5 102:22 106:10
**Correction** 83:2
**corrections** 107:11
**correspondence** 10:6 12:19
**costs** 39:19, 21
**Counsel** 7:23 9:1, 8 25:13 44:3 50:7 53:11 55:7 63:11 67:14 70:20 83:7, 25 86:14 95:11 103:7 106:16
**Counsel's** 24:10
**count** 95:11
**country** 20:5 60:4
**COUNTY** 106:3
**couple** 27:21 31:13 100:3
**course** 88:17
**COURT** 1:1 5:7 6:1, 19 106:18
**COVID** 28:23, 25 29:10
**CPA** 7:19
**CPAs** 94:15
**Crain's** 76:23 79:24 80:2, 20 81:1, 5 82:7, 18 88:7 89:1
**crazed** 29:14
**crazy** 89:6
**create** 44:5
**creates** 61:14, 15
**credence** 81:4
**credit** 67:25 68:4, 6 83:22 85:3, 15, 17, 22, 23
**credits** 85:12, 18
**Crilley** 66:14
**critical** 18:19 22:9

101:1
**cultivating** 94:8
**current** 14:19
**customer** 36:13 37:6 46:17 49:7 54:8, 13 57:19
**customers** 20:21 41:4 56:13 57:7, 16, 17 59:7

< D >
**daily** 29:17, 20, 21 30:12
**Daniels** 79:24 80:2, 9, 18, 20, 24 82:7, 18 88:7 89:2
**data** 65:7, 19 90:25 91:17 92:16 93:8, 19 94:6 95:17 96:3, 10
**database** 64:15
**Date** 1:14 68:15 84:25 105:3 107:2
**dated** 86:8 88:9
**dates** 32:16
**Dave** 66:14
**day** 42:15 57:10 103:9 106:23 107:16
**days** 19:24 39:6
**deal** 49:24 53:1, 9, 19 54:21 55:23, 24 56:11, 15 57:2, 18
**dealing** 80:15 101:7
**deals** 57:9
**decades** 27:21
**decamped** 76:9 79:6
**decent** 31:25
**decide** 97:12
**decided** 98:8
**decision** 38:5 57:12, 13
**decisions** 38:3
**DECLARATION** 107:5
**declare** 107:6
**decline** 51:1 52:1, 18 57:18, 24 66:3
**declines** 52:25
**deep** 21:12 23:2, 9, 21 24:24 36:15 41:9
**deepen** 23:7
**defections** 76:10 79:7, 12 81:25 82:9
**Defendants** 1:10 2:9 5:19
**Defense** 5:22
**define** 18:14 96:4
**defined** 10:3 11:16 12:13, 16 60:9 106:19
**definition** 10:5 12:18 62:18
**Degree** 7:17
**deliberations** 104:2
**demands** 10:12
**demonstrate** 95:20
**departed** 79:14
**departing** 79:19, 22
**Department** 5:24 8:21 66:12, 18, 19
**departments** 101:10
**departure** 55:15 82:2
**departures** 82:11
**dependent** 32:1
**depends** 68:14
**Deponent** 2:9 106:12
**deposed** 6:5
**deposit** 22:12
**Deposition** 1:14 3:4 4:13, 14, 15, 16, 17 5:4 6:12 7:22 8:1, 15 9:3, 9 24:11 60:11 62:21 64:8 71:6, 8, 12 72:1 75:21 78:16, 17, 19 82:19 86:3 87:21 90:2 97:17 104:13 105:5 106:7, 12 107:1, 8, 12 108:1 109:1
**depositors** 60:7
**deposits** 22:15 39:3, 19 58:22, 24, 25 59:4, 6, 14, 15, 24 60:2, 3, 7 61:20 62:5, 16, 18 64:14 65:21, 23, 25 66:8, 10, 16, 20 102:10, 11
**describe** 40:17 100:8
**described** 40:17
**destined** 53:9, 19
**develop** 35:20 94:17
**developed** 21:12
**dialogue** 23:6 80:25
**different** 21:17 37:14 38:4, 5 42:2 56:6 59:2 74:9 75:12, 16 89:7 94:20 95:1
**difficult** 54:17, 19, 20 101:21
**diligence** 26:1
**Dimon** 96:13, 14, 21
**direct** 14:10 39:24 41:8 47:8
**Director** 10:4 11:3, 16, 22 12:2, 10 14:9 40:23
**Directors** 8:11 22:24 27:22 69:17 70:2, 9 72:25 73:7, 14 74:11
**disclosure** 10:6 12:19
**discussed** 8:3, 7, 10 98:6 103:2
**discussing** 36:24
**discussion** 45:4 72:24 104:2
**discussions** 10:10 14:10 18:22 21:10 103:5, 17, 21
**dishing** 29:8
**disparate** 54:12, 21
**dispute** 65:3
**DISTRICT** 1:1, 2 5:7, 8
**diverse** 93:12
**DIVISION** 1:3 5:8
**divisions** 46:25 47:5 49:11, 15
**document** 9:13 10:9 60:17, 20, 25 61:3, 4 62:20 63:12, 15, 22 65:17 77:6, 18 84:2 86:15 87:11 88:5, 16, 20 90:9, 10 91:12 92:3 97:25
**documentation** 9:23 53:14
**documents** 8:14, 18, 22, 24, 25 9:9, 15 10:16 86:24
**document's** 76:13
**doing** 17:5, 7 20:22 22:5 27:6 36:20 39:21 61:8 82:15 94:12 103:9
**dollar** 59:4, 5
**dozens** 55:14 68:23, 24, 25
**drive** 31:23
**driven** 38:21
**drive-thru** 39:4
**driving** 74:18 91:2, 19
**dropped** 51:3, 15
**dropping** 51:10
**due** 26:1
**duly** 6:3 106:4, 8

< E >
**earlier** 12:18 65:21 66:5, 21 84:13 91:9 93:6 100:6 101:15 102:3
**early** 19:23 27:9
**East** 2:13
**easy** 62:13
**economics** 52:19 53:2
**Edgar** 61:11
**editor** 81:1
**education** 7:16
**effective** 31:23
**effectively** 93:10
**effects** 66:20
**efficient** 37:5
**Eileen** 96:12
**either** 38:7 47:14 48:12 99:20
**elaborate** 102:6
**eliminate** 54:17
**eliminated** 66:18
**eliminating** 53:24
**Email** 2:8, 15 10:9 86:7
**emailed** 11:14
**emails** 13:5 14:11,

15 87:7, 8
**emotional** 19:7
**emotionally** 19:7
**employed** 14:8 15:23 16:3 27:16
**employee** 46:9, 11 49:3 55:18 56:8 57:20 81:8 101:13 106:16
**employees** 8:8, 11 20:4, 20 22:8 41:3 55:15 56:13
**employment** 14:19
**encouraged** 23:6
**ends** 57:25 96:20
**engagement** 46:10, 11 49:3
**Engineering** 7:18
**entered** 96:21
**entire** 107:7
**entirely** 42:3 74:25 94:20 102:10
**entities** 69:2
**entity** 39:16, 19
**Erie** 2:6
**ERRATA** 107:1, 13 108:1 109:1
**ESG** 93:23
**especially** 20:9, 10 22:14 92:1 94:22
**Esq** 2:1, 4, 5, 9, 18
**essential** 97:8
**essentially** 49:25 70:17
**et** 1:9 5:6 107:4
**Eve** 51:4
**eventually** 16:13
**everybody** 40:17, 18 52:25
**everybody's** 29:2, 3
**evidence** 34:16 84:21 96:1
**evolving** 21:25
**exact** 26:2 40:19 84:23
**exactly** 27:8 36:14 37:20 38:14 53:4 58:5 78:14 97:15
**exam** 7:19
**Examination** 3:4 6:6 100:4
**examined** 6:4
**example** 57:15 59:19, 22 69:5 94:14
**excellent** 96:19
**exchange** 10:7 83:17 86:8
**exchanged** 72:11
**Excuse** 14:16 66:23, 24 67:6 73:24 79:19 87:8 96:13
**execution** 37:24 91:5, 21
**executive** 33:5, 21 48:22 81:11 82:12 84:9 98:23
**executives** 27:9 93:12
**Exhibit** 3:4 4:13, 14, 15, 16, 17 9:3, 7, 25 10:1 60:11, 15 62:21, 25 72:1, 7 75:21, 25 79:3 82:19, 23 83:13 86:3, 7, 20 87:21 88:3 90:2, 6 97:17, 21, 24
**EXHIBITS** 3:4 4:10, 12
**exist** 14:1, 2
**existed** 67:10
**existing** 93:11
**exists** 96:11
**exiting** 72:3 83:9
**exodus** 76:3
**expand** 62:12
**expect** 55:22 57:5, 6, 8, 19, 20
**expectation** 56:12
**expectations** 53:2
**expected** 51:2 53:3, 4 56:5 57:6, 23
**expects** 53:1
**experience** 40:14, 15, 20 41:6, 8 42:6 44:16 46:17 49:7 101:6
**experienced** 93:2
**Expires** 106:25
**explain** 19:11 20:16 42:18 50:6 53:21 63:13, 14 66:21 102:6
**explained** 24:3
**explanation** 59:17 80:12
**extensive** 80:25
**extent** 7:15
**external** 54:8
**eye** 91:4, 21
**eyes** 83:8

**< F >**
**fact** 23:3 57:23 58:2 80:11 82:15 98:8 100:14 102:14
**factor** 103:3, 19, 23 104:2
**facts** 34:15 84:21
**failed** 53:7
**failure** 58:7
**false** 50:18
**familiar** 52:14 64:13 69:16 70:1
**fantastic** 36:21 37:23 38:1 41:3 93:5
**far** 54:16, 19, 20
**fashion** 58:8 73:17
**faster** 74:20
**FDIC** 39:17 58:17 59:9, 12, 13 60:10 63:7, 19 64:13, 15 65:12, 16, 20, 21 89:4
**February** 1:14 5:2 29:1 86:9 87:19 107:2
**Federal** 69:3, 5, 6
**FedNow** 40:3
**fee** 102:11
**feel** 6:17 18:16 22:16 23:5 101:11, 25
**feeling** 48:4
**feelings** 80:1
**feels** 84:24
**FEIGER** 1:14 3:3 5:5, 21, 23 6:2, 8, 11 9:6, 22 60:14 62:24 65:2 66:22 71:14 72:6 75:24 79:2 82:22 86:6 88:2 90:5, 24 97:20 100:6 105:1 106:7 107:19 108:24 109:24
**F-e-i-g-e-r** 6:11
**felt** 22:4, 9, 15 27:20 84:24
**FIFTH** 1:9, 14 2:13, 18 5:6, 23 7:25 8:5, 8, 12, 20 10:4, 16 11:4, 7, 17, 23 12:3 13:4 15:3, 9 17:6, 11, 12 18:10, 17, 23, 24 19:17, 25 20:1, 12 23:11, 25 25:6 26:5, 8, 16 27:17 31:9 33:5, 21 34:12, 22 35:23 36:18, 23 37:11 38:6, 12 40:23 41:18 49:17 50:19 52:1, 18 53:24 55:21, 24 56:16, 17 57:13 61:21 65:4 66:8, 10, 19 67:10, 19 69:10, 17 70:2, 17 71:16 74:18 76:3 79:15, 20 81:9, 24 88:8, 23 89:17, 19, 21, 23 90:20 92:8 93:21 107:4
**FIFTHTHIRD-MCHUGH** 88:3
**FIFTHTHIRD-MCHUGH-001074** 90:7
**FIFTHTHIRD-MCHUGH-001079** 90:8
**FIFTHTHIRD-MCHUGH-001216** 97:22
**FIFTHTHIRD-MCHUGH-001218** 97:24
**FIFTHTHIRD-MCHUGH-001222** 97:23
**FIFTHTHIRD-MCHUGH-01557** 63:1

**FIFTHTHIRD-MCHUGH-0212883** 82:25
**FIFTHTHIRD-MCHUGH-0213143** 72:8
**FIFTHTHIRD-MCHUGH-0213203** 83:1, 14
**FIFTHTHIRD-MCHUGH-212499** 86:21
**FIFTHTHIRD-MCHUGH-212500** 86:22
**fight** 56:7, 8, 10
**filed** 89:4, 5
**filing** 61:11 89:9
**filled** 39:6 80:10
**Finance** 76:25
**Financial** 15:10, 11, 19, 24 16:4 18:10, 17 21:23 23:11, 25 25:6 26:4, 8 29:11 36:12 46:24 49:10, 17 61:21 67:20 69:18 70:3 71:16 76:8 79:6, 15, 19, 20 80:1 92:7
**Financial/Fifth** 24:17
**Financing** 76:2
**find** 59:23 80:5
**finish** 6:24 37:12 103:7
**FIRE** 52:25
**firm** 8:20 90:17 106:18
**first** 6:3 10:13 16:9, 23 17:20 20:13 25:21, 23 26:2, 14 35:14 38:7 57:9, 10, 11 63:7 76:17 79:3 82:24 83:12, 15, 18 86:20 93:2 106:8
**Firstar** 96:22
**firsthand** 93:2
**five** 70:24, 25
**Fix** 36:9
**fixed** 85:4, 5, 6
**flat** 51:21, 22
**flip** 18:25
**floor** 48:22
**Florida** 7:8
**focused** 22:9 44:22
**follow** 82:2
**FOLLOWING** 4:3, 10
**follows** 6:5
**fool** 56:1
**foolish** 55:22
**foot** 85:21
**force** 29:1 57:22
**forefront** 20:23
**foregoing** 106:10
**forget** 56:3
**form** 10:10 11:14 12:6 18:11 23:12 28:2, 14 32:11 33:23 34:13, 25 35:24 50:2 51:17 55:7 56:19 63:10 65:14 67:12 76:12 84:20 87:4 88:14 89:22 91:6 95:24 96:15, 24 101:17
**former** 79:15, 20
**formerly** 76:8 79:5
**Forrest** 83:17 84:8
**fortunate** 96:5
**forward** 19:20 22:2 23:10
**foundation** 37:2, 3, 7, 17 40:25 63:15 64:22 65:18 76:15 84:1, 3, 20 86:14, 16 88:15
**foundational** 63:18 64:5, 10
**four** 75:8 82:23
**frame** 17:21 27:7 33:8 39:11, 13
**franchise** 52:24 61:15
**Frank** 83:17 84:8 85:19
**frankly** 45:5 91:25
**free** 6:18
**freeze** 54:7
**frequent** 18:7
**frequently** 85:25
**Friday** 5:2 73:1
**frivolous** 89:9
**frustrated** 55:1
**full** 21:21 57:22 77:2 102:16
**fundamental** 19:10 97:11
**funny** 96:18
**further** 104:6
**future** 22:6 41:2 97:14

< G >
**gained** 27:4
**gather** 102:10
**gathered** 39:3
**gathering** 22:13
**general** 48:22
**generally** 29:11 30:12
**geographic** 60:9
**getting** 29:13 43:1 72:23
**give** 59:19 80:13 96:6
**given** 39:15 65:7 74:18 106:11
**giving** 106:6
**go** 6:8 15:22 17:12 19:24 21:4 29:5 36:6 44:14 50:16 51:19 52:19 53:10, 19 62:16 64:19 76:22 77:7, 11 78:3, 8, 24 92:19
**goals** 46:24 49:10
**goes** 36:22 42:4 85:14
**going** 6:15 8:16 9:18 10:18 11:18 13:19 19:21, 22 20:23 22:6 30:14 32:25 38:14 39:4, 13 42:2 48:23 49:25 55:17 56:4, 8, 13 57:15, 16, 18 64:1 66:2 67:16 70:21 73:20 74:5 77:9, 15 78:3, 15 82:11, 17 89:22 94:22 99:2 100:22
**Good** 15:14 19:14 21:18 22:7, 17 27:18 31:17, 18, 19 37:1, 3, 4 56:10 62:13 92:25 93:1 94:14 97:16
**government** 29:8
**graded** 73:17
**Great** 20:10 37:8 40:8, 21 57:15 84:10
**green** 70:10 75:14, 17
**Greg** 19:25 27:19 33:7, 22 34:11, 22 35:11, 23 36:7, 13, 25 37:18 38:9 40:25 72:12 84:13 98:4, 14 99:1, 15 103:2, 22 104:3
**Grenadier** 7:5
**G-r-e-n-a-d-i-e-r** 7:7
**group** 93:12
**grow** 57:25
**guess** 15:14 18:25 27:20 92:7
**guessing** 24:8 73:21
**guy** 22:18 36:14, 15 40:19 41:1 84:14
**guys** 31:16

< H >
**Hamilton** 106:22
**hand** 43:2 57:19 75:10 106:22
**handed** 9:6 60:14 62:24 72:6 75:24 82:22 86:6 88:2 90:5 97:20
**handful** 23:3
**happen** 19:1 20:24 24:18 37:25 51:24 52:17 53:5 56:4 58:6 60:4 62:7 69:13 84:11
**happened** 18:21 19:2 37:25 48:8 50:19 53:4 62:9, 15

**happening** 30:13 41:11 52:20 70:6
**happens** 26:21 56:3 65:22 69:3
**hard** 19:2 79:25
**Harris** 76:9 79:6
**head** 6:21 85:19 98:9
**headache** 88:9, 23
**heading** 61:16 77:1 83:20
**hear** 6:17
**heard** 35:14 36:2
**hearsay** 53:13 88:16
**heavily** 36:19
**heaviness** 80:12
**heir** 99:10
**help** 26:24, 25 28:20 30:1, 10, 21 61:7 71:19
**helped** 70:18
**helpful** 101:23
**helping** 27:10
**helps** 90:18 94:17, 18
**hereinafter** 6:4
**hereof** 107:13
**hereunto** 106:21
**high** 19:7 52:24 59:25 82:12
**highlighted** 83:15
**highly** 32:1
**high-touch** 81:25
**hold** 15:5, 12
**home** 29:3
**hoped** 37:15, 25
**Hoppe** 81:6, 7
**Hoppe's** 81:23 82:7
**hour** 72:22 95:14
**hours** 78:16 95:12
**house** 54:3
**household** 59:8
**households** 60:8
**human** 14:13

