UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

PHILIP R. MCHUGH,
Plaintiff,
vs.
FIFTH THIRD BANCORP, et al.,
Defendants.

CASE NO. 1:21-cv-00238

***THIS TRANSCRIPT CONTAINS CONFIDENTIAL -- SUBJECT TO PROTECTIVE ORDER TESTIMONY***

Videotaped Deposition of: THOMAS HAROLD HARVEY

Taken: By the Plaintiff
Pursuant to Notice

Date: February 26, 2025

Time: Commencing at 10:10 a.m.

Place: Fifth Third Center
511 Walnut Street
Cincinnati, Ohio 45202

Before: Wendy L. Raymer, RPR, CRR
and
Connie Ihle-Adkins, Videographer
Notaries Public-State of Ohio

APPEARANCES:

On behalf of the Plaintiff:

Peter A. Saba, Esq.
and
Joshua M. Smith, Esq.
and
Bailey E. Sharpe, Esq.
(Appearing via Zoom Videoconference)
of
Stagnaro, Saba & Patterson Co., L.P.A.
2623 Erie Avenue
Cincinnati, Ohio 45208
Phone: (513) 533-2701
Email: pas@sspfirm.com
jms@sspfirm.com
bes@sspfirm.com

On behalf of the Defendants and the Witness:

Michael L. Cioffi, Esq.
of
Blank Rome LLP
1700 PNC Center
201 East Fifth Street
Cincinnati, Ohio 45202
Phone: (513) 362-8700
Email: michael.cioffi@blankrome.com

and

Phenise Poole, Esq.
and
Brian Thomas, Esq.
of
Fifth Third Bank
Fifth Third Center
511 Walnut Street
Cincinnati, Ohio 45202
Phone: (513) 629-2716
Email: Brian.Thomas@53.com

Also Present:

Philip R. McHugh, Plaintiff

# I N D E X


| THOMAS HAROLD HARVEY | PAGE |
|---|---|
| Examination by Mr. Saba | 6 |
| Examination by Mr. Cioffi | 87 |
| Further Examination by Mr. Saba | 102 |

| EXHIBITS | MARKED | REFERENCED |
|---|---|---|
| Plaintiff's Exhibit 1 | 45 | 45 |
| Plaintiff's Exhibit 2 | 54 | 54 |
| Plaintiff's Exhibit 3 | 72 | 72 |
| Plaintiff's Exhibit 5 | 77 | 77 |
| Plaintiff's Exhibit 6 | 84 | 84 |
| Deposition Exhibit 7 | 86 | 87 |
| Deposition Exhibit 8 | 88 | 88 |
| Deposition Exhibit 9 | 88 | 88 |

I N D E X (CONTINUED)

***THE FOLLOWING PAGES CONTAIN CONFIDENTIAL -- SUBJECT TO PROTECTIVE ORDER TESTIMONY***

Page 47

***THE FOLLOWING EXHIBITS ARE CONFIDENTIAL -- SUBJECT TO PROTECTIVE ORDER***


| EXHIBITS | MARKED | REFERENCED |
| --- | --- | --- |
| Plaintiff's Exhibit 4 | 74 | 74 |


- - -

THE VIDEOGRAPHER: We're on videotape record. Today is Wednesday, February the 26th, 2025. The time is 10:10 a.m. We're here today to take the deposition of Thomas Harvey in the case styled Philip R. McHugh versus Fifth Third Bancorp, et al., United States District Court, Southern District of Ohio, Western Division, Case Number 1:21-cv-00238.

Would the attorneys now introduce themselves and state who they represent?

MR. SABA: Peter Saba on behalf of the Plaintiff Philip McHugh. We also have Bailey Sharpe on Zoom from my office.

MR. SMITH: And Joshua Smith on behalf of the Plaintiff Philip McHugh as well.

MR. CIOFFI: Michael Cioffi of Blank Rome on behalf of all the defendants. We also represent the witness, Mr. Harvey, personally, pursuant to a joint representation agreement.

Also representing the defendants and Mr. Harvey are Brian Thomas and Phenise Poole, lawyers in-house in the legal department of Fifth Third, also counsel to the defendants and Mr. Harvey.

THE VIDEOGRAPHER: And would the court



reporter please swear in the witness.

THOMAS HAROLD HARVEY,

of lawful age, a witness herein, being first duly sworn as hereinafter certified, was examined and deposed as follows:

EXAMINATION

BY MR. SABA:

Q. Mr. Harvey, could you go ahead and state your name for the record, please, and spell your last name?
**A. Yes. It'S Thomas Harold Harvey, and last named is spelled H-a-r-v-e-y.**
Q. And you sometimes go by Hal; is that correct?
**A. I go by Hal informally, yes.**
Q. What's your date of birth?
**A. 7/18/60.**
Q. What's your address?
**A. 6 Compton Circle in Mill Valley, California.**
Q. What's your ZIP code there?
**A. 94941.**
Q. Have you ever had your deposition taken before?
**A. No, I have not.**
Q. I'm going to be asking you a series of questions. If there's anything you don't hear or don't understand, please feel free to ask me to repeat or



rephrase the question.

For the sake of the court reporter, although we're taking this via video, I do need you to answer verbally. No shaking of the head, no uh-uhs, no uh-huhs. Additionally, if you could wait for me to finish my question before you answer and I'll try and do the same before I ask another question, it also makes for a clearer record.

Do you understand those instructions?
**A. I do.**
Q. How long have you lived on Compton Circle?
**A. 20 years, roughly.**
Q. Who do you live there with?
**A. My wife.**
Q. What is her name?
**A. Heather Thompson.**
Q. What did you do to prepare for today's deposition?
**A. Nothing.**
Q. Did you review any documents?

MR. CIOFFI: Objection. I'm going to instruct the witness not to answer that question to the extent it pertains to documents shown to him by counsel. Those are protected by the attorney-client privilege and the work product



privilege. I will allow him to answer a question about documents other than those that might have been shown by counsel.

BY MR. SABA:

Q. Did you review any documents other than those shown to you by counsel in preparation for today?
**A. No, I did not.**
Q. Did you attend a recent Fifth Third board of directors meeting?
**A. Yes, I did.**
Q. When was that?
**A. The last two days, yesterday and the day before yesterday.**
Q. During that time, did you have any discussions with any other directors about this case?
**A. No.**
Q. Did you have any conversations with any of the other directors about your deposition today?
**A. No, I did not.**
Q. Have you ever had any conversations with any directors about this litigation?
**A. No.**
Q. Have you ever had any conversations with any directors about depositions being taken in this case?
**A. No.**

Page 9

Q. Did you have any discussions with Mitch Fieger following his deposition last Friday?
**A. No, I did not.**
Q. Are you currently employed?
**A. Self-employed. I have my own company.**
Q. What's the name of your company?
**A. Energy Innovation, LLC.**
Q. What does Energy Innovation, LLC do?
**A. We prepare strategies for governments to reduce carbon dioxide emissions and other pollutants, and we work directly with policy makers in that work.**
Q. How long have you been self-employed with Energy Innovation, LLC?
**A. 12 years.**
Q. What did you do prior to that time?
**A. I had several jobs in the energy and climate space. I was director of the Hewlett Foundation's climate programs. I was CEO of energy -- of Climate Imperative. I still am. I have started eight companies around the world.**
Q. What do those eight companies do?
**A. Same thing that I mentioned before. We help governments with clean air strategies and climate change strategies.**
Q. Is Climate Imperative the same thing as

Page 10

Climate Works Foundation?
**A. No.**
Q. What is Climate Works Foundation?
**A. Same mission, different geography.**
Q. Have you ever worked in the banking industry?
**A. I have served on the board of banks and as chairman at the board of banks, but I have never been an employee, per se.**
Q. Which banks have you served on the board of?
**A. Mid-City National Bank, which became MB as part of a merger, and I served as chairman of MB as well. And then I serve as a board member at Fifth Third.**
Q. Any other banks that you serve on the board of?
**A. No.**
Q. When did you become a board member of Mid-City National?
**A. I don't remember exactly. It's been a while.**
Q. Do you recall what decade it was in?
**A. I began in the '90s.**
Q. Sometime in the '90s you would have started on the board at Mid-City National?
**A. Correct.**
Q. When was Mid-City National merged into or

Page 11

bought by MB?
**A. Again, I don't remember the exact date.**
Q. Do you recall a year?
**A. No, I don't.**
Q. Was that pre or post 2000?
**A. Pre, I believe. I'd have to check that.**
Q. And did you remain on the Mid-City National, MB boards continuously up until the time that MB was merged into Fifth Third?
**A. Yes, I did.**
Q. How long did you serve as chairman of MB Financial?
**A. I would say about eight years, before we did the merger, but, again, I'm not -- I would need these checked with the records. I don't know it off the top of my head.**
Q. Were you serving as chairman of the board at the time of the merger?
**A. Yes.**
Q. Just to be clear, I'm referring to the merger between Fifth Third and MB Financial?
**A. Yes. Thanks for being clear. And I was board chair during that time.**
Q. Do you serve on any other boards?
**A. Currently I serve on Climate Imperative board**

Page 12

**of directors and I serve on several family corporations. I serve on Fifth Third, of course. I'm trying to remember. I mentioned I have started eight corporations and I serve on some of those as well.**
Q. When did you become a member of Fifth Third's board of directors?
**A. It was part of our merger agreement.**
Q. When did that occur?
**A. Again, I don't know the exact date.**
Q. Fifth Third's directors minutes would indicate that the first board meeting you attended was in April of 2019.
**A. That seems reasonable.**
Q. Is that when you would have first joined Fifth Third's board?
**A. Correct.**
Q. Have you served on any committees while on the Fifth Third board?
**A. Yes.**
Q. What committees have you served on?
**A. Nominations and corporate governance, technology, risk, audit, and what's -- what is called finance. It's been Rechristened as the executive committee.**
Q. Have you ever served on the human capital

Page 13

compensation committee?
A. I have not.
Q. When did you serve on the nomination committee?
A. For all the timeline questions, I would suggest you consider the formal board minutes and so forth of the bank. I don't remember all these dates. Or you can supply them now if you like.
Q. As you sit here today, did you start on the nomination committee in April 2019?
A. I'm not certain.
Q. Do you currently serve on the nomination committee?
A. Yes.
Q. Was there ever a period of time that you've been on the Fifth Third board of directors that you did not serve on the nomination committee?
A. I don't believe so, but this would have to be checked. And I should say I'm chairman of the nominations and corporate governance committee.
Q. What is your understanding of the executive succession process at Fifth Third for president and CEO?
A. Well, it's fairly involved. Selecting an executive is one of the most important things that boards of directors do. They require assessments of

Page 14

recent and long-term productivity by the candidates. They typically involve a 360-degree review of prior work. They test and question a candidate's ability to think strategically long term, but also to execute well, and there's tension between those realms. They require ability to build a bank's business, to manage regulatory affairs, which is a big deal in banking, to work in communities and develop customized products for different communities, special initiatives for different communities.
Strategic vision as to where to conduct operations, what offerings to put before potential clients in terms of financial tools, for example. They tend to be citizens of the community, supporting good local policy and national policy, typically state or even community policy. And more than policy, actually programs is a better way to put it.
There's a significant amount of weight that's put into relationships, people's ability to get along with others, make -- make change happen in the real world rather than just on paper. I would say it's the suite of characteristics that drive great leaders. They can do a lot of things, and they can inspire employees.
People use the word "vision" a lot. Vision has to be coupled with action, specific tasks, but also

Page 15

the broader transformation changes that are required. Big corporations have special obligations that the government pays attention to. Banking is especially influenced by regulatory affairs.
Then there's national policy, which can be important. Not always, but sometimes. Certainly right nowadays, as we enter this chaotic policy world. Building different lines of businesses, building fee-based businesses is absolutely crucial so you're not anchored strictly to monetary policy that you do not control.
Devising strategy to -- to prosper through difficult times. Internal personnel, finding and dispatching the best. Managing the tension between short-term investments and dividends versus long-term investments for software, for hardware. Keeping up with technology is a big deal right now.
So when asked to consider all these questions and have to be considered by a broad range of audiences as well, because there's -- I mentioned the regulators, your board of directors, your staff, communities in which you work. You have to try to not just please but help drive their performance.
So it's a big job. It's a complex job. There are internal tensions between some of these goals, big

Page 16

dividends versus big technology spent, as an example. Which areas, which geographic areas to go in, which products to offer. How do you inspire a staff of approaching 20,000 employees? How do you prepare them for the future? How do you manage the tension between goals? How do you build a consensus? How do you build a spirit and a culture?
And it's amazing in banking and in other professions how crucial it is to get the right leadership. And leader is the important part of that work -- or that word, I mean, and the work.
I would say leadership by command doesn't work. You have to create both a rationale and a spirit in order to get great performance out of people. I mean, this is a very abbreviated list of what actually you have to do, because each of these elements requires the particular. And if you look at performance indicators, there may -- there are quite a few of them for each aspect of the work and there are a lot of people.
But if you don't both build those elements and then make sure they come alive and stay alive and constantly refresh, you're going to end up with a subpar institution.
So leadership is -- leadership is a small

**word, but a big concept. Some of the specifics are for outside experts to review potential, both the current performance and the potential of candidates. There's a decision whether to look inside or outside or both for candidates.**

**I mean, there are entire, of course, firms that do this work, and they get -- it's a very involved process. It can take days, it can take months, and it can go wrong. So you need to -- you need to be prepared for that as well. I mean, that's a very abbreviated list, but all of those are required elements. None of those are an option.**

Q. When you came on the board in April of 2019, do you know who the potential candidates were to succeed Greg Carmichael as president and CEO of Fifth Third Bank?

MR. CIOFFI: Objection to the form of the question. Assumes facts not in evidence and whether there was such questions, but to the extent you have personal knowledge, you can answer.

THE WITNESS: Can you repeat the question, please?

MR. SABA: Sure.

BY MR. SABA:

Q. When you joined the board of Fifth Third in



April of 2019, do you know who the potential candidates were to succeed Greg Carmichael as president and CEO at Fifth Third Bank?

**A. No.**

Q. Did you ever develop an understanding of who the potential candidates were to succeed Greg Carmichael as president and CEO of Fifth Third Bank?

**A. Certainly.**

Q. When did you develop that understanding?

**A. Over time as, you know, with a decision this complex, one wants to think through the fit and the strategy and which of these boxes are easy to check and which ones are hard to check. There's not a single moment when that comes up, and I don't remember how far into my service on the board those conversations began, but one picks up information over time by watching performance, and that's part of the process. But I can't tell you on day one we were part of a search. It's a -- it takes time. It takes work. It takes a modicum of luck.**

Q. Who did you eventually determine were the potential candidates at -- to replace Greg Carmichael as president and CEO of Fifth Third Bank?

MR. CIOFFI: Objection to the form of the question, especially the use of the word



"candidates," plural, but you may answer the question if you can.

THE WITNESS: The question is actually quite broad because there are internal potential candidates, there are external potential candidates. There are some people we know well. Can you repeat the question?

MR. SABA: Certainly.

BY MR. SABA:

Q. You said you eventually developed understanding of who the potential candidates were to replace Greg Carmichael as president and CEO of Fifth Third Bank. I'm just asking, who were those potential candidates that you -- that you understood to be potential candidates for succeeding Greg Carmichael as president and CEO of Fifth Third Bank?

MR. CIOFFI: Objection to the form of the question. It misstates his prior testimony.

THE WITNESS: The only candidate that I can -- that I know of was Tim, Tim Spence.

BY MR. SABA:

Q. Do you recall when you developed the understanding that the only candidate you knew of was Tim Spence?

**A. I don't recall.**



Q. And what did you personally do to determine that Tim Spence was the only candidate to replace Greg Carmichael as president and CEO of Fifth Third Bank?

**A. When you go back to the pre-merger and merger of Fifth Third with MB, we spent a lot of time with Tayfun, but it was really Tim Spence who was the inspirational leader in those conversations and the deciding factor.**

Q. When did you first meet Tim Spence?

**A. In preparation in the -- I don't know the date, but it was when we -- it was when we were doing the merger discussions. Tim reached out to officers, to our CEO, and actually our board chairman -- no, it was our CEO of the bank, of MB -- and we began a series of conversations that were not directly leading to Tim becoming a candidate, but were creating -- they spurred the interest by us because we saw what an outstanding performer he was. And it grew over time. That obviously early conversations are introductory conversations and they became strategic conversations.**

Q. MB Financial and Fifth Third eventually reached an agreement in May of 2018; is that correct?

**A. Again, I'm not sure about the dates, but we did reach an agreement.**

Q. Do you recall how long before reaching

Page 21

agreement between Fifth Third and MB Financial that you first met Tim Spence?
**A. I do not.**
Q. Do you recall how many times you met with Tim Spence prior to the time that Fifth Third and MB Financial reached an agreement for the merger?
**A. I don't recall.**
Q. How often would you meet with Tim Spence after May 2018, after -- excuse me, strike that.
How frequently would you meet with Tim Spence after Fifth Third and MB Financial had reached an agreement regarding the merger?
**A. It took a -- again, I can't give you an exact date. I will say bank mergers are complicated. They involve all the factors I mentioned already, but they also involve regulatory approval. They require regulatory approval, and that can take a year or more, and it took longer than I expected. I don't remember exactly how long.**
Q. How frequently would you meet with him during that time period?
**A. Do you count phone calls as meeting?**
Q. Include phone calls as meeting with him or speaking to him.
**A. I would say probably a dozen times on the way**

Page 22

**to the altar. Most of this was handled by Mitch Fieger, our president and CEO of MB, most of the day-to-day assessments of compatibility. The strategic ones I was much more involved in.**
Q. Of those 12 times that you would have had meetings with Tim Spence during that year following the agreement, how many of those would have been by phone and how many of those would have been in person?
MR. CIOFFI: Objection to the form of the question. It confuses the time frame he's talking about.
BY MR. SABA:
Q. Do you understand the question?
**A. No.**
Q. You indicated you met with Tim Spence 12 times between the time that the agreement was reached and the close of the deal; is that correct?
**A. I'm guessing.**
Q. Okay. And you indicated that 12 times would include phone calls and in-person meetings; is that correct?
**A. Yes.**
Q. My question is, how many of those 12 times would have been in-person meetings?
**A. I am not sure.**

Page 23

Q. When you met with Tim Spence in person, where would you meet with him?
**A. At the MB headquarters.**
Q. After you joined the board in April of 2019, how frequently would you meet with Tim Spence?
**A. During the Fifth Third board?**
Q. That's correct.
**A. Well, during board meetings, or for board meetings. I don't think I've ever missed one.**
Q. Would you ever meet with Tim Spence outside of Fifth Third board meetings after you joined the board in April of 2019?
**A. We would have conversations about strategy, about trends in banking, about the communities in which Fifth Third operates, sort of the get-to-know-you conversations, but also checking on how we're doing. Mergers are complicated. Most mergers fail to meet their goals. We were determined to meet and exceed our goals, and we did.**
Q. How frequently would you meet with Tim Spence outside board of directors meetings?
**A. Not frequently. It was more on the side of board meetings.**
Q. What do you mean by "on the side of board meetings"? What does that mean?

Page 24

**A. Maybe a guest -- maybe we had a presentation by an expert, and we want to chat about his or her presentation. Just the sort of follow-up you do when you have an issue that you want to dig into a little bit that doesn't involve the whole board.**
**But really, almost all my reactions were in the format -- almost all my experiences, my connections, were in the format of the board meetings themselves.**
Q. You're saying your experiences with Tim Spence after April of 2019, right?
**A. I'm not sure what you're asking.**
Q. You had indicated but almost all your experiences were in the format of the board meeting, and I'm just trying to clarify your testimony.
**A. I meant beyond the board meeting, but at the same time and place, just discussing reactions, worries, aspirations, so forth.**
Q. And just to -- just so I understand what you're saying, you're saying that in conjunction with actual board meetings, you would have conversations --
**A. Sidebar conversations.**
Q. -- with Tim Spence?
**A. Sure.**
Q. And would those be at the dinners following the board meeting or --

Page 25

**A. For example.**
Q. -- cocktails following board meetings?
**A. Things like that. I'm not much of a cocktailer, but yes. One of the things that's important in these conversations is to get past precooked topics and to see how agile -- how agile somebody's mind is, and whether they can -- whether they've mastered many of the different aspects of banking, and understanding how quickly they think on their feet, how much they build a strategy that reflects the items that I mentioned earlier. You get a lot of information with the conversation. In fact, I often, in my own work, prohibit the use of PowerPoints.**
Q. You mentioned earlier that one of the requirements for selecting a president and CEO candidate for Greg Carmichael was a 360-degree review of the candidate's prior work, correct?
**A. Correct.**
Q. What did you do to do a 360-degree review of Tim Spence's prior work?
MR. CIOFFI: Objection to the form of the question. It misstates his prior testimony, who the board, he testified was doing the 360, but --
THE WITNESS: That's correct.
MR. CIOFFI: You may answer.

Page 26

THE WITNESS: So this is the board that I'm answering for. We retained RHR to do a comprehensive assessment, and they produced a really important and terrific and useful read. They got into the things that Tim does well and opportunities for growth.
I would read it to you if I could. I don't think that's allowed here, but if it is, let me know. But it begins with vision. You know, banking is not only complex, but it's the recipient of sometimes contradictory regulations, economic cycles. We had to go through some big economic cycles in the last 20 years and so forth.
And so we needed to know, what is Tim's vision for the bank and how much of that was reflected in the work he's done so far? But also what experience did he build as a consultant in banking? Really important for a leader to understand other cultures besides one's own and the impacts and opportunities and growth, the dangers in growth, and the RHR study did all that.
And then it walked through other characteristics, leadership, very broadly, but also in the particular knowledge of banking technology, huge field, many opportunities to make a mistake,

Page 27

fairly narrow windows to get it right.
And, again, Tim's work in the field for years had led him to have a very rich understanding of different approaches and what works and what doesn't. The -- the whole tableau of characteristics, ability to listen well, ability to adjust one's perspective as new data comes in. There are a lot of -- there are all the mechanical particulars in running a bank, but there's also the bigger strategy question and the profound help is in wedding the two together, the nearby day-to-day execution and the long-term vision, and not many people can do both.
BY MR. SABA:
Q. Do you know if Greg Carmichael and Bob Shaffer were involved in editing the report that RHR prepared for the Fifth Third board?
**A. I do not know that.**
Q. Do you know if Tim Spence was involved in editing the report that RHR prepared for the board regarding Tim Spence?
**A. I would not know that, but I would stand by everything that's in that report.**
Q. Did you make any investigation into the source of information that was put forth in the RHR report

Page 28

regarding Tim Spence?
**A. There was a lot of sources of information.**
Q. What do you mean by that?
**A. I mean when you do a 360 review, you talk to a lot of people and you look at objectively what they've produced in their career, and you get a sense of what their vision is, looking forward. It's a very involved process.**
Q. Other than the RHR report, what else did the board do to do a 360-degree review of Tim Spence?
**A. We had extensive conversations in the board meetings themselves. We had -- we have a -- we have a board with a lot of experience in building corporations and a lot of experience in banking. We know how to get these things done, and there was deep involvement.**
Q. Did you ever participate in or perform any of Tim Spence's annual reviews or midyear reviews?
**A. I may have been consulted, by people working on them, but I've never been a lead on doing an evaluation of Tim Smith -- Tim Spence.**
Q. Who consulted with you regarding Tim Spence's annual reviews or midyear reviews?
**A. I can't recall.**
Q. And when did they -- when did this person consult with you regarding Tim Spence's annual reviews

Page 29

or midyear reviews?
A. **I don't know the date.**
Q. What specifically did they consult you about regarding Tim Spence's midyear reviews or annual reviews?
**A. What did I think was going well? What did work? Just general appraisals to see if they matched.**
Q. And you don't remember who this person was that would have asked you those questions?
**A. I don't remember the sequence, but I think it was other board members.**
Q. Were other board members doing Tim Spence's annual reviews or midyear reviews?
MR. CIOFFI: Objection to the form of the question. Lacks any kind of time frame, among other defects. But if you can answer, you can answer.
THE WITNESS: Repeat the question, please.
MR. SABA: Sure.
BY MR. SABA:
Q. You said that other board members were asking you questions for Tim Spence's midyear reviews --
**A. Yes.**
Q. -- or annual reviews, correct?
**A. Yes. Again, it was not in a formal setting.**

Page 30

**I'm not on the HCCC committee and I have not been, but had a lot of experience working with Tim, as did the other board members. So just comparing conversations.**
Q. And who was that information communicated to regarding Tim Spence's annual -- annual reviews or midyear reviews?
MR. CIOFFI: Objection. Asked and answered. Please answer it again one more time.
THE WITNESS: No. I mean, it's conversations amongst directors, and then watching the man in the real world.
BY MR. SABA:
Q. Did you ever review any of the materials from Tim Spence's midyear or annual reviews?
**A. The RHR report.**
Q. It's your understanding that the RHR report was from Tim Spence's midyear or annual reviews?
**A. I'm not certain what -- what do you mean by it was from?**
Q. I asked did you review any documents from Tim Spence's midyear reviews or annual reviews?
**A. We have a review of all senior leaders, and there's an annual process which is led by the -- I can't remember who leads it. I have to think about that for a minute. But we have these performance cards which are a**

Page 31

**highly condensed assessment of the work of different senior leaders across the bank, and we review those in an executive session of the bank that might last several hours. We review not just Tim, but top leadership.**
Q. And when does that take place?
**A. It's annual, but -- and I think it's near the end of each year, but I'm not certain of that. I've never been on that committee.**
Q. And is it your understanding that these performance cards would contain the same materials that would be part of Tim Spence's midyear reviews and annual reviews?
**A. Since I'm not involved in all these reviews, I can't answer that question.**
Q. Do you know if any of the information that you may have provided became part of any of Tim Spence's midyear reviews or annual reviews?
**A. I wouldn't know.**
Q. Did you ever review Tim Spence's employee engagement surveys?
**A. I don't believe so.**
Q. Did you ever review Tim Spence's customer experience surveys?
**A. No.**
Q. Did you ever review Tim Spence's financial

Page 32

performance relative to goals for his divisions?
**A. Yes.**
Q. When did you review those?
**A. It was part of the review of the company and it was part of his -- his review.**
Q. His review when?
**A. I think it was during the cycle of our annual review. I don't remember again the dates. I think it's in the late fall each year, but that would have to be checked.**
Q. And it's your understanding that you would receive a breakout of a financial performance of Tim Spence's specific areas; is that correct?
**A. No. Tim's -- Tim's work crossed many parts of the board. I mean, certainly when there's a specific duty, for example, managing the regional banks, when he did that, sure, we'd compare his work to our expectations. But as I just said before, leadership has many more elements than that.**
Q. My --
**A. And so it's not just a did he reach this number or that number.**
Q. No. My question is just did you review Tim Spence's financial performance relative to goals for his divisions?

