UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| PHILIP R. MCHUGH,<br>Plaintiff,<br>vs.<br>FIFTH THIRD BANCORP, et al.,<br>Defendants. | CASE NO. 1:21-cv-00238 |

Videotaped Deposition of: GARY R. HEMINGER

Taken: By the Plaintiff
Pursuant to Notice

Date: December 20, 2022

Time: Commencing at 9:39 a.m.

Place: Fifth Third Center
511 Walnut Street
Cincinnati, Ohio 45202

Before: Wendy L. Raymer, RPR, CRR
and
Bruce L. Sandy, Videographer
Notaries Public-State of Ohio

APPEARANCES:

On behalf of the Plaintiff:

Peter A. Saba, Esq.
and
Joshua M. Smith, Esq.
of
Stagnaro, Saba & Patterson Co., L.P.A.
2623 Erie Avenue
Cincinnati, Ohio 45208
Phone: (513) 533-2701
Email: Pas@sspfirm.com
jms@sspfirm.com

On behalf of the Defendants and the Deponent:

Michael L. Cioffi, Esq.
of
Blank Rome LLP
1700 PNC Center
201 East Fifth Street
Cincinnati, Ohio 45202
Phone: (513) 362-8700
Email: Michael.cioffi@blankrome.com

Also Present:

Philip R. McHugh
Phenise Poole, Esq., Fifth Third Bancorp
Brian Thomas, Esq., Fifth Third Bancorp

- - -

# I N D E X


| GARY R. HEMINGER | PAGE |
|---|---|
| Examination by Mr. Saba | 5 |
| Examination by Mr. Cioffi | 161 |
| Further Examination by Mr. Saba | 212 |

| EXHIBITS | MARKED | REFERENCED |
|---|---|---|
| Plaintiff's Exhibit 1 | 46 | 46 |
| Plaintiff's Exhibit 2 | 51 | 52 |
| Plaintiff's Exhibit 3 | 55 | 55 |
| Plaintiff's Exhibit 4 | 56 | 57 |
| Plaintiff's Exhibit 5 | 58 | 59 |
| Plaintiff's Exhibit 6 | 60 | 60 |
| Plaintiff's Exhibit 7 | 62 | 62 |
| Plaintiff's Exhibit 8 | 64 | 64 |
| Plaintiff's Exhibit 9 | 66 | 66 |
| Plaintiff's Exhibit 10 | 84 | 84 |
| Plaintiff's Exhibit 11 | 111 | 111 |
| Plaintiff's Exhibit 12 | 112 | 112 |
| Plaintiff's Exhibit 13 | 114 | 114 |
| Plaintiff's Exhibit 14 | 115 | 115 |
| Plaintiff's Exhibit 15 | 116 | 116 |
| Plaintiff's Exhibit 16 | 119 | 119 |
| Plaintiff's Exhibit 17 | 120 | 120 |
| Plaintiff's Exhibit 18 | 121 | 121 |
| Plaintiff's Exhibit 19 | 123 | 123 |
| Plaintiff's Exhibit 20 | 125 | 125 |
| Plaintiff's Exhibit 21 | 128 | 128 |
| Plaintiff's Exhibit 22 | 132 | 132 |
| Plaintiff's Exhibit 23 | 132 | 132 |
| Plaintiff's Exhibit 24 | 138 | 138 |
| Plaintiff's Exhibit 25 | 140 | 140 |
| Plaintiff's Exhibit 26 | 156 | 156 |
| Plaintiff's Exhibit 27 | 157 | 157 |
| Plaintiff's Exhibit 28 | 159 | 159 |


\- - -

Page 4

THE VIDEOGRAPHER: Today is December 20th, 2022. The time is 9:39 a.m. We're on the record for the deposition of Gary R. Heminger for a case pending in the United States District Court, Southern District of Ohio, Western Division, entitled Philip R. McHugh, Plaintiff, vs. Fifth Third Bancorp, et al., Defendants, Case No. 1:21-cv-00238.
If at this time all counsel present would introduce themselves for the record, then the witness can be sworn.
MR. SABA: Peter Saba on behalf of the Plaintiff Philip R. McHugh.
MR. SMITH: Joshua Smith on behalf of the Plaintiff Philip R. McHugh.
MR. CIOFFI: Michael Cioffi on behalf of all the defendants. I also represent Mr. Heminger personally pursuant to a written joint representation agreement.
MR. THOMAS: Brian Thomas with Fifth Third Bank.
MS. POOLE: Phenise Poole for Fifth Third Bank.
GARY R. HEMINGER,
of lawful age, a witness herein, being first duly sworn

Page 5

as hereinafter certified, was examined and deposed as follows:

EXAMINATION

BY MR. SABA:
Q. Mr. Heminger, can you go ahead and state your name for the record, please, and spell your last name?
**A. Gary R. Heminger, H-e-m-i-n-g-e-r.**
Q. Have you ever had your deposition taken before?
**A. Yes, sir.**
Q. As a reminder, I'm going to be asking you a series of questions. If there's anything you don't hear or don't understand, please feel free to ask me to repeat or rephrase the question. I think you indicated earlier you may have some problems with hearing so --
**A. Right.**
Q. -- please let me know if you need me to speak up and clarify anything. For the sake of the court reporter, although this is being taken down via video, I do need you to answer verbally. No shaking or nodding of the head or uh-huh or uh-uhs. It's difficult for her to take that down with a written record.
Additionally, if you'd wait for me to finish my question before you answer and I'll try and do the same with your answers, it also makes for a clearer

Page 6

record. Do you understand all those instructions?
**A. Yes, sir.**
Q. Could I have your residence address, please?
**A. My residence is 312 Pheasant Run Place, Findlay, Ohio.**
Q. How long have you lived there?
**A. 20 -- 25 years.**
Q. Who lives there with you?
**A. My wife, Jane.**
Q. What's your date of birth?
**A. 9/10/53.**
Q. You indicated you've had depositions taken before. Have you ever given trial testimony?
**A. I have.**
Q. When is the last time that you gave a deposition?
**A. Approximately ten years.**
Q. And what was that for?
**A. It was a case involving one of the refineries at Marathon Petroleum Company.**
Q. And with respect to the trial testimony you gave, when was -- when did you give the trial testimony?
**A. I'm sorry, I didn't hear. What?**
Q. You indicated that you've also given trial testimony?

Page 7

**A. Oh, yes.**
Q. When's the last time you gave trial testimony?
**A. Probably 20 years ago. The same with Marathon Petroleum Company.**
Q. What did you do to prepare for today's deposition?
**A. I met with my counsel.**
Q. Anything else?
**A. No, sir.**
Q. Did you review the deposition of Mr. McCallister?
**A. I did.**
MR. CIOFFI: Objection. I'm going to instruct him not to answer. What he reviewed were documents that I instructed him to review. Those instructions are a part of my thought process and work product. So for that reason, I would instruct him not to answer.
MR. SABA: I asked a specific question. Did you review the deposition of Mr. McCallister? Whether or not he reviewed it is a specific question. It doesn't go into --
MR. CIOFFI: The identity of the documents is what's privileged because I selected them. You can ask him if he reviewed any documents that I didn't

Page 8

select or that he selected. I'm not going to object to that. The documents I selected, if he reviewed it other than through my selection, you can ask him that.
BY MR. SABA:
Q. You indicated yes to the previous question about whether or not you reviewed Mr. McCallister's deposition. Is there anything specific with respect to Mr. McCallister's testimony that you disagree with?
MR. CIOFFI: Objection. Move to strike his answer, is that he answered it while I was objecting and I'm going to instruct him not to answer.
MR. SABA: And what's the basis of the instruction?
MR. CIOFFI: Again, it -- it goes to the privilege of the document.
BY MR. SABA:
Q. Did you speak to Mr. McCallister at all prior to this deposition?
**A. No.**
Q. With respect to Mr. McCallister's deposition, did you note anything that you agreed with?
MR. CIOFFI: Objection. I'm going to instruct him not to answer about documents that he reviewed

Page 9

at my request.
MR. SABA: And that's going to be a continuing objection?
MR. CIOFFI: Yes. Yes, sir.
MR. SABA: All right. So we'll just -- we'll note to bring that up with the court at a later time.
BY MR. SABA:
Q. What's the extent of your education?
**A. I have a bachelor's degree in accounting from Tiffin University, MBA from University of Dayton.**
Q. Are you currently employed?
**A. I'm retired.**
Q. Where did you retire from?
**A. I retired from Marathon Petroleum Company in 2020.**
Q. What was your position?
**A. I was a chairman and CEO.**
Q. How long had you held the position of chairman and CEO at Marathon Petroleum?
**A. 11 years.**
Q. Were you involved in the process to select your replacement?
**A. I was.**
Q. What was your involvement?

Page 10

**A. I had made recommendations to the board on various candidates.**
Q. How many candidates did you recommend to the board?
**A. We reviewed over -- over the span of preparing for my succession, we reviewed three intensively.**
Q. What was that span that you referenced?
**A. Over the last three years.**
Q. By "the last three years," you mean the last three years prior to your departure?
**A. Yes, sir.**
Q. Did Marathon Oil retain any outside agencies to do an independent review or analysis or assessment of the candidates?
**A. Let me correct you. It's Marathon Petroleum.**
Q. Marathon Petroleum.
**A. Okay. Now repeat the question.**
Q. Certainly. Did Marathon Petroleum retain any outside agency to do a review or assessment of any of the candidates?
**A. We do.**
Q. Who did you retain?
**A. I don't recall the name of the -- of the firm.**
Q. And did the firm analyze more than one candidate or assess more than one candidate?

Page 11

**A. Yes.**
Q. How many candidates did the outside firm that Marathon Petroleum retained assess?
**A. I believe it was two.**
Q. Who was ultimately selected as your replacement?
**A. A fellow by the name of Mike Hennigan.**
Q. Was Mike Hennigan one of the people that you recommended to the board?
**A. Yes.**
Q. How many boards do you serve on currently?
**A. I serve on two public boards, Fifth Third Bank and PPG in Pittsburgh, and I'm on Ohio State University's board as well.**
Q. How long have you served on the board at Fifth Third Bank?
**A. I believe 2006 was the year that I joined.**
Q. And just to be clear, when you say you "served on the board of Fifth Third Bank," you're indicating that you've served on the board of both Fifth Third Bancorp and Fifth Third National Association, correct?
**A. I don't know the difference there. I'm just aware of it as Fifth Third Bancorp.**
Q. Okay. You don't have an understanding of one being the holding company for the other?

**A. I do understand that, yes.**
Q. Okay. What is your understanding?
**A. My understanding is I'm a board member of Fifth Third Bancorp.**
Q. You don't know if you're a board member of Fifth Third Bank National Association?
**A. I don't.**
Q. How often does the Fifth Third Bank board meet a year?
**A. Approximately six or seven times. Our -- you know, dates that are already predetermined at the end of each quarter, and then we'll have a strategy session and -- probably two strategy sessions. So six or seven that are determined, and then you may have a call now and then.**
Q. And you referenced "a strategy session." Is a strategy session different from a board meeting?
**A. No.**
Q. Is that separate and apart from board meetings?
**A. No. It's a -- it's a full board meeting.**
Q. So when you count board meetings, you're saying you set four or so board meetings a year and then a couple strategy sessions?
MR. CIOFFI: Objection. That was not his



testimony, but you can ask him.
BY MR. SABA:
Q. I'm just trying to understand what you mean by which meetings you hold and what they are?
**A. All of them are board meetings, but you meet as a board on the quarterly cycle to review financial statements and public documents or documents you're going to make public. And then we'll have at least one, maybe two board meetings that we review the business plan, the strategy plan, for the upcoming years, but they're all part of the board meeting.**
Q. The meetings where you review the strategy plan for the upcoming years, are those held at the same time each year?
**A. I believe so.**
Q. When are those held?
**A. We'll have one -- the preliminary review in -- I believe it's October, and then a final review in December.**
Q. And what is your understanding of what the duties of the -- of the board members are?
**A. Oh, the duties of a board member are -- are to give an independent view, advice and counsel, on the business of the Fifth Third Bank and the -- and the direction that management is recommending to take the**



**company forward.**
Q. How many board members are there?
**A. I believe there are 12.**
Q. And how many of those board members are independent of Fifth Third Bank?
**A. All except the CEO, and currently the outgoing CEO is still on the board, but I don't believe he would be considered independent yet.**
Q. And that is Mr. Carmichael you're referring to as the outgoing CEO?
**A. Yes, sir.**
Q. And the other CEO member that you're referring to is Mr. Spence; is that correct?
**A. That's correct.**
Q. What is the board's role with respect to executive succession?
**A. I would say that that is the primary role of the board, is to be able to learn, observe development, observe, you know, the management team, both inside the bank and outside the bank for future succession planning.**
Q. Do you serve on any committees?
**A. I do.**
Q. Which committees do you serve on?
**A. I chair the finance committee. I serve on the**



**risk committee and on the human capital compensation committee.**
Q. What does the finance committee do?
**A. The finance committee is a committee of all the chairs of the different committees, where it serves kind of as a quasi executive committee.**
Q. How long have you served on the finance committee?
**A. Approximately five years.**
Q. How long have you been the chair?
**A. From the beginning, all five years.**
Q. What does the risk committee do?
**A. The risk committee reviews all of the policies, both credit, risk, governmental compliance, so anything associated with risk on lending, credit allowances, loss allowances, anything to do with risk in and around the bank is reviewed by the risk committee.**
Q. How long have you been on the risk committee?
**A. About the last four years.**
Q. And what does the Human Capital Compensation Committee do?
**A. We review all of the executive compensation and company compensation for the bank, and it is our duty to observe and advise and make the final recommendations to the board on any compensation for the**

**executives and management.**
Q. Is the Human Capital Compensation Committee also referred as to the HCCC?
**A. Yes, sir.**
Q. What role does the HCCC play in the process of executive succession for the president and CEO?
**A. The members of the HCC are joined by the other members of the board, and so executive succession for the CEO is all done at the board level, not just particularly within the HCCC -- HCC, I should say.**
Q. Independent of the board, does the HCCC have any part in the process of executive succession for the president and CEO?
MR. CIOFFI: Objection. Asked and answered, but you may answer.
THE WITNESS: Repeat it, independent --
BY MR. SABA:
Q. Independent of the board, does the HCCC have any role in the executive succession for the president and CEO?
**A. No, sir.**
Q. How often do each of those committees meet?
**A. The finance committee will meet -- and let me clarify, you want me to talk about each committee I'm on?**



Q. Please.
**A. The finance committee will meet probably six times a year. The risk committee meets every board meeting and maybe a call -- we will have a separate risk committee call with regulatory agencies about twice a year. The HCC committee meets I would say five, six times a year.**
Q. Is it correct to say that the finance committee and risk committee have no involvement in the succession planning for president and/or CEO?
**A. At the committee level, that is correct.**
Q. At what level do they have any involvement in the succession planning for president and/or CEO?
**A. At the committee level, they do not. The board members separately do, but not at the committee level.**
Q. And just to clarify that, are you saying the board members do as members of the board, but not necessarily as members of the finance or risk committee?
**A. That's correct.**
Q. Prior to January 1st, 2020, what was your relationship with Philip McHugh?
**A. I've known Philip for all of the years that I've been on the board, so it was a professional relationship that I would see Philip at the board**



**meetings.**
Q. Other than seeing Philip at the board meetings, where else would you see him?
**A. I believe that's it.**
Q. You didn't spend any time with him socially; is that correct?
**A. No, sir.**
Q. Did you, outside of the board meetings, did you ever observe Philip in the workplace?
**A. No.**
Q. Did -- outside board meetings, did you ever meet with Philip at any time to discuss any Fifth Third issues?
**A. Not that I recall.**
Q. Did you ever communicate with Phil McHugh by phone, by text, by email?
**A. I may have, but not that I recall.**
Q. Did you ever discuss Phil McHugh with any of his direct reports or any of his subordinates?
**A. Not that I recall.**
Q. Did you ever discuss Phil McHugh with Greg Carmichael? And, again, the period of time I'm referring to is prior to January 1, 2020.
**A. Could you repeat that question?**
Q. Sure. Prior to January 1 of 2020, did you



ever discuss Phil McHugh with Greg Carmichael?
**A. We would have discussed inside the boardroom, but not specifically one-on-one with Greg Carmichael, but I would have had discussions inside the boardroom where Greg was presenting.**
Q. Prior to January 1 of 2020, do you recall any specific discussions in the boardroom about Phil McHugh?
**A. As we, you know, reviewed the development of executives, yes, we would have had discussions about Mr. McHugh's development, yes.**
Q. What do you recall about those discussions?
**A. I don't -- I really don't recall any of the details at this time.**
Q. Do you know what the enterprise committee is?
**A. I do.**
Q. What is the enterprise committee?
**A. The enterprise committee is the members of the executive team of the bank.**
Q. Outside the board meetings, did you have any discussions with any members of the enterprise committee regarding Phil McHugh?
**A. No, sir.**
Q. Outside of any board meetings, did you do any of your own independent analysis of Phil McHugh's performance with Fifth Third bank?

**A. No, sir.**
Q. Was there ever a discussion during any of the board meetings of Phil McHugh succeeding Greg Carmichael as president and/or CEO of Fifth Third Bank?
MR. CIOFFI: Objection. Vague. And discussions with whom?
MR. SABA: Let me rephrase the question.
BY MR. SABA:
Q. Prior to January 1, 2020, during any board meetings, do you recall any discussions about Phil McHugh succeeding Greg Carmichael as president and/or CEO of Fifth Third Bank?
MR. CIOFFI: Objection. I didn't hear the first part of that. Could you read that back, please?
(The record was read.)
MR. CIOFFI: Your first question was outside the board meeting, but this one is during the board meeting.
MR. SABA: Correct. I rephrased the question.
MR. CIOFFI: Do you understand the question?
THE WITNESS: Well, now I'm confused, so remind me again.
MR. SABA: Let me repeat the question.
THE WITNESS: And excuse me one second. I



forgot to turn my phone off. I'm sorry.
BY MR. SABA:
Q. Prior to January 1st, 2020, do you recall any discussions during any of the board meetings regarding Phil McHugh replacing Greg Carmichael as president and/or CEO of Fifth Third Bank?
**A. I do not.**
Q. Do you believe that there were any discussions of -- regarding Phil McHugh replacing Greg Carmichael as president and/or CEO of Fifth Third Bank prior to January 1st, 2020 during any of the board meetings?
**A. Not as replacing Greg Carmichael, no.**
Q. What about other than replacing Greg Carmichael?
MR. CIOFFI: Objection, vague. Other discussions?
BY MR. SABA:
Q. Other discussions of Fifth -- I can rephrase the question.
MR. CIOFFI: Please do.
BY MR. SABA:
Q. Prior to January 1, 2020, were there ever any discussions during any board meetings regarding Phil McHugh becoming president and/or CEO of Fifth Third Bank?



**A. Isn't that the same question I just answered?**
MR. CIOFFI: I think so, but --
BY MR. SABA:
Q. You answered not with respect to replacing Greg Carmichael.
**A. Okay.**
Q. So I rephrased the question --
**A. All right.**
Q. -- to remove that characteristic of replacing Greg Carmichael to see if there were any discussions, separate and apart from replacing Greg Carmichael?
**A. Right.**
Q. Do you understand the question?
**A. I do.**
Q. Okay.
**A. The -- in the board meeting, when we're doing succession planning, we review -- it's a continuous process that we review candidates. So we would have had discussions, you know, not only Mr. McHugh, but other candidates as well.**
Q. When you say "candidates," as candidates for president and CEO of Fifth Third Bank?
**A. Candidates for potential for any upward movement within the enterprise team.**
Q. Were there any specifically with respect to



Phil McHugh as president and/or CEO of Fifth Third Bank?
**A. Not that I recall.**
Q. Focusing on the period after January 1st, 2020, was your relationship with Phil McHugh any different after that date?
MR. CIOFFI: Objection. Vague. Different than what?
BY MR. SABA:
Q. Different than what you indicated prior to January 1st, 2020? I'll ask it a different way.
Describe to me your relationship with Phil McHugh after January 1st, 2020?
**A. I don't see my relationship any different. It's always been a professional relationship.**
Q. Did you have any direct meetings with Phil McHugh after January 1st, 2020, outside any board meetings?
**A. Not that I recall.**
Q. Did you have any conversations with Phil McHugh after January 1st, 2020, outside any board meetings?
MR. CIOFFI: Objection. You just asked that question, I think.
THE WITNESS: Not that I recall.

Page 24

BY MR. SABA:
Q. Did you have any communication by text, email, or telephone with Phil McHugh after January 1st, 2020?
**A. Not that I recall.**
Q. After January 1st, 2020, did you do any independent analysis of Phil McHugh's performance at Fifth Third Bank?
MR. CIOFFI: Objection. I didn't get the preface. Did you say outside the board meetings?
MR. SABA: After.
MR. CIOFFI: Could you read the question back? I'm sure it's perfectly fine, but I didn't hear it.
(The record was read.)
MR. CIOFFI: Objection. Lack of clarity. Are you saying outside the board meetings?
MR. SABA: In or outside board meetings.
MR. CIOFFI: Could you -- because that wasn't the question. Could you rephrase the question, please?
MR. SABA: Sure.
BY MR. SABA:
Q. After January 1st, 2020, did you do any independent analysis of Phil McHugh outside any board meetings?
**A. No, sir.**

Page 25

Q. After January 1st, 2020, did you meet with any of Phil McHugh's direct reports or subordinates to discuss Phil McHugh's performance?
**A. No, sir.**
Q. After January 1st, 2020, did you have any meetings or conversations with Greg Carmichael to discuss Phil McHugh succeeding him as president and/or CEO of Fifth Third bank?
**A. Not that I recall.**
Q. Outside of any board meetings, did you have any meetings with Greg Carmichael during which you discussed Phil McHugh?
**A. Not that I recall.**
Q. After January 1st, 2020, did you have any meetings with any members of the enterprise committee, other than Greg Carmichael, during which you discussed Phil McHugh?
**A. That's --**
Q. It's broad.
**A. That's broad. Run that by my again.**
Q. Sure. After January 1, 2020, did you have any meetings with any members of the enterprise committee during which you discussed Phil McHugh?
**A. No, sir.**
Q. Prior to January 1st, 2020, what was your

Page 26

relationship with Tim Spence?
**A. A professional relationship as a member of the management team of Fifth Third.**
Q. Prior to January 1st, 2020, did you have any meetings with Mr. Spence outside any board meetings?
**A. I would have had some phone calls.**
Q. When did you have those phone calls with Mr. Spence?
**A. I don't recall.**
Q. Why did you have phone calls with Mr. Spence prior to January 1, 2020?
**A. Just, again, as a professional relationship for clarification of different things that were presented at a board meeting.**
Q. How many phone calls did you have with Mr. Spence?
**A. I don't recall.**
Q. More than five?
**A. No.**
Q. Do you recall what year those phone calls were?
**A. No.**
Q. Do you recall any of the topics that you followed up with him about?
**A. One was to get -- have further information,**

Page 27

**further understanding, I should say, of some of the digital platforms that were being considered at the bank.**
Q. Do you recall any of the other topics?
**A. I do not.**
Q. Did you ever communicate with Mr. Spence by email or text message prior to January 1, 2020?
**A. I don't recall.**
Q. Prior to January 1, 2020, did you have any conversations with Mr. Carmichael about Mr. Spence succeeding him as president and CEO of Fifth Third Bank?
MR. CIOFFI: Objection. Are you saying outside the board meetings?
MR. SABA: I'm saying at any time prior to January 1, 2020, did you have any conversations with Mr. Carmichael about Mr. Spence succeeding him as president and/or CEO of Fifth Third Bank?
MR. CIOFFI: My objection is are you including both inside and outside the board meetings in your question? That's what is not clear.
MR. SABA: No, my question is clear. Any conversations. So that could be in a board meeting, it could be outside a board meeting.
MR. CIOFFI: Do you understand the question?
THE WITNESS: I do.

Page 28

MR. CIOFFI: Please answer.
THE WITNESS: I would have had conversations inside the board meeting.
BY MR. SABA:
Q. Did you have any conversations outside the board meeting with Mr. Carmichael about Mr. Spence succeeding him as president and/or CEO of Fifth Third Bank?
**A. Not that I recall.**
Q. During which board meetings did you have conversations with Mr. Carmichael about Mr. Spence succeeding him as president and CEO of Fifth Third Bank?
**A. I don't recall the actual dates.**
Q. Did you have any conversations with any of the other board meetings -- excuse me, let me rephrase that.
Did you have any conversations with any of the other board members, either during a board meeting our outside a board meeting, regarding Mr. Spence succeeding Mr. Carmichael as president and/or CEO of Fifth Third Bank?
MR. CIOFFI: Objection. Time frame. Ever?
MR. SABA: I wasn't done with my question.
MR. CIOFFI: Oh, I thought you were.
BY MR. SABA:
Q. This is prior to January 1st, 2020.

Page 29

MR. CIOFFI: Can you read the question back please.
MR. SABA: Let me repeat the question.
BY MR. SABA:
Q. Prior to January 1st, 2020, did you have any conversations with any other board members, either inside a board meeting or outside a board meeting, regarding Mr. Spence succeeding Mr. Carmichael as president and/or CEO of Fifth Third Bank?
**A. Yes.**
Q. When were those conversations?
**A. I don't recall the exact dates.**
Q. Who did you have those conversations with?
**A. Well, as part of -- as I mentioned earlier in my deposition, its responsibility -- the number one responsibility of the board is succession planning, and we would have had discussions in executive session of the board, you know, a couple times a year.**
Q. Did you have any conversations outside any board meetings or executive sessions with any of the other board members regarding Mr. Spence succeeding Mr. Carmichael as president and/or CEO of Fifth Third Bank?
MR. CIOFFI: Objection. Asked and answered. The same question.

Page 30

MR. SABA: No, I'm clarifying whether he had any conversations outside any board meetings.
THE WITNESS: Not that I recall.
BY MR. SABA:
Q. Did you ever observe Mr. Spence in the workplace?
MR. CIOFFI: Objection.
BY MR. SABA:
Q. Outside any board meeting?
**A. Run that question by me again.**
Q. Certainly. Prior to January 1, 2020, did you ever observe Mr. Spence in the workplace?
**A. In the workplace? Yes.**
Q. When did you observe him in the workplace?
**A. In many presentations at the board meetings.**
Q. Outside any board meetings, did you ever observe Mr. Spence in the workplace?
**A. Not that I recall.**
Q. Did you ever meet with any of Mr. Spence's subordinates or direct reports regarding Mr. Spence?
MR. CIOFFI: Objection. Clarity. You keep going inside, outside the board meetings. Is this ever or inside or outside or what are you asking?
MR. SABA: I can rephrase the question.

Page 31

BY MR. SABA:
Q. Prior to January 1, 2020, did you ever have any meetings with any of the direct reports or subordinates to Mr. Spence outside any board meetings to discuss Mr. Spence?
**A. Not that I recall.**
Q. Outside -- excuse me. Prior to January 1, 2020, outside any board meetings, did you have any conversations with any members of the enterprise committee regarding Mr. Spence succeeding Mr. Carmichael as president and/or CEO of Fifth Third Bank?
MR. CIOFFI: Objection. Lack of clarity. You're asking those questions really fast. Could you read it back, please?
MR. SABA: I can repeat it slower.
MR. CIOFFI: I couldn't really follow it.
BY MR. SABA:
Q. After -- excuse me. Prior to January 1, 2020, did you ever have any conversations with any members of the enterprise committee outside any board meetings regarding Mr. Spence succeeding Mr. Carmichael as president and/or CEO of Fifth Third Bank?
**A. Not that I recall.**
Q. You indicated that you first joined the Fifth Third board in 2006; is that correct?

Page 32

**A. Yes, sir.**
Q. Were you involved in the process of Mr. Kabat succeeding Mr. Shaffer's position?
**A. I was not.**
Q. Obviously you were here when Mr. Carmichael succeeded Mr. Kabat; is that correct?
**A. That's correct.**
Q. Explain to me what your understanding is of the executive succession process at Fifth Third for replacing the president and/or CEO?
**A. The process, the executive succession planning -- and it's not just the process here at Fifth Third, it's the process that I'm very familiar with at the company that I ran for many years, Marathon Petroleum, it's the same process at PPG -- where we evaluate many candidates over a span of time, and so it's a continuous process to see how they're developing, to see what their strategic vision is, to see what their -- I will call it a culture index, how they manage people, their leadership skills with people. So we are continually evaluating the development of executives that might some day be considered for that position.**
Q. What else?
**A. I think I summed it up pretty well.**
Q. With respect to Fifth Third Bank

Page 33

specifically -- and we'll focus on the most recent transition from Mr. Carmichael to Mr. Spence -- who were the many candidates that were evaluated?
MR. CIOFFI: Objection. Time frame? You are talking about the process, so --
MR. SABA: You said many candidates were evaluated. Who were the many candidates that were evaluated?
MR. CIOFFI: Again, time frame. I mean, are you talking about from the time Mr. Carmichael became CEO?
MR. SABA: He said they evaluate many candidates. I'm asking about with respect to Mr. -- locating Mr. Carmichael's replacement, who were the many candidates that were considered?
THE WITNESS: I don't recall that that's what I stated. I said in the executive succession planning --
MR. SABA: Right.
THE WITNESS: -- that can be for many different executive enterprise positions, we evaluate many candidates over time. Not specifically the president and CEO.
BY MR. SABA:
Q. My question goes specifically with respect to

Page 34

president and CEO, what is that process at Fifth Third Bank?
**A. As we evaluate the -- in this case, a very short list, it would not be many. We evaluate internal candidates in this case to determine how those possible candidates are developing.**
Q. Anything else that goes into selecting the president and/or CEO at Fifth Third Bank?
**A. It's very important to understand, as I said, the strategic vision of a person, their apparent leadership skills, their gravitas with the employees, with the outside investment community, and their presentation skills, you know, to the board itself.**
Q. And what did the board do to gain that understanding of Mr. Spence?
**A. Throughout all of the board meetings that I spoke about earlier, including the strategy sessions, every meeting, you're being evaluated. Every breakfast, lunch, and dinner you're with the board, you're being interviewed on how you're developing and how you're preparing. So over all of those meetings, we would have observed Mr. Spence, observed how he's developing, observed his strategic vision, observed his interpersonal skills with the enterprise team. You always, as a director, you're always observing the**

Page 35

**executive management team.**
Q. And that's all within the board meetings, correct?
**A. Well, within the board meetings, as I said, within -- whether you have a breakfast, lunch, or dinner, it's all part of the board meeting, but you break away from the actual board meeting when you have a dinner.**
Q. Outside the board meetings and the breakfast, lunch, or dinner, anything else?
**A. No, sir.**
Q. And during what period of time was Mr. Spence evaluated as a candidate to replace Mr. Carmichael as president and CEO?
**A. Over the last -- I don't recall the exact dates, but the last three or four years, the board continuously observed and were evaluating Mr. Spence's development.**
Q. You referenced a short list of internal candidates for president and CEO of Fifth Third Bank to replace Mr. Carmichael. Who was on the short list of internal candidates?
MR. CIOFFI: Objection. That misstates his testimony, but you may answer.
THE WITNESS: The CFO, Mr. Tayfun Tazun, would

have been evaluated. Mr. McHugh would have been evaluated. Mr. Spence. At one point in time we observed Mr. Anderson, Lars Anderson. Again, the board is continuously observing their development. It doesn't mean that any or all of them were considered to be the president and CEO. We're observing their development to see how they are -- how they're coming along.
BY MR. SABA:
Q. With respect to Mr. McHugh, during what period of time would he have been on that short list of candidates?
MR. CIOFFI: Objection. Asked and answered, but you may answer.
THE WITNESS: I would have -- first of all, I said he was on the short list of people we observed. I didn't say he was a short list of -- as a candidate for president and CEO, but a short list of the executives that we are observing and evaluating.
BY MR. SABA:
Q. Was there a short list of candidates for president and CEO?
**A. Yes.**
Q. And who was on that short list of candidates



for president and CEO to replace Mr. Carmichael?
**A. Mr. Spence.**
Q. Anybody else?
**A. Not that I'm aware of.**
Q. When was Mr. Spence placed on that short list of candidates to replace Mr. Carmichael as president and CEO?
**A. I don't recall the exact date.**
Q. Do you know a time frame?
**A. Within the last three to four years.**
Q. Was Mr. McHugh ever on the short list of candidates to become president and CEO of Fifth Third bank?
**A. Not that I recall.**
Q. Who creates the short list of candidates for someone to become the next president and CEO of Fifth Third Bank?
**A. It's an iterative process where executives are reviewed with the board and then within the board meeting, within the succession planning group, it is determined who we are going to further observe as a potential candidate as a successor.**
Q. You mentioned a succession planning group. What is a succession planning group?
MR. CIOFFI: Objection. Asked and answered.



THE WITNESS: The full board.
BY MR. SABA:
Q. There's no separate group within the full board?
MR. CIOFFI: Objection. Asked and answered. Redundant. Argumentative. You may answer.
THE WITNESS: There's no separate group.
BY MR. SABA:
Q. Why was Mr. Spence the only person on the short list to replace Mr. Carmichael as president and CEO of Fifth Third Bank?
MR. CIOFFI: Objection. Mischaracterizes his testimony. You may answer.
THE WITNESS: From our observation of members of the management team, we felt that Tim had the -- during his presentations, that he observed, you know, exemplary strategic vision, a tremendous depth and breadth of the digital Fintech platforms, outstanding interpersonal skills, and a passion to really take the bank forward.
BY MR. SABA:
Q. What do you do to prepare for a Fifth Third board meeting?
**A. You need to -- I don't hear you when you're talking that way.**



Q. Oh, I'm sorry. Excuse me. What do you do to prepare for a Fifth Third board meeting?
**A. We receive in advance, depending on the committee, whether it's the finance committee or excuse me, whether it's the audit committee, the HCC committee, the risk committee, the finance committee, we receive in advance all of the materials that are going to be presented at those different committees, and so I read those. The information that is detailed and the agendas that are detailed per committee, and you read and are prepared so that when you get into the board meeting, it all doesn't have to be recited again.**
Q. Who presides over the board meetings?
**A. The chairman of the board and the lead director.**
Q. Chairman would be Mr. Carmichael; is that right?
**A. At this time, yes.**
Q. Well, going back for the past several years, he's been presiding over the board meetings, correct?
MR. CIOFFI: Objection. Lack of clarity, over several years. You may answer.
THE WITNESS: Yes. Marsha Williams was our lead director early in Mr. Carmichael's career. I don't recall, but I don't believe that

Page 40

Mr. Carmichael was immediately chairman upon succeeding Mr. Kabat, but Marsha Williams was our lead director and presided over a good number of meetings during that period of time.
BY MR. SABA:
Q. Mr. Carmichael became CEO in 2015; does that sound correct?
**A. Approximately, yes.**
Q. And since that time, he's presided over the board meetings; is that correct?
MR. CIOFFI: Objection. Asked and answered. That is not what he said.
THE WITNESS: I don't recall the exact date that Mr. Carmichael was made chairman.
BY MR. SABA:
Q. Let me represent to you that it was November 1st, 2015. Since that time, has Mr. Carmichael presided over the board meetings?
MR. CIOFFI: Objection. Counsel's testifying. The witness answered the question. He doesn't know.
THE WITNESS: I don't know the exact date.
BY MR. SABA:
Q. Since Mr. Carmichael has become CEO, has he presided over the board meetings?

Page 41

MR. CIOFFI: Objection. Asked and answered. Argumentative. Redundant.
THE WITNESS: The CEO does not preside over the board meetings.
BY MR. SABA:
Q. Excuse me. Since Mr. Carmichael has become chairman of the board, he has presided over the board meetings; is that correct?
**A. Since he became chairman, that's correct.**
Q. Thank you. How and when are the documents provided to the board members for the board meetings?
**A. Usually a week, maybe up to two weeks in advance of the board meeting via a system called Diligent. They are downloaded and --**
Q. The Diligent board's portal; is that what that is?
**A. Yes, sir.**
Q. And who provides those documents for the board meetings?
**A. They come from the secretary's office, the legal office of Fifth Third.**
Q. Who sets the agenda for each board meeting?
**A. The agenda is discussed with the chair of each committee, reviews their committee information, and then**

Page 42

**the lead director will review the agenda for the full board with the chairman.**
Q. And who determines who the presenters or speakers will be at each board meeting?
**A. It will be the management team, but usually the CEO.**
MR. SABA: If we can go off the record.
THE VIDEOGRAPHER: The time is 10:35 a.m. We're going off the record.
(A recess was taken from 10:36 a.m. to 11:01 a.m.)
THE VIDEOGRAPHER: The time is 11:01. We are back on the record.
BY MR. SABA:
Q. Mr. Heminger, how much are you paid for being a member of the board at Fifth Third?
**A. Approximately $300,000, half in cash and half in stock.**
Q. And do you receive additional funds for being on the committees?
**A. No, sir.**
Q. What about for being a -- the chair of a committee?
**A. You get an additional fee as the chair of a committee, yes.**

Page 43

Q. How much is that?
**A. I believe -- I believe it's about 35,000 -- 35 to $40,000 to be the chair of the finance committee.**
Q. Did Mr. Carmichael ever recommend to the board that Mr. Spence replace him as president and/or CEO of Fifth Third?
MR. CIOFFI: Objection. Time frame?
MR. SABA: Any time.
THE WITNESS: In our last meeting, it was a collective -- it was a recommendation from Greg, but it was a decision in the executive session of the board where we made the decision.
BY MR. SABA:
Q. By the last meeting, what are you referring to, "the last meeting"?
**A. Whatever meeting it was where we made the decision on Tim Spence.**
Q. And are you referring to the decision for Tim Spence to become president or the decision for Tim Spence to become CEO?
**A. I was referring to when he became CEO.**
Q. Did Mr. Carmichael ever make a recommendation with respect to Mr. Spence becoming president to the board?
**A. There would have been a recommendation back**

Page 44

**when we made Mr. Spence president, yes, there would have been a recommendation by Mr. Carmichael that we consider him.**
Q. Do you recall when that recommendation was made?
**A. I don't recall the exact date.**
Q. Did he make that recommendation -- did Mr. Carmichael make that recommendation at more than one board meeting?
**A. Not that I recall.**
Q. Do you recall if the recommendation made by Mr. Carmichael was during a regular portion of the board meeting or during an executive session?
**A. The recommendation had been made during an executive session of the board.**
Q. Are minutes taken of executive sessions?
**A. I believe so.**
Q. Who is responsible for taking the minutes during an executive session of the board?
**A. I don't know.**
Q. Have you ever seen minutes from an executive session of the board?
**A. I've seen minutes of the entire board meeting, and I think that they are inclusive of executive session.**

Page 45

Q. You think the board minutes include minutes of what takes place in the executive session?
**A. I think, but I'm not sure.**
Q. You'd agree, from a practical standpoint, the -- you would want a record of what happened during the executive session so you all know what you did during the prior executive session, correct?
MR. CIOFFI: Objection to the form. Counsel is testifying. Do you have a question or do you want him to agree with your testimony?
MR. SABA: That was my question.
MR. CIOFFI: Your testimony was your question.
BY MR. SABA:
Q. Do you understand the question, Mr. Heminger? Do you understand the question?
**A. Run it by me again, please.**
Q. From a practical standpoint, wouldn't you want a record of what happened during an executive session so you would know what you all decided during the executive session?
**A. Yes.**
Q. Did Mr. Carmichael ever recommend to the board that Mr. McHugh should succeed him as president and/or CEO?
**A. Not that I recall.**

Page 46

(Plaintiff's Exhibit 1 is marked for identification.)
BY MR. SABA:
Q. Mr. Heminger, I've handed you what's been marked as Exhibit Number 1. Can you identify that for me, please?
**A. Fifth Third Bancorp Minutes of the Meeting of the Board of Directors February 28, 2019.**
Q. And if you look down at the bottom right-hand corner of that document, it has what we call a Bates stamp. Do you see where it says Fifth Third McHugh 212471?
**A. Yes.**
Q. Do you see that number there? And if you page through, it goes through to 212474; is that correct?
**A. Yes.**
Q. Have you seen this document before, Mr. Heminger?
**A. I would have seen the minutes before, yes.**
Q. And as you indicated, this was for the meeting that took place on February the 26th, 2019; is that correct?
**A. Yes. I'm sorry, I said earlier February 28. It's hard to read, but it is February 26.**
Q. And you were present at that meeting, correct?

Page 47

**A. Yes.**
Q. And if we look down, Mr. Carmichael presided over this meeting; is that correct?
**A. Yes.**
Q. You would agree, Mr. Heminger -- actually, let me rephrase the question. Does this appear to you to be a full set of the minutes from the February 26, 2019 board meeting for Fifth Third Bancorp?
**A. I can't determine if it's a full set or not.**
Q. Based upon Exhibit 1, are you able to tell me whether or not there was any discussion of succession timelines and candidates for the position of president during the February 26, 2019 board meeting?
MR. CIOFFI: Objection. The document speaks for itself, but if you have --
MR. SABA: Go ahead.
MR. CIOFFI: -- an answer, go ahead and answer it.
THE WITNESS: Rephrase the question, please. I have to look at the minutes.
BY MR. SABA:
Q. Sure. Based upon Exhibit Number 1?
**A. Uh-huh.**
Q. Are you able to tell me whether or not there was any discussion of succession timelines and

candidates for the position of president during the February 26, 2019 board meeting?

MR. CIOFFI: Counsel, do you have a section of this you want to direct his attention to rather than have him read the whole thing or --

MR. SABA: No. My question speaks for itself.

MR. CIOFFI: So does the document. Whether he points it out right now doesn't matter, but go ahead. You may answer if you have one.

THE WITNESS: I do not see anything in this document, no.

BY MR. SABA:

Q. As you sit here today, can you tell me whether or not there were any discussions during the February 26, 2019 board meeting, regarding the succession timelines and candidates for the position of president?

**A. I do not recall.**

Q. What would you need in order to determine whether or not there were any discussions during the February 26, 2019 board meeting regarding the succession timelines and candidates for the position of president?

MR. CIOFFI: Objection to the form of the question. It's vague. You mean out --

MR. SABA: Go ahead, Mr. Heminger.



MR. CIOFFI: Other than total recall, I mean, he said he just didn't recall. So do you have something to refresh his memory?

BY MR. SABA:

Q. Do you understand my question?

**A. I do.**

Q. What is your answer?

**A. I -- I don't see anything in this document that makes me recall if there was any discussion or not.**

Q. You would agree with me that this document -- let me represent to you this is what was produced by Fifth Third's counsel with respect to the minutes of the meeting of the board of directors for Fifth Third Bancorp on February 26, 2019, that there would appear to be several pages missing. Recognizing it goes from the first page to page 15.

MR. CIOFFI: Objection to the form of the question. Are you asking him to agree with you?

THE WITNESS: I --

BY MR. SABA:

Q. You indicated before you couldn't tell if this was a full set of the minutes or not; is that right?

**A. That's what I said, yes.**

Q. If you look at the first page, Fifth Third McHugh 212471?



**A. Correct.**

Q. We don't have a page number there, but when you turn the page, the next page, Fifth Third McHugh 212472 has a page number 15; do you see that?

**A. I do.**

Q. Which would appear to indicate that there is at least 13 pages missing; is that correct?

**A. According to this numbering sequence, yes.**

Q. If you had the full set of board minutes for February 26, 2019, would you be able to tell us whether or not there was a discussion regarding succession timelines and candidates for the position of president during that meeting?

MR. CIOFFI: Objection to the form.

THE WITNESS: I don't know. I can't observe anything from -- other than what you've put in front of me.

BY MR. SABA:

Q. Based upon Exhibit 1, can you tell me everyone who made a presentation at the February 26, 2019 board meeting for Fifth Third Bancorp?

**A. I can't tell you everyone, no.**

Q. If you had a full set of the minutes for the board of directors meeting for Fifth Third Bancorp for February 26, 2019, would you be able to tell me everyone



who made a presentation at that meeting?

**A. I believe --**

MR. CIOFFI: Objection to the form. You're asking him to speculate on what might or might not be in the minutes and whether those presentations were recorded, but you may answer. Go ahead.

THE WITNESS: I believe I could.

MR. SABA: We'll make a note at this point as we proceed, Michael. Obviously we've made a request for the full set of minutes which haven't been provided, but we will have to continue this deposition in progress for additional questions regarding the full sets of minutes.

MR. CIOFFI: Again, like the deposition of Mr. McCallister, I recognize you're trying to keep the deposition open and preserving whatever rights you may have. I don't agree that you have any rights. We've produced every page of the minutes that are arguably relevant in this case, but -- so there's no need to keep it open because you have more than what's relevant and what is responsive to Civil Rule 26, but I recognize you're trying to preserve whatever rights you believe you have.

(Plaintiff's Exhibit 2 is marked for identification.)

Page 52

BY MR. SABA:
Q. Mr. Heminger, I've handed you what has been marked as Exhibit Number 2. Can you identify that for me, please?
**A. Yes. Fifth Third Bank Minutes of the Meeting of the Board of Directors February 26, 2019.**
Q. And do you recognize that this is a separate set of minutes for Fifth Third Bank as opposed to Fifth Third Bancorp?
**A. Yes.**
Q. Does this clarify your understanding that you're actually on the board of directors for both Fifth Third Bank and Fifth Third Bancorp?
**A. Yes.**
Q. And is it fair to say that these meetings are held simultaneously both beginning at the same time?
**A. I believe that is correct.**
Q. Essentially they're joint meetings of both board of directors?
**A. Yes.**
Q. You serve both roles simultaneously, correct?
**A. Yes.**
Q. And, again, referring to the Bates stamps at the bottom of Exhibit Number 2, this is marked Fifth Third McHugh 212475 through McHugh 212479; is that

Page 53

correct?
**A. That's correct.**
Q. If you could look through Exhibit Number 2, Mr. Heminger, are you able to tell me whether or not this is a complete set of the minutes -- of the board minutes for Fifth Third Bank for February 26, 2019?
**A. No, I'm not.**
Q. Making the same reference as before, the -- you'll see that the first page goes from having no page mark on it 212475, but the second page, Firth Third McHugh 212476, is marked as page 21; do you see that?
**A. Yes.**
Q. So it would appear that there is at least 19 pages missing between there; is that correct?
**A. It appears.**
Q. Based upon your review of these minutes, are you able to tell me whether or not there was any discussion of succession timelines and candidates for the position of president during the February 26, 2019 board meeting for Fifth Third Bank?
**A. I do not see anything in these minutes, no.**
Q. Based upon Exhibit 2, are you able to tell me who the presenters were during the February 26, 2019 board meeting for Fifth Third Bank?
**A. In some cases, yes.**

Page 54

Q. Can you tell me who all the presenters were?
**A. During the strategy update, it was Mr. Spence and Mr. Carmichael, Mr. Anderson, Mr. Tazun, Mr. Leonard.**
Q. Anyone else?
**A. Hang on. That's all I can see from what you've given me.**
Q. So going back to my earlier question, are you able to identify every presenter?
**A. I'm sorry?**
Q. Are you able to identify everyone who made a presentation at the February 26, 2019 board meeting of Fifth Third Bank, based upon Exhibit 2?
MR. CIOFFI: Objection to the form. It seems that there are others besides what he answered, but you may answer.
THE WITNESS: I answered on -- based on what you gave me, I answered who appears to have been the presenters.
BY MR. SABA:
Q. And my question is, are you able to identify everyone who presented during that board meeting?
**A. No.**
MR. CIOFFI: Objection. Argumentative. Assumes facts not before the witness.

Page 55

(Plaintiff's Exhibit 3 is marked for identification.)
BY MR. SABA:
Q. Mr. Heminger, I have handed you what has been marked as Exhibit Number 3. Can you identify that for me, please?
**A. Fifth Third Bancorp Minutes of Meeting of the Board of Directors February 26, 2019.**
Q. And, sir, if you compare this to Exhibit 1, which is also Fifth Third Bancorp Minutes of Meeting of the Board of Directors February 26, 2019, if I can first refer you to the Bates stamp numbers on Exhibit 3, those are marked Fifth Third McHugh 212771; is that correct?
**A. Yes.**
Q. And they run through 212774; is that correct?
**A. Yes.**
Q. Which you agree are different than the Bates stamp numbers on Exhibit 1 for the same set of minutes; is that correct?
MR. CIOFFI: Objection. The documents speak for themselves.
BY MR. SABA:
Q. Do you agree with that, sir, Exhibit 1 and Exhibit 3 have different Bates stamp numbers; is that correct?

**A. That's correct.**
Q. And they are both listed as Fifth Third Bancorp minutes for the same day. Do you know if one is a draft set of minutes?
**A. I don't know.**
Q. Do you know if either one is the final set of minutes that was approved by the board?
**A. I don't.**
Q. What would you need to see in order to determine whether or not the minutes were a final set of minutes approved by the board?
**A. I would need to see the record that is held with the corporate secretary.**
Q. Comparing Exhibit 1 to Exhibit Number 3, Mr. Heminger, the first paragraph under executive session with CEO, under Exhibit Number 3, has been blacked out. Whereas under Exhibit Number 1 under executive session with CEO, that paragraph has not been blacked out. My question is, is there any additional information that you can recall that occurred during that executive session that is not disclosed under Exhibit Number 1?
**A. Not that I recall.**
(Plaintiff's Exhibit 4 is marked for identification.)



BY MR. SABA:
Q. Mr. Heminger, I have handed you what has been marked as Exhibit Number 4. Can you identify that for me, please?
**A. Fifth Third Bancorp Minutes of Meeting of the Board of Directors April 16, 2019.**
Q. Have you seen this document before?
**A. I don't recall.**
Q. You would agree with me this document is Bates stamped at the bottom Fifth Third McHugh 212480 through 212481; is that correct?
**A. Yes.**
Q. Do you recall if the Fifth Third Bancorp board meeting minutes for April 16, 2019 were more than two pages?
**A. I don't recall.**
Q. Based upon Exhibit 4, are you able to tell whether or not there was any discussion of succession timelines of candidates for the position of president during the April 16, 2019 meeting?
**A. I cannot -- I cannot determine that, no.**
Q. Based upon Exhibit 4, are you able to tell me who the presenters were at the April 16, 2019 board meeting for Fifth Third Bancorp?
**A. Mr. Carmichael and Ms. Somalya.**



Q. Were there any other presenters?
**A. Not that I read here.**
Q. Based on Exhibit 4, are you able to tell me the complete list of presenters at the April 16, 2019 meeting?
**A. No.**
Q. And just to be clear, you did attend that meeting; is that correct?
**A. Yes.**
Q. And Mr. Carmichael presided over that meeting; is that correct?
**A. Yes.**
Q. During that April 16, 2019 meeting, was there also a simultaneous meeting for Fifth Third Bank Board of Directors?
**A. I don't know.**
Q. Is it fair to say that if there was a board of directors meeting for Fifth Third Bank on April 16th, 2019, that there would also be a set of minutes for that meeting?
**A. Yes.**
(Plaintiff's Exhibit 5 is marked for identification.)
THE WITNESS: That is an extra.
MR. SABA: Thank you.



BY MR. SABA:
Q. Mr. Heminger, I've handed you what has been marked as Exhibit 5. Can you identify that for me, please?
**A. Fifth Third Bancorp Minutes of Meeting of the Board of Directors, June 18, 2019.**
Q. And do you agree with me that Exhibit Number 5 is Bates stamped Fifth Third McHugh 212487 through Fifth Third McHugh 212489?
**A. Yes.**
Q. If you can just let me finish before you answer.
Do you agree with that, sir?
**A. Repeat it.**
Q. Do you agree with me that Exhibit Number 5 is Bates stamped Fifth Third McHugh 212487 through Fifth Third McHugh 212489?
**A. Yes.**
Q. And to be clear, you were present for that board meeting; is that correct?
**A. Yes.**
Q. And Mr. Carmichael presided over that board meeting; is that correct?
**A. Yes.**
Q. Based upon Exhibit Number 5, are you able to

Page 60

tell me whether or not there was any discussion of succession timelines and candidates for the position of president during the June 18, 2019 board meeting for Fifth Third Bancorp?
A. **No, I cannot.**
Q. Based upon Exhibit Number 5, are you able to identify for me all of the presenters at the June 18, 2019 board meeting for Fifth Third Bancorp?
A. **Mr. Carmichael, Mr. Spence, Mr. Anderson, Mr. Tazun.**
Q. Are those all the people that presented during the June 18, 2019 board meeting for Fifth Third Bancorp?
A. **I don't know.**
(Plaintiff's Exhibit 6 is marked for identification.)
BY MR. SABA:
Q. Mr. Heminger, I've handed you what's been marked as Exhibit Number 6. Can you identify that for me, please?
A. **Fifth Third Bank Minutes of Meeting of the Board of Directors, June 18, 2019.**
Q. Do you agree, sir, that Exhibit 6 is Bates stamped Fifth Third McHugh 212490 through Fifth Third McHugh 212501?
A. **That's correct.**

Page 61

Q. Based upon Exhibit -- excuse me, let me go back again, sir.
Again, this was a meeting that was held simultaneous with the board meeting for Fifth Third Bancorp on June 18, 2019; is that correct?
A. **That's correct.**
Q. As you previously indicated, you were in attendance for that meeting; is that right?
A. **That's correct.**
Q. And Mr. Carmichael presided over that meeting; is that correct?
A. **Yes.**
Q. Based upon Exhibit 6, are you able to tell me whether or not there was any discussion of succession timelines and candidates for the position of president during the June 18, 2019 board meeting for Fifth Third Bank?
A. **I cannot tell.**
Q. As you sit here today, do you recall whether or not there was a discussion regarding succession timelines and candidates for the position of president during the June 18, 2019 board meeting for Fifth Third Bank?
A. **I do not recall.**
Q. Based upon Exhibit 6, are you able to tell me

Page 62

who all of the presenters were at the June 18, 2019 board meeting for Fifth Third Bank?
A. **Mr. Carmichael, Mr. Tazun, Mr. -- Mr. Spence, Mr. Schramm. That's all I can tell.**
Q. Are you able to tell me whether or not those were all of the presenters at the June 18, 2019 board meeting for Fifth Third Bank?
A. **No.**
(Plaintiff's Exhibit 7 is marked for identification.)
BY MR. SABA:
Q. Mr. Heminger, I have handed you what's been marked as Exhibit Number 7. Can you identify that for me, please?
A. **Fifth Third Bancorp Minutes of Joint Meeting of the Board of Directors, September 16, 2019.**
Q. And you were present for that meeting; is that correct?
A. **Yes.**
Q. And Mr. Carmichael presided over that meeting; is that right?
A. **Yes.**
Q. You would agree with me that Exhibit 7 is Bates stamped Fifth Third McHugh 212502 through 212506; is that correct?

Page 63

A. **Yes.**
Q. Based upon Exhibit Number 7, are you able to tell me whether or not there was any discussion regarding succession timelines and candidates for the position of president during the board meeting on September 16, 2019?
A. **I do not see any.**
Q. Based upon Exhibit Number 7, are you able to identify for me all of the presenters during the September 16, 2019 board meeting for Fifth Third Bancorp?
A. **Mr. Carmichael, Mr. Tazun, Mr. Leonard, Mr. Anderson, Mr. McHugh, Mr. Spence. That's it.**
Q. Are those all the people that presented during that time?
A. **I don't recall.**
Q. Independent of Exhibit Number 7, do you recall whether or not there was a discussion of succession timelines and candidates for the position of president during the September 16, 2019 meeting of the board of directors for Fifth Third Bancorp?
A. **I don't recall.**
Q. Independent of Exhibit Number 7, do you recall who all the presenters were during the September 16, 2019 meeting of the board of directors for Fifth Third

Page 64

Bancorp?
A. **I do not recall.**
(Plaintiff's Exhibit 8 is marked for identification.)
BY MR. SABA:
Q. Mr. Heminger, I've handed you what has been marked as Exhibit Number 8. Can you identify that for me, please?
A. **Fifth Third Bank Minutes of Meeting of the Board of Directors, September 16, 2019.**
Q. And Exhibit 8 is Bates stamped Fifth Third McHugh 212507 through McHugh 212512; is that correct?
A. **Yes, sir.**
Q. And briefly, sir, explain to me the process by which the minutes are created and approved?
MR. CIOFFI: Objection to the form. Lack of foundation. If you know, you can answer.
THE WITNESS: I'm sorry, what did you say at the end?
MR. CIOFFI: If you know. If you have some knowledge about how it was created, you can answer.
THE WITNESS: I know that they are -- the minutes are taken by the corporate secretary, and it's the corporate secretary's office then that assembles the minutes and sends them out to the

Page 65

board after their completion.
BY MR. SABA:
Q. And does the board vote on and approve the minutes?
A. **That's correct.**
Q. And when does that typically occur?
A. **At the next meeting of the board of directors.**
Q. Based upon Exhibit Number 8, are you able to tell me whether or not there was any discussion of succession timelines and candidates for the position of president during the September 16, 2019 meeting of the board of directors of Fifth Third Bank?
A. **I cannot.**
Q. Based upon Exhibit Number 8, are you able to tell me who all of the presenters were at the September 16, 2019 board meeting for the board of directors for Fifth Third Bank?
A. **I could tell Mr. Carmichael, Mr. Spence, Mr. Bashara and Mr. Carbody. That's all I can tell.**
Q. Based upon Exhibit Number 8, are you able to determine whether or not those were all of the presenters at the board meeting for Fifth Third Bank on September 16, 2019?
A. **I cannot.**

Page 66

(Plaintiff's Exhibit 9 is marked for identification.)
BY MR. SABA:
Q. Mr. Heminger, I've handed you what's been marked as Exhibit Number 9. Are you able to identify that for me?
A. **It's a document to be utilized for the human capital executive talent management and succession plan updates discussion on December 17, 2019.**
Q. You'd agree with me that Exhibit Number 9 is Bates stamped Fifth Third McHugh 001104 through 001154; is that correct?
A. **Yes.**
Q. The first page is an email; is that correct?
A. **That's correct.**
Q. And you're one of the recipients of that email; is that right?
A. **Yes.**
Q. And this would be an email to the entire board; is that correct?
A. **Yes.**
Q. And the email is from Bob Shaffer; is that right?
A. **That is correct.**
Q. And in the email where he references,

Page 67

"Attached is the document Greg and I will utilize," Greg is Greg Carmichael; is that right?
A. **That's correct.**
Q. Beginning on the second page of Exhibit 9, Fifth Third McHugh 001105 through McHugh 001154, can you explain to me what that document is?
MR. CIOFFI: Objection. Do you want to direct him to a particular page or do you want him to look at all of 45 pages? No particular page?
MR. SABA: No. Do you understand my question?
THE WITNESS: I do.
BY MR. SABA:
Q. Can you identify for me what that document is, please?
A. **This is a document that the full board uses for an update on executive talent management, the development of executive talent management and succession planning that we use as a collective board as we continue to follow a candidates' performance.**
Q. And how and when was this particular document used?
A. **It was presented at the December 17th meeting of the -- of the full board.**
Q. Would you have reviewed this prior to the board meeting?

Page 68

**A. I believe this would have been sent out prior to the board meeting, yes.**
Q. Do you know when you received Mr. Shaffer's email?
**A. I don't.**
Q. Based upon the email that Mr. Shaffer sent, it would appear he sent it roughly a week before the meeting itself; is that correct?
**A. I don't see a date on here.**
Q. Looking at the last line of his email, "I look forward to seeing you next week."
**A. Okay. I would assume that's correct.**
Q. And is there a term for these roughly 50 pages that comprise the back portion of Exhibit 9?
MR. CIOFFI: Objection to the form. When you say the back pages, what are you referring to?
MR. SABA: Let me rephrase.
BY MR. SABA:
Q. The document that's Bates stamped McHugh 001105 through 001154, attached to the email of Mr. Shaffer, is there a particular term that's used for this document?
**A. As it says on 1105, Human Capital Executive Talent Management and Succession Plan Updates.**
Q. Have you ever heard this referred to as the

Page 69

talent deck?
**A. No.**
Q. And how is this document -- strike that.
How was this document used during the December 17, 2019 board meeting?
**A. The full board reviews, the strategic -- human capital strategic priorities, the talent framework, the development of management, executive succession planning materials. So the full board reviews this to be able to observe how management has continued to develop and be prepared for the future.**
Q. So does the full board go through this document in detail?
**A. Yes.**
Q. Who prepares the board of directors human capital executive talent management and succession plan updates?
**A. I don't know everyone that prepares it.**
Q. This is not prepared by the board, it's prepared for the board, correct?
**A. It's prepared in combination with the board.**
Q. And what role does the board play in preparing this document?
**A. The board -- so in this case, the lead director and the chair of the human capital compensation**

Page 70

**committee would review this along with the chairman/CEO in preparing the agenda and preparing the materials for this meeting.**
Q. Who are those three people?
**A. At this time frame it would have been Greg Carmichael, Marsha Williams, and Michael McCallister.**
Q. Would you have seen any drafts of the board of directors human capital and executive talent management succession plan updates?
**A. No. I would only see whatever was going to be presented.**
Q. Do you know if Mr. McCallister saw any drafts of the board of directors human capital and executive talent management succession plan updates?
**A. I don't know.**
Q. Do you know if -- you said Marsha Williams; is that right?
**A. That's what I said, yes.**
Q. Do you know if Ms. Williams saw any drafts of the board of directors human capital and executive talent management and succession plan updates?
**A. I don't know.**
Q. Did the board make any decisions based in whole or in part upon the information provided in the board of directors human capital and executive talent

Page 71

management and succession plan updates?
MR. CIOFFI: Objection to the form. Any decisions about what?
BY MR. SABA:
Q. Do you understand the question?
MR. CIOFFI: It's vague, but it's your question. You may answer if you have an answer.
THE WITNESS: I understand what you said, but I don't understand the question. Repeat the question, please.
BY MR. SABA:
Q. Sure. I asked if the board made any decisions, based in whole or in part, on the information provided in the board of directors human capital and executive talent management and succession plan updates?
**A. I don't recall at this particular meeting if we made decisions or not.**
Q. To be more specific, did the board of directors make any decisions regarding succession planning for president and/or CEO based upon any of the information provided in the human capital and executive talent management and succession plan updates?
**A. I don't know if it was this exact meeting.**
Q. What role would this document play with respect to the succession planning process for president

Page 72

and/or CEO?
**A. Well, this document is used to give the board, again, the full board, an update on the qualities of management that might be considered, how they've developed over the past year, areas where they may be working on particular different development attributes, and so all this is assembled for the board to observe, and then the board takes this very seriously. As I said earlier, this is the number one job of the board, to determine who is going to be the future leader or leaders of the company. So we take this very serious, and we question vigorously the presenter or presenters into the content of this meeting.**
Q. When you say "the presenter or the presenters" that you question seriously, is this information also presented to the board as a PowerPoint?
**A. Not -- it's presented like you've handed it to me here.**
Q. And does the board question anybody about the content of the information that's contained in the board of directors human capital and executive talent management and succession plan updates?
**A. Absolutely.**
Q. And who does the board question about that?
**A. We will question the current CEO. We'll**

Page 73

**question the head of HR that generally is in the meeting. We'll question them on the development, what they're seeing with the development of different people that might be mentioned in here. But we question the CEO vigorously, as I said.**
Q. And the CEO is Mr. Carmichael; is that correct?
**A. That's correct.**
Q. And the head of HR, would that be Mr. Shaffer?
**A. At this meeting, that would be correct.**
Q. You said you didn't recall if there were decisions made at this particular meeting regarding the information provided in Exhibit 9. Were there decisions that were ultimately made at either another meeting or this meeting, based upon the information provided in Exhibit Number 9?
MR. CIOFFI: Objection to the form. Earlier you asked in whole or part. Is that part of your question or just --
MR. SABA: Sure. I can rephrase it that way.
BY MR. SABA:
Q. You didn't -- Mr. Heminger, you indicated you didn't recall whether or not a decision was made at this particular December 2019 meeting regarding the information provided in Exhibit Number 9. And my

Page 74

question is, was there ever a decision made, based in whole or in part, on the information provided in Exhibit Number 9 regarding the succession for president and/or CEO?
**A. I don't recall.**
Q. If I can refer you to Fifth Third McHugh 001142.
**A. 12? 1112?**
Q. No. 1142.
**A. I'm sorry. Okay.**
Q. Can you identify what is on that page for me, please?
**A. This is a page that says CEO succession where the board -- the CEO reports to the board of directors and it relates on -- it looks at different people within the company who might be considered, you know, for possible succession to the CEO over -- this illustrates over the next seven-plus years.**
Q. Have you seen this document before?
**A. I have.**
Q. And what does this document indicate about who would be ready to be CEO over the next seven years?
**A. It indicates that Mr. Spence could be ready in three-plus years. Mr. Lamb in seven-plus years.**
Q. Who is Mr. Lamb?

Page 75

**A. He was an executive with the -- with the bank back in this period of time. I don't believe he's with the company anymore.**
Q. Is it fair to say that Mr. Lamb was considered as a candidate for president and/or CEO of Fifth Third Bank?
**A. No, it did not -- this page does not indicate to me that he is being considered. It's saying that he may be developed to be able to be considered in seven-plus years, but not being considered right at this time.**
Q. What does it indicate about Mr. Spence?
**A. It says that if he continues his development, he may be, you know, considered in three-plus years.**
Q. With respect to emergency successor, what does that mean?
**A. That means if something were to happen to the CEO, you know, something tragic or catastrophic were to happen to the CEO, that we would possibly consider in this case Mr. Tazun or Mr. McHugh or possibly a board member as an interim successor until we could locate who we want or determine who we want to be the CEO going forward.**
Q. The list that we see there, Mr. Tazun, Mr. McHugh, and then a board member, is that ranked by

Page 76

order of priority or are those just individuals under consideration?
**A. I believe it's just individuals under consideration.**
Q. Do you know who prepared 001142?
**A. It would have been prepared with the input of the lead director, the head of the comp committee, and the CEO, and the head of HR.**
Q. What characteristics would be required to be considered an emergency successor for CEO?
**A. Oh, it -- you know, someone who can keep the business operating for a period of time that takes to recruit and determine who the next CEO should be. But characteristics to have the knowledge to how to continue running the bank during this period of time, and to be able to direct, you know -- direct the responsibilities of, you know, workings of the bank under control.**
Q. In your experience with the various boards you've been on and companies you've been involved with, was there ever a situation where an emergency CEO needed to be appointed?
**A. At Ohio State we had one indication or one particular time, yes.**
Q. When did that occur? After the Michigan football game?

Page 77

**A. Both of them. Coincidentally it did occur, but had nothing to do with it. In 2019, 2020 time frame.**
Q. And using that as an example, how long did it take to find the -- strike that.
In that situation where there was an emergency -- a need for an emergency CEO -- how long did that person who came in as the emergency CEO, how long did they remain in that position?
**A. About four months.**
Q. Beyond your experience at Ohio State, have you had any other situations where it was necessary to put in an emergency CEO?
**A. No.**
Q. Do you recall any of the discussions that the board had with respect to Mr. McHugh serving as an emergency successor CEO?
MR. CIOFFI: Objection to the form. He didn't testify that they did, but you may answer.
THE WITNESS: I recall we had that discussion, yes.
BY MR. SABA:
Q. Do you recall when that discussion took place?
**A. That discussion was in the event of an emergency, that Mr. McHugh would be one that would be**

Page 78

**considered, only on an emergency interim basis.**
Q. Do you recall when that conversation took place?
**A. In this time frame of the document that we're looking at.**
Q. The December 2019 time frame; is that correct?
**A. That's correct.**
Q. Outside that time frame, were there any other discussions of Mr. McHugh serving as the emergency successor as CEO?
**A. I don't recall the exact time frame if we -- in subsequent meetings, I do recall this time frame, but I don't recall a subsequent meeting or prior meetings.**
Q. Can you explain to me what, if any, different characteristics would be required from an emergency CEO versus the regular replacement of a CEO?
**A. Yes. When you -- in all of my background and naming new CEOs to companies, you're looking for someone that you believe has the superior qualities to be able to be the CEO for a long period of time. So this process is going through and observing candidates that as they continue to develop, and you're looking for those superior qualities of strategic planning, strategic vision, interpersonal skills, presentations to investment communities, and someone that really has the**

Page 79

**depth, the breadth, and has the pulse of this entire banking industry, that really understands what's going on, whether it's venture capital, whether it's activism, whether it's fed policy, somebody who has that depth and breadth that can really fulfill the entire engagement process of being a CEO.**
Q. You said "long period of time." What did you mean by a long period of time?
**A. Well, I mean more than, you know, as I answered before, on an interim basis, you know, four to five months. So I'm talking about a longer period of time. Someone who can take the span of control. And you always want to look at a CEO that would have a runway of, you know, probably a minimum of five to seven years.**
Q. What do you mean, "a runway of a minimum of five to seven years"?
**A. Someone who you believe you can develop and has a -- someone that you believe has the passion and the ability, you know, to work that long.**
Q. What are the factors that determine whether or not somebody has a runway of a minimum of five to seven years?
**A. What I just said, strategic vision, interpersonal skills, depth and breadth of the market.**

**Somebody who really understands how to take the business forward.**
Q. How does that translate in determining whether or not that runway is five to seven years?
**A. You look and see how they have developed over time and whether or not you believe they can continue to develop and perform at the, you know, exceptional level that you expect.**
Q. Is there a certain age at which you believe someone would not be able to complete the runway of a minimum of five to seven years?
**A. It's all individual, based on the individual.**
Q. You're identifying the attributes of the chairman during the regular process. What are the distinctions between those and the emergency successor CEO?
MR. CIOFFI: Objection to the form. You used the word "chairman."
MR. SABA: Excuse me. Let me rephrase the question.
BY MR. SABA:
Q. You're identifying the -- what is required for a CEO during the regular succession process and the characteristics you're looking for. How do those differ from the characteristics of an emergency successor CEO?



**A. As you're going through this process, you're looking at the skills of each individual and, you know, the pyramid is a very, very -- gets narrow very quick. So you're looking for, what I said earlier, the superior qualities. Every executive I expect has qualities, that's what I have observed throughout my entire, you know, tenure as an executive, but you're looking for that person that has the superior qualities versus someone who can keep the lights on and keep the business running on an interim basis under control, and I would expect any executive to be able to do that at this level, but you're looking for that person who can, for a long period of time, be able to manage and bring their vision to the table and not someone that's just, you know, can run the place for a short period of time.**
Q. And, again, that long period of time that you just referenced, that's the five to seven year period?
**A. It could be -- it could be three to five. It could be -- it's longer than four months, let's put it that way.**
Q. Okay. If I could refer you to 001135.
**A. Got it.**
Q. Can you identify for me what that is on McHugh 001135?
**A. This would be the document used to review the**



**current development and the expected potential, in this case, of Tim Spence.**
Q. And how is this information used?
**A. I'm sorry?**
Q. How does the board use this information? What do you do with it?
**A. We look at this information for every executive that is presented and we use this to really question. In this case the CEO that's presenting, the head of HR that might be there, but we use this, as I say, in all cases of everyone that's being presented to really question and based on the observations that we have and the meetings that we've set in on the performance of what we think the potential could be of this person.**
Q. And who would have provided the information on McHugh 001135?
**A. It would have been provided by the head of HR, the CEO, in review and consultation with the head of the compensation committee and the lead director.**
Q. Would you have seen any drafts of McHugh 001135?
**A. This is all I would see, right here.**
MR. SABA: If we can go off the record.
THE VIDEOGRAPHER: The time is 12:18 p.m. We



are going off the record.
(A recess was taken from 12:18 p.m. to 12:19 p.m.)
THE VIDEOGRAPHER: The time is 12:19 p.m. We are back on the record.
BY MR. SABA:
Q. Mr. Heminger, you were explaining how the information presented on McHugh 001135 would be used by the board, with respect to succession planning and identifying potential candidates for different positions at the bank; is that correct?
**A. That's correct.**
Q. And that would be true for all the summary pages that we see of explaining individuals that are on McHugh 001127 through McHugh 1137; is that correct?
MR. CIOFFI: Objection to the form. Could you read the question back, please?
(The record was read.)
MR. CIOFFI: And the indefinite pronoun, "that" means what?
MR. SABA: We can clarify.
MR. CIOFFI: Please.
BY MR. SABA:
Q. Can you identify what we see on McHugh pages 001127 through McHugh 001137?

Page 84

**A. In this case, the board is reviewing the performance and potential of -- I should say the background, we are looking at the background and the development of the potential executive, and then what we see is the potential that they might be able to aspire to in the future.**

Q. And just to clarify, I think foundationally going back to my question, can you just clarify for the record what we see on McHugh 001127 through McHugh 001137?

**A. It's an individual document on each of the officers that are being reviewed as to their -- as to their background, their development, and their potential.**

Q. And I believe you were previously explaining how that information is used by the board; is that correct?

**A. That's correct.**

(Plaintiff's Exhibit 10 is marked for identification.)

BY MR. SABA:

Q. Mr. Heminger, I've handed you what has been marked as Exhibit Number 10. Can you identify that for me, please?

**A. Minutes of the Joint Meeting of the Board of Directors, December 17, 2019.**

Page 85

Q. And this is for both Fifth Third Bancorp and Fifth Third Bank; is that correct?

**A. Yes.**

Q. And you were in attendance at that meeting; is that right?

**A. Yes.**

Q. And Mr. Carmichael presided over that meeting; is that right?

**A. Yes.**

Q. And Exhibit Number 10 is Bates stamped Fifth Third McHugh 007108 through 007128; is that correct?

**A. That's correct.**

Q. Referring you to the last page, Fifth Third McHugh 007128, there's a signature line for Saema Somalya as assistant secretary; do you see that?

**A. Yes.**

Q. Do you know why these minutes are not signed?

**A. No.**

Q. Do you know if these are a draft of the minutes for that meeting or are they a final copy?

**A. I don't know.**

Q. Have you seen these minutes before?

**A. I don't recall.**

Q. Would you typically see the minutes after they are prepared?

Page 86

**A. I would.**

Q. As far as you know, have you seen the minutes for the meeting that took place on December 17th, 2019?

**A. I would expect that I would.**

Q. Under Executive Performance Review, referring to the second paragraph, the first sentence reads, "They then reviewed the proposed performance review for each executive officer other than Mr. Carmichael, including a discussion of key achievements, strengths, opportunities, and development planning priorities for such individuals."

Do you see that?

**A. Yes.**

Q. And would it appear that "they" is referring to Mr. Carmichael and Mr. Shaffer?

**A. That's correct.**

Q. And with respect to their review of the proposed performance review for each executive officer, is that referring to the information that is provided on Exhibit Number 9 for the Bates stamped pages 001127 through 001137?

**A. That would be correct.**

Q. And do you recall, are they just summarizing the information in each of those sheets, or are they providing additional information?

Page 87

**A. Well, we go into detailed discussions and sometimes debate as the board is trying to, you know, gain a consensus of how they feel on the development of different officers.**

Q. And that debate and discussion is -- I'm just trying to understand where the information comes from -- that debate and discussion you referenced, is it based upon the information that we see in Exhibit 9, 001127 through 001137?

**A. Correct.**

Q. Other than the information we see here in Exhibit 9, is there additional information in document form or otherwise that Mr. Carmichael, Mr. Shaffer, are also presenting during that time?

MR. CIOFFI: Objection. You're confining this question only to what Carmichael and Shaffer presented or other information? You started out broad and then you sort of all of a sudden narrowed it.

BY MR. SABA:

Q. My question goes back to, I'm focused -- do you understand, Mr. Heminger, what I'm talking about, the December 19th -- excuse me, the December 17th meeting, 2019?

Page 88

**A. Frame it for me again.**
Q. What I'm asking is, based upon the minutes, Mr. Carmichael and Mr. Shaffer reviewed the proposed performance review for each executive officer, including a discussion of key achievements, strengths, opportunities, and development planning opportunities for such individuals. What I am trying to get an understanding of is the information that went into that presentation by Mr. Carmichael, Mr. Shaffer in that discussion. We did discuss from Exhibit 9 the various pages regarding the respective officers. My question now goes to, as you sit here today, do you recall if they referred to any other documentation or information regarding each of these officers?
MR. CIOFFI: I'll renew my objection, but if you can answer. Again, you're only talking about what Carmichael and Shaffer said, nobody else.
MR. SABA: I am talking about right now this presentation.
THE WITNESS: Yes. I'm not aware of any other documentation, but we had vigorous discussions about each individual.
BY MR. SABA:
Q. But in terms of other information, as you sit here today, you don't recall any other information other

Page 89

than what we see provided here in Exhibit 9 by Mr. Carmichael and Mr. Shaffer during that portion?
**A. I don't recall.**
Q. If you could turn to Fifth Third McHugh 007109, which is the second page of Exhibit 10. Referring first to the resolution that we -- that's first listed on the top of the second page, McHugh 007109, can you read that resolution to me?
**A. "Resolved that the chief executive officer shall have the authority to negotiate potential role changes for each of Mr. Forrest and Mr. Anderson respectively, including, at his discretion, a potential removal of category 1, section 16, and Regulation O status from such individuals, and to appoint succession candidates" -- excuse me -- "appoint succession candidates for the roles of chief risk officer, head of commercial banking, and treasurer from among the candidates discussed at the meeting."**
Q. And the chief executive officer referred to there is Mr. Carmichael, correct?
**A. That's correct.**
Q. Referring to the first full paragraph after the resolutions, it says, "Thereafter, Mr. Carmichael and Mr. Shaffer initiated a review of potential succession timelines and candidates for the chief

Page 90

executive officer/CEO position."
Do you see that sentence?
**A. I do.**
Q. Did I read that correctly?
**A. Yes.**
Q. Who were the candidates that Mr. Carmichael and Mr. Shaffer referenced and reviewed?
**A. Well, this meeting, as in every meeting that we do succession planning, we review all of the officers and we determine from that whether or not we have any internal candidate or candidates that might be considered for possible potential to CEO.**
Q. The next sentence reads, "They reviewed top succession candidates, including Mr. Spence, and discussed the potential timelines for their readiness and key development priorities for each such candidate."
Do you see that?
**A. I do.**
Q. Who were the other candidates that were reviewed other than Mr. Spence?
MR. CIOFFI: Objection. Asked and answered. Redundant. He just answered it, and argumentative here. You're just repeating the question so you get the answer you want. You're entitled to an answer, but not the answer you want.

Page 91

BY MR. SABA:
Q. Go ahead, Mr. Heminger?
MR. CIOFFI: You may answer.
THE WITNESS: Every executive here that is listed on these pages 27 through 37, we review, and as I stated earlier, we vigorously question. That's why the resolution that I just reviewed, where we were making a couple changes, is because the board questions the potential and the current performance of a couple of executives. So we review everyone in this -- on these pages to determine what their potential might be.
BY MR. SABA:
Q. And so everyone would be considered a top succession candidate?
MR. CIOFFI: Objection. Argumentative. You may answer.
THE WITNESS: I didn't say "a top succession." I said to determine their succession, their potential. I didn't say that they were -- everyone is going to be considered to be the CEO.
BY MR. SABA:
Q. So going back to that second sentence and how the minutes read, they say, "They reviewed top succession candidates, including Mr. Spence." Is every

Page 92

officer considered a top succession candidate?
MR. CIOFFI: Objection. Asked and answered. This is the fourth time you asked it, but you may answer.
THE WITNESS: Every officer is considered a candidate for what their potential might be, but not everyone can ascend to -- but not everyone does ascend to be a candidate to be the CEO.
BY MR. SABA:
Q. Do you see a distinction between a succession candidate and a top succession candidate?
MR. CIOFFI: Objection. Distinction how?
BY MR. SABA:
Q. Go ahead.
**A. Repeat the question.**
Q. Do you -- and I'm asking for your opinion. Do you see a distinction between a succession candidate and a top succession candidate?
**A. Excuse me. I had turned this off. That's what happens when you have hearing aids. Sorry. And I apologize.**
**A distinction between a top succession candidate and a candidate?**
Q. Correct.
**A. Yeah, everyone is a candidate, but only very,**

Page 93

**very few will ever ascend to being a top candidate.**
Q. And so with respect to the review of the top succession candidates that was done by Mr. Carmichael and Mr. Shaffer, who was included in the top succession candidates?
**A. I'll have to review each one to determine that.**
Q. Okay.
**A. Okay. In this presentation, only Tim Spence was considered to have the potential to be a top candidate.**
Q. Are you able to explain why the minutes referred to them reviewing top succession candidates, plural, including Mr. Spence?
**A. As I stated earlier, all officers are reviewed as candidates. So a distinction between a candidate and top candidate, I think that's a parallel.**
Q. Well, their sense would indicate they reviewed more than one top succession candidate?
**A. I just --**
MR. CIOFFI: Objection. Argumentative. He answered the question that they're, in his mind, parallel concepts. You're now arguing with him to get the answer you want, which is improper. Read the question back, please.

Page 94

MR. SABA: I didn't finish my question.
BY MR. SABA:
Q. Mr. Heminger, the sentence in the minutes indicates that Mr. Carmichael and Mr. Shaffer reviewed more than one top succession candidate. And my question is, because you indicated that Mr. Spence was the only top succession candidate at that time, correct?
**A. What I stated was --**
MR. CIOFFI: Wait a minute. Objection. It's repetitive, argumentative. You're stating and testifying as to your interpretation. He already answered as to his interpretation the sentence.
BY MR. SABA:
Q. Mr. Heminger?
MR. CIOFFI: Do you have a different answer than you gave last time?
THE WITNESS: As I stated, everyone is considered a candidate. Only one out of this funnel that we go through of all the candidates, only one graded out to what we considered, on this particular date, to have the potential to be, as is stated here, president in one to two years, CEO three-plus years. Only one of the candidates is considered to have that potential.

Page 95

BY MR. SABA:
Q. What were the key development priorities for Mr. Spence?
**A. Well, Mr. Spence came to the bank with a tremendous background in banking consultancy so as to develop him in operations. He had all the requisite skills, the financial skills, the financial digital platform background, he understood that. So as to develop him in operations, to develop him in executive leadership roles and just to continue to really observe his skills and observe how, you know, he continued to, you know, develop and perform. But as I said, he had all the requisite skills when he joined the firm, and then it was just to continue to develop him in operations, in markets, understand his ability to do M and A work, mergers and acquisitions work.**
Q. Anything else?
**A. I think that sums it up.**
Q. You indicated that all of the officers are considered, and that you have detailed discussions and questions regarding each person. Were there any detailed discussions or conversations regarding Mr. McHugh as a candidate for the chief executive officer position?
**A. We would have had discussions, yes.**

Page 96

Q. And what were those discussions?
**A. We had just discussed, again, his development, his performance within the bank and the different jobs he had had. We had several discussions among the board members as to that performance and where we would see the potential and discussed those types of items.**
Q. And what were the content of those discussions?
**A. It was a clear consensus by the board that we didn't feel that Mr. McHugh had the potential to be the CEO of the company.**
Q. And what was that based upon?
**A. Based on his strategic vision, presentation skills, and just performance of the organizations of which he was operating.**
Q. What was your understanding of Mr. McHugh's strategic vision?
**A. You know, we would see his vision of the operations and, again, over this period of time that I have been on the board he had several different jobs and you would continue -- or you would get a flavor for how he continued to develop and what his vision might be and, you know, any executive at this level you expect to have a good vision and be a good tactical operator, but a big difference between being a tactical operator and a**

Page 97

**strategic operator. Strategic operator has the vision for where you can go and where can we expand the horizons of this business and the other business of boards that I've been on, and it's a rare quality. It's a superior quality to see somebody that has the whole package. And that's what we saw in Tim versus what we saw in Mr. McHugh.**
Q. Where did you get your understanding of Mr. McHugh's strategic vision?
**A. Different presentations that he would have made over the many years I've been on the board.**
Q. Anywhere else?
**A. No. No. We had -- you know, as a board member since 2006, I observed many, many presentations by Mr. McHugh. So I was able to have a pretty good understanding over all of these years as to what I thought the potential was.**
Q. You also said there was an issue with Mr. McHugh's presentation abilities. What was that?
**A. I was just making a comparison to his presentation skills, his command of the subject wasn't as strong as what we -- what I expected to see in a future CEO.**
Q. Do you have specific examples of any command of subject matter that Mr. McHugh did not have?

Page 98

**A. I can't recall specific examples.**
Q. And then you said "performance of the areas of the corporation that were managed by Mr. McHugh"; is that correct?
**A. That's correct.**
Q. And what issues do you have with the performance of the areas of the corporation that were managed by Mr. McHugh?
**A. I don't have any specific areas of performance I recall. What I was trying to explain is that you just observe the different organizations that Mr. McHugh would be managing and how they were performing vis-à-vis business plan vis-à-vis the market, you know, again, the different organizations of which he may have been managing at the time.**
Q. Can you recall any specific situation where the areas of the corporation that were managed by Mr. McHugh were deficient relative to any business plan or to any areas of the market?
MR. CIOFFI: Objection to the form of the question and any basis for it. He didn't testify that there was a deficiency. He testified it wasn't as good.
MR. SABA: He didn't testify. That's your answer, Michael.

Page 99

MR. CIOFFI: No, he testified three minutes ago, come on.
MR. SABA: You testified to your own interpretation.
MR. CIOFFI: You have a selective memory, Counsel, come on.
BY MR. SABA:
Q. Mr. Heminger, although I appreciate Mr. Cioffi's attempt to help you testify and to provide answers to you, if you can go back and answer my question please, and I can ask it again if you --
**A. Will you please.**
MR. CIOFFI: Objection. Asked and answered, but go ahead.
MR. SABA: You answered it. He didn't.
MR. CIOFFI: No, he answered it before. The record will speak for itself. Come on.
BY MR. SABA:
Q. Mr. Heminger, are you aware of any situations where Mr. McHugh's management of any areas of the corporation were deficient relative to either any business plan or any market performance?
**A. And I did not state "deficient." I stated they weren't as, in my opinion, weren't as polished as what we expected in the next CEO.**

Page 100

Q. Can you give me any specific examples where Mr. McHugh's management of any particular areas of the corporation were not as polished as you would expect from the next CEO?
**A. I don't recall.**
Q. Can you give me a time frame of when these situations were -- would have occurred where Mr. McHugh's performance was not as polished?
**A. I observed -- I've been on the board for 16 years, so probably over the last 10 years and 8 years in Mr. McHugh's tenure with the company, I would have observed his presentation.**
Q. My specific question goes to where his performance with respect to the areas of the corporation that he managed were not as polished as you would expect from a CEO?
**A. Yeah. I can't -- I don't recall the exact incident.**
Q. And do you know if there was an incident at all, even though you're saying -- you're referring to an incident that you can't recall. Was there a particular incident?
**A. What I'm comparing against is Mr. McHugh's performance versus Mr. Spence, and in my opinion, there was a completely superior qualities performed by**

Page 101

**Mr. Spence.**
Q. So let's talk about those superior qualities that you talked about, Mr. Spence's superior qualities. With respect to the areas of the corporation that were managed by Mr. Spence compared to Mr. -- the areas managed by Mr. McHugh, where were -- in what situation were Mr. Spence's management superior to Mr. McHugh's?
**A. Sure. I think he had a superior strategic vision, understood venture capital markets, understood the competition much better. Had a very strong ability to, in my opinion, to build a culture within the company, a culture of working together as one single team, and I just observed that those were superior qualities.**
Q. Well, going back to my question. My question was about performance of the particular areas of the company that they managed, the corporation that they managed. Can you cite to any example or situation where the performance of the areas of the corporation that were managed by Mr. Spence were superior in performance to those managed by Mr. McHugh?
**A. You're managing different -- they're managing different operations of the company, so no, I can't.**
Q. You can't compare those?
**A. They're managing completely different**

Page 102

**businesses.**
Q. Based upon that, can you say whether or not Mr. Spence's management of areas of the corporation were superior to the areas -- and performance were superior to those managed by Mr. McHugh?
MR. CIOFFI: Objection to the form. Can you read the question back? I'm confused by it.
(The record was read.)
MR. CIOFFI: Objection to the form.
MR. SABA: Go ahead.
MR. CIOFFI: If you can answer.
THE WITNESS: It was the observation of a board member, every board member has the requirement and the duty to observe the performance of different executives. It's my opinion that Mr. Spence was clearly a -- had superior qualities in all the areas that I mentioned earlier.
BY MR. SABA:
Q. Do you have any objective information with respect to the areas of the bank that he managed or with respect to the people reporting to him that he was superior to Mr. McHugh in any of those areas?
MR. CIOFFI: Objection. He testified that it was his judgment. It wasn't -- it was his judgment.

Page 103

MR. SABA: That's not my question.
THE WITNESS: Yeah, I will answer that to Mr. Spence's intellect and immediate grasp of all parts of the banking industry was far superior.
BY MR. SABA:
Q. And what objective information do you have to base that upon?
MR. CIOFFI: Objection. Asked and answered. He talked about his observations over many, many years. You keep repeating the questions hoping you will get the answer you want.
MR. SABA: I'm not asking about his subjective observations. I said objective information.
MR. CIOFFI: His observations are objective.
MR. SABA: By definition, his observations are subjective.
BY MR. SABA:
Q. What objective information do you have, Mr. Heminger, to in any way indicate that Mr. Spence's qualities and the characteristics that you're examining were superior to that of Mr. McHugh's?
**A. During this period of time, many transactions within the banking industry, many different changes within the banking industry throughout Fintech, and, you know, digital platforms, and Tim just had, you know, an**

**unbelievable grasp and understanding and control of -- and vision for not only where the digital platform was going, but any discussion about a -- the competitive landscape, he had a far superior understanding of what is making up the competitive landscape, how Fifth Third is performing versus other banks.**

Q. And, again, that's all from presentations made during board meetings, correct?

**A. Presentations, but my answer is more to off the -- out of the presentation questions and discussions and debate being held within the board, we just don't accept any presentation that's being made by an executive as being -- being the end, and that's all they're going to present. We would have several detailed questions about what's going on in the market? Why is this transaction? Why is this company outperforming? And Tim always had a superior grasp of the entire industry.**

Q. That's all within the board meeting itself, correct?

**A. Correct.**

Q. You reference Mr. Spence's strong ability to build consensus within the company; is that correct?

**A. Did I say that? I'm not sure that I said exactly that, but go on.**



Q. Well, correct me if I'm wrong; I'm just trying to understand one of the characteristics that you pointed to within which you felt Mr. Spence was superior to Mr. McHugh?

**A. Yeah, I don't -- you can go back and read it. I don't recall saying "consensus." Maybe I did, I don't recall.**

Q. All right. Okay.

MR. CIOFFI: Counsel, do you want to finish up your line of questioning because it's well past lunchtime.

MR. SABA: Certainly. We can go --

MR. CIOFFI: If you're about ready to conclude, we can conclude. I don't want to --

MR. SABA: Oh, no, no, I'm not ready to conclude, but we can go off the record and break for lunch, certainly.

THE VIDEOGRAPHER: The time is 12:55 p.m. We can go off the record.

(A recess was taken from 12:56 p.m. to 1:42 p.m.)

THE VIDEOGRAPHER: The time is 1:42 p.m. We're back on the record.

BY MR. SABA:

Q. Mr. Heminger, before we broke I asked you



about in what ways Mr. Spence's management abilities were superior to Mr. McHugh's, and you indicated four different things in your answer. Superior strategic vision, understood venture capital markets, understood the competition much better, and he's able to build a culture within the company, a culture of working together as one single team. Do you recall that?

**A. Yes, sir.**

Q. With respect to -- we've talked about strategic vision. With respect to understanding venture capital markets, what, if any, objective information or evidence or data do you have that Mr. Spence understood venture capital markets better than Mr. McHugh?

**A. In various presentations that would have been made in the board meetings, Mr. Spence was able to articulate how venture capital and then activism in and around venture capital, that it was affecting the entire banking industry, and I believe that he had a very deep knowledge and understanding of this new change of competition within the banking industry.**

Q. Outside the presentations made by Mr. Spence to the board, do you have any other evidence or data that shows that Mr. Spence understood venture capital markets better than Mr. McHugh did?

**A. No, sir.**



MR. CIOFFI: Objection. Asked and answered. Go ahead.

BY MR. SABA:

Q. With respect to understanding the competition much better, do you have any evidence, objective -- excuse me, strike that.

With respect to understanding the competition much better, do you have any objective evidence or data indicating that Mr. Spence's skills were superior to that of Mr. McHugh?

MR. CIOFFI: Objection. Could you read that back? Are you saying inside or outside the board presentations? Could you read the question back?

(The record was read.)

THE WITNESS: No.

BY MR. SABA:

Q. With respect to building a culture within the company, a culture of working together as one single team, do you have any objective evidence or information indicating that Mr. Spence's skills were superior to Mr. McHugh's?

**A. Yes. My observations of the culture within the boardroom.**

Q. Outside the culture within the boardroom, anything else?

Page 108

**A. No.**
Q. And the team you're referring to, is that the team of employees and employees of the bank that would be under Mr. Spence?
**A. No.**
Q. What team are you referring to?
**A. The enterprise team.**
Q. Did you interview the enterprise team about their opinions regarding Mr. Spence?
**A. No.**
Q. Did you interview the enterprise team regarding their opinions regarding Mr. McHugh?
**A. No.**
Q. Did you ever ask any of the enterprise team about their ability to work with Mr. McHugh as one team?
**A. No.**
Q. Did you ever ask any of the enterprise team about their ability to work with Mr. Spence as one team?
**A. No.**
Q. Did you ever review any of the employee engagement scores?
**A. I don't recall.**
Q. Do you know what the employee engagement scores are?
**A. I know what the term means, yes.**

Page 109

Q. And what do those show?
**A. It's an array of questions on how an individual performance on many different attributes.**
Q. Do you recall ever seeing employee engagement scores for Fifth Third Bank?
**A. I don't recall, no.**
Q. Did you ever receive -- excuse me, strike that.
Did you ever see any income statements or profit and loss statements for any areas of Fifth Third that were managed by Mr. McHugh?
**A. I certainly would have.**
Q. And did you see any income statements or profit and loss statements for the areas of Fifth Third Bank that were managed by Mr. Spence?
**A. Yes, I would have.**
Q. And did you ever compare the two?
**A. I remember reviewing them and seeing them, but doing a comparative analysis, no.**
Q. As you sit here today, are you able to say, based upon the income statements or profit and loss statements for the respective areas that Mr. McHugh and Mr. Spence managed, that Mr. McHugh's areas performed better than Mr. - excuse me, that Mr. Spence's areas performed better than Mr. McHugh's?

Page 110

**A. I don't know.**
Q. Mr. Heminger --
**A. Yes.**
Q. -- referring you back to Exhibit 10, and the second page of that exhibit, which is Bates stamped Fifth Third McHugh 007109, below the section titled "Executive Session With CEO," it says, "Following conclusion of the executive performance review discussion, Mr. Shaffer departed the meeting and the directors went into executive session with Mr. Carmichael. During this session, there was a discussion of key talent management and succession planning concerns, as well as a discussion of key strategic priorities that would be discussed in the general session."
Do you see the area I'm referring to?
**A. Yes, sir.**
Q. Do you recall what the discussions were regarding succession planning concerns?
**A. I do not.**
Q. Do you recall if there were minutes taken during that executive session?
**A. I do not.**
Q. As of the conclusion of the December 17, 2019 board meeting, was there a definitive determination made

Page 111

regarding who would succeed Mr. Carmichael as president and/or CEO of Fifth Third?
**A. I don't recall the exact timing.**
Q. Do you recall if any decision had been made as of the end of that meeting?
**A. As I just stated, I don't know the exact timing of when that decision was made.**
(Plaintiff's Exhibit 11 is marked for identification.)
BY MR. SABA:
Q. Mr. Heminger, I've just handed you what has been marked as Exhibit Number 11. Can you identify that for me, please?
**A. It's Fifth Third Bancorp Minutes of Meeting of the Board of Directors, February 25, 2020.**
Q. And were you in attendance at that meeting?
**A. Yes, sir.**
Q. Was that meeting presided over by Mr. Carmichael?
**A. Yes, sir.**
Q. You would agree with me that Exhibit 11 is Bates stamped Fifth Third McHugh 212523 through Fifth Third McHugh 212532?
**A. Yes.**
Q. Based upon Exhibit Number 11, are you able to

Page 112

determine whether or not there was any discussion of succession timelines and candidates for the position of president during the February 25, 2020 board meeting?
**A. I do not see any.**
Q. Based upon Exhibit Number 11, are you able to tell me or identify everyone who presented information at the February 25, 2020 board meeting?
**A. Mr. Carmichael. Mr. King, who was an outside consultant with FW Cook, Mr. Spence, Mr. Lamb, Mr. Leonard, Mr. Tazun, Ms. Zaunbrecher. That's all that I can ascertain from this document.**
Q. Are those all the people that made presentations at the February 25, 2020 board meeting?
**A. I don't know.**
(Plaintiff's Exhibit 12 is marked for identification.)
BY MR. SABA:
Q. Mr. Heminger, I've handed you what's been marked as Exhibit Number 12. Can you mark that for me -- excuse me, can you identify that for me, please?
**A. Fifth Third Bancorp Minutes of Meeting of the Board of Directors, September 17, 2019.**
Q. You were in attendance at that meeting; is that correct?
**A. Yes.**

Page 113

Q. And Mr. Carmichael presided over that meeting; is that correct?
**A. Yes.**
Q. Exhibit 12 is Bates stamped Fifth Third McHugh 212513 through 212516; is that correct?
**A. Yes.**
Q. Based upon Exhibit 12, are you able to tell me whether or not there was any discussion regarding succession timelines and candidates for the position of president during the September 17th, 2019 board meeting for Fifth Third Bancorp?
**A. No.**
Q. Based upon Exhibit Number 12, are you able to identify for me all of the presenters at the September 17, 2019 Fifth Third Bancorp meeting?
**A. Mr. Carmichael, Mr. Spence, Mr. Anderson, Mr. Schramm. Did I say Mr. Tazun? Mr. McHugh. Mr. Forrest. Okay. That's all.**
Q. Based upon Exhibit Number 12, are you able to tell me whether or not those were all the presenters and/or presentations made at the September 17, 2019 board meeting for Fifth Third Bancorp?
**A. I can't, but presumably whenever it says management present, generally everyone will make some sort of a presentation.**

Page 114

Q. You're saying that's true for every meeting?
**A. Most generally.**
Q. Would the board meeting -- would the board meeting minutes indicate whether or not that's accurate?
**A. It should.**
Q. But you would need a complete set of the board meeting minutes to determine that, correct?
**A. Yeah. I mean, it should -- yes, it should be stated in a complete set of the board meeting minutes, yes.**
(Plaintiff's Exhibit 13 is marked for identification.)
BY MR. SABA:
Q. Mr. Heminger, I've handed you what's been marked as Exhibit Number 13. Can you identify that for me, please?
**A. That's Fifth Third Bank Minutes of Meeting of the Board of Directors, September 17, 2019.**
Q. This took place at the same time as the board of directors meeting for Fifth Third Bancorp on that date; is that correct?
**A. Yes.**
Q. And as indicated before, you were in attendance at the meeting and Mr. Carmichael presided over the meeting; is that right?

Page 115

**A. Right.**
Q. Exhibit Number 13 is Bates stamped Fifth Third McHugh 212517 through Fifth Third McHugh 212522; is that correct?
**A. Yes.**
Q. Based upon Exhibit Number 13, are you able to determine whether or not there was any discussion of succession timelines and candidates for the position of president during the September 17, 2019 board meeting for Fifth Third Bank?
**A. I do not see any.**
(Plaintiff's Exhibit 14 is marked for identification.)
BY MR. SABA:
Q. Mr. Heminger, I've handed you what has been marked as Exhibit Number 14. Can you identify that for me, please?
**A. Fifth Third Bank, National Association Minutes of Meeting of the Board of Directors, February 25, 2022.**
Q. And you were present for that meeting, correct?
**A. Yes.**
Q. And Mr. Carmichael presided over that meeting; is that right?
**A. Yes.**

Page 116

Q. Exhibit Number 14 is Bates stamped Fifth Third McHugh 212533 through Fifth Third McHugh 212538; is that correct?
**A. That's correct.**
Q. Based upon Exhibit Number 14, can you determine whether or not there was any discussion regarding timeline or candidates for succession planning for president for Fifth Third Bank?
**A. No.**
Q. Based upon Exhibit Number 14, are you able to identify all of the presenters that made presentations at the February 25, 2020 board meeting for Fifth Third Bank, National Association?
**A. Mr. Carmichael, Mr. Spence, Mr. Tazun, Mr. Leonard, Ms. Zaunbrecher. That appears to be it.**
Q. Were you able to determine whether or not that was all the people who made presentations at the February 25, 2020 board meeting for Fifth Third Bank, National Association?
**A. No.**
(Plaintiff's Exhibit 15 is marked for identification.)
BY MR. SABA:
Q. Mr. Heminger, I've handed you what has been marked as Exhibit Number 14. Can you identify that for

Page 117

me, please?
**A. Fifth Third Bancorp Minutes of Meeting of the Board of Directors, April 14, 2020.**
MR. SMITH: That might be 15.
MR. SABA: Excuse me, Exhibit 15, I misspoke.
BY MR. SABA:
Q. Correction. That's Exhibit 15; is that correct, Mr. Heminger?
**A. Yes.**
Q. Thank you. Exhibit 15 is Bates stamped Fifth Third McHugh 212539 through Fifth Third McHugh 212543; is that correct?
**A. Correct.**
Q. And you attended that meeting by telephone; is that correct?
**A. That's correct.**
Q. This would have been post COVID; is that right? Let me clarify my question.
**A. I don't know if it was post COVID or not.**
MR. CIOFFI: Are you making a medical determination?
MR. SABA: No. Let me clarify my question.
BY MR. SABA:
Q. Do you recall that there was a period of time where the meetings were done by phone because of issues

Page 118

with COVID after March of 2020?
**A. I just -- I don't know the exact dates. I do recall we had several meetings by phone due to the pandemic, yes.**
Q. And this meeting would have taken place on April 14, 2020; is that right, and Mr. Carmichael presided over the meeting?
**A. That's correct.**
Q. Based upon Exhibit Number 15, are you able to tell me whether or not there was any discussion regarding succession timelines and candidates for the position of president of Fifth Third on April 14, 2020?
**A. No.**
Q. And with respect to this particular board meeting and the directors being present by telephone, was that a video teleconference?
**A. I believe it was.**
Q. Based upon Exhibit Number 15, are you able to determine who the presenters were at the April 14, 2020 board meeting for Fifth Third Bancorp?
**A. Mr. Carmichael, Mr. McCallister on behalf of the human capital compensation committee. Ms. Zaunbrecher. And Ms. Somalya.**
Q. Based upon Exhibit Number 15, are you able to determine whether or not that was everyone who made a

Page 119

presentation at the April 14, 2020 board meeting for Fifth Third Bancorp?
**A. No.**
(Plaintiff's Exhibit 16 is marked for identification.)
BY MR. SABA:
Q. Mr. Heminger, I've handed you what has been marked as Exhibit Number 16. Can you identify is that for me, please?
**A. Fifth Third Bank, National Association Minutes of Meeting of the Board of Directors, April 14, 2020.**
Q. Exhibit Number 16 is Bates stamped Fifth Third McHugh 212544 through 212546; is that correct?
**A. That's correct.**
Q. Based upon the minutes for Fifth Third Bank, National Association on April 14, 2020, are you able to determine whether or not there was any discussion regarding succession timelines and candidates for the position of president during that April 14, 2020 meeting?
**A. No.**
Q. Based upon Exhibit Number 16, are you able to determine who all of the presenters were at that meeting?
**A. Mr. Carmichael. Ms. Somalya. I believe**

**that's it.**
Q. Are you able to determine whether or not those were all the presenters who made a presentation at the April 14, 2020 meeting?
**A. I don't know.**
(Plaintiff's Exhibit 17 is marked for identification.)
BY MR. SABA:
Q. Mr. Heminger, I've handed you what's been marked as Exhibit Number 17. Can you identify that for me, please?
**A. Fifth Third Bancorp Minutes of Meeting of the Board of Directors, June 16, 2020.**
Q. Based upon Exhibit Number 17, are you able to determine whether or not there was any discussion regarding CEO succession during that meeting?
**A. Under page 28, it says that the "CEO succession key executive departures were discussed."**
Q. Do you recall specifically what was discussed concerning CEO succession and key executive departures during an executive session of the full board on June 16, 2020?
**A. I do not.**
Q. Would that also be true with respect to the executive session with independent directors only, where



it again indicates that CEO succession key executive departures were discussed?
**A. I don't recall.**
Q. You don't recall what was discussed during that time period either; is that correct?
**A. No.**
Q. And just to clarify, the June 16, 2020 meeting, you, again, attended by phone; is that correct?
**A. That's correct.**
Q. And Mr. Carmichael presided over that meeting; is that right?
**A. That's correct.**
Q. Based upon Exhibit Number 17, are you able to tell me who the presenters were at that June 16, 2020 board meeting for Fifth Third Bancorp?
**A. Mr. Carmichael, and then Marsha Williams in the executive session.**
Q. Does Exhibit Number 17 indicate who all the presenters were at the June 16, 2020 meeting for Fifth Third Bancorp?
**A. I don't know.**
(Plaintiff's Exhibit 18 is marked for identification.)
BY MR. SABA:
Q. Mr. Heminger, I've handed you what has been



marked as Exhibit Number 18. Can you identify that for me, please?
**A. Fifth Third Bank, National Association Minutes of Meeting of the Board of Directors on June 16, 2020.**
Q. This took place simultaneous with the board of directors meeting for Fifth Third Bancorp; is that correct?
**A. That's correct.**
Q. Exhibit Number 18 is Bates stamped Fifth Third McHugh 212549 through Fifth Third McHugh 212556; is that correct?
**A. That's correct.**
Q. Referring to page Fifth Third McHugh 212556, there's again a reference to the executive session of the full board and executive session of independent directors only, both of which indicate there was a discussion of CEO succession and key executive departures; do you see that?
**A. Yes.**
Q. Is your answer the same as it was with respect to the board of directors meeting minutes for -- excuse me, for Exhibit Number 17, do you recall what was discussed during those executive sessions?
**A. I do not.**



Q. Based upon the -- strike that.
Based upon Exhibit Number 18, are you able to identify who made presentations during the June 16, 2020 meeting for Fifth Third Bank National Association?
**A. Mr. Carmichael, Mr. Spence, Ms. Garrett, Mr. Lavender, Mr. McHugh, Mr. Spence, Ms. Somalya, and Ms. Williams.**
Q. Based upon Exhibit Number 18, are you able to determine whether that is all of the presenters who made presentations at the June 16, 2020 board meeting for Fifth Third Bank, National Association?
**A. I don't know.**
(Plaintiff Exhibit 19 is marked for identification.)
BY MR. SABA:
Q. Mr. Heminger, I've handed you what has been marked as Exhibit Number 19. Can you identify that for me, please?
**A. Fifth Third Bancorp Minutes of Meeting of the Board of Directors, September 21, 2020.**
Q. And you were present at that meeting in person; is that correct?
**A. That's correct.**
Q. And Mr. Carmichael presided over that meeting; is that correct?

Page 124

**A. That's correct.**
Q. Exhibit Number 19 is Bates stamped Fifth Third McHugh 212557 through Fifth Third McHugh 212560; is that correct?
**A. Correct.**
Q. Are you able to determine whether or not there was any discussion regarding CEO or president succession planning during the September 21, 2020 board of directors meeting for Fifth Third Bancorp?
MR. CIOFFI: Are you asking based on this document or his recollection?
MR. SABA: I'm asking based on this document.
THE WITNESS: I'm sorry. Could you rephrase that, please?
MR. SABA: Certainly.
BY MR. SABA:
Q. Based upon Exhibit Number 19, are you able to determine whether or not there were any discussions regarding the CEO or president succession at Fifth Third Bank during the September 21, 2020 board of directors meeting for Fifth Third Bancorp?
**A. I did see an indication for president and CEO competency model, and I'm trying to read if there were any discussions inside of that note, but I do not see any. So no.**

Page 125

(Plaintiff's Exhibit 20 is marked for identification.)
BY MR. SABA:
Q. Mr. Heminger, I've handed you what's been marked as Exhibit Number 20. Can you identify that for me, please?
**A. Fifth Third Bank, National Association Minutes of Meeting of the Board of Directors, September 21, 2020.**
Q. And this board of directors meeting at Fifth Third Bank, National Association took place simultaneously with the meeting for Fifth Third Bancorp; is that correct?
**A. Yes.**
Q. As you previously indicated, you were present at that meeting; is that right?
**A. Yes.**
Q. And Mr. Carmichael presided over that meeting; is that right?
**A. Yes.**
Q. Based upon review -- let me clarify. Exhibit Number 20 is Bates stamped Fifth Third McHugh 212561 through Fifth Third McHugh 212565; is that correct?
**A. Correct.**
Q. Based upon your review of Exhibit Number 20,

Page 126

does it appear that president and chief executive officer succession planning was discussed during that board meeting?
**A. Yes.**
Q. Did you have a conference call with Greg Carmichael sometime between August 18, 2020 and September 21, 2020, to discuss the upcoming succession discussion at the September 21, 2020 board meeting?
**A. I don't recall.**
Q. Under Talent Management, the second sentence reads, "Mr. Shaffer began by reminding the directors of prior discussions related to executive succession planning, including discussions related to Mr. Spence as a possible president and chief executive officer successor to Mr. Carmichael."
Do you see that?
**A. Yes, sir.**
Q. Do you know which prior discussions Mr. Shaffer was reminding the board of?
**A. I would -- I believe it would be, based on those documents we reviewed earlier today, on our different talent -- executive talent management updates that we would review.**
Q. Do you know who RHR International -- excuse me. Do you know what RHR International is?

Page 127

**A. You need to -- you need to direct your voice this way.**
Q. I'm sorry. I apologize. You indicated that before.
Do you know what RHR International is?
**A. Yes.**
Q. What is RHR International?
**A. They're a consulting firm that is renowned for their assessment of executive management.**
Q. Outside of Fifth Third, have you ever used RHR International?
**A. I believe I used them once at Marathon.**
Q. And was that to locate your replacement?
**A. No. That was a -- just an executive that I was doing some assessment on.**
Q. In the second full paragraph below Talent Management, the third sentence reads, "Mr. Shaffer also reminded the board members of the succession planning discussion at the June 2020 board meeting in which the board approved the CEO profile to be utilized by Mr. Beaudin and Mr. Evans to assess Mr. Spence."
Do you see that sentence?
**A. I do.**
Q. Do you know what they're referring to with respect to the CEO profile?

Page 128

**A. Yes. We discussed at one of our meetings what we believed the attributes and the -- and the profile, to use that term, profile should be as we considered the next CEO.**
Q. Is it your understanding that Mr. Spence was the only individual assessed by RHR for the president and CEO positions?
**A. I don't know.**
Q. Did you ever see an assessment for anybody other than Mr. Spence that was made by RHR?
**A. No.**
Q. Are you aware if anyone made a determination that Mr. Spence would be the only person assessed by RHR?
**A. I don't, no.**
(Plaintiff's Exhibit 21 is marked for identification.)
BY MR. SABA:
Q. Mr. Heminger, I handed you what's marked as Exhibit Number 21. Can you identify that for me, please?
**A. It's an email from Bob Shaffer to Guy Beaudin of RHR International and Chuck Evans pertaining to the CEO profile draft.**
Q. And specifically, if we stop -- excuse me. If

Page 129

we start at the top of the first page of Exhibit 21, which is Bates stamped Fifth Third McHugh 001071; is that correct?
**A. Yes.**
Q. Looking at that, that's an email from Bob Shaffer to Mr. Beaudin and Chuck Evans, correct?
**A. Right.**
Q. And that is dated July 23, 2020; is that right?
**A. Correct.**
Q. And the attachment that's indicated is for the Fifth Third CEO profile final; is that right?
**A. Correct.**
Q. The email that Mr. Shaffer sends says, "Guy - hope all is well. I have reviewed the updated profile with Greg and with the Human Capital & Compensation Committee members."
And by "Greg," is he referring to Greg Carmichael there?
**A. Yes.**
Q. And with respect to the Human Capital and Compensation Committee members, did he review this document with you?
**A. I've got to look at the document to refresh my memory.**

Page 130

Q. All right. And just to clarify, there's an initial email that is three pages, Bates stamped Fifth Third McHugh 001071 through 001073; is that correct?
**A. Correct.**
Q. Then attached to the email are documents that are Bates stamped Fifth Third McHugh 001013 through 001024; is that correct?
**A. That's correct.**
Q. Turning to the page that's Bates stamped Fifth Third McHugh 001013, can you identify what this document is for me, please?
**A. It's a draft of what's called "The Winning Formula for Fifth Third Bank President and Chief Executive Officer."**
Q. Do you recall if this is the CEO profile that's being referenced in the email?
**A. Can I look at it?**
Q. Yes.
**A. Yes, it appears so.**
Q. And referring to McHugh 001019, does that appear to be the final version of the CEO profile?
**A. That's what it illustrates.**
Q. Going back to my earlier question, would you have reviewed the draft and/or final version of the CEO

Page 131

profile that's attached to -- as part of Exhibit 21?
**A. As a member of the compensation committee meeting, yes.**
Q. Did you make any changes to the CEO profile?
**A. I don't recall.**
Q. And what was your understanding of the purpose of the CEO profile?
**A. Well, as the board is reviewing, you know, succession planning alternatives, you start with this is the foundation of what you're looking for, the attributes of a CEO successor. This is the foundation of what you're looking for as well as those key elements that you want to see the next CEO be able to build upon within the Fifth Third Bank.**
Q. Referring you back to Exhibit 20.
**A. Okay.**
Q. And I'm again referring to the second full paragraph under Talent Management on the first page of Exhibit 20, and the last sentence of that paragraph says, "Mr. Shaffer then asked Mr. Beaudin to describe the assessment process utilized by RHR International to assess Mr. Spence and to review the assessment report distributed to the directors at today's meeting."
Do you see that?
**A. Yes.**

Page 132

(Plaintiff's Exhibits 22 and Exhibit 23 are marked for identification.)

MR. SABA: This is 23. The first one I handed you is 22.

BY MR. SABA:

Q. Mr. Heminger, I just handed you two exhibits, one marked as Exhibit Number 22, the other one marked as Exhibit Number 23. Can you identify Exhibit Number 22 for me, please?

**A. Exhibit 22 is Board Summary of Tim Spence, provided by RHR International.**

Q. And that document is Bates stamped Fifth Third McHugh 001033 through Fifth Third McHugh 001040; is that correct?

**A. Right.**

Q. Can you also identify Exhibit Number 23 for me, please?

**A. Exhibit 23 is Executive Assessment Development Report provided by RHR International for Tim Spence as Executive Vice President and Head of Consumer Bank, Payments, and Strategies, Fifth Third Bank, July 31st, 2020.**

Q. And Exhibit Number 23 is Bates stamped Fifth Third McHugh 000954 through Fifth Third McHugh 000976; is that correct?

Page 133

**A. Yes.**

Q. With respect to the assessment report that was distributed to the directors at the September 21st, 2020 meeting, are you able to determine whether or not the assessment report that was distributed is either Exhibit 22 or 23 or both?

**A. The date again, please?**

Q. This is at the September 21st, 2020 meeting. It's referenced in the minutes that Mr. Beaudin was going to describe the assessment report distributed to the directors at today's meeting. What I'm trying to determine is do either Exhibit 22 or 23 or both constitute the report that was distributed to the directors at the September 21st, 2020 meeting?

**A. Can I go back and look at these minutes?**

Q. Sure. The minutes are Exhibit 20.

**A. 20?**

Q. 20.

**A. It appears as though that's the case, yes.**

Q. Well, my question is -- let me ask you first, sir, have you seen Exhibit 22 before?

**A. I recall seeing it, 22, I recall seeing it a while back, yes.**

Q. Do you recall seeing it at that September 21st, 2020 board meeting?

Page 134

**A. I don't recall the exact date, but presumably.**

Q. Have you seen Exhibit Number 23 before?

**A. Yes, I believe I recall seeing this.**

Q. And do you recall seeing it at the September 21st, 2020 board meeting?

**A. I don't recall the exact date, but presumably.**

Q. Referring you back to Exhibit 20 and to the second full paragraph again under Talent Management?

**A. Uh-huh.**

Q. And within that paragraph, the second to last sentence of the paragraph reads, "Mr. Shaffer noted that the CEO profile identified essential behaviors related to business management, leadership, interpersonal skills and personal attributes deemed critical to assess Fifth Third Bank president and CEO successor candidates."

Is that correct?

**A. Yes.**

Q. Do you agree with that statement?

**A. I do.**

Q. If you would turn to the second page of Exhibit 20, please, which is Bates stamped Fifth Third McHugh 212562. At the top of the page, the paragraph that continues over from the first page, the last sentence reads, "Lastly, Mr. Beaudin reviewed the development goals for Mr. Spence included in the assessment report."

Page 135

Do you see that?

**A. Yes.**

Q. What is your understanding of what those development goals were? And if need be, you can refer to the assessment report.

**A. I'd probably have to refer to that.**

Q. Go ahead.

**A. We need to take a time out.**

MR. SABA: Go off the record.

THE VIDEOGRAPHER: The time is 2:45 p.m.

(A recess was taken from 2:46 p.m. to 2:58 p.m.)

THE VIDEOGRAPHER: The time is 2:57 p.m. We are back on the record.

BY MR. SABA:

Q. Mr. Heminger, before we broke, we were discussing the development recommendations for Mr. Spence. I was asking you about if you recalled those and what they were. You indicated that you'd have to refer to the report. If you can go ahead and refer to the report that's Bates stamped as Exhibit Number 23 and I believe beginning on Fifth Third McHugh 000971. Can you identify the development recommendations for me?

**A. They're outlined here. "To slow down, avoid**

Page 136

**overwhelming others with too many change initiatives, and sustain focus across all initiatives. And gain greater comfort in having difficult conversations and holding others accountable."**

Q. Do you disagree with any of the development recommendations that RHR gave regarding Mr. Spence?

**A. I understand. I can't say I agree or disagree.**

Q. Why is that?

**A. I'm sorry?**

Q. Why can't you say if you agree or disagree?

**A. "Sustain focus across all initiatives." I find that as a very positive attribute. I believe "avoid overwhelming others with too many change initiatives," I believe that's a developmental process that as you're trying to assimilate all of the work to be done, you learn over time, you know, where to really identify your priorities. So I agree with some, but I think some of those are positive.**

Q. What's your read of when it says "sustain focus across all initiatives"?

MR. CIOFFI: Objection to the form of the question.

MR. SABA: I'll clarify the question.

MR. CIOFFI: If you have an opinion.

Page 137

MR. SABA: I'll clarify the question.

BY MR. SABA:

Q. Mr. Heminger, are you saying you read that as Mr. Spence sustains focus across all initiatives or that he needs to sustain focus across all initiatives?

**A. I read it that he does sustain focus across all initiatives, highly focused.**

Q. Do you see the second bullet point next to sustain focus across all initiatives?

**A. Yes.**

Q. And do you see that reads, "Timothy needs to ensure he evenly distributes his focus across all the activities his direct reports are pursuing"; is that correct?

**A. Correct.**

Q. "He needs to take the time to check in and ask about progress"; do you see that?

**A. Yes.**

Q. Wouldn't that indicate to you that he needs to improve on sustaining focus across all initiatives, not that he has it?

MR. CIOFFI: Objection. He gave you his interpretation, now you're arguing with him to adopt yours. You may answer.

THE WITNESS: I read it that, yes, he's very

Page 138

focused on many things, and he has sustained focus on many things is how I read it.

BY MR. SABA:

Q. Do you read all the development recommendations for Mr. Spence as positives for him?

**A. I'll have to read the rest of them.**

Q. Go ahead.

**A. Yes. I can read that -- I can read positives into them, and then areas that he certainly can be coached to improve.**

(Plaintiff's Exhibit 24 is marked for identification.)

BY MR. SABA:

Q. Mr. Heminger, I've handed you what's been marked as Exhibit Number 24. Can you identify that for me, please?

**A. It's a memo of June 8, 2020 from Bob Shaffer to Greg Carmichael, subject of "Guy Conversation on the Winning Formula for the CEO Profile."**

Q. You said a memo. It's actually an email; is that a fair statement?

**A. Yes.**

Q. And under key highlights and next steps, the first bullet point reads, "Guy agrees that if Tim is 'the' successor, don't add Tayfun and Phil formerly.

Page 139

Although, he would recommend, at a minimum, we discuss with Marsha that she/the board is okay with only having Tim assessed by Guy. He said he has seen a few boards surprised in the past. The CEO/CHRO did have at least one other internal candidate assessed."

Do you see that?

**A. I do.**

Q. Does that refresh your recollection as to how the decision was made to only have Tim Spence assessed?

**A. I wasn't part of this email or part of that discussion.**

Q. Was it your understanding as of June 8, 2020, that Tim Spence was the successor?

**A. I don't recall the exact date -- the exact dates, but it was clear in my mind that Tim was head and shoulders above any other candidate.**

Q. Do you recall the question of whether or not Tayfun and/or Phil McHugh should be assessed by RHR as well?

**A. I don't recall that.**

Q. Did anyone ever come and ask you if more than one internal candidate should be assessed by RHR to succeed Greg Carmichael as president and/or CEO?

**A. Not that I recall.**

Page 140

(Plaintiff's Exhibit 25 is marked for identification.)
BY MR. SABA:
Q. Mr. Heminger, I've just handed you Exhibit Number 25, and let me represent to you this is a remarking of the CEO profile that is previously marked as part of Exhibit 21. It again just contains Bates stamped numbers 001074 through 001079; is that correct?
**A. Correct.**
Q. With respect to the Essential Leadership Behaviors, and under Business Management, do you have any objective information or data indicating that as of September 22nd, 2020, Tim Spence was superior to or better than Phil McHugh with respect to driving "innovative thinking on the strategic side while simultaneously maintaining a close eye on rigorous execution"?
MR. CIOFFI: Objection to the form of the question. You mean other than what he experienced?
MR. SABA: I'm asking does he have any objective information or data.
BY MR. SABA:
Q. Do you understand the question?
**A. Uh-huh.**
Q. And what's your answer?

Page 141

**A. My objective information would come from observations of presentations by the various parties. And, yes, I believe that Tim Spence provided superior qualities in being able to present detailed technology, detailed digital platforms that were exemplary.**
Q. Other than your opinion of their presentations or Mr. Spence's presentation, do you have any objective information or data indicating that as of September 22nd, 2020, Tim Spence was superior to or better than Phil McHugh with respect to driving innovative thinking on the strategic side while simultaneously maintaining a close eye on rigorous execution?
MR. CIOFFI: Objection to the form of the question.
THE WITNESS: I believe I answered the question to the best of my ability.
BY MR. SABA:
Q. Do you have anything beyond just your personal judgment based on their presentations, any data, any objective evidence?
**A. I don't have any, no.**
Q. Do you have any objective information or data, other than just your personal opinion, indicating that as of September 22nd, 2020, Tim Spence was superior to or better than Phil McHugh with respect to establishing

Page 142

strategic direction?
MR. CIOFFI: Objection to the form of the question. Are you, in his personal opinion, are you including his business judgment or are you excluding his business judgment?
MR. SABA: I'm asking for any objective information or data.
MR. CIOFFI: Well, you said other than his personal opinion. I'm just asking what's included in his personal opinion? Is it his business judgment or not his business judgment?
MR. SABA: I'm asking for objective information or data.
THE WITNESS: My objective information is my business acumen, and that's what I rely on.
BY MR. SABA:
Q. That's your own personal business judgment, correct?
**A. Yes.**
Q. I'm asking for any objective data -- objective information or data.
MR. CIOFFI: Objection.
MR. SABA: Other than just -- let me finish my question.
MR. CIOFFI: You're arguing with him. You're

Page 143

not asking a question.
MR. SABA: I'm clarifying my question for him. I'm not asking for his opinion or his business judgment. I'm asking, does he have any objective information or data that would indicate that Tim Spence is superior to or better than Phil McHugh with respect to establishing strategic direction as of September 22nd, 2020.
MR. CIOFFI: Objection. Redundant. Argumentative.
MR. SABA: Go ahead.
THE WITNESS: There were many presentations made throughout the last few years in the board meeting that were objective. I can't recall the exact presentations, but he was far superior in making strategic and technical presentations.
BY MR. SABA:
Q. That's your opinion of the presentation, correct?
MR. CIOFFI: Objection. You're mischaracterizing his testimony. He's saying that was his business judgment.
MR. SABA: Fine. That's your --
BY MR. SABA:
Q. Other than your business judgment, other than

Page 144

your judgment call, what data do you have? What objective evidence do you have that Tim Spence was superior to or better than Phil McHugh with respect to establishing strategic direction?
MR. CIOFFI: Objection. He answered that question. What he based his business judgment on.
THE WITNESS: The presentations that were made were not objective. They were actual presentations made. And from those presentations, it's my business judgment that they were far superior.
BY MR. SABA:
Q. Other than your business judgment, do you have anything else to indicate that Mr. Spence was superior to Phil McHugh with respect to establishing strategic direction?
MR. CIOFFI: Objection. Asked and answered.
THE WITNESS: I can't answer it any better than what I've done.
BY MR. SABA:
Q. I'm asking if you have any other data, any -- purely data, do you have any data to support that?
MR. CIOFFI: Objection. He described it.
THE WITNESS: No.
BY MR. SABA:
Q. Do you have any objective information or data

Page 145

indicating that as of September 22nd, 2020, Tim Spence was superior to or better than Phil McHugh with respect to possessing the vision to outline a balanced, "organic growth, acquisitions, and optimization, rooted in deep knowledge of the banking industry"?
**A. Again, from all the presentations that were made, it was quite obvious and clear that he had a much deeper understanding, depth and breadth of the future of banking. So that's my assessment of the presentations that were made.**
Q. Other than your assessment of the presentations that were made, do you have any data or objective evidence that would indicate that Mr. Spence is superior to or better than Phil McHugh with respect to "possessing the vision to outline a balanced organic growth, acquisitions, and optimization, rooted in a deep knowledge of the banking industry"?
MR. CIOFFI: Objection. Asked and answered. Argumentative.
THE WITNESS: I've answered the question.
BY MR. SABA:
Q. No, you didn't. I asked other than the presentations and your opinion of them, do you have any objective information or data indicating that as of September 22nd, 2020, Tim Spence was superior to or

Page 146

better than Phil McHugh with respect to possessing the vision to outline a balanced organic growth, acquisitions, and optimization, rooted in deep knowledge of the banking industry?
**A. Presentation skills and the depth and breadth of those presentation skills, in my opinion, are objective, and they were clearly --**
Q. I didn't ask that question. I said other than the presentation --
MR. CIOFFI: Objection, Counsel. You're being argumentative. Allow him to finish.
THE WITNESS: I've answered the question to the best of my ability.
MR. CIOFFI: Allow him to finish answering. Finish your answer. Go ahead.
BY MR. SABA:
Q. Do you understand my question, because you're not answering?
MR. CIOFFI: Counsel, let him answer his question.
THE WITNESS: I understand your question and I'm giving you my business judgment on watching the objective presentations made by not those two, other executives as well, and intellectually it was quite obvious and clear from the data that was

Page 147

presented that Tim Spence had a much better grasp.
BY MR. SABA:
Q. Other than the presentations, do you understand that clause?
**A. I do.**
Q. So other than the presentations, do you have any objective information or data indicating that as of September 22nd, 2020, Tim Spence was superior to or better than Phil McHugh with respect to possessing the vision to outline a balanced organic growth, acquisitions, and optimization, rooted in deep knowledge of the banking industry?
MR. CIOFFI: Objection. Redundant. Argumentative. He answered.
MR. SABA: He didn't answer. Go ahead.
MR. CIOFFI: He did answer. He answered based on the data in the presentations and his assessment --
MR. SABA: I said other than the presentations. He said -- answer the question.
THE WITNESS: I don't know what "other" would be.
BY MR. SABA:
Q. Do you have anything, other than the presentations, that's data or objective evidence that

Page 148

would support that?
**A. The presentations would be data.**
Q. I didn't have -- did you hear my question?
MR. CIOFFI: Counsel, you keep cutting him off. Let him finish his answer. Finish your answer, please.
THE WITNESS: The presentations would include data and objective presentation materials that I based my judgment on.
BY MR. SABA:
Q. What data and presentation materials were ever presented in a presentation that would indicate that Tim Spence possessed the vision to outline a balanced organic growth, acquisitions, and optimization, rooted in a deep knowledge of the banking industry? What specific data can you point to?
**A. I don't know.**
Q. Do you have any objective information or data, specific data, indicating that as of September 22nd, 2020, Tim Spence was superior to or better than Phil McHugh with respect to driving execution?
**A. Again, based on all the presentations in the board meetings, my answer is yes, I feel that he drove the performance of the bank much better.**
Q. Outside your observation of the presentations,

Page 149

do you have any data?
**A. No.**
Q. Do you have any objective information?
**A. No.**
MR. CIOFFI: Objection. Asked and answered.
BY MR. SABA:
Q. Do you have any objective information or data indicating that as of September 22, 2020, Tim Spence was superior to Phil McHugh with respect to effectively managing the strength of the existing team while continuing to attract a more diverse group of executives?
**A. Again, from the presentations made in all the various -- and recall, I would have sat through dozens and dozens of meetings, watching both present and, again, it's my clear view that Tim was far superior in all of those attributes.**
Q. Do you have any objective data or information outside those presentations indicating that Tim Spence was superior to Phil McHugh with respect to "effectively managing the strength of the existing team while continuing to attract a more diversive group of executives"?
**A. No.**
MR. CIOFFI: Objection. Asked and answered.

Page 150

BY MR. SABA:
Q. Do you have any objective information or data indicating that as of September 22nd, 2020, Tim Spence was superior to Phil McHugh with respect to "maintaining FTB's standing with the regulators and managing the implications of the rise of ESG issues in 2020 and beyond"?
**A. From all the presentations that were made, again, at the board meetings with regulators present, Tim was far superior than any other executive we've ever had in being able to articulate the design, articulate the balance, and articulate the new controls put in place to be able to meet or exceed the compliance reporting requirements.**
Q. Outside your opinions regarding Tim Spence's presentations, do you have any objective information or actual data indicating that as of September 22nd, 2020, Tim Spence was superior to Phil McHugh with respect to "maintaining FTB's standing with the regulators and managing the implications of the rise of ESG issues in 2020 and beyond"?
MR. CIOFFI: Objection. You just asked that question.
MR. SABA: No, I didn't.
MR. CIOFFI: Yeah, you did.

Page 151

MR. SABA: No, I didn't. Go ahead.
THE WITNESS: No.
BY MR. SABA:
Q. Do you have any objective information or data indicating that as of September 22nd, 2020, Tim Spence was superior to Phil McHugh with respect to the "ability to navigate complexity and demonstrate resilience in a challenging world"?
**A. Again, all of the presentations, the dozens of presentations that I've sat through during my years on the board, again, it is my business judgment in watching all those presentations that he did possess a far superior quality.**
Q. Other than the presentations you observed, do you have any objective information or actual data indicating that as of September 22nd, 2020, Tim Spence was superior to Phil McHugh with respect to the ability to navigate complexity and demonstrate resilience in a challenging world?
MR. CIOFFI: Objection. Redundant. Argumentative. Asked and answered.
THE WITNESS: No.
BY MR. SABA:
Q. Referring you to Exhibit 22 again. And I'm going to refer you to the page Fifth Third McHugh

001036. And do you see where Mr. Spence received a benchmark rating of 4 out of 5 from RHR International's assessment; is that correct?
**A. Correct.**
Q. Do you have any objective information or data indicating that as of September 22nd, 2020, that Phil McHugh would have not received a 4 or better in an assessment by RHR?
MR. CIOFFI: Objection. Form of the question. Asking a hypothetical.
MR. SABA: You can answer.
MR. CIOFFI: If you have an answer.
THE WITNESS: No.
BY MR. SABA:
Q. You don't?
**A. I don't have any information, no.**
Q. What is your understanding of why Mr. McHugh's employment with Fifth Third Bank was terminated?
MR. CIOFFI: Objection. Form of the question. Assumes facts not in evidence. It's argumentative. He wasn't terminated. He quit. You may answer.
THE WITNESS: It's my understanding and my opinion that Mr. McHugh was not terminated. In fact, he quit, which was a very substantial, very important position.



BY MR. SABA:
Q. What specifically is your understanding of the facts, other than Mr. Cioffi's prompting, what specifically is your understanding of the facts that led to Mr. Spence's -- excuse me, led to the termination of Mr. McHugh's employment?
MR. CIOFFI: Objection. Assumes facts not in evidence. Is argumentative. He wasn't terminated.
MR. SABA: That's not what the question said.
MR. CIOFFI: Yes, it did. Read the question back, please.
MR. SABA: His employment terminated, his employment ended, that's what it means. It doesn't mean to anything else other than it ended.
BY MR. SABA:
Q. Is it your understanding that Mr. McHugh's employment terminated, it ended, correct?
**A. He was not terminated.**
Q. That's not what my question said?
**A. That's my definition of terminated.**
Q. What is your understanding of what led to the end of Mr. McHugh's employment with Fifth Third Bank?
**A. My understanding is he was disappointed that he was not selected to become the future CEO of the company and, therefore, he decided to leave.**



Q. What is your understanding of why he was disappointed?
MR. CIOFFI: Objection to the form of the question. Lacks a foundation. If you know. If you know what he was thinking.
THE WITNESS: I just stated he was disappointed that he did not -- he was not offered the top CEO job.
BY MR. SABA:
Q. And what is your understanding of his basis for being disappointed that he was not given the top CEO or president job?
**A. What I just said. He didn't get the top job.**
Q. Did you have an understanding that Mr. McHugh was under the impression that he would be receiving the top job of president or CEO?
**A. Absolutely --**
MR. CIOFFI: Objection to the form of the question as to what impression Mr. McHugh was under, but you may answer. Go ahead.
THE WITNESS: Absolutely not. It was never discussed. He was never discussed as a top candidate within the boardroom.
BY MR. SABA:
Q. Did you ever discuss the termination or end of



Mr. McHugh's employment with Fifth Third Bank with anybody inside Fifth Third Bank?
MR. CIOFFI: Objection to the form of the question. Are you saying outside of the board meetings or --
MR. SABA: No. At any time.
THE WITNESS: Would you restate that for me?
MR. CIOFFI: Read it back, please.
BY MR. SABA:
Q. Have you had any discussions with any person at Fifth Third Bank regarding Mr. McHugh's termination or end of his employment with Fifth Third Bank?
**A. Yes. All the board, we were informed of Mr. McHugh's decision to leave the bank. I don't know the exact date, but, yes, we were informed. We had a discussion pertaining to that information.**
Q. Who informed the board of that?
**A. I believe it was the CEO, Greg Carmichael.**
Q. And when was the board informed of that?
**A. I don't know the exact date.**
Q. Outside the board venue, did you have any discussions with any other employees of Fifth Third Bank regarding Mr. McHugh's departure or termination of employment from Fifth Third Bank?

Page 156

**A. Not that I recall.**
Q. Was there any decision made regarding Mr. Spence becoming president of Fifth Third Bank during the September 21st, 2020 meeting of the board?
**A. I don't recall the exact dates.**
(Plaintiff's Exhibit 26 is marked for identification.)
BY MR. SABA:
Q. Mr. Heminger, I've handed you what is marked as Exhibit 26. Can you identify that for me?
**A. Yes. Fifth Third Bank, National Association Minutes of Joint Meeting of the Board of Directors, September 22, 2020.**
Q. And Exhibit Number 26 is Bates stamped Fifth Third McHugh 212566 through Fifth Third McHugh 212569; is that correct?
**A. Correct.**
Q. And you attended that meeting in person; is that correct?
**A. Yes.**
Q. And that meeting was presided over by Mr. Carmichael; is that correct?
**A. That's correct.**
Q. Based upon Exhibit Number 26, are you able to determine whether or not there was any decision made

Page 157

regarding Mr. Spence becoming president of Fifth Third Bank during that board meeting?
**A. I do not see any.**
Q. Based upon Exhibit Number 26, are you able to determine whether or not there was any discussion regarding CEO or president succession planning or candidates during the September 22nd, 2020 joint board meeting of the board of directors?
**A. I do not.**
(Plaintiff's Exhibit 27 is marked for identification.)
BY MR. SABA:
Q. Mr. Heminger, I've handed you what's been marked as Exhibit Number 27. Can you identify that for me, please?
**A. Yes. Fifth Third Bancorp Unanimous Written Consent of the Board of Directors Appointing President, October 26, 2020.**
Q. And do you know what the purpose of this unanimous written consent was?
**A. It was to appoint Tim Spence as the president of Fifth Third Bancorp.**
Q. Prior to this unanimous consent being circulated for signature, had there already been a determination that Mr. Spence would become president of

Page 158

Fifth Third Bancorp?
**A. It wasn't a determination until this final document was signed, but there were presentations in effect that Tim was being developed and being recommended to be the next president of the bank.**
Q. Was there a meeting held in conjunction with the signing of this unanimous written consent identified as Exhibit Number 27?
**A. I don't recall if there was a separate meeting.**
Q. Just to clarify, Exhibit Number 27 is Bates stamped Fifth Third McHugh 212871 through 212872; is that correct?
**A. Yes.**
Q. Do you know why -- strike that.
Do you know if there's a particular reason why the appointment of Mr. Spence as president was done as unanimous written consent instead of being done as a vote at a board meeting?
MR. CIOFFI: Objection to the form of the question. Because it was unanimous written consent. I mean, the document speaks for itself, Counsel.
MR. SABA: That's not my question.

Page 159

BY MR. SABA:
Q. Do you know why it was done in this fashion, as a unanimous written consent, as opposed to being done as a vote at a board meeting?
**A. I don't recall.**
(Plaintiff's Exhibit 28 is marked for identification.)
BY MR. SABA:
Q. Mr. Heminger, I've handed you what's been marked as Exhibit Number 28. Can you identify that for me, please?
**A. Yes.**
Q. What is Exhibit Number 28?
**A. An organizational announcement representing that Tim Spence will become the president of Fifth Third Bancorp.**
Q. Have you seen this announcement before?
**A. I don't recall that I have exactly seen this announcement.**
Q. Do you know when this announcement was issued that's marked as Exhibit Number 28?
**A. No. I don't see a date on it.**
Q. Do you know who prepared the announcement that's marked as Exhibit Number 28?
**A. It would have been prepared under Greg**

**Carmichael's direction, but I don't know who prepared it.**

MR. SABA: We can go off the record.

THE VIDEOGRAPHER: The time is 3:38 p.m. We're going off the record.

(A recess was taken from 3:38 p.m. to 3:48 p.m.)

THE VIDEOGRAPHER: The time is 3:48 p.m. We're back on the record.

MR. SABA: At this point in time, that is all the questions I have. We are going to keep the deposition continued in progress pending resolution of the various discovery disputes and documents that we have been given, so we keep it open for the purpose of asking Mr. Heminger about those additional documents as soon as they are produced.

MR. CIOFFI: While I recognize that you are attempting to keep the deposition open without agreeing that you have the right to keep it open, but I understand your position. So we will take a break and decide.

THE VIDEOGRAPHER: The time is 3:49 p.m. We're going off the record.

(A recess was taken from 3:49 p.m. to 4:02 p.m.)



THE VIDEOGRAPHER: The time is 4:02 p.m. We are back on the record.

EXAMINATION

BY MR. CIOFFI:

Q. Mr. Heminger, earlier today you testified that succession planning by a board is an iterative process; do you remember that testimony?

**A. Yes, sir.**

Q. Is that true of all boards you're familiar with?

**A. It is.**

Q. Okay.

**A. In fact, it's the number one responsibility of the board.**

Q. Would you describe what that process is like generally for boards and then specifically how it took place at Fifth Third with respect to the succession planning for Greg Carmichael's successor?

**A. You're continually assessing the executive management of the company, and you, in this assessment, usually you review a couple times a year formally and then -- but you're making observations at every meeting. And during executive sessions you will have discussions on how a person performed in their presentation, how their business is performing or not performing, and then**



**you questioned. And it's not just one person, the whole board questions. And I will say that this board is not bashful and really questioning and requiring very strong answers on why one person is assessed one way or another.**

Q. Did this iterative process in the evaluation of members of the enterprise team take place over one or two meetings in presentations by them or over many?

MR. SABA: Objection as to form. Go ahead. You can answer.

BY MR. CIOFFI:

Q. You may answer.

THE WITNESS: And I'm sorry, I couldn't hear you.

MR. SABA: I just said objection as to form. Go ahead, you can answer.

THE WITNESS: No, it takes, you know, I've sat through dozens and dozens of meetings. So -- but we formally -- once, sometimes twice a year, we formally sit down and kind of update the files on how we're seeing the performance and development of an executive, but it's a very iterative process over many different meetings, and you're always assessing. As I said early this morning, every day that you're in a board meeting, you're assessing



all the management that's there.

BY MR. CIOFFI:

Q. In the succession planning with respect to Mr. Carmichael's successor, you testified that part of the business judgment that you made and the board made was based on presentations from various enterprise team members; is that correct?

**A. That's correct.**

Q. Were these -- approximately how many presentations by Mr. Spence?

MR. SABA: Objection. Go ahead, you can answer.

THE WITNESS: I'm assuming we've had -- we will average approximately six meetings per year and sometimes a couple of telephonic calls, and Tim would make at times multiple presentations throughout the day and a half, two-day board meetings. So, you know, probably at least a dozen per year presentations, at least.

BY MR. CIOFFI:

Q. And this iterative process, with respect to Mr. Carmichael's successor, continued over what period of time?

**A. Well, we would have assessed -- I believe Tim came to the bank in approximately 2015, and when you're**

Page 164

**bringing someone in at a very high level, executive level that we did, trust me, the board is assessing them every meeting.**
Q. Are you familiar with the hiring of Tim Spence?
**A. I am.**
Q. Would you describe that?
**A. Well, we were -- in fact, I, for one, was always very impressed when Tim was -- we had hired Tim to do some work when he was with the consultancy firm called Oliver Wyman, and he made various presentations on the banking industry specifically in and around the digital platforms, but other, as I said earlier, venture capital-type competitive threats that were coming in, and I was always, you know, very, very impressed with his knowledge, not only of the banking industry but his intimate knowledge of Fifth Third. And I spoke to Greg at one time, Greg Carmichael, that is, and said if you ever have a chance, you ought to take a look and see if there's any way that you could steal him away from Oliver Wyman.**
Q. And did, in fact, that happen?
**A. It did.**
Q. You mentioned that Tim Spence came into the bank at a very high level; is that correct?

Page 165

**A. That's correct.**
Q. And, in fact, from the beginning of his employment, he was one of the named executives in the proxy statement; is that correct?
**A. I believe so.**
Q. What does that mean, a "named executive" in the proxy statement?
**A. A named executive in the proxy, it depends on kind of an outgoing or incoming a person, but generally it's the top five compensated officers in the company. Sometimes it might go to six if you straddle a -- I think it's a CEO or a chairman or CFO, if one of those straddle a time period, you'll have an extra in the proxy, but usually it's five or six people.**
Q. Does the board make that determination as to the compensation of those executives?
**A. Yes, sir.**
Q. Is -- does the compensation reflect the judgment, the business judgment of the board as to the value of those employees?
MR. SABA: Objection as to form. Go ahead, you can answer.
MR. CIOFFI: You may answer.
THE WITNESS: The board makes an assessment not only of the value and judgment, but how that

Page 166

executive stacks up or compares to other executives within our industry.
BY MR. CIOFFI:
Q. At any time from -- at any time during your tenure on the board, was Phil McHugh a named executive?
**A. I don't recall whether in the last proxy he was a named executive or not. He had been very close, but I don't recall whether he was or not.**
Q. But Tim Spence was for certain; is that correct?
**A. To my knowledge, yes.**
Q. You talked about the board forming its business judgment based on presentations from members of the executive team, the enterprise team, and you talked about Mr. Spence making dozens of presentations; is that correct?
**A. Yes, sir.**
Q. How many presentations approximately did Mr. McHugh make to the board?
**A. Oh, he would have made presentations. Generally, the members of the enterprise team will make a presentation either in one of the committees, such as the risk committee, the audit committee, the technology committee, or -- generally not human capital because for that we're just reviewing the management team -- but**

Page 167

**they'll make presentations possibly inside of those committees, but then at the full board meeting, most generally the enterprise leaders will review their organization. So most generally every meeting they'll have at least one presentation.**
Q. Is it accurate to say that Mr. McHugh would have made dozens of presentations to the board?
MR. SABA: Objection as to form. Go ahead, you can answer.
MR. CIOFFI: You may answer.
THE WITNESS: I'm sorry. I couldn't hear you.
MR. SABA: I just said objection as to form. Go ahead, you can answer.
THE WITNESS: Okay. Okay. Yes. Over my tenure, I would have seen dozens of presentations by Mr. McHugh.
BY MR. CIOFFI:
Q. Is the same thing true of other members of the enterprise team, dozens of presentations?
**A. Yes, sir.**
Q. I'm going to direct your attention to Exhibit Number 10 that was marked by counsel for the plaintiff. Would you look at that, please?
**A. Okay.**
Q. You see that document? What is that document?

Page 168

**A. It's the document of Minutes of the Joint Meeting of the Board of Directors on December 17, 2019.**
Q. I want to direct your attention to page 2 of that document which has the Bates stamp 010 -- 7109; do you see that at the bottom?
**A. Yes, sir.**
Q. Would you read into the record at the bottom of the page, beginning with "following this approval."
**A. Under Market Context?**
Q. Yes, under Market Context.
**A. "Following this approval, Mr. Spence provided an overview of the strategy plan review as included in the materials for the meeting. He began with a discussion of the market context, including a discussion of political, economic, social, technological, and competitive factors. He described the expected population trends in Fifth Third's footprint, noting that larger regional cities were generally increasing modestly, whereas population growth in smaller cities and the largest U.S. markets have leveled off. In response to" --**
Q. Let me stop you there. So based on this aspect of Mr. Spence's presentation, did you have an opportunity to observe objective data about these particular subjects?

Page 169

MR. SABA: Objection as to form. Go ahead, you can answer.
THE WITNESS: Mr. Spence would have provided generally market data, population data, economic data, to support his presentation.
BY MR. CIOFFI:
Q. What kind of facility with that data did Mr. Spence demonstrate?
**A. The facility used?**
Q. The facility, his ability to comprehend and understand that data?
**A. You know, I always compare executives on do they read to you or do they really know the subject matter by just looking at the data and really draw your attention to the important parts, important analytics of that data, and Tim was exceptional in doing that.**
Q. Based on that information, were you able to form an independent business judgment as to Mr. Spence's depth of knowledge about strategy with respect to the bank?
MR. SABA: Objection as to form. Go ahead, you can answer.
THE WITNESS: Yes, I was always very impressed. In fact, I believe -- I believe Tim was one of the top executives I've ever dealt with and

Page 170

watched them develop into becoming a CEO.
BY MR. CIOFFI:
Q. Were you able to form an independent business judgment with respect to Mr. Spence's knowledge about competitive factors affecting the bank in the industry?
**A. I was.**
MR. SABA: Objection as to form.
THE WITNESS: I was.
BY MR. CIOFFI:
Q. Were you able to form an independent business judgment with respect to his breadth and depth of knowledge concerning population trends in the Fifth Third footprint?
**A. Yes.**
Q. Were you able to compare Mr. Spence's knowledge and depth of analysis in those areas to Mr. McHugh?
MR. SABA: Objection. Lack of foundation. Form of the question. Go ahead, you can answer.
MR. CIOFFI: He's being disruptive, you can answer.
THE WITNESS: Yeah, you know --
MR. SABA: He's even correcting my objections.
THE WITNESS: They would -- both Mr. Spence and Mr. McHugh would make presentations, but they

Page 171

always weren't making anywhere near the same presentation. So in this case, Tim was reviewing a broad strategic plan, whereas Phil might be reviewing organizational data within his organization, which did not pertain to the same information that Tim was presenting.
BY MR. CIOFFI:
Q. What conclusions, if any, were you able to draw based on this presentation by Mr. Spence in comparison to the presentation by Mr. McHugh and others?
MR. SABA: Objection as to form. Go ahead, you can answer.
THE WITNESS: I don't recall the data behind the exact presentation that was made in December of 2019.
BY MR. CIOFFI:
Q. But in terms of the depth of knowledge about competitive factors and about strategic planning, were you able to draw a business judgment as to Mr. Spence's qualifications?
**A. Yes.**
MR. SABA: Objection. Go ahead, you can answer.
THE WITNESS: Yes. Over the time of watching, as I said earlier, being able to observe the

Page 172

analytics behind the presentations between Tim and Mr. McHugh, I was. I felt that Tim was always, just at his fingertips, had all the data and was very articulate and succinct in being able to present that data to the full board.
BY MR. CIOFFI:
Q. You mentioned a little bit earlier one of the distinguishing factors you made between enterprise team members was that some members, like Mr. Spence, really understood the information and the data that was being presented, and others were simply reading that information.
**A. Correct. That's correct.**
Q. Where would you put Mr. Spence and where would you put Mr. McHugh?
**A. And I recognized that back when Tim was with Oliver Wyman, why I recommended to Greg that if there's ever a chance, you ought to see if you could bring him on board; that he just had such a grasp of the intricate details of the banking industry at his fingertips. And up to the last board meeting, I still recognize that he has that intellectual capacity to draw on his knowledge and have the facts at his fingertips, and he's quite remarkable.**
Q. Did you find Mr. McHugh performing at that

Page 173

same level in his presentations or did you find that he was more or less reading?
MR. SABA: Objection. Go ahead. You can answer.
MR. CIOFFI: You may answer.
THE WITNESS: And they're presenting different things, but I found Mr. Spence's presentation skills superior to Mr. McHugh's.
BY MR. CIOFFI:
Q. You mentioned in the iterative process that the board members would discuss these presentations; is that correct?
**A. Yes, sir.**
Q. Did you have a discussion with the other board members about your business judgment as to Mr. Spence's skill set that you just described?
MR. SABA: Objection as to form. Go ahead, you can answer.
THE WITNESS: Yes, we did. Often we would have, in the executive sessions, we would have discussions about how we saw executives developing. So yes.
BY MR. CIOFFI:
Q. Did that involve comparing Mr. Spence to other members of the enterprise team?

Page 174

**A. At times it would be a comparison, but it was quickly observed that Tim was, in my business judgment, head and shoulders above anybody else on the enterprise team.**
Q. I want to direct your attention to the -- well, before I ask you that question, did the other board members share that business judgment with you?
MR. SABA: Objection. Go ahead, you can answer.
MR. CIOFFI: You may answer.
THE WITNESS: Sir, I'm -- when you turn your head, I'm sorry, I just can't hear you.
MR. SABA: No, no, you're fine.
THE WITNESS: Yes, they did share that with me.
BY MR. CIOFFI:
Q. When they -- when I say "share," they had the same business judgment as you did with respect to Mr. Spence; is that your testimony?
MR. SABA: Objection. Go ahead, you can answer.
MR. CIOFFI: You may answer.
THE WITNESS: Yes. I mean, it was clearly a consensus of the board that as we were watching Tim's development, that we believed that he had the

Page 175

entire package.
BY MR. CIOFFI:
Q. Go to the next paragraph of Exhibit Number 10, which is 7110. Would you read that first sentence of that first full paragraph, which is --
**A. Oh, on 7110.**
Q. Yes, 7110.
**A. "Mr. Spence then discussed the competitive dynamics with the US banking industry, including, a discussion of non-traditional threats to the regional banking industry generally and to Fifth Third specifically. He reviewed the threats posed by large technology companies, which have significantly larger budgets to leverage for digital innovation and to drive disintermediation of traditional banks."**
Q. Let me stop you there and ask you again, based on Mr. Spence's presentation, were you able to form a business judgment as to the breadth and depth of his knowledge with respect to the competitive dynamics for the US banking industry?
**A. Absolutely.**
MR. SABA: Objection. Go ahead, you can answer.
THE WITNESS: In fact, upon Mr. Spence coming into Fifth Third, we had never received that type

Page 176

of detail and depth and breadth of the competitive landscape before. Tim really brought that knowledge and that background to -- and I think it comes from his consultancy days where he saw the entire industry, but he saw the threats coming in the industry outside of the traditional banks.
BY MR. CIOFFI:
Q. In this part of Mr. Spence's presentation on December 17, 2019, did he present to the board objective data and information?
**A. Yes.**
MR. SABA: Objection.
BY MR. CIOFFI:
Q. Was he -- did he analyze that information?
**A. Within his presentation, there was analysis and, you know, yes, deep thought and recommendations on how Fifth Third can counteract, compete, or maybe not compete in certain operations or in business.**
Q. How would you assess Mr. Spence's understanding of the competitive dynamics of the banking industry?
MR. SABA: Objection. Go ahead, you can answer.
THE WITNESS: I would assess it, you know, one of the best visions of the business and a point in

Page 177

fact, when I first joined the board, banking was all about auto liens and, you know, loaning money for autos. Tim turned us around and said you guys got to figure out how to do something other than just autos. He was very good at bringing a different view into the business.
BY MR. CIOFFI:
Q. Did you share that business judgment with other members of the board?
**A. Yes, sir. We talked often about that.**
Q. Did other members of the board share your assessment of Tim's depth and breadth of knowledge of the competitive dynamics?
MR. SABA: Objection.
THE WITNESS: Yes, sir.
BY MR. CIOFFI:
Q. Was that -- was there a consensus developing about Tim at this point in time in terms of being a leading candidate for president and CEO?
**A. In 2019, we were certainly building the consensus that he was the top candidate, leading candidate, and we wanted to continue to see him develop.**
Q. Was that view you've just articulated shared unanimously among the board members?
**A. That's my opinion, yes.**

Page 178

Q. Go ahead and move to the next paragraph if you would, the Bank M&A Outlook, would you look at that section?
**A. Yes.**
Q. Could you read the first couple of sentences there?
**A. "Mr. Spence next reviewed the bank mergers and acquisitions (M&A) outlook. He noted that trillionaire banks were unable to execute M&A due to deposit cap legislation and that, based on recent commentary and executive level changes, large regional bank mergers of equals were appearing less probable."**
Q. Let me stop you there. In this aspect of Mr. Spence's presentation regarding mergers and acquisitions, did he present to the board objective facts, information, and data?
**A. Yes.**
MR. SABA: Objection. Go ahead, you can answer.
THE WITNESS: Yes, he did.
BY MR. CIOFFI:
Q. Did he present an analysis of that data that -- those facts and that information?
**A. Yes, he would have presented several different combinations, several different merger candidates, and**

Page 179

**the positives, negatives, looking at balance sheet information, income statement information, allowance for losses, an array of different financial information that the board should take into context if ever making a decision.**
Q. Based on this aspect of Mr. Spence's presentation on December 17, 2019, were you able to form a business judgment as to Mr. Spence's qualifications to be president?
MR. SABA: Objection. Go ahead, you can answer.
THE WITNESS: Yes. My business judgment and the judgment of the board was that he was developing rapidly and someone that we thought certainly had the potential.
MR. SABA: Objection. Move to strike.
BY MR. CIOFFI:
Q. Go ahead and move to the next paragraph. Would you look at that, please?
**A. The Look Back?**
Q. The Look Back, yeah?
**A. "Next, Mr. Spence reviewed progress against key Northstar metrics and goals to become a top quartile bank, including progress on return on tangible common equity, (ROTCE), return on assets, (ROA), efficiency**

**ratio, and primary bank consideration since 2016."**
Q. Keep going.
**A. "He noted that performance against each of these metrics had improved significantly in the past several years."**
Q. Given the reference to metrics and this part of the presentation, did Mr. Spence's presentation on these metrics contain objective data, facts, and other information?
MR. SABA: Objection. Go ahead, you can answer.
THE WITNESS: Yes, sir. It would have been a comparative, not just of Fifth Third by itself but comparing us against all of our peers. And generally, the peers that are included in the proxy that we compare ourselves to for compensation purposes.
BY MR. CIOFFI:
Q. How would you describe Mr. Spence's analytical abilities with respect to this data and his facility with those metrics facts objective data?
**A. His recall on all these objectives and the analytics on which he would present -- and he had that -- he possesses that ability to take very intricate, difficult, complex situations and be able to**


**explain them in a very levelheaded, common sense way to directors who don't work with this data every day. So, yes, he was an outstanding presenter and assessed the business knowledge to be able to, again, articulate what the numbers meant.**
Q. Did you discuss your business judgment with respect to his presentation about the metrics with the other board members?
**A. Yes, sir.**
Q. Did they share your assessment of Mr. Spence?
**A. Yes, sir.**
Q. Let's go on to the next page, page 4, which is 7111. Can you see that?
**A. Yes, sir.**
Q. Would you read that first sentence at the top of the page?
**A. "Mr. Spence then reviewed the strategic planning process against OCC requirements under heightened standards, and made note of required enhancements."**
Q. What -- were you able to form a business judgment about Mr. Spence's strategic planning capabilities from this presentation?
**A. This would have been one part of the presentation, yes.**


Q. In this part of the presentation, did Mr. Spence also present objective facts, data, and information?
**A. He did.**
MR. SABA: Objection.
BY MR. CIOFFI:
Q. Based on his presentation and those objective facts, data, and information, were you able to form a business judgment as to Mr. Spence's capabilities as a strategic planner?
**A. Yes, I was.**
Q. What business judgment did you form?
**A. I felt that he had a tremendous ability to, again, articulate a vision to really -- to be passionate and drive a culture within the bank and within the management team to make us better.**
Q. On this point, go on down to the next paragraph, and please read that first sentence -- first two sentences, please?
**A. "Thereafter, Mr. Spence proceeded to a preliminary discussion of strategic priorities. He discussed the focus on relationship banking and articulated the vision, sources of differentiation, and foundation for achieving the vision around relationship banking. He noted that the focus would be on pursuing**


**strategic enablers including leading share and attractive markets, One Bank value and execution, differentiated digitally enabled and maintaining an ability to engage in selective M&A as opportunities arise."**
Q. In this part of his presentation, did Mr. Spence present objective facts, data, and information to the board?
**A. Yes, sir.**
MR. SABA: Objection.
BY MR. CIOFFI:
Q. Did he analyze those facts, that information, and that data?
**A. Yes.**
Q. How would you describe his analysis of those facts, information, and data?
**A. Again, he had a very keen way of being able to present for everybody to understand and I would say one of his best attributes was getting people to think a new way around banking and not just the old school of banking.**
Q. Based on the strategic vision articulated by Mr. Spence, were you able to form a business judgment as to his qualifications to be president of the bank?
MR. SABA: Objection. Go ahead, you can

Page 184

answer.
THE WITNESS: Yes.
BY MR. CIOFFI:
Q. And what was that business judgment?
**A. We felt clearly that he was our top candidate to become the president and CEO, and we were very interested and continued to watch him develop.**
Q. Go ahead and read into the record the next couple of sentences at the beginning of the third full paragraph.
**A. "Mr. Spence then reviewed the strengths and weaknesses of the organization against these strategic enablers and foundation elements. With respect to leading share, he noted that Fifth Third was first in its peer group with respect to deposits in its top three share and that early de novo branching results were strong."**
Q. Let me stop you there. And, again, this analysis of the strengths and weaknesses of the organization is referring to the bank; is that right?
**A. Yes, sir.**
Q. And in this analysis of the strengths and weaknesses of the bank, did Mr. Spence present to you objective data, facts, and information?
**A. Yes.**

Page 185

Q. Did he analyze the data, those facts, and that information?
**A. He did. And what we were most impressed with, in fact, what I was most impressed with, is he never -- he just didn't present the good things. He presented all the metrics and exactly where we stood. So you could really ascertain where we needed to work and where we needed to continue to perform better.**
Q. Did that ability on the part of Mr. Spence allow you to form a business judgment with respect to his leadership skills?
**A. Yes, sir.**
Q. And would you explain how, please.
**A. His leadership skills and how he was bringing the team together to recognize where we stood on these metrics, we always weren't at the top. There were many areas that we needed to improve, and he was able to, as I say, really coalesce the team to recognize where we needed to improve, and where we could improve quickly. We couldn't get, you know, to the top immediately, but where we could start pecking away at improving our position within our competitors.**
Q. Did you discuss your business judgment with respect to his leadership skills with the other board members?

Page 186

**A. Yes, sir.**
Q. Did the other board members have the same opinion as you did with respect to his leadership skills?
MR. SABA: Objection.
MR. CIOFFI: You may answer.
THE WITNESS: Yes, sir.
BY MR. CIOFFI:
Q. Go ahead and read the next paragraph, please.
**A. Next Mr. Spence, right there?**
Q. Yes.
**A. "Next Mr. Spence identified the four key strategic objectives for the near future and reviewed key investments and investments relating thereto: Leading share and attractive markets, One Bank value proposition, digitally enabled experience, strategic M&A, and strong foundations. With respect to leading share in attractive markets, he reviewed target build-outs required to achieve top five market share in key geographies primarily in the southeast, and discussed necessary investments in relationship in relation thereto."**
Q. Let me stop you there. In this part of his presentation, did Mr. Spence present additional facts, data, and information to the board?

Page 187

**A. Yes, sir.**
Q. Did he analyze those facts, data, and that information?
**A. Yes, sir.**
Q. Based on that analysis of those facts, data, and information, were you able to form a business judgment as to Mr. Spence's qualifications to be president of the bank?
**A. Yes, sir.**
Q. Did you discuss your business judgment with the other board members?
**A. Yes, sir.**
Q. What was your business judgment and did the other board members agree with it?
MR. SABA: Objection as to form. Go ahead.
MR. CIOFFI: Go ahead.
THE WITNESS: My business judgment, and as a -- also agreed to by other members, was that Tim was developing rapidly and certainly had the skills that we thought was going to be required to be the president.
BY MR. CIOFFI:
Q. Turn to the next page, please, page 5, there's a -- the first full paragraph, would you read?
**A. "Thereafter, Mr. Spence discussed the plans**

Page 188

**for digital transformation and reviewed the consumer and commercial focus areas for 2020."**
Q. Let me stop you there. Did Mr. Spence have a particular expertise in addition to everything you've articulated with respect to digital banking?
**A. Yes, sir.**
Q. Would you describe that expertise?
**A. His expertise really came from what he was able to learn and develop and, you know, in the consultancy business, sell. They sell that expertise and those digital platform ideas to many competitors in the industry. So he brought that depth and breadth of knowledge with him when he came to the bank, and as I said earlier, one of the first times we saw it articulated within our management team.**
Q. And presenting to you information about digital transformation of the banking industry, did Mr. Spence present to you objective facts, data, and information?
**A. Yes, sir.**
Q. Did he analyze those facts, data, and information?
**A. Yes, sir.**
Q. And how would you assess his ability to understand and analyze that data, those facts, and that

Page 189

information?
**A. He had a tremendous acumen to understand the digital information, the digital space, and then be able to explain it to those people who did not have, you know, that deep IT digital transformation background.**
Q. Based on this presentation, did you discuss with the other board members the depth and breadth of Mr. Spence's knowledge of the industry, his knowledge of Fintech, his knowledge of the strategic initiatives and goals of the company and his leadership skills with the other board members?
**A. Yes, sir.**
Q. And what was their assessment?
**A. Again, we felt he was developing rapidly and he brought a new depth -- and Greg was outstanding at understanding this as well, but Tim brought a new depth and breadth of information that he saw from outside the banking industry, which was very helpful.**
Q. This depth and breadth of knowledge on the part of Mr. Spence, at this point in time did the board members have an opportunity to compare it to other members of the enterprise team?
**A. We continuously observed, continuously assessed the presentation skills and the depth and breadth and the acumen of the executives as they**

Page 190

**presented. As I said earlier this morning, every day everyone was being interviewed. So, yes, we did that. We talked amongst ourselves and would always reach a consensus.**
Q. At this point in time, in December of 2019, was that sentiment about Mr. Spence held unanimously by the board?
MR. SABA: Objection.
THE WITNESS: Yes, sir.
BY MR. CIOFFI:
Q. Did you or anyone on the board form a business judgment that anyone else on the enterprise team, including but not limited to Mr. McHugh, possess anything comparable to Mr. Spence's strategic vision, strategic planning, presentation skills, knowledge of Fintech, leadership skills?
MR. SABA: Objection. Go ahead, you can answer.
THE WITNESS: No. We felt -- my business judgment and my colleagues on the board's business judgment -- was that Tim was, you know, far and above any other candidate.
BY MR. CIOFFI:
Q. If you could direct your attention to Exhibit 9 now. Go ahead and describe this document

Page 191

again. I know you did in your prior testimony. Go ahead and describe it, just so we can put it in context of what we were just talking about.
**A. This is a document to all of the board members from Bob Shaffer, and it appears to a couple people in management as well, Greg Carmichael, and I think -- I think Paula at the time was in the HR department. But anyway -- and copied Bob Shaffer as well, who's in the HR department. But this is a Fifth Third Talent Management and Succession Planning Document for Board Meeting on December 17, 2019.**
Q. I'd like to direct your attention to again at the bottom, this numbering system we call Bates numbers, 1135; do you see that? Mr. Saba asked you some questions about this, but I want to direct your attention to that section of this page that talks about potential next positions for Mr. Spence; do you see that?
**A. Uh-huh.**
Q. Across from that it shows president in one to two years; do you see that?
**A. Yes, sir.**
Q. And the CEO in three-plus years?
**A. Yes, sir.**
Q. Did, in fact, those potentials materialize?

Page 192

**A. They did.**
Q. And at the time of this document, was it the consensus of the board that Tim could become president in one to two years?
**A. It was the consensus of the board that we were hoping that he would continue to develop to be able to get the job, but there was no decision at that time that the job was his.**
Q. Right. And is the same thing true of the CEO position?
**A. Yes, sir.**
Q. Is it accurate to say that there was a consensus around the fact that he was the leading candidate?
**A. Absolutely.**
Q. Is that because of what you just described in terms of his strategic vision, his leadership, his depth and breadth of knowledge of the industry?
**A. Yes. His business acumen, leadership skills, strategic vision, and just his overall performance.**
Q. Going back to Exhibit 10, do you see that?
**A. Okay.**
Q. So we went through Mr. Spence's presentation. And I believe your earlier testimony was this was but one of many presentations by Mr. Spence to the board; is

Page 193

that right?
MR. SABA: Objection. Go ahead, you can answer.
THE WITNESS: Yes, sir.
BY MR. CIOFFI:
Q. I believe your testimony was there were dozens; is that correct?
MR. SABA: Objection. Leading. Go ahead, you can answer.
THE WITNESS: Yes, I sat through dozens of presentations that Mr. Spence made.
BY MR. CIOFFI:
Q. With respect to those other presentations, how would you assess Mr. Spence's depth of and breadth of knowledge of the industry, his strategic vision, his leadership skills, as demonstrated in those other presentations?
**A. I would say that they were exemplary. I've -- you know, throughout my career, I've had a tremendous amount of vision inside of all the major -- the trillionaire banks, because I used to present to them all the time and they would come and present to me. And I would stack Tim up with any of the leads of the trillionaire banks. I think he is of that caliber.**
Q. And is this true prior to December of 2019, in

Page 194

your judgment?
**A. Well, I saw him developing. Remember, we hired Tim in 2015.**
Q. Right.
**A. And he's been through a very rapid development cycle through that period of time. So not from the very beginning, but as he has continued to develop, I see him, you know, at that level that I say, you know, at the top shelf of all the trillionaire banks.**
Q. I want to direct your attention to Exhibit 14 that Mr. Saba marked. Do you see that? Directing your attention to what's numbered as page 4, it has the Bates number 212534; do you see that?
**A. Yes, sir.**
Q. Is this another presentation by Mr. Spence?
**A. Yes. This is a presentation on the Three Year Strategic Plan in February of 2020.**
Q. Would you read the first sentence of that first paragraph on 212534, please?
**A. "Next, Mr. Spence discussed the Three-Year Strategic Plan. He noted that, based on OCC requirements, the strategic plan was presented in written form as included with the materials for the meeting. He began" to review -- or "He began the review of this plan with a discussion of the strategic context,**

Page 195

**which included a discussion of the macroeconomic context, technological developments, and M&A markets."**
Q. Let me stop you there. So with respect to macroeconomic context, technological developments, M&A markets, and overall strategic plan, did Mr. Spence present to you objective facts, data, and information?
**A. Yes, sir.**
Q. Did he present to you an analysis of those facts, that data, and that information?
**A. Yes, sir.**
Q. Based on his presentation, were you able to form a business judgment as to his depth and breadth of knowledge about technological developments, M&A markets, macroeconomic context, and strategic context?
**A. Yes, sir.**
MR. SABA: Objection.
BY MR. CIOFFI:
Q. What was that judgment that you were able to form?
**A. That we felt that Mr. Spence possessed the ability to frame a vision of what, in his opinion, could happen over the next three years. It's not always perfect, but what could happen, looking at different risks, different variables for the board to, you know, be able to have a good understanding of where some of**

Page 196

**the positives could be, but where some of the pitfalls could be of the business going forward.**
Q. Did you discuss your business judgment at this point in time in February of 2020 with other members of the board?
**A. Yes, sir.**
Q. Did other members of the board share your assessment of Mr. Spence?
MR. SABA: Objection.
MR. CIOFFI: You may answer.
THE WITNESS: Yes, sir.
BY MR. CIOFFI:
Q. Also in those discussions with the other board members, did you have an opportunity to compare and contrast Mr. Spence's depth and breadth of knowledge, his strategic vision, his knowledge of technology, his knowledge of macroeconomic context, his knowledge of M&A matters, with other members of the enterprise team?
**A. Well, other members of the enterprise team did not present this data. This was under Mr. Spence's peer, you know, review, his -- I shouldn't say peer review, but his organizational review, and but, you know, what was so impressive was that he had the base knowledge, but he had the ability, as I said earlier, to explain this data, which is very, very complex, but**

Page 197

**explain how it can affect all parts of the business going forward.**
Q. In your business judgment at this point in time, did any other member of the enterprise team, including but not limited to Mr. McHugh, have that kind of ability?
MR. SABA: Objection.
THE WITNESS: No.
BY MR. CIOFFI:
Q. Based on the depth and breadth of knowledge of the industry, of technology, macroeconomic trends, of strategic vision, of leadership skills, throughout 2020, did Mr. Spence continue to be the leading candidate to be president?
MR. SABA: Objection. Go ahead, you can answer.
THE WITNESS: Yes.
BY MR. CIOFFI:
Q. Did there come a time in 2020 where the board wanted to validate its assessment or as we sometimes say in the industry, pressure test its business judgment with respect to Mr. Spence?
**A. Yes. I would call it due diligence.**
Q. Due diligence is a better term?
**A. Yes.**

Page 198

Q. And --
**A. It was clear that the board wanted to have an outside opinion, therefore due diligence on, are we missing anything?**
Q. How did the board go about securing that due diligence for that outside evaluation?
**A. I don't recall the exact dates or the timing, but sometime I believe over early summer the -- our lead director, Marsha Williams, would have been involved with the Human Capital Compensation Committee as well as the CEO, the head of HR, to hire an outside firm to provide that assessment.**
Q. I want to direct your attention to a couple of exhibits and see if that refreshes your memory as to the time frame. Will you look at Exhibit 24, please.
**A. Got it.**
Q. And then if you would, if you would look at Exhibit 21.
**A. Okay.**
Q. Based on the dates of those documents, are you able to determine approximately when the board went to an outside consultant to conduct the due diligence in the vetting of Mr. Spence?
MR. SABA: Objection. Go ahead, you can answer.

Page 199

THE WITNESS: I'm sorry, I got lost with your question and your objection.
MR. CIOFFI: That happens with objections. Could you read my question back, please?
Do you want to take a break?
THE WITNESS: I'm just going to take my jacket off.
(The record was read.)
MR. SABA: Objection. Go ahead.
THE WITNESS: Yes. Again, I was close in my assessment before. It was early summer, so it looks like it started around June 8th, and then the report that came back on the profile around July 23rd. So it was over the early summer, midsummer time frame.
BY MR. CIOFFI:
Q. What did the board do in order to commence its due diligence with respect to Mr. Spence?
MR. SABA: Objection. Go ahead, you can answer.
THE WITNESS: The board did hire a firm by the name of RHR International, who is one of the top firms in the field of assessing executives and assessing their abilities and their interpersonal skills, you know, for the possible potential

Page 200

advancement within their company.
BY MR. CIOFFI:
Q. I want to direct your attention to Exhibit Number 25. Will you look at that?
**A. Got it.**
Q. Is this the first step in the due diligence process of vetting Mr. Spence?
**A. Yes, sir.**
Q. What is this document again?
**A. This document is, as stated here, the final -- what they call competency model developed for the CEO in 2015. It talks about that, but this is the final document of the profile of what working with RHR International and with the board what we believe the profile would be for our next CEO.**
Q. Directing your attention to the first sentence of this document, which is on page 1, it's 1076. Would you look at that, please?
**A. "The structure of the competency model developed for the CEO in 2015 still largely stands as very accurate today."**
Q. What's your interpretation of that sentence?
MR. SABA: Objection. Go ahead, you can answer.
THE WITNESS: The board is doing a very good

Page 201

job. In 2015 we had an assessment of what we felt the requirements of the CEO should be and they still stand pretty firm today that those are still in place or still are required.
BY MR. CIOFFI:
Q. So it talks about the model developed for the CEO in 2015. Was that the decision by the board to hire Mr. Carmichael?
MR. SABA: Objection. Go ahead, you can answer.
THE WITNESS: I'm not exactly sure the date we hired Mr. Carmichael, but that's pretty close. And I know that the model we have today pretty much mirrors the same as Mr. Carmichael.
BY MR. CIOFFI:
Q. Does it also mirror the CEO profile for almost all corporations?
MR. SABA: Objection. Go ahead, you can answer.
THE WITNESS: I mean, almost all corporations today go through this similar exercise of a profile, and it depends whether you're in pharmaceuticals or energy or banking, it depends on what type of business you're in, but we all have a profile and we all try to come to a consensus on

Page 202

what type of leader is it that we want going forward.
BY MR. CIOFFI:
Q. This document -- and Mr. Saba took you through it -- on 1076 talks about Essential Leadership Behaviors; do you see that?
**A. Yes, sir.**
Q. One of them is under the heading of Business Management; do you see that?
**A. I do.**
Q. Establishing Strategic Direction; do you see that?
**A. Yes.**
Q. And the other subheading, Driving Execution; do you see that?
**A. Yes.**
Q. On the next page, Leadership, do you see that?
**A. Yes.**
Q. Interpersonal; do you see that characteristic?
**A. Uh-huh, yes.**
Q. Under Interpersonal, Cultivating Networks; do you see that?
**A. Yes.**
Q. And then Influencing; do you see that?
**A. Yes.**

Page 203

Q. And on the last page, Personal Attributes, Navigating Complexity; do you see that?
**A. Yes.**
Q. Demonstrating Resilience; do you see that?
**A. Yes.**
Q. Based on the facts, data, information analysis that Mr. Spence presented to the board dozens of times, was the board able to form a business judgment as to whether Mr. Spence satisfied those characteristics?
MR. SABA: Objection. Go ahead and answer.
THE WITNESS: Clearly it was a consensus of the board and not over -- excuse me, not over just one meeting but several meetings, and watching Tim develop that he by far was the consensus of the board to be our next CEO.
BY MR. CIOFFI:
Q. I want to direct your attention to Exhibit 24. Do you see that? Exhibit 24.
**A. Got it.**
Q. Mr. Saba also showed you this exhibit in the first bullet. Would you read the first bullet?
**A. "Guy agrees that if Tim is 'the' successor, don't add Tayfun and Phil formerly."**
Q. And Guy is --
**A. Guy is Guy Beaudin.**

Page 204

Q. Who is that?
**A. Would have been the consultant that we hired within RHR International.**
Q. And he agrees that if Tim is the -- the successor, don't add Tayfun and Phil -- I think it's formally, but --
**A. It should be formally, yeah.**
Q. It's a typo. Did the board also agree with that statement?
MR. SABA: Objection. Go ahead, you can answer.
THE WITNESS: I don't recall the details.
BY MR. CIOFFI:
Q. Well, going back to your prior testimony, and if you look at Exhibit 9, do you see that there?
**A. Got it.**
Q. At this point in time in December of 2019, the consensus was forming, I believe you testified, that Tim was the leading candidate to be president; is that correct?
MR. SABA: Objection. Go ahead, you can answer.
THE WITNESS: That is correct.
BY MR. CIOFFI:
Q. Based on that consensus that was forming, was

Page 205

it the board's view that Tim is the leading candidate, is the only person who should be vetted?
MR. SABA: Objection. Contrary to prior testimony. Misrepresents his prior testimony. Go ahead, you can answer.
MR. CIOFFI: Read my question back, please. He's trying to disrupt your testimony. So go ahead, read my question back, please.
(The record was read.)
MR. SABA: Objection. Contrary to prior testimony, misrepresents the prior testimony and contradicts his prior testimony. You're trying to create perjury.
MR. CIOFFI: Counsel, that's totally ridiculous. State your objection, not a speaking objection.
You may answer.
THE WITNESS: Okay. It clearly was a consensus of the board that Tim was our leading candidate, but I was not the lead director. I don't know whether it was recommended or not to look at one more -- more than one. I don't recall and I don't recall that I said anything different in my earlier testimony.
MR. CIOFFI: You didn't. But go ahead, read

Page 206

the next sentence.
THE WITNESS: Am I on 24?
BY MR. CIOFFI:
Q. Yes.
**A. So schedule a 90 minute, that one?**
Q. No, the next sentence.
**A. "Although he would recommend, at a minimum, we discuss with Marsha that she/the board is okay with only having Tim assessed by Guy."**
Q. And Marsha is Marsha Williams; is that correct?
**A. Yes, sir. She was the lead director.**
Q. She was the lead director, yeah. Do you know if there was such a discussion with Marsha Williams?
**A. I don't know.**
Q. Would it surprise you to know that there was such a discussion?
MR. SABA: Objection. Misrepresentation. Trying to provide his own testimony. But there's no evidence in the record --
MR. CIOFFI: What are you talking about?
MR. SABA: You're trying to create testimony in evidence that is not in the record.
MR. CIOFFI: That's ridiculous. It's all in the record. It's right. Read my question back,

Page 207

please.
(The record was read.)
MR. SABA: There's no indication in this record or this document that there was such a discussion.
MR. CIOFFI: The question stands.
THE WITNESS: It would not surprise me, but as I said, I was not the lead director.
BY MR. CIOFFI:
Q. Marsha Williams was the lead director, correct?
**A. Yes, sir.**
Q. Sir, I want to direct your attention to what Mr. Saba marked as Exhibit 22. Will you look at that, please?
**A. Got it.**
Q. What is that document again, please, for the record?
**A. This is a board summary for Fifth Third Bank presented by RHR International of an assessment of Tim Spence.**
Q. Is this part of the due diligence you were testifying about earlier?
**A. Yes, sir.**
Q. And this was an independent assessment of

Page 208

Mr. Spence by RHR; is that correct?
**A. Yes, sir.**
Q. Would you read the executive summary on the first page, please? Read it into the record.
**A. "Tim Spence demonstrates a strong fit to the leadership characteristics desired in a chief executive officer at Fifth Third Bank."**
Q. A little bit slower because she needs to take it down.
**A. I'm sorry.**
Q. Keep going.
**A. "He is a creative, forward-thinking strategic thinker who balances objective data with his subjective experience to derive innovative solutions to business challenges. He demonstrates exceptional abilities in dealing with complexity and ambiguity and a capacity to exercise the business levers most material to having an impact on the bottom line. He is a thoughtful and thorough decision maker who is disciplined and structured in his approach to work. He holds himself to high standards of performance but also knows when good enough is good enough.**
**"A values-based leader, he cares deeply about organizational culture and the well-being of its employees. He is admired for his ability to adjust his**

Page 209

**leadership approach based on what is required by the individual and the circumstance at hand. He is a compelling speaker who projects a passionate message to his audience. His diplomatic manner allows him to challenge the ideas of others without creating defensiveness or resistance, which facilities his ability to gain buy-in to his strategies and objectives. He perseveres in the face of difficulties and has effective strategies in place to manage the stresses and strengths inherent in an executive position.**
**"As a continuous learner, Tim pushes himself to further hone his skills. He is very insightful regarding his strengths and weaknesses and remains open to feedback and ongoing development."**
Q. As part of the iterative process and the discussions within the board, did the board in the exercise of its business judgment come to the same conclusions about Tim's characteristics?
**A. Yes, sir.**
Q. In the exercise of its business judgment, did the board view any other member of the enterprise team, including but not limited to Mr. McHugh, as possessing these characteristics?
**A. Not at this level.**
MR. SABA: Objection.

Page 210

BY MR. CIOFFI:
Q. In the exercise of its business judgment, did the board come to a conclusion that Mr. McHugh did not possess these characteristics?
MR. SABA: Objection. Go ahead, you can answer.
THE WITNESS: He did not possess them at the same level.
BY MR. CIOFFI:
Q. In coming to that conclusion, did the board decide to name Tim the president of Fifth Third Bank?
**A. Yes, sir.**
Q. In doing so, did the board in any way consider age as the factor in that determination?
MR. SABA: Objection. Go ahead, you can answer.
THE WITNESS: No, sir.
BY MR. CIOFFI:
Q. Did you or any member of the board discriminate against Mr. McHugh on account of his age?
MR. SABA: Objection. Go ahead, you can answer.
THE WITNESS: Absolutely not.
BY MR. CIOFFI:
Q. Was the decision to name Tim Spence the

Page 211

president of Fifth Third Bank based on the qualifications that you described in your testimony this afternoon?
MR. SABA: Objection. Go ahead, you can answer.
THE WITNESS: The consensus -- my judgment and the consensus of the full board was that Tim possessed superior qualities in all of the things I testified earlier today.
BY MR. CIOFFI:
Q. Did Mr. Carmichael tell the board to appoint Tim Spence as president of Fifth Third Bank?
**A. No, sir. That's the board's job.**
Q. Did the board exercise its independent judgment, its independent business judgment, in naming Tim Spence president of Fifth Third Bank?
MR. SABA: Objection as to form. Go ahead, you can answer.
THE WITNESS: Yes, sir.
BY MR. CIOFFI:
Q. Did RHR tell the board to name Tim Spence president of Fifth Third Bank?
**A. No, sir.**
Q. Did anyone tell the board to name Tim Spence the president of Fifth Third Bank?

MR. SABA: Objection.
THE WITNESS: No, sir. It was a board decision.
BY MR. CIOFFI:
Q. In making that decision, did the board exercise its sound and independent business judgment?
MR. SABA: Objection.
THE WITNESS: Yes, sir.
MR. CIOFFI: Why don't we go off the record. I think he has to change the tapes. I may or may not have more questions.
THE WITNESS: Okay.
THE VIDEOGRAPHER: The time is 5:10 p.m. We're going off the record.
(A recess was taken from 5:11 p.m. to 5:22 p.m.)
THE VIDEOGRAPHER: The time is 5:22 p.m. We're back on the record.
MR. CIOFFI: I have no further questions.
FURTHER EXAMINATION
BY MR. SABA:
Q. Mr. Heminger, during your -- the questions asked by Mr. Cioffi, you indicated that one to two times a year the board will update the files and how we see an executive. What files were you talking about?



**A. I'm talking about the executive succession plan. The same document that we reviewed.**
Q. So the board would update -- which document are you referring to specifically? Is it the document attached to Exhibit 9? Did you hear my question, Mr. Heminger?
**A. I'm looking for the document.**
Q. Okay.
**A. Just hang loose. I think this is it right here. It's this Exhibit 22, it's this type of document that we would just -- we would review this one to two times a year, just to see how the executive is doing versus the, you know, behavior ratings.**
Q. So you would review the board summary provided by RHR twice a year?
**A. Well, that's RHR. No, it is --**
Q. Sir, let me refer you to Exhibit Number 9 and see if that's the document you are referring to. Turn to the second page of it.
**A. Okay. This is what I'm looking at, was looking for. So these documents of the individuals. We would just have an update one time in this level of detail, and then another time of the year when we do compensation, how's the person doing.**
Q. So when you're referring to the files that you



were updating, you would refer to those talent profiles that we see in Exhibit Number 9; is that right?
**A. Correct.**
Q. And so when would you do the compensation review?
**A. Usually at the end of February.**
Q. All right. And when would be the second time that you would review them?
**A. This document is -- this is done usually at the December board meeting, the full talent review is done at the December board meeting.**
Q. At the December board meeting?
**A. And in February -- end of February when we do the annual compensation is when we look to see if there's any updates.**
Q. All right. And that would be done each year; is that correct?
**A. I'm sorry?**
Q. That would be done each year, each December and each February; is that correct?
**A. That's my understanding, yes.**
Q. Mr. Cioffi was asking you about the top five compensated employees?
**A. Uh-huh.**
Q. You indicated that the compensation reflects



their value to Fifth Third; do you recall that?
**A. I do.**
Q. And so based on that, Lars Anderson would have more value to Fifth Third than Mr. Spence?
MR. CIOFFI: Objection to the form. Mischaracterizes his testimony.
BY MR. SABA:
Q. Mr. Heminger?
MR. CIOFFI: No, you may answer.
THE WITNESS: Mr. Anderson was hired long before Mr. Spence, and he was brought in at a higher value, as you'll -- as I stated in my testimony, we had discussions with the board and Mr. Anderson is no longer in that position.
BY MR. SABA:
Q. But at that point in time, he would have reflected more value to the company than Mr. Spence?
MR. CIOFFI: Objection to the form. What is that point? What you referred to, "that"?
BY MR. SABA:
Q. So let's go back to 2019 and 2020, where Mr. Anderson's compensation exceeded that of Mr. Spence's. He would have reflected more value to Fifth Third than Mr. Spence, correct?
MR. CIOFFI: Objection, misstates his

Page 216

testimony, mischaracterizes the facts. He has answered the question as to why.
BY MR. SABA:
Q. Go ahead, Mr. Heminger.
**A. We had hired Mr. Anderson earlier than Mr. Spence, and he had many more years of experience, and so I wouldn't say that it prescribed more value, it's just where he was in his career.**
Q. So the amount of salary an employee is receiving may not be indicative of their value to Fifth Third; is that correct?
**A. That's correct.**
Q. Since you had Exhibit 9 open, let me go back to that for a second. And if you could go back to Fifth Third McHugh 001135?
**A. Got it.**
Q. Are you on that page?
**A. Yes, sir.**
Q. And that's Mr. Spence's talent profile; is that correct?
**A. Yes, sir.**
Q. And if I -- Mr. Cioffi was pointing out the potential next positions and focusing on that it says president, one to two years and CEO three-plus years; is that correct?

Page 217

**A. That's correct.**
Q. Who put that information in there?
**A. That would have been determined by the head of HR, the head of the talent and compensation committee, at the time would have been Mr. McCallister. Marsha Williams, lead independent director, and then Greg Carmichael, CEO, is how they would have presented this. But then the board has a very rigorous -- the board doesn't -- we don't rubber stamp anything. We would have a very rigorous discussion on whether or not we agree with that.**
Q. And with respect to that information being in there, do you know if that was first put in there by Mr. Shaffer and Mr. Carmichael?
**A. I don't.**
MR. CIOFFI: Objection. He answered the question. You're arguing with him. You want your answer. He answered the question.
MR. SABA: No.
MR. CIOFFI: Marsha Williams --
MR. SABA: I didn't finish my --
MR. CIOFFI: Mike McCallister, Greg Carmichael, head of HR.
MR. SABA: It's nice that you have your answer, Mike.

Page 218

MR. CIOFFI: That's what he said.
MR. SABA: Mike, let me finish my question. I know you want to coach your witness. I know you want to try and create an answer that's not there. Let me finish my question.
MR. CIOFFI: I can't coach him on what he's already said.
BY MR. SABA:
Q. Do you know whether or not that information was put into this talent deck for Mr. Spence by Mr. Shaffer and Mr. Carmichael before it was ever seen by Mr. McCallister?
**A. I do not.**
Q. What about Ms. Williams before she ever saw it, do you know if that's the case?
**A. I do not.**
Q. You indicated that when you first joined Fifth Third they were only doing auto loans. When did Fifth Third switch out of just doing auto loans?
**A. That's not what I said. I said when I first joined Fifth Third, one of the biggest businesses was auto loans and we needed to learn how to do something other than just auto loans.**
Q. Was auto loans Fifth Third's largest portion of their business when you joined?

Page 219

**A. No.**
Q. What was the largest portion of their business?
**A. Probably mortgage. Probably commercial banking. But auto loans was a big piece of it.**
Q. And what line of loans has Mr. Spence added since that time?
**A. I don't know.**
Q. Has he added any?
**A. Any --**
Q. Any lines of loans that the bank engages in that they didn't engage in before he came?
**A. Oh, yes. We've gone to several things. We have this company called Dividend and this company called Provide, which does solo work, ESG-type work. A number of Fintech type of, you know, technologies on being able to provide financial services.**
Q. And which of those are added by Mr. Spence and which were added by other executives?
**A. I just stated those are the ones that Tim provided.**
Q. And are those -- do those provide a new line of loans for the bank?
**A. Yes, sir.**
Q. What type of loans do those provide?

Page 220

**A. Consumer and commercial lending.**
Q. And what year was that added?
**A. Over the last three or four years we've been adding these companies or these parts of business.**
Q. If I can refer you back to Exhibit 10.
**A. Got it.**
Q. If you can go to page 2 again, McHugh 007109. Do you see that there?
**A. Yes.**
Q. Mr. Cioffi had you focus on the first sentence on the bottom, below Market Context; do you see that?
**A. Yes.**
Q. And it refers to again, "Mr. Spence provided an overview of the strategy plan review as included in the materials for the meeting."
Who prepared the strategy plan review?
**A. With me?**
Q. No. As referenced here on Exhibit Number 10, Fifth Third McHugh 007109. It references the strategy plan review as included in the materials. Do you know who included -- excuse me, who prepared the strategy plan review?
**A. No. It would have been a large team under the direction of Mr. Spence, but number of members that will provide economic data, credit data, market data, but it**

Page 221

**would be a big team.**
Q. There's a number of members of the enterprise team that are involved in preparing that information; is that right?
MR. CIOFFI: Objection. Counsel, you're testifying.
MR. SABA: It's a question.
MR. CIOFFI: If you want to file a question.
BY MR. SABA:
Q. There are a number of members of the enterprise team that are involved in that, correct?
**A. I would assume so.**
Q. Yes. If you could refer to Exhibit 14, please.
**A. Got it.**
Q. And if you could turn to the second page of Exhibit 14, Fifth Third McHugh 212534. Do you have that page?
**A. Got it.**
Q. All right. And Mr. Cioffi was focused on beginning with the first sentence at the top there, "Next, Mr. Spence discussed the Three-Year Strategic Plan."
Do you see that?
**A. Yes.**

Page 222

Q. Who prepared the three-year strategic plan?
**A. I don't know, but several people.**
Q. Do you know who any of the specific people were?
**A. Well, all of the enterprise -- not all the enterprise leaders. HR wouldn't have been involved. Well, they could be involved on the labor side. General counsel would not be involved, but generally members of the commercial banking, consumer banking, economics, CFO, a number of people, all bring it together and then Mr. Spence presented it.**
Q. He's presenting information that other people prepared, correct?
MR. CIOFFI: Objection. Misstates the testimony.
THE WITNESS: No, I disagree with that. Other people presented objective data, as you like to call it, but it takes a certain skill to be able to bring it all together and to explain it and articulate it at a board level.
BY MR. SABA:
Q. And that's what he's explaining? He's explaining what other people brought together in the three-year strategic plan, correct?
MR. CIOFFI: Objection. That's not what he

Page 223

testified to. The record will speak for itself. You're trying to put words in his mouth.
MR. SABA: That's not the case.
MR. CIOFFI: It is the case.
MR. SABA: Go ahead.
THE WITNESS: That's the way it's done in every business I've ever been involved with. One person doesn't do it all.
BY MR. SABA:
Q. Have you ever reviewed the revenue generated by Mr. Spence's digital initiatives?
**A. Parts of it. I don't recall it in total, but yes, parts of it.**
Q. And what's your understanding of what the revenue has been that's been generated by Mr. Spence's digital initiatives?
**A. Off the top of my head, I don't know.**
Q. Referring you back to Exhibit Number 22.
**A. Got it.**
Q. The board summary. And you read the executive summary into the record, correct?
**A. Yes.**
Q. Do you know whether or not Mr. Carmichael and Mr. Shaffer were involved in reviewing and/or otherwise editing Exhibit Number 22?

Page 224

**A. I am not aware.**
Q. You indicated and Mr. Cioffi asked you several times over and over again whether or not within his presentations Mr. Spence references data or numbers. Do you ever go through the process of verifying the numbers or the data represented by Mr. Spence?
**A. I do. As a board member, I take great pride in the homework that I do and understanding the data that makes up the material that's presented.**
Q. And what specifically did you do to verify the data and the numbers presented by Mr. Spence in any of his reports?
**A. Well, first of all, you have to have the business acumen to understand the data to begin with, which I do. But a case in point, I recall from a macroeconomic standpoint some data was being presented on inflation, and you might understand that we've had a very difficult inflationary period. And one of Tim's thoughts and advice was be careful, this is not temporary inflation. In fact, this inflation can be prolonged. So that's one of the things that really stuck with me in understanding that, you know, things aren't all going to be simple going forward over the last three to four years.**
Q. When did he say that?

Page 225

**A. This would have been during one of the strategic planning reviews, probably in the 2020 -- it was probably in the 2020, early 2021 time frame.**
Q. And what did you do to go verify that information?
**A. I --**
MR. CIOFFI: Objection. He answered that already, but go ahead.
THE WITNESS: Yeah, I'm -- sorry. There. I'm -- as I said earlier, I was of the opinion that inflationary trends were going to be much more difficult from my background and my understanding of energy policy, fiscal policy, other inflationary tendencies. So from all the data that I have observed and I understood from doing a lot of economic work myself, I was of the same ilk that inflationary period was going to be much more difficult than quote to the experts were saying outside of the bank.
BY MR. SABA:
Q. Did you do anything outside that particular board meeting to go verify his data?
**A. I didn't need to. I already had a pretty good understanding of it.**
Q. So you agreed with what he was saying,

Page 226

essentially?
**A. I agree with what Tim was saying, yes.**
MR. SABA: We can go off the record just for one minute. I'll be right back.
THE VIDEOGRAPHER: The time is 5:42 p.m. We're going off the record.
(A recess was taken from 5:43 p.m. to 5:44 p.m.)
THE VIDEOGRAPHER: The time is 5:43 p.m. We are back on the record.
MR. SABA: That's all the questions I have at this time. As I indicated before, we are continuing this in progress.
MR. CIOFFI: We recognize that you've attempted to reserve a right to continue in progress. We dispute that you have such a right. So at this point in time the witness will read and sign the deposition.
THE VIDEOGRAPHER: The time is 5:44 p.m. We're going off the record.

______________________________
GARY R. HEMINGER

______________________________
DATE

\- - -

DEPOSITION CONCLUDED AT 5:44 p.m.

\- - -

C E R T I F I C A T E

STATE OF OHIO :
: SS
COUNTY OF HAMILTON :

I, Wendy L. Raymer, RPR, CRR, the undersigned, a duly qualified and commissioned notary public within and for the State of Ohio, do hereby certify that before the giving of his aforesaid deposition, GARY R. HEMINGER was by me first duly sworn to depose the truth, the whole truth and nothing but the truth; that the foregoing is the deposition given at said time and place by GARY R. HEMINGER; that said deposition was taken in all respects pursuant to stipulation of counsel; that I am neither a relative of nor employee of any of the parties or their counsel, and have no interest whatever in the result of the action; that I am not, nor is the court reporting firm with which I am affiliated, under a contract as defined in Civil Rule 28 (D).

IN WITNESS WHEREOF, I hereunto set my hand and official seal of office at Cincinnati, Ohio, this 9th day of January, 2023.

My Commission expires December 6, 2026

S/Wendy L. Raymer, RPR, CRR
Notary Public - State of Ohio

1 DEPOSITION ERRATA SHEET

Date Taken: December 20, 2022

Case Caption: PHILIP R. MCHUGH vs. FIFTH THIRD BANCORP, et al.

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the ______ day of ____________, 20___.

___________________________________

GARY R. HEMINGER

2 DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
SIGNATURE:_______________________DATE:___________
GARY R. HEMINGER

3 DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

SIGNATURE:_______________________DATE:___________

GARY R. HEMINGER

**WORD INDEX**

< $ >
**$300,000** 42:17
**$40,000** 43:3

< 0 >
**000954** 132:24
**000971** 135:23
**000976** 132:24
**001013** 130:6, 10
**001019** 130:20
**001024** 130:7
**001033** 132:13
**001036** 152:1
**001040** 132:13
**001071** 129:2 130:3
**001073** 130:3
**001074** 140:8
**001079** 140:8
**001104** 66:11
**001105** 67:5 68:20
**001127** 83:15, 25 84:9 86:21 87:9
**001135** 81:21, 24 82:17, 22 83:8 216:15
**001137** 83:25 84:10 86:22 87:10
**001142** 74:7 76:5
**001154** 66:11 67:5 68:20
**007108** 85:12
**007109** 89:5, 8 110:6 220:7, 19
**007128** 85:12, 15
**010** 168:4

< 1 >
**1** 3:8 18:23, 25 19:6 20:9 21:22 25:21 26:11 27:7, 9, 15 30:11 31:2, 7, 18 46:1, 5 47:10, 22 50:19 55:9, 18, 23 56:14, 17, 22 89:13 200:17 229:1
**1:21-cv-00238** 1:9 4:8
**1:42** 105:21, 22
**10** 3:12 84:19, 23 85:11 89:5 100:10 110:4 167:22 175:3 192:21 220:5, 18
**10:35** 42:8
**10:36** 42:10
**1076** 200:17 202:5
**11** 3:12 9:21 111:8, 12, 21, 25 112:5
**11:01** 42:11, 12
**1105** 68:23
**111** 3:12
**1112** 74:8
**112** 3:14
**1135** 191:14
**1137** 83:15
**114** 3:14
**1142** 74:9
**115** 3:15
**116** 3:15
**119** 3:16
**12** 3:14 14:3 74:8 112:15, 19 113:4, 7, 13, 19
**12:18** 82:25 83:2
**12:19** 83:3, 4
**12:55** 105:18
**12:56** 105:20
**120** 3:16
**121** 3:17
**123** 3:17
**125** 3:18
**128** 3:19
**13** 3:14 50:7 114:11, 15 115:2, 6
**132** 3:19, 20
**138** 3:20
**14** 3:15 115:12, 16 116:1, 5, 10, 25 117:3 118:6, 12, 19 119:1, 11, 16, 19 120:4 194:10 221:13, 17
**140** 3:21
**15** 3:15 49:16 50:4 116:21 117:4, 5, 7, 10 118:9, 18, 24
**156** 3:21
**157** 3:22
**159** 3:22
**16** 3:16 57:6, 14, 20, 23 58:4, 13 62:16 63:6, 10, 20, 24 64:10 65:11, 16, 24 89:13 100:9 119:4, 8, 12, 22 120:13, 22 121:7, 14, 19 122:5 123:3, 10
**161** 3:4
**16th** 58:18
**17** 3:16 66:9 69:5 85:1 110:24 112:22 113:15, 21 114:18 115:9 120:6, 10, 14 121:13, 18 122:23 168:2 176:9 179:7 191:11
**1700** 2:12
**17th** 67:22 86:4 87:24 113:10
**18** 3:17 59:6 60:3, 7, 12, 21 61:5, 16, 22 62:1, 6 121:22 122:1, 10 123:2, 8 126:6
**19** 3:17 53:13 123:13, 17 124:2, 17
**19th** 87:24
**1st** 17:21 21:3, 11 23:3, 10, 12, 17, 21 24:3, 5, 22 25:1, 5, 14, 25 26:4 28:25 29:5 40:17

< 2 >
**2** 3:8 51:24 52:3, 24 53:3, 22 54:13 168:3 220:7 230:1
**2:45** 135:11
**2:46** 135:12
**2:57** 135:14
**2:58** 135:13
**20** 1:14 3:18 6:7 7:3 125:1, 5, 22, 25 131:15, 19 133:16, 17, 18 134:7, 21 229:2, 17
**2006** 11:17 31:25 97:14
**201** 2:12
**2015** 40:6, 17 163:25 194:3 200:12, 20 201:1, 7
**2016** 180:1
**2019** 46:8, 21 47:7, 13 48:2, 15, 21 49:14 50:10, 20, 25 52:6 53:6, 19, 23 54:12 55:8, 11 57:6, 14, 20, 23 58:4, 13, 19 59:6 60:3, 8, 12, 21 61:5, 16, 22 62:1, 6, 16 63:6, 10, 20, 25 64:10 65:11, 16, 24 66:9 69:5 73:24 77:2 78:6 85:1 86:4 87:25 110:24 112:22 113:10, 15, 21 114:18 115:9 168:2 171:15 176:9 177:20 179:7 190:5 191:11 193:25 204:17 215:21
**2020** 9:16 17:21 18:23, 25 19:6 20:9 21:3, 11, 22 23:4, 10, 12, 17, 21 24:3, 5, 22 25:1, 5, 14, 21, 25 26:4, 11 27:7, 9, 15 28:25 29:5 30:11 31:2, 8, 18 77:2 111:15 112:3, 7, 13 116:12, 18 117:3 118:1, 6, 12, 19 119:1, 11, 16, 19 120:4, 13, 22 121:7, 14, 19 122:5 123:3, 10, 20 124:8, 20 125:9 126:6, 7, 8 127:19 129:8 132:22 133:3, 8, 14, 25 134:5 138:17 139:13 140:13 141:9, 24 143:8 145:1, 25 147:8 148:20 149:8 150:3, 6, 17, 21 151:5, 16 152:6 156:4, 13 157:7, 18 188:2 194:17 196:4 197:12, 19 215:21 225:2, 3
**2021** 225:3

**2022** 1:14 4:2 115:19 229:2
**2023** 228:20
**2026** 228:25
**20th** 4:1
**21** 3:19 53:11 123:20 124:8, 20 125:8 126:7, 8 128:16, 20 129:1 131:1 140:7 198:18
**212** 3:5
**212471** 46:12 49:25
**212472** 50:4
**212474** 46:15
**212475** 52:25 53:10
**212476** 53:11
**212479** 52:25
**212480** 57:10
**212481** 57:11
**212487** 59:8, 16
**212489** 59:9, 17
**212490** 60:23
**212501** 60:24
**212502** 62:24
**212506** 62:24
**212507** 64:12
**212512** 64:12
**212513** 113:5
**212516** 113:5
**212517** 115:3
**212522** 115:3
**212523** 111:22
**212532** 111:23
**212533** 116:2
**212534** 194:13, 19 221:17
**212538** 116:2
**212539** 117:11
**212543** 117:11
**212544** 119:13
**212546** 119:13
**212549** 122:11
**212556** 122:11, 14
**212557** 124:3
**212560** 124:3
**212561** 125:22
**212562** 134:22
**212565** 125:23
**212566** 156:15
**212569** 156:15
**212771** 55:13
**212774** 55:15
**212871** 158:13
**212872** 158:13
**21st** 133:3, 8, 14, 25 134:5 156:4
**22** 3:19 132:1, 4, 7, 8, 10 133:6, 12, 21, 22 149:8 151:24 156:13 207:14 213:10 223:18, 25
**22nd** 140:13 141:9, 24 143:8 145:1, 25 147:8 148:19 150:3, 17 151:5, 16 152:6 157:7
**23** 3:20 129:8 132:1, 3, 8, 16, 18, 23 133:6, 12 134:2 135:22
**23rd** 199:14
**24** 3:20 138:11, 15 198:15 203:17, 18 206:2
**25** 3:21 6:7 111:15 112:3, 7, 13 115:19 116:12, 18 140:1, 5 200:4
**26** 3:21 46:24 47:7, 13 48:2, 15, 21 49:14 50:10, 20, 25 51:22 52:6 53:6, 19, 23 54:12 55:8, 11 156:6, 10, 14, 24 157:4, 18
**2623** 2:6
**26th** 46:21
**27** 3:22 91:5 157:10, 14 158:9, 12
**28** 3:22 46:8, 23 120:17 159:6, 10, 13, 21, 24 228:17

< 3 >
**3** 3:9 55:1, 5, 12, 24 56:14, 16 231:1
**3:38** 160:4, 6
**3:48** 160:7, 8
**3:49** 160:22, 24
**312** 6:4
**31st** 132:21
**35** 43:2
**35,000** 43:2
**362-8700** 2:13
**37** 91:5

< 4 >
**4** 3:9 56:24 57:3, 17, 22 58:3 152:2, 7 181:12 194:12
**4:02** 160:25 161:1
**45** 67:9
**45202** 1:20 2:13
**45208** 2:6
**46** 3:8

< 5 >
**5** 3:4, 10 58:22 59:3, 7, 15, 25 60:6 152:2 187:23
**5:10** 212:13
**5:11** 212:15
**5:22** 212:16, 17
**5:42** 226:5
**5:43** 226:7, 9
**5:44** 226:8, 19 227:9
**50** 68:13
**51** 3:8
**511** 1:20
**513** 2:7, 13
**52** 3:8
**533-2701** 2:7
**55** 3:9
**56** 3:9
**57** 3:9
**58** 3:10
**59** 3:10

< 6 >
**6** 3:10 60:14, 18, 22 61:13, 25 228:25
**60** 3:10
**62** 3:11
**64** 3:11
**66** 3:12

< 7 >
**7** 3:11 62:9, 13, 23 63:2, 8, 17, 23
**7109** 168:4
**7110** 175:4, 6, 7
**7111** 181:13

< 8 >
**8** 3:11 64:3, 7, 11 65:8, 14, 21 100:10 138:17 139:13
**84** 3:12
**8th** 199:12

< 9 >
**9** 3:12 66:1, 5, 10 67:4 68:14 73:13, 16, 25 74:3 86:21 87:9, 13 88:10 89:1 190:25 204:15 213:5, 17 214:2 216:13
**9/10/53** 6:11
**9:39** 1:14 4:2
**90** 206:5
**9th** 228:19

< A >
**a.m** 1:14 4:2 42:8, 10, 11
**abilities** 97:19 106:1 180:20 199:24 208:15
**ability** 79:20 95:15 101:10 104:22 108:15, 18 141:16 146:13 151:6, 17 169:10 180:24 182:13 183:4 185:9 188:24 195:21 196:24 197:6 208:25 209:7
**able** 14:18 47:10, 24 50:10, 25 53:4, 17, 22 54:9, 11, 21 57:17, 22 58:3 59:25 60:6 61:13, 25 62:5 63:2, 8 65:8, 14, 21 66:5 69:9 75:9 76:16 78:19 80:10 81:11, 13 84:5 93:12 97:15 106:5, 15 109:20 111:25 112:5 113:7, 13, 19 115:6 116:10,

16 118:9, 18, 24 119:16, 22 120:2, 14 121:13 123:2, 8 124:6, 17 131:13 133:4 141:4 150:11, 13 156:24 157:4 169:17 170:3, 10, 15 171:8, 19, 25 172:4 175:17 179:7 180:25 181:4, 21 182:8 183:17, 23 185:17 187:6 188:9 189:3 192:6 195:11, 18, 25 198:21 203:8 219:17 222:18
**Absolutely** 72:23 154:17, 21 175:21 192:15 210:23
**accept** 104:12
**account** 210:20
**accountable** 136:4
**accounting** 9:10
**accurate** 114:4 167:6 192:12 200:21 229:10
**achieve** 186:19
**achievements** 86:10 88:5
**achieving** 182:24
**acquisitions** 95:16 145:4, 16 146:3 147:11 148:14 178:8, 15
**action** 228:15
**activism** 79:3 106:16
**activities** 137:13
**actual** 28:13 35:7 144:8 150:17 151:15
**acumen** 142:15 189:2, 25 192:19 224:14
**add** 138:25 203:23 204:5
**added** 219:6, 9, 18, 19 220:2
**adding** 220:4
**addition** 188:4
**additional** 42:19, 24 51:12 56:19 87:1, 13 160:16 186:24
**Additionally** 5:23
**address** 6:3
**adjust** 208:25
**admired** 208:25
**adopt** 137:24
**advance** 39:3, 7 41:14
**advancement** 200:1
**advice** 13:23 224:19
**advise** 15:24
**affect** 197:1
**affiliated** 228:16
**aforesaid** 228:7
**afternoon** 211:3
**age** 4:25 80:9 210:14, 20
**agencies** 10:12 17:5
**agency** 10:19
**agenda** 41:23, 24 42:1 70:2
**agendas** 39:9
**ago** 7:3 99:2
**agree** 45:4, 10 47:5 49:10, 18 51:17 55:17, 23 57:9 59:7, 13, 15 60:22 62:23 66:10 111:21 134:18 136:7, 11, 18 187:14 204:8 217:11 226:2
**agreed** 8:23 187:18 225:25
**agreeing** 160:19
**agreement** 4:19
**agrees** 138:24 203:22 204:4
**ahead** 5:5 47:16, 17 48:9, 25 51:6 91:2 92:14 99:14 102:10 107:2 135:8, 21 138:7 143:11 146:15 147:15 151:1 154:20 162:9, 16 163:11 165:21 167:8, 13 169:1, 21 170:19 171:11, 22 173:3, 17 174:8, 20 175:22 176:22 178:1, 18 179:10, 18 180:10 183:25 184:8 186:9 187:15, 16 190:17, 25 191:2 193:2, 8 197:15 198:24 199:9, 19 200:23 201:9, 18 203:10 204:10, 21 205:5, 8, 25 210:5, 15, 21 211:4, 17 216:4 223:5 225:8
**aids** 92:20
**al** 1:10 4:7 229:4
**Allow** 146:11, 14 185:10
**allowance** 179:2
**allowances** 15:16
**allows** 209:4
**alternatives** 131:9
**ambiguity** 208:16
**amount** 193:20 216:9
**analysis** 10:13 19:24 24:6, 23 109:19 170:16 176:15 178:22 183:15 184:19, 22 187:5 195:8 203:6
**analytical** 180:19
**analytics** 169:15 172:1 180:23
**analyze** 10:24 176:14 183:12 185:1 187:2 188:21, 25
**and/or** 17:10, 13 20:4, 11 21:6, 10, 24 23:1 25:7 27:17 28:7, 19 29:9, 22 31:11, 22 32:10 34:8 43:5 45:23 71:20 72:1 74:3 75:5 111:2 113:21 130:25 139:19, 24 223:24 229:11
**Anderson** 36:3 54:3 60:9 63:13 89:11 113:16 215:3, 10, 14 216:5
**Anderson's** 215:22
**announcement** 159:14, 17, 19, 20, 23
**annual** 214:14
**answer** 5:20, 24 7:14, 18 8:11, 13, 25 16:15 28:1 35:24 36:14 38:6, 13 39:22 47:17 48:9 49:7 51:6 54:16 59:12 64:17, 21 71:7 77:19 88:16 90:24, 25 91:3, 17 92:4 93:24 94:16 98:25 99:10 102:11 103:2, 11 104:9 106:3 122:21 137:24 140:25 144:17 146:15, 19 147:15, 16, 20 148:5, 6, 23 152:11, 12, 21 154:20 162:10, 12, 16 163:12 165:22, 23 167:9, 10, 13 169:2, 22 170:19, 21 171:12, 23 173:4, 5, 18 174:9, 10, 21, 22 175:23 176:23 178:19 179:11 180:11 184:1 186:6 190:18 193:3, 9 196:10 197:16 198:25 199:20 200:24 201:10, 19 203:10 204:11, 22 205:5, 17 210:6, 16, 22 211:5, 18 215:9 217:18, 25 218:4
**answered** 8:11 16:14 22:1, 4 29:24 36:13 37:25 38:5 40:11, 20 41:1 54:15, 17, 18 79:10 90:21, 22 92:2 93:22 94:12 99:13, 15, 16 103:8 107:1 141:15 144:5, 16 145:18, 20 146:12 147:14, 16 149:5, 25 151:21 216:2 217:16, 18 225:7
**answering** 146:14, 18
**answers** 5:25 99:10 162:4
**Anybody** 37:3 72:19 128:9 155:2 174:3
**anymore** 75:3
**anyway** 191:8
**apart** 12:19 22:11

**apologize** 92:21 127:3
**apparent** 34:10
**appear** 47:6 49:14 50:6 53:13 68:7 86:15 126:1 130:21
**APPEARANCES** 2:1
**appearing** 178:12
**appears** 53:15 54:18 116:15 130:19 133:19 191:5
**appoint** 89:14, 15 157:21 211:11
**appointed** 76:21
**Appointing** 157:17
**appointment** 158:18
**appreciate** 99:8
**approach** 208:20 209:1
**approval** 168:8, 11
**approve** 65:3
**approved** 56:7, 11 64:15 127:20
**Approximately** 6:17 12:10 15:9 40:8 42:17 163:9, 14, 25 166:18 198:21
**April** 57:6, 14, 20, 23 58:4, 13, 18 117:3 118:6, 12, 19 119:1, 11, 16, 19 120:4
**area** 110:16
**areas** 72:5 98:2, 7, 9, 17, 19 99:20 100:2, 14 101:4, 5, 16, 19 102:3, 4, 17, 20, 22 109:10, 14, 22, 23, 24 138:9 170:16 185:17 188:2
**arguably** 51:19
**arguing** 93:23 137:23 142:25 217:17
**Argumentative** 38:6 41:2 54:24 90:22 91:16 93:21 94:10 143:10 145:19 146:11 147:14 151:21 152:20 153:8
**array** 109:2 179:3
**articulate** 106:16 150:11, 12 172:4 181:4 182:14 222:20
**articulated** 177:23 182:23 183:22 188:5, 15
**ascend** 92:7, 8 93:1
**ascertain** 112:11 185:7
**asked** 7:19 16:14 23:23 29:24 36:13 37:25 38:5 40:11 41:1 71:12 73:18 90:21 92:2, 3 99:13 103:8 105:25 107:1 131:20 144:16 145:18, 22 149:5, 25 150:22 151:21 191:14 212:23 224:2
**asking** 5:11 30:24 31:13 33:13 49:18 51:4 88:2 92:16 103:12 124:10, 12 135:19 140:20 142:6, 9, 12, 20 143:1, 3, 4 144:20 152:10 160:15 214:22
**aspect** 168:23 178:13 179:6
**aspire** 84:5
**assembled** 72:7
**assembles** 64:25
**assess** 10:25 11:3 127:21 131:22 134:14 176:19, 24 188:24 193:14
**assessed** 128:6, 13 139:3, 5, 10, 19, 23 162:4 163:24 181:3 189:24 206:9
**assessing** 161:19 162:24, 25 164:2 199:23, 24
**assessment** 10:13, 19 127:9, 15 128:9 131:21, 22 132:18 133:2, 5, 10 135:1, 6 145:9, 11 147:18 152:3, 8 161:20 165:24 177:12 181:10 189:13 196:8 197:20 198:12 199:11 201:1 207:20, 25
**assets** 179:25
**assimilate** 136:16
**assistant** 85:16
**associated** 15:15
**Association** 11:21 12:6 115:18 116:13, 19 119:10, 16 122:3 123:4, 11 125:7, 11 156:11
**assume** 68:12 221:12
**Assumes** 54:25 152:20 153:7
**assuming** 163:13
**Attached** 67:1 68:20 130:5 131:1 213:5
**attachment** 129:11
**attempt** 99:9
**attempted** 226:15
**attempting** 160:18
**attend** 58:7
**attendance** 61:8 85:5 111:16 112:23 114:24
**attended** 117:14 121:8 156:18
**attention** 48:4 167:21 168:3 169:15 174:5 190:24 191:12, 16 194:10, 12 198:13 200:3, 16 203:17 207:13
**attract** 149:11, 22
**attractive** 183:2 186:15, 18
**attribute** 136:13
**attributes** 72:6 80:13 109:3 128:2 131:11 134:14 149:17 183:19 203:1
**audience** 209:4
**audit** 39:5 166:23
**August** 126:6
**authority** 89:10
**auto** 177:2 218:18, 19, 22, 23, 24 219:5
**autos** 177:3, 5
**Avenue** 2:6
**average** 163:14
**avoid** 135:25 136:14
**aware** 11:23 37:4 88:20 99:19 128:12 224:1

**< B >**
**bachelor's** 9:10
**back** 20:14 24:11 29:1 31:14 39:19 42:13 43:25 54:8 61:2 68:14, 16 75:2 83:5, 17 84:8 87:22 91:23 93:25 99:10 101:15 102:7 105:5, 23 107:12, 13 110:4 130:24 131:15 133:15, 23 134:7 135:15 153:11 155:8 160:9 161:2 172:16 179:20, 21 192:21 199:4, 13 204:14 205:6, 8 206:25 212:18 215:21 216:13, 14 220:5 223:18 226:4, 10
**background** 78:17 84:3, 13 95:5, 8 176:3 189:5 225:12
**balance** 150:12 179:1
**balanced** 145:3, 15 146:2 147:10 148:13
**balances** 208:13
**BANCORP** 1:10 2:17 4:7 11:21, 23 12:4 46:7 47:8 49:14 50:21, 24 52:9, 13 55:7, 10 56:3 57:5, 13, 24 59:5 60:4, 8, 12 61:5 62:15 63:11, 21 64:1 85:2 111:14 112:21 113:11, 15, 22 114:20 117:2 118:20 119:2 120:12 121:15, 20 122:7 123:19 124:9, 21 125:12 157:16, 22 158:1 159:16 229:4

**Bank** 4:21, 23 11:12, 16, 19 12:6, 8 13:24 14:5, 20 15:17, 23 19:18, 25 20:4, 12 21:6, 10, 25 22:22 23:1 24:7 25:8 27:3, 11, 17 28:8, 12, 20 29:9, 23 31:11, 22 32:25 34:2, 8 35:20 37:13, 17 38:11, 20 52:5, 8, 13 53:6, 20, 24 54:13 58:14, 18 60:20 61:17, 23 62:2, 7 64:9 65:12, 17, 23 75:1, 6 76:15, 17 83:11 85:3 95:4 96:3 102:20 108:3 109:5, 15 114:17 115:10, 18 116:8, 13, 18 119:10, 15 122:3 123:4, 11 124:20 125:7, 11 130:13 131:14 132:20, 21 134:15 148:24 152:18 153:22 155:1, 2, 11, 13, 15, 23, 25 156:3, 11 157:2 158:6 163:25 164:25 169:20 170:5 178:2, 7, 11 179:24 180:1 182:15 183:2, 24 184:20, 23 186:15 187:8 188:13 207:19 208:7 210:11 211:1, 12, 16, 22, 25 219:11, 23 225:19
**banking** 79:2 89:17 95:5 103:4, 23, 24 106:18, 20 145:5, 9, 17 146:4 147:12 148:15 164:12, 16 172:20 175:9, 11, 20 176:20 177:1 182:22, 25 183:20, 21 188:5, 17 189:18 201:23 219:5 222:9
**banks** 104:6 175:15 176:6 178:9 193:21, 24 194:9
**base** 103:7 196:23
**Based** 47:10, 22 50:19 53:16, 22 54:13, 17 57:17, 22 58:3 59:25 60:6 61:1, 13, 25 63:2, 8 65:8, 14, 21 68:6 70:23 71:13, 20 73:15 74:1 80:12 82:12 87:8 88:2 96:12, 13 102:2 109:21 111:25 112:5 113:7, 13, 19 115:6 116:5, 10 118:9, 18, 24 119:15, 22 120:14 121:13 123:1, 2, 8 124:10, 12, 17 125:21, 25 126:20 141:19 144:6 147:16 148:9, 22 156:24 157:4 163:6 166:13 168:22 169:17 171:9 175:16 178:10 179:6 182:7 183:22 187:5 189:6 194:21 195:11 197:10 198:20 203:6 204:25 209:1 211:1 215:3
**Bashara** 65:19
**bashful** 162:3
**basis** 8:14 78:1 79:10 81:10 98:21 154:10
**Bates** 46:10 52:23 55:12, 17, 24 57:9 59:8, 16 60:22 62:24 64:11 66:11 68:19 85:11 86:21 110:5 111:22 113:4 115:2 116:1 117:10 119:12 122:10 124:2 125:22 129:2 130:2, 6, 9 132:12, 23 134:21 135:22 140:7 156:14 158:12 168:4 191:13 194:12
**Beaudin** 127:21 128:22 129:6 131:20 133:9 134:24 203:25
**becoming** 21:24 43:23 156:3 157:1 170:1
**began** 126:11 168:13 194:24
**beginning** 15:11 52:16 67:4 135:23 165:2 168:8 184:9 194:7 221:21
**behalf** 2:1, 8 4:12, 14, 16 118:21
**behavior** 213:13
**behaviors** 134:12 140:11 202:6
**believe** 11:4, 17 13:15, 18 14:3, 7 18:4 21:8 39:25 43:2 44:17 51:2, 7, 23 52:17 68:1 75:2 76:3 78:19 79:18, 19 80:6, 9 84:15 106:18 118:17 119:25 126:20 127:12 134:3 135:23 136:13, 15 141:3, 15 155:19 163:24 165:5 169:24 192:24 193:6 198:8 200:14 204:18
**believed** 128:2 174:25
**benchmark** 152:2
**best** 141:16 146:13 176:25 183:19
**better** 101:10 106:5, 13, 24 107:5, 8 109:24, 25 140:14 141:9, 25 143:6 144:3, 17 145:2, 14 146:1 147:1, 9 148:20, 24 152:7 182:16 185:8 197:24
**Beyond** 77:11 141:18 150:7, 21
**big** 96:25 219:5 221:1
**biggest** 218:21
**birth** 6:10
**bit** 172:7 208:8
**blacked** 56:17, 19
**Blank** 2:11
**board** 10:1, 4 11:9, 14, 15, 19, 20 12:3, 5, 8, 17, 19, 21, 22, 23 13:5, 6, 9, 11, 21, 22 14:2, 4, 7, 18 15:25 16:8, 9, 11, 18 17:3, 15, 18, 24, 25 18:2, 8, 11 19:19, 23 20:3, 9, 18 21:4, 11, 23 22:16 23:17, 21 24:9, 15, 16, 23 25:10 26:5, 14 27:13, 19, 22, 23 28:3, 6, 10, 15, 17, 18 29:6, 7, 16, 18, 20, 21 30:2, 9, 15, 16, 22 31:4, 8, 20, 25 34:13, 14, 16, 19 35:2, 4, 6, 7, 9, 16 36:4 37:19 38:1, 4, 23 39:2, 11, 13, 14, 20 40:10, 18, 25 41:4, 7, 11, 12, 14, 19, 23 42:2, 4, 16 43:4, 12, 24 44:9, 12, 15, 19, 22, 23 45:1, 22 46:8 47:8, 13 48:2, 15, 21 49:13 50:9, 20, 24 52:6, 12, 19 53:5, 20, 24 54:12, 22 55:8, 11 56:7, 11 57:6, 13, 23 58:14, 17 59:6, 20, 22 60:3, 8, 12, 21 61:4, 16, 22 62:2, 6, 16 63:5, 10, 20, 25 64:10 65:1, 3, 7, 12, 16, 23 66:20 67:15, 18, 23, 25 68:2 69:5, 6, 9, 12, 15, 19, 20, 21, 22, 24 70:7, 13, 20, 23, 25 71:12, 14, 18 72:2, 3, 7, 8, 9, 16, 19, 20, 24 74:14 75:20, 25 77:16 82:5 83:9 84:1, 16, 25 87:3 91:9 96:4, 9, 20 97:11, 13 100:9 102:13 104:8, 11, 19 106:15, 22 107:12 110:25 111:15 112:3, 7, 13, 22 113:10, 22 114:3, 6, 9, 18, 19 115:9, 19 116:12, 18

117:3 118:14, 20 119:1, 11 120:13, 21 121:15 122:4, 6, 16, 22 123:10, 20 124:8, 20 125:8, 10 126:3, 8, 19 127:18, 19, 20 131:8 132:10 133:25 134:5 139:2 143:13 148:23 150:9 151:11 155:4, 14, 18, 20, 22 156:4, 12 157:2, 7, 8, 17 158:20 159:4 161:6, 14 162:2, 25 163:5, 17 164:2 165:15, 19, 24 166:5, 12, 19 167:2, 7 168:2 172:5, 19, 21 173:11, 14 174:7, 24 176:9 177:1, 9, 11, 24 178:15 179:4, 13 181:8 183:8 185:24 186:2, 25 187:11, 14 189:7, 11, 20 190:7, 11 191:4, 10 192:3, 5, 25 195:24 196:5, 7, 13 197:19 198:2, 5, 21 199:17, 21 200:14, 25 201:7 203:7, 8, 12, 15 204:8 205:19 206:8 207:19 209:16, 21 210:3, 10, 13, 19 211:7, 11, 14, 21, 24 212:2, 5, 24 213:3, 14 214:10, 11, 12 215:13 217:8 222:20 223:20 224:7 225:22

**boardroom** 19:2, 4, 7 107:23, 24 154:23

**boards** 11:11, 12 76:18 97:4 139:3 161:9, 16

**board's** 14:15 41:16 190:20 205:1 211:13

**Bob** 66:22 128:22 129:5 138:17 191:5, 8

**bottom** 46:9 52:24 57:10 168:5, 7 191:13 208:18 220:11

**branching** 184:16

**breadth** 38:18 79:1, 5, 25 145:8 146:5 170:11 175:18 176:1 177:12 188:12 189:7, 17, 19, 25 192:18 193:14 195:12 196:15 197:10

**break** 35:7 105:16 160:21 199:5

**breakfast** 34:18 35:5, 9

**Brian** 2:17 4:20

**briefly** 64:14

**bring** 9:6 81:13 172:18 222:10, 19

**bringing** 164:1 177:5 185:14

**broad** 25:19, 20 87:19 171:3

**broke** 105:25 135:17

**brought** 176:2 188:12 189:15, 16 215:11 222:23

**Bruce** 1:22

**budgets** 175:14

**build** 101:11 104:23 106:5 131:13

**building** 107:17 177:20

**build-outs** 186:19

**bullet** 137:8 138:24 203:21

**business** 13:9, 24 76:12 80:1 81:9 97:3 98:13, 18 99:22 134:13 140:11 142:4, 5, 10, 11, 15, 17 143:3, 22, 25 144:6, 10, 12 146:22 151:11 161:25 163:5 165:19 166:13 169:18 170:3, 10 171:19 173:15 174:2, 7, 18 175:18 176:18, 25 177:6, 8 179:8, 12 181:4, 6, 21 182:9, 12 183:23 184:4 185:10, 23 187:6, 10, 13, 17 188:10 190:11, 19, 20 192:19 195:12 196:2, 3 197:1, 3, 21 201:24 202:8 203:8 208:14, 17 209:17, 20 210:2 211:15 212:6 218:25 219:3 220:4 223:7 224:14

**businesses** 102:1 218:21

**buy-in** 209:7

**< C >**

**caliber** 193:24

**call** 12:15 17:4, 5 32:19 46:10 126:5 144:1 191:13 197:23 200:11 222:18

**called** 41:14 130:12 164:11 219:14, 15

**calls** 26:6, 7, 10, 15, 20 163:15

**candidate** 10:25 35:13 36:18 37:22 75:5 90:11, 16 91:15 92:1, 6, 8, 11, 17, 18, 23, 25 93:1, 11, 16, 17, 19 94:5, 7, 19 95:23 139:5, 17, 23 154:23 177:19, 21, 22 184:5 190:22 192:14 197:13 204:19 205:1, 20

**candidates** 10:2, 3, 14, 20 11:2 22:18, 20, 21, 23 32:16 33:3, 6, 7, 13, 15, 22 34:5, 6 35:20, 22 36:12, 22, 25 37:6, 12, 15 47:12 48:1, 16, 22 50:12 53:18 57:19 60:2 61:15, 21 63:4, 19 65:10 67:19 78:21 83:10 89:15, 16, 18, 25 90:6, 11, 14, 19 91:25 93:3, 5, 13, 16 94:20, 24 112:2 113:9 115:8 116:7 118:11 119:18 134:15 157:7 178:25

**cap** 178:9

**capabilities** 181:23 182:9

**capacity** 172:22 208:16

**capital** 15:1, 20 16:2 66:8 68:23 69:7, 16, 25 70:8, 13, 20, 25 71:14, 21 72:21 79:3 101:9 106:4, 11, 13, 16, 17, 23 118:22 129:16, 21 166:24 198:10

**capital-type** 164:14

**Caption** 229:3

**captioned** 229:8

**Carbody** 65:19

**career** 39:24 193:19 216:8

**careful** 224:19

**cares** 208:23

**Carmichael** 14:9 18:22 19:1, 3 20:3, 11 21:5, 9, 12, 14 22:5, 10, 11 25:6, 11, 16 27:10, 16 28:6, 11, 19 29:8, 22 31:10, 21 32:5 33:2, 10 35:13, 21 37:1, 6 38:10 39:16 40:1, 6, 14, 17, 24 41:6 43:4, 22 44:2, 8, 12 45:22 47:2 54:3 57:25 58:10 59:22 60:9 61:10 62:3, 20 63:12 65:18 67:2 70:6 73:6 85:8 86:9, 16 87:14, 17 88:3, 9, 17 89:2, 20, 23 90:6 93:3 94:4 110:11 111:1, 19 112:8 113:1, 16 114:24 115:23 116:14 118:6, 21 119:25 121:10, 16 123:5, 24 125:18 126:6, 15 129:19 138:18 139:24 155:19 156:22 164:18 191:6 201:8,

12, 14 211:11 217:7, 14, 23 218:11 223:23
**Carmichael's** 33:14 39:24 160:1 161:18 163:4, 22
**CASE** 1:9 4:3, 7 6:19 34:3, 5 51:19 69:24 75:20 82:2, 9 84:1 133:19 171:2 218:15 223:3, 4 224:15 229:3
**cases** 53:25 82:11
**cash** 42:17
**catastrophic** 75:18
**category** 89:13
**Center** 1:14 2:12
**CEO** 9:18, 20 14:6, 7, 10, 12 16:6, 9, 13, 20 17:10, 13 20:4, 12 21:6, 10, 24 22:22 23:1 25:8 27:11, 17 28:7, 12, 19 29:9, 22 31:11, 22 32:10 33:11, 23 34:1, 8 35:14, 20 36:6, 18, 23 37:1, 7, 12, 16 38:11 40:6, 24 41:3 42:6 43:5, 20, 21 45:24 56:16, 18 71:20 72:1, 25 73:5, 6 74:4, 13, 14, 17, 22 75:5, 18, 19, 22 76:8, 10, 13, 20 77:7, 8, 13, 17 78:10, 15, 16, 20 79:6, 13 80:16, 23, 25 82:9, 19 90:12 91:21 92:8 94:23 96:11 97:23 99:25 100:4, 16 110:7 111:2 120:16, 17, 20 121:1 122:18 124:7, 19, 22 127:20, 25 128:4, 7, 24 129:12 130:15, 21, 25 131:4, 7, 11, 13 134:12, 15 138:19 139:24 140:6 153:24 154:8, 11, 16 155:19 157:6 165:12 170:1 177:19 184:6 191:23 192:9 198:11 200:11, 15, 20 201:2, 7, 16 203:15 216:24 217:7
**CEO/CHRO** 139:4
**CEOs** 78:18
**certain** 80:9 166:9 176:18 222:18
**Certainly** 10:18 30:11 105:12, 17 109:12 124:15 138:9 177:20 179:15 187:19
**certified** 5:1
**certify** 228:6
**CFO** 35:25 165:12 222:10
**chair** 14:25 15:10 41:24 42:22, 24 43:3 69:25
**chairman** 9:18, 19 39:14, 16 40:1, 14 41:7, 9 42:2 80:14, 18 165:12
**chairman/CEO** 70:1
**chairs** 15:5
**challenge** 209:5
**challenges** 208:15
**challenging** 151:8, 19
**chance** 164:19 172:18
**change** 106:19 136:1, 14 212:10 230:4, 7, 10, 13, 16, 19, 22 231:4, 7, 10, 13, 16, 19, 22
**changes** 89:11 91:8 103:23 131:4 178:11 229:11, 14
**characteristic** 22:9 202:19
**characteristics** 76:9, 14 78:15 80:24, 25 103:20 105:2 203:9 208:6 209:18, 23 210:4
**check** 137:16
**chief** 89:9, 16, 19, 25 95:23 126:1, 14 130:13 208:6
**Chuck** 128:23 129:6
**Cincinnati** 1:20 2:6, 13 228:19
**Cioffi** 2:8 3:4 4:16 7:13, 23 8:10, 16, 24 9:4 12:25 16:14 20:5, 13, 17, 21 21:15, 20 22:2 23:6, 23 24:8, 11, 14, 17 27:12, 18, 24 28:1, 21, 23 29:1, 24 30:7, 21 31:12, 16 33:4, 9 35:23 36:13 37:25 38:5, 12 39:21 40:11, 19 41:1 43:7 45:8, 12 47:14, 17 48:3, 7, 23 49:1, 17 50:14 51:3, 14 54:14, 24 55:20 64:16, 20 67:7 68:15 71:2, 6 73:17 77:18 80:17 83:16, 19, 22 87:16 88:15 90:21 91:3, 16 92:2, 12 93:21 94:9, 16 98:20 99:1, 5, 13, 16 102:6, 9, 11, 23 103:8, 14 105:9, 13 107:1, 11 117:20 124:10 136:22, 25 137:22 140:18 141:13 142:2, 8, 22, 25 143:9, 20 144:5, 16, 22 145:18 146:10, 14, 19 147:13, 16 148:4 149:5, 25 150:22, 25 151:20 152:9, 12, 19 153:7, 10 154:3, 18 155:3, 8 158:21 160:17 161:4 162:11 163:2, 20 165:23 166:3 167:10, 17 169:6 170:2, 9, 20 171:7, 16 172:6 173:5, 9, 23 174:10, 16, 22 175:2 176:7, 13 177:7, 16 178:21 179:17 180:18 182:6 183:11 184:3 186:6, 8 187:16, 22 190:10, 23 193:5, 12 195:17 196:10, 12 197:9, 18 199:3, 16 200:2 201:5, 15 202:3 203:16 204:13, 24 205:6, 14, 25 206:3, 21, 24 207:6, 9 210:1, 9, 18, 24 211:10, 20 212:4, 9, 19, 23 214:22 215:5, 9, 18, 25 216:22 217:16, 20, 22 218:1, 6 220:10 221:5, 8, 20 222:14, 25 223:4 224:2 225:7 226:14
**Cioffi's** 99:9 153:3
**circulated** 157:24
**circumstance** 209:2
**cite** 101:18
**cities** 168:18, 19
**Civil** 51:22 228:17
**clarification** 26:13
**clarify** 5:18 16:24 17:17 52:11 83:21 84:7, 8 117:18, 22 121:7 125:21 130:1 136:24 137:1 158:12
**clarifying** 30:1 143:2
**clarity** 24:14 30:21 31:12 39:21
**clause** 147:4
**clear** 11:18 27:20, 21 58:7 59:19 96:9 139:16 145:7 146:25 149:16 198:2
**clearer** 5:25
**clearly** 102:16 146:7 174:23 184:5 203:11 205:18
**close** 140:16 141:12 166:7 199:10 201:12
**coach** 218:3, 6
**coached** 138:10
**coalesce** 185:18
**Coincidentally** 77:1
**colleagues** 190:20
**collective** 43:10 67:18
**combination** 69:21
**combinations** 178:25
**come** 41:21 99:2, 6, 17 139:22 141:1

193:22 197:19 201:25 209:17 210:3
**comes** 87:7 176:4
**comfort** 136:3
**coming** 36:8 164:14 175:24 176:5 210:10
**command** 97:21, 24
**commence** 199:17
**Commencing** 1:14
**commentary** 178:10
**commercial** 89:17 188:2 219:4 220:1 222:9
**Commission** 228:24
**commissioned** 228:5
**committee** 14:25 15:1, 2, 3, 4, 6, 8, 12, 13, 17, 18, 21 16:2, 23, 24 17:2, 3, 5, 6, 9, 11, 14, 15, 19 19:14, 16, 17, 20 25:15, 22 31:10, 20 39:4, 5, 6, 10 41:25 42:23, 25 43:3 70:1 76:7 82:20 118:22 129:17, 22 131:2 166:23, 24 198:10 217:4
**committees** 14:22, 24 15:5 16:22 39:8 42:20 166:22 167:2
**common** 179:24 181:1
**communicate** 18:15 27:6
**communication** 24:2
**communities** 78:25
**community** 34:12
**comp** 76:7
**companies** 76:19 78:18 175:13 220:4
**Company** 6:20 7:4 9:15 11:25 14:1 15:23 32:14 72:11 74:16 75:3 96:11 100:11 101:12, 17, 23 104:16, 23 106:6 107:18 153:25 161:20 165:10 189:10 200:1 215:17 219:14
**comparable** 190:14
**comparative** 109:19 180:13
**compare** 55:9 101:24 109:17 169:12 170:15 180:16 189:21 196:14
**compared** 101:5
**compares** 166:1
**Comparing** 56:14 100:23 173:24 180:14
**comparison** 97:20 171:10 174:1
**compelling** 209:3
**compensated** 165:10 214:23
**compensation** 15:1, 20, 22, 23, 25 16:2 69:25 82:20 118:22 129:16, 22 131:2 165:16, 18 180:16 198:10 213:24 214:4, 14, 25 215:22 217:4
**compete** 176:17, 18
**competency** 124:23 200:11, 19
**competition** 101:10 106:5, 20 107:4, 7
**competitive** 104:3, 5 164:14 168:16 170:5 171:18 175:8, 19 176:1, 20 177:13
**competitors** 185:22 188:11
**complete** 53:5 58:4 80:10 114:6, 9
**completely** 100:25 101:25
**completion** 65:1
**complex** 180:25 196:25
**complexity** 151:7, 18 203:2 208:16
**compliance** 15:14 150:13
**comprehend** 169:10
**comprise** 68:14
**concepts** 93:23
**concerning** 120:20 170:12
**concerns** 110:13, 19
**conclude** 105:14, 16
**CONCLUDED** 227:9
**conclusion** 110:8, 24 210:3, 10
**conclusions** 171:8 209:18
**conduct** 198:22
**conference** 126:5
**confining** 87:16
**confused** 20:22 102:7
**conjunction** 158:7
**consensus** 87:4 96:9 104:23 105:6 174:24 177:17, 21 190:4 192:3, 5, 13 201:25 203:11, 14 204:18, 25 205:19 211:6, 7
**Consent** 157:17, 20, 23 158:8, 19, 23 159:3
**consider** 44:2 75:19 210:13
**consideration** 76:2, 4 180:1
**considered** 14:8 27:2 32:22 33:15 36:6 72:4 74:16 75:4, 8, 9, 10, 14 76:10 78:1 90:12 91:14, 21 92:1, 5 93:10 94:19, 21, 25 95:20 128:3
**constitute** 133:13
**consultancy** 95:5 164:10 176:4 188:10
**consultant** 112:9 198:22 204:2
**consultation** 82:19
**consulting** 127:8
**Consumer** 132:20 188:1 220:1 222:9
**contain** 180:8
**contained** 72:20
**contains** 140:7
**content** 72:13, 20 96:7
**Context** 168:9, 10, 14 179:4 191:2 194:25 195:2, 4, 14 196:17 220:11
**continually** 32:21 161:19
**continue** 51:11 67:19 76:14 78:22 80:6 95:10, 14 96:21 177:22 185:8 192:6 197:13 226:15
**continued** 69:10 95:11 96:22 160:12 163:22 184:7 194:7
**continues** 75:13 134:23
**continuing** 9:2 149:11, 22 226:13
**continuous** 22:17 32:17 209:11
**continuously** 35:17 36:4 189:23
**contract** 228:17
**contradicts** 205:12
**Contrary** 205:3, 10
**contrast** 196:15
**control** 76:17 79:12 81:10 104:1
**controls** 150:12
**conversation** 78:2 138:18
**conversations** 23:20 25:6 27:10, 15, 22 28:2, 5, 11, 14, 16 29:6, 11, 13, 19 30:2 31:9, 19 95:22 136:3
**Cook** 112:9
**copied** 191:8
**copy** 85:21
**corner** 46:10
**corporate** 56:13 64:23, 24
**corporation** 98:3, 7, 17 99:21 100:3, 14 101:4, 17, 19 102:3
**corporations** 201:17, 20

**correct** 10:15 11:21 14:13, 14 17:8, 11, 20 18:6 20:20 31:25 32:6, 7 35:3 39:20 40:7, 10 41:8, 9 45:7 46:15, 22, 25 47:3 50:1, 7 52:17, 21 53:1, 2, 14 55:13, 15, 19, 25 56:1 57:11 58:8, 11 59:20, 23 60:25 61:5, 6, 9, 11 62:18, 25 64:12 65:5 66:12, 14, 15, 20, 24 67:3 68:8, 12 69:20 73:7, 8, 10 78:6, 7 83:11, 12, 15 84:17, 18 85:3, 12, 13 86:17, 23 87:11 89:20, 21 92:24 94:7 98:4, 5 104:8, 20, 21, 23 105:1 112:24 113:2, 5 114:7, 21 115:4, 21 116:3, 4 117:8, 12, 13, 15, 16 118:8 119:13, 14 121:5, 8, 9, 12 122:8, 9, 12, 13 123:22, 23, 25 124:1, 4, 5 125:13, 23, 24 129:3, 6, 10, 13 130:3, 4, 7, 8 132:14, 25 134:16 137:14, 15 140:8, 9 142:18 143:19 152:3, 4 153:17 156:16, 17, 19, 22, 23 158:14 163:7, 8 164:25 165:1, 4 166:10, 16 172:13 173:12 193:7 204:20, 23 206:11 207:11 208:1 214:3, 17, 20 215:24 216:11, 12, 20, 25 217:1 221:11 222:13, 24 223:21
**correcting** 170:23
**Correction** 117:7
**corrections** 229:11
**correctly** 90:4
**counsel** 4:9 7:7 13:23 45:8 48:3 49:12 99:6 105:9 146:10, 19 148:4 158:24 167:22 205:14 221:5 222:8 228:12, 14
**Counsel's** 40:19
**count** 12:22
**counteract** 176:17
**COUNTY** 228:3
**couple** 12:24 29:18 91:8, 10 161:21 163:15 178:5 184:9 191:5 198:13
**COURT** 1:2 4:4 5:18 9:6 228:16
**COVID** 117:17, 19 118:1
**create** 205:13 206:22 218:4
**created** 64:15, 21
**creates** 37:15
**creating** 209:5
**creative** 208:12
**credit** 15:14, 15 220:25
**critical** 134:14
**CRR** 1:20 228:4, 24
**Cultivating** 202:21
**culture** 32:19 101:11, 12 106:6 107:17, 18, 22, 24 182:15 208:24
**current** 72:25 82:1 91:9
**currently** 9:12 11:11 14:6
**cutting** 148:4
**cycle** 13:6 194:6

**< D >**
**data** 106:12, 22 107:8 140:12, 21 141:8, 19, 22 142:7, 13, 20, 21 143:5 144:1, 20, 21, 25 145:12, 24 146:25 147:7, 17, 25 148:2, 8, 11, 16, 18, 19 149:1, 7, 18 150:2, 17 151:4, 15 152:5 168:24 169:4, 5, 7, 11, 14, 16 171:4, 13 172:3, 5, 10 176:10 178:16, 22 180:8, 20, 21 181:2 182:2, 8 183:7, 13, 16 184:24 185:1 186:25 187:2, 5 188:18, 21, 25 195:6, 9 196:20, 25 203:6 208:13 220:25 222:17 224:4, 6, 8, 11, 14, 16 225:14, 22
**Date** 1:14 6:10 23:5 37:8 40:13, 22 44:6 68:9 94:22 114:21 133:7 134:1, 6 139:15 155:16, 21 159:22 201:11 227:6 229:2
**dated** 129:8
**dates** 12:11 28:13 29:12 35:16 118:2 139:16 156:5 198:7, 20
**day** 32:22 56:3 162:24 163:17 181:2 190:1 228:20 229:16
**days** 176:4
**Dayton** 9:11
**de** 184:16
**dealing** 208:16
**dealt** 169:25
**debate** 87:3, 6, 8 104:11
**December** 1:14 4:1 13:19 66:9 67:22 69:5 73:24 78:6 85:1 86:4 87:24 110:24 168:2 171:14 176:9 179:7 190:5 191:11 193:25 204:17 214:10, 11, 12, 19 228:25 229:2
**decide** 160:21 210:11
**decided** 45:19 153:25
**decision** 43:11, 12, 17, 18, 19 73:23 74:1 111:4, 7 139:9 155:15 156:2, 25 179:5 192:7 201:7 208:19 210:25 212:3, 5
**decisions** 70:23 71:3, 13, 17, 19 73:12, 13
**deck** 69:1 218:10
**DECLARATION** 229:5
**declare** 229:6
**deemed** 134:14
**deep** 106:18 145:4, 16 146:3 147:11 148:15 176:16 189:5
**deeper** 145:8
**deeply** 208:23
**Defendants** 1:11 2:8 4:7, 17
**defensiveness** 209:6
**deficiency** 98:22
**deficient** 98:18 99:21, 23
**defined** 228:17
**definition** 103:15 153:20
**definitive** 110:25
**degree** 9:10
**demonstrate** 151:7, 18 169:8
**demonstrated** 193:16
**demonstrates** 208:5, 15
**Demonstrating** 203:4
**departed** 110:9
**department** 191:7, 9
**departure** 10:10 155:24
**departures** 120:18, 20 121:2 122:19
**depending** 39:3
**depends** 165:8 201:22, 23
**Deponent** 2:8
**depose** 228:8
**deposed** 5:1
**deposit** 178:9
**Deposition** 1:14 4:3 5:8 6:16 7:6, 10, 20 8:8, 20, 22 29:15 51:12, 14, 16 160:12, 18 226:18 227:9 228:7, 10, 11 229:1, 8, 12 230:1 231:1

**depositions** 6:12
**deposits** 184:15
**depth** 38:18 79:1, 4, 25 145:8 146:5 169:19 170:11, 16 171:17 175:18 176:1 177:12 188:12 189:7, 15, 16, 19, 24 192:17 193:14 195:12 196:15 197:10
**derive** 208:14
**Describe** 23:11 131:20 133:10 161:15 164:7 180:19 183:15 188:7 190:25 191:2
**described** 144:22 168:16 173:16 192:16 211:2
**design** 150:11
**desired** 208:6
**detail** 69:13 176:1 213:23
**detailed** 39:9, 10 87:2 95:20, 22 104:15 141:4, 5
**details** 19:13 172:20 204:12
**determination** 110:25 117:21 128:12 157:25 158:2 165:15 210:14
**determine** 34:5 47:9 48:19 56:10 57:21 65:22 72:10 75:22 76:13 79:21 90:10 91:12, 19 93:6 112:1 114:7 115:7 116:6, 16 118:19, 25 119:17, 23 120:2, 15 123:9 124:6, 18 133:4, 12 156:25 157:5 198:21
**determined** 12:14 37:21 217:3
**determines** 42:3
**determining** 80:3
**develop** 69:10 78:22 79:18 80:7 95:6, 9, 12, 14 96:22 170:1 177:22 184:7 188:9 192:6 194:7 203:14
**developed** 72:5 75:9 80:5 158:4 200:11, 20 201:6
**developing** 32:17 34:6, 20, 22 173:21 177:17 179:14 187:19 189:14 194:2
**development** 14:18 19:8, 10 32:21 35:18 36:4, 7 67:17 69:8 72:6 73:2, 3 75:13 82:1 84:4, 13 86:11 87:4 88:6 90:16 95:2 96:2 132:18 134:25 135:5, 18, 24 136:5 138:4 162:21 174:25 194:5 209:14
**developmental** 136:15
**developments** 195:2, 4, 13
**differ** 80:24
**difference** 11:22 96:25
**different** 12:17 15:5 23:5, 6, 9, 10, 14 26:13 33:21 39:8 55:17, 24 72:6 73:3 74:15 78:14 83:10 87:5 94:16 96:3, 20 97:10 98:11, 14 101:22, 23, 25 102:15 103:23 106:3 109:3 126:22 162:23 173:6 177:6 178:24, 25 179:3 195:23, 24 205:23
**differentiated** 183:3
**differentiation** 182:23
**difficult** 5:21 136:3 180:25 224:18 225:12, 18
**difficulties** 209:8
**digital** 27:2 38:18 95:7 103:25 104:2 141:5 164:13 175:14 188:1, 5, 11, 17 189:3, 5 223:11, 16
**digitally** 183:3 186:16
**diligence** 197:23, 24 198:3, 6, 22 199:18 200:6 207:22
**Diligent** 41:15, 16
**dinner** 34:19 35:6, 8, 10
**diplomatic** 209:4
**direct** 18:19 23:16 25:2 30:20 31:3 48:4 67:7 76:16 127:1 137:13 167:21 168:3 174:5 190:24 191:12, 15 194:10 198:13 200:3 203:17 207:13
**Directing** 194:11 200:16
**direction** 13:25 142:1 143:7 144:4, 15 160:1 202:11 220:24
**director** 34:25 39:15, 24 40:3 42:1 69:25 76:7 82:20 198:9 205:20 206:12, 13 207:8, 10 217:6
**Directors** 46:8 49:13 50:24 52:6, 12, 19 55:8, 11 57:6 58:15, 18 59:6 60:21 62:16 63:21, 25 64:10 65:7, 12, 17 69:15 70:8, 13, 20, 25 71:14, 19 72:21 74:14 85:1 110:10 111:15 112:22 114:18, 20 115:19 117:3 118:15 119:11 120:13, 25 122:4, 7, 17, 22 123:20 124:9, 20 125:8, 10 126:11 131:23 133:3, 11, 14 156:12 157:8, 17 168:2 181:2
**disagree** 8:9 136:5, 8, 11 222:16
**disappointed** 153:23 154:2, 7, 11
**disciplined** 208:19
**disclosed** 56:21
**discovery** 160:13
**discretion** 89:12
**discriminate** 210:20
**discuss** 18:12, 18, 21 19:1 25:3, 7 31:5 88:10 126:7 139:1 154:25 173:11 181:6 185:23 187:10 189:6 196:3 206:8
**discussed** 19:2 25:12, 16, 23 41:24 89:18 90:15 96:2, 6 110:14 120:18, 19 121:2, 4 122:24 126:2 128:1 154:22 175:8 182:22 186:21 187:25 194:20 221:22
**discussing** 135:18
**discussion** 20:2 47:11, 25 49:9 50:11 53:18 57:18 60:1 61:14, 20 63:3, 18 65:9 66:9 77:20, 23, 24 86:10 87:6, 8 88:5, 10 104:3 110:9, 12, 13 112:1 113:8 115:7 116:6 118:10 119:17 120:15 122:18 124:7 126:8 127:19 139:12 155:17 157:5 168:14 173:14 175:10 182:21 194:25 195:1 206:14, 17 207:5 217:10
**discussions** 19:4, 7, 9, 11, 20 20:6, 10 21:4, 8, 16, 18, 23 22:10, 19 29:17 48:14, 20 77:15 78:9 87:2 88:21 95:20, 22, 25 96:1, 4, 8 104:10 110:18 124:18, 24 126:12, 13, 18 155:10, 23 161:23 173:21 196:13 209:16 215:13

**disintermediation** 175:15
**dispute** 226:16
**disputes** 160:13
**disrupt** 205:7
**disruptive** 170:20
**distinction** 92:10, 12, 17, 22 93:16
**distinctions** 80:15
**distinguishing** 172:8
**distributed** 131:23 133:3, 5, 10, 13
**distributes** 137:12
**DISTRICT** 1:2, 3 4:4, 5
**diverse** 149:11
**diversive** 149:22
**Dividend** 219:14
**DIVISION** 1:4 4:5
**document** 8:17 46:10, 17 47:14 48:7, 11 49:8, 10 57:7, 9 66:7 67:1, 6, 13, 15, 20 68:19, 22 69:3, 4, 13, 23 71:24 72:2 74:19, 21 78:4 81:25 84:11 87:13 112:11 124:11, 12 129:23, 24 130:10 132:12 158:3, 23 167:25 168:1, 4 190:25 191:4, 10 192:2 200:9, 10, 13, 17 202:4 207:4, 17 213:2, 3, 4, 7, 10, 18 214:9
**documentation** 88:13, 21
**documents** 7:14, 23, 25 8:2, 25 13:7 41:11, 19 55:20 126:21 130:5 160:13, 16 198:20 213:21
**doing** 22:16 109:19 127:15 169:16 200:25 210:13 213:12, 24 218:18, 19 225:15
**downloaded** 41:15
**dozen** 163:18
**dozens** 149:14, 15 151:9 162:18 166:15 167:7, 15, 19 193:7, 10 203:7
**draft** 56:4 85:20 128:24 130:12, 25
**drafts** 70:7, 12, 19 82:21
**draw** 169:14 171:9, 19 172:22
**drive** 175:14 182:15
**driving** 140:14 141:10 148:21 202:14
**drove** 148:23
**due** 118:3 178:9 197:23, 24 198:3, 5, 22 199:18 200:6 207:22
**duly** 4:25 228:5, 8
**duties** 13:21, 22
**duty** 15:24 102:14
**dynamics** 175:9, 19 176:20 177:13

**< E >**
**earlier** 5:15 29:14 34:17 46:23 54:8 72:9 73:17 81:4 91:6 93:15 102:17 126:21 130:24 161:5 164:13 171:25 172:7 188:14 190:1 192:24 196:24 205:24 207:23 211:9 216:5 225:10
**early** 39:24 162:24 184:16 198:8 199:11, 14 225:3
**East** 2:12
**economic** 168:15 169:4 220:25 225:16
**economics** 222:9
**editing** 223:25
**education** 9:9
**effect** 158:4
**effective** 209:9
**effectively** 149:9, 20
**efficiency** 179:25
**either** 28:17 29:6 56:6 73:14 99:21 121:5 133:5, 12 166:22
**elements** 131:12 184:13
**Email** 2:7, 14 18:16 24:2 27:7 66:14, 17, 19, 22, 25 68:4, 6, 10, 20 128:22 129:5, 14 130:2, 5, 16 138:20 139:11
**emergency** 75:15 76:10, 20 77:7, 8, 13, 17, 25 78:1, 9, 15 80:15, 25
**employed** 9:12
**employee** 108:20, 23 109:4 216:9 228:13
**employees** 34:11 108:3 155:23 165:20 208:25 214:23
**employment** 152:18 153:6, 12, 13, 17, 22 155:1, 12, 25 165:3
**enabled** 183:3 186:16
**enablers** 183:1 184:13
**ended** 153:13, 14, 17
**energy** 201:23 225:13
**engage** 183:4 219:12
**engagement** 79:5 108:21, 23 109:4
**engages** 219:11
**enhancements** 181:20
**ensure** 137:12
**enterprise** 19:14, 16, 17, 20 22:24 25:15, 22 31:9, 20 33:21 34:24 108:7, 8, 11, 14, 17 162:7 163:6 166:14, 21 167:3, 19 172:8 173:25 174:3 189:22 190:12 196:18, 19 197:4 209:21 221:2, 11 222:5, 6
**entire** 44:23 66:19 79:1, 5 81:6 104:18 106:17 175:1 176:5 229:7
**entitled** 4:6 90:24
**equals** 178:12
**equity** 179:25
**Erie** 2:6
**ERRATA** 229:1, 13 230:1 231:1
**ESG** 150:6, 20
**ESG-type** 219:15
**Esq** 2:1, 4, 8, 17
**essential** 134:12 140:10 202:5
**Essentially** 52:18 226:1
**establishing** 141:25 143:7 144:4, 14 202:11
**et** 1:10 4:7 229:4
**evaluate** 32:16 33:12, 22 34:3, 4
**evaluated** 33:3, 7, 8 34:18 35:13 36:1, 2
**evaluating** 32:21 35:17 36:20
**evaluation** 162:6 198:6
**Evans** 127:21 128:23 129:6
**evenly** 137:12
**event** 77:24
**everybody** 183:18
**evidence** 106:12, 22 107:5, 8, 19 141:20 144:2 145:13 147:25 152:20 153:8 206:20, 23
**exact** 29:12 35:15 37:8 40:13, 22 44:6 71:23 78:11 100:17 111:3, 6 118:2 134:1, 6 139:15 143:15 155:16, 21 156:5 171:14 198:7
**exactly** 104:25 159:18 185:6 201:11
**Examination** 3:4, 5 5:3 161:3 212:20
**examined** 5:1

**examining** 103:20
**example** 77:4 101:18
**examples** 97:24 98:1 100:1
**exceed** 150:13
**exceeded** 215:22
**exceptional** 80:7 169:16 208:15
**excluding** 142:5
**excuse** 20:25 28:15 31:7, 18 39:1, 4 41:6 61:1 80:19 87:24 89:15 92:19 107:6 109:7, 24 112:20 117:5 122:22 126:24 128:25 153:5 203:12 220:21
**execute** 178:9
**execution** 140:17 141:12 148:21 183:2 202:14
**executive** 14:16 15:6, 22 16:6, 8, 12, 19 19:18 29:17, 20 32:9, 11 33:17, 21 35:1 43:11 44:13, 15, 16, 19, 21, 24 45:2, 6, 7, 18, 19 56:15, 18, 21 66:8 67:16, 17 68:23 69:8, 16 70:8, 13, 20, 25 71:15, 21 72:21 75:1 81:5, 7, 11 82:8 84:4 86:6, 9, 19 88:4 89:9, 19 90:1 91:4 95:9, 23 96:23 104:13 110:7, 8, 10, 22 120:18, 20, 21, 25 121:1, 17 122:15, 16, 18, 24 126:1, 12, 14, 22 127:9, 14 130:14 132:18, 20 150:10 161:19, 23 162:22 164:1 165:6, 8 166:1, 5, 7, 14 173:20 178:11 208:3, 6 209:10 212:25 213:1, 12 223:20
**executives** 16:1 19:9 32:21 36:19 37:18 91:10 102:15 146:24 149:12, 23 165:3, 16 166:1 169:12, 25 173:21 189:25 199:23 219:19
**exemplary** 38:17 141:5 193:18
**exercise** 201:21 208:17 209:17, 20 210:2 211:14 212:6
**Exhibit** 3:8, 9, 10, 11, 12, 14, 15, 16, 17, 18, 19, 20, 21, 22 46:1, 5 47:10, 22 50:19 51:24 52:3, 24 53:3, 22 54:13 55:1, 5, 9, 12, 18, 23, 24 56:14, 16, 17, 22, 24 57:3, 17, 22 58:3, 22 59:3, 7, 15, 25 60:6, 14, 18, 22 61:1, 13, 25 62:9, 13, 23 63:2, 8, 17, 23 64:3, 7, 11 65:8, 14, 21 66:1, 5, 10 67:4 68:14 73:13, 16, 25 74:2 84:19, 23 85:11 86:21 87:9, 13 88:10 89:1, 5 110:4, 5 111:8, 12, 21, 25 112:5, 15, 19 113:4, 7, 13, 19 114:11, 15 115:2, 6, 12, 16 116:1, 5, 10, 21, 25 117:5, 7, 10 118:9, 18, 24 119:4, 8, 12, 22 120:6, 10, 14 121:13, 18, 22 122:1, 10, 23 123:2, 8, 13, 17 124:2, 17 125:1, 5, 21, 25 128:16, 20 129:1 131:1, 15, 19 132:1, 7, 8, 10, 16, 18, 23 133:5, 12, 16, 21 134:2, 7, 21 135:22 138:11, 15 140:1, 4, 7 151:24 156:6, 10, 14, 24 157:4, 10, 14 158:9, 12 159:6, 10, 13, 21, 24 167:21 175:3 190:25 192:21 194:10 198:15, 18 200:3 203:17, 18, 20 204:15 207:14 213:5, 10, 17 214:2 216:13 220:5, 18 221:13, 17 223:18, 25
**EXHIBITS** 3:7 132:1, 6 198:14
**existing** 149:10, 21
**expand** 97:2
**expect** 80:8 81:5, 11 86:5 96:23 100:3, 15
**expected** 82:1 97:22 99:25 168:16
**experience** 76:18 77:11 186:16 208:14 216:6
**experienced** 140:19
**expertise** 188:4, 7, 8, 10
**experts** 225:18
**expires** 228:24
**Explain** 32:8 64:14 67:6 78:14 93:12 98:10 181:1 185:13 189:4 196:25 197:1 222:19
**explaining** 83:7, 14 84:15 222:22, 23
**extent** 9:9
**extra** 58:24 165:13
**eye** 140:16 141:12

**< F >**
**face** 209:8
**facilities** 209:6
**facility** 169:7, 9, 10 180:20
**fact** 152:24 161:13 164:8, 22 165:2 169:24 175:24 177:1 185:4 191:25 192:13 224:20
**factor** 210:14
**factors** 79:21 168:16 170:5 171:18 172:8
**facts** 54:25 152:20 153:3, 4, 7 172:23 178:16, 23 180:8, 21 182:2, 8 183:7, 12, 16 184:24 185:1 186:24 187:2, 5 188:18, 21, 25 195:6, 9 203:6 216:1
**fair** 52:15 58:17 75:4 138:21
**familiar** 32:13 161:9 164:4
**far** 86:3 103:4 104:4 143:15 144:10 149:16 150:10 151:12 190:21 203:14
**fashion** 159:2
**fast** 31:13
**February** 46:8, 21, 23, 24 47:7, 13 48:2, 15, 21 49:14 50:10, 20, 25 52:6 53:6, 19, 23 54:12 55:8, 11 111:15 112:3, 7, 13 115:19 116:12, 18 194:17 196:4 214:6, 13, 20
**fed** 79:4
**fee** 42:24
**feedback** 209:14
**feel** 5:13 87:4 96:10 148:23
**fellow** 11:7
**felt** 38:15 105:3 172:2 182:13 184:5 189:14 190:19 195:20 201:1
**field** 199:23
**FIFTH** 1:10, 14 2:12, 17 4:6, 20, 22 11:12, 15, 19, 20, 21, 23 12:4, 6, 8 13:24 14:5 18:12 19:25 20:4, 12 21:6, 10, 18, 24 22:22 23:1 24:7 25:8 26:3 27:11, 17 28:7, 12, 19 29:9, 22 31:11, 22, 24 32:9, 12, 25 34:1, 8 35:20 37:12, 16 38:11, 22 39:2 41:22 42:16 43:6 46:7, 11 47:8 49:12, 13, 24 50:3, 21, 24 52:5, 8, 12, 13, 24 53:6, 20, 24

54:13 55:7, 10, 13 56:2 57:5, 10, 13, 24 58:14, 18 59:5, 8, 16 60:4, 8, 12, 20, 23 61:4, 16, 22 62:2, 7, 15, 24 63:10, 21, 25 64:9, 11 65:12, 17, 23 66:11 67:5 74:6 75:5 85:2, 3, 11, 14 89:4 104:5 109:5, 10, 14 110:6 111:2, 14, 22 112:21 113:4, 11, 15, 22 114:17, 20 115:2, 3, 10, 18 116:1, 2, 8, 12, 18 117:2, 10, 11 118:12, 20 119:2, 10, 12, 15 120:12 121:15, 19 122:3, 7, 10, 11, 14 123:4, 11, 19 124:2, 3, 9, 19, 21 125:7, 10, 12, 22, 23 127:10 129:2, 12 130:2, 6, 9, 13 131:14 132:12, 13, 21, 23, 24 134:14, 21 135:23 151:25 152:18 153:22 155:1, 2, 11, 12, 23, 25 156:3, 11, 14, 15 157:1, 16, 22 158:1, 13 159:15 161:17 164:17 168:17 170:12 175:11, 25 176:17 180:13 184:14 191:9 207:19 208:7 210:11 211:1, 12, 16, 22, 25 215:1, 4, 24 216:10, 14 218:17, 18, 21, 24 220:19 221:17 229:4
**figure** 177:4
**file** 221:8
**files** 162:20 212:24, 25 213:25
**final** 13:18 15:24 56:6, 10 85:21 129:12 130:21, 25 158:3 200:10, 12
**finance** 14:25 15:3, 4, 7 16:23 17:2, 8, 19 39:4, 6 43:3
**financial** 13:6 95:7 179:3 219:17
**find** 77:5 136:13 172:25 173:1
**Findlay** 6:5
**fine** 24:12 143:23 174:13
**fingertips** 172:3, 20, 23
**finish** 5:23 59:11 94:1 105:9 142:23 146:11, 14, 15 148:5 217:21 218:2, 5
**Fintech** 38:18 103:24 189:9 190:16 219:16
**firm** 10:23, 24 11:2 95:13 127:8 164:10 198:11 199:21 201:3 228:16
**firms** 199:23
**first** 4:25 20:14, 17 31:24 36:15 49:16, 24 53:9 55:11 56:15 66:14 86:7 89:6, 7, 22 129:1 131:18 132:3 133:20 134:23 138:24 175:4, 5 177:1 178:5 181:15 182:18 184:14 187:24 188:14 194:18, 19 200:6, 16 203:21 208:4 217:13 218:17, 20 220:10 221:21 224:13 228:8
**Firth** 53:10
**fiscal** 225:13
**fit** 208:5
**five** 15:9, 11 17:6 26:18 79:11, 14, 17, 22 80:4, 11 81:17, 18 165:10, 14 186:19 214:22
**flavor** 96:21
**focus** 33:1 136:2, 12, 21 137:4, 5, 6, 9, 12, 20 138:1 182:22, 25 188:2 220:10
**focused** 87:22 137:7 138:1 221:20
**Focusing** 23:3 216:23
**follow** 31:16 67:19
**followed** 26:24
**Following** 110:7 168:8, 11
**follows** 5:2
**football** 76:25
**footprint** 168:17 170:13
**foregoing** 228:10
**forgot** 21:1
**form** 45:8 48:23 49:17 50:14 51:3 54:14 64:16 68:15 71:2 73:17 77:18 80:17 83:16 87:14 98:20 102:6, 9 136:22 140:18 141:13 142:2 152:9, 19 154:3, 18 155:3 158:21 162:9, 15 165:21 167:8, 12 169:1, 18, 21 170:3, 7, 10, 19 171:11 173:17 175:17 179:7 181:21 182:8, 12 183:23 185:10 187:6, 15 190:11 194:23 195:12, 19 203:8 211:17 215:5, 18
**formally** 161:21 162:19, 20 204:6, 7
**formerly** 138:25 203:23
**forming** 166:12 204:18, 25
**Formula** 130:13 138:19
**Forrest** 89:11 113:18
**forward** 14:1 38:20 68:11 75:23 80:2 196:2 197:2 202:2 224:23
**forward-thinking** 208:12
**found** 173:7
**foundation** 64:17 131:10, 11 154:4 170:18 182:24 184:13
**foundationally** 84:7
**foundations** 186:17
**four** 12:23 15:19 35:16 37:10 77:10 79:10 81:19 106:2 186:12 220:3 224:24
**fourth** 92:3
**frame** 28:21 33:4, 9 37:9 43:7 70:5 77:3 78:4, 6, 8, 11, 12 88:1 100:6 195:21 198:15 199:15 225:3
**framework** 69:7
**free** 5:13
**front** 50:17
**FTB's** 150:5, 19
**fulfill** 79:5
**full** 12:21 38:1, 3 42:1 47:7, 9 49:22 50:9, 23 51:10, 13 67:15, 23 69:6, 9, 12 72:3 89:22 120:21 122:16 127:16 131:17 134:8 167:2 172:5 175:5 184:9 187:24 211:7 214:10
**funds** 42:19
**funnel** 94:20
**Further** 3:5 26:25 27:1 37:21 209:12 212:19, 20
**future** 14:20 69:11 72:10 84:6 97:23 145:8 153:24 186:13
**FW** 112:9

**< G >**
**gain** 34:14 87:4 136:2 209:7
**game** 76:25
**Garrett** 123:5
**GARY** 1:14 3:3 4:3, 24 5:7 227:4 228:7, 11 229:19 230:24 231:24
**general** 110:15 222:7
**generally** 73:1 113:24 114:2 161:16

165:9 166:21, 24 167:3, 4 168:18 169:4 175:11 180:15 222:8
**generated** 223:10, 15
**geographies** 186:20
**getting** 183:19
**give** 6:22 13:23 72:2 100:1, 6
**given** 6:13, 24 54:7 154:11 160:14 180:6 228:10
**giving** 146:22 228:7
**go** 5:5 7:22 42:7 47:16, 17 48:8, 25 51:6 61:1 69:12 82:24 87:2 91:2 92:14 94:20 97:2 99:10, 14 102:10 104:25 105:5, 12, 16, 19 107:2 133:15 135:8, 10, 21 138:7 143:11 146:15 147:15 151:1 154:20 160:3 162:9, 16 163:11 165:11, 21 167:8, 13 169:1, 21 170:19 171:11, 22 173:3, 17 174:8, 20 175:3, 22 176:22 178:1, 18 179:10, 18 180:10 181:12 182:17 183:25 184:8 186:9 187:15, 16 190:17, 25 191:1 193:2, 8 197:15 198:5, 24 199:9, 19 200:23 201:9, 18, 21 203:10 204:10, 21 205:4, 7, 25 210:5, 15, 21 211:4, 17 212:9 215:21 216:4, 13, 14 220:7 223:5 224:5 225:4, 8, 22 226:3
**goals** 134:25 135:5 179:23 189:10
**goes** 8:16 33:25 34:7 46:15 49:15 53:9 87:22 88:12 100:13
**going** 5:11 7:13 8:1, 12, 24 9:2 13:8 30:22 37:21 39:7, 19 42:9 54:8 70:10 72:10 75:22 78:21 79:2 81:1 83:1 84:8 91:21, 23 101:15 104:3, 14, 15 130:24 133:10 151:25 160:5, 11, 23 167:21 180:2 187:20 192:21 196:2 197:2 199:6 202:1 204:14 208:11 212:14 224:23 225:11, 17 226:6, 20
**good** 40:3 96:24 97:15 98:23 177:5 185:5 195:25 200:25 208:21, 22 225:23
**governmental** 15:14
**graded** 94:21
**grasp** 103:3 104:1, 17 147:1 172:19
**gravitas** 34:11
**great** 224:7
**greater** 136:3
**Greg** 18:21 19:1, 3, 5 20:3, 11 21:5, 9, 12, 13 22:5, 10, 11 25:6, 11, 16 43:10 67:1, 2 70:5 126:5 129:16, 18 138:18 139:24 155:19 159:25 161:18 164:17, 18 172:17 189:15 191:6 217:6, 22
**group** 37:20, 23, 24 38:3, 7 149:11, 22 184:15
**growth** 145:4, 16 146:2 147:10 148:14 168:19
**Guy** 128:22 129:14 138:18, 24 139:3 203:22, 24, 25 206:9
**guys** 177:3

**< H >**
**half** 42:17 163:17
**HAMILTON** 228:3
**hand** 209:2 228:18
**handed** 46:4 52:2 55:4 57:2 59:2 60:17 62:12 64:6 66:4 72:17 84:22 111:11 112:18 114:14 115:15 116:24 119:7 120:9 121:25 123:16 125:4 128:19 132:3, 6 138:14 140:4 156:9 157:13 159:9
**Hang** 54:6 213:9
**happen** 75:17, 19 164:22 195:22, 23
**happened** 45:5, 18
**happens** 92:20 199:3
**hard** 46:24
**HCC** 16:7, 10 17:6 39:5
**HCCC** 16:3, 5, 10, 11, 18
**head** 5:21 73:1, 9 76:7, 8 82:10, 18, 19 89:16 132:20 139:16 174:3, 12 198:11 217:3, 4, 23 223:17
**heading** 202:8
**hear** 5:12 6:23 20:13 24:12 38:24 148:3 162:13 167:11 174:12 213:5
**heard** 68:25
**hearing** 5:15 92:20
**heightened** 181:19
**held** 9:19 13:13, 16 52:16 56:12 61:3 104:11 158:7 190:6
**help** 99:9
**helpful** 189:18
**HEMINGER** 1:14 3:3 4:3, 17, 24 5:5, 7 42:15 45:14 46:4, 18 47:5 48:25 52:2 53:4 55:4 56:15 57:2 59:2 60:17 62:12 64:6 66:4 73:22 83:7 84:22 87:23 91:2 94:3, 15 99:8, 19 103:19 105:25 110:2 111:11 112:18 114:14 115:15 116:24 117:8 119:7 120:9 121:25 123:16 125:4 128:19 132:6 135:17 137:3 138:14 140:4 156:9 157:13 159:9 160:15 161:5 212:22 213:6 215:8 216:4 227:4 228:7, 11 229:19 230:24 231:24
**H-e-m-i-n-g-e-r** 5:7
**Hennigan** 11:7, 8
**hereinafter** 5:1
**hereof** 229:13
**hereunto** 228:18
**high** 164:1, 25 208:21
**higher** 215:12
**highlights** 138:23
**highly** 137:7
**hire** 198:11 199:21 201:7
**hired** 164:9 194:3 201:12 204:2 215:10 216:5
**hiring** 164:4
**hold** 13:4
**holding** 11:25 136:4
**holds** 208:20
**homework** 224:8
**hone** 209:12
**hope** 129:15
**hoping** 103:10 192:6
**horizons** 97:3
**how's** 213:24
**HR** 73:1, 9 76:8 82:10, 18 191:7, 9 198:11 217:4, 23 222:6
**human** 15:1, 20 16:2 66:7 68:23 69:6, 15, 25 70:8, 13, 20, 25 71:14, 21 72:21 118:22 129:16, 21 166:24 198:10
**hypothetical** 152:10

< I >

**ideas** 188:11 209:5
**identification** 46:2 51:25 55:2 56:25 58:23 60:15 62:10 64:4 66:2 84:20 111:9 112:16 114:12 115:13 116:22 119:5 120:7 121:23 123:14 125:2 128:17 132:2 138:12 140:2 156:7 157:11 159:7
**identified** 134:12 158:8 186:12
**identify** 46:5 52:3 54:9, 11, 21 55:5 57:3 59:3 60:7, 18 62:13 63:9 64:7 66:5 67:13 74:11 81:23 83:24 84:23 111:12 112:6, 20 113:14 114:15 115:16 116:11, 25 119:8 120:10 122:1 123:3, 17 125:5 128:20 130:10 132:8, 16 135:24 136:18 138:15 156:10 157:14 159:10
**identifying** 80:13, 22 83:10
**identity** 7:23
**ilk** 225:16
**illustrates** 74:17 130:23
**immediate** 103:3
**immediately** 40:1 185:20
**impact** 208:18
**implications** 150:6, 20
**important** 34:9 152:25 169:15
**impressed** 164:9, 15 169:24 185:3, 4
**impression** 154:15, 19
**impressive** 196:23
**improper** 93:24
**improve** 137:20 138:10 185:17, 19
**improved** 180:4
**improving** 185:21
**incident** 100:18, 19, 21, 22
**include** 45:1 148:7
**included** 93:4 134:25 142:9 168:12 180:15 194:23 195:1 220:14, 20, 21
**including** 27:18 34:17 86:9 88:4 89:12 90:14 91:25 93:14 126:13 142:4 168:14 175:9 179:24 183:1 190:13 197:5 209:22
**inclusive** 44:24
**income** 109:9, 13, 21 179:2
**incoming** 165:9
**increasing** 168:18
**indefinite** 83:19
**independent** 10:13 13:23 14:5, 8 16:11, 16, 18 19:24 24:6, 23 63:17, 23 120:25 122:16 169:18 170:3, 10 207:25 211:14, 15 212:6 217:6
**index** 32:19
**indicate** 50:6 74:21 75:7, 12 93:18 103:19 114:4 121:18 122:17 137:19 143:5 144:13 145:13 148:12
**indicated** 5:14 6:12, 24 8:6 23:9 31:24 46:20 49:21 61:7 73:22 94:6 95:19 106:2 114:23 125:15 127:3 129:11 135:20 212:23 214:25 218:17 224:2 226:12 229:12
**indicates** 74:23 94:4 121:1
**indicating** 11:19 107:9, 20 140:12 141:8, 23 145:1, 24 147:7 148:19 149:8, 19 150:3, 17 151:5, 16 152:6
**indication** 76:22 124:22 207:3
**indicative** 216:10
**individual** 80:12 81:2 84:11 88:22 109:3 128:6 209:2
**individuals** 76:1, 3 83:14 86:12 88:7 89:14 213:21
**industry** 79:2 103:4, 23, 24 104:18 106:18, 20 145:5, 17 146:4 147:12 148:15 164:12, 16 166:2 170:5 172:20 175:9, 11, 20 176:5, 6, 21 188:12, 17 189:8, 18 192:18 193:15 197:11, 21
**inflation** 224:17, 20
**inflationary** 224:18 225:11, 13, 17
**Influencing** 202:24
**information** 26:25 39:9 41:25 56:20 70:24 71:13, 21 72:15, 20 73:13, 15, 25 74:2 82:3, 5, 7, 16 83:8 84:16 86:20, 25 87:1, 7, 9, 12, 13, 18 88:8, 13, 24, 25 102:19 103:6, 13, 18 106:11 107:19 112:6 140:12, 21 141:1, 8, 22 142:7, 13, 14, 21 143:5 144:25 145:24 147:7 148:18 149:3, 7, 18 150:2, 16 151:4, 15 152:5, 16 155:17 169:17 171:6 172:10, 12 176:10, 14 178:16, 23 179:2, 3 180:9 182:3, 8 183:8, 12, 16 184:24 185:2 186:25 187:3, 6 188:16, 19, 22 189:1, 3, 17 195:6, 9 203:6 217:2, 12 218:9 221:3 222:12 225:5
**informed** 155:14, 16, 18, 20
**inherent** 209:10
**initial** 130:2
**initiated** 89:24
**initiatives** 136:1, 2, 12, 15, 21 137:4, 5, 7, 9, 20 189:9 223:11, 16
**innovation** 175:14
**innovative** 140:15 141:10 208:14
**input** 76:6
**inside** 14:19 19:2, 4 27:19 28:3 29:7 30:22, 23 107:12 124:24 155:2 167:1 193:20
**insightful** 209:12
**instruct** 7:13, 17 8:12, 24
**instructed** 7:15
**instruction** 8:15
**instructions** 6:1 7:16
**intellect** 103:3
**intellectual** 172:22
**intellectually** 146:24
**intensively** 10:6
**interest** 228:14
**interested** 184:7
**interim** 75:21 78:1 79:10 81:10
**internal** 34:4 35:19, 22 90:11 139:5, 23
**International** 126:24, 25 127:5, 7, 11 128:23 131:21 132:11, 19 199:22 200:14 204:3 207:20
**International's** 152:2
**interpersonal** 34:24 38:19 78:24 79:25 134:13 199:24 202:19, 21
**interpretation** 94:11, 12 99:4 137:23

200:22
**interview** 108:8, 11
**interviewed** 34:20 190:2
**intimate** 164:17
**intricate** 172:19 180:25
**introduce** 4:10
**investment** 34:12 78:25
**investments** 186:14, 21
**involve** 173:24
**involved** 9:22 32:2 76:19 198:9 221:3, 11 222:6, 7, 8 223:7, 24
**involvement** 9:25 17:9, 12
**involving** 6:19
**issue** 97:18
**issued** 159:20
**issues** 18:13 98:6 117:25 150:6, 20
**items** 96:6
**iterative** 37:18 161:6 162:6, 22 163:21 173:10 209:15
**its** 29:15 166:12 184:15 197:20, 21 199:17 208:24 209:17, 20 210:2 211:14, 15 212:6

< J >
**jacket** 199:6
**Jane** 6:9
**January** 17:21 18:23, 25 19:6 20:9 21:3, 11, 22 23:3, 10, 12, 17, 21 24:3, 5, 22 25:1, 5, 14, 21, 25 26:4, 11 27:7, 9, 15 28:25 29:5 30:11 31:2, 7, 18 228:20
**jms@sspfirm.com** 2:8
**job** 72:9 154:8, 12, 13, 16 192:7, 8 201:1 211:13
**jobs** 96:3, 20
**joined** 11:17 16:7 31:24 95:13 177:1 218:17, 21, 25
**joint** 4:18 52:18 62:15 84:25 156:12 157:7 168:1
**Joshua** 2:4 4:14
**judgment** 102:24, 25 141:19 142:4, 5, 11, 17 143:4, 22, 25 144:1, 6, 10, 12 146:22 148:9 151:11 163:5 165:19, 25 166:13 169:18 170:4, 11 171:19 173:15 174:2, 7, 18 175:18 177:8 179:8, 12, 13 181:6, 22 182:9, 12 183:23 184:4 185:10, 23 187:7, 10, 13, 17 190:12, 20, 21 194:1 195:12, 18 196:3 197:3, 21 203:8 209:17, 20 210:2 211:6, 15 212:6
**July** 129:8 132:21 199:14
**June** 59:6 60:3, 7, 12, 21 61:5, 16, 22 62:1, 6 120:13, 22 121:7, 14, 19 122:5 123:3, 10 127:19 138:17 139:13 199:12

< K >
**Kabat** 32:2, 6 40:2
**keen** 183:17
**keep** 30:22 51:15, 20 76:11 81:9 103:10 148:4 160:11, 14, 18, 19 180:2 208:11
**key** 86:10 88:5 90:16 95:2 110:12, 13 120:18, 20 121:1 122:18 131:12 138:23 179:23 186:12, 14, 20
**kind** 15:6 162:20 165:9 169:7 197:5
**King** 112:8
**know** 5:17 11:22 12:5, 11 14:19 19:8, 14 22:19 29:18 34:13 37:9 38:17 40:21, 22 44:20 45:6, 19 50:15 56:3, 5, 6 58:16 60:13 64:17, 20, 22 68:3 69:18 70:12, 15, 16, 19, 22 71:23 74:16 75:14, 18 76:5, 11, 16, 17 79:9, 10, 14, 20 80:7 81:2, 7, 15 85:18, 20, 22 86:3 87:3 95:11, 12 96:18, 23 97:13 98:13 100:19 103:25 108:23, 25 110:1 111:6 112:14 117:19 118:2 120:5 121:21 123:12 126:18, 24, 25 127:5, 24 128:8 131:8 136:17 147:21 148:17 154:4, 5 155:15, 21 157:19 158:16, 17 159:2, 20, 23 160:1 162:17 163:18 164:15 169:12, 13 170:22 176:16, 24 177:2 185:20 188:9 189:5 190:21 191:1 193:19 194:8 195:24 196:21, 23 199:25 201:13 205:21 206:13, 15, 16 213:13 217:13 218:3, 9, 15 219:8, 16 220:20 222:2, 3 223:17, 23 224:22
**knowledge** 64:21 76:14 106:19 145:5, 17 146:3 147:11 148:15 164:16, 17 166:11 169:19 170:4, 12, 16 171:17 172:22 175:19 176:3 177:12 181:4 188:13 189:8, 9, 19 190:15 192:18 193:15 195:13 196:15, 16, 17, 24 197:10
**known** 17:23
**knows** 208:21

< L >
**L.P.A** 2:5
**labor** 222:7
**Lack** 24:14 31:12 39:21 64:16 170:18
**Lacks** 154:4
**Lamb** 74:24, 25 75:4 112:9
**landscape** 104:4, 5 176:2
**large** 175:12 178:11 220:23
**largely** 200:20
**larger** 168:18 175:13
**largest** 168:20 218:24 219:2
**Lars** 36:3 215:3
**Lastly** 134:24
**Lavender** 123:6
**lawful** 4:25
**lead** 39:14, 24 40:3 42:1 69:24 76:7 82:20 198:8 205:20 206:12, 13 207:8, 10 217:6
**leader** 72:10 202:1 208:23
**leaders** 72:11 167:3 222:6
**leadership** 32:20 34:11 95:10 134:13 140:10 185:11, 14, 24 186:3 189:10 190:16 192:17, 19 193:16 197:12 202:5, 17 208:6 209:1
**leading** 177:19, 21 183:1 184:14 186:15, 17 192:13 193:8 197:13 204:19 205:1, 19
**leads** 193:23
**learn** 14:18 136:17 188:9 218:22
**learner** 209:11

**leave** 153:25 155:15
**led** 153:4, 5, 21
**legal** 41:22
**legislation** 178:10
**lending** 15:15 220:1
**Leonard** 54:4 63:12 112:10 116:15
**level** 16:9 17:11, 12, 14, 16 80:7 81:12 96:23 164:1, 2, 25 173:1 178:11 194:8 209:24 210:8 213:22 222:20
**leveled** 168:20
**levelheaded** 181:1
**leverage** 175:14
**levers** 208:17
**liens** 177:2
**lights** 81:9
**limited** 190:13 197:5 209:22
**line** 68:10 85:15 105:10 208:18 219:6, 22
**lines** 219:11
**list** 34:4 35:19, 21 36:11, 16, 17, 19, 22, 25 37:5, 11, 15 38:10 58:4 75:24
**listed** 56:2 89:7 91:5
**little** 172:7 208:8
**lived** 6:6
**lives** 6:8
**LLP** 2:11
**loaning** 177:2
**loans** 218:18, 19, 22, 23, 24 219:5, 6, 11, 23, 25
**locate** 75:21 127:13
**locating** 33:14
**long** 6:6 9:19 11:15 15:7, 10, 18 77:4, 7, 8 78:20 79:7, 8, 20 81:13, 16 215:10
**longer** 79:11 81:19 215:14
**look** 46:9 47:2, 20 49:24 53:3 67:8 68:10 79:13 80:5 82:7 129:24 130:17 133:15 164:19 167:23 178:2 179:19, 20, 21 198:15, 17 200:4, 18 204:15 205:22 207:14 214:14
**Looking** 68:10 78:5, 18, 22 80:24 81:2, 4, 7, 12 84:3 129:5 131:10, 12 169:14 179:1 195:23 213:7, 20, 21
**looks** 74:15 199:12
**loose** 213:9
**loss** 15:16 109:10, 14, 21
**losses** 179:3
**lost** 199:1
**lot** 225:15
**lunch** 34:19 35:5, 10 105:17
**lunchtime** 105:11

**< M >**
**M&A** 178:2, 8, 9 183:4 186:17 195:2, 4, 13 196:17
**macroeconomic** 195:1, 4, 14 196:17 197:11 224:16
**maintaining** 140:16 141:11 150:4, 19 183:3
**major** 193:20
**maker** 208:19
**Making** 53:8 91:8 97:20 104:5 117:20 143:16 161:22 166:15 171:1 179:4 212:5
**manage** 32:19 81:13 209:9
**managed** 98:3, 8, 17 100:15 101:5, 6, 17, 18, 20, 21 102:5, 20 109:11, 15, 23
**management** 13:25 14:19 16:1 26:3 35:1 38:15 42:5 66:8 67:16, 17 68:24 69:8, 10, 16 70:8, 14, 21 71:1, 15, 22 72:4, 22 99:20 100:2 101:7 102:3 106:1 110:12 113:24 126:10, 22 127:9, 17 131:18 134:8, 13 140:11 161:20 163:1 166:25 182:16 188:15 191:6, 10 202:9
**managing** 98:12, 15 101:22, 25 149:10, 21 150:5, 20
**manner** 209:4
**Marathon** 6:20 7:3 9:15, 20 10:12, 15, 16, 18 11:3 32:14 127:12
**March** 118:1
**mark** 53:10 112:19
**MARKED** 3:7 46:1, 5 51:24 52:3, 24 53:11 55:1, 5, 13 56:24 57:3 58:22 59:3 60:14, 18 62:9, 13 64:3, 7 66:1, 5 84:19, 23 111:8, 12 112:15, 19 114:11, 15 115:12, 16 116:21, 25 119:4, 8 120:6, 10 121:22 122:1 123:13, 17 125:1, 5 128:16, 19 132:2, 7 138:11, 15 140:1, 6 156:6, 9 157:10, 14 159:6, 10, 21, 24 167:22 194:11 207:14
**market** 79:25 98:13, 19 99:22 104:15 168:9, 10, 14 169:4 186:19 220:11, 25
**markets** 95:15 101:9 106:4, 11, 13, 24 168:20 183:2 186:15, 18 195:2, 5, 13
**Marsha** 39:23 40:2 70:6, 16 121:16 139:2 198:9 206:8, 10, 14 207:10 217:5, 20
**material** 208:17 224:9
**materialize** 191:25
**materials** 39:7 69:9 70:2 148:8, 11 168:13 194:23 220:15, 20
**matter** 48:8 97:25 169:14 229:8
**matters** 196:18
**MBA** 9:11
**McCallister** 7:11, 20 8:19 51:15 70:6, 12 118:21 217:5, 22 218:12
**McCallister's** 8:7, 9, 22
**MCHUGH** 1:7 2:14 4:6, 13, 15 17:22 18:15, 18, 21 19:1, 7, 21 20:3, 11 21:5, 9, 24 22:19 23:1, 4, 12, 17, 21 24:3, 23 25:7, 12, 17, 23 36:1, 10 37:11 45:23 46:11 49:25 50:3 52:25 53:11 55:13 57:10 59:8, 9, 16, 17 60:23, 24 62:24 63:13 64:12 66:11 67:5 68:19 74:6 75:20, 25 77:16, 25 78:9 81:23 82:17, 21 83:8, 15, 24, 25 84:9 85:12, 15 89:4, 7 95:23 96:10 97:7, 15, 25 98:3, 8, 11, 18 101:6, 21 102:5, 22 105:4 106:13, 24 107:10 108:12, 15 109:11, 22 110:6 111:22, 23 113:4, 17 115:3 116:2 117:11 119:13 122:11, 14 123:6 124:3 125:22, 23 129:2 130:3, 6, 10, 20 132:13, 24 134:22 135:23 139:19

140:14 141:10, 25 143:6 144:3, 14 145:2, 14 146:1 147:9 148:21 149:9, 20 150:4, 18 151:6, 17, 25 152:7, 23 154:14, 19 156:15 158:13 166:5, 19 167:6, 16 170:17, 25 171:10 172:2, 15, 25 190:13 197:5 209:22 210:3, 20 216:15 220:7, 19 221:17 229:3
**McHugh's** 19:10, 24 24:6 25:2, 3 96:16 97:9, 19 99:20 100:2, 8, 11, 23 101:7 103:21 106:2 107:21 109:23, 25 152:17 153:6, 16, 22 155:1, 11, 15, 24 173:8
**mean** 10:9 13:3 33:9 36:5 48:24 49:1 75:16 79:8, 9, 16 114:8 140:19 153:14 158:23 165:6 174:23 201:20
**means** 75:17 83:20 108:25 153:13
**meant** 181:5
**medical** 117:20
**meet** 12:8 13:5 16:22, 23 17:2 18:12 25:1 30:19 150:13
**meeting** 12:17, 21 13:11 17:4 20:18, 19 22:16 26:14 27:23 28:3, 6, 17, 18 29:7 30:9 34:18 35:6, 7 37:20 38:23 39:2, 11 41:14, 23 42:4 43:9, 14, 15, 16 44:9, 13, 23 46:7, 20, 25 47:3, 8, 13 48:2, 15, 21 49:13 50:13, 21, 24 51:1 52:5 53:20, 24 54:12, 22 55:7, 10 57:5, 14, 20, 24 58:5, 8, 10, 13, 14, 18, 20 59:5, 20, 23 60:3, 8, 12, 20 61:3, 4, 8, 10, 16, 22 62:2, 7, 15, 17, 20 63:5, 10, 20, 25 64:9 65:7, 11, 16, 23 67:22, 25 68:2, 8 69:5 70:3 71:16, 23 72:13 73:2, 10, 12, 14, 15, 24 78:13 84:25 85:5, 8, 21 86:4 87:25 89:18 90:8 104:19 110:9, 25 111:5, 14, 16, 18 112:3, 7, 13, 21, 23 113:1, 10, 15, 22 114:1, 3, 4, 7, 9, 17, 20, 24, 25 115:9, 19, 20, 23 116:12, 18 117:2, 14 118:5, 7, 15, 20 119:1, 11, 20, 24 120:4, 12, 16 121:8, 10, 15, 19 122:4, 7, 22 123:4, 10, 19, 21, 24 124:9, 21 125:8, 10, 12, 16, 18 126:3, 8 127:19 131:3, 23 133:4, 8, 11, 14, 25 134:5 143:14 156:4, 12, 18, 21 157:2, 8 158:7, 11, 20 159:4 161:22 162:25 164:3 167:2, 4 168:2, 13 172:21 191:11 194:24 203:13 214:10, 11, 12 220:15 225:22
**meetings** 12:20, 22, 23 13:4, 5, 9, 12 18:1, 3, 8, 11 19:19, 23 20:3, 10 21:4, 11, 23 23:16, 18, 22 24:9, 15, 16, 24 25:6, 10, 11, 15, 22 26:5 27:13, 19 28:10, 15 29:20 30:2, 15, 16, 22 31:3, 4, 8, 20 34:16, 21 35:2, 4, 9 39:13, 20 40:4, 10, 18, 25 41:4, 8, 12, 20 52:15, 18 78:12, 13 82:13 104:8 106:15 117:25 118:3 128:1 148:23 149:15 150:9 155:5 162:8, 18, 23 163:14, 18 203:13
**meets** 17:3, 6
**member** 12:3, 5 13:22 14:12 26:2 42:16 75:21, 25 97:14 102:13 131:2 197:4 209:21 210:19 224:7
**members** 13:21 14:2, 4 16:7, 8 17:15, 18, 19 19:17, 20 25:15, 22 28:17 29:6, 21 31:9, 19 38:14 41:11 96:5 127:18 129:17, 22 162:7 163:7 166:13, 21 167:18 172:9 173:11, 15, 25 174:7 177:9, 11, 24 181:8 185:25 186:2 187:11, 14, 18 189:7, 11, 21, 22 191:4 196:4, 7, 14, 18, 19 220:24 221:2, 10 222:8
**memo** 138:17, 20
**memory** 49:3 99:5 129:25 198:14
**mentioned** 29:14 37:23 73:4 102:17 164:24 172:7 173:10
**merger** 178:25
**mergers** 95:16 178:7, 11, 14
**message** 27:7 209:3
**met** 7:7
**metrics** 179:23 180:4, 6, 8, 21 181:7 185:6, 16
**Michael** 2:8 4:16 51:9 70:6 98:25
**Michael.cioffi@blankrome.com** 2:14
**Michigan** 76:24
**midsummer** 199:15
**Mike** 11:7, 8 217:22, 25 218:2
**mind** 93:22 139:16
**minimum** 79:14, 16, 22 80:11 139:1 206:7
**minute** 94:9 206:5 226:4
**minutes** 44:16, 18, 21, 23 45:1 46:7, 19 47:7, 20 49:12, 22 50:9, 23 51:5, 10, 13, 18 52:5, 8 53:5, 6, 16, 21 55:7, 10, 18 56:3, 4, 7, 10, 11 57:5, 14 58:19 59:5 60:20 62:15 64:9, 15, 23, 25 65:4 84:25 85:18, 21, 23, 25 86:3 88:2 91:24 93:12 94:3 99:1 110:21 111:14 112:21 114:4, 7, 9, 17 115:18 117:2 119:10, 15 120:12 122:4, 22 123:19 125:7 133:9, 15, 16 156:12 168:1
**mirror** 201:16
**mirrors** 201:14
**Mischaracterizes** 38:12 215:6 216:1
**mischaracterizing** 143:21
**Misrepresentation** 206:18
**Misrepresents** 205:4, 11
**missing** 49:15 50:7 53:14 198:4
**misspoke** 117:5
**misstates** 35:23 215:25 222:14
**model** 124:23 200:11, 19 201:6, 13
**modestly** 168:19
**money** 177:2
**months** 77:10 79:11 81:19
**morning** 162:24 190:1
**mortgage** 219:4
**mouth** 223:2
**Move** 8:10 178:1

179:16, 18
**movement** 22:24
**multiple** 163:16

< N >
**name** 5:6 10:23 11:7 199:22 210:11, 25 211:21, 24
**named** 165:3, 6, 8 166:5, 7
**naming** 78:18 211:15
**narrow** 81:3
**narrowed** 87:19
**National** 11:21 12:6 115:18 116:13, 19 119:10, 16 122:3 123:4, 11 125:7, 11 156:11
**navigate** 151:7, 18
**Navigating** 203:2
**near** 171:1 186:13
**necessarily** 17:19
**necessary** 77:12 186:21
**need** 5:17, 20 38:24 48:19 51:20 56:9, 12 77:7 114:6 127:1 135:5, 9 225:23
**needed** 76:20 185:7, 8, 17, 19 218:22
**needs** 137:5, 11, 16, 19 208:8
**negatives** 179:1
**negotiate** 89:10
**neither** 228:13
**Networks** 202:21
**never** 154:21, 22 175:25 185:4
**new** 78:18 106:19 150:12 183:19 189:15, 16 219:22
**nice** 217:24
**No._____Change** 230:2, 5, 8, 11, 14, 17, 20 231:2, 5, 8, 11, 14, 17, 20
**No._____Line** 230:2, 5, 8, 11, 14, 17, 20 231:2, 5, 8, 11, 14, 17, 20
**nodding** 5:20
**non-traditional** 175:10
**Northstar** 179:23
**Notaries** 1:23
**notary** 228:5, 25
**note** 8:23 9:6 51:8 124:24 181:19
**noted** 134:11 178:8 180:3 182:25 184:14 194:21
**Notice** 1:14
**noting** 168:17
**November** 40:17
**novo** 184:16
**number** 29:15 40:3 46:5, 14 47:22 50:2, 4 52:3, 24 53:3 55:5 56:14, 16, 17, 22 57:3 59:7, 15, 25 60:6, 18 62:13 63:2, 8, 17, 23 64:7 65:8, 14, 21 66:5, 10 72:9 73:16, 25 74:3 84:23 85:11 86:21 111:12, 25 112:5, 19 113:13, 19 114:15 115:2, 6, 16 116:1, 5, 10, 25 118:9, 18, 24 119:8, 12, 22 120:10, 14 121:13, 18 122:1, 10, 23 123:2, 8, 17 124:2, 17 125:5, 22, 25 128:20 132:7, 8, 16, 23 134:2 135:22 138:15 140:5 156:14, 24 157:4, 14 158:9, 12 159:10, 13, 21, 24 161:13 167:22 175:3 194:13 200:4 213:17 214:2 219:16 220:18, 24 221:2, 10 222:10 223:18, 25
**numbered** 194:12
**numbering** 50:8 191:13
**numbers** 55:12, 18, 24 140:8 181:5 191:13 224:4, 5, 11

< O >
**oath** 229:15
**object** 8:2
**objecting** 8:12
**Objection** 7:13 8:10, 24 9:3 12:25 16:14 20:5, 13 21:15 23:6, 23 24:8, 14 27:12, 18 28:21 29:24 30:7, 21 31:12 33:4 35:23 36:13 37:25 38:5, 12 39:21 40:11, 19 41:1 43:7 45:8 47:14 48:23 49:17 50:14 51:3 54:14, 24 55:20 64:16 67:7 68:15 71:2 73:17 77:18 80:17 83:16 87:16 88:15 90:21 91:16 92:2, 12 93:21 94:9 98:20 99:13 102:6, 9, 23 103:8 107:1, 11 136:22 137:22 140:18 141:13 142:2, 22 143:9, 20 144:5, 16, 22 145:18 146:10 147:13 149:5, 25 150:22 151:20 152:9, 19 153:7 154:3, 18 155:3 158:21 162:9, 15 163:11 165:21 167:8, 12 169:1, 21 170:7, 18 171:11, 22 173:3, 17 174:8, 20 175:22 176:12, 22 177:14 178:18 179:10, 16 180:10 182:5 183:10, 25 186:5 187:15 190:8, 17 193:2, 8 195:16 196:9 197:7, 15 198:24 199:2, 9, 19 200:23 201:9, 18 203:10 204:10, 21 205:3, 10, 15, 16 206:18 209:25 210:5, 15, 21 211:4, 17 212:1, 7 215:5, 18, 25 217:16 221:5 222:14, 25 225:7
**objections** 170:23 199:3
**objective** 102:19 103:6, 13, 14, 18 106:11 107:5, 8, 19 140:12, 21 141:1, 7, 20, 22 142:6, 12, 14, 20 143:4, 14 144:2, 8, 25 145:13, 24 146:7, 23 147:7, 25 148:8, 18 149:3, 7, 18 150:2, 16 151:4, 15 152:5 168:24 176:9 178:15 180:8, 21 182:2, 7 183:7 184:24 188:18 195:6 208:13 222:17
**objectives** 180:22 186:13 209:7
**observation** 38:14 102:12 148:25
**observations** 82:12 103:9, 13, 14, 15 107:22 141:2 161:22
**observe** 14:18, 19 15:24 18:9 30:5, 12, 14, 17 37:21 50:15 69:10 72:7 95:10, 11 98:11 102:14 168:24 171:25
**observed** 34:22, 23 35:17 36:3, 17 38:16 81:6 97:14 100:9, 12 101:13 151:14 174:2 189:23 225:15
**observing** 34:25 36:4, 7, 19 78:21
**obvious** 145:7 146:25
**Obviously** 32:5 51:9
**OCC** 181:18 194:21
**occur** 65:6 76:24 77:1
**occurred** 56:20 100:7
**October** 13:18 157:18
**offer** 229:14
**offered** 154:7
**office** 41:21, 22 64:24 228:19

**officer** 86:9, 19 88:4 89:9, 16, 19 92:1, 5 95:24 126:2, 14 130:14 208:7
**officer/CEO** 90:1
**officers** 84:12 87:5 88:11, 14 90:9 93:15 95:19 165:10
**official** 228:19
**Oh** 7:1 13:22 28:23 39:1 76:11 105:15 166:20 175:6 219:13
**OHIO** 1:3, 20, 23 2:6, 13 4:5 6:5 11:13 76:22 77:11 228:2, 6, 19, 25
**Oil** 10:12
**Okay** 10:17 11:24 12:2 22:6, 15 68:12 74:10 81:21 93:8, 9 105:8 113:18 131:16 139:2 161:12 167:14, 24 192:22 198:19 205:18 206:8 212:12 213:8, 20
**old** 183:20
**Oliver** 164:11, 21 172:17
**once** 127:12 162:19
**one-on-one** 19:3
**ones** 219:20
**ongoing** 209:14
**open** 51:16, 20 160:14, 18, 19 209:13 216:13
**operating** 76:12 96:15
**operations** 95:6, 9, 15 96:19 101:23 176:18
**operator** 96:24, 25 97:1
**opinion** 92:16 99:24 100:24 101:11 102:15 136:25 141:6, 23 142:3, 9, 10 143:3, 18 145:23 146:6 152:23 177:25 186:3 195:21 198:3 225:10
**opinions** 108:9, 12 150:15
**opportunities** 86:11 88:6 183:4
**opportunity** 168:24 189:21 196:14
**opposed** 52:8 159:3
**optimization** 145:4, 16 146:3 147:11 148:14
**order** 48:19 56:9 76:1 199:17
**organic** 145:3, 15 146:2 147:10 148:14
**organization** 167:4 171:5 184:12, 20
**organizational** 159:14 171:4 196:22 208:24
**organizations** 96:14 98:11, 14
**ought** 164:19 172:18
**outgoing** 14:6, 10 165:9
**outline** 145:3, 15 146:2 147:10 148:13
**outlined** 135:25
**Outlook** 178:2, 8
**outperforming** 104:17
**outside** 10:12, 19 11:2 14:20 18:8, 11 19:19, 23 20:17 23:17, 21 24:9, 15, 16, 23 25:10 26:5 27:13, 19, 23 28:5, 18 29:7, 19 30:2, 9, 16, 22, 23 31:4, 7, 8, 20 34:12 35:9 78:8 106:21 107:12, 24 112:8 127:10 148:25 149:19 150:15 155:4, 22 176:6 189:17 198:3, 6, 11, 22 225:19, 21
**outstanding** 38:19 181:3 189:15
**overall** 192:20 195:5
**overview** 168:12 220:14
**overwhelming** 136:1, 14

**< P >**
**p.m** 82:25 83:2, 3, 4 105:18, 20, 21, 22 135:11, 12, 13, 14 160:4, 6, 7, 8, 22, 24, 25 161:1 212:13, 15, 16, 17 226:5, 7, 8, 9, 19 227:9
**package** 97:6 175:1
**PAGE** 3:3 46:14 49:16, 24 50:2, 3, 4 51:18 53:9, 10, 11 66:14 67:4, 8, 9 74:11, 13 75:7 85:14 89:5, 7 110:5 120:17 122:14 129:1 130:9 131:18 134:20, 22, 23 151:25 168:3, 8 181:12, 16 187:23 191:16 194:12 200:17 202:17 203:1 208:4 213:19 216:17 220:7 221:16, 18 230:2, 5, 8, 11, 14, 17, 20 231:2, 5, 8, 11, 14, 17, 20
**pages** 49:15 50:7 53:14 57:15 67:9 68:13, 16 83:14, 24 86:21 88:11 91:5, 11 130:2
**paid** 42:15
**pandemic** 118:4
**paragraph** 56:15, 18 86:7 89:22 127:16 131:18, 19 134:8, 10, 11, 22 175:3, 5 178:1 179:18 182:18 184:10 186:9 187:24 194:19
**parallel** 93:17, 23
**part** 7:16 13:11 16:12 20:14 29:14 35:6 70:24 71:13 73:18 74:2 131:1 139:11 140:7 163:4 176:8 180:6 181:24 182:1 183:6 185:9 186:23 189:20 207:22 209:15
**particular** 67:8, 9, 20 68:21 71:16 72:6 73:12, 24 76:23 94:22 100:2, 21 101:16 118:14 158:17 168:25 188:4 225:21
**particularly** 16:10
**parties** 141:2 228:14
**parts** 103:4 169:15 197:1 220:4 223:12, 13
**Pas@sspfirm.com** 2:7
**passion** 38:19 79:19
**passionate** 182:14 209:3
**Patterson** 2:5
**Paula** 191:7
**Payments** 132:21
**pecking** 185:21
**peer** 184:15 196:21
**peers** 180:14, 15
**PENALTY** 229:5, 6
**pending** 4:4 160:12
**people** 11:8 32:20 36:16 60:11 63:14 70:4 73:3 74:15 102:21 112:12 116:17 165:14 183:19 189:4 191:5 222:2, 3, 10, 12, 17, 23
**perfect** 195:23
**perfectly** 24:12
**perform** 80:7 95:12 185:8
**performance** 19:25 24:6 25:3 67:19 82:14 84:2 86:6, 8, 19 88:4 91:10 96:3, 5, 14 98:2, 7, 9 99:22 100:8, 14, 24 101:16, 19, 20 102:4, 14 109:3 110:8 148:24 162:21 180:3 192:20 208:21
**performed** 100:25 109:23, 25 161:24

**performing** 98:*12* 104:*6* 161:*25* 172:*25*
**period** 18:*22* 23:*3* 35:*12* 36:*10* 40:*4* 75:*2* 76:*12, 15* 78:*20* 79:*7, 8, 11* 81:*13, 15, 16, 17* 96:*19* 103:*22* 117:*24* 121:*5* 163:*22* 165:*13* 194:*6* 224:*18* 225:*17*
**perjury** 205:*13* 229:*5, 6*
**perseveres** 209:*8*
**person** 34:*10* 38:*9* 77:*8* 81:*8, 12* 82:*15* 95:*21* 123:*22* 128:*13* 155:*11* 156:*18* 161:*24* 162:*1, 4* 165:*9* 205:*2* 213:*24* 223:*8*
**personal** 134:*14* 141:*18, 23* 142:*3, 9, 10, 17* 203:*1*
**personally** 4:*18*
**pertain** 171:*5*
**pertaining** 128:*23* 155:*17*
**Peter** 2:*1* 4:*12*
**Petroleum** 6:*20* 7:*4* 9:*15, 20* 10:*15, 16, 18* 11:*3* 32:*15*
**pharmaceuticals** 201:*23*
**Pheasant** 6:*4*
**Phenise** 2:*17* 4:*22*
**Phil** 18:*15, 18, 21* 19:*1, 7, 21, 24* 20:*3, 10* 21:*5, 9, 23* 23:*1, 4, 11, 16, 20* 24:*3, 6, 23* 25:*2, 3, 7, 12, 17, 23* 138:*25* 139:*19* 140:*14* 141:*10, 25* 143:*6* 144:*3, 14* 145:*2, 14* 146:*1* 147:*9* 148:*20* 149:*9, 20* 150:*4, 18* 151:*6, 17* 152:*6* 166:*5* 171:*3* 203:*23* 204:*5*
**PHILIP** 1:*7* 2:*14* 4:*6, 13, 15* 17:*22, 23, 25* 18:*2, 9, 12* 229:*3*
**Phone** 2:*7, 13* 18:*16* 21:*1* 26:*6, 7, 10, 15, 20* 117:*25* 118:*3* 121:*8*
**piece** 219:*5*
**pitfalls** 196:*1*
**Pittsburgh** 11:*13*
**Place** 1:*14* 6:*4* 45:*2* 46:*21* 77:*23* 78:*3* 81:*15* 86:*4* 114:*19* 118:*5* 122:*6* 125:*11* 150:*13* 161:*17* 162:*7* 201:*4* 209:*9* 228:*10*
**placed** 37:*5*
**Plaintiff** 1:*8, 14* 2:*1* 4:*6, 13, 15* 123:*13* 167:*22*
**Plaintiff's** 3:*8, 9, 10, 11, 12, 14, 15, 16, 17, 18, 19, 20, 21, 22* 46:*1* 51:*24* 55:*1* 56:*24* 58:*22* 60:*14* 62:*9* 64:*3* 66:*1* 84:*19* 111:*8* 112:*15* 114:*11* 115:*12* 116:*21* 119:*4* 120:*6* 121:*22* 125:*1* 128:*16* 132:*1* 138:*11* 140:*1* 156:*6* 157:*10* 159:*6*
**plan** 13:*10, 13* 66:*8* 68:*24* 69:*16* 70:*9, 14, 21* 71:*1, 15, 22* 72:*22* 98:*13, 18* 99:*22* 168:*12* 171:*3* 194:*17, 21, 22, 25* 195:*5* 213:*2* 220:*14, 16, 20, 22* 221:*23* 222:*1, 24*
**planner** 182:*10*
**planning** 14:*21* 17:*10, 13* 22:*17* 29:*16* 32:*12* 33:*18* 37:*20, 23, 24* 67:*18* 69:*8* 71:*20, 25* 78:*23* 83:*9* 86:*11* 88:*6* 90:*9* 110:*13, 19* 116:*7* 124:*8* 126:*2, 13* 127:*18* 131:*9* 157:*6* 161:*6, 18* 163:*3* 171:*18* 181:*18, 22* 190:*15* 191:*10* 225:*2*
**plans** 187:*25*
**platform** 95:*8* 104:*2* 188:*11*
**platforms** 27:*2* 38:*18* 103:*25* 141:*5* 164:*13*
**play** 16:*5* 69:*22* 71:*24*
**please** 5:*6, 13, 17* 6:*3* 17:*1* 20:*15* 21:*20* 24:*19* 28:*1* 29:*2* 31:*14* 45:*16* 46:*6* 47:*19* 52:*4* 55:*6* 57:*4* 59:*4* 60:*19* 62:*14* 64:*8* 67:*14* 71:*10* 74:*12* 83:*17, 22* 84:*24* 93:*25* 99:*11, 12* 111:*13* 112:*20* 114:*16* 115:*17* 117:*1* 119:*9* 120:*11* 122:*2* 123:*18* 124:*14* 125:*6* 128:*21* 130:*11* 132:*9, 17* 133:*7* 134:*21* 138:*16* 148:*6* 153:*11* 155:*8* 157:*15* 159:*11* 167:*23* 179:*19* 182:*18, 19* 185:*13* 186:*9* 187:*23* 194:*19* 198:*15* 199:*4* 200:*18* 205:*6, 8* 207:*1, 15, 17* 208:*4* 221:*14*
**plural** 93:*14*
**PNC** 2:*12*
**point** 36:*2* 51:*8* 137:*8* 138:*24* 148:*16* 160:*10* 176:*25* 177:*18* 182:*17* 189:*20* 190:*5* 196:*4* 197:*3* 204:*17* 215:*16, 19* 224:*15* 226:*17*
**pointed** 105:*3*
**pointing** 216:*22*
**points** 48:*8*
**policies** 15:*14*
**policy** 79:*4* 225:*13*
**polished** 99:*24* 100:*3, 8, 15*
**political** 168:*15*
**Poole** 2:*17* 4:*22*
**population** 168:*17, 19* 169:*4* 170:*12*
**portal** 41:*16*
**portion** 44:*12* 68:*14* 89:*2* 218:*24* 219:*2*
**posed** 175:*12*
**position** 9:*17, 19* 32:*3, 22* 47:*12* 48:*1, 16, 22* 50:*12* 53:*19* 57:*19* 60:*2* 61:*15, 21* 63:*5, 19* 65:*10* 77:*9* 90:*1* 95:*24* 112:*2* 113:*9* 115:*8* 118:*12* 119:*19* 152:*25* 160:*20* 185:*22* 192:*10* 209:*10* 215:*14*
**positions** 33:*21* 83:*10* 128:*7* 191:*17* 216:*23*
**positive** 136:*13, 19*
**positives** 138:*5, 8* 179:*1* 196:*1*
**possess** 151:*12* 190:*13* 210:*4, 7*
**possessed** 148:*13* 195:*20* 211:*8*
**possesses** 180:*24*
**possessing** 145:*3, 15* 146:*1* 147:*9* 209:*22*
**possible** 34:*5* 74:*17* 90:*12* 126:*14* 199:*25*
**possibly** 75:*19, 20* 167:*1*
**post** 117:*17, 19*
**potential** 22:*23* 37:*22* 82:*1, 14* 83:*10* 84:*2, 4, 5, 14* 89:*10, 12, 24* 90:*12, 15* 91:*9, 12, 20* 92:*6* 93:*10* 94:*22, 25* 96:*6, 10* 97:*17* 179:*15* 191:*17* 199:*25* 216:*23*
**potentials** 191:*25*
**PowerPoint** 72:*16*

**PPG** 11:13 32:15
**practical** 45:4, 17
**predetermined** 12:11
**preface** 24:9
**preliminary** 13:17 182:21
**prepare** 7:5 38:22 39:2
**prepared** 39:11 69:11, 19, 20, 21 76:5, 6 86:1 159:23, 25 160:1 220:16, 21 222:1, 13
**prepares** 69:15, 18
**preparing** 10:5 34:21 69:22 70:2 221:3
**prescribed** 216:7
**Present** 2:14 4:9 46:25 59:19 62:17 104:14 113:24 115:20 118:15 123:21 125:15 141:4 149:15 150:9 172:5 176:9 178:15, 22 180:23 182:2 183:7, 18 184:23 185:5 186:24 188:18 193:21, 22 195:6, 8 196:20
**presentation** 34:13 50:20 51:1 54:12 88:9, 19 93:9 96:13 97:19, 21 100:12 104:10, 12 113:25 119:1 120:3 141:7 143:18 146:5, 6, 9 148:8, 11, 12 161:24 166:22 167:5 168:23 169:5 171:2, 9, 10, 14 173:7 175:17 176:8, 15 178:14 179:7 180:7 181:7, 23, 25 182:1, 7 183:6 186:24 189:6, 24 190:15 192:23 194:15, 16 195:11
**presentations** 30:15 38:16 51:5 78:24 97:10, 14 104:7, 9 106:14, 21 107:13 112:13 113:21 116:11, 17 123:3, 10 141:2, 6, 19 143:12, 15, 16 144:7, 8, 9 145:6, 9, 12, 23 146:23 147:3, 6, 17, 20, 25 148:2, 7, 22, 25 149:13, 19 150:8, 16 151:9, 10, 12, 14 158:4 162:8 163:6, 10, 16, 19 164:11 166:13, 15, 18, 20 167:1, 7, 15, 19 170:25 172:1 173:1, 11 192:25 193:11, 13, 17 224:4
**presented** 26:14 39:8 54:22 60:11 63:14 67:22 70:11 72:16, 17 82:8, 11 83:8 87:18 112:6 147:1 148:12 172:11 178:24 185:5 190:1 194:22 203:7 207:20 217:7 222:11, 17 224:9, 11, 16
**presenter** 54:9 72:12, 14 181:3
**presenters** 42:3 53:23 54:1, 19 57:23 58:1, 4 60:7 62:1, 6 63:9, 24 65:15, 23 72:12, 14 113:14, 20 116:11 118:19 119:23 120:3 121:14, 19 123:9
**presenting** 19:5 82:9 87:15 171:6 173:6 188:16 222:12
**preserve** 51:23
**preserving** 51:16
**preside** 41:3
**presided** 40:3, 9, 18, 25 41:7 47:2 58:10 59:22 61:10 62:20 85:8 111:18 113:1 114:24 115:23 118:7 121:10 123:24 125:18 156:21
**president** 16:6, 13, 19 17:10, 13 20:4, 11 21:5, 10, 24 22:22 23:1 25:7 27:11, 17 28:7, 12, 19 29:9, 22 31:11, 22 32:10 33:23 34:1, 8 35:14, 20 36:6, 18, 23 37:1, 6, 12, 16 38:10 43:5, 19, 23 44:1 45:23 47:12 48:1, 17, 22 50:12 53:19 57:19 60:3 61:15, 21 63:5, 19 65:11 71:20, 25 74:3 75:5 94:23 111:1 112:3 113:10 115:9 116:8 118:12 119:19 124:7, 19, 22 126:1, 14 128:6 130:13 132:20 134:15 139:24 154:12, 16 156:3 157:1, 6, 17, 21, 25 158:5, 18 159:15 177:19 179:9 183:24 184:6 187:8, 21 191:20 192:3 197:14 204:19 210:11 211:1, 12, 16, 22, 25 216:24
**presides** 39:13
**presiding** 39:20
**pressure** 197:21
**presumably** 113:23 134:1, 6
**pretty** 32:24 97:15 201:3, 12, 13 225:23
**previous** 8:6
**previously** 61:7 84:15 125:15 140:6
**pride** 224:7
**primarily** 186:20
**primary** 14:17 180:1
**prior** 8:19 10:10 17:21 18:23, 25 19:6 20:9 21:3, 10, 22 23:9 25:25 26:4, 11 27:7, 9, 14 28:25 29:5 30:11 31:2, 7, 18 45:7 67:24 68:1 78:13 126:12, 18 157:23 191:1 193:25 204:14 205:3, 4, 10, 11, 12
**priorities** 69:7 86:11 90:16 95:2 110:14 136:18 182:21
**priority** 76:1
**privilege** 8:17
**privileged** 7:24
**probable** 178:12
**Probably** 7:3 12:13 17:2 79:14 100:10 135:7 163:18 219:4 225:2, 3
**problems** 5:15
**proceed** 51:9
**proceeded** 182:20
**process** 7:16 9:22 16:5, 12 22:18 32:2, 9, 11, 12, 13, 15, 17 33:5 34:1 37:18 64:14 71:25 78:21 79:6 80:14, 23 81:1 131:21 136:15 161:6, 15 162:6, 22 163:21 173:10 181:18 200:7 209:15 224:5
**produced** 49:11 51:18 160:16
**product** 7:17
**professional** 17:24 23:14 26:2, 12
**profile** 127:20, 25 128:2, 3, 24 129:12, 15 130:15, 22 131:1, 4, 7 134:12 138:19 140:6 199:13 200:13, 15 201:16, 22, 25 216:19
**profiles** 214:1
**profit** 109:10, 14, 21
**progress** 51:12 137:17 160:12 179:22, 24 226:13, 16
**projects** 209:3
**prolonged** 224:21
**prompting** 153:3
**pronoun** 83:19
**proposed** 86:8, 19

88:3
**proposition** 186:16
**provide** 99:9 198:11 206:19 219:15, 17, 22, 25 220:25
**provided** 41:11 51:11 70:24 71:14, 21 73:13, 15, 25 74:2 82:16, 18 86:20 89:1 132:11, 19 141:3 168:11 169:3 213:14 219:21 220:13
**provides** 41:19
**providing** 87:1
**proxy** 165:4, 7, 8, 14 166:6 180:15
**public** 11:12 13:7, 8 228:5, 25
**Public-State** 1:23
**pulse** 79:1
**purely** 144:21
**purpose** 131:6 157:19 160:15
**purposes** 180:17
**Pursuant** 1:14 4:18 228:12
**pursuing** 137:13 182:25
**pushes** 209:11
**put** 50:16 77:12 81:19 150:12 172:14, 15 191:2 217:2, 13 218:10 223:2
**pyramid** 81:3

**< Q >**
**qualifications** 171:20 179:8 183:24 187:7 211:2
**qualified** 228:5
**qualities** 72:3 78:19, 23 81:5, 8 100:25 101:2, 3, 14 102:16 103:20 141:4 211:8
**quality** 97:4, 5 151:13
**quarter** 12:12
**quarterly** 13:6
**quartile** 179:23
**quasi** 15:6
**question** 5:14, 24 7:19, 22 8:6 10:17 18:24 20:7, 17, 20, 21, 24 21:19 22:1, 7, 13 23:24 24:11, 18 27:20, 21, 24 28:22 29:1, 3, 25 30:10, 25 33:25 40:20 45:9, 11, 12, 14, 15 47:6, 19 48:6, 24 49:5, 18 54:8, 21 56:19 67:10 71:5, 7, 9, 10 72:12, 15, 19, 24, 25 73:1, 2, 4, 19 74:1 80:20 82:9, 12 83:17 84:8 87:17, 22 88:11 90:23 91:6 92:15 93:22, 25 94:1, 5 98:21 99:11 100:13 101:15 102:7 103:1 107:13 117:18, 22 130:24 133:20 136:23, 24 137:1 139:18 140:19, 23 141:14, 16 142:3, 24 143:1, 2 144:6 145:20 146:8, 12, 17, 20, 21 147:20 148:3 150:23 152:9, 19 153:9, 10, 19 154:4, 19 155:4 158:22, 25 170:19 174:6 199:2, 4 205:6, 8 206:25 207:6 213:5 216:2 217:17, 18 218:2, 5 221:7, 8
**questioned** 162:1
**questioning** 105:10 162:3
**questions** 5:12 31:13 51:12 91:9 95:21 103:10 104:10, 15 109:2 160:11 162:2 191:15 212:11, 19, 22 226:11
**quick** 81:3
**quickly** 174:2 185:19
**quit** 152:21, 24
**quite** 145:7 146:25
172:23
**quote** 225:18

**< R >**
**ran** 32:14
**ranked** 75:25
**rapid** 194:5
**rapidly** 179:14 187:19 189:14
**rare** 97:4
**rating** 152:2
**ratings** 213:13
**ratio** 180:1
**Raymer** 1:20 228:4, 24
**reach** 190:3
**read** 20:14, 16 24:11, 13 29:1 31:14 39:8, 10 46:24 48:5 58:2 83:17, 18 89:8 90:4 91:24 93:24 102:7, 8 105:5 107:11, 13, 14 124:23 136:20 137:3, 6, 25 138:2, 4, 6, 8 153:10 155:8 168:7 169:13 175:4 178:5 181:15 182:18 184:8 186:9 187:24 194:18 199:4, 8 203:21 205:6, 8, 9, 25 206:25 207:2 208:3, 4 223:20 226:17 229:7, 9
**readiness** 90:15
**reading** 172:11 173:2
**reads** 86:7 90:13 126:11 127:17 134:11, 24 137:11 138:24
**ready** 74:22, 23 105:13, 15
**really** 19:12 31:13, 16 38:20 78:25 79:2, 5 80:1 82:8, 12 95:10 136:17 162:3 169:13, 14 172:9 176:2 182:14 185:7, 18 188:8 224:21
**reason** 7:17 158:17 230:4, 7, 10, 13, 16, 19, 22 231:4, 7, 10, 13, 16, 19, 22
**recall** 10:23 18:14, 17, 20 19:6, 11, 12 20:10 21:3 23:2, 19, 25 24:4 25:9, 13 26:9, 17, 20, 23 27:4, 8 28:9, 13 29:12 30:3, 18 31:6, 23 33:16 35:15 37:8, 14 39:25 40:13 44:4, 6, 10, 11 45:25 48:18 49:1, 2, 9 56:20, 23 57:8, 13, 16 61:19, 24 63:16, 17, 22, 23 64:2 71:16 73:11, 23 74:5 77:15, 20, 23 78:2, 11, 12, 13 85:24 86:24 88:12, 25 89:3 98:1, 10, 16 100:5, 17, 21 105:6, 7 106:7 108:22 109:4, 6 110:18, 21 111:3, 4 117:24 118:3 120:19 121:3, 4 122:23 126:9 130:15 131:5 133:22, 24 134:1, 3, 4, 6 139:15, 18, 21, 25 143:14 149:14 156:1, 5 158:10 159:5, 18 166:6, 8 171:13 180:22 198:7 204:12 205:22, 23 215:1 223:12 224:15
**recalled** 135:19
**receive** 39:3, 6 42:19 109:7
**received** 68:3 152:1, 7 175:25
**receiving** 154:15 216:10
**recess** 42:10 83:2 105:20 135:12 160:6, 24 212:15 226:7
**recipients** 66:16
**recited** 39:12
**recognize** 51:15, 22 52:7 160:17 172:21 185:15, 18 226:14

**recognized** 172:16
**Recognizing** 49:15
**recollection** 124:11 139:8
**recommend** 10:3 43:4 45:22 139:1 206:7
**recommendation** 43:10, 22, 25 44:2, 4, 7, 8, 11, 14
**recommendations** 10:1 15:25 135:18, 24 136:6 138:5 176:16
**recommended** 11:9 158:5 172:17 205:21
**recommending** 13:25
**record** 4:2, 10 5:6, 22 6:1 20:16 24:13 42:7, 9, 13 45:5, 18 56:12 82:24 83:1, 5, 18 84:9 99:17 102:8 105:16, 19, 23 107:14 135:10, 15 160:3, 5, 9, 23 161:2 168:7 184:8 199:8 205:9 206:20, 23, 25 207:2, 4, 18 208:4 212:9, 14, 18 223:1, 21 226:3, 6, 10, 20
**recorded** 51:6
**recruit** 76:13
**Redundant** 38:6 41:2 90:22 143:9 147:13 151:20
**refer** 55:12 74:6 81:21 135:5, 7, 21 151:25 213:17 214:1 220:5 221:13
**reference** 53:8 104:22 122:15 180:6
**REFERENCED** 3:7 10:7 12:16 35:19 81:17 87:8 90:7 130:16 133:9 220:18
**references** 66:25 220:19 224:4
**referred** 16:3 68:25 88:13 89:19 93:13 215:19
**referring** 14:9, 12 18:23 43:14, 18, 21 52:23 68:16 85:14 86:6, 15, 20 89:6, 22 100:20 108:2, 6 110:4, 16 122:14 127:24 129:18 130:20 131:15, 17 134:7 151:24 184:20 213:4, 18, 25 223:18
**refers** 220:13
**refineries** 6:19
**reflect** 165:18
**reflected** 215:17, 23
**reflects** 214:25
**refresh** 49:3 129:24 139:8
**refreshes** 198:14
**regarding** 19:21 21:4, 9, 23 28:18 29:8, 21 30:20 31:10, 21 48:15, 21 50:11 51:13 61:20 63:4 71:19 73:12, 24 74:3 88:11, 14 95:21, 22 108:9, 12 110:19 111:1 113:8 116:7 118:11 119:18 120:16 124:7, 19 136:6 150:15 155:11, 24 156:2 157:1, 6 178:14 209:13
**regional** 168:18 175:10 178:11
**regular** 44:12 78:16 80:14, 23
**Regulation** 89:13
**regulators** 150:5, 9, 19
**regulatory** 17:5
**related** 126:12, 13 134:12
**relates** 74:15
**relating** 186:14
**relation** 186:22
**relationship** 17:22, 25 23:4, 11, 13, 15 26:1, 2, 12 182:22, 24 186:21
**relative** 98:18 99:21
228:13
**relevant** 51:19, 21
**rely** 142:15
**remain** 77:9
**remains** 209:13
**remarkable** 172:24
**remarking** 140:6
**remember** 109:18 161:7 194:2
**remind** 20:23
**reminded** 127:18
**reminder** 5:11
**reminding** 126:11, 19
**removal** 89:13
**remove** 22:9
**renew** 88:15
**renowned** 127:8
**repeat** 5:14 10:17 16:16 18:24 20:24 29:3 31:15 59:14 71:9 92:15
**repeating** 90:23 103:10
**repetitive** 94:10
**rephrase** 5:14 20:7 21:18 24:18 28:15 30:25 47:6, 19 68:17 73:20 80:19 124:13
**rephrased** 20:20 22:7
**replace** 35:13, 21 37:1, 6 38:10 43:5
**replacement** 9:23 11:6 33:14 78:16 127:13
**replacing** 21:5, 9, 12, 13 22:4, 9, 11 32:10
**report** 131:22 132:19 133:2, 5, 10, 13 135:1, 6, 21, 22 199:13
**reporter** 5:19
**reporting** 102:21 150:14 228:16
**reports** 18:19 25:2 30:20 31:3 74:14 137:13 224:12
**represent** 4:17 40:16 49:11 140:5
**representation** 4:19
**represented** 224:6
**representing** 159:14
**request** 9:1 51:10
**required** 76:9 78:15 80:22 181:19 186:19 187:20 201:4 209:1
**requirement** 102:14
**requirements** 150:14 181:18 194:22 201:2
**requiring** 162:3
**requisite** 95:6, 13
**reserve** 226:15
**residence** 6:3, 4
**resilience** 151:7, 18 203:4
**resistance** 209:6
**resolution** 89:6, 8 91:7 160:12
**resolutions** 89:23
**Resolved** 89:9
**respect** 6:21 8:8, 22 14:15 22:4, 25 32:25 33:13, 25 36:10 43:23 49:12 71:25 75:15 77:16 83:9 86:18 93:2 100:14 101:4 102:20, 21 106:9, 10 107:4, 7, 17 118:14 120:24 122:21 127:25 129:21 133:2 140:10, 14 141:10, 25 143:7 144:3, 14 145:2, 14 146:1 147:9 148:21 149:9, 20 150:4, 18 151:6, 17 161:17 163:3, 21 169:19 170:4, 11 174:18 175:19 180:20 181:7 184:13, 15 185:10, 24 186:3, 17 188:5 193:13 195:3 197:22 199:18 217:12
**respective** 88:11 109:22
**respectively** 89:12
**respects** 228:12
**response** 168:21
**responsibilities** 76:16

**responsibility** 29:15, 16 161:13
**responsible** 44:18
**responsive** 51:21
**rest** 138:6
**restate** 155:7
**result** 228:15
**results** 184:16
**retain** 10:12, 18, 22
**retained** 11:3
**retire** 9:14
**retired** 9:13, 15
**return** 179:24, 25
**revenue** 223:10, 15
**review** 7:10, 15, 20 10:13, 19 13:6, 9, 12, 17, 18 15:22 22:17, 18 42:1 53:16 70:1 81:25 82:19 86:6, 8, 18, 19 88:4 89:24 90:9 91:5, 11 93:2, 6 108:20 110:8 125:21, 25 126:23 129:22 131:22 161:21 167:3 168:12 194:24 196:21, 22 213:11, 14 214:5, 8, 10 220:14, 16, 20, 22
**reviewed** 7:14, 21, 25 8:3, 7, 25 10:5, 6 15:17 19:8 37:19 67:24 84:12 86:8 88:3 90:7, 13, 20 91:7, 24 93:15, 18 94:4 126:21 129:15 130:25 134:24 175:12 178:7 179:22 181:17 184:11 186:13, 18 188:1 213:2 223:10
**reviewing** 84:1 93:13 109:18 131:8 166:25 171:2, 4 223:24
**reviews** 15:13 41:25 69:6, 9 225:2
**RHR** 126:24, 25 127:5, 7, 10 128:6, 10, 14, 23 131:21 132:11, 19 136:6 139:19, 23 152:2, 8 199:22 200:13 204:3 207:20 208:1 211:21 213:15, 16
**ridiculous** 205:15 206:24
**Right** 5:16 9:5 22:8, 12 33:19 39:17 48:8 49:22 61:8 62:21 66:17, 23 67:2 70:17 75:10 82:23 85:6, 9 88:18 105:8 114:25 115:1, 24 117:18 118:6 121:11 125:16, 19 129:7, 9, 12 130:1 132:15 160:19 184:20 186:10 192:9 193:1 194:4 206:25 213:9 214:2, 7, 16 221:4, 20 226:4, 15, 16
**right-hand** 46:9
**rights** 51:16, 18, 23
**rigorous** 140:16 141:12 217:8, 10
**rise** 150:6, 20
**risk** 15:1, 12, 13, 14, 15, 16, 17, 18 17:3, 4, 9, 19 39:6 89:16 166:23
**risks** 195:24
**ROA** 179:25
**role** 14:15, 17 16:5, 19 69:22 71:24 89:10
**roles** 52:21 89:16 95:10
**Rome** 2:11
**rooted** 145:4, 16 146:3 147:11 148:14
**ROTCE** 179:25
**roughly** 68:7, 13
**RPR** 1:20 228:4, 24
**rubber** 217:9
**Rule** 51:22 228:17
**Run** 6:4 25:20 30:10 45:16 55:15 81:15
**running** 76:15 81:10
**runway** 79:14, 16, 22 80:4, 10

< S >
**S/Wendy** 228:24
**Saba** 2:1, 5 3:4, 5 4:12 5:4 7:19 8:5, 14, 18 9:2, 5, 8 13:2 16:17 20:7, 8, 20, 24 21:2, 17, 21 22:3 23:8 24:1, 10, 16, 20, 21 27:14, 21 28:4, 22, 24 29:3, 4 30:1, 4, 8, 25 31:1, 15, 17 33:6, 12, 19, 24 36:9, 21 38:2, 8, 21 40:5, 15, 23 41:5 42:7, 14 43:8, 13 45:11, 13 46:3 47:16, 21 48:6, 12, 25 49:4, 20 50:18 51:8 52:1 54:20 55:3, 22 57:1 58:25 59:1 60:16 62:11 64:5 65:2 66:3 67:10, 12 68:17, 18 71:4, 11 73:20, 21 77:22 80:19, 21 82:24 83:6, 21, 23 84:21 87:21 88:18, 23 91:1, 13, 22 92:9, 13 94:1, 2, 14 95:1 98:24 99:3, 7, 15, 18 102:10, 18 103:1, 5, 12, 15, 17 105:12, 15, 24 107:3, 16 111:10 112:17 114:13 115:14 116:23 117:5, 6, 22, 23 119:6 120:8 121:24 123:15 124:12, 15, 16 125:3 128:18 132:3, 5 135:10, 16 136:24 137:1, 2 138:3, 13 140:3, 20, 22 141:17 142:6, 12, 16, 23 143:2, 11, 17, 23, 24 144:11, 19, 24 145:21 146:16 147:2, 15, 19, 23 148:10 149:6 150:1, 24 151:1, 3, 23 152:11, 14 153:1, 9, 12, 15 154:9, 24 155:6, 9 156:8 157:12 158:25 159:1, 8 160:3, 10 162:9, 15 163:11 165:21 167:8, 12 169:1, 21 170:7, 18, 23 171:11, 22 173:3, 17 174:8, 13, 20 175:22 176:12, 22 177:14 178:18 179:10, 16 180:10 182:5 183:10, 25 186:5 187:15 190:8, 17 191:14 193:2, 8 194:11 195:16 196:9 197:7, 15 198:24 199:9, 19 200:23 201:9, 18 202:4 203:10, 20 204:10, 21 205:3, 10 206:18, 22 207:3, 14 209:25 210:5, 15, 21 211:4, 17 212:1, 7, 21 215:7, 15, 20 216:3 217:19, 21, 24 218:2, 8 221:7, 9 222:21 223:3, 5, 9 225:20 226:3, 11
**Saema** 85:15
**sake** 5:18
**salary** 216:9
**Sandy** 1:22
**sat** 149:14 151:10 162:17 193:10
**satisfied** 203:9
**save** 229:10
**saw** 70:12, 19 97:6, 7 173:21 176:4, 5 188:14 189:17 194:2 218:14
**saying** 12:23 17:17 24:15 27:12, 14 75:8 100:20 105:6 107:12 114:1 137:3 143:21 155:4 225:18, 25 226:2
**says** 46:11 68:23 74:13 75:13 89:23 110:7 113:23 120:17

129:14 131:20 136:20 216:23
**schedule** 206:5
**school** 183:20
**Schramm** 62:4 113:17
**scores** 108:21, 24 109:5
**seal** 228:19
**second** 20:25 53:10 67:4 86:7 89:5, 7 91:23 110:5 126:10 127:16 131:17 134:8, 10, 20 137:8 213:19 214:7 216:14 221:16
**secretary** 56:13 64:23 85:16
**secretary's** 41:21 64:24
**section** 48:3 89:13 110:6 178:3 191:16
**securing** 198:5
**see** 17:25 18:3 22:10 23:13 32:17, 18 36:7 46:11, 14 48:10 49:8 50:4 53:9, 11, 21 54:6 56:9, 12 63:7 68:9 70:10 75:24 80:5 82:23 83:14, 24 84:5, 9 85:16, 25 86:13 87:9, 12 89:1 90:2, 17 92:10, 17 96:5, 18 97:5, 22 109:9, 13 110:16 112:4 115:11 122:19 124:22, 24 126:16 127:22 128:9 131:13, 24 135:2 137:8, 11, 17 139:6 152:1 157:3 159:22 164:19 167:25 168:5 172:18 177:22 181:13 191:14, 17, 21 192:21 194:7, 11, 13 198:14 202:6, 9, 11, 15, 17, 19, 22, 24 203:2, 4, 18 204:15 212:24 213:12, 18 214:2, 14 220:8, 11 221:24
**seeing** 18:2 68:11 73:3 109:4, 18 133:22, 24 134:3, 4 162:21
**seen** 44:21, 23 46:17, 19 57:7 70:7 74:19 82:21 85:23 86:3 133:21 134:2 139:3 159:17, 18 167:15 218:11
**select** 8:1 9:22
**selected** 7:24 8:1, 2 11:5 153:24
**selecting** 34:7
**selection** 8:3
**selective** 99:5 183:4
**sell** 188:10
**sends** 64:25 129:14
**sense** 93:18 181:1
**sent** 68:1, 6, 7
**sentence** 86:7 90:2, 13 91:23 94:3, 13 126:10 127:17, 22 131:19 134:11, 24 175:4 181:15 182:18 194:18 200:16, 22 206:1, 6 220:10 221:21
**sentences** 178:5 182:19 184:9
**sentiment** 190:6
**separate** 12:19 17:4 22:11 38:3, 7 52:7 158:10
**separately** 17:15
**September** 62:16 63:6, 10, 20, 24 64:10 65:11, 16, 24 112:22 113:10, 15, 21 114:18 115:9 123:20 124:8, 20 125:8 126:7, 8 133:3, 8, 14, 25 134:5 140:13 141:8, 24 143:8 145:1, 25 147:8 148:19 149:8 150:3, 17 151:5, 16 152:6 156:4, 13 157:7
**sequence** 50:8
**series** 5:12
**serious** 72:11
**seriously** 72:8, 15
**serve** 11:11, 12 14:22, 24, 25 52:21
**served** 11:15, 18, 20 15:7
**serves** 15:5
**services** 219:17
**serving** 77:16 78:9
**session** 12:13, 16, 17 29:17 43:11 44:13, 15, 19, 22, 25 45:2, 6, 7, 18, 20 56:16, 18, 21 110:7, 10, 11, 15, 22 120:21, 25 121:17 122:15, 16
**sessions** 12:13, 24 29:20 34:17 44:16 122:24 161:23 173:20
**set** 12:23 47:7, 9 49:22 50:9, 23 51:10 52:8 53:5 55:18 56:4, 6, 10 58:19 82:13 114:6, 9 173:16 228:18
**sets** 41:23 51:13
**seven** 12:10, 14 74:22 79:14, 17, 22 80:4, 11 81:17
**seven-plus** 74:18, 24 75:10
**Shaffer** 66:22 68:6, 21 73:9 86:16 87:14, 17 88:3, 9, 17 89:2, 24 90:7 93:4 94:4 110:9 126:11, 19 127:17 128:22 129:6, 14 131:20 134:11 138:17 191:5, 8 217:14 218:11 223:24
**Shaffer's** 32:3 68:3
**shaking** 5:20
**share** 174:7, 14, 17 177:8, 11 181:10 183:1 184:14, 16 186:15, 18, 19 196:7
**shared** 177:23
**she/the** 139:2 206:8
**sheet** 179:1 229:1, 13 230:1 231:1
**sheets** 86:25
**shelf** 194:9
**short** 34:4 35:19, 21 36:11, 16, 17, 18, 22, 25 37:5, 11, 15 38:10 81:15
**shoulders** 139:17 174:3
**show** 109:1
**showed** 203:20
**shows** 106:23 191:20
**side** 140:15 141:11 222:7
**sign** 226:18
**signature** 85:15 157:24
**SIGNATURE:_________________________DATE** 230:23 231:23
**signed** 85:18 158:3 229:16
**significantly** 175:13 180:4
**signing** 158:8
**similar** 201:21
**simple** 224:23
**simply** 172:11
**simultaneous** 58:14 61:4 122:6
**simultaneously** 52:16, 21 125:12 140:16 141:11
**single** 101:12 106:7 107:18
**sir** 5:10 6:2 7:9 9:4 10:11 14:11 16:4, 21 18:7 19:22 20:1 24:25 25:4, 24 32:1 35:11 41:18 42:21 55:9, 23 59:13 60:22 61:2 64:13, 14 106:8, 25 110:17 111:17, 20 126:17 133:21 161:8 165:17 166:17 167:20 168:6 173:13 174:11

177:10, 15 180:12 181:9, 11, 14 183:9 184:21 185:12 186:1, 7 187:1, 4, 9, 12 188:6, 20, 23 189:12 190:9 191:22, 24 192:11 193:4 194:14 195:7, 10, 15 196:6, 11 200:8 202:7 206:12 207:12, 13, 24 208:2 209:19 210:12, 17 211:13, 19, 23 212:2, 8 213:17 216:18, 21 219:24
**sit** 48:13 61:19 88:12, 24 109:20 162:20
**situation** 76:20 77:6 98:16 101:6, 18
**situations** 77:12 99:19 100:7 180:25
**six** 12:10, 13 17:2, 6 163:14 165:11, 14
**skill** 173:16 222:18
**skills** 32:20 34:11, 13, 24 38:19 78:24 79:25 81:2 95:7, 11, 13 96:14 97:21 107:9, 20 134:13 146:5, 6 173:8 185:11, 14, 24 186:4 187:19 189:10, 24 190:15, 16 192:19 193:16 197:12 199:25 209:12
**slow** 135:25
**slower** 31:15 208:8
**smaller** 168:19
**Smith** 2:4 4:14 117:4
**social** 168:15
**socially** 18:5
**solo** 219:15
**solutions** 208:14
**Somalya** 57:25 85:16 118:23 119:25 123:6
**somebody** 79:4, 22 80:1 97:5
**soon** 160:16
**sorry** 6:23 21:1 39:1 46:23 54:10 64:18 74:10 82:4 92:20 124:13 127:3 136:10 162:13 167:11 174:12 199:1 208:10 214:18 225:9
**sort** 87:19 113:25
**sound** 40:7 212:6
**sources** 182:23
**southeast** 186:20
**SOUTHERN** 1:3 4:5
**space** 189:3
**span** 10:5, 7 32:16 79:12
**speak** 5:17 8:19 55:20 99:17 223:1
**speaker** 209:3
**speakers** 42:4
**speaking** 205:15
**speaks** 47:14 48:6 158:23
**specific** 7:19, 21 8:8 19:7 71:18 97:24 98:1, 9, 16 100:1, 13 148:16, 19 222:3
**specifically** 19:3 22:25 33:1, 23, 25 120:19 128:25 153:2, 4 161:16 164:12 175:12 213:4 224:10
**speculate** 51:4
**spell** 5:6
**Spence** 14:13 26:1, 5, 8, 10, 16 27:6, 10, 16 28:6, 11, 18 29:8, 21 30:5, 12, 17, 20 31:4, 5, 10, 21 33:2 34:15, 22 35:12 36:2 37:2, 5 38:9 43:5, 17, 19, 20, 23 44:1 54:2 60:9 62:3 63:13 65:19 74:23 75:12 82:2 90:14, 20 91:25 93:9, 14 94:6 95:3, 4 100:24 101:1, 5, 20 102:16 105:3 106:12, 15, 21, 23 108:4, 9, 18 109:15, 23 112:9 113:16 116:14 123:5, 6 126:13 127:21 128:5, 10, 13 131:22 132:10, 19 134:25 135:19 136:6 137:4 138:5 139:9, 14 140:13 141:3, 9, 24 143:6 144:2, 13 145:1, 13, 25 147:1, 8 148:13, 20 149:8, 19 150:3, 18 151:5, 16 152:1 156:3 157:1, 21, 25 158:18 159:15 163:10 164:5, 24 166:9, 15 168:11 169:3, 8 170:24 171:9 172:9, 14 173:24 174:19 175:8, 24 178:7 179:22 181:10, 17 182:2, 20 183:7, 23 184:11, 23 185:9 186:10, 12, 24 187:25 188:3, 18 189:20 190:6 191:17 192:25 193:11 194:15, 20 195:5, 20 196:8 197:13, 22 198:23 199:18 200:7 203:7, 9 207:21 208:1, 5 210:25 211:12, 16, 21, 24 215:4, 11, 17, 24 216:6 218:10 219:6, 18 220:13, 24 221:22 222:11 224:4, 6, 11
**Spence's** 30:19 35:17 101:3, 7 102:3 103:3, 19 104:22 106:1 107:9, 20 109:24 141:7 150:15 153:5 168:23 169:18 170:4, 15 171:19 173:7, 15 175:17 176:8, 19 178:14 179:6, 8 180:7, 19 181:22 182:9 187:7 189:8 190:14 192:23 193:14 196:15, 20 215:23 216:19 223:11, 15
**spend** 18:5
**spoke** 34:17 164:17
**SS** 228:2
**stack** 193:23
**stacks** 166:1
**Stagnaro** 2:5
**stamp** 46:11 55:12, 18, 24 168:4 217:9
**stamped** 57:10 59:8, 16 60:23 62:24 64:11 66:11 68:19 85:11 86:21 110:5 111:22 113:4 115:2 116:1 117:10 119:12 122:10 124:2 125:22 129:2 130:2, 6, 9 132:12, 23 134:21 135:22 140:8 156:14 158:13
**stamps** 52:23
**stand** 201:3
**standards** 181:19 208:21
**standing** 150:5, 19
**standpoint** 45:4, 17 224:16
**stands** 200:20 207:6
**start** 129:1 131:9 185:21
**started** 87:18 199:12
**state** 5:5 11:13 76:22 77:11 99:23 205:15 228:2, 6, 25
**stated** 33:17 91:6 93:15 94:8, 18, 23 99:23 111:6 114:9 154:6 200:10 215:12 219:20
**statement** 134:18 138:21 165:4, 7 179:2 204:9
**statements** 13:7 109:9, 10, 13, 14, 21, 22
**STATES** 1:2 4:4
**stating** 94:10
**status** 89:14
**steal** 164:20
**step** 200:6

**steps** 138:23
**stipulation** 228:12
**stock** 42:18
**stood** 185:6, 15
**stop** 128:25 168:22 175:16 178:13 184:18 186:23 188:3 195:3
**straddle** 165:11, 13
**strategic** 32:18 34:10, 23 38:17 69:6, 7 78:23, 24 79:24 96:13, 17 97:1, 9 101:8 106:3, 10 110:14 140:15 141:11 142:1 143:7, 16 144:4, 14 171:3, 18 181:17, 22 182:10, 21 183:1, 22 184:12 186:13, 16 189:9 190:14, 15 192:17, 20 193:15 194:17, 21, 22, 25 195:5, 14 196:16 197:12 202:11 208:12 221:22 222:1, 24 225:2
**Strategies** 132:21 209:7, 9
**strategy** 12:12, 13, 16, 17, 24 13:10, 12 34:17 54:2 168:12 169:19 220:14, 16, 19, 21
**Street** 1:20 2:12
**strength** 149:10, 21
**strengths** 86:10 88:5 184:11, 19, 22 209:10, 13
**stresses** 209:9
**strike** 8:10 69:3 77:5 107:6 109:7 123:1 158:16 179:16
**strong** 97:22 101:10 104:22 162:3 184:17 186:17 208:5
**structure** 200:19
**structured** 208:20
**stuck** 224:22
**subheading** 202:14
**subject** 97:21, 25 138:18 169:13
**subjective** 103:12, 16 208:13
**subjects** 168:25
**subordinates** 18:19 25:2 30:20 31:4
**subsequent** 78:12, 13
**substantial** 152:24
**succeed** 45:23 111:1 139:24
**succeeded** 32:6
**succeeding** 20:3, 11 25:7 27:11, 16 28:7, 12, 18 29:8, 21 31:10, 21 32:3 40:2
**succession** 10:6 14:16, 20 16:6, 8, 12, 19 17:10, 13 22:17 29:16 32:9, 11 33:17 37:20, 23, 24 47:11, 25 48:16, 21 50:11 53:18 57:18 60:2 61:14, 20 63:4, 18 65:10 66:8 67:18 68:24 69:8, 16 70:9, 14, 21 71:1, 15, 19, 22, 25 72:22 74:3, 13, 17 80:23 83:9 89:14, 15, 25 90:9, 14 91:15, 18, 19, 25 92:1, 10, 11, 17, 18, 22 93:3, 4, 13, 19 94:5, 7 110:12, 19 112:2 113:9 115:8 116:7 118:11 119:18 120:16, 18, 20 121:1 122:18 124:7, 19 126:2, 7, 12 127:18 131:9 157:6 161:6, 17 163:3 191:10 213:1
**successor** 37:22 75:15, 21 76:10 77:17 78:10 80:15, 25 126:15 131:11 134:15 138:25 139:14 161:18 163:4, 22 203:22 204:5
**succinct** 172:4
**sudden** 87:19
**summarizing** 86:24
**summary** 83:13 132:10 207:19 208:3 213:14 223:20, 21
**summed** 32:24
**summer** 198:8 199:11, 14
**sums** 95:18
**superior** 78:19, 23 81:4, 8 97:5 100:25 101:2, 3, 7, 8, 13, 20 102:4, 16, 22 103:4, 21 104:4, 17 105:3 106:2, 3 107:9, 20 140:13 141:3, 9, 24 143:6, 15 144:3, 10, 13 145:2, 14, 25 147:8 148:20 149:9, 16, 20 150:4, 10, 18 151:6, 13, 17 173:8 211:8
**support** 144:21 148:1 169:5
**Sure** 18:25 24:12, 20 25:21 45:3 47:22 71:12 73:20 101:8 104:24 133:16 201:11
**surprise** 206:16 207:7
**surprised** 139:4
**sustain** 136:2, 12, 20 137:5, 6, 9
**sustained** 138:1
**sustaining** 137:20
**sustains** 137:4
**switch** 218:19
**sworn** 4:11, 25 228:8
**system** 41:14 191:13

**< T >**
**table** 81:14
**tactical** 96:24, 25
**take** 5:22 13:25 38:20 72:11 77:5 79:12 80:1 135:9 137:16 160:20 162:7 164:19 179:4 180:24 199:5, 6 208:8 224:7
**Taken** 1:14 5:8, 19 6:12 42:10 44:16 64:23 83:2 105:20 110:21 118:5 135:12 160:6, 24 212:15 226:7 228:11 229:2, 8
**takes** 45:2 72:8 76:12 162:17 222:18
**talent** 66:8 67:16, 17 68:24 69:1, 7, 16 70:8, 14, 21, 25 71:15, 22 72:21 110:12 126:10, 22 127:16 131:18 134:8 191:9 214:1, 10 216:19 217:4 218:10
**talk** 16:24 101:2
**talked** 101:3 103:9 106:9 166:12, 14 177:10 190:3
**talking** 33:5, 10 38:25 79:11 87:23 88:16, 18 191:3 206:21 212:25 213:1
**talks** 191:16 200:12 201:6 202:5
**tangible** 179:24
**tapes** 212:10
**target** 186:18
**Tayfun** 35:25 138:25 139:19 203:23 204:5
**Tazun** 35:25 54:3 60:10 62:3 63:12 75:20, 24 112:10 113:17 116:14
**team** 14:19 19:18 22:24 26:3 34:24 35:1 38:15 42:5 101:13 106:7 107:19 108:2, 3, 6, 7, 8, 11, 14, 15, 17, 18 149:10, 21 162:7 163:6 166:14, 21, 25 167:19 172:8 173:25 174:4 182:16 185:15, 18 188:15 189:22 190:12 196:18, 19 197:4

209:21 220:23 221:1, 3, 11
**technical** 143:16
**technological** 168:15 195:2, 4, 13
**technologies** 219:16
**technology** 141:4 166:23 175:13 196:16 197:11
**teleconference** 118:16
**telephone** 24:3 117:14 118:15
**telephonic** 163:15
**tell** 47:10, 24 48:13 49:21 50:10, 19, 22, 25 53:4, 17, 22 54:1 57:17, 22 58:3 60:1 61:13, 18, 25 62:4, 5 63:3 65:9, 15, 18, 20 112:6 113:7, 20 118:10 121:14 211:11, 21, 24
**temporary** 224:20
**ten** 6:17
**tendencies** 225:14
**tenure** 81:7 100:11 166:5 167:15
**term** 68:13, 21 108:25 128:3 197:24
**terminated** 152:18, 21, 23 153:8, 12, 17, 18, 20
**termination** 153:5 154:25 155:12, 24
**terms** 88:24 171:17 177:18 192:17
**test** 197:21
**testified** 98:22 99:1, 3 102:23 161:5 163:4 204:18 211:9 223:1
**testify** 77:19 98:21, 24 99:9
**testifying** 40:19 45:9 94:11 207:23 221:6
**testimony** 6:13, 21, 22, 25 7:2 8:9 13:1 35:24 38:13 45:10, 12 143:21 161:7 174:19 191:1 192:24 193:6 204:14 205:4, 7, 11, 12, 24 206:19, 22 211:2 215:6, 13 216:1 222:15
**text** 18:16 24:2 27:7
**Thank** 41:10 58:25 117:10
**thereto** 186:14, 22
**thing** 48:5 167:18 192:9
**things** 26:13 106:3 138:1, 2 173:7 185:5 211:8 219:13 224:21, 22
**think** 5:14 22:2 23:24 32:24 44:24 45:1, 3 82:14 84:7 93:17 95:18 101:8 136:19 165:12 176:3 183:19 191:6, 7 193:24 204:5 212:10 213:9
**thinker** 208:13
**thinking** 140:15 141:10 154:5
**THIRD** 1:10, 14 2:17 4:7, 20, 22 11:12, 16, 19, 20, 21, 23 12:4, 6, 8 13:24 14:5 18:12 19:25 20:4, 12 21:6, 10, 24 22:22 23:1 24:7 25:8 26:3 27:11, 17 28:7, 12, 19 29:9, 22 31:11, 22, 25 32:9, 13, 25 34:1, 8 35:20 37:12, 17 38:11, 22 39:2 41:22 42:16 43:6 46:7, 11 47:8 49:13, 24 50:3, 21, 24 52:5, 8, 9, 13, 25 53:6, 10, 20, 24 54:13 55:7, 10, 13 56:2 57:5, 10, 13, 24 58:14, 18 59:5, 8, 9, 16, 17 60:4, 8, 12, 20, 23 61:4, 16, 22 62:2, 7, 15, 24 63:10, 21, 25 64:9, 11 65:12, 17, 23 66:11 67:5 74:6 75:5 85:2, 3, 12, 14 89:4 104:5 109:5, 10, 14 110:6 111:2, 14, 22, 23 112:21 113:4, 11, 15, 22 114:17, 20 115:2, 3, 10, 18 116:1, 2, 8, 12, 18 117:2, 11 118:12, 20 119:2, 10, 12, 15 120:12 121:15, 20 122:3, 7, 10, 11, 14 123:4, 11, 19 124:2, 3, 9, 19, 21 125:7, 11, 12, 22, 23 127:10, 17 129:2, 12 130:3, 6, 10, 13 131:14 132:12, 13, 21, 24 134:15, 21 135:23 151:25 152:18 153:22 155:1, 2, 11, 12, 23, 25 156:3, 11, 15 157:1, 16, 22 158:1, 13 159:15 161:17 164:17 170:13 175:11, 25 176:17 180:13 184:9, 14 191:9 207:19 208:7 210:11 211:1, 12, 16, 22, 25 215:1, 4, 24 216:11, 15 218:18, 19, 21 220:19 221:17 229:4
**Third's** 49:12 168:17 218:24
**Thomas** 2:17 4:20
**thorough** 208:19
**thought** 7:16 28:23 97:17 176:16 179:14 187:20
**thoughtful** 208:18
**thoughts** 224:19
**threats** 164:14 175:10, 12 176:5
**three** 10:6, 8, 9, 10 35:16 37:10 70:4 81:18 99:1 130:2 184:15 194:16 195:22 220:3 224:24
**three-plus** 74:24 75:14 94:24 191:23 216:24
**Three-Year** 194:20 221:22 222:1, 24
**Tiffin** 9:11
**Tim** 26:1 38:15 43:17, 18, 19 82:2 93:9 97:6 103:25 104:17 132:10, 19 138:24 139:3, 9, 14, 16 140:13 141:3, 9, 24 143:5 144:2 145:1, 25 147:1, 8 148:12, 20 149:8, 16, 19 150:3, 10, 15, 18 151:5, 16 157:21 158:4 159:15 163:15, 24 164:4, 9, 24 166:9 169:16, 24 171:2, 6 172:1, 2, 16 174:2 176:2 177:3, 18 187:18 189:16 190:21 192:3 193:23 194:3 203:13, 22 204:4, 18 205:1, 19 206:9 207:20 208:5 209:11 210:11, 25 211:7, 12, 16, 21, 24 219:20 226:2
**Time** 1:14 4:2, 9 6:15 7:2 9:7 13:14 18:5, 12, 22 19:13 27:14 28:21 32:16 33:4, 9, 10, 22 35:12 36:2, 11 37:9 39:18 40:4, 9, 17 42:8, 12 43:7, 8 52:16 63:15 70:5 75:2, 11 76:12, 15, 23 77:2 78:4, 6, 8, 11, 12, 20 79:7, 8, 12 80:6 81:13, 15, 16 82:25 83:4 87:15 92:3 94:7, 17 96:19 98:15 100:6 103:22 105:18, 22 114:19 117:24 121:5 135:9, 11, 14 136:17 137:16 155:6 160:4, 8, 10, 22 161:1 163:23 164:18 165:13 166:4 171:24 177:18 189:20 190:5 191:7 192:2, 7

193:22 194:6 196:4 197:4, 19 198:15 199:15 204:17 212:13, 17 213:22, 23 214:7 215:16 217:5 219:7 225:3 226:5, 9, 12, 17, 19 228:10
**timeline** 116:7
**timelines** 47:12, 25 48:16, 22 50:12 53:18 57:19 60:2 61:15, 21 63:4, 19 65:10 89:25 90:15 112:2 113:9 115:8 118:11 119:18
**times** 12:10 17:3, 7 29:18 161:21 163:16 174:1 188:14 203:7 212:23 213:12 224:3
**timing** 111:3, 7 198:7
**Timothy** 137:11
**Tim's** 174:25 177:12 209:18 224:18
**titled** 110:6
**Today** 4:1 48:13 61:19 88:12, 25 109:20 126:21 161:5 200:21 201:3, 13, 21 211:9
**today's** 7:5 131:23 133:11
**top** 89:7 90:13 91:14, 18, 24 92:1, 11, 18, 22 93:1, 2, 4, 10, 13, 17, 19 94:5, 7 129:1 134:22 154:8, 11, 13, 16, 22 165:10 169:25 177:21 179:23 181:15 184:5, 15 185:16, 20 186:19 194:9 199:22 214:22 221:21 223:17
**topics** 26:23 27:4
**total** 49:1 223:12
**totally** 205:14
**traditional** 175:15 176:6
**tragic** 75:18
**transaction** 104:16
**transactions** 103:22
**transcript** 229:7
**transformation** 188:1, 17 189:5
**transition** 33:2
**translate** 80:3
**treasurer** 89:17
**tremendous** 38:17 95:5 182:13 189:2 193:19
**trends** 168:17 170:12 197:11 225:11
**trial** 6:13, 21, 22, 24 7:2
**trillionaire** 178:8 193:21, 24 194:9
**true** 83:13 114:1 120:24 161:9 167:18 192:9 193:25 229:10
**trust** 164:2
**truth** 228:8, 9
**try** 5:24 201:25 218:4
**trying** 13:3 51:15, 22 87:3, 7 88:7 98:10 105:1 124:23 133:11 136:16 205:7, 12 206:19, 22 223:2
**turn** 21:1 50:3 89:4 134:20 174:11 187:23 213:18 221:16
**turned** 92:19 177:3
**Turning** 130:9
**twice** 17:5 162:19 213:15
**two** 11:4, 12 12:13 13:9 41:13 57:14 94:23 109:17 132:6 146:23 162:8 182:19 191:21 192:4 212:23 213:11 216:24
**two-day** 163:17
**type** 175:25 201:24 202:1 213:10 219:16, 25
**types** 96:6
**typically** 65:6 85:25
**typo** 204:8

< U >
**U.S** 168:20
**uh-huh** 5:21 47:23 134:9 140:24 191:19 202:20 214:24
**uh-uhs** 5:21
**ultimately** 11:5 73:14
**unable** 178:9
**Unanimous** 157:16, 20, 23 158:8, 19, 22 159:3
**unanimously** 177:24 190:6
**unbelievable** 104:1
**undersigned** 228:4
**understand** 5:13 6:1 12:1 13:3 20:21 22:13 27:24 34:9 45:14, 15 49:5 67:10 71:5, 8, 9 87:7, 23 95:15 105:2 136:7 140:23 146:17, 21 147:4 160:20 169:11 183:18 188:25 189:2 224:14, 17
**understanding** 11:24 12:2, 3 13:20 27:1 32:8 34:15 52:11 88:8 96:16 97:8, 16 104:1, 4 106:10, 19 107:4, 7 128:5 131:6 135:4 139:13 145:8 152:17, 22 153:2, 4, 16, 21, 23 154:1, 10, 14 176:20 189:16 195:25 214:21 223:14 224:8, 22 225:12, 24 229:13
**understands** 79:2 80:1
**understood** 95:8 101:9 106:4, 12, 23 172:10 225:15
**UNITED** 1:2 4:4
**University** 9:11
**University's** 11:14
**upcoming** 13:10, 13 126:7
**update** 54:2 67:16 72:3 162:20 212:24 213:3, 22
**updated** 129:15
**updates** 66:9 68:24 69:17 70:9, 14, 21 71:1, 15, 22 72:22 126:22 214:15
**updating** 214:1
**upward** 22:23
**use** 67:18 82:5, 8, 10 128:3
**uses** 67:15
**Usually** 41:13 42:5 161:21 165:14 214:6, 9
**utilize** 67:1
**utilized** 66:7 127:20 131:21

< V >
**Vague** 20:5 21:15 23:6 48:24 71:6
**validate** 197:20
**value** 165:20, 25 183:2 186:15 215:1, 4, 12, 17, 23 216:7, 10
**values-based** 208:23
**variables** 195:24
**various** 10:2 76:18 88:10 106:14 141:2 149:14 160:13 163:6 164:11
**venture** 79:3 101:9 106:4, 10, 13, 16, 17, 23 164:13
**venue** 155:22
**verbally** 5:20
**verify** 224:10 225:4, 22
**verifying** 224:5
**version** 130:21, 25
**versus** 78:16 81:8 97:6 100:24 104:6 213:13
**vetted** 205:2
**vetting** 198:23 200:7
**Vice** 132:20
**video** 5:19 118:16

**Videographer** 1:22 4:1 42:8, 12 82:25 83:4 105:18, 22 135:11, 14 160:4, 8, 22 161:1 212:13, 17 226:5, 9, 19
**Videotaped** 1:14
**view** 13:23 149:16 177:6, 23 205:1 209:21
**vigorous** 88:21
**vigorously** 72:12 73:5 91:6
**vis-à-vis** 98:12, 13
**vision** 32:18 34:10, 23 38:17 78:24 79:24 81:14 96:13, 17, 18, 22, 24 97:1, 9 101:9 104:2 106:4, 10 145:3, 15 146:2 147:10 148:13 182:14, 23, 24 183:22 190:14 192:17, 20 193:15, 20 195:21 196:16 197:12
**visions** 176:25
**voice** 127:1
**vote** 65:3 158:20 159:4
**vs** 1:9 4:6 229:4

< W >
**wait** 5:23 94:9
**Walnut** 1:20
**want** 16:24 45:5, 10, 17 48:4 67:7, 8 75:22 79:13 90:24, 25 93:24 103:11 105:9, 14 131:13 168:3 174:5 191:15 194:10 198:13 199:5 200:3 202:1 203:17 207:13 217:17 218:3, 4 221:8
**wanted** 177:22 197:20 198:2
**watch** 184:7
**watched** 170:1
**watching** 146:22 149:15 151:11 171:24 174:24 203:13
**way** 23:10 38:25 73:20 81:20 103:19 127:2 162:4 164:20 181:1 183:17, 20 210:13 223:6
**ways** 106:1
**weaknesses** 184:12, 19, 23 209:13
**week** 41:13 68:7, 11
**weeks** 41:13
**well** 11:14 20:22 22:20 29:14 32:24 35:4 39:19 72:2 79:9 87:2 90:8 93:18 95:4 101:15 105:1, 10 110:13 129:15 131:8, 12 133:20 139:20 142:8 146:24 163:24 164:8 174:6 189:16 191:6, 8 194:2 196:19 198:10 204:14 213:16 222:5, 7 224:13
**well-being** 208:24
**Wendy** 1:20 228:4
**went** 88:8 110:10 192:23 198:21
**We're** 4:2 22:16 36:6 42:9 78:4 105:23 160:5, 9, 23 162:21 166:25 212:14, 18 226:6, 20
**WESTERN** 1:4 4:5
**we've** 51:9, 18 82:13 106:9 150:10 163:13 219:13 220:3 224:17
**When's** 7:2
**WHEREOF** 228:18
**wife** 6:9
**Williams** 39:23 40:2 70:6, 16, 19 121:16 123:7 198:9 206:10, 14 207:10 217:6, 20 218:14
**Winning** 130:12 138:19
**witness** 4:11, 25 16:16 20:22, 25 23:25 27:25 28:2 30:3 33:16, 20 35:25 36:15 38:1, 7, 14 39:23 40:13, 20, 22 41:3 43:9 47:19 48:10 49:19 50:15 51:7 54:17, 25 58:24 64:18, 22 67:11 71:8 77:20 88:20 91:4, 18 92:5 94:18 102:12 103:2 107:15 124:13 137:25 141:15 142:14 143:12 144:7, 17, 23 145:20 146:12, 21 147:21 148:7 151:2, 22 152:13, 22 154:6, 21 155:7 162:13, 17 163:13 165:24 167:11, 14 169:3, 23 170:8, 22, 24 171:13, 24 173:6, 19 174:11, 14, 23 175:24 176:24 177:15 178:20 179:12 180:12 184:2 186:7 187:17 190:9, 19 193:4, 10 196:11 197:8, 17 199:1, 6, 10, 21 200:25 201:11, 20 203:11 204:12, 23 205:18 206:2 207:7 210:7, 17, 23 211:6, 19 212:2, 8, 12 215:10 218:3 222:16 223:6 225:9 226:17 228:18
**word** 80:18
**words** 223:2
**work** 7:17 79:20 95:16 108:15, 18 136:16 164:10 181:2 185:7 208:20 219:15 225:16
**working** 72:6 101:12 106:6 107:18 200:13
**workings** 76:17
**workplace** 18:9 30:6, 12, 13, 14, 17
**world** 151:8, 19
**written** 4:18 5:22 157:16, 20 158:8, 19, 22 159:3 194:23
**wrong** 105:1
**Wyman** 164:11, 21 172:17

< Y >
**Yeah** 92:25 100:17 103:2 105:5 114:8 150:25 170:22 179:21 204:7 206:13 225:9
**year** 11:17 12:9, 23 13:14 17:3, 6, 7 26:20 29:18 72:5 81:17 161:21 162:19 163:14, 19 194:16 212:24 213:12, 15, 23 214:16, 19 220:2
**years** 6:7, 17 7:3 9:21 10:8, 9, 10 13:10, 13 15:9, 11, 19 17:23 32:14 35:16 37:10 39:19, 22 74:18, 22, 24 75:10, 14 79:15, 17, 23 80:4, 11 94:23, 24 97:11, 16 100:10 103:10 143:13 151:10 180:5 191:21, 23 192:4 195:22 216:6, 24 220:3 224:24

< Z >
**Zaunbrecher** 112:10 116:15 118:23

# EXHIBIT 1

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 2

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 3

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 4

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 5

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 6

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 7

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 8

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

Message

| | |
|---|---|
| **To:** | nkakins@aep.com; evanbayh1@gmail.com; Jorge@jorgebenitez.com; Katie.blackburn@bengals.nfl.net; embrumback@aol.com; jb5nupe@yahoo.com; bdaniels@prairie-capital.com; hal@energyinnovation.org; garyheminger@marathonpetroleum.com; jhoover5@carolina.rr.com; emallesch@gmail.com; mbm2045@gmail.com; Marshawilliams@outlook.com |
| **CC:** | Carmichael, Greg [/O=FIFTH THIRD BANK/OU=Cincinnati/cn=Recipients/cn=Greg.Carmichael]; Wires, Lisa [/O=FIFTH THIRD BANK/OU=Cincinnati/cn=Recipients/cn=E513863]; Hennard, Paula [/O=FIFTH THIRD BANK/OU=Cincinnati/cn=Recipients/cn=Paula.Hennard]; lrharris@aep.com; christi.mayer@gmail.com; leichler@praire-capital.com; giselle@energyinnovation.org; aaberger@marathonpetroleum.com; p.denning@yahoo.com |
| **BCC:** | Shaffer, Bob [/O=FIFTH THIRD BANK/OU=Cincinnati/cn=Recipients/cn=Bob.Shaffer]; Shaffer, Bob [/o=fifth third bank/ou=cincinnati/cn=recipients/cn=bob.shaffer] |
| **Subject:** | Fifth Third Talent Management and Succession Planning Document for Board Meeting on December 17 |
| **Attachments:** | FIANLExecutive Talent Management_Update-2019_121019.pptx |

Board Members:

Attached is the document Greg and I will utilize for the Human Capital and Executive Talent Management and Succession Plan Updates discussion on 12/17/19, starting at 7:00AM. This discussion will focus on our Human Capital strategies, talent management processes, key 2019 talent actions, discussions of our Enterprise Team members and our executive pipeline. I look forward to seeing you next week.

Bob

PLAINTIFF'S EXHIBIT 9
Heminger
uln 12-20-22
PENGAD 800-631-6989

FIFTH THIRD BANK

# Board of Directors

## Human Capital and Executive Talent Management and Succession Plan Updates

December 17, 2019

| | Page |
|---|---|
| Opening Comments | |
| Human Capital Strategic Priorities | 3 |
| Talent Framework | 6 |
| Talent Metrics/Highlights and 2019 Employee Survey | 11 |
| Executive Talent Management | 21 |
| Executive Succession Plan | 34 |
| CEO Succession Plan | 37 |
| CEO Emergency Succession Plan | 39 |


Note - Inclusion and diversity information excluded from this document given related presentation to the Board in September 2019.

## Fifth Third Vision: To be the One Bank people most value and trust

### Our Division's Mission:

**Create an inclusive culture that inspires innovative solutions and enables people to thrive**

### OUR STRATEGIC PRIORITIES (2020-2021)

**Invest and Build Workforce 2025**

Develop and execute innovative workforce strategies that embrace inclusion and diversity for sustained growth and success across our footprint

**Evolve Employee Experience**

Evolve the employee experience and value proposition as a key relationship bank differentiator that inspires improved retention, engagement and business outcomes

**Develop Great Leaders**

Accelerate leadership capabilities to drive success and empowerment in an increasingly diverse workforce and digital environment

**Expand Continuous Learning**

Provide the ongoing education and resources that equips our workforce with the skills and knowledge to excel in their roles today and grow their careers for the future

Measurement, Change Management, Communication and HR Technology

# Four Trends Influencing Human Capital

## Digital Transformation



## Open Talent Economy



## Workforce of the Future



## Inclusive Leadership



# LEADING AT FIFTH THIRD

Great leaders have a way of bringing out greatness in others. Every day, as your team members and colleagues look to you for inspiration, use these **Leader Capabilities** to guide your actions.

## Create Connections

- Hyper-collaborative
- Leverage Internal & External Networks
- Self-Aware
- Actively Inclusive
- Communicate Effectively

## Lead with Agility

- Anticipate & Lead Change
- Build Winning Strategies
- Test, Learn & Adapt
- Navigate Ambiguity
- Courageous & Resilient

## Be a Great Coach

- Setting Clear Expectations
- Inspiring Others
- Actively Listen
- Empathy
- Consistently Seek & Provide Feedback

## Act Like an Owner

- Execute on Targeted Outcomes
- Keeping the Customer at the Center
- Drive Informed Decision Making
- Deliver On Their Commitments

FIFTH THIRD BANK

FIFTH THIRD BANK

# Talent Framework

December 2019

## Talent Framework
*Integrated Human Capital Processes*



# 2019 Talent Review Approach



# Performance Reviews

- **Evaluation:** Identify high performers based upon achievement of goals and calibrate across teams.
- **Provide feedback:** Engage employees in conversations on both ***what*** and ***how*** goals were achieved.
- **Development:** Highlight strengths to leverage and determine development opportunities to focus on to achieve and/or exceed expectations in current role.
- **Sustainability:** Establish and clearly communicate performance expectations going forward.
- **Senior leadership:** (CRO) Conducts formal risk reviews to ensure consistent evaluation of the alignment between strategic and financial objectives and risk principles.



## Talent Reviews



- **Assessment:** Identify high potentials who can take on roles of greater responsibility.
- **Development:** Highlight strengths to leverage and determine development gaps between current capabilities and what is needed in the next role to focus development actions.
- **Diversity:** Ensure a diverse mix of leaders to enhance diversity of thought and innovation as well as reflect the communities in which we do business.
- **Sustainability:** Identify the most critical talent actions to track for accountability, provide targeted feedback and developmental coaching and ensure individual development plans are updated.

**Ultimately, to ensure that the organization — now and in the future — has top-performing talent in the roles that matter most by aligning the talent strategy with the business strategy.**

FIFTH THIRD BANK

# Talent Metrics/Highlights and 2019 Employee Viewpoints Survey

December 2019

# Talent Review Metrics

**2019 All Employees Assessed (n=5,092)**

| | | |
|---|---|---|
| 17.5%<br>2018 = 15% | 19%<br>2018 = 22% | 7%<br>2018 =5% |
| 22%<br>2018 = 27% | 20%<br>2018 = 18% | 5.5%<br>2018 = 2% |
| .5%<br>2018 = 1% | 1.5%<br>2018 = 1% | 7%<br>2018 = 9% |

- Performance and Potential is assessed for all management and leadership positions, as well as other top individual contributor roles which allows us visibility into leadership pipeline and sustainability.
- Each leader assessed receives feedback from the talent review process and applicable feedback is incorporated into their Individual Development Plan (IDP).
- For those assessed across the organization in 2019, the percentage of high potentials increased from 29% in 2018 to 31.5%. For those assessed in the Bancorp Talent Review there was a decrease in high potentials from 30% to 26% and an increase of those "too new to rate" from 12% to 15%.

**2019 Bancorp Talent Review (n= 133)**

| | | |
|---|---|---|
| 32%<br>2018 = 31% | 21%<br>2018 = 25% | 2.5%<br>2018 = 2% |
| 15.5%<br>2018 = 15% | 11.5%<br>2018 =11% | 2.5%<br>2018 = 3% |
| 0%<br>2018 = 1% | 0%<br>2018 = 0% | 15%<br>2018 = 12% |

**9 Box Performance / Potential Matrix**

Performance (vertical axis) / Potential (horizontal axis)

| | | |
|---|---|---|
| A3<br>Greater Capacity | A2<br>Promotable | A1<br>Highly Promotable |
| B3<br>Well Placed | B2<br>Well Placed | B1<br>Promotable |
| C-<br>Underperforming | C+<br>Underperforming | TNTR<br>Too New To Rate |

FIFTH THIRD BANK

## Workforce of the Future
*Five Generations in the Workplace - Fifth Third Bank*

| Generation Name | Year Range | December 2017 | | September 2019 | |
|---|---|---|---|---|---|
| | | # of Employees | % of Employees | # of Employees | % of Employees |
| Centennials (Gen Z) | 1998-Later | 84 | 0.4% | 300 | 1.5% |
| Millennials | 1979-1997 | 8,766 | 46.5% | 9,564 | 47.9% |
| Generation X | 1965-1978 | 6,120 | 32.5% | 6,395 | 32.0% |
| Baby Boomers | 1946-1964 | 3,831 | 20.3% | 3,692 | 18.5% |
| Mature | Up to 1945 | 34 | 0.2% | 30 | 0.2% |
| Total | | 18,835 | | 19,981 | |



Confidential
FIFTHTHIRD-MCHUGH-001117

# 2019 Talent Wins

(F) Female
(PoC) Person of Color
(E) Enterprise Member

## Internal Promotions

### Regions

| | |
|---|---|
| Dan Feldmann | Senior Commercial Banker – Cincinnati |
| Mike Guenthner | Senior Commercial Banker – Kentucky |
| Doug Riddle | Senior Commercial Banker - North Carolina |
| David Houston | Senior Commercial Banker - North Carolina |
| Todd Flick | Senior Commercial Banker – Indiana |
| Jill Hagan (F) | Treasury Mgmt., Area Manager - Chicago |
| Michael Jones | Managing Director, Private Bank – NW Ohio |

### Bancorp

| | |
|---|---|
| Kris Garrett (F,E) | Head of Wealth & Asset Mgmt. (W&AM) |
| Mike Ryan | Corporate Banking Group Head |
| Stephanie Smith (F, PoC) | Chief Inclusion & Diversity Officer |
| Lori Frischer (F) | Managing Director, Shared Services, W&AM |
| Jim Evans | Chief Security Officer |
| Hope Schall (F) | Deputy General Counsel |
| Patricia Hartsfield-Davis (F) | Chief Compliance Officer |
| Thea Langsam (F) | Deputy General Counsel |
| Thomas Neltner | Managing Dir., Enterprise Workplace Svcs. |
| Scott McLachlan | Group Mgr., Applications Development |
| Marybeth McManus (F) | Head of Commercial Operations |
| Carolyn David (F) | LOB Marketing Director |
| Amber Hamilton (F) | Chief Agility & Product Mgmt. Officer |
| Chad Slaughter | MD, Private Bank Sales Effectiveness |

## External Hires

### Regions

| | | |
|---|---|---|
| Jeremy Gutierrez (PoC) | Senior Commercial Banker – Central Ohio | Huntington |
| David Briggs | Senior Commercial Banker - Tennessee | First Tennessee |
| Todd Sondrini | Treasury Mgmt. Area Manager - Florida | AndBank |
| Mark Griffin | Treasury Mgmt., Area Manager - Georgia | BB&T |
| David Olson | Managing Director, Private Bank – Georgia | Regions Financial |
| Susan Vogel-Vanderson (F) | Managing Director, Private Bank – West MI | Meijer |

### Bancorp

| | | |
|---|---|---|
| Gary Rhodes | Chief Communications & Reputation Officer | Ashland Global |
| Scott Silvas (PoC) | Market President – Dallas | JPMC |
| Daniel Seay | Wholesale Transformation Director | Accenture |
| Tim Crandall | Head of Mortgage Capital Markets | US Bank |
| Eric Muench | Commercial LOB CIO | Citibank |
| Tyson Swartz | Enterprise CIO | GE |
| Gordon Cameron | Chief Consumer Credit Risk Officer | PNC |
| Subhash Khatri (PoC) | Head of Card Acquisitions | Green Dot |
| Kathleen Dockery (F) | Technology Director | Key Bank |
| James Anthos | Dir., Retail Distribution Strategy & Analytics | BB&T |
| Rex Werner | Bancorp Consumer Contact Center Director | JPMC |
| Peter Gruebele | Senior Commercial Banker – California | Wells Fargo |
| Navia McCloud (F, PoC) | Dir., Bus. Banking Business Effectiveness | Huntington |
| Matt Sargent | Nat'l Group Mgr., Commercial Deposits | US Bank |

# Fifth Third Talent Wins
# Ensuring the Right Talent to Support Key Strategies

## Wholesale Service Excellence

- Commercial Customer Experience Initiative (CCEI) - *Phase 2*
- nCino and other system enhancements over the next 2-3 years
- Hired Daniel Seay (Wholesale Transformation Director) from Accenture
- Hired Leslie Marinov (Wholesale Transformation Delivery Director)

## Continued National Commercial Middle Market Expansion

- **California:** Further expansion in California; Hired Peter Gruebele, Sr. Commercial Banker
- **Dallas:** Hired Scott Silvas, Market President, and Caroline Verot-Moore, Commercial LOB Manager

## Build out of Renewable Energy Banking Business

- Ongoing expansion of Middle Market and Corporate Banking capability in solar into other renewables
- Hired 3 new managing directors, Timothy Beach, Ari Citrin and Oliver Janssen, to create the renewable energy national investment banking team based in San Francisco



Confidential

# Fifth Third Talent Wins
# Ensuring the Right Talent to Support Key Strategies

## Building Institutional Deposits Center of Excellence

- Matt Sargent hired from US Bank, to lead the group, responsible for direct business development as well as strategy across the Bank
- Team expanded to three with possibility of 5-6 in 2020

## Digital Transformation

**Acquired key talent with significant experience in the digital space**

- Tyson Swartz (Enterprise CIO ) from GE
- Eric Muench (Commercial LOB CIO) from Citibank
- Russell Accashian (Director of Cloud Platform) from Fannie Mae
- Kathy Dockery (Technology Director) from Key Bank
- Promoted Amber Hamilton to Chief Agility & Product Management Officer, leading 40+ active agile squads

## Business Banking Expansion

- Hired Navia McCloud from Huntington to lead Business Banking Business Effectiveness
- Hired 14 Business Bankers from Huntington in Q4 2019.

# Fifth Third Talent Wins
# Ensuring the Right Talent to Support Key Strategies

## Regional Banking

Realigned local Business Banking and Treasury Management sales teams, as well as, Regional Marketing/Communications staff to report directly into the Regional Presidents to maximize the distinct value proposition of our regional model.

- Key Regional Hires:
  - Jeremy Gutierrez, Sr. Commercial Banker, Central Ohio
  - David Olson, Managing Director, Wealth & Asset Management, Georgia
  - Susan Vogel Vanderson, Managing Director, Wealth & Asset Management, W. Michigan (Re-Hire)
  - Mark Griffin, Treasury Management Area Manager, Atlanta
  - Todd Sondrini, Treasury Management Area Manager, Florida
  - Jill Hagan (promotion), Treasury Management Area Manager, Chicago
  - Business Banking leadership roles, East and West Michigan *(in process)*

# Select Fifth Third HR Awards & Recognition

## 2017

- Disability Matters Honoree, *Springboard Consulting LLC: Employer of Choice*
- Gallup Great Workplace honoree, *Gallup*
- 2018 Best Places to Work for LGBT Equality, *Human Rights Campaign*
- 67% employee engagement score, outpacing national and industry averages, *AON Hewitt*
- Best Brand in Commercial Banking, Middle Market, *Greenwich Associates, 2017 Best Brand honors*
- Tied for 2nd in small business satisfaction in the Midwest, *J.D. Power, 2017*
- Online Banking Leader for online platform in customer service and money movement categories, *Javelin Strategy & Research, 2017 Online Banking Awards*
- Maternity Concierge Program featured on NBC's Today Show and in the WSJ
- Teresa Tanner named one of the nation's Most Powerful Women in Banking, *American Banker*
- Brian Lamb named one of 100 Most Influential Blacks in Corporate America, *Savoy Magazine*

## 2018

- Maternity Concierge program recognized for Human Capital innovation, *BAI Banking Strategies*
- SuperEmployer recognition, *Southwest Ohio Region Workforce Investment Board*
- Top Workplaces in Greater Cincinnati Honoree, *The Cincinnati Enquirer*
- America's Top Corporations for Women's Business Enterprise Award, *Women's Business Enterprise National Council*
- Healthiest Employers, *Cincinnati Business Courier*
- Teresa Tanner named one of the nation's Most Powerful Women in Banking, *American Banker*
- Matt Jauchius, Chief Marketing Officer of the Year, *Cincinnati Business Courier*
- Tim Spence, Digital Banker of the Year, *American Banker*
- Melissa Stevens named Digital Leader of the Year, *Information Age*
- Jule Kucera, Top Executives in Corporate Diversity, *Black Enterprise Magazine*
- Stephanie Smith, 2018 Top 25 Women in Power Impacting Diversity, *Diversity Plus Magazine*
- Deb Lewinski, Employee of the Year, *Careers and the disABLED magazine*

## 2019

- Fifth Third named Best Regional Bank, 2019, *Kiplinger*
- Listed in Forbes 2019 Best Employers for Diversity, *Forbes Magazine*
- Fifth Third included in the 2019 Bloomberg Gender-Equality Index, *Bloomberg*
- #1 Midwest bank for attracting Millennial employees, *Bank Director*
- Fifth Third named a top firm for Including Women-Owned Businesses in Supplier Diversity, *Cincinnati Business Courier*
- Fifth Third named among top 100 Adoption-Friendly Workplaces, 2019, *Dave Thomas Foundation for Adoption*
- Brian Lamb honored by the Cincinnati USA Regional Chamber during the 2019 "We Are Making Black History" campaign, *Cincinnati Enquirer*
- Melissa Stevens named to American Banker's 2019 Top 25 Women to Watch list, *American Banker*
- Carrie Lichter named to the 2019 Most Powerful Women in Banking *Next* list (40 and under), *American Banker*
- Byna Elliott and Stephanie Smith included in the 2019 Most Influential Women in Corporate America, *Savoy Magazine*

FIFTH THIRD BANK

Classification: Confidential

FOR INTERNAL USE ONLY

18

We continue to receive positive external recognition related to our human capital initiatives (both at the organization and individual level).

(highlight 2019 bullets)

# 2019 Employee Viewpoints Survey - Executive Summary

***Excludes Ratings from Former MB Employees***

## Key Findings




**+5** points — **67%**
Compared to 2018 EVS

**+ 8** points — **64%**
Compared to Kincentric U.S. Financial Services Norm

**- 2** points — **74%**
Compared to Kincentric U.S. Top Quartile Norm

### *Engagement during times of change*

**Key Populations (change from 2018):**

- Customer-facing roles: 74% (+4 pts)
- People Leaders (managers): 72% (+2 pts)
- Cincinnati region: 78% (+4 pts)
- Millennials (1981-1997): 69% (+5 pts)
- Females: 71% (+3 pts)
- 1 to 3 year tenure employees: 68% (+5 pts)

- **FTB is making solid progress in its people journey** as manifested in increased survey participation rates, higher engagement levels across the employee lifecycle and key demographics, near top-quartile levels of highly engaged employees, and leadership sponsorship.
- **Increase in engagement driven by employee churn (new and exiting FTB employees) and incumbent employees...and all tenure groups.**
- **Engagement levels at MB Financial clearly reflect an employee population still in the process of integration into FTB.** Including the results of the legacy MB Financial employees in the FTB total results in a -3% decrease and a 69% engagement.
- **Discretionary effort** at FTB as measured by "Strive" component of engagement increased but **remains weakest** of three behaviors.
- **Broad-based improvement** in engagement levels (managers and non managers) and in employee perceptions of FTB's work experience.
- **Perceptions of The Bank's Work Practices (tools, process, technology) remain a challenge and increased their drag on perceptions of the Bank's work experience** -- for legacy MB Financial and FTB employees alike.
- **5 of the 10 largest increases in how FTB employees perceive the work experience were 2018 Focus Areas.**

KINCENTRIC› A Spencer Stuart Company

FIFTH THIRD BANK

Confidential

FIFTHTHIRD-MCHUGH-001123

# The Fifth Third Bank work experience

***Broad-based improvement in all categories except Work Practices***




20

FIFTH THIRD BANK

# Executive Talent Management

December 2019


Enterprise Committee
Board of Directors
Lisa Wires
Executive Assistant to CEO
Greg Carmichael
Chairman, President & CEO
Lars Anderson
COO, Head of Commercial Bank
Tim Spence
Head of Consumer Bank, Payments & Strategy
Kris Garrett
Head of Wealth & Asset Management
Brian Lamb
Head of Retail Banking and Retail Brokerage
Phil McHugh
Head of Regional Banking, WAM & Business Banking
Susan Zaunbrecher
Chief Legal Officer & Corporate Secretary
Jude Schramm
Chief Information Officer
Bob Shaffer
Chief Human Resources Officer
Frank Forrest
Chief Risk Officer
Tayfun Tuzun
Chief Financial Officer
FIFTH THIRD BANK
FOR INTERNAL USE ONLY
22

# Lars Anderson | EVP, Chief Operating Officer and Head of Commercial Banking



Age: 58

Length of Service: 4 years, 4 months

Time in Current Role: 4 years, 4 months

2019 Key Responsibility Changes: N/A

## Talent Information

| | | | | | |
|---|---|---|---|---|---|
| **Retirement Eligible:** Y/N | No<br>Eligible: 3/4/2021 | **Risk of Leaving:** High/Med/Low | Low | **Leader Capabilities (How)** Strength/Effective/Opportunity | |
| **Unvested Equity:** | $1,322,773 (1.4xTDC) | **Potential:** High/Moderate/At Potential | At Potential<br>Leverage strengths in current role | Act Like an Owner | Strength |
| **2018 PM Rating:** | Exceeds | | | Be a Great Coach | Effective |
| **2019 PM Rating:** | Exceeds | **Potential Next Positions:** (Ready Now, 1-2 yrs, 2+ yrs) | N/A | Create Connections | Opportunity |
| | | | | Lead with Agility | Effective |

## Education

Bachelors Degree, Suffolk University

Advanced Management Program, University of North Carolina

Graduate of Executive Institute, University of Chicago Booth School of Business

## 5/3 Job History

| | |
|---|---|
| EVP, Chief Operating Officer and Head of Commercial Banking | 2015 |

## Community/Board Service

Cincinnati Symphony Orchestra, Board Member

Taft Museum of Art, Board Member

VanEv, Board Member (prior)

5/3 Regional Advisory Board, Georgia

## Prior to 5/3 Job History

| | |
|---|---|
| Vice Chairman, Business Bank, Comerica | 2010 |
| Group Executive, BB&T | 1985 |

## Key Strengths

- Seasoned commercial (middle market) banker with deep industry expertise
- Demonstrates strong strategic skills, including investments in out-of-footprint middle market and M&A advisory strategies.
- Attracts high quality, experienced commercial and middle market talent.
- Very active and visible in the community.

## Key Focus Areas

- Continue to focus on middle market production growth, acquisition of new relationships as well as building out existing out of footprint markets.
- Continue to focus on improving the overall commercial customer experience from point of application through onboarding and solving customer problems
- More succinct and efficient communication and operating rhythm approaches to drive performance accountability and improve engagement of team
- Needs to enhance ability to inspire followership at all levels and strengthen collaboration with peers.

## Succession Candidates

| | |
|---|---|
| Kevin Lavender | Ready Now |
| Tim Spence | 1-2 yrs |
| Consider restructure of responsibilities to other leaders | |

## Emergency Successor

Tom Heiks

FIFTH THIRD BANK

FOR INTERNAL USE ONLY 23

Confidential

FIFTHTHIRD-MCHUGH-001127

# Shellie Creson | EVP, Chief Auditor



Age: 51

Length of Service: 2 years, 3 months

Time in Current Role: 2 years, 3 months

2019 Key Responsibility Changes: N/A

**Talent Information**

| | | | |
|---|---|---|---|
| **Retirement Eligible:** Y/N | No<br>Eligible: 8/28/2025 | **Risk of Leaving:** High/Med/Low | Medium |
| **Unvested Equity:** | $630,453 (0.8xTDC) | **Potential:** High/Moderate/At Potential | At Potential<br>Leverage strengths in current role |
| **2018 PM Rating:** | Exceeds | | |
| **2019 PM Rating:** | Exceeds | **Potential Next Positions:** (Ready Now, 1-2 yrs, 2+ yrs) | N/A |

| **Leader Capabilities (How)** Strength/Effective/Opportunity | |
|---|---|
| Act Like an Owner | Effective |
| Be a Great Coach | Effective |
| Create Connections | Opportunity |
| Lead with Agility | Effective |

**Education**

Bachelor's degrees in Economics and Business Administration, Rhodes College

Professional Licenses:
- Certified Public Accountant
- Certified Internal Auditor
- Certified Enterprise Risk Professional

**5/3 Job History**

| | |
|---|---|
| EVP, Chief Auditor | 2017 |

**Community/Board Service**

American Red Cross: Go Red for Women

Ronald McDonald House

ArtsWave

5/3 Regional Advisory Board, Tennessee

**Prior to 5/3 Job History**

| | |
|---|---|
| Regions Financial Corp EVP, Deputy Dir. of Audit | 2017 |
| First Horizon Nat'l Corp., VP, Financial Accounting & Control | 2007 |
| Independent Holdings, VP, Chief Accounting Officer | 2005 |
| Pfizer Inc., Mgr., Corp Accounting & Analysis | 2004 |
| KPMG, Senior Manager, Assurance, Financial Services | 2002 |

**Key Strengths**

- Provides strong leadership to the Audit Division and leads effective execution of the audit plan.
- Has strong understanding of regulatory requirements and builds strong relationships with regulators.
- Actively drives assessments of talent optimization in the Audit Division to focus on changing requirements.
- Works to build and strengthen relationships with peers and senior management.

**Key Focus Areas**

- Consistently demonstrate a thoughtful and balanced approach to solving and communicating issues and ensure initial responses and points of view are fact based and appropriately address opportunities.
- Ensure Audit function is forward-thinking and functioning as efficiently as possible without sacrificing coverage of key business risks and quality of execution.
- Continue to focus on strengthening relationships with Audit Committee and other Board members.
- Increase exposure across the Bank, including identifying opportunities to mentor high potential women.

**Succession Candidates**

| | |
|---|---|
| External Search | |
| Elizabeth Osborne | 2+ yrs |

**Emergency Successor**

Jason Foley

# Frank Forrest | EVP, Chief Risk Officer



**Age:** 65

**Length of Service:** 6 years, 3 months

**Time in Current Role:** 6 years, 3 months

**2019 Key Responsibility Changes:** N/A

**Talent Information**

| | | | | Leader Capabilities (How) Strength/Effective/Opportunity | |
|---|---|---|---|---|---|
| **Retirement Eligible:** Y/N | Yes | **Risk of Leaving:** High/Med/Low | High<br>Retirement | Act Like an Owner | Effective |
| **Unvested Equity:** | $3,163,268 (1.3xTDC) | **Potential:** High/Moderate/At Potential | At Potential<br>• Leverage strengths in current role | Be a Great Coach | Effective |
| **2018 PM Rating:** | Exceeds | | | Create Connections | Effective |
| **2019 PM Rating:** | Exceeds | **Potential Next Positions:** (Ready Now, 1-2 yrs, 2+ yrs) | N/A | Lead with Agility | Opportunity |

**Education**

Bachelors, Accounting & Finance, Florida State University

**5/3 Job History**

| | |
|---|---|
| EVP, Chief Risk & Credit Officer | 2013 |

**Community/Board Service**

Providence Day School Board of Advisors, Board of Trustees and Chairman of the Board of Trustees

Wake Forest University College Board of Visitors

5/3 Regional Advisory Board, Northeast Ohio

**Prior to 5/3 Job History**

| | |
|---|---|
| Bank of America, Quality Executive, Legacy Asset Services | 2012 |
| Global Corporate Debt Product Executive | 2008 |
| Risk Management Executive, Global Risk Management | 2007 |
| Global Bank Debt Executive | 2005 |
| Nations Bank, Senior Credit Policy Executive | 1998 |

**Key Strengths**

- Seasoned, experienced leader with deep banking, risk management and compliance knowledge
- Builds high quality teams that appropriately manage risk.
- Strong relationships with our regulators and represents the company very well.

**Key Focus Areas**

- Continue to optimize the risk and compliance organizations to ensure appropriate support of business objectives, drive more effective and efficient approaches and to address the OCC's heightened standards.
- Continue to test his organization for best in class performance and ensure he is engaged and has details to support conclusions.
- Ensure credit organization is appropriately aligned with our business strategies to help drive performance and the right outcomes.

**Succession Candidates**

| | |
|---|---|
| Jamie Leonard | Ready Now |
| Bob Shaffer | Ready Now |
| Reorganize Chief Credit Officer role to report directly to CEO | |

**Emergency Successor**

Jamie Leonard

Bob Shaffer

FIFTH THIRD BANK

Confidential

FOR INTERNAL USE ONLY



Confidential

# Kris Garrett | EVP, Head of Wealth & Asset Management



**Age: 61**

**Length of Service:** 2 years, 2 months

**Time in Current Role:** 6 months

**2019 Key Responsibility Changes:** Assumed Head of Wealth & Asset Management

### Talent Information

| | | | |
|---|---|---|---|
| **Retirement Eligible: Y/N** | No<br>Eligible: 10/16/2022 | **Risk of Leaving:** High/Med/Low | Low |
| **Unvested Equity:** | $1,840,546 (1.9xTDC) | **Potential:** High/Moderate/At Potential | Moderate Potential |
| **2018 PM Rating:** | Exceeds | | |
| **2019 PM Rating:** | Exceeds | **Potential Next Positions:** (Ready Now, 1-2 yrs, 2+ yrs) | Expand current responsibilities |

| Leader Capabilities (How) Strength/Effective/Opportunity | |
|---|---|
| Act Like an Owner | Strength |
| Be a Great Coach | Strength |
| Create Connections | Strength |
| Lead with Agility | Strength |

### Education

Bachelors, History, Allegheny College

### 5/3 Job History

| | |
|---|---|
| EVP, Head of Wealth and Asset Management | 2019 |
| Head of Private Bank | 2017 |

### Community/Board Service

- Ensemble Theater
- United Way Tocqueville Member
- 5/3 Regional Advisory Board, Greater Indiana

### Prior to 5/3 Job History

| | |
|---|---|
| CIBC Bank USA, President Private Wealth | 2009 |
| J.P. Morgan National Practice Leader Banking | 1989 |

### Key Strengths

- Seasoned leader with deep experience in the Wealth and Asset Management businesses
- Brings a strong strategic focus to developing and growing the business and improving customer experience.
- Effectively assimilated onto Enterprise Committee and as the Head of Wealth & Asset Management.
- Has built strong relationships with peers and senior management members.

### Key Focus Areas

- Continue to develop exposure to and relationships with regional leaders.
- Continue to deepen key customer relationships and enhance customer experience and performance.
- Focus on further developing the next level leaders and optimization of talent.
- Continue to develop relationships with Board members.

### Succession Candidates

| | |
|---|---|
| Kim Halbauer | 1-2 yrs |
| Chad Slaughter | 2+ yrs |

### Emergency Successor

Phil McHugh

Brian Lamb

# Brian Lamb | EVP, Head of Retail Banking & Brokerage



**Age: 43**

**Length of Service:**
13 years, 0 months

**Time in Current Role:**
6 months

**2019 Key Responsibility Changes:**
Assumed Head of Retail Banking and Retail Brokerage

## Talent Information

| | | | |
|---|---|---|---|
| **Retirement Eligible:** Y/N | No<br>Eligible: 7/7/2031 | **Risk of Leaving:** High/Med/Low | Medium |
| **Unvested Equity:** | $1,778,190 (1.2xTDC) | **Potential:** High/Moderate/At Potential | High Potential |
| **2018 PM Rating:** | Exceeds | | |
| **2019 PM Rating:** | Exceeds | **Potential Next Positions:** (Ready Now, 1-2 yrs, 2+ yrs) | • Head of Consumer Bank (1-2 years)<br>• Head of Regional Banking (1-2 years) |

| **Leader Capabilities (How)** Strength/Effective/Opportunity | |
|---|---|
| Act Like an Owner | Strength |
| Be a Great Coach | Effective |
| Create Connections | Strength |
| Lead with Agility | Strength |

## Education

- MBA, University of South Florida
- Bachelors, Accounting, University of South Florida
- Graduate of Stonier Graduate Banking School, University of Pennsylvania

## 5/3 Job History

| | |
|---|---|
| EVP, Head of Retail Banking and Brokerage | 2019 |
| EVP, Head of Wealth & Asset Management | 2018 |
| EVP, Chief Corp. Resp. & Reputation Officer | 2016 |
| President & CEO, Fifth Third Bank (North Florida) | 2011 |
| Head of Business Banking, Tampa Bay Market | 2007 |

## Community/Board Service

- Vice Chair, Florida Board of Governors
- Urban League of Greater Southern Ohio, Board Member
- 5/3 Regional Advisory Board, Eastern Michigan

## Prior to 5/3 Job History

| | |
|---|---|
| Chief Financial Officer, Home Discovery Real Estate Services Corporation | 2004 |
| Director of Finance, TECO Energy | 1997 |

## Key Strengths

- Initial assimilation into Head of Retail Banking & Brokerage role has been effective.
- Inspirational and resonant leader. Builds followership with all levels of employees throughout the Bank.
- Strong business acumen and execution skills. Models the way in terms of teamwork and collaboration. Strong public speaking skills.
- Positively builds and represents our brand.

## Key Focus Areas

- Continue to deepen knowledge of the retail business and customers to strengthen customer experience and business performance. Build exposure to regulators and industry groups.
- Further demonstrate capabilities to develop and drive high-impact business strategies as well as to attract and develop high performing talent.
- Develop deeper commercial credit skill set for future opportunities.
- Develop opportunities to deepen community involvement in Cincinnati.
- Demonstrate patience in career management and progression. Demonstrate vulnerability when he does not know something. Recognize asking for help is not a weakness.

## Succession Candidates

| | |
|---|---|
| Shawn Niehaus | 1-2 yrs |

## Emergency Successor

Shawn Niehaus

FIFTH THIRD BANK

FOR INTERNAL USE ONLY



Confidential

# Phil McHugh | EVP, Head of Regional Banking, W&AM and Business Banking



Age: 55

**Length of Service:** 33 years, 2 months

**Time in Current Role:** 1 year, 4 months

**2019 Key Responsibility Changes:** Assumed Community & Economic Development and Corporate Communications

## Talent Information

| | | | |
|---|---|---|---|
| **Retirement Eligible:** Y/N | Yes | **Risk of Leaving:** High/Med/Low | Low |
| **Unvested Equity:** | $2,249,055 (1.1xTDC) | **Potential:** High/Moderate At Potential | Moderate Potential |
| **2018 PM Rating:** | Exceeds | | |
| **2019 PM Rating:** | Exceeds | **Potential Next Positions:** (Ready Now, 1-2 yrs, 2+ yrs) | Expand current responsibilities to include Middle Market leadership |

| **Leader Capabilities (How)** Strength/Effective/Opportunity | |
|---|---|
| Act Like an Owner | Strength |
| Be a Great Coach | Effective |
| Create Connections | Strength |
| Lead with Agility | Strength |

## Education

Bachelors, Business Administration, Xavier University

Young President's Organization
- Harvard Leadership Programs

## 5/3 Job History

| | |
|---|---|
| EVP, Head of Regional Banking, Business Banking and Wealth Management | 2018 |
| EVP, Head of Consumer Bank | 2017 |
| EVP, Head of Wealth and Asset Management | 2010 |
| President & CEO, Fifth Third Bank (Louisville) | 2004 |

## Community/Board Service

CISE, Board Member and 2018 Campaign Chair

Xavier University President's Advisory Council, Athletics Leadership Committee

Wealth Management Executive Circle of the Corporate Executive Board

5/3 Regional Advisory Board, Chicago

## Prior to 5/3 Job History

N/A

## Key Strengths

- Seasoned, versatile leader with significant organizational knowledge and credibility.
- Highly engaged, thoughtful, does a good job of setting organizational direction and drives execution.
- Holds himself and his team accountable to deliver results in the right way. Inspires followership.
- Effectively represents Fifth Third in the community and positively builds our brand.

## Key Focus Areas

- Continue to focus on ensuring necessary strategies and resources are applied to the Chicago region to drive planned business results.
- Continue to identify and implement strategies to enhance the performance of our regions as well as the efficiency and consistency of our regional operating rhythms.
- Timely execution of talent management actions to ensure the very best leaders are in key positions.

## Succession Candidates

| | |
|---|---|
| Tim Spence | Ready Now |
| Brian Lamb | 1-2 yrs |
| Consider restructure of responsibilities to other leaders | |

## Emergency Successor

Tom Heiks

FIFTH THIRD BANK

Classification: Confidential

FOR INTERNAL USE ONLY

# Jude Schramm | EVP, Chief Information Officer



**Age: 47**

**Length of Service:** 1 year, 9 months

**Time in Current Role:** 1 year, 9 months

**2019 Key Responsibility Changes:** Assumed Head of Central Operations and Enterprise Project Mgmt. Office

## Talent Information

| | | | |
|---|---|---|---|
| **Retirement Eligible:** Y/N | No<br>Eligible: 3/1/2028 | **Risk of Leaving:** High/Med/Low | Low |
| **Unvested Equity:** | $937,911 (0.6xTDC) | **Potential:** High/Moderate/At Potential | Moderate Potential |
| **2018 PM Rating:** | Achieves | | |
| **2019 PM Rating:** | Exceeds | **Potential Next Positions:** (Ready Now, 1-2 yrs, 2+ yrs) | Expand current responsibilities |

| **Leader Capabilities (How)** Strength/Effective/Opportunity | |
|---|---|
| Act Like an Owner | Strength |
| Be a Great Coach | Strength |
| Create Connections | Strength |
| Lead with Agility | Strength |

## Education

**University of Cincinnati:**
- BBA in Information Systems,
- BBA in Business Management

## 5/3 Job History

| | |
|---|---|
| EVP, Chief Information Officer | 2018 |

## Community/Board Service

Crossroads Mason Kids Club-special needs

UC College of Business, analytics curriculum board member

5/3 Regional Advisory Board, Kentucky

## Prior to 5/3 Job History

| | |
|---|---|
| GE Aviation: | |
| Chief Information Officer | 2016 |
| CIO Digital | 2014 |
| CIO Commercial | 2012 |
| CIO Digital Solutions | 2012 |
| Whittman Hart LLP – Project Manager | 1999 |
| Ernst & Young – Senior Consultant | 1997 |

## Key Strengths

- Deep technical skills and strategic insight of future technology needs.
- Builds strong peer and team relationships. Works in a highly collaborative manner and has strong teamwork capabilities.
- Has implemented a disciplined and transparent approach to our existing and new technology investments and related prioritization methodology.
- Direct and transparent in approach to talent management. Has attracted external talent to strengthen his direct report team.

## Key Focus Areas

- Effectively execute on strategic plans to enhance existing technology infrastructure and minimize system outages and customer disruptions.
- Continue to assess process and control gaps in Central Operations and implement enhancements to improve customer experience and efficiencies.
- Ensure appropriate focus on strengthening talent deeper on IT team and insourcing talent where appropriate.
- More proactive networking with industry peers and centers of excellence.

## Succession Candidates

| | |
|---|---|
| Tom Gottlieb | 2+ yrs |

## Emergency Successor

Hollis Schuler

FIFTH THIRD BANK

FOR INTERNAL USE ONLY



Confidential

FIFTHTHIRD-MCHUGH-001133

# Bob Shaffer | EVP, Chief Human Resources Officer



**Age:** 50

**Length of Service:** 17 years, 5 months

**Time in Current Role:** 2 years, 9 months

**2019 Key Responsibility Changes:** Assumed Enterprise Workplace Services and Corporate Security

## Talent Information

| | | | |
|---|---|---|---|
| **Retirement Eligible:** Y/N | No<br>Eligible: 5/9/2024 | **Risk of Leaving:** High/Med/Low | Low |
| **Unvested Equity:** | $1,503,125 (0.9xTDC) | **Potential:** High/Moderate/At Potential | Moderate Potential<br>Expand current responsibilities |
| **2018 PM Rating:** | Exceeds | | |
| **2019 PM Rating:** | Exceeds | **Potential Next Positions:** (Ready Now, 1-2 yrs, 2+ yrs) | • Chief Risk Officer (Ready Now) |

| Leader Capabilities (How) Strength/Effective/Opportunity | |
|---|---|
| Act Like an Owner | Strength |
| Be a Great Coach | Strength |
| Create Connections | Strength |
| Lead with Agility | Strength |

## Education

Bachelors Business Administration and Accounting, Bucknell University

Certified Public Accountant

## 5/3 Job History

| | |
|---|---|
| EVP, Chief HR Officer | 2017 |
| EVP, Chief Auditor | 2007 |
| SVP, Dir. of Financial Audit | 2003 |
| VP, Group Audit Manager | 2002 |

## Community/Board Service

American Heart Association's Heart Mini Marathon, 2018 City of Cincinnati Chairman

United Way, Impact Cabinet Member

Bank Administration Institute, CHRO Roundtable

5/3 Regional Advisory Board, Northwest Ohio

## Prior to 5/3 Job History

| | |
|---|---|
| Partner, Arthur Andersen, Business Advisory Practice | 1998 |
| Various Audit Roles, KPMG | 1991 |

## Key Strengths

- Strong business acumen, leadership skills and organizational awareness. Versatile leader.
- Quick learning agility and drives operational excellence
- Fact based and balanced approach. Always appropriately challenges the Enterprise team to do what is in the best interest of the Bank.
- Is a trusted advisor of CEO and peers and appropriately aligns his business areas to help achieve organizational objectives.

## Key Focus Areas

- Continue to look for ways to help Enterprise team enhance engagement and effectiveness.
- Continue to provide leadership to ensure our talent strategies appropriately prepares our leaders and workforce of the future as well as provides a positive employee experience.
- Ensure optimization of capital spend for EWS projects.

## Succession Candidates

| | |
|---|---|
| Nancy Pinckney | Ready Now |
| Peg Jula | 1-2 yrs |

## Emergency Successor

Nancy Pinckney

# Tim Spence | EVP, Head of Consumer Bank, Payments & Strategy



Age: 40

Length of Service: 4 years, 3 months

Time in Current Role: 1 year, 4 months

2019 Key Responsibility Changes: Assumed Marketing

## Talent Information

| | | | |
|---|---|---|---|
| **Retirement Eligible:** Y/N | No<br>Eligible: 1/23/2034 | **Risk of Leaving:** High/Med/Low | Medium |
| **Unvested Equity:** | $3,455,782 (1.5xTDC) | **Potential:** High/Moderate/At Potential | High Potential<br>• Head of Regional Banking (Ready Now)<br>• Head of Commercial Banking (1-2 yrs) |
| **2018 PM Rating:** | Exceeds | | |
| **2019 PM Rating:** | Exceeds | **Potential Next Positions:** (Ready Now 1-2 yrs, 2+ yrs) | • President (1-2 years)<br>• CEO (3+ yrs) |

| Leader Capabilities (How) Strength/Effective/Opportunity | |
|---|---|
| Act Like an Owner | Strength |
| Be a Great Coach | Strength |
| Create Connections | Strength |
| Lead with Agility | Strength |

## Education

Bachelors, English and Economics, Colgate University

## 5/3 Job History

| | |
|---|---|
| EVP, Head of Consumer, Payments and Strategy | 2018 |
| EVP, Head of Payments, Strategy and Digital Solutions | 2016 |
| EVP, Chief Strategy Officer | 2015 |

## Community/Board Service

Consumer Bankers Association, Board Member

Cintrifuse, Board Member, Executive Committee

Miami University School of Entrepreneurship, Advisory Board

5/3 Regional Advisory Board, North Carolina

## Prior to 5/3 Job History

| | |
|---|---|
| Senior Partner, Financial Services Practice, Oliver Wyman | 2008 |

## Key Strengths

- Has strategic vision. Sees and executes on growth opportunities. Is called on by key industry stakeholders and media to help shape dialogue around banking strategy and digital transformation.
- Proactively manages risks and profitability in his business. Leads execution by being in the details. Sets high standards and holds himself and team accountable.
- Has courage and will make tough decisions. Challenges and pushes back on his team, peers, and CEO when he believes it is warranted.
- Has followership and is viewed as inspiring and approachable.

## Key Focus Areas

- Continue to execute on the consumer bank transformation and deliver top financial performance.
- Expand responsibilities/exposure to build more commercial and regional banking experience.
- Deepen exposure to certain key stakeholders (e.g., investors, rating agencies, etc.).
- Demonstrate consistent attraction of key senior talent.
- Consistently show patience in letting people come along with thinking/discussion, prior to decision making.
- Broaden community involvement and local business connectivity in Cincinnati.

## Succession Candidates

| | |
|---|---|
| Consider restructure of responsibilities to other leaders | |
| Brian Lamb (Head of Consumer Bank) | 1-2 yrs |

## Emergency Successor

Phil McHugh

FIFTH THIRD BANK

# Tayfun Tuzun | EVP, Chief Financial Officer



**Age:** 55

**Length of Service:** 12 years, 6 months

**Time in Current Role:** 6 years, 1 month

**2019 Key Responsibility Changes:** Assumes Strategic Sourcing

## Talent Information

| | | | |
|---|---|---|---|
| **Retirement Eligible:** Y/N | Yes | **Risk of Leaving:** High/Med/Low | Low |
| **Unvested Equity:** | $3,404,817 (1.3xTDC) | **Potential:** High/Moderate/At Potential | Moderate Potential |
| **2018 PM Rating:** | Exceeds | | |
| **2019 PM Rating:** | Exceeds | **Potential Next Positions:** (Ready Now, 1-2 yrs, 2+ yrs) | Expand current responsibilities |

| **Leader Capabilities (How)** Strength/Effective/Opportunity | |
|---|---|
| Act Like an Owner | Strength |
| Be a Great Coach | Effective |
| Create Connections | Effective |
| Lead with Agility | Strength |

## Education

Masters & Doctorate, Economics, Ohio State University

Bachelors, Economics, Bosphorus University (Istanbul, Turkey)

## 5/3 Job History

| | |
|---|---|
| EVP, Chief Financial Officer | 2013 |
| SVP, Bancorp Treasurer | 2011 |
| SVP, Assistant Bancorp Treasurer | 2010 |
| VP, Structured Finance Manager | 2007 |

## Community/Board Service

Cincinnati Shakespeare Company, Board President

Bank Policy Institute, Member

Down Syndrome Association Of Greater Cincinnati, Board Member (prior)

Hamilton County Special Olympics, Board Member (prior)

5/3 Regional Advisory Board, Western Michigan

## Prior to 5/3 Job History

| | |
|---|---|
| Director, Research & Risk, FSI Group Management | 2004 |
| SVP, Treasury, Provident Bank | 1993 |

## Key Strengths

- Very capable CFO with a strong grasp of our businesses with respect to opportunities and issues. Calm demeanor.
- Highly analytical and process oriented when addressing issues.
- Well respected by the analyst and investment community.

## Key Development Opportunities

- Continue to proactively partner with business and staff leaders to identify opportunities to grow and optimize their businesses with a longer-term strategic view
- Continue to focus on ensuring he is creating the right culture and engagement within Finance and how that translates into working with other areas of the Bank.
- Although his direct report team is very strong and experienced, continued focus is needed on improving succession planning and diversity within Finance.

## Succession Candidates

| | |
|---|---|
| Jamie Leonard | Ready Now |
| Bryan Preston | 2+ yrs |

## Emergency Successor

Jamie Leonard

FIFTH THIRD BANK

Classification: Confidential

FOR INTERNAL USE ONLY

# Susan Zaunbrecher | EVP, Chief Legal Officer



Age: 60

Length of Service: 1 year, 7 months

Time in Current Role: 1 year, 7 months

2019 Key Responsibility Changes: N/A

## Talent Information

| | | | |
|---|---|---|---|
| **Retirement Eligible: Y/N** | No<br>Eligible: 1/30/2023 | **Risk of Leaving:** High/Med/Low | Low |
| **Unvested Equity:** | $735,146 (0.5xTDC) | **Potential:** High/Moderate/At Potential | At Potential<br>• Leverage strengths in current role |
| **2018 PM Rating:** | Achieves | | |
| **2019 PM Rating:** | Exceeds | **Potential Next Positions:** (Ready Now, 1-2 yrs, 2+ yrs) | N/A |

| Leader Capabilities (How) Strength/Effective/Opportunity | |
|---|---|
| Act Like an Owner | Strength |
| Be a Great Coach | Effective |
| Create Connections | Strength |
| Lead with Agility | Effective |

## Education

Tulane University, BA

UC College of Law, JD

## 5/3 Job History

| | |
|---|---|
| EVP, Chief Legal Officer & Corporate Secretary | 2018 |

## Community/Board Service

Playhouse in the Park Board

UC Econ Center Board

Queen City Club Board

Cincinnati Women's Executive Forum Board

ArtsWave

United Way – Tocqueville Society

5/3 Regional Advisory Board, Central Ohio

## Prior to 5/3 Job History

| | |
|---|---|
| Partner, Chair of Corporate Department, Dinsmore & Shohl LLP, Cincinnati | 1990 |

## Key Strengths

- Highly seasoned legal professional with significant technical banking expertise.
- Has built strong peer relationships. Is balanced and thoughtful in helping to develop business solutions.
- Provides effective leadership of legal team and has built strong relationships and trust.
- Very well-known and connected in the community. Effectively represents Fifth Third.

## Key Focus Areas

- Continue to build relationships with regulators and network in Washington, D.C., including OCC regulators given recent charter conversion.
- Further build working relationships with Board members.
- Ensure mix of utilization of internal and external legal resources is optimized and efficient. Develop strategies to improve engagement of Legal team.
- Leverage executive sponsor role of the Women's Enterprise Business Resource Group to maximize impact of investment in high potential women.
- Consistently demonstrate effective listening skills.

## Succession Candidates

| | |
|---|---|
| External Search – Candidate identified | |
| Phenise Poole | 2+ yrs |

## Emergency Successor

Phenise Poole

FIFTH THIRD BANK

# Executive Succession Plan

December 2019

# Enterprise Leadership | Succession *(LOB Roles)*

CEO

| | | | | | |
|---|---|---|---|---|---|
| Critical Line of Business Roles | Head of Commercial Bank | Head of Consumer Bank, Payments & Strategy* | Head of Retail Banking and Retail Brokerage | Head of Regional Banking, WAM and Business Banking | Head of Wealth & Asset Management |
| Successor(s) | Kevin Lavender (Ready Now) Tim Spence (1-2 years) | Brian Lamb - Consumer Bank (1-2 years) | Shawn Niehaus (1-2 years) | Tim Spence (Ready Now) Brian Lamb (1-2 years) | Kim Halbauer (1-2 years) Chad Slaughter (2+ years) |
| Emergency Cover | Tom Heiks | Phil McHugh | Shawn Niehaus | Tom Heiks | Phil McHugh Brian Lamb |
| | Consider restructure of responsibilities to other leaders | Consider restructure of responsibilities to other leaders | | | |

Note - See Executive Talent Management section for key strengths and focus areas of Enterprise Committee members.

FIFTH THIRD BANK

# Enterprise Leadership | Succession *(Functional Roles)*

CEO

| Critical Function Roles | Chief Auditor (1) | Chief Financial Officer | Chief HR Officer | Chief Information Officer | Chief Legal Officer | Chief Risk Officer |
|---|---|---|---|---|---|---|
| Successor(s) | Liz Osborne (2+ years) | Jamie Leonard (Ready Now) - Bryan Preston (2+ years) | Nancy Pinckney (Ready Now) Peg Jula (1-2 years) | Tom Gottlieb (2+ years) | External Search Phenise Poole (2+ years) | Jamie Leonard (Ready Now) Bob Shaffer (Ready Now) |
| Emergency Cover | Jason Foley | Jamie Leonard | Nancy Pinckney | Hollis Schuler | Phenise Poole | Jamie Leonard Bob Shaffer |

Consider external search

(1) Successor for Chief Auditor role will be approved in advance by the Audit Committee.

Note - See Executive Talent Management section for key strengths and focus areas of Enterprise Committee members.

FIFTH THIRD BANK

# CEO Succession Plan

December 2019

# CEO Succession

Board of Directors

CEO(1)

| | |
|---|---|
| Ready Now | N/A |
| 3+ Years | Tim Spence |
| 7+ Years | Brian Lamb |
| *Emergency Successor | Tayfun Tuzun<br>Phil McHugh<br>Board Member |

*See CEO Emergency Succession Plan page 39

(1) Successor for CEO role will be approved in advance by the Board of Directors.

Note - See Executive Talent Management section for key strengths and focus areas of Enterprise Committee members.

FIFTH THIRD BANK

# Emergency CEO Succession Plan

December 2019

# Emergency CEO Succession Plan

Purpose:

This Emergency CEO Succession Plan is designed to prepare for and address an unexpected and permanent departure of the CEO in the event of resignation due to health issues, personal reasons, death, allegations of wrong-doing, etc.

Annual Succession Planning:

The Board of Directors (or delegated board committee) reviews the Emergency CEO Succession Plan at least annually and more frequently, as appropriate or needed. The Board's review may include the following:

- A summary review of the company officers who are potential candidates to succeed the CEO, including current readiness, strengths and key focus areas.
- A review of the specific communication elements to ensure the notification process response team, regulatory filings and communication scenarios are up to date.

# Notification Process




Fifth Third Bank

FOR INTERNAL USE ONLY 41

# Emergency CEO Succession Process

This entire process should be worked through within 4 hours of CEO vacating unexpectedly




(1) Includes establishing compensation arrangements

FIFTH THIRD BANK

## Specific Emergency Scenarios

- Identify the applicable scenario:
  - Scenario 1A: CEO Resignation Due to Health Issues/Personal Reasons
  - Scenario 1B: CEO Position Vacated Due to Death
  - Scenario 2: CEO and Multiple Executives Vacate Positions Unexpectedly
  - Scenario 3: CEO (and potentially other executives) Removed for Alleged Wrong-doing

Fifth Third Bank

# Scenario # 1A and #1B

| Scenario | Scenario-Specific Skills Required | Potential Scenario-Specific Interim Candidates |
|---|---|---|
| CEO position vacated unexpectedly (health issues, personal reasons, death, etc.) | ▪ Ability to Maintain/Stabilize Investor and Employee Confidence in Short Term<br>▪ Business Acumen/Execution<br>▪ Ability to Mobilize Resources<br>▪ Strategic Agility<br>▪ Existing Relationship with Key Regulators<br>▪ Communication Skills<br>▪ Ability to carry out responsibilities within the risk governance framework | **Potential Board Members**<br>*Assess if there are any board members that could potentially fill role on an interim/emergency basis*<br><br>**Potential Management Candidates**<br>Tayfun Tuzun<br>Phil McHugh |

**Key Considerations for the Board:**

- Are there any internal or external events currently taking place that require different skill sets?
- If an internal candidate is close to being ready, should that person act as interim, or should an objective party not currently interested in the position be named?
- If a person close to being ready is chosen as interim, what can/should the Board do to help accelerate his/her readiness?
- If replacement CEO (interim or otherwise) is an existing Board member, what travel/time commitments will be expected and for how long?
- Is the current CEO available for counsel via phone or on a part-time basis?
- What role should the Board play to help facilitate on-boarding the new CEO (interim or long term successor)?

# Scenario #2

| Scenario | Scenario-Specific Skills Required | Potential Scenario-Specific Interim Candidates |
|---|---|---|
| CEO and multiple executives vacate positions unexpectedly<br>(plane crash scenario) | ▪ Ability to Maintain/Stabilize Investor and Employee Confidence in Short Term<br>▪ Existing Relationship with Key Regulators<br>▪ Existing Relationships with Key Customers, Analysts and Major Shareholders to help reassure stability<br>▪ Ability to Mobilize Resources<br>▪ Business Acumen/Execution<br>▪ Communication Skills<br>▪ Strategic Agility<br>▪ Ability to carry out responsibilities within the risk governance framework | **Potential Board Members**<br>*Assess if there are any board members that could potentially fill role on an interim/emergency basis*<br><br>**Potential Management Candidates**<br>Tayfun Tuzun<br>Phil McHugh<br><br>If above unavailable:<br>Other key executives? |

**Key Considerations for the Board:**

- Are there any internal or external events currently taking place that require different skill sets?
- Do the identified emergency successors for key executive roles need outside help (consultants, etc.)?
- What role should each board member take on to provide additional support to the executive management team?
- If potential successors or other key executives have been through an extensive assessment process, should the Board meet with the assessment consultant(s) and/or the Chief Human Resources Officer for a thorough debrief on assessment results to help with selection/assimilation?

# Scenario #3

| Scenario | Scenario-Specific Skills Required | Potential Scenario-Specific Interim Candidates |
|---|---|---|
| CEO (and potentially other executives) removed from positions due to allegations of wrong-doing | ▪ Ability to Maintain/Stabilize Investor and Employee Confidence in Short Term<br>▪ Existing Relationship with Investors<br>▪ Instills Confidence; Builds Trust; Authentic<br>▪ Leads with Courage<br>▪ Ability to Mobilize Resources<br>▪ Communication Skills; Empathetic and Objective<br>▪ Business Acumen/Execution<br>▪ Strategic Agility<br>▪ Ability to carry out responsibilities within the risk governance framework | **Potential Board Members**<br>*Assess if there are any board members that could potentially fill role on an interim/emergency basis*<br><br>**Potential Management Candidates**<br>*Would need to assess if there was an executive that meets required competencies and is objective and unrelated to current allegations* |

**Key Considerations for the Board:**

- Are there any internal or external events currently taking place that require different skill sets?
- Are there any members of executive management that are unrelated to incident, and perceived by internal and external parties as being objective?
- What additional resources are needed, internally or externally, to shore up the talent and knowledge loss?
- Retain outside counsel to assist in any investigation required.
- Engage with FW Cook and outside counsel to determine any compensation action required (i.e., clawbacks, forfeiture of equity/bonus, etc.)

FIFTH THIRD BANK

# Emergency CEO Succession Plan
## *Communication Elements*

December 2019

# Checklist of Required Regulatory Filings

| Party to Notify | Notice Form | Timing | Contents | Pre Conditions |
|---|---|---|---|---|
| SEC | 8-K | Within four business days of a final decision regarding retirement, resignation or termination of the principal executive officer | • The fact that the event has occurred, the date of the decision, and the date of effectiveness.<br>• If resignation or termination from director role included, disclosure of date of decision, the date of effectiveness, and whether the departure resulted from disagreement with the Company | None |
| SEC | 8-K | Within four business days of execution of incremental separation agreements , if any | • Brief description of any material compensatory arrangements or grants or awards incremental to those already required by previously disclosed agreements (agreements to be filed) | None |
| SEC | 8-K | Within four business days of the appointment of a new principal executive officer | • Name and position of the new officer and the date of the appointment<br>• Proxy Statement type Information about the new officer<br>• Brief description of any material plan, contract or arrangement or any grant or award to such officer (agreements to be filed)<br>• If appointment includes board seat, information that accompanies new director appointments | None |
| Public | Press Release | Promptly on the happening of the event | Information similar to 8-K | None |

FIFTH THIRD BANK

# Checklist of Required Regulatory Filings

| Party to Notify | Notice Form | Timing | Contents | Pre Conditions |
|---|---|---|---|---|
| Nasdaq | Electronic notice | 10 minutes before release of 8-K and Press Release | Information in Press Release and 8-K | None |
| Office of the Comptroller of the Currency and Federal Reserve | • FR 2081b<br>• FR 2081c | 30 Days before the event (may be waived in an emergency) | Applications for approval of the change (includes questions on the Bank's evaluation efforts to hire the officer as well as biographical and financial information about the officer) | This notice is required only if:<br>• The institution is not in compliance with all minimum capital requirements<br>• The institution is in troubled condition; or<br>• The OCC or Fed determines, in connection with their review of a capital restoration plan, that such notice is appropriate |
| Secretaries of State where we are qualified to do business | Notice | Promptly after the event | The fact that the event has occurred and the date of the event. | None |



Confidential

# Scenario Specific Communications

- Scenario 1A: CEO Resignation Due to Health Issues/Personal Reasons
  - ❑ Press Release (CHRO, Investor Relations, Legal and Communications)
  - ❑ Internal Communication from Lead Independent Director
  - ❑ Internal Manager Talking Points (CHRO, Legal and Communications)
  - ❑ Communications to applicable regulators
- Scenario 1B: CEO Position Vacated Due to Death
  - ❑ Press Release (CHRO, Investor Relations, Legal and Communications)
  - ❑ Internal Communication from Lead Independent Director
  - ❑ Internal Manager Talking Points (CHRO, Legal and Communications)
  - ❑ Communications to applicable regulators
- Scenario 2: CEO & Multiple Execs Vacate Position Unexpectedly
  - ❑ Press Release (CHRO, Investor Relations, Legal and Communications)
  - ❑ Internal Communication from Lead Independent Director
  - ❑ Internal Manager Talking Points (CHRO, Legal and Communications)
  - ❑ Communications to applicable regulators
- Scenario 3: CEO (and potentially other executives) Removed from positions due to allegations of wrong-doing
  - ❑ Press Release (CHRO, Investor Relations, Legal and Communications)
  - ❑ Internal Communication from Lead Independent Director
  - ❑ Internal Manager Talking Points (CHRO, Legal and Communications)
  - ❑ Communications to applicable regulators

# EXHIBIT 10

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 11

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 12

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 13

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 14

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 15

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 16

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 17

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 18

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 19

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 20

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 21

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 22

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 23

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

Message

From: Shaffer, Bob [/O=FIFTH THIRD BANK/OU=CINCINNATI/CN=RECIPIENTS/CN=BOB.SHAFFER]
Sent: 6/8/2020 9:16:28 PM
To: Carmichael, Greg [/o=Fifth Third Bank/ou=Cincinnati/cn=Recipients/cn=Greg.Carmichael]
Subject: Guy Conversation
Attachments: Winning Formula - CEO Profile FTB -2015.docx

**Key Highlights/next Steps:**

- Guy agrees that if Tim is "the" successor don't add Tayfun and Phil formerly. Although, he would recommend, at a minimum, we discuss with Marsha that she/the Board is ok with only having Tim assessed by Guy. He said he has seen a few Boards surprised in the past the CEO/CHRO did have at least one other internal candidate assessed.

- Schedule a 90 minute call for Greg, Guy and me to assess and modify the attached CEO Profile used in 2015. Guy would also use this time to get feedback from each of us on Tim. We will try to schedule for this week or next.

- Guy wants to interview four of Tim's other peers, not including me, and four of his direct reports. Guy wants us to pick the interviewees. My recommendations are below. Let me know what you think.

  <u>Enterprise</u>
  - Phil - Yes
  - Tayfun - Yes
  - Jude - Yes
  - Susan – Yes

  - Kevin - No
  - Kris - No
  - Jamie - No
  - Lars - No
  - Shellie – No

  <u>Direct Reports</u>
  - Chris Shroat - Yes
  - Melissa Stevens - Yes
  - Howard Hammond - Yes
  - Art Weston - Yes

  - Ben Hoffman - No
  - Ben Smith - No
  - Matt Jauchius - No
  - Peter Kidd - No
  - Mike Butera – No
  - Tim Harden - No

- Bob to send Tim and Guy an introductory email so they can set up their three hour assessment discussion.

- Guy to send us a revised proposal. He feels confident that we can execute a similar timeline as the original proposal with a full/final Board report in September. This will likely require a call with the HCCC in August since we will not have a preliminary report for them in June.

PLAINTIFF'S EXHIBIT
Heminger 24
12-20-22
PENGAD 800-631-6989

Please let me know of any questions.

Bob

# EXHIBIT 25

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 26

# [PRODUCED FOR *IN CAMERA* INSPECTION]

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER


## FIFTH THIRD BANCORP

## UNANIMOUS WRITTEN CONSENT OF THE BOARDS OF DIRECTORS APPOINTING PRESIDENT

**October 26, 2020**

The undersigned, being all of the Directors of Fifth Third Bancorp, an Ohio Corporation ("Bancorp"), in accordance with Section 1701.54 of the Ohio Revised Code, do hereby authorize, consent, and agree to the adoption, without a meeting, of the following resolutions through this unanimous written consent (this "Consent"), effective as of the date first set forth above:

**WHEREAS,** the members of the Board, in connection with succession and leadership planning, have discussed potential promotions and appointments to senior officer positions of Bancorp at previous meetings;

**WHEREAS,** the members of the Board have determined that it is appropriate to implement one such promotion and appointment at this time;

**NOW, THEREFORE,** it is hereby:

**OFFICER APPOINTMENT**

**RESOLVED,** that Timothy N. Spence be promoted and appointed to the position of President of Bancorp;

**GENERAL RESOLUTIONS**

**RESOLVED FURTHER,** that the officers of the Bancorp be, and each are hereby, authorized, directed and empowered to perform any and all other acts and things as in such officer's opinion may be necessary or appropriate in order to carry out the intent and purposes of the foregoing resolution with respect to the Bancorp; and

**RESOLVED FURTHER,** that any act of any Director or officer of the Bancorp and of any person designated or authorized to act by any officer of the Bancorp, which act would have been authorized by the foregoing resolutions except that such act was taken prior to the adoption of such resolutions is hereby ratified, confirmed, approved, and adopted as the act of the Bancorp.

[Remainder of page intentionally left blank. Signature page follows.]

PLAINTIFF'S EXHIBIT
Heminger 27
12-20-22
PENGAD 800-631-6989

Classification: Restricted

In Witness Whereof, the undersigned Directors have executed this signature page as of the date first set forth above in this Unanimous Written Consent.

Nicholas K. Akins October 22, 2020 3:38 PM

Mitchell S. Feiger October 22, 2020 4:25 PM

B. Evan Bayh III October 22, 2020 9:53 AM

Thomas H. Harvey October 21, 2020 11:04 PM

Jorge L. Benitez October 22, 2020 6:27 AM

Gary R. Heminger October 22, 2020 6:00 PM

Katherine B. Blackburn October 21, 2020 8:05 PM

Jewell D. Hoover October 21, 2020 7:25 PM

Emerson L. Brumback October 22, 2020 9:22 AM

Eileen L. Mallesch October 21, 2020 8:04 PM

Greg D. Carmichael October 22, 2020 6:41 AM

Michael B. McCallister October 23, 2020 12:49 PM

Linda W. Clement-Holmes October 21, 2020 7:17 PM

Marsha C. Williams October 21, 2020 7:01 PM

C. Bryan Daniels October 21, 2020 7:07 PM

https://thebank.info53.com/teams/CRR/CorpCommsTS/CorpComms/Published_Internal_Communicat

## Organizational Announcement

The strategic course we have set and diligently executed over the past several years has proven its value time and again. We see that value in our financial results, in our customer satisfaction and employee engagement scores, in our reputation rankings and in the consistency of our decision-making.

Today, I'm pleased to share news about two leaders whose tireless efforts have helped enable these achievements; leaders who have been instrumental in helping to transform our Bank into an organization that keeps the customer at the center of everything we do.

Effective immediately, **Tim Spence** becomes president of Fifth Third Bancorp. Tim joined us in 2015 as chief strategy officer. He came to us with deep knowledge about who we were and where we wanted to be longer term. With a passion for using innovation to ease and enhance our customers' banking experience, Tim has demonstrated extraordinary leadership in driving a customer-centric transformation. He further advanced this transformation when he became head of Consumer Banking, Payments, Strategy and Digital Solutions. Tim has been a catalyst for strong organic growth. His leadership also was integral in our 2019 merger with MB Financial Inc., which was our largest acquisition in many years and a vital step to position us well for further growth in the Chicago region.

Tim was recognized as American Banker's Digital Banker of the Year in 2018 and has elevated Fifth Third's stature in the industry and among consumers as an innovation leader. He has helped all of us understand what it means to be a forward-thinking relationship bank.

As president, Tim will oversee all lines of business and regional banking, in addition to continuing his oversight of our strategy.

Below are additional changes in roles, responsibilities or reporting structures. All of these leaders will report to Tim:

- **Kevin Lavender** continues as head of Commercial Banking. Additionally, he will assume responsibility for Middle Market Banking, ensuring that all of Commercial is under common leadership.
- **Kris Garrett** continues as head of Wealth & Asset Management, and she also now will oversee our insurance business.
- **Lars Anderson** continues as vice chairman of commercial strategic growth initiatives.
- **Kala Gibson** continues as head of Business Banking.
- **Ben Hoffman**, named chief strategy officer last week, will continue to oversee Corporate Strategy, Decision Sciences and FinTech.
- **Howard Hammond** will serve as interim head of Consumer Banking.
- **Byna Elliott** continues as chief enterprise responsibility officer and head of Community and Economic Development.
- **Regional presidents** continue to lead their respective markets. Phil McHugh, who formerly managed this group, has left the Bank. We

PLAINTIFF'S EXHIBIT
Heminger 28
12-20-22
PENGAD 800-631-6989

appreciate his long service and wish him well.

In addition, **Melissa Stevens** becomes executive vice president and head of Digital, Marketing, Design and Innovation.

Melissa joined the Bank in 2016 as chief digital officer, later adding responsibilities for our design and innovation capabilities. Previously, she had served as chief operating officer at Citi FinTech. Melissa is an inspirational leader and the consummate team player, and her presence here resulted in an immediate positive impact. She recently was recognized by American Banker as one of its Most Powerful Women to Watch. It was the second time she was honored among this list.

Melissa's commitment to instilling a customer-friendly, digital-first approach to all areas of the Bank has ensured a smooth, integrated and seamless experience for customers across all channels. Adding marketing activities to Melissa's responsibilities will further align messaging and enhance efficiencies as we continue to advance the future of relationship banking.

In her new role, Melissa will join the Enterprise leadership team. She will report to me.

While I'm proud of the leadership that has helped to set our strategic course over these last few years, I am equally proud of the team effort behind bringing it to life. It is that shared commitment, day in and day out, that has enabled us to consistently perform better for our customers, our communities and our fellow employees, and I thank all of you.

Please join me in congratulating Tim and Melissa on these milestone achievements, and in supporting our teams as they transition.

**Greg D. Carmichael**
**Chairman and CEO**
**Fifth Third Bancorp**

**©Fifth Third Bank, National Association | All Rights Reserved | For Internal Use Only**

| Distribution Information: | | | |
|---|---|---|---|
| Classification: | For Internal Use Only | Sent to: | All employees |