UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

- - -

| | | |
|---|---|---|
| PHILIP R. MCHUGH, | : | |
| Plaintiff, | : | |
| -vs- | : | CASE NO. 1:21-CV-00238 |
| FIFTH THIRD BANCORP, et al., | : | |
| Defendants. | : | |

- - -

Videotaped deposition of MICHAEL MCALLISTER, a witness herein, taken by the Plaintiff as upon Cross-Examination and pursuant to the Federal Rules of Civil Procedure and Notice at the offices of Fifth Third Bancorp, 515 East Walnut Street, Cincinnati, Ohio, on December 14, 2022 at 10:00 a.m., before Bruce Sandy, videographer, and Jennifer K. Starner, RPR, a Notary Public within and for the State of Ohio.

- - -

APPEARANCES:

On behalf of the Plaintiff:

John J. McHugh, III, Esquire
McHugh & McCarthy, Limited
5580 Monroe Street
Sylvania, Ohio 43560
419.885.3597

Peter A. Saba, Esquire
Joshua M. Smith, Esquire
Stagnaro, Saba & Patterson Company, LPA
2623 Erie Avenue
Cincinnati, Ohio 45208
513.533.2711
pas@sspfirm.com
jms@sspfirm.com

On behalf of the Defendant:

Michael L. Cioffi, Esquire
Blank Rome LLP
201 East Fifth Street
Cincinnati, Ohio 45202
michael.cioffi@blankrome.com
513.362.8701

Also present: Brian Thomas, Esquire
Fifth Third Bancorp

\- - -

S T I P U L A T I O N S

It is stipulated by and among counsel for the respective parties that the deposition of MICHAEL MCALLISTER, a witness herein, called as upon Cross-Examination by the Plaintiff may be taken at this time and place pursuant to the Federal Rules of Civil procedure and Notice as to the time and place of taking said deposition; that the deposition was recorded in stenotypy by the court reporter, Jennifer K. Starner, RPR, and transcribed out of the presence of the witness; and that said deposition is to be submitted to the witness for his examination and signature, and that signature may be affixed out of the presence of the Notary Public.

\- - -

# I N D E X

WITNESS:

MICHAEL MCALLISTER


| | Page |
|---|---|
| Cross-Examination By Mr. McHugh | 6 |
| Direct Examination By Mr. Cioffi | 137 |
| Recross-Examination By Mr. McHugh | 160 |
| Redirect Examination By Mr. Cioffi | 168 |


# E X H I B I T S


| | Page |
|---|---|
| Plaintiff's Exhibit 1 | 76 |
| Plaintiff's Exhibit 2 | 101 |
| Plaintiff's Exhibit 3 | 102 |
| Plaintiff's Exhibit 3 | 103 |
| Plaintiff's Exhibit 3A | 127 |
| Plaintiff's Exhibit 3B | 127 |
| Plaintiff's Exhibit 3C | 127 |
| Plaintiff's Exhibit 3D | 127 |
| Plaintiff's Exhibit 4 | 108 |
| Plaintiff's Exhibit 5 | 121 |
| Defendant's Exhibit 7 | 138 |
| Defendant's Exhibit 8 | 141 |

VIDEOGRAPHER: Today is December 14th, 2022. The time is 10:08 a.m. We're on the record for the deposition of Michael B. McAllister for a case pending in the United States District Court, Southern District of Ohio, Western Division, entitled Philip R. McHugh, Plaintiff, versus Fifth Third Bancorp, et al., Defendants, Case No. 1:21-CV-00238. If at this time all counsel present would introduce themselves for the record, then the witness can be sworn.

MR. MCHUGH: My name is John McHugh. I am co-trial counsel for Philip R. McHugh, plaintiff.

MR. SABA: Peter Saba, co-counsel for Philip McHugh.

MR. CIOFFI: Michael Cioffi of Blank Rome on behalf of all the defendants. I represent all the defendants and Mr. McAllister personally through a joint representation agreement.

MR. THOMAS: Brian Thomas, Fifth Third Bank.

MICHAEL MCALLISTER,

of lawful age, as having been duly sworn, as hereinafter certified, was examined and testified as follows:



CROSS-EXAMINATION

BY MR. MCHUGH

Q. Good morning, Mr. McAllister.

**A. Good morning.**

Q. Have you ever had your deposition taken before?

**A. Yes.**

Q. And on how many occasions?

**A. Oh, a handful.**

Q. Have you ever testified live in any trial in front of a jury?

**A. I have.**

Q. And do you recall when that took place?

**A. Oh my, that would be a wild estimate. Probably 2000 -- you know, no. '96.**

Q. Can you tell me briefly whether your testimony was in the role of a fact witness or as an expert witness?

**A. I don't know the difference frankly.**

Q. Do you know who the parties in that litigation were?

**A. It was a physician suing my company at the time.**

Q. Your company at the time was?

**A. Humana.**



Q. Mr. Cioffi and I have been at this for sometime in the practice of law, but there are a few simple rules that we like to at least share with the witness as a matter of courtesy so that we establish a clean record and we make sure that we're communicating with each other and I'd like just to touch briefly on those, if you may -- if I may.

**A. Sure.**

Q. First of all, I'd like you to listen to my question and let me finish my question. And I will in turn listen to your answer and let you finish your answer completely before I ask the next question. Okay?

**A. Yeah.**

Q. Second, I will trust you that since you've been deposed before that if you answer a question that you do understand the question and that the answer is your truthful response to the best of your ability.

**A. Okay. If I don't understand it, I'll ask you to clarify it.**

Q. Thank you very much. And one other slight change is always to verbalize your answer, if you will, please. Even though we have a videographer, uh-huh and other nods of the head are difficult to perceive sometimes. So a verbal answer will ensure we have a clean record.



**A. Okay.**

Q. Okay. Thank you. Will you give me your full residence address, please?

**A. 8644 North Morning Glory Road, Paradise Valley, Arizona 85253.**

Q. How long have you lived there?

**A. Since 2012.**

Q. You live there with your wife?

**A. Yes.**

Q. And do you have any children that live there with you?

**A. No.**

Q. Mr. Cioffi earlier mentioned that there was a joint representation agreement between you and him that was signed. Did you hear him say that this morning?

**A. I did hear him.**

Q. When was that document signed?

**A. Oh, I don't actually recall. Within the last few weeks.**

Q. Did you have a lawyer review that document for you before it was signed?

**A. I did not.**

Q. I don't mean to be impertinent by the question, but did you read the entire document before you signed it?

**A. I did.**
Q. And the joint representation is because you understand that there's a current consistent interest between you and Fifth Third Bank in this litigation?
MR. CIOFFI: Objection. Calls for a legal conclusion. If you -- if you know an answer.
**A. That would be my assumption.**
Q. Did you ask for the joint representation agreement or was it presented to you?
**A. It was presented as an option and I accepted it.**
Q. How was it presented to you? In person? In a meeting? Via email?
**A. Started with a conference call.**
Q. And that conference call involved what parties?
**A. The two of us.**
Q. Anyone else present?
**A. No.**
Q. And did it progress from the conference call then to an exchange of documents?
**A. Yes.**
Q. How long was the conference call? Do you have any idea?



**A. 30, 45 minutes.**
Q. Was that the first time that you had spoke with Mr. Cioffi?
**A. Yes.**
Q. And do you have a time frame when you think that occurred? Daily or monthly range?
**A. Oh, I don't know exactly. Maybe a month ago, something like that.**
Q. Did you take any notes at all from that conference?
**A. No.**
Q. Was the summary of the conference provided to you by Mr. Cioffi?
**A. No.**
Q. Were there any other agreements that you executed between Mr. Cioffi as counsel for the bank and -- the bank?
**A. No.**
Q. Can you tell me the length of the agreement? Was it a two or three-page agreement or was it longer than that?
**A. I remember it being relatively brief. Probably one page. It might have been a page and a half.**
Q. And then Mr. Cioffi explained the language of the agreement to you and what it was intended to



accomplish?
**A. Yes.**
Q. Okay. And I assume you have still a copy of that agreement?
**A. Yes.**
Q. After you received the agreement, you signed it and sent it back to Mr. Cioffi?
**A. Yes.**
Q. And did you have any subsequent meetings with him then?
**A. Yes.**
Q. And when did those meetings occur?
**A. Yesterday.**
Q. How long that was meeting?
**A. Several hours.**
Q. Where did it occur?
**A. This room.**
Q. Does the heat get any better in here?
**A. It's pretty hot.**
Q. I just wondered.
Did you happen to be in town for a Fifth Third Bank at a board meeting at that time?
**A. I was.**
Q. And when did the board meeting conclude?
**A. Noon-ish.**



Q. And how long did you meet with Mr. Cioffi?
**A. Probably a couple of hours.**
Q. Was anyone else present?
**A. Yes.**
Q. Could you identify who they were?
**A. Two lawyers from the bank, Brian being one of them.**
Q. Do you know the identity of the other lawyer?
**A. I don't recall her name.**
Q. Do you recall anything about her that you could -- in other words, that you might describe her that would help us identify her? Is she young? Old? White? Black?
MR. CIOFFI: Objection. I'm not going to allow -- it's -- it's. He identified her as a lawyer. That's sufficient for the purpose of your examination.
MR. MCHUGH: I think I get to decide that, but are you instructing him not to answer?
MR. CIOFFI: No.
MR. MCHUGH: Okay. Thank you.
MR. CIOFFI: I'll -- for the record, I'll represent that the other person was Phenise Poole.

Page 13

MR. MCHUGH: Thank you.
Q. Other than --
MR. MCHUGH: Brian, your last name is Thomas; is that right?
MR. THOMAS: Correct.
Q. Other than Mr. Thomas and Miss Poole and Mr. Cioffi, have you met with any other lawyers of the bank?
MR. CIOFFI: Objection. Time frame.
**A. Ever?**
Q. I'm sorry. Yes. With respect to the claim that's been made by Philip McHugh.
**A. Yesterday the general counsel stepped in here for about five minutes.**
Q. And the general counsel was Susan Zaunbrecher?
**A. Correct.**
Q. And the length of her stay was very brief?
**A. Very brief. Just said hello and left.**
Q. Were there documents that you reviewed at that meeting?
**A. Yes.**
Q. Could you tell me what format those documents appeared in and how they were presented to you?
**A. I don't know what you mean by format.**
Q. Was it a stack of documents like I have here or was it put in a binder?

Page 14

**A. It's very similar to your stack right there.**
Q. Some lawyers share old habits, I think.
**A. It seems to be a pattern.**
Q. Did you take any of those documents with you? Do you intend to take them with you when you leave?
**A. Nope.**
Q. And do you have a fairly good recollection of the type and the nature of the content of the documents that you reviewed?
**A. In general, sure.**
Q. Did you ask to see any other documents?
**A. I did not.**
Q. Were you told that there were documents that were not being provided to you for any particular reason?
MR. CIOFFI: Objection as to what he was told by counsel. Instruct him not to answer.
Q. Do you have any reason to think there were documents that you might have asked for that you weren't shown or seen?
**A. No.**
Q. Did you -- well, did you review minutes of the HCCC committee?
MR. CIOFFI: Objection as to what he reviewed. Privileged.

Page 15

MR. MCHUGH: You're instructing him on that one?
MR. CIOFFI: Yeah, I'm instructing him not to answer.
MR. MCHUGH: Michael, I'm not sure I want to cause difficulty, but is there a protocol or procedure that is followed generally down here in the Southern District of Ohio with respect to the preservation of an objection on privilege and the instruction answer?
MR. CIOFFI: No. I think my objection and instructing him not to --
MR. MCHUGH: You think that's sufficient for your purposes?
MR. CIOFFI: Sure. You can take the transcript to the judge if you want a motion to compel. That's the procedure.
MR. MCHUGH: All right. Thank you.
Q. Apart from yesterday, when was the last time that you reviewed the HCC minutes for, let's say, 2017, '18, '19 or '20?
**A. It would have been back in those years.**
Q. Contemporaneous with the meeting itself?
**A. Within a month or so after the meeting.**
Q. Okay. Do you recall any episode where you -- following an HCC meeting where you might have gone back to review how it was recorded or how it was reported?

Page 16

MR. CIOFFI: Objection. Lack of clarity. At least as to time frame. Ever or when?
Q. My time frame is going to be 2017 through 2020.
**A. Try that again.**
Q. Sure, I'd be happy to. At any time let's say within the four years, five years at the most, was there an occasion where you went back to a file that you had or maintained to review or refresh your recollection as to what was recorded about action or comments taken by the committee?
**A. No.**
Q. Would you -- would you tell me your -- your practice or your protocol when you attended the meeting and the meeting concluded? This meeting is the HCC meeting. What did you do with any documents or papers that you saw at the meeting?
**A. We never had papers. It was all done online or systems. So I would be -- basically you would have a meeting and the folks draw up their minutes. It's reviewed by the group and basically approved in the following meeting.**

Q. Great. So there was a portal that you accessed as a member of the committee to review the documents --
**A. Yes.**
Q. -- that were presented? Do you recall what that portal's name was?
**A. I think it's Diligent.**
Q. Okay. How many of the HCC meetings in 2018, '19 and '20 were you physically present in Cincinnati, Ohio for?
**A. I don't recall.**
Q. Were you present for any?
**A. Yes.**
Q. Were you present for all?
**A. I don't recall. There are occasional virtual meetings. The timelines and when those occurred or didn't occur, I can't tie together for you right now.**
Q. What was the general length of an HCC meeting?
**A. About an hour.**
Q. Was there a format that you followed as the chairman?
**A. There's an agenda drawn up, I review it with the staff before the meeting. And that's pretty much the way it works. There is an annual schedule of what's going to be done at certain meetings that's established**



**before the year starts and that sometimes changes and sometimes not.**
Q. Did you have a principal inside contact at Fifth Third Bank who assisted you in preparing the agenda or the schedules?
**A. Yes.**
Q. And who was that?
**A. Let me be sure about the timelines. I dealt with a couple of people. Peg Julia was one of them.**
Q. Okay.
**A. And Nancy Pinckney was the other one, but I'm not sure about the timelines and when all that conversion took place. Or turnover.**
Q. May I ask you who preceded who?
**A. Peg was before Nancy.**
Q. And how would that be accomplished in terms of exchanging communication? Would the format customarily be a telephone call or would it be a text or would it be through Diligent? Can you tell me?
**A. The digital documents would be on Diligent. They would be prepared as a draft. Then we would have a conference call and in many cases Zoom meetings as a prep meeting to go through all of that before the actual meeting would occur at the board.**
Q. Do you make a distinction between the meeting



in which you attended as a member of the board and a meeting in which you chaired as part of the HCC committee?
**A. Try that again. I'm not sure what you're asking me.**
Q. In your mind, do you keep those two events separate?
**A. They were separate.**
Q. Right. And so when you're telling me that you had a -- you would see it on a Diligent presentation, then you would have a conference call --
**A. That would be an HCC.**
Q. Thank you. And then what would be the final results of that HCC conference call?
**A. There would be a report out to the board and approval of anything that the board in total needed to deal with.**
Q. And would you see that before it was presented to the board?
**A. I'm the one that presented it.**
Q. Was it generally your practice to review presentations to the board with Mr. Carmichael in 2018, '19 or '20?
**A. You mean between the HCC and the board?**
Q. Yes, sir.



**A. No.**
Q. There was never a time where you expected him to review and approve your report?
**A. No.**
Q. The report would then be contained in the HCC committee records and then a summary of your report would be reflected customarily in the board minutes?
**A. The report would be reflected in the board minutes.**
Q. The report was not a part of the board minutes, was it?
**A. Eventually it would be.**
Q. The full report from the committee?
**A. Yeah.**
Q. And I'm going to repeat this question just to make sure I have the process in my mind.
Once you delivered the report and once the meeting concluded, the board meeting concluded, you can't recall an instance where you went back and reviewed how it was written up or --
**A. Oh, I always looked at the minutes in terms of how they were -- both the board minutes get reviewed and the HCC minutes get reviewed after they're done.**
Q. And that's at the following meeting?
**A. Yes.**

Q. All right. My question to you is do you recall any instance where you did that personally as part of just to make sure that everything was recorded properly outside your role as a board member or committee member?
MR. CIOFFI: Objection. Lack of clarity. You mean did he proofread documents? I don't know what you're asking.
**A. I'm not sure what you're asking me. I mean, I -- I --**
Q. Okay. After the board meeting minutes --
**A. After the board minutes are completed --**
Q. Right.
**A. -- and before they get approved at the next meeting, everybody looks at them to see if they reflect whatever occurred at the meeting.**
Q. Right. And so it's your practice that this is done after you get the Diligent access or before that? Because the report can only be provided to you as part of the Diligent facility, correct?
**A. I'm not sure exactly what point you're asking about.**
Q. Okay.
**A. What do you -- try it again.**



Q. Sure. I'd be happy to. Thank you.
The first thing that would occur in the -- in that universe would be the HCC committee convention?
**A. We would hold a meeting, yes.**
Q. Right. And that meeting would generate minutes of what was decided at that meeting?
**A. Eventually, but I would take it before those minutes were finished and take it to the board to review what occurred in that meeting.**
Q. Oh, okay. So you would -- you would complete your draft of the minutes to take it to the board and approve it and then the HCC --
**A. I would review -- I would review what happened at that meeting verbally with the board.**
Q. And then the HCC minutes would be prepared?
**A. At a later date along with the board minutes.**
Q. Okay. Thank you. That's what I was trying to establish.
**A. Okay.**
Q. Thank you very much.
Did you have anyone assist you at any time in 2018, '19 or '20 in preparing the minutes that you were presenting to the board?
**A. The law department drafts the minutes and asks**



**for changes or to make sure they're clear on what happened.**
Q. So would you take me through then the steps -- let's say this last -- this most recent meeting, was there a meeting of the HCC?
**A. There was.**
Q. All right. And when did that take place? Date and time, if you can.
**A. The day before the overall board meeting.**
Q. And so the overall --
**A. Well, it was before the board. Same day, but part of it. Before it.**
Q. Same place?
**A. Same building.**
Q. Same building. Okay. But not in the board room, some other room?
**A. Some other room.**
Q. Okay. And you took notes of what was decided --
**A. Right.**
Q. -- at that meeting?
**A. Correct.**
Q. Before those notes were presented to the board at the board meeting, they would be presented to the law department for --



**A. No. The minutes would not be generated that quickly.**
Q. Would your notes --
**A. I basically use the agenda --**
Q. Uh-huh.
**A. -- on the system --**
Q. Yes.
**A. -- at the board meeting to walk the board through what we did --**
Q. All right.
**A. -- verbally.**
Q. Does the law department have any intervention between the conclusion of the HCC meeting and your report to the board?
**A. They do not.**
Q. When does the law department get this?
**A. They produce them in the next few weeks.**
Q. And you became a director of Fifth Third Bank in 2011; is that right?
**A. That's correct.**
Q. And you're a chair of the HCCC?
**A. Yes.**
Q. Are you a member of any other committees?
**A. Audit.**
Q. Any other committees?

**A. Finance.**
Q. Any others?
**A. No.**
Q. You chair the HCC and member of the other two?
**A. Correct.**
Q. And how long have you been a member of auditor and finance committee?
**A. Oh, I don't know the exact years? I've been off and on and back on the audit committee, so -- and finance committee, it's been a few years, but I don't know when it started. I can't remember.**
Q. And you are compensated as -- as the chairman of the HCC committee?
**A. I think there's -- there's a -- yeah, there's a bit extra for that.**
Q. Okay. And what is your director fee for those services?
**A. I honestly don't know.**
Q. Okay. All right. And same is true for both audit and finance?
**A. I don't know. I could give you round numbers, but I would be guessing. I don't look at it.**
MR. CIOFFI: John, as you know, these are publicly available information. It is public finance.



Q. One of the tasks or duties of the HCC is to decide director of compensation?
**A. No. The board approves the director of compensation, but the HCC looks at it and recommends whatever changes.**
Q. So as I understand your testimony, the -- the staff source comes from the HCC, presented to the board and the board approves it?
**A. Correct.**
Q. Okay. And you look that in terms of both base compensation for -- and these are management -- senior management employees. You look at base compensation of the board?
**A. Are you talking board or management now?**
Q. Now I'm talking management.
**A. Okay.**
Q. You do the same for management; isn't that right?
**A. There's market research that's done, studies about where people are positioned individually and generally. And specific changes are made as necessary and they -- ultimately when it comes to the executive officers, it goes to the board for approval.**
Q. And that assistance is usually provided to you by Charlie King's firm?



**A. Yes.**
Q. Does Mr. King's firm in any way engage in recommendations for succession planning?
**A. No.**
Q. In connection with the succession planning that was done by Fifth Third Bank in 2018, '19 or '20, can you tell me who your commission -- your committee consulted with?
**A. The HCC does not do the succession work. That's done at the board level.**
Q. Did you have any role at the committee level with regard to succession planning?
**A. Succession, no.**
Q. Did the committee ever see any what I would call talent deck presentations of evaluations by management of senior leaders or members of the enterprise committee?
MR. CIOFFI: Objection. He just answered the committee didn't deal with succession planning. It was done at the board level. Do you mean as part of the board? I mean, obviously all members of the HCC were part of the board. Could you clarify, please?
MR. MCHUGH: I'm going to stand on the question, but I'll be happy to clarify.



Q. As a member of the HCC, did you ever see talent deck presentations that were prepared by senior management evaluating members of the enterprise committee for succession?
**A. HCC separately and individually does not do that. However, there is an annual meeting where the board in total is there which includes the HCC --**
Q. Uh-huh.
**A. -- where that does occur.**
Q. Okay. And at which annual meeting does that occur?
**A. Usually December. Well, always December.**
Q. Did it recently occur?
**A. It did.**
Q. And that was at the meeting that you just concluded?
**A. Yes.**
Q. Have you apart from a formal meeting of either the board or HCC spoken to Greg Carmichael regarding the claims that have been made by Philip McHugh in this lawsuit?
**A. I have not.**
Q. Have you spoken to Robert Shaffer?
**A. No, not outside of the board context.**
Q. Within the board context, has there been

discussion of the claims made by Philip McHugh against Fifth Third Bank?
**A. I'm not sure what you mean by claims, but there's been discussion about what occurred.**
Q. And when did that take place, please?
**A. Back when the occurrence happened.**
Q. All right. And the occurrence, if we talk about it, is at least -- seems to be centered around the middle October of 2020. Is that consistent with your recollection?
**A. I don't recall specifically the time line.**
Q. Well, what -- what -- can you tell me what you do recall? If somebody said what happened, what would be your presentation of what your understanding was?
**A. I would say there was an organizational change announced in the company and Mr. McHugh got angry and left.**
Q. Did you ever have any conversations with Philip McHugh --
**A. Not --**
Q. -- regarding that?
**A. Not after that.**
Q. Not after his departure?
**A. No.**
Q. Did you have any discussions with Philip


McHugh prior to that event regarding his expectations or continued roles at Fifth Third Bank?
**A. No.**
Q. Your testimony would be that you had no discussions of any kind with Philip regarding his succeeding Greg Carmichael as president of the bank?
**A. No.**
Q. And no communications or discussions with Philip McHugh regarding his succeeding to the position of chairman of the board or chief executive officer?
**A. No.**
Q. At the -- at the board meeting where this was discussed?
**A. What was discussed?**
MR. CIOFFI: Objection to the indefinite pronoun "this." Can you -- I mean, it's confusing. You've just got to clarify, please.
MR. MCHUGH: Sure. As I asked Mr. McAllister and I also extended you the courtesy, if you'll let me finish the question, I may be able to do that.
MR. CIOFFI: Well, not when you start with "this." I mean, go ahead, please.
Q. At the meeting where this organizational change was discussed, was it a full board meeting?
**A. Yes.**


Q. And do you have any recollection as to when that occurred?
**A. I wouldn't know the specific one. These kind of conversations happen periodically. It's not like one single event.**
Q. Okay. Tell me what you recall of the discussion.
**A. Well, it was part of an overall discussion about succession. Are you talking about the announcement kind of event or everything that led to it? Or what are you getting at?**
Q. Well, it's my impression -- perhaps unwisely. It's my impression that when a 34-year executive of the bank leaves, that there's some explanation as to the circumstances under which he left. Well, that may be wrong. That's just what I'm asking you. Is that the case?
MR. CIOFFI: Objection, Counsel. You can't testify. You know that. Just ask a question.
MR. MCHUGH: I just did.
MR. CIOFFI: That's not a question.
MR. MCHUGH: Yes. I just asked him what took place.
MR. CIOFFI: That's a speech. Took


place when?
MR. MCHUGH: Following your example. Okay?
MR. CIOFFI: What took place when? Can you give him a specific -- you have the minutes. You know when it was discussed. This is not a memory test. Just ask him what happened at the September 21st, 2020 meeting and see if he has recollection, but you really should just show him the document.
MR. MCHUGH: Thank you. I'll do the examination. I afforded you that same courtesy.
MR. CIOFFI: You've got to be fair, come on.
MR. MCHUGH: I was.
MR. CIOFFI: No. You're making this a memory test. That's not fair, but go ahead.
Q. Mr. McAllister, do you remember when you first learned that Philip McHugh was no longer with the bank?
**A. It would have been at a board meeting. I'm not sure exactly which one. It probably would have been one after the announcement of the organizational change because that would have -- that would have led to everything else, so...**
Q. No one reached out to you privately before the

organizational announcement to let you know that that had happened?
A. **You've got -- the organizational announcement came first.**
Q. Yes, I'm asking you that. It's a different question.
Did anyone reach to you personally before the organizational announcement was made to let you know what had happened?
MR. CIOFFI: Objection. Could you read the question back, please?
MR. MCHUGH: Wait, wait, wait a minute. You have a right to object to the question. If Mr. McAllister told me that he didn't understand the question, I would be happy to rephrase it.
A. **I still feel like you have it backwards.**
Q. You do? All right. Well, you tell me why.
A. **Because you're asking me if somebody reached out before the --**
Q. Yes.
A. **-- announcement.**
Q. Right.
A. **What occurred did not happen before the announcement that I'm aware of. If it did, I didn't know that.**



Q. That's what I'm asking you. Let's -- let's just for my purposes and your purposes see if we can establish a couple of dates.
A. **Okay.**
Q. Okay. The announcement occurred on October 26th?
A. **All right.**
Q. And the announcement simply said Philip McHugh left the bank?
MR. CIOFFI: Objection. The problem, John, is you're -- you're confusing the witness with what announcement. He was assuming that you meant the announcement of Tim Spence becoming president.
THE WITNESS: That's right.
Q. I'm sorry. That's, you know --
A. **That's what I was thinking.**
Q. Nice to have Mr. Cioffi tell me what you're thinking, but that's all right. That's what I'm trying to establish here is just what you did know.
A. **Okay.**
Q. So when Tim Pence is announced as president --
A. **Right.**
Q. -- it says that Philip McHugh left the bank, that announcement. Did you have any prior notice before



that announcement issued that Philip had left the bank?
A. **I -- I -- I don't recall. I mean, I was at the board when the decision was made to make the organizational change.**
Q. And when was that meeting?
A. **I don't know which one that was within I would have to do some research.**
Q. Well, the --
A. **And then --**
Q. Go ahead. No. No. I want you --
A. **You're up.**
Q. No. I'd like you to finish your answer.
A. **No. I'm done.**
Q. All right. So let's go back to the -- to the announcement. The announcement then that you saw or received, how did you get that?
MR. CIOFFI: Again, objection. John, you're confusing the record and witness. If you have a document to show him, show him the document.
MR. MCHUGH: Michael, I'm asking as I choose to ask him, which I have the right.
MR. CIOFFI: But you don't have the right to confuse the record and the witness. That's what I'm objecting to.



MR. MCHUGH: I'm not going to -- I'm not going to engage in argument. You know what the rules are. If you have an objection, state it. That's all you need to say. I don't mean to quibble with you in front of Mr. McAllister. His time is important.
Q. My question is how did you learn it?
A. **What?**
Q. How did you learn that Philip had left the bank?
A. **In a board meeting verbally from Mr. Carmichael.**
Q. Okay. And did you see any written announcement to that effect?
A. **I don't recall specifically.**
Q. Okay. And was the first time that you were aware that Philip had left the bank was when Mr. Carmichael said that you to in the board meeting?
A. **That's the way I recall it.**
Q. What did Mr. Carmichael say?
A. **Something along the lines when the announcement was made Phil came to see him, he was angry about the thing, didn't agree with it and just was leaving. And he was frankly surprised at that.**
Q. Did he say anything else of substance that you

Page 37

can recall?
**A. I don't think so. I think he kept it relatively brief.**
Q. Did anyone confirm that a counter version to you any other executive officer of the bank?
**A. What kind of version?**
Q. What Mr. Carmichael had reported to you.
**A. Try it again.**
Q. Sure. Did Bob Shaffer make any comment with respect to that?
**A. No.**
Q. Did Susan Zaunbrecher make any comment with respect to that?
**A. No.**
Q. Did you at any time in that October or November time frame of 2020 review any court papers that were filed by Philip McHugh against the bank?
**A. No.**
Q. Have you ever seen the amended complaint that was filed against the bank and Mr. Carmichael?
**A. No.**
Q. And you said that you had had no private communications with Mr. Carmichael regarding the exchange that he and Philip McHugh had?
**A. No.**

Page 38

Q. And none with Mr. Shaffer?
**A. No.**
Q. And I'm not interested in any conversations that you may have had with Mr. Cioffi, but with any other inside counsel at the bank did you have any such communications?
MR. CIOFFI: I'm going to object to any communication with counsel for the bank. It's privileged.
MR. MCHUGH: Well, I don't believe an announcement like that is privileged, but --
MR. CIOFFI: Well, you asked him if he had any other conversations. So I'm going to object and instruct him not to answer if he had conversations with counsel from the bank.
Q. Did you have any communications with counsel for the bank in which you were informed by bank counsel as to the circumstances of Philip McHugh's departure?
MR. CIOFFI: Objection. Privileged. Instruct him not to answer.
Q. Did you participate in any vetting of Timothy Spence to become the president of Fifth Third Bank in 2016?
**A. Again, the timelines I don't --**

Page 39

Q. I'm sorry. That's a bad question on my part. 2020?
**A. What do you mean by vetting?**
Q. Did you have any conversations between you and Mr. Spence personally where you had a meeting with him to evaluate his credentials or his competencies?
**A. I think I did have a dinner with him one time just to talk about his future, but I have no idea when that occurred. It's somewhere in this process which is over multiple years, so...**
Q. Do you recall where that dinner took place?
**A. I don't recall. It would have been here in Cincinnati or Arizona, but I don't recall.**
Q. Did you ever invite him to your residence in Cincinnati for such conversation?
**A. I never lived here.**
Q. I'm sorry. Did you ever invite him to your residence in Arizona?
**A. I probably did, but I don't think he -- that that ever happened.**
Q. Was anyone else present?
**A. For the dinner?**
Q. Yes.
**A. No.**
Q. Did you submit any report or make any written

Page 40

evaluations of any kind?
**A. No.**
Q. Did you conduct any investigation of any kind into Mr. Carmichael's assertion that Philip was angry and just --
**A. No.**
Q. In your association with Philip, had you ever seen him get angry?
**A. Nope.**
Q. Had you ever received any report from anyone at Fifth Third Bank that Philip McHugh's conduct was unacceptable or it reflected or demonstrated some anger issues?
**A. No.**
Q. As I understand it, you had a preexisting business relationship with Philip McHugh before coming to Fifth Third Bank; is that right?
**A. That's correct.**
Q. Could you tell me a little bit about that, please?
**A. I was CEO of Humana based in Louisville, Kentucky. Philip was the market, I guess, president or leader for Fifth Third in that market. I was a banking customer going back to, well, early -- I don't know -- probably 2000. And so through that we got to know each**

Page 41

**other in various us community settings, civic things.**
Q. Did you consider Philip McHugh to be your personal banker at Fifth Third?
**A. Not directly, no. At one time he was over the private bank, which I'm a customer of.**
Q. Uh-huh.
**A. So in a line of authority, yes. But no. I had people below him that were dealing directly with me.**
Q. Was there anybody above him in Cincinnati or in Louisville that you dealt with for your matters at Humana?
**A. No. I mean, at Humana or me personally?**
Q. I'm sorry. First -- I did mean Humana. And then I'll ask you you personally.
**A. You know, I'd have to go back. It's possible that the company had a minor banking relationship. It would have been small, so...**
Q. My understanding is that you've pretty much had Fifth Third now manage your money along with another investment bank since you came on board at Fifth Third?
**A. That's correct.**
MR. CIOFFI: I'm sorry. We're getting pretty far field. How his money was being managed in 2000. So I ask you to be at least within the Rule 26 scope of discovery, John.

Page 42

MR. MCHUGH: Well, thank you.
Q. You -- you were also at one time a director of National City Bank; isn't that right?
**A. That's correct.**
Q. And who is the regulator of National City Bank, if you know?
**A. Federal Reserve.**
Q. The officer, the controller of currency have any obligations with respect to National City Bank since it was a national bank?
**A. I don't -- I don't recall to be honest with you.**
Q. When were you -- when did you serve as director of National City Bank?
**A. From December of '06 through December of -- boy, I think it was '08.**
Q. Did you --
**A. Might have been '09. I don't know exactly. Two or three years.**
Q. Did you resign your position?
**A. No. The bank sold.**
Q. And the bank was sold to PNC?
**A. Correct.**
Q. You did not continue on as a director at PNC?
**A. Did not.**

Page 43

Q. Were you asked to do so?
**A. No.**
Q. You first became a director at Fifth Third when?
**A. I think it was '11.**
Q. Did you have any supervisory responsibility as a board member for any other financial institution between 2008 and 2011?
**A. My own company.**
Q. And that was Humana?
**A. Yes.**
Q. Do you have -- I don't mean to press too much on this issue, but do you have a private investment foundation or anything like that --
MR. CIOFFI: Objection.
Q. -- that you're involved in managing money for?
MR. CIOFFI: Objection. How does that come within the scope of Rule 26?
MR. MCHUGH: Well, I'll --
MR. CIOFFI: You know that's pretty far field.
MR. MCHUGH: No. No.
**A. Ask it again. I'm not sure what you mean.**
Q. Do you have a charitable foundation that you have selected an institutional money manager for?

Page 44

**A. I have two.**
Q. Great. And is Fifth Third involved in managing that money for you?
**A. Yes. It's a family foundation.**
Q. And that family foundation's name?
**A. McAllister Family Foundation.**
Q. And is that a shared investment responsibility between Fifth Third and any other party?
**A. No.**
Q. When you -- well, were you at all involved in the decision by Fifth Third Bank to seek supervision by the OCC rather than the State of Ohio?
MR. CIOFFI: Objection. Again, it's beyond the scope of discovery.
MR. MCHUGH: Well, we don't know that, Michael. That's why I'm asking the question.
MR. CIOFFI: What does that have to do with the -- any claim --
MR. MCHUGH: It's the foundation --
MR. CIOFFI: -- in your complaint? It doesn't, but I'm going to allow him to answer this one, but you're really -- you're really far field.
**A. At the board level, yes.**
Q. Okay. And do you know why that was undertaken?

Page 45

**A. It was felt that the OCC would represent a more appropriate regulator given the size of the bank. The bank had grown to be pretty significant. It's one of the biggest banks I've actually dealt with.**
Q. At that time, the bank was somewhere in the top ten of the national banks?
**A. I don't recall exactly.**
Q. But somewhere in that range?
**A. Sizable.**
Q. Did you -- did you have any training from the bank regarding duties and responsibilities regarding executive succession as part of the OCC supervisory process?
**A. I don't -- I don't recall any specific training relative anything to the OCC would do. I mean, there's general organization as to what a board member is supposed as a board member. I've been through five of these HCC successions. So I've got a lot of track record on this, so it's -- I generally know what I'm supposed to do.**
MR. MCHUGH: Excuse me for a second.
Q. When you say you've been through six of these --
**A. Five.**
Q. Five of the CEO successions who was the first

Page 46

one?
**A. Me.**
Q. And then after that?
**A. One at AT&T. I'm not sure. We'd have to stack them up time wise. Two here. Actually three here.**
Q. There would be --
**A. Maybe Cavett, Carmichael. Well, Cavett was already here. So Carmichael, Spence. I'm chairman of Zoetis. We had a CEO succession here -- there in the last two years. And one at AT&T, which occurred last year.**
Q. So this is -- this is not an area which is either unfamiliar to you or --
**A. I'm relatively familiar with this.**
Q. Okay. So let me go back, if I can, just for a minute to your time in Louisville with Humana just for a couple of purposes.
When -- when you accepted the position as director of National City Bank --
**A. Uh-huh.**
Q. -- did you -- were you required to move money from some depository account to acquire a certain amount of stock at National City Bank?
MR. CIOFFI: Objection. Beyond the

Page 47

scope of discovery.
Q. You may answer the question.
**A. No. No, there was nothing required.**
Q. Okay. I see that Fifth Third appears to have a policy that requires its director to have a certain percentage of equity in the institution itself?
**A. That's -- yeah, that's true.**
Q. That is true. Do you know if the same policy existed with respect to National City Bank?
**A. I would argue that virtually every public company has a policy as such.**
Q. Do you recall withdrawing money from Fifth Third to fund the purchase at National City Bank and then when you accepted the position --
**A. That's not what happened.**
Q. Can you tell me what happened?
**A. Yeah. To me you have to have loyalty to the people you work with. So when I went on National City's board, I told them this should be my bank.**
Q. Okay.
**A. It's really simple. So I moved my banking business to National City.**
Q. Right.
**A. In terms of meeting their requirements relative to ownership of stock, that's done a different**

Page 48

**way.**
Q. So the same principle of loyalty applied to --
**A. I mean, I could have gone in and bought the stock and solved the problem, but over time it would have been solved through the relationship with the bank.**
Q. And that's the same relationship that you then established with Fifth Third Bank when you became a member of its board?
**A. I'm not sure about the timing of all of that, but at some point I brought everything back to Fifth Third because I wasn't going to be doing banking with someone else if I'm on the board here.**
Q. Do you have any conversation that you recall with Philip McHugh regarding what your strategies then were for your banking relationship with Fifth Third Bank?
MR. CIOFFI: Objection. Beyond the scope of discovery. Has nothing to do with the claims in this case.
**A. Like I said, I don't recall.**
Q. Well, when -- you told me, I think, that you -- you didn't really consider Philip to be your personal private banker in Louisville?
MR. CIOFFI: Objection. Asked and answered.

Page 49

**A. Not directly. Clearly he was in the line of authority in the process, but...**
Q. Did you have -- did you have experience with Philip that enabled you to determine whether or not he was honest?
MR. CIOFFI: Objection. Beyond the scope of discovery.
**A. I don't know what you mean by that.**
Q. Well, simple question. Did you have any reason to think that Philip was not honest?
**A. I have no reason to believe he's dishonest.**
Q. Did you have any reason to think he was not competent to discharge the responsibilities he had as a banker for Fifth Third in Louisville?
**A. I had no reason to think otherwise.**
Q. Do you have any reason to think that Phil was not competent or prepared to discharge the responsibilities he had at Fifth Third in the positions he held before his departure?
MR. CIOFFI: Objection. Vague. Imprecise. What positions are you talking about?
Q. Do you understand my question?
**A. Well, I would answer it more broadly than Philip. No one at the executive level in an institution like this will be incompetent and in that position very**

Page 50

**long.**
Q. Okay. And the fact that Philip was in the successive position for 34 years speaks to his competency?
**A. It does.**
Q. Does it speak to his diligence and activity and loyalty to the bank?
**A. It does.**
Q. Does it speak to his temperament and his ability to retain management and to improve management?
**A. It does.**
Q. Is there any detriment, as far as you can see, to his 34 years of service at Fifth Third Bank in the various positions he held?
MR. CIOFFI: Objection. Vague. Confusing. But if you can answer, you may answer.
**A. No.**
Q. Okay. I'm going to try to repeat that question so we don't have the -- the possible confusion that may arise from a negative answer or the objection.
Is there anything at all that you think prevented Philip McHugh from becoming president of Fifth Third Bank?
**A. Yes.**
Q. And what was that?

Page 51

**A. Because it's part of the succession process which had gone on for several years.**
Q. Uh-huh.
**A. And this happens in all companies.**
Q. Uh-huh.
**A. You've got to have people positioned in the right place so the succession can be successfully done. And while Philip was very good at doing what he did, the perception of the board -- this was a growing consensus over several years -- was that Tim, in fact, had broader -- had more broadly met the general criteria of what we thought a CEO needed to be here. And so in order to make all that work, somebody had to be stepped up to get ready. And that's how Tim ended up being promoted to the president slot.**
Q. So were there any talent deficiencies that Philip exhibited that prevented him from exercising the responsibilities as president of the bank?
**A. Ask it again.**
Q. Yes. Were there any talent deficiencies that Philip McHugh prevented him from qualifying to be president of the bank?
**A. I would answer that along the lines of there's a lot of variables that go into this. Some of the judgments are going to be around which strengths and**

Page 52

**weaknesses exist.**
Q. Did you make any such judgments of strengths or weaknesses which would disqualify Philip from being president?
**A. I wouldn't say disqualify, but clearly the board made the decision based on all the variables that we were considering that Tim was a better choice.**
Q. And to the best of your knowledge, when did that occur?
**A. Well, until the -- until the vote -- the vote actually happened on the change, it was always up in the air. But, I mean, again, it was a growing consensus that this was the way this was going to go barring something unusual happening, so -- but it's never done until it's done.**
Q. Do you -- do you know whether there was a recommendation by Mr. Carmichael to make Mr. Spence president in 1999? I'm sorry. In 2019? I'm losing track of mind.
**A. I wouldn't say board recommendation is appropriate. I would say that he believed that Tim could be the CEO at some point.**
Q. And do you know that whether Mr. Carmichael ever made a recommendation for Philip McHugh to be president?

Page 53

**A. He never did.**
Q. Did he tell you that he never did?
**A. What?**
Q. Did Carmichael tell you that he had never done that?
**A. I'm not sure. That makes no sense to me. Try that question a different way.**
Q. Sure. Did Mr. Carmichael tell you that he never considered Philip McHugh as a candidate for presidency of Fifth Third Bank?
**A. I don't know if I remember him saying that specifically like that. I mean, if you look over a ten-year period, you know, people come on and off lists for these things. And there's always an effort to try to figure out what talents you have and what's possible because you never know if your CEO is going to get hit by a bus tomorrow. So, I mean, this is what -- this is what boards have to do is look down the road. And whatever CEO you have in place, you better be thinking about what the next one looks like. And that can change year to year and, you know, it does and it does often.**
Q. Okay. So you don't have a recollection -- or -- that Mr. Carmichael ever made in a presentation to the board or to the HCC that Timothy Spence should be the president of the bank in 2019?

Page 54

**A. I don't know about that specific timeline, but the board was always looking around at what succession would look like. Tim had been teed up somewhere along the way there and over time the board got real comfortable that that was the future.**
Q. Was there ever a consideration of any candidates other than Tim Spence?
**A. We never really looked at seriously outside the company. And I guess if you go back through all the succession work, he came to the top of the pile relatively early. So then it became a question of what do you have to do to prepare him for the job.**
Q. So my question was, were there any other internal candidates?
**A. I don't -- I don't recall what that list would have looked liked it. It changed over the years. It's possible there were others on that. I don't know.**
Q. Well, were there any other candidates that you as either a commissioner, committee member of the HCC or as a board member thought ought to be considered that you voiced at a board meeting or at any committee meeting?
**A. No.**
Q. Did you ever give any consideration to Philip R. McHugh becoming the president of Fifth Third Bank?

Page 55

**A. Of course that would have been part of the conversations over the years. Phil was a senior executive. Everybody on that senior team is potentially going to be stepping up. So that's -- that's -- yes, that's the normal course of business. Whether he's on some roster or not, I don't know, but yes, that discussion would occur.**
Q. And you're testifying under oath that you know Philip was in fact considered to be the president -- among the candidates to become the president of Fifth Third Bank?
**A. I don't recall specifically, but it's likely at some point, yes.**
Q. Now, in -- I want to be fair to the facts here. My question to you is to testify under oath whether you can recall that, that Philip was in fact --
**A. I don't actually.**
Q. And do you as you sit here --
MR. CIOFFI: John.
MR. MCHUGH: Oh, I'm sorry. I'm going to ask for a break in just a minute.
Q. Do you as you sit here right now recall any disabling factor in your mind that prevented Philip McHugh from becoming president of Fifth Third Bank?
**A. I'm not sure disabling is the right word. All**

Page 56

**I'm saying is if you're comparing people that are potential candidates, some are stronger in some areas, some are weaker in other areas and you balance all those things when you make your choice.**
Q. And in -- in that regard, was there ever a comparative analysis done between Tim Spence and Philip McHugh by either the commission, your committee or by the board?
**A. There wouldn't have been a side-by-side comparison done anywhere. That was something that would have evolved -- and it did -- over time in terms of who appeared to be coming to the top of the list, to the top of the consideration.**
Q. When you say that there wasn't a side-by-side comparison, was there any formal evaluation, comparative evaluation between those two candidates?
**A. Formal?**
Q. Yes, sir.
**A. I don't believe so.**
Q. Was there ever any independent evaluation of multiple candidates?
**A. Not multiple candidates.**
Q. Were you aware of any recommendations by the consultant that -- that normal practice is to have more than one internal candidate evaluated?

**A. I'm not sure what you mean by normal practice. Like I said, I've been through five of these. That didn't always follow that pattern.**
Q. Well --
**A. What do you mean by normal? I don't know what that means.**
Q. Did you have -- did you have any communications with Guy Beaudin in HR?
**A. Personally and directly?**
Q. Yes, sir.
**A. No.**
Q. You know who he is?
**A. Yes.**
Q. And I take it that you -- you heard and you relied on his report then when you cast your vote or made your decision with respect to the selection of president?
**A. That's one factor.**
Q. Okay. Any other factors that you relied upon from other persons' reports?
**A. Other individuals and reports?**
Q. Yes.
**A. No.**
Q. So from at least your perspective, it was your perception of Philip's strengths and weaknesses and your



perception of Tim Spence's strengths and weaknesses and the recommendations of Mr. Bodan?
**A. That was a component, yes.**
Q. I'm sorry?
**A. Yes.**
Q. Okay. Was there anything else?
**A. No. I mean, it's -- again, this a process where the entire board is sort of involved in this and there's a lot of experience around that table. A lot of people have been through these things many times. It's -- it's difficult to pick somebody for these jobs. You never really know what you're going to get until they're in it to be honest with you. So you do your best, you do your due diligence, you look for outside input. It's one thing. And then ultimately there's a collective judgment made.**
Q. Did you -- did you seek any information from any other members of the executive management team or the enterprise group for their comments on that issue?
**A. Well, you look to Mr. Carmichael for his comments. He works with everybody every day, so...**
Q. Anybody else?
**A. No.**
Q. Okay. So we had Mr. Carmichael's comments, Mr. Bodan's comments and your overall perception based



on your experience and judgment that led to that?
**A. Right.**
MR. MCHUGH: All right. Time to take a quick break.
VIDEOGRAPHER: The time is 11:13 a.m. We're going off the record.
(Whereupon, a brief recess was taken.)
VIDEOGRAPHER: The time is 11:35 a.m. We're back on the record.
Q. Mr. McAllister, I'd like to follow up just on a couple of things and we'll move on to another area.
The responsibility for establishing the compensation of the president and the CEO of the board is with the human capital committee?
**A. That committee does the legwork. It ultimately goes to the full board for approval.**
Q. And when the full board makes approval, then it publishes that as a part of its proxy statement; is that right?
**A. Ultimately.**
Q. Has it generally been the practice at Fifth Third Bank that the president and CEO are -- if the position is divided or if it's held by the same person, that they are included in the highest compensated officers in the bank?



**A. Ask that again.**
Q. Sure. Is the salary and the benefits --
**A. For the CEO?**
Q. -- equity of the CEO listed?
**A. In the proxy?**
Q. Yes, sir.
**A. Yes.**
Q. And is the same true for the president if the president is not part of -- is not the CEO?
**A. If the -- the dollar amount dictates it so, it will be.**
Q. Okay.
**A. It's a math problem. That's all it is.**
Q. All right. And it's -- it's for the five highest compensated executive officers; is that right?
**A. Correct.**
Q. And is that reviewed in any way by the HCCC before it is published?
**A. The HCC reviews the proxy before it's published.**
Q. Okay. Now, I've used the -- the acronym the HCCC. Is there a -- a better way to describe that? That -- that does constitute the human capital and compensation committee, right?
**A. It does.**

Page 61

Q. Okay. When you speak about it, do you refer to it by any shorthand term or is HCCC sufficient?
**A. I've probably called it the comp committee once in a while.**
Q. Comp committee. So if I use comp committee as opposed to repeating the acronym --
**A. I'll understand.**
Q. -- you'll understand. Okay. Thank you.
Did I understand your correctly to say from your perspective the comp committee has nothing to do with succession planning, executive succession planning?
**A. That's not part of the process. That's all done at the board level.**
Q. Okay. So that would be a true statement that the --
**A. To my knowledge, yes.**
Q. Okay. Have you ever had any disagreement with anybody about that at the comp committee?
**A. I don't think so.**
Q. Okay. In the -- how many years have you been a member of the comp committee?
**A. I don't know off the top of my head.**
Q. Does it make it easier if I say how many years have you been the chairman of the comp committee?
**A. Again, that's probably two, three, at the most**

Page 62

**four.**
Q. Okay. At any time during your tenure either as the chairman of the compensation committee or as a member of the committee, do you recall it ever undertaking any role or responsibility with respect to executive succession?
**A. I don't recall.**
Q. If -- if you were to be asked, as you are now, what is the role of the comp committee with respect to executive succession, you would simply say it has none?
**A. It's not directly involved.**
Q. And when you say it's not directly --
**A. I mean --**
Q. Sure. Okay.
**A. For example, yesterday in the meeting I mentioned earlier --**
Q. Yes, sir.
**A. -- it's a combined comp/HCC meeting with the full board doing succession work, but the comp committee/HCC doesn't do that independently.**
Q. Okay.
**A. So it's part of a -- it's basically a board function.**
Q. And I think I understand it. We're going to

Page 63

try this case, if we do, to a number of people who don't have that same level of familiarity. So if I say the HCC or the comp committee doesn't have any independent responsibility for executive succession, that's a true statement?
**A. That would be right.**
Q. And whatever role it has, it only has because of a membership on the board?
**A. It's in the context of the board.**
Q. Great. One other matter I wanted to make sure I understood you correctly on. You said that Mr. Carmichael offered an explanation that Phil was angry and that he was surprised. Do you remember that?
**A. Uh-huh.**
Q. Can you elaborate, if you can, a little bit more on that conversation or that report from Mr. Carmichael?
**A. I wouldn't remember it extensively, but what I recall is, like, he had basically sat down with Phil to talk about what he wanted to do going forward and Phil didn't want any part of it. So it wasn't -- I mean, he expected him, I think -- you'll have to ask him -- for Phil to stick around, so -- and continue to function at the executive team or whatever the particular assignment**

Page 64

**was.**
Q. Can you explain to me what you understood or what he communicated with regard to his being surprised?
**A. Not really. I guess I don't think he expected that reaction.**
Q. Did he offer any explanation about the context of his communication with Phil at that -- at that incident?
**A. Not beyond what I've described. I mean, that he had done the reorganization.**
Q. Uh-huh.
**A. Announcement was going to happen. He talked to Phil. Phil didn't like it. Phil left.**
Q. And he was surprised by that reaction?
**A. He was surprised by that, yeah.**
Q. And did he offer any emphasis or any explanation or qualitatively explain Phil was angry? I mean, I could see upset. I can see angry. I can see different things. And I'm just wondering if he --
**A. Well, that's my word. It could be interchanged by anything else you use.**
Q. Could disappointed be --
**A. Could be.**
Q. -- similarly --

Page 65

**A. I wouldn't -- yeah, I wouldn't quibble with that.**
Q. All right. Were you trying to, by the use of the word 'angry,' characterize the reaction as in any way inappropriate?
**A. No. Again, I go back to surprise more than anything else.**
Q. Okay. Thank you. Thank you.
Now, I -- I am, I suppose, a novice and a little bit confused about the process. And you mentioned that you had at least five experiences with this succession. So I wonder if you would educate me just a little bit about this in the context of what happened in 2018, '19 or '20 with regard to Tim Spence. Okay? So that's the context of my questions.
MR. CIOFFI: Objection to the form. It's confusing. I think you have the dates mixed up. I mean, you used the word -- the date 2000. Tim Spence wasn't here.
MR. MCHUGH: I thought I said 2016, '17, '18. I'll be happy to rephrase it.
MR. CIOFFI: Rephrase.
THE WITNESS: Try it again. Try it again.
BY MR. MCHUGH:
Q. Sure. I'd be happy to.

Page 66

From the time that Tim Spence came to the bank --
**A. Okay.**
Q. Okay. When he originally came there, Greg Carmichael hired him, right?
**A. I think so.**
Q. Okay. Were you aware of any commitment or communication that he was hired to become the next president and CEO?
**A. No.**
Q. And --
**A. That would be inappropriate anyway. The CEO can't make that commitment.**
Q. Okay. Only the board can make that decision?
**A. Correct.**
Q. And so when Tim Spence came and was given the assignments he had, he was part of the enterprise group, right?
**A. Yeah.**
Q. And when I use the word "enterprise group," I have a -- I kind of mean senior management. Is that a --
**A. That's accurate.**
Q. That's accurate. Okay.
**A. Or I would call it the executive team.**

Page 67

Q. The executive team?
**A. Yeah.**
Q. As -- as a board member and with your experience at AT&T -- and did you say Zatus?
**A. Zoetis, Z-O-E-T-I-S.**
Q. Z-O-E-T-I-S. What kind of company is that?
**A. Animal health. Animal health.**
Q. Tell me how the process at Fifth Third started when you first became aware of the need to plan for the corporate succession as it affected Greg Carmichael's ultimate departure?
**A. So this process to me was very similar to one I've seen everywhere. I mean, they all follow the same sort of course.**
Q. Okay.
**A. You know, it starts -- your succession starts the day you hire the one you hire and you start talking about who's next. And so from that moment forward, the CEO has the responsibility to prepare somebody for their replacement.**
Q. Uh-huh.
**A. That's part of their job. And so it's just an ongoing process at that point to figure out, you know, who do we think might do this, how long is it going to take to get them ready, you know, who develops over**

Page 68

**time. And, once again, that changes as things, you know, progress over several years. I mean, you hope to have a CEO come on for, you know, five to ten years so you don't go through this. It's always high risk to make this change.**
Q. Uh-huh.
**A. So you want somebody who's going to be around a while, but once you bring the CEO in you start on the next one. And so that's the way this works. You have people -- watch them, they're brought in, they get before the board. The board gets a chance to see them work, think, how they communicate, what they know, the breadth of their knowledge. You get to watch their operating rhythm, what their businesses can do, how they led them. You get a sense of how people respond to them. And all of those things go into an ultimate judgment call over time.**
**And, of course, the CEO has input into that because they work with them even more closely than the board does. The board has to work to get, you know, exposure to these folks. It's part of the job. And so that's how it the works. It works that way everywhere. And then basically it takes a while to get comfortable that you've got the right candidate. And then at that point, you've got to think about whatever you're going**

**to do organizationally to sort of tee him up for the thing.**
Q. Does the board's responsibility begin even before the incumbent says this is my time deadline for departure?
**A. Try that one more time.**
Q. Sure. Does the board's responsibility to find a replacement to proceed with corporate succession commence even before the incumbent says this is my schedule?
**A. It's a perpetual ongoing process.**
Q. Okay.
**A. So it's possible you would have several people maybe on a succession program even before this next CEO gets named because they may be considered five, ten years out before they're going to be ready. I mean, it's possible you can have that kind of long-term view. So the answer is sometimes that can be true, yes.**
Q. Do you know if that were true with regard to Tim Spence?
**A. I don't think it was.**
Q. When do you think that Tim Spence first became considered to become president and then CEO of Fifth Third Bank?
**A. I wouldn't know the exact date of that.**


**I mean, it was relatively early on. He was considered very bright and had a great strategic view of the world. He brought a whole, you know, background in terms of fintec and the use of technology. He had a broad array of skills and talents that became pretty clear pretty fast. So I would not know exactly when. I would say it's pretty early.**
Q. What -- what reports or what evaluations would the board as a board have looked at as it engaged in the succession planning process?
**A. Specific to succession planning or just in terms of --**
Q. Yes.
**A. -- succession reports.**
Q. Yes.
**A. There's an annual -- remember that meeting I've talked about where you sit down and, you know, you look at the entire executive team.**
Q. Uh-huh.
**A. And you look at the succession planning of virtually every spot, not just the CEO, so...**
Q. And this is the December board meeting that you talked about?
**A. Yeah. In terms of actual form -- you know, formulaic review, that's when it happens. That was not**


**my point earlier. It's going on all the time.**
Q. Right.
**A. Because there's discussions and things where there's no documents. We're just having a chat about what we're thinking, so...**
Q. And as you said, this is always at board level?
**A. Uh-huh.**
Q. Is there anybody at that stage independent or outside of the bank who's participating in that process?
**A. Usually not.**
Q. We've seen some minutes that suggest that there were candidates, the plural, for position of president at the bank in 2019 and 2020. Do you -- can you identify any of those candidates other than Mr. Spence?
MR. CIOFFI: Objection. Again, it's -- the deposition is not a memory test. If you have a document, show it to him and let him answer the question. But it's unfair the way you phrased the question.
BY MR. MCHUGH:
Q. Can you answer the question as I've asked it?
**A. Well, there was always, you know -- I mean, I**


**don't know how to say this. There's usually a couple of names that are there that could step in the short term should something happen. So if you're referring to something like that, the answer is yes. If you're talking about somebody who's absolutely been identified as a candidate for the top job --**
Q. Right.
**A. -- I don't know that there's anybody beyond Tim.**
Q. Okay. And I understand that -- that sometimes the first position you talked about is the emergency or interim or a temporary president in the event of a catastrophe of an incumbent?
**A. I always refer to it as who can keep the lights on long enough for us to make a final decision.**
Q. Okay. So that's -- that's maintaining the status quo --
**A. Right.**
Q. -- as best we can --
**A. Right.**
Q. -- in light of an emergency?
**A. Right.**
Q. All right. Excluding that -- excluding that, do you recall the identity of any candidates other than

Tim Spence for president while you were --
**A. I do not recall.**
Q. So how -- the communication must essentially have come from Mr. Carmichael as he winnows out the candidates; is that fair?
MR. CIOFFI: Objection to the form of the question. It's not -- it's not what he testified to. You may answer.
THE WITNESS: I'm not sure I understood it. Try it again.
BY MR. MCHUGH:
Q. Uh-huh. Who provides the information to the board that the board uses in this process?
MR. CIOFFI: Objection. Asked and answered. He talked about that already.
THE WITNESS: The staff work is done by the staff and -- but the board ultimately looks at what they've done. I don't care what they present to us. If we have a different point of view, it's going to be handled differently. So I'm not sure what you're getting at.
BY MR. MCHUGH:
Q. Well, what I'm looking for is just to find out who are the people that are presenting it. How -- just tell me again how that process works in



terms of collecting information and evaluating it and sorting it?
**A. The corporate human resources people will do the staff work and -- for all the executives, not just this. And they present that to the -- to the board. I'm sure Carmichael or whoever's sitting in that seat has got a view of all of that clearly.**
Q. Uh-huh.
**A. And so it's a combination. When we have the meeting, the CEO is sitting in the room, he's a member of the board. The HR people walk us through all this with all the executives and all the people and there's a discussion among the board, so...**
Q. Okay. There was a document that was marked at Mr. McHugh's deposition by Mr. Cioffi that's marked as Board of Directors Human Capital and Executive Talent and Management Succession Plan Updates --
**A. Right.**
Q. -- for December of 2019. That would be consistent with the time frame that you talked about, right?
**A. Relative to what?**
Q. Relative to when in the year the board considers this a succession planning?
**A. Yes. Correct.**



Q. Okay. And I'm wondering -- I'd like you to just take a look at that, if you would, please.
MR. CIOFFI: Do you want to mark it in this deposition as well?
MR. MCHUGH: Well, I'm happy to do whatever you feel, Mike. It's -- it's easy to do it either way.
MR. CIOFFI: Well, I think we ought to -- to make the record clear, we ought to mark it -- if you're going to ask the witness to look at it, we're going to mark it as Exhibit 1 orwhatever it was in the other deposition.
MR. MCHUGH: No. It's marked right on the top. That's why I did that.
MR. CIOFFI: Well, it's marked as -- it looks like the pages are coming out of it, but -- Brian, do we have a stapler.
MR. SABA: Can we go off the record one second?
MR. CIOFFI: Yeah.
VIDEOGRAPHER: Time is 11:55 a.m. We're going off the record.
(Whereupon, a brief recess was taken.)
VIDEOGRAPHER: The time is 11:57 a.m. We're now back on the record.



(Whereupon, Plaintiff's Exhibit 1 was marked for identification purposes.)
Q. Mr. McAllister, I've placed in front of you what -- after some trouble as we've learned -- for identification purposes as Plaintiff's Exhibit 1.
**A. Okay.**
Q. First of all, could I direct your attention to the front page of that exhibit? Do you recognize that this is the -- an email from Bob Shaffer to members of the board, you included?
**A. Yep.**
Q. And you see your email address on there?
**A. No. But I'm going to find it if you know where it is.**
Q. Are you MBM2045?
**A. I still haven't found it, but I --**
Q. Oh, I'm sorry. Yes. See where it says "MBM"?
**A. Oh, yep. Okay. Got it.**
Q. Okay.
**A. Yes.**
Q. And so this, as it reflects, is the -- a report from Bob Shaffer?
**A. Okay.**
Q. That's what it says, right?
**A. Looks like it, yep.**

Page 77

Q. And it says it's the document that he and Mr. Carmichael will utilize for the HC -- Human Capital and Executive Talent Management and Succession Plan Updates --
**A. Yep.**
Q. -- for the December 19th meeting, right?
**A. Okay.**
Q. And that appears to then have attached to it the December 17th, 2019 Board of Directors Report. This is the document that you saw at the board?
**A. Yes.**
Q. Okay. So may I -- will you take me through that and especially when you get to -- the first part of this talks about the mission and the trends and leading. And then there's a section that -- it has talent framework. Will you tell me why we -- why that is the approach that's utilized?
MR. CIOFFI: Objection to the form of the question. You -- you asked about three questions there. You were asking him to confirm your representation of what the beginning pages were and then you ask another. Can you just ask one question and -- about the document and let him answer that question?
MR. MCHUGH: All right. Let's do it the easy way.

Page 78

Q. Would you take us through the document itself and tell us what -- what it reflects?
MR. CIOFFI: Each page?
MR. MCHUGH: Yes, sir. Since that's what you want me to do, that's what we're going to do.
MR. CIOFFI: Why don't you direct him to the page you want him to talk about?
MR. MCHUGH: Because I want him to talk about all the pages.
Q. Okay. So let's --
MR. CIOFFI: What -- what --
**A. All right.**
MR. CIOFFI: You have to ask him a question about them. You can't just say talk about them. Ask him a question. Ask him a question about a page. You can't just say talk about it.
MR. MCHUGH: Michael --
MR. CIOFFI: That's not a proper question.
MR. MCHUGH: I'm trying to accommodate your objection, but...
Q. Explain how this document, please, reflects the process that you've described for me as you said you watched it emerge for the selection of Tim Spence as the president.

Page 79

**A. First of all, I would point out this is for all executives that are in this document.**
Q. All right.
**A. It's not specific to the CEO.**
MR. CIOFFI: I'm going to object further because it mischaracterizes the record. He didn't say this document is the only document that represents how the board came to its decision about Tim Spence.
MR. MCHUGH: I didn't ask him that, but --
MR. CIOFFI: So you can't mischaracterize it, but just ask him a question about the document or any page of the document, please.
MR. MCHUGH: I just did.
Q. Is this the report -- is this the first report that the board saw with respect to the succession management for the executive management team in 2019?
**A. It is the one that we used.**
Q. All right. Was there anything else that preceded it that you saw?
**A. No, not that I saw. I'm sure there were drafts that somebody was dealing with, but I didn't see them.**

Page 80

Q. Okay. So -- so what was presented to the board was this document that we marked as Exhibit 1?
**A. Correct.**
Q. Now, the -- well, Page 1,110 is -- begins a section called Talent Framework?
**A. All right.**
Q. And you reviewed this?
**A. Then I would have, yes.**
Q. And tell me what this then reflects. Does it show the schedule and the time deadline?
**A. Where?**
Q. Well, if you'd like, it's Page 1,111 or Page 1,112?
MR. CIOFFI: For the witness's benefit, he's referring to the lower right-hand numbers called Bates numbers.
THE WITNESS: I see them. I see them.
**A. Ask me again.**
Q. There's a pending question.
MR. CIOFFI: Could you read it back?
(Whereupon, the previous question was read back by the court reporter.)
**A. For what?**

Q. For the process? In other words, let's look at Page 1,112.
**A. 1,112. Okay.**
Q. How does the board use that information?
**A. It just outlines how we got to this point and over what period of time.**
Q. So this is explanatory to the board?
**A. It's just a review more than anything else.**
Q. All right. And then a few pages later there's a Talent Metrics Highlights and an Employee Viewpoint Survey?
**A. What page are you on?**
Q. There on Page 1,115.
**A. Okay.**
Q. Now, was this all reviewed by the board at this meeting?
**A. Yes.**
Q. And did this information come to you through that portal that you described where it was this --
**A. You know, normally at this meeting there's an option and it is on the portal, but they also bring hard copies in if somebody wants to use them, so...**
Q. Okay. Were you at this -- physically present in Cincinnati at this time?
**A. I don't know. If this was pre-pandemic, I**



**probably was.**
Q. Yes. This is, I believe, pre-pandemic.
**A. Yes, likely. I mean, I'm not a hundred percent certain, but yes, I think so.**
Q. All right. Directing your attention to 1,117.
**A. Okay.**
Q. How was this used by the board?
**A. This is FYI kind of information, frankly --**
Q. Uh-huh.
**A. -- just to kind of lay out where we are with various things.**
Q. Well, what does it tell you in terms of that?
**A. Tells you what the employee makeup is based on age, the mix.**
Q. Okay. So that it shows you the -- the age of what they identify as a five generations in the workplace?
**A. Correct.**
Q. Do you know if this is relied upon for any decision making by the board?
**A. I don't think it's really given much time.**
Q. Can you tell me what Page 1,118 means, the talent wins?
**A. Well, these are -- these are hires and/or**



**internal movement that we consider to be good hires or good moves, so...**
Q. Is there anything else that you relied upon or that the board considered in the succeeding pages, the succeeding three or four pages?
**A. For what purposes?**
Q. For purposes of evaluating succession planning.
**A. It's all here.**
Q. Do you see the enterprise committee that appears on 1,126?
**A. 1,126? Yep.**
Q. Are these the people who the board is considering for purposes of succession planning?
**A. Well, not all of these people would be on the -- generally succession folks come from this roster, though.**
Q. Okay. So in 2019 who were -- who were the people that were on the list for succession planning for president and CEO?
MR. CIOFFI: Objection. Assumes facts not in evidence that there was a list. I mean, do you have a document that says -- that shows there's a list?
MR. MCHUGH: This is the document.



MR. CIOFFI: Is there a page in here as to what it was?
MR. MCHUGH: Michael --
**A. Ask it again.**
Q. Sure. From this list -- from this presentation, how did the board use it to determine the succession for the president and CEO?
**A. We wouldn't have done anything from this page this is just information that says this is who we have.**
Q. Okay. Can you tell me whether all of these were potential candidates?
**A. Of course not.**
Q. Okay. Can you tell me who were the candidates?
**A. I don't know exactly at this time who would show up where, but I know Tim Spence would be there. And beyond that, I would not know.**
Q. All right. Now, beyond this executive talent management presentation, there appear to be talent cards --
**A. Right.**
Q. -- for each of the individuals?
**A. Right.**
Q. How did the board use those?
**A. It was just a discussion thing. We'd go**

**through each individual and kind of go through the information that's in front of you and decide whether you're feeling good about it, feeling bad about it, how they're doing, were they progressing, were they not progressing, were they going to move anywhere. I mean, this was all the kind of background information you would use to determine, you know, what's going on with your senior people.**

Q. Generally, how long would this process take in the board meeting?

**A. At least a couple of hours.**

Q. Okay. And would the board consider every listed individual?

**A. While we absolutely considered them, we'd spend a different amount of time on people depending on the situation, but...**

Q. Can you tell me that -- what particular form -- why the information is there, how it is important to you to make a decision?

**A. I don't know. I don't know what you mean.**

Q. The first thing that is informative on there is the participants' age after his name and his title. Do you see that?

**A. I see that, yeah.**

Q. Okay. And there's other information.



How do you -- how does the board take in that information?

**A. Which information?**

Q. All the information that is contained in that page?

**A. I have no idea how to answer that question. I mean, basically -- this is an annual review. Many times there's nothing to do with this information, so...**

Q. Can you tell me what information you used to evaluate the potential candidates to succeed Greg Carmichael?

MR. CIOFFI: Objection. Time frame. Meaning any given year? He said it was a process that lasted over a number of years. So are you asking him totally?

MR. MCHUGH: You know I'm speaking about this report.

MR. CIOFFI: No, I don't know what you're talking about.

MR. MCHUGH: This report.

Q. This is the report that you said is the only will report that you received. So I'm asking you, in looking at this the report, who were the candidates that were identified as potential successors to Greg Carmichael?



MR. CIOFFI: Objection. Mischaracterizes his testimony about how the board came to its decision. He didn't say it was just this report.

MR. MCHUGH: No.

MR. CIOFFI: But you --

MR. MCHUGH: Michael, please, you're testifying.

MR. CIOFFI: I'm not testifying.

MR. MCHUGH: Yes, you are.

MR. CIOFFI: I'm simply objecting to the mischaracterization.

MR. MCHUGH: Make your objection and we'll move forward, please.

**A. I have no idea what's on the table for questions right now.**

Q. Who were the candidates that you considered to replace Greg Carmichael for president as reflected in this report marked as Exhibit 1?

**A. Tim Spence.**

Q. Anybody else?

**A. I don't think so.**

Q. What was the discussion that you recall?

**A. Specific to succession in this meeting on this document?**

Q. On Tim Spence?



**A. We do this in the board meeting all of the time. This is not that big of a moment in time in terms of criticality. Other than the fact that we're doing sort of an annual look across the entire organization, Tim is one of many people that are in here. So I'm not sure what you're trying to get to.**

Q. Well, what I'm trying to get to is simply to inquire is whether there was any other candidate considered at the board in 2019 other than Tim Spence?

**A. I think by the time 2019 rolled around Tim was the one.**

Q. Okay. Have you ever seen any other versions of this report, earlier drafts or --

**A. I would not see this report.**

Q. There is a listing for Philip McHugh. Do you see that?

**A. What page?**

Q. Page 132.

**A. Okay.**

Q. In the first instance, did you review this -- did you review this evaluation for Philip McHugh?

MR. CIOFFI: Objection to the form of the question. It being an evaluation, it doesn't say that.

Q. Did you review it?

Page 89

A. **Well, as part of the meeting, we went through every single one of these. So I don't know what you mean by review, but yes.**
Q. Did you make a decision with respect to Philip?
A. **There's -- no decisions came out of this meeting.**
Q. So at the December 19th meeting, there were no board decisions with respect to finality of the selection?
A. **None.**
Q. There was the recommendation from Mr. Carmichael that it be Mr. Spence?
A. **If you point at that moment in time, was that it was going to be Tim barring something unusual in his continued progression in the job.**
Q. And did you have any further discussion with the members of the board other than what you just told me about your assessment of Timothy Spence?
A. **Gee, I'm going to keep coming back to it. This is a routine process. It was discussed at almost virtually every board meeting at some level, sometimes more in depth, sometimes not. There wasn't a lot of documents flying around. There was communication among the board relative to impressions. What did they think?**

Page 90

**What did they think of Tim's presentation today? Does he seem to be on top of his game? This was common and constant. So these moments in time weren't, you know, not relative -- relatively critical to the process.**
Q. Are you aware of any records of any of those communications or assessments, either informal or otherwise --
A. **I don't -- I don't know.**
Q. -- among members of the board?
A. **I don't know that there are. A lot of that happened in executive session.**
Q. When executive session took place, how did that -- what happened then?
A. **Well, management leaves and the board just chats among theirselves.**
Q. So Mr. Carmichael --
A. **He'd be there for part, he would leave and it would just be us for the rest of it.**
Q. Was there any other use that was made of this report by the board then in December of 2019?
MR. CIOFFI: Objection to form of the form question as confused. But you may answer.
A. **You know, in terms of correct context, no. This was -- this was sort of our -- I mean, there's always conversations going every meeting about what's**

Page 91

**happening with staff and executives and who's stepping up, who's got issues. I mean, that's just part of management and the board's interaction with -- with management. But in terms of formally going through and talking about folks and getting a viewpoint of sort of where they are, this is it.**
Q. Was there any discussion of Philip McHugh as candidate for presidency --
A. **No.**
Q. -- at that time?
A. **No.**
Q. Was there ever a discussion at any time in 2019 that you participated in regarding Philip McHugh as a successor to Greg Carmichael for presidency?
A. **I don't recall any of that.**
Q. When the -- after the December 17th board meeting, was there any further use made by the board of Plaintiff's Exhibit 1?
A. **No.**
Q. Did you have any discussions with Mr. Carmichael following the review of the talent management cards?
A. **Afterwards specific to this process?**
Q. Yes, sir.
A. **Not specific, but again, I'll say it for the**

Page 92

**20th time. We constantly talked to him about all of this all of the time. So, yes. The answer is yes. But as specific follow-up to these documents?**
Q. Yes.
A. **No.**
Q. Was there any question in your mind as to how many candidates there were then in December of 2019 to succeed Mr. Carmichael?
A. **There was no question in mind.**
Q. Were you aware of any question that was expressed by any of the other board members at that meeting as to potential candidates?
A. **By that time, I think the consensus has grown that Tim was the candidate.**
Q. Okay. What did you then do next to as the member of the board with regard to determine whether Tim Spence was the candidate?
A. **I mean, at this time or any time?**
Q. After 2019, after this was considered, you heard that Tim Spence is the only candidate?
A. **Right.**
Q. Okay.
A. **Well, eventually we -- I mean, we would probe Carmichael regularly about how Tim was doing and what was happening and whether he was progressing and who he**

**was -- just questioning him getting mature, you know, in the president's role and getting going. So that was a routine sort of conversation that occurred. Eventually there was an outside consulting firm that did an analysis of things based on a profile that we drafted for the job, so...**
Q. Who drafted the profile?
**A. I think, again, that was a collective board thing at the end of the day as to what we thought, so...**
Q. Did you -- was it presented -- was it drafted and prepared by the board or by the staff?
**A. Obviously it was done by the staff, but it's on behalf of the board. I mean, so the board tells the staff what to do, so...**
Q. Did you -- did you involve Mr. Spence in any fashion in that process?
**A. No.**
Q. What -- in your mind, would it be appropriate to ask Mr. Spence, you know, what he thought of his evaluation and how he would respond to it?
**A. I would not -- I would not ask him.**
Q. Okay.
**A. Sorry.**
Q. Do you know whether anybody did?
**A. I don't know.**



Q. Why wouldn't you ask him?
**A. It might be interesting, but, you know, I think the board should have its own point of view about what they're looking for and shouldn't be miss -- you know, not -- it shouldn't be led anywhere by a potential candidate. That just sounds inappropriate to me. I've never seen that done either anywhere, so -- where you go to a candidate and say what would you like your profile to look like so we can evaluate you. I mean...**
Q. That would kind of be --
**A. It would be ridiculous.**
Q. The -- would it be your testimony then that the -- there were -- there was one succession candidate as of December 19th, 2019?
**A. You know, I don't know about the exact timeline, but I would say that sounds about right to me. But by then the consensus had developed and there was a question of, you know -- and at that time, we weren't even certain how long Greg was going to stay, so...**
Q. What was your understanding about Mr. Carmichael's tenure?
**A. I would say generally it wasn't going to be long-term, but we weren't sure whether it was a year, 18 months, three years. I mean, that -- that never really clarified. And A lot of that was going to be developing**



**around the idea is -- is Tim ready or not because nobody's going to pull that trigger until the board comes to the conclusion that, yeah, he's ready, so...**
Q. Did the board ever request that Mr. Carmichael delay his plans?
**A. You know, in the middle of this process I'm not really sure whether that happened. I mean, I would argue that if you've got a good CEO, every board would want the CEO to stick around forever.**
Q. Right.
**A. So probably somewhere along the way it's possible that you want to keep him as long as you can because you've got a bird in the hand versus something you're not sure of.**
Q. Right.
**A. So that's just the way it tends to work. But I don't recall specifically whether we ever -- Greg had made the commitment he wasn't leaving until he was comfortable with his replacement, so -- and that was always left a little nebulous. We knew it wasn't going to be five years.**
Q. When you look at Plaintiff's Exhibit 1, does Greg make a recommendation as to when his replacement would be ready?
**A. At that time, I can't recall what his opinion**



**would have been at that time.**
Q. All right. Would you look at the -- and the page for that is -- it looks like it may be cut off, but it looks like 1,135.
**A. Okay.**
Q. Do -- do you remember any consideration of that at all?
**A. I can't even read this print. It's so tiny.**
Q. Okay.
**A. Consideration of what?**
Q. Any consideration of the information there? They talk about, you know, 2018 rating, 2019 rating. Any of those matters.
**A. All of this would have been considered.**
Q. All right. What -- after you received this, what next did the board do as it progressed along this matter or this process to select Mr. Spence as president?
**A. Just stay in communication with Carmichael about what was happening in the company, continued to evaluate his work, made sure he was in front of us for various things. He was attending the meetings regularly. We had a lot of exposure to him, so...**
Q. And you told me earlier that you did not have any direct contact with Mr. -- is it Guy Beaudin? Is

that he pronounces his name?
**A. I don't know.**
Q. Okay. But --
**A. I know who you're talking about.**
Q. And you had not had any direct contact?
**A. Not directly, no.**
Q. Were you aware of any contact by any members of the compensation committee with Mr. Beaudin?
**A. I don't think they would have had any contact with him. I think, again, that's a board thing, so...**
Q. Okay. Do you have any recollection of what the discussion was about Philip McHugh at the December 19th -- December 2019 meeting?
**A. Nothing specific.**
Q. Was it ever indicated to you that he was at risk of departing the bank?
**A. No.**
Q. Were you ever told by Mr. Carmichael or Mr. Shaffer or anybody prior to October 16th that Philip McHugh was at risk of leaving the bank?
**A. No.**
Q. So who -- who's driving the boat at this time then? Once you have the December 19 talent management assessment, who establishes the deadline for what's next occurring?


**A. Again, that's a collective board thing.**
Q. How does it do that?
**A. And there wasn't necessarily a deadline.**
Q. How does the board do that?
**A. In discussions just amongst us.**
Q. All right. Anything formal?
**A. Not on that sort of thing, no. I mean, the things we could talk about are, you know, what are -- how long do you think Greg's going to stick in here? Do we have any risk with him leaving earlier than we want him to? Those kind of things pop up. As to how far do we think Tim is being ready versus what Greg may think, you know, what is he not -- what bases has he not touched? Has he had enough exposure to Wall Street? All the things that a CEO is going to need that an operator does not -- it's on the other side of the company. So that's the kind of thing we talk about. Ultimately just kind of assess general maturity along all those lines.**
Q. Do you remember any of those particular discussions?
**A. No.**
Q. Do you remember any of the directors who had input into those -- you know, more than just a customary input into those communications or evaluations?


**A. No.**
Q. Was anybody on the board a particular champion or advocate for Mr. Spence above all other board members?
**A. Again, that was -- that was a consensus that had grown. I would consider it unanimous among the board members that this was -- so I wouldn't -- I wouldn't tee up any individual on it.**
Q. Okay. And if you can, when -- when did this crystalize first as it emerged?
**A. Oh, I don't know the exact timeline. Like I say, he emerged pretty early as -- as we thought the strongest candidate. But in terms of that consensus being nailed down, I couldn't give you a specific time to that. Probably -- if I'm -- if I'm guessing, which I probably shouldn't be doing, it was probably in the '19 time frame, somewhere along in there.**
Q. Reasonably contemporaneous with the talent review that we've marked as Exhibit Plaintiff's Exhibit 1?
**A. Yeah. I wouldn't -- I wouldn't argue with that.**
MR. MCHUGH: Pete, can I have --
MR. SABA: Let's go off the record for a second, so we can have a second.


VIDEOGRAPHER: The time is 12:26 p.m. We are going off the record.
(Whereupon, a brief recess was taken.)
VIDEOGRAPHER: The time is 1:17 p.m. We are back on the record.
MR. MCHUGH: Thank you.
BY MR. MCHUGH
Q. You ready to proceed?
**A. Uh-huh.**
Q. When we -- when we spoke before lunch, you indicated that the -- could you indicate when it was in your mind that the board actually voted on making Mr. Spence president?
MR. CIOFFI: Objection. Minutes and documents speaks for themselves. The deposition is not a memory test. It doesn't really matter what his recollection is.
**A. I don't recall what that meeting was.**
Q. Do you recall whether it was a meeting or unanimous written consent?
**A. I don't recall.**
Q. Okay. It was your position, as I understand it, that until the board made the vote everything was still up in the air?
**A. Well, yes. I mean, it's never done until it's**

**done.**
Q. Right. So until the board makes a decision, there is no decision?
**A. Correct.**
(Whereupon, Plaintiff's Exhibit 2 was marked for identification purposes.)
Q. Okay. Mr. McAllister, I'm going to place in front of you what's marked for identification as Plaintiff's Exhibit 2.
**A. Okay.**
Q. And I will represent to you that these are papers that were filed by Mr. Cioffi in connection with the lawsuit that was filed in connection with this case.
**A. Okay.**
Q. And I would direct your attention to the answer that is set forth on Page 6, Paragraph 4. And I won't read the entire thing to you, but the essence is that Fifth Third has interposed an objection based upon its position. And it says that without waiving that we're going to identify for you the documents that we think are responsive to your request.
Do you see that there in that "Subject to and without waiver"?
**A. Yes.**
Q. Okay. And you also see in the answers to



Paragraph 5 that Fifth Third asserts the same objection and it makes the same response?
**A. Without reading the whole thing, I'll stipulate to that.**
Q. All right. Thank you.
(Off-the-record discussion.)
(Whereupon, Plaintiff's Exhibit 3 was marked for identification purposes.)
MR. MCHUGH: I'm going to hand you, Michael, first the document that I'm going to show Mr. McAllister and ask you if -- if you will confirm that those are the four documents that you referred to in the interrogatories. I'll have him do it if you wish, but...
MR. CIOFFI: You want me to testify? Is that -- is that what you're doing?
MR. MCHUGH: No. I'm asking you as a courtesy -- I'm showing them to you as a courtesy. I'm happy to do that. Okay.
Q. So the -- you have the interrogatory response then, correct?
**A. That's what this is?**
Q. Yes, sir.
**A. Okay.**
Q. That is the interrogatory response.



(Whereupon, Plaintiff's Exhibit 3 was marked for identification purposes.)
Q. And now I'm going to hand you what's been marked for identification as Plaintiff's Exhibit 3. Do you see that?
**A. I see the marking, yes.**
Q. Okay. And Exhibit 3 says that those are the documents that are identified.
MR. CIOFFI: I don't have an Exhibit 3.
MR. MCHUGH: You won't. That's why I handed you those.
MR. CIOFFI: All right. Let me look at what you've marked as Exhibit 3. What's the source of the first page of Exhibit 3?
MR. MCHUGH: Those are our notes. Thank you.
MR. CIOFFI: So you -- you -- okay. You're going to ask him questions about your notes? Okay.
MR. MCHUGH: Thank you. You can teach me afterwards. All right.
Q. So would you take a look at those documents that are attached? And in the first tab do you see that it matches the documents that are shown here? And you can tell that quite easily, Mr. McAllister, just by



looking at the notes in the right-hand corner which are the Bates Stamp numbers.
MR. CIOFFI: I'm going to object to this line of questions. He's here as a fact witness, not as a 30(b)6 witness. He has no authority to speak on behalf of the bank and he's not here to speak on behalf of the bank. If he has personal knowledge about these interrogatories that he can speak about, I'm going to allow him to answer. If he doesn't, then I'm not.
MR. MCHUGH: Okay. Now, I've asked you a couple of times nicely. Speaking objections you know are inappropriate. You can make your objection and that's it.
MR. CIOFFI: It's not a speaking objection.
MR. MCHUGH: If you're trying to coach the witness, then it is a speaking objection and it's going to delay what we're doing. So make your objection, understand it, we'll move forward.
MR. CIOFFI: Objecting that he's not a 30(b)(6) witness doesn't tell the witness anything to say.
MR. MCHUGH: Well, you --
MR. CIOFFI: Go ahead, ask your

Page 105

question, but...
Q. All right. Do you see the first document there that's called "Final: The Winning Formula"?
**A. I do.**
Q. All right. And that has a Bates Stamp number that begins with the n01074. Do you see that?
**A. I do.**
Q. Second document is "Board Summary, Timothy Spence." Do you see that? That's behind Tab 2.
**A. Nothing behind Tab 2.**
Q. Nothing behind Tab 2?
**A. No.**
Q. It says "Board Summary"?
**A. Nope.**
Q. Let me hand that to you.
MR. CIOFFI: You just handed it to him. Is that what you say that should go into Tab 2?
MR. MCHUGH: Yes, I am saying that. That's why I handed them to you ahead of time.
Q. Okay. Is there anything behind Tab 3?
**A. Yes.**
Q. Is behind Tab 3 the executive vice president -- I'm sorry -- the Executive Assessment Development Report?
**A. Yes.**

Page 106

Q. Okay. And what is behind Tab 4?
**A. Executive Succession Planning.**
Q. Those are the documents I handed to you, so -- all right. So can you -- if you place that 2 behind the Tab 2, do you find those four documents that are identified in response to the questions 4 and 5?
**A. It looks like it.**
Q. Now, I will represent to you that subject to the bank's objection the bank has indicated that those are the documents that it relied upon to make the decision it did. And I'd like to ask you are you aware of any other documents that you saw or that you as a member of the board relied upon in reaching a decision that the board made?
**A. That's a very broad question. What do you mean other documents? I mean, we just went through something earlier where there was evaluation done. So I guess -- this was -- this was part of the process, yes.**
Q. Okay. Apart from the evaluation that I showed you earlier that we had marked as Plaintiff's Exhibit 1 and those that are marked as Exhibit 4 --
**A. I would -- I would agree that these are things that we considered. I would not agree this is all I ever saw, so...**
Q. What -- what do you -- what else do you think

Page 107

you saw?
**A. I don't recall because this happened over multiple years. I mean, I don't have that kind of memory to know what came before us all the time.**
Q. Well, was there any recommendation that was made in 2017 for succession planning for president?
**A. Five years ago?**
Q. Five years ago, yes.
MR. CIOFFI: Objection to the form of the question. Recommendation from whom? From anyone?
**A. I don't know what -- I don't recall that.**
Q. All right. Do you recall any recommendations by the board in 2018? In the December 2018 meeting?
**A. I wouldn't be surprised if the board hadn't started -- at that point started consolidated around the idea that Tim was the candidate. I don't know a -- I don't know of a specific date or that particular time line, but...**
Q. Okay. Is there anything other than board minutes, to your recollection, that would show that?
**A. No.**
Q. As -- as you said, this was not a compensation committee matter?

Page 108

**A. Correct.**
Q. In 2019 I've shown you those documents that were put together?
**A. These were produced by the bank?**
Q. Yes, sir.
**A. Okay.**
Q. Yes. As you'll see in each one of them, it says "Fifth Third" in the cue down in the lower right-hand corner?
**A. All right.**
Q. And you haven't seen any other document?
**A. Not that I recall.**
Q. Okay. Thank you. Now, the --
(Whereupon, Plaintiff's Exhibit 4 was marked for identification purposes.)
BY MR. MCHUGH:
Q. Mr. McAllister, I'm going to place in front of you what I've had marked for identification as Plaintiff's Exhibit --
**A. Are we done with this?**
Q. Yes, sir, we are. 4.
**A. Okay.**
Q. And do you recognize that document?
**A. Yep.**
Q. And could you tell us what that is, please?

Page 109

**A. That's the proxy.**
Q. Okay. And what -- what -- what is the proxy?
**A. It's a required document from a public company outlining many things, what's going on in the company, compensation issues. I mean, there's dozens of things in there.**
Q. Okay. And in that proxy there's an indication, is there not, of the compensation of named executive officers?
**A. There is.**
Q. Okay. And are you able to locate that section of the proxy?
**A. No. You'll have to tell me what page it is.**
Q. The copy I have is Page 71. Let me see it in this one.
**A. Nope, that's not it.**
Q. Find it in there. I'm going to show you what is an excerpt from that page to see if we can facilitate this, which is reported to be the Page 71 out of the proxy statement issued by Fifth Third Bank.
**A. According to the table of contents, it's probably 48. I'd rather get it out of here than this.**
Q. 48 doesn't seem to be that one either.
**A. Nope. All right.**

Page 110

MR. CIOFFI: Wait a minute.
MR. MCHUGH: We'll get it for you. We'll get it for you. I'll have that back, Michael, when you're finished with it.
MR. CIOFFI: Just on the record, you handed the witness a document that says "Proxy Statement Highlights." You want that marked as an exhibit or --
MR. MCHUGH: No, I do not. He doesn't feel comfortable with it. Oh, it does say 71. Oh, that's mine. Okay.
BY MR. MCHUGH:
Q. It is marked as Bates 77 in your document and you'll see about halfway up it says 71.
**A. Okay.**
Q. Do you recognize that document?
**A. Yes.**
Q. All right. Could you tell us what that?
**A. It's the compensation table for the NEOs.**
Q. And it has the compensation, does it not, for the -- that was paid to the president of the bank for 2019, 2020 and 2021?
**A. It does.**
Q. And could you describe for me briefly the -- the table itself and what the table is designed to

Page 111

illustrate?
MR. CIOFFI: Objection. The document speaks for itself. This is a waste of time.
THE WITNESS: He's right, but...
MR. CIOFFI: What do you want him to do? It's an exhibit. It's a proxy. We'll stipulate it's the proxy, but what -- what do you want him to describe?
MR. MCHUGH: Well, what I'd like him to do then is stipulate that it is in fact the compensation, both salary, bonus, stock awards, option awards and nonessential compensation.
MR. CIOFFI: Well --
MR. MCHUGH: Hold on. You asked me the question and I'm going to answer it. And all other compensation that was paid during the three-year period.
MR. CIOFFI: Assuming that this is an authentic document. I mean, he can't authenticate it. This was actually what was filed. We'll stipulate that -- that the company properly reported and accurately reported to the SEC in the proxy the salaries. Yes, we'll stipulate to that. I don't know where you -- you printed this

Page 112

document. I don't know where you got it from, but whatever was filed with the SEC does accurately state the salaries.
MR. MCHUGH: That were paid during the stated periods of time?
MR. CIOFFI: Yes. Yes. Yes.
MR. MCHUGH: Very good. Thank you.
BY MR. MCHUGH:
Q. And those were positions that were paid to the -- for the positions that -- those were payments for the positions held, correct?
**A. That's what this chart is intended to say.**
Q. All right. And it does include all components of compensation?
**A. It does.**
Q. Is there any other better summary that you're aware of that sets forth that information?
**A. No.**
Q. Now, at the December 17th board of directors meeting that we talked about previously --
**A. Okay.**
Q. -- you said that at that point it was established that Tim Spence was the candidate to be reviewed for the president?
**A. Absolutely.**

Page 113

MR. CIOFFI: Objection. That mischaracterizes his testimony. The consensus was forming, but...
THE WITNESS: I never specifically said that was the date.
BY MR. MCHUGH:
Q. Oh, all right. When -- when do you think that -- that consensus emerged?
**A. Over time. I don't know exactly when, but it was -- you know, it could have been in that time frame.**
Q. Okay.
**A. But I don't know that there was a moment in time where all of a sudden everybody declared this is it, so...**
Q. Well, was there consideration that you recall of any other candidate than Tim Spence in December of 2019 to succeed Mr. Carmichael?
**A. I don't recall consideration of anyone else at that time.**
Q. Okay. And you told me that you never considered Phil McHugh to be a candidate for president?
**A. Not me. The board never went down there.**
Q. Did you, sir?

Page 114

**A. No.**
Q. And you told me that -- did you feel that there were any disabling characteristics or traits that disqualified Mr. McHugh from that position?
MR. CIOFFI: Objection to the form. Compared to what?
BY MR. MCHUGH:
Q. You can answer.
**A. I answered that about two hours ago. The answer is not about him. It's about the upside possible by having Tim take the job. So there was no specific thing that said Phil had a problem. What we did look at was the overall picture. We saw executives all of the time. Every meeting we had people coming in and talking to us, talking about their businesses, talking about the markets, talking technology, talking about everything you can think of.**
**That's what they do.**
Q. Uh-huh.
**A. So we saw them all along.**
Q. Okay.
**A. And the valuation was that Tim had the broader and best opportunity to succeed as our CEO.**
Q. To what -- what credit did you give the 34 years of experience that Phil had had with the

Page 115

bank?
**A. I spent 39 years with my company and I don't think time and spot is in this particular situation a critical factor.**
Q. And what was the particulars of the situation that gave you that -- to help you to draw that conclusion?
**A. About what?**
Q. Well, as you said, the particulars of this situation, you don't think time and service is that determinative?
**A. I think looking backwards, when you're talking about putting somebody like -- somebody in a job like this is interesting, it's important, but you're looking forward. What does the company need going forward? What does the future look like, in this case, banking? You know what are the implications of whatever's going on competitively, market positions, geography? There's a thousand things you're looking at, but it's a going forward consideration. It's not about the past.**
Q. All right. Well, was there anything that you thought was, again, something that was inadequate in Philip McHugh's performance --
**A. I would say --**
Q. -- or background?

Page 116

**A. You're characterizing that backwards. What I'm telling you is the board's evaluation was that Tim was better --**
Q. Okay. And --
**A. -- at Strategic thinking, presentation, possibly, you know, relative to -- I mean, there's a dozen factors that go into this.**
Q. Well, tell me what those are, please.
**A. I just did.**
Q. Well, I heard three.
**A. Well, how many do you need?**
Q. Well, as many as you can --
**A. The board could have done it on one if they had chosen too.**
Q. Well, that's what I'm asking you. What were the factors that were considered by the board in making that decision?
**A. Did you read the profile that the board has established for hiring into the job?**
Q. I'm going to ask you about that in just a minute.
**A. Well, it's in there.**
Q. Can you tell me anything beyond what's in that profile?
MR. CIOFFI: Objection. Again, you keep

Page 117

trying to make this a memory test. Show him the document and -- and he'll answer the question, but what he recalls is totally irrelevant. It's what the documents say and what his testimony is based on the documents.
MR. MCHUGH: Well, we'll -- we'll see. We'll see.
BY MR. MCHUGH:
Q. May I see that Exhibit 3, please? Thank you.
Take a look at, please, for me, Tab 2 and Tab 3, the first page beneath -- the first substantive page, both of which are called executive summaries.
MR. CIOFFI: Can you identify them by the Bates number, please, because you gave me an incomplete exhibit?
MR. MCHUGH: You have the numbers there, Mr. McAllister.
MR. CIOFFI: For me, what are the numbers?
MR. MCHUGH: Yes, I'm asking him if he can tell you which one's he's looking at.
THE COURT: Well, which one are you asking him to look at?
MR. MCHUGH: I asked him to look at Tab 2.

Page 118

MR. CIOFFI: I know, but you gave me an exhibit with no tabs. So what numbers are you referring to so that I can know if you're asking a proper question?
MR. MCHUGH: What I'm looking at is Document No. 036 and 956, both of which were identified by you in your answers to interrogatories.
MR. CIOFFI: All right. From what you handed me, I don't see anything that's 036.
MR. MCHUGH: Well, I don't know what you might have done with it, but I handed you the exhibits.
MR. CIOFFI: 1036 is what you're referring to, right? Not 036?
MR. MCHUGH: No. I'm referring to 036 as those are the last three digits.
MR. CIOFFI: No. Come on, it's right there. It's 1036.
MR. MCHUGH: Do you have the document?
MR. CIOFFI: I do now.
MR. MCHUGH: Okay.
MR. CIOFFI: But you've got to tell me the accurate number.

Page 119

BY MR. MCHUGH:
Q. Mr. McAllister, if you look at Tab 3, there's a different executive summary.
**A. Okay. Well, I don't know. All right.**
Q. All right. Did you receive that summary?
**A. I did.**
Q. You did?
**A. At the board level.**
Q. You're sure of that?
**A. I think so.**
Q. Okay. Do you know why there was a summary then -- a different summary presented to you for the board at --
**A. No. I don't even know if that happened, but you're saying it did.**
Q. Well, that's why I want to know from your best recollection because I don't know whether you saw 3 at the board level. And that's why I'm just asking the question.
**A. I'd have to go back and probably pour through all the minutes to figure that out to be honest with you. I mean, the board asked for this assessment. The fact that it would not come would be ridiculous.**
Q. Well, you may have gotten just an abbreviated assessment presented to the board?

Page 120

**A. I don't recall.**
Q. Okay. So you don't know one way or the other?
**A. No, I don't.**
Q. Okay. That's fair. All right. Thank you.
**A. You want this back?**
Q. I would for just a moment, please. Directing your attention to the Document 4, Executive Succession Planning, Document No. 6991. Can you tell me what positions were recommended for Tim Spence and for Philip McHugh, if you can read them? If you can't, that's okay.
**A. That's not even -- do you have a magnifying glass?**
Q. No, sir, I don't.
**A. I don't either. I can't read it.**
Q. If I read it to you and it said, "Tim Spence, head of consumer bank payments and strategy; Phil McHugh, head of regional middle market and business banking and wealth management" --
**A. Okay.**
Q. -- would that --
**A. I'm trusting that you're reading it.**
Q. So the -- all right.
MR. MCHUGH: Would you mark that as Exhibit 5.

(Whereupon, Plaintiff's Exhibit 5 was marked for identification purposes.)
BY MR. MCHUGH:
Q. Mr. McAllister, I've handed you what's been marked as Plaintiff's Exhibit 5. Can you identify that document and can you identify your signature on the second page?
**A. Okay.**
Q. That is the document that you understand that the board used to appoint Tim Pence -- Tim Spence as president of the bank?
MR. CIOFFI: Objection. The document speaks for itself. Memorializes that decision.
MR. MCHUGH: I think it records the decision, but we'll debate that later.
BY MR. MCHUGH:
Q. But do you understand that's what it is?
**A. It looks like it.**
Q. Okay. Thank you. I'm going to -- I'm just going to show you what was provided to us recently.
MR. CIOFFI: John, usually when we do this here in the Southern District of Ohio you have a counsel -- you give counsel a copy and the



witness a copy and the court reporter a copy.
MR. MCHUGH: Thank you for the information.
MR. CIOFFI: But, I mean, I'd appreciate that courtesy going forward because we've always done that. We did it -- I deposed your client and I did that for every exhibit.
BY MR. MCHUGH:
Q. Mr. McAllister, I've handed you what's been marked for identification as Plaintiff's Exhibit 6 and ask you if you can identify that document?
**A. It looks like the minutes of the meeting.**
Q. Okay. And you can see that there's a portions of that that's redacted, but there's also a portion that is legible immediately above that?
**A. Yes.**
Q. And it talks about the introduction of Mr. Beaudin? I am saying his name right?
**A. Oh, I don't know.**
Q. Mr. Beaudin did not report on any other candidate for presidency, did he?
**A. Did not.**
Q. And no other the candidate for president was considered by any other consultant, was he?
**A. No.**



Q. Thank you.
MR. MCHUGH: Mike, if you give me five minutes, I may be finished.
MR. CIOFFI: Okay.
MR. MCHUGH: Or ten minutes.
MR. CIOFFI: Okay.
MR. MCHUGH: The time is 1:46 p.m. We're going off the record.
(Whereupon, a brief recess was taken.)
VIDEOGRAPHER: The time is 2:11 p.m. We are back on the record.
BY MR. MCHUGH:
Q. I'm going to try to clarify one matter and then --
**A. Okay.**
Q. -- we'll stop, but we're not finished.
**A. All right.**
Q. I'll discuss that with Mr. Cioffi.
With respect to the interrogatories that I showed you that were marked as Exhibit 2 -- and I told you about the bank's objection and then the documents that were produced to you. And we read those for Mr. Cioffi. Did that put you back in the frame of mind?
**A. Okay.**



Q. Okay. The question that we asked was: "State the factual basis for the defendant's decision to appoint Timothy N. Spence as president in 2020." And the four documents that I showed to you are these four that are attached?
**A. Okay.**
Q. All right. Do you agree with that?
MR. CIOFFI: Objection. Again, he's only here as a fact witness. There's no foundation that he has any personal knowledge about these things.
MR. MCHUGH: Well, that doesn't make sense.
MR. CIOFFI: Well, ask him and then we can go on.
MR. MCHUGH: Well, they -- all right.
BY MR. MCHUGH:
Q. You understand that these are the four documents that they've identified and I asked you about those?
MR. CIOFFI: Objection. You're asking him to accept your representation.
MR. MCHUGH: All right. Michael, we'll do --
MR. CIOFFI: Ask him if he's seen the interrogatories before.

MR. MCHUGH: We'll do it your way. We'll do it your way.
MR. CIOFFI: Ask him.
BY MR. MCHUGH:
Q. I apologize for this, Mr. McAllister. I'll hand you what's marked as Exhibit 3. And I'm going to ask you if you can pull out of that section out of Exhibit 3 the document that is marked 1074 to 1079.
**A. Okay.**
Q. Do you have that, sir?
**A. I do.**
Q. Okay. Can I ask you next to pull out the document that is marked 1033 to 1040?
**A. Okay.**
Q. Do you -- do you have that, sir?
**A. I do.**
Q. Can I ask you next to pull out the document that is marked 0954 to 0976?
**A. It starts at -- wait a minute. No.**
Q. Do you have that, sir?
**A. I do.**
Q. All right. And, lastly, I'm going to ask you if you can pull out of that set the document that is marked 6977 to 7015?



**A. Okay. I have it.**
Q. Do you have all four of those documents in front of you?
**A. I do.**
Q. All right. Thank you. Now, I'm going to read to you the two questions that were asked to give you a framework for answer. And I know you're not the bank. I know you're Michael McAllister. We asked the bank to tell us the factual basis for their decision to appoint Mr. Spence president and to identify all criteria which Fifth Third considered in selecting Timothy N. Spence for the position of president of Fifth Third Bancorp. Okay?
**A. Okay.**
Q. To repeat what you told me, Mr. Carmichael cannot appoint Mr. Spence?
**A. Correct.**
Q. That's solely a board decision?
**A. Correct.**
Q. You have the four documents that were identified in both of these answers to interrogatories. We just went through that, correct?
**A. (Witness nods head).**
**Now, would you be so kind as to tell me with regard to Exhibit 3 -- oh, I'm sorry. Here, let's do -- let's make this really easy. Can I have those, please?**



MR. MCHUGH: Michael, I'm going to mark these as individual documents.
MR. CIOFFI: No. It's going to confuse the record. You've already marked them as 3. Just ask him your question.
MR. MCHUGH: All right. Very good. We'll keep them like that. Go ahead.
(Off-the-record discussion.)
MR. MCHUGH: Would you make four tabs for me, 3A, 3B, 3C and 3D?
(Whereupon, Plaintiff's Exhibit 3A, Exhibit 3B, Exhibit 3C, and Exhibit 3D were marked for identification purposes.)
BY MR. MCHUGH:
Q. Mr. McAllister --
**A. You're going to trust me to do this Properly.**
Q. Yes, I am. 3A, B, C and D, just as you have them in order.
MR. MCHUGH: That's 3A, 3B, 3C and 3D. Mr. Cioffi, would you like to examine the exhibits as they've been marked?
MR. CIOFFI: I can see them from where they sit.



MR. MCHUGH: Okay. Very good.
THE WITNESS: I think we got it right.
BY MR. MCHUGH:
Q. Mr. McAllister, with respect to Exhibit 3C --
**A. Okay.**
Q. -- it is a document called Executive Assessment Development Report. It appears to be dated July 31st, 2020 and it's signed by Mr. Beaudin or Beaudin or however his name is pronounced.
**A. Okay.**
Q. My first question to you is, do you remember seeing this report? Reading and reviewing this report?
**A. I don't remember it.**
Q. All right. Now, may I take you then to Exhibit 3A? Do you see that 3A precedes 3C in the dating?
**A. Yes.**
Q. And do you see that the -- this is a proposal to establish the winning formula in the developing model for the selection of the CEO and the identification of the central leadership behaviors?
**A. How did you describe this?**

Page 129

Q. This is the proposal for Mr. Beaudin to identify the winning formula and to outline the essential leadership behaviors that he is evaluating?
**A. Where does it say -- it doesn't say proposal anywhere.**
MR. CIOFFI: Objection. It's your characterization. Why don't you ask the witness about the document instead of giving him your characterization of it. It's totally improper. Objection.
MR. MCHUGH: I'll be happy to do that.
BY MR. MCHUGH:
Q. Tell me what Exhibit 3A is, please, to the best of your knowledge.
**A. 3A is the outline of what we're trying to seek out in finding a CEO.**
Q. The proposed 3A?
**A. This is -- I don't know the answer to that. The board as a group sort of developed this over time, but I don't know. I'm not sure who reduced it to a document, but this is the board's thinking about what we're looking for.**
Q. And this identifies the -- on the two and a half pages, are these the criteria that you talked about

Page 130

earlier when you said I could name a dozen criteria?
**A. I wouldn't say criteria. I would say attributes.**
Q. Okay. This is the document that you were identifying?
**A. Yes.**
Q. Okay. So with respect to establishing strategic direction, you see the three paragraphs there, right?
**A. Yeah.**
Q. All right. What factors did you consider in comparing Philip McHugh for these positions -- for this position?
MR. CIOFFI: Objection. Assumes facts not in evidence. You can answer.
THE WITNESS: I'm not sure how you characterized it. Try it again so I can --
BY MR. MCHUGH:
Q. Let me ask it this way: What strengths does Mr. Spence have that are better than Philip McHugh in terms of establishing strategic direction?
**A. Well, this -- it was Spence's background on strategy. I mean, he comes to the dance with an awful lot here. And this is what he was presenting to the board, was the streety. And so far we were interested**

Page 131

**in the strategy given where the bank was at that time. And so, I mean, that's not a comparison.**
Q. All right. It says, "The CEO must possess the vision to outline a balanced strategy of organic growth, acquisitions and optimization rooted in deep knowledge of the banking industry."
Do you see that?
**A. I do.**
Q. Do you believe that Mr. Spence had a better knowledge of the banking industry than Mr. McHugh did?
**A. I would say the subjective evaluation of the board on all of these things is that collectively Spence was in a better position to take the job.**
Q. The subjective evaluation --
**A. Because you're never going to come up with specific criteria on this. There's no map associated with this. It's judgment based on what we hear from people over time, the presentations they make, their broad-based thinking. That's how you figure this out.**
Q. All right. Do you have any other criteria other than this subjective determination by the board based upon what they hear?
MR. CIOFFI: Objection to the form of

Page 132

the question. Hear when?
MR. MCHUGH: Just -- just answer -- I'll be happy to rephrase it.
THE WITNESS: Try it again.
BY MR. MCHUGH:
Q. Sure. What else do you have other than the subjective determination by the board which identifies factors?
**A. You have the experience of listening to these people in meeting after meeting and hearing what they're thinking, what they think needs to be done, their view of the world. That's what you have, is our experience over time.**
Q. Okay. Do you have any document that memorializes or records those factors?
**A. Specifically I can't think of one.**
Q. Okay. All right. There is a notion of an essential leadership behavior as a driving execution for the bank. Where is Tim Spence's capabilities exceeding Philip McHugh in that regard?
**A. Are we going to go through this and compare every single one side by side? Because you're going down the wrong path.**
Q. Well, I just --
**A. This is not the way -- this is not the way**

**this is done, the way you're trying to do it.**

Q. Well, I'm just asking you then -- I appreciate you indulging my question, but I'm trying to see -- I understand what you're telling me in terms of the subjective knowledge. And I'm asking you do we have anything other than subjective knowledge?

**A. We have the experience of listening to these people present their business plans, what they think about the industry, their results. I don't know what else you would need to come to an opinion.**

Q. What is the last presentation that you can recall made by Philip McHugh to the board?

MR. CIOFFI: Objection. Again, not a memory test. It's in the minutes. You have the minutes. Why don't you show it to him?

THE WITNESS: I don't know.

BY MR. MCHUGH:

Q. Do you remember -- do you remember the last presentation that was made by Philip McHugh?

**A. I do not.**

Q. Okay. Do you remember Philip McHugh being away from the last board meeting from illness due to the covid pandemic?

**A. No.**



Q. In the last two or three years, who made more presentations to the board, Philip McHugh or Timothy Spence?

**A. Oh, I don't know the actual math on that. It would be close because both of them presented at most meetings something, you know, so...**

Q. So in -- in your sense, was that there was sufficient exposure that you had to both executives to enable you to make the determination that you did?

**A. Yes.**

Q. Okay. Were you given any reports or data by Mr. Beaudin or anyone elsewhere there was an attempt to quantify the information that are identified in this winning formula?

**A. Do that one again.**

Q. Sure. Were you given any hard data to address these items?

**A. From the consultant?**

Q. Yes, sir.

**A. That we're hiring of their opinion.**

Q. Okay. So the answer to that would be no?

**A. Yes.**

Q. Okay. Are you --

**A. They may have some quantitative thing they do, but at the end of the day they're giving us their**



**opinion.**

Q. Right.

**A. Right.**

Q. And the -- did you ever see any employment engagement -- employee engagement surveys or summaries affecting Mr. Spence?

**A. If so, I don't recall it. I mean, I know the bank does them, but I think by the time it gets to the board it's pretty high level.**

Q. Do you remember any discussions at the board level about Mr. Spence's lack of structure and organization?

**A. I do not.**

MR. CIOFFI: Objection.

BY MR. MCHUGH:

Q. Do you -- do you remember any discussions at the board level about Mr. Spence's need to develop the skills to communicate more directly and succinctly?

**A. No.**

Q. Do you remember any comments or discussions at the board level about Mr. Spence being defensive when challenged?

**A. No.**

Q. Do you remember any discussions at the board about whether Mr. Spence can make correct talent



decisions?

**A. Nope.**

Q. Do you remember any discussions at the board regarding evaluations of Mr. Spence's ability to spend and invest enough time in developing personal relationships?

**A. No.**

Q. Do you have any recollection, Mr. McAllister, of looking at a SWOT analysis of strength, weakness, opportunities and -- that type analysis for Mr. Spence?

**A. If there was one, I don't recall it.**

Q. Okay. And as I understand your testimony, from your perspective, from at least 2019 -- at this point in 2019 on, Tim Spence was the only candidate and Philip McHugh was never a candidate?

**A. That's true.**

MR. MCHUGH: All right. I think at this point what I'm going to do is suspend the deposition because we have some outstanding discovery disputes with Mr. Cioffi. I don't want to bother you with those. Thank you for your courtesy and time, but -- and hopefully we won't speak again, but if we do it'll be here. And I, again, thank you for your courtesy.

MR. CIOFFI: Just for the record, I'll recognize you've tried to reserve rights to keep the deposition open. I recognize you've tried to do that. We don't agree that you have any such rights.

MR. MCHUGH: Yes. And excuse me. Thank you for reminding me. There's also the reason that you instructed him not to answer certain questions on the assertion of privilege and I'm preserving that as well.

MR. CIOFFI: Well, you have the right to --

MR. MCHUGH: Thank you. I have a right to speak.

MR. CIOFFI: -- whatever remedy. So I have some questions.

DIRECT EXAMINATION

BY MR. CIOFFI

Q. Mr. McAllister, Mr. McHugh asked you some questions about from 2019 forward Tim was the only candidate. Do you remember that question just now?

**A. (Witness nods head).**

Q. You testified earlier that over a number of years the consensus developed --

MR. MCHUGH: Objection to the form of



the question. This is redirect.

MR. CIOFFI: Okay. State your objection.

MR. MCHUGH: I just did.

Q. Okay. Over -- was it your testimony earlier today that over a number of years the board began forming consensus that Tim Spence was the best candidate?

**A. Yes.**

MR. CIOFFI: Let's mark this as -- just continue the numbering.

(Whereupon, Defendant's Exhibit 7 was marked for identification purposes.)

Q. Please look at Exhibit No. 7, please. Look at the first page. What is that document?

**A. Executive Succession Planning.**

Q. Is it a document from -- from what executive session planning meeting?

**A. It looks like August.**

Q. And what -- what's the date on the document?

**A. 2017.**

Q. Is it -- no. Look at the front page.

**A. Oh, front page. December of 2018.**

Q. If you turn to the last page of that document, read into the record the caption of the document?



**A. "Strategic Talent Opportunities Planning for Future Talent Moves."**

Q. There are a series of bullets after that, right?

**A. Yes.**

Q. And what's the first bullet?

**A. Tim Spence.**

Q. And after Tim Spence what?

**A. CEO.**

Q. And after that there are a number of other --

**A. Yep.**

Q. -- talent opportunities; is that correct?

**A. Correct.**

Q. Is Phil McHugh listed anywhere there?

**A. No.**

Q. Based on this document, does it refresh your memory as to when the board began developing its consensus that Tim Spence was the best president and CEO candidate?

**A. Like I say, this sounds about the right time line, so...**

Q. 2018?

**A. Something in that range, yes.**

Q. Why did the board begin forming this consensus at least as far back as 2018 that Tim Spence possessed



the qualities to be the CEO and president?

MR. MCHUGH: Objection. Competency.

**A. Say it again.**

Q. Why did the board form this consensus that Tim Spence as early as 2018 demonstrated the qualities that would make him the best candidate for president and CEO?

**A. Again --**

MR. MCHUGH: Same objection. Excuse me.

MR. CIOFFI: What's your objection?

MR. MCHUGH: My objection is he can't speak for the board.

MR. CIOFFI: Well, let's just clarify this.

Q. So, first of all, did you form that opinion?

**A. I did.**

Q. And did you discuss that opinion at board meetings?

**A. Yes.**

Q. And through those discussions, did you learn what the board thought?

**A. Yes.**

Q. Okay. And based on that consensus, why is it that the board began developing that consensus in 2018?

**A. Well, I mean, we've been watching all this -- you know, again, meeting after meeting for a couple of**

**years and the board -- again, we talk about the succession all of the time because it is a primary responsibility of the board to make sure there's a CEO in place. So it's not like it was an event. It was like a process that we basically -- every meeting there's some conversation about that and people would respond, you know, that was actually pretty well done or this was interesting and da da da da da. That's how -- you know, that's how it happens and just over time people kind of come to the conclusion that this -- you know, this -- this is making a lot of sense, so...**

MR. CIOFFI: Would you mark this as the next Exhibit, please. Jennifer, is that 8?

THE COURT REPORTER: Yes.

(Whereupon, Plaintiff's Exhibit 8 was marked for identification purposes.)

Q. When you talk about this process over a number of years, do you have any experience of your own personal knowledge of this process?

**A. A lot.**

Q. Describe, first of all, your background and number of years in which you were a CEO?

**A. Well, I was -- I became a hospital CEO at the age of 25. Humana was a company that used to be in the hospital business, so I kind of came up through the**



**company as a hospital CEO. And then when they -- we got in insurance business, I ultimately ended up on the insurance side of the business. The company was split in two and I became a divisional president. It was some point in the insurance business ultimately finding my way to the CEO job in 2000. And served as their CEO until 2012, stayed on as chairman until 2013.**

**And then after the passage of healthcare reform, I announced to my board I was going to be going. So I spent the next couple of years preparing for my replacement. Unfortunately, I had to go to the outside to do that. I had a COO which was terrific. I mean, he kept the trains running. He was good, but he was not going to be going to the CEO job. He knew it, we knew it, the board knew it. And so we ended up bringing somebody from the outside, spent about -- I don't know -- 18 to 24 months kind of getting him ready and then I stepped down.**

Q. In your experience, CEO's have a senior executive management team; is that correct?

**A. Correct.**

Q. And at Fifth Third, that's called the enterprise team; is that right?

**A. I think that's the title, yep.**

Q. In your -- based on your experience, can you



explain the difference between the qualities needed to be CEO and the qualities needed to be a member of the management team with his or her specific responsibilities?

**A. Well, through my own experience. I sort of got thrust into the job because I was an operator running a division. And so all of a sudden I'm now dealing with Wall Street and a whole level of different financial issues and, you know, team building and endless things that were way different than anything I had ever done just running a division as an operator. I had about half of the company at that time.**

**So it was just a different skill set in terms of -- they tended -- some of it tended to be soft stuff, leadership skills, the ability to motivate and encourage people and, you know, bring about a passion for performance from them. Dealing with the street is a whole new deal. You're managing a balance sheet which you never really manage when you're running a division. And you've got to -- generally you have an executive team, which is a bunch of type A's. So you're herding some pretty serious cats usually. So it's just a different -- a different job.**

Q. I want to direct your attention to Exhibit -- I think it was 3, The Winning Formula.



**A. There it is, right here, 3A.**

Q. Yeah. And this document was -- was developed with board input; is that correct?

MR. MCHUGH: Objection. You're leading your witness.

Q. I believe you testified earlier; is that correct?

**A. I did. This was developed with board input and --**

Q. And this was developed -- was it developed after this consensus that was beginning to develop in 2018?

**A. I'm not sure where along the way, but yeah.**

Q. Look at the front page of that document.

**A. I assume we were familiar sort of finalizing our thoughts before we started the process of really deciding where to go next. So, yes, the consensus was building before this was ever produced.**

Q. Does it -- is it fair to say that that document 3C is a way for the board to validate its consensus?

**A. Yes. That's exactly what it was. Basically we've come to an opinion. We wanted to make sure we, you know, had somebody else to take a look at it, which is where 3C came from, and it came back and validated**

**sort of what we believed, so...**
Q. Is it your experience that that is a customary and usual process for a corporation to go through -- for a board of a corporation to go through in its succession choices?
**A. It's relatively routine. I wouldn't say it's a hundred percent, but in my experience, yes, we'll do this kind of work. In my particular case, when I was replacing myself I had -- I had to evaluate about six people.**
Q. Back again. I just want to make sure I get the number right. 3C.
**A. That's -- that's --**
Q. Are there two 3Cs? The winning formula one.
**A. Yep, A.**
Q. 3A. Okay. It's been numbered a couple of different ways. So, again, Mr. John McHugh was asking you some questions about the qualifications or characteristics and he talked about -- if you look at the first page of the document, business management; do you see that?
**A. Yep.**
Q. Establishing a strategic direction, do you see that?
**A. I do.**



Q. Driving execution, do you see that?
**A. Yep.**
Q. Leading teams, do you see that as a qualification?
**A. I do.**
Q. Interpersonal, do you see that as a qualification?
**A. I do.**
Q. Influencing, do you see that as a qualification?
**A. Yes.**
Q. And over the years in which the board was developing a consensus that Tim Spence was the best candidate to be president and CEO, did the board evaluate Tim Spence's vis-a-vis these qualification?
**A. I wouldn't say we went and ticked off a list, but basically these are the things we were looking for. So this was an effort to kind of, you know, put it all down so we would be pretty robust about how we thought about it, so -- but yeah, that's how it came about.**
Q. In the exercise of its sound business judgment, did the board come to a conclusion with respect to Mr. Spence and these qualifications?
MR. MCHUGH: Objection.
**A. We did.**



Q. And what was that conclusion?
**A. The conclusion was he was the best candidate.**
Q. He was the best in comparison to everyone else on the enterprise team; is that correct?
**A. Yes.**
Q. You mentioned before over a period of years as the board was forming this consensus you had an opportunity to observe members of the enterprise team doing their job; is that correct?
**A. Well, at least reporting the work.**
Q. Okay. Did they report this work at the board meetings?
**A. Pretty routinely, yes. And then randomly they would come in with longer term plans and that sort of thing, but every meeting we had a pretty good insight of what was going on.**
Q. Handing you what's been marked as Exhibit 8, I'll represent to you that those are board meetings that have been produced in this case. They're redacted to delete confidential business information. But these are a collection of board minutes beginning in February of 2019 and going forward through October of 2020. I want to direct your attention to the first page. And that's a board minutes from what particular date?
**A. February 28th, 2020. Is that a 6 or an 8? I**



**think it's an 8.**
Q. Turning your attention to the second page, which is Bates stamp 212472, do you see that at the bottom?
**A. I do.**
Q. Would you read the first couple of sentences under strategy update?
**A. "Mr. Carmichael introduced Mr. Spence to provide the strategic update as included in the meeting materials. Mr. Spence began with the digital update. He noted that first that significant progress had been made in 2018 on the digital channel and product adoption and reviewed increases in active mobile customers, new account sales, deposits going through mobile or ATM's and statements suppressed -- statements suppressed. He stated that the rate of accusation was somewhat slowed by the evolution pace in cyber security, technology and that certain capabilities had not yet come on line pending the implementation of information security technology solutions."**
Q. Okay. With -- with respect to the -- the digital channels and digital update, how would you describe Mr. Spence's breadth of knowledge?
**A. Well, the board was confronted with the -- I mean, these fintech companies were starting to**

**emerge and things were changing and the big banks were being pretty aggressive about using technology to run the business and make it more productive and all those sort of things. So this was of particular interest. He had -- he had particularly strong background in this and so we were very interested in this. And he was actually quite good at being able to kind of lay out our -- both our opportunities and our problems, so, you know...**
Q. Would you say his breadth of knowledge was superior to anyone else on the management team?
**A. I would think so, yes.**
Q. And go to the next paragraph, please.
**A. "Mr. Spence then turned to digital transformation. He reviewed efforts to organize and inform the enterprise noting that mark management had -- had built excitement and advocacy by sharing the digit transformation approach with approximately 1,000 employees and then revalidated the stakeholder digital priorities."**
Q. At this moment in time, which was February of 2019, was this digital transformation a matter of importance for the bank?
**A. The board's view of it was it was critical.**
Q. Was Mr. Spence's knowledge and command of this particular aspect of the business superior to others on


the management team?
**A. In our opinion, it was.**
Q. Going to the next paragraph, which is on the next page.
**A. "Mr. Spence then turned to a strategic discussion on bancorp and bank landscape. Mr. Carmichael noted that the Sun Trust BBT merger and the general regional bank landscape had been discussed by the board extensively in executive session. In response to a direct request from Mr. Spence, Mr. Carmichael commented on the potential for synergies in the Sun Trust BBT merger given branch overlaps and whether similar opportunities exist in other industry pairings."**
Q. I'll ask you to stop there. Was Mr. Spence's knowledge of the bank landscape superior to others on the management team?
**A. It was very good. And I would say in my own experience, it's some of the best I've seen.**
Q. How would you characterize, based on your experience of many, many years, Mr. Spence's strategic vision?
**A. Well, this is probably the first thing that the board came to a consensus on was he really had his strategic hat on and understood it. So it was strong, so...**


Q. Was it among the strongest strategic visions that you had seen in your career?
**A. Absolutely.**
Q. Going back in time, had Mr. Spence made other presentations of a similar nature about the bank landscape, about technology, about strategic vision to the board?
**A. Each meeting he basically touched on some aspect of those things. We always didn't do the full bank landscape at every meeting, but it happened a lot, so...**
Q. All right. I know later on in this particular board minute there's a report from Mr. Tuzun. Do you see that?
**A. Yes.**
Q. Is it customary for Mr. Tuzun to report?
**A. He is. He's the CFO.**
MR. MCHUGH: Would you excuse me for one minute. I hate to interrupt, but I have a call from my wife that's an emergency.
MR. CIOFFI: Okay. Well, we can go off the record. Go ahead. Emergencies are important.
VIDEOGRAPHER: The time is 2:46 p.m. We're going off the record.
(Whereupon, a brief recess was taken.)


VIDEOGRAPHER: The time is 2:49 p.m. We are back on the record.
Q. Directing your attention back to Exhibit A, would you go to Page No. -- Bates No. 212513, please?
**A. Okay.**
Q. You see that's board minutes from what date meeting?
**A. September 17th, 2019.**
Q. Do you see the heading "Strategy Market Context Progress and Next Steps"?
**A. Yes.**
Q. Would you read just the first two sentences of the first paragraph?
**A. "Mr. Carmichael then invited Mr. Spence to begin the meeting with a review of market context, progress and next steps as included in the materials in the meeting -- for the meeting. Mr. Spence provided an overview of the annual strategic planning process and noted some new requirements that would become applicable to Fifth Third as a result of conversion to the OCC charter and were in the process of being created."**
Q. Will you read the first sentence of the next paragraph, please?
**A. "Next, Mr. Spence reviewed key political, economic, social, technological and competitive factions**

Page 153

**-- factors shaping the regional banking market."**
Q. Read the next paragraph, first sentence, please.
**A. "Mr. Spence also discussed competitive dynamics in the U.S. banking sector. He noted that following the financial crisis alternative lenders became an important source of capital and liquidity as traditional banking sector entrenched -- retrenched."**
Q. All right. And the first sentence of the next paragraph.
**A. "Mr. Spence then provided further details regarding the taking of market share by alternative lenders."**
Q. The next paragraph please.
**A. "Thereafter, Mr. Spence provided perspectives on the competitive threats posed by venture capital companies, VC's, and trillionaire banks."**
Q. Read the first sentence in the next paragraph, please.
**A. "Mr. Spence then discussed the importance of local regional markets."**
Q. Read -- read the next sentence.
**A. "He noted that sufficient market presence in pivotal regional markets was key to growth and that banking was still predominantly won and lost in local**

Page 154

**markets."**
Q. If you'll read the first sentence in the next paragraph, please.
**A. "Mr. Spence then reviewed trends in financial technology. He noted that fintech companies lead in product innovation, but no one firm has been able to dominate the landscape."**
Q. The first sentence in the next paragraph, please.
**A. "Following the session, Mr. Spence provided a review of the impact of Project North Star."**
Q. Read the next sentence, please.
**A. "He noted that the project was implemented in 2016 to improve profitability and competitive positioning."**
Q. What was Project North Star?
**A. It was an effort to actually drive a lot of efficiency in the company and there's some more organizational changes that were part of it, but generally, it was about, you know, taking technology and processes and making a lot of changes in order to get a lot of expense out of the company.**
Q. Go on to the next page. Read the first sentence of the next paragraph.
**A. "Mr. Spence then provided a detailed**

Page 155

**discussion of progress against specific initiatives under Project North Star as described on slide 162 of the materials for the meeting."**
Q. And then the first sentence in the next paragraph.
**A. "Next, Mr. Spence proceeded to a discussion of lessons learned and conclusions through the implementation of North Star."**
Q. And, finally, the next paragraph, first sentence.
**A. "Thereafter, Mr. Spence reviewed results of tuck-in acquisitions and strategic investments executed under North Star including Franklin Street, Cogo Capital, EPIC Insurance, GreenSky, AvidXchange, Transactis and Dade Systems."**
Q. Finally, the next paragraph.
**A. "Mr. Spence concluded with the current state assessment and discussion of key priorities for the near and medium term. He noted that in the regional banking sector relationship banking was the key strategic differentiator and that key strategic enablers included leading share and attractive markets."**
Q. How did you evaluate Mr. Spence's presentation both in terms of substance, thoroughness and -- and communication skills?

Page 156

**A. Well, personally I looked at this and this is a -- I mean, this is a broad-based review of things. And his -- his knowledge of these things was actually outstanding, deep and he was very articulate about what it really meant to us, so...**
Q. Okay. Did you have a discussion about your impressions with the other board members?
**A. This is the kind of thing that we'd produce in discussion at the executive session. At the end of the meeting we'd say, Tim did a nice job with da da da da da or whatever the thoughts were among the group, but yeah.**
Q. And based on his presentations over time and those discussions following those presentations, did the board form its business judgment as to Tim's qualifications to be president and CEO?
MR. MCHUGH: Objection.
Q. You may answer.
**A. That's exactly how it happened. I mean, over time this is the kind of thing we would have a lot. And so just over and over and the redundancy of it in terms of getting a chance to see him in action, it became pretty clear.**
Q. I note -- continuing with this document, Exhibit No. 8, I note that at the bottom of Page 212515 there's also a presentation by Mr. McHugh?

Page 157

**A. Yep.**
Q. Is that right?
**A. Yep.**
Q. And then on the next page a presentation by a Mr. Anderson; is that right?
**A. Yes.**
Q. Okay. Over the course of several years and several meetings, were the -- there -- did the board have the opportunity to see all of these members of the enterprise team make presentations about the business strategic vision side by side?
**A. They all were before the board regularly. The broad-based strategic vision was usually carried by -- by Tim, but everybody within their own business segment would talk about the strategy they had for their own business, what they were doing operationally and performance and all those sort of things. So we got to see everyone present their business cases, how they were doing and what they thought about their business.**
Q. Based on that assessment, did the board in the exercise of its sound business judgment, make a determination about Tim's qualifications?
MR. MCHUGH: Same objection.
**A. Well, that's how it came about. I mean, it was -- like I said earlier, it's a judgment call at the**

Page 158

**end of the day based on everything we knew and everything we'd seen. And that was the judgment and the consensus that the board came to.**
Q. That determination, that business judgment was the result of a several-year process as you've described it; is that correct?
MR. MCHUGH: Objection. Leading and repetitive.
**A. Well, as I said earlier today, yes. The process was -- it was in some ways, you know, meeting by meeting, but, God, it was a result of conversations, a lot of presentations, a lot of opportunities to see people and it took -- you know, it developed over years.**
Q. Did the board rely on one person's recommendation in making its business judgment as to hiring Tim as the president and CEO?
**A. No.**
Q. Did it rely on one consultant and that consultant's report in making the determination?
**A. That was one input. The whole thing.**
Q. In forming its business judgment to hire Tim as the president, did the board discriminate against Phil McHugh on account of his age?
MR. MCHUGH: Objection. Objection.
**A. I don't even know that age was ever brought**

Page 159

**up, so no.**
Q. Did you even know the age of --
**A. I did not.**
Q. -- of Tim Spence --
**A. It was --**
Q. -- versus the other members of the management team?
**A. It was on a document here somewhere earlier, but that's not something we pay much attention to. When it comes to age basically -- you know, if you're bringing a CEO, you want to make sure they have some running room. So, you know, you don't want to be hiring somebody for two years. So you're looking at somewhere between -- this is -- all companies do this. You try to think in terms of five to ten-year run and that's the way you think about it, so, you know...**
Q. So that five or ten-year run -- it is -- allows one to consider anyone between the age of 40 and 60; is that correct?
**A. I mean, you're not -- there's no hard line even for that, frankly, but that generally is where you'd want to land, yes, if possible, just because of the timelines of getting in the job, finding the next one, getting them ready. I mean, all of this is an ongoing thing.**

Page 160

Q. Did any individual on the board in the exercise of his or her business judgment discriminate against Phil McHugh on account of his age?
MR. MCHUGH: Objection.
**A. Not that I'm aware of.**
Q. Did Phil McHugh ever tell anyone on the board that he wanted to be considered for the position of president or CEO?
**A. I don't think so. I don't know. Not that I'm aware of.**
Q. Not that you're aware of. Did he ever send an email or a letter putting in an application or a petition to be considered?
**A. Not that I ever saw, no.**
MR. CIOFFI: I have no further questions.

RECROSS-EXAMINATION

BY MR. MCHUGH
Q. Mr. McAllister, I'm going to ask you a couple more.
Is it the practice that you've seen in your business career that executives request appointment to the CEO or the presidency's office.
**A. I have seen cases where people make it quite clear what their interests are. So yes. I**

Page 161

**wouldn't -- it's not something you see every day, but it's not unusual to have somebody raise their hand and say, you know -- as a matter of fact, that's how I ended up with my job.**
Q. Did you ever see it happen in the bank business?
**A. Not here, no.**
Q. In fact, it's pretty well established what the succession plan is, isn't it?
**A. You mean in the bank?**
Q. Yes.
**A. Well, I don't know what you mean by established. I mean, we followed the normal pattern that you would normally do in something like this.**
Q. Does your succession plan anywhere say see if anyone is interested?
**A. No. No.**
Q. Does it say anywhere check the box if you want to be a president?
**A. No. I would say that if somebody wants to -- they will generally make it be known, but no, it's not written in the process anywhere or a book. But I -- just the real world case is is that, yes, it gets -- it gets known.**
Q. And you -- if you were going to say it to

Page 162

somebody, you might say it to your immediate superior officer, right?
**A. I don't know who else you'd bother telling, I mean, other than maybe a board member.**
Q. I mean, if it were Phil, the person he would talk to about that would be Greg Carmichael, right?
MR. CIOFFI: Objection. Calls for speculation. If you know.
**A. I don't know. I would speculate. That's all you can do. The answer is is that would make sense.**
Q. That would make sense, right?
**A. Right.**
Q. And, in fact, it might be perceived as insubordinate to go the board and avoid the president and chief executive officer, wouldn't it?
**A. That depends on the -- that depends on the CEO. Some would not be bothered by that and some would.**
Q. Some would be irate by that, right?
**A. Yeah.**
Q. At -- at what point is an executive too old to be considered for president or CEO given your five to ten-year run?
**A. There's no hard line on it. And my experience is, you know, once somebody gets into their 60s, it's --**

Page 163

**it depends -- it kind of depends on the company. What exactly do you need? You know, do you need somebody that's got a two or three-year window that brings specifically exactly what you might want? You would definitely consider somebody like that. But if you're in a situation where you have time and you have some flexibility around setting schedules and going through a process and all that sort of thing, again, you're going to be looking for somebody to be around for five to ten years, so...**
Q. Certainly, Fifth Third Bank had that flexibility?
**A. In this case, yes.**
Q. When you were asked whether Phil McHugh or Tim Spence was the best candidate, you said he was the best candidate. And my question to you is he was the only candidate, right?
**A. Well, it certainly -- you know, yes, at some point that became the facts.**
Q. Are you aware when Mr. Cioffi showed you that -- I think it was 3A when you finally identified it with regard to the perspective management plans in succession where Brian Lamb was listed, where Kevin Lipscomb was listed. Do you remember that document?
**A. Uh-huh.**

Page 164

Q. What time frame was that for?
**A. For those particular jobs?**
Q. Yes, sir.
**A. I don't know if I know off the top of my head.**
Q. Yeah. And if you look at the document, you won't find anything there, will you?
**A. Correct.**
Q. Okay. So that could have been three-year plan, could have been a five-year plan, could have been a seven-year or ten-year plan?
**A. They rarely go out that far, so...**
Q. Five years?
**A. When we look at these things -- if you look at the analysis we look at, we generally don't think beyond five for developing someone. They're too far out, so...**
(Off-the-record discussion.)
Q. I said this was Exhibit 3A. It is not. It was a special exhibit that was marked by Mr. Cioffi. It was called Executive Succession Planning dated September 2018 and it was --
**A. Exhibit 7 --**
MR. CIOFFI: Exhibit 7.
Q. -- Exhibit 7. Thank you very much. And if you look at that, you can see that there is no time frame set on that, right?

Page 165

**A. That's what it says.**
Q. What experience did Tim Spence have with Wall Street before joining the bank?
**A. Before joining the bank?**
Q. Uh-huh.
**A. I don't know.**
Q. Okay. And each of the -- each of the candidates had -- had strengths and comparative weaknesses between Phil and Tim; isn't that the right?
MR. CIOFFI: Objection.
**A. You're -- you haven't characterized -- we only had one candidate.**
Q. Are you familiar with the Life 360 Program?
**A. I generally know what it is, yes.**
Q. What is it?
**A. It's a -- well, I have it myself personally because it comes with the private bank.**
Q. Okay.
**A. It's basically an aggregation of all of your financial life into one place.**
Q. It's been a tremendous success for the bank, hasn't it, in terms of aggregating client well?
**A. You'd have to ask somebody else about that. I'm not real happy with it personally, but it --**
Q. Has the bank retained it, the program?

Page 166

Is it --
**A. Still there?**
Q. -- still there?
**A. It's still there. I occasionally still look at it. It's got a fair number of bugs in it, so...**
Q. It has a fair number of bucks in it? What do you mean by --
**A. Bugs.**
Q. Bugs?
**A. Yes.**
Q. Okay.
**A. So it's a piece of software that was purchased outside the company and brought in.**
Q. Who's responsible for that acquisition?
**A. I don't know.**
Q. Would you be surprised if it were Philip?
**A. I guess not because it tends to be private wealth kind of management sort of documents.**
Q. Were you ever aware -- ever aware of Mr. Spence losing areas of responsibility due to underperformance while at the bank?
MR. CIOFFI: Objection. Vague. What -- losing? What do you mean?
THE WITNESS: I don't know anything about that.

Page 167

BY MR. MCHUGH:
Q. You have no information at all about that. Were you aware of Mr. Spence's areas of responsibility regarding financial integration of NB?
**A. Not specific to the tasks.**
Q. Okay.
**A. But he was in -- he was part of the acquisition team that was part of the big transaction.**
Q. And would you qualify -- or characterize that as a qualified success?
**A. That has been a big success.**
Q. When Mr. Cioffi talked to you about the criteria, he handed you that Exhibit 7. Were there any other documents that he showed you or you discussed with him or that you considered to be evidence upon which the board relied in reaching its decision?
MR. CIOFFI: Exhibit 7 is wrong. It's Exhibit 3A.
MR. MCHUGH: I'm sorry. You showed him Exhibit 7. I thought you --
MR. CIOFFI: I know. That's executive succession planning.
MR. MCHUGH: Right.
THE WITNESS: I would say it more generally.

Page 168

Based on everything you all have put in front of me, I can't think of anything that I haven't seen outside of this.
BY MR. MCHUGH:
Q. Okay. And is there -- as a result of this fairly extensive discussion that we've had this afternoon, is there anything that has led you now to more firmly believe that you did in fact see Exhibit 3B or 3C?
**A. I just don't recall. To be honest with you, I just don't know.**
Q. Okay. All right.
**A. So no. The answer is no.**
MR. MCHUGH: Thank you. I think that's all the questions I have, sir. Thank you.
MR. CIOFFI: One follow-up question.

REDIRECT EXAMINATION

BY MR. CIOFFI
Q. Did anyone tell the board to hire Tim Spence to be president?
**A. No.**
Q. Did the board exercise its own independent business judgment in making that determination?
**A. Yes.**

MR. MCHUGH: Objection. Repetitive. And now argumentative.

**A. Yes.**

MR. CIOFFI: Now, I usually don't argue with my own witnesses, but all right. I have no further questions.

MR. MCHUGH: You do usually argue with your opponents.

MR. CIOFFI: All the time.

VIDEOGRAPHER: The time is 3:09 p.m. We're now going off the record.

___________________________

MICHAEL MCALLISTER

(DEPOSITION CONCLUDED AT 3:09 P.M.)

C E R T I F I C A T E

STATE OF OHIO :
: SS:
COUNTY OF HAMILTON :

I, Jennifer K. Starner, the undersigned, a duly qualified and commissioned Notary Public within and for the State of Ohio, do hereby certify that before giving of the aforesaid deposition, the said MICHAEL MCALLISTER was by me first duly sworn to depose the truth, the whole truth and nothing but the truth; that the foregoing deposition was given at the said time and place and was taken in all respects pursuant to Notice; that the deposition was taken in stenotypy by me and transcribed into typewritten form under my supervision; that the transcribed deposition is to be submitted to the witness for his examination and signature, and that signature may be affixed out of the presence of the Notary Public; that I am neither relative, attorney, nor employee of any party or their counsel and have no interest in the result of this pending action.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal of office at Cincinnati, Ohio, this 23rd day of December, 2022.

My commission expires: March 7, 2024

Jennifer K. Starner, RPR
Notary Public

1 DEPOSITION ERRATA SHEET

Date Taken: December 14, 2022

Case Caption: PHILIP R. MCHUGH vs. FIFTH THIRD BANCORP, et al.

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the ______ day of ____________, 20___.

___________________________________

MICHAEL MCALLISTER

2 DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

SIGNATURE:_______________________DATE:___________

MICHAEL MCALLISTER

3 DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

SIGNATURE:_______________________DATE:___________

MICHAEL MCALLISTER

**WORD INDEX**

< 0 >
**036** 118:6, 11, 16, 17
**06** 42:15
**08** 42:16
**09** 42:18
**0954** 125:19
**0976** 125:19

< 1 >
**1** 4:9 75:11 76:1, 5 80:4 87:18 91:18 95:22 99:20 106:20 171:1
**1,000** 149:17
**1,110** 80:6
**1,111** 80:14
**1,112** 80:15 81:2, 3
**1,115** 81:13
**1,117** 82:5
**1,118** 82:23
**1,126** 83:11, 12
**1,135** 96:4
**1:17** 100:4
**1:21-CV-00238** 1:6 5:8
**1:46** 123:7
**10:00** 1:16
**10:08** 5:2
**101** 4:9
**102** 4:10
**103** 4:10
**1033** 125:14
**1036** 118:15, 20
**1040** 125:14
**1074** 125:8
**1079** 125:9
**108** 4:13
**11** 43:5
**11:13** 59:5
**11:35** 59:8
**11:55** 75:21
**11:57** 75:24
**12:26** 100:1
**121** 4:13
**127** 4:11, 12
**132** 88:18
**137** 4:5
**138** 4:14
**14** 1:16 171:2
**141** 4:14
**14th** 5:1
**160** 4:6
**162** 155:2
**168** 4:6
**16th** 97:19
**17** 65:20
**17th** 77:9 91:16 112:19 152:8
**18** 15:21 65:21 94:23 142:17
**19** 15:21 17:9 19:23 22:23 27:6 65:14 97:23 99:16
**1999** 52:18
**19th** 77:6 89:8 94:14 97:13

< 2 >
**2** 4:9 101:5, 9 105:9, 10, 11, 17 106:4, 5 117:10, 25 123:20 172:1
**2:11** 123:10
**2:46** 151:23
**2:49** 152:1
**20** 15:21 17:9 19:23 22:23 27:6 65:14 171:17
**2000** 6:15 40:25 41:24 65:18 142:6
**2008** 43:8
**201** 2:12
**2011** 24:19 43:8
**2012** 8:7 142:7
**2013** 142:7
**2016** 38:24 65:20 154:14
**2017** 15:20 16:6 107:6 138:21
**2018** 17:8 19:22 22:23 27:6 65:14 96:12 107:14 138:23 139:22, 25 140:5, 23 144:12 148:12 164:20
**2019** 52:18 53:25 71:15 74:19 77:9 79:21 83:18 88:9, 10 90:20 91:13 92:7, 19 94:14 96:12 97:13 108:2 110:22 113:18 136:14, 15 137:20 147:22 149:21 152:8
**2020** 16:7 29:9 32:8 37:16 39:2 71:15 110:22 124:3 128:10 147:22, 25
**2021** 110:22
**2022** 1:16 5:1 170:21 171:2
**2024** 170:25
**20th** 92:1
**212472** 148:3
**212513** 152:4
**212515** 156:24
**21st** 32:8
**23rd** 170:21
**24** 142:17
**25** 141:24
**26** 41:25 43:18
**2623** 2:7
**26th** 34:6
**28th** 147:25

< 3 >
**3** 4:10 102:7 103:1, 4, 7, 9, 13, 14 105:20, 22 117:9, 11 119:2, 17 125:6, 8 126:25 127:6 143:25 173:1
**3:09** 169:10, 15
**30** 10:1
**30(b)(6** 104:22
**30(b)6** 104:5
**31st** 128:10
**34** 50:3, 13 114:25
**34-year** 31:13
**360** 165:13
**39** 115:2
**3A** 4:11 127:13, 14, 20, 22 128:18 129:14, 16, 18 144:1 145:16 163:21 164:17 167:19
**3B** 4:11 127:13, 15, 22 168:8
**3C** 4:12 127:13, 15, 22 128:6, 18 144:20, 25 145:12 168:9
**3Cs** 145:14
**3D** 4:12 127:13, 15, 22

< 4 >
**4** 4:13 101:16 106:1, 6, 21 108:14, 21 120:7
**40** 159:18
**419.885.3597** 2:5
**43560** 2:4
**45** 10:1
**45202** 2:13
**45208** 2:8
**48** 109:22, 24

< 5 >
**5** 4:13 102:1 106:6 120:25 121:1, 5
**513.362.8701** 2:14
**513.533.2711** 2:8
**515** 1:15
**5580** 2:4

< 6 >
**6** 4:5 101:16 122:10 147:25
**60** 159:19
**60s** 162:25
**6977** 125:25
**6991** 120:8

< 7 >
**7** 4:14 138:12, 14 164:21, 22, 23 167:14, 18, 21 170:25
**7015** 125:25
**71** 109:14, 19 110:10, 14
**76** 4:9
**77** 110:13

< 8 >
**8** 4:14 141:13, 15 147:17, 25 148:1 156:24

**85253** 8:5
**8644** 8:4

< 9 >
**956** 118:6
**96** 6:15

< A >
**a.m** 1:16 5:2 59:5, 8 75:21, 24
**abbreviated** 119:24
**ability** 7:17 50:10 136:4 143:15
**able** 30:20 109:11 149:7 154:6
**absolutely** 72:5 85:14 112:25 151:3
**accept** 124:21
**accepted** 9:11 46:19 47:14
**access** 21:19
**accessed** 17:2
**accommodate** 78:23
**accomplish** 11:1
**accomplished** 18:16
**account** 46:23 148:14 158:23 160:3
**accurate** 66:23, 24 118:25 171:10
**accurately** 111:23 112:2
**accusation** 148:16
**acquire** 46:23
**acquisition** 166:14 167:8
**acquisitions** 131:5 155:12
**acronym** 60:21 61:6
**action** 16:13 156:21 170:18
**active** 148:13
**activity** 50:6
**actual** 18:23 70:24 134:4
**address** 8:3 76:12 134:16
**adoption** 148:12
**advocacy** 149:16
**advocate** 99:3
**affixed** 3:13 170:15
**afforded** 32:12
**aforesaid** 170:6
**afternoon** 168:7
**age** 5:23 82:15, 16 85:22 141:24 158:23, 25 159:2, 10, 18 160:3
**agenda** 17:22 18:5 24:4
**aggregating** 165:22
**aggregation** 165:19
**aggressive** 149:2
**ago** 10:7 107:7, 8 114:9
**agree** 36:23 106:22, 23 124:7 137:4
**agreement** 5:19 8:14 9:10 10:19, 20, 25 11:4, 6
**agreements** 10:15
**ahead** 30:22 32:17 35:10 104:25 105:19 127:10 151:22
**air** 52:12 100:24
**al** 1:8 5:7 171:4
**allow** 12:16 44:21 104:9
**allows** 159:18
**alternative** 153:6, 12
**amended** 37:19
**amount** 46:23 60:10 85:15
**analysis** 56:6 93:5 136:9, 10 164:14
**and/or** 82:25 171:11
**Anderson** 157:5
**anger** 40:12
**angry** 29:16 36:22 40:4, 8 63:13 64:18, 19 65:4
**Animal** 67:7
**announced** 29:16 34:22 142:9
**announcement** 31:10 32:22 33:1, 3, 8, 21, 24 34:5, 8, 12, 13, 25 35:1, 15 36:14, 22 38:11 64:13
**annual** 17:24 28:6, 10 70:16 86:7 88:4 152:18
**answer** 7:11, 12, 15, 16, 21, 24 9:7 12:20 14:17 15:4, 10 35:12 38:14, 21 44:21 47:2 49:23 50:16, 20 51:23 69:18 71:20, 24 72:4 73:8 77:24 86:6 90:22 92:2 101:16 104:9 111:16 114:8, 10 117:2 126:7 129:19 130:15 132:2 134:21 137:8 156:17 162:10 168:13
**answered** 27:19 48:25 73:14 114:9
**answers** 101:25 118:7 126:21
**anybody** 41:9 58:22 61:18 71:9 72:8 87:20 93:24 97:19 99:2
**anyway** 66:12
**Apart** 15:19 28:18 106:19
**apologize** 125:5
**appear** 84:19
**APPEARANCES** 2:1
**appeared** 13:22 56:12
**appears** 47:4 77:8 83:11 128:9
**applicable** 152:19
**application** 160:12
**applied** 48:2
**appoint** 121:10 124:3 126:9, 16
**appointment** 160:22
**appreciate** 122:4 133:2
**approach** 77:17 149:17
**appropriate** 45:2 52:21 93:18
**approval** 19:16 26:23 59:16, 17
**approve** 20:3 22:13
**approved** 16:24 21:15
**approves** 26:3, 8
**approximately** 149:17
**area** 46:13 59:11
**areas** 56:2, 3 166:20 167:3
**argue** 47:10 95:8 99:21 169:4, 7
**argument** 36:2
**argumentative** 169:2
**Arizona** 8:5 39:13, 18
**array** 70:4
**articulate** 156:4
**A's** 143:21
**asked** 14:19 30:18 31:23 38:12 43:1 48:24 62:8 71:24 73:14 77:19 104:11 111:15 117:24 119:22 124:1, 18 126:6, 8 137:19 163:14
**asking** 19:5 21:8, 9, 22 31:16 33:5, 18 34:1 35:21 44:16 77:20 86:15, 22 102:17 116:15 117:20, 23 118:3 119:18 124:20 133:2, 5 145:17
**asks** 22:25
**aspect** 149:25 151:9
**assertion** 40:4 137:9
**asserts** 102:1
**assess** 98:18
**assessment** 89:19 97:24 105:23 119:22, 25 128:9 155:18 157:20
**assessments** 90:6
**assignment** 63:25
**assignments** 66:17
**assist** 22:22
**assistance** 26:24
**assisted** 18:4
**associated** 131:18
**association** 40:7
**assume** 11:3 144:15

**Assumes** 83:21 130:14
**assuming** 34:12 111:19
**assumption** 9:8
**AT&T** 46:4, 11 67:4
**ATM's** 148:14
**attached** 77:8 103:23 124:5
**attempt** 134:12
**attended** 16:17 19:1
**attending** 96:22
**attention** 76:7 82:5 101:15 120:7 143:24 147:23 148:2 152:3 159:9
**attorney** 170:16
**attractive** 155:22
**attributes** 130:3
**Audit** 24:24 25:9, 20
**auditor** 25:6
**August** 138:19
**authentic** 111:20
**authenticate** 111:20
**authority** 41:7 49:2 104:5
**available** 25:24
**Avenue** 2:7
**AvidXchange** 155:14
**avoid** 162:15
**awards** 111:12
**aware** 33:24 36:17 56:23 66:7 67:9 90:5 92:10 97:7 106:11 112:17 160:5, 10, 11 163:20 166:19 167:3
**awful** 130:23

**< B >**
**back** 11:7 15:22 16:1, 11 20:19 25:9 29:6 33:11 35:14 40:24 41:15 46:16 48:10 54:9 59:9 65:6 75:25 80:22, 24 89:20 100:5 110:3 119:20 120:5 123:11, 23 139:25 144:25 145:11 151:4 152:2, 3
**background** 70:3 85:6 115:25 130:22 141:21 149:5
**backwards** 33:16 115:12 116:1
**bad** 39:1 85:3
**balance** 56:3 143:18
**balanced** 131:4
**BANCORP** 1:7, 15 2:16 5:7 126:12 150:6 171:4
**Bank** 5:21 9:4 10:16, 17 11:22 12:7 13:7 18:4 24:18 27:6 29:2 30:2, 6 31:14 32:19 34:9, 24 35:1 36:10, 17 37:5, 17, 20 38:5, 8, 15, 17, 23 40:11, 17 41:5, 20 42:3, 6, 9, 10, 14, 21, 22 44:11 45:2, 3, 5, 11 46:20, 24 47:9, 13, 19 48:5, 7, 16 50:7, 13, 23 51:18, 22 53:10, 25 54:25 55:11, 24 59:22, 25 66:2 69:24 71:10, 15 97:16, 20 104:6, 7 106:9 108:4 109:20 110:21 115:1 120:17 121:11 126:7, 8 131:1 132:19 135:8 149:22 150:6, 8, 15 151:5, 10 161:5, 10 163:11 165:3, 4, 17, 21, 25 166:21
**banker** 41:3 48:23 49:14
**banking** 40:23 41:16 47:21 48:11, 15 115:16 120:19 131:6, 10 153:1, 5, 8, 25 155:19, 20
**banks** 45:4, 6 149:1 153:17
**bank's** 106:9 123:21
**barring** 52:13 89:15
**base** 26:10, 12
**based** 40:21 52:6 58:25 82:14 93:5 101:18 117:4 131:18, 24 139:16 140:22 142:25 150:19 156:12 157:20 158:1 168:1
**bases** 98:13
**basically** 16:22, 24 24:4 62:23 63:20 68:23 86:7 141:5 144:22 146:17 151:8 159:10 165:19
**basis** 124:2 126:9
**Bates** 80:18 104:2 105:5 110:13 117:14 148:3 152:4
**BBT** 150:7, 12
**Beaudin** 57:8 96:25 97:8 122:18, 20 128:10, 11 129:1 134:12
**becoming** 34:13 50:22 54:25 55:24
**began** 138:6 139:17 140:23 148:10
**beginning** 77:21 144:11 147:21
**begins** 80:6 105:6
**behalf** 2:2, 9 5:17 93:13 104:6, 7
**behavior** 132:18
**behaviors** 128:24 129:3
**believe** 38:10 49:11 56:19 82:2 131:9 144:6 168:8
**believed** 52:21 145:1
**beneath** 117:11
**benefit** 80:16
**benefits** 60:2
**best** 7:17 52:8 58:13 72:20 114:23 119:16 129:15 138:7 139:18 140:6 146:13 147:2, 3 150:18 163:15
**better** 11:18 52:7 53:19 60:22 112:16 116:3 130:20 131:10, 14
**beyond** 44:14 46:25 48:17 49:6 64:10 72:8 84:17, 18 116:23 164:14
**big** 88:2 149:1 167:8, 12
**biggest** 45:4
**binder** 13:25
**bird** 95:13
**bit** 25:15 40:19 63:16 65:10, 13
**Black** 12:14
**Blank** 2:12 5:16
**board** 11:22, 24 18:24 19:1, 15, 16, 19, 22, 24 20:7, 8, 10, 18, 22 21:4, 11, 13 22:9, 12, 15, 17, 24 23:9, 11, 15, 23, 24 24:8, 14 26:3, 8, 13, 14, 23 27:10, 20, 21, 22 28:7, 19, 24, 25 30:10, 12, 24 32:20 35:3 36:11, 18 41:20 43:7 44:23 45:16, 17 47:19 48:8, 12 51:9 52:6, 20 53:24 54:2, 4, 20, 21 56:8 58:8 59:13, 16, 17 61:13 62:19, 23 63:8, 9 66:14 67:3 68:11, 20 70:9, 22 71:6 73:13, 17 74:5, 11, 13, 16, 23 76:10 77:9, 10 79:11, 20 80:4 81:4, 7, 15 82:7, 21 83:4, 13 84:6, 24 85:10, 12 86:1 87:2 88:1, 9 89:9, 18, 22, 25 90:9, 14, 20 91:16, 17 92:11, 16 93:8, 11, 13 94:3 95:2, 4, 8 96:16 97:10 98:1, 4 99:2, 3, 7 100:12, 23 101:2 105:8, 13 106:13, 14 107:14, 15, 21 112:19 113:24 116:13, 16, 18 119:8, 13, 18, 22, 25 121:10

126:18 129:20 130:25 131:13, 23 132:7 133:12, 23 134:2 135:9, 10, 17, 21, 24 136:3 138:6 139:17, 24 140:4, 11, 16, 20, 23 141:1, 3 142:9, 15 144:3, 8, 20 145:4 146:12, 14, 22 147:7, 11, 18, 21, 24 148:24 150:9, 23 151:7, 13 152:6 156:7, 14 157:8, 12, 20 158:3, 14, 22 160:1, 6 162:4, 15 167:17 168:20, 23
**boards** 53:18
**board's** 69:3, 7 91:3 116:2 129:22 149:23
**boat** 97:22
**Bob** 37:9 76:9, 22
**Bodan** 58:2
**Bodan's** 58:25
**bonus** 111:11
**book** 161:22
**bother** 136:21 162:3
**bothered** 162:18
**bottom** 148:4 156:24
**bought** 48:3
**box** 161:18
**boy** 42:16
**branch** 150:12
**breadth** 68:13 148:23 149:9
**break** 55:21 59:4
**Brian** 2:16 5:20 12:7 13:3 75:17 163:23
**brief** 10:22 13:16, 17 37:3 59:7 75:23 100:3 123:9 151:25
**briefly** 6:16 7:6 110:24
**bright** 70:2
**bring** 68:8 81:21 143:16
**bringing** 142:15 159:11
**brings** 163:4
**broad** 70:4 106:15
**broad-based** 131:20 156:2 157:13
**broader** 51:11 114:22
**broadly** 49:23 51:11
**brought** 48:10 68:10 70:3 158:25 166:13
**Bruce** 1:16
**bucks** 166:6
**bugs** 166:5, 8, 9
**building** 23:14, 15 143:9 144:18
**built** 149:16
**bullet** 139:6
**bullets** 139:3
**bunch** 143:21
**bus** 53:17
**business** 40:16 47:22 55:5 120:18 133:8 141:25 142:2, 3, 5 145:20 146:21 147:20 149:3, 25 156:14 157:10, 14, 16, 18, 19, 21 158:4, 15, 21 160:2, 22 161:6 168:24
**businesses** 68:14 114:15

**< C >**
**call** 9:15, 16, 21, 24 18:18, 22 19:11, 14 27:15 66:25 68:17 151:19 157:25
**called** 3:4 61:3 80:7, 18 105:3 117:12 128:8 142:22 164:19
**Calls** 9:5 162:7
**candidate** 53:9 56:25 68:24 72:6 88:8 91:8 92:14, 17, 20 94:6, 8, 13 99:13 107:17 112:23 113:17, 22 122:21, 23 136:15, 16 137:21 138:8 139:19 140:6 146:14 147:2 163:15, 16, 17 165:12
**candidates** 54:7, 14, 18 55:10 56:2, 16, 21, 22 71:14, 16 72:25 73:5 84:11, 14 86:10, 23 87:16 92:7, 12 165:8
**capabilities** 132:19 148:18
**capital** 59:14 60:23 74:16 77:2 153:7, 16 155:14
**caption** 138:25 171:3
**captioned** 171:8
**cards** 84:20 91:22
**care** 73:18
**career** 151:2 160:22
**Carmichael** 19:22 28:19 30:6 36:12, 18, 20 37:7, 20, 23 46:8, 9 52:17, 24 53:4, 8, 23 58:20 63:12, 18 66:5 73:4 74:6 77:2 86:11, 25 87:17 89:13 90:16 91:14, 21 92:8, 24 95:5 96:19 97:18 113:18 126:15 148:8 150:7, 10 152:14 162:6
**Carmichael's** 40:4 58:24 67:10 94:21
**carried** 157:13
**CASE** 1:6 5:3, 7 31:17 48:19 63:1 101:13 115:16 145:8 147:19 161:23 163:13 171:3
**cases** 18:22 157:18 160:24
**cast** 57:15
**catastrophe** 72:13
**cats** 143:22
**cause** 15:6
**Cavett** 46:8
**centered** 29:8
**central** 128:24
**CEO** 40:21 45:25 46:10 51:12 52:22 53:16, 19 59:13, 22 60:3, 4, 9 66:9, 12 67:19 68:3, 8, 18 69:14, 23 70:21 74:10 79:7 83:20 84:7 95:8, 9 98:15 114:23 128:23 129:17 131:3 139:9, 18 140:1, 6 141:3, 22, 23 142:1, 6, 14 143:2 146:14 156:15 158:16 159:11 160:8, 23 162:18, 22
**CEO's** 142:19
**certain** 17:25 46:23 47:5 82:4 94:19 137:8 148:18
**Certainly** 163:11, 18
**certified** 5:24
**certify** 170:5
**CFO** 151:17
**chair** 24:21 25:4
**chaired** 19:2
**chairman** 17:21 25:12 30:10 46:9 61:24 62:3 142:7
**challenged** 135:22
**champion** 99:2
**chance** 68:11 156:21
**change** 7:21 29:15 30:24 32:22 35:4 52:11 53:20 68:5 172:4, 7, 10, 13, 16, 19, 22 173:4, 7, 10, 13, 16, 19, 22
**changed** 54:16
**changes** 18:1 23:1 26:5, 21 68:1 154:19, 21 171:11, 14
**changing** 149:1
**channel** 148:12
**channels** 148:22
**characteristics** 114:3 145:19
**characterization** 129:8, 10
**characterize** 65:4 150:19 167:10
**characterized** 130:17 165:11
**characterizing** 116:1
**charitable** 43:24
**Charlie** 26:25
**chart** 112:12

**charter** 152:21
**chat** 71:4
**chats** 90:15
**check** 161:18
**chief** 30:10 162:16
**children** 8:10
**choice** 52:7 56:4
**choices** 145:5
**choose** 35:22
**chosen** 116:14
**Cincinnati** 1:15 2:8, 13 17:9 39:13, 15 41:9 81:24 170:20
**Cioffi** 2:9 4:5, 6 5:16 7:1 8:13 9:5 10:3, 13, 16, 24 11:7 12:2, 15, 21, 23 13:7, 8 14:16, 24 15:3, 11, 15 16:3 21:6 25:23 27:18 30:15, 21 31:18, 22, 25 32:4, 13, 16 33:10 34:10, 18 35:17, 23 38:4, 7, 12, 20 41:22 43:15, 17, 20 44:13, 17, 20 46:25 48:17, 24 49:6, 20 50:15 55:19 65:16, 22 71:18 73:6, 14 74:15 75:3, 8, 15, 20 77:18 78:4, 8, 13, 15, 21 79:8, 15 80:16, 22 83:21 84:1 86:12, 18 87:1, 5, 8, 10 88:22 90:21 100:14 101:12 102:15 103:9, 12, 17 104:3, 15, 21, 25 105:16 107:9 110:1, 5 111:2, 5, 14, 19 112:6 113:1 114:5 116:25 117:13, 18 118:1, 9, 15, 19, 22, 24 121:12, 23 122:4 123:4, 6, 18, 23 124:8, 13, 20, 24 125:3 127:5, 23, 25 129:7 130:14 131:25 133:13 135:14 136:21 137:1, 11, 15, 18 138:2, 10 140:9, 12 141:12 151:21 160:15 162:7 163:20 164:18, 22 165:10 166:22 167:13, 18, 22 168:17, 19 169:4, 9
**circumstances** 31:15 38:18
**City** 42:3, 5, 9, 14 46:20, 24 47:9, 13, 22
**City's** 47:18
**civic** 41:1
**Civil** 1:14 3:6
**claim** 13:10 44:18
**claims** 28:20 29:1, 3 48:19
**clarified** 94:25
**clarify** 7:19 27:23, 25 30:17 123:13 140:12
**clarity** 16:4 21:7
**clean** 7:5, 25
**clear** 23:1 70:5 75:9 156:22 160:25
**Clearly** 49:1 52:5 74:7
**client** 122:6 165:22
**close** 134:5
**closely** 68:19
**coach** 104:17
**co-counsel** 5:14
**Cogo** 155:13
**collecting** 74:1
**collection** 147:21
**collective** 58:15 93:8 98:1
**collectively** 131:13
**combination** 74:9
**combined** 62:18
**come** 32:14 43:18 53:13 68:3 73:4 81:18 83:16 118:19 119:23 131:16 133:10 141:10 144:23 146:22 147:14 148:18
**comes** 26:7, 22 95:3 130:23 159:10 165:17
**comfortable** 54:5 68:23 95:19 110:10
**coming** 40:16 56:12 75:16 89:20 114:14
**command** 149:24
**commence** 69:9
**comment** 37:9, 12
**commented** 150:11
**comments** 16:13 58:19, 21, 24, 25 135:20
**commission** 27:7 56:7 170:24
**commissioned** 170:4
**commissioner** 54:19
**commitment** 66:7, 13 95:18
**committee** 14:23 16:14 17:2 19:3 20:6, 13 21:5 22:3 25:7, 9, 10, 13 27:7, 11, 14, 17, 19 28:4 54:19, 21 56:7 59:14, 15 60:24 61:3, 5, 10, 18, 21, 24 62:3, 4, 9 63:3 83:10 97:8 107:25
**committee/HCC** 62:20
**committees** 24:23, 25
**common** 90:2
**communicate** 68:12 135:18
**communicated** 64:3
**communicating** 7:5
**communication** 18:17 38:8 64:8 66:8 73:3 89:24 96:19 155:25
**communications** 30:8 37:23 38:6, 16 57:8 90:6 98:25
**community** 41:1
**comp** 61:3, 5, 10, 18, 21, 24 62:9, 20 63:3
**comp/HCC** 62:18
**companies** 51:4 148:25 153:17 154:5 159:14
**Company** 2:7 6:22, 24 29:16 41:16 43:9 47:11 54:9 67:6 96:20 98:17 109:3, 4 111:22 115:2, 15 141:24 142:1, 3 143:12 154:18, 22 163:1 166:13
**comparative** 56:6, 15 165:8
**compare** 132:21
**Compared** 114:6
**comparing** 56:1 130:12
**comparison** 56:10, 15 131:2 147:3
**compel** 15:17
**compensated** 25:12 59:24 60:15
**compensation** 26:2, 4, 11, 12 59:13 60:24 62:3 97:8 107:24 109:5, 8 110:19, 20 111:11, 13, 17 112:14
**competencies** 39:6
**competency** 50:4 140:2
**competent** 49:13, 17
**competitive** 152:25 153:4, 16 154:14
**competitively** 115:18
**complaint** 37:19 44:20
**complete** 22:11
**completed** 21:13
**completely** 7:12
**component** 58:3
**components** 112:13
**conclude** 11:24
**concluded** 16:18 20:18 28:16 155:17 169:15
**conclusion** 9:6 24:13 95:3 115:7 141:10 146:22 147:1, 2
**conclusions** 155:7
**conduct** 40:3, 11
**conference** 9:15, 16, 21, 24 10:10, 12 18:22 19:11, 14
**confidential** 147:20
**confirm** 37:4 77:20 102:12

**confronted** 148:24
**confuse** 35:24 127:5
**confused** 65:10 90:22
**confusing** 30:17 34:11 35:18 50:16 65:17
**confusion** 50:19
**connection** 27:5 101:12, 13
**consensus** 51:9 52:12 92:13 94:17 99:5, 13 113:2, 8 137:24 138:7 139:18, 24 140:4, 22, 23 144:11, 17, 21 146:13 147:7 150:23 158:3
**consent** 100:20
**consider** 41:2 48:22 83:1 85:12 99:6 130:11 159:18 163:5
**consideration** 54:6, 24 56:13 96:6, 10, 11 113:16, 19 115:20
**considered** 53:9 54:20 55:9 69:15, 23 70:1 83:4 85:14 87:16 88:9 92:19 96:14 106:23 113:22 116:16 122:24 126:11 160:7, 13 162:22 167:16
**considering** 52:7 83:14
**considers** 74:24
**consistent** 9:3 29:9 74:20
**consolidated** 107:16
**constant** 90:3
**constantly** 92:1
**constitute** 60:23
**consultant** 56:24 122:24 134:18 158:18
**consultant's** 158:19
**consulted** 27:8
**consulting** 93:4
**consumer** 120:17
**contact** 18:3 96:25 97:5, 7, 9
**contained** 20:5 86:4
**Contemporaneous** 15:23 99:18
**content** 14:8
**contents** 109:21
**context** 28:24, 25 63:9 64:7 65:13, 15 90:23 152:10, 15
**continue** 42:24 63:24 138:11
**continued** 30:2 89:16 96:20
**continuing** 156:23
**controller** 42:8
**convention** 22:4
**conversation** 39:15 48:13 63:17 93:3 141:6
**conversations** 29:18 31:4 38:3, 13, 15 39:4 55:2 90:25 158:11
**conversion** 18:13 152:20
**COO** 142:12
**copies** 81:22
**copy** 11:3 109:14 121:25 122:1
**corner** 104:1 108:9
**corporate** 67:10 69:8 74:3
**corporation** 145:3, 4
**Correct** 13:5, 15 21:21 23:22 24:20 25:5 26:9 40:18 41:21 42:4, 23 60:16 66:15 74:25 80:5 82:19 90:23 101:4 102:21 108:1 112:11 126:17, 19, 22 135:25 139:12, 13 142:20, 21 144:3, 7 147:4, 9 158:6 159:19 164:7
**corrections** 171:11
**correctly** 61:9 63:11
**co-trial** 5:12
**counsel** 3:2 5:8, 12 10:16 13:12, 14 14:17 31:18 38:5, 8, 15, 17, 18 121:25 170:17
**counter** 37:4
**COUNTY** 170:2
**couple** 12:3 18:9 34:3 46:18 59:11 72:1 85:11 104:12 140:25 142:10 145:16 148:6 160:19
**course** 55:1, 5 67:14 68:18 84:12 157:7
**COURT** 1:1 3:9 5:4 37:16 80:24 117:22 122:1 141:14
**courtesy** 7:4 30:19 32:12 102:18 122:5 136:22, 25
**covid** 133:24
**created** 152:21
**credentials** 39:6
**credit** 114:24
**crisis** 153:6
**criteria** 51:11 126:10 129:25 130:1, 2 131:17, 22 167:14
**critical** 90:4 115:4 149:23
**criticality** 88:3
**Cross-Examination** 1:13 3:5 4:5 6:1
**crystalize** 99:10
**cue** 108:8
**currency** 42:8
**current** 9:3 155:17
**customarily** 18:17 20:7
**customary** 98:24 145:2 151:16
**customer** 40:24 41:5
**customers** 148:13
**cut** 96:3
**cyber** 148:17

**< D >**
**da** 141:8 156:10
**Dade** 155:15
**Daily** 10:6
**dance** 130:23
**data** 134:11, 16
**date** 22:17 23:8 65:18 69:25 107:18 113:5 138:20 147:24 152:6 171:2
**dated** 128:9 164:19
**dates** 34:3 65:17
**dating** 128:19
**day** 23:9, 11 58:21 67:17 93:9 134:25 158:1 161:1 170:21 171:16
**deadline** 69:4 80:12 97:24 98:3
**deal** 19:17 27:19 143:18
**dealing** 41:8 80:1 143:8, 17
**dealt** 18:8 41:10 45:4
**debate** 121:16
**December** 1:16 5:1 28:12 42:15 70:22 74:19 77:6, 9 89:8 90:20 91:16 92:7 94:14 97:13, 23 107:14 112:19 113:17 138:23 170:21 171:2
**decide** 12:19 26:2 85:2
**decided** 22:7 23:19
**deciding** 144:17
**decision** 35:3 44:11 52:6 57:16 66:14 72:16 79:11 82:21 85:19 87:2 89:4 101:2, 3 106:11, 13 116:17 121:14, 16 124:2 126:9, 18 167:17
**decisions** 89:6, 9 136:1
**deck** 27:15 28:2
**DECLARATION** 171:5
**declare** 171:6
**declared** 113:14
**deep** 131:5 156:4
**Defendant** 2:9
**Defendants** 1:9 5:7, 17, 18

**Defendant's** 4:14 124:2 138:12
**defensive** 135:21
**deficiencies** 51:16, 20
**definitely** 163:5
**delay** 95:5 104:19
**delete** 147:20
**delivered** 20:17
**demonstrated** 40:12 140:5
**departing** 97:16
**department** 22:25 23:25 24:12, 16
**departure** 29:23 38:19 49:19 67:11 69:5
**depending** 85:15
**depends** 162:17 163:1
**depose** 170:7
**deposed** 7:15 122:6
**deposition** 1:11 3:3, 8, 11 5:3 6:5 71:19 74:15 75:4, 12 100:15 136:19 137:3 169:15 170:6, 9, 11, 13 171:1, 8, 12 172:1 173:1
**depository** 46:23
**deposits** 148:14
**depth** 89:23
**describe** 12:12 60:22 110:24 111:8 128:25 141:21 148:23
**described** 64:10 79:1 81:19 155:2 158:5
**designed** 110:25
**detailed** 154:25
**details** 153:11
**determination** 131:23 132:7 134:9 157:22 158:4, 19 168:24
**determinative** 115:11
**determine** 49:4 84:6 85:7 92:16
**detriment** 50:12
**develop** 135:17 144:11
**developed** 94:17 129:20 137:24 144:2, 8, 10 158:13
**developing** 94:25 128:22 136:5 139:17 140:23 146:13 164:15
**Development** 105:24 128:9
**develops** 67:25
**dictates** 60:10
**difference** 6:19 143:1
**different** 33:5 47:25 53:7 64:20 73:19 85:15 119:3, 12 143:8, 10, 13, 23 145:17
**differentiator** 155:21
**differently** 73:20
**difficult** 7:23 58:11
**difficulty** 15:6
**digit** 149:16
**digital** 18:20 148:10, 12, 22 149:13, 18, 21
**digits** 118:18
**diligence** 50:6 58:14
**Diligent** 17:7 18:19, 20 19:10 21:19, 21
**dinner** 39:7, 11, 22
**Direct** 4:5 76:7 78:8 96:25 97:5 101:15 137:17 143:24 147:23 150:10
**Directing** 82:5 120:6 152:3
**direction** 130:8, 21 145:23
**directly** 41:4, 8 49:1 57:9 62:11, 12 97:6 135:18
**director** 24:18 25:16 26:2, 3 42:2, 14, 24 43:3 46:20 47:5
**Directors** 74:16 77:9 98:23 112:19
**disabling** 55:23, 25 114:3
**disagreement** 61:17
**disappointed** 64:23
**discharge** 49:13, 17
**discovery** 41:25 44:14 47:1 48:18 49:7 136:20
**discriminate** 158:22 160:2
**discuss** 123:18 140:16
**discussed** 30:13, 14, 24 32:6 89:21 150:8 153:4, 20 167:15
**discussion** 29:1, 4 31:7, 8 55:7 74:13 84:25 87:22 89:17 91:7, 12 97:12 102:6 127:11 150:6 155:1, 6, 18 156:6, 9 164:16 168:6
**discussions** 29:25 30:5, 8 71:3 91:20 98:5, 21 135:10, 16, 20, 24 136:3 140:19 156:13
**dishonest** 49:11
**disputes** 136:20
**disqualified** 114:4
**disqualify** 52:3, 5
**distinction** 18:25
**DISTRICT** 1:1, 2 5:4, 5 15:8 121:24
**divided** 59:23
**DIVISION** 1:3 5:5 143:7, 11, 19
**divisional** 142:4
**document** 8:17, 20, 24 32:10 35:19, 20 71:20 74:14 77:1, 10, 23 78:2, 25 79:5, 10, 16, 17 80:4 83:23, 25 87:24 102:10 105:2, 8 108:11, 23 109:3 110:6, 13, 16 111:2, 20 112:1 117:2 118:6, 21 120:7, 8 121:6, 9, 13 122:11 125:8, 14, 18, 24 128:8 129:9, 22 130:4 132:14 138:15, 17, 20, 24, 25 139:16 144:2, 14, 20 145:20 156:23 159:8 163:24 164:5
**documents** 9:22 13:18, 21, 24 14:4, 8, 11, 13, 19 16:19 17:3 18:20 21:7 71:4 89:24 92:3 100:15 101:20 102:12 103:8, 22, 24 106:3, 5, 10, 12, 16 108:2 117:4, 5 123:22 124:4, 18 126:2, 20 127:4 166:18 167:15
**doing** 48:11 51:8 62:19 85:4 88:3 92:24 99:16 102:16 104:19 147:9 157:16, 19
**dollar** 60:10
**dominate** 154:7
**dozen** 116:7 130:1
**dozens** 109:5
**draft** 18:21 22:12
**drafted** 93:5, 7, 10
**drafts** 22:25 80:1 88:13
**draw** 16:23 115:6
**drawn** 17:22
**drive** 154:17
**driving** 97:22 132:18 146:1
**due** 58:14 133:23 166:20
**duly** 5:23 170:4, 7
**duties** 26:1 45:11
**dynamics** 153:5

**< E >**
**earlier** 8:13 62:16 71:1 88:13 96:24 98:10 106:17, 20 130:1 137:23 138:5 144:6 157:25 158:9 159:8
**early** 40:24 54:11 70:1, 7 99:12 140:5
**easier** 61:23
**easily** 103:25
**East** 1:15 2:12

**easy** 75:6 78:1 127:1
**economic** 152:25
**educate** 65:12
**effect** 36:14
**efficiency** 154:18
**effort** 53:14 146:18 154:17
**efforts** 149:14
**either** 28:18 46:14 54:19 56:7 62:2 75:7 90:6 94:7 109:24 120:15
**elaborate** 63:16
**email** 9:14 76:9, 12 160:12
**emerge** 79:2 149:1
**emerged** 99:10, 12 113:8
**Emergencies** 151:22
**emergency** 72:11, 22 151:20
**emphasis** 64:17
**Employee** 81:10 82:14 135:5 170:17
**employees** 26:12 149:18
**employment** 135:4
**enable** 134:9
**enabled** 49:4
**enablers** 155:21
**encourage** 143:15
**ended** 51:14 142:2, 15 161:3
**endless** 143:10
**engage** 27:2 36:2
**engaged** 70:9
**engagement** 135:5
**ensure** 7:24
**enterprise** 27:17 28:3 58:19 66:17, 20 83:10 142:23 147:4, 8 149:15 157:10
**entire** 8:24 58:8 70:18 88:4 101:17 171:7
**entitled** 5:6
**entrenched** 153:8
**EPIC** 155:14
**episode** 15:25
**equity** 47:6 60:4
**Erie** 2:7
**ERRATA** 171:1, 13 172:1 173:1
**especially** 77:13
**Esquire** 2:3, 6, 9, 16
**essence** 101:17
**essential** 129:3 132:18
**essentially** 73:3
**establish** 7:4 22:19 34:3, 20 128:22
**established** 17:25 48:7 112:23 116:19 161:8, 13
**establishes** 97:24
**establishing** 59:12 130:7, 21 145:23
**estimate** 6:14
**et** 1:7 5:7 171:4
**evaluate** 39:6 86:10 94:9 96:21 145:9 146:15 155:23
**evaluated** 56:25
**evaluating** 28:3 74:1 83:7 129:4
**evaluation** 56:15, 16, 20 88:21, 23 93:20 106:17, 19 116:2 131:12, 15
**evaluations** 27:15 40:1 70:8 98:25 136:4
**event** 30:1 31:5, 10 72:12 141:4
**events** 19:6
**Eventually** 20:12 22:8 92:23 93:3
**everybody** 21:16 55:3 58:21 113:14 157:14
**evidence** 83:22 130:15 167:16
**evolution** 148:17
**evolved** 56:11
**exact** 25:8 69:25 94:15 99:11
**exactly** 10:7 21:22 32:21 42:18 45:7 70:6 84:15 113:9 144:22 156:18 163:2, 4
**examination** 3:12 4:5, 6 12:18 32:12 137:17 168:18 170:14
**examine** 127:23
**examined** 5:24
**example** 32:2 62:15
**exceeding** 132:19
**excerpt** 109:18
**exchange** 9:22 37:24
**exchanging** 18:17
**excitement** 149:16
**Excluding** 72:24
**Excuse** 45:21 137:6 140:8 151:18
**executed** 10:16 155:12
**execution** 132:18 146:1
**executive** 26:22 30:10 31:13 37:5 45:12 49:24 55:3 58:18 60:15 61:11 62:6, 10 63:4, 25 66:25 67:1 70:18 74:16 77:3 79:21 84:18 90:11, 12 105:22, 23 106:2 109:9 117:12 119:3 120:7 128:8 138:16, 17 142:20 143:20 150:9 156:9 162:16, 21 164:19 167:22
**executives** 74:4, 12 79:5 91:1 114:13 134:8 160:22
**exercise** 146:21 157:21 160:2 168:23
**exercising** 51:17
**Exhibit** 4:9, 10, 11, 12, 13, 14 75:11 76:1, 5, 8 80:4 87:18 91:18 95:22 99:19 101:5, 9 102:7 103:1, 4, 7, 9, 13, 14 106:20, 21 108:14, 19 110:8 111:6 117:9, 15 118:2 120:25 121:1, 5 122:7, 10 123:20 125:6, 8 126:25 127:14, 15 128:6, 18 129:14 138:12, 14 141:13, 15 143:24 147:17 152:3 156:24 164:17, 18, 21, 22, 23 167:14, 18, 19, 21 168:8
**exhibited** 51:17
**exhibits** 118:14 127:23
**exist** 52:1 150:13
**existed** 47:9
**expectations** 30:1
**expected** 20:2 63:23 64:5
**expense** 154:22
**experience** 49:3 58:9 59:1 67:4 114:25 132:9, 12 133:7 141:18 142:19, 25 143:5 145:2, 7 150:18, 20 162:24 165:2
**experiences** 65:11
**expert** 6:17
**expires** 170:24
**explain** 64:2, 18 78:25 143:1
**explained** 10:24
**explanation** 31:14 63:12 64:7, 18
**explanatory** 81:7
**exposure** 68:21 96:23 98:14 134:8
**expressed** 92:11
**extended** 30:19
**extensive** 168:6
**extensively** 63:19 150:9
**extra** 25:15

**< F >**
**facilitate** 109:18
**facility** 21:21
**fact** 6:17 50:2 51:10 55:9, 16 88:3 104:4 111:10 119:23

124:9 161:3, 8 162:14 168:8
**factions** 152:25
**factor** 55:23 57:18 115:4
**factors** 57:19 116:7, 16 130:11 132:8, 15 153:1
**facts** 55:14 83:21 130:14 163:19
**factual** 124:2 126:9
**fair** 32:13, 17 55:14 73:5 120:4 144:19 166:5, 6
**fairly** 14:7 168:6
**familiar** 46:15 144:15 165:13
**familiarity** 63:2
**family** 44:4, 5, 6
**far** 41:23 43:20 44:22 50:12 98:11 130:25 139:25 164:11, 15
**fashion** 93:16
**fast** 70:6
**February** 147:21, 25 149:20
**Federal** 1:13 3:6 42:7
**fee** 25:16
**feel** 33:16 75:6 110:10 114:2
**feeling** 85:3
**felt** 45:1
**field** 41:23 43:21 44:22
**FIFTH** 1:7, 14 2:12, 16 5:6, 20 9:4 11:21 18:4 24:18 27:6 29:2 30:2 38:23 40:11, 17, 23 41:3, 19, 20 43:3 44:2, 8, 11 47:4, 12 48:7, 10, 15 49:14, 18 50:13, 22 53:10 54:25 55:11, 24 59:21 67:8 69:23 101:18 102:1 108:8 109:20 126:11, 12 142:22 152:20 163:11 171:4
**figure** 53:15 67:23 119:21 131:20
**file** 16:11
**filed** 37:17, 20 101:12, 13 111:21 112:2
**final** 19:13 72:15 105:3
**finality** 89:9
**finalizing** 144:15
**finally** 155:9, 16 163:21
**Finance** 25:1, 7, 10, 20, 25
**financial** 43:7 143:9 153:6 154:4 165:20 167:4
**find** 69:7 73:23 76:13 106:5 109:17 164:6
**finding** 129:17 142:5 159:23
**finish** 7:10, 11 30:20 35:12
**finished** 22:9 110:4 123:3, 16
**fintec** 70:4
**fintech** 148:25 154:5
**firm** 26:25 27:2 93:4 154:6
**firmly** 168:8
**First** 7:9 10:2 22:2 32:18 33:4 36:16 41:13 43:3 45:25 67:9 69:22 72:11 76:7 77:13 79:4, 19 85:21 88:20 99:10 102:10 103:14, 23 105:2 117:11 128:13 138:15 139:6 140:14 141:21 145:20 147:23 148:6, 11 150:22 152:12, 13, 22 153:2, 9, 18 154:2, 8, 23 155:4, 9 170:7
**five** 13:13 16:10 45:17, 24, 25 57:2 60:14 65:11 68:3 69:15 82:17 95:21 107:7, 8 123:2 159:15, 17 162:22 163:10 164:12, 15
**five-year** 164:9
**flexibility** 163:7, 12
**flying** 89:24
**folks** 16:23 68:21 83:16 91:5
**follow** 57:3 59:10 67:13
**followed** 15:7 17:20 161:13
**following** 16:1, 25 20:24 32:2 91:21 153:6 154:10 156:13
**follows** 5:24
**follow-up** 92:3 168:17
**foregoing** 170:9
**forever** 95:9
**form** 65:16 70:24 73:6 77:18 85:18 88:22 90:21, 22 107:9 114:5 131:25 137:25 140:4, 14 156:14 170:12
**formal** 28:18 56:15, 17 98:6
**formally** 91:4
**format** 13:21, 23 17:20 18:17
**forming** 113:3 138:7 139:24 147:7 158:21
**Formula** 105:3 128:22 129:2 134:14 143:25 145:14
**formulaic** 70:25
**forth** 101:16 112:17
**forward** 63:21 67:18 87:13 104:20 115:15, 20 122:5 137:20 147:22
**found** 76:16
**foundation** 43:14, 24 44:4, 6, 19 124:9
**foundation's** 44:5
**four** 16:10 62:1 83:5 102:12 106:5 124:4, 17 126:2, 20 127:12
**frame** 10:5 13:8 16:4, 6 37:16 74:20 86:12 99:17 113:11 123:23 164:1, 25
**framework** 77:16 80:7 126:7
**Franklin** 155:13
**frankly** 6:19 36:24 82:9 159:21
**front** 6:11 36:5 76:3, 8 85:2 96:21 101:8 108:17 126:3 138:22, 23 144:14 168:1
**full** 8:2 20:13 30:24 59:16, 17 62:19 151:9
**function** 62:24 63:24
**fund** 47:13
**further** 79:8 89:17 91:17 153:11 160:15 169:6
**future** 39:8 54:5 115:16 139:2
**FYI** 82:8

**< G >**
**game** 90:2
**Gee** 89:20
**general** 13:12, 14 14:10 17:18 45:16 51:11 98:18 150:8
**generally** 15:7 19:21 26:21 45:19 59:21 83:16 85:9 94:22 143:20 154:20 159:21 161:21 164:14 165:14 167:25
**generate** 22:6
**generated** 24:1
**generations** 82:17
**geography** 115:18
**getting** 31:11 41:22 73:21 91:5 93:1, 2 142:17 156:21 159:23, 24
**give** 8:2 25:21 32:5 54:24 99:14 114:24 121:25 123:2 126:6

**given** 45:2 66:16 82:22 86:13 131:1 134:11, 16 150:12 162:22 170:9
**giving** 129:9 134:25 170:6
**glass** 120:13
**Glory** 8:4
**go** 18:23 30:22 32:17 35:10, 14 41:15 46:16 51:24 52:13 54:9 65:6 68:4, 16 75:18 84:25 85:1 94:7 99:24 104:25 105:17 116:7 119:20 124:14 127:9 132:21 142:11 144:17 145:3, 4 149:12 151:21, 22 152:4 154:23 162:15 164:11
**God** 158:11
**goes** 26:23 59:16
**going** 12:15 16:6 17:25 20:15 27:24 36:1, 2 38:7, 13 40:24 44:21 48:11 50:18 51:25 52:13 53:16 55:4, 20 58:12 59:6 62:25 63:21 64:13 67:24 68:7, 25 69:16 71:1 73:20 75:10, 11, 22 76:13 78:6 79:8 85:5, 7 89:15, 20 90:25 91:4 93:2 94:19, 22, 25 95:2, 20 98:9, 15 100:2 101:7, 20 102:9, 10 103:3, 18 104:3, 9, 19 108:17 109:4, 17 111:16 115:15, 17, 19 116:20 121:20, 21 122:5 123:8, 13 125:7, 23 126:5 127:3, 5, 19 131:16 132:21, 22 136:19 142:9, 14 147:16, 22 148:14 150:3 151:4, 24 160:19 161:25 163:7, 9 169:11
**Good** 6:3, 4 14:7 51:8 83:1, 2 85:3 95:8 112:7 127:9 128:2 142:13 147:15 149:7 150:17
**gotten** 119:24
**Great** 17:1 44:2 63:10 70:2
**GreenSky** 155:14
**Greg** 28:19 30:6 66:4 67:10 86:10, 24 87:17 91:14 94:19 95:17, 23 98:12 162:6
**Greg's** 98:9
**group** 16:24 58:19 66:17, 20 129:20 156:11
**growing** 51:9 52:12
**grown** 45:3 92:13 99:6
**growth** 131:4 153:24
**guess** 40:22 54:9 64:5 106:18 166:17
**guessing** 25:22 99:15
**Guy** 57:8 96:25

< H >
**habits** 14:2
**half** 10:23 129:25 143:12
**halfway** 110:14
**HAMILTON** 170:2
**hand** 95:13 102:9 103:3 105:15 125:6 161:2 170:20
**handed** 103:11 105:16, 19 106:3 110:6 118:10, 13 121:4 122:9 167:14
**handful** 6:9
**Handing** 147:17
**handled** 73:20
**happen** 11:21 31:4 33:23 64:13 72:3 161:5
**happened** 22:14 23:2 29:6, 13 32:7 33:2, 9 39:20 47:15, 16 52:11 65:14 90:11, 13 95:7 107:2 119:14 151:10 156:18
**happening** 52:14 91:1 92:25 96:20
**happens** 51:4 70:25 141:9
**happy** 16:9 22:1 27:25 33:15 65:21, 25 75:5 102:19 129:12 132:3 165:24
**hard** 81:21 134:16 159:20 162:24
**hat** 150:24
**hate** 151:19
**HC** 77:2
**HCC** 15:20 16:1, 18 17:8, 18 19:2, 12, 14, 24 20:5, 23 22:3, 13, 16 23:5 24:13 25:4, 13 26:1, 4, 7 27:9, 22 28:1, 5, 7, 19 45:18 53:24 54:19 60:19 63:3
**HCCC** 14:23 24:21 60:17, 22 61:2
**head** 7:23 61:22 120:17, 18 126:23 137:22 164:4
**heading** 152:9
**health** 67:7
**healthcare** 142:8
**hear** 8:15, 16 131:19, 24 132:1
**heard** 57:14 92:20 116:10
**hearing** 132:10
**heat** 11:18
**He'd** 90:17
**held** 49:19 50:14 59:23 112:11
**he'll** 117:2
**hello** 13:17
**help** 12:13 115:6
**herding** 143:21
**hereinafter** 5:23
**hereof** 171:13
**hereunto** 170:19
**high** 68:4 135:9
**highest** 59:24 60:15
**Highlights** 81:10 110:7
**hire** 67:17 158:21 168:20
**hired** 66:5, 8
**hires** 82:25 83:1
**hiring** 116:19 134:20 158:16 159:12
**hit** 53:16
**hold** 22:5 111:15
**honest** 42:11 49:5, 10 58:13 119:21 168:10
**honestly** 25:18
**hope** 68:2
**hopefully** 136:23
**hospital** 141:23, 25 142:1
**hot** 11:19
**hour** 17:19
**hours** 11:15 12:3 85:11 114:9
**HR** 57:8 74:11
**human** 59:14 60:23 74:3, 16 77:2
**Humana** 6:25 40:21 41:11, 12, 13 43:10 46:17 141:24
**hundred** 82:3 145:7

< I >
**idea** 9:25 39:8 86:6 87:14 95:1 107:17
**identification** 76:2, 5 101:6, 8 102:8 103:2, 4 108:15, 18 121:2 122:10 127:16 128:23 138:13 141:16
**identified** 12:16 72:5 86:24 103:8 106:6 118:7 124:18 126:21 134:13 163:21
**identifies** 129:24 132:7

**identify** 12:6, 13 71:16 82:17 101:20 117:13 121:5, 6 122:11 126:10 129:2
**identifying** 130:5
**identity** 12:9 72:25
**III** 2:3
**illness** 133:23
**illustrate** 111:1
**immediate** 162:1
**immediately** 122:15
**impact** 154:11
**impertinent** 8:23
**implementation** 148:19 155:8
**implemented** 154:13
**implications** 115:17
**importance** 149:22 153:20
**important** 36:6 85:19 115:14 151:22 153:7
**Imprecise** 49:21
**impression** 31:12, 13
**impressions** 89:25 156:7
**improper** 129:10
**improve** 50:10 154:14
**inadequate** 115:22
**inappropriate** 65:5 66:12 94:6 104:13
**incident** 64:9
**include** 112:13
**included** 59:24 76:10 148:9 152:16 155:21
**includes** 28:7
**including** 155:13
**incompetent** 49:25
**incomplete** 117:15
**increases** 148:13
**incumbent** 69:4, 9 72:13
**indefinite** 30:15
**independent** 56:20 63:3 71:9 168:23
**independently** 62:21
**indicate** 100:11
**indicated** 97:15 100:11 106:9 171:12
**indication** 109:8
**individual** 85:1, 13 99:8 127:4 160:1
**individually** 26:20 28:5
**individuals** 57:21 84:22
**indulging** 133:3
**industry** 131:6, 10 133:9 150:13
**Influencing** 146:9
**inform** 149:15
**informal** 90:6
**information** 25:24 58:17 73:12 74:1 81:4, 18 82:8 84:9 85:2, 6, 18, 25 86:2, 3, 4, 8, 9 96:11 112:17 122:3 134:13 147:20 148:19 167:2
**informative** 85:21
**informed** 38:17
**initiatives** 155:1
**innovation** 154:6
**input** 58:14 68:18 98:24, 25 144:3, 8 158:20
**inquire** 88:8
**inside** 18:3 38:5
**insight** 147:15
**instance** 20:19 21:2 88:20
**institution** 43:7 47:6 49:24
**institutional** 43:25
**Instruct** 14:17 38:14, 21
**instructed** 137:8
**instructing** 12:20 15:1, 3, 12
**instruction** 15:10
**insubordinate** 162:15
**insurance** 142:2, 3, 5 155:14
**integration** 167:4
**intend** 14:5
**intended** 10:25 112:12
**interaction** 91:3
**interchanged** 64:22
**interest** 9:3 149:4 170:18
**interested** 38:3 130:25 149:6 161:16
**interesting** 94:2 115:14 141:8
**interests** 160:25
**interim** 72:12
**internal** 54:14 56:25 83:1
**Interpersonal** 146:6
**interposed** 101:18
**interrogatories** 102:13 104:8 118:8 123:19 124:25 126:21
**interrogatory** 102:20, 25
**interrupt** 151:19
**intervention** 24:12
**introduce** 5:9
**introduced** 148:8
**introduction** 122:17
**invest** 136:5
**investigation** 40:3
**investment** 41:20 43:13 44:7
**investments** 155:12
**invite** 39:14, 17
**invited** 152:14
**involve** 93:15
**involved** 9:16 43:16 44:2, 10 58:8 62:11
**irate** 162:19
**irrelevant** 117:3
**issue** 43:13 58:19
**issued** 35:1 109:20
**issues** 40:13 91:2 109:5 143:9
**items** 134:17
**it'll** 136:24
**its** 47:5 48:8 59:18 79:11 87:2 94:3 101:19 139:17 144:20 145:5 146:21 156:14 157:21 158:15, 21 167:17 168:23

< J >
**Jennifer** 1:17 3:9 141:13 170:3, 24
**jms@sspfirm.com** 2:9
**job** 54:12 67:22 68:21 72:6 89:16 93:6 114:11 115:13 116:19 131:14 142:6, 14 143:6, 23 147:9 156:10 159:23 161:4
**jobs** 58:11 164:2
**John** 2:3 5:11 25:23 34:11 35:17 41:25 55:19 121:23 145:17
**joining** 165:3, 4
**joint** 5:19 8:14 9:2, 9
**Joshua** 2:6
**judge** 15:16
**judgment** 58:16 59:1 68:17 131:18 146:22 156:14 157:21, 25 158:2, 4, 15, 21 160:2 168:24
**judgments** 51:25 52:2
**Julia** 18:9
**July** 128:10
**jury** 6:11

< K >
**keep** 19:6 72:14 89:20 95:12 116:25 127:9 137:2
**Kentucky** 40:22
**kept** 37:2 142:13
**Kevin** 163:23
**key** 152:24 153:24 155:18, 20, 21
**kind** 30:5 31:3, 10 37:6 40:1, 3 66:21 67:6 69:17 82:8, 11 85:1, 6 94:10 98:11, 17, 18 107:3 126:24 141:10, 25 142:17 145:8 146:18 149:7

156:8, 19 163:1 166:18
**King's** 26:25 27:2
**knew** 95:20 142:14, 15 158:1
**know** 6:15, 19, 20 9:6 10:7 12:9 13:23 21:8 25:8, 11, 18, 21, 23 31:3, 19 32:6 33:1, 8, 25 34:16, 20 35:6 36:2 40:24, 25 41:15 42:6, 18 43:20 44:15, 24 45:19 47:8 49:8 52:16, 23 53:11, 13, 16, 21 54:1, 17 55:6, 8 57:5, 12 58:12 61:22 67:16, 23, 25 68:1, 3, 12, 20 69:19, 25 70:3, 6, 17, 24 71:25 72:1, 8 76:13 81:20, 25 82:20 84:15, 16, 17 85:7, 20 86:16, 18 89:2 90:3, 8, 10, 23 93:1, 19, 24, 25 94:2, 5, 15, 18 95:6 96:12 97:2, 4 98:8, 13, 24 99:11 104:13 107:4, 12, 17, 18 111:25 112:1 113:9, 10, 13 115:17 116:6 118:1, 3, 12 119:4, 11, 14, 16, 17 120:2 122:19 126:7, 8 129:19, 21 133:9, 16 134:4, 6 135:7 140:25 141:7, 9, 11 142:17 143:9, 16 144:24 146:18 149:8 151:12 154:20 158:10, 13, 25 159:2, 10, 12, 16 160:9 161:3, 12 162:3, 8, 9, 25 163:2, 18 164:4 165:6, 14 166:15, 24 167:22 168:11
**knowledge** 52:8 61:16 68:13 104:8 124:10 129:15 131:5, 10 133:5, 6 141:19
148:23 149:9, 24 150:15 156:3
**known** 161:21, 24

< L >
**Lack** 16:3 21:6 135:11
**Lamb** 163:23
**land** 159:22
**landscape** 150:6, 8, 15 151:6, 10 154:7
**language** 10:24
**lasted** 86:14
**lastly** 125:23
**law** 7:2 22:25 23:24 24:12, 16
**lawful** 5:23
**lawsuit** 28:21 101:13
**lawyer** 8:20 12:9, 17
**lawyers** 12:7 13:7 14:2
**lay** 82:11 149:7
**lead** 154:5
**leader** 40:23
**leaders** 27:16
**leadership** 128:24 129:3 132:18 143:15
**leading** 77:14 144:4 146:3 155:22 158:7
**learn** 36:7, 9 140:19
**learned** 32:19 76:4 155:7
**leave** 14:5 90:17
**leaves** 31:14 90:14
**leaving** 36:24 95:18 97:20 98:10
**led** 31:10 32:23 59:1 68:15 94:5 168:7
**left** 13:17 29:17 31:15 34:9, 24 35:1 36:9, 17 64:14 95:20
**legal** 9:6
**legible** 122:15
**legwork** 59:15
**lenders** 153:6, 13
**length** 10:19 13:16 17:18
**lessons** 155:7
**letter** 160:12
**level** 27:10, 11, 20 44:23 49:24 61:13 63:2 71:7 89:22 119:8, 18 135:9, 11, 17, 21 143:8
**Life** 165:13, 20
**light** 72:22
**lights** 72:15
**liked** 54:16
**Limited** 2:3
**line** 29:11 41:7 49:1 104:4 107:19 139:21 148:18 159:20 162:24
**lines** 36:21 51:23 98:19
**Lipscomb** 163:24
**liquidity** 153:7
**list** 54:15 56:12 83:19, 22, 24 84:5 146:16
**listed** 60:4 85:13 139:14 163:23, 24
**listen** 7:9, 11
**listening** 132:9 133:7
**listing** 88:15
**lists** 53:13
**litigation** 6:20 9:4
**little** 40:19 63:16 65:10, 13 95:20
**live** 6:10 8:8, 10
**lived** 8:6 39:16
**LLP** 2:12
**local** 153:21, 25
**locate** 109:11
**long** 8:6 9:24 11:14 12:1 25:6 50:1 67:24 72:15 85:9 94:19 95:12 98:9
**longer** 10:20 32:19 147:14
**long-term** 69:17 94:23
**look** 25:22 26:10, 12 53:12, 18 54:3 58:14, 20 70:18, 20 75:2, 10 81:1 88:4 94:9 95:22 96:2 103:12, 22 114:13 115:16 117:10, 23, 24 119:2
138:14, 22 144:14, 24 145:19 164:5, 13, 14, 24 166:4
**looked** 20:21 54:8, 16 70:9 156:1
**looking** 54:2 73:23 86:23 94:4 104:1 115:12, 14, 19 117:21 118:5 129:23 136:9 146:17 159:13 163:9
**looks** 21:16 26:4 53:20 73:17 75:16 76:25 96:3, 4 106:7 121:19 122:12 138:19
**losing** 52:18 166:20, 23
**lost** 153:25
**lot** 45:18 51:24 58:9 89:23 90:10 94:25 96:23 130:24 141:11, 20 151:10 154:17, 21, 22 156:19 158:12
**Louisville** 40:21 41:10 46:17 48:23 49:14
**lower** 80:17 108:8
**loyalty** 47:17 48:2 50:7
**LPA** 2:7
**lunch** 100:10

< M >
**magnifying** 120:12
**maintained** 16:12
**maintaining** 72:17
**makeup** 82:14
**making** 32:16 82:21 100:12 116:16 141:11 154:21 158:15, 19 168:24
**manage** 41:19 143:19
**managed** 41:23
**management** 26:11, 12, 14, 15, 17 27:16 28:3 50:10 58:18 66:21 74:17 77:3 79:21 84:19 90:14 91:3, 4, 22 97:23

120:19 142:20 143:3 145:20 149:10, 15 150:1, 16 159:6 163:22 166:18
**manager** 43:25
**managing** 43:16 44:3 143:18
**map** 131:17
**March** 170:25
**mark** 75:3, 9, 11 120:24 127:3 138:10 141:12 149:15
**marked** 74:14, 15 75:13, 15 76:2 80:4 87:18 99:19 101:6, 8 102:8 103:2, 4, 13 106:20, 21 108:15, 18 110:7, 13 121:2, 5 122:10 123:20 125:6, 8, 14, 19, 25 127:6, 15, 24 138:13 141:16 147:17 164:18
**market** 26:19 40:22, 23 115:18 120:18 152:9, 15 153:1, 12, 23
**markets** 114:16 153:21, 24 154:1 155:22
**marking** 103:6
**matches** 103:24
**materials** 148:10 152:16 155:3
**math** 60:13 134:4
**matter** 7:4 63:10 96:17 100:16 107:25 123:13 149:21 161:3 171:8
**matters** 41:10 96:13
**mature** 93:1
**maturity** 98:18
**MBM** 76:17
**MBM2045** 76:15
**MCALLISTER** 1:11 3:4 4:3 5:3, 18, 22 6:3 30:18 32:18 33:14 36:5 44:6 59:10 76:3 101:7 102:11 103:25 108:17 117:17 119:2 121:4 122:9 125:5 126:8 127:18 128:5 136:8 137:19 160:19 169:15 170:7 171:19 172:24 173:24
**McCarthy** 2:3
**MCHUGH** 1:5 2:3 4:5, 6 5:6, 11, 12, 15 6:2 12:19, 22 13:1, 3, 11 15:1, 5, 13, 18 27:24 28:20 29:1, 16, 19 30:1, 9, 18 31:21, 23 32:2, 11, 15, 19 33:12 34:8, 24 35:21 36:1 37:17, 24 38:10 40:16 41:2 42:1 43:19, 22 44:15, 19 45:21 48:14 50:22 51:21 52:25 53:9 54:25 55:20, 24 56:7 59:3 65:20, 24 71:23 73:11, 22 75:5, 13 77:25 78:5, 10, 20, 23 79:13, 18 83:25 84:3 86:16, 20 87:4, 6, 9, 12 88:15, 21 91:7, 13 97:12, 20 99:23 100:6, 7 102:9, 17 103:10, 15, 20 104:11, 17, 24 105:18 108:16 110:2, 9, 12 111:9, 15 112:4, 7, 8 113:6, 22 114:4, 7 117:6, 8, 16, 20, 24 118:5, 12, 17, 21, 23 119:1 120:10, 18, 24 121:3, 15, 17 122:2, 8 123:2, 5, 7, 12 124:11, 15, 16, 22 125:1, 4 127:3, 8, 12, 17, 22 128:2, 4 129:12, 13 130:12, 18, 20 131:10 132:2, 5, 20 133:12, 17, 20, 22 134:2 135:15 136:16, 18 137:6, 13, 19, 25 138:4 139:14 140:2, 8, 10 144:4 145:17 146:24 151:18 156:16, 25 157:23 158:7, 23, 24 160:3, 4, 6, 18 163:14 167:1, 20, 24 168:4, 14 169:1, 7 171:3
**McHugh's** 38:18 40:11 74:15 115:23
**mean** 8:23 13:23 19:24 21:7, 9 27:21 29:3 30:16, 22 35:2 36:4 39:3 41:12, 13 43:12, 23 45:15 48:3 49:8 52:12 53:12, 17 57:1, 5 58:7 62:13 63:22 64:10, 19 65:18 66:21 67:13 68:2 69:16 70:1 71:25 82:3 83:22 85:5, 20 86:7 89:3 90:24 91:2 92:18, 23 93:13 94:9, 24 95:7 98:7 100:25 106:16 107:3 109:5 111:20 116:6 119:22 122:4 130:23 131:2 135:7 140:24 142:12 148:25 156:2, 18 157:24 159:20, 24 161:10, 12, 13 162:4, 5 166:7, 23
**Meaning** 86:12
**means** 57:6 82:23
**meant** 34:13 156:5
**medium** 155:19
**meet** 12:1
**meeting** 9:14 11:14, 22, 24 13:19 15:23, 24 16:1, 17, 18, 19, 20, 23, 25 17:18, 23 18:23, 24, 25 19:2 20:18, 24 21:11, 16, 17 22:5, 6, 7, 10, 15 23:4, 5, 9, 21, 24 24:8, 13 28:6, 10, 15, 18 30:12, 23, 24 32:8, 20 35:5 36:11, 18 39:5 47:24 54:21, 22 62:15, 18 70:16, 22 74:10 77:6 81:16, 20 85:10 87:23 88:1 89:1, 7, 8, 22 90:25 91:17 92:12 97:13 100:18, 19 107:14 112:20 114:14 122:12 132:10 133:23 138:18 140:25 141:5 147:15 148:9 151:8, 10 152:7, 15, 17 155:3 156:10 158:10, 11
**meetings** 11:9, 12 17:8, 16, 25 18:22 96:22 134:6 140:17 147:12, 18 157:8
**member** 17:2 19:1 21:4, 5 24:23 25:4, 6 28:1 43:7 45:16, 17 48:8 54:19, 20 61:21 62:4 67:3 74:10 92:16 106:13 143:2 162:4
**members** 27:16, 22 28:3 58:18 76:9 89:18 90:9 92:11 97:7 99:4, 7 147:8 156:7 157:9 159:6
**membership** 63:8
**Memorializes** 121:13 132:15
**memory** 32:7, 17 71:19 100:16 107:4 117:1 133:14 139:17
**mentioned** 8:13 62:16 65:11 147:6
**merger** 150:7, 12
**met** 13:7 51:11
**Metrics** 81:10
**MICHAEL** 1:11 2:9 3:3 4:3 5:3, 16, 22 15:5 35:21 44:16 78:20 84:3 87:6 102:10 110:4 124:22 126:8 127:3 169:15 170:6 171:19 172:24 173:24
**michael.cioffi@blankrome.com** 2:13
**middle** 29:9 95:6 120:18
**Mike** 75:6 123:2

**mind** 19:6 20:16 52:19 55:23 92:6, 9 93:18 100:12 123:24
**mine** 110:11
**minor** 41:16
**minute** 33:12 46:17 55:21 110:1 116:21 125:20 151:13, 19
**minutes** 10:1 13:13 14:22 15:20 16:23 20:7, 9, 11, 21, 22, 23 21:12, 13 22:7, 9, 12, 16, 17, 23, 25 24:1 32:5 71:13 100:14 107:21 119:21 122:12 123:3, 5 133:14, 15 147:21, 24 152:6
**mischaracterization** 87:11
**mischaracterize** 79:15
**mischaracterizes** 79:9 87:1 113:2
**mission** 77:14
**mix** 82:15
**mixed** 65:17
**mobile** 148:13, 14
**model** 128:22
**moment** 67:18 88:2 89:14 113:13 120:6 149:20
**moments** 90:3
**money** 41:19, 23 43:16, 25 44:3 46:22 47:12
**Monroe** 2:4
**month** 10:7 15:24
**monthly** 10:6
**months** 94:24 142:17
**morning** 6:3, 4 8:4, 15
**motion** 15:16
**motivate** 143:15
**move** 46:22 59:11 85:5 87:13 104:20
**moved** 47:21
**movement** 83:1
**moves** 83:2 139:2
**multiple** 39:10 56:21, 22 107:3

< N >
**n01074** 105:6
**nailed** 99:14
**name** 5:11 12:10 13:3 17:6 44:5 85:22 97:1 122:18 128:11 130:1
**named** 69:15 109:8
**names** 72:2
**Nancy** 18:11, 15
**National** 42:3, 5, 9, 10, 14 45:6 46:20, 24 47:9, 13, 18, 22
**nature** 14:8 151:5
**NB** 167:4
**near** 155:18
**nebulous** 95:20
**necessarily** 98:3
**necessary** 26:21
**need** 36:4 67:9 98:15 115:15 116:11 133:10 135:17 163:2
**needed** 19:16 51:12 143:1, 2
**needs** 132:11
**negative** 50:20
**neither** 170:16
**NEOs** 110:19
**never** 16:21 20:2 39:16 52:14 53:1, 2, 4, 9, 16 54:8 58:12 94:7, 24 100:25 113:4, 21, 24 131:16 136:16 143:19
**new** 143:18 148:13 152:19
**Nice** 34:18 156:10
**nicely** 104:12
**No._____Change** 172:2, 5, 8, 11, 14, 17, 20 173:2, 5, 8, 11, 14, 17, 20
**No._____Line** 172:2, 5, 8, 11, 14, 17, 20 173:2, 5, 8, 11, 14, 17, 20
**nobody's** 95:2
**nods** 7:23 126:23 137:22
**nonessential** 111:12
**Noon-ish** 11:25
**Nope** 14:6 40:9 105:14 109:16, 25 136:2
**normal** 55:5 56:24 57:1, 5 161:13
**normally** 81:20 161:14
**North** 8:4 154:11, 16 155:2, 8, 13
**Notary** 1:17 3:14 170:4, 16, 25
**note** 156:23, 24
**noted** 148:11 150:7 152:19 153:5, 23 154:5, 13 155:19
**notes** 10:9 23:18, 23 24:3 103:15, 19 104:1
**Notice** 1:14 3:7 34:25 170:10
**noting** 149:15
**notion** 132:17
**November** 37:16
**novice** 65:9
**number** 63:1 86:14 105:5 117:14 118:25 137:23 138:6 139:10 141:17, 22 145:12 166:5, 6
**numbered** 145:16
**numbering** 138:11
**numbers** 25:21 80:17, 18 104:2 117:16, 19 118:2

< O >
**oath** 55:8, 15 171:15
**object** 33:13 38:7, 14 79:8 104:3
**objecting** 35:25 87:10 104:21
**Objection** 9:5 12:15 13:8 14:16, 24 15:9, 11 16:3 21:6 27:18 30:15 31:18 33:10 34:10 35:17 36:3 38:20 43:15, 17 44:13 46:25 48:17, 24 49:6, 20 50:15, 20 65:16 71:18 73:6, 14 77:18 78:24 83:21 86:12 87:1, 12 88:22 90:21 100:14 101:18 102:1 104:14, 16, 18, 20 106:9 107:9 111:2 113:1 114:5 116:25 121:12 123:21 124:8, 20 129:7, 11 130:14 131:25 133:13 135:14 137:25 138:3 140:2, 8, 9, 10 144:4 146:24 156:16 157:23 158:7, 24 160:4 162:7 165:10 166:22 169:1
**objections** 104:12
**obligations** 42:9
**observe** 147:8
**obviously** 27:21 93:12
**OCC** 44:12 45:1, 12, 15 152:20
**occasion** 16:11
**occasional** 17:15
**occasionally** 166:4
**occasions** 6:8
**occur** 11:12, 16 17:17 18:24 22:2 28:9, 11, 13 52:9 55:7
**occurred** 10:6 17:16 21:17 22:10 29:4 31:2 33:23 34:5 39:9 46:11 93:3
**occurrence** 29:6, 7
**occurring** 97:25
**October** 29:9 34:5 37:15 97:19 147:22
**offer** 64:7, 17 171:14
**offered** 63:12
**office** 160:23 170:20
**officer** 30:10 37:5 42:8 162:2, 16
**officers** 26:23 59:25

60:15 109:9
**offices** 1:14
**official** 170:20
**Off-the-record** 102:6 127:11 164:16
**Oh** 6:9, 14 8:18 10:7 20:21 22:11 25:8 55:20 76:17, 18 99:11 110:10, 11 113:7 122:19 126:25 134:4 138:23
**OHIO** 1:2, 15, 18 2:4, 8, 13 5:5 15:8 17:10 44:12 121:24 170:1, 5, 20
**Okay** 7:12, 18 8:1, 2 11:3 12:22 15:25 17:8 18:10 21:11, 24 22:11, 18, 20 23:15, 18 25:16, 19 26:10, 16 28:10 31:6 32:3 34:4, 5, 21 36:13, 16 44:24 46:16 47:4, 20 50:2, 18 53:22 57:19 58:6, 24 60:12, 21 61:1, 8, 14, 17, 20 62:2, 14, 22 65:8, 15 66:3, 4, 7, 14, 24 67:15 69:12 72:10, 17 74:14 75:1 76:6, 18, 19, 23 77:7, 12 78:12 80:3 81:3, 14, 23 82:6, 16 83:18 84:10, 13 85:12, 25 88:12, 19 92:15, 22 93:22 96:5, 9 97:3, 11 99:9 100:22 101:7, 10, 14, 25 102:19, 24 103:7, 17, 19 104:11 105:20 106:1, 19 107:20 108:6, 13, 22 109:2, 7, 11 110:11, 15 112:21 113:12, 21 114:21 116:4 118:23 119:4, 11 120:2, 4, 11, 20 121:8, 20 122:13 123:4, 6, 15, 25 124:1, 6 125:10, 13, 15 126:1, 13, 14 128:2, 7, 12 130:4, 7 132:14, 17 133:22 134:11, 21, 23 136:13 138:2, 5 140:22 145:16 147:11 148:21 151:21 152:5 156:6 157:7 164:8 165:7, 18 166:11 167:6 168:5, 12
**Old** 12:13 14:2 162:21
**Once** 20:17 61:4 68:1, 8 97:23 162:25
**one's** 117:21
**ongoing** 67:23 69:11 159:25
**online** 16:21
**open** 137:3
**operating** 68:14
**operationally** 157:16
**operator** 98:16 143:6, 11
**opinion** 95:25 133:10 134:20 135:1 140:14, 16 144:23 150:2
**opponents** 169:8
**opportunities** 136:10 139:1, 12 149:8 150:13 158:12
**opportunity** 114:23 147:8 157:9
**opposed** 61:6
**optimization** 131:5
**option** 9:11 81:21 111:12
**order** 51:13 127:21 154:21
**organic** 131:4
**organization** 45:16 88:4 135:12
**organizational** 29:15 30:23 32:22 33:1, 3, 8 35:4 154:19
**organizationally** 69:1
**organize** 149:14
**originally** 66:4
**orwhatever** 75:12
**ought** 54:20 75:8, 9
**outline** 129:2, 16 131:4
**outlines** 81:5
**outlining** 109:4
**outside** 21:4 28:24 54:8 58:14 71:10 93:4 142:11, 16 166:13 168:3
**outstanding** 136:20 156:4
**overall** 23:9, 10 31:8 58:25 114:13
**overlaps** 150:12
**overview** 152:18
**ownership** 47:25

**< P >**
**p.m** 100:1, 4 123:7, 10 151:23 152:1 169:10, 15
**pace** 148:17
**Page** 4:4, 8 10:23 76:8 78:4, 9, 18 79:17 80:6, 14 81:2, 12, 13 82:23 84:1, 8 86:5 88:17, 18 96:3 101:16 103:14 109:13, 14, 18, 19 117:11 121:7 138:15, 22, 23, 24 144:14 145:20 147:23 148:2 150:4 152:4 154:23 156:24 157:4 172:2, 5, 8, 11, 14, 17, 20 173:2, 5, 8, 11, 14, 17, 20
**pages** 75:16 77:21 78:11 81:9 83:4, 5 129:25
**paid** 110:21 111:17 112:4, 9
**pairings** 150:13
**pandemic** 133:24
**papers** 16:19, 21 37:16 101:12
**Paradise** 8:4
**Paragraph** 101:16 102:1 149:12 150:3 152:13, 23 153:2, 10, 14, 18 154:3, 8, 24 155:5, 9, 16
**paragraphs** 130:8
**part** 19:2 20:10 21:3, 20 23:12 27:21, 22 31:8 39:1 45:12 51:1 55:1 59:18 60:9 61:12 62:23 63:22 66:17 67:22 68:21 77:13 89:1 90:17 91:2 106:18 154:19 167:7, 8
**participants** 85:22
**participate** 38:22
**participated** 91:13
**participating** 71:10
**particular** 14:14 63:25 85:17 98:20 99:2 107:18 115:3 145:8 147:24 149:4, 25 151:12 164:2
**particularly** 149:5
**particulars** 115:5, 9
**parties** 3:3 6:20 9:17
**party** 44:8 170:17
**pas@sspfirm.com** 2:9
**passage** 142:8
**passion** 143:16
**path** 132:23
**pattern** 14:3 57:3 161:13
**Patterson** 2:7
**pay** 159:9
**payments** 112:10 120:17
**Peg** 18:9, 15
**PENALTY** 171:5, 6
**Pence** 34:22 121:10
**pending** 5:4 80:21 148:19 170:18
**people** 18:9 26:20 41:8 47:18 51:6 53:13 56:1 58:10 63:1 68:10, 15 69:13 73:24 74:3, 11, 12 83:13, 15, 19 85:8, 15 88:5 114:14 131:19 132:10 133:8 141:6,

10 143:16 145:10 158:13 160:24
**perceive** 7:23
**perceived** 162:14
**percent** 82:4 145:7
**percentage** 47:6
**perception** 51:9 57:25 58:1, 25
**performance** 115:23 143:17 157:17
**period** 53:13 81:6 111:18 147:6
**periodically** 31:4
**periods** 112:5
**PERJURY** 171:5, 6
**perpetual** 69:11
**person** 9:13 12:24 59:23 162:5
**personal** 41:3 48:22 104:7 124:10 136:5 141:19
**personally** 5:18 21:2 33:7 39:5 41:12, 14 57:9 156:1 165:16, 24
**persons** 57:20
**person's** 158:14
**perspective** 57:24 61:10 136:14 163:22
**perspectives** 153:15
**Pete** 99:23
**Peter** 2:6 5:14
**petition** 160:13
**Phenise** 12:24
**Phil** 36:22 49:16 55:2 63:12, 20, 21, 24 64:8, 14, 18 113:22 114:12, 25 120:17 139:14 158:23 160:3, 6 162:5 163:14 165:9
**PHILIP** 1:5 5:6, 12, 15 13:11 28:20 29:1, 19, 25 30:5, 9 32:19 34:8, 24 35:1 36:9, 17 37:17, 24 38:18 40:4, 7, 11, 16, 22 41:2 48:14, 22 49:4, 10, 24 50:2, 22 51:8, 17, 21 52:3, 24 53:9 54:24 55:9, 16, 23 56:6 88:15, 21 89:5 91:7, 13 97:12, 19 115:23 120:9 130:12, 20 132:20 133:12, 19, 22 134:2 136:16 166:16 171:3
**Philip's** 57:25
**phrased** 71:21
**physically** 17:9 81:23
**physician** 6:22
**pick** 58:11
**picture** 114:13
**piece** 166:12
**pile** 54:10
**Pinckney** 18:11
**pivotal** 153:24
**place** 3:6, 7 6:13 18:13 23:7, 13 29:5 31:24 32:1, 4 39:11 51:7 53:19 90:12 101:7 106:4 108:17 141:4 165:20 170:10
**placed** 76:3
**Plaintiff** 1:6, 12 2:2 3:5 5:6, 13
**Plaintiff's** 4:9, 10, 11, 12, 13 76:1, 5 91:18 95:22 99:19 101:5, 9 102:7 103:1, 4 106:20 108:14, 19 121:1, 5 122:10 127:14 141:15
**plan** 67:9 74:17 77:3 161:9, 15 164:9, 10
**planning** 27:3, 5, 12, 20 61:11 70:10, 11, 20 74:24 83:8, 14, 19 106:2 107:6 120:8 138:16, 18 139:1 152:18 164:19 167:23
**plans** 95:5 133:8 147:14 163:22
**please** 7:22 8:3 27:23 29:5 30:17, 22 33:11 40:20 75:2 78:25 79:17 87:6, 13 108:25 116:8 117:9, 10, 14 120:6 127:2 129:14 138:14 141:13 149:12 152:4, 23 153:3, 14, 19 154:3, 9, 12
**plural** 71:14
**PNC** 42:22, 24
**point** 21:22 48:10 52:22 55:13 67:23 68:25 71:1 73:19 79:4 81:5 89:14 94:3 107:16 112:22 136:15, 18 142:5 162:21 163:19
**policy** 47:5, 8, 11
**political** 152:24
**Poole** 12:25 13:6
**pop** 98:11
**portal** 17:1 81:19, 21
**portal's** 17:6
**portion** 122:14
**portions** 122:13
**posed** 153:16
**position** 30:9 42:20 46:19 47:14 49:25 50:3 59:23 71:14 72:11 100:22 101:19 114:4 126:12 130:13 131:14 160:7
**positioned** 26:20 51:6
**positioning** 154:15
**positions** 49:18, 21 50:14 112:9, 10, 11 115:18 120:9 130:12
**possess** 131:3
**possessed** 139:25
**possible** 41:15 50:19 53:15 54:17 69:13, 17 95:12 114:11 159:22
**possibly** 116:6
**potential** 56:2 84:11 86:10, 24 92:12 94:5 150:11
**potentially** 55:3
**pour** 119:20
**practice** 7:2 16:17 19:21 21:18 56:24 57:1 59:21 160:21
**preceded** 18:14 79:24
**precedes** 128:18
**predominantly** 153:25
**preexisting** 40:15
**prep** 18:23
**pre-pandemic** 81:25 82:2
**prepare** 54:12 67:19
**prepared** 18:21 22:16 28:2 49:17 93:11
**preparing** 18:4 22:23 142:10
**presence** 3:10, 13 153:23 170:15
**present** 2:16 5:9 9:19 12:4 17:9, 12, 14 39:21 73:18 74:5 81:23 133:8 157:18
**presentation** 19:10 29:14 53:23 84:6, 19 90:1 116:5 133:11, 19 155:23 156:25 157:4
**presentations** 19:22 27:15 28:2 131:19 134:2 151:5 156:12, 13 157:10 158:12
**presented** 9:10, 11, 13 13:22 17:5 19:18, 20 23:23, 24 26:7 80:3 93:10 119:12, 25 134:5
**presenting** 22:24 73:24 130:24
**preservation** 15:9
**preserving** 137:10
**presidency** 53:10 91:8, 14 122:21
**presidency's** 160:23
**president** 30:6 34:14, 22 38:23 40:22 50:22 51:15, 18, 22 52:4, 18, 25 53:25 54:25 55:10, 11, 24 57:17 59:13, 22 60:8, 9 66:9 69:23 71:15 72:12 73:1 79:3 83:20 84:7 87:17

96:18 100:13 105:23 107:6 110:21 112:24 113:23 121:11 122:23 124:3 126:10, 12 139:18 140:1, 6 142:4 146:14 156:15 158:16, 22 160:8 161:19 162:15, 22 168:21
**president's** 93:2
**press** 43:12
**pretty** 11:19 17:23 41:18, 23 43:20 45:3 70:5, 7 99:12 135:9 141:7 143:22 146:19 147:13, 15 149:2 156:22 161:8
**prevented** 50:22 51:17, 21 55:23
**previous** 80:23
**previously** 112:20
**primary** 141:2
**principal** 18:3
**principle** 48:2
**print** 96:8
**printed** 111:25
**prior** 30:1 34:25 97:19
**priorities** 149:19 155:18
**private** 37:22 41:5 43:13 48:23 165:17 166:17
**privately** 32:25
**privilege** 15:9 137:9
**Privileged** 14:25 38:9, 11, 20
**Probably** 6:14 10:22 12:3 32:21 39:19 40:25 61:3, 25 82:1 95:11 99:15, 16 109:22 119:20 150:22
**probe** 92:23
**problem** 34:10 48:4 60:13 114:12
**problems** 149:8
**Procedure** 1:14 3:7 15:7, 17
**proceed** 69:8 100:8
**proceeded** 155:6
**process** 20:16 39:9 45:13 49:2 51:1 58:7 61:12 65:10 67:8, 12, 23 69:11 70:10 71:11 73:13, 25 79:1 81:1 85:9 86:13 89:21 90:4 91:23 93:16 95:6 96:17 106:18 141:5, 17, 19 144:16 145:3 152:18, 21 158:5, 10 161:22 163:8
**processes** 154:21
**produce** 24:17 156:8
**produced** 108:4 123:22 144:18 147:19
**product** 148:12 154:6
**productive** 149:3
**profile** 93:5, 7 94:8 116:18, 24
**profitability** 154:14
**program** 69:14 165:13, 25
**progress** 9:21 68:2 148:11 152:10, 16 155:1
**progressed** 96:16
**progressing** 85:4, 5 92:25
**progression** 89:16
**Project** 154:11, 13, 16 155:2
**promoted** 51:15
**pronoun** 30:16
**pronounced** 128:11
**pronounces** 97:1
**proofread** 21:7
**proper** 78:21 118:4
**properly** 21:4 111:22 127:19
**proposal** 128:21 129:1, 5
**proposed** 129:18
**protocol** 15:6 16:17
**provide** 148:9
**provided** 10:12 14:14 21:20 26:24 121:21 152:17 153:11, 15 154:10, 25
**provides** 73:12
**proxy** 59:18 60:5, 19 109:1, 2, 7, 12, 20 110:6 111:6, 7, 24
**Public** 1:18 3:14 25:24 47:10 109:3 170:4, 16, 25
**publicly** 25:24
**published** 60:18, 20
**publishes** 59:18
**pull** 95:2 125:7, 13, 18, 24
**purchase** 47:13
**purchased** 166:12
**purpose** 12:17
**purposes** 15:14 34:2 46:18 76:2, 5 83:6, 7, 14 101:6 102:8 103:2 108:15 121:2 127:16 138:13 141:16
**pursuant** 1:13 3:6 170:10
**put** 13:25 108:3 123:23 146:18 168:1
**putting** 115:13 160:12

**< Q >**
**qualification** 146:4, 7, 10, 15
**qualifications** 145:18 146:23 156:15 157:22
**qualified** 167:11 170:4
**qualify** 167:10
**qualifying** 51:21
**qualitatively** 64:18
**qualities** 140:1, 5 143:1, 2
**quantify** 134:13
**quantitative** 134:24
**question** 7:10, 12, 15, 16 8:24 20:15 21:1 27:25 30:20 31:20, 22 33:6, 11, 13, 15 36:7 39:1 44:16 47:2 49:9, 22 50:19 53:7 54:11, 13 55:15 71:21, 22, 24 73:7 77:19, 23, 24 78:16, 17, 18, 22 79:16 80:21, 23 86:6 88:23 90:22 92:6, 9, 10 94:18 105:1 106:15 107:10 111:16 117:2 118:4 119:19 124:1 127:7 128:13 132:1 133:3 137:21 138:1 163:16 168:17
**questioning** 93:1
**questions** 65:15 77:20 87:15 103:18 104:4 106:6 126:6 137:9, 16, 20 145:18 160:16 168:15 169:6
**quibble** 36:5 65:1
**quick** 59:4
**quickly** 24:2
**quite** 103:25 149:7 160:24
**quo** 72:18

**< R >**
**raise** 161:2
**randomly** 147:13
**range** 10:6 45:8 139:23
**rarely** 164:11
**rate** 148:16
**rating** 96:12
**reach** 33:7
**reached** 32:25 33:18
**reaching** 106:13 167:17
**reaction** 64:6, 15 65:4
**read** 8:24 33:10 80:22, 24 96:8 101:17 116:18 120:10, 15, 16 123:22 126:5 138:25 148:6 152:12, 22 153:2, 18, 22 154:2, 12, 23 171:7, 9

**reading** 102:3 120:22 128:14
**ready** 51:14 67:25 69:16 95:1, 3, 24 98:12 100:8 142:17 159:24
**real** 54:4 161:23 165:24
**really** 32:9 44:22 47:21 48:22 54:8 58:12 64:5 82:22 94:24 95:7 100:16 127:1 143:19 144:16 150:23 156:5
**reason** 14:15, 18 49:10, 11, 12, 15, 16 137:7 172:4, 7, 10, 13, 16, 19, 22 173:4, 7, 10, 13, 16, 19, 22
**Reasonably** 99:18
**recall** 6:13 8:18 12:10, 11 15:25 17:5, 11, 15 20:19 21:2 29:11, 13 31:6 35:2 36:15, 19 37:1 39:11, 12, 13 42:11 45:7, 14 47:12 48:13, 20 54:15 55:12, 16, 22 62:4, 7 63:20 72:25 73:2 87:22 91:15 95:17, 25 100:18, 19, 21 107:2, 12, 13 108:12 113:16, 19 120:1 133:12 135:7 136:12 168:10
**recalls** 117:3
**receive** 119:5
**received** 11:6 35:16 40:10 86:22 96:15
**recess** 59:7 75:23 100:3 123:9 151:25
**recognize** 76:8 108:23 110:16 137:2, 3
**recollection** 14:7 16:12 29:10 31:1 32:9 53:22 97:11 100:17 107:21 119:17 136:8
**recommendation** 52:17, 20, 24 89:12 95:23 107:5, 10 158:15
**recommendations** 27:3 56:23 58:2 107:13
**recommended** 120:9
**recommends** 26:4
**record** 5:2, 9 7:5, 25 12:23 35:18, 24 45:19 59:6, 9 75:9, 18, 22, 25 79:9 99:24 100:2, 5 110:5 123:8, 11 127:6 137:1 138:25 151:22, 24 152:2 169:11
**recorded** 3:8 16:2, 13 21:3
**records** 20:6 90:5 121:15 132:15
**Recross-Examination** 4:6 160:17
**redacted** 122:14 147:19
**Redirect** 4:6 138:1 168:18
**reduced** 129:21
**redundancy** 156:20
**refer** 61:1 72:14
**referred** 102:13
**referring** 72:3 80:17 118:3, 16, 17
**reflect** 21:16
**reflected** 20:7, 8 40:12 87:17
**reflects** 76:21 78:3, 25 80:11
**reform** 142:9
**refresh** 16:12 139:16
**regard** 27:12 56:5 64:3 65:14 69:19 92:16 126:25 132:20 163:22
**regarding** 28:19 29:21 30:1, 5, 9 37:23 45:11 48:14 91:13 136:4 153:12 167:4
**regional** 120:18 150:8 153:1, 21, 24 155:19
**regularly** 92:24 96:23 157:12
**regulator** 42:5 45:2
**relationship** 40:16 41:16 48:5, 6, 15 155:20
**relationships** 136:6
**relative** 45:15 47:25 74:22, 23 89:25 90:4 116:6 170:16
**relatively** 10:22 37:3 46:15 54:11 70:1 90:4 145:6
**relied** 57:15, 19 82:20 83:3 106:10, 13 167:17
**rely** 158:14, 18
**remedy** 137:15
**remember** 10:22 25:11 32:18 53:11 63:13, 19 70:16 96:6 98:20, 23 128:14, 16 133:18, 22 135:10, 16, 20, 24 136:3 137:21 163:24
**reminding** 137:7
**reorganization** 64:11
**repeat** 20:15 50:18 126:15
**repeating** 61:6
**repetitive** 158:8 169:1
**rephrase** 33:15 65:21, 22 132:3
**replace** 87:17
**replacement** 67:20 69:8 95:19, 23 142:11
**replacing** 145:9
**report** 19:15 20:3, 5, 6, 8, 10, 13, 17 21:20 24:14 39:25 40:10 57:15 63:17 76:22 77:9 79:19 86:17, 20, 21, 22, 23 87:3, 18 88:13, 14 90:20 105:24 122:20 128:9, 14, 15 147:11 151:13, 16 158:19
**reported** 16:2 37:7 109:19 111:23
**reporter** 3:9 80:24 122:1 141:14
**reporting** 147:10
**reports** 57:20, 21 70:8, 14 134:11
**represent** 5:17 12:24 45:1 101:11 106:8 147:18
**representation** 5:19 8:14 9:2, 9 77:21 124:21
**represents** 79:11
**request** 95:4 101:21 150:10 160:22
**required** 46:22 47:3 109:3
**requirements** 47:24 152:19
**requires** 47:5
**research** 26:19 35:7
**Reserve** 42:7 137:2
**residence** 8:3 39:14, 18
**resign** 42:20
**resources** 74:3
**respect** 13:10 15:8 37:10, 13 42:9 47:9 57:16 62:5, 9 79:20 89:4, 9 123:19 128:5 130:7 146:23 148:21
**respective** 3:3
**respects** 170:10
**respond** 68:15 93:20 141:7
**response** 7:17 102:2, 20, 25 106:6 150:9
**responsibilities** 45:11 49:13, 18 51:18 143:4
**responsibility** 43:6 44:7 59:12 62:5 63:4 67:19 69:3, 7 141:3 166:20 167:3
**responsible** 166:14
**responsive** 101:21
**rest** 90:18

**result** 152:20 158:5, 11 168:5 170:18
**results** 19:14 133:9 155:11
**retain** 50:10
**retained** 165:25
**retrenched** 153:8
**revalidated** 149:18
**review** 8:20 14:22 16:2, 12 17:2, 22 19:21 20:3 22:9, 14 37:16 70:25 81:8 86:7 88:20, 21, 25 89:3 91:21 99:19 152:15 154:11 156:2
**reviewed** 13:18 14:9, 25 15:20 16:24 20:20, 22, 23 60:17 80:9 81:15 112:24 148:13 149:14 152:24 154:4 155:11
**reviewing** 128:14
**reviews** 60:19
**rhythm** 68:14
**ridiculous** 94:11 119:23
**right** 13:4 14:1 15:18 17:17 19:9 21:1, 14, 18 22:6 23:7, 20 24:10, 19 25:19 26:18 29:7 33:13, 17, 22 34:7, 15, 19, 23 35:14, 22, 24 40:17 42:3 47:23 51:7 55:22, 25 59:2, 3, 19 60:14, 15, 24 63:6 65:3 66:5, 18 68:24 71:2 72:7, 19, 21, 23, 24 74:18, 21 75:13 76:24 77:6, 25 78:14 79:6, 23 80:8 81:9 82:5 84:18, 21, 23 87:15 92:21 94:16 95:10, 15 96:2, 15 98:6 101:2 102:5 103:12, 21 105:2, 5 106:4 107:13 108:10 109:25 110:18 111:4 112:13 113:7 115:21 118:9, 16, 19 119:4, 5 120:4, 23 122:18 123:17 124:7, 15, 22 125:23 126:5 127:8 128:3, 17 130:9, 11 131:3, 22 132:17 135:2, 3 136:18 137:11, 13 139:4, 20 142:23 144:1 145:12 151:12 153:9 157:2, 5 162:2, 6, 12, 13, 19 163:17 164:25 165:9 167:24 168:12 169:5
**right-hand** 80:17 104:1 108:9
**rights** 137:2, 5
**risk** 68:4 97:16, 20 98:10
**Road** 8:4 53:18
**Robert** 28:23
**robust** 146:19
**role** 6:17 21:4 27:11 62:5, 9 63:7 93:2
**roles** 30:2
**rolled** 88:10
**Rome** 2:12 5:17
**room** 11:17 23:16, 17 74:10 159:12
**rooted** 131:5
**roster** 55:6 83:16
**round** 25:21
**routine** 89:21 93:3 145:6
**routinely** 147:13
**RPR** 1:17 3:10 170:24
**Rule** 41:25 43:18
**Rules** 1:13 3:6 7:3 36:3
**run** 149:2 159:15, 17 162:23
**running** 142:13 143:7, 11, 19 159:12

**< S >**
**Saba** 2:6, 7 5:14 75:18 99:24
**salaries** 111:24 112:3
**salary** 60:2 111:11
**sales** 148:14
**Sandy** 1:16
**sat** 63:20
**save** 171:10
**saw** 16:20 35:15 77:10 79:20, 24, 25 106:12, 24 107:1 114:13, 20 119:17 160:14
**saying** 53:11 56:1 105:18 119:15 122:18
**says** 34:24 69:4, 9 76:17, 24 77:1 83:23 84:9 101:19 103:7 105:13 108:8 110:6, 14 131:3 165:1
**schedule** 17:24 69:10 80:12
**schedules** 18:5 163:7
**scope** 41:25 43:18 44:14 47:1 48:18 49:7
**seal** 170:20
**seat** 74:6
**SEC** 111:23 112:2
**Second** 7:14 45:21 75:19 99:25 105:8 121:7 148:2
**section** 77:15 80:7 109:11 125:7
**sector** 153:5, 8 155:20
**security** 148:17, 19
**see** 14:11 19:10, 18 21:16 27:14 28:1 32:8 34:2 36:13, 22 47:4 50:12 64:19 68:11 76:12, 17 80:1, 19 83:10 85:23, 24 88:14, 16 101:22, 25 103:5, 6, 23 105:2, 6, 9 108:7 109:14, 18 110:14 117:6, 7, 9 118:10 122:13 127:25 128:18, 21 130:8 131:7 133:4 135:4 145:21, 23 146:1, 3, 6, 9 148:3 151:14 152:6, 9 156:21 157:9, 18 158:12 161:1, 5, 15 164:24 168:8
**seeing** 128:14
**seek** 44:11 58:17 129:16
**seen** 14:20 37:19 40:8 67:13 71:13 88:12 94:7 108:11 124:24 150:18 151:2 158:2 160:21, 24 168:2
**segment** 157:14
**select** 96:17
**selected** 43:25
**selecting** 126:11
**selection** 57:16 79:2 89:10 128:23
**send** 160:11
**senior** 26:11 27:16 28:2 55:2, 3 66:21 85:8 142:19
**sense** 53:6 68:15 124:12 134:7 141:11 162:11, 12
**sent** 11:7
**sentence** 152:22 153:2, 9, 18, 22 154:2, 8, 12, 24 155:4, 10
**sentences** 148:6 152:12
**separate** 19:7, 8
**separately** 28:5
**September** 32:8 152:8 164:20
**series** 139:3
**serious** 143:22
**seriously** 54:8
**serve** 42:13
**served** 142:6
**service** 50:13 115:10
**services** 25:17
**session** 90:11, 12 138:18 150:9 154:10 156:9
**set** 101:16 125:24 143:13 164:25 170:19
**sets** 112:17

**setting** 163:7
**settings** 41:1
**seven-year** 164:10
**several-year** 158:5
**Shaffer** 28:23 37:9 38:1 76:9, 22 97:19
**shaping** 153:1
**share** 7:3 14:2 153:12 155:22
**shared** 44:7
**sharing** 149:16
**sheet** 143:18 171:1, 13 172:1 173:1
**short** 72:2
**shorthand** 61:2
**show** 32:9 35:19 71:20 80:12 84:16 102:10 107:22 109:17 117:1 121:21 133:15
**showed** 106:19 123:20 124:4 163:20 167:15, 20
**showing** 102:18
**shown** 14:20 103:24 108:2
**shows** 82:16 83:23
**side** 98:16 132:22 142:3 157:11
**side-by-side** 56:9, 14
**signature** 3:12, 13 121:6 170:14, 15
**SIGNATURE:_________________________DATE** 172:23 173:23
**signed** 8:15, 17, 21, 25 11:6 128:10 171:16
**significant** 45:3 148:11
**similar** 14:1 67:12 150:13 151:5
**similarly** 64:25
**simple** 7:3 47:21 49:9
**simply** 34:8 62:10 87:10 88:7
**single** 31:5 89:2 132:22
**sir** 19:25 56:18 57:10 60:6 62:17 78:5 91:24 102:23 108:5, 21 113:25 120:14 125:11, 16, 21 134:19 164:3 168:15
**sit** 55:18, 22 70:17 128:1
**sitting** 74:6, 10
**situation** 85:16 115:3, 5, 10 163:6
**six** 45:22 145:9
**Sizable** 45:9
**size** 45:2
**skill** 143:13
**skills** 70:5 135:18 143:15 155:25
**slide** 155:2
**slight** 7:20
**slot** 51:15
**slowed** 148:16
**small** 41:17
**Smith** 2:6
**social** 152:25
**soft** 143:14
**software** 166:12
**sold** 42:21, 22
**solely** 126:18
**solutions** 148:20
**solved** 48:4, 5
**somebody** 29:13 33:18 51:13 58:11 67:19 68:7 72:5 80:1 81:22 115:13 142:16 144:24 159:13 161:2, 20 162:1, 25 163:3, 5, 9 165:23
**somewhat** 148:16
**sorry** 13:10 34:16 39:1, 17 41:13, 22 52:18 55:20 58:4 76:17 93:23 105:23 126:25 167:20
**sort** 58:8 67:14 69:1 88:4 90:24 91:5 93:3 98:7 129:20 143:5 144:15 145:1 147:14 149:4 157:17 163:8 166:18
**sorting** 74:2
**sound** 146:21 157:21
**sounds** 94:6, 16 139:20
**source** 26:7 103:14 153:7
**SOUTHERN** 1:2 5:5 15:8 121:24
**speak** 50:6, 9 61:1 104:6, 7, 9 136:23 137:14 140:11
**speaking** 86:16 104:12, 15, 18
**speaks** 50:3 100:15 111:3 121:13
**special** 164:18
**specific** 26:21 31:3 32:5 45:14 54:1 70:11 79:7 87:23 91:23, 25 92:3 97:14 99:14 107:18 114:12 131:17 143:3 155:1 167:5
**specifically** 29:11 36:15 53:12 55:12 95:17 113:4 132:16 163:4
**speculate** 162:9
**speculation** 162:8
**speech** 31:25
**Spence** 34:13 38:23 39:5 46:9 52:17 53:24 54:7 56:6 65:14, 19 66:1, 16 69:20, 22 71:17 73:1 79:2, 12 84:16 87:19, 25 88:9 89:13, 19 92:17, 20 93:15, 19 96:17 99:3 100:13 105:9 112:23 113:17 120:9, 16 121:10 124:3 126:10, 11, 16 130:20 131:9, 13 134:3 135:6, 21, 25 136:11, 15 138:7 139:7, 8, 18, 25 140:5 146:13, 23 148:8, 10 149:13 150:5, 10 151:4 152:14, 17, 24 153:4, 11, 15, 20 154:4, 10, 25 155:6, 11, 17 159:4 163:15 165:2 166:20 168:20
**Spence's** 58:1 130:22 132:19 135:11, 17 136:4 146:15 148:23 149:24 150:15, 20 155:23 167:3
**spend** 85:15 136:4
**spent** 115:2 142:10, 16
**split** 142:3
**spoke** 10:2 100:10
**spoken** 28:19, 23
**spot** 70:21 115:3
**SS** 170:2
**stack** 13:24 14:1 46:5
**staff** 17:23 26:7 73:16, 17 74:4 91:1 93:11, 12, 14
**stage** 71:9
**Stagnaro** 2:7
**stakeholder** 149:18
**Stamp** 104:2 105:5 148:3
**stand** 27:24
**stapler** 75:17
**Star** 154:11, 16 155:2, 8, 13
**Starner** 1:17 3:9 170:3, 24
**start** 30:21 67:17 68:8
**Started** 9:15 25:11 67:8 107:16 144:16
**starting** 148:25
**starts** 18:1 67:16 125:20
**State** 1:18 36:3 44:12 112:3 124:1 138:2 155:17 170:1, 5
**stated** 112:5 148:16
**statement** 59:18 61:14 63:5 109:20 110:7

**statements** 148:15
**STATES** 1:1 5:4
**status** 72:18
**stay** 13:16 94:19 96:19
**stayed** 142:7
**stenotypy** 3:9 170:11
**step** 72:2
**stepped** 13:12 51:13 142:18
**stepping** 55:4 91:1
**steps** 23:3 152:10, 16
**stick** 63:24 95:9 98:9
**stipulate** 102:4 111:6, 10, 22, 24
**stipulated** 3:2
**stock** 46:24 47:25 48:4 111:11
**stop** 123:16 150:14
**strategic** 70:2 116:5 130:8, 21 139:1 145:23 148:9 150:5, 20, 24 151:1, 6 152:18 155:12, 20, 21 157:11, 13
**strategies** 48:14
**strategy** 120:17 130:23 131:1, 4 148:7 152:9 157:15
**Street** 1:15 2:4, 12 98:14 143:8, 17 155:13 165:3
**streety** 130:25
**strength** 136:9
**strengths** 51:25 52:2 57:25 58:1 130:19 165:8
**strong** 149:5 150:24
**stronger** 56:2
**strongest** 99:13 151:1
**structure** 135:11
**studies** 26:19
**stuff** 143:14
**Subject** 101:22 106:8
**subjective** 131:12, 15, 23 132:7 133:5, 6
**submit** 39:25
**submitted** 3:11 170:13
**subsequent** 11:9
**substance** 36:25 155:24
**substantive** 117:11
**succeed** 86:10 92:8 113:18 114:23
**succeeding** 30:6, 9 83:4, 5
**success** 165:21 167:11, 12
**successfully** 51:7
**succession** 27:3, 5, 9, 12, 13, 19 28:4 31:9 45:12 46:10 51:1, 7 54:2, 10 61:11 62:6, 10, 19 63:4 65:12 67:10, 16 69:8, 14 70:10, 11, 14, 20 74:17, 24 77:3 79:20 83:7, 14, 16, 19 84:7 87:23 94:13 106:2 107:6 120:7 138:16 141:2 145:5 161:9, 15 163:23 164:19 167:23
**successions** 45:18, 25
**successive** 50:3
**successor** 91:14
**successors** 86:24
**succinctly** 135:18
**sudden** 113:14 143:7
**sufficient** 12:17 15:13 61:2 134:8 153:23
**suggest** 71:13
**suing** 6:22
**summaries** 117:12 135:5
**summary** 10:12 20:6 105:8, 13 112:16 119:3, 5, 11, 12
**Sun** 150:7, 11
**superior** 149:10, 25 150:15 162:1
**supervision** 44:11 170:12
**supervisory** 43:6 45:12
**suppose** 65:9
**supposed** 45:17, 20
**suppressed** 148:15
**sure** 7:5, 8 14:10 15:5, 15 16:9 18:8, 12 19:4 20:16 21:3, 9, 22 22:1 23:1 29:3 30:18 32:21 37:9 43:23 46:4 48:9 53:6, 8 55:25 57:1 60:2 62:14 63:11 65:25 69:7 73:9, 20 74:6 79:25 84:5 88:6 94:23 95:7, 14 96:21 119:9 129:21 130:16 132:6 134:16 141:3 144:13, 23 145:11 159:11
**surprise** 65:6
**surprised** 36:24 63:13 64:4, 15, 16 107:15 166:16
**Survey** 81:11
**surveys** 135:5
**Susan** 13:14 37:12
**suspend** 136:19
**sworn** 5:10, 23 170:7
**SWOT** 136:9
**Sylvania** 2:4
**synergies** 150:11
**system** 24:6
**systems** 16:22 155:15

**< T >**
**tab** 103:23 105:9, 10, 11, 17, 20, 22 106:1, 5 117:10, 25 119:2
**table** 58:9 87:14 109:21 110:19, 25
**tabs** 118:2 127:12
**take** 10:9 14:4, 5 15:15 22:8, 9, 12 23:3, 7 29:5 57:14 59:3 67:25 75:2 77:12 78:2 85:9 86:1 103:22 114:11 117:10 128:17 131:14 144:24
**taken** 1:12 3:5 6:5 16:13 59:7 75:23 100:3 123:9 151:25 170:10, 11 171:2, 8
**takes** 68:23
**talent** 27:15 28:2 51:16, 20 74:16 77:3, 15 80:7 81:10 82:24 84:18, 19 91:21 97:23 99:18 135:25 139:1, 2, 12
**talents** 53:15 70:5
**talk** 29:7 39:8 63:21 78:9, 10, 16, 18 96:12 98:8, 17 141:1, 17 157:15 162:6
**talked** 64:13 70:17, 23 72:11 73:15 74:20 92:1 112:20 129:25 145:19 167:13
**talking** 26:14, 15 31:9 49:21 67:17 72:5 86:19 91:5 97:4 114:15, 16 115:12
**talks** 77:14 122:17
**tasks** 26:1 167:5
**teach** 103:20
**team** 55:3 58:18 63:25 66:25 67:1 70:18 79:21 142:20, 23 143:3, 9, 21 147:4, 8 149:10 150:1, 16 157:10 159:7 167:8
**teams** 146:3
**technological** 152:25
**technology** 70:4 114:16 148:17, 20 149:2 151:6 154:5, 20
**tee** 69:1 99:8
**teed** 54:3
**telephone** 18:18
**tell** 6:16 10:19 13:21 16:16 18:19 27:7 29:12 31:6 33:17 34:18 40:19 47:16 53:2, 4, 8 67:8 73:25 77:16 78:3

80:11 82:13, 23 84:10, 13 85:17 86:9 103:25 104:22 108:25 109:13 110:18 116:8, 23 117:21 118:24 120:8 126:9, 24 129:14 160:6 168:20
**telling** 19:9 116:2 133:4 162:3
**Tells** 82:14 93:13
**temperament** 50:9
**temporary** 72:12
**ten** 45:6 68:3 69:15 123:5 163:10
**tended** 143:14
**tends** 95:16 166:17
**tenure** 62:2 94:21
**ten-year** 53:13 159:15, 17 162:23 164:10
**term** 61:2 72:2 147:14 155:19
**terms** 18:16 20:21 26:10 47:24 56:11 70:3, 12, 24 74:1 82:13 88:2 90:23 91:4 99:13 130:21 133:4 143:13 155:24 156:21 159:15 165:22
**terrific** 142:12
**test** 32:7, 17 71:19 100:16 117:1 133:14
**testified** 5:24 6:10 73:8 137:23 144:6
**testify** 31:19 55:15 102:15
**testifying** 55:8 87:7, 8
**testimony** 6:16 26:6 30:4 87:2 94:12 113:2 117:4 136:13 138:5
**text** 18:18
**Thank** 7:20 8:2 12:22 13:1 15:18 19:13 22:1, 18, 21 32:11 42:1 61:8 65:8 100:6 102:5 103:15, 20 108:13 112:7 117:9 120:4 121:20 122:2 123:1 126:5 136:22, 24 137:6, 13 164:23 168:14, 15
**theirselves** 90:15
**thing** 22:2 36:23 58:15 69:2 84:25 85:21 93:9 97:10 98:1, 7, 17 101:17 102:3 114:12 134:24 147:15 150:22 156:8, 19 158:20 159:25 163:8
**things** 41:1 53:14 56:4 58:10 59:11 64:20 68:1, 16 71:3 82:12 93:5 96:22 98:8, 11, 15 106:22 109:4, 5 115:19 124:10 131:13 143:10 146:17 149:1, 4 151:9 156:2, 3 157:17 164:13
**think** 10:5 12:19 14:2, 18 15:11, 13 17:7 25:14 37:2 39:7, 19 42:16 43:5 48:21 49:10, 12, 15, 16 50:21 61:19 62:25 63:23 64:5 65:17 66:6 67:24 68:12, 25 69:21, 22 75:8 82:4, 22 87:21 88:10 89:25 90:1 92:13 93:8 94:3 97:9, 10 98:9, 12 101:21 106:25 113:7 114:17 115:3, 10, 12 119:10 121:15 128:3 132:11, 16 133:8 135:8 136:18 142:24 143:25 148:1 149:11 159:15, 16 160:9 163:21 164:14 168:2, 14
**thinking** 34:17, 19 53:19 71:5 116:5 129:22 131:20 132:11
**THIRD** 1:7, 14 2:16 5:7, 20 9:4 11:21 18:4 24:18 27:6 29:2 30:2 38:23 40:11, 17, 23 41:3, 19, 20 43:3 44:2, 8, 11 47:4, 13 48:7, 11, 15 49:14, 18 50:13, 23 53:10 54:25 55:11, 24 59:22 67:8 69:24 101:18 102:1 108:8 109:20 126:11, 12 142:22 152:20 163:11 171:4
**Thomas** 2:16 5:20 13:4, 5, 6
**thoroughness** 155:24
**thought** 51:12 54:20 65:20 93:9, 19 99:12 115:22 140:20 146:19 157:19 167:21
**thoughts** 144:16 156:11
**thousand** 115:19
**threats** 153:16
**three** 42:19 46:5 61:25 77:19 83:5 94:24 116:10 118:18 130:8 134:1
**three-page** 10:20
**three-year** 111:18 163:3 164:8
**thrust** 143:6
**ticked** 146:16
**tie** 17:17
**Tim** 34:13, 22 51:10, 14 52:7, 21 54:3, 7 56:6 58:1 65:14, 19 66:1, 16 69:20, 22 72:9 73:1 79:2, 12 84:16 87:19, 25 88:5, 9, 10 89:15 92:14, 16, 20, 24 95:1 98:12 107:17 112:23 113:17 114:11, 22 116:2 120:9, 16 121:10 132:19 136:15 137:20 138:7 139:7, 8, 18, 25 140:4 146:13, 15 156:10 157:14 158:16, 21 159:4 163:14 165:2, 9 168:20
**time** 3:6, 7 5:2, 8 6:23, 24 10:2, 5 11:22 13:8 15:19 16:4, 6, 9 20:2 22:22 23:8 29:11 36:6, 16 37:15, 16 39:7 41:4 42:2 45:5 46:5, 17 48:4 54:4 56:11 59:3, 5, 8 62:2 66:1 68:1, 17 69:4, 6 71:1 74:20 75:21, 24 80:12 81:6, 24 82:22 84:15 85:15 86:12 88:2, 10 89:14 90:3 91:10, 12 92:1, 2, 13, 18 94:18 95:25 96:1 97:22 99:14, 17 100:1, 4 105:19 107:4, 18 111:3 112:5 113:9, 10, 14, 20 114:14 115:3, 10 123:7, 10 129:20 131:1, 19 132:13 135:8 136:5, 22 139:20 141:2, 9 143:12 149:20 151:4, 23 152:1 156:12, 19 163:6 164:1, 24 169:9, 10 170:9
**timeline** 54:1 94:16 99:11
**timelines** 17:16 18:8, 12 38:25 159:23
**times** 58:10 86:7 104:12
**timing** 48:9
**Timothy** 38:22 53:24 89:19 105:8 124:3 126:11 134:2
**Tim's** 90:1 156:14 157:22
**tiny** 96:8
**title** 85:22 142:24

**Today** 5:1 90:1 138:6 158:9
**told** 14:13, 17 33:14 47:19 48:21 89:18 96:24 97:18 113:21 114:2 123:21 126:15
**tomorrow** 53:17
**top** 45:6 54:10 56:12 61:22 72:6 75:14 90:2 164:4
**total** 19:16 28:7
**totally** 86:15 117:3 129:10
**touch** 7:6
**touched** 98:14 151:8
**town** 11:21
**track** 45:18 52:19
**traditional** 153:8
**training** 45:10, 15
**trains** 142:13
**traits** 114:3
**transaction** 167:9
**Transactis** 155:15
**transcribed** 3:10 170:12, 13
**transcript** 15:16 171:7
**transformation** 149:14, 17, 21
**tremendous** 165:21
**trends** 77:14 154:4
**trial** 6:10
**tried** 137:2, 3
**trigger** 95:2
**trillionaire** 153:17
**trouble** 76:4
**true** 25:19 47:7, 8 60:8 61:14 63:4 69:18, 19 136:17 171:10
**trust** 7:14 127:19 150:7, 12
**trusting** 120:22
**truth** 170:8
**truthful** 7:17
**Try** 16:8 19:4 21:25 37:8 50:18 53:6, 14 63:1 65:23 69:6 73:10 123:13 130:17 132:4 159:14
**trying** 22:18 34:19 65:3 78:23 88:6, 7 104:17 117:1 129:16 133:1, 3
**tuck-in** 155:12
**turn** 7:11 138:24
**turned** 149:13 150:5
**Turning** 148:2
**turnover** 18:13
**Tuzun** 151:13, 16
**two** 9:18 10:20 12:7 19:6 25:4 42:19 44:1 46:5, 11 56:16 61:25 114:9 126:6 129:24 134:1 142:4 145:14 152:12 159:13 163:3
**type** 14:8 136:10 143:21
**typewritten** 170:12

< U >
**U.S** 153:5
**uh-huh** 7:22 24:5 28:8 41:6 46:21 51:3, 5 63:15 64:12 67:21 68:6 70:19 71:8 73:12 74:8 82:10 100:9 114:19 163:25 165:5
**ultimate** 67:11 68:16
**ultimately** 26:22 58:15 59:16, 20 73:17 98:18 142:2, 5
**unacceptable** 40:12
**unanimous** 99:6 100:20
**underperformance** 166:21
**undersigned** 170:3
**understand** 7:16, 18 9:3 26:6 33:14 40:15 49:22 61:7, 8, 9 62:25 72:10 100:22 104:20 121:9, 18 124:17 133:4 136:13
**understanding** 29:14 41:18 94:20 171:13
**understood** 63:11 64:2 73:9 150:24
**undertaken** 44:25
**undertaking** 62:5
**unfair** 71:21
**unfamiliar** 46:14
**Unfortunately** 142:11
**UNITED** 1:1 5:4
**universe** 22:3
**unusual** 52:14 89:15 161:2
**unwisely** 31:12
**update** 148:7, 9, 10, 22
**Updates** 74:17 77:4
**upset** 64:19
**upside** 114:10
**use** 24:4 61:5 64:22 65:3 66:20 70:4 81:4, 22 84:6, 24 85:7 90:19 91:17
**uses** 73:13
**usual** 145:3
**usually** 26:24 28:12 71:12 72:1 121:23 143:22 157:13 169:4, 7
**utilize** 77:2
**utilized** 77:17

< V >
**Vague** 49:20 50:15 166:22
**validate** 144:20
**validated** 144:25
**Valley** 8:5
**valuation** 114:22
**variables** 51:24 52:6
**various** 41:1 50:14 82:12 96:22
**VC's** 153:17
**venture** 153:16
**verbal** 7:24
**verbalize** 7:21
**verbally** 22:15 24:11 36:11
**version** 37:4, 6
**versions** 88:12
**versus** 5:6 95:13
98:12 159:6
**vetting** 38:22 39:3
**vice** 105:22
**videographer** 1:17 5:1 7:22 59:5, 8 75:21, 24 100:1, 4 123:10 151:23 152:1 169:10
**Videotaped** 1:11
**view** 69:17 70:2 73:19 74:7 94:3 132:11 149:23
**Viewpoint** 81:10 91:5
**virtual** 17:15
**virtually** 47:10 70:21 89:22
**vis-a-vis** 146:15
**vision** 131:4 150:21 151:6 157:11, 13
**visions** 151:1
**voiced** 54:21
**vote** 52:10 57:15 100:23
**voted** 100:12
**vs** 1:6 171:4

< W >
**Wait** 33:12 110:1 125:20
**waiver** 101:23
**waiving** 101:19
**walk** 24:8 74:11
**Wall** 98:14 143:8 165:2
**Walnut** 1:15
**want** 15:6, 16 35:10 55:14 63:22 68:7 75:3 78:6, 9, 10 95:9, 12 98:10 102:15 110:7 111:5, 7 119:16 120:5 136:21 143:24 145:11 147:23 159:11, 12, 22 161:18 163:4
**wanted** 63:10, 21 144:23 160:7
**wants** 81:22 161:20
**waste** 111:3

**watch** 68:10, 13
**watched** 79:2
**watching** 140:24
**way** 17:24 27:2 36:19 48:1 52:13 53:7 54:4 60:17, 22 65:5 68:9, 22 71:21 75:7 78:1 95:11, 16 120:2 125:1, 2 130:19 132:25 133:1 142:6 143:10 144:13, 20 159:16
**ways** 145:17 158:10
**weaker** 56:3
**weakness** 136:9
**weaknesses** 52:1, 3 57:25 58:1 165:9
**wealth** 120:19 166:18
**weeks** 8:19 24:17
**well** 14:22 23:11 28:12 29:12 30:21 31:8, 12, 15 33:17 35:8 38:10, 12 40:24 42:1 43:19 44:10, 15 46:8 48:21 49:9, 23 52:10 54:18 57:4 58:20 64:21 71:25 73:23 75:4, 5, 8, 15 80:6, 14 82:13, 25 83:15 88:7 89:1 90:14 92:23 100:25 104:24 107:5 111:9, 14 113:16 115:9, 21 116:8, 10, 11, 12, 15, 22 117:6, 22 118:12 119:4, 16, 24 124:11, 13, 15 130:22 132:24 133:2 137:10, 11 140:12, 24 141:7, 23 143:5 147:10 148:24 150:22 151:21 156:1 157:24 158:9 161:8, 12 163:18 165:16, 22
**went** 16:11 20:19 47:18 89:1 106:16 113:24 126:22 146:16
**We're** 5:2 7:5 41:22 59:6, 9 62:25 71:4, 5 75:11, 21, 25 78:6 88:3 101:20 104:19 123:8, 16 129:16, 23 134:20 151:24 169:11
**WESTERN** 1:3 5:5
**We've** 71:13 76:4 99:19 122:5 140:24 144:23 168:6
**whatever's** 115:17
**WHEREOF** 170:19
**White** 12:14
**whoever's** 74:6
**wife** 8:8 151:20
**wild** 6:14
**window** 163:3
**Winning** 105:3 128:22 129:2 134:14 143:25 145:14
**winnows** 73:4
**wins** 82:24
**wise** 46:5
**wish** 102:14
**withdrawing** 47:12
**witness** 1:12 3:4, 10, 12 4:2 5:10 6:17, 18 7:4 34:11, 15 35:18, 24 65:23 73:9, 16 75:10 80:19 104:4, 5, 18, 22 110:6 111:4 113:4 122:1 124:9 126:23 128:3 129:8 130:16 132:4 133:16 137:22 144:5 166:24 167:25 170:14, 19
**witnesses** 169:5
**witness's** 80:16
**won** 153:25
**wonder** 65:12
**wondered** 11:20
**wondering** 64:20 75:1
**word** 55:25 64:21 65:4, 18 66:20
**words** 12:12 81:1
**work** 27:9 47:18 51:13 54:10 62:19 68:12, 19, 20 73:16 74:4 95:16 96:21 145:8 147:10, 11
**workplace** 82:18
**works** 17:24 58:21 68:9, 22 73:25
**world** 70:2 132:12 161:23
**written** 20:20 36:13 39:25 100:20 161:22
**wrong** 31:16 132:23 167:18

**< Y >**
**Yeah** 7:13 15:3 20:14 25:14 47:7, 17 64:16 65:1 66:19 67:2 70:24 75:20 85:24 95:3 99:21 130:10 144:2, 13 146:20 156:11 162:20 164:5
**year** 18:1 46:12 53:21 74:23 86:13 94:23
**years** 15:22 16:10 25:8, 10 39:10 42:19 46:11 50:3, 13 51:2, 10 54:16 55:2 61:20, 23 68:2, 3 69:16 86:14 94:24 95:21 107:3, 7, 8 114:25 115:2 134:1 137:24 138:6 141:1, 18, 22 142:10 146:12 147:6 150:20 157:7 158:13 159:13 163:10 164:12
**Yep** 76:11, 18, 25 77:5 83:12 108:24 139:11 142:24 145:15, 22 146:2 157:1, 3
**Yesterday** 11:13 13:12 15:19 62:15
**young** 12:13

**< Z >**
**Zatus** 67:4
**Zaunbrecher** 13:14 37:12
**Zoetis** 46:10 67:5
**Z-O-E-T-I-S** 67:5, 6
**Zoom** 18:22

# EXHIBIT 1

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

PHILIP R. McHUGH,

Plaintiff,

vs.

FIFTH THIRD BANCORP, *et al.*,

Defendants.

Case No. 1:21-cv-00238-MRB

Judge: Hon. Michael R. Barrett

**DEFENDANTS/COUNTERCLAIMANTS FIFTH THIRD BANCORP'S, FIFTH THIRD BANK, NATIONAL ASSOCIATION'S & GREGORY D. CARMICHAEL'S OBJECTIONS & ANSWERS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES**

Pursuant to Federal Rule of Civil Procedure 33, Defendants/Counterclaimants Fifth Third Bancorp, Fifth Third Bank, National Association, and Gregory D. Carmichael (collectively "Fifth Third Bank" or the "Bank"), by and through their undersigned counsel, Blank Rome LLP, hereby serve the within Objections and Answers to Plaintiff Philip McHugh's ("Plaintiff") First Set of Interrogatories ("Requests").

**PRELIMINARY STATEMENT**

These responses to Plaintiff's Requests are based upon discovery and investigation conducted to date. Fifth Third Bank reserves the right to supplement these responses with, and/or introduce at trial, evidence and documents not identified at this time that are subsequently discovered and/or the relevance of which is subsequently ascertained. The fact that Fifth Third Bank has responded in part or at all to any of the Requests herein is not intended to be and shall not be construed as a waiver by Fifth Third Bank of all or any part of any objection to any such Request.

PLAINTIFF'S EXHIBIT
2
McAllister
PENGAD 800-631-6989

## GENERAL OBJECTIONS

The following objections are incorporated into each and every response to Plaintiff's Requests:

1. Fifth Third Bank has not completed its investigation of the facts relating to this case, its discovery in this case, or its preparation for trial. The responses contained herein are based only upon the information and documents presently available to and known by Fifth Third Bank. Nothing contained herein shall be used to preclude Fifth Third Bank from further research and investigation of the facts or from presentation of the results of that research and investigation to the trier of fact at the time of trial.

2. The following responses are provided without prejudice to the right of Fifth Third Bank to produce and introduce at the time of trial subsequently discovered evidence relating to the proof of presently unknown material facts, and to produce and introduce all evidence when discovered relating to proof of subsequently discovered material facts. Moreover, because the facts and evidence now known may be imperfectly understood, or the relevance or consequence of certain facts and evidence may be imperfectly understood, such facts and evidence in good faith may not be included in the following responses. Fifth Third Bank reserves the right to refer to, conduct discovery with reference to, or offer into evidence at the time of trial, any and all documents and things notwithstanding the responses and objections interposed herein.

3. To the extent that a Request has not been objected to, Fifth Third Bank has used reasonable diligence to obtain facts, documents, and things responsive to the Requests responded to herein. To the extent that Plaintiff seeks to require Fifth Third Bank to do more than the foregoing, the Requests are objected to on the grounds that they are not relevant to any party's

claim or defense, not proportional to the needs of the case, and impose an undue burden and expense not commensurate with any legitimate discovery need.

4. Fifth Third Bank generally objects to the Requests, and specifically to each Request contained therein, to the extent that they seek disclosure of facts or other information that is protected from disclosure by the attorney-client privilege, the attorney work product privilege, any other applicable privilege or protection, or that is otherwise protected from discovery. Fifth Third Bank will not undertake to produce any such privileged or protected information, and nothing contained herein is intended as, or shall be deemed, a waiver of any attorney-client privilege, attorney work product privilege, or any other applicable privilege.

5. Fifth Third Bank generally objects to the Requests, and specifically to each Request contained therein, on the grounds that they are overbroad, unduly burdensome, unreasonable, vexatious, harassing and oppressive, in that they seek information that is not relevant to any party's claim or defense in this case. By responding to the Requests and each Request as set forth herein, Fifth Third Bank will not undertake to provide any facts or documents that are not relevant to any party's claim or defense or not proportional to the needs of this case, and Fifth Third Bank expressly disavows any obligation or undertaking not interposed by the Federal Rules of Civil Procedure, the Local Rules of the U.S. District Court for the Southern District of Ohio, or any other applicable law.

6. Fifth Third Bank generally objects to the Requests, and specifically to each Request contained therein, to the extent they seek information protected by rights of privacy of any person or entity.

7. Fifth Third Bank generally objects to the Requests, and specifically to each Request contained therein, to the extent that they purport to require Fifth Third Bank to disclose

information, documents, or other materials constituting or containing, in whole or in part, confidential data, proprietary information, non-public information, and/or financial information relating or pertaining to Fifth Third Bank, its past or present employees, or other persons or entities.

8. Fifth Third Bank generally objects to the Requests, and specifically to each Request contained therein, to the extent that the information called for in the Requests is at least equally available to Plaintiff, or is already in the possession of Plaintiff or her counsel.

9. Fifth Third Bank hereby expressly reserves its right to supplement or amend this response, or any of the various responses contained herein, in the future should Fifth Third Bank discover additional information that may be responsive to the Requests. Nothing contained herein shall obligate or commit Fifth Third Bank to supplement or amend this response, or any of the various responses contained herein.

Subject to and without waiving the foregoing Preliminary Statement and General Objections, Fifth Third Bank makes the following specific objections and answers to Plaintiff's Requests:

## SPECIFIC OBJECTIONS & ANSWERS TO INTERROGATORIES

1. Identify all persons with knowledge of the events involved in this litigation.

**ANSWER:** Fifth Third Bank incorporates by reference herein its Preliminary Statement and General Objections. Fifth Third Bank objects to this Request because it is overly broad, unduly burdensome, and not reasonably limited in scope. Fifth Third Bank objects to this Request to the extent it seeks information protected by the attorney client-privilege and/or the attorney work product privilege.

Subject to and without waiver of its objections, Fifth Third Bank identifies the following individuals who may have knowledge of the events involved in this litigation:

Plaintiff Philip McHugh
Suzanne McHugh
Colleen McHugh Sweeney
Erin McHugh
Philip Raymond McHugh, Jr.

Patrick McHugh
Gregory D. Carmichael
Robert Shaffer
Michael B. McCallister
Gary R. Heminger
Eileen A. Mallesch
Marsha C. Williams
Emerson L. Brumback
Karen Koewler
Guy Beaudin
All Individuals Identified in Plaintiff's Initial Rule 26 Disclosures
All Individuals Identified During Plaintiff's Deposition
All Individuals Identified in Documents Exchanged by the Parties During Discovery

2. If your responses to Requests for Admission Nos. 1-11 are anything other than an unqualified admission, identify the factual basis for your denial.

**ANSWER:** Fifth Third Bank incorporates by reference herein its Preliminary Statement and General Objections. Fifth Third Bank objects to this Request because it seeks a legal conclusion. Fifth Third Bank objects to this Request because it seeks information that is not relevant to any party's claim or defense and is not proportional to the needs of the case. Fifth Third Bank objects to this Request because it is overly broad, unduly burdensome, and not reasonably limited in scope.

Subject to and without waiver of its objections, Fifth Third Bank refers Plaintiff to the documents produced in response to Plaintiff's First Set of Requests for Production, at Bates Numbers FifthThird-McHugh-000001 to 007203.

3. Identify all internal and external candidates Defendants considered for the positions of President and/or Chief Executive Officer in its "many months of succession planning" as identified in Paragraph 10 of the Counterclaim.

**ANSWER:** Fifth Third Bank incorporates by reference herein its Preliminary Statement and General Objections. Fifth Third Bank objects to this Request because the terms "candidates" and "considered" are undefined, vague, and ambiguous, and are therefore subject to multiple interpretations. Fifth Third Bank objects to this Request because it calls for confidential and non-public information.

Subject to and without waiver of its objections, Fifth Third Bank states that the following individuals were considered for the President/CEO role during the relevant period:

Timothy Spence
Brian Lamb

Phil McHugh (Interim, Emergency Basis Only)
Tayfun Tuzun (Interim, Emergency Basis Only)

4. State the factual basis for Defendant's decision to appoint Timothy N. Spence to the position of President in 2020.

**ANSWER:** Fifth Third Bank incorporates by reference herein its Preliminary Statement and General Objections. Fifth Third Bank objects to this Request because the phrase "factual basis for the Defendant's decision to appoint" is undefined, vague, and ambiguous, and is therefore subject to multiple interpretations. Fifth Third Bank objects to this Request because it is overly broad and unduly burdensome. Fifth Third Bank objects to this Request because it calls for a detailed narrative, which is not a proper Interrogatory question, but is rather better suited for a deposition. Fifth Third Bank objects to this Request to the extent it seeks information protected by the attorney client-privilege and/or the attorney work product privilege.

Subject to and without waiver of its objections, Fifth Third Bank refers Plaintiff to: "Final, The Winning Formula, Fifth Third Bank, President and Chief Executive Officer," at FifthThird-McHugh-001074 to 001079; "Board Summary: Tim Spence," at FifthThird-McHugh-001033 to 001040; "Executive Assessment Development Report: Timothy Spence, Executive Vice President and Head of Consumer Bank, Payments, and Strategies, Fifth Third Bank," at FifthThird-McHugh-000954 to 00976; and the "Chief Executive Officer: Skills and Abilities" slide (FifthThird-McHugh-006995) included in the Bank's "Executive Succession Planning" PowerPoint presentation slides, at FifthThird-McHugh-006990 to 007015.

5. Identify all criteria which Fifth Third considered in selecting Timothy N. Spence for the position of President of Fifth Third Bancorp in 2020.

**ANSWER:** Fifth Third Bank incorporates by reference herein its Preliminary Statement and General Objections. Fifth Third Bank objects to this Request because the term "criteria" is undefined, vague, and ambiguous, and is therefore subject to multiple interpretations. Fifth Third Bank objects to this Request because it is overly broad and unduly burdensome. Fifth Third Bank objects to this Request because it calls for a detailed narrative, which is not a proper Interrogatory question, but is rather better suited for a deposition. Fifth Third Bank objects to this Request to the extent it seeks information protected by the attorney client-privilege and/or the attorney work product privilege.

Subject to and without waiver of its objections, Fifth Third Bank refers Plaintiff to: "Final, The Winning Formula, Fifth Third Bank, President and Chief Executive Officer," at FifthThird-McHugh-001074 to 001079; "Board Summary: Tim Spence," at FifthThird-McHugh-001033 to 001040; "Executive Assessment Development Report: Timothy Spence, Executive Vice President and Head of Consumer Bank, Payments, and Strategies, Fifth Third Bank," at FifthThird-McHugh-000954 to 00976; and the "Chief Executive

Officer: Skills and Abilities" slide (FifthThird-McHugh-006995) included in the Bank's "Executive Succession Planning" PowerPoint presentation slides, at FifthThird-McHugh-006990 to 007015.

6. Identify all individuals who participated in the decision to promote Timothy N. Spence to the position of President in 2020, including but not limited to any individuals who made a recommendation to promote Spence. For each individual identified, identify their participation in the decision.

**ANSWER:** Fifth Third Bank incorporates by reference herein its Preliminary Statement and General Objections. Fifth Third Bank objects to this Request because it misstates and/or attempts to characterize the facts and applicable law, and assumes matters in controversy. Fifth Third Bank objects to this Request because the phrases "participated in the decision to promote" and "made a recommendation to promote" are undefined, vague, and ambiguous, and is therefore subject to multiple interpretations. Fifth Third Bank objects to this Request because it is overly broad and unduly burdensome. Fifth Third Bank objects to this Request because it calls for a detailed narrative, which is not a proper Interrogatory question, but is rather better suited for a deposition. Fifth Third Bank objects to this Request to the extent it seeks information protected by the attorney client-privilege and/or the attorney work product privilege.

Subject to and without waiver of its objections, Fifth Third Bank identifies the following individuals who were involved in various capacities with respect to the vetting, evaluation, and subsequent decision to select Timothy Spence for the position of Fifth Third Bancorp President in October 2020:

Gregory D. Carmichael
Robert Shaffer
Michael B. McCallister
Gary R. Heminger
Eileen A. Mallesch
Marsha C. Williams
Emerson L. Brumback
Nicholas K. Adkins
Mitchell S. Feiger
B. Evan Bayh III
Thomas H. Harvey
Jeorge L. Benitez
Katherine B. Blackburn
Jewell D. Hoover
Linda W. Clement-Holmes
C. Bryan Daniels

7. Identify the basis for Defendant's decision to demote or otherwise transfer Plaintiff to Head of Consumer Banking in October 2020.

**ANSWER:** Fifth Third Bank incorporates by reference herein its Preliminary Statement and General Objections. Fifth Third Bank objects to this Request because it misstates and/or attempts to characterize the facts and applicable law, and assumes matters in controversy. Fifth Third Bank objects to this Request because the phrase "decision to demote or otherwise transfer" is undefined, vague, and ambiguous, and is therefore subject to multiple interpretations. Fifth Third Bank objects to this Request because it is overly broad and unduly burdensome. Fifth Third Bank objects to this Request because it calls for a detailed narrative, which is not a proper Interrogatory question, but is rather better suited for a deposition.

Subject to and without waiver of its objections, Fifth Third Bank states that Plaintiff was asked to transition from his then-current Head of Regions position to step in to the Head of Consumer Bank position in October 2020 because Plaintiff was best suited to assume that particular leadership role in October 2020.

8. Identify all individuals who were involved in the decision to demote or otherwise transfer Plaintiff to the position of Head of Consumer Banking in 2020. For each individual identified, please provide a brief description of their involvement.

**ANSWER:** Fifth Third Bank incorporates by reference herein its Preliminary Statement and General Objections. Fifth Third Bank objects to this Request because it misstates and/or attempts to characterize the facts and applicable law, and assumes matters in controversy. Fifth Third Bank objects to this Request because the phrase "involved in the decision to demote or otherwise transfer" is undefined, vague, and ambiguous, and is therefore subject to multiple interpretations. Fifth Third Bank objects to this Request because it is overly broad and unduly burdensome. Fifth Third Bank objects to this Request because it calls for a detailed narrative, which is not a proper Interrogatory question, but is rather better suited for a deposition. Fifth Third Bank objects to this Request to the extent it seeks information protected by the attorney client-privilege and/or the attorney work product privilege.

Subject to and without waiver of its objections, Fifth Third Bank refers Plaintiff to the individuals identified in its answer to Interrogatory No. 6.

9. Identify each reason, in order of importance, as to why Plaintiff was not selected for the position of President.

**ANSWER:** Fifth Third Bank incorporates by reference herein its Preliminary Statement and General Objections. Fifth Third Bank objects to this Request because it is overly broad and unduly burdensome. Fifth Third Bank objects to this Request because it calls for a detailed narrative, which is not a proper Interrogatory question, but is rather better suited for a deposition. Fifth Third Bank objects to this Request to the extent it seeks information protected by the attorney client-privilege and/or the attorney work product privilege.

Subject to and without waiver of its objections, Fifth Third Bank states that Timothy Spence was selected for the position of Fifth Third Bancorp President in the Board's exercise of its business judgment. Fifth Third Bank further refers Plaintiff to "Final, The Winning Formula, Fifth Third Bank, President and Chief Executive Officer," at FifthThird-McHugh-001074 to 001079.

10. Identify all individuals who had any involvement in preparing, editing, revising, or reviewing the Human Capital and Executive Talent Management and Succession Plan Updates PowerPoint presented to the Board of Directors on December 17, 2019.

**ANSWER:** Fifth Third Bank incorporates by reference herein its Preliminary Statement and General Objections. Fifth Third Bank objects to this Request because the terms "involvement," "preparing," "editing," "revising," and "reviewing" are undefined, vague, and ambiguous, and are therefore subject to multiple interpretations. Fifth Third Bank objects to this Request because it is overly broad and unduly burdensome. Fifth Third Bank objects to this Request because it calls for a detailed narrative, which is not a proper Interrogatory question, but is rather better suited for a deposition. Fifth Third Bank objects to this Request to the extent it seeks information protected by the attorney client-privilege and/or the attorney work product privilege.

Subject to and without waiver of its objections, Fifth Third Bank identifies the following individuals who were involved in various capacities with respect to the process of preparing the Bank's Succession Plan Update PowerPoint presentation slides that were presented during the December 17, 2019 Board meeting:

Gregory D. Carmichael
Robert Shaffer
Michael B. McCallister
Marsha C. Williams
Nancy C. Pinckney
Elizabeth McKay

11. Identify each of the succession candidates reviewed for the Chief Executive Officer ("CEO") position at the December 17, 2019 meeting of the Board of Directors.

**ANSWER:** Fifth Third Bank incorporates by reference herein its Preliminary Statement and General Objections. Fifth Third Bank objects to this Request because the terms "succession candidates" and "reviewed" are undefined, vague, and ambiguous, and are therefore subject to multiple interpretations. Fifth Third Bank objects to this Request because it is overly broad and unduly burdensome. Fifth Third Bank objects to this Request because it calls for a detailed narrative, which is not a proper Interrogatory question, but is rather better suited for a deposition. Fifth Third Bank objects to this Request to the extent it seeks information protected by the attorney client-privilege and/or the attorney work product privilege.

Subject to and without waiver of its objections, Fifth Third Bank states that the Board exercised its business judgment in deciding who, if anyone, should be the next President and Chief Executive Officer of the Bank. Fifth Third Bank further refers Plaintiff to its answers to Interrogatory Nos. 4 and 5, as well as the Bank's December 17, 2019 "Board of Directors: Human Capital and Executive Talent Management and Succession Plan Updates" PowerPoint presentation slides at FifthThird-McHugh-005727 to 005776.

Respectfully submitted,

**DATE:** December 22, 2021

**BLANK ROME LLP**

*s/ Michael L. Cioffi*
Michael L. Cioffi (0031098)
David J. Oberly (0088410)
Thomas H. Stewart (0059246)
1700 PNC Center
201 E. Fifth Street
Cincinnati, Ohio 45202
Tel.: (513) 362-8701
Fax: (513) 362-8702
Email: michael.cioffi@blankrome.com
Email: david.oberly@blankrome.com
Email: tom.stewart@blankrome.com

*Attorneys for Defendants/Counterclaimants Fifth Third Bancorp, Fifth Third Bank, National Association, and Gregory D. Carmichael*

## CERTIFICATE OF SERVICE

I, Michael L. Cioffi, hereby certify that on December 22, 2021, a copy of the foregoing Objections and Answers to Plaintiff's First Set of Interrogatories of Defendants/Counterclaimants Fifth Third Bancorp, Fifth Third Bank, National Association, and Gregory D. Carmichael was served by electronic email at the following address:

John J. McHugh
McHugh & McCarthy, LTD
5580 Monroe Street
Sylvania, Ohio 43560
mchugh@mchughlaw.com

Peter A. Saba
Joshua M. Smith
Stagnaro, Saba & Patterson Co., L.P.A.
2623 Erie Avenue
Cincinnati, Ohio 45208
pas@sspfirm.com
jms@sspfirm.com

*Attorney for Plaintiff,*
*Philip McHugh*

**BLANK ROME LLP**

*s/ Michael L. Cioffi*
Michael L. Cioffi (0031098)

*Attorney for Defendants/Counterclaimants Fifth Third Bancorp, Fifth Third Bank, National Association, and Gregory D. Carmichael*

Fifth Third Response to Interrogatory 4

1. "Final, The Winning Formula, Fifth Third Bank, President and Chief Executive Officer," at FifthThird-McHugh-001074 to 001079
2. "Board Summary: Tim Spence," at FifthThird-McHugh-001033 to 001040
3. "Executive Assessment Development Report: Timothy Spence, Executive Vice President and Head of Consumer Bank, Payments, and Strategies, Fifth Third Bank," at FifthThird-McHugh-000954 to 00976
4. "Chief Executive Officer: Skills and Abilities" slide (FifthThird-McHugh-006995) included in the Bank's "Executive Succession Planning" PowerPoint presentation slides, at FifthThird-McHugh-006990 to 007015

PENGAD 800-631-6989
PLAINTIFF'S
EXHIBIT
3
McAllister

# EXHIBIT 3A, 3B, 3C, and 3D

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

DEF 14A 1 d204490ddef14a.htm DEF 14A

Table of Contents

---

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# SCHEDULE 14A

**PROXY STATEMENT PURSUANT TO SECTION 14(a) OF THE SECURITIES EXCHANGE ACT OF 1934**
**(AMENDMENT NO. )**

Filed by the Registrant ☒

Filed by a Party other than the Registrant ☐

**Check the appropriate box:**

☐ Preliminary Proxy Statement
☐ CONFIDENTIAL, FOR USE OF THE COMMISSION ONLY (AS PERMITTED BY RULE 14a-6(e)(2))
☒ Definitive Proxy Statement
☐ Definitive Additional Materials
☐ Soliciting Material Pursuant to Section 240.14a-12

**FIFTH THIRD BANCORP**

---

(NAME OF REGISTRANT AS SPECIFIED IN ITS CHARTER)

---

(NAME OF PERSON(S) FILING PROXY STATEMENT, IF OTHER THAN THE REGISTRANT)

Payment of Filing Fee (Check the appropriate box):

☒ No fee required.

☐ Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

(1) Title of each class of securities to which transaction applies:

(2) Aggregate number of securities to which transaction applies:

(3) Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (Set forth the amount on which the filing fee is calculated and state how it was determined):

(4) Proposed maximum aggregate value of transaction:

(5) Total fee paid:

☐ Fee paid previously with preliminary materials.

☐ Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

(1) Amount Previously Paid:

(2) Form, Schedule or Registration Statement No.:

(3) Filing Party:

(4) Date Filed:

---

PENGAD 800-631-6989
PLAINTIFF'S EXHIBIT
4
McAllister

Table of Contents

FIFTH THIRD BANCORP 2022 PROXY STATEMENT

Table of Contents

# Chair & Lead Independent Director Joint Letter to our Shareholders

To our Fellow Shareholders:

In 2021, it was once again our pleasure and privilege to continue to lead our Board of Directors, to guide our Company, and to serve our shareholders. We are pleased to invite you to attend our Annual Meeting of Shareholders, which will be held virtually on Tuesday, April 12, 2022.

At each Annual Meeting, we have the opportunity to reflect on how our Board has served you, our shareholders, over the past year. Despite the challenges of the operating environment, we've maintained a steadfast and resolute commitment to delivering value to all of our stakeholders. Several years ago, we committed to deliver strong and sustainable results through the cycle, and our 2021 results delivered on that commitment. We believe our risk discipline and governance have provided a foundation on which we can build continued success. Our strong and stable position is bolstered by a focus on peer-leading environmental, social and governance, or ESG, practices; a pledge to community-focused initiatives; and a commitment to robust governance policies and practices. Combined, these approaches bring value to our shareholders and fulfill our purpose and vision. We have a legacy of helping others and being a source of value and trust for our customers, communities, employees and shareholders—and we will never stop doing what's right for those we serve.

In 2021, Fifth Third delivered record financial results, including record net income driven by record revenue combined with continued expense discipline. In addition, we produced a historical high adjusted return on tangible common equity ("ROTCE") excluding unrealized gains. From the initial February 2020 pandemic sell-off through year-end 2021, our stock price reflected these record results, outperforming our peers, and the KBW Nasdaq Bank Index ("BKX") and the S&P 500.

Our strong financial results are coupled with ESG excellence. We continue to receive high ratings relative to peers from independent, third-party ESG ratings agencies. In 2021, we joined the Partnership for Carbon Accounting Financials ("PCAF") and the Ceres Company Network, signaling our commitment to achieving robust sustainability goals as the economy continues to move toward a lower carbon future. As part of our $8 billion, five-year sustainable finance goal, we extended an additional $1.9 billion in lending and financing to renewable energy projects in 2021. We also issued an inaugural Green Bond, aligning our financing with our investment and lending priorities to provide our customers with liquidity in their transition to a sustainable future. Fifth Third has also developed a Climate Risk Program, and we will soon publish our second Task Force on Climate-related Financial Disclosures ("TCFD") report. We've committed to being an ESG leader in our industry, and we are more confident than ever that the execution of our ESG strategies will continue to produce sustainable value to our shareholders.

We also have remained focused on the communities we serve. We successfully concluded our five-year Community Commitment at the end of 2020, delivering $41.6 billion in lending and investments, a total 30% higher than our targeted commitment. Following the success of our Community Commitment, we've committed $2.8 billion over three years to our Accelerating Racial Equity, Equality, and Inclusion initiative. In 2021, as part of that initiative, we embarked upon our Empowering Black Futures neighborhood program. Through this innovative program, we will invest up to $180 million in nine local neighborhoods across our markets with a focus on creating more affordable housing, helping small businesses grow, addressing gaps in financial access and employment, and making infrastructure improvements.

Underpinning our success in each of these areas are strong underlying governance practices that focus on the needs and expectations of our business, our industry and our shareholders. Last year, our shareholders approved management's proposals to remove supermajority shareholder approval requirements for mergers and amendments to our Articles of Incorporation, thereby further empowering our shareholders. In addition, our Board approved changes to our Corporate Governance Guidelines, reducing the number of public company boards on which our directors may serve in order to better align with shareholder expectations. In response to direct feedback during engagement sessions with many of our largest shareholders, our Board approved the inclusion of an ESG modifier as part of our annual incentive compensation program beginning in 2022. Our Board has also remained committed to ensuring its membership represents the diversity of our key constituencies and has deepened its resolve to recruiting diverse directors.

On behalf of all the members of our Board of Directors, thank you for your continued support and investment in Fifth Third. We invite you to read our Annual Report for more details on our financial highlights and performance in 2021, and we encourage you to review this Proxy Statement carefully and vote your shares according to the instructions provided. We look forward to continuing to deliver on our commitments as a leading institution that is a "Fifth Third Better."

Faithfully,

**Greg D. Carmichael**
*Chair and*
*Chief Executive Officer*



**Marsha C. Williams**
*Lead Independent Director*



Table of Contents

FIFTH THIRD BANCORP

# Notice of 2022 Annual Meeting of Shareholders

## To: Holders of Outstanding Common Stock and 6.00% Non-Cumulative Perpetual Class B Preferred Stock, Series A

**Date and Time**

**Tuesday, April 12, 2022, 11:30 a.m.,** Eastern daylight saving time

**Location**

**Virtual**
www.virtualshareholdermeeting.com/FITB2022

**Vote**

Shareholders of record at close of business on **Friday, February 18, 2022** are entitled to vote

### Items of Business:

| | |
|---|---|
| 1 | Election of all members of the Board of Directors to serve until the Annual Meeting of Shareholders in 2023. |
| 2 | Ratification of the appointment of Deloitte & Touche LLP to serve as the independent external audit firm for the Company for the year 2022. |
| 3 | An advisory approval of the Company's compensation of its named executive officers. |
| 4 | Approval of an amendment to the Fifth Third Bancorp Code of Regulations to establish the exclusive jurisdiction of federal courts for actions brought under the Securities Act of 1933, as amended. |
| 5 | Transaction of such other business that may properly come before the Annual Meeting or any adjournment thereof. |

**Even if you plan to attend the virtual meeting, please vote at your earliest convenience by signing and returning the proxy card you receive or by voting over the internet or by telephone.**

If you plan to attend the virtual Annual Meeting:

Please note that any member of the public will be able to attend and listen to the Annual Meeting, though voting and the submission of questions will be limited only to holders of common stock and of 6.00% Non-Cumulative Perpetual Class B Preferred Stock, Series A (and depository shares representing Series A, Class B Preferred Stock) (collectively, "Series A, Class B Preferred Stock") of the Company and the holders of shareholder proxies. Shareholders and others may access the Annual Meeting website beginning at approximately 11:15 a.m., Eastern daylight saving time on April 12, 2022. To vote and/or submit questions at the meeting, shareholders must use their 16-digit control number. For more information on attending the virtual Annual Meeting, please see page 2.

**If you have any questions or need assistance voting your shares, please call D.F. King & Co., Inc., which is assisting us, toll-free at 1-800-870-0653.**

By Order of the Board of Directors,

Joseph C. Alter, *Corporate Secretary*

# Table of Contents


Proxy Statement Highlights 1

Election of Directors (Item 1 on Proxy Card) 15

Board of Directors, Its Committees, Meetings, and Functions 29

Corporate Governance 37
- Board Governance 37
- Board Performance Evaluations 37
- Board Leadership 38
- Risk Management Oversight 41
- Communication with the Board 43
- Shareholder Engagement 44
- Shareholder Communication with Investor Relations Department 44

Board of Directors Compensation 45

Compensation Discussion and Analysis 48
- Summary of Executive Compensation Program 49
- Highlights of 2021 Company Performance 49
- Compensation Methodology and Structure 50
- 2021 Total Compensation Pay Mix 55
- 2021 Executive Compensation Plan Design and Award Decisions 56
- 2022 Executive Compensation Plan Design Changes 64
- Executive Benefits and Perquisites 64
- Executive Ownership and Capital Accumulation 66
- Tax and Accounting Impacts of Compensation Programs 68

Human Capital and Compensation Committee Report 69

CEO Pay Ratio 70

Compensation of Named Executive Officers 71
- Potential Payments Upon Termination or Change in Control 78

Certain Transactions 81

Report of the Audit Committee 82

Principal Independent External Audit Firm Fees 83

Company Proposal No. 1: Independent External Audit Firm (Item 2 on Proxy Card) 84

Company Proposal No. 2: Advisory Vote on Executive Compensation (Item 3 on Proxy Card) 85

Company Proposal No. 3: Approval of an Amendment to the Fifth Third Bancorp Code of Regulations to add a federal forum selection provision (Item 4 on Proxy Card) 86

Compensation Committee Interlocks and Insider Participation 87

Certain Beneficial Owners 88

Delinquent Section 16(a) Reports 88

2023 Shareholder Proposals 89

Other Business 90

Questions and Answers About the Annual Meeting and Voting 91

Annex A: Proposed Amendment to the Fifth Third Bancorp Code of Regulations to Add a Federal Forum Selection Provision A-1

Table of Contents

# Proxy Statement Highlights

This highlights section does not contain all the information that you should consider before voting. Please read this entire proxy statement carefully. For more information on our 2021 performance, please review our Annual Report on Form 10-K for the year ended December 31, 2021, a copy of which is available at ir.53.com.

## Voting matters and Board recommendations:

| Proposal | Board Recommendation |
|---|---|
| Election of 15 directors to serve until the Annual Meeting of Shareholders in 2023. | ✓ **"FOR" all nominees** |
| Ratification of the appointment of Deloitte & Touche to serve as the independent external audit firm for Fifth Third Bancorp for the year 2022. | ✓ **"FOR"** |
| Advisory approval of Fifth Third Bancorp's compensation of its named executive officers. | ✓ **"FOR"** |
| Approval of an amendment to the Fifth Third Bancorp Code of Regulations to establish the exclusive jurisdiction of federal courts for actions brought under the Securities Act of 1933, as amended. | ✓ **"FOR"** |

## Casting your vote:

- Our Board of Directors is soliciting proxies and voting instructions for the Annual Meeting of Shareholders to be held virtually on Tuesday, April 12, 2022 at 11:30 a.m. eastern daylight saving time. The proxy materials were first made available to shareholders on or about March 1, 2022.
- **Your vote is important!** Please cast your vote as soon as possible, but, if you vote by Internet or phone, you must vote no later than 11:59 p.m. eastern daylight saving time on April 11, 2022 for Common Stock held directly and by 11:59 p.m. eastern daylight saving time on April 7, 2022 for Common Stock held in a Plan and for Series A, Class B Preferred Stock.

**Internet:**

**www.proxyvote.com**

**Telephone:**

**1.800.690.6903**

**Mail:**

Sign, date, and mail the enclosed Proxy card.

**For more information on how to cast your vote, please see pages 93-94.**

Table of Contents



## Attending the Annual Meeting:

Due to the ongoing global health pandemic caused by COVID-19, the 2022 Annual Meeting of Shareholders ("Annual Meeting") of Fifth Third Bancorp (the "Company," the "Bancorp," or "Fifth Third") will be held in a virtual format only, via the internet. We believe holding our Annual Meeting in a virtual-only format ensures and protects the health and safety of our employees, shareholders, and directors and is consistent with federal, state, and local public health guidance. In addition, we believe that holding our Annual Meeting virtually facilitates greater shareholder attendance and participation by allowing all shareholders to participate equally, through any internet-connected device from any location, free of cost. In practice, we have experienced increased engagement and shareholder participation at our virtual Annual Meeting than occurred at meetings prior to our adopting a virtual format. Moreover, a virtual meeting has a reduced carbon footprint and less environmental impact compared to an in-person meeting. As described below, we observe best practices for virtual shareholder meetings, including by providing a support line for technical and other assistance and addressing as many shareholder questions as time allows.

The Annual Meeting will start at 11:30 a.m. eastern daylight saving time on April 12, 2022. Shareholders and guests may join the virtual meeting beginning at 11:15 a.m. eastern daylight saving time. Any member of the public is invited to attend as a guest and listen to the Annual Meeting by logging onto **www.virtualshareholdermeeting.com/FITB2022** and logging in as a guest. Shareholders of record of Fifth Third Common Stock or of Series A, Class B Preferred Stock, beneficial holders of Fifth Third Common Stock or of Series A, Class B Preferred Stock, or authorized representatives of a beneficial holder of Fifth Third Common Stock or of Series A, Class B Preferred Stock, or their legal proxy holders, as of the close of business on February 18, 2022, the record date, are entitled to vote and/or submit questions at the virtual Annual Meeting. Shareholders may participate by visiting **www.virtualshareholdermeeting.com/FITB2022** and choosing the shareholder log-in and entering their 16-digit control number that is printed in the box marked by the arrow on the Notice of Internet Availability of Proxy Materials or your Proxy Card. We encourage shareholders and guests wishing to attend the Annual Meeting to visit **www.virtualshareholdermeeting.com/FITB2022** in advance of the meeting to verify their internet connection, familiarize themselves with the online access process, and update their devices and/or browsers, as appropriate. The virtual Annual Meeting platform is fully supported across browsers and devices equipped with the most updated version of applicable software and plugins. Additionally, shareholders should allow sufficient time after logging in to ensure that they can hear streaming audio prior to the start of the meeting.

Anyone wishing to attend the meeting and encountering difficulty with the Annual Meeting virtual platform during the sign-in process or at any time during the meeting may utilize technical support provided by the Company through Broadridge Financial Solutions, Inc. Technical support information is provided on the sign-in page.

Shareholders will have substantially the same opportunities to participate in our virtual Annual Meeting as they would have at an in-person meeting. Shareholders will be able to attend, vote (in the case of holders of Common Stock), examine the shareholder list, and submit questions before and during a portion of the meeting via the online platform. Shareholders may submit questions by signing into the virtual meeting platform at **www.virtualshareholdermeeting.com/FITB2022**, and by typing a question into the "Ask a Question" field, and clicking submit. Shareholders may submit questions beginning on April 5, 2022 by logging onto proxyvote.com with their 16-digit control number. Questions that are germane to the purpose of the Annual Meeting will be answered during the meeting, subject to time constraints. Questions regarding personal matters or matters not relevant to the Annual Meeting will not be answered. If we receive substantially similar questions, we will group them together.

Shareholders of Common Stock may vote during the Annual Meeting. Shareholders may also vote before the date of the Annual Meeting using the one of the methods provided on the proxy card. Holders of depositary shares representing Preferred Stock may only submit voting instructions prior to the Annual Meeting using one of the methods provided on the proxy card. We recommend that shareholders vote by mail, internet, or telephone prior to the Annual Meeting, even if they plan to attend the Annual Meeting virtually.

Table of Contents



## About Our Company

Fifth Third is a diversified financial services company headquartered in Cincinnati, Ohio and is the indirect holding company of Fifth Third Bank, National Association. The Bancorp operates four main businesses: Commercial Banking, Branch Banking, Consumer Lending, and Wealth & Asset Management.

### Core Values

**1. Work as One Bank**
Proactively collaborate to achieve shared goals.

**2. Take Accountability**
Own what you do and speak up if something feels wrong, looks wrong, or is wrong.

**3. Be Respectful and Inclusive**
Respect diversity. Fully integrate ideas from varying perspectives.

**4. Act with Integrity**
Be honest. Be fair. Do the right thing.

### Fifth Third Bank Footprint Map




[1] Defined as MSAs with $5BN+ in capped deposits (branch deposits capped at $250 million per June 2021 FDIC data)

Table of Contents

PROXY STATEMENT HIGHLIGHTS

## Corporate Performance Highlights

### Strong financial performance, reflecting solid operating results

- Record full-year net income of $2.8B, or $3.73 per common share
- Generated record revenue of nearly $8 billion in 2021 which increased 4% compared to 2020
- Record average core deposits of $162 billion
- Generated consumer household growth in excess of 3% year-over-year

### Environmental, Social, and Governance (ESG) Leadership

- Issued an inaugural Green Bond, aligning our financing with our sustainable financing priorities
- Achieved four of the five bold operational sustainability goals announced in 2017 and achieved carbon neutrality in our operations for the second year
- Developed a Climate Risk Program led by Fifth Third's first climate risk officer, who is focused on integrating climate-related risks in our enterprise risk framework
- Only bank within peer group to have maintained CDP leadership band score for three consecutive years
- Fifth Third's actions and disclosures are ranked #1 or #2 by several key independent third-party ESG data providers
- Contributing to our communities and celebrating their achievements
  - Exceeded our $32 billion 5-year Community Commitment goal by 30%
  - Launched our Empowering Black Futures Neighborhood Program with up to $180 million investment in nine neighborhoods across our footprint
  - Continued to work closely with customers to support them through PPP and other outreach efforts
  - Made second special Covid-19 staffing bonus to front-line employees in 2021

### Robust capital & liquidity

- Maintained strong capital levels with Common Equity Tier 1 of 9.53%
- Heavily core-funded, with loan-to-core deposit ratio near historic lows

### Peer-leading shareholder returns

- In 2021, Fifth Third stock price appreciated 58%, which was No. 1 among peers and outperformed the KBW Bank index by 23 percentage points
- For the first time since the financial crisis, Fifth Third is top quartile among peers in key investor valuation metric, price-to-tangible book value, excluding unrealized gains

### Balance sheet management

- $15 billion cash flow hedge portfolio to provide protection against low interest rate environment
- Well-positioned to benefit when interest rates rise due to highly asset-sensitive balance sheet and significant excess liquidity position
- Successfully managed interest-bearing core deposits 24 bps lower during the year

### Disciplined risk management

- Credit results demonstrate our disciplined client selection, conservative underwriting, and continued benefit from fiscal and monetary government stimulus programs
- Many of our key credit metrics, including nonperforming assets and nonperforming loans, are top quartile among peers
- Historically low full-year net-charge offs of just 16 basis points

Table of Contents



## Item 1: Election of Directors

The Board of Directors proposes the election of 15 Directors to serve until the 2023 Annual Meeting of Shareholders. Our Directors provide robust and effective governance and oversight. The nominees for Director, collectively, represent diverse perspectives and provide a broad range of skills, expertise, and experience to guide the Company.

Our Board of Directors recommends a vote "For" each nominee. For more information on our nominees, please see page 19.

## Board of Directors Highlights

### 2022 Director Nominee Overview

| Name | Age | Gender | Ethnicity | Director Since | Other Public Company Boards* |
|---|---|---|---|---|---|
| Nicholas K. Akins | 61 | M | White | 2013 | American Electric Power |
| B. Evan Bayh, III | 66 | M | White | 2011 | Marathon Petroleum Company<br>Berry Global Group, Inc.<br>RLJ Lodging Trust |
| Jorge L. Benitez | 62 | M | Hispanic | 2015 | World Fuel Services |
| Katherine B. Blackburn | 56 | F | White | 2014 | None |
| Emerson L. Brumback | 70 | M | White | 2009 | M&T Bank (2007) |
| Greg D. Carmichael | 60 | M | White | 2015 | Encompass Health Corporation |
| Linda W. Clement-Holmes | 59 | F | African American | 2020 | Cincinnati Financial Corporation |
| C. Bryan Daniels | 63 | M | White | 2019 | MB Financial, Inc. (2019) |
| Mitchell S. Feiger | 63 | M | White | 2020 | MB Financial, Inc. (2019) |
| Thomas H. Harvey | 61 | M | White | 2019 | MB Financial, Inc. (2019) |
| Gary R. Heminger | 68 | M | White | 2006 | PPG Industries, Inc.<br>Marathon Petroleum Company (2020)<br>MPLX GP LLC (2020) |
| Jewell D. Hoover | 73 | F | African American | 2009 | None |
| Eileen A. Mallesch | 66 | F | White | 2016 | Arch Capital Group, Ltd.<br>Brighthouse Financial<br>State Auto Financial Corp. (2021)<br>Libbey, Inc. (2020)<br>Bob Evans Farms, Inc. (2018) |
| Michael B. McCallister | 69 | M | White | 2011 | AT&T, Inc.<br>Zoetis, Inc. |
| Marsha C. Williams | 70 | F | White | 2008 | Modine Manufacturing Company<br>Davis Funds<br>Crown Holdings, Inc.<br>McDermott International, Inc. (2020)<br>Chicago Bridge & Iron Company, N.V. (2018) |

* The year in which a public company directorship previously ended is indicated by the parenthetical year following the company name.

Table of Contents

PROXY STATEMENT HIGHLIGHTS

Diverse Skills and Attributes Among Board Members

| Skill or Attribute | Directors | Skill or Attribute | Directors |
|---|---|---|---|
| Accounting/ Financial Reporting | 11/15 | Executive Management | 15/15 |
| Compensation and Benefits | 12/15 | Financial Services Industry | 10/15 |
| Corporate Governance | 15/15 | Human Capital Management | 12/15 |
| Cybersecurity | 8/15 | Legal and Regulatory | 10/15 |
| Digital Innovation and FinTech | 8/15 | Risk Management | 14/15 |
| Environmental, Social, and Governance | 11/15 | Strategic Planning | 15/15 |

■ represents each director who possesses the skill or attribute

Table of Contents



## Board Diversity Matrix (as of February 18, 2022)

| | Female | Male |
|---|---|---|
| Total Number of Directors | 15 | |
| **Part I: Gender Identity** | | |
| Directors | 5 | 10 |
| **Part II: Demographic Background** | | |
| African American or Black | 2 | — |
| Hispanic or Latinx | — | 1 |
| White | 3 | 9 |

Directors' Gender




Directors' Ethnicity




Directors' Average Tenure




Directors' Independence



Table of Contents

PROXY STATEMENT HIGHLIGHTS

## Board Governance Overview

Fifth Third's Board of Directors is committed to strong and effective governance and oversight. Annually, the Board reviews and enhances, as necessary, its practices for Board independence, Board accountability, and Board effectiveness. Below are some highlights of our Board governance program.

### Board Independence

- **Strong Lead Independent Director:** Ms. Williams, our Lead Independent Director, provides strong leadership of the independent directors through responsibilities expressly defined in Fifth Third's Corporate Governance Guidelines. The Lead Independent Director is annually elected by all independent directors.
- **Substantial Majority of Independent Directors:** The Board of Directors is comprised of a substantial majority of independent directors. All directors are considered independent under applicable standards except Mr. Carmichael, our CEO, and Mr. Feiger, a former employee of Fifth Third and former CEO of MB Financial, Inc., which merged with Fifth Third in 2019.
- **Independent Director-Led Committees:** All committees of the Board of Directors are comprised of independent directors.
- **Executive Sessions:** Independent directors regularly meet in executive session throughout the year.
- **Engagement with Regulators:** Fifth Third's regulators are invited to meet with independent directors outside the presence of management.

### Board Accountability

- **Ethics Training and Certification:** Directors receive annual ethics training and must review and acknowledge the Code of Business Conduct and Ethics on an annual basis.
- **Attendance:** The Board of Directors and its Committees had a 98% aggregate attendance rate in 2021.
- **Majority Voting Standards:** Fifth Third utilizes majority voting requirements for uncontested director elections and all directors must be elected annually with no staggered or multi-year terms. In addition, in 2021, Fifth Third eliminated supermajority voting requirements for shareholder approval of amendments to the Articles of Incorporation and for certain business mergers and combinations.
- **Retirement Age:** Our Code of Regulations provides that a director should not stand for re-election at the Annual Meeting following his/her 72nd birthday; provided that the Nominating and Corporate Governance Committee may waive this requirement upon consideration of relevant factors listed in our Corporate Governance Guidelines.
- **Annually Reviewed Director Pay Program:** The Director Pay Program is reviewed and approved annually by the Human Capital and Compensation Committee.
- **Oversight of Strategy:** The Board of Directors actively oversees the development of strategic objectives during its September Board meeting and receives updates on the implementation of strategic plans throughout the year at regularly scheduled Board meetings. The Board also reviews the risk assessment of the strategic plan.
- **Proxy Access:** The Board amended the Bancorp's Code of Regulations in 2020 to allow proxy access.
- **Stock Ownership Requirements:** Directors are required to own Fifth Third stock equal in value to six times their annual Board member salary (not including fees for Committee service) within five years of their Board appointment.
- **Oversight of Executive Management Succession Planning:** The Board engages in an annual executive management succession planning review meeting, in addition to regular succession planning discussions at the Committee level.

### Board Effectiveness

- **Robust Self-Assessments, Including Lead Independent Director Interviews:** The Board of Directors and the Nominating and Corporate Governance Committee oversee the annual self-evaluation process, which includes both written assessments of the Board and each Committee and interviews between the Lead Independent Director and each independent director. Management implements action plans based on directors' feedback and reports to the Board on the implementation of those plans in order to ensure continuous improvement.
- **Director Diversity, Skills, and Expertise:** The Board annually reviews directors' diversity, skills, and expertise to ensure the Board represents a diverse skill set oriented to the historical and emerging needs of the business.
- **Strong Director Education Program:** Fifth Third has instituted a robust director education program, approved annually by the Board, to enhance directors' knowledge on topics relevant to oversight of a large financial institution. Director education sessions typically occur at every regularly scheduled Board meeting and also several times a year in Committee meetings. In 2021, the Board and its Committees had a total of 35 education sessions.
- **Broad Director Onboarding Program:** Our Board-approved, comprehensive Director Onboarding Program seeks to quickly integrate new Directors in our business and culture and features one-on-one sessions with senior executives and functional area representatives, facility tours, and training on company policies and industry trends.
- **Board Succession Planning:** The Board, and its relevant Committees, regularly discuss Director succession planning, focusing on business needs, industry trends, diverse perspectives, and shareholder expectations.
- **Over-boarding Restrictions:** Directors are subject to over-boarding restrictions, updated in 2021, to improve Board effectiveness, ensure that directors have sufficient time and attention to devote to their duties at Fifth Third, and more closely align with shareholder expectations. Directors may serve on four total public company boards and Directors who are active CEOs may serve on two total public company boards.
- **Strong Corporate Governance Guidelines:** The Corporate Governance Guidelines and Board Committee Charters are reviewed annually to maintain strong and sound governance practices.

Table of Contents



## Item 2: Ratification of the Appointment of Deloitte & Touche to serve as Independent Auditor

The Board of Directors proposes to ratify the appointment of Deloitte & Touche to serve as the independent external audit firm for Fifth Third Bancorp until the Annual Meeting of Shareholders in 2023. The Audit Committee and the Board of Directors believe Deloitte & Touche's continued service as Fifth Third's independent external audit firm is in the best interests of the Company and our shareholders. The Audit Committee will further evaluate the appointment of Deloitte & Touche as independent external audit firm if the appointment is not ratified by a majority of shareholders.

Our Audit Committee and our Board of Directors recommends a vote "For" the ratification of the appointment of Deloitte & Touche as the Company's independent external audit firm for 2022. For more information on this item, please see page 84. This item appears as Item 2 on your proxy card.

## Item 3: Advisory Approval of the Company's Compensation of its Named Executive Officers

The Board of Directors seeks advisory approval of the compensation for Fifth Third's Named Executive Officers. The Human Capital and Compensation Committee and our Board of Directors have established a compensation philosophy and a compensation program that rewards employees for delivering the right products to the right customers. Our compensation program considers our shareholders' long-term interests and align with Fifth Third's values, while also staying within our risk tolerance.

Our Human Capital and Compensation Committee and our Board of Directors recommends a vote "For" the advisory approval of the compensation of our Named Executive Officers. For more information on this item, please see page 85. This item appears as Item 3 on your proxy card.

## Executive Compensation Highlights

Our Named Executive Officers have approximately 50% or more of their target total compensation delivered in the form of long-term, equity-based compensation.

***2021 Total Compensation Pay Mix***(1)

**Chief Executive Officer**




**Average of Other NEOs**




(1) The percentages reflect the Named Executive Officer's base salary as of December 31, 2021, target annual cash incentive award for 2021, and target long-term, equity-based incentive award for 2021.

Table of Contents

PROXY STATEMENT HIGHLIGHTS

Our compensation program incorporates best practices in governance and executive compensation, including the following:

| Compensation matter | Fifth Third's practice |
|---|---|
| Frequency of pay equity practices review | Annual |
| Frequency of say-on-pay advisory vote | Annual |
| Robust code of business conduct and ethics | ✓ |
| Pay for performance | ✓ |
| ESG modifier included in annual incentive goals | ✓ |
| Employment agreements for executive officers | ✗ |
| Excessive perks | ✗ |

Table of Contents



## Item 4: Approval of an Amendment to the Fifth Third Bancorp Code of Regulations to Establish the Exclusive Jurisdiction of Federal Courts for Actions Brought under the Securities Act of 1933

The Board of Directors proposes that shareholders adopt an amendment to the Company's Code of Regulations. The proposed amendment would add a new Article XI which provides that, unless the Company consents to the selection of an alternative forum in writing, the federal district courts of the United States will be the exclusive forum for the resolution of any claims arising under the Securities Act of 1933, as amended (the "Securities Act"). The Company believes that the adoption of a federal forum selection provision requiring that all claims arising under the Securities Act be brought in federal court will allow the Company to avoid state court forum shopping, eliminate parallel litigation in state and federal jurisdictions for claims arising out of the same or a similar set of facts, and improve procedural efficiencies in litigating claims arising out of the Securities Act. Based on these considerations and others, the Board of Directors believes it is in the best interests of Company and our shareholders that the Code of Regulations be amended to add the proposed federal forum selection provision.

Our Board of Directors recommends a vote "For" the approval of this amendment to our Code of Regulations. For more information on this item, please see page 86. This item appears as Item 4 on your proxy card.

Table of Contents

PROXY STATEMENT HIGHLIGHTS

# ESG Highlights

## OUR APPROACH TO ESG

**Our approach to ESG is focused on doing well by doing good.**

We are focused on generating long-term sustainable value for our stakeholders, including shareholders, customers, employees, communities and regulators. This focus is aligned with our Vision and guided by our Core Values and Strategic Actions.

### OUR PURPOSE

**To improve the lives of customers and the well-being of communities.**

### OUR VISION

**To be the One Bank people most value and trust. Our Vision is personal. It's about showing our customers, communities and employees that we provide something different, something of value—because without them, we could not exist.**




Our **Core Values** guide us as we work with customers, communities and each other:

**WORK AS ONE BANK**
Proactively collaborate to achieve shared goals

**TAKE ACCOUNTABILITY**
Own what you do. Speak up if something feels wrong, looks wrong, or is wrong

**BE RESPECTFUL & INCLUSIVE**
Respect diversity. Fully integrate ideas from varying perspectives

**ACT WITH INTEGRITY**
Be honest. Be fair. Do the right thing

Led by our Core Values, our **Strategic Actions** help us make decisions among competing demands, test the soundness of our actions and set boundaries within which we must operate.

**BUILD A STRONGER COMMUNITY**
Effect positive change. Empower the underserved. Be actively engaged.

**PROVIDE BETTER SOLUTIONS**
Drive product and service innovation. Provide a world-class customer experience, every single time.

**STRIVE FOR OPERATIONAL EXCELLENCE**
Do quality work. Be efficient. Perform through the cycle.

**CONTINUOUSLY MANAGE RISK**
Challenge ideas. Test soundness. Promptly escalate issues.

Table of Contents






**Our commitment to ESG excellence is integrated across our Company and aligned to our strategic priorities.** Our ESG strategy and reporting is led by our Investor Relations team, with support from across the Company and with oversight from the Board of Directors. In 2020, we established an ESG Committee to monitor emerging risks and trends through stakeholder engagement, shareholder resolutions and recommendations from independent organizations such as the Global Reporting Initiative ("GRI"), the Sustainability Accounting Board ("SASB"), TCFD, World Economic Forum and the United Nations.

**In 2020, we became the first U.S. commercial bank to join the SASB Alliance and GRI Community.** We also became a TCFD Supporter. We use these frameworks to allow for transparency in our ESG data reporting. In May 2021, we became a member of the Ceres Network, joining a group of companies who commit to achieving robust sustainability goals, improving resiliency in their operations and supply chains, and advancing market-based and equitable solutions to the world's biggest sustainability challenges.

## ESG priorities and actions

| Addressing climate change | Promoting inclusion and diversity | Keeping the customer at the center | Demonstrating our commitment to employees | Strengthening our communities |
|---|---|---|---|---|
| ~**$7.3BN** in lending and financing to renewable energy projects towards our **$8BN** goal by 2025[1] | **$2.8BN** Accelerating Racial Equality, Equity and Inclusion initiative | **99%** of banking centers remained open and **3MM+** customer calls since start of the pandemic | **$18** minimum wage per hour since 2019 | **$180MM** Empowering Black Futures Neighborhood Program in nine majority-Black communities |
| **$500MM inaugural Green Bond** issued in October 2021 | **40%** board diversity[3] | **Momentum Banking,** with Extra Time®, Early Pay and MyAdvance™ | **Up to $2,250** in special payments to front-line employees | **$41.6BN** delivered against 2016 $32BN community commitment[4] |
| Continued **carbon neutrality** in our operations since 2020[2] | **59%** women; **27%** persons of color in workforce | **Low** reliance on punitive consumer fees | **Up to 7%** 401(k) employer contribution with **84%** participation | **2.6MM** people educated through our L.I.F.E (Lives Improved through Financial Empowerment) programs |
| Agreed to acquire **Dividend Finance,** focused on consumer renewable energy solutions | **>99% pay equity** for women and minorities | **50,000+** fee-free ATMs | **MyDay** customer recommendation engine | ~**95K** hours of community service |
| | **$75.4MM** diverse supplier spend in 2020 | **Expert AP/AR** innovative TM offerings | ~765K hours of training (39 hours average/FTE) | |

*Datais for fiscal year 2021, unless otherwise noted;*

1. *1/1/2012-12/31/2021;*
2. *For Scope 1, Scope 2 and business travel under Scope 3 emissions. Projected full year 2021 CO2e emissions are based on 2021 year-to-date data as well as historical company data from 2014-2020. Final CO2e emissions will be made available in 2022 following independent verification;*
3. *In terms of ethnicity or gender;*
4. *2016-2020;*
5. *Since 2004.*

Table of Contents

PROXY STATEMENT HIGHLIGHTS

## AWARDS AND ACCOLADES

Fifth Third earned the following honors from Jan. 1, 2020 through December 31, 2021, unless otherwise noted.

- A+ in Financial Health, *DepositAccounts.com*
- *Forbes'* World's Best Banks
- 2021 WORLD'S MOST ETHICAL COMPANIES® WWW.ETHISPHERE.COM 2-TIME HONOREE
- *Newsweek* 2020 Most Responsible Companies*
- Winning "W" Company 2020 Women on Boards
- 3BL Media Responsible CEO of the Year
- National Certification for Express Banking Product as safe and affordable
- Customer Experience Leader from Greenwich Associates in 2020 for middle market banking
- Best Private Bank - Digitally Empowering RMs, Global Private Banking Innovation Awards, 2021
- American Heart Association Gold Level Workplace Health Achievement
- Diversity Best Practices Inclusion Index
- Disability Equality Index
- *Minority Business News'* All Star Supplier Diversity Team
- Energage Top Workplaces, *multiple regions*
- Human Rights Campaign Foundation Corporate Equality Index
- Women's Business Enterprise National Council Top Corporation
- #1 in Covid Response from 2021 Financial Health and Advice from a leading study
- Green Power Partnership National Top 100
- CDP 2021 and 2020 Climate Leadership Score of A-
- EPA Green Leadership Award
- Green Achievement Award, *Green Energy Ohio*

*Award announced in December 2019

Table of Contents

# Election of Directors (Item 1 on Proxy Card)

In accordance with our Code of Regulations, directors are each elected annually to a one-year term expiring at the next Annual Meeting of Shareholders. The terms of our current directors expire at the Annual Meeting on April 12, 2022. Each of our current directors has been nominated to be elected to serve until the Annual Meeting of Shareholders in 2023.

## Process for Director Nominations

Director candidates are nominated by the Nominating and Corporate Governance Committee. Pursuant to its Charter, the Nominating and Corporate Governance Committee annually reviews the current composition of the Board, in light of director skills, expertise, diversity, background, and experience, the current and emerging needs of our business, and feedback from directors in the Board's robust self-evaluation process. In addition, the Nominating and Corporate Governance Committee reviews the background and skills of director candidates based on the needs of the Company and the Board. Candidates are reviewed by the Nominating and Corporate Governance Committee and the Board of Directors prior to nomination or appointment to the Board.

Our Corporate Governance Guidelines provide that shareholders may propose nominees to the Nominating and Corporate Governance Committee by submitting the names and qualifications of such persons to the Nominating and Corporate Governance Committee no later than December 31 of each year. Submissions are to be addressed to the Nominating and Corporate Governance Committee at our executive offices and will be forwarded to the Committee. The Nominating and Corporate Governance Committee will then evaluate the possible nominee using the criteria provided in our Corporate Governance Guidelines, in the Nominating and Corporate Governance Committee Charter, and other relevant corporate governance disclosures and will consider such person in comparison to all other candidates. The Nominating and Corporate Governance Committee is not obligated to nominate any such individual for election. No such shareholder nominations have been received by Fifth Third for this Annual Meeting. Shareholders may also nominate candidates directly for election by following the procedures in our Code of Regulations. These are summarized in the "2023 Shareholder Proposals" section of this proxy statement.

Pursuant to applicable law and our Code of Regulations, any vacancies that occur after the directors are elected may be filled by the Board of Directors for the remainder of the full term of the vacant directorship or the Board may elect not to fill the vacancy and to reduce the size of the Board. There is no family relationship between and among any of our executive officers or directors. There are no arrangements or understandings between any of our executive officers or directors and any other person pursuant to which any directors are elected director or officers are appointed.

Table of Contents

ELECTION OF DIRECTORS

## Criteria for Director Nominations

Our Corporate Governance Guidelines set forth the following non-exclusive criteria for directors:

- independence (in order to compose a Board of Directors that has a majority of its members who are independent);
- highest personal and professional ethics and integrity;
- willingness to devote sufficient time to fulfilling duties as a director;
- impact on the diversity of the Board's overall experience in business, government, education, technology, and other areas relevant to our business;
- impact on the diversity of the Board's composition in terms of age, skills, ethnicity, and other factors relevant to our business; and
- the number of other public company boards on which the candidate may serve (e.g., a director may not serve on more than three public company boards in addition to Fifth Third).

The Board of Directors and Nominating and Corporate Governance Committee value diversity among our directors. The Board believes that diversity on our Board should be a priority and therefore actively seeks diverse candidates with regard to gender, race, ethnicity, age, background, and other attributes. We strive to include candidates who reflect the diverse markets which we serve in our pools from which nominee are chosen. Any third-party search firms engaged to assist in the searches for Director candidates are required to include candidates with diverse characteristics.

The Nominating and Corporate Governance Committee reviewed the qualifications of each nominee for election as director and found that each possesses strong personal and professional ethics and integrity and each was committed to representing the interests of Fifth Third and our shareholders. In addition, as a group, the skills, expertise, experience, and diversity of our Board are well-suited to address the current and emerging needs of our business and to achieve our strategic goals. Our Board of Directors believes that each of our directors, including each of our director nominees, has demonstrated the ability to devote sufficient time and attention to board duties and to otherwise fulfill the responsibilities required of directors. Therefore, the Nominating and Corporate Governance Committee has nominated for election as directors the following fifteen (15) persons: Nicholas K. Akins, B. Evan Bayh, III, Jorge L. Benitez, Katherine B. Blackburn, Emerson L. Brumback, Greg D. Carmichael, Linda W. Clement-Holmes, C. Bryan Daniels, Mitchell S. Feiger, Thomas H. Harvey, Gary R. Heminger, Jewell D. Hoover, Eileen A. Mallesch, Michael B. McCallister, and Marsha C. Williams. All nominees are current directors of Fifth Third Bancorp. Our Board of Directors has determined that all nominees are considered independent under applicable Nasdaq standards, with the exception of Messrs. Carmichael and Feiger.

Table of Contents



## Director Nominee Overview

| Name | Age | Gender | Ethnicity | Director Since | Other Public Company Boards* |
|---|---|---|---|---|---|
| Nicholas K. Akins | 61 | M | White | 2013 | American Electric Power |
| B. Evan Bayh, III | 66 | M | White | 2011 | Marathon Petroleum Company<br>Berry Global Group, Inc.<br>RLJ Lodging Trust |
| Jorge L. Benitez | 62 | M | Hispanic | 2015 | World Fuel Services |
| Katherine B. Blackburn | 56 | F | White | 2014 | None |
| Emerson L. Brumback | 70 | M | White | 2009 | M&T Bank (2007) |
| Greg D. Carmichael | 60 | M | White | 2015 | Encompass Health Corporation |
| Linda W. Clement-Holmes | 59 | F | African American | 2020 | Cincinnati Financial Corporation |
| C. Bryan Daniels | 63 | M | White | 2019 | MB Financial, Inc. (2019) |
| Mitchell S. Feiger | 63 | M | White | 2020 | MB Financial, Inc. (2019) |
| Thomas H. Harvey | 61 | M | White | 2019 | MB Financial, Inc. (2019) |
| Gary R. Heminger | 68 | M | White | 2006 | PPG Industries, Inc.<br>Marathon Petroleum Company (2020)<br>MPLX GP LLC (2020) |
| Jewell D. Hoover | 73 | F | African American | 2009 | None |
| Eileen A. Mallesch | 66 | F | White | 2016 | Arch Capital Group, Ltd.<br>Brighthouse Financial<br>State Auto Financial Corp. (2021)<br>Libbey, Inc. (2020)<br>Bob Evans Farms, Inc. (2018) |
| Michael B. McCallister | 69 | M | White | 2011 | AT&T, Inc.<br>Zoetis, Inc. |
| Marsha C. Williams | 70 | F | White | 2008 | Modine Manufacturing Company<br>Davis Funds<br>Crown Holdings, Inc.<br>McDermott International, Inc. (2020)<br>Chicago Bridge & Iron Company, N.V. (2018) |

* The year in which a public company directorship previously ended is indicated by the parenthetical year following the company name.

Table of Contents

ELECTION OF DIRECTORS

## Director Retirement Age Provision

Fifth Third's Corporate Governance Guidelines provide that a director should retire from the Board at the next annual meeting of shareholders that follows his or her 72nd birthday. Upon recommendation from the Nominating and Corporate Governance Committee, the Board may waive this retirement age provision a maximum of three times per director after consideration of the following, among other factors: whether Fifth Third is undergoing significant transition periods in executive leadership, whether there has been an unexpected loss of directors, or whether such a director possesses a specific expertise relevant to the current or emerging business needs of Fifth Third, has unique and valuable industry-specific knowledge, or possesses some other attributes deemed essential by the Board or Nominating and Corporate Governance Committee.

Pursuant to our Corporate Governance Guidelines, Ms. Hoover offered to retire prior to the 2022 Annual Meeting. The Nominating and Corporate Governance Committee evaluated Ms. Hoover's offer of retirement, her contributions to the Board, and the current areas of skills and expertise of the Board.

The Committee noted that Ms. Hoover annually receives high shareholder approval (including over 98% in 2021) and has significant experience as a former bank regulator for the Office of the Comptroller of the Currency ("OCC") and continues to provide Fifth Third guidance in its recent conversion to an OCC-chartered bank from an Ohio state-chartered bank. The Committee also considered Ms. Hoover's diverse perspectives and her leadership roles on the Board, including as the former Chair of the Risk and Compliance Committee, as well as her ongoing unique and valuable contributions as a member of both the Risk and Compliance and Audit Committees. Based on these considerations, the Committee unanimously agreed to grant an exception to Fifth Third's Corporate Governance Guidelines for Ms. Hoover, as a 2022 nominee. As such, the Committee nominated Ms. Hoover for an additional one-year term. For more specific information on Ms. Hoover's qualifications as a director, please see page 24.

Table of Contents



## Nominees for Election as Directors



### Nicholas K. Akins

**Chair, President, and Chief Executive Officer of American Electric Power Company**

Career Highlights:

- Chair, President, and Chief Executive Officer of American Electric Power Company
- 38-year career of increasing leadership responsibility with American Electric Power Company (initially with the former Central and South West Corporation that merged with AEP in 2000), including roles as Chief Executive Officer (November 2011), President (January 2011), and Executive Vice President (2006)

Key Qualifications and Experience

- Business expertise as chief executive officer of multi-state utility
- Oversight of operational, financial, and compliance-related management in heavily regulated industry
- Significant experience leading corporate and employee culture initiatives
- Oversight of cyber-related activities in business systems and critical infrastructure

Skills and Attributes:

Accounting/Financial Reporting, Compensation and Benefits, Corporate Governance, Cybersecurity, ESG, Executive Management, Human Capital Management, Legal and Regulatory, Risk Management, Strategic Planning



### B. Evan Bayh, III

**Senior Advisor, Apollo Global Management**

Career Highlights:

- Non-executive Senior Advisor, Apollo Global Management
- Served as United States Senator for the State of Indiana
- Served as Governor of the State of Indiana
- Partner, McGuire Woods
- Partner, Cozen O'Connor

Key Qualifications and Experience

- Oversight of a broad array of financial, economic, and policy issues impacting a wide variety of businesses as Governor and Senator
- Service as a member of the Senate Banking Committee and the Chair of the International Trade and Finance Subcommittee
- Extensive knowledge of cybersecurity issues as a result of membership on the Senate Intelligence Committee and the Central Intelligence Agency External Advisory Board

Skills and Attributes:

Compensation and Benefits, Corporate Governance, Cybersecurity, Digital Innovation and FinTech, ESG, Executive Management, Financial Services Industry, Human Capital Management, Legal and Regulatory, Risk Management, Strategic Planning

Table of Contents

ELECTION OF DIRECTORS



## Jorge L. Benitez

**Retired Chief Executive Officer of North America, Accenture**

### Career Highlights:

- Retired Chief Executive Officer of North America, Accenture
- Former Chief Operating Officer, Accenture Products Operating Group

### Key Qualifications and Experience

- Extensive experience developing and executing business strategies across a range of industries
- Significant experience implementing large-scale systems integration services
- Oversight of operating units within a large multinational publicly-traded company

### Skills and Attributes:

Accounting/Financial Reporting, Compensation and Benefits, Corporate Governance, Cybersecurity, Digital Innovation and Fintech, ESG, Executive Management, Human Capital Management, Risk Management, Strategic Planning



## Katherine B. Blackburn

**Executive Vice President of Cincinnati Bengals, Inc.**

### Career Highlights:

- Executive Vice President, Cincinnati Bengals, Inc.

### Key Qualifications and Experience

- Extensive experience managing Cincinnati Bengals professional football franchise, including human resource management, cost and efficiency management, marketing, and business negotiations
- Extensive experience with inclusion and diversity initiatives, including with the National Football League's Diversity Committee
- Knowledge and familiarity of Fifth Third Bank and the Cincinnati, Ohio regional market

### Skills and Attributes:

Compensation and Benefits, Corporate Governance, Cybersecurity, Digital Innovation and Fintech, ESG, Executive Management, Human Capital Management, Legal and Regulatory, Risk Management, Strategic Planning



## Emerson L. Brumback

**Retired President and Chief Operating Officer of M&T Bank**

### Career Highlights:

- Retired President and Chief Operating Officer of M&T Bank
- Vice Chair of the Board of Ascendium Education Group
- Former Chair, President, and Chief Executive Officer of Bank One Cincinnati

### Key Qualifications and Experience

- 30 years of experience in the financial services industry with several banking organizations
- Extensive executive experience overseeing retail banking, commercial banking, banking operations, and banking systems
- Knowledge of risk management systems in complex financial organizations

### Skills and Attributes:

Accounting/Financial Reporting, Compensation and Benefits, Corporate Governance, Executive Management, Financial Services Industry, Human Capital Management, Legal and Regulatory, Risk Management, Strategic Planning

Table of Contents





## Greg D. Carmichael

**Chair and Chief Executive Officer of Fifth Third Bancorp**

### Career Highlights:

- Chair and Chief Executive Officer of Fifth Third Bancorp; President (2012-2020); Chief Operating Officer (2006-2012); Chief Information Officer (2003-2006)

### Key Qualifications and Experience

- Extensive executive experience and valuable insight and knowledge from roles of Chief Executive Officer and Chief Operating Officer of Fifth Third Bancorp
- Technical expertise from his tenure as Fifth Third's Chief Information Officer and prior service in information technology roles with prior employers
- Substantial industry knowledge and leadership, including participation and leadership in industry organizations

### Skills and Attributes:

Accounting/Financial Reporting, Compensation and Benefits, Corporate Governance, Cybersecurity, Digital Innovation and FinTech, ESG, Executive Management, Financial Services Industry, Human Capital Management, Legal and Regulatory, Risk Management, Strategic Planning



## Linda W. Clement-Holmes

**Retired Chief Information Officer, The Procter & Gamble Company**

### Career Highlights:

- Retired Chief Information Officer, Global Information and Decision Solutions Officer, Senior Vice President of Global Business Services, and Chief Diversity Officer of The Procter and Gamble Company

### Key Qualifications and Experience

- 35-year career at Procter and Gamble, culminating in service as Chief Information Officer
- Extensive technology, cybersecurity, and digital innovation expertise, including leadership of global Procter and Gamble technology team and responsibility for digital and IT architecture and governance, including information security
- Experience in corporate strategy, including use of emerging business technologies to support speed and innovation
- Knowledge of Cincinnati, Ohio regional market and leadership in inclusion and diversity efforts

### Skills and Attributes:

Compensation and Benefits, Corporate Governance, Cybersecurity, Digital Innovation and FinTech, ESG, Executive Management, Human Capital Management, Risk Management, Strategic Planning

Table of Contents

ELECTION OF DIRECTORS



## C. Bryan Daniels

**Co-Founder and Principal of Prairie Capital, a Chicago-based private equity firm**

### Career Highlights:

- Co-Founder and Principal of Prairie Capital, a Chicago-based private equity firm
- Former Senior Vice President of Commercial Banking at American National Bank and Trust Company

### Key Qualifications and Experience

- Extensive and varied experiences as an executive, director, and investor in the financial services industry
- Possesses a rich and multi-faceted understanding of many different industries, companies, and business practices from his role at Prairie Capital
- Substantial experience in technology in several industries, including financial services

### Skills and Attributes:

Corporate Governance, Cybersecurity, Digital Innovation and FinTech, Executive Management, Financial Services Industry, Risk Management, Strategic Planning



## Mitchell S. Feiger

**Retired Chair and Chief Executive Officer of Fifth Third Bank (Chicago)**

### Career Highlights:

- Former Chief Executive Officer and President of MB Financial, Inc.
- Former Chief Executive Officer and President of MB Financial Bank, National Association
- Former Chief Executive Officer, President, and director of Coal City Corporation (merged with Avondale Financial Corp and was renamed MB Financial, Inc.)

### Key Qualifications and Experience

- 35 years of experience in the financial services industry, including 27 years as the president or chief executive officer of a bank holding company or commercial bank; President and Chief Executive Officer of MB Financial, Inc. immediately prior to its merger with Fifth Third Bancorp
- Extensive knowledge of the financial services industry and banking business and operations in Chicago region
- Significant experience in leadership of public companies
- Substantial bank regulatory experience

### Skills and Attributes:

Accounting and Reporting, Compensation and Benefits, Corporate Governance, Digital Innovation and Fintech, Executive Management, Financial Services Industry, Human Capital Management, Legal and Regulatory, Risk Management, Strategic Planning

Table of Contents





## Thomas H. Harvey

**Chief Executive Officer of Energy Innovation: Policy and Technology, LLC**

### Career Highlights:

- Chief Executive Officer of Energy Innovation: Policy and Technology, LLC
- Managing Partner and Principal Owner, Ajax, LLC
- Former Chair of the Board of MB Financial, Inc.
- Former Chief Executive Officer of ClimateWorks Foundation
- Former Environmental Program Director of the William and Flora Hewlett Foundation
- Former President of Energy Foundation

### Key Qualifications and Experience

- 25 years of service in the financial services industry
- Strong organizational and leadership skills and extensive investment experience derived from his executive positions with multiple foundations and organizations
- Unique and diverse knowledge and experience with the emergence and growth of technology in the banking industry
- Extensive knowledge and experience with renewable energy, ESG, and climate matters

### Skills and Attributes:

Accounting/Financial Reporting, Corporate Governance, ESG, Executive Management, Financial Services Industry, Human Capital Management, Strategic Planning



## Gary R. Heminger

**Retired Chair and Chief Executive Officer of Marathon Petroleum Corporation**

### Career Highlights:

- Retired Chair and Chief Executive Officer of Marathon Petroleum Corporation
- Former Chief Executive Officer of MPLX GP LLC

### Key Qualifications and Experience

- Over 40 years of experience with Marathon Petroleum Corporation in a variety of groups and functions
- Extensive valuable business knowledge from overseeing all operations, performance, reporting, and financial metrics for Marathon's refining, marketing, transportation, and Speedway businesses
- Substantial financial experience through oversight of all financial data, working capital, and merger and acquisition activity at Marathon

### Skills and Attributes:

Accounting/Financial Reporting, Compensation and Benefits, Corporate Governance, ESG, Executive Management, Human Capital Management, Risk Management, Strategic Planning

Table of Contents

ELECTION OF DIRECTORS



## Jewell D. Hoover

**Retired Senior Official with the Office of the Comptroller of the Currency**

### Career Highlights:

- Retired Senior Official with the Office of the Comptroller of the Currency
- Co-Author of the "Ultimate Guide for Bank Directors"
- Former Principal with the bank consulting firm Hoover and Associates, LLC
- Former Director of First Charter Corporation, a predecessor to Fifth Third Bancorp

### Key Qualifications and Experience

- 28 years of service with the Office of the Comptroller of the Currency, including service as the Deputy Comptroller of the agency's western district
- Extensive banking experience and knowledge as a bank consultant related to corporate governance, regulatory matters, director training, and problem bank resolution matter
- National Association of Corporate Directors Board Leadership fellow

### Skills and Attributes:

Accounting/Financial Reporting, Corporate Governance, Executive Management, Financial Services Industry, Legal and Regulatory, Risk Management, Strategic Planning



## Eileen A. Mallesch

**Certified Public Accountant and Retired Senior Vice President & Chief Financial Officer of Nationwide Property and Casualty Segment, Nationwide Mutual Insurance Company**

### Career Highlights:

- Certified Public Accountant
- Retired Senior Vice President & Chief Financial Officer of Nationwide Property and Casualty Segment, Nationwide Mutual Insurance Company
- Former Senior Vice President and Chief Financial Officer of Genworth Financial Life Insurance/Service Company

### Key Qualifications and Experience

- More than 25 years of broad financial and strategy experience in a variety of industries, including insurance, telecommunications, consumer products, and manufacturing
- Extensive financial management experience from tenure with Nationwide and Genworth
- Vast knowledge of enterprise resource planning and large-scale technology integrations, strategic planning, managing acquisitions and divestitures, and risk and compliance management.
- National Association of Corporate Directors Governance Fellow

### Skills and Attributes:

Accounting/Financial Reporting, Compensation and Benefits, Corporate Governance, Cybersecurity, ESG, Executive Management, Financial Services Industry, Legal and Regulatory, Risk Management, Strategic Planning



## Michael B. McCallister

**Retired Chair of the Board of Directors of Humana, Inc.**

### Career Highlights:

- Retired Chair of the Board of Directors of Humana, Inc.
- 39 years of service with Humana, Inc., including as Chief Executive Officer from 2000 through 2012 and as a board member from 2000 through 2013, including as Chair from 2010 through 2013

### Key Qualifications and Experience

- 39 years of experience in health care sector, including expertise in operational, financial, and strategic development
- Key roles in business advocacy groups, including the Business Roundtable, where he served as chair of the organization's Health and Retirement Task Force
- Substantial experience as a public-company director

### Skills and Attributes:

Accounting/Financial Reporting, Compensation and Benefits, Corporate Governance, ESG, Executive Management, Financial Services Industry, Human Capital Management, Legal and Regulatory, Risk Management, Strategic Planning



## Marsha C. Williams

**Retired Senior Vice President & Chief Financial Officer of Orbitz Worldwide, Inc.**

### Career Highlights:

- Retired Senior Vice President & Chief Financial Officer of Orbitz Worldwide, Inc.
- Former Executive Vice President & Chief Financial Officer of Equity Office Properties Trust

### Key Qualifications and Experience

- Extensive experience in financial matters, including 47 years in finance
- Knowledge and expertise of the financial services industry through 15 years of service with banking organizations
- Expertise from serving as a director of publicly traded companies and mutual funds, including leadership experience as a Chair and Lead Independent Director

### Skills and Attributes:

Accounting/Financial Reporting, Compensation and Benefits, Corporate Governance, Digital Innovation/FinTech, ESG, Executive Management, Financial Services Industry, Human Capital Management, Legal and Regulatory, Risk Management, Strategic Planning

Table of Contents

ELECTION OF DIRECTORS

| | Shares of Company Common Stock Beneficially Owned as of December 31, 2021(1) | Percent of Class |
|---|---|---|
| Nicholas K. Akins | 45,491 | .0067% |
| B. Evan Bayh, III | 28,021 | .0041% |
| Jorge L. Benitez | 27,427 | .0040% |
| Katherine B. Blackburn | 121,622 | .0178% |
| Emerson L. Brumback | 69,872 | .0102% |
| Greg D. Carmichael | 1,551,856 | .2269% |
| Linda W. Clement-Holmes | 7,669 | .0011% |
| C. Bryan Daniels(2) | 251,880 | .0369% |
| Mitchell S. Feiger(3) | 675,159 | .0989% |
| Thomas H. Harvey(4) | 148,732 | .0218% |
| Gary R. Heminger | 74,934 | .0110% |
| Jewell D. Hoover | 34,618 | .0051% |
| Eileen A. Mallesch | 29,029 | .0043% |
| Michael B. McCallister(5) | 56,671 | .0083% |
| Marsha C. Williams | 80,410 | .0118% |
| **All Directors and Executive Officers (28 persons)** | **4,622,180** | **.6746%** |

(1) As reported to Fifth Third Bancorp by the Directors as of the date stated. Includes shares held in the name of spouses, minor children, certain relatives, trusts, estates, and certain affiliated companies as to which beneficial ownership may be disclaimed. Unless otherwise noted, all shares of our Common Stock are subject to the sole voting power and investment power of the directors and executive officers. As of December 31, 2021, none of the Company's current executive officers or directors owned any Series H Preferred Stock, Series I Preferred Stock, Series J Preferred Stock, Series K Preferred Stock, Series A, Class B Preferred Stock, or any Depositary Shares representing interests in Series H Preferred Stock, Series I Preferred Stock, Series J Preferred Stock, Series K Preferred Stock, or Series A, Class B Preferred Stock.

The amounts shown represent the total shares owned outright by such individuals together with stock appreciation rights exercisable as of (or exercisable within 60 days of) December 31, 2021 but unexercised and shares of common stock underlying outstanding restricted stock units. Specifically, Mr. Carmichael had 935, 838 stock appreciation rights exercisable as of (or exercisable within 60 days of) December 31, 2021. The amounts listed for stock appreciation rights represent the number of rights that may be exercised; the actual number of shares delivered will vary based on the stock's appreciation over the grant price at the time of exercise. The aggregate number of stock appreciation rights exercisable as of (or exercisable within 60 days of) December 31, 2021 but unexercised held by the executive officers who are not also directors or nominees is 713,755. Directors owned the following number of restricted stock units as of December 31, 2021: Nicholas K. Akins, 45,491; B. Evan Bayh III, 40,140; Jorge L. Benitez, 30,876; Katherine B. Blackburn, 39,921; Emerson L. Brumback, 40,140; Greg D. Carmichael, 129,517; Linda W. Clement-Holmes, 7,669; C. Bryan Daniels, 16,626; Mitchell S. Feiger, 7,754; Thomas H. Harvey, 16,110; Gary R. Heminger, 40,140; Jewell D. Hoover, 40,140; Eileen A. Mallesch, 29,029; Michael B. McCallister, 45,491; and Marsha C. Williams, 54,085. Some directors have deferred receipt of the common stock underlying certain of their restricted stock units: B. Evan Bayh III, 31,477; Jorge L. Benitez, 3,448; C. Bryan Daniels, 3,448; Mitchell S. Feiger, 4,413; Thomas H. Harvey, 3,448; Gary R. Heminger, 15,988; Jewell D. Hoover, 5,522; Michael B. McCallister, 4,962; and Marsha C. Williams, 5,496. All directors and executive officers as a group own 939,089 restricted stock units. 755,039 of these restricted stock units are subject to vesting within 60 days of December 31, 2021.

(2) Includes 30,941 shares of Common Stock owned by a trust of Mr. Daniels or an immediate family member.
(3) Includes 585,108 shares of Common Stock owned by a trust of Mr. Feiger or an immediate family member.
(4) Includes 55,146 shares of Common Stock owned by a trust of Mr. Harvey or an immediate family member.
(5) Includes 5,000 shares of Common Stock owned by a trust of Mr. McCallister or an immediate family member.

Table of Contents



## Key to Director Skills Matrix

We believe each of our directors makes unique, valuable, and substantial contributions to the Board, both individually and as a collective group. The following matrix provides information regarding the members of the Board, including certain types of knowledge, skills, and experience that the Board believes are relevant to our business and achievement of our strategy. The type and degree of knowledge, skill, or experience below may vary among our directors. The matrix does not include all knowledge, skills, experience, or other attributes of our directors that may be relevant and valuable to their service on our Board; a director may possess other knowledge, skills, and experience not indicated in the matrix. The diversity of knowledge, skill, experience, and attributes of our directors, collectively, lends itself to a highly collaborative and effective Board.

| | Nicholas K. Akins | B. Evan Bayh, III | Jorge L. Benitez | Katherine B. Blackburn | Emerson L. Brumback | Greg D. Carmichael | Linda W. Clement-Holmes | C. Bryan Daniels | Mitchell S. Feiger | Thomas H. Harvey | Gary R. Heminger | Jewell D. Hoover | Eileen A. Mallesch | Michael B. McCallister | Marsha C. Williams |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Accounting/Financial Reporting** Experience as an accountant or auditor at large accounting firm, Chief Financial Officer, or other relevant experience in accounting and financial reporting. | ● | | ● | | ● | ● | | | ● | ● | ● | ● | ● | ● | ● |
| **Compensation and Benefits** Experience in management and development of human capital, compensation, or benefits programs. | ● | ● | ● | ● | ● | ● | ● | | ● | | ● | | ● | ● | ● |
| **Corporate Governance** Experience in governance matters, principles, and administration. | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● |
| **Cybersecurity** Experience in information security, data privacy, and cybersecurity. | ● | ● | ● | ● | | ● | ● | ● | | | | | ● | | |
| **Digital Innovation and FinTech** Experience in use of technology to facilitate business operations and customer service. | | ● | ● | ● | | ● | ● | ● | ● | | | | | | ● |
| **ESG** Experience in Environmental, Social, and Governance criteria and community affairs matters, including as part of a business and managing corporate social responsibility issues as business imperatives. | ● | ● | ● | ● | | ● | ● | | | ● | ● | | ● | ● | ● |
| **Executive Management** Business and strategic management experience from service in a significant leadership position, such as a chief executive officer, chief financial officer, or other senior leadership role. | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● |
| **Financial Services Industry** Experience in one or more of the Company's specific financial services areas, including retail banking, wholesale banking, wealth and investment management, or global payments. | | ● | | | ● | ● | | ● | ● | ● | | ● | ● | ● | ● |
| **Human Capital Management** Experience in managing and developing a large workforce, managing compensation, directing strategies leveraging human capital, managing inclusion and diversity efforts, establishing culture, implementing succession planning and talent management, and/or managing other human capital initiatives. | ● | ● | ● | ● | ● | ● | ● | | ● | ● | ● | | | ● | ● |
| **Legal and Regulatory** Experience acquired through a law degree and as a practicing attorney in understanding legal risks and obligations; experience in governmental and regulatory affairs, including as part of a business and/or through positions with government organizations and regulatory bodies. | ● | ● | | ● | ● | ● | | | ● | | | ● | ● | ● | ● |
| **Risk Management** Experience with reviewing or managing risk in a large organization, including specific types of risk (e.g., physical security, financial risk, or risks facing large financial institutions). | ● | ● | ● | ● | ● | ● | ● | ● | ● | | ● | ● | ● | ● | ● |
| **Strategic Planning** Experience defining and driving strategic direction and growth and managing the operations of a business or large organization. | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● |

Table of Contents

ELECTION OF DIRECTORS

## Vote Required

*(of our outstanding Common Stock and Series A, Class B Preferred Stock, voting together as a single class)*

Our directors are elected by the holders of our outstanding Common Stock and Series A, Class B Preferred Stock, voting together as a single class. The holders of the Common Stock have one vote per share, and the holders of Preferred Stock have 24 votes per share. Under Ohio law, our Articles of Incorporation, and our Code of Regulations, in an uncontested election of directors (i.e., an election where the number of candidates nominated for election to the Board of Directors equals the number of directors to be elected), each person receiving a greater number of votes "for" his or her election than votes "against" his or her election will be elected as a director.

We have also adopted provisions of our Corporate Governance Guidelines stating that in an uncontested election of directors, any nominee for director who receives a greater number of votes "against" his or her election than votes "for" his or her election will promptly tender his or her resignation to the Chair of the Board following certification of the shareholder vote. The Nominating and Corporate Governance Committee will promptly consider the tendered resignation and will recommend to the Board whether to accept or reject the tendered resignation no later than 60 days following the date of the shareholders' meeting at which the election occurred. In considering whether to accept or reject the tendered resignation, the Nominating and Corporate Governance Committee will consider factors deemed relevant by the Committee members including, without limitation, the director's length of service, the director's particular qualifications and contributions to Fifth Third, the reasons underlying the majority "against" vote (if known) and whether these reasons can be cured, and compliance with stock exchange listing standards and the Corporate Governance Guidelines. The Board will act on the Nominating and Corporate Governance Committee's recommendation no later than 90 days following the date of the shareholders' meeting at which the election occurred. In considering the Nominating and Corporate Governance Committee's recommendation, the Board will evaluate the factors considered by the Nominating and Corporate Governance Committee and such additional information and factors the Board believes to be relevant.

If any nominee(s) shall be unable to serve, which is not now contemplated, the proxies will be voted for such substitute nominee(s) as the Nominating and Corporate Governance Committee of the Board of Directors recommends.

***THE BOARD OF DIRECTORS RECOMMENDS A VOTE "FOR" EACH OF THE CANDIDATES FOR DIRECTOR NAMED ABOVE.***

Table of Contents

# Board of Directors, Its Committees, Meetings, and Functions

Our Board of Directors met ten times during 2021. Our Board of Directors also holds executive sessions of those members of the Board of Directors who meet the then-current standards of independence. In 2021, these sessions were led by our Lead Independent Director, Ms. Williams.

No current member of our Board of Directors attended less than 75% of the aggregate number of meetings of the Board of Directors and all committees on which such director served during 2021.

Neither the Board nor the Nominating and Corporate Governance Committee has implemented a formal policy regarding director attendance at the Annual Meeting; however, the Board typically holds a Board meeting directly following the Annual Meeting. In 2021, all directors attended the Annual Meeting.

During 2021, there were six standing committees of the Board of Directors, which assisted the Board in carrying out its responsibilities: Audit, Finance, Human Capital and Compensation, Nominating and Corporate Governance, Risk and Compliance, and Technology. Each Committee operates under a charter approved by the Board of Directors and reviewed annually by the respective Committee and the Board of Directors. The Board's committees meet on a regular basis according to the requirements of their charters. Each committee reports its activities, discussions, recommendations, and approvals to the Board at each regularly scheduled Board meeting. Committee leadership and membership is reviewed annually by the Board of Directors, upon recommendation of the Nominating and Corporate Governance Committee. Each Committee is comprised of only independent directors.

## Committee Composition

| Directors: | Nicholas K. Akins | B. Evan Bayh, III | Jorge L. Benitez | Katherine B. Blackburn | Emerson L. Brumback | Greg D. Carmichael (Board Chairman) | Linda W. Clement-Holmes | C. Bryan Daniels | Mitchell S. Feiger | Thomas H. Harvey | Gary R. Heminger | Jewell D. Hoover | Michael B. McCallister | Eileen A. Mallesch | Marsha C. Williams (Lead Independent Director) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Audit | | | | ■ | | | | | | ■ | | ■ | ■ | Chair | * |
| Finance | ■ | | ■ | | ■ | | | | | | Chair | | ■ | ■ | ■ |
| Human Capital and Compensation | | | | | ■ | | | | | | ■ | | Chair | ■ | ■ |
| Nominating and Corporate Governance | Chair | ■ | ■ | ■ | | | | | | ■ | | | | | ■ |
| Risk and Compliance | | | | | Chair | | ■ | ■ | | | ■ | ■ | | ■ | * |
| Technology | ■ | ■ | Chair | | | | ■ | ■ | | ■ | | | | | * |

■ = member
* = Served as an ex-officio, non-voting member

Table of Contents



## Audit Committee

Our Audit Committee serves in a dual capacity as the Audit Committee of Fifth Third Bancorp and Fifth Third Bank, National Association and is comprised entirely of independent directors.

**12**
Audit Committee meetings in 2021

The Audit Committee's functions include:

- Engagement of Fifth Third's independent external audit firm and review of its independence
- Review and approval of the independent external audit firm's annual plan and review of audit results
- Approval of all auditing and non-auditing services performed by our independent external audit firm
- Approval of annual internal audit plan and review of the results of the procedures for internal auditing
- Review and oversight of appointment and performance of senior internal audit executive
- Review of Fifth Third's financial results and periodic SEC and other regulatory filings
- Review of the design and effectiveness of internal controls
- Oversight of the administration of Fifth Third's Code of Business Conduct and Ethics
- Review of reporting regarding calls to Fifth Third's EthicsLine
- Fulfillment of the statutory requirements of a bank audit committee, as prescribed under applicable law



Audit Committee members in 2021 were (*from left to right*) Eileen A. Mallesch (Chair), Jewell D. Hoover, Thomas H. Harvey, Katherine B. Blackburn, and Michael B. McCallister.

Table of Contents



All members of the Audit Committee met the independence standards of Rule 5605(a)(2) and the audit committee qualifications of Rule 5605(c)(2) of the Nasdaq listing standards. The Board of Directors has determined that Mses. Mallesch and Hoover are audit committee financial experts and are independent as described in the preceding sentence. As Lead Independent Director, Ms. Williams serves as an ex-officio, non-voting member of the Audit Committee. The Board of Directors has adopted a written charter for the Audit Committee, which may be found in the Corporate Governance section of our website at www.53.com. The formal report of the Audit Committee with respect to the year 2021 is on page 82 herein.

Table of Contents



## Finance Committee

The Finance Committee serves in a dual capacity as the Finance Committee of Fifth Third Bancorp and Fifth Third Bank, National Association and is comprised entirely of independent directors.

4

Finance Committee meetings in 2021

The Finance Committee's functions include:

- Exercise of the powers of the Board of Directors of Fifth Third Bancorp and Fifth Third Bank during the intervals between meetings
- Exercise of management of the business, properties, and affairs of both Fifth Third Bancorp and Fifth Third Bank to the extent permissible



Finance Committee members for 2021 were (*from left to right*) Eileen A. Mallesch, Nicholas K. Akins, Marsha C. Williams, Gary R. Heminger (Chair), Michael B. McCallister, Emerson L. Brumback, and Jorge L. Benitez.

The Board of Directors has adopted a Finance Committee charter which may be found in the Corporate Governance section of our website at www.53.com.

Table of Contents



## Human Capital and Compensation Committee

Our Human Capital and Compensation Committee serves in a dual capacity as the Human Capital and Compensation Committee of Fifth Third Bancorp and Fifth Third Bank, National Association and is comprised entirely of independent directors.

7

Human Capital and Compensation Committee meetings in 2021

The Human Capital and Compensation Committee's functions include:

- Oversight of benefit, bonus, incentive compensation, severance, equity-based and other compensation plans, policies, and programs
- Review and approval of executive compensation and equity plan allocation
- Oversight of the development and administration of incentive compensation plans, policies, and programs
- Oversight of Talent Management and Succession Planning Programs, including succession planning for the CEO and other executive officers
- Review and recommendation of director compensation
- Oversight of establishment and administration of effective incentive compensation strategy which provides balanced risk-taking incentives in alignment with risk appetite



Human Capital and Compensation Committee members for 2021 were (*from left to right*) Eileen A. Mallesch, Gary R. Heminger, Michael B. McCallister (Chair), Emerson L. Brumback, and Marsha C. Williams.

The Board of Directors has adopted a Human Capital and Compensation Committee charter which may be found in the Corporate Governance section of our website at www.53.com. The formal report of the Human Capital and Compensation Committee with respect to 2021 compensation is on page 69 herein.

Table of Contents



## Nominating and Corporate Governance Committee

Our Nominating and Corporate Governance Committee serves in a dual capacity as the Nominating and Corporate Governance Committee of Fifth Third Bancorp and Fifth Third Bank, National Association and is comprised entirely of independent directors.

4

Nominating and Corporate Governance Committee meetings in 2021

The Nominating and Corporate Governance Committee's functions include:

- Recommendation of corporate governance policies and guidelines to enhance effectiveness, including those related to Board size and composition; Board function; meeting frequency and structure; the frequency, structure, and guidelines for calling executive sessions; meeting procedures; and the formation of new committees
- Review of Fifth Third's governance structure, including committee structure
- Identification and assessment of independence, backgrounds, and skills required for members of the Board
- Identification and nomination of director candidates and committee chairs and member candidates
- Review of and oversight of compliance with Corporate Governance Guidelines
- Review of potential conflicts of interest involving directors
- Creation and oversight of director education and onboarding programs
- Oversight of corporate social responsibility
- Creation and review of the Code of Business Conduct and Ethics
- Oversight of the Company's commitment to ESG issues and the Company's ESG business strategy
- Annual review of Board and committee performance



Nominating and Corporate Governance Committee members for 2021 were (*from left to right*) Thomas H. Harvey, Jorge L. Benitez, Nicholas K. Akins (Chair), Katherine B. Blackburn, B. Evan Bayh, III, and Marsha C. Williams.

The Board of Directors has adopted a Nominating and Corporate Governance Committee charter which may be found in the Corporate Governance section of our website at www.53.com.

Table of Contents



## Risk and Compliance Committee

Our Risk and Compliance Committee serves in a dual capacity as the Risk and Compliance Committee of Fifth Third Bancorp and Fifth Third Bank, National Association and is comprised entirely of independent directors.

The Risk and Compliance Committee's functions include:

**11**
Risk and Compliance Committee meetings in 2021

- Oversight of compliance with all regulatory obligations arising under applicable federal and state banking laws, rules, and regulations
- Oversight of risk management policies of Fifth Third's global operations
- Development and oversight of Fifth Third's global risk management framework, inclusive of risk appetite
- Creation of processes and policies for identifying, assessing, managing, monitoring, and reporting risks of all types, including the categories of credit risk, interest rate risk, price risk, liquidity risk, operational risk (including cybersecurity risk), legal and regulatory compliance risk, reputation risk, and strategic risk
- Development and oversight of risk governance structure
- Oversight of environmental and social risk activities, including climate change, and monitoring of their impact across all risk types
- Oversight of the exercise of trust and other fiduciary powers and of the fiduciary structure of Fifth Third
- Oversight of the Retail Non-deposit Investment Product Program
- Oversight of efforts to comply with or remediate regulatory findings or supervisory issues



Risk and Compliance Committee members in 2021 were (from left to right) C. Bryan Daniels, Eileen A. Mallesch, Gary R. Heminger, Jewell D. Hoover, Emerson L. Brumback (Chair), and Linda W. Clement-Holmes.

As Lead Independent Director, Ms. Williams serves as an ex-officio, non-voting member of the Risk and Compliance Committee. The Board of Directors has adopted a Risk and Compliance Committee charter which may be found in the Corporate Governance section of our website at www.53.com.

[Table of Contents](#)



## Technology Committee

Our Technology Committee serves in a dual capacity as the Technology Committee of Fifth Third Bancorp and Fifth Third Bank, National Association and is comprised entirely of independent directors. The Technology Committee was created by the Board of Directors in 2021.

**4**

Technology Committee meetings in 2021

The Technology Committee's functions include:

- Oversight of technology and innovation strategy and operations
- Oversight of strategy for information security, cybersecurity, and third-party technology risk management
- Oversight of technology policies, standards, and controls
- Oversight of enterprise data management program and strategy



Technology Committee members in 2021 were (*from left to right*) C. Bryan Daniels, B. Evan Bayh, III, Linda W. Clement-Holmes, Thomas H. Harvey, Jorge L. Benitez (Chair), and Nicholas K. Akins.

As Lead Independent Director, Ms. Williams serves as an ex-officio, non-voting member of the Technology Committee. The Board of Directors has adopted a Technology Committee charter which may be found in the Corporate Governance section of our website at www.53.com.

Table of Contents

# Corporate Governance

## Board Governance

The Board of Directors has adopted the Fifth Third Bancorp Corporate Governance Guidelines and the Fifth Third Bancorp Code of Business Conduct and Ethics, which applies to our directors and all of our employees, including our Chief Executive Officer, Chief Financial Officer, and Controller. The Corporate Governance Guidelines delineate the responsibilities of our directors, Board, and Board Committees as well as standards for Board composition, service, and meetings, and are reviewed annually to ensure standards remain consistent with evolving business needs and best practices.

Our principal Corporate Governance documents may be found at www.53.com.

- Corporate Governance Guidelines
- Code of Business Conduct and Ethics
- Articles of Incorporation
- Code of Regulations
- Information Disclosure Policy
- Government Affairs Policy
- Stock Ownership and Retention Guidelines
- Charter for each standing committee

## Board Performance Evaluations

The Board of Directors and the Nominating and Corporate Governance Committee annually review directors' skills and expertise to ensure the Board represents a diverse skill set oriented to the historical and emerging needs of our business. The comprehensive evaluation process also seeks to enhance the Board's effectiveness through the identification of opportunities for improvement. Our evaluation tools include both written questionnaires and individual interviews with the Lead Independent Director. The evaluations focus on function, organization, practices, and performance of the Board and each committee. The directors' anonymous responses and comments, along with feedback from the Lead Independent Director interviews, are analyzed by the committee chairs, who identify specific opportunities for improvement. Management develops and implements action plans to address opportunities for improvement and provides updates to the Nominating and Corporate Governance Committee.

The following is a timeline of the evaluation process:

### Purpose, Scope, and Focus

The Nominating and Corporate Governance Committee reviews and approves the self-assessment questionnaires for the Board of Directors and each committee, as well as suggested areas of discussion for the Lead Independent Director's interviews with individual directors.

### Evaluation and Discussion

Each director completes a written assessment of the Board of Directors and each committee on which he/she serves.

The Lead Independent Director conducts individual interviews with each independent director.

Table of Contents



## Review and Analysis

Anonymous results from the Board and committee assessments and from the Lead Independent Director's interviews are aggregated and analyzed. The results are provided to the Nominating and Corporate Governance Committee and each committee chair and are later discussed by the full Board.

## Development and Implementation of Action Plans

The Board and each Committee identify and prioritize opportunities for improvement based on the aggregated evaluation and interview responses and provide these opportunities to management.

Management develops and implements action plans to address the opportunities identified by the Board and each of its committees.

Management provides updates on the action plans and implementation thereof to the Nominating and Corporate Governance Committee as appropriate through the year and at the conclusion of each year before the next review cycle begins. The Nominating and Corporate Governance Committee provides feedback as appropriate.

The following year's evaluation process solicits feedback on the implementation of action items from the previous year.

## Board Training and Education

The Director Onboarding Program and Director Education Program are reviewed and approved each year by our Nominating and Corporate Governance Committee and Board of Directors. Our directors participate in a broad onboarding program upon their appointment to the Board and receive continued education throughout the year pursuant to Fifth Third's Director Education Program. Our onboarding program aims to integrate new directors into the overall function of the Board of Directors, so that new directors may meaningfully contribute to the Board, while increasing and enhancing the background, experience, and perspective of new directors. The Onboarding Program covers organization structure, corporate culture, lines of business, functional areas, operations, strategic planning, risk, director responsibilities, committee roles, regulatory landscape, and other senior management responsibilities.

The goal of the Director Education Program is to enhance director effectiveness by providing education on issues that are relevant to oversight and management of Fifth Third in order to create long-term value and reflect shareholder and regulatory expectations that directors continually enhance their knowledge and skills. Our Director Education Program provides training on a wide array of relevant topics, such as complex products and services, lines of business, legal and regulatory developments, human capital and executive compensation trends, finance practices, audit methodologies, areas of historical, current, and anticipated risk, cybersecurity trends, and strategy. Education sessions are offered consistently at both the Board and Committee levels and include both internal and external presenters. During 2021, the Board participated in at least one, and typically multiple, director education sessions at every regularly scheduled Board meeting, providing a consistent, ongoing forum for broadening and deepening directors' knowledge of salient topics. Our directors also participate in forums and education sessions hosted by regulatory agencies and public company director organizations.

## Board Leadership

The Board believes that our shareholders are best served by a Board that has the flexibility to establish a leadership structure that fits our needs at any particular point in time. Accordingly, under our Code of Regulations and Corporate Governance Guidelines, the Board of Directors has the authority to combine or separate the positions of Chair and Chief Executive Officer as well as determine whether, if the positions are separated, the Chair is an affiliated director or an independent director.

Table of Contents



The Board's Chair is currently Fifth Third's Chief Executive Officer, Mr. Carmichael, and Ms. Williams currently serves as the Lead Independent Director. The Board believes that this leadership structure is appropriate at this time given Mr. Carmichael's experience as CEO and his ability to provide strategic and operational leadership. The Board determined that leadership by our CEO, coupled with oversight from our strong Lead Independent Director, experienced Committee Chairs, and our other well-qualified directors, almost all of whom are independent, will allow Fifth Third to grow and meet the challenges facing the industry and the expectations of our shareholders.

The Lead Independent Director is nominated by the Nominating and Corporate Governance Committee and annually elected by all independent directors. When nominating and electing a Lead Independent Director, our Board considers candidates' independence in accordance with Nasdaq listing standards and other applicable laws and regulations; knowledge of the Board, Company, and financial services industry; leadership experience in public companies; familiarity with corporate governance best practices and procedures; ability to achieve consensus and alignment among independent directors and among independent directors and the Chair; and, ability to work effectively and constructively with and advise the Chair. The Committee may also consider other factors, relevant to the Board's oversight, Fifth Third's business and industry, and/or Company strategy when considering candidates for Lead Independent Director. The Board believes Ms. Williams, in her role as Lead Independent Director, provides the Board with strong independent leadership among both independent directors and with the Chair, possesses significant knowledge of the Board, Company, and financial services industry, possesses expertise in corporate governance practices and procedures, and exhibits appropriate independent oversight of management.

Table of Contents

CORPORATE GOVERNANCE

Under our Code of Regulations and Corporate Governance Guidelines, our Lead Independent Director will exercise the following duties:

**Leadership**

Lead executive sessions of independent directors and preside at any Board sessions in the absence of the Chair

Provide leadership in times of crisis

**Communication**

Facilitate discussion among independent directors and between independent directors and the CEO

Facilitate communication with major shareholders and regulators

**Agendas**

Approve Board agendas and schedules to ensure topics and discussion times are appropriate

**Special Meetings**

As appropriate, call special meetings of independent directors or suggest special meetings of the entire Board to the Chair

**Executive Sessions**

Lead executive sessions of independent directors, including the development agendas for such sessions, and serve as a conduit to the Chair on issues and outcomes discussed in such sessions

**Consultants**

Recommend the retention of consultants

**Board Composition**

Recommend director candidates for nomination and consult with the Chair on committee membership and leadership

**Corporate Governance Guidelines**

Assist the Board and management with implementation of, and compliance with, Corporate Governance Guidelines and consult with the Chair on revisions to Corporate Governance Guidelines

**CEO and Board Performance Evaluations**

Consult with the Human Capital and Compensation Committee on the CEO performance evaluation and meet with CEO to discuss the evaluation

Act as a liaison between the Chair and independent directors on Board performance evaluations

**Culture**

Act as a liaison between the Chair and independent directors on issues relating to Board culture

Table of Contents



***Risk Management Oversight***. An important role of the Board of Directors is to provide oversight to ensure an enterprise risk management program is implemented and operating effectively, including an appropriate enterprise risk management framework and related governance structure. The Bancorp establishes a risk appetite in alignment with its strategic, financial and capital plans. The Bancorp's risk appetite is defined using quantitative metrics and qualitative measures to ensure prudent risk taking and drive balanced decision making. The Bancorp's goal is to ensure that aggregate residual risks do not exceed the Bancorp's risk appetite, and that risks taken are supportive of the Bancorp's portfolio diversification and profitability objectives. The Board and executive management approve the risk appetite, which is considered in the development of business strategies and forms the basis for enterprise risk management. Through their oversight role, directors also ensure that the risk management processes defined in the framework are functioning as intended. The Board also considers the optimal organizational structure at both the Board and management levels. This may include delegating responsibility through Board committees, management committees, the Chief Executive Officer, the Chief Risk Officer, and the Chief Credit Officer.

The Board's risk oversight responsibility is primarily carried out through its standing committees, as follows:




The Risk and Compliance Committee currently consists of six outside directors and has responsibility for the oversight of risk management, including credit, interest rate, liquidity, price, operational, legal and regulatory compliance, reputational, and strategic risks. The Risk and Compliance Committee also has responsibility to ensure that risks are properly controlled and quantified and are within our risk appetite. The Chief Risk Officer and Chief Credit Officer have a direct reporting relationship to the Chief Executive Officer and the Risk and Compliance Committee.

Table of Contents

CORPORATE GOVERNANCE

Each of the Chief Risk Officer and the Chief Credit Officer have regular executive sessions with the Risk and Compliance Committee without other members of management present. In addition, the Director of Credit Risk Review provides reporting and has direct access to the Risk and Compliance Committee.

The Bancorp's risk governance structure ensures proper oversight of risk across the firm and provides a path for escalation of risks and issues to management and board-level committees to drive effective risk decisioning. The Risk and Compliance Committee oversees a robust management-level risk committee structure which allows the Board and management to assess the company's risk exposure and to ensure it is aligned with the Bancorp's appetite for risk.

During times when there may be elevated levels of risk, the Board monitors the impact on the risk profile by regularly reviewing and reporting on management's response and actions taken to mitigate risks, including financial and non-financial risks, business continuity, and human capital risks.

The **Enterprise Risk Management Committee** is the executive-level management committee chaired by the Chief Risk Officer. Membership includes the Chief Executive Officer and senior level management, including risk experts and management from each line of business. The Enterprise Risk Management Committee is responsible for reviewing and approving the Enterprise Risk Management Framework and policies, overseeing the management of all risk categories to ensure that risks remain within our risk appetite, and fostering a culture that supports risk management objectives. In order to fulfill these responsibilities, the Enterprise Risk Management Committee reviews information on risk levels and trends, capital adequacy, and top and emerging risks during each quarterly meeting. The Enterprise Risk Management Committee has several subordinate management committees and councils which oversee specific areas of risk, including oversight of front line unit risk-taking activities, to determine if risk management practices are aligned with the Enterprise Risk Management Framework, including monitoring risk appetite, review of key risk indicators, concentration risk limits, and other risk metrics and reporting.

Table of Contents



***Communication with the Board.*** Shareholders may communicate directly with the Board of Directors in writing by sending a letter to the Board at: Fifth Third Bancorp Board of Directors, c/o Fifth Third Legal Department, Office of the Corporate Secretary, 38 Fountain Square Plaza, MD 10909F, Cincinnati, Ohio 45263. All communications directed to the Board of Directors will be received and processed by the Fifth Third Legal Department and will be transmitted to the Nominating and Corporate Governance Committee.

The Audit Committee has also established Fifth Third's EthicsLine, a toll-free hotline and web portal through which confidential complaints may be made anonymously regarding: illegal or fraudulent activity; questionable accounting, internal controls, or auditing matters; conflicts of interest, dishonest or unethical conduct, including incentive gaming; disclosures in the Company's SEC reports, bank regulatory filings, and other public disclosures that are not full, fair, accurate, timely, and understandable; violations of our Code of Business Conduct and Ethics; and/or any other violations of laws, rules, or regulations. The contact information for the EthicsLine is available in the Code of Business Conduct and Ethics, which is available at our website. Complaints submitted through this process are presented to the Audit Committee on a regular, periodic basis.

Table of Contents

CORPORATE GOVERNANCE

## *Shareholder Engagement.*

We are committed to engaging with and listening to our shareholders, and we have continued our engagement throughout the COVID-19 pandemic. In addition to our regular and continuing meetings with shareholders and investors, whether individually or at conferences, in the fall of 2021, we reached out to our 30 largest shareholders and engaged with many of them on issues including ESG, corporate governance, and executive compensation matters.

### Who we engage:

- Institutional shareholders
- Retail shareholders
- Fixed-income investors
- Proxy advisory firms
- Industry thought leaders

### What we provide:

- Annual report
- Proxy statement
- SEC filings
- Press releases
- Company website
- Environmental, Social & Governance Report

### How we engage:

- Quarterly earnings calls
- Investor conferences
- Annual shareholder meetings
- Investor road shows
- On-site visits
- Virtual meetings and calls

### How we communicate:

- Our senior executives, including our CEO, President, and Chief Financial Officer, regularly engaged with shareholders.
- Our CEO presents at our Annual Shareholder Meeting
- Senior management offered off-season individual engagements to shareholders representing 50% of our outstanding institutionally-held shares.
- In the off-season, senior management met with shareholders representing 32% of our outstanding institutionally-held shares

### What we discussed:

- Community Investment and Services offered to our communities
- ESG
- Human Capital Management
- Executive Management and Compensation
- Green Bonds
- Carbon Emissions and Neutrality
- Corporate Governance
- Strategic Priorities
- Technology
- New and enhanced products

***Shareholder Communication with Investor Relations Department.*** Shareholders who wish to speak to a Fifth Third representative regarding their investment in Fifth Third may communicate directly with our Investor Relations Department by calling 866-670-0468. In addition, shareholders may communicate in writing directly with the Investor Relations Department by sending a letter to 38 Fountain Square Plaza, MD 1090FV, Cincinnati, Ohio 45263 or by emailing ir@53.com. Shareholders can also view information and request documents from the Investor Relations page of Fifth Third's website at ir.53.com.

Table of Contents

# Board of Directors Compensation

Each non-employee director is awarded an annual cash retainer and an award of restricted stock units ("RSUs") for their service on the Board. The Human Capital and Compensation Committee reviewed director compensation for 2021 in consultation with its independent compensation consultant in light of best practices, peer institution benchmarking (using the same Compensation Peer Group as used for the executive pay analysis), and other relevant factors. There were no changes to director compensation in 2021 from the prior year. Employee directors receive no additional compensation for their Board service. In addition to the 2021 compensation structure described below, non-employee directors were reimbursed for reasonable out-of-pocket expenses incurred for travel and attendance related to meetings of the Board of Directors or its committees.

| Element of Compensation | Position | | 2021 Amount ($)(1)(2) |
|---|---|---|---|
| Annual Retainer (cash) | Board Member | | 90,000 |
| | Lead Director Additional Retainer | | 65,000 |
| Annual Retainer (equity) | Board Member | | 130,000 |
| | Lead Director Additional Retainer | | 25,000 |
| Annual Committee Retainers | Audit Committee | Chair | 45,000 |
| | | Member | 10,000 |
| | Risk & Compliance Committee | Chair | 45,000 |
| | | Member | 10,000 |
| | Human Capital & Compensation Committee | Chair | 25,000 |
| | Nominating & Corporate Governance Committee | Chair | 20,000 |
| | Finance Committee | Chair | 55,000 |
| | Technology Committee | Chair | 20,000 |

(1) Payments of cash retainers are made in arrears on a quarterly basis each January, April, July, and October.
(2) All equity awards granted to the Board of Directors are granted in RSUs that vest on the date the director's service on the Board ends. Directors may defer these awards by submitting their deferral instructions prior to the beginning of the year of grant. RSU awards are granted on the date of the annual shareholders meeting or upon joining the Board.

The Company's 2021 Incentive Compensation Plan provides that the Human Capital and Compensation Committee has full authority to provide equity-based or other incentive awards to non-employee directors, and the equity-based awards shown in the table below were granted under that plan.

Pursuant to the Fifth Third Bancorp Unfunded Deferred Compensation Plan for Non-Employee Directors, such directors may annually elect to defer from one-half to all of their cash compensation. The deferred funds receive earnings based on the mutual fund(s) elected by each director. The directors do not receive any above-market or preferential earnings. Under the plan, directors may not defer their future cash compensation into Company stock.

Table of Contents

## BOARD OF DIRECTORS COMPENSATION

The following table summarizes the compensation earned by or awarded to each non-employee director who served on the Board of Directors during 2021. The amounts listed in the "Stock Awards" column represent RSU awards that vest at the completion of a director's service on the Board. The award relates to the fiscal year in which it was granted. Directors did not receive any option awards, non-equity incentive compensation, or above market or preferential earnings from nonqualified deferred compensation in 2021. The 2021 Incentive Compensation Plan establishes a shareholder-approved annual limitation of $700,000 on the amount of cash compensation and the value of shares (determined on the date of the grant) paid to any non-employee director in a calendar year.

2021 Director Compensation

| Name | Fees Earned or Paid in Cash ($) | Stock Awards ($)(1) | Option Awards ($) | Non-Equity Incentive Plan Compensation ($) | Nonqualified Deferred Compensation Earnings ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|
| Nicholas K. Akins | 110,000 | 130,000 | — | — | — | — | 240,000 |
| B. Evan Bayh, III | 90,000 | 130,000 | — | — | — | — | 220,000 |
| Jorge L. Benitez | 110,000 | 130,000 | — | — | — | — | 240,000 |
| Katherine B. Blackburn | 100,000 | 130,000 | — | — | — | — | 230,000 |
| Emerson L. Brumback | 135,000 | 130,000 | — | — | — | — | 265,000 |
| Linda W. Clement-Holmes(2) | 94,670 | 166,329 | — | — | — | — | 260,999 |
| C. Bryan Daniels | 100,000 | 130,000 | — | — | — | — | 230,000 |
| Mitchell Feiger(2) | 90,000 | 166,329 | — | — | — | — | 256,329 |
| Thomas H. Harvey | 100,000 | 130,000 | — | — | — | — | 230,500 |
| Gary R. Heminger | 155,000 | 130,000 | — | — | — | — | 285,000 |
| Jewell D. Hoover | 110,000 | 130,000 | — | — | — | — | 240,000 |
| Eileen A. Mallesch | 145,000 | 130,000 | — | — | — | — | 275,000 |
| Michael B. McCallister | 125,000 | 130,000 | — | — | — | — | 255,000 |
| Marsha C. Williams | 155,000 | 155,000 | — | — | — | — | 310,000 |

(1) The values shown for stock awards in the Director Compensation Table reflect the grant date fair value of $38.22, which was the closing price of Fifth Third stock on the grant date April 13, 2021. All values are calculated in accordance with FASB ASC Topic 718.

(2) Upon joining the Board Mr. Feiger and Ms. Clement-Holmes received a prorated grant in 2020 for service through December 31, 2020. The 2021 award for these directors was increased to account for service from January 1, 2021 through April 12, 2021.

Table of Contents



In 2021, the Company's stock ownership guidelines required each director to own Fifth Third Stock equal in value to six times his/her annual cash retainer, not including fees paid for committee service. Directors have five years from their election date to meet this requirement. For all directors appointed after June 1, 2020 dividends on shares subject to equity awards will automatically be reinvested. As of December, 2021, all directors had sufficient holdings to meet or exceed the stock ownership requirement, or had not yet served on our Board for five years and were on pace to meet the guidelines. The outstanding equity awards for each director as of December 31, 2021 are provided below.

| Outstanding Equity Awards at December 31, 2021 | | |
|---|---|---|
| Director | Options Awards # | Stock Awards (#) |
| Nicholas K. Akins | | 45,491 |
| B. Evan Bayh, III | | 40,410 |
| Jorge L. Benitez | | 30,876 |
| Katherine B. Blackburn | | 39,921 |
| Emerson L. Brumback | | 40,140 |
| Linda W. Clement-Holmes | | 7,669 |
| C. Bryan Daniels | | 16,626 |
| Mitchell Feiger | 61,193(1) | 7,754 |
| Thomas H. Harvey | | 16,610 |
| Gary R. Heminger | | 40,140 |
| Jewell D. Hoover | | 40,140 |
| Eileen A. Mallesch | | 29,029 |
| Michael B. McCallister | | 45,491 |
| Marsha C. Williams | | 54,085 |

(1) All options awards were granted while Mr. Fieger was an employee and do not reflect compensation as a member of the Board of Directors.

The Human Capital and Compensation Committee reviewed director compensation for 2022 in consultation with its independent compensation consultant in light of best practices, peer institution benchmarking, and other relevant factors. The Board approved a $10,000 increase to overall director compensation, split equally between cash and equity, effective January 1, 2022. Additionally, $5,000 increases to the cash retainer for the Chairs of the Nominating and Corporate Governance Committee and Technology Committee were also approved, effective January 1, 2022.

Table of Contents

# Compensation Discussion and Analysis

The Company's Compensation Discussion and Analysis provides information concerning the compensation for its Named Executive Officers. This information is set forth in the following sections:

## Compensation Methodology and Structure

- Compensation Philosophy
- Features of our Executive Compensation Program
- Compensation Risk Management
- The Committee's Role
- Role of Executive Officers in Compensation Decisions
- Role of the Independent Compensation Consultant
- Benchmarking Methodology
- Tally Sheet
- Say-on-Pay
- Compensation Structure
- Pay Mix and Pay for Performance

## 2021 Executive Compensation Plan Design and Award Decisions

- Base Salary
- 2021 Variable Compensation Plan Design
- Variable Compensation Plan Performance Goals
- Performance Against Variable Compensation Plan Goals
- Determination of Variable Compensation Plan Awards
- 2021 Long-term, Equity-based Incentive Compensation Plan Design
- Payout of 2019 Performance Share Awards
- Other Long-term, Equity-based Plan Provisions
- Determination of Long-term, Equity-based Incentive Awards
- Qualitative Performance Assessments
- The Committee's Considerations

## 2022 Executive Compensation Plan Design Changes

- 2022 Variable Compensation Plan Changes
- 2022 Long-term, Equity-based Incentive Plan Changes

## Executive Benefits and Perquisites

- Summary of Eligibility for Benefits and Perquisites
- Use of the Corporate Aircraft
- Retirement Benefits
- Health and Welfare Benefits
- Severance and Change in Control Benefits
- Executive Severance Benefits Plan

## Executive Ownership and Capital Accumulation

- Stock Ownership Guidelines
- Beneficial Ownership
- Prohibition on Hedging and Pledging
- Clawbacks and Recoupments

## Tax and Accounting Impacts of Compensation Programs

- Deductibility of Executive Compensation
- Accounting and Financial Reporting

Table of Contents



In the various sections of this Compensation Discussion and Analysis, we will describe our compensation philosophy, methodology, and structure and how pay decisions were made in 2021. We will focus on the compensation of individuals who served in the following roles during fiscal year 2021, who are referred to as our Named Executive Officers ("NEOs"):

| | |
|---|---|
| Greg D. Carmichael | Chairman and Chief Executive Officer |
| James C. Leonard | Executive Vice President and Chief Financial Officer |
| Timothy N. Spence | President |
| Lars C. Anderson | Vice Chairman, Strategic Growth Initiatives |
| Kevin P. Lavender | Executive Vice President and Head of Commercial Bank |

## Summary of Executive Compensation Program

Fifth Third endeavors to attract and retain the best talent and motivate them to fulfill Fifth Third's vision to be the One Bank that people most value and trust. We plan to accomplish this by establishing compensation programs that reward our people for delivering the right products to the right customers, in ways that consider our shareholders' long-term interests, and align with Fifth Third's values, while also staying within our risk tolerance. Our compensation philosophy guides us in this endeavor.

Our compensation is delivered through three primary elements:

Base Salary + Annual Cash Incentive *(Variable Compensation Plan)* + Long-Term Incentives *(Equity-based Compensation)*

The Company typically pays base salary and annual incentive compensation awards through our Variable Compensation Plan, in cash. All long-term, equity-based incentive compensation awards are settled in shares of the Company's Common Stock. These three elements combined define our "Total Direct Compensation," which is referred to in the discussion that follows.

When making pay decisions, the Human Capital and Compensation Committee (the "Committee") considers the aggregate and mix of an executive officer's Total Direct Compensation and reviews Company performance results, individual performance, and risk assessment information to ensure that pay decisions align with performance and ultimately shareholders' interests.

### Highlights of 2021 Company Performance

In 2021, the Company performed extremely well in a unique environment, highlighting our performance through the cycle. For detailed highlights of 2021 Company performance, please see page 4.

Table of Contents



## Compensation Methodology and Structure

***Compensation Philosophy.*** Our compensation methodology centers on our compensation philosophy, which is comprised of the following key tenets:




***Our commitment to this philosophy.*** The company is committed to making compensation decisions that are fiscally responsible, while remaining competitive to attract and retain talent.

Our expected total compensation opportunities generally reflect the median pay levels of our Compensation Peer Group, with variations based on specific talent needs, experience, and other internal factors. We believe that actual total compensation should vary with the performance of the organization so that outstanding performance results in above-market compensation. Long-term incentives are a key focus of our executive compensation program. This focus facilitates collaboration among business units, ownership in the Company, and a focus on shareholder goals.

Fifth Third is committed to a pay philosophy that ensures all employees are paid fairly and equitably in compliance with the law.

Table of Contents



***Features of our Executive Compensation Program.*** Our executive compensation program incorporates the following features:

| |
|---|
| Pay for performance. |
| Risk-balancing features. |
| Double-trigger change-in-control provisions. |
| No excise tax gross-ups to executive officers. |
| Stock ownership guidelines and stock retention policies. |
| Prohibition on speculative trading and hedging strategies by executive officers. |
| Prohibition on use of securities as collateral for a loan. |
| Utilization of an independent compensation consultant hired and overseen by the Committee. |
| Grant of long-term incentives on pre-determined dates. |
| Committee reviews of both financial and non-financial performance. |
| Clawback features in all executive officer pay. |

***Compensation Risk Management.*** We believe it is critical to bring a multi-faceted strategy toward mitigating risk in our compensation programs and incentive plans. Our executive compensation program includes several features that address potential compensation risk:

| |
|---|
| Downward discretion based on risk, performance, and regulatory factors. |
| Caps on the maximum payment under our Variable Compensation Plan and our Performance Share Plan. |
| Mix of short-term and long-term compensation. |
| Forfeiture provisions related to material risk events. |
| Stock ownership and retention guidelines. |
| Ability to clawback compensation received as a result of misconduct. |

To execute the risk mitigation strategies, we conduct yearly review processes, which are documented and incorporate input from business segments including Finance, Legal, Human Capital, Risk Management, and the Company's business leaders. These processes include:

| Processes | Purpose |
|---|---|
| **Market Reviews** | Human Capital uses peer benchmark data to ensure that pay programs are competitive. |
| **Incentive Plan Reviews** | Senior business leaders ensure that incentive plans support the business strategy. |
| **Risk Reviews** | Senior risk and credit leaders serving on the Compensation Risk Oversight Committee (a management committee that reports to the Human Capital and Compensation Committee) determine whether incentive plans support the Company's risk culture of not promoting unnecessary risk and are consistent with the incentive compensation risk framework. |
| **Financial Reviews** | Senior finance executives confirm that the incentive plans are fiscally sound and contribute to shareholder value. |
| **Board Reviews** | Independent directors, serving on the Human Capital and Compensation Committee and Risk and Compliance Committee, assess the strategic, risk, and fiscal soundness of the compensation plans and ensure that they are aligned with the Company's compensation philosophy. |

Table of Contents

COMPENSATION DISCUSSION AND ANALYSIS

We believe it is critical that our people clearly understand how they are rewarded to ensure that pay facilitates the appropriate strategic and risk awareness behaviors. Because of this, we provide ongoing compensation communication and education to our employees.

In December 2021, the Committee met jointly with the Risk and Compliance Committee to review our 2022 executive and other incentive programs. Based in part on the provisions and actions above, the Committee concluded that neither the design nor metrics of such programs encourage taking unnecessary or inappropriate risk and that our compensation policies and practices are not reasonably likely to have a material adverse effect on the Company.

***The Committee's Role.*** The Committee is comprised of independent directors and is responsible for establishing, implementing, and monitoring the administration of compensation and benefits programs in accordance with the Company's compensation philosophy and strategy, along with approving executive compensation and equity plan awards. Among other things, the Committee focuses on the attraction and retention of key executives. When making decisions, the Committee considers the Company's compensation philosophy, the achievement of business goals set by the Company, relevant peer data, recommendations made by the chief executive officer, and the advice of F.W. Cook, an independent, external executive compensation consulting firm with financial services industry expertise hired by the Committee. The Committee seeks to establish "Total Rewards" for the Company's executive officers that are fair, reasonable, risk-balanced, and competitive. The Total Rewards program includes Total Direct Compensation, benefits, and certain perquisites. Generally, the types of compensation and benefits paid to Named Executive Officers are similar to those provided to other executive officers of the Company.

The Committee typically follows the annual cycle described below:




***Role of Executive Officers in Compensation Decisions.*** The chief executive officer annually reviews the performance of each of the other Named Executive Officers, which includes a risk performance assessment completed by the Company's chief risk officer. Based on this review, the chief executive officer makes compensation recommendations to the Committee, including recommendations for salary adjustments, Variable Compensation Plan awards, and long-term, equity-based incentive awards. In addition, the chief executive officer and certain other members of management annually assess

Table of Contents



performance for other executive officers and make compensation recommendations to the Committee. Also, the appropriate committees provide review and approval of the compensation for key risk-related roles such as the chief risk officer, chief credit officer, and chief audit executive. Although the Committee considers these recommendations along with data provided by its consultant, F.W. Cook, it retains full discretion to set all compensation for the Company's executive officers. The Committee works directly with its consultant to determine compensation for the chief executive officer. The chief executive officer has no input into his own compensation determinations.

Additionally, the chief risk officer reviews and evaluates with the Committee all executive officer and employee incentive compensation plans, described in more detail in the Compensation Risk Management section above. The purpose of the review is to confirm that the Company's incentive compensation plans do not incent or pose unnecessary or excessive risks to the Company.

***Role of the Independent Compensation Consultant.*** The Committee uses the services of its external executive compensation consultant to provide guidance and advice to the Committee on all matters covered by its charter. This consultant was directly selected and approved by the Committee to provide a broad set of services pertaining to the compensation of the Company's executives and Board of Directors. In 2021, the Committee's compensation consultant performed the key actions listed below:

| |
|---|
| Advising the Committee on competitive practices, market trends, and peer group composition. |
| Providing recommendations to the Committee on the compensation of the chief executive officer. |
| Providing recommendations to the Committee and members of management regarding the compensation of the other executive officers. |
| Reviewing competitive pay practices in the Compensation Peer Group for their boards of directors and recommending to the Committee changes required to pay the Company's Board of Directors in a competitive fashion. |
| Providing an annual review of performance and pay levels for the Company and its Compensation Peer Group. |
| Undertaking special projects at the request of the Committee, including director education sessions on specific topics related to executive compensation. |

The Company does not engage the Committee's compensation consultant for additional services outside of the services to the Board, as described above. The Committee conducted an assessment of potential conflicts of interest and independence issues for F.W. Cook and did not identify any conflicts of interest or independence issues relating to F.W. Cook's services.

***Benchmarking Methodology.*** In making compensation decisions, the Committee compares Company performance and each element of each executive officer's Total Direct Compensation with the Compensation Peer Group. The Committee refers to this Compensation Peer Group for both compensation and performance-related benchmarks. Financial performance data is prepared either by the Committee's independent compensation consultant or by the Company, using data from public filings. Compensation data is generally prepared by the Committee's compensation consultant, using third-party survey data as provided by management and publicly available data from proxy statements. The Committee's compensation consultant reviews all financial and compensation data that is prepared by the Company and provided to the Committee.

Table of Contents

## COMPENSATION DISCUSSION AND ANALYSIS

The Compensation Peer Group consists of companies with which the Committee believes the Company competes for talent and for shareholder investment, and which are generally similar in asset size and business mix. The following 10 companies were identified by the Committee as the 2021 Compensation Peer Group:

| | |
|---|---|
| Citizen's Financial Group | M&T Bank Corporation |
| Comerica Incorporated | The PNC Financial Services Group, Inc. |
| First Horizon National Corporation | Regions Financial Corporation |
| Huntington Bancshares Incorporated | Truist Financial Corporation |
| KeyCorp | Zions Bancorporation |

The Committee annually reviews the Compensation Peer Group and considers changes to the Compensation Peer Group deemed necessary to ensure that the business structure and size of the organizations continue to be appropriate. Based on the Committee's evaluation of the Compensation Peer Group, no changes were made for 2022.

***Tally Sheet.*** The Company annually prepares a tally sheet of all compensation and potential payouts for the Committee's use to review our compensation programs. The Committee reviews all components of compensation for the Company's chief executive officer, chief financial officer, and the other NEOs, including:

| |
|---|
| Base salary. |
| Annual cash incentive targets. |
| Long-term, equity-based incentive targets. |
| Accumulated, realized, and unrealized equity award gains. |
| The dollar value to the executive and cost to the Company of all perquisites and other personal benefits. |
| The earnings and accumulated payout obligations under the Company's nonqualified deferred compensation plan. |
| Several potential termination scenarios, including change-in-control, where applicable. |

The Committee reviewed the above compensation components and the associated dollar amounts for 2020 compensation in June 2021.

***Say-on-Pay.*** The Committee annually reviews the results of the non-binding advisory say-on-pay proposal and considers them when approving plan design changes as well as pay decisions.

| | |
|---|---|
| 87% Approval | At the Company's 2021 Annual Meeting, shareholders approved a non-binding advisory say-on-pay proposal with 87 percent of the votes cast voting in favor of that proposal |

The say-on-pay vote resulted in 87% approval from shareholders in 2021, which is modestly lower than prior years' votes. The Company leveraged its ongoing Stakeholder Engagement activities to solicit direct shareholder feedback and suggestions on its compensation program or practices.

Two relevant topics that were raised by shareholders during these discussions were (i) disclosure of the adjustments to performance results for purposes of the 2020 Variable Compensation Plan, and (ii) the inclusion of ESG in our executive compensation program. Management discussed these two items with the Committee and the Company has implemented changes to address both of them. Those changes are disclosed in this Proxy Statement.

The Committee believes that the most recent vote, and consistently high level of approval of compensation in the annual shareholder vote, demonstrates a strong alignment with shareholders'

Table of Contents



interests. Additionally, these results indicate broad support among shareholders for our pay-for-performance approach. Future votes cast, as well as our ongoing Stakeholder Engagement discussions, will be closely monitored to ensure continued support for our compensation program and decisions among our shareholders.

*Compensation Structure.* The compensation structure (including each element of pay described below and the respective amounts for each element) for executive officers is reviewed annually by management and the Committee. When determining the compensation structure, the following items are considered:

| |
|---|
| The most recent and prior years' comparative proxy statement and survey data for similar positions among the Compensation Peer Group. |
| The 25th percentile, median (50th percentile), and 75th percentile peer data for each element of compensation (base salary, target variable compensation, and target long-term, equity-based incentive compensation, as well as the resulting Total Direct Compensation). |
| The ability to provide median Total Direct Compensation for 50th percentile performance relative to the Compensation Peer Group. |
| The ability to provide upper quartile Total Direct Compensation for upper quartile (i.e., 75th percentile or better relative to the Compensation Peer Group) performance and lower quartile Total Direct Compensation for lower quartile (i.e., 25th percentile or lower relative to the Compensation Peer Group) performance. |

*Pay Mix and Pay for Performance.* Our Named Executive Officers have approximately 50% or more of their target total compensation delivered in the form of long-term, equity-based compensation.

***2021 Total Compensation Pay Mix*(1)**

**Chief Executive Officer** **Average of Other NEOs**




(1) The percentages reflect the Named Executive Officer's base salary as of December 31, 2021, target annual cash incentive award for 2021, and target long-term, equity-based incentive award for 2021.

The Committee considers several factors and objectives relevant to each program when determining compensation. The Committee also contemplates the impact of each award on the Total Direct Compensation package. Total Direct Compensation opportunities are intended to target the median of the relevant market data, and actual compensation (both amount and mix) for executives varies, based on their performance, prior experience, and other pertinent factors. In addition, for purposes of attracting and retaining key executives, the Committee may determine that an additional award, an above-median sign-on package, an incentive guarantee for a new hire, or a Total Direct Compensation package that is above market median, is appropriate.

As shown in the pay mix charts above, the annual cash incentive award and long-term, equity-based incentives constitute the majority of executive officers' Total Direct Compensation under our pay-for-performance structure. The actual amounts realized by executive officers under these incentive plans vary based on individual performance and the performance of the Company.

Table of Contents



Company performance under these incentive plans is evaluated from a variety of perspectives, including:




## 2021 Executive Compensation Plan Design and Award Decisions

As stated above, compensation is delivered through three primary elements: base salary, an annual cash incentive through our Variable Compensation Plan, and long-term, equity-based incentives. We review and assess our compensation practices and programs on an annual basis, taking into account the Company's strategic objectives, compensation philosophy, regulatory guidance, risk culture, and external market practices. Each element of the senior executive compensation program, along with any changes that were made to the program for 2021, are described in the following paragraphs.

***Base Salary.*** The Committee reviews individual base salaries of the Company's executive officers annually or at the time of promotion or hire, as applicable. The objectives of the Company's base salary program are to provide salaries at a level that allows the Company to attract and retain qualified executives and to recognize and reward individual performance. The following items are considered when determining base salary levels:

A competitive market analysis provided by the Company's external compensation consultant.

The executive officer's experience, scope of responsibilities, performance, and potential.

Internal equity in relation to other executives with similar levels of experience, scope of responsibilities, performance, and potential.

Other relevant information, which may include governmental or regulatory considerations.

Salary increases, if any, are based on the Company's overall performance and the executive's attainment of individual objectives during the preceding year. After the annual review and evaluation at the beginning of 2021, base salary adjustments were recommended and approved for executives who were promoted or gained additional responsibilities in 2021. Unrelated to performance, no other adjustments were made to other executives' base salaries in 2021 given the ongoing uncertainty related to the COVID-19 pandemic.

***2021 Variable Compensation Plan Design.*** The Variable Compensation Plan's objective is to reward executives for strong corporate, business unit, and individual performance. The design of our 2021 Variable Compensation Plan (VCP) was structured as follows:



Table of Contents



It is the view of the Committee that this mix of Bancorp funding metrics provides executives with balanced incentives to increase the level of absolute earnings growth, to ensure that shareholder capital is used efficiently to generate competitive returns, and to assess the cost efficiency of the Company's operations. The funding modifiers are useful as complementary metrics to add focus on best-in-class business processes. The Committee retains discretion to adjust pool funding upward or downward based on other factors, such as individual performance and risk assessment.

***Variable Compensation Plan Performance Goals.*** The financial plan approved by the Board of Directors includes specific target goals for the Company in each of the Bancorp funding metrics as detailed below. When determining the available funding pool for all VCP participants, including NEOs, the Committee first determines if the performance hurdle has been met, then considers actual performance against target goals, in addition to three funding modifiers.

**Bancorp Funding Metrics**

| | Threshold (50% of target payout) | Target (100% of target payout) | Maximum (200% of target payout) | Funding Weight |
|---|---|---|---|---|
| Earnings Per Share | $2.18 | $2.44 | $2.70 | 50% |
| Return on Assets | 0.86% | 0.96% | 1.06% | 25% |
| Efficiency Ratio | 64.0% | 60.7% | 57.4% | 25% |

Actual awards are approved by the Committee from the pool. This pool of available compensation awards is allocated to each participant based on qualitative assessments of individual performance against a set of stated objectives and, additionally for executives, an individual risk assessment. Amounts realizable from prior compensation awards do not influence decisions relative to future awards. To determine the Variable Compensation Plan funding pool, performance against each target Bancorp funding metric is reviewed to determine the performance level that was achieved, with results between threshold and target, and target and maximum, being interpolated. The overall funding amount represents the sum of the weighted average score for each of the Bancorp funding metrics. The maximum payout for any executive is limited to 200% of the individual target.

The Committee may use final results of the funding modifiers to increase or decrease the pool funding amount. The Committee may exercise discretion to increase the funding pool amount up to a maximum of 10 funding points; however, downward discretion is not capped.

| | Assessment Criteria |
|---|---|
| **Performance Hurdle** | |
| Capital Levels | Common Equity Tier 1 Ratio must remain above 7% for any Variable Compensation Plan funding to occur. |
| **Funding Modifiers** | |
| Non-Performing Assets (NPAs) | Performance measured relative to peer distribution, and targeting performance at least at peer median. |
| Loan to Deposit Ratio | The absolute level and change in the loan to deposit ratio is viewed as an indicator of liquidity and core deposit franchise health. The evaluation of the modifier will consider a ratio of 75-76% as the target, as well as the environmental factors impacting the ratio's performance. |
| Customer Experience | Qualitative assessment of the Bank's annual performance of customer experience which may include external benchmarks and overall customer satisfaction results in the line of business scorecards. |

Table of Contents

COMPENSATION DISCUSSION AND ANALYSIS

*Performance Against Variable Compensation Plan (VCP) Goals.* Overall, the Company's performance in 2021 was extremely strong, as highlighted on page 4. The strength is also apparent when comparing the Company's financial results to its VCP targets, which the Committee approved in February of 2021. It should be noted that at the time the Committee approved the targets, the trajectory and speed of the economic recovery from the COVID-19 pandemic-related shutdowns were still highly uncertain. Additionally, the ultimate efficacy of vaccines being developed and used by the public was unknown. Also, the $1.9 trillion American Rescue Plan Act of 2021 was passed after the approval of these targets, providing further stimulus to the economy. Consistent with last year, and our historical practice, the Company chose to maintain the initially approved targets and provide reasonable adjustments in consideration of the financial effects of certain events not contemplated in the targets, which are referred to herein as the "2021 VCP Adjusted Actual."

In determining 2021 VCP Adjusted Actual performance under the plan, the Committee reviewed certain items assessed annually for potential exclusion from the VCP calculation (where items could have the effect of increasing or decreasing funding). For the 2021 performance year, the annual adjustments, including the adjustment described below relating to the allowance for credit losses, had a negative ($0.24) impact to earnings per share, negative (8) basis point impact to Return on Assets, and a favorable (63) basis point impact to the efficiency ratio.

The items the Committee evaluated and adjusted are consistent with prior practice and include: Gains or Losses related to the Visa Total Return Swap; securities gains and losses excluding the impact of Non-Qualified Deferred Compensation valuation changes; the gain from the sale of HSA deposits; a donation to the Fifth Third Foundation in support of the Accelerating Racial Equity, Equality and Inclusion Initiative; and a special staffing bonus to front-line employees that provided customers with essential banking services throughout the COVID-19 pandemic. The most significant adjustment was made to neutralize the positive impact of a lower Allowance for Credit Losses than was anticipated at the time of setting the targets. The adjustment is consistent with the Committee approval of 2020 VC in excluding the negative impact of higher Allowance for Credit Losses that was incurred but not included in the target due to the COVID-19 pandemic (i.e., increased provision expense). The result of that adjustment increased the 2020 adjusted VC performance. The Committee believes consistent application of these adjustments is important to maintain the integrity of the VC Plan.

The table below sets forth the impact of each of the aforementioned items used to calculate 2021 VCP Adjusted Actual performance.

| | Performance Impact: | | |
|---|---|---|---|
| Adjustment: | EPS | ROA | Efficiency Ratio (FTE) |
| Visa Total Return Swap | $ 0.09 | 0.03% | (0.65%) |
| Securities (Gain) / Loss | $ 0.02 | 0.01% | (0.13%) |
| Gain on HSA Deposits Sale | ($ 0.07) | (0.02%) | 0.46% |
| Donation to Fifth Third Foundation | $ 0.02 | 0.01% | (0.19%) |
| Special Bonus to Front-Line Employees | $ 0.01 | 0.00% | (0.12%) |
| Allowance for Credit Losses | $ (0.31) | (0.11%) | — |

In addition to the performance adjustments above, the VCP Adjusted Actual results include any increase or decrease to variable compensation implied by the funding calculation, further impacting the VCP Adjusted Actual as reported below. Unadjusted reported financial results, as well as adjusted results for each of the Bancorp funding metrics, are shown in the table below:

| Bancorp Funding Metrics | 2021 Reported Metrics | 2021 VCP Adjusted Actual (Including Impact of funding) |
|---|---|---|
| EPS | $ 3.73 | $ 3.40 |
| ROA | 1.34% | 1.23% |
| Efficiency Ratio (FTE) | 60.1% | 60.6% |

Table of Contents



The Company also met or exceeded target on the funding modifiers considered by the Committee in assessing annual performance:

| Performance Hurdle | 2021 Actual |
|---|---|
| Capital Levels | 9.5% Common Equity Tier 1 |
| Funding Modifiers<br>Non-Performing Assets ("NPA") | Ranked 3rd best of 11 |
| Loan to Deposit Ratio | 70.5%<br>(Internal Target 75%-76%) |
| Customer Experience | Modifier assessment criteria related to customer experience resulted in results either at parity or exceeding peers. The Company was also ranked the #1 bank among the top 25 banks for our COVID response in a leading retail branch satisfaction survey. |

***Determination of Variable Compensation Plan Awards.*** Based on the 2021 performance results described above, the calculated pool funding level of 176% of target was achieved as shown below:

| Bancorp Funding Metrics | Threshold | Target | Maximum | 2021 VCP Adjusted Actual | Funding % | Funding Weight | Funding Level |
|---|---|---|---|---|---|---|---|
| Earnings Per Share | $2.18 | $2.44 | $2.70 | $3.40 | 200% | 50% | 100% |
| Return on Assets | 0.86% | 0.96% | 1.06% | 1.23% | 200% | 25% | 50% |
| Efficiency Ratio | 64.0% | 60.7% | 57.4% | 60.6% | 104% | 25% | 26% |
| **Total Funding** | | | | | | | 176% |

Due to the overall favorable performance related to the funding modifiers, including top quartile Non-Performing Asset ("NPA") performance on a relative basis to our peer group and continued progress on customer experience, an increase of 4% was recommended to the funding pool for a total funding level of 180%. Taking into consideration a recommendation from management, the Committee recommended a final cash performance payout target of 130%. The Committee determined that funding the cash VCP award at 130% of target was appropriate as a significant factor in the Company's outperformance versus its targets was impacted by the continued benefits from monetary and fiscal government support to the economy and our customers, combined with a faster than anticipated economic recovery versus the expectations at the time the targets were approved, which were set under the backdrop of extreme uncertainty and volatility attributable to the pandemic. The most material effect of the improving environment was the impact to credit losses, for us and the industry, which were significantly lower than the expectations when the target was set in early 2021.

When making the final determination of individual awards using the approved funding pool, the Committee had the benefit of information relating to market median compensation levels as well as performance and risk assessment rating information. Considering each individual's qualitative performance assessment (described for each NEO in the qualitative performance assessments section below) and risk performance assessment, the Committee thought it appropriate to make final individual award decisions ranging from 130 percent to 150 percent of the NEO's target in cash funding.

The determination of 2022 annual long-term equity incentive awards consider the factors outlined in the Determination of Long-term, Equity-based Incentive Awards that follows. As stated, this includes consideration of the strong 2021 performance as described in the performance highlights on page 4 and reflected in the calculation above. 2022 LTI awards are expected to exceed certain Named Executive Officers' targets given those factors. Management believes this provides continued incentive on prospective performance, further stock ownership opportunity, and maintains alignment with our pay for performance philosophy.

Table of Contents

## COMPENSATION DISCUSSION AND ANALYSIS

***2021 Long-Term, Equity-based Incentive Compensation Plan Design.*** The long-term, equity-based incentive plan is an important piece of the compensation mix for our Named Executive Officers. The objectives of our plan, the types of equity-based awards employed under the plan, and areas included in individual performance assessments used to determine award amounts for Named Executive Officers are:

| Plan Objectives |
| --- |
| Align management and shareholders' interests |
| Motivate senior executives to optimize long-term shareholder value |
| Encourage stock ownership among our employees |
| Enhance the Company's ability to retain key talent |
| Ensure the program design is consistent with our compensation philosophy and reflective of external market trends |
| Strengthen risk-adjusted pay decisions |

| Areas of Assessment |
| --- |
| The Company's revenue and expense results |
| Division revenue and expenses vs. budget |
| Internal and external customer service levels |
| Performance relative to the Company's strategic initiatives |
| Results related to specific individual responsibilities |
| Results related to specific individual risk assessments |

Equity Type Mix




For the 2021 awards, Stock Appreciation Right Awards, or "SARs," are calculated by taking 15% of the total LTI award amount divided by the SARs Black-Scholes value on the date of grant. Restricted Stock Unit Awards, or "RSUs," are calculated by taking 35% of the total LTI award amount divided by the Company's closing stock price on the date of the grant. Performance Share awards are calculated by taking 50% of the total LTI award amount divided by the Company's closing stock price on the date of the grant.

In the December 2021 compensation plan reviews, the Committee approved granting future Restricted Stock Unit and Performance Share Awards based on the average closing stock price for each trading day during the month of January. The Committee determined that this approach will likely reduce the volatility compared to using a single day price target. For 2022, Performance Share Awards and Restricted Stock Awards will be calculated by taking 50% and 35%, respectively, of the total LTI award

Table of Contents



amount divided by the Company's average closing stock price for each trading day in the month of January. SARs will remain priced on the Black-Scholes value as of the grant date.

The Committee believes that performance shares are an important piece of the equity-based incentive compensation opportunity because they create a clear connection between results achieved and compensation earned. In addition, the Committee believes that full-value awards in the form of performance shares and restricted stock units complement each other and are important for driving strong retention value and enhanced ownership-creation opportunities. The Committee also believes that a portion of the opportunity should come from a growth-oriented incentive, specifically stock-settled SARs which align executives' interests with those of the Company's shareholders. The Committee has maintained the Long Term Incentive mix of 50% performance share awards, 35% restricted stock units, and 15% stock appreciation rights and feel it aligns well with the Company's long-term incentive plan objectives, strategic objectives, compensation philosophy, regulatory guidance, risk culture, and competitive practice.

Target award levels are established at the beginning of the year for each Named Executive Officer considering market median compensation for each position. Award levels are not automatically made at target. Actual award levels are based upon Company performance, and the Committee includes qualitative assessments of individual performance of each Named Executive Officer in the areas shown in the graphic display on the preceding page. Amounts realizable from prior compensation awards do not influence decisions relative to future awards.

The grant date of the LTI awards is the date of the Committee's approval of the awards, which typically occurs at a first quarter meeting of the Committee. The grant dates for awards made in 2021 are detailed in the "2021 Grants of Plan-Based Awards" table later in this proxy statement. The Company does not adjust the timing of its annual grant based on SEC filings or press releases. Rather, the annual grant date is established and communicated well in advance.

Performance share grants made in 2021 were structured as follows:




Performance share grants are granted at "target," calculated by taking 50% of the LTI award amount divided by the share price used for purposes of the grant. Executives have the opportunity to earn between zero and 150% of their target award based upon the Company's three-year cumulative result on Return on Average Common Equity ("ROACE") versus our Compensation Peer Group. The payout table

Table of Contents



represented above was approved in 2019 in lieu of a pure stack ranking to limit the impact of potential changes among the Compensation Peer group potentially arising from M&A activity, delisting, or bankruptcy. Performance share grants are eligible for dividend equivalents which accrue in cash and are paid when the award is earned and distributed.

RSUs have a three-year graded vesting schedule. These grants do not have voting rights during the vesting period, but are eligible for dividend equivalent payments, which accrue in cash and are paid upon vest and distribution of the underlying award.

SARs are granted at the closing price of the Company's Common Stock on the date of grant and have a 10-year term. Grants made in 2021 have a three-year graded vesting schedule. The Company does not grant discounted stock options or SARs, re-price previously granted stock options or SARs, or grant reload stock options.

The Committee believes that the design of the long-term, equity-based incentive plan provides incentive for the creation of shareholder value since the full benefit of the grant to each Named Executive Officer can be realized only with an appreciation in the price of the Company's Common Stock or by meeting goals based on relative ROACE, depending on the type of award.

***Payout of 2019 Performance Share Awards.*** The 2019 performance share grant measured the Company's performance on ROACE versus our compensation peer group over the three-year period beginning January 1, 2019 through December 31, 2021. In its February 2022 meeting, the Committee reviewed final ROACE results showing the Company ranked third among peers and the absolute metric thresholds for ROTCE and efficiency ratio were met. Accordingly, the Committee approved a 150% payout. The grant paid out in Company stock and the shares were distributed on February 17, 2022, after the approval date of February 16, 2022.

***Other Long-term, Equity-based Plan Provisions.*** The Variable Compensation Plan and long-term, equity-based incentive compensation awards made in 2021 were issued under the Company's 2019 Incentive Compensation Plan (the "Plan"), which was approved and adopted by the Company's shareholders in 2019. The awards granted in 2022 will be issued under the 2021 Incentive Compensation Plan, which was approved and adopted by the Company's shareholders in 2021.

***Determination of Long-term, Equity-based Incentive Awards.*** The chief executive officer recommends the award levels for each Named Executive Officer except for himself, and the Committee makes the final award determination for all Named Executive Officers, including the chief executive officer. The award considerations are not based on a formula. Rather, the Committee may choose to make the actual award higher or lower than the target award based on the qualitative assessment of performance against stated objectives as well as the individual's risk assessment results. The Committee believes that, by including a performance element as part of the up-front grant process, the Company is able to further reinforce the pay-for-performance objective of the Company's compensation structure.

When making the final determination to grant long-term, equity-based incentive compensation awards in February 2021, the Committee considered information relating to market median compensation levels, Company financial performance during 2020, the qualitative performance assessment, and individual risk performance assessments. After reviewing this information for 2020, the Committee granted a 2021 long-term equity incentive compensation award of 100% of target for all Named Executive Officers.

Table of Contents



***Qualitative Performance Assessments.*** The individual qualitative performance assessment is a review of each Named Executive Officer's performance against a set of stated objectives. This assessment is performed by the Board of Directors with respect to the chairman and chief executive officer's performance and by the chairman and chief executive officer with respect to the performance of the other NEOs. Each NEO was evaluated on the following objectives:

| |
|---|
| 2021 financial plan |
| Strategic initiatives |
| Risk management |
| Operational excellence |
| Customer experience |
| Talent optimization and employee engagement |
| Promotion of the Bank's Core Values and Leader Capabilities |

***The Committee's Considerations.*** The Committee considers both the aggregate amount and mix of an executive officer's Total Direct Compensation when making the decisions discussed above. The Committee assesses Total Direct Compensation relative to competitive market data annually. Recommendations for executive compensation are reviewed and approved as final during one of the Committee's first quarter meetings.

Based on its most recent review of the competitive data, the Committee has determined that the compensation structure for executive officers is effective and appropriate. The structure reflects the Company's compensation philosophy in that its incentive payout ranges are aligned with the competitive market data; it has appropriate leverage to ensure a strong linkage between compensation, risk outcomes, and performance; and it drives rewards based on the most relevant performance measures for the Company and shareholders.

The Committee also has reviewed the internal relationships between the compensation for the chief executive officer and for other executive officers and has deemed them to be appropriate. The Committee believes that the relative difference between the compensation of the chief executive officer and the compensation of the Company's other executive officers is consistent with such differences found in the Company's Compensation Peer Group.

Objectives considered for 2021 performance for each Named Executive Officer and Executive Compensation Decision Highlights are discussed in the next section.

*For Mr. Carmichael:* As Chair and Chief Executive Officer, Mr. Carmichael had responsibility for delivering both short and long-term financial results and leading key strategic initiatives. He was also responsible for customer experience results, for leveraging human capital programs to ensure effective succession planning and to promote an inclusive and diverse workforce. He drove accountability for a culture of strong risk management and regulatory results, and provided strong Board leadership, including Board composition, a culture of open dialogue and effective challenge.

The Variable Compensation Plan award was based on 2021 performance and his overall contribution to Fifth Third's performance. The long-term, equity-based award granted in February 2021 was based on performance against 2020 objectives.

*For Mr. Leonard:* As Chief Financial Officer, Mr. Leonard had responsibility for managing the Company's financial performance against the 2021 plan, providing strategic advice for long-term business planning, and providing strategic and analytic support for M&A activity. Additionally, he drove accountability for a culture of strong risk management and effectively managed the Company's capital plan.

Table of Contents



The Variable Compensation Plan award was based on 2021 performance and his overall contribution to Fifth Third's performance. The long-term, equity-based award granted in February 2021 was based on performance against 2020 objectives.

*For Mr. Spence:* As President, Mr. Spence was responsible for leading Fifth Third's strategic planning process and executing on strategic priorities. He was accountable for driving organic and inorganic growth and providing an enhanced customer experience across multiple lines of business and the regional footprint. Additionally, he drove accountability for a culture of strong risk management.

The Variable Compensation Plan award was based on 2021 performance and his overall contribution to Fifth Third's performance. The long-term, equity-based award granted in February 2021 was based on performance against 2020 objectives.

*For Mr. Anderson:* As Vice Chairman, Strategic Growth Initiatives, Mr. Anderson was responsible for identifying and executing on private equity opportunities, acquisitions and strategic partnerships that complement the Commercial line of business's strategic initiatives, and for continued client and talent growth in targeted expansion markets. He was also responsible for managing strategic and reputational risks.

The Variable Compensation Plan award was based on 2021 performance and his overall contribution to Fifth Third's performance. The long-term, equity-based award granted in February 2021 was based on performance against 2020 objectives.

*For Mr. Lavender:* As the head of the Commercial bank at Fifth Third, Mr. Lavender was responsible for developing a clear vision for the Commercial bank that includes business strategy, driving cultural and talent priorities and delivering strong financial, operational and risk outcomes.

The Variable Compensation Plan award was based on 2021 performance and his overall contribution to Fifth Third's performance. The long-term, equity-based award granted in February 2021 was based on performance against 2020 objectives.

## 2022 Executive Compensation Plan Design Changes

*2022 Variable Compensation Plan Changes.* The Company and the Committee review the Variable Compensation Plan annually to determine if changes should be made to the plan for the next year. During the review in 2021, the Committee approved the addition of an ESG modifier and the removal of the Loan to Deposit Ratio modifier. The ESG modifier will be reviewed based on the Bank's qualitative performance against the Company's ESG priorities, as reviewed by the Board. Our ESG priorities include: addressing climate change; promoting inclusion and diversity; demonstrating our commitment to our employees; and strengthening our communities. The removal of the Loan to Deposit ratio as a modifier is indicative of the current liquidity environment and will be reviewed as appropriate with the annual review of the plan.

*2022 Long-term, Equity-based Incentive Plan Changes.* The Company and the Committee also review the long-term, equity-based incentive plan annually to determine if any changes need to be made to the plan (i.e., award mix, performance measures, modifiers, etc.) for the next year. During its 2021 review, the Committee determined no material changes to plan design were necessary.

## Executive Benefits and Perquisites

*Summary of Eligibility for Benefits and Perquisites.* The Company provides few benefits and perquisites to executive officers that are not available to the general employee population. Special benefits include health programs, a deferred compensation plan, financial planning reimbursement, nominal holiday gifts, parking, and occasional personal use of the corporate aircraft. Additionally, spouses or guests of named executive officers may be provided travel and/or entertainment benefits related to business events at which their attendance is expected and appropriate, such as Company recognition events or trips, recruiting meals, or social events held for marketing or other business purposes.

These benefits are often provided with little or no incremental cost to the Company. The Company does not provide tax gross-ups for these limited perquisites.

Table of Contents



***Use of the Corporate Aircraft.*** The Committee has approved limited personal use of the corporate aircraft by Mr. Carmichael up to a maximum value of $100,000 per year. In 2021, the Board approved a change to the Company's corporate aircraft policy that allows certain executive officers to use the corporate aircraft for personal use in certain special situations (e.g., death in family). Such use by any NEO is accounted for in the summary compensation table.

Mr. Carmichael is subject to a lease ("time-sharing") agreement with the Company that governs the terms and conditions of his personal use of the corporate aircraft. Under the terms of the time-sharing agreement, Mr. Carmichael will pay for the costs of any personal flights that exceed the allowance described above.

***Retirement Benefits.*** The Company's retirement benefits are designed to assist employees in accumulating wealth to provide income during their retirement years. The retirement benefits are designed to attract and retain employees and to encourage employees to save money for their retirement while maintaining a competitive cost structure for the Company. Based upon the Company's research using two national benefits surveys, its retirement benefits are positioned near the market median for similar employers.

The Company's primary retirement benefit plan is a defined contribution 401(k) plan with a Company match. The same 401(k) plan is maintained for all eligible employees, including the Named Executive Officers. The 401(k) plan provides a match to employee contributions of 150% on the first 2% and 100% on the next 4 percent of eligible compensation an employee contributes to the plan and is invested in the employee's selection of the plan's existing investment alternatives. This Company match is immediately 100% vested. All Named Executive Officers are eligible for this plan up to the IRS wage or contribution limits. Under the plan, NEOs may not defer their future cash compensation into Company stock.

The Company offers employees at certain salary band levels, including its Named Executive Officers, a nonqualified deferred compensation plan. This plan allows for the deferral of base salary and awards received under the Variable Compensation Plan. The plan also provides for the Company to make a contribution for loss of the qualified plan 401(k) match due to the deferral of pay into this plan or due to wage or contribution limitations under the qualified 401(k) plan. The deferred funds receive earnings based on the mutual funds elected by each executive. The executives do not earn any preferential or above-market returns on these earnings. Under the plan, NEOs may not defer their cash compensation into Company stock.

The Company maintains a defined benefit pension plan which was frozen to new participants as of November 15, 1998. Employees who met the age and service requirement at that time are "grandfathered" and continue to accrue benefits under that plan. No Named Executive Officers are participants in this plan.

***Health and Welfare Benefits.*** The Company offers broad-based medical, dental, vision, life, and disability plans to all of its employees. The Company also provides to each Named Executive Officer a comprehensive physical exam program and access to an executive fitness facility.

***Severance and Change in Control Benefits.*** The Fifth Third Bancorp Executive Change in Control Severance Plan (the "CIC Severance Plan") provides severance benefits to certain officers upon a qualifying termination after a change in control, subject to execution of a release and non-compete agreement. The plan covers approximately 45 officers, including all Named Executive Officers.

Table of Contents

COMPENSATION DISCUSSION AND ANALYSIS

Under the CIC Severance Plan, certain executives will receive severance if, in connection with a change in control, the executive's employment is terminated without "cause" (as defined in the CIC Severance Plan) or the executive resigns for "good reason" (as defined in the CIC Severance Plan). For this purpose, a change in control would occur in any of the following instances:

| |
|---|
| Any person is or becomes the beneficial owner of 30% or more of the voting power of the Company's outstanding securities; |
| During any consecutive 12-month period, the directors in office in the beginning of such period (or directors who were approved by two-thirds of such directors) cease to constitute a majority of the Board; |
| The sale or disposition of substantially all of the Company's assets or the merger or consolidation of the Company with any other corporation unless the voting securities of the Company outstanding prior to such action continue to represent at least 60% of the voting power of the merged or consolidated entity; or |
| The Company's shareholders approve a plan of complete liquidation of the Company. |

The treatment of long-term, equity-based incentive compensation in the event of a change in control is determined by the applicable incentive compensation plans. More specific details are discussed in the "Potential Payments Upon Termination or Change in Control" section below.

***Executive Severance Benefits Plan.*** On February 17, 2021, the Human Capital and Compensation Committee adopted the Executive Severance Benefits Plan, in which participating executives are eligible to receive certain severance benefits as described in the Severance Benefits Plan if such executive's employment terminates prior to a change in control of Fifth Third or more than 24 months following a change in control, but only if the Bank determines, in its sole discretion, that the executive's employment was terminated involuntarily by the Bank without "cause" or by the executive for "good reason" (each as defined in the Severance Benefits Plan). For purposes of the Severance Benefits Plan, a change in control has the same meaning given to that term in the CIC Severance Plan, as amended.

## Executive Ownership and Capital Accumulation

***Stock Ownership Guidelines.*** The executive compensation program is designed, in part, to provide opportunities for executive officers to build ownership in the Company and to align performance with shareholder interests. Accordingly, the Company has established stock ownership guidelines for senior employees in the Company's salary band structure, including the named executive officers. The amount of stock required to be retained varies based upon the assigned salary band and associated multiple of base salary.

These employees are expected to use stock net of taxes obtained through awards under the long-term, equity-based incentive compensation program to establish a significant level of direct ownership. Stock ownership includes:

| | | |
|---|---|---|
| Stock owned individually and by immediate family sharing the same household. | Restricted stock units not yet vested. | Stock held in the employee stock purchase plan. |

In 2021, the executive ownership guidelines were updated to provide additional flexibility to less tenured executives, while also further deepening the overall ownership targets. Until ownership guidelines are met, executive officers are required to retain 75% (reduced from 100%) of net, after tax shares received from stock appreciation right exercises and restricted stock unit and performance share award vesting until the minimum ownership guidelines are met. As an additional requirement, once these guidelines are met, executives must retain 25% of net, after tax shares until two times their guidelines are met.

Table of Contents



Executives have five years to achieve the minimum executive stock ownership requirements. There is no specific time frame required to meet the two times guideline. Specific ownership guidelines for the Named Executive Officers are:

| Stock Ownership Guidelines | |
|---|---|
| Chief Executive Officer | 6x Salary |
| Other Named Executive Officers | 3x Salary |

The Committee reviews progress toward achieving the ownership goal for the Company's executive officers on an annual basis. As of the most recent annual review performed in June 2021, all Named Executive Officers had sufficient holdings to meet or exceed the stock ownership requirements or had not yet been in the role for five years and are on pace to meet the guidelines.

***Beneficial Ownership.*** The following table sets forth certain information regarding the Named Executive Officers' beneficial ownership of the Common Stock of the Company as of December 31, 2021:

| Title of Class | Name of Officer | Number of Stock Beneficially Owned(1) | % of Class |
|---|---|---|---|
| Common Stock | Greg D. Carmichael | 1,551,856 | 0.2269% |
| Common Stock | James C. Leonard | 142,329 | 0.0208% |
| Common Stock | Timothy N. Spence | 282,940 | 0.0414% |
| Common Stock | Lars C. Anderson | 341,396 | 0.0500% |
| Common Stock | Kevin P. Lavender | 109,064 | 0.0160% |

(1) The amounts shown represent the total stock owned outright by such individuals together with stock held in the name of spouses, minor children, certain relatives, trusts, estates, and certain affiliated companies (as to which beneficial ownership may be disclaimed) and SARs and RSAs or RSUs exercisable (or exercisable within 60 days) of December 31, 2021 but unexercised. These individuals have the number of SARs indicated after their names that are exercisable as of December 31, 2021 or will become exercisable within 60 days of December 31, 2021: Mr. Carmichael, 935,838; Mr. Leonard, 40,892; Mr. Anderson, 215,966; Mr. Spence, 139,710; and Mr. Lavender, 36,729. The amounts listed for SARs represent the number of rights that may be exercised; the actual number of stock delivered will vary based on the stock's appreciation over the grant price at the time of exercise. For beneficial ownership of individual directors and all directors and executive officers as a group see "Election of Directors" on pages 15-28.

***Prohibition on Hedging and Pledging.*** The Company prohibits all employees and directors from engaging in speculative trading and hedging shares of Company securities. This includes prohibitions against day trading or short-selling of Company securities and transactions in any derivative of Company securities, including buying and writing options. Employees and directors are restricted from buying Company securities on margin or using Company securities as collateral for a loan. Additionally, the Company's Insider Trading Policy prohibits trading for directors and certain employees during designated blackout periods and requires approval by the Legal Department prior to any trade.

***Clawbacks and Recoupments.*** The Company's Code of Business Conduct and Ethics and its Compensation Clawback and Disclosure Policy provide that the Company reserves the right to seek restitution of any bonus, commission, or other compensation received as a result of an employee's intentional or knowing fraudulent or illegal conduct or misconduct, including the making of a material misrepresentation contained in the Company's financial statements.

Table of Contents



## Tax and Accounting Impacts of Compensation Programs

*Deductibility of Executive Compensation.* Section 162(m) of the Internal Revenue Code limits the tax deductibility of compensation for certain executive officers that is more than $1 million. The Committee is not limited to paying compensation that is fully deductible and retains the flexibility to consider tax and accounting impacts as some factors among many in structuring compensation programs. For the year ending December 31, 2021, the tax impact related to non-deductible compensation expense was approximately $4.5 million.

*Accounting and Financial Reporting.* The Company accounts for long-term, equity-based incentive compensation payments including SARs, RSUs, RSAs, stock options, and performance shares in accordance with accounting principles generally accepted in the United States (U.S. GAAP).

Table of Contents

# Human Capital and Compensation Committee Report

*The following Report of the Human Capital and Compensation Committee does not constitute soliciting material and should not be deemed filed or incorporated by reference into any other Company filing under the Securities Act of 1933, as amended or the Securities Exchange Act of 1934, as amended, except to the extent the Company specifically incorporates this Report by reference therein.*

The Human Capital and Compensation Committee has reviewed and discussed with management the preceding Compensation Discussion and Analysis. Based on that discussion, the Committee recommended to the Board of Directors that the Compensation Discussion and Analysis be included in this proxy statement and incorporated into the Company's Annual Report on Form 10-K for the year ended December 31, 2021.

Michael B. McCallister, Chair
Emerson L. Brumback
Gary R. Heminger
Eileen A. Mallesch
Marsha C. Williams

Table of Contents

# CEO Pay Ratio

As required by Section 953(b) of the Dodd-Frank Wall Street Reform and Consumer Protection Act, and Item 402(u) of Regulation S-K, we are providing information about the relationship of the annual total compensation of Greg D. Carmichael, our chief executive officer ("CEO"), and the median annual total compensation of our employees. The Company believes that the ratio of pay included in this information is a reasonable estimate calculated in a manner consistent with Item 402(u) of Regulation S-K.

As of December 31, 2021:

- The median annual total compensation of all employees of our company (other than the CEO) was $66,720; and
- The annual total compensation of our CEO, as reported in the Summary Compensation Table included on page 71, was $10,531,649.

Based on this information, for 2021, the ratio of the annual total compensation for our CEO to the median of the annual total compensation of our employees was 158 to 1.

In order to determine this ratio, we first identified one of our employees as the median employee. Since only 12% of our employees receive equity compensation, we considered total cash compensation as a consistently applied compensation measure. As allowed by the rules, we excluded our CEO and our 9 employees located outside the United States (7 in Canada and 2 in the United Kingdom) who are less than 1% of our total 19,452 employee base. We then examined the total cash compensation (salary, wages, and bonus) for the remaining employees who were employed on December 31, 2021, as reflected in our payroll records and reported to the Internal Revenue Service on Form W-2 for 2021. In making this examination we annualized the salary of approximately 3,145 full-time employees hired in 2021 who did not work the entire year. We did not annualize the pay of any other type of employee (e.g., part-time, co-ops) or make any other adjustments to the payroll data.

Once we identified the median employee, we then compared all elements of that employee's 2021 compensation in accordance with the requirements of Item 402(c)(2)(x) of Regulation S-K; the same methodology we used for our Named Executive Officers in the 2021 Summary Compensation Table on page 71 of this proxy statement, to comparable total compensation of our CEO in order to determine the ratio as shown below:

| | Chairman and CEO ($) | Median employee ($) |
|---|---|---|
| Base salary | 1,100,070 | 64,383 |
| Stock awards | 4,887,500 | 0 |
| Option awards | 862,502 | 0 |
| Non-equity incentive plan compensation | 3,300,000 | 0 |
| Change in pension value/NQDC earnings | 0 | 0 |
| All other compensation | 381,577 | 2,337 |
| **TOTAL** | **10,531,649** | **66,720** |
| **CEO pay ratio** | **158 : 1** | |

December 31, 2021 was the date selected to identify the median employee because it is the date consistent with the rest of the discussion included in this proxy statement and because our employee base does not materially change at any point during the year.

Table of Contents

# Compensation of Named Executive Officers

***Summary Compensation Table.*** The table below summarizes the compensation awarded, paid to, or earned by the Company's Named Executive Officers during 2019 through 2021. The amounts in the Stock Awards and Option Awards columns indicate the fair value on the grant date associated with all grants awarded in the corresponding year and do not correspond with the amounts that the Named Executive Officers may eventually realize with respect to these awards. The benefit, if any, actually received from these awards will depend upon the future value of our Common Stock.

**2021 Summary Compensation Table**

| Name & Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards ($)[1] | Option Awards ($)[2] | Non-Equity Incentive Plan Compensation ($)[3] | All Other Compensation ($)[5] | Total ($) |
|---|---|---|---|---|---|---|---|---|
| Greg D. Carmichael, Chairman and Chief Executive Officer | 2021 | 1,100,070 | 0 | 4,887,500 | 862,502 | 3,300,000 | 381,577 | 10,531,649 |
| | 2020 | 1,100,070 | 0 | 4,674,998 | 825,002 | 2,860,000 | 337,519[4] | 9,797,589 |
| | 2019 | 1,100,070 | 0 | 4,462,507 | 787,498 | 2,200,000 | 449,162 | 8,999,237 |
| James C. Leonard, Executive Vice President and Chief Financial Officer | 2021 | 570,577 | 0 | 1,019,983 | 179,999 | 862,500 | 87,982 | 2,721,040 |
| | 2020 | 452,565 | 0 | 452,083 | 56,251 | 598,000 | 57,945 | 1,616,844 |
| Timothy N. Spence, President, Fifth Third Bancorp | 2021 | 514,987 | | 1,275,012 | 225,000 | 1,312,500 | 139,143 | 3,572,570 |
| | 2020 | 514,987 | 0 | 1,020,002 | 180,000 | 910,472 | 91,819 | 2,717,280 |
| | 2019 | 492,694 | 0 | 1,121,999 | 197,998 | 670,000 | 122,914 | 2,605,605 |
| Lars C. Anderson, Vice Chairman, Strategic Growth Initiatives | 2021 | 688,501 | 0 | 1,444,975 | 255,004 | 984,556 | 113,115 | 3,486,151 |
| | 2020 | 688,501 | 0 | 1,444,979 | 255,000 | 833,086 | 120,751 | 3,342,317 |
| | 2019 | 688,500 | 0 | 1,444,991 | 255,001 | 760,000 | 158,214 | 3,306,706 |
| Kevin P. Lavender, Executive Vice President and Head of Commercial Bank | 2021 | 498,462 | 0 | 934,984 | 165,001 | 750,000 | 117,382 | 2,465,829 |

Table of Contents

COMPENSATION OF NAMED EXECUTIVE OFFICERS

(1) The values shown for performance share awards for 2021 in the Summary Compensation Table and the table below reflect the grant date fair value of $33.53, which was the closing price on the February 17, 2021 grant date and the price used to calculate the number of performance shares awarded. The values shown for performance share awards for 2020 in both tables reflect the grant date fair value of $29.64, which was the closing price on the February 12, 2020 grant date and the price used to calculate the number of performance shares awarded. The values shown for performance share awards for 2019 in both tables reflect the grant date fair value of $26.72, which was the closing price on the February 6, 2019 grant date and also the price used to calculate the number of performance shares awarded. Fair values assuming maximum performance as of the date of grant are as follows:

| | Fair Value at Maximum Performance | | |
|---|---|---|---|
| Executive | 2019 ($) | 2020 ($) | 2021 ($) |
| Greg D. Carmichael | 3,543,753 | 4,124,999 | 4,312,494 |
| James C. Leonard | — | 281,254 | 899,979 |
| Timothy N. Spence | 891,018 | 900,004 | 1,124,999 |
| Lars C. Anderson | 1,147,491 | 1,274,979 | 1,274,978 |
| Kevin P. Lavender | — | — | 824,989 |

(2) Amounts reflect the aggregate grant date fair value of awards granted during the year valued in accordance with statement of accounting principles generally accepted in the United States. Assumptions used in determining fair value are disclosed in Note 25, "Stock Based Compensation," of the Company's Annual Report on Form 10-K for the year ended December 31, 2021.

(3) Amounts reflect the Variable Compensation Plan award paid in cash to each NEO.

(4) For 2020, an amendment was made to Greg D. Carmichael to include the costs of home security pursuant to our executive corporate security program ($31,111).

(5) The amounts reflected in the All Other Compensation column consist of the benefits provided to the Company's Named Executive Officers as described above under "Compensation Discussion and Analysis—Executive Benefits and Perquisites. The following table reflects the costs of these benefits for 2021.

| Executive | Perquisites and Other Personal Benefits ($) | | Registrant Contributions to Defined Contribution Plans ($) | Tax Reimbursements & Insurance Premiums ($) | Severance ($) | Other ($)(F) | Total ($) |
|---|---|---|---|---|---|---|---|
| Greg D. Carmichael | 103,476 | (A) | 277,205 | 396 | — | 500 | 381,577 |
| James C. Leonard | 3,900 | (B) | 81,800 | 182 | — | 2,100 | 87,982 |
| Timothy N. Spence | 30,240 | (C) | 107,197 | 206 | — | 1,500 | 139,143 |
| Lars C. Anderson | 5,831 | (D) | 106,511 | 273 | — | 500 | 113,115 |
| Kevin P. Lavender | 37,708 | (E) | 79,242 | 182 | — | 250 | 117,382 |

(A) The amount shown for Mr. Carmichael represents parking, an executive physical, and the personal use of corporate aircraft ($84,641).

(B) The amount shown for Mr. Leonard represents trust and estate planning fees and parking.

(C) The amount shown for Mr. Spence represents parking, the personal use of corporate aircraft ($3,892), and costs of home security upgrades pursuant to our executive corporate security program ($23,948)

(D) The amount shown for Mr. Anderson represents parking and an executive physical.

(E) The amount shown for Mr. Lavender represents trust and estate planning fees, parking, and an executive physical ($27,758)

(F) The amount shown for Mr. Carmichael represents a company Health Savings Account contribution. The amount shown for Mr. Leonard represents wellness rewards and a company Health Savings Account contribution. The amount shown for Mr. Anderson represents a company Health Savings Account contribution. The amount shown for Mr. Spence represents wellness rewards and a company Health Savings Account contribution. The amount shown for Mr. Lavender represents a company Health Savings Account contribution

Table of Contents



*Grants of Plan-Based Awards.* The following table reflects the full grant date fair value of long-term, equity-based incentive compensation awards made to our Named Executive Officers during 2021. Each of the Named Executive Officers received grants of performance shares that will vest in full three years from the grant date (contingent on meeting the performance threshold), SARs that will vest in three equal annual installments from the grant date, and RSUs that will vest in three equal annual installments from the grant date. Dividend equivalents are accrued in cash for RSUs and performance shares granted in 2021 and will be paid out when the underlying awards are earned and distributed. None of these awards have been re-priced or modified.

Performance shares are reported in the "Estimated Future Payouts Under Equity Incentive Plan Award" columns below; RSUs are reported in the "All Other Stock Awards: Number of Shares of Stock or Units" column below; and SARs are reported in the "All Other Option Awards: Number of Securities Underlying Options" column below.

**2021 Grants of Plan-Based Awards**

| Name | Grant Date(1) | Date Grant Approved by Compensation Committee | Estimated Future Payouts Under Non-Equity Incentive Plan Awards(2) | | | | Estimated Future Payouts Under Equity Incentive Plan Awards(3) | | | | All Other Stock Awards: Number of Shares of Stock or Units (#) | All Other Option Awards: Number of Securities Underlying Options (#) | Exercise or Base Price of Option Awards ($/Sh) | Grant Date Fair Value of Stock and Option Awards(4) ($) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Number of Units | Threshold ($) | Target ($) | Maximum ($) | Number of Units | Threshold (#) | Target (#) | Maximum (#) | | | | |
| Greg D. Carmichael | | | | — | 2,200,000 | 4,400,000 | | | | | | | | |
| | 2/17/2021 | 2/17/2021 | | | | | 85,744 | 51,446 | 85,744 | 128,616 | | | | 2,874,996 |
| | 2/17/2021 | 2/17/2021 | | | | | | | | | | 110,013 | 33.53 | 862,502 |
| | 2/17/2021 | 2/17/2021 | | | | | | | | | 60,021 | | | 2,012,504 |
| James C. Leonard | | | | — | 575,000 | 1,150,000 | | | | | | | | |
| | 2/17/2021 | 2/17/2021 | | | | | 17,894 | 10,736 | 17,894 | 26,841 | | | | 599,986 |
| | 2/17/2021 | 2/17/2021 | | | | | | | | | | 22,959 | 33.53 | 179,999 |
| | 2/17/2021 | 2/17/2021 | | | | | | | | | 12,526 | | | 419,997 |
| Timothy N. Spence | | | | — | 875,000 | 1,750,000 | | | | | | | | |
| | 2/17/2021 | 2/17/2021 | | | | | 22,368 | 13,421 | 22,368 | 33,552 | | | | 749,999 |
| | 2/17/2021 | 2/17/2021 | | | | | | | | | | 28,699 | 33.53 | 225,000 |
| | 2/17/2021 | 2/17/2021 | | | | | | | | | 15,658 | | | 525,013 |
| Lars C. Anderson | | | | — | 757,351 | 1,514,702 | | | | | | | | |
| | 2/17/2021 | 2/17/2021 | | | | | 25,350 | 15,210 | 25,350 | 38,025 | | | | 849,986 |
| | 2/17/2021 | 2/17/2021 | | | | | | | | | | 32,526 | 33.53 | 255,004 |
| | 2/17/2021 | 2/17/2021 | | | | | | | | | 17,745 | | | 594,990 |
| Kevin P. Lavender | | | | — | 500,000 | 1,000,000 | | | | | | | | |
| | 2/17/2021 | 2/17/2021 | | | | | 16,403 | 9,842 | 16,403 | 24,605 | | | | 549,993 |
| | 2/17/2021 | 2/17/2021 | | | | | | | | | | 21,046 | 33.53 | 165,001 |
| | 2/17/2021 | 2/17/2021 | | | | | | | | | 11,482 | | | 384,991 |

(1) Awards were made under the 2019 Incentive Compensation Plan as approved by shareholders on April 16, 2019.
(2) Includes a range of possible payouts for 2021 performance under the Variable Compensation Plan, based on percent of salary targets and subject to threshold, target and maximum levels of corporate performance. Awards are subject to adjustments based on individual performance, risk assessment results, and business unit performance. Actual awards received for 2021 are reported in the Summary Compensation Table under the "Non-Equity Incentive Plan Compensation" column.
(3) Includes performance shares that are settled in Company Common Stock, only after threshold or greater performance is achieved.
(4) "Grant Date Fair Value of Option Awards" granted on February 17, 2021, calculated as the total number of shares multiplied by \$7.84 (Black-Sholes value) for the SARs. "Grant Date Fair Value of Stock Awards" granted (including the RSUs and the performance shares) on February 17, 2021, is calculated as the total number of shares multiplied by \$33.53.

Table of Contents

**COMPENSATION OF NAMED EXECUTIVE OFFICERS**

***Outstanding Equity Awards at Year-End.*** The following table outlines outstanding long-term, equity-based incentive compensation awards for the Named Executive Officers as of December 31, 2021. Each outstanding award is shown separately. The “Option Awards” columns reflect SARs. The “Stock Awards” columns include RSUs and Performance Shares. Performance Shares are listed in the “Equity Incentive Plan Award” columns. Performance shares settle entirely in shares of Company Common Stock only after threshold performance or greater is achieved. The vesting schedule for each award is described in the footnotes to this table.

**Outstanding Equity Awards at December 31, 2021**

| | Option Awards | | | | | Stock Awards(9) | | | |
|---|---|---|---|---|---|---|---|---|---|
| Name | Number of Securities Underlying Unexercised Options (#) Exercisable | Number of Securities Underlying Unexercised Options (#) Unexercisable | Equity Incentive Plan Awards: Number of Securities Underlying Unexercised Unearned Options (#) | Option Exercise Price ($) | Option Expiration Date | Number of Shares or Units of Stock That Have Not Vested (#) | Market Value of Shares or Units of Stock That Have Not Vested ($) | Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other Rights That Have Not Vested (#) | Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested ($) |
| Greg D. Carmichael | 141,447 | | | 16.15 | 4/16/2023 | | | | |
| | 82,312 | | | 21.63 | 4/15/2024 | | | | |
| | 56,933 | | | 18.78 | 2/11/2025 | | | | |
| | 147,912 | | | 14.87 | 2/12/2026 | | | | |
| | 93,421 | | | 26.52 | 2/3/2027 | | | | |
| | 76,125 | | | 33.10 | 1/31/2028 | | | | |
| | 71,138 | 35,569(1) | | 26.72 | 2/06/2029 | | | | |
| | 40,322 | 80,646(2) | | 29.62 | 2/12/2030 | | | | |
| | | 110,113(3) | | 33.53 | 2/17/2031 | | | | |
| | | | | | | 26,198(1) | 1,140,923 | | |
| | | | | | | 43,298(2) | 1,885,628 | | |
| | | | | | | 60,021(3) | 2,613,915 | | |
| | | | | | | | | 88,417(4) | 3,850,560 |
| | | | | | | | | 92,780(5) | 4,040,569 |
| | | | | | | | | 85,744(6) | 3,734,151 |

Table of Contents



**Outstanding Equity Awards at December 31, 2021**

| | Option Awards | | | | | Stock Awards[9] | | | |
|---|---|---|---|---|---|---|---|---|---|
| Name | Number of Securities Underlying Unexercised Options (#) Exercisable | Number of Securities Underlying Unexercised Options (#) Unexercisable | Equity Incentive Plan Awards: Number of Securities Underlying Unexercised Unearned Options (#) | Option Exercise Price ($) | Option Expiration Date | Number of Shares or Units of Stock That Have Not Vested (#) | Market Value of Shares or Units of Stock That Have Not Vested ($) | Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other Rights That Have Not Vested (#) | Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested ($) |
| James C. Leonard | 4,350 | | | 14.87 | 2/12/2026 | | | | |
| | 8,772 | | | 26.52 | 2/3/2027 | | | | |
| | 4,965 | | | 33.17 | 1/29/2028 | | | | |
| | 6,436 | 3,218[1] | | 26.72 | 2/06/2029 | | | | |
| | 2,749 | 5,499[2] | | 29.64 | 2/12/2030 | | | | |
| | | 22,959[3] | | 33.53 | 2/17/2031 | | | | |
| | | | | | | 2,371[1] | 103,257 | | |
| | | | | | | 2,952[2] | 128,560 | | |
| | | | | | | 12,526[3] | 545,507 | | |
| | | | | | | 7,310[7] | 318,351 | | |
| | | | | | | | | 8,000[4] | 348,400 |
| | | | | | | | | 6,326[5] | 275,497 |
| | | | | | | | | 17,894[6] | 779,284 |
| Timothy N. Spence | 41,763 | | | 14.87 | 2/12/2026 | | | | |
| | 28,070 | | | 26.52 | 2/3/2027 | | | | |
| | 15,887 | | | 33.17 | 1/29/2028 | | | | |
| | 17,886 | 8,943[1] | | 26.72 | 2/6/2029 | | | | |
| | 8,797 | 17,596[2] | | 29.64 | 2/12/2030 | | | | |
| | | 28,699[3] | | 33.53 | 2/17/2031 | | | | |
| | | | | | | 6,587[1] | 286,864 | | |
| | | | | | | 9,447[2] | 411,417 | | |
| | | | | | | 15,658[3] | 681,906 | | |
| | | | | | | | | 22,231[4] | 968,160 |
| | | | | | | | | 20,243[5] | 881,583 |
| | | | | | | | | 22,368[6] | 974,126 |

Table of Contents

## COMPENSATION OF NAMED EXECUTIVE OFFICERS

### Outstanding Equity Awards at December 31, 2021

| | Option Awards | | | | | Stock Awards[9] | | | |
|---|---|---|---|---|---|---|---|---|---|
| Name | Number of Securities Underlying Unexercised Options (#) Exercisable | Number of Securities Underlying Unexercised Options (#) Unexercisable | Equity Incentive Plan Awards: Number of Securities Underlying Unexercised Unearned Options (#) | Option Exercise Price ($) | Option Expiration Date | Number of Shares or Units of Stock That Have Not Vested (#) | Market Value of Shares or Units of Stock That Have Not Vested ($) | Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other Rights That Have Not Vested (#) | Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested ($) |
| Lars C. Anderson | 59,165 | | | 14.87 | 2/12/2026 | | | | |
| | 29,825 | | | 26.52 | 2/3/2027 | | | | |
| | 22,507 | | | 33.17 | 1/29/2028 | | | | |
| | 23,035 | 11,518(1) | | 26.72 | 2/6/2029 | | | | |
| | 12,463 | 24,927(2) | | 29.64 | 2/12/2030 | | | | |
| | | 32,526(3) | | 33.53 | 2/17/2031 | | | | |
| | | | | | | 8,483(1) | 369,435 | | |
| | | | | | | 13,383(2) | 582,830 | | |
| | | | | | | 17,745(3) | 772,795 | | |
| | | | | | | | | 28,630(4) | 1,246,837 |
| | | | | | | | | 28,677(5) | 1,248,883 |
| | | | | | | | | 25,350(6) | 1,103,993 |
| Kevin P. Lavender | 7,437 | | | 21.63 | 4/15/2024 | | | | |
| | 8,246 | | | 26.52 | 2/3/2027 | | | | |
| | | 21,046(3) | | 33.53 | 2/17/2031 | | | | |
| | | | | | | 1,432(6) | 62,364 | | |
| | | | | | | 6,549(1) | 285,209 | | |
| | | | | | | 10,121(2) | 440,770 | | |
| | | | | | | 11,482(3) | 500,041 | | |
| | | | | | | 16,432(8) | 715,614 | | |
| | | | | | | 8,997(7) | 391,819 | | |
| | | | | | | | | 16,403(3) | 714,351 |

(1) All unvested shares are scheduled to vest on February 6, 2022.
(2) One-half of the unvested shares will vest on each of February 12, 2022 and 2023.
(3) One-third of the unvested shares will vest on each of February 17, 2022, 2023 and 2024
(4) All unvested shares are scheduled to vest on February 6, 2022, subject to achievement of stated performance goals
(5) All unvested shares are scheduled to vest on February 12, 2023, subject to achievement of stated performance goals.
(6) All unvested shares are scheduled to vest on February 17, 2024, subject to achievement of stated performance goals.
(7) All unvested shares are scheduled to vest March 23, 2023.
(8) All unvested shares are scheduled to vest November 6, 2022.
(9) Values are based on the December 31, 2021, closing price of the Company's common stock of $43.55 with performance shares valued as if target performance was achieved.

Table of Contents



***Option Exercises and Stock Vested. The following table outlines SARs exercised and restricted stock and RSUs that vested during 2021.***

| | 2021 Option Exercises & Stock Vested | | | |
|---|---|---|---|---|
| | Option Awards(1) | | Stock Awards(2) | |
| Executive | Number of Shares Acquired on Exercise (#) | Value Realized on Exercise ($) | Number of Shares Acquired on Vesting (#) | Value Realized on Vesting ($) |
| Greg D. Carmichael | 236,407 | 3,576,838 | 149,180 | 4,476,194 |
| James C. Leonard | | | 14,096 | 447,666 |
| Timothy N. Spence | | | 32,414 | 975,493 |
| Lars C. Anderson | | — | 45,071 | 1,354,707 |
| Kevin P. Lavender | 7,182 | 154,126 | 14,129 | 467,781 |

(1) The dollar figures in the table represent the value at exercise for SARs.
(2) The dollar figures in the table represent the value on the vest date for RSUs.

***Nonqualified Deferred Compensation.*** As discussed above, the Company maintains a Nonqualified Deferred Compensation Plan ("NQDCP") that allows participant and Company contributions.

The plan allows participants to defer up to 70% of their base salary and up to 100% of their Variable Compensation award. In addition, the Company makes contributions for loss of qualified 401(k) plan matching contributions for two reasons: (1) due to base salary or Variable Compensation Plan award deferrals into the NQDCP plan and/or (2) due to wage and/or contribution limitations under the qualified 401(k) plan. The Company's contribution to the NQDCP is determined by taking the participant's eligible wages above the qualified 401(k) plan compensation limits ($290,000 for 2021) and applying the Company's 401(k) match (7%). If other qualified plan 401(k) limitations applied, the participants would also have contributions made to the plan for those limitations.

Distributions are made in a lump sum or in up to 10 annual installments. The Named Executive Officers may elect when the payments commence. The earliest distribution is August of the calendar year following the year of retirement. If a change is made to an initial distribution election which pushes out the start date of the payments, the entire distribution of the account must be made no later than the 15th calendar year following the year of retirement. This plan is intended to comply with the requirements of Section 409(A) of the Internal Revenue Code.

The following table illustrates the nonqualified deferred compensation plan benefits. It includes each Named Executive Officer's and the Company's contributions (each of which are reflected in the amounts disclosed in the 2021 Summary Compensation Table) under the NQDCP as well as the earnings during 2021. It does not reflect matching 401(k) or discretionary contributions made under the qualified plan.

| | 2021 Nonqualified Deferred Compensation | | | | | |
|---|---|---|---|---|---|---|
| Executive | Plan | Executive Contributions in 2021 ($) | Company Contributions in 2021 ($) | Aggregate Earnings in 2021 ($) | Aggregate Withdrawals / Distributions ($) | Aggregate Balance at 12/31/2021 ($) |
| Greg D. Carmichael | NQDCP(1) | — | 256,905 | 2,451,209 | — | 11,783,668 |
| James C. Leonard | NQDCP(1) | — | 61,500 | 32,268 | — | 1,458,341 |
| Timothy N. Spence | NQDCP(1) | 136,571 | 86,897 | 80,924 | — | 726,605 |
| Lars C. Anderson | NQDCP(1) | 83,309 | 86,211 | 161,990 | — | 1,278,137 |
| Kevin P. Lavender | NQDCP(1) | 94,692 | 58,942 | 296,446 | — | 2,186,860 |

(1) The investments under this plan would produce earnings equal to those of any other investor who invested similar amounts of money in like investments for the same time period during the year.

Table of Contents

## COMPENSATION OF NAMED EXECUTIVE OFFICERS

***Potential Payments Upon Termination or Change in Control.*** The treatment of long-term, equity-based awards issued as of December 31, 2021, under all termination scenarios, is dictated by the 2011, 2014, 2017, and 2019 Incentive Compensation Plans, which were approved by shareholders on: April 19, 2011; April 15, 2014; April 18, 2017; and April 16, 2019, respectively.

The Company's change in control policies were determined by the Committee to provide appropriate benefits based on a competitive review of the Compensation Peer Group and published guidance at the time of their adoption from institutional shareholder groups.

These arrangements fit into the Company's overall compensation objectives as they are viewed to be competitive, but not excessive, relative to our Compensation Peer Group, and they allow us to attract and retain qualified senior executives. However, these arrangements impact neither the compensation target levels that are based on market median compensation nor the compensation awards based on a variety of performance factors as described in this proxy statement.

The estimated payouts under a variety of termination scenarios for the Named Executive Officers are discussed below. Except in a change in control scenario, the Named Executive Officer's termination would not result in enhanced retirement benefits.

***Voluntary.*** The Company does not currently have contracts with its Named Executive Officers that would require cash severance payments upon voluntary termination. Under the terms of the 2011, 2014, 2017, and 2019 Incentive Compensation Plans, if the Named Executive Officer meets certain retirement eligibility criteria, any exercisable SARs would remain outstanding and under certain other criteria outstanding equity awards may continue to vest. These values, as applicable, are included in the following pages.

***With Cause.*** The Company does not currently have contracts with its Named Executive Officers that would require cash severance payments upon involuntary termination by the Company for cause. Under the terms of the Company's 2011, 2014, 2017, and 2019 Incentive Compensation Plans, all equity-based awards would be immediately forfeited

***Death and Disability.*** Under the terms of the 2011, 2014, 2017, and 2019 Incentive Compensation Plans, all unvested stock and option awards vest

Immediately upon termination of a participant's employment due to death or disability, and SARs remain outstanding for the remaining term of the grant. Performance shares granted prior to 2021 are earned on a prorated basis determined by the Named Executive Officer's full months of service and are adjusted based on the achievement of the performance goals for the full performance period. Performance shares granted in 2021 and future years will vest immediately based on the target number of shares and will not be prorated for months of service for the performance period. The table on page 80 reflects an assumed payout each Named Executive Officer would be eligible to receive if the Company achieved 100% of its performance goals for each outstanding performance share award and paid out effective December 31, 2021.

***Involuntary Without Cause or For Good Reason.*** On February 17, 2021, the Human Capital and Compensation Committee adopted the Executive Severance Benefits Plan, in which participating executives are eligible to receive certain severance benefits as described in the Severance Benefits Plan if such executive's employment terminates prior to a change in control of the Bank or more than 24 months following a change in control, but only if the Bank determines, in its sole discretion, that the executive's employment was terminated involuntarily by the Bank without "cause" or by the executive for "good reason" (each as defined in the Severance Benefits Plan). For purposes of the Severance Benefits Plan, a change in control has the meaning given to that term in the Fifth Third Bancorp Executive Change in Control Severance Plan, as amended.

The cash severance payment received upon a triggering event under the Severance Benefits Plan would be equal to 2 times the Named Executive Officer's base salary for Messrs. Carmichael, and Spence and 1.5 times base salary Messrs. Leonard, Anderson, and Lavender. The payment is payable in quarterly installments over the 12-month period following termination of employment.

In addition to the base annual salary, a Named Executive Officer will receive a lump sum payment of a portion of the executive's annual bonus for the year in which termination of

employment occurs prorated based on the number of days elapsed; and a lump sum payment equal to twelve (12) times the monthly COBRA premium costs for the Bank-sponsored medical, dental and vision coverage in which the executive participated.

The table below reflects an assumed full-year Variable Compensation Plan award at the amount each Named Executive Officer would be eligible to receive if the Company achieves 100% of its Variable Compensation Plan performance targets.

***Change in Control.*** As described in the "Severance and Change in Control Benefits" section, the Company's CIC Severance Plan provides for the payment of benefits upon a qualifying termination following a change in control (a "triggering event") for the Named Executive Officers and other officers of the Company. In exchange for the payments and benefits under the plan, the eligible Named Executive Officer would be required to sign an agreement at the time of the triggering event not to compete with, nor solicit employees or customers from, the Company for a period of three years following the executive's termination for Messrs. Carmichael, Leonard, and Spence and for a period of two years for Messrs. Anderson, and Lavender.

The cash severance payment would be equal to 2.99 times the Named Executive Officer's base salary plus his or her Variable Compensation amount for Messrs. Carmichael, Leonard, and Spence and 2 times base salary plus his Variable Compensation amount for Messrs. Anderson and Lavender. In addition, the Named Executive Officer would earn a prorated Variable Compensation Plan award for the fiscal year of the termination. The table below reflects an assumed full-year Variable Compensation Plan award at the amount each Named Executive Officer would be eligible to receive if the Company achieves 100% of its Variable Compensation Plan performance targets.

Since April 2008, we have not granted any awards that provide for "single-trigger" vesting upon a change in control to our executives. Instead, as defined in our incentive compensation plans, any outstanding long-term, equity-based award (stock options, SARs, RSUs, and restricted stock awards) would vest immediately only if there is a change in control and a subsequent qualifying termination of employment ("double-trigger" vesting). Performance share awards would be deemed earned and paid out based on the greater of (1) the extent to which applicable performance goals have been met through and including the effective date of the change in control or (2) the value on the date of the change in control of the number of target shares, in each case prorated based on the portion of the performance period elapsed at the time of the change in control. The value of performance share awards would be calculated based on current market value of the Company's stock on the date of the change in control times the earned number of shares. The table on the following page reflects an assumed payout each Named Executive Officer would be eligible to receive if the Company achieved 100% of its performance goals for each outstanding performance share award and paid out effective December 31, 2021. The treatment of equity awards applies to all long-term, equity-based award recipients eligible for change in control benefits, not just for the Company's Named Executive Officers.

Upon a triggering event under the CIC Severance Plan, Messrs. Carmichael, Leonard, and Spence would receive three, and Messrs. Anderson and Lavender would receive two, additional years of age and service credit under the qualified and nonqualified defined contribution plans; medical, dental, and life insurance benefits; and the additional value, if any, of the pension benefit at age 60. These benefits are reflected in the Other Benefits category below. The NEO's termination would not result in enhanced retirement benefits. Eligibility for these benefits, as well as any other benefits in a change in control scenario, is determined in a manner consistent with all eligible employees, not just the Company's Named Executive Officers.

Material differences in circumstances relate to retirement eligibility, as described above. As of December 31, 2021, Messrs. Carmichael, Anderson, and Lavender meet all retirement eligibility criteria under outstanding long-term, equity-based compensation award agreements. All three have met the criteria to retain all vested and unvested awards except in a termination for cause scenario.

Table of Contents

## COMPENSATION OF NAMED EXECUTIVE OFFICERS

The tables below contain the total payments each Named Executive Officer would receive under each termination scenario if the Named Executive Officer separated on December 31, 2021. For all termination scenarios, the figures for long-term, equity-based incentive compensation awards are as of December 31, 2021, at the closing stock price of $43.55 on that date.

| Executive | Termination Scenarios | | | |
|---|---|---|---|---|
| | Voluntary ($)(1) | With Cause | Death or Disability ($)(2) | Involuntary or for Good Reason ($)(3) |
| Greg D. Carmichael | 35,565,359 | — | 34,218,503 | 39,990,854 |
| James C. Leonard | — | — | 3,239,961 | 2,662,835 |
| Timothy N. Spence | — | — | 6,857,119 | 3,642,134 |
| Lars C. Anderson | 9,190,698 | — | 8,774,404 | 10,998,138 |
| Kevin P. Lavender | 3,624,496 | — | 3,624,496 | 4,882,198 |

(1) Amounts in this column include the amount of long-term, equity-based compensation each NEO is entitled to retain for meeting all retirement eligibility criteria under outstanding award agreements in a voluntary termination scenario.
(2) Amounts in this column include the total amount of long-term, equity-based compensation each NEO is entitled either to retain or to have the vesting accelerated because of a death or disability scenario.
(3) Amounts in this column include the amount of base salary, variable compensation, a lump sum COBRA payment each NEO is entitled to receive in a termination without "cause" or for "good reason" scenario, as well as the value of long term equity each NEO is entitled to retain due to meeting retirement eligibility criteria, or as otherwise provided for in the award agreements.

| Executive | Involuntary Termination Upon a Change in Control | | | | |
|---|---|---|---|---|---|
| | Cash Severance ($) | Unvested Equity ($) | Potential Excise Tax Gross-Up ($) | Other Benefits ($) | Total ($) |
| Greg D. Carmichael | 12,067,210 | 20,088,488 | — | 763,081 | 32,918,780 |
| James C. Leonard | 4,013,500 | 2,859,555 | — | 312,430 | 7,185,484 |
| Timothy N. Spence | 5,360,000 | 4,886,891 | — | 363,274 | 10,610,165 |
| Lars C. Anderson | 3,649,054 | 6,191,264 | — | 236,186 | 10,076,505 |
| Kevin P. Lavender | 2,500,000 | 3,321,048 | — | 155,404 | 5,976,452 |

Table of Contents

# Certain Transactions

The Charter of the Company's Human Capital and Compensation Committee requires that the Human Capital and Compensation Committee approve all related person or affiliate transactions between Fifth Third Bancorp and any of its affiliates, directors, officers, and/or employees or in which any of such persons directly or indirectly is interested or benefited. Loans to directors, executive officers, and their immediate family members have been made in the ordinary course of business, on substantially the same terms, including interest rates and collateral, as those prevailing at the time for comparable loans with persons not related to Fifth Third, and do not involve more than the normal risk of collectability or present other unfavorable features. The Board reviews all extensions of credit made to directors and executive officers and related interests which are subject to the Federal Reserve Board Regulation O. For 2021, all of these extensions of credit complied with the policies and procedures governed by Federal Reserve Regulation O.

Certain of these related person transactions are required to be disclosed by Fifth Third Bancorp in this proxy statement:

> One of our directors, Katherine B. Blackburn, is the Executive Vice President of the Cincinnati Bengals professional football team. She and members of her immediate family own substantially all of the equity interests in the parent company of the Cincinnati Bengals. Fifth Third Bancorp's corporate headquarters is located in Cincinnati and the region is a significant market for the Company. During 2021, we paid the Cincinnati Bengals approximately $2.1 million for sponsorship arrangements, tickets, and advertising expenses. In 2020, Fifth Third and the Cincinnati Bengals signed a five-year sponsorship contract that calls for total payments by Fifth Third Bancorp during that period of up to $2.05 million per year, subject to a 3.5% escalator per year. By virtue of Ms. Blackburn's being an executive officer and a principal owner of the Cincinnati Bengals, she is deemed to be a related party having a direct material interest in these arrangements. The sponsorship contract was negotiated at arms-length and on market terms and Ms. Blackburn did not participate in the negotiations or execution of the contract. Fifth Third's sponsorship of the Cincinnati Bengals began prior to Ms. Blackburn's election as a director.

Noel Hamilton is employed by Fifth Third Bank as a Senior Vice President. He is the brother-in-law of Kristine R. Garrett, who is an Executive Vice President of Fifth Third Bancorp. In 2021, Mr. Hamilton received compensation of approximately $419,478, including base salary and incentive and equity compensation, as well as benefits generally available to similarly situated employees.

Nicholas Carmichael is employed by Fifth Third Bank as an Investment Banking Analyst. He is the son of Greg D. Carmichael, who is the Chief Executive Officer of Fifth Third Bancorp. In 2021, Nicholas Carmichael received compensation of approximately $132,500, including base salary and incentive and equity compensation, as well as benefits generally available to similarly situated employees.

The compensation packages of Noel Hamilton and Nicholas Carmichael were established by Fifth Third Bancorp in accordance with its employment and compensation policies and practices applicable to employees with equivalent qualifications and responsibilities in similar positions.

We have also engaged in transactions with certain entities that have reported beneficial ownership of over 5% of our Common Stock. In 2021, we paid BlackRock Financial Management, Inc. approximately $3,901,787 for tools used to manage an investment portfolio, including a trading platform, risk analytics, and daily reporting. This business relationship and transaction was conducted at arm's length in our ordinary course of business.

Additionally, Fifth Third Bancorp has engaged and intends to continue to engage in the lending of money through its subsidiary bank to various of its directors, executive officers and shareholders, and corporations or other entities in which they may own a controlling interest. The loans to such persons and/or entities (i) were made in the ordinary course of business, (ii) were made on substantially the same terms, including interest rates and collateral, as those prevailing at the time for comparable loans with persons not related to the lender, and (iii) did not involve more than a normal risk of collectability or did not present other features unfavorable to Fifth Third Bancorp.

Table of Contents

# Report of the Audit Committee

*The following Report of the Audit Committee does not constitute soliciting material and should not be deemed filed or incorporated by reference into any other Company filing under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended, except to the extent the Company specifically incorporates this Report by reference therein.*

In accordance with its written charter adopted by the Board of Directors, which may be found in the Corporate Governance section of the Company's website at www.53.com, the Audit Committee of the Board assists the Board in fulfilling its responsibility for oversight of the quality and integrity of the accounting, auditing, and financial reporting practices of the Company. During 2021, the Committee met 12 times, and the Committee discussed the interim financial and other information contained in each quarterly earnings announcement and periodic filings to the SEC with the Chief Executive Officer, Chief Financial Officer, Controller, and the independent external audit firm prior to public release.

In discharging its oversight responsibility as to the audit process, the Committee obtained from the independent external audit firm a formal written statement describing all relationships between the firm and the Company that might bear on the firm's independence consistent with applicable requirements of the Public Company Accounting Oversight Board (United States) regarding the independent accountant's communications with the audit committee concerning independence, and has discussed with the independent accountant the independent accountant's independence and satisfied itself as to the firm's independence. The Committee also discussed with management, the internal auditors, and the independent external audit firm the quality and adequacy of the Company's internal controls and the internal audit function's organization, responsibilities, budget, and staffing. The Committee reviewed both with the independent external audit firm and internal auditors, their audit plans, audit scope, and identification of audit risks.

The Committee discussed and reviewed with the independent external audit firm all communications required by standards of the Public Company Accounting Oversight Board, including the matters required to be discussed by Auditing Standard No. 1301, *Communications with Audit Committees*, and Rule 2-07, *Communication with Audit Committees*, of Regulation S-X, and, with and without management present, discussed and reviewed the results of the independent external audit firm's examination of the financial statements. The Committee also discussed the results of internal audits.

The Committee reviewed and discussed the audited consolidated financial statements of the Company as of and for the year ended December 31, 2021 and management's assessment as to the effectiveness of Company's internal control over financial reporting as of December 31, 2021 with management and the independent external audit firm. Management has the responsibility for the preparation of the Company's consolidated financial statements and their assessment of the effectiveness of the Company's internal control over financial reporting and the independent external audit firm has the responsibility for the audits of those consolidated statements and of the effectiveness of internal control over financial reporting.

Based on the above-mentioned reviews and discussions with management and the independent external audit firm, the Committee recommended to the Board that the Company's audited consolidated financial statements and report on the effectiveness of internal control over financial reporting be included in its Annual Report on Form 10-K for the year ended December 31, 2021, for filing with the SEC. The Committee also appointed the independent external audit firm for 2022.

Eileen A. Mallesch, Chair
Katherine B. Blackburn
Thomas H. Harvey
Jewell D. Hoover
Michael B. McCallister

Table of Contents

# Principal Independent External Audit Firm Fees

The following table sets forth the aggregate fees billed to Fifth Third Bancorp for the fiscal years ended December 31, 2021 and December 31, 2020 by the Company's independent external audit firm Deloitte & Touche LLP.

| | December 31, | |
|---|---|---|
| | 2021 | 2020 |
| Audit fees | $ 5,034,650 | $ 5,178,650 |
| Audit-related fees(1) | 1,283,800 | 1,321,800 |
| Tax fees(2) | 230,351 | 245,312 |
| All other fees(3) | 67,553 | 72,382 |
| | $ 6,616,354 | $ 6,818,144 |

(1) Includes fees for services related to benefit plan audits, private and other common trust fund audits, stand-alone statutory audits, examinations of management's assertion, reports pursuant to Statement on Standards for Attestation Engagements No. 18, loan servicing reports, comfort letters and trust compliance.
(2) Includes fees for services related to tax compliance and tax consulting and planning. Of these amounts, for 2021, $105,314 represents fees for tax compliance services and $125,037 represents fees for tax consulting and planning services; and for 2020, $196,333 represents fees for tax compliance services and $48,979 represents fees for tax consulting and planning services.
(3) Includes fees for accounting subscription services. The Audit Committee has concluded that the provision of these services is compatible with maintaining the principal accountant's independence.

The Audit Committee is responsible for pre-approving all auditing services and permitted non-audit services to be performed by the independent external audit firm, except as described below.

The Audit Committee will establish general guidelines for the permissible scope and nature of any permitted non-audit services in connection with its annual review of the audit plan and will review such guidelines with the Board of Directors. Pre-approval may be granted by action of the full Audit Committee or, in the absence of such Audit Committee action, by the Audit Committee Chair, whose action shall be considered to be that of the entire Committee. Pre-approval shall not be required for the provision of non-audit services if (1) the aggregate amount of all such non-audit services constitutes no more than 5% of the total amount of fees paid by the Company to the auditors during the fiscal year in which the non-audit services are provided, (2) such services were not recognized by the Company at the time of engagement to be non-audit services, and (3) such services are promptly brought to the attention of the Audit Committee and approved prior to the completion of the audit. No services were provided by Deloitte & Touche LLP during 2021 or 2020 pursuant to this exception.

Table of Contents

# Company Proposal 1: Independent External Audit Firm (Item 2 on Proxy Card)

The Audit Committee of the Board of Directors proposes and recommends that the shareholders ratify the selection by the Committee of the firm of Deloitte & Touche LLP to serve as its independent external audit firm for the Company for the year 2022. The firm has served as the independent external audit firm for Fifth Third Bank since 1970 and for the Company since 1975. Representatives of Deloitte & Touche LLP will be present at the Annual Meeting to make such comments as they desire, and to respond to questions from shareholders of the Company. Action by the shareholders is not required by law in the appointment of an independent external audit firm, but their appointment is submitted by the Audit Committee in order to give the shareholders a voice in the designation of the independent external audit firm. If the resolution ratifying Deloitte & Touche LLP as the Company's independent external audit firm is rejected by the shareholders, then the Audit Committee will take the opportunity to re-evaluate its choice of independent external audit firm. Even if the resolution is approved, the Audit Committee at its discretion may direct the appointment of a different independent external audit firm at any time during the year if it determines that such a change would be in the best interests of the Company and its shareholders.

The Audit Committee is directly responsible for the appointment, compensation, retention, and oversight of the Company's independent external audit firm. The Audit Committee is also responsible for the audit fee negotiations associated with the Company's retention of Deloitte & Touche LLP. In order to assure continuing auditor independence, the Audit Committee periodically considers whether there should be a regular rotation of the independent external audit firm. Additionally, the Audit Committee and its Chair are directly involved in the selection and mandated rotation of the lead engagement partner from Deloitte & Touche LLP.

The members of the Audit Committee believe that the continued retention of Deloitte & Touche LLP to serve as the Company's independent external audit firm is in the best interest of the Company and its investors.

## Vote Required

Proxies received by the Company and not revoked prior to or at the Annual Meeting will be voted in favor of the resolution unless otherwise instructed by the shareholder. Pursuant to the Company's Code of Regulations, the affirmative vote of the holders of a majority of the voting power of the Company's Common Stock and Series A, Class B Preferred Stock, voting together as a single class, present electronically or by proxy at the Annual Meeting and entitled to vote on this proposal is required to approve the appointment of Deloitte & Touche LLP.

***THE AUDIT COMMITTEE OF THE BOARD OF DIRECTORS RECOMMENDS A VOTE "FOR" THE ADOPTION OF THE RESOLUTION.***

Table of Contents

# Company Proposal 2: Advisory Vote on Compensation of Named Executive Officers (Item 3 on Proxy Card)

As required by Section 14A of the Exchange Act, we are seeking advisory shareholder approval of the compensation of the Named Executive Officers as disclosed in this proxy statement. This proposal, commonly known as a "Say-on-Pay" proposal, gives you, as a shareholder, the opportunity to endorse or not endorse the compensation of our Named Executive Officers through the following resolution:

> **RESOLVED**, that the shareholders advise that they approve the compensation of Fifth Third Bancorp's Named Executive Officers, as disclosed pursuant to the disclosure rules of the Securities and Exchange Commission (which disclosure shall include the "Compensation Discussion and Analysis" section and the compensation tables and any related material in this proxy statement for its 2022 Annual Meeting).

Because your vote is advisory, it will not be binding upon the Board. However, the Human Capital and Compensation Committee will take into account the outcome of the vote when considering future executive compensation arrangements.

As discussed in "Compensation Discussion and Analysis," the Human Capital and Compensation Committee has determined that the compensation structure for executive officers is effective and appropriate and has determined that the Company's aggregate 2021 Total Rewards package (and potential payouts in the severance and change-in-control scenarios) for its Named Executive Officers are reasonable, appropriate and align our executive officers' interests with the long-term interests of our shareholders. Shareholders are encouraged to read the section of this proxy statement titled "Compensation Discussion and Analysis" as well as the tabular disclosure regarding Named Executive Officer compensation together with the accompanying narrative disclosure.

We conduct "Say-on-Pay" advisory votes on an annual basis.

## Vote Required

Proxies received by Fifth Third Bancorp and not revoked prior to or at the Annual Meeting will be voted in favor of this non-binding advisory proposal unless otherwise instructed by the shareholder. Pursuant to the Company's Code of Regulations, the affirmative vote of the holders of a majority of the voting power of the Company's Common Stock and Series A, Class B Preferred Stock, voting together as a single class, present electronically or by proxy at the Annual Meeting and entitled to vote on this proposal is required to approve this advisory proposal.

***THE BOARD OF DIRECTORS RECOMMENDS A VOTE "FOR" THE ADVISORY APPROVAL OF THE COMPENSATION OF THE NAMED EXECUTIVE OFFICERS AS DISCLOSED PURSUANT TO THE DISCLOSURE RULES OF THE SECURITIES AND EXCHANGE COMMISSION.***

Table of Contents

# Company Proposal 3: Approval Of An Amendment To The Fifth Third Code of Regulations To Add a Federal Forum Selection Provision (Item 4 on Proxy Card)

The Board of Directors recommends that the shareholders adopt an amendment to the Company's Code of Regulations, as amended (the "Regulations"), to add new Article XI, which will provide that, unless we consent in writing to the selection of an alternative forum, the federal district courts of the United States will be the exclusive forum for the resolution of any claims arising under the Securities Act of 1993, as amended (the "Securities Act") This provision is sometimes referred to as a federal forum selection provision.

The Securities Act provides that federal and state courts have concurrent jurisdiction over all suits brought to enforce any duty or liability created by the Securities Act. Adoption of a federal forum selection provision requiring that all claims arising under the Securities Act be brought exclusively in the federal district courts would allow the Company to avoid state court forum shopping and parallel litigation in multiple federal and state jurisdictions asserting claims arising out of the same underlying circumstances. In addition, the Company also believes that limiting claims under the Securities Act to federal court would improve certain procedural efficiencies, particularly since federal courts often have significant experience with federal securities law issues. The proposed amendment to the Regulations does not require that such claims be brought in any particular federal district court.

Given these considerations, the Board of Directors has determined that it is in the best interests of the Company and its shareholders that the Regulations be amended to add the proposed federal forum selection provision.

## Effect of the Amendment

Although the Board of Directors is asking the shareholders to adopt the proposed amendment to the Regulations to add a federal forum selection provision for the reasons described above, if adopted, the provision could have the effect, among other things, of discouraging claims under the Securities Act or limiting the ability of litigants to bring a claim in a state judicial forum they believe is more favorable to them, and could result in additional costs for a litigant seeking to bring such claims.

## Text of the Proposed Amendment

The proposed amendment to our Regulations would add a new Article XI to read as follows:

**"ARTICLE XI**

**FORUM FOR ADJUDICATION OF CERTAIN DISPUTES**

Unless the Corporation consents in writing to the selection of an alternative forum, the federal courts of the United States shall be the exclusive forum for the resolution of any claim arising under the Securities Act of 1933, as amended."

## Vote Required

Adoption of the proposed amendment to the Code of Regulations to add a federal forum selection clause requires the affirmative vote of the holders of at least a majority of the voting power of our outstanding Common Stock and Series A Class B Preferred Stock, voting together as a single class. Proxies received by the Company and not revoked prior to or at the Annual Meeting will be voted in favor of the proposed amendment unless otherwise instructed by the shareholder.

***THE BOARD OF DIRECTORS RECOMMENDS A VOTE "FOR" ADOPTION OF THE COMPANY PROPOSAL TO AMEND THE CODE OF REGULATIONS TO ADD A FEDERAL FORUM SELECTION PROVISION AS ARTICLE XI.***

Table of Contents

# Compensation Committee Interlocks and Insider Participation

In 2021, the Human Capital and Compensation Committee members were Messrs. Brumback, Heminger, and McCallister and Mses. Mallesch and Williams. No executive officer of Fifth Third serves on any board of directors or compensation committee of an entity that compensates any member of the Human Capital and Compensation Committee.

Table of Contents

# Certain Beneficial Owners

Under Section 13(d) of the Exchange Act, a beneficial owner of a security is any person who directly or indirectly has or shares voting power or investment power over such security. Such beneficial owner under this definition need not enjoy the economic benefit of such security. Pursuant to publicly available information and filings, the following table contains information regarding the only persons who, to our knowledge, beneficially own more than five percent of our common stock as of February 15, 2022:

| Title of Class | Name and Address of Beneficial Owner | Amount and Nature of Beneficial Ownership | Percent of Class |
|---|---|---|---|
| Common stock | The Vanguard Group<br>100 Vanguard Blvd.<br>Malvern, PA 19355 | 83,040,329(1) | 12.14% |
| Common stock | BlackRock, Inc.<br>55 East 52nd Street<br>New York, NY 10055 | 53,486,431(2) | 7.8% |
| Common stock | T. Rowe Price Associates, Inc.<br>100 East Pratt Street<br>Baltimore, MD 21202 | 47,228,752(3) | 6.9% |
| Common Stock | State Street Corporation<br>One Lincoln Street<br>Boston, MA 02111 | 34,876,408(4) | 5.1% |

(1) The Vanguard Group owns the above holdings in its capacity as an investment advisor in accordance with SEC Rule 13d-1(b)(1)(ii)(E). According to the Schedule 13G filed with the SEC on February 10, 2022, in aggregate, the Vanguard Group and the affiliated entities included in the Schedule 13G have shared voting power over 1,093,912 shares of common stock, have sole dispositive power over 80,212,187 shares of common stock, and have shared dispositive power over 2,828,142 shares of common stock.

(2) BlackRock, Inc. owns the above holdings in its capacity as a parent company or control person in accordance with SEC Rule 13d-1(b)(1)(ii)(G). According to the Schedule 13G filed with the SEC on January 31, 2022, in aggregate, BlackRock, Inc. and the affiliated entities included in Schedule 13G have sole voting power over 47,374,612 shares of common stock and have sole dispositive power over 53,486,431 shares of common stock.

(3) T. Rowe Price Associates, Inc. owns the above holdings in its capacity as an investment advisor in accordance with SEC Rule 13d-1(b)(1)(ii)(E). According to the Schedule 13G filed with the SEC on February 14 2022, in aggregate, T. Rowe Price Associates, Inc. and the affiliated entities included in Schedule 13G have sole voting power over 23,586,671 shares of common stock and have sole dispositive power over 47,228,752 shares of common stock.

(4) State Street Corporation owns the above holdings in its capacity as a parent company or control person in accordance with SEC Rule 13d-1(b)(1)(ii)(G). According to the Schedule 13G filed with the SEC on February 11, 2022, in aggregate, State Street Corporation, and the affiliated entities included in Schedule 13G have shared voting power over 31,305,286 shares of common stock and have shared dispositive power over 34,779,315 shares of common stock.

## Delinquent Section 16(a) Reports

Section 16(a) of the Exchange Act requires our executive officers and directors, and persons who own more than ten percent of a registered class of our stock, to file reports of ownership and changes in ownership with the SEC. Executive officers and directors, and persons who own greater than ten percent of a registered class of our stock, are required by SEC regulation to furnish us with copies of all Section 16(a) forms they file.

The Company believes that, for the period from January 1, 2021 through December 31, 2021, its executive officers and directors complied with all filing requirements applicable to them with one exception. On January 5, 2022, the Company filed a Form 5 on behalf of Mr. Feiger regarding four trusts that owned shares of Company Common Stock on June 15, 2020, the date on which Mr. Feiger became a director of the Company. The Company based this determination solely on its review of such forms filed electronically or written representations from certain reporting persons that no Annual Statement of Changes In Beneficial Ownership of Securities on Form 5 was required for those persons.

Table of Contents

# 2023 Shareholder Proposals

***Shareholder Proposals to be included in Fifth Third Bancorp's Proxy Statement.*** In order for a shareholder proposal for the 2023 Annual Meeting of Shareholders to be eligible for inclusion in our proxy statement, it must comply with the requirements of Rule 14a-8 of the Exchange Act and must be received by Fifth Third Bancorp on or before November 1, 2022 at the following address or facsimile number:

Fifth Third Bancorp
c/o Fifth Third Legal Department
Office of the Corporate Secretary
38 Fountain Square Plaza
MD10909F
Cincinnati, Ohio 45263
Attn: Corporate Secretary
Facsimile: 513-534-6757

***Nominees to the Board of Directors for Inclusion in Fifth Third Bancorp's Proxy Statement:*** In 2020, the Board of Directors adopted amendments to our Code of Regulations to implement proxy access for the election of directors. An eligible shareholder or group of up to 20 shareholders, owning continuously for at least three years shares of our common stock representing an aggregate of at least 3% of our outstanding common stock, may nominate and include in our proxy statement director nominees constituting up to 20% of the total number of our directors (subject to certain adjustments) provided that the shareholders and their nominees satisfy the requirements specified in Article II, Section 12 of our Code of Regulations. Notice of nominations under the proxy access provisions of our Code of Regulations for our 2023 Annual Meeting of Shareholders must be received by our Corporate Secretary at the address listed above by no earlier than October 2, 2022 and no later than the close of business on November 1, 2022, assuming that we do not change the date of our 2023 Annual Meeting of Shareholders by more than 30 days from the date of our 2022 Annual Meeting of Shareholders.

***Shareholder Proposals not included in Fifth Third Bancorp's Proxy Statement.*** Any shareholder who intends to nominate a person for election to the Board, or to propose other business to be considered by the shareholders, at the 2023 Annual Meeting of Shareholders without such nomination or proposal being included in our proxy statement as a shareholder proposal must be a record holder of shares entitled to vote at the meeting and must send a notice that complies with all of the applicable requirements set forth in Article II, Section 11 of our Code of Regulations and Rule 14a-19 of the Exchange Act to the Corporate Secretary using the address and facsimile number listed above no earlier than January 12, 2023 and no later than February 11, 2023. Among other requirements, the notice must include information regarding the shareholder giving the notice, specified background information regarding the person to be nominated or the proposal to be made and a representation that the shareholder intends to appear at the meeting and make the nomination or other proposal. If notice is provided by February 11, 2023, and the proposal is voted upon at the meeting, SEC rules permit the persons named as proxies for the 2023 Annual Meeting to exercise discretionary authority to vote on such additional matters if we advise shareholders in the proxy statement for the 2023 Annual Meeting how they intend to vote.

Our Code of Regulations, which sets forth the detailed requirements for making nominations to the Board using proxy access and for making nominations to the Board and proposing other business to be considered by the shareholders at shareholder meetings without inclusion in our proxy statement as a shareholder proposal, may be found in the Corporate Governance section of our website at www.53.com.

Table of Contents

# Other Business

Our Code of Regulations provides that only such business will be conducted as is properly brought before the meeting in accordance with the procedures set forth in Article II, Section 11 and 12 of the Code of Regulations. Except as otherwise provided by law, our Articles, or our Code of Regulations, the determination of whether any business sought to be brought before the Annual Meeting of Shareholders is properly brought before such meeting will be made by the Chair of such meeting. If the Chair determines that any business is not properly brought before the meeting, then any such business will not be conducted or considered.

***Discretion of Proxies.*** The Board of Directors does not know of any other business to be presented at the Annual Meeting and does not intend to bring other matters before the Annual Meeting. However, if any other matters properly come before the Annual Meeting, it is intended that the persons named in the Proxy will vote thereon according to their best judgment and interest of Fifth Third Bancorp. No other shareholder has informed us of any intention to propose any other matter to be acted upon at the Annual Meeting. Accordingly, the persons named in the accompanying Proxy are allowed to exercise their discretionary authority to vote upon any such proposal without the matter having been discussed in this proxy statement.

***Series A, Class B Preferred Stock.*** All of the outstanding Series A, Class B Preferred Stock is held of record and will be voted at the Annual Meeting by American Stock Transfer & Trust Company, LLC, as depositary, in accordance with instructions received by the depositary from the record holders of the depositary receipts issued with respect to the Series A, Class B Preferred Stock (which we sometimes refer to as depositary shares). Each outstanding depositary share represents 1/40 of a share of Series A, Class B Preferred Stock and, therefore, has the right to instruct the depositary with respect to the voting of 1/40th of the 24 votes to which each share of Series A, Class B Preferred Stock is entitled, which is 0.6 vote for each depositary share. Holders of depositary shares may not vote directly at the Annual Meeting, but should follow the directions given to them as to how to instruct the depositary to vote the Series A, Class B Preferred Stock represented by such holder's depositary shares, using our proxy card, which also serves as voting instructions to the depositary. A failure by the holder of depositary shares to give timely voting instructions to the depositary will result in the Series A, Class B Preferred Stock represented by such holder's depositary shares not being voted at the Annual Meeting.

***Householding.*** Shareholders of record who have the same address and last name and have not previously requested electronic delivery of proxy materials will receive a single envelope containing the notices or the proxy statement and proxy card for all shareholders having that address. The notice or proxy card for each shareholder will include that shareholder's unique control number needed to vote his or her shares. This procedure reduces our printing costs and postage fees. If, in the future, you do not wish to participate in householding and prefer to receive your notice or proxy statement in a separate envelope, or if your household currently receives more than one Notice or Proxy Statement and in the future, you would prefer to participate in householding, please call us toll-free at 1-800-870-0653 in the U.S., or inform us in writing at: Fifth Third Bancorp, c/o D.F. King & Co., Inc., 48 Wall Street – 22nd Floor, New York, New York 10005, or by email at FITB@dfking.com. We will respond promptly to such requests.

For those shareholders who have the same address and last name and who request to receive a printed copy of the proxy materials by mail, we will send only one copy of such materials to each address unless one or more of those shareholders notifies us, in the same manner described above, that they wish to receive a printed copy for each shareholder at that address.

Beneficial shareholders can request information about householding from their bank, broker or other nominee.

***Copies.*** A copy of our Annual Report on Form 10-K for the most recent fiscal year, as filed with the SEC, not including exhibits, will be mailed without charge to shareholders upon written request. Requests should be addressed to Investor Relations, 38 Fountain Square Plaza, MD 1090FV, Cincinnati, Ohio 45263 or by emailing ir@53.com. You can also view information and request documents from the Investor Relations page of Fifth Third's website at ir.53.com. The Form 10-K includes certain listed exhibits, which will be provided upon payment of a fee covering our reasonable expenses.

By Order of the Board of Directors
Joseph C. Alter
*Corporate Secretary*

Table of Contents

# Questions and Answers About the Annual Meeting and Voting

## What is this document?

This document is called a proxy statement. This proxy statement includes information regarding the matters to be acted upon at the 2022 Fifth Third Bancorp Annual Meeting of Shareholders (the "Annual Meeting") and certain other information required by the Securities and Exchange Commission (the "SEC") and the rules of the Nasdaq Global Select Market ("Nasdaq").

Our Annual Report for the year 2021, including financial statements, has been delivered or made available to all shareholders. Such report and financial statements are not a part of this proxy statement. This proxy statement, form of proxy, notice of Annual Meeting, Notice of Internet Availability, and the Annual Report are first being sent or made available to shareholders on or about March 1, 2022.

## When is the Annual Meeting and where will it be held?

The Annual Meeting will be held on Tuesday, April 12, 2022, at 11:30 a.m. eastern daylight saving time. **The meeting will occur virtually. There is no physical location for the meeting and you cannot attend in person.**

Shareholders and guests may attend the meeting by visiting www.virtualshareholdermeeting.com/FITB2022 beginning at 11:15 a.m. eastern daylight saving time. Guests may attend and listen to the meeting by registering as a guest. Shareholders of record of common stock and depositary interests in Series A, Class B Preferred Stock on February 18, 2022 may vote and ask questions at the meeting. To do so, shareholders must use the 16-digit control number that is printed in the box marked by the arrow on the Notice of Internet Availability of Proxy Materials or the Proxy Card to log in and access the meeting.

## Why am I being provided this proxy statement?

Fifth Third Bancorp (the "Company" or "Fifth Third") is required by the SEC to give you, or provide you access to, this proxy statement because it is soliciting your proxy to vote your shares of Fifth Third stock at the Annual Meeting. The enclosed proxy statement summarizes information you need in order to vote at the Annual Meeting. The holders of the Common Stock have one vote per share, and the holders of the Series A, Class B Preferred Stock have 24 votes per share.

## What is a proxy?

A proxy is your designation of another person to vote stock you own. That other person is called a proxy. If you designate someone as your proxy in a written document, that document is also called a proxy or a proxy card. When you designate a proxy, you may also direct the proxy how to vote your shares. Three Fifth Third directors, Emerson L. Brumback, Greg D. Carmichael, and Marsha C. Williams, have been designated as the proxies to cast the votes of Fifth Third's shareholders at the Annual Meeting.

## What actions are shareholders approving at the Annual Meeting?

***Election of Directors.*** The Nominating and Corporate Governance Committee of the Board of Directors has recommended a slate of nominees for election to the Board of Directors. Information about these nominees may be found in the proxy statement section titled "Election of Directors."

***Company Proposal 1: Ratification of Appointment of Auditors.*** This is a proposal to ratify the re-appointment of Deloitte & Touche LLP as our independent external audit firm for 2022. This approval is not required by law to appoint an independent external audit firm, but the appointment is submitted by the Audit Committee in order to give shareholders a voice in the designation of the independent external audit firm. If this resolution is rejected by the shareholders, then the Audit Committee will take the

Table of Contents



opportunity to reevaluate its choice of independent external audit firm. Even if this resolution is approved, the Audit Committee, at its discretion, may direct the appointment of a different independent external audit firm at any time during the year if it determines that such a change would be in our best interests and the best interests of our shareholders.

*Company Proposal 2: Advisory Approval of Executive Compensation.* Company Proposal 2 is an annual advisory vote to approve the compensation of our named executive officers ("NEOs"). The Board will strongly consider the outcome of this advisory vote in determining the compensation of such executives.

*Company Proposal 3: Approval of an Amendment to the Fifth Third Bancorp Code of Regulations to Add a Federal Forum Selection Provision.* Company Proposal 3 is a proposal to approve an Amendment to the Fifth Third Bancorp Code of Regulations to add a federal forum selection clause. Information about this proposal is included in the proxy statement section entitled: "Company Proposal 3: Approval of an Amendment to the Fifth Third Bancorp Code of Regulations Add a Federal Forum Selection Provision."

## What vote is required to approve the proposals considered at the Annual Meeting?

*Election of Directors.* Our directors are elected by the holders of our outstanding Common Stock and Series A, Class B Preferred Stock, voting together as a single class. The holders of the Common Stock have one vote per share, and the holders of the Series A, Class B Preferred Stock have 24 votes per share. In an uncontested election of directors, each nominee for director receiving a greater number of votes "for" his or her election than votes "against" his or her election will be elected as a director. In the event of a contested election, the nominees receiving the greatest number of votes "for" his or her election will be elected. Abstentions and shares not voted by brokers and other entities holding shares on behalf of beneficial owners will not be counted and will have no effect on the outcome of the election in accordance with Ohio law and our Articles of Incorporation and Code of Regulations.

*Company Proposals 1-3.* Company proposals 1-3 at the Annual Meeting require the affirmative vote of the holders of a majority of the voting power of our outstanding Common Stock and Series A, Class B Preferred Stock, voting together as a single class, present electronically or by proxy at the Annual Meeting and entitled to vote on each such proposal. Abstentions will have the same effect as a vote cast against such proposal and shares not voted on these proposals by brokers and other entities holding shares on behalf of beneficial owners will not be counted as present to vote on these proposals and will have no effect on the outcome.

It is important to vote your shares at the Annual Meeting.

## Who may vote and what constitutes a quorum at the meeting?

Holders of Fifth Third Common Stock and Series A, Class B Preferred Stock on February 18, 2022 are entitled to vote on every matter that is to be voted on at the Annual Meeting. Please see the following question for more information on voting shares of Series A, Class B Preferred Stock.

In order to conduct the Annual Meeting, a majority of the voting power of Fifth Third Common Stock and Series A, Class B Preferred Stock, together constituting a single class, entitled to vote at the Annual Meeting on every matter that is to be voted on must be present electronically or by proxy. This is called a quorum. Shareholders who deliver valid proxies or vote electronically at the meeting will be considered part of the quorum. Once a share is represented for any purpose at the meeting, it is deemed present for quorum purposes for the remainder of the meeting and for any adjourned meeting. Abstentions will be counted as present and entitled to vote for purposes of determining a quorum. Broker "non-votes" (which are explained below) are counted as present and entitled to vote for purposes of determining a quorum.

Table of Contents



## How many votes do I have?

Each share of Fifth Third common stock outstanding on February 18, 2022 is entitled to one vote on all proposals at the meeting, either electronically or by proxy.

Each share of outstanding Series A, Class B Preferred Stock on February 18, 2022 has 24 votes per share on all proposals at the meeting, either electronically or by proxy. All of the outstanding Series A, Class B Preferred Stock is held of record and will be voted at the Annual Meeting by American Stock Transfer & Trust Company, LLC, as depositary, in accordance with instructions received by the depositary from the record holders of the depositary receipts issued with respect to the Series A, Class B Preferred Stock (which we sometimes refer to as depositary shares). Each outstanding depositary share represents 1/40 of a share of Series A, Class B Preferred Stock and, therefore, has the right to instruct the depositary with respect to the voting of 1/40th of the 24 votes to which each share of Series A, Class B Preferred Stock is entitled, which is 0.6 vote for each depositary share. Holders of depositary interests in the Series A, Class B Preferred Stock may not vote directly at the Annual Meeting, but should follow the directions given to them as to how to instruct the depositary to vote the Series A, Class B Preferred Stock represented by such holder's depositary interests, using our proxy card which also serves as voting instructions to the depositary. A failure by the holder of depositary shares to give timely voting instructions to the depositary will result in the Series A, Class B Preferred Stock represented by such holder's depositary shares not being voted at the Annual Meeting.

As of the close of business on February 18, 2022, there were approximately 685,672,590 shares of Fifth Third common stock outstanding and entitled to vote and 8,000,000 depositary shares of Series A, Class B Preferred Stock outstanding and entitled to vote.

The shares represented by all properly executed proxies that are sent to us will be voted as designated and each not designated will be voted and counted as described below. Each person giving a proxy may revoke it by giving notice to us in writing or in open meeting at any time before it is voted.

Fifth Third bears the expense of soliciting proxies. Proxies will be solicited principally by mail, but may also be solicited by our directors, officers, and other regular employees, who will receive no additional compensation therefore in addition to their regular compensation. Brokers and others who hold stock on behalf of others will be asked to send proxy materials to the beneficial owners of the stock, and we will reimburse them for their expenses. We have retained D.F. King & Co., a proxy solicitation firm to assist us in soliciting proxies. We anticipate that the costs of D.F. King's proxy solicitation services will be approximately $14,500, plus reasonable out-of-pocket expenses.

## How do I vote?

***Record Shareholders.*** A shareholder who owns Common Stock in Fifth Third directly, and not through a broker, bank, or other nominee ("record holder" or "record shareholder"), may vote electronically at the Annual Meeting by filling out a ballot or may authorize a proxy to vote on his or her behalf. There are three ways to authorize a proxy:

1. ***Internet:*** You may access the proxy materials on the Internet at www.proxyvote.com and follow the instructions on the proxy card or on the Notice of Internet Availability.
2. ***Telephone:*** You may call toll-free 1-800-690-6903, and follow the instructions on the proxy card or on the Notice of Internet Availability.
3. ***Mail:*** If you received your proxy materials by mail, you may vote by signing, dating, and mailing the enclosed proxy card in the postage-paid envelope provided.

Shareholders who vote over the Internet may incur costs, such as telephone and Internet access charges, for which the shareholder is responsible. The Internet and telephone voting procedures are designed to authenticate a shareholder's identity and to allow a shareholder to vote his or her shares and confirm that his or her instructions have been properly recorded. You may use the Internet or telephone to submit your proxy, but you must vote no later than 11:59 p.m. eastern daylight saving time on April 11, 2022 for shares held directly and by 11:59 p.m. eastern daylight saving time on April 7, 2022 for shares held in a Plan.

Table of Contents

QUESTIONS AND ANSWERS ABOUT THE ANNUAL MEETING AND VOTING

Holders of depositary shares representing the Series A, Class B Preferred Stock are not record holders of the Series A, Class B Preferred Stock and must instruct the depositary as to how the Series A, Class B Preferred Stock represented by the depositary interests are to be voted. Your proxy serves as your voting instructions to the depositary. You may use the Internet or telephone to submit your proxy (voting instructions), but you must submit your proxy by 11:59 p.m. eastern daylight saving time on April 7, 2022.

*Street Name Shareholders.* Shareholders who hold shares in "street name," that is, through a broker, bank, or other nominee ("beneficial holder" or "street name shareholder"), should instruct their nominee to vote their shares by following the instructions provided by the nominee. Your vote as a shareholder is important. Please vote as soon as possible to ensure that your vote is recorded. Please see "Can my broker vote for me?" below.

## What if I sign and date my proxy but do not provide voting instructions?

A proxy that is signed and dated, but which does not contain voting instructions, will be voted as follows:

- "FOR" the election of each of the directors nominated by the Fifth Third Bancorp Nominating and Corporate Governance Committee;
- "FOR" the ratification of the selection of Deloitte & Touche LLP as the Company's independent external audit firm (Company Proposal 1);
- "FOR" the advisory vote on the Company's compensation of its Named Executive Officers (Company Proposal 2); and,
- "FOR" the approval of an amendment to the Fifth Third Bancorp Code of Regulations to Add a Federal Forum Selection Provision (Company Proposal 3).

## Can my broker vote for me?

If you are a beneficial holder of shares and do not provide the organization that holds your shares with specific voting instructions then, under applicable rules, the organization that holds your shares generally has discretionary authority to vote on "routine" matters without receiving instructions from you but cannot vote on "non-routine" matters unless you provide instructions. If the organization that holds your shares does not receive instructions from you on how to vote your shares on a non-routine matter, that organization will inform the inspector of election that it does not have the authority to vote on that matter with respect to your shares. This is generally referred to as a "broker non-vote."

All proposals at the Annual Meeting except Company Proposal 1 (Ratification of the Selection of Auditors) are considered non-routine matters under applicable rules. A broker, bank, or other nominee cannot vote without instructions on non-routine matters, and therefore broker non-votes may exist in connection with the election of directors and Company Proposals 2 and 3. It is important to instruct your broker, bank, or other nominee to vote your shares.

The ratification of the selection of Deloitte & Touche LLP as the Company's independent external audit firm for 2022 (Company Proposal 1) is considered a routine matter under applicable rules. A broker or other nominee generally exercises its discretionary authority to vote on routine matters without instructions. Although brokers and other nominees are not required to exercise discretionary authority, we expect that no broker non-votes will exist in connection with Company Proposal 1.

## What happens if the meeting is postponed or adjourned?

Your proxy will still be good and may be voted at the postponed or adjourned meeting. You will still be able to change or revoke your proxy until it is voted.

Table of Contents



## Can I change my vote or revoke my proxy?

You may change your vote or revoke your proxy at any time before it is voted at the Annual Meeting by filing with us an instrument revoking it, filing a duly executed proxy bearing a later date (including a proxy given over the Internet or by telephone), or by attending the meeting and electing to vote electronically. ***Even if you plan to attend the virtual Annual Meeting, you are encouraged to vote your shares by proxy.***

## How are proxy materials delivered?

We control costs by following SEC rules that allow for the delivery of proxy materials to our shareholders primarily through the Internet. In addition to reducing the amount of paper used in producing these materials, this method lowers the costs associated with mailing the proxy materials to shareholders. Record holders will have a Notice of Internet Availability of Proxy Materials delivered directly to their mailing address. Beneficial holders will have a Notice of Internet Availability of Proxy Materials forwarded to them by the intermediary that holds the shares. Shareholders who have requested paper copies of all proxy materials and certain institutional and other shareholders will also receive paper copies of the other proxy materials including this proxy statement, the 2021 Annual Report of Fifth Third Bancorp, and a proxy card or voting instruction sheet.

If you received only a Notice of Internet Availability of Proxy Materials by mail, you will not receive a printed copy of the proxy materials unless you request a copy by following the instructions on the notice. The Notice of Internet Availability of Proxy Materials also contains instructions for accessing and reviewing the proxy materials over the Internet and provides directions for submitting your vote over the Internet.

## What if I share an address and a last name with other Fifth Third shareholders?

To reduce the expenses of delivering duplicate proxy materials to shareholders, we are relying upon SEC "householding" rules that permit delivery of only one set of applicable proxy materials to multiple shareholders who share an address and have the same last name, unless we receive contrary instructions from any shareholder at that address. Shareholders of record who have the same address and last name and have not previously requested electronic delivery of proxy materials will receive a single envelope containing the notices or the proxy statement and proxy card for all shareholders having that address. The notice or proxy card for each shareholder will include that shareholder's unique control number needed to vote his or her shares. This procedure reduces our printing costs and postage fees. If, in the future, you do not wish to participate in householding and prefer to receive your Notice or Proxy Statement in a separate envelope, or if your household currently receives more than one Notice or Proxy Statement and in the future, you would prefer to participate in householding, please call 1-800-870-0653 (toll-free) in the U.S., or inform us in writing at: Fifth Third Bancorp, c/o D.F. King & Co., Inc., 48 Wall Street—22nd Floor, New York, NY 10005, or by email at FITB@dfking.com. Requests will be responded to promptly.

For those shareholders who have the same address and last name and who request to receive a printed copy of the proxy materials by mail, we will send only one copy of such materials to each address unless one or more of those shareholders notifies us, in the same manner described above, that the shareholder(s) wish to receive a printed copy for each shareholder at that address.

Beneficial shareholders can request information about householding from their banks, brokers, or other holders of record.

Table of Contents

QUESTIONS AND ANSWERS ABOUT THE ANNUAL MEETING AND VOTING

## How do I request a paper or e-mail copy of the proxy materials?

*Record Shareholders*. Record holders may request a paper or e-mail copy of the proxy materials by following the instructions below. You will be asked to provide your 16-digit control number located on your proxy card or Notice of Internet Availability.

1. Call the toll-free telephone number 1-800-579-1639 and follow the instructions provided;
2. Access the website www.proxyvote.com and follow the instructions provided; or
3. Send an e-mail to sendmarterial@proxyvote.com with your control number in the subject line. The remainder of the email should be blank. Unless you instruct otherwise, we will reply to your e-mail with links to the proxy materials in PDF format for this meeting only.

Please make your request for a copy on or before March 29, 2022 to facilitate timely delivery.

*Street Name Shareholders*. Beneficial holders, also known as street name shareholders, should request copies of the proxy materials by following the instructions provided by their bank, broker, or other nominee.

## Can I attend the virtual Annual Meeting?

The Annual Meeting is being held virtually. There will be no physical meeting and you cannot attend in person. Please refer to page 2 for instructions on how to attend the virtual Annual Meeting. Annual Meeting. Individuals who are not shareholders of the Company will be permitted to listen to the Annual Meeting. In order to vote (though not holders of depositary shares representing Series A, Class B Preferred Stock), examine the shareholder list, or submit questions at the Annual Meeting, you must be one of the following:

1. Record holder of Fifth Third common stock or of Series A, Class B Preferred Stock;
2. Holder of depositary shares representing Series A, Class B Preferred Stock;
3. Beneficial holder of Fifth Third Common Stock or of depositary shares representing Series A, Class B Preferred Stock; or
4. Authorized representative of persons or entities who are beneficial holders of Fifth Third common stock or of depositary shares representing Series A, Class B Preferred Stock.

## Can I participate in the Annual Meeting?

Shareholders will have substantially the same opportunities to participate in our virtual Annual Meeting as they would have in an in-person meeting. Only shareholders of the Company will be able to attend, vote, examine the shareholder list, and submit questions before and during a portion of the meeting via the online platform. Shareholders may submit questions by signing into the virtual meeting platform at www.virtualshareholdermeeting.com/FITB2022, typing a question into the "Ask a Question" field, and clicking submit. You may submit questions beginning on April 5, 2022 by logging onto proxyvote.com with your 16-digit control number. Questions which comply with the Rules of Conduct and that are germane to the purpose of the Annual Meeting will be answered during the Annual Meeting, subject to time constraints. Questions regarding personal matters or matters not relevant to the Annual Meeting will not be answered. If we receive substantially similar questions, we will group them together.

Shareholders (but not holders of depositary shares representing Series A, Class B Preferred Stock) may vote during the Annual Meeting. Shareholders may also vote before the date of the Annual Meeting, by proxy or by telephone using the one of the methods provided on the proxy card. We recommend at that shareholders vote by mail, internet, or telephone prior to the Annual Meeting, even if they plan to attend the Annual Meeting virtually.

Table of Contents



## What if I experience technical difficulties logging into the virtual Annual Meeting?

Shareholders encountering difficulty accessing the Annual Meeting virtual platform during the sign-in process or at any time during the meeting may utilize technical support provided by the Company through Broadridge Financial Solutions, Inc. Technical support information is provided on the sign-in page for all shareholders. If you have difficulties accessing the virtual Annual Meeting during check-in or during the meeting, please call the technical support number listed on the Annual Meeting sign-in page.

## How do I propose actions for the 2023 Annual Meeting of Shareholders?

***Shareholder Proposals to be included in our 2023 Proxy Statement.*** In order for a shareholder proposal for the 2023 Annual Meeting of Shareholders to be eligible for inclusion in our proxy statement, it must comply with the requirements of Rule 14a-8 of the Securities Exchange Act of 1934 (the "Exchange Act"), and must be received by us on or before the date provided on page 89 at the address or facsimile number provided on page 89.

***Shareholder Proposals not included in our 2023 Proxy Statement.*** Any shareholder who intends to propose any matter to be acted upon at the 2023 Annual Meeting of Shareholders without such proposal being included in the Company's proxy statement as a shareholder proposal must send a notice to the Corporate Secretary during the period referenced on page 89 using the address and facsimile number listed on page 89.

## Who can I call for help in voting my shares?

If you have any questions or need assistance voting your shares, please call D.F. King & Co., Inc., which is assisting us, toll-free at 1-800-870-0653.

## Who can I contact with questions about my investment in Fifth Third?

Shareholders who wish to speak to a Fifth Third representative regarding their investment in Fifth Third may communicate directly with our Investor Relations Department by calling 866-670-0468. In addition, shareholders may communicate in writing directly with the Investor Relations Department by sending a letter to 38 Fountain Square Plaza, MD 1090FV, Cincinnati, OH 45263 or by emailing ir@53.com. You can also view information and request documents from the Investor Relations page of our website at ir.53.com.

Table of Contents

# Annex A: Proposed Amendment to The Fifth Third Bancorp Code of Regulations to Add a Federal Forum Selection Provision

RESOLVED, that the Code of Regulations, as amended, be, and hereby is amended by inserting the following new Article XI:

## ARTICLE XI
## FORUM FOR ADJUDICATION OF CERTAIN DISPUTES

Unless the Corporation consents in writing to the selection of an alternative forum, the federal courts of the United States shall be the exclusive forum for the resolution of any claim arising under the Securities Act of 1933, as amended.

Table of Contents

FIFTH THIRD BANCORP

Table of Contents

FIFTH THIRD BANCORP
*FIFTH THIRD BANCORP*
*38 FOUNTAIN SQUARE PLAZA*
*CINCINNATI, OHIO 45263*

**SCAN TO**
**VIEW MATERIALS & VOTE**

**VOTE BY INTERNET**
*Before The Meeting* - Go to **www.proxyvote.com or scan the QR Barcode above**

Use the Internet to transmit your voting instructions and for electronic delivery of information. Vote by **11:59 p.m. Eastern Time on April 11, 2022** for Common Stock held directly and by **11:59 p.m. Eastern Time on April 7, 2022** for Common Stock held in a Plan and for depositary shares representing Series A, Class B Stock held directly. Have this card in hand when you access the website and follow the instructions to obtain your records and to create an electronic voting instruction form.

*During The Meeting, if you hold Common Stock* - Go to **www.virtualshareholdermeeting.com/FITB2022**

You may attend the meeting via the Internet and, if you hold Common Stock, vote during the meeting. **The 2022 Annual Meeting of Shareholders will be online in a virtual meeting format only via live webcast. You will not be able to attend the Annual Meeting physically in person.** Have the information that is printed in the box marked by the arrow available and follow the instructions.

**VOTE BY PHONE - 1-800-690-6903**
Use any touch-tone telephone to transmit your voting instructions. Vote by **11:59 p.m. Eastern Time on April 11, 2022** for Common Stock held directly and by **11:59 p.m. Eastern Time on April 7, 2022** for Common Stock held in a Plan and depositary shares representing Series A, Class B Stock held directly. Have this card in hand when you call and then follow the instructions.

**VOTE BY MAIL**
Mark, sign and date this card and return it in the postage-paid envelope we have provided or return it to Vote Processing, c/o Broadridge, 51 Mercedes Way, Edgewood, NY 11717.

TO VOTE, MARK BLOCKS BELOW IN BLUE OR BLACK INK AS FOLLOWS:

D67436-P66097-Z81618 KEEP THIS PORTION FOR YOUR RECORDS

DETACH AND RETURN THIS PORTION ONLY

**THIS PROXY CARD IS VALID ONLY WHEN SIGNED AND DATED.**

**FIFTH THIRD BANCORP**

**The Board of Directors recommends a vote "FOR" the election of all Directors, "FOR" Items 2, 3, and 4.**

1. Election of all members of the Board of Directors to serve until the Annual Meeting of Shareholders in 2023:

| Nominees: | For | Against | Abstain |
|---|---|---|---|
| 1a. Nicholas K. Akins | ☐ | ☐ | ☐ |
| 1b. B. Evan Bayh, III | ☐ | ☐ | ☐ |
| 1c. Jorge L. Benitez | ☐ | ☐ | ☐ |
| 1d. Katherine B. Blackburn | ☐ | ☐ | ☐ |
| 1e. Emerson L. Brumback | ☐ | ☐ | ☐ |
| 1f. Greg D. Carmichael | ☐ | ☐ | ☐ |
| 1g. Linda W. Clement-Holmes | ☐ | ☐ | ☐ |
| 1h. C. Bryan Daniels | ☐ | ☐ | ☐ |
| 1i. Mitchell S. Feiger | ☐ | ☐ | ☐ |
| 1j. Thomas H. Harvey | ☐ | ☐ | ☐ |
| 1k. Gary R. Heminger | ☐ | ☐ | ☐ |
| 1l. Jewell D. Hoover | ☐ | ☐ | ☐ |
| 1m. Eileen A. Mallesch | ☐ | ☐ | ☐ |
| 1n. Michael B. McCallister | ☐ | ☐ | ☐ |
| 1o. Marsha C. Williams | ☐ | ☐ | ☐ |
| 2. Ratification of the appointment of Deloitte & Touche LLP to serve as the independent external audit firm for the Company for the year 2022. | ☐ | ☐ | ☐ |
| 3. An advisory vote on approval of Company's compensation of its named executive officers. | ☐ | ☐ | ☐ |
| 4. Approval of an amendment to the Fifth Third Bancorp Code of Regulations to establish the exclusive jurisdiction of federal courts for actions brought under the Securities Act of 1933, as amended. | ☐ | ☐ | ☐ |

Please sign exactly as name appears on this card. If shares are held jointly, each holder should sign. When signing as attorney, executor, administrator, corporation, trustee, guardian, or custodian, please give full title as such. If a corporation, please sign in full corporate name by President or other authorized officer. If a partnership, please sign in partnership name by authorized person.

Signature [PLEASE SIGN WITHIN BOX] Date

Signature (Joint Owners) Date

Table of Contents

**Important Notice Regarding the Availability of Proxy Materials for the Annual Meeting:**
The Notice of Meeting, Proxy Statement, and Proxy Card are available at www.proxyvote.com.

D67437-P65097-Z81618

## PROXY CARD AND VOTING INSTRUCTIONS FOR VIRTUAL MEETING

**This is a proxy card for shares of Common Stock you hold directly and voting instructions to the depositary for depositary shares representing Series A, Class B Preferred Stock you hold directly.**

**FIFTH THIRD BANCORP** **ANNUAL SHAREHOLDERS MEETING**

**THIS PROXY AND VOTING INSTRUCTIONS ARE SOLICITED ON BEHALF OF THE BOARD OF DIRECTORS.**

The undersigned hereby appoints Emerson L. Brumback, Greg D. Carmichael, and Marsha C. Williams, and each of them, with full power of substitution and power to act alone, as proxies to vote all shares of stock of FIFTH THIRD BANCORP which the undersigned would be entitled to vote if personally present and acting at the Annual Meeting of the Shareholders of Fifth Third Bancorp, to be held live via the Internet at www.virtualshareholdermeeting.com/FITB2022 on April 12, 2022 at 11:30 a.m. Eastern Time, and at any adjournments or postponements thereof.

FOR HOLDERS OF DEPOSITARY SHARES REPRESENTING INTERESTS IN FIFTH THIRD BANCORP 6.00% NON-CUMULATIVE PERPETUAL CLASS B PREFERRED STOCK, SERIES A (THE "SERIES A, CLASS B PREFERRED STOCK"):

All of the outstanding shares of Fifth Third Bancorp Series A, Class B preferred stock are held of record and will be voted at the Annual Meeting by American Stock Transfer & Trust Company, LLC, as depositary, in accordance with instructions received from the record holders of the depositary shares issued with respect to the Series A, Class B preferred stock. The Series A, Class B preferred stock is entitled to 24 votes per share, and each outstanding depositary share represents 1/40 of a share of Series A, Class B preferred stock. The depositary will vote the Series A, Class B preferred stock represented by all depositary shares held by the person(s) whose signature(s) appear on the reverse side of this proxy card in accordance with instructions indicated on the reverse side of this card by such holder. The depositary will not vote Series A, Class B preferred stock represented by depositary shares for which the holder has not returned voting instructions. Holders of depositary shares may not vote directly at the Annual Meeting.

In their discretion, the PROXIES and the depositary holding the Series A, Class B Preferred Stock are authorized to vote upon such other business as may properly come before the meeting. These shares represented by this proxy and these voting instructions when executed will be voted in the manner directed herein by the undersigned. If **no direction is made, the shares represented by this proxy and these voting instructions will be voted FOR the election of Directors, FOR Items 2, 3, and 4.**

*(Continued, and please sign on reverse side.)*

**FIFTH THIRD BANCORP**

**UNANIMOUS WRITTEN CONSENT OF THE BOARDS OF DIRECTORS APPOINTING PRESIDENT**

**October 26, 2020**

The undersigned, being all of the Directors of Fifth Third Bancorp, an Ohio Corporation ("Bancorp"), in accordance with Section 1701.54 of the Ohio Revised Code, do hereby authorize, consent, and agree to the adoption, without a meeting, of the following resolutions through this unanimous written consent (this "Consent"), effective as of the date first set forth above:

**WHEREAS,** the members of the Board, in connection with succession and leadership planning, have discussed potential promotions and appointments to senior officer positions of Bancorp at previous meetings;

**WHEREAS,** the members of the Board have determined that it is appropriate to implement one such promotion and appointment at this time;

**NOW, THEREFORE**, it is hereby:

**OFFICER APPOINTMENT**

**RESOLVED**, that Timothy N. Spence be promoted and appointed to the position of President of Bancorp;

**GENERAL RESOLUTIONS**

**RESOLVED FURTHER,** that the officers of the Bancorp be, and each are hereby, authorized, directed and empowered to perform any and all other acts and things as in such officer's opinion may be necessary or appropriate in order to carry out the intent and purposes of the foregoing resolution with respect to the Bancorp; and

**RESOLVED FURTHER,** that any act of any Director or officer of the Bancorp and of any person designated or authorized to act by any officer of the Bancorp, which act would have been authorized by the foregoing resolutions except that such act was taken prior to the adoption of such resolutions is hereby ratified, confirmed, approved, and adopted as the act of the Bancorp.

[Remainder of page intentionally left blank. Signature page follows.]



PENGAD 800-631-6989 PLAINTIFF'S EXHIBIT 5 McAllister

In Witness Whereof, the undersigned Directors have executed this signature page as of the date first set forth above in this Unanimous Written Consent.

Nicholas K. Akins October 22, 2020 3:38 PM

B. Evan Bayh III October 22, 2020 9:53 AM

Jorge L. Benitez October 22, 2020 6:27 AM

Katherine B. Blackburn October 21, 2020 9:05 PM

Emerson L. Brumback October 22, 2020 9:22 AM

Greg D. Carmichael October 22, 2020 6:41 AM

Linda W. Clement-Holmes October 21, 2020 7:17 PM

C. Bryan Daniels October 21, 2020 7:07 PM

Mitchell S. Feiger October 22, 2020 4:25 PM

Thomas H. Harvey October 21, 2020 11:04 PM

Gary R. Heminger October 22, 2020 6:00 PM

Jewell D. Hoover October 21, 2020 7:25 PM

Eileen L. Mallesch October 21, 2020 8:04 PM

Michael B. McCallister October 23, 2020 12:49 PM

Marsha C. Williams October 21, 2020 7:01 PM

# EXHIBIT 6

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 7

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]

# EXHIBIT 8

# [PRODUCED FOR

# *IN CAMERA* INSPECTION]