UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION
JUDGE MICHAEL R. BARRETT
CASE NO. 1:21-cv-00238

PHILIP R. MCHUGH,
Plaintiff

V.

FIFTH THIRD BANCORP, ET AL.,
Defendants

DEPONENT: ROBERT SHAFFER
DATE: NOVEMBER 6, 2025
REPORTER: BURGUNDY MALONEY

APPEARANCES

ON BEHALF OF THE PLAINTIFF, PHILIP R. MCHUGH:
Peter A. Saba, Esquire
Joshua M. Smith, Esquire
Bailey E. Sharpe, Esquire
SSP Law CO., L.P.A.
2623 Erie Avenue
Cincinnati, Ohio 45208
Telephone No.: (513) 533-2701
E-mail: Pas@sspfirm.com
jms@sspfirm.com
bes@sspfirm.com

ON BEHALF OF THE DEFENDANTS AND THE WITNESS, FIFTH THIRD BANCORP, ET AL. AND ROBERT SHAFFER:
Michael L. Cioffi, Esquire
Blank Rome LLP
201 East Fifth Street
Cincinnati, Ohio 45202
Telephone No.: (513) 362-8701
E-mail: Michael.cioffi@blankrome.com

APPEARANCES (CONTINUED)

ON BEHALF OF THE DEFENDANT, FIFTH THIRD BANCORP:

Phenise Poole, Esquire
Brian Thomas, Esquire
Fifth Third Bank General Counsel
38 Fountain Square Plaza
Cincinnati, Ohio 45202
Telephone No.: (513) 579-5203
E-mail: Jadene.poole@53.com
brian.thomas@53.com

Also Present: Arthur Funk, Videographer

INDEX

| | Page |
|---|---|
| PROCEEDINGS | 7 |
| DIRECT EXAMINATION BY MR. SABA | 8 |

EXHIBITS

| Exhibit | Page |
|---|---|
| Exhibit 34 - Court Order | 9 |
| Exhibit 35 - E-mail exchange about the proposal dated March 18, 2020 | 12 |
| Exhibit 36 - E-mail exchange dated 3/30/20 | 13 |
| Exhibit 37 - Proposal: Executive Assessment and Development/CEO Succession | 16 |
| Exhibit 38 - E-mail dated March 6, 2020 | 19 |
| Exhibit 39 - E-mail dated April 3, 2020 | 27 |
| Exhibit 40 - Text Message exchange dated April 1, 2020 - April 23, 2020 | 28 |
| Exhibit 41 - Text Message exchange dated May 4, 2020 - May 19, 2020 | 30 |
| Exhibit 42 - E-mail exchange dated 6/1/20 | 32 |
| Exhibit 43 - E-mail exchange to set up a Meeting dated June 1, 2020 | 35 |

EXHIBITS (CONTINUED)


| Exhibit | Page |
|---|---|
| Exhibit 44 - E-mail Exchange for a Meeting Request Request dated June 5, 2020 | 36 |

STIPULATION

The VIDEO deposition of ROBERT SHAFFER was taken at FIFTH THIRD CENTER, 38 FOUNTAIN SQUARE PLAZA, CINCINNATI, OHIO 45202 on THURSDAY the 6TH day of NOVEMBER 2025 at 10:58 a.m. (ET); said deposition was taken pursuant to the FEDERAL Rules of Civil Procedure.

It is agreed that BURGUNDY MALONEY, being a Notary Public and Court Reporter for the State of OHIO, may swear the witness and that the reading and signing of the completed transcript by the witness is not waived.

PROCEEDINGS

THE VIDEOGRAPHER: We are now on the record. Today is Thursday, November 6, 2025, and the time is 10:58 a.m. This is the beginning of the deposition of Robert P. Shaffer in the matter of Philip McHugh v. Fifth Third Bancorp in the United States District Court, Southern District of Ohio, Western Division, Case number 1:21-CV-00238. We are at 38 Fountain Square Plaza, Cincinnati, Ohio. I am Arthur Funk. I am the videographer. The Court recorder is Burgundy Maloney. Will all parties please announce themselves for the record?

MR. SABA: Peter Saba and Josh Smith on behalf of the plaintiff, Philip McHugh.

MR. CIOFFI: Michael Cioffi of Blank Rome on behalf of the defendant -- the defendants in the case, but also this particular witness, pursuant to a joint representation agreement. Also representing the defendants are Brian Thomas and Phenise Poole, lawyers at Fifth Third Bank.

THE VIDEOGRAPHER: Okay. Will the person on the Zoom call please announce themselves for the record?

MS. SHARPE: Yes. Bailey Sharpe for the plaintiff.

THE VIDEOGRAPHER: Okay. Okay. Will the court reporter please swear in the witness?

THE REPORTER: Do you solemnly swear or affirm that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

THE REPORTER: Okay. Thank you. You may begin.

DIRECT EXAMINATION

BY MR. SABA:

Q. Mr. Shaffer, can you go ahead and state your name for the record, please, and spell your last name?

A. Sure. Robert Paul Shaffer, S-H-A-F-F-E-R.

Q. As a reminder, Mr. Shaffer, I'm going to be asking you a series of questions. If there's anything you don't hear or don't understand, please feel free to ask me to repeat and rephrase the question. For the sake of the court reporter, I do need you to answer verbally, no shaking or nodding of the heads, or uh-uh's or uh-huh's. Although we are taking this via video, it also makes for a clearer record for what she's taken down. If you can wait for me to finish my questions before you answer the question. I'll try and do the same before asking you another question. It also makes for a clearer record. Do you understand those instructions?

A. I do.
Q. Can you give me your residence address please?
A. 768 Cedar Drive, Loveland, Ohio 45140.
Q. Has that changed since last time we took your deposition?
A. No.
Q. What is your current employment?
A. I'm sorry?
Q. What is your current employment?
A. I'm the chief risk officer at Fifth Third Bank.
Q. And that's the same position you held when we took your deposition a few years ago; is that correct?
A. That's correct.
Q. Okay. Do you know why you're here today?
A. Yes.
Q. And what is your understanding of why you're here today?
A. To be deposed on a supplemental materials.
MR. SABA: Mr. Shaffer, I've handed to you what's been marked as Exhibit number 34 in your deposition.
(Exhibit 34 was marked for identification.)
BY MR. SABA:
Q. Have you ever seen this document? Excuse me.

I've handed you what's been marked as Exhibit number 34. Let me represent to you, this is a two-page document. Have you ever seen this document before?

A. No.

Q. Were you aware that there were RHR communications that were withheld in this case?

A. No.

Q. Are you aware which documents were withheld in this case?

MR. CIOFFI: Objection. To the extent that it calls for an answer based on documents that Counsel provided to this particular witness, I'm going to instruct him not to answer. If it's from some source other than Counsel, I'll allow him to answer.

THE WITNESS: It is from Counsel.

BY MR. SABA:

Q. Are you aware of any other correspondence or communications with RHR that have been withheld in this case?

A. No.

Q. What did you do to prepare for today's deposition?

A. Talk to my attorneys.

Q. Did you review any documents in this case?

MR. CIOFFI: Objection. Going to instruct the

witness not to answer to the extent your question pertains to documents provided to the witness by Counsel, as those invade the attorney-client privilege and the work product privilege. I'll allow him to answer as to any other documents.

THE WITNESS: There are no other documents.

BY MR. SABA:

Q. Have you reviewed your prior depositions in this case?

MR. CIOFFI: Same objection. I'm -- instruct him not to answer to the extent that they were materials provided by Counsel. If he reviewed them other than by Counsel or any other documents other than provided by Counsel, I'll allow him to answer.

THE WITNESS: I did not have any other documents.

BY MR. SABA:

Q. Have you ever read your prior deposition in this case?

MR. CIOFFI: You may answer that.

THE WITNESS: As provided by my counsel.

BY MR. SABA:

Q. Have you discussed this litigation with anyone at Fifth Third since your prior deposition?

MR. CIOFFI: Same objection, except as it

pertains to Counsel both from my firm, but also in house at Fifth Third Bank.

THE WITNESS: Nobody else other than who you referenced.

BY MR. SABA:

Q. Have you discussed this case with anybody outside Fifth Third since your prior deposition?

A. No.

MR. SABA: Mr. Shaffer, I've handed you what's been marked as Exhibit number 35.

(Exhibit 35 was marked for identification.)

BY MR. SABA:

Q. Can you identify that document for me, please?

A. It's an e-mail from Guy Beaudin at RHR to me.

Q. It's actually an e-mail exchange between the two of you; isn't that right?

A. Yeah. That's what I said.

Q. Okay.

A. E-mail from him to me. Right.

Q. And just to be clear, Exhibit number 35 is a two-page document Bates stamped FifthThirdMcHugh005687 and FifthThirdMcHugh005688; is that correct?

A. I'm looking for the numbers. Oh, down here?

Q. Correct. In the bottom, right-hand corner.

A. Okay. What? You said 56875688?

Q. Correct.
A. Yep.
Q. Okay. Going back again. My question was just basically, this is an e-mail exchange between you and Mr. Beaudin with an e-mail from you on March -- excuse me. An e-mail from him to you on March 12th and again on March 18th; is that right?
A. Yes.
MR. SABA: Mr. Shaffer, I've handed you what's been marked as Exhibit number 36.
(Exhibit 36 was marked for identification.)
BY MR. SABA:
Q. This document is Bates stamped RHRThirdParty00087 through RHRThirdParty00092; is that correct?
A. Yes.
Q. Can you identify Exhibit number 36 for me, please?
A. Yes. E-mail exchanges between -- so Guy and I and some of our executive assistants.
Q. I'm sorry. You said it was e-mail exchange between you and Mr. Beaudin and some of your executive assistants --
A. Correct.
Q. -- is that correct?

A. Uh-huh.
Q. And Exhibit number 36, those e-mails are actually from March 12th, March 18th, March 28th, March 29th, and three from March 30th; is that correct?
A. You said three from March 30th?
Q. Correct.
A. Yes.
Q. And they're also from March 29th, 28th --
A. Yes. Yeah.
Q. -- 18th and 12th?
A. Yes.
Q. And Exhibit 36 includes the e-mails that are part of Exhibit 35; is that right?
A. Let's see here. I don't see the -- but I'm -- I'm sure you're -- you don't have a lot of issues at the moment. Is that not here somewhere?
Q. If I can refer you to RHRThirdParty00089, and at the top of that page?
A. Oh, good. Thank you. Yes. Yes.
Q. So just to confirm that Exhibit 35 and Exhibit 36 are part of the same e-mail chain; is that correct?
A. Yes.
Q. Okay. But Exhibit 36 obviously includes some additional e-mails from you; is that right?
A. That's right. And one for my assistant,

Paula.

Q. And with respect to the e-mail that you sent to Mr. Beaudin on March 30th at 11:07 a.m., can you read that e-mail for me, please?

A. Sure. "Thanks, Guy. Paula will work to set up the meeting for 8:00 a.m. Friday. I have reviewed your proposal, and it looks. The one thing Greg and I discussed is delaying the start of your work for 30 days at this point, given the coronavirus and not wanting to signal to certain executives internally that we may be starting the CEO succession process. Saying that, you, Greg, and I can get the CEO's profile updated. Let's discuss that on Friday. Thanks, Bob."

Q. In your second sentence, you said, "I've reviewed your proposal, and it looks"?

Q. Did -- is there a typo? Are we missing a word after "it looks"?

A. I would say it is a -- just, I missed a word.

Q. And what would the word have been that you meant to put in there?

MR. CIOFFI: Objection to the form. If you have an answer, since you didn't put it there, it might be hard.

THE WITNESS: Yeah. I don't recall exactly what it -- what that word would've been.

