# Transcript of **Brian Sweeney**

Thursday, May 26, 2022

***Philip R. McHugh vs. Fifth Third Bancorp***

www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO (800.367.3376)
Scheduling@Trustpoint.One

Reference Number: 117162

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| PHILIP R. McHUGH,<br>Plaintiff,<br>vs.<br>FIFTH THIRD BANCORP, et al.,<br>Defendants. | Case No. 1:21-CV-00238-MRB |

Videotaped deposition of BRIAN SWEENEY, a witness herein, taken by the defendants as upon cross-examination, pursuant to the Federal Rules of Civil Procedure and pursuant to notice of counsel as to the time and place and stipulations hereinafter set forth, at the offices of Blank & Rome, LLP, 201 East Fifth Street, Suite 1700, Cincinnati, Ohio 45202, at 9:07 a.m., Thursday, May 26, 2022, before BRUCE L. SANDY, Videographer and ANN BELMONT, RPR, a Registered Professional Reporter and Notary Public within and for the State of Ohio.

- - -

APPEARANCES:

On behalf of Plaintiff:
JOSHUA M. SMITH, ESQ.
Stagnaro Saba & Patterson Co., LPA
2623 Erie Avenue
Cincinnati, Ohio 45208

On behalf of Defendant:
MICHAEL L. CIOFFI, ESQ.
COLLIN D. HART, ESQ.
Blank & Rome, LLP
201 East Fifth Street
Suite 1700
Cincinnati, Ohio 45202

J. PHENISE POOLE, ESQ.
Fifth Third Bank
38 Fountain Square Plaza
MD: 10909F
Cincinnati, Ohio 45202



S T I P U L A T I O N S

It is stipulated by counsel for the respective parties that the deposition of BRIAN SWEENEY, a witness herein, may be taken at this time by the defendants as upon cross-examination and pursuant to the Federal Rules of Civil Procedure and notice to take deposition, all other legal formalities being waived by agreement; that the deposition may be taken in stenotype by the Notary Public Reporter and transcribed by her out of the presence of the witness; that the transcribed deposition was made available to the witness for examination and signature and that signature may be affixed outside the presence of the Notary Public-Court Reporter.



INDEX


| WITNESS | DIRECT | CROSS | RE-DIRECT | RE-CROSS |
|---|---|---|---|---|
| BRIAN SWEENEY | | | | |
| BY MR. CIOFFI: | | 7 | | |

| EXHIBIT IDENTIFIED | PAGE |
|---|---|
| Exhibit 1 statute defining the penalty of perjury under Ohio law | 9 |
| Exhibit 2 notice to take Brian Sweeney's deposition | 22 |
| Exhibit 3 Amended Complaint With Endorsed Jury Demand | 78 |
| Exhibit 4 copy of pages 70, 71, 72, 73 from Phil McHugh's deposition | 124 |

| OBJECTIONS | PAGE | LINE |
|---|---|---|
| MR. SMITH: | 10 | 24 |
| MR. SMITH: | 19 | 7 |
| MR. SMITH: | 19 | 11 |
| MR. SMITH: | 25 | 11 |
| MR. SMITH: | 25 | 19 |
| MR. SMITH: | 26 | 22 |
| MR. SMITH: | 29 | 14 |
| MR. SMITH: | 29 | 22 |
| MR. SMITH: | 30 | 6 |
| MR. SMITH: | 30 | 16 |
| MR. SMITH: | 30 | 23 |
| MR. SMITH: | 31 | 1 |
| MR. SMITH: | 31 | 7 |
| MR. SMITH: | 31 | 20 |
| MR. SMITH: | 31 | 24 |
| MR. SMITH: | 34 | 5 |
| MR. SMITH: | 35 | 4 |
| MR. SMITH: | 36 | 15 |
| MR. SMITH: | 38 | 16 |
| MR. SMITH: | 38 | 22 |
| MR. SMITH: | 39 | 1 |
| MR. SMITH: | 39 | 21 |
| MR. SMITH: | 40 | 10 |
| MR. SMITH: | 40 | 18 |
| MR. SMITH: | 41 | 2 |
| MR. SMITH: | 42 | 10 |
| MR. SMITH: | 43 | 18 |
| MR. SMITH: | 44 | 11 |





| | | |
|---|---|---|
| MR. SMITH: | 45 | 7 |
| MR. SMITH: | 46 | 9 |
| MR. SMITH: | 46 | 19 |
| MR. SMITH: | 47 | 2 |
| MR. SMITH: | 48 | 20 |
| MR. SMITH: | 49 | 3 |
| MR. SMITH: | 49 | 12 |
| MR. SMITH: | 50 | 3 |
| MR. SMITH: | 53 | 15 |
| MR. SMITH: | 53 | 24 |
| MR. SMITH: | 54 | 5 |
| MR. SMITH: | 55 | 11 |
| MR. SMITH: | 56 | 3 |
| MR. SMITH: | 57 | 10 |
| MR. SMITH: | 58 | 4 |
| MR. SMITH: | 60 | 7 |
| MR. SMITH: | 60 | 19 |
| MR. SMITH: | 66 | 11 |
| MR. SMITH: | 68 | 3 |
| MR. SMITH: | 69 | 7 |
| MR. SMITH: | 69 | 24 |
| MR. SMITH: | 70 | 10 |
| MR. SMITH: | 70 | 15 |
| MR. SMITH: | 70 | 25 |
| MR. SMITH: | 71 | 7 |
| MR. SMITH: | 71 | 17 |
| MR. SMITH: | 72 | 7 |
| MR. SMITH: | 73 | 4 |
| MR. SMITH: | 74 | 22 |
| MR. SMITH: | 75 | 9 |
| MR. SMITH: | 76 | 3 |
| MR. SMITH: | 76 | 12 |
| MR. SMITH: | 78 | 6 |
| MR. SMITH: | 80 | 18 |
| MR. SMITH: | 85 | 12 |
| MR. SMITH: | 85 | 17 |
| MR. SMITH: | 89 | 16 |
| MR. SMITH: | 89 | 22 |
| MR. SMITH: | 90 | 7 |
| MR. SMITH: | 90 | 12 |
| MR. SMITH: | 92 | 10 |
| MR. SMITH: | 95 | 3 |
| MR. SMITH: | 95 | 19 |
| MR. SMITH: | 96 | 6 |
| MR. SMITH: | 98 | 4 |
| MR. SMITH: | 98 | 14 |
| MR. SMITH: | 98 | 21 |
| MR. SMITH: | 99 | 2 |
| MR. SMITH: | 99 | 9 |

| | | |
|---|---|---|
| MR. SMITH: | 99 | 18 |
| MR. SMITH: | 100 | 10 |
| MR. SMITH: | 100 | 25 |
| MR. SMITH: | 104 | 19 |
| MR. SMITH: | 104 | 22 |
| MR. SMITH: | 114 | 11 |
| MR. SMITH: | 115 | 1 |
| MR. SMITH: | 116 | 12 |
| MR. SMITH: | 116 | 15 |
| MR. SMITH: | 117 | 19 |
| MR. SMITH: | 118 | 19 |
| MR. SMITH: | 121 | 24 |
| MR. SMITH: | 122 | 2 |
| MR. SMITH: | 126 | 2 |
| MR. SMITH: | 126 | 6 |
| MR. SMITH: | 127 | 9 |
| MR. SMITH: | 127 | 18 |
| MR. SMITH: | 129 | 15 |
| MR. SMITH: | 130 | 11 |



MR. SANDY: Today is May 26, 2022. The time is 9:07 a.m. We're on the record for the deposition of Brian Sweeney for a case pending in the United States District Court, Southern District of Ohio, Western Division, entitled Philip R. McHugh, Plaintiff, v. Fifth Third Bancorp, Defendant, Case No. 1:21-CV-00238-MRB. If at this time all counsel present would introduce themselves for the record, then the witness can be sworn.

MR. SMITH: Joshua Smith, counsel for plaintiff, Phil McHugh.

MR. CIOFFI: Michael Cioffi and Collin Hart for the defendants.

BRIAN SWEENEY,

a witness herein, of lawful age, having been first duly sworn as hereinafter certified, was examined and testified as follows:

CROSS-EXAMINATION

BY MR. CIOFFI:

Q. You've just been administered the oath to answer my questions fully, completely and honestly. Do you understand



that obligation?

A. I do.

Q. Do you understand that this obligation is enforced by the penalty of perjury under Ohio law?

A. I do.

Q. Let's mark this as Exhibit No. 1.

MR. SMITH: Hey, Michael, I do want to make a statement for the record before we get started, just as to the scope of this deposition.

MR. CIOFFI: -- go ahead, Counsel, sure.

MR. SMITH: Yeah. So, I just wanted to state for the record that it's plaintiff's position that this deposition and the scope of it is supposed to be limited to Mr. Sweeney's personal knowledge regarding the search of plaintiff's text messages and the software utilized to do so. Our intent here is not at all to disrupt this deposition to the extent it stays reasonably within those parameters. But if questions do fall outside of that scope, we will be objecting,



and to the extent they continue, we will instruct the witness not to answer pursuant to that limitation.

MR, CIOFFI: Anything further?

MR. SMITH: No, that's it.

(Exhibit 1 identified.)

Q. If you could mark that as Exhibit 1, please. Sir, directing your attention to Exhibit No. 1, this is the statute defining the penalty of perjury under Ohio law. I'll ask you to read in the record Section A. Would you read that, please.

A. No person, in any official proceeding, shall knowingly make a false statement under oath or affirmation, or knowingly swear or affirm the truth of a false statement previously made, when either statement is material.

Q. Do you understand that this is an official proceeding?

A. I do.

Q. Would you read Section B, please.

A. A falsification is material, regardless of its admissibility in evidence,

Page 10

if it can affect the course or outcome of the proceedings. It is no defense to a charge under this section that the offender mistakenly believed falsification to be immaterial.
Q. Directing your attention to that second sentence, what's your understanding of that?
A. It states here, it is no defense to a charge under this section that the offender mistakenly believed a falsification to be immaterial.
Q. Yeah, my question to you is what's your understanding of the meaning of that?
A. That -- that somebody who falsifies and thought it was immaterial to a case is not a defense.
Q. So, in other words, is it fair to say that, this section means, among other things, that I'm asking -- if I ask you a question and you think it's not important, it's okay to falsify it?
MR. SMITH: Objection.
A. Can you restate the question?

Page 11

Q. Sure. If I ask you a question and you think it's not important, you're not permitted, because you think it's unimportant or immaterial to falsify that, your response, correct?
A. Correct.
Q. All right. And read Section D, please.
A. Where contradictory statements relating to the same material fact are made by the offender under oath or affirmation and within the period of the statute of limitations for perjury, it is not necessary for the prosecution to prove which statement was false, but only that one or the other was false.
Q. And what's your understanding of that section?
A. If two statements contradict each other, it's not necessary for the prosecution to prove which statement was false, but only that one was false.
Q. Read Section F, please.
A. Whoever violates this section is guilty of perjury, a felony of the third

Page 12

degree.
Q. Do you know the penalty for perjury under Ohio law?
A. I don't.
Q. I'll represent to you that it's a minimum of nine months and a maximum of 36 months in prison, plus a fine of up to $10,000. Understood?
A. Yep.
Q. Sir, in this case, for this deposition, have you retained a lawyer to represent you?
A. I have not.
Q. And counsel present today, as he stated on the record, is counsel for the plaintiffs, correct?
A. As I understand it, yes.
Q. He's not your counsel?
A. Correct.
Q. All right. Have you entered into any kind of engagement letter or agreement with the lawyer about your deposition today?
A. I have not.
Q. Have you discussed your

Page 13

deposition today with any lawyer?
A. I have not. Well, other than --
Q. Go ahead --
A. -- counsel present --
Q. -- you have to answer fully and completely. Are you saying you discussed it with Mr. Smith?
A. Correct, yes.
Q. State your full name for the record.
A. Brian Patrick Sweeney.
Q. Do you go by any nicknames or aliases or monikers?
A. No.
Q. Describe for the record, please, your educational background.
A. I have a bachelor's degree from Miami University in psychology and a minor in aeronautical science.
Q. Before attending Miami, did you graduate from high school somewhere?
A. I did.
Q. And where was that?
A. Sycamore High School.
Q. At Miami, did you receive any

awards or honors or other acknowledgements of your academic performance?
A. None that I recall.
Q. Did you graduate with honors at Miami?
A. I did not.
Q. What year did you graduate?
A. 2006.
Q. What did you do postgraduate? Did you continue education or engage in some other activity?
A. Engaged in some other activity.
Q. And what was that?
A. Obtaining full-time employment.
Q. Let's talk about your job history.
A. Okay.
Q. Beginning with that year of 2006.
A. Yeah.
Q. Please.
A. I worked as a network cabling specialist for a -- for, like, a small IT company.
Q. Let me stop you there.



A. Em-hm.
Q. What was the name of the company?
A. Technology Services Group.
Q. Describe your activities as a cabling specialist. What did you do?
A. Install Ethernet cable in small businesses and simple break/fix work on machines.
Q. How long were you employed in that capacity?
A. Exactly?
Q. To the best of your knowledge. You understand your obligations.
A. About a year.
Q. What did you do next? So, this would've been 2007; is that right?
A. Yes, approximately.
Q. Okay.
A. What did I do after that? I worked for a -- I was a manager at a retail clothing store.
Q. What was the name of the store?
A. Abercrombie & Fitch.
Q. How long did you perform that



job?
A. Approximately three years.
Q. Where was that Abercrombie & Fitch?
A. In Ohio.
Q. Where in Ohio?
A. At TriCounty.
Q. So that takes us up to about 2010; is that right?
A. Approximately, yeah.
Q. What did you do beginning in 2010 as a job?
A. I worked for a freight logistics company.
Q. Which company?
A. Total Quality Logistics.
Q. And how long did you work at TQL?
A. Approximately a year or two.
Q. What was your next job after TQL?
A. I worked for a dental and surgical instrument repair company.
Q. What was the name of that company?



A. Hayes Handpiece.
Q. I'm sorry, what is it?
A. Hayes Handpiece, H-A-Y-E-S.
Q. Where is that company located?
A. Cincinnati, Ohio.
Q. And how long at Hayes?
A. Approximately a year.
Q. This takes us up to approximately 2014, or so; is that right?
A. About, yeah.
Q. What did you do next?
A. I worked -- I took a job with Cincinnati Bell.
Q. What were your job duties at Cincinnati Bell?
A. I had several positions there.
Q. Go ahead and describe them.
A. The first position was a fiber premise technician, and then I was promoted to -- it was a team called Video 16, it was a specialized technician position. After that, I took a job as a access video NOC, network operations center technician. After that, I managed that former group. And then after that, I transitioned into the Problem

Page 18

Management and Continual Service Improvement Group.
Q. This is all within Cincinnati Bell?
A. Correct.
Q. How many months or years did you work at Cincinnati Bell?
A. Approximately seven.
Q. Seven months?
A. Years.
Q. Seven years. After Cincinnati Bell, where did you work?
A. My current employer is Crown Castle.
Q. And describe what Crown Castle does, and then what your duties are within Crown Castle, please.
A. Crown Castle has a tower side of the business, cell phone towers, and then they also have a network side of the business, where I work, that primarily deals with enterprise fiber and small cell builds.
Q. And you're currently employed at Crown Castle?
A. Correct.

Page 19

Q. You've just articulated a number of different jobs, I think by my count, six or seven different companies you worked at. When you departed those companies, did you depart on your own volition or were you terminated?
MR. SMITH: Objection.
A. On my own volition.
Q. Were you ever reprimanded in any of those positions?
MR. SMITH: Objection. This is definitely outside the scope, but I'll let you answer this one.
MR. CIOFFI: It's clearly background. As to his ability and qualifications of a witness.
Q. Go ahead.
A. What do you mean by reprimanded?
Q. Well, did you receive any verbal or written reprimands from any of those employers? Let's take verbal. Did you receive any verbal reprimands?
A. None that I recall.
Q. What about written reprimands?
A. None that I recall.

Page 20

Q. Did you receive any demotions?
A. No.
Q. Let's go back to your first job out of college. And I want you to articulate for me from 2006 forward, your various residence addresses. Where did you live in this time frame between college and now?
A. Post college, I moved back home for a period of months.
Q. And what was that address? I assume it was somewhere in Sycamore Township?
A. It was in Blue Ash, Ohio.
Q. Okay. What address?
A. 444 East Boardwalk Court.
Q. And your next residence after that?
A. After that was 2942 Cortelyou Place.
Q. Where is that?
A. Pleasant Ridge.
Q. Did you live alone or with roommates or anyone else?
A. With roommates.
Q. Okay. And your next address after that?

Page 21

A. Was 4549 Leslie Avenue.
Q. What city?
A. Blue Ash, Ohio.
Q. How long did you live there?
A. Approximately a few years.
Q. So this takes us to what? Approximately 2011?
A. No, this would take us to '14, 2014.
Q. Pick it up at there, please.
A. After that, I moved to 7250 Osceola Drive.
Q. Where is that?
A. In Madeira, Ohio.
Q. How long did you live there?
A. Approximately until 2020.
Q. After that address where did you live?
A. 7248 Osceola Drive.
Q. Is that your current address?
A. It is.
Q. Are you married?
A. I am.
Q. To whom are you married?
A. Colleen McHugh.

Page 22

Q. Colleen is the daughter of the plaintiff in this case, Phil McHugh; is that correct?
A. Yes.
Q. Do you have any children?
A. We do.
Q. How many children?
A. Well, we have one child who is born and expecting a second.
Q. Congratulations.
A. Thank you.
Q. Does Colleen McHugh work outside of the home?
A. She does.
Q. And what is her job?
A. She is an adjunct professor at Xavier University.
Q. Teaching what course?
A. There are several, but it's within the Montessori Department.
(Exhibit 2 identified.)
Q. Let's mark this as Exhibit No. 2, please. Have you ever seen that document prior to today?
A. Not that I recall.

Page 23

Q. This is a notice to take your deposition. Do you see that?
A. I do.
Q. If you didn't see this document, how were you notified that you were required to appear as a witness at this deposition?
A. I believe I was first notified by John McHugh.
Q. And John McHugh is Philip McHugh's brother; is that right?
A. Correct.
Q. And that would make him your wife, Colleen's, uncle; is that right?
A. Correct.
Q. What did John McHugh say to you?
A. As I recall, he said that -- I don't recall exactly. He said, you know, we'll probably need to take your deposition.
Q. When did you first have this conversation with John McHugh?
A. Maybe in the last month.
Q. Can you be any more specific than that?
A. Not without going back and trying to figure out when that call was.

Page 24

Q. Well, when you spoke to him, did you talk about dates for your deposition?
A. We did.
Q. What dates did you discuss?
A. It was less specifically about dates, more about, what is your general availability and I'll try to find those.
Q. What did you say to him about your general availability?
A. That I travel unpredictably for work, and generally the latter part of the week is better.
Q. Did you have this discussion with John McHugh by telephone or in person?
A. By telephone.
Q. Did you have any in person discussions with John McHugh about your deposition?
A. Not face to face.
Q. Well, when you say not face to face, did you have it over Zoom?
A. About this -- about scheduling this deposition?
Q. Well, about the deposition generally. But let's talk first about

Page 25

scheduling, and then we'll talk about substance. So, just about the scheduling, did you have any conversations with him face to face?
A. No. Not that I recall.
Q. How many conversations did you have with him about scheduling?
A. Maybe three.
Q. What was discussed during those conversations?
MR. SMITH: Objection. Asked and answered. Go ahead.
MR. CIOFFI: Well, this is the first time we've heard on the record that there were three discussions.
Q. But go ahead. All three, what did you discuss? The first one, the second one, the third one. The first one?
MR. SMITH: Same objection.
A. What is your general availability, on the first one. The second one, dates were proposed. And on the third one, I believe I gave my availability to those dates.
Q. As we discussed, and you

Page 26

testified earlier, John McHugh's your uncle. The plaintiff Philip McHugh is your father-in-law, correct?
A. Correct.
Q. And you're all part of the same family. Does the family come together and meet from time to time?
A. Yes.
Q. Describe, sort of, how frequently. Is this an every week dinner or gathering?
A. What members of the family are you referring to coming together?
Q. Well, let's talk about your -- first of all, with John McHugh, as your uncle.
A. Em-hm.
Q. How often would the family gather that would include John and your in-laws and your wife and other members of the family?
MR. SMITH: I'm just going to object again. This really has nothing to do with the text messages, go but go ahead for now.

Page 27

MR. CIOFFI: It has to do with his deposition prep.
Q. But go ahead.
A. As I recall, meetings with John McHugh, our wedding, Colleen and I's wedding.
Q. When was that?
A. That was July 15, 2017.
Q. Go ahead.
A. Colleen's grandmother's death. And he visited our home after it was built.
Q. Did you see John McHugh any time during this period that you were discussing said -- scheduling your deposition?
A. Scheduling, I did not see him.
MR. SANDY: Excuse me. Your microphone.
THE WITNESS: Oh, thank you.
Q. When was the last time you saw John McHugh for any purpose?
A. On video during preposition -- or preparation for this deposition.
Q. Well, let's talk about that preparation for this deposition. Who else was on the video or in person with you?
A. Josh and Peter.

Page 28

Q. Josh, and that's Peter Saba, who is also counsel for the plaintiff; is that right?
A. Correct.
Q. And John McHugh; is that correct?
A. On video.
Q. Anyone else participate in that preparation session?
A. No.
Q. Was there more than one preparation session?
A. No.
Q. When did that preparation session, you're describing, take place?
A. Tuesday of this week.
Q. Tuesday of this week. What time?
A. 1 p.m.
Q. How long did the preparation session last?
A. Approximately an hour and a half.
Q. What did you discuss during this preparation session?

Page 29

A. What a deposition is, how I fit into it.
Q. All right. Let's stop there. So what was discussed about what a deposition is?
A. Just the general overview of the process and, basically, that.
Q. Well, I'm not asking you basically. This was two days goes, so I'm asking you what did any of those individuals you described; Mr. Smith, Mr. Saba or Mr. John McHugh say to you about what the deposition is?
MR. SMITH: Objection. Asked and answered. Go ahead.
A. Who would be present, approximately how long it would take, that it would be videotaped, and that's what I recall.
Q. Well, what did they tell you about how long it would take?
MR. SMITH: Objection. Asked and answered.
A. I don't recall a finite amount of time. Approximately a couple hours is

Page 30

what I'm anticipating.
Q. So, is your testimony that they prepared you for about an hour and a half for a deposition that would last a couple of hours?
MR. SMITH: Objection. Mischaracterizes testimony. Go ahead.
A. Can you restate the question?
MR. CIOFFI: Can you read my question back, please.
(Record read by Reporter.)
A. Yes.
Q. The next topic you said you discussed was your role in the deposition. What was discussed about that?
MR. SMITH: Same objection.
A. I was advised to speak truthfully and clearly and succinctly.
Q. But that's not your role in the deposition, that's how you should behave at the deposition. What did they describe about your role at the deposition?
MR. SMITH: Objection.
A. What do you mean by role?
Q. What did you mean by it?

Page 31

MR. SMITH: Objection. It's already been answered.
Q. You said they talked to you about your role in the deposition. I'm asking you, under oath, what was discussed about your role in the deposition?
MR. SMITH: Same objection. Asked and answered.
A. I'm confused. You bifurcated role and behavior.
Q. Right.
A. So, my role in the deposition is to -- as I understand it, is to tell the truth and give clear succinct answers.
Q. Is your role a substantive role?
A. I don't know what you mean by substantive.
Q. Well, did they discuss with you the substance of your deposition?
MR. SMITH: Objection.
A. I don't understand the question.
Q. Did they discuss with you what your role was as a witness in this case?
MR. SMITH: Objection.
A. I don't fully understand the

Page 32

question.
Q. What is it that you don't understand?
A. What you mean by role.
Q. Well, you used the term -- let me ask it this way.
A. Em-hm.
Q. After you discussed your role in the deposition, and you described the admonishments, did you discuss the substance of your deposition?
A. I still don't know what you mean by substance.
Q. The subject matter of your deposition.
A. Generally, yes.
Q. What was discussed about the subject matter of your deposition?
A. The involvement with assisting Phil with the retrieval of texts. Any discussions or my knowledge of the case.
Q. What else?
A. That's what I recall.
Q. What was discussed specifically about your assistance with Phil in retrieving

Page 33

the text messages?
A. The degree of involvement I had with that process.
Q. What did they say to you about your degree of involvement, and what did you say to them?
A. To your first question, they didn't say. They asked what my degree of involvement was.
Q. Well, they had to say their questions to you, so I'm asking you --
A. Yeah.
Q. -- what did they say to you and what did you say to them?
A. They asked my involvement in the retrieval of texts and I conveyed the process that -- my part in that.
Q. You said the second topic was your knowledge of the case?
A. Correct.
Q. What did they say to you and what did you say to them about your knowledge of the case?
A. They asked what I knew about the case. And I conveyed that I understood very

Page 34

little.
Q. Well, I'm not asking you for conclusions, I'm asking what you said to them about your knowledge of the case.
MR. SMITH: Objection. I think he answered that. Go ahead.
A. I told them that I knew there was a case between Phil and Fifth Third, and that I didn't understand much about the legalese around it.
Q. How did you come to a knowledge about the case? The knowledge that there was a case between Phil and Fifth Third?
A. I think Phil mentioned it.
Q. What was the first time Phil mentioned to you a case between him and Fifth Third?
A. Are you asking for the date?
Q. No, yeah. Yes.
A. I don't recall the date.
Q. Well, approximately? Was it a month ago or a year or more ago?
A. It was probably shortly before the case was filed.
Q. So, he said to you before the

Page 35

case was filed, that there would be this case that he would bring against Fifth Third; is that correct?
MR. SMITH: Objection. Mischaracterizes testimony. Go ahead.
A. He alluded to, that there would be a legal case against Fifth Third, yes.
Q. Was this a meeting in person?
A. This was, yes.
Q. And who else was at that meeting?
A. As I recall, his family. Immediate family.
Q. And by immediate family, you mean yourself, Colleen?
A. Correct.
Q. Your mother-in-law?
A. Correct.
Q. What is her name?
A. Suzanne.
Q. And were there other family members present?
A. Yes.
Q. And who else was present?
A. Patrick.

