UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

CASE NO. 1:21-CV-00238-MRB

JUDGE: HON. MICHAEL R. BARRETT

PHILIP R. MCHUGH,

Plaintiff

V.

FIFTH THIRD BANCORP, ET AL.,

Defendants

DEPONENT: PHILIP R. MCHUGH

DATE: AUGUST 30, 2021

REPORTER: GABRYEL REINSTATLER

APPEARANCES

ON BEHALF OF THE PLAINTIFF/COUNTERCLAIM DEFENDANT,
PHILIP R. MCHUGH:
Peter A. Saba
Joshua M. Smith
Stagnaro, Saba & Patterson Co., L.P.A.
2623 Erie Avenue
Cincinnati, Ohio 45208
Telephone No.: (513) 533-2700
E-mail: pas@sspfirm.com
jms@sspfirm.com

AND

John J. McHugh
McHugh & McCarthy, LTD
5580 Monroe Street
Sylvania, Ohio 43560
Telephone No.: (419) 885-3597
E-mail: mchugh@mchughlaw.com

APPEARANCES (CONTINUED)

ON BEHALF OF THE DEFENDANTS/COUNTERCLAIMANTS, FIFTH THIRD BANCORP, FIFTH THIRD BANK, NATIONAL ASSOCIATION, AND GREGORY D. CARMICHAEL:

Michael L. Cioffi
David J. Oberly
Blank Rome LLP
1700 PNC Center
201 East Fifth Street
Cincinnati, Ohio 45202
Telephone No.: (513) 362-8701
Facsimile No.: (513) 362-8702
E-mail: cioffi@blankrome.com
doberly@blankrome.com

GENERAL COUNSEL FOR FIFTH THIRD:

J. Phenise Poole
Brian Thomas
38 Fountain Square Plaza
Cincinnati, Ohio 45263
Telephone No.: (513) 579-5203
E-mail: phenise.poole@53.com
brian.thomas@53.com

APPEARANCES (CONTINUED)

ALSO PRESENT: Elizabeth Harlow, Videographer

# INDEX

| | Page |
|---|---|
| PROCEEDINGS | 9 |
| DIRECT EXAMINATION BY MR. CIOFFI | 10 |

## EXHIBITS

| Exhibit | Page |
|---|---|
| 1 - Perjury Statute of Ohio | 10 |
| 2 - Text Messages from 07-15-2019 to | 45 |
| 3 - Merriam-Webster Definition | 52 |
| 4 - Text Messages from 01-22-2020 to 02-06-2020 | 53 |
| 5 - Text Messages from 04-05-2020 to 04-29-2020 | 62 |
| 6 - Collection of Handwritten Charts | 78 |
| 7 - Documents for Annual Meeting of Shareholders in 2017 | 103 |
| 8 - Documents for Annual Meeting of Shareholders in 2018 | 117 |
| 9 - Documents for Annual Meeting of Shareholders in 2019 | 117 |
| 10 - Documents for Annual Meeting of Shareholders in 2020 | 118 |
| 11 - Text Messages from 10-01-2020 to 10-01-2020 | 119 |

EXHIBITS (CONTINUED)


12 - Text Messages from 10-01-2020 to 10-05-2020 119

13 - Text Messages from 9-24-2019 to 10-04-2019 148

14 - Text Messages from 7-29-2020 to 7-29-2020 149

15 - Text Messages from 7-29-2020 to 8-05-2020 158

16 - Text Messages from 7-21-2020 to 7-29-2020 159

17 - Text Messages from 8-24-2020 to 8-26-2020 162

18 - Text Messages from 8-25-2020 to 8-27-2020 162

19 - Text Messages from 9-29-2020 to 10-01-2020 181

20 - Video 187

21 - Collection of E-mails and Text Messages to and from Colleen Sweeney 211

CERTIFIED QUESTION

| | Page |
|---|---|
| Q Not by topics. Did you discuss, for example, that your deposition would be taken? | 19 |

STIPULATION

The deposition of PHILIP R. MCHUGH, was taken at BLANK ROME LLP, PNC CENTER, 201 EAST FIFTH STREET, SUITE 1700, CINCINNATI, OHIO 45202 on MONDAY, the 30th day of AUGUST 2021 at 10:09 a.m.; said deposition was taken pursuant to RULE 30(b)(1) OF THE FEDERAL Rules of Civil Procedure.

It is agreed that GABRYEL REINSTATLER, being a Notary Public and Court Reporter for the State of OHIO, may swear the witness.

PROCEEDINGS

VIDEOGRAPHER: Okay. We are now on the record. My name is Elizabeth Harlow. I'm the videographer today, and Gabby Reinstatler is the court reporter. Today is the 30th day of August 2021. The time is 10:09 a.m. We're at the offices of Blank Rome LLP located in Cincinnati, Ohio to take the deposition of Philip McHugh, in the matter of Philip R. McHugh versus Fifth Third Bancorp, et al. pending in the United States District Court, Southern District of Ohio, Western Division, Case Number 1:21-CV-00238-MRB. Will counsel please identify themselves for the record?

MR. SABA: Certainly. Peter Saba on behalf of the Plaintiff. I'm also here with John McHugh and Joshua Smith.

MR. CIOFFI: On behalf of the Defendants, Michael Cioffi and David Oberly of Blank Rome.

VIDEOGRAPHER: Okay. Sir, would you raise your right hand to be sworn in by the reporter?

COURT REPORTER: Do you solemnly swear or affirm that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

COURT REPORTER: All right. Thank you.

DIRECT EXAMINATION

BY MR. CIOFFI:

Q You have just been administered the oath to answer my questions fully and completely and truthfully. Do you understand your legal obligations to answer truthfully?

A I do.

Q Do you understand that your testimony is subject to the penalty of perjury?

A I do.

Q Are you familiar with the Perjury Statute in Ohio?

A I am not.

Q Let's mark as Exhibit 1. One for the court reporter, one for the witness, one for Counsel -- two for counsel.

(EXHIBIT 1 MARKED FOR IDENTIFICATION)

MR. SABA: Thank you.

MR. CIOFFI: Did you mark that as 1?

COURT REPORTER: Yes.

BY MR. CIOFFI:

Q Sir, I'm directing your attention to Exhibit 1. At the top, you see RC Section 2921.11, perjury? Would you look at --

A Yes.
Q Do you see that?
A Yes.
Q Would you read Section A, please? And read into the record.
A "No person, in any official proceeding, shall knowingly make a false statement under oath or affirmation or knowingly swear or affirm the truth of a false statement previously made when either statement is material."
Q Read Section B2, please.
A "A falsification is material, regardless of its admissibility in evidence, if it can affect the course or outcome of the proceeding. It is no defense to a charge under this section that the offender mistakenly believed a falsification to be immaterial."
Q Directing your attention back to Section A, do you understand that this is an official proceeding?
A Yes.
Q All right. Now, read Section D, please.
A Could you repeat that? C or D? I didn't --
Q D. Read Section D, please.
A "Where contradictory statements relating to the same material fact are made by the offender under oath or affirmation and within the period of the statute

of limitations for perjury, it is not necessary for the prosecution to prove which statement was false, but only that one or the other was false."

Q What is your understanding of that section?

A Section D or all of that I have read?

Q Section D.

A That if there are contradictory statements relating to the same material fact, that it's not necessary for prosecution to prove which statement was false and which statement was true.

Q Okay. In your understanding -- what's your understanding of the term "contradictory statements"?

A If the statements were not the same.

Q And please read Section F.

A "Whoever violates this section is guilty of perjury, a felony of the third degree."

Q Do you know what the penalty for perjury is in the state of Ohio?

A I do not.

Q I will represent to you it's a minimum of nine months and a maximum with 36 months in prison, plus a fine of up to $10,000. State your full name, please.

A Philip Raymond McHugh.

Q What is your residence address?

A 8000 Finley Lane, Cincinnati, Ohio 45242.

Q Have you ever used an alias?
A Not that I can recall.
Q Have you ever gone by a moniker or nickname?
A Phil McHugh?
Q Phil is abbreviation for Philip; is that right?
A Correct.
Q Any other moniker or nickname?
A Not that I can recall.
Q What did you do to prepare for your deposition today? And I'm including not the period of time just previous to this deposition, but there was an earlier deposition that was noticed in December. For both of those periods of time, what did you do to prepare?
A Could you be more clear -- more specific?
Q What don't you understand?
A In terms of your question, I'm asking you to be more specific.
Q But what don't you understand about my question?
A In terms of preparation.
Q What did you do to prepare yourself for this deposition?
A I reviewed our complaint.
Q Okay.

A I reviewed the counterclaim or counter-complaint, and I briefly reviewed the documents that were provided by Fifth Third to our request.

Q Did you review the documents that your counsel produced in this case?

A I provided those documents to my counsel.

Q So what -- is your testimony that all the documents that were produced were provided by you personally?

A All the documents? Can you clarify that question? You're saying all the documents?

MR. CIOFFI: Yeah. Read back his answer -- previous answer, please.

COURT REPORTER: Yes. Give me one second. Sorry. I'm going back a little bit to get your question.

MR. CIOFFI: Yeah. Yeah. Sure. Yeah. His answer began "I provided."

(REPORTER PLAYS BACK REQUESTED TESTIMONY)

MR. CIOFFI: And his answer prior to that.

COURT REPORTER: Yes. Oh, of course.

(REPORTER PLAYS BACK REQUESTED TESTIMONY)

BY MR. CIOFFI:

Q What's your answer to that question?

A Can you repeat the question?

MR. CIOFFI: Please, repeat the question.
COURT REPORTER: Yes. Give me one second.
(REPORTER PLAYS BACK REQUESTED TESTIMONY)
A I believe so, but I cannot claim with 100 percent certainty that all the documents my attorneys provided were produced by me.
BY MR. CIOFFI:
Q Do you know which ones for certain you produced and then articulate which documents you're not certain about?
A I will do it to the best of my ability, but there were numerous documents that were produced.
Q Please answer the question.
A I believe I -- I have produced a notes from discussions of meetings with Mr. Carmichael, Mr. Shaffer, and other executives of the bank. I have produced e-mails, I have produced LinkedIn messages, I produced performance reviews that were in my possession, I produced copies of text messages. I -- I -- I'm certain there were other documents I produced, but I can't recall them all off the top of my mind.
Q In preparation for your deposition today, did you have meetings with your counsel or anyone else?
A I've met with my counsel to discuss many --
MR. SABA: Let me object. Philip, as an

instructional thought, I don't want you to discuss anything that we discussed during our meetings. Any of those are protected by the attorney-client privilege.

THE WITNESS: Okay.

MR. SABA: Whether or not we had a meeting, that's fine, you can disclose there was a meeting --

THE WITNESS: Yes.

MR. SABA: -- but I do not want you to discuss --

THE WITNESS: Thank you.

MR. SABA: -- the content of those meetings.

THE WITNESS: Yes.

BY MR. CIOFFI:

Q When did you meet with Counsel?

A I had meetings with my Counsel in November of 2020, December of 2020. I can't recall if we had meetings in January, February, March, or April. I had a meeting with Counsel in May of 2020, and I believe in June, July, as well as August of '20. I'm sorry. I'm sorry. I'm sorry. I met with Counsel in November and December of 2020. I cannot say for certainty that we met in January, February, March, or April of 2021. I do recall meetings in May of 2021, June of 2021, July of 2021, and August of 2021.

Q And all those meetings were in preparation for your deposition today?
A I cannot recall if all of those meetings were in preparation. Those were meetings that I had with my counsel.
Q Were some of them in preparation for your deposition today?
A Yes.
Q At that meeting, did you review documents?
A Yes.
Q Without describing the content, describe the nature of the documents.
A Could you repeat that question?
MR. CIOFFI: Please read it back.
COURT REPORTER: Yes. Give me one second.
(REPORTER PLAYS BACK REQUESTED TESTIMONY)
A Documents concerning the request from the defendants.
BY MR. CIOFFI:
Q One category, it's your testimony, is you reviewed documents that were requested by the defendants; is that right?
A Correct.
Q Any other documents?
A I can't recall other -- other documents at

this time.

Q Earlier, you testified that you reviewed the complaint and the counterclaim. Did you review that in these meetings with counsel?

A What meeting specifically are you referring to?

MR. CIOFFI: Read back his prior answer, please.

COURT REPORTER: Yes. Of course. And I'll play your question as well.

MR. CIOFFI: Sure.

(REPORTER PLAYS BACK REQUESTED TESTIMONY)

MR. CIOFFI: There was answer about meetings with counsel.

COURT REPORTER: Oh, okay. Sorry. About reviewing the documents? Because there are a few questions.

MR. CIOFFI: No. He has an answer about the number of meetings with counsel.

COURT REPORTER: Oh, yes, of course. Sorry.

(REPORTER PLAYS BACK REQUESTED TESTIMONY)

BY MR. CIOFFI:

Q So those meetings?

A So your question is all the meetings I've had? That's why I'm asking you to be more specific in terms

of you've asked me. I believe the question is, did I review the complaint and the counterclaim? Is that the question?

Q My question is, in those meetings with counsel, did you review documents?

A I've answered that question.

MR. CIOFFI: Read back his answer.

COURT REPORTER: Yes. Give me one second.

(REPORTER PLAYS BACK REQUESTED TESTIMONY)

COURT REPORTER: I'm sorry. I got the wrong one.

(REPORTER PLAYS BACK REQUESTED TESTIMONY) BY MR. CIOFFI:

Q What did you answer to that question?

A I'm asking for clarification. Are you asking the meetings, all my meetings, did I review the complaint and the counterclaim?

Q In any of those meetings, did you review the complaint and counterclaim?

A I -- I reviewed the complaint before it was filed. And yes, I reviewed the counterclaim.

Q All right. Any other documents that you reviewed in any of those meetings?

A Yes. Any documents that were requested by the defendant.

Q You've testified that you reviewed documents requested by defendant, you -- now added to that, you reviewed the complaint and counterclaim. My question to you, sir, is, did you review any other documents in these meetings that you've described?

A I cannot recall any other documents that we reviewed at this time.

Q In these meetings that you've described, what other topics did you discuss?

MR. SABA: Objection. Instruction not to answer.

MR. CIOFFI: What's the basis?

MR. SABA: Attorney-client privilege. You're asking for --

MR. CIOFFI: I'm not asking for substance.

MR. SABA: I don't think you have privilege to find out about topics either. You find out the meeting took place. You find out when the date says meeting took place, but once we get into topics, duration, any discussion beyond that, then you're delving into the attorney-client privilege.

MR. CIOFFI: Not by topics.

(CERTIFIED QUESTION)

BY MR. CIOFFI:

Q Did you discuss, for example, that your

deposition would be taken?

MR. SABA: I'm going to object. Instruction not to answer.

MR. CIOFFI: Instruct the witness to answer.

COURT REPORTER: I'm sorry?

MR. CIOFFI: Would you instruct the witness to answer the question?

COURT REPORTER: I can certify the question.

MR. CIOFFI: Yeah.

COURT REPORTER: Yeah.

BY MR. CIOFFI:

Q At these meetings with counsel, did you engage in any role-playing in practice for your deposition?

MR. SABA: Objection. Instruction not to answer.

MR. CIOFFI: What's the basis of that?

MR. SABA: Again, you're delving into attorney-client privilege. What do we engage in one of the topics? I think once you try and cross that threshold, then you're trying to open the door into other issues. So to the extent you're going to try and delve into anything further with respect to those conversations -- those meeting with counsel, we're going to object and instruct him not to answer.

MR. CIOFFI: So is it your position that asking the question of whether there was role-playing in preparation for his deposition is protected by the attorney-client privilege?

MR. SABA: Correct. Then once you want to delve into the actions that were taken during those meetings, what was done, you can disagree, and I think you're free to certify the question, and we can discuss with Judge Barrett. But I'm just letting you know for purposes of today's deposition, to the extent you can try and delve into those conversations, we're going to instruct him not to answer.

MR. CIOFFI: Counsel, just to be clear, I'm not asking about the substance. I'm just asking if it happened.

MR. SABA: I think you're crossing to the gray area of substance by starting to talk about, "Well, what did you do there but don't tell me about the substance." So it's form of a function. And so to that extent, we're going to object, instruct him not to answer to the extent we need to raise it with Judge Barrett, we can. I'm just letting you know that's the position we're taking with respect to those conversations and those meetings.

MR. CIOFFI: Just so the record is clear, because you're saying two different things, I'm not asking him about the substance of the role-playing. I'm asking what happened.

MR. SABA: I understand what you're asking, and you're free to ask your questions and certify them for the record. I'm just letting you know we're going to instruct him not to answer.

BY MR. CIOFFI:

Q During your preparation for this deposition, did you have discussions with counsel on how you should answer questions?

MR. SABA: Objection. Instruction not to answer.

Q During your preparation for this deposition, did anyone play the role of opposing counsel in questioning you?

MR. SABA: Objection. Instruction not to answer.

Q In addition to counsel, did you meet with anyone else to discuss your deposition here today?

MR. SABA: Go ahead and answer that question.

A Can you repeat the question?

MR. CIOFFI: Please read back.

COURT REPORTER: Yes. Give me one second.

(REPORTER PLAYS BACK REQUESTED TESTIMONY)
A Not that I recall.
BY MR. CIOFFI:
Q What is it that you don't recall? The person or persons you met with or the fact that there were such meetings?
A I understood your question to be, did I meet with any other person other than counsel to discuss my deposition? Was that your question?
MR. CIOFFI: Would you read my question back, please?
COURT REPORTER: Yes. Give me one second.
(REPORTER PLAYS BACK REQUESTED TESTIMONY)
A I don't recall meeting with any other person to discuss my deposition other than my counsel.
BY MR. CIOFFI:
Q In your preparation for the deposition today, did you review the documents produced by the defendants in this case?
MR. SABA: Objection. Asked and answered. Go ahead. You can answer it again.
MR. CIOFFI: It wasn't.
THE WITNESS: I'm sorry, what?
MR. SABA: I was just objecting for the record. You can go ahead and answer the question.

THE WITNESS: And the question was, did I review the documents produced by the defendant?

MR. CIOFFI: Read the question back, please.

(REPORTER PLAYS BACK REQUESTED TESTIMONY)

A Yes. I scanned the documents. I did not review those documents in detail.

BY MR. CIOFFI:

Q Which documents did you scan?

A I scanned all the documents.

Q Did you do anything else in preparation for your deposition today?

A Can you be more specific, please?

Q Anything at all that you did in preparation for the deposition today.

A Sure. I prayed that God would be with me.

Q And which -- and what God do you pray to?

A I'm a Roman Catholic practicing.

Q And besides praying, is there anything else you did?

A I showered and shaved this morning and put a suit on, and drove downtown from 8000 Finley to your offices. Yes, sir.

Q Are you married?

A Yes. Happily.

Q And to whom are you married?

A Suzanne, S-U-Z-A-N-N-E Eileen, E-I-L-E-E-N McHugh.
Q Do you and Suzanne have children?
A Yes, we do.
Q What are their names and residence addresses?
A Colleen Theresa Sweeney, Cincinnati, Ohio.
Q What's her street address?
A I believe it's Osceola.
Q Please continue.
A Erin Marie McHugh. Cincinnati, Ohio.
Q Street address?
A 8000 Finley Lane.
Q Please continue.
A Philip Raymond McHugh Junior, Cleveland, Ohio.
Q What's his street address?
A Just changed residences. I believe 58th Street, but I cannot confirm that at this time. Patrick Michael McHugh, Cincinnati, Ohio.
Q Does he live at Finley Lane?
A Patrick McHugh lives at Finley Lane -- 8000 Finley Lane.
Q Did you discuss your deposition today with either your wife or your children?
MR. SABA: I'm going to object to the extent you're asking him about conversations between he and

his spouse, to the extent those are protected by spouse privilege. Otherwise, you can answer the question.

MR. CIOFFI: Read my question back just so we're clear.

COURT REPORTER: Yes. Give me one second. I'm going to back a little bit to get the question.

(REPORTER PLAYS BACK REQUESTED TESTIMONY)

A My wife and children are aware that I'm giving a deposition this morning. Yes.

BY MR. CIOFFI:

Q That wasn't my question.

MR. CIOFFI: Could you read my question back, please, and answer my question.

COURT REPORTER: Yes. Sorry.

(REPORTER PLAYS BACK REQUESTED TESTIMONY)

A I do not recall discussing my deposition with my wife nor with Colleen, Erin, Patrick, or Philip.

BY MR. CIOFFI:

Q So where were you born, and where did you grow up?

A I was born in Toledo, Ohio, on August 2, 1964, to Jack and Rosemary McHugh. I was raised in Toledo, Ohio.

Q Are you currently employed?

A No.
Q Since leaving Fifth Third Bank in October of 2020, have you looked for other work?
A Yes.
Q And what work have you looked for?
A Could you be more specific?
Q Did you apply for any jobs?
A I have spoken to other employers, yes. I have not completed an employment application, no.
Q So your answer to my question is no, you have not applied for any jobs; is that right?
A I have not completed an application.
Q Have you partially completed an application?
A I have had many conversations with potential employers.
MR. CIOFFI: Read my question back, please?
COURT REPORTER: Just give me one second.
(REPORTER PLAYS BACK REQUESTED TESTIMONY)
BY MR. CIOFFI:
Q Please answer that question.
A I have --
Q And you have an obligation to answer the question I ask, not the question you want to answer.
A Can you repeat your question?
Q I -- it just was repeated for you.

MR. CIOFFI: Repeat it again, please.
COURT REPORTER: Just one second.
(REPORTER PLAYS BACK REQUESTED TESTIMONY)
A No.
BY MR. CIOFFI:
Q You mentioned conversations you've had. With whom have you had conversations with?
A Could you be more specific?
MR. CIOFFI: Read back his prior answer, please.
COURT REPORTER: Yes. The last question?
MR. CIOFFI: The question before that.
COURT REPORTER: Okay.
(REPORTER PLAYS BACK REQUESTED TESTIMONY)
A Is your question concerning conversations with potential employers?
BY MR. CIOFFI:
Q Yes. You said you had many conversations with potential employers, and I'm asking you to describe those for the judge and jury.
A To the best of my recollection this morning, I've talking to the financial institutions; Republic Bank, Stock Yards Bank, BMO Bank of Montreal. There have been executive recruiters who have called me about potential positions with other financial services. I

have talked to wealth management firms in Cincinnati by the name of Dimensions Wealth and Burke & Company. I can't recall their specific name at the moment. Glenview Trust in Louisville, Kentucky. And I have had conversations with charitable organizations, including CISE, which is the C-I-S-E, Cincinnati Inner-City School Education Fund, as well as Bellarmine Chapel.

Q For each one of those entities or organizations, tell me the person with whom you've had these conversations?

A For CISE, the Cincinnati Inter -- Inner-City School Education Fund, I have spoken to Mabe Rodriguez, Larry Kyte, and Don Mellott. For Bellarmine Chapel, Father Eric Sundrup. For Dimension, I think it's Wealth Dimensions -- Wealth Dimensions, Dan Vogepohl and his two partners, I don't recall their names off the top of my head. For Republic Bank, Steve Trager. For Stock Yards Bank, Rich Lechleiter. For Glenview Trust, Mike Richardson. Those are all the names that I recall at this moment.

Q For each one of those entities, describe the positions that you were discussing for your employment?

A For CISE, C-I-S-E, the Cincinnati Inner-City School Education Fund, the role of president and executive director. For Bellarmine Chapel, the role of

business advisor. For Wealth Dimensions, a partner in that firm. For Burke & Company, their wealth management firm, a partner in that company. For Republic Bank, the position of -- of their wealth leader, I guess they do not have a wealth division. And for Sto -- for Glenview Trust, a senior advisor. And for Stock Yards Bank, position of senior advisor.

Q For those positions, what salary range have you been discussing?

A Salary range was the question. I would say my understanding at this time was the salary was somewhere between 150,000 and up from there.

Q Up from where to what?

A From 150,000 to a range above that.

Q What is the range?

A It could be higher than 150,000.

Q Did you discuss how much higher with any of these entities?

A The only group I had discussions in terms of base salary was the CISE group, Cincinnati Inner-City School Education Fund, and their current pay of their president and CEO is 150,000 a year.

Q But did you have a discussion with other entities for salaries higher than 150,000?

A Yes.

Q In which one of the entities did you have those discussions?
A Wealth Dimensions.
Q What was that salary discussion?
A They asked me what my salary was when I left the bank.
Q And what did you tell them?
A $500,000.
Q Okay. And did you describe the other salary benefits at the bank?
A I don't recall at this time discussing the other benefits with them.
Q When you left the bank, what was your total compensation?
A Are you asking for my total compensation in terms of paid dollars or benefits as well?
Q Benefits as well.
A So my understanding, to the best of my recollection, is my base pay was $500,000. I was eligible for variable compensation with a target of 550,000. I was eligible for long-term incentives that would comprise various stock programs with a target of 1.2 million. I was provided healthcare benefits as well as a deferred compensation plan.
Q What did all of those benefits add up to in

terms of total dollars?
A I don't -- I don't know the exact dollar amount of what those benefits would add up to.
Q But approximately?
A In excess of $2 million.
Q Describe your educational background, beginning with high school.
A I attended and graduated from Saint Francis de Sales High School in Toledo, Ohio. I attended and graduated from Xavier University in Cincinnati, Ohio.
Q Why didn't you go to Notre Dame like your brother?
A I didn't go to Notre Dame like my brother because I couldn't afford Notre Dame. I paid for my high school, and I paid for my college. I went to Xavier because I could afford the education at Xavier.
Q Did you apply to Notre Dame?
A I don't recall applying to the University of Notre Dame.
Q And when did you graduate from Xavier?
A I've already answered that question.
THE WITNESS: You can read that back?
COURT REPORTER: Yes. Give me one second.
(REPORTER PLAYS BACK REQUESTED TESTIMONY)
BY MR. CIOFFI:

Q I didn't hear a date.
A Okay. I graduated from Xavier University in Cincinnati, Ohio in May of 1986. I do not know the specific date I received my degree.
Q Did you graduate with any honors?
A I can't recall at this time.
Q Well, for example, did -- did you graduate cum laude, or summa cum laude, or magna cum laude?
A I can't recall at this time.
Q Those kinds of honors are something a person will normally remember. Why -- what -- why is it that you cannot remember it?
A You asked me if I remember those, and it -- sitting in front of you, I do not remember those.
Q Well, throughout your career, you've published the fact that you graduated from Xavier University, correct?
A Could you be more specific in terms of what you mean by publish?
Q Well, everything from your CV to descriptions of your professional background has a notation that you graduated from Xavier University, correct?
A I would say yes. Some profiles show that I graduated from Xavier University.
Q So, in any of those profiles, does it say you

graduated cum laude, or summa cum laude, or magna cum laude?

A I don't believe so.

Q Would it be fair to conclude, therefore, that you did not graduate either cum laude, summa cum laude, or magna cum laude?

A I can not confirm what would be fair or unfair. I've answered that I don't recall at this time.

Q If you had graduated with one of those honors, you would have put it on your resume, wouldn't you?

A I cannot say that with 100 percent certainty that I would put that on my resume.

Q Well, you've looked at a lot of resumes, CVs, and profiles in the business community, correct?

A Yes.

Q It's true, isn't it, when you've looked at those people who graduate with those kinds of honors, generally note that after the name of the university they graduated from, isn't that true?

A I cannot attest that that's 100 percent accurate.

Q I didn't ask you if it's 100 percent accurate. I asked you, isn't it generally true?

A I have seen some resumes with that.

Q Well, if you had graduated with one of those

honors, wouldn't you have put it on your profile?

MR. SABA: Objection. Asked and answered. Go ahead. You can answer.

A The resume that I provided to Fifth Third Bank said I anticipated to graduate in May of 1986.

Q But that document said nothing about with honors, did it?

A I can't recall at this time what that document specifically said.

Q Do you have an MBA?

A I do not have an MBA.

Q Do you have a JD?

A I do not have a JD.

Q Do you have a CPA?

A No.

Q Do you have any degrees beyond your BA from Xavier University?

A Official degrees, no.

Q Do you have a master's degree in anything?

A No.

Q Describe any course or study you engaged in after Xavier University to advance your education?

A To the best of my recollection this morning, I was involved in numerous programs concerning retirement plans. The programs provided for defined contribution

as well as defined benefit programs. In addition to that, I was a member of the Young -- Young Presidents' Organization when I was in Louisville, Kentucky. I participated in numerous education programs, including a summer series at Harvard in Boston, Massachusetts.

Q These programs are seminars; is that right?

A The programs are seminars as well as leadership programs. In addition, I would have participated in any programs that were part of my employment during my 34 years with Fifth Third Bank in terms of leadership development.

Q None of these programs were for an advanced degree, were they?

A The YPO program is considered one of the best programs to develop Young Presidents.

MR. CIOFFI: Read my question back, please.

COURT REPORTER: Yes.

(REPORTER PLAYS BACK REQUESTED TESTIMONY)

BY MR. CIOFFI:

Q Would you answer that question, please, and not the question you want to answer?

A The -- your question about advanced degree awarded by whom?

Q Any of those programs?

A I don't recall what the recognition was by

Harvard of attendance. At the YPO series, it was not an MBA, but I can't recall the specific, in terms of what the recognition of completion of that program was.

MR. CIOFFI: Read my question back, please.

COURT REPORTER: Yes.

Q If you listen carefully and answer the question.

MR. SABA: I'm going to object to the extent I think he answered your question. You didn't define advanced degrees. He indicated he doesn't recall what kind of certification came from that, and your definition of advanced degrees, which wasn't provided, didn't necessarily exclude certifications. Otherwise, I think he answered the other question that he never had an MBA, CPA, JD, or any sort of master's degree.

MR. CIOFFI: Counsel, you know better than to make speaking objection here. You're just trying to tell him, and the record will be very clear about this, how to answer the question.

MR. SABA: I'm not --

MR. CIOFFI: You are not permitted to make those kinds of speaking objections.

MR. SABA: I'm not telling him to answer --

MR. CIOFFI: You know that.

MR. SABA: -- the question. I'm just trying to clarify. He's answered the question already for you.

MR. CIOFFI: The objection then is simply is asked and answered, but you may not -- put into the witness' mind and narrative on how to answer a question. You know that's improper.

MR. SABA: Right. And we're not doing anything improper --

MR. CIOFFI: Yes. You are.

MR. SABA: -- nor are we trying to do that. We can disagree about that. But to the extent of your question, I'm going to object to the form of your question. Go ahead and answer if you can.

MR. CIOFFI: That's a speaking objection. Go ahead. Read my question back.

COURT REPORTER: All right.

(REPORTER PLAYS BACK REQUESTED TESTIMONY)

BY MR. CIOFFI:

Q What is your answer to that question?

A Could you define advanced degree?

Q Did you receive any kind of degree from an institution of higher learning as a result of these programs that you attended?

A I cannot recall what the certification was

from Harvard. I've provided that answer for the YPO series.

Q I'm not asking you for a certification. I'm asking you for a degree. Did you earn a degree for any of these seminars or programs you attended?

A I am not aware of a degree that was awarded.

Q You joined Fifth Third right after graduating from Xavier; is that right?

A I joined Fifth Third Bank in October of 1986. I'm not sure of the specific date.

Q You graduated in May, and then you joined Fifth Third in October. What did you do in-between?

A I -- in between May of '86 and October '86?

Q Yes.

A I worked for Black Diamond Incorporated in Toledo, Ohio, and I worked for General Electric Credit.

Q What did you do in those jobs?

A I worked in the credit collection area of General Electric Credit, and for Black Diamond, I did numerous jobs involving lawn care and -- lawn care and landscaping.

Q How did you come to work at Fifth Third?

A Could you be more specific?

Q Why did Fifth Third offer you a job?

A I believe Fifth Third offered me a job because

I was a strong candidate for their bank associate program at the time.

Q Did you apply for a job at Fifth Third?

A I can't recall the exact application, but I am sure that I provided an application of my background for Fifth Third, corr -- yes.

Q How did you come to the attention of Fifth Third?

A It would be speculation in terms of how I came to the attention of Fifth Third. I can't speak to why the individuals at Fifth Third hired me in October of '86.

Q That wasn't my question. So if you listen to my question and only answer my question, did you contact Fifth Third, or did someone from Fifth Third contact you?

A I believe a classmate of mine at Xavier University was employed by Fifth Third at the time and recommended me to, I believe her name was -- I can't give 100 percent certainty since this was 35 years ago -- was Tracy Jones who was in charge of the program and I believe Ms. Jones reached out to me and encouraged me to come to Cincinnati to have a conversation with her.

Q And who was this person who recommended you?

A Peter Seuss.

Q Was he an employee of Fifth Third?
A Yes.
Q Is he still an employee of Fifth Third?
A I don't believe so.
Q When did he leave the employment of Fifth Third?
A I do not know when Peter Seuss left employment at Fifth Third.
Q After that recommendation, what happened in terms of your employment at Fifth Third?
A Well, I believe I drove down from Toledo, Ohio, to Cincinnati. I met with Ms. Jones or Mrs. Jones, as well as some other -- I'm sure I interviewed with other individuals at the bank, and after those interviews, I was offered employment with Fifth Third Bank.
Q Have you performed any military service?
A I have not performed any military service.
Q Why not?
A I never explored military service.
MR. CIOFFI: Read my question back.
COURT REPORTER: Yes.
(REPORTER PLAYS BACK REQUESTED TESTIMONY)
MR. CIOFFI: Keep going.
(REPORTER PLAYS BACK REQUESTED TESTIMONY)

BY MR. CIOFFI:
Q Would you answer that question, please? I didn't ask you if you explored. I asked you why you didn't perform any military service, not whether you explored it or not --
MR. SABA: Object to --
Q -- please answer my question.
MR. SABA: Objection. Asked and answered. Go ahead. You can answer.
Q Why?
MR. SABA: Objection. Asked and answered. Go ahead.
A I never considered military service.
Q My question is, why not?
MR. SABA: Objection to form of the question. Go ahead. You can answer.
A I don't know why I did not. I chose not to.
Q Did you seek a deferment?
MR. SABA: Objection to the form of the question. Go ahead. You can answer.
A Deferment from what?
Q Military service.
A No.
Q Did you register for the draft?
MR. SABA: Objection. Go ahead. You can

answer.

A I don't recall if I've registered or not for the draft.

Q Beginning in October of 1986, describe for me the various positions you've had at Fifth Third?

A I joined the bank in October of 1986 as a bank associate. I believe I was in that position until July of 1987, at which time I became a trust associate. Shortly thereafter, I became a trust officer. I want to say in 1988 or 1989. 1990 or '91, I was named the vice president of the bank. And 1994, upon relocation at the bank's request to Louisville, Kentucky, I was named an -- senior vice president and then an executive vice president, and then president and CEO. And then, upon returning to Cincinnati, I was named an executive vice president of Fifth Third Bank Corp. That's the job I held until the point the bank -- 'til the date, the bank terminated me. And in that position and Mr. Carmichael's direction, I'm -- my groups that I managed accounted for 63 percent of the bank's net income.

Q During your entire employment at Fifth Third, you were always an employee at will; isn't that correct?

A Yes.

Q What does employment at will mean?

MR. SABA: Objection to the extent you're asked for a legal conclusion. Go ahead. You can answer.
A Appointment at will means I do not have a contract with the -- my employer.
Q And it means, does it not, that you -- that the employer can terminate an employee at will at any time for any reason except an illegal reason or for no reason at all, correct?
MR. SABA: Objection to the extent it calls for legal conclusion. Go ahead. You can answer.
Q And I asked you for your understanding?
A Yes.
Q And likewise, an employee is free to leave a job for -- at any time for any reason with no adverse consequences, correct?
MR. SABA: Continuing objection. Go ahead. You can answer.
A Yes.
MR. CIOFFI: Let's mark these as Exhibit number 2. Let's mark these as number 2, please. Thank you.
Q Directing your attention to Exhibit number 2, have you ever seen this document before?
(EXHIBIT 2 MARKED FOR IDENTIFICATION)
A Yes.

Q And what is it?
A Appears to be a -- it appears to be a printout of text messages between myself and Jamie Leonard.
Q It bears the Bates stamp of McHugh 00246. Do you see that at the bottom right-hand corner?
A Yes.
Q This is the document produced by you and your counsel, correct?
A Yes.
Q Describe to me the process you employed to pull all of the text messages between you and Jamie Leonard and others?
A I used a software system called iMazing or iMazing.
Q How did you use that software?
A I downloaded that software onto my computer. I attached my phone to the computer, and it downloaded the text messages.
Q If you look at the top of the page, you see on the far left-hand, at the top, Jamie Leonard, and then you see some numbers. Do you know what those numbers mean?
A The numbers next to Jamie Leonard's name?
Q Yes.
A It would appear that is the date.

Q So what is the date of that first line?
A 2019-07-15.
Q After that, there are some more numbers. What are those?
A 14:54:55.
Q What does that mean?
A It appear to be the time of the text.
Q So this is the top text is the one that was sent on July 15, 2019, at 14:54 or in non-military time, 2:54, correct?
A It would appear so.
Q And then the line extends across. It repeats the date again. Do you see that?
A 2019-07-15?
Q Yes. And then it has me -- iMessage incoming. Do you see that?
A Uh-huh.
Q And then what's the next number? It appears to be a telephone number.
A It would appear to be, yes.
Q And what is that number?
A It would appear to be the cell phone number.
Q And then the next after that is the name again, Jamie Leonard, right?
A Yes. Jamie Leonard.

Q And then there's another word, read, right?
A Correct.
Q What does that mean?
A That the individual read the e-mail.
Q And the individual in question, is you right? This was an incoming e-mail to you, right?
A Appears so. Yes.
Q And read out the e-mail that came into you?
A "I'm thinking I don't go -- I'm thinking I don't do Chicago ops review because too many going? Happy to go and help, but I'm worried we get yelled at."
Q Now, the next line again says what on the far left-hand side?
A "2019 -- Jamie Leonard, 2019-07-15."
Q And then there's the reference to the time, which is 15:33; is that correct?
A Yes.
Q So approximately 40 minutes after the previous text; is that right?
A Yes. It appears 15:33 would be 40 minutes after 14:54.
Q And it says, "iMessage outgoing."
A Uh-huh.
Q Do you know what that means?
A Yes. It would have been an outgoing message

from my cell phone.
Q Okay. Then it has the word "delivered," do you see that?
A I see delivered, yes.
Q Right.
A It's probably doesn't print the last ED, but I do see delivered, yes.
Q Then there's the text of what you sent, right?
A Correct.
Q Would you read that, please?
A "I understand. Probably a good decision."
Q Proceeding down about three-quarters of the page, you see a line -- entry six from the bottom with Jamie Leonard, 2019-08-28 9:27, as in terms of the time?
A I'm sorry. Could you be more specific?
Q Well, can you count six lines up from the bottom?
A Two, three, four, five, six. Yes.
Q Do you see that? It says, Jamie Leonard. They all say that at the left-hand margin, correct?
A Jamie Leonard, yes.
Q Then you see 2019?
A Yes.
Q 08-28?
A Yes.

Q 9:27?
A Yes.
Q Then, further to the right, it says, "iMessage outgoing"?
A Yes.
Q Then it has "delivered." So this is an outgoing message you sent to Jamie, correct?
A Yes.
Q Read what that says, please.
A "Oh, my silver fox made the call to send those employees home."
Q What is his response?
A That's -- "thats why you are the silver fox."
Q Here, you're referring to yourself as the silver fox; is that right?
A That's how Jamie referred to me, yes.
Q Well, that first e-mail is from you, right?
A Yes.
Q So you're referring to yourself in the third person as the silver fox; is that correct?
A Yes.
Q Why are you calling yourself the silver fox?
A That's the name Jamie called me.
Q But you're referring to yourself here as the silver fox, right?

A Yes.
Q Why?
A Because that's the name Jamie used to speak to me. Used to call me.
Q So why did you use that in your own e-mail? Why did you refer to yourself as the silver fox?
A I don't recall specifically why I used that at this -- at that time.
Q Do you recall generally why you used the term silver fox when referring to yourself in third person?
A I do not recall.
Q Do you consider yourself a fox?
MR. SABA: Object to the form of the question. Go ahead. You can answer.
A No. I do not consider myself a fox.
Q But what does the word fox mean, do you know?
MR. SABA: Objection to the form of question. Go ahead. You can answer.
A I -- I -- I -- I know a fox is an animal. I don't know the specific Webster definition for fox.
Q Well, let me hand you the Webster definition. We mark this as Exhibit number 3, please. Directing your attention to Exhibit number 3. Look at the second page, please. Do you see in bold where it says definition of fox?

(EXHIBIT 3 MARKED FOR IDENTIFICATION)
A Yes.
Q Do you see definition number 2 Would you read that into the record?
A "A clever, crafty person. He's a sly old fox."
Q And on the next page. Fox could be used as a verb as well, right? And what does that mean?
A Would you like me to read 1A --
Q 1A --
A -- B2?
Q -- please, yeah.
A "To trick by ingenuity or cunning, outwit, baffle fox by behavior obsolete, intoxicate."
Q So when you were referring to yourself as a fox, were you meaning to convey that you were a crafty person, a cunning person, a conniving person?
A No. That was the name that Jamie Leonard used for me.
Q But you used it yourself here to describe --
A Yes.
Q -- yourself?
A Yes. I use it there.
Q Well, I'm asking you why you used it to describe yourself --

A Because that's --

MR. SABA: Objection. Asked and answered. Go ahead. You can answer.

Q Why did you use it?

MR. SABA: Objection. Asked and answered. Go ahead. You can answer.

A Because that's the name that Jamie Leonard used for me.

Q Well, on using it, didn't you mean that you were clever, crafty, conniving?

MR. SABA: Objection. Asked and answered. Go ahead. You can answer.

A No.

Q Why does Jamie respond, "and that's why you are the silver fox"?

A I couldn't speculate why Gre -- Jamie used those words.

MR. CIOFFI: Lets mark this --

COURT REPORTER: Exhibit 4.

Q Handing you Exhibit number 4. What is this document?

(EXHIBIT 4 MARKED FOR IDENTIFICATION)

A Appears to be every -- a summary of text messages between Jamie Leonard and myself.

Q And this bears the Bates stamp McHugh 00254,

right?

A Yes.

Q About 13 lines from the bottom --

A 13, one.

Q -- approximately. You see Jamie Leonard and then the letters or the numbers 2020-01-28 16:51, message outgoing.

A Can you read those numbers again, so I have the right one?

Q Sure. It's a text that was sent at 16:51. So 4:51 in the afternoon, right?

A Uh-huh.

Q Do you see that? And then it has message outgoing --

A Uh-huh.

Q -- then delivered. So this is a text message from you to Jamie, right?

A It would appear so. Yes.

Q Read what you said to him then.

A "Be careful when threatening the silver fox."

Q Again, you're referring to yourself in the third person as the silver fox, right?

A Yes.

Q Why are you doing that?

A Because that's the name that Jamie called me.

Q But why are you referring to yourself that way?

A Because I was speaking to Jamie. Was a text message between Jamie Leonard and myself.

Q And you have an emoji that you added of the face of a fox, right?

A It would appear so.

Q Why did you put that emoji there?

A I don't recall.

Q So I asked you earlier today if you used a moniker or nickname, or went by a moniker or nicks name -- nickname, you said no, wasn't that your testimony?

A I believe so.

Q That testimony is not true, is it?

MR. SABA: Objection. Go ahead. You can answer.

A Silver fox was a name that Jamie used for myself, for Phil McHugh.

Q You used it here.

A When speaking to Joe.

Q Well, you used a moniker or nickname, didn't you?

A In this text, yes.

Q And in the prior text --

A Yes.

Q -- right. So your prior testimony wasn't true, was it?

MR. SABA: Objection. Go ahead. You can answer.

A You asked me if I went by any other nicknames, and I did not believe that was a nickname that I went by. It was a name that Jamie used for me and that I told Jamie when I communicated with him.

Q But you're going by it in these text messages, aren't you?

MR. SABA: Objection. Asked and answered. Go ahead. You can answer.

A Yes.

Q What do you mean by saying be careful when threatening the silver fox?

A I don't know what preceded that conversation, so I would only be speculating in terms of -- I go on to invite him to the Xavier game that night. I don't know what the specifics of the conversation were prior to that.

Q Well, does it mean that if someone crosses you or doesn't do what you want them to do, that you're clever enough to get back at them?

A No.

MR. SABA: Objection --

THE WITNESS: It absolutely --

MR. SABA: -- asked and answered. Go ahead. You can answer.

MR. CIOFFI: I never asked that question before.

MR. SABA: Okay.

MR. CIOFFI: Counsel, you're trying to coach the witness. You need to stop. Just state your objection.

MR. SABA: I'm not coaching the witness.

MR. CIOFFI: Yes. You are.

MR. SABA: I might object to the extent of question as asked and answered.

MR. CIOFFI: Okay.

MR. SABA: That is not coaching the witness. In particular, since you've gone through this ad nauseum, and he's already answered the question numerous times. Go ahead. You can answer.

MR. CIOFFI: I never asked that question. Would you read my question, please? And quit, making speaking objections, without proper --

MR. SABA: Objection. Asked and answered is not a speaking objection, and you know that.

MR. CIOFFI: I've never asked this question before and hadn't asked the question.

MR. SABA: Fine. We can disagree over the objection later. Go ahead.

(REPORTER PLAYS BACK REQUESTED TESTIMONY)

BY MR. CIOFFI:

Q Answer that question, please?

A No. It does not mean that. I had a track record of 34 years of employment at Fifth Third Bank, where I was continually promoted to areas of increasing responsibility and was told by Mr. Carmichael as well as Mr. Shaffer that I had the highest integrity and the most respected individual on the executive team.

Q Mr. McHugh, you've been sworn to answer my questions, not to give speeches or answer the questions you want to ask -- answer.

MR. CIOFFI: Would you read my question back, please?

COURT REPORTER: Yes.

Q Do you understand that?

A Counselor, you asked me to answer the question. I did answer your question.

MR. SABA: Ask it.

(REPORTER PLAYS BACK REQUESTED QUESTION)

MR. SABA: Objection. Asked and answered. Go ahead.

BY MR. CIOFFI:

Q And your answer to that question is?
A No. Mr. Carmichael --
Q And --
A -- as well as Mr. Shaffer.
Q I didn't ask you about Mr. Carmichael or Mr. Shaffer. I'm asking you what you meant by calling yourself a silver fox, and be careful when threatening the silver fox has nothing to do with Mr. Carmichael or Mr. Shaffer. Do you understand that?
A You asked me to answer the question --
Q Do you understand that?
A -- I've answered the question.
Q What does it mean then?
MR. SABA: Objection. Asked and answered. You've asked him several times, and what did you mean by that? He answered that question numerous times. And then you tried to characterize in your own way. He answered that question.
MR. CIOFFI: He did not answer the question of --
MR. SABA: He answered the question several times.
MR. CIOFFI: -- what does it mean to be careful when threatening the silver fox? What does that mean?

MR. SABA: Objection. Asked and answered.
BY MR. CIOFFI:
Q "Be careful when threatening the silver fox," what does that mean?
A I cannot at this time tell you what that means because I don't know what preceded that, as well as what phone calls or other conversations would have preceded that discussion.
Q Well, read the texts right before that and see if it helps.
A This isn't one of the text. There could have been other phone calls and like.
Q Do you -- did you understand my question? Read the preceding lines.
A "You are in risk now. Think of it as credit. I own you."
Q Okay. And then why do you say to be careful of the silver fox in this context?
MR. SABA: Objection. Asked and answered. Go ahead. You can answer.
A I can't -- I -- I can't recall this time.
Q Direct your attention to the bottom of this page, six lines from the bottom.
A Six lines from the bottom?
Q Yes.

A Uh-huh.
Q Do you see an outgoing message from you at 11:06, correct?
A Correct.
Q And what does that say?
A That's at 1:00 -- 11:06. Okay. "Outgoing, deliver GC out until next Friday."
Q And who is GC?
A I would assume that's Greg Carmichael.
Q Well, do you have to assume, but you wrote it. Is that who you meant?
A Yes. I -- to the best of my knowledge, GC would mean Greg Carmichael.
Q And what's Jamie's response?
A "Nice."
Q Do you know why he said nice?
A I couldn't speculate why Jamie said nice.
Q No. I'm asking, do you know? You can speculate.
A I don't know.
Q You don't know? Is it nice because the boss is away?
A I don't know.
Q Okay. Well, read the rest of those texts out loud from that point to the bottom of the page.

A "GC out 'til next -- out until next Friday. Nice, painful. Welcome to the mess hall."

Q Let's stop there. What -- and so he responds by saying on the 6th, painful, welcome to the mess hall. What is that exchange about?

A I -- I couldn't speculate, that's a week later, and I don't know what conversations or events took place prior to the time of that text.

Q Okay. And read the next lines.

A After welcome to the mess hall?

Q Yeah.

A "What the fuck was sucked into CECL meeting will spring -- will swing by later today."

Q And what does that refer to?

A I assume it's something with CC -- CECL, but beyond that, I could not recall at this time what that means.

MR. CIOFFI: Gabryel, I think that's in number 5?

COURT REPORTER: Yes. That's correct.

Q Directing your attention to Exhibit number 5, McHugh 00258, I want to direct your attention to specifically about ten lines from the top. Do you see a text on April 9, 2020, at 20:47 or 8:47?

(EXHIBIT 5 MARKED FOR IDENTIFICATION)

A Yes.
Q Jamie says what to you then?
A Jamie says what to me then? Patty will kill this, no.
Q No. Above that. The -- follow the line across.
A Okay.
Q The text that --
A You had said it was --
Q 20:47.
A -- you had said it was 20:47, 27, that's what I read. So you want me to read 0409203234?
Q Yeah. But if you keep going across --
A Right.
Q -- you'll see 20:47.
A It says, "the fox is on."
Q "The fox is on."
A Uh-huh.
Q Then you respond, what?
A "Patty will kill this, no."
Q And what does that -- what does that refer to?
A I -- I can't recall at this moment what that specifically refers to.
Q When Jamie Leonard says the fox is on, he's referring to you again, right?

A Yes. I believe so.
Q When you had telephone conversations with Jamie Leonard, did you refer to yourself as the fox in any of those calls?
A I cannot recall at this time if I referred to myself as the fox during calls with Jamie Leonard.
Q Okay. Did he refer to you as the fox?
A Yes.
Q In ca -- in telephone calls?
A Yes.
Q But you did refer to yourself as the fox in text messages; is that right?
A To Jamie Leonard, to -- to the best of my recall, yes.
Q Anyone else?
A I do not recall at this time anyone else.
MR. CIOFFI: Counsel, I saw you looking at your watch. Do you want to take a break?
MR. SABA: Whenever you're ready. I'm just -- I think we're a little over an hour and --
MR. CIOFFI: Yeah. Probably an hour and 25. So let's do that and then take another break between 12:30 and 1:00.
MR. SABA: All right.
VIDEOGRAPHER: All right. We're going off the

record at 11:35.

(OFF THE RECORD)

VIDEOGRAPHER: We are back on the record at 11:54.

BY MR. CIOFFI:

Q Mr. McHugh, directing your attention back to Exhibit 5, will you look at that, please? All of the texts that appear on that came from you personally, right? I realize they came from your phone, but you sent them.

A No.

Q You didn't send them?

A Some of these came from Jamie to me.

Q No. But the texts that came from you were from you personally, not someone using your phone; is that right?

A Yes. They are from my phone.

Q That wasn't my question. Listen carefully. They came from you personally, correct?

A To the best of my knowledge, yes, they came from me.

Q Is that true for all the text messages that you've produced?

A To the best of my recollection, yes.

Q Let me ask the question a different way. To

the best of your knowledge, no one had access to your phone to send a message from you that appeared to be from you, right?

A I don't believe so, but I can't say that with 100 percent certainty.

Q During the relevant time frame, 2016, '17, '18, '19, and '20 of these various text messages, your phone was never stolen, was it?

A There was a period of time when I did not have my either iPad or cell phone was left at the Northern Ken -- or the Cincinnati Northern Kentucky Airport, and I had to retrieve it at the police station. I can't recall at this moment the specific date that was.

Q Do you recall the year?

A At this moment, I cannot recall the year.

Q Well, was it in the last one or two years, or was it three or four years ago?

A I can't recall, it's -- with that specificity.

Q As we go through other texts, if you believe you did not send the text, will you tell me that it wasn't a text from you?

A Yes.

Q You mentioned the software you use to retrieve these text messages and to print Exhibit 5 in the other Exhibits. Did this software capture deleted text

messages?
A I believe it captured all my text messages.
MR. CIOFFI: Do read my question back.
COURT REPORTER: Yes. Give me one second.
(REPORTER READS BACK REQUESTED TESTIMONY)
A I believe it captured all my text messages.
BY MR. CIOFFI:
Q What is the answer to my question? Did it capture deleted text messages?
A I -- I don't know. I believe it captured all my text messages.
Q Was there a command that you gave the software to retrieve the deleted messages?
A I do not recall.
Q Is there some type of manual or instruction guide that you looked at in order to use the software?
A I don't recall.
Q Well, how did you know about the software?
A I researched what was available, and I asked my son-in-law if he had any expertise in this, and he recommended iMazing software.
Q Did he help you retrieve your e-mails?
A No.
Q What's your son-in-law's name?
A Brian Sweeney.

Q When did you have this conversation with him?
A I can't recall specifically. Would have been sometime following your request for documents.
Q Did counsel assist you in retrieving these e-mails?
A You mean text messages?
Q Te -- sorry, text messages, correct.
A No. I do not believe so.
Q You did it completely on your own with no assistance of counsel, is that what your testimony is?
A Yes.
Q Except with your -- the assistance of your son-in-law, Brian?
A In terms of the software itself, yes.
Q What did Brian tell you about the iMazing software?
A He told me that it would allow me to download all of my text messages and -- and voice messages.
Q When you say all of your text messages, all of the text messages that had not been deleted; is that correct?
A I -- I can't recall. If we -- if -- if the discussion was that specific, it was relative to all text messages.
Q Tell me what you did to retrieve your messages

physically. What did you do with your phone?
A I plugged my phone into my computer.
Q Why did you plug it into your computer?
A Because -- I plugged my phone into my computer because the iMazing software was on the computer.
Q Okay. Had you previously loaded the iMazing software onto your computer?
A I can't recall if I did it previously or concurrently.
Q Did you use some sort of instruction manual?
A I can't recall if I used a -- I did not use any printed instruction manual. I cannot recall if there were instructions on the screen.
Q Well, there surely were instructions on the screen, right? I mean, you read instructions on the screen; isn't that true?
A Yes. I would have read instructions on the screen, how to download the iMazing software.
Q Uh-huh. And did those instructions include instructions on how to retrieve deleted text messages?
A I cannot recall that.
Q It's -- but if it exists, it would be in the software, isn't that right?
A I cannot speak to what's in the software and what's not in the software.

Q When you were downloading the messages, did you see any instructions about how to retrieve deleted text messages?

A I can't recall if I saw any such instructions.

Q So as you sit here today, you cannot testify, under oath, whether the text messages you produced include all deleted text messages, can you?

A I provided all the text messages that were in my phone.

Q Do you mean by that, then, you did not produce text messages that had been deleted from your phone?

A I cannot recall that.

Q Okay. What can you recall?

A I downloaded all the messages in my phone, including I've had a backup into the iCloud. I cannot confirm whether that included all deleted messages. I've had this phone for numerous years.

Q Did you do anything to assure that you had captured the deleted text messages?

A Could you be more specific in terms of anything?

MR. CIOFFI: Could you read my question back?

COURT REPORTER: Yes. Give me one second.

(REPORTER READS BACK REQUESTED TESTIMONY)

BY MR. CIOFFI:

Q Did you do anything at all, anything, to capture the deleted text messages?

MR. SABA: Objection to form of the question. Go ahead. You can answer.

A I don't recall.

Q But your testimony is that you only captured what was on your phone, correct?

A I provided all the text message that was on my phone.

Q All right. And you provided no text messages that had been deleted from your phone; isn't that correct?

MR. SABA: Objection. Asked and answered. Go ahead. You can answer.

A I -- I cannot confirm that. I provided all the text messages that were on my phone.

MR. CIOFFI: I want to state this on the record. Counsel, we'll make a request on the record for his phone so that we can inspect and make sure that deleted text messages were produced. We produced deleted text messages.

MR. SABA: Yeah. I'm going to make a --

MR. CIOFFI: Now that's within the scope of our request.

MR. SABA: Okay. I'm going to make a note,

Michael, but if you could follow up with a letter as well just to confirm your request, and then we can make sure we're -- I'm sure there's going to be more that you may come across and just make sure we're on the same page.

MR. CIOFFI: All right. And if you can make sure that nothing happens to the phone in the interim, that would spoliate that evidence.

BY MR. CIOFFI:

Q Also, with respect to the text messages, I noted that the text messages with Jamie Leonard stopped on October 26, 2020. Did you provide a cutoff date for the text messages with him?

A No. I did not provide a cutoff date.

Q There are other text messages that you produced, well into 2021 with other people, but not with Jamie Leonard.

A Correct.

Q Okay. Why is that?

A I believe the request was to provide all text messages up and to the date of response, and I did that with all my text messages.

Q Is it your testimony under oath that you had no text messages with Jamie Leonard after October 26, 2020?

A As best I can recall, yes. That is -- that is accurate.
Q Okay. Why is that?
A I understand the bank employees were told not to contact me after October of 2020.
Q But there are several text messages with bank employees after October 2020, right?
A Yes.
Q But not with Jamie Leonard. Why not?
A I don't believe there are any text messages with Jamie after October 26 of 2020.
Q Did you have any telephone calls with him after October 26, 2020?
A I don't believe I've had any telephone conversations with Jamie Leonard after October 26, 2020.
Q Any meetings?
A I have not had any meetings with Jamie Leonard after October 26, 2020.
Q You mentioned earlier this morning that one of the entities you had discussions with about employment was BMO, which is Bank of Montreal, right?
A BMO is Bank of Montreal, correct.
Q I believe you testified that you had discussions with BMO --
A Yes.

Q -- about employment; is that right? Who at BMO did you talk to?
A The individual I spoke to at BMO was Dave Casper.
Q Anyone else at BMO?
A That I spoke with?
Q Well, that's my first question that you spoke with, yes.
A I may have spoken to an individual by the name of Sid Deloatch.
Q Did you have any e-mail exchanges with anyone at BMO?
A I had e-mail exchanges with Dave Casper, I believe Dave's assistant. I can't recall that name, and I can't recall with Sid if it was an e-mail, a text, or a phone conversation.
Q Any text messages with individuals at BMO concerning your job search discussions?
A Can -- can you an -- ask that question again? I want --
MR. CIOFFI: Sure. Read it back, please.
(REPORTER READS BACK REQUESTED TESTIMONY)
A Text messages from BMO employees?
Q Text messages from you to BMO employees or affiliates, and text messages from them to you.

A Can you be specific in terms of the time frame?
Q Sure. Between October 26th to the present time. October 26 --
A Yes.
Q -- 2020.
A I would had text messages with Tayfun Tuzun, who's now an employee of BMO.
Q And what was th nature of those text messages?
A I can't recall the specifics of all of them. I believe I told Mr. Tuzun I was talking to Mr. Casper. I believe there was a date we were meeting with our wives as well as another couple to have dinner. I believe I met with him to have drinks in December or January. There could have been -- I don't recall all the specific texts since October of 26 -- October of 2021, with Mr. Tuzun.
Q Did you produce all those texts?
A Yes. Through the date of record.
Q Through when?
A Through the date when you requested them.
Q Okay. To the present time? Okay.
MR. CIOFFI: Counsel, I'll also ask for that'd be supplemented.
MR. SABA: But I agree. We'll serve you with a

supplemental letter. Or letter request, but if you can just list this for us, that'd be great.

MR. CIOFFI: And I just want to say on the record we want to reserve our rights to question her about that if it happens to be necessary.

BY MR. CIOFFI:

Q In your amended complaint, paragraph 3, you say that Fifth Third is engaged principally in commercial banking, branch banking, consumer lending, and wealth and asset management; is that right?

A Was that in the complaint or --

Q Yes.

A -- the count?

Q Paragraph 3 of your complaint.

A Yes.

Q All right. Those four broad categories of businesses are conducted by, or through, various lines of businesses or business units; is that right?

A Well, there are multiple lines of business within Fifth Third Bank.

Q Right. And it's these lines of businesses that perform the services that you describe in paragraph 3, of commercial banking, branch banking, consumer lending, and wealth and asset management, correct?

A There would it be multiple lines of business

underneath those four --
Q Right.
A -- general categories.
Q All right. I want you to go to the board, if you would please, and use one of the black marker and put at the top, let's start with commercial banking and then the lines of businesses after that.
MR. SABA: I -- I don't think he's under any obligation to draw or write or create a document. If you want him to give verbal responses today, he's prepared to do that. He's under no obligation to create any sort of diagram or draw anything as part of the deposition. He can answer verbally any question you have, but he's not obligated to draw anything out or provide a diagram. We can do that in a separate production if you want to ask for that or a response to an interrogatory, but that's not part of the deposition.
MR. CIOFFI: Are you refusing to have him put anything on the board?
MR. SABA: Yes. He's going to answer verbally any question you have.
MR. CIOFFI: All right. We'll create the document. Dave, you want to go up?
MR. OBERLY: Yeah.

MR. CIOFFI: So here's the black.

MR. OBERLY: Commercial at the top?

MR. CIOFFI: Yeah. Let's put commercial at the top.

VIDEOGRAPHER: Counsel, would you like me to film the drawing of the diagram or the witness?

MR. OBERLY: The witness.

MR. CIOFFI: No. But use a bigger marker so we can see it. You can film the witness. We are going to mark this as an exhibit.

(EXHIBIT 6 MARKED FOR IDENTIFICATION)

VIDEOGRAPHER: Yes, sir.

COURT REPORTER: Okay. This will be 6.

BY MR. CIOFFI:

Q So, under commercial banking, what are the lines of businesses?

A It would include large corporate, middle market, business banking --

Q Hold on.

A -- small --

Q Hold on, hold on.

MR. OBERLY: The second one, you said middle --

THE WITNESS: Yeah. But do it below that, yeah.

MR. OBERLY: Below it?
THE WITNESS: Yeah.
MR. OBERLY: What's the third one you listed?
THE WITNESS: Busin -- middle arch corporate, middle-market, business banking, and small business. Treasury management. Capital markets and institutional investments under the broker-dealer.
A I want to clarify that you asked lines of business?
BY MR. CIOFFI:
Q Lines of business, sure.
A Not all divisions that supported the commercial division?
Q Well, I'm just asking lines of business.
A Lines of business. At this time, those are the ones that I recall. There may be additional areas.
Q When you say different areas, you mean different lines of businesses?
A Well, different lines of business, either underneath those or in addition to those.
Q All right. Let's go on the next page, do branch banking. All right. What are the lines of business under that?
A Retail and any individual lending. Non-mortgage, non -- non-mortgage, and non-auto loan.

Q Hold on. Did you say individual lending to the end of that?

A Non-mortgage and non-auto lending. There may be others that I -- beyond that, I don't recall others at this time.

Q Okay. Let's look at commercial lending.

A We've already done commercial lending. That was the first one we did. Want us to do it again?

Q No. You -- so commercial banking -- it's commercial banking, commercial lending, the same thing?

A Yes.

Q All right. So in your complaint, you say principally engaged in commercial banking, branch banking, consumer lending, and wealth and asset management. But when you use commercial banking and consumer lending, you're talking about the same thing?

A No. You asked me if commercial banking and commercial lending were the same.

Q All right.

A Now, you're asking me if commercial banking and consumer lending are the same. Consumer lending is different thing than --

Q Right. Let's take consumer. I think commer -- consumer.

A -- commercial thing -- okay. Okay. That's

why I wanted you clarify what you're asking me. Consumer lending would include the mortgage division, would include the auto leasing, indirect auto for individuals, lending, and leasing. There were some third-party platforms that would fall under consumer lend. I think the -- maybe the green sky program. I'm not sure the official name of those businesses, but they would have fallen under consumer lending.

MR. OBERLY: Do you want to tell what that is?

A Other third parties, well, green sky, would've been an example underneath that. And there may be others that I'm not recalling at the moment.

Q The next page, do wealth and asset management. Lines of business under wealth and asset management.

A Okay. So wealth and asset management, you would have the -- the third securities retail. And then might be, I'm sorry to correct that, that move when I ran wealth and asset management, we had the third securities underneath wealth. That ma -- that may be under the second one. I forget how you titled it retail banking. But the third securities would be underneath wealth and asset management, maybe under both areas.

MR. OBERLY: You said the third securities?

THE WITNESS: The third securities, the broker-dealer. But that may also be under the

branch banking, the private bank, trust division, the investment division, the institutional division. One time there was a family office, and I'm not sure where that line of business is today, whether it's under one of those subcategories or its own category, and may be others as well.

BY MR. CIOFFI:

Q Anything else that you can remember?

A There may be others as well, but I don't recall them at this time.

Q Let's go back to commercial banking.

MR. OBERLY: Can you flip over the page?

THE WITNESS: Yeah.

Q Yes. For the time frame 2019 and 2020, who was the head of large corporate under commercial bank?

A Could you be specific in terms of the dates. You said 2019 to 2020 --

Q 20 -- yeah.

A -- could you be for that entire year?

Q Maybe between January 1, 2019, through the date you left, October 26, 2020.

A The date I was terminated?

Q That day, you left.

A Okay. So large corporate --

Q I'll put this up in red. Does the initially

-- go ahead. Who was in charge of that?
A Large corporate?
Q Yeah.
A Okay. I believe in 2019, that started with Lars Anderson, and then the date of my termination, it was Kevin Lavender.
Q Yeah. And this time frame 20 -- as I said Jan --
A You're covering -- you're covering two, four years --
Q I know, I understand.
A -- after so my termination in Octo --
Q I understand there might be two people.
A Okay.
Q That's fine. The best of your knowledge. Okay. Middle market?
A Middle market would have been Lars Anderson.
Q Okay.
A And then Phil McHugh. Business banking, Phil McHugh. Small business was a hybrid because we were doing something different in Chicago than we were doing in virtually every other market. So everywhere but Chicago, it would have been Phil McHugh.
Q Why was Chicago treated differently?
A Because we -- could you repeat that? Why was

Chicago treated differently in regards to this?

Q Yeah. What do you just said, yeah.

A Because the Chicago market had a different -- had a different number of personnel dedicated to small business banking from the acquisition of MB Financial.

Q Next, treasury management.

A Oh, treasury management. So it started with -- can I ask a question? Is this the EVP who was involved with it or the executive that was responsible reporting to the EVP?

Q Well, the person who was the head --

A Ultimate -- ultimately responsible for that. That's your question. So it would be on treasury management. It started with Tim Spence, and then it moved to Kevin -- no, it moved to Lars Anderson, and then it moved to Kevin -- Kevin Lavender. I don't have the specific dates. I know early '19, it was Spence. It was removed from Spence and given to Mr. Anderson, and concurrent with Mr. Anderson's moving large corporate to La -- Kevin Lavender, he also picked up treasury management.

Q Capital markets?

A Lars Anderson and then Kevin Lavender.

Q Institutional investments?

A It started in '19 with Lars Anderson, and I

believe moved to Kevin Lavender.
Q Let's go onto the next page. Retail?
A Tim Spence.
Q Individual lending, non-mortgage, non-other?
A Tim Spence. I asked you to correct this as well and put up the third securities up there as well because I think that transitioned at some point.
Q As another business line?
A Of the third securities would have been in multiple business lines.
Q Next, oh yeah, who is the head?
A Exactly how I've been and reported to. So let's see. In the beginning of '19 -- beginning of '19, I believe it was Brian Lamb and then Tim Spence.
Q Let's go on. Consumer lending?
A All three of those would've been Spence.
Q Let's go on. The third securities?
A And to clarify your question, this was the executive ultimately responsible for these?
Q Yeah -- McHugh for all of this? Okay. That's it. Let's go back up to the first page. Use green for this. So with respect to, again, this time frame of 2019, 2020, what percentage of Fifth Third's gross revenue was generated by large corporate?
A Without seeing financial statements and doing

a thorough review, I --
Q Well, about -- approximately.
A I -- I -- I -- I can't answer that. It would vary from year to year.
Q Well, let's break it down. In 2019?
A I could not speculate on those numbers unless I had the financial statements in front of me.
Q Well, with large corporate, did it generate five percent, ten percent, 15 percent?
A It would only be a guess. I could not do --
Q No.
A -- not without the fi --
Q I want you to -- give me your best guess.
A In what year? It varies year to year. The reporting changes year to year --
Q I appreciate that. Well, let's first do 2019.
A I -- I would -- it would only be a guess based on the fact I don't have any numbers in front of me.
Q How about 2020?
A I -- I don't have any 2020 performance numbers in front of me either.
Q Okay. But in 2019, looking at commercial banking, tell me the four business lines that generated the largest percentage of gross revenue.
A Again, I couldn't tell you that without

looking at those financial statements. I did not memorize the financial statements.

Q Well, was large corporate bigger than middle market in terms of generating gross revenue?

A I -- I -- I don't recall.

Q Was large corporate larger than treasury management and capital markets in terms of gross revenue?

MR. SABA: Objection to the form of the question. Go ahead. You can answer.

A Again, it would be a guess. I don't know without seeing those financial statements. And I'd have to see how the revenue from treasury management and capital markets was recorded versus the revenue for large corporate commercial.

Q Uh-huh. Well, under commercial banking, what two business lines generated the greatest -- largest percentage of gross revenue?

A Without seeing the financial statements in front of me, I would guess it would be middle market and large corporate.

MR. CIOFFI: Okay. Put a -- a 1 and 2 next to large corporate and middle management.

Q Let's go back. What would be number 3?

A I couldn't -- without numbers in front of me,

I couldn't tell you. I've been --
Q Let's go --
A Would depend how the revenue is recorded in those lines of business.
Q Let's go onto the next page. So with respect to branch banking?
A Retail would be the largest.
Q In what percentage of revenue would retail be?
A I -- I don't know off the top of my head.
Q Would it be ten or a greater percent?
A Of the retail --
Q Of the --
A -- component, or of the banks?
Q -- gross revenue?
A Again, it would be a guess, but yes. My guess is it would be greater than ten percent.
Q And how much greater?
A I don't know without those numbers in front of me.
Q And what about the other two categories?
A Are you talking about revenue --
Q Yeah.
A -- or profit?
Q No. Revenue. What's gross revenue?
A I believe mortgage.

Q We're not there yet. We're talking about individual lending.
A Right. But that was mortgage.
Q It's non-mortgage and not auto lending.
A That would be relatively small.
MR. CIOFFI: Uh-huh. Just put relatively small in green.
Q And those -- and what kind of loans are those?
A That's a loan to an individual. For a home equity loan.
Q But it's not mortgage, right?
A Right. A mortgage would be a first mortgage.
Q Okay.
A First mortgages are done through the mortgage group, and home equity loans are done through branch banking through the date of my termination.
MR. CIOFFI: All right. Let's --
MR. OBERLY: Next page.
A And Fifth Third securities are pretty small.
Q Yeah. And mortgage division, auto leasing, and lending?
A I believe revenue was the largest and the mortgage -- of these subcategories, revenue would be largest, and mortgage, second-largest and indirect auto.
MR. OBERLY: This one is not very clear.

MR. CIOFFI: Auto leasing and lending.
THE WITNESS: Yeah. Auto leasing and lending.
MR. OBERLY: Okay.
BY MR. CIOFFI:
Q And what would the mortgage division generated a lot of revenue, correct?
MR. SABA: Objection to form. Go ahead. You can answer.
A Could you be specific, in terms of a lot.
Q Well, did -- what -- of all these business lines, what generated the highest percentage of gross revenue?
MR. SABA: Objection to form. Go ahead. You can answer.
A I believe mortgage, but without the financial statements in front of me, I could not confirm that.
Q And certainly, you would agree with me that mortgage and auto leasing and lending, together, generate the most revenue inside the bank?
MR. SABA: Objection --
Q Correct?
MR. SABA: -- to the form. Go ahead. You can answer.
A Could you repeat the question?
MR. CIOFFI: Read it back, please.

COURT REPORTER: Yes. Give me one second.
(REPORTER READS BACK REQUESTED TESTIMONY)
A I cannot answer.
MR. SABA: Objection. Go ahead. You can answer.
A Not without the financial statements in front of me.
BY MR. CIOFFI:
Q All right. Do you know of any two groups combined that generated a larger percentage of revenue than mortgage and auto leasing and lending?
MR. SABA: Objection as to form. Go ahead. You can answer.
A Very difficult to answer that question without financial statements in front of me. But I would guess the retail branch banking and commercial lending together would generate more revenue than those two divisions.
Q Let's go on. Now, of these businesses, Fifth Third Securities generated a relatively small percentage of gross revenue, right?
A Gross revenue --
Q Right.
A -- I think Fifth Third Securities had a reasonable amount of revenue.

Q But lower in comparison to mortgage lending or auto lending, right?
A Yes.
Q Private bank, relatively small percentage, isn't that right?
MR. SABA: Objection to form. Go ahead. You can answer.
A No. Private banking had substantial revenues.
Q But percentage-wise, in terms of all of the banks gross revenue, what would be the percentage from the private bank?
MR. SABA: Objection to form. Go ahead. You can answer.
A Without financial statements in front of me, I couldn't confirm this, but my guess would be ten to 20 percent of the total revenue.
Q And mortgage lending and auto lending together, it would be more like 50 or 60 percent, right?
MR. SABA: Objection to form. Go ahead. You can answer.
A I cannot agree with that statement.
Q Do you think it's too high or too low?
A I would only be speculating.
Q Well, what's your best guess?
A That mortgage and indirect auto would be

greater than --
Q Mortgage --
A -- 60 percent --
Q -- are auto --
A -- of the total revenue of the bank.
Q Right.
A To clarify, only the mortgage division and only the auto division.
Q Well, the mortgage division and auto lending and leasing.
A Are more than 60 percent of the bank's revenue. That is your question towards me?
Q I'm saying -- I -- no. I'm asking you, is it -- is that roughly the percentage that those lines of businesses generated in terms of gross revenue?
A Gross --
MR. SABA: Objection to the form. Go ahead.
Q -- gross revenue.
A I could not confirm that without financial statements in front of me, that they were more -- 60 percent or more of revenue.
Q I didn't say 60 percent or more. I said between 50 and 60 percent. Is that seem about right?
A I could not --
MR. SABA: Objection to the form. Go ahead.

Q You may answer.
A I could not confirm if they were 50 to 60 percent of revenue.
Q In the trust division, relatively small percentage of gross revenue, correct?
MR. SABA: Objection to the form. Go ahead.
A I included the trust division revenue with the private bank, and that would be somewhere between ten and 20 percent.
Q Okay. So each one by themselves would be, what, five to six percent?
A I would only be speculating without statements in front of me.
Q But you said five -- you said ten to 15 percent. So --
A Ten to 20 percent.
Q So each one would be, at max, ten percent? Is that what you're saying?
A Not necessarily.
Q Okay. What would they be? Would it be three percent? Five percent?
A Without --
Q Eight percent?
A -- those financial statements, I don't know. The gross revenue of the family office would have been a

small amount.

Q Tiny amount, right? It wouldn't even be one percent, would it?

A Okay. But gross revenue with either bank would be high.

Q Would what -- family office wouldn't even be one percent of gross revenue, would it? In 2019 to 2020?

A Gross revenue of the entire bank?

Q Yes. Of the entire bank?

A Yes. I believe it would be less than one percent of the gross revenues of the entire bank.

Q And investment division would be less than five percent, correct?

A I -- I couldn't confirm that.

Q So what would it be? Greater or less than five percent?

A I don't know. The greater -- the entire wealth and asset management was somewhere between ten and 20 percent. The individual components of that, I could not give you a clarity in terms of what those percentages are.

MR. CIOFFI: So let's put at the top of that, well, next to wealth and asset management, ten to 20 percent.

Q And all these lines of businesses below that would be some fraction of ten to 20 percent, right?

A Fifth Third Securities, private bank, trust division, ins -- yes. They would be less than 20 percent if the aggregate total is 20 percent.

Q All right. This could be released. Leave that there.

COURT REPORTER: And would you like each page to be a collective Exhibit 6?

MR. CIOFFI: Yes. Well, the whole thing will be Exhibit -- don't -- let's not mark it yet.

COURT REPORTER: Okay. Okay.

MR. CIOFFI: Well, I'll come back to it later.

BY MR. CIOFFI:

Q Under Fifth Third Bancorp's bylaws and regulations, the board of directors selects senior vice presidents and top executives, right?

A Yes. I believe that under the bylaws, it is the responsibility of the board of directors to appoint Fifth Third's senior vice presidents and executives.

Q It necessarily follows, therefore, that the board selects the president and CEO of the Bancorp, correct?

MR. SABA: Objection as to form. Go ahead. You can answer.

A Yes. I believe the ultimate responsibility of selecting the board -- the president and CEO rest with the board. Mr. Carmichael told me that he recommended Mr. Spence to be the next president and that the board approved that recommendation.

Q I didn't ask you that question.

MR. CIOFFI: Would you read my question back?

COURT REPORTER: Yes.

Q I realize you want to preach and say things into the record, but your obligation is to answer my questions.

A I'm trying to answer your question, sir.

Q You're trying to filibuster me, but that's okay. Go ahead. The record will speak for itself.

(REPORTER READS BACK REQUESTED TESTIMONY)

Q The answer to that is yes, right?

A The board has ultimate authority to approve the president and the CEO, yes.

Q Did you ever submit an application to the board to be president or CEO?

MR. SABA: Objection to form of question. Go ahead.

A No.

Q Did you ever submit your qualifications to the board to be president or CEO?

MR. SABA: Objection as to form. Go ahead.
THE WITNESS: Can you repeat that question?
COURT REPORTER: Yes.
(REPORTER READS BACK REQUESTED TESTIMONY)
A Is the question directly to board members?
BY MR. CIOFFI:
Q Yes. To the board. Right.
MR. SABA: Objection as to form. Go ahead.
A My qualifications were requested by Mr. Shaffer, who I provided those to, who then would provide those to the board of directors.
Q But did you ever submit your qualifications to the board?
A I --
MR. SABA: Objection as to form. Go ahead. You can answer.
A I did not submit my qualifications directly to the board.
Q Did you ever tell any board member that you wanted to be president and CEO?
A Yes.
Q Who did you tell?
A I told Mr. Carmichael as a board member. On Octo -- August -- the date is August 19 -- August of 2019. I believe the date was the 15th, but I'm not

certain of that. When he told me that he would be leaving to do something with his son and would recommend me and I told him I absolutely wanted that position. I may have told Mr. McCallister, but I can't recall specifically when I told him that.

Q What are your remembering that you told Mr. McCallister?

A I believe Mr. McCallister and I had a conversation and -- the first quarter of Janu -- the first quarter January, February, March of 2010, when Mr. McCallister asked me why I was going -- returning from Louisville to Cincinnati, and I told him I was coming back to run the wealth and asset management division and I needed to go back to Cincinnati if I were ever going to have an opportunity to be CEO Fifth Third Bank.

Q And this would have --

A Now, at the time, Mr. McCallister was not a board member of Fifth Third Bank.

Q Well, who was he?

A He was -- at that time, he was the CEO of Humana.

Q Okay. But if this happened, it happened in 2010. Is that what you're saying?

A That happened in 2010. I can't recall if I

had other conversations with Mr. McCallister after 2010.

Q Did you ever ask the board to vet you for president and CEO?

MR. SABA: Objection to form of question. Go ahead. You can answer.

A No. I did not ask the board to vet me.

Q You knew, though, that the board had a mechanism and a process for vetting potential presidents and CEO, didn't you?

A I understood the board had many mechanisms to evaluate potential candidates.

MR. CIOFFI: Let's mark the next exhibit.

MR. SABA: Michael, how long do you want to go until lunch break?

MR. CIOFFI: Well, this is going to ta -- this will take a little bit of while, do you want to stop now?

MR. SABA: I think if we're -- it's what? About 1:00 so --

MR. CIOFFI: No. No. I look, you guys get to have a view. So let us stop we've got two days so --

MR. SABA: Okay. All right.

VIDEOGRAPHER: Okay. We're going off the record at 12:54.

(OFF THE RECORD)

VIDEOGRAPHER: All right. We are back on the record at 2:02.

BY MR. CIOFFI:

Q Directing your attention to Exhibit 6, which is the chart we were looking at before the break, would you point out as we go through the lines of businesses which lines of businesses fell within the commercial bank?

A Have you mar -- put it?

Q We'll mark those with a CB, commercial bank. Excuse me. I didn't mean commercial. I meant consumer bank. So which lines of businesses fell within or under the consumer bank?

A On this page?

Q Yes.

A The small business banking in Chicago would have been under consumer.

MR. CIOFFI: Yes. Continue to mark it CB.

Q All right. Let's go to the next page. Anything else on that page within the consumer bank?

A No.

Q Let's go to the next page. Which lines on that page were within the consumer bank?

A Retail, individual lending.

MR. CIOFFI: Just, so the record's clear, we're marking Exhibit 6 based on the witness' testimony with CB for consumer bank next to the lines as he's indicated in his testimony.

A And Fifth Third securities would have been the consumer bank, the commercial bank, and wealth and asset management. All three.

BY MR. CIOFFI:

Q Next page. Same question. Which one of those lines fell under consumer bank?

A The mortgage division, auto leasing, and other third-parties.

Q Looking at the third page of Exhibit 6, which one of those lines --

A This would be the fourth page, right? You just said the third page.

MR. CIOFFI: Would you count them?

MR. OBERLY: This is four.

Q Okay. The fourth page, anything there falling under consumer bank?

A I mentioned Fifth Third securities would be under wealth, commercial, and consumer, all three. Private bank would not, trust division would not, investment division would not, institutional would not, and family office would not.

MR. CIOFFI: Okay. Still, we're on 27. If we can mark, this is 7, right?

COURT REPORTER: Yes.

MR. CIOFFI: All right. One for the witness, one here, and -- so to save a tree because is a big exhibit. We're giving --

MR. SABA: I have one.

MR. CIOFFI: -- one to counsel.

MR. SABA: We're good.

BY MR. CIOFFI:

Q Directing your attention to Exhibit number 7, what is that document?

(EXHIBIT 7 MARKED FOR IDENTIFICATION)

MR. SABA: Michael, do you have a copy that's bate-stamped?

MR. CIOFFI: You didn't ask for these.

MR. SABA: I'm thinking just for points of reference today. It looks like we had a bunch of different random page numbers just to figure out where we are and just to confirm.

MR. CIOFFI: They're random, I think they are in order, but --

MR. SABA: Let's -- well, instead of random, it re-passes at different times with different exhibits. I'm just making sure we're referencing the

same thing and have the same number of documents.

MR. CIOFFI: Just, so there's no confusion or problem, what the court reporter will do is take this exhibit as it is and upload it so that it's preserved electronically, and then counsel will have access to it.

THE WITNESS: It would appear it is the annual meeting of shareholder notice. That annual meeting to be held in March of '17, March 9. I believe following that is the 2017 proxy statement.

BY MR. CIOFFI:

Q Have you seen this document prior to --

A Well --

Q today?

A -- I think there's other things here. I'm just -- up here, there was an agenda for the shareholders meeting on April 18 of 2017. Up here, there was a proxy car to vote shares owned, followed by a form to elect directors, and accounting firm, advisory approval of executive committee, and other shareholder votes. I haven't reviewed all these pages in detail.

Q Have you seen this document prior to today?

A Yes.

Q Did you receive it as a shareholder of Fifth Third in 2017?

A Yes.
Q What does the term named executive officer mean? I'm just asking you what the term means, not what's in the document.
A The named executive officers would be the executives, ranked by pay, the five largest or five highest-paid executives or six could be more than that. I didn't look how many were in this, whether it's five or six.
Q The board determines the pay of the named executive officers, correct?
A Yes.
Q And in the board's judgment, it reflects the highest performers of the company; does it not?
A No.
Q To your knowledge, would the board name someone, a named executive officer, and pay him or her one of the five or six highest salaries if they were not one of the five or six highest performers in the company?
A Could you repeat that question?
MR. CIOFFI: Could you read back, please?
COURT REPORTER: Yes. Of course.
(REPORTER READS BACK REQUESTED TESTIMONY)
A Yes. The board could name one of five

individuals as highest-paid, and those same five individuals would not necessarily be the highest performers.

BY MR. CIOFFI:

Q In the board's judgment, they would be the highest performers, right?

MR. SABA: Objection to form of the question. Go ahead. You can answer.

A I could not speculate on what the board's judgment would be.

Q The named executive officer named by the board is, in the board's view, the most valuable of the employees, correct?

MR. SABA: Objection to the form of the question. Go ahead. You can answer.

THE WITNESS: Can -- can you repeat the question? I'm sorry.

(REPORTER READS BACK REQUESTED TESTIMONY)

A I couldn't speculate on what the board's view or board's opinion is.

BY MR. CIOFFI:

Q But generally speaking, your knowledge of boards is that they pay the most money to those employees who are the highest performers, in their judgment?

MR. SABA: Objection to the form of the question. Go ahead. You can answer.
A No. I cannot make that statement.
Q And why not?
A My experience would tell me there were higher performers than these five individuals listed.
Q In whose judgment?
A Mr. Carmichael told me my performance was better than some of these individuals.
Q But the board didn't agree with him, right?
A I can't speculate on what the board agreed or disagreed with.
Q But it -- as a basic protocol, you would agree with me, wouldn't you, that a board awards the highest salaries to those employees they believe to be most valuable, right?
MR. SABA: Objection to the form of the question.
A No. I would not agree to that.
Q They would pay an employee one of the five or six highest salaries even though they believe that employee was not a high performer?
MR. SABA: Objection to the form of the question.
THE WITNESS: I'd like you to repeat the

question.
(REPORTER READS BACK REQUESTED TESTIMONY)
MR. SABA: Continuing objection.
A I -- I can't speculate what the board would do. I only know what was told to me.
BY MR. CIOFFI:
Q Well, let me ask you this: From the perspective of a reasonable board -- from that perspective, what a reasonable board would do in order to retain the best talent, they would pay the best talent the most money, correct?
MR. SABA: Objection to the form of the question. Go ahead. You can answer.
A I -- I cannot confirm that statement, no.
Q What can't you confirm about it?
A I believe there were higher performance by individuals not listed. And --
Q That wasn't my question.
MR. CIOFFI: Read my question back, please.
COURT REPORTER: Yes. Of course.
(REPORTER READS BACK REQUESTED TESTIMONY)
MR. CIOFFI: Read the broader question.
COURT REPORTER: Yes. Of course.
(REPORTER READS BACK REQUESTED TESTIMONY)
MR. SABA: Continuing objection.

COURT REPORTER: I'm going to continue?
MR. CIOFFI: No -- no -- no.
A That was the last question that's open on the table?
BY MR. CIOFFI:
Q That's what I'm asking you. Yes.
A Okay.
Q Answer that question.
MR. SABA: Continuing objection.
A Well, I cannot state that a board would pay the -- the five largest -- the -- the named executive officers would also have the highest performance records in -- highest performance in a company, no, I cannot.
Q All right. That wasn't my question. You keep changing the question, and you've done that a lot today.
MR. SABA: No --
MR. CIOFFI: Read the question back, please.
MR. SABA: -- no, I object. He answered your question.
MR. CIOFFI: No. He didn't.
MR. SABA: No -- no. He just --
MR. CIOFFI: He ans --
MR. SABA: -- he doesn't agree with you, and that's the problem you have with it.
MR. CIOFFI: Counsel, you know what's going on.

He's rephrased the question with his answer. Read my question back. That's totally improper.
COURT REPORTER: Yes. Of course.
(REPORTER READS BACK REQUESTED TESTIMONY)
MR. SABA: Continuing objection.
A And I cannot attest to it.
BY MR. CIOFFI:
Q The board has a fiduciary duty to retain the best talent for the corporation. Would you agree with that?
MR. SABA: Objection. Go ahead. You can answer.
A Yes.
Q In order to retain the best talent, they pay that talent whom they consider the best the highest salary, correct?
A No.
MR. SABA: Objection to form of question.
A No. I cannot attest to that.
Q Why?
MR. SABA: Objection. Asked and answered.
A I know Mr. Carmichael told me my performance was --
Q That wasn't my question of what Mr. Carmichael told you. I'm asking you about the board.

A You're -- you're -- you're -- you're --
Q No. I'm asking you about the board. Don't change the question.
A Mr. Carmichael is a board member.
Q No. I --
A You're asking me if the performance of these individuals is the highest of any five individuals of the bank. And I am saying, no, I do not believe that is the case.
Q I realize you don't believe it, but the board believed it, right?
A I cannot tell you what the board believes or doesn't believe.
Q Well, the board you said has a fiduciary duty to retain the best talent, correct?
A The board has a fiduciary duty, yes.
Q To retain the best talent?
A Yes.
Q And in order to retain the best talent, they pay the best talent the highest salary, correct?
MR. SABA: Objection to the form of the question. Asked and answered. Go ahead. You can answer.
A No. I do not agree with your statement.
MR. CIOFFI: All right. Read my question back.

MR. SABA: Objection. Argumentative. You've asked him the same question. He's not going to agree with you.

MR. CIOFFI: Counsel --

MR. SABA: Can you just keep it -- no. All you're doing is asking the same question over and over again, and he said, no, I don't agree with you. You asked him why he told you why. You can't just keep reasking the question because he doesn't agree with you. That's not what the deposition is for. That is argumentative. We're not here to have you argue with him because he disagrees with the statement that you are trying to put in.

MR. CIOFFI: Counsel, the witness, each time I've asked the question has rephrased the question in his answer and answered things I didn't ask him. I didn't ask him anything about Mr. Carmichael or what was told to him --

MR. SABA: You --

MR. CIOFFI: -- et cetera. It's a simple proposition.

MR. SABA: You asked him why and he told you why. That's why he said that.

MR. CIOFFI: I'm entitled to have an honest, straightforward answer to my questions.

MR. SABA: And that's what he's giving you.
MR. CIOFFI: No.
MR. SABA: No. No. You're not entitled to get the answer you want. You're entitled to get his answer.
MR. CIOFFI: No. I want an answer to --
MR. SABA: That's what you're entitled to.
MR. CIOFFI: I said -- the record is clear --
MR. SABA: No. No. No. You want your answer. He's answered your question five different times. He can answer it one more time, then I'm going to instruct him not to answer, and we can move on.
MR. CIOFFI: You can do that.
MR. SABA: But you do not -- just because you don't like an answer and you're going to reask it and trying to say no, I want you to agree with me. He doesn't agree with you. He's explained that to you. He's explained why he doesn't agree with you. Reasking, for now, the seventh time is not going to change that answer. That's what you need to understand. You cannot badger him and argue with him to try and get some response that you want to try and get. Ask your question, he'll answer it.
MR. CIOFFI: He has to answer my question --
MR. SABA: No. No. He doesn't have to give

you the --

MR. CIOFFI: -- not the question he wants.

MR. SABA: No. No. He doesn't have to give you the answer you want.

MR. CIOFFI: The record will speak for itself --

MR. SABA: It absolutely will. Go ahead and ask your question.

MR. CIOFFI: Read it back.

COURT REPORTER: Let me go back to it.

(REPORTER READS BACK REQUESTED TESTIMONY)

MR. SABA: Objection. Asked and answered. Go ahead. You can answer.

MR. CIOFFI: Right here, he's never answered that question.

MR. SABA: He's answered it several times.

BY MR. CIOFFI:

Q It's -- it's a simple proposition. In order to retain the best talent, the board pays the best talent in its judgment, the highest salary, correct?

MR. SABA: Objection. Asked and answered. Go ahead. You can answer.

Q Can you tell me a reason why the board would not pay the best talent, in its judgment, the highest salary?

MR. SABA: Objection to the form of the question. Go ahead. You can answer it.

A I can only tell you what was told to me.

MR. CIOFFI: I'm not asking you that. I -- read my question back. I'm not asking you what anyone told you.

COURT REPORTER: Yes.

(REPORTER READS BACK REQUESTED TESTIMONY)

MR. SABA: Objection.

BY MR. CIOFFI:

Q Answer that question, not what was told to you.

A I cannot tell you that. I've answered that question.

Q You cannot tell me that? Okay. I want to direct your attention to page 28 of Exhibit number 7. You see the bullet points on page 28?

A Yes.

Q These bullet points are a recitation by the company's board through its Human Capital and Compensation Committee of the activities of that committee; is that right?

A Yes. This looks like -- appears to be the compensation discussing -- discussion and analysis by the Human Capital and Compensation Committee.

Q And one of the things, and it's a bullet point about in the middle that this committee of the board does, is, "Conducted an annual review of the succession plan for Mr. Carmichael," correct? Do you see that?
A Yes.
Q You were aware in 2017 that that's one of the activities of this particular committee of the board, right?
A Yes.
Q And in fact, any prudent board would think about planning for the succession of the president and CEO regardless of who the company is?
A Yes.
Q You testified earlier this morning that the board, in fact, to your knowledge, used a number of mechanisms in order to vet and plan for the succession; is that right?
A Yes.
Q Directing your attention to page 41. Who were the named executive officers in 2017 in -- reflected in the proxy of 2017?
A Mr. Carmichael, Mr. Tuzun, Mr. Anderson, Mr. Borden, Mr. Spence, and Mr. Forest.
Q Directing your attention to Exhibit number 8.
MR. CIOFFI: Gabby, this one's for you.

(EXHIBIT 8 MARKED FOR IDENTIFICATION)

COURT REPORTER: Thank you.

MR. CIOFFI: Counsel.

BY MR. CIOFFI:

Q Directing your attention to what's been marked as Exhibit 8, have you seen that document before?

A Yes.

Q Directing your attention to page 44 of Exhibit 8. Who were the named executive officers in the 2018 proxy statement?

A Mr. Carmichael, Mr. Tuzun, Mr. Anderson, Mr. Spence, and Mr. Forest.

MR. CIOFFI: So mark that as 9.

Q Have you seen this document before?

(EXHIBIT 9 MARKED FOR IDENTIFICATION)

A Yes.

Q What is it?

A It would appear to be a notice of shareholder meeting scheduled for March 16 -- I'm sorry, March 6, 2019, the 2019 proxy statement, as well as an agenda for the Annual Meeting of Shareholders, some blank pages, then a reference to the bank's audited consolidated --, audited consolidated financial statements, but they're not attached to this.

Q Do you receive this document as a shareholder,

correct?
A Correct.
Q You also received the 2018 proxy we just looked at, correct?
A Yes.
Q Directing your attention to page 36. Who are the named executive officers in Fifth Third's 2019 proxy statement?
A Greg D. Carmichael, Tayfun Tuzun, Lars Anderson, Theresa J. Tanner, Timothy N. Spence, Frank R. Forest.
Q Thanks. Directing your attention to Exhibit number 10. Have you seen that document before?
(EXHIBIT 10 MARKED FOR IDENTIFICATION)
A Yes.
Q Did you receive it as a shareholder of Fifth Third?
A Yes.
Q Directing your attention to page 41 of Exhibit 10. Who were the named executive officers on the company's 2019 -- excuse me, 2020 proxy statement?
A Greg D. Carmichael, Tayfun Tuzun, Lars C. Anderson, Timothy N. Spence, Frank R. Forest.
Q As a shareholder of Fifth Third, did you ever object to any of these individuals being named as --

named executive officers?
A No.
Q Did you ever complain to the board about either there being named executive officers or their salary?
A No.
MR. CIOFFI: Let's do this. 284. 284. So mark this one is --
COURT REPORTER: 11.
MR. CIOFFI: 11, and I'm going to give you one more before I question. Let's mark 00285 as 12. Mark that -- directing your attention to what's been marked -
-
(EXHIBIT 11 MARKED FOR IDENTIFICATION)
(EXHIBIT 12 MARKED FOR IDENTIFICATION)
MR. SABA: One second. Michael, you've a second exhibit number 12, second one of 00285?
MR. CIOFFI: Yep.
MR. SABA: Thank you.
MR. CIOFFI: I may have more than one down there.
BY MR. CIOFFI:
Q Directing your attention to 00284, which has been marked as Exhibit 11. What is this document?

A It would appear to be a summary of texts exchanges between myself and Jamie Leonard.
Q Directing your attention to the bottom of the page with a text from -- outgoing from you to Leonard at 9:45 on October 1st. Do you see that?
A Yes.
Q And what do you write there?
A GC is the expert in every issue with TS close to behind.
Q Who is GC, and who is TS?
A Greg Carmichael and Tim Spence.
Q What did you mean by this text message?
A I can't recall what specifically I meant. I don't know what led up to that or what conversations were had prior to that.
Q But generally, why are you sniping at Greg Carmichael and Tim Spence?
A I don't believe this is sniping at him. I'm saying to Jamie that Greg is the expert in these issues, with Tim close behind.
Q You're saying that facetiously, right?
A No.
Q Well, that's not how Jamie Leonard understood it, right? Why don't you read his response?
A I don't know how Jamie --

Q Well, read his response to see if you can figure it out.
A "As Jamie says about Tom Cruise that asshole thinks he knows everything about everything."
Q And then you responded with?
A Jamie responds with the next line. I respond with, "I love when Greg Carmichael offers accounting advice."
Q All right, then what's Jamie's response to you?
A "I love it when Tayfun does" on the following page.
Q No. No. No. Before that.
A Jamie responded after his e-mail -- I'm sorry, his text. So the text I read aloud was the text at 9:46:39. The next text is again from Jamie, this time at 10:04.
Q All right.
A Okay. And he says, "What the fuck."
Q Then you respond?
A I respond 17 minutes later --
Q All right.
A -- and said, "I love when Greg offers accounting advice."
Q Now, let's go on to the next page. And in

this colloquy, Jamie Leonard then responds, what?
A Jamie responds at 10:21, "I love it when Tayfun does" -- and then there's some symbol, and I cannot ascertain what that is.
Q What -- yeah, what is that emoji?
A I don't know.
Q Then you respond literally a second later -- a minute later. Read your response.
A "Three amigos, GC, TT, and BS."
Q Who are you referring to there?
A Yes. Greg Carmichael. TT would have to be Tayfun Tuzun, and BS would be Bob Shaffer.
Q What did you mean by the three amigos?
A I'm not sure. What was the conversation prior to that text?
Q Well, look at the prior page. What --
A Those were just texts. It could've also been phone conversations. I'm not sure what meeting we were in or what we were doing. I have not received my calendar to review that.
Q Well, what can you tell from the context of these text messages?
A I can't recall specifically. There were numerous issues we were dealing with at the time, including our response to COVID-19 and bringing

employees back to the office.
Q Well, when you called them the three amigos, were you complimenting them or making a derogatory comment?
A I don't recall.
Q Were you trying to make a derogatory comment with some kind of racial slur?
A Absolutely not.
Q Well, why did you call them amigos?
A I can't recall.
Q Do you normally call people amigos?
A No.
Q But why did you do it here?
A I can't recall.
Q You were criticizing them, weren't you?
A I can't recall that.
Q Where were -- were you being complementary of them?
A I can't recall.
Q Besides these three, you ever call anybody else amigos?
A I can't recall.
Q Let's go down. So there's a text message from Jamie Leonard at 12:41.
A On what day?

Q On October 1, 2020.
A I'm sorry, could you repeat that? I'm trying to find your reference.
Q So go down to 2020, 10:01. You see that? And then there's a 12:31:06. Do you see that?
A 10:21 -- no. I'm sorry. Can you tell me again? You're asking me to look at --
Q All right. So the -- we saw -- you see the three amigos comment?
A Yes.
Q All right. If you go down about 13 lines below that, you see Jamie Leonard, 2020, 10:01. 12:31, do you see that? It's more like six or seven lines down.
A Okay.
Q All right. And what's that text?
A So I'm reading the 12:31:06 text?
Q 12:31:06, right.
A And what would appear, he said he would yell at them.
Q No. Above that. So you -- you see the time stamp from the e-mail we were just discussing, your three amigos --
A The text message?
Q -- do you see that? Your text message of --

the time is 12:00 or 10:22 for your three amigos text. Do you see that?
A Yes.
Q Then the next one is 10:22, the next one is 10:27. Then the next one is 10:27, then 10:45, then 10:45, then 11:16. So you're having a long colloquy here, then 12:30. You see that? Following me?
A Yes.
Q Then 12:31, 12:41, 12:42, 12:42, a couple of seconds later. And then, I want you to go back up to the 12:31.
A 12:31. Yes.
Q Timestamp.
A Yes.
Q All right. What does Jamie write to you there?
A He writes to me, he said he would yell at them. I believe I've read that.
Q No. Below -- and then below that, there's another text. Read below that.
A Okay. It's following text again from Jamie Leonard to me. I said I wanted tears. "The fox ringing the bell prematurely." That was at 12:41 --
Q Right.
A -- approximately ten minutes later.

Q Again, he refers to you with a moniker of the fox, right?
A I -- I don't know -- I don't -- I can't -- I can't confirm that.
Q Well, when he says the fox ringing the bell prematurely, the fox is you, right?
A I don't know. I don't know what context he's talking about ringing a bell prematurely.
Q Are you aware of Jamie referring to anyone else as the fox besides you?
A No.
Q So it's probably you, right?
A I cannot confirm that.
Q Well, I'm just asking you. You don't know anyone else that he's referred to as the fox. So you do know he refers to you as the fox, so it must be you, right?
A I can't confirm that.
Q Do you think it could be someone else?
A I don't know.
Q Well, he's sending it to you.
A I don't know what context he's sending it. It is an exchange where he continues to send, and I have not responded.
Q Well, let's keep --

A My response response with --
Q -- let's keep reading. So keep reading.
A But I --
Q Gregory, right?
A Okay. He sends this to me again, Mr. Leonard, "I agree that she has done a ton." Then I send to Mr. Leonard --
Q All right.
A -- "She's done -- she's good." I'm sorry. Correcting myself. "She's good. Just complimenting a business partner."
Q Right. And then --
A He gives me a response with a thumbs up.
Q And what's that mean?
A I assume he agrees with the fact that I said she's good with the previous text, "She's good. Just complimenting a business partner."
Q All right. And then, what does he write to you?
A "I know."
Q Keep going.
A Then he says, "That's why you are the silver fox."
Q So up above where you said you couldn't figure out if he was referring to you, he was referring to you,

right?
A I -- he -- he -- I believe he's referring to me in the text at 12:42:29. Yes. I cannot confirm that he is referring to me in the text at 12:41.
Q And why is he again referring to you as the silver fox?
A That is the name Jamie called me.
Q Well, and read your response.
A "As Schrantz said, you get more bees with honey than vinegar."
Q What does that mean?
A Means you get more bees with honey than vinegar.
Q Yeah. But what -- is that some example of your cleverness, your foxiness?
MR. SABA: Objection to the form of the question. Go ahead. You can answer.
A No. It's more a form of how I manage people with empowerment in honey rather than vinegar.
Q So let's keep reading. So he says, "So true."
A "So true." Then he says, "Tell Tayfun that." Then he says, "You can suck a little [redacted] or a lot of [redacted], but either way, you're a [redacted]."
Q Then your response to that comment was what?
A I laughed at that with emoji, haha.

Q Right. And -- so it says, laughed at -- keep reading.
A Then he says, "Are you really out Wednesday, October 2nd? "
Q No -- no. You laughed at his comment, and it's repeated there, right?
A Right. I've read that.
Q All right.
A Isn't -- I'm sorry.
Q And what -- and so -- what were you laughing at?
A His comment.
Q Now, but what was funny about it?
A So Jamie would say that.
Q But why did you find it funny?
A I -- I can't remember the context or what meeting I was in or what I was doing.
Q Well, you have the whole context here in this exchange of text messages, right?
A Right. But I don't recall in what meet -- if we were in a meeting if we were on a call together, I don't -- I can't recall that.
Q Well, you -- it's unlikely you were at a meeting together, right? Because you're texting each other.

A It's unlikely we were physically in a meeting together, but we could have been in a meeting together because we were working -- some of us were working remotely at the time, and others were working in the main office.

Q Well, what does it mean when he says, "Tell Tayfun that you can suck a little [redacted] or a lot of [redacted], but either way, you are a -- still a [redacted]" What -- when he says, "Tell Tayfun," what's he referring to?

A I don't know. I don't know what he's referring to.

Q But why did you laugh at it if you didn't know what he was referring to?

A I can't recall at this moment why I laughed at it.

Q Well, going back up to the top of the page, are the two of you laughing at the three amigos?

A I don't believe so.

Q What do you mean you don't believe so? They've -- if not them, who were you laughing at?

A Well, there's -- there's a -- appears to be a series of exchanges between those two texts as well as any phone calls or anything else that could have occurred.

Q Is he saying to you, tell -- that he wants you

to tell Tayfun this obscene comment or it is -- and then you laugh at it? What's he saying tell Tayfun?

A I don't know what context he's telling me in order to tell Tayfun.

Q But Tayfun is referred to up above as one of the three amigos, right?

A Uh-huh.

Q So why isn't that the case that this [redacted] comment and your laughing and your referral to the three amigos all fit together, don't they? Aren't you making fun of the three amigos?

MR. SABA: Objection to the form of the question.

A No.

Q You're not? Is that your -- is that your testimony under oath, you're not making fun of them?

A No.

Q What are you doing then?

MR. SABA: Objection. Asked and answered. Go ahead.

A I don't know. I don't know what was going on during this time. I don't know what other conversations were go -- taking place.

Q If you were on the board of Fifth Third, would you hire someone that used the phrase tell another

officer, "You can suck a little [redacted] or a lot of [redacted], but either way you are [redacted] -- still a [redacted]," would you hire that person as president and CEO?

MR. SABA: Objection to the form of the question. Go ahead. You can answer.

A I did not make that comment.

Q Well, you laughed at it, right?

A Yes. I laughed at --

Q When you laughed at it --

A -- but I did not make that comment.

Q -- when you laughed at it, you endorsed it; did you not?

A No.

MR. SABA: Objection.

A No? There are -- when you laugh at something, you're going along with the joke, right?

MR. SABA: Objection to the form of the question. Go ahead. You can answer.

A Not necessarily.

Q Well, there's a way in text messaging where you can say you disagree with something, right?

A I don't know.

Q Well, you've done it, right? So go up several lines. I mean, you've seen this, and you've used it. So you go to the text of 10:01, 12:42, you see the thumbs

up?
A Uh-huh.
Q That's agreement, right?
A Right. That's from Mr. Leonard to me.
Q Right. Right. So and then disagreement is thumbs down, right?
A Correct.
Q You didn't do that?
A I didn't do a thumbs --
Q You laughed along?
A I did not do a thumbs up on his text to me, correct.
Q Right. No. You didn't do a thumbs down, either?
A Correct.
Q You laughed at it?
A I said, haha.
Q Right. But what -- and by that, when you laughed, you were clearly laughing at Tayfun, right?
MR. SABA: Objection. Asked and answered. Go ahead. You can answer.
A No.
Q But if you were on the board, would you want someone who is your president and CEO laughing about a [redacted] joke about another executive?

MR. SABA: Objection to the form of the question. Go ahead. You can answer.
A I did not make the comment.
Q But you laughed at it. That wasn't my question.
MR. CIOFFI: Read my question back.
(REPORTER READS BACK REQUESTED TESTIMONY)
MR. SABA: Objection to form of the question. Go ahead. You can answer.
A I would only be speculating if I were a board member, so I don't know --
BY MR. CIOFFI:
Q Well, I'm asking you --
A -- I don't know what I would do.
Q -- if you were a board member.
A I don't know what I would do. I would want to clearly understand the proper context.
Q But you would agree that this -- it's not conduct becoming of a president and CEO, correct?
MR. SABA: Objection to the form of the question. Go ahead. You can answer.
A No. I would not agree.
Q You would not agree? You think it's okay to laugh about a [redacted] joke about another executive?
A I don't know what --

MR. SABA: Objection to the form of the question. Go ahead. You can answer.

A I don't know what context this was provided nor what preceded this.

Q Well, he's making a [redacted] joke about Tayfun, and you're laughing at it. What other context is there?

MR. SABA: Objection to the form of the question. Go ahead. You can answer. Asked and answered.

A There could be other conversations that were happening within the meeting.

Q Did you have other conversations like this?

A I don't recall.

Q Go back to 00284, Exhibit 11. So the bottom of that page, there's a reference, "That [redacted] thinks he knows everything about everything. What the [redacted]." And that's directly in the context of your statement that Greg Carmichael is the expert in every issue with TS close behind, right?

A That is the message that follows that, correct?

Q Right. So there you're -- the reference is to Greg Carmichael and Tim Spence being [redacted], right?

A I did not make a reference to Mr. Spence or

Mr. Carmichael being [redacted].

Q Well, and again, you didn't disapprove or disagree with that statement, right? In your text messaging?

A I did not approve that message, nor did I disapprove it.

Q And then on the next page, though, you refer to them as the three amigos, right?

A Different individuals at a different time.

Q Well, all right. And then there's the comment about Tayfun. So what -- why is it that the two of you were being so angry, disagreeing, criticizing, being derogatory about Greg Carmichael, Tayfun, Bob Shaffer, Tim Spence, why are you -- these are your fellow executives?

MR. SABA: Objection to the form of the question. Go ahead. You can answer.

Q Why are you behaving like this?

A I -- I can't --

MR. SABA: Objection. Go ahead. You can answer.

A I don't know what else was involved in these discussions. So I can't answer your question.

Q Outside of your work life, do you refer to other people this way?

MR. SABA: Objection. Go ahead. You can answer.

A I don't recall.

Q Well, do you normally make a practice of referring to other people as amigos or [redacted] or [redacted]?

MR. SABA: Objection.

Q Do you?

MR. SABA: Contrary to the evidence. It's contrary to what it said. He didn't refer to anybody as [redacted] or [redacted], so now you're altering all the evidence that's in the record.

MR. CIOFFI: The document speaks for itself, it's a fair --

MR. SABA: It's right.

MR. CIOFFI: -- reading on the document.

MR. SABA: No -- no. You're mischaracterizing --

MR. CIOFFI: I'm not.

MR. SABA: -- it, to try and create an issue that's not there.

MR. CIOFFI: The jury will decide.

MR. SABA: I know, fortunately.

BY MR. CIOFFI:

Q But -- so my question is--

MR. CIOFFI: Read my question back.
COURT REPORTER: Yes. Of course.
(REPORTER READS BACK REQUESTED TESTIMONY)
MR. SABA: Objection to the form of the question. Go ahead. You can answer.
BY MR. CIOFFI:
Q Please answer that question.
A As I mentioned, I did not refer to anyone as a [redacted] or [redacted]. And I would not use those terms outside.
Q You're saying it, laughing at it, is different than calling someone that?
A I believe --
Q Is that it? Is that your testimony?
MR. SABA: Objection to the form of the question. Go ahead. You can answer.
A I believe that text response is, "Haha," which appears as laughed at, okay? And that could be -- had been a sarcastic reply too, if I knew what the context of his text to me was and when this occurred.
Q In addition to having these type of exchanges with Jamie Leonard, you often told Jamie Leonard that you wanted to quit Fifth Third or retire, didn't you?
MR. SABA: Objection to the form of the question. Go ahead. You can answer.

A I don't recall any serious conversations with Jamie that I said I was going to quit or I -- I -- I would always be preparing for retirement from Fifth Third. I did not plan to work at Fifth Third forever.

Q What were your retirement plans at Fifth Third?

A Could you be more specific?

Q Yes. You said you were planning for retirement. In what time frame were you planning for retirement?

A So I believe I informed Mr. Carmichael, during our formal review, performance review in February of 2020, when he informed me the board asked him that he would stay two-plus additional years, that I would be willing to work five more years in my EVP capacity.

Q And prior to that, when you were offered the presidency of the Cincinnati region, you declined, right?

A I told Mr. Carmichael that that position required five to seven years to be successful and that I was not prepared to give him five to seven years for that position.

Q And when was that offered to you, as in, do you remember the year?

A I -- I have not received my calendar from the

bank, so I can't confirm that, but I believe it was the Thursday following the Talent Management discussions in 2018.

Q It was before that, but you told -- regardless, we'll be able to document that, but you told him that you didn't want to take the position because you plan to retire?

A That is not true. I believe that meeting occurred in June -- on -- in June. I don't know the specific date of 2018. I believe that meeting occurred the Thursday or potentially Friday after Talent Management. It was a very short conversation. Mr. Carmichael entered my office, we both stood. The conversation lasted a very short amount of time.

Q But you declined it, and you told him the reason was that you were planning to retire?

A No.

Q You just said you were -- told him that you were going -- planning to retire?

MR. SABA: Objection.

A No. I did not say that. I said that position required a commitment of five to seven years to be successful.

Q Uh-huh.

A And I was not prepared to give him a

commitment of five to seven years for that position.
Q It -- because before the end of five to seven years, you would retire, right?
A No.
Q You used the word retirement?
A No. I did not use the word --
MR. CIOFFI: Read back his prior answer, please, with retirement in it.
COURT REPORTER: Hang on a second.
THE WITNESS: And, please read the question before you read my answer so I can make sure -- what -- I want to understand what you're asking, whether you're asking for the June 18 discussion or the February 2020 discussion. Those are two different discussions.
MR. CIOFFI: Very good. Go ahead, read it back.
(REPORTER READS BACK REQUESTED TESTIMONY)
THE WITNESS: No. There was a question before that where I believe I was asked when did I tell Mr. Carmichael to retire. I believe I referenced a February 2020 meeting which would have been my annual performance review when Mr. Carmichael told me that at that point he was going to stay on, the board asked him to stay on, to be CEO for two-plus

years, and I said I would continue to work five more years in my EVP position.

COURT REPORTER: Do you want me to read that? Okay.

(REPORTER PLAYS BACK REQUESTED TESTIMONY)

THE WITNESS: Repeat that question. I want to make sure I understood it correctly.

(REPORTER READS BACK REQUESTED TESTIMONY)

A There was a meeting in June 18 where Mr. Carmichael asked me if I would be the regional President for Cincinnati. Yes.

BY MR. CIOFFI:

Q And you said no because it would take five to seven years, and you planned to retire before then, right?

MR. SABA: Objection. Asked and answered. Go ahead. You can answer.

A No. I said to be successful in that position, it would take five to seven years, and I didn't have five to seven years. I wasn't going to commit to that position for five to seven years. 60 days after that meeting, Mr. Carmichael assigned to me responsibility for all the regions, including Cincinnati.

Q But the re -- but the reason you said you didn't want to commit to it is that you planned to

retire sooner than that?
A No.
MR. SABA: Objection. Asked and answered. Go ahead. You can answer.
Q Isn't that right?
A No. I had already served as a regional president. It's a job that I was successful in. And then, frankly, Mr. Carmichael promoted me out of that role.
Q So you're changing your earlier answer? I mean, it's all in the record, so we'll be able to look at it, but --
MR. SABA: Objection.
A I've not changed anything about an earlier comment.
MR. CIOFFI: All right. Pause.
(OFF THE RECORD)
BY MR. CIOFFI:
Q So look at the second timeline. Do you see that? 2019-9-24? This is in 2019 at 18:06, which is 6:06, right?
A 18:06?
Q Right. You see that?
A Uh-huh.
Q All right. This is an e-mail from you to

Jamie; is that right?

A The first e-mail is from Jamie that says, "This is," -- I'm sorry, this is my first e-mail at the top of the page.

Q Uh-huh. Go ahead.

A "This is one of my frustrations. GC tells several different people to solve the problem, then is not clear who is accountable. Commercial is not very disciplined." Jamie responds, "Lars, Hikes (phonetic), Phil, pick one, and lets go."

Q That's Jamie's e-mail. And then what do you say?

A Then I say, "I can pack my bags tomorrow."

Q All right. When you say pack your bags, does that mean quit or retire?

A No. It means I would not be responsible for Commercial any longer.

Q Well, you didn't say that you pack your bags --

A No. That's what we're talking about. I said that we were -- with -- that I was frustrated. There were several individuals. Commercial is not very disciplined, and if it were not me, I would leave Commercial alone.

Q I know you want to rewrite history, but let's

keep reading because the document speaks for itself.
MR. SABA: Objection. Argumentative.
Q Go to the next text messages from Jamie.
A "Just give me 50 percent of Theresa's deal."
Q All right. What was Theresa's (phonetic) deal?
A I believe she had a exit separation agreement with the bank that was filed.
Q So that's either quitting or retiring, right?
A No. She stayed on for a period of time, I believe as a consultant, and I don't know the de -- specific details of that.
Q But the deal was about quitting or retiring, right? It wasn't about whether you're going to take Commercial or not.
A No. It was not.
Q So he says, just give me the Theresa deal, then what do you say?
A "Take 50 percent of her deal."
Q You say, "I would take 50 percent of her deal."
A Uh-huh.
Q And that's either to quit or retire, right?
A No.
Q To -- well, to do what?

A To not have Commercial any longer.
Q Her deal had nothing to do with having Commercial any longer.
A She stayed on as a consultant. I don't recall the specifics of the deal, but she stayed on for a period of time.
Q Were you -- are you talking about a consultant's deal, or --
A Again, I don't know what other discussions were taking place at the time, okay?
Q But her deal was a severance deal, wasn't it?
A There was multiple deals. There was a --
Q All right.
A -- consulting agreement, there were multiple facets to that deal.
Q But it involved her leaving the bank, correct?
A Yes.
Q And you said you would take 50 percent of her deal to leave the bank. What was the -- what -- do you know the monetary amount?
A No. I do not.
Q But that's what you said, you would take 50 percent of her deal, right?
A That's what it says, yes.
Q Go down to the timeline of 2019-10-01, the day

being 10-01, 11:16. Do you see that?
A 10-01, 11:16:51?
Q Yes. Correct.
A Yes.
Q All right. So go ahead and read Jamie's e-mail to you.
A "Thoughts?"
Q Keep reading.
A "I thought the purpose of the dinner was to uncover truth and then take action. I clearly misunderstood your purpose."
Q Read your response.
A I said, "Disliked."
Q Uh-huh. Keep reading.
A I thought, disliked. "I thought the purpose of the dinner was uncother -- uncover truth, and then take action. I clearly misunderstood."
Q Yeah. So you clearly know how to use an emoji to say you dislike a comment as opposed to laughing and a comment, right?
A Can you repeat the question?
Q It's a simple question. You use "Dislike" to respond to his prior comment, right?
A I replied that I disliked --
Q Then you used it --

A -- the thought of purpose of the dinner was to uncover the truth and take action. I clearly misunderstood your purpose.

Q And so you know how to dislike or disapprove a statement using an emoji, right?

A I know how to do a thumbs down emoji on response to a text, yes.

Q And that's what you did here on Exhibit 13, right?

(EXHIBIT 13 MARKED FOR IDENTIFICATION)

A I dis -- I -- I responded with a disliked, yes.

Q So my question to you, you knew how to do it, right?

A Correct.

Q But previously, you testified you didn't know how to do it when you laughed at the [redacted] joke?

MR. SABA: Objection. Mischaracterize the testimony. He never said he didn't know how to do it. That's a complete mischaracterization and --

MR. CIOFFI: Well --

MR. SABA: -- attempt to mislead the witness.

BY MR. CIOFFI:

Q Did you know? When you responded laughing? Did you know the difference between laughing and

dislike?

MR. SABA: Objection. Asked and answered. We've been through this. He already covered that for you.

MR. CIOFFI: Counsel, you are trying to cover for the witness. He's --

MR. SABA: I'm not trying to cover for the witness. You're just trying to mischaracterize him, and he said yes, I know how to use the dislike emoji, and then he didn't use it before. He used the, haha emoji.

MR. CIOFFI: That's what you're testifying. That's not what he said before.

MR. SABA: No -- no. That -- his testimony speaks for itself. You just keep going back over to re- characterize this, something that is not.

BY MR. CIOFFI:

Q You knew how to express your dislike or disfavor of a comment, right?

MR. SABA: Objection. Asked and answered. Go ahead. You can answer.

A Yes. I knew how to use the dislike.

MR. CIOFFI: Just mark these 14.

(EXHIBIT 14 MARKED FOR IDENTIFICATION)

COURT REPORTER: Yes.

MR. CIOFFI: Okay.
BY MR. CIOFFI:
Q Directing your attention to Exhibit 14, which is McHugh 00268. Look at the text at 19:30, which is, again, 7:30 on 7-29-2020. Read Jamie Leonard's text to you in your response.
A "I almost quit today," from Jamie to --
Q Well, above that. Above that. 19:30 -- 13.
A "So I hired three FTEs to save" --
Q No. Below that. The next one.
A "[redacted] stupid."
Q All right. And then your response to that is --
A "The three" --
Q -- what?
A -- "amigos will lead us to the promised land."
Q The three amigos, you're referring again to Greg Carmichael, Tayfun, and Bob Shaffer, right?
A I -- I -- I can't recall who I was referring to there.
Q Well, that's --
A Again, this is a different time, and I believe this is -- this document you just gave me is prior to the previous document you had just given me --
Q Might have been before you --

A -- meaning -- meaning the date was different.
Q Right, of course. But they're all within the same time frame, right?
A No. They're not.
Q Okay.
A The document -- I don't have the dates, but McHugh 00285 is October of 2020, and the document you've just provided me is July of 2020.
Q All right. But is it -- it's the same time frame. It's not the same day, but it's in the same time frame.
MR. SABA: Objection to the form of the question.
Q All right. All right. Let me ask you about the three amigos because you're using that again. Who are you referring to if not the three amigos you articulated in the other text, that is, Greg Carmichael, Tayfun, and Bob Shaffer?
A I -- I don't know. I don't know what context this is or what other conversations were taking place.
Q So your testimony under oath is you have no idea who you are referring to when you use the word "three amigos" in this text.
A In this --
Q Is that right?

A In this text --
Q What --
A -- of July 29, 2020. That's correct.
Q Did you -- when you use the word "amigos" here, were you intending a racial slur?
A No.
Q Would you call -- do you call other people amigos?
MR. SABA: Objection. Asked and answered. Go ahead. You can answer.
A Not that I recall.
Q Then you go on to say, "The three amigos will lead us to the promised land," and then there's an exclamation point after that. What do you -- what do you mean by that?
A I don't recall specifically because I don't know what else was going -- what other meetings, discussions we were having at this time.
Q Then read Jamie Leonard's next text to you.
A "I almost quit today."
Q And the next line.
A "It was so absurd."
Q And then what did you respond?
A "I'm ready to join you."
Q And when you say, "I'm ready to join you," you

mean to quit?
A I -- I don't know. I -- I --
Q He says to you, "I almost quit today. It was so absurd." And you say, "I'm ready to join you." Are you telling the judge and the jury under oath that you don't know what that means?
MR. SABA: Objection. The form of the question --
Q Is that --
MR. SABA: -- but you can answer.
Q Really? Is that your -- is that your testimony? You don't know what that means?
MR. SABA: Objection. Asked and answered. Go ahead. You can answer.
A I don't recall specifically --
Q I didn't ask you --
A -- that "ready to join you."
Q -- specifically. When you say -- right after he says, "I almost quit today," you say, "I'm ready to join you," it means that you're ready to quit, right?
A No. I cannot --
MR. SABA: Objection. Asked and answered.
Q What other interpretation is there?
A He may have been saying it's time to go to dinner, may have said something else. I can't speculate

in terms of what else. He also said, "It was so absurd," period.

Q So he writes, "I almost quit today" at 7:30 and 36 seconds, right? You see that?

A Uh-huh.

Q Then he adds, 14 seconds later, "It was so absurd," and then you respond literally three seconds later, right?

A Uh-huh.

Q In those three seconds, weren't you responding to his statement, "I almost quit today," and you said, "I'm ready to join you"?

A I can't recall. We may have been meeting for dinner or ballgame or something that night.

Q In those three seconds, was there any discussion about a ballgame or dinner?

A There was not a text message. I can't recall if there was another discussion about what we were going to do the night of July 29th.

Q Well, did you stop texting and call him in the three seconds between 19:30 and 50 seconds and 19:30 and 53 seconds?

A I can't recall. I may have spoken to him prior to 19:30.

Q Prior about what?

A I don't know. I don't have -- you have not provided my calendar, so I can't -- I don't know what we were doing July 20th -- 29th of 2020 at 19:30.

Q Well, let's see if the next two lines help you a little bit. So when you say, "I'm ready to join you," what does he respond?

A "Go get a CEO job."

Q And what do you say?

A I say, "Okay."

Q All right.

A Because I believed, at that time, I was going to be the next president and CEO of Fifth Third Bank. This is July 29 of 2020.

Q Well, you didn't believe that in July of 2020, but -- and I'll --

A Yes. I --

Q -- show you some -- I'll show you some texts. Sorry.

A Yes. I did believe that in July of 2020.

Q Okay. That's your testimony under oath?

A Yes.

Q All right. And it doesn't mean that you were going to quit, and Jamie says to you, go get another CEO job, and you say, "Okay"?

MR. SABA: Objection. Mischaracterizes what's

written in the the text. Go ahead. You can answer.
A I believed, in July 29, 2020, based on Mr. Carmichael's promises, I would be the next present CEO of Fifth Third.
Q That's your testimony under oath. Hold what you said. Direct your attention to 00269. Do you see that?
A 0026 -- yes.
Q All right. Do you see the text message from you at -- on 7-29, at 19:50, that is, 7:50?
A Uh-huh. Yes.
Q All right. And that's just 20 minutes after the text we were just looking at, right?
A Yes.
Q All right. And at 19:50, Jamie writes to you, "Good for Kevin (phonetic)." Do you see that?
A Yes.
Q And then what's he say after that?
A "Let's get you a big bank CEO gig."
Q Let's get you a bank CEO gig. And what do you respond?
A "Ready and willing."
Q And it's your testimony under oath that that is not a statement that you were ready to quit Fifth Third and look for a bank CEO gig?

A I'll --
MR. SABA: Objection to the form of the question. Go ahead. You can answer.
Q Is that your testimony?
A I was ready and willing to be the president and CEO of Fifth Third Bank, as Mr. Carmichael promised me.
Q That wasn't my question. My question is: He says, let's get you a bank CEO job -- gig, and you say, "ready and willing."
A Yes.
Q All right. It doesn't say anything about Fifth Third, right?
A It says, "ready and willing."
Q No. Your -- his e-mail to you just says nothing about Fifth Third. Says a "bank CEO gig," right?
A It does not say anything about Fifth Third. It says bank CEO. It doesn't reference any bank.
MR. CIOFFI: So we've been going about an hour-and-a-half. Why don't we take a break?
MR. SABA: Sure.
VIDEOGRAPHER: We are going off the record at 3:30.
(OFF THE RECORD)

VIDEOGRAPHER: We're back on the record at 3:57.

BY MR. CIOFFI:

Q At the time of the break, we were looking at Exhibit 15, McHugh 00269. Would you look at that again? We were looking at Jamie's texts and your reply, and the text is at 19:50 and 12 seconds, in which he says, let's get you a bank CEO gig.

(EXHIBIT 15 MARKED FOR IDENTIFICATION)

A Wait, wait, wait. 19:50:11?

Q 19:50:12.

A Okay. Moving over to the right second column, third from -- okay. Uh-huh.

Q Do you see that? What's he say?

A "Let's get you a bank CEO gig."

Q You say, "ready and willing" --

A Uh-huh.

Q -- right? And I just want to be sure. You're saying that -- it's your testimony under oath that that was not about quitting Fifth Third.

A No.

Q Is that right?

A That's right.

Q Okay. Let's look at a text message a couple of days prior to this text we were just discussing,

which was July 29, right?
THE WITNESS: 26 --
MR. SABA: 267.
MR. CIOFFI: Mark that 16, please.
(EXHIBIT 16 MARKED FOR IDENTIFICATION)
COURT REPORTER: Yes.
BY MR. CIOFFI:
Q Directing your attention to what's been marked as Exhibit 16, which is McHugh 00267. Do you see a text message on 7-27, which is two days before the texting we were looking at in 00269. And this text message I want to direct your attention to is a text at 13:22, which is 1:22, and it's from Jamie. Do you see that?
A 13:22:16?
Q 13:22:13 is his text to you.
A Okay.
Q You see there? Okay. Will you read that.
A "Are you riding back with Greg?"
Q And your response?
A No.
Q And then the next text is from Jamie, at 23:32 -- 13:23:32, a few seconds later, and he writes what?
A 13:22:43. Is that the one --
Q The next text. Read the next text.
A "Are you riding back with Greg?" I say, "no."

His next text, from Jamie to me, says, "That sucks. That would be your chance."

Q And then what's your response?

A "Dude, GC is done with me."

Q So two days earlier, you're writing to Jamie that GC -- which is Greg Carmichael, right?

A Uh-huh.

Q Is done with you.

A Uh-huh.

Q And then there's the text message a couple of days later, about let's get you a "bank CEO gig," and you said you're "ready and willing." Weren't you ready and willing to leave Fifth Third because GC was done with you?

A No.

Q Well, what did -- what was your reaction to your text message, that "Dude, GC is done with me"?

A I don't know what --

Q What did you do in reaction to that?

MR. SABA: Objection to the form of the question. Go ahead. You can answer.

THE WITNESS: Can you repeat the question.

COURT REPORTER: Yes.

(REPORTER READS BACK REQUESTED TESTIMONY)

A Yes. I -- I don't know what other

discussions, context -- there was something about a ride home or ride -- are you riding back?

BY MR. CIOFFI:

Q What did Jamie mean by that would be your chance?

A I don't know.

Q You have no idea?

A What -- we were doing regional ops reviews at the time. I, again, don't have my calendar in front of me, so I can't speak to where I was on July. So I assume I was somewhere with Mr. Carmichael and Jamie's asking me if I would be riding back. I don't know what other discussions we would have been -- would -- would've arisen during the earlier meetings that day.

Q When you write, dude, GC is done with me, what did you mean?

A That Greg's done with me that day. I was not riding back with him.

Q That's it? All right. Let's go on. Any other -- do you have any other interpretation of that?

A Not that I can recall at this time.

MR. CIOFFI: Let's do some -- let's have this marked.

COURT REPORTER: That's 17.

BY MR. CIOFFI:

Q Okay. Directing your attention to Exhibit 17, McHugh 00275. Look at the text at the bottom of the page. Do you see a text from Jamie Leonard to you at 15:08?

(EXHIBIT 17 MARKED FOR IDENTIFICATION)

A Yes.

Q Okay. And go ahead and read that.

A "Facts matter."

Q All right. And then you respond with a long text. Read that.

A "GC is out here speaking to Brian Daniels. My guess is he's reaching out to each board member recommending Tim be considered as his successor. I think they will give him the COO and/or president title in fourth quarter or first quarter next year."

Q So you believed on August 24th of 2020 that Tim would be the successor, and they'd give the title of president and/or COO in the fourth quarter or on queue next year, right? I mean, that's what you --

A I guessed that and sent that to Jamie, correct.

Q Let's go on to the next exhibit. 18. Read the first text at the top of the page. It follows your text about Tim being named president and COO.

(EXHIBIT 18 MARKED FOR IDENTIFICATION)

A He says, agreed.
Q All right. Then, let's go down to the text from Jamie to you at 16:34 on August 26. Do you see that?
A 16:34, August 26? Yes. I do.
Q All right. And read that.
A There's no doubt Tim will be the guy. He has stayed in the room with Chris the entire time today.
Q Keep reading. Keep -- the next text.
A He's telling -- he's never done that before. He's telling Chris what we need to do.
Q All right. And --
A He's telling Tim -- I'm sorry. He's telling Chris what we need to do to answer questions.
Q And how do you respond? What's your text, the next text?
A I'm a -- I am sad as a shareholder.
Q So Jamie Leonard's agreeing with you that Tim will be the president and COO, and this is on August 26th, correct?
A I don't know. There's time between that. There's 20 some odd minutes to my reply to back to Jamie. I am sad as a shareholder. I don't know what else we could have been talking about at that time.
Q Well, there are no other texts in-between that

time, right?
A It would appear there's no other text, but I don't re --
Q All right.
A -- have in front of me what conversations we may have had.
Q You're both in agreement that Tim will be the guy, right?
A No. That was my guess. I'm asking Jamie, and he says, agreed.
Q Well, and then he says, there's no doubt Tim will be the guy, right?
A That's Jamie's opinion.
Q Right. And then you say, I'm sad as a shareholder. Why did you write that?
A I don't -- as I've said, I don't know what other information we exchanged between those texts, what other context there would have been, what answers were provided.
Q Isn't it clear you're responding to his statement that there's no doubt Tim will be the guy. It's the next text you send literally less than a minute-and-a-half later?
A No. That is not as clear. He also says he's telling Chris what we need to do to answer questions.

Q Right. Tim is, right?
A Uh-huh.
Q Right. And then you respond a few minutes later. I'm sad as a shareholder.
A Correct.
Q Why did you say that?
A Again, I don't know specifically why I said that. I don't know what other information I would've had or conversations I would've had.
Q Is your -- is it your testimony that your statement, "I am sad as a shareholder," is not in response to the immediate preceding text from Jamie Leonard?
A I cannot recall that with 100 percent certainty.
Q Well, it looks like on paper, it's a direct response to what he said, right?
A I -- I cannot confirm that. I don't know what other discussions we would have had or where this meeting on October 26 took place.
Q Well, there are no texts in-between, correct?
A Correct.
Q All right. And your text follows his by less than 20 minutes, right?
MR. SABA: Objection.

Q Well, you see that, right? You see his text at 16:34, right, which is 4:34, right? Agreed?
A Yes.
Q And the next one is 4:35:09, the next one is 4:35:24, and then the next one is 4:35:33. So in rapid succession, he sends you several texts. You respond approximately 15 minutes later, right?
MR. SABA: Objection. Misleading.
Q Well, when do you respond?
A I respond at 16:58:29.
Q All right. And what's the difference between 16:35 and 16:58?
A Roughly 23 minutes.
Q And it's still your testimony that I am sad as a shareholder was not in response to the immediately preceding text from Jamie?
MR. SABA: Objection. Asked and answered.
Q Is that your testimony?
A The immediate preceding text is he's telling Chris what we need to do to answer questions. That's the preceding text.
Q Well, there are several texts in rapid succession with literally seconds apart, right?
A Right. But then my response, as I've conveyed, is 23 minutes later.

Q Right.
A I'm not sure if we had a phone conversation about something else. I can't recall with 100 percent certainty what other discussions we may or may not have had.
Q So your testimony -- is it your testimony that your statement, I am sad as a shareholder, was the result of some other conversation you had?
MR. SABA: Objection. Asked and answered. Go ahead.
A I can't recall what other discussions we had in between those -- that 23-minute time frame.
Q What -- I didn't ask you earlier today. Are you under the influence of any medication?
MR. SABA: Answer the question.
A No.
Q Is there any over-the-counter or prescription medication you're taking that could affect your memory?
A No.
Q Let's continue down. Still on the same day, 8-26. This time at 17:17, which is how many minutes apart from your text, I am sad as a shareholder?
A I'm sorry, you're asking me how much longer the 17 minutes is from 16:58?
Q Yeah.

A And which -- which reference are you asking in terms of Jamie's question to me or Jamie's text?
Q So Jay -- Jamie -- you say at --
A If it's 17:00, it would be two minutes.
Q You say at 16:58:29, right, I am sad as a shareholder?
A Uh-huh.
Q Well, go ahead and -- at 17:16, Jamie responds?
A Is call over? No. No. I say, is call over?
Q All right. And what's that refer to; do you know?
A Yes. Is call over -- whatever call. Call is ending now. I -- I think there was a conference call or some type of Zoom call during that time. I can't say specifically what it was.
Q All right. You were not on that call, right?
A Yeah. At some point, I was on that call because I believe --
Q Well, you were asking is the call over?
A I can't say with 100 percent certainty, but there was an e-mail from Jamie to me, you still in room?
Q And then he responds ten minutes ago, right?
A Which -- which date, time?
Q Well, on the same -- this is the same day.

This is literally 19 minutes after your text. I am sad as a shareholder, right?
A My text, I am sad as a shareholder, is at 16:58.
Q Right.
A Call is ending now is at 17 minutes?
Q Right.
A 17 -- 00:16.
Q And now I want to go to your next text, which is 17:17. Do you see that?
A Uh-huh.
Q And what do you write to him?
A I ask him if -- can you find me another job?
Q All right. Clearly, here you're talking about leaving Fifth Third and getting another job, right?
A I can't say with 100 percent certainty, no.
Q I didn't -- read my question back. I didn't ask you about 100 percent certainty. That's what witnesses say when they're trying to fudge. I ask you --
MR. SABA: Objection.
Q I ask you: When you say can you find me another job, you're talking about leaving Fifth Third, right?
A I can't say that I was talking about leaving

with Fifth Third. This could have been a tongue-in-cheek reply to Jamie.

Q I didn't ask you if it was tongue in cheek, whether it was tongue or -- in cheek. But when you say can you find me another job --

A Uh-huh.

Q -- you're talking about a job outside of Fifth Third, aren't you?

A Not necessarily. I had numerous jobs at Fifth Third.

Q All right. Are you saying you're not talking here about quitting Fifth Third?

A I'm asking: Can you find me another job? I'm not suggesting I'm quitting Fifth Third Bank.

Q But you're saying that the interpretation of that statement, can you find me another job, does not mean you intended to quit Fifth Third?

A No.

Q Okay. What other possible meaning does it have?

MR. SABA: Objection. Asked and answered. Go ahead. You can answer.

A It could be other jobs within the company. I worked for Fifth Third for 34 years.

Q But here you're talking about another job?

MR. SABA: Objection. Asked and answered.
A I've said another job could have included another job at Fifth Third.
Q But my question to you: Did it, or are you talking about a job outside of Fifth Third?
MR. SABA: Objection. Asked and answered. Go ahead. You can answer.
A I'm saying I can't fully recall.
Q What it is -- is it about the word another job that you can't recall --
A I had --
Q -- whether it was inside or outside the company?
A -- I had numerous jobs over my 34 years with Fifth Third Bank, areas of increasing responsibility.
Q But you're asking Jamie to find you another job?
A Correct.
Q What does that mean? Is it inside or outside?
A It could be an inside job. I'm telling you, I can't recall specifically what that comment meant.
Q All right. But then what's his response?
A Go get --
Q Now, what -- you say, can you find me another job?

A I will be your C --
Q All right.
A Wait a minute. Wait a minute. Okay. Jamie's response, which I'm reading from 2020-8-26 17:41:44.
Q All right.
A I will be your CFO.
Q All right. And what else?
A Go get a CEO gig. I'm in a meeting with Tayfun.
Q Right. And that's another job, right?
A No. I don't -- no. My response to him is I'm in a meeting with Tayfun, and that's 31 minutes after go get a CEO job. I have told you before on August 26 of 2020, I still believed I was going to be, based on Mr. Carmichael's promises, the next president and CEO of Fifth Third. I --
Q Go back in -- and look at 00275, Exhibit 17. The previous page, do you see that?
A Yes.
Q All right. And read your text at the bottom of that page, "GC" --
A "Is out here speaking to Brian Daniels. My guess is, he's reaching out to each board member, recommending Tim be considered as his successor. I think they will give Tim COO and/or the president title

in fourth quarter or first quarter next year."
Q So that's you writing that Tim is going to be the next president or COO, right? It's you?
A Correct.
Q So you wrote that, but your testimony under oath that you want us to believe is that you were still going to be the next president --
A Yes.
Q -- or COO, even though you said Tim was going to be.
A I said --
Q How do you square that?
A I asked Mr. Leonard if he believed, okay. My guess is that Tim would be next COO or president, okay? I stopped thought I was still in the running for president. No one at Fifth Third has told me, at this point, I'm not going to be considered and appointed the next president or COO. Tim could've been appointed COO, and I could have been appointed president.
Q Well, it's you saying that, you're saying you think. It's not what someone's telling you, right? You say, "I think they will give Tim the COO and/or president in title."
A Right.
Q And for Tim or one Tim.

A Or -- and/or. Correct. Yes. I wrote that.
Q It's you saying that?
A Yes.
Q So at that point in time, you thought that they were going to give the presidency or the COO position to Tim, right?
A One of those two positions, yes.
Q Well, you say "and."
A No. I say "and/or."
Q Well, it could be, and right?
A It could be.
Q Right. And that's what you thought?
A No. I thought I was still in the running.
Q Well, is it -- isn't it true that you thought Tim was going to be the next COO and president, and that time frame, the next two days, you tell Jamie, "Can you find me another job?" right?
A No.
MR. SABA: Objection to form of the question. Go ahead, you can answer.
Q You don't think one follows from the other?
A I do believe, based on Mr. Carmichael's comments to me, that Mr. Spence would be president CEO, but he would follow me as president CEO based on our August and February conversations.

Q But that's not what the -- you -- that's not what you're saying on August 24, 2020, contemporaneously. I understand that that's a theory you made up for this case, but that's not what you said --

MR. SABA: Objection.

Q -- at the time?

MR. SABA: Objection.

A That is not it.

MR. SABA: Argumentative. Objection to the form of the question. Go ahead, you can answer.

A That is not --

Q Contemporaneously, before there was any lawsuit before a complaint was drafted, you said on August 24, 2020, that you thought Tim will be the CEO and/or president?

A I was concerned. I sent this text message to Jamie, but I thought I was still in the running based on the assurances that Mr. Carmichael had previously provided me.

Q But he provided you no assurance on August 24th, did he?

A Whom did he -- who --

Q Go ahead.

A -- who are you referring to?

Q You're making that up. Did he give you any assurances on August 24th?

MR. SABA: Objection.

A Who -- who?

Q Mr. Carmichael.

MR. SABA: He made no representation that anything was given on August 24, so there's nothing he's making up. You're mischaracterizing his testimony.

MR. CIOFFI: Well, again, the testimony is going to speak for itself.

BY MR. CIOFFI:

Q But when you talk about GC is out here speaking to Brian Daniels, my guess is that he is reaching out to each board member recommending Tim be considered as his successor. How does that square with your testimony just now that you thought you were going to be his -- the successor?

A Mr. Carmichael told me in August of 2019 that I would be the next president CEO. That conversation was confirmed by Mr. Shaffer. Three days later, in February of 2020, Mr. Carmichael still told me I would be the next president or CEO. I was concerned, certainly concerned at this time, that there were discussions going on, but I didn't want to do anything

that would rock the boat or jeopardize my employment with the Third Bank or under Mr. Carmichael.

Q Isn't it true you didn't believe for a second, on August 24, 2020, that you would be the next president or CEO?

A Absolutely not.

MR. SABA: Objection.

A I took Mr. Ca --

MR. SABA: Asked and answered. Go ahead, you can answer.

A Absolutely not. I took Mr. Carmichael at his word, and I believed what he told me.

Q Well, you've made an allegation of what he told you, right?

MR. SABA: Objection.

Q But the contemporaneous evidence as we're going through and painful fashion today is the opposite.

MR. SABA: Object --

Q The opposite is that Greg Carmichael was speaking to others and recommending Tim be his successor, right?

MR. SABA: Objection.

A That was happening.

MR. SABA: Asked and answered -- objection. Asked and answered for the fourth time,

argumentative. We're back to where if he doesn't agree with you, you just keep reasking the question.

MR. CIOFFI: Read my question back.

MR. SABA: Just ask him a question, and if he did -- if you -- if he won't give you your answer that you're trying to get, you have to accept that. You can't just make somebody create an answer because you don't like.

MR. CIOFFI: Again, the record will be clear that he keeps changing the question with his answer, but reread my question back, please.

COURT REPORTER: Give me one second.

(REPORTER READS BACK REQUESTED TESTIMONY)

MR. SABA: Continuing objection. Asked and answered. Go ahead.

BY MR. CIOFFI:

Q That's what this contemporaneous evidence which comes directly from you on August 24, 2020, says, right?

MR. SABA: Continue --

Q That he's talking to others recommending Tim, not you?

MR. SABA: Continuing Objection. Asked and answered. Go ahead.

A This says that I thought he was going to give

him the COO or president title in first -- fourth quarter or first quarter, but I was relying on Mr. Carmichael's words supported by Mr. Shaffer from our August 2019 conversations. And that was further confirmed when Mr. Carmichael informed me in October 15th that I be demoted to the head of consumer role. And I said to him, Greg, you never told me I was no longer being considered for president, and he said, I apologize for that. Not once but twice.

Q I realize that an allegation and a theory in the case, but I'm asking you a different question. My question is, the contemporaneous evidence -- before you left the bank on August 26 and before there was a lawsuit, the contemporaneous evidence is that you believed Greg Carmichael is out here speaking to Brian Daniels, my guess is that he is reaching out to each board member, recommending Tim be considered as successor?

MR. SABA: For the seven --

Q That's the contemporaneous evidence, right?

MR. SABA: For the seventh time. Objection. Asked and answered. Argumentative. You can go ahead and answer the same answer again now, for the seventh time.

MR. CIOFFI: You keep coaching the witness, but

go ahead.

MR. SABA: I'm not coaching --

BY MR. CIOFFI:

Q But is there --

MR. SABA: -- we are just objecting your argument.

Q -- any contemporaneous evidence in August 24, an e-mail or text to anyone, in which you say, "I'm going to be the next president C" --

MR. SABA: Objection to the form of the question.

Q Is there any contemporaneous evidence before the lawsuit?

MR. SABA: Objection.

Q In this time frame that contradicts with you saying right here --

A I don't know. I can't recall at this time.

Q -- in the Exhibit 17?

MR. CIOFFI: All right. Let's go on to the next exhibit.

COURT REPORTER: 19.

MR. CIOFFI: 19.

BY MR. CIOFFI:

Q Directing your attention to McHugh 00283, Exhibit 19, an e-mail exchange on September 29, 2020, at

10:26. It's about halfway down the page, almost halfway down. Do you see that?

(EXHIBIT 19 MARKED FOR IDENTIFICATION)

A Say it again.

Q All right. Do you see a text from Jamie Leonard to you on 9-29-2020, at 10:23?

A Uh-huh.

Q And then you respond at 9-29, 10:27. Do you see that response?

A 9-29,10:27. Yes.

Q And what do you say?

A "When I " -- "I appreciate your insights. When I move on, I will suggest the regions report to you."

Q And his response to that is?

A "I want to retire before you."

Q And you say "Better."

A Better hurry.

Q Better hurry. All right. So in September 29, you were planning to retire, right?

A At some point, I told you I was going to retire from Fifth Third Bank.

Q Did you say --

A I did not plan to work at Fifth Third my entire life?

Q Well, you said, "better hurry," what do you

mean by that?
A I don't exactly recall what I meant by that.
Q Do -- you have no recollection of what you meant by better hurry. Is that your testimony under oath?
A I -- I don't know what all the context. I don't know other questions, other conversations that we would've had at that time, okay? He -- his comment is he wanted to retire before me. I said better hurry.
Q All right. Th -- you couldn't have had a conversation in-between these texts, right? They're seconds apart, isn't that true?
A Yes.
Q So it's not true that you could have had a conversation in-between, right?
A I don't know that.
Q Well, tell me how that could've happened. Because his text "I wanted to retire before you" was at 10:28:41, and you respond literally six seconds later, right?
A Yes. He could have walked into my office. I don't know where we were on 9:29, so I -- I can't recall the specifics of that --
Q So you would -- let me just -- I just want to know what your answer is.

A Uh-huh.

Q So you're suggesting that, in that six seconds, he might've walked into your office and said something to you, and then you texted it back instead of responding?

A I'm -- I'm telling you --

Q I'm just asking what your testimony is. Is that your testimony?

MR. SABA: Objection to the form of the question. Go ahead, you can answer.

Q What's you --

A I'm telling you I can't re --

Q What's your testimony? Is it your testimony that in this six seconds, he walked into your office?

A No. That is not my testimony.

Q Okay.

A I'm saying I could not recall any other conversations or were there other -- if there were other conversations here.

Q Didn't you tell Jamie Leonard, many times, that you would quit or retire from Fifth Third rather than report to Tim Spence?

A No.

Q You never told him that?

A No.

Q Are you -- these e-mails we -- all right -- sorry, these text messages, you're saying that; aren't you?
A No.
Q They're not evidence that you would quit or retire because you thought Tim Spence was going to be the president or COO? That's what they mean.
A No.
Q Well, what did they mean?
MR. SABA: Objection. Asked and answered.
A I've given you the answer to all of those questions, okay? You're asking me give you specifics around texts. I'm telling you I don't know what other conversations could have taken place, okay? I did not say I would not report to Tim Spence. Well, I haven't seen a text on here that said I did not report -- would not report to Tim Spence.
Q The only text we reviewed is as you -- it became clear to you, and you thought that Tim Spence was going to be named president and/or COO that you began talking about quitting and retiring, right?
A No.
MR. SABA: Objection. Mischaracterizes the evidence. Go ahead, you can answer.
A No.

Q What do those texts mean that we just reviewed?

MR. SABA: Objection. Asked and answered. Go ahead, you can answer.

A I've answered that question.

Q What do they mean?

A I was concerned. I told you when he was talking to Brian Daniels, but I relied on Mr. Carmichael word. I worked directly for Mr. Carmichael for ten years --

Q You keep repeating the same thing.

A He told me I would be the next president and CEO. I counted on his work. Was I concerned? Yes. I was concerned, but I didn't want to do anything to rock the boat or in any way jeopardize my position.

Q You keep repeating the same thing. My question was different.

A No.

Q Answer my question, please.

MR. SABA: You keep asking the same question. Objection.

MR. CIOFFI: No. I -- read my ne -- last question.

COURT REPORTER: Just give me one second, and I can read back.

(REPORTER READS BACK REQUESTED TESTIMONY)
COURT REPORTER: Do you want me to go back --
MR. CIOFFI: Yeah. Go back.
COURT REPORTER: -- and read the question?
(REPORTER READS BACK REQUESTED TESTIMONY)
MR. SABA: Objection. Asked and answered. Go ahead. You can answer.
MR. CIOFFI: Read the previous question.
(REPORTER READS BACK REQUESTED TESTIMONY)
A I said no. I was concerned, but I was counting on the insura -- assurances received from Mr. Carmichael and confirmed by Mr. Shaffer.
BY MR. CIOFFI:
Q I didn't ask you that. I asked you if you were considering quitting or retiring as it became clear to you that Tim Spence was going to become president and COO?
A No.
MR. SABA: Objection --
A No.
MR. SABA: -- asked and answered.
MR. CIOFFI: Okay.
VIDEOGRAPHER: And, Counsel, could we move the water bottles out of the middle of the table so I can get a good shot at the laptop?

COURT REPORTER: And if you can have a seat right there, we need to get the video on.

MR. SABA: Are you marking that as 20?

MR. CIOFFI: We will mark it as 20. And I think there's a flash drive that --

(EXHIBIT 20 MARKED FOR IDENTIFICATION)

VIDEOGRAPHER: There is.

MR. CIOFFI: We'll put it in an envelope and mark it. But you've produced it obviously, as you know.

VIDEOGRAPHER: Counsel, can you grab the water bottle in the middle of the table, please?

MR. SABA: Yeah.

COURT REPORTER: Okay. Does that work? I guess.

MR. CIOFFI: What do you want to do? Did -- will you be able to pick it up or do you want to cut the lights?

VIDEOGRAPHER: I can see him if that actually, can you point it towards me a little bit more that way, like lean the screen a little.

MR. CIOFFI: The screen. Yeah.

VIDEOGRAPHER: Yes. That's perfect. Thank you.

MR. CIOFFI: Okay.

COURT REPORTER: Just let me know when you're ready.
VIDEOGRAPHER: I believe I am ready.
COURT REPORTER: Are you-all ready? I'll play it.
(VIDEO PLAYED)
(VIDEO ENDED)
MR. SABA: Okay. You can go back to the seat.
MR. CIOFFI: The video is marked as Exhibit 20, right?
COURT REPORTER: Yes.
BY MR. CIOFFI:
Q So we just watched Exhibit 20, which is a video. Have you seen this video before today?
A Yes.
Q When was the first time?
A I believe -- I believe it was either in May or June of 2021. I can't recall specifically.
Q Who was the person in the video?
A Ron Kaes, K-A-E-S.
Q Who is Ron Kaes?
A He's an employee of Fifth Third Bank.
Q How is it that you came to see this video in May or June of 2021?
A I believe you requested any videos from Fifth

Third employees. I don't know the specific request, but it was a request from a -- from you.

Q In response to that request, how did you come across this video which is Exhibit 20?

A The video was provided to my daughter, Colleen Theresa Sweeney.

Q The video was provided to your daughter, Colleen; when?

A That, I don't know.

Q How did you know that she had this video?

A I asked her if there were any videos that she received.

Q Did you -- do you know when she came in possession of this video?

A No.

Q Colleen would know, right?

A Yes. I think so.

Q And do you know when she came in possession of this video?

MR. SABA: Objection. Asked and answered. You just answered that, and he said, I don't know.

MR. CIOFFI: No. I said how.

MR. SABA: Third time -- third time.

MR. CIOFFI: I said when. All right.

BY MR. CIOFFI:

Q When -- do you know how she came in possession of the video?
A No.
Q And you don't know when? Right?
A No.
Q She would know how and when correct?
A I think so.
Q Whose idea was it to create the video?
A I guess it would be Ron's idea to create the video.
Q Was it Ron's idea or Colleen's idea?
A Colleen would have asked if anyone wanted to create a video.
Q When would Colleen have done this?
A I believe sometime in October of 2020.
Q Who wrote the script for the video?
A I don't know.
Q Would Colleen know?
A I don't know.
Q Ron would know?
A I'm sorry?
Q Ron would know, I suppose?
A For his video?
Q Yeah.
A I don't know.

Q Did you tell Ron you retired from Fifth Third?
A No. I don't recall that I did. I want to make a clarification.
Q You always anticipate you didn't tell him, or you don't recall.
A I -- I would like to make a clarification.
Q Well, first of all, answer my question. Is it going to --
A I'm going to.
MR. CIOFFI: No. No. No. Answer my question first, then you can clarify. I read my question back.
COURT REPORTER: Yes. Of course.
(REPORTER READS BACK REQUESTED TESTIMONY)
MR. CIOFFI: Before that, what was the question?
(REPORTER READS BACK REQUESTED TESTIMONY)
BY MR. CIOFFI:
Q What is the answer to that question?
A I may have told him I retired because based on my termination date when the bank asked me not to return to work, I qualified, based on tenure and years of service, for early retirement.
Q So the answer to my question is yes. You told him you retired.

A I don't recall specifically what I told him, but I could have told him that I qualified for early retirement, so I was eligible for early retirement.

Q Let's be clear. Did you tell him you retired or that you qualified for retirement?

A I can't recall the specifics. Retired would mean that you were eligible under early retirement for certain benefits.

Q Well, he congratulates you for retiring, not for qualifying for retirement, right?

A I'd have to see the video again to see the exact words.

MR. CIOFFI: All right. Let's play it again, please.

COURT REPORTER: Do you want it to play in front of the camera again?

MR. CIOFFI: Yes.

(VIDEO PLAYED)

(VIDEO ENDED)

MR. CIOFFI: Read my question back, please.

COURT REPORTER: Yes. Of course. Give me one second.

(REPORTER READS BACK REQUESTED TESTIMONY)

A I can't recall whether I said retired, or qualified for retirement, or early retirement. I was

entitled to the retirement benefits.

BY MR. CIOFFI:

Q Well, he congratulates you for retiring, right?

A Correct.

Q And that's what the video says?

A Yes. But I qualified for retirement based on my tenure and my age.

Q I didn't ask you that. You realize that. I didn't ask you if you qualified for retirement. I asked you what you told him, right?

A I don't re -- can you repeat the question? You're asking me if I told him I was retired. I'm telling you retirement can be achieved by meeting the criteria for early retirement.

Q I'm not asking you how retirement can be achieved. I'm asking you what you told the man in the video. Did you tell him that you retired?

A I can't specifically recall whether I told him retired or early retirement. I know the bank told people I retired.

Q I didn't ask you what the bank asked. I asked what you told. You told him that you retired or that you retired early, is that your answer?

A I don't recall whether it was retired or met

the qualifications of early retirement.

Q But he doesn't say in the video, congratulations for meeting the qualifications of retirement, does he?

A He says congratulations on your retirement.

Q Right. So then you must have told him you retired, right?

MR. SABA: Objection. Asked and answered. Argumentative. Go ahead. You can answer.

A I do not recall whether I told him I retired or I met the qualifications of early retirement.

Q Who else did you tell you retired from Fifth Third?

MR. SABA: Objection to the form of the question. Go ahead. You can answer.

A As I stated, I met the qualifications for retire based on tenure and service. I cannot recall everyone I told who I retired from Fifth Third.

MR. CIOFFI: Read my question back, please.

COURT REPORTER: Yes. Of course.

(REPORTER READS BACK REQUESTED TESTIMONY)

BY MR. CIOFFI:

Q Did you hear me ask you about whether you qualified for retirement in my question?

A You're asking --

Q No. Answer that. Did I ask you if you qualified for retirement in my question?
A No.
Q All right. Would you answer my question?
A Repeat your question.
Q My question is, who else besides Ron Kaes did you tell you retired from Fifth Third?
MR. SABA: Objection to the form of the question. Misleading. Go ahead. You can answer.
A I -- I can't recall everyone that I have told I retired from Fifth Third Bank.
Q It's more than one person, correct?
A I can't recall that whether it's more than one person or not.
Q Well, did you tell at least one person?
A I'm sure I told one person. I can't recall how many others I would've told.
Q Was there more than one?
A I can't recall.
Q Well, who is the one person, besides --
A I --
Q -- Ron Kaes?
A I -- I don't know. Ron Kaes would've been one whether I told him I was early retired or retired. I met the definition of retired.

Q It wasn't my question. Would you listen and answer my question. You are under oath to answer my questions.

MR. SABA: He's answering the question.

MR. CIOFFI: No. He hasn't.

MR. SABA: Yes. He has.

MR. CIOFFI: Will you read it back?

COURT REPORTER: Yes. Give me a second.

(REPORTER READS BACK REQUESTED TESTIMONY)

BY MR. CIOFFI:

Q Who is the one person that you can recall?

A I can't recall at this moment who that one person would be or more than one person.

Q Well, was it one person or more than one person?

A I cannot recall at this time.

Q But you -- is it your testimony under oath that you told other people that you had retired?

MR. SABA: Objection to the form of the question.

Q Right. You've testified that you told people that you retired, right?

MR. SABA: Objection. Asked and answered.

MR. CIOFFI: Well, I'm as --

MR. SABA: Go ahead, you can answer.

BY MR. CIOFFI:
Q No. That's what he testified to. Then I asked him who, and then he couldn't recall. But I just want to make the record clear. You told people other than Ron Kaes that you had retired from Fifth Third, correct?
A I be --
MR. SABA: Objection to the form of the question. Asked and answered. Go ahead, you can answer.
A I believe I've told other people that I met the definitions of a retirement from Fifth Third.
Q That wasn't my question. My question is not whether you met the definition of retirement. My question is, did you tell other people that you retired?
MR. SABA: Objection. Asked and answered. Go ahead, you can answer.
A I'm saying I may have. I don't know how many that would be.
Q Let's break it down. The que -- the first question is, did you tell people you retired and you said you may have.
A Uh-huh.
Q Did you or didn't you?
A I met the definition of early retirement.

Retirement is a definition you can qualify for other areas. I met that so that my benefits would be that -- my healthcare benefits, okay? I would qualify for retirement benefits, okay? You're asking me how many. I'm sure I would've told my doctor I qualify for benefits.

Q My question has nothing to do with whether you qualify for benefits or what benefits you qualified. My question is very simple and straightforward, and for some reason, you're refusing to answer it. Did you tell other people other than Ron Kaes that you retired?

A Yes.

MR. SABA: Object to the form of the question.

A That I was based on retirement of meeting the early retirement definition, yes.

Q You told him that you retired --

A Based on --

Q -- correct?

A -- meeting the -- the criteria for retirement, yes.

Q Did you tell -- when you told people that you retired, did you add the phrase, I retired because I met the qualifications for a retirement?

A Yes. In some cases, I'm certain I did.

Q And in some cases, you did not. You just said

--
A I --
Q -- you retired, right?
A I can't tell you in every case I said all of that, no.
Q And how many cases were there?
A I've said I don't recall how many.
Q But more than one, right?
A There's possibly more than one, yes.
Q Okay. You can't remember any of the people you told you retired? Is that your testimony under oath?
A I'm saying I can't recall the names of the individuals that I would've told that. Not saying I didn't tell individuals that because I met the definition.
Q All right. You told them that you retired. I'm just trying to find out who you told, how many people you told, and when you told them. Yeah. And you're obligated to answer those questions.
A And I'm saying I don't recall all those people.
Q Okay. Do you recall when you told them you retired?
A Sometime after October 16 of 2020.

Q Up until when?
A Can you be more specific?
Q Yeah. So you said that the first time that you told someone was October 16?
A No. I didn't say that. I said --
Q What --
A -- after --
Q All right. Af --
A -- October 16 of 2020.
Q After October 16, you began telling people you retired. Is that your testimony?
A My testimony -- you asked me when I started telling people, and I said it would have been after October 16 of 2020.
Q And how long has it continued since after October 16, 2020, that you told people you retired?
A Well, it would continue to the present day because I met the definition of retirement.
Q So from October 16 to the present time is how many months?
A October -- ten -- ten-plus.
Q So the -- over ten months, you have told a number of people that you retired, correct?
MR. SABA: Objection to the form of the question. Go ahead, you can answer.

A Yes. I've told people I retired based on tenure and length of service.

Q All right. And over those ten months, you can't remember one person that you told?

A Sure. I told my doctor that. I said that.

Q And who else?

A I can't recall all the names. I've had numerous conversations with individuals.

Q All right. I'm not asking you if you can recall all the names. You keep changing my question. My question to you, sir, is can you name any of the people that you told you retired? Not can you name them all? That's not my question. Listen to my question and answer my question.

A I'm sure I've told some. I -- their specific -- their exact names at this moment, I can't recall.

Q Well, can you remember their inexact names?

MR. SABA: Objection to the form of the question. Badgering of the witness. Questions asked and answered.

MR. CIOFFI: It is not answered, Counsel.

MR. SABA: He just said for the fifth time, he can't recall. You asked him again, can -- you can't recall, and then you asked him a vague question of, can you recall inexact names which you know is not a

question. Which you know, it's just trying to harass him --

MR. CIOFFI: No, that --

MR. SABA: -- and mock him. so --

MR. CIOFFI: That is not true. He says he can't recall all the names. I asked him if he can recall any of the names.

MR. SABA: He said I can't recall. And then you said can you recall inexact names.

MR. CIOFFI: He said --

MR. SABA: Which is not a true --

MR. CIOFFI: -- he cannot recall exactly, which is a witness -- counsel, you've been doing this a long time. That's a witness who is trying not to answer the question.

MR. SABA: When you've asked the question for the eighth time --

MR. CIOFFI: No.

MR. SABA: -- and he's told you every time I can't recall --

MR. CIOFFI: He changes it --

MR. SABA: -- and that's it.

MR. CIOFFI: -- each time. Come on now.

MR. SABA: No. He does -- he's answered it each time. You just keep reasking because --

MR. CIOFFI: No.

MR. SABA: -- you want to get a different answer --

MR. CIOFFI: I don't want to get -- I just want to get an answer.

MR. SABA: -- to the same question.

BY MR. CIOFFI:

Q Let's be clear. Between August or October 16, 2020, and the present time, you've told more than one person that you retired, correct?

A I believe I've told one -- more than one person that I met retirement criteria for Fifth Third Bank, yes.

Q All right. But you didn't tell them you met the retirement requirements. You told them you retired, right?

MR. SABA: Objection. Asked and answered.

A I believe I told some I met retirement criteria because I think some responded that I was too young to retire.

Q And you told some of them that you just retired, right?

A No. I would -- told them I met the early retirement, okay? Whether it was retired early -- the definition of retirement encompasses meeting the early

retirement definition. So, therefore, you are entitled to retirement benefits.

Q To my -- my next question to you is, can you recall any of the names of the people you told?

MR. SABA: Objection. Asked and answered. Go ahead, and you can answer.

A I said my doctor, Robert Finlay.

Q Who else?

A I'm sure there's others. I can't recall all their names at this moment.

Q Well, one of the -- one of the boards you sit on is the CISE board, right?

A Uh-huh.

Q And CISE stands for what again?

A CISE, C-I-S-E stands for Cincinnati Inner City School Education Fund.

Q Did you tell anyone on that board that you retired?

A I can't specifically recall. They know that -- many of them know that the lawsuit was filed and that I, in fact, was terminated by Fifth Third.

MR. CIOFFI: Read my question back.

COURT REPORTER: Yes. Of course.

MR. CIOFFI: Listen to my question and answer my question, not what you want to answer.

(REPORTER READS BACK REQUESTED QUESTION).
A Yes. I --
BY MR. CIOFFI:
Q So the answer to that is yes or no.
A Yes.
Q Did you or didn't you?
A Yes. I may have told them that I met the retirement definition.
Q You -- so you told someone on -- at least one person on the CISE board that you retired. The question is -- the next question is who on the CISE board?
A I mean, Mabe Rodriguez, current president.
Q How many people are on the board?
A 35, 40.
Q Anymore in that group of 35 or 40 board members that you told that you retired, on the CISE board?
A I may have told Larry Kyte and Don Mallot when they asked me about the president role at CISE that I had met the early retirement definition for retirement and was entitled to certain benefits from Fifth Third.
Q Is it your testimony under oath that when you told them that you retired, you told them that you met the definition of benefits for retirement?
MR. SABA: Objection to form of the question.

Go ahead, you can answer.

A I can't recall the specific language wou -- I would have used with them, but they were aware that I was entitled to benefits of a retiree.

Q Well, how were they aware of that?

A Because I told them I qualified for early retirement based on tenure and age of service.

Q And that's my question. So when I subpoena them and ask them the question, will they testify that you told them that you qualified for benefits for retirement, or will they testify that you told them you retired?

MR. SABA: Objection to the form of the question.

Q What will they --

MR. SABA: Go ahead, you can answer.

Q -- testify to under oath?

MR. SABA: Objection. Go ahead, you can answer.

A I don't know how they will testify under oath.

Q Do you know what you told them?

A To the best of my recollection, I've provided that to you.

Q And your testimony is that you told some people you retired, and you may have told some people

that you qualified for benefits of retirement, right?
A I have --
MR. SABA: Objection.
A -- told you that retirement is a broad category of which you can meet the definition by age and tenure.
Q I --
A So if I meet those definitions, I am, in fact, retired.
Q I --
A I keep --
Q -- didn't ask you if you met -- what their criteria are or the rules of benefits. My question to you is when you told people you retired, is it your testimony that you told them you retired period, or that you qualify for benefits of retirement? Which is it?
MR. SABA: Objection. Asked and answered. Go ahead, you can answer.
A I've answered this question. I told you I can't recall. In some cases, I've told individuals I was terminated.
Q In some cases, you told them you retired, and in some cases, you told them that you qualified for benefits of retirement?
A I told them that I qualified for retirement.

That's what I'm trying to make clear to you. The retirement definition at Fifth Third is age 65 years of service plus age. My years of service plus age, sir, would be 90, okay?

Q I didn't ask you --

A So if I meet the --

Q I didn't ask you that.

A -- early retirement definition. I am, in fact, retired.

Q I didn't ask you that question.

A No. I wanted to provide that clarity to you.

Q It's not clarified. It's obfuscation. Let me be clear. When you told someone you retired, did you always tell them that you qualify for the benefits of retirement, or in some cases, did you just tell them you retired?

MR. SABA: Objection. Asked and answered. Go ahead --

Q What --

MR. SABA: -- you can answer.

Q What's the answer?

A I -- I cannot with clarity say whether I used the words retired or early retirement. In my mind, those are interchangeable.

Q Did you tell -- do you sit on any other

boards?
A Yes.
Q What other boards?
A I sit on the board of Summit Country Day School.
Q All right. Did you tell anyone on that board?
A I may have.
Q All right. And who did you tell?
A I may have told Allison Kropp.
Q Who else?
A I don't know. I could have told other board members. At this moment, I can't recall exactly who that would have been.
Q Well, you keep using the word exactly --
A I can't recall --
Q -- each time.
A -- the names at this moment of all the people I told.
Q What other boards?
A I serve on the -- it's not a board. It's an advisory committee for Xavier University Athletics.
Q Who did you tell on that advisory committee?
A Who did I tell what?
Q That you retired?
A I may have told Chris -- Greg Christopher that

I retired via early retirement.
Q Who else on that committee?
A I don't recall who else on that committee. We -- I don't believe we've had any face-to-face meetings with that committee. At this time, I don't recall any other names.
Q Did you tell any relatives?
A I don't recall.
Q Did you tell any neighbors?
A I may have, I don't recall. I told them I retired via early retirement.
Q You mentioned a number of conversations earlier today that you had about other employment. When you were talking to the people you described in those conversations, did you tell them that you retired?
A I can't recall if I did or not. Most of them, they were aware that I was terminated.
Q But that wasn't my question.
A I understand.
Q My question is: Did you tell them that you were retired?
A I can't recall if I told them I was retired or met the definition or early retirement.
Q Let's go to the next step. Let's mark this as -- directing your attention to Exhibit 21, which

contains a number of text messages and text message chains, and it was produced to us this -- in this way by your counsel. And it -- the range goes from McHugh 01470 to 01498. Will you look at that? Have you looked at it all?

(EXHIBIT 21 MARKED FOR IDENTIFICATION)

A I'm not memorizing. I'm going through it.

Q Have you seen Exhibit 21 before and the pages contained therein?

A Yes.

Q What is this document?

A Appears to be a collection of e-mails and text messages from my daughter Colleen to various individuals at the bank.

Q Let's look at the first page 01470. It's an exchange between whom?

A 01470?

Q Right.

A Appears to be -- it appears to be an exchange between Karen and Colleen. Karen Kohler.

Q Who is Karen Kohler?

A She is an executive assistant at the bank.

Q Was she your assistant?

A She was my assistant from April of '17 to my termination in October of 2020.

Q Read that first sentence where it begins, "It was good."
A "It was good to hear from you this morning."
Q Okay. Keep going.
A "Attached is the spreadsheet we discussed."
Q Keep going.
A "I'm sure I'm leaving a lot of folks off, so I ca -- so as I think of more, I'll send their information your way."
Q Do you know what was discussed between Karen Kohler and Colleen?
A No.
Q You've testified that Colleen is your daughter. Is she the married daughter who lives in Cleveland?
A No.
Q All right.
A She's my daughter. She's married. She lives in Cincinnati, Ohio.
Q And who is it that lives in Cleveland?
A My son.
Q All right.
A Philip Raymond McHugh Junior.
Q Was it Colleen's husband. I believe his name is Brian Who assisted you with retrieving your text

messages?
A Yes.
Q Okay. Presumably, Colleen would know what was discussed between her and Karen as reflected in this exhibit, right?
A I don't know. I presume.
Q Do you ever speak to Colleen about 01470?
A Yes.
Q Tell me the nature of that conversation, what did you say to her, and what did she say to you?
A I called my daughter when I received, I believe, an e-mail from my brother John that said Colleen was contacting bank employees for their cell phone, and John asked me what I knew about this, and I told him nothing, and I called Colleen and told her to stop immediately.
Q Why was Colleen attempting to make such a video as reflected on 01472?
A I would only speculate. I can't tell you why in Colleen's mind, she would be doing that.
Q Well, you talked to her about it, right?
A I told her to stop this initiative when I became aware of it, yes.
Q Did she tell you why she was doing it?
A Well, she's told me it was going to be a

surprise video.

Q All right. Surprise for what, your retirement?

A No. For my amazing 34 years at Fifth Third.

Q Well, let's read what she was going to say. So turn to 1472.

A Okay.

Q It's two pages in. So she sends to Karen the message that she's going to send to everyone, which is replicated throughout the exhibit, but go ahead and read the texts that she had written and that she did, in fact, send to Fifth Third employees.

A This e-mail dated October 26, 2020?

Q Correct.

A "Karen, thank you for sending me all those phone numbers earlier. Wondering if you also happen to have Brian Lamb's contact info. Here's the message I'm sending out to people. Thank you for being an integral -- integral part of my dad's amazing career at Fifth Third. My siblings and I would like you to contribute to a surprise," all is capitalized in surprise, "video we are putting together for him of people's thanks and well wishes. In light of COVID, since we weren't able to gather people together, we know he would appreciate seeing your faces and hearing your words. We plan to

present the video to our parents in the next couple weeks. Once you record the video, please click this link to upload it to a secure bid grid folder." It gives a address, internet address. "(I work for Xavier, which is why you will see that logo on the corner." When you click the link, you will be prompted to upload your video (if it is saved to the phone tag/tablet/laptop), or you can record it directly to the site. If you have any questions, you can reach me via text."

Q Why was she creating the surprise video?

A I don't know.

Q I did something very similar when my dad retired. Is it fair to characterize the video as a traditional retirement video?

MR. SABA: Objection to the form of the question. Go ahead, you can answer.

A No.

Q Did you see any of the videos that were recorded?

A I saw Mr. Kaes' video.

Q What -- was his video recorded in response to a text or e-mail from Colleen?

A Yes.

Q Going back to the previous page, 01471. There are a list of names on this page. Did they all receive

texts or e-mails from Colleen asking them to contribute or make a video?
A I do not know.
Q Colleen would know, right?
A Yes.
Q I don't see Mr. Kaes' name on this list. Do you?
A No.
Q So the list of people who were contacted by Colleen is broader than what's on 01471, correct?
MR. SABA: Objection to the form of the question.
A I don't know.
Q Did you ever ask Colleen for definitive list of who received this text or e-mail from her?
A No.
Q Did you tell Colleen you had retired from Fifth Third?
A No. I told my daughter and my sons that Fifth Third Bank terminated my employment when Mr. Shaffer told me not to return to work.
Q Well, that's your allegation, right?
MR. SABA: Objection.
Q You told them that?
MR. SABA: Objection. Argumentative.

A I told my children that I was terminated from Fifth Third Bank via a text I received from Mr. Shaffer on October 16th at approximately 3:12 p.m. or shortly therea -- where there was a phone conversation, and then the text came after that.
Q Well, did you tell them that you refused to accept an assignment from the president and CEO of Fifth Third?
A I told them I refused to accept a demotion to the head of consumer role, yes.
Q When did you tell them that?
A On Sunday, I believe it was October 18th. The Sunday following the texts I received from Mr. Shaffer.
Q Well, how is it that Ron Kaes created a retirement video and congratulate your -- you on your retirement if he received this message from Colleen?
MR. SABA: Objection. Asked and answered. Go ahead, you can answer.
Q Never been asked before.
A Yes. It has. I've given you this answer. I don't know. I do know the bank told some employees that I was retired.
Q Did Colleen tell employees that you were retired?
A I do not believe so. I didn't see this in

what you asked me to read to you earlier, but I can read it again. "My siblings and I would like to contribute to a surprise video we are putting together for him of people's thanks and well wishes. In light of COVID, we aren't able to gather together. We know he would appreciate seeing your faces and hearing your words. We plan to present the video to our parents." I don't see the word retirement in Colleen's e-mail.

Q Well, at one's retirement, people extend their thanks and well wishes, right? Do you see that?

MR. SABA: Objection to form the question. Go ahead, you can answer.

A I don't know.

Q Well, you've gone to retirement parties, right?

A Yes.

Q And at those retirement parties, people thank the person and wish him or her well, right?

MR. SABA: Objection to form the question. Go ahead, you can answer.

A Yes.

Q And in fact, people as reflected in the second line of Colleen's message, "Since we aren't able to gather people together," but that traditionally outside of COVID, you would ask people to attend a party to give

thanks and well wishes, right?
A Yes. And I think she references an amazing career. Does not reference the time, but it was 34 years. So she was referencing the career at Fifth Third. I don't see the word retirement in her --
Q Right. But the sentiments of thanking someone, wishing them well, gathering together are all things that happen at a traditional retirement party, right?
MR. SABA: Objection to form of question. Go ahead, you can answer.
A Yes. They may happen at a normal retirement party.
Q On the signature line, it's Colleen, Erin, Philip, and Patrick. Do you know if Erin, Philip, and Patrick, independent of this message from Colleen, reached out to anyone at Fifth Third?
A I'm not aware.
Q You've produced the e-mail from Mr. Kaes but did other people upload videos to Colleen?
A I'm not aware of any other employee that uploaded a video to Colleen.
Q I didn't ask you about employees only. Did any other person upload or send a video to Colleen in response to this text message?

A I can't recall at this time.
Q If she did, would those still be preserved, those videos?
A Yes.
Q In response to our request for production concerning the videos, did you ask Colleen to search her files for all videos?
A Yes.
Q All right. Did that request come from you or from counsel?
A I certainly made the request. Counsel may have made it as well.
Q So directing your attention to the responses that Colleen received.
A What page?
Q Well, let's begin with 1478.
A 1478.
Q This is from Robert Banks, right?
A Correct.
Q And who is Robert Banks?
A He's an employee of Fifth Third Bank.
Q This is a -- the text or e-mail is not clear. On 10-25-'20, in which he says, "I would be honored to make a video for Phil. I think the world of him." Did he, in fact -- did Rob Banks actually make a video?

A I'm not aware that he made a video.

Q The -- are you aware that he did not make a video?

A I am not aware of that either.

Q All right. So on 1479, this is an e-mail exchange for texts -- it looks like text messages with Francie. Who is Francie? Do you know? 01479?

A Yeah. I'm cross-referencing it back based on the cell phone of page 2 of the document 1471 to confirm Francie. And based on the information provided, that would be Francie Henry.

Q Okay. Did she make a video?

A I'm not aware that she made a video.

Q And then on 01480 --

A 01480.

Q -- in the next page, Mr. Briggs, who is that?

A I need to go back and look at the number. It would appear it is David Briggs, 615390,1968.

Q He says, "Absolutely, thanks for the opportunity." And did he follow through, did he make one?

A I do not believe Mr. Briggs made a video.

Q Now you said with certainty you don't think he made it, but with the others, you were uncertain. What makes you certain that Mr. Briggs did not make one?

A We ask Colleen to provide all the videos that she had, and she provided the video of Mr. Kaes.
Q Did Colleen tell you the process she used to search her files for these videos?
A I don't believe so.
Q The next page is 01481. Mr. Ash says, "It sounds great. Colleen, I will get it done in the coming days." Did he ever send one?
A I am not aware if he sent one or if he did not send one.
Q And jumping ahead to 01483, and who is that?
A It would appear to be David Girodat.
Q Girodat. He's says, "Happy to participate." Did he send something?
A "Happy to participate. Really enjoyed working for your father. Good man." This one?
Q Yeah. That one.
A No. I'm not aware, or I'm -- if he's provided a video or not.
Q All right. The next one 01484, Mr. Koporc.
A It appears to be Randy Koporc.
Q Did he send one?
A I'm not aware of -- if Mr. Koporc sent a video or not.
Q And on 01485, Mr. Hoppy (phonetic) says, "Will

do." But again, do we -- do we know if he did it?
A I am not aware if Mr. Hoppy sent a video or not.
Q The next one says 01486. Mr. Putrino.
A Cary Putrino.
Q Right. "Count me in." But did he send anything?
A I'm not aware of if he sent a video or not.
Q All right. The next one, Mr. Welch, again, this is 01487, says, "Hi, Colleen, happy to." Anything there?
A Not aware if Mr. Welch sent a video or not.
Q All right. So all these people -- let's continue with 01488. Again, Ms. Elliott.
A Yeah. That would be Byna Elliott.
Q Right. But again, says, "You're going to have her son help." But again, she indicates she's going to, but she -- we don't know if she did; is that right?
A Correct.
Q Okay. And, Mr. Carl 01489, did he send anything?
A I'm not aware if Mr. Carl sent a video or not.
Q Okay. And Mr. Forest in 01490 says, "I will record tomorrow." But again, did -- do we know if he did?

A I'm not aware of if he did or did not send a video.
Q On 01491, Mr. Gibson says, "Thanks, Colleen, I would love to participate. When is your deadline?" And Colleen responds, how?
A Thank you. Next Monday 11-2.
Q Why was there a deadline? Was there?
A I don't know. I didn't know about the video. It was a surprise.
Q Okay. 01492, Mr. Tuzun, did he ever send one?
A I'm not aware of Mr. Tuzun did or did not.
Q 01493, Mr. LaClair?
A I'm not aware if Mr. Lac -- LaClair did send a video or did not send a video.
Q 01494 Mr. Halbauer. Did or didn't?
A I'm not aware of a video that Mr. Halbauer sent.
Q And again, we have on 0149 Mr. Ellsbrook (phonetic) says, "Again. Absolutely." But we don't know if he actually followed through; is that right?
A I do not know if he followed through.
Q On the 01496, Carina. Do you know who Carina is?
A I believe that's Carina Graves.
Q Okay. Asks if, "Are you proceeding with plans

for videos, notes for your dad?" Do you see there?
A Yes.
Q And then what does Colleen respond?
A "Sorry, we had been told to stop."
Q Is that pursuant to your discussions with her?
A I believe so.
Q It looks like Colleen communicated that message on November 1st; is that right?
A To Ms. Graves on November 1st, yes.
Q And is that generally when she started communicating the message to stop?
A I believe she took down the video link or whatever that technology is immediately after our conversation.
Q All right. This link she stored on a system at Xavier; is that right?
A I -- I don't know.
Q If I understand her --
A I don't know.
Q Do you know if she searched that system?
A I don't know.
Q In addition to your discussions around Exhibit 21 and those text messages, did you generally discuss your work at Fifth Third with your wife?
MR. SABA: Objection to the extent on -- any

conversations with his wife are protected by the spousal privilege.

MR. CIOFFI: I'm not asking him for content. I'm just asking him if he had discussions.

MR. SABA: You can answer whether or not you've had discussions with your wife.

A Yes.

BY MR. CIOFFI:

Q And in the time frame of 2017 to 2020, did you have discussions with your children about your work at Fifth Third?

A Yes.

Q And what was the nature of those discussions with your children?

A They would generally be aware of my travel if I was traveling on behalf of the bank and would miss one of their events or if they had asked me to come to a game or some performance at their school. They were aware of my wife, and I were on business trip on behalf of the bank.

Q Did you discuss with your children your retirement plans?

A No.

Q Did you and your wife and children have dinner most nights together?

A Yes.
Q And at the dinner table, would you have conversations about your work at Fifth Third?
A Yes.
Q Those discussions would also include your retirement plans; is that correct?
A No.
Q No discussion about retirement plans?
A Correct.
Q Ever? Is that your testimony?
A My testimony is I don't believe I've ever discussed retirement plans at a kitchen table over dinner with my children.
Q Any other time besides over the kitchen table?
A No.
Q The times you did discuss your work at Fifth Third, your children were present, and your wife was present at the same time, correct?
A Not always, but they could have been, yes.
Q Right. And the conversations over dinner, the children and your wife would have been present at the same time, right?
A The conversations. Not all of the children would have been present at all of the dinners. No.
Q Well, was one or more of the children present

when you had these conversations around the dinner table about your work at Fifth Third?

A Can you repeat the question once more?

Q Sure.

MR. CIOFFI: Please repeat it.

COURT REPORTER: Yes. Give me one second.

(REPORTER READS BACK REQUESTED TESTIMONY)

THE WITNESS: Was one or more of the children present when I had conversations concerning my employment at Fifth Third?

COURT REPORTER: Yes. Let me finish the question.

THE WITNESS: Okay. I'm sorry.

(REPORTER READS BACK REQUESTED TESTIMONY)

A Yes. Potentially one or more of my children would have been there, yes.

MR. CIOFFI: Let's go off the record because I'm going to go into it. On top, maybe it's going to take some time. Do you want to stop?

MR. SABA: Sure. 5:30. Yeah. We've been going for another hour and-a-half, so that's sounds good. How long do you want break for?

MR. CIOFFI: No. I mean, do you want -- do you want to break for the day?

MR. SABA: It's up to you. What's your

thought? How many more hours do you think you have tomorrow?

MR. CIOFFI: Yeah. You know, I think a lot. Not -- I don't think a full day tomorrow, but I think four more.

MR. SABA: What time would you want to start?

MR. CIOFFI: Do you want to start at 10:00 again?

MR. SABA: That's fine.

MR. CIOFFI: All right. Well, reconvene by agreement of counsel at 10:00 a.m. tomorrow morning at the same place.

VIDEOGRAPHER: Okay. This concludes the deposition. We're off the record at 5:36.

(DEPOSITION CONCLUDED AT 5:36 P.M.)

CERTIFICATE OF REPORTER

STATE OF OHIO

I do hereby certify that the witness in the foregoing transcript was taken on the date, and at the time and place set out on the Title page hereof, by me after first being duly sworn to testify the truth, the whole truth, and nothing but the truth; and that the said matter was recorded by me and then reduced to typewritten form under my direction, and constitutes a true record of the transcript as taken, all to the best of my skill and ability. I certify that I am not a relative or employee of either counsel and that I am in no way interested financially, directly or indirectly, in this action.



GABRYEL REINSTATLER,
COURT REPORTER / NOTARY
MY COMMISSION EXPIRES: 07/05/2026
SUBMITTED ON: 09/15/2021

**WORD INDEX**


< $ >
**$10,000** 12:22
**$2** 33:5
**$500,000** 32:8, 19

< 0 >
**00:16** 169:8
**00246** 46:4
**00254** 53:25
**00258** 62:22
**0026** 156:8
**00267** 159:9
**00268** 150:4
**00269** 156:6 158:5 159:11
**00275** 162:2 172:17
**00283** 180:24
**00284** 119:24 135:15
**00285** 119:11, 18 151:7
**01-22-2020** 5:11
**01470** 211:4, 15, 17 213:7
**01471** 215:24 216:10
**01472** 213:18
**01479** 221:7
**01480** 221:14, 15
**01481** 222:6
**01483** 222:11
**01484** 222:20
**01485** 222:25
**01486** 223:4
**01487** 223:10
**01488** 223:14
**01489** 223:20
**0149** 224:18
**01490** 223:23
**01491** 224:3
**01492** 224:10
**01493** 224:12
**01494** 224:15
**01496** 224:22
**01498** 211:4
**02-06-2020** 5:12
**04-05-2020** 5:13
**0409203234** 63:12
**04-29-2020** 5:14
**07/05/2026** 230:24
**07-15-2019** 5:9
**08-28** 49:24
**09/15/2021** 230:25

< 1 >
**1** 5:8 10:15, 18, 20, 24 82:20 87:22 124:1
**1.2** 32:23
**1:00** 61:6 64:23 100:19
**1:21-CV-00238-MRB** 1:4 9:12
**1:22** 159:13
**10** 5:4, 8, 22 118:13, 14, 20
**10:00** 229:7, 11
**10:01** 124:4, 12 132:25
**10:04** 121:17
**10:09** 8:7 9:6
**10:21** 122:2 124:6
**10:22** 125:1, 4
**10:23** 181:6
**10:26** 181:1
**10:27** 125:5 181:8
**10:28:41** 182:19
**10:45** 125:5, 6
**100** 15:4 35:11, 20, 22 41:20 66:5 165:14 167:3 168:21 169:16, 18
**10-01** 147:1, 2
**10-01-2020** 5:24, 25 6:3, 18
**10-04-2019** 6:6
**10-05-2020** 6:4
**10-25-'20** 220:23
**103** 5:16
**11** 5:24 119:9, 10, 15, 25 135:15
**11:06** 61:3, 6
**11:16** 125:6 147:1
**11:16:51** 147:2
**11:35** 65:1
**11:54** 65:4
**11-2** 224:6
**117** 5:18, 20
**118** 5:22
**119** 5:24 6:3
**12** 6:3 119:11, 16, 18 158:7
**12:00** 125:1
**12:30** 64:23 125:7
**12:31** 124:12 125:9, 11, 12
**12:31:06** 124:5, 17, 18
**12:41** 123:24 125:9, 23 128:4
**12:42** 125:9 132:25
**12:42:29** 128:3
**12:54** 100:25
**13** 6:5 54:3, 4 124:11 148:8, 10 150:8
**13:22** 159:12
**13:22:13** 159:15
**13:22:16** 159:14
**13:22:43** 159:23
**13:23:32** 159:22
**14** 6:7 149:23, 24 150:3 154:6
**14:54** 47:9 48:21
**14:54:55** 47:5
**1471** 221:9
**1472** 214:6
**1478** 220:16, 17
**1479** 221:5
**148** 6:5
**149** 6:7
**15** 6:9 47:9 86:9 94:14 158:5, 9 166:7
**15:08** 162:4
**15:33** 48:16, 20
**150,000** 31:12, 14, 16, 22, 24
**158** 6:9
**159** 6:11
**15th** 98:25 179:6
**16** 6:11 117:19 159:4, 5, 9 199:25 200:4, 9, 10, 14, 16, 19 203:9
**16:34** 163:3, 5 166:2
**16:35** 166:12
**16:51** 54:6, 10
**16:58** 166:12 167:24 169:4
**16:58:29** 166:10 168:5
**162** 6:13, 15
**16th** 217:3
**17** 6:13 66:6 104:9 121:21 161:24 162:1, 5 167:24 169:6, 8 172:17 180:18 211:24
**17:00** 168:4
**17:16** 168:8
**17:17** 167:21 169:10
**17:41:44** 172:4
**1700** 3:9 8:5
**18** 6:15 66:7 104:17 141:13 142:9 162:22, 25
**18:06** 143:20, 22
**181** 6:17
**187** 6:19
**18th** 217:12
**19** 6:17 7:3 66:7 84:17, 25 85:13 98:24 169:1 180:21, 22, 25 181:3
**19:30** 150:4, 8 154:21, 24 155:3
**19:50** 156:10, 15 158:7
**19:50:11** 158:10
**19:50:12** 158:11
**1964** 27:22
**1986** 34:3 36:5 40:9 44:4, 6
**1987** 44:8
**1988** 44:10
**1989** 44:10
**1990** 44:10
**1994** 44:11
**1A** 52:9, 10
**1st** 120:5 225:8, 9

< 2 >
**2** 5:9 27:22 45:20, 22, 24 52:3 87:22 221:9
**2:02** 101:3
**2:54** 47:10
**20** 6:19 16:20 66:7 82:18 83:7 92:15 94:9, 16 95:20, 24 96:2, 4, 5 156:12 163:22 165:24 187:3, 4, 6 188:9, 13 189:4
**20:47** 62:24 63:10, 11, 15
**201** 3:10 8:5
**2010** 99:10, 24, 25 100:1
**2016** 66:6
**2017** 5:17 104:10, 17, 25 116:6, 20, 21 226:9
**2018** 5:19 117:9 118:3 140:3, 10
**2019** 5:21 47:9 48:14 49:22 82:14, 17, 20 83:4 85:23 86:5, 16, 22 95:7 98:25 117:20 118:7, 21 143:20 176:19 179:4
**2019-07-15** 47:2, 14 48:14
**2019-08-28** 49:14
**2019-10-01** 146:25
**2019-9-24** 143:20
**2020** 5:23 16:17, 19, 22 28:3 62:24 72:12, 25 73:5, 7, 11, 13, 15, 18 75:6 82:14, 17, 21 85:23 86:19, 20 95:8 118:21 124:1, 4, 12 139:13 141:14, 22 151:7, 8 152:3 155:3, 13, 14, 19 156:2 162:16 172:14 175:2, 15 176:22 177:4 178:18 180:25 190:15 199:25 200:9, 14, 16 203:9 211:25 214:13 226:9
**2020-01-28** 54:6
**2020-8-26** 172:4
**2021** 1:24 8:7 9:5 16:23, 24, 25 72:16 75:16 188:18, 24
**20th** 155:3
**21** 6:20 210:25 211:6, 8 225:23
**211** 6:20
**23** 166:13, 25
**23:32** 159:21
**23-minute** 167:12
**24** 175:2, 15 176:7 177:4 178:18 180:7
**24th** 162:16 175:22 176:2
**25** 64:21
**26** 72:12, 25 73:11, 13, 15, 18 75:4, 16 82:21 159:2 163:3, 5 165:20 172:13 179:13 214:13
**2623** 2:8
**267** 159:3
**26th** 75:3 163:20
**27** 63:11 103:1
**28** 115:16, 17
**284** 119:7
**29** 152:3 155:13 156:2 159:1 180:25 181:18
**2921.11** 10:24
**29th** 154:19 155:3
**2nd** 129:4

< 3 >
**3** 5:10 51:22, 23 52:1 76:7, 14, 23 87:24
**3:12** 217:3
**3:30** 157:24
**3:57** 158:2
**30** 1:24
**30(b)(1** 8:8
**30th** 8:6 9:5
**31** 172:12

**34** 37:10 58:7 170:24 171:14 214:4 219:3
**35** 41:20 205:14, 15
**36** 12:21 118:6 154:4
**362-8701** 3:12
**362-8702** 3:13
**38** 3:20

< 4 >
**4** 5:11 53:19, 20, 22
**4:34** 166:2
**4:35:09** 166:4
**4:35:24** 166:5
**4:35:33** 166:5
**4:51** 54:11
**40** 48:18, 20 205:14, 15
**41** 116:19 118:19
**419** 2:20
**43560** 2:19
**44** 117:8
**45** 5:9
**45202** 3:11 8:6
**45208** 2:9
**45242** 12:25
**45263** 3:21

< 5 >
**5** 5:13 62:19, 21, 25 65:7 66:24
**5:30** 228:20
**5:36** 229:14, 15
**50** 92:18 93:23 94:2 145:4, 19, 20 146:18, 22 154:21
**513** 2:10 3:12, 13, 22
**52** 5:10
**53** 5:11 154:22
**533-2700** 2:10
**550,000** 32:21
**5580** 2:18
**579-5203** 3:22
**58th** 26:16

< 6 >
**6** 5:15 78:11, 13 96:9 101:5 102:2, 13 117:20
**6:06** 143:21
**60** 92:18 93:3, 11, 20, 22, 23 94:2 142:21
**615390,1968** 221:18
**62** 5:13
**63** 44:20
**65** 208:2
**6th** 62:4

< 7 >
**7** 5:16 103:2, 11, 13 115:16
**7:30** 150:5 154:3
**7:50** 156:10
**7-21-2020** 6:11
**7-27** 159:10
**7-29** 156:10
**7-29-2020** 6:7, 8, 9, 12 150:5
**78** 5:15

< 8 >
**8** 5:18 116:24 117:1, 6, 9
**8:47** 62:24
**8000** 12:25 25:21 26:12, 20
**8-05-2020** 6:10
**8-24-2020** 6:13
**8-25-2020** 6:15
**8-26** 167:21
**8-26-2020** 6:14
**8-27-2020** 6:16
**86** 40:13 41:12
**885-3597** 2:20

< 9 >
**9** 5:3, 20 62:24 104:9 117:13, 15
**9:27** 49:14 50:1
**9:29** 182:22
**9:45** 120:5
**9:46:39** 121:16
**90** 208:4
**91** 44:10
**9-24-2019** 6:5
**9-29** 181:8
**9-29,10:27** 181:10
**9-29-2020** 6:17 181:6

< A >
**a.m** 8:7 9:6 229:11
**abbreviation** 13:5
**ability** 15:11 230:13
**able** 140:5 143:11 187:17 214:23 218:5, 23
**absolutely** 57:1 99:3 114:7 123:8 177:6, 11 221:19 224:19
**absurd** 152:22 153:4 154:2, 7
**accept** 178:6 217:7, 9
**access** 66:1 104:6
**accountable** 144:8
**accounted** 44:20
**accounting** 104:19 121:7, 24
**accurate** 35:21, 22 73:2
**achieved** 193:14, 17
**acquisition** 84:5
**action** 147:10, 17 148:2 230:16
**actions** 22:6
**activities** 115:21 116:7
**ad** 57:16
**add** 32:25 33:3 198:22
**added** 20:2 55:5
**addition** 23:20 37:1, 8 79:20 138:21 225:22
**additional** 79:16 139:14
**address** 12:24 26:7, 11, 15 215:4
**addresses** 26:5
**adds** 154:6
**administered** 10:4
**admissibility** 11:13
**advance** 36:22
**advanced** 37:12, 22 38:10, 12 39:21
**adverse** 45:14
**advice** 121:8, 24
**advisor** 31:1, 6, 7
**advisory** 104:19 209:21, 22
**Af** 200:8
**affect** 11:13 167:18
**affiliates** 74:25
**affirm** 9:22 11:8
**affirmation** 11:8, 25
**afford** 33:14, 16
**afternoon** 54:11
**age** 193:8 206:7 207:5 208:2, 3
**agenda** 104:16 117:21
**aggregate** 96:5
**ago** 41:20 66:17 168:23
**agree** 75:25 90:17 92:21 107:10, 13, 19 109:23 110:9 111:24 112:3, 7, 9 113:16, 17, 18 127:6 134:18, 22, 23 178:2
**agreed** 8:11 107:11 163:1 164:10 166:2
**agreeing** 163:18
**agreement** 133:3 145:7 146:14 164:7 229:11
**agrees** 127:15
**ahead** 23:22 24:21, 25 36:3 39:14, 16 43:9, 12, 16, 20, 25 45:2, 10, 16 51:14, 18 53:3, 6, 12 55:15 56:3, 12 57:2, 18 58:2, 24 60:20 71:4, 14 83:1 87:10 90:7, 13, 22 91:4, 12 92:6, 12, 19 93:17, 25 94:6 96:24 97:14, 22 98:1, 8, 15 100:5 106:8, 15 107:2 108:13 110:11 111:22 114:7, 13, 22 115:2 128:17 131:20 132:5, 18 133:21 134:2, 9, 21 135:2, 9 136:17, 20 137:1 138:5, 16, 25 141:16 142:17 143:4 144:5 147:5 149:21 152:10 153:14 156:1 157:3 160:21 162:7 167:10 168:8 170:22 171:7 174:20 175:11, 24 177:9 178:15, 24 179:23 180:1 183:10 184:24 185:4 186:7 194:9, 15 195:9 196:25 197:9, 17 200:25 204:6 206:1, 16, 18 207:18 208:18 214:10 215:16 217:18 218:12, 20 219:11 222:11
**Airport** 66:11
**AL** 1:12 9:9
**alias** 13:1
**allegation** 177:13 179:10 216:22
**Allison** 209:9
**allow** 68:17
**aloud** 121:15
**altering** 137:12
**amazing** 214:4, 19 219:2
**amended** 76:7
**amigos** 122:9, 13 123:2, 9, 11, 21 124:9, 23 125:1 130:17 131:6, 10, 11 136:8 137:5 150:16, 17 151:15, 16, 23 152:4, 8, 12
**amount** 33:3 91:25 95:1, 2 140:14 146:20
**analysis** 115:24
**and/or** 162:14, 18 172:25 173:22 174:1, 9 175:16 184:20
**and-a-half** 228:21
**Anderson** 83:5, 17 84:15, 18, 23, 25 116:22 117:11 118:10, 23
**Anderson's** 84:19
**angry** 136:12
**animal** 51:19
**Annual** 5:16, 18, 20, 22 104:7, 8 116:3 117:21 141:23
**ans** 109:22
**answer** 10:5, 6 14:12, 13, 18, 20, 24 15:13 18:7, 13, 18 19:7, 14 20:11 21:3, 4, 7, 15, 25 22:13, 22 23:8, 12, 14, 19, 22 24:21, 25 27:2, 14 28:10, 20, 22, 23 29:9 36:3 37:20, 21 38:6, 20, 24 39:6, 14, 20 40:1 41:14 43:2, 7, 9, 16, 20 44:1 45:2, 10, 17 51:14, 18 53:3, 6, 12 55:16 56:4, 12 57:3, 18 58:5, 12, 13, 14, 19, 20 59:1, 10, 19 60:20 67:8 71:4, 14 77:13, 21 86:3 87:10 90:8, 14, 23 91:3, 5, 13, 14 92:7, 13, 20 94:1 96:25 97:10, 12, 16 98:16 100:5 106:8, 15 107:2 108:13 109:8 110:1, 12 111:23 112:16, 25 113:4, 5, 6, 9, 11, 12, 15, 20, 23, 24 114:4,

13, 22 115:2, 11 128:17 132:5, 18 133:21 134:2, 9, 21 135:2, 9 136:17, 21, 23 137:2 138:5, 7, 16, 25 141:7, 11 142:17 143:4, 10 149:21 152:10 153:10, 14 156:1 157:3 160:21 163:14 164:25 166:20 167:15 170:22 171:7 174:20 175:11 177:10 178:5, 7, 10 179:23 182:25 183:10 184:11, 24 185:4, 19 186:7 191:7, 10, 19, 24 193:24 194:9, 15 195:1, 4, 9 196:2, 25 197:10, 17 198:10 199:20 200:25 201:14 202:15 203:3, 5 204:6, 24, 25 205:4 206:1, 16, 19 207:18 208:20, 21 215:16 217:18, 20 218:12, 20 219:11 226:5
**answered** 19:6 24:20 33:21 35:8 36:2 38:9, 14 39:2, 5 43:8, 11 53:2, 5, 11 56:11 57:2, 13, 17, 22 58:23 59:12, 14, 16, 18, 21 60:1, 19 71:13 109:18 110:21 111:22 112:16 113:10 114:12, 14, 16, 21 115:13 131:19 133:20 135:10 142:16 143:3 149:2, 20 152:9 153:13, 22 166:17 167:9 170:21 171:1, 6 177:9, 24, 25 178:15, 24 179:22 184:10 185:3, 5 186:6, 21 189:20, 21 194:8 196:23 197:9, 16 201:20, 21 202:24 203:17 204:5 207:17, 19 208:17 217:17
**answering** 196:4
**answers** 164:18
**anticipate** 191:4
**anticipated** 36:5
**anybody** 123:20 137:11
**Anymore** 205:15
**apart** 166:23 167:22 182:12
**apologize** 179:8
**appear** 46:25 47:7, 11, 20, 22 54:18 55:7 65:8 104:7 117:18 120:1 124:19 164:2 221:18 222:12
**APPEARANCES** 2:1 3:1 4:1
**appeared** 66:2
**Appears** 46:2 47:18 48:7, 20 53:23 115:23 130:21 138:18 211:12, 19 222:21
**application** 28:9, 12, 13 41:4, 5 97:19
**applied** 28:11
**apply** 28:7 33:17 41:3
**applying** 33:18
**appoint** 96:19
**appointed** 173:17, 18, 19
**Appointment** 45:3
**appreciate** 86:16 181:12 214:24 218:6
**approval** 104:20
**approve** 97:17 136:5
**approved** 97:5
**approximately** 33:4 48:18 54:5 86:2 125:25 166:7 217:3
**April** 16:18, 23 62:24 104:17 211:24
**arch** 79:4
**area** 22:18 40:18
**areas** 58:8 79:16, 17 81:22 171:15 198:2
**argue** 112:12 113:21
**argument** 180:6
**Argumentative** 112:1, 11 145:2 175:10 178:1 179:22 194:9 216:25
**arisen** 161:14
**articulate** 15:9
**articulated** 151:17
**ascertain** 122:4
**Ash** 222:6
**asked** 19:1 24:20 32:5 34:13 35:23 36:2 39:5 43:3, 8, 11 45:1, 11 53:2, 5, 11 55:10 56:5, 11 57:2, 4, 13, 19, 22, 24, 25 58:19, 23 59:10, 14, 15 60:1, 19 67:19 71:13 79:8 80:17 85:5 99:11 110:21 111:22 112:2, 8, 15, 22 114:12, 21 131:19 133:20 135:9 139:13 141:20, 25 142:10, 16 143:3 149:2, 20 152:9 153:13, 22 166:17 167:9 170:21 171:1, 6 173:13 177:9, 24, 25 178:14, 23 179:22 184:10 185:3 186:6, 14, 21 189:11, 20 190:12 191:21 193:10, 22 194:8 196:23 197:3, 9, 16 200:12 201:20, 23, 24 202:6, 16 203:17 204:5 205:19 207:17 208:17 213:14 217:17, 19 218:1 226:17
**asking** 13:17 18:25 19:15 20:14, 15 22:1, 15 23:3, 4, 5 26:25 29:19 32:15 40:3, 4 52:24 59:6 61:18 79:14 80:20 81:1 93:13 105:3 109:6 110:25 111:2, 6 112:6 115:4, 5 124:7 126:14 134:13 141:12, 13 161:12 164:9 167:23 168:1, 20 170:13 171:16 179:11 183:7 184:12 185:20 193:13, 16, 17 194:25 198:4 201:9 216:1 226:3, 4
**Asks** 224:25
**asset** 76:10, 24 80:14 81:13, 14, 15, 18, 22 95:19, 24 99:13 102:6
**asshole** 121:3 135:16 137:11 138:9
**assholes** 135:24 136:1 137:5
**assigned** 142:22
**assignment** 217:7
**assist** 68:4
**assistance** 68:10, 12
**assistant** 74:14 211:22, 23, 24
**assisted** 212:25
**associate** 41:1 44:7, 8
**ASSOCIATION** 3:4
**assume** 61:9, 10 62:15 127:15 161:11
**assurance** 175:21
**assurances** 175:19 176:2 186:11
**assure** 70:18
**Athletics** 209:21
**attached** 46:17 117:24 212:5
**attempt** 148:22
**attempting** 213:17
**attend** 218:25
**attendance** 38:1
**attended** 33:8, 9 39:24 40:5
**attention** 10:23 11:17 41:7, 10 45:22 51:23 60:22 62:21, 22 65:6 101:5 103:11 115:16 116:19, 24 117:5, 8 118:6, 12, 19 119:12, 24 120:3 150:3 156:6 159:8, 12 162:1 180:24 210:25 220:13
**attest** 35:20 110:6, 19
**attorney-client** 16:3 20:13, 21 21:18 22:4
**attorneys** 15:5
**audited** 117:22, 23
**AUGUST** 1:24 8:6 9:5 16:20, 25 27:22 98:24 162:16 163:3, 5, 19 172:13 174:25 175:2, 15, 21 176:2, 7, 19 177:4 178:18 179:4, 13 180:7 203:8
**authority** 97:17
**auto** 81:3 89:4, 20, 24 90:1, 2, 18 91:11 92:2, 17, 25 93:4, 8, 9 102:11
**available** 67:19
**Avenue** 2:8
**awarded** 37:23 40:6
**awards** 107:14
**aware** 27:9 40:6 116:6 126:9 206:3, 5 210:17 213:23 219:18, 21 221:1, 2, 4, 13 222:9, 18, 23 223:2, 8, 12, 22 224:1, 11, 13, 16 226:15, 19

< B >
**B2** 11:11 52:11
**BA** 36:16
**back** 11:17 14:12, 15, 19, 22 15:3 17:14, 16 18:7, 12, 21 19:7, 9, 12 23:24 24:1, 10, 13 25:3, 4 27:4, 7, 8, 13, 16 28:16, 18 29:3, 9, 14 33:22, 24 37:16, 18 38:4 39:16, 18 42:21, 23, 25 56:23 58:3, 15, 22 65:3, 6 67:3, 5 70:22, 24 74:21, 22 82:11 85:21 87:24 90:25 91:2 96:13 97:7, 15 98:4 99:13, 14 101:2 105:22, 24 106:18 108:2, 19, 21, 24 109:17 110:2, 4 111:25 114:9, 10, 11 115:5, 8 123:1 125:10 130:16 134:6, 7 135:15 138:1, 3 141:7, 17, 18 142:5, 8 149:15 158:1 159:18, 25 160:24 161:2, 12, 18 163:22 169:17 172:17 178:1, 3, 11, 13 183:4 185:25 186:1, 2, 3, 5, 9 188:8 191:12, 14, 17 192:20, 23 194:19, 21 196:7, 9 204:22 205:1

215:24 221:8, 17 228:7, 14
**background** 33:6 34:21 41:5
**backup** 70:15
**badger** 113:21
**Badgering** 201:19
**baffle** 52:14
**bags** 144:13, 14, 18
**ballgame** 154:14, 16
**BANCORP** 1:12 3:4 9:9 96:22
**Bancorp's** 96:15
**BANK** 3:4 15:16 28:2 29:23 30:17, 18 31:3, 6 32:6, 10, 13 36:4 37:10 40:9 41:1 42:14, 16 44:6, 11, 16, 17 58:7 73:4, 6, 21, 22 76:20 82:1, 15 90:19 92:4, 11 93:5 94:8 95:4, 9, 10, 12 96:3 99:16, 19 101:9, 11, 13, 14, 21, 24 102:3, 6, 10, 20, 23 111:8 140:1 145:8 146:16, 19 155:12 156:19, 20, 25 157:6, 9, 16, 19 158:8, 15 160:11 170:14 171:15 177:2 179:13 181:21 188:22 191:21 193:20, 22 195:11 203:13 211:14, 22 213:13 216:20 217:2, 21 220:21 226:16, 20
**banking** 76:9, 23 77:6 78:15, 18 79:5, 22 80:9, 10, 13, 14, 15, 17, 20 81:21 82:1, 11 83:19 84:5 86:23 87:16 88:6 89:16 91:16 92:8 101:17
**banks** 88:13 92:10 220:18, 20, 25
**bank's** 44:12, 20 93:11 117:22
**BARRETT** 1:5 22:9, 23
**base** 31:20 32:19
**based** 86:17 102:2 156:2 172:14 174:22, 24 175:18 191:20, 22 193:7 194:17 198:14, 17 201:1 206:7 221:8, 10
**basic** 107:13
**basis** 20:12 21:16
**Bates** 46:4 53:25
**bate-stamped** 103:15
**bears** 46:4 53:25
**becoming** 134:19
**bees** 128:9, 12
**began** 14:18 184:20 200:10
**beginning** 33:7 44:4 85:13
**begins** 212:1
**BEHALF** 2:3 3:3 9:14, 17 226:16, 19
**behaving** 136:18
**behavior** 52:14
**believe** 15:4, 14 16:19 19:1 26:8, 16 35:3 40:25 41:17, 19, 22 42:4, 11 44:7 55:13 56:6 64:1 66:4, 19 67:2, 6, 10 68:8 72:20 73:10, 14, 23 74:14 75:11, 12, 13 83:4 85:1, 14 88:25 89:22 90:15 95:11 96:18 97:1 98:25 99:8 104:9 107:15, 21 108:16 111:8, 10, 13 120:18 125:18 128:2 130:18, 19 138:13, 17 139:11 140:1, 8, 10 141:20, 21 145:7, 11 150:22 155:14, 19 168:19 173:6 174:22 177:3 188:3, 17, 25 190:15 197:11 203:11, 18 210:4 212:24 213:12 217:12, 25 221:22 222:5 224:24 225:6, 12 227:11
**believed** 11:16 111:11 155:11 156:2 162:16 172:14 173:13 177:12 179:15
**believes** 111:12
**bell** 125:23 126:5, 8
**Bellarmine** 30:7, 13, 25
**benefit** 37:1
**benefits** 32:10, 12, 16, 17, 23, 25 33:3 192:8 193:1 198:2, 3, 4, 6, 8 204:2 205:21, 24 206:4, 10 207:1, 13, 16, 24 208:14
**best** 15:11 29:21 32:18 36:23 37:14 61:12 64:13 65:20, 24 66:1 73:1 83:15 86:13 92:24 108:10 110:9, 14, 15 111:15, 17, 19, 20 114:19, 24 206:22 230:12
**better** 38:17 107:9 181:16, 17, 18, 25 182:4, 9
**beyond** 20:20 36:16 62:16 80:4
**bid** 215:3
**big** 103:5 156:19
**bigger** 78:8 87:3
**bit** 14:15 27:7 100:16 155:5 187:20
**Black** 40:15, 19 77:5 78:1
**Blank** 3:8 8:4 9:6, 18 117:22
**BMO** 29:23 73:21, 22, 24 74:2, 3, 5, 12, 17, 23, 24 75:8
**board** 77:4, 20 96:16, 19, 22 97:2, 3, 4, 17, 20, 25 98:5, 7, 11, 13, 18, 19, 23 99:19 100:2, 6, 7, 10 105:10, 16, 25 106:11 107:10, 11, 14 108:4, 8, 9 109:10 110:8, 25 111:2, 4, 10, 12, 14, 16 114:19, 23 115:20 116:2, 7, 10, 15 119:3 131:24 133:23 134:10, 15 139:13 141:25 162:12 172:23 176:15 179:17 204:12, 17 205:10, 11, 13, 15, 17 209:4, 6, 11, 20
**boards** 106:23 204:11 209:1, 3, 19
**board's** 105:13 106:5, 9, 12, 19, 20
**boat** 177:1 185:15
**Bob** 122:12 136:13 150:18 151:18
**bold** 51:24
**Borden** 116:23
**born** 27:20, 22
**boss** 61:21
**Boston** 37:5
**bottle** 187:12
**bottles** 186:24
**bottom** 46:5 49:13, 17 54:3 60:22, 23, 24 61:25 120:3 135:15 162:2 172:20
**branch** 76:9, 23 79:22 80:13 82:1 88:6 89:15 91:16
**break** 64:18, 22 86:5 100:14 101:6 157:21 158:4 197:20 228:22, 24
**Brian** 3:19 67:25 68:13, 15 85:14 162:11 172:22 176:14 179:15 185:8 212:25 214:17
**brian.thomas@53.com** 3:24
**briefly** 14:2
**Briggs** 221:16, 18, 22, 25
**bringing** 122:25
**broad** 76:16 207:4
**broader** 108:22 216:10
**broker-dealer** 79:7 81:25
**brother** 33:12, 13 213:12
**BS** 122:9, 12
**bullet** 115:17, 19 116:1
**bunch** 103:18
**Burke** 30:2 31:2
**Busin** 79:4
**business** 31:1 35:14 76:18, 19, 25 78:18 79:5, 9, 11, 14, 15, 19, 23 81:14 82:4 83:19, 20 84:5 85:8, 10 86:23 87:17 88:4 90:10 101:17 127:11, 17 226:19
**businesses** 76:17, 18, 21 77:7 78:16 79:18 81:7 91:19 93:15 96:1 101:7, 8, 13
**bylaws** 96:15, 18
**Byna** 223:15

< C >
**ca** 64:9 177:8 212:8
**calendar** 122:20 139:25 155:2 161:9
**call** 50:10 51:4 123:9, 11, 20 129:21 152:7 154:20 168:10, 13, 14, 15, 17, 18, 20 169:6
**called** 29:24 46:13 50:23 54:25 123:2 128:7 213:11, 15
**calling** 50:22 59:6 138:12
**calls** 45:9 60:7, 12 64:4, 6, 9 73:12 130:23
**camera** 192:16
**candidate** 41:1
**candidates** 100:11
**capacity** 139:15
**Capital** 79:6 84:22 87:7, 14 115:20, 25
**capitalized** 214:21
**capture** 66:25 67:9 71:2
**captured** 67:2, 6, 10 70:19 71:6
**car** 104:18
**care** 40:20
**career** 34:15 214:19 219:3, 4
**careful** 54:20 56:14 59:7, 23 60:3, 17
**carefully** 38:6 65:18
**Carina** 224:22, 24
**Carl** 223:20, 22
**CARMICHAEL** 3:5 15:15 58:9 59:2, 5, 8 61:9, 13 97:3 98:23 107:8 110:22, 24 111:4 112:17 116:4, 22 117:11 118:9, 22 120:11, 17 121:7 122:11 135:19, 24 136:1, 13 139:11, 19 140:13 141:21, 23 142:10, 22 143:8 150:18 151:17 157:6

160:6 161:11 175:19 176:5, 19, 22 177:2, 11, 19 179:5, 15 185:8, 9 186:12
**Carmichael's** 44:19 156:3 172:15 174:22 179:3
**Cary** 223:5
**CASE** 1:4 9:11 14:5 24:19 111:9 131:8 175:4 179:11 199:4
**cases** 198:24, 25 199:6 207:20, 22, 23 208:15
**Casper** 74:4, 13 75:11
**categories** 76:16 77:3 88:20
**category** 17:20 82:6 207:5
**Catholic** 25:17
**CB** 101:11, 19 102:3
**CC** 62:15
**CECL** 62:12, 15
**cell** 47:22 49:1 66:10 213:13 221:9
**Center** 3:9 8:5
**CEO** 31:22 44:14 96:22 97:2, 18, 20, 25 98:20 99:15, 21 100:3, 9 116:12 132:3 133:24 134:19 141:25 155:7, 12, 23 156:4, 19, 20, 25 157:6, 9, 16, 19 158:8, 15 160:11 172:8, 13, 15 174:23, 24 175:15 176:20, 23 177:5 185:13 217:7
**certain** 15:8, 10, 20 99:1 192:8 198:24 205:21 221:25
**Certainly** 9:14 90:17 176:24 220:11
**certainty** 15:5 16:22 35:11 41:20 66:5 165:15 167:4 168:21 169:16, 18 221:23
**CERTIFICATE** 230:1
**certification** 38:11 39:25 40:3
**certifications** 38:13
**CERTIFIED** 7:1 20:23
**certify** 21:8 22:8 23:6 230:4, 13
**cetera** 112:20
**CFO** 172:6
**chains** 211:2
**chance** 160:2 161:5
**change** 111:3 113:20
**changed** 26:16 143:14
**changes** 86:15 202:21
**changing** 109:15 143:10 178:10 201:10
**Chapel** 30:7, 13, 25
**characterize** 59:17 149:16 215:13
**charge** 11:15 41:21 83:1
**charitable** 30:5
**chart** 101:6
**Charts** 5:15
**cheek** 170:3, 4
**Chicago** 48:10 83:21, 23, 24 84:1, 3 101:17
**children** 26:3, 23 27:9 217:1 226:10, 14, 21, 24 227:13, 17, 21, 23, 25 228:8, 15
**chose** 43:17
**Chris** 163:8, 11, 14 164:25 166:20 209:25
**Christopher** 209:25
**Cincinnati** 2:9 3:11, 21 8:6 9:7 12:25 26:6, 10, 18 30:1, 6, 11, 23 31:20 33:10 34:3 41:23 42:12 44:15 66:11 99:12, 14 139:17 142:11, 23 204:15 212:19
**Cioffi** 3:6 5:4 9:17, 18 10:3, 20, 22 14:12, 17, 20, 23 15:1, 7 16:14 17:14, 19 18:7, 11, 13, 18, 22 19:7, 13 20:12, 15, 22, 24 21:4, 6, 9, 11, 16 22:1, 14 23:1, 9, 24 24:3, 10, 16, 22 25:3, 7 27:4, 11, 13, 19 28:16, 19 29:1, 5, 9, 12, 17 33:25 37:16, 19 38:4, 17, 22, 25 39:4, 10, 15, 19 42:21, 24 43:1 45:19 53:18 57:4, 7, 11, 14, 19, 24 58:4, 15, 25 59:19, 23 60:2 62:18 64:17, 21 65:5 67:3, 7 70:22, 25 71:17, 23 72:6, 9 74:21 75:23 76:3, 6 77:19, 23 78:1, 3, 8, 14 79:10 82:7 87:22 89:6, 17 90:1, 4, 25 91:8 95:23 96:10, 13, 14 97:7 98:6 100:12, 15, 20 101:4, 19 102:1, 8, 17 103:1, 4, 8, 10, 16, 21 104:2, 11 105:22 106:4, 21 108:6, 19, 22 109:2, 5, 17, 20, 22, 25 110:7 111:25 112:4, 14, 20, 24 113:2, 6, 8, 13, 24 114:2, 5, 9, 14, 17 115:4, 10 116:25 117:3, 4, 13 119:7, 10, 19, 21, 23 134:6, 12 137:13, 16, 19, 22, 24 138:1, 6 141:7, 16 142:12 143:16, 18 148:21, 23 149:5, 12, 17, 23 150:1, 2 157:20 158:3 159:4, 7 161:3, 22, 25 176:10, 12 178:3, 9, 16 179:25 180:3, 19, 22, 23 185:22 186:3, 8, 13, 22 187:4, 8, 16, 22, 25 188:9, 12 189:22, 24, 25 191:10, 15, 18 192:13, 17, 20 193:2 194:19, 22 196:5, 7, 10, 24 197:1 201:21 202:3, 5, 10, 12, 18, 21, 23 203:1, 4, 7 204:22, 24 205:3 226:3, 8 228:5, 17, 23 229:3, 7, 10
**cioffi@blankrome.com** 3:14
**CISE** 30:6, 11, 23 31:20 204:12, 14, 15 205:10, 11, 16, 19
**C-I-S-E** 30:6, 23 204:15
**City** 204:15
**Civil** 8:8
**claim** 15:4
**clarification** 19:15 191:3, 6
**clarified** 208:12
**clarify** 14:10 39:2 79:8 81:1 85:18 93:7 191:11
**clarity** 95:21 208:11, 22
**classmate** 41:17
**clear** 13:15 22:14 23:1 27:5 38:19 89:25 102:1 113:8 144:8 164:20, 24 178:9 184:19 186:15 192:4 197:4 203:8 208:1, 13 220:22
**clearly** 133:19 134:17 147:10, 17, 18 148:2 169:14
**Cleveland** 26:14 212:15, 20
**clever** 52:5 53:10 56:23
**cleverness** 128:15
**click** 215:2, 6
**close** 120:8, 20 135:20
**coach** 57:7
**coaching** 57:10, 15 179:25 180:2
[redacted] 132:2
[redacted] 128:23 130:8 131:9 132:2 133:25 134:24 135:5 137:11 138:9 148:17
[redacted] 137:6
**Collection** 5:15 6:20 40:18 211:12
**collective** 96:9
**Colleen** 6:21 26:6 27:18 189:5, 8, 16 190:12, 14, 18 211:13, 20 212:11, 13 213:3, 7, 13, 15, 17 215:22 216:1, 4, 10, 14, 17 217:16, 23 219:14, 16, 20, 22, 24 220:6, 14 222:1, 3, 7 223:10 224:3, 5 225:3, 7
**Colleen's** 190:11 212:24 213:20 218:8, 23
**college** 33:15
**colloquy** 122:1 125:6
**column** 158:12
**combined** 91:10
**come** 40:22 41:7, 23 72:4 96:13 189:3 202:23 220:9 226:17
**comes** 178:18
**coming** 99:13 222:7
**command** 67:12
**comment** 123:4, 6 124:9 128:24 129:5, 12 131:1, 9 132:6, 10 134:3 136:10 143:15 147:19, 20, 23 149:19 171:21 182:8
**comments** 174:23
**commer** 80:23
**commercial** 76:9, 23 77:6 78:2, 3, 15 79:13 80:6, 7, 9, 10, 13, 15, 17, 18, 20, 25 82:11, 15 86:22 87:15, 16 91:16 101:8, 11, 12 102:6, 22 144:8, 17, 22, 24 145:15 146:1, 3
**COMMISSION** 230:24
**commit** 142:20, 25
**commitment** 140:22 141:1
**committee** 104:20 115:21, 22, 25 116:2, 7 209:21, 22 210:2, 3, 5
**communicated** 56:8 225:7
**communicating** 225:11
**community** 35:14
**Company** 30:2 31:2, 3 105:14, 20 109:13 116:12 170:23 171:13
**company's** 115:20 118:21
**comparison** 92:1
**compensation** 32:14, 15, 20, 24 115:21, 24, 25
**complain** 119:3

**complaint** 13:24 18:3 19:2, 17, 19, 20 20:3 76:7, 11, 14 80:12 175:14
**complementary** 123:17
**complete** 148:20
**completed** 28:9, 12, 13
**completely** 10:5 68:9
**completion** 38:3
**complimenting** 123:3 127:10, 17
**component** 88:13
**components** 95:20
**comprise** 32:22
**computer** 46:16, 17 69:2, 3, 4, 5, 7
**concerned** 175:17 176:23, 24 185:7, 13, 14 186:10
**concerning** 17:17 29:15 36:24 74:18 220:6 228:9
**conclude** 35:4
**CONCLUDED** 229:15
**concludes** 229:13
**conclusion** 45:2, 10
**concurrent** 84:19
**concurrently** 69:9
**conduct** 134:19
**conducted** 76:17 116:3
**conference** 168:14
**confirm** 26:17 35:7 70:16 71:15 72:2 90:16 92:15 93:19 94:2 95:15 103:20 108:14, 15 126:4, 13, 18 128:3 140:1 165:18 221:9
**confirmed** 176:21 179:5 186:12
**confusion** 104:2
**congratulate** 217:15
**congratulates** 192:9 193:3
**congratulations** 194:3, 5
**conniving** 52:17 53:10
**consequences** 45:15
**consider** 51:12, 15 110:15
**considered** 37:14 43:13 162:13 172:24 173:17 176:16 179:8, 17
**considering** 186:15
**consolidated** 117:23
**constitutes** 230:11
**consultant** 145:11 146:4
**consultant's** 146:8
**consulting** 146:14
**consumer** 76:9, 23 80:14, 16, 21, 23, 24 81:1, 5, 8 85:15 101:12, 14, 18, 21, 24 102:3, 6, 10, 20, 22 179:6 217:10
**contact** 41:14, 15 73:5 214:17
**contacted** 216:9
**contacting** 213:13
**contained** 211:9
**contains** 211:1
**contemporaneous** 177:16 178:17 179:12, 14, 20 180:7, 12
**contemporaneously** 175:3, 13
**content** 16:12 17:11 226:3
**context** 60:18 122:21 126:7, 22 129:16, 18 131:3 134:17 135:3, 6, 18 138:19 151:19 161:1 164:18 182:6
**continually** 58:8
**continue** 26:9, 13 101:19 109:1 142:1 167:20 178:20 200:17 223:14
**CONTINUED** 3:1 4:1 6:1 200:15
**continues** 126:23
**Continuing** 45:16 108:3, 25 109:9 110:5 178:14, 23
**contract** 45:4
**contradictory** 11:23 12:7, 12
**contradicts** 180:15
**Contrary** 137:9, 10
**contribute** 214:20 216:1 218:2
**contribution** 36:25
**conversation** 41:23 56:16, 19 68:1 74:16 99:9 122:14 140:12, 14 167:2, 8 176:20 182:11, 15 213:9 217:4 225:14
**conversations** 21:23 22:12, 25 26:25 28:14 29:6, 7, 15, 18 30:5, 10 60:7 62:7 64:2 73:15 100:1 120:14 122:18 131:22 135:11, 13 139:1 151:20 164:5 165:9 174:25 179:4 182:7 183:18, 19 184:14 201:8 210:12, 15 226:1 227:3, 20, 23 228:1, 9
**convey** 52:16
**conveyed** 166:25
**COO** 162:14, 18, 24 163:19 172:25 173:3, 9, 14, 18, 22 174:5, 15 179:1 184:7, 20 186:17
**copies** 15:19
**copy** 103:14
**corner** 46:5 215:5
**Corp** 44:16
**corporate** 78:17 79:4 82:15, 24 83:2 84:19 85:24 86:8 87:3, 6, 15, 21, 23
**corporation** 110:9
**corr** 41:6
**Correct** 13:7 17:23 22:5 34:17, 22 35:14 44:23 45:8, 15 46:8 47:10 48:2, 16 49:9, 20 50:7, 20 61:3, 4 62:20 65:19 68:7, 21 71:7, 12 72:18 73:22 76:24 81:17 85:5 90:6, 21 94:5 95:14 96:23 105:11 106:13 108:11 110:16 111:15, 20 114:20 116:4 118:1, 2, 4 133:7, 12, 15 134:19 135:22 146:16 147:3 148:15 152:3 162:21 163:20 165:5, 21, 22 171:18 173:4 174:1 190:6 193:5 195:12 197:6 198:18 200:23 203:10 214:14 216:10 220:19 223:19 227:6, 9, 18
**Correcting** 127:10
**correctly** 142:7
**could've** 122:17 173:18 182:17
**COUNSEL** 3:17 9:12 10:16, 17 14:4, 6 15:23, 24 16:15, 16, 19, 21 17:5 18:4, 14, 19 19:5 21:12, 23 22:14 23:11, 16, 20 24:8, 15 38:17 46:8 57:7 64:17 68:4, 10 71:18 75:23 78:5 103:8 104:5 109:25 112:4, 14 117:3 149:5 186:23 187:11 201:21 202:13 211:3 220:10, 11 229:11 230:14
**Counselor** 58:19
**count** 49:16 76:13 102:17 223:6
**counted** 185:13
**counterclaim** 14:1 18:3 19:2, 17, 19, 21 20:3
**counter-complaint** 14:2
**counting** 186:11
**Country** 209:4
**couple** 75:13 125:9 158:24 160:10 215:1
**course** 11:14 14:21 18:9, 20 36:21 105:23 108:20, 23 110:3 138:2 151:2 191:13 192:21 194:20 204:23
**COURT** 1:1 8:12 9:4, 10, 21 10:1, 15, 21 14:14, 21 15:2 17:15 18:9, 15, 20 19:8, 10 21:5, 8, 10 23:25 24:12 27:6, 15 28:17 29:2, 11, 13 33:23 37:17 38:5 39:17 42:22 53:19 58:17 62:20 67:4 70:23 78:13 91:1 96:8, 12 97:8 98:3 103:3 104:3 105:23 108:20, 23 109:1 110:3 114:10 115:7 117:2 119:9 138:2 141:9 142:3 149:25 159:6 160:23 161:24 178:12 180:21 185:24 186:2, 4 187:1, 14 188:1, 4, 11 191:13 192:15, 21 194:20 196:8 204:23 228:6, 11 230:23
**cover** 149:5, 7
**covered** 149:3
**covering** 83:9
**COVID** 214:23 218:4, 25
**COVID-19** 122:25
**CPA** 36:14 38:15
**crafty** 52:5, 16 53:10
**create** 77:9, 12, 23 137:20 178:7 190:8, 9, 13
**created** 217:14
**creating** 215:10
**Credit** 40:16, 18, 19 60:15
**criteria** 193:15 198:19 203:12, 19 207:13
**criticizing** 123:15 136:12
**cross** 21:19
**crosses** 56:21
**crossing** 22:17
**cross-referencing** 221:8
**Cruise** 121:3
**cum** 34:7, 8 35:1, 5, 6
**cunning** 52:13, 17
**current** 31:21 205:12
**currently** 27:25
**cut** 187:17
**cutoff** 72:12, 14
**CV** 34:20
**CVs** 35:13

< D >
**dad** 215:12 225:1
**dad's** 214:19
**Dame** 33:11, 13, 14, 17, 19
**Dan** 30:15
**Daniels** 162:11 172:22 176:14 179:16 185:8

**DATE** 1:24 20:18 34:1, 4 40:10 44:17 46:25 47:1, 13 66:13 72:12, 14, 21 75:12, 19, 21 82:21, 22 83:5 89:16 98:24, 25 140:10 151:1 168:24 191:21 230:5
**dated** 214:13
**dates** 82:16 84:17 151:6
**daughter** 189:5, 7 211:13 212:14, 18 213:11 216:19
**Dave** 74:3, 13 77:24
**Dave's** 74:14
**David** 3:7 9:18 221:18 222:12
**day** 8:6 9:5 82:23 123:25 146:25 151:10 161:14, 17 167:20 168:25 200:17 209:4 228:24 229:4
**days** 100:21 142:21 158:25 159:10 160:5, 11 174:16 176:21 222:8
**de** 33:8 145:11
**deadline** 224:4, 7
**deal** 145:4, 6, 13, 17, 19, 21 146:2, 5, 8, 11, 15, 19, 23
**dealing** 122:24
**deals** 146:12
**December** 13:13 16:17, 22 75:14
**decide** 137:22
**decision** 49:11
**declined** 139:17 140:15
**dedicated** 84:4
**DEFENDANT** 2:3 19:25 20:2 25:2
**Defendants** 1:13 9:17 17:18, 22 24:18
**DEFENDANTS/COUNTERCLAIMANTS** 3:3
**defense** 11:14
**deferment** 43:18, 21
**deferred** 32:24
**define** 38:9 39:21
**defined** 36:25 37:1
**Definition** 5:10 38:12 51:20, 21, 25 52:3 195:25 197:14, 25 198:1, 15 199:16 200:18 203:25 204:1 205:8, 20, 24 207:5 208:2, 8 210:23
**definitions** 197:12 207:8
**definitive** 216:14
**degree** 12:16 34:4 36:19 37:13, 22 38:16 39:21, 22 40:4, 6
**degrees** 36:16, 18 38:10, 12
**deleted** 66:25 67:9, 13 68:20 69:20 70:2, 7, 11, 16, 19 71:2, 11, 20, 21
**deliver** 61:7
**delivered** 49:2, 4, 7 50:6 54:16
**Deloatch** 74:10
**delve** 21:22 22:6, 11
**delving** 20:21 21:17
**demoted** 179:6
**demotion** 217:9
**depend** 88:3
**DEPONENT** 1:23
**deposition** 7:4 8:4, 7 9:7 13:10, 12, 13, 23 15:22 17:2, 7 21:1, 13 22:3, 10 23:10, 15, 21 24:9, 15, 17 25:11, 14 26:22 27:10, 17 77:13, 18 112:10 229:14, 15
**derogatory** 123:3, 6 136:13
**describe** 17:11 29:19 30:21 32:9 33:6 36:21 44:4 46:10 52:20, 25 76:22
**described** 20:5, 8 210:14
**describing** 17:11
**descriptions** 34:20
**detail** 25:6 104:21
**details** 145:12
**determines** 105:10
**develop** 37:15
**development** 37:11
**diagram** 77:12, 15
78:6
**Diamond** 40:15, 19 [redacted] 128:22, 23 130:7 132:1
**difference** 148:25 166:11
**different** 23:2 65:25 79:17, 18, 19 80:22 83:21 84:3, 4 103:19, 24 113:10 136:9 138:11 141:14 144:7 150:22 151:1 179:11 185:17 203:2
**differently** 83:24 84:1
**difficult** 91:14
**Dimension** 30:14
**Dimensions** 30:2, 15 31:1 32:3
**dinner** 75:13 147:9, 16 148:1 153:25 154:14, 16 226:24 227:2, 13, 20 228:1
**dinners** 227:24
**DIRECT** 5:4 10:2 60:22 62:22 115:16 156:6 159:12 165:16
**directing** 10:23 11:17 45:22 51:22 62:21 65:6 101:5 103:11 116:19, 24 117:5, 8 118:6, 12, 19 119:12, 24 120:3 150:3 159:8 162:1 180:24 210:25 220:13
**direction** 44:19 230:10
**directly** 98:5, 17 135:18 178:18 185:9 215:8 230:15
**director** 30:25
**directors** 96:16, 19 98:11 104:19
**dis** 148:11
**disagree** 22:7 39:12 58:1 132:21 136:3
**disagreed** 107:12
**disagreeing** 136:12
**disagreement** 133:5
**disagrees** 112:12
**disapprove** 136:2, 6 148:4
**disciplined** 144:9, 23
**disclose** 16:7
**discuss** 7:3 15:24 16:1, 9 20:9, 25 22:9 23:21 24:8, 15 26:22 31:17 225:23 226:21 227:16
**discussed** 16:2 212:5, 10 213:4 227:12
**discussing** 27:17 30:22 31:9 32:11 115:24 124:22 158:25
**discussion** 20:20 31:23 32:4 60:8 68:23 115:24 141:13, 14 154:16, 18 227:8
**discussions** 15:15 23:11 31:19 32:2 73:20, 24 74:18 136:23 140:2 141:15 146:9 152:18 161:1, 13 165:19 167:4, 11 176:25 225:5, 22 226:4, 6, 10, 13 227:5
**disfavor** 149:19
**dislike** 147:19, 22 148:4 149:1, 9, 18, 22
**Disliked** 147:13, 15, 24 148:11
**DISTRICT** 1:1, 2 9:10
**DIVISION** 1:3 9:11 31:5 79:13 81:2 82:1, 2 89:20 90:5 93:7, 8, 9 94:4, 7 95:13 96:4 99:14 102:11, 23, 24
**divisions** 79:12 91:18
**doberly@blankrome.com** 3:15
**doctor** 198:5 201:5 204:7
**document** 36:6, 8 45:23 46:7 53:21 77:9, 24 103:12 104:12, 22 105:4 117:6, 14, 25 118:13 119:25 137:13, 16 140:5 145:1 150:23, 24 151:6, 7 211:11 221:9
**Documents** 5:16, 18, 20, 22 14:2, 4, 6, 8, 10, 11 15:5, 9, 12, 20 17:9, 12, 17, 21, 24, 25 18:16 19:5, 22, 24 20:1, 4, 6 24:18 25:2, 5, 6, 8, 9 68:3 104:1
**doing** 39:8 54:24 83:21 85:25 112:6 122:19 129:17 131:18 155:3 161:8 202:13 213:20, 24
**dollar** 33:2
**dollars** 32:16 33:1
**Don** 30:13 205:18
**door** 21:20
**doubt** 163:7 164:11, 21
**download** 68:17 69:18
**downloaded** 46:16, 17 70:14
**downloading** 70:1
**downtown** 25:21
**draft** 43:24 44:3
**drafted** 175:14
**draw** 77:9, 12, 14
**drawing** 78:6
**drinks** 75:14
**drive** 187:5
**drove** 25:21 42:11
**Dude** 160:4, 17 161:15
**duly** 230:7
**duration** 20:20
**duty** 110:8 111:14, 16

< E >
**earlier** 13:12 18:2 55:10 73:19 116:14 143:10, 14 160:5 161:14 167:13 210:13 214:16 218:1
**early** 84:17 191:23 192:2, 3, 7, 25 193:15, 20, 24 194:1, 11 195:24 197:25 198:15 203:23, 24, 25 205:20 206:6 208:8, 23 210:1, 11, 23
**earn** 40:4
**East** 3:10 8:5
**ED** 49:6

**Education** 30:7, 12, 24 31:21 33:16 36:22 37:4 204:16
**educational** 33:6
**Eight** 94:23
**eighth** 202:17
**Eileen** 26:1
**E-I-L-E-E-N** 26:1
**either** 11:9 20:17 26:23 35:5 66:10 79:19 86:21 95:4 119:4 128:23 130:8 132:2 133:14 145:9, 23 188:17 221:4 230:14
**elect** 104:19
**Electric** 40:16, 19
**electronically** 104:5
**eligible** 32:20, 21 192:3, 7
**Elizabeth** 4:3 9:3
**Elliott** 223:14, 15
**Ellsbrook** 224:18
**E-mail** 2:11, 21 3:14, 23 48:4, 6, 8 50:17 51:5 74:11, 13, 15 121:14 124:22 143:25 144:2, 3, 11 147:6 157:15 168:22 180:8, 25 213:12 214:13 215:22 216:15 218:8 219:19 220:22 221:5
**E-mails** 6:20 15:17 67:22 68:5 184:1 211:12 216:1
**emoji** 55:5, 8 122:5 128:25 147:18 148:5, 6 149:10, 11
**employed** 27:25 41:18 46:10
**employee** 42:1, 3 44:23 45:6, 13 75:8 107:20, 22 188:22 219:21 220:21 230:14
**employees** 50:11 73:4, 7 74:23, 24 106:13, 24 107:15 123:1 189:1 213:13 214:12 217:21, 23 219:23
**employer** 45:4, 6
**employers** 28:8, 15 29:16, 19
**employment** 28:9 30:22 37:10 42:5, 7, 10, 15 44:22, 25 58:7 73:20 74:1 177:1 210:13 216:20 228:10
**empowerment** 128:19
**encompasses** 203:25
**encouraged** 41:22
**ENDED** 188:7 192:19
**endorsed** 132:11
**engage** 21:12, 18
**engaged** 36:21 76:8 80:13
**enjoyed** 222:15
**entered** 140:13
**entire** 44:22 82:19 95:9, 10, 12, 18 163:8 181:24
**entities** 30:8, 21 31:18, 24 32:1 73:20
**entitled** 112:24 113:3, 4, 7 193:1 204:1 205:21 206:4
**entry** 49:13
**envelope** 187:8
**equity** 89:10, 15
**Eric** 30:14
**Erie** 2:8
**Erin** 26:10 27:18 219:14, 15
**ET** 1:12 9:9 112:20
**evaluate** 100:11
**events** 62:7 226:17
**evidence** 11:13 72:8 137:9, 12 177:16 178:17 179:12, 14, 20 180:7, 12 184:5, 24
**EVP** 84:8, 10 139:15 142:2
**exact** 33:2 41:4 192:12 201:16
**Exactly** 85:12 182:2 202:12 209:12, 14
**EXAMINATION** 5:4 10:2
**example** 7:4 20:25 34:7 81:11 128:14
**excess** 33:5
**exchange** 62:5 126:23 129:19 180:25 211:16, 19 221:6
**exchanged** 164:17
**exchanges** 74:11, 13 120:2 130:22 138:21
**exclamation** 152:14
**exclude** 38:13
**Excuse** 101:12 118:21
**executive** 29:24 30:25 44:13, 15 58:11 84:9 85:19 104:20 105:2, 5, 11, 17 106:11 109:11 116:20 117:9 118:7, 20 119:1, 4 133:25 134:24 211:22
**executives** 15:16 96:17, 20 105:6, 7 136:15
**Exhibit** 5:7 10:15, 18, 23 45:19, 22, 24 51:22, 23 52:1 53:19, 20, 22 62:21, 25 65:7 66:24 78:10, 11 96:9, 11 100:12 101:5 102:2, 13 103:6, 11, 13 104:4 115:16 116:24 117:1, 6, 8, 15 118:12, 14, 19 119:15, 16, 18, 25 135:15 148:8, 10 149:24 150:3 158:5, 9 159:5, 9 162:1, 5, 22, 25 172:17 180:18, 20, 25 181:3 187:6 188:9, 13 189:4 210:25 211:6, 8 213:5 214:10 225:22
**EXHIBITS** 5:6 6:1 66:25 103:25
**exists** 69:22
**exit** 145:7
**experience** 107:5
**expert** 120:8, 19 135:19
**expertise** 67:20
**EXPIRES** 230:24
**explained** 113:17, 18
**explored** 42:20 43:3, 5
**express** 149:18
**extend** 218:9
**extends** 47:12
**extent** 21:21 22:11, 21, 22 26:24 27:1 38:8 39:12 45:1, 9 57:12 225:25

< F >
**face** 55:6
**faces** 214:25 218:6
**facetiously** 120:21
**face-to-face** 210:4
**facets** 146:15
**Facsimile** 3:13
**fact** 11:24 12:8 24:5 34:16 86:18 116:10, 15 127:15 204:21 207:8 208:9 214:12 218:22 220:25
**Facts** 162:8
**fair** 35:4, 7 137:14 215:13
**fall** 81:5
**fallen** 81:8
**falling** 102:19
**false** 11:7, 9 12:2, 3, 10
**falsification** 11:12, 16
**familiar** 10:12
**family** 82:3 94:25 95:6 102:25
**far** 46:20 48:12
**fashion** 177:17
**Father** 30:14 222:16
**February** 16:18, 23 99:10 139:12 141:14, 22 174:25 176:22
**FEDERAL** 8:8
**fell** 101:8, 13 102:10
**fellow** 136:14
**felony** 12:16
**fi** 86:12
**fiduciary** 110:8 111:14, 16
**FIFTH** 1:12 3:3, 4, 10, 17 8:5 9:9 14:3 28:2 36:4 37:10 40:7, 9, 12, 22, 24, 25 41:3, 6, 7, 10, 11, 15, 18 42:1, 3, 5, 8, 10, 16 44:5, 16, 22 58:7 76:8, 20 85:23 89:19 91:19, 24 96:3, 15, 20 99:15, 19 102:5, 21 104:24 118:7, 16, 24 131:24 138:23 139:3, 4, 5 155:12 156:4, 24 157:6, 13, 16, 18 158:20 160:13 169:15, 23 170:1, 7, 9, 12, 14, 17, 24 171:3, 5, 15 172:16 173:16 181:21, 23 183:21 188:22, 25 191:1 194:12, 18 195:7, 11 197:5, 12 201:22 203:12 204:21 205:21 208:2 214:4, 12, 19 216:18, 19 217:2, 7 219:4, 17 220:21 225:24 226:11 227:3, 16 228:2, 10
**figure** 103:19 121:2 127:24
**filed** 19:21 145:8 204:20
**files** 220:7 222:4
**filibuster** 97:13
**film** 78:6, 9
**financial** 29:22, 25 84:5 85:25 86:7 87:1, 2, 12, 19 90:15 91:6, 15 92:14 93:19 94:24 117:23
**financially** 230:15
**find** 20:17, 18 124:3 129:15 169:13, 22 170:5, 13, 16 171:16, 24 174:17 199:18
**fine** 12:22 16:7 58:1 83:15 229:9
**finish** 228:11
**Finlay** 204:7
**Finley** 12:25 25:21 26:12, 19, 20, 21
**firm** 31:2, 3 104:19
**firms** 30:1
**first** 47:1 50:17 74:7 80:8 85:21 86:16 89:12, 14 99:9, 10 144:2, 3 162:15, 23 173:1 179:1, 2 188:16 191:7, 11 197:20 200:3 211:15 212:1 230:7
**fit** 131:10
**five** 49:18 86:9 94:11, 14, 21 95:14, 17 105:6, 8, 18, 19, 25 106:1 107:6, 20

109:11 111:7 113:10 139:15, 20, 21 140:22 141:1, 2 142:1, 13, 19, 20, 21
**flash** 187:5
**flip** 82:12
**folder** 215:3
**folks** 212:7
**follow** 63:5 72:1 174:24 221:20
**followed** 104:18 224:20, 21
**following** 68:3 104:10 121:11 125:7, 21 140:2 217:13
**follows** 96:21 135:21 162:23 165:23 174:21
**foregoing** 230:4
**Forest** 116:23 117:12 118:11, 23 223:23
**forever** 139:4
**forget** 81:20
**form** 22:20 39:13 43:15, 19 51:13, 17 71:3 87:9 90:7, 13, 22 91:12 92:6, 12, 19 93:17, 25 94:6 96:24 97:21 98:1, 8, 15 100:4 104:19 106:7, 14 107:1, 17, 23 108:12 110:18 111:21 115:1 128:16, 18 131:12 132:4, 17 134:1, 8, 20 135:1, 8 136:16 138:4, 15, 24 151:12 153:7 157:2 160:20 174:19 175:11 180:10 183:9 194:14 195:8 196:19 197:8 198:13 200:24 201:18 205:25 206:13 215:15 216:11 218:11, 19 219:10 230:10
**formal** 139:12
**fortunately** 137:23
**Fountain** 3:20
**four** 49:18 66:17 76:16 77:1 83:9 86:23 102:18 229:5
**fourth** 102:15, 19 162:15, 18 173:1 177:25 179:1
**fox** 50:10, 13, 15, 20, 22, 25 51:6, 10, 12, 15, 16, 19, 20, 25 52:6, 7, 14, 16 53:15 54:20, 22 55:6, 17 56:15 59:7, 8, 24 60:3, 18 63:16, 17, 24 64:3, 6, 7, 11 125:22 126:2, 5, 6, 10, 15, 16 127:23 128:6
**foxiness** 128:15
**fraction** 96:2
**frame** 66:6 75:2 82:14 83:7 85:22 139:9 151:3, 10, 11 167:12 174:16 180:15 226:9
**Francie** 221:7, 10, 11
**Francis** 33:8
**Frank** 118:10, 23
**frankly** 143:8
**free** 22:8 23:6 45:13
**Friday** 61:7 62:1 140:11
**front** 34:14 86:7, 18, 21 87:20, 25 88:18 90:16 91:6, 15 92:14 93:20 94:13 161:9 164:5 192:16
**frustrated** 144:21
**frustrations** 144:6
**FTEs** 150:9
**fuck** 62:12 121:19 135:17
**Fucking** 150:11
**fudge** 169:19
**full** 12:22 229:4
**fully** 10:5 171:8
**fun** 131:11, 16
**function** 22:20
**Fund** 30:7, 12, 24 31:21 204:16
**funny** 129:13, 15
**further** 21:22 50:3 179:4

**< G >**
**Gabby** 9:4 116:25
**GABRYEL** 1:25 8:11 62:18 230:22
**game** 56:18 226:18
**gather** 214:24 218:5, 24
**gathering** 219:7
**GC** 61:7, 8, 12 62:1 120:8, 10 122:9 144:6 160:4, 6, 13, 17 161:15 162:11 172:21 176:13
**GENERAL** 3:17 40:16, 19 77:3
**generally** 35:18, 23 51:9 106:22 120:16 225:10, 23 226:15
**generate** 86:8 90:19 91:17
**generated** 85:24 86:23 87:17 90:5, 11 91:10, 20 93:15
**generating** 87:4
**getting** 169:15
**Gibson** 224:3
**gig** 156:19, 20, 25 157:9, 16 158:8, 15 160:11 172:8
**Girodat** 222:12, 13
**give** 9:22 14:14 15:2 17:15 19:8 23:25 24:12 27:6 28:17 33:23 41:20 58:13 67:4 70:23 77:10 86:13 91:1 95:21 113:25 114:3 119:10 139:21 140:25 145:4, 17 162:14, 17 172:25 173:22 174:5 176:1 178:5, 12, 25 184:12 185:24 192:21 196:8 218:25 228:6
**given** 84:18 150:24 176:7 184:11 217:20
**gives** 127:13 215:4
**giving** 27:9 103:6 113:1
**Glenview** 30:3, 18 31:5
**Go** 23:22 24:20, 25 33:11, 13 36:2 39:14, 15 43:8, 11, 16, 20, 25 45:2, 10, 16 48:9, 11 51:14, 18 53:2, 5, 11 55:15 56:3, 11, 17 57:2, 18 58:2, 23 60:19 66:19 71:4, 13 77:4, 24 79:21 82:11 83:1 85:2, 15, 17, 21 87:10, 24 88:2, 5 90:7, 13, 22 91:4, 12, 19 92:6, 12, 19 93:17, 25 94:6 96:24 97:14, 21 98:1, 8, 15 99:14 100:4, 13 101:7, 20, 23 106:8, 15 107:2 108:13 110:11 111:22 114:7, 10, 12, 21 115:2 121:25 123:23 124:4, 11 125:10 128:17 131:19, 23 132:5, 18, 23, 25 133:20 134:2, 9, 21 135:2, 9, 15 136:17, 20 137:1 138:5, 16, 25 141:16 142:16 143:3 144:5, 10 145:3 146:25 147:5 149:20 152:9, 12 153:13, 24 155:7, 23 156:1 157:3 160:21 161:19 162:7, 22 163:2 167:9 168:8 169:9 170:21 171:6, 23 172:8, 12, 17 174:20 175:11, 24 177:9 178:15, 24 179:22 180:1, 19 183:10 184:24 185:3 186:2, 3, 6 188:8 194:9, 15 195:9 196:25 197:9, 16 200:25 204:5 206:1, 16, 18 207:17 208:17 210:24 214:10 215:16 217:17 218:11, 19 219:10 221:17 228:17, 18
**God** 25:15, 16
**goes** 211:3
**going** 14:15 21:2, 21, 24 22:12, 21 23:8 26:24 27:7 38:8 39:13 42:24 48:10 56:9 63:13 64:25 71:22, 25 72:3 77:21 78:9 99:11, 15 100:15, 24 109:1, 25 112:2 113:11, 15, 19 119:10 127:21 130:16 131:21 132:16 139:2 140:19 141:24 142:20 145:14 149:15 152:17 154:18 155:11, 23 157:20, 23 172:14 173:2, 7, 9, 17 174:5, 15 176:11, 17, 25 177:17 178:25 180:9 181:20 184:6, 20 186:16 191:8, 9 211:7 212:4, 6 213:25 214:5, 9 215:24 223:16, 17 228:18, 21
**good** 49:11 103:9 127:9, 10, 16 141:16 156:16 186:25 212:2, 3 222:16 228:22
**grab** 187:11
**graduate** 33:20 34:5, 7 35:5, 17 36:5
**graduated** 33:8, 10 34:2, 16, 22, 24 35:1, 9, 19, 25 40:11
**graduating** 40:7
**Graves** 224:24 225:9
**gray** 22:17
**Gre** 53:16
**great** 76:2 222:7
**greater** 88:10, 16, 17 93:1 95:16, 18
**greatest** 87:17
**green** 81:6, 10 85:21 89:7
**Greg** 61:9, 13 118:9, 22 120:11, 16, 19 121:7, 23 122:11 135:19, 24 136:13 150:18 151:17 159:18, 25 160:6 177:19 179:7, 15 209:25
**GREGORY** 3:5 127:4
**Greg's** 161:17
**grid** 215:3
**gross** 85:23 86:24 87:4, 7, 18 88:14, 24 90:11 91:21, 22 92:10 93:15, 16, 18 94:5, 25 95:4, 7, 9, 12
**group** 31:19, 20 89:15 205:15
**groups** 44:19 91:9
**grow** 27:20
**guess** 31:4 86:10, 13, 17 87:11, 20 88:15 91:15 92:15, 24 162:12 164:9 172:23 173:14 176:14 179:16

187:15 190:9
**guessed** 162:20
**guide** 67:16
**guilty** 12:15
**guy** 163:7 164:8, 12, 21
**guys** 100:20

< H >
**haha** 128:25 133:17 138:17 149:11
**Halbauer** 224:15, 16
**halfway** 181:1
**hall** 62:2, 4, 10
**hand** 9:20 51:21
**Handing** 53:20
**Handwritten** 5:15
**Hang** 141:9
**happen** 214:16 219:8, 12
**happened** 22:16 23:4 42:9 99:23, 25 182:17
**happening** 135:12 177:23
**happens** 72:7 76:5
**Happily** 25:24
**Happy** 48:11 222:13, 15 223:10
**harass** 202:2
**Harlow** 4:3 9:3
**Harvard** 37:5 38:1 40:1
**head** 30:17 82:15 84:11 85:11 88:9 179:6 217:10
**healthcare** 32:23 198:3
**hear** 34:1 194:23 212:3
**hearing** 214:25 218:6
**held** 44:17 104:9
**he'll** 113:23
**help** 48:11 67:22 155:4 223:17
**helps** 60:10
**Henry** 221:11
**hereof** 230:6
**Hi** 223:10
**high** 33:7, 9, 14 92:22 95:5 107:22
**higher** 31:16, 17, 24 39:23 107:5 108:16
**highest** 58:10 90:11 105:14, 18, 19 106:2, 6, 24 107:14, 21 109:12, 13 110:15 111:7, 20 114:20, 24
**highest-paid** 105:7 106:1
**Hikes** 144:9
**hire** 131:25 132:3
**hired** 41:11 150:9
**history** 144:25
**Hold** 78:19, 21 80:1 156:5
**home** 50:11 89:9, 15 161:2
**HON** 1:5
**honest** 112:24
**honey** 128:10, 12, 19
**honored** 220:23
**honors** 34:5, 10 35:9, 17 36:1, 7
**Hoppy** 222:25 223:2
**hour** 64:20, 21 228:21
**hour-and-a-half** 157:21
**hours** 229:1
**Human** 115:20, 25
**Humana** 99:22
**hurry** 181:17, 18, 25 182:4, 9
**husband** 212:24
**hybrid** 83:20

< I >
**iCloud** 70:15
**idea** 151:22 161:7 190:8, 9, 11
**IDENTIFICATION** 10:18 45:24 52:1 53:22 62:25 78:11 103:13 117:1, 15 118:14 119:15, 16 148:10 149:24 158:9 159:5 162:5, 25 181:3 187:6 211:6
**identify** 9:12
**illegal** 45:7
**iMazing** 46:13, 14 67:21 68:15 69:5, 6, 18
**iMessage** 47:15 48:22 50:3
**immaterial** 11:16
**immediate** 165:12 166:19
**immediately** 166:15 213:16 225:13
**improper** 39:7, 9 110:2
**in-between** 40:12 163:25 165:21 182:11, 15
**incentives** 32:21
**include** 69:19 70:7 78:17 81:2, 3 227:5
**included** 70:16 94:7 171:2
**including** 13:11 30:5 37:4 70:15 122:25 142:23
**income** 44:21
**incoming** 47:15 48:6
**Incorporated** 40:15
**increasing** 58:8 171:15
**independent** 219:16
**INDEX** 5:1
**indicated** 38:10 102:4
**indicates** 223:17
**indirect** 81:3 89:24 92:25
**indirectly** 230:15
**individual** 48:4, 5 58:11 74:3, 9 79:24 80:1 85:4 89:2, 9 95:20 101:25
**individuals** 41:11 42:14 74:17 81:3 106:1, 2 107:6, 9 108:17 111:7 118:25 136:9 144:22 199:14, 15 201:8 207:20 211:13
**inexact** 201:17, 25 202:9
**influence** 167:14
**info** 214:17
**information** 164:17 165:8 212:8 221:10
**informed** 139:11, 13 179:5
**ingenuity** 52:13
**initially** 82:25
**initiative** 213:22
**Inner** 204:15
**Inner-City** 30:6, 11, 23 31:20
**ins** 96:4
**inside** 90:19 171:12, 19, 20
**insights** 181:12
**inspect** 71:19
**institution** 39:23
**institutional** 79:7 82:2 84:24 102:24
**institutions** 29:22
**Instruct** 21:4, 6, 24 22:12, 21 23:8 113:12
**Instruction** 20:10 21:2, 14 23:13, 18 67:15 69:10, 12
**instructional** 16:1
**instructions** 69:13, 14, 15, 17, 19, 20 70:2, 4
**insura** 186:11
**integral** 214:18, 19
**integrity** 58:10
**intended** 170:17
**intending** 152:5
**Inter** 30:11
**interchangeable** 208:24
**interested** 230:15
**interim** 72:8
**internet** 215:4
**interpretation** 153:23 161:20 170:15
**interrogatory** 77:17
**interviewed** 42:14
**interviews** 42:15
**intoxicate** 52:14
**investment** 82:2 95:13 102:24
**investments** 79:7 84:24
**invite** 56:18
**involved** 36:24 84:9 136:22 146:16
**involving** 40:20
**iPad** 66:10
**issue** 120:8 135:19 137:20
**issues** 21:21 120:19 122:24
**its** 11:13 82:5 114:20, 24 115:20

< J >
**Jack** 27:23
**Jamie** 46:3, 11, 20, 23 47:24, 25 48:14 49:14, 19, 21 50:7, 16, 23 51:3 52:18 53:7, 14, 16, 24 54:5, 17, 25 55:3, 4, 17 56:7, 8 61:17 63:2, 3, 24 64:3, 6, 13 65:13 72:11, 17, 24 73:9, 11, 15, 17 120:2, 19, 23, 25 121:3, 6, 14, 16 122:1, 2 123:24 124:12 125:15, 21 126:9 128:7 129:14 138:22 139:2 144:1, 2, 9 145:3 150:5, 7 152:19 155:23 156:15 159:13, 21 160:1, 5 161:4 162:3, 20 163:3, 18, 23 164:9 165:12 166:16 168:3, 8, 22 170:2 171:16 174:16 175:18 181:5 183:20
**Jamie's** 61:14 121:9 144:11 147:5 158:6 161:11 164:13 168:2 172:3
**Jan** 83:7
**Janu** 99:9
**January** 16:18, 23 75:14 82:20 99:10
**Jay** 168:3
**JD** 36:12, 13 38:15
**jeopardize** 177:1 185:15
**jms@sspfirm.com** 2:12
**job** 40:24, 25 41:3 44:16 45:14 74:18 143:7 155:7, 24 157:9 169:13, 15, 23 170:5, 7, 13, 16, 25 171:2, 3, 5, 9, 17, 20, 25 172:10, 13 174:17
**jobs** 28:7, 11 40:17, 20 170:9, 23 171:14
**Joe** 55:20
**John** 2:16 9:15 213:12, 14
**join** 152:24, 25 153:4, 17, 20 154:12 155:5
**joined** 40:7, 9, 11 44:6
**joke** 132:16 133:25 134:24 135:5 148:17
**Jones** 41:21, 22 42:12, 13
**Joshua** 2:6 9:16
**JUDGE** 1:5 22:9, 23 29:20 153:5
**judgment** 105:13 106:5, 10, 25 107:7 114:20, 24

**July** 16:20, 24 44:7 47:9 151:8 152:3 154:19 155:3, 13, 14, 19 156:2 159:1 161:10
**jumping** 222:11
**June** 16:20, 24 140:9 141:13 142:9 188:18, 24
**Junior** 26:14 212:23
**jury** 29:20 137:22 153:5

< K >
**Kaes** 188:20, 21 195:6, 22, 23 197:5 198:11 215:20 216:6 217:14 219:19 222:2
**K-A-E-S** 188:20
**Karen** 211:20, 21 212:10 213:4 214:8, 15
**Keep** 42:24 63:13 109:14 112:5, 9 126:25 127:2, 21 128:20 129:1 145:1 147:8, 14 149:15 163:9 178:2 179:25 185:11, 16, 20 201:10 202:25 207:11 209:14 212:4, 6
**keeps** 178:10
**Ken** 66:11
**Kentucky** 30:4 37:3 44:12 66:11
**Kevin** 83:6 84:15, 16, 20, 23 85:1 156:16
**kill** 63:3, 20
**kind** 38:11 39:22 89:8 123:7
**kinds** 34:10 35:17 38:23
**kitchen** 227:12, 14
**knew** 100:7 138:19 148:13 149:18, 22 213:14
**know** 12:17 15:8 22:10, 23 23:7 33:2 34:3 38:17, 25 39:7 42:7 43:17 46:21 48:24 51:16, 19, 20 56:16, 18 57:23 60:6 61:16, 18, 20, 21, 23 62:7 67:10, 18 83:11 84:17 87:11 88:9, 18 91:9 94:24 95:18 108:5 109:25 110:22 120:14, 25 122:6 126:3, 7, 14, 16, 20, 22 127:20 130:10, 12 131:3, 21, 22 132:22 134:11, 14, 16, 25 135:3 136:22 137:23 140:9 144:25 145:11 146:9, 20 147:18 148:4, 6, 16, 19, 24, 25 149:9 151:19 152:17 153:2, 6, 12 155:1, 2 160:18, 25 161:6, 12 163:21, 23 164:16 165:7, 8, 18 168:12 180:17 182:6, 7, 16, 22, 25 184:13 187:10 188:1 189:1, 9, 10, 13, 16, 18, 21 190:1, 4, 6, 17, 18, 19, 20, 22, 25 193:20 195:23 197:18 201:25 202:1 204:19, 20 206:20, 21 209:11 212:10 213:3, 6 214:24 215:11 216:3, 4, 13 217:21 218:5, 13 219:15 221:7 223:1, 18, 24 224:8, 20, 21, 22 225:17, 19, 20, 21 229:3
**knowingly** 11:7, 8
**knowledge** 61:12 65:20 66:1 83:15 105:16 106:22 116:15
**knows** 121:4 135:17
**Kohler** 211:20, 21 212:11
**Koporc** 222:20, 21, 23
**Kropp** 209:9
**Kyte** 30:13 205:18

< L >
**L.P.A** 2:7
**La** 84:20
**Lac** 224:13
**LaClair** 224:12, 13
**Lamb** 85:14
**Lamb's** 214:17
**land** 150:16 152:13
**landscaping** 40:21
**Lane** 12:25 26:12, 19, 20, 21
**language** 206:2
**laptop** 186:25
**large** 78:17 82:15, 24 83:2 84:19 85:24 86:8 87:3, 6, 15, 21, 23
**larger** 87:6 91:10
**largest** 86:24 87:17 88:7 89:22, 24 105:6 109:11
**Larry** 30:13 205:18
**Lars** 83:5, 17 84:15, 23, 25 118:9, 22 144:9
**lasted** 140:14
**laude** 34:8 35:1, 2, 5, 6
**laugh** 130:12 131:2 132:15 134:24
**laughed** 128:25 129:1, 5 130:14 132:7, 8, 9, 11 133:10, 16, 19 134:4 138:18 148:17
**laughing** 129:10 130:17, 20 131:9 133:19, 24 135:6 138:11 147:19 148:24, 25
**Lavender** 83:6 84:16, 20, 23 85:1
**lawn** 40:20
**lawsuit** 175:14 179:14 180:13 204:20
**lead** 150:16 152:13
**leader** 31:4
**leadership** 37:8, 11
**lean** 187:21
**learning** 39:23
**leasing** 81:3, 4 89:20 90:1, 2, 18 91:11 93:10 102:11
**leave** 42:5 45:13 96:6 144:23 146:19 160:13
**leaving** 28:2 99:2 146:16 169:15, 23, 25 212:7
**Lechleiter** 30:18
**led** 120:14
**left** 32:5, 13 42:7 66:10 82:21, 23 179:13
**left-hand** 46:20 48:13 49:20
**legal** 10:6 45:2, 10
**lend** 81:5
**lending** 76:9, 24 79:24 80:1, 3, 6, 7, 10, 14, 16, 18, 21 81:2, 4, 8 85:4, 15 89:2, 4, 21 90:1, 2, 18 91:11, 16 92:1, 2, 17 93:9 101:25
**length** 201:2
**Leonard** 46:3, 12, 20 47:24, 25 48:14 49:14, 19, 21 52:18 53:7, 24 54:5 55:4 63:24 64:3, 6, 13 72:11, 17, 24 73:9, 15, 17 120:2, 4, 23 122:1 123:24 124:12 125:22 127:5, 7 133:4 138:22 162:3 165:13 173:13 181:6 183:20
**Leonard's** 46:23 150:5 152:19 163:18
**Lets** 53:18 144:10
**letter** 72:1 76:1
**letters** 54:6
**letting** 22:10, 23 23:7
**life** 136:24 181:24
**light** 214:23 218:4
**lights** 187:18
**likewise** 45:13
**limitations** 12:1
**line** 47:1, 12 48:12 49:13 63:5 82:4 85:8 121:6 152:21 218:23 219:14
**lines** 49:16 54:3 60:14, 23, 24 62:9, 23 76:17, 19, 21, 25 77:7 78:16 79:8, 11, 14, 15, 18, 19, 22 81:14 85:10 86:23 87:17 88:4 90:11 93:14 96:1 101:7, 8, 13, 23 102:3, 10, 14 124:11, 13 132:24 155:4
**link** 215:3, 6 225:12, 15
**LinkedIn** 15:17
**list** 76:2 215:25 216:6, 9, 14
**listed** 79:3 107:6 108:17
**listen** 38:6 41:13 65:18 196:1 201:13 204:24
**literally** 122:7 154:7 164:22 166:23 169:1 182:19
**little** 14:15 27:7 64:20 100:16 128:22 130:7 132:1 155:5 187:20, 21
**live** 26:19
**lives** 26:20 212:14, 18, 20
**LLP** 3:8 8:5 9:6
**loaded** 69:6
**loan** 79:25 89:9, 10
**loans** 89:8, 15
**located** 9:7
**logo** 215:5
**long** 100:13 125:6 162:9 200:15 202:14 228:22
**longer** 144:17 146:1, 3 167:23 179:7
**long-term** 32:21
**look** 10:25 46:19 51:23 65:7 80:6 100:20 105:8 122:16 124:7 143:11, 19 150:4 156:25 158:5, 24 162:2 172:17 211:4, 15 221:17
**looked** 28:3, 5 35:13, 16 67:16 118:4 211:4
**looking** 64:17 86:22 87:1 101:6 102:13 156:13 158:4, 6 159:11
**looks** 103:18 115:23 165:16 221:6 225:7
**lot** 35:13 90:6, 9 109:15 128:22 130:7 132:1 212:7 229:3
**loud** 61:25
**Louisville** 30:4 37:3 44:12 99:12
**love** 121:7, 11, 23 122:2 224:4

**low** 92:22
**lower** 92:1
**lunch** 100:14

< M >
**ma** 81:19
**Mabe** 30:12 205:12
**magna** 34:8 35:1, 6
**main** 130:5
**making** 57:20 103:25 123:3 131:11, 16 135:5 176:1, 8
**Mallot** 205:18
**man** 193:17 222:16
**manage** 128:18
**managed** 44:20
**management** 30:1 31:2 76:10, 24 79:6 80:15 81:13, 14, 15, 18, 22 84:6, 7, 14, 21 87:7, 13, 23 95:19, 24 99:13 102:7 140:2, 12
**manual** 67:15 69:10, 12
**mar** 101:10
**March** 16:18, 23 99:10 104:9 117:19, 20
**margin** 49:20
**Marie** 26:10
**mark** 10:15, 20 45:19, 20 51:22 53:18 78:10 96:11 100:12 101:11, 19 103:2 117:13 119:8, 11, 12 149:23 159:4 187:4, 9 210:24
**MARKED** 10:18 45:24 52:1 53:22 62:25 78:11 103:13 117:1, 5, 15 118:14 119:13, 15, 16, 25 148:10 149:24 158:9 159:5, 8 161:23 162:5, 25 181:3 187:6 188:9 211:6
**marker** 77:5 78:8
**market** 78:18 83:16, 17, 22 84:3 87:4, 20
**markets** 79:6 84:22 87:7, 14
**marking** 102:2 187:3
**married** 25:23, 25 212:14, 18
**Massachusetts** 37:5
**master's** 36:19 38:16
**material** 11:10, 12, 24 12:8
**matter** 9:8 162:8 230:9
**max** 94:17
**maximum** 12:21
**MB** 84:5
**MBA** 36:10, 11 38:2, 15
**McCallister** 99:4, 7, 8, 11, 18 100:1
**McCarthy** 2:17
**MCHUGH** 1:7, 23 2:4, 16, 17 8:4 9:8, 15 12:23 13:4 26:2, 10, 14, 18, 20 27:23 46:4 53:25 55:18 58:12 62:22 65:6 83:19, 20, 23 85:20 150:4 151:7 158:5 159:9 162:2 180:24 211:3 212:23
**mchugh@mchughlaw.com** 2:21
**mean** 34:19 44:25 46:22 47:6 48:3 51:16 52:8 53:9 56:14, 21 58:6 59:13, 16, 23, 25 60:4 61:13 68:6 69:15 70:10 79:17 101:12 105:3 120:12 122:13 127:14 128:11 130:6, 19 132:24 143:11 144:15 152:15 153:1 155:22 161:4, 16 162:19 170:17 171:19 182:1 184:7, 9 185:1, 6 192:7 205:12 228:23
**meaning** 52:16 151:1 170:19
**means** 45:3, 5 48:24 60:5 62:17 105:3 128:12 144:16 153:6, 12, 20
**meant** 59:6 61:11 101:12 120:13 171:21 182:2, 4
**mechanism** 100:8
**mechanisms** 100:10 116:16
**medication** 167:14, 18
**meet** 16:15 23:20 24:7 129:20 207:5, 8 208:6
**Meeting** 5:16, 18, 20, 22 16:6, 7, 19 17:9 18:5 20:18, 19 21:23 24:14 62:12 75:12 104:8, 17 117:19, 21 122:18 129:17, 21, 24 130:1, 2 135:12 140:8, 10 141:22 142:9, 22 154:13 165:20 172:8, 12 193:14 194:3 198:14, 19 203:25
**meetings** 15:15, 23 16:2, 12, 16, 18, 24 17:1, 3, 4 18:4, 13, 19, 23, 24 19:4, 16, 18, 23 20:5, 8 21:12 22:7, 25 24:6 73:16, 17 152:17 161:14 210:4
**Mellott** 30:13
**member** 37:2 98:19, 23 99:19 111:4 134:11, 15 162:12 172:23 176:15 179:17
**members** 98:5 205:16 209:12
**memorize** 87:2
**memorizing** 211:7
**memory** 167:18
**mentioned** 29:6 66:23 73:19 102:21 138:8 210:12
**Merriam-Webster** 5:10
**mess** 62:2, 4, 10
**message** 48:25 50:7 54:7, 13, 16 55:4 61:2 66:2 71:8 120:12 123:23 124:24, 25 135:21 136:5 154:17 156:9 158:24 159:10, 11 160:10, 17 175:17 211:1 214:9, 17 217:16 218:23 219:16, 25 225:8, 11
**Messages** 5:9, 11, 13, 24 6:3, 5, 7, 9, 11, 13, 15, 17, 21 15:17, 19 46:3, 11, 18 53:24 56:9 64:12 65:22 66:7, 24 67:1, 2, 6, 9, 11, 13 68:6, 7, 18, 19, 20, 24, 25 69:20 70:1, 3, 6, 7, 8, 11, 14, 16, 19 71:2, 10, 16, 20, 21 72:10, 11, 13, 15, 21, 22, 24 73:6, 10 74:17, 23, 24, 25 75:7, 9 122:22 129:19 145:3 184:2 211:1, 13 213:1 221:6 225:23
**messaging** 132:20 136:4
**met** 15:24 16:21, 23 24:5 42:12 75:14 193:25 194:11, 16 195:25 197:11, 14, 25 198:2, 22 199:15 200:18 203:12, 14, 18, 23 205:7, 20, 23 207:12 210:23
**MICHAEL** 1:5 3:6 9:18 26:18 72:1 100:13 103:14 119:17
**middle** 78:17, 22 79:4 83:16, 17 87:3, 20, 23 116:2 186:24 187:12
**middle-market** 79:5
**might've** 183:3
**Mike** 30:18
**military** 42:17, 18, 20 43:4, 13, 22
**million** 32:23 33:5
**mind** 15:21 39:6 208:23 213:20
**mine** 41:17
**minimum** 12:20
**minute** 122:8 172:3
**minute-and-a-half** 164:23
**minutes** 48:18, 20 121:21 125:25 156:12 163:22 165:3, 24 166:7, 13, 25 167:21, 24 168:4, 23 169:1, 6 172:12
**mischaracterization** 148:20
**Mischaracterize** 148:18 149:8
**Mischaracterizes** 155:25 184:23
**mischaracterizing** 137:17 176:8
**mislead** 148:22
**Misleading** 166:8 195:9
**mistakenly** 11:16
**misunderstood** 147:11, 17 148:3
**mock** 202:4
**moment** 30:3, 20 63:22 66:13, 15 81:12 130:14 196:12 201:16 204:10 209:12, 17
**MONDAY** 8:6 224:6
**monetary** 146:20
**money** 106:23 108:11
**moniker** 13:3, 8 55:11, 21 126:1
**Monroe** 2:18
**months** 12:21 200:20, 22 201:3
**Montreal** 29:23 73:21, 22
**morning** 25:20 27:10 29:21 36:23 73:19 116:14 212:3 229:11
**mortgage** 81:2 88:25 89:3, 11, 12, 14, 20, 23, 24 90:5, 15, 18 91:11 92:1, 17, 25 93:2, 7, 9 102:11
**mortgages** 89:14
**move** 81:17 113:12 181:13 186:23
**moved** 84:15, 16 85:1
**moving** 84:19 158:12
**multiple** 76:19, 25 85:10 146:12, 14

< N >
**name** 9:3 12:22 30:2, 3 35:18 41:19 46:23 47:23 50:23 51:3 52:18 53:7 54:25 55:11, 17 56:7 67:24 74:9, 14 81:7

105:16, 25 128:7 201:11, 12 212:24 216:6
**named** 44:10, 12, 15 105:2, 5, 10, 17 106:11 109:11 116:20 117:9 118:7, 20, 25 119:1, 4 162:24 184:20
**names** 26:5 30:16, 19 199:13 201:7, 10, 16, 17, 25 202:6, 7, 9 204:4, 10 209:17 210:6 215:25
**narrative** 39:6
**NATIONAL** 3:4
**nature** 17:12 75:9 213:9 226:13
**nauseum** 57:17
**ne** 185:22
**necessarily** 38:13 94:19 96:21 106:2 132:19 170:9
**necessary** 12:1, 9 76:5
**need** 22:22 57:8 113:20 163:11, 14 164:25 166:20 187:2 221:17
**needed** 99:14
**neighbors** 210:9
**net** 44:20
**never** 38:15 42:20 43:13 57:4, 19, 24 66:8 114:14 148:19 163:10 179:7 183:24 217:19
**Nice** 61:15, 16, 17, 21 62:2
**nickname** 13:3, 8 55:11, 12, 21 56:6
**nicknames** 56:5
**nicks** 55:11
**night** 56:18 154:14, 19
**nights** 226:25
**nine** 12:20
**non** 79:25
**non-auto** 79:25 80:3
**non-military** 47:9
**Non-mortgage** 79:25 80:3 85:4 89:4
**non-other** 85:4
**normal** 219:12
**normally** 34:11 123:11 137:4
**Northern** 66:10, 11
**Notary** 8:11 230:23
**notation** 34:21
**note** 35:18 71:25
**noted** 72:11
**notes** 15:14 225:1
**notice** 104:8 117:18
**noticed** 13:13
**Notre** 33:11, 13, 14, 17, 19
**November** 16:16, 21 225:8, 9
**Number** 9:11 18:19 45:19, 20, 22 47:18, 19, 21, 22 51:22, 23 52:3 53:20 62:18, 21 84:4 87:24 103:11 104:1 115:16 116:15, 24 118:13 119:18 200:23 210:12 211:1 221:17
**numbers** 46:21, 23 47:3 54:6, 8 86:6, 18, 20 87:25 88:18 103:19 214:16
**numerous** 15:12 36:24 37:4 40:20 57:18 59:16 70:17 122:24 170:9 171:14 201:8

**< O >**
**oath** 10:4 11:7, 25 70:6 72:23 131:16 151:21 153:5 155:20 156:5, 23 158:19 173:6 182:5 196:2, 17 199:12 205:22 206:17, 20
**Oberly** 3:7 9:18 77:25 78:2, 7, 22 79:1, 3 81:9, 23 82:12 89:18, 25 90:3 102:18
**obfuscation** 208:12
**object** 15:25 21:2, 24 22:21 26:24 38:8 39:13 43:6 51:13 57:12 109:18 118:25 177:18 198:13
**objecting** 24:24 180:5
**Objection** 20:10 21:14 23:13, 18 24:20 36:2 38:18 39:4, 15 43:8, 11, 15, 19, 25 45:1, 9, 16 51:17 53:2, 5, 11 55:15 56:3, 11, 25 57:9, 22, 23 58:2, 23 59:14 60:1, 19 71:3, 13 87:9 90:7, 13, 20 91:4, 12 92:6, 12, 19 93:17, 25 94:6 96:24 97:21 98:1, 8, 15 100:4 106:7, 14 107:1, 17, 23 108:3, 12, 25 109:9 110:5, 11, 18, 21 111:21 112:1 114:12, 21 115:1, 9 128:16 131:12, 19 132:4, 14, 17 133:20 134:1, 8, 20 135:1, 8 136:16, 20 137:1, 7 138:4, 15, 24 140:20 142:16 143:3, 13 145:2 148:18 149:2, 20 151:12 152:9 153:7, 13, 22 155:25 157:2 160:20 165:25 166:8, 17 167:9 169:21 170:21 171:1, 6 174:19 175:6, 8, 10 176:3 177:7, 15, 22, 24 178:14, 23 179:21 180:10, 14 183:9 184:10, 23 185:3, 21 186:6, 19 189:20 194:8, 14 195:8 196:19, 23 197:8, 16 200:24 201:18 203:17 204:5 205:25 206:13, 18 207:3, 17 208:17 215:15 216:11, 23, 25 217:17 218:11, 19 219:10 225:25
**objections** 38:23 57:21
**obligated** 77:14 199:20
**obligation** 28:22 77:9, 11 97:10
**obligations** 10:6
**obscene** 131:1
**obsolete** 52:14
**obviously** 187:9
**occurred** 130:24 138:20 140:9, 10
**Octo** 83:12 98:24
**October** 28:2 40:9, 12, 13 41:11 44:4, 6 72:12, 25 73:5, 7, 11, 13, 15, 18 75:3, 4, 16 82:21 120:5 124:1 129:4 151:7 165:20 179:5 190:15 199:25 200:4, 9, 10, 14, 16, 19, 21 203:9 211:25 214:13 217:3, 12
**odd** 163:22
**offender** 11:15, 24
**offer** 40:24
**offered** 40:25 42:15 139:16, 23
**offers** 121:7, 23
**office** 82:3 94:25 95:6 102:25 123:1 130:5 140:13 182:21 183:3, 14
**officer** 44:9 105:2, 17 106:11 132:1
**officers** 105:5, 11 109:12 116:20 117:9 118:7, 20 119:1, 4
**offices** 9:6 25:22
**official** 11:6, 18 36:18 81:7
**Oh** 14:21 18:15, 20 50:10 84:7 85:11
**OHIO** 1:2 2:9, 19 3:11, 21 5:8 8:6, 12 9:7, 11 10:13 12:18, 25 26:6, 10, 14, 18 27:22, 24 33:9, 10 34:3 40:16 42:12 212:19 230:2
**Okay** 9:2, 19 12:11 13:25 16:5 18:15 29:13 32:9 34:2 49:2 57:6, 14 60:17 61:6, 24 62:9 63:7 64:7 69:6 70:13 71:25 72:19 73:3 75:22 78:13 80:6, 25 81:15 82:24 83:4, 14, 16, 18 85:20 86:22 87:22 89:13 90:3 94:10, 20 95:4 96:12 97:14 99:23 100:23, 24 102:19 103:1 109:7 115:15 121:19 124:15 125:21 127:5 134:23 138:18 142:4 146:10 150:1 151:5 155:9, 20, 24 158:12, 13, 24 159:16, 17 162:1, 7 170:19 172:3 173:13, 14 182:8 183:16 184:12, 14 186:22 187:14, 25 188:8 198:3, 4 199:10, 23 203:24 208:4 212:4 213:3 214:7 221:12 223:20, 23 224:10, 25 228:13 229:13
**old** 52:5
**once** 20:19 21:19 22:5 179:9 215:2 228:3
**ones** 15:8 79:16
**one's** 116:25 218:9
**open** 21:20 109:3
**opinion** 106:20 164:13
**opportunity** 99:15 221:20
**opposed** 147:19
**opposing** 23:16
**opposite** 177:17, 19
**ops** 48:10 161:8
**order** 67:16 103:22 108:9 110:14 111:19 114:18 116:16 131:4
**Organization** 37:3
**organizations** 30:5, 9
**Osceola** 26:8
**outcome** 11:14
**outgoing** 48:22, 25 50:4, 7 54:7, 14 61:2, 6 120:4
**Outside** 136:24 138:10 170:7 171:5, 12, 19 218:24
**outwit** 52:13
**over-the-counter** 167:17
**owned** 104:18

**< P >**
**p.m** 217:3 229:15
**pack** 144:13, 14, 18
**Page** 5:2, 7 7:2 46:19 49:13 51:24 52:7 60:23 61:25 72:5 79:21 81:13 82:12 85:2, 21

88:5 89:18 96:8 101:15, 20, 21, 23, 24 102:9, 13, 15, 16, 19 103:19 115:16, 17 116:19 117:8 118:6, 19 120:4 121:12, 25 122:16 130:16 135:16 136:7 144:4 162:3, 23 172:18, 21 181:1 211:15 215:24, 25 220:15 221:9, 16 222:6 230:6
**pages** 104:21 117:22 211:8 214:8
**paid** 32:16 33:14, 15
**painful** 62:2, 4 177:17
**paper** 165:16
**paragraph** 76:7, 14, 22
**parents** 215:1 218:7
**part** 37:9 77:12, 18 214:19
**partially** 28:13
**participate** 222:13, 15 224:4
**participated** 37:4, 9
**particular** 57:16 116:7
**parties** 81:10 218:14, 17
**partner** 31:1, 3 127:11, 17
**partners** 30:16
**party** 218:25 219:8, 13
**pas@sspfirm.com** 2:11
**Patrick** 26:17, 20 27:18 219:15, 16
**Patterson** 2:7
**Patty** 63:3, 20
**Pause** 143:16
**pay** 31:21 32:19 105:6, 10, 17 106:23 107:20 108:10 109:10 110:14 111:20 114:24
**pays** 114:19
**penalty** 10:10 12:17
**pending** 9:9
**people** 35:17 72:16 83:13 123:11 128:18 136:25 137:5 144:7 152:7 193:21 196:18, 21 197:4, 11, 15, 21 198:11, 21 199:10, 19, 22 200:10, 13, 16, 23 201:1, 11 204:4 205:13 206:25 207:14 209:17 210:14 214:18, 24 216:9 218:9, 17, 22, 24, 25 219:20 223:13
**people's** 214:22 218:4
**percent** 15:5 35:11, 20, 22 41:20 44:20 66:5 86:9 88:10, 16 92:16, 18 93:3, 11, 21, 22, 23 94:3, 9, 11, 15, 16, 17, 21, 23 95:3, 7, 12, 14, 17, 20, 25 96:2, 5 145:4, 19, 20 146:18, 23 165:14 167:3 168:21 169:16, 18
**percentage** 85:23 86:24 87:18 88:8 90:11 91:10, 20 92:4, 10 93:14 94:5
**percentages** 95:22
**percentage-wise** 92:9
**perfect** 187:23
**perform** 43:4 76:22
**performance** 15:18 86:20 107:8 108:16 109:12, 13 110:22 111:6 139:12 141:23 226:18
**performed** 42:17, 18
**performer** 107:22
**performers** 105:14, 19 106:3, 6, 24 107:6
**period** 11:25 13:11 66:9 145:10 146:6 154:2 207:15
**periods** 13:14
**Perjury** 5:8 10:10, 12, 24 12:1, 16, 17
**permitted** 38:22
**person** 11:6 24:4, 8, 14 30:9 34:10 41:24 50:20 51:10 52:5, 17 54:22 84:11 132:3 188:19 195:12, 14, 15, 16, 20 196:11, 13, 14, 15 201:4 203:10, 12 205:10 218:18 219:24
**personally** 14:9 65:8, 15, 19
**personnel** 84:4
**persons** 24:5
**perspective** 108:8, 9
**Peter** 2:5 9:14 41:25 42:7
**Phenise** 3:18
**phenise.poole@53.com** 3:23
**Phil** 13:4, 5 55:18 83:19, 23 144:10 220:24
**PHILIP** 1:7, 23 2:4 8:4 9:8 12:23 13:5 15:25 26:14 27:18 212:23 219:15
**phone** 46:17 47:22 49:1 60:7, 12 65:9, 15, 17 66:2, 8, 10 69:1, 2, 4 70:9, 11, 14, 17 71:7, 9, 11, 16, 19 72:7 74:16 122:18 130:23 167:2 213:14 214:16 215:7 217:4 221:9
**phonetic** 144:9 145:5 156:16 222:25 224:19
**phrase** 131:25 198:22
**physically** 69:1 130:1
**pick** 144:10 187:17
**picked** 84:20
**place** 20:18, 19 62:8 131:23 146:10 151:20 165:20 184:14 229:12 230:6
**Plaintiff** 1:8 9:15
**PLAINTIFF/COUNTERCLAIM** 2:3
**plan** 32:24 116:4, 16 139:4 140:7 181:23 214:25 218:7
**planned** 142:14, 25
**planning** 116:11 139:8, 9 140:16, 19 181:19
**plans** 36:25 139:5 224:25 226:22 227:6, 8, 12
**platforms** 81:5
**play** 18:10 23:16 188:4 192:13, 15
**PLAYED** 188:6 192:18
**PLAYS** 14:19, 22 15:3 17:16 18:12, 21 19:9, 12 24:1, 13 25:4 27:8, 16 28:18 29:3, 14 33:24 37:18 39:18 42:23, 25 58:3, 22 142:5
**Plaza** 3:20
**please** 9:12 11:4, 11, 20, 22 12:14, 22 14:13 15:1, 13 17:14 18:8 23:24 24:11 25:3, 12 26:9, 13 27:14 28:16, 20 29:1, 10 37:16, 20 38:4 43:2, 7 45:20 49:10 50:9 51:22, 24 52:12 57:20 58:5, 16 65:7 74:21 77:5 90:25 105:22 108:19 109:17 138:7 141:8, 10 159:4 178:11 185:19 187:12 192:14, 20 194:19 215:2 228:5
**plug** 69:3
**plugged** 69:2, 4
**plus** 12:21 208:3
**PNC** 3:9 8:5
**point** 44:17 61:25 85:7 101:7 116:1 141:24 152:14 168:18 173:17 174:4 181:20 187:20
**points** 103:17 115:17, 19
**police** 66:12
**Poole** 3:18
**position** 22:1, 24 31:4, 7 44:7, 18 99:3 139:19, 22 140:6, 21 141:1 142:2, 18, 21 174:6 185:15
**positions** 29:25 30:22 31:8 44:5 174:7
**possession** 15:18 189:14, 18 190:1
**possible** 170:19
**possibly** 199:9
**potential** 28:14 29:16, 19, 25 100:8, 11
**potentially** 140:11 228:15
**practice** 21:13 137:4
**practicing** 25:17
**pray** 25:16
**prayed** 25:15
**praying** 25:18
**preach** 97:9
**preceded** 56:16 60:6, 7 135:4
**preceding** 60:14 165:12 166:16, 19, 21
**prematurely** 125:23 126:6, 8
**preparation** 13:21 15:22 17:1, 4, 6 22:3 23:10, 15 24:17 25:10, 13
**prepare** 13:10, 14, 22
**prepared** 77:11 139:21 140:25
**preparing** 139:3
**prescription** 167:17
**PRESENT** 4:3 75:3, 22 156:3 200:17, 19 203:9 215:1 218:7 227:17, 18, 21, 24, 25 228:9
**preserved** 104:5 220:2
**presidency** 139:17 174:5
**president** 30:24 31:22 44:11, 13, 14, 16 96:22 97:2, 4, 18, 20, 25 98:20 100:3 116:11 132:3 133:24 134:19 142:11 143:7 155:12 157:5 162:14, 18, 24 163:19 172:15, 25 173:3, 7, 14, 16, 18, 19, 23 174:15, 23, 24 175:16 176:20, 23 177:4 179:1, 8 180:9

184:7, 20 185:12 186:16 205:12, 19 217:7
**Presidents** 37:2, 15 96:17, 20 100:8
**Presumably** 213:3
**presume** 213:6
**pretty** 89:19
**previous** 13:12 14:13 48:18 127:16 150:24 172:18 186:8 215:24
**previously** 11:9 69:6, 8 148:16 175:19
**principally** 76:8 80:13
**print** 49:6 66:24
**printed** 69:12
**printout** 46:2
**prior** 14:20 18:7 29:9 55:24 56:1, 19 62:8 104:12, 22 120:15 122:14, 16 139:16 141:7 147:23 150:23 154:24, 25 158:25
**prison** 12:21
**private** 82:1 92:4, 8, 11 94:8 96:3 102:23
**privilege** 16:4 20:13, 16, 21 21:18 22:4 27:2 226:2
**probably** 49:6, 11 64:21 126:12
**problem** 104:3 109:24 144:7
**Procedure** 8:9
**proceeding** 11:6, 14, 18 49:12 224:25
**PROCEEDINGS** 5:3 9:1
**process** 46:10 100:8 222:3
**produce** 70:10 75:18
**produced** 14:5, 8 15:6, 9, 12, 14, 17, 18, 19, 20 24:18 25:2 46:7 65:23 70:6 71:20, 21 72:16 187:9 211:2 219:19
**production** 77:16 220:5
**professional** 34:21
**profile** 36:1
**profiles** 34:23, 25 35:14
**profit** 88:23
**program** 37:14 38:3 41:2, 21 81:6
**programs** 32:22 36:24, 25 37:1, 4, 6, 7, 8, 9, 12, 15, 24 39:24 40:5
**promised** 150:16 152:13 157:6
**promises** 156:3 172:15
**promoted** 58:8 143:8
**prompted** 215:6
**proper** 57:21 134:17
**proposition** 112:21 114:18
**prosecution** 12:2, 9
**protected** 16:3 22:3 27:1 226:1
**protocol** 107:13
**prove** 12:2, 9
**provide** 72:12, 14, 20 77:15 98:11 208:11 222:1
**provided** 14:3, 6, 8, 18 15:6 32:23 36:4, 25 38:13 40:1 41:5 70:8 71:8, 10, 15 98:10 135:3 151:8 155:2 164:19 175:20, 21 189:5, 7 206:22 221:10 222:2, 18
**proxy** 104:10, 18 116:21 117:10, 20 118:3, 7, 21
**prudent** 116:10
**Public** 8:12
**publish** 34:19
**published** 34:15
**pull** 46:11
**purpose** 147:9, 11, 15 148:1, 3
**purposes** 22:10
**pursuant** 8:7 225:5
**put** 25:20 35:10, 12 36:1 39:5 55:8 77:6, 19 78:3 82:25 85:6 87:22 89:6 95:23 101:10 112:13 187:8
**Putrino** 223:4, 5
**putting** 214:22 218:3

**< Q >**
**qualifications** 97:24 98:9, 12, 17 194:1, 3, 11, 16 198:23
**qualified** 191:22 192:2, 5, 25 193:7, 10 194:24 195:2 198:8 206:6, 10 207:1, 23, 25
**qualify** 198:1, 3, 5, 8 207:16 208:14
**qualifying** 192:10
**quarter** 99:9, 10 162:15, 18 173:1 179:2
**que** 197:20
**QUESTION** 7:1 13:17, 20 14:11, 16, 24, 25 15:1, 13 17:13 18:10, 24 19:1, 3, 4, 6, 14 20:3, 23 21:7, 8 22:2, 8 23:22, 23 24:7, 9, 10, 25 25:1, 3 27:3, 4, 7, 12, 13, 14 28:10, 16, 20, 23, 24 29:11, 12, 15 31:10 33:21 37:16, 20, 21, 22 38:4, 7, 9, 14, 20 39:1, 2, 7, 13, 14, 16, 20 41:13, 14 42:21 43:2, 7, 14, 15, 20 48:5 51:13, 17 57:4, 13, 17, 19, 20, 24, 25 58:5, 15, 20, 22 59:1, 10, 12, 16, 18, 19, 21 60:13 65:18, 25 67:3, 8 70:22 71:3 74:7, 19 76:4 77:14, 22 84:8, 13 85:18 87:10 90:24 91:14 93:12 97:6, 7, 12, 21 98:2, 5 100:4 102:9 105:21 106:7, 15, 17 107:2, 18, 24 108:1, 13, 18, 19, 22 109:3, 8, 14, 15, 17, 19 110:1, 2, 18, 24 111:3, 22, 25 112:2, 6, 9, 15 113:10, 23, 24 114:2, 8, 15 115:2, 5, 11, 14 119:11 128:17 131:13 132:5, 18 134:2, 5, 6, 8, 21 135:2, 9 136:17, 23 137:25 138:1, 5, 7, 16, 25 141:10, 19 142:6 147:21, 22 148:13 151:13 153:7 157:3, 8 160:21, 22 167:15 168:2 169:17 171:4 174:19 175:11 178:2, 3, 4, 10, 11 179:11, 12 180:11 183:10 185:5, 17, 19, 20, 23 186:4, 8 191:7, 10, 11, 16, 19, 24 192:20 193:12 194:15, 19, 24 195:2, 4, 5, 6, 9 196:1, 2, 4, 20 197:9, 13, 15, 21 198:7, 9, 13 200:25 201:10, 11, 13, 14, 19, 24 202:1, 15, 16 203:6 204:3, 22, 24, 25 205:1, 10, 11, 25 206:8, 9, 14 207:13, 19 208:10 210:18, 20 215:16 216:12 218:11, 19 219:10 228:3, 12
**questioning** 23:17
**questions** 10:5 18:17 23:6, 12 58:13 97:11 112:25 163:14 164:25 166:20 182:7 184:12 196:3 199:20 201:19 215:9
**queue** 162:18
**quit** 57:20 138:23 139:2 144:15 145:23 150:7 152:20 153:1, 3, 19, 20 154:3, 11 155:23 156:24 170:17 183:21 184:5
**quitting** 145:9, 13 158:20 170:12, 14 184:21 186:15

**< R >**
**racial** 123:7 152:5
**raise** 9:19 22:22
**raised** 27:23
**ran** 81:18
**random** 103:19, 21, 23
**Randy** 222:21
**range** 31:8, 10, 14, 15 211:3
**ranked** 105:6
**rapid** 166:5, 22
**Raymond** 12:23
26:14 212:23
**RC** 10:24
**reach** 215:9
**reached** 41:22 219:17
**reaching** 162:12 172:23 176:15 179:16
**reaction** 160:16, 19
**read** 11:4, 11, 20, 22 12:5, 14 14:12 17:14 18:7 19:7 23:24 24:10 25:3 27:4, 13 28:16 29:9 33:22 37:16 38:4 39:16 42:21 48:1, 4, 8 49:10 50:9 52:3, 9 54:8, 19 57:20 58:15 60:9, 13 61:24 62:9 63:12 67:3 69:15, 17 70:22 74:21 90:25 97:7 105:22 108:19, 22 109:17 110:1 111:25 114:9 115:5 120:24 121:1, 15 122:8 125:18, 20 128:8 129:7 134:6 138:1 141:7, 10, 11, 16 142:3 147:5, 12 150:5 152:19 159:17, 24 162:7, 10, 22 163:6 169:17 172:20 178:3 185:22, 25 186:4, 8 191:11 192:20 194:19 196:7 204:22 212:1 214:5, 10 218:1
**reading** 124:17 127:2 128:20 129:2 137:16 145:1 147:8, 14 163:9 172:4
**READS** 67:5 70:24 74:22 91:2 97:15 98:4 105:24 106:18 108:2, 21, 24 110:4 114:11 115:8 134:7 138:3 141:18 142:8 160:24 178:13 186:1, 5, 9 191:14, 17 192:23 194:21 196:9 205:1 228:7, 14
**ready** 64:19 152:24, 25 153:4,

17, 19, 20 154:12 155:5 156:22, 24 157:5, 10, 14 158:16 160:12 188:2, 3, 4
**realize** 65:9 97:9 111:10 179:10 193:9
**really** 129:3 153:11 222:15
**reask** 113:15
**reasking** 112:9 113:19 178:2 202:25
**reason** 45:7, 8, 14 114:23 140:16 142:24 198:10
**reasonable** 91:25 108:8, 9
**recall** 13:2, 9 15:21 16:17, 24 17:3, 25 20:6 24:2, 4, 14 27:17 30:3, 16, 19 32:11 33:18 34:6, 9 35:8 36:8 37:25 38:2, 10 39:25 41:4 44:2 51:7, 9, 11 55:9 60:21 62:16 63:22 64:5, 14, 16 66:13, 14, 15, 18 67:14, 17 68:2, 22 69:8, 11, 12, 21 70:4, 12, 13 71:5 73:1 74:14, 15 75:10, 15 79:16 80:4 82:10 87:5 99:4, 25 120:13 122:23 123:5, 10, 14, 16, 19, 22 129:20, 22 130:14 135:14 137:3 139:1 146:4 150:19 152:11, 16 153:15 154:13, 17, 23 161:21 165:14 167:3, 11 171:8, 10, 21 180:17 182:2, 22 183:17 188:18 191:2, 5 192:1, 6, 24 193:19, 25 194:10, 17 195:10, 13, 16, 19 196:11, 12, 16 197:3 199:7, 13, 21, 23 201:7, 10, 16, 23, 24, 25 202:6, 7, 8, 9, 12, 20 204:4, 9, 19 206:2 207:20 209:12, 15 210:3, 5, 8, 10, 16, 22 220:1
**recalling** 81:12
**receive** 39:22 104:24 117:25 118:16 215:25
**received** 34:4 118:3 122:19 139:25 186:11 189:12 213:11 216:15 217:2, 13, 16 220:14
**recitation** 115:19
**recognition** 37:25 38:3
**recollection** 29:21 32:19 36:23 65:24 182:3 206:22
**recommend** 99:2
**recommendation** 42:9 97:5
**recommended** 41:19, 24 67:21 97:3
**recommending** 162:13 172:24 176:15 177:20 178:21 179:17
**reconvene** 229:10
**record** 9:2, 13 11:5 23:1, 7 24:24 38:19 52:4 58:7 65:1, 2, 3 71:18 75:19 76:4 97:10, 14 100:25 101:1, 3 113:8 114:5 137:12 143:11, 17 157:23, 25 158:1 178:9 197:4 215:2, 8 223:24 228:17 229:14 230:11
**recorded** 87:14 88:3 215:19, 21 230:9
**records** 109:12
**record's** 102:1
**recruiters** 29:24
**red** 82:25
**reduced** 230:10
**refer** 51:6 62:14 63:21 64:3, 7, 11 136:7, 24 137:10 138:8 168:11
**reference** 48:15 103:18 117:22 124:3 135:16, 23, 25 157:19 168:1 219:3
**referenced** 141:21
**references** 219:2
**referencing** 103:25 219:4
**referral** 131:9
**referred** 50:16 64:5 126:15 131:5
**referring** 18:5 50:14, 19, 24 51:10 52:15 54:21 55:1 63:25 122:10 126:9 127:25 128:2, 4, 5 130:9, 11, 13 137:5 150:17, 19 151:16, 22 175:25
**refers** 63:23 126:1, 16
**reflected** 116:20 213:4, 18 218:22
**reflects** 105:13
**refused** 217:6, 9
**refusing** 77:19 198:10
**regardless** 11:12 116:12 140:5
**regards** 84:1
**region** 139:17
**regional** 142:10 143:6 161:8
**regions** 142:23 181:13
**register** 43:24
**registered** 44:2
**regulations** 96:16
**REINSTATLER** 1:25 8:11 9:4 230:22
**relating** 11:23 12:8
**relative** 68:23 230:13
**relatively** 89:5, 6 91:20 92:4 94:4
**relatives** 210:7
**released** 96:6
**relevant** 66:6
**relied** 185:8
**relocation** 44:11
**relying** 179:2
**remember** 34:11, 12, 13, 14 82:8 129:16 139:24 199:10 201:4, 17
**remembering** 99:6
**remotely** 130:4
**removed** 84:18
**re-passes** 103:24
**repeat** 11:21 14:25 15:1 17:13 23:23 28:24 29:1 83:25 90:24 98:2 105:21 106:16 107:25 124:2 142:6 147:21 160:22 193:12 195:5 228:3, 5
**repeated** 28:25 129:6
**repeating** 185:11, 16
**repeats** 47:12
**rephrased** 110:1 112:15
**replicated** 214:10
**replied** 147:24
**reply** 138:19 158:6 163:22 170:2
**report** 181:13 183:22 184:15, 16, 17
**reported** 85:12
**REPORTER** 1:25 8:12 9:4, 20, 21 10:1, 16, 21 14:14, 19, 21, 22 15:2, 3 17:15, 16 18:9, 12, 15, 20, 21 19:8, 9, 10, 12 21:5, 8, 10 23:25 24:1, 12, 13 25:4 27:6, 8, 15, 16 28:17, 18 29:2, 3, 11, 13, 14 33:23, 24 37:17, 18 38:5 39:17, 18 42:22, 23, 25 53:19 58:3, 17, 22 62:20 67:4, 5 70:23, 24 74:22 78:13 91:1, 2 96:8, 12 97:8, 15 98:3, 4 103:3 104:3 105:23, 24 106:18 108:2, 20, 21, 23, 24 109:1 110:3, 4 114:10, 11 115:7, 8 117:2 119:9 134:7 138:2, 3 141:9, 18 142:3, 5, 8 149:25 159:6 160:23, 24 161:24 178:12, 13 180:21 185:24 186:1, 2, 4, 5, 9 187:1, 14 188:1, 4, 11 191:13, 14, 17 192:15, 21, 23 194:20, 21 196:8, 9 204:23 205:1 228:6, 7, 11, 14 230:1, 23
**reporting** 84:10 86:15
**represent** 12:20
**representation** 176:6
**Republic** 29:22 30:17 31:3
**request** 14:3 17:17 44:12 68:3 71:18, 24 72:2, 20 76:1 189:1, 2, 3 220:5, 9, 11
**REQUESTED** 14:19, 22 15:3 17:16, 21 18:12, 21 19:9, 12, 24 20:2 24:1, 13 25:4 27:8, 16 28:18 29:3, 14 33:24 37:18 39:18 42:23, 25 58:3, 22 67:5 70:24 74:22 75:21 91:2 97:15 98:4, 9 105:24 106:18 108:2, 21, 24 110:4 114:11 115:8 134:7 138:3 141:18 142:5, 8 160:24 178:13 186:1, 5, 9 188:25 191:14, 17 192:23 194:21 196:9 205:1 228:7, 14
**required** 139:20 140:22
**requirements** 203:15
**reread** 178:11
**researched** 67:19
**reserve** 76:4
**residence** 12:24 26:5
**residences** 26:16
**respect** 21:22 22:24 72:10 85:22 88:5
**respected** 58:11
**respond** 53:14 63:19 121:6, 20, 21 122:7 147:23 152:23 154:7 155:6 156:21 162:9 163:15 165:3 166:6, 9, 10 181:8 182:19 225:3
**responded** 121:5, 14 126:24 148:11, 24 203:19
**responding** 154:10 164:20 183:5
**responds** 62:3 121:6 122:1, 2 144:9 168:9, 23 224:5
**response** 50:12 61:14 72:21 77:17

113:22 120:24 121:1, 9 122:8, 25 127:1, 13 128:8, 24 138:17 147:12 148:7 150:6, 12 159:19 160:3 165:12, 17 166:15, 24 171:22 172:4, 11 181:9, 14 189:3 215:21 219:25 220:5
**responses** 77:10 220:13
**responsibility** 58:9 96:19 97:1 142:22 171:15
**responsible** 84:9, 12 85:19 144:16
**rest** 61:24 97:2
**result** 39:23 167:8
**resume** 35:10, 12 36:4
**resumes** 35:13, 24
**Retail** 79:24 81:16, 20 85:2 88:7, 8, 11 91:16 101:25
**retain** 108:10 110:8, 14 111:15, 17, 19 114:19
**retire** 138:23 140:7, 16, 19 141:3, 21 142:14 143:1 144:15 145:23 181:15, 19, 21 182:9, 18 183:21 184:6 194:17 203:20
**retired** 191:1, 20, 25 192:4, 6, 24 193:13, 18, 20, 21, 23, 24, 25 194:7, 10, 12, 18 195:7, 11, 24, 25 196:18, 22 197:5, 15, 21 198:11, 16, 22 199:3, 11, 17, 24 200:11, 16, 23 201:1, 12 203:10, 15, 22, 24 204:18 205:10, 16, 23 206:12, 25 207:9, 14, 15, 22 208:9, 13, 16, 23 209:24 210:1, 11, 15, 21, 22 215:13 216:17 217:22, 24
**retiree** 206:4
**retirement** 36:24 139:3, 5, 9, 10 141:5, 8 191:23 192:3, 5, 7, 10, 25 193:1, 7, 10, 14, 15, 16, 20 194:1, 4, 5, 11, 24 195:2 197:12, 14, 25 198:1, 4, 14, 15, 19, 23 200:18 203:12, 15, 18, 24, 25 204:1, 2 205:8, 20, 24 206:7, 11 207:1, 4, 16, 24, 25 208:2, 8, 15, 23 210:1, 11, 23 214:3 215:14 217:15, 16 218:8, 9, 14, 17 219:5, 8, 12 226:22 227:6, 8, 12
**retiring** 145:9, 13 184:21 186:15 192:9 193:3
**retrieve** 66:12, 23 67:13, 22 68:25 69:20 70:2
**retrieving** 68:4 212:25
**return** 191:21 216:21
**returning** 44:15 99:11
**revenue** 85:24 86:24 87:4, 8, 13, 14, 18 88:3, 8, 14, 21, 24 89:22, 23 90:6, 12, 19 91:10, 17, 21, 22, 25 92:10, 16 93:5, 12, 15, 18, 21 94:3, 5, 7, 25 95:4, 7, 9
**revenues** 92:8 95:12
**review** 14:4 17:9 18:3 19:2, 5, 16, 18 20:4 24:18 25:2, 6 48:10 86:1 116:3 122:20 139:12 141:23
**reviewed** 13:24 14:1, 2 17:21 18:2 19:20, 21, 23 20:1, 3, 7 104:21 184:18 185:2
**reviewing** 18:16
**reviews** 15:18 161:8
**rewrite** 144:25
**Rich** 30:18
**Richardson** 30:19
**ride** 161:1, 2
**riding** 159:18, 25 161:2, 12, 18
**right** 9:20 10:1 11:20 13:6 17:22 19:22 28:11 37:6 39:8, 17 40:7, 8 47:24 48:1, 5, 6, 19 49:5, 8 50:3, 15, 17, 25 52:8 54:1, 9, 11, 17, 22 55:6 56:1 60:9 63:14, 25 64:12, 24, 25 65:9, 16 66:3 69:15, 23 71:10 72:6 73:7, 21 74:1 76:10, 16, 18, 21 77:2, 4, 23 79:21, 22 80:12, 19, 23 89:3, 11, 12, 17 91:9, 21, 23 92:2, 5, 18 93:6, 23 95:2 96:2, 6, 17 97:16 98:7 100:23 101:2, 20 102:15 103:2, 4 106:6 107:10, 16 109:14 111:11, 25 114:14 115:22 116:8, 17 120:21, 24 121:9, 18, 22 124:8, 11, 16, 18 125:15, 24 126:2, 6, 12, 17 127:4, 8, 12, 18 128:1 129:1, 6, 7, 8, 19, 20, 24 131:6 132:7, 16, 21, 23 133:3, 4, 5, 6, 13, 18, 19 135:20, 23, 24 136:3, 8, 10 137:15 139:18 141:3 142:15 143:5, 16, 21, 23, 25 144:1, 14 145:5, 9, 14, 23 146:13, 23 147:5, 20, 23 148:5, 9, 14 149:19 150:12, 18 151:2, 3, 9, 14, 25 153:18, 20 154:4, 8 155:10, 22 156:9, 12, 13, 15 157:12, 13, 17 158:12, 18, 22, 23 159:1 160:6 161:19 162:9, 19 163:2, 6, 12 164:1, 4, 8, 12, 14 165:1, 3, 17, 23, 24 166:1, 2, 7, 11, 23, 24 167:1 168:5, 11, 17, 23 169:2, 5, 7, 14, 15, 24 170:11 171:22 172:2, 5, 7, 10, 20 173:3, 21, 24 174:6, 10, 12, 17 177:14, 21 178:19 179:20 180:16, 19 181:5, 18, 19 182:10, 11, 15, 20 184:1, 21 187:2 188:10 189:16, 24 190:4 192:10, 13 193:4, 11 194:6, 7 195:4 196:21, 22 199:3, 8, 17 200:8 201:3, 9 203:14, 16, 22 204:12 207:1 209:6, 8 211:18 212:17, 22 213:5, 21 214:2 216:4, 22 218:10, 15, 18 219:1, 6, 9 220:9, 18 221:5 222:20 223:6, 9, 13, 16, 18 224:20 225:8, 15, 16 227:20, 22 229:10
**right-hand** 46:5
**rights** 76:4
**ringing** 125:22 126:5, 8
**risk** 60:15
**Rob** 220:25
**Robert** 204:7 220:18, 20
**rock** 177:1 185:14
**Rodriguez** 30:12 205:12
**role** 23:16 30:24, 25 143:9 179:6 205:19 217:10
**role-playing** 21:13 22:2 23:3
**Roman** 25:17
**Rome** 3:8 8:5 9:6, 18
**Ron** 188:20, 21 190:20, 22 191:1 195:6, 22, 23 197:5 198:11 217:14
**Ron's** 190:9, 11
**room** 163:8 168:22
**Rosemary** 27:23
**roughly** 93:14 166:13
**RULE** 8:8
**Rules** 8:8 207:13
**run** 99:13
**running** 173:15 174:13 175:18

< S >
**Saba** 2:5, 7 9:14 10:19 15:25 16:6, 9, 12 20:10, 13, 16 21:2, 14, 17 22:5, 17 23:5, 13, 18, 22 24:20, 24 26:24 36:2 38:8, 21, 24 39:1, 8, 11 43:6, 8, 11, 15, 19, 25 45:1, 9, 16 51:13, 17 53:2, 5, 11 55:15 56:3, 11, 25 57:2, 6, 10, 12, 15, 22 58:1, 21, 23 59:14, 21 60:1, 19 64:19, 24 71:3, 13, 22, 25 75:25 77:8, 21 87:9 90:7, 13, 20, 22 91:4, 12 92:6, 12, 19 93:17, 25 94:6 96:24 97:21 98:1, 8, 15 100:4, 13, 18, 23 103:7, 9, 14, 17, 23 106:7, 14 107:1, 17, 23 108:3, 12, 25 109:9, 16, 18, 21, 23 110:5, 11, 18, 21 111:21 112:1, 5, 19, 22 113:1, 3, 7, 9, 14, 25 114:3, 7, 12, 16, 21 115:1, 9 119:17, 20 128:16 131:12, 19 132:4, 14, 17 133:20 134:1, 8, 20 135:1, 8 136:16, 20 137:1, 7, 9, 15, 17, 20, 23 138:4, 15, 24 140:20 142:16 143:3, 13 145:2 148:18, 22 149:2, 7, 14, 20 151:12 152:9 153:7, 10, 13, 22 155:25 157:2, 22 159:3 160:20 165:25 166:8, 17 167:9, 15 169:21 170:21 171:1, 6 174:19 175:6, 8, 10 176:3, 6 177:7, 9, 15, 18, 22, 24 178:4, 14, 20, 23 179:19, 21 180:2, 5, 10, 14 183:9 184:10, 23 185:3, 20 186:6, 19, 21 187:3, 13 188:8 189:20, 23 194:8, 14 195:8 196:4, 6, 19, 23, 25 197:8, 16 198:13 200:24 201:18, 22 202:4, 8, 11, 16, 19, 22, 24 203:2, 6, 17 204:5 205:25 206:13, 16, 18 207:3, 17 208:17, 20 215:15 216:11, 23, 25 217:17 218:11, 19

219:10 225:25 226:5 228:20, 25 229:6, 9
**sad** 163:17, 23 164:14 165:4, 11 166:14 167:7, 22 168:5 169:1, 3
**Saint** 33:8
**salaries** 31:24 105:18 107:15, 21
**salary** 31:8, 10, 11, 20 32:4, 5, 9 110:16 111:20 114:20, 25 119:5
**Sales** 33:9
**sarcastic** 138:19
**save** 103:5 150:9
**saved** 215:7
**saw** 64:17 70:4 124:8 215:20
**saying** 14:11 23:2 56:14 62:4 93:13 94:18 99:24 111:8 120:19, 21 130:25 131:2 138:11 153:24 158:19 170:11, 15 171:8 173:20 174:2 175:2 180:16 183:17 184:2 197:18 199:13, 14, 21
**says** 20:18 48:12, 22 49:19 50:3, 9 51:24 63:2, 3, 16, 24 121:3, 19 126:5 127:22 128:20, 21, 22 129:1, 3 130:6, 9 144:2 145:17 146:24 153:3, 19 155:23 157:9, 14, 15, 16, 19 158:7 160:1 163:1 164:10, 11, 24 178:18, 25 193:6 194:5 202:5 220:23 221:19 222:6, 13, 25 223:4, 10, 16, 23 224:3, 19
**scan** 25:8
**scanned** 25:5, 9
**scheduled** 117:19
**School** 30:6, 12, 24 31:21 33:7, 9, 15 204:16 209:5 226:18
**Schrantz** 128:9
**scope** 71:23
**screen** 69:13, 15, 16, 18 187:21, 22
**script** 190:16
**search** 74:18 220:6 222:4
**searched** 225:20
**seat** 187:1 188:8
**second** 14:14 15:2 17:15 19:8 23:25 24:12 27:6 28:17 29:2 33:23 51:23 67:4 70:23 78:22 81:20 91:1 119:17, 18 122:7 141:9 143:19 158:12 177:3 178:12 185:24 192:22 196:8 218:22 228:6
**second-largest** 89:24
**seconds** 125:10 154:4, 6, 7, 10, 15, 21, 22 158:7 159:22 166:23 182:12, 19 183:3, 14
**Section** 10:24 11:4, 11, 15, 17, 20, 22 12:4, 5, 6, 14, 15
**secure** 215:3
**securities** 81:16, 19, 21, 23, 24 85:6, 9, 17 89:19 91:20, 24 96:3 102:5, 21
**see** 10:24 11:2 46:5, 19, 21 47:13, 16 49:3, 4, 7, 13, 19, 22 51:24 52:3 54:5, 13 60:9 61:2 62:23 63:15 70:2 78:9 85:13 87:13 115:17 116:4 120:5 121:1 124:4, 5, 8, 12, 13, 21, 25 125:2, 7 132:25 143:19, 23 147:1 154:4 155:4 156:6, 9, 16 158:14 159:9, 13, 17 162:3 163:3 166:1 169:10 172:18 181:2, 5, 9 187:19 188:23 192:11 215:5, 18 216:6 217:25 218:7, 10 219:5 225:1
**seeing** 85:25 87:12, 19 214:25 218:6
**seek** 43:18
**seen** 35:24 45:23 104:12, 22 117:6, 14 118:13 132:24
184:16 188:14 211:8
**selecting** 97:2
**selects** 96:16, 22
**seminars** 37:6, 7 40:5
**send** 50:10 65:12 66:2, 20 126:23 127:6 164:22 212:8 214:9, 12 219:24 222:8, 10, 14, 22 223:6, 20 224:1, 10, 13, 14
**sending** 126:21, 22 214:15, 18
**sends** 127:5 166:6 214:8
**senior** 31:6, 7 44:13 96:16, 20
**sent** 47:9 49:8 50:7 54:10 65:10 162:20 175:17 222:9, 23 223:2, 8, 12, 22 224:17
**sentence** 212:1
**sentiments** 219:6
**separate** 77:16
**separation** 145:7
**September** 180:25 181:18
**series** 37:5 38:1 40:2 130:22
**serious** 139:1
**serve** 75:25 209:20
**served** 143:6
**service** 42:17, 18, 20 43:4, 13, 22 191:23 194:17 201:2 206:7 208:3
**services** 29:25 76:22
**set** 230:6
**Seuss** 41:25 42:7
**seven** 124:13 139:20, 21 140:22 141:1, 2 142:14, 19, 20, 21 179:19
**seventh** 113:19 179:21, 24
**severance** 146:11
**Shaffer** 15:16 58:10 59:4, 6, 9 98:10 122:12 136:13 150:18 151:18 176:21 179:3 186:12 216:20 217:2, 13
**shareholder** 104:8, 20, 24 117:18, 25 118:16, 24 163:17, 23 164:15 165:4, 11 166:15 167:7, 22 168:6 169:2, 3
**Shareholders** 5:17, 19, 21, 23 104:17 117:21
**shares** 104:18
**shaved** 25:20
**short** 140:12, 14
**Shortly** 44:9 217:3
**shot** 186:25
**show** 34:23 155:17
**showered** 25:20
**siblings** 214:20 218:2
**Sid** 74:10, 15
**side** 48:13
**signature** 219:14
**silver** 50:10, 13, 15, 20, 22, 25 51:6, 10 53:15 54:20, 22 55:17 56:15 59:7, 8, 24 60:3, 18 127:22 128:6
**similar** 215:12
**simple** 112:20 114:18 147:22 198:9
**simply** 39:4
**Sir** 9:19 10:23 20:4 25:22 78:12 97:12 201:11 208:3
**sit** 70:5 204:11 208:25 209:4
**site** 215:8
**sitting** 34:14
**six** 49:13, 16, 18 60:23, 24 94:11 105:7, 9, 18, 19 107:21 124:13 182:19 183:2, 14
**skill** 230:12
**sky** 81:6, 10
**slur** 123:7 152:5
**sly** 52:5
**small** 78:20 79:5 83:20 84:4 89:5, 6, 19 91:20 92:4 94:4 95:1 101:17
**Smith** 2:6 9:16
**sniping** 120:16, 18
**software** 46:13, 15, 16 66:23, 25 67:12, 16, 18, 21 68:14, 16 69:5, 7, 18, 23, 24, 25
**solemnly** 9:21
**solve** 144:7
**somebody** 178:7
**someone's** 173:21
**son** 99:2 212:21 223:17
**son-in-law** 67:20 68:13
**son-in-law's** 67:24
**sons** 216:19
**sooner** 143:1
**Sorry** 14:15 16:20, 21 18:15, 20 19:10 21:5 24:23 27:15 49:15 68:7 81:17 106:17 117:19 121:14 124:2, 6 127:9 129:9 144:3 155:18 163:13 167:23 184:2 190:21 225:4 228:13
**sort** 38:15 69:10 77:12
**sounds** 222:7 228:21
**SOUTHERN** 1:2 9:10
**speak** 41:10 51:3 69:24 97:14 114:5 161:10 176:11 213:7
**speaking** 38:18, 23 39:15 55:3, 20 57:21, 23 106:22 162:11 172:22 176:14 177:20 179:15
**speaks** 137:13 145:1 149:15
**specific** 13:15, 18 18:25 25:12 28:6 29:8 30:3 34:4, 18 38:2 40:10, 23 49:15 51:20 66:13 68:23 70:20 75:1, 15 82:16 84:17 90:9 139:7 140:10 145:12 189:1 200:2 201:15 206:2
**specifically** 18:5 36:9 51:7 62:23 63:23 68:2 99:5 120:13 122:23 152:16 153:15, 18 165:7 168:16 171:21 188:18 192:1 193:19 204:19
**specificity** 66:18
**specifics** 56:19 75:10 146:5 182:23 184:12 192:6

**speculate** 53:16 61:17, 19 62:6 86:6 106:9, 19 107:11 108:4 153:25 213:19
**speculating** 56:17 92:23 94:12 134:10
**speculation** 41:9
**speeches** 58:13
**Spence** 84:14, 17, 18 85:3, 5, 14, 16 97:4 116:23 117:12 118:10, 23 120:11, 17 135:24, 25 136:14 174:23 183:22 184:6, 15, 17, 19 186:16
**spoke** 74:3, 6, 7
**spoken** 28:8 30:12 74:9 154:23
**spoliate** 72:8
**spousal** 226:2
**spouse** 27:1, 2
**spreadsheet** 212:5
**spring** 62:13
**Square** 3:20 173:12 176:16
**Stagnaro** 2:7
**stamp** 46:4 53:25 124:22
**stands** 204:14, 15
**start** 77:6 229:6, 7
**started** 83:4 84:7, 14, 25 200:12 225:10
**starting** 22:18
**State** 8:12 12:18, 22 57:8 71:17 109:10 230:2
**stated** 194:16
**statement** 11:7, 9 12:2, 9, 10 92:21 104:10 107:3 108:14 111:24 112:13 117:10, 20 118:8, 21 135:18 136:3 148:5 154:11 156:24 164:21 165:11 167:7 170:16
**statements** 11:23 12:7, 12, 13 85:25 86:7 87:1, 2, 12, 19 90:16 91:6, 15 92:14 93:20 94:12, 24 117:24
**STATES** 1:1 9:10
**station** 66:12
**Statute** 5:8 10:12 11:25
**stay** 139:14 141:24, 25
**stayed** 145:10 146:4, 5 163:8
**step** 210:24
**Steve** 30:17
**STIPULATION** 8:1
**Sto** 31:5
**Stock** 29:23 30:17 31:6 32:22
**stolen** 66:8
**stood** 140:13
**stop** 57:8 62:3 100:16, 21 154:20 213:16, 22 225:4, 11 228:19
**stopped** 72:11 173:15
**stored** 225:15
**straightforward** 112:25 198:9
**Street** 2:18 3:10 8:5 26:7, 11, 15, 17
**strong** 41:1
**study** 36:21
**stupid** 150:11
**subcategories** 82:5 89:23
**subject** 10:10
**submit** 97:19, 24 98:12, 17
**SUBMITTED** 230:25
**subpoena** 206:8
**substance** 20:15 22:15, 18, 20 23:3
**substantial** 92:8
**successful** 139:20 140:23 142:18 143:7
**succession** 116:3, 11, 16 166:6, 23
**successor** 162:13, 17 172:24 176:16, 18 177:21 179:18
**suck** 128:22 130:7 132:1
**sucked** 62:12
**sucks** 160:1
**suggest** 181:13
**suggesting** 170:14 183:2
**suit** 25:21
**SUITE** 8:5
**summa** 34:8 35:1, 5
**summary** 53:23 120:1
**summer** 37:5
**Summit** 209:4
**Sunday** 217:12, 13
**Sundrup** 30:14
**supplemental** 76:1
**supplemented** 75:24
**supported** 79:12 179:3
**suppose** 190:22
**Sure** 14:17 18:11 25:15 40:10 41:5 42:13 54:10 71:19 72:3, 4, 7 74:21 75:3 79:11 81:6 82:3 103:25 122:14, 18 141:11 142:7 157:22 158:18 167:2 195:16 198:5 201:5, 15 204:9 212:7 228:4, 20
**surely** 69:14
**surprise** 214:1, 2, 21 215:10 218:3 224:9
**Suzanne** 26:1, 3
**S-U-Z-A-N-N-E** 26:1
**swear** 8:13 9:21 11:8
**Sweeney** 6:21 26:6 67:25 189:6
**swing** 62:13
**sworn** 9:20 58:12 230:7
**Sylvania** 2:19
**symbol** 122:3
**system** 46:13 225:15, 20

< T >
**ta** 100:15
**table** 109:4 186:24 187:12 227:2, 12, 14 228:1
**tag/tablet/laptop** 215:7
**take** 9:7 64:18, 22 80:23 100:16 104:3 140:6 142:13, 19 145:14, 19, 20 146:18, 22 147:10, 17 148:2 157:21 228:19
**taken** 7:4 8:4, 7 21:1 22:6 184:14 230:5, 12
**talent** 108:10, 11 110:9, 14, 15 111:15, 17, 19, 20 114:19, 20, 24 140:2, 11
**talk** 22:18 74:2 176:13
**talked** 30:1 213:21
**talking** 29:22 75:11 80:16 88:21 89:1 126:8 144:20 146:7 163:24 169:14, 23, 25 170:7, 11, 25 171:5 178:21 184:21 185:8 210:14
**Tanner** 118:10
**target** 32:20, 22
**Tayfun** 75:7 118:9, 22 121:11 122:3, 12 128:21 130:7, 9 131:1, 2, 4, 5 133:19 135:6 136:11, 13 150:18 151:18 172:9, 12
**Te** 68:7
**team** 58:11
**tears** 125:22
**technology** 225:13
**Telephone** 2:10, 20 3:12, 22 47:19 64:2, 9 73:12, 14
**tell** 22:19 30:9 32:7 38:19 60:5 66:20 68:15, 25 81:9 86:23, 25 88:1 98:19, 22 107:5 111:12 114:23 115:3, 13, 15 122:21 124:6 128:21 130:6, 9, 25 131:1, 2, 4, 25 141:20 174:16 182:17 183:20 191:1, 4 192:4 193:18 194:12 195:7, 15 197:15, 21 198:10, 21 199:4, 15 203:14 204:17 208:14, 15, 25 209:6, 8, 22, 23 210:7, 9, 15, 20 213:9, 19, 24 216:17 217:6, 11, 23 222:3
**telling** 38:24 131:3 153:5 163:10, 11, 13 164:25 166:19 171:20 173:21 183:6, 12 184:13 193:14 200:10, 13
**tells** 144:6
**ten** 62:23 86:9 88:10, 16 92:15 94:8, 14, 16, 17 95:19, 24 96:2 125:25 168:23 185:9 200:21, 22 201:3
**ten-plus** 200:21
**tenure** 191:22 193:8 194:17 201:2 206:7 207:6
**term** 12:12 51:9 105:2, 3
**terminate** 45:6
**terminated** 44:18 82:22 204:21 207:21 210:17 216:20 217:1
**termination** 83:5, 12 89:16 191:21 211:25
**terms** 13:17, 21 18:25 31:19 32:16 33:1 34:18 37:11 38:2 41:9 42:10 49:14 56:17 68:14 70:20 75:1 82:16 87:4, 7 90:9 92:9 93:15 95:21 138:9 154:1 168:2
**testified** 18:2 20:1 73:23 116:14 148:16 196:21 197:2 212:13
**testify** 70:5 206:9, 11, 17, 20 230:7
**testifying** 149:12
**testimony** 9:22 10:9 14:7, 19, 22 15:3 17:16, 20 18:12, 21 19:9, 12 24:1, 13 25:4 27:8, 16 28:18 29:3, 14 33:24 37:18 39:18 42:23, 25 55:12, 14 56:1 58:3 67:5 68:10 70:24 71:6 72:23 74:22 91:2 97:15 98:4 102:2, 4 105:24 106:18 108:2, 21, 24 110:4 114:11 115:8 131:16 134:7 138:3, 14 141:18 142:5, 8 148:19 149:14 151:21 153:12 155:20 156:5, 23 157:4 158:19 160:24 165:10 166:14, 18 167:6 173:5 176:9,

10, 17 178:13 182:4 183:7, 8, 13, 15 186:1, 5, 9 191:14, 17 192:23 194:21 196:9, 17 199:11 200:11, 12 205:22 206:24 207:15 227:10, 11 228:7, 14
**Text** 5:9, 11, 13, 24 6:3, 5, 7, 9, 11, 13, 15, 17, 20 15:19 46:3, 11, 18 47:7, 8 48:19 49:8 53:23 54:10, 16 55:3, 23, 24 56:9 60:11 62:8, 24 63:8 64:12 65:22 66:7, 20, 21, 24, 25 67:2, 6, 9, 11 68:6, 7, 18, 19, 20, 24 69:20 70:3, 6, 7, 8, 11, 19 71:2, 8, 10, 16, 20, 21 72:10, 11, 13, 15, 20, 22, 24 73:6, 10 74:15, 17, 23, 24, 25 75:7, 9 120:4, 12 121:15, 16 122:15, 22 123:23 124:16, 17, 24, 25 125:1, 20, 21 127:16 128:3, 4 129:19 132:20, 25 133:11 136:3 138:17, 20 145:3 148:7 150:4, 5 151:17, 23 152:1, 19 154:17 156:1, 9, 13 158:7, 24, 25 159:9, 11, 12, 15, 21, 24 160:1, 10, 17 162:2, 3, 10, 23, 24 163:2, 9, 15, 16 164:2, 22 165:12, 23 166:1, 16, 19, 21 167:22 168:2 169:1, 3, 9 172:20 175:17 180:8 181:5 182:18 184:2, 16, 18 211:1, 12 212:25 215:9, 22 216:15 217:2, 5 219:25 220:22 221:6 225:23
**texted** 183:4
**texting** 129:24 154:20 159:10
**texts** 60:9 61:24 65:8, 14 66:19 75:16, 18 120:1 122:17 130:22 155:17 158:6 163:25 164:17 165:21 166:6, 22 182:11 184:13 185:1 214:11 216:1 217:13 221:6
**th** 75:9 182:10
**Thank** 10:1, 19 16:11 45:20 117:2 119:20 187:23 214:15, 18 218:17 224:6
**thanking** 219:6
**Thanks** 118:12 214:22 218:4, 10 219:1 221:19 224:3
**that'd** 75:23 76:2
**thats** 50:13
**theory** 175:3 179:10
**therea** 217:4
**Theresa** 26:6 118:10 145:17 189:6
**Theresa's** 145:4, 5
**thing** 80:10, 16, 22, 25 96:10 104:1 185:11, 16
**things** 23:2 97:9 104:15 112:16 116:1 219:8
**think** 20:16 21:19 22:8, 17 30:14 38:9, 14 60:15 62:18 64:20 77:8 80:23 81:5 85:7 91:24 92:22 100:18 103:21 104:15 116:10 126:19 134:23 162:14 168:14 172:25 173:21, 22 174:21 187:5 189:17 190:7 203:19 212:8 219:2 220:24 221:23 229:1, 3, 4, 5
**thinking** 48:9 103:17
**thinks** 121:4 135:16
**THIRD** 1:12 3:4, 17 9:9 12:16 14:3 28:2 36:4 37:10 40:7, 9, 12, 22, 24, 25 41:3, 6, 8, 10, 11, 15, 18 42:1, 3, 6, 8, 10, 16 44:5, 16, 22 50:19 51:10 54:22 58:7 76:8, 20 79:3 81:10, 16, 18, 21, 23, 24 85:6, 9, 17 89:19 91:20, 24 96:3, 15 99:15, 19 102:5, 13, 16, 21 104:25 118:17, 24 131:24 138:23 139:4, 6 155:12 156:4, 25 157:6, 13, 16, 18 158:13, 20 160:13 169:15, 23 170:1, 8, 10, 12, 14, 17, 24 171:3, 5, 15 172:16 173:16 177:2 181:21, 23 183:21 188:22 189:1, 23 191:1 194:13, 18 195:7, 11 197:5, 12 203:12 204:21 205:21 208:2 214:4, 12, 20 216:18, 20 217:2, 8 219:5, 17 220:21 225:24 226:11 227:3, 17 228:2, 10
**third-parties** 102:12
**third-party** 81:4
**Third's** 85:23 96:20 118:7
**Thomas** 3:19
**thorough** 86:1
**thought** 16:1 147:9, 15 148:1 173:15 174:4, 12, 13, 14 175:15, 18 176:17 178:25 184:6, 19 229:1
**Thoughts** 147:7
**threatening** 54:20 56:15 59:7, 24 60:3
**three** 49:18 66:17 85:16 94:20 102:7, 22 122:9, 13 123:2, 20 124:9, 23 125:1 130:17 131:6, 10, 11 136:8 150:9, 14, 17 151:15, 16, 23 152:12 154:7, 10, 15, 21 176:21
**three-quarters** 49:12
**threshold** 21:20
**thumbs** 127:13 132:25 133:6, 9, 11, 13 148:6
**Thursday** 140:2, 11
**Tim** 84:14 85:3, 5, 14 120:11, 17, 20 135:24 136:14 162:13, 17, 24 163:7, 13, 18 164:7, 11, 21 165:1 172:24, 25 173:2, 9, 14, 18, 22, 25 174:6, 15 175:15 176:15 177:20 178:21 179:17 183:22 184:6, 15, 17, 19 186:16
**time** 9:5 13:11, 14 18:1 20:7 26:17 31:11 32:11 34:6, 9 35:8 36:8 41:2, 18 44:8 45:7, 14 47:7, 9 48:15 49:14 51:8 60:5, 21 62:8, 16 64:5, 16 66:6, 9 75:1, 4, 22 79:15 80:5 82:3, 10, 14 83:7 85:22 99:18, 21 112:14 113:11, 19 121:16 122:24 124:21 125:1 130:4 131:22 136:9 139:9 140:14 145:10 146:6, 10 150:22 151:3, 9, 10 152:18 153:24 155:11 158:4 161:9, 21 163:8, 21, 24 164:1 167:12, 21 168:15, 24 174:4, 16 175:7 176:24 177:25 179:21, 24 180:15, 17 182:8 188:16 189:23 196:16 200:3, 19 201:22 202:14, 17, 19, 23, 25 203:9 209:16 210:5 219:3 220:1 226:9 227:14, 18, 22 228:19 229:6 230:6
**timeline** 143:19 146:25
**times** 57:18 59:15, 17, 22 103:24 113:10 114:16 183:20 227:16
**Timestamp** 125:13
**Timothy** 118:10, 23
**Tiny** 95:2
**title** 162:14, 17 172:25 173:23 179:1 230:6
**titled** 81:20
**today** 9:4, 5 13:11 15:22 17:2, 7 23:21 24:17 25:11, 14 26:22 55:10 62:13 70:5 77:10 82:4 103:18 104:14, 22 109:15 150:7 152:20 153:3, 19 154:3, 11 163:8 167:13 177:17 188:14 210:13
**today's** 22:10
**told** 56:8 58:9 68:17 73:4 75:11 97:3 98:23 99:1, 3, 4, 5, 6, 12 107:8 108:5 110:22, 25 112:8, 18, 22 115:3, 6, 11 138:22 139:19 140:4, 5, 15, 18 141:23 172:13 173:16 176:19, 22 177:12, 14 179:7 181:20 183:24 185:7, 12 191:20, 24 192:1, 2 193:11, 13, 17, 19, 20, 23 194:6, 10, 18 195:10, 16, 17, 24 196:18, 21 197:4, 11 198:5, 16, 21 199:11, 14, 17, 18, 19, 23 200:4, 16, 22 201:1, 4, 5, 12, 15 202:19 203:9, 11, 15, 18, 21, 23 204:4 205:7, 9, 16, 18, 23 206:6, 10, 11, 21, 24, 25 207:4, 14, 15, 19, 20, 22, 23, 25 208:13 209:9, 11, 18, 25 210:10, 22 213:15, 22, 25 216:19, 21, 24 217:1, 9, 21 225:4
**Toledo** 27:22, 23 33:9 40:16 42:11
**Tom** 121:3
**tomorrow** 144:13 223:24 229:2, 4, 11
**ton** 127:6
**tongue** 170:3, 4
**tongue-in-cheek** 170:2
**top** 10:24 15:21 30:16 46:19, 20 47:8 62:23 77:6 78:2, 4 88:9 95:23

96:17 130:16
144:4 162:23
228:18
**topics** 7:3 20:9, 17, 19, 22 21:19
**total** 32:13, 15
33:1 92:16 93:5
96:5
**totally** 110:2
**track** 58:6
**Tracy** 41:21
**traditional** 215:14
219:8
**traditionally**
218:24
**Trager** 30:17
**transcript** 230:5, 12
**transitioned** 85:7
**travel** 226:15
**traveling** 226:16
**Treasury** 79:6
84:6, 7, 13, 20 87:6, 13
**treated** 83:24 84:1
**tree** 103:5
**trick** 52:13
**tried** 59:17
**trip** 226:19
**true** 12:10 35:16, 19, 23 55:14 56:2
65:22 69:16
128:20, 21 140:8
174:14 177:3
182:12, 14 202:5, 11 230:11
**Trust** 30:4, 18
31:6 44:8, 9 82:1
94:4, 7 96:3
102:23
**truth** 9:23, 24
11:8 147:10, 16
148:2 230:8
**truthfully** 10:5, 7
**try** 21:19, 21
22:11 113:22, 23
137:20
**trying** 21:20
38:18 39:1, 11
57:7 97:12, 13
112:13 113:16
123:6 124:2 149:5, 7, 8 169:19 178:6
199:18 202:1, 14
208:1
**TS** 120:8, 10
135:20
**TT** 122:9, 11
**turn** 214:6
**Tuzun** 75:7, 11, 17
116:22 117:11
118:9, 22 122:12
224:10, 11
**twice** 179:9
**two** 10:16 23:2
30:16 49:18 66:16
83:9, 13 87:17
88:20 91:9, 17
100:21 130:17, 22
136:11 141:14
155:4 159:10
160:5 168:4 174:7, 16 214:8
**two-plus** 139:14
141:25
**type** 67:15 138:21
168:15
**typewritten** 230:10

< U >
**Uh-huh** 47:17
48:23 54:12, 15
61:1 63:18 69:19
87:16 89:6 131:7
133:2 140:24
143:24 144:5
145:22 147:14
154:5, 9 156:11
158:13, 17 160:7, 9
165:2 168:7
169:11 170:6
181:7 183:1
197:23 204:13
**Ultimate** 84:12
97:1, 17
**ultimately** 84:12
85:19
**uncertain** 221:24
**uncother** 147:16
**uncover** 147:10, 16
148:2
**underneath** 77:1
79:20 81:11, 19, 21
**understand** 10:6, 9
11:18 13:16, 19
23:5 49:11 58:18
59:9, 11 60:13
73:4 83:11, 13
113:21 134:17
141:12 175:3
210:19 225:18
**understanding**
12:4, 11, 12 31:11
32:18 45:11
**understood** 24:7
100:10 120:23
142:7
**unfair** 35:8
**UNITED** 1:1 9:10
**units** 76:18
**University** 33:10, 18 34:2, 16, 22, 24
35:18 36:17, 22
41:18 209:21
**upload** 104:4
215:3, 6 219:20, 24
**uploaded** 219:22
**use** 46:15 51:5
52:23 53:4 66:23
67:16 69:10, 11
77:5 78:8 80:15
85:21 138:9 141:6
147:18, 22 149:9, 10, 22 151:22
152:4

< V >
**vague** 201:24
**valuable** 106:12
107:16
**variable** 32:20
**varies** 86:14
**various** 32:22
44:5 66:7 76:17
211:13
**vary** 86:4
**verb** 52:8
**verbal** 77:10
**verbally** 77:13, 21
**versus** 9:9 87:14
**vet** 100:2, 6 116:16
**vetting** 100:8
**vice** 44:10, 13, 15
96:16, 20
**Video** 6:19 187:2
188:6, 7, 9, 14, 19, 23 189:4, 5, 7, 10, 14, 19 190:2, 8, 10, 13, 16, 23 192:11, 18, 19 193:6, 18
194:2 213:18
214:1, 21 215:1, 2, 7, 10, 13, 14, 20, 21
216:2 217:15
218:3, 7 219:22, 24
220:24, 25 221:1, 3, 12, 13, 22 222:2, 19, 23 223:2, 8, 12, 22
224:2, 8, 14, 16
225:12
**Videographer** 4:3
9:2, 3, 19 64:25
65:3 78:5, 12
100:24 101:2
157:23 158:1
186:23 187:7, 11, 19, 23 188:3
229:13
**videos** 188:25
189:11 215:18
219:20 220:3, 6, 7
222:1, 4 225:1
**view** 100:21
106:12, 19
**vinegar** 128:10, 13, 19
**violates** 12:15
**virtually** 83:22
**Vogepohl** 30:15
**voice** 68:18
**vote** 104:18
**votes** 104:21

< W >
**Wait** 158:10 172:3
**walked** 182:21
183:3, 14
**want** 16:1, 9 22:5
28:23 37:21 44:9
56:22 58:14 62:22
63:12 64:18 71:17
74:20 76:3, 4 77:4, 10, 16, 24 79:8
80:8 81:9 86:13
97:9 100:13, 16
113:4, 6, 9, 16, 22
114:4 115:15
125:10 133:23
134:16 140:6
141:12 142:3, 6, 25
144:25 158:18
159:11 169:9
173:6 176:25
181:15 182:24
185:14 186:2
187:16, 17 191:2
192:15 197:4
203:2, 4 204:25
228:19, 22, 23, 24
229:6, 7
**wanted** 81:1
98:20 99:3 125:22
138:23 182:9, 18
190:12 208:11
**wants** 114:2
130:25
**watch** 64:18
**watched** 188:13
**water** 186:24
187:11
**way** 55:2 59:18
65:25 128:23
130:8 132:2, 20
136:25 185:15
187:21 211:2
212:9 230:14
**wealth** 30:1, 2, 14, 15 31:1, 2, 4, 5
32:3 76:10, 24
80:14 81:13, 14, 15, 18, 19, 22 95:19, 24
99:13 102:6, 22
**Webster** 51:20, 21
**Wednesday** 129:3
**week** 62:6
**weeks** 215:2
**Welch** 223:9, 12
**Welcome** 62:2, 4, 10
**well** 16:20 18:10
22:18 30:7 32:16, 17, 23 34:7, 15, 20
35:13, 25 37:1, 7
42:11, 13 49:16
50:17 51:21 52:8, 24 53:9 55:21
56:21 58:9 59:4
60:6, 9 61:10, 24
66:16 67:18 69:14
72:2, 16 74:7
75:13 76:19 79:14, 19 81:10 82:6, 9
84:11 85:6 86:2, 5, 8, 16 87:3, 16
90:10 92:24 93:9
95:24 96:10, 13
99:20 100:15
103:23 104:13
108:7 109:10
111:14 117:20
120:23 121:1
122:16, 21 123:2, 9
126:5, 14, 21, 25
128:8 129:18, 23
130:6, 16, 21, 22
132:7, 20, 23
134:13 135:5
136:2, 10 137:4
144:18 145:25
148:21 150:8, 21
154:20 155:4, 14
160:16 163:25
164:11 165:16, 21
166:1, 9, 22 168:8, 20, 25 173:20
174:8, 10, 14
176:10 177:13
181:25 182:17
184:9, 15 191:7
192:9 193:3
195:15, 20 196:14, 24 200:17 201:17
204:11 206:5
209:14 213:21, 25
214:5, 23 216:22
217:6, 14 218:4, 9, 10, 14, 18 219:1, 7
220:12, 16 227:25
229:10
**went** 33:15 55:11
56:5, 6
**We're** 9:6 21:24
22:12, 21, 24 23:7

27:5 39:8 64:20, 25 72:3, 4 89:1 100:18, 24 102:1 103:1, 6, 9, 25 112:11 144:20 158:1 177:16 178:1 229:14
**WESTERN** 1:3 9:11
**We've** 80:7 100:21 149:3 157:20 210:4 228:20
**wife** 26:23 27:9, 18 225:24 226:1, 6, 19, 24 227:17, 21
**willing** 139:15 156:22 157:5, 10, 14 158:16 160:12, 13
**wish** 218:18
**wishes** 214:23 218:4, 10 219:1
**wishing** 219:7
**witness** 8:13 9:25 10:16 16:5, 8, 11, 13 21:4, 6 24:23 25:1 33:22 39:6 57:1, 8, 10, 15 78:6, 7, 9, 24 79:2, 4 81:24 82:13 90:2 98:2 102:2 103:4 104:7 106:16 107:25 112:14 141:10, 19 142:6 148:22 149:6, 8 159:2 160:22 179:25 201:19 202:13, 14 228:8, 13 230:4
**witnesses** 169:19
**wives** 75:12
**Wondering** 214:16
**word** 48:1 49:2 51:16 141:5, 6 151:22 152:4 171:9 177:12 185:9 209:14 218:8 219:5
**words** 53:17 179:3 192:12 208:23 214:25 218:6
**work** 28:3, 5 40:22 136:24 139:4, 15 142:1 181:23 185:13 187:14 191:22 215:4 216:21 225:24 226:10 227:3, 16 228:2
**worked** 40:15, 16, 18 170:24 185:9
**working** 130:3, 4 222:15
**world** 220:24
**worried** 48:11
**wou** 206:2
**would've** 81:10 85:16 161:14 165:8, 9 182:8 195:17, 23 198:5 199:14
**write** 77:9 120:7 125:15 127:18 161:15 164:15 169:12
**writes** 125:17 154:3 156:15 159:22
**writing** 160:5 173:2
**written** 156:1 214:11
**wrong** 19:10
**wrote** 61:10 173:5 174:1 190:16

< X >
**Xavier** 33:10, 15, 16, 20 34:2, 16, 22, 24 36:17, 22 40:8 41:17 56:18 209:21 215:4 225:16

< Y >
**Yards** 29:23 30:18 31:6
**Yeah** 14:12, 17 21:9, 10 52:12 62:11 63:13 64:21 71:22 77:25 78:3, 24, 25 79:2 82:13, 18 83:3, 7 84:2 85:11, 20 88:22 89:20 90:2 122:5 128:14 147:18 167:25 168:18 186:3 187:13, 22 190:24 199:19 200:3 221:8 222:17 223:15 228:20 229:3
**year** 31:22 66:14, 15 82:19 86:4, 14, 15 139:24 162:15, 19 173:1
**years** 37:10 41:20 58:7 66:16, 17 70:17 83:10 139:14, 15, 20, 21 140:22 141:1, 3 142:1, 2, 14, 19, 20, 21 170:24 171:14 185:10 191:22 208:2, 3 214:4 219:4
**yell** 124:19 125:17
**yelled** 48:11
**Yep** 119:19
**you-all** 188:4
**Young** 37:2, 15 203:20
**YPO** 37:14 38:1 40:1

< Z >
**Zoom** 168:15

Trustpoint.One | Alderson®

# Transcript of **Philip R. McHugh Vol. II**

Tuesday, August 31, 2021

***Philip R. McHugh vs. Fifth Third Bancorp***

www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO (800.367.3376)
Scheduling@Trustpoint.One

Reference Number: 106858

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

CASE NO. 1:21-cv-00238-MRB

PHILIP R. MCHUGH,

Plaintiff

V.

FIFTH THIRD BANCORP, ET AL.,

Defendants

DEPONENT: PHILIP R. MCHUGH, VOL. II

DATE: AUGUST 31, 2021

REPORTER: GABRYEL REINSTATLER

APPEARANCES

ON BEHALF OF THE PLAINTIFF/COUNTERCLAIM DEFENDANT,
PHILIP R. MCHUGH:

Peter A. Saba
Stagnaro, Saba & Patterson Co., L.P.A.
2623 Erie Avenue
Cincinnati, Ohio 45208
Telephone No.: (513) 533-2700
E-mail: pas@sspfirm.com

AND

John J. McHugh
McHugh & McCarthy, LTD
5580 Monroe Street
Sylvania, Ohio 43560
Telephone No.: (419) 885-3597

E-mail: mchugh@mchughlaw.com

APPEARANCES (CONTINUED)

ON BEHALF OF THE DEFENDANTS/COUNTERCLAIMANTS, FIFTH THIRD BANCORP, FIFTH THIRD BANK, NATIONAL ASSOCIATION, AND GREGORY D. CARMICHAEL:

Michael L. Cioffi
David J. Oberly
Blank Rome LLP
1700 PNC Center
201 East Fifth Street
Cincinnati, Ohio 45202
Telephone No.: (513) 362-8701
Facsimile No.: (513) 362-8702
E-mail: cioffi@blankrome.com
doberly@blankrome.com

GENERAL COUNSEL FOR FIFTH THIRD:
J. Phenise Poole
Brian Thomas
38 Fountain Square Plaza
Cincinnati, Ohio 45263
Telephone No.: (513) 579-5203
E-mail: phenise.poole@53.com
brian.thomas@53.com

APPEARANCES (CONTINUED)

ALSO PRESENT: Elizabeth Harlow, Videographer

# INDEX



| | Page |
|---|---|
| PROCEEDINGS | 7 |
| DIRECT EXAMINATION BY MR. CIOFFI | 8 |



## EXHIBITS



| Exhibit | Page |
|---|---|
| 22 - Amended Complaint | 8 |
| 23 - Notes | 22 |
| 24 - 2019 Performance Review | 57 |
| 25 - Fifth Third Bank Board of Directors Human Capital and Executive Talent Management and Succession Plan Up-dates | 66 |
| 26 - Regions and Business Banking Presentation | 92 |

STIPULATION

The VIDEO deposition of PHILIP R. MCHUGH, VOL. II was taken at BLANK ROME LLP, PNC CENTER, 201 EAST FIFTH STREET, SUITE 1700, CINCINNATI, OHIO 45202 on TUESDAY the 31st day of AUGUST, 2021 at approximately 10:03 a.m.; said VIDEO deposition was taken pursuant to RULE 30(b)(1) OF THE FEDERAL Rules of Civil Procedure.

It is agreed that GABRYEL REINSTATLER, being a Notary Public and Court Reporter for the State of OHIO, may swear the witness and that the reading and signing of the completed transcript by the witness is not waived.

PROCEEDINGS

COURT REPORTER: Okay. We're now on the record. My name is Elizabeth Harlow. I'm the videographer today and we have Gabyrel Reinstatler as court reporter. Today is the 31st day of August 2021, the time is 10:03 a.m. We're at the offices of Blank Rome LLP located in Cincinnati, Ohio to take the deposition of Philip McHugh, volume two, in the matter of Philip R. McHugh versus Fifth Third Bancorp et al, pending in the United States District Court, Southern District of Ohio, Western Division, Case Number 121-CB- 00238-MRV. Will Counsel please identify themselves for the record?

MR. SABA: On behalf of the plaintiff, Peter Saba and John McHugh.

MR. CIOFFI: On behalf of the defendants, Michael Cioffi and David Oberly.

VIDEOGRAPHER: Thank you. Sir, will you raise your right hand to be sworn by the reporter?

COURT REPORTER: Do you solemnly swear or affirm that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

COURT REPORTER: All right. Thank you.

DIRECT EXAMINATION

BY MR. CIOFFI:

Q Good morning, Mr. McHugh.

A Good morning.

Q Yeah. You've been sworn in again subject to the same penalties of perjury we discussed yesterday, do you understand that?

A I do.

Q This morning we'll try to see if we understand as the defendants the allegations in your complaint.

MR. CIOFFI: So let's mark as Exhibit 22 of the complaint.

(EXHIBIT 22 MARKED FOR IDENTIFICATION)

BY MR. CIOFFI:

Q Sir, have you seen Exhibit 22 before?

A Yes.

Q And what is it?

A It's amended complaint.

Q Who filed the amended complaint?

A My attorneys.

Q Is this the complaint that you're filing against the defendants in this case?

A Yes. I believe so.

Q My question this morning pertain to whether or not we understand the allegations in your complaint. So

the -- direct your attention to paragraph 23, please. If I understand the allegations in paragraph 23 on October 13, 2020, Greg Carmichael offers you the position of head of consumer banking, and you tell them that you're not happy with that position because you believed it to be a demotion; is that correct?

MR. SABA: Objection to form of the question. Go ahead. You can answer.

A Could you repeat the question?

(REPORTER READS BACK REQUESTED TESTIMONY)

MR. SABA: Continuing objection. Brad, you can answer.

A Yes.

BY MR. CIOFFI:

Q In that meeting on October 13th, you then tell Greg Carmichael, even though you're unhappy, you're going to think about it; is that correct?

A Yes.

Q Then the two of you meet again on October 15, 2020, right?

A I believe so.

Q Directing your attention that, that's what it says in paragraph 23, okay? I'm just trying to understand what happened. So you meet -- if you look at paragraph 25 --

A That --
Q The last sentence, that you met with Carmichael on October 15th. So you meet with Carmichael again on October 15, 2020, right?
A Yes.
Q At that meeting, you tell Greg Carmichael, that you believe that you were best utilized in your current role, and that you would not accept the position of head of consumer banking; is that correct?
A On October 15th, yes. I met with Mr. Carmichael, told him that I would not accept the position of head of consumer bank since I was previously promoted from that role. And that I would stay in my existing role. And I inquired based on a comment that Mr. Carmichael made in the October 3rd meeting that there were other options available for me, what other options were available.
Q Directing your attention to paragraph 29, later on October 15th, you have a conversation with Bob Schaffer; is that correct?
A Yes.
Q And in that conversation, Bob Schaffer told you that your only choice was to accept the consumer banking position and if you did not accept the consumer banking position, you should not return to work; is that

correct?

MR. SABA: Objection of form of the question. Go ahead, you can answer.

A Yes. I had a conversation with Mr. Schaffer. Yes, he told me to accept the demotion or not to return to work. It was either that day or the following day.

Q If you had accepted the position of head of consumer banking, you would've continued working at Fifth Third with your same salary and benefits; is that correct?

A Yes.

Q I want to direct your attention to the beginning part of your complaint, if you would turn, please, to paragraph number 8, please. Would you read that -- second sentence of that paragraph into the record, please. In April.

A "April 1994, the bank requested him to move to Louisville, Kentucky to build the trust and investment division of its newly acquired affiliate."

Q Who appointed you to that position?

A Jim Gaunt.

Q Was he your manager at that point in time?

A In April of 1994, yes.

Q And how long was he your manager?

A From April of 1994 to December of 2005.

Q Directing your attention to paragraph number four. Did Greg Carmichael become your manager in 2005?
A No.
Q When did he become your manager?
A January of 2010.
Q You should read the last sentence of paragraph number four.
A "At all times relevant herein, Carmichael was McHugh's manager."
Q When you say manager, what meaning are you using that term?
A It would have been my supervisor or the individual responsible for the division I was running.
Q By using the term manager, do you mean boss?
A I don't know.
Q I'm asking what you're meaning by this term "manager" and you don't know if it means boss?
A We use the term manager.
Q Did you use that term to denote a superior?
A Yes.
Q As your superior, he had the authority to assign job duties to you, isn't that correct?
A Yes.
Q Directing your attention to paragraph number 10. Would you read that paragraph into the record,

please?

A "In April 2017, Carmichael, then bank chief executive officer and president, requested McHugh become Head of Fifth Third Consumer Bank, which included full responsibility for retail banking, mortgage lending, business banking for companies with less than $20 million in annual revenues, and for indirect auto lending." Later that year, in December, McHugh assigned respond -- additional -- I'm sorry. "Later that year in December, Carmichael assigned additional responsibility to McHugh, charging him with oversight of the wealth and asset management division of the bank.

Q As a result of this assignment to be head of consumer bank, did you receive an increase in salary?

A I don't recall.

Q Did you consider this assignment a promotion?

A Yes.

Q Did you consider a promotion because head of consumer bank is a significant position inside the bank, is it not?

A I considered a promotion because it was larger than my previous responsibilities.

MR. SABA: Just to be clear. Michael, you're referring to the April 2017 context, correct?

MR. CIOFFI: Paragraph 10.

MR. SABA: Okay.
BY MR. CIOFFI:
Q What percentage of the Bancorp's total revenue is generated within the consumer bank?
MR. SABA: Objection to the form of the question, but you can answer.
A I do not recall.
Q Can you estimate it?
MR. SABA: Objection to the form of the question, but you can answer.
A I do not recall.
Q Well, you testified that it was a larger position. Why was it a larger or a greater position?
A It was larger than my previous responsibilities.
Q That's because the consumer bank responsibilities are larger, right?
A Than my previous responsibilities.
Q Isn't it true that the consume -- the consumer bank generates about 40-to fif -- 40 to 45 percent of the total revenue of the Bancorp?
MR. SABA: Objection to the form of the question, but you can answer.
A I cannot recall,
MR. CIOFFI: Counsel, what's your objection to

the form? You keep on saying --

MR. SABA: To -- it's a lack of predicate and foundation. There's no definition of what you mean by revenue, whether or not it's gross or that it's net, whether talking about an EBITDA revenue. There's no indication what revenue you're referring to So by using such a broad ambiguous term, there's no way that somebody can necessarily give an accurate answer. Those can fluctuate greatly. That's my objection.

BY MR. CIOFFI:

Q How would you define gross revenue?

A Total revenue.

Q Using that definition, is it not true that the consumer bank generates about 40 to 45 percent of the gross revenue of the Bancorp?

A I do not recall that without the financial statements in front of me.

Q Do you think 40 to 45 percent is too high or too low?

A I don't know.

Q Directing your attention to paragraph number 11. Would you read that paragraph into the record please?

A "In August 2018, Carmichael, in his first year

as Board chairman, assigned McHugh responsibility for leadership of all 14 of the bank's" region -- "regional presidents." Noting the additional as -- excuse me, "noting that the additional assignment involved a much larger role, greater responsibility, and a more significant impact on Fifth Third Bank. The advance now gave McHugh responsibility for business banking, Walton asset management, as well as regional banking."

Q When you used the term responsibility for a leadership, what did you mean?

A I was the executive-in-charge of those areas of the bank.

Q But it's true is it not, that each regional president had full responsibility for all business and staff functions within his or her region?

MR. SABA: Objection to form of the question. You can answer.

THE WITNESS: Could you repeat that?

MR. SABA: Continuing objection. You can answer.

A No.

BY MR. CIOFFI:

Q Well, go back and look at paragraph number 8, would you, please? Read the second sentence of paragraph 8 into the record and the third sentence

please.

A Beginning in April?

Q Yes.

A "In April 1994, the bank requested him, McHugh, to move to Louisville, Kentucky to build the trust and investment division of its newly acquired affiliate. In March 2001, he was promoted to run the commercial division of the Louisville affiliate. And in December of 2005 was named president, CEO of Fifth Third Louisville with full responsibility for all business and staff functions."

Q So you were regional president in 1994, right?

A No.

Q What were you?

A 1994, I was in charge of the trust and investment division,

Q Okay. In 19 -- in 2005 you were named president and CEO of Fifth Third Louisville, right?

A Yes.

Q And that's when you became a regional president?

A Yes.

Q You say in that sentence in paragraph 8 that as regional president, you had full responsibility for all business and staff functions --

A Yes.

Q -- correct? So the regional presidents have full responsibility for all business and staff functions, isn't that right?

MR. SABA: Objection to form of the question, but you can answer.

A Could you be more clear in terms of the date you're asking me that it -- 2005 or a date after that?

Q Well, from 2005 forward?

A 2005, yes, but there's been many changes since 2005.

Q Well, describe those changes.

A I could not describe all of them, but different functions moved to a centralized resource. Some of the staff functions in terms of human resources and accounting. I believe credit transitioned at one point. I don't have all of those committed to memory and when those changes occurred.

Q Any other changes you can describe?

A I believe there were other changes in terms of minor business reporting for some of the areas of the consumer bank.

Q What kind of changes in lines of reporting?

A I recall the mortgage division was centralized with a dotted line for the regional president. Same for

indirect auto and same for retail banking.

Q When did those changes get implemented?

A I don't recall the specific date.

Q Any other changes?

A I don't recall.

Q Except for those changes you've articulated, the regional presidents in 2018 had full responsibility for all business and staff functions, correct?

MR. SABA: Objection to form the question. You can answer.

A I've provided the changes that I can recall. I don't recall other changes at this time.

Q Except for those changes, the regional presidents have full responsibility for all business and staff functions, correct?

A You're asking about the ones I can recall, can't recall?

Q Yes. Sure.

A I don't recall.

Q Well, what responsibilities did the regional presidents have in 2018 and what responsibilities did you have for leadership of the regional presidents?

A I was the executive reporting directly to Mr. Carmichael who was responsible for all of the regional banking presidents.

MR. CIOFFI: Read his answer back please.
COURT REPORTER: Yes. Of course.
(REPORTER READS BACK REQUESTED TESTIMONY)
BY MR. CIOFFI:
Q When you say you were reporting to Mr. Carmichael who was responsible for all the regional banking presidents. The pronoun "who" refers to who? Mr. Carmichael?
THE WITNESS: Can you read back my answer?
(REPORTER READS BACK REQUESTED TESTIMONY)
A Me.
BY MR. CIOFFI:
Q You were responsible for them?
A I was responsible for regional banking. Yes.
Q When you say you were responsible for them, what did you do? What were your duties?
A I had full responsibility for regional banking, reporting directly to Mr. Carmichael.
Q But except for the changes you articulated earlier, the regional presidents themselves had full responsibility for their business and staff functions, correct?
MR. SABA: Objection to form. Go ahead, you can answer.
A I don't recall other changes at this moment.

Q But again, including the changes you articulated and those you can't recall. Other than those changes, the regional presidents had responsibility for their business and their staff functions, right?

MR. SABA: Objection to form the question. Go ahead, you can answer.

A Yes.

Q Directing your attention to paragraph 15, read that first sentence.

A "On August 15, 2019, during McHugh's mid-year performance review, Carmichael, the Chairman of the Board, president and chief executive officer, told McHugh that he, Carmichael, would be pursuing other matters and he, Carmichael, promised he would recommend McHugh to be the next president and chief executive officer for a term of three to five years until Spence was ready for the assignment. Carmichael told McHugh he was the most qualified officer on the executive team to take the president and chief executive officer positions. And that Spence was not only too young, but lacked the necessary banking experience, having been at Fifth Third for only four years."

Q Where did this meeting take place?

A Mr. Carmichael's office.

Q Are there any contemporaneous notes of what happened at this meeting?
A Yes.
Q And what are they?
A I believe we've provided those notes to you.
MR. CIOFFI: Let's mark that one.
Q Any what's been marked as Exhibit 23, are those the notes you're referring to?
(EXHIBIT 23 MARKED FOR IDENTIFICATION)
A Yes.
Q When was Exhibit 23 created?
A The specific notes of the August 15th meeting?
Q Well, the whole document. When did you put the whole document together?
A I would've put the document together shortly after these meetings occurred. Either that day of the afternoon of the 15th or the 16th, in that case.
Q Well, let's go through it. So the first page, which is 00053, at the top is written what?
A Conversation with Tayfun.
Q And then it has Tuesday, 10-13, but 10-13 of what year?
A 10-13 of 2020.
Q All right. So this begins -- this document begins with some notations about a meeting on

10-13-2020. The next notation is Thursday, 10-15, is that also 2020?

A Yes.

Q And then 10-16, is that also 2020?

A Yes.

Q So the next page, 0054, it's Friday, 10-16. Well, I can't read what's after the --

A Continued. C-O-N-T.

Q So that you're continuing some sort of notation. And then there's 10-18 at the bottom of the page, right?

A Correct.

Q Is that also 2020?

A Yes.

Q And then there's 10-15, right? Is that 2020?

A Yes.

Q Then again, we're now on page 0055. And then there's 10-16-2020.

A 10-15, then 10-16, yes.

Q The next page, 0056. It's 10-16 again, is that 2020?

A Yes.

Q Okay. Saturday, 10-17, is that 2020?

A Yes.

Q Next page 0057, that's 10-17, is that also

2020?

A Yes.

Q Then on the next page, 00058, there's no notation on the left-hand side, but on the right-hand side. It says 10-21-2020; is that right?

A Correct.

Q Then the document -- the next page in the document 0059 and that says August 10, 2018; is that right?

A Correct.

Q Why does the document then go back in time?

A I don't know why these documents are ordered this way. We produced the notes as requested. The notes reflect the dates the meetings occurred or shortly thereafter.

Q My question to you, sir, is: When did you write the notes? So going back to page 0053, the first page, when did you write those notes?

A Shortly after the meeting occurred, either that day, the next day, or the following day. I can't recall specifically the day.

Q Is there anything that you can point to that says you recorded it on that particular day as opposed to creating a timeline for your lawyers for purposes of the litigation?

MR. SABA: Objection to the form of the question. Go ahead. You can answer.
A These are my notes that I made either the same day or shortly after these meetings occurred or these discussions occurred.
Q Did you make a practice of creating notes of all meetings that you have?
A No.
Q Why did you make notes of these particular meetings?
A These meetings were significant meetings and significant discussions relative to my career at Fifth Third Bank.
Q Well, in your 34 years at Fifth Third, you've had other significant discussions related to your career, have you not?
A Yes.
Q Did you create notes about those?
A I don't recall.
Q Is it just coincidental that all of these notes pertain to the allegations in your complaint?
MR. SABA: Objection. Go ahead. You can answer.
A No.
Q It's not a coincidence, is it?

MR. SABA: Objection. Go ahead. You can answer.

A No.

Q Mr. McHugh, I notice every time I ask you a question, you look at your lawyer.

MR. SABA: Objection. Mischaracterization. Go ahead. You can answer.

Q Would you look into the camera and answer the questions?

A Sure.

Q So it's not a coincidence that all of these notations relate to allegations in your complaint, is it?

MR. SABA: Objection. Go ahead. You can answer.

A It's not a coincidence. That's what you asked for that's what we produced. No.

Q Isn't it true that after you decided to bring a lawsuit, then you created this timeline?

MR. SABA: Objection.

Q How do we know that's not true?

MR. SABA: Objection. Go ahead, you can answer.

A I just told you it's not true.

Q Did you give these notes to your attorneys in

this case?
A Yes.
Q When did you give them to your lawyers?
A When they requested them.
Q When was that?
A I don't recall.
Q Did you share these notes with anyone else besides your attorneys?
A Yes.
Q Who did you share them with?
A I shared them with you.
Q Besides me. Who else did you share them with?
A I don't recall we've shared them with anyone.
Q Did you share them with your executive assistant, Karen?
A I don't recall.
Q Directing your attention to 00059, which is about six pages into the document -- marked as Exhibit 23. Is it your testimony under oath that you created 00059, 00060, 00061, all on Friday, August 10, 2018?
A No.
Q When -- you testified earlier that you created these on the date recorded or within a day or two. So I'm asking you the notations on -- for Friday, August 10th, which extend from 00059 to 00 -- through 00061.

Were those created on August 10, 2018?
A I believe they were created on August 11th or on August 12th. Ironically, I ran into Mr. Carmichael that evening at a dinner location.
Q I didn't ask you that, I asked you when they were created? So your testimony under oath is that they were created either on the August 10, 11 or 12?
A 10, 11, 12, I believe the 13th would be that Monday, so a couple of days after that conversation, yes.
Q I noticed we're on the same type of paper as the documents created off -- in 2020; is that right?
A Yes.
Q How do you explain that? Two years later?
A These were the pads of paper that we used at the bank. Standard size.
Q And you're always made the notes on the same pads even though they're two years apart?
A No.
Q But you did with respect to the documents created according to your testimony in 2020, and those created on or about August 10, 2018?
MR. SABA: Objection.
Q Those we're all written on the same kind of paper; is that right?

A They were not written on the same pad of paper. They were written on the same type of paper, 8-and-a-half by 11 pads of paper. Yes.
Q Who had custody of the documents marked as 0059, 0061 -- 0060, 0061? Those three pages. Who had custody of those documents from August 10, 2018 to the time you gave them to your attorneys?
A I did.
Q Where did you keep them for those two plus years?
A I don't recall specifically where I kept these.
Q Well, if you don't recall where you kept them, how did you know where to go to retrieve them?
A I don't recall where I had them at the entire time from 2018 to 2020, but I had these in my possession in 2020.
Q Well, they didn't just materialize in 2020. Where did you go to get them in 2020?
A I don't recall specifically where I went to get them prior to 2020. In 2020, they were in my possession.
Q But you don't know where or how they were in your possession. Is that your testimony?
A Prior to 2020?

Q Yes. From 2018 to 2020, where were these documents?
A These documents could have been in my briefcase. They could have been in my file at home or in a business file at the bank.
Q But I'm asking you, where were they?
A I can't recall specifically where they were.
Q And where did you go to retrieve them in 2020 in order to give them to your lawyers?
A My briefcase.
Q Your briefcase. You kept them in your briefcase for two years from August 2018 to the end of 2020?
A You asked me where I retrieved them when I gave them to my attorneys, and I told you that I gave -- got them from my briefcase and gave them to my attorneys.
Q But how did they get in your briefcase?
A I would have put them in my briefcase.
Q You would have put them in your briefcase from where?
A From either my file at home or a file at the bank.
Q But how did you know where did it go in order to get them to put them in your briefcase?

A I would've looked at those two places.
Q Directing your attention to 00064. When was this document created? There two dates on it, August 15, 2019 and August 18, 2019.
A It would've been created multiple times shortly after the August 15th meeting, shortly after the August 18th meeting, and shortly after the February 14th meeting. There's different handwriting on all of those.
Q Well, it's all your handwriting, isn't it?
A Correct.
Q But McHugh 00064, do you see that?
A Yes.
Q There are three different dates.
A Correct.
Q August 15, 2019, August 18, 2019, and then February 14, 2020. Do you see that?
A Yes.
Q So the last entry is written several months after the first two?
A Yes.
Q Where did you keep 00064 between August 18, 2019 in February 14, 2020?
A Either been file at work or a file at my home.
Q Why did you put -- do you know which one?
A I do not recall.

Q Why did you pull the document out to make an entry for February 14, 2020 on the same document that records August 15, 2019 and August 18, 2019?

A Because that's the next time we had a conversation about this issue.

Q Did you preserve these documents in some sort of file that was by category of discussion?

A These documents would have been held in a personnel file. I was either at the bank or at my home.

Q Describe that file for me.

A Would be a Manila folder or maybe if it's not Manila, it might be red or blue. It was likely same accuse personnel file and it would include some performance reviews, self evaluations, as well as any -- any notes, or anything else I would have taken to remember those meetings.

Q The next page, 00065, you have Tuesday, October 13th, but there's not a year. What year i -- is this pertaining to?

A And you've already asked that. That's October 13, 2020.

Q When were those notes created?

A Either October 13th, or October 14th, shortly thereafter -- those meetings.

Q Directing your attention back to 0059, 00060,

and 0061. Why did you preserve those for two years?

A I don't recall.

Q Directing your attention to 00064. There's one entry for August 15, 2019; is that right?

A Yes.

Q Would you read that into the record?

A "Mid-year review. GC is very complementary of work with regions, et cetera. Very happy with wealth and business banking progress. GC tells me he wants to do other things and I would be the successor. So I could be CEO for three to five years and then Tim Spence would be ready."

Q Is there a Fifth Third evaluation related to this mid-year performance review?

A I don't recall.

Q You had an annual review for 2019; isn't that right?

A Yes.

Q Why is it that none of this information is reflected in that annual review?

A I don't know.

Q Well, you have an opportunity in your self-evaluation to put it into the annual review, do you not?

A I don't know.

Q Well, you do know from your 34 years that in the annual review you have an, not only an opportunity but an obligation to do a self-evaluation, including goals and objectives; isn't that right?

A I believe that self-evaluation covers performance versus financial goals, performance versus employee engagement, and performance versus customer experience. There maybe other criteria, but I don't recall what those are at this time.

Q But none of this information that GC is very complimentary of work, very happy with wealth and BB progress. Nothing about you being successor in the annual review; isn't that right?

A Correct. He told me that this would be the progress in August 15, 2019 meeting. Yes.

Q Yes. There's nothing in the annual review; is that right?

A You have that annual review, I would have to look at it.

Q Well, I'm asking you.

A I do not recall.

Q You know that there's nothing in there about? it --

A I don't recall.

Q -- don't you?

A I don't recall.
Q Did you -- you didn't look at that in preparation for your deposition?
A No.
Q When was the last time you saw your 2019 annual review?
A When I provided it pursuant to your request.
Q But that was on July 31st, of this year, right? That's when you produced the documents.
A That's when our attorneys produced the documents --
Q Yeah.
A -- to you. Yes.
Q All right. So in that short amount of time between the end of July and today, you don't remember what's in your 2019 annual performance review?
A I can not recall.
Q Isn't it true you created the notations on 00064 as a means of supporting allegations in your complaint?
MR. SABA: Objection.
A No. That is not true. These notes were created shortly after these meetings.
Q But if you had these notes, why didn't you put the substance of these notes into your annual

performance review for 2019?
MR. SABA: Objection to form of the question. Go ahead. You can answer.
A I don't know.
Q Directing your attention back to paragraph 15.
A Of the complaint?
Q Of the complaint. You say that Mr. Carmichael would be pursuing other matters. Did he tell you what other matters he would be pursuing?
A Told me that he had a desire to work with his sons, and get into businesses with his sons. I did not ask specifically what he was referring to.
Q Directing your attention to paragraph 16. Go ahead and read that.
A "Following an offsite meeting on August 18, 2019," Robert Schaffer -- "Francis Schaffer, then the bank's chief -- "chief human resource's officer confirm to McHugh what Carmichael had earlier promised him."
Q Go ahead.
A "That McHugh would be the next president and chief executive officer and confided to McHugh, his opinion that McHugh was the most qualified" executor -- "executive to acquire such responsibility."
Q Now, go back up to paragraph 15. That's not

what you say above. Do you see that? You say at the bottom of page 15, read after the word "Carmichael."
A "Promised that he would recommend McHugh to be the next president and chief executive officer."
Q So what is your allegation in this complaint? Is it that Mr. Carmichael promise to recommend you as alleged in paragraph 15. Is that your allegation?
MR. SABA: Objection. Go ahead, you can answer.
A Mr. Carmichael, as president, chief executive officer, and Chairman of the Board promised me that he would recommend me to be the next president and path to CEO.
Q He did not promise you that you would be the next president and CEO?
MR. SABA: Objection.
Q Did he?
MR. SABA: Objection to form of the question. Go ahead, you can answer.
A Yes.
Q Well, which is it? Did he promise to recommend you or did he promise that you would be the next president?
A I don't recall specifically, but as Chairman of the Board, chief executive, and president, I was

cognizant that Mr. Carmichael's recommendation to the Board would carry with the Board. I took Mr. Carmichael at his word when he promised me a job. Frankly, I've been working 32 years for and was delighted to hear that from Mr. Carmichael.

Q I just wanna know what your allegation is. Your allegation is that he promised to recommend you to the Board, is that it?

MR. SABA: Objection to form of the question. The complaint speaks for itself.

Q With two different allegations in the complaint, what --

MR. SABA: Objection.

COURT REPORTER: Read back the question?

THE WITNESS: Right.

(REPORTER READS BACK REQUESTED TESTIMONY)

MR. SABA: Continuing objection. Go ahead, you can answer.

A Yes.

BY MR. CIOFFI:

Q That's the allegation. In paragraph 16, it is not your allegation that he promised that you would be the next president and chief executive officer. Is it?

MR. SABA: Objection. The complaint speaks for itself. Go ahead, you can answer.

A Yes. Schaffer confirmed to me what Carmichael said.

Q Well, in paragraph 15, the allegation is that he said he would recommend you and then there's a different statement in paragraph 16 and that is that he promised you would be the next president.

MR. SABA: Objection. Mischaracterization, the evidence from the pleadings. Go ahead. You can answer.

MR. CIOFFI: Counsel. You may not make speaking objections. Just state an objection. Not --

MR. SABA: Stating my objection. The complaint speaks for itself.

MR. CIOFFI: No. The complaint doesn't speak for itself. It says -- it says two different things.

MR. SABA: The complaints speaks for itself. Draft with the assistance of --

MR. CIOFFI: Let the witness testify, you're trying to coach him --

MR. SABA: Oh, I'm not trying to coach him. You're reading a pleading which is prepared by counsel, which you recognize is prepared by counsel and which is a pleading. It's not evidence. It's

not a sworn statement by him. No. You're mischaracterizing what it is. It speaks for itself. So I'm allowing him to answer the question, but I'm voicing my objection that the complaint speaks for itself. It says what it says.

MR. CIOFFI: It says two different things.

MR. SABA: Now, that -- that's your mischaracterization. So you're misleading the witness instead of just asking him a question. You're trying to mislead him.

MR. CIOFFI: Quit coaching.

MR. SABA: Quit misleading. You quit misleading and I won't have to object

MR. CIOFFI: Tried to get it a -- the answers to my questions is not misleading --

MR. SABA: Well, don't mischaracterize it. Just ask him what is meant by the pleading and move on. Don't mischaracterize it and then ask him. Ask the straightforward question, not the mischaracterized one.

MR. CIOFFI: There's no characterizing.

MR. SABA: Yes. It is. You're mischaracterizing that they're contradictory. You went to go ahead and box it in. That's not the nature of a discovery deposition. Ask him a

question and he'd give you an answer. Don't mischaracterize the question first, it's very basic. Go ahead. You can answer.

BY MR. CIOFFI:

Q Looking at Paragraph 15, is your allegation that Mr. Carmichael promised to recommend you to the Board?

MR. SABA: Objection. You can answer.

A Yes.

Q He did not promise that you would be the next president and CEO, did he?

A By recommending me to the Board, I took Mr. Carmichael at his word that I would be the next president and CEO.

Q I'm not asking you what you thought. I'm asking you what Mr. Carmichael promised. He promised to recommend you, period, right?

A He promised that I would be the next president and CEO.

Q Did he promise to recommend you or did he promise that you would be the next president and CEO?

A I -- I don't recall.

Q You don't recall if he promised to recommend you? Do you recall that?

A He promised to recommend me and he promised me

to -- that that recommendation would go to the Board that he would carry with Mr. Carmichael. I was not aware of any recommendations Mr. Carmichael made to the Board that did not pass the Board.

Q I'm trying to understand what Mr. Carmichael said to you. Tell me exactly what he said to you.

A Mr. Carmichael said that he was going to do other things, okay? That I could be the next CEO -- pre -- president and CEO for a period of three to five years from Mr. Spence. Mr. Carmichael went on to say many other things about other executives and why I was the most qualified and most respected.

Q What did he say about recommending you?

A That he would recommend me. Okay? And I took that as he may have said, promised, I don't know. Okay. I can't recall that specifically at this time.

Q Are you certain that he said he would recommend you? Is that your testimony?

A Yes.

Q But you are not certain that he promised that you would be the next president and CEO. Is that your testimony?

A Could you repeat that question?

MR. CIOFFI: Read it back, please.

(REPORTER READS BACK REQUESTED TESTIMONY)

A I was certain when I left the office that I was going to be Mr. Carmichael's successor as president and CEO.

BY MR. CIOFFI:

Q That wasn't my question, my -- read my question back.

(REPORTER READS BACK REQUESTED TESTIMONY)

A Yes. I was certain that Mr. Carmichael was going to recommend me to be the next president and CEO Fifth Third Bank.

BY MR. CIOFFI:

Q So your testimony is that he was going to recommend you, is that it?

A He re -- yes. He told me he would recommend me.

Q But he did not tell you, did he? He did not promise you, did he? That you would be the next president?

A I believe he promised me, yes.

Q So he both promised that he would recommend you, and he promised that you would be the next president. Is that your testimony?

A He did not in any way say that his recommendation would not carry with the Board. He led me to believe that I would be the next president and

CEO, and I counted on Mr. Carmichael's word.
Q How did he lead you to believe that?
A He told me.
Q What did he tell you? I'm asking you. I -- I'm entitled to a straight answer of what he told you. What did he tell you?
A He told me that I would be the individual to succeed him as president and CEO of Fifth Third Bank.
Q But you understood he did not have the power to do that, right?
A I understood that the Board makes the ultimate recommendation, but that the Board re -- relies on the recommendation of the pre -- existing president and CEO.
Q But how many members are on the Board?
A I don't know their specific counts, 15, 16.
Q Then Mr. Carmichael has one vote; is that right?
A Yes.
Q But you understood at this meeting which took place on August 15, 2019, that Mr. Carmichael did not have the authority to appoint you as president and CEO; isn't that right?
A I understood that the ultimate authority rested with the Board. Mr. Carmichael was Chairman of the Board, and I relied on Mr. Carmichael's word to me,

and I knew that most, if not all, of the request Mr. Carmichael took to the Board were approved.

Q But you knew that he was just one of 15 or 16 votes; isn't that right?

A Yes.

Q At this meeting, did he tell you when he was going to recommend you?

A He said he was going to do other things and then he would be moving on. He didn't tell me a month or a day, no.

Q So the answer to my question is he did not tell you when he was going to recommend you, is that true?

A Yes.

Q Was his promise as you allege it reduced to writing or was it only verbal?

MR. SABA: Objection to form of the question. You can answer.

A It was verbal.

Q Did you ever ask him to reduce it to writing?

A No. I took Mr. Carmichael at his word, having worked for him for ten-plus years.

Q Because he's a man of his word, right?

A Yes.

Q Did he tell you what your salary was going to

be as president and CEO?
A No.
Q Did he tell you what your benefits would be?
A No.
Q Did you refrain from doing anything as a result of this promise?
MR. SABA: Objection to form of the question. Go ahead, you can answer.
A Could you be more specific?
Q Yeah. For example, did you turn down and other job as a result of this promise?
A I refused to take phone calls from other potential had honors or firms offering different employment.
Q Did you have any offer of employment?
A Could you be more specific?
Q Yeah. In this time frame after this alleged promise, did anyone offer you a job?
A In terms of an employment -- a letter of employment?
Q Yeah.
A No. I did not receive a letter of employment.
Q In fact, you weren't looking for a job, were you?
A No.

Q Okay. So you turned down no employment opportunities as a result of this promise, correct?
A I told people I was not interested in conversations that could potentially lead to employment. I was focused on my job and responsibilities at Fifth Third.
Q And who did you make those comments to?
A I -- I believe there were folks at Republic Bank in Louisville, Kentucky that wanted -- that were doing a CEO search.
Q Who at Republic Bank?
A I can't recall specifically.
Q Who else did you tell?
A That one I know for sure. I don't recall others at this time.
MR. SABA: I don't mean to interrupt you, but I have sometimes difficulty of an old man who has been in a surgeon's bladder.
MR. CIOFFI: We could take a break then.
VIDEOGRAPHER: All right. We're going off the record at 11:14.
(OFF THE RECORD)
VIDEOGRAPHER: Back on the record at 11:37. Go ahead.
BY MR. CIOFFI:

Q Directing your attention back to McHugh 00053 through 00066 which is I think Exhibit 22.
A 23.
COURT REPORTER: That's 23.
Q Exhibit 23. Did anyone suggest to you to create these notes?
A No.
Q With whom have you discussed the contents of these notes besides your lawyers?
A No one.
Q Well, you discussed the contents with Tayfun, right? Because you referenced comments he made to you.
A Yes. Anyone who I made notes of our conversation. Yes. I talked to Tayfun about it. I thought your question was, anyone not in these conversations.
Q Well, since October 26, 2020, you've continued to talk to Tayfun; isn't that correct?
A Yes.
Q You've talked to him about your strategy and tactics in this litigation, haven't you?
A No.
Q You haven't?
A No.
Q Okay. Have you discussed your strategy and

tactics in this litigation with anyone?
A No.
Q Did you discuss your strategy and tactics with your children?
A No.
Q With your wife?
A No.
COURT REPORTER: (Coughs)
THE WITNESS: Bless you.
Q With Jamie Leonard?
A No.
Q With Junior Bridgeman?
A No.
Q What did you discuss with Junior Bridgeman?
A Mr. Bridgeman asked what happened at the bank and I told him what happened in terms of the bank terminating my employment.
Q What else did you say to him?
A I told him of Mr. Carmichael's conversation with me in August. Mr. Carmichael's conversation with me August of '19, Mr. Carmichael's conversations in 2020, up -- up to and including the conversation on Thursday, October 15th.
Q Did you show him a copy of the complaint?
A No.

Q Who else did you have discu -- similar discussions with concerning your allegations about Mr. Carmichael and what he said or didn't say?

A I don't recall.

Q You don't recall the person or you don't recall having those conversations?

A I know I had a conversation with Mr. Bridgeman, I don't recall other conversations in terms of providing the detail. I -- I would recall Ms. -- I've talked some to Mr. Jim Gaunt. I don't know if I provided him the same level of detail that I provided to Mr. Bridgeman. There may have been others as well that I don't recall at this moment. Yes. Mr. Gaunt, I would've talked to.

Q So again, your -- is it your testimony that you had other conversations about the allegations in your complaint with other people, but you cannot remember with whom. Is that your testimony?

A I had conversations with Mr. Bridgeman, as well as Mr. Gaunt. I may have had other conversations. I don't recall those at this time.

Q Did you have conversations about the allegations in your complaint with members of the CISE Board?

A I don't recall those conversations. No. I

don't believe so.

Q And you mentioned another Board that you sat on. What was that?

A A Summit Country Day School Board.

Q Yeah. You have any discussions with anyone on that Board concerning the allegations in your complaint?

A I do not recall having discussions with anyone on that Board.

Q I believe you said you also participated in a committee on athletics at Xavier University; is that right?

A Yes.

Q Do you have any discussions with any of those people on that committee about the allegations in your complaint.

A I don't believe so.

Q What are the names of the people on the CISE Board?

A I don't have all the names. Mabe Rodriguez was this -- executive director, Larry Kyte, Don Mellott. Those are the individuals that I met with. There's other names that I could certainly retrieve for you.

Q We'll make a follow-up request for those names.

A Again, just similar to yesterday, if you can

include that in a letter.
Q Was there a right to continue your question if it's necessary as a result of that additional disclosure. In -- with respect to the Summit Board, who sits on that Board?
A Allison Kropp is the chair again, there's 20 or 30 folks that would be on that Board.
Q The Xavier committee?
A Greg Christopher chairs it. There would be eight to 12 members of that Board.
Q Directing your attention back to the complaint in paragraph 17. Could you look at that, please?
A Yes.
Q Turn to paragraph 17. Do you have them?
A Uh-huh.
Q At that meeting on February 14, 2020, what exactly did Greg Carmichael say to you, and what did you say to him?
A He provided my annual performance review, a written performance review, way before rating. Good variable compensation for the year, which he would discuss during that process. An increase in my long-term incentive. And he tells me that the Board has asked him to stay for two plus years and that I may be too old for CEO role at that time. I told them my

timeline was to work to five years as an EVP, but not longer.

Q In 2017, when you were offered the presidency of the Cincinnati region, you declined it because you made a similar comment, right? That your timeline was to work only another five years?

A No.

Q What did you say?

A That meeting happened in June of '18. That meeting happened following talent management. We discussed this yesterday. Mr. Carmichael came into my office and asked if I would consider the regional president of the Cincinnati region. I told Mr. Carmichael I had already done that job. That that job required five to seven years for the person to be successful in that job. And I did not have five to seven years to commit to that position. Mr. Carmichael, 60 days later, gave me responsibility for all the regions of Fifth Third Bank.

Q So in this conversation in 2018, did you put forward the five year timeline? Is that your testimony?

A I put forward the five to seven year time frame to be successful as a regional president.

Q Because you only wanted to work another five to seven years; isn't that right?

A No.

Q Well, at this meeting in February of 2020, you again repeated that you only wanted to work another five years as EVP, correct?

A I told Mr. Carmichael when he told me he was extending -- or the Board extended -- was asking him to extend his term, that I would stay out. My timeline was to work five years longer as an EVP. Certainly, if I was president or CEO and the Board asked me to stay, I would certainly stay. I've worked my whole career at Fifth Third.

Q Was it in that context that he said, "You might be too old"?

A I don't know what context he told me I was already too old. He told me --

Q Well what did -- what exactly did he say about being too old?

A Said I was -- would be too old.

Q For what?

A For the president and CEO role.

Q Tell me exactly what he said.

A These are the notes I recall. These are the notes I recorded to help me with the conversation. I believe Mr. Carmichael told me that at that point I would be too old to be the president and CEO.

Q I'm just trying to find out what exactly happened at this meeting. How long did the meeting last?

A I don't have my calendar in front of me. I guess is the meeting lasted 30 to 60 minutes.

Q Is that a normal time frame for an annual performance review?

A I'd say typically annual performance reviews are somewhere between 30 and 60 minutes, yes.

Q Starting with the beginning of that performance review to the end, tell me what Mr. Carmichael said to you?

MR. SABA: Objection. Asked and answered. Go ahead.

A We would've first discussed my self evaluation. We would have discussed his performance review of me, and he would have then discussed the variable compensation and the increase. He then informed me that the Board had asked him to stay on for two plus years and that I might be too old for the CEO role at that time. And I told him I was happy to continue my existing position for five years.

Q You're existing position as EVP; is that right?

A Correct.

Q Is there anything else he said to you?
A I don't recall the entire discussion. There was a performance review and his health evaluation that we would have discussed as well.
Q But at the end of that conversation, you told him you'd be content to work another five years as EVP, correct?
A Correct. Up to five years as EVP, yes.
Q Up to five.
A Uh-huh.
Q Directing your attention back to paragraph 17. Read the last clause in that paragraph.
A Where the director had requested --
Q But did not --
A "But did not indicate that Carmichael changed the plans would adversely impact McHugh."
Q What is the meaning of that allegation? What are you alleging there?
A He said that his plans to stay on would not adversely impact me to be his president and successor.
Q Did he use those words?
A I don't recall.
Q In this annual performance review, as alleged in paragraph 17, you do not allege that Mr. Carmichael promised to recommend you to be president and CEO. Do

you?

A No. He had made that promise on August 18th of 2019.

Q Was the promise on August 18, 2019 the only time he promised that to you?

A Yes.

Q The annual performance review is reduced to writing; isn't that right?

A Yes.

MR. CIOFFI: As far as --

COURT REPORTER: This is 24.

Q Directing your attention to Exhibit 24, what is this document?

(EXHIBIT 24 MARKED FOR IDENTIFICATION)

A It appears to be a 2019 performance review.

Q Look through it. It extends from Fifth Third, McHugh 000846 through 000855. Do you see that?

A Yes.

Q Is that the complete 2019 annual review?

A It appears to be.

Q This 2019 annual review covers the whole year of 2019; isn't that correct?

A Yes.

Q It covers the mid-year performance review which took place in August 15, 2019; isn't that right?

A Yes.
Q I want to direct your attention to the first page of the performance review, which is 000846. Do you see that?
A Yes.
Q Does it say anywhere on this page that in August of 2019, Mr. Carmichael promised to recommend you to the Board?
A No.
Q Does it say anywhere on this page that you were the most qualified officer on the executive team?
A No.
Q Look at the next page, 000847. Does it say anywhere on this page that in August 2019, Mr. Carmichael promised to recommend you to the Board to be president and CEO?
A No.
Q Does it say anywhere on this page that Mr. Carmichael said in August, or believed you to be in 2019, the most qualified officer on the executive team?
A No.
Q Same question with respect to 00848?
A No.
Q Same question with respect to 000849?
A No.

Q Same question with respect to 000850?
A No.
Q But there is a section of the performance review on 000850, which is captioned, "Focus for the Future"; isn't that right?
A Yes.
Q And it's a comment field; isn't that right?
A Yes.
Q And whose comment is that in that field?
A I can't say for certain, but it looks like a standard part of the document. I'm assuming you're referring to looking to the new year --
Q Yeah. Looking to the new year, reflect on their performance. Go ahead and read that into the record.
A "Looking to the new year, reflect on the performance and development prio -- priorities needed to drive individual and team success. Indicate these priorities and consider what support may be needed. Leverage these considerations in goal setting discussions."
Q There's nothing in this section on Focus For The Future about you being recommended or becoming the president and CEO, is there?
A No.

Q There is, below what you just read, an employee response field; isn't that right?
A Yes.
Q It's blank, is it not?
A Yes.
Q Does that mean you had no response?
A No. It means it's blank.
Q It's blank. You didn't write a response to this performance review, did you?
A There's nothing in that --
Q There's nothing at a -- I'm asking you is that an accurate reflection, you made no comment in this document about being promised a recommendation to be the next president and CEO.
A Yes.
Q Directing your attention to 000851. Is there anything on that page?
A No.
Q Nothing at all about Mr. Carmichael's promise in your mid-term review, according to your allegations, to recommend you to be president and CEO, nothing in there?
A No.
Q Directing your attention to 000852, the next page. There's nothing on that page which reflects that

in 2019 at the mid-year review, you were allegedly promised per recommendation to be president and CEO. Is there?

A Correct.

Q There is however a field for opportunities for 2020, right?

A Yes.

Q And read those opportunities. These are opportunities for you that Mr. Carmichael wrote; is that right?

A That's my understanding, yes.

Q Okay. And go ahead and read those please.

A "Continued to identify and implement strategies to enhance the performance of our regions, as well as the efficiency and consistency of our regional operating rhythms. Ensure that sustained integration of a legacy MB Financial employees and customers to realize, plan business results, and promote growth opportunities. Be very visible to our key clients and appropriately support client acquisition in our markets. Ensure timely execution of talent management actions to make certain the very best leaders are in key positions."

Q So here on your official 2019 performance review, Mr. Carmichael says nothing about the alleged

promise to recommend you to be president and CEO, does he?
A That's correct.
Q At the performance review on February 14, 2020, did you raise this omission with Mr. Carmichael?
A No.
Q Did you ask him why didn't you put as one of my opportunities the fact that you would recommend me as president and CEO?
A No. I relied on Mr. Carmichael's word to me in February or in -- I'm sorry, August of 2019, during my mid-year review. And I took Mr. Carmichael at his word.
Q At the very least doesn't the admission of any reference to a promise to recommend you suggest that the two of you had a different understanding about what happened in August of 2019?
MR. SABA: Objection. Go ahead. You can answer.
A No.
Q It doesn't?
A No.
Q Wouldn't a reasonable employee who had been promised a recommendation and then saw no reference to it in his performance review, raised that omission?

MR. SABA: Objection. Go ahead. You can answer.

A I can't speak to what a reasonable employee would do. I can tell you what I did. And I counted on Mr. Carmichael's word. For 34 years, I worked at Fifth Third Bank, it was not a job, it was a career. Every day I worked in the best interest of our shareholders and our customers. I did not at any time, okay, asked Mr. Carmichael to put his commitment to me in writing. I took Mr. Carmichael at his word. I thought he was a man of his word at that time. Obviously, I've learned since then that was not accurate.

Q But there could have been a misunderstanding, right? Of the conversation in August of 2019?

A I do not believe there was a misunderstanding because three days later, Mr. Schaffer confirmed that discussion and Mr. Schaffer initiated the discussion while we were at the end up Perry -- and at Perry Cabinet.

Q Isn't it true that the only discussion about president and CEO was in the context of an emergency break-the-glass situation, in which Mr. Carmichael was willing to recommend you as a management candidate to perform the role of an interim CEO until a new CEO could be named?

A No.

MR. SABA: Objection to the form of the question. Go ahead, you can answer.

Q Did you ever have that discussion with him?

A No. Mr. Carmichael never had a discussion with me about being an emergency replacement president and CEO. The only discussion he had with me was August of '19 about being his successor.

Q None of that appears in your 2019 performance review, correct?

A Yes.

Q Were you aware though as part of Fifth Third succession planning that there was an emergency break the glass scenario in the event of the unfortunate death or disability of a CEO, right?

A Yes.

Q What was your understanding of that emergency succession plan?

A My understanding would -- was that in an emergency case that needed an individual be the successor CEO that that would be the CFO at the time Tayfun Tazun.

Q Did you have any discussion with anyone that you might be recommended to be an alternate management candidate for that role?

A I do not recall any discussions about an emergency -- emergency CEO replacement.

Q Did you ever have any discussions with Tayfun about it?

A I can't recall.

Q Did you have any discussions with Jamie Leonard about the emergency succession plan?

A I can't recall.

Q Did you have any discussions with anyone about Fifth Third's emergency succession planning?

A I cannot recall.

MR. CIOFFI: Let's mark this one.

THE WITNESS: Getting your 24, Michael.

MR. CIOFFI: I do?

THE WITNESS: Yeah.

MR. CIOFFI: Thank you.

THE WITNESS: Okay.

COURT REPORTER: This is 25.

MR. CIOFFI: 25. Sorry, guys. Staples are -- I think that's a full copy on the right.

COURT REPORTER: Could you have one for Mr. McHugh?

THE WITNESS: Come a little bit loose, but what number is it?

COURT REPORTER: 25.

(EXHIBIT 25 MARKED FOR IDENTIFICATION)

BY MR. CIOFFI:

Q Have you ever seen this document before?

A Yes. I believe this was produced.

Q Right.

A In response to our request.

Q Did you review this document?

A I briefly scanned it.

Q You didn't tell me when I asked you what preparation for deposition, and you've looked at it, but --

MR. SABA: Okay. It mischaracterizes the testimony.

Q So directing your attention to the first page of this document, what's the caption of it?

A "Board of Directors to Third Bank, human capital and executive talent management and succession plan updates."

Q What's the date of this document?

A December 17th of 2019.

Q So this document was created and presented to the Board well before any of the controversies in this lawsuit; isn't that right?

MR. SABA: Objection. Mischaracterizes testimony.

A Yes. December 2019. This document was produced.
Q Did you see this document in or around December of 2019?
A No.
Q Were you aware that such a document existed?
A No.
Q But you were aware, generally, that there were, we covered this yesterday, that just like every prudent Board, the Board considers succession planning.
A Yes. I'm generally aware. Yes.
Q When you saw this as being produced in discovery, you weren't surprised, were you?
A Yes. I was surprised.
Q You were surprised that the document existed?
A No. Not that the document existed. I'm sorry. I thought you said that --
Q What were you surprised about?
A I was surprised under CEO succession 001142.
Q Okay. And what surprised you about that?
A That my name was not listed above Mr. Spence, as it was on previous editions of this that were provided.
Q You saw previous editions of this, but you didn't see this edition. Is that what your testimony

is?

A I said to you yesterday and I'm saying to you today, I briefly scanned the documents that were provided, based on our request. There was a previous draft of this document that had my name on -- two that had my name as the next CEO under CEO succession. In this case, 001142. So yes, I was surprised when I saw this version did not have my name.

Q Well, looking at 001142, it does have your name, right?

A Has my name only under emergency successor, beneath Tayfun's.

Q And that's what Mr. Carmichael discussed with you in August of 2019, isn't that right?

MR. SABA: Objection. Asked and answered

A I had said this to you, Mr. Carmichael did not discuss the emergency CEO. Mr. Carmichael discussed the successor to him as president and CEO.

Q But that's not what this document says that was presented to the Board, right?

A Yes. This document does not have my name, other than emergency successor.

Q You have mentioned a couple of other places in this document.

A What page?

Q Direct your attention to 001132. Do you see that?
A Yes.
Q Have you seen that document before?
A Yes.
Q What is that document?
A I think we refer to it as a talent management card.
Q Talent management card.
A Executive card, I'm not sure of the official title, but yes, I've seen this document.
Q Do you draft this document?
A We provide a comments for this in partnership with our human resource business partner, and then submitted to Mr. Schaffer and Mr. Carmichael.
Q And who's that human resource business partner who collaborated with you -- collaborated with you on this 001132 document?
A I believe it would have been Chris Sauna (phonetic).
Q In the first field, on the top right, there's a box that talks about potential next positions. Do you see that?
A Yes.
Q There's a parenthetical below that, can you

read that?
A I can't read that. I'm sorry.
Q I believe it says, "We're ready now, one to two years, two plus years." But the next box talks about your potential next position. And it is expand current responsibilities to include middle market leadership, you see that?
A Yes.
Q No mention at all about your next position being president or CEO; isn't that correct?
A Yes.
Q And what -- did you create this document with Mr. Sauna?
A We would have completed portions of this document, but not the entire document.
Q Well, did you complete this portion about your potential next position?
A I don't recall.
Q Well, you saw this document listing your next potential position as expand current responsibilities to include middle market leadership, right?
A I saw it when it was produced here. I don't recall seeing a final copy when it was submitted to the Board.
Q What's shown on 001132, in terms of your next

potential position is exactly consistent with your 2019 performance review, right?

A Could you be more specific, please?

Q Yes. It says, expand current responsibilities to include middle market leadership. Those --

A I didn't see that in our previous comments that's why I asked you to be more specific. Are you referring now back to 000852?

Q No. No. No. I'm referring back to the performance review.

A All right.

Q If you look at Exhibit 24, 000852. That next position is consistent with first bullet, right? The first bullet is, "to continue identifying, implement strategies to enhance the performance of our regions, as well as the efficiency and consistency of our regional operating rhythms." That's what your 2019 performance review says, which is consistent with your curr -- expand your current responsibilities to include middle market leadership, which is reflected on 001132, right?

MR. SABA: Objection. Form of the question. Go ahead. You can answer.

A No. I don't believe those are the same.

Q I didn't say they're the same. They're consistent, right?

A I don't believe they're --

MR. SABA: Objection. Go ahead. You can answer.

Q Please answer.

A I don't believe they're consistent. They're -- they're similar.

Q They're same consistent about -- they're similar. But when you saw your performance review and when you saw this document in whatever draft form, you didn't object to anyone about your future of expanding current responsibilities? Did you?

MR. SABA: Objection.

A No.

Q I want to direct your attention to page 001135. What is that document?

A Appears to be a card, a talent management card.

Q For whom?

A Tim Spence.

Q It's identical to yours, right? In terms of the number of fields and the topics of the fields, correct?

A The fields, yes. Uh-huh.

Q It has a field for potential next positions, correct?

A Correct.
Q And what does it say next to that field?
A President, one to two years.
Q And, in fact, what's reflected on this document happened, right?
A In less than one year, yes.
Q Approximately --
A October --
Q This at December of 2019, right?
A Right. In September of that year, yes.
Q Right. Did you see the document 001135 in December --
A No.
Q -- of 2019?
A No.
Q With respect to Tim Spence becoming the president in October of 2020, that decision was preceded by a vetting process; isn't that correct?
A Yes.
Q Describe what you know about that vetting process.
A Mr. Carmichael came into my office, said that I would -- he asked me to participate in a discussion with Guy Beaudin that would that they would be providing some -- he wanted me to provide feedback about Tim and

how Tim could be a better leader at Fifth Third. And he said, you'll need to know Guy as well.

Q And Guy, I think his name is pronounced Guy.

A Okay.

Q Pronounced Guy --

A I never spoke to Guy.

Q Was a principal at the firm RHR; isn't that correct?

A I believe so.

Q Did you have other familiarity with the company RHR?

A Only from the fact that Jamie or Tayfun told me they were utilized before by the bank.

Q And the truth is that for a number of years they'd used RHR as a consultant to that -- the position of president and CEO, right?

A Jamie told me, or Tayfun, that they use them back in '15 or so for -- I forget the specific years for CFO and CEO, I believe.

Q You understood, did you not, that RHR was one of the leading consultants in executive vetting, right?

A I was not familiar with RHR.

Q But you were asked to participate in the vetting of Tim Spence, isn't that right?

A Correct.

Q And, in fact, Guy interviewed you as one of the executives in the vetting process?
A No. He did not interview me.
Q Did his associate Chuck Evans interview you?
A I believe so.
Q So Chuck Evans interviewed you. Did you -- do you have any discussions with Guy?
A I don't recall any discussions.
Q What did -- scratch that. When did you participate in the vetting process? What was the date?
A I don't have the specific date in front of me. Sometime in 2020.
Q Was it August of 2020?
A It could have been. Again, I can't verify without a calendar.
Q Well, you know that other executives were part of the vetting process as well, correct?
A Yes. Uh-huh.
Q Who else participated?
A I was aware that Jamie participated and Tayfun participated.
Q Anyone else that you're aware of?
A I think Jamie told me some of his direct reports, and his direct reports did as well, maybe Mike Butera and Howard Hammond.

Q In fact, the vetting process included a lot of executives and officers and employees of the company, correct?
A I think it involved six to 12.
Q You were one of those?
A Correct.
Q Your participation in the vetting process began with a meeting with Chuck Evans?
A A phone call.
Q A phone call? Did you complete any written forms or respond to any written e-mails concerning the vetting process?
A I don't recall.
Q Describe for the record what Mr. Evans said to you and what you said to him.
A I believe Mr. Evans asked me a series of questions and I provided him answers to those questions. If my recollection is correct, it was not a very long call. And I had a vested interest in providing feedback to make Tim a better leader, because Mr. Carmichael told me he would follow me. And I provided what I believed were some opportunities for Tim to improve his performance.
Q What were the questions?
A I don't recall.

Q Describe what was asked.
A I don't recall the specific questions.
Q At any time during the vetting process, did you say to Mr. Evans that Tim Spence should not be the president and CEO?
A I don't believe so.
Q At any time in the vetting process, did you say to Mr. Evans that you should be the president and CEO?
A No.
Q At any time in the vetting process, did you say that you wanted to be vetted for president and CEO?
A No.
Q What comments did you make about Tim Spence as a president and CEO to Mr. Evans?
A I can't recall the specific comments. I'm sure I told him that Tim had a good knowledge of the banking industry, but I -- the development opportunity was to understand regional banking and how relationship banking worked, and that was a key success driver for Fifth Third. The specific comments, specific words, I can't recall at this time.
Q Were any of those comments or words reduced to writing?
A No.

Q Have you ever seen Mr. Evans' notes of his interview with you?
A I don't believe so.
Q Directing your attention back to the complaint.
A Back to the complaint?
Q Yes. Look at paragraph 38. Read that paragraph.
A "Has a direct result of such discrimination and retaliation in violation of both federal and state law, McHugh has sustained financial losses in base pay, variable compensation, long-term incentive compensation, equity awards, stock options, health coverage for himself and his family. All to the detriment in an amount exceeding $12.5 million."
Q How did you arrive at the 12.500 -- $12.5 million?
A Well, it's an amount exceeding 12 five and it would have been the discrimination in terms of value to promote, the demotion, and then the retaliation claim against Fifth Third, what the 12 five would be in ex -- in --
Q What are the components of the --
A It would be --
Q -- 12.5?

A -- it would be base pay, variable compensation, long-term incentive, other benefits that I was entitled to, for value to promote as president, CEO. And then for a demotion of my existing pack.

Q I believe you testified yesterday that your best -- your base pay plus variable compensation plus long-term incentive compensation was roughly equal to about 2.2 million?

A Correct.

Q And that was your your compensation in October of 2020?

A Correct.

Q Is there some multiple of that you're seeking in this lawsuit or is that it?

MR. SABA: Objection to form of the question. You can answer.

A It is lost pay from the failure to promote as well as the demotion. It would -- and it would also include the 12 -- the 2.2 million you just referenced would not include other benefits beyond the base pay, variable compensation, and long-term incentive.

Q What were some of those other benefits that you enjoyed in October 2020?

A Medical benefits, dental benefits, there was a non-qualified deferred compensation. There were

retirement benefits, retirement matching program.
Q You also had other benefits like country club dues and memberships, isn't that right?
A I did not have any dues in October of 2020. I had a forgiveness loan that covered my initiation. And as long as I was employed by Fifth Third on the last day of the year, they would make a payment to me to cover that loan.
Q And the loan was for country club memberships; is that right?
A Yes.
Q Which country clubs?
A The country club in Cincinnati was Kenwood Country Club. And I had previously had a loan for Valhalla Country Club in Louisville, Kentucky.
Q And those are benefits you had in October of 2020, correct?
A I did not have country club dues in October of 2020. I had two payments due on the loan. And when Fifth Third terminated my employment they immediately demanded payment of that note.
Q But if you continued in your employment, that is it your testimony -- I'm trying to just understand your damage. Is your testimony that that loan would have been forgiving at the end of the year?

A Yes. If I were continuing to be employed at 12-31-2020 and 12-31-2020.

Q And how much was that loan for?

A I think October of 2020 roughly 13,000, 14,000. I don't know.

Q Is that a damage you're seeking in this lawsuit?

A I'm sorry?

Q Is that a damage that you're seeking in this lawsuit?

A A damage being the $13,000 or could you be specific in terms of this?

Q So one of the benefits you lost is the forgiveness of this loan. I'm just asking you, is that something --

A We paid that loan at the bank's request.

Q Have you continued your memberships at those country clubs?

A Yes.

Q And what other components of damages are you claiming in paragraph 38?

A Well, I've given you those.

Q I -- I'm just asking. Are there any other --

A Failure to promote, a demotion, the retaliation claim these hover just, I mean, there are

other benefits, whatever benefits I was entitled to before the bank terminated me.

Q Directing your attention to paragraph 39 through 47. Is there any other basis for your failure to promote claim other than what's described in these paragraphs?

MR. SABA: Objection to the form of the question. Go ahead. You can answer.

THE WITNESS: Could you repeat the question?

(REPORTER READS BACK REQUESTED TESTIMONY)

MR. SABA: Continuing objection.

A I don't know.

BY MR. CIOFFI:

Q Well, you testified here today under oath. Are you aware of any other facts other than what's described in these paragraph to support your claim?

MR. SABA: Objection to the form of the question. Go ahead. You can answer.

A I don't know.

Q When do you think you'll know?

A After we've had a chance to review all the documents and all the documents have been provided then I would know.

Q Directing your attention to paragraph 51. Read that first sentence.

A "October 2020. Defendants deliberately created intolerable working conditions for McHugh with the intention of forcing McHugh to leave his employment. This included requiring McHugh accepted the motion to head of consumer banking, a position he previously held. And to report directly to Spence, a substantially younger and less qualified individual, who until that point reported directly to McHugh."

Q What specifically were the intolerable working conditions that you're alleging in this paragraph?

A So the bank, Mr. Carmichael, during our October 13th meeting, asked me to take the head of consumer bank role. That was a role at that I had previously been promoted from. In addition, a bank was involved with a lawsuit with the federal government's Consumer of Financial Protection Bureau alleging unauthorized accounts. I was not going to be the scapegoat of any adverse selection. Any adverse action by the Consumer Financial Protection Bureau. Those unauthorized accounts did not happen under my leadership. And finally, I was asked to report to Mr. Spence, who was substantially younger and substantially less qualified than me.

Q Anything else that created intolerable working condition?

A I can't recall at this time.
Q I don't see in this paragraph any allegations about the accounts. Is that a new allegation you're making?
MR. SABA: Objection. Go ahead. You can answer.
A There is something previous. I don't see this in terms of it's page 4, paragraph 20.
Q Go ahead and read that allegation.
A "On March 9, 2020, the Bureau of the Consumer Financial Protection, CFPB, in quotes, filed at second misconduct complaint against Fifth Third Bank. This time in Chicago, Illinois. In case number 120.33.01683, asserting that the bank had unlawfully and illegally open deposit accounts in consumers names without their authorization to do so, transferred funds from existing accounts to new accounts without authorization. Issued cards, issued credit cards, enrolled consumers in online banking services and opened lines of credit on consumers accounts. In doing so, the CFPB alleged that Fifth Third had engaged in repeated violations of the Consumer Financial Protection Act, the Truth in Lending Act, Truth and Saving Act together with their implementing regulations and sought injunctive relief -- injunctive and monetary relief." I'm sorry.

Q Do you know how those allegations were resolved?

A No. I don't believe they've been resolved.

Q You're aware though, in your history of working for the bank, that banks often get complaints filed against them by regulators; isn't that right?

A Yes.

Q You said something about being a scapegoat. What -- I don't understand what you're alleging.

A Mr. Carmichael asked me to be in the head of consumer role. The consumer bank has where these unauthorized accounts were opened. I was not going to be the escape goat of the CFPB was coming after an executive of Fifth Third bank. Those unauthorized accounts did not happen under my leadership.

Q Well, these unauthorized accounts may not have happened at all, right?

A No. I believe they did because Mr. Carmichael and Mr. Spence said they did.

Q But your point is that in March of 2020, you were not head of the consumer bank; is that right?

A My point is in March of 2020, the CFPB filed suit against the bank.

Q All right. But you were not in charge of the consumer bank at that point in time, right?

A Correct.
Q Do you know how far back the allegations in the CFPB complaint extended?
A I believe it was a period that covered 20 -- 2009 or 2010 through 2012, '13 or '14. I'm not sure of the specifics without it in front of me.
Q For what period of time were you the head of consumer banking?
A April 17th until Mr. Carmichael promoted me in August of '18.
Q So, to your knowledge, did the CFPB complaint cover the period of time where you were head of consumer banking?
A No. I do not believe it covers that time frame.
Q But do you know? Have you actually read the complaint?
A I read the complaint at one point. I can't say with certainty the time period it covers.
Q Well, how -- if it goes back to 2012 or 2013, did you testify that it would have to cover the period of time where you were head of consumer bank?
A I was head of the consumer bank from April of 2017 until I was promoted from that position in August of 2018.

Q And my question to you is: If, in fact, the CFPB complaint extends back to 2012, it would have covered a period of time in which you were the head of consumer banking, right?

MR. SABA: Objection. You can answer.

A No.

Q You --

A I was head of the consumer bank from April of 2017 through August of 2018.

Q Right.

A I told you that complaint runs from some period. Again, I do not know the exact date. We can certainly get that for you from '09 to '12 or '13.

Q It wasn't from '09 to the present time?

A I don't believe so.

Q The complain will speak for itself.

A Yes. Uh-huh.

Q Okay. Who was the head of consumer bank in this time frame that you've described as '09 to 2012?

A I can't say with certainty. I know Mr. Carmichael, Mr. Kabat was CEO. I believe Mr. Carmichael was president, it may have been an individual by name of Terry Zink, who was head of the consumer bank. I -- I -- I can't say with certainty the timing of who was in what role at what time.

Q So if you're right about the time frame, this complaint by the CFPB has nothing to do with you or Mr. Spence, correct?

A Correct.

Q Directing your attention back to the complaint, page 8. Read Paragraph 41, please?

A "McHugh with highly qualified for the positions of president of Fifth Third, and CEO of Fifth Third, and expressed a willingness to accept the positions after Carmichael informed McHugh that he would be recommended for them."

Q Is there any other basis for this allegation of the complaint other than the alleged recommendation promise by Mr. Carmichael?

MR. SABA: Objection to the form of the question. Go ahead, you can answer.

A Yes. I would say, Mr. Carmichael's conversation and the follow-up conversation with Mr. Schaffer three days later.

Q Those two conversations?

THE WITNESS: Yes. Could we take a restroom break?

MR. CIOFFI: Sure.

VIDEOGRAPHER: We're going off record at 1:47.

(OFF THE RECORD)

VIDEOGRAPHER: We're back on the record at 01:54 p.m.

BY MR. CIOFFI:

Q Good afternoon, Mr. McHugh. Reminding you again that you're under oath. Do you understand that?

A Yes.

Q I'd like to direct your attention to page 10 of the complaint. Do you have that in front of you? Let me see if I understand your retaliation claim. Would you read paragraph 61 and 62? So go ahead and read it into the record.

A "Within two days of engaging in this protected activity," defendants took adv -- excuse me. "Defendants took adverse actions against McHugh through the filing of a frivolous counterclaim asserting abuse of process, which seeks awards of punitive damages and attorney's fees against McHugh for the mere filing of an age discrimination lawsuit."

Q Read paragraph 62 as well.

A "Since that time, Defendants have engaged in further unlawful retaliatory acts, including abuse of subpoenas directed to McHugh's wife and four children."

Q So as I understand your retaliation claim is set forth in the complaint. It involves two actions by

the defendants, right?

MR. SABA: Objection to the form of the question. Go ahead. You can answer.

A Yes. These two and potentially more.

Q All right. Well, allow me just to look at the two that you've set forth in the complaint. The first one is the filing of a frivolous counterclaim. That's one basis for your retaliation claim, right?

A Yes.

Q The second basis in the complaint is abusive subpoenas, right?

A Yes.

Q Are there any other bases for your retaliation claim?

A There maybe others that we would bring once we have received all the documents requested.

Q But as you sit here today, those are the only two bases that you know of?

A Yes.

Q I wanted to direct your attention back in earlier in the complaint, paragraph 22, please.

A Could you repeat that paragraph?

Q Paragraph 22. Would you read that first sentence?

A "Shortly before the Board of Director meeting

of September 21 and 22, McHugh discussed with Carmichael, McHugh's presentation to the Board regarding the bank's performance and was explicitly directed by Carmichael to indicate across all lines of business of the bank, regional banking contributed 63 percent of the bank's net income. This representation underscored significance of McHugh's role and re- emphasized Mr. Carmichael's promise to endorse McHugh for the president, Chief off -- Chief Executive Officer position."

Q Just to be clear in this discussion on about the Board presentation in September 21 and 22, Carmichael did not say anything about a promise to endorse you as president and CEO at that meeting?

A The September 21st?

Q Yeah.

A Yes. Correct.

Q Did the -- this preparation meeting you describe in the first sentence, it happened a few days before the September 21?

A Yes. We could confirm quickly once we saw our calendar for that, but yes. It would have -- a meeting would have occurred before September 21st and 22nd. Yes.

Q So that you could prepare a presentation?

A Yes. It was multiple meetings before that was Carmichael.

Q You used the phrase in here, "across all lines of businesses or all lines of business." What lines where you're referring to?

A All lines of business of the bank.

Q Read in -- within a particular region, right?

A Yeah. Yes. "All lines of business for the bank, regional banking contribute." So across all lines of business for Fifth Third Bank, regional banking -- the regional banking contributed 63 percent the net income.

Q All the lines within regional banking contributed 63 percent of the Bancorp's income, right?

A Mr. Carmichael asked us to include that 63 percent of the bank's net income came from regional banking.

MR. CIOFFI: Mark this as Exhibit 25. Is that right?

COURT REPORTER: 26.

MR. CIOFFI: 26.

(EXHIBIT 26 MARKED FOR IDENTIFICATION)

COURT REPORTER: You have one in --

A In your next one. I'm sorry. Let me give you that.

BY MR. CIOFFI:
Q Directing your attention to Exhibit 26, look through it, please.
A Okay.
Q Is that the presentation you made to the Board?
A It appears to be.
Q Looking at the second page of the exhibit, which actually bears a page number of 242. Do you see that?
A Yes.
Q In the upper left-hand corner there are two pie charts. You see them?
A Yes.
Q The pie chart on the right is underneath a heading of "net income contribution," correct?
A Yes.
Q What is that pie chart designed to convey to the reader?
A The percentage of net income coming from these business lines.
Q The business lines are across the bottom of that highlighted square, is that correct?
A Consumer, yes.
Q Right to left. Go ahead and read them.

A Consumer, WAM, non-business banking, commercial middle market, commercial corporate national.
Q And the head of consumer was Tim Spence, correct?
A Correct.
Q And the head of WAM was you, Philip McHugh, right?
A Correct.
Q The head of business banking was you, Phil McHugh, correct?
A Correct.
Q The head of commercial middle market was again, you Phil McHugh, right?
A Yes.
Q And the head of commercial corporate national was Lars Anderson and Kevin Lavender?
A Kevin Lavender at the time.
Q Kevin Lavender at that time. The total percentage of net income contributed -- let me go back a step and stop and ask you this. The pie chart shows the net income contribution of the 63 percent that the regional banking network contributed to the Bancorp's net income; is that correct?
A No.
Q Is it total --

A This is --
Q -- Bancorp?
A -- as you referenced, Consumer, WAM, business banking, middle market, commercial, corporate. Regional banking would be represented in all of those.
Q My question though -- go to the next page. Do you see that 243? And at the bottom in green highlighting, read that?
A "Including retail and mortgage, overall regional business banking. Businesses contribute 63 percent of the net income of the bank."
Q What I'm asking you -- I -- I'm just trying to understand what the pie chart says. Is the pie chart we were just discussing, a pie chart that represents those business lines that contributed to the 63 percent?
A Which pie chart? The pie chart --
Q Yeah. The pie chart we were just discussing at the top.
A It would appear to be, yes.
Q All right. So those percentages are -- the whole pie chart is 63 percent of the net income of the bank, correct?
A No. The pie chart, it would appear to me, I don't have a calculator at my fingertips, is adding up to 100 percent.

Q Correct. But it's representing that constituent percentages of the 63 percent, correct?
A I'm sorry, I don't understand your question.
Q So the point of the presentation is -- and looking at 242, 243, is that demonstrate that regional banking contributed 63 percent?
A The comment on page 254 was inserted at the request of Nick -- Mr. Carmichael to say regional banking businesses contribute 63 percent of the net income to the bank.
Q And those banking businesses are the ones we just described earlier, which appear on 242 specifically, consumer, WAM, business banking, commercial middle market, and commercial corporate national, correct?
A I believe so. But I see on page 242, we don't break apart mortgage from a net income standpoint or indirect audit we see.
Q Going back to the pie chart 242, net income contribution. Consumer contributed to net income 35 percent, correct?
A Correct.
Q WAM contributed five percent, correct?
A Correct.
Q Business banking contributed three percent,

correct?
A Correct.
Q Commercial middle market contributed 18 percent, right?
A Correct.
Q What's the total of those? Five, three, and 18. 26 percent?
A 26.
Q Right. 26 percent. The businesses that reported to you contributed 26 percent, correct?
A These businesses did.
Q All right.
A There would also be something of the net income that may have been reflected in the other areas come through the regional banking. Yes.
Q I'm talking about this pie chart.
A Yeah. The WAM, business banking, commercial middle market, yeah.
Q Contributed 26 percent?
A Correct.
Q Consumer, which was headed by Tim Spence, contributed 35 percent, correct?
A Correct.
Q And then commercial corporate national contributed 39 percent, correct?

A Correct.
Q So of these groups, your groups of businesses contributed the least amount?
A Under this chart, yes.
Q Under that chart. Is there another chart? Is there another chart that's showing something different?
A There's a point on the next page. On page 243. Okay. That says your overall regional banking businesses contributed 63 percent of the net income of the bank. So some of these in the pie chart that are reflected in these various business lines would also come through the Regional banking area of the bank.
Q But the phrase "overall regional banking businesses" refers to the five business lines on page 242, right?
A I don't know. I was not in the office when this was put in place. This was put in place at the request of Mr. Carmichael. I did not go back and verify that it was 63 percent of the net income of the bank or at what date he was using that comment.
Q That wasn't my question.
A Okay.
MR. CIOFFI: Can you read my question back, please?
COURT REPORTER: Of course. Give me one

second.

(REPORTER READS BACK REQUESTED TESTIMONY)

A I would say there may be other businesses. I'm not sure what all went into the 63 percent.

BY MR. CIOFFI:

Q But in terms of this document, the phrase on 243 of regional banking businesses, refers back to those business is shown on page 242, doesn't it?

MR. SABA: Objection. Go ahead. You can answer.

A Can you repeat the question?

(REPORTER READS BACK REQUESTED TESTIMONY)

A I -- excuse me. I don't know.

BY MR. CIOFFI:

Q Well, when you were presenting this document, is that what you said?

A No.

Q Well, what did you say about this document?

A I said 63 percent of the net income of the bank comes from regional bank. I don't have transcript of everything I presented to the Board and what I said.

Q In the business lines that make up that 63 percent, are those business lines on 242, correct?

A I'm saying --

MR. SABA: Objection. Asked and answered. Go

ahead.

A Yes. But there could be more.

Q Well, name the other ones.

A I don't know what all is in there. You don't have auto lending, you don't have indirect. There's -- I don't know where institutional investments covered. The point of the slide on page 243, as I understood it at Mr. Carmichael's direction, was he wanted us to convey to the Board that regional banking contribute 63 percent of the net income of the bank.

Q Well, read the line at the bottom of page 243.

A "Including retail and mortgage, the overall regional banking businesses contribute 63 percent of the net income of the bank." Retail and mortgage are done in our retail -- in our regional banks.

Q But the 63 percent is what's being contributed by the regional banking businesses; isn't that right?

A I believe so.

MR. SABA: Objection. Go ahead and answer.

A I did not perform the calculation myself.

Q And those businesses are on 242, right?

MR. SABA: Objection. Asked and answered. Go ahead. You can answer.

A Those businesses and potentially others.

Q Okay. What are those potentially others that aren't reflected on the document?

MR. SABA: Objection. Asked and answered. Go ahead. You can answer.

A Okay. Mortgage and indirect auto. I'm not sure whether revenue and net income of Fifth Third security is captured. There's many areas of the bank that have a separate financial statement and I can't -- I'm trying to answer your question relative to the comparison on page 242 to 243.

Q What does the phrase "including retail and mortgage" mean on page 243?

A Including retail and mortgage.

Q With respect to the five businesses on 242. Consumer, WAM, business banking, commercial middle market, and commercial corporate national. You would agree with me, wouldn't you, that your businesses contributed 26 percent, correct?

A On the chart on page 242, yes, I would agree with that.

Q And Tim Spence's businesses contributed 35 percent, correct?

A Yes.

Q And Kevin Lavender's businesses contributed 39 percent, correct?

A For purposes of this chart, yes.
Q Okay. Directing your attention back to page 10 of the complaint. Do you see at the bottom of the page, there's a clause with bold letters wherefore?
A Yes.
Q Please read after wherefore.
A "Wherefore Plaintiff demands judgment against Defendants joint and severally consistent with Civil Rule 8, parentheses A and the parentheses for damages in excess of 25,000 together with the following relief."
Q And it has lost wages, but there's no amount there for lost wages, correct?
A Correct. There is no amount there.
Q Okay. What amount are you claiming for lost wages?
MR. SABA: Objection. You're asking for his understanding, not the legal -- not the legal conclusion, the legal definition of --
MR. CIOFFI: He's the plaintiff. I'm asking what lost wages are you claiming?
MR. SABA: I understand. You're asking for -- you're not -- I'm clarifying objection to the extent you're asking for a legal conclusion.
MR. CIOFFI: Doesn't require --
MR. SABA: Yes. It does.

MR. CIOFFI: He doesn't --

MR. SABA: He doesn't have a legal definition of back pay, the estimate.

MR. CIOFFI: Counsel, you're coaching the witness.

MR. SABA: No. No. We're trying to clarify here for the legal question.

MR. CIOFFI: No, you know what you're doing,

MR. SABA: No. Not at all. Go ahead and answer the question.

MR. CIOFFI: Read my question back, please.

COURT REPORTER: Yes. Of course.

(REPORTER READS BACK REQUESTED TESTIMONY)

MR. SABA: Objection. Go ahead, you can answer.

A The amount I would've been paid based on the positions I held and were promised to me at Fifth Third Bank.

BY MR. CIOFFI:

Q And how much is that?

A I -- I don't know off the top of my head.

Q Who would know if you don't know?

A Oh, we can calculate it for you. I don't have it off the top of my head.

Q B, read that.

A "Lost benefits."
Q And how much are you claiming for loss benefits?
A I don't know the specific amount.
Q C, read that, please.
A "Reinstatement or front pay in lieu thereof."
Q How much are you claiming for that?
A I don't know.
Q Compensatory damages. How much did you -- claiming for that?
A I don't know.
Q Punitive damages, how much are you claiming for that?
A I don't know.
Q Liquidated damages, F. How much are you claiming for liquidated damages?
A I don't know.
Q G. Read G.
A "Pre-judgment and post-judgment interest."
Q Do you know what amount you're claiming for that?
A No. I wouldn't know.
Q H.
A "Attorney's fees and expenses."
Q Do you know what amount you would be claiming

for that?

A No.

Q Then read I.

A "All other relief to which plaintiff is entitled."

Q As you sit here today, are you aware of any other relief you would be claiming?

A No. Not at this time. Not seeing the other documents.

MR. CIOFFI: I have no further questions. So let me say, complete subject to reopening this deposition as warranted by additional documents that might be produced. So for example, we find out that there are deleted e-mails that weren't -- or/and text messages that weren't captured. We'd want a question about that and other topics that we've talked about in this deposition.

COURT REPORTER: And Exhibit 6, that you wanted me to --

MR. CIOFFI: And is that 6 or 7?

COURT REPORTER: That's 6.

MR. CIOFFI: Alright. 6. Yeah. One clarification on 6. The court reporter has represented that she's taken a photograph of each page and proposes to include that photograph in the

transcript as an exhibit. Is that acceptable?

MR. SABA: That's acceptable. That's fine. We'll read.

COURT REPORTER: Okay. Perfect.

MR. SABA: All right.

VIDEOGRAPHER: Do you have any further questions? Okay. This is today's deposition. We're off the record at 2:16.

(DEPOSITION CONCLUDED AT 2:16 P.M.)

CERTIFICATE OF REPORTER

STATE OF OHIO

I do hereby certify that the witness in the foregoing transcript was taken on the date, and at the time and place set out on the Title page hereof, by me after first being duly sworn to testify the truth, the whole truth, and nothing but the truth; and that the said matter was recorded by me and then reduced to typewritten form under my direction, and constitutes a true record of the transcript as taken, all to the best of my skill and ability. I certify that I am not a relative or employee of either counsel and that I am in no way interested financially, directly or indirectly, in this action.



GABRYEL REINSTATLER,
COURT REPORTER / NOTARY
MY COMMISSION EXPIRES: 07/05/2026
SUBMITTED ON: 09/15/2021

Notice Date: 09/15/2021

Deposition Date: 8/31/2021

Deponent: Philip R. McHugh Vol. II

Case Name: Philip R. McHugh vs. Fifth Third Bancorp

| Page:Line | Now Reads | Should Read |
|---|---|---|
| ______ | ________________________ | ___________________ |
| ______ | ________________________ | ___________________ |
| ______ | ________________________ | ___________________ |
| ______ | ________________________ | ___________________ |
| ______ | ________________________ | ___________________ |
| ______ | ________________________ | ___________________ |
| ______ | ________________________ | ___________________ |
| ______ | ________________________ | ___________________ |
| ______ | ________________________ | ___________________ |
| ______ | ________________________ | ___________________ |
| ______ | ________________________ | ___________________ |
| ______ | ________________________ | ___________________ |
| ______ | ________________________ | ___________________ |
| ______ | ________________________ | ___________________ |
| ______ | ________________________ | ___________________ |
| ______ | ________________________ | ___________________ |
| ______ | ________________________ | ___________________ |

CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the foregoing transcript, and the same is a true and accurate record of the testimony given by me.

Any additions or corrections that I feel are necessary, I will attach on a separate sheet of paper to the original transcript.

_________________________

Signature of Deponent

I hereby certify that the individual representing himself/herself to be the above-named individual, appeared before me this _____ day of ____________, 20__, and executed the above certificate in my presence.

________________________

NOTARY PUBLIC IN AND FOR

________________________

County Name

MY COMMISSION EXPIRES:

**WORD INDEX**


< $ >
**$12.5** 78:15, 16
**$13,000** 81:11
**$20** 13:6

< 0 >
**00** 27:25
**00053** 22:19 48:1
**00058** 24:3
**00059** 27:17, 20, 25
**00060** 27:20 32:25
**00061** 27:20, 25
**00064** 31:2, 11, 21 33:3 35:19
**00065** 32:17
**00066** 48:2
**000846** 57:17 58:3
**000847** 58:13
**000849** 58:24
**000850** 59:1, 4
**000851** 60:16
**000852** 60:24 71:8, 12
**000855** 57:17
**001132** 69:1, 18 70:25 71:20
**001135** 72:15 73:11
**001142** 67:19 68:7, 9
**00238-MRV** 7:12
**0053** 24:17
**0054** 23:6
**0055** 23:17
**0056** 23:20
**0057** 23:25
**0059** 24:8 29:5 32:25
**0060** 29:5
**0061** 29:5 33:1
**00848** 58:22
**01:54** 89:3
**07/05/2026** 107:24
**09** 87:13, 14, 19
**09/15/2021** 107:25

< 1 >
**1:21-cv-00238-MRB** 1:4
**1:47** 88:25
**10** 12:25 13:25 24:8 27:20 28:1, 7, 8, 22 29:6 89:8 102:3
**10:03** 6:6 7:6
**100** 95:25
**10-13** 22:21, 23
**10-13-2020** 23:1
**10-15** 23:1, 15, 19
**10-16** 23:4, 6, 19, 20
**10-16-2020** 23:18
**10-17** 23:23, 25
**10-18** 23:10
**10-21-2020** 24:5
**10th** 27:25
**11** 15:23 28:7, 8 29:3
**11:14** 47:21
**11:37** 47:23
**11th** 28:2
**12** 28:7, 8 52:10 76:4 78:18, 21 79:19 87:13
**12.5** 78:25
**12.500** 78:16
**120.33.01683** 84:13
**121-CB** 7:12
**12-31-2020** 81:2
**12th** 28:3
**13** 9:3 32:21 86:5 87:13
**13,000** 81:4
**13th** 9:15 28:8 32:18, 23 83:12
**14** 16:2 31:16, 22 32:2 52:16 62:4 86:5
**14,000** 81:5
**14th** 31:7 32:23
**15** 9:19 10:4 21:9, 11 31:4, 15 32:3 33:4 34:15 36:6, 25 37:2, 7 39:3 41:5 44:15, 20 45:3 57:25 74:18
**15th** 10:3, 10, 19 22:12, 17 31:6 49:23
**16** 36:14 38:21 39:5 44:15 45:3
**16th** 22:17
**17** 52:12, 14 56:11, 24
**1700** 3:9 6:5
**17th** 66:20 86:9
**18** 31:4, 15, 21 32:3 36:16 53:9 57:4 86:10 97:3, 7
**18th** 31:7 57:2
**19** 17:17 49:21 64:8
**1994** 11:17, 23, 25 17:4, 12, 15

< 2 >
**2.2** 79:8, 19
**2:16** 106:8, 9
**20** 52:6 84:8 86:4
**2001** 17:7
**2005** 11:25 12:2 17:9, 17 18:8, 9, 10, 11
**2009** 86:5
**201** 3:10 6:4
**2010** 12:5 86:5
**2012** 86:5, 20 87:2, 19
**2013** 86:20
**2017** 13:2, 24 53:3 86:24 87:9
**2018** 15:25 19:7, 21 24:8 27:20 28:1, 22 29:6, 16 30:1, 12 53:20 86:25 87:9
**2019** 5:10 21:11 31:4, 15, 22 32:3 33:4, 16 34:15 35:5, 16 36:1, 17 44:20 57:3, 4, 15, 19, 21, 22, 25 58:7, 14, 20 61:1, 24 62:11, 17 63:14 64:9 66:20 67:1, 4 68:14 71:1, 17 73:9, 14
**2020** 9:3, 20 10:4 22:23 23:2, 4, 13, 15, 21, 23 24:1 28:12, 21 29:16, 17, 18, 19, 21, 25 30:1, 8, 13 31:16, 22 32:2, 21 48:17 49:22 52:16 54:2 61:6 62:5 73:17 75:12, 13 79:11, 23 80:4, 17, 19 81:4 83:1 84:10 85:20, 22
**2021** 1:24 6:6 7:6
**21** 91:1, 12, 20
**21st** 91:15, 23
**22** 5:8, 9 8:11, 13, 15 48:2 90:21, 23 91:1, 12
**22nd** 91:23
**23** 5:9 9:1, 2, 23 22:7, 9, 11 27:19 48:3, 4, 5
**24** 5:10 57:11, 12, 14 65:13 71:12
**242** 93:9 96:5, 12, 16, 19 98:15 99:8, 23 100:22 101:10, 14, 19
**243** 95:7 96:5 98:8 99:7 100:7, 12 101:10, 12
**25** 5:11 9:25 65:18, 19, 25 66:1 92:18
**25,000** 102:10
**254** 96:7
**26** 5:15 48:17 92:20, 21, 22 93:2 97:7, 8, 9, 10, 19 101:18
**2623** 2:7
**29** 10:18

< 3 >
**30** 52:7 55:5, 9
**30(b)(1** 6:8
**31** 1:24
**31st** 6:6 7:5 35:8
**32** 38:4
**34** 25:14 34:1 63:5
**35** 96:20 97:22 101:21
**362-8701** 3:12
**362-8702** 3:13
**38** 3:20 78:7 81:21
**39** 82:3 97:25 101:24
**3rd** 10:15

< 4 >
**4** 84:8
**40** 14:20 15:15, 19
**40-to** 14:20
**41** 88:6
**419** 2:18
**43560** 2:17
**45** 14:20 15:15, 19
**45202** 3:11 6:5
**45208** 2:8
**45263** 3:21
**47** 82:4

< 5 >
**51** 82:24
**513** 2:9 3:12, 13, 22
**533-2700** 2:9
**5580** 2:16
**57** 5:10
**579-5203** 3:22

< 6 >
**6** 105:18, 20, 21, 22, 23
**60** 53:18 55:5, 9
**61** 89:11
**62** 89:11, 20
**63** 91:5 92:11, 14, 15 94:21 95:10, 15, 21 96:2, 6, 9 98:9, 19 99:4, 19, 22 100:9, 14, 17
**66** 5:11

< 7 >
**7** 5:3 105:20

< 8 >
**8** 5:4, 8 11:14 16:23, 25 17:23 88:6 102:9
**885-3597** 2:18
**8-and-a-half** 29:3

< 9 >
**9** 84:10
**92** 5:15

< A >
**a.m** 6:7 7:6
**ability** 107:12
**abuse** 89:16, 22
**abusive** 90:10
**accept** 10:8, 11, 23, 24 11:5 88:9
**acceptable** 106:1, 2
**accepted** 11:7 83:4
**accounting** 18:16
**accounts** 83:17, 20 84:3, 15, 17, 20 85:12, 15, 16
**accurate** 15:9 60:12 63:12
**accuse** 32:13
**acquire** 36:24
**acquired** 11:19 17:6
**acquisition** 61:20
**Act** 84:22, 23
**action** 83:18 107:15
**actions** 61:21 89:15, 25
**activity** 89:14
**acts** 89:22
**adding** 95:24
**addition** 83:14
**additional** 13:9, 10 16:3, 4 52:3 105:12
**admission** 62:14
**adv** 89:14
**advance** 16:6
**adverse** 83:18 89:15
**adversely** 56:16, 20
**affiliate** 11:19 17:7, 8
**affirm** 7:21
**afternoon** 22:17

89:5
**age** 89:18
**agree** 101:17, 19
**agreed** 6:10
**ahead** 9:8 11:3 20:23 21:7 25:2, 22 26:1, 7, 14, 22 36:3, 15, 20 37:8, 19 38:17, 25 39:8 40:24 41:3 46:8 47:24 55:14 59:14 61:12 62:18 63:1 64:3 71:22 72:2 82:8, 18 84:5, 9 88:16 89:11 90:3 93:25 99:9 100:1, 20, 24 101:4 103:9, 14
**AL** 1:11 7:10
**allegation** 37:5, 7 38:6, 7, 21, 22 39:3 41:5 56:17 84:3, 9 88:12
**allegations** 8:10, 25 9:2 25:21 26:12 35:19 38:11 50:2, 16, 23 51:6, 14 60:20 84:2 85:1 86:2
**allege** 45:15 56:24
**alleged** 37:7 46:17 56:23 61:25 84:20 88:13
**allegedly** 61:1
**alleging** 56:18 83:10, 16 85:9
**Allison** 52:6
**allow** 90:5
**allowing** 40:3
**Alright** 105:22
**alternate** 64:24
**ambiguous** 15:7
**Amended** 5:8 8:18, 19
**amount** 35:14 78:15, 18 98:3 102:11, 13, 14 103:16 104:4, 20, 25
**Anderson** 94:16
**annual** 13:7 33:16, 20, 23 34:2, 13, 16, 18 35:6, 16, 25 52:19 55:6, 8 56:23 57:7, 19, 21
**answer** 9:8, 12 11:3 14:6, 10, 23 15:9 16:17, 20 18:6 19:10 20:1, 9, 24 21:7 25:2, 23 26:2, 7, 8, 15, 23 36:3 37:9, 19 38:18, 25 39:9 40:3 41:1, 3, 8 44:5 45:11, 18 46:8 62:19 63:2 64:3 71:22 72:3, 4 79:16 82:8, 18 84:6 87:5 88:16 90:3 99:10 100:20, 24 101:4, 9 103:10, 15
**answered** 55:13 68:15 99:25 100:23 101:3
**answers** 40:14 76:17
**apart** 28:18 96:17
**appear** 95:19, 23 96:12
**APPEARANCES** 2:1 3:1 4:1
**appears** 57:15, 20 64:9 72:16 93:7
**appoint** 44:21
**appointed** 11:20
**appropriately** 61:20
**approved** 45:2
**approximately** 6:6 73:7
**April** 11:16, 17, 23, 25 13:2, 24 17:2, 4 86:9, 23 87:8
**area** 98:12
**areas** 16:11 18:21 97:14 101:7
**arrive** 78:16
**articulated** 19:6 20:19 21:2
**asked** 26:16 28:5 30:14 32:20 49:15 52:24 53:12 54:9 55:13, 19 63:8 66:9 68:15 71:7 73:23 74:23 76:16 77:1 83:12, 21 85:10 92:15 99:25 100:23 101:3
**asking** 12:16 18:8 19:16 27:24 30:6 34:20 40:9 41:15, 16 44:4 54:6 60:11 81:14, 23 95:12 102:16, 19, 21, 23
**asserting** 84:14 89:16
**asset** 13:12 16:8
**assign** 12:22
**assigned** 13:8, 10 16:1
**assignment** 13:13, 16 16:4 21:18
**assistance** 39:19
**assistant** 27:15
**associate** 75:4
**ASSOCIATION** 3:4
**assuming** 59:11
**athletics** 51:10
**attention** 9:1, 22 10:18 11:12 12:1, 24 15:22 21:9 27:17 31:2 32:25 33:3 36:5, 14 48:1 52:11 56:11 57:12 58:2 60:16, 24 66:14 69:1 72:14 78:4 82:3, 24 88:5 89:8 90:20 93:2 102:2
**attorneys** 8:20 26:25 27:8 29:7 30:15, 17 35:10
**attorney's** 89:17 104:24
**audit** 96:18
**AUGUST** 1:24 6:6 7:5 15:25 21:11 22:12 24:8 27:20, 24 28:1, 2, 3, 7, 22 29:6 30:12 31:3, 4, 6, 7, 15, 21 32:3 33:4 34:15 36:16 44:20 49:20, 21 57:2, 4, 25 58:7, 14, 19 62:11, 17 63:14 64:7 68:14 75:13 86:10, 24 87:9
**authority** 12:21 44:21, 23
**authorization** 84:16, 17
**auto** 13:7 19:1 100:5 101:5
**available** 10:16, 17
**Avenue** 2:7
**awards** 78:13 89:17
**aware** 42:3 64:12 67:6, 8, 11 75:20, 22 82:15 85:4 105:6

< B >
**BACK** 9:10 16:23 20:1, 3, 9, 10 24:11, 17 32:25 36:5, 25 38:14, 16 42:24, 25 43:6, 7 47:23 48:1 52:11 56:11 71:8, 9 74:18 78:4, 6 82:10 86:2, 20 87:2 88:5 89:2 90:20 94:19 96:19 98:18, 23 99:2, 7, 12 102:2 103:3, 11, 13
**BANCORP** 1:11 3:4 7:10 14:21 15:16 95:2
**Bancorp's** 14:3 92:14 94:22
**BANK** 3:4 5:11 10:12 11:17 13:2, 4, 12, 14, 19 14:4, 16, 20 15:15 16:6, 12 17:4 18:22 25:13 28:16 30:5, 23 32:9 43:10 44:8 47:9, 11 49:15, 16 53:19 63:6 66:16 74:13 82:2 83:11, 13, 14 84:12, 14 85:5, 11, 14, 21, 23, 25 86:22, 23 87:8, 18, 24 91:5 92:6, 9, 10 95:11, 22 96:10 98:10, 12, 19 99:20 100:10, 15 101:7 103:18
**Banking** 5:15 9:4 10:9, 24, 25 11:8 13:5, 6 16:7, 8 19:1, 25 20:7, 14, 18 21:22 33:9 77:18, 19, 20 83:5 84:19 86:8, 13 87:4 91:5 92:9, 10, 11, 13, 17 94:1, 9, 22 95:4, 5, 10 96:6, 9, 11, 13, 25 97:15, 17 98:8, 12, 13 99:7 100:9, 14, 18 101:15
**banks** 85:5 100:16
**bank's** 16:2 36:18 81:16 91:3, 6 92:16
**base** 78:11 79:1, 6, 20
**based** 10:14 68:4 103:16
**bases** 90:13, 18
**basic** 41:2
**basis** 82:4 88:12 90:8, 10
**BB** 34:11
**bears** 93:9
**Beaudin** 73:24
**becoming** 59:23 73:16
**began** 76:8
**beginning** 11:13 17:2 55:10
**begins** 22:24, 25
**BEHALF** 2:3 3:3 7:14, 16
**believe** 8:23 9:21 10:7 18:16, 20 22:5 28:2, 8 34:5 43:19, 25 44:2 47:8 51:1, 9, 16 54:24 63:15 66:4 69:19 70:3 71:23 72:1, 5 74:9, 19 75:5 76:16 77:6 78:3 79:5 85:3, 18 86:4, 14 87:15, 21 96:16 100:19
**believed** 9:6 58:19 76:21
**beneath** 68:12
**benefits** 11:9 46:3 79:2, 20, 22, 24 80:1, 2, 16 81:13 82:1 104:1, 3
**best** 10:7 61:22 63:7 79:6 107:12
**better** 74:1 76:20
**beyond** 79:20
**bit** 65:23
**bladder** 47:18
**Blank** 3:8 6:4 7:7 60:4, 7, 8
**Bless** 49:9
**blue** 32:12
**Board** 5:11 16:1 21:13 37:11, 25 38:2, 8 41:7, 12 42:1, 4 43:24 44:11, 12, 14, 24, 25 45:2 50:24 51:2, 4, 6, 8, 18 52:4, 5, 7, 10, 23 54:6, 9 55:19 58:8, 15 66:16, 22 67:10 68:20 70:24 90:25 91:2, 12 93:6 99:21 100:9
**Bob** 10:19, 22
**bold** 102:4
**boss** 12:14, 17
**bottom** 23:10 37:2 93:22 95:7 100:11 102:3
**box** 40:24 69:22 70:4
**Brad** 9:11
**break** 47:19 64:13 88:22 96:17

**break-the-glass** 63:22
**Brian** 3:19
**brian.thomas@53.com** 3:24
**Bridgeman** 49:12, 14, 15 50:8, 12, 19
**briefcase** 30:4, 10, 11, 12, 16, 18, 19, 20, 25
**briefly** 66:8 68:3
**bring** 26:18 90:15
**broad** 15:7
**build** 11:18 17:5
**bullet** 71:13, 14
**Bureau** 83:16, 19 84:10
**Business** 5:15 13:6 16:7, 14 17:10, 25 18:3, 21 19:8, 14 20:21 21:4 30:5 33:9 61:18 69:14, 16 91:4 92:4, 6, 8, 10 93:21, 22 94:9 95:3, 10, 15 96:13, 25 97:17 98:11, 14 99:8, 22, 23 101:15
**businesses** 36:12 92:4 95:10 96:9, 11 97:9, 11 98:2, 9, 14 99:3, 7 100:14, 18, 22, 25 101:14, 17, 21, 24
**Butera** 75:25

**< C >**
**Cabinet** 63:19
**calculate** 103:23
**calculation** 100:21
**calculator** 95:24
**calendar** 55:4 75:15 91:22
**call** 76:9, 10, 19
**calls** 46:12
**camera** 26:8
**candidate** 63:23 64:25
**Capital** 5:12 66:17
**caption** 66:15
**captioned** 59:4
**captured** 101:7 105:15
**card** 69:8, 9, 10 72:16, 17
**cards** 84:18
**career** 25:12, 16 54:10 63:6
**CARMICHAEL** 3:5 9:3, 16 10:3, 6, 11, 15 12:2, 8 13:2, 10 15:25 19:24 20:6, 8, 18 21:12, 14, 15, 18 28:3 36:8, 19 37:2, 6, 10 38:2, 5 39:1 41:6, 13, 16 42:2, 3, 5, 7, 10 43:8 44:16, 20, 24 45:2, 21 50:3 52:17 53:11, 14, 17 54:5, 24 55:12 56:15, 24 58:7, 15, 19 61:9, 25 62:5, 12 63:9, 10, 22 64:5 68:13, 16, 17 69:15 73:22 76:20 83:11 85:10, 18 86:9 87:21, 22 88:10, 14 91:2, 4, 13 92:2, 15 96:8 98:18
**Carmichael's** 21:25 38:1 43:2 44:1, 25 49:19, 20, 21 60:19 62:10 63:5 88:17 91:8 100:8
**carry** 38:2 42:2 43:24
**CASE** 1:4 7:12 8:22 22:17 27:1 64:20 68:7 84:13
**category** 32:7
**Center** 3:9 6:4
**centralized** 18:14, 24
**CEO** 17:9, 18 33:11 37:13, 15 41:11, 14, 19, 21 42:8, 9, 21 43:3, 9 44:1, 8, 13, 21 46:1 47:10 52:25 54:9, 20, 25 55:20 56:25 58:16 59:24 60:14, 21 61:2 62:1, 9 63:21, 24 64:7, 15, 21 65:2 67:19 68:6, 17, 18 70:10 74:16, 19 77:5, 9, 12, 15 79:3 87:21 88:8 91:14
**certain** 42:17, 20 43:1, 8 59:10 61:22
**certainly** 51:22 54:8, 10 87:13
**certainty** 86:19 87:20, 24
**CERTIFICATE** 107:1
**certify** 107:4, 12
**cetera** 33:8
**CFO** 64:21 74:19
**CFPB** 84:11, 20 85:13, 22 86:3, 11 87:2 88:2
**chair** 52:6
**chairman** 16:1 21:12 37:11, 24 44:24
**chairs** 52:9
**chance** 82:21
**changed** 56:15
**changes** 18:10, 12, 18, 19, 20, 23 19:2, 4, 6, 11, 12, 13 20:19, 25 21:1, 3
**characterizing** 40:21
**charge** 17:15 85:24
**charging** 13:11
**chart** 93:15, 18 94:20 95:13, 14, 16, 17, 21, 23 96:19 97:16 98:4, 5, 6, 10 101:19 102:1
**charts** 93:13
**Chicago** 84:13
**chief** 13:2 21:13, 16, 20 36:18, 22 37:4, 10, 25 38:23 91:9
**children** 49:4 89:23
**choice** 10:23
**Chris** 69:19
**Christopher** 52:9
**Chuck** 75:4, 6 76:8
**Cincinnati** 2:8 3:11, 21 6:5 7:7 53:4, 13 80:13
**Cioffi** 3:6 5:4 7:16, 17 8:2, 11, 14 9:14 13:25 14:2, 25 15:11 16:22 20:1, 4, 12 22:6 38:20 39:10, 15, 20 40:6, 11, 14, 21 41:4 42:24 43:4, 11 47:19, 25 57:10 65:12, 14, 16, 19 66:2 82:13 88:23 89:4 92:18, 21 93:1 98:23 99:5, 14 102:19, 24 103:1, 4, 8, 11, 19 105:10, 20, 22
**cioffi@blankrome.com** 3:14
**CISE** 50:23 51:17
**Civil** 6:8 102:8
**claim** 78:20 81:25 82:5, 16 89:10, 24 90:8, 14
**claiming** 81:21 102:14, 20 104:2, 7, 10, 12, 16, 20, 25 105:7
**clarification** 105:23
**clarify** 103:6
**clarifying** 102:22
**clause** 56:12 102:4
**clear** 13:23 18:7 91:11
**client** 61:20
**clients** 61:19
**club** 80:2, 9, 13, 14, 15, 18
**clubs** 80:12 81:18
**coach** 39:21, 22
**coaching** 40:11 103:4
**cognizant** 38:1
**coincidence** 25:25 26:11, 16
**coincidental** 25:20
**collaborated** 69:17
**Come** 65:23 97:15 98:12
**comes** 99:20
**coming** 85:13 93:20
**comment** 10:14 53:5 59:7, 9 60:12 96:7 98:20
**comments** 47:7 48:12 69:13 71:6 77:14, 16, 21, 23
**commercial** 17:8 94:2, 12, 15 95:4 96:14 97:3, 17, 24 101:15, 16
**COMMISSION** 107:24
**commit** 53:17
**commitment** 63:9
**committed** 18:17
**committee** 51:10, 14 52:8
**companies** 13:6
**company** 74:11 76:2
**comparison** 101:10
**compensation** 52:21 55:18 78:12 79:2, 6, 7, 10, 21, 25
**Compensatory** 104:9
**complain** 87:16
**Complaint** 5:8 8:10, 12, 18, 19, 21, 25 11:13 25:21 26:12 35:20 36:7, 8 37:5 38:10, 12, 24 39:13, 15 40:4 49:24 50:17, 23 51:6, 15 52:11 78:5, 6 84:12 86:3, 11, 17, 18 87:2, 11 88:2, 6, 13 89:9, 25 90:6, 10, 21 102:3
**complaints** 39:18 85:5
**complementary** 33:7
**complete** 57:19 70:16 76:10 105:11
**completed** 6:13 70:14
**complimentary** 34:11
**components** 78:23 81:20
**concerning** 50:2 51:6 76:11
**CONCLUDED** 106:9
**conclusion** 102:18, 23
**condition** 83:25
**conditions** 83:2, 10
**confided** 36:22
**confirm** 36:18 91:21
**confirmed** 39:1 63:16
**consider** 13:16, 18 53:12 59:19
**considerations** 59:20
**considered** 13:21
**considers** 67:10
**consistency** 61:15 71:16
**consistent** 71:1, 13, 18, 25 72:5, 7 102:8
**constituent** 96:2
**constitutes** 107:10
**consultant** 74:15
**consultants** 74:21
**consume** 14:19
**consumer** 9:4 10:9, 12, 23, 24 11:8 13:4, 14, 19 14:4, 16, 19 15:15 18:22 83:5, 13, 16, 19 84:10, 21 85:11, 21, 25 86:8, 12, 22,

23 87:4, 8, 18, 24 93:24 94:1, 3 95:3 96:13, 20 97:21 101:15
**consumers** 84:15, 18, 19
**C-O-N-T** 23:8
**contemporaneous** 22:1
**content** 56:6
**contents** 48:8, 11
**context** 13:24 54:12, 14 63:21
**continue** 52:2 55:22 71:14
**CONTINUED** 3:1 4:1 11:8 23:8 48:17 61:13 80:22 81:17
**Continuing** 9:11 16:19 23:9 38:17 81:1 82:11
**contradictory** 40:23
**contribute** 92:9 95:10 96:9 100:9, 14
**contributed** 91:5 92:11, 14 94:19, 22 95:15 96:6, 20, 23, 25 97:3, 10, 19, 22, 25 98:3, 9 100:17 101:18, 21, 24
**contribution** 93:16 94:21 96:20
**controversies** 66:22
**conversation** 10:19, 22 11:4 22:20 28:9 32:5 48:14 49:19, 20, 22 50:7 53:20 54:23 56:5 63:14 88:18
**conversations** 47:4 48:16 49:21 50:6, 8, 16, 19, 20, 22, 25 88:20
**convey** 93:18 100:9
**copy** 49:24 65:20 70:23
**corner** 93:12
**corporate** 94:2, 15 95:4 96:14 97:24 101:16
**correct** 9:6, 17 10:9, 20 11:1, 10 12:22 13:24 18:2 19:8, 15 20:22 23:12 24:6, 10 31:10, 14 34:14 47:2 48:18 54:4 55:25 56:7, 8 57:22 61:4 62:3 64:10 70:10 72:22, 25 73:1, 18 74:8, 25 75:17 76:3, 6, 18 79:9, 12 80:17 86:1 88:3, 4 91:17 93:16, 23 94:4, 5, 8, 10, 11, 23 95:22 96:1, 2, 15, 21, 22, 23, 24 97:1, 2, 5, 10, 20, 22, 23, 25 98:1 99:23 101:18, 22, 25 102:12, 13
**Coughs** 49:8
**COUNSEL** 3:17 7:12 14:25 39:10, 24 103:4 107:13
**counted** 44:1 63:4
**counterclaim** 89:16 90:7
**Country** 51:4 80:2, 9, 12, 13, 14, 15, 18 81:18
**counts** 44:15
**couple** 28:9 68:23
**course** 20:2 98:25 103:12
**COURT** 1:1 6:11 7:2, 5, 11, 20, 25 20:2 38:14 48:4 49:8 57:11 65:18, 21, 25 92:20, 23 98:25 103:12 105:18, 21, 23 106:4 107:23
**cover** 80:7 86:12, 21
**coverage** 78:13
**covered** 67:9 80:5 86:4 87:3 100:6
**covers** 34:5 57:21, 24 86:14, 19
**create** 25:18 48:6 70:12
**created** 22:11 26:19 27:19, 22 28:1, 2, 6, 7, 12, 21, 22 31:3, 5 32:22 35:18, 23 66:21 83:2, 24
**creating** 24:24 25:6
**credit** 18:16 84:18, 19
**criteria** 34:8
**curr** 71:18
**current** 10:8 70:6, 20 71:4, 19 72:11
**custody** 29:4, 6
**customer** 34:7
**customers** 61:17 63:8

< D >
**damage** 80:24 81:6, 9, 11
**damages** 81:20 89:17 102:9 104:9, 12, 15, 16
**DATE** 1:24 18:7, 8 19:3 27:23 66:19 75:10, 11 87:12 98:20 107:5
**dates** 5:14 24:14 31:3, 13
**David** 3:7 7:17
**day** 6:6 7:5 11:6 22:16 24:20, 21, 23 25:4 27:23 45:10 51:4 63:7 80:6
**days** 28:9 53:18 63:16 88:19 89:13 91:19
**death** 64:14
**December** 11:25 13:8, 10 17:9 66:20 67:1, 4 73:9, 12
**decided** 26:18
**decision** 73:17
**declined** 53:4
**DEFENDANT** 2:3
**Defendants** 1:12 7:16 8:10, 22 83:1 89:14, 21 90:1 102:8
**DEFENDANTS/COUNTERCLAIMANTS** 3:3
**deferred** 79:25
**define** 15:12
**definition** 15:3, 14 102:18 103:2
**deleted** 105:14
**deliberately** 83:1
**delighted** 38:4
**demanded** 80:21
**demands** 102:7
**demonstrate** 96:5
**demotion** 9:6 11:5 78:20 79:4, 18 81:24
**denote** 12:19
**dental** 79:24
**DEPONENT** 1:23
**deposit** 84:15
**deposition** 6:3, 7 7:8 35:3 40:25 66:10 105:12, 17 106:7, 9
**describe** 18:12, 13, 19 32:10 73:20 76:14 77:1 91:19
**described** 82:5, 15 87:19 96:12
**designed** 93:18
**desire** 36:11
**detail** 50:9, 11
**detriment** 78:14
**development** 59:17 77:18
**different** 18:14 31:8, 13 38:11 39:5, 16 40:6 46:13 62:16 98:6
**difficulty** 47:17
**dinner** 28:4
**DIRECT** 5:4 8:1 9:1 11:12 58:2 69:1 72:14 75:23, 24 78:9 89:8 90:20
**directed** 89:23 91:3
**Directing** 9:22 10:18 12:1, 24 15:22 21:9 27:17 31:2 32:25 33:3 36:5, 14 48:1 52:11 56:11 57:12 60:16, 24 66:14 78:4 82:3, 24 88:5 93:2 102:2
**direction** 100:8 107:10
**directly** 19:23 20:18 83:6, 8 107:14
**director** 51:20 56:13 90:25
**Directors** 5:11 66:16
**disability** 64:15
**disclosure** 52:4
**discovery** 40:25 67:13
**discrimination** 78:9, 19 89:19
**discu** 50:1
**discuss** 49:3, 14 52:22 68:17
**discussed** 8:6 48:8, 11, 25 53:11 55:15, 16, 17 56:4 68:13, 17 91:1
**discussing** 95:14, 17
**discussion** 32:7 56:2 63:17, 20 64:4, 5, 7, 23 73:23 91:11
**discussions** 25:5, 12, 15 50:2 51:5, 7, 13 59:21 65:1, 3, 6, 9 75:7, 8
**DISTRICT** 1:1, 2 7:10, 11
**DIVISION** 1:3 7:11 11:19 12:13 13:12 17:6, 8, 16 18:24
**doberly@blankrome.com** 3:15
**document** 22:13, 14, 15, 24 24:7, 8, 11 27:18 31:3 32:1, 2 57:13 59:11 60:13 66:3, 7, 15, 19, 21 67:1, 3, 6, 15, 16 68:5, 19, 21, 24 69:4, 6, 11, 12, 18 70:12, 15, 19 72:9, 15 73:5, 11 99:6, 15, 18 101:2
**documents** 24:12 28:12, 20 29:4, 6 30:2, 3 32:6, 8 35:9, 11 68:3 82:22 90:16 105:9, 12
**doing** 46:5 47:10 84:20 103:8
**Don** 51:20
**dotted** 18:25
**Draft** 39:19 68:5 69:12 72:9
**drive** 59:18
**driver** 77:20
**due** 80:19
**dues** 80:3, 4, 18
**duly** 107:7
**duties** 12:22 20:16

< E >
**earlier** 20:20 27:22 36:19 90:21 96:12
**East** 3:10 6:4
**EBITDA** 15:5
**edition** 67:25
**editions** 67:22, 24
**efficiency** 61:15 71:16
**eight** 52:10
**either** 11:6 22:16 24:19 25:3 28:7 30:22 31:23 32:9, 23 107:13
**Elizabeth** 4:3 7:3
**E-mail** 2:10, 20 3:14, 23

**e-mails** 76:11 105:14
**emergency** 63:21 64:6, 13, 17, 20 65:2, 7, 10 68:11, 17, 22
**emphasized** 91:7
**employed** 80:6 81:1
**employee** 34:7 60:2 62:23 63:3 107:13
**employees** 61:17 76:2
**employment** 46:14, 15, 19, 20, 22 47:1, 4 49:17 80:20, 22 83:3
**endorse** 91:8, 14
**engaged** 84:21 89:21
**engagement** 34:7
**engaging** 89:13
**enhance** 61:14 71:15
**enjoyed** 79:23
**enrolled** 84:18
**Ensure** 61:16, 21
**entire** 29:15 56:2 70:15
**entitled** 44:5 79:3 82:1 105:5
**entry** 31:18 32:2 33:4
**equal** 79:7
**equity** 78:13
**Erie** 2:7
**escape** 85:13
**estimate** 14:8 103:3
**ET** 1:11 7:10 33:8
**evaluation** 33:13 55:16 56:3
**evaluations** 32:14
**Evans** 75:4, 6 76:8, 14, 16 77:4, 8, 15 78:1
**evening** 28:4
**event** 64:14
**evidence** 39:8, 25
**EVP** 53:1 54:4, 8 55:23 56:6, 8
**ex** 78:21
**exact** 87:12
**exactly** 42:6 52:17 54:16, 21 55:1 71:1
**EXAMINATION** 5:4 8:1
**example** 46:10 105:13
**exceeding** 78:15, 18
**excess** 102:10
**excuse** 16:3 89:14 99:13
**execution** 61:21
**Executive** 5:12 13:3 19:23 21:13, 16, 19, 20 27:14 36:22, 24 37:4, 10, 25 38:23 51:20 58:11, 20 66:17 69:10 74:21 85:14 91:9
**executive-in-charge** 16:11
**executives** 42:11 75:2, 16 76:2
**executor** 36:23
**Exhibit** 5:7 8:11, 13, 15 22:7, 9, 11 27:18 48:2, 5 57:12, 14 66:1 71:12 92:18, 22 93:2, 8 105:18 106:1
**EXHIBITS** 5:6
**existed** 67:6, 15, 16
**existing** 10:14 44:13 55:22, 23 79:4 84:16
**expand** 70:5, 20 71:4, 19
**expanding** 72:10
**expenses** 104:24
**experience** 21:22 34:8
**EXPIRES** 107:24
**explain** 28:14
**explicitly** 91:3
**expressed** 88:9
**extend** 27:25 54:7
**extended** 54:6 86:3
**extending** 54:6
**extends** 57:16 87:2
**extent** 102:22

< F >
**Facsimile** 3:13
**fact** 46:23 62:8 73:4 74:12 75:1 76:1 87:1
**facts** 82:15
**failure** 79:17 81:24 82:4
**familiar** 74:22
**familiarity** 74:10
**family** 78:14
**far** 57:10 86:2
**February** 31:7, 16, 22 32:2 52:16 54:2 62:4, 11
**FEDERAL** 6:8 78:10 83:15
**feedback** 73:25 76:19
**fees** 89:18 104:24
**field** 59:7, 9 60:2 61:5 69:21 72:24 73:2
**fields** 72:21, 23
**fif** 14:20
**FIFTH** 1:11 3:3, 4, 10, 17 5:11 6:4 7:9 11:9 13:4 16:6 17:9, 18 21:23 25:12, 14 33:13 43:10 44:8 47:5 53:19 54:11 57:16 63:5 64:12 65:10 74:1 77:21 78:21 80:6, 20 84:12, 20 85:14 88:8 92:10 101:6 103:17
**file** 30:4, 5, 22 31:23 32:7, 9, 10, 13
**filed** 8:19 84:11 85:6, 22
**filing** 8:21 89:15, 18 90:7
**final** 70:23
**finally** 83:21
**financial** 15:17 34:6 61:17 78:11 83:16, 19 84:11, 22 101:8
**financially** 107:14
**find** 55:1 105:13
**fine** 106:2
**fingertips** 95:24
**firm** 74:7
**firms** 46:13
**first** 15:25 21:10 22:18 24:17 31:19 41:2 55:15 58:2 66:14 69:21 71:13, 14 82:25 90:6, 23 91:19 107:7
**five** 21:17 33:11 42:9 53:1, 6, 15, 16, 21, 22, 24 54:3, 8 55:22 56:6, 8, 9 78:18, 21 96:23 97:6 98:14 101:14
**fluctuate** 15:9
**Focus** 59:4, 22
**focused** 47:5
**folder** 32:11
**folks** 47:8 52:7
**follow** 76:21
**following** 11:6 24:20 36:16 53:10 102:10
**follow-up** 51:23 88:18
**forcing** 83:3
**foregoing** 107:4
**forget** 74:18
**forgiveness** 80:5 81:14
**forgiving** 80:25
**form** 9:7 11:2 14:5, 9, 22 15:1 16:16 18:5 19:9 20:23 21:6 25:1 36:2 37:18 38:9 45:17 46:7 64:2 71:21 72:9 79:15 82:7, 17 88:15 90:2 107:10
**forms** 76:11
**forth** 89:25 90:6
**forward** 18:9 53:21, 22
**foundation** 15:3
**Fountain** 3:20
**four** 12:2, 7 21:23 89:23
**frame** 46:17 53:23 55:6 86:15 87:19 88:1
**Francis** 36:17
**Frankly** 38:3
**Friday** 23:6 27:20, 24
**frivolous** 89:16 90:7
**front** 15:18 55:4 75:11 86:6 89:9 104:6
**full** 13:4 16:14 17:10, 24 18:3 19:7, 14 20:17, 20 65:20
**functions** 16:15 17:11, 25 18:4, 14, 15 19:8, 15 20:21 21:5
**funds** 84:16
**further** 89:22 105:10 106:6
**Future** 59:5, 23 72:10

< G >
**GABRYEL** 1:25 6:10 107:22
**Gabyrel** 7:4
**Gaunt** 11:21 50:10, 14, 20
**GC** 33:7, 9 34:10
**GENERAL** 3:17
**generally** 67:8, 11
**generated** 14:4
**generates** 14:20 15:15
**Getting** 65:13
**give** 7:21 15:8 26:25 27:3 30:9 41:1 92:24 98:25
**given** 81:22
**glass** 64:14
**Go** 9:8 11:3 16:23 20:23 21:6 22:18 24:11 25:2, 22 26:1, 6, 14, 22 29:14, 19 30:8, 24 36:3, 14, 20, 25 37:8, 19 38:17, 25 39:8 40:24 41:3 42:1 46:8 47:23 55:13 59:14 61:12 62:18 63:1 64:3 71:21 72:2 82:8, 18 84:5, 9 88:16 89:11 90:3 93:25 94:19 95:6 98:18 99:9, 25 100:20, 23 101:3 103:9, 14
**goal** 59:20
**goals** 34:4, 6
**goat** 85:13
**goes** 86:20
**going** 9:17 24:17 42:7 43:2, 9, 12 45:7, 8, 12, 25 47:20 83:17 85:12 88:24 96:19
**Good** 8:3, 4 52:20 77:17 89:5
**government's** 83:15
**greater** 14:13 16:5
**greatly** 15:9
**green** 95:7
**Greg** 9:3, 16 10:6 12:2 52:9, 17
**GREGORY** 3:5
**gross** 15:4, 12, 16
**groups** 98:2
**growth** 61:18
**guess** 55:5
**Guy** 73:24 74:2, 3, 5, 6 75:1, 7
**guys** 65:19

< H >
**Hammond** 75:25
**hand** 7:19
**handwriting** 31:8, 9

**happen** 83:20 85:15
**happened** 9:24 22:2 49:15, 16 53:9, 10 55:2 62:17 73:5 85:17 91:19
**happy** 9:5 33:8 34:11 55:21
**Harlow** 4:3 7:3
**head** 9:4 10:9, 12 11:7 13:4, 13, 18 83:5, 12 85:10, 21 86:7, 12, 22, 23 87:3, 8, 18, 23 94:3, 6, 9, 12, 15 103:21, 24
**headed** 97:21
**heading** 93:16
**health** 56:3 78:13
**hear** 38:4
**he'd** 41:1
**held** 32:8 83:5 103:17
**help** 54:23
**hereof** 107:6
**high** 15:19
**highlighted** 93:23
**highlighting** 95:8
**highly** 88:7
**history** 85:4
**home** 30:4, 22 31:23 32:9
**honors** 46:13
**hover** 81:25
**Howard** 75:25
**Human** 5:12 18:15 36:18 66:16 69:14, 16

< I >
**identical** 72:20
**IDENTIFICATION** 8:13 22:9 57:14 66:1 92:22
**identify** 7:13 61:13
**identifying** 71:14
**II** 1:23 6:3
**illegally** 84:14
**Illinois** 84:13
**immediately** 80:20
**impact** 16:6 56:16, 20
**implement** 61:13 71:14
**implemented** 19:2
**implementing** 84:23
**improve** 76:22
**incentive** 52:23 78:12 79:2, 7, 21
**include** 32:13 52:1 70:6, 21 71:5, 19 79:19, 20 92:15 105:25
**included** 13:4 76:1 83:4
**including** 21:1 34:3 49:22 89:22 95:9 100:13 101:11, 13
**income** 91:6 92:12, 14, 16 93:16, 20 94:19, 21, 23 95:11, 21 96:10, 17, 19, 20 97:14 98:9, 19 99:19 100:10, 15 101:6
**increase** 13:14 52:22 55:18
**INDEX** 5:1
**indicate** 56:15 59:18 91:4
**indication** 15:6
**indirect** 13:7 19:1 96:18 100:5 101:5
**indirectly** 107:15
**individual** 12:13 44:7 59:18 64:20 83:7 87:23
**individuals** 51:21
**industry** 77:18
**information** 33:19 34:10
**informed** 55:19 88:10
**initiated** 63:17
**initiation** 80:5
**injunctive** 84:24
**inquired** 10:14
**inserted** 96:7
**inside** 13:19
**institutional** 100:6
**integration** 61:16
**intention** 83:3
**interest** 63:7 76:19 104:19
**interested** 47:3 107:14
**interim** 63:24
**interrupt** 47:16
**interview** 75:3, 4 78:2
**interviewed** 75:1, 6
**intolerable** 83:2, 9, 24
**investment** 11:18 17:6, 16
**investments** 100:6
**involved** 16:4 76:4 83:15
**involves** 89:25
**Ironically** 28:3
**issue** 32:5
**Issued** 84:17, 18
**its** 11:19 17:6

< J >
**Jamie** 49:10 65:6 74:12, 17 75:20, 23
**January** 12:5
**Jim** 11:21 50:10
**job** 12:22 38:3 46:11, 18, 23 47:5 53:14, 15, 16 63:6
**John** 2:14 7:15
**joint** 102:8
**judgment** 102:7
**July** 35:8, 15
**June** 53:9
**Junior** 49:12, 14

< K >
**Kabat** 87:21
**Karen** 27:15
**keep** 15:1 29:9 31:21
**Kentucky** 11:18 17:5 47:9 80:15
**Kenwood** 80:13
**kept** 29:11, 13 30:11
**Kevin** 94:16, 17, 18 101:24
**key** 61:19, 22 77:20
**kind** 18:23 28:24
**knew** 45:1, 3
**know** 12:15, 17 15:21 24:12 26:21 29:14, 23 30:24 31:24 33:21, 25 34:1, 22 36:4 38:6 42:15 44:15 47:14 50:7, 10 54:14 73:20 74:2 75:16 81:5 82:12, 19, 20, 23 85:1 86:2, 16 87:12, 20 90:18 98:16 99:13 100:4, 6 103:8, 21, 22 104:4, 8, 11, 14, 17, 20, 22, 25
**knowledge** 77:17 86:11
**Kropp** 52:6
**Kyte** 51:20

< L >
**L.P.A** 2:6
**lack** 15:2
**lacked** 21:22
**larger** 13:21 14:12, 13, 14, 17 16:5
**Larry** 51:20
**Lars** 94:16
**lasted** 55:5
**Lavender** 94:16, 17, 18
**Lavender's** 101:24
**law** 78:11
**lawsuit** 26:19 66:23 79:14 81:7, 10 83:15 89:19
**lawyer** 26:5
**lawyers** 24:24 27:3 30:9 48:9
**lead** 44:2 47:4
**leader** 74:1 76:20
**leaders** 61:22
**leadership** 16:2, 10 19:22 70:7, 21 71:5, 20 83:21 85:15
**leading** 74:21
**learned** 63:11
**leave** 83:3
**led** 43:24
**left** 43:1 93:25
**left-hand** 24:4 93:12
**legacy** 61:17
**legal** 102:17, 18, 23 103:2, 7
**lending** 13:5, 8 84:22 100:5
**Leonard** 49:10 65:7
**letter** 46:19, 22 52:1
**letters** 102:4
**level** 50:11
**Leverage** 59:20
**lieu** 104:6
**line** 18:25 100:11
**lines** 18:23 84:19 91:4 92:3, 4, 6, 8, 9, 13 93:21, 22 95:15 98:11, 14 99:22, 23
**Liquidated** 104:15, 16
**listed** 67:21
**listing** 70:19
**litigation** 24:25 48:21 49:1
**little** 65:23
**LLP** 3:8 6:4 7:7
**loan** 80:5, 8, 9, 14, 19, 24 81:3, 14, 16
**located** 7:7
**location** 28:4
**long** 11:24 55:2 76:18 80:6
**longer** 53:2 54:8
**long-term** 52:23 78:12 79:2, 7, 21
**look** 9:24 16:23 26:5, 8 34:19 35:2 52:12 57:16 58:13 71:12 78:7 90:5 93:2
**looked** 31:1 66:10
**Looking** 41:5 46:23 59:12, 13, 16 68:9 93:8 96:5
**looks** 59:10
**loose** 65:23
**loss** 104:2
**losses** 78:11
**lost** 79:17 81:13 102:11, 12, 14, 20 104:1
**lot** 76:1
**Louisville** 11:18 17:5, 8, 10, 18 47:9 80:15
**low** 15:20

< M >
**Mabe** 51:19
**making** 84:4
**man** 45:23 47:17 63:10
**Management** 5:13 13:12 16:8 53:10 61:21 63:23 64:24 66:17 69:7, 9 72:16
**manager** 11:22, 24 12:2, 4, 9, 10, 14, 17, 18
**Manila** 32:11, 12
**March** 17:7 84:10 85:20, 22
**mark** 8:11 22:6 65:12 92:18
**MARKED** 8:13 22:7, 9 27:18 29:4 57:14 66:1 92:22
**market** 70:6, 21 71:5, 20 94:2, 12 95:4 96:14 97:3, 18 101:16
**markets** 61:20
**matching** 80:1
**materialize** 29:18
**matter** 7:9 107:9
**matters** 21:15 36:9, 10
**MB** 61:17
**McCarthy** 2:15

**MCHUGH** 1:6, 23 2:4, 14, 15 6:3 7:8, 9, 15 8:3 13:3, 8, 11 16:1, 7 17:5 21:14, 16, 18 26:4 31:11 36:19, 21, 22, 23 37:3 48:1 56:16 57:17 65:22 78:11 83:2, 3, 4, 8 88:7, 10 89:5, 15, 18 91:1, 8 94:6, 10, 13
**mchugh@mchughlaw.com** 2:20
**McHugh's** 12:9 21:11 89:23 91:2, 7
**mean** 12:14 15:3 16:10 47:16 60:6 81:25 101:12
**meaning** 12:10, 16 56:17
**means** 12:17 35:19 60:7
**meant** 40:17
**Medical** 79:24
**meet** 9:19, 24 10:3
**meeting** 9:15 10:6, 15 21:24 22:2, 12, 25 24:19 31:6, 7, 8 34:15 36:16 44:19 45:6 52:16 53:9, 10 54:2 55:2, 5 76:8 83:12 90:25 91:14, 18, 22
**meetings** 22:16 24:14 25:4, 7, 10, 11 32:16, 24 35:23 92:1
**Mellott** 51:20
**members** 44:14 50:23 52:10
**memberships** 80:3, 9 81:17
**memory** 18:17
**mention** 70:9
**mentioned** 51:2 68:23
**mere** 89:18
**messages** 105:15
**met** 10:2, 10 51:21
**Michael** 3:6 7:17 13:23 65:13
**middle** 70:6, 21 71:5, 19 94:2, 12 95:4 96:14 97:3, 18 101:15
**mid-term** 60:20
**mid-year** 21:11 33:7, 14 57:24
61:1 62:12
**Mike** 75:24
**million** 13:7 78:15, 17 79:8, 19
**minor** 18:21
**minutes** 55:5, 9
**Mischaracterization** 26:6 39:7 40:8
**mischaracterize** 40:16, 18 41:2
**mischaracterized** 40:19
**mischaracterizes** 66:12, 24
**mischaracterizing** 40:2, 23
**misconduct** 84:12
**mislead** 40:10
**misleading** 40:8, 12, 13, 15
**misunderstanding** 63:13, 15
**moment** 20:25 50:13
**Monday** 28:9
**monetary** 84:25
**Monroe** 2:16
**month** 45:9
**months** 31:18
**morning** 8:3, 4, 9, 24
**mortgage** 13:5 18:24 95:9 96:17 100:13, 15 101:5, 12, 13
**motion** 83:4
**move** 11:17 17:5 40:17
**moved** 18:14
**moving** 45:9
**multiple** 31:5 79:13 92:1

< N >
**name** 7:3 67:21 68:5, 6, 8, 10, 11, 21 74:3 87:23 100:3
**named** 17:9, 17 63:25
**names** 51:17, 19, 22, 24 84:15
**NATIONAL** 3:4 94:2, 15 96:15 97:24 101:16
**nature** 40:25
**necessarily** 15:8
**necessary** 21:22 52:3
**need** 74:2
**needed** 59:17, 19 64:20
**net** 15:5 91:6 92:11, 16 93:16, 20 94:19, 21, 23 95:11, 21 96:9, 17, 19, 20 97:13 98:9, 19 99:19 100:10, 15 101:6
**network** 94:22
**never** 64:5 74:6
**new** 59:12, 13, 16 63:24 84:3, 17
**newly** 11:19 17:6
**Nick** 96:8
**non-business** 94:1
**non-qualified** 79:25
**normal** 55:6
**Notary** 6:10 107:23
**notation** 23:1, 10 24:4
**notations** 22:25 26:12 27:24 35:18
**note** 80:21
**Notes** 5:9 22:1, 5, 8, 12 24:13, 14, 17, 18 25:3, 6, 9, 18, 21 26:25 27:7 28:17 32:15, 22 35:22, 24, 25 48:6, 9, 13 54:22, 23 78:1
**notice** 26:4
**noticed** 28:11
**Noting** 16:3, 4
**Number** 7:12 11:14 12:1, 7, 24 15:22 16:23 65:24 72:21 74:14 84:13 93:9

< O >
**oath** 27:19 28:6 82:14 89:6
**Oberly** 3:7 7:17
**object** 40:13 72:10
**Objection** 9:7, 11 11:2 14:5, 9, 22, 25 15:10 16:16, 19 18:5 19:9 20:23 21:6 25:1, 22 26:1, 6, 14, 20, 22 28:23 35:21 36:2 37:8, 16, 18 38:9, 13, 17, 24 39:7, 11, 13 40:4 41:8 45:17 46:7 55:13 62:18 63:1 64:2 66:24 68:15 71:21 72:2, 12 79:15 82:7, 11, 17 84:5 87:5
88:15 90:2 99:9, 25 100:20, 23 101:3 102:16, 22 103:14
**objections** 39:11
**objectives** 34:4
**obligation** 34:3
**Obviously** 63:11
**occurred** 18:18 22:16 24:14, 19 25:4, 5 91:23
**October** 9:3, 15, 19 10:3, 4, 10, 15, 19 32:18, 20, 23 48:17 49:23 73:8, 17 79:10, 23 80:4, 16, 18 81:4 83:1, 12
**offer** 46:15, 18
**offered** 53:3
**offering** 46:13
**offers** 9:3
**office** 21:25 43:1 53:12 73:22 98:16
**officer** 13:3 21:13, 17, 19, 20 36:18, 22 37:4, 11 38:23 58:11, 20 91:9
**officers** 76:2
**offices** 7:6
**official** 61:24 69:10
**offsite** 36:16
**Oh** 39:22 103:23
**OHIO** 1:2 2:8, 17 3:11, 21 6:5, 11 7:7, 11 107:2
**Okay** 7:2 9:23 14:1 17:17 23:23 42:8, 14, 15 47:1 48:25 61:12 63:8 65:17 66:12 67:20 74:4 87:18 93:4 98:8, 22 101:1, 5 102:2, 14 106:4, 7
**old** 47:17 52:25 54:13, 15, 17, 18, 25 55:20
**omission** 62:5, 25
**once** 90:15 91:21
**ones** 19:16 96:11 100:3
**online** 84:18
**open** 84:15
**opened** 84:19 85:12
**operating** 61:16 71:17
**opinion** 36:23
**opportunities** 47:2 61:5, 8, 9, 19 62:8 76:22
**opportunity** 33:22 34:2 77:18
**opposed** 24:23
**options** 10:16, 17 78:13
**or/and** 105:14
**order** 30:9, 24
**ordered** 24:12
**overall** 95:9 98:8, 13 100:13
**oversight** 13:11

< P >
**p.m** 89:3 106:9
**pack** 79:4
**pad** 29:1
**pads** 28:15, 18 29:3
**Page** 5:2, 7 22:18 23:6, 11, 17, 20, 25 24:3, 7, 17, 18 32:17 37:2 58:3, 6, 10, 13, 14, 18 60:17, 25 66:14 68:25 72:14 84:8 88:6 89:8 93:8, 9 95:6 96:7, 16 98:7, 14 99:8 100:7, 11 101:10, 12, 19 102:2, 4 105:25 107:6
**pages** 27:18 29:5
**paid** 81:16 103:16
**paper** 28:11, 15, 25 29:2, 3
**paragraph** 9:1, 2, 23, 25 10:18 11:14, 15 12:1, 6, 24, 25 13:25 15:22, 23 16:23, 25 17:23 21:9 36:5, 14, 25 37:7 38:21 39:3, 5 41:5 52:12, 14 56:11, 12, 24 78:7, 8 81:21 82:3, 16, 24 83:10 84:2, 8 88:6 89:11, 20 90:21, 22, 23
**paragraphs** 82:6
**parentheses** 102:9
**parenthetical** 69:25
**part** 11:13 59:11 64:12 75:16
**participate** 73:23 74:23 75:10
**participated** 51:9 75:19, 20, 21
**participation** 76:7
**particular** 24:23 25:9 92:7

**partner** 69:14, 16
**partnership** 69:13
**pas@sspfirm.com** 2:10
**pass** 42:4
**path** 37:12
**Patterson** 2:6
**pay** 78:11 79:1, 6, 17, 20 103:3 104:6
**payment** 80:7, 21
**payments** 80:19
**penalties** 8:6
**pending** 7:10
**people** 47:3 50:17 51:14, 17
**percent** 14:20 15:15, 19 91:5 92:11, 14, 16 94:21 95:11, 15, 21, 25 96:2, 6, 9, 21, 23, 25 97:4, 7, 9, 10, 19, 22, 25 98:9, 19 99:4, 19, 23 100:10, 14, 17 101:18, 22, 25
**percentage** 14:3 93:20 94:19
**percentages** 95:20 96:2
**Perfect** 106:4
**perform** 63:24 100:21
**Performance** 5:10 21:12 32:14 33:14 34:6, 7 35:16 36:1 52:19, 20 55:7, 8, 11, 16 56:3, 23 57:7, 15, 24 58:3 59:3, 14, 17 60:9 61:14, 24 62:4, 25 64:9 71:2, 10, 15, 17 72:8 76:23 91:3
**period** 41:17 42:9 86:4, 7, 12, 19, 21 87:3, 12
**perjury** 8:6
**Perry** 63:18
**person** 50:5 53:15
**personnel** 32:9, 13
**pertain** 8:24 25:21
**pertaining** 32:19
**Peter** 2:5 7:14
**Phenise** 3:18
**phenise.poole@53.com** 3:23
**Phil** 94:9, 13
**PHILIP** 1:6, 23 2:4 6:3 7:8, 9 94:6
**phone** 46:12 76:9, 10
**phonetic** 69:20
**photograph** 105:24, 25
**phrase** 92:3 98:13 99:6 101:11
**pie** 93:13, 15, 18 94:20 95:13, 14, 16, 17, 21, 23 96:19 97:16 98:10
**place** 21:24 44:20 57:25 98:17 107:6
**places** 31:1 68:23
**Plaintiff** 1:7 7:14 102:7, 19 105:4
**PLAINTIFF/COUNTERCLAIM** 2:3
**Plan** 5:13 61:18 64:18 65:7 66:18
**planning** 64:13 65:10 67:10
**plans** 56:16, 19
**Plaza** 3:20
**pleading** 39:23, 25 40:17
**pleadings** 39:8
**please** 7:12 9:1 11:14, 16 13:1 15:24 16:24 17:1 20:1 42:24 52:12 61:12 71:3 72:4 88:6 90:21 93:3 98:24 102:6 103:11 104:5
**plus** 29:9 52:24 55:20 70:4 79:6
**PNC** 3:9 6:4
**point** 11:22 18:17 24:22 54:24 83:8 85:20, 22, 25 86:18 96:4 98:7 100:7
**Poole** 3:18
**portion** 70:16
**portions** 70:14
**position** 9:4, 5 10:8, 12, 24, 25 11:7, 20 13:19 14:13 53:17 55:22, 23 70:5, 9, 17, 20 71:1, 13 74:15 83:5 86:24 91:10
**positions** 21:21 61:23 69:22 72:24 88:8, 10 103:17
**possession** 29:16, 22, 24
**post-judgment** 104:19
**potential** 46:13 69:22 70:5, 17, 20 71:1 72:24
**potentially** 47:4 90:4 100:25 101:1
**power** 44:9
**practice** 25:6
**pre** 42:8 44:13
**preceded** 73:17
**predicate** 15:2
**Pre-judgment** 104:19
**preparation** 35:3 66:10 91:18
**prepare** 91:25
**prepared** 39:23, 24
**PRESENT** 4:3 87:14
**Presentation** 5:16 91:2, 12, 25 93:5 96:4
**presented** 66:21 68:20 99:21
**presenting** 99:15
**preserve** 32:6 33:1
**presidency** 53:3
**president** 13:3 16:14 17:9, 12, 18, 21, 24 18:25 21:13, 16, 20 36:21 37:4, 10, 12, 15, 23, 25 38:23 39:6 41:11, 14, 18, 21 42:9, 21 43:2, 9, 18, 22, 25 44:8, 13, 21 46:1 53:13, 23 54:9, 20, 25 56:20, 25 58:16 59:24 60:14, 21 61:2 62:1, 9 63:21 64:6 68:18 70:10 73:3, 17 74:16 77:5, 8, 12, 15 79:3 87:22 88:8 91:9, 14
**presidents** 16:3 18:2 19:7, 14, 21, 22, 25 20:7, 20 21:3
**previous** 13:22 14:14, 18 67:22, 24 68:4 71:6 84:7
**previously** 10:12 80:14 83:5, 14
**principal** 74:7
**prio** 59:17
**prior** 29:21, 25
**priorities** 59:17, 19
**Procedure** 6:8
**PROCEEDINGS** 5:3 7:1
**process** 52:22 73:18, 21 75:2, 10, 17 76:1, 7, 12 77:3, 7, 11 89:16
**produced** 24:13 26:17 35:9, 10 66:4 67:2, 12 70:22 105:13
**program** 80:1
**progress** 33:9 34:12, 15
**promise** 37:6, 14, 21, 22 41:10, 20, 21 43:17 45:15 46:6, 11, 18 47:2 57:2, 4 60:19 62:1, 15 88:14 91:8, 13
**promised** 21:15 36:19 37:3, 11 38:3, 7, 22 39:6 41:6, 16, 18, 23, 25 42:15, 20 43:19, 20, 21 56:25 57:5 58:7, 15 60:13 61:2 62:24 103:17
**promote** 61:18 78:20 79:3, 17 81:24 82:5
**promoted** 10:13 17:7 83:14 86:9, 24
**promotion** 13:16, 18, 21
**pronoun** 20:7
**pronounced** 74:3, 5
**proposes** 105:25
**protected** 89:13
**Protection** 83:16, 19 84:11, 22
**provide** 69:13 73:25
**provided** 19:11 22:5 35:7 50:11, 12 52:19 67:23 68:4 76:17, 21 82:22
**providing** 50:9 73:24 76:19
**prudent** 67:10
**Public** 6:11
**pull** 32:1
**punitive** 89:17 104:12
**purposes** 24:24 102:1
**pursuant** 6:7 35:7
**pursuing** 21:14 36:9, 10
**put** 22:13, 15 30:19, 20, 25 31:24 33:23 35:24 53:20, 22 62:7 63:9 98:17

< Q >
**qualified** 21:19 36:23 42:12 58:11, 20 83:7, 23 88:7
**question** 8:24 9:7, 9 11:2 14:6, 10, 23 16:16 18:5 19:9 21:6 24:16 25:2 26:5 36:2 37:18 38:9, 14 40:3, 9, 19 41:1, 2 42:23 43:5, 6 45:11, 17 46:7 48:15 52:2 58:22, 24 59:1 64:3 71:21 79:15 82:8, 9, 18 87:1 88:16 90:3 95:6 96:3 98:21, 23 99:11 101:9 103:7, 10, 11 105:16
**questions** 26:9 40:15 76:17, 24 77:2 105:10 106:7
**quickly** 91:21
**Quit** 40:11, 12
**quotes** 84:11

< R >
**raise** 7:18 62:5
**raised** 62:25
**ran** 28:3
**rating** 52:20
**read** 11:14 12:6, 25 15:23 16:24 20:1, 9 21:9 23:7 33:6 36:15 37:2 38:14 42:24 43:5 56:12 59:14 60:1 61:8, 12 70:1, 2 78:7 82:24 84:9 86:16, 18 88:6 89:11, 20 90:23 92:7 93:25 95:8 98:23 100:11 102:6 103:11, 25 104:5, 18 105:3 106:3
**reader** 93:19
**reading** 6:12 39:23
**READS** 9:10 20:3, 10 38:16 42:25 43:7 82:10 99:2, 12 103:13
**ready** 21:18 33:12 70:3
**realize** 61:18
**reasonable** 62:23 63:3
**recall** 13:15 14:7, 11, 24 15:17 18:24 19:3, 5, 11, 12, 16, 17, 19 20:25 21:2

24:21 25:19 27:6, 13, 16 29:11, 13, 15, 20 30:7 31:25 33:2, 15 34:9, 21, 24 35:1, 17 37:24 41:22, 23, 24 42:16 47:12, 14 50:4, 5, 6, 8, 9, 13, 21, 25 51:7 54:22 56:2, 22 65:1, 5, 8, 11 70:18, 23 75:8 76:13, 25 77:2, 16, 22 84:1
**receive** 13:14 46:22
**received** 90:16
**recognize** 39:24
**recollection** 76:18
**recommend** 21:15 37:3, 6, 12, 22 38:7 39:4 41:6, 17, 20, 23, 25 42:14, 18 43:9, 13, 14, 20 45:7, 12 56:25 58:7, 15 60:21 62:1, 8, 15 63:23
**recommendation** 38:1 42:1 43:24 44:12, 13 60:13 61:2 62:24 88:13
**recommendations** 42:3
**recommended** 59:23 64:24 88:11
**recommending** 41:12 42:13
**record** 7:3, 13 11:16 12:25 15:23 16:25 33:6 47:21, 22, 23 59:15 76:14 88:24 89:1, 2, 12 106:8 107:11
**recorded** 24:23 27:23 54:23 107:9
**records** 32:3
**red** 32:12
**reduce** 45:20
**reduced** 45:15 57:7 77:23 107:9
**refer** 69:7
**reference** 62:15, 24
**referenced** 48:12 79:19 95:3
**referring** 13:24 15:6 22:8 36:13 59:12 71:8, 9 92:5
**refers** 20:7 98:14 99:7
**reflect** 24:14 59:13, 16
**reflected** 33:20 71:20 73:4 97:14 98:11 101:2
**reflection** 60:12
**reflects** 60:25
**refrain** 46:5
**refused** 46:12
**regarding** 91:2
**region** 16:2, 15 53:4, 13 92:7
**regional** 16:2, 8, 13 17:12, 20, 24 18:2, 25 19:7, 13, 20, 22, 25 20:6, 14, 17, 20 21:3 53:12, 23 61:15 71:16 77:19 91:5 92:9, 10, 11, 13, 16 94:22 95:4, 10 96:5, 8 97:15 98:8, 12, 13 99:7, 20 100:9, 14, 16, 18
**Regions** 5:15 33:8 53:19 61:14 71:15
**regulations** 84:24
**regulators** 85:6
**Reinstatement** 104:6
**REINSTATLER** 1:25 6:10 7:4 107:22
**relate** 26:12
**related** 25:15 33:13
**relationship** 77:19
**relative** 25:12 101:9 107:13
**relevant** 12:8
**relied** 44:25 62:10
**relief** 84:24, 25 102:10 105:4, 7
**relies** 44:12
**remember** 32:16 35:15 50:18
**Reminding** 89:5
**reopening** 105:11
**repeat** 9:9 16:18 42:23 82:9 90:22 99:11
**repeated** 54:3 84:21
**replacement** 64:6 65:2
**report** 83:6, 21
**reported** 83:8 97:10
**REPORTER** 1:25 6:11 7:2, 5, 19, 20, 25 9:10 20:2, 3, 10 38:14, 16 42:25 43:7 48:4 49:8 57:11 65:18, 21, 25 82:10 92:20, 23 98:25 99:2, 12 103:12, 13 105:18, 21, 23 106:4 107:1, 23
**reporting** 18:21, 23 19:23 20:5, 18
**reports** 75:24
**representation** 91:6
**represented** 95:5 105:24
**representing** 96:1
**represents** 95:14
**Republic** 47:8, 11
**request** 35:7 45:1 51:23 66:6 68:4 81:16 96:8 98:18
**REQUESTED** 9:10 11:17 13:3 17:4 20:3, 10 24:13 27:4 38:16 42:25 43:7 56:13 82:10 90:16 99:2, 12 103:13
**require** 102:24
**required** 53:15
**requiring** 83:4
**resolved** 85:2, 3
**resource** 18:14 69:14, 16
**resources** 18:15
**resource's** 36:18
**respect** 28:20 52:4 58:22, 24 59:1 73:16 101:14
**respected** 42:12
**respond** 13:9 76:11
**response** 60:2, 6, 8 66:6
**responsibilities** 13:22 14:15, 17, 18 19:20, 21 47:5 70:6, 20 71:4, 19 72:11
**responsibility** 13:5, 10 16:1, 5, 7, 9, 14 17:10, 24 18:3 19:7, 14 20:17, 21 21:4 36:24 53:18
**responsible** 12:13 19:24 20:6, 13, 14, 15
**rested** 44:24
**restroom** 88:21
**result** 13:13 46:6, 11 47:2 52:3 78:9
**results** 61:18
**retail** 13:5 19:1 95:9 100:13, 15, 16 101:11, 13
**retaliation** 78:10, 20 81:25 89:10, 24 90:8, 13
**retaliatory** 89:22
**retirement** 80:1
**retrieve** 29:14 30:8 51:22
**retrieved** 30:14
**return** 10:25 11:5
**revenue** 14:3, 21 15:4, 5, 6, 12, 13, 16 101:6
**revenues** 13:7
**Review** 5:10 21:12 33:7, 14, 16, 20, 23 34:2, 13, 16, 18 35:6, 16 36:1 52:19, 20 55:7, 11, 17 56:3, 23 57:7, 15, 19, 21, 24 58:3 59:4 60:9, 20 61:1, 25 62:4, 12, 25 64:10 66:7 71:2, 10, 18 72:8 82:21
**reviews** 32:14 55:8
**RHR** 74:7, 11, 15, 20, 22
**rhythms** 61:16 71:17
**right** 7:19, 25 9:20 10:4 14:17 17:12, 18 18:4 21:5 22:24 23:11, 15 24:5, 9 28:12, 25 33:4, 17 34:4, 13, 17 35:9, 14 38:15 41:17 44:10, 17, 22 45:4, 23 47:20 48:12 51:11 52:2 53:5, 25 55:24 57:8, 25 59:5, 7 60:2 61:6, 10 63:14 64:15 65:20 66:5, 23 68:10, 14, 20 69:21 70:21 71:2, 11, 13, 20, 25 72:20 73:5, 9, 10, 11 74:16, 21, 24 80:3, 10 85:6, 17, 21, 24, 25 87:4, 10 88:1 90:1, 5, 8, 11 92:7, 14, 19 93:15, 25 94:7, 13 95:20 97:4, 9, 12 98:15 100:18, 22 106:5
**right-hand** 24:4
**Robert** 36:17
**Rodriguez** 51:19
**role** 10:8, 13, 14 16:5 52:25 54:20 55:21 63:24 64:25 83:13 85:11 87:25 91:7
**Rome** 3:8 6:4 7:7
**roughly** 79:7 81:4
**RULE** 6:7 102:9
**Rules** 6:8
**run** 17:7
**running** 12:13
**runs** 87:11

< S >
**Saba** 2:5, 6 7:14, 15 9:7, 11 11:2 13:23 14:1, 5, 9, 22 15:2 16:16, 19 18:5 19:9 20:23 21:6 25:1, 22 26:1, 6, 14, 20, 22 28:23 35:21 36:2 37:8, 16, 18 38:9, 13, 17, 24 39:7, 13, 18, 22 40:7, 12, 16, 22 41:8 45:17 46:7 47:16 55:13 62:18 63:1 64:2 66:12, 24 68:15 71:21 72:2, 12 79:15 82:7, 11, 17 84:5 87:5 88:15 90:2 99:9, 25 100:20, 23 101:3 102:16, 21, 25 103:2, 6, 9, 14 106:2, 5
**salary** 11:9 13:14 45:25
**sat** 51:2
**Saturday** 23:23
**Sauna** 69:19 70:13
**Saving** 84:23
**saw** 35:5 62:24 67:12, 24 68:7 70:19, 22 72:8, 9 91:21
**saying** 15:1 68:2 99:24
**says** 9:23 24:5, 8, 23 39:16 40:5, 6 61:25 68:19 70:3 71:4, 18 95:13 98:8
**scanned** 66:8 68:3
**scapegoat** 83:18 85:8
**scenario** 64:14
**Schaffer** 10:20, 22 11:4 36:17 39:1 63:16, 17 69:15 88:19
**School** 51:4

**scratch** 75:9
**search** 47:10
**second** 11:15 16:24 84:11 90:10 93:8 99:1
**section** 59:3, 22
**security** 101:7
**see** 8:9 31:11, 16 37:1 57:17 58:4 67:3, 25 69:1, 23 70:7 71:6 73:11 84:2, 7 89:10 93:9, 13 95:7 96:16, 18 102:3
**seeing** 70:23 105:8
**seeking** 79:13 81:6, 9
**seeks** 89:17
**seen** 8:15 66:3 69:4, 11 78:1
**selection** 83:18
**self** 32:14 55:15
**self-evaluation** 33:23 34:3, 5
**sentence** 10:2 11:15 12:6 16:24, 25 17:23 21:10 82:25 90:24 91:19
**separate** 101:8
**September** 73:10 91:1, 12, 15, 20, 23
**series** 76:16
**services** 84:19
**set** 89:25 90:6 107:6
**setting** 59:20
**seven** 53:15, 17, 22, 25
**severally** 102:8
**share** 27:7, 10, 12, 14
**shared** 27:11, 13
**shareholders** 63:7
**short** 35:14
**shortly** 22:15 24:14, 19 25:4 31:6, 7 32:23 35:23 90:25
**show** 49:24
**showing** 98:6
**shown** 70:25 99:8
**shows** 94:20
**side** 24:4, 5
**significance** 91:7
**significant** 13:19 16:6 25:11, 12, 15
**signing** 6:12
**similar** 50:1 51:25 53:5 72:6, 8
**Sir** 7:18 8:15
24:16
**sit** 90:17 105:6
**sits** 52:5
**situation** 63:22
**six** 27:18 76:4
**size** 28:16
**skill** 107:12
**slide** 100:7
**solemnly** 7:20
**somebody** 15:8
**sons** 36:12
**sorry** 13:9 62:11 65:19 67:17 70:2 81:8 84:25 92:24 96:3
**sort** 23:9 32:6
**sought** 84:24
**SOUTHERN** 1:2 7:11
**speak** 39:15 63:3 87:16
**speaking** 39:11
**speaks** 38:10, 24 39:14, 18 40:2, 4
**specific** 19:3 22:12 44:15 46:9, 16 71:3, 7 74:18 75:11 77:2, 16, 21 81:12 104:4
**specifically** 24:21 29:11, 20 30:7 36:13 37:24 42:16 47:12 83:9 96:13
**specifics** 86:6
**Spence** 21:17, 21 33:11 42:10 67:21 72:19 73:16 74:24 77:4, 14 83:6, 22 85:19 88:3 94:3 97:21
**Spence's** 101:21
**spoke** 74:6
**Square** 3:20 93:23
**staff** 16:15 17:11, 25 18:3, 15 19:8, 15 20:21 21:4
**Stagnaro** 2:6
**Standard** 28:16 59:11
**standpoint** 96:17
**Staples** 65:19
**Starting** 55:10
**State** 6:11 39:11 78:10 107:2
**statement** 39:5 40:1 101:8
**statements** 15:18
**STATES** 1:1 7:10
**Stating** 39:13
**stay** 10:13 52:24 54:7, 9, 10 55:19 56:19
**step** 94:20
**STIPULATION** 6:1
**stock** 78:13
**stop** 94:20
**straight** 44:5
**straightforward** 40:19
**strategies** 61:14 71:15
**strategy** 48:20, 25 49:3
**Street** 2:16 3:10 6:5
**subject** 8:5 105:11
**submitted** 69:15 70:23 107:25
**subpoenas** 89:23 90:11
**substance** 35:25
**substantially** 83:6, 22, 23
**succeed** 44:8
**success** 59:18 77:20
**successful** 53:16, 23
**Succession** 5:13 64:13, 18 65:7, 10 66:17 67:10, 19 68:6
**successor** 33:10 34:12 43:2 56:20 64:8, 21 68:11, 18, 22
**suggest** 48:5 62:15
**suit** 85:23
**SUITE** 6:5
**Summit** 51:4 52:4
**superior** 12:19, 21
**supervisor** 12:12
**support** 59:19 61:20 82:16
**supporting** 35:19
**Sure** 19:18 26:10 47:14 69:10 77:17 86:5 88:23 99:4 101:6
**surgeon's** 47:18
**surprised** 67:13, 14, 15, 18, 19, 20 68:7
**sustained** 61:16 78:11
**swear** 6:12 7:20
**sworn** 7:19 8:5 40:1 107:7
**Sylvania** 2:17

**< T >**
**tactics** 48:21 49:1, 3
**take** 7:8 21:20, 24 46:12 47:19 83:12 88:21
**taken** 6:4, 7 32:15 105:24 107:5, 11
**Talent** 5:12 53:10 61:21 66:17 69:7, 9 72:16
**talk** 48:18
**talked** 48:14, 20 50:10, 14 105:17
**talking** 15:5 97:16
**talks** 69:22 70:4
**Tayfun** 22:20 48:11, 14, 18 64:22 65:3 74:12, 17 75:20
**Tayfun's** 68:12
**Tazun** 64:22
**team** 21:19 58:11, 20 59:18
**Telephone** 2:9, 18 3:12, 22
**tell** 9:4, 15 10:6 36:9 42:6 43:16 44:4, 6 45:6, 9, 12, 25 46:3 47:13 54:21 55:11 63:4 66:9
**tells** 33:9 52:23
**ten-plus** 45:22
**term** 12:11, 14, 16, 18, 19 15:7 16:9 21:17 54:7
**terminated** 80:20 82:2
**terminating** 49:17
**terms** 18:7, 15, 20 46:19 49:16 50:9 70:25 72:20 78:19 81:12 84:8 99:6
**Terry** 87:23
**testified** 14:12 27:22 79:5 82:14
**testify** 39:20 86:21 107:7
**testimony** 7:21 9:10 20:3, 10 27:19 28:6, 21 29:24 38:16 42:18, 22, 25 43:7, 12, 22 50:15, 18 53:21 66:13, 25 67:25 80:23, 24 82:10 99:2, 12 103:13
**text** 105:15
**Thank** 7:18, 25 65:16
**thereof** 104:6
**things** 33:10 39:17 40:6 42:8, 11 45:8
**think** 9:17 15:19 48:2 65:20 69:7 74:3 75:23 76:4 81:4 82:20
**THIRD** 1:11 3:4, 17 5:11 7:9 11:9 13:4 16:6, 25 17:9, 18 21:23 25:13, 14 33:13 43:10 44:8 47:6 53:19 54:11 57:16 63:6 64:12 66:16 74:1 77:21 78:21 80:6, 20 84:12, 21 85:14 88:8, 9 92:10 101:6 103:17
**Third's** 65:10
**Thomas** 3:19
**thought** 41:15 48:15 63:10 67:17
**three** 21:17 29:5 31:13 33:11 42:9 63:16 88:19 96:25 97:6
**Thursday** 23:1 49:23
**Tim** 33:11 72:19 73:16, 25 74:1, 24 76:20, 22 77:4, 14, 17 94:3 97:21 101:21
**time** 7:6 11:22 19:12 24:11 26:4 29:7, 16 32:4 34:9 35:5, 14 42:16 46:17 47:15 50:21 52:25 53:22 55:6, 21 57:5 63:8, 11 64:21 77:3, 7, 11, 22 84:1, 13 85:25 86:7, 12, 14, 19, 22 87:3, 14, 19, 25 88:1 89:21 94:17, 18 105:8 107:5
**timeline** 24:24 26:19 53:1, 5, 21 54:7
**timely** 61:21
**times** 12:8 31:5
**timing** 87:25
**title** 69:11 107:6
**today** 7:4, 5 35:15 68:3 82:14 90:17 105:6
**today's** 106:7
**told** 10:11, 22 11:5 21:13, 18 26:24 30:15 34:14

36:11 43:14 44:3, 5, 7 47:3 49:16, 19 52:25 53:13 54:5, 14, 15, 24 55:21 56:5 74:12, 17 75:23 76:20 77:17 87:11
**top** 22:19 69:21 95:18 103:21, 24
**topics** 72:21 105:16
**total** 14:3, 21 15:13 94:18, 25 97:6
**transcript** 6:13 99:20 106:1 107:5, 11
**transferred** 84:16
**transitioned** 18:16
**Tried** 40:14
**true** 14:19 15:14 16:13 26:18, 21, 24 35:18, 22 45:13 63:20 107:11
**trust** 11:18 17:6, 15
**truth** 7:22, 23 74:14 84:22, 23 107:7, 8
**try** 8:9
**trying** 9:23 39:21, 22 40:10 42:5 55:1 80:23 95:12 101:9 103:6
**TUESDAY** 6:5 22:21 32:17
**turn** 11:13 46:10 52:14
**turned** 47:1
**two** 7:8 9:19 27:23 28:14, 18 29:9 30:12 31:1, 3, 19 33:1 38:11 39:16 40:6 52:24 55:20 62:16 68:5 70:4 73:3 80:19 88:20 89:13, 25 90:4, 6, 18 93:12
**type** 28:11 29:2
**typewritten** 107:10
**typically** 55:8

< U >
**Uh-huh** 52:15 56:10 72:23 75:18 87:17
**ultimate** 44:11, 23
**unauthorized** 83:17, 20 85:12, 14, 16
**underneath** 93:15
**underscored** 91:6
**understand** 8:7, 9, 25 9:2, 24 42:5 77:19 80:23 85:9 89:6, 10, 24 95:13 96:3 102:21
**understanding** 61:11 62:16 64:17, 19 102:17
**understood** 44:9, 11, 19, 23 74:20 100:7
**unfortunate** 64:14
**unhappy** 9:16
**UNITED** 1:1 7:10
**University** 51:10
**unlawful** 89:22
**unlawfully** 84:14
**updates** 66:18
**upper** 93:12
**use** 12:18, 19 56:21 74:17
**utilized** 10:7 74:13

< V >
**Valhalla** 80:15
**value** 78:19 79:3
**variable** 52:21 55:18 78:12 79:1, 6, 21
**various** 98:11
**verbal** 45:16, 19
**verify** 75:14 98:18
**version** 68:8
**versus** 7:9 34:6, 7
**vested** 76:19
**vetted** 77:12
**vetting** 73:18, 20 74:21, 24 75:2, 10, 17 76:1, 7, 12 77:3, 7, 11
**VIDEO** 6:3, 7
**Videographer** 4:3 7:4, 18 47:20, 23 88:24 89:2 106:6
**violation** 78:10
**violations** 84:21
**visible** 61:19
**voicing** 40:4
**VOL** 1:23 6:3
**volume** 7:8
**vote** 44:16
**votes** 45:4

< W >
**wages** 102:11, 12, 15, 20
**waived** 6:13
**Walton** 16:7
**WAM** 94:1, 6 95:3 96:13, 23 97:17 101:15
**wanna** 38:6
**want** 11:12 58:2 72:14 105:15
**wanted** 47:9 53:24 54:3 73:25 77:12 90:20 100:8 105:18
**wants** 33:9
**warranted** 105:12
**way** 15:8 24:13 43:23 52:20 107:14
**wealth** 13:11 33:8 34:11
**Well** 14:12 16:8, 23 18:9, 12 19:20 22:13, 18 23:7 25:14 29:13, 18 31:9 32:14 33:22 34:1, 20 37:21 39:3 40:16 48:11, 17 50:13, 20 54:2, 16 56:4 61:15 66:22 68:9 70:16, 19 71:16 74:2 75:16, 17, 24 78:18 79:18 81:22 82:14 85:16 86:20 89:20 90:5 99:15, 18 100:3, 11
**went** 29:20 40:24 42:10 99:4
**We're** 7:2, 6 23:17 28:11, 24 47:20 70:3 88:24 89:2 103:6 106:8
**WESTERN** 1:3 7:11
**we've** 22:5 27:13 82:21 105:16
**wherefore** 102:4, 6, 7
**wife** 49:6 89:23
**willing** 63:23
**willingness** 88:9
**witness** 6:12, 13 7:24 16:18 20:9 38:15 39:20 40:9 49:9 65:13, 15, 17, 23 82:9 88:21 103:5 107:4
**word** 37:2 38:3 41:13 44:1, 25 45:21, 23 62:10, 13 63:5, 10, 11
**words** 56:21 77:21, 23
**work** 10:25 11:6 31:23 33:8 34:11 36:11 53:1, 6, 24 54:3, 8 56:6
**worked** 45:22 54:10 63:5, 7 77:20
**working** 11:8 38:4 83:2, 9, 24 85:5
**would've** 11:8 22:15 31:1, 5 50:14 55:15 103:16
**write** 24:17, 18 60:8
**writing** 45:16, 20 57:8 63:9 77:24
**written** 22:19 28:24 29:1, 2 31:18 52:20 76:10, 11
**wrote** 61:9

< X >
**Xavier** 51:10 52:8

< Y >
**Yeah** 8:5 35:12 46:10, 17, 21 51:5 59:13 65:15 91:16 92:8 95:17 97:17, 18 105:22
**year** 13:8, 9 15:25 22:22 32:18 35:8 52:21 53:21, 22 57:21 59:12, 13, 16 73:6, 10 80:7, 25
**years** 21:17, 23 25:14 28:14, 18 29:10 30:12 33:1, 11 34:1 38:4 42:9 45:22 52:24 53:1, 6, 15, 17, 25 54:4, 8 55:20, 22 56:6, 8 63:5 70:4 73:3 74:14, 18
**yesterday** 8:6 51:25 53:11 67:9 68:2 79:5
**young** 21:21
**younger** 83:7, 22

< Z >
**Zink** 87:23