**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **PHILIP R. MCHUGH,** | : | Case No. 1:21-cv-00238 |
| Plaintiff, | : | Judge Michael R. Barrett |
| v. | : | |
| **FIFTH THIRD BANCORP, ET AL.** | : | **PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – ABUSE OF PROCESS AND RETALIATION** |
| Defendants. | : | |

Six years ago, Fifth Third Bank[1] and Greg Carmichael threatened Phil McHugh with "harm and discomfort," "sanctions," and "torts and other remedies" if he dared to proceed with age discrimination claims against the Bank. Defendants followed through with those threats just two days after this lawsuit was filed via a frivolous abuse of process counterclaim. There is not, nor has there ever been, a factual or legal basis for that counterclaim, and there is undisputed direct evidence of Defendants' retaliatory intent in filing it. As a result, pursuant to Fed. R. Civ. P. 56 Plaintiff respectfully requests that this Court,: (1) dismiss Defendants' Abuse of Process Counterclaim in its entirety; and (2) grant partial summary judgment to Plaintiff as to his retaliation claims, with damages reserved to the jury.

A Memorandum in Support with Supporting Declarations and Exhibits of Plaintiff Philip McHugh and Joshua M. Smith, Esq. are attached.[2]

Respectfully Submitted,

*/s/ Peter A. Saba*__________
Peter A. Saba, Esq. (0055535)
Joshua M. Smith, Esq. (0092360)
SSP LAW CO., L.P.A.

---

[1] For purposes of this motion, Defendants Fifth Third Bancorp and Fifth Third Bank, N.A. are collectively referred to as "Fifth Third Bank," "Fifth Third," or "the Bank."

2623 Erie Avenue
Cincinnati, Ohio 45208
(513) 533-2701
(513) 533-2711 (fax)
pas@sspfirm.com
jms@sspfirm.com

*/s/ John J. McHugh*
John J. McHugh, III
McHUGH & McCARTHY, LTD
5580 Monroe Street
Sylvania, Ohio 43560
(419) 885-3597
(419) 885-3861 (fax)

**Co-Counsel for Plaintiff Philip McHugh**

# MEMORANDUM IN SUPPORT

## I. FACTUAL BACKGROUND[3]

Phil McHugh was a 34-year career employee of Fifth Third, beginning as a bank associate in October 1986, and excelling up to the Bank's enterprise committee in 2015, a small group of the highest level of bank executives reporting directly to the CEO. (*See* Doc. # 123, PAGEID # 6885, 6899 (McHugh Dep. Vol. I - 44:4-21, 58:6-11); Doc. # 66-3, PAGEID # 2786 (Carmichael Dep. Vol. I - 22:9-16). Throughout his career, McHugh consistently received positive annual performance reviews, and lead almost all lines of business including Wealth and Asset Management, Business Banking, Consumer Banking, Middle Market Banking, and Head of Fifth Third's 12 Regions (a role traditionally reserved for the Bank's President). *See* Doc. # 66-3, PAGEID # 2784, 2788, 2808-2812 (Carmichael Dep. 13:15-21; 30:12-31:14; 110:17-122:24; 127:7-152:8); Doc. # 120, PAGEID # 6572-79, 6584-91, 6630-35 (Carmichael Dep. Exhibits 5-8, 11-14, 36-38)(2011-2019 Performance Reviews).

On August 15, 2019, Carmichael held a mid-year review with McHugh in Carmichael's office. (McHugh Dec. ¶ 1).[4] During this meeting, Carmichael expressed that he intended to step down as CEO, that McHugh was the most qualified executive to succeed him, and that Carmichael would be recommending McHugh to the board as his successor. (Doc. # 123, PAGEID # 6939-40, 7017-20 (McHugh Dep. Vol. I, 98:23-99:5, 176:19-177:2; 178:25-179:9); (McHugh Dec. ¶ 2-4). Three days later, Bob Shaffer (Chief HR Officer at the time) affirmed Carmichael's message to McHugh at an off-site executive retreat. (Doc. # 123, PAGEID # 7135, 7159, 7184 (McHugh Dep.,

---

[3] The facts set forth herein are primarily provided for purposes of the dismissal of Defendant's abuse of process claim and summary judgment as to Plaintiff's retaliation claim. There are additional facts which further support Plaintiff's claims for age discrimination that are not set forth herein, but will be included in Plaintiff's opposition to Defendant's Motion for Summary Judgment.

[4] *See also* Doc. # 66-3, PAGEID # 2825 (Carmichael Dep. 177:10-21 ) and Doc. # 120, PAGEID # 6597 (Carmichael Dep. Exhibit 17);

Vol. II, 39:1-2, 63:15-19, 88:17-19); (McHugh Dec. ¶ 5-10). Shaffer and Carmichael confirm having had discussions with McHugh on these dates but claim it was only for purposes of designating McHugh an "emergency successor." (Doc. # 66-3, PAGEID # 2826 (Carmichael 180:5-182:11); Doc. # 77-14, PAGEID # 3624 (Shaffer Dep. 68:8-18)).