**< I >**
**identification** 9:4 60:12 62:22 72:2 75:22 82:20 86:4 87:22 90:3 97:18
**identified** 11:5 65:17 76:14
**identify** 63:12 88:5 90:8
**Illinois** 7:18 66:17
**imagine** 13:5 31:16
**immediately** 50:16
**implications** 93:23 95:1
**imply** 58:6
**implying** 51:25 53:6
**important** 19:16 38:11 48:1, 2
**impression** 19:4 20:13 31:4, 15 41:13 45:8 101:10
**impressive** 21:24 22:20
**improper** 86:16
**improperly** 9:15
**improve** 36:12, 13
**improved** 37:6
**incidences** 29:4
**includes** 65:21
**including** 10:10 43:20
**income** 47:4 49:14
**incomplete** 89:1
**incorrect** 58:19, 20
**incorrectly** 34:16
**independently** 22:24
**indicate** 45:18 96:10
**indicated** 23:20 32:17, 23 107:12
**indicates** 76:6 79:3 86:9 88:8, 22 98:5
**indicating** 87:14 90:25 91:17 92:16 93:8, 19 94:6 95:17 96:3 98:14 99:15
**indication** 99:8
**individual** 38:8
**industry** 16:8 17:4 20:24 21:11, 13, 16, 22, 24 22:12 23:2, 9, 21 24:25 38:19, 21 39:14 44:19 52:9, 11, 21 56:2
**infielder** 41:25
**info** 72:23
**information** 10:7 30:13 61:7 90:25 91:17, 25 92:16, 21 93:8, 14, 19, 25 94:6 95:6, 17 96:3, 10
**informed** 59:3 60:5
**infrastructure** 54:3, 17, 25 55:3 67:9, 18 68:10
**inherit** 89:24
**inherits** 88:9, 23
**initiate** 69:7
**initiating** 24:23
**innovative** 91:3, 19
**innuendo** 80:10
**inquiries** 10:11
**inside** 21:15 28:17 30:21 31:25 81:23 99:9
**instantly** 26:18
**institution** 29:12 92:7
**instruct** 8:17 67:16
**instructions** 7:2
**insurance** 39:18
**integrated** 26:16, 18
**integration** 28:4 72:25 73:8, 14 74:6, 16 82:10
**intelligence** 19:7
**intense** 28:22 29:18
**inter** 39:22
**interaction** 28:23 29:18 30:1, 24 32:5 101:12
**interactions** 26:3 32:9 33:1 101:5
**interest** 106:16
**interested** 17:8, 10 20:25 21:1 44:18
**interesting** 44:20 94:11 96:23
**interestingly** 89:11
**intermediary** 40:2
**intermediation** 39:22
**International** 90:13, 16, 22
**interview** 47:7
**intimately** 27:5 52:14
**introduce** 5:10
**introduced** 22:23
**invaluable** 41:2
**invest** 97:14
**investigate** 46:4, 6 89:14
**investigated** 45:14 46:1
**investigation** 41:14
**investment** 53:3 57:11, 12 61:7
**investors** 52:16 62:13
**involve** 104:2
**involved** 25:25 27:5, 12, 25 32:20 35:3 52:6 70:6 85:13 90:21
**involvement** 18:21 26:7 27:24 28:7 29:6 33:4, 12, 14, 20 34:1
**issue** 74:2
**issues** 19:9 21:8 30:16 54:22 68:2, 5 73:25 83:22 85:3 93:23
**items** 74:7 92:13
**iterations** 17:13
**its** 20:3, 4 26:12, 19 71:21, 22 97:11

**< J >**
**Jackson** 1:20 106:4
**Jamie** 96:13, 14, 21
**Jamie's** 97:1, 8
**January** 14:16
**Jms@sspfirm.com** 2:8
**job** 22:17 36:21 82:7, 8
**jobs** 53:25 81:23 94:19 100:17, 21, 23
**joined** 102:21
**joining** 90:20
**Joint** 5:22
**Joshua** 2:4 5:16
**JPMorgan** 97:9
**Jude** 72:22 73:3
**judge** 62:14 89:8
**July** 88:10

**June** 31:3, 5 34:2, 7 35:4, 15, 17 38:6 48:12 65:4 69:15, 25 71:14, 17, 20, 25 72:15 102:21, 24

< K >
**keep** 40:6 44:11
**keeping** 40:7
**key** 73:16 81:23
**kind** 26:15, 24 39:16 41:9 66:6 71:21 94:23 100:15
**kinds** 44:18 52:8 69:13 95:1
**knew** 56:4
**know** 14:3 17:2, 3, 5, 14 18:24 19:3, 8 21:4 26:25 27:11 30:19 32:3 35:12, 18 37:6 39:11 40:21 41:7, 17, 19 44:22 47:11 48:3, 10 58:12 59:25 62:8, 15, 17 64:5, 10, 18 65:24 70:12 71:19 73:6 74:1 75:1 79:13, 17 82:17 84:5 85:21, 23 88:12, 19, 24 89:14 90:13 92:22 93:3 94:3, 10, 12 95:24 96:21 97:2 99:3 100:13 101:7
**knowledge** 21:21 40:20 42:5 44:14 45:8, 19 66:7
**known** 80:24
**knows** 52:25

< L >
**L.P.A** 2:6
**lack** 30:13 55:2 64:21 65:18 80:12 84:1, 20 86:13 88:15 101:16
**laid** 37:18
**landscape** 97:10
**large** 65:22, 25
**larger** 38:9
**largest** 38:8 59:21 61:22, 25
**Lars** 26:14, 24 71:15, 18, 23 72:11, 14 84:14
**LaSalle** 16:17 81:11
**lawful** 6:3
**laws** 36:11 37:4
**lawsuits** 89:6, 9
**lead** 70:16
**leader** 41:2
**leading** 61:15, 19 80:21
**leads** 82:1
**learn** 21:16, 18
**learned** 37:22
**learning** 17:8, 10
**leave** 55:3 56:14
**leaving** 98:10
**left** 101:10
**Legal** 5:23 8:21
**lender's** 39:5
**lending** 54:13, 21 102:12
**length** 92:18, 25
**letter** 98:3
**level** 31:19 32:4 55:15 74:22 100:18
**limited** 10:10 31:21
**line** 79:3
**list** 63:6 65:3
**listed** 63:8 72:14
**Listen** 41:24
**literally** 74:6
**litigation** 89:16, 18, 22 106:15, 17
**little** 37:12 62:12 73:20 89:14 97:2
**live** 7:13
**lived** 7:9
**LLP** 2:12
**loans** 29:7, 9, 13, 14, 16, 24 30:6, 10, 14 39:1, 2, 5, 8, 20 68:7, 8, 9 102:10, 11
**located** 66:16
**long** 7:9 14:7 15:5, 12, 23 52:6 81:12 98:18
**long-term** 57:11, 12
**look** 19:9 21:8 38:22 48:14 52:19 59:4, 5, 7, 9, 20 60:18, 19 62:19 75:2 77:4, 5, 17 80:4 88:18 97:9
**looked** 38:13 40:22 80:3
**looking** 11:13 19:20 22:2 30:20 59:22 61:19 65:10
**looks** 88:6 92:3, 8
**lose** 56:11 57:7, 16
**loss** 54:25 57:4 81:25
**lost** 57:3 89:11
**lot** 23:5 29:6 38:20 45:1 54:2 74:21 101:8 102:14
**love** 44:19
**lower** 39:19, 21 57:8

< M >
**macro** 74:10
**Magazine** 76:2
**mail** 10:8
**main** 30:25 71:23, 24
**maintaining** 91:4, 21 93:21
**major** 25:8
**making** 29:24 30:8 36:25 37:1 55:8
**Mallesch's** 96:12
**manage** 55:1
**managed** 47:5 49:15 66:15 70:19
**management** 22:23 57:2 70:17 82:8, 12 85:20 98:23
**manager** 31:18, 20 42:2 97:2, 5
**managers** 57:3 82:1 101:9
**managing** 93:10, 22
**March** 29:2 106:23
**Mark** 81:6, 7
**MARKED** 3:4 4:12 9:3, 7 60:11, 15 62:21 72:1, 7 75:21, 25 82:19, 23, 24 83:1 86:3, 7 87:21 88:3, 4 90:2, 6 97:17, 21
**market** 17:9 20:3 31:18 56:17, 24, 25 57:4, 8 58:3, 4, 9, 14, 15, 18, 21, 23 59:1, 8, 16, 17, 20, 22 60:2, 6 61:19, 25 62:2 63:6, 20 65:3 66:4 94:13, 14 99:9 101:9
**marketplace** 41:11 44:23 59:11 81:15 99:9
**mass** 76:7 79:4
**math** 57:9
**matter** 66:3 107:8
**MB** 15:10, 11, 19, 24 16:4 19:16, 18 22:23 23:1, 11, 25 24:17 25:6 26:4, 8, 12 27:25 36:23 37:9, 24 38:4 40:22 51:2 52:2, 24 53:3, 25 55:16, 17, 18, 23 56:17 57:12 61:21 66:1, 12, 13, 18 67:20 69:9, 10, 18 70:3 71:16, 21 74:18 76:8, 9 79:6, 11, 15, 19, 20 80:1, 5, 7 81:2, 8 82:8 84:10 85:3 89:19, 20, 21, 22 100:19
**MB/Fifth** 65:24
**MBA** 7:19
**MCHUGH** 1:6 2:18 5:6, 13, 17 11:19 12:4, 14, 20, 24 13:2, 8 25:22 26:4, 8 27:25 28:7 31:4 38:15 45:17, 19 49:15 60:16, 17 61:14 72:3 75:19 76:1 81:20 83:9 86:1, 10 87:15, 23 88:4 91:2, 19 93:10, 21 94:8 95:19 98:7, 15 99:16 100:7 101:4 102:4 107:3

**McHugh's** 41:6 42:5 44:15 49:2, 6, 10 101:16
**mean** 10:20 14:6 26:18 28:4 45:23 47:12, 20 50:7 53:22 56:6 62:12 64:17 65:6 68:3 69:13 74:7 75:4 85:6, 10 90:10 96:21
**means** 12:19 18:15 24:8 40:12 93:3 99:3
**meant** 18:24 100:9 102:6, 17
**measure** 62:3
**Media** 71:11
**meet** 16:23 17:16 25:21 47:7, 10
**meeting** 10:24 17:14, 20 32:8 34:8 35:15, 17 46:13, 14, 18 47:24, 25 49:5 63:23 73:14 98:6, 14 99:17 102:24
**meetings** 10:21 34:4, 5 46:23 47:2, 14, 15, 18, 23 48:12, 13 103:1
**meld** 54:20
**melded** 54:7
**member** 10:24 48:2 103:20
**members** 7:25 8:4 22:23
**memory** 30:3
**mention** 12:3 99:19
**mentioned** 65:20 82:9 92:13 93:6 94:10 102:19
**mentioning** 98:18, 19 99:18
**mentions** 10:5 11:4, 17, 23 92:8
**merged** 15:20 16:9, 13 67:10, 19
**merger** 15:20 18:10, 18, 20 23:10 24:6, 18, 23 26:4, 9, 17 49:18 52:2, 22 57:7 61:1, 6, 8 65:22 66:22, 25 67:5, 8 68:15 69:19 70:4 71:16 82:1, 10 89:23
**mergers** 52:7
**merging** 96:24
**message** 10:9 13:8 72:13, 21 83:15, 17, 18 84:6
**messages** 72:11 83:16 87:2
**met** 7:23 17:1 32:24 84:13 92:23
**method** 57:2
**Michael** 2:9 5:18 42:12 64:24
**Michael.cioffi@blankrome.com** 2:15
**mid** 31:19 32:3 39:11 59:10
**middle** 31:18 58:4, 15 94:13, 14 101:8
**midway** 27:8
**milestone** 75:6
**milestones** 73:16
**million** 88:9, 23
**mind** 95:3
**mingle** 47:24
**minimum** 40:7
**minute** 42:19, 25 86:10 87:7, 14 88:19
**minutes** 35:19 48:15, 16 70:22, 24 71:1 86:11 87:16 95:14
**mischaracterizes** 45:22 87:5
**missing** 77:1
**mission** 36:8 82:11
**misstatements** 80:11
**misstates** 32:12
**Mitch** 72:24 73:1, 3
**MITCHELL** 1:14 3:3 5:5 6:2, 11 105:1 106:7 107:19 108:24 109:24
**moment** 58:13
**money** 29:8 38:25 39:20, 21 58:1
**months** 75:8, 18 84:25
**morning** 43:19 44:1 102:3
**mortgage** 39:1 102:12
**move** 9:20 43:7 52:15 65:22 66:20 74:3 75:14 100:25
**moved** 66:10 73:3, 25 75:1
**movement** 76:7 79:4
**moving** 66:8

**< N >**
**name** 6:9, 10 15:21 66:14
**named** 106:7
**Naples** 7:8
**national** 96:25
**nature** 55:13 89:23 97:11
**navigate** 95:19
**NBD** 16:9 96:22
**necessarily** 20:1 48:20
**necessary** 40:7 84:15
**need** 6:20 12:16 24:9 63:17 74:8 75:2, 11, 12 79:1 84:9 85:18 88:18 100:16, 23 102:19
**needed** 28:19 85:4, 8
**needs** 73:4 75:6 84:14 94:21 102:20
**negative** 80:6
**negatively** 51:7, 14
**negotiations** 10:11
**neither** 106:14
**network** 94:17, 21 95:3
**networks** 94:8, 11, 12 95:2
**never** 36:2 41:8 91:25 92:9, 10 93:13 103:16
**Nevertheless** 9:17
**new** 40:3 82:3 89:8
**newsletter** 76:2
**nineties** 16:10
**No._____Change** 108:2, 5, 8, 11, 14, 17, 20 109:2, 5, 8, 11, 14, 17, 20
**No._____Line** 108:2, 5, 8, 11, 14, 17, 20 109:2, 5, 8, 11, 14, 17, 20
**non-performing** 68:8
**normal** 28:17 55:25
**Notaries** 1:23
**notary** 106:5
**note** 82:24 83:7 99:23
**notes** 91:14
**Notice** 1:14 9:8
**notices** 10:12
**number** 14:12 17:13 18:7 42:1 47:12 56:12, 13 57:2, 7 59:2, 4, 7, 10, 13, 24 74:12
**numbers** 63:7 65:3, 11, 13 66:20

**< O >**
**oath** 107:15
**Object** 33:23 42:22
**objecting** 42:24
**Objection** 8:16 9:11 10:18 11:8, 9 12:5, 6 17:19 18:11 23:12 24:2 28:2, 14 32:11 33:8 34:13, 24, 25 35:24 42:8 43:4, 5, 7, 18 44:9 45:21 50:2 51:17 53:11, 16 55:6 56:19 63:10, 25 64:21, 24 65:14 67:12 69:20 74:20 76:12 83:25 84:3, 19 86:13 87:4 88:14 91:6, 22 92:17 95:7 96:15 103:4, 6, 12, 24 104:4
**objective** 74:20 90:25 91:16, 24 92:15, 20 93:7, 14, 18, 25 94:5 95:5, 16, 22 96:1, 2, 4, 9
**obviously** 16:16, 20

48:16
**occasion** 28:21
**occur** 14:9
**occurred** 14:10 28:4
**October** 13:20 14:17 34:2 79:16 83:19 84:17 86:1
**odd** 68:15
**offer** 107:14
**office** 5:14 39:5 66:17 70:17 106:22
**Officer** 10:4 11:3, 17, 22 12:2
**offices** 66:2
**official** 106:22
**Oh** 18:19 19:6 21:10 25:17, 23 47:11 91:15 92:7
**OHIO** 1:2, 20, 23 2:7, 14 5:8 106:2, 6, 22
**Okay** 6:15 16:20 18:8 23:24 25:11, 19 31:12 34:18 36:6 49:24 53:17 54:5, 11, 16 60:19, 20, 24 61:18, 24 63:22 72:18 73:10 74:5 75:8 76:17, 24 88:21 98:3 104:17
**old** 37:19 38:16 66:1 82:2 102:5, 8, 17
**old-fashioned** 22:5, 6
**Oliver** 21:14
**ones** 30:25 31:1 56:10
**one's** 65:17
**one-year** 28:24 30:3 101:12
**operate** 26:12, 20 37:3
**operating** 68:20 71:21
**operation** 67:10
**operational** 36:16 68:16, 17, 18, 22 69:11
**operations** 26:19 36:19 37:6
**opinion** 18:8 21:7 23:8 29:5 51:9 80:6, 10 81:13 93:16 94:3, 9 95:10 100:7 101:1 102:4, 19
**opportunities** 22:8
**opportunity** 74:19
**oppose** 43:4
**oral** 10:7
**ORDER** 1:12 4:3, 10
**ordering** 104:15, 19
**ordinary** 22:4
**organization** 32:1
**outside** 10:20 33:2 48:21 81:24
**oversee** 26:15
**overseeing** 84:10
**oversight** 71:24
**overstatements** 80:11
**owners** 94:16
**ownership** 38:9

< P >
**P.M** 105:5
**PAGE** 3:3 9:24 10:1 12:12, 15 13:10 60:21 61:13 63:7 69:17 70:2, 9, 11 72:13, 25 73:7 81:19 82:24 83:4, 13 97:24 108:2, 5, 8, 11, 14, 17, 20 109:2, 5, 8, 11, 14, 17, 20
**PAGES** 4:3, 5, 6, 7 39:8 63:9 82:24, 25 83:2 106:10
**Pamela** 1:20 106:4
**papers** 55:17
**Paragraph** 11:19 81:22 98:5
**part** 55:21 101:17
**participate** 34:6
**participated** 34:3
**particular** 9:13, 16, 19 60:5 85:17 91:12
**particularly** 20:2 22:2, 12 29:14 38:21 58:3 68:14 96:23 97:7 99:7
**parties** 106:15
**parts** 60:3
**party** 9:16 89:17, 20
**Pas@sspnfirm.com** 2:8
**passed** 7:18
**Patterson** 2:6
**paying** 52:24
**payment** 39:25 94:25
**payments** 22:12
**payoff** 58:1
**Payroll** 29:9
**PENALTY** 107:5, 6
**pending** 89:16, 19
**People** 17:5 19:8 20:14 22:25 39:3, 5 44:18, 20 45:1 48:1, 3, 21, 23 55:23 62:16 69:13 70:18 74:18 82:13, 17 85:12 91:8 96:25 98:25 99:4, 11 100:14, 16, 20 102:14, 15
**perceived** 74:21
**percent** 51:3, 10, 16, 25 52:18 80:5
**performance** 36:12 46:24 49:10 74:22 85:23 101:16, 20, 21
**performers** 100:16, 18
**period** 14:7, 8 20:7 26:22 28:24 29:14 30:4 32:8 52:25 57:25 101:13
**PERJURY** 107:5, 6
**Permanent** 7:11
**permitted** 63:12
**person** 10:8 19:7, 11, 12, 14 41:9 42:20 55:16 97:5 99:12 101:23
**personal** 14:10 38:4 100:13 101:5
**personally** 5:21 46:5 99:4
**person's** 85:15
**perspective** 68:22
**pertains** 8:18 10:19
**Peter** 2:1 5:12 104:14
**Phil** 5:13, 17 12:4, 20, 24 13:2, 8 25:22, 25 26:4, 8 27:4, 11, 25 28:7, 18, 20 29:6, 17 30:1, 9, 20 31:4, 15 32:6, 10, 20 33:2 38:15 40:12, 13 41:6, 13, 25 42:5 44:15 45:4, 17, 19 49:2, 6, 10, 15 84:14, 15, 18 86:1, 10 87:15 91:2, 19 92:1, 9 93:10, 21 94:8 95:19 98:7, 8, 15, 19 99:16, 19 100:7 101:4, 16 102:4
**PHILIP** 1:6 2:18 5:5 11:19 12:14 107:3
**Phil's** 93:3
**Phone** 2:7, 14 14:10
**phrase** 85:7
**pick** 59:24
**picks** 76:3
**Place** 1:14 106:11
**Plaintiff** 1:7, 14 2:1 5:13, 17
**plan** 55:14, 25
**planned** 53:24 55:12 56:5
**planning** 10:15, 20
**plans** 35:5
**play** 25:1 37:24 42:1
**player** 32:3 100:25
**players** 100:23, 25
**please** 6:1, 9, 17 7:4 24:8 33:18 53:17 64:22 82:24 102:5 103:8, 15
**pleased** 38:12
**plural** 34:15
**plus** 92:22
**PNC** 2:13
**point** 27:3 40:20 71:20 80:23 101:6
**policies** 54:14
**poor** 20:3, 4