Page 33

MR. CIOFFI: Objection. Asked and answered. Counsel, you're entitled to an answer, not the answer you want but an answer, and he answered it.
BY MR. SABA:
Q. Do you understand the question?
**A. The question fails to apprehend what we looked for and how we looked for a leader.**
Q. That's okay. Can you go ahead and answer the question? Did you review Tim Spence's financial performance relative to goals for his division?
MR. CIOFFI: Objection. Asked and answered. You may answer.
THE WITNESS: We looked at every divisions, whether they met their goals, and that is communicated -- it doesn't need to be communicated because the leaders of our bank understand it, how we're doing in each of the sectors. So it's a part of the evaluation of leaders, but it's not the whole.
BY MR. SABA:
Q. Did you review income statements and balance sheets specifically broken out for the divisions managed by Tim Spence?
**A. I did not.**
Q. Were you aware that RHR was originally

Page 34

retained to also assess Phil McHugh and Tayfun Tuzun?
MR. CIOFFI: Objection to the form of the question. There's no foundation or basis for that, but you may answer if you have knowledge.
THE WITNESS: The annual review process included an annual review of Phil McHugh.
BY MR. SABA:
Q. Okay. That wasn't my question. I'm asking about RHR.
**A. RHR.**
Q. Did you have an understanding that RHR was first retained to do an assessment of Tayfun Tuzun and Phil McHugh, in addition to Tim Spence, for the position of president and CEO at Fifth Third Bank?
MR. CIOFFI: Objection to the form of the question.
THE WITNESS: I'm not sure. I don't recall. I know they had reviews on scorecards, as it were.
BY MR. SABA:
Q. When did you first meet Phil McHugh?
**A. I believe just in the hallways before and after board meetings.**
Q. Have you ever met -- had you ever met Phil McHugh prior to April 2019?
**A. I don't think so, no.**

Page 35

Q. Other than meeting with Phil McHugh and always before/after board meetings or seeing him during board meetings, did you have any other interactions with Phil McHugh?
**A. No.**
Q. How many of the board meetings that you attended in 2019 did Phil McHugh attend?
**A. I'm not certain. I would guess five of them, but just because we have five meetings a year and senior staff typically attend at least part of those board meetings or those -- I didn't keep track of who was at each one.**
Q. Do you know at how many board meetings in 2019 that you attended did Phil McHugh make a presentation?
**A. I don't recall.**
Q. What was your understanding of Phil McHugh's role at Fifth Third Bank prior to January 1 of 2020?
**A. I believe he was the head of the regional banks.**
Q. Anything else?
**A. I'm not certain.**
Q. Did you ever develop an understanding that Phil McHugh was a potential candidate to replace Greg Carmichael as president and CEO of Fifth Third Bank?
MR. CIOFFI: Objection to the form of the

Page 36

question. Misstates the records and the facts, but you may answer.
THE WITNESS: No.
BY MR. SABA:
Q. Did you ever consider Phil McHugh as a potential candidate to replace Greg Carmichael as president and CEO of Fifth Third Bank?
**A. No.**
Q. Why is that?
**A. It gets back to the question of leadership, and leadership has many dimensions, including a vision for the future, including ability to inspire, including views on being ahead of the curve on technology rather than behind the curve. There's a lot of day-to-day work that goes into running a bank, and I think we did a good job there, and Phil was part of that, but that's a world of difference between somebody who contributes and somebody who leads, as I mentioned already.**
Q. Other than board meetings, did you ever observe Phil McHugh in the workplace at Fifth Third?
**A. No.**
Q. Did you ever interview any of Phil McHugh's direct reports or subordinates?
**A. No, not to my knowledge.**
Q. Did you participate in or perform any of Phil

Page 37

McHugh's annual reviews or midyear reviews?
**A. I don't think so.**
Q. Did you review any of the materials from Phil McHugh's midyear reviews or annual reviews?
**A. Yes, with those scorecards that I mentioned. I'm not sure what they're called, but the summary, statistics, and issues.**
Q. The scorecards you're referring to, have you ever heard them referred to as talent decks?
**A. Yes.**
Q. Is it your understanding that those talent decks would have contained all of the information from the materials from Phil McHugh's annual reviews or midyear reviews?
**A. Well, they are abbreviations, certainly, so they would not contain all the information.**
Q. Who would -- who would determine what information would go into the talent decks and what wouldn't?
**A. I presume the HCCC committee.**
Q. Anybody else?
**A. I think in the hierarchal sections of the board. Again, I'm guessing.**
MR. CIOFFI: I'll instruct the witness not to guess, but if you know.

Page 38

THE WITNESS: Yes, I don't know.
MR. SABA: Okay.
THE WITNESS: Sorry.
BY MR. SABA:
Q. Did you ever communicate with Phil McHugh by cell phone or email?
**A. No.**
Q. Did you ever review Phil McHugh's employee engagement surveys?
**A. Only if they were embedded in the talent cards.**
Q. But you don't know; is that correct?
**A. Correct.**
Q. Did you ever review Phil McHugh's customer experience surveys?
**A. No.**
Q. Did you ever review Phil McHugh's financial performance relative to goals for his divisions?
**A. I believe we did.**
Q. And when would you have done that?
**A. In the annual review. Again, I was not on the HCCC, and so I didn't get the full presentations and so forth that everybody did.**
Q. As you sit here today, do you know for certain whether or not you actually reviewed financial

Page 39

performance relative to goals for Phil McHugh's divisions?
**A. No, I do not.**
Q. Did you ever review income statements and balance sheets specifically broken out for the divisions managed by Phil McHugh?
**A. I'm not sure.**
Q. Did you have any specific criticisms of how the divisions Phil McHugh was managing were performing during the time that they were being managed by Phil McHugh?
**A. I don't recall. I know we discussed the regions' banks and what work they needed, but I couldn't correlate to Phil's work exactly.**
Q. Do you know who determined which members of the enterprise committee would attend board meetings?
**A. I presume it was the chairman, but I don't know.**
Q. That would be Greg Carmichael; is that correct?
**A. Correct.**
Q. Do you know who would determine which members of the enterprise committee would make presentations at a board meeting?
**A. I think different people did, depending on the**

Page 40

**topics to be considered.**
**Sorry, I think I misunderstood the question.**
Q. I'm asking who would determine which members of the enterprise committee would make presentations at a board meeting?
**A. Again, I would presume Greg Carmichael would, but I don't know that for a fact.**
Q. Prior to January 1, 2020, did you ever discuss with any other members of the board the topic of Phil McHugh succeeding Greg Carmichael as president and CEO of Fifth Third?
**A. I don't believe so.**
Q. During the time that you were on the board with Fifth Third Bank, was there ever anyone else considered to replace or succeed Phil -- excuse me, Greg Carmichael as president and CEO of Fifth Third Bank other than Tim Spence?
MR. CIOFFI: Objection to the form of the question, specifically undefined terms like "considered." But if you can answer the question in the form it's stated, you may do so.
THE WITNESS: I can only speak to my own self, my own concerns.
BY MR. SABA:
Q. And who else did you consider besides Tim

Page 41

Spence as a potential candidate to succeed Greg Carmichael as president and CEO of Fifth Third Bank?
**A. I came to the conclusion that we did not have any other candidates from within the staff.**
Q. In your opinion, were there any external candidates that you believe were potential candidates to replace Greg Carmichael as president and CEO of Fifth Third Bank?
**A. There certainly are a possibility that other people could make a good show of it, but when you work with Tim and you realize what he's capable of doing and the depth and breadth of his understanding of banking and his style and his mastery of all those topics that I mentioned earlier, no, I would say he is -- and I think the other board members share my view -- an extraordinary leader. Not modestly different from other leaders in the bank, but dramatically more advanced and is something that's backed up by the performance of the bank since he took over.**
Q. One of the criterias you identified with respect to someone being considered for CEO and president of Fifth Third was citizens of the community supporting good local programs and national programs; is that correct?
**A. Yes, it is correct.**

Page 42

Q. Okay. What was your understanding of any indication that Tim Spence was a citizen of the community supporting good local programs?
**A. He developed a nine -- nine regions economic development strategy, put together for each of these -- these are regions with lower than desired economic performance. And so we put together -- or Tim put together a program to help them do a comprehensive plan. Avondale here was one of them. A mixture of philanthropic commitments, lending programs, lots of technical assistance, the kind of thing that actually bears dividends for the community in a serious way, increase a great amount of goodwill, but also economic performance. He served on local boards of directors. He's paid attention -- deep attention to the economic development of the area, contributed to it directly.**
Q. When was the nine regions program?
**A. It's still underway.**
Q. When did it begin?
**A. Shortly after Tim took over as CEO, I believe.**
Q. So that would have been sometime in 2022?
MR. CIOFFI: Objection to the form of the question.
BY MR. SABA:
Q. Is that correct?

Page 43

**A. Yeah. I do not know when it started, but I believe it was before then. But it was under Tim's leadership throughout.**
Q. As you sit here today, do you know whether or not that occurred prior to October of 2020?
**A. I think it -- I think it was -- I don't know for certain. I believe it was coincident with Tim taking over as president of the bank, but that would have to be checked, the timing.**
Q. What was your knowledge of Phil McHugh's role as a citizen of the community supporting good, local programs?
**A. I don't recall. I mean, I'm sure it was on his talent card, but I'm not -- I didn't see it directly.**
Q. Is it your belief that any indications that these members of the enterprise committee had with respect to being citizens of the community and supporting good local programs, that that would be included on their talent card?
**A. Yes.**
Q. And if it's not on their talent card, then they just didn't do it, correct?
**A. No. Talent cards is a steep abbreviation of what different people did.**

Page 44

Q. So the information may be included on the talent card, it may not be; is that correct?
**A. I'm laughing because it's fairly obvious that on a card, you don't put an encyclopedia of information. Sorry, I don't mean to be snarky.**
Q. No, I'm just trying to confirm your testimony. You're indicating that, based on the size of the card, all the information would not be included, correct?
MR. CIOFFI: Objection. Asked and answered, Counsel. You're arguing with the witness. You -- you may answer one more time.
THE WITNESS: Correct. The -- can I add to that answer?
MR. CIOFFI: You may. Go ahead.
THE WITNESS: It again gets to the question of leadership, which is not a humdrum activity. It means engaging other members of the community. It means putting out a vision, but letting other people feel that they own it themselves. It means avoiding cliches and thinking through something as complicated as a neighborhood redevelopment strategy. It means having the courage not just to support the local symphony or art museum, but to work with people in institutions and neighborhoods that really need help.

(Plaintiff's Exhibit 1 is marked for identification.)
BY MR. SABA:
Q. Mr. Harvey, I've handed you what's been marked as Exhibit Number 1.
**A. Okay.**
Q. And in the bottom right-hand corner you'll see what we refer to as a Bates number. The first one is Fifth Third-McHugh 001105. The last one should be Fifth Third-McHugh 001154; is that correct?
**A. That's correct.**
Q. Do you recognize Exhibit 1?
**A. Yes.**
Q. What is Exhibit 1?
**A. It's the vision. Well, let me make sure I answer that carefully.**
**Our strategic priorities and human capital strategic priorities.**
Q. Exhibit 1 is dated December 17, 2019; is that correct? If you turn to the first page, it has the date on it.
**A. I'm not seeing it.**
Q. The very first page.
**A. Yes. Inclusion and diversity information.**
Q. No, my question is, this is from



December 17th --
**A. Got it.**
Q. -- 2019; is that correct?
**A. That's correct.**
Q. Okay. Is Exhibit 1 information that would be presented to the board at the December board meeting?
**A. It looks like it.**
Q. If you'd turn to Fifth Third-McHugh 001135, please.
**A. Okay.**
Q. Are you able to identify this page for me?
**A. Yes.**
Q. What is Fifth Third-McHugh 001135?
**A. It is Tim Spence's talent card.**
Q. This talent card makes no reference to the nine regions; is that correct?
MR. CIOFFI: Objection to the form of the question. The talent card speaks for itself. Are you asking him to read every word here and verify what you just said to be true? If that's the case, he'll do it. Could you clarify your question?
MR. SABA: Sure.
BY MR. SABA:
Q. Mr. Harvey, the talent card from Mr. Spence --
**A. Yeah.**



Q. -- for December 2019, makes no reference to the nine regions, does it?
MR. CIOFFI: Again, objection to the form of the question. Counsel is testifying. The document speaks for itself. If you want him to validate what the card says, he is going to have to read each line. And I'm going to designate the next part of this deposition as confidential.
The witness has an eye problem that prohibits him from reading really small print. So if you want to ask him about a specific line in this small print, you're either going to have to read it or I'm going to have to read it.
BY MR. SABA:
Q. Well, let me ask you this, Mr. Harvey. Referring to the bottom left-hand corner of this card, it talks about community board service.
**A. Correct.**
Q. All right. In that box, there's no reference to the nine regions, is there?
**A. No.**
Q. Having seen this talent card, does that refresh your recollection whether or not the talent card failed to include that information or that the nine regions had not taken place as of December 2019?



MR. CIOFFI: Objection to the form of the question. Do you understand the question?
THE WITNESS: No.
MR. SABA: Counsel, could you rephrase the question, please?
BY MR. SABA:
Q. Mr. Harvey, you indicated earlier you referenced about with respect to Mr. Spence's community involvement that you reference work with the nine regions.
**A. Yes, I did.**
Q. And then we went through when that would have occurred.
**A. Yes.**
Q. You indicated that -- it didn't appear that you were certain about the date, that it was after he became CEO, and then you indicated it might have been after he became president. I'm just trying to confirm that as we are looking at this talent deck of December 2019, and you had said that the talent deck's a card, so it might not have included everything -- is this a situation where the nine regions was not included, or it just hadn't taken place at this point in time?
**A. I am not certain. I am certain that the program is underway and that it's quite a fascinating**

Page 49

**and useful and rare program.**
Q. Do you know who prepares the talent cards?
**A. No.**
Q. Did you ever review drafts of the talent cards?
**A. No.**
Q. How would Exhibit 1 be used at the board meeting?
**A. It should pique board member's interest in different elements, depending on their -- what they are most concerned with and give you a chance to look at a bunch of information very efficiently. It necessarily circumscribes many topics and issues, but it's being presented to a board of directors which has a suite of other resources and specialty experience. So it's a way of compacting information, spurring debate, spurring conversation.**
Q. If you could turn to Fifth Third-McHugh 001142, please.
**A. Okay.**
Q. Are you able to identify this document for me?
**A. Yes.**
Q. What is this document?
**A. This document says if there is an emergency need for new CEO, other candidates, how would we find**

Page 50

**out who -- who was on that list? How do we know -- it was just preparation for an emergency. To find an interim -- let me rephrase that.**
**It looks at CEO succession and in the last box of the card, looks at emergency successors while the others look at ordinary, one hopes, succession.**
Q. Who would have prepared Fifth Third-McHugh 001142?
**A. Who would prepare it?**
Q. Yes.
**A. I don't know. I presume -- well, I'm not going to presume.**
MR. CIOFFI: I'm going to instruct the witness not to guess.
THE WITNESS: Yeah, I'm not going to guess.
BY MR. SABA:
Q. And this CEO succession plan indicates that Tim Spence would be in three-plus years, Brian Lamb in seven-plus years; is that correct?
**A. That's what it says.**
Q. And then emergency successors are listed as Tayfun Tuzun, Phil McHugh, and a board member; is that correct?
**A. That is what it says.**
Q. Did you agree with what was set forth on Fifth

Page 51

Third-McHugh 001142 regarding CEO succession?
**A. No.**
Q. Why did you not agree with it?
**A. Well, for example, under emergency successor, it says "board member." We have CEOs of three other banks or former CEOs of three other banks on our board of directors.**
**So that's really -- and if you look at across the suite of talent, that's -- it comes up to like 17 names for the emergency successor. They weren't ranked. They weren't -- they weren't stratified by their contributions or the potential. There really was basically saying we need an emergency successor. In fact, obviously the two names that are here are no longer candidates for an emergency successor, and in my opinion, none of them are candidates for CEO.**
Q. You see Phil McHugh's name listed as emergency successor, correct?
**A. I do.**
Q. Did you agree with that designation for Phil McHugh as a potential successor as president and CEO of Fifth Third Bank?
MR. CIOFFI: Objection to the form of the question. You may answer.
THE WITNESS: Can you repeat the question,

Page 52

please?
MR. SABA: Yes.
BY MR. SABA:
Q. Did you agree with the designation of Phil McHugh as potential emergency successor for president and CEO of Fifth Third Bank?
**A. I would have thought that a number of our senior officials could potentially be an emergency successor, but we did not vet them for that. This is just an indication as, why it says board member, an indication of the places to look. So this is an incomplete assessment.**
Q. With respect to Phil McHugh specifically, did you disagree with him being designated as a potential successor, emergency successor, for president and CEO of Fifth Third Bank?
**A. Yes.**
Q. Why?
**A. In all my experience with Phil, I didn't see leadership potential.**
Q. What do you base that upon?
MR. CIOFFI: Objection. Asked and answered. You may answer. Go ahead, please.
THE WITNESS: I guess the whole question about leadership and what your job is, how you blend long

term and short term, how you handle disparate interests, how you deal with the street. What about regulatory affairs? Phil is a -- done a lot of banking, but he has not shown the leadership capacity that we need in a CEO.
BY MR. SABA:
Q. What specifically have you seen Phil McHugh do or not do with respect to long term -- blending long-term versus short-term interests?
**A. I've seen Phil doing day-to-day banking requirements. I've not seen him laying out a strategy that he's led, that he's designed. I've not seen him in conversations with regulators or Wall Street analysts.**
Q. Prior to October 2020, when had you seen Tim Spence in conversations with regulators?
**A. I don't recall.**
Q. Prior to October 2020, when had you seen Tim Spence in conversations with Wall Street analysts?
**A. I wasn't in on those calls. I don't remember when I started with Tim, but he was -- well, I'll leave it at that.**
Q. Are you aware of any conversations that Tim Spence had with Wall Street analysts prior to October 2020?
**A. No.**



Q. Are you aware of any conversations Tim Spence had with regulators prior to October 2020?
**A. Again, we had regulators at many of our meetings, but I couldn't tell you which ones.**
Q. By "many of our meetings," you're referring to Fifth Third Bank board meetings; is that correct?
**A. Correct.**
Q. And just specific recollections of conversations that Tim Spence had with those regulators?
**A. No.**
(Plaintiff's Exhibit 2 is marked for identification.)
BY MR. SABA:
Q. Mr. Harvey, I've handed you what's been marked as Exhibit Number 2, which is Bates stamped Fifth Third-McHugh 001074 through Fifth Third-McHugh 001079. Are you able to identify this document for me?
**A. Yes.**
Q. What is this document?
**A. It's a synopsis of RHR's report on what you need in banking to succeed.**
Q. And the title of the document is "The Winning Formula at Fifth Third Bank President and Chief Executive Officer"; is that correct?
**A. Yes, it is.**



Q. Do you know who prepared Exhibit Number 2?
**A. Well, it says RHR International, so I presume it was them.**
Q. Do you know if any board members were involved in editing Exhibit 2?
**A. No, I don't.**
Q. Do you have any objective information or data indicating that as of September 22, 2020, Tim Spence was superior to or better than Phil McHugh with respect to driving innovative thinking on the strategic side while simultaneously maintaining a close eye on rigorous execution?
MR. CIOFFI: Objection to the form of the question. Just -- I don't understand it, but let me ask you, you're asking a time frame, any time before October 2020 did he have any objective information about that?
MR. SABA: That's not the date I gave, but I'll read it again.
MR. CIOFFI: Please do, yeah.
MR. SABA: Sure.
BY MR. SABA:
Q. Do you have any objective information or data indicating that as of September 22, 2020, Tim Spence was superior to or better than Phil McHugh with respect to



driving innovative thinking on the strategic side while simultaneously maintaining a close eye on rigorous execution?
MR. CIOFFI: Objection. Again, in terms of the time frame you're asking for, is it any time prior to September 22, 2020, is that your question?
MR. SABA: Correct.
MR. CIOFFI: Please answer that question.
THE WITNESS: In a way, this document itself answers that question. I will just choose one thing here. "Given the continued rise of competition in the fintechs/non-banks and the role that technology and artificial intelligence will play in the future of banking, the CEO must be particularly adept at managing the digital transformation of FTB and alert to opportunities and threats."
So that's part of the tension that I mentioned earlier about needing to understand technologies in banking and to lead with them. That's exactly what Tim has done, and he has done it with some pretty amazing success already, where we have clients out of -- many of the fintechs have come to Fifth Third to manage their technology.

Page 57

BY MR. SABA:
Q. So my specific question is --
**A. Yeah.**
Q. -- going back to prior to September 22, 2020 --
**A. Yeah.**
Q. -- do you have any objective information or data indicating that Tim Spence was superior to or better than Phil McHugh with respect to even your point there, "adept at managing the digital transformation at Fifth Third Bank and alert to both the opportunities and threats"?
**A. It comes up all the time with Tim and I didn't see it once with Phil, so that's objective and that's information.**
Q. I'm sorry, what was the objective information, it comes up all the time?
**A. In conversations with Tim Spence, he will almost inevitably include a significant part of the meeting on technology, and with Phil I never saw that.**
Q. You never had a conversation with Phil about technology?
**A. No.**
Q. Is that correct?
**A. Correct.**

Page 58

Q. So your objective basis for that is that you had conversations with Tim Spence about technology but you did not have conversations with Phil McHugh about technology?
**A. We could walk through page by page the RHR reports, and you would see a pattern very quickly about who is qualified to lead the bank in -- in the future, about all these different characteristics that we identified as necessary for success in banking, and you will see page after page the answer to your question.**
Q. Oh, so the RHR report, your understanding, it compared Phil McHugh and Tim Spence; is that correct?
MR. CIOFFI: Objection to the form of the question. That wasn't your prior question.
THE WITNESS: I think it was my sense that this was what you were asking us to -- asking me to opine upon.
BY MR. SABA:
Q. I'm asking what objective data or information do you have that Tim Spence was superior to or better than Phil McHugh with respect to what they define here "driving innovative thinking on the strategic side while simultaneously maintaining a close eye on rigorous execution." It's asking for what evidence do you have that he was superior to Phil McHugh?

Page 59

MR. CIOFFI: Counsel, again, the time frame is -- he testified that he first met Tim Spence in 2016. Are you -- is that the whole time frame, 2016 to 2020?
MR. SABA: He didn't testify that he met him in 2016.
MR. CIOFFI: He did.
MR. SABA: No, he testified he met him when they had discussions regarding the merger.
MR. CIOFFI: Well, that -- he testified when that began, but anyway, the record will speak for itself. But you're talking about any time prior to 2020?
BY MR. SABA:
Q. I'm asking for the objective information or data indicating that he was -- that Tim Spence was superior to Phil McHugh with respect to driving innovative thinking on the strategic side while simultaneously maintaining a close eye on rigorous execution.
**A. So if you look at the talent cards for each of them, you'll find a marked difference and those have been widely shared.**
Q. Your basis is on the talent card; is that correct?

Page 60

**A. It's one indicator.**
Q. Okay.
**A. On the winning formula document you just gave me -- which I presume has been vetted by other people, by a consulting firm who does this for a living -- they make it pretty clear what's important here. It's pretty easy to see as you read this that Tim is far better suited than Phil to meet these characteristics.**
Q. What in there specifically indicates that -- that Tim Spence is far better suited than Phil McHugh? What specifically in there indicates that?
**A. Well, one, it overlays what one reads with one's experience, right? So it doesn't say that this is a comparison document between the two, but it clearly shows up very different talents.**
Q. And --
**A. So to use this as a filter, it would be obvious differences.**
Q. And one of those filtering characteristics is leadership that they referred to; is that correct?
**A. Yes.**
Q. Okay. So specifically, do you have any objective information or data indicating that as of September 22, 2020, Tim Spence was superior to Phil McHugh with respect to effectively managing the strength

Page 61

of the existing team while continuing to attract a more diverse group of executives?
**A. The problem with the question is the use of objective data because you're making a judgment between two people's potential, and you'd have to look at how each of them has done on each of these measurements. This report doesn't do that.**
Q. Right. You'd have to have both of them assessed to be able to do that, wouldn't you?
**A. If you -- it depends on the situation. There are instances in which you can make a quick if somebody had no experience on fintech, that would be a disqualifying characteristic.**
Q. Do you know what Phil McHugh's experience was with fintech?
**A. No, but it wasn't something that we saw. It wasn't something that I saw, certainly, in the review that we did over the years.**
Q. You're saying it was something -- you didn't see it during the board meetings; is that correct?
MR. CIOFFI: Objection. That wasn't his testimony. The record will speak for itself. Counsel is arguing and mischaracterizing the testimony.

Page 62

BY MR. SABA:
Q. Go ahead and explain, Mr. Harvey. You said it's not something you saw during your review and I'm asking well, what was your review composed of with respect to Mr. McHugh's experience with fintech?
MR. CIOFFI: Objection. The question is argumentative. He's answered it, but you may answer it again.
THE WITNESS: You're asking for objective information when the question demands subjective -- at least partly subjective answer.
BY MR. SABA:
Q. Well, my next question was, what understanding did you have, what did you review with respect to Mr. McHugh's experience in fintech?
**A. It didn't come up as a strength in his cards. He's been -- I guess, let me ask a bigger question.**
**Are you asking me to rate these two candidates or these two professionals against each other?**
Q. I'm asking you to provide me with any objective information that would indicate that Tim Spence was superior to Mr. McHugh.
**A. And I would go -- I would say if you go line by you line through this what's desired qualifications done by an outside firm, it would be obvious that Tim**

Page 63

**was a superior candidate.**
Q. Why would it be obvious?
**A. Because he has mastery over these things. Because he's a magnetic leader. Because he understands fintech. Because he can make a deal with the Silicon Valley guys that put Fifth Third on top.**
Q. And --
**A. Because -- because he's -- his name in the community is -- rings bells. Because the federal bankers call up Tim for advice. I mean, on topic after topic, day after day, there is a yawning gap between the two.**
Q. And I'm asking for what do you base that information on with respect to Mr. McHugh?
MR. CIOFFI: Objection. He just answered --
THE WITNESS: So did Mr. McHugh get phone calls?
MR. CIOFFI: I'm going to instruct the witness.
THE WITNESS: Sorry.
MR. CIOFFI: I do want you to continue your question. Counsel, he's answered the question, but go ahead and continue your answer.
THE WITNESS: So the top regulators in banking regularly call Tim for advice. They don't

Page 64

regularly call Phil for advice.
BY MR. SABA:
Q. When did the topic --
**A. That's --**
Q. Let me ask, when did the top regulators in banking start calling Tim Spence for advice?
**A. I would say during the liquidity crisis.**
Q. When during the --
**A. I don't remember the exact dates of that.**
Q. What year?
**A. Last year.**
Q. Okay. So you're referring to what the regulators calling him in 2024, correct?
**A. Yes.**
Q. What about prior to October of 2020?
**A. Well, I don't know what specific regulators he talked to on what day, but I know that he talks to the regulators. They respect him. They call him for advice, and our reputation with the regulators has gone from horrible to top of the pack. That's an objective answer.**
Q. When did Mr. Spence's conversations with regulators begin?
**A. I'm not certain, but I've seen -- I've seen the results of them. That doesn't just happen.**

Page 65

Q. Are you aware of any conversations that Mr. Spence had with regulators prior to October of 2020?
**A. Again, I don't know the -- I don't know the dates when these conversations took place. I don't think that's the germane question in any event.**
Q. Do you have any objective information or data indicating that as of September 22, 2020, Tim Spence was superior to Phil McHugh with respect to maintaining Fifth Third Bank's standing with the regulators and managing the implications with the rise of BSG issues in 2020 and beyond?
And, again, I'm referring to prior to September 22, 2020.
**A. So you just said 2020 and beyond?**
Q. I'll read the question to you again.
**A. Okay.**
Q. Do you have any objective information or data indicating that as of September 22, 2020, Tim Spence was superior to Phil McHugh with respect to maintaining Fifth Third Bank's standing with the regulators and managing the implications of the rise of BSG issues in 2020 and beyond?
**A. I'd have to look at them side by side. I don't have that in front of me.**
Q. You'd have to have them both assessed side by

Page 66

side to be able to determine that; isn't that correct?
MR. CIOFFI: Objection to the form of the question.
THE WITNESS: That's not entirely correct.
BY MR. SABA:
Q. Why not?
**A. That's part of it. Because there's a whole wealth of experience and, you know, the North Star project, which Tim led when he was number two to Greg, which pulled the bank from last place to first amongst regional banks or near last, near first.**
Q. When was the North Star project?
**A. That was under Greg and it lasted about six years, if memory serves, and involved all the bankers, what they had to do. But Tim was the one that thought it up and drove it.**
Q. When did it begin?
**A. It began about four years before the MB merger, but I don't know exactly. I mean, Tim thought that up and led it, and the results speak for themselves.**
Q. Who told you that Tim thought that up and led it? You weren't at Fifth Third then, correct?
**A. No. I mean, Greg spoke widely and positively about Tim's leadership there, and he was the boss of**

Page 67

**both of these folks.**
Q. Did you ever have -- prior to October 2020, did you ever have a conversation with Greg Carmichael about Tim Spence becoming the next president and CEO of Fifth Third Bank?
**A. No.**
Q. You never did?
**A. No.**
Q. Did you ever have any conversations with Greg Carmichael about Tim Spence's potential with Fifth Third Bank?
MR. CIOFFI: Objection to the form of the question. Are you talking about inside the board meetings or outside the board meetings?
MR. SABA: Ever.
THE WITNESS: I never had a one-on-one conversation with Greg.
BY MR. SABA:
Q. About Tim Spence?
**A. About anything.**
Q. Do you have any objective information or data indicating that as of September 22, 2020, Tim Spence was superior to Phil McHugh with respect to the ability to navigate complexity and demonstrate resilience in a challenging world?