BY MR. SABA:
Q. Did you review the proposal?
A. Yes.
Q. Did you have any issues with the proposal?
A. I can't recall if I had issues or just questions and clarifications. I -- obviously, at the end of the day, we didn't have any issues, and we got anything we needed to clarify or whatever. But I don't remember specifically what that -- what that would've been.
MR. SABA: Mr. Shaffer, I've handed you what's been marked as Exhibit number 37, which is Bates stamped FifthThirdMcHugh006699 through FifthThirdMcHugh006709.
(Exhibit 37 was marked for identification.)
BY MR. SABA:
Q. Can you identify that document for me, please?
MR. CIOFFI: Objection. Counsel, this is not part of the supplemental production. It's something that you questioned the witness about previously and it's beyond the Court's order of this being a targeted deposition only to the supplemental documents. I'm not going to instruct him at this point not to answer, but please be mindful of the Court's limitations. You may answer.

THE WITNESS: It's the proposal of the executive assessment and development for CEO Succession Fifth Third Bank from RHR.

BY MR. SABA:

Q. Have you seen this document before?

A. I'm -- well, I can't speak specifically to this document, but we reviewed, I'm sure, a draft and got a final document at the end of the process of getting the engagement signed with RHR.

Q. Do you recognize this is the proposal that you're referring to in Exhibit number 36 from your e-mailing to Guy Beaudin?

MR. CIOFFI: Objection to the form of the question. He said he didn't recognize it specifically. But you may answer.

THE WITNESS: I have no idea if this is what I'm referencing in here, this particular version.

BY MR. SABA:

Q. What would you have to see to know if this is the particular version that you were referencing in the -- in your e-mail to Guy Beaudin?

A. I -- I don't know. Maybe the e-mail that he sent with the proposal.

Q. Do you recall as of March 30th, with respect to the proposal that Guy Beaudin made, how many

individuals were being assessed as part of that proposal?

MR. CIOFFI: Objection. Again, it's outside the scope of the Court's order. You questioned him about this previously, Counsel.

MR. SABA: Well, just to be clear, it's not outside the scope of the Court's orders. If you look at the Court's order, clearly indicates anything relating to these documents, number one. Number two --

MR. CIOFFI: Those words don't appear in the order.

MR. SABA: Number two, he was not asked about this previously. Go ahead.

MR. CIOFFI: Let me be clear. And the order speaks for itself. It's targeted to the supplemental production, which is a handful of scheduling documents, but take it up with the Court that I think you're beyond the scope of the Court's order. There -- there's no language related to the documents in the order. Go ahead. You may answer.

THE WITNESS: What's the question again?

BY MR. SABA:

Q. Did you have an understanding as of March 30, 2020, that the proposal that Guy Beaudin is making on

behalf of RHR was for assessing three individuals?

A. There was -- there was never a proposal at the end of the day to assess three individuals.

Q. It -- it's your position today that RHR never made a proposal to assess three individuals?

A. Oh, sure. We talked about that as a potential, for sure.

Q. As a potential or they actually made a proposal to assess three individuals?

A. I don't recall them making a proposal to assess three individuals. I recall he and I talking about what his recommendation would be. And he clearly stated to me that it would be up to the board who they want to assess, and the board made the decision to assess one, Tim Spence.

Q. Didn't you initially send bios for Mr. Tuzun, and Mr. McHugh, and Mr. Spence so that RHR could provide a proposal to assess each of those people?

MR. CIOFFI: Objection. Beyond the scope of the Court's order. You may answer.

THE WITNESS: I don't recall sending bios of all three of them.

MR. SABA: Mr. Shaffer, I've handed you what's been marked as Exhibit number 38, which is Bates stamped FifthThirdMcHugh005951.

(Exhibit 38 was marked for identification.)

BY MR. SABA:

Q. Identify this document for me, please?

MR. CIOFFI: Objection. It's not part of the supplemental production. It's beyond the scope of the Court's order and you've already questioned him about it. But again, you may answer. But, Counsel, you're wasting time and violating the order. Go ahead, Mr. Shaffer.

THE WITNESS: What's the question?

BY MR. SABA:

Q. Can you identify Exhibit number 38 for me, please?

A. It's an e-mail from me to RHR, Guy Beaudin, copying RHR.

Q. What's the date of that e-mail?

A. March 6, 2020.

Q. Can you read that e-mail for me, please?

A. "Guy, good to talk to you this morning. Attached are bios, Word document, and one-pagers PowerPoint document we use with the board of talent discussion in December 2019. A lot of similarities, but I thought both would be helpful. Please let me know if you have any questions. Also, if you have the CEO profile information you use when assessing Greg, could

you please send to me? I know you may want to update it. I just want to see what we used before. Thanks, Bob."

Q. Does Exhibit 38 refresh your recollection about sending bios for Mr. Tuzun, Mr. McHugh, and Mr. Spence to Mr. Beaudin for a proposal from RHR?

A. What the attachments are, right, yeah. I would send them bios.

Q. Does that also refresh your recollection that RHR submitted a proposal for assessing all three of those individuals to be the next president and CEO of Fifth Third Bank?

A. I -- I don't know if -- I can't recall that they actually sent in a proposal for all three.

Q. As you sit here today, do you recall if the proposal that you reviewed as of March 30th was for one individual or was for three individuals?

A. I don't recall.

Q. Your e-mail indicates "the one thing Greg and I discussed is delaying the start of your work for 30 days at this point, given the coronavirus and not wanting to signal to certain executives internally that we may be starting a CEO succession process." Do you see that?

A. I do.

Q. Why did you not want to signal to certain executives internally that you may be starting a CEO succession process?

A. Well, you got to remember, this is right at the start of the coronavirus and the focus of our company needed to be on making sure our business was stable, our operations were stable, customers, employees. So that -- that created a lot of uncertainty in and of itself. And starting a process like a CEO succession planning process, you know, wasn't the right time to do it. So the board wanted us to take the time we needed to stabilize the company, and our business and operations, and customers, and employees before we introduced the start of that planning process.

Q. Who were the certain executives referenced that you did not want to signal that you were starting a CEO succession process?

A. I mean, I don't recall why those words are in here. I know that I would want to maintain confidentiality of the process for all executives, all employees, and -- and anyone else until the board is ready to go.

Q. Why would you want to maintain confidentiality of the entire process until the board is ready to go?

MR. CIOFFI: Objection. Asked and answered. He

already answered that question under the circumstances. But go ahead. You may answer again.
THE WITNESS: Repeat the question?
BY MR. SABA:
Q. Yeah. Why do you want to maintain confidentiality with respect to all executives and all staff?
A. Because it -- it's a process that's the highest level in the company and creates, you know, change and -- and uncertainty. And that was not the time to get it going when -- at -- right at the beginning of the coronavirus. The world was shutting down, and we needed to get things stabilized.
Q. When did you and Greg have a discussion about delaying the start of Guy's work for 30 days?
A. I don't recall the date and time of that discussion. Everything was very fluid right there in March when the coronavirus was starting.
Q. You indicated the board told you to delay the start of the CEO succession process; is that correct?
A. Well, Greg would've been having discussions with the board quite frequently in -- in March and April with the coronavirus. So he -- you know, he indicated to me and that's why I communicated to -- to Guy that we wanted to wait to get it going.

Q. Are you saying that Greg said that the board said that you should delay the CEO succession process?
A. Yeah. Yeah. The board wanted us to wait and get the company stabilized before we get this CEO succession process going.
Q. Did you ever hear that from anybody on the board yourself?
A. Not myself. But as we had subsequent discussions after, you know, this -- this time period, I mean, the -- the board wanted us to focus solely on getting the company stabilized and our customers and employees.
Q. But what you said, "when we had discussions from," who's the "we"?
A. Well, we would have regular board meetings, committee meetings, like -- I would've been on the risk and compliance committee and so forth. So the whole board was talking about the world and what was going on. And the first and foremost thing was to stabilize our company.
Q. And you're saying during those meetings is when you were informed that the CEO succession process should be delayed?
A. Not during those meetings. Greg talked to me about it after, yeah, I believe he had a discussion with

the board.

Q. Okay. Other than your communication with Greg, did anyone from the board at any meetings or otherwise ever communicate to you that the CEO succession process should be delayed?

MR. CIOFFI: Objection. Asked and answered. You may answer again.

THE WITNESS: Not directly. Just, like I said, in the committee meetings we were in, we would have discussions that the main focus of the management team and the board was to get the company stabilized, our customers and employees. So that was the -- the number one priority.

BY MR. SABA:

Q. As part of that discussion, main focus during those meetings, was there a specific statement made that the CEO succession process should be delayed?

MR. CIOFFI: Objection. Asked and answered. Go ahead.

THE WITNESS: I mean, not -- not directly to me.

BY MR. SABA:

Q. Did you hear it made to anybody else?

A. No. But again, it was Greg informing me of discussions he's had with the board at that time period

that the number one focus was to do this, and we would delay this process so that we can get the company stabilized.

Q. How many conversations did you and Greg have where he indicated that the board said that the CEO succession process should be delayed?

A. I don't recall that. We were talking about all this every day.

Q. You referenced in the last sentence -- excuse me, not the last sentence, but the -- actually, the second last sentence of your e-mail saying that "You, Greg, and I can get the CEO profile updated." Do you see that?

A. Uh-huh.

Q. Did you and Guy Beaudin and Greg start to update the CEO profile?

A. I don't remember the exact timing and so forth, but we did have a meeting about it. But again, I don't remember the exact timing, but we wanted to get it going so we would have it ready to go. I know once Greg, Guy, and I agreed to it, as I testified last time, I sent it out to the entire human capital and compensation committee to get their review and any comments or additions or deletions that they may want to have. So I just don't know. I don't -- it's five and a

half years ago. I just don't know all the timing of -- of those activities.

Q. Your e-mail also indicates, "Paula will work to set up the meeting for 8:00 a.m. Friday." Did you have a meeting with Guy Beaudin that following Friday?

A. I don't recall.

MR. SABA: Mr. Shaffer, I've handed you what's been marked as RHR Third Party -- excuse me -- as Exhibit number 39, which is Bates stamped RHRThirdParty00126.

(Exhibit 39 was marked for identification.)

BY MR. SABA:

Q. Can you identify that document for me, please?

A. It looks like a -- I don't know exactly who set this up, but it's a -- it is for a meeting on Friday, April 3rd, with Greg, Guy, and I.

Q. Did that --

A. Not sure --

Q. I'm sorry, go ahead.

A. Well, okay. Lisa Wires, Greg's assistant --

Q. Did that --

A. -- must have --

Q. I'm sorry, go ahead.

A. Must have stepped that meeting. I can't remember.

Q. Did that meeting take place on April 3, 2020, between you, Greg, and Guy Beaudin?

A. I don't recall.

MR. SABA: Mr. Shaffer. I've handed you what has been marked as Exhibit number 40, which is Bates stamped FifthThirdMcHugh0213076.

(Exhibit 40 was marked for identification.)

BY MR. SABA:

Q. Do you recognize this as a text message exchange between you and Mr. Carmichael?

MR. CIOFFI: Objection. This is not part of the supplemental production. It's outside the scope of the Court's targeted order and inappropriate and a waste of time. You've already questioned him about it.

MR. SABA: Yeah. And again, I've not questioned him about this document. It's well within the scope of the Court's order.

MR. CIOFFI: It was available to you, and you did question him about it, but I'm not going to instruct him at this point not to answer. But, Counsel, you really are far outside what the Court has permitted here and wasting time. But go ahead. You may answer.