Page 36

Q. Anyone else?
A. Probably Erin.
Q. And did this take place at your home or Phil McHugh and Suzanne's home?
A. It was most likely Phil and Suzanne's home at dinner.
Q. What did Phil McHugh say to you that gave you knowledge about the case?
A. That it was -- it was more a matter of fact statement that a case will being brought. I don't recall the specific wording.
Q. Generally, what did he say to you?
MR. SMITH: Objection. He already answered that.
A. To the best of my knowledge, it was just a matter of fact statement, more for awareness that it looks like there will be a case.
Q. Did he tell you why there would be a case?
A. No.
Q. Did he tell you that he was no longer employed by Fifth Third?

Page 37

A. Yes.
Q. What did he tell you about being no longer employed by Fifth Third?
A. As I recall, before a case was filed, he called the family together.
Q. Okay.
A. And was emotionally upset and hurt --
Q. Let me stop you there. Did he say he was emotionally upset and hurt?
A. I observed it.
Q. Did he say anything about being emotionally upset and hurt?
A. He did.
Q. What did he say?
A. After he advised us of the uncertainty of his employment with Fifth Third, he then went on to reassure the immediate family that we needn't worry.
Q. What did he say when he advised you of the uncertainty of his employment with Fifth Third?
A. I don't recall specifically. It didn't -- what he said, didn't make sense to me at the time, the chain of events.

Page 38

Q. And what did he say?
A. I don't recall exactly, that -- let me think. In general, it was, he said something to the effect of, it was a high level of chain of events that had conspired to that point. I was -- there was a job I was asked to consider, and I wanted to discuss it, but then -- but I was -- you know, that wasn't an option, and it was, basically, you know, a take it or leave it type situation. I don't know. I didn't follow the chain of logic that he conveyed there.
Q. But he did convey that he decided to leave it, right?
MR. SMITH: Objection. Mischaracterizes testimony.
A. No.
Q. Well, he told you he wasn't going to accept the job that was offered to him, correct?
MR. SMITH: Same objection.
A. No.
Q. Well, what did he say about the job that was being offered to him?

Page 39

MR. SMITH: Objection. Asked and answered.
A. That he wanted to discuss that it was the correct move for the company.
Q. And then he told you that it was a take it or leave it offer, that he should take the job or leave it, correct?
A. No.
Q. Well, what did he tell you?
A. I can't convey specifically what was said. I can convey to you what I took away from him telling us about the logistics of what conspired, but it was cursory. And then he immediately went to -- he wanted to deliver the message at the same time to everyone, and to just reassure us that this not need affect anyone else at the table.
Q. But the message he conveyed to you, you just testified, was that he was offered a job, correct? By Fifth Third?
MR. SMITH: Objection. Mischaracterizes testimony.
A. That is my understanding. I don't know what he conveyed. I couldn't follow what he was trying to convey.

Page 40

Q. And why couldn't you follow it?
A. It just didn't seem logical to me.
Q. And he was -- and it didn't seem logical why? Because he was -- he was currently employed by Fifth Third, right?
A. As I understand it.
Q. Right. And he was offered a different job, correct?
MR. SMITH: Same objection.
A. As I interpreted his statement.
Q. And did you have an understanding that it was at his same salary and benefits, same position?
A. No.
Q. You thought it was a different salary?
MR. SMITH: Objection.
A. No mention of salary, benefits, etc. was mentioned.
Q. Okay.
A. I also -- it wasn't an offer, as I understood it. It was something to consider.
Q. Yeah, a change of

Page 41

responsibilities; is that correct?
MR. SMITH: Objection.
A. I don't know. It didn't make sense, the logic he was saying to us.
Q. Okay. And what about the logic didn't make sense? I'm trying to get you to describe that. What didn't make sense to you?
A. The urgency of the time line on how things conspired. The -- as I understood it, those things conspired outside of normal work hours.
Q. When you say things conspired outside of normal work hours, what do you mean?
A. As it was conveyed to me, or as I understood it, whatever conversation between his employer, at the time, and Phil, conspired, at some point, over the weekend.
Q. And what did he say about those conversations?
A. He didn't say anything. I interpreted it based on him conveying just high-level facts of, I don't know where I am with Fifth Third.

Page 42

Q. But you testified that this position was take it or leave it. He wanted to discuss it, but his employer said, take this position or leave this position; is that correct?
A. I inferred that. He never said that.
Q. And did Phil tell you that it was his decision to leave the position?
MR. SMITH: Objection. Now, we are way off from the text messages. Are we going to get to the subject matter --
MR. CIOFFI: We are, we're talking about his deposition prep in which you, apparently, over an hour and a half, discussed all of this, including his knowledge of the case.
MR. SMITH: I'm pretty sure we're talking about a dinner meeting, not deposition prep.
MR. CIOFFI: Well, I don't know what you're talking about, Counsel, but he testified that he had a prep session with you and your co-counsel beginning at about one o'clock in the afternoon for an hour and

Page 43

a half.
MR. SMITH: You're asking him questions about a dinner he had with his father-in-law in detail. You've gone over this for ten minutes. I've given you a lot of leeway, I mean, I'll let it keep going, but we really need to get to the subject matter of what we're here for today.
MR. CIOFFI: Would you read back my last question, please.
(Record read by Reporter.)
A. No.
Q. Well, you said it was take it or leave it. What did he -- and then he told you, the family need not worry. So, connect those two for me. What did he say that his decision was going to be?
MR. SMITH: Continuing objection.
A. I don't understand the question. Phil never said what you just said to me. I inferred that.
Q. Okay.
A. As I tried to rationalize what he was saying.

Page 44

Q. Well, did he tell you he was -- at any time in this conversation, did he tell you he was retiring from Fifth Third?
A. No.
Q. Well, you were aware that, after this meeting, Colleen contacted people at Fifth Third, correct?
A. I'm aware.
Q. And that was to create a tribute or retirement video; is that right?
MR. SMITH: Objection --
A. No.
MR. SMITH: -- mischaracterizes. Assumes facts not in evidence as well.
Q. What was the purpose of that?
A. I -- I can't testify to that.
Q. Well, I'm asking of your knowledge. Not her knowledge, of course. Your knowledge.
A. My knowledge?
Q. Yes, of course.
A. I think one of Phil's best qualities is his ability to create relationships with people. And during the aforementioned meeting, Phil had mentioned

Page 45

just the -- the sadness that would come from not being able to close connections or connect with people or, you know.
Q. But you're aware that retirement videos in which people congratulated him for retiring were created, don't you?
MR. SMITH: Objection. Assumes facts not in evidence. Mischaracterizes testimony.
A. I was aware that someone misinterpreted the point of the exercise.
Q. Well, how do you know what was in someone's mind? Did you --
A. I don't understand the question.
Q. Well, who are you saying misinterpreted and what did that person misinterpret?
A. I don't know exactly.
Q. Well, you just testified under oath that you were aware that someone misinterpreted the message. What -- who were you referring to and how do you come to the conclusion that they misinterpreted?
A. Well, I'm just responding to you telling to me that somebody thought it was a

Page 46

retirement video.
Q. No --
A. I don't know it to be a retirement video. I know that family has a history of making tribute videos.
Q. Well, when you said that a person misinterpreted the message, what were you referring to in your testimony?
MR. SMITH: Objection. Asked and answered.
Q. That has nothing to do with what I said.
A. You are the one that just told me that.
Q. All right. But then your testimony was that someone misinterpreted the message. I'm asking you what you meant by that.
MR. SMITH: Objection. Asked and answered for the third or fourth time.
A. If somebody submitted a video in regards to retirement, they missed the point of the tribute video.
Q. And I'm asking you, on what basis do you make the testimony under oath

Page 47

that they misinterpreted the purpose?
MR. SMITH: Same objection.
A. Knowing the history of the family making tribute videos.
Q. And what family are you talking about?
A. The McHugh family.
Q. Okay. Did someone in the McHugh family misinterpret something or are you referring to someone else?
A. I'm saying as I've known the family, they have made tribute videos in the past.
Q. For what purpose?
A. One example I can recall is when Erin went to Guatemala to serve as a missioner, we gathered people to make a tribute video.
Q. But what's that have to do with your testimony? Your testimony's that someone misinterpreted when he made a retirement video.
A. I don't understand the question.
Q. What is it that you don't understand?

Page 48

A. Repeat the last question.
MR. CIOFFI: Read my question back, please.
(Record read by Reporter.)
Q. Let's start over. You're aware that at least one person made a retirement video congratulating Phil McHugh for his retirement, correct?
A. As of you advising me.
Q. Oh, so do you have any independent knowledge of that?
A. I wasn't part of the video process.
Q. I didn't ask you that, but were you aware of that fact?
A. Yes.
Q. Which is consistent with your earlier testimony. Then you said that that person had misinterpreted the message.
MR. SMITH: Objection. Mischaracterizes testimony.
Q. Right?
A. Yeah, as I understood what the tribute video was for.
Q. My question to you is, what

Page 49

person are you talking about in terms of making the retirement video?
MR. SMITH: Objection. Asked and answered.
A. The submission video person or the person trying to gather the videos?
Q. No, the person, there's a retirement tribute video, which you're aware of, as you testified. And I'm asking you, do you know who made that video?
A. I don't --
MR. SMITH: Objection to the term retirement. Counsel continues to use that. It's not a retirement tribute video. It would speak for itself however.
MR. CIOFFI: We certainly agree it speaks for itself.
Q. Have you seen the video?
A. I have not.
Q. All right. And then you testified that that person misinterpreted the purpose of the tribute video, correct? That's your testimony under oath?
A. Yes.
Q. And I'm asking you, what's your

Page 50

basis for testifying that that person misinterpreted the purpose of the video?
MR. SMITH: Asked and answered.
A. My general knowledge of what was the purpose of gathering videos.
Q. Do you know who made the video?
A. I don't.
Q. Did you ever talk to him about the video?
A. The submission?
Q. Yes.
A. No.
Q. Did he ever tell you that he misinterpreted something?
A. Not that I know of.
Q. Did someone else tell you that he misinterpreted something?
A. No.
Q. Any other basis for your testimony that he misinterpreted?
A. Other than the aforementioned, my general knowledge of gathering tribute videos, no.
Q. And you mentioned the tribute video for Erin. Were there tribute videos

Page 51

that the McHugh family made for retirements?
A. Not that I know of.
Q. And going back to this discussion that you were describing in which Phil told you before the lawsuit was filed that there would probably be a legal action. Do you remember discussing that --
A. I do.
Q. -- meeting? At that meeting, did he tell you that he was going to retire from Fifth Third?
A. No.
Q. Did he tell you he was going to leave Fifth Third?
A. No.
Q. Did he tell you he was no longer going to be employed by Fifth Third?
A. At the meeting where a lawsuit was going to be present?
Q. You testified that he had this family meeting before the lawsuit was filed. And, again, this is all about your knowledge of the case.
A. Yeah.
Q. You discussed in preparing for

Page 52

this deposition, right? So at this meeting, what did he tell but his future employment at Fifth Third? What did he tell you?
A. So, I'm confused. We're talking about two events. Which event?
Q. What two events?
A. The first event where Phil was uncertain where he stood with Fifth Third, wanted to give that message to the family. And then the other one, I'm assuming it was a family dinner, where it was mentioned that a lawsuit might transpire.
Q. How far apart were these two meetings?
A. I don't recall.
Q. But they both took place before the lawsuit was filed; is that right?
A. To the best of my knowledge, the second one did.
Q. Yeah.
A. The first --
Q. The first one had to, right?
A. -- definitely.
Q. Logically, right? So -- and what did he tell you about his uncertainty in

Page 53

his employment with Fifth Third?
A. As I recall, I couldn't really comprehend what was going on, but that meeting was not meant -- as I understand Phil's intention of bringing us together, it was not to unfold that, but rather just to reassure the family that, if rumors start to come about, he wanted us to hear it from him first.
Q. Okay. And in this first meeting, what was it that was uncertain about his employment at Fifth Third?
A. I don't know.
Q. What did he say about that?
MR. SMITH: Objection. Asked and answered.
A. I don't recall specifically. He tried to convey a high-level overview to people who don't live and work in that type of environment what had transpired, and then went on to reassure the family.
Q. But what did he tell you had transpired?
MR. SMITH: Same objection.
A. I -- it -- I couldn't comprehend

Page 54

the time line of events, like --
Q. I appreciate that. I'm not asking you if you could comprehend. I'm just asking you what he said. Just what he said.
MR. SMITH: Same objection. It's been asked and answered.
Q. Just what you heard, not whether you could comprehend it or not.
A. What I heard was that a position was proposed to him, and that he thought it would be best to discuss it to make sure it was in the best interest of the company.
Q. And what else about what he told you, just what you heard, about what transpired? So, you said a position was proposed to him. He thought it would be best to discuss it. What else?
A. In that -- I don't recall specifically, in that it went from a proposal to him, basically, saying, let's discuss and make sure this is in the best interest, to that being acknowledged and saying, yeah. To HR, basically, saying we need a decision or something. That's what I recall.
Q. In that last point about, we

Page 55

need a decision, is that what you were referring to earlier as, sort of, take it or leave it?
A. I was referring to my comprehension of trying to understand this event.
Q. But what is it -- this statement about HR saying we need a decision, is that what you're interpreting as take it or leave it?
MR. SMITH: Objection. Asked and answered. He answered it.
Q. You may answer.
A. I don't know how to answer. I'm just recalling vague, my comprehension. I don't -- I don't -- I don't know the answer to that.
Q. Going back to the very first question I asked you, you have to answer the question, even though you don't want to, okay? You have to answer to the best of your ability.
A. Yeah.
Q. I'm asking you, is your statement about take it or leave it, was it

Page 56

based on what Phil McHugh said to you that HR needed a decision?
MR. SMITH: Objection.
A. It was based on my trying to comprehend the events laid out by Phil.
Q. All right. And you laid the events out. I'm trying to get you to testify honestly and completely about what those events were. So, and you said there was a proposal that he take a position, correct?
A. It was proposed.
Q. Proposed.
A. That I understood. I don't --
Q. And so that was proposed. And then you said Phil said to you, he wanted to discuss it internally, right? That was the next step of what he said?
A. As I understand it.
Q. I'm just asking you what it is you heard.
A. I comprehend what you're saying here.
Q. And then the next one is, that HR said we need a decision?
A. I inferred that.

Page 57

Q. And in this meeting, did Phil tell you what his decision was going to be?
A. No.
Q. Did you eventually learn what his decision was?
A. No.
Q. Well, let's look at him telling you HR needed a decision. What did he say next?
MR. SMITH: Objection. He's answered that.
A. As I recall, at that point, he went on to reassure the family not to worry, and that if -- he wanted to make sure that we understood there might be uncertainty, and he didn't want other people conveying that first.
Q. What did he say about uncertainty? Was the uncertainty that he was no longer going to be employed by Fifth Third?
A. I think the uncertainty is, as I recall, he didn't know where he stood in all of that.
Q. What I'm asking you, though, is,

Page 58

what did he say next after telling you that HR needed a decision? What was the next thing he said to you?
MR. SMITH: Objection. It's been answered and answered.
MR. CIOFFI: It hasn't been answered at all, that's why I'm asking --
MR. SMITH: We can read it back.
Q. Go ahead.
MR. SMITH: You just don't like his answer.
A. As I recall, he went on to reassure the family, that was the majority of the conversation.
Q. But did he tell --
A. I don't recall anything post what you're saying --
Q. And reassure the family about being financially okay if he was no longer employed? Is that what the reassurance was about?
A. I think the reassurance was that, any instability in his life need not to affect us, and to make sure that he delivered a message to all of us in case somebody would

Page 59

mention something or we ran into somebody who might say something.
Q. Did he say that the instability was going to arise because he was going to tell HR he didn't want the position?
A. No.
Q. Then why would the instability arise?
A. I don't know.
Q. Did he tell you how he was going to respond to HR?
A. No.
Q. Anything else at this first meeting before the lawsuit was filed?
A. What do you mean by anything else?
Q. What else did he say, and what else did you infer.
A. I mean, the words that -- his actual discourse was really short. It was just -- it was emotional for the family to hear. It was kind of shocking for me to see Phil in a position where it seemed like he was -- he was hurt and confused.
Q. Well, did anyone at this meeting

Page 60

say, just take the position? Why don't you just take the position?
A. Not that I recall.
Q. No one said that?
A. (Witness shakes head negatively.)
MR. SMITH: Objection. Asked and answered.
Q. Did anyone say, well, what's the need for this uncertainty? You just take the position and continue on. Did anyone say that?
A. Not that I recall. We were focused on being strong and supportive of him.
Q. But did it -- is the reason for your confusion because that seemed to be an obvious solution?
MR. SMITH: Objection.
A. No.
Q. What --
MR. SMITH: Michael, we've been going for about an hour and ten minutes. You haven't asked one question about the text messages or the search, which is supposed to

Page 61

be the scope of this deposition. You need to get to that or I'm going to -- we need to get the court involved, because --
MR. CIOFFI: Josh, as you know --
MR. SMITH: -- this is way off topic.
MR, CIOFFI: It's not off topic. We're talking about his deposition prep, and which included --
MR. SMITH: This is not deposition prep, this is a --
MR. CIOFFI: -- the record will speak for itself.
MR. SMITH: -- meeting with the family.
MR. CIOFFI: His deposition prep included his knowledge about the case. What I'm exploring in this examination is what was discussed, what he told you. Everything he's testifying about is what he told you during the preparation.
MR. SMITH: You are assuming that, first of all.
MR. CIOFFI: Well, that's --

Page 62

MR. SMITH: We didn't ask him that.

MR. CIOFFI: Well, anyway, you talked about his knowledge of the case, he's testifying about it. It all goes to what was going on in this hour and a half of prep and I'm entitled to question him about that.

MR. SMITH: This deposition should take 20 minutes, 20 minutes. And it's gone an hour and ten minutes and you haven't asked a question about the text messages.

MR. CIOFFI: That's what you say.

MR. SMITH: Either get to it or we're going stop it now.

MR. CIOFFI: You can't stop the deposition.

MR. SMITH: I can call the -- I can direct him not to answer. He can choose whether's not going to answer, but I can get the court involved and ask the court to tell you to get on topic or end this deposition. It is way off topic.

MR. CIOFFI: Josh, with all due respect, you cannot instruct him not to

Page 63

answer. You don't represent him.

MR. SMITH: I can tell him not to answer until we get the court involved.

MR. CIOFFI: You can't.

MR. SMITH: He can choose whether or not --

MR. CIOFFI: You don't represent him --

REPORTER: You both are talking at the same time.

MR. CIOFFI: All right.

MR. SMITH: He can choose whether or not to answer. I can tell him, I would say don't answer that until we get the court involved because this is way outside of the scope of why you are supposed to be here. He is a witness for a very limited purpose and you are well outside of that.

MR, CIOFFI: I am not, and this all comes out of his deposition prep, and you know that. You can go all the way back to the line of questioning, but you -- let's be clear. I mean, he testified, you don't represent him. You can't instruct him to do anything.

Page 64

MR. SMITH: I can get the court on the line right now and ask the court for a protective order over this whole deposition process. He's here voluntarily. You didn't subpoena him. He's here voluntarily to answer your question.

MR. CIOFFI: He's not here voluntarily. The court ordered this deposition to go forward.

MR. SMITH: You didn't subpoena him, he's here voluntarily, but that's besides the point.

MR. CIOFFI: Josh, you know he's been ordered to appear --

MR. SMITH: Just get to the topic at hand.

MR. CIOFFI: You're trying to disrupt him.

MR. SMITH: I am not. I'm trying to move this along. Go ahead.

Q. You talked about this second meeting before the lawsuit was filed as forming the basis of your knowledge of the case; is that right?

A. Of when I became aware of the

Page 65

case, I hypothesized that, yes.

Q. And at the second meeting, Phil McHugh said that a lawsuit might be filed. Is that your testimony? I just want to know what you heard.

A. Correct.

Q. Why? Did he tell you why there might be a lawsuit?

A. Not that I recall.

Q. Did he tell you the subject matter of the lawsuit?

A. Not that I recall.

Q. Did he say that it was because he told HR he didn't want a position --

A. No.

Q. -- at Fifth Third? Well, what was your understanding of what the lawsuit was about?

A. In general?

Q. Yes. We'll start there.

A. Phil tends to be pretty reserved in discussing personal and work matters. My knowledge of the case, I think there was a Business Courier article that came out. That's what I can recall about what and how a

Page 66

case came about.
Q. And that article came out after Phil McHugh and John McHugh filed the lawsuit, right?
A. As I assume.
Q. You testified that your knowledge of the case arose out of this meeting, this second meeting, in which Phil McHugh told you that there was going to be a lawsuit, right?
MR. SMITH: Objection. Mischaracterizes testimony.
A. I don't agree with that.
Q. Well, the second meeting, had the lawsuit been filed or hadn't it?
A. It hadn't.
Q. And I believe you testified earlier, and you correct me if I'm wrong, that he told you the lawsuit was going to be filed, right?
A. No, that's not correct.
Q. Okay. Well, what -- what did you hear? Just tell us what you heard.
A. You asked me to try to convey when I first became aware that a lawsuit was

Page 67

going to be filed. And I -- I mean, I hypothesized that I would've overheard that at a family dinner, or something like that, and I vaguely recall a mention of that.
Q. That a lawsuit would be filed?
A. That potentially a lawsuit might be filed.
Q. And my very logical next question was, what did he tell you why that lawsuit was going to be filed? Why?
A. I don't recall him saying.
Q. At that point in time, did he tell you that he was no longer employed by Fifth Third?
A. No.
Q. Did he tell you he quit working at Fifth Third?
A. No.
Q. Did he tell you he had been fired by Fifth Third?
A. Not that I recall.
Q. Did he tell you he was retiring from Fifth Third?
A. Not that I recall.
Q. What did he tell you -- then why

Page 68

did he tell you a lawsuit was going to be filed?
MR. SMITH: Objection. Asked and answered numerous times.
A. I don't recall him specifically mentioning why, only mentioning that it may be potentially filed.
Q. Was the same group of family members present at the time, as you described the first meeting?
A. Which group of family members?
Q. Well, you tell me who was present at this discussion.
A. I don't recall specifically which siblings of Colleen's were at the meeting. I'm sure Phil and Suzanne were there.
Q. And you and Colleen?
A. Correct.
Q. And the other siblings?
A. I don't recall exactly which ones. I mean, they -- some have residences outside of the city of Cincinnati --
Q. I'm just asking you --
A. -- college.

Page 69

Q. -- who was there.
A. Yeah.
Q. And you have to tell --
A. I don't recall.
Q. -- me based on your best recollections.
MR. SMITH: Objection. Asked and answered.
A. To the best of my recollection, which siblings were present, I don't recall exactly.
Q. Did you or Colleen or anyone ask why there would have to be a lawsuit against Fifth Third?
A. Did Colleen?
Q. You were there at this meeting. Did you or Colleen ever ask why?
A. Not that I recall.
Q. Well --
A. It's --
Q. -- it was pretty shocking that he said was going to sue his employer of 35 years, right?
MR. SMITH: Objection. Mischaracterizes testimony.