As it pertains to Plaintiff's discrimination claims, the above is a disputed material fact requiring resolution by a jury. However, it is worth noting that the documentary evidence confirms McHugh's version of events—that he was being recommended as a long-term successor to Carmichael as President and CEO. In the weeks that followed these disputed discussions, the plan for McHugh to succeed Carmichael was put into writing, including in the first drafts of the Board of Director's December 2019 "Talent Deck." Typically, each December, the Board reviews the Talent Deck materials to understand the enterprise executives' respective performances, and to discuss general succession planning at the Bank. The 2019 Talent Deck was significant, in that for the first time since Carmichael was appointed in 2015, the board would be provided a CEO Succession Plan along with a recommended candidate to succeed Carmichael in the next 1-2 years. For the first time, the Talent Deck would also include the ages of each of the enterprise executives in addition to a breakdown of the Fifth Third employee population by generation, the "Generations of the Workforce."

As CHRO, Shaffer along with two of his direct reports—Nancy Pinckney and Elizabeth McKay—had responsibility for preparing drafts of the 2019 Talent Deck. (Doc. # 77-14, PAGEID # 3630-3631 (Shaffer Dep. 91:5-11; 92:4-93:16)). The first draft was created by McKay, following an hours-long whiteboard session between Shaffer, Pinckney, and McKay on October 23, 2019. (*Id.* at # 3632 (Shaffer Dep. 99:10-25); Doc. # 115, PAGEID # 5842-43 (McKay Dep. 60:16-61:11). McKay shared the 2019 Talent Deck with Shaffer and Pinckney via e-mail on October 25,

2019. (Doc. # 115, 115-1, PAGEID # 5823, 5843, 5920 (McKay Dep. 41:1-21, 61:12-18 and Exhibit 10); Doc. # 117-1, PAGEID # 6382 (Shaffer Dep. Exhibit 10)). According to McKay, she created the slide decks using notes from the whiteboard session with Pinckney and Shaffer. (*Id.* at PAGEID # 5798-99 (McKay Dep. 16:21-17:13)). She also made clear that all content placed in the drafts, including CEO Succession Planning, the identified candidates, potential next positions, and information pertaining to enterprise executives came at Shaffer's direction during the whiteboard session. (*Id.* at PAGEID # 5829-30, 5832, 5836-38, 5840-43, 5845-47 (McKay Dep. 47:7-48:9; 50:4-11; 54:2-56:11; 58:12-61:6; 63:14-65:23).

Consistent with McHugh's version of the mid-year review discussions, McHugh's talent card refers to McHugh as the Bank's next President (ready now) and CEO (1-2 years), with Spence as the next potential Head of Regional Banking and/or Commercial Banking (2+ years):






(Doc. # 115-1, PAGEID # 5921 (McKay Dep. Exhibit 11, pg. 26 and 29); Doc. # 117-1, PAGEID # 6382, 6385 (Shaffer Dep. Exhibit 10 and 12, pg. 26 and 29)).

The 2019 Talent Deck also contains a single-page "CEO Succession Plan," which likewise confirms McHugh as Carmichael's successor in a timeline, with Spence to follow in 2+ years:




Shaffer reviewed this first draft containing the above CEO Succession Plan, and submitted a revised second draft back to McKay and Pinckney on November 7, 2019. (Doc. # 77-14, PAGEID # 3638-3640 (Shaffer Dep. 123:17-129:13) Doc. # 117-1, PAGEID # 6384-85 (Shaffer Dep. Exhibits 11-12)). Notably, Shaffer made no changes to the CEO succession plan nor McHugh's recommended positions (President/CEO). (*Id.*).

By a third draft on November 11, 2019, however, the CEO succession plan was changed. Specifically, Shaffer made significant changes including (1) flipping the "key strengths," "key focus areas," and "leader capability" ratings for McHugh and Spence; (2) changing McHugh's recommended next position to "Head of Middle Market Banking" while adding "President/COO" and "CEO" to Spence's potential next positions; and (3) removing McHugh from the CEO Succession Plan, and moving Spence into the "1-2 years" slot with another younger executive, Brian Lamb (age 44) to follow:










(*See Id.* at PAGEID # 6387 (Shaffer Dep. Exhibit 13, pp. 32, 35, 42)).

From there, the Talent Deck, including the CEO succession plan, was presented to the Board on December 17, 2019, with Spence as the sole recommended candidate for President/CEO. (*Id.* at PAGEID # 3652 (Shaffer Dep. 179:5-17) and # 6399 (Shaffer Dep. Exhibit 20)).