**position** 10:15 11:6 15:2, 6, 8, 13 30:5 38:10 61:19
**positions** 42:1
**possible** 68:16 69:8 75:1 102:1
**possibly** 74:17 82:13
**post** 31:6, 8 35:5 71:16
**potential** 34:21
**PPP** 29:7, 24 42:9 43:20, 23 101:17
**practices** 36:11 54:13
**predecessor** 15:16, 17
**predicate** 56:11
**premise** 50:14
**premium** 52:24
**preparation** 8:15 63:23
**prepare** 7:21 72:23
**prepared** 61:5
**preparing** 69:16 70:1
**presence** 17:6
**Present** 2:17 48:11, 17 56:23
**presenters** 47:23
**preserve** 100:1
**President** 10:15 11:6 15:10, 15, 16, 18 29:21 33:6, 22 34:2, 12, 22 35:10, 22 41:22 46:22 81:10, 11 98:22 99:2, 7 101:1
**press** 61:5
**pretty** 17:4 58:2 92:25 101:11
**previously** 9:12
**price** 52:24
**prior** 14:16 15:8 19:24 20:9, 10 26:4 32:8, 12, 24 35:4 36:16, 18 47:18 81:9, 10 90:20 106:6
**private** 52:9
**PrivateBank** 16:21
**probably** 14:13 18:5 19:2 24:18 25:24 31:22 35:14 37:10 38:7, 9 39:7 73:14, 15 81:15 92:6, 23 98:1 102:14, 16
**problem** 68:8 82:18 83:21 85:9, 17, 18
**problematic** 74:14
**problems** 67:9, 14, 19, 24 68:4, 5, 13, 16, 17, 18 69:11 73:20
**procedures** 37:4
**proceed** 64:22
**process** 24:23 33:5, 21 39:22 54:7 69:16 70:1 85:21, 22 89:12
**processes** 36:10 37:4 71:22 85:12
**produce** 9:23
**Production** 9:14
**productive** 72:24 83:21
**products** 22:14 40:3
**Program** 29:9, 22 42:9 43:20, 23 101:17
**progress** 36:25 37:1 99:22, 25 104:9
**project** 70:16
**projects** 70:19
**promoted** 99:6
**promoting** 98:21
**promotion** 98:8, 16
**Protection** 29:9
**PROTECTIVE** 1:12 4:3, 10
**provide** 9:9 22:7
**provided** 9:1, 8 64:2
**public** 52:8 99:9 106:5
**publication** 76:18 80:4, 6, 9
**Public-State** 1:23
**published** 80:20
**publisher** 81:1
**pure** 37:19 102:9
**purely** 102:9
**Pursuant** 1:14 5:21
**pursuing** 21:2
**put** 13:19 56:24 81:4
**putting** 37:19

**< Q >**
**qualified** 40:12 92:9 93:4 106:4
**qualities** 37:17 97:6 101:24
**quarters** 72:13
**question** 6:18, 24, 25 8:18 10:19 13:18, 22 15:14 18:12 19:1 23:13 24:7, 14 25:18 27:18 28:3, 15 32:12, 14 33:16 34:14 35:25 37:21 42:4, 13 43:20, 25 44:8, 12 50:3, 10, 12 51:18 55:7 56:20 63:11, 18 64:5, 11, 13 65:15 67:13, 17 69:21 70:21 76:13 78:1 84:20 86:16, 18 88:15, 22 91:7 92:2 94:11 95:3 96:16 103:8, 11, 13, 14
**questions** 6:16 8:22 9:12, 19 64:11, 20 95:25 96:6 100:3 104:7, 8
**Quit** 103:8
**quite** 18:6 66:6, 9

**< R >**
**radically** 37:6 39:13
**raise** 38:25 39:18
**raises** 75:10
**ran** 26:13 38:24 41:22
**range** 32:4 51:2
**rank** 53:13
**ranked** 100:20, 21
**rapidly** 40:5
**rating** 75:13, 15
**reachout** 18:22
**react** 51:7 99:11
**reacting** 51:14
**reaction** 23:4
**read** 12:16, 18 35:18 77:2, 15, 18, 22, 25 78:25 79:1 80:13 89:13 92:6 104:12 107:7, 9
**reading** 89:15 91:11, 13
**reads** 72:21 81:23
**real** 59:17 82:16
**really** 24:14 29:16 37:2 38:11, 12 69:12 102:15
**reason** 29:22 30:23 65:2 108:4, 7, 10, 13, 16, 19, 22 109:4, 7, 10, 13, 16, 19, 22
**reasonable** 101:14
**reasonably** 14:7 31:21
**recall** 13:9 16:10 26:3 32:24 70:7, 8 73:23 76:10 84:17 85:2, 25 87:18 98:13 99:14 103:25 104:5
**recess** 71:6 78:17
**Recession** 20:10
**recognize** 100:1
**reconciled** 54:14
**reconvened** 71:8 78:19
**record** 5:2 6:9 7:1 44:9 45:24 71:4, 11 77:8, 10, 12, 13, 21 78:4, 5, 8, 12, 13, 22 99:24 104:11
**red** 70:10 73:3, 25 74:3 75:2, 4, 14, 15, 16
**reduce** 74:21 97:11
**re-entering** 75:19 87:23
**refer** 11:18 12:3 72:12 83:12 97:23
**REFERENCED** 3:4 4:12
**referrals** 94:15
**referred** 73:15
**referring** 9:24 12:12, 15 13:10 20:7 46:21 60:21 61:10, 13 73:6 79:2 81:19 83:18 84:6 85:11, 17 88:12, 24 100:24

**refers** 10:2, 4 11:4, 17, 23
**reflect** 48:17 66:3
**reflected** 23:24
**reflection** 24:24
**reformulation** 11:12
**regard** 92:2
**regarding** 7:25 10:14 14:16 85:3
**region** 27:5, 6, 15 28:19 29:21 32:21 41:22 56:18 65:5
**regional** 96:23
**regions** 27:14 28:19 41:23
**regular** 73:13
**regulations** 36:11 37:5
**regulators** 93:22
**regulatory** 94:25
**relate** 12:3
**relates** 10:5 11:5, 18, 24 13:13
**relationship** 14:7 28:18 29:12 55:22 57:3 82:1
**relationships** 55:1, 4 59:8 60:8
**relative** 46:24 49:10 106:14, 15
**release** 61:5
**relocated** 66:1
**remember** 14:12 18:3, 7 25:23, 25 26:2, 14, 23 27:8 28:24 29:5, 7 30:25 31:1 33:3 45:4 47:15 48:9, 14, 24 68:12, 20 70:5 71:20 77:1 81:17 82:9 84:23 86:2 87:12, 13, 17 90:11 98:1, 17, 18, 19 99:18, 20
**reminder** 6:15
**remove** 60:6
**removed** 73:24
**reorient** 36:10
**reorienting** 20:19
**repeat** 6:18 53:17 86:18
**rephrase** 6:18 23:16 24:12
**rephrased** 24:9
**replace** 33:6, 22 34:11, 21 35:11, 23
**report** 27:17 58:17, 21, 22, 23, 25 59:14 60:10 65:12 74:10
**reported** 27:19 59:9, 12
**reporter** 6:1, 19 42:25 104:14, 17, 18
**reporting** 65:22 73:13 74:10, 21 106:18
**reports** 47:8 51:13 59:13 63:19 93:15 94:1 95:9
**represent** 5:11 72:10 83:16
**representation** 18:23 64:17
**representative** 56:16
**represented** 64:14
**representing** 5:22
**reputation** 20:3
**Request** 9:14
**requesting** 9:9
**requests** 10:11
**require** 100:18
**required** 22:10
**requirements** 92:4
**Reserve** 69:3, 5, 6
**residence** 7:11
**resilience** 95:20
**resolution** 83:21 85:9
**resolved** 85:8, 19
**resources** 74:23 75:3, 11, 16
**respect** 12:8 18:17 23:10 25:5 33:6 44:15 54:24 55:2 71:15 73:7 91:2, 19 93:10, 21 94:8 95:19 101:16
**respected** 81:13, 14
**respond** 50:9 86:11
**responds** 84:8, 12
**response** 9:20
**responses** 9:8 10:12
**responsibility** 27:4 31:22
**responsible** 18:9, 15, 25 27:14 28:18 41:23 52:18 69:7
**responsive** 44:8
**restroom** 71:1
**result** 51:6, 11 52:1 106:17
**retail** 61:20 62:18
**retain** 56:9 82:12
**retire** 14:21 15:2
**retired** 14:20 81:8
**retirement** 31:6, 9
**returns** 22:7
**review** 8:14, 25 46:16, 20, 23 47:3 49:6, 9, 13 63:23
**reviewed** 8:23 46:9 64:2
**Reviewing** 60:19 77:6 88:20 90:10
**reviews** 70:9
**RHR** 90:13, 16, 22
**ridiculous** 50:4, 12
**right** 14:24 16:18 23:22, 23 24:22 26:14, 16, 23 28:24, 25 34:3 36:9, 14 37:16, 17 38:14 48:1, 22 49:23, 25 54:18, 22 55:5, 16 56:7 59:21, 25 61:16 62:4 66:13 67:4 73:20 74:12 75:5, 9 84:24 92:5 95:3 98:22 99:25 100:2 103:15
**right-hand** 60:16
**rigorous** 91:4, 21
**rise** 93:23
**Risk** 85:20 98:7, 15, 23 99:16
**rivals** 76:3
**role** 18:16, 20 24:3 37:20 71:15 92:10 96:21 98:9
**roles** 41:17 69:9 101:1
**Rome** 2:12 5:19
**room** 48:21 72:4 75:20 83:10 87:24
**rooted** 19:18
**Rosemont** 66:16
**Rule** 106:19
**rules** 69:6
**run** 20:19 44:24

**< S >**
**Saba** 2:1, 6 3:4 5:12 6:7 9:5 10:22 17:22, 25 23:19 25:17, 20 28:6, 9, 11 33:11, 13, 17, 19 42:11, 16, 21 43:6, 9, 13, 17, 23 44:2, 4, 7, 13 60:13 62:23 64:7, 12, 19, 23 65:1 70:23 71:2, 13 72:5 75:23 77:7, 11, 14, 19, 22, 25 78:5, 9, 13, 23 82:21 83:11 86:5 88:1 90:4 95:15 97:19 99:21 103:4, 6, 12, 24 104:4, 8, 16
**sake** 6:19
**sanctioned** 89:7, 8
**sat** 39:6
**satisfaction** 36:13
**save** 107:10
**savings** 38:25
**saw** 21:24
**saying** 47:17 52:4 63:3 80:17
**says** 20:13 72:15 75:10
**SBA** 29:12
**scale** 100:15, 20
**schedule** 73:18, 19 75:18
**school** 37:19 38:16 102:5, 8, 17
**scores** 46:10, 11 49:3
**seal** 106:22
**SEC** 61:11
**second** 38:7 61:22, 24 81:19, 22 83:4, 13 98:4
**Section** 76:25

**see** 22:19 36:4 44:24 47:12 56:1 60:24 63:9 66:3 70:11 72:19 73:4, 9, 22 76:4 82:5 83:23 84:15 86:11 98:10
**seeing** 87:12 90:11 98:2
**seen** 17:12 22:20 46:19 60:17, 22 61:2 63:16, 19 64:3 86:24 87:2, 10, 11 90:11 94:1 97:25
**sees** 22:18
**selected** 11:5 46:22
**senior** 82:8
**sense** 26:10 48:3 92:11, 21 93:1
**sent** 83:19
**sentence** 78:1
**separate** 26:13
**separately** 26:20
**September** 34:8 48:13 91:1, 17 93:9, 20 94:7 95:18 98:6, 14 99:17 102:25
**series** 6:16 27:9 85:17 89:5, 6
**seriously** 43:1 73:19
**served** 9:15, 17 21:14 41:17
**service** 9:13 22:13 37:7 54:13
**services** 21:23 100:13 102:11
**set** 36:20 106:21
**settle** 57:21
**Shaffer** 83:18 84:5, 12 85:8 86:8 87:14 98:5, 13 99:15
**shaking** 6:21
**share** 56:18, 25 57:4, 8 58:3, 9, 14, 15, 18, 21, 23 59:1, 16, 17, 20, 22 60:6 61:25 62:3 63:6, 20 65:3 66:4
**shared** 73:1
**shareholder** 38:8
**shareholders** 22:7 37:25 41:3 56:16 57:12
**shares** 72:24
**Sharpe** 2:5 5:14
**SHEET** 107:1, 13 108:1 109:1
**sheets** 47:4 49:14
**shortest** 64:23
**Shortly** 31:11
**shut** 29:10
**side** 18:25 58:3 85:22, 23 91:3, 20
**sides** 85:21
**sideways** 49:25 50:5, 15, 16 53:10, 20 58:7
**sign** 55:16 104:13
**SIGNATURE:________________________DA TE** 108:23 109:23
**Signed** 107:16
**significant** 31:24
**significantly** 36:12, 13
**signs** 55:16
**silos** 74:9
**similar** 94:2
**simplify** 21:8
**simply** 82:14
**simultaneously** 91:4, 20
**single** 21:15
**sit** 48:10 73:23 99:14
**situation** 29:15 30:19
**six** 84:25
**size** 22:3 59:10 89:21
**skill** 45:7
**skills** 25:7, 14 37:16 92:4, 12
**skillset** 42:3
**slightly** 73:18 75:9
**slowly** 18:6
**small** 59:10 68:21, 24, 25
**Smith** 2:4 5:16
**society** 38:20
**sold** 55:20
**solid** 36:10 37:2, 3
**solutions** 102:1
**solve** 83:22
**somebody** 44:24 75:9
**someone's** 99:6
**someplace** 27:6
**something's** 75:5
**somewhat** 26:20
**sophisticated** 22:13, 14
**sorry** 25:10 26:12 32:7 47:21 51:19 67:6, 17 83:2
**sort** 66:4 94:3
**sources** 81:23
**SOUTHERN** 1:2 5:7
**span** 31:22
**speak** 7:24
**speaks** 42:20 44:10 45:24
**specific** 14:23 42:4 44:14 68:4 74:2
**specifically** 9:22, 24 46:21 47:4, 18 49:14 98:19
**specifics** 31:1
**speculate** 25:2
**speculating** 24:8
**speed** 76:3
**spell** 6:9 7:6
**spells** 92:3
**Spence** 11:24 12:9, 11 13:11, 19 14:5, 16 16:23 17:1, 17 18:9, 16 19:5, 24 23:8, 20 24:18, 23 35:8, 10 37:15, 22 40:19 41:1 44:20 46:4, 21 47:5 91:1, 18 93:9, 20 94:7 95:18 96:14
**Spence's** 24:3 46:17, 24 47:8, 19 48:11
**spent** 47:13 92:23 97:2
**spoke** 18:4
**spoken** 47:14 48:18 80:25
**spot** 21:25
**SS** 106:2
**stability** 22:15
**Stagnaro** 2:6
**stake** 38:3
**stakeholders** 22:8
**stamped** 60:15 62:25 76:1 86:21 90:7
**stand-alone** 66:13
**standards** 54:13 94:2
**standing** 93:22
**start** 55:3 57:25 84:10
**started** 49:25 50:16 52:10
**starts** 18:5 20:16
**state** 5:11 6:9 106:2, 5
**stated** 9:12
**statement** 24:10 50:18 79:8 82:14
**statements** 10:11 47:4 49:14
**STATES** 1:1 5:7 22:16, 17 39:17, 20
**statistics** 58:13
**stay** 40:7 77:13
**stays** 77:20
**stem** 76:10 79:7, 12 81:24 82:8
**stenotypy** 106:13
**steps** 74:10
**Steve** 79:24 80:2, 9, 18, 20, 24 82:7, 18 88:7 89:2
**sticks** 30:3
**stock** 50:19 51:10, 15 52:1, 15, 19, 25
**stocks** 52:15
**stood** 71:6 78:17
**stop** 78:16
**storied** 81:12
**strategic** 91:3, 20
**Street** 1:20 2:13 51:7, 14
**strength** 93:11
**Strike** 17:15 66:24 67:7
**strong** 37:17
**struck** 28:25 41:8
**structure** 53:20, 22

57:2
**studies** 93:15
**styled** 5:5
**styles** 101:9
**SUBJECT** 1:12 4:3, 10 11:9 12:6 13:12 45:5 81:2
**subjective** 93:16 95:10
**subordinates** 47:8, 12 48:11, 17, 19
**subquestion** 10:13
**substance** 82:16
**success** 62:14
**successful** 21:22 44:24 57:17 94:18, 22 100:22 102:19
**successfully** 36:21
**succession** 10:14, 19 33:5, 21 35:5 37:21
**successor** 103:2, 21 104:3
**sudden** 29:2
**suddenly** 30:18
**sufficiently** 25:16
**summary** 63:7
**superior** 91:1, 18 92:12 93:9, 20 94:7 95:18
**supervision** 106:13
**supplied** 8:19
**support** 55:2
**supported** 73:1
**supports** 95:6
**suppose** 52:12
**supposed** 42:22
**sure** 13:4 19:3 30:7, 16 34:19 47:13 53:18 58:2 62:19 65:19 68:7 69:24 71:2 73:11, 22 74:16 76:20, 21 77:1 85:10 86:19 88:19, 20 89:18
**surely** 56:22 59:7
**surface** 102:2
**surprise** 68:13
**surprised** 68:17 73:2 74:2
**surveys** 46:17 49:7
**swear** 6:1
**sworn** 6:4 106:8
**systems** 26:13, 21 27:1 30:17 39:25 54:7, 21 68:21, 25 71:22 94:25
**systems-related** 30:16