Page 68

**A. Again, I get hung up on the objective data. When you see that our -- everything we've done has gotten -- is dramatically approved in its realms, is that objective data? Depends on how everybody else did it.**
Q. You're saying that you're referring to that after Tim Spence become president and CEO, that those improved; is that what you're saying?
**A. I think the North Star project was part of the improvement, which, again, which Tim led, but that was before he was CEO. And certainly after he was CEO. I've only been on the bank -- most of the time I've been on the bank, Tim has been CEO and there you can see the results of his work.**
Q. You're saying after he became president and CEO?
**A. I would say both.**
Q. So what objective information or data do you have indicating that as of September 22, 2020, Tim Spence was superior to Phil McHugh with respect to the ability to navigate complexity and demonstrate resilience in a challenging world?
**A. Because the parts of North Star that he was part of and his current duties were the fastest and most improvement that I could see. Is that objective?**

Page 69

Q. What were the parts of North Star that Tim Spence was involved in?
**A. Well, he was -- it was -- he did a few different parts, and I'd have to sit down with him and review it.**
Q. What role did the other executives play in -- as part of the North Star project?
**A. They all had goals. They all had KPIs.**
Q. And who set those goals?
**A. I'm not sure. I presume it was Greg, or Greg and Tim.**
Q. How did Phil McHugh do with respect to meeting his goals?
**A. Again, I'm not sure.**
Q. What aspects of the North Star project was Phil McHugh involved in?
**A. I'm not sure. One project that he was involved in was the merger or the acquisition, I should say, of MB by Fifth Third.**
Q. Who's he?
**A. Tim.**
Q. Tim Spence?
**A. Yes. That was a -- that was a very important merger for both institutions. It created a lot of value, probably close to a billion dollars in value. It**

Page 70

**was complex in every dimension. It was overseen by the regulators and it was pretty -- a big lift there. People predicted that it would fail because almost every merger in Chicago had failed, and objectively it set a fantastic success. That was before 2020, before your time frame, and that's -- that was a big deal, and Tim was the guy that did that.**
Q. With respect to that merger, it was announced in May 2018; is that right?
**A. I presume so.**
Q. And between May of 2018 and Christmas Eve of 2018, Fifth Third stock dropped by 30 percent, didn't it?
MR. CIOFFI: Objection. Counsel is testifying. There's no foundation. Objection to the form of the question, but I'm not going to instruct you not to answer.
THE WITNESS: I'm not going to challenge --
MR. CIOFFI: Wait, hold on.
THE WITNESS: Sorry.
MR. CIOFFI: Let me finish my objection. I'm not going to instruct you not to answer. You may answer that particular question.
THE WITNESS: I am not sure of exactly where the stock was on what date. I know overall the

Page 71

performance has been spectacular.
BY MR. SABA:
Q. Were there any other mergers that Fifth Third engaged in prior to that time where Fifth Third stock price dropped by 30 percent within seven months?
**A. You can pick two dates, if you choose the two that have the biggest change in the stock market, and paint a terrible picture or you can paint a rosy picture. The overall picture should be, has it met the performance of time and is it significant? And the answer to that is yes. We've doubled the -- we have doubled the value of the bank since Tim took over. It's not this dollar amount on this date compared to another dollar amount on another date. That's a spurious way to think about it.**
Q. That wasn't my question. My question, have there been any Fifth Third Bank mergers, prior to the MB merger, where Fifth Third stock dropped 30 percent in seven months?
**A. No, not that I know of. Actually, there may have -- well, there may have been, I have no idea. It's not how one should evaluate.**
MR. SABA: We can go off the record.
THE VIDEOGRAPHER: Off the record at 11:50.

Page 72

(A recess was taken from 11:50 a.m. to 12:08 p.m.)
THE VIDEOGRAPHER: We are back on the record. This is media 2 of today's deposition. The time is 12:08.
(Plaintiff's Exhibit 3 is marked for identification.)
BY MR. SABA:
Q. Mr. Harvey, I've handed you what's been marked as Exhibit Number 3. Can you identify that for me, please?
**A. Looks like a lawsuit.**
Q. This was a lawsuit filed as a result of the Fifth Third/MB Financial merger; is that correct?
MR. CIOFFI: Objection to the form of the question. Counsel, you are not permitted to identify documents and testify. You can ask the question -- the question to the witness is what it is, if he knows, but you can't testify as to what it is.
BY MR. SABA:
Q. Did you hear my question?
**A. What is this?**
Q. You identified this as a lawsuit and I asked you if this is a lawsuit that was filed as a result of

the Fifth Third/MB Financial merger; is that correct?
MR. CIOFFI: Objection. I'm going to instruct the witness to answer the question based on your own knowledge, not on counsel's representation.
THE WITNESS: Yeah, I don't -- I don't recall this.
BY MR. SABA:
Q. You were named as a defendant --
**A. I see that.**
Q. -- in this lawsuit, correct?
**A. I see that.**
Q. Along with the other directors from MB Financial; is that correct?
**A. Yes.**
Q. And so was Fifth Third Bank?
**A. I haven't gotten that far yet.**
Q. Do you see the second page of the document where it identifies Fifth Third Bank as a defendant?
**A. Yes.**
Q. Do you recall any of the lawsuits that were filed as a result of the Fifth Third/MB Financial merger?
**A. No.**
Q. Do you recall a lawsuit filed in Cook County, Illinois, captioned Fox v. Fifth Third Bank as well as



the other named directors of Fifth Third Bank?
**A. I do not recall that.**
Q. Do you know what the result of this lawsuit was that was identified as Exhibit 3?
**A. No, I don't.**
Q. Do you know what the result of the lawsuit was that's captioned Fox v. Fifth Third Bank, as well as the other named directors of Fifth Third Bank?
**A. No, I don't.**
Q. Are you aware if any mergers or acquisitions engaged in by Fifth Third Bank prior to May of 2019 led to several lawsuits afterwards?
**A. No, I was not.**
(Mr. McHugh leaves the deposition room.)
(Plaintiff's Exhibit 4 is marked for identification.)
BY MR. SABA:
Q. Sir, I have handed you what's been marked as Exhibit Number 4. It is a two-page document. The first page is Fifth Third-McHugh 0212883. The second page is Fifth Third-McHugh 0213203.
**A. Got it.**
Q. If I could refer you to the second page, Fifth Third-McHugh 0213203.
**A. Yep.**



Q. And let me represent to you, this is a text message exchange between Bob Shaffer and Frank Forrest. Do you know who Bob Shaffer is?
**A. Yes.**
Q. Who's Bob Shaffer?
**A. He's a senior official at MB -- I mean at Fifth Third.**
Q. Do you know what role he sits -- serves in?
**A. Right now? It's recently changed, and I think he's in charge of the commercial bank, but I'm not certain. It just happened.**
Q. The other person involved was Frank Forrest. Do you know who Frank Forrest is?
**A. No, I don't.**
Q. Have you ever heard the name Frank Forrest?
**A. No.**
Q. If you could refer about two-thirds down the page, and I am referring specifically to a text message dated October 11, 2019, 10:51:14 on the Universal Time Clock. Do you see that?
**A. Is this the long paragraph section?**
Q. Just below that. The time is 10:51:14 on the Universal Time Clock. Do you see that?
**A. I got it.**
Q. And the text reads, "Heading to Chicago for



some productive conversations and problem resolution. I'll try to solve the credit issues while I'm up there as well."
Were you aware of what credit issues were going on at Fifth Third Chicago after the merger in October 2019?
MR. CIOFFI: Objection to the form of the question. Lacks foundation. Counsel is testifying. Again, I'll instruct the witness to answer based on your personal knowledge.
THE WITNESS: I'm not aware of this.
BY MR. SABA:
Q. The next text after that is October 11, 2019, 10:56:52 on the Universal Time Clock, and it's from Frank Forrest. "You need to do that. We need one capable executive, not three, overseeing MB. That would be a great start. Make it happen."
Do you see that?
**A. Uh-huh.**
Q. And then the response from Mr. Shaffer is, "I already did. I met with Greg earlier this week and told him Phil is the guy. And that Lars needs to work through Phil when necessary in Chicago."
**A. I see that.**
Q. Do you recall in October of 2019 Phil McHugh

Page 77

taking over as the person overseeing MB?
MR. CIOFFI: Objection to the form of the question. Misstates the document itself. The document speaks for itself. Counsel is testifying. Again, I'm going to instruct the witness to answer based on his own knowledge, not on counsel's representations.
THE WITNESS: I don't remember this.
(Mr. McHugh enters the deposition room.)
(Plaintiff's Exhibit 5 is marked for identification.)
BY MR. SABA:
Q. Mr. Harvey, I've handed you what's been marked as Exhibit Number 5, which is Bates stamped McHugh 01574 through McHugh 01578. It is an article from Crain's Chicago Business and the title is "Fifth Third Inherits $400 million headache."
And the first line reads, "A federal lawsuit, first filed in 2014 and unsealed only now, alleges MB Financial, acquired last year by Fifth Third, defrauded the FDIC in its treatment of loans acquired from failed Broadway Bank."
Are you aware of a lawsuit that had been filed against MB Financial back in 2014 that -- alleging that MB Financial defrauded the FDIC?

Page 78

**A. I was not aware of that until I saw this article.**
Q. Were you aware of whether or not Fifth Third was substituted in for MB Financial with respect to that lawsuit?
**A. No idea what that means.**
Q. Do you know what the end result of the lawsuit referenced in Exhibit 5 was?
**A. No, I don't.**
Q. What was your role with MB Financial at -- back in 2014?
**A. Chairman of the board.**
Q. But you don't recall any knowledge of this lawsuit; is that correct?
MR. CIOFFI: Objection. Asked and answered. Counsel is arguing with the witness. He already answered the question.
THE WITNESS: Do you want me to say it again?
MR. SABA: Yes.
THE WITNESS: No. I saw a lot of documents and dealt with them at the time.
BY MR. SABA:
Q. Are you aware of any other Fifth Third mergers that occurred prior to May of 2019 where Fifth Third inherited FDIC fraud litigation as a result of buying

Page 79

the other bank?
**A. No.**
Q. Do you agree with Eileen Mallesch's testimony that Tim Spence is a young Jamie Dimon?
MR. CIOFFI: Objection to the form of the question. Misstates the testimony. Counsel is testifying, but you may answer.
THE WITNESS: I don't know Jamie Dimon. I would say in the ranks of powerfully brilliant bankers, those two names come to the top, the second one, of course, being Fifth Third.
BY MR. SABA:
Q. Do you agree with Mitch Fieger's testimony that Phil McHugh is an old-fashioned, traditional banker?
MR. CIOFFI: Objection to the form of the question. Misstates the record.
THE WITNESS: I don't love that terminology. I think he's a nuts-and-bolts banker.
BY MR. SABA:
Q. What do you mean by that?
**A. He takes a task and does it.**
Q. Anything else?
**A. I don't know Phil well enough to elaborate on that. I would say leadership is much more than that.**

Page 80

**I've tried to emphasize this throughout the conversation. And you can't just choose tasks as your metric.**
Q. You testified earlier that you felt that the Fifth Third acquisition of MB Financial was a home run; is that correct?
**A. I'm not sure I used that terminology, but I think it was very successful.**
Q. What metrics do you use to indicate that the Fifth Third/MB Financial merger was very successful?
**A. Almost every rating of the big regional banks, there is about 20 banks, and the cohort would come out either in the first or second place up from the bottom quartile.**
Q. Ratings by whom?
**A. This is a peer group presentation given to the board of directors of Fifth Third.**
Q. Who gave the peer group presentation?
**A. Tim. Tim Spence.**
Q. And do you know what the source of Tim Spence's indication was that Fifth Third finished that high in the ratings?
**A. I presume it was different sources, but I don't know. There's no question that this has been a terrific success.**

Page 81

Q. Other than Tim Spence indicating that it was a terrific success, what other information or data or metric do you have to indicate that the merger between MB Financial and Fifth Third was a success?
MR. CIOFFI: Objection to the form of the question. He has answered that question, but you may answer it again.
THE WITNESS: We used a lot of data sources, including the popular press, but the Fifth Third Bank is now -- has great growth, low -- low numbers of loans that didn't get repaid properly, excellent staff retention, big growth in fee-based income, leadership with fintech, the great love poured upon us by the regulators, very keen on what we do and how and why we do it. I mean, it's -- this is not -- it's very hard to achieve these numbers. It's not hard to understand them.
BY MR. SABA:
Q. The love from the regulators, you're saying that love from the regulators is because of the Fifth Third/MB Financial merger?
**A. It's because of the way Fifth Third is being managed right now.**
Q. Does the --
**A. Which is the recent history.**

Page 82

Q. Does the love from the regulators have anything to do with the Fifth Third/MB Financial merger?
**A. I would say it was part of Fifth Third's cleaning up its own book, using that opportunity to -- the merger to tighten up a lot of screws, as it were. The merger was a success by any measure. It took a lot to shake out. It took over a year to get regulatory approval.**
**Most mergers as I said in the Chicago market have been failures, and this one was managed completely differently with a completely different result.**
Q. The -- you referenced growth.
**A. Yep.**
Q. You referred to growth and fee-based income. What other growth was there?
**A. There was growth in loans. There was --**
Q. Are you saying in the number or total value of loans?
**A. Both. There was a reduction in loans that didn't pay off -- I'm trying to remember the exact term -- look at my mind doesn't right at this second. I'd have to look at the reports to do this without error, but it's unambiguous.**
Q. Any other measures that you indicate or that you feel indicate that the MB Financial and Fifth Third

Page 83

Bank mergers was a success?
**A. Well, our earnings are up very substantially. Our regulatory affairs have dropped to a regulatory -- our work with regulators is excellent compared to terrible.**
Q. When you say "earnings," are you saying earnings per share?
**A. Of course, yes.**
Q. Did the earnings per share drop from 2023 to 2024?
**A. I don't believe so, but it's possible. They were secular drops. Certainly between the time of the merger and today. It's a great story.**
Q. Anything else?
**A. The strategic moves of expanding into the southeast have been widely celebrated.**
Q. What did that have to do with the Fifth Third/MB Financial merger?
**A. Well, it gave us a bigger platform from which to move, more monies available, which is important.**
Q. You're saying that the movement into the southeast would not have occurred without the Fifth Third/MB Financial merger?
**A. No, I'm not saying that. I'm saying if you have more money, you can buy more things and start more**

Page 84

**de novos. If you're more capitalized, which is a more polite way to put it, you have more options.**
MR. SABA: We can go off the record.
THE VIDEOGRAPHER: Off the record, 12:26.
(A recess was taken from 12:27 p.m. to 12:27 p.m.)
THE VIDEOGRAPHER: Back on the record, 12:27.
(Plaintiff's Exhibit 6 is marked for identification.)
BY MR. SABA:
Q. Mr. Harvey, I've handed you what's been marked as Exhibit Number 6, which is Bates stamped Fifth Third-McHugh 001216 through Fifth Third-McHugh 001222. Have you seen this document before?
**A. I probably did. I can't remember. I can't remember it exactly.**
Q. You can turn to the third page, Fifth Third-McHugh 001218, which is a letter from Greg Carmichael to the board and the second paragraph it indicates, "As Bob Shaffer and I discussed with you at the September board meeting, we believed that Phil McHugh could be at risk with Tim's promotion. And, in fact, Phil has decided not to accept the role of head of consumer and business banking and is leaving the company."

Do you recall Greg Carmichael and Bob Shaffer indicating to the board that they believe Phil McHugh could be at risk with Tim's promotion?
**A. I recall getting this memo.**
Q. Say that again. I'm sorry.
**A. Yes, I recall getting this memo.**
Q. Do you recall -- do you recall at this September board meeting Bob Shaffer and Greg Carmichael indicating that Phil McHugh could be at risk with Tim's promotion?
**A. I don't remember when it was, but I do recall the conversation.**
Q. And what was the basis for that conversation? Why did they indicate that?
MR. CIOFFI: Objection to the form of the question. Lacks foundation. Again, I'll instruct the witness to answer based on your own personal knowledge.
THE WITNESS: I don't know quite what they were thinking. Sorry, repeat --
BY MR. SABA:
Q. What led to Mr. Shaffer and Mr. Carmichael indicating at the September board meeting that Phil McHugh could be at risk with Tim's promotion?
**A. I'm not sure what led to it, but I**



**presume it's because --**
MR. CIOFFI: Object. I'm going to instruct the witness not to presume or guess. If you know, you may answer the question.
THE WITNESS: I don't know.
BY MR. SABA:
Q. Did Mr. Carmichael and Mr. Shaffer indicate why they thought Phil McHugh could be at risk with Tim's promotion?
MR. CIOFFI: Objection. Asked and answered.
THE WITNESS: Yeah, I don't know.
MR. CIOFFI: Counsel, I think you're out of time.
MR. SABA: Okay. That's all I have. We'll continue in progress.
MR. CIOFFI: Again, we object. You have no right to continue in progress, but we recognize you've tried to preserve whatever right you think you have.
I have a few questions. Let's mark this as Exhibit Number 7, please.
(Deposition Exhibit 7 is marked for identification.)



EXAMINATION
BY MR. CIOFFI:
Q. Mr. Harvey, what is Exhibit Number 7?
**A. This one I've just been handed?**
Q. Yes.
**A. It's minutes of a board meeting of the board of directors from September 21, 2021 -- 2020.**
Q. I want to direct your attention to the last paragraph on the first page.
**A. Okay.**
Q. I'm just going to read it into the record and ask you a couple questions about it. "Next, Mr. Beaudin reviewed the process utilized to assess Mr. Spence. Mr. Beaudin described the leadership, personality style, problem solving and critical thinking online assessment tools utilized by RHR International. He also discussed the extensive structured behavior interview process completed with Mr. Spence and the stakeholder input received through interviews with Mr. Carmichael and Mr. Spence's peers and direct reports. Mr. Beaudin then reviewed the assessment report of Mr. Spence."
Do you see that language at the bottom of the page?
**A. Yes.**
Q. When you testified earlier about a 360



assessment, is that what you were referring to?
MR. SABA: Objection.
BY MR. CIOFFI:
Q. You may answer.
**A. Yes.**
Q. Let's --
**A. In part.**
MR. CIOFFI: Let's mark this as Exhibit 8.
MS. POOLE: You need to hand that to the court reporter.
MR. CIOFFI: And this is Exhibit 9, please. Sorry. Let me retract that. Exhibit 8, I gave you the wrong document. This should be Exhibit 8. So I'm withdrawing that.
(Deposition Exhibit 8 and Exhibit 9 are marked for identification.)
MR. CIOFFI: So this should be Exhibit 8.
BY MR. CIOFFI:
Q. Do you have Exhibit 8 and 9 in front of you there?
**A. Yes.**
Q. In terms of the assessment that Mr. Beaudin was referring to at the board meeting of September 21, 2020, are these copies of that assessment?
MR. SABA: Objection.

BY MR. CIOFFI:
Q. You may answer.
**A. Yes.**
Q. Were these documents part of the board package that you received prior to the meeting?
**A. Yes.**
MR. SABA: Objection.
BY MR. CIOFFI:
Q. I want to direct your attention to Exhibit Number 9, and you see, if you turn to the first page that, you see at the bottom the Bates number is 0991 (sic); do you see that? This is Exhibit Number 9.
**A. Right.**
Q. Yeah, look at the bottom of the page, to the right-hand side. Do you see those numbers?
**A. Yes.**
Q. Okay. So this is the first page and you see the sentence there says, "RHR International interviewed the following people as part of the 360 process"?
**A. Yes.**
Q. Do you see that? And there are direct reports and peers?
**A. Yep.**
Q. When you testified earlier about the 360 process and these interviews, were you referring to this



particular process?
MR. SABA: Objection.
THE WITNESS: Yes.
BY MR. CIOFFI:
Q. And who was interviewed in the peers list, if you could read that into the record?
**A. Lars Anderson; Kevin Lavender; Jamie Leonard; Phil McHugh; Jude Schramm; Tayfun Tuzun; Susan Zaunbrecher.**
Q. I want you to turn to the next page, page 2, and I'm going to read the first three paragraphs of page 2 and ask you a couple questions about it.
**A. Okay.**
Q. You see in -- so it says, "Timothy Spence demonstrates a strong fit to the leadership characteristics desired in a chief executive officer at Fifth Third Bank. His passion and exceptional analytic and problem-solving skills, coupled with his values-driven leadership and capacity to continuously learn and develop, make him an exceptional candidate.
Timothy is a creative, forward-thinking strategic thinker who balances objective data with his subjective experience to derive innovative solutions to business challenges. He demonstrates exceptional abilities in dealing with complexity and ambiguity and a



capacity to exercise the business levers most material to having an impact on the bottom line. He is a thoughtful and thorough decision maker who is disciplined and structured in his approach to work. He holds himself and others to high standards of performance but also knows when good enough is good enough.
He is a values-based leader who cares deeply about the organization -- organizational culture and the well-being of his employees. With a fine-tuned understanding of others' needs and motivations, he is admired for his ability to adjust his leadership approach based on what is required by the individual and the circumstances at hand. He is a compelling speaker who projects a passionate message to his audience. His diplomatic manner allows him to challenge the ideas of others without creating defensiveness or resistance, which facilitates his ability to gain buy-in to his strategies and objectives."
Do you see those paragraphs?
**A. I do.**
Q. What's your understanding of how that summary came to be about in the 360 process?
MR. SABA: Objection.



BY MR. CIOFFI:
Q. You may answer.
**A. This is an outside firm that doesn't run the place on a day-to-day basis but is responsible for assessing organizational leaders, how they are, how they could be, where they have room for improvement, and this is their assessment of Tim Spence. It's extremely positive, as fits the situation.**
Q. Was this assessment consistent or inconsistent with your experience and observations of Tim Spence from the first time you met him prior to the MB transaction through September 21, 2020?
MR. SABA: Objection.
THE WITNESS: Yes, it's completely consistent and there's more. This is a boil down.
BY MR. CIOFFI:
Q. Let me -- let's parse through it. So, again, just so the record's clear, when did you first meet Tim Spence?
**A. I believe it was 2016. I'd have to check on the exact date. Greg brought him to our first meeting at MB Financial, our first conversation that we had on this topic, and we recognized immediately the man has got something special going on, that he -- he knows his stuff, he's -- every single major dimension of banking,**

Page 93

**he's a leader, and banking is more than providing a financial service to him. It's about building communities, willing them together, and you can't help but be impressed by the guy when you see it's not just words, it's what he does every day.**

**If I sound like an advertisement, it's because -- it's because it's -- the man is truly exceptional and we're -- I don't think we would have consummated or even pursued the merger with MB if it wasn't for Tim's leadership or if Tim was not part of the group, we would not have pursued it.**

Q. During the time you met with Tim Spence between 2016 throughout the merger discussions up to September 21, 2020, did you observe these characteristics and qualities in Tim Spence?

**A. Yes, from the very first meeting.**

Q. Yes, please explain what you observed over those years.

**A. So the first meeting we had, Tim and Greg presented and Tayfun presented the case for a merger, and we talked about it privately afterwards as one would do, and we came to a tacit understanding that this is worth pursuing, explicit understanding that this was worth pursuing, but we also felt that without Tim it wouldn't happen.**

Page 94

Q. Why do you say that?

**A. Again, because he is an -- he is an exceptional leader and he knows a huge amount about banking beyond what you learn from running a bank. Tim was in the bank consulting business for I think six years at Oliver Wyman, so he got to see dozens of organizations, successes and failures, understand from them and teach from them as well. That's -- that's a rare set of extras when you think about a merger or an acquisition.**

**Beyond that, cold -- you know, his first meeting with us in the MB boardroom, it was not a receptive audience, it was not a hostile audience, it was a questioning audience, and the questioning was over after two or three hours of conversation. And there were no PowerPoints and there was no jargon, it was just straight out strategy and a lot of discussions about the particulars. And turns out Tim knew about the operating systems of our computers and he knew about the legal issues that both sides had and so forth. Just one box after another was ticked off and it gave us a huge amount of confidence to proceed.**

Q. When you say one box or another was ticked off, are you referring to your earlier testimony today?

MR. SABA: Objection.

Page 95

THE WITNESS: Some of it.

BY MR. CIOFFI:

Q. Could you describe that in more detail, please?

MR. SABA: Objection.

THE WITNESS: Leadership is not the same as doing tasks or doing chores. It's a pretty rare characteristic in human species. And Tim has got his share of it, and he stands apart. It's just that simple.

And there are other good bankers in the world and there are other smart people in the word, but this is not a -- this is not a minor difference between them and Tim.

BY MR. CIOFFI:

Q. When you say "not a minor difference," what do you mean by that?

**A. I mean, to have somebody who is understanding and leading in so many dimensions at once and who is -- combines the visionary aspect and the executive actions aspect is just rare. There's -- there are trade-offs in banking and there are very few people who can transcend those trade-offs, and Tim is one of them.**

**And I'm a pretty hard judge. I mean, I've had to build a lot of companies from scratch. And if you**

Page 96

**don't have a good BS detector, you won't get the job done. If you're more about words than actions, you won't get the job done. But symmetrically, if you don't have any vision, if you don't know where the -- how to get ahead of the puck, as it were, you can produce decent results but you won't be transformative.**

Q. Directing your attention back to Exhibit Number 9, I want you to turn to page 13. This is Exhibit Number 9. Exhibit Number 9, page 13.

**A. Got it.**

Q. You see the heading of this is Peer Feedback Strengths?

**A. Yep.**

Q. What's your understanding in this 360 process of peer feedback?

MR. SABA: Objection.

THE WITNESS: So these are direct quotes, as I understand it, from his interviews from -- sorry, HRH's interviews about him.

BY MR. CIOFFI:

Q. And interviews of whom, peers?

MR. SABA: Objection.

THE WITNESS: Interviews of Tim.

BY MR. CIOFFI:

Q. It says peer feedback?

Page 97

MR. SABA: Objection.
THE WITNESS: Yeah.
BY MR. CIOFFI:
Q. It says peer feedback. What's your understanding of that?
MR. SABA: Objection.
THE WITNESS: Yeah. So there are interviews of peers that are anonymized and synthesized.
BY MR. CIOFFI:
Q. And the peers are listed back if you look back on page 1 of that document?
**A. Yes.**
MR. SABA: Objection.
BY MR. CIOFFI:
Q. And the peers include Phil McHugh; is that correct?
MR. SABA: Objection.
THE WITNESS: That is correct.
BY MR. CIOFFI:
Q. I want you to read through the bullet points on page 13 into the record. Go to page 13.
**A. I've got these scrambled.**
Q. This is page 13 of that Exhibit Number 9.
**A. It stops at page 12. I think it is -- sorry.**
Q. Do you see that, page 13?