BY MR. SABA:

Q. Do you recall my question, Mr. Shaffer?
A. No. What is it?
Q. My question was: Do you recognize this as a text message exchange between you and Mr. Carmichael?
A. Yeah, it looks -- looks like it.
Q. Okay. And if I can refer you to the April 3, 2020 text message that is sent from you to Mr. Carmichael, do you see that there?
A. April 3rd? At the top?
Q. Yeah. It'd be the third one down from the top.
A. Yeah.
Q. Can you read that text message to me?
A. "We have a meeting with Guy at 8:00 a.m. Do you still want to meet with him today, or do you want me to push it out?"
Q. And do you see his response?
A. Yep.
Q. How did he respond?
A. "We can meet with him at 8:00."
Q. Does that refresh your recollection about having that meeting with Greg Carmichael and Guy and yourself?
A. At least the text message chain says we were going to have it on -- at 8:00 a.m. on the 3rd or 4th, I

guess. 3rd.
Q. And do you recall anything that was discussed during that meeting between yourself and Mr. Beaudin and Mr. Carmichael?
A. I don't remember the specifics of it.
MR. SABA: Mr. Shaffer, I've handed you what's been marked as Exhibit number 41, which is Bates stamped FifthThirdMcHugh0213078.
(Exhibit 41 was marked for identification.)
BY MR. SABA:
Q. Can you identify this document for me, please?
MR. CIOFFI: Objection. Again, it's not part of the supplemental production. It's beyond the scope of the Court's targeted order, which you're violating, Counsel. You may answer.
THE WITNESS: Yeah. Look like -- yeah. Yes. Text screen.
BY MR. SABA:
Q. This would appear to be a text chain between yourself and Mr. Carmichael, correct?
A. Yes.
Q. And if I can refer you to the text that you sent to Mr. Carmichael on May 4, 2020, actually the second one listed; do you see that?
A. Yes.

Q. Can you read that to me, please?

A. "I had my first monthly update call with Guy Beaudin today, since you and I had talked -- talked to him. Unless you see differently, I think we should just stay in the same mode of not getting anything substantially started at this point. Agree?"

Q. And how did Mr. Carmichael respond?

A. "Yes. Agree."

Q. Why did you think that you should just stay in the same mode of not getting anything substantially started as of May 4, 2020?

A. Because we originally put a 30-day -- the board, you know, wanted a 30-day pause on this. And we were still well in the uncertainty and deep throws of the beginning of COVID, and we still needed to get a lot of things stabilized in -- in the company. So in my view, we needed to wait this out. Greg agreed. You know, again, he was, you know, having conversations with the board just on COVID overall, so...

Q. Were you still maintaining confidentiality of the CEO succession process at that point in time?

MR. CIOFFI: Objection. Again, beyond the scope of the Court's order and lack of foundation. You may answer.

THE WITNESS: As -- as far as I know, I -- I

was. Yes.

MR. SABA: Mr. Shaffer, I've handed you what's been marked as Exhibit number 42, which is Bates stamped RHRThirdParty00062 through RHRThirdParty00063.

(Exhibit 42 was marked for identification.)

BY MR. SABA:

Q. Can you identify that document for me, please?

A. So again, e-mail exchange between Guy, Paula, my assistant. Yes. Between the two of them.

Q. And that e-mail exchange is dated June 1, 2020; is that correct?

A. Yes.

Q. And the second e-mail on the first page, it reads, on Monday, June 20 -- June 1, 2020, at 11:45 a.m. Bob Shaffer wrote, "Good morning, Guy. We would like to cancel this meeting as Bob has no new information. Given the current environment, Bob would like to meet in 30 to 45 days. Would you mind sending me dates, times that you are available? Thanks, Paula."

A. Yeah.

Q. Do you see that? Did I read that correctly?

A. Yes.

Q. It indicates it's from you, but that was actually sent by your assistant; is that correct?

A. Correct.
Q. Okay. Were you scheduled to have a monthly meeting with Guy Beaudin first week of June?
A. We did set up monthly meetings after we went through the initial profile. I don't know if June 1st was one of those scheduled monthly meetings or not.
Q. It indicates that "Bob has no new information." Do you see that?
A. I do.
MR. CIOFFI: Objection. Reading the incomplete sentence. I will instruct the witness to read the whole statement.
THE WITNESS: The "we would"?
MR. CIOFFI: Yeah. Read both sentences so --
THE WITNESS: All right.
MR. CIOFFI: -- get the whole context.
THE WITNESS: "We -- we would like to cancel this meeting as Bob has no new information. Given the current environment, Bob would like to meet in 30 to 45 days. Would you mind sending me dates, times that you are available?"
BY MR. SABA:
Q. With respect to the reference to "new information," what were the -- what was the new information that you were waiting on or trying to

obtain?
A. I don't recall.
Q. And with respect to the "current environment," what was the current environment that would necessitate the delay?
A. COVID.
Q. Any other issues?
A. No, not that I'm aware of.
Q. And was Fifth Third still maintaining the confidentiality of the CEO succession process at this point in time?
A. As -- as far as I know, but -- yeah.
Q. You also indicate -- or excuse me. Paula Hennard also indicates that "Bob would like to meet in 30 to 45 days." Do you see that?
A. I do.
Q. Is that what you would've indicated to Paula to kick the meeting out by 30 to 45 days?
A. I'm sure I would have told her that. Yeah.
Q. And why would you have told her to kick the meeting out for 30 to 45 days?
A. I don't recall specifically.
Q. And why that time period in particular? Why 30 to 45 days?
A. I don't recall.

MR. SABA: Mr. Shaffer, I've handed you what's been marked as Exhibit number 43, which is Bates stamped RHRThirdParty00171 through RHRThirdParty00175.

(Exhibit 43 was marked for identification.)

BY MR. SABA:

Q. Is that correct?

A. Yes.

Q. Can you identify this document for me, please?

A. It's an e-mail exchange between my executive assistant and Guy's setting up a meeting.

Q. And referring you to RHRThirdParty00173. This e-mail exchange includes the e-mail that is referenced in Exhibit number 42; is that correct?

A. I don't see that. Exhibit 42 has one for me and one for Guy.

Q. Well, specifically what I'm referring to, if you look at the top of RHRThirdParty00173, it includes Paula Hennard's e-mail that begins, "We requested -- oh, I'm sorry. Strike that. Referring to 00173, and similar to Exhibit number 42, it references where Paula Hennard indicates that they want to reschedule the meeting for 30 to 45 days; is that correct?

A. That's correct.

Q. Okay. And consistent with that, on Exhibit

number 43, they scheduled for -- a meeting for you and Guy on July 14, 2020; is that correct?
A. Yes.
Q. And referring to Exhibit 43, that e-mail exchange setting up the rescheduled meeting for July 14th, that took place on June 1, 2020; is that correct?
A. When the e-mail occurred to me?
Q. Correct.
A. Yes.
MR. SABA: Mr. Shaffer, I've handed you what's been marked as Exhibit number 44, which is Bates stamped RHRThirdParty00202 through RHRThirdParty00204.
(Exhibit 44 was marked for identification.)
BY MR. SABA:
Q. Is that correct?
A. Yes.
Q. Can you identify this document for me, please?
A. It's another e-mail exchange between my executive assistant and Guy's.
Q. And we're referring specifically to RHRThirdParty00203. There's an e-mail at the bottom of that page from Paula Hennard sent on June 5, 2020, at 9:53 a.m.; is that correct?
A. Yes.

Q. And that reads, "Hi, Lisa. Bob Shaffer would like to schedule a 30-minute call with Guy on Monday or Tuesday of next week. Can you please let me know if Guy is available any of the following," and then there's, "Monday, June 8th at 8:00 a.m., 8:30, 4:00, or 4:30; Tuesday, June 9th at 2:30, 3:30, and 5:00. If none of these work, please propose alternate times on these dates." Do you see that?

A. I do.

Q. And through the bouts of the e-mail exchange, they eventually schedule a meeting on June 8th at 4:30; is that correct?

A. Monday. Yeah. Yes.

Q. What changed between June 1st and June 5th that necessitated that you wanted to have a call with Guy Beaudin on June 8th?

MR. CIOFFI: Objection to the form of the question. Lacks foundation that anything changed. You may answer.

THE WITNESS: I don't recall what -- what, if anything, changed.

BY MR. SABA:

Q. Well, originally, you delayed the meeting to July 14th and then it was accelerated to June the 8th.

What new information did you obtain between

June 1st and June 5th that would've necessitated accelerating that meeting by over a month?

MR. CIOFFI: Objection to the form of the question. There's no foundation of new information, et cetera. Counsel is literally making it up. But you can answer.

THE WITNESS: I -- I don't recall what, if anything, changed.

BY MR. SABA:

Q. Between June 1st and June 5th, had the current environment at Fifth Third changed at all that would've led to accelerating a meeting with Guy Beaudin from July 14th to June 8th?

MR. CIOFFI: Objection. Asked and answered. You may answer.

THE WITNESS: I -- I don't know what you mean by current environment at Fifth Third. Could mean a lot of different things.

BY MR. SABA:

Q. You previously indicated that due to the current environment, you were delaying your June meeting with Guy Beaudin to July 14th. Four days later, you accelerate that meeting to June the 8th?

MR. CIOFFI: Objection. Lack of foundation as to any acceleration. Counsel is, again, testifying

and -- But you may answer.

MR. SABA: I didn't finish my question.

MR. CIOFFI: He's answered it a number of times. It's --

BY MR. SABA:

Q. You indicated earlier that due to the current environment at Fifth Third that you were rescheduling your meeting in early June with Guy Beaudin by 30 to 45 days to July 14th. Four days later, your meeting is then accelerated to June the 8th from July 14th. What, if anything, changed in the current environment at Fifth Third Bank related to the acceleration of that meeting?

MR. CIOFFI: Objection. Asked and answered. You may answer.

THE WITNESS: I don't recall if anything changed in that time period.

BY MR. SABA:

Q. Had you had any discussions with Greg Carmichael about accelerating that meeting from July 14th to June 8th?

MR. CIOFFI: Okay. Objection to the form. Counsel is testifying.

THE WITNESS: I don't recall.

BY MR. SABA:

Q. Were -- did you have any conversations with

any other board members about proceeding with the CEO succession process at Fifth Third?

A. I don't recall if I did.

Q. As of June 5, 2020, was Fifth Third still maintaining the confidentiality of the CEO succession process?

A. I don't recall at that time if we -- I -- I believe we would have, but -- because I don't think we quite -- we were getting it ready to get it started. The board wanted to get go, I know -- or get us ready to go.

Q. Who would've told you that the board wanted to go -- the board wanted to get it going?

MR. CIOFFI: Objection. Lack of foundation. Misstates his prior testimony.

THE WITNESS: Well, whenever the board was ready to go, Greg would've been made aware and told me.

BY MR. SABA:

Q. So when did Greg tell you that?

A. I don't recall.

Q. Are you saying he told you that prior to June 5, 2020?

MR. CIOFFI: Objection. Asked and answered.

THE WITNESS: Yeah. I don't recall.

BY MR. SABA:

Q. No one from the board ever directly told you to proceed with the CEO succession process at Fifth Third during that period from June 1st to June 5, 2020; is that correct?

MR. CIOFFI: Objection. Asked and answered. You may answer it again.

THE WITNESS: Yeah. I don't recall.

BY MR. SABA:

Q. Mr. Shaffer, did you proceed to have your meeting with Mr. Beaudin on June 8, 2020?

MR. CIOFFI: Objection. Asked and answered.

THE WITNESS: I don't recall.

BY MR. SABA:

Q. You don't recall if you had that meeting?

A. Correct, yeah, on that date.

Q. Mr. Shaffer, you've been handed what's previously been marked as Shaffer Exhibit 28, which is Bates stamped FifthThirdMcHugh006414 through FifthThirdMcHugh006415. Do you see that?