Page 70

Q. I'm asking, would you agree with that?
A. Was it shocking to Colleen --
Q. Yes.
A. -- and myself?
Q. Yes.
A. I mean, I don't fully agree with shocking. It's disheartening.
Q. And did you ask him why --
MR. SMITH: Objection.
Q. -- given that -- it's obvious that it was shocking, disheartening however you want to describe it. It was unusual, right?
MR. SMITH: Asked and answered.
A. I don't know if I agree with the adjectives you're using. But, Phil tends to be pretty private in those matters.
Q. I'm not asking you about Phil and his privacy, I'm just asking you about your reaction when he told you he was going to sue his employer of 35 years when the employer was paying him over $2 million a year, that's strange, correct?
MR. SMITH: Objection.

Page 71

A. I don't know if I agree with characterizing it as strange.
Q. Well, would you expect someone who was making over $2 million a year and had worked for Fifth Third Bank for 35 years to sue them?
MR. SMITH: Objection. Assumes facts not in evidence. We're way, way off topic again.
A. Would I expect someone to do that is your question?
Q. Right.
A. I -- I would expect someone to do that who was wronged.
Q. And my question to you, did you ask him if he was wronged?
MR. SMITH: Objection. Asked and answered.
A. I did not.
Q. Did you ask him why he was going to?
A. I did not.
Q. Was there any discussion about being wronged?
A. Any discussion about being

Page 72

wronged?
Q. Yeah, at this meeting, any discussion as to explaining the rationale?
A. Not that I recall.
Q. If there had been a discussion, you would surely recall it, wouldn't you?
MR. SMITH: Objection.
A. Potentially, but Phil is my father-in-law. It's not my place to pry.
Q. My son-in-law likes to question me all the time.
MR. CIOFFI: Let's go off the record. The tape needs to be changed.
MR. SANDY: The time is 10:27 a.m. We're going off the record.
(Break taken.)
MR. SANDY: The time is 10:42 a.m. We're back on the record.
Q. Before the break, we were discussing the prep session on Tuesday, a couple of days ago.
A. Em-hm.
Q. And you said the first topic was your role in the deposition, and the next topic was your knowledge of the case. And

Page 73

then we were discussing your knowledge of the case, based on these two meetings that you testified about this morning.
MR. SMITH: I'm going to object. That completely mischaracterizes the line of questioning before the break, but go ahead.
A. Are you looking for a response to that statement?
Q. Yeah. Is that what we talked about this morning?
A. I don't agree. You have asked me when I became aware of certain things and I hypothesized that's when it may have came about, to the best of my knowledge.
Q. But you did testify truthfully and to the best of your knowledge this morning; is that right?
A. Correct.
Q. What other events form your knowledge of the case besides what you testified about this morning?
A. What other events?
Q. What other events, yeah. Meetings, discussions?
A. I can't recall a formal event

Page 74

where I would have been privy to more knowledge about the case other than the deposition prep here.

MR. CIOFFI: Read back his answer, please.

(Record read by Reporter.)

Q. You really need to listen to my questions carefully. I didn't ask you about formal events. I asked you what else formed your knowledge of the case besides the meetings we discussed this morning? What else? Formal. Informal. What you read in the papers. Anything.

A. I don't know if I can rattle off an exhaustive list.

Q. Again, listen to my question. I didn't ask for an exhaustive list. I asked for your best testimony under oath of what else formed the basis of your knowledge of this case, which was one of the topics you discussed in your preparation.

MR. SMITH: Objection. Argumentative.

A. I don't recall any specific events.

Page 75

Q. What else formed your knowledge of the case besides what you testified about this morning?

A. I can't think of anything further.

Q. Well, what other aspects of the case did you discuss on Tuesday with Mr. Smith, Mr. Saba and your uncle, John McHugh?

MR. SMITH: Objection. I think this was -- we've already gone over this, but go ahead.

MR. CIOFFI: We're barely scratching the surface.

Q. But go ahead. What else did you discuss on Tuesday about the case?

A. Text messages. About the case in particular? That's -- that's what I can recall, or I don't really recall anything else.

Q. In this prep session -- or in your meeting, during the break here with Mr. Smith, did anyone tell you to answer by saying you don't recall?

A. No.

Q. Do you realize that you violate

Page 76

the oath if you say you don't recall and, in fact, you do recall something?

MR. SMITH: Objection. Argumentative, harassing.

A. I do.

Q. So, focusing again on your knowledge of the case, I'm going to ask you, first of all, what else was discussed concerning the case besides text messages when you met for an hour and a half on Tuesday?

MR. SMITH: Objection. This has been asked and answered.

MR. CIOFFI: We only covered two things. The role and his knowledge of the case, I'm not even on to other things yet.

MR. SMITH: He testified that's all I can recall.

MR. CIOFFI: Counsel, you're a good lawyer, you know what you're doing, you're coaching the witness. You can't suggest answers to him, that's wrong.

MR. SMITH: I am not --

MR. CIOFFI: Just make the objection. You can't even object on behalf

Page 77

of this witness. You can object on behalf of your client.

MR. SMITH: I can object based on the form of your questions, and when you're asking questions repeatedly. You're not liking the answers and you ask them again and again and again. You are abusing this discovery process for a limited deposition that should take 20 minutes, Michael.

MR. CIOFFI: You're coaching. You're coaching.

MR. SMITH: I am not coaching. I am objecting to asked and answered --

MR. CIOFFI: I'm entitled to ask --

MR. SMITH: -- well outside the scope of this deposition.

MR. CIOFFI: I am not outside the scope at all. I'm entitled to ask him about this prep session that lasted for an hour and a half. That's what I'm doing.

MR. SMITH: And you have and he's answered the question. Go ahead.

MR. CIOFFI: As far as I know, we've only covered the first half hour of the

Page 78

prep session.
MR. SMITH: We're -- okay.
Q. All right. So, in terms of the knowledge of the case, what else did you discuss about the case on Tuesday?
MR. SMITH: Same objection.
A. Specifically, about my role and assisting with exporting texts. We talked about what deleted means. We talked about the scope of why I was called to this deposition. That's what I recall.
(Exhibit 3 identified.)
Q. Will you mark that, please. Handing you what's been marked as Exhibit No. 3. Have you seen this document prior to being handed to you now?
A. I have not.
Q. Could you read the caption, please.
A. What is the caption?
Q. Well, the top of the page. The first page, page 1.
A. In the Court of Common Pleas, Hamilton County, Ohio.
Q. Right. And the plaintiff is

Page 79

Philip McHugh, right?
A. Correct.
Q. And then the defendant's Fifth Third Bancorp, correct?
A. Appears so.
Q. And this is the caption describing the document as Amended Complaint With Endorsed Jury Demand. Do you see that?
A. I do.
Q. Did you discuss this complaint or the prior complaint that was filed in this case?
A. Not that I recall. I mean, the only thing I recall mentioning, you know -- actually, I don't recall anything specifically about -- or even understood that there is an amended complaint and a prior one.
Q. Again, I didn't ask you whether you understood any of that. I'm just asking you, did you discuss the allegations in either the original complaint or this amended complaint?
A. Well, I'm just becoming aware there was an original complaint and an

Page 80

amended complaint. So, to answer your question, I would need to understand that firstly. And then you're asking what we discussed in terms of these two things that I just became aware of.
Q. Right. Directing your attention to Exhibit 3, we'll look through it. You understand what a complaint is?
A. I don't. I'm not in this industry.
Q. Have you ever been a plaintiff or a defendant in a lawsuit?
A. Not that I know of.
Q. Well, look at this document and, again, I'm going to ask you, did you discuss this document at your meeting on Tuesday to prepare?
MR. SMITH: Objection.
A. Did we discuss this document? No.
Q. Did anyone point out to you a paragraph or paragraphs in the complaint and discuss it with you?
A. I don't recall a document being present.

Page 81

Q. Was there any document that you were asked to review, either at the prep session, before the prep session or after the prep session?
A. Not that I recall.
Q. Separate and apart from the prep session, did you ever review the complaint or amended complaint?
A. No.
Q. Did you ever review a transcript of Phil McHugh's deposition in this case?
A. I have not.
Q. Was that ever discussed with you?
A. Reviewing it?
Q. Yeah.
A. No.
Q. But was his deposition discussed with you?
A. The only statement I recall towards Phil's deposition is that, you know, Phil was nervous at first, but it's okay to be nervous.
Q. And who told you that?
A. I believe it was Josh.

Page 82

Q. Well, there was -- there had to be a discussion, right? About Phil's testimony about the software and the deleted messages, correct?
A. Not that I recall. I mean, in -- I think there was a general statement made.
Q. And what was that statement?
A. That, to the extent of what I helped Phil with in the retrieval of the text messages.
Q. Well, what was said? I'm asking you what was said.
A. Verbatim what was said?
Q. As best you can recall it, yes. It was only two days ago.
A. Oh, I agree.
Q. Okay. So what was said?
A. To the best of my knowledge, what was said was -- actually, it was just a question. What involvement did you have with the extraction of text messages?
Q. Was there a discussion about deleted text messages?
A. Yes.

Page 83

Q. What was discussed about deleted text messages?
A. I asked what the term deleted meant.
Q. Was there a response to your question?
A. The response was that, if you're unsure of what deleted meant, testify to the best of your ability, and ask clarifying questions if you're unsure of what's being asked of you in terms of that. If you don't fully understand the word or question, ask clarifying questions.
Q. In this prep session, did the four of you discuss what deleted means?
A. I proposed some definitions, but nobody gave me, like, this is explicitly what deleted means because it has a contextual nature to it.
Q. Well, what definition did you propose?
A. I never proposed a comprehensive definition. I suggested ways that it could be used and what it actually means might differ.

Page 84

MR. CIOFFI: Read back my question, please.
(Record read by Reporter.)
Q. Would you answer that question, please. I didn't ask you anything about a comprehensive definition. I just asked you when it was you proposed?
A. I didn't propose a definition. I asked clarifying questions and supported those with concepts that I might understand it and --
Q. Well, you just testified that you proposed a definition. I'm just asking you what it was you proposed.
A. I proposed that, for example, I made the comment on emails, if one is deleted, specifically maybe in a corporate environment, that it might be deleted from the user's inbox, but maybe the IT person actually retains all emails longer. So, is that actually deleted, or is it deleted from the end user's experience? And I proposed that question in trying to understand what you would mean by deleted.
Q. What response did you get to

Page 85

that proposed definition?
A. I don't recall anything specific, other than, great point, ask clarifying questions if you don't understand.
MR. CIOFFI: Read back his prior answer?
(Record read by Reporter.)
Q. And my question to you is, did you receive an answer to that proposal from either Mr. Smith, Mr. Saba or your uncle, John McHugh?
MR. SMITH: Objection. Asked and answered.
A. Not that I recall.
Q. Well, what did they say in response?
MR. SMITH: Objection. Asked and answered.
A. They gave guidance rather than providing a definition.
Q. Now, you gave an example of emails. What about text messages? Did you discuss deletion in terms of text messages?
A. We did.
Q. What was discussed?

Page 86

A. Whether or not a deleted text could be recovered.
Q. Who raised that question?
A. I don't recall specifically who raised it.
Q. Did you have an answer to that question?
A. I had a proposed take on it.
Q. Well, what was your proposed take?
A. My proposed take is that the answer to that question is actually really technical, as alluded by the earlier simpler analogy about emails and that I would be unsure I could answer a question regarding deleted without fully understanding what the word deleted meant. And also the technical process behind the scene.
Q. And what's technical about it?
A. The fact that the medium uses technology.
Q. But what technology?
A. Specifically, what technology is used in the conveyance of text messages? Is that the question?

Page 87

Q. It's the question, yes.
A. Okay. To the best of my ability, and I am no technical expert on the matter. I know that texts can be encrypted, and they can be conveyed through different, shall I say, technical platforms.
Q. And what did you discuss about all of that in this prep session on Tuesday?
A. Specifically, we went over nuances, like the word deleted. If I'm unsure, what does that, like, if I don't understand, if somebody would just make a generic statement, like, is something deleted or not is subjective. Analogies were proposed, similar to the email situation, like on texts. Because the definition of that word might have different meanings by the path it was transmitted on. And that, I was unsure of my technical ability to understand or to answer those questions from a technical perspective.
Q. You said various nuances were discussed. What were those nuances?
A. Well, I just answered most of those in my previous response. But the

Page 88

nuances would've been, who was the underpinning body that actually conveyed the text to the end user? What deleted means in, like, a historical context. That's what I recall.
Q. What do you mean when you say what deleted means in a historical context?
A. Again, I'm not a technical expert but, I -- I, you know, made a similar analogy to, you know, let's say there was an Excel file that has been produced over time, if you went to an older version of it, there might be a value in there that's not in the newer version, because it was snapshoted historically. So, was that row deleted or does it exist in a historical, like, context? That's what I understood. That's what we were discussing as far as nuances.
Q. Did you discuss all of these nuances with Phil McHugh when he asked you to assist in retrieving his text messages?
A. No.
Q. What else was discussed about text messages during your prep session on Tuesday?

Page 89

A. The deleted concept, the exportation of text messages, the concept of deleted as it relates to text messages. And that's pretty much what I recall.
Q. During this prep session on Tuesday, did any playacting occur? Did someone, for example, play my part in this deposition and ask you questions?
A. Playacting? What do you mean by playacting? Play your part?
MR. CIOFFI: Read my question back, please.
(Record read by Reporter.)
Q. Would you answer that question, please?
MR. SMITH: Objection. I think -- well, form.
A. I don't know if they were playacting, but questions were asked to me.
Q. As if the deposition were taking place, correct?
MR. SMITH: Objection. Mischaracterizes testimony.
A. I don't know if that is the context. I think it was more to understand

Page 90

what questions would be like in a deposition from a general sense, I don't know. It was never explained to me.
Q. Well, it wasn't general questions in any deposition, it was questions that you might be asked by me, correct?
MR. SMITH: Objection.
A. I don't know that to be the case.
Q. Well, what were the questions you were asked?
MR. SMITH: Objection. Asked and answered.
A. Did the software recover deleted text messages.
Q. What else?
A. Did it recover all text messages.
Q. What else?
A. The questions that were asked of me? That's what I can recall, basically --
Q. Did you give an answer to these questions that were posed to you?
A. I assume I did.
Q. Well, it was two days ago.

Page 91

Either you did or you didn't. Did you give answers to the questions?
A. I mean, it was a conversation.
Q. Did you give answers to these proposed questions?
A. I'm sure I did.
Q. Were your answers then evaluated and discussed?
A. I think my -- rather than answers, I asked clarifying questions, like, well, what do you mean by deleted? How do I understand that? How do I answer that question? What do I do in that situation where I don't understand the question being asked? Because it's of a technical nature that's beyond my expertise.
Q. I didn't ask you that.
MR. CIOFFI: Would you read my question back.
(Record read by Reporter.)
A. What do you mean by evaluated?
Q. Well, what's your understanding of the word evaluated?
A. I assume graded. I don't know what you mean by evaluate. I mean, evaluate

Page 92

would be to compare something to something else, or -- I don't know what you mean by evaluated. It was more --
Q. Well, they were -- your answers were discussed, right?
A. Correct.
Q. And then part of that discussion was whether you could form a formulate a better answer; isn't that right?
MR. SMITH: Objection. Mischaracterizes testimony. Assumes facts not in evidence. Go ahead.
A. So, your last statement was incorrect --
MR. CIOFFI: Again, Counsel, I'm admonishing you not to coach your witness and he's not even your witness.
MR. SMITH: I'm stating an objection, Michael, I'm not coaching the witness.
MR. CIOFFI: Yeah, you are.
Q. But go ahead.
A. So, to correct your last statement, I gave answers, and then they were evaluated. I don't agree with that

Page 93

statement. I asked questions to questions that were asked about specifically, well, what does deleted mean and what happens when I don't know how to answer something from a technical perspective? I just have lay knowledge.
Q. And you gave that as a kind of answer; is that right?
A. It was a question to a question. It wasn't an answer.
Q. Yeah. And were you told to respond to a question in this deposition with a question?
A. No.
Q. What were you told when you provided an answer? Were you told that it was right? Wrong? It could be better phrased? What were you told?
A. Nothing to that extent that I recall.
Q. I'm not asking you to that extent. What were you told?
A. You're asking me specifically what I was told in response to my answers to questions?

Page 94

Q. Yes.
A. I was specifically told when I responded to questions, that were asked of me, I then asked, well, what if I don't understand a vague question, or specifically how to answer it. And then we had a dialogue on, if you don't understand a word, a phrase or the question, to then ask clarifying questions. Don't just let somebody question you, as if this is -- this is what it means. Ask what it means, if you don't understand.
Q. Prior to this prep session on Tuesday, what was your understanding of the meaning of deleted text message?
A. Prior to Tuesday what was my understanding --
Q. Yes, prior.
A. -- to the meaning of deleted text messages? Well, I certainly hadn't thought of it that deeply. But I assumed if a text message was deleted, it was removed from the device.
Q. Okay. So, your understanding of deleted text message, prior to Tuesday, was that a deleted message was one that was

Page 95

removed from the device? In this case, a mobile phone; is that right?
MR. SMITH: Objection.
A. Not exactly. I would say it was probably removed from the end user's experience, but deleted is a complicated term and it needs to be defined with --
Q. I'm asking just what your understanding was about the meaning of deleted. You answered it.
MR. CIOFFI: Would you read back his earlier answer.
REPORTER: When was the answer?
MR. CIOFFI: Prior to Tuesday, my understanding was.
(Record read by Reporter.)
Q. Any -- you want to change that answer?
MR. SMITH: Objection. Argumentative.
A. No.
Q. And after Tuesday, what was your understanding of the word deleted?
A. I would say it was less defined.
Q. How so?

Page 96

A. That it could be a complicated question to answer depending on what context it was in.
Q. Were you told to answer that it was complicated?
MR. SMITH: Objection.
A. Not that I recall. I was told to ask questions when you don't understand to get clarification.
Q. But using your definition of deleted --
A. Which definition?
Q. The one that the court reporter read back and the one you gave and the one I asked you if you wanted to change.
A. Okay.
Q. And you said no. Do you remember that definition?
A. Well, there were two. We talked about the one after my deposition prep and my knowledge of it prior.
Q. And you -- after your deposition prep, you came to believe that it was more complicated?
A. Correct.

Page 97

Q. And I asked you how so? How was it more complicated?
A. In that it has a contextual basis.
Q. And what is the contextual basis?
A. The situation to which it's applied.
Q. Well, what situation are you talking about?
A. I gave two earlier examples. An email and text.
Q. Well, let's talk specifically about Phil McHugh's phone.
A. Sure.
Q. But before we do that, I want to -- and we'll get to that a little bit later on today. But what else were you told in the prep session?
A. I don't -- I don't recall anything other than what we've talked about.
Q. What other topics were covered? So, you covered your role, you covered your knowledge of the case, you talked to them about text messages, you had this discussion

Page 98

about deleted and what it means and that it might or might not be complicated. What other topics were covered on Tuesday?

MR. SMITH: Objection. Asked and answered a few times.

A. We talked about what would be appropriate to wear to a deposition. At what time the deposition was. To arrive 15 minutes early. And we talked about how you might ask questions.

Q. Did someone engage in what we discussed before as role playing and ask questions how I might ask them?

MR. SMITH: Objection. Asked and answered.

A. I don't know if it was role play. People asked me questions.

Q. It wasn't represented to you that they were asking questions how I might ask them?

MR. SMITH: Same objection.

A. It was not representative. It was said that you may ask questions this way or that way.

Q. And then those questions were

Page 99

posed to you, right?

MR. SMITH: Objection.

A. I don't know if those questions, if that was before or after they discussed how you might ask questions in a deposition.

Q. But then someone asked you questions how I might ask them; isn't that right?

MR. SMITH: Objection. Asked and answered.

A. I -- I don't know if the questions that were asked were in terms of how you would've asked them or questions that were just asked.

Q. My question to you, was it represented to you that, he might ask questions like this?

MR. SMITH: Same objection.

A. Yeah, he might -- not specific question, his behavior and how he would ask questions.

Q. Did you discuss your deposition with anyone else besides the three men you mentioned on Tuesday?

A. Discussed the subject of the

Page 100

deposition or that I have a deposition?

Q. Discuss any aspect of the deposition and then we'll explore what those aspects were.

A. I told my wife that I have a deposition on Thursday. I told my employer that I have a deposition today.

Q. And what did you discuss with your wife about the deposition?

MR. SMITH: I'm going to object and direct you not to answer. It's your choice, but you have a spousal privilege in Ohio and under federal law, you do not have to discuss confidential communications with your spouse.

THE WITNESS: Okay.

MR. CIOFFI: I'm going to note for the record that it's clear that counsel does not represent the witness and has no authority to instruct him to do anything, number one. Number two, if he doesn't answer the questions I pose to him, we'll renotice this deposition and get those questions answered.

MR. SMITH: We'll object to any

Page 101

renotice of a deposition to discuss confidential communications with a spouse of a witness, because it's not permitted. It's not admissible as evidence and it's a privilege under law.

Q. Do you remember the question?

A. What did I discuss with my wife?

Q. Yeah.

A. That I have a deposition.

Q. Okay.

A. The time, my expected duration and how I felt.

Q. And how did you say how you felt?

MR. SMITH: Just reiterate you have a privilege here. And you do not need to answer these questions.

Q. Are you refusing to answer?

A. I was unsure of how to convey emotionally how I felt.

Q. Did you discuss your deposition today with Phil McHugh?

A. I did not.

Q. Other than those meetings that you testified about earlier this morning that

Page 102

formed your understanding and your knowledge of the case, did you have any other meetings with Phil McHugh or Suzanne McHugh or anyone that formed your knowledge of the case?
A. Not that I recall.
Q. Did the -- did any discussion about the case arise at other family meetings and gatherings, other than what you described this morning?
A. Not that I recall.
Q. Well, one discussion you had at some point in time, obviously, is that Phil McHugh approached you to ask for help about retrieving text messages from his phone; isn't that right?
A. That's not correct. He asked --
Q. Well, what did he ask -- you had a discussion about the text messages on his phone and how he should retrieve them; isn't that right?
A. He asked if I knew of a way to export texts from a phone.
Q. Did he explain to you why he needed to do that?
A. Yeah.

Page 103

Q. Okay. What did he tell you?
A. For evidence.
Q. And what about that evidence?
A. That it was needed to export texts for evidence.
Q. Was it just a one-on-one meeting with you and Phil McHugh or was anyone else present?
A. I'm sure it was at -- nobody was present in the conversation, but it would've been at a dinner or something.
Q. My question to you, were the meetings -- was the meeting between just the two of you or were there other people present at this meeting when you began talking about retrieving the text messages?
A. The conversation was just Phil and I.
Q. Was there more than one conversation?
A. About a medium to export texts?
Q. Yes.
A. Yes.
Q. Okay. How many?
A. I don't recall exactly the

Page 104

number.
Q. Was it ten?
A. Well, I don't recall the exact number, but to the best of my knowledge it was less than ten.
Q. Less than five?
A. To the best of my knowledge, yes.
Q. Less than three?
A. I can't answer yes or no. It was several.
Q. Well, what I'm doing here, obviously, and I've been doing this morning is sort of probing your lack of memory.
A. Okay.
Q. So the only way I can do that is to ask you follow-up questions because you're not remembering a lot of things.
MR. SMITH: Objection.
Q. So is it fair to say it's a number between one and five?
MR. SMITH: Objection. Asked and answered.
A. Sure.
Q. Okay. And at the first meeting,

Page 105

what was discussed?
A. If I knew of a way to export text messages.
Q. And what did you say in response to that question?
A. Off the top of my head, I don't know of one. Let me -- let me think on it and see if there's a solution.
Q. As you were thinking on it, did you research the question?
A. What do you mean by research?
Q. What's your understanding of the word research?
A. Like, did I Google how to get text off of a phone?
Q. I would --
A. Yes.
Q. What else did you do in order to try to discern how to get text messages off of a phone?
A. Googled how to get text messages off an iPhone.
Q. What else did you do?
A. Clicked one of the first results.

Page 106

Q. Before we get to those results, did you talk to anyone about it?
A. I didn't.
Q. Besides using Google, did you use any other search methodologies?
A. Not that I recall.
Q. You said that when you looked on Google, that you clicked on something. What was that?
A. I believe it was a program called iMazing.
Q. iMazing. Had you used iMazing software prior to finding it on Google?
A. I think I had.
Q. So you knew it existed, right?
A. At some point, I knew it existed.
Q. Did you tell Phil McHugh in this first meeting that you knew it existed?
A. Not in the first meeting.
Q. But prior to that meeting, you had already used iMazing, right?
A. I'm sure at some point in my history, yeah.
Q. But prior to that meeting?