On February 14, 2020, McHugh had his annual performance review with Carmichael. (Doc. # 77-16, PAGEID # 3853 (Carmichael Dep. 353:21-354:4)). According to McHugh, Carmichael stated to him during this review that the board had asked him to stay on for two plus years and that McHugh "**may be too old for the CEO role at that time**." (Doc. # 123, PAGEID # 6893-94 (McHugh Dep. 52:19-53:2)). McHugh responded that his timeline was to work five years longer as an EVP, however he also confirmed, "if I was president or CEO and the Board asked me to stay, I would certainly stay." (*Id.* at PAGEID # 6895 (McHugh Dep. 54:5-11)).[5]

Thereafter, Defendants moved forward with conducting a confidential third-party assessment of Spence by RHR International beginning in June 2020, the results of which were presented to the board at its September 21, 2020 meeting during an executive session. (Doc. # 77-14, PAGEID # 3667 (Shaffer Dep. 237:21-238:18); Doc. # 117-1, PAGEID # 6424 (Shaffer Dep. Exhibit 33.[6] According to Carmichael, and consistent with McHugh's understanding that McHugh was still being considered for the President and CEO role, Carmichael informed the Board at this meeting that promoting Spence to President meant McHugh would be "at risk" of leaving the Bank. (Doc. # 120, PAGEID # 6704 (Carmichael Dep. Exhibit 72, pg. 3)("As Bob Shaffer and I discussed with you at the September Board meeting, <u>we believed Phil McHugh could be at risk with Tim's promotion</u>.")).

On October 13, 2020, Carmichael met with McHugh and informed him for the first time that Spence (and not McHugh) was being promoted to President and would be assuming McHugh's

[5] Carmichael confirms that he discussed CEO succession with McHugh during his annual review, but similar to the August 2019 discussion Carmichael claims it only pertained to McHugh no longer being designated an emergency successor. (Doc. # 77-16, PAGEID # 3853 (Carmichael Dep. 354:15-20).

[6] Contrary to the allegations in the Bank's counterclaims, this assessment and its purpose was not "widely known" around the Bank, and in fact Shaffer and Carmichael engaged in efforts to ensure it was kept secret. *See* Doc. # 117-1, PAGEID # 6430 (Shaffer Dep. Vol. II Exhibit 36 (Mar. 30, 2020 E-mail)("The one thing Greg and I discussed is delaying the start of your work for 30 days at this point given the Coronavirus and not wanting to signal to certain executives internally that we may be starting a CEO succession process.").

job duties including McHugh's oversight of the Bank's 12 regions, Wealth & Asset Management, Business Banking, and Corporate Communications. (McHugh Dec. ¶ 11-15). McHugh was also informed that he would be returning to the role of Head of Consumer Banking, which he was previously promoted from in 2018, and which at the time was the subject of a lawsuit filed by the CFPB. (Doc. # 77-16 PAGEID # 3879, 3884 (Carmichael Dep., 456:23-458:13; 475:18-476:5); Doc. # 123, PAGEID # 7107 (McHugh Dep. Vol. II, 11:10-17, 83:11-14); (McHugh Dec.¶ 16-19). McHugh asked for time to digest the discussion and consider the move. (*Id.* ¶ 20).

The two met again on Thursday, October 15, 2020. (McHugh Dec. ¶ 21). At this follow-up meeting, McHugh informed Carmichael he would prefer to stay in his current role or explore another role, to which Carmichael respond that staying in McHugh's current role was not an option and offered no other options. (*Id.* at ¶ 29-30). In closing the conversation, Carmichael stated he would treat McHugh like other departing executives. (*Id.*).

The next day, Friday October 16, 2020, Shaffer spoke with McHugh and informed him that the Bank was now terminating McHugh's employment and characterizing it as a voluntary resignation. (*Id.* at ¶ 32). Shaffer confirmed this again in a text following day, while also directing McHugh not to report to work the following Monday. (McHugh Dec. Exhibit 1-A). That same day, Susan Zaunbrecher, the Bank's General Counsel, texted McHugh to confirm that he had been terminated, and offered to speak with him in her capacity as the Bank's counsel. (*Id.* at Exhibit 1-B.). McHugh responded, and they scheduled a call for Monday October 19, 2020. (*Id.*).

That same weekend, Shaffer and Zaunbrecher were also exchanging texts, making crude jokes about how McHugh had apparently interrupted Shaffer's vacation. (Smith Dec. Exhibit 2-A)("[Shaffer]: Kirsten (Shaffer's wife) wants me to send the bill to Phil for our vacation.". [Zaunbrecher]: "thumbs up" and, "you can ask him for it on Monday!"). The texts continued the

next day, this time adding Spence to the mix. (Smith Dec. Exhibit 2-B)("[Shaffer]: I would like Phil to pay for my vacation. Susan, can you make that happen? [Zaunbrecher]: Only if there is something valuable in his office that you want. Or offset against his last paycheck. [Shaffer]: I'm obviously kidding. [Zaunbrecher]: Of course. Me too. But those are the only ways.").

Zaunbrecher and McHugh had their call that Monday.[7] Zaunbrecher then conveyed a severance offer via text, in which she indicated that she would send a courier with a formal separation agreement that evening, and requested a call with Phil. (*Id.*). In response, McHugh sent Zaunbrecher a written counterdemand accounting for the lost opportunity to become President and CEO, and violations of age discrimination laws. (McHugh Dec. Exhibit 1-C). Zaunbrecher responded by cancelling the follow-up call and then sending a follow-up letter, directing McHugh's counsel to now call Zaunbrecher. (McHugh Dec. Exhibit 1-D).

Per her request, Plaintiff's counsel—John J. McHugh III—spoke further with Zaunbrecher regarding Plaintiff's counterdemand and the age discrimination claims, and on October 23, Zaunbrecher sent a letter to John McHugh which started the series of retaliatory threats made by Defendants. (Smith Dec. Exhibit 2-D).