**< T >**
**table** 25:5, 8, 15
**take** 5:4 41:1 55:4 60:6 70:23, 25 77:3 84:18 94:13, 22 95:25 97:13
**Taken** 1:14 6:13 106:12 107:2, 8
**takes** 93:1
**talent** 82:13 90:18
**talk** 17:16 20:13 43:5 44:19 45:3, 6 47:25 48:1, 3, 5, 6 69:1 86:10 87:14
**talked** 42:9, 10
**talking** 14:6 42:12, 14 61:20 68:25 69:2 94:23 103:8
**task** 75:9
**Taylor** 81:10, 16
**team** 22:23 37:19 40:25 51:2 81:16 82:12 93:11 98:23
**technical** 42:5 44:16
**technically** 27:19
**technological** 94:24
**technology** 38:22 39:13 40:4 41:6, 10 44:22 45:12, 17, 19
**telecopy** 10:9
**telephone** 10:8
**tell** 31:2 32:16 44:17 48:25 52:21 65:11 81:2 96:20 99:1, 2
**tells** 59:15
**term** 50:5, 7
**testified** 43:19 44:10 92:18 100:6 101:15 102:3
**testify** 106:8
**testifying** 67:14
**TESTIMONY** 1:12 4:3 32:13 42:17 45:22 65:16 84:1 86:14 91:9 96:13 102:7 106:11
**text** 10:9 13:8 72:11, 13, 21 83:15, 16, 18 84:6 87:2
**texter** 14:11
**texts** 14:11
**Thank** 42:11
**Thanks** 71:3
**thing** 21:15, 17 37:20 38:1, 10, 11 39:23 40:21 42:18 44:17 48:2 59:3 68:15 78:25 92:6 96:5 98:24
**things** 19:15 20:23, 24, 25 21:3, 16, 19 22:3, 10, 12, 15 26:25 28:20 30:3, 17, 22 37:2 39:2 40:3, 9 41:24 42:10 44:18, 20 45:6 48:7, 8 56:1 57:21 62:16 69:13 70:10 71:19, 22 73:21 74:8, 13 90:19 93:17 96:1 97:14 99:4
**think** 13:16 16:24 17:4, 8 18:20 19:8, 12 20:2 21:5, 13 22:1 25:15 26:10, 16, 24 27:3, 14, 18 28:13, 17, 22 29:19, 22, 25 31:14, 15, 17, 21, 22, 23, 24 32:2 33:25 34:7 35:14 36:16 38:19, 23 39:25 40:11, 12, 22 41:21 45:5 49:23 50:23 52:16 56:7 57:19 59:1, 2, 14 61:12, 23 62:5 64:7 71:17, 23, 24 75:2 88:19, 25 89:2 90:17, 23 92:25 93:3 96:11, 18, 19 97:5, 15 98:20, 24 99:10 100:2, 14 101:13, 23 102:16
**thinking** 19:20 36:23 37:9, 10 48:4 89:5, 25 91:3, 20
**thinks** 102:9
**THIRD** 1:9, 14 2:18 5:6, 23 7:25 8:5, 8, 12, 20 10:4, 16 11:4, 7, 17, 23 12:3 13:4 15:3, 9 17:6, 11, 12 18:23, 24 19:17, 25 20:1, 12 23:11, 25 24:17 25:6 26:5, 8, 16 27:17 31:9 33:5, 21 34:12, 22 35:23 36:18, 23 37:11 38:6, 12 40:23 41:18 50:19 52:1, 18 53:24 55:21, 24 56:16, 17 57:13 61:21 65:4, 24 66:8, 10, 19 67:19 69:10, 17 70:2, 17 71:16 74:18 76:3 79:15, 20 81:9, 24 88:8, 23 89:17, 19, 21, 23 92:8 93:21 97:24 107:4
**Third/MB** 18:10, 17 49:17 67:10
**Third's** 90:20
**Thomas** 2:18 5:24
**thought** 21:3, 25 22:19, 22 23:5 25:3 40:24 53:5 57:14, 15 58:5 92:10
**thousands** 74:8
**three** 57:11, 17 72:13 82:25 84:10
**thrilled** 81:15
**tight** 17:4
**Tim** 12:11 16:23 17:1, 8, 17 18:9, 16, 21 19:5, 24 20:15 21:4 23:8, 20 24:3, 18, 23 34:2 35:8, 10, 13 37:15, 22 40:10, 19 41:1 44:20 46:4, 17, 21, 24 47:5, 8, 19

48:11 72:22 73:3 91:1, 18 92:1, 11, 12 93:4, 9, 20 94:7 95:4, 18 96:14 97:5, 15 99:1, 2
**Time** 1:14 5:3 13:4 16:8 17:21 20:7 21:14, 25 24:15 25:24 26:2 27:7 32:7 33:8, 16 35:2, 3 37:8, 10, 13, 15 39:11, 12 42:20 43:1 46:21 47:13, 18 52:6, 20, 21 53:8 61:1 69:23 71:12 72:16, 17 77:3, 16 83:20 85:2 92:23 96:20, 23 97:3 98:18 99:6, 10, 22 101:21 106:11
**timeline** 13:19
**times** 16:2 18:3, 7 47:23
**Timothy** 11:24 12:9 13:11, 19
**Tim's** 98:7, 16
**title** 88:8, 22
**titled** 76:2
**Today** 5:2, 4, 24 39:7, 9 40:1 48:10 53:8 68:24 73:23 89:20 97:1, 9 99:14 100:7 102:16, 19
**today's** 7:22 8:15 63:23 71:11
**told** 37:9 84:13 93:17
**topic** 44:25
**topics** 92:19
**total** 58:9, 17 59:13, 15 61:20
**trade** 52:15
**traditional** 37:19 38:16, 24 102:5
**transaction** 25:9 28:1, 3, 10 51:6, 8, 12, 15 52:2, 17 53:7 58:7
**transactions** 54:6, 8 55:13 73:12
**transcribed** 106:13
**TRANSCRIPT** 1:12 106:11 107:7
**transfer** 10:7 12:19 69:9, 10
**transferred** 66:19
**transfers** 40:1 68:11, 14 69:7
**Treasurer** 66:14, 15
**treasury** 22:13, 14 66:12, 18, 19
**treat** 20:20
**treated** 20:4 89:4
**tried** 66:21 100:1
**trillion** 96:25
**trillionaire** 97:1
**true** 48:20 50:14 58:2 80:17 106:10 107:10
**truth** 31:2 106:8, 9
**try** 6:25 19:19 24:15 43:14 83:22
**trying** 22:3 23:10 24:16, 25 43:9, 11, 21 44:5 58:6
**turn** 50:15
**turns** 75:17
**twice** 29:21
**two** 7:12 18:1 26:18 39:15 46:23 47:1, 18 54:12 56:22 68:19 69:4 78:16 83:2, 15 94:2 95:1, 12
**two-page** 39:7
**type** 52:23 54:6 73:12 82:11
**typed** 104:15

< U >
**U.S** 39:25
**uh-huh** 15:1 24:19 60:20 72:20 81:21 84:16
**uh-huhs** 6:22
**ultimately** 89:10
**unable** 29:25 30:9
**uncommon** 74:24 98:24
**understand** 6:17 7:1 18:12 23:15, 17, 18 24:1, 6, 15, 25 32:14 33:24, 25 34:17 35:1, 25 47:20, 21, 22 54:5, 11 55:10 61:8 62:14, 20 79:23 102:15 103:11, 13, 14
**understanding** 21:13 22:11 23:2, 9, 21 24:24 25:12 34:10, 20 35:5, 21 40:20 41:5, 9 45:3 107:13
**understood** 53:23
**Unfortunately** 89:20
**unhappy** 80:8 89:3
**unh-unhs** 6:21
**unilaterally** 78:7
**Unit** 7:8 70:18
**UNITED** 1:1 5:7 22:16, 17 39:17, 20
**Universal** 72:17 83:20
**universe** 8:23
**University** 7:18, 19
**untrue** 53:8
**update** 73:1, 8, 15
**updated** 72:23
**upper** 31:19 32:4
**use** 39:20 85:7
**useful** 65:11
**useless** 66:6
**usually** 34:9
**utility** 41:25

< V >
**values** 19:18
**values-driven** 19:19 20:2, 18
**variety** 41:24
**various** 69:18 70:3 73:16 74:9
**verbally** 6:21
**verse** 80:14
**versus** 5:6
**veteran** 76:9 79:7, 11
**Vice** 81:11
**video** 6:20
**Videographer** 1:23 5:1, 25 71:4, 10 78:11, 21 95:13 104:10
**videotape** 5:2
**Videotaped** 1:14
**view** 21:17 36:7 37:8, 11, 14 40:13 49:2
**viewed** 96:13, 14
**voice** 81:3
**vs** 1:8 107:4

< W >
**wait** 6:23 42:19, 25 75:10
**walking** 39:3
**Wall** 51:7, 14
**Walnut** 1:20
**want** 20:13, 15 24:4, 13 25:13 28:15 36:3 44:11 45:2, 3 55:23 56:8 58:15 66:5
**wanted** 17:2 74:15, 16
**wants** 77:14
**war** 79:25
**watch** 26:25 71:19
**watched** 44:21, 22, 23
**watching** 5:14 52:9, 11
**watchlist** 68:8
**way** 17:18 19:12, 15 20:3, 19, 20, 22 21:4, 16, 22, 24 22:5, 6, 19 27:3 36:3 38:2, 20, 23, 24 39:3, 4 40:24 50:22, 23 51:24 53:4 62:3, 14 75:3 89:4 92:11 94:10 95:25 96:20 99:13 102:17, 18
**ways** 14:12 59:2
**week** 57:10 84:13
**weeks** 31:13
**Well** 13:16 15:19 16:17 18:14 21:14 25:7 29:5 30:11 35:4 36:6, 24 38:4 41:21 42:7, 21 43:6 46:5 52:5, 10, 11, 16 53:9, 23 56:9, 22 57:5 58:12, 16 59:21 68:3 69:2 74:5

83:*23* 85:*5, 22* 87:*6, 9* 91:*13* 96:*8* 99:*11*
**well-rounded** 19:*6*
**went** 13:*5* 15:*20* 24:*17* 27:*9* 31:*9* 38:*6* 50:*21, 22, 23* 58:*7* 89:*6*
**We're** 5:*1, 4* 6:*19* 14:*6* 20:*22* 21:*1* 30:*14* 47:*22* 75:*10* 77:*9, 15* 78:*3, 5, 13, 15* 95:*13* 99:*2* 104:*10*
**WESTERN** 1:*3* 5:*8*
**whatsoever** 90:*1* 106:*17*
**WHEREOF** 106:*21*
**wholesale** 60:*2* 65:*23, 25* 66:*10, 15* 73:*2*
**wife** 7:*14*
**win** 56:*11*
**wire** 39:*25* 68:*11, 14* 69:*7*
**withdrew** 80:*8*
**witness** 5:*20* 6:*1, 3* 8:*17* 9:*16* 23:*14, 17* 43:*10, 12* 63:*13* 64:*16* 76:*14* 106:*21*
**woefully** 89:*1*
**word** 36:*9*
**work** 21:*15, 16, 19* 27:*1* 31:*16, 25* 37:*12* 38:*13* 53:*7* 55:*16, 17* 66:*18* 69:*14* 84:*14* 85:*16* 99:*12, 13* 100:*15*
**worked** 13:*3* 21:*22, 23* 70:*16*
**working** 16:*7, 13, 16* 27:*21* 29:*3* 98:*25*
**works** 78:*14*
**world** 19:*9* 22:*19* 95:*21* 100:*14*
**worthless** 65:*8, 12*
**writes** 80:*9*
**written** 10:*8, 23* 11:*13* 80:*18, 19*
**wrong** 37:*20* 51:*21, 23* 52:*2, 3, 4* 58:*8* 76:*18* 80:*11* 100:*11, 24*
**wrote** 80:*5*
**Wyman** 21:*14*

**< Y >**
**Yeah** 15:*25* 23:*14* 31:*13* 32:*19, 22* 33:*17* 43:*1* 49:*23* 51:*5* 57:*19* 59:*14* 62:*17* 66:*9* 69:*23* 76:*19* 78:*9* 82:*4* 83:*7* 88:*11*
**year** 15:*7* 49:*21* 57:*10*
**years** 7:*12* 17:*13* 18:*1* 20:*17, 18* 52:*12, 13* 57:*11, 17* 76:*7* 79:*4* 80:*21, 24* 81:*15* 92:*22* 101:*7*
**yellow** 70:*10* 73:*2* 75:*14, 17*
**York** 89:*8*
**young** 96:*14* 102:*14, 15*

**< Z >**
**Zelle** 40:*2*
**Zoom** 2:*5* 5:*15*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| PHILIP R. McHUGH, Plaintiff, vs. FIFTH THIRD BANCORP, *et al.*, Defendants. | Case No. 1:21-cv-00238-MRB<br>Judge: Hon. Michael R. Barrett |

**DEFENDANTS/COUNTERCLAIMANTS FIFTH THIRD BANCORP'S, FIFTH THIRD BANK, NATIONAL ASSOCIATION'S & GREGORY D. CARMICHAEL'S OBJECTIONS & RESPONSES TO PLAINTIFF'S REQUESTS FOR PRODUCTION OF DOCUMENTS DIRECTED TOWARDS MITCHELL S. FEIGER AND DEFENDANTS**

Pursuant to Federal Rule of Civil Procedure 34, Defendants/Counterclaimants Fifth Third Bancorp; Fifth Third Bank, National Association; and Gregory D. Carmichael (collectively "Fifth Third Bank" or the "Bank"), by and through their undersigned counsel, Blank Rome LLP, hereby serve the within Objections and Responses to Plaintiff Philip McHugh's ("Plaintiff") Requests for Production of Documents directed towards Mitchell S. Feiger and Defendants ("Requests").

**PRELIMINARY STATEMENT**

These responses to Plaintiff's Requests are based upon discovery and investigation conducted to date. Fifth Third Bank reserves the right to supplement these responses with, and/or introduce at trial, evidence and documents not identified at this time that are subsequently discovered and/or the relevance of which is subsequently ascertained. The fact that Fifth Third Bank has responded in part or at all to any of the Requests herein is not intended to be and shall

PENGAD 800-631-6989
EXHIBIT
1

not be construed as a waiver by Fifth Third Bank of all or any part of any objection to any such Request.

## GENERAL OBJECTIONS

The following objections are incorporated into each and every response to Plaintiff's Requests:

1. Fifth Third Bank objects to these Requests as plainly improper and in violation of Civil Rule 34. Pursuant to Civil Rule 34, "a party may serve on *any other party* a request within the scope of Rule 26(b) . . . ." Fed. R. Civ. P. 34(a) (emphasis added). Conversely, a party has no authority under Rule 34 to serve requests for production on a nonparty. Mitchell S. Feiger is not a party to this litigation. Accordingly, given that Plaintiff's Requests are directed towards, and demand production from, nonparty Mitchell S. Feiger,[1] Plaintiff's Requests are improper under Civil Rule 34.

2. Fifth Third Bank has not completed its investigation of the facts relating to this case, its discovery in this case, or its preparation for trial. The responses contained herein are based only upon the information and documents presently available vto and known by Fifth Third Bank. Nothing contained herein shall be used to preclude Fifth Third Bank from further research and investigation of the facts or from presentation of the results of that research and investigation to the trier of fact at the time of trial.

3. The following responses are provided without prejudice to the right of Fifth Third Bank to produce and introduce at the time of trial subsequently discovered evidence relating to the

[1] Plaintiff's requests are styled as "Request for Production of Documents Directed to Defendants Fifth Third Bancorp, Fifth Third Bank N.A. (jointly "Fifth Third"), *and their Director Mitchell S. Feiger*." *See* Requests, p. 1 (emphasis added). Further, Instruction No. 2 to Plaintiff's Requests specifically instructs that "In answering these Requests for the Production of Documents, Defendants *and their Director* are to divulge all information in their possession, custody, or control . . . ." *See* Requests, p. 2, Instruction No. 2 (emphasis added).

proof of presently unknown material facts, and to produce and introduce all evidence when discovered relating to proof of subsequently discovered material facts. Moreover, because the facts and evidence now known may be imperfectly understood, or the relevance or consequence of certain facts and evidence may be imperfectly understood, such facts and evidence in good faith may not be included in the following responses. Fifth Third Bank reserves the right to refer to, conduct discovery with reference to, or offer into evidence at the time of trial, any and all documents and things notwithstanding the responses and objections interposed herein.

4. To the extent that a Request has not been objected to, Fifth Third Bank has used reasonable diligence to obtain facts, documents, and things responsive to the Requests responded to herein. To the extent that Plaintiff seeks to require Fifth Third Bank to do more than the foregoing, the Requests are objected to on the grounds that they are not relevant to any party's claim or defense, not proportional to the needs of the case, and impose an undue burden and expense not commensurate with any legitimate discovery need.

5. Fifth Third Bank generally objects to the Requests, and specifically to each Request contained therein, to the extent that they seek disclosure of facts or other information that is protected from disclosure by the attorney-client privilege, the attorney work product privilege, any other applicable privilege or protection, or that is otherwise protected from discovery. Fifth Third Bank will not undertake to produce any such privileged or protected information, and nothing contained herein is intended as, or shall be deemed, a waiver of any attorney-client privilege, attorney work product privilege, or any other applicable privilege.

6. Fifth Third Bank generally objects to the Requests, and specifically to each Request contained therein, on the grounds that they are overbroad, unduly burdensome, unreasonable, vexatious, harassing, and oppressive, in that they seek information that is not relevant to any

party's claim or defense in this case, including by seeking documents or communications created or utilized after Fifth Third Bank voted to appoint Timothy Spence to the Position of Bank President and Plaintiff filed the lawsuit at issue here. By responding to the Requests and each Request as set forth herein, Fifth Third Bank will not undertake to provide any facts or documents that are not relevant to any party's claim or defense or not proportional to the needs of this case, and Fifth Third Bank expressly disavows any obligation or undertaking not interposed by the Federal Rules of Civil Procedure, the Local Rules of the U.S. District Court for the Southern District of Ohio, or any other applicable law.