Page 98

**A. I'm not used to working on analog form. Yes.**
Q. Just an aside, lawyers always work on analog papers. We kill a lot of trees.
So would you read those bullet points, please, of the peer feedback?
**A. The whole?**
Q. Yeah, just go on down that list?
**A. "He is very charismatic in advocating for his ideas. He's very articulate and has a great ability to present in a way that conveys his knowledge of the topic at hand. He is very clear and articulate and is a good storyteller. He's clear on vision, expectations, and telling the FTB story. His ability to grasp concepts and relate them to the real-life examples is incredible. He is strategic and intelligent and brings a level of empathy and authenticity to his conversations. He is a genuine and kind human being."**
Q. Keep going.
**A. Under the heading "is very innovative." "He is one of those people who is always looking forward and has incredible ideas for the company. He knows how the banking business" -- sorry, "he knows the banking business and thinks outside the box; he thinks of how we can do things differently and how we can use data differently. He challenges everyone -- not from a**

Page 99

**competitive standpoint but from the perspective of having seen many different businesses. He brings a fresh pair of eyes and a new way of thinking; he has seen what other banks do and is able to bring the lens" -- "bring that lens to the team."**
Q. Keep going.
**A. Under the heading "Is a good colleague and a great leader. Is open to constructive feedback, and he is always looking to grow. His intelligence, his charisma, and his care for employees and the community are all exceptional. He really stands out; he has the whole package. He's very collaborative with his peers. He's one of those people whom people are drawn to. He is impressive and unique -- he will rise to the top. I think he would make a great CEO. He is a very impressive guy; I think he is a wonderful leader.**
Q. Keep going, please.
**A. Under the heading of "Is bright and insightful; is a great thinker and problem solver. He has a strong ability to use data, technology, and analytics to enhance what we are doing in the business -- he has a very good 30,000-foot understanding and view of what the company should look like. He's very bright and insightful. He's intellectually curious on a variety of topics. He possesses a deep knowledge in**

Page 100

**banking, technical especially. He quickly gets to the root cause of an issue; a lot of imperfect info comes at us fast, but he can process it quickly and effectively."**
Q. And the next page?
**A. Okay. Under the heading "Has had a great impact from a strategy perspective. He is the best at being able to look out into the future. He is dynamic, as he positions his team and the bank to take advantage of opportunities. He has been instrumental in guiding the digital strategy. Before him, we had strategy officers, but it did not have the impact we needed until Tim. He spent time with everyone on their own strategic portfolios. He's a good facilitator among the team, and he was able to formulate the strategies in different business lines."**
Q. That peer feedback that you just read, is it inconsistent or consistent with your observations of Tim Spence from the first time you met him in 2016 up to September 21, 2020?
MR. SABA: Objection.
THE WITNESS: Consistent.
BY MR. CIOFFI:
Q. In what way? Can you please elaborate?
MR. SABA: Objection.
THE WITNESS: I'll have to read all the

Page 101

bullets.
MR. CIOFFI: No, no, but just explain, please.
THE WITNESS: The point I kept making is, it's the culmination of putting it all together that shows leadership, and it's the respect he derives from the team. He has people reaching for their best possible future, their best possible outcome. It's not Tim the hero, it's Tim the enabler. And he's a true visionary.
And, you know, these sound like puffy words, but when you get to know the guy, you realize it's the real thing. He's not just unusually a great, great leader. He's a uniquely great leader.
BY MR. CIOFFI:
Q. Mr. Harvey, in your discussions with your fellow board members at the board meetings and any other time when the board discussed who the successor should be to Greg Carmichael as president, was age ever a factor in those discussions?
**A. No.**
Q. Did any board member ever mention age?
**A. No.**
Q. Did any board member in those discussions ever mention that age should be considered or discussed?
MR. SABA: Objection.

Page 102

THE WITNESS: No.
MR. CIOFFI: I have no further questions.
FURTHER EXAMINATION
BY MR. SABA:
Q. Mr. Harvey, referring back to Exhibit Number 9.
**A. Yes.**
Q. What was your involvement in creating Exhibit Number 9?
**A. I was a customer, not a creator.**
Q. You didn't have any involvement in creating this document; is that correct?
**A. That's correct.**
Q. When did you first see Exhibit Number 9?
**A. I'm not certain.**
Q. Have you ever seen Exhibit Number 9 before today?
**A. I'm not certain.**
Q. Do you know what Tim Spence's involvement was in creating Exhibit Number 9?
**A. No, I don't.**
Q. Do you know if Tim Spence was able to edit Exhibit Number 9?
**A. No, I don't.**
Q. Do you know if Bob Shaffer and Greg Carmichael

Page 103

were involved in editing Exhibit Number 9?
**A. No, I don't.**
Q. What does Exhibit Number 9 indicate about the skills and abilities of Phil McHugh?
**A. Well, in one sense it indicates he has good taste because he was one of the authors of this.**
Q. He was one of the authors of what?
**A. Of this peer feedback.**
Q. With respect to the peer feedback, if you can turn to page 15, please. If you can go ahead and read page 15 into the record, please. And this is "Peer feedback opportunities," correct?
**A. Yes.**
Q. So this is the additional peer feedback that was provided regarding Mr. Spence; is that correct?
MR. CIOFFI: Objection to the form of the question. Counsel is testifying.
If you know what this page is, you may -- you may answer.
MR. SABA: Let me rephrase.
BY MR. SABA:
Q. This is what Mr. Cioffi represented as peer feedback from earlier that was provided from the individuals listed, that's what he indicated. I'm just trying to follow his representation to you, and these

Page 104

are the peer feedback opportunities.
Can you go ahead and read those into the record, please?
**A. Sure.**
THE WITNESS: I'm assuming?
MR. CIOFFI: Yeah, you may answer. Go ahead.
THE WITNESS: Sorry.
So an editorial comment. Every decent assessment of personnel requires room for improvement to be covered and this is no exception. Okay.
"Opportunities can lack structure and organization. Accessibility is an issue, as so much is on his plate. He has 10 to 12 direct reports; this prevents him from creating the right kind of followership among his peers. He needs to focus his resources -- he could say no to more things and invest more in doubling down on the things that we know we are going to hit. This would increase his impact. He needs to be more mind of responding to messages; he often doesn't respond, which creates the impression that he's not interested in my" option.
MR. SABA: Opinion, that's what it said.
THE WITNESS: Opinion. I'm sorry. I do have

trouble reading.
MR. SABA: I understand.
THE WITNESS: Under opportunities -- under the next one, "Needs to communicate more directly and" effectively.
"He needs to reduce the consultant speak and be more direct in his communication, e.g., expense optimization versus expense cuts. He will dilute the point after a while because he is not succinct. He should spend more time learning the details of an issue. His answers sometimes indicate a lack of depth of thinking, which undermines his credibility."
Under the heading of what -- of "Can be defensive when challenged. When challenged about an idea, he grabs on to what he considers as supporting information for his thesis. He elaborates his perspective and becomes too defensive. He should admit when he does not have the answer. His replies can be vague when this happens, which makes us more hesitant to trust his answer. It's okay to be vulnerable; he has the credibility."
Under "Can make questionable talent decisions. He likes people who like him -- curious, idea



people -- and not every job suits these people well. He is coming along, but he needs to surround himself for complementarity, especially around operations. He has done a good job in responding -- sorry, has done a good job in responding" -- sorry. "He has done a good job in repositioning his talent on the team, but has not brought in as much successful talent" -- "as much talent as he might need. To be successful and not burn out, he needs better people around him."
And then the last heading is "Does not invest enough time in personal relationships. There's not a lot of interaction with the team, and it would mean a lot to" -- "for him to go out of his way to talk to people about their lives. It would create more of the experience he cares most about" -- "that he cares about you. He is very personable once he makes the effort. He has strong relationships in the bank, but if he is going to take on a more senior leadership role, he's going to create more complete" -- "he's going to need to create a more complete followership in the organization."
MR. SABA: It continues on the next page.
THE WITNESS: Oh. Under subheading of "Should



bring others along and give people time to catch up. It is hard for me to meet" -- "it is very hard for others to meet his standard -- he is in a class by himself. It can be difficult for others to perform at his level of expectation. He should be careful that he does not come across as dominating group discussions and overwhelming the others -- there are times when he should just sit back and listen. He needs to get help" -- sorry. "He needs to" -- I'm having trouble.
Can somebody else read that last sentence?
BY MR. SABA:
Q. "Needs to help others get the end point and bring them along with his thinking. Everyone agrees with the end point and the outcome, but they need to understand how he got this each step taken along the way."
Is that correct?
**A. Yes, thank you.**
Q. These peer feedback opportunities --
**A. Yeah.**
Q. -- do you know which specific peers gave the specific comments either for opportunities or for strengths?
**A. I do not.**

Q. Do you know if any of the peer feedback, either opportunities or strengths, was not included in the RHR report marked as Exhibit 9?

**A. No, I don't.**

MR. SABA: That's all I have. Continued in progress.

MR. CIOFFI: Disagree that you have the right to continue in progress. We'll read the transcript.

THE VIDEOGRAPHER: We are off the record. The time is 12:56.

_______________________________
THOMAS HAROLD HARVEY

_______________________________
DATE

\- - -

DEPOSITION CONCLUDED AT 12:56 P.M.

\- - -

C E R T I F I C A T E

STATE OF OHIO :
: SS
COUNTY OF HAMILTON :

I, Wendy L. Raymer, RPR, CRR, the undersigned, a duly qualified and commissioned notary public within and for the State of Ohio, do hereby certify that before the giving of his aforesaid deposition, THOMAS HAROLD HARVEY was by me first duly sworn to depose the truth, the whole truth and nothing but the truth; that the foregoing is the deposition given at said time and place by THOMAS HAROLD HARVEY; that said deposition was taken in all respects pursuant to stipulation of counsel; that I am neither a relative of nor employee of any of the parties or their counsel, and have no interest whatever in the result of the action; that I am not, nor is the court reporting firm with which I am affiliated, under a contract as defined in Civil Rule 28 (D).

IN WITNESS WHEREOF, I hereunto set my hand and official seal of office at Cincinnati, Ohio, this 12th day of March, 2025.

My Commission expires December 6, 2026

S/Wendy L. Raymer, RPR, CRR
Notary Public - State of Ohio

1 DEPOSITION ERRATA SHEET

Date Taken: February 26, 2025

Case Caption: PHILIP R. MCHUGH

vs. FIFTH THIRD BANCORP, et al.

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the ______ day of

____________, 20___.

___________________________________

THOMAS HAROLD HARVEY

2 DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

SIGNATURE:_______________________DATE:___________

THOMAS HAROLD HARVEY

3 DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

SIGNATURE:_______________________DATE:___________

THOMAS HAROLD HARVEY

**WORD INDEX**


< $ >
**$400** 77:17

< 0 >
**001074** 54:16
**001079** 54:16
**001105** 45:9
**001135** 46:8, 13
**001142** 49:19 50:8 51:1
**001154** 45:10
**001216** 84:13
**001218** 84:18
**001222** 84:13
**01574** 77:14
**01578** 77:15
**0212883** 74:20
**0213203** 74:21, 24
**0991** 89:12

< 1 >
**1** 3:8 35:17 40:8 45:1, 5, 12, 14, 19 46:5 49:7 97:11 110:1
**1:21-cv-00238** 1:9 5:8
**10** 104:14
**10:10** 1:20 5:3
**10:51:14** 75:19, 22
**10:56:52** 76:14
**102** 3:5
**11** 75:19 76:13
**11:50** 71:24 72:1
**12** 9:14 22:5, 15, 19, 23 97:24 104:14
**12:08** 72:2, 5
**12:26** 84:4
**12:27** 84:5, 7
**12:56** 108:11, 20
**12th** 109:19
**13** 96:8, 9 97:21, 23, 25
**15** 103:10, 11
**17** 45:19 51:9
**1700** 2:14
**17th** 46:1

< 2 >
**2** 3:8 54:11, 15 55:1, 5 72:4 90:10, 12 111:1
**20** 7:12 26:13 80:12 110:17
**20,000** 16:4
**2000** 11:5
**201** 2:14
**2014** 77:19, 24 78:11
**2016** 59:3, 4, 6 92:20 93:13 100:18
**2018** 20:22 21:9 70:9, 11, 12
**2019** 12:12 13:10 17:13 18:1 23:4, 12 24:10 34:24 35:7, 13 45:19 46:3 47:1, 25 48:20 74:11 75:19 76:6, 13, 25 78:24
**2020** 35:17 40:8 43:5 53:14, 17, 24 54:2 55:8, 16, 24 56:6 57:5 59:4, 13 60:24 64:15 65:2, 7, 11, 13, 14, 18, 22 67:2, 22 68:19 70:5 87:7 88:24 92:12 93:14 100:19
**2021** 87:7
**2022** 42:21
**2023** 83:9
**2024** 64:13 83:10
**2025** 1:19 5:2 109:20 110:2
**2026** 109:25
**21** 87:7 88:23 92:12 93:14 100:19
**22** 55:8, 24 56:6 57:4 60:24 65:7, 13, 18 67:22 68:19
**26** 1:19 110:2
**2623** 2:7
**26th** 5:2
**28** 109:17

< 3 >
**3** 3:9 72:6, 10 74:4 112:1
**30** 70:12 71:5, 18
**30,000-foot** 99:22
**360** 25:23 28:4 87:25 89:19, 24 91:23 96:14
**360-degree** 14:2 25:16, 19 28:10
**362-8700** 2:15

< 4 >
**4** 4:11 74:15, 19
**45** 3:8
**45202** 1:22 2:15, 21
**45208** 2:8
**47** 4:5

< 5 >
**5** 3:10 77:10, 14 78:8
**511** 1:21 2:21
**513** 2:8, 15, 22
**533-2701** 2:8
**54** 3:8

< 6 >
**6** 3:4, 10 6:17 84:8, 12 109:25
**629-2716** 2:22

< 7 >
**7** 3:10 86:21, 22 87:3
**7/18/60** 6:15
**72** 3:9
**74** 4:11
**77** 3:10

< 8 >
**8** 3:12 88:8, 12, 13, 15, 17, 19
**84** 3:10
**86** 3:10
**87** 3:4, 10
**88** 3:12

< 9 >
**9** 3:12 88:11, 15, 19 89:10, 12 96:8, 9 97:23 102:6, 9, 14, 16, 20, 23 103:1, 3 108:3
**90s** 10:21, 22
**94941** 6:19

< A >
**a.m** 1:20 5:3 72:1
**abbreviated** 16:15 17:10
**abbreviation** 43:24
**abbreviations** 37:15
**abilities** 90:25 103:4
**ability** 14:3, 6, 19 27:6 36:12 67:23 68:21 91:12, 18 98:9, 13 99:20
**able** 46:11 49:21 54:17 61:9 66:1 99:4 100:7, 14 102:22
**absolutely** 15:9
**accept** 84:23
**Accessibility** 104:13
**accurate** 110:10
**achieve** 81:16
**acquired** 77:20, 21
**acquisition** 69:18 80:5 94:10
**acquisitions** 74:10
**action** 14:25 109:15
**actions** 95:20 96:2
**activity** 44:16
**actual** 24:20
**add** 44:12
**addition** 34:13
**additional** 103:14
**Additionally** 7:5
**address** 6:16
**adept** 56:15 57:10
**adjust** 27:7 91:12
**admired** 91:12
**admit** 105:19
**advanced** 41:17
**advantage** 100:8
**advertisement** 93:6
**advice** 63:10, 25 64:1, 6, 19
**advocating** 98:8
**affairs** 14:7 15:4

53:3 83:3
**affiliated** 109:16
**aforesaid** 109:7
**age** 6:3 101:18, 21, 24
**agile** 25:6
**agree** 50:25 51:3, 20 52:4 79:3, 13
**agreement** 5:19 12:7 20:22, 24 21:1, 6, 12 22:7, 16
**agrees** 107:14
**ahead** 6:8 33:8 36:13 44:14 52:23 62:2 63:23 96:5 103:10 104:2, 6
**air** 9:23
**al** 1:10 5:6 110:4
**alert** 56:16 57:11
**alive** 16:22
**alleges** 77:19
**alleging** 77:24
**allow** 8:1
**allowed** 26:8
**allows** 91:16
**altar** 22:1
**amazing** 16:8 56:22
**ambiguity** 90:25
**amount** 14:18 42:13 71:13, 14 94:3, 22
**analog** 98:1, 2
**analysts** 53:13, 18, 23
**analytic** 90:17
**analytics** 99:21
**anchored** 15:10
**and/or** 110:11
**Anderson** 90:7
**announced** 70:8
**annual** 28:17, 22, 25 29:4, 13, 24 30:5, 14, 17, 21, 23 31:6, 11, 17 32:7 34:5, 6 37:1, 4, 13 38:21
**anonymized** 97:8
**answer** 7:3, 6, 22 8:1 17:20 19:1 25:25 29:16, 17 30:8 31:14 33:2, 3, 8, 12 34:4 36:2 40:20 44:11, 13 45:16 51:24 52:23 56:8 58:10 62:8, 11 63:23 64:21 70:17, 22, 23 71:11 73:3 76:10 77:5 79:7 81:7 85:17 86:4 88:4 89:2 92:2 103:19 104:6 105:20, 22
**answered** 30:7 33:1, 3, 11 44:9 52:22 62:7 63:15, 22 78:15, 17 81:6 86:10
**answering** 26:2
**answers** 56:10 105:11
**Anybody** 37:21
**anyway** 59:11
**apart** 95:9
**appear** 48:15
**APPEARANCES** 2:1
**Appearing** 2:6
**appraisals** 29:7
**apprehend** 33:6
**approach** 91:4, 13
**approaches** 27:4
**approaching** 16:4
**approval** 21:16, 17 82:8
**approved** 68:3
**April** 12:11 13:10 17:13 18:1 23:4, 12 24:10 34:24
**area** 42:16
**areas** 16:2 32:13
**arguing** 44:10 61:23 78:16
**argumentative** 62:7
**art** 44:23
**article** 77:15 78:2
**articulate** 98:9, 11
**artificial** 56:13
**aside** 98:2
**asked** 15:18 29:9 30:7, 20 33:1, 11 44:9 52:22 72:24 78:15 86:10
**asking** 6:23 19:13 24:11 29:21 34:8 40:3 46:19 55:15 56:5 58:16, 19, 24 59:15 62:4, 9, 18, 20 63:13
**aspect** 16:19 95:20, 21
**aspects** 25:8 69:15
**aspirations** 24:17
**assess** 34:1 87:13
**assessed** 61:9 65:25
**assessing** 92:5
**assessment** 26:3 31:1 34:12 52:12 87:15, 21 88:1, 22, 24 92:7, 9 104:9
**assessments** 13:25 22:3
**assistance** 42:11
**Assumes** 17:18
**assuming** 104:5
**attend** 8:8 35:7, 10 39:16
**attended** 12:11 35:7, 14
**attention** 15:3 42:15 87:8 89:9 96:7
**attorney-client** 7:25
**attorneys** 5:9
**attract** 61:1
**audience** 91:15 94:13, 14
**audiences** 15:19
**audit** 12:22
**authenticity** 98:16
**authors** 103:6, 7
**available** 83:20
**Avenue** 2:7
**avoiding** 44:20
**Avondale** 42:9
**aware** 33:25 53:22 54:1 65:1 74:10 76:4, 11 77:23 78:1, 3, 23

**< B >**
**back** 20:4 36:10 57:4 72:3 77:24 78:11 84:7 96:7 97:10 102:5 107:8
**backed** 41:18
**Bailey** 2:5 5:12
**balance** 33:21 39:5
**balances** 90:22
**BANCORP** 1:10 5:5 110:4
**Bank** 2:20 10:10 13:7 17:16 18:3, 7, 23 19:13, 16 20:3, 14 21:14 26:15 27:9 31:2, 3 33:16 34:14 35:17, 24 36:7, 15 40:14, 16 41:2, 8, 17, 19 43:8 51:22 52:6, 16 54:6, 23 57:11 58:7 66:10 67:5, 11 68:12, 13 71:12, 17 73:15, 18, 25 74:1, 7, 8, 11 75:10 77:22 79:1 81:10 83:1 90:17 94:4, 5 100:8 106:19
**banker** 79:15, 19
**bankers** 63:10 66:14 79:10 95:11
**banking** 10:5 14:7 15:3 16:8 23:14 25:8 26:10, 17, 24 28:14 41:12 53:4, 10 54:21 56:14, 20 58:9 63:24 64:6 84:24 92:25 93:1 94:4 95:22 98:22 100:1
**banks** 10:6, 7, 9, 14 32:16 35:19 39:13 51:6 66:11 80:11, 12 99:4
**bank's** 14:6 65:9, 20
**base** 52:21 63:13
**based** 44:7 73:3 76:10 77:6 85:17 91:13
**basically** 51:13
**basis** 34:3 58:1 59:24 85:13 92:4
**Bates** 45:8 54:15 77:14 84:12 89:11
**bears** 42:12
**Beaudin** 87:12, 14, 20 88:22
**becoming** 20:16 67:4
**before/after** 35:2

**began** 10:21 18:15 20:14 59:11 66:18
**begins** 26:9
**behalf** 2:1, 10 5:11, 14, 17
**behavior** 87:17
**belief** 43:16
**believe** 11:6 13:18 31:21 34:21 35:18 38:19 40:12 41:6 42:20 43:2, 7 83:11 85:2 92:20
**believed** 84:21
**bells** 63:9
**bes@sspfirm.com** 2:10
**best** 15:14 100:6 101:7
**better** 14:17 55:9, 25 57:9 58:20 60:7, 10 106:10
**beyond** 24:15 65:11, 14, 22 94:4, 11
**big** 14:7 15:2, 17, 24, 25 16:1 17:1 26:12 70:2, 6 80:11 81:12
**bigger** 27:10 62:17 83:19
**biggest** 71:7
**billion** 69:25
**birth** 6:14
**bit** 24:4
**Blank** 2:13 5:16
**blend** 52:25
**blending** 53:8
**board** 8:8 10:6, 7, 9, 12, 14, 17, 23 11:17, 22, 25 12:6, 11, 15, 18 13:6, 16 15:21 17:13, 25 18:15 20:13 23:4, 6, 8, 11, 21, 23, 24 24:5, 8, 13, 15, 20, 25 25:2, 23 26:1 27:17, 20 28:10, 11, 13 29:11, 12, 21 30:3 32:15 34:22 35:2, 6, 10, 13 36:19 37:23 39:16, 24 40:5, 9, 13 41:15 46:6 47:17 49:7, 9, 14 50:22 51:5, 6 52:10 54:6 55:4 61:20 67:13, 14 78:12 80:17 84:19, 21 85:2, 8, 23 87:6 88:23 89:4 101:16, 17, 21, 23
**boardroom** 94:12
**boards** 11:8, 24 13:25 42:14
**Bob** 27:15 75:2, 3, 5 84:20 85:1, 8 102:25
**boil** 92:15
**book** 82:4
**boss** 66:25
**bottom** 45:7 47:16 80:13 87:22 89:11, 14 91:2
**bought** 11:1
**box** 47:19 50:4 94:20, 23 98:23
**boxes** 18:12
**breadth** 41:12
**breakout** 32:12
**Brian** 2:19 5:21 50:18
**Brian.Thomas@53.com** 2:22
**bright** 99:18, 23
**brilliant** 79:9
**bring** 99:4, 5 107:1, 14
**brings** 98:15 99:2
**broad** 15:19 19:4
**broader** 15:1
**broadly** 26:23
**Broadway** 77:22
**broken** 33:22 39:5
**brought** 92:21 106:8
**BS** 96:1
**BSG** 65:10, 21
**build** 14:6 16:6, 21 25:9 26:17 95:25
**Building** 15:8 28:13 93:2
**bullet** 97:20 98:4
**bullets** 101:1
**bunch** 49:12
**burn** 106:10
**business** 14:6 77:16 84:24 90:24 91:1 94:5 98:22, 23 99:21 100:15
**businesses** 15:8, 9 99:2
**buy** 83:25
**buy-in** 91:18
**buying** 78:25

< C >
**California** 6:17
**call** 63:10, 25 64:1, 18
**called** 12:22 37:6
**calling** 64:6, 13
**calls** 21:22, 23 22:20 53:19 63:17
**candidate** 19:19, 23 20:2, 16 25:15 35:23 36:6 41:1 63:1 90:20
**candidates** 14:1 17:3, 5, 14 18:1, 6, 22 19:1, 5, 6, 11, 14, 15 41:4, 6 49:25 51:15, 16 62:18
**candidate's** 14:3 25:17
**capable** 41:11 76:16
**capacity** 53:5 90:19 91:1
**capital** 12:25 45:17
**capitalized** 84:1
**Caption** 110:3
**captioned** 73:25 74:7 110:8
**carbon** 9:10
**card** 43:14, 20, 22 44:2, 4, 7 46:14, 15, 18, 24 47:6, 16, 22, 23 48:20 50:5 59:24
**cards** 30:25 31:10 38:11 43:24 49:2, 5 59:21 62:16
**care** 99:10
**career** 28:6
**careful** 107:6
**carefully** 45:16
**cares** 91:8 106:16, 17
**Carmichael** 17:15 18:2, 6, 22 19:12, 15 20:3 25:16 27:15 35:24 36:6 39:19 40:6, 10, 16 41:2, 7 67:3, 10 84:19 85:1, 8, 22 86:7 87:19 101:18 102:25
**CASE** 1:9 5:4, 7 8:15, 24 46:20 93:20 110:3
**catch** 107:1
**cause** 100:2
**celebrated** 83:16
**cell** 38:6
**Center** 1:21 2:14, 20
**CEO** 9:18 13:22 17:15 18:2, 7, 23 19:12, 16 20:3, 13, 14 22:2 25:15 34:14 35:24 36:7 40:10, 16 41:2, 7, 21 42:20 48:17 49:25 50:4, 17 51:1, 16, 21 52:6, 15 53:5 56:14 67:4 68:7, 11, 13, 16 99:15
**CEOs** 51:5, 6
**certain** 13:11 30:18 31:7 35:8, 21 38:24 43:7 48:16, 24 64:24 75:11 102:15, 18
**Certainly** 15:6 18:8 19:8 32:15 37:15 41:9 61:17 68:11 83:12
**certified** 6:4
**certify** 109:6
**chair** 11:23
**chairman** 10:7, 11 11:11, 17 13:19 20:13 39:17 78:12
**challenge** 70:18 91:16
**challenged** 105:15
**challenges** 90:24 98:25
**challenging** 67:25 68:22
**chance** 49:11
**change** 9:23 14:20 71:7 111:4, 7, 10, 13,