A. I do.

Q. Okay. Can you identify this document for me, please?

MR. CIOFFI: Objection. As Counsel indicated, this has been previously marked. This witness has been questioned about this document. This line of

questioning is far outside of and in violation of the Court's order to take a targeted deposition and not to repeat what you've already done. This is really an utter waste of time.

BY MR. SABA:

Q. Go ahead, Mr. Shaffer.

MR. CIOFFI: You may answer.

THE WITNESS: It is an e-mail from me to Greg Carmichael on June 8th.

BY MR. SABA:

Q. Okay.

A. Yeah.

Q. Does this refresh your recollection whether or not you had a meeting with Guy Beaudin on June 8, 2020?

A. I still don't know if I had it on June 8th. Obviously, I wrote this e-mail on June 8th with this information. Yes.

Q. Do you recall if this information that we see in the Exhibit number 28 was the information that you would've discussed with Mr. Beaudin on a meeting on or around June 8, 2020?

A. Yes.

Q. The individuals that are listed on Exhibit number 28, did you personally have any conversations with these individuals regarding the assessment that RHR

was going to do with Tim Spence to be the next president and CEO of Fifth Third Bank?

MR. CIOFFI: Objection to the form of the question. Lacks a time frame.

THE WITNESS: Can you repeat it?

BY MR. SABA:

Q. Sure. There's a series of individuals listed on Exhibit number 28. My question is: Did you ever speak to these individuals and discuss with them that RHR was going to be doing an assessment of Tim Spence to be the next president and CEO of Fifth Third Bank?

A. I'm sure I did. Greg would've had the initial discussions once the board decided to -- to go. He talked to the enterprise members that were going to be involved in that process of evaluating Tim and including all the folks you see here on the page under the enterprise team.

Q. Were you present for any of those conversations that Greg had with the enterprise team?

A. I don't recall.

Q. And are you saying that you separately had meetings with the members of the enterprise team regarding the topic that RHR would be doing an assessment of Tim Spence to be the next president and CEO Fifth Third Bank?

A. I don't recall specific meetings, but there could have been, you know, questions or discussions. But I don't recall the specifics.

Q. Okay. As you sit here today, do you recall any conversations with the -- any of the individuals listed on Exhibit number 28 where you discussed with them that Fifth -- that Tim Spence was being assessed by RHR to be the next president and CEO of Fifth Third Bank?

MR. CIOFFI: Objection. He answered that question three questions ago, that he had those conversations. But you may answer it again.

THE WITNESS: Yeah. I mean, it -- it's certainly possible I did, but I don't recall any of the details, whether they had questions or -- or what have you.

BY MR. SABA:

Q. Can you identify the dates of those conversations?

A. No.

Q. Can you identify the locations where those conversations took place?

A. No.

Q. Were any of those conversations documented in writing?

A. Not mine, no.
Q. Would any of those conversations have otherwise been communicated by e-mail or text or in writing to any of these individuals?
A. I don't recall.
Q. And is that also true for the direct reports? Did you speak to any of the direct reports about any -- that RHR would be doing an assessment of Tim Spence to be the next president and CEO of Fifth Third Bank?
A. Again, I don't recall talking to any of these direct reports. I know Tim communicated out via Guy's guidance, I think, in an e-mail of -- of the -- they were being asked to provide an interview to provide feedback.
Q. But you personally did not have any direct interaction with any of the direct reports regarding the assessment that RHR was doing of Tim Spence to be the next president and CEO of Fifth Third Bank?
MR. CIOFFI: Objection. Asked and answered.
THE WITNESS: I don't recall whether I did or not.
BY MR. SABA:
Q. Were you involved in any text messages or e-mail exchanges with any of the individuals listed on Exhibit number 28, specifically the direct reports,

regarding that Tim Spence was being assessed by RHR to be the next president and CEO of Fifth Third Bank?

A. I don't recall.

MR. SABA: We can go off the record.

THE VIDEOGRAPHER: The time is 11:57. We are off the record.

(A recess was taken.)

THE VIDEOGRAPHER: The time is 12:09. We are on the record.

BY MR. SABA:

Q. Mr. Shaffer, going back to earlier, we've reviewed e-mails where on June 1st there was a canceling of a meeting that was supposed to take place in early June with Mr. Beaudin, and it was rescheduled to July 14th. And then on June 5th, that meeting was again rescheduled back to a June 8th time period. Do you recall that?

A. I do.

Q. The -- had anything changed about the coronavirus between June 1st and June 5th?

A. I don't know specifically in that time period. But as we all know, from March on, for a lot of that year, the whole world was in turmoil and uncertainty, was shutting down. So as I said several times earlier, you know, we were working constantly to stabilize our

business and our operations. We were moving people, jobs offshore, onshore, reallocating our own resources to handle our customer needs, making sure our employees are taken care of. So things were changing by the minute for a long time that year. And we're still feeling the impacts even today of -- you know, of -- of the coronavirus. So I can't give you any specifics that happened between that particular time frame, other than that things were changing minute by minute.

Q. And the coronavirus, all the dysfunction that was created by that, that was still going on in early June, correct?

A. Oh, yeah.

Q. And that continued even through October of 2020, correct?

A. Uh-huh.

Q. You need to answer verbally?

A. I'm sorry. Yes. But by the time we got to June or -- you know, we had done a lot of work to stabilize our business, get resources reallocated. For instance, I had a credit risk review team and risk it shut down their credit risk review jobs and started working on deposit services so we could service our -- our customers. So we did a lot of work between March and June to make sure that we were as stable as possible

so we could move forward with a -- with a more stabilized business. But there were a lot of things going on in the world that were impacting us and our customers every day, but we had done a good job of preparing for that.

Q. At what point in time did the coronavirus no longer have any impact or effect on the CEO succession process at Fifth Third Bank?

A. Early June is when we wanted to get it going -- when the board wanted to get it going, felt that the company had done a nice job, the management team had done a nice job to stabilize all the things I mentioned before. So the -- the board was ready to go.

Q. So it -- it's your position today that the coronavirus no longer had any impact on the CEO succession process of Fifth Third Bank effective early June of 2020?

MR. CIOFFI: Objection to the form of the question. That's an inaccurate restatement of what he was saying. I mean, you may answer.

THE WITNESS: Yeah. I mean, there were still impacts going on in -- in the company and our customers. But again, the board felt that we were stabilized enough to get the process moving forward.

BY MR. SABA:

Q. How do you know the board felt that you were stabilized enough to get the process moving?

A. Via conversations with Greg Carmichael.

Q. Did anybody at the board indicate to -- any member of the board indicate to you, other than conversation with Greg Carmichael, that the board felt the company was stabilized enough to move forward with the CEO succession process?

A. Not directly when we started it. But as I testified earlier, we were having, you know, board meetings, and risk committee meetings, and human capital committee meetings, you know, at our normal schedule. So this was a -- the coronavirus was a constant discussion of how we're dealing with it and stabilizing the company so as -- human capital and comp. Committee and the board wanted to get the CEO process going. I wasn't on the human capital and comp.

committee. I'm sorry. I was on the human capital and comp. Committee at that time, so we were those discussions, and they were ready to go.

Q. There were no board meetings that were canceled because of the coronavirus, correct?

A. I don't recall. I'm sure there were in-person board meetings that were moved to virtual, as well as committee meetings, but I -- I'd have to go back and

look at all the details of all the meetings. But from a governance perspective, we probably tried to keep, you know, everything intact.

Q. So the meetings were still ongoing, correct?

A. Yes.

Q. Okay.

A. I -- I can't say every specific meeting happened on the day that it was originally scheduled, because we scheduled these meetings out for two, three years in -- in advance. So did we move something? We may have, but I'd have to go back and look at it. But we continued our meeting process.

Q. Is the indication that the board felt that the company was stabilized enough to move forward with the CEO succession process in early June, is that documented in writing anywhere?

A. Not that I'm aware of.

Q. Was that topic specifically discussed in any human capital compensation meeting that, we feel that the bank is stable enough to proceed forward with the CEO succession process?

A. I mean, it was discussed in -- I'm sure, in full board meetings in some sort and -- and maybe the human capital and comp. Committee, but I -- I can't recall specifically.

Q. Were you present for a board meeting where that was discussed?
A. I can't recall at the beginning of that process. Because like I said earlier, Greg and the board were having conversation and that's why we got the process going.
Q. Are any of those conversations documented in any board minutes?
A. Not that I'm aware of.
Q. When you said Greg communicated to you that the board felt the company was stable enough to move forward with CEO succession, were any of Greg's communication -- communications to you documented in writing?
A. Not that I recall.
Q. Did Greg specifically communicate to you between June 1st and June 5, 2020, that the board felt the company is stabilized enough that we need to move forward with the CEO succession process?
MR. CIOFFI: Objection. Asked and answered. You may answer again.
THE WITNESS: Greg did communicate to me that. I don't remember the exact date.
MR. SABA: Thank you, Mr. Shaffer. That's all I have. As indicated before with Mr. Carmichael,

we're continuing some progress subject to the location of any additional documents, okay, in this case.

MR. CIOFFI: We certainly object that for the reasons been stated at the end of every deposition in this case that you don't have such a right. You can petition the Court for it, but that right doesn't exist. We'll -- just for the record, the witness will read and sign the transcript. We'll order both the transcript and the videotape.

THE REPORTER: All right. Perfect. And before we go off record, Mr. Saba, would you like to order the transcript?

MR. SABA: Yes, please.

THE REPORTER: And video, too?

MR. SABA: Yes, please.

THE REPORTER: Okay. Perfect. Good.

THE VIDEOGRAPHER: This ends the deposition. The time is 12:17. We are off the record.

(Deposition concluded at 12:17 p.m. ET)

______________________________
ROBERT SHAFFER

CERTIFICATE OF REPORTER

STATE OF OHIO

I do hereby certify that the witness in the foregoing transcript was taken on the date, and at the time and place set out on the Title page here of by me after first being duly sworn to testify the truth, the whole truth, and nothing but the truth; and that the said matter was recorded digitally by me and then reduced to typewritten form under my direction, and constitutes a true record of the transcript as taken, all to the best of my skill and ability. I certify that I am not a relative or employee of either counsel, and that I am in no way interested financially, directly or indirectly, in this action.

BURGUNDY MALONEY,
COURT REPORTER/NOTARY
COMMISSION EXPIRES: 06/15/2030
SUBMITTED ON: 11/24/2025.

1 DEPOSITION ERRATA SHEET.

Date Taken: November 6, 2025

Case Caption: PHILIP R. MCHUGH vs. FIFTH THIRD BANCORP, ET AL.