Page 107

A. Correct.
Q. So you clicked on iMazing on Google, and what did you learn?
A. That a software existed that had the functionality to export text messages.
Q. And what else?
A. I downloaded the program -- well, I noted that it could do -- export to Excel, downloaded the program, tried it on my phone. Concluded it seemed like a viable solution.
Q. Prior to that exercise, had you down -- when you used iMazing, did you use it to download or export text messages?
A. No.
Q. In what context did you use iMazing?
A. I believe photos.
Q. What else did you do in researching the question on how iMazing worked?
A. Nothing else that I recall.
Q. Well, did you try it with any other phone or mobile device?
A. I did not.

Page 108

Q. And did you report your findings back to Phil McHugh?
A. I did.
Q. This was a second separate meeting?
A. Correct.
Q. And what did you tell him?
A. A program named iMazing exists that could export text messages.
Q. What did he say in response?
A. Great. Thank you. Is it difficult to use? Is there a cost?
Q. How did you respond to that?
A. That it's easy to use. I think there could be a cost if you wanted -- actually, I don't know if there was a cost or not. I don't recall paying a cost. And that it had the ability to export to Excel.
Q. Did you discuss with him whether a license was required for iMazing?
A. I did not.
Q. Did he purchase the software himself or did you give it to him?
A. I believe he purchased a copy of it.

Page 109

Q. Did he tell you he purchased it?
A. I was standing there behind him while he was installing the software, and I think he asked for his wallet to get a credit card out.
Q. So, you were present when he installed the data -- or the software, right?
A. I was.
Q. And the software works in a couple of different steps. The first is that it allows access to the data on the mobile device, right?
A. I disagree.
Q. Okay. Well, how does it work?
A. This is where it gets into technicalities. As I understand it, it doesn't directly connect to the data on the phone.
Q. What does it connect to?
A. It connects to the phone physically.
Q. Correct. The phone gets actually plugged in to a PC, right?
A. Correct.
Q. All right. And then what

Page 110

happens?
A. As I understand it as a layperson, it creates a backup file.
Q. Well, you used the term exportation earlier. It, in fact, exports the data on to the computer; isn't that right?
A. It exports data from the backup, as I understand it.
Q. On to the PC?
A. That would be the logical place for it to export to.
Q. Well, is there any other place it's exported to?
A. Is there any other places to export to?
Q. Is it, when it's plugged in to a PC, it exports the data to that PC, right?
A. If you choose to export it to that PC, it would export it to that PC.
Q. With the iMazing software, what data is exported?
A. The data that iMazing exports would be the backup. To my knowledge.
Q. Well, that assumes that there's

Page 111

a backup, like a cloud, right? That the phone is using, or the mobile device?
A. I don't agree with that statement.
Q. Well, what's your -- what's your understanding about the backup?
A. Again, I'm not a technical expert. iMazing makes a backup of the phone. It has nothing to do with the cloud, necessarily, to the best of my knowledge. And that file can then -- you can export from.
Q. Let's back up. So the phone gets plugged in?
A. Correct.
Q. And then the software exports data from or through the phone to the PC; isn't that right?
A. As I understand it, it does. I'm not a software engineer.
Q. I'm asking you what your knowledge is and what you told Phil McHugh.
A. Em-hm.
Q. So did you discuss with him what was being exported to his PC?

Page 112

A. Did I discuss with him what was being exported? I -- yeah, I did.
Q. And how did you explain it to him?
A. In layman's terms, it needed to make a backup first before it would export text.
Q. When you say needed to make a backup, you mean it simply stored the data that was being pulled on to the PC, right?
A. Not as I understand it. A backup file is propriety Apple stuff, it's a package. So that, in theory, you could grab a new phone and then upload that backup --
Q. All right.
A. -- and you have it.
Q. So when you say backup, you're using it differently than the mobile device itself may have -- may be backed up, right? For example, in cloud?
A. Yeah, backed up is the state.
Q. Right.
A. A backup file is an item.
Q. Em-hm. And with respect to Phil McHugh's phone, from which data was being

Page 113

exported, do you know whether it was backed up?
A. I only know of one data that was exported from Phil McHugh's phone and that was an Apple backup file.
Q. But it was data about what?
A. Again, I'm not an expert on backup of iPhone devices. But it's a file that has all of the unique characteristics of the phone in it.
Q. And one unique characteristic is that the phone can delete text messages, right?
A. That's a functionality of an iPhone device.
Q. Right. And do you know whether the data that was pulled off of Phil Mc -- Phil McHugh's phone was backed up, both, in terms of the current undeleted messages and then also the deleted messages?
A. Can you repeat that, please?
MR. CIOFFI: Could you read that back, please?
(Record read by Reporter.)
A. I don't understand the question.

Page 114

Q. What is it that you don't understand?
A. Backed up in terms of deleted?
Q. Right.
A. I don't understand what you mean by, backed up in terms of deleted.
Q. Well, were the deleted messages -- do you know whether the deleted messages on Phil McHugh's phone were backed up in cloud or some other storage device?
MR. SMITH: Objection. Assumes facts not in evidence.
Q. I'm asking you what you know.
A. I don't understand two aspects of that question.
Q. Go ahead.
A. Whether or not a deleted -- something that is deleted can be backed up. And the second part, if that would then be backed up to the cloud. I don't understand the question.
Q. So you described earlier in your definition of deleted before Tuesday, was that you remove it from the mobile device, right?

Page 115

MR. SMITH: Objection. Mischaracterizes testimony. Go ahead.
A. That was my general assumption of what I thought deleted meant prior to my deposition prep on Tuesday.
Q. We'll use that as the definition of deleted.
A. Okay.
Q. All right. So, if a message is removed from the mobile device?
A. Em-hm.
Q. That means that you can no longer retrieve that message on the mobile device itself, correct?
A. I don't know specifically if Apple's devices have that functionality --
Q. Well, that's what I was asking you about, the functionality of his phone.
A. Okay.
Q. Do you know whether, on his phone, he could retrieve deleted messages?
A. I don't know if on his phone or an Apple device you can retrieve deleted --
Q. I'm not asking you about some Apple device. I'm just asking you, do you

Page 116

know on his phone whether -- after he removes a text message from his phone, he can then use the device to retrieve it. Do you know whether he has that functionality?
A. I don't know if that ability exists, I don't know of deleted messages.
Q. You do know, however, it is possible, theoretically possible, that once a text message is removed from a phone, that that message itself could be backed up and in the cloud?
MR. SMITH: Objection.
Q. You do understand that possibility exists, correct?
MR. SMITH: Same objection.
A. Theoretically, I think anything's possible, yeah.
Q. Well, I'm asking you. Do you know that that is possible?
A. I'm not an expert on iOS, iPhones, Apple devices, and know, the technicalities of what exists in a backup. I'm agreeing with you that, theoretically, anything could be possible.
Q. So, when one uses iMazing, and

Page 117

you watched Phil McHugh use it, when that data is exported -- and what's your understanding of what's exported? The messages that were removed or deleted from the device or the messages that remain on the device?
A. Again, I don't understand how -- the question of backing up something that was deleted using the term prior to the deposition.
Q. Well, that wasn't my question. So using iMazing --
A. Well, what I said is, I don't understand your question.
Q. Yeah, because you're misinterpreting my question.
MR. CIOFFI: Would you read my question back.
MR. SMITH: Objection.
(Record read by Reporter.)
A. You want me to answer that question?
Q. I want you to answer that question.
A. Specifically?

Page 118

Q. Specifically.
A. I don't understand the question.
Q. What is it that you don't understand?
A. The bifurcation between the state of messages being existing and deleted and messages that exist.
Q. All right. Well, let's break it down.
A. Okay.
Q. So, using your definition of deleted, which is the message is removed from the device, correct?
A. We're talking about my definition that was proposed before deposition prep?
Q. Right. Sure. Yeah. Using that definition.
MR. SMITH: Objection. Form. Go ahead.
A. Can you restate the question?
MR. CIOFFI: Read the question back, please.
(Record read by Reporter.)
A. So using your definition of the

Page 119

the message are deleted from the device?
Q. Em-hm.
A. I'm agreeing that that fits what my --
Q. Right --
A. -- prior deposition prep would be.
Q. So I'm asking you, does the iMazing export messages that were deleted from the device?
A. Again, I don't understand exporting something that would be deleted from the device.
Q. I'm asking you, does the iMazing software export messages that were deleted from the device?
A. I don't understand the question, and you're using the term deleted. If it doesn't exist on the device, I don't understand how something that doesn't exist could be exported.
Q. Well, it could be stored in the cloud?
A. I don't understand that rationalization in terms of this scenario.

Page 120

I'm not an expert on this, but you're talking about --
Q. I'm asking what you know and what you talked to Phil McHugh about. Did you talk to Phil McHugh about any of this?
A. In detail? No.
Q. In this level of detail that we're discussing?
A. Not at all.
Q. So, the iMazing software that he used, to the best of your knowledge, did it export messages on his mobile device that he never removed?
A. That he had never removed?
Q. Right.
A. What do you mean by removed?
Q. Well, deleted, removed, erased from his device.
A. I assume it did, yeah.
Q. Did it remove text messages that he -- did it export text messages that he had removed from his device?
A. I don't understand the question.
Q. Well, you just testified that you're assuming that it exported -- the

Page 121

iMazing software exported messages that he had never removed from his device, right?
A. I just testified that iMazing removed -- yes, I agree.
Q. Exported.
A. Yeah.
Q. Now, my next question is, did iMazing also export text messages that he had removed from his device?
A. I don't understand the question. It seems nonsensical to me.
Q. What's nonsensical about it?
A. I don't understand how you can export something that doesn't exist.
Q. Well, I just explained to you, it could exist in -- backed up in the cloud.
A. I am no technical expert on iMazing or the software, but my understanding is that it doesn't interface with the cloud.
Q. Really? I thought you testified earlier, and I think everyone's understanding of iMazing is that it, in fact, pulls data from the cloud.
MR. SMITH: Objection. Mischaracterizes testimony.

Page 122

Q. Right?
MR. SMITH: Assumes facts not in the evidence.
A. I don't agree with that statement.
Q. Well, when you connect the mobile device to the PC using the iMazing software, where does the iMazing software export the data from?
A. Again, I'm not an expert on the iMazing software. I assumed it made a backup on the local machine.
Q. When you say made a backup, it exports it and puts it on to the PC, right?
A. It exports, to my understanding -- again, I'm not an expert on iMazing or worked in the software industry or am an export on Apple devices its iteration and backing up over the years, as I understand it, iMazing creates a backup file on the machine that is then used to export text messages from.
Q. Well, the exportation is the action of taking the data from the mobile device or its backup and putting it on to the

Page 123

PC. That's exportation, right?
A. Correct. You could --
Q. Okay. And my question is not the backup file on the PC. My question is, what data is exported? Is it the data that's only on -- visible on the mobile device?
A. I don't understand the question.
Q. So, you know what? Visible on the mobile device. You can go to your -- your text messages and you can scroll through and you can see the history of text messages, right?
A. I'm aware of that.
Q. All right. So my question to you, does iMazing only export what is visible on the phone, that can be retrieved on the phone itself? And you testified, yes, it certainly retrieves that?
A. Yeah, to the best of my knowledge.
Q. To the best of your knowledge.
A. That's --
Q. My question to you, though, is, if you've removed a text message from the device so that you can no longer read it on

Page 124

the device, does iMazing also retrieve that message?
A. I don't understand the question. How would you retrieve a message that's not on the device?
Q. Because it's stored in a backup file in the cloud or some other storage device.
A. I don't know the technical back end on how iMazing works.
Q. Okay. So you don't know?
A. I don't know.
(Exhibit 4 identified.)
Q. All right. Let's mark this. Have you ever seen this document before?
A. Not that I know of.
Q. So, these are pages, four pages; 70, 71, 72, 73 from Phil McHugh's deposition. Have you ever seen these in any form with the questions and answers? The questions I posed to him, etc.?
A. No, not that I recall.
Q. All right. So, I want you to look at the top left-hand corner, you see page 70. Do you see that?

Page 125

A. I do.
Q. All right. Would you read lines 1 through 4. This a question that I posed to him. So read that and then read his answer.
A. The question, When you were downloading the messages, did you see any instructions about how to retrieve deleted text messages?
Q. And his answer?
A. I can't recall if I saw any such instructions.
Q. While you were watching him install the software and export the data, did you see any such instructions?
A. I did not.
Q. Read the question that appears on 5, and then the answer on page 6.
A. So as you sit here today, you cannot testify, under oath, whether the text messages you produced include all deleted text messages, can you?
Q. And his answer?
A. I provided all text messages that were in my phone.
Q. What's your understanding of his

Page 126

answer?
MR. SMITH: Objection. Form.
A. What is my --
Q. Do you have an understanding of what he's saying there?
MR. SMITH: Same objection.
A. I provided all the texts messages that were in my phone. Do I have an understanding of that?
Q. Yeah. If you know.
A. Yes.
Q. Okay. And is your understanding based on your discussions with Phil McHugh?
A. No.
Q. Okay. What's your understanding of it?
A. As I understand it, Phil must have provided you with all text messages that were in his phone.
Q. And does that mean visible on his phone?
A. I don't understand the question.
Q. Well, we just had a discussion about that. You know what that means. You said you know what it means. If you open

Page 127

your phone and you scroll through your text messages, then those messages are visible, right?
A. Sure. Yeah, I agree with that.
Q. There are also text messages that might have been removed from the phone that are no longer visible if you scroll through, correct?
MR. SMITH: Objection. Assumes facts not in evidence.
A. I don't know of any such instance of that.
Q. You've never deleted or removed a text message from your phone?
A. Not that I recall.
Q. You never removed any text messages?
MR. SMITH: Objection. Asked and answered.
A. I'm sure I have previously.
Q. Right. Previous to today, you've removed text messages from your phone, right?
A. From my current phone?
Q. From your current phone or any

Page 128

other phone that you've had in your possession.
A. I can't recall a specific instance, but I'm sure I have, yeah.
Q. And you know from your own knowledge that, when you do that, you can no longer see that text message on your phone, correct?
A. As I understand it, yeah.
Q. My question to you, do you know whether Phil McHugh, when he exported the data -- exported those messages that were only visible on his phone?
A. That's the question?
Q. That's the question.
A. To the best of my knowledge, I know he exported all messages that were on his phone.
Q. But, if it's deleted, he could no longer see it, right?
A. I -- I don't understand that question.
Q. Well, let's go look at 12 -- line 10.
A. Okay.

Page 129

Q. You see that question?
A. No. 10?
Q. Yeah.
A. Yeah.
Q. Read that, please.
A. Do you mean by that, then, you did not produce text messages that had been deleted from your phone?
Q. And he says what?
A. I cannot recall that.
Q. Do you have any superior knowledge to his testimony? Do you know whether he produced text messages that had been deleted from his phone?
MR. SMITH: Assumes facts not in evidence.
A. I don't know what you mean by superior knowledge.
Q. Do you have any reason to believe that what he testified to is incorrect or inaccurate?
A. I have no reason to believe that.
Q. Go down page 71. Do you see the first question posed there?

A. I do.
Q. Go ahead and read that.
A. Did you do anything at all, anything, to capture the deleted text messages?
Q. And read the answer at line 5.
A. I don't recall.
Q. Do you know whether he did anything at all to capture deleted text messages?
MR. SMITH: Objection.
A. I don't.
MR. CIOFFI: I have no further questions.
MR. SMITH: Great.
MR. SANDY: The time is 11:57 a.m. This concludes the deposition.

* * *
(DEPOSITION CONCLUDED AT 11:57 a.m.)
* * *



C E R T I F I C A T E

STATE OF OHIO
: SS
COUNTY OF CLERMONT

I, ANN BELMONT, RPR, the undersigned, a duly qualified notary public within and for the State of Ohio, do hereby certify that BRIAN SWEENEY was by me first duly sworn to depose the truth and nothing but the truth; foregoing is the deposition given at said time and place by said witness; deposition was taken pursuant to stipulations hereinbefore set forth; deposition was taken by me in stenotype and transcribed by me by means of computer; deposition was provided to witness for examination and signature outside the presence of the Notary Public. I am neither a relative of any of the parties or any of their counsel; I am not, nor is the court reporting firm with which I am affiliated, under a contract as defined in Civil Rule 28(D) and have no financial interest in the result of this action.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal of office at Cincinnati, Ohio this 9th day of June, 2022.

My commission expires: ANN BELMONT, RPR
December 4, 2025 Notary Public - State of Ohio

Notice Date: 06/10/2022

Deposition Date: 5/26/2022

Deponent: Brian Sweeney

Case Name: Philip R. McHugh vs. Fifth Third Bancorp

| Page:Line | Now Reads | Should Read |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the foregoing transcript, and the same is a true and accurate record of the testimony given by me.

Any additions or corrections that I feel are necessary, I will attach on a separate sheet of paper to the original transcript.

___________________________

Signature of Deponent

I hereby certify that the individual representing himself/herself to be the above-named individual, appeared before me this _____ day of ____________, 20__, and executed the above certificate in my presence.

___________________________

NOTARY PUBLIC IN AND FOR

___________________________

County Name

MY COMMISSION EXPIRES:

## WORD INDEX

< $ >
**$10,000** 12:8
**$2** 70:23 71:4

< 1 >
**1** 4:6, 17, 21 6:4 8:8 9:6, 8, 9 28:19 78:22 125:3
**1:21-CV-00238-MRB** 1:6 7:8
**10** 4:9, 22, 24 5:7, 11, 21 6:1 128:24 129:2
**10:27** 72:14
**10:42** 72:17
**100** 6:1, 2
**104** 6:2, 3
**10909F** 2:12
**11** 4:12, 13, 25 5:6, 9 6:3, 10
**11:57** 130:16, 22
**114** 6:3
**115** 6:4
**116** 6:4, 5
**117** 6:5
**118** 6:6
**12** 5:4, 16, 18, 20 6:4 128:23
**121** 6:6
**122** 6:7
**124** 4:9
**126** 6:7, 8
**127** 6:8, 9
**129** 6:9
**130** 6:10
**14** 4:14 5:23 21:8
**15** 4:20 5:5, 12 6:5, 9 27:7 98:9
**16** 4:16, 20 5:19 17:20
**17** 5:13, 18
**1700** 1:18 2:9
**18** 4:23, 24 5:17 6:1, 9
**19** 4:12, 13 5:2, 9, 22 6:2, 5, 6

< 2 >
**2** 4:7, 23 5:2, 24 6:7 22:21, 23
**20** 4:18 5:3 62:9 77:9
**2006** 14:8, 19 20:5
**2007** 15:17
**201** 1:17 2:8
**2010** 16:9, 12
**2011** 21:7
**2014** 17:9 21:9
**2017** 27:7
**2020** 21:16
**2022** 1:19 7:2 131:16
**2025** 131:19
**21** 4:22 5:24
**22** 4:7, 14, 15, 21 5:15, 19 6:3
**23** 4:16
**24** 4:9, 18 5:5, 11 6:6
**25** 4:13 5:12 6:2
**26** 1:19 4:14 7:1
**2623** 2:4
**28(D** 131:13
**29** 4:14, 15
**2942** 20:17

< 3 >
**3** 4:8 5:3, 4, 7, 10, 16, 21 78:12, 15 80:7
**30** 4:15, 16
**31** 4:17, 18
**34** 4:19
**35** 4:19 69:22 70:22 71:5
**36** 4:20 12:7
**38** 2:11 4:20, 21
**39** 4:21, 22

< 4 >
**4** 4:9, 19 5:8, 14, 23 124:13 125:3 131:19
**40** 4:22, 23
**41** 4:23
**42** 4:24
**43** 4:24
**44** 4:25
**444** 20:14
**45** 5:1
**45202** 1:19 2:9, 12
**45208** 2:5
**4549** 21:1
**46** 5:1, 2
**47** 5:2
**48** 5:3
**49** 5:3, 4

< 5 >
**5** 4:19 5:6 125:17 130:6
**50** 5:4
**53** 5:5
**54** 5:6
**55** 5:6
**56** 5:7
**57** 5:7
**58** 5:8

< 6 >
**6** 4:15 5:17, 22 6:8 125:17
**60** 5:8, 9
**66** 5:9
**68** 5:10
**69** 5:10, 11

< 7 >
**7** 4:4, 12, 17 5:1, 8, 10, 13, 14, 20
**70** 4:9 5:11, 12 124:18, 25
**71** 4:9 5:13 124:18 129:24
**72** 4:9 5:14 124:18
**7248** 21:19
**7250** 21:11
**73** 4:9 5:14 124:18
**74** 5:15
**75** 5:15
**76** 5:16
**78** 4:8 5:17

< 8 >
**80** 5:17
**85** 5:18
**89** 5:19

< 9 >
**9** 4:6 5:1, 15, 25 6:8
**9:07** 1:19 7:2
**90** 5:20
**92** 5:21
**95** 5:21, 22
**96** 5:22
**98** 5:23, 24
**99** 5:24, 25 6:1
**9th** 131:16

< A >
**a.m** 1:19 7:2 72:15, 18 130:17, 22
**Abercrombie** 15:24 16:3
**ability** 19:15 44:23 55:22 83:9 87:3, 19 108:18 116:5
**able** 45:2
**abusing** 77:7
**academic** 14:2
**accept** 38:20
**access** 17:22 109:11
**acknowledged** 54:22
**acknowledgements** 14:1
**action** 51:6 122:24 131:14
**activities** 15:5
**activity** 14:11, 12
**actual** 59:20
**address** 20:10, 13, 24 21:17, 20
**addresses** 20:6
**adjectives** 70:17
**adjunct** 22:16
**administered** 7:23
**admissibility** 9:25
**admissible** 101:4
**admonishing** 92:16
**admonishments** 32:10
**advised** 30:17 37:16, 20
**advising** 48:9
**aeronautical** 13:19
**affect** 10:1 39:17 58:24
**affiliated** 131:13
**affirm** 9:16
**affirmation** 9:15 11:11
**affixed** 3:15
**aforementioned** 44:25 50:21
**afternoon** 42:25
**age** 7:17
**ago** 34:22 72:21 82:16 90:25
**agree** 49:16 66:13 70:1, 7, 16 71:1 73:11 82:17 92:25 111:3 121:4 122:4 127:4
**agreeing** 116:23 119:3
**agreement** 3:9 12:22
**ahead** 8:13 13:3 17:17 19:17 25:12, 16 26:24 27:3, 8 29:15 30:7 34:6 35:5 58:9 64:20 73:6 75:11, 14 77:23 92:12, 22 114:16 115:2 118:20 130:2
**al** 1:7
**aliases** 13:13
**allegations** 79:21
**allows** 109:11
**alluded** 35:6 86:13
**Amended** 4:8 79:7, 17, 22 80:1 81:8
**amount** 29:24
**Analogies** 87:14
**analogy** 86:14 88:10
**ANN** 1:20 131:5, 18
**answer** 7:24 9:2 13:5 19:13 55:13, 14, 16, 19, 21 58:11 62:19, 20 63:1, 3, 13, 14 64:6 74:5 75:22 80:1 84:4 85:6, 9 86:6, 12, 15 87:20 89:14 90:22 91:12 92:9 93:4, 8, 10, 16 94:6 95:12, 13, 18 96:2, 4 100:11, 21 101:17, 18 104:10 117:21, 23 125:4, 9, 17, 22 126:1 130:6
**answered** 25:12 29:15, 23 31:2, 8 34:6 36:16 39:2 46:10, 20 49:4 50:3 53:16 54:6 55:12 57:11 58:5, 7 60:8 68:4 69:8 70:15 71:18 76:13 77:13, 23 85:13, 18 87:24 90:13 95:10 98:5, 15 99:10 100:24 104:23 127:19