Zaunbrecher's letter was labeled a Rule 408 communication, though it made no offers of compromise or settlement.[8] Instead, the letter threatened that if McHugh or his brother dared to file "preposterous" age discrimination claims, "Fifth Third will not only strongly defend against

---

[7] This was the only phone call McHugh and Zaunbrecher had and, according to Zaunbrecher, this call in no way supports Defendants' abuse of process counterclaim. (*See* Doc. # 122, PAGEID # 6808 (Zaunbrecher Dep. 27:14-18)).

[8] For purposes of Plaintiff's retaliation claims, the Zaunbrecher letter is relevant and admissible regardless of whether it falls under Rule 408. *Uforma/Shelby Business Forms v. NLRB*, 111 F.3d 1284, 1294 (6th Cir.1997)("Accordingly, we hold that Rule 408 does not exclude evidence of alleged threats to retaliate for protected activity when the statements occurred during negotiations focused on the protected activity and the evidence serves to prove liability either for making, or later acting upon, the threats.").

these claims" but will also, "take whatever action is appropriate against both your client and you for inaccurate and frivolous claims that are based on lies and malice." (*Id.*)(emphasis added). The letter went on to state that the Bank's threatened actions would, "inevitably cause harm and discomfort to your client," and that, "the purpose of this letter is to ensure that you and Phil know how serious the company is about vigorously defending itself and taking strong action against untruths and inaccuracies." (*Id.*).

Plaintiff's counsel responded via e-mail on October 27, 2020, at 11:00 a.m. with a copy of Plaintiff's draft complaint, making clear that if the bank stood by their decision not to negotiate, Plaintiff would proceed with filing his discrimination claims and conducting discovery. (Doc. # 122-1, PAGEID # 6839 (Zaunbrecher Dep. Exhibit 3)). Zaunbrecher did not respond directly but later that evening, Defendants sent another threat through counsel:

> [P]lease consider this formal notice pursuant to Rule 11 and RC 2323.51 that if you choose to proceed further with instituting litigation against Fifth Third Bank, we will vigorously pursue sanctions against you for the time, expense, and other damages incurred by the Bank in defending against your meritless claims. **In addition to Rule 11 and RC 2323.51, we will also vigorously pursue tort and other remedies, including but not limited to defamation, available under Ohio law**.

(Smith Dec., Exhibit 2-E). McHugh filed his age discrimination claims in Hamilton County the next day, and Defendants retaliated just two days later with a 40-paragraph counterclaim for "abuse of process." (*See* Doc. # 1-3, PAGEID # 15-23; Doc. # 1-11, PAGEID # 51-59).

The counterclaim opens with a statement that Defendants, "have been forced to bring this Counterclaim to prevent attempts by the Plaintiff to coerce Fifth Third Bank to act in a way that benefits him personally to the detriment of the Bank's shareholders, customers, employees, and the public[,]" and that "the Bank will steadfastly protect its shareholders, customers, and employees." (*Id.* at ¶ 1). The counterclaim then accuses McHugh of becoming angry and acting

"in a fit of petulance" during which he "boastfully bellowed" to Carmichael that McHugh was, "the best person to be President and CEO" and that "he, Plaintiff, was the most respected executive on the floor." (*Id.* at ¶ 17-21). It then claims Plaintiff "left the Fifth Third Center, refused to follow Carmichael's directive to assume the role of Head of Consumer Banking, and refused to return to work." (*Id.*). These false, irrelevant, and slanderous allegations simply support the retaliatory animus Defendants held toward Plaintiff for pursuing age discrimination claims.

The crux of the abuse of process counterclaim is in Paragraphs 24-25, in which Defendants allege that John McHugh's October 27 e-mail constituted "guerrilla litigation tactics:"

> 24. On October 27, 2020, at 11:00 AM, Plaintiff's lawyer emailed a draft of a Complaint to Susan Zaunbrecher, Fifth Third's Chief Legal Officer. The email threatened: "If the Bank continues to stand by its decision, Phil will file his complaint with the Hamilton County Court of Common Pleas tomorrow afternoon."
>
> 25. The email also explicitly detailed the guerilla litigation tactics that would be deployed to further coerce the Bank and its officers: "I suspect that we will look to conduct discovery of Messrs. Carmichael, Shaffer, and McCallister fairly soon, and look for proposed dates in early December for that purpose."

It alleges that Plaintiff's lawsuit was "cloaked in the veneer" of a proper age discrimination claim, but that it is actually a "pretext" that is "designed to achieve an ulterior purpose[,]" specifically "to coerce the Defendants to abandon their decision about Tim Spence and the decision about Plaintiff's duties at the Bank versus Tim Spence's duties…" (*Id.*). In other words, Defendants incorrectly allege that Plaintiff's age discrimination claims were filed to somehow coerce a publicly traded entity like Fifth Third into making Plaintiff President and CEO. This is obviously fantastical, given the Bank had already promoted Spence and publicly announced[9] that decision

---

[9]https://ir.53.com/news/news-details/2020/Fifth-Third-Announces-Appointment-of-Timothy-N.-Spence-as-President/default.aspx

on October 26, two days before Plaintiff's complaint was filed. Moreover, the complaint does not seek nor has McHugh ever demanded the remedy that he be made President and CEO.