7. Fifth Third Bank generally objects to the Requests, and specifically to each Request contained therein, to the extent they seek information protected by rights of privacy of any person or entity.

8. Fifth Third Bank generally objects to the Requests, and specifically to each Request contained therein, to the extent that they purport to require Fifth Third Bank to disclose information, documents, or other materials constituting or containing, in whole or in part, confidential data, proprietary information, non-public information, and/or financial information relating or pertaining to Fifth Third Bank, its past or present employees, or other persons or entities.

9. Fifth Third Bank generally objects to the Requests, and specifically to each Request contained therein, to the extent that the information called for in the Requests is at least equally available to Plaintiff, or is already in the possession of Plaintiff or his counsel.

10. Fifth Third Bank hereby expressly reserves its right to supplement or amend this response, or any of the various responses contained herein, in the future should Fifth Third Bank discover additional information that may be responsive to the Requests. Nothing contained herein

shall obligate or commit Fifth Third Bank to supplement or amend this response, or any of the various responses contained herein.

Subject to and without waiving the foregoing Preliminary Statement and General Objections, Fifth Third Bank makes the following specific objections and responses to Plaintiff's Requests:

**SPECIFIC OBJECTIONS & RESPONSES TO REQUESTS FOR PRODUCTION**

1. Communications (as defined above) between You and any other Director or Officer of Fifth Third which refers, mentions, or otherwise relates to:

a. Succession planning for the position of President and/or CEO of Fifth Third;

b. Identified and/or selected candidates for the position of President and/or CEO of Fifth Third;

c. Processes or timelines, whether proposed or final, with respect to the identification and/or selection of candidates for the position of President and/or CEO of Fifth Third.

d. Development of potential candidates for the position of President and/or CEO of Fifth Third; and

e. Any facts upon which You or any other Director relied upon when identifying and/or selecting candidates for the position of President and/or CEO of Fifth Third.

f. Philip McHugh

g. Timothy Spence

**RESPONSE:** Fifth Third Bank objects to this Request on the grounds that it demands production of documents by a nonparty, Mitchell S. Feiger, and that it seeks documents that are not presently known to be in the possession, custody or control of Fifth Third Bank or any Defendant. Fifth Third Bank objects to this Request on the grounds that it violates the Court's prior rulings as to the scope of relevance (and discovery) in this case, including Plaintiff's entitlement to the personal communications of Bank employees. Fifth Third Bank objects to this Request on the grounds that it is duplicative—and therefore not proportional to the needs to the needs of the case—of Plaintiff's previously served requests for production of documents. As such, Fifth Third Bank objects to this Request because the Bank has already produced all relevant communications concerning succession planning, the Bank's decision to promote Timothy Spence to the position of Bank President, Philip McHugh, and Timothy Spence which are currently known to be within the Bank's possession, custody or control. Fifth Third Bank objects to this Request because any documents created after the Plaintiff was no longer employed by the Bank (October 26, 2020) and after the Complaint was filed (October 28, 2020) are not relevant to any allegations in the Complaint or otherwise discoverable. *See Tibbs v. Calvary United Methodist Church*, 505 Fed. App'x 508, 515-516 (6th Cir. 2012) (holding that documents created after Plaintiff's termination were not temporally connected or relevant to Plaintiff's wrongful termination claims); *West v. Tyson Foods*, 374 Fed. App'x 624, 635-36 (6th Cir. 2010) (concluding that evidence related to Plaintiff's exit interview with her supervisor was not relevant to Plaintiff's constructive discharge claim because the exit interview occurred after Plaintiff's constructive discharge); *Kaveler v. U.S. Bancorp Ins. Serv.*, No. 06-CV-04-DRH, 2008 U.S. Dist. LEXIS 45769, *5-7 (S.D. Ill. June 12, 2008) (holding that post-dismissal evidence was not admissible to demonstrate employer's motivation relative to Plaintiff's termination).

Furthermore, Fifth Third Bank incorporates by reference herein its Preliminary Statement and General Objections. Fifth Third Bank objects to this Request because it is unreasonable, vexatious, harassing, and oppressive, in that the Request seeks information and documentation that is not relevant to any party's claim or defense, is not relevant to any of the issues in dispute in this case as framed by the parties' pleadings, and is not proportional to the needs of the case. Fifth Third Bank objects to this Request because it is overly broad, unduly burdensome, and not reasonably limited in scope, and is therefore harassing and oppressive. Fifth Third Bank objects to this Request because it seeks confidential and/or commercial sensitive business information that bears no relevance to this case as framed by the pleadings.

2. Any Communications (as defined above) between You and Philip McHugh.

**RESPONSE:** Fifth Third Bank objects to this Request on the grounds that it demands production of documents by a nonparty, Mitchell S. Feiger, and that it seeks documents that are not presently known to be in the possession, custody or control of Fifth Third Bank or any Defendant. Fifth Third Bank objects to this Request on the grounds that it demands production of documents to which Plaintiff was a party and, therefore, to which Plaintiff has direct and equal access. Accordingly, Plaintiff's Request is not proportional to the needs of the case pursuant to Civil Rule 26(b) considering the parties' (Plaintiff's direct) relative access to

relevant information sought by this Request. Fifth Third Bank objects to this Request because any documents created after the Plaintiff was no longer employed by the Bank (October 26, 2020) and after the Complaint was filed (October 28, 2020) are not relevant to any allegations in the Complaint or otherwise discoverable. *See Tibbs v. Calvary United Methodist Church*, 505 Fed. App'x 508, 515-516 (6th Cir. 2012) (holding that documents created after Plaintiff's termination were not temporally connected or relevant to Plaintiff's wrongful termination claims); *West v. Tyson Foods*, 374 Fed. App'x 624, 635-36 (6th Cir. 2010) (concluding that evidence related to Plaintiff's exit interview with her supervisor was not relevant to Plaintiff's constructive discharge claim because the exit interview occurred after Plaintiff's constructive discharge); *Kaveler v. U.S. Bancorp Ins. Serv.*, No. 06-CV-04-DRH, 2008 U.S. Dist. LEXIS 45769, *5-7 (S.D. Ill. June 12, 2008) (holding that post-dismissal evidence was not admissible to demonstrate employer's motivation relative to Plaintiff's termination).

Furthermore, Fifth Third Bank incorporates by reference herein its Preliminary Statement and General Objections. Fifth Third Bank objects to this Request because it is unreasonable, vexatious, harassing, and oppressive, in that the Request seeks information and documentation that is not relevant to any party's claim or defense, is not relevant to any of the issues in dispute in this case as framed by the parties' pleadings, and is not proportional to the needs of the case. Fifth Third Bank objects to this Request because it is overly broad, unduly burdensome, and not reasonably limited in scope, and is therefore harassing and oppressive. Fifth Third Bank objects to this Request because it seeks confidential and/or commercial sensitive business information that bears no relevance to this case as framed by the pleadings.

3. Any Communications (as defined above) between You and Timothy Spence.

**RESPONSE:** Fifth Third Bank objects to this Request on the grounds that it demands production of documents by a nonparty, Mitchell S. Feiger, and that it seeks documents that are not presently known to be in the possession, custody or control of Fifth Third Bank or any Defendant. Fifth Third Bank objects to this Request on the grounds that it violates the Court's prior rulings as to the scope of relevance (and discovery) in this case, including Plaintiff's entitlement to the personal communications of Bank employees. Fifth Third Bank objects to this Request on the grounds that it is duplicative and therefore not proportional to the needs of the case of Plaintiff's previously served requests for production of documents. As such, Fifth Third Bank objects to this Request because the Bank has already produced all relevant communications between Timothy Spence and any Bank Director. Fifth Third Bank objects to this Request because any documents created after the Plaintiff was no longer employed by the Bank (October 26, 2020) and after the Complaint was filed (October 28, 2020) are not relevant to any allegations in the Complaint or otherwise discoverable. *See Tibbs v. Calvary United Methodist Church*, 505 Fed. App'x 508, 515-516 (6th Cir. 2012) (holding that documents created after Plaintiff's termination were not temporally connected or relevant to Plaintiff's wrongful termination claims); *West v. Tyson Foods*, 374 Fed. App'x 624, 635-36 (6th Cir. 2010) (concluding that evidence related to Plaintiff's exit interview with her supervisor was not relevant to Plaintiff's constructive discharge claim because the exit interview occurred after Plaintiff's constructive discharge); *Kaveler*

*v. U.S. Bancorp Ins. Serv.*, No. 06-CV-04-DRH, 2008 U.S. Dist. LEXIS 45769, *5-7 (S.D. Ill. June 12, 2008) (holding that post-dismissal evidence was not admissible to demonstrate employer's motivation relative to Plaintiff's termination).

Furthermore, Fifth Third Bank incorporates by reference herein its Preliminary Statement and General Objections. Fifth Third Bank objects to this Request because it is unreasonable, vexatious, harassing, and oppressive, in that the Request seeks information and documentation that is not relevant to any party's claim or defense, is not relevant to any of the issues in dispute in this case as framed by the parties' pleadings, and is not proportional to the needs of the case. Fifth Third Bank objects to this Request because it is overly broad, unduly burdensome, and not reasonably limited in scope, and is therefore harassing and oppressive. Fifth Third Bank objects to this Request because it seeks confidential and/or commercial sensitive business information that bears no relevance to this case as framed by the pleadings.

4. All Documents created, received, or obtained by You which refer, mention, or otherwise relate to:

a. Succession planning for the position of President and/or CEO of Fifth Third;

b. Identified and/or selected candidates for the position of President and/or CEO of Fifth Third;

c. Processes or timelines, whether proposed or final, with respect to the identification and/or selection of candidates for the position of President and/or CEO of Fifth Third;

d. Development of potential candidates for the position of President and/or CEO of Fifth Third; and

e. Any facts upon which You or any other Director relied upon when identifying and/or selecting candidates for the position of President and/or CEO of Fifth Third.

f. Philip McHugh

g. Timothy Spence

**RESPONSE:** Fifth Third Bank objects to this Request on the grounds that it demands production of documents by a nonparty, Mitchell S. Feiger, and that it seeks documents that are not presently known to be in the possession, custody or control of Fifth Third Bank or any Defendant. Fifth Third Bank objects to this Request on the grounds that it violates the Court's prior rulings as to the scope of relevance (and discovery) in this case. Fifth Third Bank objects to this Request on the grounds that it is duplicative—and therefore not proportional to the needs to the needs of the case—of Plaintiff's previously served requests for production of documents. As such, Fifth Third Bank objects to this Request because the Bank has already produced all relevant documents concerning succession planning, the Bank's decision to promote Timothy Spence to the position of Bank President, Philip McHugh, and Timothy Spence which are currently known to be within the Bank's possession, custody or control. Fifth Third Bank objects to this Request because any documents created after the Plaintiff was no longer employed by the Bank (October 26, 2020) and after the Complaint was filed (October 28, 2020) are not relevant to any allegations in the Complaint or otherwise discoverable. *See Tibbs v. Calvary United Methodist Church*, 505 Fed. App'x 508, 515-516 (6th Cir. 2012) (holding that documents created after Plaintiff's termination were not temporally connected or relevant to Plaintiff's wrongful termination claims); *West v. Tyson Foods*, 374 Fed. App'x 624, 635-36 (6th Cir. 2010) (concluding that evidence related to Plaintiff's exit interview with her supervisor was not relevant to Plaintiff's constructive discharge claim because the exit interview occurred after Plaintiff's constructive discharge); *Kaveler v. U.S. Bancorp Ins. Serv.*, No. 06-CV-04-DRH, 2008 U.S. Dist. LEXIS 45769. *5-7 (S.D. Ill. June 12, 2008) (holding that post-dismissal evidence was not admissible to demonstrate employer's motivation relative to Plaintiff's termination).

Furthermore, Fifth Third Bank incorporates by reference herein its Preliminary Statement and General Objections. Fifth Third Bank objects to this Request because it is unreasonable, vexatious, harassing, and oppressive, in that the Request seeks information and documentation that is not relevant to any party's claim or defense, is not relevant to any of the issues in dispute in this case as framed by the parties' pleadings, and is not proportional to the needs of the case. Fifth Third Bank objects to this Request because it is overly broad, unduly burdensome, and not reasonably limited in scope, and is therefore harassing and oppressive. Fifth Third Bank objects to this Request because it seeks confidential and/or commercial sensitive business information that bears no relevance to this case as framed by the pleadings.

**DATE:** April 1, 2024

Respectfully submitted,

**BLANK ROME LLP**

*s/ Michael L. Cioffi*

Michael L. Cioffi (0031098)
Thomas H. Stewart (0059246)
Collin D. Hart (0099869)
1700 PNC Center
201 E. Fifth Street

Cincinnati, Ohio 45202
Tel.: (513) 362-8701
Fax: (513) 362-8702
Email: michael.cioffi@blankrome.com
Email: tom.stewart@blankrome.com
Email: collin.hart@blankrome.com

*Attorneys for Defendants/Counterclaimants Fifth Third Bancorp, Fifth Third Bank, National Association, and Gregory D. Carmichael*

**CERTIFICATE OF SERVICE**

I, Michael L. Cioffi, hereby certify that on April 1, 2024, a copy of the foregoing Objections and Responses to Plaintiff's [Fourteenth] Set of Requests for Production of Documents of Mitchell S. Feiger and Defendants/Counterclaimants Fifth Third Bancorp, Fifth Third Bank, National Association, and Gregory D. Carmichael was served by electronic email at the following address:

John J. McHugh
McHugh & McCarthy, LTD
5580 Monroe Street
Sylvania, Ohio 43560
mchugh@mchughlaw.com

Peter A. Saba
Joshua M. Smith
Stagnaro, Saba & Patterson Co., L.P.A.
2623 Erie Avenue
Cincinnati, Ohio 45208
pas@sspfirm.com
jms@sspfirm.com

*Counsel for Plaintiff,*
*Philip McHugh*

**BLANK ROME LLP**

*s/ Michael L. Cioffi*
Michael L. Cioffi (0031098)

*Attorney for Defendants/Counterclaimants Fifth Third Bancorp, Fifth Third Bank, National Association, and Gregory D. Carmichael*

EX-99.2 3 d569882dex992.htm EX-99.2

Exhibit 99.2

# Fifth Third Bancorp Merger with MB Financial

## May 21, 2018

Refer to press release dated May 21, 2018 for further information.

1

© Fifth Third Bancorp | All Rights Reserved

PENGAD 800-631-6989
EXHIBIT
2

## IMPORTANT ADDITIONAL INFORMATION AND WHERE TO FIND IT

*In connection with the proposed merger, Fifth Third Bancorp will file with the SEC a Registration Statement on Form S-4 that will include the Proxy Statement of MB Financial, Inc. and a Prospectus of Fifth Third Bancorp, as well as other relevant documents concerning the proposed transaction. This communication does not constitute an offer to sell or the solicitation of an offer to buy any securities or a solicitation of any vote or approval. INVESTORS AND STOCKHOLDERS ARE URGED TO READ THE REGISTRATION STATEMENT AND THE PROXY STATEMENT/PROSPECTUS REGARDING THE MERGER WHEN IT BECOMES AVAILABLE AND ANY OTHER RELEVANT DOCUMENTS FILED WITH THE SEC, AS WELL AS ANY AMENDMENTS OR SUPPLEMENTS TO THOSE DOCUMENTS, BECAUSE THEY WILL CONTAIN IMPORTANT INFORMATION.*

*A free copy of the Proxy Statement/Prospectus, as well as other filings containing information about Fifth Third Bancorp and MB Financial, Inc., may be obtained at the SEC's Internet site (http://www.sec.gov). You will also be able to obtain these documents, free of charge, from Fifth Third Bancorp at ir.53.com or from MB Financial, Inc. by accessing MB Financial, Inc.'s website at investor.mbfinancial.com. Copies of the Proxy Statement/Prospectus can also be obtained, free of charge, by directing a request to Fifth Third Investor Relations at Fifth Third Investor Relations, MD 1090QC, 38 Fountain Square Plaza, Cincinnati, OH 45263, by calling (866) 670-0468, or by sending an e-mail to ir@53.com or to MB Financial, Attention: Corporate Secretary, at 6111 North River Road, Rosemont, Illinois 60018, by calling (847) 653-1992 or by sending an e-mail to dkoros@mbfinancial.com.*

*Fifth Third Bancorp and MB Financial, Inc. and certain of their respective directors and executive officers may be deemed to be participants in the solicitation of proxies from the stockholders of MB Financial, Inc. in respect of the transaction described in the Proxy Statement/Prospectus. Information regarding Fifth Third Bancorp's directors and executive officers is contained in Fifth Third Bancorp's Annual Report on Form 10-K for the year ended December 31, 2017 and its Proxy Statement on Schedule 14A, dated March 6, 2018, which are filed with the SEC. Information regarding MB Financial, Inc.'s directors and executive officers is contained in its Proxy Statement on Schedule 14A filed with the SEC on April 3, 2018. Additional information regarding the interests of those participants and other persons who may be deemed participants in the transaction may be obtained by reading the Proxy Statement/Prospectus regarding the proposed merger when it becomes available. Free copies of this document may be obtained as described in the preceding paragraph.*

## FORWARD-LOOKING STATEMENTS

*This communication contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995 including, but not limited to, Fifth Third Bancorp's and MB Financial, Inc.'s expectations or predictions of future financial or business performance or conditions. Forward-looking statements are typically identified by words such as "believe," "expect," "anticipate," "intend," "target," "estimate," "continue," "positions," "plan," "predict," "project," "forecast," "guidance," "goal," "objective," "prospects," "possible" or "potential," by future conditional verbs such as "assume," "will," "would," "should," "could" or "may", or by variations of such words or by similar expressions. These forward-looking statements are subject to numerous assumptions, risks and uncertainties, which change over time. Forward-looking statements speak only as of the date they are made and we assume no duty to update forward-looking statements. Actual results may differ materially from current projections.*