16, 19, 22 112:4, 7, 10, 13, 16, 19, 22
**changed** 75:9
**changes** 15:1 110:11, 14
**chaotic** 15:7
**characteristic** 61:13 95:8
**characteristics** 14:22 26:23 27:6 58:8 60:8, 19 90:16 93:15
**charge** 75:10
**charisma** 99:10
**charismatic** 98:8
**chat** 24:2
**check** 11:6 18:12, 13 92:20
**checked** 11:15 13:19 32:10 43:9
**checking** 23:16
**Chicago** 70:4 75:25 76:5, 23 77:16 82:9
**Chief** 54:23 90:16
**choose** 56:10 71:6 80:2
**chores** 95:7
**Christmas** 70:11
**Cincinnati** 1:22 2:8, 15, 21 109:19
**Cioffi** 2:10 3:4 5:16 7:21 17:17 18:24 19:17 22:9 25:21, 25 29:14 30:7 33:1, 11 34:2, 15 35:25 37:24 40:18 42:22 44:9, 14 46:17 47:3 48:1 50:13 51:23 52:22 55:13, 20 56:4, 8 58:13 59:1, 7, 10 61:21 62:6 63:15, 18, 21 66:2 67:12 70:14, 19, 21 72:15 73:2 76:7 77:2 78:15 79:5, 16 81:5 85:15 86:2, 10, 12, 16 87:2 88:3, 8, 11, 17, 18 89:1, 8 90:4 92:1, 16 95:2, 15 96:20, 24 97:3, 9, 14, 19 100:22 101:2, 14 102:2 103:16, 22 104:6 108:7
**Circle** 6:17 7:11
**circumscribes** 49:13
**circumstances** 91:14
**citizen** 42:2 43:11
**citizens** 14:14 41:22 43:18
**Civil** 109:17
**clarify** 24:14 46:21
**class** 107:3
**clean** 9:23
**cleaning** 82:4
**clear** 11:20, 22 60:6 92:18 98:11, 12
**clearer** 7:8
**clearly** 60:14
**cliches** 44:20
**clients** 14:13 56:22
**climate** 9:16, 18, 23, 25 10:1, 3 11:25
**Clock** 75:20, 23 76:14
**close** 22:17 55:11 56:2 58:23 59:19 69:25
**cocktailer** 25:4
**cocktails** 25:2
**code** 6:18
**cohort** 80:12
**coincident** 43:7
**cold** 94:11
**collaborative** 99:12
**colleague** 99:7
**combines** 95:20
**come** 16:22 56:23 62:16 79:10 80:12 107:6
**comes** 18:14 27:7 51:9 57:13, 17 100:2
**coming** 106:2
**command** 16:12
**Commencing** 1:20
**comment** 104:8
**comments** 107:23
**commercial** 75:10
**Commission** 109:24
**commissioned** 109:5
**commitments** 42:10
**committee** 12:24 13:1, 4, 10, 13, 17, 20 30:1 31:8 37:20 39:16, 23 40:4 43:17
**committees** 12:17, 20
**communicate** 38:5 105:4
**communicated** 30:4 33:15
**communication** 105:7
**communities** 14:8, 9, 10 15:21 23:14 93:3
**community** 14:14, 16 41:22 42:3, 12 43:11, 18 44:17 47:17 48:8 63:9 99:10
**compacting** 49:16
**companies** 9:19, 21 95:25
**company** 9:5, 6 32:4 84:25 98:21 99:23
**compare** 32:17
**compared** 58:12 71:13 83:4
**comparing** 30:3
**comparison** 60:14
**compatibility** 22:3
**compelling** 91:14
**compensation** 13:1
**competition** 56:12
**competitive** 99:1
**complementarity** 106:3
**complete** 106:21, 22
**completed** 87:18
**completely** 82:10, 11 92:14
**complex** 15:24 18:11 26:10 70:1
**complexity** 67:24 68:21 90:25
**complicated** 21:14 23:17 44:21
**composed** 62:4
**comprehensive** 26:3 42:8
**Compton** 6:17 7:11
**computers** 94:19
**concept** 17:1
**concepts** 98:13
**concerned** 49:11
**concerns** 40:23
**CONCLUDED** 108:20
**conclusion** 41:3
**condensed** 31:1
**conduct** 14:11
**confidence** 94:22
**CONFIDENTIAL** 1:12 4:1, 8 47:8
**confirm** 44:6 48:18
**confuses** 22:10
**conjunction** 24:19
**connections** 24:7
**Connie** 1:24
**consensus** 16:6
**consider** 13:6 15:18 36:5 40:25
**considered** 15:19 40:1, 15, 20 41:21 101:24
**considers** 105:16
**consistent** 92:9, 14 100:17, 21
**constantly** 16:23
**constructive** 99:8
**consult** 28:25 29:3
**consultant** 26:17 105:6
**consulted** 28:18, 21
**consulting** 60:5 94:5
**consumer** 84:24
**consummated** 93:9
**CONTAIN** 4:1 31:10 37:16
**contained** 37:12
**CONTAINS** 1:12
**continue** 63:21, 23 86:15, 17 108:8
**CONTINUED** 4:1 56:11 108:5
**continues** 106:24
**continuing** 61:1
**continuously** 11:8 90:19
**contract** 109:17
**contradictory** 26:11
**contributed** 42:16

**contributes** 36:17
**contributions** 51:12
**control** 15:11
**conversation** 25:12 49:17 57:21 67:3, 17 80:2 85:12, 13 92:22 94:15
**conversations** 8:17, 20, 23 18:15 20:7, 15, 19, 20 23:13, 16 24:20, 21 25:5 28:11 30:3, 9 53:13, 15, 18, 22 54:1, 9 57:18 58:2, 3 64:22 65:1, 4 67:9 76:1 98:16
**conveys** 98:10
**Cook** 73:24
**copies** 88:24
**corner** 45:7 47:16
**corporate** 12:21 13:20
**corporations** 12:1, 3 15:2 28:13
**correct** 6:12 10:24 12:16 20:22 22:17, 21 23:7 25:17, 18, 24 29:24 32:13 38:12, 13 39:20, 21 41:24, 25 42:25 43:23 44:2, 8, 12 45:10, 11, 20 46:3, 4, 16 47:18 50:19, 23 51:18 54:6, 7, 24 56:7 57:24, 25 58:12 59:25 60:20 61:20 64:13 66:1, 4, 23 72:14 73:1, 10, 13 78:14 80:6 97:16, 18 102:12, 13 103:12, 15 107:18
**corrections** 110:11
**correlate** 39:14
**counsel** 5:23 7:24 8:3, 6 33:2 44:10 47:4 48:4 59:1 61:23 63:22 70:14 72:16 76:8 77:4 78:16 79:6 86:12 103:17 109:12, 14
**counsel's** 73:4 77:6
**count** 21:22
**County** 73:24 109:3
**couple** 87:12 90:12
**coupled** 14:25 90:18
**courage** 44:22
**course** 12:2 17:6 79:11 83:8
**COURT** 1:2 5:6, 25 7:2 88:9 109:16
**covered** 104:10
**Crain's** 77:15
**create** 16:13 106:15, 21, 22
**created** 69:24
**creates** 104:22
**creating** 20:16 91:17 102:8, 11, 20 104:15
**creative** 90:21
**creator** 102:10
**credibility** 105:13, 23
**credit** 76:2, 4
**crisis** 64:7
**criterias** 41:20
**critical** 87:15
**criticisms** 39:8
**crossed** 32:14
**CRR** 1:23 109:4, 24
**crucial** 15:9 16:9
**culmination** 101:4
**culture** 16:7 91:9
**cultures** 26:19
**curious** 99:24 105:25
**current** 17:2 68:24
**currently** 9:4 11:25 13:12
**curve** 36:13, 14
**customer** 31:22 38:14 102:10
**customized** 14:8
**cuts** 105:8
**cycle** 32:7
**cycles** 26:12, 13

**< D >**
**dangers** 26:20
**data** 27:7 55:7, 23 57:8 58:19 59:16 60:23 61:4 65:6, 17 67:21 68:1, 4, 18 81:2, 8 90:22 98:24 99:20
**Date** 1:19 6:14 11:2 12:9 20:11 21:14 29:2 45:20 48:16 55:18 70:25 71:13, 14 92:21 108:17 110:2
**dated** 45:19 75:19
**dates** 13:7 20:23 32:8 64:9 65:4 71:6
**day** 8:12 18:18 63:11 64:17 93:5 109:20 110:16
**days** 8:12 17:8
**day-to-day** 22:2 27:11 36:14 53:10 92:4
**de** 84:1
**deal** 14:7 15:17 22:17 53:2 63:5 70:6
**dealing** 90:25
**dealt** 78:21
**debate** 49:16
**decade** 10:20
**December** 45:19 46:1, 6 47:1, 25 48:19 109:25
**decent** 96:6 104:8
**decided** 84:23
**deciding** 20:8
**decision** 17:4 18:10 91:3
**decisions** 105:24
**deck** 48:19
**decks** 37:9, 12, 18
**deck's** 48:20
**DECLARATION** 110:5
**declare** 110:6
**deep** 28:15 42:15 99:25
**deeply** 91:8
**defects** 29:16
**defendant** 73:8, 18
**Defendants** 1:11 2:10 5:17, 20, 23
**defensive** 105:15, 19
**defensiveness** 91:17
**define** 58:21
**defined** 109:17
**defrauded** 77:20, 25
**demands** 62:10
**demonstrate** 67:24 68:21
**demonstrates** 90:15, 24
**department** 5:22
**depending** 39:25 49:10
**depends** 61:10 68:4
**depose** 109:8
**deposed** 6:4
**Deposition** 1:16 3:10, 12 5:4 6:20 7:18 8:18 9:2 47:8 72:4 74:14 77:9 86:22 88:15 108:20 109:7, 10, 11 110:1, 8, 12 111:1 112:1
**depositions** 8:24
**depth** 41:12 105:12
**derive** 90:23
**derives** 101:5
**describe** 95:3
**described** 87:14
**designate** 47:7
**designated** 52:14
**designation** 51:20 52:4
**designed** 53:12
**desired** 42:6 62:24 90:16
**detail** 95:3
**details** 105:10
**detector** 96:1
**determine** 18:21 20:1 37:17 39:22 40:3 66:1
**determined** 23:18 39:15
**develop** 14:8 18:5, 9 35:22 90:20
**developed** 19:10, 22 42:4
**development** 42:5, 16
**Devising** 15:12

**difference** 36:*17* 59:*22* 95:*13, 16*
**differences** 60:*18*
**different** 10:*4* 14:*9* 15:*8* 25:*8* 27:*4* 31:*1* 39:*25* 41:*16* 43:*25* 49:*10* 58:*8* 60:*15* 69:*4* 80:*23* 82:*11* 99:*2* 100:*14*
**differently** 82:*11* 98:*24, 25*
**difficult** 15:*13* 107:*4*
**dig** 24:*4*
**digital** 56:*15* 57:*10* 100:*10*
**dilute** 105:*8*
**dimension** 70:*1* 92:*25*
**dimensions** 36:*11* 95:*19*
**Dimon** 79:*4, 8*
**dinners** 24:*24*
**dioxide** 9:*10*
**diplomatic** 91:*16*
**direct** 36:*23* 87:*8, 20* 89:*9, 21* 96:*17* 104:*14* 105:*7*
**Directing** 96:*7*
**directly** 9:*11* 20:*15* 42:*16* 43:*15* 105:*4*
**director** 9:*17*
**directors** 8:*9, 15, 18, 21, 24* 12:*1, 6, 10* 13:*16, 25* 15:*21* 23:*21* 30:*10* 42:*14* 49:*14* 51:*7* 73:*12* 74:*1, 8* 80:*17* 87:*7*
**disagree** 52:*14* 108:*7*
**disciplined** 91:*4*
**discuss** 40:*8*
**discussed** 39:*12* 84:*20* 87:*16* 101:*17, 24*
**discussing** 24:*16*
**discussions** 8:*14* 9:*1* 20:*12* 59:*9* 93:*13* 94:*17* 101:*15, 19, 23* 107:*7*
**disparate** 53:*1*
**dispatching** 15:*14*
**disqualifying** 61:*13*
**DISTRICT** 1:*2, 3* 5:*6, 7*
**diverse** 61:*2*
**diversity** 45:*24*
**dividends** 15:*15* 16:*1* 42:*12*
**DIVISION** 1:*4* 5:*7* 33:*10*
**divisions** 32:*1, 25* 33:*13, 22* 38:*18* 39:*2, 5, 9*
**document** 47:*4* 49:*21, 23, 24* 54:*17, 19, 22* 56:*9* 60:*3, 14* 73:*17* 74:*19* 77:*3, 4* 84:*14* 88:*13* 97:*11* 102:*12*
**documents** 7:*20, 23* 8:*2, 5* 30:*20* 72:*17* 78:*20* 89:*4*
**doing** 20:*11* 23:*16* 25:*23* 28:*19* 29:*12* 33:*17* 41:*11* 53:*10* 95:*7* 99:*21*
**dollar** 71:*13, 14*
**dollars** 69:*25*
**dominating** 107:*6*
**doubled** 71:*11, 12*
**doubling** 104:*18*
**dozen** 21:*25*
**dozens** 94:*6*
**drafts** 49:*4*
**dramatically** 41:*17* 68:*3*
**drawn** 99:*13*
**drive** 14:*22* 15:*23*
**driving** 55:*10* 56:*1* 58:*22* 59:*17*
**drop** 83:*9*
**dropped** 70:*12* 71:*5, 18* 83:*3*
**drops** 83:*12*
**drove** 66:*16*
**duly** 6:*3* 109:*5, 8*
**duties** 68:*24*
**duty** 32:*16*
**dynamic** 100:*7*

< E >
**e.g** 105:*7*
**earlier** 25:*11, 14* 41:*14* 48:*7* 56:*19* 76:*21* 80:*4* 87:*25* 89:*24* 94:*24* 103:*23*
**early** 20:*19*
**earnings** 83:*2, 6, 7, 9*
**East** 2:*14*
**easy** 18:*12* 60:*7*
**economic** 26:*11, 12* 42:*4, 6, 13, 15*
**edit** 102:*22*
**editing** 27:*16, 20* 55:*5* 103:*1*
**editorial** 104:*8*
**effectively** 60:*25* 100:*3* 105:*5*
**efficiently** 49:*12*
**effort** 106:*18*
**eight** 9:*19, 21* 11:*13* 12:*3*
**Eileen** 79:*3*
**either** 47:*12* 80:*13* 107:*23* 108:*2*
**elaborate** 79:*24* 100:*23*
**elaborates** 105:*18*
**elements** 16:*16, 21* 17:*11* 32:*19* 49:*10*
**Email** 2:*9, 16, 22* 38:*6*
**embedded** 38:*10*
**emergency** 49:*24* 50:*2, 5, 21* 51:*4, 10, 13, 15, 17* 52:*5, 8, 15*
**emissions** 9:*10*
**empathy** 98:*16*
**emphasize** 80:*1*
**employed** 9:*4*
**employee** 10:*8* 31:*19* 38:*8* 109:*13*
**employees** 14:*23* 16:*4* 91:*10* 99:*10*
**enabler** 101:*8*
**encyclopedia** 44:*4*
**Energy** 9:*7, 8, 13, 16, 18*
**engaged** 71:*4* 74:*11*
**engagement** 31:*20* 38:*9*
**engaging** 44:*17*
**enhance** 99:*21*
**enter** 15:*7*
**enterprise** 39:*16, 23* 40:*4* 43:*17*
**enters** 77:*9*
**entire** 17:*6* 110:*7*
**entirely** 66:*4*
**entitled** 33:*2*
**Erie** 2:*7*
**ERRATA** 110:*1, 13* 111:*1* 112:*1*
**error** 82:*23*
**especially** 15:*3* 18:*25* 100:*1* 106:*3*
**Esq** 2:*1, 4, 5, 10, 18, 19*
**et** 1:*10* 5:*5* 110:*4*
**evaluate** 71:*22*
**evaluation** 28:*20* 33:*18*
**Eve** 70:*11*
**event** 65:*5*
**eventually** 18:*21* 19:*10* 20:*21*
**everybody** 38:*23* 68:*4*
**evidence** 17:*18* 58:*24*
**exact** 11:*2* 12:*9* 21:*13* 64:*9* 82:*20* 92:*21*
**exactly** 10:*19* 21:*19* 39:*14* 56:*20* 66:*19* 70:*24* 84:*16*
**Examination** 3:*4, 5* 6:*6* 87:*1* 102:*3*
**examined** 6:*4*
**example** 14:*13* 16:*1* 25:*1* 32:*16* 51:*4*
**examples** 98:*14*
**exceed** 23:*18*
**excellent** 81:*11* 83:*4*
**exception** 104:*10*
**exceptional** 90:*17, 20, 24* 93:*8* 94:*3* 99:*11*
**exchange** 75:*2*
**excuse** 21:*9* 40:*15*
**execute** 14:*4*

**execution** 27:12 55:12 56:3 58:24 59:20
**executive** 12:23 13:21, 24 31:3 54:24 76:16 90:16 95:20
**executives** 61:2 69:6
**exercise** 91:1
**Exhibit** 3:8, 9, 10, 12 4:11 45:1, 5, 12, 14, 19 46:5 49:7 54:11, 15 55:1, 5 72:6, 10 74:4, 15, 19 77:10, 14 78:8 84:8, 12 86:21, 22 87:3 88:8, 11, 12, 13, 15, 17, 19 89:9, 12 96:7, 9 97:23 102:5, 8, 14, 16, 20, 23 103:1, 3 108:3
**EXHIBITS** 3:7 4:8, 10
**existing** 61:1
**expanding** 83:15
**expectation** 107:5
**expectations** 32:18 98:12
**expected** 21:18
**expense** 105:7, 8
**experience** 26:17 28:13, 14 30:2 31:23 38:15 49:15 52:19 60:13 61:12, 14 62:5, 15 66:8 90:23 92:10 106:16
**experiences** 24:7, 9, 13
**expert** 24:2
**experts** 17:2
**expires** 109:24
**explain** 62:2 93:17 101:2
**explicit** 93:23
**extensive** 28:11 87:17
**extent** 7:23 17:19
**external** 19:5 41:5
**extraordinary** 41:16
**extras** 94:9
**extremely** 92:7
**eye** 47:9 55:11 56:2 58:23 59:19
**eyes** 99:3

**< F >**
**facilitates** 91:18
**facilitator** 100:13
**fact** 25:12 40:7 51:14 84:23
**factor** 20:8 101:19
**factors** 21:15
**facts** 17:18 36:1
**fail** 23:17 70:3
**failed** 47:24 70:4 77:21
**fails** 33:6
**failures** 82:10 94:7
**fairly** 13:23 27:1 44:3
**fall** 32:9
**family** 12:1
**fantastic** 70:5
**far** 18:14 26:16 60:7, 10 73:16
**fascinating** 48:25
**fast** 100:3
**fastest** 68:24
**FDIC** 77:21, 25 78:25
**February** 1:19 5:2 110:2
**federal** 63:9 77:18
**fee-based** 15:9 81:12 82:14
**Feedback** 96:11, 15, 25 97:4 98:5 99:8 100:16 103:8, 9, 12, 14, 23 104:1 107:20 108:1
**feel** 6:25 44:19 82:25
**feet** 25:9
**fellow** 101:16
**felt** 80:4 93:24
**Fieger** 9:1 22:1
**Fieger's** 79:13
**field** 26:25 27:2
**FIFTH** 1:10, 21 2:14, 20 5:5, 22 8:8 10:12 11:9, 21 12:2, 5, 10, 14, 18 13:16, 22 17:15, 25 18:3, 7, 23 19:12, 16 20:3, 5, 21 21:1, 5, 11 23:6, 11, 15 27:17 34:14 35:17, 24 36:7, 20 40:11, 14, 16 41:2, 7, 22 45:9 46:8, 13 49:18 50:7, 25 51:22 52:6, 16 54:6, 15, 16, 23 56:23 57:11 63:6 65:9, 20 66:23 67:5, 10 69:19 70:12 71:3, 4, 17, 18 72:14 73:1, 15, 18, 21, 25 74:1, 7, 8, 11, 20, 21, 24 75:7 76:5 77:16, 20 78:3, 23, 24 79:11 80:5, 10, 17, 21 81:4, 9, 20, 22 82:2, 3, 25 83:17, 22 84:12, 13, 17 90:17 110:4
**filed** 72:13, 25 73:21, 24 77:19, 23
**filter** 60:17
**filtering** 60:19
**finance** 12:23
**Financial** 11:12, 21 14:13 20:21 21:1, 6, 11 31:25 32:12, 24 33:9 38:17, 25 72:14 73:1, 13, 21 77:20, 24, 25 78:4, 10 80:5, 10 81:4, 21 82:2, 25 83:18, 23 92:22 93:2
**find** 49:25 50:2 59:22
**finding** 15:13
**fine-tuned** 91:10
**finish** 7:6 70:21
**finished** 80:21
**fintech** 61:12, 15 62:5, 15 63:5 81:13
**fintechs** 56:23
**fintechs/non-banks** 56:12
**firm** 60:5 62:25 92:3 109:16
**firms** 17:6
**first** 6:3 12:11, 14 20:9 21:2 34:12, 20 45:8, 20, 23 59:2 66:10, 11 74:19 77:18, 19 80:13 87:9 89:10, 17 90:11 92:11, 18, 21, 22 93:16, 19 94:11 100:18 102:14 109:8
**fit** 18:11 90:15
**fits** 92:8
**five** 35:8, 9
**focus** 104:17
**folks** 67:1
**follow** 103:25
**followership** 104:16 106:22
**FOLLOWING** 4:1, 8 9:2 22:6 24:24 25:2 89:19
**follows** 6:5
**follow-up** 24:3
**foregoing** 109:10
**form** 17:17 18:24 19:17 22:9 25:21 29:14 34:2, 15 35:25 40:18, 21 42:22 46:17 47:3 48:1 51:23 55:13 58:13 66:2 67:12 70:16 72:15 76:7 77:2 79:5, 16 81:5 85:15 98:1 103:16
**formal** 13:6 29:25
**format** 24:7, 8, 13
**former** 51:6
**Formula** 54:23 60:3
**formulate** 100:14
**Forrest** 75:2, 12, 13, 15 76:15
**forth** 13:7 24:17 26:13 27:25 38:23 50:25 94:20
**forward** 28:7 98:20
**forward-thinking** 90:21
**Foundation** 10:1, 3 34:3 70:15 76:8 85:16

**Foundation's** 9:17
**four** 66:18
**Fox** 73:25 74:7
**frame** 22:10 29:15 55:15 56:5 59:1, 3 70:6
**Frank** 75:2, 12, 13, 15 76:15
**fraud** 78:25
**free** 6:25
**frequently** 21:10, 20 23:5, 20, 22
**fresh** 99:3
**Friday** 9:2
**front** 65:24 88:19
**FTB** 56:16 98:13
**full** 38:22
**Further** 3:5 102:2, 3
**future** 16:5 36:12 56:14 58:7 100:7 101:7

< G >
**gain** 91:18
**gap** 63:11
**general** 29:7
**genuine** 98:17
**geographic** 16:2
**geography** 10:4
**germane** 65:5
**getting** 85:4, 6
**get-to-know-you** 23:15
**give** 21:13 49:11 107:1
**Given** 56:11 80:16 109:10
**giving** 109:7
**go** 6:8, 12, 13 16:2 17:9 20:4 26:12 33:8 37:18 44:14 52:23 62:2, 23 63:23 71:23 84:3 97:21 98:7 103:10 104:2, 6 106:14
**goals** 15:25 16:6 23:18, 19 32:1, 24 33:10, 14 38:18 39:1 69:8, 9, 13
**goes** 36:15
**going** 6:23 7:21 16:23 29:6 47:6, 7, 12, 13 50:12, 13, 15 57:4 63:18 70:16, 18, 22 73:2 76:5 77:5 86:2 87:11 90:11 92:24 98:18 99:6, 17 104:19 106:19, 20, 21
**good** 14:14 36:15 41:10, 23 42:3 43:11, 19 91:6 95:11 96:1 98:11 99:7, 22 100:13 103:5 106:4, 5, 6
**goodwill** 42:13
**gotten** 68:3 73:16
**governance** 12:21 13:20
**government** 15:3
**governments** 9:9, 23
**grabs** 105:16
**grasp** 98:13
**great** 14:22 16:14 42:13 76:17 81:10, 13 83:13 98:9 99:8, 15, 19 100:5 101:12, 13
**Greg** 17:15 18:2, 6, 22 19:12, 15 20:2 25:16 27:15 35:23 36:6 39:19 40:6, 10, 15 41:1, 7 66:9, 13, 24 67:3, 9, 17 69:10 76:21 84:18 85:1, 8 92:21 93:19 101:18 102:25
**grew** 20:18
**group** 61:2 80:16, 18 93:11 107:7
**grow** 99:9
**growth** 26:6, 20 81:10, 12 82:12, 14, 15, 16
**guess** 35:8 37:25 50:14, 15 52:24 62:17 86:3
**guessing** 22:18 37:23
**guest** 24:1
**guiding** 100:9
**guy** 70:7 76:22 93:4 99:16 101:11
**guys** 63:6

< H >
**Hal** 6:12, 13
**hallways** 34:21
**HAMILTON** 109:3
**hand** 88:9 91:14 98:11 109:18
**handed** 45:4 54:14 72:9 74:18 77:13 84:11 87:4
**handle** 53:1
**handled** 22:1
**happen** 14:20 64:25 76:17 93:25
**happened** 75:11
**happens** 105:21
**hard** 18:13 81:16, 17 95:24 107:2
**hardware** 15:16
**HAROLD** 1:16 3:3 6:2, 10 108:15 109:7, 11 110:19 111:24 112:24
**HARVEY** 1:16 3:3 5:4, 18, 21, 24 6:2, 8, 10 45:4 46:24 47:15 48:7 54:14 62:2 72:9 77:13 84:11 87:3 101:15 102:5 108:15 109:8, 11 110:19 111:24 112:24
**H-a-r-v-e-y** 6:11
**HCCC** 30:1 37:20 38:22
**head** 7:4 11:16 35:18 84:23
**headache** 77:17
**Heading** 75:25 96:11 98:19 99:7, 18 100:5 105:14 106:11
**headquarters** 23:3
**hear** 6:24 72:22
**heard** 37:9 75:15
**Heather** 7:16
**he'll** 46:21
**help** 9:22 15:23 27:10 42:8 44:25 93:3 107:9, 13
**hereinafter** 6:4
**hereof** 110:13
**hereunto** 109:18
**hero** 101:8
**hesitant** 105:21
**Hewlett** 9:17
**hierarchal** 37:22
**high** 80:22 91:5
**highly** 31:1
**history** 81:25
**hit** 104:19
**hold** 70:19
**holds** 91:5
**home** 80:5
**hopes** 50:6
**horrible** 64:20
**hostile** 94:13
**hours** 31:4 94:15
**HRH's** 96:19
**huge** 26:25 94:3, 21
**human** 12:25 45:17 95:8 98:17
**humdrum** 44:16
**hung** 68:1

< I >
**idea** 71:21 78:6 105:16, 25
**ideas** 91:16 98:9, 21
**identification** 45:2 54:12 72:7 74:16 77:11 84:9 86:23 88:16
**identified** 41:20 58:9 72:24 74:4
**identifies** 73:18
**identify** 46:11 49:21 54:17 72:10, 17
**Ihle-Adkins** 1:24
**Illinois** 73:25
**immediately** 92:23
**impact** 91:2 100:6, 11 104:20
**impacts** 26:19
**Imperative** 9:19, 25 11:25

**imperfect** 100:*2*
**implications** 65:*10, 21*
**important** 13:*24* 15:*6* 16:*10* 25:*4* 26:*4, 18* 60:*6* 69:*23* 83:*20*
**impressed** 93:*4*
**impression** 104:*22*
**impressive** 99:*14, 16*
**improved** 68:*8*
**improvement** 68:*10, 25* 92:*6* 104:*10*
**Include** 21:*23* 22:*20* 47:*24* 57:*19* 97:*15*
**included** 34:*6* 43:*20* 44:*1, 8* 48:*21, 22* 108:*2*
**including** 36:*11, 12* 81:*9*
**Inclusion** 45:*24*
**income** 33:*21* 39:*4* 81:*12* 82:*14*
**incomplete** 52:*12*
**inconsistent** 92:*9* 100:*17*
**increase** 42:*13* 104:*20*
**incredible** 98:*14, 21*
**indicate** 12:*10* 62:*21* 80:*9* 81:*3* 82:*24, 25* 85:*14* 86:*7* 103:*3* 105:*11*
**indicated** 22:*15, 19* 24:*12* 48:*7, 15, 17* 103:*24* 110:*12*
**indicates** 50:*17* 60:*9, 11* 84:*20* 103:*5*
**indicating** 44:*7* 55:*8, 24* 57:*8* 59:*16* 60:*23* 65:*7, 18* 67:*22* 68:*19* 81:*1* 85:*2, 9, 23*
**indication** 42:*2* 52:*10, 11* 80:*21*
**indications** 43:*16*
**indicator** 60:*1*
**indicators** 16:*18*
**individual** 91:*13*
**individuals** 103:*24*
**industry** 10:*5*
**inevitably** 57:*19*
**influenced** 15:*4*
**info** 100:*2*
**informally** 6:*13*
**information** 18:*16* 25:*11* 27:*25* 28:*2* 30:*4* 31:*15* 37:*12, 16, 18* 44:*1, 4, 8* 45:*24* 46:*5* 47:*24* 49:*12, 16* 55:*7, 17, 23* 57:*7, 15, 16* 58:*19* 59:*15* 60:*23* 62:*10, 21* 63:*14* 65:*6, 17* 67:*21* 68:*18* 81:*2* 105:*17*
**inherited** 78:*25*
**Inherits** 77:*16*
**in-house** 5:*22*
**initiatives** 14:*9*
**Innovation** 9:*7, 8, 13*
**innovative** 55:*10* 56:*1* 58:*22* 59:*18* 90:*23* 98:*19*
**in-person** 22:*20, 24*
**input** 87:*18*
**inside** 17:*4* 67:*13*
**insightful** 99:*19, 24*
**inspirational** 20:*7*
**inspire** 14:*23* 16:*3* 36:*12*
**instances** 61:*11*
**institution** 16:*24*
**institutions** 44:*24* 69:*24*
**instruct** 7:*21* 37:*24* 50:*13* 63:*18* 70:*17, 22* 73:*2* 76:*9* 77:*5* 85:*16* 86:*2*
**instructions** 7:*9*
**instrumental** 100:*9*
**intellectually** 99:*24*
**intelligence** 56:*13* 99:*9*
**intelligent** 98:*15*
**interaction** 106:*13*
**interactions** 35:*3*
**interest** 20:*17* 49:*9* 109:*14*
**interested** 104:*23*
**interests** 53:*2, 9*
**interim** 50:*3*
**Internal** 15:*13, 25* 19:*4*
**International** 55:*2* 87:*16* 89:*18*
**interview** 36:*22* 87:*17*
**interviewed** 89:*18* 90:*5*
**interviews** 87:*19* 89:*25* 96:*18, 19, 21, 23* 97:*7*
**introduce** 5:*9*
**introductory** 20:*19*
**invest** 104:*18* 106:*11*
**investigation** 27:*24*
**investments** 15:*15, 16*
**involve** 14:*2* 21:*15, 16* 24:*5*
**involved** 13:*23* 17:*7* 22:*4* 27:*16, 19* 28:*7* 31:*13* 55:*4* 66:*14* 69:*2, 16, 18* 75:*12* 103:*1*
**involvement** 28:*15* 48:*9* 102:*8, 11, 19*
**issue** 24:*4* 100:*2* 104:*13* 105:*11*
**issues** 37:*7* 49:*13* 65:*10, 21* 76:*2, 4* 94:*20*
**items** 25:*10*
**its** 68:*3* 77:*21* 82:*4*