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the ______ day of

____________, 20___.

___________________________________

ROBERT SHAFFER

2 DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

SIGNATURE:_______________________DATE:___________

ROBERT SHAFFER

3 DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

SIGNATURE:_______________________DATE:___________

ROBERT SHAFFER

**WORD INDEX**

< 0 >
**00173** 35:20
**06/15/2030** 53:24

< 1 >
**1** 4:18, 23 32:11, 15 36:6 54:1
**1:21-cv-00238** 1:5 7:9
**10:58** 6:7 7:5
**11/24/2025** 53:25
**11:07** 15:3
**11:45** 32:15
**11:57** 46:5
**12** 4:11
**12:09** 46:8
**12:17** 52:19, 20
**12th** 13:6 14:3, 10
**13** 4:12
**14** 36:2
**14th** 36:6 37:24 38:13, 22 39:9, 10, 20 46:15
**16** 4:14
**18** 4:11
**18th** 13:7 14:3, 10
**19** 4:15, 20
**1st** 33:5 37:14 38:1, 10 41:3 46:12, 20 51:17

< 2 >
**2** 55:1
**2:30** 37:6
**20** 32:15 54:17
**201** 2:19
**2019** 20:22
**2020** 4:11, 15, 16, 18, 20, 23 5:4 18:25 20:17 28:1 29:7 30:23 31:11 32:12, 15 36:2, 6, 23 40:4, 22 41:3, 10 42:14, 21 47:15 48:17 51:17
**2025** 1:24 6:7 7:4 54:2
**23** 4:18
**2623** 2:8
**27** 4:16
**28** 4:18 41:17 42:19, 24 43:8 44:6 45:25
**28th** 14:3, 8
**29th** 14:4, 8

< 3 >
**3** 4:16 28:1 29:6 56:1
**3/30/20** 4:12
**3:30** 37:6
**30** 4:20 15:8 18:24 21:20 23:15 32:19 33:20 34:15, 18, 21, 24 35:23 39:8
**30-day** 31:12, 13
**30-minute** 37:2
**30th** 14:4, 5 15:3 17:24 21:16
**32** 4:21
**34** 4:9 9:21, 23 10:1
**35** 4:10, 23 12:10, 11, 20 14:13, 20
**36** 4:12 5:4 13:10, 11, 17 14:2, 12, 21, 23 17:11
**362-8701** 2:21
**37** 4:13 16:12, 15
**38** 3:7 4:15 6:5 7:9 19:24 20:1, 12 21:4
**39** 4:16 27:9, 11
**3rd** 27:16 29:9, 25 30:1

< 4 >
**4** 4:20 30:23 31:11
**4:00** 37:5
**4:30** 37:5, 11
**40** 4:17 28:5, 7
**41** 4:19 30:7, 9
**42** 4:21 32:3, 6 35:14, 15, 21
**43** 4:22 35:2, 5 36:1, 4
**44** 5:3 36:11, 14
**45** 32:19 33:20 34:15, 18, 21, 24 35:23 39:8
**45140** 9:3
**45202** 2:20 3:8 6:6
**45208** 2:9
**4th** 29:25

< 5 >
**5** 5:4 36:23 40:4, 22 41:3 51:17
**5:00** 37:6
**513** 2:10, 21 3:9
**533-2701** 2:10
**56875688** 12:25
**579-5203** 3:9
**5th** 37:14 38:1, 10 46:15, 20

< 6 >
**6** 1:24 4:15 7:4 20:17 54:2
**6/1/20** 4:21
**6TH** 6:6

< 7 >
**7** 4:3
**768** 9:3

< 8 >
**8** 4:4 41:10 42:14, 21
**8:00** 15:6 27:4 29:14, 20, 25 37:5
**8:30** 37:5
**8th** 37:5, 11, 16, 24 38:13, 23 39:10, 20 42:9, 15, 16 46:16

< 9 >
**9** 4:9
**9:53** 36:24
**9th** 37:6

< A >
**a.m** 6:7 7:5 15:3, 6 27:4 29:14, 25 32:15 36:24 37:5
**ability** 53:12
**accelerate** 38:23
**accelerated** 37:24 39:10
**accelerating** 38:2, 12 39:19
**acceleration** 38:25 39:12
**accurate** 54:10
**action** 53:15
**activities** 27:2
**additional** 14:24 52:2
**additions** 26:24
**address** 9:2
**advance** 50:10
**affirm** 8:3
**ago** 9:13 27:1 44:11
**Agree** 31:6, 8
**agreed** 6:10 26:21 31:17
**agreement** 7:19
**ahead** 8:10 18:14, 21 20:9 23:2 25:19 27:19, 23 28:23 42:6
**AL** 1:12 2:16 54:4
**allow** 10:14 11:5, 14
**alternate** 37:7
**and/or** 54:11
**announce** 7:12, 23
**answer** 8:17, 22 10:11, 13, 14 11:1, 5, 11, 14, 20 15:22 16:24, 25 17:15 18:21 19:20 20:7 23:2 25:7 28:21, 24 30:15 31:24 37:19 38:6, 15 39:1, 14 41:6 42:7 44:12 47:17 48:20 51:21
**answered** 22:25 23:1 25:6, 18 38:14 39:3, 13 40:23 41:5, 11 44:10 45:19 51:20
**anybody** 12:6 24:6 25:23 49:4
**appear** 18:11 30:19
**APPEARANCES** 2:1 3:1
**April** 4:16, 18 23:22 27:16 28:1 29:6, 9
**Arthur** 3:13 7:10
**asked** 18:13 22:25 25:6, 18 38:14 39:13

40:23 41:5, 11 45:13, 19 51:20
**asking** 8:14, 23
**assess** 19:3, 5, 9, 11, 14, 15, 18
**assessed** 18:1 44:7 46:1
**assessing** 19:1 20:25 21:10
**Assessment** 4:13 17:2 42:25 43:10, 24 45:8, 17
**assistant** 14:25 27:20 32:10, 25 35:11 36:20
**assistants** 13:20, 23
**Attached** 20:20
**attachments** 21:7
**attorney-client** 11:3
**attorneys** 10:23
**available** 28:19 32:20 33:21 37:4
**Avenue** 2:8
**aware** 10:5, 8, 17 34:8 40:16 50:17 51:9

**< B >**
**back** 13:3 46:11, 16 49:25 50:11
**Bailey** 2:6 7:24
**BANCORP** 1:12 2:16 3:3 7:7 54:4
**Bank** 3:6 7:21 9:11 12:2 17:3 21:12 39:12 43:2, 11, 25 44:9 45:9, 18 46:2 48:8, 16 50:20
**BARRETT** 1:4
**based** 10:11
**basically** 13:4
**Bates** 12:21 13:13 16:12 19:24 27:9 28:5 30:7 32:3 35:2 36:11 41:18
**Beaudin** 12:14 13:5, 22 15:3 17:12, 21, 25 18:25 20:14 21:6 26:15 27:5 28:2 30:3 31:3 33:3 37:16 38:12, 22 39:8 41:10 42:14, 20 46:14
**beginning** 7:5 23:12 31:15 51:3
**begins** 35:19
**BEHALF** 2:3, 15 3:3 7:14, 17 19:1
**believe** 24:25 40:8
**bes@sspfirm.com** 2:13
**best** 53:11
**beyond** 16:21 18:19 19:19 20:5 30:13 31:22
**bios** 19:16, 21 20:20 21:5, 8
**Blank** 2:18 7:16
**board** 19:13, 14 20:21 22:11, 21, 24 23:19, 22 24:1, 3, 7, 10, 15, 18 25:1, 3, 11, 25 26:5 31:13, 19 40:1, 10, 11, 12, 15 41:1 43:13 48:10, 13, 23 49:1, 4, 5, 6, 10, 16, 21, 24 50:13, 23 51:1, 5, 8, 11, 17
**Bob** 15:13 21:3 32:16, 17, 18 33:7, 18, 19 34:14 37:1
**bottom** 12:24 36:22
**bouts** 37:10
**Brian** 3:5 7:20
**brian.thomas@53.com** 3:11
**BURGUNDY** 1:25 6:10 7:12 53:22
**business** 22:6, 12 47:1, 20 48:2

**< C >**
**call** 7:23 31:2 37:2, 15
**calls** 10:11
**cancel** 32:17 33:17
**canceled** 49:22
**canceling** 46:12
**capital** 26:22 49:11, 15, 17, 19 50:19, 24
**Caption** 54:3
**captioned** 54:8
**care** 47:4
**Carmichael** 28:10 29:4, 8, 22 30:4, 20, 23 31:7 39:19 42:9 49:3, 6 51:25
**CASE** 1:5 7:9, 18 10:6, 9, 19, 24 11:9, 19 12:6 52:3, 6 54:3
**Cedar** 9:3
**CENTER** 6:5
**CEO** 15:11 17:2 20:24 21:11, 23 22:2, 9, 17 23:20 24:2, 4, 22 25:4, 17 26:5, 12, 16 31:21 34:10 40:1, 5 41:2 43:2, 11, 25 44:8 45:9, 18 46:2 48:7, 15 49:8, 16 50:15, 21 51:12, 19
**CEO's** 15:12
**certain** 15:10 21:22 22:1, 15
**certainly** 44:14 52:4
**CERTIFICATE** 53:1
**certify** 53:4, 12
**cetera** 38:5
**chain** 14:21 29:24 30:19
**change** 23:10 55:4, 7, 10, 13, 16, 19, 22 56:4, 7, 10, 13, 16, 19, 22
**changed** 9:4 37:14, 18, 21 38:8, 11 39:11, 16 46:19
**changes** 54:11, 14
**changing** 47:4, 9
**chief** 9:10
**Cincinnati** 2:9, 20 3:8 6:6 7:10
**Cioffi** 2:17 7:16 10:10, 25 11:10, 20, 25 15:21 16:18 17:13 18:3, 11, 15 19:19 20:4 22:25 25:6, 18 28:11, 19 30:12 31:22 33:10, 14, 16 37:17 38:3, 14, 24 39:3, 13, 21 40:13, 23 41:5, 11, 23 42:7 43:3 44:10 45:19 48:18 51:20 52:4
**circumstances** 23:2
**Civil** 6:8
**clarifications** 16:6
**clarify** 16:8
**clear** 12:20 18:6, 15
**clearer** 8:20, 24
**clearly** 18:8 19:12
**comments** 26:24
**COMMISSION** 53:24
**committee** 24:16, 17 25:9 26:23 49:11, 12, 15, 18, 19, 25 50:24
**communicate** 25:4 51:16, 22
**communicated** 23:24 45:3, 11 51:10
**communication** 25:2 51:13
**communications** 10:6, 18 51:13
**comp** 49:15, 17, 19 50:24
**company** 22:6, 12 23:9 24:4, 11, 20 25:11 26:2 31:16 48:11, 22 49:7, 15 50:14 51:11, 18
**compensation** 26:23 50:19
**completed** 6:13
**compliance** 24:17
**concluded** 52:20
**confidentiality** 22:20, 23 23:6 31:20 34:10 40:5
**confirm** 14:20
**consistent** 35:25
**constant** 49:13
**constantly** 46:25
**constitutes** 53:10
**context** 33:16
**CONTINUED** 3:1 5:1 47:14 50:12
**continuing** 52:1
**conversation** 49:6 51:5

**conversations** 26:4 31:18 39:25 42:24 43:19 44:5, 12, 19, 22, 24 45:2 49:3 51:7
**copying** 20:15
**corner** 12:24
**coronavirus** 15:9 21:21 22:5 23:12, 18, 23 46:20 47:7, 10 48:6, 15 49:13, 22
**correct** 9:13, 14 12:22, 24 13:1, 15, 24, 25 14:4, 6, 21 23:20 30:20 32:12, 25 33:1 35:7, 14, 23, 24 36:2, 6, 8, 16, 24 37:12 41:4, 15 47:12, 15 49:22 50:4
**corrections** 54:11
**correctly** 32:22
**correspondence** 10:17
**Counsel** 3:6 10:11, 14, 15 11:3, 12, 13, 14, 21 12:1 16:18 18:5 20:7 28:22 30:15 38:5, 25 39:22 41:23 53:13
**COURT** 1:1 4:9 6:11 7:8, 11 8:1, 17 18:18 28:22 52:7 53:23
**Court's** 16:21, 25 18:4, 7, 8, 19 19:20 20:6 28:13, 18 30:14 31:23 42:2
**COVID** 31:15, 19 34:6
**created** 22:8 47:11
**creates** 23:9
**credit** 47:21, 22
**current** 9:7, 9 32:18 33:19 34:3, 4 38:10, 17, 21 39:6, 11
**customer** 47:3
**customers** 22:7, 13 24:11 25:12 47:24 48:4, 23