**answers** 31:14 76:22 77:6 91:2, 4, 7, 10 92:4, 24 93:24 124:20
**anticipating** 30:1
**anything's** 116:17
**anyway** 62:3
**apart** 52:13 81:6
**apparently** 42:15
**appear** 23:6 64:14
**APPEARANCES** 2:1
**Appears** 79:5 125:16
**Apple** 112:12 113:5 115:23, 25 116:21 122:18
**Apple's** 115:16
**applied** 97:8
**appreciate** 54:2
**approached** 102:13
**appropriate** 98:7
**approximately** 15:18 16:2, 10, 19 17:7, 9 18:8 21:5, 7, 16 28:22 29:17, 25 34:21
**Argumentative** 74:23 76:4 95:20
**arose** 66:7
**arrive** 98:8
**article** 65:24 66:2
**articulate** 20:4
**articulated** 19:1
**Ash** 20:12 21:3
**Asked** 25:11 29:14, 22 31:8 33:8, 15, 24 38:7 39:1 46:9, 19 49:3 50:3 53:15 54:6 55:11, 19 60:7, 24 62:11 66:24 68:3 69:7 70:15 71:17 73:11 74:9, 17 76:13 77:13 81:2 83:3, 11 84:6, 9 85:12, 17 88:20 89:19 90:6, 11, 12, 20 91:10, 15 93:1, 2 94:3, 4 96:15 97:1 98:4, 14, 17 99:6, 9, 12, 13, 14 102:16, 21 104:22 109:4 127:18
**asking** 10:21 29:8, 10 31:5 33:11 34:2, 3, 18 43:2 44:17 46:17, 24 49:9, 25 54:3, 4 55:24 56:19 57:25 58:7 68:24 70:1, 19, 20 77:5 79:20 80:3 82:12 84:13 93:21, 23 95:8 98:19 111:21 114:13 115:17, 24, 25 116:18 119:8, 14 120:3
**aspect** 100:2
**aspects** 75:6 100:4 114:14
**assist** 88:21
**assistance** 32:25
**assisting** 32:19 78:8
**assume** 20:11 66:5 90:24 91:24 120:19
**assumed** 94:20 122:11
**Assumes** 44:14 45:7 71:7 92:11 110:25 114:11 122:2 127:9 129:15
**assuming** 52:10 61:23 120:25
**assumption** 115:3
**attending** 13:20
**attention** 9:9 10:6 80:6
**authority** 100:20
**availability** 24:7, 9 25:21, 23
**available** 3:13
**Avenue** 2:4 21:1
**awards** 14:1
**aware** 44:5, 8 45:4, 10, 20 48:5, 15 49:8 64:25 66:25 73:12 79:24 80:5 123:13
**awareness** 36:19

**< B >**
**bachelor's** 13:17
**back** 20:3, 8 23:24 30:10 43:9 48:3 51:3 55:18 58:8 63:21 72:18 74:4 84:1 85:5 89:12 91:19 95:11 96:14 108:2 111:13 113:23 117:18 118:23 124:9
**backed** 112:19, 21 113:1, 18 114:3, 6, 9, 18, 20 116:10 121:16
**background** 13:16 19:15
**backing** 117:8 122:19
**backup** 110:3, 8, 24 111:1, 6, 8 112:6, 9, 12, 14, 17, 23 113:5, 8 116:22 122:11, 13, 20, 25 123:4 124:6
**BANCORP** 1:7 7:7 79:4
**Bank** 2:11 71:5
**barely** 75:12
**based** 41:23 56:1, 4 69:5 73:2 77:3 126:13
**basically** 29:7, 9 38:10 54:20, 23 90:21
**basis** 46:25 50:1, 19 64:23 74:19 97:4, 6
**becoming** 79:24
**began** 103:15
**Beginning** 14:18 16:11 42:24
**behalf** 2:1, 6 76:25 77:1
**behave** 30:20
**behavior** 31:10 99:20
**believe** 23:7 25:23 66:17 81:25 96:23 106:10 107:18 108:24 129:20, 22
**believed** 10:4, 11
**Bell** 17:13, 15 18:4, 7, 12
**BELMONT** 1:21 131:5, 18
**benefits** 40:14, 19
**best** 15:13 36:17 44:22 52:18 54:11, 12, 16, 21 55:21 69:5, 9 73:14, 16 74:18 82:15, 19 83:9 87:2 104:4, 7 111:10 120:11 123:19, 21 128:16
**better** 24:12 92:9 93:17
**beyond** 91:16
**bifurcated** 31:9
**bifurcation** 118:5
**bit** 97:17
**Blank** 1:17 2:8
**Blue** 20:12 21:3
**Boardwalk** 20:14
**body** 88:2
**born** 22:9
**Break** 72:16, 19 73:6 75:21 118:8
**break/fix** 15:8
**BRIAN** 1:11 3:4 4:2, 7 7:3, 16 13:11 131:6
**bring** 35:2
**bringing** 53:5
**brother** 23:10
**brought** 36:11
**BRUCE** 1:20
**builds** 18:22
**built** 27:10
**business** 18:19, 21 65:24
**businesses** 15:8

**< C >**
**cable** 15:7
**cabling** 14:22 15:6
**call** 23:25 62:18
**called** 17:20 37:5 78:10 106:11
**capacity** 15:11
**caption** 78:18, 20 79:6
**capture** 130:4, 9
**card** 109:5
**carefully** 74:8
**Case** 1:6 7:4, 8 10:18 12:10 22:2 31:23 32:21 33:19, 23, 25 34:4, 8, 12, 13, 16, 24 35:1, 7 36:8, 10, 20, 22 37:4 42:17 51:23 58:25 61:18 62:4 64:24 65:1, 23 66:1, 7 72:25 73:2, 20 74:2, 10, 20 75:2, 7, 15, 16 76:7, 9, 16 78:4, 5 79:12 81:11 90:9 95:1 97:24 102:2, 4, 7
**Castle** 18:14, 15, 17, 18, 24
**cell** 18:19, 22
**center** 17:23
**certain** 73:12
**certainly** 49:16 94:19 123:18
**certified** 7:19
**certify** 131:6
**chain** 37:25 38:5, 12
**change** 40:25 95:17 96:15
**changed** 72:13
**characteristic** 113:11
**characteristics** 113:9
**characterizing** 71:2
**charge** 10:2, 10
**child** 22:8
**children** 22:5, 7
**choice** 100:12
**choose** 62:19 63:5, 12 110:19
**Cincinnati** 1:18 2:5, 9, 12 17:5, 13, 15 18:3, 7, 11 68:23 131:16
**CIOFFI** 2:7 4:4 7:14, 22 8:13 9:4 19:14 25:13 27:1 30:9 42:13, 21 43:9 48:2 49:16 58:6 61:4, 8, 13, 17, 25 62:3, 12, 16, 24 63:4, 7, 11, 19 64:7, 13, 17 72:12 74:4 75:12 76:14, 19, 24 77:10, 14, 18, 24 84:1 85:5 89:11 91:18 92:15, 21 95:11, 14 100:17 113:22 117:17 118:22 130:13
**city** 21:2 68:23
**Civil** 1:14 3:7 131:13
**clarification** 96:9
**clarifying** 83:9, 13 84:9 85:4 91:10 94:8
**clear** 31:14 63:23 100:18
**clearly** 19:14 30:18
**CLERMONT** 131:3
**Clicked** 105:24 106:8 107:2
**client** 77:2
**close** 45:2
**clothing** 15:22
**cloud** 111:1, 9 112:20 114:10, 20 116:11 119:23 121:16, 19, 23 124:7
**coach** 92:16

coaching 76:21 77:10, 11, 12 92:19
co-counsel 42:24
Colleen 21:25 22:1, 12 27:5 35:15 44:6 68:18 69:12, 15, 17 70:3
Colleen's 23:13 27:9 68:15
college 20:4, 7, 8 68:25
COLLIN 2:7 7:15
come 26:6 34:11 45:1, 22 53:8
comes 63:20
coming 26:13
comment 84:16
commission 131:18
Common 78:23
communications 100:14 101:2
companies 19:3, 4
company 14:24 15:3 16:14, 15, 23, 25 17:4 39:4 54:12
compare 92:1
Complaint 4:8 79:7, 10, 11, 17, 22, 23, 25 80:1, 8, 22 81:7, 8
completely 7:25 13:6 56:8 73:5
complicated 95:6 96:1, 5, 24 97:2 98:2
comprehend 53:3, 25 54:3, 8 56:5, 21
comprehension 55:5, 15
comprehensive 83:22 84:6
computer 110:6 131:10
concept 89:1, 2
concepts 84:10
concerning 76:9
Concluded 107:10 130:22
concludes 130:17
conclusion 45:23
conclusions 34:3
confidential 100:14 101:2
confused 31:9 52:4 59:24
confusion 60:17
congratulated 45:5
congratulating 48:7
Congratulations 22:10
connect 43:15 45:3 109:17, 19 122:6
connections 45:2
connects 109:20
consider 38:7 40:24
consistent 48:17
conspired 38:5 39:13 41:10, 11, 13, 19
contacted 44:6
context 88:4, 7, 16 89:25 96:2 107:16
contextual 83:18 97:3, 5
Continual 18:1
continue 9:1 14:10 60:11
continues 49:13
Continuing 43:18
contract 131:13
contradict 11:19
contradictory 11:9
conversation 23:20 41:17 44:2 58:14 91:3 103:10, 17, 20
conversations 25:3, 6, 10 41:21
convey 38:14 39:10, 11, 25 53:18 66:24 101:19
conveyance 86:24
conveyed 33:16, 25 38:12 39:18, 24 41:16 87:5 88:2
conveying 41:23 57:16
copy 4:9 108:24
corner 124:24
corporate 84:17
correct 11:5, 6 12:16, 19 13:8 18:5, 25 22:3 23:11, 14 26:3, 4 28:4, 6 33:20 35:3, 16, 18 38:21 39:4, 7, 20 40:9 41:1 42:5 44:7 48:8 49:22 56:10 65:6 66:18, 21 68:19 70:24 73:18 79:2, 4 82:4 89:21 90:6 92:6, 23 96:25 102:16 107:1 108:6 109:22, 24 111:15 115:14 116:14 118:13 123:2 127:8 128:8
Cortelyou 20:17
cost 108:12, 15, 16, 17
counsel 1:15 3:2 7:9, 13 8:14 12:14, 15, 18 13:4 28:2 42:22 49:13 76:19 92:15 100:18 131:12
count 19:2
County 78:24 131:3
couple 29:25 30:4 72:21 109:10
Courier 65:24
course 10:1 22:18 44:18, 21
COURT 1:1 7:5 20:14 61:3 62:21 63:3, 15 64:1, 2, 8 78:23 96:13 131:12
covered 76:14 77:25 97:22, 23 98:3
create 44:9, 23
created 45:6
creates 110:3 122:20
credit 109:4
CROSS 4:2
cross-examination 1:13 3:6 7:21
Crown 18:13, 15, 17, 18, 24
current 18:13 21:20 113:19 127:24, 25
currently 18:23 40:6
cursory 39:13

< D >
data 109:7, 11, 17 110:6, 8, 18, 22, 23 111:17 112:9, 25 113:3, 6, 17 117:2 121:22 122:9, 24 123:5 125:13 128:12
date 34:18, 20
dates 24:2, 4, 6 25:22, 24
daughter 22:1
day 131:16
days 29:9 72:21 82:16 90:25
deals 18:21
death 27:9
December 131:19
decided 38:15
decision 42:9 43:17 54:23 55:1, 8 56:2, 24 57:2, 5, 8 58:2
deeply 94:20
Defendant 2:6 7:7 80:12
Defendants 1:8, 12 3:5 7:15
defendant's 79:3
defense 10:2, 9, 18
defined 95:7, 24 131:13
defining 4:6 9:10
definitely 19:12 52:23
definition 83:20, 23 84:6, 8, 13 85:1, 20 87:16 96:10, 12, 18 114:23 115:6 118:11, 15, 18, 25
definitions 83:16
degree 12:1 13:17 33:2, 5, 8
delete 113:12
deleted 78:9 82:3, 24 83:1, 3, 8, 15, 18 84:17, 18, 21, 24 86:1, 16, 17 87:10, 13 88:3, 7, 15 89:1, 3 90:14 91:11 93:3 94:14, 18, 21, 24, 25 95:6, 10, 23 96:11 98:1 113:20 114:3, 6, 7, 8, 17, 18, 23 115:4, 7, 21, 23 116:6 117:4, 9 118:6, 12 119:1, 9, 12, 15, 18 120:17 125:7, 20 127:13 128:19 129:8, 14 130:4, 9
deletion 85:23
deliver 39:15
delivered 58:24
Demand 4:8 79:8
demotions 20:1
dental 16:22
depart 19:5
departed 19:4
Department 22:20
depending 96:2
depose 131:7
deposition 1:11 3:3, 8, 9, 13 4:7, 9 7:3 8:12, 17, 22 12:11, 23 13:1 23:2, 6, 18 24:2, 18, 23, 24 27:2, 13, 21, 23 29:1, 4, 13 30:4, 14, 20, 21, 22 31:4, 6, 12, 19 32:9, 11, 15, 18 42:14, 20 52:1 61:1, 9, 12, 17 62:8, 17, 22 63:20 64:3, 9 72:24 74:3 77:8, 17 78:11 81:11, 18, 21 89:8, 20 90:1, 5 93:12 96:20, 22 98:7, 8 99:5, 22 100:1, 3, 6, 7, 9, 23 101:1, 9, 21 115:5 117:10 118:16 119:6 124:18 130:17, 22 131:7, 8, 9, 10
Describe 13:15 15:5 17:17 18:15 26:9 30:21 41:7 70:13
described 29:11 32:9 68:9 102:8 114:22
describing 28:15 51:4 79:7
detail 43:4 120:6, 7
device 94:22 95:1 107:24 109:12 111:2 112:18 113:15 114:10, 24 115:10, 14, 23, 25 116:3 117:5, 6 118:13 119:1, 10, 13, 16, 19 120:12, 18, 22 121:2, 9 122:7, 25 123:6, 9, 25 124:1, 5, 8
devices 113:8 115:16 116:21 122:18
dialogue 94:6
differ 83:25
different 19:2, 3 40:9, 16 87:5, 17 109:10
differently 112:18
difficult 108:12

**dinner** 26:10 36:6 42:19 43:3 52:11 67:3 103:11
**DIRECT** 4:2 62:19 100:11
**directing** 9:8 10:6 80:6
**directly** 109:17
**disagree** 109:13
**discern** 105:19
**discourse** 59:20
**discovery** 77:8
**discuss** 24:4 25:17 28:24 31:18, 22 32:10 38:8 39:3 42:3 54:11, 17, 20 56:16 75:7, 15 78:5 79:10, 21 80:15, 19, 23 83:15 85:23 87:7 88:19 99:22 100:2, 8, 14 101:1, 7, 21 108:19 111:24 112:1
**discussed** 12:25 13:6 25:9, 25 29:4 30:14, 15 31:5 32:8, 17, 24 42:16 51:25 61:20 74:11, 21 76:8 80:4 81:13, 18 83:1 85:25 87:23 88:23 91:8 92:5 98:12 99:4, 25 105:1
**discussing** 27:12 51:7 65:22 72:20 73:1 88:18 120:8
**discussion** 24:13 51:4 68:13 71:23, 25 72:3, 5 82:2, 23 92:7 97:25 102:6, 11, 18 126:23
**discussions** 24:17 25:15 32:21 73:24 126:13
**disheartening** 70:8, 12
**disrupt** 8:22 64:18
**DISTRICT** 1:1 7:5
**DIVISION** 1:2 7:6
**document** 22:23 23:4 78:15 79:7 80:14, 16, 19, 24 81:1 124:15
**doing** 76:20 77:21 104:12, 13
**download** 107:14
**downloaded** 107:7, 9
**downloading** 125:6
**Drive** 21:12, 19
**due** 62:24
**duly** 7:18 131:5, 6
**duration** 101:11
**duties** 17:14 18:16

< E >
**earlier** 26:1 48:18 55:2 66:18 86:13 95:12 97:11 101:25 110:5 114:22 121:21
**early** 98:9
**East** 1:17 2:8 20:14
**easy** 108:14
**education** 14:10
**educational** 13:16
**effect** 38:4
**either** 9:17 62:14 79:22 81:2 85:10 91:1
**email** 87:15 97:12
**emails** 84:16, 20 85:22 86:14
**Em-hm** 15:1 26:17 32:7 72:22 111:23 112:24 115:11 119:2
**emotional** 59:21
**emotionally** 37:7, 10, 13 101:20
**employed** 15:10 18:23 36:25 37:3 40:6 51:17 57:20 58:20 67:13
**employer** 18:13 41:18 42:3 69:22 70:22, 23 100:6
**employers** 19:21
**employment** 14:14 37:17, 21 52:2 53:1, 12
**encrypted** 87:4
**Endorsed** 4:8 79:8
**enforced** 8:4
**engage** 14:10 98:11
**Engaged** 14:12
**engagement** 12:21
**engineer** 111:20
**entered** 12:20
**enterprise** 18:22
**entitled** 7:6 62:7 77:14, 19
**environment** 53:20 84:18
**erased** 120:17
**Erie** 2:4
**Erin** 36:2 47:16 50:25
**ESQ** 2:1, 7, 9
**et** 1:7
**Ethernet** 15:7
**evaluate** 91:25
**evaluated** 91:7, 21, 23 92:3, 25
**event** 52:5, 7 55:6 73:25
**events** 37:25 38:5 52:5, 6 54:1 56:5, 7, 9 73:19, 22, 23 74:9, 25
**eventually** 57:4
**everyone's** 121:21
**evidence** 9:25 44:14 45:8 71:8 92:12 101:4 103:2, 3, 5 114:12 122:3 127:10 129:16
**exact** 104:3
**Exactly** 15:12 23:17 38:2 45:18 68:21 69:11 95:4 103:25
**examination** 3:14 61:19 131:10
**examined** 7:19
**example** 47:15 84:15 85:21 89:7 112:20
**examples** 97:11
**Excel** 88:11 107:9 108:18
**Excuse** 27:15
**exercise** 45:11 107:12
**exhaustive** 74:15, 17
**EXHIBIT** 4:5, 6, 7, 8, 9 8:7 9:6, 8, 9 22:21, 22 78:12, 14 80:7 124:13
**exist** 88:16 118:7 119:19, 20 121:14, 16
**existed** 106:15, 17, 19 107:4
**existing** 118:6
**exists** 108:8 116:6, 14, 22
**expect** 71:3, 10, 13
**expected** 101:11
**expecting** 22:9
**experience** 84:22 95:6
**expert** 87:3 88:9 111:8 113:7 116:20 120:1 121:17 122:10, 16
**expertise** 91:16
**expires** 131:18
**explain** 102:23 112:3
**explained** 90:3 121:15
**explaining** 72:3
**explicitly** 83:17
**explore** 100:3
**exploring** 61:19
**export** 102:22 103:4, 21 105:2 107:5, 8, 14 108:9, 18 110:12, 16, 19, 20 111:11 112:6 119:9, 15 120:12, 21 121:8, 14 122:9, 18, 21 123:15 125:13
**exportation** 89:2 110:5 122:23 123:1
**exported** 110:14, 22 111:25 112:2 113:1, 4 117:2, 3 119:21 120:25 121:1, 5 123:5 128:11, 12, 17
**exporting** 78:8 119:12
**exports** 110:5, 8, 18, 23 111:16 122:14, 15
**extent** 8:23 9:1 82:9 93:19, 22
**extraction** 82:22

< F >
**face** 24:19, 20, 21 25:3, 4
**fact** 11:10 36:10, 18 48:15 76:2 86:20 110:5 121:22
**facts** 41:24 44:14 45:8 71:8 92:11 114:12 122:2 127:10 129:15
**fair** 10:19 104:20
**fall** 8:24
**false** 9:14, 17 11:15, 16, 22
**falsification** 9:24 10:4, 11
**falsifies** 10:17
**falsify** 10:23 11:4
**family** 26:6, 12, 18, 21 35:12, 13, 14, 21 37:5, 19 43:15 46:4 47:4, 5, 7, 9, 12 51:1, 21 52:9, 11 53:7, 21 57:13 58:13, 18 59:21 61:16 67:3 68:8, 11 102:7
**far** 52:13 77:24 88:18
**father-in-law** 26:3 43:4 72:9
**Federal** 1:14 3:6 100:13
**felony** 11:25
**felt** 101:12, 14, 20
**fiber** 17:18 18:22
**FIFTH** 1:7, 18 2:8, 11 7:7 34:8, 13, 16 35:2, 7 36:25 37:3, 17, 22 39:20 40:6 41:25 44:3, 7 51:11, 14, 17 52:3, 8 53:1, 12 57:20 65:16 67:14, 17, 20, 23 69:14 71:5 79:3
**figure** 23:25
**file** 88:11 110:3 111:11 112:12, 23 113:5, 8 122:20 123:4 124:7
**filed** 34:24 35:1 37:5 51:5, 21 52:17 59:14 64:22 65:3 66:3, 15, 20 67:1, 5, 7, 10 68:2, 7 79:11
**financial** 131:13
**financially** 58:19
**find** 24:7
**finding** 106:13
**findings** 108:1
**fine** 12:7
**finite** 29:24
**fired** 67:20
**firm** 131:12
**first** 7:18 17:18 20:3 23:7, 19 24:25 25:14, 17, 18, 21 26:15 33:7 34:15 52:7, 21, 22 53:9, 10 55:18 57:17 59:13 61:24 66:25 68:10 72:23 76:8 77:25 78:22

81:22 104:25 105:24 106:19, 20 109:10 112:6 129:25 131:6
**firstly** 80:3
**fit** 29:1
**Fitch** 15:24 16:4
**fits** 119:3
**five** 104:6, 21
**focused** 60:14
**focusing** 76:6
**follow** 38:12 39:25 40:1
**follows** 7:20
**follow-up** 104:17
**foregoing** 131:7
**form** 73:19 77:4 89:17 92:8 118:19 124:19 126:2
**formal** 73:25 74:9, 12
**formalities** 3:8
**formed** 74:9, 19 75:1 102:1, 4
**former** 17:24
**forming** 64:23
**formulate** 92:8
**forth** 1:16 131:9
**forward** 20:5 64:9
**Fountain** 2:11
**four** 83:15 124:17
**fourth** 46:20
**frame** 20:7
**freight** 16:13
**frequently** 26:10
**full** 13:9
**full-time** 14:14
**fully** 7:24 13:5 31:25 70:7 83:12 86:16
**functionality** 107:5 113:14 115:16, 18 116:4
**further** 9:4 75:5 130:13
**future** 52:2

< G >
**gather** 26:19 49:6
**gathered** 47:17
**gathering** 26:11 50:5, 22
**gatherings** 102:8
**general** 24:6, 9 25:20 29:6 38:3 50:4, 22 65:19 82:6 90:2, 4 115:3
**generally** 24:11, 25 32:16 36:13
**generic** 87:13
**give** 31:14 52:9 90:22 91:1, 4 108:23
**given** 43:5 70:11 131:7
**go** 8:13 13:3, 12 17:17 19:17 20:3 25:12, 16 26:24 27:3, 8 29:15 30:7 34:6 35:5 58:9 63:21 64:9, 20 72:12 73:6 75:11, 14 77:23 92:12, 22 114:16 115:2 118:20 123:9 128:23 129:24 130:2
**goes** 29:9 62:5
**going** 23:24 26:22 38:20 42:12 43:6, 17 51:3, 10, 13, 17, 19 53:3 55:18 57:2, 20 59:4, 10 60:23 61:2 62:6, 15, 20 66:9, 19 67:1, 10 68:1 69:22 70:21 71:20 72:15 73:4 76:7 80:15 100:10, 17
**good** 76:20
**Google** 105:14 106:4, 8, 13 107:3
**Googled** 105:21
**grab** 112:13
**graded** 91:24
**graduate** 13:21 14:4, 7
**grandmother's** 27:9
**great** 85:3 108:11 130:15
**Group** 15:4 17:24 18:2 68:8, 11
**Guatemala** 47:16
**guidance** 85:19
**guilty** 11:25

< H >
**half** 28:23 30:3 42:15 43:1 62:6 76:10 77:21, 25
**Hamilton** 78:24
**hand** 64:16 131:15
**handed** 78:16
**Handing** 78:14
**Handpiece** 17:1, 3
**happens** 93:3 110:1
**harassing** 76:4
**HART** 2:7 7:15
**Hayes** 17:1, 3, 6
**H-A-Y-E-S** 17:3
**head** 60:5 105:6
**hear** 53:8 59:22 66:23
**heard** 25:14 54:7, 9, 14 56:20 65:5 66:23
**help** 102:13
**helped** 82:10
**hereinafter** 1:16 7:18
**hereinbefore** 131:9
**hereunto** 131:15
**Hey** 8:9
**high** 13:21, 24 38:4
**high-level** 41:24 53:18
**historical** 88:4, 7, 16
**historically** 88:15
**history** 14:16 46:5 47:3 106:24 123:11
**home** 20:8 22:13 27:10 36:4, 6
**honestly** 7:25 56:8
**honors** 14:1, 4
**hour** 28:22 30:3 42:15, 25 60:23 62:6, 10 76:10 77:21, 25
**hours** 29:25 30:5 41:12, 14
**HR** 54:23 55:8 56:1, 24 57:8 58:2 59:5, 11 65:14
**hurt** 37:8, 10, 13 59:24
**hypothesized** 65:1 67:2 73:13