After Plaintiff sought to begin discovery, Defendants amplified their retaliatory conduct by issuing subpoenas duces tecum directed to Plaintiff, his wife, and his four children for broad swaths of documents, communications, and deposition testimony. (*See* Doc. # 1-22 – 1-31, PAGEID # 99-202).[10] The McHugh family filed a motion for a protective order and to quash the subpoenas and informed Defense counsel they would not be attending. (*See* Doc. # 1-32, PAGEID # 204-216) Defendants proceeded with the depositions anyway, hiring a court reporter, taking the "deposition," and then seeking sanctions against Plaintiff and his family. (Doc. # 1-33, PAGEID # 376-401). After extensive briefing, the court quashed the subpoenas. (*See* Doc. # 45, PAGEID # 1657). Nevertheless, Defendants continued to pursue the McHugh family in this Court, which was also denied. (*See* Doc. # 15, PAGEID # 1862-1864).

Following removal to this Court, Defendants provided initial disclosures demanding more than $3.5 million against Plaintiff including "reputational damages" in an unquantified amount, attorney's fees in the amount of $1.25 million, and punitive damages in the amount of $2,250,000.00. (Smith Dec. Exhibit 2-D). According to Defendants, the punitive damages figure, "represents the approximate total annual compensation Plaintiff would have received from the Bank in 2021 had he not voluntarily resigned his position and then immediately thereafter initiated this baseless, malicious litigation[,]" and is "both reasonable…and accomplishes the twin aims of punishment and deterrence as to Plaintiff." (*Id.*).

---

[10]Defense counsel voiced Defendants' retaliatory intentions in a November 27, 2020 letter to Plaintiff, stating that, "you have decided to begin this litigation…by attempting to notice non-party depositions and compel the production of documents[.] As you can see, we have followed the precedent that you have set by noticing the Plaintiff's deposition and subpoenaing Suzanne McHugh, Colleen McHugh Sweeney, Erin McHugh, Patrick McHugh, and Philip McHugh Jr., without any consultation with you." (Doc. # 1-32, PAGEID # 337).

Defendant Greg Carmichael further affirmed this retaliatory intent when asked during his deposition about these initial disclosures:

> I'm not going to argue the wording. The wording is what it says. But at the end of the day, we don't -- individuals who bring false claims against the company intentionally to harm the company, in order to get -- extract money from the company because they didn't get what they wanted is not -- **is not something that's acceptable in a professional workplace and something that should never occur**. It's occurring in this case because he never thought he'd file this lawsuit when he did. Now he has to defend it, and the claims were egregious, incorrect, inaccurate, and put the organization at risk with our shareholders, our investment community, analysts, **and at the end of the day, this is something we wouldn't want to see occur again**.

(Doc. # 66-3, PAGEID # 2804 (Carmichael Dep. 94:4-18).

## II. LAW AND ARGUMENT

### A. Summary Judgment Standard

In deciding whether summary judgment is appropriate under Rule 56, the court views the "evidence in the light most favorable to the nonmoving party."*Internatl. Outdoor, Inc. v. City of Troy*, 974 F.3d 690, 697 (6th Cir.2020). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

### B. Abuse of Process

In order to prevail on their abuse of process claim, Defendants must prove the following elements: "(1) that a legal proceeding has been set in motion in proper form and with probable cause; (2) that the proceeding has been perverted to attempt to accomplish an ulterior purpose for which it was not designed; and (3) that direct damage has resulted from the wrongful use of process." *Hahn v. Star Bank*, 190 F.3d 708, 718 (6th Cir. 1999), quoting *Yaklevich v. Kemp, Schaeffer & Rowe Co., L.P.A.*, 1994-Ohio-503, 68 Ohio St. 3d 294, 298, 626 N.E.2d 115, 118. Stated more succinctly, "abuse of process occurs where someone attempts to achieve through the use of the court that which the court itself is powerless to order." *Moore v. WesBanco Bank, Inc.*, 613 F. App'x 816, 823 (6th Cir. 2015). Here, Defendants counterclaim fails all three elements:

1. Defendants' allege *a lack of* probable cause, which is fatal to the first element.

By alleging abuse of process, Defendants must essentially admit that Plaintiff has probable cause for his discrimination claims. In other words, by maintaining an "abuse of process" based upon Plaintiff's age discrimination claim, Defendants must have a reasonable belief that Plaintiff's claims are justified and proper.[11]

Notwithstanding Defendants' obligation to make this concession, over the past six years Defendants have made unequivocal statements to the contrary, referring to Plaintiff's discrimination claims as "preposterous," "inaccurate," "frivolous," "patently false," "naked," "had virtually no support whatsoever," "concocted," "untrue," "egregious," and "incorrect."[12] In their

[11] "Probable cause means a reasonable belief, supported by trustworthy information and circumstances, that the defendant's proceeding was legally just and proper." *Armatas v. Aultman Hosp.*, 2022-Ohio-4376 at ¶ 14 (5th Dist. 2022).