*In addition to factors previously disclosed in Fifth Third Bancorp's and MB Financial, Inc.'s reports filed with or furnished to the SEC and those identified elsewhere in this communication, the following factors, among others, could cause actual results to differ materially from forward-looking statements or historical performance: the ability to obtain regulatory approvals and meet other closing conditions to the merger, including approval of the merger by MB Financial, Inc.'s stockholders on the expected terms and schedule, including the risk that regulatory approvals required for the merger are not obtained or are obtained subject to conditions that are not anticipated; delay in closing the merger; difficulties and delays in integrating the businesses of MB Financial, Inc. or fully realizing cost savings and other benefits; business disruption following the merger; changes in asset quality and credit risk; the inability to sustain revenue and earnings growth; changes in interest rates and capital markets; inflation; customer acceptance of Fifth Third Bancorp's products and services; customer borrowing, repayment, investment and deposit practices; customer disintermediation; the introduction, withdrawal, success and timing of business initiatives; competitive conditions; the inability to realize cost savings or revenues or to implement integration plans and other consequences associated with mergers, acquisitions and divestitures; economic conditions; and the impact, extent and timing of technological changes, capital management activities, and other actions of the Federal Reserve Board and legislative and regulatory actions and reforms. Annualized, pro forma, projected and estimated numbers are used for illustrative purpose only, are not forecasts and may not reflect actual results.*


© Fifth Third Bancorp | All Rights Reserved



MCHUGH 01527

# Strategically attractive and financially accretive combination

mb financial bank

**Acquisition of a premium Chicago franchise**

- In-footprint acquisition of high-performing franchise in a high-priority growth market
- Creates a leading Chicago bank with top-tier commercial capabilities and an attractive low-cost deposit base
  - Significant benefits of scale, enabling us to better serve a larger client base
  - #2 in retail deposits[1] and #4 in total deposits in the Chicago MSA
  - #2 middle market lending share[2]

**Improves strategic positioning & enhances profitability**

- Compatible, relationship-driven business model focused on sustainable revenue growth, strong risk management and through-the-cycle outperformance
- Combines MB Financial's middle-market commercial lending & leasing and national niche businesses with Fifth Third's broad Midwest and Southeast footprint
- Identified and attainable cost savings and revenue synergies
- Materially enhances NorthStar targets
- Should not impact ability to achieve previously communicated capital distribution goals
- MB Financial's complementary business model and concentrated footprint reduces execution risk and allows us to remain focused on customer service and profitability

3

© Fifth Third Bancorp | All Rights Reserved

5/3



MCHUGH 01528

# Transaction highlights and assumptions

**Consideration & pricing[1]**

- $54.20 of total consideration per MB Financial share (90% stock / 10% cash)
  - 1.450 FITB shares and $5.54 of cash per MBFI share
  - Total consideration of ~$4.7BN
- 9.6x P / 2019E EPS with fully phased-in cost savings, 16.4x P / 2019E EPS excluding cost savings
- 2.76x P / TBV

**Key assumptions**

- Cost savings equal to 45% of MB Financial's non-interest expense base or ~$255MM pre-tax on a fully phased-in basis
- Restructuring costs of ~$300MM after-tax
- Estimated gross credit mark of $236MM (~1.7% of current gross loans)
- CDI of 1.50% amortized over 10 years[2]
- Revenue synergies identified but not included in financial model

**Compelling strategic & financial opportunity**

- Opportunity for significant shareholder value creation
  - Accretive to ROA and ROTCE by ~12 bps & ~200 bps, respectively, and reduces efficiency ratio by ~400 bps through improved operating leverage
- Operating EPS accretion of ~2% in 2019 and nearly 7% in 2020
- IRR of ~18.5%
- TBVPS dilution of $1.43 or 7.7% with a crossover earnback of 6.8 years



Fifth Third Bancorp | All Rights Reserved

# Key executives, governance & approvals

| | |
|---|---|
| **Valuable additions to Fifth Third Management** | • Mitch Feiger to become Chairman and CEO of Fifth Third Chicago<br>• Other key members of the MB Financial leadership team will join Fifth Third |
| **Governance** | • Fifth Third Board of Directors to expand to 14 members through the addition of two directors from MB Financial |
| **Approvals** | • Subject to customary regulatory and shareholder approvals |



© Fifth Third Bancorp | All Rights Reserved

# Combination creates a leading Chicago franchise

## Pro forma branch footprint




## Leading Chicago market position

($ in billions)

| | Institution | Total Branches | Retail Deposits | Market Share |
|---|---|---|---|---|
| 1 | JPMorgan Chase | 368 | $49.4 | 24.7% |
| | Fifth Third (Pro Forma) | 239 | 19.4 | 9.7 |
| 2 | Bank of Montreal | 218 | 18.8 | 9.4 |
| 3 | Wintrust Financial | 135 | 17.5 | 8.8 |
| 4 | Bank of America | 156 | 15.5 | 7.7 |
| 5 | Citigroup | 81 | 11.0 | 5.5 |
| 6 | U.S. Bancorp | 173 | 10.6 | 5.3 |
| 7 | Fifth Third | 148 | 10.0 | 5.0 |
| 8 | First Midwest | 114 | 9.5 | 4.7 |
| 9 | PNC | 147 | 9.5 | 4.7 |
| 10 | MB Financial | 91 | 9.3 | 4.7 |

## Chicago middle market relationship share[2]






© Fifth Third Bancorp | All Rights Reserved



MCHUGH 01531

# Overview of MB Financial

## Company overview

- Founded in 1911, MB Financial is the 2nd largest independent community bank headquartered in Chicago with $20BN in assets and $15BN in deposits
- 91 locations predominantly in Cook and DuPage counties
- Commercially focused institution with a diversified loan portfolio and an attractive deposit franchise
- National lending & leasing businesses, ~$8BN AUM wealth management and diverse sources of recurring fee income
- Deep bench of highly experienced management team and relationship managers with local knowledge and strong customer relationships

## Financial highlights – 1Q18

| *Balance sheet ($BN)* | | *Performance metrics* | |
|---|---|---|---|
| Total assets | $20.2 | Efficiency ratio[1] | 65.6% |
| Total deposits | 15.0 | Fee income ratio | 37.7 |
| Total Loans[1] | 13.9 | Core ROAA | 1.17 |
| Loans / deposits | 93% | Core ROATCE | 13.6 |
| ***Capitalization*** | | ***Asset quality*** | |
| TCE / TA | 8.9% | NPAs / loans & REO | 0.52% |
| CET1 | 9.5 | NCOs / avg loans | 0.10 |

## Loan portfolio

*Commercial: 82%[1]*

*Consumer: 18%*

*Core Yield: 4.33%[2]*




## Deposit portfolio

*Noninterest-bearing: 43%*

*Cost: 0.41%*

*Non-time deposits: 83%*






© Fifth Third Bancorp | All Rights Reserved

# MB Financial – A premier Chicago commercial bank

## Consistent growth in profitability

*Operating earnings*

*22% CAGR through 1Q18*




## Commercial loan growth[2]

*12% CAGR through 1Q18*




## Strong credit quality

*NCOs / Avg. Loans*




## Awards & recognition

*MB won four Greenwich Middle Market Excellence awards in each of the last two years*

1) National Overall Satisfaction
2) National Cash Management
3) Midwest Overall Satisfaction
4) Midwest Cash Satisfaction

*Named one of the best mid-size employers in America and included in Forbes' list of America's 100 Best Banks*

*Received Five Top Workplaces awards (2011, 2012, 2013, 2014, 2017)*

8

© Fifth Third Bancorp | All Rights Reserved

MCHUGH 01533


Pro forma loan and deposit composition
FIFTH THIRD BANK
mb financial bank
Pro forma
Loans
CRE & Multifamily 7%
1-4 Family 17%
C&D 5%
Consumer 21%
C&I 50%
$92.7BN
Yield: 4.11%
CRE & Multifamily 29%
1-4 Family 10%
C&D 4%
Other 1%
Consumer 7%
C&I 49%
$13.9BN¹
Yield: 4.33%²
CRE & Multifamily 10%
1-4 Family 16%
C&D 5%
Consumer 19%
C&I 50%
$106.6BN
Yield: 4.14%²
Deposits
Retail Time 4%
Jumbo 2%
MMDA & Savings 33%
Transaction 61%
$105.5BN
Cost: 0.37%
Jumbo 3%
Retail Time 14%
MMDA & Savings 25%
Transaction 58%
$15.0BN
Cost: 0.41%
Retail Time 5%
Jumbo 2%
MMDA & Savings 32%
Transaction 61%
$120.5BN
Cost: 0.37%
9
© Fifth Third Bancorp | All Rights Reserved

# Opportunity to drive scale in an attractive market

## Chicago MSA overview

- The Chicago MSA is the 3rd largest in the U.S. with a population of 9.5 million people
- 31 Fortune 500 companies headquartered in the Chicago MSA with the vast majority of middle-market businesses in Cook and DuPage counties
- Attractive demographics relative to Fifth Third's overall footprint
- Transportation hub with the 3rd busiest U.S. airport

## Household income




## Projected household income growth




## Number of middle market firms




10

© Fifth Third Bancorp | All Rights Reserved

# Compelling cost savings opportunity

*($ pre-tax in millions)*

| *Identified opportunity* | *Estimated cost savings* |
|---|---|
| Compensation | $159 |
| Technology | 32 |
| Facilities | 28 |
| Other operating expenses | 36 |
| **Total estimated cost savings** | **$255** |

## Cost savings overview

- Identified expected net cost savings of $255 million with 50% achieved in 2019 and 100% thereafter
- ~45% of MB Financial's expense base[1]
- Consolidation of certain back office locations and ~20% of combined Chicago branches
  - 70% of MB Financial branches are within 2 miles of a Fifth Third branch, and 35% within 1 mile
- Personnel reductions to occur predominantly in non-client facing roles; expect to conduct "best of breed" review of all roles



© Fifth Third Bancorp | All Rights Reserved

# Capitalizes on complementary strengths across franchise

## What MB Financial offers

- Diversified revenue base
- Efficient origination model in business banking
- Successful products and services able to be leveraged throughout footprint, including:
  - Middle market banking franchise focused on smaller end of the market, including ABL
  - Specialized equipment leasing in technology, healthcare, and equipment handling, among other areas
  - Consumer banking products and services

## What Fifth Third offers

- Significant scale and range of products and services
- Robust capital markets capabilities
- Strong wealth & asset management teams
- Advanced treasury management products and services to appeal to middle market clients
- Innovative consumer payments and digital banking capabilities

***Leveraging a wider array of products and services to create strategic partnerships and generate higher returns***

12

© Fifth Third Bancorp | All Rights Reserved



MCHUGH 01537

# Enhances NorthStar targets

| | Current 4Q19 NorthStar targets | Fully phased-in transaction impact | Enhanced targets |
|---|---|---|---|
| ROTCE | 16+% | ~200bps | 18%+ |
| ROA | 1.25 - 1.35% | ~12bps | 1.35 – 1.50% |
| Efficiency | <60% | ~(400)bps | <56% |

***Combination allows Fifth Third to continue to return capital to shareholders consistent with recent levels[1]***

13

© Fifth Third Bancorp | All Rights Reserved

## Summary observations and takeaways

- **Strategically important acquisition**
  - Adds significant scale in a priority market and enhances product and service delivery to a larger number of clients
  - Builds upon strong commercial franchise with product expertise that can be deployed across a broader footprint
  - Compatible corporate cultures with focus on customers and the community
- **Financially attractive**
  - Substantial EPS accretion with improved profitability metrics above the previously-stated NorthStar targets
  - Identified and realizable cost savings with additional upside from revenue synergies
  - Internal rate of return in excess of alternative uses of capital
- **Low-risk integration**
  - In-market acquisition with familiar customer and product base
  - Thorough due-diligence process and clear integration plan
  - Led by senior management with significant technology experience



© Fifth Third Bancorp | All Rights Reserved

THIS IS BANKING ★ A FIFTH THIRD BETTER ★

15

Fifth Third Bank
Chicago MSA Market Share Report (%)

| | MB | Fifth Third | Total |
|---|---|---|---|
| 6/30/2018 | 3.79% | 2.83% | 6.62% |
| 6/30/2019 | 0.00% | 5.77% | 5.77% |
| 6/30/2020 | 0.00% | 5.63% | 5.63% |
| 6/30/2021 | 0.00% | 5.12% | 5.12% |
| 6/30/2022 | 0.00% | 5.04% | 5.04% |
| 6/30/2023 | 0.00% | 4.92% | 4.92% |
| 6/30/2024 | 0.00% | 4.89% | 4.89% |

PENGAD 800-631-6989
EXHIBIT
3

Home > Resources > Data Tools > BankFind Suite > Market Share

Help

< BankFind Suite Home

Back to SOD

# BankFind Suite: Summary of Deposits—Market Share Reports

Report Type

Deposit Market Share

Total = 586,919,168

Institution Type

Banks

BHCs

Reporting Period Ending

06/30/2024

Locations

Metropolitan Statistical Areas (MSA)

Chicago-Naperville-Elgin, IL-IN

Generate Report

## Deposit Market Share Results - 157 Matching Results

Selected Search Criteria

Hide

Reporting Period: 06/30/2024 MSA: Chicago-Naperville-Elgin, IL-IN

Results
25

1 2 3 4 5 6 7

Page #

Go

| | | Selected Market | | | Outside Selected Market | | | |
|---|---|---|---|---|---|---|---|---|
| Institution Name | CERT | Office Count | Total Deposits (Thousands USD) | Market Share (%) | Office Count | Total Deposits (Thousands USD) | Bank Class | Char |
| JPMorgan Chase Bank, National Association | 628 | 270 | 117,263,833 | 19.98% | 4,611 | 1,891,487,167 | N | Fede |
| BMO Bank National Association | 16571 | 184 | 107,449,136 | 18.31% | 849 | 99,354,090 | N | Fede |
| Bank of America, National Association | 3510 | 121 | 46,797,435 | 7.97% | 3,622 | 1,854,971,215 | N | Fede |
| CIBC Bank USA | 33306 | 19 | 41,299,219 | 7.04% | 5 | 2,492,596 | NM | Stat |
| The Northern Trust Company | 913 | 5 | 34,191,253 | 5.83% | 53 | 13,969,421 | SM | Stat |
| Fifth Third Bank, National Association | 6672 | 171 | 28,711,381 | 4.89% | 907 | 143,330,654 | N | Fede |
| PNC Bank, National Association | 6384 | 120 | 18,172,951 | 3.10% | 2,215 | 404,587,230 | N | Fede |
| Old National Bank | 3832 | 89 | 16,354,051 | 2.79% | 199 | 24,089,312 | N | Fede |
| Citibank, National Association | 7213 | 55 | 14,717,000 | 2.51% | 603 | 728,646,000 | N | Fede |
| U.S. Bank National Association | 6548 | 118 | 14,022,370 | 2.39% | 2,126 | 513,166,732 | N | Fede |
| The Huntington National Bank | 6560 | 130 | 9,667,307 | 1.65% | 888 | 149,559,224 | N | Fede |
| Wintrust Bank, National Association | 33935 | 35 | 8,297,727 | 1.41% | 0 | 0 | N | Fede |
| Wells Fargo Bank, National Association | 3511 | 8 | 7,927,595 | 1.35% | 4,296 | 1,395,269,405 | N | Fede |
| Byline Bank | 20624 | 49 | 7,260,687 | 1.24% | 1 | 116,007 | NM | Stat |
| Centier Bank | 12854 | 34 | 6,144,019 | 1.05% | 24 | 1,285,155 | NM | Stat |
| Lake Forest Bank & Trust Company, National Association | 27589 | 7 | 6,106,284 | 1.04% | 2 | 162,869 | N | Fede |
| Old Second National Bank | 3603 | 50 | 4,499,470 | 0.77% | 1 | 52,989 | N | Fede |

Home > Resources > Data Tools > BankFind Suite > Market Share

Help

< BankFind Suite Home

Back to SOD

# BankFind Suite: Summary of Deposits—Market Share Reports

**Report Type**

Deposit Market Share

$568,829,213

**Institution Type**

Banks

BHCs

**Reporting Period Ending**

06/30/2023

**Locations**

Metropolitan Statistical Areas (MSA)

Chicago-Naperville-Elgin, IL-IN

Generate Report

## Deposit Market Share Results - 158 Matching Results

**Selected Search Criteria**

Hide

Reporting Period: 06/30/2023 MSA: Chicago-Naperville-Elgin, IL-IN

Results
25

1 2 3 4 5 6 7

Page #

Go

| | | Selected Market | | | Outside Selected Market | | | |
|---|---|---|---|---|---|---|---|---|
| Institution Name | CERT | Office Count | Total Deposits (Thousands USD) | Market Share (%) | Office Count | Total Deposits (Thousands USD) | Bank Class | Char |
| JPMorgan Chase Bank, National Association | 628 | 285 | 126,917,183 | 22.31% | 4,590 | 1,941,124,817 | N | Fede |
| BMO Harris Bank National Association | 16571 | 188 | 94,700,364 | 16.65% | 857 | 107,536,790 | N | Fede |
| Bank of America, National Association | 3510 | 124 | 50,302,695 | 8.84% | 3,687 | 1,828,857,960 | N | Fede |
| CIBC Bank USA | 33306 | 19 | 37,664,533 | 6.62% | 5 | 2,361,287 | NM | Stat |
| Fifth Third Bank, National Association | 6672 | 172 | 27,969,139 | 4.92% | 910 | 141,678,181 | N | Fede |
| The Northern Trust Company | 913 | 5 | 26,778,028 | 4.71% | 53 | 12,719,044 | SM | Stat |
| Citibank, National Association | 7213 | 56 | 18,661,000 | 3.28% | 613 | 738,474,000 | N | Fede |
| PNC Bank, National Association | 6384 | 125 | 17,212,866 | 3.03% | 2,317 | 417,297,759 | N | Fede |
| Old National Bank | 3832 | 89 | 15,816,462 | 2.78% | 174 | 20,730,575 | N | Fede |
| U.S. Bank National Association | 6548 | 120 | 14,480,788 | 2.55% | 2,222 | 512,260,934 | N | Fede |
| The Huntington National Bank | 6560 | 134 | 8,957,514 | 1.57% | 917 | 143,089,483 | N | Fede |
| Wintrust Bank, National Association | 33935 | 35 | 7,821,185 | 1.37% | 0 | 0 | N | Fede |
| Wells Fargo Bank, National Association | 3511 | 8 | 7,109,994 | 1.25% | 4,543 | 1,353,105,002 | N | Fede |
| Byline Bank | 20624 | 41 | 5,846,761 | 1.03% | 1 | 89,743 | NM | Stat |
| Lake Forest Bank & Trust Company, National Association | 27589 | 7 | 5,586,070 | 0.98% | 2 | 126,820 | N | Fede |
| Centier Bank | 12854 | 34 | 5,375,221 | 0.94% | 22 | 983,170 | NM | Stat |
| Old Second National Bank | 3603 | 50 | 4,679,834 | 0.82% | 1 | 51,696 | N | Fede |