< J >
**Jamie** 79:*4, 8* 90:*7*
**January** 35:*17* 40:*8*
**jargon** 94:*16*
**jms@sspfirm.com** 2:*9*
**job** 15:*24* 36:*16* 52:*25* 96:*1, 3* 106:*1, 4, 5, 6*
**jobs** 9:*16*
**joined** 12:*14* 17:*25* 23:*4, 11*
**joint** 5:*19*
**Joshua** 2:*4* 5:*14*
**Jude** 90:*8*
**judge** 95:*24*
**judgment** 61:*4*

< K >
**keen** 81:*14*
**keep** 35:*11* 98:*18* 99:*6, 17*
**Keeping** 15:*16*
**kept** 101:*3*
**Kevin** 90:*7*
**kill** 98:*3*
**kind** 29:*15* 42:*11* 98:*17* 104:*16*
**knew** 19:*23* 94:*18, 19*
**know** 11:*15* 12:*9* 17:*14* 18:*1, 10* 19:*6, 20* 20:*10* 26:*9, 14* 27:*15, 18, 19, 22* 28:*14* 29:*2* 31:*15, 18* 34:*18* 35:*13* 37:*25* 38:*1, 12, 24* 39:*12, 15, 18, 22* 40:*7* 43:*1, 4, 6* 49:*2* 50:*1, 11* 55:*1, 4* 61:*14* 64:*16, 17* 65:*3* 66:*8, 19* 70:*25* 71:*20* 74:*3, 6* 75:*3, 8, 13* 78:*7* 79:*8, 24* 80:*20, 24* 85:*19* 86:*3, 5, 11* 94:*11* 96:*4* 101:*10, 11* 102:*19, 22, 25* 103:*18* 104:*19* 107:*22* 108:*1*
**knowledge** 17:*20* 26:*24* 34:*4* 36:*24* 43:*10* 73:*4* 76:*10* 77:*6* 78:*13* 85:*18* 98:*10* 99:*25*
**knows** 72:*19* 91:*6* 92:*24* 94:*3* 98:*21, 22*
**KPIs** 69:*8*

< L >
**L.P.A** 2:*7*
**lack** 104:*12* 105:*11*
**Lacks** 29:*15* 76:*8* 85:*16*
**Lamb** 50:*18*
**language** 87:*22*
**Lars** 76:*22* 90:*7*
**lasted** 66:*13*
**late** 32:*9*

**laughing** 44:3
**Lavender** 90:7
**lawful** 6:3
**lawsuit** 72:12, 13, 24, 25 73:10, 24 74:3, 6 77:18, 23 78:5, 7, 14
**lawsuits** 73:20 74:12
**lawyers** 5:22 98:2
**laying** 53:11
**lead** 28:19 56:20 58:7
**leader** 16:10 20:7 26:18 33:7 41:16 63:4 91:8 93:1 94:3 99:8, 16 101:13
**leaders** 14:22 30:22 31:2 33:16, 18 41:17 92:5
**leadership** 16:10, 12, 25 26:23 31:4 32:18 36:10, 11 43:3 44:16 52:20, 25 53:4 60:20 66:25 79:25 81:13 87:14 90:15, 19 91:12 93:10 95:6 101:5 106:20
**leading** 20:15 95:19
**leads** 30:24 36:18
**learn** 90:20 94:4
**learning** 105:10
**leave** 53:20
**leaves** 74:14
**leaving** 84:24
**led** 27:3 30:23 53:12 66:9, 20, 22 68:10 74:11 85:22, 25
**left-hand** 47:16
**legal** 5:22 94:19
**lending** 42:10
**lens** 99:5
**Leonard** 90:7
**letter** 84:18
**letting** 44:18
**level** 98:15 107:5
**levers** 91:1
**lift** 70:2
**likes** 105:25
**line** 47:7, 11 62:23, 24 77:18 91:2
**lines** 15:8 100:15
**liquidity** 64:7
**list** 16:15 17:11 50:1 90:5 98:7
**listed** 50:21 51:17 97:10 103:24
**listen** 27:6 107:9
**litigation** 8:21 78:25
**little** 24:4
**live** 7:13
**lived** 7:11
**lives** 106:15
**living** 60:5
**LLC** 9:7, 8, 13
**LLP** 2:13
**loans** 77:21 81:11 82:16, 18, 19
**local** 14:15 41:23 42:3, 14 43:11, 19 44:23
**long** 7:11 9:12 11:11 14:4 20:25 21:19 52:25 53:8 75:21
**longer** 21:18 51:15
**long-term** 14:1 15:15 27:12 53:9
**look** 16:17 17:4 28:5 49:11 50:6 51:8 52:11 59:21 61:5 65:23 82:21, 22 89:14 97:10 99:23 100:7
**looked** 33:6, 7, 13
**looking** 28:7 48:19 98:20 99:9
**looks** 46:7 50:4, 5 72:12
**lot** 14:23, 24 16:19 20:5 25:11 27:8 28:2, 5, 13, 14 30:2 36:14 53:3 69:24 78:20 81:8 82:5, 6 94:17 95:25 98:3 100:2 106:13, 14
**lots** 42:10
**love** 79:18 81:13, 19, 20 82:1
**low** 81:10
**lower** 42:6
**luck** 18:20

**< M >**
**magnetic** 63:4
**maintaining** 55:11 56:2 58:23 59:19 65:8, 19
**major** 92:25
**maker** 91:3
**makers** 9:11
**making** 61:4 101:3
**Mallesch's** 79:3
**man** 30:10 92:23 93:7
**manage** 14:6 16:5 56:24
**managed** 33:22 39:6, 10 81:23 82:10
**Managing** 15:14 32:16 39:9 56:15 57:10 60:25 65:10, 21
**manner** 91:16
**March** 109:20
**mark** 86:20 88:8
**MARKED** 3:7 4:10 45:1, 4 54:11, 14 59:22 72:6, 9 74:15, 18 77:10, 13 84:8, 11 86:22 88:15 108:3
**market** 71:7 82:9
**mastered** 25:7
**mastery** 41:13 63:3
**matched** 29:7
**material** 91:1
**materials** 30:13 31:10 37:3, 13
**matter** 110:8
**MB** 10:10, 11 11:1, 8, 11, 21 20:5, 14, 21 21:1, 5, 11 22:2 23:3 66:18 69:19 71:17 73:12 75:6 76:16 77:1, 19, 24, 25 78:4, 10 80:5 81:4 82:25 92:11, 22 93:9 94:12
**MCHUGH** 1:7 2:25 5:5, 12, 15 34:1, 6, 13, 20, 24 35:1, 4, 7, 14, 23 36:5, 20 38:5 39:6, 9, 11 40:10 50:22 51:21 52:5, 13 53:7 55:9, 25 57:9 58:3, 12, 21, 25 59:17 60:10, 25 62:22 63:14, 16 65:8, 19 67:23 68:20 69:12, 16 74:14 76:25 77:9, 14, 15 79:14 84:22 85:2, 9, 24 86:8 90:8 97:15 103:4 110:3
**McHugh's** 35:16 36:22 37:1, 4, 13 38:8, 14, 17 39:1 43:10 51:17 61:14 62:5, 15
**mean** 16:11, 15 17:6, 10 23:24, 25 28:3, 4 30:9, 18 32:15 43:13 44:5 63:10 66:19, 24 75:6 79:21 81:15 95:17, 18, 24 106:14
**means** 44:17, 18, 19, 22 78:6
**meant** 24:15
**measure** 82:6
**measurements** 61:6
**measures** 82:24
**mechanical** 27:8
**media** 72:4
**meet** 20:9 21:8, 10, 20 23:2, 5, 10, 17, 18, 20 34:20 60:8 92:18 107:2, 3
**meeting** 8:9 12:11 21:22, 23 24:13, 15, 25 35:1 39:24 40:5 46:6 49:8 57:20 69:12 84:21 85:8, 23 87:6 88:23 89:5 92:21 93:16, 19 94:12
**meetings** 22:6, 20, 24 23:8, 9, 11, 21, 23, 25 24:8, 20 25:2 28:12 34:22 35:2, 3, 6, 9, 11, 13 36:19 39:16 54:4,

5, 6 61:20 67:14 101:16
**member** 10:12, 17 12:5 50:22 51:5 52:10 101:21, 23
**members** 29:11, 12, 21 30:3 39:15, 22 40:3, 9 41:15 43:17 44:17 55:4 101:16
**member's** 49:9
**memo** 85:4, 6
**memory** 66:14
**mention** 101:21, 24
**mentioned** 9:22 12:3 15:20 21:15 25:10, 14 36:18 37:5 41:14 56:18
**merged** 10:25 11:9
**merger** 10:11 11:14, 18, 20 12:7 20:4, 12 21:6, 12 59:9 66:19 69:18, 24 70:4, 8 71:18 72:14 73:1, 22 76:5 80:10 81:3, 21 82:2, 5, 6 83:13, 18, 23 93:9, 13, 20 94:9
**mergers** 21:14 23:17 71:3, 17 74:10 78:23 82:9 83:1
**message** 75:2, 18 91:15
**messages** 104:21
**met** 21:2, 4 22:15 23:1 33:14 34:23 59:2, 5, 8 71:9 76:21 92:11 93:12 100:18
**metric** 80:3 81:3
**metrics** 80:9
**Michael** 2:10 5:16
**michael.cioffi@blankrome.com** 2:16
**Mid-City** 10:10, 17, 23, 25 11:7
**midyear** 28:17, 22 29:1, 4, 13, 22 30:6, 14, 17, 21 31:11, 17 37:1, 4, 14
**Mill** 6:17
**million** 77:17
**mind** 25:6 82:21 104:21
**minor** 95:13, 16
**minute** 30:25
**minutes** 12:10 13:6 87:6
**mischaracterizing** 61:23
**missed** 23:9
**mission** 10:4
**misstates** 19:18 25:22 36:1 77:3 79:6, 17
**mistake** 26:25
**misunderstood** 40:2
**Mitch** 9:1 22:1 79:13
**mixture** 42:9
**modestly** 41:16
**modicum** 18:20
**moment** 18:14
**monetary** 15:10
**money** 83:25
**monies** 83:20
**months** 17:8 71:5, 19
**motivations** 91:11
**move** 83:20
**movement** 83:21
**moves** 83:15
**museum** 44:23

< N >
**name** 6:9 7:15 9:6 51:17 63:8 75:15
**named** 6:11 73:8 74:1, 8
**names** 51:10, 14 79:10
**narrow** 27:1
**National** 10:10, 18, 23, 25 11:7 14:15 15:5 41:23
**navigate** 67:24 68:21
**near** 31:6 66:11
**nearby** 27:11
**necessarily** 49:12
**necessary** 58:9 76:23
**need** 7:3 11:14 17:9 33:15 44:25 49:25 51:13 53:5 54:21 76:15 88:9 106:9, 21 107:15
**needed** 26:14 39:13 100:11
**needing** 56:19
**needs** 76:22 91:11 104:16, 20 105:4, 6 106:2, 10 107:9, 13
**neighborhood** 44:21
**neighborhoods** 44:24
**neither** 109:13
**never** 10:7 28:19 31:8 57:20, 21 67:7, 16
**new** 27:7 49:25 99:3
**nine** 42:4, 17 46:16 47:2, 20, 24 48:9, 22
**No._____Change** 111:2, 5, 8, 11, 14, 17, 20 112:2, 5, 8, 11, 14, 17, 20
**No._____Line** 111:2, 5, 8, 11, 14, 17, 20 112:2, 5, 8, 11, 14, 17, 20
**nomination** 13:3, 10, 12, 17
**Nominations** 12:21 13:20
**North** 66:8, 12 68:9, 23 69:1, 7, 15
**Notaries** 1:25
**notary** 109:5, 25
**Notice** 1:18
**novos** 84:1
**nowadays** 15:7
**Number** 5:7 32:22 45:5, 8 52:7 54:15 55:1 66:9 72:10 74:19 77:14 82:17 84:12 86:21 87:3 89:10, 11, 12 96:8, 9 97:23 102:5, 9, 14, 16, 20, 23 103:1, 3
**numbers** 81:10, 16 89:15
**nuts-and-bolts** 79:19

< O >
**oath** 110:15
**Object** 86:2, 16
**Objection** 7:21 17:17 18:24 19:17 22:9 25:21 29:14 30:7 33:1, 11 34:2, 15 35:25 40:18 42:22 44:9 46:17 47:3 48:1 51:23 52:22 55:13 56:4 58:13 61:21 62:6 63:15 66:2 67:12 70:14, 15, 21 72:15 73:2 76:7 77:2 78:15 79:5, 16 81:5 85:15 86:10 88:2, 25 89:7 90:2 91:24 92:13 94:25 95:5 96:16, 22 97:1, 6, 13, 17 100:20, 24 101:25 103:16
**objective** 55:7, 16, 23 57:7, 14, 16 58:1, 19 59:15 60:23 61:4 62:9, 21 64:20 65:6, 17 67:21 68:1, 4, 18, 25 90:22
**objectively** 28:5 70:4
**objectives** 91:19
**obligations** 15:2
**observations** 92:10 100:17
**observe** 36:20 93:14
**observed** 93:17
**obvious** 44:3 60:18 62:25 63:2
**obviously** 20:19 51:14
**occur** 12:8
**occurred** 43:5 48:13 78:24 83:22
**October** 43:5 53:14, 17, 23 54:2 55:16 64:15 65:2 67:2 75:19 76:6, 13, 25
**offer** 16:3 110:14
**offerings** 14:12
**office** 5:13 109:19
**Officer** 54:24 90:16

**officers** 20:12 100:11
**official** 75:6 109:19
**officials** 52:8
**Oh** 58:11 106:25
**OHIO** 1:3, 22, 25 2:8, 15, 21 5:7 109:2, 6, 19, 25
**Okay** 22:19 33:8 34:8 38:2 42:1 45:6 46:5, 10 49:20 60:2, 22 64:12 65:16 86:14 87:10 89:17 90:13 100:5 104:11 105:22
**old-fashioned** 79:14
**Oliver** 94:6
**once** 57:14 95:19 106:18
**one-on-one** 67:16
**ones** 18:13 22:3 54:4
**one's** 26:19 27:7 60:13
**online** 87:15
**open** 99:8
**operates** 23:15
**operating** 94:18
**operations** 14:12 106:4
**opine** 58:17
**opinion** 41:5 51:16 104:24, 25
**opportunities** 26:6, 20, 25 56:16 57:11 100:9 103:12 104:1, 12 105:3 107:20, 23 108:2
**opportunity** 82:4
**optimization** 105:8
**option** 17:12 104:23
**options** 84:2
**ORDER** 1:14 4:1, 8 16:14
**ordinary** 50:6
**organization** 91:9 104:13 106:23
**organizational** 91:9 92:5
**organizations** 94:7
**originally** 33:25
**outcome** 101:7 107:15
**outside** 17:2, 4 23:10, 21 62:25 67:14 92:3 98:23
**outstanding** 20:17
**overall** 70:25 71:9
**overlays** 60:12
**overseeing** 76:16 77:1
**overseen** 70:1
**overwhelming** 107:7

< P >
**p.m** 72:2 84:5, 6 108:20
**pack** 64:20
**package** 89:4 99:12
**PAGE** 3:3 4:5 45:20, 23 46:11 58:5, 10 73:17 74:20, 23 75:18 84:17 87:9, 23 89:10, 14, 17 90:10, 12 96:8, 9 97:11, 21, 23, 24, 25 100:4 103:10, 11, 18 106:24 111:2, 5, 8, 11, 14, 17, 20 112:2, 5, 8, 11, 14, 17, 20
**PAGES** 4:1
**paid** 42:15
**paint** 71:8
**pair** 99:3
**paper** 14:21
**papers** 98:3
**paragraph** 75:21 84:19 87:9
**paragraphs** 90:11 91:20
**parse** 92:17
**part** 10:11 12:7 16:10 18:17, 18 31:11, 16 32:4, 5 33:17 35:10 36:16 47:8 56:18 57:19 66:7 68:9, 24 69:7 82:3 88:7 89:4, 19 93:10
**participate** 28:16 36:25
**particular** 16:17 26:24 70:23 90:1
**particularly** 56:15
**particulars** 27:9 94:18
**parties** 109:14
**partly** 62:11
**parts** 32:14 68:23 69:1, 4
**pas@sspfirm.com** 2:9
**passion** 90:17
**passionate** 91:15
**pattern** 58:6
**Patterson** 2:7
**pay** 82:20
**pays** 15:3
**peer** 80:16, 18 96:11, 15, 25 97:4 98:5 100:16 103:8, 9, 11, 14, 22 104:1 107:20 108:1
**peers** 87:20 89:22 90:5 96:21 97:8, 10, 15 99:12 104:16 107:22
**PENALTY** 110:5, 6
**People** 14:24 16:14, 20 19:6 27:13 28:5, 18 39:25 41:10 43:25 44:19, 24 60:4 70:3 89:19 95:12, 22 98:20 99:13 101:6 105:25 106:1, 10, 15 107:1
**people's** 14:19 61:5
**percent** 70:12 71:5, 18
**perform** 28:16 36:25 107:5
**performance** 15:23 16:14, 17 17:3 18:17 30:25 31:10 32:1, 12, 24 33:10 38:18 39:1 41:18 42:7, 14 71:1, 10 91:6
**performer** 20:18
**performing** 39:9
**period** 13:15 21:21
**PERJURY** 110:5, 6
**permitted** 72:16
**person** 22:8 23:1 28:24 29:8 75:12 77:1
**personable** 106:17
**personal** 17:20 76:10 85:17 106:12
**personality** 87:14
**personally** 5:18 20:1
**personnel** 15:13 104:9
**perspective** 27:7 99:1 100:6 105:18
**pertains** 7:23
**Peter** 2:1 5:11
**Phenise** 2:18 5:21
**Phil** 34:1, 6, 13, 20, 23 35:1, 3, 7, 14, 16, 23 36:5, 16, 20, 22, 25 37:3, 13 38:5, 8, 14, 17 39:1, 6, 9, 10 40:9, 15 43:10 50:22 51:17, 20 52:4, 13, 19 53:3, 7, 10 55:9, 25 57:9, 14, 20, 21 58:3, 12, 21, 25 59:17 60:8, 10, 24 61:14 64:1 65:8, 19 67:23 68:20 69:12, 16 76:22, 23, 25 79:14, 24 84:21, 23 85:2, 9, 23 86:8 90:8 97:15 103:4
**philanthropic** 42:10
**PHILIP** 1:7 2:25 5:5, 12, 15 110:3
**Phil's** 39:14
**Phone** 2:8, 15, 22 21:22, 23 22:7, 20 38:6 63:16
**pick** 71:6
**picks** 18:16
**picture** 71:8, 9
**pique** 49:9
**Place** 1:21 24:16 31:5 47:25 48:23 65:4 66:10 80:13 92:4 109:10
**places** 52:11
**Plaintiff** 1:8, 17 2:1, 25 5:12, 15

**Plaintiff's** 3:8, 9, 10 4:11 45:1 54:11 72:6 74:15 77:10 84:8
**plan** 42:8 50:17
**plate** 104:14
**platform** 83:19
**play** 56:14 69:6
**please** 6:1, 9, 25 15:22 17:22 29:18 30:8 46:9 48:5 49:19 52:1, 23 55:20 56:8 72:11 86:21 88:11 93:17 95:4 98:4 99:17 100:23 101:2 103:10, 11 104:3
**plural** 19:1
**PNC** 2:14
**point** 48:23 57:9 101:3 105:9 107:13, 15
**points** 97:20 98:4
**policy** 9:11 14:15, 16 15:5, 7, 10
**polite** 84:2
**pollutants** 9:10
**Poole** 2:18 5:21 88:9
**popular** 81:9
**portfolios** 100:13
**position** 34:13
**positions** 100:8
**positive** 92:8
**positively** 66:24
**possesses** 99:25
**possibility** 41:9
**possible** 83:11 101:7
**post** 11:5
**potential** 14:12 17:2, 3, 14 18:1, 6, 22 19:4, 5, 11, 13, 15 35:23 36:6 41:1, 6 51:12, 21 52:5, 14, 20 61:5 67:10
**potentially** 52:8
**poured** 81:13
**powerfully** 79:9
**PowerPoints** 25:13
94:16
**pre** 11:5, 6
**precooked** 25:5
**predicted** 70:3
**pre-merger** 20:4
**preparation** 8:6 20:10 50:2
**prepare** 7:17 9:9 16:4 50:9
**prepared** 17:9 27:16, 20 50:7 55:1
**prepares** 49:2
**Present** 2:24 98:10
**presentation** 24:1, 3 35:14 80:16, 18
**presentations** 38:22 39:23 40:4
**presented** 46:6 49:14 93:20
**preserve** 86:18
**president** 13:22 17:15 18:2, 7, 23 19:12, 16 20:3 22:2 25:15 34:14 35:24 36:7 40:10, 16 41:2, 7, 22 43:8 48:18 51:21 52:5, 15 54:23 67:4 68:7, 15 101:18
**press** 81:9
**presume** 37:20 39:17 40:6 50:11, 12 55:2 60:4 69:10 70:10 80:23 86:1, 3
**pretty** 56:21 60:6 70:2 95:7, 24
**prevents** 104:15
**price** 71:5
**print** 47:10, 12
**prior** 9:15 14:2 19:18 21:5 25:17, 20, 22 34:24 35:17 40:8 43:5 53:14, 17, 23 54:2 56:6 57:4 58:14 59:12 64:15 65:2, 12 67:2 71:4, 17 74:11 78:24 89:5 92:11
**priorities** 45:17, 18
**privately** 93:21
**privilege** 7:25 8:1
**probably** 21:25 69:25 84:15
**problem** 47:9 61:3 76:1 87:15 99:19
**problem-solving** 90:18
**proceed** 94:22
**process** 13:22 17:8 18:17 28:8 30:23 34:5 87:13, 17 89:19, 25 90:1 91:23 96:14 100:3
**produce** 96:5
**produced** 26:3 28:6
**product** 7:25
**productive** 76:1
**productivity** 14:1
**products** 14:8 16:3
**professionals** 62:19
**professions** 16:9
**profound** 27:10
**program** 42:8, 17 48:25 49:1
**programs** 9:18 14:17 41:23 42:3, 10 43:12, 19
**progress** 86:15, 17 108:6, 8
**prohibit** 25:13
**prohibits** 47:9
**project** 66:9, 12 68:9 69:7, 15, 17
**projects** 91:15
**promotion** 84:22 85:3, 10, 24 86:9
**properly** 81:11
**prosper** 15:12
**protected** 7:24
**PROTECTIVE** 1:14 4:1, 8
**provide** 62:20
**provided** 31:16 103:15, 23
**providing** 93:1
**public** 109:5, 25
**Public-State** 1:25
**puck** 96:5
**puffy** 101:10
**pulled** 66:10
**Pursuant** 1:18 5:18 109:12
**pursued** 93:9, 11
**pursuing** 93:23, 24
**put** 14:12, 17, 19 27:25 42:5, 7 44:4 63:6 84:2
**putting** 44:18 101:4

**< Q >**
**qualifications** 62:24
**qualified** 58:7 109:5
**qualities** 93:15
**quartile** 80:14
**question** 7:1, 6, 7, 22 8:1 14:3 17:18, 21 18:25 19:2, 3, 7, 18 22:10, 13, 23 25:22 27:10 29:15, 18 31:14 32:23 33:5, 6, 9 34:3, 8, 16 36:1, 10 40:2, 19, 20 42:23 44:15 45:25 46:18, 21 47:4 48:2, 5 51:24, 25 52:24 55:14 56:6, 8, 10 57:2 58:10, 14 61:3 62:6, 10, 13, 17 63:22 65:5, 15 66:3 67:13 70:16, 23 71:16 72:16, 18, 22 73:3 76:8 77:3 78:17 79:6, 17 80:24 81:6 85:16 86:4 103:17
**questionable** 105:24
**questioning** 94:14
**questions** 6:24 13:5 15:18 17:19 29:9, 22 86:20 87:12 90:12 102:2
**quick** 61:11
**quickly** 25:9 58:6 100:1, 3
**quite** 16:18 19:3 48:25 85:19
**quotes** 96:17