**< D >**
**DATE** 1:24 20:16 23:16 41:15 51:23 53:5 54:2
**dated** 4:11, 12, 15, 16, 17, 19, 21, 23 5:4 32:11
**dates** 32:19 33:20 37:8 44:18
**day** 6:6 16:7 19:3 26:8 48:4 50:8 54:16
**days** 15:8 21:21 23:15 32:19 33:20 34:15, 18, 21, 24 35:23 38:22 39:9
**dealing** 49:14
**December** 20:22
**decided** 43:13
**decision** 19:14
**DECLARATION** 54:5
**declare** 54:6
**deep** 31:14
**DEFENDANT** 3:3 7:17
**Defendants** 1:13 2:15 7:17, 20
**delay** 23:19 24:2 26:2 34:5
**delayed** 24:23 25:5, 17 26:6 37:23
**delaying** 15:8 21:20 23:15 38:21
**deletions** 26:24
**DEPONENT** 1:23
**deposed** 9:19
**deposit** 47:23
**deposition** 6:4, 7 7:5 9:5, 13, 22 10:22 11:18, 24 12:7 16:22 42:2 52:5, 18, 20 54:1, 8, 12 55:1 56:1
**depositions** 11:8
**details** 44:15 50:1
**development** 17:2
**Development/CEO** 4:14
**different** 38:18
**differently** 31:4
**digitally** 53:9
**DIRECT** 4:4 8:8 45:6, 7, 11, 15, 16, 25
**direction** 53:10
**directly** 25:8, 20 41:1 49:9 53:14
**discuss** 15:13 43:9
**discussed** 11:23 12:6 15:8 21:20 30:2 42:20 44:6 50:18, 22 51:2
**discussion** 20:22 23:14, 17 24:25 25:15 49:14
**discussions** 23:21 24:9, 13 25:10, 25 39:18 43:13 44:2 49:20
**DISTRICT** 1:1, 2 7:7, 8
**DIVISION** 1:3 7:8
**document** 9:25 10:2, 3 12:13, 21 13:13 16:17 17:5, 7, 8 20:3, 20, 21 27:13 28:17 30:11 32:8 35:9 36:18 41:21, 25
**documented** 44:24 50:15 51:7, 13
**documents** 10:8, 11, 24 11:2, 5, 6, 13, 16 16:23 18:9, 18, 21 52:2
**doing** 43:10, 23 45:8, 17
**draft** 17:7
**Drive** 9:3
**due** 38:20 39:6
**duly** 53:7
**dysfunction** 47:10

**< E >**
**earlier** 39:6 46:11, 24 49:10 51:4
**early** 39:8 46:13 47:11 48:9, 16 50:15
**East** 2:19
**effect** 48:7
**effective** 48:16
**either** 53:13
**E-mail** 2:11, 22 3:10 4:10, 12, 15, 16, 21, 22 5:3 12:14, 15, 19 13:4, 5, 6, 19, 21 14:21 15:2, 4 17:21, 22 20:14, 16, 18 21:19 26:11 27:3 32:9, 11, 14 35:10, 13, 19 36:4, 7, 19, 22 37:10 42:8, 16 45:3, 12
**e-mails** 14:2, 12, 24 46:12
**employee** 53:13
**employees** 22:8, 13, 21 24:12 25:12 47:3
**employment** 9:7, 9
**ends** 52:18
**engagement** 17:9
**enterprise** 43:14, 17, 19, 22
**entire** 22:24 26:22 54:7
**environment** 32:18 33:19 34:3, 4 38:11, 17, 21 39:7, 11
**Erie** 2:8
**ERRATA** 54:1, 13 55:1 56:1
**Esquire** 2:4, 5, 6, 17 3:4, 5
**ET** 1:12 2:16 6:7 38:5 52:20 54:4
**evaluating** 43:15
**eventually** 37:11
**exact** 26:17, 19 51:23
**exactly** 15:24 27:14
**EXAMINATION** 4:4 8:8
**exchange** 4:10, 12, 17, 19, 21, 22 5:3 12:15 13:4, 21 28:10 29:4 32:9, 11 35:10, 13 36:5, 19 37:10
**exchanges** 13:19 45:24
**Excuse** 9:25 13:5 26:9 27:8 34:13

**Executive** 4:13 13:20, 22 17:2 35:10 36:20
**executives** 15:10 21:22 22:2, 15, 20 23:6
**Exhibit** 4:8, 9, 10, 12, 13, 15, 16, 17, 19, 21, 22 5:2, 3 9:21, 23 10:1 12:10, 11, 20 13:10, 11, 17 14:2, 12, 13, 20, 23 16:12, 15 17:11 19:24 20:1, 12 21:4 27:9, 11 28:5, 7 30:7, 9 32:3, 6 35:2, 5, 14, 15, 21, 25 36:4, 11, 14 41:17 42:19, 23 43:8 44:6 45:25
**EXHIBITS** 4:7 5:1
**exist** 52:8
**EXPIRES** 53:24
**extent** 10:10 11:1, 11

< F >
**far** 28:22 31:25 34:12 42:1
**FEDERAL** 6:8
**feedback** 45:14
**feel** 8:15 50:19
**feeling** 47:6
**felt** 48:10, 23 49:1, 6 50:13 51:11, 17
**FIFTH** 1:12 2:15, 19 3:3, 6 6:5 7:7, 21 9:10 11:24 12:2, 7 17:3 21:12 34:9 38:11, 17 39:7, 11 40:2, 4 41:2 43:2, 11, 25 44:7, 8 45:9, 18 46:2 48:8, 16 54:4
**FifthThirdMcHugh005687** 12:21
**FifthThirdMcHugh005688** 12:22
**FifthThirdMcHugh005951** 19:25
**FifthThirdMcHugh006414** 41:18
**FifthThirdMcHugh006415** 41:19
**FifthThirdMcHugh006699** 16:13
**FifthThirdMcHugh006709** 16:14
**FifthThirdMcHugh0213076** 28:6
**FifthThirdMcHugh0213078** 30:8
**final** 17:8
**financially** 53:14
**finish** 8:21 39:2
**firm** 12:1
**first** 24:19 31:2 32:14 33:3 53:7
**five** 26:25
**fluid** 23:17
**focus** 22:5 24:10 25:10, 15 26:1
**folks** 43:16
**following** 27:5 37:4
**foregoing** 53:4
**foremost** 24:19
**form** 15:21 17:13 37:17 38:3 39:21 43:3 48:18 53:10
**forth** 24:17 26:18
**forward** 48:1, 24 49:7 50:14, 20 51:12, 19
**foundation** 31:23 37:18 38:4, 24 40:13
**Fountain** 3:7 6:5 7:9
**Four** 38:22 39:9
**frame** 43:4 47:8
**free** 8:15
**frequently** 23:22
**Friday** 15:6, 13 27:4, 5, 16
**full** 50:23
**Funk** 3:13 7:10

< G >
**General** 3:6
**getting** 17:9 24:11 31:5, 10 40:9
**give** 8:4 9:2 47:7
**given** 15:9 21:21 32:18 33:18
**go** 8:10 18:14, 21 20:8 22:22, 24 23:2 25:18 26:20 27:19, 23 28:23 40:10, 12, 16 42:6 43:13 46:4 48:13 49:20, 25 50:11 52:12
**going** 8:13 10:12, 25 13:3 16:23 23:11, 25 24:5, 18 26:20 28:20 29:25 40:12 43:1, 10, 14 46:11 47:11 48:3, 9, 10, 22 49:16 51:6
**good** 14:19 20:19 32:16 48:4 52:17
**governance** 50:2
**Greg** 15:7, 12 20:25 21:19 23:14, 21 24:1, 24 25:3, 24 26:4, 12, 15, 21 27:16 28:2 29:22 31:17 39:18 40:16, 19 42:8 43:12, 19 49:3, 6 51:4, 10, 16, 22
**Greg's** 27:20 51:12
**guess** 30:1
**guidance** 45:12
**Guy** 12:14 13:19 15:5 17:12, 21, 25 18:25 20:14, 19 23:24 26:15, 21 27:5, 16 28:2 29:14, 22 31:2 32:9, 16 33:3 35:16 36:2 37:2, 3, 16 38:12, 22 39:8 42:14
**Guy's** 23:15 35:11 36:20 45:11

< H >
**half** 27:1
**handed** 9:20 10:1 12:9 13:9 16:11 19:23 27:7 28:4 30:6 32:2 35:1 36:10 41:16
**handful** 18:17
**handle** 47:3
**happened** 47:8 50:8
**hard** 15:23
**heads** 8:18
**hear** 8:15 24:6 25:23
**held** 9:12
**helpful** 20:23
**Hennard** 34:14 35:21 36:23
**Hennard's** 35:19
**hereof** 54:13
**Hi** 37:1
**highest** 23:9
**house** 12:2
**human** 26:22 49:11, 15, 17, 18 50:19, 24

< I >
**idea** 17:16
**identification** 9:23 12:11 13:11 16:15 20:1 27:11 28:7 30:9 32:6 35:5 36:14
**identify** 12:13 13:17 16:17 20:3, 12 27:13 30:11 32:8 35:9 36:18 41:21 44:18, 21
**impact** 48:7, 15
**impacting** 48:3
**impacts** 47:6 48:22
**inaccurate** 48:19
**inappropriate** 28:13
**includes** 14:12, 23 35:13, 18
**including** 43:15
**incomplete** 33:10
**INDEX** 4:1
**indicate** 34:13 49:4, 5
**indicated** 23:19, 23 26:5 34:17 38:20 39:6 41:23 51:25 54:12
**indicates** 18:8 21:19 27:3 32:24 33:7 34:14 35:22
**indication** 50:13
**indirectly** 53:14
**individual** 21:17

**individuals** 18:1 19:1, 3, 5, 9, 11 21:11, 17 42:23, 25 43:7, 9 44:5 45:4, 24
**information** 20:25 32:17 33:8, 18, 24, 25 37:25 38:4 42:17, 18, 19
**informed** 24:22
**informing** 25:24
**initial** 33:5 43:12
**initially** 19:16
**in-person** 49:23
**instance** 47:21
**instruct** 10:13, 25 11:10 16:23 28:21 33:11
**instructions** 8:25
**intact** 50:3
**interaction** 45:16
**interested** 53:14
**internally** 15:10 21:22 22:2
**interview** 45:13
**introduced** 22:14
**invade** 11:3
**involved** 43:15 45:23
**issues** 14:15 16:4, 5, 7 34:7
**It'd** 29:10

**< J >**
**Jadene.poole@53.com** 3:10
**jms@sspfirm.com** 2:12
**job** 48:4, 11, 12
**jobs** 47:2, 22
**joint** 7:19
**Josh** 7:14
**Joshua** 2:5
**JUDGE** 1:4
**July** 36:2, 5 37:24 38:12, 22 39:9, 10, 19 46:14
**June** 4:23 5:4 32:11, 15 33:3, 5 36:6, 23 37:5, 6, 11, 14, 16, 24 38:1, 10, 13, 21, 23 39:8, 10, 20 40:4, 21 41:3, 10 42:9, 14, 15, 16, 21 46:12, 14, 15, 16, 20 47:12, 19, 25 48:9, 17 50:15 51:17

**< K >**
**keep** 50:2
**kick** 34:18, 20
**know** 9:15 17:19, 22 20:23 21:1, 13 22:10, 19 23:9, 23 24:9 26:20, 25 27:1, 14 31:13, 18, 25 33:5 34:12 37:3 38:16 40:10 42:15 44:2 45:11 46:21, 22, 25 47:6, 19 49:1, 10, 12 50:3