< I >
**IDENTIFIED** 4:5 9:6 22:21 78:12 124:13
**iMazing** 106:11, 12, 22 107:2, 13, 17, 20 108:8, 20 110:21, 23 111:8 116:25 117:12 119:9, 14 120:10 121:1, 3, 8, 18, 22 122:7, 8, 11, 17, 20 123:15 124:1, 10
**immaterial** 10:5, 12, 17 11:4
**Immediate** 35:13, 14 37:19
**immediately** 39:14
**important** 10:22 11:2
**Improvement** 18:1
**inaccurate** 129:21
**inbox** 84:19
**include** 26:19 125:20
**included** 61:10, 18
**including** 42:16
**incorrect** 92:14 129:21
**independent** 48:11
**INDEX** 4:1
**individuals** 29:10
**industry** 80:10 122:17
**infer** 59:18
**inferred** 42:6 43:22 56:25
**Informal** 74:12
**in-laws** 26:20
**instability** 58:23 59:3, 7
**Install** 15:7 125:13
**installed** 109:7
**installing** 109:3
**instance** 127:12 128:4
**instruct** 9:2 62:25 63:24 100:20
**instructions** 125:7, 11, 14
**instrument** 16:23
**intent** 8:21
**intention** 53:5
**interest** 54:12, 21 131:14
**interface** 121:19
**internally** 56:16
**interpreted** 40:11 41:23
**interpreting** 55:9
**introduce** 7:9
**involved** 61:3 62:21 63:3, 15
**involvement** 32:19 33:2, 5, 9, 15 82:21
**iOS** 116:20
**iPhone** 105:22 113:8, 15
**iPhones** 116:21
**I's** 27:5
**item** 112:23
**iteration** 122:18
**its** 9:25 122:18, 25

< J >
**job** 14:15 16:1, 12, 20 17:12, 14, 22 20:3 22:15 38:6, 20, 25 39:7, 20 40:9
**jobs** 19:2
**John** 23:8, 9, 15, 20 24:14, 17 26:1, 15, 19 27:4, 11, 19 28:5 29:12 66:3 75:8 85:11
**Josh** 27:25 28:1 61:4 62:24 64:13 81:25
**JOSHUA** 2:1 7:12
**July** 27:7
**June** 131:16
**Jury** 4:8 79:8

< K >
**keep** 43:6
**kind** 12:21 59:22 93:7
**knew** 33:24 34:7 102:21 105:2 106:15, 16, 19
**know** 12:2 23:17 31:16 32:12 38:9, 10, 11 39:24 41:3, 24 42:21 45:3, 12, 18 46:3, 4 49:10 50:6, 15 51:2 53:13 55:14, 16 57:23 59:9 61:5 63:21 64:13 65:4 70:16 71:1 74:14 76:20 77:24 79:14 80:13 81:21 87:4 88:9, 10 89:18, 24 90:2, 8 91:24 92:2 93:4 98:16 99:3, 11 105:7 108:16 113:1, 3, 16 114:8, 13 115:15, 20, 22 116:1, 3, 5, 6, 7, 19, 21 120:3 123:8 124:9, 11, 12, 16 126:10, 24, 25 127:11 128:5, 10, 17 129:12, 17 130:8
**Knowing** 47:3
**knowingly** 9:14, 16

**knowledge** 8:19 15:13 32:21 33:19, 22 34:4, 11, 12 36:8, 17 42:17 44:18, 19, 20 48:11 50:4, 22 51:22 52:18 61:18 62:4 64:23 65:23 66:7 72:25 73:1, 14, 16, 20 74:2, 10, 19 75:1 76:7, 15 78:4 82:19 93:6 96:21 97:24 102:1, 4 104:4, 7 110:24 111:10, 22 120:11 123:20, 21 128:6, 16 129:12, 18
**known** 47:11

< L >
**lack** 104:14
**laid** 56:5, 6
**lasted** 77:20
**law** 4:6 8:5 9:11 12:3 100:13 101:5
**lawful** 7:17
**lawsuit** 51:5, 18, 21 52:12, 17 59:14 64:22 65:3, 8, 11, 17 66:4, 10, 15, 19, 25 67:5, 6, 10 68:1 69:13 80:12
**lawyer** 12:11, 22 13:1 76:20
**lay** 93:5
**layman's** 112:5
**layperson** 110:3
**learn** 57:4 107:3
**leave** 38:10, 15 39:6, 7 42:2, 4, 9 43:14 51:14 55:3, 9, 25
**leeway** 43:6
**left-hand** 124:24
**legal** 3:8 35:7 51:6
**legalese** 34:10
**Leslie** 21:1
**letter** 12:21
**level** 38:5 120:7
**license** 108:20
**life** 58:23
**likes** 72:10
**liking** 77:6
**limitation** 9:3
**limitations** 11:13
**limited** 8:18 63:17 77:8
**LINE** 4:9 41:9 54:1 63:22 64:2 73:5 128:24 130:6
**lines** 125:2
**list** 74:15, 17
**listen** 74:7, 16
**little** 34:1 97:17
**live** 20:6, 21 21:4, 15, 18 53:19
**LLP** 1:17 2:8
**local** 122:12
**located** 17:4
**logic** 38:12 41:4, 5
**logical** 40:2, 5 67:8 110:11
**Logically** 52:24
**logistics** 16:13, 16 39:12
**long** 15:10, 25 16:17 17:6 21:4, 15 28:20 29:17, 21
**longer** 36:25 37:3 51:16 57:20 58:19 67:13 84:20 115:13 123:25 127:7 128:7, 20
**look** 57:7 80:7, 14 124:24 128:23
**looked** 106:7
**looking** 73:7
**looks** 36:19
**lot** 43:5 104:18
**LPA** 2:4

< M >
**machine** 122:12, 21
**machines** 15:9
**Madeira** 21:14
**majority** 58:13
**making** 46:5 47:4 49:2 71:4
**managed** 17:24
**Management** 18:1
**manager** 15:21
**mark** 8:7 9:7 22:22 78:13 124:14
**marked** 78:14
**married** 21:22, 24
**material** 9:18, 24 11:10
**matter** 32:14, 18 36:10, 18 42:12 43:8 65:11 87:4
**matters** 65:22 70:18
**maximum** 12:6
**Mc** 113:17
**McHUGH** 1:4 7:6, 13 21:25 22:2, 12 23:8, 9, 15, 20 24:14, 17 26:2, 15 27:5, 11, 19 28:5 29:12 36:4, 7 47:7, 8 48:7 51:1 56:1 65:3 66:3, 9 75:8 79:1 85:11 88:20 101:22 102:3, 13 103:7 106:18 108:2 111:22 117:1 120:4, 5 126:13 128:11
**McHugh's** 4:9 23:10 26:1 81:11 97:14 112:25 113:4, 18 114:9 124:18
**MD** 2:12
**mean** 19:18 30:24, 25 31:16 32:4, 12 35:15 41:15 43:6 59:15, 19 63:23 67:1 68:22 70:7 79:13 82:5 84:24 88:6 89:9 91:3, 11, 21, 25 92:2 93:3 105:11 112:9 114:5 120:16 126:20 129:6, 17
**meaning** 10:14 94:14, 18 95:9
**meanings** 87:17
**means** 10:20 78:9 83:15, 18, 24 88:3, 7 94:10, 11 98:1 115:12 126:24, 25 131:10
**meant** 46:17 53:4 83:4, 8 86:17 115:4
**medium** 86:20 103:21
**meet** 26:7
**meeting** 35:8, 11 42:19 44:6, 25 51:9, 18, 21 52:1 53:4, 11 57:1 59:14, 25 61:15 64:22 65:2 66:8, 14 68:10, 16 69:16 72:2 75:21 80:16 103:6, 13, 15 104:25 106:19, 20, 21, 25 108:5
**meetings** 27:4 52:14 73:2, 24 74:11 101:24 102:2, 7 103:13
**members** 26:12, 20 35:22 68:9, 11
**memory** 104:14
**men** 99:23
**mention** 40:19 59:1 67:4
**mentioned** 34:14, 16 40:20 44:25 50:24 52:11 99:24
**mentioning** 68:6 79:14
**message** 39:15, 18 45:21 46:7, 17 48:19 52:9 58:25 94:14, 21, 24, 25 115:9, 13 116:2, 9, 10 118:12 119:1 123:24 124:2, 4 127:14 128:7
**messages** 8:20 26:24 33:1 42:11 60:25 62:11 75:16 76:9 82:4, 11, 22, 24 83:2 85:22, 23 86:24 88:21, 24 89:2, 3 90:15, 18 94:19 97:25 102:14, 18 103:16 105:3, 19, 21 107:5, 14 108:9 113:12, 19, 20 114:8, 9 115:21 116:6 117:4, 5 118:6, 7 119:9, 15 120:12, 20, 21 121:1, 8 122:22 123:10, 11 125:6, 8, 20, 21, 23 126:8, 18 127:2, 5, 17, 22 128:12, 17 129:7, 13 130:5, 10
**met** 76:10
**methodologies** 106:5
**Miami** 13:18, 20, 25 14:5
**MICHAEL** 2:7 7:14 8:9 60:22 77:9 92:19
**microphone** 27:16
**million** 70:23 71:4
**mind** 45:13
**minimum** 12:6
**minor** 13:18
**minutes** 43:5 60:23 62:9, 10 77:9 98:9
**Mischaracterizes** 30:7 35:5 38:17 39:22 44:13 45:8 48:21 66:12 69:25 73:5 89:23 92:11 115:2 121:25
**misinterpret** 45:17 47:9
**misinterpreted** 45:11, 16, 21, 23 46:7, 16 47:1, 21 48:19 49:21 50:2, 14, 17, 20
**misinterpreting** 117:16
**missed** 46:22
**missioner** 47:17
**mistakenly** 10:4, 11
**mobile** 95:2 107:24 109:11 111:2 112:18 114:24 115:10, 13 120:12 122:7, 24 123:6, 9
**monikers** 13:13
**Montessori** 22:20
**month** 23:21 34:22
**months** 12:6, 7 18:6, 9 20:9
**morning** 73:3, 10, 17, 21 74:11 75:3 101:25 102:9 104:13
**mother-in-law** 35:17
**move** 39:4 64:20
**moved** 20:8 21:11

< N >
**name** 13:9 15:2, 23 16:24 35:19
**named** 108:8
**nature** 83:19 91:15
**necessarily** 111:10
**necessary** 11:13, 20
**need** 23:18 39:17 43:7, 15 54:23 55:1, 8 56:24 58:23 60:10 61:1, 2 74:7 80:2 101:16
**needed** 56:2 57:8 58:2 102:24 103:4 112:5, 8
**needn't** 37:19
**needs** 72:13 95:7
**negatively** 60:6

**neither** 131:11
**nervous** 81:22, 23
**network** 14:22 17:22 18:20
**never** 42:6 43:21 83:22 90:3 120:13, 14 121:2 127:13, 16
**new** 112:14
**newer** 88:14
**nicknames** 13:12
**nine** 12:6
**NOC** 17:22
**nonsensical** 121:11, 12
**normal** 41:11, 14
**Notary** 1:22 3:10, 16 131:5, 11, 19
**note** 100:17
**noted** 107:8
**notice** 1:15 3:7 4:7 23:1
**notified** 23:5, 7
**nuances** 87:10, 22, 23 88:1, 18, 20
**number** 19:1 100:21 104:1, 4, 21
**numerous** 68:4

< O >
**oath** 7:24 9:15 11:11 31:5 45:20 46:25 49:23 74:18 76:1 125:19
**object** 26:23 73:4 76:25 77:1, 3 100:10, 25
**objecting** 8:25 77:13
**Objection** 10:24 19:7, 11 25:11, 19 29:14, 22 30:6, 16, 23 31:1, 7, 20, 24 34:5 35:4 36:15 38:16, 22 39:1, 21 40:10, 18 41:2 42:10 43:19 44:11 45:7 46:9, 19 47:2 48:20 49:3, 12 53:15, 24 54:5 55:11 56:3 57:10 58:4 60:7, 19 66:11 68:3 69:7, 24 70:10, 25 71:7, 17 72:7 74:22 75:9 76:3, 12, 25 78:6 80:18 85:12, 17 89:16, 22 90:7, 12 92:10, 19 95:3, 19 96:6 98:4, 14, 21 99:2, 9, 18 104:19, 22 114:11 115:1 116:12, 15 117:19 118:19 121:24 126:2, 6 127:9, 18 130:11
**OBJECTIONS** 4:9
**obligation** 8:1, 4
**obligations** 15:14
**observed** 37:11
**Obtaining** 14:14
**obvious** 60:18 70:11
**obviously** 102:12 104:13
**occur** 89:6
**o'clock** 42:25
**offender** 10:3, 11 11:11
**offer** 39:6 40:22
**offered** 38:20, 25 39:20 40:8
**office** 131:15
**offices** 1:17
**official** 9:13, 20 131:15
**Oh** 27:17 48:10 82:17
**OHIO** 1:1, 18, 23 2:5, 9, 12 4:6 7:5 8:5 9:11 12:3 16:5, 6 17:5 20:12 21:3, 14 78:24 100:13 131:1, 6, 16, 19
**okay** 10:23 14:17 15:19 20:13, 24 37:6 40:21 41:5 43:23 47:8 53:10 55:21 58:19 66:22 78:2 81:22 82:18 87:2 94:23 96:16 100:16 101:10 103:1, 24 104:15, 25 109:14 115:8, 19 118:10 123:3 124:11 126:12, 15 128:25
**older** 88:12
**once** 116:8
**one-on-one** 103:6
**ones** 68:22
**open** 126:25
**operations** 17:23
**option** 38:9
**order** 64:3 105:18
**ordered** 64:8, 14
**original** 79:22, 25
**Osceola** 21:12, 19
**outcome** 10:1
**outside** 3:15 8:25 19:12 22:12 41:11, 14 63:15, 18 68:23 77:16, 18 131:10
**overheard** 67:2
**overview** 29:6 53:18

< P >
**p.m** 28:19
**package** 112:13
**PAGE** 4:5, 9 78:21, 22 124:25 125:17 129:24
**pages** 4:9 124:17
**papers** 74:13
**paragraph** 80:22
**paragraphs** 80:22
**parameters** 8:24
**part** 24:11 26:5 33:17 48:12 89:7, 10 92:7 114:19
**participate** 28:8
**particular** 75:17
**parties** 3:3 131:11
**path** 87:18
**Patrick** 13:11 35:25
**Patterson** 2:4
**paying** 70:23 108:17
**PC** 109:23 110:10, 18, 20 111:17, 25 112:10 122:7, 14 123:1, 4
**penalty** 4:6 8:4 9:10 12:2
**pending** 7:4
**people** 44:6, 24 45:3, 5 47:17 53:19 57:16 98:17 103:14
**perform** 15:25
**performance** 14:2
**period** 11:12 20:9 27:12
**perjury** 4:6 8:5 9:10 11:13, 25 12:3
**permitted** 11:3 101:3
**person** 9:13 24:14, 16 27:24 35:8 45:16 46:7 48:6, 19 49:1, 5, 6, 7, 21 50:1 84:19
**personal** 8:19 65:22
**perspective** 87:21 93:5
**Peter** 27:25 28:1
**PHENISE** 2:9
**Phil** 4:9 7:13 22:2 32:20, 25 34:8, 13, 14, 15 36:4, 5, 7 41:18 42:8 43:21 44:25 48:7 51:5 52:7 56:1, 5, 15 57:1 59:23 65:2, 21 66:3, 8 68:16 70:17, 19 72:8 81:11, 22 82:10 88:20 97:14 101:22 102:3, 12 103:7, 17 106:18 108:2 111:22 112:24 113:4, 17, 18 114:9 117:1 120:4, 5 124:18 126:13, 17 128:11
**PHILIP** 1:4 7:6 23:9 26:2 79:1
**Phil's** 44:22 53:5 81:21 82:2
**phone** 18:19 95:2 97:14 102:14, 19, 22 105:15, 20 107:10, 24 109:18, 20, 22 111:2, 8, 13, 17 112:14, 25 113:4, 10, 12, 18 114:9 115:18, 21, 22 116:1, 2, 9 123:16, 17 125:24 126:8, 19, 21 127:1, 6, 14, 22, 24, 25 128:1, 7, 13, 18 129:8, 14
**photos** 107:18
**phrase** 94:7
**phrased** 93:18
**physically** 109:21
**Pick** 21:10
**place** 1:15 20:18 28:15 36:3 52:16 72:9 89:21 110:11, 13 131:8
**places** 110:15
**Plaintiff** 1:5 2:1 7:7, 13 22:2 26:2 28:2 78:25 80:11
**plaintiffs** 12:16
**plaintiff's** 8:17, 20
**platforms** 87:6
**play** 89:7, 10 98:17
**playacting** 89:6, 9, 10, 19
**playing** 98:12
**Plaza** 2:11
**Pleas** 78:23
**Pleasant** 20:20
**please** 9:8, 12, 23 11:8, 23 13:15 14:21 18:17 21:10 22:23 30:10 43:10 48:3 74:5 78:13, 19 84:2, 5 89:12, 15 113:21, 23 118:23 129:5
**plugged** 109:23 110:17 111:14
**plus** 12:7
**point** 38:6 41:19 45:11 46:22 54:25 57:12 64:12 67:12 80:21 85:3 102:12 106:16, 23
**POOLE** 2:9
**pose** 100:22
**posed** 90:23 99:1 124:20 125:3 129:25
**position** 8:17 17:18, 21 40:14 42:2, 4, 9 54:9, 15 56:10 59:5, 23 60:1, 2, 11 65:14
**positions** 17:16 19:10
**possession** 128:2
**possibility** 116:14
**possible** 116:8, 17, 19, 24
**Post** 20:8 58:16
**postgraduate** 14:9
**potentially** 67:6 68:7 72:8
**premise** 17:19
**prep** 27:2 42:14, 20, 23 61:9, 12, 17 62:6 63:20 72:20 74:3 75:20 77:20 78:1 81:2, 3, 4, 6 83:14 87:8 88:24 89:5 94:12 96:20, 23 97:19 115:5 118:16 119:6
**preparation** 27:21, 23 28:9, 12, 14, 20, 25 61:22 74:21
**prepare** 80:17
**prepared** 30:3

**preparing** 51:25
**preposition** 27:20
**presence** 3:12, 15 131:11
**present** 7:9 12:14 13:4 29:16 35:22, 24 51:19 68:9, 13 69:10 80:25 103:8, 10, 14 109:6
**pretty** 42:18 65:21 69:21 70:18 89:4
**previous** 87:25 127:21
**previously** 9:17 127:20
**primarily** 18:21
**prior** 22:24 78:15 79:11, 17 85:5 94:12, 15, 17, 24 95:14 96:21 106:13, 21, 25 107:12 115:4 117:9 119:6
**prison** 12:7
**privacy** 70:20
**private** 70:18
**privilege** 100:12 101:5, 16
**privy** 74:1
**probably** 23:18 34:23 36:2 51:6 95:5
**probing** 104:14
**Problem** 17:25
**Procedure** 1:14 3:7
**proceeding** 9:14, 20
**proceedings** 10:2
**process** 29:7 33:3, 16 48:13 64:4 77:8 86:18
**produce** 129:7
**produced** 88:11 125:20 129:13
**Professional** 1:21
**professor** 22:16
**program** 106:10 107:7, 9 108:8
**promoted** 17:19
**proposal** 54:19 56:10 85:9
**propose** 83:21 84:8
**proposed** 25:22 54:10, 16 56:11, 12, 14 83:16, 22 84:7, 13, 14, 15, 22 85:1 86:8, 9, 11 87:15 91:5 118:15
**propriety** 112:12
**prosecution** 11:14, 21
**protective** 64:3
**prove** 11:14, 21
**provided** 93:16 125:23 126:7, 18 131:10
**providing** 85:20
**pry** 72:9
**psychology** 13:18
**Public** 1:22 3:10 131:5, 11, 19
**Public-Court** 3:16
**pulled** 112:10 113:17
**pulls** 121:22
**purchase** 108:22
**purchased** 108:24 109:1
**purpose** 27:19 44:15 47:1, 14 49:22 50:2, 5 63:17
**pursuant** 1:13, 14 3:6 9:2 131:8
**puts** 122:14
**putting** 122:25

< Q >
**qualifications** 19:16
**qualified** 131:5
**qualities** 44:23
**Quality** 16:16
**question** 10:13, 22, 25 11:1 30:8, 10 31:21 32:1 33:7 43:10, 20 45:14 47:23 48:1, 2, 25 55:19, 20 60:24 62:7, 11 64:6 67:9 71:11, 15 72:10 74:16 77:23 80:2 82:21 83:6, 12 84:2, 4, 23 85:8 86:3, 7, 12, 15, 25 87:1 89:11, 14 91:13, 14, 19 93:9, 12, 13 94:5, 8, 9 96:2 99:15, 20 101:6 103:12 105:5, 10 107:20 113:25 114:15, 21 117:8, 11, 14, 16, 18, 22, 24 118:2, 21, 22 119:17 120:23 121:7, 10 123:3, 4, 7, 14, 23 124:3 125:3, 5, 16 126:22 128:10, 14, 15, 22 129:1, 25
**questioning** 63:22 73:6
**questions** 7:24 8:24 33:11 43:3 74:8 77:4, 5 83:10, 13 84:9 85:4 87:20 89:8, 19 90:1, 5, 10, 20, 23 91:2, 5, 10 93:1, 25 94:3, 9 96:8 98:10, 13, 17, 19, 23, 25 99:3, 5, 7, 12, 13, 17, 21 100:22, 23 101:17 104:17 124:20 130:14
**quit** 67:16

< R >
**raised** 86:3, 5
**ran** 59:1
**rationale** 72:3
**rationalization** 119:25
**rationalize** 43:24
**rattle** 74:14
**reaction** 70:21
**read** 9:11, 12, 22 11:7, 23 30:9, 11 43:9, 11 48:2, 4 58:8 74:4, 6, 12 78:18 84:1, 3 85:5, 7 89:11, 13 91:18, 20 95:11, 16 96:14 113:22, 24 117:17, 20 118:22, 24 123:25 125:2, 4, 16 129:5 130:2, 6
**realize** 75:25
**really** 26:23 43:7 53:2 59:20 74:7 75:18 86:12 121:20
**reason** 60:16 129:19, 22
**reasonably** 8:23
**reassurance** 58:20, 22
**reassure** 37:18 39:16 53:7, 21 57:13 58:13, 18
**recall** 14:3 19:23, 25 22:25 23:16, 17 25:5 27:4 29:19, 24 32:23 34:20 35:12 36:11 37:4, 23 38:2 47:15 52:15 53:2, 17 54:18, 24 57:12, 23 58:12, 16 60:3, 13 65:9, 12, 25 67:4, 11, 21, 24 68:5, 14, 21 69:4, 10, 18 72:4, 6 73:25 74:24 75:18, 23 76:1, 2, 18 78:11 79:13, 14, 15 80:24 81:5, 20 82:5, 15 85:2, 14 86:4 88:5 89:4 90:21 93:20 96:7 97:20 102:5, 10 103:25 104:3 106:6 107:22 108:17 124:22 125:10 127:15 128:3 129:10 130:7
**recalling** 55:15
**receive** 13:25 19:19, 22 20:1 85:9
**recollection** 69:9
**recollections** 69:6
**record** 7:3, 10 8:10, 16 9:11 12:15 13:10, 15 25:14 30:11 43:11 48:4 61:13 72:13, 15, 18 74:6 84:3 85:7 89:13 91:20 95:16 100:18 113:24 117:20 118:24
**recover** 90:14, 17
**recovered** 86:2
**referring** 26:13 45:22 46:8 47:10 55:2, 4
**refusing** 101:18
**regarding** 8:19 86:15
**regardless** 9:25
**regards** 46:22
**Registered** 1:21
**reiterate** 101:15
**relates** 89:3
**relating** 11:10
**relationships** 44:24
**relative** 131:11
**remain** 117:5
**remember** 51:7 96:18 101:6
**remembering** 104:18
**remove** 114:24 120:20
**removed** 94:21 95:1, 5 115:10 116:9 117:4 118:12 120:13, 14, 16, 17, 22 121:2, 4, 9 123:24 127:6, 13, 16, 22
**removes** 116:1
**renotice** 100:22 101:1
**repair** 16:23
**Repeat** 48:1 113:21
**repeatedly** 77:5
**report** 108:1
**Reporter** 1:22 3:11, 16 30:11 43:11 48:4 63:9 74:6 84:3 85:7 89:13 91:20 95:13, 16 96:13 113:24 117:20 118:24
**reporting** 131:12
**represent** 12:5, 12 63:1, 7, 24 100:19
**representative** 98:22
**represented** 98:18 99:16
**reprimanded** 19:9, 18
**reprimands** 19:20, 22, 24
**required** 23:5 108:20
**research** 105:10, 11, 13
**researching** 107:20
**reserved** 65:21
**residence** 20:6, 15
**residences** 68:22
**respect** 62:25 112:24
**respective** 3:3
**respond** 59:11 93:12 108:13
**responded** 94:3
**responding** 45:24
**response** 11:4 73:7 83:5, 7 84:25 85:16 87:25 93:24 105:4 108:10
**responsibilities** 41:1
**restate** 10:25 30:8 118:21
**result** 131:14
**results** 105:25 106:1
**retail** 15:21
**retained** 12:11
**retains** 84:20
**retire** 51:10
**retirement** 44:10 45:4 46:1, 4, 22 47:22 48:6, 8 49:2, 8, 13, 14
**retirements** 51:1
**retiring** 44:3 45:6 67:22
**retrieval** 32:20 33:16 82:10