[12] *See* Smith Dec. Exhibits 2-C-2-D (Oct. 23, 2020 Zaunbrecher Letter)(Stating that "any claims of age discrimination is preposterous," and the Bank "will take whatever action is appropriate…for inaccurate and frivolous claims that are based on lies and malice."); (Oct. 27, 2020 Defense Counsel E-mail)(Stating that "any action filed against Fifth Third Bank would be plainly frivolous," that "these are patently false assertions," and "outside of your client's naked assertions, there is virtually no support whatsoever for any of the allegations articulated in the draft Complaint."); Doc. # 122, PAGEID # 6803-04 (Zaunbrecher Dep. 22:18-23:4) (claiming that Plaintiff "concocted a story about being abused, about his situation…a story that is now the basis of all of this, an untrue story on age discrimination,"

initial disclosures, Defendants refer to Plaintiff's claims as "baseless, malicious litigation," which, "from the outset of this action, has been designed for no purpose other than to damage the Bank's financial position and its reputation with customers, other consumers, and the community as a whole—all because the Bank did not capitulate and make him CEO." *Smith* Dec., Exhibit 2-E.

The above statements and testimony contradict what Defendants have alleged for abuse of process, and are fatal to Defendants' abuse of process claim, specifically the probable cause element. On that point, it is helpful to distinguish abuse of process from its companion tort of malicious prosecution. Indeed, "[t]he presence or absence of probable cause is the determining factor that divides the operation of the two torts." *Hershey v. Edelman*, 2010-Ohio-1992, ¶ 40 (10th Dist.) citing *Yaklevich,* 68 Ohio St.3d at 300 (1994)("The key consideration in a malicious civil prosecution action is whether probable cause was initially present to bring a previous suit, while the key consideration in an abuse of process action is whether an improper purpose was sought to be achieved by the use of a lawfully brought previous action."). Given this distinction, statements that a lawsuit is "frivolous" or "bogus" are fatal to an abuse of process claim. *See Stout v. Columbia Gas of Ohio, Inc.*, 2021-Ohio-609, ¶ 75 (2nd Dist.)(affirming trial's courts judgment that plaintiff's references to frivolous nature of defendant's complaint, and "bogus claim against him" defeated the first element of his abuse of process claim).[13]

---

and that the allegations of age discrimination are "untrue."); Doc. # 66-3, PAGEID # 2804, 2805 (Carmichael Dep. 94:1-18, 98:5-9) (Claiming "there's no substance" for Plaintiff's age discrimination claims[,]" and that, "the claims were egregious, incorrect, inaccurate, and put the organization at risk with our shareholders, our investment community, analyst, and at the end of the day this is something we wouldn't want to see occur again.").

[13] *Williams v. Syphan,* N.D.Ohio No. 3:20 CV 591, 2022 U.S. Dist. LEXIS 37121, at *5 (Mar. 2, 2022)("Defendants, by alleging the claim was brought from the beginning without merit, have failed to plead an abuse of process claim."); *Cantrell v. Deitz*, 2013-Ohio-1204, at ¶ 23 (10th Dist.). ("We find the absence of probable cause is a basis upon which to grant summary judgment in favor of Deitz on appellant's claim for abuse of process.").

Defendants' derogatory criticisms of Plaintiff's claims are wrong, contradicted by the record evidence, and will be sorted out at trial. But for purposes of alleging and proving an abuse of process counterclaim, those statements warrant dismissal of the claim under Rule 56.

**2.** Defendants have not alleged nor proven any "further act" nor "ulterior motive."

Second, Defendants' claim fails for the simple reason that an abuse of process claim cannot rely upon threats nor the filing of a lawsuit. Instead, to prove abuse of process a party must show both "an act committed *during the process* that was not proper in the normal context of the proceeding *and the [Plaintiff's] ulterior motive*." *Beamer v. NETCO Inc.*, 411 F. Supp.2d 882, 890 (S.D. Ohio 2005)(internal citations omitted); *W. Bend Mut. Ins. Co. v. Westfield Ins. Grp.*, No. 1:13CV60, 2013 U.S. Dist. LEXIS 140879, at *13 (S.D. Ohio Sep. 30, 2013)(internal quotations omitted). Indeed, "there is no liability for abuse of process where the plaintiff has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions." *The Sherwin-Williams Co. v. Motley Rice, LLC*, No. 1:09 CV 1038, 2009 U.S. Dist. LEXIS 153505, at *11 (N.D. Ohio Sep. 2, 2009). Instead, abuse of process can only arise based upon "the improper use, or 'abuse' of process once it is issued." *Id.; See also Gliatta v. Tectum, Inc.*, 211 F. Supp.2d 992, 1010 (S.D. Ohio 2002)(stating that the key to abuse of process is "the purpose for which the process is used once it is issued."). *Stanley v. Historic Newark Basket, LLC*, S.D.Ohio No. 2:22-cv-1783, 2023 U.S. Dist. LEXIS 52424, at *14 (Mar. 27, 2023) citing *Gillman v. Schlagetter,* 777 F.Supp.2d 1084, 1099 (S.D.Ohio 2010)("abuse of process will not lie for the wrongful initiation of an action but only for the improper use, or 'abuse' of an action."). Given this principle, "a plaintiff cannot base an abuse of process claim upon the assertion that an action was improperly initiated." *Id.*