Home > Resources > Data Tools > BankFind Suite > Market Share

Help

< BankFind Suite Home

Back to SOD

# BankFind Suite: Summary of Deposits—Market Share Reports

Report Type

Deposit Market Share

$599,051,659

Institution Type

Banks

BHCs

Reporting Period Ending

06/30/2022

Locations

Metropolitan Statistical Areas (MSA)

Chicago-Naperville-Elgin, IL-IN-WI

Generate Report

## Deposit Market Share Results - 162 Matching Results

Selected Search Criteria

Hide

Reporting Period: 06/30/2022 MSA: Chicago-Naperville-Elgin, IL-IN-WI

Results

25

1 2 3 4 5 6 7

Page #

Go

| | | Selected Market | | | Outside Selected Market | | | |
|---|---|---|---|---|---|---|---|---|
| Institution Name | CERT | Office Count | Total Deposits (Thousands USD) | Market Share (%) | Office Count | Total Deposits (Thousands USD) | Bank Class | Char |
| Jpmorgan Chase Bank, National Association | 628 | 304 | 139,767,394 | 23.33% | 4,514 | 1,988,694,606 | N | Fede |
| Bmo Harris Bank National Association | 16571 | 193 | 85,668,751 | 14.30% | 326 | 47,660,001 | N | Fede |
| Bank of America, National Association | 3510 | 127 | 60,518,376 | 10.10% | 3,778 | 1,903,522,484 | N | Fede |
| The Northern Trust Company | 913 | 5 | 38,494,824 | 6.43% | 53 | 16,138,652 | SM | Stat |
| Cibc Bank Usa | 33306 | 19 | 35,061,375 | 5.85% | 3 | 3,129,104 | NM | Stat |
| Fifth Third Bank, National Association | 6672 | 173 | 30,208,931 | 5.04% | 917 | 136,368,027 | N | Fede |
| Citibank, National Association | 7213 | 57 | 21,516,000 | 3.59% | 620 | 741,790,000 | N | Fede |
| PNC Bank, National Association | 6384 | 130 | 17,950,129 | 3.00% | 2,487 | 428,730,918 | N | Fede |
| U.S. Bank National Association | 6548 | 128 | 14,974,140 | 2.50% | 2,123 | 440,337,037 | N | Fede |
| Old National Bank | 3832 | 92 | 14,867,580 | 2.48% | 180 | 21,199,754 | N | Fede |
| Wells Fargo Bank, National Association | 3511 | 9 | 9,257,435 | 1.55% | 4,757 | 1,432,776,565 | N | Fede |
| The Huntington National Bank | 6560 | 142 | 9,112,151 | 1.52% | 938 | 139,577,744 | N | Fede |
| Wintrust Bank, National Association | 33935 | 35 | 7,879,261 | 1.32% | 0 | 0 | N | Fede |
| Lake Forest Bank & Trust Company, National Association | 27589 | 7 | 6,603,815 | 1.10% | 1 | 103,572 | N | Fede |
| Byline Bank | 20624 | 41 | 5,359,215 | 0.89% | 1 | 59,645 | NM | Stat |
| Old Second National Bank | 3603 | 53 | 5,296,213 | 0.88% | 1 | 57,654 | N | Fede |
| Centier Bank | 12854 | 36 | 4,443,541 | 0.74% | 23 | 948,375 | NM | Stat |

MCHUGH 01563

Home > Resources > Data Tools > BankFind Suite > Market Share

Help

BankFind Suite Home

Back to SOD

# BankFind Suite: Summary of Deposits—Market Share Reports

**Report Type**

Deposit Market Share

568,238,769

**Institution Type**

Banks

BHCs

**Reporting Period Ending**

06/30/2021

**Locations**

Metropolitan Statistical Areas (MSA)

Chicago-Naperville-Elgin, IL-IN-WI

Generate Report

## Deposit Market Share Results - 168 Matching Results

Selected Search Criteria

Hide

Reporting Period: 06/30/2021 MSA: Chicago-Naperville-Elgin, IL-IN-WI

Results
25 ▾

‹ 1 2 3 4 5 6 7 ›

Page #

Go

| | | Selected Market | | | Outside Selected Market | | | |
|---|---|---|---|---|---|---|---|---|
| Institution Name | CERT | Office Count | Total Deposits (Thousands USD) | Market Share (%) | Office Count | Total Deposits (Thousands USD) | Bank Class | Char |
| Jpmorgan Chase Bank, National Association | 628 | 315 | 131,154,903 | 23.08% | 4,609 | 1,880,189,097 | N | Fede |
| Bmo Harris Bank National Association | 16571 | 205 | 85,952,486 | 15.13% | 339 | 48,345,906 | N | Fede |
| Bank of America, National Association | 3510 | 136 | 48,004,985 | 8.45% | 4,079 | 1,823,207,790 | N | Fede |
| The Northern Trust Company | 913 | 5 | 38,407,541 | 6.76% | 50 | 14,940,117 | SM | Stat |
| Cibc Bank Usa | 33306 | 22 | 32,213,034 | 5.67% | 4 | 3,512,429 | NM | Stat |
| Fifth Third Bank, National Association | 6672 | 173 | 29,080,149 | 5.12% | 937 | 139,721,279 | N | Fede |
| Citibank, National Association | 7213 | 57 | 19,601,000 | 3.45% | 622 | 684,347,000 | N | Fede |
| PNC Bank, National Association | 6384 | 136 | 17,703,227 | 3.12% | 2,010 | 350,875,106 | N | Fede |
| First Midwest Bank | 3709 | 95 | 15,243,240 | 2.68% | 14 | 2,167,230 | SM | Stat |
| U.S. Bank National Association | 6548 | 131 | 13,868,822 | 2.44% | 2,188 | 408,903,484 | N | Fede |
| Wells Fargo Bank, National Association | 3511 | 9 | 11,998,369 | 2.11% | 4,980 | 1,453,952,369 | N | Fede |
| The Huntington National Bank | 6560 | 147 | 9,919,727 | 1.75% | 1,144 | 137,623,351 | N | Fede |
| Wintrust Bank, National Association | 33935 | 36 | 7,583,304 | 1.33% | 0 | 0 | N | Fede |
| Byline Bank | 20624 | 47 | 5,088,467 | 0.90% | 1 | 67,467 | NM | Stat |
| Lake Forest Bank & Trust Company, National Association | 27589 | 7 | 4,611,452 | 0.81% | 1 | 79,951 | N | Fede |
| Centier Bank | 12854 | 37 | 4,148,269 | 0.73% | 23 | 827,962 | NM | Stat |
| First American Bank | 3657 | 51 | 3,834,251 | 0.67% | 8 | 729,793 | NM | Stat |

Home > Resources > Data Tools > BankFind Suite > Market Share

Help

< BankFind Suite Home

Back to SOD

# BankFind Suite: Summary of Deposits—Market Share Reports

Report Type

Deposit Market Share

516,407,537

Institution Type

Banks

BHCs

Reporting Period Ending

06/30/2020

Locations

Metropolitan Statistical Areas (MSA)

Chicago-Naperville-Elgin, IL-IN-WI

Generate Report

## Deposit Market Share Results - 172 Matching Results

Selected Search Criteria

Hide

Reporting Period: 06/30/2020 MSA: Chicago-Naperville-Elgin, IL-IN-WI

Results

25

1 2 3 4 5 6 7

Page #

Go

| | | Selected Market | | | Outside Selected Market | | | |
|---|---|---|---|---|---|---|---|---|
| Institution Name | CERT | Office Count | Total Deposits (Thousands USD) | Market Share (%) | Office Count | Total Deposits (Thousands USD) | Bank Class | Char |
| Jpmorgan Chase Bank, National Association | 628 | 328 | 111,639,686 | 21.62% | 4,653 | 1,594,641,314 | N | Fede |
| Bmo Harris Bank National Association | 16571 | 205 | 83,651,475 | 16.20% | 341 | 45,167,387 | N | Fede |
| Bank of America, National Association | 3510 | 139 | 46,345,193 | 8.97% | 4,114 | 1,682,755,576 | N | Fede |
| The Northern Trust Company | 913 | 6 | 34,446,777 | 6.67% | 50 | 12,913,766 | SM | Stat |
| Fifth Third Bank, National Association | 6672 | 185 | 29,088,276 | 5.63% | 951 | 133,356,564 | N | Fede |
| Cibc Bank Usa | 33306 | 20 | 27,228,225 | 5.27% | 4 | 2,772,228 | NM | Stat |
| PNC Bank, National Association | 6384 | 138 | 16,277,060 | 3.15% | 2,187 | 321,808,959 | N | Fede |
| Citibank, National Association | 7213 | 61 | 15,255,000 | 2.95% | 649 | 648,807,000 | N | Fede |
| First Midwest Bank | 3709 | 112 | 13,930,627 | 2.70% | 14 | 1,908,345 | SM | Stat |
| U.S. Bank National Association | 6548 | 142 | 12,809,540 | 2.48% | 2,632 | 385,643,175 | N | Fede |
| Wells Fargo Bank, National Association | 3511 | 10 | 8,871,972 | 1.72% | 5,401 | 1,456,035,028 | N | Fede |
| TCF National Bank | 28330 | 113 | 7,422,781 | 1.44% | 408 | 31,997,172 | N | Fede |
| Wintrust Bank, National Association | 33935 | 34 | 7,313,131 | 1.42% | 0 | 0 | N | Fede |
| Byline Bank | 20624 | 60 | 4,911,584 | 0.95% | 1 | 110,208 | NM | Stat |
| Lake Forest Bank & Trust Company, National Association | 27589 | 9 | 3,977,659 | 0.77% | 1 | 76,992 | N | Fede |
| Associated Bank, National Association | 5296 | 25 | 3,758,111 | 0.73% | 229 | 22,832,219 | N | Fede |
| First American Bank | 3657 | 51 | 3,731,833 | 0.72% | 8 | 626,320 | NM | Stat |

Help

< BankFind Suite Home

Back to SOD

# BankFind Suite: Summary of Deposits—Market Share Reports

Report Type

Deposit Market Share $ 415,679,774

Institution Type

Banks

BHCs

Reporting Period Ending

06/30/2019

Locations

Metropolitan Statistical Areas (MSA)

Chicago-Naperville-Elgin, IL-IN-WI

Generate Report

## Deposit Market Share Results - 180 Matching Results

Selected Search Criteria

Hide

Reporting Period: 06/30/2019 MSA: Chicago-Naperville-Elgin, IL-IN-WI

Results

25

1 2 3 4 5 … 8

Page #

Go

| | | Selected Market | | | Outside Selected Market | | | |
|---|---|---|---|---|---|---|---|---|
| Institution Name | CERT | Office Count | Total Deposits (Thousands USD) | Market Share (%) | Office Count | Total Deposits (Thousands USD) | Bank Class | Clas |
| JPMorgan Chase Bank, National Association | 628 | 342 | 87,840,179 | 21.13% | 4,682 | 1,223,378,821 | N | Fede |
| BMO Harris Bank National Association | 16571 | 214 | 63,390,597 | 15.25% | 376 | 37,623,996 | N | Fede |
| Bank of America, National Association | 3510 | 154 | 35,572,365 | 8.56% | 4,182 | 1,318,114,440 | N | Fede |
| Fifth Third Bank | 6672 | 233 | 23,967,415 | 5.77% | 991 | 105,954,858 | SM | Stat |
| The Northern Trust Company | 913 | 7 | 23,216,879 | 5.59% | 49 | 11,333,070 | SM | Stat |
| CIBC Bank USA | 33306 | 20 | 20,107,899 | 4.84% | 4 | 2,290,472 | NM | Stat |
| Citibank, National Association | 7213 | 61 | 14,071,000 | 3.39% | 650 | 536,706,000 | N | Fede |
| PNC Bank, National Association | 6384 | 140 | 13,468,089 | 3.24% | 2,258 | 255,941,145 | N | Fede |
| First Midwest Bank | 3709 | 115 | 12,629,974 | 3.04% | 10 | 736,854 | SM | Stat |
| U.S. Bank National Association | 6548 | 150 | 11,969,510 | 2.88% | 2,829 | 330,683,183 | N | Fede |
| Wells Fargo Bank, National Association | 3511 | 11 | 7,509,449 | 1.81% | 5,558 | 1,283,625,551 | N | Fede |
| TCF National Bank | 28330 | 125 | 6,730,771 | 1.62% | 205 | 12,573,388 | N | Fede |
| Wintrust Bank | 33935 | 32 | 5,374,437 | 1.29% | 0 | 0 | SM | Stat |
| Associated Bank, National Association | 5296 | 25 | 4,811,685 | 1.16% | 230 | 20,500,666 | N | Fede |
| Byline Bank | 20624 | 64 | 3,937,125 | 0.95% | 1 | 129,417 | NM | Stat |
| First American Bank | 3657 | 51 | 3,364,392 | 0.81% | 3 | 228,235 | NM | Stat |
| Lake Forest Bank & Trust Company, National Association | 27589 | 9 | 3,292,344 | 0.79% | 1 | 50,425 | N | Fede |

# BankFind Suite: Summary of Deposits—Market Share Reports

Report Type

Deposit Market Share $398,014,514

Institution Type

Banks

BHCs

Reporting Period Ending

06/30/2018

Locations

Metropolitan Statistical Areas (MSA)

Chicago-Naperville-Elgin, IL-IN-WI

Generate Report

## Deposit Market Share Results - 189 Matching Results

Selected Search Criteria

Hide

Reporting Period: 06/30/2018 MSA: Chicago-Naperville-Elgin, IL-IN-WI

Results
25

1 2 3 4 5 ... 8

Page #

Go

| | | Selected Market | | | Outside Selected Market | | | |
|---|---|---|---|---|---|---|---|---|
| Institution Name | CERT | Office Count | Total Deposits (Thousands USD) | Market Share (%) | Office Count | Total Deposits (Thousands USD) | Bank Class | Char |
| JPMorgan Chase Bank, National Association | 628 | 361 | 89,018,884 | 22.37% | 4,786 | 1,185,072,116 | N | Fede |
| BMO Harris Bank National Association | 16571 | 215 | 49,525,793 | 12.44% | 379 | 34,049,095 | N | Fede |
| Bank of America, National Association | 3510 | 156 | 34,090,946 | 8.57% | 4,318 | 1,278,609,653 | N | Fede |
| The Northern Trust Company | 913 | 9 | 24,898,673 | 6.26% | 50 | 10,504,406 | SM | Stat |
| CIBC Bank USA | 33306 | 19 | 16,358,232 | 4.11% | 4 | 2,140,119 | NM | Stat |
| Citibank, National Association | 7213 | 61 | 15,621,000 | 3.92% | 655 | 494,350,000 | N | Fede |
| MB Financial Bank, National Association | 3628 | 92 | 15,088,310 | 3.79% | 0 | 0 | N | Fede |
| PNC Bank, National Association | 6384 | 142 | 13,279,278 | 3.34% | 2,340 | 248,897,071 | N | Fede |
| U.S. Bank National Association | 6548 | 170 | 12,106,458 | 3.04% | 2,958 | 308,846,407 | N | Fede |
| Fifth Third Bank | 6672 | 145 | 11,252,295 | 2.83% | 1,028 | 96,913,904 | SM | Stat |
| First Midwest Bank | 3709 | 115 | 10,878,658 | 2.73% | 13 | 787,201 | SM | Stat |
| Wells Fargo Bank, National Association | 3511 | 11 | 8,153,568 | 2.05% | 5,860 | 1,261,844,432 | N | Fede |
| TCF National Bank | 28330 | 125 | 6,584,483 | 1.65% | 208 | 11,927,649 | N | Fede |
| Associated Bank, National Association | 5296 | 25 | 4,813,064 | 1.21% | 222 | 19,095,884 | N | Fede |
| Wintrust Bank | 33935 | 28 | 4,577,314 | 1.15% | 0 | 0 | SM | Stat |
| Byline Bank | 20624 | 62 | 3,518,206 | 0.88% | 1 | 145,333 | NM | Stat |
| Centier Bank | 12854 | 40 | 2,905,933 | 0.73% | 20 | 414,461 | NM | Stat |

# High-quality deposit franchise

## Deposit trend vs. peers and H8

Average total deposits indexed to 100; non-seasonally adjusted total deposits




## Fifth Third continues to outpace the industry in deposit share growth[1]

*Deposit share rankings*

**#2 Midwest** unchanged YoY

**#6 Southeast** unchanged YoY

- Approaching target locational share in key SE MSAs of focus

*Significant locational share improvement since 2018 in key SE MSAs*

| | 2018 | 2024 |
|---|---|---|
| Naples, FL | #2 | #1 |
| Fort Myers, FL | #4 | #2 |
| Nashville, TN | #6 | #3 |
| Charlotte, NC | #5 | #4 |
| Raleigh-Durham, NC | #15 | #4 |

## Commercial and consumer deposit franchise highlights

*Consumer franchise*

- >80% of balances from clients with 5+ year tenure
- Average age of household: ~13 years
- 1.5 million Momentum Households (~60% of total)

*Commercial franchise*

- 94% of balances represented by relationships that utilized Treasury Management services
- Balanced-weighted relationship age of ~24 years
- Median relationship deposit balance of ~$401K

## Continued investment in the southeast

Branch network mix






MCHUGH 01572

# Maintaining top quartile deposit density while expanding branch network in the Southeast

Deposit density market rank[1]




We continue to focus on achieving a top 5 rank in the MSAs we serve

# EXHIBIT 4

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

≡

Newsletters

Good Morning, Joshua

Finance & Banking

# Fifth Third bankers' exodus to rivals picks up speed

In the biggest mass movement of bankers in years, more than 30 bankers formerly with acquired MB Financial have decamped for BMO Harris. And an MB veteran has been brought in to stem the defections.

By Steve Daniels

Gift Article




Credit: Bloomberg

Reprints Share

October 03, 2019 03:51 PM

Fifth Third Bank's big bet on Chicago via its $3.5 billion purchase of MB Financial is looking shakier.

More than 30 former MB Financial bankers left Fifth Third for BMO Harris Bank over the past few months in one of the largest mass migrations of business bankers in the industry's recent Chicago history, sources say.