**< R >**
**range** 15:19

**ranked** 51:10
**ranks** 79:9
**rare** 49:1 94:9 95:7, 21
**rate** 62:18
**rating** 80:11
**Ratings** 80:15, 22
**rationale** 16:13
**Raymer** 1:23 109:4, 24
**reach** 20:24 32:21
**reached** 20:12, 22 21:6, 11 22:16
**reaching** 20:25 101:6
**reactions** 24:6, 16
**read** 26:4, 7 46:19 47:6, 12, 13 55:19 60:7 65:15 87:11 90:6, 11 97:20 98:4 100:16, 25 103:10 104:2 107:11 108:8 110:7, 9
**reading** 47:10 105:1
**reads** 60:12 75:25 77:18
**real** 14:20 30:11 101:12
**realize** 41:11 101:11
**real-life** 98:14
**really** 20:6 24:6 26:4, 18 44:25 47:10 51:8, 12 99:11
**realms** 14:5 68:3
**Reason** 111:4, 7, 10, 13, 16, 19, 22 112:4, 7, 10, 13, 16, 19, 22
**reasonable** 12:13
**recall** 10:20 11:3 19:22, 25 20:25 21:4, 7 28:23 34:17 35:15 39:12 43:13 53:16 73:5, 20, 24 74:2 76:25 78:13 85:1, 4, 6, 7, 11
**receive** 32:12
**received** 87:19 89:5
**receptive** 94:13
**recess** 72:1 84:5
**Rechristened** 12:23
**recipient** 26:10
**recognize** 45:12 86:17
**recognized** 92:23
**recollection** 47:23
**recollections** 54:8
**record** 5:1 6:9 7:8 59:11 61:22 71:23, 24 72:3 79:17 84:3, 4, 7 87:11 90:6 97:21 103:11 104:3 108:10
**records** 11:15 36:1
**record's** 92:18
**redevelopment** 44:21
**reduce** 9:10 105:6
**reduction** 82:19
**refer** 45:8 74:23 75:17
**reference** 46:15 47:1, 19 48:9
**REFERENCED** 3:7 4:10 48:8 78:8 82:12
**referred** 37:9 60:20 82:14
**referring** 11:20 37:8 47:16 54:5 64:12 65:12 68:6 75:18 88:1, 23 89:25 94:24 102:5
**reflected** 26:15
**reflects** 25:10
**refresh** 16:23 47:23
**regarding** 21:12 27:21 28:1, 21, 25 29:4 30:5 51:1 59:9 103:15
**regional** 32:16 35:18 66:11 80:11
**regions** 39:13 42:4, 6, 17 46:16 47:2, 20, 25 48:10, 22
**regularly** 63:25 64:1
**regulations** 26:11
**regulators** 15:20 53:13, 15 54:2, 3, 9 63:24 64:5, 13, 16, 18, 19, 23 65:2, 9, 20 70:2 81:14, 19, 20 82:1 83:4
**regulatory** 14:6 15:4 21:16, 17 53:3 82:7 83:3
**relate** 98:14
**relationships** 14:19 106:12, 19
**relative** 32:1, 24 33:10 38:18 39:1 109:13
**remain** 11:7
**remember** 10:19 11:2 12:3 13:7 18:14 21:18 29:8, 10 30:24 32:8 53:19 64:9 77:8 82:20 84:15, 16 85:11
**repaid** 81:11
**repeat** 6:25 17:21 19:7 29:18 51:25 85:20
**rephrase** 7:1 48:4 50:3 103:20
**replace** 18:22 19:12 20:2 35:23 36:6 40:15 41:7
**replies** 105:20
**report** 27:16, 20, 23, 25 28:9 30:15, 16 54:20 58:11 61:7 87:21 108:3
**reporter** 6:1 7:2 88:10
**reporting** 109:16
**reports** 36:23 58:6 82:22 87:20 89:21 104:15
**repositioning** 106:7
**represent** 5:10, 17 75:1
**representation** 5:19 73:4 103:25
**representations** 77:7
**represented** 103:22
**representing** 5:20
**reputation** 64:19
**require** 13:25 14:5 21:16
**required** 15:1 17:11 91:13
**requirements** 25:15 53:11
**requires** 16:16 104:9
**resilience** 67:24 68:22
**resistance** 91:17
**resolution** 76:1
**resources** 49:15 104:17
**respect** 41:21 43:18 48:8 52:13 53:8 55:9, 25 57:9 58:21 59:17 60:25 62:5, 14 63:14 64:18 65:8, 19 67:23 68:20 69:12 70:8 78:4 101:5 103:9
**respects** 109:12
**respond** 104:22
**responding** 104:21 106:5, 6
**response** 76:20
**responsible** 92:4
**result** 72:13, 25 73:21 74:3, 6 78:7, 25 82:11 109:15
**results** 64:25 66:20 68:14 96:6
**retained** 26:2 34:1, 12
**retention** 81:12
**retract** 88:12
**review** 7:20 8:5 14:2 17:2 25:16, 19 28:4, 10 30:13, 20, 22 31:2, 4, 19, 22, 25 32:3, 4, 5, 6, 8, 23 33:9, 21 34:5, 6 37:3 38:8, 14, 17, 21 39:4 49:4 61:17 62:3, 4, 14 69:5
**reviewed** 38:25 87:13, 21
**reviews** 28:17, 22, 25 29:1, 4, 5, 13, 22, 24 30:5, 6, 14, 17, 21 31:11, 12, 13, 17 34:18 37:1, 4, 13, 14
**RHR** 26:2, 21 27:16, 20, 25 28:9 30:15, 16

33:25 34:9, 10, 11 55:2 58:5, 11 87:16 89:18 108:3
**RHR's** 54:20
**rich** 27:3
**right** 15:6, 17 16:9 24:10 27:1 47:19 60:13 61:8 70:9 75:9 81:23 82:21 86:17, 18 89:13 104:15 108:7
**right-hand** 45:7 89:15
**rigorous** 55:11 56:2 58:23 59:19
**rings** 63:9
**rise** 56:11 65:10, 21 99:14
**risk** 12:22 84:22 85:3, 9, 24 86:8
**role** 35:17 43:10 56:12 69:6 75:8 78:10 84:23 106:20
**Rome** 2:13 5:16
**room** 74:14 77:9 92:6 104:9
**root** 100:2
**rosy** 71:8
**roughly** 7:12
**RPR** 1:23 109:4, 24
**Rule** 109:17
**run** 80:5 92:3
**running** 27:9 36:15 94:4

**< S >**
**S/Wendy** 109:24
**Saba** 2:1, 7 3:4, 5 5:11 6:7 8:4 17:23, 24 19:8, 9, 21 22:12 27:14 29:19, 20 30:12 33:4, 20 34:7, 19 36:4 38:2, 4 40:24 42:24 45:3 46:22, 23 47:14 48:4, 6 50:16 52:2, 3 53:6 54:13 55:18, 21, 22 56:7 57:1 58:18 59:5, 8, 14 62:1, 12 64:2 66:5 67:15, 18 71:2, 23 72:8, 21 73:7 74:17 76:12 77:12 78:19, 22 79:12, 20 81:18 84:3, 10 85:21 86:6, 14 88:2, 25 89:7 90:2 91:24 92:13 94:25 95:5 96:16, 22 97:1, 6, 13, 17 100:20, 24 101:25 102:4 103:20, 21 104:24 105:2 106:24 107:12 108:5
**sake** 7:2
**save** 110:10
**saw** 20:17 57:20 61:16, 17 62:3 78:1, 20
**saying** 24:9, 19 51:13 61:19 68:6, 8, 15 81:19 82:17 83:6, 21, 24
**says** 47:6 49:24 50:20, 24 51:5 52:10 55:2 89:18 90:14 96:25 97:4
**Schramm** 90:8
**scorecards** 34:18 37:5, 8
**scrambled** 97:22
**scratch** 95:25
**screws** 82:5
**se** 10:8
**seal** 109:19
**search** 18:18
**second** 73:17 74:20, 23 79:11 80:13 82:21 84:19
**section** 75:21
**sections** 37:22
**sectors** 33:17
**secular** 83:12
**see** 25:6 29:7 43:14 45:7 51:17 52:19 57:14 58:6, 10 60:7 61:20 68:2, 13, 25 73:9, 11, 17 75:20, 23 76:18, 24 87:22 89:10, 11, 12, 15, 17, 21 90:14 91:20 93:4 94:6 96:11 97:25 102:14
**seeing** 35:2 45:22
**seen** 47:22 53:7, 10, 11, 12, 14, 17 64:24 84:14 99:2, 4 102:16
**Selecting** 13:23 25:15
**self** 40:22
**Self-employed** 9:5, 12
**senior** 30:22 31:2 35:9 52:8 75:6 106:20
**sense** 28:6 58:15 103:5
**sentence** 89:18 107:11
**September** 55:8, 24 56:6 57:4 60:24 65:7, 13, 18 67:22 68:19 84:21 85:8, 23 87:7 88:23 92:12 93:14 100:19
**sequence** 29:10
**series** 6:23 20:14
**serious** 42:12
**serve** 10:12, 14 11:11, 24, 25 12:1, 2, 4 13:3, 12, 17
**served** 10:6, 9, 11 12:17, 20, 25 42:14
**serves** 66:14 75:8
**service** 18:15 47:17 93:2
**serving** 11:17
**session** 31:3
**set** 50:25 69:9 70:4 94:9 109:18
**setting** 29:25
**seven** 71:5, 19
**seven-plus** 50:19
**Shaffer** 27:15 75:2, 3, 5 76:20 84:20 85:1, 8, 22 86:7 102:25
**shake** 82:7
**shaking** 7:4
**share** 41:15 83:7, 9 95:9
**shared** 59:23
**Sharpe** 2:5 5:13
**SHEET** 110:1, 13 111:1 112:1
**sheets** 33:22 39:5
**short** 53:1
**Shortly** 42:20
**short-term** 15:15 53:9
**show** 41:10
**shown** 7:23 8:3, 6 53:4
**shows** 60:15 101:5
**sic** 89:12
**side** 23:22, 24 55:10 56:1 58:22 59:18 65:23, 25 66:1 89:15
**Sidebar** 24:21
**sides** 94:20
**SIGNATURE:________________________DATE** 111:23 112:23
**Signed** 110:16
**significant** 14:18 57:19 71:10
**Silicon** 63:5
**simple** 95:10
**simultaneously** 55:11 56:2 58:23 59:19
**single** 18:13 92:25
**Sir** 74:18
**sit** 13:9 38:24 43:4 69:4 107:8
**sits** 75:8
**situation** 48:22 61:10 92:8
**six** 66:13 94:5
**size** 44:7
**skills** 90:18 103:4
**small** 16:25 47:10, 11
**smart** 95:12
**Smith** 2:4 5:14 28:20
**snarky** 44:5
**software** 15:16
**solutions** 90:23
**solve** 76:2
**solver** 99:19
**solving** 87:15
**somebody** 36:17, 18 61:11 95:18 107:11
**somebody's** 25:6

**Sorry** 38:3 40:2 44:5 57:16 63:20 70:20 85:5, 20 88:12 96:18 97:24 98:22 104:7, 25 106:5, 6 107:9
**sort** 23:15 24:3
**sound** 93:6 101:10
**source** 27:24 80:20
**sources** 28:2 80:23 81:8
**southeast** 83:16, 22
**SOUTHERN** 1:3 5:6
**space** 9:17
**speak** 40:22 59:11 61:22 66:20 105:6
**speaker** 91:14
**speaking** 21:24
**speaks** 46:18 47:5 77:4
**special** 14:9 15:2 92:24
**specialty** 49:15
**species** 95:8
**specific** 14:25 32:13, 15 39:8 47:11 54:8 57:2 64:16 107:22, 23
**specifically** 29:3 33:22 39:5 40:19 52:13 53:7 60:9, 11, 22 75:18
**specifics** 17:1
**spectacular** 71:1
**spell** 6:9
**spelled** 6:11
**Spence** 19:20, 24 20:2, 6, 9 21:2, 5, 8, 10 22:6, 15 23:1, 5, 10, 20 24:9, 22 27:19, 21 28:1, 10, 20 33:23 34:13 40:17 41:1 42:2 46:24 50:18 53:15, 18, 23 54:1, 9 55:8, 24 57:8, 18 58:2, 12, 20 59:2, 16 60:10, 24 62:22 64:6 65:2, 7, 18 67:4, 19, 22 68:7, 20 69:2, 22 79:4 80:19 81:1 87:13, 18, 21 90:14 92:7, 10, 19 93:12, 15 100:18 102:22 103:15
**Spence's** 25:20 28:17, 21, 25 29:4, 12, 22 30:5, 14, 17, 21 31:11, 16, 19, 22, 25 32:13, 24 33:9 46:14 48:8 64:22 67:10 80:21 87:20 102:19
**spend** 105:10
**spent** 16:1 20:5 100:12
**spirit** 16:7, 13
**spoke** 66:24
**spurious** 71:14
**spurred** 20:16
**spurring** 49:16
**SS** 109:2
**staff** 15:21 16:3 35:10 41:4 81:12
**Stagnaro** 2:7
**stakeholder** 87:18
**stamped** 54:15 77:14 84:12
**stand** 27:22
**standard** 107:3
**standards** 91:5
**standing** 65:9, 20
**standpoint** 99:1
**stands** 95:9 99:11
**Star** 66:8, 12 68:9, 23 69:1, 7, 15
**start** 13:9 64:6 76:17 83:25
**started** 9:19 10:22 12:3 43:1 53:20
**state** 5:10 6:8 14:15 109:2, 6, 25
**stated** 40:21
**statements** 33:21 39:4
**STATES** 1:2 5:6
**statistics** 37:7
**stay** 16:22
**steep** 43:24
**step** 107:16
**stipulation** 109:12
**stock** 70:12, 25 71:4, 7, 18
**stops** 97:24
**story** 83:13 98:13
**storyteller** 98:12
**straight** 94:17
**Strategic** 14:11 20:20 22:3 45:17, 18 55:10 56:1 58:22 59:18 83:15 90:22 98:15 100:12
**strategically** 14:4
**strategies** 9:9, 23, 24 91:19 100:14
**strategy** 15:12 18:12 23:13 25:10 27:10 42:5 44:22 53:11 94:17 100:6, 10
**stratified** 51:11
**Street** 1:21 2:14, 21 53:2, 13, 18, 23
**strength** 60:25 62:16
**Strengths** 96:12 107:24 108:2
**strictly** 15:10
**strike** 21:9
**strong** 90:15 99:20 106:18
**structure** 104:12
**structured** 87:17 91:4
**study** 26:21
**stuff** 92:25
**style** 41:13 87:14
**styled** 5:4
**subheading** 106:25
**SUBJECT** 1:14 4:1, 8
**subjective** 62:10, 11 90:23
**subordinates** 36:23
**subpar** 16:23
**substantially** 83:2
**substituted** 78:4
**succeed** 17:14 18:2, 6 40:15 41:1 54:21
**succeeding** 19:15 40:10
**success** 56:22 58:9 70:5 80:25 81:2, 4 82:6 83:1
**successes** 94:7
**successful** 80:8, 10 106:8, 9
**succession** 13:22 50:4, 6, 17 51:1
**successor** 51:4, 10, 13, 15, 18, 21 52:5, 9, 15 101:17
**successors** 50:5, 21
**succinct** 105:9
**suggest** 13:6
**suite** 14:22 49:14 51:9
**suited** 60:8, 10
**suits** 106:1
**summary** 37:6 91:22
**superior** 55:9, 25 57:8 58:20, 25 59:17 60:24 62:22 63:1 65:8, 19 67:23 68:20
**supply** 13:8
**support** 44:23
**supporting** 14:14 41:23 42:3 43:11, 19 105:17
**sure** 16:22 17:23 20:23 22:25 24:11, 23 29:19 32:17 34:17 37:6 39:7 43:13 45:15 46:22 55:21 69:10, 14, 17 70:24 80:7 85:25 104:4
**surround** 106:2
**surveys** 31:20, 23 38:9, 15
**Susan** 90:8
**swear** 6:1
**sworn** 6:3 109:8
**symmetrically** 96:3
**symphony** 44:23
**synopsis** 54:20
**synthesized** 97:8
**systems** 94:19

**< T >**

**tableau** 27:5
**tacit** 93:22
**take** 5:3 17:8 21:17 31:5 100:8 106:20
**Taken** 1:17 6:20 8:24 47:25 48:23 72:1 84:5 107:16 109:11 110:2, 8
**takes** 18:19 79:22
**talent** 37:9, 11, 18 38:10 43:14, 20, 22, 24 44:2 46:14, 15, 18, 24 47:22, 23 48:19, 20 49:2, 4 51:9 59:21, 24 105:24 106:7, 8, 9
**talents** 60:15
**talk** 28:4 106:15
**talked** 64:17 93:21
**talking** 22:10 59:12 67:13
**talks** 47:17 64:17
**task** 79:22
**tasks** 14:25 80:2 95:7
**taste** 103:6
**Tayfun** 20:6 34:1, 12 50:22 90:8 93:20
**teach** 94:8
**team** 61:1 99:5 100:8, 13 101:6 106:7, 13
**technical** 42:11 100:1
**technologies** 56:19
**technology** 12:22 15:17 16:1 26:24 36:13 56:13, 24 57:20, 22 58:2, 4 99:20
**tell** 18:18 54:4
**telling** 98:13
**tend** 14:14
**tension** 14:5 15:14 16:5 56:18
**tensions** 15:25
**term** 14:4 53:1, 8 82:21
**terminology** 79:18 80:7
**terms** 14:13 40:19 56:4 88:22
**terrible** 71:8 83:5
**terrific** 26:4 80:25 81:2
**test** 14:3
**testified** 25:23 59:2, 8, 10 80:4 87:25 89:24
**testify** 59:5 72:17, 19
**testifying** 47:4 70:15 76:9 77:4 79:7 103:17
**TESTIMONY** 1:14 4:1 19:18 24:14 25:22 44:6 61:22, 24 79:3, 6, 13 94:24
**text** 75:1, 18, 25 76:13
**thank** 107:19
**Thanks** 11:22
**thesis** 105:17
**thing** 9:22, 25 42:11 56:11 101:12
**things** 13:24 14:23 25:3, 4 26:5 28:15 63:3 83:25 98:24 104:18, 19
**think** 14:4 18:11 23:9 25:9 26:8 29:6, 10 30:24 31:6 32:7, 8 34:25 36:15 37:2, 22 39:25 40:2 41:14 43:6 58:15 65:5 68:9 71:15 75:9 79:19 80:8 86:12, 18 93:8 94:5, 9 97:24 99:15, 16
**thinker** 90:22 99:19
**thinking** 44:20 55:10 56:1 58:22 59:18 85:20 87:15 99:3 105:12 107:14
**thinks** 98:23
**THIRD** 1:10, 21 2:20 5:5, 23 8:8 10:13 11:9, 21 12:2, 18 13:16, 22 17:15, 25 18:3, 7, 23 19:13, 16 20:3, 5, 21 21:1, 5, 11 23:6, 11, 15 27:17 34:14 35:17, 24 36:7, 20 40:11, 14, 16 41:2, 8, 22 51:22 52:6, 16 54:6, 23 56:23 57:11 63:6 65:9, 20 66:23 67:5, 10 69:19 70:12 71:3, 4, 17, 18 73:15, 18, 25 74:1, 7, 8, 11 75:7 76:5 77:16, 20 78:3, 23, 24 79:11 80:5, 17, 21 81:4, 9, 22 82:25 84:17 90:17 110:4
**Third/MB** 72:14 73:1, 21 80:10 81:21 82:2 83:18, 23
**Third-McHugh** 45:9, 10 46:8, 13 49:18 50:7 51:1 54:16 74:20, 21, 24 84:13, 18
**Third's** 12:5, 10, 15 82:3
**THOMAS** 1:16 2:19 3:3 5:4, 21 6:2, 10 108:15 109:7, 11 110:19 111:24 112:24
**Thompson** 7:16
**thorough** 91:3
**thought** 52:7 66:15, 19, 22 86:8
**thoughtful** 91:3
**threats** 56:17 57:12
**three** 51:5, 6 76:16 90:11 94:15
**three-plus** 50:18
**ticked** 94:21, 23
**tighten** 82:5
**Tim** 19:20, 24 20:2, 6, 9, 12, 15 21:2, 4, 8, 10 22:6, 15 23:1, 5, 10, 20 24:9, 22 25:20 26:5 27:19, 21 28:1, 10, 17, 20, 21, 25 29:4, 12, 22 30:2, 5, 14, 17, 20 31:4, 11, 16, 19, 22, 25 32:12, 23 33:9, 23 34:13 40:17, 25 41:11 42:2, 7, 20 43:7 46:14 50:18 53:14, 17, 20, 22 54:1, 9 55:8, 24 56:21 57:8, 13, 18 58:2, 12, 20 59:2, 16 60:7, 10, 24 62:21, 25 63:10, 25 64:6 65:7, 18 66:9, 15, 19, 22 67:4, 10, 19, 22 68:7, 10, 13, 19 69:1, 11, 21, 22 70:6 71:12 79:4 80:19, 20 81:1 92:7, 10, 18 93:10, 12, 15, 19, 24 94:4, 18 95:8, 14, 23 96:23 100:12, 17 101:8 102:19, 22
**Time** 1:20 5:3 8:14 9:15 11:8, 18, 23 13:15 18:10, 16, 19 20:5, 18 21:5, 21 22:10, 16 24:16 29:15 30:8 39:10 40:13 44:11 48:23 55:15 56:5 57:13, 17 59:1, 3, 12 68:12 70:6 71:4, 10 72:4 75:19, 22, 23 76:14 78:21 83:12 86:13 92:11 93:12 100:12, 18 101:17 105:10 106:12 107:1 108:11 109:10
**timeline** 13:5
**times** 15:13 21:4, 25 22:5, 15, 19, 23 107:8
**timing** 43:9
**Timothy** 90:14, 21
**Tim's** 26:14 27:2 32:14 43:2 66:25 84:22 85:3, 9, 24 86:8 93:10
**title** 54:22 77:16
**Today** 5:2, 3 8:6, 18 13:9 38:24 43:4 83:13 94:24 102:17
**today's** 7:17 72:4
**told** 66:22 76:21
**tools** 14:13 87:16

**top** 11:15 31:4 63:6, 24 64:5, 20 79:10 99:14
**topic** 40:9 63:10, 11 64:3 92:23 98:10
**topics** 25:5 40:1 41:13 49:13 99:25
**total** 82:17
**track** 35:11
**trade-offs** 95:21, 23
**traditional** 79:14
**transaction** 92:11
**transcend** 95:22
**TRANSCRIPT** 1:12 108:9 110:7
**transformation** 15:1 56:16 57:10
**transformative** 96:6
**treatment** 77:21
**trees** 98:3
**trends** 23:14
**tried** 80:1 86:18
**trouble** 105:1 107:10
**true** 46:20 101:9 110:10
**truly** 93:7
**trust** 105:21
**truth** 109:8, 9
**try** 7:6 15:22 76:2
**trying** 12:2 24:14 44:6 48:18 82:20 103:25
**turn** 45:20 46:8 49:18 84:17 89:10 90:10 96:8 103:10
**turns** 94:18
**Tuzun** 34:1, 12 50:22 90:8
**two** 8:12 27:11 51:14 60:14 61:5 62:18, 19 63:12 66:9 71:6 79:10 94:15
**two-page** 74:19
**two-thirds** 75:17
**typically** 14:2, 15 35:10

**< U >**
**Uh-huh** 76:19
**uh-huhs** 7:5
**uh-uhs** 7:4
**unambiguous** 82:23
**undefined** 40:19
**undermines** 105:12
**undersigned** 109:4
**understand** 6:25 7:9 22:13 24:18 26:18 33:5, 16 48:2 55:14 56:19 81:17 94:7 96:18 105:2 107:16
**understanding** 13:21 18:5, 9 19:11, 23 25:8 27:3 30:16 31:9 32:11 34:11 35:16, 22 37:11 41:12 42:1 58:11 62:13 91:11, 22 93:22, 23 95:18 96:14 97:5 99:22 110:13
**understands** 63:4
**understood** 19:14
**underway** 42:18 48:25
**unique** 99:14
**uniquely** 101:13
**UNITED** 1:2 5:6
**Universal** 75:19, 23 76:14
**unsealed** 77:19
**unusually** 101:12
**use** 14:24 18:25 25:13 60:17 61:3 80:9 98:24 99:20
**useful** 26:4 49:1
**utilized** 87:13, 16

**< V >**
**vague** 105:20
**validate** 47:5
**Valley** 6:17 63:6
**value** 69:25 71:12 82:17
**values-based** 91:8
**values-driven** 90:19
**variety** 99:25
**verbally** 7:4
**verify** 46:19
**versus** 5:5 15:15 16:1 53:9 105:8
**vet** 52:9
**vetted** 60:4
**video** 7:3
**Videoconference** 2:6
**Videographer** 1:24 5:1, 25 71:24 72:3 84:4, 7 108:10
**videotape** 5:1
**Videotaped** 1:14
**view** 41:15 99:22
**views** 36:13
**vision** 14:11, 24 26:9, 14 27:12 28:7 36:11 44:18 45:15 96:4 98:12
**visionary** 95:20 101:9
**vs** 1:9 110:4
**vulnerable** 105:22

**< W >**
**wait** 7:5 70:19
**walk** 58:5
**walked** 26:22
**Wall** 53:13, 18, 23
**Walnut** 1:21 2:21
**want** 24:2, 4 33:3 47:5, 11 63:21 78:18 87:8 89:9 90:10 96:8 97:20
**wants** 18:11
**watching** 18:16 30:10
**way** 14:17 21:25 42:12 49:15 56:9 71:14 81:22 84:2 98:10 99:3 100:23 106:14 107:17
**wealth** 66:8
**wedding** 27:11
**Wednesday** 5:2
**week** 76:21
**weight** 14:18
**well** 5:15 10:12 12:4 13:23 14:4 15:20 17:10 19:6 23:8 26:5 27:6 29:6 37:15 45:15 47:15 50:11 51:4 53:20 55:2 59:10 60:12 62:4, 13 64:16 69:3 71:21 73:25 74:7 76:3 79:24 83:2, 19 94:8 103:5 106:2
**well-being** 91:10
**Wendy** 1:23 109:4
**went** 48:12
**We're** 5:1, 3 7:3 23:16 33:17 93:8
**WESTERN** 1:4 5:7
**we've** 68:2 71:11
**WHEREOF** 109:18
**widely** 59:23 66:24 83:16
**wife** 7:14
**willing** 93:3
**windows** 27:1
**Winning** 54:22 60:3
**withdrawing** 88:14
**Witness** 2:10 5:18 6:1, 3 7:22 17:21 19:3, 19 25:24 26:1 29:18 30:9 33:13 34:5, 17 36:3 37:24 38:1, 3 40:22 44:10, 12, 15 47:9 48:3 50:13, 15 51:25 52:24 56:9 58:15 62:9 63:16, 19, 20, 24 66:4 67:16 70:18, 20, 24 72:18 73:3, 5 76:9, 11 77:5, 8 78:16, 18, 20 79:8, 18 81:8 85:17, 19 86:3, 5, 11 90:3 92:14 95:1, 6 96:17, 23 97:2, 7, 18 100:21, 25 101:3 102:1 104:5, 7, 25 105:3 106:25 109:18
**wonderful** 99:16
**word** 14:24 16:11 17:1 18:25 46:19 95:12
**words** 93:5 96:2 101:10
**work** 7:25 9:11 14:3, 7 15:22 16:11,

*13, 19* 17:*7* 18:*19* 25:*12, 17, 20* 26:*16* 27:*2* 29:*7* 31:*1* 32:*14, 17* 36:*14* 39:*13, 14* 41:*10* 44:*24* 48:*9* 68:*14* 76:*22* 83:*4* 91:*4* 98:*2*
**worked** 10:*5*
**working** 28:*18* 30:*2* 98:*1*
**workplace** 36:*20*
**Works** 10:*1, 3* 27:*4*
**world** 9:*20* 14:*21* 15:*7* 30:*11* 36:*16* 67:*25* 68:*22* 95:*11*
**worries** 24:*16*
**worth** 93:*23, 24*
**wrong** 17:*9* 88:*13*
**Wyman** 94:*6*

**< Y >**
**yawning** 63:*11*
**Yeah** 43:*1* 46:*25* 50:*15* 55:*20* 57:*3, 6* 73:*5* 86:*11* 89:*14* 97:*2, 7* 98:*7* 104:*6* 107:*21*
**year** 11:*3* 21:*17* 22:*6* 31:*7* 32:*9* 35:*9* 64:*10, 11* 77:*20* 82:*7*
**years** 7:*12* 9:*14* 11:*13* 26:*13* 27:*2* 50:*18, 19* 61:*18* 66:*14, 18* 93:*18* 94:*6*
**Yep** 74:*25* 82:*13* 89:*23* 96:*13*
**yesterday** 8:*12, 13*
**young** 79:*4*

**< Z >**
**Zaunbrecher** 90:*9*
**ZIP** 6:*18*
**Zoom** 2:*6* 5:*13*

# EXHIBIT 1

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 2

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

PAUL PARSHALL, Individually and on
Behalf of All Others Similarly Situated
Naples, Florida 34110,

*Plaintiff*

v.

MB FINANCIAL, INC.
800 West Madison Street
Chicago, Illinois 60607
Serve on: The Corporation Trust, Incorporated
2405 York Road
Suite 201
Lutherville Timonium, Maryland 21093

DAVID P. BOLGER
800 West Madison Street
Chicago, Illinois 60607

CHARLES BRYAN DANIELS
800 West Madison Street
Chicago, Illinois 60607

MITCHELL FEIGER
800 West Madison Street
Chicago, Illinois 60607

SUNIL GARG
800 West Madison Street
Chicago, Illinois 60607

CHARLES J. GRIES
800 West Madison Street
Chicago, Illinois 60607

JAMES N. HALLENE
800 West Madison Street
Chicago, Illinois 60607

THOMAS H. HARVEY
800 West Madison Street
Chicago, Illinois 60607

CASE NO.: ______________

CLASS ACTION COMPLAINT

JURY TRIAL DEMANDED

PENGAD 800-631-6989
PLAINTIFF'S EXHIBIT
3
wlh 2-26-25

RICHARD J. HOLMSTROM )
800 West Madison Street )
Chicago, Illinois 60607 )
)
MARK A. HOPPE )
800 West Madison Street )
Chicago, Illinois 60607 )
)
KAREN J. MAY )
800 West Madison Street )
Chicago, Illinois 60607 )
)
RENEE TOGHER )
800 West Madison Street )
Chicago, Illinois 60607 )
)
and )
)
FIFTH THIRD BANCORP )
38 Fountain Square Plaza )
Cincinnati, Ohio 45263 )
)
*Defendants.* )

---

**COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934**

Plaintiff, by his undersigned attorneys, for this complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

**NATURE OF THE ACTION**

1. This action stems from a proposed transaction announced on May 21, 2018 (the "Proposed Transaction"), pursuant to which MB Financial, Inc. ("MB Financial" or the "Company") will be acquired by Fifth Third Bancorp ("Fifth Third").