**< L >**
**L.P.A** 2:7
**lack** 31:23 38:24 40:13
**Lacks** 37:18 43:4
**language** 18:20
**Law** 2:7
**lawyers** 7:21
**led** 38:12
**level** 23:9
**limitations** 16:25
**line** 41:25
**Lisa** 27:20 37:1
**listed** 30:24 42:23 43:7 44:6 45:24
**literally** 38:5
**litigation** 11:23
**LLP** 2:18
**location** 52:2
**locations** 44:21
**long** 47:5
**longer** 48:7, 15
**look** 18:8 30:16 35:18 50:1, 11
**looking** 12:23
**looks** 15:7, 15, 17 27:14 29:5
**lot** 14:15 20:22 22:8 31:15 38:18 46:22 47:19, 24 48:2
**Loveland** 9:3

**< M >**
**mail** 45:24
**mailing** 17:12
**main** 25:10, 15
**maintain** 22:19, 23 23:5
**maintaining** 31:20 34:9 40:5
**making** 18:25 19:10 22:6 38:5 47:3
**MALONEY** 1:25 6:10 7:12 53:22
**management** 25:10 48:11
**March** 4:11, 15 13:5, 6, 7 14:3, 4, 5, 8 15:3 17:24 18:24 20:17 21:16 23:18, 22 46:22 47:24
**marked** 9:21, 23 10:1 12:10, 11 13:10, 11 16:12, 15 19:24 20:1 27:8, 11 28:5, 7 30:7, 9 32:3, 6 35:2, 5 36:11, 14 41:17, 24
**materials** 9:19 11:12
**matter** 7:6 53:9 54:8
**MCHUGH** 1:7 2:3 7:6, 15 19:17 21:5 54:3
**mean** 22:18 24:10 25:20 38:16, 17 44:13 48:20, 21 50:22
**meant** 15:20
**meet** 29:15, 20 32:18 33:19 34:14
**Meeting** 4:23 5:3 15:6 26:18 27:4, 5, 15, 24 28:1 29:14, 22 30:3 32:17 33:3, 18 34:18, 21 35:11, 22 36:1, 5 37:11, 23 38:2, 12, 21, 23 39:8, 9, 12, 19 41:10, 14 42:14, 20 46:13, 15 50:7, 12, 19 51:1
**meetings** 24:15, 16, 21, 24 25:3, 9, 16 33:4, 6 43:22 44:1 49:11, 12, 21, 24, 25 50:1, 4, 9, 23
**member** 49:5
**members** 40:1 43:14, 22
**mentioned** 48:12
**Message** 4:17, 19 28:9 29:4, 7, 13, 24
**messages** 45:23
**MICHAEL** 1:4 2:17 7:16
**Michael.cioffi@blankrome.com** 2:22
**mind** 32:19 33:20
**mindful** 16:24
**mine** 45:1
**minute** 47:5, 9
**minutes** 51:8
**missed** 15:18
**missing** 15:16
**Misstates** 40:14
**mode** 31:5, 10
**moment** 14:16
**Monday** 32:15 37:2, 5, 13
**month** 38:2
**monthly** 31:2 33:2, 4, 6
**morning** 20:19 32:16
**move** 48:1 49:7 50:10, 14 51:11, 18
**moved** 49:24
**moving** 47:1 48:24 49:2

**< N >**
**name** 8:11
**necessitate** 34:4
**necessitated** 37:15 38:1
**need** 8:17 47:17 51:18
**needed** 16:8 22:6, 12 23:13 31:15, 17
**needs** 47:3
**never** 19:2, 4

**new** 32:17 33:7, 18, 23, 24 37:25 38:4
**nice** 48:11, 12
**No._____Change** 55:2, 5, 8, 11, 14, 17, 20 56:2, 5, 8, 11, 14, 17, 20
**No._____Line** 55:2, 5, 8, 11, 14, 17, 20 56:2, 5, 8, 11, 14, 17, 20
**nodding** 8:18
**normal** 49:12
**Notary** 6:10
**NOVEMBER** 1:24 6:7 7:4 54:2
**number** 7:9 9:21 10:1 12:10, 20 13:10, 17 14:2 16:12 17:11 18:9, 10, 13 19:24 20:12 25:13 26:1 27:9 28:5 30:7 32:3 35:2, 14, 21 36:1, 11 39:3 42:19, 24 43:8 44:6 45:25
**numbers** 12:23

**< O >**
**oath** 54:15
**object** 52:4
**Objection** 10:10, 25 11:10, 25 15:21 16:18 17:13 18:3 19:19 20:4 22:25 25:6, 18 28:11 30:12 31:22 33:10 37:17 38:3, 14, 24 39:13, 21 40:13, 23 41:5, 11, 23 43:3 44:10 45:19 48:18 51:20
**obtain** 34:1 37:25
**obviously** 14:23 16:6 42:16
**occurred** 36:7
**October** 47:14
**offer** 54:14
**officer** 9:10
**offshore** 47:2
**Oh** 12:23 14:19 19:6 35:19 47:13
**OHIO** 1:2 2:9, 20 3:8 6:6, 11 7:8, 10 9:3 53:2
**Okay** 7:22 8:1, 7 9:15 12:18, 25 13:3 14:23 25:2 27:20 29:6 33:2 35:25 39:21 41:21 42:11 44:4 50:6 52:2, 17
**once** 26:20 43:13
**one-pagers** 20:20
**ongoing** 50:4
**onshore** 47:2
**operations** 22:7, 13 47:1
**Order** 4:9 16:21 18:4, 8, 12, 15, 20, 21 19:20 20:6, 8 28:13, 18 30:14 31:23 42:2 52:10, 12
**orders** 18:7
**originally** 31:12 37:23 50:8
**outside** 12:7 18:3, 7 28:12, 22 42:1
**overall** 31:19

**< P >**
**p.m** 52:20
**Page** 4:2, 8 5:2 14:18 32:14 36:23 43:16 53:6 55:2, 5, 8, 11, 14, 17, 20 56:2, 5, 8, 11, 14, 17, 20
**part** 14:13, 21 16:19 18:1 20:4 25:15 28:11 30:12
**particular** 7:18 10:12 17:17, 20 34:23 47:8
**parties** 7:12
**Party** 27:8
**Pas@sspfirm.com** 2:11
**Paul** 8:12
**Paula** 15:1, 5 27:3 32:9, 20 34:13, 17 35:19, 21 36:23
**pause** 31:13
**PENALTY** 54:5, 6
**people** 19:18 47:1
**Perfect** 52:11, 17
**period** 24:9 25:25 34:23 39:16 41:3 46:16, 21
**PERJURY** 54:5, 6
**permitted** 28:23
**person** 7:22
**personally** 42:24 45:15
**perspective** 50:2
**pertains** 11:2 12:1
**Peter** 2:4 7:14
**petition** 52:7
**Phenise** 3:4 7:20
**PHILIP** 1:7 2:3 7:6, 15 54:3
**place** 28:1 36:6 44:22 46:13 53:6
**Plaintiff** 1:8 2:3 7:15, 25
**planning** 22:10, 14
**Plaza** 3:7 6:5 7:10
**please** 7:12, 23 8:2, 11, 15 9:2 12:13 13:18 15:4 16:17, 24 20:3, 13, 18, 23 21:1 27:13 30:11 31:1 32:8 35:9 36:18 37:3, 7 41:22 52:14, 16
**point** 15:9 16:24 21:21 28:21 31:6, 21 34:11 48:6
**Poole** 3:4 7:20
**position** 9:12 19:4 48:14
**possible** 44:14 47:25
**potential** 19:7, 8
**PowerPoint** 20:21
**prepare** 10:21
**preparing** 48:5
**Present** 3:13 43:18 51:1
**president** 21:11 43:1, 11, 24 44:8 45:9, 18 46:2
**previously** 16:20 18:5, 14 38:20 41:17, 24
**prior** 11:8, 18, 24 12:7 40:14, 21
**priority** 25:13
**privilege** 11:4
**probably** 50:2
**Procedure** 6:8
**proceed** 41:2, 9 50:20
**proceeding** 40:1
**PROCEEDINGS** 4:3 7:1
**process** 15:11 17:8 21:23 22:3, 9, 10, 14, 17, 20, 24 23:8, 20 24:2, 5, 22 25:5, 17 26:2, 6 31:21 34:10 40:2, 6 41:2 43:15 48:8, 16, 24 49:2, 8, 16 50:12, 15, 21 51:4, 6, 19
**product** 11:4
**production** 16:19 18:17 20:5 28:12 30:13
**profile** 15:12 20:25 26:12, 16 33:5
**progress** 52:1
**proposal** 4:11, 13 15:7, 15 16:2, 4 17:1, 10, 23, 25 18:2, 25 19:2, 5, 9, 10, 18 21:6, 10, 14, 16
**propose** 37:7
**provide** 19:17 45:13
**provided** 10:12 11:2, 12, 14, 21
**Public** 6:11
**pursuant** 6:8 7:18
**push** 29:16
**put** 15:20, 22 31:12

**< Q >**
**question** 8:16, 22, 23 11:1 13:3 17:14 18:22 20:10 23:1, 3 28:20 29:1, 3 37:18

38:4 39:2 43:4, 8 44:11 48:19
**questioned** 16:20 18:4 20:6 28:14, 17 41:25
**questioning** 42:1
**questions** 8:14, 22 16:6 20:24 44:2, 11, 15
**quite** 23:22 40:9

< R >
**read** 11:18 15:3 20:18 29:13 31:1 32:22 33:11, 14 52:9 54:7, 9
**reading** 6:12 33:10
**reads** 32:15 37:1
**ready** 22:22, 24 26:20 40:9, 10, 16 48:13 49:20
**reallocated** 47:20
**reallocating** 47:2
**really** 28:22 42:4
**Reason** 55:4, 7, 10, 13, 16, 19, 22 56:4, 7, 10, 13, 16, 19, 22
**reasons** 52:5
**recall** 15:24 16:5 17:24 19:10, 11, 21 21:13, 15, 18 22:18 23:16 26:7 27:6 28:3 29:1 30:2 34:2, 22, 25 37:20 38:7 39:15, 23 40:3, 7, 20, 24 41:7, 12, 14 42:18 43:20 44:1, 3, 4, 14 45:5, 10, 20 46:3, 17 49:23 50:25 51:3, 15
**recess** 46:7
**recognize** 17:10, 14 28:9 29:3
**recollection** 21:4, 9 29:21 42:13
**recommendation** 19:12
**record** 7:3, 13, 23 8:11, 20, 24 46:4, 6, 9 52:8, 12, 19 53:11
**recorded** 53:9
**recorder** 7:11
**reduced** 53:9
**refer** 14:17 29:6 30:22
**reference** 33:23
**referenced** 12:4 22:15 26:9 35:13
**references** 35:21
**referencing** 17:17, 20
**referring** 17:11 35:12, 17, 20 36:4, 21
**refresh** 21:4, 9 29:21 42:13
**regarding** 42:25 43:23 45:16 46:1
**regular** 24:15
**related** 18:20 39:12
**relating** 18:9
**relative** 53:13
**remember** 16:9 22:4 26:17, 19 27:25 30:5 51:23
**reminder** 8:13
**repeat** 8:16 23:3 42:3 43:5
**rephrase** 8:16
**REPORTER** 1:25 6:11 8:2, 3, 7, 17 52:11, 15, 17 53:1
**REPORTER/NOTARY** 53:23
**reports** 45:6, 7, 11, 16, 25
**represent** 10:2
**representation** 7:19
**representing** 7:19
**Request** 5:3, 4
**requested** 35:19
**reschedule** 35:22
**rescheduled** 36:5 46:14, 16
**rescheduling** 39:7
**residence** 9:2
**resources** 47:2, 20
**respect** 15:2 17:24 23:6 33:23 34:3
**respond** 29:19 31:7
**response** 29:17
**restatement** 48:19
**review** 10:24 16:2 26:23 47:21, 22
**reviewed** 11:8, 12 15:6, 15 17:7 21:16 46:12
**RHR** 10:5, 18 12:14 17:3, 9 19:1, 4, 17 20:14, 15 21:6, 10 27:8 42:25 43:10, 23 44:8 45:8, 17 46:1
**RHRThirdParty00062** 32:4
**RHRThirdParty00063** 32:5
**RHRThirdParty00087** 13:14
**RHRThirdParty00089** 14:17
**RHRThirdParty00092** 13:14
**RHRThirdParty00126** 27:10
**RHRThirdParty00171** 35:3
**RHRThirdParty00173** 35:12, 18
**RHRThirdParty00175** 35:4
**RHRThirdParty00202** 36:12
**RHRThirdParty00203** 36:22
**RHRThirdParty00204** 36:13
**right** 12:16, 19 13:7 14:13, 24, 25 21:7 22:4, 10 23:11, 17 33:15 52:6, 7, 11
**right-hand** 12:24
**risk** 9:10 24:16 47:21, 22 49:11
**ROBERT** 1:23 2:16 6:4 7:6 8:12 52:23 54:19 55:24 56:24
**Rome** 2:18 7:16
**Rules** 6:8