**retrieve** 102:19 115:13, 21, 23 116:3 124:1, 4 125:7
**retrieved** 123:16
**retrieves** 123:18
**retrieving** 32:25 88:21 102:14 103:16
**review** 81:2, 7, 10
**Reviewing** 81:15
**Ridge** 20:20
**right** 11:7 12:20 15:17 16:9 17:9 23:10, 13 28:3 29:3 31:11 38:15 40:6, 8 44:10 46:15 48:22 49:20 52:1, 17, 22, 24 56:6, 16 63:11 64:2, 24 66:4, 10, 20 69:23 70:14 71:12 73:17 78:3, 25 79:1 80:6 82:2 92:5, 9 93:8, 17 95:2 99:1, 8 102:15, 20 106:15, 22 109:7, 12, 23, 25 110:7, 18 111:1, 18 112:10, 15, 19, 22 113:13, 16 114:4, 25 115:9 118:8, 17 119:5 120:15 121:2 122:1, 14 123:1, 12, 14 124:14, 23 125:2 127:3, 21, 23 128:20
**role** 30:14, 19, 22, 24 31:4, 6, 10, 12, 15, 23 32:4, 8 72:24 76:15 78:7 97:23 98:12, 16
**Rome** 1:17 2:8
**roommates** 20:22, 23
**row** 88:15
**RPR** 1:21 131:5, 18
**Rule** 131:13
**Rules** 1:14 3:7
**rumors** 53:7

< S >
**Saba** 2:4 28:1 29:11 75:8 85:10
**sadness** 45:1
**salary** 40:13, 17, 19
**SANDY** 1:20 7:1 27:15 72:14, 17 130:16
**saw** 27:18 125:10
**saying** 13:6 41:4 43:25 45:15 47:11 54:20, 22, 23 55:8 56:21 58:17 67:11 75:23 126:5
**says** 129:9
**scenario** 119:25
**scene** 86:18
**scheduling** 24:22 25:1, 2, 7 27:13, 14
**school** 13:21, 24
**science** 13:19
**scope** 8:11, 18, 25 19:12 61:1 63:16 77:17, 19 78:10
**scratching** 75:13
**scroll** 123:10 127:1, 7
**seal** 131:15
**search** 8:20 60:25 106:5
**second** 10:7 22:9 25:17, 21 33:18 52:19 64:21 65:2 66:8, 14 108:4 114:19
**Section** 9:12, 22 10:3, 10, 20 11:7, 18, 23, 24
**see** 23:2, 4 27:11, 14 59:22 79:8 105:8 123:11 124:24, 25 125:6, 14 128:7, 20 129:1, 24
**seen** 22:23 49:18 78:15 124:15, 19
**sense** 37:24 41:4, 6, 7 90:2
**sentence** 10:7
**Separate** 81:6 108:4
**serve** 47:16
**Service** 18:1
**Services** 15:4
**session** 28:9, 12, 15, 21, 25 42:23 72:20 75:20 77:20 78:1 81:3, 4, 7 83:14 87:8 88:24 89:5 94:12 97:19
**set** 1:16 131:9, 15
**seven** 18:8, 9, 11 19:3
**shakes** 60:5
**shocking** 59:22 69:21 70:3, 8, 12
**short** 59:20
**shortly** 34:23
**siblings** 68:15, 20 69:10
**side** 18:18, 20
**signature** 3:14, 15 131:10
**similar** 87:15 88:9
**simple** 15:8
**simpler** 86:13
**simply** 112:9
**Sir** 9:8 12:10
**sit** 125:18
**situation** 38:11 87:15 91:13 97:7, 9
**six** 19:2
**small** 14:23 15:7 18:22
**SMITH** 2:1 4:9, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25 5:1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25 6:1, 2, 3, 4, 5, 6, 7, 8, 9, 10 7:12 8:9, 15 9:5 10:24 13:7 19:7, 11 25:11, 19 26:22 29:11, 14, 22 30:6, 16, 23 31:1, 7, 20, 24 34:5 35:4 36:15 38:16, 22 39:1, 21 40:10, 18 41:2 42:10, 18 43:2, 18 44:11, 13 45:7 46:9, 19 47:2 48:20 49:3, 12 50:3 53:15, 24 54:5 55:11 56:3 57:10 58:4, 8, 10 60:7, 19, 22 61:6, 11, 15, 23 62:1, 8, 14, 18 63:2, 5, 12 64:1, 10, 15, 19 66:11 68:3 69:7, 24 70:10, 15, 25 71:7, 17 72:7 73:4 74:22 75:8, 9, 22 76:3, 12, 17, 23 77:3, 12, 16, 22 78:2, 6 80:18 85:10, 12, 17 89:16, 22 90:7, 12 92:10, 18 95:3, 19 96:6 98:4, 14, 21 99:2, 9, 18 100:10, 25 101:15 104:19, 22 114:11 115:1 116:12, 15 117:19 118:19 121:24 122:2 126:2, 6 127:9, 18 129:15 130:11, 15
**snapshoted** 88:14
**software** 8:21 82:3 90:14 106:13 107:4 108:22 109:3, 7, 9 110:21 111:16, 20 119:15 120:10 121:1, 18 122:8, 11, 17 125:13
**solution** 60:18 105:8 107:11
**somebody** 10:16 45:25 46:21 58:25 59:1 87:12 94:9
**someone's** 45:13
**son-in-law** 72:10
**sorry** 17:2
**sort** 26:9 55:2 104:14
**SOUTHERN** 1:1 7:5
**speak** 30:17 49:15 61:14
**speaks** 49:17
**specialist** 14:23 15:6
**specialized** 17:21
**specific** 23:22 36:11 74:24 85:3 99:19 128:3
**specifically** 24:5 32:24 37:23 39:10 53:17 54:19 68:5, 14 78:7 79:16 84:17 86:4, 23 87:9 93:2, 23 94:2, 5 97:13 115:15 117:25 118:1
**spoke** 24:1
**spousal** 100:12
**spouse** 100:15 101:2
**Square** 2:11
**SS** 131:3
**Stagnaro** 2:4
**standing** 109:2
**start** 48:5 53:7 65:20
**started** 8:11
**State** 1:23 8:16 13:9 112:21 118:6 131:1, 6, 19
**stated** 12:15
**statement** 8:10 9:15, 17, 18 11:14, 21 36:10, 18 40:11 55:7, 25 73:8 81:20 82:6, 8 87:13 92:13, 24 93:1 111:4 122:5
**statements** 11:9, 19
**STATES** 1:1 7:4 10:9
**stating** 92:18
**statute** 4:6 9:10 11:12
**stays** 8:23
**stenotype** 3:10 131:9
**step** 56:17
**steps** 109:10
**stipulated** 3:2
**stipulations** 1:16 131:8
**stood** 52:8 57:23
**stop** 14:25 29:3 37:9 62:15, 16
**storage** 114:10 124:7
**store** 15:22, 23
**stored** 112:9 119:22 124:6
**strange** 70:24 71:2
**Street** 1:18 2:8
**strong** 60:14
**stuff** 112:12
**subject** 32:14, 18 42:12 43:7 65:10 99:25
**subjective** 87:14
**submission** 49:5 50:10
**submitted** 46:21
**subpoena** 64:5, 10
**substance** 25:2 31:19 32:10, 13
**substantive** 31:15, 17
**succinct** 31:14
**succinctly** 30:18
**sue** 69:22 70:22 71:6
**suggest** 76:22
**suggested** 83:23
**Suite** 1:18 2:9
**superior** 129:11, 18
**supported** 84:9
**supportive** 60:14
**supposed** 8:18 60:25 63:16
**sure** 8:14 11:1 42:18 54:11, 21 57:14 58:24 68:16 91:6 97:15 103:9

104:24 106:23 118:17 127:4, 20 128:4
**surely** 72:6
**surface** 75:13
**surgical** 16:23
**Suzanne** 35:20 68:16 102:3
**Suzanne's** 36:4, 6
**swear** 9:16
**SWEENEY** 1:11 3:4 4:2 7:3, 16 13:11 131:6
**Sweeney's** 4:7 8:19
**sworn** 7:11, 18 131:6
**Sycamore** 13:24 20:11

< T >
**table** 39:17
**take** 3:7 4:7 19:21 21:8 23:1, 18 28:15 29:17, 21 36:3 38:10 39:6, 7 42:2, 3 43:13 55:2, 9, 25 56:10 60:1, 2, 10 62:9 77:9 86:8, 10, 11
**taken** 1:12 3:4, 10 72:16 131:8, 9
**takes** 16:8 17:8 21:6
**talk** 14:15 24:2, 25 25:1 26:14 27:22 50:8 97:13 106:2 120:5
**talked** 31:3 62:4 64:21 73:9 78:8, 9 96:19 97:21, 24 98:6, 9 120:4
**talking** 42:14, 19, 22 47:5 49:1 52:4 61:9 63:9 97:10 103:15 118:14 120:1
**tape** 72:13
**Teaching** 22:18
**team** 17:20
**technical** 86:13, 17, 19 87:3, 6, 19, 21 88:8 91:15 93:5 111:7 121:17 124:9
**technicalities** 109:16 116:22
**technician** 17:19, 21, 23
**Technology** 15:4 86:21, 22, 23
**telephone** 24:14, 15
**tell** 29:20 31:13 36:21, 24 37:2 39:9 42:8 44:1, 2 50:13, 16 51:10, 13, 16 52:2, 3, 25 53:22 57:2 58:15 59:5, 10 62:21 63:2, 13 65:7, 10 66:23 67:9, 13, 16, 19, 22, 25 68:1, 12 69:3 75:22 103:1 106:18 108:7 109:1
**telling** 39:12 45:25 57:7 58:1
**ten** 43:5 60:23 62:10 104:2, 5
**tends** 65:21 70:17
**term** 32:5 49:13 83:3 95:6 110:4 117:9 119:18
**terminated** 19:6
**terms** 49:1 78:3 80:4 83:11 85:23 99:12 112:5 113:19 114:3, 6 119:25
**testified** 7:19 26:1 39:19 42:1, 23 45:19 49:9, 21 51:20 63:23 66:6, 17 73:3, 21 75:2 76:17 84:12 101:25 120:24 121:3, 20 123:17 129:20
**testify** 44:16 56:7 73:15 83:8 125:19
**testifying** 50:1 61:21 62:5
**testimony** 30:2, 7 35:5 38:17 39:22 45:9 46:8, 16, 25 47:20 48:18, 21 49:23 50:20 65:4 66:12 69:25 74:18 82:3 89:23 92:11 115:2 121:25 129:12
**testimony's** 47:20
**text** 8:20 26:24 33:1 42:11 60:24 62:11 75:16 76:9 82:10, 22, 24 83:2 85:22, 23 86:1, 24 88:3, 21, 24 89:2, 3 90:15, 17 94:14, 19, 21, 24 97:12, 25 102:14, 18 103:16 105:3, 15, 19, 21 107:5, 14 108:9 112:7 113:12 116:2, 9 120:20, 21 121:8 122:22 123:10, 11, 24 125:8, 19, 21, 23 126:18 127:1, 5, 14, 16, 22 128:7 129:7, 13 130:4, 9
**texts** 32:20 33:16 78:8 87:4, 16 102:22 103:5, 21 126:7
**Thank** 22:11 27:17 108:11
**theoretically** 116:8, 16, 23
**theory** 112:13
**thing** 58:3 79:14
**things** 10:21 41:10, 11, 13 73:12 76:15, 16 80:4 104:18
**think** 10:22 11:2, 3 19:2 34:5, 14 38:3 44:22 57:22 58:22 65:23 75:4, 9 82:6 89:17, 25 91:9 105:7 106:14 108:14 109:4 116:16 121:21
**thinking** 105:9
**THIRD** 1:7 2:11 7:7 11:25 25:18, 22 34:8, 13, 17 35:2, 7 36:25 37:3, 18, 22 39:20 40:6 41:25 44:3, 7 46:20 51:11, 14, 17 52:3, 8 53:1, 12 57:21 65:16 67:14, 17, 20, 23 69:14 71:5 79:4
**thought** 10:17 40:16 45:25 54:10, 16 94:20 115:4 121:20
**three** 16:2 25:8, 15, 16 99:23 104:9
**Thursday** 1:19 100:6
**time** 1:15 3:5 7:2, 8 20:7 25:14 26:7 27:11, 18 28:18 29:25 34:15 37:25 39:15 41:9, 18 44:2 46:20 54:1 63:10 67:12 68:9 72:11, 14, 17 88:11 98:8 101:11 102:12 130:16 131:8
**times** 68:4 98:5
**Today** 7:1 12:14, 23 13:1 22:24 43:8 97:18 100:7 101:22 125:18 127:21
**told** 34:7 38:19 39:5 43:14 46:13 51:5 54:13 61:20, 21 65:14 66:9, 19 70:21 81:24 93:11, 15, 16, 18, 22, 24 94:2 96:4, 7 97:18 100:5, 6 111:22
**top** 78:21 105:6 124:24
**topic** 30:13 33:18 61:7, 8 62:22, 23 64:16 71:9 72:23, 25
**topics** 74:20 97:22 98:3
**Total** 16:16
**tower** 18:18
**towers** 18:19
**Township** 20:11
**TQL** 16:18, 21
**transcribed** 3:11, 12 131:9
**transcript** 81:10
**transitioned** 17:25
**transmitted** 87:18
**transpire** 52:12
**transpired** 53:20, 23 54:15
**travel** 24:10
**tribute** 44:9 46:5, 23 47:4, 12, 18 48:24 49:8, 14, 22 50:22, 24, 25
**TriCounty** 16:7
**tried** 43:24 53:18 107:9
**truth** 9:16 31:14 131:7
**truthfully** 30:18 73:15
**try** 24:7 66:24 105:19 107:23
**trying** 23:25 39:25 41:6 49:6 55:5 56:4, 7 64:17, 20 84:23
**Tuesday** 28:16, 17 72:20 75:7, 15 76:11 78:5 80:16 87:8 88:25 89:6 94:13, 15, 24 95:14, 22 98:3 99:24 114:23 115:5
**two** 11:19 16:19 29:9 43:16 52:5, 6, 13 73:2 76:14 80:4 82:16 90:25 96:19 97:11 100:21 103:14 114:14
**type** 38:11 53:19

< U >
**uncertain** 52:8 53:11
**uncertainty** 37:17, 21 52:25 57:15, 19, 22 60:10
**uncle** 23:13 26:1, 16 75:8 85:10
**undeleted** 113:19
**underpinning** 88:2
**undersigned** 131:5
**understand** 7:25 8:3 9:19 12:17 15:14 31:13, 21, 25 32:3 34:9 40:7 43:20 45:14 47:23, 25 53:4 55:5 56:18 80:2, 8 83:12 84:10, 23 85:4 87:12, 20 89:25 91:12, 14 94:5, 7, 11 96:8 109:16 110:2, 9 111:19 112:11 113:25 114:2, 5, 14, 20 116:13 117:7, 14 118:2, 4 119:11, 17, 20, 24 120:23 121:10, 13 122:20 123:7 124:3 126:17, 22 128:9, 21
**understanding** 10:7, 14 11:17 39:23 40:13 65:17 86:16 91:22 94:13, 16, 23 95:9, 15, 23 102:1 105:12 111:6 117:3 121:18, 21 122:16 125:25 126:4, 9, 12, 15
**Understood** 12:8 33:25 40:23 41:10, 17 48:23 56:13 57:15 79:16, 20 88:17
**unfold** 53:6
**unimportant** 11:3

**unique** 113:9, 11
**UNITED** 1:1 7:4
**University** 13:18 22:17
**unpredictably** 24:10
**unsure** 83:8, 10 86:15 87:11, 19 101:19
**unusual** 70:13
**upload** 112:14
**upset** 37:7, 10, 13
**urgency** 41:9
**use** 49:13 106:5 107:13, 16 108:12, 14 115:6 116:3 117:1
**user** 88:3
**user's** 84:19, 22 95:5
**uses** 86:20 116:25
**utilized** 8:21

< V >
**vague** 55:15 94:5
**vaguely** 67:4
**value** 88:13
**various** 20:5 87:22
**verbal** 19:19, 21, 22
**Verbatim** 82:14
**version** 88:12, 14
**viable** 107:10
**Video** 17:20, 22 27:20, 24 28:7 44:10 46:1, 4, 21, 23 47:18, 22 48:7, 12, 24 49:2, 5, 8, 10, 14, 18, 22 50:2, 6, 9, 25
**Videographer** 1:20
**videos** 45:5 46:5 47:4, 12 49:6 50:5, 23, 25
**Videotaped** 1:11 29:18
**violate** 75:25
**violates** 11:24
**visible** 123:6, 8, 15 126:20 127:2, 7 128:13
**visited** 27:10
**volition** 19:5, 8
**voluntarily** 64:4, 5, 8, 11
**vs** 1:6

< W >
**waived** 3:9
**wallet** 109:4
**want** 8:10 20:4 55:20 57:16 59:5 65:4, 14 70:13 95:17 97:16 117:21, 23 124:23
**wanted** 8:16 38:7 39:3, 14 42:2 52:9 53:8 56:15 57:14 96:15 108:15
**watched** 117:1
**watching** 125:12
**way** 32:6 42:11 61:6 62:23 63:15, 21 71:8 98:23, 24 102:21 104:16 105:2
**ways** 83:23
**wear** 98:7
**wedding** 27:5
**week** 24:12 26:10 28:16, 17
**weekend** 41:19
**Well** 13:2 19:19 22:8 24:1, 20, 24 25:13 26:14 27:22 29:8, 20 31:18 32:5 33:10 34:2, 21 38:19, 24 39:9 42:21 43:13 44:1, 5, 14, 17 45:12, 15, 19, 24 46:6 57:7 59:25 60:9 61:25 62:3 63:18 65:16 66:14, 22 68:12 69:19 71:3 75:6 77:16 78:21 79:24 80:14 82:1, 12 83:20 84:12 85:15 86:9 87:24 89:17 90:4, 10, 25 91:11, 22 92:4 93:2 94:4, 19 96:19 97:9, 13 102:11, 17 104:3, 12 107:8, 23 109:14 110:4, 13, 25 111:5 114:7 115:17 116:18 117:11, 13 118:8 119:22 120:17, 24 121:15 122:6, 23 126:23 128:23
**went** 37:18 39:14 47:16 53:21 54:19 57:13 58:12 87:9 88:12
**We're** 7:2 42:13, 19 43:8 52:4 61:9 62:15 71:8 72:15, 18 75:12 78:2 118:14 120:8
**WESTERN** 1:2 7:6
**we've** 25:14 60:22 75:10 77:25 97:21
**WHEREOF** 131:15
**whether's** 62:20
**wife** 23:13 26:20 100:5, 9 101:7
**witness** 1:12 3:4, 12, 13 4:2 7:10, 17 9:2 19:16 23:6 27:17 31:23 60:5 63:17 76:21 77:1 92:16, 17, 20 100:16, 19 101:3 131:8, 10, 15
**word** 83:12 86:17 87:10, 17 91:23 94:7 95:23 105:13
**wording** 36:12
**words** 10:19 59:19
**work** 15:8 16:17 18:7, 12, 21 22:12 24:11 41:12, 14 53:19 65:22 109:14
**worked** 14:22 15:21 16:13, 22 17:12 19:3 71:5 107:21 122:17
**working** 67:16
**works** 109:9 124:10
**worry** 37:19 43:15 57:13
**would've** 15:17 67:2 88:1 99:13 103:10
**written** 19:20, 24
**wrong** 66:18 76:22 93:17
**wronged** 71:14, 16, 24 72:1

< X >
**Xavier** 22:17

< Y >
**Yeah** 8:15 10:13 14:20 16:10 17:10 33:12 34:19 40:25 48:23 51:24 52:20 54:22 55:23 69:2 72:2 73:9, 23 81:16 92:21 93:11 99:19 101:8 102:25 106:24 112:2, 21 116:17 117:15 118:17 120:19 121:6 123:19 126:10 127:4 128:4, 9 129:3, 4
**year** 14:7, 18 15:15 16:19 17:7 34:22 70:24 71:4
**years** 16:2 18:6, 10, 11 21:5 69:23 70:22 71:5 122:19
**Yep** 12:9

< Z >
**Zoom** 24:21

Δπ EXHIBIT 1
Deponent Sweeney
Date 5/26 Rptr. AB
WWW.DEPOBOOKPRODUCTS.COM

Baldwin's Ohio Revised Code Annotated
Title XXIX. Crimes--Procedure (Refs & Annos)
Chapter 2921. Offenses Against Justice and Public Administration (Refs & Annos)
Perjury

R.C. § 2921.11

2921.11 Perjury

Currentness

(A) No person, in any official proceeding, shall knowingly make a false statement under oath or affirmation, or knowingly swear or affirm the truth of a false statement previously made, when either statement is material.

(B) A falsification is material, regardless of its admissibility in evidence, if it can affect the course or outcome of the proceeding. It is no defense to a charge under this section that the offender mistakenly believed a falsification to be immaterial.

(C) It is no defense to a charge under this section that the oath or affirmation was administered or taken in an irregular manner.

(D) Where contradictory statements relating to the same material fact are made by the offender under oath or affirmation and within the period of the statute of limitations for perjury, it is not necessary for the prosecution to prove which statement was false, but only that one or the other was false.

(E) No person shall be convicted of a violation of this section where proof of falsity rests solely upon contradiction by testimony of one person other than the defendant.

(F) Whoever violates this section is guilty of perjury, a felony of the third degree.

**CREDIT(S)**

(1972 H 511, eff. 1-1-74)

**LEGISLATIVE SERVICE COMMISSION**

**1973:**

This section changes former law to limit the crime of perjury to falsification committed in the course of a judicial or quasi-judicial proceeding. Other falsifications under oath or affirmation are covered in section 2921.13 of the Revised Code. Also, unlike former law, it is no defense to a charge of perjury under this section that the oath or affirmation was irregularly taken. The section also changes the former requirement for corroboration to include a number of qualifications not previously stated.

Formerly, perjury included any falsification of a material matter in any proceeding before a tribunal or before an officer created by law, and also any falsification in a matter for which an oath was authorized, whether or not material. Under this section, the falsification must be in an "official proceeding" (defined in section 2921.01 of the Revised Code as, in essence, a judicial or quasi-judicial proceeding). Also, under this section, the falsification must be made while under oath or equivalent affirmation.

Former law required that an oath had to be "lawfully administered," and this was strictly construed. Straight v State, 39 Ohio St 496 (1883). Under this section, an irregularity in the oath or affirmation is no defense.

Under former law, perjury could not be proved except upon the testimony of two witnesses, or upon the testimony of one witness plus corroborating circumstances. This section narrows the requirement for corroboration by stating merely that conviction is precluded where proof that the statement involved was false depends entirely on its contradiction by one person other than the defendant.

Under this section, the false statement involved must be material, i.e., it must be such that it can affect the course or outcome of the proceeding in which it is made, regardless of its admissibility under the rules of evidence. This is substantially the same as the requirement for materiality in former law. See, 42 Ohio Jur 2d 433. Whether a perjurer mistakenly believes his false statement to be immaterial has no bearing on the case.

Notes of Decisions (139)

Notes of Decisions (139)

R.C. § 2921.11, OH ST § 2921.11
Current through Files 29, 30 (immediately effective Revised Code sections only), and 31 to 47 of the 134th General Assembly (2021-2022).

End of Document

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

ΔΠ EXHIBIT 2
Deponent Sweeney
Date 5/26 Rptr. AB
WWW.DEPOBOOKPRODUCTS.COM

| | | |
|---|---|---|
| PHILIP R. McHUGH, Plaintiff, | : | Case No. 1:21-cv-00238-MRB |
| vs. | : | Judge: Hon. Michael R. Barrett |
| FIFTH THIRD BANCORP, *et al.*, Defendants. | : | |

**NOTICE OF VIDEOTAPE DEPOSITION OF BRIAN SWEENEY**

PLEASE TAKE NOTICE that, by agreement of the parties, and pursuant to Rule 30(b)(1) of the Federal Rules of Civil Procedure, Defendants/Counterclaimants Fifth Third Bancorp, Fifth Third Bank, National Association, and Gregory D. Carmichael (collectively "Defendants/Counterclaimants"), by and through their undersigned counsel, Blank Rome LLP, will take the videotaped deposition upon oral examination of Brian Sweeney at 9:00 a.m. on Thursday, May 26, 2022, before a Notary Public or other officer authorized by law to administer oaths. The deposition will take place at the office of Blank Rome LLP, located at 1700 PNC Center, 201 East Fifth Street, Cincinnati, Ohio 45202. The deposition will be recorded by stenographic and videographic means and may be used in evidence at trial or other proceedings in the above-captioned action.