Here, Defendants' allegations are based *purely* upon the threats and filing of Plaintiffs' age discrimination lawsuit. This cannot genuinely be questioned, given the counterclaim for abuse of process was filed *a mere two days* after Plaintiff filed a complaint for age discrimination. Defendants have not alleged nor can they establish any act in furtherance of some abuse of a properly filed lawsuit. Beyond that, there is simply no evidence that McHugh has done anything more than pursue discrimination claims against Defendants, nor that he had any "ulterior motives" for doing so. While Defendants make wild allegations of an attempt to somehow *coerce* Fifth Third into "capitulating" and making Plaintiff CEO, there is zero record evidence nor testimony to support this theory, nor was there at the time the Answer and Counterclaim were filed. Plaintiff has never sought, nor does Plaintiff seek the remedy of appointment to President or CEO. Beyond that, by the time the complaint was filed, Fifth Third had already publicly announced its promotion of Tim Spence as President.[14] For these additional reasons, summary judgment is appropriate.

**3.** Defendants have no evidence of any direct damages.

Finally, despite claiming reputational and other damages, Defendants have provided zero evidence of any such damages. Defendants have had six years of discovery to submit and establish such damages and have done nothing. Such a lack of damages evidence is likewise fatal to Defendants' abuse of process claim.

**C. Retaliation**

The ADEA and Ohio law both prohibit retaliation against a person who has opposed a discriminatory act or otherwise made a charge, testified, assisted, or participated in an investigation, proceeding, or litigation. 29 U.S.C. § 623(d); O.R.C. § 4112.02(I). Such retaliatory

[14] https://ir.53.com/news/news-details/2020/Fifth-Third-Announces-Appointment-of-Timothy-N.-Spence-as-President/default.aspx

acts extend beyond the employment or workplace relationship. *See Burlington Northern and Santa Fe Ry. Co. v. White,* 548 U.S. 53, 67 (2006)(unanimous)(holding that "[t]he scope of the [Title VII] antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm."); *Watford v. Jefferson Cty. Pub. Schs.*, 870 F.3d 449, 453 (6th Cir. 2017)(Affirming that "the ADEA contains a nearly identical anti-retaliation provision [to Title VII], which is functionally equivalent for purposes of this analysis.").[15]

Counterclaims can be materially adverse actions, and constitute actionable retaliation when "(1) the employer acted with retaliatory motive; and (2) the employer's counterclaims lack a reasonable basis in fact or law." *Aday*, 2022 U.S. App. LEXIS 2319 at *37, citing *Lynch v. Studebaker*, 2007-Ohio-4014, ¶ 20; *See also Rosania* 303 F. Supp.2d at 885-886, citing *Bill Johnson's Restaurants v. NLRB,* 461 U.S. 731, 740-41 (1983)(adopting two-part test in context of FMLA and employer retaliatory counterclaim). This is because such a countersuit, "could well dissuade a reasonable worker from making or supporting" a discrimination claim. *EEOC v. Outback Steakhouse,* 75 F. Supp.2d 756 (N.D. Ohio 1999)("A lawsuit…may be used by an employer as a powerful instrument of coercion or retaliation."); *Cruz v. Don Pancho Mkt. LLC,* 167 F. Supp.3d 902, 912 (W.D. Mich. 2016)("Alleging a frivolous counterclaim can constitute a materially adverse action, and seeking drastic relief, such as attorney's fees, 'could well dissuade a reasonable worker from making or supporting an FLSA claim.").

---

[15] *See also Gliatta v. Tectum, Inc.*, 211 F. Supp.2d 992, 1009 (S.D. Ohio 2002)(denying dismissal of plaintiff's retaliation claim based upon counterclaims filed two years after plaintiff's termination, and holding that "the anti-retaliation provision of Title VII cannot be exclusively limited to adverse actions that are changes in the employment relationship.").*Aday v. Westfield Ins. Co.*, 2022 U.S. App. LEXIS 2319 at *36-37 ("While an employer is not barred from filing a well-grounded, objectively based action against an employee who has engaged in a protected activity, in some situations, the filing of counterclaims may constitute an adverse employment action[,]" including where, "the counterclaims are filed not in good faith and instead motivated by retaliation."); *Rosania v. Taco Bell of Am., Inc.*, 303 F. Supp.2d 878 (N.D. Ohio 2004)(granting plaintiff's motion for leave to amend complaint to add retaliation claims under the FMLA based upon retaliatory counterclaims asserted by employer); *Gill v. Rinker Materials Corp.*, 2003 U.S. Dist. LEXIS 2986 at *12 (E.D. Tenn. 2003)(Concluding that "the anti-retaliation provisions of the ADA, ADEA, and the THRA cannot be exclusively limited to adverse actions that are changes in the employment relationship.").