---

**Earlier** →

EXHIBIT
5
PENGAD 800-631-6989

MCHUGH 01554

**Fifth Third-MB merger fallout has competing bankers licking their chops**

In that time frame, about 20 others split in smaller groups for Wintrust Financial of Rosemont, Chicago's First Midwest and Chicago-based Byline Bank. Combined with the 20 or so who have left to join former American Chartered Bank President Dan Miller at First National Bank of Ottawa, at least 70 bankers have exited since Cincinnati-based Fifth Third announced its MB Financial acquisition in May 2018.

Fifth Third has brought back a key reinforcement from the old MB Financial. Mark Hoppe, who was president of MB Financial Bank, was named Fifth Third's regional president for the Chicago market in July, Fifth Third confirms. The announcement was made only internally at the time. Hoppe had been employed at Fifth Third following the deal for MB Financial, but before the July elevation wasn't involved in day-to-day management.

ADVERTISING

Hoppe is reporting to Chicago Chairman and CEO Mitch Feiger just as he did at MB Financial, Fifth Third spokesman Larry Magnesen says. Hoppe's return has led to widespread market speculation that Feiger is retiring —something Magnesen says isn't true.

"Mitch Feiger is at the bank on a daily basis, runs our management committee and oversees our executive leadership," Magnesen writes in an email. "Mark Hoppe reports directly to Mitch and invests the majority of his time working with our commercial banking team and our most important clients."

One of Hoppe's key jobs, sources inside and outside of Fifth Third say, is to stem the banker defections. In this high-touch business, the loss of relationship managers after a merger often leads to the departure of business clients, who follow their old bankers to their new banks.

For Fifth Third, the deal for MB Financial was sold to investors as the key to addressing its difficulty over many years to gain traction in Chicago's vast business-lending market. Following the deal, Chicago overtook Fifth Third's home turf of Cincinnati as its largest single market. But Fifth Third's stock sunk after the deal's announcement, and investors have taken a wait-and-see stance since.

Of the defections so far, the mass move to BMO Harris has been most alarming to Fifth Third leadership, these sources say. The leaders of that group of former MB Financial bankers are John Kolbus and Steve Fansler, both of whom have been named managing directors at BMO Harris. They report to Ray Whitacre, BMO Harris' head of U.S. diversified industries, effectively the executive in charge of commercial banking for the second-largest business bank in Chicago.

That BMO Harris is causing the most headaches so far for Fifth Third is interesting given that MB Financial spurned a higher offer from BMO Harris to sell to Fifth Third. Depending on how the new bankers perform, this could be a far cheaper way for BMO Harris to add market share than the billions it was prepared to shell out for the prize.

BMO Harris expects the new blood to be a difference-maker in competing more effectively for the Chicago area's many midsize companies between $20 million and $50 million in revenue. BMO Harris' market share among that group isn't as strong as with larger private companies — $100 million or more.

"We have a very high regard for these bankers, some of whom we've known and competed against for over 20 years, and we're delighted that they've chosen BMO Harris as the best place for them to be successful in the highly competitive Chicago marketplace," Whitacre said in an email.

Says Fifth Third's Magnesen, "Highly qualified, experienced middle-market bankers are always in demand and are actively recruited by competitors. The numbers you provided to us include individuals we did not retain as part of our merger plan who have now found roles elsewhere. Fifth Third still has one of the largest groups of experienced and talented commercial bankers dedicated to the Chicago market. Fifth Third is fully committed to the Chicago market and we fully expect to maintain our market-leading position. To date, we also have not experienced any material client attrition since the merger."

Client attrition, if it happens, typically lags the movement of relationship managers. The bankers are subject to contracts barring them for a period (often a year) from soliciting their former clients.

Memories remain fresh of the mass migration of former LaSalle Bank lenders to PrivateBancorp and Cole Taylor after the 2007 purchase of LaSalle by Charlotte, N.C.-based Bank of America. In the first two years following the banker exodus, both Chicago banks grew fast — particularly PrivateBancorp — largely due to business clients leaving Bank of America and rejoining their old bankers.

Cole Taylor ultimately sold to MB Financial in 2014. The group of bankers who recently joined BMO Harris are mainly alums of Cole Taylor. The most senior of them participated in that original migration from LaSalle Bank and, after two separate deals forcing them to adjust to new company cultures, evidently sought a platform that was highly unlikely to be sold. BMO Harris, the U.S. arm of Toronto-based BMO Financial Group, fits that bill.

"There's a long list of Chicago banks that have benefited from market disruption," says Terry McEvoy, an analyst at Stephens.

Will Fifth Third be yet another cautionary tale for out-of-town banks seeking front-line status in the nation's third-largest market via a splashy acquisition? Competing bankers already think so. Wall Street is concerned.

"MB Financial was viewed as an acquisition that would help Fifth Third with a more consistent strategy in the Chicago market," McEvoy says. "The departure of bankers in any transaction is expected, but should the number continue to grow, investors may begin to question the merits of the deal."

**More →**

# EXHIBIT 6

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 7

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

Newsletters

Good Morning, Caroline

Subscribe

EXHIBIT 8

PENGAD 800-631-6989

Finance & Banking

# Fifth Third inherits $400 million headache

A federal lawsuit, first filed in 2014 and unsealed only now, alleges MB Financial, acquired last year by Fifth Third, defrauded the FDIC in its treatment of loans acquired from failed Broadway Bank.

By Steve Daniels

Gift Article




Credit: Bloomberg

Reprints Share

July 22, 2020 06:52 PM

Fifth Third Bank has inherited an unwelcome legacy of its acquisition of Chicago's MB Financial — a $400 million lawsuit, first filed six years ago.

The complaint was filed in federal court in New York by a whistleblower alleging MB Financial defrauded the Federal Deposit Insurance Corp. by improperly collecting hundreds of millions under

MCHUGH 01574

an agreement with the agency after it took over failed Broadway Bank in 2010 and sold the deposits and assets to MB Financial.

**More →**

**Citadel Securities pays $700,000 fine**

**Banking vet Mitch Feiger stepping down as Fifth Third Chicago chair**

Sign up for Today's Crain's: A free roundup of Chicago business news delivered every weekday afternoon.

Subscribe

The lawsuit was sealed until July 20, six years after it was first filed. Federal officials took those six years to determine they wouldn't handle the litigation themselves, a decision they reached last month.

That left plaintiff Lee Moncho, a former Broadway Bank borrower, to pursue the lawsuit, and his attorneys at Davis & Gilbert in New York are doing that. Federal prosecutors in New York's Southern District are free to join later if they choose under the federal law that enables whistleblowers like Moncho to sue defendants they claim have defrauded the feds.

ADVERTISING




MB Financial is alleged in the complaint to have collected money from the FDIC under a "loss-share" agreement with the agency, which promised to absorb most of the bank's losses tied to resolving soured loans of Chicago's Broadway Bank. Much of that money, the complaint alleged, was for loans that Broadway never made, already had been paid off or otherwise were no longer in its portfolio.

The FDIC suffered at least $400 million in losses due to MB Financial's actions, damages that can potentially be tripled under the False Claims Act, which MB is alleged to have violated, according to the complaint. That raises potential damages to well over $1 billion.

"Rather than notify the FDIC that these 'loans' never should have been included in the portfolio of Broadway Bank loans, MB Financial included them all in the write-downs reported to the FDIC which then paid MB Financial hundreds of millions of dollars under the shared-losses agreement," the complaint stated. "In addition, MB Financial failed to inform the FDIC in its quarterly reports of funds it had received in connection with certain of its loans that would have required MB Financial to reimburse the FDIC."

A Fifth Third spokesman declined to comment, saying the bank was reviewing the lawsuit. Cincinnati-based Fifth Third's $4.7 billion purchase of MB Financial closed just last year.

The unsealing of the suit comes at a somewhat awkward time, since Fifth Third named former MB Financial CEO Mitch Feiger to its board just last month. Feiger ran MB Financial for decades, including the years the lawsuit references. He retired as Fifth Third's chairman for the Chicago market at the end of May and joined the board a few weeks later.

Assuming the lawsuit moves into discovery, it's practically a sure bet that Feiger will have to testify under oath in a deposition about the Broadway Bank loans.

Broadway Bank was its own scandal more than a decade ago. Owned by the Giannoulias family, the bank for years was one of the top-earning lenders in the entire state, thanks to high-rate loans to developers during the latter stages of the real estate bubble. The loans mainly were funded with "hot money" deposits from investors. The family extracted tens of millions in dividends just before the housing bust took down the bank.

The scandal helped to torpedo the 2010 bid by former state Treasurer Alexi Giannoulias to defeat U.S. Sen. Mark Kirk. Kirk, an Illinois Republican, was defeated six years later by current U.S. Sen. Tammy Duckworth, who is reported to be on Joe Biden's short list for his running mate.

After winning the FDIC's auction for the assets of Broadway Bank, MB Financial knew that about 50 of the loans it had acquired had no collateral files, according to the complaint. The loans were on properties located in Chicago, but also in markets like New York and Miami. Though relatively small at about $1 billion in assets, Broadway, as well as other entities controlled by the Giannoulias family, made commercial real estate loans all over the country.

"These 'loans' included loans that had been fully paid off and the collateral released, loans that had been sold to third parties by Broadway Bank, loans that were joint ventures and were not directly secured by any real estate, loans that were never made by Broadway Bank and construction loans and lines of credit that had never been drawn down," the complaint stated.

The lawsuit accused MB Financial of depicting these loans to the FDIC as qualified for reimbursement under its loss-share agreement and collecting accordingly.

Plaintiff Moncho, a Connecticut resident, said in the complaint, "It was in connection with MB Financial's attempt to seize Moncho's commercial real estate (in New York), though it knew it was not the actual lender, that the much larger scheme to defraud the FDIC became evident."

Under the federal whistleblower law, Moncho stands to collect up to 30 percent of any damages if, as is currently the case, the federal government doesn't pursue the issue itself. It would be a smaller percentage if the government decides later to take over the case.

By Steve Daniels

---

Fifth Third Bancorp, MB Financial, Mitchell Feiger, Broadway Bank, Alexi Giannoulias, Banking, Federal Deposit Insurance Corp., U.S. Attorney, Law and Legal Issues, Homepage

## More in Finance & Banking →




**Proposal calls for Illinois to create its own CFPB as federal agency is gutted**

The bill from Illinois Sen. Mark Walker already faces pushback from a state banking association, which says patchwork efforts at financial regulation could create confusion.



**GTCR raises $3.6 billion for latest private-equity fund**

The Chicago-based firm said it will use the money to make $50 million to $250 million investments in lower-and middle-market companies.




**Kinzie Capital buys Fraser Steel in private-equity deal**

The acquisition is the Chicago private-equity firm's fifth platform investment and its first since February 2024.

# EXHIBIT 9

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

FIFTH THIRD BANK

# Unanimous Written Consent: Officer Appointment

October 21, 2020

PENGAD 800-631-6989
EXHIBIT
10

Classification: Restricted

FIFTH THIRD BANK

Fifth Third Bancorp & Fifth Third Bank, N.A.

## Board of Directors

### Unanimous Written Consent: Officer Appointment

TABLE OF CONTENTS

CEO Note Regarding Officer Appointment

Press Release

Unanimous Written Consent: Board of Directors*

* *Denotes items requiring unanimous written consent.*

FIFTH THIRD BANK
OFFICE OF THE SECRETARY

FIFTH THIRD BANK

Dear Board Members:

As previously discussed in our talent management and succession planning sessions, we are executing on the plan to promote Tim Spence to President. The lines of business, regional banking and strategic planning will now report to Tim. We plan to announce this on Monday, October 26. Attached is a draft of the external release.

As Bob Shaffer and I discussed with you at the September Board meeting, we believed that Phil McHugh could be at risk with Tim's promotion. And, in fact, Phil has decided not to accept the role of Head of Consumer and Business Banking and is leaving the company. This is unfortunate as this is one of the largest roles we have. However, we have a very capable leader, Howard Hammond, who will serve as the interim Head of Consumer and Business Banking. Howard currently leads our Retail Banking business and Fifth Third Securities. As Howard has the opportunity to work in this role, we will also test the market and conduct an external search for this position.

Included with this message is a request for unanimous consent to approve the promotion of Tim to President. I appreciate your prompt approval as we will be announcing his promotion on Monday morning. I am very excited for Tim and look forward to working with him as he further develops in his new role. Please let me know if you have any questions.

Thanks,

Greg

© Fifth Third Bank | All Rights Reserved | For Internal Use Only

Classification: Restricted

FIFTH THIRD BANCORP
NEWS RELEASE

*DRAFT 10/21/20*

CONTACTS
Ed Loyd (Media Relations)
email.address@53.com | 123-456-7890
Chris Doll (Investor Relations)
Christopher.Doll@53.com | 513-534-2345

October 26, 2020

## Fifth Third Announces Appointment of Timothy N. Spence as President

CINCINNATI – Fifth Third Bancorp (Nasdaq: FITB) today announced the appointment of Tim Spence as president. His promotion will support the Company's ongoing successful execution of its strategic initiatives and further strengthen its position as a leading regional bank.

In his new role, effective immediately, Spence will oversee all business lines and regional banking, while continuing his leadership of the Bank's strategy. It was Spence's strength in strategy that first brought him to Fifth Third in 2015. He led that area as chief strategy officer and then advanced in 2017 to head consumer banking and payments as well. Before joining Fifth Third, Spence was a senior partner in the financial services practice at Oliver Wyman, a global strategy and risk management consulting firm. Spence will continue to report to Greg Carmichael, the Company's chairman and chief executive officer.

"Tim has demonstrated extraordinary leadership and vision in driving the strategy and execution to transform Fifth Third through innovation and technology," said Carmichael. "Over the past several years, he has been a principal architect and catalyst of many of the Company's most important strategic initiatives. Those initiatives include organic growth investments, numerous partnerships with fintechs and other third parties, and the 2019 acquisition of MB Financial Inc. in Chicago – a move that dramatically changed the competitive landscape and positioned us for success in one of our most important markets. Tim is keenly focused on solutions that enable Fifth Third to best serve our customers – from individuals to small and large businesses – and help them achieve their goals."

Spence long has been heralded for his commitment to innovation and has helped the Bank significantly advance its digital transformation. In 2018, American Banker recognized him as Digital Banker of the Year, an award whose past honorees have included forward-thinking leaders from the nation's largest financial institutions. In addition to recognizing his many achievements to date, that award highlighted his customer-centric approach, which has been the hallmark of Spence's banking career.

Originally from the Pacific Northwest, Spence and his family make their home in Cincinnati. Spence devotes time to several local community and economic development organizations, including serving on the executive committee of the board at Cintrifuse, a public-private partnership that exists to build a sustainable tech-based economy in Greater Cincinnati, on the advisory board for Miami University's Altman Institute for Entrepreneurship, and as member and co-chair of the commerce committee for the

Confidential - Internal Use



Confidential

FIFTH THIRD BANCORP
NEWS RELEASE

Cincinnati Chamber's RESTART Taskforce. He also serves as a board member for the Consumer Bankers Association.

**About Fifth Third**

Fifth Third Bancorp is a diversified financial services company headquartered in Cincinnati, Ohio, and the indirect parent company of Fifth Third Bank, National Association, a federally chartered institution. As of September 30, 2020, the Company had $202 billion in assets and operates 1,122 full-service Banking Centers, and 2,414 Fifth Third branded ATMs in Ohio, Kentucky, Indiana, Michigan, Illinois, Florida, Tennessee, West Virginia, Georgia, North Carolina and South Carolina. In total, Fifth Third provides its customers with access to approximately 52,000 fee-free ATMs across the United States. Fifth Third operates four main businesses: Commercial Banking, Branch Banking, Consumer Lending, and Wealth & Asset Management. Fifth Third is among the largest money managers in the Midwest and, as of September 30, 2020, had $427 billion in assets under care, of which it managed $53 billion for individuals, corporations and not-for-profit organizations through its Trust and Registered Investment Advisory businesses. Investor information and press releases can be viewed at www.53.com. Fifth Third's common stock is traded on the NASDAQ® Global Select Market under the symbol "FITB."

# # #

Classification: Internal Use

**FIFTH THIRD BANCORP**

**UNANIMOUS WRITTEN CONSENT OF THE BOARDS OF DIRECTORS APPOINTING PRESIDENT**

**October 26, 2020**

The undersigned, being all of the Directors of Fifth Third Bancorp, an Ohio Corporation ("Bancorp"), in accordance with Section 1701.54 of the Ohio Revised Code, do hereby authorize, consent, and agree to the adoption, without a meeting, of the following resolutions through this unanimous written consent (this "Consent"), effective as of the date first set forth above:

**WHEREAS,** the members of the Board, in connection with succession and leadership planning, have discussed potential promotions and appointments to senior officer positions of Bancorp at previous meetings;

**WHEREAS,** the members of the Board have determined that it is appropriate to implement one such promotion and appointment at this time;

**NOW, THEREFORE**, it is hereby:

**OFFICER APPOINTMENT**

**RESOLVED**, that Timothy N. Spence be promoted and appointed to the position of President of Bancorp;

**GENERAL RESOLUTIONS**

**RESOLVED FURTHER,** that the officers of the Bancorp be, and each are hereby, authorized, directed and empowered to perform any and all other acts and things as in such officer's opinion may be necessary or appropriate in order to carry out the intent and purposes of the foregoing resolution with respect to the Bancorp; and

**RESOLVED FURTHER,** that any act of any Director or officer of the Bancorp and of any person designated or authorized to act by any officer of the Bancorp, which act would have been authorized by the foregoing resolutions except that such act was taken prior to the adoption of such resolutions is hereby ratified, confirmed, approved, and adopted as the act of the Bancorp.

[Remainder of page intentionally left blank. Signature page follows.]

In Witness Whereof, the undersigned Directors have executed this signature page as of the date first set forth above in this Unanimous Written Consent.

Nicholas K. Akins October 22, 2020 3:38 PM

B. Evan Bayh III October 22, 2020 9:58 AM

Jorge L. Benitez October 22, 2020 6:27 AM

Katherine B. Blackburn October 21, 2020 3:05 PM

Emerson L. Brumback October 22, 2020 9:22 AM

Greg D. Carmichael October 22, 2020 8:41 AM

Linda W. Clement-Holmes October 21, 2020 2:57 PM

C. Bryan Daniels October 21, 2020 7:07 PM

Mitchell S. Feiger October 22, 2020 4:25 PM

Thomas H. Harvey October 21, 2020 11:04 PM

Gary R. Heminger October 22, 2020 6:00 PM

Jewell D. Hoover October 21, 2020 7:25 PM

Eileen L. Mallesch October 21, 2020 8:04 PM

Michael B. McCallister October 22, 2020 12:49 PM

Marsha C. Williams October 21, 2020 7:01 PM

Classification: Restricted



Confidential