2. On May 20, 2018, MB Financial's Board of Directors (the "Board" or "Individual Defendants") caused the Company to enter into an agreement and plan of merger (the "Merger Agreement") with Fifth Third. Pursuant to the terms of the Merger Agreement, if the merger is completed, MB Financial stockholders will receive $5.54 in cash and 1.450 shares of Fifth Third common stock for each share of MB Financial common stock they own.

3. On August 3, 2018, defendants filed a proxy statement/prospectus (the "Prospectus") with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction.

4. The Prospectus, which scheduled a stockholder vote on the Proposed Transaction for September 18, 2018, omits material information with respect to the Proposed Transaction, which renders the Prospectus false and misleading. Accordingly, plaintiff alleges herein that defendants violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Prospectus.

**JURISDICTION AND VENUE**

5. This Court has jurisdiction over the claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the

of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

6. This Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7. Venue is proper under 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

8. Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of MB Financial common stock.

9. Defendant MB Financial is a Maryland corporation and maintains its principal executive offices at 800 West Madison Street, Chicago, Illinois 60607. MB Financial's common stock is traded on the NasdaqGS under the ticker symbol "MBFI."

10. Defendant David P. Bolger ("Bolger") is a director of MB Financial.

11. Defendant Charles Bryan Daniels ("Daniels") is a director of MB Financial.

12. Defendant Mitchell Feiger ("Feiger") is President, Chief Executive Officer ("CEO"), and a director of MB Financial.

13. Defendant Sunil Garg ("Garg") is a director of MB Financial.

14. Defendant Charles J. Gries ("Gries") is a director of MB Financial.

15. Defendant James N. Hallene ("Hallene") is a director of MB Financial.

16. Defendant Thomas H. Harvey ("Harvey") is a director of MB Financial.

17. Defendant Richard J. Holmstrom ("Holmstrom") is a director of MB Financial.

18. Defendant Mark A. Hoppe ("Hoppe") is a director of MB Financial.

19. Defendant Karen J. May ("May") is a director of MB Financial.

20. Defendant Renee Togher ("Togher") is a director of MB Financial.

21. The defendants identified in paragraphs 10 through 20 are collectively referred to herein as the "Individual Defendants."

22. Defendant Fifth Third is an Ohio corporation with its principal executive offices located at 38 Fountain Square Plaza, Cincinnati, Ohio 45263. Fifth Third is the bank holding company for Fifth Third Bank. Fifth Third's common stock is traded on the NasdaqGS under the ticker symbol "FITB."

## CLASS ACTION ALLEGATIONS

23. Plaintiff brings this action as a class action on behalf of himself and the other public stockholders of MB Financial (the "Class"). Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

24. This action is properly maintainable as a class action. The Class is so numerous that joinder of all members is impracticable. As of May 18, 2018, there were approximately 84,077,597 shares of MB Financial common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

25. Questions of law and fact are common to the Class, including, among others: (i) whether defendants violated the 1934 Act; and (ii) whether defendants will irreparably harm plaintiff and the other members of the Class if defendants' conduct complained of herein continues.

26. Plaintiff is committed to prosecuting this action and has retained competent

counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the Class. Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

27. The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

28. Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class. Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

**Background of the Company and the Proposed Transaction**

29. MB Financial is the Chicago-based holding company for MB Financial Bank, which has approximately $20 billion in assets and a more than one hundred year history of building relationships with middle-market companies and individuals.

30. The Company offers a full range of powerful financial solutions and the expertise and experience of bankers who are focused on their clients' success.

31. On May 20, 2018, the Individual Defendants caused the Company to enter into the Merger Agreement.

32. Pursuant to the terms of the Merger Agreement, if the merger is completed, MB Financial stockholders will receive $5.54 in cash and 1.450 shares of Fifth Third common stock

for each share of MB Financial common stock they own.

33. According to the press release announcing the Proposed Transaction:

> Fifth Third Bancorp (Nasdaq: FITB; www.53.com) and MB Financial, Inc. (Nasdaq: MBFI; www.mbfinancial.com) jointly announced today the signing of a definitive merger agreement under which MB Financial, Inc. ("MB Financial") will merge with Fifth Third Bancorp ("Fifth Third") in a transaction valued at approximately $4.7 billion. Approximately 90 percent of the consideration will be in stock with the rest in cash.
>
> Based on the closing price of Fifth Third's common shares on May 18, 2018, common shareholders of MB Financial will receive $54.20 of total consideration, consisting of 1.45 shares of Fifth Third common stock and $5.54 in cash for each share of MB Financial common stock. The consideration implies a premium of approximately 24 percent to MB Financial's closing share price on May 18, 2018. In conjunction with the closing of the transaction, two members of MB Financial's Board of Directors are expected to join the Fifth Third Bancorp Board.
>
> Chicago-based MB Financial is the holding company for MB Financial Bank, N.A. MB Financial has approximately $20 billion in assets with a history of successfully serving the Chicago market for over 100 years. MB Financial is well recognized as a leader in serving middle-market customers, for its strong deposit franchise, and for its customer centric corporate culture.
>
> The merger will result in a total Chicago deposit market share of 6.5 percent, ranking the combined company fourth in total deposits and second in estimated retail deposits among the nearly 200 banks in the marketplace. Additionally, the combined company will have a 20 percent share of middle market relationships in Chicago, ranking it second. . . .
>
> The transaction is expected to reduce Fifth Third's regulatory common equity Tier 1 (CET1) ratio by approximately 45 basis points. The pro forma tangible common equity to tangible assets (TCE) ratio of the combined entity is projected to be 8.2 percent at closing.
>
> Fifth Third intends to complete its 2017 CCAR buyback plan by repurchasing up to $235 million of its shares of common stock before the beginning of the proxy solicitation in connection with the MB Financial shareholder vote on the transaction, and, subject to regulatory approvals, may repurchase additional shares after the vote. The timing and amount of this repurchase activity is subject to market conditions and applicable securities laws.
>
> The transaction is subject to the satisfaction of all customary closing conditions, including regulatory approvals as well as the approval of MB Financial

shareholders.

**The Prospectus Omits Material Information, Rendering It False and Misleading**

34. Defendants filed the Prospectus with the SEC in connection with the Proposed Transaction.

35. The Prospectus omits material information with respect to the Proposed Transaction, which renders the Prospectus false and misleading.

36. First, the Prospectus omits material information regarding the Company's and Fifth Third's financial projections as well as the analyses performed by the Company's financial advisor in connection with the Proposed Transaction, Sandler O'Neill & Partners, L.P. ("Sandler").

37. With respect to the Company's financial projections, the Prospectus fails to disclose the Company's projections for years 2020 through 2022. The Prospectus provides that, "[i]n preparing its analyses, Sandler O'Neill used internal financial projections for MB Financial for the years ending December 31, 2018 through December 31, 2022, as provided by the senior management of MB Financial." However, the Prospectus only discloses certain projected financial information, only for years 2018 and 2019.

38. With respect to Fifth Third's financial projections, the Prospectus fails to disclose the "median analyst earnings per share estimates for Fifth Third for the years ending December 31, 2018 through December 31, 2020 and [the] estimated long-term annual earnings growth rate for the years thereafter, as provided by the senior management of MB Financial, as well as [the] estimated dividend payout ratio and estimated share buyback ratios as provided by the senior management of Fifth Third."

39. With respect to Sandler's Net Present Value Analysis for MB Financial, the

Prospectus fails to disclose: (i) the internal financial projections for MB Financial for the years ending December 31, 2018 through December 31, 2022, as provided by the senior management of MB Financial; (ii) the terminal value of MB Financial common stock at December 31, 2022; (iii) Sandler's basis for applying price to 2022 earnings multiples ranging from 14.0x to 18.0x and multiples of December 31, 2022 tangible book value ranging from 200% to 275%; and (iv) the inputs and assumptions underlying the discount rates ranging from 8.5% to 11.5%.

40. With respect to Sandler's Net Present Value Analysis for Fifth Third, the Prospectus fails to disclose: (i) the median analyst earnings per share estimates for Fifth Third for the years ending December 31, 2018 through December 31, 2020 and the estimated annual earnings growth rate for Fifth Third for the years ending December 31, 2021 and December 31, 2022, as provided by MB Financial senior management; (ii) the estimated dividend payout ratio and estimated share buyback ratios as provided by Fifth Third senior management; (iii) the terminal value of Fifth Third common stock at December 31, 2022; (iv) Sandler's basis for applying price to 2022 earnings multiples ranging from 13.0x to 16.0x and multiples of December 31, 2022 tangible book value ranging from 175% to 275%; and (v) the inputs and assumptions underlying the discount rates ranging from 8.0% to 11.0%.

41. With respect to Sandler's Pro Forma Analysis, the Prospectus fails to disclose: (i) the median analyst earnings per share estimates for Fifth Third for the years ending December 31, 2018 through December 31, 2020, and the estimated long-term annual earnings growth rate for Fifth Third for the years thereafter as provided by the senior management of MB Financial; (ii) the estimated dividend payout ratio and estimated share buyback ratios as provided by Fifth Third senior management; (iii) the median consensus analyst earnings per share estimates for MB Financial for the years ending December 31, 2018 and December 31, 2019 and

the estimated long-term annual earnings growth rate for MB Financial for the years thereafter as provided by MB Financial senior management; and (iv) the assumptions relating to transaction expenses, purchase accounting adjustments, and cost savings, as provided by Fifth Third senior management.

42. With respect to Sandler's Comparable Company Analyses, the Prospectus fails to disclose the individual multiples and financial metrics for the companies observed by Sandler in the analyses.

43. With respect to Sandler's Analysis of Precedent Transactions, the Prospectus fails to disclose the individual multiples and financial metrics for the transactions observed by Sandler in the analysis.

44. The disclosure of projected financial information is material because it provides stockholders with a basis to project the future financial performance of a company, and allows stockholders to better understand the financial analyses performed by the company's financial advisor in support of its fairness opinion. Moreover, when a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.

45. Second, the Prospectus fails to disclose whether the Company entered into any nondisclosure agreements that contained standstill and/or "don't ask, don't waive" provisions that are or were preventing the counterparties from submitting superior offers to acquire the Company.

46. Without this information, stockholders may have the mistaken belief that, if these potentially interested parties wished to come forward with a superior offer, they are or were

permitted to do so, when in fact they are or were contractually prohibited from doing so.

47. Third, the Prospectus omits material information regarding potential conflicts of interest of Sandler.

48. The Prospectus fails to disclose the amount of compensation Sandler received for the past services it provided to MB Financial.

49. Full disclosure of investment banker compensation and all potential conflicts is required due to the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives.

50. The omission of the above-referenced material information renders the Prospectus false and misleading, including, *inter alia*, the following sections of the Prospectus: (i) Background of the Merger; (ii) Recommendation of the MB Financial Board of Directors and the Reasons for the Merger; (iii) Certain MB Financial Prospective Financial Information; and (iv) Opinion of MB Financial's Financial Advisor.

51. The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to the Company's stockholders.

## COUNT I

### Claim for Violation of Section 14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder Against the Individual Defendants and MB Financial

52. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

53. The Individual Defendants disseminated the false and misleading Prospectus, which contained statements that, in violation of Section 14(a) of the 1934 Act and Rule 14a-9, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not materially false or misleading. MB Financial is liable as the issuer of these statements.

54. The Prospectus was prepared, reviewed, and/or disseminated by the Individual Defendants. By virtue of their positions within the Company, the Individual Defendants were aware of this information and their duty to disclose this information in the Prospectus.

55. The Individual Defendants were at least negligent in filing the Prospectus with these materially false and misleading statements.

56. The omissions and false and misleading statements in the Prospectus are material in that a reasonable stockholder will consider them important in deciding how to vote on the Proposed Transaction. In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available in the Prospectus and in other information reasonably available to stockholders.

57. The Prospectus is an essential link in causing plaintiff and the Company's stockholders to approve the Proposed Transaction.

58. By reason of the foregoing, defendants violated Section 14(a) of the 1934 Act and Rule 14a-9 promulgated thereunder.

59. Because of the false and misleading statements in the Prospectus, plaintiff and the Class are threatened with irreparable harm.

## COUNT II

**Claim for Violation of Section 20(a) of the 1934 Act**
**Against the Individual Defendants and Fifth Third**

60. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

61. The Individual Defendants and Fifth Third acted as controlling persons of MB Financial within the meaning of Section 20(a) of the 1934 Act as alleged herein. By virtue of their positions as officers and/or directors of MB Financial and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the

Prospectus, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

62. Each of the Individual Defendants and Fifth Third was provided with or had unlimited access to copies of the Prospectus alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

63. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same. The Prospectus contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in the making of the Prospectus.

64. Fifth Third also had direct supervisory control over the composition of the Prospectus and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Prospectus.

65. By virtue of the foregoing, the Individual Defendants and Fifth Third violated Section 20(a) of the 1934 Act.

66. As set forth above, the Individual Defendants and Fifth Third had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act. As a direct and proximate result of defendants' conduct, plaintiff and the Class are

threatened with irreparable harm.

**PRAYER FOR RELIEF**

**WHEREFORE,** plaintiff prays for judgment and relief as follows:

A. Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B. In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C. Directing the Individual Defendants to disseminate a Prospectus that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D. Declaring that defendants violated Sections 14(a) and/or 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

E. Awarding plaintiff the costs of this action, including reasonable allowance for plaintiff's attorneys' and experts' fees; and

F. Granting such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated: August 13, 2017

**GOLDMAN & MINTON, P.C.**

By: /S/

Thomas J. Minton (Bar No. 03370)
3600 Clipper Mill Rd., Suite 201
Baltimore, MD 21211
(410) 783-7575
tminton@charmcitylegal.com

*Attorneys for Plaintiff*

**OF COUNSEL:**

**RIGRODSKY & LONG, P.A.**
300 Delaware Avenue, Suite 1220
Wilmington, DE 19801
(302) 295-5310

**RM LAW, P.C.**
1055 Westlakes Drive, Suite 300
Berwyn, PA 19312
(484) 324-6800

# EXHIBIT 4

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

Good Morning, Caroline

Newsletters

Subscribe

Finance & Banking

# Fifth Third inherits $400 million headache

A federal lawsuit, first filed in 2014 and unsealed only now, alleges MB Financial, acquired last year by Fifth Third, defrauded the FDIC in its treatment of loans acquired from failed Broadway Bank.

By Steve Daniels

Gift Article




Credit: Bloomberg

Reprints Share

PLAINTIFF'S EXHIBIT 5
PENGAD 800-631-6989
2-26-25

July 22, 2020 06:52 PM

Fifth Third Bank has inherited an unwelcome legacy of its acquisition of Chicago's MB Financial — a $400 million lawsuit, first filed six years ago.

The complaint was filed in federal court in New York by a whistleblower alleging MB Financial defrauded the Federal Deposit Insurance Corp. by improperly collecting hundreds of millions under

an agreement with the agency after it took over failed Broadway Bank in 2010 and sold the deposits and assets to MB Financial.

**More →**

**Citadel Securities pays $700,000 fine**

**Banking vet Mitch Feiger stepping down as Fifth Third Chicago chair**

Sign up for Today's Crain's: A free roundup of Chicago business news delivered every weekday afternoon.
Subscribe

The lawsuit was sealed until July 20, six years after it was first filed. Federal officials took those six years to determine they wouldn't handle the litigation themselves, a decision they reached last month.

That left plaintiff Lee Moncho, a former Broadway Bank borrower, to pursue the lawsuit, and his attorneys at Davis & Gilbert in New York are doing that. Federal prosecutors in New York's Southern District are free to join later if they choose under the federal law that enables whistleblowers like Moncho to sue defendants they claim have defrauded the feds.

ADVERTISING



MB Financial is alleged in the complaint to have collected money from the FDIC under a "loss-share" agreement with the agency, which promised to absorb most of the bank's losses tied to resolving soured loans of Chicago's Broadway Bank. Much of that money, the complaint alleged, was for loans that Broadway never made, already had been paid off or otherwise were no longer in its portfolio.

MCHUGH 01575

The FDIC suffered at least $400 million in losses due to MB Financial's actions, damages that can potentially be tripled under the False Claims Act, which MB is alleged to have violated, according to the complaint. That raises potential damages to well over $1 billion.

"Rather than notify the FDIC that these 'loans' never should have been included in the portfolio of Broadway Bank loans, MB Financial included them all in the write-downs reported to the FDIC which then paid MB Financial hundreds of millions of dollars under the shared-losses agreement," the complaint stated. "In addition, MB Financial failed to inform the FDIC in its quarterly reports of funds it had received in connection with certain of its loans that would have required MB Financial to reimburse the FDIC."

A Fifth Third spokesman declined to comment, saying the bank was reviewing the lawsuit. Cincinnati-based Fifth Third's $4.7 billion purchase of MB Financial closed just last year.

The unsealing of the suit comes at a somewhat awkward time, since Fifth Third named former MB Financial CEO Mitch Feiger to its board just last month. Feiger ran MB Financial for decades, including the years the lawsuit references. He retired as Fifth Third's chairman for the Chicago market at the end of May and joined the board a few weeks later.

Assuming the lawsuit moves into discovery, it's practically a sure bet that Feiger will have to testify under oath in a deposition about the Broadway Bank loans.

Broadway Bank was its own scandal more than a decade ago. Owned by the Giannoulias family, the bank for years was one of the top-earning lenders in the entire state, thanks to high-rate loans to developers during the latter stages of the real estate bubble. The loans mainly were funded with "hot money" deposits from investors. The family extracted tens of millions in dividends just before the housing bust took down the bank.

The scandal helped to torpedo the 2010 bid by former state Treasurer Alexi Giannoulias to defeat U.S. Sen. Mark Kirk. Kirk, an Illinois Republican, was defeated six years later by current U.S. Sen. Tammy Duckworth, who is reported to be on Joe Biden's short list for his running mate.

After winning the FDIC's auction for the assets of Broadway Bank, MB Financial knew that about 50 of the loans it had acquired had no collateral files, according to the complaint. The loans were on properties located in Chicago, but also in markets like New York and Miami. Though relatively small at about $1 billion in assets, Broadway, as well as other entities controlled by the Giannoulias family, made commercial real estate loans all over the country.

"These 'loans' included loans that had been fully paid off and the collateral released, loans that had been sold to third parties by Broadway Bank, loans that were joint ventures and were not directly secured by any real estate, loans that were never made by Broadway Bank and construction loans and lines of credit that had never been drawn down," the complaint stated.

The lawsuit accused MB Financial of depicting these loans to the FDIC as qualified for reimbursement under its loss-share agreement and collecting accordingly.

Plaintiff Moncho, a Connecticut resident, said in the complaint, "It was in connection with MB Financial's attempt to seize Moncho's commercial real estate (in New York), though it knew it was not the actual lender, that the much larger scheme to defraud the FDIC became evident."

Under the federal whistleblower law, Moncho stands to collect up to 30 percent of any damages if, as is currently the case, the federal government doesn't pursue the issue itself. It would be a smaller percentage if the government decides later to take over the case.

By Steve Daniels

Fifth Third Bancorp, MB Financial, Mitchell Feiger, Broadway Bank, Alexi Giannoulias, Banking, Federal Deposit Insurance Corp., U.S. Attorney, Law and Legal Issues, Homepage

## More in Finance & Banking →




**Proposal calls for Illinois to create its own CFPB as federal agency is gutted**

The bill from Illinois Sen. Mark Walker already faces pushback from a state banking association, which says patchwork efforts at financial regulation could create confusion.



**GTCR raises $3.6 billion for latest private-equity fund**

The Chicago-based firm said it will use the money to make $50 million to $250 million investments in lower-and middle-market companies.




**Kinzie Capital buys Fraser Steel in private-equity deal**

The acquisition is the Chicago private-equity firm's fifth platform investment and its first since February 2024.

MCHUGH 01578

FIFTH THIRD BANK

# Unanimous Written Consent: Officer Appointment

October 21, 2020

PLAINTIFF'S EXHIBIT
6
PENGAD 800-631-6989
2-26-25

Classification: Restricted

FIFTH THIRD BANK

Fifth Third Bancorp & Fifth Third Bank, N.A.

## Board of Directors

## Unanimous Written Consent: Officer Appointment

TABLE OF CONTENTS

CEO Note Regarding Officer Appointment

Press Release

Unanimous Written Consent: Board of Directors*

** Denotes items requiring unanimous written consent.*

FIFTH THIRD BANK
OFFICE OF THE SECRETARY

FIFTH THIRD BANK

Dear Board Members:

As previously discussed in our talent management and succession planning sessions, we are executing on the plan to promote Tim Spence to President. The lines of business, regional banking and strategic planning will now report to Tim. We plan to announce this on Monday, October 26. Attached is a draft of the external release.

As Bob Shaffer and I discussed with you at the September Board meeting, we believed that Phil McHugh could be at risk with Tim's promotion. And, in fact, Phil has decided not to accept the role of Head of Consumer and Business Banking and is leaving the company. This is unfortunate as this is one of the largest roles we have. However, we have a very capable leader, Howard Hammond, who will serve as the interim Head of Consumer and Business Banking. Howard currently leads our Retail Banking business and Fifth Third Securities. As Howard has the opportunity to work in this role, we will also test the market and conduct an external search for this position.

Included with this message is a request for unanimous consent to approve the promotion of Tim to President. I appreciate your prompt approval as we will be announcing his promotion on Monday morning. I am very excited for Tim and look forward to working with him as he further develops in his new role. Please let me know if you have any questions.

Thanks,

Greg

© Fifth Third Bank | All Rights Reserved | For Internal Use Only

Classification: Restricted

FIFTH THIRD BANCORP
NEWS RELEASE

*DRAFT 10/21/20*

October 26, 2020

CONTACTS
Ed Loyd (Media Relations)
email.address@53.com | 123-456-7890
Chris Doll (Investor Relations)
Christopher.Doll@53.com | 513-534-2345

## Fifth Third Announces Appointment of Timothy N. Spence as President

CINCINNATI – Fifth Third Bancorp (Nasdaq: FITB) today announced the appointment of Tim Spence as president. His promotion will support the Company's ongoing successful execution of its strategic initiatives and further strengthen its position as a leading regional bank.

In his new role, effective immediately, Spence will oversee all business lines and regional banking, while continuing his leadership of the Bank's strategy. It was Spence's strength in strategy that first brought him to Fifth Third in 2015. He led that area as chief strategy officer and then advanced in 2017 to head consumer banking and payments as well. Before joining Fifth Third, Spence was a senior partner in the financial services practice at Oliver Wyman, a global strategy and risk management consulting firm. Spence will continue to report to Greg Carmichael, the Company's chairman and chief executive officer.

"Tim has demonstrated extraordinary leadership and vision in driving the strategy and execution to transform Fifth Third through innovation and technology," said Carmichael. "Over the past several years, he has been a principal architect and catalyst of many of the Company's most important strategic initiatives. Those initiatives include organic growth investments, numerous partnerships with fintechs and other third parties, and the 2019 acquisition of MB Financial Inc. in Chicago – a move that dramatically changed the competitive landscape and positioned us for success in one of our most important markets. Tim is keenly focused on solutions that enable Fifth Third to best serve our customers – from individuals to small and large businesses – and help them achieve their goals."

Spence long has been heralded for his commitment to innovation and has helped the Bank significantly advance its digital transformation. In 2018, American Banker recognized him as Digital Banker of the Year, an award whose past honorees have included forward-thinking leaders from the nation's largest financial institutions. In addition to recognizing his many achievements to date, that award highlighted his customer-centric approach, which has been the hallmark of Spence's banking career.

Originally from the Pacific Northwest, Spence and his family make their home in Cincinnati. Spence devotes time to several local community and economic development organizations, including serving on the executive committee of the board at Cintrifuse, a public-private partnership that exists to build a sustainable tech-based economy in Greater Cincinnati, on the advisory board for Miami University's Altman Institute for Entrepreneurship, and as member and co-chair of the commerce committee for the

FIFTH THIRD BANCORP

# NEWS RELEASE

Cincinnati Chamber's RESTART Taskforce. He also serves as a board member for the Consumer Bankers Association.

**About Fifth Third**

Fifth Third Bancorp is a diversified financial services company headquartered in Cincinnati, Ohio, and the indirect parent company of Fifth Third Bank, National Association, a federally chartered institution. As of September 30, 2020, the Company had $202 billion in assets and operates 1,122 full-service Banking Centers, and 2,414 Fifth Third branded ATMs in Ohio, Kentucky, Indiana, Michigan, Illinois, Florida, Tennessee, West Virginia, Georgia, North Carolina and South Carolina. In total, Fifth Third provides its customers with access to approximately 52,000 fee-free ATMs across the United States. Fifth Third operates four main businesses: Commercial Banking, Branch Banking, Consumer Lending, and Wealth & Asset Management. Fifth Third is among the largest money managers in the Midwest and, as of September 30, 2020, had $427 billion in assets under care, of which it managed $53 billion for individuals, corporations and not-for-profit organizations through its Trust and Registered Investment Advisory businesses. Investor information and press releases can be viewed at www.53.com. Fifth Third's common stock is traded on the NASDAQ® Global Select Market under the symbol "FITB."

###

**FIFTH THIRD BANCORP**

**UNANIMOUS WRITTEN CONSENT OF THE BOARDS OF DIRECTORS APPOINTING PRESIDENT**

**October 26, 2020**

The undersigned, being all of the Directors of Fifth Third Bancorp, an Ohio Corporation ("Bancorp"), in accordance with Section 1701.54 of the Ohio Revised Code, do hereby authorize, consent, and agree to the adoption, without a meeting, of the following resolutions through this unanimous written consent (this "Consent"), effective as of the date first set forth above:

**WHEREAS,** the members of the Board, in connection with succession and leadership planning, have discussed potential promotions and appointments to senior officer positions of Bancorp at previous meetings;

**WHEREAS,** the members of the Board have determined that it is appropriate to implement one such promotion and appointment at this time;

**NOW, THEREFORE**, it is hereby:

**OFFICER APPOINTMENT**

**RESOLVED**, that Timothy N. Spence be promoted and appointed to the position of President of Bancorp;

**GENERAL RESOLUTIONS**

**RESOLVED FURTHER,** that the officers of the Bancorp be, and each are hereby, authorized, directed and empowered to perform any and all other acts and things as in such officer's opinion may be necessary or appropriate in order to carry out the intent and purposes of the foregoing resolution with respect to the Bancorp; and

**RESOLVED FURTHER,** that any act of any Director or officer of the Bancorp and of any person designated or authorized to act by any officer of the Bancorp, which act would have been authorized by the foregoing resolutions except that such act was taken prior to the adoption of such resolutions is hereby ratified, confirmed, approved, and adopted as the act of the Bancorp.

[Remainder of page intentionally left blank. Signature page follows.]

In Witness Whereof, the undersigned Directors have executed this signature page as of the date first set forth above in this Unanimous Written Consent.

Nicholas K. Akins October 22, 2020 3:38 PM

B. Evan Bayh III October 22, 2020 9:53 AM

Jorge L. Benitez October 22, 2020 5:27 AM

Katherine B. Blackburn October 21, 2020 9:05 PM

Emerson L. Brumback October 22, 2020 9:22 AM

Greg D. Carmichael October 22, 2020 8:41 AM

Linda W. Clement-Holmes October 21, 2020 7:17 PM

C. Bryan Daniels October 21, 2020 7:07 PM

Mitchell S. Feiger October 22, 2020 4:25 PM

Thomas H. Harvey October 21, 2020 11:04 PM

Gary R. Heminger October 22, 2020 6:00 PM

Jewell D. Hoover October 21, 2020 7:25 PM

Eileen L. Mallesch October 21, 2020 9:04 PM

Michael B. McCallister October 23, 2020 12:49 PM

Marsha C. Williams October 21, 2020 7:01 PM

# EXHIBIT 7

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 8

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 9

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]