< S >
**Saba** 2:4 4:4 7:14 8:9 9:20, 24 10:16 11:7, 17, 22 12:5, 9, 12 13:9, 12 16:1, 11, 16 17:4, 18 18:6, 13, 23 19:23 20:2, 11 23:4 25:14, 22 27:7, 12 28:4, 8, 16, 25 30:6, 10, 18 32:2, 7 33:22 35:1, 6 36:10, 15 37:22 38:9, 19 39:2, 5, 17, 24 40:18, 25 41:8, 13 42:5, 10 43:6 44:17 45:22 46:4, 10 48:25 51:24 52:12, 14, 16
**sake** 8:17
**save** 54:10
**Saying** 15:11 24:1, 21 26:11 40:21 43:21 48:20
**says** 29:24
**schedule** 37:2, 11 49:12
**scheduled** 33:2, 6 36:1 50:8, 9
**scheduling** 18:18
**scope** 18:4, 7, 19 19:19 20:5 28:12, 18 30:14 31:23
**screen** 30:17
**second** 15:14 26:11 30:24 32:14
**see** 14:14 17:19 21:2, 24 26:13 29:8, 17 30:24 31:4 32:22 33:8 34:15 35:15 37:8 41:19 42:18 43:16
**seen** 9:25 10:3 17:5
**send** 19:16 21:1, 8
**sending** 19:21 21:5 32:19 33:20
**sent** 15:2 17:23 21:14 26:22 29:7 30:23 32:25 36:23
**sentence** 15:14 26:9, 10, 11 33:11
**sentences** 33:14
**separately** 43:21
**series** 8:14 43:7

**service** 47:23
**services** 47:23
**set** 4:22 15:5 27:4, 15 33:4 53:6
**setting** 35:11 36:5
**SHAFFER** 1:23 2:16 6:4 7:6 8:10, 12, 13 9:20 12:9 13:9 16:11 19:23 20:9 27:7 28:4 29:1 30:6 32:2, 16 35:1 36:10 37:1 41:9, 16, 17 42:6 46:11 51:24 52:23 54:19 55:24 56:24
**S-H-A-F-F-E-R** 8:12
**shaking** 8:18
**Sharpe** 2:6 7:24
**SHEET** 54:1, 13 55:1 56:1
**shut** 47:22
**shutting** 23:12 46:24
**sign** 52:9
**signal** 15:10 21:22 22:1, 16
**SIGNATURE:________________________DATE** 55:23 56:23
**signed** 17:9 54:16
**signing** 6:12
**similar** 35:20
**similarities** 20:22
**sit** 21:15 44:4
**skill** 53:12
**Smith** 2:5 7:14
**solely** 24:10
**solemnly** 8:3
**sorry** 9:8 13:21 27:19, 23 35:20 47:18 49:18
**sort** 50:23
**source** 10:14
**SOUTHERN** 1:2 7:8
**speak** 17:6 43:9 45:7
**speaks** 18:16
**specific** 25:16 44:1 50:7
**specifically** 16:9 17:6, 15 34:22 35:17 36:21 45:25 46:21 50:18, 25 51:16
**specifics** 30:5 44:3 47:7
**spell** 8:11
**Spence** 19:15, 17 21:6 43:1, 10, 24 44:7 45:8, 17 46:1
**Square** 3:7 6:5 7:10
**SSP** 2:7
**stabilize** 22:12 24:19 46:25 47:20 48:12
**stabilized** 23:13 24:4, 11 25:12 26:3 31:16 48:2, 24 49:2, 7 50:14 51:18
**stabilizing** 49:14
**stable** 22:7 47:25 50:20 51:11
**staff** 23:7
**stamped** 12:21 13:13 16:13 19:25 27:9 28:6 30:8 32:4 35:3 36:12 41:18
**start** 15:8 21:20 22:5, 14 23:15, 20 26:15
**started** 31:6, 11 40:9 47:22 49:9
**starting** 15:11 21:23 22:2, 9, 16 23:18
**State** 6:11 8:10 53:2
**stated** 19:13 52:5
**statement** 25:16 33:12
**STATES** 1:1 7:7
**stay** 31:5, 9
**stepped** 27:24
**STIPULATION** 6:1
**Street** 2:19
**Strike** 35:20
**subject** 52:1
**submitted** 21:10 53:25
**subsequent** 24:8
**substantially** 31:6, 10
**Succession** 4:14 15:11 17:3 21:23 22:3, 10, 17 23:20 24:2, 5, 22 25:5, 17 26:6 31:21 34:10 40:2, 5 41:2 48:7, 16 49:8 50:15, 21 51:12, 19
**supplemental** 9:19 16:19, 22 18:17 20:5 28:12 30:13
**supposed** 46:13
**Sure** 8:12 14:15 15:5 17:7 19:6, 7 22:6 27:18 34:19 43:7, 12 47:3, 25 49:23 50:22
**swear** 6:12 8:2, 3
**sworn** 53:7

**< T >**
**take** 18:18 22:11 28:1 42:2 46:13
**taken** 6:4, 8 8:21 46:7 47:4 53:5, 11 54:2, 8
**talent** 20:21
**Talk** 10:23 20:19
**talked** 19:6 24:24 31:3 43:14
**talking** 19:11 24:18 26:7 45:10
**targeted** 16:22 18:16 28:13 30:14 42:2
**team** 25:11 43:17, 19, 22 47:21 48:11
**Telephone** 2:10, 21 3:9
**tell** 40:19
**testified** 26:21 49:10
**testify** 53:7
**testifying** 38:25 39:22
**testimony** 8:4 40:14
**Text** 4:17, 19 28:9 29:4, 7, 13, 24 30:17, 19, 22 45:3, 23
**Thank** 8:7 14:19 51:24
**Thanks** 15:5, 13 21:2 32:20
**thing** 15:7 21:19 24:19
**things** 23:13 31:16 38:18 47:4, 9 48:2, 12
**think** 18:19 31:4, 9 40:8 45:12
**THIRD** 1:12 2:16 3:3, 6 6:5 7:7, 21 9:10 11:24 12:2, 7 17:3 21:12 27:8 29:10 34:9 38:11, 17 39:7, 12 40:2, 4 41:3 43:2, 11, 25 44:8 45:9, 18 46:2 48:8, 16 54:4
**Thomas** 3:5 7:20
**thought** 20:23
**three** 14:4, 5 19:1, 3, 5, 9, 11, 22 21:10, 14, 17 44:11 50:9
**throws** 31:14
**THURSDAY** 6:6 7:4
**Tim** 19:15 43:1, 10, 15, 24 44:7 45:8, 11, 17 46:1
**time** 7:4 9:4 20:8 22:11 23:11, 16 24:9 25:25 26:21 28:14, 23 31:21 34:11, 23 39:16 40:7 42:4 43:4 46:5, 8, 16, 21 47:5, 8, 18 48:6 49:19 52:19 53:5
**times** 32:19 33:21 37:7 39:4 46:24
**timing** 26:17, 19 27:1
**Title** 53:6
**Today** 7:4 9:15, 18 19:4 21:15 29:15 31:3 44:4 47:6 48:14
**today's** 10:21
**told** 23:19 34:19, 20 40:11, 16, 21 41:1
**top** 14:18 29:9, 11 35:18
**topic** 43:23 50:18
**transcript** 6:13 52:9, 10, 13 53:5, 11 54:7
**tried** 50:2

**true** 45:6 53:11 54:10
**truth** 8:5 53:7, 8
**try** 8:22
**trying** 33:25
**Tuesday** 37:3, 6
**turmoil** 46:23
**Tuzun** 19:16 21:5
**two** 12:16 18:10, 13 32:10 50:9
**two-page** 10:2 12:21
**typewritten** 53:10
**typo** 15:16

< U >
**uh** 8:18
**Uh-huh** 14:1 26:14 47:16
**uh-huh's** 8:19
**uh's** 8:19
**uncertainty** 22:8 23:10 31:14 46:23
**understand** 8:15, 24
**understanding** 9:17 18:24 54:13
**UNITED** 1:1 7:7
**update** 21:1 26:16 31:2
**updated** 15:12 26:12
**use** 20:21, 25
**utter** 42:4

< V >
**verbally** 8:18 47:17
**version** 17:17, 20
**VIDEO** 6:4 8:20 52:15
**Videographer** 3:13 7:3, 11, 22 8:1 46:5, 8 52:18
**videotape** 52:10
**view** 31:17
**violating** 20:8 30:15
**violation** 42:1
**virtual** 49:24
**vs** 54:4

< W >
**wait** 8:21 23:25 24:3 31:17
**waiting** 33:25
**waived** 6:13
**want** 19:14 21:1, 2 22:1, 16, 19, 23 23:5 26:24 29:15 35:22
**wanted** 22:11 23:25 24:3, 10 26:19 31:13 37:15 40:10, 11, 12 48:9, 10 49:16
**wanting** 15:9 21:22
**waste** 28:14 42:4
**wasting** 20:8 28:23
**way** 53:14
**week** 33:3 37:3
**well** 17:6 18:6 22:4 23:21 24:15 27:20 28:17 31:14 35:17 37:23 40:15 49:24
**went** 33:4
**we're** 36:21 47:5 49:14 52:1
**WESTERN** 1:3 7:8
**we've** 46:11
**Wires** 27:20
**withheld** 10:6, 8, 18
**WITNESS** 2:15 6:12, 13 7:18 8:2, 6 10:12, 15 11:1, 2, 6, 15, 21 12:3 15:24 16:20 17:1, 16 18:22 19:21 20:10 23:3 25:8, 20 30:16 31:25 33:11, 13, 15, 17 37:20 38:7, 16 39:15, 23 40:15, 24 41:7, 12, 24 42:8 43:5 44:13 45:20 48:21 51:22 52:9 53:4
**word** 15:16, 18, 19, 25 20:20
**words** 18:11 22:18
**work** 11:4 15:5, 8 21:20 23:15 27:3 37:7 47:19, 24
**working** 46:25 47:23
**world** 23:12 24:18 46:23 48:3
**would've** 15:25 16:9 23:21 24:16 34:17 38:1, 11 40:11, 16 42:20 43:12
**writing** 44:25 45:4 50:16 51:14
**wrote** 32:16 42:16

< Y >
**Yeah** 12:17 14:9 15:24 21:7 23:5 24:3, 25 28:16 29:5, 10, 12 30:16 32:21 33:14 34:12, 19 37:13 40:24 41:7, 15 42:12 44:13 47:13 48:21
**year** 46:23 47:5
**years** 9:13 27:1 50:10
**Yep** 13:2 29:18

< Z >
**Zoom** 7:23