**DATE:** May 20, 2022

Respectfully submitted,

**BLANK ROME LLP**

*s/ Michael L. Cioffi*

Michael L. Cioffi, Esq. (0031098)
Thomas H. Stewart, Esq. (0059246)
1700 PNC Center
201 E. Fifth Street
Cincinnati, Ohio 45202
Tel.: (513) 362-8701
Fax: (513) 362-8702
Email: Michael.Cioffi@BlankRome.com
Email: Tom.Stewart@BlankRome.com

*Attorneys for Defendants/Counterclaimants Fifth Third Bancorp, Fifth Third Bank, National Association & Gregory D. Carmichael*

**CERTIFICATE OF SERVICE**

I, Michael L. Cioffi, Esquire, hereby certify that, on May 20, 2022, a copy of the foregoing Notice of Videotape Deposition of Brian Sweeney was served by electronic mail at the following addresses:

John J. McHugh, Esq.
McHugh & McCarthy, LTD
5580 Monroe Street
Sylvania, Ohio 43560
mchugh@mchughlaw.com

Peter A. Saba, Esq.
Joshua M. Smith, Esq.
Stagnaro, Saba & Patterson Co., L.P.A.
2623 Erie Avenue
Cincinnati, Ohio 45208
pas@sspfirm.com
jms@sspfirm.com

*Attorneys for Plaintiff/Counterclaim Defendant, Philip McHugh*

**BLANK ROME LLP**

*s/ Michael L. Cioffi*
Michael L. Cioffi, Esq. (0031098)

*Attorney for Defendants/Counterclaimants Fifth Third Bancorp, Fifth Third Bank, National Association & Gregory D. Carmichael*

Δπ EXHIBIT 3
Deponent Sweeney
Date 5/26 Rptr. JB
WWW.DEPOBOOKPRODUCTS.COM

**IN THE COURT OF COMMON PLEAS**
**HAMILTON COUNTY, OHIO**

| | |
|---|---|
| **PHILIP R. MCHUGH,** Plaintiff, | Case No. A 2003792 |
| v. | Hon. Alison Hatheway |
| **FIFTH THIRD BANCORP, ET AL.,** Defendants. | **AMENDED COMPLAINT WITH ENDORSED JURY DEMAND** |

Now comes Plaintiff Philip R. McHugh ("Plaintiff"), and for his Amended Complaint against Defendants Fifth Third Bancorp, Fifth Third Bank, N.A., and Gregory D. Carmichael (collectively, "Defendants") for violations of the Age Discrimination in Employment Act ("ADEA"), 26 U.S.C. Section 621, *et seq*., as well as O.R.C. § 4112, having secured the consent of Defendants to file the same pursuant to Civ. R. 15(A), says that:

1. He is a resident of Cincinnati, Ohio; a citizen of the State of Ohio, and until October 16, 2020, was employed as the Executive Vice President of Fifth Third Bank, reporting directly to Gregory D. Carmichael, its President, Chief Executive Officer, and Chairman of the Board of Fifth Third Bancorp ("Carmichael").

2. Fifth Third Bancorp is a diversified financial services company with its principal place of business in Cincinnati, Ohio, and is the parent company of Fifth Third Bank.

3. Fifth Third Bank, N.A. is now a federally chartered bank, regulated by the Office of the Comptroller of the Currency, and is engaged principally in Commercial Banking, Branch Banking, Consumer Lending, and Wealth and Asset Management. It is one of the largest such banks in the United States, and engages in its business activities in Ohio, Michigan, In



VERIFY RECORD

E-FILED 03/17/2021 10:04 AM / CONFIRMATION 1045334 / A 2003792 / JUDGE HATHEWAY / COMMON PLEAS DIVISION / ACOM

Illinois, Kentucky, West Virginia, Tennessee, North Carolina, Georgia and Florida. It employs more than twenty (20) persons, and is subject to both the federal and state laws prohibiting age discrimination in employment.

4. Carmichael is, upon information and belief, a resident of Cincinnati, a citizen of the State of Ohio, and the incumbent Chairman of the Board, President and Chief Executive Officer of Fifth Third Bancorp, having held such position since January, 2018. Carmichael began his career with Fifth Third in 2003, and has held various executive management positions at the bank, including Chief Information Officer, Chief Operating Officer, and President and CEO. At all times relevant herein, Carmichael was McHugh's manager.

5. Carmichael has been a director of the Bank since 2015, and presently serves on ten of the eleven committees of the Board.

6. According to the Fifth Third Bancorp 2020 Proxy Statement, the average annual Chief Executive Officer compensation for 2017-2019 was nearly $10,000,000.00.

7. This court has concurrent subject matter jurisdiction under federal law and original jurisdiction under Ohio law. This court has personal jurisdiction over all named defendants. Venue is appropriate in Hamilton County, Ohio as the events giving rise to the Complaint occurred there.

8. McHugh, now fifty-six (56) years of age, began his career with Fifth Third Bank in Cincinnati in October, 1986. In April, 1994 the Bank requested him to move to Louisville, Kentucky to build the Trust and Investment Division of its then newly acquired affiliate. In March, 2001, he was promoted to run the Commercial Division of the Louisville Affiliate, and in December, 2005, was named President and CEO of Fifth Third Louisville with full responsibility for all business and staff functions.

9. In January, 2010, Carmichael, then the Bank's Executive Vice President and Chief Operating Officer, requested that McHugh return to Cincinnati to lead the Fifth Third Private Bank, Trust and Investment Division. During his tenure then and there, the Trust and Investment

Division substantially grew its assets, revenue, and net income.

10. In April, 2017, Carmichael, then Bank Chief Executive Officer and President, requested that McHugh become head of Fifth Third's Consumer Bank, which included full responsibility for Retail Banking, Mortgage Lending, Business Banking for companies with less than $20.0 million in annual revenues, and for indirect auto lending. Later that year, in December, Carmichael reassigned additional responsibility to McHugh, charging him with oversight of the Wealth and Asset Management division of the Bank.

11. In August, 2018, Carmichael, in his first year as Board Chairman, assigned McHugh responsibility for leadership of all fourteen of the Bank's regional presidents, noting that this additional assignment involved a much larger role, greater responsibility, and a more significant impact on Fifth Third Bank. The advance now gave McHugh responsibility for Business Banking, Wealth and Asset Management, as well as Regional Banking.

12. At that time, Carmichael appointed Timothy N. Spence ("Spence"), succeeding McHugh, to be head of the Consumer Bank, but McHugh kept Business Banking, Wealth and Asset Management, and overall responsibility for Regional Banking.

13. In late June, 2019, Carmichael delegated further responsibility to McHugh, directing that he accept the Public Relations and Community and Economic Development Groups, as well as retaining all prior assignments.

14. In each and every successive position at Fifth Third Bank, McHugh excelled in his performance, and was rewarded with additional compensation, greater responsibility and a higher profile within the Bank. At no time did Carmichael ever communicate to McHugh that his performance was lacking, inadequate, insufficient, or less than expected.

15. On August 15, 2019, during McHugh's mid-year performance review, Carmichael, the Chairman of the Board, President and Chief Executive Officer, told McHugh that he, Carmichael, would be pursuing other matters, and that he, Carmichael, promised that he would

recommend McHugh to be the next President and Chief Executive Officer, for a term of three to five years, until Spence was ready for the assignment. Carmichael told McHugh that he was the most qualified officer on the executive team to take the President and Chief Executive Officer positions, and that Spence was not only too young but also lacked necessary banking experience, having been at that point at Fifth Third only four years.

16. Following an off-site meeting on August 18, 2019, Robert Shaffer ("Shaffer"), then the Bank's Chief Human Resources Officer, confirmed to McHugh what Carmichael had earlier promised him, that McHugh would be the next President and Chief Executive Officer, and confided to McHugh his opinion that McHugh was the most qualified executive to acquire such responsibility.

17. On February 14, 2020, during his annual performance review, Carmichael told McHugh that the Board of Directors had requested that Carmichael extend his term for one to two years, and suggested to McHugh that McHugh might then be too old to hold that position, but did not indicate that Carmichael's change of plans would adversely impact McHugh.

18. Shortly thereafter, Shaffer informed McHugh that with his then assigned responsibilities, he would be one of the five most-highly compensated employees at the Bank, and as a Named Executive Officer, would be identified in the 2021 proxy statement issued in connection with the 2021 Annual Meeting of the Shareholders of Fifth Third Bank.

19. In February, 2020, Carmichael requested that McHugh take on additional responsibility for Middle Market Banking (for companies with revenues ranging from $20 - $500 million), and Fifth Third Insurance, resulting in McHugh having twenty direct reports, substantially more than any other senior executive.

20. On March 9, 2020, the Bureau of Consumer Financial Protection ("CFPB") filed its second misconduct complaint against Fifth Third Bank, this time in Chicago, Illinois, in Case No. 1:20-cv-01683, asserting that the Bank had unlawfully and illegally opened deposit accounts

in consumers' names without their authorization to do so, transferred funds from existing accounts to new accounts, without authorization, issued credit cards, enrolled consumers in online banking services, and opened lines of credit on consumers' accounts. In doing so, the CFPB alleged that Fifth Third Bank had engaged in repeated violations of the Consumer Financial Protection Act, the Truth in Lending Act, and the Truth in Savings Act, together with their implementing regulations, and sought injunctive and monetary relief.

21. The assignment of this additional responsibility required that McHugh commit substantial time to resolution of then serious credit issues in the Middle Market Banking Portfolio, as well as supervise the Bank's SBA lending response in light of the COVID-19 pandemic. In the first and second iterations of the Paycheck Protection Program, Fifth Third Bank made loans of $5.5 billion, against an average SBA loan year with $400 million extended.

22. Shortly before the Board of Director meetings of September 21 and 22, McHugh discussed with Carmichael McHugh's presentation to the Board regarding the Bank's performance, and was explicitly directed by Carmichael to indicate that, across all lines of business for the Bank, the Regional Banking contributed 63% of the Bank's net income. This representation underscored the significance of McHugh's role, and reemphasized Carmichael's promise to endorse McHugh for the President and Chief Executive Officer position.

23. On October 13, 2020, Carmichael met with McHugh, and, for the first time, advised McHugh that he was to be demoted to head of Consumer Banking, a role from which he had previously been promoted, and was to report to Spence, who would assume McHugh's responsibilities for Regional Banking, and Wealth and Asset Management. McHugh was also informed that he would lose his responsibilities for Middle Market Banking.

24. Carmichael voiced no criticism of McHugh's performance. He did not express any cause for such action.

25. Surprised by this turn of events, McHugh inquired whether there were any

alternatives available to him. Carmichael said that was not McHugh's only option, but offered no other alternatives. McHugh requested that he have a few days to consider demotion to head of Consumer Bank. McHugh next met with Carmichael on October 15, 2020.

26. McHugh informed Carmichael that he believed that it was in the best interest of the Bank and its shareholders that he remain in his incumbent position. Carmichael told McHugh that McHugh had consistently delivered excellent results in every management position he had held. Carmichael said that his reputation for honesty and integrity within the Bank was unchallenged.

27. Carmichael told him that his position, and most of its significant duties and responsibilities, were being given to Spence to enable Spence to acquire the experience he needed to become the next President and Chief Executive Officer. Carmichael told McHugh that he made the decision to advance Spence, and acknowledged that it came at McHugh's expense. Spence is forty-one (41) years old.

28. Carmichael acknowledged that he had never suggested to McHugh that McHugh was no longer to be considered for President and Chief Executive Officer, and twice apologized that he had not discussed this with McHugh. He agreed that this change in assignment came at McHugh's expense, and was made to enable Spence, an individual substantially younger than and less qualified than McHugh, to get the experience needed to become Chief Executive Officer.

29. Later that day, Shaffer called McHugh, and informed him that his only choice was to accept the demotion, failing which he was not to return to work. McHugh suggested he and Shaffer meet face to face Monday morning to discuss the matter; Shaffer told McHugh that if he did not accept the demotion, he should not to return to work on Monday. McHugh called Carmichael to confirm such an instruction; but Carmichael refused to take the call or to return the call. McHugh's employment with Fifth Third Bank was terminated on Monday, October 26, 2020.

30. On October 26, 2020, Carmichael and Fifth Third Bank announced the appointment of Spence as President of the Bank. Fifth Third disingenuously announced that McHugh had left

the Bank.

31. McHugh was discriminated against in his employment by the Bank because of his age.

32. McHugh commenced this action seeking relief on October 28, 2020.

33. McHugh's filing of this action was an exercise of protected activity, including an opposition to unlawful discriminatory practices by Defendants, and the participation in a proceeding.

34. Two days after McHugh's filing of this action, Defendants engaged in unlawful retaliation against McHugh on the basis of his protected activity, including by filing a retaliatory counterclaim against McHugh for abuse of process

35. Defendants' retaliatory acts have continued, including attempts to immediately harass McHugh's wife and four children through subpoenas for documents and testimony which have no relation to McHugh's claims or employment at Fifth Third.

36. McHugh filed a timely charge of discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC"), on November 5, 2020.

37. On December 18, 2020, McHugh received a notice of dismissal and right to sue from the EEOC. A true and accurate copy of the same is attached hereto as Exhibit A. McHugh has satisfied all conditions precedent to exercise his rights under federal and state law.

38. As a direct result of such discrimination and retaliation, in violation of both federal and state law, McHugh has sustained financial losses in base pay, variable compensation, long term incentive compensation, equity awards, stock options, and health coverage for himself and his family, all to his detriment in an amount exceeding $12,500,000.00.

**COUNT I: FAILURE TO PROMOTE, ADEA**

39. The allegations of Paragraphs 1 through 38 are hereby incorporated by reference as if fully restated herein.

40. McHugh was 56 years old at the time of his termination from Fifth Third.

41. McHugh was highly qualified for the positions of President of Fifth Third and CEO of Fifth Third, and expressed a willingness to accept the positions after Carmichael informed McHugh that he would be recommended for them.

42. Despite the positions of President and CEO being promised to McHugh, he was later rejected for the promotion.

43. Instead, Defendants promoted Spence, a substantially younger and less qualified individual, to the position of President. Defendants' articulated reasons for promoting Spence over McHugh are false, and a mere pretext for age discrimination.

44. Defendants above-referenced discriminatory acts are willful violations such that McHugh is entitled to liquidated damages.

**COUNT II: FAILURE TO PROMOTE, O.R.C. § 4112**

45. The allegations of Paragraphs 1 through 45 are hereby incorporated by reference as if fully restated herein.

46. The allegations which state a cause of action under the "Count I: Failure to Promote" under the ADEA also state a cause of action for failure to promote under O.R.C. § 4112.02(N), 4112.14, and 4112.99.

47. Defendants committed the above-referenced discriminatory acts with malice and/or reckless indifference to the rights to Plaintiff such that Plaintiff is entitled to punitive damages.

**COUNT III: WRONGFUL TERMINATION, ADEA**

48. The allegations of Paragraphs 1 through 47 are hereby incorporated by reference as if fully restated herein.

49. Plaintiff was 56 years old at the time of his termination.

50. Plaintiff was highly qualified for the Executive Vice President position he held at Fifth Third.

51. In October 2020, Defendants deliberately created intolerable working conditions for McHugh, with the intention of forcing McHugh to leave his employment. This included requiring McHugh to accept a demotion to Head of Consumer Banking, a position he previously held, and to report directly to Spence, a substantially younger and less qualified individual who, until that point, reported directly to McHugh.

52. When McHugh did not accept the demotion, Fifth Third terminated his employment, and promoted Spence to the position of President, taking on substantially all of McHugh's responsibilities.

53. Defendants' attempts to demote McHugh, and termination of McHugh when he did not accept, were discriminatory on the basis of McHugh's age.

54. Defendant's articulated reason for Plaintiff's termination is a pretext for age discrimination.

55. Defendant's above-referenced discriminatory acts are willful violations such that Plaintiff is entitled to liquidated damages.

**COUNT IV: WRONGFUL TERMINATION, O.R.C. § 4112**

56. The allegations of Paragraphs 1 through 55 are hereby incorporated by reference as if fully restated herein.

57. The allegations which state a cause of action under "Count III: Wrongful Termination" under the ADEA also state a cause of action for wrongful termination under O.R.C. § 4112.02(N), 4112.14, and 4112.99.

58. Defendants committed the above-referenced discriminatory acts with malice and/or reckless indifference to the rights to Plaintiff such that Plaintiff is entitled to punitive damages.

**COUNT V: RETALIATION, ADEA**

59. The allegations of Paragraphs 1 through 58 are hereby incorporated by reference as if fully restated herein.

60. McHugh engaged in protected activity under O.R.C. § 4112, including by initiating this action on October 29, 2020 for age discrimination.

61. Within two days of engaging in this protected activity, Defendants took adverse actions against McHugh through the filing of a frivolous counterclaim asserting abuse of process, which seeks awards of punitive damages and attorney's fees against McHugh for the mere filing of an age discrimination lawsuit.

62. Since that time, Defendants have engaged in further unlawful retaliatory acts, including abusive subpoenas directed to McHugh's wife and four children.

63. Defendants' abuse of process counterclaim has no basis in fact, and is nothing more than a retaliatory tactic in response to Plaintiff engaging in protected activity under the ADEA, including his opposition to Defendants' unlawful conduct and participation in this action.

64. Defendants committed the above-referenced retaliatory acts with malice and/or reckless indifference to the rights of Plaintiff.

**COUNT VI: RETALIATION, O.R.C. § 4112**

65. The allegations of Paragraphs 1 through 65 are hereby incorporated by reference as if fully restated herein.

66. The allegations which state a cause of action under "Count V: Retaliation" under the ADEA also state a cause of action for retaliation under O.R.C. § 4112.02(I).

67. Defendants committed the above-referenced discriminatory acts with malice and/or reckless indifference to the rights to Plaintiff such that Plaintiff is entitled to punitive damages.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, consistent with Civil Rule 8(A), for damages in excess of $25,000.00, together with the following relief:

A. Lost Wages (back pay)

B. Lost benefits;

C. Reinstatement, or front pay in lieu thereof;

D. Compensatory damages

E. Punitive damages

F. Liquidated damages

G. Pre-judgment and post-judgment interest

H. Attorneys' fees and expenses; and

I. All other relief to which Plaintiff is entitled.

**JURY DEMAND**

Plaintiff hereby demands trial by jury on all issues on all issues triable to a jury

Of Counsel for Plaintiff:

Stagnaro, Saba & Patterson Co., L.P.A.
2623 Erie Ave
Cincinnati, Ohio 45208 Stagnaro, Saba & Patterson Co., L.P.A.
2623 Erie Ave
Cincinnati, Ohio 45208

*/s/ Joshua M. Smith*
Peter A. Saba, Esq. (0055535)
Joshua M. Smith, Esq. (0092360)
Stagnaro, Saba & Patterson Co., L.P.A.
2623 Erie Avenue
Cincinnati, Ohio 45208
pas@sspfirm.com
jms@sspfirm.com

McHugh & McCarthy, Ltd.
5580 Monroe Street
Sylvania, Ohio 43560

John J. McHugh, III
5580 Monroe Street
Sylvania, Ohio 43560
Telephone: (419) 885-3597
Facsimile: (419) 885-3861
Co-Counsel for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing Amended Complaint with Endorsed Jury Demand was duly served by electronic mail upon the following attorneys for defendants, in compliance with Civ. R. 5(B)(2)(f) of the Ohio Rules of Civil Procedure, this 18th day of March, 2021:

Michael L. Cioffi, Esq.
cioffi@blankrome.com

Liza J. Brackman, Esq.
LBrackman@blankrome.com

Thomas H. Stewart, Esq.
stewart@blankrome.com

David J. Oberly, Esq.
doberly@blankrome.com

*/s/ Joshua M. Smith*
Attorney for Plaintiff

EEOC Form 161 (11/2020)

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

To: **Philip McHugh**
**8000 Finley Lane**
**Cincinnati, OH 45242**

From: **Cincinnati Area Office**
**John W. Peck Fed. Bldg**
**550 Main Street, Suite 10-191**
**Cincinnati, OH 45202**

☐ *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **473-2021-00174** | **Matthew G. Meisman, Investigator** | **(513) 914-6009** |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☐ The EEOC issues the following determination: The EEOC will not proceed further with its investigation, and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[X] Other *(briefly state)* **To be determined in a court of competent jurisdiction**

### - NOTICE OF SUIT RIGHTS -

*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

Matthew Meisman Digitally signed by Matthew Meisman DN: cn=Matthew Meisman, o=EEOC, ou, email=matthew.meisman@eeoc.gov, c=US Date: 2020.12.17 09:15:21 -05'00'

**Richard Burgamy,**
**Acting Area Office Director**

12/18/2020
*(Date Issued)*

Enclosures(s)

cc:

**Trevor Gillette, Esq.**
**Vice President and Counsel, Legal Dept.**
**FIFTH THIRD BANCORP**
**Fifth Third Bank, N.A.**
**38 Fountain Square Plaza, Mail Drop 10at83**
**Cincinnati, OH 45263**

**Smith, Esq, Joshua M**
**Staganaro, Saba, & Patterson**
**2623 Erie Avenue**
**Cincinnati, OH 45208**

Page 70

Q When you were downloading the messages, did you see any instructions about how to retrieve deleted text messages?
A I can't recall if I saw any such instructions.
Q So as you sit here today, you cannot testify, under oath, whether the text messages you produced include all deleted text messages, can you?
A I provided all the text messages that were in my phone.
Q Do you mean by that, then, you did not produce text messages that had been deleted from your phone?
A I cannot recall that.
Q Okay. What can you recall?
A I downloaded all the messages in my phone, including I've had a backup into the iCloud. I cannot confirm whether that included all deleted messages. I've had this phone for numerous years.
Q Did you do anything to assure that you had captured the deleted text messages?
A Could you be more specific in terms of anything?
MR. CIOFFI: Could you read my question back?
COURT REPORTER: Yes. Give me one second.
(REPORTER READS BACK REQUESTED TESTIMONY)
BY MR. CIOFFI:

Page 71

Q Did you do anything at all, anything, to capture the deleted text messages?
MR. SABA: Objection to form of the question. Go ahead. You can answer.
A I don't recall.
Q But your testimony is that you only captured what was on your phone, correct?
A I provided all the text message that was on my phone.
Q All right. And you provided no text messages that had been deleted from your phone; isn't that correct?
MR. SABA: Objection. Asked and answered. Go ahead. You can answer.
A I -- I cannot confirm that. I provided all the text messages that were on my phone.
MR. CIOFFI: I want to state this on the record. Counsel, we'll make a request on the record for his phone so that we can inspect and make sure that deleted text messages were produced. We produced deleted text messages.
MR. SABA: Yeah. I'm going to make a --
MR. CIOFFI: Now that's within the scope of our request.
MR. SABA: Okay. I'm going to make a note,

Page 72

Michael, but if you could follow up with a letter as well just to confirm your request, and then we can make sure we're -- I'm sure there's going to be more that you may come across and just make sure we're on the same page.
MR. CIOFFI: All right. And if you can make sure that nothing happens to the phone in the interim, that would spoliate that evidence.
BY MR. CIOFFI:
Q Also, with respect to the text messages, I noted that the text messages with Jamie Leonard stopped on October 26, 2020. Did you provide a cutoff date for the text messages with him?
A No. I did not provide a cutoff date.
Q There are other text messages that you produced, well into 2021 with other people, but not with Jamie Leonard.
A Correct.
Q Okay. Why is that?
A I believe the request was to provide all text messages up and to the date of response, and I did that with all my text messages.
Q Is it your testimony under oath that you had no text messages with Jamie Leonard after October 26, 2020?

Page 73

A As best I can recall, yes. That is -- that is accurate.
Q Okay. Why is that?
A I understand the bank employees were told not to contact me after October of 2020.
Q But there are several text messages with bank employees after October 2020, right?
A Yes.
Q But not with Jamie Leonard. Why not?
A I don't believe there are any text messages with Jamie after October 26 of 2020.
Q Did you have any telephone calls with him after October 26, 2020?
A I don't believe I've had any telephone conversations with Jamie Leonard after October 26, 2020.
Q Any meetings?
A I have not had any meetings with Jamie Leonard after October 26, 2020.
Q You mentioned earlier this morning that one of the entities you had discussions with about employment was BMO, which is Bank of Montreal, right?
A BMO is Bank of Montreal, correct.
Q I believe you testified that you had discussions with BMO --
A Yes.

EXHIBIT 4
Deponent Sweeney
Date 5/24 Rptr. JB
WWW.DEPOBOOKPRODUCTS.COM