As with any other claim, a plaintiff can prove retaliation "either by introducing direct evidence of retaliation or by proffering circumstantial evidence that would support an inference of retaliation." *Imwalle v. Reliance Medical Products, Inc.*, 515 F.3d 531, 538 (6th Cir. 2008). Direct evidence requires the conclusion that the defendant had unlawfully retaliated against the plaintiff, whereas circumstantial evidence requires making a series of inferences. *Abbott v. Crown Motor Co.*, 348 F.3d 537 (6th Cir.2003). When a Plaintiff provides direct evidence, they do not need to prove pretext on the part of their employer. *Christopher v. Stouder Mem. Hosp.*, 936 F.2d 870 (6th Cir.1991). Instead, "an employee who has presented direct evidence of improper motive does not bear the burden of disproving other possible nonretaliatory reasons for the adverse action." *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir.2004). "Rather, the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive." *Id.*

The Sixth Circuit has been clear that threats to retaliate followed by the action constitute direct evidence. *See, e.g., Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 708 (6th Cir. 2008)(Finding direct evidence where supervisor "explicitly threatened such retaliation and the threat—that Daugherty would not have a job waiting for him when he returned from leave – was realized."); *Demyanovich v. Cadon Plating & Coatings, LLC,* 747 F.3d 419, 432 (6th Cir. 2017)(holding plaintiff presented direct evidence where supervisor referred to plaintiff as a "liability" immediately after request for FMLA leave, and then made the ultimate decision to terminate plaintiff that same evening).

Here, there is such direct evidence, spelled out in Defendants' own words. It began with General Counsel Susan Zaunbrecher threatening McHugh with retaliatory torts and other acts in a letter to McHugh's counsel, immediately after being put on notice of age discrimination claims.

(Smith Dec. Exhibit 2-D)("[A]ny claim of age discrimination is preposterous," and "**in the event you proceed with filing** a frivolous lawsuit against Fifth Third Bank…**the Bank will vigorously pursue all sanctions, as well as tort and other remedies**…available under Ohio law."). The threats were then re-iterated by Defense counsel, stating, "**[i]f you choose to proceed further with instituting litigation** …**we will also vigorously pursue tort and other remedies**[.]" *Id.* Then, *just two days* after Plaintiff filed his discrimination claims, Defendants followed through with the threats by filing their frivolous abuse of process counterclaim, seeking $1.25 million in attorney's fees and $2.25 million in punitive damages to "punish and deter" Plaintiff, and harassing Plaintiff and his family with subpoenas. If this evidence were not clear enough, Carmichael spelled out Defendants' retaliatory intent in his own testimony, stating that McHugh's lawsuit, "is not something that's acceptable in a professional workplace and something that should never occur," and, "at the end of the day, this is something we wouldn't want to see occur again." Doc. # 66-3, PAGEID # 2804 (Carmichael Dep. 94:4-18).

All of the above is direct evidence, thus shifting the burden to Defendants to prove they would have made the same decision absent the impermissible motive. This Defendants cannot do, because their counterclaim *specifically alleges* that it was only brought because of Plaintiff's age discrimination claims.[16] Moreover, the unequivocal statements of the Bank's General Counsel, its trial counsel, and Defendant Carmichael himself make clear that counterclaims were retaliatory.

As a final point, even if this Court were not to consider the above sufficient direct evidence, Plaintiff's retaliation claims are also easily proven through circumstantial evidence. Plaintiff engaged in protected conduct, and Defendants filed their retaliatory counterclaim just *two days*

---

[16] *See* Doc. # 10 PAGEID # 1810 (Counterclaim ¶ 1)("Unfortunately, the Defendants have been forced to bring this Counterclaim to prevent attempts by Plaintiff to coerce Fifth Third Bank to act in a way that benefits him personally to the detriment of the Bank's shareholders, customers, employees, and public."); ¶ 29 ("This Counterclaim is Fifth Third Bank's statement that it will not be coerced into succumbing to the whims of an executive...").

after Plaintiff filed his discrimination lawsuit. Beyond the obvious timing, causation is further established by Defendants' stated intentions immediately prior to filing the lawsuit. And finally, any claimed legitimate basis for asserting the abuse of process counterclaim is belied by the lack of any reasonable basis in fact or law for asserting it at the time it was filed, or at any point thereafter.

## III. CONCLUSION

For all the foregoing reasons, Plaintiff Phil McHugh respectfully requests that this Court grant his motion for summary judgment and dismiss Defendants' abuse of process counterclaim in its entirety, and likewise grant partial summary judgment as to Plaintiff's retaliation claims, leaving only the issue of damages to be determined by the trier of fact.

Respectfully Submitted,

*/s/ Peter A. Saba*

Peter A. Saba, Esq. (0055535)
Joshua M. Smith, Esq. (0092360)
STAGNARO, SABA
& PATTERSON CO., L.P.A.
2623 Erie Avenue
Cincinnati, Ohio 45208
(513) 533-2701
(513) 533-2711 (fax)
pas@sspfirm.com
jms@sspfirm.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was served on all counsel of record this 20th day of November, 2026 via the Court's CM/ECF system.

*/s/ Peter A. Saba*
Peter A. Saba, Esq. (0055535)